# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-00180 |
| | ) | |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS AVA DUVERNAY AND ATTICA LOCKE'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, OR IN THE ALTERNATIVE, JOINT MOTION WITH NETFLIX, INC. TO DISMISS FOR IMPROPER VENUE OR TRANSFER, AND INCORPORATED MEMORANDUM OF LAW

Kelley Geraghty Price (Florida Bar #889539)
Eric S. Olson (Florida Bar #99079)
DENTONS COHEN & GRIGSBY P.C.
Mercato - Suite 6200
9110 Strada Place
Naples, Florida 34108
Phone: (239) 390-1913
kelley.price@dentons.com
eric.olson@dentons.com

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

Kiran Patel (*pro hac vice* pending)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Phone: (212) 768-6700
kiran.patel@dentons.com

*Trial Counsel for Defendants Netflix, Inc.,
Ava DuVernay and Attica Locke*

## **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

ARGUMENT ....................................................................................................................... 5

I.  DUVERNAY AND LOCKE ARE NOT SUBJECT TO PERSONAL
    JURISDICTION IN THE SOUTHERN DISTRICT OF FLORIDA ............................... 5

    A.  Personal Jurisdiction Does Not Comport With Due Process ............................... 5

        1.  The Individual Defendants Have No Florida Contacts Out of
            Which Plaintiff's Claims Arise or Relate ................................................. 6

        2.  The Individual Defendants Did Not "Purposefully Avail"
            Themselves of the Privilege of Conducting Activities in Florida.............. 9

        3.  Asserting Jurisdiction Over the Individual Defendants Would
            Offend Fair Play and Substantial Justice. ................................................ 12

II.  THE SOUTHERN DISTRICT OF FLORIDA IS AN IMPROPER VENUE ................ 13

    A.  Not One Substantial Event Occurred in Florida ............................................... 14

    B.  The Brunt of Any Harm Occurred in New York, Not Florida............................ 14

III.  IN THE ALTERNATIVE, TRANSFER TO THE SOUTHERN DISTRICT OF
     NEW YORK ("SDNY") IS WARRANTED ................................................................. 16

    A.  The Southern District of New York Is The Proper Venue.................................. 16

    B.  The Southern District of New York is More Convenient for the Witnesses
        and Transfer Will Serve the Interests of Justice. ............................................. 17

        1.  Critical non-party witnesses are subject to compulsory process in
            New York, but not in Florida .................................................................. 17

        2.  The locus of operative facts is New York, not Florida ........................... 20

        3.  New York has a monumental interest in this case—Florida has
            none ........................................................................................................ 21

        4.  New York's or California's defamation law applies—not Florida's ....... 22

    C.  None of the Other Factors Point Toward Florida .............................................. 24

        1.  New York is more convenient for Defendants and not burdensome
            for Plaintiff............................................................................................. 24

2.  Little weight should be given to Plaintiff's choice of forum ................... 24

3.  The location of relevant documents and the relative means of the parties are neutral ...................................................................................... 25

CONCLUSION ...................................................................................................... 25

REQUEST FOR HEARING ………………………………………………………25

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Advantus Corp. v. Sandpiper of Calif., Inc.*,
  2019 WL 4751725 (M.D. Fla. Sept. 30, 2019) ........................................................9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................8

*Bishop v. Fla. Specialty Paint Co*,
  389 So. 2d 999 (Fla. 1980)........................................................22

*BPI Sports, LLC v. PHD Fitness LLC*,
  2014 WL 11706458 (S.D. Fla. June 13, 2014) ...........................................13, 14

*BTG Patent Holdings, LLC v. Bag2Go, GmbH*,
  193 F. Supp. 3d 1310 (S.D. Fla. 2016) ........................................................5

*Busch v. Viacom Int'l, Inc.*,
  477 F. Supp. 2d 764 (N.D. Tex. 2007) ........................................................10

*Calder v. Jones*,
  465 U.S. 783 (1984)...............................................................9, 10, 11

*Carucel Investments, L.P. v. Novatel Wireless, Inc.*,
  157 F. Supp. 3d 1219 (S.D. Fla. 2016) ...........................................16, 17, 24

*Dean v. Easterling*,
  2020 WL 1665482 (M.D. Fla. Apr. 3, 2020) ........................................................11

*Frey v. Minter*,
  2017 WL 2172195 (M.D. Fla. May 17, 2017) ........................................................15

*Game Controller Tech. LLC v. Sony Computer Entm't Am. LLC*,
  994 F. Supp. 2d 1268 (S.D. Fla. 2014) ........................................................21

*Gonzalez v. Pirelli Tire, LLC*,
  2008 WL 516847 (S.D. Fla. Feb. 22, 2008) ........................................................17

*Grail Semiconductor, Inc. v. Stern*,
  2013 WL 2243961 (S.D. Fla. May 21, 2013) ........................................................25

*Greiser v. Drinkard*,
  2018 WL 7287083 (S.D. Fla. Nov. 16, 2018).........................................................25

*Citations in the Table of Authorities are hyperlinked to Westlaw or PACER.

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*,
   669 F. Supp. 2d 1353 (S.D. Fla. 2009) ...................................................................14

*Hight v. Dep't of Homeland Sec.*,
   391 F. Supp. 3d 1178 (S.D. Fla. 2019) .................................................................25

*Hitchcock v. Scipione*,
   2014 WL 12623406 (M.D. Fla. May 30, 2014)......................................................11

*Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*,
   896 F. Supp. 1190 (M.D. Fla. 1995) .....................................................................12

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
   326 U.S. 310 (1945) ...............................................................................................12

*Internet Sols. Corp. v. Marshall*,
   39 So. 3d 1201 (Fla. 2010).......................................................................................5

*Internet Sols. Corp. v. Marshall*,
   2010 WL 11617855 (M.D. Fla. Sept. 30, 2010) .................................................7, 10

*Jenkins Brick Co. v. Bremer*,
   321 F. 3d 1366 (11th Cir. 2003) ............................................................................14

*John E. Reid & Assocs., Inc. v. Netflix, Inc.*,
   2020 WL 1330657 (N.D. Ill. Mar. 23, 2020) .....................................................7, 10

*Kesner v. Barron's, Inc.*,
   No. 19-cv-61370-RS, ECF No. 76 (S.D. Fla., May 1, 2020)....................14, 15, 17

*Licciardello v. Lovelady*,
   544 F. 3d 1280 (11th Cir. 2008) .......................................................................11, 12

*Louis Vuitton Malletier, S.A. v. Mosseri*,
   736 F. 3d 1339 (11th Cir. 2013) .......................................................................11, 12

*Michel v. NYP Holdings, Inc.*,
   816 F. 3d 686 (11th Cir. 2016) .........................................................................22, 23

*Miller v. Gizmodo Media Grp., LLC*,
   383 F. Supp. 3d 1365 (S.D. Fla. 2019) ...................................................................8

*Motorola Mobility, Inc. v. Microsoft Corp.*,
   804 F. Supp. 2d 1271 (S.D. Fla. 2011) .................................................................25

*Nix v. ESPN, Inc.*,
   2018 WL 8802885 (S.D. Fla. Aug. 30, 2018)........................................................23

*Nix v. ESPN, Inc.*,
   772 F. App. 807 (11th Cir. 2019)...........................................................................23

*Osgood v. Discount Auto Parts, LLC,*
    981 F. Supp. 2d 1259 (S.D. Fla. 2013) ...................................................................24

*People v. Salaam,*
    83 N.Y. 2d 51, 629 N.E. 2d 371 (1993) ..............................................................20

*Ramsey v. Fox News Network, LLC,*
    323 F. Supp. 2d 1352 (N.D. Ga. 2004) ...........................................................20, 22

*Roberts v. Gordy,*
    2015 WL 11202324 (S.D. Fla. Apr. 3, 2015) ......................................................11

*Suomen Colorize Oy v. DISH Network L.L.C.,*
    801 F. Supp. 2d 1334 (M.D. Fla. 2011) ..............................................................17

*Two Worlds United v. Zylstra,*
    46 So. 3d 1175 (Fla. Dist. Ct. App. 2010) .............................................................5

*United Techs. Corp. v. Mazer,*
    556 F. 3d 1260 (11th Cir. 2009) ............................................................................9

*Verizon Trademark Servs., LLC v. Producers, Inc.,*
    810 F. Supp. 2d 1321 (M.D. Fla. 2011) ................................................................6

*Volt, LLC v. Volt Lighting Grp. LLC,*
    369 F. Supp. 3d 1241 (M.D. Fla. 2019) ..............................................................12

*Waite v. All Acquisition Corp.,*
    901 F. 3d 1307 (11th Cir. 2018) .........................................................................5, 6

*Walden v. Fiore,*
    571 U.S 277 (2014) ..................................................................................... *passim*

*Weller v. Flynn,*
    312 F. Supp. 3d 706 (N.D. Ill. 2018) ................................................................7, 12

**Statutes**

28 U.S.C.
    § 1332.................................................................................................................16
    § 1391(b)............................................................................................................13
    § 1391(b)(2)........................................................................................................16
    § 1404(a)......................................................................................................1, 2, 16
    § 1406(a).............................................................................................................16

Federal Rules of Civil Procedure
    12(b)(2)……………………………………………………………………… …1
    12(b)(3)……………………………………………………………………1, 13

Pursuant to Federal Rule of Civil Procedure 12(b)(2), Defendants Ava DuVernay ("DuVernay") and Attica Locke ("Locke") (collectively, "Individual Defendants") move to dismiss the Complaint of Plaintiff Linda Fairstein ("Fairstein") for lack of personal jurisdiction. Alternatively, DuVernay and Locke, joined by Defendant Netflix, Inc. ("Netflix"), move to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).  Finally, all Defendants move to transfer this action to the District Court for the Southern District of New York ("SDNY") pursuant to 28 U.S.C. § 1404(a).

## **INTRODUCTION**

This case has nothing to do with Florida.  Nor would personal jurisdiction over DuVernay and Locke in Florida remotely meet constitutional due process.  Plaintiff's Complaint challenges her portrayal in the four-part critically-acclaimed Netflix series *When They See Us* (the "Series"), a dramatization of the infamous "Central Park Jogger" case, one of the most controversial and highly-publicized criminal cases in New York's history.  The Series focuses on the wrongful conviction and subsequent exoneration of five young men for the brutal rape of a female jogger in Central Park in 1989.  Plaintiff Linda Fairstein was a long-time New York public official—the head of the Manhattan District Attorney's Sex Crimes Unit in 1989—who oversaw and had critical responsibility for the prosecution of the Central Park Jogger case.  All of the events depicted in the Series took place in New York—the rape of which the men were falsely accused, the investigation by the NYPD and Manhattan D.A.'s office, the prosecution in the New York Courts, the men's incarceration in New York state prisons, and their eventual exoneration.

The entire focus of the Series, written by DuVernay and Locke, is New York-based, and was filmed in New York.  The Series has literally zero to do with Florida.  And DuVernay and Locke have zero relevant connections to Florida on which jurisdiction could be predicated.

Rather, the only connection this matter has to Florida is that Plaintiff Fairstein became a "resident" of Florida mere months before filing her Complaint, and months *after* the complained of acts giving rise to this action, including the release of the Series by Netflix in May 2019. This Court cannot exercise personal jurisdiction over DuVernay and Locke under controlling Supreme Court precedent, as "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S 277, 285 (2014).

Not only is there no basis for exercising personal jurisdiction over the Individual Defendants, but this case does not belong in Florida. Venue in this district is improper. None of the substantial events giving rise to Plaintiff's claims occurred in Florida, and she suffered no damages in Florida. If not dismissed outright for improper venue, this action should be transferred to the SDNY. There is no valid reason for litigating this case in Florida. It is a textbook example of why Section 1404(a) exists. Nearly all of the critical third-party witnesses—including essentially every witness identified by Plaintiff in her Complaint—reside in or around New York and therefore could not be compelled to testify in Florida. Further, New York's connection to and interest in this case is patent: the Series concerns New York residents, their government and one of the most important and controversial criminal cases in New York history. Florida, in contrast, has no ties to this case. Given that Fairstein only recently became a Florida resident and in fact still maintains a penthouse home, her law license and business locations in New York, transfer to the SDNY would not inconvenience her one iota. Instead, transfer would serve the interests of justice.[1]

---

[1] Netflix, the distributor of the Series, does not challenge personal jurisdiction, and has separately moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. If the Court decides not to dismiss DuVernay and Locke from this case, they will join in Netflix's Motion to Dismiss.

## FACTUAL BACKGROUND

***The Netflix Film Series, When They See Us.***  The film Series *When They See Us* was

released by Netflix in May 2019 and distributed worldwide through Netflix's subscription-based

Internet streaming service.  (Compl. ¶ 1.)  The Series follows the arrest, conviction,

imprisonment and subsequent exoneration of the five young men (the "Five") for the 1989 rape

of a jogger in New York's Central Park.  The Five, who all lived in New York City, were

interrogated and arrested by New York City Police Department (NYPD) officers, prosecuted by

the Manhattan D.A.'s Office, under the Sex Crimes Unit which Plaintiff headed, and tried in

New York state court.  Each of them served time in New York state prison before their convictions

were vacated at the request of the Manhattan D.A. and order of the New York Court, when an

unrelated man confessed to the rape for which they had been wrongfully convicted.  Following

their release, the men brought a civil lawsuit against the City of New York and several individuals,

including Plaintiff.  That case settled with an award of $41 million to the Five.  (*Id.* ¶ 43.)

***Plaintiff Fairstein and The Complaint.***  Fairstein, the former head of the Manhattan

District Attorney's Sex Crimes Unit at the time of the arrests and prosecution which are the

subject of the Series, alleges that the Series "portrays [her] in a false and defamatory manner in

nearly every scene in the three episodes in which she appears[.]"  (Compl. ¶ 9.)  Fairstein worked

at the Manhattan District Attorney's Office for 30 years.  (*Id.* ¶ 32.)

Fairstein is a life-long New York resident, who only moved to Florida recently, months

after the Series was released in May 2019 and after all of the events recited in her Complaint.

The Declaration of Domicile that Fairstein filed with Lee County on October 24, 2019, states

that she became a resident of Florida on September 27, 2019.  (*See* Declaration of Jacqueline

Giannini ("Giannini Decl.") ¶ 2; Ex. 1.)  In January 2020, Fairstein purchased a new, substantial

property in Florida.  (*Id.* ¶ 3; Ex. 2.)  Her Declaration of Domicile further states she maintains

another home in New York (Ex. 1).  Her New York home is a multi-million dollar penthouse condo that public records show she has owned for many years and still owns.  (*Id*. ¶ 4; Ex. 3.) She also owns two businesses, Fairstein Enterprises, LLC and Bobbie & Bones, Ltd, both of which are headquartered in New York out of her condo.  (*Id*. ¶¶ 6, 7; Exs. 5 and 6.)

*Ava DuVernay.*  Defendant Ava DuVernay is an award-winning film writer, producer and director.  (Declaration of Ava DuVernay ("DuVernay Decl.") ¶ 1.)  She lives and works in California.  (*Id*. ¶ 2.)  She is the director and one of the writers and executive producers of the Series at issue in this litigation.  (*Id*. ¶ 3.)  DuVernay researched the script for the Series from California, New York and Georgia and wrote the script in California and New York; the Series was filmed on location in New York.  (*Id*. ¶ 4.)  Post-production on the Series took place in California.  (*Id*.)  DuVernay did not travel to Florida in connection with the Series and did not contact anyone in Florida in connection with, or in writing, the Series.  (*Id*. ¶ 5.)

*Attica Locke.*  Defendant Attica Locke is an award-winning novelist and screenwriter. (Declaration of Attica Locke ("Locke Decl.") Decl. ¶ 1.)  She was one of the writers and producers of the Series.  (*Id*. ¶ 4.)  Locke lives in Los Angeles and worked on the Series only in California.  (*Id*. ¶¶ 3, 5.)  Locke did not travel to Florida in connection with the Series and did not contact anyone in Florida in connection with, or in writing, the Series.  (*Id*. ¶ 6.)

*Third-party Witnesses.*  Plaintiff's Complaint identifies numerous third-parties, mostly current or former prosecutors and members of the New York Police Department, who have knowledge of the investigation and prosecution as depicted in the Series.  As detailed below, almost every single one of these witnesses still resides in New York.  The damages alleged in the Complaint also occurred in New York, and relevant damage witnesses would likewise be located in New York.  In addition to the witnesses identified by Plaintiff's Complaint, other critical

4

witnesses—including the Five, their families and attorneys—also reside in or have significant

connections to New York.  Not a single witness, other than Plaintiff herself, resides in Florida.

**ARGUMENT**

I.    **DUVERNAY AND LOCKE ARE NOT SUBJECT TO PERSONAL
      JURISDICTION IN THE SOUTHERN DISTRICT OF FLORIDA**

The Individual Defendants, DuVernay and Locke, are not subject to personal jurisdiction

in this Court under the well-established two-step framework for the exercise of personal

jurisdiction.  *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018).  First, the

Court must determine whether the exercise of jurisdiction is appropriate under the forum state's

long-arm statute.  *Id.*  Second, even if the long-arm statute is applicable, the "the exercise of

jurisdiction must comport with the Due Process Clause of the Fourteenth Amendment."  *Id.*

Regardless of whether the exercise of jurisdiction could be asserted under the long-arm

statute,[2] "the exercise of jurisdiction must comport with the Due Process Clause of the Fourteenth

Amendment."  *Id.*  Here it does not; nor does Plaintiff even remotely make a *prima facie* case.

Exercising personal jurisdiction over DuVernay and Locke is incompatible with due process where

Plaintiff is "the only link between the defendant and the forum."  *Walden*, 571 U.S. at 285.

A.    **Personal Jurisdiction Does Not Comport With Due Process**

To determine whether the exercise of specific personal jurisdiction is compatible with

due process, the Eleventh Circuit examines three critical elements: (1) whether the claims "'arise

---

[2] Defendants acknowledge that the Florida Supreme Court's decision in *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201 (Fla. 2010) (decided on certified question from Eleventh Circuit) interpreted the Florida long arm statute broadly in defamation cases.  But even the *Internet Sols.* standard is not met where DuVernay and Locke did not control Netflix's distribution of the Series and their only alleged Florida contact consists of social media posts.  *See BTG Patent Holdings, LLC v. Bag2Go, GmbH*, 193 F. Supp. 3d 1310, 1319 (S.D. Fla. 2016) ("press releases, third-party news coverage, and social media activity" was not "sufficiently analogous to the creation and operation of a website accessible in Florida" for purposes of the long-arm statute); *Two Worlds United v. Zylstra*, 46 So. 3d 1175, 1178 (Fla. Dist. Ct. App. 2010) (where defendant did not personally own the website where posts about plaintiff were made, "the holding in *Marshall* is inapplicable").

out of or relate to' at least one of the defendant's contacts with the forum"; (2) whether "plaintiffs have demonstrated that the defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state"; and (3) whether the exercise of jurisdiction would "'violate traditional notions of fair play and substantial justice[.]'" *Waite*, 901 F.3d at 1313 (citation omitted).  Under each of these prongs, any one of which would defeat personal jurisdiction, exercising jurisdiction here over the Individual Defendants offends due process.

      1.      **The Individual Defendants Have No Florida Contacts Out of Which Plaintiff's Claims Arise or Relate**

The Complaint alleges, in conclusory fashion, that personal jurisdiction over the Individual Defendants is appropriate because each committed "a tortious act within Florida by participating in, facilitating and causing the publication of defamatory content on Netflix's website, namely *When They See Us*[.]"  (Compl. ¶¶ 28-29.)  However, neither DuVernay nor Locke had control over the distribution of the Series by Netflix on its internet-based streaming platform.  (DuVernay Decl. ¶ 7; Locke Decl. ¶ 8.)  It is well-established that "[i]n assessing personal jurisdiction, each defendant's contacts with the forum state must be weighed individually." *Verizon Trademark Servs., LLC v. Producers, Inc*., 810 F. Supp. 2d 1321, 1324 (M.D. Fla. 2011).  Netflix's conduct in publishing the Series thus cannot serve as the basis for the exercise of personal jurisdiction over DuVernay and Locke.

Indeed, the Northern District of Illinois recently addressed this same question as to DuVernay in a purported defamation action brought by an interrogation training company in Illinois against her and an alleged production company (Array) regarding the Series.  The court found that the complaint's allegations, similar to those here, were insufficient for the exercise of personal jurisdiction over DuVernay:

> Nowhere does it allege that either Array or DuVernay exercised any control over Netflix, instructed Netflix to offer the series for streaming in Illinois, or did

anything else to purposefully target Illinois via Netflix. The forum-targeting actions of distributors are not generally imputed to the people that created the distributed product, and Reid has not alleged any facts that suggest that Array or DuVernay should be treated any differently.

*John E. Reid & Assocs., Inc. v. Netflix, Inc*., 2020 WL 1330657, at *5 (N.D. Ill. Mar. 23, 2020). In so ruling, the *Reid* court cited an illustrative case involving a nationally distributed film, *Gone Girl*, which similarly held that "Twentieth Century Fox's efforts to *distribute* the film in Illinois cannot be imputed to [producers] Witherspoon and Papandrea on the basis of any independent contribution they made to the film's production." *Weller v. Flynn*, 312 F. Supp. 3d 706, 718 (N.D. Ill. 2018) (dismissing producers for lack of personal jurisdiction, and noting that courts "distinguish[] between developing *and distributing* entertainment for jurisdictional purposes") (emphasis added).  Like the defendants in *Weller*, DuVernay and Locke had no involvement in the distribution of the Series, and Netflix's distribution cannot be imputed to them personally. (*See* Declarations, *supra.*)

The same result is warranted here.  Personally, DuVernay and Locke have zero contacts with Florida out of which Plaintiff's claim may arise or relate.  DuVernay researched and wrote the Series from California, New York, and Georgia, directed the filming in New York and worked as a producer from California and New York.  (DuVernay Decl. ¶ 4.)  She did not travel to Florida in connection with the Series nor contact anyone in Florida in connection with the Series.  (*Id*. ¶ 5.)  Locke similarly had no contact with Florida related to the Series—she did not travel there or communicate with persons located in Florida.  (Locke Decl. ¶ 6.)  And, Locke conducted her research and writing for the Series entirely from California.  (*Id*. ¶ 5.)

Nor can Plaintiff's allegations that the Individual Defendants posted allegedly defamatory material on social media support the exercise of personal jurisdiction.  Merely posting material on social media is not sufficient to support the exercise of personal jurisdiction.  In *Internet Sols. Corp. v. Marshall*, after the Florida Supreme Court's decision on the certified question under

7

Florida's long-arm statute, this Court next considered whether the exercise of personal jurisdiction comported with due process.  2010 WL 11617855 (M.D. Fla. Sept. 30, 2010).  Finding it did *not*, this Court held that even though defendant "included in her post three Florida addressees associated with" plaintiff, and "Florida residents may have posted in response to the [allegedly defamatory] article, personal jurisdiction cannot be based solely on the ability of a Florida resident to access the website."  *Id.* at *5.

Here, again, the same is true.  There are simply no allegations that the Individual Defendants' social media posts or tweets were in any way related or directed to Florida, thereby barring the exercise of personal jurisdiction.  *Miller v. Gizmodo Media Grp., LLC*, 383 F. Supp. 3d 1365, 1375 (S.D. Fla. 2019) ("[C]ourts have uniformly rejected the argument that a tweet, not specifically directed to a forum state, is a sufficient minimum contact to confer personal jurisdiction under the Due Process Clause.").[3]

The Complaint's final claim for "conspiracy to defame" also is insufficient to support personal jurisdiction over the Individual Defendants.  To begin, applicable law does not recognize a cause of action for conspiracy; and even if it did, the conclusory allegations that "Defendants agreed and maliciously conspired together to write, product and publish scenes in Defendants' film series" (Compl. ¶ 376) completely fail to meet the pleading standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Merely because DuVernay and Locke had contracts with Netflix to write and produce the Series does not mean that they were in a "conspiracy to defame" Plaintiff.  The Complaint fails to include any factual allegations "to raise a right to relief above the speculative level."  *Id.* at 555.

---

[3] Additionally, the Complaint's reference to a June 2019 article in the *Florida Courier* is also insufficient for personal jurisdiction.  The cited article, as reflected in its byline, is merely a syndicated story from *the Los Angeles Times*.  (*See* flcourier.com/duvernay-responds-to-trumps-latest-central-park-five-comments/.)  Neither DuVernay nor Locke gave an interview to the Florida paper (DuVernay Decl. ¶ 6; Locke Decl. ¶ 7) and the story has no Florida focus.

Further, "if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy,' then Florida courts decline to apply the co-conspirator theory to extend personal jurisdiction over a non-resident defendant." *Advantus Corp. v. Sandpiper of Calif., Inc.*, 2019 WL 4751725, at *23 (M.D. Fla. Sept. 30, 2019) (citations omitted); *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009) (finding the "conspiracy allegations are insufficient to justify the exercise of personal jurisdiction over" defendant).

### 2. The Individual Defendants Did Not "Purposefully Avail" Themselves of the Privilege of Conducting Activities in Florida

Under both the Supreme Court's controlling decision in *Walden v. Fiore*, 571 U.S. 277 (2014) and prior Eleventh Circuit precedent, the Individual Defendants cannot be found to have purposefully availed themselves of the privilege of conducting activities in Florida.

*Walden* forecloses the exercise of personal jurisdiction over DuVernay and Locke in Florida under the due process clause.  In finding that a Georgia defendant did not have sufficient minimum contacts with Nevada to be subject to personal jurisdiction there, *Walden* held that, "*the plaintiff cannot be the only link between the defendant and the forum*.  Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."  571 U.S. at 285 (emphasis added).  Here, there is no other link between DuVernay or Locke and Florida other than Plaintiff.

The *Walden* Court also clarified its decades-old decision in *Calder v. Jones*, 465 U.S. 783 (1984), which dealt with actress Shirley Jones's defamation claims against the National Enquirer, Inc., a Florida corporation, and the paper's reporter and editor, who were Florida residents, all of whom challenged the California state court's exercise of jurisdiction.  *Id.* at 785-786.  In *Calder*, the Supreme Court found jurisdiction existed in California under the "effects test" reasoning that:

"*California is the focal point both of the story* and of the harm suffered.  Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."  *Id*. at 789 (emphasis added).  As to the reporter and editor individually, the Court found that "their intentional, and allegedly tortious, actions were expressly aimed at California . . . .  And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation."  *Id*. at 789-90.  When reexamined in *Walden*, the Court explained that *Calder* was based on "the injury to the plaintiff's reputation in the estimation of the California public . . . *combined with the various facts that gave the article a California focus*[.]"  571 U.S. at 288 (emphasis added).

That critical combination in *Calder* of alleged harm to plaintiff Jones in California, with additional "facts that gave the article a California focus" are utterly absent here.  In *Calder*, California was the focal point of not only the harm suffered, but also *the story itself*.

> The allegedly libelous story concerned the *California activities* of a California resident.  It impugned the professionalism of an entertainer whose *television career was centered in California*.  The article was drawn from *California sources*, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California.

465 U.S. at 788-89 (emphasis added).  The same cannot remotely be said of Florida here.

As the federal court in Illinois found, "Array and DuVernay are not like the writers in *Calder*."  *Reid*, 2020 WL 1330657, at *5.  The Series focuses on five New York teenagers who were arrested by New York City police for a crime committed in Central Park, were tried in New York court and served sentences in New York state prison.  The Series has no relation to Florida that would satisfy jurisdiction under *Calder*.[4]  *See Internet Sols.*, 2010 WL 11617855, at *5

---

[4] *See also, e.g., Busch v. Viacom Int'l, Inc.,* 477 F. Supp. 2d 764 (N.D. Tex. 2007) (finding no jurisdiction over Jon Stewart, where Texas resident sued Viacom and Stewart for defamation and misappropriation; production and filming of the challenged The Daily Show segment occurred in

(even where website post noted "three Florida addresses associated with [plaintiff]," personal jurisdiction not found where "article contains no other connection to Florida.").

A recent case from this Court applying *Walden* further confirms that the exercise of personal jurisdiction is not appropriate here, where the only connection to Florida is that the Plaintiff now lives there.  The court faced a similar situation in *Dean v. Easterling*, 2020 WL 1665482 (M.D. Fla. Apr. 3, 2020).  In *Dean*, the court found that there was no personal jurisdiction over defendants where Plaintiff's "only connection to Florida is that he moved to the state following the alleged defamatory conduct in the Complaint and now resides here."  *Id*. at *3.  In the present case, Fairstein did *not* establish residency in Florida until *after* the Series was released.   (Giannini Decl. ¶ 2; Ex. 1.)

While the Eleventh Circuit has not had the opportunity to address *Walden* in the context of an intentional tort case, the Eleventh Circuit's two main decisions—*Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008) and *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013)—also support a finding of no personal jurisdiction.[5]

In *Licciardello*, the defendant allegedly infringed the plaintiff's trademarked name and picture by posting them on his website and falsely implying that plaintiff endorsed defendant. 544 F.3d at 1282-83.  Applying the *Calder* "effects test," the *Licciardello* court found that it could appropriately exercise personal jurisdiction over the foreign defendant "because his intentional conduct in his state of residence was *calculated to cause injury to [plaintiff] in*

---

New York and "there are no allegations or a shred of evidence that Texas was the 'focal point' of the subject matter, or that the sources relied upon for the challenged broadcast were in Texas").

[5] Following *Walden*, some district courts have suggested that the *Licciardello* and *Louis Vuitton* may no longer be good law.  *See Hitchcock v. Scipione*, 2014 WL 12623406, at *1, n.2 (M.D. Fla. May 30, 2014) ("After *Walden v. Fiore*, 134 S. Ct. 1115 (2014), *Licciardello* and other Eleventh Circuit opinions . . . are in doubt"); *Roberts v. Gordy*, 2015 WL 11202324, at *6, n.3 (S.D. Fla. Apr. 3, 2015) ("The Court is cognizant of D&G's contention that *Licciardello* and *Louis Vuitton* and their progeny have been called into question by *Walden v. Fiore*").

*Florida.*"  *Id.* at 1288 (emphasis added).  Here, the same cannot be said of DuVernay's and

Locke's actions in writing and producing the Series about an infamous New York crime

prosecuted by the Manhattan District Attorney's office, and its impact on the five wrongfully

accused and imprisoned young men and their families in New York.  Indeed, Fairstein was not

even a resident of Florida at the time the Series was written, produced and released.

Nor does *Louis Vuitton* support personal jurisdiction over the Individual Defendants.  The

court there held that a foreign defendant had sufficient minimum contacts to be subject to

jurisdiction in Florida because the website he owned was accessible in Florida and he sold and

distributed the allegedly infringing product "through his website to Florida consumers—*and the*

*cause of action here derives directly from those contacts.*"  736 F.3d at 1358 (emphasis in

original).  In contrast, Plaintiff's claims are not derived from *the Individual Defendants' contacts*

with Florida, as Netflix's publication of the Series cannot be imputed to DuVernay and Locke as

individuals.  *See Weller, supra.*  Again, DuVernay and Locke simply do not have sufficient

minimum contacts for the exercise of personal jurisdiction.

### 3.   Asserting Jurisdiction Over the Individual Defendants Would Offend Fair Play and Substantial Justice

The final due process consideration is whether exercise of personal jurisdiction over the

defendant would "offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co.*

*v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)

(citations omitted).  In this case, because DuVernay and Locke lack sufficient minimum contacts

with the state of Florida, as discussed above, "this Court cannot say that the present case is 'one

of those rare cases' in which notions of fair play and substantial justice may, in and of

themselves, establish personal jurisdiction over a nonresident defendant."  *Hoechst Celanese*

*Corp. v. Nylon Eng'g Resins, Inc.*, 896 F. Supp. 1190, 1196–97 (M.D. Fla. 1995); *see also Volt,*

*LLC v. Volt Lighting Grp. LLC*, 369 F. Supp. 3d 1241, 1249 (M.D. Fla. 2019) ("But because VLG lacks minimum contacts with Florida under *Calder's* 'effects test,' determining whether the burden on VLG outweighs the other considerations is unnecessary.").  Put simply, the exercise of personal jurisdiction over DuVernay and Locke would offend fair play and substantial justice.  As a result, the Individual Defendants should be dismissed from this action.

## II.     THE SOUTHERN DISTRICT OF FLORIDA IS AN IMPROPER VENUE[6]

This action should also be dismissed as to all Defendants under Rule 12(b)(3) because it was brought in an improper venue.  Under the federal venue statute, an action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which *a substantial part* of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b) (emphasis added).

Plaintiff relies on subsection (b)(2), alleging that "a substantial part of the events giving rise to the instant claim" occurred in this district because it is "where Plaintiff resides and where a substantial number of readers and potential readers of Ms. Fairstein's novels are located who have viewed *When They See Us*, or seen attendant press coverage or social media posts about the same." (Compl. ¶ 30.)  These conclusory allegations utterly fail to establish that the Middle District of Florida is a proper venue.  *See BPI Sports, LLC v. PHD Fitness LLC*, 2014 WL 11706458, at *4 (S.D. Fla. June 13, 2014) ("Plaintiff's conclusory assertion that it has suffered harm in this district is insufficient to establish that venue is proper here").

---

[6] Defendant Netflix joins in Sections II and III seeking dismissal on the grounds of improper venue, or in the alternative, transfer to the Southern District of New York.

### A.    Not One Substantial Event Occurred in Florida

Plaintiff has not pointed to a single event that occurred in Florida that would make this

Court a proper venue.  Nor can she.  "[O]ther than the fact that Plaintiff [resides] here, the

Complaint is devoid of any other allegations demonstrating that venue is proper in the Southern

District of Florida."  *BPI Sports, LLC*, 2014 WL 11706458, at *3 (dismissing defamation action).

Section 1391 is "meant to require courts to focus on relevant activities of the defendant,

not of the plaintiff."  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371–72 (11th Cir. 2003)

(citations omitted) (affirming transfer to S.D. Ga. as "the only proper venue for this litigation");

*see also Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc*., 669 F. Supp. 2d 1353, 1357

(S.D. Fla. 2009) (finding plaintiff's bases for venue "inapposite" where plaintiff "focuses largely

on its own activities and location, but the proper focus of the venue inquiry is on the relevant

activities of the Defendants"; transferring case to N.D. Ga.).  Under this standard, the Middle

District of Florida is in no conceivable way the proper venue for this action; the relevant

substantial activities of the Defendants occurred in New York and otherwise California.  The

focus of the entire Series was New York, and it was written in part from New York and filmed

on location in New York.  As discussed above, none of Defendants' conduct occurred in Florida.

*See Kesner v. Barron's, Inc.*, No. 19-cv-61370-RS, ECF No. 76 at 4 (S.D. Fla., May 1, 2020)

(defamation case not properly venued in Florida where events giving rise to plaintiff's claims

"occurred in New York" -- article at issue was written in New York and "focused on Plaintiff's

firm's representation of three clients while he was a named partner" in a New York law firm).

### B.    The Brunt of Any Harm Occurred in New York, Not Florida

Plaintiff does not even attempt to argue that she suffered injury to her professional

reputation in Florida and cannot seriously claim that she has a professional reputation as an

attorney and businesswoman in Florida.  Fairstein is most widely-known for her 30-year career

as a New York County Assistant District Attorney.  Although she claims she has worked in

private practice since 2002, Plaintiff is not licensed to practice law in Florida.[7]  She is however

licensed to practice in New York.  (*See* Giannini Decl. ¶ 5, Ex. 4.)  *Frey v. Minter*, 2017 WL

2172195, at *3 (M.D. Fla. May 17, 2017) (rejecting plaintiff's argument that he was injured in

Florida, finding that "the bulk of the injury they caused to Plaintiff's career would have occurred

in Georgia, where Plaintiff is licensed to practice law"); *Kesner v. Barron's, supra*, ECF No. 76

at 4 (venue improper in Florida where plaintiff Florida resident's "reputation as a securities

lawyer was based in New York," he was "licensed to practice law in New York, not Florida,"

and "practiced his entire legal career in New York").  Plaintiff's publishing businesses and board

affiliations also are centered in New York.

Likewise, all of Plaintiff's claimed damages occurred predominantly in New York.  First,

Plaintiff alleges that her publisher Dutton (an imprint of Penguin Random House) terminated her

publishing contract with three books remaining on the contract.  (Compl. ¶ 244.)  Penguin is a

Delaware corporation headquartered in New York.  (*See* Giannini Decl. ¶ 20, Ex. 7.)  Plaintiff

also alleges that her literary agency ICM Partners "dropped Ms. Fairstein as a result of the film

series."  (Compl. ¶ 246.)  ICM is a Delaware corporation headquartered in California.  (*See*

Giannini Decl. ¶ 21, Ex. 8.)  Plaintiff's other allegations related to her United Kingdom publisher

and agent (Compl. ¶¶ 245-246) clearly have no relationship to Florida.  Additionally, Plaintiff

alleges that she was forced to resign from Vassar College's Board of Trustees.  (Compl. ¶¶ 250-

252.)  Vassar is located in Poughkeepsie, New York.  (*See* Giannini Decl. ¶ 22; Ex. 9.)  She also

alleges that she resigned from the non-profit boards of Safe Horizon, God's Love We Deliver,

and Joyful Heart Foundation.  (Compl. ¶ 253-254.)  Each of these organizations is based in New

---

[7] A search for "Linda Fairstein" on the Florida Bar website returns no hits.

York.  (*See* Giannini Decl. ¶¶ 23-25; Exs. 10 and 11.)  In sum, venue is simply improper in the Middle District of Florida.

## III.   IN THE ALTERNATIVE, TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK ("SDNY") IS WARRANTED

This case has nothing to do with Florida—it belongs in New York, not Florida.  Whether or not this Court finds that it can properly exercise personal jurisdiction over the Individual Defendants or that venue is proper, the Court should transfer this action to the SDNY "[f]or the convenience of parties and witnesses, in the interest of justice" under 28 U.S.C. § 1404(a).[8] Given that New York is the focus of the Series, virtually all of the key third-party witnesses are located in New York and could not be compelled to trial in Florida, the Series is based on a landmark New York case with significant importance to the people of New York, Plaintiff's claims arise out of the Series' portrayal of her role as a New York public official, and her recent move to Florida *post*-dated the Series' release, it would disserve the interest of justice to maintain this action here; it should be transferred to the SDNY.

### A.    The Southern District of New York Is The Proper Venue

This case can be—and should be—transferred to the SDNY under Section 1404.  "[A]n action 'might have been brought' in any court that has subject-matter jurisdiction, where venue is proper, and where the defendant is amenable to process issuing out of the transferee court." *Carucel Investments, L.P. v. Novatel Wireless, Inc*., 157 F. Supp. 3d 1219, 1223 (S.D. Fla. 2016). The SDNY meets each of these requirements.

First, like this Court, the SDNY has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and there is at least $75,000 in controversy.  Second, venue is proper in the SDNY under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or

---

[8] The Court may also transfer under 28 U.S.C. 1406(a) if it finds that this District is an improper venue.

omissions giving rise to the claim occurred" in that district.  The Series, which was filmed in New York, details the events of an infamous New York crime and prosecution, and experiences of five New York young men wrongfully accused of the crime.  Plaintiff's allegations relating to the Series focus on the Series' portrayal of her as a *New York* Assistant District Attorney.  Third, all Defendants are subject to personal jurisdiction in New York based on their activities in writing about the New York-focused Series and residents, and filming the Series in New York. Thus, the SDNY is a proper venue to which this action may be transferred.

**B.** **The Southern District of New York is More Convenient for the Witnesses and Transfer Will Serve the Interests of Justice**

In determining whether transfer is warranted, courts in the Eleventh Circuit consider nine private and public interest factors.  *Carucel Investments, L.P.*, 157 F. Supp. 3d at 1224.  The majority of the factors overwhelming favor transfer here, including, crucially, the convenience and availability of the witnesses.

**1.** **Critical non-party witnesses are subject to compulsory process in New York, but not in Florida**

"The Middle District of Florida 'gives great weight to the convenience of the parties and witnesses.'"  *Suomen Colorize Oy v. DISH Network L.L.C.*, 801 F. Supp. 2d 1334, 1338 (M.D. Fla. 2011) (quoting *Am. Aircraft Sales Int'l, Inc. v. Airwarsaw, Inc.*, 55 F.Supp.2d 1347, 1352 (M.D.Fla.1999)).  In fact, "[t]he convenience of both the party and non-party witnesses is probably considered the single most important factor in the analysis whether a transfer should be granted."  *Gonzalez v. Pirelli Tire, LLC*, 2008 WL 516847, at *2 (S.D. Fla. Feb. 22, 2008) (citations omitted); *Kesner v. Barron's, supra*, ECF No. 76 at 5 (transferring defamation case to SDNY; New York was more convenient forum, "particularly" where majority of "potential witnesses, and relevant persons reside[d] in New York").  Here, the location of non-party witnesses compels transfer.

Not a single witness, other than Plaintiff herself, resides in Florida. Rather, virtually all of the critical non-party witnesses are located in New York. If this case proceeds to the trial stage, Defendants will assert various defenses including but not limited to substantial truth and Plaintiff's inability to establish either a false statement of defamatory fact or the actual malice that the First Amendment requires her to prove as a public official and figure. Plaintiff's Complaint references numerous prosecutors, police officers and detectives who will be able to testify as to the truth of the matters depicted in the Series. Additional witnesses necessary to Defendants' defenses also reside in New York. Those witnesses include the following:

**New York Prosecutors.** Assistant District Attorney Elizabeth Lederer, according to Plaintiff's Complaint, "was responsible for the prosecution of the case" (Compl. ¶ 40); Lederer is referenced in the Complaint more than 100 times. Clearly her testimony will be essential to both parties' view of this case. ADA Lederer is still with the District Attorney's office in New York. (*See* Giannini Decl. ¶ 9.) ADA Lederer's assistant, ADA Tim Clements (Compl. ¶ 40), now practices in Cleveland. (Giannini Decl. ¶ 10.) The former Chief of the Trial Division, John Fried (Compl. ¶ 39) still practices in New York. (Giannini Decl. ¶ 11.)

ADA Nancy Ryan (who re-investigated the Central Park case after the real rapist confessed), is also a critical witness, as one of Plaintiff's main contentions with the Series is the way in which it depicts her relationship with ADA Ryan. (Compl. ¶ 46(d).) Ryan, no longer an ADA, still practices and lives in New York. (Giannini Decl. ¶ 12.) ADA Peter Casolaro is also mentioned in the Complaint in connection with a scene that Plaintiff alleges is false and defamatory. (Compl. ¶ 127.) ADA Casolaro is still with the District Attorney's office in New York. (Giannini Decl. ¶ 13.)[9]

---

[9] Longtime District Attorney Morgenthau is deceased. (Giannini Decl. ¶ 8.)

***New York Police Officers/Detectives.***  Plaintiff's Complaint also references several police officers who would have knowledge of the facts related to the underlying criminal case.  Detective Robert Honeyman, who is alleged to have processed the crime scene (Compl. ¶ 56) and would have knowledge of Fairstein's presence at the crime scene, is believed to still be a member of the New York Police Department.  (Giannini Decl. ¶ 15.)  So is Detective Robert Nugent, who was "tasked with putting together a timeline for when Ms. Meili was attacked."  (Compl. ¶ 85; Giannini Decl. ¶ 16.)  Officer Eric Reynolds, who is mentioned in the Complaint repeatedly, is no longer on the force but is believed to reside in New York.  (Giannini Decl. ¶ 17.)  Former Detective Glen Whelpley also resides in New York.  (*Id*. ¶ 18.)[10]  These are just a few of the 17 current or former members of the NYPD that were deposed in the civil lawsuit and who may have knowledge relevant to the claims or defenses in this litigation.

***Damages Witnesses in New York.***  Based on the allegations of the Complaint, Plaintiff's damages witnesses are also likely to be located in New York.  As discussed above, all of Fairstein's alleged damages occurred in New York.  Thus witnesses from her publishing company, Vassar College and the non-profits are likely to be based in New York.

***The Five men and their Families.***  In addition to those witnesses identified in the Complaint, New York is also a more convenient forum for many of Defendants' witnesses.  Of the five men who are the focus of the film, Korey Wise lives in New York and Kevin Richardson lives in nearby New Jersey.  (DuVernay Decl. ¶¶ 10-11.)  While the other three men—Yusef Salaam, Antron McCray and Raymond Santana—all live in Georgia (*id*. ¶ 12), their roots and families are in New York City.  Several of the men's family members may also be important witnesses.  The Complaint admits the Mr. Santana's father and grandmother, Mr. McCray's mother and father

---

[10] Detective Sheehan, who is referenced repeatedly in the Complaint, is deceased.  (Giannini Decl. ¶ 14.)  Defendants are unaware of the current whereabouts of Detective John Farrell.  (*Id*. ¶ 19.)

and Mr. Salaam's mother (who had significant interaction with Plaintiff) were at the police

station.  (Compl. ¶¶ 64, 72, 86.)  Given Plaintiff's allegations regarding the scenes at the station,

these witnesses will likely be important were this case to proceed to discovery.  David Nocenti,

Salaam's then "Big Brother" (and former SDNY AUSA) also was present at the police station

and may be a witness.[11]  Nocenti still lives in New York.  (Giannini Decl. ¶ 26.)

    ***Defense Attorneys in New York.***  Additionally, the original criminal defense attorneys

may have information relevant to Fairstein's claims concerning the investigation and trial of the

underlying criminal action.  Of the three attorneys still living, all three live in New York.  (*See*

Giannini Decl. ¶¶ 27 - 31.)

    Because many of the above-identified witnesses reside in New York, the availability of

the compulsory process in New York is crucial.  *See Delorenzo v. HP Enter. Servs*., LLC, 79 F.

Supp. 3d 1277, 1283 (M.D. Fla. 2015) ("Each party's list of witnesses shows that, in the event a

witness is unwilling to testify, the witness will likely reside within the territorial subpoena power

of the District of Columbia, not the Middle District of Florida. This factor favors transfer.").

"Given the fact that, when possible, live testimony is preferred over other means of presenting

evidence," the ability to compel non-parties to testify in New York is deemed "critical".  *Ramsey

v. Fox News Network, LLC*, 323 F. Supp. 2d 1352, 1356 (N.D. Ga. 2004).  Without that ability,

Defendants would not be able to effectively defend this case.

        **2.**        **The locus of operative facts is New York, not Florida**

    If ever there were a case where the locus of operative facts is New York, it is this case.

Fairstein's Complaint challenges Netflix's portrayal of her role as the head of the Manhattan

District Attorney's Sex Crimes Unit during one of the most high-profile cases in New York

---

[11] *See People v. Salaam*, 83 N.Y.2d 51, 59, 629 N.E.2d 371 (1993) (Titone, J., dissenting) ("Fairstein
told Nocenti that he could not see defendant and that he would have to leave the premises because he
was neither an immediate family member nor an attorney representing the suspect.").

history.  The Series at issue in this litigation details the story of five young men who were arrested and convicted in the infamous 1989 Central Park Jogger case.  Everything about the Series is set in New York—the crime, the arrests, interrogatories, prosecutions, imprisonment and later civil suit against the City of New York.  The Series itself was filmed on location in New York.  (DuVernay Decl. ¶ 4.)

Fairstein herself is a well-known New York public official and figure.  As a career prosecutor, she rose to prominence in connection with the Central Park Jogger case and other high-profile prosecutions, and then rode that success in her career as a crime novelist.  Although she left the Manhattan District Attorney's Office in 2002, Fairstein is still a licensed lawyer in New York, where she continued to consult on legal matters and take on private case work. (Compl. ¶ 33.)  Further, as discussed above, all of her alleged damages occurred in New York where she has her publishing businesses and was active with local non-profit organizations.

The mere fact that the Series was distributed globally on Netflix's streaming-service, including to Florida, is not sufficient to establish a locus of operative facts here.  *See Game Controller Tech. LLC v. Sony Computer Entm't Am. LLC*, 994 F. Supp. 2d 1268, 1275 (S.D. Fla. 2014) (rejecting argument in patent infringement case that "*sale* of accused products in this District is sufficient to establish a locus of operative facts in the Southern District of Florida"). This factor "distinctly favors" transfer.  *Delorenzo*, 79 F. Supp. 3d at 1282.

### 3.    New York has a monumental interest in this case—Florida has none

Given that the subject of the Series is one of the most famous New York criminal cases in recent history, New York has a strong interest in this case.  In a similar case, concerning an allegedly defamatory report relating to another infamous crime, the JonBenet Ramsey case, the Southern District of Georgia explained:

> In addition to the above factors, it is undisputed that this defamation action arises out of a report researched, written, and produced in Colorado, about a crime that took place in Colorado, at the Plaintiffs' former residence in Colorado, and that was investigated by Colorado law enforcement, Colorado prosecutors and Colorado private investigators. The only reason the Northern District of Georgia is even involved in this dispute is because at the time the allegedly defamatory report was aired, the Plaintiffs lived here. . . . In short, this is primarily a Colorado case, with a Georgia connection that is at best, now tenuous. Accordingly, the interests of justice weigh heavily in favor of transferring this action.

*Ramsey*, 323 F. Supp. 2d 1352, 1358 (N.D. Ga. 2004).  Like the *Ramsey* case, this litigation has significant ties to New York and the interests of justice weigh in favor of transfer.

### 4.   New York's or California's defamation law applies—not Florida's

While federal Constitutional law principles fundamentally doom Plaintiff's claim, either New York or California defamation law otherwise applies here.  In this diversity action, the Court applies Florida choice-of law principles, *i.e.*, the Restatement's "most significant relationship" factors in the, which "include": (a) where the injury occurred, (b) where the conduct causing the injury occurred, (c) the "domicil, residence, nationality, place of incorporation and place of business of the parties", and (d) where the parties' "relationship, if any, . . . is centered." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (citing Restatement (2nd) of Conflict of Laws § 145(2)).  These factors overwhelmingly point to either the law of New York (where the Series was partially written and filmed, and where Plaintiff worked for decades and still maintains property and businesses) or California (where the Series also was written and all Defendants are domiciled).

As the Eleventh Circuit has held, with respect to the place of injury factor, "a plaintiff may suffer greater injury in another state if the defamatory matter 'related to an activity of the plaintiff that is principally located in [that] state,' or 'the plaintiff suffered greater special damages in [that] state than in the state of his domicil.'"  *Nix v. ESPN, Inc.*, 772 F. App'x 807, 810 (11th Cir. 2019) (quoting Restatement § 150).  Such is the case here—New York is both the

locus of Plaintiff's activities that were the Series' subject, and her claimed reputational damage. Indeed, Plaintiff's claimed reputational damages have nothing to do with Florida, and virtually all occurred in New York.  (*See* Section II, *supra*.)  Plaintiff, a long-time public official and public figure in New York, has lived in New York City for decades (where she still maintains a residence and publishing business offices), and only recently, less than five months before the Complaint was filed, claimed "residency" in Florida.  (*See* Giannini Decl. ¶ 2.)

The other relevant choice of law factors—the place conduct occurred and location of parties[12]—point to either New York law or California law, but again, not Florida law: the underlying events and filming were centered in New York; and all Defendants are domiciled in California and wrote and developed the Series there.[13]  Thus, "even if Plaintiff was a [newly minted] resident of Florida, this factor would not outweigh the others." *Nix v. ESPN, Inc.*, 2018 WL 8802885, n. 2  (S.D. Fla. Aug. 30, 2018); *see also Michel*, 816 F.3d at 694 (applying New York law in defamation suit by a Florida resident).

While Defendants are confident that this Court is more than capable of applying either New York or California law, a judge in the SDNY does have an "advantage" in applying New York law.  *Delorenzo*, 79 F. Supp. 3d at 1281 ("A district judge in the District of Columbia indisputably enjoys an advantage over the Middle District of Florida in deciding a claim based on the law of the District of Columbia.").  To that extent, this factor too favors transfer.

---

[12]  The "place where the parties' relationship is centered" factor is of "neutral weight because the parties did not allege any relationship outside of the defamation suit."  *Nix*, 772 F. App'x at 811.

[13]  As discussed in Netflix's Special anti-SLAPP Motion to Strike, under the "dépeçage" choice of law doctrine applied in Florida and in this Circuit, even if New York law applies to the merits of Plaintiff's defamation claims, California's anti-SLAPP law applies as a defense in any event, given that California has the preeminent interest in applying its anti-SLAPP law to protect the speech of its citizens, such as the Defendants.

### C.        None of the Other Factors Point Toward Florida

#### 1.        New York is more convenient for Defendants and not burdensome for Plaintiff

As set forth in Section I, DuVernay and Locke have no relevant contacts with the State of

Florida and subjecting them to an action in Florida would be unfairly burdensome.  DuVernay

regularly conducts business in and travels to New York (DuVerany Decl. ¶ 9); and the Series

was filmed in New York (*id.* ¶ 4), where Netflix maintains offices and a production presence.

Additionally, Plaintiff would not be burdened by a transfer to New York.  Plaintiff has lived in

New York for decades, only became a resident of Florida months ago and still owns property in

New York.  (Giannini Decl. ¶ 2.)  Thus, this factor weighs heavily in favor of transfer.  *See*

*Carucel Investments, L.P.,* 157 F. Supp. 3d at 1228 ("Similarly, here, this factor weighs heavily

in favor of transfer, particularly because Plaintiff has ties to [transferee court] the Southern

District of California as well.").

#### 2.        Little weight should be given to Plaintiff's choice of forum

The deference generally paid to a Plaintiff's choice of forum should be given little

weight.  "[W]here the operative facts underlying the cause of action did not occur within the

forum chosen by the Plaintiff, the choice of forum is entitled to less consideration."  *Osgood v.*

*Discount Auto Parts, LLC*, 981 F. Supp. 2d 1259, 1267 (S.D. Fla. 2013); *see also Hight v. Dep't*

*of Homeland Sec*., 391 F. Supp. 3d 1178, 1187 (S.D. Fla. 2019) ("the only nexus this case has to

the Southern District of Florida is Plaintiff's residence—a consideration that is provided less

deference where, as here, the operative facts underlying the claim did not take place in Plaintiff's

chosen forum").[14]  As detailed above, the "locus of operative facts" in this action occurred in

---

[14] *See also, e.g.*, *Motorola Mobility, Inc. v. Microsoft Corp*., 804 F. Supp. 2d 1271, 1276 (S.D. Fla.
2011) (where claims "only appear to have a limited connection with this District, only minimal
deference will be given to Plaintiff's choice of forum"); *Greiser v. Drinkard*, 2018 WL 7287083, at *5

New York, not Florida.[15]

### 3. The location of relevant documents and the relative means of the parties are neutral

In today's world where documents are easily accessible electronically the location of relevant documents and sources of proof is usually neutral. *See Grail Semiconductor, Inc. v. Stern*, 2013 WL 2243961, at *4 (S.D. Fla. May 21, 2013). In this case, Fairstein has not pointed to any documents or sources of proof that are located in Florida. Additionally, Plaintiff has the means to litigate this case in the SDNY as evidenced by her ownership of property within that district and the fact that she has retained New York counsel on this matter.

### CONCLUSION

Based on the foregoing, in accordance with due process considerations and in the interest of justice, Defendants Ava DuVernay and Attica Locke request that this Court dismiss them from this action for lack of personal jurisdiction. Alternatively, all Defendants jointly move to dismiss for improper venue, or in the alternative, to transfer the entirety of the action to the United States District Court for the Southern District of New York.

### REQUEST FOR HEARING

Pursuant to Local Rule 3.01(j), Defendants respectfully request oral argument on their Motion. Defendants believe the Court's decision-making process would be aided by oral argument. Defendants estimate that a total of one hour will be required.

---

(S.D. Fla. Nov. 16, 2018) (since "the 'locus of operative facts' is in Pennsylvania rather than in Florida, the weight accorded Plaintiff's choice of forum is entitled to less deference").

[15] The Defendants acknowledge that cases generally reach trial faster in this Court than in the SDNY, but that fact alone cannot prevent transfer. The other significant factors, including the convenience of parties and witnesses, favor transfer to the SDNY. Thus, "the mere possibility that trial will be held sooner in the original court does not justify denial of transfer when it is otherwise supported by the convenience of the parties and the witnesses." *Delorenzo*, 79 F. Supp. 3d at 1284 (quoting *Moore's Federal Practice*, Vol. 17 § 111.13[1][k] (3d ed. 2014)).

Dated: May 18, 2020                    Respectfully submitted,

                                       /s/ Natalie J. Spears
                                       _____

                                       Natalie J. Spears (*pro hac vice*)
                                       Gregory R. Naron (*pro hac vice*)
                                       Jacqueline A. Giannini (*pro hac vice*)
                                       DENTONS US LLP
                                       233 South Wacker Drive, Suite 5900
                                       Chicago, Illinois 60606
                                       Phone: (312) 876-8000
                                       *natalie.spears@dentons.com*
                                       *gregory.naron@dentons.com*
                                       *jacqui.giannini@dentons.com*

                                       Kelley Geraghty Price (Florida Bar #889539)
                                       Eric S. Olson (Florida Bar #99079)
                                       DENTONS COHEN & GRIGSBY P.C.
                                       Mercato - Suite 6200
                                       9110 Strada Place
                                       Naples, Florida  34108
                                       Phone: (239) 390-1913
                                       *kelley.price@dentons.com*
                                       *eric.olson@dentons.com*

                                       Kiran Patel (*pro hac vice* pending)
                                       DENTONS US LLP
                                       1221 Avenue of the Americas
                                       New York, New York  10020
                                       Phone: (212) 768-6700
                                       *kiran.patel@dentons.com*

                                       *Attorneys for Defendants Netflix, Inc.,*
                                       *Ava DuVernay and Attica Locke*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May, 2020 a copy of the foregoing was filed electronically via the ECF filing system.

/s/ Natalie J. Spears
_____