**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

LINDA FAIRSTEIN,

Plaintiff,

v.

NETFLIX, INC., AVA DUVERNAY, and ATTICA LOCKE,

Defendants.

Case No. 20-cv-00180

**DEFENDANT NETFLIX INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, AND INCORPORATED MEMORANDUM OF LAW, AND JOINDER IN MOTION OF DEFENDANTS DUVERNAY AND LOCKE TO DISMISS FOR IMPROPER VENUE OR TO TRANSFER VENUE**

Kelley Geraghty Price (Florida Bar #889539)
Eric S. Olson (Florida Bar #99079)
DENTONS COHEN & GRIGSBY P.C.
Mercato - Suite 6200
9110 Strada Place
Naples, Florida 34108
Phone: (239) 390-1913
*kelley.price@dentons.com*
*eric.olson@dentons.com*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

Kiran Patel (*pro hac vice* pending)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Phone: (212) 768-6700
*kiran.patel@dentons.com*

*Trial Counsel for Defendant Netflix, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 4

ARGUMENT ..... 12

I. Standard of Review ..... 12

II. Choice of Law ..... 13

III. The Dramatized, Opinionative Speech At Issue Is Protected by the First Amendment ..... 13

IV. Powerful, Hyperbolic Language in the Dramatized Dialogue of Which Plaintiff Complains Cannot Be the Basis for Liability and Is Substantially True in Any Event ..... 18

V. None of the Specific Scenes and Dialogue Plaintiff Identifies In the Complaint Are Actionable Defamation ..... 21

A. Scenes Showing Plaintiff "At the Crime Scene" (Scene 1), "Drafting a Press Release" (Scene 2), and "Fighting With Nancy Ryan Over Who Would Prosecute Case" (Scene 5) Have No Plausible Defamatory Meaning ..... 23

B. It Is Not Defamatory to Portray Plaintiff As Expressing Views She Has Publicly Espoused for Decades ..... 24

1. "Putting Together a Timeline" (Scene 4) ..... 25

2. Interactions With ADA Lederer (Scenes 8 and 10) ..... 26

3. Interactions With ADA Ryan (Scenes 5 and 11) ..... 28

C. The Complained-of Dialogue Does Not Support Plaintiff's Claimed Defamatory Imputation That She "Violated the Law" ..... 29

1. No Claim Based On Purported Questioning of "Unaccompanied Minors" (Scene 3) ..... 30

2. No Claim Based on Purported "Directing" of Detectives (Scenes 7, 8) ..... 32

3. No Claim Based on Discussion of DNA Evidence (Scene 9) ..... 33

VI. The Purported Conspiracy Claim Does Not Exist Under Applicable Law ..... 35

CONCLUSION ..... 35

REQUEST FOR HEARING ..... 35

## TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Aronson v. Wiersma*,
65 N.Y. 2d 592 (1985) ....22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....12

*Bordoni v. N.Y. Times Co.*,
400 F. Supp. 1223 (S.D.N.Y. 1975) ....31, 34

*Brooks v. Blue Cross & Blue Shield*,
116 F. 3d 1364 (11th Cir. 1997) ....5

*Campanelli v. Regents of Univ. of Cal.*,
44 Cal.App.4th 572 (1996) ....19, 22

*Carlisle v. Fawcett Publ'ns, Inc.*,
201 Cal.App.2d 733 (1962) ....22

*Carlson v. Am. Int'l Inc.*,
30 N.Y.3d 288 (2017) ....35

*Carto v. Buckley*,
649 F. Supp. 502 (S.D.N.Y. 1986) ....21

*Carver v. Bonds*,
135 Cal.App.4th 328 (2005) ....20

*Cerasani v. Sony Corp.*,
991 F. Supp. 343 (S.D.N.Y. 1998) ....12, 18, 33

*Chao v Mt. Sinai Hosp.*,
476 F. App'x 892 (2d Cir. 2012) ....35

*Chau v. Lewis*,
771 F. 3d 118 (2d Cir. 2014) ....15, 17, 22, 32

*Chavez v. Martinez*,
538 U.S. 760 (2003) ....31

*Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*,
29 A.D. 2d 423 (1st Dept 1968) ....22, 23

*Citations in the Table of Authorities are hyperlinked to Westlaw.

*De Havilland v. FX Networks, LLC*,
21 Cal.App.5th 845 (2018) ....................................................................15, 17, 22

*Degirmenci v. Sapphire–Ft. Lauderdale*,
693 F. Supp. 2d 1325 (S.D. Fla. 2010) ....................................................................12

*Deripaska v. AP*,
282 F. Supp. 3d 133 (D.D.C. 2017) ....................................................................13

*Dobies v. Brefka*,
263 A.D.2d 721 (3d Dep't 1999) ....................................................................35

*Edelman v. Croonquist*,
2010 WL 1816180 (D.N.J. May 4, 2010) ....................................................................21

*El Meson Espanol v. NYM Corp.*,
521 F. 2d 737 (2d Cir. 1975)....................................................................33

*Ent'mnt Rsch. Group, Inc. v. Genesis Creative Group, Inc.*,
122 F.3d 1211 (9th Cir. 1997) ....................................................................35

*Ferlauto v. Hamsher*,
74 Cal.App.4th 1394 (1999) ....................................................................29, 30

*Goldman v. Barrett*,
733 F. App'x 568 (2d Cir. 2018) ....................................................................35

*Idema v. Wager*,
120 F. Supp. 2d 361 (S.D.N.Y. 2000) …………………………………………….. 20

*Immuno AG v. Moor-Jankowski*,
77 N.Y. 2d 235 (1991) ....................................................................29

*Issa v. Applegate*,
31 Cal.App.5th 689 (2019) ....................................................................22

*Jackson v. Mayweather*,
10 Cal.App.5th 1240 (2017) ....................................................................23

*John E. Reid & Assocs., Inc. v. Netflix, Inc.*,
2020 WL 1330657 (N.D. Ill. Mar. 23, 2020).................................................... *passim*

*Kimmerle v. N.Y. Evening Jour.*,
262 N.Y. 99, 186 N.E. 217 (1933)....................................................................23

*Lott v. Levitt*,
556 F. 3d 564 (7th Cir. 2009) ....................................................................12

*Love v. Wm. Morrow & Co.*,
193 A.D.2d 586 (2d Dep't 1993) ....................18

*Lovingood v. Discovery Commc'ns, Inc.*,
800 F. App'x 840 (11th Cir. 2020) .................... *passim*

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991) ....................15

*McGill v. Parker*,
179 A.D. 2d 98 (1st Dept 1992) ....................14

*Michel v. NYP Holdings, Inc.*,
816 F. 3d 686 (11th Cir. 2016) ....................13

*Milkovich v. Lorain Jour.*,
497 U.S. 1 (1990) ....................14, 16

*Mirage Ent'mnt, Inc. v. FEG Entretenimientos SA*,
326 F. Supp. 3d 26 (S.D.N.Y. 2018) ....................20

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971) ....................14

*New York Times v. Sullivan*,
376 U.S. 254 (1964) ....................15

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ....................12

*Nix v. ESPN, Inc.*,
2018 WL 8802885 (S.D. Fla. Aug. 30, 2018) ....................12, 13, 19

*U.S. ex rel. Osheroff v. Humana Inc.*,
776 F. 3d 805 (11th Cir. 2015) ....................12

*Partington v. Bugliosi*,
56 F. 3d 1147 (9th Cir. 1995) .................... *passim*

*People v Salaam*,
83 N.Y. 2d 51 (1993) ....................8, 31, 32

*People v. Wise*,
194 Misc. 2d 481 (N.Y. Sup. Ct. 2002) ....................9

*Phila. Newsp., Inc. v. Hepps*,
475 U.S. 767 (1986) ....................14

*Proskin v. Hearst Corp.*,
14 A.D. 3d 782 (3d Dept 2005) ....................34

*Rappaport v. VV Publ'g Corp.*,
163 Misc. 2d 1 (Sup.Ct. N.Y. County 1994) ....................21, 22

*Reed v. Gallagher*,
248 Cal.App.4th 841 (2016) ....................22

*Sarver v. Chartier*,
813 F. 3d 891 (9th Cir. 2016) ....................16

*Scialdone v. Derosa*,
148 A.D.3d 741 (2d Dep't 2017) ....................28

*Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*,
2017 WL 3503371 (S.D. Fla. Aug. 15, 2017) ....................12

*Seymour v. Lakeville Jour. Co. LLC*,
150 F. App'x 103 (2d Cir. 2005) ....................30, 31, 34

*Tannerite Sports, LLC v. NBCUniversal News Group*,
864 F. 3d 236 (2d Cir. 2017) ....................3, 4, 22, 25

*Tracy v Newsday, Inc.*,
5 N.Y. 2d 134 (1959) .................... *passim*

*Uzamere v. Daily News*,
34 Misc. 3d 1203(A) (Sup. Ct. N.Y. Cty. Nov. 10, 2011) ....................19

*Yorty v. Chandler*,
13 Cal.App.3d 467 (1970) ....................27

**Statutes and Rules**

28 USC § 1404 ....................1

Federal Rules of Civil Procedure
12(b)(3) ....................1
12(b)(6) ....................1, 5

Defendant Netflix, Inc. ("Netflix") moves to dismiss the Complaint of Plaintiff Linda Fairstein for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), or in the alternative to transfer this case to the Southern District of New York pursuant to 28 U.S.C. § 1404, and joins in and adopts the arguments set forth in the motion of Defendants Ava DuVernay and Attica Locke to dismiss for improper venue, or in the alternative to transfer venue. In the alternative, Netflix moves to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[1] In support of its motion to dismiss for failure to state a claim, Netflix states as follows:

## INTRODUCTION

The four-part film series *When They See Us* (the "Series"), released by Netflix, is a critically-acclaimed dramatization of the infamous 1989 "Central Park Jogger" rape case, told from the perspective of the five men (the "Five") who as teenage boys were wrongfully accused, convicted and imprisoned for the crime. The Series follows the lives of the Five and their families as they wind their way through the frightening maze of the criminal justice system. Convicted despite mutually inconsistent confessions and a lack of physical evidence, the boys spend the rest of their youth in prison, only to be exonerated years later based on the DNA match and confession of the real offender, a serial rapist who committed a similar assault near Central Park weeks earlier.

Plaintiff Linda Fairstein—the head of the Manhattan District Attorney's Sex Crimes Unit in 1989—was the public official who oversaw and had critical involvement in and responsibility for the prosecution of the Central Park Jogger case; she spent over 30 hours at the police station during the investigation and interrogations of the boys as the highest-ranking prosecutor from the D.A.'s office. She visited the crime scene with detectives, and testified for the prosecution at

[1] Netflix respectfully requests, in the interest of judicial economy, that the Court take up the Joint Motion of all Defendants to dismiss for improper venue and transfer before addressing Netflix's substantive motion to dismiss for failure to state a claim.

suppression hearings and at trial. She then became a famous writer of crime novels, touting her involvement in the case and using that platform to express her view, which she has relentlessly maintained, that the Five are guilty. Fairstein is now suing Netflix, the filmmaker, Ava DuVernay, and one of the writers on the Series, Attica Locke, for defamation, claiming her portrayal in the Series by actress Felicity Huffman made her look like a "villain." (Compl. ¶ 9.)

Plaintiff's claims fail under the First Amendment as a matter of law. Material falsity is essential to any defamation claim and is an element Plaintiff must establish. Here, the Series is an artistic dramatization of controversial and contested historical events. Plaintiff's complaint that the Series' portrayal of her is "false" because it "depict[s] her at places where she never was" and "puts words in her mouth" that "she never uttered" (*id.* ¶ 12), is simply a non sequitur. In the context of a "dramatic interpretation[] of events and dialogue filled with rhetorical flourishes" viewers will be "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995). The context is obvious: not every scene and piece of dialogue is a transcription of actual conversations but involves "the selective editing of real history not only for time but also for clarity, flow, and emotional impact." *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 847 (11th Cir. 2020). Another District Judge recently recognized just that in dismissing defamation claims based on the Series by an interrogation training company. *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, 2020 WL 1330657, *8 (N.D. Ill. Mar. 23, 2020).

Equally clear is that this dramatization has a distinct point of view: that of the Five. The Series tells *their* truth—that they did not commit the heinous crime for which they were wrongfully imprisoned—a truth that is reflected in the order vacating the Five's convictions and settlement of their civil action for $41 million against New York City, Plaintiff and the other prosecutors and detectives, and in the work of writers, reporters, scholars, and documentarians

before the Series was made. No less than a dry, abstract expression of opinion, the dramatized dialogue of which Plaintiff complains is protected speech. And here, criticism of Plaintiff's actions as a powerful public official is at the heart of what the First Amendment protects. In illuminating the injustice visited upon the Five, the Series raises questions for public scrutiny and debate, calling into question the "party line" advanced by Plaintiff and other law enforcement officials, even now, that the prosecution was just and the evidence supported the conviction of the Five. The Series reflects the other side of that crucial debate—one that Plaintiff seeks to censor.

Plaintiff's prolix 119-page Complaint is designed to give a false impression of substance where none exists. Beyond running afoul of the First Amendment's protection for dramatized, opinionative speech, Plaintiff indulges in revisionist history that is contradicted by her own words and admissions in the public record cited extensively in her Complaint, and of which this Court can take judicial notice. Plaintiff attempts, solely for purposes of this lawsuit, to now disclaim responsibility for the prosecution, contending that the portrayal "assign[s] her a role" that "she did not play" and shows her "making decisions she never made". (Compl. ¶ 12.) Plaintiff cannot have it both ways: as the public official in charge of the Manhattan Sex Crimes Unit she had critical involvement and responsibility for the prosecution, and for years has vocally defended all aspects of the investigation and trial of the Five, relentlessly proclaiming their guilt. She cannot now, for purposes of a defamation suit, claim to be made a villain by dialogue showing her using language and espousing the *very theories and decisions she has so vigorously defended to this day*.

Defamation law does not require "an overly technical or exacting conception of truth in publication," and certainly not in a dramatization, "because fact and fiction may not be crisply delineated categories in defamation cases." *Tannerite Sports, LLC v. NBCUniversal News*

*Group*, 864 F.3d 236, 243 (2d Cir. 2017) (affirming dismissal). The standard is one of *substantial* truth, and here the portrayal of the Fairstein character as a "true believer" in the prosecution's theory and the guilt of the Five notwithstanding the evidence to the contrary "could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Id.* at 241-42.

Fundamentally, Fairstein's complaint is that in telling this important story from the perspective of the Five, and not her point of view, she is not portrayed in a flattering light. But Plaintiff has told her side of the story. The First Amendment does not allow her to silence the Five's story and their belief, founded in the facts leading to their exoneration, that the prosecution she helped lead, was a colossal injustice. Plaintiff also complains that some dialogue in the Series marks her as a racist, but even if the language she complains of supported that conclusion, such protected expressions of opinion are not actionable speech. Every other asserted defamation in the Complaint falls apart upon examination, either as incapable of defamatory meaning or as substantially true as matter of law, or both. Dismissal with prejudice is in order.

## FACTUAL BACKGROUND

***The Series.*** "When They See Us is a limited film series comprised of four (4) episodes." (Compl. ¶ 44.) The Series dramatizes the story of "the arrests, trials and convictions of five young men of color"—Yusef Salaam, Antron McCray, Kevin Richardson, Raymond Santana, and Korey Wise—in what became known as the "Central Park Jogger" case. (*Id*. ¶¶ 4, 36-38.) The story is told from the perspective of the Five: how they were wrongfully accused and convicted based on false confessions notwithstanding a total lack of physical evidence, and struggled to return to society after their imprisonment.

The title, "*When They See Us*", and the Series' opening scenes, dramatically frame the entire narrative, with viewers *seeing* the boys and their families *as they did*—happy, normal

*children* making their way through the joys and struggles of everyday life in the inner city, prior to that fateful night in Central Park. Episodes 1 and 2 focus on the boys' and their parents' vulnerability during the investigation and their controversial interrogations, and subsequent trials and convictions. Episode 3 explores the families' turmoil during the boys' incarceration and the struggles they faced rejoining society; and much of Episode 4 is devoted to Korey Wise, the oldest of the Five who had disabilities and served the longest sentence; the Episode reflects his harrowing experiences in adult prison and includes dramatic interior monologues and flashbacks.[2]

As Plaintiff acknowledges, each Episode ends with a disclaimer that states:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

(Compl. ¶ 228, *see also* Ex. A hereto.)

***Plaintiff Linda Fairstein.*** "[F]rom 1972 until 2002, Ms. Fairstein served in the office of the New York County District Attorney, where she was chief of the County's Sex Crimes Prosecution Unit for twenty-six years" (Compl. ¶ 32); she is known for her "legal work and advocacy for survivors of sexual assault" (*id.* ¶ 34), and, drawing on her prosecutorial experience, has also achieved notoriety as an author of a bestselling "series of crime novels" (*id.* ¶ 35).

In the Series, "Fairstein is portrayed by actress Felicity Huffman." (Compl. ¶ 44.) "[T]he first episode is the one "in which Ms. Fairstein is most prominently featured." (*Id.* ¶ 49.) Consistent with her "storied reputation as a career prosecutor who pioneered the fight to gain

---

[2] Since Plaintiff only selectively quotes from the Series, Defendant submits herewith a video copy of the entire four-part Series. (Ex. A.) Consideration of the full context of the dialogue and Series is appropriate because it is "central to the plaintiff's claim" and "the Court may consider [it] part of the pleadings for purposes of Rule 12(b)(6) dismissal." *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1369 (11th Cir. 1997).

access in courts for victims of sexual assault" (*id.* ¶ 19), the Series depicts the Fairstein character as passionately committed to obtaining justice for the female jogger, Trisha Meili, who was "brutally beaten, raped, and left for dead" in Central Park (*id.* ¶¶ 36-37).[3]

***Plaintiff's Responsibility for and Involvement in the Central Park Jogger Case.*** Plaintiff "was the head of the Manhattan District Attorney's Sex Crimes Unit" when the 1989 attack on the Central Park Jogger took place. The case came under Plaintiff's area of responsibility and direction, and she assigned her subordinate Assistant District Attorney Elizabeth Lederer to the case. (Compl. ¶ 39.)

"Ms. Fairstein met ADA Lederer at the 20th Precinct on the night of April 20, 1989. They later went to the 24th Precinct." (*Id.*) Plaintiff also visited the Central Park crime scene with two of the boys. (*Id.* ¶ 86; 4/24/13 Fairstein Dep., NYCLD_039240-42 (Appx Ex. 4).)[4] Plaintiff was deeply involved in the investigation of the case from the outset; she stayed with Ms. Lederer at "the stationhouse" for over 30 hours from "the Thursday night after the crime . . . until Saturday morning at 4 a.m.," "doing a variety of things—including witness interviews, walks of the crime scenes, talking to families, etc." 7/15/02 letter from L. Fairstein to J. Kindler, NYCLD_039818 (Appx. Ex. 2); 6/4/10 letter from L. Fairstein to R. Morgenthau, NYCLD_039803 (Appx. Ex. 3)

---

[3] *See, e.g.*, Compl. ¶ 90 ("[Fairstein] goes on to say there were '3,412 rapes reported to the NYPD last year. 3,412 times someone was assaulted, held down, threatened, degraded, forced. This is an epidemic'" (quoting Ep. 1, 17:03-18:41)); *id.* ¶¶ 122-23 ("Where's the line for Patricia [Meili]? I'm sick of this shit. Where's the line for her? . . . Fucking City, we hear something gruesome, we grimace and we move on. Well not this time. . . . Remember her" (quoting Ep. 2, 29:51--32:23)).

[4] The Complaint contains numerous citations to the "documents concerning the arrest, prosecution and conviction of the Five, and their subsequent lawsuit, [that] were made publicly available on the New York City Law Department's website" claiming "[a] great many of these documents . . . demonstrat[e] the falsity of the manner in which Ms. Fairstein is portrayed" (Compl. ¶ 7, citing http://www.nyc-cpj.org/Home/Disclaimer). In fact, many of the public records on the New York City website, *including admissions by Plaintiff*, flatly contradict the premises for this lawsuit. Of course, the Court may take judicial notice of these records for purposes of this motion. *See supra*, Section I. Copies of records from the official public record website relied upon in Plaintiff's Complaint are submitted herewith in an Appendix (citations to which will take the form "Appx. Ex. __").

("I was a fact witness in the case about many things (including the 32 hours I spent at the stationhouse during the initial investigation)").[5] She was the highest ranking prosecutor from the D.A.'s office on the scene. As Plaintiff boasted in 2002, "I was there to be *the eight-hundred-pound gorilla*, to help Elizabeth [Lederer] and the cops get the resources they needed….it was one of the most brilliant police investigations I've ever seen." Jeffrey Toobin, A Prosecutor Speaks Up, THE NEW YORKER (Nov. 25, 2002) (Appx. Ex. 12) (emphasis added); *see also* 4/24/13 Fairstein Dep., NYCLD_039451 (Appx. Ex. 4).

Plaintiff has taken credit for the prosecution. The cover of her book *Sexual Violence: Our War Against Rape* (New York: Wm. Morrow & Co. 1993) (Compl. ¶ 35) specifically highlights her involvement: "Linda Fairstein has personally tried or been involved in scores of nationally prominent rape cases including the Robert Chambers Preppy Murder Trial and the case of the Central Park Jogger." (Appx. Ex. 9).[6] Plaintiff's book describes her hands-on involvement in investigations: "Our tasks included *interviewing witnesses*" and "responding to police precinct houses on a twenty-four-hour-call basis *to take statements or admissions from defendants in custody*" and it was "my responsibility . . . to offer legal advice for the purpose of assuring the propriety of police procedures for their eventual use at trial." *Id.* at 120 (emphasis added).

As Plaintiff admits, she served as a witness "in the suppression hearings and trials" of the Five, testifying about "events that occurred on the night of April 20 and on April 21, 1989" when

---

[5] *See also* 4/23/13 Fairstein Dep., NYCLD_038926-38; 4/24/13 Fairstein Dep., NYCLD_039229-35, 039237-50 (Appx. Ex. 4); Katherine Bouton; *Linda Fairstein Vs. Rape*, N.Y. TIMES (Feb. 25, 1990) ("The evening after the attack, [Fairstein] testified, she had accompanied Lederer to the precinct police station where the suspects were being held. Her presence over the next 32 hours was, in retrospect, invaluable to the prosecution") (Appx. Ex. 18).

[6] Plaintiff's public image (and writing career) are built on "the high-profile cases which made her famous" including the Central Park Jogger case; "she wanted the big cases for herself . . . And she got them, positioning herself at the center of the most important and controversial cases of her tenure." Benjamin Smith, *The Practitioner*, LEGAL AFFAIRS (Sept.-Oct. 2003) (Appx. Ex. 16). *See also, e.g.,* published photo of Linda Fairstein attending trial in the jogger case (Appx. Ex. 22).

the boys and other witnesses were being interrogated. (Compl. ¶ 39.) The Complaint does not discuss the conduct of Plaintiff that was at issue in the suppression hearings, but that conduct was the subject of a scathing dissent by New York Court of Appeals Judge Vito Titone in Mr. Salaam's appeal from his conviction in 1993. Specifically, the dissent relates, after "ascertain[ing] that [Salaam] had already made a number of inculpatory statements," Plaintiff contrived to keep friends of the family from seeing him, even after his mother arrived:

> [T]here can have been *no other reason for the decisions of Detective Taglioni and Assistant District Attorney Fairstein to prevent defendant's aunt, "Big Brother" and mother from speaking to him other than to capitalize on his youth and isolation* and to assure that he did not receive aid and advice from the supportive adults who were in a position to retain counsel for him. Indeed, it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment. . . . *Assistant District Attorney Fairstein made the authorities' motives in this regard explicit when she told defendant's mother that she would not be permitted to see her son until after the detectives were finished with their questioning*.

*People v Salaam*, 83 N.Y.2d 51, 58 (1993) (Titone, J., dissenting) (emphasis added); *see also* 4/24/13 Fairstein Dep., NYCLD_039137-51, 039393-94 and 039447-48 (Appx. Ex. 4).[7]

***Injustice Redressed: Convictions Vacated and Civil Suit Settled.*** In 2002, an individual named Matias Reyes, "came forward" and confessed to the rape of Ms. Meili in 1989. (Compl. ¶¶ 5, 41.) The New York District Attorney's office then (without Plaintiff's involvement) reinvestigated the convictions of the Five. "Testing found that Mr. Reyes' DNA matched the DNA taken from Ms. Meili and her personal belongings." (*Id.* ¶ 41.) Based on that new evidence, and Reyes' conviction for a similar rape near Central Park only weeks prior, the D.A.'s Office submitted to the court a 34 page single-spaced Affidavit, the "Affirmation in Response to

---

[7] Asked about his dissent, Judge Titone said in 2002 "'I was concerned about a criminal justice system that would tolerate the conduct of the prosecutor, Linda Fairstein, who deliberately engineered the 15-year-old's confession. . . . Fairstein wanted to make a name. She didn't care. She wasn't a human.'" Rivka Gewirtz Little, *Ash-Blond Ambition*, VILLAGE VOICE (Nov. 19, 2002) (Appx. Ex. 17.)

Motion to Vacate Judgment of Conviction;" the Affidavit details why the D.A. found Reyes' confession (corroborated by the DNA evidence) that he was *solely* responsible for the rape to be credible, and identifies facts and circumstances incompatible with the Five's guilt, including lack of physical evidence, exclusion of DNA and troubling inconsistencies in the confessions. (*See* Compl. fn. 56; Appx. Ex. 5.)

The New York Court's decision vacating the convictions confirmed the D.A.'s conclusion that the "newly discovered evidence fatally weaken[ed]" the evidence presented at trial. *People v. Wise*, 194 Misc.2d 481, 489-90 (N.Y. Sup. Ct. 2002). While the purported confessions by the Five were contradictory on "significant details" about the rape, "Reyes was accurate about specific details of the crimes against the jogger". *Id.* at 492. The boys' flawed confessions "laid the foundation for a course of action developed, followed, and relied on for the prosecution and conviction of the defendants. That course was based on a theory that the defendants were involved as a group in a single incident; a crime rampage, which included rape, robbery and other crimes." *Id.* at 496. That theory no longer being tenable, there was "a persuasive and compelling argument for the granting of the motion as to all convictions." *Id.* at 494.

The Five brought a civil action against the City of New York and prosecutors on the case, "including Ms. Fairstein, and scores of NYPD officers and detectives" arising from the Five's claims that their convictions and imprisonments were wrongful and their confessions were coerced; in 2014 those claims were resolved with a settlement award to the Five of $41 million. (Compl. ¶¶ 6, 42-43 and fn. 2.) Mayor de Blasio stated that "This settlement is an act of justice for those five men that is long overdue. The City had a moral obligation to right this injustice." Stmts. on Central Park Five Settlement (Sept. 5, 2014) (Compl. fn.1; Appx. Ex. 20). While in settling the City did not admit liability, its counsel acknowledged "[t]o the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to

substantial prison terms for a crime they did not commit, that in and of itself constitutes an injustice in need of redress." (*Id.*)

***Plaintiff's Public Statements.*** Plaintiff has bitterly defended the prosecution. She has consistently and publicly voiced her belief that, notwithstanding Reyes' DNA and confession that he alone raped Ms. Meili, the rape was connected to other criminal activity in the Park that night—and specifically, to the Five, whom she continues to hold responsible. *See, e.g.*, Linda Fairstein, Stmt. for Pub. Safety Comm. of N.Y.C. Council (Jan. 30. 2003), NYCLD_039826 (Appx. Ex. 1).

In her 2019 *Wall Street Journal* Op-Ed condemning the Series, Plaintiff emphasizes her belief that even though Reyes "confessed in 2002 to the rape of Ms. Meili," it is incorrect "to assume the prosecution had no basis on which to charge the five suspects in 1989," repeating her belief that the Five were properly "charged as accomplices, as persons 'acting in concert' with each other *and with the then-unknown man who raped the jogger*." (Compl., fn. 131: Linda Fairstein, Netflix's False Story of the Central Park Five, WALL ST. JOUR. (June 10, 2019) (emphasis added) (Appx. Ex. 6).) In recent years, she has voiced the same opinions, in, *e.g.*, newspapers, legal journals,[8] and on national radio while promoting her crime books.[9]

These statements are consistent with Plaintiff's public statements in 2002 when the convictions were vacated: "*I think Reyes ran with that pack of kids.* He stayed longer when the

---

[8] *See* Compl., fn. 109: Piccoli and Gold, *After Furor, Literary Group Withdraws Honor for 'Central Park Five' Prosecutor*, N.Y. TIMES (Nov. 28. 2018) ("In July, Ms. Fairstein wrote an op-ed in the New York Law Journal defending the prosecution. 'The confessions were not coerced,' she wrote") (Appx. Ex. 10) (citing Linda Fairstein, *In defense of The Central Park 5 Prosecution*, N.Y. LAW J./Law.com (July 31, 2018), https://finance.yahoo.com/news/defense-central-park-5-prosecution-161954549.html ("each of the 5" were "participants in the riot, rampage, vicious attacks on civilians and some in the rape of the jogger"). (Appx. Ex. 7.)

[9] "Linda Fairstein discusses her book and the New York Jogger muggings," Imus in the Morning, June 20, 2014, https://video.foxbusiness.com/v/3633082806001/#sp=show-clips ("I think that these men were participants in the attack on the jogger as charged"). (Appx. Ex. 11.)

others moved on. He completed the assault. *I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night but in the attack on the jogger*." Toobin, *A Prosecutor Speaks Up*, *supra* (emphasis added).[10]

***The Complaint.*** Even though she indisputably had direct oversight and critical responsibility for the case, was intimately involved in the investigation and prosecution, and subsequently became the prime defender of the case after the convictions were vacated, Plaintiff brought this lawsuit based on the implausible premise that she had nothing to do with the prosecution and that she was defamed by being portrayed expressing views about the case and evidence that she has consistently maintained to this day. *E.g.,* Compl. ¶ 199 ("Defendants chose to cast Ms. Fairstein as the villain in the film series, despite her obvious, minimal involvement in all aspects of the original investigation").[11]

---

[10] *See also* Dave Goldiner, 5 *'Absolutely' Guilty: Prosecutor has no regrets in jogger rape convictions*, DAILY NEWS (Nov. 25, 2002) ("Asked if she still believes the five participated in the attack on the jogger, Fairstein replied 'Absolutely.' . . . They were part of 'the pack that saw the jogger, attacked her with a pipe and began to physically assault her as well as sexually assault her,' . . . Fairstein, who also has penned five crime novels, said she still counts the jogger case as one of the high points of her distinguished career"); Jim Dwyer and Kevin Flynn, *New Light on Jogger's Rape Calls Evidence Into Question*, N.Y. TIMES (Dec. 1, 2002) ("Linda Fairstein, the chief of the Sex Crimes Unit -- who oversaw the prosecution when she was a member of the district attorney's office -- continue[s] to hold that the teenagers managed to have some contact with the jogger, and perhaps ran the jogger off the path, starting the assault that Mr. Reyes finished"); *Key prosecutor: No regrets in Central Park attack convictions*, ASSOCIATED PRESS (Nov. 24, 2002) ("A key prosecutor in the infamous 1989 attack on a Central Park jogger says she has no regrets about the investigation that led to the convictions of the five youths. . . . Linda Fairstein said"). (Appx. Exs. 13-15.)

[11] The Complaint recites assorted "tweets" and social media posts by the Individual Defendants; as to Netflix none are (or could be) identified as defamatory. Suffice it to say, to the extent Plaintiff claims the tweets of Ms. DuVernay and Ms. Locke (who are moving to dismiss for lack of personal jurisdiction) are defamatory, such a claim is not well-pleaded and entirely conclusory; Plaintiff neither identifies which of the scores of cited tweets are the subject of the putative claim nor why they are false or defamatory -- the rudiments of a defamation claim.

## ARGUMENT

### I. Standard of Review

Plaintiff's claims fail as a matter of law under well-established First Amendment and common law precedent. On a motion to dismiss, the Court begins by excluding any conclusory allegations, and then, taking only the well-pleaded facts, must decide "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Thus, while the Court must take all well-pleaded non-conclusory allegations as true for purposes of a motion to dismiss, it need not "take the plaintiff's *interpretation* of the allegedly defamatory words at face value." *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009) (italics in original).

Where allegations are contradicted by matters referenced or incorporated in the Complaint (such as books and articles Plaintiff authored and the body of public records about the case compiled on the New York City website that Plaintiff extensively relies upon and invites the Court to review), the latter controls, "and the allegations are nullified." *Degirmenci v. Sapphire–Ft. Lauderdale*, 693 F. Supp. 2d 1325, 1341 (S.D. Fla. 2010). Those documents, along with Plaintiff's published statements, are also subject to judicial notice for purposes of this motion. *See, e.g., Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, *7 (S.D. Fla. Aug. 15, 2017).[12]

Courts routinely dismiss defamation claims based on plaintiff's "own admissions" in material referenced in the complaint or subject to judicial notice. *See, e.g., Nix v. ESPN, Inc.*, 2018 WL 8802885, *6 (S.D. Fla. Aug. 30, 2018), *aff'd*, 772 F. App'x 807 (11th Cir. 2019); *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 351, 354 & n. 3 (S.D.N.Y. 1998) (film based on a true story did not

---

[12] In addition to the publications that are cited in and part of the Complaint, the Court may also consider, by way of judicial notice, other news reports regarding and quoting Plaintiff for the "purpose of determining which statements the documents contain". *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n. 4 (11th Cir. 2015). *See also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018) (court may judicially notice "news articles discussing the conduct raised in the complaint").

portray plaintiff "engaged in conduct notably worse than that described" in prior testimony, book and press coverage, of which court took judicial notice in dismissing defamation claim).[13] Early dismissal of untenable defamation claims is favored because of "the chilling effect" these cases have on First Amendment rights. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

## II. <u>**Choice of Law**</u>

While federal Constitutional law principles fundamentally doom Plaintiff's claim, either New York or California defamation law otherwise applies here. As set forth in Defendants' Joint Improper Venue and Transfer Motion, under the Florida choice-of law principles applicable in this diversity action, *see Michel*, 816 F.3d at 694, Florida has nothing to do with this dispute, and the Restatement's "most significant relationship" factors overwhelmingly point to either New York (where the Series was filmed and Plaintiff worked for decades and still maintains property and businesses) or California (where the Series was written and all Defendants are domiciled). Even if Plaintiff is a newly minted resident of Florida, "this factor would not outweigh" the factors pointing to application of New York or California law. *Nix*, 2018 WL 8802885, n. 2 (applying New York law). Since, for purposes of this Motion, the applicable defamation law principles do not differ materially, Defendants will primarily discuss New York law.

## III. <u>**The Dramatized, Opinionative Speech At Issue Is Protected by the First Amendment**</u>

The First Amendment protects Defendants' ability to discuss controversial historical events —including through highly critical dramatizations that have a strong point of view. No less than politicians, scholars and editorial writers, filmmakers have to be able to create works that criticize the government and officials that act in its name. The Constitution protects even sharply hostile

[13] *See also Deripaska v. AP*, 282 F. Supp. 3d 133, 140, 146 (D.D.C. 2017) ("Judicial notice is properly taken of publicly available historical articles" on motion to dismiss; dismissing defamation claim where "readily available, judicially noticeable information [showed] that Deripaska openly associates himself with the Russian government. For the AP to do the same cannot be defamatory, even if it were not true").

expressions of opinion about prominent public officials like Plaintiff. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276-77 (1971) (First Amendment protects "exaggeration [and] vilification of men who have been, or are, prominent in church or state" and "vehement, caustic, and sometimes unpleasantly sharp attacks" on public officials) (citations omitted).

To that end, the First Amendment provides "'breathing space' in order to criticize and interpret the actions and decisions of those involved in a public controversy"; if writers and filmmakers "are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important to the survival of our democracy will be stifled." *Partington*, 56 F.3d at 1159. "We must not force writers to confine themselves to dry, factual recitations or to abstract expressions of opinion wholly divorced from real events." Instead, "we must allow, even encourage, them to express their opinions concerning public controversies and those who become involved in them." *Id.* Thus, whether Fairstein thinks it fair or harsh, the Series and dialogue is the filmmakers' artistic and dramatic recreation of contested historical events, expressing their point of view that the government's prosecution of the Five boys—indisputably overseen by Fairstein, and vociferously defended by her to this day—was unjust. That speech is at the very core of the Constitution's protection.

Fundamentally, a defamation claim requires a *false statement of fact*, and Plaintiff has the burden of "showing that the speech at issue is false," *Phila. Newsp., Inc. v. Hepps*, 475 U.S. 767, 777 (1986); statements that "cannot reasonably be interpreted as stating actual facts" are not actionable under the First Amendment. *Milkovich v. Lorain Jour.*, 497 U.S. 1, 2 (1990)[14]; *see also*

[14] In determining whether a statement is one of fact or opinion the courts consider both "the full context of the communication in which the statement is made" and "the broader social context surrounding the communication, including the existence of any applicable customs or convention which might alert the reader that he or she is reading opinion and not fact." *McGill v. Parker*, 179 A.D.2d 98, 110 (1st Dep't 1992) (citing *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 255 (1991)); *see also Partington*, 56 F.3d at 1153 (factors for distinguishing fact from opinion include "whether the general tenor of the entire work

*Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014) (elements of libel include a "defamatory factual statement" and "falsity of the defamatory statement").[15] In the Complaint, Plaintiff's claim of "falsity" principally consists of pointing out that she was not at a particular location or didn't say certain specific dialogue her character speaks in the Series. (*See, e.g.,* Compl. ¶ 45.)

However, "[a]s the Supreme Court has noted, statements made in 'a so-called docudrama or historical fiction' should not be accepted unquestioningly," because, by definition, they "rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." *Partington*, 56 F.3d at 1155 (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 512-13 (1991)).[16] Viewers know they are not getting a documentary, line-by-line transcription of what actually was said; they will be "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that parts of such programs are more fiction than fact." *Id.; see also De Havilland v. FX Networks, LLC*, 21 Cal.App.5th 845, 866 (2018) ("Viewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined").

Such artistic interpretations of historical fact require compressing and changing the order of events for dramatic purposes. *Lovingood*, 800 F. App'x at 847. As the Eleventh Circuit recently explained, a viewer would "understand that condensing the entire Challenger [shuttle]

negates the impression that the defendant was asserting an objective fact" and use of "figurative or hyperbolic language that negates that impression").

[15] Fault is another essential element of a defamation claim, and as an admitted public figure, the standard of fault Plaintiff must meet is actual malice under *New York Times v. Sullivan*, 376 U.S. 254 (1964) -- a heavy burden Plaintiff ultimately would not be able to sustain either in all events.

[16] *Masson* involved allegedly fabricated quotes in a journalistic setting -- the *New Yorker* magazine, which has "a reputation for scrupulous factual accuracy" and "would, or at least could, lead a reader to take the quotations at face value" as "nearly verbatim reports of statements made by the subject." 501 U.S. at 513. The Court specifically contrasted docudramas, a format that "indicate[s] that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed." *Id.*

investigation into a 90-minute dramatic film required the selective editing of real history not only for time but also for clarity, flow, and emotional impact." *Id*. Thus, for example, that Plaintiff is depicted as arriving at the police station in the morning of April 20, 1989 when she did not get there until the evening (*e.g.*, Compl. ¶¶ 57, 64) is not defamatory.

And "most importantly," a viewer "would understand that the [Series] presents the . . . story [of the Five] not as a disinterested, objective narrative but through a single critical perspective." *Lovingood*, 800 F. App'x at 847. This "context" is critical. The Series is not a documentary; a "reasonable viewer would understand within the first two minutes that he is not watching a documentary film." *Id*. at 848. "The purpose of the [Series] is to offer the personal viewpoint . . . concerning the trials" of the Five, through the filmmakers' creative lens, and because the Series "outlines [their] own version of what took place," viewers "would expect [them] to set forth [their] personal theories about the facts of the trials and the conduct of those involved in them." *Partington*, 56 F.3d at 1153.

Plaintiff's lawsuit flies in the face of these constitutional principles and improperly seeks to blue-pencil powerful dialogue and dramatic treatments that she thinks unfairly depict her as a "villain" or "in a foul manner, using derogatory language" (Compl. ¶ 119), but hyperbolic, dramatized dialogue "filled with rhetorical flourishes" is precisely what the constitution protects: "As the Supreme Court emphasized in *Milkovich*, the First Amendment protects the 'rhetorical hyperbole' and 'imaginative expression' that enlivens writers' prose." *Partington*, 56 F.3d at 1157; *John E. Reid & Assocs., Inc.*, 2020 WL 1330657 at *8 (same; addressing this Series).

"[T]he First Amendment . . . safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays." *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016). The Series is in the tradition of historical dramas "based on a true story"

involving (and holding up for critique) actions of public officials; for example, *All the President's Men*, *Chappaquiddick*, *The Looming Tower* and *Selma* (also directed by Ms. DuVernay).[17]

Litigants like Fairstein "do[] not own history" or "have the legal right to control, dictate, approve, disapprove, or veto the creator's portrayal of actual people." *De Havilland*, 21 Cal.App.5th at 850. "We must not permit juries to dissect the creative process in order to determine what was necessary to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity is, by its nature, creative." *Id.* at 869.

In short, that Plaintiff is depicted in what is clearly a dramatized and artistic retelling of historical events as being somewhere she was not at the time, or speaking lines she did not actually speak, is not actionable as defamation. And while some might find the depiction of the Fairstein character unflattering, others might see a tough, no-nonsense prosecutor seeking justice for the female victim of a horrible crime. One thing it is not is a false statement of fact that could be the basis for a defamation claim.[18]

---

[17] Plaintiff asserts that "While the film series purports to be 'based on' a true story, Defendants have publicly referred to the film as a true story" (Compl. ¶ 169). Whatever statements were made outside the Series cannot govern whether, given its context and obvious genre -- and disclaimer -- the Series is non-actionable protected speech. *Lovingood*, 800 F. App'x at 847 ("the perspective of a reasonable viewer encompasses more than a one or two word label; it looks to the film itself"). Also, Plaintiff's point is disingenuous. As the external statements Plaintiff relies on make clear, this is the story and the "truth" of the Five, told from *their* perspective and not that of the NYPD or Linda Fairstein: "The story you know is the lie that police, prosecutors and Donald Trump told you. WHEN THEY SEE US *is the story of the boys from their eyes and their hearts*." (Compl. ¶ 171 (emphasis added) (quoting DuVernay Instagram post).)

[18] Plaintiff alleges at length the "public outcry" that followed the Series (Compl. ¶¶ 13, 232-57); however, she, and the prosecution with which she is identified, were the subject of controversy and criticism long "before the release of *When They See Us*." *John E. Reid & Assocs.*, 2020 WL 1330657 at *8 n. 7. Strong public reaction to the Series cannot be used to establish that it is defamatory: "a non-defamatory reflection on this disastrous chapter of . . . history would not necessarily have an 'innocent meaning' for those depicted." *Chau*, 771 F.3d at 132. "To the extent [Plaintiff] is complaining that the show echoes (and maybe amplifies) the voices of the critics," the "remedy for that kind of dispute is 'the publication of a rebuttal, not an award of damages.'" *John E. Reid & Assocs.*, 2020 WL 1330657 at *8 n. 7. That is particularly true of Plaintiff -- the public official with direct oversight of the prosecution and its most outspoken proponent, who, using the megaphone her notoriety affords her, has issued innumerable "rebuttals."

## IV. **Powerful, Hyperbolic Language in the Dramatized Dialogue of Which Plaintiff Complains Cannot Be the Basis for Liability and Is Substantially True in Any Event**

Throughout the Complaint, Plaintiff complains in particular of scenes where the Fairstein character uses harsh, "dehumanizing" language (*i.e.*, "thugs"; "animals"; "bastards," *see* Compl. ¶¶ 10, 45, 74-76, 94-95, 103, 118-19) and the "loaded term 'wilding,'" which she alleges brands her as the "villain in a racist plot against The Five" (*id.* ¶¶ 46b, 74-76).

For one thing, *there is nothing false about the depiction*. Plaintiff asserts that she would "never . . . use[] the language ascribed to her" (*id.* ¶ 165), but in truth, Plaintiff has repeatedly used the term "wilding" in describing the alleged actions of the Five boys and assorted "dehumanizing" verbiage in condemning them. For example:

- Plaintiff's Statement to the New York City Council, stating the Five "*participat[ed] in the wilding* and attacks" and "mob violence" and describing them as "*a deadly pack*" (Linda Fairstein, Stmt. for Pub. Safety Comm. of N.Y.C. Council (Jan. 30. 2003), at NYCLD_039832, 039835-36) (Appx. Ex. 1).

- Plaintiff's 1994 Daily News column describing "the rape of a Russian woman in Coney Island by a gang of teens who showed the same lack of remorse as *the 'wilding' teens who attacked a Central Park jogger* on an April evening almost exactly two years ago" (Linda Fairstein, *It is a season to be fearful*, DAILY NEWS (Apr. 19, 1994)) (Appx. Ex. 8).

- Plaintiff's non-fiction book refers to the Five boys as a gang of "vicious marauders," who attacked a jogger "without interruption" (Linda Fairstein, *Sexual Violence: Our War Against Rape* 202 (New York: Wm. Morrow & Co. 1993)) (Compl. ¶ 35; Appx. Ex. 9).

- Plaintiff's 2019 *Wall Street Journal* Op-Ed describes the Five as "acting in concert" with a "sociopath," Matias Reyes (Compl., fn. 131; Appx. Ex. 6).

Plaintiff's own words alone bar any claim that this dialogue is less than substantially true. *See, e.g.*, *Love v. Wm. Morrow & Co.*, 193 A.D.2d 586, 588 (2d Dep't 1993) ("comparison of the disputed language" in book with "plaintiff's own words in his term paper" established substantial truth); *Cerasani*, 991 F. Supp. at 354 (film based on true story did not portray plaintiff "engaged in conduct notably worse than that described" in prior testimony, book and press coverage;

dismissing claim).[19] Further, Plaintiff has been known to use similar language in other cases; in the "Preppy Murder" case, for example, "[e]ven in court, Fairstein's talk seemed calculated, at times, to write headlines. Her statement at [Robert] Chambers's bail hearing was a ready-made sound bite: '*He is a thug* and a murderer.'" Smith, *The Practitioner*, *supra* (emphasis added).

Even if it did not accurately reflect Plaintiff's own words, the dialogue, given its context, would not be actionable. The words were spoken in the wake of a brutal rape. The audience would recognize that the Fairstein character was deeply upset by what she saw in the Park, and, committed to solving the crime and getting justice for the jogger, reacting with heat and emotion. Powerful language is the essence of drama and this is the paradigmatic case for dramatic license. The language used in these Scenes cannot be the basis for defamation.

Plaintiff alleges, for example, that she was "falsely portrayed as calling for a roundup of young, black males in Harlem" when she "had no authority" and "never gave orders to the investigating officers and detectives." (Compl. ¶¶ 97-99.) In context, it is not reasonable to read the dialogue ("Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. . . . You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night," *see id.* ¶¶ 46e, 97) as depicting Plaintiff as "a racist." At that point in the narrative, there had been eyewitness reports of people being randomly attacked in the park by a group of "young black male[s]" so it stands to reason that those would be the persons of interest to investigators. And Plaintiff herself has long maintained—despite Reyes' confession as the sole rapist—that it was proper to link the

[19] *See also Uzamere v. Daily News*, 34 Misc.3d 1203(A) (Sup. Ct. N.Y. Cty. Nov. 10, 2011) (dismissing defamation claim where plaintiff's website refuted alleged falsity of statement that he was known for anti-Semitic screeds); *Nix*, 2018 WL 8802885 at *6 (dismissing claims where, based on statements in his prior lawsuit, "the reports—by Plaintiffs' own admission—are true"); *Campanelli v. Regents of Univ. of Cal.*, 44 Cal.App.4th 572, 582 (1996) (dismissing defamation claim where complaint's allegations and referenced material "admitted the essential accuracy of [defendant's] statement").

other attacks in the park to the rape, and that the work the police did in rounding up suspects was "brilliant." Depicting her as saying as much could in no way defame her.

The dialogue, moreover, is clearly hyperbolic and reflects the fraught circumstances. No reasonable viewer would believe the Fairstein character was literally expecting officers to arrest "every kid" who was in Central Park. In dramatizing controversial events Defendants "have substantial latitude in describing the events involved" under the First Amendment through the "use of hyperbolic language." *Partington,* 56 F.3d at 1154 and 1157. "Even a novice police-procedural viewer in Netflix's audience would pick up on that context and understand the character's aggressive word choice as a rhetorical device." *John E. Reid & Assocs.*, 2020 WL 1330657 at *8.

Further, Plaintiff's assertion that term "thug" and "wilding" are "loaded" "code words" in some quarters and have "widely been questioned and analyzed" (Compl. ¶¶ 74-76, 103) also does not mean that anyone using them would ipso facto be viewed as "racist". Indeed, having used the term "thug" in court in reference to a white defendant—Mr. Chambers—Plaintiff cannot now change course and claim it is singularly racist.[20] Defamation is not measured by how terms may—or may not be—subjectively "encoded." Where statements "may mean different things to different people," they "are not capable of being proven true or false because of their subjective, relative meanings." *Mirage Ent'mnt, Inc. v. FEG Entretenimientos SA*, 326 F.Supp.3d 26, 37 (S.D.N.Y. 2018).[21] Certainly, "characterization of [someone] as racist[] is a subjective assertion, not

---

[20] A "Thug" is "a violent person, especially a criminal" (Oxford Adv. American Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/thug); like Plaintiff, a large segment of society, including political leaders and commentators, also use the word "thug" to describe violent criminals. *E.g.,* M. Devine, *Freed thugs sow fear in NYC during coronavirus lockdown*, N.Y. POST (Apr, 15, 2020), https://nypost.com/2020/04/15/freed-thugs-sow-fear-in-nyc-during-coronavirus-lockdown-devine/; *Do-Nothing San Jose Police Hammered for Allowing Thug Riot*, BREITBART NEWS (June 4, 2016), https://www.breitbart.com/politics/2016/06/04/ap-nothing-san-jose-police-hammered-allowing-thug-riot/.

[21] *See also Idema v. Wager*, 120 F. Supp. 2d 361, 366 (S.D.N.Y. 2000); *Carver v. Bonds*, 135 Cal.App.4th 328, 348 (2005) (statements based on "entirely subjective matters rather than provably false factual assertions" not actionable).

sufficiently susceptible to being proved true or false to constitute defamation." *Edelman v. Croonquist*, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010); *Carto v. Buckley*, 649 F. Supp. 502, 508 (S.D.N.Y. 1986) (accusation of "racial and religious bigotry" was "protected opinion").

Thus, even if the dialogue did not actually reflect Plaintiff's own words and even if her portrayal could be interpreted to attribute "racist motivations" to her (Compl. ¶ 46), such statements are protected opinion in the context of this dramatization and its clear point of view, countering Plaintiff's publicly stated view, even after their exoneration, that the Five not only are guilty but a "wilding" "pack" of "marauders." As *Carto* aptly put it, an individual like Plaintiff "who sallies forth to espouse a specific creed or conviction" cannot "resort to the courts to silence those who disagree with that viewpoint." 649 F. Supp. at 508.

That is particularly so where the Plaintiff is a public official. "Courts have uniformly found that the question of bias or motivation is quintessentially subjective and therefore may not form the basis for an action for defamation"; Plaintiff cannot hold Defendants liable for "expressing their opinion of" her actions as a public official who helped lead, and to this day supports, the prosecution against the Five, "no matter how unreasonable, extreme or erroneous these opinions might be." *Rappaport v. VV Publ'g Corp.*, 163 Misc.2d 1, 9 (Sup.Ct. N.Y. County 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996).

## V. None of the Specific Scenes and Dialogue Plaintiff Identifies In the Complaint Are Actionable Defamation

In addition to not being actionable under the First Amendment principles discussed above, the specific scenes ("Scenes") of which Plaintiff complains are simply not defamatory under the common law.[22] "Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance," and they "must be construed in the context of the

[22] For the Court's convenience, Defendants attach hereto a chart of the allegedly defamatory "Scenes" (Ex. B). The Scenes will be referred to herein by the number assigned to them in the chart.

entire statement or publication as a whole." *Aronson v. Wiersma*, 65 N.Y.2d 592, 593-94 (1985).

Plaintiff pleads both defamation per se and per quod; the former requires that the challenged statement be "libelous on its face" and the latter "requires an averment, called an innuendo, to show the defamatory meaning." *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*, 29 A.D.2d 423, 427 (1st Dep't 1968), *aff'd*, 25 N.Y.2d 943 (1969). Plaintiff cannot use innuendo to "enlarge upon the meaning of words so as to convey a meaning that is not expressed." *Tracy v Newsday, Inc.*, 5 N.Y.2d 134, 136 (1959).[23] The court must "interpret the challenged language from the viewpoint of the average reader, without straining to find a defamatory meaning beyond the natural and ordinary meaning of the language at issue. . . ." *Rappaport*, 163 Misc.2d at 6; *see also De Havilland*, 21 Cal.App.5th at 865-66.

Also, "falsity is an element" of defamation, and Plaintiff "must identify how the defendant's statement was false to survive a motion to dismiss." *Tannerite Sports*, 864 F.3d at 245 (affirming dismissal). The standard is one of *substantial* truth. A statement is substantially true and therefore not actionable if its "overall 'gist or substance'" is true, *Chau*, 771 F.3d at 129; that is, "if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Tannerite Sports*, 864 F.3d at 241-42.[24]

---

[23] *Accord, Carlisle v. Fawcett Publ'ns, Inc.*, 201 Cal.App.2d 733, 743 (1962) ("it is not the purpose of an innuendo to 'beget an action,' and the meaning of the language complained of may not be enlarged or extended thereby"; plaintiff "cannot ascribe a meaning to assertedly defamatory matter other or broader than the words themselves naturally bear; it cannot add to, enlarge, or change the sense of the published words"; affirming demurrer); *see also Issa v. Applegate*, 31 Cal.App.5th 689, 707 (2019) ("a plaintiff may not construct an actionable statement by reading whatever implication it wishes into the defendants' words") (citation omitted).

[24] *See also Campanelli*, 44 Cal.App.4th at 582 ("defendant need not prove the literal truth of the allegedly libelous accusation, so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark"; affirming dismissal); *Reed v. Gallagher*, 248 Cal.App.4th 841, 851, 860-61 (2016) (same; complained of statements substantially true as matter of law based on judicially noticed public records).

As demonstrated below, the specific Scenes of which Plaintiff complains cannot support a defamation claim because the statements therein are either (a) incapable of defamatory meaning, (b) substantially true as matter of law, or (c) protected expressions of opinion and hyperbole used for dramatic effect in the context of a dramatization of controversial events. Upon examination, Plaintiff's claims fail for one or more of these reasons as a matter of law.

### A. Scenes Showing Plaintiff "At the Crime Scene" (Scene 1), "Drafting a Press Release" (Scene 2), and "Fighting With Nancy Ryan Over Who Would Prosecute Case" (Scene 5) Have No Plausible Defamatory Meaning

Certain scenes Plaintiff identifies in her Complaint simply cannot be said to bring the "hatred, shame," or "contempt" necessary to sustain a defamation claim. *Kimmerle v. N.Y. Evening Jour.*, 262 N.Y. 99, 102, 186 N.E. 217 (1933). The "language used" does not "naturally import a criminal or disgraceful charge." *Cole Fischer Rogow*, 29 A.D.2d at 427.[25]

For example, Plaintiff asserts the scene "at the Meili crime scene on the morning of April 20, 1989" is defamatory because it purportedly shows Plaintiff "stating that there was only *one* individual involved in the attack." (Compl. ¶¶ 46a, 54.) First, the comment ("[m]ake sure to get those drag marks. . . . Clear as day. *His footsteps*, her body" (*id.* ¶ 52 (emphasis Plaintiff's)) does not support Plaintiff's reading. It is an initial observation of physical evidence and not a definitive determination that there was "only one" perpetrator. Moreover, it is simply not defamatory to say that an initial theory changed based on additional evidence that was gathered (at that point, the authorities did not know the full extent of the criminal activity that night).

Nor is it defamatory to depict Plaintiff as "drafting a press release" (*id.* ¶ 59) when she allegedly did not. It is a gigantic and unreasonable leap to interpret that depiction as conveying that her press release was the "source" or cause of "widely criticized" press coverage that

[25] *See also Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1262 (2017) (statement that defendant ended his relationship with plaintiff "did not expose [her] to contempt, ridicule or other reputational injury").

"fuel[ed] racial tensions in New York City, and against The Five" (*id.* ¶ 61). That is nothing but Plaintiff's spin and invention with no basis in the text; it improperly "adds an entirely new and independent thought that finds no support in the article". *Tracy,* 5 N.Y.2d at 137.

Likewise, no defamation claim will lie based on the purported suggestion that Plaintiff "fought with" Nancy Ryan over "who would prosecute the case" and "wrest[ed] the case" from Ryan. (Compl. ¶ 46d and p. 25.) That ambitious, dedicated prosecutors would want to be in charge of the most high profile and significant cases is totally unremarkable—and could not be defamatory. And in the case of Linda Fairstein, it is also true. As Plaintiff has admitted: "at the same time I assigned the case to Liz [Lederer], Nancy [Ryan] had assigned it to Peter [Casolaro] -- and the Boss [DA Morgenthau] made the call, later in the day, to let Liz keep it." July 15, 2002 letter from L. Fairstein to J. Kindler, NYCLD_039818.[26]

### B. It Is Not Defamatory to Portray Plaintiff As Expressing Views She Has Publicly Espoused for Decades

Plaintiff complains she is portrayed as "singlehandedly mastermind[ing] a theory of the case" (Compl. ¶ 10), but she undeniably was not only the head of the Manhattan D.A.'s Sex Crimes Unit with direct oversight and critical responsibility for the Jogger case tried by her Unit (including whether to continue to press charges after DNA evidence ruled out the Five), she was the highest ranking prosecutor (in her words, the "eight-hundred-pound gorilla") on the scene for 30-plus hours during the interrogations. She also has been the most outspoken public face of the prosecution, for decades and even to this day defends the theories under which the Five were tried and convicted.

[26] Indeed, it was common knowledge at the time that "Fairstein elbowed aside her office rival, Nancy Ryan, to bring the jogger case and its huge headlines to the sex crimes unit." Smith, *The Practitioner*, *supra* (Appx. Ex. 16); Timothy Sullivan, *Unequal Verdicts: The Central Park Jogger Trials* 21-22 (New York: Am. Lawyer Books 1992) (describing "turf war" between Fairstein and Ryan) (Appx. Ex. 19). Plaintiff has expressed her continued animosity toward Ryan in no uncertain terms. *See* Jan. 4, 2010 letter from L. Fairstein to R. Morgenthau, NYCLD_039805 ("Nancy Ryan is a pathologically crippled individual. . . . I can prove that she has withheld information from you . . . her lack of management and interpersonal skills are the reason for the hideously low morale in the trial division now") (Appx. Ex. 3).

Portraying her as having a central role in the case is at the very least substantially true and in no way unfair to her. The Scenes about which Plaintiff complains are not actionable as defamation.

### 1. "Putting Together a Timeline" (Scene 4)

Plaintiff complains of the scenes at the police station on April 20 in which the Fairstein character is shown piecing together a timeline of events from the night of the rape based on the evidence gathered at that point. Again, Plaintiff asserts "falsity" because she allegedly "was not at any precinct at the times and places depicted" (Compl. ¶ 80); was not "in front of a map" on April 20 and did not know of "the locations of all the attacks in Central Park, as some of the victims and witnesses did not come forward until days later" (*id.* ¶ 84). There is simply nothing defamatory about the act of putting together a timeline as part of the investigative process—it would be unusual if that was not done. That Plaintiff was not at the time and place depicted, or that events are compressed for dramatic purposes, cannot be a false statement of defamatory fact in the context of a dramatization. *See, e.g.*, *Lovingood*, 800 F. App'x at 847.

Nor is there any basis for Plaintiff to complain about showing her constructing a timeline "to connect the rape to the other assaults that happened in Central Park on the night of April 19, 1989." (Compl. ¶ 79.) It could not be defamatory to say that it was her theory that the rape was connected with the other criminal activity in the Park that night—after all, *that has been Plaintiff's consistent belief to this day*.[27] A depiction that so states is the very definition of substantial truth. *See Love v. Wm. Morrow*, 193 A.D.2d at 588; *Tannerite Sports*, 864 F.3d at 241-42 (both dismissing on substantial truth grounds).

Indeed, the Complaint *admits* that both the D.A.'s Office and the NYPD created a "timeline of events" to that effect and that timeline was the basis for presentation to grand jury and trial. (Compl. ¶ 85.) Plaintiff objects that she "did not participate in the creation of any of these

---

[27] *See, e.g.*, Compl., fn. 131 (Appx. Ex. 6: Fairstein, *Netflix's False Story of the Central Park Five*).

timelines" (*id.*) but cannot deny that *the case for which she had supervisory authority and material involvement went to trial on that theory and timeline* and Plaintiff *has specifically defended that theory and timeline*, and the "brilliant" police work in the Jogger case that produced it. Linda Fairstein, Stmt. for Pub. Safety Comm. of N.Y.C. Council (Jan. 30. 2003), at NYCLD_039832, 039835 (Appx. Ex. 1) (refuting "[s]ome critics" that "have questioned the timeline in the case, talking about exoneration as something to be determined by discrepancies of two or three minutes"). Plaintiff's attempt to dodge responsibility for the timeline in this forum—while continuing to publicly proclaim its essential correctness—cannot be sustained as the basis for a defamation suit.

### 2. Interactions With ADA Lederer (Scenes 8 and 10)

Plaintiff alleges that Scene 8 in Episode 1 depicts her as "devising a theory of the case that did not fit the known facts, and which ADA Lederer questioned" (Compl. ¶ 46g) and that Scene 10 in Episode 2 similarly shows the Fairstein character "forcing ADA Lederer to prosecute a case against The Five for which there was insufficient evidence." (*Id.* ¶ 46i.) Once again, Plaintiff asserts "falsity" because these "interactions" as written "never happened." (*Id.* ¶¶ 116, 120.) But these "fictionalized conversation[s], as part of series that uses actors and actresses, music, and imagined dialogue to dramatize historical events," are not actionable. *John E. Reid & Assocs.*, 2020 WL 1330657 at *8. Plaintiff also editorializes that they "falsely depict Ms. Fairstein as desperate to put together a case against The Five, imposing her theory of the case on ADA Lederer." (Compl. ¶ 116.) What they do is dramatize a debate over the strengths and weaknesses of the prosecution's case, with the Fairstein character taking a more aggressive view of the evidence and the guilt of the accused. Using the characters to voice competing opinions about the evidence is a literary vehicle and "rhetorical device . . . designed to maintain the viewer's attention" in a dramatization, not an actionable statement of defamatory fact. *Partington*, 56 F.3d at 1157.

Again, it could hardly be defamatory of Plaintiff's "ethics and integrity" (Compl. ¶ 122) to show her espousing a "view of the evidence" that she maintains to this day. Indeed, the points the Fairstein character makes in Scene 10—that (a) "there must have been another attacker? One must have gotten away"; (b) "the 5 can't be ruled out"; (c) "They were in the park beating people up the same night that she's getting beat up and you're telling me they had nothing to do with it? Bullshit" (*id.* ¶¶ 120-22)—are, almost to the letter, the points made in her 2019 *Wall Street Journal* Op-Ed, 2003 Statement to the New York City Council, and 2002 *New Yorker* interview.

Certainly, nothing in Scene 10 "falsely portrays Ms. Fairstein as admitting that the confessions of The Five were coerced" much less "attributes responsibility for that to Ms. Fairstein." (*Id.* ¶ 123.) The Fairstein character, consistent with what the real Linda Fairstein believes, says that the Five "said it themselves, they told us what happened" and when challenged that "They were told" what happened, responds that the only thing the young men were "told" was "how their one part fit into the whole". Nothing in the scene can be read as an admission by Fairstein that the confessions were "coerced"—just the opposite.

Finally, the Lederer character's reference to the Fairstein character as "delusional" is nothing but hyperbolic rhetoric in a dramatic setting and cannot be deemed to actionably "impugn[] Ms. Fairstein's reputation and career as an Assistant District Attorney because it portrays her as bordering on mental illness and lacking any sense of rationality when making judgments about cases." (*Id.* ¶ 125.) No reasonable reader would take that dialogue as a serious accusation of mental illness. "The popular usage of words denoting mental incompetency, such as insane, mad, or crazy, to express the idea of excessive optimism, extravagant expectation, overweening ambition, foolish hope, distraction with eager desire, goes back in the English language to the time of Milton and Shakespeare." *Yorty v. Chandler,* 13 Cal.App.3d 467, 474

(1970) (affirming dismissal of defamation complaint). *See Scialdone v. Derosa*, 148 A.D.3d 741, 742 (2d Dep't 2017) ("delusional" was non-actionable "expression of opinion").

**3. Interactions With ADA Ryan (Scenes 5 and 11)**

Plaintiff makes an editorial complaint that in Scene 5 "ADA Ryan is shown as the voice of reason, confronting Ms. Fairstein because ADA Ryan believed that the young men in custody engaged in nothing more than harassment in Central Park on the night in question" (Compl. ¶ 93). That is not actionable either. The confrontation reflects dueling opinions over a contested set of facts in a dramatic setting; even if "[t]he show casts . . . Ryan as [a] truth-telling protagonist[]," heated dialogue "during a fictionalized conversation," where both parties have "an ax to grind" cannot be the basis for liability. *John E. Reid & Assocs.*, 2020 WL 1330657 at *8. And again, the Fairstein character is only stating what the actual Linda Fairstein believes and has repeatedly stated, and that can't be defamatory.

Plaintiff also complains of a "final scene," Scene 11, "which takes place in 2002," depicting the Ryan and Fairstein characters meeting in a restaurant. The Fairstein character tells the Ryan character, "You're here to gloat. It doesn't matter, you simply identified a sixth rapist, I always said there may be more." Ryan responds, "You said that to cover because you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes." The Ryan character then dramatically puts several of Ms. Fairstein's novels on the table, noting that while she was writing crime novels, five innocent young men were serving time. (Compl. ¶ 128, citing Ep. 4 at 1:09:49-1:12:43.)

Plaintiff complains the scene is false because she and Ryan never met for lunch in 2002 (*id.* ¶ 128) and it "falsely attribute[s] the theory of the case to Ms. Fairstein" (*id.* ¶ 129); even if now, for purposes of this lawsuit, Plaintiff seeks to disclaim responsibility for the prosecution she helped lead, she cannot deny that she did and continues to espouse the "sixth rapist" theory (that the Five

boys acted in concert with Reyes in the rape and are guilty). Her unwavering support for the prosecution, the confessions and the convictions of the Five is, and was, well-known.

Moreover, as with the complained-of scenes between the Fairstein and Lederer characters, the dialogue represents the two sides of the debate over an ambiguous historical event. The Ryan character is clearly a biased partisan with "an axe to grind"; her angry outburst ("you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes") is the hyperbolic expression of the Ryan character's opinion. Given the context, it cannot be read as a factual statement that *Plaintiff herself* was responsible for the "alleged coercive tactics used during police questioning" (*id.* ¶ 129), when the detectives themselves are the ones shown using coercion and the Fairstein character is not shown as present when it happens. "When allegedly defamatory statements take place in a setting in which 'the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole,' language that might otherwise be thought of as statements of fact 'may well assume the character of statements of opinion.'" *John E. Reid & Assocs.*, 2020 WL 1330657 at *9 (citation omitted).[28]

### C. The Complained-of Dialogue Does Not Support Plaintiff's Claimed Defamatory Imputation That She "Violated the Law"

In addition to her untenable attempt to claim defamation based on attributing the views to her that she has publicly espoused for years and language she has herself used, Plaintiff also complains of dialogue and scenes in the Series that she attempts to gin up into accusations that Plaintiff "violat[ed] the law" by "interrogating unaccompanied minors," "pressuring" detectives to

[28] *See also, e.g.*, *Immuno AG*, 77 N.Y.2d at 254 (where speech "related to a public controversy" and speakers were "fully identified to readers" as partisans of one side, the "average reader" would "look upon the communication as an expression of opinion rather than a statement of fact"); *Ferlauto v. Hamsher*, 74 Cal.App.4th 1394, 1404 (1999) ("the overall context of the book, the subject matter, and the author's literary style alert readers that they are reading the subjective views of a partisan participant to the events described"; such "imaginative expression, and rhetorical hyperbole . . . generally constitute a legitimate exercise of literary style").

"force confessions," and "withholding exculpatory evidence from defense counsel" (*e.g.*, Compl. ¶¶ 340, 360). Upon examination, none of these claimed defamations have a basis in the actual content of the identified scenes and, once again, are simply Plaintiff's own strained interpretation.

Defamation cannot be built solely on innuendo. Thus, in *Tracy v. Newsday*, *supra*, a newspaper article discussing criminal defendant's failure to appear for trial reported that the plaintiff, a former policeman that defendant hired as an investigator, was seen carrying his luggage out of a hotel and was the "last person to hear" from him before he disappeared. The court held plaintiff's innuendo that the article accused him of aiding and abetting defendant in skipping bail was "'strained, unreasonable and unjustified,' . . . add[ing] an entirely new and independent thought that finds no support in the article." 5 N.Y.2d at 137. The same is true here.

Furthermore, in determining whether statements are "reasonably susceptible to a defamatory connotation . . . a court does not construe the challenged statements 'with the close precision expected from lawyers and judges' but rather considers how they would be 'read and understood by the public to which they are addressed.'" *Seymour v. Lakeville Jour. Co. LLC*, 150 F. App'x 103, 104-105 (2d Cir. 2005) (citations omitted) (no reasonable reader would infer that plaintiff deliberately violated state tax law); *Ferlauto*, 74 Cal.App.4th at 1404 (courts analyze allegedly defamatory statements "from the perspective of the average reader, not a person trained in the technicalities of the law").

**1. No Claim Based On Purported Questioning of "Unaccompanied Minors" (Scene 3)**

Plaintiff complains of Scene 3, at the police station on April 20, which Plaintiff describes as "a room full of young men of color, who were allegedly involved in the attacks in Central Park. They are not with their parents"; the Fairstein character is "told by the detective that the young men are ages 13 or 14"; "Fairstein then begins questioning the young men without reading

them their Miranda rights, in violation of New York State law, which prohibited the questioning of minors under age 16 without a parent present." (Compl. ¶¶ 65-66.)

However, there is no mention in the scene of any State law that would bar Fairstein from speaking to the young men (and no suggestion that Fairstein is violating that unidentified law), and no indication that the youths were not Mirandized previously. Thus, on its face, the scene does not say Plaintiff "unlawfully question[ed] unaccompanied minors without reading them their Miranda rights" in violation of State law. (Compl. ¶¶ 46b, 66.) As viewed and understood by the general public and not "with the close precision expected from lawyers and judges," no reasonable viewer would understand Plaintiff's brief exchange with one of the witnesses to be a violation of New York statutory law. *Seymour*, 150 F. App'x at 104-105. That is simply Plaintiff's own addition to the text, for which Defendants cannot be liable. *Tracy*, 5 N.Y.2d at 137. "The innuendo that plaintiff participated in or committed criminal acts is unwarranted—it is 'strained, unreasonable and unjustified.'" *Bordoni v. N.Y. Times Co.*, 400 F. Supp. 1223, 1230 (S.D.N.Y. 1975) (dismissing bank director's claim that news article reporting on his resignation and referring to "pressure from the regulatory authorities" charged him with participation in crime).

Even the statement that Plaintiff alleges could be conjured from the Scene, a technical failure to comply with *Miranda* or the New York statute is not defamatory. Here, moreover, the individual depicted being questioned was not one of the Five boys and the questioning did not result in any evidence being suppressed.[29] Non-compliance with *Miranda* is not itself a criminal act—or even a Constitutional violation, "absent use of the compelled statements in a criminal case against the witness." *Chavez v. Martinez*, 538 U.S. 760, 769-70 (2003) ("procedural safeguards"

---

[29] *Cf. People v. Salaam*, 83 N.Y.2d 51, 56-57 (1993) ("failure to strictly comply with" Family Ct. Act § 305.2 "does not necessarily require suppression where a good-faith effort at compliance has been made") (citing *Matter of Emilio M.*, 37 N.Y.2d 173 (1975), where statement not suppressed even though "juvenile was arrested, identified by the victim and taken to the station house before his mother was notified" and "questioned before she arrived at the station house").

required by *Miranda* are "not themselves rights protected by the Constitution but . . . provide practical reinforcement for the right" against self-incrimination).

Plaintiff alleges she "never questioned any of the young men in custody—including any of the Five—on April 20th, at any police precinct." (Compl. ¶ 67.) Whether or not that is plausible, given her admitted extensive participation (30+ consecutive hours) in the investigation from April 20 on, what is telling is that the Complaint does not mention the scene in Episode 1 (at 43:08 - 44:52) where Yusuf Salaam's mother challenges the Fairstein character about interrogating her minor son without her present. Indisputably, Plaintiff was involved in that incident—the subject of Judge Titone's scathing dissent in *People v. Salaam*. A false statement is not actionable if it could have produced no worse an effect on the mind of the reader than the truth. *See, e.g.*, *Tannerite Sports*, 864 F.3d at 241-42; *Chau*, 771 F.3d at 129-31.

**2. No Claim Based on Purported "Directing" of Detectives (Scenes 7, 8)**

Plaintiff complains of a scene (Scene 7) depicting the Fairstein character telling NYPD officers: "We've got suspects, we've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this." (Compl. ¶ 104.) Again, Plaintiff claims "falsity" because "Ms. Fairstein was not involved in the NYPD's questioning of witnesses or suspects" (*id.*) but even if that were true, the dialogue does not defame her. Like the "roundup" dialogue (Scene 6, *see* section IV, *supra*), "not business as usual. . . . No kid gloves here" is the kind of typical heated rhetoric used for dramatic purposes when a novel or film depicts authorities under pressure, trying to solve a particularly heinous crime. *John E. Reid & Assocs.*, 2020 WL 1330657 at *8. That dramatic trope cannot be the basis for the factual conclusion that Plaintiff "direct[ed] NYPD police officers and detectives to bend the rules, or alter

procedures, with respect to the interrogation of minors in criminal cases." (Compl. ¶¶ 46f, 107.)[30]

Likewise, Scene 8 cannot reasonably be taken as an assertion that the Fairstein character, by stating that Mr. Wise is the "glue" that will hold the case together, is therefore responsible for Detective Sheehan "forc[ing] a confession out of Mr. Wise, resulting in Mr. Wise being beaten into confessing to involvement in the rape of Ms. Meili" (*id.* ¶¶ 115-16); that is simply Plaintiff's attempt to amend the dialogue through improper innuendo. The actions portrayed are those of the detectives alone, and "the interpretation plaintiff attempts to establish by innuendo distorts the logical meaning of the text beyond the limits of its language." *El Meson Espanol v. NYM Corp.*, 521 F. 2d 737, 740 (2d Cir. 1975) (stating that plaintiff restaurant was a good place "to meet a connection" to buy cocaine "cannot be read to accuse [plaintiff] of 'knowing' acquiescence or participation in narcotics activity). Just as in *Tracy*, *supra*, where the court found a report that plaintiff was "last one to hear from" a criminal defendant who skipped bail, and was seen carrying his luggage, could not be extrapolated to accuse plaintiff of aiding and abetting the defendant's crime (5 N.Y.2d at 137), Plaintiff's attempt to tease out a defamatory meaning from this dialogue must be rejected.[31]

### 3. No Claim Based on Discussion of DNA Evidence (Scene 9)

Finally, Plaintiff complains of a scene in Episode 2 featuring the Fairstein, Lederer and Morgenthau characters, which she describes as follows:

> DA Morgenthau says "We have useless tape, we lost our gang narrative, we can't find DNA." Ms. Fairstein replies, "We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it, but we

---

[30] Plaintiff alleges that "[t]he next image is of Mr. Richardson in an interrogation room, with a black eye" (*id.* ¶ 104), but that does not support Plaintiff's apparent inference that detectives beat him at Plaintiff's behest; an earlier scene shows Mr. Richardson *already had* a black eye when he was brought to the station. (Ep. 1 at 07:10-22.)

[31] *See also Cerasani*, 991 F. Supp. at 354 (dismissing claim alleging that film depicting plaintiff's character "as a bystander, present at the murder scene, who carried and dismembered the bloody corpse of one murder victim" defamed him by implying that he "actually committed the murder"; "No such inference is warranted from what is depicted").

> found it." Morgenthau then says, "We have DNA, good. The match will nail this thing down." ADA Lederer says, "How did the NYPD miss this?" To which Ms. Fairstein says, "Who cares? We have it now and the kicker is none of the defense is aware yet so we can test it right before the trial—surprise!" ADA Lederer, looking upset, says, "surprise." (Compl. ¶ 118, citing Ep. 2 at 16:39-17:14.)

Plaintiff asserts that she "is falsely portrayed as trying to conceal DNA evidence from defense counsel before the trials began, directly attacking her prosecutorial ethics." (*Id*. ¶ 117.) However, the scene nowhere raises the prosecution's disclosure obligations under the rules of criminal procedure, and ordinary viewers would not assume that the "surprise" comment was intended to allude to those obligations, *Seymour*, 150 F. App'x at 104-105, much less to assert that Plaintiff or the rest of the experienced prosecution team, including DA Morgenthau, would not in fact comply with those unspecified obligations. Again, Plaintiff's innuendo is "strained, unreasonable and unjustified." *Bordoni*, 400 F. Supp. at 1230; *Proskin v. Hearst Corp*., 14 A.D.3d 782, 783-84 (3d Dep't 2005) (news article stated that plaintiff' lawyer "altered a client's will to leave $49,000 of the elderly woman's money to his own children"; held, "innuendo or adverse inferences" implying that "he modified the will illegally, surreptitiously or without authority from his client" could not render article actionable).

Furthermore, read in context of the entire Episode, it is clear that the sock DNA evidence came back negative as to the Five boys, and was *not* in fact helpful evidence the prosecution would or could have used to "surprise" defense counsel. (*See* Compl. ¶ 120.) The Series accurately reflects what the trial record established: the prosecution did *not* hide the sock DNA evidence—or their expert who read it—but *did* unsuccessfully attempt to downplay the importance of that evidence. As the Series depicts, while the theory the prosecution had expounded was that the DNA evidence was "inconclusive," *see* 4/24/13 Fairstein Dep., NYCLD_039456-57 (Appx. Ex. 4); R. Sullivan, *Genetic Tests 'Inconclusive' in Jogger Rape*, N.Y. TIMES (Oct. 10, 1989), NYCLD_039536 (Appx. Ex. 21), cross-examination of the prosecution's DNA expert at trial revealed that the sock DNA *was in fact*

"conclusive"—*i.e.*, it did not belong to any of the Five. (Ep. 2 at 41:50-43:53.) That was a revelation—a "surprise," if you will—not only to defense counsel but to the press.[32]

## VI. The Purported Conspiracy Claim Does Not Exist Under Applicable Law

Plaintiff's count alleging a purported "conspiracy to defame" (Count VII) must be dismissed because neither New York nor California law "recognize a freestanding claim for conspiracy." *Carlson v. Am. Int'l Inc.*, 30 N.Y.3d 288, 310 (2017) (affirming dismissal); *Dobies v. Brefka*, 263 A.D.2d 721, 722 (3d Dep't 1999) (dismissing claim of conspiracy to defame); *Ent'mnt Rsch. Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997) ("Under California law, there is no separate and distinct tort cause of action for civil conspiracy"). And even if they did, duplicative tort claims based on the same underlying facts as a meritless defamation claim must also be dismissed. *Chao v Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012); *Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (affirming dismissal).

## CONCLUSION

Defendant Netflix respectfully requests that the Court dismiss the Complaint with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 3.01(j), Defendant respectfully requests oral argument on its Motion to Dismiss. Defendant believes the Court's decision-making process would be aided by oral argument. Defendant estimates that a total of one hour will be required.

---

32 *See, e.g.*, L. Alvarez, *DNA Prints Fail to ID Jogger's Attackers*, DAILY NEWS (July 14, 1990) (noting "revelation" at trial of DNA being conclusive so as to exclude the Five) (Appx. Ex. 21).

Dated: May 18, 2020

Respectfully submitted,

/s/ Natalie J. Spears

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

Kelley Geraghty Price (Florida Bar #889539)
Eric S. Olson (Florida Bar #99079)
DENTONS COHEN & GRIGSBY P.C.
Mercato - Suite 6200
9110 Strada Place
Naples, Florida 34108
Phone: (239) 390-1913
*kelley.price@dentons.com*
*eric.olson@dentons.com*

Kiran Patel (*pro hac vice* pending)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Phone: (212) 768-6700
*kiran.patel@dentons.com*

*Attorneys for Defendant Netflix, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 18, 2020, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record on the service list

/s/ Natalie J. Spears