# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: |
| | ) | |
| v. | ) | |
| | ) | |
| NETFLIX, INC., AVA DUVERNAY, | ) | |
| and ATTICA LOCKE, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

As and for her complaint against Defendants Netflix, Inc., Ava DuVernay and Attica Locke, Plaintiff Linda Fairstein ("Ms. Fairstein"), by and through her undersigned counsel, Cheffy Passidomo, P.A. and Nesenoff & Miltenberg, LLP alleges as follows:

## NATURE OF THE ACTION

1.      This defamation action arises from Defendant Netflix, Inc.'s ("Netflix") release of the limited film series *When They See Us* to its worldwide streaming service on May 31, 2019. A significant portion of the film series (three of four episodes) contains scenes that portray Ms. Fairstein in a false and defamatory manner.

2.      Defendant Ava DuVernay ("Ms. DuVernay") wrote, directed and produced *When They See Us* in collaboration with Netflix's Vice President of Original Content, Cindy Holland.

3.      Defendant Attica Locke ("Ms. Locke") co-wrote and produced *When They See Us* in collaboration with Ms. DuVernay and Netflix.

4.      *When They See Us* addresses the arrests, trials and convictions of five young men of color—Kharey (aka Korey) Wise ("Mr. Wise"), Raymond Santana ("Mr. Santana"), Kevin

Richardson ("Mr. Richardson"), Yusef Salaam ("Mr. Salaam") and Antron McCray ("Mr. McCray") (collectively "The Five")—who were accused of beating and raping a female jogger, in addition to rioting and attacking seven other victims, in New York City's Central Park in April 1989.

5.      The convictions were later vacated based on the confession of, and DNA evidence from, an individual who came forward in 2002. The men sued New York City, New York District Attorney Robert Morgenthau, three prosecutors, including Ms. Fairstein, and scores of NYPD officers and detectives. Ms. Fairstein was the head of the Manhattan District Attorney's Sex Crimes Unit in April 1989, but did not personally prosecute the case.

6.      The case settled in 2014, and New York City's Corporation Counsel, Zach Carter, stated at the time, "the assistant district attorneys involved in the case acted reasonably, given the circumstances with which they were confronted on April 19, 1989 and thereafter."[1] Manhattan District Attorney, Cyrus Vance, Jr. said at the time "[a]fter more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."[2]

7.      As part of the settlement, millions of pages of documents concerning the arrest, prosecution and conviction of The Five, and their subsequent lawsuit, were made publicly available on the New York City Law Department's website.[3] A great many of these documents, including sworn testimony from the criminal and civil matters, contradict scenes depicted in *When They See Us*, demonstrating the falsity of the manner in which Ms. Fairstein is portrayed.

---

[1]  https://www1.nyc.gov/office-of-the-mayor/news/431-14/statements-mayor-de-blasio-corporation-counsel-zachary-w-carter-central-park-five
[2] https://www.nytimes.com/2014/09/06/nyregion/41-million-settlement-for-5-convicted-in-jogger-case-is-approved.html
[3] http://www.nyc-cpj.org/Home/Disclaimer. *See also* https://www1.nyc.gov/site/law/index.page, at "In re McCray (Central Park Jogger Case)."

8.     Prior to the release of the film series, Ms. Fairstein notified Netflix and Ms. DuVernay that they should consult specific documents in the public record when creating the film series in order to avoid portraying Ms. Fairstein in a false and defamatory manner. Netflix did not respond to the notice. Ms. DuVernay dismissed the notice, asserting that, among other things, Ms. Fairstein had no right to preemptively object to her portrayal in the film series.

9.     *When They See Us* portrays Ms. Fairstein in a false and defamatory manner in nearly every scene in the three episodes in which she appears, portrayed by actress Felicity Huffman. The film series' portrayal of Ms. Fairstein cannot be justified as the mere use of artistic license or dramatization. In the film series, which Defendants have marketed and promoted as a true story, Defendants depict Ms. Fairstein—using her true name—as a racist, unethical villain who is determined to jail innocent children of color at any cost.

10.     As falsely portrayed in the film series, and fully detailed below, Ms. Fairstein singlehandedly masterminds a theory of the case against the children by, among other things: unlawfully interrogating unaccompanied minors; calling for a roundup of "young, black" "thugs;" manipulating a timeline of events to pin the rape of the Central Park jogger on The Five; referring to people of color as "animals;" directing NYPD detectives to coerce confessions from unaccompanied minors who are beaten while in custody; suppressing DNA evidence; and forcing her colleague to prosecute a meritless case against The Five. In fact, Ms. Fairstein took none of these actions.

11.     As fully detailed below, Defendants acted with actual malice when publishing *When They See Us* because they knew that the portrayal of Ms. Fairstein in the film series, and statements and conduct attributed to her, were false. Alternatively, Defendants entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed. At

the very least, Defendants exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

12.    The portrayal of Ms. Fairstein in the film series was deliberately calculated to create one, clear and unmistakable villain to be targeted for hatred and vilification for what happened to The Five. The means of doing so was to cast Ms. Fairstein as morally and legally culpable by assigning her a role in the New York Police Department ("NYPD") investigation that she did not play, including depicting her at places where she never was, making decisions she never made, supervising police officers and detectives over whom she had no control, and putting words in her mouth—that were outrageously offensive—that she never uttered.

13.    As a direct result of the false and defamatory portrayal of Ms. Fairstein in *When They See Us*, there was an immediate public outcry against Ms. Fairstein. Defendants led the public to believe that the film series is a true and accurate account of what occurred. Indeed, the trailer for the film series, launched before the premiere and promoted by Defendants on social media, contains banners which state "The Story You Know" and "Is the Lie They Told You." Felicity Huffman, as Ms. Fairstein, is featured in the trailer stating "every black male in the park last night is a suspect. I need all of them."[4] Post-premiere marketing and promotion by Defendants further reinforced the "truth" of the account presented in the film series.

14.    Ms. DuVernay, Ms. Locke and Netflix have made numerous public statements about *When They See Us*, representing that it is a true story, based on evidence and research. Ms. DuVernay and Ms. Locke have further represented that the film series was intended to serve as a means to hold Ms. Fairstein accountable for her "misdeeds" and for being unrepentant.

15.    Both Ms. DuVernay and Ms. Locke have publicly expressed anger and hostility towards Ms. Fairstein. For example, Ms. DuVernay told Oprah Winfrey that one "goal" of *When*

---

[4] https://www.youtube.com/watch?time_continue=58&v=f9hRxkHv3Vk

*They See Us* was to hold Ms. Fairstein "accountable" and "punish" her "for what she did." Ms. Locke publicly called Ms. Fairstein an "unrepentant liar" who deserved all the "rage and hate and consequences that are coming her way." Ms. Locke also started, and orchestrated, a vicious smear campaign on social media which caused significant harm to Ms. Fairstein.

16.     Ms. DuVernay made false, public statements in which she asserted that Ms. Fairstein attempted to exercise control over the content of *When They See Us* and prevent Ms. DuVernay from speaking to The Five as part of the film-making process.

17.     As a result of Defendants' publication of *When They See Us*, which continues to stream on Netflix, and their misrepresentations that the film series is a true story, Ms. Fairstein has received death threats and threats to her personal safety. Prior to the premiere of the film series, Ms. Fairstein had an extremely successful career as a prolific, internationally best-selling crime book novelist and author of twenty-four published books. Immediately after *When They See Us* premiered, Ms. Fairstein's contracts were terminated by her American publisher and by her publisher in the United Kingdom, and her representation by ICM, her literary and film agency of twenty-five years, was also terminated abruptly.

18.      Since June 1, 2019, all of Ms. Fairstein's speaking appearances have been cancelled, and she has lost a significant number of legal consulting jobs.

19.     Ms. Fairstein's storied reputation as a career prosecutor who pioneered the fight to gain access in courts for victims of sexual assault, domestic violence, and child abuse has also been sullied if not destroyed. As a consequence, Ms. Fairstein has been forced to resign from the boards of directors of a number of non-profit organizations, three of which—Safe Horizon, God's Love We Deliver and the Joyful Heart Foundation—she supported for decades.

20. Prior to filing this lawsuit, on March 2, 2020, Ms. Fairstein served presuit notices to Defendants, copies of which are annexed hereto as Exhibits 1-3. *See* F.S.A. §770.01.

21. Ms. Fairstein now files this defamation action seeking actual damages, punitive damages and injunctive relief against Defendants.

## THE PARTIES

22. Ms. Fairstein is a natural person, a citizen of Florida and a resident of this District.

23. Netflix, Inc. is a citizen of Delaware, because it is a Delaware corporation. Netflix is also a citizen of California, because its headquarters, and principal place of business, is located at 100 Winchester Circle, Los Gatos, California 90523. Netflix, Inc. is registered to do business in Florida. Netflix intentionally markets and advertises its services to Florida customers. Netflix has had offices in Florida, including in Clearwater, Florida, while filming the Netflix original series *Bloodline* which filmed for three seasons that aired in 2015-2018. In 2018, Netflix filmed a documentary, *The Legend of Cocaine Island*, in Archer, Florida. The film premiered on Netflix in March 2019.[5] Netflix recently premiered a Florida-based episode of its original series, *Big Mouth* in Miami.[6] Netflix provides a subscriber-based online video streaming service to approximately 150 million subscribers worldwide, including in the Florida.[7] As part of its services, Netflix creates, develops and produces original content in collaboration with outside writers, directors and production companies.

---

[5] https://www.staugustine.com/news/20190401/florida-mans-cocaine-odyssey-retold-in-netflix-documentary
[6] https://www.miaminewtimes.com/arts/things-to-do-in-miami-big-mouth-premiere-at-o-cinema-south-beach-october-3-2019-11278081
[7] https://www.tampabay.com/business/netflix-subscriber-drop-hints-at-streaming-service-fatigue-20190718/; https://help.netflix.com/en/node/14164

24.     Ms. DuVernay is a natural person and a citizen of California. She is a writer, director, producer and film distributor.[8] Ms. DuVernay co-wrote, directed and produced *When They See Us* in collaboration with Netflix.

25.     Ms. Locke is a natural person and citizen of California. Ms. Locke is a novelist as well as a screenwriter. She co-wrote and produced *When They See Us* in collaboration with Ms. DuVernay and Netflix.[9]

## JURISDICTION AND VENUE

26.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as the parties are citizens of different states and the matter in controversy exceeds $75,000.

27.     The Court has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(1), Florida Statutes, because the causes of action arise from Netflix "operating, conducting, engaging in, or carrying on a business venture in this state." Netflix continuously and systematically does business in Florida by streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website, engaging in film production activities in Florida and premiering its original content in Florida. This Court also has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(2), Florida Statutes, because the causes of action arise from Netflix "committing a tortious act within this state" by releasing *When They See Us* for viewing on its website, which contains false and defamatory statements about Ms. Fairstein, and was, and continues to be, accessed by Netflix's Florida subscribers. This Court also has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(6), Florida Statutes, because the causes of action arise from Netflix "causing injury to persons…within this state arising out of an act or omission by [Netflix] outside this state" and "at or about the time of the

---

[8] http://www.avaduvernay.com/about
[9] http://www.atticalocke.com/about/

injury" Netflix was "engaged in solicitation or service activities within the state," and "products…processed, serviced, or manufactured anywhere" by Netflix  "were used or consumed within this state in the ordinary course of commerce, trade, or use." Further, this Court has personal jurisdiction over Netflix because the causes of action arise from Netflix conspiring with Ms. DuVernay and Ms. Locke to defame Ms. Fairstein through the publication of *When They See Us* in Florida, as alleged in Count VII. In addition, Netflix is engaged in substantial and not isolated activity within this Florida, and therefore, Netflix is subject to the jurisdiction of the court of this state pursuant to Section 48.193(2), Florida Statutes.

28.     The Court has personal jurisdiction over Ms. DuVernay because the causes of action alleged against her arise from her commission of a tortious act within Florida by participating in, facilitating and causing the publication of defamatory content on Netflix's website, namely *When They See Us*, for which she served as co-writer, director and producer, and which contains false and defamatory statements about Ms. Fairstein and was, and continues to be, accessed in Florida by Netflix subscribers. *See* Section 48.193 (1)(a)(2), Florida Statutes. Ms. DuVernay also committed a tortious act in Florida by publishing false and defamatory posts about Ms. Fairstein on Twitter, which were published and accessed by Ms. DuVernay's followers, in Florida. *See* Section 48.193 (1)(a)(2), Florida Statutes. Further the causes of action arise from Ms. DuVernay conspiring with Netflix and Ms. Locke to portray Ms. Fairstein in a false and defamatory manner in *When They See Us*., as alleged in Count VII. *See Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335 (Fla. 2d DCA 1994).

29.     The Court has personal jurisdiction over Ms. Locke because the causes of action alleged against her arise from her commission of a tortious act within Florida by participating in,

facilitating and causing the publication of defamatory content on Netflix's website, namely *When They See Us*, for which she served as co-writer and producer, and which contains false and defamatory statements about Ms. Fairstein and was, and continues to be, accessed in Florida by Netflix subscribers. *See* Section 48.193 (1)(a)(2), Florida Statutes. Ms. Locke also committed a tortious act in Florida by publishing false and defamatory posts about Ms. Fairstein on social media, including on Twitter, which were published and accessed by Ms. Locke's followers, in Florida. *See* Section 48.193 (1)(a)(2), Florida Statutes. Further, the causes of action arise from Ms. Locke conspiring with Netflix and Ms. DuVernay to portray Ms. Fairstein in a false and defamatory manner in *When They See Us*, as alleged in Count VII. *See Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335 (Fla. 2d DCA 1994).

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the instant claim occurred in the Middle District of Florida where Plaintiff resides and where a substantial number of readers and potential readers of Ms. Fairstein's novels are located who have viewed *When They See Us*, or seen attendant press coverage or social media posts about the same. Venue pursuant to 28 U.S.C. § 1391(b)(2) is also proper because this Court has personal jurisdiction over Defendants.

31.     All conditions precedent to this action have been performed, waived or otherwise satisfied. Specifically, Plaintiff provided Defendants with presuit notices pursuant to Section 770.01, Florida Statutes.[10]

## FACTS RELEVANT TO ALL CLAIMS

## I.     Ms. Fairstein's Background

---

[10] It is debatable whether Defendants were entitled to receive presuit notice. *See Mazur v. Baraya*, 275 So. 3d 812, 818-819 (Fla. 2d DCA 2019). However, in an abundance of caution, Ms. Fairstein elected to comply with Section 770.01, Florida Statutes.

32.     Ms. Fairstein is an attorney, former prosecutor and author. For three decades, from 1972 until 2002, Ms. Fairstein served in the office of the New York County District Attorney, where she was chief of the County's Sex Crimes Prosecution Unit for twenty-six years.

33.     Ms. Fairstein regularly consulted on legal matters involving sexual assault allegations. She also engaged in private case work, much of which involved the exoneration of falsely accused men, which was a hallmark of her prosecutorial career, too.

34.     Ms. Fairstein has received dozens of awards for her legal work and advocacy for survivors of sexual assault, as well as in the fields of domestic violence and child abuse. For many years she served on the boards of a number of non-profit organizations which advocate for victims of sexual assault and domestic violence.

35.     Ms. Fairstein has authored and published twenty-four books. The first one, *SEXUAL VIOLENCE: Our War Against Rape*, is a non-fiction work published in 1993, which was a New York Times "Notable Book of the Year."  There are twenty books in her bestselling series of crime novels, the most recent (*Blood Oath*) being published in March 2019. In 2016, Ms. Fairstein debuted a fiction series for middle grade readers, consisting of three books.

## II.     Background: The 1989 "Central Park Jogger" Case

36.     *When They See Us* concerns the events surrounding a number of assaults that occurred in New York City's Central Park on the night of April 19, 1989, and the evolution of the criminal cases arising from those events.

37.     On that night, jogger Trisha Meili ("Ms. Meili") was brutally beaten, raped, and left for dead. The press referred to these incidents as "The Central Park Jogger" case.

38.     Five young men of color, Messrs. Wise, Santana, Salaam, Richardson and McCray were arrested, charged, tried and convicted with respect to, among other things, the attack on Ms. Meili.

39.     As detailed below, Ms. Fairstein, who was the head of the Manhattan District Attorney's Sex Crimes Unit in April 1989, took part in the decision, along with District Attorney Robert Morgenthau ("DA Morgenthau") and Chief of the Trial Division John Fried, to assign Assistant District Attorney Elizabeth Lederer ("ADA Lederer" or "Ms. Lederer") to the case. Ms. Fairstein met ADA Lederer at the 20th Precinct on the night of April 20, 1989. They later went to the 24th Precinct. Ms. Fairstein served as liaison to DA Morgenthau and provided technical assistance to ADA Lederer. Ms. Fairstein later served as a witness in the suppression hearings and trials of Messrs. Wise, Santana, Salaam, Richardson and McCray, testifying about limited issues concerning her observations about events that occurred on the night of April 20 and on April 21, 1989.

40.     ADA Lederer was responsible for the prosecution of the case and was assisted by Assistant District Attorney Arthur Tim Clements ("ADA Clements"). ADA Lederer and ADA Clements tried the cases against The Five. Fairstein was neither the lead prosecutor nor did she play any role in the courtroom litigation, other than as a witness.

41.     In 2002, the convictions were vacated, on the basis of newly discovered evidence, after an individual named Matias Reyes came forward and confessed to the attack on Ms. Meili. Testing found that Mr. Reyes' DNA matched the DNA taken from Ms. Meili and her personal belongings.

42.     Shortly thereafter, The Five sued New York City and a number of individuals involved in the case. Ms. Fairstein was a named defendant. During the progress of the litigation,

a number of books and films about The Central Park Jogger case were published, some of which falsely portrayed Ms. Fairstein as prosecuting The Five. At the time, Ms. Fairstein, at the direction of a federal district court judge, was unable to comment on the case or respond to any such false portrayals.

43.     In 2014, The Five's lawsuit against New York City settled for $41 million. When announcing the settlement, New York City's Corporation Counsel publicly stated "our review of the record suggests that both the investigating detectives and the assistant district attorneys involved in the case acted reasonably, given the circumstances with which they were confronted."[11] As part of the settlement, the records from the original case, the documents from the two reinvestigations (one by the DA's Office and one by the NYPD), and the dozens of sworn depositions taken in the New York City lawsuit were made public via a website hosted by the New York City Law Department.[12] Manhattan District Attorney, Cyrus Vance, Jr. said at the time "[a]fter more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."[13]

## III.     *When They See Us*: The False and Defamatory Portrayal of Ms. Fairstein

44.     *When They See Us* is a limited film series comprised of four (4) episodes. Three (3) of the four (4) episodes contain scenes in which Ms. Fairstein is portrayed by actress Felicity Huffman. Nearly every portrayal is false and defamatory.

45.     Throughout the film series, Ms. Fairstein is portrayed as making statements that she never said, taking actions that she did not take—many of them racist and unethical, if not

---

[11] https://www.nytimes.com/2014/09/06/nyregion/41-million-settlement-for-5-convicted-in-jogger-case-is-approved.html
[12] http://www.nyc-cpj.org/Home/Disclaimer
[13] https://www.nytimes.com/2014/09/06/nyregion/41-million-settlement-for-5-convicted-in-jogger-case-is-approved.html

unlawful—in places that she never was on the days and times depicted. On a number of occasions, Ms. Fairstein is portrayed using inflammatory language, referring to young men of color as "thugs," "animals" and "bastards," that she never used.

46.     The film's portrayal of Ms. Fairstein extends far beyond artistic license or dramatization. Using Ms. Fairstein's real name, Defendants depict Mr. Fairstein as the singular mastermind behind a racist plot to obtain convictions of The Five at any cost. As detailed fully below, *When They See Us* contains numerous false and defamatory depictions of Ms. Fairstein, including:

a)  at the Meili crime scene on the morning of April 20, 1989, stating that there was only one individual involved in the attack, setting up the viewer to question Ms. Fairstein's credibility as she is later falsely portrayed as building a case against The Five despite a lack of evidence;

b)  using the term "wilding" while unlawfully questioning unaccompanied minors without reading them their *Miranda* rights;

c)  creating and manipulating a timeline of the events that took place in Central Park on the night of April 19, 1989 in order to pin the Meili rape on The Five, even though significant discrepancies existed in the known timing of the various assaults;

d)  wresting the case from Assistant District Attorney Nancy Ryan ("ADA Ryan") in order to make an example of The Five, over Ryan's protestations that The Five did nothing more than harass a few cyclists. ADA Ryan is later portrayed as uncovering what she deemed Ms. Fairstein's original theory of the case—that there was a single rapist—and obtaining vacatur of The Five's convictions;

e)  calling for a police roundup of every "young, black male" who was in Central Park on the night of April 19, 1989, using "an army of blue" to "stop every little thug" they see;

f)  directing NYPD police officers and detectives to bend the rules, or alter procedures, with respect to the interrogation of minors in criminal cases, telling them "no kid gloves" should be used;

g)  devising a theory of the case that did not fit the known facts, and which ADA Lederer questioned, resulting in Ms. Fairstein pressuring an NYPD detective to ensure that the questioning of Mr. Wise pieced the theory together. Subsequent scenes show detectives coercing testimony from, or physically beating, The Five;

h) concealing exculpatory DNA evidence from defense counsel; and

i) forcing ADA Lederer to prosecute a case against The Five for which there was insufficient evidence.

As fully addressed below, these scenes—which portray Ms. Fairstein undertaking unlawful and unethical acts grounded in racist motivations—are complete fabrications and readily contradicted by evidence in the public record.

47.     Defendants, acting with actual malice, designed *When They See Us* to incite anger, hatred and ridicule against Ms. Fairstein in particular. They have succeeded in their intended result as, among other things, Ms. Fairstein's professional and personal reputations have been irreparably damaged by the false and defamatory manner in which she is portrayed in the film series. She has received threats of death and bodily harm. News outlets have reported on the film as if it is a documentary, even weaving scenes from the film into broadcasts purporting to report the news.[14]

48.     Defendants have made no efforts to correct the public's misperception that *When They See Us* is a documentary in which Ms. Fairstein was accurately and truthfully portrayed. On the contrary, Defendants have asserted on numerous occasions that the film *is* an accurate and truthful depiction of events, particularly with respect to the scenes in which Ms. Fairstein appears, and maintained falsely that Ms. Fairstein's language and actions are taken from trial transcripts and sworn testimony.

**A.  <u>Part One</u>**

49.     Part One, or the first episode of *When They See Us*, is the episode in which Ms. Fairstein is most prominently featured. This episode contains a number of scenes which portray Ms. Fairstein in a false and defamatory manner, each scene building on the next to depict Ms.

---

[14] *See, e.g.*, https://www.youtube.com/watch?v=5PDz5m5bkbo.

Fairstein as desperate to pin the brutal rape and beating of Ms. Meili on innocent children of color; manipulating evidence and the media to build a case against The Five; and knowingly and willingly breaking the law to build the prosecution's case.

50.     Publicly available evidence from the original trial, as well as the lawsuit filed by The Five against New York City, demonstrates that Ms. Fairstein was falsely portrayed in Part One, as described below.

### 1.     **The Crime Scene: Morning of April 20, 1989**

51.     The beginning of the film depicts Mr. Richardson being beaten by an NYPD officer in Central Park. *See* Part One, at 7:20-7:30.[15] The title of the film series appears on screen and, within 10 seconds of the image of Mr. Richardson being beaten, Ms. Fairstein appears.

52.     Ms. Fairstein is falsely depicted in this first scene at the Meili crime scene in Central Park on the morning of April 20, 1989. Ms. Fairstein looks around and says "What the fuck was she doing here?" and "Make sure to get those drag marks…. Clear as day. *His footsteps*, her body." Part One, 7:30-8:50 (emphasis added).

53.     The scene falsely depicts Ms. Fairstein as heading up the NYPD's Crime Scene Unit's ("CSU") work in collecting evidence—evidence which will later be used against The Five. Ms. Fairstein was never in Central Park on that day. Ms. Fairstein had no oversight over the CSU, nor did she have any contact or communication with any CSU detectives on April 20, 1989.

54.     This scene also falsely depicts Ms. Fairstein as concluding that there was only *one* individual involved in the rape. This sets up the viewer to question Ms. Fairstein's credibility as she is falsely portrayed throughout Part One as responsible for the pursuit of rape charges against The Five.

---

[15] This form of citation is to the time stamp of each scene referenced in a given episode of the film series.

55.     As shown in publicly available trial transcripts (two trials, in fact) from the New York City Law Department's website,[16] Ms. Fairstein was *not at* the crime scene on April 20, 1989.[17] Nor was Michael Sheehan ("Detective Sheehan"), an NYPD detective who appears in the film scene with Ms. Fairstein, at the crime scene on the morning of April 20, 1989.[18] In fact, on April 20, 1989, Fairstein was never in Central Park.

56.     The crime scene was processed only and entirely by the NYPD, more specifically Detective Robert Honeyman, as directed by Night Watch homicide detectives, leading into the morning hours of April 20, 1989.[19] Ms. Fairstein was not in charge of the police investigation in Central Park nor in the various stationhouses. She never directed any police activity in this case.[20]

## 2.   24th Precinct: Morning of April 20, 1989

57.     The next false depiction of Ms. Fairstein is getting out of a police car in front of the 24th Precinct and entering the Precinct on the morning of April 20, 1989. Part One, at 8:50. Ms. Fairstein was not *at any* police precinct until approximately 8:30 p.m. on the night of April 20th when she met ADA Lederer, the prosecutor assigned to the case, at the 20th Precinct to assist her as needed.[21]

---

[16] As part of the settlement between New York City and Messrs. Salaam, Wise, Richardson, Santana and McCray, the New York City Law Department created a public website on which it posted hundreds of thousands of pages of documents from the original trial, as well as the civil litigation brought by The Five against the City. The site went live in July 2018. http://www.nyc-cpj.org/Home. *See also* https://www1.nyc.gov/site/law/index.page, at "In re McCray (Central Park Jogger Case)."

[17] *See* 11/13/89 Suppression Hearing Testimony of ADA L. Fairstein, at NYCLD_015187, NYCLD_015197-NYCLD_015198 (stating that, on April 21, 1989, it was the first time she had been to the area); M. Sheehan 5/9/13 Dep. Tr., at NYCLD_044145-NYCLD_044147; W. Roe 11/22/11 Dep. Tr., at NYCLD_060899-NYCLD_060902.

[18] 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_018954-018956 (testifying that he reported to Central Park Precinct during the afternoon hours of April 20th when his shift started).

[19] 11/2/90 Testimony of Det. R. Honeyman, Richardson/Wise Trial, at NYCLD_019626-NYCLD_19650; 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023705-NYCLD_023707.

[20] 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023569-NYCLD_023572, NYCLD_023597-NYCLD_023607, NYCLD_023612-NYCLD_023614, NYCLD_023669; 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015465-NYCLD_015468.

[21] 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015465- NYCLD_015468.

58.     The NYPD's interviews of young men picked up by NYPD officers in Central Park on the night of April 19th began at the Central Park Precinct.[22] At some point during the early evening hours of April 20, 1989, the case was moved to the 20th Precinct. At around midnight, or in the early morning of April 21, 1989, the interviews were moved to the 24th Precinct.[23]

### 3.     **Creating A Press Narrative: April 20, 2019**

59.     The next false depiction of Ms. Fairstein has her drafting a press release to give to reporters waiting outside the 24th Precinct. This occurs, again, on the morning of April 20, 1989. In Part One, immediately after Ms. Fairstein arrives at the 24th Precinct, she begins drafting the press release about the case, incorporating details that she learned from the crime scene. Ms. Fairstein is then depicted as stating, "Got to get this statement out, a few reporters out there." Part One, 8:50-9:19.

60.     Ms. Fairstein was not only absent from *any police precinct* on the morning of April 20th, she did not have details about the jogger from the crime scene because she had not yet visited the crime scene. She only learned of the attacks on Ms. Meili when she received a call at her home from a police lieutenant on the morning of April 20, 1989.[24]

61.     Ms. Fairstein did not draft any press release about any aspect of the case. This scene is a false portrayal of Ms. Fairstein creating a narrative for the press about the Central Park jogger case for which she was not responsible. This is significant because the press has been widely criticized as fueling racial tensions in New York City, and against The Five, during the days following the attack on Ms. Meili. In the scene, Ms. Fairstein is falsely portrayed as the

---

[22] *See generally* 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial.
[23] 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_018976-NYCLD_018985; 10/27/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_019008-NYCLD_019017.
[24] L. Fairstein 4/23/13 Dep. Tr., at NYCLD_039089-NYCLD_039094; Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015464-NYCLD_015467.

source of that inflammatory information. In fact, DA Morgenthau had a strict policy about his lawyers not talking to the press about ongoing investigations. All press releases were drafted by the NYPD Public Relations Office or, after arrest, by the DA's Public Relations Office.

### 4. Interrogating Unaccompanied Minors About "Wilding"

62.     After working on the press release, as described *supra*, Ms. Fairstein next asks out loud what "wiling out" or "wilding" is when reading from a folder. Part One, 9:46-9:55.

63.     Immediately after asking about the meaning of "wiling" or "wilding," Ms. Fairstein is seen walking past a 24th Precinct banner in a building lobby, past Mr. Santana's grandmother and father, asking for Detective Farrell. This scene is set at 8:00 a.m. on April 20, 1989. New York City Police Officer Eric Reynolds ("Officer Reynolds") is also in this scene, speaking with Mr. Santana's father. Part One, 9:55-11:01.

64.     Publicly available transcripts demonstrate that Mr. Santana was at the Central Park Precinct—not the 24th—in the morning hours of April 20th, along with his grandmother and father.[25] Again, Ms. Fairstein was never at any police precinct on the morning of April 20th, including the Central Park Precinct.[26] This was confirmed by Officer Reynolds, who testified at trial that Ms. Fairstein was not at the Central Park Precinct during the morning hours of April 20th.[27] The testimony of an NYPD Detective who interviewed Mr. Santana at the Central Park Precinct in the afternoon and evening hours of April 20th confirmed that Ms. Fairstein was not at

---

[25] 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023530-NYCLD_23541, NYCLD_23593-23596, NYCLD_023625-NYCLD_023648.
[26] 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015433, NYCLD_015464-015467; 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023612-NYCLD_023614; L. Fairstein 4/23/13 Dep. Tr., at NYCLD_039089-NYCLD_039094.
[27] 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023612-NYCLD_023614.

the Central Park Precinct during that timeframe.[28] The first time he saw Ms. Fairstein was when she arrived with ADA Lederer at the 20th Precinct during the evening hours of April 20, 1989.[29]

65.     Ms. Fairstein appears in the next scene in a room full of young men of color, who were allegedly involved in the attacks in Central Park. They are not with their parents. Part One, 11:00-12:38. When Ms. Fairstein enters the room, she spots Mr. Richardson, with a black eye, and harshly asks, "What happened to that one?" *Id.*

66.     In the scene, Ms. Fairstein raises the issue of "wilding" again with a detective, believed to be Detective Farrell. She is told by the detective that the young men are ages 13 or 14. Detective Sheehan is also in the room. *Id.* Ms. Fairstein then begins questioning the young men without reading them their *Miranda* rights, in violation of New York State law, which prohibited the questioning of minors under age 16 without a parent present. *Id.*[30] Ms. Fairstein asks a young man if he saw bad people doing bad things in the park. The young man responds that he was with his "boy Tron." Ms. Fairstein then asks if the young man was "out wilding with Tron," (Antron McCray), and asks for Mr. McCray's address. *Id.* The young man responds that Tron lives at Schomberg. *Id.*

67.     Ms. Fairstein never spoke with Detective Farrell in regard to the case.[31] Ms. Fairstein never questioned any of the young men in custody—including any of the Five—on April 20th, at any police precinct.

68.     Ms. Fairstein was, further, unfamiliar with the terms "wiling out" or "wilding," or any given meaning to those terms, at the time of the attacks in Central Park.

---

[28]   11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, at NYCLD_017516-NYCLD_017517, NYCLD_017529-NYCLD_017531.
[29]  7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial, at NYCLD_017753-NYCLD_017756.
[30]  New York Family Court Act § 305.2.
[31]  J. Farrell 2/22/13 Dep. Tr., at NYCLD_058208-NYCLD_058212.

69.     Publicly available documents show that the portrayal of Ms. Fairstein unlawfully questioning unaccompanied minors to get information about Mr. McCray is false and never happened. On the night of April 19, 1989, when Clarence Thomas ("Mr. Thomas") and Mr. Richardson were picked up at Central Park and placed in a police van to be taken to the Central Park Precinct for questioning, both Mr. Thomas and Mr. Richardson told NYPD Officer Robert Powers ("Officer Powers") that they know who did the "murder" in the Park.[32] Both named Mr. McCray and told the police officer where Mr. McCray lived.[33] This occurred before any prosecutors were even notified about the crimes in the Park, and hours before Ms. Meili's body was found.[34]

70.     According to his testimony, Officer Powers arrived at the Central Park Precinct with Mr. Thomas and Mr. Richardson shortly before 11:30 p.m. on the night of April 19, 1989. He then made phone calls on behalf of Mr. Richardson and Mr. Thomas.[35] As a result, Mr. Thomas' mother came down to the Central Park Precinct. She brought Mr. McCray and his mother with her.[36] Mr. McCray was not arrested at that time. Nor was he interviewed.[37]

71.     In a subsequent interview at the Central Park Precinct, Mr. Thomas identified Mr. McCray as present during the assault of a homeless person and a male jogger in Central Park on the night of April 19, 1989. This interview was conducted in the presence of Mr. Thomas' mother, after he was read his rights, and occurred in the early morning hours of April 20, 1989, before any prosecutors had been notified of the crimes in Central Park. The interview took place in the juvenile room at the Central Park Precinct. Officer Reynolds was present and the interview

---

[32] 10/16/89 Suppression Hearing Testimony of PO R. Powers, at NYCLD_024495-NYCLD_024496.
[33] Id.
[34] 10/16/19 Suppression Hearing Testimony of PO R. Powers, at NYCLD_024466-NYCLD_024499, NYCLD_024546-024547; 10/13/89 Suppression Hearing Testimony of PO E. Reynolds NYCLD_023067-023101. NYCLD_023219; L. Fairstein 4/23/13 Dep. Tr., at NYCLD_039089-NYCLD_039094.
[35] 10/16/19 Suppression Hearing Testimony of PO R. Powers, at NYCLD_024498-NYCLD_024506.
[36] Id. at NYCLD_024507-NYCLD_024512.
[37] Id. See also A. McCray 4/2/13 Dep. Tr., at NYCLD_046476-NYCLD_046507.

was conducted by NYPD Detective Farrell. The *only other* person present was NYPD Detective Glen Whelpley ("Detective Whelpley").[38]

72.     At around 11:30 a.m. on the morning of April 20th, Reynolds, Farrell and other NYPD detectives re-interviewed Mr. Thomas at his home in the presence of his mother. Immediately thereafter, they went to Mr. McCray's home. Officer Reynolds and NYPD detectives spoke to Mr. McCray's mother and father, both of whom accompanied him to the Central Park Precinct for questioning. Mr. McCray was asked to wear his clothing from the night of April 19, 1989 and complied, with his parents' consent. The clothes were caked in mud.[39]

73.     As the public record shows, Ms. Fairstein did not interview any minors about the involvement, or location of, Mr. McCray, and was not even at the Central Park Precinct when Mr. Thomas' interview was conducted, and Mr. McCray appeared at, the Central Park Precinct.

74.     Portraying Ms. Fairstein as using the term "wilding" when questioning unaccompanied minors in violation of the law, adds to the defamatory nature of the scene, as the term "wilding" was first used by a number of the approximately thirty (30) young men questioned about the riot and attacks in Central Park, *not by* Ms. Fairstein. The term "wilding," was then adopted by the press when reporting on the Central Park jogger case[40] and has widely been questioned and analyzed. In the present day, the term is viewed as a word which stoked the public's fear of young black men, and caused the public to view them as criminals rather than people, including in the Central Park jogger case.[41]

---

[38] 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023129, NYCLD023136-NYCLD_023139. *See* E. Reynolds 7/20/11 Dep. Ex. 1; Farrell Dep. Ex. 2, at NYCLD_058344, NYCLD_058348-NYCLD_058349; Farrell Dep. Ex. 4, at NYCLD_058353-058354.

[39] 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023141-023145. *See also* E. Reynolds 7/20/11 Dep. Ex. 11, at NYCLD_057950-NYCLD_057951. *See* Farrell Dep. Ex. 4, at NYCLD_058353-NYCLD_058354. *See* A. McCray 4/2/13 Dep. Tr., at NYCLD_046476-NYCLD_046507.

[40] Pitt, D., *Jogger's Attackers Terrorized At Least 9 In 2 Hours*, N.Y. Times, Apr. 22, 1989.

[41] *See* https://www.oxygen.com/martinis-murder/what-is-wilding-central-park-5 (dated on the same day that *When They See Us* premiered); https://www.theatlantic.com/entertainment/archive/2019/06/when-they-see-us-shows-

75. The distinction between the use of the term "wiling" or "wilding"—and the portrayal of Ms. Fairstein using the term "wilding" rather than "wiling"—is significant. As stated by Ms. DuVernay in an interview with National Public Radio:[42]

> wiling out is - does not mean, you know, gang-raping women. Wiling out is hanging out, you know, kind of like being free for the night and, like, just, you know, acting, you know, carefree. And I always have trouble when I try to translate urban slang into (laughter) something else, but it is - it's not a wolf pack of animal-like thugs going into the park to, you know, torture and demean and assault and rape people. That's not what wiling out means. So part of what we do in our piece is try to kind of trace and track how wiling out becomes wilding becomes wolf pack becomes, you know, animals becomes, you know, a prison sentence for these five boys.

76. By her own account, Ms. DuVernay's use of the term "wilding" was intentional, and meant to signal growing hostility and racism against The Five. Though the public record shows that Ms. Fairstein was not involved in questioning young men, or The Five, in the manner in which she is portrayed in *When They See Us*, Defendants intentionally elected to falsely depict Ms. Fairstein not only engaging in unlawful conduct but using the loaded term "wilding" to support the role in which they cast Ms. Fairstein, as the villain in a racist plot against The Five.

### 5. Putting Together A Timeline

77. During the scene in which Ms. Fairstein is falsely depicted as questioning unaccompanied minors, she says to Detective Farrell, "So you were just going to let possible witnesses to a rape go on a family court ticket? We've got a lady raped and clinging to life here. I want their interviews on my desk immediately so I can put together a timeline." Part One, 12:39-13:03. Here, Ms. Fairstein is portrayed as imbuing urgency into completing the investigation and hastening the interviews of unaccompanied minors.

---

cases-impact-us-policy/590779/; https://www.npr.org/2019/06/19/733722341/ava-duvernay-focuses-on-the-central-park-5s-perspective-now-people-know

[42] https://www.npr.org/2019/06/19/733722341/ava-duvernay-focuses-on-the-central-park-5s-perspective-now-people-know

78.     This is a false depiction in several respects. Ms. Fairstein never had a conversation with Detective Farrell in regard to the case,[43] never directed any part of the NYPD investigation nor discussed which individuals would be held in custody and which would be released with a family court ticket.[44]

79.     Next, Ms. Fairstein is seen sitting at a desk on the same day, April 20th, reviewing paperwork and placing Post-It notes on a map of Central Park. Detective Sheehan enters the room and Ms. Fairstein says, "Farrell's interviews with the boys are in, all of this is happening in the Park and it's not connected?" Part One, 15:58-16:52. This shows viewers that Detective Farrell complied with Ms. Fairstein's directive to rush the interviews so she could put together a timeline to connect the rape to the other assaults that happened in Central Park on the night of April 19, 1989. Ms. Fairstein then places a Post-It note on the map that says "RAPE" and then declares to Detective Sheehan, "they're not witnesses, they're suspects." *Id.*

80.     This is yet another complete fabrication. Apart from the fact that, as set forth *supra*, Ms. Fairstein was *not at any precinct* at the times and places depicted, and did not question unaccompanied minors, including about Mr. McCray, neither Detective Farrell nor Detective Whelpley interacted with Ms. Fairstein during the case, nor did she give any orders or commands to them during the investigation of the crimes that occurred in Central Park on the night of April 19, 1989.[45]

81.     Ms. Fairstein's interaction with Detective Sheehan also did not occur. Nor did she ever speak the words attributed to her to Detective Sheehan. Detective Sheehan was at the

---

[43] J. Farrell 2/22/13 Dep. Tr., at NYCLD_058208-NYCLD_058212.

[44] These decisions were made by members of the NYPD at the Central Park Precinct on April 19-20, 1989—where Ms. Fairstein never was. *See* 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023104-NYCLD_023106, NYCLD_023117-NYCLD_023129, NYCLD_023216-NYCLD_023222, NYCLD023257-NYCLD_023266, NYCLD_023268-NYCLD_23270, NYCLD-023274-NYCLD_023276.

[45] J. Farrell 2/22/13 Dep. Tr., at NYCLD_058208-NYCLD_058212 (Farrell didn't really know Fairstein, couldn't recall working with her and didn't "keep track of her" after 1986); G. Whelpley 10/12/11 Dep. Tr., at NYCLD_058056-58059 (did not personally know Ms. Fairstein, did not know she was working on Meili case).

Central Park Precinct on the afternoon, and into the early evening hours, of April 20, 1989.[46] He

did not see Ms. Fairstein until the early morning hours of April 21, 1989.[47]

82.     Per Ms. Fairstein's publicly available trial testimony, she arrived at the 20th

Precinct at around 8:30 p.m. on April 20th to assist ADA Lederer. At no time did Ms. Fairstein

supervise the police investigation, according to her own testimony and the publicly available

testimony of every police officer, detective, and supervising officer who worked on the

investigation.[48] ADA Lederer—not Ms. Fairstein—was in charge of the Manhattan District

Attorney's investigation.[49]

83.     In a later scene, Ms. Fairstein is seen in front of a large map plotting the female

jogger's path. She notes a 45-minute discrepancy in the timeline and says, "how can the same

kids be raping her at the same time they are jumping bicyclists way over there?" A detective in

the room says, "We got problems." Ms. Fairstein then comes up with a new order for the attacks,

saying that the rape happened so obviously there was enough time. Part One, 34:45-36:24.

84.     This is yet another entirely false and defamatory scene. Ms. Fairstein was never in

front of a map plotting the female jogger's path. On April 20, 1989, there was no one present—

---

[46] 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_018954-018959, NYCLD_018963-018964, NYCLD_018981-NYCLD_018994.

[47] 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_018954-NYCLD_018994; M. Sheehan 5/9/13 Dep. Tr., at NYCLD_044001-NYCLD_044147.

[48] 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015468-NYCLD_015469. *See* 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023612-NYCLD_023614; 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023129, NYCLD023136-NYCLD_023145; 7/20/11 E. Reynolds Dep. Ex. 11; 11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, at NYCLD_017528-NYCLD_17531; 7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial, at NYCLD_017753-NYCLD_017756; 11/13/90 Testimony of Det. J. Hartigan, Richardson/Wise Trial, at NYCLD_018270-NYCLD_018281, NYCLD_018334-18337, NYCLD_018356, NYCLD_018359-NYCLD_018360, NYCLD_018390-NYCLD_018392, NYCLD_018396-018397, NYCLD0018411-NYCLD0018414; 7/25/90 Testimony of Det. M. Sheehan, McCray, Salaam, Santana Trial, at NYCLD_019175-019178, NYCLD_019204-NYCLD_019205; 10/25/89 Suppression Hearing Testimony of Det. M. Sheehan, at NYCLD_018954-018958, NYCLD_018963-NYCLD_018964; 10/25/89 Suppression Hearing Testimony of Det. J. Taglioni, at NYCLD_06915-06933; 10/24/89 Suppression Hearing Testimony of Det. H. Hildebrandt, at NYCLD016983-NYCLD017000; Farrell Dep. Ex. 4, at NYCLD_058353-058354.

[49] A. Clements 4/4/13 Dep. Tr., at NYCLD_035224-NYCLD_035225, NYCLD_035230-NYCLD_035232 (noting that ADA Lederer would not have had a supervisor with her at any police precinct because assistant district attorneys handled matters on their own). *See also* L. Fairstein 4/23/13 Dep. Tr., at NYCLD_39129-NYCLD_39133.

including Ms. Fairstein—who knew the path the female jogger had taken. In fact, Ms. Meili remained in a coma at Metropolitan Hospital for eleven days from the time she was found in the Park, and there was no person who knew where she had been running. Nor did Ms. Fairstein have knowledge of the locations of all the attacks in Central Park, as some of the victims and witnesses did not come forward until days later.[50] Ms. Fairstein did not discuss the timeline or order of the attacks with police during the course of the investigation.

85.     Ms. Fairstein was not responsible for putting together, nor did she put together, a timeline of events during the course of the interviews that took place between April 19, 1989-April 21, 1989 or anytime thereafter. At some point before presenting the case to the Grand Jury in the weeks that followed, and after developing information from many more witnesses, ADA Lederer and ADA Clements—working at the District Attorney's Office and not at an NYPD stationhouse—created their own timeline of events, separate and distinct from the NYPD timeline.[51] NYPD Detective Robert Nugent was also tasked with putting together a timeline for when Ms. Meili was attacked.[52] Ms. Fairstein  did not participate in the creation of any of these timelines.

86.     Ms. Fairstein's role in the case was as a witness. She testified at pre-trial hearings and at trial about a visit to the Central Park crime scene with Messrs. Wise and Richardson, as well as conversations with Mr. Salaam's mother, relatives and a family friend.[53]

### 6.  Fighting with Nancy Ryan Over Who Would Prosecute Case

---

[50] *See* E. Lederer 7/24/13 Dep. Tr., at NYCLD_036699-NYCLD_036723 and Ex. 27.

[51] *Id.*

[52] R. Nugent 11/19/10 Dep. Tr., at NYCLD_044971-044973 (discussing Detective Nugent's investigation of jogger timeline). *See also* Report to Police Commissioner, Ex. F, Timeline Chart, at NYCLD_031921-031923.

[53] A. Clements 4/4/13 Dep. Tr., at NYCLD_035308-NYCLD_035314. *See generally* Suppression Hearing Testimony of ADA L. Fairstein; Trial Testimony of L. Fairstein.

87.     In the next false depiction of Ms. Fairstein, she is having an argument about the case with ADA Ryan at the 24th Precinct, during the day, on April 20, 1989. ADA Ryan *was not* involved in the original investigation in April 1989. ADA Ryan had no conversations or meetings with Ms. Fairstein about the case in April 1989. In 2002, ADA Ryan re-investigated the case against The Five after Matias Reyes confessed to the rape of Ms. Meili, and she supported the motion to vacate the convictions against The Five.

88.     In this scene concerning ADA Ryan, Ms. Fairstein is shown walking through the 24th Precinct with a female police officer, telling her to get ADA Lederer on the phone. The officer tells Ms. Fairstein that ADA Ryan has already been assigned to the case, to which Ms. Fairstein replies, "This is a sex crime not a homicide." Part One, 16:53-17:03.

89.     Nothing about this scene is true. Ms. Fairstein was never at a police precinct at the time depicted. She spent the day of April 20th at her office in Lower Manhattan. Ms. Fairstein spoke with ADA Lederer by phone between their offices at Hogan Place and later met ADA Lederer, at the 20th Precinct, at around 8:30 p.m.[54] ADA Ryan was not assigned to the case in April, 1989.

90.     In another completely falsified and defamatory scene, ADA Ryan appears at the 24th Precinct stationhouse, and she and Ms. Fairstein call DA Morgenthau. During that call, ADA Ryan says that Homicide has been handling the case and she was at the crime scene before daylight, to which Ms. Fairstein replies, "Well I got there before you. I have had precinct guys here interviewing suspects." ADA Ryan incredulously says "Suspects? A dozen kids harassing bicyclists." Ms. Fairstein responds, "These kids were on a rampage." She then goes on to say there were "3,412 rapes reported to the NYPD last year. 3,412 times someone was assaulted,

---

[54] 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015433-15435.

held down, threatened, degraded, forced. This is an epidemic, we are not in control and we can be." Morgenthau tells the two of them to work it out. Part One, 17:03-18:41.

91.     These events never happened. These words between ADA Ryan, Ms. Fairstein and DA Morgenthau were never spoken. Ms. Fairstein was never at the crime scene on the morning of April 20th. In fact, on the morning of April 20th, shortly after Ms. Fairstein was notified about the attacks in Central Park, she called DA Morgenthau at his home to tell him about the riot and the rape of an as yet unidentified female jogger. At that time, Trial Division Chief John Fried assumed his unit would handle the case because it might become a homicide if the female jogger did not survive.

92.     The scene is a complete fabrication. ADA Ryan was not involved in the case in April, 1989. Nor did any argument occur between Ms. Fairstein and ADA Ryan over who would handle the case.[55] ADA Ryan's presence in Part One is significant because she was heavily involved in vacating the convictions years later, and the scene suggests that, had Ms. Fairstein not taken charge of the case (which, in reality, she did not do), The Five would not have been charged with, or convicted of, raping Ms. Meili.

93.     Ms. Fairstein is portrayed as acting without reason, to use innocent young men as an example to gain control over the rape epidemic in New York City at the time. ADA Ryan is shown as the voice of reason, confronting Ms. Fairstein because ADA Ryan believed that the young men in custody engaged in nothing more than harassment in Central Park on the night in question. ADA Ryan's own statements contradict this portrayal. In her 2002 affirmation in support of vacating The Five's convictions, which is part of the public record, ADA Ryan emphasized that, "[t]he other crimes committed on April 19 were grave and inexcusable—

---

[55] L. Fairstein 4/23/13 Dep. Tr., at NYCLD_039089-NYCLD_039112. *See* A. Clements 4/4/13 Dep. Tr., at NYCLD_035217-NYCLD_035225.

unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured." [56]

94.     In the next scene, Ms. Fairstein is shown briefing police in front of a map of Central Park. ADA Ryan is present. Ms. Fairstein says, "They brutally raped a woman and discarded her like a piece of garbage, left her for dead, bleeding, bound, naked. And to think we were going to release these animals to family court and put them back on the streets." Part One, 18:42-19:48. Ms. Fairstein then notes a missing half-hour in the timeline, asking "What did these animals do between here and here (pointing to map)? Are there other victims still in the Park?" *Id.* ADA Ryan then approaches Ms. Fairstein and says, "Good luck, you're gonna need it." *Id.* at 19:49. Every detail and line of dialogue in this scene is false.

95.     This scene is also defamatory in that it portrays Ms. Fairstein as dehumanizing children of color by referring to them as "animals," while trying to create support among police officers for a weak case, as indicated by ADA Ryan's skepticism. This also, again, falsely portrays a feud between ADA Ryan and Ms. Fairstein over control of the investigation, as well as the case's merits, setting up Ms. Fairstein as the wrongdoer responsible for the incarceration of innocent children of color.

96.     Despite the wealth of evidence that ADA Ryan was not involved in the 1989 investigation, and never argued with Ms. Fairstein over the case, Ms. DuVernay publicly affirmed the truth of the scene on Twitter. On June 2, 2019, Ms. DuVernay retweeted a Twitter post written by another user that quoted Part Four of the film series, stating: "When you were writing crime novels Kevin, Antron, Yusef, Raymon[d] and Korey were serving time for crimes

---

[56] Ex. E to Article 78 Petition For A Judgment Requiring Justice Charles Tejada To Vacate Petitioner's Judgments of Conviction, Nancy Ryan's Affirmation In Response to Motion to Vacate Judgment of Conviction, December 5, 2002, at ¶ 113 (NYCLD_030712-NYCLD_030713).

they didn't commit. #FamkeJanssen Drop #Linda Fairstein@Penguinbooks @WhenTheySeeUs #WhenTheySeeUs." Above this quoted tweet, Ms. DuVernay wrote:

> Famke played Nancy Ryan beautifully. And the arc of the Fairstein/Ryan relationship is real. Fairstein really battled Ryan for the case in 1989. Ryan really ended up getting it back after Matias Reyes confessed. Wild. #WhenTheySeeUs[57]

### 7. Calling for A Roundup of Young, Black "Thugs"

97.     In the next scene, Ms. Fairstein is falsely portrayed as calling for a roundup of young, black males in Harlem, stating:

> I need that whole group…I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night.[58] Part One, at 19:54-20:30.

98.     Again, this defamatory scene never occurred. Ms. Fairstein made no such statement nor gave *any* directions to police officers in the case. She was not involved in, or responsible for, the NYPD investigation into Ms. Meili's attack, which was entirely under the supervision of senior police leaders present throughout the first 72 hours.[59]

99.     Ms. Fairstein had no authority to direct NYPD officers to "round-up" or stop any young black men who were in Central Park or otherwise. She never gave orders to the

---

[57] https://twitter.com/ava/status/1135331321952104448?lang=en
[58] This scene is prominently featured in the trailer for *When They See Us*, released on April 19, 2019.
[59] *See* 7/2/90 Testimony of PO E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023569-NYCLD023572, NYCLD_023600, NYCLD_023602-023605, NYCLD_023612-NYCLD_023614; 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023129-NYCLD_023131, NYCLD023136-NYCLD_023145; 7/20/11 E. Reynolds Dep. Ex. 11; 11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, at NYCLD_017528-NYCLD_17531; 7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial, at NYCLD_017753-NYCLD_017756; 11/13/90 Testimony of Det. J. Hartigan, Trial of K. Richardson and K. Wise, at NYCLD_018270-NYCLD_018281,      NYCLD_018334-18337,      NYCLD_018356,      NYCLD_018359-NYCLD_018360, NYCLD_018390-NYCLD_018392,   NYCLD_018396-018397,   NYCLD0018411-NYCLD0018414;   7/25/90 Testimony of Det. M. Sheehan, McCray, Salaam, Santana Trial, at NYCLD_019175-019178, NYCLD_019204-NYCLD_019205; 10/25/89 Suppression Hearing Testimony of Det. Michael Sheehan, at NYCLD_018954-018958, NYCLD_018963-NYCLD_018964;   10/25/89   Suppression   Hearing   Testimony   of   Det.   J.   Taglioni,   at NYCLD_06915-06933; 10/24/89 Suppression Hearing Testimony of Det. H. Hildebrandt, at NYCLD016983-NYCLD017000; Farrell Dep. Ex. 4, at NYCLD_058353-058354.

investigating officers and detectives. By the time Ms. Fairstein first reached the 20th Police Precinct, at approximately 8:30 p.m. on April 20th,[60] at least ten young men had been picked up for questioning. Messrs. Richardson, Santana and McCray had been picked up during the night of April 19th and into the day of the 20th.[61] Detectives were dispatched from the 20th Precinct by their supervisors to find Mr. Salaam and Mr. Wise, and the two were picked up by those detectives, on the night of April 20th.[62] The only orders to find and bring in persons of interest were given by NYPD supervisors.

100.    The NYPD was solely in charge of bringing individuals in for questioning on April 19-21, 1989. The publicly available testimony of Officer Reynolds shows that there was an NYPD canvas of Central Park on the night of April 19, 1989, after numerous NYPD radio calls came in about assaults in the northern end of Central Park on a homeless man, a number of joggers, and taxi cabs driving through the area. The radio calls referred to young men of color as potential suspects in the assaults. Per Officer Reynolds, on the night of April 19, 1989, his supervisor, Sergeant Lail also organized a "show up" identification procedure for the homeless man who had been assaulted in Central Park. Sergeant Lail held a group of young men at a playground located near West 100th Street.[63] Officer Reynolds was at the show up. The homeless man viewed the group and said they were not his attackers and they were let go.[64]

101.    Shortly thereafter, Officer Reynolds and his partner, Officer Powers, came upon a large group of youths on Central Park West at 102nd Street, most of whom began to run when

---

[60] *Id.*
[61] *See generally* 10/13/89 and 10/16/89 Suppression Hearing Testimony of E. Reynolds; 7/2/90 Testimony of E. Reynolds, Trial of McCray, Salaam and Santana.
[62] 7/23/90 Testimony of J. Taglioni, McCray, Salaam and Santana Trial, at NYCLD_018540-NYCLD_018546, NYCLD_018573; 10/25/89 Suppression Hearing Testimony of Det. J. Taglioni, at NYCLD_06906-NYCLD_06918; 11/17/89 Suppression Hearing Testimony of K. Wise, at NYCLD_06985-NYCLD_06989.
[63] E. Reynolds 7/20/11 Dep. Tr., at NYCLD_057663-NYCLD_057668; 10/13/89 Suppression Hearing Testimony of E. Reynolds, at NYCLD_23070-NYCLD_23081; 7/2/90 Trial Testimony of E. Reynolds, McCray, Salaam and Santana Trial, at NYCLD_023497-NYCLD_023501.
[64] E. Reynolds 7/20/11 Dep. Tr., at NYCLD_057663-NYCLD_057668.

they spotted a third police officer on a scooter. Per Officer Reynolds, Mr. Santana and Steve
Lopez did not run and he approached and patted them down. His partner, Officer Powers, chased
another few youths who split off from the first large group they saw. As a result of the canvas
and chase, five individuals were brought back to the Central Park Precinct, including Mr.
Thomas, Mr. Santana and Mr. Richardson.[65] The five individuals in custody were interviewed
and began naming other individuals, whom NYPD officers and/or detectives later sought for
questioning.[66] At this time, Ms. Meili's body had not yet been found. Also, at this time, no
prosecutors had been informed of the matters in Central Park.[67]

102.    As detailed *supra*, the portrayal of Ms. Fairstein ordering police officers to round
up suspects is factually false.

103.    The scene is also defamatory because the actions and language attributed to Ms.
Fairstein in the scene portray her as a racist, because she directs police to round up "every little
thug" they see. The word "thug" has become recognized as a racist code word. As explained by
Dr. John H. McWorter, a linguistics professor at Columbia University, in an interview with
National Public Radio:

> Well, the truth is that thug today is a nominally polite way of using the N-word.
> Many people suspect it, and they are correct. When somebody talks about thugs
> ruining a place, it is almost impossible today that they are referring to somebody
> with blond hair. It is a sly way of saying there go those black people ruining

---

[65] 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, NYCLD_23080-NYCLD_23106; 7/2/90 Testimony
of E. Reynolds, McCray, Salaam, and Santana Trial , at NYCLD_023501-NYCLD_023529; E. Reynolds 7/20/11
Dep. Tr., at NYCLD_057669-NYCLD_057689.
[66] 10/13/89 Suppression Hearing Testimony of PO E. Reynolds, at NYCLD_023141-023145. *See also* E. Reynolds
Dep. Ex. 11; *See* Farrell Dep. Ex. 2, at NYCLD_058344, NYCLD_058348-NYCLD_058349; Farrell Dep. Ex. 4;
11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, at NYCLD_017357-017358; 10/25/89 Suppression
Hearing Testimony of Det. John Taglioni, at NYCLD_006906-NYCLD_006918.
[67] 10/16/89 Suppression Hearing Testimony of PO R. Powers, at NYCLD_024466-NYCLD_024499,
NYCLD_024546-024547; 10/13/89 Suppression Hearing Testimony of PO E. Reynolds NYCLD_023067-023101,
NYCLD_023219; L. Fairstein 4/23/13 Dep. Tr., at NYCLD_039089-NYCLD_039094.

things again. And so anybody who wonders whether thug is becoming the new N-word doesn't need to. It most certainly is.[68]

The publicly available evidence from the case files does not support the manner in which Ms. Fairstein was portrayed in this scene.

### 8. **Telling Officers "No Kid Gloves Here"**

104.    The next scene falsely depicts Ms. Fairstein telling the NYPD officers who are about to interview Mr. Richardson:

> We've got suspects, we've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this. Part One, 22:35-22:53.

The next image is of Mr. Richardson in an interrogation room, with a black eye, handcuffed to a chair. Part One, 22:54-24:17.

105.    This scene portrays Ms. Fairstein not only as a racist, but unethical as well. Ms. Fairstein was not present at the Central Park Precinct when Mr. Richardson was brought to the precinct for questioning, nor was she present before—or during—the NYPD's interview of Mr. Richardson.[69] In fact, Ms. Fairstein was not involved in the NYPD's questioning of witnesses or suspects at any precinct.[70] Moreover, the involvement of the press in the Central Park Jogger case did not and could not affect any of Ms. Fairstein's actions, because she had no role in supervising the police investigation.[71]

---

[68] *The Racially Charged Meaning Behind the Word "Thug,"* NPR, All Things Considered, April 30, 2015, available at https://www.npr.org/2015/04/30/403362626/the-racially-charged-meaning-behind-the-word-thug.

[69] 10/13/89 Suppression Hearing Testimony of E. Reynolds, NYCLD_23080-NYCLD_23116; 7/2/90 Testimony of E. Reynolds, McCray, Salaam, Santana Trial, at NYCLD_023501-NYCLD_023529, NYCLD_023612-NYCLD_023614; E. Reynolds 7/20/11 Dep. Tr., at NYCLD_057669-NYCLD_057691. 11/28/90 Testimony of J. Hartigan, Trial of K. Richardson and K. Wise, at NYCLD_018270-NYCLD_018273; 11/8/89 Suppression Hearing Testimony of Det. H. Arroyo, at NYCLD_017529-NYCLD_17531; 7/16/90 Testimony of Det. H. Arroyo, McCray, Salaam, Santana Trial, at NYCLD_017753-NYCLD_017756; J. Hartigan 11/10/10 Dep. Tr., at NYCLD_037959-NYCLD_037965, NYCLD_037968-NYCLD_037978.

[70] *Id.*

[71] *See supra* footnotes 20, 45 and 48.

106.     ADA Lederer handled the videotaped statements on behalf of the District

Attorney's office, and Ms. Fairstein was not present for the taking of any of those statements, nor

did she see any of the resultant videos.[72] Mr. Richardson gave a videotaped statement to ADA

Lederer at the 24th Precinct, which occurred in the early morning hours of April 21, 1989.[73] Mr.

Richardson testified at his deposition in the civil litigation that he did not recall seeing Ms.

Fairstein at any precinct.[74]

107.     Given these facts, it is clear that Ms. Fairstein did not have the authority to—nor

did she—direct NYPD detectives that "no kid gloves" should be used, or any other unethical

direction about how to interview minors. She never told NYPD detectives to bend the rules, or

alter procedure, with respect to the interrogation of minors in a criminal case, including with

respect to Mr. Richardson.

### 9.   Directing NYPD Detectives to Coerce Testimony That Fits Ms. Fairstein's Unsupported Theory of the Case

108.     The next scene shows Ms. Fairstein approaching ADA Lederer in a library and

telling Lederer that she was up all night working on the case. ADA Lederer points out that the

facts provided in the witness statements align with each other except "when we arrive at the

rape," to which Ms. Fairstein interrupts, "they all start lying." ADA Lederer says that there are a

number of different versions of what occurred with respect to the rape and confronts Ms.

Fairstein, stating "I've got to face a judge and prosecute this Linda…what is your case?" Ms.

Fairstein responds that "they're all guilty, each of these boys assaulted Patricia Meili, they all

raped her and we know this because in each of these boys' confessions, they all bear eyewitness

against each other." ADA Lederer then says, "I'm imagining myself walking into the courtroom,

---

[72] *See* Video Statements of K. Richardson, 4/21/89; A. McCray, 4/21/89; R. Santana, 4/21/89; K. Wise, 4/21/89; S. Lopez, 4/21/89; L. McCall, 4/21/89; C. Thomas, 4/21/89; J. Smith, 4/21/89.
[73] Video Statement of K. Richardson, 4/21/89.
[74] K. Richardson 2/1/13 Dep. Tr., at NYCLD_054900.

armed with a stack of wildly conflicting statements, no physical evidence, no weapon." To which Ms. Fairstein replies, "all we need is for one of these little shits to tie this whole thing together." Part One, at 47:42-49:28.

109.     This is another scene that is designed to make Ms. Fairstein the villain in the case. This conversation between Ms. Fairstein and ADA Lederer never occurred. At no time during the investigation did Ms. Fairstein have a theory of the case. At no time did she and ADA Lederer argue about the evidence in the case, and at this point in the investigation neither Ms. Fairstein nor ADA Lederer had assumed, or discussed, that the prosecution's case would focus on The Five. Again, Ms. Fairstein's use of abusive and derogatory language is entirely false and meant to inflame viewers' hatred and animosity towards Ms. Fairstein.

110.     Ms. Fairstein, Detective Sheehan and ADA Lederer are next seen viewing Mr. McCray's videotaped statement. Ms. Lederer says to Ms. Fairstein, "[t]his kid is a dumpster fire,[75] he says he didn't rape her, he says he didn't actually witness it, you've lost Yusef and Antron and you don't have a location." The next scene shows Detective Sheehan feeding information to Mr. Richardson. Part One, 49:30-50:13.

111.     Ms. Fairstein and ADA Lederer never viewed any of the videotaped statements together, nor with Detective Sheehan.

112.     ADA Lederer next tells Ms. Fairstein, "the biggest issue isn't that their statements don't match, it's that nothing these boys state matches the central facts of the crime." Detective Sheehan is then shown telling Mr. Santana how to change his statement. Part One, 49:59-50:29. This conversation is yet another complete fabrication which never took place.

---

[75] According to Merriam Webster's online dictionary, a "dumpster fire" is an "utterly calamitous or mismanaged situation or occurrence. It's first known use was in 2006." https://www.merriam-webster.com/dictionary/dumpster%20fire. Accordingly, this terminology would not have been used in 1989.

113.     ADA Lederer next tells Ms. Fairstein, "Meili was found raped and beaten in an area half a mile north of the reservoir, all of them say the attack happened beside the reservoir. So, did they rape her there and then drag her a half mile? Where is the physical evidence to support that?" Part One, 50:30-50:49. This is yet another conversation that never happened.

114.     Next, Ms. Fairstein and ADA Lederer are seen speaking with Detective Sheehan. Ms. Fairstein asks "We still got one more, right?" to which Sheehan responds, "Korey Wise." Ms. Fairstein says, "He's the one, he's the glue, we'll make sure he sticks it together." ADA Lederer says, "Well make sure this kid knows where he actually was." Part One, at 50:46-51:01. This conversation never happened. Ms. Fairstein did not speak with ADA Lederer about any of the facts elicited in previous statements before ADA Lederer's first interview with Mr. Wise, who had previously been interviewed by the police. Mr. Wise was not considered to be, by any of the police or prosecutors, the "glue" who held the case together.

115.     Within approximately one minute of the false depiction of Ms. Fairstein referring to Mr. Wise as "the glue" to hold her theory together, Mr. Wise is shown being physically beaten by detectives before he gives a statement. Part One, 52:25. This is an entirely false scene, designed, again, to impugn Ms. Fairstein's ethics and villainize her. The implication that Ms. Fairstein authorized the alleged mistreatment of Mr. Wise in order to obtain testimony that supported her theory of the case is entirely false and defamatory.

116.     The scenes also falsely depict Ms. Fairstein as desperate to put together a case against The Five, imposing her theory of the case on ADA Lederer and pressuring Detective Sheehan to force a confession out of Mr. Wise, resulting in Mr. Wise being beaten into confessing to involvement in the rape of Ms. Meili. None of the interactions depicted between ADA Lederer, Ms. Fairstein and Detective Sheehan occurred. Ms. Fairstein did not supervise

suspect interviews, nor was she present during the videotaping sessions.[76] She did not supervise the police investigation, or the investigation conducted by the District Attorney's office, which was led by ADA Lederer.[77] Moreover, Ms. Lederer further testified at deposition in the civil litigation against New York City that the differences in certain details of The Five's statements, as taken by the NYPD in April 1989, were not significant to her in 1989 or at the time of her deposition in 2013.[78] Ms. Lederer also testified that it was her theory that the attack on Ms. Meili was part of an overall series of attacks in Central Park that The Five had participated in on April 19, 1989.[79]

### B. Part Two

117.     In Part Two of the series, Ms. Fairstein is falsely portrayed as trying to conceal DNA evidence from defense counsel before the trials began, directly attacking her prosecutorial ethics.

118.     Ms. Fairstein is seen discussing the case against The Five with ADA Lederer and DA Morgenthau. DA Morgenthau says "We have useless tape, we lost our gang narrative, we can't find DNA." Ms. Fairstein replies, "We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it." Morgenthau then says, "We have DNA, good. The match will nail this thing down." ADA Lederer says, "How did the NYPD miss this?" To which Ms. Fairstein says, "Who cares? We have it now and the kicker is none of the defense

---

[76] *See supra* footnotes 20, 45, 48, and 72-74.

[77]  8/6/90 Trial Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015468-NYCLD_015469; A. Clements 4/4/13 Dep. Tr., at NYCLD_035224, 035230-35232. *See also* L. Fairstein 4/23/13 Dep. Tr., at NYCLD_39129-NYCLD_39133.

[78] E. Lederer 7/24/13 Dep. Tr., at NYCLD_036810 ("I think I already said that there were differences between one statement and the next, and I'm happy to explain why those were not significant to me at the time or today if you want me to.") *See id.* at NYCLD_036735-NYCLD_036753. *See also* E. Lederer 7/17/13 Dep. Tr., at NYCLD_036018-NYCLD_036023.

[79] E. Lederer 7/24/13 Dep. Tr., at NYCLD_036691-NYCLD_036695.

is aware yet so we can test it right before the trial—surprise!" ADA Lederer, looking upset, says, "surprise." Part Two, at 16:39-17:14.

119.    Not only is Ms. Fairstein once again depicted in a foul manner, using derogatory language to describe The Five to DA Morgenthau in a manner in which she never spoke with him throughout the twenty-six years that they worked together, this is another scene that is completely fabricated. Ms. Fairstein did not bring the sock to ADA Lederer's attention. Public records, including trial testimony, show that, on March 28, 1990, NYPD lab chemist Mary Veit was preparing for trial by reviewing the forensic evidence documented in the case. When viewing one of Ms. Meili's socks, Ms. Veit noted a stain indicating the potential presence of semen and took samples from the sock.[80] On the very next day after the stain was discovered, ADA Lederer informed the court and defense counsel, in writing, that additional DNA testing was required on a newly discovered stain, and requested an adjournment of the April 16, 1990 trial date.[81] On April 2 and 5, 1990, hearings were held on the matter.[82] ADA Lederer immediately provided defense counsel with copies of the serology reports concerning the samples that were taken from the sock.[83] The FBI provided its DNA analysis to ADA Lederer prior to trial, showing that the sock did not match any of the available DNA samples.[84] ADA Lederer provided the DNA results to The Five's counsel before trial.[85] In her opening statement at trial, ADA Lederer specifically referenced this fact—there was no concealment of this

---

[80] 11/9/90 Testimony of M. Veit, Richardson/Wise Trial, at NYCLD_022274-NYCLD_022275, NYCLD022313-NYCLD0022318; 7/18/90 Testimony of M. Veit, McCray, Salaam, Santana Trial at NYCLD_022239-NYCLD_022243.
[81] Letter to T. Galligan from E. Lederer, 3/29/90, NYCLD_000318.
[82] 4/5/90 Pre-Trial Hearing Tr., at NYCLD_006313-NYCLD_006314. *See* 4/2/90 Pre-Trial Hearing Tr., at NYCLD_006642-6654.
[83] 4/5/90 Pre-Trial Hearing Tr., at NYCLD_006313-NYCLD_006314. *See* 4/2/90 Pre-Trial Hearing Tr., at NYCLD_006642-6654.
[84] 5/25/90 FBI Report re DNA Analysis, at NYCLD_009083.
[85] 6/5/90 Correspondence from E. Lederer to Defense Counsel, NYCLD_000330, NYCLD_000363, NYCLD_000345.

evidence.[86] There was never an attempt to conceal this evidence from counsel or the court, nor did Ms. Fairstein play any role in this discovery issue. Moreover, the NYPD serologist and FBI analyst each testified at trial, as prosecution witnesses, and informed the jury that there was no DNA match to the defendants.[87]

120.     In a later scene, ADA Lederer and Ms. Fairstein learn that the sock is not a match to any of The Five. ADA Lederer says, "I needed this DNA in the sock to nail all this down—it doesn't match. The five defendants are clean." Ms. Fairstein responds, "So there must have been another attacker? One must have gotten away." ADA Lederer replies, "You honestly believe that?" to which Ms. Fairstein responds, "I do if it helps a jury believe what we know is true." Part Two, at 29:51-31:23. This continuation of the film scene is yet another falsehood. This conversation between Ms. Fairstein and ADA Lederer never happened, and was deliberately inserted into the film to impugn Ms. Fairstein's integrity and ethics.

121.     ADA Lederer then asks, "Do you understand what is happening here?" Ms. Fairstein replies, "We have still got the cervical DNA." To which ADA Lederer responds, "which was inconclusive." Ms. Fairstein then says, "It means the 5 can't be ruled out. Deal with the sock DNA, play up the cervical DNA." ADA Lederer then says, "Are you listening to yourself? You sound delusional. You want me to pretend that the sock never existed, this is crossing a line." Ms. Fairstein responds, "What line, Elizabeth? Where's the line for Patricia? I'm sick of this shit. Where's the line for her? .... Fucking City, we hear something gruesome, we

---

[86] Transcript of Opening Statement for the People, 6/25/90, at NYCLD_013824-NYCLD_013825; Transcript of Opening Statement for the People, 10/22/90, at NYCLD_013869.

[87] 7/18/90 Testimony of M. Veit, McCray, Salaam, Santana Trial, at NYCLD_022239-NYCLD_022243; 11/9/90 Testimony of M. Veit, Richardson/Wise Trial, at NYCLD_022274-NYCLD_022275, NYCLD022313-NYCLD0022318; 7/13/90 Testimony of D. Adams, McCray, Salaam, Santana Trial, NYCLD_020968-NYCLD_020969 (noting neither cervical DNA nor sock DNA matched defendants but that cervical DNA and sock DNA matched each other); 11/5/90 Testimony of D. Adams, Richardson/Wise Trial, NYCLD_021021-021022 (noting that neither cervical DNA nor sock DNA matched defendants but that cervical DNA and sock DNA matched each other).

grimace and we move on. Well not this time." *Id.* As part of the continuing theme in the paragraphs above, this event never occurred. Ms. Fairstein never suggested to ADA Lederer that she should pretend that the sock didn't exist.

122.   ADA Lederer then says, "But these boys Linda…" Ms. Fairstein responds, "They were in the park beating people up the same night that she's getting beat up and you're telling me they had nothing to do with it? Bullshit. They said it themselves, they told us what happened." ADA Lederer then stresses, "They were told," to which Ms. Fairstein says, "C'mon, the eye sees but it cannot see itself, they couldn't see the whole picture of how their one part fit into the whole, that is all we did. It's too late for this. Like you said the whole country is watching. They are watching you. This is your opportunity. Remember her." Part Two, 31:24-32:23. This is yet another false and defamatory scene designed to impugn Ms. Fairstein's ethics and integrity.

123.   The exchanges detailed above did not take place. At the point in time portrayed in the episode, Ms. Fairstein was to be a witness at trial, as she had been at the suppression hearing.[88] Ms. Fairstein never forced—or attempted to force—a theory of the case upon ADA Lederer and ADA Clements.[89] ADA Lederer's publicly available sworn testimony demonstrates that she firmly believed that the young men's statements, alone, were sufficient to prosecute the case—even without DNA evidence.[90] The episode further falsely portrays Ms. Fairstein as admitting that the confessions of The Five were coerced and attributes responsibility for that to Ms. Fairstein, even though she was not in charge of, and did not participate in, questioning the young men or taking their videotaped statements.[91]

---

[88] A. Clements 4/4/13 Dep. Tr., at NYCLD_035309-035314.
[89] E. Lederer 7/24/13 Dep. Tr., at NYCLD_036691-NYCLD_036696.
[90] E. Lederer 7/24/13 Dep. Tr., at NYCLD_036695 ("The fact that the DNA didn't match the defendants who had been arrested did not preclude that it was somebody else who was with the young men."). *See also* E. Lederer 7/17/13 Dep. Tr., at NYCLD_036018-NYCLD_036023, NYCLD_036121-NYCLD_036125.
[91] 8/6/90 Testimony of ADA L. Fairstein, McCray, Salaam, Santana Trial, at NYCLD_015468; A. Clements 4/4/13 Dep. Tr., at NYCLD_035224, 035230-35232. *See also* L. Fairstein 4/23/13 Dep. Tr., at NYCLD_39129-

124.    It also, once again, portrays Ms. Fairstein as biased against The Five, placing justice for Ms. Meili above a fair trial for young men of color—even in the absence of evidence. Yet the FBI analyst in charge of testing the DNA evidence—called by the prosecution—testified at trial that none of the DNA obtained from Ms. Meili matched the defendants.' He further informed the jury that the cervical swab DNA and the sock DNA matched each other.[92]

125.    ADA Lederer's reference to Ms. Fairstein as "delusional" further impugns Ms. Fairstein's reputation and career as an Assistant District Attorney because it portrays her as bordering on mental illness and lacking any sense of rationality when making judgments about cases. ADA Lederer's publicly available sworn testimony shows that ADA Lederer's opinion of Ms. Fairstein during the time period in question was quite the opposite.[93] ADA Lederer testified at her deposition in the federal lawsuit that she thought Ms. Fairstein had "integrity, I thought she was responsible. This was in large measure by reputation because I wasn't personally particularly close to her."[94] When asked if Ms. Fairstein was "assertive in her positions as a prosecutor," Ms. Lederer responded "[i]n my experience, she was always willing to hear another opinion. So I wouldn't characterize her that way."[95]

## C.  Part Four

126.    Ms. Fairstein is featured in the final scenes of Part Four, and portrayed as singularly responsible for jailing innocent young men of color after changing the theory of the case from a single attacker to multiple attackers (this was set up in Part One with the false

---

NYCLD_39133; Video Statements of K. Richardson, 4/21/89; A. McCray, 4/21/89; R. Santana, 4/21/89; K. Wise, 4/21/89; S. Lopez 4/21/89; L. McCall 4/21/89; C. Thomas 4/21/89; J. Smith 4/21/89.
[92] 7/13/90 Testimony of D. Adams, McCray, Salaam, Santana Trial, at NYCLD_020968-NYCLD_020969 (noting neither cervical DNA nor sock DNA matched defendants but that cervical DNA and sock DNA matched each other); 11/5/90 Testimony of D. Adams, Richardson/Wise Trial, at NYCLD_021021-021022 (noting that neither cervical DNA nor sock DNA matched defendants but that cervical DNA and sock DNA matched each other).
[93] E. Lederer 7/17/13 Dep. Tr., at NYCLD_035940-NYCLD_035941.
[94] *Id.* at NYCLD_035940.
[95] *Id.* at NYCLD_035941.

depictions of Ms. Fairstein at the crime scene and later arguing with ADA Ryan—with whom Fairstein never spoke—about the theory of the case. *See supra* Paragraphs 51-56, 87-96.

127. In the first scene, Assistant District Attorney Peter Casolaro ("ADA Casolaro") is seen reading from a file to ADA Ryan, saying, "Fairstein acknowledged the track marks… 'this is where he pulled her in.'" He asks Ryan, "When did the theory change?" To which ADA Ryan responds, "I was there when it changed." Part Four, at 1:04:11-1:04:35. This is another completely false statement. As detailed *supra* Paragraphs 87-96, Ms. Fairstein did not discuss the investigation into the attack on Ms. Meili with ADA Ryan in April 1989.

128. In a later and final scene, which takes place in 2002, ADA Ryan meets Ms. Fairstein in a restaurant. Ms. Fairstein tells ADA Ryan, "You're here to gloat. It doesn't matter, you simply identified a sixth rapist, I always said there may be more." ADA Ryan responds, "You said that to cover because you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes." ADA Ryan then puts several of Ms. Fairstein's novels on the table, noting that while Ms. Fairstein was writing crime novels, five innocent young men were serving time. Part Four, at 1:09:49-1:12:43. This scene is completely fabricated. At no point in 2002, during or after ADA Ryan led one of the two re-investigations of the case, did Ms. Fairstein and ADA Ryan ever meet—for lunch or for any other reason.

129. These two scenes once again falsely attribute: the theory of the case to Ms. Fairstein; responsibility for any alleged coercive tactics used during police questioning (even though Ms. Fairstein was not in the police precinct when such questioning occurred) or during videotaped statements (even though Ms. Fairstein was not present in those rooms); and a change in the narrative of what occurred with respect to Ms. Meili in order to cover up the coercion that took place. As discussed *supra* Paragraphs 49-128, none of these attributions are truthful.

Moreover, ADA Ryan never spoke with Ms. Fairstein—formally or informally—about the Reyes confession and DNA evidence despite Ms. Fairstein's efforts to be interviewed by ADA Ryan during the reinvestigation in 2002.

130.     Given the sheer volume of documents in the public record that show that the manner in which Ms. Fairstein is portrayed in *When They See Us* is a complete fabrication, Defendants' marketing and promotion of the film series as a true story, and other public statements to that effect, which are detailed below, could only have been intended to mislead viewers into believing that the film series' false and defamatory portrayal of Ms. Fairstein is accurate. Defendants claim to have reviewed the trial transcripts and court records pertaining to the case against The Five, which would have revealed to them that the scenes described above are a wholly false depiction of Ms. Fairstein. Defendants' actual malice is clear, as they intentionally portrayed Ms. Fairstein as engaging in unlawful and unethical conduct motivated by racism against The Five. Defendants' portrayal of Ms. Fairstein in *When They See Us* is simply unsupported by the hundreds of thousands of pages of sworn testimony, transcripts and other documents available for viewing on the New York City Law Department website.

## IV.   Defendants Are Placed on Notice Regarding Defamation Prior to Release of Film

### A.     Ms. DuVernay is Placed on Notice in 2016

131.     In or around spring 2016, Ms. Fairstein learned that Ms. DuVernay had acquired life rights from Messrs. Wise, Santana, McCray, Salaam and Richardson and was planning to write and direct a film about The Five.

132.     Shortly after learning about this, Ms. Fairstein alerted Ms. Lederer to the news of the upcoming project.

### 1.  Ms. Lederer's Phone Calls with Ms. DuVernay

133.    Ms. Lederer contacted Ms. DuVernay in or around July 2016 and had a phone conversation with her about the project. Ms. DuVernay asked Ms. Lederer to participate in the project.

134.    During the conversation, Ms. Lederer asked Ms. DuVernay if she had reviewed various records and sources, such as police reports and video confessions, so that she could convey a truthful account of what happened. Ms. DuVernay said she did not review those sources, that she was interested in focusing solely on the rape charge and telling the "truths" of The Five rather than redoing the trial.

135.    Ms. Lederer told Ms. DuVernay that the New York City Law Department's website would soon be up and would provide public access to all of the documents that related to the case against The Five. These documents include papers from the original investigation by the NYPD, the transcripts and rulings from the suppression hearings and two trials in New York State Supreme Court, the re-investigations by the NYPD and the District Attorney's Office, and dozens of depositions from the Federal Civil Litigation. Ms. DuVernay responded that she was tired of waiting for the website and was going ahead with the script.

136.    A few days later, Ms. Lederer called Ms. DuVernay again and told her that she was unwilling to participate in the project. Ms. DuVernay told Ms. Lederer that people were interested in knowing about her. Ms. Lederer reiterated that she was not interested in working with Ms. DuVernay to tell a story that was not factually accurate.

### 2.  Ms. Fairstein's Email Correspondence with Ms. DuVernay's Colleague

137.    At around the same time, Ms. Fairstein exchanged emails with Ms. DuVernay's colleague, Jane Rosenthal of Tribeca Films, whom she knew casually. Ms. Rosenthal initiated

the conversation by sending a request to Ms. Fairstein's former literary agent, Esther Newberg, who forwarded it to Ms. Fairstein. Ms. Rosenthal encouraged Ms. Fairstein to speak with Ms. DuVernay and offered to set up a conference call between the two. Ms. Fairstein said she needed to know what was being researched for the film in order to help her make a decision about whether or not she would speak with Ms. DuVernay. Ms. Rosenthal informed Ms. Fairstein that the project was in the early stages and they were compiling research materials at the time, including "pulling public court records." Ms. Fairstein replied:

> Hello, Jane –
> You say you would like to hear our 'perspective.' I'd like to make clear-there are literally facts (in the form of sworn testimony, official reports and records, medical evidence just to name a few of the many forms the facts take) and evidence in this matter-from 1989, from 2002, and from the sworn depositions from 2003-2013). I don't expect you to go forward on a 'perspective.'-I expect you to use facts. Have you made any progress in researching any of those things?[96]

### 3.  An Attorney Notification is Sent to Ms. DuVernay

138.    On June 9, 2016, Ms. Fairstein's counsel, who also represented Ms. Lederer, sent a letter to Ms. DuVernay and Ms. Rosenthal stating:

> Based on past, unfair treatment of Ms. Fairstein and Ms. Lederer in the media in connection with the Central Park jogger case, my clients are, quite justifiably, profoundly concerned that your project might also fail to portray them accurately and fairly. To that end, we want to make clear to you that factual matter critical to understanding what our clients did and did not do was ignored in many accounts of the events of April 1989, and intentionally misrepresented in others, including in speeches and social media publications by the five individuals who later sued the city.
>
> ....
>
> Of particular concern…is that more recent public accounts (2003 and thereafter) of their roles in the underlying events were grossly inaccurate and defamatory. These have prompted a series of death threats and other threats of physical violence (which often specifically reference the depictions of them in a particular book, film and other speeches) have given rise to other reasons for concern for their personal safety and have prompted other serious, unwarranted retributive conduct against them.

---

[96] Email correspondence between L. Fairstein and J. Rosenthal, June 7, 2016.

Among other things both Ms. Fairstein and Ms. Lederer have been wrongly accused of being racist, of having participated in an unlawful conspiracy to violate the then-defendants' civil rights, and otherwise engaging in inappropriate and unprofessional conduct.

….

Certain past treatments of this subject matter appear to have been pursued in order to achieve a predetermined objective and not to represent truthfully what the facts demanded, including a book published by Sarah Burns in 2011 and a film purporting to be a documentary released in 2012 by Sarah, her father Ken Burns, and her husband David McMahon. Presumably you are aware that Sarah Burns was a college student intern hired by Jonathan Moore, who was acting as contingency fee counsel for Antron McCray and Khorey Wise in their lawsuit against the City of New York, which resulted in her developing a relationship with the five plaintiffs in the civil case and their families. Likewise, you are also likely aware that Ken Burns has said in multiple news accounts that he hoped his film would push the City of New York to settle the civil suit brought by those charged with the rape. Accordingly, it would be reckless at best for you to accept or rely uncritically on these sources. *Id.* at pp. 1-4.

139.    The letter cited a non-exhaustive list of over twenty (20) sources that should be consulted as "part of any honest fact-finding effort" including: i) the transcripts of the suppression hearings that occurred prior to trial; ii) the transcripts of the two trials; and the iii) more than 100 depositions in the lawsuit against New York City. *Id.* at pp. 4-7. As cited above at Paragraphs 49-128, these sources, which are publicly available, clearly provide the reader with a view of the factually accurate role that Ms. Fairstein played with respect to the Central Park Jogger case.

140.    The letter further noted that Ms. DuVernay had requested a meeting with Ms. Fairstein and Ms. Lederer for their "perspectives" and suggested that they would consider the request when Ms. DuVernay could confirm that she had examined the sources cited in the letter and provide a list of topics that she wished to review with them. *Id.* at p. 7.

141.     Finally, the letter directed Ms. DuVernay to take "all steps as are necessary to retain and preserve all records and communications, whether in hard-copy or electronic form, that have already come into your possession relating to this project, and that come in to your possession at any point going forward." *Id.* Appended to the letter was a copy of a report issued by the Armstrong Commission which, among other things, was assigned the task of investigating misconduct during the police investigation of the Central Park jogger case.

142.     On July 25, 2016, Ms. DuVernay's counsel responded to Ms. Fairstein's counsel that Ms. Fairstein and Ms. Lederer had no right to preemptively object to their portrayal in the project, the "filmmakers" had no obligation to preserve evidence, and that "any portrayal" of Ms. Lederer and Ms. Fairstein would be protected by the First and Fourteenth Amendments. The letter further stated, "It is also worth noting that your clients, who were government officials prosecuting one of the highest-profile cases of the 20th Century, are public figures." The response also stated that the filmmakers would not meet with Ms. Fairstein or Ms. Lederer subject to any preconditions.

143.     On July 28, 2016, Ms. Fairstein's counsel replied to this letter, noting "if anything, your letter underscores the risk of a casual approach to the facts: Ms. Fairstein, for instance, was not a prosecutor in the Central Park jogger case as you assert." *Id.* at p. 2. "Moreover, your reference to the case as a 'historical event' and 'one of the highest-profile cases of the 20th Century' echoes the hyperbolic tendencies of those claiming—but ultimately failing— to accurately recount and portray the events of the case and our clients' roles in the prosecution. If the film's portrayal of our clients also fails to adhere to the truth, our clients are prepared to exercise the full scope of their rights to challenge any defamatory statements, portrayals, and

implications in the final released film." *Id.* at pp. 2-3. Counsel further reiterated his request for the preservation of relevant documents.

144. Ms. DuVernay's response to Ms. Fairstein's notice, including about potentially biased and unreliable sources, as well as her comment to Ms. Lederer about Ms. Fairstein, showed that, even in the preliminary stages of the film project, Ms. DuVernay intended to portray Ms. Fairstein inaccurately, or, at the very least, acted in reckless disregard as to the truth or falsity of how she would be portrayed in Defendants' film series.

### 4. Post-Premiere Misrepresentations About Ms. Fairstein

145. After *When They See Us* premiered, in June 2019, Ms. Rosenthal misrepresented Ms. Fairstein's position about the film when speaking on a panel with Ms. DuVernay. Per Ms. Rosenthal, Ms. Fairstein's point of view "was clearly that she didn't want us talking to the five men if we were talking to her." Ms. DuVernay added, "Are we saying that Jane? I guess we are. That's the tea that just got spilled."[97]

146. In an interview that Ms. DuVernay gave to the *Daily Beast*, published on June 2, 2019, she was reported as stating:

> I reached out to Ms. Meili, I reached out to Ms. Fairstein, I reached out to Ms. Lederer, I reached out to Mr. Sheehan—a lot of the key figures on the other side. I informed them that I was making the film, that they would be included, and invited them to sit with me and talk with me so that they could share their point of view and their side of things so that I could have that information as I wrote the script with my co-writers. Linda Fairstein actually tried to negotiate. I don't know if I've told anyone this, but she tried to negotiate conditions for her to speak with me, including approvals over the script and some other things. So you know what my answer was to that, and we didn't talk.[98]

---

[97] https://variety.com/2019/tv/news/central-park-five-prosecutor-linda-fairstein-wouldnt-consult-netflix-1203237218/

[98] https://www.thedailybeast.com/netflixs-when-they-see-us-ava-duvernay-on-central-park-five-case-and-why-she-treated-trump-as-a-footnote; https://www.washingtonpost.com/arts-entertainment/2019/06/04/when-they-see-us-prompts-renewed-backlash-former-prosecutor-linda-fairstein/;https://www.vanityfair.com/hollywood/2019/06/linda-fairstein-boycott-backlash-when-they-see-us-ava-duvernay; https://nypost.com/2019/06/03/when-they-see-us-

As detailed above, Ms. Fairstein did not seek, negotiate or demand script approval from Ms. DuVernay as a precondition to having a conversation with her.

147.    This is yet another example of Ms. DuVernay's intention to impugn Ms. Fairstein's integrity and reputation, falsely casting Ms. Fairstein as trying to control Ms. DuVernay's narrative when Ms. Fairstein simply requested that she be portrayed truthfully, as based on publicly available, reliable sources.

### B.    Netflix is Placed On Notice in 2017

148.    In July 2017, it was announced in the press that Ms. DuVernay was bringing a limited series about the Central Park Five to Netflix. Netflix "greenlit" the series for a 2019 debut. Ms. DuVernay had previously worked with Netflix on a documentary.[99]

149.    Cindy Holland, Netflix's vice president for original content, was responsible for greenlighting *When They See Us*, which would be marketed and streamed on Netflix as part of its original programming. Upon information and belief, in this role Ms. Holland had approval over the content of the film series, including script approval.[100]

150.    After learning of Netflix's involvement in the project, on July 11, 2017, Ms. Fairstein's and Ms. Lederer's counsel sent a letter to Netflix's General Counsel to which he appended the July 2016 correspondence with Ms. DuVernay and her attorney, described *supra* Paragraphs 138-144. The letter notified Netflix that Ms. Fairstein and Ms. Lederer had "a justifiable and abiding concern that they will be treated in a false and defamatory manner in dramatizations of the Central Park Jogger case. We hope that the statement attributed to Ms. DuVernay in the press accounts of your planned collaboration, that the Central Park Five

---

sparks-call-to-boycott-linda-fairstein-books/; http://flsentinel.com/ava-duvernay-on-the-central-park-five-case-and-why-she-treated-trump-as-a-footnote/; https://newsone.com/3853676/linda-fairstein-ava-duvernay-central-park-5/
[99] https://variety.com/2017/tv/news/central-park-five-ava-duvernay-limited-series-netflix-1202488697/
[100] *Id.*

experienced 'injustice at every turn' was a bit of hyperbole and not intended to characterize their intersections, such as they were, with our clients." *Id.* at p. 1. The letter further directed Netflix to take all steps necessary to retain and preserve all records and communications relating to the project. *Id.* at p. 2.

151.    Netflix did not respond to this letter.

## V.    Ms. Locke's Efforts to Strip Ms. Fairstein of Her Mystery Writers of America Award

152.    Prior to the release of *When They See Us*, Ms. Locke, who co-wrote *When They See Us* with Ms. DuVernay, waged a smear campaign against Ms. Fairstein, which she grounded in her purported research and involvement in writing the film series.

153.    On November 27, 2018, six months prior to *When They See Us* premiered on Netflix, Ms. Locke made a post on Twitter directed at Ms. DuVernay and the Mystery Writers of America ("MWA"), more specifically to @EdgarAwards, stating that Ms. Fairstein should be removed as winner of the prestigious Grand Master Award—the highest honor given by the organization—for the 2019 Edgar Awards. She posted a series of tweets as follows:

> @EdgarAwards As a member and 2018 Edgar winner, I am begging you to reconsider having Linda Fairstein serve as a Grand Master in next year's awards ceremony. She is almost singlehandedly responsible for the wrongful incarceration of the Central Park Five 1/[101]

> For which she has never apologized or recanted her insistence on their guilt for the most heinous of crimes, "guilt" based solely on evidence procured through violence and ill treatment of children in lock up. 2/[102]

> Even after all five (now) men have been exonerated by the state of NY, and other members of the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office. 3/[103]

> ADAs who were led by Linda Fairstein 4/[104]

---

[101] https://twitter.com/atticalocke/status/1067463803187560448?lang=en
[102] https://twitter.com/atticalocke/status/1067463846749585410
[103] https://twitter.com/atticalocke/status/1067463849480089600

Just because she has a flourishing publishing career does not mean we should ignore her past—or continued unwillingness to accept responsibility for ruining five innocent [*sic*] men's lives. I cannot support this decision. 5/[105]

Surely, someone else is more worthy of our attention, support, and this laudatory role in the 2019 @EdgarAwards. End. @santanaraymond @ava[106]

Next year's ceremony will be the same month as the 30th anniversary of the wrongful arrest and subsequent incarceration of five innocent black boys. It is unconscionable that Linda Fairstein be on stage representing our organization. It is unacceptable. #centralparkfive[107]

I said I was done but I'm not. As an organization navigating its own diversity pitfalls @EdgarAwards willingness to overlook Linda Fairstein's racist actions is very upsetting. I don't have that luxury.[108]

154.     On the same day, Ms. Fairstein responded to Ms. Locke on Twitter, putting her on notice that she was inaccurately portraying Ms. Fairstein's role in the prosecution of the Central Park Jogger case:

@atticalocke Ms. Locke- I was neither the prosecutor nor investigator in the case you mention. I was certainly NOT the person who "singlehandedly spearheaded" the investigation. Why don't you and I have a civilized conversation, so I can refresh you with the facts? Thank you.[109]

155.     Ms. Locke posted part of her Twitter exchange with Ms. Fairstein on Instagram stating:

When I called out The Mystery Writers of America, of which I'm a member, for giving Linda Fairstein, whose office prosecuted the Central Park Five, an award, and she tried to defend herself, couldn't, and started to duck and weave (with more lies)…(She's reinvented herself as a crime writer and most people never connected her to THAT Linda Fairstein) No more. #goodnightindeed[110]

The featured tweet stated:

---

[104] https://twitter.com/atticalocke/status/1067463850776121345
[105] https://twitter.com/atticalocke/status/1067463855700238336
[106] https://twitter.com/atticalocke/status/1067463858606895104
[107] https://twitter.com/atticalocke/status/1067466492436930560
[108] https://twitter.com/atticalocke/status/1067467310279979008
[109] https://www.nytimes.com/2018/11/28/nyregion/linda-fairstein-central-park-5.html
[110] https://www.instagram.com/p/BquoDD0BX0t/

Actually, I think "good night!" here is the sun setting on all the years you've gotten away with not being held to account for your actions in the court of public opinion. So to that…good night indeed[111]

156.    In the thread of comments posted in response to her tweet, on November 27, 2018, Ms. Locke also promoted Ken Burns' film "Central Park Five" which was referenced in the notices provided by Ms. Fairstein's counsel to Ms. DuVernay and Netflix:

Ava's CP5 project hasn't aired yet, But the Ken Burns documentary, also on @netflix is amazing and informative.[112]

157.    In response to her social media posts, a number of Ms. Locke's followers called for Ms. Fairstein to be jailed, referred to her as "the enemy" of victims of racial discrimination, and deserving of "brutal" justice. Ms. Locke's followers undoubtedly believed her false assertions about Ms. Fairstein to be true, as did MWA.

158.    On November 29, 2018, MWA issued a press release, "Mystery Writers of America Withdraws Fairstein Award,"[113] which stated:

On Tuesday, November 27, 2018, Mystery Writers of America announced the recipients of Grand Master, Raven & Ellery Queen Awards given out annually. Shortly afterwards, the MWA membership began to express concern over the inclusion of Linda Fairstein as a Grand Master, citing controversy in which she has been involved.

When the MWA Board made its selection, it was unaware of Ms. Fairstein's role in the controversy…the Board of Directors has decided to withdraw the Linda Fairstein Grand Master award.

….

We hope our members will all work with us to move forward from this extremely troubling event and continue to build a strong and inclusive organization.

159.    Before rescinding the award, MWA undertook no investigation into the false allegations against Ms. Fairstein, or considered that the attack on Ms. Fairstein was made in

---

[111] https://www.instagram.com/p/BquoDD0BX0t/
[112] https://twitter.com/atticalocke/status/1067550854540972032
[113] https://mysterywriters.org/mystery-writers-of-america-withdraws-fairstein-award/

relationship to a film project that was purported to be a dramatization of what occurred in the Central Park Jogger case.

160.    On the same day as MWA's announcement, Ms. Locke thanked MWA on Twitter. She made a public statement about Ms. Fairstein to blog site Bustle.com that "the MWA has rescinded her award. A positive outcome."[114]

161.    The rescission of Ms. Fairstein's MWA award, and Ms. Locke's preceding Twitter storm, was reported nationwide, including in *USA Today, The LA Times, The New York Times, The Washington Post,* the *AP Wire, Publishers Weekly, The Seattle Review of Books, The Guardian* and *The American Bar Association Journal.*[115]

162.    On December 18, 2018, Ms. Locke posted the following Tweet:

> If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case – which, don't get it twisted, she did lead – then I'm not sure who the real bully is. It's certainly not a writer who simply asked the MWA to reconsider.[116]

163.    On December 18, 2018, Ms. Locke also posted the following on Twitter:

> And, yes I worked on Ava Duvernay's project in the case. That's why I know so much about the case. The research on the project is extensive. *And I actually read the trial transcripts.* And I chose to share my knowledge of Fairstein's misdeeds with MWA. Me, one person. Not a mob. (emphasis added).[117]

---

[114] https://www.bustle.com/p/a-literary-group-rescinds-award-for-linda-fairstein-amid-outcry-over-her-role-in-central-park-five-case-13220990

[115] https://www.usatoday.com/story/life/books/2018/11/29/mystery-writers-rescind-honor-linda-fairstein-prosecutor-central-park-five/2156900002/; https://www.nytimes.com/2018/11/28/nyregion/linda-fairstein-central-park-5.html; https://www.washingtonpost.com/nation/2018/11/30/mystery-writers-group-rescinds-award-sex-crimes-prosecutor-over-her-role-central-park-five-rape-case/; https://www.apnews.com/c2023c14fa2c4ca9bf9b5f53e99f0bdb; https://www.publishersweekly.com/pw/by-topic/industry-news/awards-and-prizes/article/78694-mwa-withdraws-grand-master-honors-for-linda-fairstein.html; https://www.latimes.com/books/la-et-jc-mwa-linda-fairstein-20181127-story.html; https://www.seattlereviewofbooks.com/notes/2018/11/29/mystery-writers-of-america-withdraws-grand-master-award-for-linda-fairstein/; https://www.theguardian.com/books/2018/nov/29/linda-fairstein-mystery-writers-of-america-grand-master-award-rescinded; http://www.abajournal.com/news/article/mystery_writers_group_withdraws_award_to_former_prosecutor_because_of_contr

[116] https://twitter.com/atticalocke/status/1075091099163623424

[117] https://twitter.com/atticalocke/status/1075098413627203584

And I came into the world "race-tinged." It is a privilege to hold a world view broader than that of Otto Penzler, Nelson DeMille, and Barbara Peters.[118]

164.    Ms. Locke, a key individual involved in writing the script for *When They See Us*, and close collaborator of Ms. DuVernay, demonstrated clear anger and hostility toward Ms. Fairstein prior to the release of the film series. She also referenced biased and unreliable sources, such as the Ken Burns' film, as credible sources of information about Ms. Fairstein. Ms. Locke further intended her actions, and the film series' portrayal of Ms. Fairstein, to cost Ms. Fairstein her reputation as a storied prosecutor who not only led the Manhattan District Attorney's Sex Crimes Unit, but was the national leader on crimes of sexual violence, domestic violence, and child abuse—as well as her career as an internationally best-selling crime novelist. Ms. Locke's statements referring to Ms. Fairstein as racist subjected Ms. Fairstein to hatred, contempt, ridicule, disgrace and threats to her life, as intended by Ms. Locke. As detailed further, below, Ms. Locke's campaign against Ms. Fairstein continued after *When They See Us* premiered, with the film continuing to be a source of support for Ms. Locke's false statements.

## VI.    Defendants' Assertions That *When They See Us* Is a True Story

165.    On March 1, 2019, Netflix released a teaser video for *When They See Us*, in which Mr. McCray is depicted, with a voiceover by Felicity Huffman who plays Ms. Fairstein, saying, "Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see."[119] As discussed *supra* Paragraphs 97-103, this depiction of Ms. Fairstein is false and defamatory, as she never supervised any aspect of the NYPD's investigation nor used the language ascribed to her.

---

[118] https://twitter.com/atticalocke/status/1075093302662246401
[119] https://www.youtube.com/watch?v=YyoSErErnCE.

166.     Netflix posted the teaser on its Twitter account on the same day, with the message "The truth you haven't heard. This is the story of the boys they call the Central Park Five. @Ava DuVernay's #WhenTheySeeUs debuts May 31, only on Netflix."

167.     On or about April 19, 2019, Netflix released the official trailer for *When They See Us*.[120] Ms. Fairstein is depicted in the trailer saying "every black male in the park last night is a suspect. I need all of them." The trailer says, "based on the true story of the Central Park Five" but then flashes bold banners which state, "The Story You Know" and "Is the Lie They Told You."

168.     The film series premiered on May 31, 2019. Upon information and belief, when the film series was released on Netflix, it was categorized as a documentary. In or around mid-July 2019, Netflix changed its categorization to a TV Drama or Crime TV Show. At present, Netflix categorizes the film series as a Crime TV Show.

169.     While the film series purports to be "based on" a true story, Defendants have publicly referred to the film *as a* true story, supported by documentary evidence from the case against The Five, including with respect to Ms. Fairstein.

170.     Defendants DuVernay and Locke, further made express, public statements against Ms. Fairstein, using their false portrayal of Ms. Fairstein in the film series as purported evidence of the truth of their statements about her. Set forth *infra* is a non-exhaustive recitation of the numerous times in which Defendants referred to *When They See Us* as real, true, or based on documentary evidence, including with respect to the false and defamatory portrayal of Ms. Fairstein in the film series.

---

[120] https://www.youtube.com/watch?time_continue=58&v=f9hRxkHv3Vk.
https://www.palmbeachpost.com/ZZ/entertainment/20190419/trailer-for-ava-duvernays-central-park-five-series-when-they-see-us-is-deeply-unsettling

### A. **Ms. DuVernay's Statements**

171.    On April 19, 2019, Ms. DuVernay posted the trailer for *When They See Us* on Instagram with the message:

> On this exact day 30 years ago, a woman was raped in Central Park. Five black + brown boys were framed for her rape. The story you know is the lie that police, prosecutors and Donald Trump told you. WHEN THEY SEE US is the story of the boys from their eyes and their hearts. May 31 on @Netflix. (Full trailer in bio)[121]

172.    On May 17, 2019, Ms. DuVernay responded to a user on her Twitter account: "I wish it was fiction too. Thanks for watching early. #whentheyseeus."[122]

173.    On May 24, 2019 Ms. DuVernay tweeted: "The Story you know is the lie they told you. 30 years ago. Tonight. Always. @WhenTheySeeUs, the real story of The Central Park 5 told by the falsely imprisoned men themselves, debuts on @Netflix next Friday, May 31."[123]

174.    On May 29, 2019, two days before the film series premiered, *Rolling Stone* published an interview with Ms. DuVernay in which she represented that the film was based on her review of documentary evidence pertaining to the case:

> I started speaking with the men first. That was my first way in. And from there I folded in all of the court transcripts, different records and files that we were able to get a hold of through public means and private transfer. We then read every single stitch of press coverage to really get an understanding of the ways in which this was being reported, to understand the propaganda around this case.[124]

175.    On May 31, 2019, the day of the film series' premiere, Ms. DuVernay tweeted:

> The story you know… is the lie you were told. Today, the truth prevails. #WhenTheySeeUs. Now streaming worldwide. Love to Korey, Ray, Yusef, Kev, Antron.[125]

---

[121] https://www.instagram.com/p/BwcZkrOF4xY/
[122] https://twitter.com/ava/status/1129629307771314176
[123] https://twitter.com/ava/status/1132118462162063361
[124] https://www.rollingstone.com/tv/tv-features/when-they-see-us-netflix-central-park-five-ava-duvernay-interview-841081/
[125] https://twitter.com/ava/status/1134354271980232704

176.    On May 31, 2019, Ms. DuVernay tweeted a reply to a post:

Not drama. 100% real. The real rapist is Matias Reyes. I shot the prison yard scene just as Korey told it to me. And the words Matias says to Nancy Ryan are almost word for word from his real confession. Wild, I know. #When TheySeeUs[126]

177.    On June 1, 2019, Ms. DuVernay tweeted:

the incredible work of @AtticaLocke who was my partner on this part of the script. She delved deep into the court transcripts, testimony, legal maneuvers. She had the patience + experience to decipher the legal mumbo jumbo, explain it to me, build the suspense. She's sensational.[127]

178.    On June 2, 2019, Ms. DuVernay retweeted a Twitter post written by another user that attacked Ms. Fairstein, quoting Nancy Ryan in Part Four of the film series, stating: "When you were writing crime novels Kevin, Antron, Yusef, Raymon[d] and Korey were serving time for crimes they didn't commit. #FamkeJanssen Drop #Linda Fairstein@Penguinbooks @WhenTheySeeUs #WhenTheySeeUs." Above this post Ms. DuVernay wrote:

Famke played Nancy Ryan beautifully. And the arc of the Fairstein/Ryan relationship is real. Fairstein really battled Ryan for the case in 1989. Ryan really ended up getting it back after Matias Reyes confessed. Wild. #WhenTheySeeUs[128]

179.    In a June 2, 2019 interview with the *Daily Beast*, Ms. DuVernay said that the research she conducted for the film series included "reading the court transcripts and all the paperwork on the case."[129]

180.    On June 8, 2019, Ms. DuVernay retweeted celebrity Reese Witherspoon:

What an extraordinary telling of a harrowing story. A story that needed to be retold with truth and accuracy. @WhenTheySeeUs is profound and so

---

[126] https://twitter.com/ava/status/1134675309981102080?lang=en
[127] https://twitter.com/ava/status/1134866046618202112
[128] https://twitter.com/ava/status/1135331321952104448?lang=en
[129] https://www.thedailybeast.com/netflixs-when-they-see-us-ava-duvernay-on-central-park-five-case-and-why-she-treated-trump-as-a-footnote

heartbreaking. And necessary. Bravo @ava and her @ARRAYNow team who are changing the way stories are told.[130]

181.    On June 10, 2019, Ms. DuVernay retweeted a Twitter post showing a meme of Joan Collins saying "I have receipts" and addressing Ms. Fairstein's editorial about *When They See Us*, published in *The Wall Street Journal*, in which Ms. Fairstein called the film's portrayal of her an "outright fabrication."[131] Ms. DuVernay called Ms. Fairstein's reaction "*Expected* and typical. Onward…" (emphasis added).

182.    On June 12, 2019, Netflix aired an interview conducted by Oprah Winfrey of Ms. DuVernay and Messrs. McCray, Santana, Salaam, Richardson and Wise, in which Ms. Fairstein was discussed as follows:

> It is widely reported that detectives, influenced by the head of the Manhattan District Attorney's Sex Crimes Unit, Linda Fairstein, coerced the young men, then just seventh and eighth graders, into signing confessions. Film footage is then shown of the Raymond Santana confession, and Ms. DuVernay says "the goal was to create something that stuck to your ribs and that wasn't junk food. It was to create something that was gonna be a catalyst for conversation."

> Ms. Winfrey asks ,"So you were surprised by the public. Have you been surprised by Linda Fairstein's response?" Ms. DuVernay responds "Um, no, I wouldn't say I'm surprised by it. I think it's expected."

> Ms. Winfrey says, "Linda Fairstein, as you know was a prosecutor in the Manhattan District Attorney's office, and she led the Sex Crimes Unit during this case. And it's, of course, been reported that she has stepped down from the board positions, some, and also stepped down from charities, and has been reported that she's been dropped by her publisher. What do you have to say about that?"

> Ms. DuVernay responds, "I think it's important that people be held accountable. And that accountability is happening in a way today that it did not happen for the real men 30 years ago. But I think that it would be a tragedy if this story and the telling of it, um, came down to one woman being punished for what she did, because it's not about her. It's really not all about her. She is a part of a system that's broken. It was built to be this way. Okay? It was built this way. It was built to oppress. It was built to control. It was built to shape our culture in a specific

---

[130] https://twitter.com/ReeseW/status/1137606163149623301
[131] https://www.wsj.com/articles/netflixs-false-story-of-the-central-park-five-11560207823. *See also*
https://www.nytimes.com/2019/06/11/arts/television/linda-fairstein-when-they-see-us.html; Tampa Bay Times,
*Linda Fairstein Condemns Netflix Series on Central Park Five*, June 6, 2019.

way that kept some people here and some people here. It was built for profit. It was built for political gain and power, and it is upon – incumbent upon us. It lives off of us, our taxpayer dollars, our votes, the goods that we buy that are made inside – inside of prisons. It lives off of our ignorance and we can no longer be ignorant. And so the goal of this—okay, Linda Fairstein, okay Elizabeth Lederer, okay, all of these people on this particular case we need to be held accountable. But the real thing that we are all trying to do, all the artists who collaborated with me…our real goal is to be able to say, Go, America. Let's do this. Let's change this. And you can't change what you don't know. So, we came together to show you what you may not know. Now that you know, what will you do? How will you change this? That's our goal."

183. On June 12, 2019, Ms. DuVernay tweeted "it's their time. #WhenTheySeeUsNow." In the Tweet was an embedded tweet stating "not a single publication needs to give Linda Fairstein a chance to speak. These men are broken because of her actions. She has done more than enough damage. #WhenTheySeeUsNow."[132]

184. On June 25, 2019, Ms. DuVernay tweeted:

Imagine believing the world doesn't care about real stories of black people. It always made me sad. So when Netflix just shared with me that 23M+ account worldwide have watched #WhenTheySeeUs, I cried. Our stories matter and can move across the globe. A new truth for a new day.[133]

185. Ms. DuVernay's public statements about *When They See Us* demonstrate that she intended the film series to be construed by audiences in a manner that would incite hatred, contempt and disgrace towards Ms. Fairstein. Ms. DuVernay further intended that Ms. Fairstein be "held accountable" as a result of the film.

186. Given Ms. DuVernay's representations that she, and Ms. Locke, reviewed the public record relating to the underlying case against The Five, Ms. DuVernay's deliberately false and inflammatory portrayal of Ms. Fairstein in *When They See Us*, detailed *supra* Paragraphs 44-130, evidences Ms. DuVernay's actual knowledge that the manner in which Ms. Fairstein was portrayed was false or, at the very least, that Ms. DuVernay acted in reckless disregard as to the

---

[132] https://twitter.com/ava/status/1139009911788937216
[133] https://twitter.com/ava/status/1143665686062886912

truth of how Ms. Fairstein was portrayed. Ms. DuVernay's subsequent representations that the film is a true, or real, story evidence Ms. DuVernay's deliberate intention to harm Ms. Fairstein.

**B. Ms. Locke's Statements**

187.    On May 29, 2019 Ms. Locke posted on Instagram

> Friday! A piece of American History gets rewritten with the truth. Happy to have used my talents to help rewrite this wrong. #WhenTheySeeUs #Repost @whentheyseeus @ava @robinbooboo @santanaraymond @dr.yusefsalaam @koreykingwise @kevrichardson77 #AntronMcCray[134]

188.    On May 31, 2019, the day of the film series' premiere, Ms. Locke tweeted a *People* magazine article, "Inside the Controversy About Linda Fairstein, Central Park 5 Prosecutor play by Felicity Huffman"[135] noting "In which I remember with zeal telling Linda Fairstein her time is up."[136]

189.    On May 31, 2019, Ms. Locke also retweeted the following

> Since I'm stuck in bed for yet another day, I'm about to binge watch @WhenTheySeeUs with this little puppy. I'm eager to learn the TRUE story of the Central Park Five. @centralparkfive And for @LindaFairstein, as no one said it better than @atticalocke -#yourtimeisup

190.    On June 1, 2019, Ms. Locke retweeted an article, "Writer Linda Fairstein's past as prosecutor overseeing the Central Park Five case causes award controversy," to which a user added "while y'all are being introduced to #lindafairstein because of #WhenTheySeeUs lemme intro you to @atticalocke who's had everyone's back."

191.    On June 3, 2019, Ms. Locke posted a tweet from Sarah Weinman who wrote an article about Matias Reyes' victims,[137] stating "This blood is on Linda Fairstein's hands."[138] She

---

[134] https://www.instagram.com/p/ByDmvbWgKib/
[135] https://people.com/crime/linda-fairstein-central-park-five-prosecutor-controversy/
[136] https://twitter.com/atticalocke/status/1134473617150885889
[137] https://www.thecut.com/2019/06/the-attackers-other-victims-in-the-central-park-five-case.html
[138] https://twitter.com/atticalocke/status/1135624250574888960

further tweeted on the same day, "These women deserved better from NYPD and Linda Fairstein. By locking in on five children as rapists, many more lives were ruined."[139]

192.    On June 4, 2019, as part of the discussion in the Twitter thread concerning Ms. Fairstein's MWA award, Ms. Locke posted a tweet that stated:

> The Central Park Five were not involved in any of the other crimes that night. Other, older kids were identified by the victims as their attackers. Not Korey, Raymond, Yusef, Kevin or Antron. In fact when they saw other kids acting rough, they left the park….
>
> They weren't guilty of anything. I read the trial transcripts. I know this case. You can't argue with facts.[140]

193.    On June 7, 2019, Ms. Locke tweeted a story by the *Hollywood Reporter* about Ms. Fairstein getting dropped by her publisher, stating "…good night indeed." She posted a similar post on Instagram.

194.    On June 11, 2019, Ms. Locke posted on Twitter:

> I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes even people I hate act the way they do. But fuck it: Linda Fairstein is trash, was trash, will always be trash.[141]

195.    On June 11, 2019, Ms. Locke posted a related tweet, regarding an editorial Ms. Fairstein wrote about *When They See Us* published in *The Wall Street Journal*:

> This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her.[142]

196.    On June 19, 2019, as reported in the *Florida Courier*, under the article subheading "Why Documentary Resonates," Ms. Locke discussed "restorative justice" with respect to Ms. Fairstein's loss of her publishing deal, agent and resignation from various boards after the film

---

[139] https://twitter.com/atticalocke/status/1135929864798605312
[140] https://twitter.com/atticalocke/status/1067463803187560448?lang=en
[141] https://twitter.com/atticalocke/status/1138455226720149506
[142] https://twitter.com/atticalocke/status/1138455227605114880

series premiered and accused Ms. Fairstein of "gaslighting"[143] the public in response to the film series:

> We are living in a time of cognitive dissonance, which is how you have Linda Fairstein's ass talking all the stuff she's talking about…Lies [are] so easily bent to where you question your own sanity…That's another reason why I think it resonates in this particular time: We are living in another time where we are being gaslit on a daily basis.[144]

197.   On July 7, 2019, Ms. Locke posted photos on Twitter of the purported evidence she and Ms. DuVernay have of the truth of what was portrayed in *When They See Us*, showing a binder of Writer's Room Timelines, and a plastic container holding a binder and some folders. Ms. Locke states in the Tweet:

> Just found these… all the research/work I brought home to start writing Episode 2 of @WhenTheySeeUs. When I tell you this is one of the most accurate portrayals of a true story … this is why. @ava our team took the truth as our bible.[145]

On the same day, Netflix retweeted this tweet on its Twitter account.

198.   Ms. Locke's post-premiere statements show that her anger, hostility, and venomous actions toward Ms. Fairstein—the singular subject of her attacks, out of the forty-plus law enforcement individuals connected to the original case—continued and that she intended to, and did, use *When They See Us* as a means of continuing to attack Ms. Fairstein and incite hatred, contempt and disgrace against Ms. Fairstein. Ms. Locke, who represented that she and Ms. DuVernay extensively researched the public record when writing the film series, relied on the film series as evidence to support her defamatory statements that, among other things, Ms.

---

[143] "Gaslighting is a tactic in which a person or entity, in order to gain more power, makes a victim question their reality. It works much better than you may think. Anyone is susceptible to gaslighting, and it is a common technique of abusers, dictators, narcissists, and cult leaders. It is done slowly, so the victim doesn't realize how much they've been brainwashed. For example, in the movie Gaslight (1944), a man manipulates his wife to the point where she thinks she is losing her mind." https://www.psychologytoday.com/us/blog/here-there-and-everywhere/201701/11-warning-signs-gaslighting.

[144] http://flcourier.com/duvernay-responds-to-trumps-latest-central-park-five-comments/. This piece was also published in the *L.A. Times*. *See id.*

[145] https://twitter.com/atticalocke/status/1147979707918405633

Fairstein engaged in prosecutorial misconduct, was an "unrepentant liar," and that "blood is on" Ms. Fairstein's hands.

199.    Given the innumerable examples in the public record that demonstrate that Ms. Fairstein was falsely depicted throughout *When They See Us*, Ms. Locke must have known that the manner in which Ms. Fairstein is portrayed in the film series is false, or at the very least recklessly disregarded the truthfulness of the manner in which Ms. Fairstein was depicted. Ms. Locke's public statements further demonstrate that Defendants chose to cast Ms. Fairstein as the villain in the film series, despite her obvious, minimal involvement in all aspects of the original investigation.

### C.   Netflix's Statements

200.    On April 19, 2019, Netflix's Twitter account posted the official film trailer, with "The story you know is the lie they told you. #WhenTheySeeUs arrives May 31, only on @Netflix."[146]

201.    On April 19, 2019, Netflix tweeted a reply to @DebUrTheWorst @ava "May 31. The truth is coming out."[147]

202.    On May 1, 2019, Netflix posts a Tweet, @Rissy503 @ava @netflix "It's a powerful story that allows for the truth to come out."[148]

203.    On May 1, 2019, Netflix embedded a tweet by Shonda Rhimes, and added "Time for the truth to be told."[149]

204.    On May 2, 2019, Netflix tweeted a reply to @ShelsDash @ava @netflix, "It's time for the truth."[150]

---

[146] https://twitter.com/whentheyseeus/status/1119254330866053121
[147] https://twitter.com/whentheyseeus/status/1119291484967067653
[148] https://twitter.com/whentheyseeus/status/1123627167852531718
[149] https://twitter.com/whentheyseeus/status/1123629530067849216

205.    On May 8, 2019, Netflix tweeted a reply to @LoveandHope778, "It's almost time to witness the power of truth."[151]

206.    On May 9, 2019, Netflix tweeted a reply to @iamwesmoore, "False rhetoric that is due to be overturned."[152]

207.    On May 12, 2019, Netflix tweeted a reply to @Malgran, "There's power in the truth."[153]

208.    On May 14, 2019, Netflix tweeted a reply to @THEOFFICALJASJ, "You're in luck, we shed light on the truth May 31st."[154]

209.    On May 14, 2019, Netflix tweets a reply to @franklinleonard @kristapley @JharrelJerome, "We're here to speak the truth."[155]

210.    On May 15, 2019, Netflix tweeted a reply @alexiajh_, "We are ready to share the truth."[156]

211.    On May 28, 2019, Netflix tweeted a reply to @Shadell_, "Their truth will finally be revealed."[157]

212.    On May 30, 2019, Netflix posted on Instagram, "At Midnight PT, we begin to tell the true story of the boys they called the Central Park Five."

213.    On June 1, 2019, Netflix tweeted a reply to @angelaapereez15, in which she says "I'm watching @WhenTheySeeUs and it's so infuriating to see how poorly this case was handled." Netflix replied, "It is even more of a reason to share their truth."[158]

---

[150] https://twitter.com/whentheyseeus/status/1124104459175505921
[151] https://twitter.com/whentheyseeus/status/1126304621041864704
[152] https://twitter.com/whentheyseeus/status/1126633879433908225
[153] https://twitter.com/whentheyseeus/status/1127633208240234497
[154] https://twitter.com/whentheyseeus/status/1128354266991812608
[155] https://twitter.com/whentheyseeus/status/1128413611657793537
[156] https://twitter.com/WhenTheySeeUs/status/1128809312107679744
[157] https://twitter.com/WhenTheySeeUs/status/1133386353822052353
[158] https://twitter.com/WhenTheySeeUs/status/1134954505206870016

214. On June 4, 2019, Netflix replied to a Tweet from @terrybright in which he tweets "35 minutes in of @WhenTheySeeUs I don't think I can finish this!! They can't be real life" Netflix replies "This story is real, but please watch at your own pace."[159]

215. On June 10, 2019, Netflix posted photos from the film series premiere and the Oprah Winfrey interview with the message, "Shedding light on the truth. @Oprah Winfrey interviewed The Exonerated Five, cast, and @Ava DuVernay last night for @Netflix's FYSEE event. Watch the full interview this Wednesday @10PM ET/ 1AM PT on @OWNTV and Netflix."[160]

216. On June 15, 2019, Netflix posted a video from the *When They See Us* set on Twitter with the message, "There's power in truth. What did you learn in watching #WhenTheySeeUs?"[161]

217. On July 12, 2019, Netflix replies to a Tweet by abrar_rh1, "@WhenTheySeeUs everyone needs to watch this and know what happened." Netflix replied, "The true story for all to hear."[162]

218. On July 15, 2019, Netflix tweeted, "This might have been the greatest thing to touch Netflix @netflix @WhenTheySeeUs #Facts #100 @NiecyNash@Netflix #Facts.[163]

219. On August 28, 2019, *Vanity Fair* published an article online with the title, "*When They See Us* and *Chernobyl* Prove Truth is Stronger than Fiction," which reported that, as of that date, *When They See Us* had been watched by more than 23 million Netflix accounts worldwide.

---

[159] https://twitter.com/WhenTheySeeUs/status/1136011515889250309
[160] https://twitter.com/WhenTheySeeUs/status/1138158580593377280
[161] https://twitter.com/WhenTheySeeUs/status/1139590623718043648
[162] https://twitter.com/WhenTheySeeUs/status/1149847630450581504
[163] https://twitter.com/jperks631/status/1150827817497554944 *and*
https://twitter.com/WhenTheySeeUs/status/1150917176615817216

A tweet by Ms. DuVernay is cited in the article, referring to the film series "Imagine believing the world doesn't care about real stories of black people."

220.    Later, the article quotes Ms. Holland, Netflix's vice president of original content, as follows: "The majority of our members watched at least one documentary in the past year…So we know that they're really drawn to true stories." With respect to *When They See Us*, Ms. Holland is quoted as saying, "you empathize or sympathize with these characters and you can't turn away from those faces."[164]

221.    In embracing Ms. DuVernay's and Ms. Locke's representations, and marketing *When They See Us* as a true story, Netflix relied on sources with demonstrated bias against Ms. Fairstein. To the extent that Ms. Holland, or other agents/employees of Netflix, were involved in the filmmaking process, including script approval, they acted either with knowledge of, or in reckless disregard of, the falsity of the manner in which Ms. Fairstein was portrayed in the film series. They also ignored Ms. Fairstein's notice—which they received two years prior to the film series' premiere—that the public record should be carefully reviewed to avoid such a result. Given the innumerable public documents that demonstrate that Ms. Fairstein is falsely portrayed in the film series, Netflix must have entertained serious doubts as to the truth of the manner in which Ms. Fairstein is depicted in *When They See Us*.

222.    Ms. Holland's public statements concerning Netflix's reliance on data concerning viewership with respect to documentaries, demonstrates that Netflix intended to send a message to the public that *When They See Us* is a documentary as opposed to a dramatization, as do Netflix's social media pages which repeatedly referred to the "truth" and "facts."

---

[164] https://www.vanityfair.com/hollywood/2019/08/chernobyl-when-they-see-us-ava-duvernay-craig-mazin-must-endure-tv

223.    Despite receiving presuit notice under Section 770.01 of the Florida Statutes—

specifically outlining the false and defamatory content in *When They See Us*—Defendants took

no immediate actions to correct the false and defamatory manner in which Ms. Fairstein is

portrayed.

## VII.    The Film Series Lacks a Prominent Disclaimer

224.    *When They See Us* contains no prominently displayed disclaimer to inform

viewers that the manner in which individuals are portrayed in the film is a dramatization.

225.    Rather, the viewer must purposely elect to watch the film credits at the end of

each episode by clicking a button on the screen.

226.    The disclaimer appears *at the end* of the credits—only if the viewer chooses to

click on that button—and is barely legible.

227.    Thus, if a viewer does not elect to watch each episode's credits through to the

end, he or she will not see the disclaimer. If he or she does watch the credits through to the end,

it is unlikely that he or she will be able to read the disclaimer. Upon information and belief,

Defendants strategically placed the disclaimer at the end of each episode, and in small font, so

that it is highly unlikely that it would be seen by viewers.

228.    The disclaimer states as follows:

> While the motion picture is inspired by actual events and persons, certain
> characters, incidents, locations, dialogue and names are fictionalized for
> the purposes of dramatization. As to any such fictionalization, any
> similarity to the name or to the actual character or history of any person,
> living or dead, or actual incident is entirely for dramatic purposes and not
> intended to reflect on any actual character or history.

229.    Regardless of the existence of this strategically placed and barely legible

disclaimer, as detailed above, Defendants have gone out of their way to market, and promote,

*When They See Us* as a *true* story.

230.    As detailed above, at Paragraphs 44-130, Defendants' portrayal of Ms. Fairstein in *When They See Us* goes far beyond dramatization and is a wholly fictional portrayal of Ms. Fairstein using her real name. The manner in which she is portrayed is intended to—and has— incited hatred, ridicule, contempt and disgrace against Ms. Fairstein, as well as threats to her life. The film series has further impugned Ms. Fairstein's reputation and decades-long career as a ground-breaking prosecutor for the Manhattan District Attorney's office by portraying Ms. Fairstein as repeatedly violating the law and, at the very least, acting in a racist, unethical and corrupt manner.

231.    The film scenes in which Ms. Fairstein's character appears do not concern events or situations in which any of The Five were present, and cannot be explained or justified as portraying their account of what happened.

## VIII.    The Public's Response to *When They See Us* and Ms. Fairstein's Resulting Damages

232.    The manner in which Defendants have marketed and spoken about *When They See Us* led to the public's perception that the film series is factual rather than a dramatization of what occurred. As noted in a *Rolling Stone* article published on June 8, 2019:

> [T]he anger spilling from viewers is being aimed at Linda Fairstein, perhaps the most conspicuous villain of the story. Fairstein, now 72, was in 1989 the chief of the Sex Crimes Prosecution Unit in the Manhattan District Attorney's office, the inspiration for the enduring NBC series Law & Order: Special Victims Unit. In the miniseries, Felicity Huffman portrays her as obsessed with pinning the crime on the five boys, no matter what blatant abuses of power or utter falsehoods are required to make her narrative work. Though she has objected to her portrayal in When They See Us, in the real world, Fairstein remains unapologetic about the treatment of the Central Park Five, despite their exoneration and DNA proof connecting a confessed serial rapist to the attack... The release of the miniseries has brought some overdue karma for Fairstein.[165]

233.    As reported in *The New York Times*:

---

[165] https://www.rollingstone.com/culture/culture-features/when-they-see-us-central-park-five-kalief-browder-845839/

For much of her life, Linda Fairstein was widely viewed as a law enforcement hero.

As one of the first leaders of the Manhattan district attorney's sex crimes unit, later the inspiration for "Law & Order: Special Victims Unit," she became one of the best known prosecutors in the country. She went on to a successful career as a crime novelist and celebrity former prosecutor, appearing on high-profile panels and boards.

But since last Friday and the premiere of "When They See Us," Ava DuVernay's Netflix series about the Central Park jogger case, Ms. Fairstein has become synonymous with something else: The story of how the justice system wrongly sent five black and Latino teenagers to prison for a horrific rape.

Ms. Fairstein ran the sex crimes division when, in 1989, a white woman jogging in Central Park was viciously raped, beaten, and left for dead. In the four-part series, Ms. Fairstein's character is shown as the driving force in the case, urging on a prosecutor who had doubts and finding ways to explain away facts that pointed to the teens' innocence.[166]

234.     As reported in *The Florida Courier*:

The four-part Netflix project debuted on May 31 to critical acclaim and soon led to real-world fallout for the authorities involved.

Fairstein, the head of the sex crimes unit in the Manhattan district attorney's office at the time of the case, and who had prospered in her second career as a crime novelist, was dropped by her book publisher and her agency after a viewer-led petition went viral. (It currently has more than 200,000 signatures.)

She also resigned from her board positions at Vassar College and charitable organizations God's Love We Deliver and Safe Horizon.[167]

235.     That the film series has been perceived as a true and accurate account of what happened is evidenced by the public's response to the film, attacking Ms. Fairstein on all fronts, including through death threats. For example, under #WhenTheySeeUs on Twitter, users have called for Ms. Fairstein to "die a horrific and painful death," be "hung, drawn and quartered," and "knocked out, stomped and spit on." A group called "Close Rosies"—an organization of

---

[166] https://www.nytimes.com/2019/06/06/arts/television/linda-fairstein-when-they-see-us.html
[167] http://flcourier.com/duvernay-responds-to-trumps-latest-central-park-five-comments/

present and former female inmates of the Riker's Island prison—published Ms. Fairstein's address on Twitter, suggesting that the proximity of her address to Jeffrey Epstein's was evidence of a link between the two, and discussing whether suggesting violence against her person, though justified, might get their own members in further trouble.[168]

### A. #CancelLindaFairstein

236.     Immediately after the premiere of *When They See Us*, a hashtag was started on Twitter through which members of the public sought to #CancelLindaFairstein. "#Cancel" campaigns are part of today's "callout culture" and are used in social media to intentionally harm and publicly shame individuals for perceived wrongdoing. Oftentimes the people seeking to #cancel an individual believe that, in doing so, they are engaging in a form of activism. Recently, former President Barack Obama had this to say about "callout culture":

> 'Like, if I tweet or hashtag about how you didn't do something right or used the wrong verb. Then, I can sit back and feel pretty good about myself because, man, you see how woke I was?' he said. 'You know, that's not activism. That's not bringing about change. If all you're doing is casting stones, you're probably not going to get that far.'

> He went on to say that he sees callout culture being especially prevalent on college campuses.

> I do get a sense sometimes now among certain young people — and this is accelerated by social media — there is this sense sometimes of 'the way of me making change is to be as judgmental as possible about other people,' he said.

> Obama went on to say, 'This idea of purity, and you're never compromised, and you're always politically woke and all that stuff, you should get over that quickly.'

> Calling for more nuance in difficult conversations, Obama said, 'The world is messy, there are ambiguities. People who do really good stuff have flaws. People who you are fighting may love their kids and share certain things with you.'[169]

---

[168] Notably, during the filming of *When They See Us*, individuals working on the film went to Ms. Fairstein's New York apartment to scope it out and attempted to interview building staff, including to determine whether Ms. Fairstein was there.

[169] https://www.nytimes.com/2019/10/31/us/politics/obama-woke-cancel-culture.html

237.     Twitter users posted the following under the hashtag #CancelLindaFairstein:

- On June 4, 2019, a user tweeted the portion of Part Four of the series where Ms. Ryan and Ms. Fairstein meet in a restaurant, stating "this woman clearly had no remorse WHATSOEVER and this part of the film #WhenTheySeeUs clearly defines her as having an agenda. There's absolutely NO excuse for her behavior. I can now understand why people want to #CancelLindaFairstein."

- On June 4, 2019, a user tweeted "Just finished When they see us on Netflix, broke my heart, most of all I never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail, and suffer things no child should, so fuck you linda, say hi to the devil for me #CancelLindaFairstein."

- On June 6, 2019, a user tweeted "What #LindaFairstein did to these young men is beyond disgusting & excruciating to watch. Thank u @netflix for bringing their story to light. Everyone pls watch #WhenTheySeeUs #BlackLivesMatter."

- On June 6, 2019, a user tweeted "Your camp issued a statement condemning the work of @ava after you requested your image be controlled in the docuseries after she reached out to you, only to later deny that conversation ever took place. You're doing a lot for someone who 'did no wrong' #CancelLindaFairstein."

- Color of Change.Org, an organization with which Ms. DuVernay is affiliated,[170] tweeted on June 8, 2019, "#LindaFairstein prosecuted the five innocent Black boys featured in Ava's #WhenTheySeeUs. She shouldn't be able to make more money off ruining the lives of young Black people she targeted. Tell @simonschuster to #CancelLindaFairstein http://cancellindafairstein.org." The Tweet featured a picture of Ms. Fairstein from when she was a prosecutor.

- On June 11, 2019, a user tweeted "hope Linda Fairstein knows that nobody believes a word that comes out of her mouth. Saying the Netflix series isn't true. Just like she lied and made things up about innocent kids. Karmas a bitch Linda. Tsk. What goes around comes around #CancelLindaFairstein."

- On June 11, 2019, a user tweeted "Linda Fairstein should not have any kind of platform. Clearly, she's still using hers to weaponize an unjust system to attack Black people. Publishers should be more concerned about enabling her than about page clicks & selling crime novels. #CancelLindaFairstein #WhenTheySeeUs."

- On June 24, 2019, a user tweeted "this bitch needs to be locked tf up and die in jail."

- On June 30, 2019, a user tweeted "I hope the bitch dies she should rot in jail."

---

[170] https://justiceroundtable.org/resource/message-from-ava-duvernay-about-whentheyseeus-central-park-five/

- On August 17, 2019, a user tweeted "Forget cancelling her put her ass in jail in a mens [sic] jail where she can be raped."

- On August 17, 2019, the same user tweeted "I hope she dies."

- On August 19, 2019, a user tweeted "Having watched #WhenTheySeeUs I will never read another Linda Fairstein book ever again. Goodbye Alexandra Cooper & Mike Chapman, you were created by a monster. #CancelLindaFairstein."

- On September 24, 2019, a user tweeted "she should get 13 years in jail - the same as Korey Wise who served the longest sentence. Those she put behind bars were innocent. But Linda Fairstein is not. Only one set of footprints. She knew better from the outset."

- On October 14, 2019, a user tweeted "she's a sad excuse for a human being and should have lost her job, she is honestly the most disgusting person I've ever heard of, hope She has a horrible life being a racist asshole."

- On October 14, 2019, a user tweeted "There's a special V.I.P spot in hell for this wretched deceitful bitch may she suffer for the pain misery & heartache she caused, she the prosecutor police all involved in the case need to be locked up for their part in destroying the lives of those men."

- On December 9, 2019, a user tweeted "What a disgusting piece of human garbage. Burning in hell is not a good enough punishment for her! Why isn't this racist b*tch in jail for what she has done?"

- On December 11, 2019 a user described Ms. Fairstein as the "prosecutor that falsely and unfairly pushed the case forward against the Central Park Five."

- On December 27, 2019, a user tweeted about Ms. Fairstein "I hope you burn in hell your [sic] a parasite to this society i really hope you die like a parasite for what you have done."

238.   On June 4, 2019, Ms. Locke posted a tweet embedding an article by *Esquire* magazine[171] discussing #CancelLindaFairstein and how the hashtag, and Twitter contributed to a boycott against Ms. Fairstein, causing her publisher and literary agent to terminate their

---

[171] https://www.esquire.com/entertainment/tv/a27699384/linda-fairstein-netflix-when-they-see-us-central-park-5-prosecutor-boycott/

professional relationships with her immediately. Ms. Locke stated in her tweet, "we get justice where we can…."[172]

239. On June 4, 2019, Ms. Locke posted another related tweet about Ms. Fairstein:

she also described the #CancelLindaFairstein movement as a 'mob-mentality reaction. LADY, you stay seeing mobs where they ain't none. That's what got you in this trouble in the first place. FOH.[173]

## B. Petitions

240. Shortly after the film series premiered, a number of petitions were circulated to remove Ms. Fairstein from various boards, have her book publishers of many decades end their relationships with her, demand that retailers stop selling her books, and to insist that the District Attorney reopen all of the cases that she prosecuted over the course of her career—even though, in the latter case, the petitions claimed no other examples of prosecutorial misconduct or racism.

### 1. Ms. Fairstein's Books and Publishing Agreements

241. Immediately after *When They See Us* premiered, a petition was posted on Change.org calling for the removal of Ms. Fairstein's books from Amazon, Barnes and Noble and other booksellers' platforms. Per the petition:

Prosecutor Linda Fairstein coerced and convicted five innocent black boys of a crime they did not commit in 1989. The Central Park jogger criminal case involved the assault and rape of a Caucasian woman Trisha Meili, and was one of the most widely publicized cases of the decade. Fairstein accused five boys ranging from ages 14 to 16 of the rape and assault, and abused their legal rights as she manipulated them without the presence of their guardians. Korey Wise, Yusef Salaam, Raymond Santana, Antron McCray and Kevin Richardson were wrongfully convicted in 1989 and served sentences that ranged from 6 to 14 years in the system. Despite a serial rapist confessing to the crime and their records being exonerated, Fairstein still profits off of the promotion and sale of her many books as an author. In Netflix's recent film When They See Us (2019), Ava DuVernay highlights the lives that were dehumanized for decades because of this woman. We are asking Barnes and Noble, Amazon, Audible and any other outlets

---

[172] https://twitter.com/atticalocke/status/1135907878273863680
[173] https://twitter.com/atticalocke/status/1136059268799401984

that allow this woman to profit through their organizations to remove her books from their platforms. Show consumers of color what our rights and stories mean to you![174]

242. A second petition, which presently has nearly 240,000 signatures, seeks to remove

Ms. Fairstein's books from all retailers:[175]

Linda Fairstein achieved her fame & fortune through her wild imagination & at the expense of five INNOCENT children's pain... let's start off with why this petition was started , Linda Fairstein led a witch hunt against five teenage boys even though the physical evidence didn't support her theory she raged on with one goal in mind & that was to get a conviction at any expense even the lives of teenage boys... she led the hunt that fundamentally changed these men's lives forever & unfairly tarnished their reputation, you could almost say she hunted these boys for their lives & after securing the conviction she wanted & the spotlight being off the case Linda decided to do what she does best tell story's [sic], she became a fictional true crime writer once again using that imagination. I believe it to be fact that she's led this whole entire crusade out of the aspiration of financial gain knowing the media coverage the case would generate & knowing if she secured a conviction regardless of the evidence her book career on true crime (her career field) would flourish... I believe her actions were led by her greed & desire to relevant maybe even famous & I believe these character flaws of hers led her to KNOWINGLY & WRONGFULLY hunt these boys into a conviction & because of her shameful past I am starting a petition to ask ALL retailers & book publishers to stop selling Linda Fairstein books or any product that has ties to her.

243. A third petition, created by Color of Change.Org, urges Simon & Schuster to drop

Ms. Fairstein:[176]

Linda Fairstein was one of the top prosecutors of the Central Park Five case and oversaw the young boys' interrogation. She falsely prosecuted these young innocent Black boys and lied and altered evidence illegally to gain convictions and false confessions.

244. In response to the public outcry over *When They See Us*, within a week of the film

series' premiere, Ms. Fairstein's publisher, Dutton (an imprint of Penguin Random House),

---

[174] https://www.change.org/p/barnes-noble-cancellindafairstein-justice-for-the-central-park-5
[175] https://www.change.org/p/amazon-all-other-book-retailers-linda-fairstein-central-park-five-book-removal?use_react=false. *See* https://www.latimes.com/books/la-et-jc-linda-fairstein-boycott-20190606-story.html
[176] https://act.colorofchange.org/sign/drop_linda_fairstein/?source=twitter

terminated her publishing agreement. This was publicized nationwide.[177] At the time, Ms. Fairstein had three (3) books remaining on her contract.

245. At around the same time, her publisher in the United Kingdom, Little Brown UK, terminated its agreement with Ms. Fairstein.

246. Ms. Fairstein's literary agency since 1994, ICM Partners, also dropped Ms. Fairstein as a result of the film series.[178] This was also publicized nationally. Ms. Fairstein's agent in the United Kingdom followed suit.

### 2. Calls to Reopen Ms. Fairstein's Cases

247. In June 2019, an online petition was created asking Manhattan District Attorney Cy Vance to reopen all of Ms. Fairstein's cases.[179] Per the petition:

> Ava Duvernay's powerful 4-part series When They See Us has brought Fairstein's wretched practices back out into the open and sparked new outrage. Prompted by the series, Linda has been forced to step down from the boards of 3 nonprofit organizations, Vassar College, dropped from one of her publishing companies, and have had awards rescinded. It's not enough just to affect Fairstein's ability to profit from this injustice--we have to make sure ALL of her past harms are undone. If there are any other people wrongfully convicted, like the 'Exonerated Five', then we must go back and clear their records. Will you join us in calling on Manhattan DA Cy Vance to do the right thing and review all of Fairstein's convictions?

248. On June 14, 2019, New York City Advocate Jumaane Williams submitted a letter to District Attorney Vance, requesting a review of Ms. Fairstein's and Ms. Lederer's cases, as well as the firing of Ms. Lederer, who still works as an Assistant District Attorney. District Attorney Vance declined these requests.[180]

---

[177] https://www.heraldtribune.com/news/20190608/publisher-drops-central-park-five-prosecutor-linda-fairstein; https://www.apnews.com/98524380b1b749dc988528a94d197207
[178] https://www.essence.com/celebrity/linda-fairstein-dropped-icm-when-they-see-us-backlash/
[179] https://actionnetwork.org/petitions/reopen-linda-fairsteins-cases-now
[180] https://www.newsweek.com/central-park-five-decision-not-re-open-linda-fairstein-case-blasted-disgrace-1444623

249.     On September 25, 2019, Color of Change and Mr. Williams presented a petition with 43,000 signatures to District Attorney Vance and held a public protest.[181] A local news report, published on YouTube, spliced scenes from the film into the newscast covering the petition.[182]

### 3.  Vassar College

250.     Shortly after the premier of *When They See Us*, a Vassar College ("Vassar") student started a petition to remove Ms. Fairstein from Vassar's Board of Trustees, on which she had served for more than a dozen years.[183] Vassar is Ms. Fairstein's alma mater.[184]

251.     On June 3, 2019, Ms. Locke retweeted a post about the petition to remove Ms. Fairstein from Vassar College's Board of Trustees, "Please help the Vassar Community by raising awareness for our student-led petition!!"

252.     In an effort to avoid damage to Vassar as a result of the negative publicity, and at the direct suggestion of Vassar President Elizabeth Bradley and Board Chair Anthony Friscia, Ms. Fairstein resigned her post as a Trustee. Bradley also advised Fairstein not to attend her 50th reunion the following weekend, at which she was to be one of the three featured class speakers. The President of Vassar followed Fairstein's resignation with a public announcement.[185] The matter was reported in the national news media.[186]

---

[181] https://act.colorofchange.org/survey/reopen_linda_fairstein_cases_petition_delivery/
[182] https://www.youtube.com/watch?v=5PDz5m5bkbo
[183] https://www.change.org/p/vassar-college-remove-linda-fairstein-from-vassar-college-board-of-trustees
[184] Ms. Fairstein's high school in Mount Vernon, New York, also removed her from its Wall of Fame.
[185] https://president.vassar.edu/community/2019/190604-announcement-trustees-resignation.html
[186] https://www.floridatoday.com/story/news/nation/2019/06/04/when-they-see-us-case-ex-prosecutor-resigns-vassar-college-post/1347003001/; https://www.cnn.com/2019/06/05/us/linda-fairstein-vassar-college/index.html; https://variety.com/2019/tv/news/linda-fairstein-resigns-vassar-board-when-they-see-us-1203233923/; https://www.newsweek.com/central-park-five-linda-fairstein-resigns-vassar-petition-1442183

### C.   Resignation from Non-Profit Boards

253.   At the same time that Ms. Fairstein resigned from Vassar, she was asked to resign from the Board of non-profit Safe Horizon, an organization with which she had been involved for 30 years, that provides support and outreach to victims of domestic violence, sexual abuse, and sexual assault, among other things. She was told to resign by Board Chair Michael Slocum and CEO Ariel Zwang.

254.   Ms. Fairstein also resigned from the boards of God's Love We Deliver, an organization which feeds terminally ill New Yorkers, and on whose board she served for almost two decades, and the Joyful Heart Foundation, a victim advocacy board for which she had served as a founding board member.

### D.   *Glamour's* 1993 Woman of the Year Award

255.   On June 4, 2019, *Glamour* magazine's Editor-in-Chief published the following letter concerning a Woman of the Year award that Ms. Fairstein received in 1993:[187]

> We've heard from some of you in recent days as we, and the world, have been remembering the injustice of the prosecution of Antron McCray, Kevin Richardson, Yusef Salaam, Raymond Santana, and Korey Wise. Glamour has covered the new limited series centered on their story, *When They See Us*, through interviews with some of its actors and with director Ava DuVernay.

> Many of you have contacted us on social media to ask about the Glamour Woman of the Year award that the prosecutor in the case, Linda Fairstein, received a quarter century ago.

> Unequivocally, Glamour would not bestow this honor on her today. She received the award in 1993, before the full injustices in this case were brought to light. Though the convictions were later vacated and the men received a settlement from the City of New York, the damage caused is immeasurable.

> Glamour's Women of the Year awards should reflect our culture, the values of our brand, and our audience. We remain committed to being thoughtful and purposeful about whom we choose to celebrate, and in this case, the lens of history has shown us that we got it wrong.

---

[187] https://www.glamour.com/story/a-note-on-linda-fairstein-1993-woman-of-the-year-award

It's important to hold institutions accountable, and we appreciate the commitment to this issue that so many of you have demonstrated. Glamour is, and will always be, a platform that celebrates outspoken women. So to those of you who raised this issue, thank you. We want you to know that we hear you, and we assure you that while we can't erase the past, we will continue to learn from it.

256.    The harm to Ms. Fairstein's name, reputation, and career outlined above resulted solely from Defendants' false portrayal of Ms. Fairstein in *When They See Us*. The timing of the actions taken against Ms. Fairstein demonstrates this connection. Prior to the release of the film series, and Defendants' misrepresentations, Ms. Fairstein had two thriving careers—one in the law and one in literature—and was held in high-esteem for her decades of work as a prosecutor and advocate for crime victims, including her work to assist the wrongfully accused, both in her thirty years as an Assistant District Attorney and in private practice since 2002.

257.    Because the film series continues to be aired, and the defamatory content republished without correction, Ms. Fairstein continues to suffer harm, and will continue to suffer harm for the foreseeable future. More recently, her scheduled speaking appearances were cancelled, she has not been called for future speaking engagements or book signings, she has lost legal consulting jobs with national organizations and private individuals, she is unable to use social media to promote or market her books, and she is concerned for her safety. In January 2020, Ms. Fairstein became the subject of national politics when Amy Klobuchar, who was a Democratic presidential candidate at the time, returned a campaign contribution that Ms. Fairstein made to Ms. Klobuchar's campaign *prior to* the premiere of *When They See Us*. Media reports attributed the decision to return the contribution to the film series' portrayal of Ms.

Fairstein.[188] Senator Elizabeth Warren also backtracked from past support she received from Ms.

Fairstein due to the airing of the film series.[189]

## COUNT I
### (Defamation *Per Se* Against Ava DuVernay)

258.    Ms. Fairstein reasserts and realleges each and every allegation set forth above as

if fully set forth herein.

259.    Ms. DuVernay wrote, produced and directed the film series *When They See Us*,

which Ms. DuVernay caused to be published nationwide on Netflix on May 31, 2019. Since May

31, 2019, the film series has been accessed by millions of Netflix subscribers, including in the

State of Florida.[190] Since that date, the film series has continuously been republished nationwide

on Netflix's streaming service, including to subscribers in the State of Florida.

260.    As written by Ms. DuVernay, the film series depicted Ms. Fairstein in a false and

defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist

and derogatory language, violating the law by interrogating unaccompanied minors, pressuring

NYPD police officers and detectives to abuse and coerce confessions from The Five, ordering a

roundup of young men of color without probable cause, and withholding exculpatory evidence

from defense counsel prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took

none of the aforementioned actions.

---

[188] https://www.cnn.com/2020/01/03/politics/klobuchar-central-park-five-prosecutor-donation/index.html;
https://www.newsweek.com/linda-fairstein-central-park-five-amy-klobuchar-donation-return-1480410
[189] https://www.cnn.com/2020/01/03/politics/klobuchar-central-park-five-prosecutor-donation/index.html
[190] *See, e.g.*, https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-
blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-
showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

261.     The scenes are defamatory *per se* because they subject Ms. Fairstein personally, and in her professional capacity as an attorney and author, to hatred, distrust, ridicule, contempt disgrace, and threats to her life.

262.     There is a wealth of evidence in the public record, including the transcripts and "paperwork" that Ms. DuVernay claims to have reviewed as part of her research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially a complete fabrication.

263.     Ms. Fairstein pointed out these sources to Ms. DuVernay when the film project was announced in 2016, and alerted Ms. DuVernay to a number of unreliable and defamatory sources which should not be relied upon when depicting Ms. Fairstein in the film series.

264.     Ms. DuVernay acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein through Netflix. Ms. DuVernay either knew that the portrayal of Ms. Fairstein, and statements and conduct attributed to her, in *When They See Us* were false, or she entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed. At the very least, Ms. DuVernay exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

265.     Despite her knowledge of, and/or serious doubts about, the film series' false and defamatory depictions of Ms. Fairstein, Ms. DuVernay made statements which were intended to, and did, lead the public to believe that her portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

266.     Ms. DuVernay falsely portrayed Ms. Fairstein as trying to exert control over Ms. DuVernay's writing of the script for the film series by stating Fairstein demanded "script approval."

267.     Ms. DuVernay publicly displayed anger and hostility towards Ms. Fairstein by using the false and defamatory film series as a means through which Ms. Fairstein could and should be held singularly, personally accountable for ruining the lives of The Five, including by making false and defamatory statements about Ms. Fairstein on social media. *See, e.g.*, Paragraphs 171-186, above.

268.     An organization with which Ms. DuVernay is closely affiliated, Color of Change, started petitions demanding Ms. Fairstein be terminated by book publishers.

269.     The public outcry against Ms. Fairstein demonstrates that the viewing audience has understood *When They See Us* to be a true account rather than a fictionalized dramatization, resulting in, among other things, death threats and threats to Ms. Fairstein's physical safety, numerous petitions, and the hashtag #CancelLindaFairstein. Ms. DuVernay has stated that, when making the film, she expected a strong response from the public. The public outcry against Ms. Fairstein as a result of the film series has caused her to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction.

270.     As a result of Ms. DuVernay's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in *When They See Us,* Ms. Fairstein's reputation has been substantially damaged.

271.    As a result of Ms. DuVernay's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

272.    These damages were proximately caused by Ms. DuVernay's conduct.

273.    Ms. DuVernay's actions entitle Ms. Fairstein to an award of punitive damages because Ms. DuVernay knowingly wrote, produced, directed, published, marketed and promoted a film which she knew falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Despite this knowledge, Ms. DuVernay intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. Ms. DuVernay further acknowledged that it was her intention that the film cause Ms. Fairstein to be held accountable. At the very least, Ms. DuVernay exhibited a conscious disregard for Ms. Fairstein's safety. *See* F.S.A. § 768.72.

274.    Because the harm resulting from the repetitive airing of *When They See Us* and Ms. DuVernay's social media posts, which have not been taken down, are continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff also seeks injunctive relief against Ms. DuVernay directing this Defendant to (i) remove the posts detailed in Paragraphs 171-178, 180-181, and 183 from her social media accounts; (ii) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (iii) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (iv) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130, and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile

imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (v) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (vi) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (vi) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

## COUNT II
### (Defamation *Per Quod* Against Ava DuVernay)

275.    Ms. Fairstein reasserts and realleges each and every allegation set forth in Paragraphs 1-257, as if fully set forth herein.

276.    Ms. DuVernay, wrote, produced and directed the film series *When They See Us*, which Ms. DuVernay caused to be published nationwide on Netflix on May 31, 2019. Since May 31, 2019, the film series has been accessed by millions of Netflix subscribers including in the State of Florida.[191] Since that date, the film series has continuously been republished nationwide on Netflix's streaming service, including to subscribers in the State of Florida.

277.    As written by Ms. DuVernay, the film series depicts Ms. Fairstein in a false and defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist and derogatory language, violating the law by interrogating unaccompanied minors, pressuring NYPD police officers and detectives to abuse, and coerce confessions from The Five, ordering a roundup of young men of color without probable cause, and withholding exculpatory evidence

---

[191] *See, e.g.* https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

from defense counsel prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

278.   Ms. Fairstein is also falsely depicted as investigating the crime scene and originally theorizing that there was one perpetrator of the rape of Ms. Meili, devising a timeline, forcing a theory of the case on Ms. Lederer, wresting the Central Park Jogger case from Nancy Ryan, referring to young men of color as "thugs," directing police and detectives in the manner of interrogation, i.e. that "no kid gloves" should be used, and repeatedly referring to Ms. Meili as justification for what viewers would perceive as misconduct and/or the abuse of children of color. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

279.   There is a wealth of evidence in the public record, including the transcripts and "paperwork" that Ms. DuVernay claims to have reviewed as part of her research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially a complete fabrication.

280.   Ms. Fairstein pointed out these sources to Ms. DuVernay when the film project was announced in 2016, and alerted Ms. DuVernay to a number of unreliable, and defamatory sources, which should not be relied upon with respect to depicting Ms. Fairstein in the film series.

281.   Ms. DuVernay acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein through Netflix. Ms. DuVernay either knew that the portrayal of Ms. Fairstein, and statements and conduct attributed to her, in *When They See Us* were false, or she entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was

portrayed. At the very least, Ms. DuVernay exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

282.    Despite her knowledge of and/or serious doubts about the film series' false and defamatory depictions of Ms. Fairstein, Ms. DuVernay made statements which led the public to believe that her portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

283.    Ms. DuVernay also falsely portrayed Ms. Fairstein as trying to exert control over Ms. DuVernay's writing of the script for the film series.

284.    Ms. DuVernay publicly displayed anger and hostility towards Ms. Fairstein by using the false and defamatory film series as a means through which Ms. Fairstein could and should be held accountable for ruining the lives of The Five, including by making false and defamatory statements about Ms. Fairstein on social media. *See, e.g.*, Paragraphs 171-186, above.

285.    An organization with which Ms. DuVernay is closely affiliated, Color of Change, started petitions demanding Ms. Fairstein be dropped by book publishers.

286.    The public outcry against Ms. Fairstein demonstrates that the public has understood *When They See Us* to be a true account rather than a dramatization, and that Ms. Fairstein has been understood by the public to be singlehandedly responsible for the coercion, prosecution and conviction of The Five, resulting in, among other things, death threats and threats to Ms. Fairstein's physical safety, numerous petitions, and the hashtag #CancelLindaFairstein. Ms. DuVernay has stated that, when making the film, she expected a strong response from the public.

287.     The public outcry against Ms. Fairstein as a result of the film series has caused her to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction. Ms. Fairstein has also faced death threats and threats of violence.

288.     As a result of Ms. DuVernay's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in *When They See Us*, Ms. Fairstein's reputation has been substantially damaged.

289.     As a result of Ms. DuVernay's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

290.     These damages were proximately caused by Ms. DuVernay's conduct.

291.     Ms. DuVernay's actions entitle Ms. Fairstein to an award of punitive damages because Ms. DuVernay knowingly wrote, produced, directed, published, marketed and promoted a film which she knew falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Despite this knowledge Ms. DuVernay intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. Ms. DuVernay further acknowledged that it was her intention that the film cause Ms. Fairstein to be held accountable. At the very least, Ms. DuVernay exhibited a conscious disregard for Ms. Fairstein's safety. *See* F.S.A. § 768.72.

292.     Because the harm resulting from the repetitive airing of *When They See Us* and Ms. DuVernay's social media posts, which have not been taken down, are continuing in nature,

the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff also seeks injunctive relief against Ms. DuVernay directing this Defendant to (i) remove the posts detailed in Paragraphs 171-178, 180-181, and 183 from her social media accounts; (ii) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (iii) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (iv) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130, and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (v) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (vi) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (vi) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

## COUNT III
### (Defamation *Per Se* Against Attica Locke)

293.    Ms. Fairstein reasserts and realleges each and every allegation set forth in Paragraphs 1-257, as if fully set forth herein.

294.    Ms. Locke, wrote and produced the film series *When They See Us*, which Ms. Locke, in collaboration with Ms. DuVernay and Array, caused to be published nationwide on

Netflix on May 31, 2019. Since May 31, 2019, the film series has been accessed by millions of Netflix subscribers including in the State of Florida.[192] Since that date, the film series has continuously been republished nationwide on Netflix's streaming service, including to subscribers in the State of Florida.

295.    As written by Ms. Locke, the film series depicts Ms. Fairstein in a false and defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist and derogatory language, violating the law by interrogating unaccompanied minors, pressuring NYPD police officers and detectives to abuse, and coerce confessions from The Five, ordering a roundup of young men of color without probable cause, and withholding exculpatory evidence from defense counsel prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

296.    The scenes are defamatory *per se* because they subject Ms. Fairstein, personally, as an author, and in her professional capacity as an attorney, to hatred, distrust, ridicule, contempt and disgrace.

297.    There is a wealth of evidence in the public record, including the trial transcripts, that Ms. Locke claims to have reviewed as part of her research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially complete fabrication.

298.    Ms. Locke acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein through Netflix. Ms. Locke either knew that the portrayal of Ms. Fairstein, and statements and conduct attributed to her, in *When They See Us* were false, or Ms. Locke entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein

---

[192] *See, e.g.*, https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

was portrayed. At the very least, Ms. Locke exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

299. Despite her knowledge of and/or serious doubts about the film series' false and defamatory depictions of Ms. Fairstein Ms. Locke made statements which led the public to believe that her portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

300. On November 27, 2018, Ms. Locke also published the following false and defamatory posts on Twitter:

> @EdgarAwards As a member and 2018 Edgar winner, I am begging you to reconsider having Linda Fairstein serve as a Grand Master in next year's awards ceremony. She is almost singlehandedly responsible for the wrongful incarceration of the Central Park Five 1/[193]

> For which she has never apologized or recanted her insistence on their guilt for the most heinous of crimes, "guilt" based solely on evidence procured through violence and ill treatment of children in lock up. 2/[194]

> Even after all five (now) men have been exonerated by the state of NY, and other members of the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office. 3/[195]

> ADAs who were led by Linda Fairstein 4/[196]

> Just because she has a flourishing publishing career does not mean we should ignore her past—or continued unwillingness to accept responsibility for ruining five innocent [sic] men's lives. I cannot support this decision. 5/[197]

> Surely, someone else is more worthy of our attention, support, and this laudatory role in the 2019 @EdgarAwards. End. @santanaraymond @ava[198]

> Next year's ceremony will be the same month as the 30th anniversary of the wrongful arrest and subsequent incarceration of five innocent black boys. It is

---

[193] https://twitter.com/atticalocke/status/1067463803187560448?lang=en
[194] https://twitter.com/atticalocke/status/1067463846749585410
[195] https://twitter.com/atticalocke/status/1067463849480089600
[196] https://twitter.com/atticalocke/status/1067463850776121345
[197] https://twitter.com/atticalocke/status/1067463855700238336
[198] https://twitter.com/atticalocke/status/1067463858606895104

unconscionable that Linda Fairstein be on stage representing our organization. It is unacceptable. #centralparkfive[199]

I said I was done but I'm not. As an organization navigating its own diversity pitfalls @EdgarAwards willingness to overlook Linda Fairstein's racist actions is very upsetting. I don't have that luxury.[200]

301.    On December 18, 2018, Ms. Locke posted the following Tweet:

If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case – which, don't get it twisted, she did lead – then I'm not sure who the real bully is. It's certainly not a writer who simply asked the MWA to reconsider.[201]

302.    On December 18, 2018, Ms. Locke also posted the following on Twitter:

And, yes I worked on Ava Duvernay's project in the case. That's why I know so much about the case. The research on the project is extensive. And I actually read the trial transcripts. And I chose to share my knowledge of Fairstein's misdeeds with MWA. Me, one person. Not a mob.[202]

And I came into the world "race-tinged." It is a privilege to hold a world view broader than that of Otto Penzler, Nelson DeMille, and Barbara Peters.[203]

303.    On June 3, 2019, Ms. Locke posted a Tweet from Sarah Weinman who wrote an article about Matias Reyes' victims. Ms. Locke stated "This blood is on Linda Fairstein's hands." She further tweeted on the same day, "These women deserved better from NYPD and Linda Fairstein. By locking in on five children as rapists, many more lives were ruined."

304.    On June 11, 2019, Ms. Locke posted a related Tweet, regarding an editorial Ms. Fairstein wrote about *When They See Us* that was published in *The Wall Street Journal*:

This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her.[204]

---

[199] https://twitter.com/atticalocke/status/1067466492436930560
[200] https://twitter.com/atticalocke/status/1067467310279979008
[201] https://twitter.com/atticalocke/status/1075091099163623424
[202] https://twitter.com/atticalocke/status/1075098413627203584
[203] https://twitter.com/atticalocke/status/1075093302662246401
[204] https://twitter.com/atticalocke/status/1138455227605114880

305. The above-referenced social media posts were published in Florida as Ms. Locke has a number of Twitter followers in the State of Florida.

306. These Twitter posts were defamatory *per se* because they subjected Ms. Fairstein personally, and in her professional capacity as an attorney and author, to hatred, distrust, ridicule, contempt and disgrace.

307. Ms. Locke acted with hostility and anger towards Ms. Fairstein in pursuing the decimation of Ms. Fairstein's career through a social media smear campaign. Ms. Locke acted with actual malice when publishing the false and defamatory Twitter posts concerning Ms. Fairstein because she either (i) knew from her review of the record facts in the underlying Central Park Jogger case that Ms. Fairstein was not "singlehandedly responsible"—as Ms. Locke stated in a tweet—for the investigation, prosecution and conviction of Messrs. Santana, Wise, Salaam, Richardson and McCray, or (ii) at the very least, entertained serious doubts about the truth or falsity of her statements about Ms. Fairstein's level of involvement. At the very least, Ms. Locke exercised a reckless disregard for the truth. This is evidenced by Ms. Locke's repeated assertions that she, and Ms. DuVernay had done extensive research, including by studying trial transcripts, when writing the film series.

308. The public outcry against Ms. Fairstein in response to Ms. Locke's defamatory Twitter posts demonstrates that the public understood *When They See Us* to be a true account rather than a dramatization. Ms. Locke encouraged the public's belief that the film was true through her repeated statements, tweets, and interviews confirming the same, particularly in regard to Ms. Fairstein. Consequently, the public views Ms. Fairstein as responsible for the wrongful conviction of Messrs. Santana, McCray, Richardson, Salaam and Wise. As a result, Ms. Fairstein was stripped of her Mystery Writers of America Grand Master award, she has

received death threats and threats to her physical safety, and numerous petitions were started against Ms. Fairstein, as well as the hashtag #CancelLindaFairstein.

309.    The public outcry against Ms. Fairstein as a result of the film series has caused Ms. Fairstein to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction.

310.    As a result of Ms. Locke's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in the film series *When They See Us*, and her public statements concerning Ms. Fairstein, Ms. Fairstein's reputation has been substantially damaged.

311.    As a result of Ms. Locke's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

312.    These damages were proximately caused by Ms. Locke's conduct.

313.    Ms. Locke's actions entitle Ms. Fairstein to an award of punitive damages because Ms. Locke knowingly wrote, produced, published, marketed and promoted a film which she knew falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Ms. Locke further harmed Ms. Fairstein by posting false and defamatory posts on Twitter, inciting hatred amongst Ms. Locke's followers. Ms. Locke intended her posts to cause harm to Ms. Fairstein, including with respect to her MWA Grand Master Award. Ms. Locke intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. At the very least, Ms. Locke exhibited a conscious disregard for Ms. Fairstein's safety. *See* F.S.A. § 768.72.

314.     Because the harm resulting from the repetitive airing of *When They See Us* and Ms. Locke's social media posts, which have not been taken down, are continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff also seeks injunctive relief against Ms. Locke directing this Defendant to (i) remove the posts detailed in Paragraphs 153, 155, 162-163, 187-191, 193-195 and 197 from her social media accounts; (ii) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (iii) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (iv) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 49-130 and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (v) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (vi) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-136 are removed; and (vi) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

## COUNT IV
### (Defamation *Per Quod* Against Attica Locke)

315.     Ms. Fairstein reasserts and realleges each and every allegation set forth in Paragraphs 1-257, as if fully set forth herein.

316.    Ms. Locke, wrote and produced the film series *When They See Us*, which Ms. Locke, in collaboration with Ms. DuVernay and Array, caused to be published nationwide on Netflix on May 31, 2019. Since May 31, 2019, the film series has been accessed by millions of Netflix subscribers including in the State of Florida.[205] Since that date, the film series has continuously been republished nationwide on Netflix's streaming service, including to subscribers in the State of Florida.

317.    As written by Ms. Locke, the film series depicted Ms. Fairstein in a false and defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist and derogatory language, violating the law by interrogating unaccompanied minors, pressuring NYPD police officers and detectives to abuse, and coerce confessions from, The Five, ordering a roundup of young men of color without probable cause, and withholding exculpatory evidence from defense counsel prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

318.    Ms. Fairstein is also falsely depicted as investigating the crime scene and originally theorizing that there was one perpetrator of the rape of Ms. Meili, devising a timeline, forcing a theory of the case on Ms. Lederer, wresting the Central Park Jogger case from Nancy Ryan, referring to young men of color as "thugs," directing police and detectives in the manner of interrogation, i.e. that "no kid gloves" should be used, and repeatedly referring to Ms. Meili as justification for what viewers would perceive as misconduct and/or the abuse of children of color. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

---

[205] *See, e.g.*, https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

319.    There is a wealth of evidence in the public record, including the trial transcripts, that Ms. Locke claims to have reviewed as part of her research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially a complete fabrication.

320.    Ms. Locke acted with hostility and anger towards Ms. Fairstein in pursuing the decimation of Ms. Fairstein's career through a social media smear campaign. Ms. Locke acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein through Netflix. Ms. Locke either knew that the portrayal of Ms. Fairstein in *When They See Us*, and statements and conduct attributed to her, were false, or she entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed. At the very least, Ms. Locke exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series. This is evidenced by Ms. Locke's repeated assertions that she, and Ms. DuVernay had done extensive research, including by studying trial transcripts, when writing the film series.

321.    Despite her knowledge of and/or serious doubts about the film series' false and defamatory depictions of Ms. Fairstein, Ms. Locke made statements which led the public to believe that her portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

322.    On November 27, 2018, Ms. Locke also published the following false and defamatory posts on Twitter:

> @EdgarAwards As a member and 2018 Edgar winner, I am begging you to reconsider having Linda Fairstein serve as a Grand Master in next year's awards ceremony. She is almost singlehandedly responsible for the wrongful incarceration of the Central Park Five 1/[206]

> For which she has never apologized or recanted her insistence on their guilt for the most heinous of crimes, "guilt" based solely on evidence procured through violence and ill treatment of children in lock up. 2/[207]

---

[206] https://twitter.com/atticalocke/status/1067463803187560448?lang=en
[207] https://twitter.com/atticalocke/status/1067463846749585410

Even after all five (now) men have been exonerated by the state of NY, and other members of the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office. 3/[208]

ADAs who were led by Linda Fairstein 4/[209]

Just because she has a flourishing publishing career does not mean we should ignore her past—or continued unwillingness to accept responsibility for ruining five innocent [sic] men's lives. I cannot support this decision. 5/[210]

Surely, someone else is more worthy of our attention, support, and this laudatory role in the 2019 @EdgarAwards. End. @santanaraymond @ava[211]

Next year's ceremony will be the same month as the 30th anniversary of the wrongful arrest and subsequent incarceration of five innocent black boys. It is unconscionable that Linda Fairstein be on stage representing our organization. It is unacceptable. #centralparkfive[212]

I said I was done but I'm not. As an organization navigating its own diversity pitfalls @EdgarAwards willingness to overlook Linda Fairstein's racist actions is very upsetting. I don't have that luxury.[213]

323.    On December 18, 2018, Ms. Locke posted the following Tweet:

If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case – which, don't get it twisted, she did lead – then I'm not sure who the real bully is. It's certainly not a writer who simply asked the MWA to reconsider.[214]

324.    On December 18, 2018, Ms. Locke also posted the following on Twitter:

And, yes I worked on Ava Duvernay's project in the case. That's why I know so much about the case. The research on the project is extensive. And I actually read the trial transcripts. And I chose to share my knowledge of Fairstein's misdeeds with MWA. Me, one person. Not a mob.[215]

---

[208] https://twitter.com/atticalocke/status/1067463849480089600
[209] https://twitter.com/atticalocke/status/1067463850776121345
[210] https://twitter.com/atticalocke/status/1067463855700238336
[211] https://twitter.com/atticalocke/status/1067463858606895104
[212] https://twitter.com/atticalocke/status/1067466492436930560
[213] https://twitter.com/atticalocke/status/1067467310279979008
[214] https://twitter.com/atticalocke/status/1075091099163623424
[215] https://twitter.com/atticalocke/status/1075098413627203584

And I came into the world "race-tinged." It is a privilege to hold a world view
broader than that of Otto Penzler, Nelson DeMille, and Barbara Peters.[216]

325.    On June 3, 2019, Ms. Locke posted a Tweet from Sarah Weinman who wrote an

article about Matias Reyes' victims. Ms. Locke stated "This blood is on Linda Fairstein's

hands."[217] She further tweeted on the same day, "These women deserved better from NYPD and

Linda Fairstein. By locking in on five children as rapists, many more lives were ruined."[218]

326.    On June 11, 2019, Ms. Locke posted a related Tweet, regarding an editorial Ms.

Fairstein wrote about *When They See Us* that was published in *The Wall Street Journal*:

This morning she showed us exactly why she deserves all the rage and
hate and consequences that are coming her way. She is an unrepentant liar.
Fuck her.[219]

327.    The above-referenced social media posts were published in Florida as Ms. Locke

has a number of Twitter followers in the State of Florida.

328.    The public outcry against Ms. Fairstein in response to Ms. Locke's defamatory

public statements demonstrates that the public understood *When They See Us* to be a true account

rather than a dramatization. Ms. Locke encouraged the public's belief that the film was true

through her repeated statements, tweets, and interviews confirming the same, particularly in

regard to Ms. Fairstein. As a result, the public views Ms. Fairstein as responsible for the

wrongful conviction of Messrs. Santana, McCray, Richardson, Salaam and Wise. As a result,

Ms. Fairstein was stripped of her nomination for the Mystery Writers of America Grand Master

award, she has received death threats and threats to her physical safety, and numerous petitions

were started against Ms. Fairstein, as well as the hashtag #CancelLindaFairstein.

---

[216] https://twitter.com/atticalocke/status/1075093302662246401
[217] https://twitter.com/atticalocke/status/1135624250574888960
[218] https://twitter.com/atticalocke/status/1135929864798605312
[219] https://twitter.com/atticalocke/status/1138455227605114880

329.    The public outcry against Ms. Fairstein as a result of the film series has caused Ms. Fairstein to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction.

330.    As a result of Ms. Locke's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in *When They See Us* Ms. Fairstein's reputation has been substantially damaged.

331.    As a result of Ms. Locke's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

332.    These damages were proximately caused by Ms. Locke's conduct.

333.    Ms. Locke's actions entitle Ms. Fairstein to an award of punitive damages because Ms. Locke knowingly wrote, produced, published, marketed and promoted a film which she knew falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Ms. Locke intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. At the very least Ms. Locke exhibited a conscious disregard for Ms. Fairstein's safety. *See* F.S.A. § 768.72.

334.    Because the harm resulting from the repetitive airing of *When They See Us* and Ms. Locke's social media posts, which have not been taken down, are continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff also seeks injunctive relief against Ms. Locke directing this Defendant to (i) remove the

posts detailed in Paragraphs 153, 155, 162-163, 187-191, 193-195, and 197 from her social media accounts; (ii) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (iii) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (iv) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (v) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (vi) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (vi) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

## COUNT V
### (Defamation *Per Se* Against Netflix)

335.    Ms. Fairstein reasserts and realleges each and every allegation set forth in Paragraphs 1-257 above as if fully set forth herein.

336.    *When They See Us* is part of Netflix's branded original content, and the production of the film series was "greenlit" by Cindy Holland, vice president of original content,

who, upon information and belief, had approval rights with respect to the content of the film series.

337.    On March 1, 2019, Netflix published a teaser trailer for the film series, which featured Felicity Huffman's voice portraying Ms. Fairstein and saying "Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see." This teaser trailer was available for viewing by Netflix's subscribers, including in the State of Florida, on Netflix's public website and on YouTube.

338.    On April 19, 2019, thirty years to the day after the assaults in Central Park, including the rape of Ms. Meili, Netflix released an official trailer for *When They See Us*, which portrayed Ms. Fairstein saying "every black male in the park last night is a suspect. I need all of them." The trailer says "based on the true story of the Central Park Five" but then flashes two bold banners which state "The Story You Know" and "Is the Lie They Told You." This trailer was available for viewing by Netflix's subscribers, including in the State of Florida, on Netflix's public website and on YouTube.

339.    On May 31, 2019, Netflix published *When They See Us* to its website streaming service. Since May 31, 2019, the film series has been accessed by millions of Netflix subscribers including in the State of Florida.[220] Since that date, the film series has continuously been republished nationwide on Netflix's streaming service, including to subscribers in the State of Florida.

340.    The film series depicts Ms. Fairstein in a false and defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist and derogatory language,

---

[220] *See, e.g.*, https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

violating the law by interrogating unaccompanied minors, pressuring NYPD police officers and detectives to abuse, and coerce confessions from The Five, ordering a roundup of young men of color without probable cause, and suppressing evidence from the defense prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of the aforementioned actions.

341.    The scenes are defamatory *per se* because they subject Ms. Fairstein, personally, and in her professional capacity as an attorney and author, to hatred, distrust, ridicule, contempt, disgrace, and threats to her life.

342.    There is a wealth of evidence in the public record, including the transcripts and "paperwork" that Ms. DuVernay and Ms. Locke have claimed to have reviewed as part of their research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially a complete fabrication.

343.    Ms. Fairstein pointed out these sources to Netflix when its collaboration with Ms. DuVernay was announced in 2017 and alerted Netflix to a number of unreliable, and defamatory sources, which should not have been relied upon when depicting Ms. Fairstein in the film series. Netflix disregarded this notice.

344.    Netflix acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein. Netflix, through Ms. Holland or other employees or agents involved with the film series, either knew that the portrayal of Ms. Fairstein in *When They See Us*, and statements and conduct attributed to her, were false, or entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed. At the very least, Netflix exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

345.    Despite its knowledge of/and or serious doubts about the film series' false and defamatory depictions of Ms. Fairstein, Netflix made statements on its social media accounts

which led the public to believe that the film series' portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

346.    Ms. Holland also gave a public statement to *Vanity Fair* that suggested that Netflix tracked its documentary viewership amongst subscribers in conjunction with the marketing of *When They See Us*.

347.    Upon information and belief, Netflix originally categorized *When They See Us* as a documentary. It later switched the category to TV Drama/Crime TV Show. The film series is presently categorized as a Crime TV Show.

348.    As a result of the manner in which Netflix marketed and promoted *When They See Us*, there has been a public outcry against Ms. Fairstein, demonstrating that the public understood *When They See Us* to be a true account rather than a dramatization, and resulting in, among other things, death threats and threats to Ms. Fairstein's physical safety, numerous petitions, and the hashtag #CancelLindaFairstein.

349.    The public outcry against Ms. Fairstein as a result of the film series has caused her to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction.

350.    As a result of Netflix's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in *When They See Us* Ms. Fairstein's reputation has been significantly damaged.

351.     As a result of Netflix's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

352.     These damages were proximately caused by Netflix's conduct.

353.     Netflix's misconduct in knowingly publishing a false and defamatory portrayal of Ms. Fairstein in *When They See Us*, entitles Ms. Fairstein to an award of punitive damages because Netflix knowingly produced, published, marketed and promoted a film which falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Despite this knowledge Netflix, through Ms. Holland and other employees and/or agents, intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. *See* F.S.A. § 768.72.

354.     Because the harm resulting from the repetitive airing of *When They See Us* and Netflix's social media posts, which have not been taken down, are continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Netflix, directing this Defendant to: (i) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130, and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (ii) remove Parts One, Two and Four of *When They See Us* from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed; (iii) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (iv) place a

prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (v) categorize *When They See Us* on its streaming service only as a TV Drama; and (iv) remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those detailed at Paragraphs 200-218.

## COUNT VI
### (Defamation *Per Quod* Against Netflix)

355.    Ms. Fairstein repeats and realleges each and every allegation set forth in Paragraphs 1-257 above as if fully set forth herein.

356.    *When They See Us* is part of Netflix's branded original content, and the production of the film series was "greenlit" by Cindy Holland, vice president of original content, who, upon information and belief, had approval over the content of the film.

357.    On March 1, 2019, Netflix published a teaser trailer for the film series, which featured Felicity Huffman's voice portraying Ms. Fairstein and saying "Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see." In fact, Ms. Fairstein never said these words nor ordered any "roundup" of young men of color. This teaser trailer was available for viewing by Netflix's subscribers, including in the State of Florida, on Netflix's public website and on YouTube.

358.    On April 19, 2019, thirty years to the day of the assaults in Central Park, including the rape of Ms. Meili, Netflix released an official trailer for *When They See Us*, which portrayed Ms. Fairstein saying "every black male in the park last night is a suspect. I need all of them." The trailer says "based on the true story of the Central Park Five" but then flashes two bold banners which state "The Story You Know" and "Is the Lie They Told You." This trailer

was available for viewing by Netflix's subscribers, including in the State of Florida, on Netflix's public website and on YouTube.

359.    On May 31, 2019 Netflix published *When They See Us* to its website streaming service. Since May 31, 2019, the film series has been accessed by millions of Netflix subscribers including in the State of Florida.[221] Since that date, the film series has continuously been republished nationwide on Netflix's streaming service, including to subscribers in the State of Florida.

360.    The film series depicts Ms. Fairstein in a false and defamatory manner, including scenes depicting Ms. Fairstein referring to The Five using racist and derogatory language, violating the law by interrogating unaccompanied minors, pressuring NYPD police officers and detectives to abuse, and coerce confessions from, The Five, ordering a roundup of young men of color without probable cause, and suppressing evidence from the defense prior to the trials. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of these actions.

361.    Ms. Fairstein is also falsely depicted as investigating the crime scene and originally theorizing that there was one perpetrator of the rape of Ms. Meili, devising a timeline, forcing a theory of the case on Ms. Lederer, wresting the Central Park Jogger case from Nancy Ryan, referring to young men of color as "thugs," directing police and detectives in the manner of interrogation, i.e. that "no kid gloves" should be used, and repeatedly referring to Ms. Meili as justification for what viewers would perceive as misconduct and/or the abuse of children of color. *See supra* Paragraphs 44-130. In fact, Ms. Fairstein took none of these actions.

---

[221] *See, e.g.*, https://help.netflix.com/en/node/14164; https://www.miamiherald.com/opinion/opn-columns-blogs/leonard-pitts-jr/article231347308.html; https://www.sun-sentinel.com/sns-bc-us--netflix-streaming-showdown-20191016-story.html. Netflix does not publish its subscriber statistics by jurisdiction.

362.     There is a wealth of evidence in the public record, including the transcripts and "paperwork" that Ms. DuVernay and Ms. Locke have claimed to have reviewed as part of their research, that demonstrates that the portrayal of Ms. Fairstein in *When They See Us* is essentially a complete fabrication.

363.     Ms. Fairstein pointed out these sources to Netflix when its collaboration with Ms. DuVernay was announced in 2017 and alerted Netflix to a number of unreliable, and defamatory sources, which should not have been relied upon when depicting Ms. Fairstein in the film series. Netflix disregarded this notice.

364.     Netflix acted with actual malice when publishing the false, defamatory scenes concerning Ms. Fairstein. Netflix, through Ms. Holland or other employees or agents involved with the film series, either knew that the portrayal of Ms. Fairstein in *When They See Us*, and statements and conduct attributed to her, were false, or entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed. At the very least, Netflix exercised a reckless disregard for the manner in which Ms. Fairstein was depicted in the film series.

365.     Despite its knowledge of, and/or serious doubts about, the film series' false and defamatory depictions of Ms. Fairstein Netflix made statements on its social media accounts which led the public to believe that the film series' portrayal of Ms. Fairstein was truthful and based on documentary evidence.

366.     Ms. Holland also gave a public statement to Vanity Fair that suggested that Netflix tracked its documentary viewership amongst subscribers in conjunction with the marketing of *When They See Us*.

367.    Upon information and belief, Netflix originally categorized *When They See Us* as a documentary. It later switched the category to TV Drama/Crime TV Show. The film series is presently categorized as a Crime TV Show.

368.    As a result of the manner in which Netflix marketed and promoted *When They See Us*, there has been a public outcry against Ms. Fairstein, demonstrating that the public has understood *When They See Us* to be a true account rather than a dramatization, and resulting in, among other things, death threats and threats to Ms. Fairstein's physical safety, numerous petitions, and the hashtag #CancelLindaFairstein.

369.    The public outcry against Ms. Fairstein as a result of the film series has caused her to resign from the boards of four non-profit organizations, resulted in publishers terminating longstanding contracts and relationships, the loss of numerous legal consulting jobs, the cancellation of speaking appearances, the loss of her literary agent, the necessity of her withdrawal from social media, which was a major source of promoting her literary works, and the rescission of one of the most prestigious awards in the field of crime fiction.

370.    As a result of Netflix's unprivileged publication of the false and defamatory statements concerning Ms. Fairstein in *When They See Us*, Ms. Fairstein's reputation has been significantly damaged.

371.    As a result of Netflix's actions, Ms. Fairstein suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

372.    These damages were proximately caused by Netflix's conduct.

373.    Netflix's misconduct in knowingly publishing a false and defamatory portrayal of Ms. Fairstein in *When They See Us*, entitles Ms. Fairstein to an award of punitive damages

because Netflix knowingly produced, published, marketed and promoted a film which falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Despite this knowledge Netflix, through Ms. Holland and other employees and/or agents, intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. *See* F.S.A. § 768.72.

374. Because the harm resulting from the repetitive airing of *When They See Us* and Netflix's social media posts, which have not been taken down, are continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff further seeks injunctive relief against Netflix, directing this Defendant to: (i) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (ii) remove Parts One, Two and Four of *When They See Us* from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed; (iii) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (iv) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (v) categorize *When They See Us* on its streaming service only as a TV Drama; and (iv) remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those detailed at Paragraphs 200-218.

## COUNT VII
**(Conspiracy to Defame Against All Defendants)**

375.    Plaintiff reasserts and realleges each and every allegation stated in Paragraphs 1-257 as if fully set forth herein.

376.    Defendants agreed and maliciously conspired together to write, produce and publish scenes in Defendants' film series, *When They See Us*, which portray Ms. Fairstein in a false and defamatory manner, are essentially a complete fabrication and depict Ms. Fairstein as singlehandedly responsible for *inter alia* the arrest, conviction and wrongful imprisonment of The Five.

377.    Defendants collaboratively wrote, produced, and published *When They See Us*, as alleged above in Paragraphs 1-3, with the intent to target Ms. Fairstein, and to hold her up to public hatred, scorn, ridicule, scandal and disgrace, to defame Ms. Fairstein, and to induce an evil opinion of Ms. Fairstein in the minds of the public, including but not limited to Netflix subscribers and Defendants' social media followers in the State of Florida.

378.    Defendants further conspired and agreed to purposefully market and aggressively promote *When They See Us* as a true story, in order to cause substantial harm to Ms. Fairstein's reputation, personally and in her professional capacity as an attorney and author. Just as each Defendant committed overt acts in furtherance of writing, producing and publishing *When They See Us*, each of the Defendants also committed overt acts in furtherance of this portion of the conspiracy, as alleged above in Paragraphs 165-223, as well as Paragraphs 45-47 and 152-164.

379.    As a result of Defendants' conspiracy to defame Ms. Fairstein, she suffered actual damages in an amount to be determined at trial, but in excess of $75,000, including economic losses, lost career opportunities, reputational harm, and emotional distress.

380. These damages were proximately caused by Defendants' agreed upon and purposeful conduct in defaming Ms. Fairstein.

381. Defendants' misconduct in knowingly publishing a false and defamatory portrayal of Ms. Fairstein in *When They See Us*, entitles Ms. Fairstein to an award of punitive damages because Defendants knowingly wrote, produced, published, marketed and promoted a film which falsely portrayed Ms. Fairstein in a manner that was likely to cause her injury. Despite this knowledge Defendants intentionally pursued a course of conduct likely to cause harm to Ms. Fairstein. *See* F.S.A. § 768.72.

382. Because the harm resulting from the repetitive airing of *When They See Us* and Defendants' social media posts, which have not been taken down, is continuing in nature, the damages sought herein will not provide Plaintiff with a complete remedy. For this reason, Plaintiff also seeks injunctive relief against Defendants, directing them to: (i) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are contained in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (ii) remove Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (iii) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (iv) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not

truthfully depicted; (v) categorize *When They See Us* on only as a TV Drama on any streaming service or other medium; (iv) remove all posts from their social media accounts which refer to *When They See Us* as a true, real or fact-based story; (v) remove all posts from their social media accounts and refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case; and (vi) remove from their social media accounts the posts detailed *supra* Paragraphs 153, 155, 162-163, 171-178, 180-181, 183, 187-191 and 200-218.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment against Defendants as follows:

(i)  On the first count, against Defendant Ava DuVernay for defamation *per se*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Ms. DuVernay directing this Defendant to (a) remove the posts detailed in Paragraphs 171-178, 180-181 and 183 from her social media accounts; (b) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (c) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (d) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers'

fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (e) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (f) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (g) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted;

(ii)  On the second count, against Defendant Ava DuVernay for defamation *per quod*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Ms. DuVernay directing this Defendant to (a) remove the posts detailed in Paragraphs 171-178, 180-181 and 183 from her social media accounts; (b) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (c) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (d) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is "a fictionalized dramatization, comprised of scenes and

dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (e) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (f) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (g) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted;

(iii)    On the third count, against Defendant Attica Locke, for defamation *per se*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Ms. Locke directing this Defendant to (a) remove the posts detailed in Paragraphs 153, 155, 162-163, 187-191, 193-195 and 197, from her social media accounts; (b) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (c) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (d) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-

130 and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (e) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (f) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (g) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted;

(iv) On the fourth count, against Defendant Attica Locke, for defamation *per quod*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against this Defendant, directing Ms. Locke to (a) remove the posts detailed in Paragraphs 153, 155, 162-163, 187-191, 193-195 and 197 from her social media accounts; (b) refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case, (c) remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story; (d) issue a public statement correcting the false and defamatory statements concerning Ms.

Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality;" (e) direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed; (f) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; and (g) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted;

(v)     On the fifth count, against Defendant Netflix, Inc., for defamation *per se*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Netflix, directing this Defendant to (a) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never

existed in reality"; (b) remove Parts One, Two and Four of *When They See Us* from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed; (c) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (d) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* on its streaming service only as a TV Drama; and (f) remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those detailed at Paragraphs 200-218;

(vi)     On the sixth count, against Defendant Netflix, Inc., for defamation *per quod*, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against Netflix, directing this Defendant to: (a) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are present in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (b) remove Parts One, Two and Four of *When They See Us*

from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed; (c) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (d) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* on its streaming service only as a TV Drama; and (f) remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those detailed at Paragraphs 200-218; and

(vii)    On the seventh count, against all Defendants, for conspiracy to defame, damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, emotional distress and punitive damages, costs and attorneys' fees. Plaintiff further seeks injunctive relief against all Defendants, directing them to (a) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are contained in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (b) remove Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other

medium through which the film series is, or will be, viewed; (c) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (d) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* on only as a TV Drama on any streaming service or other medium; (f) remove all posts from their social media accounts which refer to *When They See Us* as a true, real or fact-based story; (g) remove all posts from their social media accounts and refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case; and (h) remove from their social media accounts the posts detailed at Paragraphs 153, 155, 162-163, 171-178, 180-181, 183, 187-191, 193-195, 197 and 200-218;

(viii)  Equitable relief in the form of an injunction directing Defendants to: (a) issue a public statement correcting the false and defamatory statements concerning Ms. Fairstein that are contained in *When They See Us*, as detailed *supra* Paragraphs 44-130 and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Ms. Fairstein, for the public to hate that never existed in reality"; (b) remove Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series

is, or will be, viewed; (c) edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Ms. Fairstein detailed *supra* Paragraphs 49-130 are removed; (d) place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* on only as a TV Drama on any streaming service or other medium; (f) remove all posts from their social media accounts which refer to *When They See Us* as a true, real or fact-based story; (g) remove all posts from their social media accounts and refrain from making posts on social media, or making public statements, in the future which refer to Ms. Fairstein as responsible for the prosecution of the Central Park Jogger case; and (h) remove from their social media accounts the posts detailed *supra* Paragraphs 153, 155, 162-163, 171-178, 180-181, 183, 187-191, 193-195, 197 and 200-218.

(ix)    For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated this 18th day of March, 2020.


                    Respectfully submitted,

                    CHEFFY PASSIDOMO, P.A.

            By: /S/ EDWARD K. CHEFFY
                         Edward K. Cheffy
                         Florida Bar No. 393649
                         Rachael S. Loukonen
                         Florida Bar No. 668435
                         Kimberly D. Swanson
                         Florida Bar No. 1018219
                         821 Fifth Avenue South, Suite 201
                         Naples, Florida 34102
                         (239) 261-9300
                         ekcheffy@napleslaw.com
                         rloukonen@napleslaw.com
                         kdswanson@napleslaw.com


                              -and-


                    NESENOFF & MILTENBERG, LLP

            By: /S/ ANDREW MILTENBERG
                         Andrew Miltenberg
                         (*pro hac vice* admission pending)
                         Kara Gorycki
                         (*pro hac vice* admission pending)
                         363 Seventh Avenue, Fifth Floor
                         New York, New York 10001
                         (212) 736-4500
                         amiltenberg@nmllplaw.com
                         kgorycki@nmllplaw.com