**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

LINDA FAIRSTEIN,                        )
                                        )
      Plaintiff,                      )        Case No: 2:20-cv-00180-FtM-66MRM
                                        )
      v.                              )
                                        )
NETFLIX, INC., AVA DUVERNAY,            )
and ATTICA LOCKE,                       )
                                        )
                                        )
      Defendants.                     )

**DECLARATION OF LINDA FAIRSTEIN IN SUPPORT OF OPPOSITION TO
NETFLIX, INC.'S CALIFORNIA ANTI-SLAPP MOTION**

I, Linda Fairstein, declare as follows:

1.      I am the Plaintiff in this action. I submit this declaration in support of my opposition to Netflix's Anti-SLAPP motion. The facts set forth in this declaration are based on my personal knowledge.

2.      I have viewed Netflix's original film series *When They See Us* (the "Series"), which premiered on May 31, 2019. I address herein the falsity of the manner in which Defendants elected to portray me in the Series.

3.      The Series concerns the Central Park jogger case and addresses the arrests, trials and convictions of five young men of color—Kharey (aka Korey) Wise ("Mr. Wise"), Raymond Santana ("Mr. Santana"), Kevin Richardson ("Mr. Richardson"), Yusef Salaam ("Mr. Salaam") and Antron McCray ("Mr. McCray") (collectively the "Five")—who were accused of beating and

raping female jogger Patricia Meili ("Ms. Meili"), in addition to rioting and attacking seven other victims, in New York City's Central Park in April 1989.

4.      The Series further addresses the vacatur of The Five's convictions in 2002, after an individual named Matias Reyes confessed to raping Ms. Meili—although he denied participating in any of the other crimes committed in the Park that night—and his DNA matched DNA taken from Ms. Meili and her personal belongings.

5.      I am prominently featured in the Series, identified by my name, in Parts One, Two and Four. As outlined in Paragraphs 44-130 of the Complaint, nearly every scene in the Series in which I am portrayed is a complete fabrication. Defendants depict me at places where I never was, making decisions I never made, supervising New York Police Department ("NYPD") detectives and officers over whom I had no control and putting words in my mouth—that are utterly outrageous—that I never spoke.

6.      I am a lawyer, legal consultant, former prosecutor and an author. For three decades, from 1972 until 2002, I served in the office of the New York County District Attorney's Office. I was chief of the County's Sex Crimes Unit for twenty-six years, including in April 1989.

7.      The attacks in Central Park occurred on the night of April 19, 1989.

8.      I first learned of the attacks on the morning of April 20, 1989, at some time between 8:30 a.m. and 9:00 a.m., when I received a call at home from NYPD Sergeant Robert Fiston, Commanding Officer of the Manhattan Special Victims Unit, who told me about the riot and attacks, including the rape of an as yet unidentified female jogger whom he described as being hospitalized in a coma, in grave condition. Sergeant Fiston asked me to assign a prosecutor to the case who would be needed later in the day. Sergeant Fiston's call was a routine step in the procedures of the Manhattan District Attorney's office in cases involving violent felonies.

9.      Shortly after I received the call, I called Assistant District Attorney Elizabeth Lederer ("ADA Lederer") to inquire about her availability to handle the case. She informed me that she was available. I also called Manhattan District Attorney Robert Morgenthau ("DA Morgenthau") to tell him about the attacks. At that point in time, it was unclear whether the case belonged to the Sex Crimes Unit or whether it would become a homicide.

10.     After making these calls, I headed to my office in lower Manhattan where I stayed for the day. I did not visit the crime scene, nor was I in Central Park at any point in time on April 20th. I did not interact nor speak with the NYPD Crime Scene Unit detectives on that day. Nor did I form any theory or belief as to what had happened to the as yet unnamed female jogger because I had no details about what had occurred. Accordingly, the film scenes cited at Paragraphs 52, 57 and 59 of the Complaint are false.

11.     At some point during the morning of April 20th I spoke with Assistant District Attorney John Fried ("ADA Fried") who was the Chief of the Trial Division at the time. I was Deputy Chief of the Trial Division, in charge of Special Victims' cases.  I told him that I had spoken with ADA Lederer and that I wanted to assign her to the case.

12.     ADA Fried informed me that he also received a call from the NYPD and that he assumed his unit would handle the case because it might become a homicide if the female jogger did not survive. In addition, there were a number of other attacks, and riots, in Central Park on the night of April 19th that would potentially be prosecuted. ADA Fried planned to assign Assistant District Attorney Peter Casolaro ("ADA Casolaro") to the case.

13.     Subsequent to this conversation, ADA Fried and I met with DA Morgenthau who assigned ADA Lederer to the case.

14.     The film scenes cited at Paragraphs 88, 90 and 94, which depict me wresting the case from Assistant District Attorney Nancy Ryan ("ADA Ryan"), are false. As set forth above, ADA Ryan had absolutely no involvement in selecting the prosecutor for the case. She and I never argued about who would prosecute the case.

15.     ADA Ryan was not assigned to the case in April 1989, nor involved in the case in any way. I had **no** meetings or discussions with her about the case on April 20, 1989 or in the days thereafter. Accordingly, there was no competition between ADA Ryan and me over who would prosecute the Central Park jogger case. We had no arguments about the involvement of the Five in the attack on Ms. Meili or the nature, or severity, of the attack. Nor did we discuss the other crimes and attacks that had occurred in the Park.

16.     As set forth at Paragraphs 63, 65, 66, 77 and 79 of the Complaint, the Series places me at the 24th Precinct at 8:00 a.m. on the morning of April 20th, interacting with NYPD Detective John Farrell in a room full of young men of color who were involved in the attacks in Central Park, including Mr. Richardson. They are not with their parents. I do not read them their *Miranda* rights. I ask a young man whether he was out "wilding" with Mr. McCray and ask him to provide Mr. McCray's address. I also direct Detective Farrell to hurry up with his interviews so I can put together a timeline of the attacks. I am later shown putting together a timeline and concluding that the young men in custody are suspects as opposed to witnesses. These scenes are false.

17.     None of the above-listed events occurred, nor could they have occurred, because I never spoke to, or met with, Detective Farrell about the Central Park jogger case. I certainly had no supervisory responsibility for NYPD Detective Farrell. I did not direct any aspect of the police investigation, including the preparation of interview memoranda.

18.     I was not at any precinct, including the Central Park Precinct, on the morning of April 20th. I had no part in determining the location of Mr. McCray, who had actually been brought into the precinct in the early morning hours of April 20th by his mother. I conducted no interviews of any unaccompanied minors in custody, including with respect to the whereabouts of Mr. McCray.

19.     At the time of the attacks in Central Park I was unfamiliar with the term "wilding."

20.     As set forth at Paragraphs 79, 83, and 94 of the Complaint, the Series portrays me as responsible for creating a timeline of the attacks in Central Park, including the rape, and then manipulating the timeline after briefing police and detectives who point out problems with connecting the other assaults to the rape. These scenes are false.

21.     I was not responsible for putting together, nor did I ever put together, a timeline of events, during the course of the interviews that took place between April 19-April 21, 1989, or at any point in time thereafter. ADA Lederer and her colleague Assistant District Attorney Arthur ("Tim") Clements ("ADA Clements") created their own timeline of events at some point before presenting the case to the Grand Jury in the weeks that followed ADA Lederer's interviews at the 20th and 24th Precincts. It is my understanding from reviewing documents on the New York City Law Department's public website (http://www.nyc-cpj.org/Home) that NYPD Detective Robert Nugent also worked on a timeline. I did not participate in the creation of either of these timelines.

22.     As set forth at Paragraph 97 of the Complaint, the Series portrays me as telling police to roundup "every young black male" "thug" that they see in the projects in Harlem. This scene is false.

23.     I gave no orders to police officers and detectives investigating the Central Park jogger case in regard to picking up witnesses or suspects who may have been in the Park on the

night of April 19, 1989.  The only orders to find and bring in persons of interest were given by NYPD supervisors.

24.     I did not arrive at any police precinct until approximately 8:30 p.m. on April 20, 1989, where I met ADA Lederer who was in charge of the District Attorney's investigation. We moved to the 24th Precinct a little after midnight. My job was to provide support assistance to ADA Lederer and serve as a liaison to DA Morgenthau.

25.     At the 20th Precinct, I spent time making a number of phone calls to DA Morgenthau, Assistant District Attorney John Hogan (ADA Lederer's direct supervisor), Chief Assistant District Attorney Barbara Jones ("ADA Jones"), and to staff at Metropolitan Hospital, where Ms. Meili was located. I also spoke to Ms. Meili's brother. I also called ahead to the 24th Precinct to determine whether they could handle operations if we moved there and clear the youth room for ADA Lederer and ADA Clements to conduct interviews. Later in the evening, I spoke with Mr. Salaam's mother. I gave testimony about our interaction at a suppression hearing and at Mr. Salaam's trial.

26.     On the morning of April 21, 1989, I left the 24th Precinct to attend a crime scene walk with NYPD Detective Michael Sheehan, Mr. Wise and Mr. Richardson. I provided testimony about this at a suppression hearing and at Mr. Wise's and Mr. Richardson's trial.

27.     ADA Lederer and ADA Clements began their video interviews in the Designated Youth Room of the 24th Precinct at approximately 1:00 a.m. on April 21st. They not only conducted video interviews of four of the five young men (Messrs. Santana, Richardson, McCray, and Wise), but also video interviewed other suspects in the series of crimes in the Park, including Steve Lopez, Clarence Thomas, Lamont McCall, Jomo Smith, and Michael Briscoe. Because the 24th Precinct

6

had one designated youth room, only one interview could be conducted at a time. The last interview concluded after one a.m. on Saturday, April 22nd.

28.     When I returned to the 24th Precinct after the crime scene walk, I continued to provide support assistance to ADA Lederer and ADA Clements. Because they were fully occupied conducting interviews, I took care of organizational tasks such as arranging for replacement videographers as shifts came to an end, directing witnesses and their family members where to wait until they were called for interviews, taking food and drink orders for witnesses and family members, and placing periodic phone calls to DA Morgenthau and ADA Jones.

29.     It was approximately 3:00 a.m. on April 22nd when I left the 24th Precinct to go home, when ADA Lederer and ADA Clements had completed all the interviews and made their charging decisions.

30.     As set forth at Paragraph 104 of the Complaint, the Series portrays me as telling NYPD officers about to interview Mr. Richardson, a minor, that "no kid gloves" should be used because "[t]hese are not kids." This scene is false.

31.     I was not present in the police precinct when the NYPD's interview of Mr. Richardson took place. In fact, I was not involved in the NYPD's questioning of any witnesses or suspects at any police precinct. I issued no directives with respect to the manner in which NYPD officers and detectives should interview Mr. Richardson, or any other minors in custody.

32.     ADA Lederer conducted videotaped interviews on behalf of the District Attorney's office, witnessed by ADA Clements. I was not present for the taking of any of those statements, including Mr. Richardson's. I did not see the resultant videos until several weeks after the Five and others were indicted.

33.     As set forth at Paragraphs 108, 110, and 112-115, the Series portrays me as forcing a theory of the case on ADA Lederer that The Five engaged in a group assault of Ms. Meili. In the scene, ADA Lederer confronts me about the lack of evidence against The Five and I disregard her concerns. I then tell Detective Sheehan, who is about to interview Mr. Wise, that he is the "glue, we'll make sure he sticks it together." These scenes are false.

34.     On April 21, 1989, the time in which this scene appears to take place, neither I nor Ms. Lederer held any assumptions about the focus of the prosecution's case. At no time during the investigation did I have a theory of the case nor did ADA Lederer confront me about a lack of evidence against the Five. I did not participate in, or watch, any of the videotaped statements of the Five with ADA Lederer or ADA Clements, nor did I speak with ADA Lederer about her interview of Mr. Wise.

35.     I did not discuss Mr. Wise's interview with Detective Sheehan nor did I direct him to conduct Mr. Wise's interview in any particular way. I was not responsible for, nor did I direct, the NYPD's investigation.

36.     As set forth in Paragraph 128, at the end of the Series, ADA Ryan is seen telling me that she "pored over" my confession tapes and that I "coerced" The Five "into saying what they did." This is false.

37.     As I have already detailed above, I was not in charge of, nor did I participate in, either the NYPD's or ADA Lederer's interviews of the Five or any other witnesses or suspects. I was not present for, nor did I participate in, the videotaping of any statements made by the Five or any other suspects. I did not, nor would I have, pressured NYPD officers and detectives to coerce any testimony. The tapes referred to by ADA Ryan in the Series were not "my" tapes.

38.     As set forth at Paragraph 118, the Series depicts me as engaging in a discussion with DA Morgenthau and ADA Lederer about DNA found on Ms. Meili's sock. In the scene, I alert ADA Lederer and DA Morgenthau to the existence of the sock and then inform them that since none of the defense counsel know about it "we can test it right before trial—surprise!" This scene is false.

39.     This meeting did not occur, nor did a conversation of this nature occur. I did not bring the sock DNA to ADA Lederer's attention, nor did I recommend that she withhold information about the sock from defense counsel until the eve of trial. During this timeframe, I was to serve as a witness at trial and, accordingly, did not play any role in this discovery issue. As the public record shows, ADA Lederer learned about the sock DNA from an NYPD lab chemist and she immediately notified the Court and counsel.

40.     As set forth at Paragraphs 120-122 of the Complaint, the Series portrays ADA Lederer and me fighting over inconclusive DNA evidence and me, once again, attempting to force the theory of the case on ADA Lederer that the Five participated in the attack on Ms. Meili. I then encourage ADA Lederer to continue prosecuting the case, despite a lack of substantial evidence, because "the whole country is watching." These scenes are false.

41.     These conversations did not occur. At the point in time portrayed in the Series, I was to be a witness at trial concerning observations I had made and conversations I had participated in on April 20-21, 1989. I did not force a theory of the case on either ADA Lederer or ADA Clements, who together created and constructed the entire prosecution strategy and who together prosecuted the case against The Five.

42.     As set forth in Paragraph 127, the Series portrays ADA Ryan, in 2002, telling ADA Casolaro that she was there when I changed the theory of the case from a single attacker to multiple attackers. This scene is false.

43.     I did not discuss any theories of the case with ADA Ryan in April 1989 as she was neither assigned to nor involved in the investigation of the case. More than twenty young men were interviewed by NYPD detectives and by ADAs Lederer and Clements in the days and weeks immediately following the attacks in Central Park on April 19th. Most admitted their involvement in the riots and other assaults on civilians. None gave investigators any reason to believe there was a single attacker who raped and assaulted Ms. Meili.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29 day of June 2020.

LINDA FAIRSTEIN