**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

LINDA FAIRSTEIN,                            )
                                           )
               Plaintiff,                   )          Case No: 2:20-cv-00180-FtM-66MRM
                                           )
v.                                          )
                                           )
NETFLIX, INC., AVA DUVERNAY,                )
and ATTICA LOCKE,                           )
                                           )
                                           )
               Defendants.                  )

**DECLARATION OF KARA L. GORYCKI**

I, Kara L. Gorycki, declare as follows:

1.      I am Of Counsel to Nesenoff & Miltenberg, LLP, counsel for Plaintiff Linda Fairstein ("Plaintiff"). I submit this declaration in support of Plaintiff's opposition to Defendant Netflix, Inc.'s Rule 12(b)(6) motion. The statements made herein are based on my personal knowledge.

2.      Annexed hereto as Exhibit 1 is a copy of, *Reid v. Viacom Int'l Inc.*, No. 1:14-cv-01252, Order, ECF No. 138 (N.D. Ga. Sept. 14, 2016)

3.      Annexed hereto as Exhibit 2 is an excerpt from the Continued Examination Before Trial of Linda Fairstein, April 24, 2013, at NYCLD_039237-50, as downloaded from the New York City Law Department website, http://www.nyc-cpj.org/Home, under "Federal Civil Litigation."

4.      Annexed hereto as Exhibit 3 is an excerpt from the Examination Before Trial of Linda Fairstein, April 23, 2013, at NYCLD_038920-45 as downloaded from the New York City Law Department website, http://www.nyc-cpj.org/Home, under "Federal Civil Litigation."

5.      Annexed hereto as Exhibit 4 is an excerpt from the Continued Examination Before Trial of Linda Fairstein, May 1, 2013, at NYCLD_039693-99, as downloaded from the New York City Law Department website, http://www.nyc-cpj.org/Home, under "Federal Civil Litigation."

6.      Annexed hereto as Exhibit 5 is a copy of Eric A. Seiff, *Weaknesses in Central Park Jogger Case Were Clear All Along*, New York Law Journal, June 3, 2019.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 1st day of July 2020.


                                                    /s/ *Kara L. Gorycki*
                                                    Kara L. Gorycki

2

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

PERRI "PEBBLES" REID,

      Plaintiff,

v.

VIACOM INTERNATIONAL INC.,
VIACOM INC., AND KATE
LANIER,

      Defendants.

CIVIL ACTION FILE

NO. 1:14-CV-1252-MHC

## ORDER

This case comes before the Court on the Defendants' Motion for Summary

Judgment [Doc. 100] and Plaintiff's Motion Under Rule 56(d) to Permit Additional

Discovery [Doc. 114] ("Pl.'s 56(d) Mot. for Additional Disc.").

## I.    BACKGROUND[1]

---

[1] At the outset, the Court notes that it views the evidence presented by the parties
in the light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Research,
Inc., 711 F.3d 1264, 1270 (11th Cir. 2013). In addition, the Court has excluded
assertions of facts by the parties that are immaterial or presented as arguments or
legal conclusions or any fact not supported by citation to evidence (including page
or paragraph number). LR 56.1B(1), NDGa. Further, the Court accepts as
admitted those facts in the parties' statements of material facts that have not been
specifically controverted with citation to the relevant portions of the record. LR
56.1B(2), NDGa. See Defs.' Statement of Undisputed Material Facts [Doc. 100-2]
("Defs.' SUMF"); Pl.'s Resp. to Defs.' SUMF [Doc. 108-1].

Plaintiff is an internationally renowned singer and performer. Compl. [Doc. 1] ¶¶ 19-22; Defs.' SUMF ¶ 1. She is also a businesswoman who is responsible for the discovery and development of TLC, one of the best-selling all-female musical groups of all time. Compl. ¶¶ 19-20; Defs.' SUMF ¶ 1; Decl. of Tionne "T-Boz" Watkins dated Sept. 22, 2015 [Doc. 100-33] ("Tionne Decl.") ¶ 16; Decl. of Rozonda "Chilli" Thomas dated Sept. 18, 2015 [Doc. 100-31] ("Chilli Decl.") ¶ 13. Plaintiff's companies Pebbitone Inc., Pebbitone Music, and PT Entertainment served at one point in time as TLC's production company, publishing company, and manager, respectively. Defs.' SUMF ¶ 2.

Defendant Viacom International Inc. is a wholly-owned subsidiary of Viacom Inc. (collectively "Viacom"), which owns, operates and controls the cable network VH1. Defs.' SUMF ¶ 3; Compl. ¶ 13. Defendant Kate Lanier ("Lanier") is a screenwriter of major motion pictures. Defs.' SUMF ¶ 4.

The above-styled action for defamation was brought by Plaintiff against Defendants based on scenes of and concerning Plaintiff that were broadcast in the made-for-TV program produced by Viacom and written by Lanier titled "CrazySexyCool: The TLC Story" (the "Movie"). Compl. ¶ 1; Defs.' SUMF ¶ 5.

2

## A.     The Creation of TLC

In 1990, Plaintiff assisted her husband L.A. Reid with the development of

his record company LaFace (a division of Arista Records).  Compl. ¶ 24; Defs.'

SUMF ¶¶ 7-8.  This assistance included searching for musical talent.  Compl.

¶¶ 24, 26.  As a part of this effort, Plaintiff was introduced by her hairdresser to

Tionne "T-Boz" Watkins ("Tionne") who, along with Lisa "Left Eye" Lopes

("Lisa") and Crystal Jones ("Crystal"), comprised an all-female R&B group in

Atlanta called "Second Nature."  Compl. ¶¶ 28-29; Defs.' SUMF ¶¶ 9-10.  After

the three sang for Plaintiff, she recognized their talent and informally became their

manager.  Compl. ¶¶ 37-38; Tionne Decl. ¶ 7.  Plaintiff renamed the trio "TLC"

after the first initials of their first names.  Compl. ¶ 41; Defs.' SUMF ¶ 13.

Plaintiff arranged for TLC to audition for LaFace.  Compl. ¶ 44; Defs.' SUMF

¶ 15.  After the audition, Plaintiff informed Tionne and Lisa that she was interested

in signing them, but not Crystal, to Pebbitone Inc. and Pebbitone Music as the

group's production company and publishing company.  Defs.' SUMF ¶ 17.  To

replace Crystal, Plaintiff, Tionne, and Lisa auditioned Rozonda Thomas (a back-up

dancer for a LaFace act).  Defs.' SUMF ¶ 20.  The group approved of Ms. Thomas

3

as a new member and dubbed her "Chilli" ("Chilli"), so as to maintain the rationale for "TLC."[2]  Defs.' SUMF ¶ 21.

### B.     The Signing of TLC

On February 13, 1991, Tionne, Lisa, and Crystal were formally released from their previous management agreement with Ian Burke (when they were known as Second Nature).  Letter Agreement dated February 7, 1991 [Doc. 100-39].  On February 28, 1991, Tionne and Lisa signed a production agreement (the "Production Agreement") [Doc. 100-40] and a songwriter agreement (the "Publishing Agreement") [Doc. 100-41] with Pebbitone, Inc. and Pebbitone Music, respectively.  Defs.' SUMF ¶ 18.  Approximately one month later, on April 2, 1991, the Production Agreement and Publishing Agreement were amended to add Chilli as a member of TLC.  Amendment to Production and Publishing Agreements [Doc. 100-45].  On April 3, 1991, the members of TLC signed a management agreement with PT Entertainment (the "Management Agreement") [Doc. 100-46].  The face of Production and Publishing Agreements, the Amendment to the Production and Publishing Agreements, and the Management Agreement all indicate that attorney Jody Graham Dunitz, of Manatt, Phelps &

---

[2] The references in this Order to "TLC," unless otherwise indicated, will mean Lisa, Tionne, and Chilli acting as the group TLC.

4

Phillips, represented Plaintiff and her companies. The same agreements indicate that attorney Marsha Sutherland of Katz & Cherry, P.C., represented Tionne, Lisa, and Chilli.

On May 10, 1991, Pebbitone, Inc. and LaFace executed an agreement for LaFace to serve as the record label for TLC (the "Recording Agreement"). [Doc. 100-47.][3] The members of TLC also signed inducement letters agreeing to provide their services exclusively to LaFace during the term of the Recording Agreement. Id. Pursuant to the Recording Agreement, Pebbitone was required to provide the services of TLC to LaFace, which was given the exclusive right to distribute TLC's records. Id.

Both Tionne and Chilli state that Plaintiff arranged for them to meet with an attorney at a "well-known Atlanta entertainment law firm" to review the contents of the Contracts before they signed them. Tionne Decl. ¶¶ 10-11; Chilli Decl. ¶ 8. Tionne and Chilli admit that they reviewed the Contracts with the attorney and signed them.[4] Tionne Decl. ¶ 11; Chilli Decl. ¶ 8.

_____

[3] The Court will refer to the Production Agreement, the Publishing Agreement, the Management Agreement, and the Recording Agreement collectively as "the Contracts."

[4] Although it is not clear from their declarations, it would appear that Tionne and Chilli may have met with an attorney from Katz & Cherry, P.C. See Dep. of

C.    "CrazySexyCool: The TLC Story"

On October 21, 2013, the Movie was aired on VH1. Compl. ¶ 116. The

Movie was advertised by VH1 as "the true story of three girls who were meant to

be," Video Advertisement [Doc. 121], and "the true story of the best-selling female

R&B group of all time," Video Advertisement [Doc. 122]. Defendants have

represented that the Movie is the "true account" of TLC from the perspective of

Tionne and Chilli. See Dep. of Maggie Malina (the Rule 30(b)(6) representative

for Defendants) taken April 23, 2015 [Doc. 86] ("Malina I Dep.") at 106; see also

Dep. of Kate Lanier taken June 18, 2015 [Doc. 90] ("Lanier Dep.") at 39, 60, 76.

In writing the Movie script, Lanier primarily relied upon the first-hand accounts of

Tionne and Chilli, but she also watched the Behind the Music documentary on

TLC and a documentary entitled "Last Days of Left Eye." Lanier Dep. at 18, 24-

25. With regard to any scenes in the Movie about Plaintiff, Tionne and Chilli were

Lanier's sole source:

> Q.    Did you do anything else besides talk to "Chilli" and Tionne to
> gather the information that was in the movie about Perri
> "Pebbles" Reid?

---

Tionne Watkins taken July 14, 2015 [Doc. 92], at 15; see also Dep. of Rozonda
"Chilli" Thomas taken July 8, 2015 [Doc. 91], at 11-12.

A.    They were the – they were the source and the truthful perspective of their own lives. So I had no – it was never a question.

Q.    So the answer to my question is, no, you didn't do anything else except talk to "Chilli" and Tionne to gather the information that was in the movie about Perri "Pebbles" Reid?

A.    Right.

Q.    The answer to my question is, you did not do anything else?

A.    Right.

Id. at 25.

### D.   **Alleged Defamatory Scenes**

Plaintiff's Complaint includes fifteen specific allegations that she has been defamed based on scenes (or combination of scenes) that directly and/or implicitly convey that:

1)    TLC and Plaintiff had the same attorneys.

2)    Plaintiff exercised control over TLC's attorneys for her personal benefit and to the detriment of the members of TLC.

3)    Plaintiff exercised control over TLC's accountants for her personal benefit and to the detriment of the members of TLC.

4)    Plaintiff pressured TLC to sign contracts without reading them or having them reviewed by TLC' s counsel.

5)    Plaintiff failed or refused to provide copies of contracts to TLC.

7

6) Plaintiff had the ability to prevent, and did prevent, TLC from obtaining copies of contracts relevant to the group.

7) Plaintiff only paid TLC Twenty-Five Dollars ($25.00) per week.

8) Plaintiff made the decision to remove Chilli from TLC.

9) Tionne had disclosed her health issues to Plaintiff prior to TLC signing any contracts.

10) Plaintiff asked or caused Tionne to put money before her health.

11) Plaintiff improperly deducted expenses from TLC's payments.

12) Plaintiff forced or coerced TLC into contracts that created a "windfall" or unearned fees benefiting Plaintiff to the detriment of the members of the group.

13) Plaintiff did not make a personal investment in TLC or its members.

14) Plaintiff did not earn fees received from contracts she had with TLC.

15) Plaintiff was aware that Chilli had an abortion and was involved in her decision to have the abortion performed.

Compl. ¶ 124.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment has the burden of informing

the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence that shows there is a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law. Celotex, 477 U.S. at 324. In determining whether a genuine issue of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. Anderson, 477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. Anderson, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Id.

9

"If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita, 475 U.S. at 587.

## III.   ANALYSIS

Plaintiff's Complaint consists of a single count for defamation.  See Compl. ¶¶ 115-26.  Defamation under Georgia law has been codified at O.C.G.A. §§ 51-5-1 *et. seq* (2015).  "Libel" is a published "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1.  "Slander or oral defamation consists in . . . [m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein.  O.C.G.A. § 51-5-4(a)(3).  "Defamation via a radio or television broadcast (or a "defamacast," as it has become generally known) includes elements of both libel under OCGA § 51-5-1, and slander under OCGA § 51-5-4."  Strange v. Henderson, 223 Ga. App. 218, 219 (1996) (citations omitted).

To prove defamation under Georgia law, Plaintiff must establish the following four elements: "(1) a false and defamatory statement concerning the

10

plaintiff; (2) an unprivileged communication to a third party; (3) fault by the

defendant amounting at least to negligence; and (4) special harm or the

actionability of the statement irrespective of special harm."[5] Infinite Energy, Inc.

v. Pardue, 310 Ga. App. 355, 356 (2011) (quoting Mathis v. Cannon, 276 Ga. 16,

20-21 (2002)). A statement via radio or television broadcast must be "both false

and malicious" to be actionable, "and the burden of proving a statement's falsity is

on the plaintiff." Jaillett v. Ga. Television Co., 238 Ga. App. 885, 888 (1999)

(citations and quotations omitted). Additionally, when the plaintiff is a public

figure,[6] she must show that the defendant was at fault in publishing the statements,

by proving by clear and convincing evidence that the defendant acted with actual

malice, or with knowledge that the statements were false or with reckless disregard

---

[5] Defendants argue in a footnote that any statement that is not libelous *per se* must be dismissed as a matter of law because Plaintiff cannot show special damages. Defs.' Br. at 15 n. 37. Defendants do not indicate which scenes they contend are not libelous *per se*. Both cases relied upon by Defendants hold that statements that tend "to injure one in his trade or business" are libelous *per se*. See McGowan v. Homeward Residential, Inc., 500 F. App'x 882, 886 (11th Cir. 2012); Zarach v. Atlanta Claims Ass'n, 231 Ga. App. 685, 688 (1998). The Court finds that, to the extent the scenes referenced in Plaintiff's Complaint are found to be defamatory, they would tend to injure her with respect to her business or trade. Accordingly, the Court rejects Defendants' argument.

[6] There is no dispute that Plaintiff is a public figure.

11

as to their falsity. <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 342 (1974); <u>Pardue</u>, 310 Ga. App. at 358 (citing <u>Mathis</u>, 276 Ga. at 22).

Defendants argue that they are entitled to judgment as a matter of law because (A) the scenes Plaintiff identifies as defamatory are not reasonably susceptible of the defamatory meanings Plaintiff ascribes to them, (B) the undisputed facts reveal that certain of the inferences conveyed by the scenes identified by Plaintiff are substantially true, and (C) there is no evidence that any false inference conveyed in the Movie was published with actual malice. Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. [Doc. 100-1] ("Defs.' Br.").[7]

---

[7] Defendants argue throughout their brief that the Movie is a "Docudrama," characterized as a dramatization of the lives of real people, and should be analyzed in that context. Defendants maintain that, in this context, an author is given leeway to present a "creative interpretation of reality" because "most viewers 'would be sufficiently familiar with the genre to avoid assuming that all the statements within them represent assertions of verifiable facts.'" Defs.' Br. at 16 (quoting <u>Davis v. Costa-Gavras</u>, 654 F. Supp. 653, 658 (S.D.N.Y. 1987)), 18, 23, 25, and 32. The Court declines to apply a more relaxed "docudrama" standard. The Movie was billed as a "true story" and Defendants have not presented a controlling case in which a work billed as "true story," was held to a lesser standard. In fact, in one case cited by Defendants, <u>Thoroughbred Legends, LLC v. The Walt Disney Co.</u>, the court was unwilling to find, as Defendants would have this Court find, that "no one could reasonably understand the scenes as "describing actual facts . . . or actual events." No. 1:07-CV-1275-BBM, 2008 WL 616253, at *13 (N.D. Ga. Feb. 12, 2008) (internal punctuation omitted). Similarly, the Movie is billed as a "true story" without using qualifying terms such as "based on" or "adapted from." There is nothing about the context of this "true story" that would convince a viewer that it represented anything other than actual facts or events.

## A.     Are the Scenes Incapable of Defamatory Meaning as a Matter of Law?

Generally, "the question whether a particular publication is libelous, that is, whether the published statement was defamatory, is a question for the jury. However, if the statement is not ambiguous and can reasonably have but one interpretation, the question is one of law [left to the judge]." Monge v. Madison Cty. Record, Inc., 802 F. Supp. 2d 1327, 1333 (N.D. Ga. 2011) (quoting Cox Enters., Inc. v. Nix, 274 Ga. 801, 803 (2002)).

> A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.  So the whole item . . . should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not.  If upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.

Hoffman-Pugh v. Ramsey, 193 F. Supp. 2d 1295, 1299 (N.D. Ga. 2002), aff'd, 312 F.3d 1222 (11th Cir. 2002) (quoting Ledger-Enquirer Co. v. Brown, 214 Ga. 422, 424 (1958)).

13

### 1. Are Plaintiff's alleged defamatory implications plausible?

Defendants contend that the Movie does not plausibly imply the defamatory inferences ascribed by Plaintiff. Defs.' Br. at 17-21.[8] As explained in the two subsections below, the Court finds that ten of the fifteen specific allegations of defamation are comprised of scenes or a combination of scenes which cannot be shown to have only one interpretation so as to permit the Court to conclude as a matter of law that they are not capable of supporting Plaintiff's claim for defamation; that is a determination to be made by a jury. However, the Court also finds that five of Plaintiff's specific allegations of defamation are comprised of scenes or a combination of scenes that cannot plausibly infer the meaning ascribed to them by Plaintiff, so that the Court can determine that those alleged scenes are not capable of supporting Plaintiff's claim for defamation as a matter of law.

---

[8] Although Defendants appear to attack Plaintiff's entire list of fifteen specific allegations of defamation in the Movie, they cite in their brief to only "a few key examples," and then reference the declaration of Maggie Malina [Doc. 100-3] as containing "additional examples." Defs.' Br. at 17 n.40. The Court has viewed the record in its entirety (including the scenes comprising the fifteen specific allegations of defamation referenced in the Complaint) and has relied on both its observations of the material presented in the Movie as well as a consideration of the arguments of counsel.

14

###### a. Scenes which plausibly imply a defamatory inference.

First, Defendants assert that the Movie does not literally or by implication convey that Plaintiff pressured TLC to sign contracts without providing them the time to read them or having them reviewed by TLC's counsel. Defs.' Br. at 18; Decl. of Maggie Malina in Supp. of Defs.' Mot. for Summ. J. [Doc. 100-3] ("Malina Decl.") ¶ 80; see also Compl. ¶ 124(d). Plaintiff alleges that the Movie implies that she failed or refused to provide, or had the ability to prevent and did prevent TLC from obtaining, copies of their contracts. Compl. ¶¶ 124(e) & (f). Although the Movie does not literally state that TLC was pressured into signing contracts without reading them or having them reviewed by TLC's counsel, or that TLC was prevented from reading their contracts, a viewer could reasonably infer this by implication based on two scenes in the Movie. First is the scene in which the TLC members each have a contract in front of them to review and sign while they were sitting in a restaurant at the same table with Plaintiff:[9]

> Pebbles:  I think you'll find these contracts are standard management and label deals. Welcome to Pebbitone and the start of your careers.

> [Chilli, Tionne, and Lisa scream with excitement and talk over each other.]

---

[9] References to individuals in the various scenes described in this Order are taken from lines performed by the actors who play those individuals in the Movie.

15

Tionne:      Speaking of money, how much we gettin'?

Pebbles:     Right now you'll get a weekly stipend of $25.00, enough
             to cover food and expenses.

Lisa:        That's it?

Pebbles:     Let me tell you something.  I'm investing in you right
             now.  I'm paying for rehearsal time, studio time,
             promotions, and videos.  The money will come in later,
             but for now, it's my risk.  This is how it works, girls.  If
             you don't like it, you don't have to sign.  I can find three
             other girls who would do this in a second.

Narrator:    We just knew we was gonna be it – and we believed
             signing those papers meant we were gonna be taken care
             of, too.

The second scene occurs later in the Movie when the members of TLC visit

Pebbles:

Lisa:        Perri, hey, we got something we want to talk to you
             about.

Pebbles:     What's going on?

Tionne:      All right, so we never got a copy of our contracts, and we
             just thought we should have that.

Chilli:      Yeah, you know, just to check them out.  Make sure we
             understand everything.

Pebbles:     You don't think I've taken care of you?  I have loved you
             and nurtured you like you were my own kids.

Tionne:      We know that.

16

Lisa:       Yeah, for sure, we know that.

Pebbles:    (Sighs) . . . and you don't trust me.  I got to say, I'm kind
            of hurt.  Excuse me.  (Pebbles walks out of the room.)

Narrator:   We knew something was up with our contracts but we
            were in the middle of our first tour and, man, were we
            having a blast.

Defendants assert there is but one interpretation of these scenes and it is not

defamatory.  However, viewed as a whole and in a light most favorable to

Plaintiff's claims in this case, the scenes depicting the TLC members signing their

contracts and then being unable to get copies of the contracts from Plaintiff are

reasonably capable of multiple interpretations, including one that is defamatory to

Plaintiff.  The scenes plausibly imply that Plaintiff pressured the TLC members

into signing the Contracts without reviewing them or having them reviewed by

counsel, and refused to give them copies upon their request.  Accordingly, whether

these scenes reasonably impart the meaning Plaintiff maintains they do is a matter

for a jury to decide.

Second, Plaintiff contends that there are scenes in the Movie that convey that

TLC and Plaintiff had that same attorneys and that Plaintiff exercised control over

those attorneys to the detriment of TLC.  Compl. ¶¶ 124(a), (b).  The relevant

scene in the Movie is presented as follows:

17

| | |
|---|---|
| Attorney: | Ladies, sorry to be running late. How can I help you? |
| Lisa: | We want to take a look at our contracts. |
| Attorney: | Okay, let me speak to Pebbles. |
| Tionne: | Why? Aren't you our lawyer? |
| Attorney: | Well, yes. |
| Lisa: | See, I'm confused. |
| Attorney: | But I have to speak to her, because . . . |
| Chilli: | Hold up. Are you her lawyer too? |
| Attorney: | (Pauses) Yes. |
| Lisa: | Now I'm really confused. |
| Tionne: | Wait, how can you represent us and Pebbles? |
| Chilli: | Yeah, how can you look out for both groups? That don't even make no sense. |
| Attorney: | (Pauses) To be honest, no one thought you girls were gonna make it this big. |
| Lisa: | Oh, that's foul. |
| Tionne: | Look, we don't care what y'all thought, why aren't we making any money? |
| Attorney: | (Pause, then opening a desk drawer to pull out a document, then thumbing through it) For starters, you have an obligation to pay back the label for all the production costs, including studio and rehearsal times, promotions, tour expenses, transportation, meals, gifts, |

18

> etcetera. Now that's fairly standard. Mrs. Reid is also taking a percentage as a manager. Then taking a percentage for her label, Pebbitone, which is also an imprint of LaFace, which is L.A. Reid's label. Oh, and LaFace also gets a cut.

Chilli: This is some bulls***. We got a platinum album, and we ain't got nothing.

Lisa: Except the cars she bought us.

Tionne: Nah, we probably paid for them too.

Attorney: Yeah, you did.

Lisa: That's f***ed up.

Chilli: What we gonna do?

Tionne: Something new.

This scene plausibly implies that Plaintiff exercised control over TLC's attorney (who was portrayed as representing Plaintiff as well) for her benefit and to their detriment. Once again, whether this scene reasonably imparts the meaning Plaintiff maintains it does is a matter for a jury to decide.

Third, Defendants argue that the Movie does not directly or implicitly convey the idea that Plaintiff improperly deducted expenses from payments that would otherwise have gone to TLC. Defs.' Br. at 18; see also Compl. ¶¶ 124(k), (l). The Movie contains several scenes during which the members of TLC grapple

19

with the fact that numerous expenses were deducted from what they thought they should have been getting paid.

Viewed as a whole and in a light most favorable to Plaintiff's claims in this case, the scenes depicting deductions from payments TLC would otherwise have received is not so unambiguous as to reasonably have but one interpretation. The scenes viewed collectively are capable of an interpretation in which Plaintiff was responsible for the allegedly improper deductions, as well as causing Plaintiff to retain unearned fees to the detriment of the group. Accordingly, the Court finds that whether the scenes depicting the deductions from TLC's pay reasonably impart the meaning ascribed to them by Plaintiff is a matter for a jury to decide.

Fourth, Defendants argue that no reasonable viewer could conclude that the Movie implies that Plaintiff paid TLC only $25.00 per week. Defs.' Br. at 19; see also Compl. ¶ 124(g). Defendants are correct that, during the scene in which Plaintiff informs TLC that they will be paid a $25.00 weekly stipend, she modifies that statement with words like "right now," implying that the $25.00 weekly stipend would be temporary at the outset of the relationship.[10]

---

[10] Defendants also refer to another scene during which Lisa indicates that the TLC members are getting paid $50,000.00 per year. This later scene, however, does not include any information that it is Plaintiff that is paying TLC the $50,000.00 per year. Additionally, the scene takes place at a moment in the story after which TLC and Plaintiff have ceased working with each other. On the other hand, there is an

Viewed as a whole and in a light most favorable to Plaintiff's claims in this case, the scenes depicting Plaintiff as having paid TLC only a $25.00 weekly stipend are not so unambiguous as to reasonably have but one interpretation. The scenes viewed collectively are capable of an interpretation in which Plaintiff paid the members of TLC only $25.00 per week. Accordingly, the Court finds that whether the scenes indeed depict Plaintiff as having paid TLC only $25.00 per week is a matter for a jury to decide.

Fifth, Plaintiff contends that there are scenes in the Movie which implicitly convey the impression that it was Plaintiff's decision to remove Chilli from TLC. Compl. ¶ 124(h). The Movie includes a scene in which Plaintiff confronts Chilli and declares "I am suspending you without pay. . . . You are on probation Missy. I don't want to see your face for a couple days, understand? And then we'll see." The scene is followed by another wherein Plaintiff is talking to Tionne and Lisa:

Pebbles:     We need to replace her [Chilli].

Tionne:     No, no way.

---

earlier scene in the Movie where, in response to an inquiry from Lisa, "Why we ain't rich yet?", Plaintiff says, "Nobody sees any money until the second album. There's cost of production, videos, touring costs. The label absorbs all of that and then gets reimbursed. We'll be lucky if we break even." This scene reinforces the implication that the members of TLC were not paid more than the $25.00 "stipend" until some point in time after the release of their second album.

21

| Pebbles: | Find another girl. |
|---|---|

Tionne:     She was perfect, man.

Pebbles:    Anyone can be replaced.  And do not talk to her.  I'll
            announce the auditions on the radio.

This interaction is followed by a scene in which Tionne and Lisa interview

numerous potential candidates to replace Chili.  Tionne and Lisa then go back to

Plaintiff and inform her that there is no one who can replace Chilli, implicitly

requesting to allow Chilli to come back to the group.  Plaintiff responds: "Fine, but

you better make sure she is ready for that video shoot next week."  After Plaintiff

consents, Tionne and Lisa call Chilli to tell her that she is back in the group.

Viewed as a whole and in a light most favorable to Plaintiff's claims in this

case, the scenes conveying the impression that it was Plaintiff's decision to remove

Chilli from TLC are not so unambiguous as to reasonably have but one

interpretation.  The scenes viewed collectively are capable of an interpretation in

which Plaintiff was the one responsible for removing Chilli from TLC.

Accordingly, the Court finds that whether the scenes indeed depict Plaintiff as

having removed Chilli from TLC is a matter for a jury to decide.

Based on the foregoing discussion, the Court finds that ten of the fifteen

specific allegations of defamation referenced in Paragraph 124 of Plaintiff's

Complaint (subparagraphs (a), (b), (d), (e), (f), (g), (h), (k), (l), and (n)) are

supported by scenes from the Movie that plausibly infer the information about Plaintiff that a reasonable jury could determine was defamatory.

### b.  Scenes which cannot plausibly imply a defamatory inference.

First, Defendants argue that there is no scene in the Movie that directly states or otherwise implies that Tionne disclosed her health issues to Plaintiff prior to signing any contract or that Plaintiff asked or caused Tionne to put money before health.  Defs.' Br. at 20; see also Compl. ¶¶ 124(i), (j).  The Court agrees with Defendants.  Viewing the scenes collectively in a light most favorable to Plaintiff's claims in this case, the Court finds that the Movie is incapable of any interpretation (directly or implicitly) that (1) Tionne disclosed her health issues to Plaintiff prior to signing any contract or (2) that Plaintiff asked Tionne to put money before health.  Because there is no scene in the Movie that supports these implications, the Court need not determine whether such implications are defamatory of Plaintiff and finds that Defendants are entitled to judgment as a matter of law on these two portions (Compl. ¶¶ 124(i), (j)) of Plaintiff's claim for defamation.[11]

---

[11] Plaintiff cites to a tweet from an individual who purportedly watched the Movie and posted the comment "Pebbles Be Like . . . That's Coming Out Yo Pay" coupled with a picture of an individual in a body cast laying in a hospital bed as evidence that a reasonable viewer could conclude that the Movie implies that

Second, Defendants argue that nothing in the Movie implies that Plaintiff was involved in Chilli's abortion. Defs.' Br. at 20-21; see also Compl. ¶ 124(o). The Court agrees with Defendants. Viewing the scenes collectively in a light most favorable to Plaintiff's claims in this case, the Court finds that they are incapable of any interpretation (directly or implicitly) that Plaintiff was aware that Chilli had an abortion or was involved in Chilli's decision to have an abortion performed. Because there is no scene in the Movie that supports the implication that Plaintiff was aware of Chilli's abortion or was involved in that decision, the Court need not determine whether such an implication is defamatory of Plaintiff and finds that Defendants are entitled judgment as a matter of law on that portion (Compl. ¶ 124(o)) of Plaintiff's claim for defamation.

Third, Defendants contend that nothing in the Movie directly or implicitly conveys that Plaintiff exercised control over TLC's accountants for her personal benefit or to the detriment of TLC. Defs.' Br. at 17 (citing Malina Decl. ¶ 79); see also Compl. ¶ 124(c). The Court again agrees with Defendants. Viewing the scenes collectively in a light most favorable to Plaintiff's claims in this case, the Court finds that they are incapable of any interpretation (directly or implicitly) that

Plaintiff asked Tionne to put money before health or that Tionne disclosed her health condition to Plaintiff. The Court does not find the "evidence" Plaintiff has presented sufficient to create an issue of fact.

24

Plaintiff had any control over the accountants. There is no mention of accountants
in the Movie until the scene where TLC accosts Clive Davis (founder and
President of Arista Records) in his office to demand more money, and Davis
indicates he would talk to the accountants. Plaintiff is not mentioned at all during
this scene. Because there is no scene in the Movie that supports the implication
that Plaintiff exercised control of TLC members' accountants for her own benefit
or to the detriment of TLC, the Court need not determine whether such an
implication is defamatory of Plaintiff and finds that Defendants are entitled
judgment as a matter of law on that portion (Compl. ¶ 124(c)) of Plaintiff's claim
for defamation.

Finally, Defendants contend that nothing in the Movie directly or implicitly
conveys that Plaintiff did not make a personal investment in TLC or its members.
Defs.' Br. at 17 (citing Malina Decl. ¶ 84); see also Compl. ¶ 124(m). The Court
again agrees with Defendants. Viewing the scenes collectively in a light most
favorable to Plaintiff's claims in this case, the Court finds that they are incapable
of any interpretation (directly or implicitly) that Plaintiff failed to make a personal
investment in TLC. In fact, the Movie indicates the opposite. In the scene where
Pebbles meets with TLC in the restaurant when the contracts are signed, Pebbles
says, "I am investing in you right now. I'm paying for rehearsal time, studio time,

25

promotions and videos.  The money will come in later, but for now, it's my risk."

In the scene where TLC asks Pebbles to see their contracts, Pebbles says, "You

don't think I've taken care of you?  I have loved and nurtured you like you were

my own kids."  There are other scenes where Pebbles in portrayed as being directly

involved with TLC's auditions and tours.  Because there is no scene in the Movie

that supports the implication that Plaintiff did not make a personal investment in

TLC, the Court need not determine whether such an implication is defamatory of

Plaintiff and finds that Defendants are entitled judgment as a matter of law on that

portion (Compl. ¶ 124(m)) of Plaintiff's claim for defamation.

Based on the foregoing discussion, the Court finds that five of the fifteen

specific allegations of defamation referenced in Paragraph 124 of Plaintiff's

Complaint (subparagraphs (c), (i), (j), (m), and (o)) refer to matters for which there

are no scenes in the Movie for which a juror could possibly infer (directly or

implicitly) the allegedly defamatory meaning that Plaintiff ascribes to them.

### 2.    Are the scenes not defamatory as a matter of law?

Assuming *arguendo* that the ten scenes or combination of scenes identified

in Plaintiff's Complaint (referenced above in Section III(A)(1)(a)) contain the

implications that Plaintiff ascribes to them, Defendants argue that many of those

alleged implications are not defamatory as a matter of law.  Defs.' Br. at 21-22.

26

First, Defendants argue that the implication that Plaintiff and TLC had the same attorney and that Plaintiff exercised control over the attorney for her personal benefit to the detriment of TLC is not defamatory as to Plaintiff as a matter of law. Id.; see also Compl. ¶¶ 124(a), (b).  Defendants argue that, if anything, these scenes reflect poorly on the attorney's reputation in his profession.  Defs.' Br. at 21-22.  The Court disagrees.

Viewed as a whole and in a light most favorable to Plaintiff's claims in this case, the scenes indicating that the same attorney represented Plaintiff as well as TLC and that Plaintiff exercised control over the attorney for her personal benefit to the detriment of TLC are not so unambiguous as to reasonably have but one non-defamatory interpretation.  These scenes viewed collectively are capable of an interpretation in which Plaintiff was the individual who presented the Contracts to TLC and arguably pressured them into signing without giving them an opportunity to independently review the Contracts or have them reviewed by counsel.  This interpretation could be found to be defamatory to Plaintiff, i.e., could be seen to injure Plaintiff's reputation in the music industry and expose her to public hatred, contempt, or ridicule.

Further, a reasonable viewer could interpret these scenes to carry an implication that Plaintiff controlled the lawyer who represented TLC and retained

27

him as her attorney as well. In one of the scenes, once TLC grew upset with their lack of compensation and sought out their lawyer to discuss the Contracts, the first thing the lawyer says in response to their queries about the seemingly-deficient compensation and wanting to see their contracts is "[o]kay, let me speak to Pebbles." It is possible that a reasonable viewer could understand this to mean that this lawyer, who is purportedly TLC's lawyer, placed a priority on his representation of Plaintiff over TLC. In the same scene, in response to direct questioning from TLC, the lawyer hesitantly admits that he represents both Plaintiff and TLC. He then appears to read from one of the Contracts while explaining the details of the agreements, such as the costs and expenses that were deducted from their pay, as well as the shares of revenue that went to Plaintiff as their manager and the shares that went to Plaintiff's music label and elsewhere. TLC expresses outrage that they recorded an album that sold over a million units and had nothing to show for it. One TLC member questions: "[w]hat we gonna do?" And another responds, "[s]omething new." Then, the next scene is a meeting between TLC and L.A. Reid in which TLC informs him that they were no longer going to work with Plaintiff as their manager.

Although these scenes may show the lawyer in a bad light, the scenes viewed collectively may also tend to injure the reputation of Plaintiff by implying

that she exercised control over the attorney for her personal benefit to the detriment

of TLC. Indeed, one could easily interpret the scenes to imply that TLC blamed

Plaintiff for their predicament. Because these scenes are capable of multiple

interpretations, one of which could be defamatory and actionable, the Court is

unable to conclude that they are not defamatory as a matter of law.

Second, Defendants argue that the scenes implying that Plaintiff failed or

refused to provide copies of the Contracts to TLC, or prevented them from

obtaining the Contracts, are not defamatory as a matter of law. Id. at 22; see also

Compl. ¶¶ 124 (e), (f). Defendants reason that Plaintiff testified during her

deposition that providing the Contracts to TLC was not her responsibility, but was

instead their attorneys' job, and therefore the implications "are simply not

defamatory of Pebbles" as a matter of law. Id. The Court disagrees.

Defendants' argument based on Plaintiff's testimony about her actual

responsibilities with regard to the Contracts misses the point. It is immaterial

whether it was actually Plaintiff's responsibility to show TLC their Contracts. The

scenes viewed collectively and in a light most favorable to Plaintiff's claims in this

case are capable of an interpretation in which a viewer could be led to believe that

Plaintiff was the one who was responsible for providing the Contracts to TLC and

failed or refused to do so. As such, the scenes are not so unambiguous as to

29

reasonably have but one non-defamatory interpretation. Accordingly, the Court finds that whether the scenes depicting Plaintiff's control over the Contracts and failure or refusal to provide the Contracts to TLC are defamatory is a question for the jury to decide.

Third, Defendants contend that the scenes that directly or implicitly convey that Plaintiff made the decision to remove Chilli from TLC cannot be defamatory as a matter of law. Defs.' Br. at 22; see also Compl. ¶ 124(h). Defendants argue that there is nothing illegal or improper about this action as it reflects a legitimate business decision on the part of Plaintiff. Defendants contend that there is no basis for claiming that this scene injured Plaintiff's reputation, or exposed her to public hatred, contempt, or ridicule. Plaintiff argues that these scenes are part of the overall defamatory portrayal of Plaintiff exercising unreasonable control over TLC by attempting to control Chilli's personal relationships and establishing her dominance over the group. Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. [Doc. 108] ("Pl.'s Resp.") at 14. The Court finds the scenes viewed collectively in a light most favorable to Plaintiff's claims in this case are not so unambiguous as to reasonably have but one non-defamatory interpretation. Whether the scenes conveying that Plaintiff made the decision to remove Chilli from TLC were defamatory is a question for the jury to decide.

### 3.     Are the scenes unactionable opinion?

Defendants argue that the Movie is a "docudrama that plainly presents

Tionne's and Chilli's perspectives" of the TLC story and every scene in the Movie

reflects their personal memories.  Defendants maintain that the Movie is comprised

of scenes filmed from Tionne's and Chilli's perspectives which constitute

expressions of opinion and are not capable of being defamatory.  Defs.' Br. at 22-

25.  In support of this position, Defendants point out that the Movie is narrated by

the voice of Tionne and begins with the phrase "Here's what I remember . . . ."  Id.

at 23.

Defendants are correct that a pure expression of opinion is not actionable as

a matter of law.

> The expression of opinion on matters with respect to which reasonable
> men might entertain differing opinions is not libelous. . . .   An
> assertion that cannot be proved false cannot be held libelous.  A writer
> cannot be sued for simply expressing his opinion of another person,
> however unreasonable the opinion or vituperous the expressing of it
> may be.

Bergen v. Martindale-Hubbell, Inc., 176 Ga. App. 745, 746 (1985) (quotations and

citations omitted).

> There is . . . no wholesale defamation exception for anything that
> might be labeled opinion.   An opinion can constitute actionable
> defamation if the opinion can reasonably be interpreted, according to
> the context of the entire writing in which the opinion appears, to state

31

or imply defamatory facts about the plaintiff that are capable of being
proved false.

Gast v. Brittain, 277 Ga. 340, 341 (2003) (quotation and citation omitted). The
question is whether the scenes "could reasonably be interpreted to state or imply
any defamatory facts about [Plaintiff] that are capable of being proved false." Id.

The Court finds that all of the scenes Plaintiff alleges defame her can
reasonably be interpreted to imply facts about her that are capable of being proven
true or false. See Compl. ¶ 124.[12] Because the scenes Plaintiff alleges defame her
can be interpreted to state or imply facts about her that are capable of being proven
false, they are not the type of opinion testimony that is unactionable as a matter of
law. See Eidson v. Berry, 202 Ga. App. 587, 588 (1992) (reversing grant of
summary judgment where the facts underlying opinion statements were capable of
being disproved). Accordingly, Defendants' Motion for Summary Judgment based
on the argument that the scenes are unactionable opinion is **DENIED**.

---

[12] Defendants cite to several specific lines from the Movie that do not form the
basis of Plaintiff's defamation claim in this case. Defs.' Br. at 23-25. For
example, Defendants argue that Lisa's statement that "we were not going down in
history as just another group who got ripped off," is a matter of protected opinion
and not actionable in this case. This statement, however, is not at issue in this
case. Defendants have failed to argue, let alone demonstrate, that any of the fifteen
scenes or combination of scenes that Plaintiff is relying upon constitute
unactionable opinion.

## B.    Are Certain Scenes Substantially True?

Defendants argue that Plaintiff is unable to satisfy the falsity element of

defamation as to three of the specific allegations of defamation in Plaintiff's

Complaint.  Defs.' Br. at 25-28.  Specifically, Defendants contend that following

scenes or combination of scenes are substantially true: (1) the scenes depicting

Plaintiff as having control over TLC's attorneys, (2) the scene that the TLC

members were paid a $25.00 per week stipend, and (3) the scene depicting Plaintiff

as the individual who removed Chilli from TLC.  See Compl. ¶¶ 124(b), (g), (h).

> In determining whether a statement is false, defamation law overlooks
> minor inaccuracies and concentrates upon substantial truth.    A
> statement is not considered false unless it would have a different
> effect on the mind of the viewer from that which the pleaded truth
> would have produced.    Minor factual errors which do not go to the
> substance, the gist, the sting of a story do not render a communication
> false for defamation purposes.

Jaillett, 238 Ga. App. at 888 (internal punctuation and citations omitted).

In support of the contention that the scenes depicting Plaintiff as controlling

TLC's lawyers are true, Defendants reference the following evidence from the

record: (1) Plaintiff's admission that she directed TLC to the law firm that

represented her husband, (2) Plaintiff's admission that she agreed to pay for the

first meeting between TLC and their lawyer, (3) deposition testimony from TLC

that they were discouraged from talking to their attorneys, (4) evidence that

Plaintiff's management company handled some communications between TLC and their lawyers, and (5) evidence that the bills for TLC's legal work were sent to Plaintiff. Defs.' Br. at 26-27. The Court finds that, as a matter of law, this evidence fails to support the inference that Plaintiff controlled TLC's lawyers. Although this evidence suggests that Plaintiff may have exerted some influence over TLC, it fails to establish that Plaintiff directly controlled TLC's lawyers or was a client of TLC's lawyers as implied by the Movie. Accordingly, Defendants are not entitled to summary judgment on this issue.

Defendants next argue that the scene that the TLC members were paid a $25 per week stipend is substantially true.[13] Defs.' Br. at 27. In support of this contention, Defendants rely on evidence that Chilli received a weekly stipend of $38.33 and Tionne and Lisa each received $85. Id.

---

[13] Defendants cite a state-court case from the Court of Appeals of Texas, where an individual sued a newspaper company over allegedly libelous statements contained in a series of newspaper articles. See Rogers v. Dallas Morning News, Inc., 889 S.W.2d 467 (Tex. App. 1994). The Rogers court found that the essence of the statements at issue in the newspaper's article (i.e. the financial competency of the charity's chief executive officer), was "founded on facts that, except for isolated discrepancies in matters of secondary importance, are undisputed." Id. at 473. In light of the undisputed facts supporting the essence of the article, matters of secondary importance, such as the amount spent by the plaintiff's charity, were "isolated discrepancies." Id. at 471, 473. However, in contrast to Rogers, the alleged $25.00 stipend in this case is not a matter of "secondary importance" in the Movie, as the entire first half of the plot is driven by the fact that the members of TLC believed they were unpaid and sought to receive more compensation.

In response, Plaintiff cites to testimony from a Chapter 11 bankruptcy proceeding involving TLC. Pl.'s Resp. at 19. During this 1996 proceeding, each of the TLC members testified that since the inception of their contracts with Plaintiff's companies they received approximately $75,000.00 per year on average in the form of advances. See Tr. of Chapter 11 Bankruptcy Proceeding, Case Nos. 95-69127, 95-69128, 95-69129 [Doc. 112] at 11, 52, and 77. Viewing the evidence in a light most favorable to Plaintiff's claims in this case, the Court finds that there is a genuine issue of material fact as to whether the scene in the Movie that the TLC members were paid a weekly stipend of $25.00 was substantially true, which precludes summary judgment on this issue.

Finally, Defendants argue that the fact that Plaintiff removed Chilli from TLC is demonstrably true, citing (1) a June 7, 1991, letter from counsel for Pebbitone removing Chilli from TLC, (2) deposition testimony from Tionne stating that it was Plaintiff, not the other members of TLC, who decided to kick Chili out of TLC, and (3) deposition testimony from Lanier indicating that both Tionne and Chilli told her that Plaintiff was the individual who decided to kick Chilli out of TLC. Plaintiff cites her own deposition testimony in which she contends that it was the other TLC members who decided to kick Chilli out of TLC. Dep. of Perri "Pebbles" Reid taken Nov. 19, 2014 [Doc. 109-1] at 261-62.

Viewing the evidence in a light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact as to whether the scene or combination of scenes in the Movie that Plaintiff made the decision to remove Chilli from TLC is true. Thus, judgment as a matter of law is inappropriate as to this issue.

Accordingly, Defendants' Motion for Summary Judgment based on the argument that some of the scenes were substantially true is **DENIED**.

## C.     Has Plaintiff Failed to Demonstrate Actual Malice?

As a compromise to the First Amendment's protections of free speech and press, the Supreme Court has held that public figures are precluded from recovery for defamation unless the plaintiff can prove the statement was made with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (concerning a public official); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 162 (1967) (concerning a "public figure"). "A person has acted with actual malice when a statement is made with knowledge that it was false, or with a high degree of awareness of the statement's probable falsity, or with reckless disregard of whether the statement was false or not." Rebozo v. Washington Post Co., 637 F.2d 375, 380 (5th Cir. 1981) (internal punctuation and citation omitted).[14] Under the actual

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

malice standard, "mere proof of failure to investigate, without more, cannot

establish reckless disregard for the truth." Gertz, 418 U.S. at 332. Rather, there

must be "sufficient evidence to permit the conclusion that the defendant in fact

entertained serious doubts as to the truth of his publication." Levan v. Capital

Cities/ABC, Inc., 190 F.3d 1230, 1239 (11th Cir. 1999) (quoting St. Amant v.

Thompson, 390 U.S. 727, 731 (1968)). A plaintiff must demonstrate actual malice

by clear and convincing evidence. Gertz, 418 U.S. at 342. "The standard of proof

of 'actual malice' with regard to a public figure is extremely high." Atlanta

Humane Soc. v. Mills, 274 Ga. App. 159, 165 (2005).

　　　　Although actual malice is subjective, it would be rare for a defendant to

admit actual malice. Consequently, a court can infer actual malice from objective

facts:

> Professions of good faith will be unlikely to prove persuasive, for
> example, where a story is fabricated by the defendant, is the product
> of his imagination, or is based wholly on an unverified anonymous
> telephone call. Nor will they be likely to prevail when the publisher's
> allegations are so inherently improbable that only a reckless man
> would have put them in circulation. Likewise, recklessness may be
> found where there are obvious reasons to doubt the veracity of the
> informant or the accuracy of his reports.

Michel v. NYP Holdings, Inc., 816 F.3d 686, 703 (11th Cir. 2016) (quoting St.

Amant, 390 U.S. at 732). "Absent an admission by the defendant that he knew his

material was false or that he doubted its truth, a public figure must rely upon

37

circumstantial evidence to prove his case." Hunt v. Liberty Lobby, 720 F.2d 631, 643 (11th Cir. 1983) (citation omitted); see also Harte-Hanks, 491 U.S. at 668 ("[A] plaintiff is entitled to prove defendant's state of mind through circumstantial evidence.").

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for defamation because there is no evidence that Defendants published any of the alleged statements or scenes with actual malice. Defs.' Br. at 28-35. Plaintiff argues the Court can infer actual malice from circumstantial evidence of objective facts in this case considered as a whole. Pl.'s Resp. at 20-35. Specifically, Plaintiff relies on the following sets of circumstances which she argues, *inter alia*, would allow a juror to infer actual malice: (1) Defendants intended the defamatory impression of Plaintiff, (2) Defendants rejected information favorable to Plaintiff, and (3) Defendants relied exclusively on biased and unreliable sources in Tionne and Chilli.

### 1. Evidence that Defendants intended to create an overall defamatory impression of Plaintiff.

Plaintiff has presented evidence she contends demonstrates that Defendants intended to convey a defamatory impression of Plaintiff in the Movie. Pl.'s Resp. at 34-35. Specifically, Plaintiff cites to a November 2012 email sent to Defendants' employee, Maggie Malina, from casting directors from an entity

38

called Breakdown Services, Ltd. See E-mail [Doc. 109-42] ("Casting Directors' Email"). Malina was the Executive Producer for the Movie, in which role she oversaw the Movie's development and production, found the screenwriter, developed the screenplay, and oversaw the creative execution of the film. Malina Decl. ¶ 7. The subject of the email sent to Malina from the casting directors was "TLC Biopic breakdown for approval and nondisclosure note." Casting Directors' Email. Attached to the email were paragraph-length descriptions of the characters of the Movie, including the following description of Plaintiff's character:

> The R&B star and head of Pebatone, [sic] the label she started with her husband L.A. Reid, Pebbles is gorgeous, talented, strong-willed, tough as nails, self-serving and very savvy but not quite ethical businesswoman. She signs TLC and is a relentless taskmaster as they rehearse; jealous of Chilli's attentions to Dallas, she is particularly hard on Chilli, frequently humiliating her and docking her pay. Pebbles loves having the girls adore her but she doesn't seem to like paying them, so she distracts them from the fact that she's never let them see their contracts by giving them all new cars—and mid-level ones at that.

Casting Directors' Email.[15]  Malina, the recipient of the e-mail, testified that

Defendants never used the word "unethical" in the Movie and the use of that word

---

[15] Plaintiff also cites to a March 1, 2013, press release from the agent of the actress who was playing the part of Plaintiff in the Movie and characterized the role in the following manner:

> [T]he R&B star and head of Pebatone [sic] and not quite ethical businesswoman. She signs TLC and is a relentless taskmaster as they

was in a document generated by another company (Breakdown Services); nevertheless, she admits that Defendants approved this description of Plaintiff's character in the Movie. Malina I Dep. at 119-20.

Whether Defendants generated the "unethical" phrase in the description of Plaintiff's character or approved this characterization created by Breakdown Services, the Casting Directors' Email and the Press Release constitute evidence from which a reasonable juror could conclude that Defendants intended to put Plaintiff in a "not quite ethical" light, whether by developing that impression themselves, or approving of it. Specifically, a reasonable juror could conclude that Defendants intended to portray Plaintiff as someone who did not like to pay TLC and prevented them from ever seeing their contracts.

---

rehearse. Jealous of Chilli's (Palmer) attentions to Dallas (Ross), she is particularly hard on Chilli, frequently humiliating her and docking her pay. Pebbles loves having the girls adore her but she doesn't seem to like paying them, so she distracts them from the fact that she's never let them see their contracts!

Press Release dated March 1, 2013 [Doc. 109-67]. Defendants argue that they had no involvement with the press release and it is therefore not imputable to them. Defs.' Reply Br. in Supp. of Their Mot. for Summ. J. [Doc. 125] ("Defs.' Reply") at 20. Although Defendants claim the press release was "put out" by another individual unaffiliated with Defendants, the language used in the press release appears to be suspiciously identical to language found in the Casting Directors' Email and may be additional evidence of actual malice.

## 2. Evidence that Defendants rejected information favorable to Plaintiff.

Plaintiff also contends that at least one of the editorial script changes made by Defendants in developing the Movie involved the removal of a line that would have moderated the defamatory inferences of a scene and, by removing that line, Defendants increased the likelihood that the a viewer would perceive Plaintiff in a negative light. Specifically, Defendants removed a line in the script that the TLC lawyers reviewed the Contracts before the members signed them.[16] Pl.'s Resp. at 32-34. Plaintiff argues that the deletion of this scene demonstrates bias and a reckless disregard for the truth on the part of Defendants. Id.

It is undisputed that Defendants were aware, as informed by both Tionne and Chilli, that TLC's lawyers met with them regarding the Contracts before TLC signed them. Dep. of Maggie Malina taken June 30, 2015 [Doc. 87] ("Malina II Dep.") at 70. The scene that was deleted would have shown TLC at the restaurant booth pulling out their own contracts and Tionne saying "[s]o we had the lawyers look over all of it." See TLC Biopic draft #4 at 17-18; TLC Biopic draft #14 [Doc.

---

[16] The scene Defendants chose to remove may have also conveyed the image that the TLC members were in possession of their own contracts and dispelled the notion that Plaintiff (1) was responsible for presenting and providing the Contracts to the TLC members, and (2) was able to prevent them from examining the Contracts and seeking counsel from their attorneys.

41

109-30] at 18-19. Had the deleted scene been included in the Movie, it would have impacted the presentation of other scenes involving the Contracts.

As discussed in Section III(A)(1)(a), based upon the scene in which Plaintiff presents the Contracts to TLC, a reasonable juror could conclude that Plaintiff pressured TLC into signing the Contracts without independently reviewing them or having them reviewed by counsel. This conclusion is based on (1) the fact that Plaintiff introduces and generally describes the Contracts to TLC, (2) their excited reaction after Plaintiff presents the Contracts, (3) the fact that they appear to be uninformed about the basics of the Contracts, and (4) the fact that they all rush to sign the Contracts.

The deleted material arguably would have clarified that TLC had copies of the Contracts at the beginning of the process and that the TLC lawyer independently reviewed the Contracts with the TLC members prior to their signature. An email between Executive Producers Alexander Motlagh and Maggie Malina suggests cutting this scene because "[i]t's confusing the issue." E-mail dated June 5, 2013 [Doc. 109-49]. Malina explained that by saying "confusing the issue," she meant that the Contracts "are standard management and label deals. That's the issue that [the deleted line is] confusing. [The deleted line] gives us information that suggests that [the Contracts] are not standard. And that's what I

42

wanted to clarify." Malina II Dep. at 75. The Court does not find Malina's explanation plausible.

More importantly, viewing this evidence in a light most favorable to Plaintiff, the Court finds that a reasonable juror could conclude that Defendants' decision to delete this material from the Movie was a deliberate effort to convey the alternative, more scurrilous representation that TLC did not independently review the Contracts or meet with their lawyer prior to signing the Contracts, which Defendants knew not to be the case. Hunt, 720 F.2d at 645 ("[A]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."); see also Time, Inc. v. Ragano, 427 F.2d 219, 221 (5th Cir. 1970) (affirming the denial of summary judgment to publisher finding sufficient evidence of actual malice where there was evidence that the publisher knew the statement published was false and evidence that a previous draft that would have rectified the libelous statement was deleted). Additionally, the deletion of the line in the script that would have established TLC's lawyer had reviewed the Contracts prior to the meeting with Plaintiff is consistent with Defendants' possible intent expressed in the Casting Directors' Email and the

43

March 1, 2013, Press Release, which describes Plaintiff's character as a "not quite ethical businesswoman" who distracts TLC from the fact that she never let them see the Contracts.

### 3. Evidence that Defendants relied exclusively on biased and unreliable sources in Tionne and Chilli.

Plaintiff argues that actual malice can be inferred in this case based on Defendants' knowledge that their sources of information (Tionne and Chilli) were (1) biased toward Plaintiff and (2) inherently unreliable based on the fact that their stories changed and were unbelievable. Pl.'s Resp. at 22-25. Plaintiff cites Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 183 (2d Cir. 2000), in support of the proposition that the bias Tionne and Chilli had against Plaintiff creates a material issue of fact where a juror could find with convincing clarity that Defendants published the Movie with actual malice. Indeed, the Celle court does recognize that "[e]vidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." Id. The same case, however, clarified that evidence of bias standing alone "is not sufficient to establish actual malice." Id. (citing Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 666 (1989) ("the actual malice standard is not

satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term")).

Defendants do not dispute that the relationship between Plaintiff and Tionne and Chilli had "degraded," which was conveyed in the Movie. Defs.' Reply at 14. Defendants maintain, however, that there was no evidence that the information provided by Tionne and Chilli was unreliable notwithstanding their potential bias towards Plaintiff. Absent evidence that Tionne's or Chilli's bias against Plaintiff gave Defendants reason to believe the information obtained from the two TLC members was unreliable, this fact alone does not establish actual malice, although it can be considered as a contributing factor. See Hunt, 720 F.2d at 645 (finding source's bias against the plaintiff was a contributing factor supporting actual malice).

Plaintiff next argues that Defendants were aware that Tionne and Chilli were inherently unreliable as sources because their stories frequently changed and were unbelievable. Pl.'s Resp. at 23. In support of this argument, Plaintiff relies on the fact that the script of the Movie was revised on numerous occasions[17] and several

---

[17] Plaintiff has not established that all script changes came about as a result of Tionne and Chilli revising their stories. As Defendants point out, there were changes made throughout the process for "countless creative reasons." Defs.' Reply at 15-16. Accordingly, it does not follow that every script change was necessitated by a changing story from Tionne and Chilli.

of Defendants' representatives noted the frequent changes in Tionne's and Chilli's stories. See, e.g., email between Author and Executive Producer Kate Lanier and Executive Producer Maggie Malina dated Feb. 11, 2013 [Doc. 109-105] ("There's def [sic] some revising of incidents as previously told to me."); email between Director Charles Stone and Author and Executive Producer Kate Lanier dated Feb. 12, 2013 [Doc. 109-106] ("Yeah, lots of revising re: what ACTUALLY happened, I've seen this before . . . where it gets close and suddenly all yr [sic] sh*#'s gonna be out there . . . so maybe you wanna [sic] tone it down."). In particular, the director of the Movie questioned one scene that did not make it into the Movie, where the script called for the members of TLC to break into an office to steal their contracts:

> Is this real or made up? It feels challenging to do and kinda [sic] nutty–unless it really happened. Tionne seems to think it didn't which is weird. How can you forget something like that if that did happen? Would love to clarify.

See email between Director Charles Stone and Author and Executive Producer Maggie Malina dated Feb. 20, 2013 [Doc. 109-21].

Defendants assert that the numerous script revisions instead show that Tionne and Chilli were vigilant in guarding the truth. See Lanier Dep. at 59-60 (indicating that Tionne and Chilli were "incredibly vigilant" and nothing they told her changed the essential story they first told her, to the extent there were changes

it was to soften some things and "make sure that everything was accurate to their own experience."), 93-95 (indicating that some scenes were changed to create tension and that not every change in the script was made based on something Tionne or Chilli told Lanier). In fact, the Movie director referred to Tionne and Chilli as the "reality police." See Email between Director Charles Stone and Author and Executive Producer Kate Lanier dated Feb. 12, 2013.

The Court finds that, to the extent there were changes in the script prompted by Tionne and Chilli's revisions, the changes were not so numerous or drastic, standing alone, to establish actual malice, although they can be considered as a contributing factor.

### 4. Review of the cumulative evidence of actual malice.

Proof of actual malice calls a defendant's state of mind into question, Sullivan, 376 U.S. at 288, but this sort of determination "does not readily lend itself to summary disposition." Hutchinson v. Proxmire, 443 U.S. 111, 120 n.9 (1979). In determining actual malice, this Court considers the accumulation of direct and circumstantial evidence and the reasonable inferences drawn from both in the context of the Movie as a whole. See Harte-Hanks, 491 U.S. at 688 (holding that a "court must consider the factual record in full" in order to determine actual malice); Hunt, 720 F.2d at 646 (considering the "sum total of the inferences of

47

actual malice."); see also Silvester v. Am. Broad. Cos., Inc., 650 F. Supp. 766, 770

(S.D. Fla. 1986) ("When the publication is a television broadcast, the script must

be evaluated in its totality, considering all the words used and not merely a

particular phrase or sentence."), aff'd, 839 F.2d 1491 (11th Cir. 1988).

The Court finds the Eleventh Circuit's decision in Hunt informative. In that

case, the Court cited with approval the following passage from a California state

court decision in which a jury verdict for a public figure plaintiff was affirmed:

> The action by the TV Guide staff showed a reckless disregard of
> whether the statement published was true or false, because the staff
> was aware that the true facts, as stated in the press release, were that
> Pat Montandon was not a call girl but would be appearing on a show
> with a call girl; and a staff decision was made to leave out crucial
> facts in rewriting the release, thereby implying that plaintiff was a call
> girl. This is proof of convincing clarity to support the jury's verdict
> that the article was published not in good faith, but with actual malice.

Hunt, 720 F.2d 644–45 (quoting Montandon v. Triangle Publ'ns, Inc., 45 Cal. App.

3d 938, 944 (1975)). In this case, it is undisputed that Defendants knew TLC met

independently with an attorney regarding their contracts before signing them, yet

decided to reject a scene that would have made this fact clear. Instead,

Defendants' final script arguably created an impression that TLC was introduced to

their contracts by Plaintiff, who pressured them into signing the Contracts. See

also Ragano, 427 F.2d at 221.

48

Viewed in a light most favorable to Plaintiff, the Court finds that the evidence that Defendants deleted material that may have rectified some of the allegedly defamatory scenes, in combination with the other circumstantial evidence discussed above, is sufficient for a reasonable jury to find that Defendants purposely avoided or deliberately ignored facts that would have established the falsity of one or more purportedly defamatory scenes.  See St. Amant, 390 U.S. at 732 ("The finder of fact must determine whether the publication was indeed made in good faith . . . . [R]ecklessness may be found where there are obvious reasons to doubt . . . the accuracy of the reports.").  Therefore, because there is a genuine issue of material fact as to whether Defendants acted in good faith or with actual malice when they published the scenes in question, Defendants' Motion for Summary Judgment based on the argument that there is no evidence of actual malice is **DENIED**.

## IV.    PLAINTIFF'S RULE 56(d) MOTION FOR ADDITIONAL DISCOVERY

Plaintiff requests that the Court delay ruling on Defendants' Motion for Summary Judgment until she has had an opportunity to conduct additional discovery to support of her claim of actual malice.  Pl.'s 56(d) Mot. for Additional Disc.  Plaintiff seeks discovery related to work performed by Defendants' legal

49

department or outside counsel on behalf of Defendants with regard to the verification of facts as represented in the Movie. Plaintiff argues that this discovery is relevant because Defendants are relying on the legal review performed by their in-house and outside counsel to substantiate their argument that there is no evidence of actual malice. Pl.'s 56(d) Mot. for Additional Disc. at 7-8 (citing, inter alia, a portion of Defendants' brief in which Defendants state that "at every turn, they corroborated TLC's story and found no evidence to contradict it.").

Defendants object to this additional discovery on the grounds that it is protected from disclosure by the attorney-client privilege. Moreover, Defendants affirmatively represent that they are not relying on any legal review, "or anything its lawyers may have done," to support their argument as to the absence of evidence of malice. Defs.' Mem. of Law in Opp'n to Pl.'s 56(d) Mot. for Additional Disc. [Doc. 124] at 2-3. In other words, Defendants contend that the evidence relied upon in support of their contention that their own research established their belief in the essential truth of the Movie already has been produced to Plaintiff, and that evidence does not include reliance upon their attorneys' legal review. Id. at 3.

Because the Court has found that Plaintiff has presented sufficient evidence of actual malice to raise a jury question and preclude summary judgment, the Court

50

finds that additional discovery on this issue is unnecessary. Accordingly, the Court **DENIES AS MOOT** Plaintiff's Motion Under Rule 56(d) to Permit Additional Discovery [Doc. 114].

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment [Doc. 100] is **GRANTED IN PART and DENIED IN PART**. The Court **GRANTS** Defendants' Motion to the extent Plaintiff's claim is based on the scenes described in ¶¶ 124(c), (i), (j), (m), and (o) of the Complaint. Defendants' Motion for Summary Judgment is otherwise **DENIED**.

It is further **ORDERED** that Plaintiff's Motion Under Rule 56(d) to Permit Additional Discovery [Doc. 114] is **DENIED AS MOOT**.

It is further **ORDERED** that the parties shall submit a proposed Consolidated Pretrial Order within thirty (30) days of the entry of this Order.

**IT IS SO ORDERED** this 14th day of September, 2016.

_Mark H. Cohen_
_____
MARK H. COHEN
United States District Judge

51

# EXHIBIT 2

Page 303

1

2    - - - - - - - - - - - - - - - - - x

3

RE:     In re:  McCRAY, RICHARDSON,

4    SANTANA, WISE

        and SALAAM Litigation,

5

Docket No. 03 CV 9685 (DAB)(RLE)

6

    - - - - - - - - - - - - - - - - - x

7

                    99 Park Avenue

8                   New York, New York

9                   April 24, 2013

                    9:37 a.m.

10

11      CONTINUED EXAMINATION BEFORE TRIAL of

12   LINDA FAIRSTEIN, a Defendant in the

13   above-entitled action, held at the above

14   time and place, taken before Alice

15   Schulman, a Notary Public of the State of

16   New York, pursuant to Subpoena and

17   stipulations between Counsel.

18

19            *        *        *

20

21

22

23

24

25

NYCLD_039211

Linda Fairstein

Page 329

| | | |
|---|---|---|
| 1 | A.     K Wise 7:00 a.m. at, abbreviated | 10:04:37 |
| 2 | station house.  I, again underlined | 10:04:43 |
| 3 | because I'm referring to myself, not | 10:04:46 |
| 4 | quoting someone, I read rights card from | 10:04:49 |
| 5 | my wallet, Bill Murphy, not cuffed. | 10:04:53 |
| 6 | Q.     Before you go on.  Let's stop at | 10:04:57 |
| 7 | Bill Murphy.  Those words that you're | 10:05:00 |
| 8 | writing here, did they involve information | 10:05:04 |
| 9 | you got from Kharey Wise or from the | 10:05:07 |
| 10 | officer? | 10:05:10 |
| 11 | A.     These words were my own actions | 10:05:11 |
| 12 | at 7:00 a.m. on April 21st. | 10:05:15 |
| 13 | Q.     So you read the rights? | 10:05:21 |
| 14 | A.     Correct. | 10:05:22 |
| 15 | Q.     To Kharey? | 10:05:23 |
| 16 | A.     Correct. | 10:05:24 |
| 17 | Q.     From what? | 10:05:24 |
| 18 | A.     From the card from my wallet. | 10:05:25 |
| 19 | Q.     What does Bill Murphy mean? | 10:05:29 |
| 20 | A.     Bill Murphy was my second bureau | 10:05:33 |
| 21 | chief in the DA's office and trained us in | 10:05:36 |
| 22 | 1973 always to carry in our wallets a card | 10:05:40 |
| 23 | containing the Miranda rights. | 10:05:45 |
| 24 | Q.     So this is 7:00 a.m. at the | 10:05:48 |
| 25 | station house.  Which station house? | 10:05:50 |

NYCLD_039237

Linda Fairstein

Page 330

| | | | |
|---|---|---|---|
| 1 | A. | 24th Precinct. | 10:05:52 |
| 2 | Q. | This is on the 21st, right? | 10:05:54 |
| 3 | A. | Yes. | 10:05:56 |
| 4 | Q. | Who was present with Kharey at | 10:05:57 |
| 5 | that time? | | 10:06:01 |
| 6 | A. | The detectives working with him. | 10:06:01 |
| 7 | I believe, well, Detective Sheehan was in | | 10:06:08 |
| 8 | the immediate area around me, and Jonza | | 10:06:11 |
| 9 | was, I don't know if Jonza was next to me | | 10:06:16 |
| 10 | but nearby. | | 10:06:23 |
| 11 | | (Mr. Wareham entered the room.) | 10:06:24 |
| 12 | Q. | This is in the station house? | 10:06:28 |
| 13 | A. | Yes. | 10:06:32 |
| 14 | Q. | This is not in the park? | 10:06:33 |
| 15 | A. | Correct. | 10:06:34 |
| 16 | Q. | You went with Kharey to the | 10:06:35 |
| 17 | park? | | 10:06:37 |
| 18 | A. | Yes. | 10:06:37 |
| 19 | Q. | Is this before you went to the | 10:06:37 |
| 20 | park? | | 10:06:39 |
| 21 | A. | Yes. | 10:06:39 |
| 22 | Q. | Where was this, where in the | 10:06:39 |
| 23 | station house did this take place? | | 10:06:44 |
| 24 | A. | In the squad room on the second | 10:06:46 |
| 25 | floor, I believe. | | 10:06:49 |

NYCLD_039238

Linda Fairstein

Page 331

| | | |
|---|---|---|
| 1 | Q.     Did you make any observations | 10:06:49 |
| 2 | about Kharey's physical condition? | 10:06:58 |
| 3 | A.     Yes. | 10:07:00 |
| 4 | Q.     Do you remember them now? | 10:07:01 |
| 5 | A.     I, in general, remember his | 10:07:04 |
| 6 | physical condition, yes, sir. | 10:07:10 |
| 7 | (Ms. Warren entered the room.) | 10:07:11 |
| 8 | Q.     What were they? | 10:07:14 |
| 9 | A.     He was alert, he appeared to be | 10:07:15 |
| 10 | comfortable.  He had been offered food and | 10:07:19 |
| 11 | drink throughout the evening. | 10:07:23 |
| 12 | Q.     How did you know that? | 10:07:26 |
| 13 | A.     Because from time to time I'm | 10:07:27 |
| 14 | one of the people who ordered the food and | 10:07:30 |
| 15 | drink for the young men, for their | 10:07:33 |
| 16 | families, for the police officers, for my | 10:07:38 |
| 17 | colleagues. | 10:07:40 |
| 18 | Q.     Is this the first time you saw | 10:07:40 |
| 19 | Kharey? | 10:07:42 |
| 20 | A.     I might have seen him in the | 10:07:43 |
| 21 | hours before 7:00 a.m.  This is the first | 10:07:51 |
| 22 | time I recall having a, being in close | 10:07:55 |
| 23 | proximity. | 10:08:02 |
| 24 | Q.     Did you see him at the 20th | 10:08:03 |
| 25 | Precinct? | 10:08:06 |

NYCLD_039239

Linda Fairstein

Page 332

| | | |
|---|---|---|
| 1 | A.    I don't believe I did see him | 10:08:06 |
| 2 | there.  I later learned he was there. | 10:08:07 |
| 3 | Q.    Go on reading the notes.  Pick | 10:08:10 |
| 4 | up with not cuffed.  What do you mean by | 10:08:21 |
| 5 | that? | 10:08:23 |
| 6 | A.    That he was never handcuffed for | 10:08:24 |
| 7 | this trip to the park, in the precinct or | 10:08:27 |
| 8 | in the park until after he was arrested | 10:08:29 |
| 9 | many hours later. | 10:08:32 |
| 10 | Q.    Why don't you read those three | 10:08:33 |
| 11 | lines. | 10:08:36 |
| 12 | A.    Okay.  Not cuffed.  In roadway | 10:08:37 |
| 13 | with Jonza and Sheehan and Kevin | 10:08:41 |
| 14 | Richardson. | 10:08:44 |
| 15 | Q.    Are those notes related to | 10:08:46 |
| 16 | events in the station house? | 10:08:50 |
| 17 | A.    No, in the park now. | 10:08:54 |
| 18 | Q.    Read the rest of the notes, | 10:08:59 |
| 19 | please. | 10:09:04 |
| 20 | A.    Pointed out where he was on ball | 10:09:04 |
| 21 | field and where, using his word in quotes, | 10:09:07 |
| 22 | snatched her. | 10:09:15 |
| 23 | Q.    Go on. | 10:09:16 |
| 24 | A.    Drove below, underlined, after | 10:09:18 |
| 25 | KR, arrow back to car. | 10:09:25 |

NYCLD_039240

Linda Fairstein

Page 333

| | | |
|---|---|---|
| 1 | Q.    What does that mean? | 10:09:28 |
| 2 | A.    That the drove below refers to | 10:09:30 |
| 3 | the fact that the officers driving me in | 10:09:35 |
| 4 | the car drove from the roadway down to the | 10:09:38 |
| 5 | ravine.   That's what drove below means. | 10:09:43 |
| 6 | After KR went back to the car | 10:09:48 |
| 7 | means that Kevin was the first of the two | 10:09:51 |
| 8 | young men the officers asked to get out of | 10:09:55 |
| 9 | the car. | 10:09:58 |
| 10 | Q.    Kharey was asked to get out | 10:10:00 |
| 11 | afterwards, is that what it means? | 10:10:02 |
| 12 | A.    Yes. | 10:10:04 |
| 13 | Q.    What time of day did you go to | 10:10:05 |
| 14 | the park? | 10:10:09 |
| 15 | A.    We left the precinct shortly | 10:10:09 |
| 16 | after 7:00 a.m. and were back by 8:00 a.m. | 10:10:12 |
| 17 | Q.    You were driven there by a | 10:10:17 |
| 18 | police officer? | 10:10:21 |
| 19 | A.    Yes. | 10:10:21 |
| 20 | Q.    Which one? | 10:10:21 |
| 21 | A.    It's my recollection, as I sit | 10:10:22 |
| 22 | here, that Detective Sheehan drove the car | 10:10:27 |
| 23 | and Detective Jonza was also in the car. | 10:10:31 |
| 24 | Q.    Were you all in the same car | 10:10:33 |
| 25 | with Kharey and Kevin? | 10:10:35 |

NYCLD_039241

Linda Fairstein

Page 334

| 1  | A.    That's my recollection.  I could | 10:10:37 |
| 2  | be mistaken. | 10:10:38 |
| 3  | Q.    Read on. | 10:10:39 |
| 4  | A.    Mike Sheehan and August Jonza. | 10:10:40 |
| 5  | Mike Sheehan, I'm sorry, to Mike Sheehan, | 10:10:47 |
| 6  | T-O, to August Jonza, quote, send Kharey | 10:10:51 |
| 7  | up - walked over alone, meaning Kharey | 10:10:55 |
| 8  | walked alone. | 10:11:01 |
| 9  | (Mr. Warren entered the room.) | 10:11:01 |
| 10 | Q.    Over to? | 10:11:04 |
| 11 | A.    To the area where Sheehan and I | 10:11:05 |
| 12 | were. | 10:11:08 |
| 13 | Q.    The next paragraph starting with | 10:11:08 |
| 14 | looked down, I can read, is this your | 10:11:14 |
| 15 | recording of what you -- | 10:11:20 |
| 16 | MR. BELDOCK:  Withdrawn. | 10:11:22 |
| 17 | Q.    Is this your recording of what | 10:11:22 |
| 18 | you understood Kharey to have said? | 10:11:25 |
| 19 | A.    Yes. | 10:11:27 |
| 20 | Q.    Where was he when you made these | 10:11:29 |
| 21 | comments? | 10:11:32 |
| 22 | A.    The car had parked in the ravine | 10:11:33 |
| 23 | and we were standing, I would say, | 10:11:37 |
| 24 | approximately a third of the way up from | 10:11:43 |
| 25 | the stream in the ravine to the roadway. | 10:11:48 |

NYCLD_039242

Linda Fairstein

Page 335

| | | |
|---|---|---|
| 1 | So when I say up, it's actually south, but | 10:11:51 |
| 2 | uphill from the stream.  And that's where | 10:11:54 |
| 3 | Kharey walked to us. | 10:12:00 |
| 4 | Q.    The last line on the page says | 10:12:03 |
| 5 | Channel 5/TV, TV what? | 10:12:09 |
| 6 | A.    Crew. | 10:12:11 |
| 7 | Q.    Where were they? | 10:12:12 |
| 8 | A.    They were, a car drove up on the | 10:12:13 |
| 9 | roadway and reporters got out of the car | 10:12:18 |
| 10 | and started to walk in the direction of | 10:12:24 |
| 11 | the ravine. | 10:12:29 |
| 12 | Q.    The second page also has to do | 10:12:31 |
| 13 | with the events relating to the visit to | 10:12:35 |
| 14 | the park? | 10:12:37 |
| 15 | A.    Yes. | 10:12:38 |
| 16 | Q.    At least the first section? | 10:12:38 |
| 17 | A.    Yes. | 10:12:42 |
| 18 | Q.    Who gives the information that | 10:12:43 |
| 19 | you record here starting with on car, in | 10:12:46 |
| 20 | car on way back, took us past scaffolding | 10:12:51 |
| 21 | on Central Park West, that's where Antron, | 10:12:55 |
| 22 | with a pipe, was breaking light bulbs? | 10:13:01 |
| 23 | A.    Kharey Wise. | 10:13:03 |
| 24 | Q.    Was Kevin in the same car as you | 10:13:05 |
| 25 | drove back? | 10:13:09 |

NYCLD_039243

Linda Fairstein

Page 336

| | | |
|---|---|---|
| 1 | A.    Yes. | 10:13:10 |
| 2 | Q.    Were there any other persons | 10:13:10 |
| 3 | present with your group, Sheehan, Jonza, | 10:13:20 |
| 4 | Kevin and Kharey in the visit to the park? | 10:13:25 |
| 5 | A.    There may have been another car | 10:13:30 |
| 6 | with police officers in it.  I don't | 10:13:34 |
| 7 | believe there were any other civilians, | 10:13:37 |
| 8 | but I don't remember talking to anyone in | 10:13:41 |
| 9 | another car.  There were, there was a | 10:13:44 |
| 10 | uniformed police officer, at least one if | 10:13:48 |
| 11 | not two, on the roadway in the park when | 10:13:50 |
| 12 | we arrived. | 10:13:54 |
| 13 | Q.    Am I correct that this visit to | 10:13:55 |
| 14 | the park took place after the video | 10:13:57 |
| 15 | statements of Kharey and Kevin? | 10:14:02 |
| 16 | A.    I believe the visit to the park | 10:14:04 |
| 17 | took place after the video statement of | 10:14:06 |
| 18 | Kevin Richardson and, as I sit here today, | 10:14:09 |
| 19 | my recollection is that Kharey Wise had | 10:14:14 |
| 20 | made two written statements at that point, | 10:14:17 |
| 21 | or a written statement but had not yet | 10:14:24 |
| 22 | been videotaped. | 10:14:27 |
| 23 | Q.    Kevin was being questioned and | 10:14:31 |
| 24 | was giving information while at the visit | 10:14:33 |
| 25 | to the park and in the car. | 10:14:36 |

NYCLD_039244

Linda Fairstein

Page 337

```
 1        A.     He was not being questioned at      10:14:40

 2   all in the car.   The only questions, as we      10:14:42

 3   told him and we told Mr. Richardson, his         10:14:44

 4   father, were to ask him to put the               10:14:54

 5   locations he'd talked about in his               10:14:57

 6   statement together with their actual             10:14:59

 7   place, physical place in the park.               10:15:04

 8        Q.     Remind me again when you took        10:15:05

 9   these notes.                                     10:15:09

10        A.     I believe I wrote these notes        10:15:10

11   after 11 o'clock on the 21st into the            10:15:13

12   early morning hours of the 22nd.                 10:15:16

13        Q.     Do any of these notes relate to      10:15:18

14   Kevin Richardson having made any                 10:15:30

15   observations at the scene?                       10:15:33

16        A.     Not in these notes, no.              10:15:35

17        Q.     Pardon me?                           10:15:46

18        A.     Not in these two pages, no.          10:15:47

19        Q.     And there are no statements on       10:15:51

20   these two pages about anything that Kevin        10:15:54

21   said at the scene, right?                        10:15:56

22        A.     In these two pages, that's           10:15:58

23   correct.                                         10:16:01

24        Q.     The next note on page 1018 is        10:16:01

25   made about the events of your observations       10:16:11
```

NYCLD_039245

Linda Fairstein

Page 338

| | | |
|---|---|---|
| 1 | of the cell? | 10:16:15 |
| 2 | A.    In the cell. | 10:16:16 |
| 3 | Q.    Read them to us, please. | 10:16:17 |
| 4 | A.    Okay.  10:30 p.m. in large cell. | 10:16:19 |
| 5 | MS. DAITZ:  I think you read | 10:16:28 |
| 6 | that wrong. | 10:16:29 |
| 7 | Q.    In large pen? | 10:16:30 |
| 8 | A.    In large pen. | 10:16:33 |
| 9 | Q.    Go on. | 10:16:34 |
| 10 | A.    Defendants standing against | 10:16:35 |
| 11 | right wall. | 10:16:37 |
| 12 | Q.    Which defendant are you | 10:16:38 |
| 13 | referring to? | 10:16:39 |
| 14 | A.    Kharey Wise. | 10:16:40 |
| 15 | (A woman entered the room.) | 10:16:41 |
| 16 | Q.    Go on. | 10:16:44 |
| 17 | A.    Here I quote him, I put quote | 10:16:45 |
| 18 | marks around him.  Did you tell them about | 10:16:50 |
| 19 | the guy who said do you want to race.  A | 10:16:52 |
| 20 | voice came from within the cell.  I | 10:16:58 |
| 21 | couldn't -- Kharey Wise was closest to | 10:17:00 |
| 22 | where I was standing.  And the person | 10:17:04 |
| 23 | responded, one person responded yeah, and | 10:17:08 |
| 24 | Wise said I did too, that was really | 10:17:11 |
| 25 | funny, end quote. | 10:17:15 |

NYCLD_039246

Linda Fairstein

Page 339

| | | |
|---|---|---|
| 1 | And then everybody sounded, it | 10:17:16 |
| 2 | sounded as though everybody in the cell | 10:17:21 |
| 3 | began to laugh. | 10:17:23 |
| 4 | Q.   How long were you observing the | 10:17:24 |
| 5 | defendants in the cell? | 10:17:26 |
| 6 | A.   I was not observing them.  I | 10:17:27 |
| 7 | came out of the office I'd been given to | 10:17:29 |
| 8 | work in to make phone calls in to get a | 10:17:33 |
| 9 | telephone book that was in a desk drawer | 10:17:38 |
| 10 | eight or ten feet from that cell.  And as | 10:17:43 |
| 11 | I came out, this conversation happened. | 10:17:46 |
| 12 | Q.   When did you write this | 10:17:51 |
| 13 | conversation down? | 10:17:53 |
| 14 | A.   Before leaving the station house | 10:17:55 |
| 15 | that night, the next day. | 10:17:56 |
| 16 | Q.   The next page has to do with | 10:18:00 |
| 17 | notes regarding Kevin Richardson, correct? | 10:18:02 |
| 18 | A.   Yes. | 10:18:04 |
| 19 | Q.   This is 1019.  It says 7:00 a.m. | 10:18:05 |
| 20 | Does that refer to the time at the | 10:18:09 |
| 21 | precinct or at the park? | 10:18:11 |
| 22 | A.   At the precinct. | 10:18:13 |
| 23 | Q.   And then it reads with Mike | 10:18:13 |
| 24 | Sheehan and August Jonza to scene, | 10:18:18 |
| 25 | correct? | 10:18:23 |

NYCLD_039247

Linda Fairstein

Page 340

| | | |
|---|---|---|
| 1 | A.    Correct. | 10:18:23 |
| 2 | Q.    And it says with Kevin | 10:18:23 |
| 3 | Richardson and Wise, and then it says | 10:18:26 |
| 4 | rights at station house. | 10:18:29 |
| 5 | A.    Yes. | 10:18:30 |
| 6 | Q.    What does that refer to? | 10:18:31 |
| 7 | A.    That, combined with the next | 10:18:32 |
| 8 | line, says that Detective Sheehan at the | 10:18:37 |
| 9 | station house read rights to Kevin | 10:18:41 |
| 10 | Richardson. | 10:18:45 |
| 11 | Q.    Going down the page, I think | 10:18:46 |
| 12 | it's readable.  Well, having said that, I | 10:18:49 |
| 13 | can't read the first two.  Is that | 10:18:58 |
| 14 | defendant at scene? | 10:19:00 |
| 15 | A.    At scene out of car. | 10:19:02 |
| 16 | Q.    Not cuffed? | 10:19:04 |
| 17 | A.    Not cuffed. | 10:19:05 |
| 18 | Q.    Why did you underline not | 10:19:05 |
| 19 | cuffed? | 10:19:09 |
| 20 | A.    Because it was quite unusual in | 10:19:10 |
| 21 | my experience to take a suspect out of a | 10:19:14 |
| 22 | station house, and this was being done | 10:19:19 |
| 23 | because of the concern and the fact that | 10:19:23 |
| 24 | these were young men. | 10:19:25 |
| 25 | Q.    This is Kevin being taken to the | 10:19:28 |

NYCLD_039248

Linda Fairstein

Page 341

| | | |
|---|---|---|
| 1 | scene after his statement, right? | 10:19:34 |
| 2 | A.    I believe Kevin had already made | 10:19:37 |
| 3 | his videotape, yes. | 10:19:40 |
| 4 | Q.    And except for possibly Kharey, | 10:19:41 |
| 5 | to your memory, had not been thoroughly or | 10:19:44 |
| 6 | completely interviewed on video, this was | 10:19:50 |
| 7 | after all the other statements were taken, | 10:19:53 |
| 8 | right? | 10:19:55 |
| 9 | MS. DAITZ:  Objection to form. | 10:19:55 |
| 10 | Q.    I mean, other statements taken | 10:19:56 |
| 11 | from other suspects who became defendants. | 10:19:58 |
| 12 | A.    All the other statements is what | 10:20:01 |
| 13 | you asked me.  By no means had all the | 10:20:02 |
| 14 | other statements been taken. | 10:20:05 |
| 15 | Q.    Which ones weren't taken? | 10:20:06 |
| 16 | A.    I'm not sure as we sit here. | 10:20:08 |
| 17 | Q.    Did you go to the scene because | 10:20:10 |
| 18 | you had some question about the | 10:20:12 |
| 19 | reliability or the accuracy of what | 10:20:15 |
| 20 | various other suspects had said about the | 10:20:18 |
| 21 | location of the rape? | 10:20:22 |
| 22 | MS. DAITZ:  Objection to form. | 10:20:23 |
| 23 | A.    No. | 10:20:25 |
| 24 | Q.    Did you know that different | 10:20:25 |
| 25 | statements had been made by the various | 10:20:35 |

NYCLD_039249

Linda Fairstein

Page 342

```
 1   defendants about the location of the rape?   10:20:37
 2        A.    At that point in time, I was not   10:20:40
 3   aware of any significant discrepancies in    10:20:43
 4   the location of the rape.                     10:20:50
 5        Q.    Do you know any reason why         10:20:58
 6   Kevin's family member, his father or         10:21:00
 7   whoever else was present, did not come to    10:21:04
 8   the scene to be there with him?              10:21:07
 9        A.    Yes.                               10:21:09
10        Q.    What was that?                     10:21:10
11        A.    I talked to his father, Paul      10:21:10
12   Richardson.  I was introduced to his        10:21:12
13   father.  I told him, told Mr. Richardson     10:21:14
14   that the police would like to take Kevin     10:21:19
15   to the scene.  I told him the purpose for    10:21:22
16   which we wanted to take him to the scene     10:21:26
17   and that he, Paul Richardson, had a right    10:21:28
18   to go with Kevin because of his age.         10:21:32
19            And Mr. Richardson told me he       10:21:36
20   didn't want to go.  And his only question    10:21:39
21   was, are you bringing Kevin back here to     10:21:42
22   me, will I see him again.  And the           10:21:46
23   detectives said yes.                         10:21:50
24        Q.    The next note on that same page   10:21:52
25   reads on roadway, quote, this is where we    10:21:59
```

NYCLD_039250

Page 606

1                    CERTIFICATION

2

3        I, Alice Schulman, a Notary Public for

4    and within the State of New York, do

5    hereby certify:

6        That the witness whose testimony as

7    herein set forth, was duly sworn by me;

8    and that the within transcript is a true

9    record of the testimony given by said

10   witness.

11       I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16       IN WITNESS WHEREOF, I have hereunto

17   set my hand this 30th day of April 2013.

18

19

                    *Alice Schulman*
20                ALICE SCHULMAN

21

22            *        *        *

23

24

25

NYCLD_039514

**EXHIBIT 3**

Page 1

1

2    - - - - - - - - - - - - - - - - - - x

3

RE:      In re:   McCRAY, RICHARDSON,

4    SANTANA, WISE

         and SALAAM Litigation,

5

Docket No. 03 CV 9685 (DAB)(RLE)

6

     - - - - - - - - - - - - - - - - - - x

7

                              99 Park Avenue

8                             New York, New York

9                             April 23, 2013

                              10:06 a.m.

10

11       EXAMINATION BEFORE TRIAL of LINDA

12   FAIRSTEIN, a Defendant in the

13   above-entitled action, held at the above

14   time and place, taken before Alice

15   Schulman, a Notary Public of the State of

16   New York, pursuant to Notice and

17   stipulations between Counsel.

18

19              *       *       *

20

21

22

23

24

25

NYCLD_038869

Linda Fairstein

Page 52

| | | |
|---|---|---|
| 1 | people there, both my colleagues and | 10:59:32 |
| 2 | police. | 10:59:34 |
| 3 | Q.    Were you -- | 10:59:35 |
| 4 | MR. BELDOCK:  Withdrawn. | 10:59:40 |
| 5 | Q.    During the two criminal trials | 10:59:44 |
| 6 | in this case, was Mr. Sheehan often at the | 10:59:46 |
| 7 | District Attorney's office? | 10:59:52 |
| 8 | A.    I have no idea. | 10:59:53 |
| 9 | Q.    Did you know that while Ms. | 10:59:54 |
| 10 | Lederer and Mr. Clements were working in | 11:00:07 |
| 11 | the criminal trials, that is in | 11:00:13 |
| 12 | preparation for the trials and the actual | 11:00:15 |
| 13 | trials and hearings, that Sheehan had a | 11:00:18 |
| 14 | special assignment to the office to assist | 11:00:23 |
| 15 | them? | 11:00:25 |
| 16 | A.    I did not know that. | 11:00:25 |
| 17 | Q.    Did you know whether any New | 11:00:27 |
| 18 | York City Police detectives were assigned | 11:00:33 |
| 19 | to assist Lederer and/or Clements in | 11:00:35 |
| 20 | preparation for and prosecution of the | 11:00:39 |
| 21 | defendants in the two criminal trials? | 11:00:43 |
| 22 | MS. DAITZ:  Objection to form. | 11:00:45 |
| 23 | Q.    You can answer. | 11:00:46 |
| 24 | A.    During which period of time? | 11:00:47 |
| 25 | Q.    During the time of the | 11:00:49 |

Linda Fairstein

Page 53

| | | |
|---|---|---|
| 1 | preparation for the criminal trials and | 11:00:51 |
| 2 | the trials, 1989 to 1990. | 11:00:52 |
| 3 | A.    All of, from April of 1989 | 11:00:56 |
| 4 | through the conclusion of the trial? | 11:01:00 |
| 5 | Q.    I'm talking about special | 11:01:02 |
| 6 | assignments -- | 11:01:07 |
| 7 | MR. BELDOCK:  I'll withdraw the | 11:01:09 |
| 8 | word special. | 11:01:10 |
| 9 | Q.    I'm talking about detectives who | 11:01:10 |
| 10 | were assigned to assist Lederer and | 11:01:12 |
| 11 | Clements in preparation for the trial, | 11:01:15 |
| 12 | trials, plural, and prosecution of the | 11:01:19 |
| 13 | defendants. | 11:01:24 |
| 14 | MS. DAITZ:  Objection to form. | 11:01:24 |
| 15 | You can answer. | 11:01:26 |
| 16 | A.    The reason I asked you to tell | 11:01:27 |
| 17 | me what time period is that in any felony | 11:01:29 |
| 18 | trial, there is a period, any and every | 11:01:32 |
| 19 | felony trial, there is a period when | 11:01:38 |
| 20 | officers are assigned to the courthouse to | 11:01:41 |
| 21 | work on the preparation for trial. | 11:01:44 |
| 22 | So, yes, I assume that happened | 11:01:47 |
| 23 | with this case, but I don't know in what | 11:01:50 |
| 24 | period.  You're not being specific. | 11:01:52 |
| 25 | Q.    The trials took place in 1990, | 11:01:54 |

NYCLD_038921

Linda Fairstein

Page 54

| | | |
|---|---|---|
| 1 | both of them, or '90 and '91? | 11:01:58 |
| 2 | A. I believe '90 and '91. | 11:02:00 |
| 3 | Q. Let's take 1990 and '91. Were | 11:02:02 |
| 4 | you aware that certain detectives were | 11:02:05 |
| 5 | assigned to assist Lederer and Clements in | 11:02:09 |
| 6 | preparation for the prosecution of those | 11:02:15 |
| 7 | trials and during the prosecution of those | 11:02:17 |
| 8 | trials? | 11:02:20 |
| 9 | A. To answer your question, | 11:02:20 |
| 10 | perhaps -- to make it clear, I was a | 11:02:24 |
| 11 | witness in those trials. So I was not | 11:02:26 |
| 12 | allowed or I was not supervising the | 11:02:29 |
| 13 | day-to-day management of Ms. Lederer's | 11:02:33 |
| 14 | assignments. That would not have been | 11:02:36 |
| 15 | appropriate. | 11:02:38 |
| 16 | Secondly, we worked in entirely | 11:02:39 |
| 17 | separate buildings. She in 80 Centre | 11:02:41 |
| 18 | Street, my office in 100 Centre Street. | 11:02:44 |
| 19 | So I didn't see on a daily basis who was | 11:02:47 |
| 20 | coming and going from her office. | 11:02:50 |
| 21 | And third, I would have to -- | 11:02:54 |
| 22 | it's no surprise to me that officers were | 11:02:55 |
| 23 | assigned for preparation for trial in any | 11:02:58 |
| 24 | case like this one. I would just have to | 11:03:02 |
| 25 | know what dates, but it would not surprise | 11:03:05 |

Linda Fairstein

Page 55

| | | |
|---|---|---|
| 1 | me. | 11:03:08 |
| 2 | Q.    But you were in their presence | 11:03:08 |
| 3 | when any detectives were assisting on a | 11:03:12 |
| 4 | regular matter, regular basis, Clements | 11:03:14 |
| 5 | and Lederer in the prosecution from 1990 | 11:03:18 |
| 6 | and 1991? | 11:03:22 |
| 7 | MS. DAITZ:  Objection to form. | 11:03:23 |
| 8 | A.    At almost no time was I present | 11:03:25 |
| 9 | with them for the preparation of their | 11:03:28 |
| 10 | case for trial. | 11:03:30 |
| 11 | Q.    You just said you were only a | 11:03:30 |
| 12 | witness; is that correct? | 11:03:32 |
| 13 | A.    I didn't say only a witness.  I | 11:03:33 |
| 14 | said I was a witness. | 11:03:35 |
| 15 | Q.    And because you were a witness, | 11:03:37 |
| 16 | you were not involved in the preparation | 11:03:38 |
| 17 | for the trial? | 11:03:40 |
| 18 | A.    In most of the preparation for | 11:03:41 |
| 19 | the trial, and things like detective | 11:03:43 |
| 20 | assignments would not have been my issue. | 11:03:44 |
| 21 | Q.    And since you were a witness, | 11:03:47 |
| 22 | are you saying you were not involved in | 11:03:49 |
| 23 | assisting Lederer in prosecution? | 11:03:51 |
| 24 | MS. DAITZ:  Objection to form. | 11:03:54 |
| 25 | A.    If you would ask me questions | 11:03:57 |

NYCLD_038923

Linda Fairstein

Page 56

| | | |
|---|---|---|
| 1 | specifically about what aspects of | 11:03:59 |
| 2 | prosecution, I would be happy to try and | 11:04:02 |
| 3 | answer.  Not overall prosecution, no. | 11:04:04 |
| 4 | Q.    All right.  You understand, I'm | 11:04:07 |
| 5 | asking these questions based on your | 11:04:10 |
| 6 | statement that you were a witness and you | 11:04:12 |
| 7 | weren't involved in the participation of | 11:04:14 |
| 8 | the prosecution.  Do I understand you | 11:04:16 |
| 9 | correctly? | 11:04:18 |
| 10 | MS. DAITZ:  I object to the | 11:04:18 |
| 11 | characterization of the witness's | 11:04:19 |
| 12 | testimony. | 11:04:21 |
| 13 | Q.    What do you mean by you were | 11:04:21 |
| 14 | only a witness? | 11:04:23 |
| 15 | MR. BELDOCK:  Withdrawn. | 11:04:24 |
| 16 | Q.    What do you mean by the fact | 11:04:24 |
| 17 | that you were a witness and therefore you | 11:04:26 |
| 18 | did not participate? | 11:04:27 |
| 19 | A.    You keep saying only a witness. | 11:04:29 |
| 20 | Q.    I took out only. | 11:04:32 |
| 21 | A.    Okay. | 11:04:33 |
| 22 | Q.    Okay.  You said you were a | 11:04:33 |
| 23 | witness and therefore you were not | 11:04:35 |
| 24 | involved in the preparation for the case? | 11:04:37 |
| 25 | MS. DAITZ:  Objection. | 11:04:40 |

NYCLD_038924

Linda Fairstein

Page 57

| | | |
|---|---|---|
| 1 | A.    In the preparation with | 11:04:41 |
| 2 | detectives for the trial of the case.  So | 11:04:43 |
| 3 | she did not have to come to me to get | 11:04:45 |
| 4 | permission to assign detectives for daily | 11:04:48 |
| 5 | work with her. | 11:04:52 |
| 6 | Q.    Were you involved in assisting | 11:04:53 |
| 7 | Ms. Lederer and/or Mr. Clements in any way | 11:04:56 |
| 8 | in the preparation for the trials and the | 11:05:02 |
| 9 | prosecutions themselves? | 11:05:06 |
| 10 | A.    In some respects, yes. | 11:05:10 |
| 11 | Q.    In what respects? | 11:05:14 |
| 12 | A.    If Ms. Lederer wanted to discuss | 11:05:16 |
| 13 | an issue with me or a matter with me, she | 11:05:21 |
| 14 | would call me and we met. | 11:05:24 |
| 15 | I don't believe I ever met with | 11:05:27 |
| 16 | Mr. Clements in the preparation of the | 11:05:29 |
| 17 | case for trial.  That's a strong statement | 11:05:31 |
| 18 | ever.  I don't recall meeting with Mr. | 11:05:33 |
| 19 | Clements during the preparation for either | 11:05:37 |
| 20 | trial. | 11:05:41 |
| 21 | Q.    Can you tell us who the lawyers | 11:05:41 |
| 22 | were who were involved in the team that | 11:05:45 |
| 23 | prosecuted the defendants outside of | 11:05:49 |
| 24 | Lederer and Clements? | 11:05:52 |
| 25 | A.    Okay.  Yes.  The layers of | 11:05:53 |

NYCLD_038925

Linda Fairstein

Page 58

| | | |
|---|---|---|
| 1 | supervision included Ms. Lederer's three | 11:06:03 |
| 2 | Trial Bureau 40 supervisors. | 11:06:07 |
| 3 | Q.    Who? | 11:06:09 |
| 4 | A.    John Hogan was the bureau chief | 11:06:10 |
| 5 | in Trial Bureau 40.  And also a former | 11:06:13 |
| 6 | member of the Sex Crimes Prosecution Unit. | 11:06:18 |
| 7 | Dan McNulty was, I believe, charged with | 11:06:22 |
| 8 | much of the supervision direct on a daily | 11:06:28 |
| 9 | basis for Ms. Lederer and Mr. McNulty.  He | 11:06:32 |
| 10 | was their Deputy Bureau Chief in Trial | 11:06:36 |
| 11 | Bureau 40.  I believe the Second Deputy | 11:06:41 |
| 12 | was Mr. Cronin, Steve Cronin. | 11:06:43 |
| 13 | Q.    Can you spell that? | 11:06:45 |
| 14 | A.    C-R-O-N-I-N. | 11:06:45 |
| 15 | Q.    Go on. | 11:06:48 |
| 16 | A.    And then I was, in the sense of | 11:06:49 |
| 17 | the sex crimes work, a supervisor.  The | 11:06:59 |
| 18 | chief of the Trial Division to whom I | 11:07:02 |
| 19 | reported was also in the supervisory role | 11:07:04 |
| 20 | in this case. | 11:07:09 |
| 21 | Q.    Who was that? | 11:07:10 |
| 22 | A.    It was at first John Fried when | 11:07:11 |
| 23 | the case was assigned in April 1989.  He | 11:07:16 |
| 24 | left the office, a date you can ascertain | 11:07:22 |
| 25 | but probably 1990, replaced by Nancy Ryan | 11:07:28 |

NYCLD_038926

Linda Fairstein

Page 59

| | | |
|---|---|---|
| 1 | who was then a supervisor. | 11:07:32 |
| 2 | And then up the chain of | 11:07:37 |
| 3 | command, the Chief Assistant District | 11:07:39 |
| 4 | Attorney and Mr. Morgenthau himself. | 11:07:41 |
| 5 | Q.    Did you ever talk to Mr. | 11:07:44 |
| 6 | Morgenthau during the period this case was | 11:07:47 |
| 7 | pending before the convictions about | 11:07:49 |
| 8 | anything having to do with the charges, | 11:07:51 |
| 9 | the indictments and the prosecution? | 11:07:56 |
| 10 | MS. DAITZ:  Objection to form. | 11:07:58 |
| 11 | A.    Did I ever speak? | 11:08:00 |
| 12 | Q.    In that period of time. | 11:08:03 |
| 13 | A.    In the period of time from April | 11:08:05 |
| 14 | 20, 1989 -- | 11:08:07 |
| 15 | Q.    Right. | 11:08:09 |
| 16 | A.    -- to the convictions? | 11:08:09 |
| 17 | Q.    Right. | 11:08:11 |
| 18 | A.    Frequently. | 11:08:12 |
| 19 | Q.    Did you talk about issues in the | 11:08:13 |
| 20 | case with him? | 11:08:15 |
| 21 | A.    Yes, I did. | 11:08:16 |
| 22 | Q.    How often? | 11:08:17 |
| 23 | A.    Well, in what period of time? | 11:08:18 |
| 24 | Q.    In that period of time. | 11:08:22 |
| 25 | A.    It varied from the morning of | 11:08:24 |

NYCLD_038927

Linda Fairstein

Page 60

| | | |
|---|---|---|
| 1 | April 20th for a month or six weeks, he | 11:08:28 |
| 2 | called me into him several times a day | 11:08:34 |
| 3 | every day.  There were periods where we | 11:08:37 |
| 4 | didn't speak as frequently. | 11:08:43 |
| 5 | He asked me, I was the person | 11:08:47 |
| 6 | who he called in this particular case.  He | 11:08:50 |
| 7 | expected me to give him information from | 11:08:55 |
| 8 | Ms. Lederer and her team that were updates | 11:08:58 |
| 9 | of any kind.  So I saw him during that | 11:09:01 |
| 10 | period.  And more frequently during the | 11:09:05 |
| 11 | hearings of the case and the trial. | 11:09:09 |
| 12 | Q.    If I can remember correctly, in | 11:09:13 |
| 13 | your answer, maybe an answer or so ago, | 11:09:23 |
| 14 | you said something about your assisting in | 11:09:26 |
| 15 | the sex crime aspects of the prosecution. | 11:09:28 |
| 16 | What did you mean by that? | 11:09:32 |
| 17 | A.    As you are well aware, there | 11:09:33 |
| 18 | were many charges in this case.  And in | 11:09:38 |
| 19 | addition to the five plaintiffs in this | 11:09:43 |
| 20 | case, there were many offenders charged | 11:09:44 |
| 21 | with acts not related to a sexual assault | 11:09:50 |
| 22 | but to physical assaults and to riot, and | 11:09:55 |
| 23 | many of them ultimately to be charged in | 11:09:58 |
| 24 | Juvenile Court. | 11:10:01 |
| 25 | And for all of those issues, Ms. | 11:10:04 |

NYCLD_038928

Linda Fairstein

Page 61

| | | |
|---|---|---|
| 1 | Lederer regularly got assistance from Mr. | 11:10:09 |
| 2 | McNulty who sat an office or two away from | 11:10:15 |
| 3 | her, and was in the chain of command her | 11:10:18 |
| 4 | direct supervisor. | 11:10:20 |
| 5 | Q.   Are you telling us that you did | 11:10:22 |
| 6 | not supervise any aspects of the | 11:10:24 |
| 7 | prosecution? | 11:10:27 |
| 8 | MS. DAITZ:  Objection to form. | 11:10:27 |
| 9 | (Mr. Warren entered the room.) | 11:10:29 |
| 10 | A.   That's not what I said. | 11:10:32 |
| 11 | MR. BELDOCK:  Michael Warren has | 11:10:34 |
| 12 | just joined us.  If we can find him a | 11:10:37 |
| 13 | chair.  Mr. Warren is an attorney for the | 11:10:40 |
| 14 | McCray, Richardson and Santana defendants, | 11:10:43 |
| 15 | former defendants, now plaintiffs. | 11:10:47 |
| 16 | MR. WARREN:  I, as a practical | 11:10:51 |
| 17 | matter with deep regret, I will sit on the | 11:10:53 |
| 18 | side over here. | 11:10:54 |
| 19 | MR. BELDOCK:  While Mr. Warren | 11:10:58 |
| 20 | is seated, I want to get a document for a | 11:11:00 |
| 21 | moment.  Don't go off the record. | 11:11:03 |
| 22 | MS. DAITZ:  Myron, is there any | 11:11:28 |
| 23 | way to adjust the temperature? | 11:11:34 |
| 24 | MS. FISHER-BYRIALSEN:  I did. | 11:11:35 |
| 25 | Do you want it hotter or colder? | 11:11:37 |

NYCLD_038929

Linda Fairstein

Page 62

| 1 | MR. BELDOCK:  If you would mark | 11:11:40 |
| 2 | this, please. | 11:12:06 |
| 3 | I have to apologize.  I need to | 11:12:46 |
| 4 | have copies of this made.  Karin, I'd like | 11:12:48 |
| 5 | an unmarked copy.  Can you help me find | 11:12:51 |
| 6 | one? | 11:12:54 |
| 7 | MS. DIPPOLD:  Okay. | 11:12:57 |
| 8 | MR. BELDOCK:  Six copies, seven | 11:13:00 |
| 9 | copies. | 11:13:02 |
| 10 | MS. DIPPOLD:  Okay. | 11:13:03 |
| 11 | MR. BELDOCK:  I'm sure she will | 11:13:34 |
| 12 | be back in a minute.  Let me go on and ask | 11:13:36 |
| 13 | a question. | 11:13:39 |
| 14 | Q.    Where was your office in 1989, | 11:13:40 |
| 15 | 1990, 1991, the same place? | 11:13:45 |
| 16 | A.    Through those years? | 11:13:47 |
| 17 | Q.    Yes. | 11:13:50 |
| 18 | A.    It was in the same place which | 11:13:50 |
| 19 | was the eighth floor of the One Hogan | 11:13:53 |
| 20 | Place/100 Centre Street building on a | 11:14:00 |
| 21 | corridor with the chief of the Trial | 11:14:05 |
| 22 | Division.  And I was a Deputy Chief of the | 11:14:08 |
| 23 | Trial Division, and there were two other | 11:14:11 |
| 24 | Deputy Chiefs of the Trial Division. | 11:14:13 |
| 25 | Q.    Where was Ryan's office? | 11:14:16 |

NYCLD_038930

Linda Fairstein

Page 63

| | | | |
|---|---|---|---|
| 1 | A. | When? | 11:14:19 |
| 2 | Q. | During that period of time. | 11:14:20 |
| 3 | A. | In 1989 when this case occurred, | 11:14:22 |

4    I have no idea where her office was.              11:14:25

5        Q.     Where was Lederer's office?        11:14:28

6        A.      In 1989 when this case occurred,   11:14:29

7    she was across the street in the building      11:14:32

8    that's 80 Centre Street within the offices    11:14:36

9    of Trial Bureau 40.                                        11:14:38

10       Q.     Is that where Clements had his      11:14:40

11   office also at that time?                            11:14:43

12       A.     Yes, it is.                                     11:14:44

13       Q.     While we're waiting for that          11:14:45

14   copy, let me go out of order and just fill     11:15:25

15   in some time.  I don't want to lose any       11:15:28

16   time.                                                          11:15:32

17            I'm giving you exhibit,                      11:15:33

18   Fairstein No. 4.  Do you recognize the       11:15:52

19   handwriting on this document?  And take a   11:15:58

20   moment, of course, to look at it.              11:16:00

21            MS. DAITZ:  For the record, this       11:16:02

22   is a multi-page document bearing Bates        11:16:03

23   stamped numbers NYC042297, 98, 99, 300 and  11:16:06

24   301.                                                           11:16:12

25       A.     Yes, I've examined these five        11:16:37

NYCLD_038931

Linda Fairstein

Page 64

| | | |
|---|---|---|
| 1 | pages. | 11:16:41 |
| 2 | Q.     Do you recognize the | 11:16:41 |
| 3 | handwriting? | 11:16:42 |
| 4 | A.     I do. | 11:16:42 |
| 5 | Q.     Whose is it? | 11:16:43 |
| 6 | A.     Elizabeth Lederer's. | 11:16:45 |
| 7 | Q.     Back at the time of the criminal | 11:16:48 |
| 8 | prosecution, did you see this document? | 11:16:50 |
| 9 | MR. BELDOCK:  I'll withdraw | 11:16:55 |
| 10 | that. | 11:16:56 |
| 11 | Q.     Did you see these notes at the | 11:16:56 |
| 12 | time of the criminal prosecution? | 11:16:59 |
| 13 | A.     As I sit here today, I simply | 11:17:00 |
| 14 | cannot remember whether I saw these hand | 11:17:03 |
| 15 | notes. | 11:17:06 |
| 16 | Q.     Did you see notes with the | 11:17:07 |
| 17 | subject matter at the time of the | 11:17:09 |
| 18 | prosecution? | 11:17:11 |
| 19 | MS. DAITZ:  Notes, I'm sorry? | 11:17:11 |
| 20 | MR. BELDOCK:  With the subject | 11:17:14 |
| 21 | matters. | 11:17:14 |
| 22 | Q.     As you can see on each page, I | 11:17:15 |
| 23 | think there are identifying names. | 11:17:18 |
| 24 | A.     But, sir, at any point in time | 11:17:26 |
| 25 | between '89 and '91?  I just don't | 11:17:30 |

NYCLD_038932

Linda Fairstein

Page 65

| | | |
|---|---|---|
| 1 | understand the time of your question. | 11:17:33 |
| 2 | Q.   Let's take the time before the | 11:17:34 |
| 3 | charges were made.  Did you see these | 11:17:40 |
| 4 | notes? | 11:17:43 |
| 5 | A.   I don't remember.  I can't say | 11:17:43 |
| 6 | that I didn't, but I don't know when they | 11:17:46 |
| 7 | were made by Ms. Lederer.  And as I sit | 11:17:47 |
| 8 | here today, I don't recall. | 11:17:50 |
| 9 | Q.   When you and Ms. Lederer first | 11:17:52 |
| 10 | got to the 20th Precinct, that was on | 11:17:55 |
| 11 | April 20th, right? | 11:17:57 |
| 12 | A.   Yes, it was. | 11:17:59 |
| 13 | Q.   One of the first things that | 11:18:00 |
| 14 | happened there -- | 11:18:03 |
| 15 | MR. BELDOCK:  Withdrawn. | 11:18:03 |
| 16 | Q.   Was one of the first things that | 11:18:04 |
| 17 | happened there a police briefing? | 11:18:06 |
| 18 | A.   On the evening of the 20th, yes, | 11:18:09 |
| 19 | I attended a short police briefing. | 11:18:13 |
| 20 | Q.   And how short, what do you mean | 11:18:15 |
| 21 | by short? | 11:18:18 |
| 22 | A.   Less than half an hour. | 11:18:19 |
| 23 | Q.   During that period of time, did | 11:18:20 |
| 24 | you see Ms. Lederer take any notes? | 11:18:22 |
| 25 | A.   I don't remember that. | 11:18:24 |

NYCLD_038933

Linda Fairstein

Page 66

| | | | |
|---|---|---|---|
| 1 | Q. | Did you take any notes? | 11:18:25 |
| 2 | A. | I did not. | 11:18:27 |
| 3 | Q. | Now, here's the document I | 11:18:27 |

4    wanted to ask you about before that we had    11:18:40

5    copied.    11:18:45

6    MR. BELDOCK:  Would you mark it,    11:18:45

7    please.    11:18:46

8    (Five-page memorandum was hereby    11:18:46

9    marked as Fairstein Exhibit 9 for    11:18:46

10    identification, as of this date.)    11:12:39

11    Q.    Exhibit 9 before you, it is a --    11:19:15

12    MS. DAITZ:  Exhibit, did you say    11:19:27

13    it's Exhibit 9?    11:19:32

14    MS. FISHER-BYRIALSEN:  Five.    11:19:32

15    MR. BELDOCK:  Yes, there are    11:19:32

16    other documents.    11:19:48

17    MS. DAITZ:  So we're going out    11:19:48

18    of order then, and this will be Fairstein    11:19:49

19    9?    11:19:52

20    MR. BELDOCK:  I go out of order    11:19:52

21    all the time.    11:19:53

22    Q.    This is a file memo from our    11:19:56

23    firm which has indicated this -- all the    11:19:59

24    references to you from the original    11:20:05

25    privileged and redaction logs provided by    11:20:11

NYCLD_038934

Linda Fairstein

Page 67

| | | |
|---|---|---|
| 1 | Corporation Counsel to plaintiffs' counsel | 11:20:14 |
| 2 | in this case.  These are obviously | 11:20:17 |
| 3 | excerpts from a greater privileged log. | 11:20:23 |
| 4 | Now, I want to inquire of you | 11:20:27 |
| 5 | about your answer, about your limited role | 11:20:30 |
| 6 | in the preparation and prosecution of the | 11:20:35 |
| 7 | case because you were a witness.  Am I | 11:20:38 |
| 8 | right you had a limited role because you | 11:20:41 |
| 9 | were a witness? | 11:20:43 |
| 10 | MS. DAITZ:  You know what, | 11:20:45 |
| 11 | before you go on to the questioning, I | 11:20:47 |
| 12 | just want to note for the record that in | 11:20:49 |
| 13 | some respects this is not an accurate | 11:20:52 |
| 14 | reproduction of the privileged and | 11:20:56 |
| 15 | redaction logs in this case, and in other | 11:20:57 |
| 16 | cases, many of these documents have since | 11:21:00 |
| 17 | been produced since they appeared on | 11:21:03 |
| 18 | privileged and redaction logs. | 11:21:05 |
| 19 | MR. BELDOCK:  It indicates on | 11:21:06 |
| 20 | the document they were produced. | 11:21:07 |
| 21 | MS. DAITZ:  Well, in connection | 11:21:08 |
| 22 | with the work product briefing when we | 11:21:10 |
| 23 | reproduced certain documents -- | 11:21:12 |
| 24 | MR. BELDOCK:  The log is | 11:21:16 |
| 25 | correct, we believe.  The documents that | 11:21:18 |

NYCLD_038935

Linda Fairstein

Page 68

| | | |
|---|---|---|
| 1 | have been produced, which were on the | 11:21:22 |
| 2 | original log are indicated to be produced | 11:21:24 |
| 3 | on the right, and where they're not | 11:21:27 |
| 4 | indicated that they were produced, then | 11:21:28 |
| 5 | they are still being kept back by the work | 11:21:30 |
| 6 | product privilege.  That's not my concern. | 11:21:35 |
| 7 | MS. DAITZ:  Okay.  I'm just | 11:21:37 |
| 8 | saying that I don't know that the | 11:21:38 |
| 9 | representation on this chart is | 11:21:38 |
| 10 | necessarily accurate. | 11:21:40 |
| 11 | MR. BELDOCK:  Well, we believe | 11:21:41 |
| 12 | it is. | 11:21:42 |
| 13 | MS. DAITZ:  And there were two | 11:21:42 |
| 14 | corrections that were made last week as | 11:21:44 |
| 15 | well. | 11:21:45 |
| 16 | MR. BELDOCK:  I think that's | 11:21:46 |
| 17 | irrelevant to what I'm asking. | 11:21:47 |
| 18 | MS. DAITZ:  Okay.  I'm just | 11:21:48 |
| 19 | making sure that the record is clear. | 11:21:50 |
| 20 | Q.    Ms. Fairstein, you said you were | 11:21:53 |
| 21 | a witness, and therefore that limited your | 11:21:55 |
| 22 | participation in the prosecution.  Is that | 11:21:57 |
| 23 | a fair summary of what you said? | 11:21:59 |
| 24 | A.    In some aspects of the | 11:22:00 |
| 25 | prosecution, like the preparation for | 11:22:03 |

NYCLD_038936

Linda Fairstein

Page 69

| | | |
|---|---|---|
| 1 | trial question that you asked me earlier. | 11:22:07 |
| 2 | Q.    What does that mean? | 11:22:11 |
| 3 | A.    That I was not doing the | 11:22:12 |
| 4 | day-to-day supervision such as determining | 11:22:17 |
| 5 | which detectives, that was your area of | 11:22:22 |
| 6 | questioning, would be assigned for the | 11:22:25 |
| 7 | purpose of that prosecution. | 11:22:28 |
| 8 | MR. BELDOCK:  Withdrawn. | 11:22:36 |
| 9 | MS. FISHER-BYRIALSEN:  Myron, we | 11:22:40 |
| 10 | need to take a break. | 11:22:42 |
| 11 | MR. BELDOCK:  Excuse me? | 11:22:42 |
| 12 | MS. FISHER-BYRIALSEN:  He needs | 11:22:44 |
| 13 | to switch the tape. | 11:22:44 |
| 14 | MR. BELDOCK:  Now? | 11:22:46 |
| 15 | MS. FISHER-BYRIALSEN:  Well, | 11:22:46 |
| 16 | yes. | 11:22:48 |
| 17 | MR. BELDOCK:  I see there are | 11:22:48 |
| 18 | five minutes left. | 11:22:49 |
| 19 | MS. FISHER-BYRIALSEN:  Well, | 11:22:51 |
| 20 | that was a while ago that that note was | 11:22:51 |
| 21 | sent, the message. | 11:22:55 |
| 22 | MR. BELDOCK:  Stop the tape. | 11:22:55 |
| 23 | We'll start after the tape has been | 11:22:55 |
| 24 | switched. | 11:22:56 |
| 25 | THE VIDEOGRAPHER:  This marks | 11:22:56 |

NYCLD_038937

Linda Fairstein

Page 70

```
 1    the end of tape No. 1 in the videotaped      11:22:57
 2    deposition of Linda Fairstein.  We are       11:23:00
 3    going off the record.  The time is 11:22.    11:23:02
 4             (A recess was taken.)               11:30:47
 5             THE VIDEOGRAPHER:  This marks        11:30:47
 6    the beginning of tape No. 2 in the           11:33:17
 7    videotaped deposition of Linda Fairstein.    11:33:20
 8    We are going on the record.  The time is     11:33:23
 9    11:33.                                       11:33:25
10        Q.    Ms. Fairstein, have you had an     11:33:27
11    opportunity to review Exhibit 9?             11:33:29
12        A.    To review it, read it, no.         11:33:34
13        Q.    Would you just kind of look        11:33:36
14    through it without reading every word --     11:33:42
15        A.    That's hard to do.                 11:33:44
16        Q.    -- so you can get a sense of the   11:33:45
17    subject matters that are involved in this    11:33:47
18    exhibit.                                     11:33:50
19        A.    (Witness complies.)  I have        11:34:31
20    skimmed this document.                       11:35:17
21        Q.    You see the scope of the subject   11:35:19
22    matter, right?                               11:35:22
23        A.    Yes.                               11:35:22
24        Q.    These are documents that were      11:35:23
25    originally on the privileged log, some of    11:35:26
```

NYCLD_038938

Linda Fairstein

Page 71

| | | |
|---|---|---|
| 1 | which remain on the privileged log and | 11:35:31 |
| 2 | some of which have since been produced to | 11:35:33 |
| 3 | us.  You understand that? | 11:35:35 |
| 4 | A.    Yes, sir. | 11:35:36 |
| 5 | Q.    Do you see that they all have to | 11:35:37 |
| 6 | do with your involvement in one or another | 11:35:40 |
| 7 | aspect of the prosecutions? | 11:35:43 |
| 8 | MS. DAITZ:  Objection to form. | 11:35:46 |
| 9 | A.    Before I answer that, may I ask, | 11:35:49 |
| 10 | this appears to be from you, prepared by | 11:35:53 |
| 11 | you. | 11:35:56 |
| 12 | Q.    No, it is excerpted from what | 11:35:56 |
| 13 | Corporation Counsel has prepared.  If it | 11:35:59 |
| 14 | was prepared by me, I may say I'd have | 11:36:02 |
| 15 | more information but it's not. | 11:36:04 |
| 16 | A.    This says from Myron Beldock. | 11:36:06 |
| 17 | Q.    That's our file memo repeating | 11:36:10 |
| 18 | the Corporation Counsel's privileged log | 11:36:13 |
| 19 | information. | 11:36:16 |
| 20 | A.    Okay.  And so may I ask, in | 11:36:16 |
| 21 | column two, the wide column where it says, | 11:36:19 |
| 22 | for example, on the first one ADA | 11:36:23 |
| 23 | Fairstein handwritten arraignment prep | 11:36:25 |
| 24 | sheet, who wrote the -- | 11:36:29 |
| 25 | Q.    That's information given by | 11:36:29 |

NYCLD_038939

Linda Fairstein

Page 72

```
 1    Corporation Counsel to plaintiffs'        11:36:32
 2    counsel.                                   11:36:33
 3         A.    As such.                        11:36:33
 4         Q.    None of this information below  11:36:34
 5    the line that reads from original         11:36:36
 6    privileged and redaction logs came from   11:36:39
 7    plaintiffs' counsel.  It was given to     11:36:41
 8    plaintiffs' counsel by defendants' counsel 11:36:43
 9    in this lawsuit.                           11:36:44
10         A.    With this description?          11:36:46
11         Q.    With this description.  As you  11:36:47
12    can see, it doesn't have dates.           11:36:48
13         A.    Okay.                           11:36:48
14         Q.    I don't mean D-A-I-T-Z, I mean  11:36:51
15    D-A-T-S.                                   11:36:54
16         A.    Got it, thank you.              11:36:54
17               MS. FISHER-BYRIALSEN:  T-E-S.   11:36:54
18               MR. BELDOCK:  My spelling is not 11:37:01
19    the best.                                  11:37:02
20               MS. DAITZ:  Gee, I never heard  11:37:04
21    that before.                               11:37:05
22         Q.    So, do you recognize from this  11:37:06
23    list that you were involved in aspects of 11:37:09
24    the prosecution from, according to this   11:37:12
25    list, from the arraignment on through to  11:37:16
```

NYCLD_038940

Linda Fairstein

Page 73

```
 1    the voir dires, the summations, the        11:37:25
 2    witnesses and so on?                        11:37:29
 3           MS. DAITZ:   Object to form.         11:37:32
 4       A.    The only reason, without being     11:37:34
 5    difficult, I can't accept your              11:37:38
 6    characterization is because I see from      11:37:40
 7    some of these descriptions that there's     11:37:42
 8    confusion somewhere, because I did not      11:37:45
 9    prepare a lot of these things.              11:37:47
10       Q.    How do you know?                    11:37:50
11       A.    Well, I know, for example, there   11:37:53
12    are names of people I've never heard of,    11:37:57
13    and I don't believe I had anything to do    11:38:01
14    with their interviews.                      11:38:03
15           I know, for example, when it's       11:38:06
16    about someone's cross-examination, notes    11:38:08
17    on someone's cross-examination, I was not   11:38:11
18    allowed by order of Judge Galligan to be    11:38:14
19    in the court because I was a witness when   11:38:18
20    other witnesses were testifying.            11:38:20
21           So some of the things alleged to     11:38:22
22    be in my hand are, in fact, not things      11:38:26
23    that I prepared.                            11:38:29
24       Q.    All right.  Were you not allowed   11:38:32
25    to review transcripts of testimony?         11:38:38
```

NYCLD_038941

Linda Fairstein

Page 74

| | | |
|---|---|---|
| 1 | MR. BELDOCK:  I'll withdraw | 11:38:42 |
| 2 | that. | 11:38:44 |
| 3 | Q.    Judge Galligan directed that all | 11:38:44 |
| 4 | witnesses not be present, including you? | 11:38:50 |
| 5 | A.    Correct. | 11:38:55 |
| 6 | Q.    Didn't you review transcripts of | 11:38:55 |
| 7 | witnesses who testified? | 11:39:00 |
| 8 | MS. DAITZ:  During the course of | 11:39:01 |
| 9 | the trial? | 11:39:03 |
| 10 | MR. BELDOCK:  Yes, during the | 11:39:03 |
| 11 | course of the trial. | 11:39:05 |
| 12 | MS. DAITZ:  You can answer. | 11:39:06 |
| 13 | A.    Outside of the courtroom during | 11:39:07 |
| 14 | the course of the trial? | 11:39:11 |
| 15 | Q.    Yes. | 11:39:12 |
| 16 | A.    I don't recall doing it.  And | 11:39:13 |
| 17 | one of Ms. Lederer's other supervisors may | 11:39:16 |
| 18 | have. | 11:39:20 |
| 19 | Q.    For example, on the second page, | 11:39:21 |
| 20 | you have starting with ████████ through | 11:39:25 |
| 21 | to the bottom of the page through ██████ | 11:39:37 |
| 22 | you have a series of statements here given | 11:39:43 |
| 23 | to us by Corporation Counsel which we, | 11:39:46 |
| 24 | quote, handwritten notes by ADA Fairstein | 11:39:53 |
| 25 | regarding Wise statements and evidence. | 11:39:57 |

NYCLD_038942

Linda Fairstein

Page 75

| | | |
|---|---|---|
| 1 | Then it reads handwritten notes | 11:39:59 |
| 2 | written by ADA Fairstein regarding | 11:40:02 |
| 3 | Richardson's statements and evidence. | 11:40:04 |
| 4 | Then it goes on, handwritten | 11:40:06 |
| 5 | notes by ADA Fairstein regarding Salaam | 11:40:08 |
| 6 | statements and evidence. | 11:40:08 |
| 7 | The next one goes on, | 11:40:13 |
| 8 | handwritten notes by ADA Fairstein | 11:40:13 |
| 9 | regarding Salaam statements and evidence | 11:40:16 |
| 10 | again. | 11:40:17 |
| 11 | And then handwritten notes by | 11:40:17 |
| 12 | ADA Fairstein regarding Briscoe statements | 11:40:19 |
| 13 | and evidence. | 11:40:21 |
| 14 | And finally, regarding Salaam | 11:40:22 |
| 15 | statements and evidence. | 11:40:24 |
| 16 | Are you saying that these | 11:40:25 |
| 17 | descriptions are inaccurate? | 11:40:27 |
| 18 | MS. DAITZ:  What is the | 11:40:28 |
| 19 | right-hand column on this document? | 11:40:29 |
| 20 | A.    Can you see, sir, to the -- | 11:40:32 |
| 21 | MS. NELSON:  Wait. | 11:40:35 |
| 22 | MS. DAITZ:  Is that our revised | 11:40:38 |
| 23 | privileged log? | 11:40:41 |
| 24 | MR. BELDOCK:  I believe so. | 11:40:41 |
| 25 | MS. DAITZ:  So we revised the | 11:40:42 |

NYCLD_038943

Linda Fairstein

Page 76

| | | |
|---|---|---|
| 1 | entry to reflect the changes.  If they | 11:40:44 |
| 2 | were originally misidentified and then the | 11:40:47 |
| 3 | privileged log was revised, then that's | 11:40:50 |
| 4 | the revision. | 11:40:52 |
| 5 | MR. BELDOCK:  I understand what | 11:40:53 |
| 6 | you're saying. | 11:40:54 |
| 7 | Q.    Did you review the Salaam, the | 11:40:54 |
| 8 | Sharonne Salaam testimony at the | 11:40:57 |
| 9 | suppression hearing during the time before | 11:41:00 |
| 10 | you testified at the trial? | 11:41:02 |
| 11 | A.    I have no recollection as I sit | 11:41:05 |
| 12 | here today.  But the five things you | 11:41:07 |
| 13 | directed me to, I did not write.  The five | 11:41:10 |
| 14 | things that you've just asked me about, I | 11:41:14 |
| 15 | did not write. | 11:41:16 |
| 16 | Q.    Do you know that as a fact, do | 11:41:18 |
| 17 | you know that because of the information | 11:41:26 |
| 18 | that is now on the right-hand column? | 11:41:27 |
| 19 | A.    Both. | 11:41:30 |
| 20 | Q.    When you say you know both, are | 11:42:12 |
| 21 | you saying that you have reviewed the | 11:42:15 |
| 22 | documents that are listed here, the ones I | 11:42:17 |
| 23 | just referred to and seen that the | 11:42:20 |
| 24 | handwritten notes on these documents are | 11:42:23 |
| 25 | not yours? | 11:42:25 |

NYCLD_038944

Linda Fairstein

Page 77

| | | |
|---|---|---|
| 1 | A.    No. | 11:42:26 |
| 2 | MS. DAITZ:  I'm instructing the | 11:42:27 |
| 3 | witness not to answer on the grounds of | 11:42:28 |
| 4 | attorney work product and attorney-client | 11:42:30 |
| 5 | privilege. | 11:42:32 |
| 6 | Myron, I wish, I wish you would | 11:42:33 |
| 7 | have asked me about this before the | 11:42:34 |
| 8 | deposition today because it could have | 11:42:36 |
| 9 | saved a lot of time.  I think it's | 11:42:38 |
| 10 | apparent that we misidentified handwriting | 11:42:41 |
| 11 | on some of the earlier privileged logs, | 11:42:42 |
| 12 | and we -- | 11:42:42 |
| 13 | MR. BELDOCK:  I don't know if | 11:42:46 |
| 14 | you have or you haven't.  I want to know | 11:42:46 |
| 15 | whether the witness examined the documents | 11:42:49 |
| 16 | to determine whether they were or not in | 11:42:51 |
| 17 | her handwriting. | 11:42:53 |
| 18 | MS. DAITZ:  And I'm instructing | 11:42:54 |
| 19 | her not to answer that question. | 11:42:55 |
| 20 | MR. BELDOCK:  I understand. | 11:42:56 |
| 21 | We'll mark it for a ruling. | 11:42:57 |
| 22 | MS. NELSON:  She already | 11:43:00 |
| 23 | answered it. | 11:43:01 |
| 24 | Q.    Have you read any of the books | 11:43:27 |
| 25 | that have been written about the Central | 11:43:29 |

NYCLD_038945

Page 301

1                    CERTIFICATION

2

3          I, Alice Schulman, a Notary Public for

4     and within the State of New York, do

5     hereby certify:

6          That the witness whose testimony as

7     herein set forth, was duly sworn by me;

8     and that the within transcript is a true

9     record of the testimony given by said

10    witness.

11         I further certify that I am not

12    related to any of the parties to this

13    action by blood or marriage, and that I am

14    in no way interested in the outcome of

15    this matter.

16         IN WITNESS WHEREOF, I have hereunto

17    set my hand this 29th day of April, 2013.

18

19

_____

20              ALICE SCHULMAN

21

22              *         *         *

23

24

25

NYCLD_039169

# EXHIBIT 4

Page 608

RE:     In re:  McCRAY, RICHARDSON,

SANTANA, WISE and SALAAM Litigation,

Docket No. 03 CV 9685 (DAB)(RLE)

                              99 Park Avenue

                              New York, New York

                              May 1, 2013

                              9:40 a.m.

        CONTINUED EXAMINATION BEFORE TRIAL of

LINDA FAIRSTEIN, a Defendant in the

above-entitled action, held at the above

time and place, taken before Alice

Schulman, a Notary Public of the State of

New York, pursuant to Notice and

stipulations between Counsel.

               *         *         *

NYCLD_039562

Page 739

| | | |
|---|---|---|
| 1 | record while I'll mark five or six | 12:40:02 |
| 2 | exhibits, please. | 12:40:05 |
| 3 | THE VIDEOGRAPHER:  We are going | 12:40:06 |
| 4 | off the record.  The time is 12:39. | 12:40:07 |
| 5 | (A recess was taken.) | 12:40:10 |
| 6 | (Six documents were hereby | 12:40:10 |
| 7 | marked as Fairstein Exhibits 48-53 for | 12:40:10 |
| 8 | identification, as of this date.) | 12:49:49 |
| 9 | THE VIDEOGRAPHER:  We are going | 12:49:49 |
| 10 | back on the record.  The time is 12:49. | 12:49:59 |
| 11 | Q.    Ms. Fairstein, I placed before | 12:50:03 |
| 12 | you Exhibit 48 which is a copy of a | 12:50:06 |
| 13 | communication from you to Jim Kindler | 12:50:11 |
| 14 | dated July 15, 2002.  Do you recognize it | 12:50:16 |
| 15 | as such? | 12:50:19 |
| 16 | A.    Yes. | 12:50:20 |
| 17 | Q.    Was this sent by computer or is | 12:50:20 |
| 18 | this a separately prepared document? | 12:50:26 |
| 19 | MS. DAITZ:  Objection to form. | 12:50:29 |
| 20 | A.    I have no idea how it was sent. | 12:50:31 |
| 21 | Q.    When you gave it to your | 12:50:33 |
| 22 | lawyers, in what form did you give it? | 12:50:39 |
| 23 | MS. DAITZ:  Objection to form. | 12:50:42 |
| 24 | A.    (No verbal response.) | 12:51:03 |
| 25 | MS. FISHER-BYRIALSEN:  Are we | 12:51:03 |

NYCLD_039693

Page 740

| | | |
|---|---|---|
| 1 | waiting for an answer? | 12:51:05 |
| 2 | Q.   There's a fax line at the bottom | 12:51:06 |
| 3 | that will assist you. | 12:51:09 |
| 4 | MS. FISHER-BYRIALSEN:   There's | 12:51:10 |
| 5 | no answer to the previous question. | 12:51:11 |
| 6 | MR. BELDOCK:   I know, I'm just | 12:51:13 |
| 7 | moving it along. | 12:51:14 |
| 8 | A.   Yes, sir. | 12:51:24 |
| 9 | Q.   In what form did you give this | 12:51:46 |
| 10 | to your lawyers? | 12:51:49 |
| 11 | A.   I'm not sure that I did. | 12:51:50 |
| 12 | Q.   There's a fax line at the bottom | 12:51:52 |
| 13 | that says Linda Fairstein, July 16, '02, | 12:51:54 |
| 14 | 09:58.  Does this indicate a fax that you | 12:51:59 |
| 15 | sent? | 12:52:04 |
| 16 | A.   Sent, I didn't have lawyers in | 12:52:05 |
| 17 | '02, so I faxed to Mr. Kindler, yes. | 12:52:08 |
| 18 | Q.   In your letter, you're talking | 12:52:13 |
| 19 | to Kindler about the reinvestigation, | 12:52:20 |
| 20 | right? | 12:52:22 |
| 21 | A.   Yes. | 12:52:22 |
| 22 | Q.   And you're giving him | 12:52:23 |
| 23 | information to undermine the | 12:52:26 |
| 24 | reinvestigation, are you not? | 12:52:28 |
| 25 | MS. DAITZ:   Objection. | 12:52:30 |

NYCLD_039694

Page 741

| | | |
|---|---|---|
| 1 | A.     No. | 12:52:31 |
| 2 | Q.     You say in the first line, I | 12:52:31 |
| 3 | thought I would drop you a line because I | 12:52:42 |
| 4 | don't now how else to get this under your | 12:52:44 |
| 5 | nose.  Does that mean that you hadn't | 12:52:47 |
| 6 | spoken to him? | 12:52:49 |
| 7 | A.     Today, I don't know what it | 12:52:50 |
| 8 | means 11 years ago. | 12:52:52 |
| 9 | Q.     Then you go on to say that you | 12:52:53 |
| 10 | heard, quote, most of what's going on in | 12:52:56 |
| 11 | regard to the jogger's case and Reyes's | 12:53:00 |
| 12 | story, unquote.  From whom had you heard | 12:53:02 |
| 13 | all that? | 12:53:05 |
| 14 | A.     The people I named when you | 12:53:05 |
| 15 | asked me that question the other day. | 12:53:08 |
| 16 | There was a lot of office gossip. | 12:53:10 |
| 17 | Q.     And I said as of or before July | 12:53:13 |
| 18 | 15, 2002.  So outside of office gossip and | 12:53:14 |
| 19 | people, from whom had you heard about it. | 12:53:18 |
| 20 | A.     I don't believe I'd heard | 12:53:20 |
| 21 | outside of former colleagues. | 12:53:23 |
| 22 | Q.     In the first sub numbered | 12:53:26 |
| 23 | paragraph 1, you say: "I heard this in | 12:53:28 |
| 24 | late May - from two former case | 12:53:32 |
| 25 | detectives." | 12:53:32 |

NYCLD_039695

Page 742

| | | |
|---|---|---|
| 1 | From whom, to whom were you | 12:53:38 |
| 2 | referring? | 12:53:41 |
| 3 | A.   Today, I have no idea. | 12:53:42 |
| 4 | Q.   In subparagraph 2 you say, I do | 12:53:44 |
| 5 | still continue to hear from ex-NYPD guys. | 12:53:52 |
| 6 | To whom were you referring? | 12:53:56 |
| 7 | A.   Mike Sheehan and several people | 12:53:57 |
| 8 | from Manhattan Special Victims, in | 12:54:13 |
| 9 | particular, Richard Marcus. | 12:54:17 |
| 10 | Q.   Richard Marcus? | 12:54:18 |
| 11 | A.   Yes. | 12:54:22 |
| 12 | Q.   Who was he? | 12:54:22 |
| 13 | A.   He was the, he was the | 12:54:23 |
| 14 | lieutenant in charge of Special Victims | 12:54:26 |
| 15 | before Sergeant Fiston. | 12:54:28 |
| 16 | Q.   You say in paragraph, | 12:54:30 |
| 17 | subparagraph 4: "I have heard all the | 12:54:33 |
| 18 | reports of things that were, quote, done | 12:54:38 |
| 19 | wrong, unquote, or, quote, not done, | 12:54:40 |
| 20 | unquote, by Elizabeth and me.  It | 12:54:43 |
| 21 | continues, that that is what the sentence | 12:54:47 |
| 22 | reads. | 12:54:51 |
| 23 | What things were you referring | 12:54:52 |
| 24 | to that were done wrong or not done by | 12:54:53 |
| 25 | Elizabeth and you. | 12:54:56 |

NYCLD_039696

Page 743

```
 1              MS. DAITZ:  Objection to form.     12:54:57
 2       A.     Things that Ms. Ryan was telling  12:54:58
 3   people in the office we had not done.        12:55:06
 4       Q.     It says I heard all the reports   12:55:10
 5   of things that were done wrong or not        12:55:12
 6   done.  Can you specify any of them?          12:55:15
 7       A.     No.  Today, no.                    12:55:17
 8       Q.     You say you may recall at the     12:55:18
 9   same time I assigned the case to her,        12:55:22
10   Nancy had assigned it to Peter.  And the     12:55:24
11   boss made the call later in the day to let   12:55:32
12   Liz keep it.                                 12:55:36
13              When you talked the other day, I  12:55:45
14   think you said it was someone else, not      12:55:47
15   Ryan, who had assigned the case.             12:55:50
16       A.     Yes, it's definitely John Fried.  12:55:52
17   It was, Ryan, it was my mistake, Ryan was    12:55:55
18   not, I was misspeaking.  Ryan had not been   12:55:57
19   chief of the Trial Division yet.             12:56:00
20       Q.     This is 2002?                     12:56:02
21       A.     Right.                            12:56:03
22       Q.     That was your memory then that    12:56:04
23   Ryan had assigned it to Peter, correct?      12:56:06
24       A.     A memory or a mistaken            12:56:08
25   communication.                              12:56:10
```

NYCLD_039697

Page 744

```
1        Q.    Why did you tell us the other      12:56:10
2   day that it was Friez?                         12:56:13
3             MS. DAITZ:   Fried.                  12:56:16
4        A.    Because I know that it was          12:56:16
5   Fried.   Fried, F-R-I-E-D.                     12:56:18
6        Q.    If you knew it was Fried, but       12:56:20
7   you said it was Nancy in this letter, I        12:56:22
8   don't understand.                              12:56:25
9        A.    I guess I made a mistake.           12:56:25
10            MS. DAITZ:   In the letter or in     12:56:29
11  the testimony?                                 12:56:30
12            THE WITNESS:   In the letter.        12:56:31
13  I'm sorry, thank you.                          12:56:32
14       A.    Yes, in my testimony, I'm quite     12:56:32
15  clear it was John Fried.                       12:56:35
16       Q.    You say in the next paragraph       12:56:37
17  that when you were in the precinct,            12:56:40
18  precincts until Saturday morning at four       12:56:44
19  a.m., you did a number of things, quote,       12:56:46
20  including witness interviews, unquote.         12:56:50
21            You have told us today, and I        12:56:52
22  think the other day, that you didn't do        12:56:57
23  any witness interviews.   Is this statement    12:56:58
24  a mistake too?                                 12:57:02
25       A.    No.                                 12:57:03
```

NYCLD_039698

Page 745

| | | | |
|---|---|---|---|
| 1 | Q. | This statement is accurate? | 12:57:03 |
| 2 | A. | Yes. | 12:57:05 |
| 3 | Q. | Now, what witness interviews did | 12:57:06 |
| 4 | you do? | | 12:57:08 |
| 5 | A. | David Nocenti, Sharonne Salaam. | 12:57:08 |
| 6 | Q. | In the next to the last | 12:57:25 |

7   paragraph you say, there is no one except   12:57:30
8   you to whom I can say that it might make   12:57:33
9   sense to talk to me about it too, unquote.   12:57:38
10          Why did you pick this spineless   12:57:39
11   and lazy person out as someone who was the   12:57:42
12   only person you could talk to in the   12:57:47
13   office?   12:57:49
14          MS. DAITZ:  Objection to form.   12:57:49
15      A.    As I said earlier, I didn't say   12:57:50
16   the only person in the office.  The person   12:57:54
17   that might make sense to because he   12:57:56
18   supervised Nancy Ryan.   12:57:59
19          And as I said earlier, he was my   12:58:00
20   good friend.  I thought he had terrific   12:58:03
21   legal judgment, was a good lawyer, we got   12:58:06
22   along well, and he was the person I sought   12:58:10
23   out to have me be heard because we had   12:58:12
24   enjoyed mutual respect and friendship.   12:58:17
25      Q.    The next exhibit is 49.  This is   12:58:24

NYCLD_039699

Page 835

1                       CERTIFICATION

2

3          I, Alice Schulman, a Notary Public for

4     and within the State of New York, do

5     hereby certify:

6          That the witness whose testimony as

7     herein set forth, was duly sworn by me;

8     and that the within transcript is a true

9     record of the testimony given by said

10    witness.

11         I further certify that I am not

12    related to any of the parties to this

13    action by blood or marriage, and that I am

14    in no way interested in the outcome of

15    this matter.

16         IN WITNESS WHEREOF, I have hereunto

17    set my hand this 6th day of May 2013.

18

19

20                _____
                  ALICE SCHULMAN

21

22            *          *          *

23

24

25

NYCLD_039789

# EXHIBIT 5

## *Weaknesses in Central Park Jogger Case Were Clear All Along*

New York Law Journal (Online)

This article also appears in the following ALM publications:

The National Law Journal

June 3, 2019 Monday

Copyright 2019 ALM Media Properties, LLC All Rights Reserved Further duplication without permission is prohibited

# New York Law Journal

**Length:** 475 words

# Body

Editor's Note: With the release of Netflix's miniseries "When They See Us," there is renewed interest in the criminal prosecution in the assault of the Central Park jogger. So, we're sharing this letter to the editor that we posted in July of 2018.

Good people sometimes do bad things, and when a wrong is identified, the hope is that an acknowledgment will be made.  So we are reminded in reading the July 20 *Law Journal report of the release of long concealed documents* relating to the destructive prosecution of five teenagers swept up in the aftermath of the brutal assault on a jogger in Central Park in 1989.  When confronted with additional facts, former District Attorney Robert M. Morgenthau assigned one of his most talented aides to re-investigate the long-closed case, which led to his publicly joining in with the defense motion to set aside the convictions and, importantly, dismiss the indictments.  Notwithstanding the dismissals, and an accumulation of evidence supporting that resolution, former sex crimes bureau chief, Linda Fairstein, continues to insist that these wrongfully prosecuted youngsters should have been convicted.

Warnings of the prosecution's infirmity were there from the very beginning: the "correcting" of a so-called "confession" after an all-night interrogation, the continuation of the sexual assaults in the same community that preceded and succeeded the arrest of the teenagers; the DNA report that placed not one of the youngsters at the crime scene; and the prosecutor's surreptitious adjustment of the timing of the events between the trial of the first group of defendants and the second.  Indeed, before either trial, the prosecuting team had obtained the DNA of the actual assailant, identified as the man who had committed numerous sexual assaults in that community, but never bothered to explore a match with the DNA left on the central park jogger.  This is not the stuff that warrants a conclusion of the youngsters' guilt.

Notwithstanding Fairstein's unsupported hypothesis, the long-delayed release of additional documents, always in the control of the prosecution, will not "change the narrative." What is known beyond any question, is that sixteen-year old Kharey Wise was sent to prison for a crime he did not commit, where he remained until he was thirty, and that this wrenching crime was not finally resolved until the actual and lone assailant, Matias Reyes, came forward with the same DNA match long in the hands of the prosecution.  Nor should it be forgotten that numerous other victims in the community were left vulnerable because of the prosecutors' close-minded, slipshod rush to judgment against the wrong defendants.

Weaknesses in Central Park Jogger Case Were Clear All Along

Eric A. Seiff, who is of counsel to Storch Amini, was the attorney for Kharey Wise at the 2003 proceedings reversing the conviction and dismissing the indictment.

**Load-Date:** July 6, 2019

---

**End of Document**