```
1              People Reynolds Cross (Mr. Joseph)           875

2    was not arrested at that point?

3         A    No.

4         Q    The first time -- WITHDRAWN.

5         Would I be correct that you were asked to identify Mr.

6    Santana in this courtroom, would I be correct that you

7    wouldn't be able to identify each of the boys that you saw

8    on Central Park West when you initially saw that group of 10

9    to 12 kids; is that correct?

10        A    Can you repeat that?

11        Q    Yes.  There came a time when you say you saw a

12   bunch of young boys walking down, walking north on Central

13   Park West?

14        A    That's correct.

15        Q    And when you saw them at first, you couldn't give

16   us a physical description of each of those kids, would you

17   be able to?

18        A    No, there was to many of them.

19        Q    All I'm asking, you wouldn't be able to identify

20   each of the kids in that group?

21        A    I could now.

22        Q    You could identify each of the kids who was in

23   that group?

24        A    That I arrested.

25        Q    Forgeting about who was arrested.  You say there
```

LDI

NYCLD_023578

```
 1                 People Reynolds Cross (Mr. Joseph)              876

 2    were more that were not arrested?

 3         A    Yes.

 4         Q    Were there more that were not arrested?

 5         A    Yes.

 6         Q    You couldn't identify those that were not

 7    arrested?

 8         A    No.

 9         Q    Thank you.

10              MR. JOSEPH:   Judge, if I may have one one

11              more.

12         Q    Taking you back again to when Antron McCray, when

13    you were at his house and Antron was leaving with you.   Did

14    you actually walk out of the building with Antron McCray and

15    his father?

16         A    Yes.

17         Q    Did you hear any police officer inform him of his

18    Miranda warnings at that point?

19         A    I don't recall hearing it.

20              MR. JOSEPH:   Okay, thank you.

21    CROSS EXAMINATION

22    BY MR. BURNS:

23         Q    Good afternoon, Officer Reynolds.

24         A    Good afternoon.

25         Q    Officer Reynolds, I want to direct and focus your
```

LDI

1          People Reynolds Cross (Mr. Burns)          877

2    time, to the period of time when you were on duty with your

3    partner Powers, in the Park Department Vehicle prior to

4    making the observations of those young people, teenagers, on

5    Central Park; all right.

6          On the evening, say starting at about 9 o'clock there

7    were numerous calls transmissions involving roving bands of

8    teenagers in Central Park; isn't that true?

9          A    No, I don't think so.

10         Q    Didn't you receive numerous calls of roving bands

11   in the upper part of the park around 9 o'clock, 9:15?

12         A    It's about 9:15, 9:30.

13         Q    Well, did you receive numerous calls?

14         A    Yes.

15         Q    Involving roving bands; isn't that true?

16         A    Yes, 9:15 to 9:30.

17         Q    That was in the upper part of the park?

18         A    Yes.

19         Q    When you say the upper part, you're talking about

20   the northern part of the park?

21         A    Yes.

22         Q    Help me on this Officer Reynolds.  What is the

23   dividing line for what you consider the northern part of the

24   park from the southern part of the park?

25         A    I'd say about 86th Street.


                              LDI

P-APP000182

1              People Reynolds Cross (Mr. Burns)              878

2          Q     So you received numerous calls of roving bands in

3    that portion of the park, that's north of 86th Street, would

4    that be true?

5          A     Yes.

6          Q     They involved jobs and calls that you made; is

7    that true?

8          A     Excuse me, I didn't --

9          Q     Did you respond to these transmissions that you

10   received?

11         A     Yes.

12         Q     When I used the term "job" when you hear a

13   transmission, what is a job in police, in police parlance?

14         A     It's an assignment.  If you're assigned to a job,

15   that means the dispatcher calls and says it's a robbery in

16   progress, you have to go to the aid of somebody that's in a

17   car accident, or whatever it is, that assignment is called a

18   job.

19         Q     You received numerous calls that evening; is that

20   correct?

21         A     Yes.

22         Q     Do you recall sometime about 10 after 4:00 in the

23   morning of April 20th having a conversation with Detective

24   Rosario, do you recall that?

25         A     Not at that time.

                              LDI

NYCLD_023581

P-APP000183

```
 1              People Reynolds Cross (Mr. Burns)          879
 2      Q    Am I up to J or I.
 3              MR. BURNS:  I would like to have this marked
 4         defendant's exhibits E.
 5              THE CLERK:  I.
 6              (Received and marked Defendant Salaam's
 7         Exhibit I For Identification)
 8      Q    As you sit here today responding to these
 9    questions about this event which took place over a year ago,
10    would you say that your recollection of the events was
11    clearer, the early morning hours of the day following the
12    day when the events actually occurred?
13      A    Can you repeat that?
14              MR. BURNS:  Would you read that back for the
15         Officer Reynolds.
16              THE COURT:  He did understand it.
17      Q    I want to ask you, is your recollection of the
18    events that you have been called upon to testify today, is
19    your recollection clearer today than it was say when you
20    spoke to Detective Rosario?
21      A    It's still pretty clear.
22      Q    That's not the answer to my question.  Is it, is
23    it  clearer, it got no clearer, it's less clear, that's all
24    I'm asking.
25      A    I would say it's around the same.
```

LDI

```
 1              People Reynolds Cross (Mr. Burns)           880

 2       Q    It's about the same.

 3            MS. LEDERER:  Excuse me.  Mr. Burns, before

 4            you show it to the witness, may I see it.

 5            MR. BURNS:  Yes.

 6       Q    Did you tell detective Rosario at 20 after 4:00 in

 7   the mornings, -- withdrawn.

 8       Did you have a conversation with him Detective Rosario

 9   at 20 after 4:00 a.m. the morning of April 20th?

10       A    No, it was a little later than then that.

11       Q    What time do you say it was?

12            MS. LEDERER:  Objection.  Objection as the

13            form of that question and the characterization.

14            THE COURT:  I will sustain it as to form.

15            What time did you have that conversation?

16       Q    What is your testimony that it was, you?

17            MS. LEDERER:  Objection.

18            THE COURT:  Objection sustained.

19            Did you have a conversation with the

20            detective that morning?

21       A    Yes.

22            THE COURT:  What time?

23       A    About 4:30.

24       Q    It wasn't 4:20, it was about 4:30 that's your

25   recollection?
```

LDI

NYCLD_023583

P-APP000185

1          People Reynolds Cross (Mr. Burns)      881

2    A    It was approximately 4:30.

3    Q    4:30?

4    A    Yes.

5    Q    I see.  Did you tell him that at approximately 9

6 o'clock there were numerous complaints of assaults being

7 committed by a large group of young males, did you tell him

8 that?

9    A    I told --

10    Q    Did you tell him that, that's a yes or no, sir, if

11 you can?

12    A    No.

13    Q    You didn't tell him that?

14    A    No.

15    Q    Did you tell him that the assaults were

16 perpetrated in the area of West 96th Street and the West

17 Drive, did you tell Detective Rosario that?

18    A    Yes, I told him one of them was.

19    Q    Did you tell him also that one of the assaults had

20 occurred at 103rd Street and the westdrive, did you tell him

21 that, did you tell him that, sir?

22    A    That I might have.

23    Q    You told him that?

24    A    I said, I might have.  I don't recall specifically

25 what I said.

NYCLD_023584

P-APP000186

```
 1              People Reynolds Cross (Mr. Burns)          882
 2      Q     It's okay, I understand.
 3              MS. LEDERER:  Objection to the unnecessary,
 4      gratuitous.
 5              THE COURT:  Okay.
 6              MR. BURNS:  I'm not arguing with Officer
 7      Reynolds.
 8              THE COURT:  You're not arguing, just ask your
 9      next question.
10      Q     In any event, it was as a result of hearing these
11  calls, these transmissions, that made you go to the
12  northside of the park; is that right?
13      A     Yes.
14      Q     You covered the park?
15      A     Yes.
16      Q     You covered the northern end?
17      A     Yes.
18      Q     Right.  Did you stay on the road?
19      A     No.
20      Q     You went off the road and went through the fields,
21  the ball fields just like a lot of other police cars did,
22  isn't that true?
23      A     Yes.
24      Q     You almost like spider webbed the northern end of
25  the park; is that true?
```

LDI

NYCLD_023585

P-APP000187

1                    People Reynolds Cross (Mr. Burns)                    883

2        A    Basically, yes.

3        Q    Now, one of the transmissions that you had

4   received was initiated by an auxiliary police man; is that

5   right?

6        A    Yes.

7        Q    Is that the call that related to a male jogger at

8   96th Street?

9        A    Yes.

10       Q    You heard -- did the transmission state, did it

11  come over the air that a male jogger was assaulted on 96th

12  Street and the Westdrive?

13       A    Yes.

14       Q    Did you hear the transmission say the people who

15  had assaulted the male jogger had fled west?

16       A    Yes.

17       Q    That was the transmission?

18       A    From the auxiliary.

19       Q    Yes?

20       A    No, I believe another Officer had said they fled

21  West.

22       Q    Said they fled west?

23       A    Yes.

24       Q    Do you know the name of that Officer?

25       A    Yes.

LDI

NYCLD_023586

P-APP000188

```
1              People Reynolds Cross (Mr. Burns)           884

2      Q    What was the name of that Officer?

3      A    Police Officer Mark Carlson.

4      Q    During the time that you were responding to these

5  jobs, did you ever notice a fire?

6      A    No.

7      Q    You never saw a fire?

8      A    No.

9      Q    Did you see any fire trucks?

10      A    Yes.

11      Q    Where did you see the fire trucks?

12      A    On Central Park West.

13      Q    Were they parked, they, meaning the fire trucks,

14  were they parked?

15      A    No.

16      Q    They were moving?

17      A    Yes.

18      Q    Did you ever see any fire trucks in the park?

19      A    I don't recall if I had seen them in the park or

20  not.

21      Q    Now, as a result of one of the transmissions, did

22  you say that you responded to the location of East 102nd

23  Street and the eastdrive?

24      A    Yes.

25      Q    Then there came a time when 5 people were
```

LDI

NYCLD_023587

P-APP000189

```
 1              People Reynolds Cross (Mr. Burns)              885

 2   arrested?

 3        A    Yes.

 4        Q    And had you seen John Loughlin?

 5        A    That night?

 6        Q    Yes, sir?

 7        A    No.

 8        Q    Did you see John Loughlin at any time in the

 9   evening of the 19th?

10        A    No.

11        Q    Was your partner, Officer Powers, with you during

12   the entire period of time except for the time when he was

13   chasing the kids around the corner up 101st Street and then

14   across Central Park West and enter the park, accept for that

15   period, that period of time when you lost sight of him, was

16   he in your company?

17        A    Yes.

18        Q    Would it be fair to say that Officer Powers, he

19   didn't see --

20              MS. LEDERER:  Objection.

21        Q    -- he didn't see Mr. Loughlin either?

22              THE COURT:  Objection sustained.

23              MR. BURNS:  I thought there was a relaxation

24         of the hearsay rule.

25              THE COURT:  Under certain circumstances, this
```

LDI

NYCLD_023588

P-APP000190

```
1              People Reynolds Cross (Mr. Burns)           886
2         is not one of them.
3              MR. BURNS:  I understand, Your Honor.
4    Q    But there came a time when the 5 arrestees and you
5  were entering the Central Park Precinct when you went to the
6  desk Officer; is that right?
7    A    Yes.
8    Q    What were they arrested for?
9    A    The 5 of them?
10   Q    Do you understand my question?
11   A    Yes.
12             MR. JOSEPH:  Judge, may we approach one
13        moment.
14             (Whereupon, a discussion was held at the
15        bench  on the record as follows:)
16             MR. BURNS:  Can we, Your Honor.
17             THE COURT:  Sure.
18             MR. BURNS:  As a matter of fact, it's 12:30
19        now.
20             MR. JOSEPH:  I asked to approach the bench
21        just because of the some what sensitive
22        questioning now, to the question of opening the
23        door as to statements.  I want to make sure that
24        if it's going to be argued, if it does, I'm
25        objecting.  It's some what of a difficult
```

LDI

NYCLD_023589

P-APP000191

1     People Reynolds Cross (Mr. Burns)   887

2     situation when you're representing a codefendant.

3     As I understand from Mr. Burns, all he wants to

4     ask him is what they were arrested for.

5        THE COURT:  What specific charge?

6        MR. BURNS:  Yes.

7        MR. JOSEPH:  I want to make sure.

8        THE COURT:  No to itemize the event.

9        MR. BURNS:  Not what.

10        MR. JOSEPH:  I just want to make sure that

11     the people are not going to intend, thereafter,

12     that that opens the door as to statements given by

13     any other kids.

14        MS. LEDERER:  You don't wants me to

15     introduce.

16        MR. JOSEPH:  I don't want you to introduce

17     anything, that's hearsay.

18        MS. LEDERER:  I don't know whether we are

19     getting to a point that there should be some

20     instruction from the court that this jury -- there

21     has been a determination by probable arrest, that

22     is not this jury's function.

23        THE COURT:  I don't know what the purpose of

24     the question is.

25        MR. JOSEPH:  I'm not concerned about this.

LDI

```
 1              People Reynolds Cross (Mr. Burns)           888
 2                   THE COURT:  Am I suppose to tell the jury
 3              there is probable cause?
 4                   MS. LEDERER:  I'm afraid there would be some
 5              opening of the door about statements that were
 6              made by codefendants, that would not normally be
 7              admissible.
 8                   THE COURT:  You want to find out what they
 9              were charged with at the point of time of arrest?
10                   MR. JOSEPH:  Why were some kids arrested for
11              unlawful assembly.  Why some kids were arrested
12              for assault.
13                   THE COURT:  What is he going to answer?
14                   MR. RIVERA:  He gave an explanation.
15                   MS. LEDERER:  I really don't know exactly.
16                   THE COURT:  Bring him back let's find out
17              what he says.  I understand what the question is,
18              when they were brought before the desk charged
19              with it.
20                   THE COURT:  Exactly.
21                   (Following occurred in open court.)
22         CROSS EXAMINATION CONT'D
23         BY MR. BURNS:
24              Q    Just so there is no mistake about where I'm going,
25         let me ask you specifically:  What was Raymond Santana
```

LDI

NYCLD_023591

P-APP000193

```
 1              People Reynolds Cross (Mr. Burns)         889
 2   charged with?
 3        A     Unlawful assembly.
 4        Q     What was Kevin Richardson charged with?
 5        A     Unlawfully assembly and assault.
 6        Q     When you say assault, that's assault on who?
 7        A     John Loughlin.
 8        Q     What was Clarence Thomas charged with?
 9        A
10        Q
11        A
12        Q     What was Lamont McCall charged with?
13        A
14        Q     And what was Steven Lopez charged with?
15        A     Unlawful assembly.
16        Q     Now, when you say assault, are you talking about
17   assault in the third degree as opposed to something else?
18        A     Excuse me?
19        Q     Are you charging them with a assault in the third
20   degree; isn't that true?
21        A     No, second degree.
22        Q     Second degree assault?
23        A     Yes.
24        Q     In any event, in any event you started the paper
25   work so that this matter was going to go into the family
```

                              LDI

1           People Reynolds Cross (Mr. Burns)            890

2     court; is that correct?

3           A     Yes.

4           Q     You said that a Mrs. Cuffee was the first parent

5     that arrived?

6           A     Yes.

7           Q     What time did she arrive?

8           A     I don't recall.

9           Q     Is there anything that you have that would refresh

10    your recollection as to what time she arrived?

11          A     I don't think so.

12          Q     Would you have a specific recollection that you

13    spoke to her for 5 minutes?

14          A     It was about five minutes, probably less.

15          Q     Did she arrive before midnight?

16          A     Probably.

17          Q     Did she arrive by 11:00 o'clock?

18          A     No.

19          Q     11:30?

20          A     Possible.

21          Q     You say there came a time when all of the parents

22    came accept Santana's parents?

23          A     Yes.

24          Q     It wasn't until after 4:00 that his grandmother

25    came?

LDI

NYCLD_023593

P-APP000195

1                    People Reynolds Cross (Mr. Burns)              891

2          A    That's correct.

3          Q    Now, the parents who came, the last parents to

4     arrive prior to Santana's grandmother, do you know which

5     parent that was?

6          A    No.

7          Q    Isn't it also true though that as each parent came

8     in, they went and they were sent to the utility; is that

9     what you called it?

10         A    No.

11         Q    The clerical room.  They went into the clerical

12    office?

13         A    Yes.

14         Q    They sat in the clerical office just the parents;

15    is that right?

16         A    That's correct.

17         Q    The teenagers then just sat in another room?

18         A    They sat in a room with me.

19         Q    You said that there came a time that all of the

20    arrestees ate?

21         A    Yes.

22         Q    This is after they woke up?

23         A    They had to.

24         Q    I'm asking you?

25         A    Sure.

LDI

NYCLD_023594

P-APP000196

1              People Reynolds Cross (Mr. Burns)              892

2        Q     Because you said also that the arrestees that they

3    had fallen asleep about 3:00 o'clock on the morning of the

4    20th; is that right?

5        A     I know at 3:00 o'clock they were, all of them,

6    except for one was definitely asleep.

7        Q     It wasn't until after 4:00 that they were --

8    withdrawn.

9              What time was it that they ate?

10       A     I would say between 4:30 and 5:00, that's when the

11   parents went to get the food, so it would have to be

12   sometime after that.

13       Q     Would it be fair to say that neither you nor any

14   of the other police officers or police employees got them

15   food?

16       A     At that point?

17       Q     No.  From the time that they arrived in the

18   precinct, until the parents brought them food, did any of

19   them have anything to eat that was provided by police

20   personnel?

21       A     No.

22       Q     Is that true?

23       A     That's true.

24       Q     You don't know.  Would it also be fair to say you

25   don't know what time they went to sleep, you just know that

LDI

NYCLD_023595

P-APP000197

1                   People Reynolds Cross (Mr. Burns)              893

2       by 3:00 o'clock they were all asleep; is that a true

3       statement?

4            A     3:00 o'clock, they were definitely sleeping.

5            Q     You don't know when they started nodding off so to

6       speak, falling asleep?

7                       MR. JOSEPH:  I would object.

8                       THE COURT:  You saw them nodding off.

9            Q     Falling asleep?

10           A     I guess about 2:00, maybe a little later.

11           Q     So that then would it also be fair to say

12      certainly in the case of Mrs. Cuffee, who you say is the

13      mother of Kevin Richardson, she was there over 4 hours

14      before she was permitted to be with her son, would that be

15      fair to say?

16           A     Yes.

17           Q     Depending upon when the other people arrived and

18      you don't recall what time they arrived, other than

19      Santana's grandmother, they all had to wait and then they

20      were all permitted to be with their children at the same

21      time?

22           A     That's correct.

23           Q     That was when the children or when the teenagers

24      were awoken to eat the meal?

25           A     That's correct.


                                    LDI

P-APP000198

```
 1              People Reynolds Cross (Mr. Burns)              894
 2       Q    Now, you mentioned the presence of chiefs.   More
 3   than one chief in the Central Park Precinct that morning?
 4       A    No.
 5                  (Continued on next page.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LDI

14

T-3    Reynolds-Ppl-cross (Burns)                 695

2      Q    Just one chief?

3      A    That's it.

4      Q    Were there any police brass, police officers who

5  who held the rank of above captain, were there several of

6  those officers present?

7      A    Not that I saw, no.

8      Q    You didn't see them?

9      A    No.

10     Q    Incidentally, where did you do your paperwork?

11     A    The juvenile paperwork?  The packages?

12     Q    Yeah, you said that after you finished their

13  booking process, you then took them to the juvenile room and

14  you said the juvenile room is in a different building.

15     A    That's correct.

16     Q    Is that correct?

17     A    That's correct.

18     Q    All right.  You you also stated that you had spoken

19  to a Lt. Mc Inerny, but that wasn't in the same room where

20  the juvenile room or the clerical office is, isn't that

21  true?

22     A    That's true.

23     Q    You saw him in the alley between the main precinct

24  and this other building, the building, the 24th or the

25  Central Park Precinct consists of two buildings; isn't that

M. C. Davis

NYCLD_023598

P-APP000200

```
 1              T-3   Reynolds-Ppl-cross (Burns)              896
 2    correct?
 3         A    Yes.
 4         Q    All right.  So, are you saying there was no other
 5    brass there or are you saying you didn't see them where you
 6    were working?
 7                   MS.  LEDERER:  Objection.
 8                   THE COURT:  I'll let him answer.
 9                   Do you understand the question?
10                   THE WITNESS:  Yeah.
11         A    I didn't see any brass.
12         Q    Where you were working?
13         A    Well, yeah.
14         Q    I mean --
15         A    Couldn't see them anywhere else?
16         Q    Well they could have been in the other building,
17    that's what I'm asking?
18         A    No, I didn't see them.  If they were there, I
19    didn't see them.
20         Q    But you weren't' in that building, that's what I'm
21    asking.
22                   MR.  BURNS:  Objection, Judge.
23                   THE COURT:  Objection sustained.
24                   How can he see them if he wasn't in that
25                   building?  The question doesn't lend itself to an


                        E. C. Davis
```

```
1              T-3   Reynolds-Ppl-cross (Burns)              097

2         answer.

3    Q    Isn't it true you were in the building where the

4    juvenile room is, and you were not in the building where

5    the, where the captain of the precinct and the-- Do you

6    understand what I'm asking you?

7    A    At the time that I was doing the paperwork, the

8    captain wasn't in.

9    Q    Yeah.

10   A    The highest ranking officer that was in the

11   precinct at that time was the lieutenant, and that was it.

12   Just one lieutenant and maybe one or two sergeants.

13   Q    Okay.  Did there come a time when you did see a

14   chief?

15   A    Yes, one chief.

16   Q    One chief.  And where did you see the chief?

17   A    I saw the chief in the captain's office.

18   Q    And the captain's office, is that located in this

19   other main building?

20   A    Yes.

21   Q    And what time was it when you saw the chief?

22   A    I have to look in my notes for that.

23   Q    Please.

24   A    That was about 12:30.

25   Q    You saw the chief at 12:30?
```

                              H. C. Davis

P-APP000202

T-3   Reynolds-Ppl-cross (Burns)                       898

1

2   A   About 12:30.

3   Q   Now, getting back to your initial observation of

4   the teenagers who were proceeding north on Central Park

5   West, where was your vehicle when you first saw them?

6   A   Our vehicle was pointed west on 100th Street

7   entrance, facing towards Central Park West.  That's the

8   northeast corner.

9   Q   So, but you were still in the park?

10   A   I don't know if you could call that in the park, we

11   were past the wall.

12   Q   And on what side of Central Park West --

13       MR.  BURNS:  Withdrawn.

14   Q   Was your vehicle parked on Central Park West?

15   A   We weren't parked.

16   Q   All right.  Had you just exited the park at that

17   point?

18   A   Yes.

19   Q   And this group was still south of 100th Street?

20   I'm sorry, this group had just passed 100th Street?

21   A   They were --

22   Q   When you first saw them?

23   A   They were going, they were on the block between

24   101st and 102nd Street, on the west side of the street.

25   Q   All right.  So then you were behind them?


                              P. C. Davis

NYCLD_023601

P-APP000203

```
1              T-3    Reynolds-Ppl-cross (Rivera)          899
2       A    Yes.
3                 MR.   BURNS:   Thank you, officer Reynolds.
4       A    You're welcome.
5   CROSS EXAMINATION
6   BY MR. RIVERA:
7       Q    Good afternoon, officer.
8       A    Good afternoon.
9       Q    Officer, you testified earlier today that you saw
10  one member, one member of the Force that's a brass, that had
11  brass; is that correct?
12      A    Well, what rank do you consider brass?
13      Q    A chief or above?
14      A    Yes, definitely yes.
15      Q    And Mr. Joseph's examining of you, you also
16  testified that you saw a Chief Colengelo and a chief
17  Selvaggi; is that correct?
18      A    I believe that was their names.  Let me take a
19  look.
20           Yes.
21      Q    Now, could you tell us who is Chief Colengelo?
22      A    He's-- Chief Colengelo?
23      Q    Yes.
24      A    I believe he's the chief of Manhattan North.
25      Q    Okay.


                        H. C. Davis
```

1               T-3   Reynolds-Ppl-cross (Rivera)            900

2       A    The Borough.

3       Q    Would he be the chief of detectives?

4       A    Yes.  Yes, Manhattan North detectives.

5       Q    And is he the chief of detectives for the City of

6  New York?

7       A    Yes.

8       Q    And would he be classified as brass?

9       A    You could call him that.

10      Q    Okay.  And could you tell us who Cheif Selvaggi?

11      A    He's the chief of the borough patrol.

12      Q    And you also testified as to see another chief; is

13  that correct?

14      A    Yes.

15      Q    And do you know, do you recall the name of that

16  chief?

17      A    Chief Rosenthal.

18      Q    Right.  And could you tell who Chief Rosenthal is?

19      A    Chief of, Manhattan chief of detectives.

20      Q    And did you see all three chiefs on either the 20th

21  or the 21st?

22      A    I believe it was the 21st.

23      Q    Okay.  Did you see Chief Rosenthal on the 20th or

24  the 1?

25      A    Chief Rosenthal I saw both days.


                          H. C. Davis

T-3   Reynolds-Ppl-cross (Rivera)                901

Q     And the other two chiefs you saw on the 21st?

A     Yes.

Q     Do you know or do you recall when you were apprised there was a chief, that there were chiefs in the building at the Central Park Precinct?

A     Excuse me.

Q     When with you informed that there were chiefs at the Central Park Precinct, a time?

A     I don't recall.  There was only one chief at the Central Park Precinct.

Q     And did Chief Rosenthal ask you to come in and speak to him?

A     No.

Q     You volunteered to go see Chief Rosenthal?

A     Definitely not.

Q     Well, there came a point in time where you saw Chief Rosenthal at the captain's room; is that correct?

A     Yes.

Q     And the purpose of your visit to see Chief Rosenthal was to tell him what you had observed on the night of the 19th and 20th, is that correct?

A     That's correct.

Q     By the way, were there other individuals present when you were speaking to Chief Rosenthal?

H. C. Davis

P-APP000206

T-3    Reynolds-Ppl-cross (Rivera)                    902

A    Yes.

Q    How many other individuals were present?

A    I'd say maybe two, three others.

Q    And were they also, could they also be deemed police brass?

A    The captain could be, the others weren't.

Q    Was there a captain in the office?

A    Yes.

Q    And the other individuals, were they captains or above?

A    No.

Q    They were below the rank of captain?

A    Yes.

Q    Outside of the precinct, were there members of the press?

A    Yes.

Q    And how many members of the press were present outside the precinct?

A    I couldn't begin to count them.

Q    Was it a countless number, a large number?

A    There were a few.

Q    When you say a few, would you classify it was less than five, more than five?

A    I don't know.

                        H. C. Davis

P-APP000207

```
 1            T-3   Reynolds-Ppl-cross (Rivera)           903
 2       Q    Would it be more than fifteen or twenty people that
 3  were present, members of the press?
 4       A    I don't know.
 5       Q    Did you see them?
 6       A    I saw a couple of them.
 7       Q    Were they together?
 8       A    No, it was scattered.
 9       Q    Were they outside the precinct?
10       A    Yes.
11       Q    Okay.  And when you say a couple, that would be
12  two; is that correct?
13       A    Well, the ones that I saw, again, I saw maybe two,
14  maybe more.
15       Q    And this would be --
16            When was the first time you saw members of the
17  press at the precinct?
18       A    What time?
19       Q    Yes.
20       A    Maybe ten.
21       Q    Ten in the morning?
22       A    Maybe.
23       Q    And that would be April the 20th; is that correct?
24       A    That's correct.
25       Q    Were you informed that members of the press were
```

H. C. Davis

NYCLD_023606

P-APP000208

```
 1              T-3    Reynolds-Ppl-cross (Rivera)          904
 2   waiting outside before ten o'clock in the morning?
 3        A     No, I just saw a truck, one of the trucks out
 4   there.
 5        Q     I'm sorry?
 6        A     I saw one of their trucks.
 7        Q     That would be a press truck; is that correct?
 8        A     Yes.
 9        Q     And you only saw one press truck?
10        A     Well, that's when I realized that they were there,
11   I saw one of their trucks.
12        Q     Prior to that you had no knowledge the press was
13   interested in this case; is that correct?
14        A     That's correct.
15        Q     Now, you testified earlier that you saw a group
16   walking northbound on Central Park West at about 10:30 in
17   the evening; is that correct?
18        A     Yes.
19        Q     Okay.  And that group consisted of about ten or
20   twenty people; is that correct?
21        A     That is correct.
22        Q     And you saw them on 101st Street going towards
23   102nd Street; is that correct?
24        A     That's correct.
25        Q     Now was was this group walking?
```

H. C. Davis

P-APP000209

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              005
 2       A    How was?
 3       Q    Yes.
 4       A    I don't have a clue.
 5       Q    Were they walking at an average pace?
 6       A    Yeah.
 7       Q    They weren't running; is that correct?
 8       A    Not at that point.
 9       Q    Yes, when you first saw them, they weren't running;
10  is that correct?
11       A    That's correct.
12       Q    And was the group broken down into other smaller
13  groups?
14       A    No, it was just like a pack.
15       Q    Okay.  Were individuals speaking with individuals
16  within the group?
17       A    I don't know, I couldn't hear them from where I
18  was.
19       Q    Did you see --
20            What distance in circumference did this group take
21  in?  Would it be a quarter of a block, a half of a block
22  that they were walking?
23       A    Maybe a quarter of a block.
24       Q    Okay.  So, this group is walking northbound; is
25  that correct?


                         H. C. Davis
```

NYCLD_023608

P-APP000210

T-3    Reynolds-Ppl-cross (Rivera)                906

A    Yes.

Q    And it's an area space of about a quarter of a block; is that correct?

A    Maybe a quarter of a block.

Q    When you say maybe, is it more than a quarter of a block or less than a quarter of a block.

A    I couldn't really tell you, you know, it was around that.   Give or take, you know.

Q    And did you observe any of the members of this group speaking to each other?  Or appear to be speaking to each other.

A    I couldn't tell, I was behind them.

Q    And were any of them laughing?

A    Again, I was behind them, I couldn't tell.

Q    And you indicated there was a minimum of ten; is that correct?

A    Yeah.

Q    And a maximum of twenty?

A    Might have been 21, I don't know.

Q    I'm asking you for a range, officer.

A    It's around ten to twenty.

Q    Okay.  And this group is walking, might have been ten, up to twenty, walking in about a quarter block radius, is that correct?

W. C. Davis

```
 1               T-3    Reynolds-Ppl-cross (Rivera)            907

 2      A    Yeah.

 3      Q    And you termed this group a pack; is that correct?

 4      A    That's correct.

 5      Q    And the reason why you termed this group a pack was

 6 because they were walking; is that correct?

 7      A    Correct.

 8      Q    Now, the group was not involved in any illegal

 9 activities when they were walking northbound; is that

10 correct?

11      A    None that I could observe.

12      Q    Right.  They were just walking.  Were they all on

13 the sidewalk, by the way?

14      A    Yes.

15      Q    And they were just walking at an average pace,

16 northbound going towards 102nd Street; is that correct?

17      A    That's correct.

18      Q    Had this group had been a group of white kids,

19 would you have termed this group a pack.

20               MS.   LEDERER:   Objection.

21               THE COURT:   I'll let him answer.

22      A    Probably.

23      Q    Okay.   So, the term pack, if this group had been a

24 group of adults, would you have termed this group a pack?

25      A    A pack of adults, sure.


                         H. C. Davis
```

NYCLD_023610

P-APP000212

```
1          T-3   Reynolds-Ppl-cross (Rivera)           908

2     Q    Okay.  So the term pack has no significance to you

3  other than the fact that this is a group of individuals who

4  were walking northbound; is that correct?

5     A    That's correct.

6          THE COURT:  Is this a point convenient to your

7  cross-examination?

8          MR.  JOSEPH:  There would be fine, your Honor.

9          THE COURT:  We'll recess for lunch, members of

10  the jury.  2:15.  Please don't discuss the case or

11  permit anyone to talk to you about the case.  And

12  we'll see you at 2:15.

13          THE COURT:  All right officer, don't discuss

14  your testimony with anyone until you get back here,

15  including the District Attorney.

16          (After the luncheon recess.)

17          THE CLERK:  Case on trial continued, People of

18  the State of New York versus Raymond Santana, Yusef

19  Salaam, Antron Mc Cray, indictment 4762 of '89.

20          THE COURT:  All right, People ready?

21          MS.  LEDERER:  Yes.

22          THE COURT:  Defendants ready?

23          MR.  RIVERA:  Yes.

24          THE OFFICER:  Jury is entering.

25          THE CLERK:  The defendants, their attorneys,
```

                              H. C. Davis

P-APP000213

1          T-3   Reynolds-Ppl-cross (Rivera)          909

2          the Assistant District Attorneys and all sworn

3          jurors are present.

4                THE COURT:  All right, good afternoon, ladies

5          and gentlemen.

6                THE CLERK:  Officer Reynolds, may I remind you

7          you're still under oath.

8                THE WITNESS:  Yes.

9  CONTINUING CROSS EXAMINATION

10 BY MR. RIVERA:

11    Q    Officer, before we broke, you indicated to us that

12 there was some chiefs and members of the press that were

13 present at the Central Park Precinct; is that correct?

14    A    Yes.

15    Q    And is that unusual to see top brass at the Central

16 Park Precinct during an arrest?

17    A    There is not a lot of arrests there, so, but yeah,

18 I would say it is.  Slight.

19    Q    Under normal circumstances would it be unusual to

20 see a high member of the brass at any precinct when youths

21 are arrested?

22                MS.  LEDERER:  Objection.

23                THE COURT:  I'll allow it.

24    A    It depends on the precinct.

25    Q    Are there some precincts where this would not be

                         E. C. Davis

```
 1                T-3    Reynolds-Ppl-cross (Rivera)              910

 2   unusual?

 3                   MS.   LEDERER:   Objection.

 4        A    Yes.

 5        Q    What about the Central Park Precinct, is this

 6   unusual at the Central Park Precinct?

 7        A    Slightly, yes.

 8        Q    And the same applies for the members of the press?

 9        A    Yes.

10        Q    Is thsi the first time you make an arrest where you

11   have that kind of brass and that kind of press present?

12        A    Yes.

13        Q    And at what point in time were you apprised that

14   there case was going to have special significance within the

15   modus operandi of the Police Department.

16                   MS.   LEDERER:   Objection.

17                   THE COURT:   Sustained.

18        Q    Were there any Assistant District Attorneys present

19   at any time when you were involved in this case between

20   April the 19th and April the 20th?

21                   MS.   LEDERER:   Objection.

22                   THE COURT:   I'll let him answer.

23        A    Yes.

24        Q    And would that about A.D.A.   Lederer?

25        A    Yes.


                             H.  C.  Davis
```

NYCLD_023613

P-APP000215

1

2      Q    And was there also an A.D.A. Fairstein?

3      A    Yes.

4      Q    Were there any other members of the District

5   Attorney, District Attorney present, paticularly any

6   Assistant District Attorney?

7      A    I don't think so.

8      Q    And when for the first time did you see an

9   Assistant District Attorney on this matter?

10     A    The night of the 20th.

11     Q    Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13     A    Regarding this matter?

14     Q    Regarding this case.

15     A    No.

16     Q    Did you see them in the building or any other

17   buildings involved in the case?

18     A    No.

19     Q    Prior to the 20th?

20     A    No.

21     Q    Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23     A    Yes.

24     Q    And police officer Alvarez informed you of an

25   assault on an individual; is that correct?


                        M. C. Davis

T-3   Reynolds-Ppl-cross (Rivera)                912

1

2      A    Yes.

3      Q    And he informed you the identification of those

4  individuals who committed that assault?

5      A    Excuse me?

6      Q    Did he give you any I.D.  as to the individuals who

7  committed that assault?

8             MS.  LEDERER:  Objection.

9             THE COURT:  I'll allow it.

10             When are you talking about?

11             MR.  RIVERA:  This is on the evening of April

12         the 19th.

13             MS.  LEDERER:  Excuse me, objection.  With

14         respect to did he give you any I.D., what does that

15         mean.

16             MR.  RIVERA:  Any identification.

17             MS.  LEDERER:  A description?

18             MR.  JOSEPH:  Right.

19      Q    Any description of the person who committed the

20  assault?

21      A    Yes.

22      Q    What description did he give you?

23      A    They were male teenagers, black and Hispanics.

24      Q    That's the description he gave you, male

25  individuals, black an Hispanics, is that correct?


                         H. C. Davis

```
1              T-3    Reynolds-Ppl-cross (Rivera)              913
2        A    Yes.
3        Q    Did he say how many blacks, how many Hispanics were
4    involved?
5        A    You mean of each group?
6        Q    Yes.
7        A    No.
8        Q    Did he give you any number in total how many were
9    involved?
10       A    He said there was a large group.
11       Q    As to the assault of the individual that police
12   officer Alvarez was involved in, the assault, did you obtain
13   any information from police officer Alvarez as to the number
14   of people who committed that assault?
15       A    No.
16       Q    Now, you also testified that you heard a
17   description over the air that there were seven male
18   Hispanics involved in the assault; is that correct?
19       A    That's correct.
20       Q    Is that the same assault that you just testified to
21   with reference to police officer Alvarez?
22       A    Yes.
23       Q    Okay.  On the air it said seven Hispanics; is that
24   correct?
25       A    That's correct.
```

                              H. C. Davis

NYCLD_023616

P-APP000218

T-3    Reynolds-Ppl-cross (Rivera)                 914

Q    And when you spoke to police officer Alvarez, he indicated that the group was Black and Hispanic; is that correct?

A    That's correct.

Q    And the group was identified as approximately seven; is that correct?

A    Originally, yes.

          MR.  BURNS:  I'm sorry, Mr. Rivera, I can't hear you.  I'm having difficulty hearing you.

          MR.  RIVERA:  I have a cold, your Honor.

          THE COURT:  I can hear you.

Q    Now, there was a lineup --

          MR.  RIVERA:  Withdrawn.

Q    There was a show up with reference to the incident that you just told us about; is that correct?

A    Which incident?

Q    The incident involving police officer Alvarez.

A    Yes.

Q    And you were present during a show up; is that correct?

A    Yes.

Q    And there was an individual who was a witness who participated in that show up; is that correct?

A    That's correct.


                              H.  C.  Davis

NYCLD_023617

P-APP000219

1                T-3    Reynolds-Ppl-cross (Rivera)              915

2        Q     Could you describe that individual.

3        A     I didn't get a good look at him.   It was a male

4    Hispanic.

5        Q     Would you know how old he was?

6        A     I couldn't hazard a guess.

7        Q     Now, how many --

8              When did the show up take place?

9        A     At the playground on 100th Street and Central Park

10   West, just inside the park.

11       Q     And how many individuals participated in the show

12   up?  How many youths participated in the show up?

13       A     Well, there were, a large number, I don't recall

14   how many were there.

15       Q     Did you assist in the show up?

16       A     As far as --

17       Q     Did you assist any of the officers, in any way,

18   shape or fashion in the show up?

19       A     There was really no need for assistance, just to

20   stand by.

21       Q     And individuals were put before this individual who

22   was a victim and asked if he could identify them; is that

23   correct?

24       A     I think basically what happened was he, the

25   complainant looked from the car and just said these weren't

                        B. C. Davis

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              916

 2   the people that assaulted him.

 3        Q    Okay.  He indicated these weren't the People; is

 4   that correct?

 5        A    That's correct.

 6        Q    How many Hispanics were participating in that show

 7   up?

 8        A    I don't know.

 9        Q    Was there at least one Hispanic?

10        A    I have no idea.

11        Q    Were you able to see the individuals who took part

12   in the show up?

13        A    Yes.

14        Q    And were you able to tell what ethnic background

15   they might have been?

16        A    They appeared to be Black, but they do have been

17   Hispanic also.

18        Q    But you didn't make any notes on this; is that

19   correct?

20        A    No.

21        Q    Now, there came a point in time that you were

22   advised that there was another individual, an individual who

23   you identified as Loughlin who was also assaulted; is that

24   correct?

25        A    That's correct.


                              H. C. Davis
```

NYCLD_023619

P-APP000221

T-3   Reynolds-Ppl-cross (Rivera)                917

Q    And during the assault on the first individual, and the assault on the second individual, how much time elapsed? From the time that you were advised as to the first and you were advised as to the second assault?

A    The second being Mr. Loughlin?

Q    Mr. Loughlin, that's correct.

A    I think it's maybe forty minutes.

Q    About forty minutes?  And during that forty minutes did you canvass the park?

A    Yes.

Q    And did you canvass the park consistently or incessantly during that forty minutes?

A    Oh, yes, definitely.

Q    And you canvassed the northern section of the park is that correct?

A    That's correct.

Q    And that would be north of 86th Street; is that correct?

A    Yeah, well we stayed mostly north of 96th.

Q    North of 96th?

A    Yes.

Q    And you indicated earlier that there were other police cars that were canvassing the park; is that correct?

A    That's correct.

                        H. C. Davis

NYCLD_023620

P-APP000222

```
 1            T-3   Reynolds-Ppl-cross (Rivera)            918

 2      Q     How many police cars that you know were canvassing

 3  the park?

 4      A     I would say about six, seven at least.

 5      Q     Okay.  And these are police cars?

 6      A     Police, there are automobiles, Blazers, scooters.

 7      Q     And did they have their dome lights on?

 8      A     Not that I recall, no.

 9      Q     They had their front lights on; is that correct?

10      A     Yes.

11      Q     And at what time did you start canvassing the park?

12      A     Approximately 9:30.

13      Q     About 9:30?

14      A     Uh huh.

15      Q     And from 9:30 for about forty minutes you canvassed

16  the park; is that correct.

17      A     I canvassed until the time we saw the group.

18      Q     And is there an area that you concentrated in your

19  canvass?

20      A     Mostly around the ball fields.  Between 102nd and

21  96th.

22      Q     From 102nd to 96; is that correct?

23      A     That's correct.

24      Q     And you would see other police cars canvassing the

25  same area; is that correct?


                          H. C. Davis
```

NYCLD_023621

P-APP000223

```
 1              T-3    Reynolds-Ppl-cross (Rivera)          919

 2        A    That's correct.

 3        Q    And approximately how many seconds apart would you

 4   see other police cars also involved in the canvass?

 5        A    Well, from certain points of the park you could see

 6   the entire ball field, because the ball fields were dark,

 7   you could see the head lights of the other radio cars, so

 8   you could see them going back and forth, you know.  In the

 9   area.

10        Q    So, would you say that only seconds elapsed between

11   one car passing and another car passing?  Would that be

12   correct?

13        A    Passing each other?

14        Q    Yes.

15        A    Well, from where I was, it was tough to gage how

16   close they were to another, I couldn't say.

17        Q    Well, it would be seconds from the time you saw one

18   car to the time you saw another car, canvassing the area?

19   Would that be correct?

20        A    Yeah, yes.

21        Q    And these cars were all concentrating from 102nd

22   Street to 96th Street; is that correct?

23        A    No.

24        Q    Where were these other cars concentrating, if you

25   know?


                         H. C. Davis
```

T-3    Reynolds-Ppl-cross (Rivera)                920

A    I'm sure they went all the way up to 110th.

Q    But you saw them, you were concentrating in the middle tier; is that correct?

A    That's correct.

Q    Would you say that the park was saturated with police vehicles?

A    I would say so.

Q    There came a point in time you arrested Raymond Santana; is that correct?

A    Yes.

Q    And the only charge that you made against Raymond Santana was the charge of unlawful assembly; is that correct?

A    That's correct.

Q    And there came a point in time that you assisted in transporting Raymond Santana to the Central Park Precinct? You detained Raymond Santana at 102nd Street and Central Park West; is that correct?

A    That's correct.

Q    And there was another police car, I think Sgt. Wheeler that transported Raymond to the Central Park Precinct?

A    Yes.  Well, yes, but not straight from 102nd Street.

H. C. Davis

NYCLD_023623

P-APP000225

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              921

 2      Q    And Raymond was cuffed; is that correct?

 3      A    That's correct.

 4      Q    And he was handcuffed in the back?  Is that the

 5 police procedure?

 6      A    That is.

 7      Q    And he was first transported to 100th Street, is

 8 that your testimony?

 9      A    Yes, it is.

10      Q    And he was on 100th Street approximately five, ten

11 minutes?

12      A    Maybe fifteen.

13      Q    Maybe fifteen?  And from 100th Street and Central

14 Park West he was taken to the Central Park Precinct?

15      A    That's correct.

16      Q    He never left the police car; is that correct?

17      A    I don't believe so.

18      Q    You didn't see Raymond Santana leave the police

19 car?

20      A    No.

21      Q    The next time you saw Raymond Santana was at the

22 Central Park Precinct?

23      A    Yes.

24      Q    And was it your testimony that you started the

25 processing of these individuals; is that correct?


                             H. C. Davis
```

P-APP000226

T-3    Reynolds-Ppl-cross (Rivera)                    922

A    Yes.

Q    And you started to --

        MR. RIVERA: Withdrawn.

Q    You started to ask them their names and addresses;
is that correct?

A    Yes.

Q    Did they have any identification on them?

A    I don't recall.

Q    Did you ask them for any I.D.?

A    I really don't remember.

Q    Did you search them?

A    Yes.

Q    Did you--
        Did any of them have any wallets?

A    That I don't recall.

Q    Did any of them have any money?

A    I don't recall that either.

Q    If they would have had a wallet or money, would you
have made a note in a voucher or anything of that sort?

A    No.

Q    And you indicated that you asked your partner,
police officer Powers to attempt to contact Raymond
Santana's family; is that correct?

A    That's correct.


                        W. C. Davis


NYCLD_023625

P-APP000227

20

```
1              T-3   Reynolds-Ppl-cross (Rivera)           923
2       Q     And Raymond Santana was the one who gave you his
3    father's telephone number; is that correct?
4       A     Excuse me?
5       Q     Raymond Santana was the individual who gave you his
6    father's telephone number; is that correct?
7       A     Yes.
8       Q     And he also gave you his father's work number; is
9    that correct?
10      A     I believe so, I'm not sure.
11      Q     Did you--
12            You were the one who filled out the various reports
13   on Raymond Santana; is that correct?
14      A     That's correct.
15      Q     And one of the reports that you filled out was a
16   Probation Intake Referral Report; is that correct?
17      A     Yes.
18      Q     And do you have your copy of the Probation Intake
19   Referral Report?
20      A     Yes, I do.
21      Q     May I see it?
22            MR.   RIVERA:   All right.   May I have that copy
23            marked as defendant's B for identification, your
24            Honor?   Referring to the Probation Intake Referral
25            Report.


                    H. C. Davis
```

NYCLD_023626

P-APP000228

1
2                (The reporter marked the exhibit.)

3       Q    Officer, I ask you to look at defendant's Santana's

4  B.  Take a look at it.

5            Now, there is a, in the middle of that exhibit

6  there is a place for the business phone; is that correct?

7       A    That's correct.

8       Q    And you have a number listed there; is that

9  correct?

10      A    That's correct.

11      Q    You also have a location which is the fifth floor;

12  is that correct?

13      A    Yes, that's correct.

14      Q    That would be the floor where my client's father

15  works; is that correct?

16      A    Yes.

17      Q    And next to that there is a home telephone number;

18  is that correct?

19      A    Yes, it is.

20      Q    Okay.  Now just below that, officer, there is a

21  listing of the questions, advised of constitutional rights

22  by, it has your name, police officer Eric Reynolds?

23      A    Yes.

24      Q    Did you advise my client of his constitutional

25  rights?


                         M. C. Davis

NYCLD_023627

P-APP000229

```
1                  T-3   Reynolds-Ppl-cross (Rivera)              925

2        A    No.

3        Q    So, you never advised my client of his

4   constitutional rights; is that correct?

5        A    No, I didn't.

6        Q    So, this document is in error; is that correct?

7        A    That's a mistake, yes.

8        Q    It's a mistake, right.  And further down on that

9   very same document where it says the question, did the

10  respondent offer resistance or verbal abuse at the time he

11  or she was taken into custody, you wrote down--

12                  MS.  LEDERER:  Objection.

13                  THE COURT:  Objection sustained.

14                  You offering that in evidence?

15                  MR.  RIVERA:  No.

16                  THE COURT:  Then don't read from it.

17                  MR.  RIVERA:  Okay.

18       Q    Officer, did my client run after being apprehended

19  by you?

20       A    No.

21       Q    Okay.  In your report you indicate that he did run;

22  is that correct?

23                  MS.  LEDERER:  Objection.

24                  THE COURT:  He's asking him.

25                  Did you make that report that he did run?


                              N. C. Davis
```

1          T-3    Reynolds-Ppl-cross (Rivera)              926

2              THE WITNESS:  Yes, I did.

3     Q    Is that a mistake, officer?

4     A    Yes, it is.

5     Q    Now officer, when you stopped my client, my client

6  made a statement to the effect that I just came from my

7  girlfriend's house; is that correct?

8     A    That's correct.

9     Q    And you never asked him any questions; is that

10 correct?

11    A    Excuse me?

12    Q    You never asked him any questions; is that correct?

13    A    That's correct.

14    Q    With reference to coming from his girlfriend's

15 house, you never asked him any questions on that; is that

16 correct?

17    A    That's correct.

18    Q    Okay.  And you never advised him of his rights

19 either?

20    A    That's right.

21    Q    Okay.  Now, in your memo book, you made a notation

22 that my client did not elaborate where or when he was coming

23 from his girlfriend's house; is that correct?

24    A    That's correct.

25    Q    Okay.  You didn't ask him any questions about where


                    W. C. Davis

NYCLD_023629

P-APP000231

T-3   Reynolds-Ppl-cross (Rivera)                   927

1

2   or when he was coming from his girlfriend's; is that

3   correct?

4        A    That's right.

5        Q    But you thought it important enough that he didn't

6   say anything about that to list it in your memo book, is

7   that correct?

8        A    That's right.

9        Q    But you didn't ask him any questions on that?

10       A    No.

11       Q    And when my client said I just came from my

12   girlfriend's house, you said hold it, don't say anymore, you

13   have not been advised of your constitutional rights?  Did

14   you say any words to that effect?

15       A    Nothing like that.

16       Q    Okay.  You didn't ask him any questions?

17       A    No.

18       Q    Didn't ask him what girlfriend are you talking

19   about?

20       A    No.

21       Q    Okay.  But, you thought it important enough to list

22   in your memo book what he did not say?

23       A    That's correct.

24       Q    Now, you testified that you spoke to my client's

25   grandmother at about four o'clock in the morning; is that

H. C. Davis

NYCLD_023630

P-APP000232

T-3    Reynolds-Ppl-cross (Rivera)                928

1

2  correct?

3       A    It was a little later than that.

4       Q    That would be about 4:30?

5       A    About 44:10, I believe.

6       Q    Did you take her name down when you spoke to her?

7       A    4:15.

8       Q    Did you take her name down when you spoke to her?

9       A    I believe I put it on a slip of paper.

10      Q    Do you have that slip of paper with you?

11      A    No.

12      Q    If I told you her name was Navida Colon, would that

13  refresh your recollection?

14            THE COURT:  Excuse me, wait a minute.

15            MR.   RIVERA:  I'm sorry.

16            THE COURT:  I didn't hear anything.  We can't

17       take that down.

18            THE WITNESS:  I really don't remember, I don't

19       remember her name.

20            THE COURT:  The reporter can only take down

21       what you say.

22      Q    And you testified that it was her who answered the

23  phone at about 4:15 in the morning?

24      A    Yes.

25      Q    And did you have an extensive conversation with

                      B. C. Davis

NYCLD_023631

P-APP000233

```
1                T-3   Reynolds-Ppl-cross (Rivera)              929

2    her?

3         A    No, not extensive one.

4         Q    What exactly did you tell her, if you can recall?

5         A    Excuse me.

6         Q    Do you recall what you spoke to her?

7         A    Basically I told her that Raymond was under arrest

8    and that we needed an adult to come pick him up, and I

9    couldn't reach his father.  I spoke to his, you know, his

10   sister, and she couldn't come because of the baby, I said

11   look, you don't even have to take a bus or train, I'll

12   provide transportation for you, you know, just get dressed,

13   stand by, we'll have a radio car pick you up.  You know,

14   give you door service to the precinct.

15        Q    You also testified this morning that a man also

16   answered the phone at about that time; is that correct?

17        A    A man had gotten on the phone, yes.

18        Q    And you also testified that you spoke to that man;

19   is that correct?

20        A    I briefly told him what was going on.

21        Q    And when you say you briefly told him, what you are

22   telling us now is what you told him, is that correct?

23        A    Pretty much.

24        Q    And did he identify himself as Raymond Santana's

25   father.
```

                          H. C. Davis

NYCLD_023632

P-APP000234

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              930
 2        A     I believe he said he was, yes.
 3        Q     Okay, he identified himself as Raymond Santana's
 4   father, you explained to him why you wanted him to come to
 5   the precinct and he indicated that he would come down; is
 6   that correct?
 7        A     Well, I had already spoke to his grandmother and
 8   she said she was coming, now--
 9        Q     But you felt, but the father got on the phone; is
10   that correct?
11        A     Yes.
12        Q     And you explained everything to the father; is that
13   correct?
14        A     Yes.
15        Q     And the mother got to the precinct at about five
16   o'clock in the morning --
17              MR.   RIVERA:   Withdrawn.
18        Q     The grandmother and the father got to the precinct
19   at about five o'clock in the morning?
20        A     Around that time.
21        Q     Did you see Raymond Santana's father?
22        A     Yes.
23        Q     Okay.  Did you have a conversation with him?
24        A     I don't recall.
25        Q     Did you, did you tell any of the parents that were
```

H. C. Davis

NYCLD_023633

P-APP000235

1

2    there that these children would be going home soon?

3        A    I told them, I think I told them they would be

4    leaving soon.

5        Q    Right.  And did you tell them that you were waiting

6    for Raymond Santana's parents to come before they went home;

7    is that correct?

8        A    That's correct.

9        Q    And when Raymond Santana's parents arrived, did the

10    parents come over to you and say, okay, we're all here,

11    let's go home?  Did that happen?  Conversation to that

12    effect take place?

13        A    Yes.

14        Q    Okay.  And what did you tell them at that point in

15    time?

16        A    At that point I told them they'd have to wait now.

17        Q    Okay.

18        A    The detective wanted to interview them, that was

19    it, it's out of my hands.

20        Q    Did you tell them what the detective wants at the

21    time to interview them about?

22        A    No.

23        Q    Did you tell them also that all that had to happen

24    was the detective was going to interview them and theywould

25    be going home?

                        N. C. Davis

NYCLD_023634

P-APP000236

1          T-3   Reynolds-Ppl-cross (Rivera)              932

2      A    Excuse me?

3      Q    That after the detective spoke to them, they'd be

4  going home.  Did you tell them that?

5      A    I might have.

6      Q    Okay.  Did you also tell them that you were waiting

7  for a warrant search to come through before they went home?

8      A    Yes.

9      Q    And this would be at about five o'clock in the

10  morning?

11     A    Around that time.

12     Q    Okay.  And did you repeat this, that you were

13  waiting for a warrant search to come in before they can go

14  home at about six o'clock in the morning?

15     A    I don't recall if that's exactly what I said.

16     Q    Did you do a warrant search, officer?

17     A    Yes.

18     Q    At what time did you perform the warrant search?

19     A    It was 2:15 in the morning.

20     Q    How long did it take you to perform the warrant

21  search?

22     A    Let's see, I had to call up, I had to call up and

23  give the names of the, you know, of the defendants to the

24  person that takes it and you know, wait for them to do the

25  check on the computer and get back to me.


                        H. C. Davis


NYCLD_023635

P-APP000237

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              933
 2        Q     And how long does it take to call to make the phone
 3   call?
 4        A     How long did it take to call them?
 5        Q     To make the phone call, yes.
 6        A     About ten minutes.
 7        Q     Okay.  And what information did you impart to the
 8   other person on the other side in reference to a warrant
 9   search?
10        A     The defendant's name, their address and their date
11   of birth and their races.
12        Q     And their race?  So you give four pieces of
13   information to the person on the other side; is that
14   correct?
15        A     That's correct.
16        Q     And this was as to five individuals, is that
17   correct?
18        A     Excuse me.
19        Q     And this is in reference to five specific
20   individuals that you gave this information to; is that
21   correct?
22        A     That's correct.
23        Q     The five individuals that were in your custody; is
24   that correct?
25        A     That's correct.


                         H. C. Davis
```

P-APP000238

T-3   Reynolds-Ppl-cross (Rivera)                     934

1

2       Q     And that took you ten minutes, is that correct?

3       A     Took me ten minutes to give them the information.

4       Q     Right.  And did they said hold on until, we'll have

5   the information right back to you.

6       A     No, I think they had to call me back.

7       Q     Okay.  And did they ever call you back?

8       A     Yes.

9       Q     What time did they call you back?

10      A     That, I don't recall.

11      Q     Okay.  How long does it normally take to get a call

12   back on a warrant search?

13                MS. LEDERER:  Objection.

14                THE COURT:  Is there a normal period when you

15            get the answer back?

16                THE WITNESS:  No.

17      Q     What's the longest you've ever waited for a

18   warrants search?

19                MS. LEDERER:  Objection.

20                THE COURT:  Objection sustained.

21      Q     What's the --

22            Now the first person who arrived at the precinct

23   was Mrs. Cuffee; is that correct?

24      A     That's correct.

25      Q     That's Kevin Richardson's mother, is that correct?


                              M. C. Davis


AM004088

NYCLD_023637

P-APP000239

T-3    Reynolds-Ppl-cross (Rivera)              935

1

2      A     That's correct.

3      Q     And as soon as she came into the precinct, she came

4  to see you; is that correct?

5      A     She might have went to the desk, and I think they

6  directed her to where I was.

7      Q     Now, there is a door into the juvenile room?

8      A     Yes.

9      Q     And was that door opened or was that door closed?

10     A     That door was closed.

11     Q     Okay.  And Mrs.Cuffee had to knock on that door; is

12 that correct?

13     A     I believe so.

14     Q     And was it you or one of your partners who answered

15 the door?

16     A     I think it was me.

17     Q     And at which point in time, I think you testified

18 earlier today that you told her that you were finishing up

19 some paperwork and you had arrested her son; is that

20 correct?

21     A     That's correct.

22     Q     And I think you had testified earlier there was a

23 brief conversation with Mrs.  , with Mrs.Cuffee and her son,

24 Kevin Richardson; is that correct?

25     A     That's correct.


                              H. C. Davis

NYCLD_023638

P-APP000240

T-3   Reynolds-Ppl-cross (Rivera)                    936

Q    And you also told her that as soon as the paperwork
was finished, she and her son would be going home. is that
correct?

A    That's correct.

Q    And you told her that in front of Kevin; is that
correct?

A    Yes.

Q    And by the way, the juvenile room, how big is that
jouvenile room?

A    In feet?

Q    Yeah, if you know.

A    I don't know.

Q    Is it the -- Is that room also used for other
purposes at the precinct?

A    Yes.

Q    What is it also used for?

A    It's also, it's the youth room, it's also the
auxiliary S.E.P.A., highway safety and community affairs
office.

Q    That's within one room; is that correct?

A    One little room.

Q    How many desks are in that room?

A    Approximately five.

Q    How many desks were there that night, April the

                    E. C. Davis

NYCLD_023639

P-APP000241

1                    T-3   Reynolds-Ppl-cross (Rivera)                937

2    19th?

3        A    There were five.

4        Q    Okay.  And were the juveniles kept at one section

5    of the room?

6        A    Yes.

7        Q    And that would be the sex furthest away from the

8    door; is that correct?

9        A    That's correct.

10       Q    And you were between the juveniles and the door; is

11   that correct?

12       A    That's correct.

13       Q    And that's the room that you are commanded to take

14   youths whenever you take them into custody, is that correct?

15       A    That's the designated jouvenile room.

16       Q    Right.  And there are no beds in that room; is that

17   correct?

18       A    No.

19       Q    There are no mattresses in that room; is that

20   correct?

21       A    That's correct.

22       Q    No pillows, no blankets?

23       A    That's correct.

24       Q    You did not proved any pillows, blankets or

25   mattresses to the juveniles?


                            H. C. Davis


NYCLD_023640

P-APP000242

```
1              T-3    Reynolds-Ppl-cross (Rivera)              938

2        A     No.

3        Q     On the 19th or the 20th?

4        A     No.

5        Q     You did not buy any food for these juveniles; is

6   that correct.

7        A     That's correct.

8        Q     You did not offer to transport juveniles to

9   Spoffard House on the evening of April the 19th or April the

10  20th, is that correct?

11       A     I don't understand.

12       Q     Did you tell the parents, we're taking these kids

13  to Spoffard House?

14       A     No.

15       Q     Did you tell the parents, we're taking these kids

16  to the court on the morning of April the 20th?

17       A     No.

18       Q     Now, you testified earlier that the grandmother

19  arrived at the precinct at about five o'clock in the

20  morning; is that correct?

21       A     Approximately.

22       Q     And this was after the other parents had left to

23  buy food for their kids?

24       A     I was gone at the time, so she might have got there

25  when they got back, I don't know which happened first.
```

                              W. C. Davis

NYCLD_023641

P-APP000243

T-3    Reynolds-Ppl-cross (Rivera)                939

1

2    Q    Okay.  You left the precinct?

3    A    Yes.

4    Q    What time did you leave the precinct?

5    A    About twenty after four.

6    Q    So, you left the precinct at about twenty after

7    four, is that correct?

8    A    Yes.

9    Q    When you left the precinct, you left the juveniles

10   in somebody's custody?

11   A    Yes.

12   Q    And whose custody did you leave them with?

13   A    It was another police officer.

14   Q    And how long were you gone?

15   A    About a half hour.

16   Q    Okay.  And where did you go?

17   A    Thirty five minutes.

18   Q    Where did you go?

19   A    Went to the crime scene on 102nd Street.

20   Q    And who did you go with?

21   A    I went alone.

22   Q    And what is the name of the police officer that was

23   left attending to the juveniles?

24   A    That I don't recall.

25   Q    And when you got back, you got back at about 5:15,

N. C. Davis

P-APP000244

1              T-3    Reynolds-Ppl-cross (Rivera)              940

2    would that be correct?

3        A    About that time, 5, 5:15.

4        Q    And when you got back, the juveniles were awake; is

5    that correct?

6        A    Yes.   Yes, they were eating at that time.

7        Q    And they were eating; is that correct?

8        A    Yes.

9        Q    And you don't know who provided the food; is that

10   correct?

11       A    Yeah, their families did.

12       Q    You don't know who --

13            MR.  RIVERA:  Withdrawn.

14       Q    You don't know what time that Evida Colon got to

15   the Central Park precinct?

16       A    No.

17       Q    You don't know what time her father--

18            MR.  RIVERA:  Withdrawn.

19       Q    Raymond Santana's father got to the Central Park

20   Precinct?

21       A    No.

22       Q    And this was after you had told all the parents to

23   go out and buy food for their kids; is that correct?

24       A    Excuse me?

25       Q    They arrived at the precinct after you had told the

                         H. C. Davis

NYCLD_023643

P-APP000245

```
 1              T-3   Reynolds-Ppl-cross (Rivera)            941

 2    parents to go out and buy food for their kid; is that

 3    correct?

 4       A     This was after I told them where they could get

 5    food.

 6       Q     Right.   And after some of the parents left, is that

 7    correct?

 8       A     That's correct.

 9       Q     And after these parents had come back and bought

10    food; is that correct?

11       A     Excuse me?

12              MR.   RIVERA:   Withdrawn.

13       Q     How long did it take for you to complete the

14    paperwork on the five juveniles that you arrested?

15       A     Excuse me.   Took a couple of hours.

16       Q     Okay.   And this would be, you started at about what

17    time?

18       A     About 11:30.

19       Q     And you finished at what time?

20       A     It was, it was late.   It was early in the morning.

21       Q     Okay.   And when you say early in the morning, that

22    would be about two, three o'clock in the morning, would that

23    about correct?

24       A     Maybe even later.

25       Q     Yeah.   And did you take any photos of Raymond
```

                                H. C. Davis

NYCLD_023644

P-APP000246

1           T-3    Reynolds-Ppl-cross (Rivera)              942

2    Santana?

3         A    Yes.   Well, there was a photo taken, I don't recall

4    if I had taken it.

5         Q    Would this be a Polaroid photo?

6         A    Yes.

7         Q    And photos of the other juveniles?

8         A    Yes.

9         Q    Did there come a point in time when individuals

10   came into the precinct to file a report against these

11   juveniles.

12        A    Some people had come in.

13        Q    And did they identify themselves to you?

14        A    Yes.

15        Q    And did they --

16             And do you recall what the names were?

17        A    No.

18        Q    Did you write it down anywhere?

19        A    No, I don't have it.

20        Q    Do you recall what they were doing, what these

21   individuals who came in to file a report, what they said

22   they were doing on the evening of April the 19th?

23        A    They were riding a bicycle.

24        Q    And did you show them the photos?

25        A    Yes.


                              H. C. Davis

NYCLD_023645

P-APP000247

```
1              T-3   Reynolds-Ppl-cross (Rivera)              943
2       Q    And did they indicate whether or not they could
3    identify anybody?
4       A    Well, they stated from the beginning they couldn't
5    identify who it was.
6                 MR. JOSEPH:  Objection.
7                 THE COURT:  Just listen to his question.
8       Q    Did they indicate to you they could not identify
9    anybody?
10      A    Yes.
11      Q    And notwithstanding the fact they said they could
12   not identify anybody, you showed them the photos any way; is
13   that correct?
14      A    Excuse me?
15      Q    Notwithstanding the fact they stated to you they
16   could not identify anybody, you in any case showed them the
17   photos; is that correct?
18      A    That's correct.
19      Q    Now, the first interrogation began at 5:30; is that
20   correct?
21      A    That's correct.
22      Q    And the first person who was interrogated was
23   Lamont Mc Call; is that correct.
24                MS. LEDERER:  Objection to the
25                characterization as interrogation.


                              H. C. Davis
```

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              944
 2                 THE COURT:  The question?  I'll allow it.
 3                 Go ahead.
 4       Q     Was Lamont Mc Call; is that correct?
 5       A     That's correct.
 6       Q     And that took approximately two hours?
 7       A     About an hour.
 8       Q     And you were present when that interrogation was
 9    taking place; is that correct?
10       A     That's correct.
11       Q     And did you take any notes?
12       A     No.
13       Q     And the second person that was questioned was
14    Clarance Thomas; is that correct?
15       A     That's correct.
16       Q     And who was present when Lamont Mc Call was being
17    questioned?
18       A     Myself, Det. Whelpley, Farrel and his mother.
19       Q     And who was present when Mr. Thomas was being
20    questioned?
21       A     The same people.
22       Q     And you indicated earlier in your testimony that
23    you were questioned by a Chief Rosenthal; is that correct?
24       A     Excuse me?
25       Q     You were questioned by a Chief Rosenthal; is that
```

H. C. Davis

NYCLD_023647

P-APP000249

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              945
 2   correct?
 3       A    Yes.
 4       Q    At about I think you indicated ten o'clock in the
 5   morning?  Of the 20th?
 6       A.   I think I said twelve.  I have to look again.
 7   Yeah, it was about twelve.
 8       Q    And who was present when you were debriefing Chief
 9   Rosenthal.
10                 MS.  LEDERER:  Objection.
11                 THE COURT:  When he was debriefing?
12       Q    When you were speaking to Chief Rosenthal?
13       A    Captains Gunther, maybe a detective or two.
14       Q    Do you recall the name of the detectives?
15       A    No.
16                 (Transcript continued on the next page.)
17
18
19
20
21
22
23
24
25
                              H.  C.  Davis
```

NYCLD_023648

P-APP000250

1          People Reynold Cross (Mr. Rivera)      T-4          946

2          Q     Would they be Detective Farrel or Detective

3     Whelpley?

4          A     No.

5          Q     Were you present when the third person was being

6     questioned by the police?

7          A     Kevin Richardon?

8          Q     Kevin Richardson.

9          A     No.

10         Q     Do you know who questioned Kevin Richardson?

11         A     I believe it was Whelpley and Farrel, but I could

12     be wrong.

13         Q     When the juveniles were in your custody --

14     withdrawn.

15         When you came back from the park at about 5:15, in the

16     morning, did you excuse the Officer who was, who had custody

17     of the two?

18         A     No.

19         Q     That Officer stayed with you?

20         A     Yes.

21         Q     Did you take custody of the juveniles at 5:15 in

22     the morning?

23         A     No.

24         Q     Did you tell the other Officer if you want to take

25     a break, you can take a break, I'll back and I'll take

                                    .

                              LDI

```
 1              People Reynold Cross (Mr. Rivera)     T-4        947
 2    charge of these kids, words to that affect?
 3         A     No.
 4         Q     Were you coming inside and outside of that room?
 5         A     At what time.
 6         Q     From 5:15 on?
 7         A     A couple of times, yes.
 8         Q     Were you speaking to the other detectives in the
 9    building?
10         A     Yes.
11         Q     Were you speaking to them about the case?
12         A     Yes, I believe so.
13         Q     This would be Detectives Farrel and Detective
14    Whelpley?
15         A     There were a couple of more detectives, I believe,
16    at the time.  I'm not sure, I spoke to a few people.
17         Q     Who ever these other detective had been, did you
18    speak to Detective Gonzalez?
19         A     That morning, yes.
20         Q     Did you speak to Detective Arroyo?
21         A     No, I don't recall speaking to him.
22         Q     Did you speak to Detective Hartigen?
23         A     I don't recall speaking to him.
24         Q     I'm sorry, you don't recall?
25         A     I don't remember.  I didn't know who he was at the
```

LDI

```
 1            People Reynold Cross (Mr. Rivera)    T-4        948

 2   time.

 3       Q    That's why you don't recall, because you don't

 4   recall the name?

 5                MS. LEDERER:  Objection, objection.

 6                THE COURT:  What are you objecting to?

 7                MS. LEDERER:  The form of the question.  The

 8            witness is answering the question, saying he

 9            doesn't know who he was.

10                THE COURT:  I'll let him answer.  What is

11            your question.

12       Q    You don't recall your names, that's why you don't

13   recall speaking to them; is that correct?

14       A    No.

15       Q    What you're saying is, you did not speak to them;

16   is that correct?

17       A    I don't recall speaking to them.

18       Q    So you might have spoken to them; is that correct?

19       A    It's possible.

20       Q    Did you permit my client the opportunity to make a

21   phone call?

22       A    No.

23       Q    Officer, I ask you to look at the on line booking

24   arrest systems, do you have a copy of that?

25       A    Yes.
```

                              LDI

NYCLD_023651

P-APP000253

```
 1          People Reynold Cross (Mr. Rivera)      T-4        949
 2                  MR. RIVERA:  Can we get it marked Santana's C
 3              for identification.
 4                  (Received and marked Defendant Santana's
 5              Exhibit C For Identification)
 6      Q    Officer, the page attached to Santana's C, is that
 7  part of the on line booking sheet also, the back?
 8      A    Yes.
 9                  MR. RIVERA:   Can we have that, Your Honor,
10              marked C-1.
11                  THE COURT:  Yes.
12                  (Received and marked Defendant Santana's
13              Exhibit C-1 For Identification)
14      Q    Officer, I ask you to look at line 19; of
15  defendant's C for identification.
16      With reference to telephone calls, does it say, you
17  refused to make telephone calls?
18      A    That's correct.
19      Q    You never permitted my client an opportunity to
20  make a telephone call; is that correct?
21      A    No, it wasn't that he wasn't permitted, he didn't
22  ask for one and even when I asked for the number of a
23  relative, he wouldn't give it to me.
24      Q    Officer, listen to the question, if you have
25  trouble understanding the question, I will repeat the
```

NYCLD_023652

P-APP000254

1    People Reynold Cross (Mr. Rivera)  T-4   950

2 question.

3    You did not ask my client if he wanted to make a

4 telephone call; is that correct?

5   A  That's correct.

6   Q  In other words, it's not that my client refused to

7 make a telephone call, he was never given the opportunity to

8 make a telephone call; is that correct?

9   A  No.

10   Q  It's not correct?

11   A  It's not correct.

12   Q  You didn't ask him though, you didn't ask him to

13 make a telephone call?

14   A  That's right.

15   Q  You didn't ask him if he wanted to make a

16 telephone call; is that right?

17   A  That's correct.

18   Q  You assumed that if he wanted to make a telephone

19 call he would have asked you; is that correct?

20   A  Yes.

21   Q  Even though he was 14 years of age; is that

22 correct?

23   A  That's correct.

24   Q  That same information is repeated on C-2, the same

25 number, number 19, is that correct?  That he refused to make

NYCLD_023653

P-APP000255

```
 1         People Reynold Cross (Mr. Rivera)     T-4         951

 2    a telephone call; is that correct?

 3         A     That's the same.

 4               THE COURT:   C-2?

 5         Q     I'm sorry, C-1.

 6         A     It's a photo to state the same thing.

 7         Q     Is that a Photostat?

 8         A     The same thing.

 9         Q     Officer, you had the authority to release at least

10    4 of the boys at 2 or 3:00 o'clock in the morning on the

11    morning of April the 20th, is that correct?

12         A     That's correct.

13         Q     You did not release them; is that correct?

14         A     That's correct.

15         Q     You indicated the reason why you didn't release

16    them was you wanted to make it easier for them; is that

17    correct?

18         A     That's correct.

19         Q     Instead of having to come to court the next

20    morning you had given them a longer adjournment date; is

21    that correct?

22         A     That's correct.

23         Q     Now, officer, if they had gone to court on the

24    morning of April the 20th, you would have to be there; is

25    that correct?
```

LDI

NYCLD_023654

P-APP000256

```
 1          People Reynold Cross (Mr. Rivera)    T-4        952

 2     A     That's correct.

 3     Q     So, it was also for your convenience; is that

 4  correct?

 5     A     That's correct.

 6     Q     It just wasn't strictly for the parents and the

 7  juveniles, it's also for you?

 8     A     For everybody's convenience.

 9     Q     You were concerned about the parents and the

10  juveniles also?

11     A     That's correct.

12     Q     Now, you testified as to a conversation between

13  Raymond Santana and Kevin Richardson; is that correct?

14     A     That is correct.

15     Q     And the words were, to the effect, that if we have

16  to go to Spofford House, we will stick together or words to

17  that effect?

18     A     A little different then that.

19     Q     Words to that effect?

20           MS. LEDERER:  Objection.

21           THE COURT:  Those are some of the words, you

22           left out a couple.

23     Q     What time did this conversation take place,

24  Officer?

25     A     Let's see, it was about 2:15, 2:10.
```

LDI

NYCLD_023655

```
1              People Reynold Cross (Mr. Rivera)     T-4        953

2        Q    This was at 2:10 in the morning; is that correct?

3        A    Yes.

4        Q    This was after you spoke to Raymond Santana's

5   sister; is that correct?

6        A    No.

7        Q    What time -- WITHDRAWN.

8             Did you call Raymond Santana's sister?

9        A    Yes.

10       Q    What time did you call his sister?

11       A    About 2:15.

12       Q    This conversation took place at about 2:15; is

13  that correct?

14       A    Yes.

15       Q    Was this before or after you called his sister?

16       A    Before I called his sister.

17       Q    Mrs. Cuffee was at the precinct all ready; is that

18  correct?

19       A    Yes.

20       Q    The conversation between Kevin Richards, Mrs.

21  Cuffee and yourself, took place much, much earlier; is that

22  correct?

23       A    Yes.

24       Q    During that conversation you indicated to Kevin

25  Richardson, and his mother, that Kevin will be going home
```

LDI

NYCLD_023656

P-APP000258

```
 1            People Reynold Cross (Mr. Rivera)      T-4         954

 2    soon; is that correct?

 3            A    That's correct.

 4            Q    Officer, you never saw Raymond Santana exit the

 5    park on the morning of April the 19th; is that correct?

 6            A    On the morning, no.

 7            Q    Withdrawn.  On the evening of April the 19th, is

 8    that correct?

 9            A    That's correct.

10            Q    The first time you saw Raymond Santana was outside

11    the park; isn't that correct?

12            A    That's correct.

13            Q    That's on the westerly side of Central Park West

14    and 102nd Street?

15            A    That's correct.

16            Q    And when you spoke to Raymond Santana's

17    grandmother, you never made any notations about your

18    conversation with her; is that correct?

19            A    That's correct.

20            Q    When you saw the juveniles sleeping at 3:30 on the

21    morning of April the 20th, you indicated they were sleeping

22    on the floor?

23            A    Some were on the floor, some were in chairs.

24            Q    The ones that were in chairs, were they sleeping,

25    sitting up?
```

LDI

1          People Reynold Cross (Mr. Rivera)      T-4          955

2          A     No, they were swivel chairs that reclined.    They

3     were like reclined against the walls on the corners.

4          Q     They were sitting down with the head back; is that

5     correct?

6          A     That's correct.

7          Q     The feet were stretched out; is that correct?

8          A     I don't recall where there feet were.

9          Q     The ones that were sleeping on the floor, they

10    just plopped down on the floor and were laying straight on

11    the floor; is that correct?

12         A     Pretty much, yes.

13         Q     How many people were sleeping on the floor?

14         A     I don't recall.

15         Q     Do you recall if Raymond Santana was sleeping in a

16    chair or on the floor?

17         A     I don't recall.

18         Q     Officer, the area of Central Park West between

19    101st and 102nd Street, there are apartment buildings on

20    that side of the street; is that correct?

21         A     That's correct.

22         Q     Many of these are coops; is that correct?

23         A     Yes.

24         Q     The further up you go, you find coops and

25    tenements; is that right?

LDI

NYCLD_023658

1          People Reynold Cross (Mr. Rivera)      T-4        956

2     A    Excuse me?

3     Q    You find coop partments and tenenemt houses?

4     A    Yes.

5     Q    That's a mixed neighborhood; is that correct?

6     A    Yes.

7     Q    You have black youths living there and you have

8     Hispanic and white youths living there; is that correct?

9     A    That is correct.

10    Q    One more second, judge.

11         The door to the juvenile room is kept closed all

12    the time?

13    A    I believe so.

14    Q    And you have parents that would pop in their heads

15    every once in a while and attempt to talk to you, but the

16    door was always kept closeed?

17    A    Yes.

18    Q    And other than Mrs Cuffee speaking to her son, no

19    other parent spoke to their child; is that correct?

20    A    I don't recall.

21    Q    The five juveniles were together; is that correct?

22    A    Yes.

23    Q    They were talking to each other; is that correct?

24    A    Yes.

25    Q    They were kept together for a considerable period

LDI

NYCLD_023659

P-APP000261

1              People Reynold Cross (Mr. Rivera)     T-4          957

2    of time; is that correct?

3         A    Yes.

4         Q    What time were they separated?

5         A    It was 5:30, four of them were brought into the

6    clerical office, but they were still together and while

7    Lamont McCall was being interviewed.

8         Q    The clerical office is where the parents were

9    being kept?

10        A    Yes.

11        Q    It was only for a short period of time when

12   parents and juveniles were together; is that correct?

13        A    Yes.

14             MR. RIVERA:  No further questions.

15             Wait a minute, judge.

16             (Whereupon, a discussion was held at the

17             bench on the record as follows:)

18             MR. BURNS:  Judge, I have a few questions,

19             which I thought he has left the answers that I was

20             given in view of what was said to me, I think I

21             would like to clear it up.

22             THE COURT:  Like what?

23             MR. BURNS:  It will be very short.

24             THE COURT:  You already had a shot.

25             MR. BURNS:  I understand that.

LDI

NYCLD_023660

P-APP000262

```
1       People Reynold Cross (Mr. Rivera)      T-4        958

2               I understood him to say that the first

3       reports that he had gotten relative to numerous

4       assaults in the park was started at 9:30.  That he

5       denied telling Detectives Rosario that it was a

6       time earlier than 9.

7               MR. RIVERA:  Did he say anything other then

8       that?

9               MR. BURNS:  Then in relation.

10              MS. LEDERER:  Clear it up.

11              MR. BURNS:  Excuse me?

12              MS. LEDERER:  I just wanted to suggest, if

13      I'm going to do redirect, maybe we can save time.

14      If I do redirect, you can do recross.  I intended

15      to ask him some questions.

16              THE COURT:  Let's follow the order.

17              MR. BURNS:  All right.

18              THE COURT:  So the questions don't satisfy

19      you.

20              MR. BURNS:  Thank you so much.

21              THE COURT:  We don't have very much left.

22              MR. BURNS:  Thank you, so much.

23              (Following occurred in open Court.)

24  REDIRECT EXAMINATION

25  BY MS. LEDERER:
```

LDI

NYCLD_023661

P-APP000263

```
 1              People Reynolds Redirect              959

 2       Q     If I can ask, please, that the witness be shown

 3  what is Salaam -- excuse me, Salaam I for identification and

 4  McCray C for identification.

 5              (Handed to the witness.)

 6       Q     Do you recognize what those two documents are?

 7       A     Yes.

 8       Q     What type -- what is the name of that type of

 9  police report?

10       A     It's called a DD-5.

11       Q     Did you prepare those DD-5's?

12       A     No.

13              MR. JOSEPH:   Objection, they are not in

14              evidence.

15              THE COURT:   He not reading from them, he was

16              just asked if he prepared them.

17       Q     Do you know who prepared those two exhibits that

18  you're holding?

19       A     Yes.

20       Q     Who was that?

21       A     Detective Rosario.

22       Q     Did Detective Rosario type those reports out in

23  front of you?

24              MR. JOSEPH:   Objection.

25              THE COURT:   I will let's him answer.
```

LDI

NYCLD_023662

P-APP000264

```
 1                  People Reynolds Redirect              960

 2        A     No.

 3        Q     Did you ever review those records after Detective

 4   Rosario prepared them, for accuracy?

 5        A     No.

 6        Q     Were you ever shown those reports and asked by

 7   Detective Rosario, is this accurate the way I have recorded

 8   it here?

 9        A     No.

10        Q     Did you ever check it in any way after it was

11   prepared to make sure that it conformed with what you had

12   told him?

13        A     No.

14              MS. LEDERER:   Thank you.

15        Q     Those two exhibits you were just looking at, are

16   these two copies of the same DD 5 or do they reflect two

17   separate interviews?

18        A     Same DD-5, same copies of the same one.

19        Q     I ask you to take out -- I'm sorry, it's the same

20   report?

21        A     Yes.

22        Q     At the time -- withdrawn.

23              You had certain conversations with the family

24   members and parents who arrived on behalf of the five people

25   who were in custody on the night of the 19th and the early
```

NYCLD_023663

P-APP000265

1

2     morning hours of April 20th, is that correct?

3          A     Yes.

4          Q     In some of those conversations did you explain to

5     the parents and family members who had arrived, what

6     procedure was in place for the handling of juvenile arrests?

7          A     Yes.

8                    MR. JOSEPH:   Objection.

9                    THE COURT:   I will allow it.

10         Q     In the course of those conversations, did you

11    explain to the family members the situation with respect to

12    whether the case would be on in court the next day, April

13    20th, or in a future date?

14         A     Yes.

15         Q     Would you tell us, please, what did you say to

16    those people?

17         A     I explained to them that if they wait for Raymond

18    Santana's parents to come, that I can give them a desk

19    appearance ticket for all their children, like a week or two

20    in the future.  They won't have to spend the entire night

21    here and then spend the day in family court.  If any of them

22    had jobs that they have to go to, they won't have to take

23    the day off from work and be inconvenienced any further, if

24    they can just wait a couple of more hours for Raymond

25    Santana's parents to come.


                              LDI

1

2              MR. RIVERA:  I would object, it's been asked

3          and answered.

4              THE COURT:  I will allow it.

5     Q    Did any of them indicate a preference when you

6    explained to them what the two alternatives were?

7              MR. JOSEPH:  Objection.

8              THE COURT:  I am allow it.

9     A    They preferred to wait.  I mean, they preferred to

10   wait the hour or two until his parents got there, so they

11   can go at a future date and not have to miss a day's work.

12             MR. RIVERA:  Objection.

13             THE COURT:  Overruled.

14    Q    During the time you were doing paper work in the

15   juvenile room, you indicated you were in the room with the

16   five people that had been taken into custody; is that

17   correct?

18    A    That's correct.

19    Q    During the time, were you completing the paper

20   work, -- withdrawn.

21        In order to complete that paper work, did you have to

22   seek any information from any of the five people who had

23   been taken into custody?

24    A    Yes.

25    Q    What types of items of information did you need

LDI

NYCLD_023665

1
2    from them?

3         A    I needed their names, addresses, height, weight,

4    parents names, addresses.

5         Q    In the course of completing paper work, did you

6    ask those people those questions in order to complete your

7    paper work?

8         A    Yes.

9         Q    Did you ask any --

10              MR. BURNS:  I'm sorry, for clarification the

11              people meaning the arrestees?

12              Is that what we are talking about?

13              THE WITNESS:   Yes.

14        Q    At any time while we are in the juvenile room

15   completing the paper work or any time until the first

16   interview began with Lamont McCall, did you ask any of the

17   people about there activities or the activity on the night

18   of April 19th of 1989 in Central Park?

19        A    No.

20              MR. RIVERA:  Objection.

21              THE COURT:  I will allow it.

22        Q    Would you describe, please, the layout of the

23   juvenile room?

24        A    It's, it's just basically an office with two

25   windows, one of which has an air-conditioner the other is

LDI

1                    People Reynolds Redirect              964

2    painted over.  We have approximately 5 desks in there with

3    seats, swivel chairs at each desk.  Then there is one, a

4    door that you go into that leads into the clerical office

5    where the civilians were.

6         Q    Is there any kind of holding cell or a jail pen in

7    that room?

8         A    No, nothing like that.

9         Q    Is there a bathroom facility adjacent to that or

10   off in that room?

11        A    Yes.

12        Q    On that night or on any other night, are any adult

13   prisoners held in that room?

14        A    Never.

15        Q    You indicated that in response to a radio

16   communication from Officer Alverez, you went to -- you told

17   us you went to a particular area.

18        Would you please step down and approach the map, the

19   People's Exhibit in evidence and point out the area where

20   you went.

21        A    Right here, the eastdrive and 102nd Street, the

22   exit and entrance going out of the park on the eastside to

23   Fifth Avenue.

24             MS. LEDERER:   Thank you, very much.  You may

25             resume the witness stand.

                            LDI

P-APP000269

1

2      Q      You told us that all of the people who had been

3    arrested, all of the juveniles but for one, were asleep

4    during that night?

5      A      Yes.

6      Q      Who was the one who did not sleep?

7      A      Clarence Thomas.

8      Q      Would you describe please the circumstances under

9    which Raymond Santana made the statements that you have

10   described about going to Spofford?

11     A      What happened was, we, Officer Powers had tried to

12   contact his father.

13             MR. RIVERA:  Objection.

14             THE COURT:  I will allow it.

15     A      Let's see, at approximately 2 o'clock Officer

16   Powers tried to contact his father again.  We called up his

17   house, there was no answer.  So Bobby had called him in

18   front of me.  He told me that there was no answer at his

19   fathers house.  We looked at each other.  I said, hopefully

20   we won't have to send him to Spoffard.  So we sat down for a

21   bit, we asked them if there was anyone else we can call and

22   they said, no.  I over heard him saying to Kevin Richardson,

23   yes, we are going to Spoffard, we are going to fuck up

24   everybody that gets in their way.  I thought he wanted to

25   go.  That's when I told him to give me another number, there

LDI

1
2    has to be somebody that we could call.  That's when he told
3    me the other number to his sister.
4         Q    You were asked by Mr. Rivera, when in the course
5    of your work on this case, was the first time that you saw
6    someone from the District Attorney's Office?  When was that?
7         A    That was the next night, the night of the 20th.
8         Q    Where was that?
9         A    That was the 20th Precinct.
10        Q    You were asked a series of questions by Mr. Rivera
11   regarding statements that Raymond Santana made to you at the
12   time that he was first detained by you and Officer Powers.
13   I believe, Mr. Rivera, was asking you about notes that you
14   made and a memo book, is that right?
15             Do you recall the exchange that I'm referring to?
16        A    Yes.
17        Q    For what reason did it strike you as significant
18   that no other information was offered by Raymond Santana at
19   that time regarding what he he said to you?
20             MR. BURNS:  Objection.
21             THE COURT:  Objection sustained.
22             MS. LEDERER:  Can we approach for a minute?
23             THE COURT:  Yes.
24             (Whereupon, a discussion was held at the
25             bench  on the record as follows:)

LDI

```
 1              People Reynolds Redirect            967
 2         MS. LEDERER:  I would not have asked it, had
 3    Mr. Rivera not spent sometime on cross examination
 4    saying that you thought, and you wrote down, and
 5    you didn't ask him that, but you thought it was
 6    significant and you didn't elaborate.  And I think
 7    it's fair to bring out.  I mean, if the Officer
 8    thought that he was -- I will ask him in a leading
 9    way, if that's how I have to do it.  Make sure
10    that the Officer understands what I'm asking.  I
11    think it's a strange area of cross examination and
12    it opens the door to bring out that he thought
13    that he was lying, because of having seen him with
14    the group.
15         MR. BURNS:  My objection, judge, which was
16    that it was not verbalized is to form, the form of
17    the question.
18         THE COURT:  Read the question back.
19         (Read back.)
20         THE COURT:  I'll sustain the objection.
21         MR. RIVERA:   That's not what I asked him.
22         MS. LEDERER:  I think I should be permitted
23    to ask him about the circumstances.  I mean, why
24    is it proper cross examination.
25         THE COURT:  You can ask him about his making
```

LDI

```
 1              People Reynolds Redirect              968

 2       the entry, but what they thought is not

 3       significant.  I don't see why that's relevant.

 4            MR. RIVERA:  I asked him about the entry.

 5            THE COURT:  That's right.

 6            MS. LEDERER:  All right.

 7            MR. RIVERA:  That's what I just asked him

 8       about.

 9            MS. LEDERER:  Let me find out the place about

10       the entry.  The defendant Santana stated he did

11       not know the others that plead and that he had

12       just come from a girl friend's house.  He did not

13       elaborate, and where and when.  You thought that

14       it was significant, he did not.  You asked him --

15            MR. RIVERA:   I thought it was significant,

16       he wrote it down.  He did not elaborate.  Notice

17       of writing it down.

18            MS. LEDERER:  Well, then is it acceptable for

19       me, to go for me, to ask him why did he?

20            THE COURT:  Where is the part?

21            MS. LEDERER:  It's right here.  He did not

22       elaborate anywhere or when --

23            THE COURT:  Yes.

24            MS. LEDERER:  He is permitted to ask him

25       whether he thought it was significant to write
```

LDI

NYCLD_023671

P-APP000273

1

2      down.  He thought it was significant enough to

3      write down.

4           THE COURT:  He is going to say that he

5      thought he was lying know.

6           I'll not allow that.

7           MS. LEDERER:  I didn't want to preclude it,

8      but that was an area, I mean -- Mr. Rivera opened

9      the door wide.

10          THE COURT:  I'm not going to allow the

11     question.

12          (Following occurred in open court.)

13          THE COURT:  We will take a short recess,

14     members of the jury please, don't discuss the

15     case.

16          (Jury left courtroom.)

17          (A recess was taken.)

18          (After the recess the following occurred.)

19          THE COURT:  People ready?

20          MS. LEDERER:  Yes.

21          THE COURT:  Defendants ready?

22          THE COURT OFFICER:  Jury entering.

23          (Jury entered courtroom.)

24          THE CLERK:  Defendants, their attorneys, the

25     Assistant District Attorney and all sworn jurors

LDI

NYCLD_023672

P-APP000274

1

2        are present.

3            Officer Reynolds, you're still under oath.

4    REDIRECT EXAMINATION CON'D

5    BY MS. LEDERER:

6        Q    Officer Reynolds, directing your attention when

7    you were at the apartment of Antron McCray on April 20th?

8            MR. BURNS:  I can't hear.  Can you speak a

9            little louder, please.

10       Q    Directing your attention to April 20th of 1989,

11   when you went to the home of Antron McCray, did there come a

12   time while you were at that apartment that there was some

13   conversation about Antron McCray's clothing?

14       A    Yes.

15       Q    Was there conversation about the clothing that he

16   had worn on the evening of April 19th of 1989?

17       A    Yes.

18       Q    Did there come a time when Antron McCray wore the

19   clothing leaving the apartment that he had worn on April

20   19th, 1989?

21       A    Yes.

22       Q    How did it come about that Antron McCray left the

23   apartment, when he left the apartment?

24       A    Detective Rosario asked Antron and his father, if

25   he could wear the clothes that he had on the night before.

LDI

NYCLD_023673

P-APP000275

1

2    Q    What, if anything, did Mr. McCray and Antron

3    McCray say when Detective Rosario made that request?

4                    MR. BURNS:  Objection.

5                    THE COURT:  Overruled.

6    A    He said, that they didn't seem to have any

7    objection to it.

8                    MR. JOSEPH:  Objection.

9                    THE COURT:  You said, they didn't say

10              anything?

11                   THE WITNESS:   They didn't object.

12                   THE COURT:  They didn't.

13   Q    After that request was made, what, if anything,

14   did you see Antron do?

15   A    What happened was, he went back into a room.  In

16   the back, I believe, it was his room and I couldn't see him.

17   But when he came back out, he had the clothes on with the

18   dried mud all over it.

19   Q    Were those different clothes that he had been

20   wearing when he first came to the apartment?

21   A    Yes.

22                   MS. LEDERER:  I ask if this could please be

23              marked as People's 29 for Identification.

24                   (Received and marked People's Exhibit 29

25              For Identification)

LDI

NYCLD_023674

P-APP000276

```
 1                   People Reynolds Redirect              972

 2       Q     Do you recognize what People's 29 for

 3  identification is?

 4       A     Yes.

 5       Q     What do you recognize it to be?

 6       A     This is a page in the desk blotter from the

 7  Central Park Precinct.

 8       Q     Does that page refer to a particular date?

 9       A     Yes.

10             THE COURT:   What?

11       Q     Does it refer to a particular date?

12       A     Yes.

13       Q     Excuse me.   I would like to direct your attention

14  to the lower portion of that page and asks you to look at

15  that.

16       Does that refresh your recollection as to whether any

17  of the five arrested individuals on the night of April 19th,

18  of 1989 had any money with them when they were brought to

19  the precinct?

20             MR. BURNS:   Objection.

21             THE COURT:   I will allow it.

22       A     Yes, it does.

23       Q     I would ask you if you could tell us with respect

24  to each individual, how much money, if any, they had with

25  them?
```

                                    LDI

NYCLD_023675

P-APP000277

```
 1                         People Reynolds Redirect                973
 2                  MR. JOSEPH:  Objection, not relevant.
 3                  THE COURT:  I will allow it.
 4          A     None of them had money with the exception of Kevin
 5     Richardson, who had 9 dollars in U S currency.
 6          Q     Specifically Raymond Santana, does that refresh
 7     your recollection as to whether he had any currency with him
 8     on that night?
 9          A     Yes, he had no money.
10          Q     Earlier you made reference to Polaroid photographs
11     that were taken of the five people who were brought into the
12     precinct on the night of April 19th of 1989.
13          Is every person who is brought into the precinct under
14     arrest, photographed?
15          A     Yes.
16          Q     Are they all photographed with Polaroid
17     photographs taken of every person who is arrested and
18     brought into the precinct?
19          A     Yes.
20          Q     Directing your attention to the time -- what time
21     was it when you spoke to Lieutenant McInerny?
22          A     It was after 4:00, about 4:10.
23          Q     How much time elapsed from the time you had that
24     conversation with Lieutenant McInerny until the very first
25     interview began in the juvenile room?
```

LDI

1

2       A      About an hour, an hour and 20 minutes.

3       Q      On April 19th of 1989, how long had you been

4   working in the Central Park Precinct?

5       A      On that day?

6       Q      Right?

7       A      About two years.

8       Q      Were there any concerts or special activities

9   going on in Central Park on the evening of April 19th, 1989.

10                  MR. BURNS:   Objection.

11                  THE COURT:   No.

12      Q      When you came out of the park at 100th Street and

13   Central Park West, and you saw the group for the first time,

14   approximately how many people were in that group?

15      A      Approximately 10 to 20.

16      Q      Was there anything unusual about the size of that

17   group, at that location, on that night?

18                  MR. JOSEPH:   I would object to that.

19                  THE COURT:   I will allow it.

20      A      It was unusual.   There is no movie theaters, or no

21   social gathering places that I know of there, that would

22   result in a large group of youths coming out at one time.

23      Q      Based on your experience from the time you began

24   working in Central Park until that night of April 19th of

25   1989, did that strike you as an unusually large group of

LDI

1
2    young teenagers to see in that area?

3        A    Yes.

4             MR. JOSEPH:  Objection.

5             THE COURT:  I will allow it.

6        Q    How many juvenile rooms are there at the Central

7    Park Precinct?

8        A    There is one.

9        Q    How many were there on April 19th of 1989?

10       A    One.

11       Q    When you returned from your trip to the crime

12   scene, what time was it, again?  I'm referring to the early

13   morning of April 20th, 1989?

14       A    Approximately, 5, 5:15.

15       Q    At that time, did you see whether any of the

16   people who were in custody were eating?

17       A    Yes.

18       Q    Was Raymond Santana eating anything at that time?

19       A    Yes, I believe so.

20            MR. RIVERA:  Objection, I move to strike

21            that.

22            THE COURT:  Is that your best recollection,

23            he was or you're guessing?

24            THE WITNESS:   I'm pretty sure everybody was

25            eating.

LDI

NYCLD_023678

P-APP000280

1

2          MR. BURNS:  Was eating?

3          THE COURT:  Eating, yes.

4          MS. LEDERER:  Excuse me, just one minute.

5     Q    When, for the first time, did you see Raymond

6  Santana's grandmother at the precinct?

7     A    When I came back from the crime scene, about 5,

8  5:15.

9     Q    How long after when you first saw Raymond

10 Santana's grandmother at the precinct did the individual

11 interviews of the arrested young men begin?

12    A    Between 15 minutes and a half an hour.

13    Q    Did you ever speak to the complainant who was with

14 Police Officer Alverez?

15    A    No.

16         MS. LEDERER:  I have nothing further, thank

17         you.

18 RECROSS EXAMINATION

19 BY MR. JOSEPH:

20    Q    Just briefly.  Miss. Lederer was asking you about

21 going to Antron McCray's house, when you told us, you told

22 us that Antron wasn't wearing the clothes that he later put

23 on and was wearing to the precinct, correct?

24    A    Correct.

25    Q    As you tell us, one of the officers, one of the

LDI

NYCLD_023679

P-APP000281

```
 1              People Reynolds Recross (Mr. Joseph)           977

 2   detectives spoke to him and asked him to put on clothes?

 3                   MS. LEDERER:  Objection to form.

 4                   THE COURT:  Let's drop the first part.

 5        Q     One of the detectives spoke to Antron and his

 6   father about Antron putting on certain clothes?

 7        A     Yes.

 8        Q     Just so I understand, Antron went back into the

 9   apartment; is that right?

10        A     Back into his room.

11        Q     And you didn't accompany him?

12        A     No.

13        Q     No Police Officer accompanied him?

14        A     I believe Detective Rosario was there in the room,

15   he either stood at the doorway or went in.

16        Q     Okay.  You at that point didn't tell Antron

17   specifically what items of clothes to put on; is that right?

18        A     That's right.

19        Q     To your knowledge, Detective Rosario didn't

20   either, did he?

21        A     He asked him to put on the clothes he had on the

22   night before.

23        Q     But there was no description that your aware of

24   that existed as to what clothes Antron McCray had on the

25   night before?
```

LDI

NYCLD_023680

P-APP000282

1          People Reynolds Recross (Mr. Joseph)          978

2     A     That's correct.

3     Q     And what you did is just ask Antron to put on the

4   same clothes; is that right?

5     A     Excuse me?

6     Q     What the police officers do, when I say, you, you

7   police officers, told Antron to do was to put on the same

8   clothes, correct?

9     A     The other Officer did, Detective Rosario.

10     Q     And then Antron came out with the clothes that had

11   the mud on it, is that right?

12     A     That's correct.

13     Q     You hadn't heard the detective to say to Antron,

14   put the clothes on with the mud or anything like that?

15     A     No.

16     Q     That's something that Antron did, on his own, he

17   picked out the clothes and put them on?

18     A     That's correct.

19     Q     Now, Miss Lederer asked you something about the

20   juvenile room, that's a designation that's given to a

21   specific group, correct?

22     A     That's correct.

23     Q     And just so I understand it, so it's clear to the

24   jury.  That room is used for a variety of purposes?

25     A     Regarding juveniles or just --


                              LDI


NYCLD_023681

P-APP000283

People Reynolds Recross (Mr. Joseph)              979

1

2    Q    When it's not being used for juveniles, it can be

3    used for other purposes?

4    A    Yes.

5    Q    There is nothing, if I were to walk into that

6    room, there is nothing that would cause me to say, oh, this

7    must be a juvenile room?  There is nothing special about

8    that room; is that right?

9    A    Yes.

10    Q    What is it that's special about that room?

11    A    First of all there's a sign on the door that sits,

12    it's designated juvenile room.

13    Q    Assuming that sign wasn't on the door?

14    A    No -- excuse me.

15    Q    I'm asking, it is a room in the precinct that's

16    been designated for one reason or another as the juvenile

17    room?

18    A    Yes.

19    Q    When that room is not being used as a juvenile

20    room, it can be used by other purposes by police officers;

21    is that correct?

22    A    Correct.

23    Q    You were asked as well about, about information

24    that you obtained from the 5 boys that were arrested.  I

25    would like to ask you a little about that.

LDI

NYCLD_023682

P-APP000284

```
1                People Reynolds Recross (Mr. Joseph)        980

2          You stated that you had to ask them certain questions

3     or look at them to get their height and weights; is that

4     fair?

5          A    Can you repeat that?

6          Q    Let me rephrase it.  You got the height and

7     weights of the boys that were arrested?

8          A    Yes.

9          Q    And can you tell me either from your recollection

10    or if you don't recall by looking at your notes, the height

11    and weight of Lamont McCall, do you recall without looking

12    at your notes?

13         A    No.

14         Q    Okay, if you look at it, I'm going to ask you also

15    about Clarence Thomas, if you want to look at that.

16         A    Lamont McCall is about five feet four inches or

17    was at the time.

18         Q    How much did he weigh?

19         A    One hundred fifteen pounds.

20         Q    That's based upon speaking to him, plus your own

21    observations, I assume?

22         A    Yes.

23         Q    Clarence Thomas?

24         A    five-three, 110 pounds at the time of the arrest.

25         Q    Again, that's based upon speaking with him plus
```

LDI

NYCLD_023683

P-APP000285

```
 1                People Reynolds Recross (Mr. Joseph)           981
 2   your own observations?
 3        A    That's correct.
 4        Q    Would I be correct, that they are both male
 5   blacks?
 6        A    Yes.
 7        Q    Now, you told us that there were interviews that
 8   were conducted of several of the boys in the early morning
 9   hours of April 20th?
10        A    Yes.
11        Q    And you were present for two of those interviews?
12        A    That's correct.
13        Q    And specifically you were in the room with Lamont
14   McCall and Clarence Thomas; is that right?
15        A    That's right.
16        Q    I believe you told us you were not the one who was
17   asking questions of the boy on either of those occasions; is
18   that right?
19        A    That's right.
20        Q    It was one of the detectives that was asking
21   questions?
22        A    Yes.
23        Q    Was it Whelpley or Farrel or both that was asking
24   questions of the boys?
25        A    I believe they were both asking questions.
```

LDI

NYCLD_023684

P-APP000286

People Reynolds Recross (Mr. Joseph)                982

1

2      Q      At no point did you ask any questions?

3      A      No.

4      Q      But it was Whelpley and Farrel who interviewed

5   both Lamont McCall and Clarence Thomas?

6      A      Yes.

7      Q      When I use the words, interview of, they asked

8   them a series of questions throughout the time you were

9   speaking to them, is that right?

10     A      That's right.

11     Q      That was true for Lamont McCall and for Clarence

12  Thomas; is that right?

13     A      That's right.

14     Q      Are you aware of whether any written record was

15  made of those statements made by McCall and or Thomas?

16            MS. LEDERER:   Objection, I would ask to

17            approach, please.

18            THE COURT:   Come up.

19            (Whereupon, a discussion was held at the

20            bench on the record as follows:)

21            MS. LEDERER:   It was my understanding that it

22            would not be permissible to reason from the

23            behavior of the police in one interview as to

24            their behavior in the next, but if they are going

25            into that area of bringing out the behavior and

LDI

NYCLD_023685

P-APP000287

1    People Reynolds Recross (Mr. Joseph)          983

2    what was done in a particular interview, I mean, I

3    think that that will open the door.  That we will

4    be able to bring out the question of the Miranda

5    rights were given, the mother was present.  It's

6    my belief when we did this direct examine, that it

7    was my belief that it wasn't touched on, on cross

8    so it wouldn't come out.  You're getting real

9    close to opening the door, then that we can bring

10   out, these people were interviewed.  There are --

11   I don't want to get into it.

12        MR. JOSEPH:  Let me tell you, so you know.

13        THE COURT:  Keep your voice down.

14        MR. JOSEPH:  Let me tell you where I'm going,

15   so you will know.  All I want to establish with

16   him is that notes were taken and a written

17   statement was made, period.  I'm not getting into,

18   it's not my intent, to get into now or later or

19   ever, what was done in the room with each of these

20   other young men.  All I want to bring out is that

21   during the time he was in the room with Clarence

22   Thomas and Lamont McCall, a Police Officer went

23   in, either this Police Officer or another.  A

24   Police Officer made written notes and that a

25   report was made of what was said and that a

LDI

NYCLD_023686

P-APP000288

```
 1        People Reynolds Recross (Mr. Joseph)        984

 2        written statement was taken from the defendant.  I

 3        don't see any relevance as to whether --

 4             MS. LEDERER:  Are you talking about a signed

 5        statement?

 6             MR. JOSEPH:  Yes.

 7             MS. LEDERER:  Because, I believe, I don't

 8        believe a signed statement was taken.

 9             MR. JOSEPH:  Then, it wasn't.

10             MS. LEDERER:  But if your going into that, I

11        think we would rightfully have a position to get

12        in and ask whether Miranda warnings were read to

13        him.

14             MR. JOSEPH:  What is relevance?

15             THE COURT:  What is the point of your

16        question?

17             MR. JOSEPH:  The point of my question is, was

18        there a record made of the information provided by

19        the young boys or was it only known by those

20        people who would be in the room.  That's all I'm

21        getting at.

22             THE COURT:  Was there a record made?

23             MR. JOSEPH:  Was a written record made of

24        what Clarence Thomas said.

25             THE COURT:  Yes.
```

LDI

NYCLD_023687

P-APP000289

1      People Reynolds Recross (Mr. Joseph)          985

2              MR. JOSEPH:   And Lamont McCall made.

3              THE COURT:   Right.

4              MR. JOSEPH:   Or not?

5              THE COURT:   What is the significance of this,

6      is there a different procedure followed?

7              MR. JOSEPH:   I'm not concerned with the

8      procedure at all.

9              THE COURT:   What is the point?

10             MR. JOSEPH:   The substance of what was said.

11     It may well be, it may well be important to my

12     defense to establish that the police were aware of

13     certain information prior to the time that they

14     interviewed my client.

15             Now, if the police officers that interviewed

16     my client were not present in the room, then was

17     there any report or document that they could have

18     reviewed that would have shown what Lamont McCall

19     said or Clarence Thomas.

20             MS. LEDERER:   I don't think it's proper to

21     bring this out through this witness.   First of

22     all --

23             MR. JOSEPH:   Let me.

24             MS. LEDERER:   What is generated here doesn't

25     show that the Officer other Officer --

LDI

NYCLD_023688

P-APP000290

1          People Reynolds Recross (Mr. Joseph)          986

2                  THE COURT:  What?

3                  MS. LEDERER:  -- that the other Officer,

4          detective --

5                  MR. JOSEPH:  Then I won't ask.

6                  THE COURT:  Please, I will allow him to ask

7          whether a statement was taken from him.

8                  MR. JOSEPH:  Was recorded.

9                  MR. BURNS:  Was recorded?

10                 MR. JOSEPH:  Whether any written record of

11         what was said.

12                 MS. LEDERER:  Will we be permitted to thing

13         bring out additional stuff for procedure?

14                 THE COURT:  Like what?

15                 MS. LEDERER:  That Miranda rights were given

16         to them.

17                 THE COURT:  I will allow that also.  If you

18         ask one, I will allow the other.

19                 MR. JOSEPH:  You want me to do it?

20                 THE COURT:  Save reredirect.

21                 MR. JOSEPH:  I'm working on a tight schedule

22         here.

23                 (Following occurred in open court.)

24      Q   Officer Reynolds, taking you back a moment.

25          When you were in the room speaking with Lamont

LDI

P-APP000291

1          People Reynolds Recross (Mr. Joseph)          987

2     McCall, do you know whether he was informed of, I put it in

3     quotes, Miranda rights, whether he was given any warnings?

4          A     I was speaking to him about what?

5          Q     Let me.  There came a time when he was brought

6     into a room and you went in with two detectives who asked

7     some questions?

8          A     Yes.

9          Q     At that point, I think you said his mother was

10    present?

11         A     Yes.

12         Q     Was he informed of his Miranda warnings?

13         A     Yes.

14         Q     Then the questions were asked of him and he gave

15    certain answers?

16         A     Correct.

17         Q     Do you know whether any, whether you or either of

18    the detectives made any written record of what he said?

19         A     Not that I know of.

20         Q     You don't know that, whether there was any written

21    record made of what Clarence Thomas said?

22         A     That's right, I didn't take any notes.

23         Q     Do you, of your own knowledge, don't know whether

24    the other officers made a written record?

25         A     Right.


                              LDI


NYCLD_023690

P-APP000292

1                    People Reynolds Recross (Mr. Joseph)                988

2          Q     They may have, they may not have, that's not

3     something you know?

4          A     Right.

5          Q     Would your answers be the same as to Lamont

6     McCall?

7          A     Yes.

8          Q     You stated that there came a later time when

9     Clarence Thomas was questioned again; is that right?

10         A     Yes.

11         Q     And do you know whether a written record was made

12    at that time?

13         A     No, I don't recall.

14         Q     It may have been, it may not have been?

15         A     Right.

16         Q     Just as you sit here now, you have no means of

17    recollecting that fact, one way or the other?

18         A     No, I don't remember.

19         Q     But, again, when he was interviewed later he was

20    again informed of his Miranda warnings?

21         A     When we went back to his house?

22         Q     Yes.

23         A     I think he was, I don't remember.

24         Q     Okay.

25         A     That, I don't remember.


                              LDI

NYCLD_023691

P-APP000293

```
 1              People Reynolds Recross (Mr. Joseph)        989
 2        Q    All right.  And would I be correct that --
 3   withdrawn.
 4        You told us, both me and Mr. Rivera asked you
 5   questions, that you had conversations with detectives with
 6   chiefs, with police officers, some of which occurred on the
 7   19th, others on the 20th; is that right?
 8        A    Yes.
 9        Q    I think I may have confused the question or
10   confused myself earlier in talking to you earlier about
11   conversations with the chiefs; that didn't occur on April
12   19th, did it?
13        A    No.
14        Q    That was on the 20th sometime in the morning; is
15   that right?
16        A    That's right.
17        Q    And some of the detectives you spoke to were in
18   there on April 20th?
19        A    The detectives I spoke to?
20        Q    Yes?
21        A    On the 20th, 19th -- yes, the 20th.
22        Q    Would I be correct that Clarence Thomas was given
23   an appearance ticket and he left the precinct in the
24   morning, early morning hours of April 20th?
25        A    Yes.
```

LDI

```
 1              People Reynolds Recross (Mr. Burns)          990

 2         Q    And would I be correct that Lamont McCall was

 3    given an appearance ticket and he also left in the early

 4    morning hours of April 20th?

 5         A    That's correct.

 6              MR. JOSEPH:  I have no further questions.

 7    RECROSS EXAMINATION

 8    BY MR. BURNS:

 9         Q    On her redirect Miss Lederer asked you a question

10    as to you're going to the 102nd Street and the eastdrive, do

11    you recall that?

12         A    Yes.

13         Q    All right.  Now, I got over here to this position

14    to slow, I didn't hear what the question was.  I heard that,

15    that was your answer.  What time did you arrive at that

16    location?

17         A    I don't recall the time.

18         Q    Would it be -- well, would it be your testimony

19    that it would be -- withdrawn.  What time -- withdrawn.

20              You went to that location as a result of a transmission

21    that you had heard; is that true?

22         A    Yes.

23         Q    The transmission that was transmitted by Patrolman

24    Alverez; is that right?

25         A    Yes.
```

NYCLD_023693

P-APP000295

1              People Reynolds Recross (Mr. Burns)            991

2       Q    That's when you went to that location; is that

3    correct?

4       A    Yes.

5       Q    And you went there, did you arrive at that

6    location at 9:30 or before 9:30?

7       A    Probably after 9:30.

8       Q    As I understand it, you told me earlier that you

9    never told Detective Rosario anything about receiving or

10   hearing transmissions of numerous calls involving assaults

11   by roving bands, do you recall that?

12      A    I recall saying that that wasn't the original

13   radio run.

14      Q    Let's clarify it.  I thought I was asking the

15   question that prior to receiving the transmission, which

16   took you to the location at East 102nd Street, you had been

17   receiving a number of different transmissions involving

18   assaults by roving bands of teenagers consisting of male

19   black groups, prior to that?

20              MS. LEDERER:  Objection.

21      Q    That's what the question is I thought I was

22   asking?

23              MS. LEDERER:  Objection as to form.

24              THE COURT:  What is your question.

25      Q    Isn't that true, didn't you receive, didn't you

LDI

```
 1              People Reynolds Recross (Mr. Burns)        992

 2   receive those reports prior to 9:30?

 3        A    No.

 4              MR. BURNS:  Can I have this marked as, I

 5              think I'm up to J.

 6              (Received and marked Defendant Salaam's

 7              Exhibit J For Identification)

 8        Q    Is it your testimony that you never told Detective

 9   Rosario that those transmissions started at 9 o'clock on the

10   evening of April 19th?

11        A    That's correct.

12        Q    When you spoke to Detective Rosario you say that

13   was at the crime scene?

14        A    Yes.

15        Q    And that's the crime scene involving the female

16   jogger; isn't it?

17        A    Yes.

18        Q    When you spoke to Detective Rosario was he taking

19   notes?

20        A    I don't recall.

21        Q    I show you defendant Salaam's Exhibis J for

22   identification, and I ask you whether the writing and

23   notations appearing thereon are in your handwriting?

24        A    Yes, they are.

25        Q    And in your handwriting -- withdrawn.
```

LDI

1                People Reynolds Recross (Mr. Burns)          993

2                The Police Department in recording times, they

3     used the military system, the four hour system; is that

4     correct?

5          A    Yes.

6          Q    If they put a notation 2115, what would that

7     denote?

8          A    Time was 9:15 in the evening.

9          Q    Did you make such an entry relative to 9:15 in the

10    evening?

11         A    Yes.

12         Q    And is it not true -- I will ask you to examine

13    the rest of what is on the page.

14         Give it back to Officer Reynolds.  Please look at it.

15         I ask you that, is it not true that you had received

16    numerous transmissions which relate to assaults of

17    individuals in Central Park, the northern end of the park,

18    by roving bands of youngsters and that that started at 2115,

19    is that true?

20         A    No.

21         Q    Do you have such a notation in your memorandum in

22    your handwriting?

23         A    Yes.

24         Q    Do you have a notation which indicates that -- if

25    I can just look at it.

                              LDI

NYCLD_023696

P-APP000298

1           People Reynolds Recross (Mr. Burns)           994

2       Do you have a notation which says 2115 receiving

3   numerous calls of roving bands in, in upper part north of

4   the park.  Received 911 job and calls from the base.

5       Does such an entry appear in your memo book, in your

6   handwriting?

7       A    Yes.

8       Q    But is it your testimony that that entry that you

9   recorded, that that's not true?

10      A    It's --

11      Q    Yes, yes or no?

12           MS. LEDERER:  Objection.

13           THE COURT:  Is it true that's a correct

14      entry?

15           MR. BURNS:  Yes.

16           THE COURT:  Is it?

17      A    No, it's not a correct entry.

18      Q    But is the entry recorded as I posed the question?

19      A    Yes.

20      Q    Now, I noticed also that there is another time

21   listed where it has been changed.  The time has been

22   changed.  I direct your attention to that.

23      A    Yes.

24      Q    Do you recall what was written before it was

25   changed?

LDI

```
1              People Reynolds Recross (Mr. Burns)          995

2       A    No.

3       Q    In so far as the time was concerned?

4       A    No.

5       Q    Now, Officer Reynolds, you stated that the group

6   that you saw as you were exiting the park at 100th Street

7   and Central Park West, seemed unusually large to you?

8       A    Yes.

9       Q    Do you recall that?

10      A    Yes.

11      Q    Can you tell the jury what was so unusually large

12  about the number of people who you saw in the group, what

13  was it about them that made it seem so unusually large?

14              MR. JOSEPH:  I would object to that.

15              THE COURT:  I will allow it.

16      A    First of all, it was 10:30 at night on a school

17  night, while they should have been in school.  I thought it

18  was a little unusual that this many kids should be out in

19  the street, while it was a school night.  They should have

20  been home getting ready for the next day.

21      Q    I understand.

22      A    I never seen a group that large before, I have

23  been in the park over two years.

24      Q    Anything else, Officer Reynolds?

25      A    That's enough, I think.
```

LDI

NYCLD_023698

P-APP000300

```
 1              People Reynolds Recross (Mr. Rivera)        996

 2        Q    I see.  How about was it the fact that they were

 3   black and Hispanic, did that make the group seem unusually

 4   large in number?

 5        A    No.

 6        Q    I understand, thank you.

 7        A    You're welcome.

 8   RECROSS EXAMINATION

 9   BY MR. RIVERA:

10        Q    Officer, if you can recall, was the evening of

11   April the 19th, Passover?

12        A    I don't know.

13        Q    You have no idea?

14        A    No.

15        Q    You would have no idea whether school children

16   were home from school that day or the next day, would you?

17        A    Excuse me?

18        Q    You won't have any idea whether school children

19   were off from school either that day, the day of April the

20   19th or April the 20th, would you?

21        A    It wasn't the summer, I thought they would have

22   school.

23        Q    You would have no idea if it were a Jewish holiday

24   and school children were off the day of April 19th or the

25   day of April 20th, would you?
```

LDI

NYCLD_023699

P-APP000301

```
 1              People Reynolds Recross (Mr. Rivera)          997

 2       A    No.

 3       Q    You testified earlier today that various parents

 4  started coming in at about 12:00 o'clock midnight; is that

 5  correct?

 6       A    That's correct.

 7       Q    You had conversation with many of the parents; is

 8  that correct?

 9       A    That's correct.

10       Q    Did you have a conversation with all the parents?

11       A    No.

12       Q    So there were parents that you didn't have any

13  conversation with; is that correct?

14       A    Yes.

15       Q    Did you ever get together with all the parents and

16  have a conversation with all the parents at one time?

17       A    No, not all of them at one time, because they

18  weren't all there at one time.

19       Q    So, basically, you would wait for one of the

20  parents to come over to you and ask you a question and you

21  would answer that question; is that right?

22       A    I spoke to four sets of the parents at one time

23  and I had to wait for the 5th.

24       Q    You also testified that there was, you gave a

25  description of the juvenile room, you said there was some
```

LDI

NYCLD_023700

P-APP000302

```
 1          People Reynolds Recross (Mr. Rivera)          998

 2   chairs?

 3        A    Yes.

 4        Q    Are these the same stool chairs, the swivel chairs

 5   that the juveniles were sleeping on?

 6        A    Yes.

 7        Q    These are the same swivel chairs?

 8        A    The padded ones, yes.

 9        Q    They are metal padded swivel chairs?

10        A    Yes, swivel chairs.

11        Q    Did you ever go to the juveniles and ask them if

12   they wanted to go to Spoffard House?

13        A    No.

14        Q    You never gave that as an option to the two

15   juveniles; is that correct?

16        A    No.

17        Q    You testified also on canvassing the area; is that

18   correct?

19        A    Yes.

20        Q    When you were canvassing, you with not restriking

21   your canvassing to the roadway; is that correct?

22        A    That's pretty much correct.

23        Q    You were also going into the grassy areas all

24   over?

25        A    Certain areas, yes.
```

LDI

NYCLD_023701

P-APP000303

1               People Reynolds Recross (Mr. Rivera)          999

2          Q     Are you familiar with any movies on on the upper

3     eastside in Manhattan?

4          A     A couple.

5          Q     Are you familiar with any movie houses on 86th

6     Street.

7          A     No not on West 86th Street.

8          Q     Are there any movie houses on the 80's?

9          A     Where, on the west side?

10         Q     Westside?

11         A     Yes, yes.

12         Q     Are there any movies houses in the 90's.

13         A     Yes.

14         Q     Officer, you testified your tour of duty on April

15    the 19th was 4:00 to 12:00; is that correct?

16         A     Yes.

17         Q     You were working a 4:00 to 12:00 on that day; is

18    that correct?

19         A     Excuse me?

20         Q     You did not work a 4:00 to 12:00 on that date; is

21    that correct?

22         A     On the 19th?

23         Q     From the, right, on the 19th?

24         A     Yes, I did.

25         Q     But you stopped working at 12 midnight?

LDI

NYCLD_023702

P-APP000304

```
 1              People Reynolds Recross (Mr. Rivera)        1000

 2        A    No.

 3        Q    You continued working; is that correct?

 4        A    That's correct.

 5        Q    When did your tour of duty end?

 6        A    Saturday, about 3 in the morning.

 7        Q    You worked from 4:00 o'clock Wednesday afternoon

 8   until Saturday at 3 in the morning; is that correct?

 9        A    That's correct.

10        Q    That would be the 19th was a Wednesday, the 20th

11   was a Thursday, 21st was a Friday, the 22nd would be the

12   Saturday; is that correct?

13        A    That's correct.

14        Q    In other words, you worked four days; is that

15   correct?

16        A    That's correct.

17        Q    That's non-stop; is that correct?

18        A    Yes.

19        Q    You worked those four days on this investigation;

20   is that correct?

21        A    Excuse me?

22        Q    You worked those four days in this investigation;

23   is that correct?

24        A    Yes.

25        Q    Assisting the other officers in this
```

LDI

NYCLD_023703

P-APP000305

```
 1              People Reynolds Recross (Mr. Rivera)        1001
 2    investigation?
 3         A    Yes.
 4         Q    You discussed various aspects of this case with
 5    all the officers that were involved; is that correct?
 6         A    No.
 7         Q    You discussed various aspects with many of the
 8    police officers involved; is that correct?
 9         A    No, not really.
10         Q    You discussed this case with none of the police
11    officers that were assigned?
12         A    No, I didn't say that.  I discussed it with a few
13    of the detectives.
14         Q    A few of the detectives?
15         A    But not everybody.
16         Q    You discussed it with a few of the detectives; is
17    that correct?
18         A    Yes.
19         Q    How many detectives did you discuss this
20    investigation with?
21         A    I don't know, maybe 6 or 7.
22         Q    Officer, did you make the choice to have Lamont
23    McCall and Clarence Thomas be the first individuals who you
24    interviewed?
25         A    No, that was the detectives.
```

LDI

1          People Reynolds Recross (Mr. Rivera)          1002

2      Q    Do you know which detective made that decision?

3      A    No.

4      Q    Officer, you also indicated that you left the

5  precinct at about 4:15 in the morning; is that correct, on

6  April the 20th?

7      A    Yes.

8      Q    You went to the crime scene; is that correct?

9      A    Yes.

10     Q    When you call it the crime scene, what were you

11 referring to?

12     A    The area where the jogger was attacked.

13     Q    That would be, where exactly did you go, Officer,

14 can you show us on the map?

15     A    Down here in this area, what is called the lot.

16 That's north of the 102nd Street crossdrive.

17     Q    Just to repeat officer, north of the 102nd Street

18 cross drive; is that correct?

19     A    Yes, right in this area.

20     Q    That would be in the center of the east and the

21 west drive; is that correct?

22     A    More or less, yes.

23     Q    You may have a seat, Officer.  Were there other

24 police officers there?

25     A    Yes.

LDI

1              People Reynolds Recross (Mr. Rivera)          1003

2         Q    How many police officers did you see there?

3         A    It was pretty dark at that time, I couldn't tell

4    how many were there.

5         Q    Was it pretty crowded?

6         A    There were a few cars there.

7         Q    Say more than 10 police officers?

8         A    I don't know.

9         Q    How many cars did you see?

10        A    About 3, 3, 4.

11        Q    I'm sorry?

12        A    3, 4.

13        Q    3, 4?

14        A    3, 4.

15        Q    These are both police officers and detectives; is

16   that correct?

17        A    Yes.

18        Q    Some of the cars there belonged to the detectives;

19   is that right?

20        A    Yes.

21        Q    Would these be the automobiles belonging to

22   Detective Whelpley and the other detective?

23        A    I don't know which car was there.

24        Q    Did you see Detective Whelpley at that location?

25        A    No, I don't recall.


                              LDI

NYCLD_023706

P-APP000308

```
 1              People Reynolds Recross (Mr. Rivera)        1004

 2       Q     Do you recall the name of the detectives you saw

 3    at that location?

 4       A     Detective Rosario.

 5       Q     You saw Detective Rosario at that location?

 6       A     Yes.

 7       Q     Officer, did you discuss the case with Detective

 8    Rosario?

 9       A     Yes.

10       Q     Did he give you all the information -- withdrawn.

11       Did he discuss the case with you also, he gave you

12    information you were not privy to; is that correct?

13       A     Excuse me?

14       Q     He also discussed the case with you, he imparted

15    information to you; is that correct?

16       A     He just explained it, a woman's body had been

17    found at that point, that was all he had.  At least that's

18    all he told me.

19       Q     You testified that you spent about 40 minutes at

20    that location, is that correct?

21       A     About that.

22       Q     Then you went back to the precinct?

23       A     Yes.

24              MR. RIVERA:  I have no further questions,

25              Judge.
```

LDI

1
2    REREDIRECT EXAMINATION

3    BY MS. LEDERER:

4        Q     A few moments ago Mr. Burns showed you something

5    marked Salaam J for identification.  Do you remember what he

6    showed you?

7        A     I believe that was the steno pad that I made notes

8    in.

9        Q     Do you recall when you made those entries on that

10   steno pad?

11       A     It was the next day.

12       Q     When you made those entries, you put down the time

13   that certain things happened and what happened; is that

14   right?

15       A     That's correct.

16       Q     How did you arrive at the time that you put down

17   on that steno book page?

18       A     Some of the times were approximate.  When I got to

19   a time which I knew was definite, and I was able to back

20   track and realize that some of the times were off.

21       Q     At the time, excuse me?

22       A     I just realized that some of the times were off,

23   due to the amount of time I spent at each location and what

24   have you.

25       Q     At the time that you heard the radio run from

LDI

NYCLD_023708

P-APP000310

```
 1              People Reynolds Re-redirect              1006

 2    Officer Alverez, did you make any notes as were you driving

 3    around as to what time that radio transmission came?

 4         A    No.

 5         Q    Did you make any notations as to time, as to any

 6    of the transmission that you had received that night?

 7         A    No.

 8         Q    Did there come a time after you made the notes on

 9    Salaam J, that you had occasion to see something or listen

10    to something that refreshed your recollection as to the

11    timing that these calls came in?

12         A    Yes.

13              MR. BURNS:  I'm going to object, if she is

14              going to testify, Your Honor, she is leading and

15              suggestive.

16              THE COURT:  No speeches.

17              MR. BURNS:  I object, judge.

18              THE COURT:  Objection sustained.  Let him

19              tell what he did.

20         Q    Did anything refresh your memory or did anything

21    make you think that the times that you had put on the first

22    document, on Salaam J, were not accurate?

23              MR. BURNS:  It's the same objection.

24              THE COURT:  Overruled, it's going into the

25              answer.
```

LDI

1                    People Reynolds Re-redirect              1007

2        A      I listened to a 911 tape of the, you know, the

3    transmissions from that night and during the tape the

4    dispatcher at certain intervals gives the time from that.    I

5    realized that some of the times were off like 5, 10 minutes

6    in some cases.

7                    (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LDI

NYCLD_023710

P-APP000312

1

2    Q    When you looked at what Mr. Burns showed you as

3    Salaam's J, you indicated that there might be some

4    inaccuracy, what--

5          MS. LEDERER:  Mr. Burns, may I have Salaam's

6          J.

7          MR. BURNS:  I'm looking for it.

8          MS. LEDERER:  For the time being, if I could

9          show, with Mr. Burns' permission, if we could show

10         that as a copy of Salaam's J.

11    Q    You indicated that there were some errors that

12    appeared on that document?

13    A    Yes.

14    Q    And where did the errors appear?

15    A    The first error is the time 21:15, receiving the

16    numerous calls, that was 21:30.  And the other time also,

17    observing the, when I made the observation of the group

18    walking on Central Park West.  I realized that that time was

19    off also.

20    Q    And what time was the time that you saw the group

21    walking west on Central Park, excuse me, walking north on

22    Central Park west?

23    A    About 10:25.

24    Q    Other than the notations that refer to time, are

25    the entries that you've made about what you saw and what you

H. C. Davis

Reynolds-Ppl-recross (Burns)                    1009

2   heard, are those entries accurate?

3       A       Absolutely.

4       Q       Thank you.

5               MS. LEDERER:   I have nothing further.

6   RECROSS EXAMINATION

7   BY MR. BURNS:

8       Q       If I can just have it.   Let me see, your fist made

9   the entry the next day?   Right?

10      A       Yes.

11      Q       That was before you had listened to the 911 tapes?

12      A       That's correct.

13      Q       All right.   When did you listen to the 911 tapes in

14  relation to when you filled this out?   You said after, but

15  when, how much later?

16      A       I don't recall when I first heard them.

17      Q       Was it a week later, two weeks later, a month

18  later?   When did you realize that it was a mistake?   The

19  time of 21:15?

20      A       I don't recall.

21      Q       All right.   Well let me ask this question, are you

22  saying you never told Det. Rosario that those calls, those

23  transmissions started at nine o'clock and between, and 9:30,

24  are you saying that or are you saying something different?

25  Are you saying you don't remember telling Det. Rosario that?


                        H. C. Davis

1          Reynolds-Ppl-recross (Burns)                  1010

2      A    I couldn't have told him that, I walked out of the

3  stationhouse for a meal at nine o'clock.  As I was walking

4  out of the stationhouse we were definitely not getting those

5  radios runs.

6      Q    I see.  So, if he had it recorded somewhere,,

7  that's a mistake he made, because you never told him that?

8  Is that what you're saying?

9      A    That's right, yes.

10     Q    And you hadn't looked at, you hadn't listened to

11 the 911 tapes at that point, had you?

12     A    Excuse me?

13     Q    You hadn't listened to the 911 tapes at that point?

14     A    At what point?

15     Q    When you had spoken to Rosario, Det. Rosario?

16     A    Oh, no.

17     Q    Right.  And it was like sometime thereafter, and

18 you don't really recall exactly when, do you?

19              MS. LEDERER:  Excuse me, exactly when?

20              MR. BURNS:  You listened to the 911 tapes.

21              MS. LEDERER:  I just didn't understand.

22              MR. BURNS:  I'm not shouting.

23              THE COURT:  Do you understand the question?

24              THE WITNESS:  Not really, no.

25     Q    You don't know?


                    H. C. Davis


NYCLD_023713

P-APP000315

1    Reynolds-Ppl-recross (Burns)    1011

2    THE COURT:  He said he doesn't understand the

3    question.

4    THE WITNESS:  That's what I said.

5    Q    When did you listen to the 911 tapes?

6    A    I don't recall.

7    Q    And as you sit here today, you still don't recall,

8  isn't that true?

9    A    That's true.

10    Q    But you know that up until the time you listened to

11  the 911 tapes, did you believe that those numerous calls of

12  roving bands began at nine o'clock or 9:15?  Did you believe

13  that?

14    A    I didn't believe it started at nine, I always knew

15  it didn't start at nine o'clock.

16    Q    But do you believe it started at 9:15, at some

17  point?

18    A    Yes.

19    Q    And that would be at the point when you made the

20  entry in your book; is that correct?

21    A    That's correct.

22    Q    And you continued to have that belief until the

23  time came when you listened to the tapes, right?

24    A    Yes.

25    Q    Okay.  Did someone suggest to you that you listen

H. C. Davis

NYCLD_023714

P-APP000316

1          Reynolds-Ppl-recross (Burns)                1012

2    to the tapes?

3         A     Excuse me?

4         Q     Did someone suggest to you that you should listen

5    to the 911 tapes to get the time straight?

6               MS.   LEDERER:   Objection.

7         A     No.

8               THE COURT:   I'll let him answer.

9         A     No.

10        Q     Do you recall why you went to the tapes?

11        A     I listened to it to refresh my memory --

12        Q     I understand, but do you recall why?

13              THE COURT:   He's just trying to explain that

14              to you.

15              MR.   BURNS:   I don't want an explanation,

16              Judge, I just want a yes or no.

17              THE COURT:   What does why ask call for?

18              MR.   JOSEPH:   I never asked why.

19              THE COURT:   Read the question back, please.

20              (The reporter read back the last question.)

21              THE COURT:   Would you like to withdraw the

22              question?

23              MR.   BURNS:   No.

24        Q     Do you have a recollection now as to why you went?

25    That's not asking why you went, I'm just asking you do you

                         H.  C.  Davis

P-APP000317

1          Reynolds-Ppl-recross (Burns)              1013

2    have a recollection as to why you went?  Can you answer that

3    question, officer Reynolds?

4         A    Why I went?

5         Q    Yes, no, not why you went.  It's all right, I

6    understand.  I have nothing further.

7                    THE COURT:  Anything else?

8                    MR.  JOSEPH:  No.

9                    THE COURT:  Thank you, officer.

10                   All right ladies and gentlemen, we're going to

11                   recess for the day.  And we'll see you tomorrow

12                   morning at ten o'clock, hopefully.  And we will be

13                   ready to resume at that time.  Have a good

14                   evening.

15                   Don't discuss the case, don't let anyone talk

16                   to you about the case.  And don't visit the

17                   location that has been mentioned.  See you

18                   tomorrow morning.

19                   (Court adjourned for the July 2, 1990 to July

20                   3, 1990.)

21

22

23

24

25

                         H.  C.  Davis

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1693

answered, "Yes."

Q    Did either Raymond Santana or his father have  any

difficulty with the English language?

A    No, sir.

Q    After you read Raymond Santana and his father  the

Miranda warnings, did you begin an interview?

A    Yes, I did.

Q    Would  you  describe  for  the  Court  how  that

interview was conducted.

A    I asked Raymond Santana, Junior, to describe to me

what  happened the night before, April 19th. I gave  him  a

point  of reference, you know: "Where did you  meet?   What

time did you meet? Who were you with? Describe to me in as

much  detail as you can what happened.  I know you spoke  to

John  Hartigan.   You didn't speak to me yet.  This  is  the

first time I am hearing it.  Try not to leave anything  out.

Try  not  to be embarrassed.  Don't  be  embarrassed  about

anything in front of your father."

Once that was all agreed to, Santana spoke for about an

hour  orally,  I would say, back and forth.   I  asked  some

questions.   Then I advised him that I was going  to  reduce

this to writing.

Q    Did Detective Jonza ask any questions?

A    I believe he did.

NYCLD_018976

P-APP000319

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1694

Q    How about Raymond's father?

A    Raymond's father didn't ask any questions, no.

Q    You mentioned that there came a time when a written statement was prepared. Would you describe how that was done.

A    The whole interview began about ten after ten. On the heading of the written statement, I put down who was present in the room. I also put, using the military time that we use in the Police Department, 22:10 hours, which is ten after ten P.M. We didn't begin writing at ten after ten.

As I said, we did an oral, more or less, discussion for about an hour. I then reduced it to writing. It is contained on five lined pages of white paper.

MR. CLEMENTS: At this time I'd like to have this five page document marked People's 16 for identification.

(Whereupon the above referred to five page document was marked collectively as People's 16 for identification.)

Q    Do you recognize People's 16?

A    Yes, I do.

Q    What do you recognize it to be?

A    This is the written statement of Raymond Santana,

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1695

April 20, 1989, which was given to me, which was written   by

me in the 20th Precinct youth room.

Q    Is it signed by you as well?

A    Yes, it is.

Q    Is it in substantially the same condition   as   it

was on April 20th?

A    Yes, sir.

MR. CLEMENTS:  At this time I offer  People's

16 into evidence.

MR. RIVERA:  May I see it, your Honor.

THE COURT:  Yes.

(Handing to Mr. Rivera.)

MR. RIVERA:  No objection for the purpose  of

the hearing, your Honor.

THE COURT:  Mark it.

(Whereupon   the   statement   was   so   marked

People's Exhibit 16 in evidence.)

Q    Detective,  if you could look at People's  16  in

evidence, do any signatures appear on People's 16?

A    Yes, sir.

Q    Where do they appear?

A    Excuse me.  Pages one, two, three and four contain

the signatures of myself and Raymond Santana in the  margin.

Page five, which is the last page of the statement  contains

NYCLD_018978

P-APP000321

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1696

the signature of Raymond Santana, my own signature and  skip
one  line below that it's witnessed by, and it contains  the
signature  of  Raymond  Santana  Senior,  the  father,  and
Detective August Jonza.

Q    Could you explain to the Court the procedure  you
used  in  writing  out  the  statement  and  how   the  signatures
came to appear on the pages you just mentioned?

A    After  speaking  for  roughly  an  hour,  I'm  not
positive if it was an exact hour, approximately an hour.  I
then  began  to reduce it to writing.  On page one,  when  I
finished page one, page one was given to Raymond Santana and
his  father to read, as was every other page.  Each  page  I
asked  Raymond  to  initial or to sign.  He  signed  in  the
margin and I signed it.

Q    Did he sign as each page was created?

A    That's correct.  And at the end of the statement I
read  the entire statement to them.  I then gave it to  them
to  look it over and then I asked them also to sign  at  the
end  of the statement.  Raymond signed it first and  then  I
signed it, his father signed it and Jonza signed it.

Q    Were any corrections made?

A    No, sir, I don't believe.  Just let me check.  Not
to my knowledge, if I recall.  No corrections.

Q    How did the interview end?

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1697

A     It ended at 12:00 midnight. We used the military time. I used the military time, 2400 hours. The statement lasted for about -- between the oral and the written, the total was one hour and 50 minutes.

MR. BURNS: Fifty, five-0?

THE WITNESS: Five-0, that's correct.

MR. CLEMENTS: With the Court's permission may the witness read the statement?

MR. RIVERA: Objection.

MR. BURNS: It speaks for itself.

THE COURT: It's in evidence. It's not necessary.

Q     After midnight what did you do?

A     When the statement was completed I then asked Mr. Santana Senior if there was any -- did he have any questions about what was going to happen. He really didn't have that many questions except for how long he would be required to stay at the precinct. I advised him that the -- representatives from the District Attorney were present in the building and that at some time in the near future he would be required to sit with his son while he was also -- while he gave an oral statement which would be video taped for the District Attorney. He didn't have any objections to that and I told him it would be soon, maybe an hour, two

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1698

hours tops.

    Q    During the period you were conducting the interview in the youth room at the 20th Precinct did you or Detective Jonza make any promises to Raymond Santana?

    A    No, sir.

    Q    Did you or Detective Jonza make any threats to Raymond Santana?

    A    No, sir, none at all.

    Q    Did Raymond Santana stay in the youth room after the interview finished?

    A    No, sir.  Raymond and his dad were escorted out of the room, back upstairs to the 20th Squad.  Basically to the same area, the same desk, same seats and were asked to take a seat until we found out when the District Attorney would be ready for them.

    Q    Did there come a time that you left the 20th Precinct and went somewhere else?

    A    Yes, sir.  About 2:00 in the morning.

    Q    Where did you go?

    A    Myself and Jonza escorted Mr. Santana Senior and his son Raymond from the 20th Precinct, by unmarked car, we went from 82nd Street up to 100th Street to the 24th Precinct.

    Q    Why was the investigation moved from the 20th

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1699

Precinct to the 24th Precinct?

A       Sometime after we finished this written statement there was some discussion among a variety of the supervisors at the 20th Precinct, uniform and detectives, as to whether or not the room we just finished our statement in was the actual designated youth room.  To continue the investigation there was -- there was definitely some question as to which was the correct room. We decided to move to the 24th Precinct which had a designated youth room that everyone agreed upon and that's where we're going to video tape.

Q       Before this investigation began did you have any experience concerning the youth room at the 20th Precinct?

A       Yes, sir.  I had been assigned to Manhattan North for 21 years.  I'd been in and out of the 20th Precinct numerous times.  That's always been the youth room in my experience.

                    MR. JOSEPH:  Objection, your Honor.

                    THE COURT:  I'll allow it.

Q       The room you're speaking of is that 125, the one you indicated earlier?

A       That's correct.  It's the Youth Officer's room. It's always been.

Q       When you went to the 24th Precinct with Raymond Santana and his father and Detective Jonza where did you go

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1700

in the precinct?

A      Upon   arriving   at  the  24th  Precinct,   which  is
located   at   151   West  100th   Street   between   Columbus   and
Amsterdam   we   went   in   passed   the   uniform   desk   and   the
designated   youth   room  in  the  24th  is  on  the   first   floor.
It's actually a part of the muster room.

            MR. CLEMENTS:  At this time, with the Court's
            permission,  I'd  like  the  witness  to  get  off  the
            stand  and  look  at  People's  5  in  evidence.

            (Whereupon  the  witness  approached  People's   5
            in evidence.)

Q      Do  you  recognize  People's  5,  detective?

A      Yes, I do.

Q      What  do  you  recognize  it  to  be?

A      It's  a  schematic  of  the  24th  Precinct  first  floor.

Q      When  you  entered  the  24th  Precinct   with   Raymond
Santana and his father where did you go?

A      This  is  the  main  uniform  desk.   This  is  the  entry.
This  is  100th  Street.   We  entered.   The  desk  is  here.   There
are   some  closing  folding  doors  which  were  open  in  the   open
position.   This is the muster room.

            MR. CLEMENTS:  The  record  should  reflect   the
            witness  is  indicating  the  large  room  on  the  right-
            hand  side  of  the  exhibit,  about  the  middle.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1701

THE WITNESS:  Now straight back here -- this
is a partitioned group of offices.

Q    When you say "partitioned" do the walls go up  to
the ceiling?

A    No, they don't.  This area back here is designated
as the youth room.

MR. CLEMENTS:  The record should reflect that
the  officer  is  pointing  to  a  room  previously
marked by another witness as  room 101.

Q    Where did Raymond Santana and his father go as you
entered the precinct?

A    Along the back wall here, which would be the  east
wall  of the 24th Precinct.  Along the back wall is a  water
fountain here, a soda machine and there is a lot of  folding
metal chairs, metal desks, this is the room where roll  call
is  held  so there are a lot of scattered desks.  They  sat
against  the  wall  basically  waited  until  the  room  was
available to do the video tape.

Q    Did there come a time when Raymond Santana made an
oral statement that was recorded on video tape?

A    Yes.

Q    And where was that statement taken?

A    About 2:30 in the morning the -- now the 21st  of
April, the video tape statement was taken in this room by  a

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1702

video tape technician from the District Attorney's office. Present in the room seated at this desk on this side was Raymond Santana. Seated next to him was his father. Seated about here was myself. Next to me was Detective Bertaroyo (phon) who was the case officer from Central Park, who was in charge of the investigation. The Assistant District Attorney, Elizabeth Lederer, sat here and the video tape technician was back here and this is where the camera was set up.

      MR. CLEMENTS: Indicating the north east corner of the room.

      THE WITNESS: That is correct, the north east corner of the room.

      MR. CLEMENTS: You can resume the stand again, detective.

      (Whereupon Detective Sheehan resumed the witness stand.)

      MR. CLEMENTS: At this time I'd like to have this video tape marked People's 17 for identification.

      (Whereupon the video tape was so marked People's Exhibit 17 for identification.)

Q    Detective, do you recognize People's 17?

A    Yes, I do.

NYCLD_018985

P-APP000328

1725

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK : CRIMINAL TERM : PART 59

3    THE PEOPLE OF THE STATE OF NEW YORK

                                          Indictment
4             - against -               No. 4762/89

5    RAYMOND SANTANA, KHAREY WISE,
     YUSAF SALAAM, ANTRON MC CRAY,
6    KEVIN RICHARDSON, STEVE LOPEZ and
     MICHAEL BRISCO,

7
                                   Defendants.
8
                                 October 27, 1989
9

10   B E F O R E:

11             HONORABLE THOMAS B. GALLIGAN,

12                            Justice

13
               (Appearances as heretofore noted)
14

15                 *    *    *    *

16
               THE   COURT   CLERK:   Hearing   continued,
17
     People  of  the  State  of  New  York  versus
18
     Kharey  Wise,  Yusaf  Salaam,  Antron  McCray,
19
     Kevin  Richardson,  Steven  Lopez,  Michael
20
     Brisco,  Raymond  Santana;  Indictment  4762  of
21
     '89.
22
               THE  COURT:  Are we ready to proceed?  Is
23
     the officer outside?
24
               MS. LEDERER:  Yes.
25
               (Witness  entered  the  courtroom  and

NYCLD_019008

P-APP000329

1726

COLLOQUY

1   (resumed the stand.)

2   D E T.   S H E E H A N,

3   called as a witness on behalf of the People,

4   having been previously sworn, resumed the stand

5   and testified further as follows:

6           THE   COURT   CLERK:   Detective,   may   I

7           remind you you're still under oath.

8   CROSS EXAMINATION

9   BY MR. BERMAN:

10      Q   Detective Sheehan, my name is Jesse Berman.

11  I represent Steve Lopez.   I just want to ask you

12  about two small areas of your testimony.

13      You mentioned on your direct when we were last

14  here, you mentioned around two in the morning on

15  April 21st, you and Detective Jonza took one of the

16  suspects to the 24th Precinct because Room 125 of

17  the 20th Precinct might not have been the actual

18  designated Youth Room.   That's what I wanted to ask

19  you about, the designated Youth Room.

20      You   yourself   are   Manhattan-wide,   Manhattan

21  North-wide?

22      A   Manhattan North, yes, sir.

23      Q   But you have experience in and out of the

24  various Manhattan North precincts over the past

NYCLD_019009

P-APP000330

1  SHEEHAN — PEOPLE — CROSS — BERMAN                1727
2  several years?
3       A    For the past twenty-one years.
4       Q    And who was it that raised the issue with
5  you that Room 125 might not have been the actual
6  designated Youth Room at the 20th Precinct?
7       A    It wasn't actually raised with me.  There
8  was some discussion among the uniformed supervisors
9  in the 20th Precinct as to whether there was
10 actually a disagreement as to which was now the
11 designated room.
12      In my opinion that had always been the
13 designated room.  That's where the youth officer
14 hangs his hat, so to speak.
15      Q    In other words, that's where the desk of the
16 youth officer is?
17      A    That's where all the youth programs come out
18 of, that room.
19      Q    But the Youth Room, in the sense of the
20 Family Court ruling requiring designated Youth Room
21 for questioning purposes, that may be different?
22           MR. CLEMENTS:  Objection.
23           THE COURT:  I'll allow it.
24      A    There is an outside possibility.  It is
25 highly unusual.

NYCLD_019010

P-APP000331

1    Q    From your experience with Room 125 of the
2 20th Precinct up until April 21st of this year, that
3 room was also used for other purposes beyond the
4 Youth Room; isn't that right?

5    A    I always knew it to be the Youth Room. I
6 never had any other dealings in that precinct other
7 than whenever we dealt with the room, that's where
8 we conducted our investigation.

9    Q    As to investigate, specifically as to
10 questioning, is that where you always questioned
11 youths?

12    A    Yes, sir.

13    Q    Who actually brought it to your attention,
14 what you told us about? Did you happen to overhear
15 the supervisors talking about it or did someone say
16 it to you?

17    A    The detective supervisors brought it to my
18 attention. Quite naturally, I said, "Why are we
19 moving here? We already moved once." And it was
20 because of a difference of opinion, and until that
21 was settled, everyone concerned felt it better if
22 we're going to continue this with the video tapes,
23 let's go to the 24th. There will be no-- without
24 question, which is the designated Youth Room.

NYCLD_019011

P-APP000332

1    SHEEHAN — PEOPLE — CROSS — BERMAN

2        Q    Police officers, detectives in a precinct,

3    if they want to find out whether the Family Court

4    has designated a particular room as the Youth Room,

5    is there some bulletin board or manual someplace you

6    could go in a precinct to find out which is the

7    right room?

8                MR. CLEMENTS:  Objection.

9                THE COURT:  I will allow it.

10       A    I would assume so, probably somewhere behind

11   the desk.

12       Q    In other words, somewhere there is a written

13   order or ruling from Family Court kept on file, and

14   one could look up behind the desk and find out?

15       A    It's also common knowledge among the

16   officers and detectives who work there.

17       Q    When that common knowledge comes questioned

18   by somebody, supervisory personnel, one way to

19   resolve it is to look up the order and find out

20   which is the designated room for questioning youths;

21   is that right?

22                MR. CLEMENTS:  Objection.

23                THE COURT:  Sustained.

24       Q    You mentioned it had already been moved once

25   and your understanding was it had been moved from

NYCLD_019012

P-APP000333

1730

SHEEHAN - PEOPLE - CROSS - BERMAN

1  
2  the Central Park Precinct to the 20th Precinct, is

3  why?

4      A    We have had numerous investigations in

5  Central Park. The facilities are very poor, to say

6  the least. It is a very old building from the

7  1800's.

8      Q    Do you know whether, as of April 19th, 20th,

9  21st, of '89, there was a designated room for the

10  questioning of youths at the Central Park Precinct?

11      A    Yes, sir.

12      Q    And what room was that, as far as you know?

13      A    In my experience again, that room has always

14  been across the alleyway the auxilliary police and

15  the youth programs are kept, in the youth officer's

16  room.

17      Q    The room is actually a separate building,

18  isn't it?

19      A    Yes, it is.

20      Q    And it has more than one room?

21      A    Two rooms in all.

22      Q    Is it your testimony both of those rooms are

23  designated as the Youth Room, youth room for

24  questioning at the Central Park Precinct, or just

25  one of those rooms?

NYCLD_019013

P-APP000334

SHEEHAN - PEOPLE - CROSS - BERMAN

1    A    In my experience, I think you can use one of

those-- either one of those rooms since it is a

separate facility.

Q    You yourself have never seen the written

designation from the Family Court to see which rooms

apply in the Central Park Precinct?

A    No, I have not.

Q    And similarly, in the 20th Precinct you have

never seen the designation from Family Court?

A    No, I have not.

Q    I'm placing before you the diagram in

evidence of the first floor of the 20th Precinct,

which is People's 2 in evidence.

And could you come down and I'll ask you a

question.

A    Sure.

(Witness complies.)

Q    Room 25 appears, the number 125; is that

right?

A    Yes.

Q    Do you know where Room 107 would be?

A    No, I don't, sir.

Q    And is it fair to say that people coming in

SHEEHAN — PEOPLE — CROSS — BERMAN

1    and out of Room 125, such as, for example, to go to

2    the men's room back here at the upper righthand

3    corner of the diagram, would be visible to people

4    entering and exiting the precinct?

5         In other words, as they came out of the door of

6    125?

7                   MR. CLEMENTS:  Objection.

8                   THE COURT:  I'll allow it.

9         A    There's a door-- if you were questioning

10   somebody, you would have the door closed.

11        Q    I am saying if someone was going from Room

12   125 to the men's room, they would be visible to

13   people entering the precinct; is that right?

14        A    Yes, sir.

15        Q    And similarly, as they pass from Room 125 to

16   go around to the toilet, they would have to pass

17   right by the main desk, civilians, people standing

18   in front of the main desk for whatever reasons they

19   might be there?

20        A    That's right.

21        Q    When the press showed up at the 20th

22   Precinct, do you know where they were kept or where

23   they stayed?

24                   MR. CLEMENTS:  Objection.

1733

1   SHEEHAN - PEOPLE - CROSS - BERMAN

2        THE COURT:  Objection sustained.

3    Q    I guess you can go back to your seat.

4        (Witness complies.)

5    Q    Just one more thing about Room 125.  When

6    you say for a long time, as far as you knew, it had

7    been the Youth Room, going back how far did you

8    understand Room 125 to be the room designated for

9    questioning youths rather than where the youth

10   officer had his desk, but as far as the room for

11   questioning youths?

12   A    Since they opened that building.

13   Q    And that would be when?

14   A    That's in the early 70's.

15   Q    And the other area I wanted to ask you

16   about, you said that on the late afternoon or the

17   early evening of the 21st of April, over at the 24th

18   Precinct, you heard a lot of noise or loud noise in

19   a cell up on the second floor of the-- the holding

20   cell in the detective squad area; is that right?

21   A    Right.

22   Q    As to Steve Lopez, he was one of the people

23   in that cell at that time, is that right?

24   A    That's right.  He was visible to me also.

25   Q    And your best estimate of what time of day

NYCLD_019016

P-APP000337

SHEEHAN - PEOPLE - CROSS - BERMAN

1  that was?

2  A   I said I think early evening or late

3  afternoon. I'd have to say it was after 6:00. I'm

4  not sure exactly. I was off duty at nine and they

5  were in the cell sometime after six.

6  Q   And is it fair to say that you're aware that

7  Steve Lopez was originally taken in on unlawful

8  assembly charges but ultimately charged with much

9  serious charges?

10         MR. CLEMENTS:  Objection.

11         THE COURT:  Sustained.

12  Q   If you know.

13         THE COURT:  Sustained.

14  Q   That holding cell in the detective area on

15  the second floor of the 24th Precinct, is that a

16  cell reserved for youths?

17  A   No, sir.

18  Q   What is that cell generally used for?

19  A   It's reserved for prisoners.

20  Q   And under what circumstances are youths put

21  in that cell?

22  A   After they are charged, formally arrested.

23  Q   Do you know at what time Steve Lopez was put

24  in that cell?

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.    Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.    Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.    Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.    As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.    Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.    Not that I can think of. | 15:46:46 |
| 21 | Q.    I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.    As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

NYCLD_039089

P-APP000339

Linda Fairstein

Page 222

| | | |
|---|---|---|
| 1 | Q.    At that time, did you know | 15:47:29 |
| 2 | anything about the events in Central Park | 15:47:32 |
| 3 | on April 19th? | 15:47:35 |
| 4 | A.    I don't believe that I did. | 15:47:36 |
| 5 | Q.    You saw nothing on television, | 15:47:38 |
| 6 | you heard nothing from other sources? | 15:47:41 |
| 7 | A.    I didn't see anything on | 15:47:44 |
| 8 | television the night of the 19th.  I may | 15:47:46 |
| 9 | have heard a news, radio news report in | 15:47:50 |
| 10 | the morning, not about a rape, but about a | 15:47:53 |
| 11 | riot. | 15:47:58 |
| 12 | Q.    Do you know why Fiston called? | 15:47:59 |
| 13 | A.    Yes, I do. | 15:48:05 |
| 14 | Q.    Why? | 15:48:06 |
| 15 | A.    He called me shortly before nine | 15:48:07 |
| 16 | to tell me that a woman had been found | 15:48:10 |
| 17 | beaten, and presumably because of her | 15:48:22 |
| 18 | state of undress, sexually assaulted in | 15:48:24 |
| 19 | the ravine, and he had been called in | 15:48:28 |
| 20 | because there had been no sexual assault | 15:48:34 |
| 21 | allegation until that woman reached the | 15:48:38 |
| 22 | hospital. | 15:48:40 |
| 23 | Q.    What else did he tell you? | 15:48:41 |
| 24 | A.    He told me that the woman was as | 15:48:47 |
| 25 | yet unidentified, and he asked me in the | 15:48:52 |

NYCLD_039090

P-APP000340

Linda Fairstein

Page 223

| | | |
|---|---|---|
| 1 | usual course of prosecutorial business if | 15:48:57 |
| 2 | I would assign a prosecutor to work on the | 15:49:00 |
| 3 | prosecutorial events that might happen | 15:49:06 |
| 4 | later in the day because there were | 15:49:14 |
| 5 | already were suspects being questioned. | 15:49:16 |
| 6 | Q.    Did you make any notes about | 15:49:22 |
| 7 | this conversation? | 15:49:24 |
| 8 | A.    No. | 15:49:25 |
| 9 | Q.    Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.    Not that I recall. | 15:49:30 |
| 12 | Q.    Did he tell you anything else? | 15:49:31 |
| 13 | A.    At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.    Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.    Not exactly. | 15:49:57 |
| 24 | Q.    Why do you say that? | 15:49:58 |
| 25 | A.    Because it was not just a call | 15:50:00 |

NYCLD_039091

P-APP000341

Linda Fairstein

Page 224

| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

P-APP000342

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q.   So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ:  Objection.  You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A.   Those are not my words, sir.  I | 15:51:43 |
| 20 | didn't say they had no connection.  I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

P-APP000343

Linda Fairstein

Page 226

```
 1    more urgent need.  He wanted a prosecutor    15:52:00
 2    assigned, that was the main purpose of the    15:52:04
 3    call.                                         15:52:06
 4        Q.    Did he tell you that it appeared    15:52:06
 5    that a homicide was involved?                 15:52:08
 6        A.    No, he didn't tell me that.  He     15:52:09
 7    told me that the victim was in very grave     15:52:12
 8    condition.                                    15:52:18
 9        Q.    The question I think I forgot to    15:52:19
10    ask you earlier when you spoke of one         15:52:21
11    person who had knowledge about the            15:52:23
12    investigation from Ryan, who was that?        15:52:26
13        A.    Lisa Friel.                         15:52:30
14        Q.    Did you know what she had           15:52:31
15    learned from Ryan and how she knew about      15:52:36
16    it?                                           15:52:38
17        A.    I knew some of the things she       15:52:39
18    learned from Ryan.                            15:52:42
19        Q.    What did you learn from Friel?      15:52:43
20        A.    I knew from Friel the point at      15:52:45
21    which Ryan no longer wanted Mooney            15:52:55
22    involved in the investigation.                15:52:59
23              I knew from Friel that she, that    15:53:00
24    on a day, I came to know from Friel that      15:53:03
25    on a date that Ryan arranged with Mooney      15:53:08
```

NYCLD_039094

P-APP000344

T2-SC-TS

4945

1                    Fairstein - People - Direct

2       Q      Thank you.

3                    MS. LEDERER:  I have nothing further.

4  CROSS EXAMINATION

5  BY MR. BURNS:

6       Q      Good morning, Ms. Fairstein.

7       A      Good morning, Mr. Burns.

8       Q      Ms. Fairstein, when you went to the 20th Precinct,

9  had Ms. Lederer arrived before you?

10      A      Yes, she had.

11      Q      What time did you send Ms. Lederer to the 20th

12 Precinct?

13                   MS. LEDERER:  Objection.

14                   THE COURT:  I'll let her answer.

15      A      I didn't send her there.

16      Q      What time did you assign her in relation to this

17 investigation?

18      A      I believe it was around 9:15 on the morning of April

19 20th.

20      Q      Do you know what time she left to go to the 20th

21 Precinct?

22      A      More or less, yes.

23      Q      What time was that?

24      A      I believe it was about eight o'clock that evening.

25      Q      Now, had -- did the police department or any

NYCLD_015464

P-APP000345

T2-SC-TS

4946

1              Fairstein — People — Cross — Burns

2    representatives   of   the   police   department   ask   for   your

3    assistance in connection with this investigation?

4                   MS. LEDERER:  Objection.

5                   THE COURT:  I'll allow it.

6        A    Yes, they did ask for our assistance.

7        Q    At what point was that?

8                   MS. LEDERER:  Objection.

9                   THE COURT:  I'll allow it.

10       A    They first --

11       Q       No.   When was the first time they asked for the

12   assistance of the District Attorney's Office   in   relation   to

13   this investigation?

14       A     When I was called at nine o'clock on the morning of

15   the 20th, I was told I would be asked later   in   the   day   for

16   assistance.

17       Q          You   were   called   by   a   police   department

18   representative?

19       A    That's right.

20       Q    And was it   a   person   who   was   in   charge   of   the

21   investigation?

22                   MS. LEDERER:  Objection.

23                   THE COURT:  I'll let her answer.

24       A    It was one of the supervising officers, yes.

25       Q    When you arrived at eight o'clock -- I'm sorry, 8:30

P-APP000346

T2-SC-TS

4947

1                    Fairstein - People - Cross - Burns

2    --

3         A    A little after 8:30.

4         Q    -- Ms. Lederer was already there, is that right?

5         A    Yes.

6         Q         And you went inside and went up to the 2nd floor

7    detective room?

8         A    Yes, I did.

9         Q    Ms. Lederer was there?

10        A    Yes, she was.

11        Q    Had any video begun?

12        A    No.

13        Q    Had any questioning or talking to people, had any of

14   that begun at the time that you arrived?

15             MS. LEDERER:   Objection.

16             THE COURT:   If she knows, I'll let her answer.

17        A    Yes, it had.

18        Q    At any time prior to your arrival, did you have

19   occasion to go to Metropolitan Hospital?

20        A    No, sir.

21        Q         And did you have an occasion to speak to the

22   officers who had -- the officers who had discovered the body

23   of the female jogger?

24             MS. LEDERER:   At what point?

25        Q         Prior to your arrival at the precinct, at

NYCLD_015466

P-APP000347

T2A-SC-TS

4948

Fairstein - People - Cross - Burns

1        approximately 8:30 in the evening of the 20th.

2

3        A    Prior to my arrival, no.

4        Q    Incidentally, the telephone call that you received

5   about nine o'clock, that was in relation to asking the

6   District Attorney's Office for assistance in connection with

7   the investigation relative to the female jogger?

8        A    In part, yes.

9        Q    You're the -- were any other units of the District

10  Attorney's Office called?

11            MS. LEDERER:  Objection.

12       Q    To your knowledge?

13            MS. LEDERER:  Objection.

14            THE COURT:  I'll allow it.

15       A    Yes.

16       Q    Well, you're the Head of the Sex Crimes Unit, right?

17       A    Yes.

18       Q    Was there any other sex crime that was being

19  investigated, in connection with Central Park?

20            MS. LEDERER:  Objection.

21            THE COURT:  Sustained.

22       Q    Your participation, as the Chief of the Sex Crimes

23  Unit, when you were called, wasn't that in connection with the

24  investigation relative to the, to the female jogger?

25       A    Yes.

NYCLD_015467

P-APP000348

T-1    Reynolds-Ppl-direct                    827

A    I saw him back in the juvenile room.

Q    Did there come a time after officer Powers had finished making those phone calls that someone arrived at the youth room, at the juvenile room?

A    Yes.

Q    And who was that?

A    That was Mrs. Cuffee.

Q    Who is Mrs. Cuffee.

A    That was Kevin Richardson's mother.

Q    Where did you see her at the jouvenile room?

A    She had come to the door, to the entrance and told me that, you know, who she was and she was there for her son.

Q    About how long did you have a conversation with her?  How long did she stay in the juvenile room?

A    I'd say about five minutes.

Q    And then what happened?

A    Then she went, she waited outside the room in a seperate area we have, you know, for the civilians, for civilian workers, and I continued to do the paperwork.

Q    What is the name of the room where she was waiting?

A    That was the clerical office.

Q    How close is the clerical office to the juvenile room.

H. C. Davis

NYCLD_023530

P-APP000349

1          T-1    Reynolds-Ppl-direct                    828

2      A    They're right next to each other.

3      Q    Do they share a common wall?

4      A    Yes.

5      Q    After Mrs. Cuffee arrived, did other parents of the

6  people in custody begin to arrive?

7      A    Yes.

8      Q    And did there come a time where you saw Antron Mc

9  Cray at the Central Park Precinct?

10     A    Yes.

11     Q    Approximately what time was that, if you recall?

12     A    That was sometime before one, around twelve.

13     Q    Did you have any conversation with him at that

14  time?

15     A    I don't believe so.

16     Q    Do you recall seeing him at the precinct?

17     A    Yes.

18     Q    Where did you see him, if you recall?

19     A    I saw him in the juvenile room, he came to the

20  juvenile room and then he was, he went into the, to the

21  clerical office.

22     Q    And do you know who he came to the precinct with?

23     A    He came, I believe he came with his mother or one

24  of the other kids that were locked up.

25     Q    Did you personally speak to him at the precinct?

H. C. Davis

P-APP000350

T-1   Reynolds-Ppl-direct                          829

1

2    A    No.

3    Q    Did there come a time where all of the other, did

4    there come a time where the parents for all of the youths

5    had arrived?

6    A    No.

7    Q    Did there come a time where parents or family

8    members for four of the five youths arrived?

9    A    Yes.

10   Q    And approximately how much time went by before the

11   family members of four of those five people were there?

12   A    I'd say about an hour, an hour and a half.

13   Q    Which was the young man for whom no family arrived?

14   A    That was for Raymond Santana.

15   Q    What efforts were made to contact someone from

16   Raymond Santana's family after the initial phone call?

17   A    There was several efforts.  By two o'clock we

18   realized nobody was coming, so police officer Powers made

19   another call to his father's house and there was no answer.

20   Q    Did there come a time where you made efforts?

21   A    Yes.  At about quarter after two I had to convince

22   him to give me the name of--

23            MR.  RIVERA:  Objection.

24            THE COURT:  Just tell us what-- You had a

25            conversation, what it was.


                    H. C. Davis

P-APP000351

1                    T-1   Reynolds-Ppl-direct                    830

2        A    I had a conversation with him and told him to give

3    me the name of somebody to come pick him up.

4        Q    Would you explain for the members of the jury for

5    what purpose the family members of these five individuals

6    were notified?

7        A    Because when you arrest a juvenile, when they go to

8    Family Court--

9             MR.   JOSEPH:   Objection, Judge.

10            THE COURT:   What was your question?

11            MS.   LEDERER:   For what purpose were the

12        family members of these five people contacted.

13            THE COURT:   I'll allow it.

14            MR.   JOSEPH:   Judge, I believe the officer is

15        giving us a general policy statement.

16            THE COURT:   In this case, why did you call

17        them?

18            THE WITNESS:   So that if the four, the four

19        that were already there, in order to give them an

20        appearance ticket so they could come back in the

21        future, all five defendants would have to be

22        released to their parents at the same time.   If

23        one of them weren't, then he would have to come

24        back at eight o'clock in the morning, and all the

25        rest of them would also.   So, in order to insure

                         H. C. Davis

NYCLD_023533

P-APP000352

T-1   Reynolds-Ppl-direct                    831

they could all come back in a week or two, all the

parents would have to be there.

Q    When these five people were arrested, were they

going to be taken to court the next morning or were they

going to be given something called a desk ticket, a desk

appearance ticket?

A    They were going to been given a desk appearance

ticket.

Q    Would you describe for the jury what is a desk

appearance ticket?

A    That's a ticket you give them to appear in court on

a certain date with their parents.  They're released to the

custody of either a parent or guardian or an adult member of

their family.

Q    And is that a date sometime in the future?

A    Yes.

Q    Are you permitted or would you be permitted in the

circumstances that you are referring to on April 19th of

1989 to release any of these juveniles in their own

recognizance to let them go from the precinct?

A    No.

MR.  JOSEPH:  Objection.

MR.  BURNS:  Objection.

THE COURT:  I'll allow it.


H. C. Davis

NYCLD_023534

P-APP000353

T-1   Reynolds-Ppl-direct                    832

1
2    A    No.

3    Q    And when you --

4              MS.   LEDERER:   Withdrawn.

5    Q    If you could not reach a family member for one or

6    more of the young men you had in custody on that night, what

7    is required of you?

8              MR.   JOSEPH:   Objection.

9              MR.   RIVERA:   Objection.

10             THE COURT:   I'll allow it.

11   A    That person would have to go to Spoffard.

12   Q    And when they go to Spoffard, how long are they

13   kept at Spoffard?

14   A    They would have to go, they would have to appear in

15   Family Court the very next morning.   As far as how long they

16   remain in Spoffard, it could be, you know, for a long time.

17   Q    With respect to your involvement in the case, the

18   person taken to Spoffard, when are you required to bring

19   them to Family Court?

20   A    The next day.

21             MR.   JOSEPH:   Objection.

22             THE COURT:   I'll allow it.   Overruled.

23   Q    What is Spoffard?

24             MR.   JOSEPH:   Objection.

25             THE COURT:   I'll allow it.


                         H. C. Davis

NYCLD_023535

P-APP000354

1
2     A     Spoffard is a jouvenile detention center.

3     Q     When Raymond Santana's father did not arrive at the

4  precinct, and the other young men had family present, did

5  you get another phone number from Raymond Santana?

6     A     Yes, I did.

7     Q     And what was the number that you got from him?

8     A     I don't recall the number, but it was for his

9  sister, for his sister in The Bronx.

10    Q     And did you phone the telephone number that he gave

11  you?

12    A     Yes.

13    Q     At the time that you asked him for another

14  telephone number, did Raymond Santana say anything to you?

15  Excuse me, in your presence?

16    A     Yes, he made a statement.

17    Q     What if anything did you see, did you hear him say

18  and to whom did you see him say it?

19          MR.  RIVERA:  Objection.

20          THE COURT:  I'll allow it.

21    A     I observed him look over to Kevin Richardson and

22  say, "Yo, we're going to Spoffard, and we're going to fuck

23  up anything that gets in out way."

24    Q     Did you phone the number that he had given you at

25  that time?


                      H. C. Davis

```
 1                    T-1   Reynolds-Ppl-direct                834
 2       A    Yes.
 3       Q    And did you have a conversation with Raymond
 4  Santana's sister?
 5       A    Yes, I did.
 6       Q    What if anything did you say to her and what if
 7  anything did she said to you?
 8       A    I told her that, that her brother was under arrest
 9  for assault and for unlawful assembly in the park, and that
10  what I needed for her to do is to come down and I would
11  release him in her custody.  And you know, as long as she
12  could insure he would go to court on a future date.
13       Q    Did you give her your name?
14       A    Yes, I did.
15       Q    And did you give her a telephone number for the
16  Central Park Precinct?
17       A    I did.
18       Q    And what if anything did she she said to you?
19            MR.  RIVERA:  Objection.
20            THE COURT:  Sustained.
21       Q    About what time did you have this phone call with
22  the sister?
23       A    It was about twenty minutes after two.
24       Q    How long did the conversation last?
25       A    I'd say about ten, fifteen minutes.
```

H. C. Davis

NYCLD_023537

P-APP000356

1

2    Q    After you got off the telephone, did there come a

3  time where Raymond Santana's sister arrived at the precinct?

4    A    No.

5    Q    Did there come a time where you made another phone

6  call to Raymond Santana's sister.

7    A    Yes.

8    Q    At about what time did you make that second phone

9  call?

10    A    About ten minutes after four.

11    Q    And when you made that phone call at ten minutes

12  after four, did you reach Raymond Santana's sister?

13    A    Yes.

14    Q    Did you have a conversation with her about getting

15  another telephone number?

16    A    Yes.

17    Q    And what telephone number did you obtain from her?

18    A    Her grandmother's, grandmother's phone number.

19    Q    What if anything did you do after you received the

20  grandmother's telephone number?

21    A    I called up his grandmother and I explained the

22  situation to her and I asked, I told her we don't even want

23  her to to to take a bus or, you know, a cab or anything, I

24  told her to stay where she is and we'd have a car come and

25  pick her up.


                      H. C. Davis

1          T-1    Reynolds-Ppl-direct                    836

2     Q     What time did you make that phone call?

3     A     That was, it was about a quarter after four.

4     Q     When you made that phone call, did you speak with a

5  man or a woman?

6     A     I spoke with a woman originally.

7     Q     When you say originally, did you also have a

8  conversation with a man at that time?

9     A     Yes.

10    Q     And did you speak to them at the same time or one

11  after the other?

12    A     one after the other.

13    Q     What if anything did you tell the grandmother with

14  respect to who you were and where you were?

15    A     I told her I was, I told her my name, that I worked

16  in the Central Park Precinct and I had arrested her grandson

17  for assault.

18    Q     Did you speak to her in english or in spanish?

19    A     In english.

20    Q     What did you do after you for --

21          MS.  LEDERER:  Withdrawn.

22    Q     Do you know, you indicated you spoke to a male, do

23  you know who that was?

24    A     I believe that was his father.

25    Q     And what if anything did you say to him?


                         H. C. Davis

NYCLD_023539

P-APP000358

T-1   Reynolds-Ppl-direct                      837

A      I just basically told him his son was under arrest for the assault.

Q      Did there come a time where you sent a police car someplace?

A      Yes.

Q      And about what time did you send a radio car?

A      That was about five minutes later, I'd gotten police officer Gans and police officer Martello and I handed them a piece of paper with the name and the address and I told them get up there as quick as you can, you know, take her in the radio car, bring her here to the precinct, and you know, that was it.

Q      And to what location did you send those officers?

A      That was 118th Street, I believe.

            MS.   LEDERER:   If I may have just a moment, please.

Q      Do you know what address you sent that radio car to?

            MR.   RIVERA:   Objection.

            THE COURT:   I'll allow it.

            Do you have the address?

            THE WITNESS:   If I have it, I have to look through my notes.

            THE COURT:   If there is something to refresh

                              H. C. Davis

1          T-1   Reynolds-Ppl-direct                838

2          your recollection, you may do that.

3     A    Just it was West 118th Street.

4          MS.   LEDERER:  I'd ask this please be marked

5     and shown to the witness.

6          (The reporter marked the exhibit.)

7          MR.   RIVERA:  I would object.   May we approach

8     for a minute?

9          THE COURT:  Yes.

10         (At side bar.)

11         MR.   RIVERA:  The officer testified that he

12    reviewed his notes and all he had was West 118th

13    Street on his notes.  Now, apparently Ms.  Lederer

14    is trying to show the police officer a piece of

15    paper.  It's not to refresh his recollection, but

16    to impeach his credibility as a witness.

17         THE COURT:  What are you showing him?

18         MS.  LEDERER:  It's an arrest report he did

19    that night.

20         MR.  RIVERA:  It's a different address there.

21         MS.  LEDERER:  I'm going to ask if it

22    refreshes his recollection.  If it doesn't, it

23    doesn't.

24         MR.  BURNS:  He didn't say his recollection

25    needed refreshing.


                    H. C. Davis

AM003992

NYCLD_023541

P-APP000360

```
 1              People Reynolds Cross (Mr. Burns)              890

 2   court; is that correct?

 3       A    Yes.

 4       Q    You said that a Mrs. Cuffee was the first parent

 5   that arrived?

 6       A    Yes.

 7       Q    What time did she arrive?

 8       A    I don't recall.

 9       Q    Is there anything that you have that would refresh

10   your recollection as to what time she arrived?

11       A    I don't think so.

12       Q    Would you have a specific recollection that you

13   spoke to her for 5 minutes?

14       A    It was about five minutes, probably less.

15       Q    Did she arrive before midnight?

16       A    Probably.

17       Q    Did she arrive by 11:00 o'clock?

18       A    No.

19       Q    11:30?

20       A    Possible.

21       Q    You say there came a time when all of the parents

22   came accept Santana's parents?

23       A    Yes.

24       Q    It wasn't until after 4:00 that his grandmother

25   came?
```

LDI

1               People Reynolds Cross (Mr. Burns)          891

2          A     That's correct.

3          Q     Now, the parents who came, the last parents to

4     arrive prior to Santana's grandmother, do you know which

5     parent that was?

6          A     No.

7          Q     Isn't it also true though that as each parent came

8     in, they went and they were sent to the utility; is that

9     what you called it?

10         A     No.

11         Q     The clerical room.  They went into the clerical

12    office?

13         A     Yes.

14         Q     They sat in the clerical office just the parents;

15    is that right?

16         A     That's correct.

17         Q     The teenagers then just sat in another room?

18         A     They sat in a room with me.

19         Q     You said that there came a time that all of the

20    arrestees ate?

21         A     Yes.

22         Q     This is after they woke up?

23         A     They had to.

24         Q     I'm asking you?

25         A     Sure.

LDI

NYCLD_023594

2        Q    Because you said also that the arrestees that they

3    had fallen asleep about 3:00 o'clock on the morning of the

4    20th; is that right?

5        A    I know at 3:00 o'clock they were, all of them,

6    except for one was definitely asleep.

7        Q    It wasn't until after 4:00 that they were --

8    withdrawn.

9             What time was it that they ate?

10       A    I would say between 4:30 and 5:00, that's when the

11   parents went to get the food, so it would have to be

12   sometime after that.

13       Q    Would it be fair to say that neither you nor any

14   of the other police officers or police employees got them

15   food?

16       A    At that point?

17       Q    No.  From the time that they arrived in the

18   precinct, until the parents brought them food, did any of

19   them have anything to eat that was provided by police

20   personnel?

21       A    No.

22       Q    Is that true?

23       A    That's true.

24       Q    You don't know.  Would it also be fair to say you

25   don't know what time they went to sleep, you just know that

NYCLD_023595

P-APP000363

1                    People Reynolds Cross (Mr. Burns)                    893

2      by 3:00 o'clock they were all asleep; is that a true

3      statement?

4           A     3:00 o'clock, they were definitely sleeping.

5           Q     You don't know when they started nodding off so to

6      speak, falling asleep?

7                    MR. JOSEPH:   I would object.

8                    THE COURT:   You saw them nodding off.

9           Q     Falling asleep?

10          A     I guess about 2:00, maybe a little later.

11          Q     So that then would it also be fair to say

12     certainly in the case of Mrs. Cuffee, who you say is the

13     mother of Kevin Richardson, she was there over 4 hours

14     before she was permitted to be with her son, would that be

15     fair to say?

16          A     Yes.

17          Q     Depending upon when the other people arrived and

18     you don't recall what time they arrived, other than

19     Santana's grandmother, they all had to wait and then they

20     were all permitted to be with their children at the same

21     time?

22          A     That's correct.

23          Q     That was when the children or when the teenagers

24     were awoken to eat the meal?

25          A     That's correct.

NYCLD_023596

P-APP000364

1                   T-3    Reynolds-Ppl-cross (Rivera)                    922

2        A    Yes.

3        Q    And you started to --

4              MR.  RIVERA:  Withdrawn.

5        Q    You started to ask them their names and addresses;

6    is that correct?

7        A    Yes.

8        Q    Did they have any identification on them?

9        A    I don't recall.

10        Q    Did you ask them for any I.D.?

11        A    I really don't remember.

12        Q    Did you search them?

13        A    Yes.

14        Q    Did you--

15             Did any of them have any wallets?

16        A    That I don't recall.

17        Q    Did any of them have any money?

18        A    I don't recall that either.

19        Q    If they would have had a wallet or money, would you

20    have made a note in a voucher or anything of that sort?

21        A    No.

22        Q    And you indicated that you asked your partner,

23    police officer Powers to attempt to contact Raymond

24    Santana's family; is that correct?

25        A    That's correct.


                        N. C. Davis


NYCLD_023625

P-APP000365

T-3   Reynolds-Ppl-cross (Rivera)                923

Q    And Raymond Santana was the one who gave you his father's telephone number; is that correct?

A    Excuse me?

Q    Raymond Santana was the individual who gave you his father's telephone number; is that correct?

A    Yes.

Q    And he also gave you his father's work number; is that correct?

A    I believe so, I'm not sure.

Q    Did you--

You were the one who filled out the various reports on Raymond Santana; is that correct?

A    That's correct.

Q    And one of the reports that you filled out was a Probation Intake Referral Report; is that correct?

A    Yes.

Q    And do you have your copy of the Probation Intake Referral Report?

A    Yes, I do.

Q    May I see it?

     MR. RIVERA:  All right.  May I have that copy marked as defendant's B for identification, your Honor?  Referring to the Probation Intake Referral Report.


                    H. C. Davis

P-APP000366

1

2                    (The reporter marked the exhibit.)

3        Q    Officer, I ask you to look at defendant's Santana's

4   B.   Take a look at it.

5             Now, there is a, in the middle of that exhibit

6   there is a place for the business phone; is that correct?

7        A    That's correct.

8        Q    And you have a number listed there; is that

9   correct?

10       A    That's correct.

11       Q    You also have a location which is the fifth floor;

12  is that correct?

13       A    Yes, that's correct.

14       Q    That would be the floor where my client's father

15  works; is that correct?

16       A    Yes.

17       Q    And next to that there is a home telephone number;

18  is that correct?

19       A    Yes, it is.

20       Q    Okay.  Now just below that, officer, there is a

21  listing of the questions, advised of constitutional rights

22  by, it has your name, police officer Eric Reynolds?

23       A    Yes.

24       Q    Did you advise my client of his constitutional

25  rights?


                         H. C. Davis

```
 1                  T-3   Reynolds-Ppl-cross (Rivera)              925

 2       A    No.

 3       Q    So, you never advised my client of his

 4  constitutional rights; is that correct?

 5       A    No, I didn't.

 6       Q    So, this document is in error; is that correct?

 7       A    That's a mistake, yes.

 8       Q    It's a mistake, right.  And further down on that

 9  very same document where it says the question, did the

10  respondent offer resistance or verbal abuse at the time he

11  or she was taken into custody, you wrote down--

12                  MS.  LEDERER:  Objection.

13                  THE COURT:  Objection sustained.

14                  You offering that in evidence?

15                  MR.  RIVERA:  No.

16                  THE COURT:  Then don't read from it.

17                  MR.  RIVERA:  Okay.

18       Q    Officer, did my client run after being apprehended

19  by you?

20       A    No.

21       Q    Okay.  In your report you indicate that he did run;

22  is that correct?

23                  MS.  LEDERER:  Objection.

24                  THE COURT:  He's asking him.

25                  Did you make that report that he did run?


                            N. C. Davis
```

NYCLD_023628

P-APP000368

THE WITNESS:  Yes, I did.

Q   Is that a mistake, officer?

A   Yes, it is.

Q   Now officer, when you stopped my client, my client made a statement to the effect that I just came from my girlfriend's house; is that correct?

A   That's correct.

Q   And you never asked him any questions; is that correct?

A   Excuse me?

Q   You never asked him any questions; is that correct?

A   That's correct.

Q   With reference to coming from his girlfriend's house, you never asked him any questions on that; is that correct?

A   That's correct.

Q   Okay.  And you never advised him of his rights either?

A   That's right.

Q   Okay.  Now, in your memo book, you made a notation that my client did not elaborate where or when he was coming from his girlfriend's house; is that correct?

A   That's correct.

Q   Okay.  You didn't ask him any questions about where

H. C. Davis

NYCLD_023629

P-APP000369

T-3    Reynolds-Ppl-cross (Rivera)              927

or when he was coming from his girlfriend's; is that

correct?

    A    That's right.

    Q    But you thought it important enough that he didn't

say anything about that to list it in your memo book, is

that correct?

    A    That's right.

    Q    But you didn't ask him any questions on that?

    A    No.

    Q    And when my client said I just came from my

girlfriend's house, you said hold it, don't say anymore, you

have not been advised of your constitutional rights?  Did

you say any words to that effect?

    A    Nothing like that.

    Q    Okay.  You didn't ask him any questions?

    A    No.

    Q    Didn't ask him what girlfriend are you talking

about?

    A    No.

    Q    Okay.  But, you thought it important enough to list

in your memo book what he did not say?

    A    That's correct.

    Q    Now, you testified that you spoke to my client's

grandmother at about four o'clock in the morning; is that

                                  B. C. Davis

NYCLD_023630

P-APP000370

```
 1                T-3    Reynolds-Ppl-cross (Rivera)              928
 2   correct?
 3        A    It was a little later than that.
 4        Q    That would be about 4:30?
 5        A    About 44:10, I believe.
 6        Q    Did you take her name down when you spoke to her?
 7        A    4:15.
 8        Q    Did you take her name down when you spoke to her?
 9        A    I believe I put it on a slip of paper.
10        Q    Do you have that slip of paper with you?
11        A    No.
12        Q    If I told you her name was Navida Colon, would that
13   refresh your recollection?
14                  THE COURT:  Excuse me, wait a minute.
15                  MR.  RIVERA:  I'm sorry.
16                  THE COURT:  I didn't hear anything.  We can't
17             take that down.
18                  THE WITNESS:  I really don't remember, I don't
19             remember her name.
20                  THE COURT:  The reporter can only take down
21             what you say.
22        Q    And you testified that it was her who answered the
23   phone at about 4:15 in the morning?
24        A    Yes.
25        Q    And did you have an extensive conversation with
```

                              B. C. Davis

NYCLD_023631

P-APP000371

1          T-3   Reynolds-Ppl-cross (Rivera)              929
2    her?
3         A     No, not extensive one.
4         Q     What exactly did you tell her, if you can recall?
5         A     Excuse me.
6         Q     Do you recall what you spoke to her?
7         A     Basically I told her that Raymond was under arrest
8    and that we needed an adult to come pick him up, and I
9    couldn't reach his father.  I spoke to his, you know, his
10   sister, and she couldn't come because of the baby, I said
11   look, you don't even have to take a bus or train, I'll
12   provide transportation for you, you know, just get dressed,
13   stand by, we'll have a radio car pick you up.  You know,
14   give you door service to the precinct.
15        Q     You also testified this morning that a man also
16   answered the phone at about that time; is that correct?
17        A     A man had gotten on the phone, yes.
18        Q     And you also testified that you spoke to that man;
19   is that correct?
20        A     I briefly told him what was going on.
21        Q     And when you say you briefly told him, what you are
22   telling us now is what you told him, is that correct?
23        A     Pretty much.
24        Q     And did he identify himself as Raymond Santana's
25   father.


                         H. C. Davis


NYCLD_023632

P-APP000372

T-3    Reynolds-Ppl-cross (Rivera)                930

1

2    A    I believe he said he was, yes.

3    Q    Okay, he identified himself as Raymond Santana's

4    father, you explained to him why you wanted him to come to

5    the precinct and he indicated that he would come down; is

6    that correct?

7    A    Well, I had already spoke to his grandmother and

8    she said she was coming, now--

9    Q    But you felt, but the father got on the phone; is

10    that correct?

11    A    Yes.

12    Q    And you explained everything to the father; is that

13    correct?

14    A    Yes.

15    Q    And the mother got to the precinct at about five

16    o'clock in the morning --

17            MR. RIVERA:  Withdrawn.

18    Q    The grandmother and the father got to the precinct

19    at about five o'clock in the morning?

20    A    Around that time.

21    Q    Did you see Raymond Santana's father?

22    A    Yes.

23    Q    Okay.  Did you have a conversation with him?

24    A    I don't recall.

25    Q    Did you, did you tell any of the parents that were

H. C. Davis

NYCLD_023633

P-APP000373

1

2    there that these children would be going home soon?

3         A    I told them, I think I told them they would be

4    leaving soon.

5         Q    Right.  And did you tell them that you were waiting

6    for Raymond Santana's parents to come before they went home;

7    is that correct?

8         A    That's correct.

9         Q    And when Raymond Santana's parents arrived, did the

10    parents come over to you and say, okay, we're all here,

11    let's go home?  Did that happen?  Conversation to that

12    effect take place?

13        A    Yes.

14        Q    Okay.  And what did you tell them at that point in

15    time?

16        A    At that point I told them they'd have to wait now.

17        Q    Okay.

18        A    The detective wanted to interview them, that was

19    it, it's out of my hands.

20        Q    Did you tell them what the detective wants at the

21    time to interview them about?

22        A    No.

23        Q    Did you tell them also that all that had to happen

24    was the detective was going to interview them and theywould

25    be going home?


                         N. C. Davis

1          T-3    Reynolds-Ppl-cross (Rivera)                932

2     A    Excuse me?

3     Q    That after the detective spoke to them, they'd be

4   going home.  Did you tell them that?

5     A    I might have.

6     Q    Okay.  Did you also tell them that you were waiting

7   for a warrant search to come through before they went home?

8     A    Yes.

9     Q    And this would be at about five o'clock in the

10  morning?

11    A    Around that time.

12    Q    Okay.  And did you repeat this, that you were

13  waiting for a warrant search to come in before they can go

14  home at about six o'clock in the morning?

15    A    I don't recall if that's exactly what I said.

16    Q    Did you do a warrant search, officer?

17    A    Yes.

18    Q    At what time did you perform the warrant search?

19    A    It was 2:15 in the morning.

20    Q    How long did it take you to perform the warrant

21  search?

22    A    Let's see, I had to call up, I had to call up and

23  give the names of the, you know, of the defendants to the

24  person that takes it and you know, wait for them to do the

25  check on the computer and get back to me.


                        H. C. Davis

P-APP000375

T-3   Reynolds-Ppl-cross (Rivera)                933

1
2     Q     And how long does it take to call to make the phone
3     call?
4     A     How long did it take to call them?
5     Q     To make the phone call, yes.
6     A     About ten minutes.
7     Q     Okay.  And what information did you impart to the
8     other person on the other side in reference to a warrant
9     search?
10    A     The defendant's name, their address and their date
11    of birth and their races.
12    Q     And their race?  So you give four pieces of
13    information to the person on the other side; is that
14    correct?
15    A     That's correct.
16    Q     And this was as to five individuals, is that
17    correct?
18    A     Excuse me.
19    Q     And this is in reference to five specific
20    individuals that you gave this information to; is that
21    correct?
22    A     That's correct.
23    Q     The five individuals that were in your custody; is
24    that correct?
25    A     That's correct.


                              W. C. Davis

NYCLD_023636

P-APP000376

T-3    Reynolds-Ppl-cross (Rivera)                     934

Q    And that took you ten minutes, is that correct?

A    Took me ten minutes to give them the information.

Q    Right.  And did they said hold on until, we'll have the information right back to you.

A    No, I think they had to call me back.

Q    Okay.  And did they ever call you back?

A    Yes.

Q    What time did they call you back?

A    That, I don't recall.

Q    Okay.  How long does it normally take to get a call back on a warrant search?

          MS. LEDERER:  Objection.

          THE COURT:  Is there a normal period when you get the answer back?

          THE WITNESS:  No.

Q    What's the longest you've ever waited for a warrants search?

          MS. LEDERER:  Objection.

          THE COURT:  Objection sustained.

Q    What's the --

     Now the first person who arrived at the precinct was Mrs. Cuffee; is that correct?

A    That's correct.

Q    That's Kevin Richardson's mother, is that correct?


                         H. C. Davis

AM004088

NYCLD_023637

P-APP000377

T-3    Reynolds-Ppl-cross (Rivera)                935

A    That's correct.

Q    And as soon as she came into the precinct, she came to see you; is that correct?

A    She might have went to the desk, and I think they directed her to where I was.

Q    Now, there is a door into the juvenile room?

A    Yes.

Q    And was that door opened or was that door closed?

A    That door was closed.

Q    Okay.  And Mrs.Cuffee had to knock on that door; is that correct?

A    I believe so.

Q    And was it you or one of your partners who answered the door?

A    I think it was me.

Q    And at which point in time, I think you testified earlier today that you told her that you were finishing up some paperwork and you had arrested her son; is that correct?

A    That's correct.

Q    And I think you had testified earlier there was a brief conversation with Mrs. , with Mrs.Cuffee and her son, Kevin Richardson; is that correct?

A    That's correct.


                          H. C. Davis

NYCLD_023638

P-APP000378

T-3   Reynolds-Ppl-cross (Rivera)                936

Q   And you also told her that as soon as the paperwork was finished, she and her son would be going home, is that correct?

A   That's correct.

Q   And you told her that in front of Kevin; is that correct?

A   Yes.

Q   And by the way, the juvenile room, how big is that jouvenile room?

A   In feet?

Q   Yeah, if you know.

A   I don't know.

Q   Is it the -- Is that room also used for other purposes at the precinct?

A   Yes.

Q   What is it also used for?

A   It's also, it's the youth room, it's also the auxiliary S.E.P.A., highway safety and community affairs office.

Q   That's within one room; is that correct?

A   One little room.

Q   How many desks are in that room?

A   Approximately five.

Q   Now many desks were there that night, April the

E. C. Davis

NYCLD_023639

P-APP000379

1                       T-3   Reynolds-Ppl-cross (Rivera)                937

2    19th?

3        A     There were five.

4        Q     Okay.  And were the juveniles kept at one section

5    of the room?

6        A     Yes.

7        Q     And that would be the sex furthest away from the

8    door; is that correct?

9        A     That's correct.

10       Q     And you were between the juveniles and the door; is

11   that correct?

12       A     That's correct.

13       Q     And that's the room that you are commanded to take

14   youths whenever you take them into custody, is that correct?

15       A     That's the designated jouvenile room.

16       Q     Right.  And there are no beds in that room; is that

17   correct?

18       A     No.

19       Q     There are no mattresses in that room; is that

20   correct?

21       A     That's correct.

22       Q     No pillows, no blankets?

23       A     That's correct.

24       Q     You did not proved any pillows, blankets or

25   mattresses to the juveniles?


                                H. C. Davis

NYCLD_023640

P-APP000380

1

2      A      No.

3      Q      On the 19th or the 20th?

4      A      No.

5      Q      You did not buy any food for these juveniles; is

6   that correct.

7      A      That's correct.

8      Q      You did not offer to transport juveniles to

9   Spoffard House on the evening of April the 19th or April the

10   20th, is that correct?

11      A      I don't understand.

12      Q      Did you tell the parents, we're taking these kids

13   to Spoffard House?

14      A      No.

15      Q      Did you tell the parents, we're taking these kids

16   to the court on the morning of April the 20th?

17      A      No.

18      Q      Now, you testified earlier that the grandmother

19   arrived at the precinct at about five o'clock in the

20   morning; is that correct?

21      A      Approximately.

22      Q      And this was after the other parents had left to

23   buy food for their kids?

24      A      I was gone at the time, so she might have got there

25   when they got back, I don't know which happened first.


                         H. C. Davis

NYCLD_023641

P-APP000381

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              939

 2        Q    Okay.  You left the precinct?

 3        A    Yes.

 4        Q    What time did you leave the precinct?

 5        A    About twenty after four.

 6        Q    So, you left the precinct at about twenty after

 7   four, is that correct?

 8        A    Yes.

 9        Q    When you left the precinct, you left the juveniles

10   in somebody's custody?

11        A    Yes.

12        Q    And whose custody did you leave them with?

13        A    It was another police officer.

14        Q    And how long were you gone?

15        A    About a half hour.

16        Q    Okay.  And where did you go?

17        A    Thirty five minutes.

18        Q    Where did you go?

19        A    Went to the crime scene on 102nd Street.

20        Q    And who did you go with?

21        A    I went alone.

22        Q    And what is the name of the police officer that was

23   left attending to the juveniles?

24        A    That I don't recall.

25        Q    And when you got back, you got back at about 5:15,


                            N. C. Davis
```

NYCLD_023642

P-APP000382

1          T-3   Reynolds-Ppl-cross (Rivera)                940

2   would that be correct?

3        A    About that time, 5, 5:15.

4        Q    And when you got back, the juveniles were awake; is

5   that correct?

6        A    Yes.   Yes, they were eating at that time.

7        Q    And they were eating; is that correct?

8        A    Yes.

9        Q    And you don't know who provided the food; is that

10  correct?

11       A    Yeah, their families did.

12       Q    You don't know who --

13            MR.   RIVERA:   Withdrawn.

14       Q    You don't know what time that Evida Colon got to

15  the Central Park precinct?

16       A    No.

17       Q    You don't know what time her father--

18            MR.   RIVERA:   Withdrawn.

19       Q    Raymond Santana's father got to the Central Park

20  Precinct?

21       A    No.

22       Q    And this was after you had told all the parents to

23  go out and buy food for their kids; is that correct?

24       A    Excuse me?

25       Q    They arrived at the precinct after you had told the

                         H. C. Davis

P-APP000383

1

2       parents to go out and buy food for their kid; is that

3       correct?

4            A     This was after I told them where they could get

5       food.

6            Q     Right.  And after some of the parents left, is that

7       correct?

8            A     That's correct.

9            Q     And after these parents had come back and bought

10      food; is that correct?

11           A     Excuse me?

12                 MR.  RIVERA:  Withdrawn.

13           Q     How long did it take for you to complete the

14      paperwork on the five juveniles that you arrested?

15           A     Excuse me.  Took a couple of hours.

16           Q     Okay.  And this would be, you started at about what

17      time?

18           A     About 11:30.

19           Q     And you finished at what time?

20           A     It was, it was late.  It was early in the morning.

21           Q     Okay.  And when you say early in the morning, that

22      would be about two, three o'clock in the morning, would that

23      about correct?

24           A     Maybe even later.

25           Q     Yeah.  And did you take any photos of Raymond

                                    B. C. Davis

T-3    Reynolds-Ppl-cross (Rivera)                    942

2   Santana?

3        A    Yes.   Well, there was a photo taken, I don't recall

4   if I had taken it.

5        Q    Would this be a Polaroid photo?

6        A    Yes.

7        Q    And photos of the other juveniles?

8        A    Yes.

9        Q    Did there come a point in time when individuals

10  came into the precinct to file a report against these

11  juveniles.

12       A    Some people had come in.

13       Q    And did they identify themselves to you?

14       A    Yes.

15       Q    And did they --

16            And do you recall what the names were?

17       A    No.

18       Q    Did you write it down anywhere?

19       A    No, I don't have it.

20       Q    Do you recall what they were doing, what these

21  individuals who came in to file a report, what they said

22  they were doing on the evening of April the 19th?

23       A    They were riding a bicycle.

24       Q    And did you show them the photos?

25       A    Yes.


                        N. C. Davis


NYCLD_023645

P-APP000385

```
1                    T-3    Reynolds-Ppl-cross (Rivera)              943
2        Q    And did they indicate whether or not they could
3    identify anybody?
4        A    Well, they stated from the beginning they couldn't
5    identify who it was.
6                    MR.  JOSEPH:  Objection.
7                    THE COURT:  Just listen to his question.
8        Q    Did they indicate to you they could not identify
9    anybody?
10       A    Yes.
11       Q    And notwithstanding the fact they said they could
12   not identify anybody, you showed them the photos any way; is
13   that correct?
14       A    Excuse me?
15       Q    Notwithstanding the fact they stated to you they
16   could not identify anybody, you in any case showed them the
17   photos; is that correct?
18       A    That's correct.
19       Q    Now, the first interrogation began at 5:30; is that
20   correct?
21       A    That's correct.
22       Q    And the first person who was interrogated was
23   Lamont Mc Call; is that correct.
24                   MS.  LEDERER:  Objection to the
25               characterization as interrogation.


                                  H. C. Davis
```

NYCLD_023646

P-APP000386

T-3    Reynolds-Ppl-cross (Rivera)                     944

  THE COURT:  The question?  I'll allow it.

  Go ahead.

Q    Was Lamont Mc Call; is that correct?

A    That's correct.

Q    And that took approximately two hours?

A    About an hour.

Q    And you were present when that interrogation was taking place; is that correct?

A    That's correct.

Q    And did you take any notes?

A    No.

Q    And the second person that was questioned was Clarance Thomas; is that correct?

A    That's correct.

Q    And who was present when Lamont Mc Call was being questioned?

A    Myself, Det. Whelpley, Farrel and his mother.

Q    And who was present when Mr. Thomas was being questioned?

A    The same people.

Q    And you indicated earlier in your testimony that you were questioned by a Chief Rosenthal; is that correct?

A    Excuse me?

Q    You were questioned by a Chief Rosenthal; is that

    M. C. Davis

NYCLD_023647

P-APP000387

T-3   Reynolds-Ppl-cross (Rivera)                945

1
2   correct?
3       A   Yes.
4       Q   At about I think you indicated ten o'clock in the
5   morning?  Of the 20th?
6       A   I think I said twelve.   I have to look again.
7   Yeah, it was about twelve.
8       Q   And who was present when you were debriefing Chief
9   Rosenthal.
10              MS.  LEDERER:  Objection.
11              THE COURT:  When he was debriefing?
12      Q   When you were speaking to Chief Rosenthal?
13      A   Captains Gunther, maybe a detective or two.
14      Q   Do you recall the name of the detectives?
15      A   No.
16              (Transcript continued on the next page.)
17
18
19
20
21
22
23
24
25

                    H. C. Davis

NYCLD_023648

P-APP000388

T1-JM-TS

4914

1                    Fairstein - People - Direct

2   District Attorney's office.

3        Q         How  long have you been employed as an Assistant

4   District Attorney?

5        A    Almost 18 years.

6        Q    Directing your attention to April 20th of 1989.

7        Did there come a time on that date that you went  to  the

8   20th Precinct?

9        A    Yes, there did.

10        Q    And at approximately what time did you arrive at the

11   20th Precinct?

12        A    A little after 8:30 that evening.

13        Q         Ms.  Fairstein,  are  you  familiar  with  the

14   circumstances under which an Assistant District Attorney, from

15   the New York County DA's office is assigned to go to a  police

16   precinct and assist or participate?

17             MR. RIVERA:  Objection, objection.

18        Q    (Continuing) in an investigation?

19             MR. JOSEPH:  Objection.

20             MR. BURNS:  Objection.

21             THE COURT:  Objection sustained.

22        Q    Was  an  Assistant District Attorney assigned to

23   assist in the investigation of this case?

24             MR. JOSEPH:  Objection.

25             THE COURT: Overruled.

NYCLD_015433

P-APP000389

T2-SC-TS

4945

1                    Fairstein - People - Direct

2        Q     Thank you.

3              MS. LEDERER:  I have nothing further.

4   CROSS EXAMINATION

5   BY MR. BURNS:

6        Q     Good morning, Ms. Fairstein.

7        A     Good morning, Mr. Burns.

8        Q     Ms. Fairstein, when you went to the 20th Precinct,

9   had Ms. Lederer arrived before you?

10       A     Yes, she had.

11       Q     What time did you send Ms. Lederer to the 20th

12  Precinct?

13             MS. LEDERER:  Objection.

14             THE COURT:  I'll let her answer.

15       A     I didn't send her there.

16       Q     What time did you assign her in relation to this

17  investigation?

18       A     I believe it was around 9:15 on the morning of April

19  20th.

20       Q     Do you know what time she left to go to the 20th

21  Precinct?

22       A     More or less, yes.

23       Q     What time was that?

24       A     I believe it was about eight o'clock that evening.

25       Q     Now, had -- did the police department or any

NYCLD_015464

P-APP000390

T2-SC-TS

4946

1           Fairstein — People — Cross — Burns
2   representatives   of   the   police   department   ask   for   your
3   assistance in connection with this investigation?
4                   MS. LEDERER:   Objection.
5                   THE COURT:   I'll allow it.
6       A    Yes, they did ask for our assistance.
7       Q    At what point was that?
8                   MS. LEDERER:   Objection.
9                   THE COURT:   I'll allow it.
10      A    They first --
11      Q       No.   When was the first time they asked for the
12  assistance of the District Attorney's Office   in   relation   to
13  this investigation?
14      A    When I was called at nine o'clock on the morning of
15  the 20th, I was told I would be asked later   in   the   day   for
16  assistance.
17      Q          You   were   called   by   a   police   department
18  representative?
19      A    That's right.
20      Q    And was it   a   person   who   was   in   charge   of   the
21  investigation?
22                  MS. LEDERER:   Objection.
23                  THE COURT:   I'll let her answer.
24      A    It was one of the supervising officers, yes.
25      Q    When you arrived at eight o'clock -- I'm sorry, 8:30

T2-SC-TS

4947

1                   Fairstein - People - Cross - Burns

2    --

3          A     A little after 8:30.

4          Q     -- Ms. Lederer was already there, is that right?

5          A     Yes.

6          Q          And you went inside and went up to the 2nd floor

7    detective room?

8          A     Yes, I did.

9          Q     Ms. Lederer was there?

10         A     Yes, she was.

11         Q     Had any video begun?

12         A     No.

13         Q     Had any questioning or talking to people, had any of

14   that begun at the time that you arrived?

15               MS. LEDERER:   Objection.

16               THE COURT:   If she knows, I'll let her answer.

17         A     Yes, it had.

18         Q     At any time prior to  your  arrival,  did  you  have

19   occasion to go to Metropolitan Hospital?

20         A     No, sir.

21         Q          And  did  you  have  an occasion to speak to the

22   officers who had --- the officers who had discovered  the  body

23   of the female jogger?

24               MS. LEDERER:   At what point?

25         Q          Prior  to  your  arrival  at  the  precinct,  at

NYCLD_015466

P-APP000392

T2A-SC-TS

4948

1              Fairstein - People - Cross - Burns
2    approximately 8:30 in the evening of the 20th.
3         A    Prior to my arrival, no.
4         Q    Incidentally, the telephone call that you received
5    about nine o'clock, that was in relation to asking the
6    District Attorney's Office for assistance in connection with
7    the investigation relative to the female jogger?
8         A    In part, yes.
9         Q    You're the -- were any other units of the District
10   Attorney's Office called?
11              MS. LEDERER:  Objection.
12        Q    To your knowledge?
13              MS. LEDERER:  Objection.
14              THE COURT:  I'll allow it.
15        A    Yes.
16        Q    Well, you're the Head of the Sex Crimes Unit, right?
17        A    Yes.
18        Q    Was there any other sex crime that was being
19   investigated, in connection with Central Park?
20              MS. LEDERER:  Objection.
21              THE COURT:  Sustained.
22        Q    Your participation, as the Chief of the Sex Crimes
23   Unit, when you were called, wasn't that in connection with the
24   investigation relative to the, to the female jogger?
25        A    Yes.

NYCLD_015467

P-APP000393

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.    Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.    Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.    Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.    As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.    Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.    Not that I can think of. | 15:46:46 |
| 21 | Q.    I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.    As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

VERITEXT REPORTING COMPANY
www.veritext.com

212-267-6868                                                    516-608-2400

Linda Fairstein

Page 222

| | | |
|---|---|---|
| 1 | Q.    At that time, did you know | 15:47:29 |
| 2 | anything about the events in Central Park | 15:47:32 |
| 3 | on April 19th? | 15:47:35 |
| 4 | A.    I don't believe that I did. | 15:47:36 |
| 5 | Q.    You saw nothing on television, | 15:47:38 |
| 6 | you heard nothing from other sources? | 15:47:41 |
| 7 | A.    I didn't see anything on | 15:47:44 |
| 8 | television the night of the 19th.  I may | 15:47:46 |
| 9 | have heard a news, radio news report in | 15:47:50 |
| 10 | the morning, not about a rape, but about a | 15:47:53 |
| 11 | riot. | 15:47:58 |
| 12 | Q.    Do you know why Fiston called? | 15:47:59 |
| 13 | A.    Yes, I do. | 15:48:05 |
| 14 | Q.    Why? | 15:48:06 |
| 15 | A.    He called me shortly before nine | 15:48:07 |
| 16 | to tell me that a woman had been found | 15:48:10 |
| 17 | beaten, and presumably because of her | 15:48:22 |
| 18 | state of undress, sexually assaulted in | 15:48:24 |
| 19 | the ravine, and he had been called in | 15:48:28 |
| 20 | because there had been no sexual assault | 15:48:34 |
| 21 | allegation until that woman reached the | 15:48:38 |
| 22 | hospital. | 15:48:40 |
| 23 | Q.    What else did he tell you? | 15:48:41 |
| 24 | A.    He told me that the woman was as | 15:48:47 |
| 25 | yet unidentified, and he asked me in the | 15:48:52 |

NYCLD_039090

P-APP000395

Linda Fairstein

Page 223

| | | |
|---|---|---|
| 1 | usual course of prosecutorial business if | 15:48:57 |
| 2 | I would assign a prosecutor to work on the | 15:49:00 |
| 3 | prosecutorial events that might happen | 15:49:06 |
| 4 | later in the day because there were | 15:49:14 |
| 5 | already were suspects being questioned. | 15:49:16 |
| 6 | Q.   Did you make any notes about | 15:49:22 |
| 7 | this conversation? | 15:49:24 |
| 8 | A.   No. | 15:49:25 |
| 9 | Q.   Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.   Not that I recall. | 15:49:30 |
| 12 | Q.   Did he tell you anything else? | 15:49:31 |
| 13 | A.   At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.   Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.   Not exactly. | 15:49:57 |
| 24 | Q.   Why do you say that? | 15:49:58 |
| 25 | A.   Because it was not just a call | 15:50:00 |

NYCLD_039091

P-APP000396

Linda Fairstein

Page 224

| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

P-APP000397

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q.   So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ:  Objection.  You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A.   Those are not my words, sir.  I | 15:51:43 |
| 20 | didn't say they had no connection.  I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

P-APP000398

Linda Fairstein

Page 226

| | | |
|---|---|---|
| 1 | more urgent need.  He wanted a prosecutor | 15:52:00 |
| 2 | assigned, that was the main purpose of the | 15:52:04 |
| 3 | call. | 15:52:06 |
| 4 | Q.    Did he tell you that it appeared | 15:52:06 |
| 5 | that a homicide was involved? | 15:52:08 |
| 6 | A.    No, he didn't tell me that.  He | 15:52:09 |
| 7 | told me that the victim was in very grave | 15:52:12 |
| 8 | condition. | 15:52:18 |
| 9 | Q.    The question I think I forgot to | 15:52:19 |
| 10 | ask you earlier when you spoke of one | 15:52:21 |
| 11 | person who had knowledge about the | 15:52:23 |
| 12 | investigation from Ryan, who was that? | 15:52:26 |
| 13 | A.    Lisa Friel. | 15:52:30 |
| 14 | Q.    Did you know what she had | 15:52:31 |
| 15 | learned from Ryan and how she knew about | 15:52:36 |
| 16 | it? | 15:52:38 |
| 17 | A.    I knew some of the things she | 15:52:39 |
| 18 | learned from Ryan. | 15:52:42 |
| 19 | Q.    What did you learn from Friel? | 15:52:43 |
| 20 | A.    I knew from Friel the point at | 15:52:45 |
| 21 | which Ryan no longer wanted Mooney | 15:52:55 |
| 22 | involved in the investigation. | 15:52:59 |
| 23 | I knew from Friel that she, that | 15:53:00 |
| 24 | on a day, I came to know from Friel that | 15:53:03 |
| 25 | on a date that Ryan arranged with Mooney | 15:53:08 |

NYCLD_039094

P-APP000399

1               T-3   Reynolds-Ppl-cross (Rivera)              909
2          the Assistant District Attorneys and all sworn
3          jurors are present.
4               THE COURT:  All right, good afternoon, ladies
5          and gentlemen.
6               THE CLERK:  Officer Reynolds, may I remind you
7          you're still under oath.
8               THE WITNESS:  Yes.
9     CONTINUING CROSS EXAMINATION
10    BY MR. RIVERA:
11         Q    Officer, before we broke, you indicated to us that
12    there was some chiefs and members of the press that were
13    present at the Central Park Precinct; is that correct?
14         A    Yes.
15         Q    And is that unusual to see top brass at the Central
16    Park Precinct during an arrest?
17         A    There is not a lot of arrests there, so, but yeah,
18    I would say it is.  Slight.
19         Q    Under normal circumstances would it be unusual to
20    see a high member of the brass at any precinct when youths
21    are arrested?
22              MS.  LEDERER:  Objection.
23              THE COURT:  I'll allow it.
24         A    It depends on the precinct.
25         Q    Are there some precincts where this would not be

                        E. C. Davis

NYCLD_023612

P-APP000400

T-3   Reynolds-Ppl-cross (Rivera)                910

unusual?

        MS.   LEDERER:   Objection.

A   Yes.

Q   What about the Central Park Precinct, is this unusual at the Central Park Precinct?

A   Slightly, yes.

Q   And the same applies for the members of the press?

A   Yes.

Q   Is thsi the first time you make an arrest where you have that kind of brass and that kind of press present?

A   Yes.

Q   And at what point in time were you apprised that there case was going to have special significance within the modus operandi of the Police Department.

        MS.   LEDERER:   Objection.

        THE COURT:   Sustained.

Q   Were there any Assistant District Attorneys present at any time when you were involved in this case between April the 19th and April the 20th?

        MS.   LEDERER:   Objection.

        THE COURT:   I'll let him answer.

A   Yes.

Q   And would that about A.D.A.   Lederer?

A   Yes.


        H. C. Davis

NYCLD_023613

P-APP000401

1           T-3    Reynolds-Ppl-cross (Rivera)              911

2        Q    And was there also an A.D.A. Fairstein?

3        A    Yes.

4        Q    Were there any other members of the District

5   Attorney, District Attorney present, paticularly any

6   Assistant District Attorney?

7        A    I don't think so.

8        Q    And when for the first time did you see an

9   Assistant District Attorney on this matter?

10        A    The night of the 20th.

11        Q    Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13        A    Regarding this matter?

14        Q    Regarding this case.

15        A    No.

16        Q    Did you see them in the building or any other

17   buildings involved in the case?

18        A    No.

19        Q    Prior to the 20th?

20        A    No.

21        Q    Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23        A    Yes.

24        Q    And police officer Alvarez informed you of an

25   assault on an individual; is that correct?


                        M. C. Davis


NYCLD_023614

P-APP000402

1          T-3    Reynolds-Ppl-cross (Rivera)                909

2          the Assistant District Attorneys and all sworn

3          jurors are present.

4               THE COURT:  All right, good afternoon, ladies

5          and gentlemen.

6               THE CLERK:  Officer Reynolds, may I remind you

7          you're still under oath.

8               THE WITNESS:  Yes.

9     CONTINUING CROSS EXAMINATION

10    BY MR. RIVERA:

11        Q    Officer, before we broke, you indicated to us that

12    there was some chiefs and members of the press that were

13    present at the Central Park Precinct; is that correct?

14        A    Yes.

15        Q    And is that unusual to see top brass at the Central

16    Park Precinct during an arrest?

17        A    There is not a lot of arrests there, so, but yeah,

18    I would say it is.  Slight.

19        Q    Under normal circumstances would it be unusual to

20    see a high member of the brass at any precinct when youths

21    are arrested?

22               MS.  LEDERER:  Objection.

23               THE COURT:  I'll allow it.

24        A    It depends on the precinct.

25        Q    Are there some precincts where this would not be

                          E. C. Davis

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              910
 2   unusual?
 3                   MS.   LEDERER:   Objection.
 4        A    Yes.
 5        Q    What about the Central Park Precinct, is this
 6   unusual at the Central Park Precinct?
 7        A    Slightly, yes.
 8        Q    And the same applies for the members of the press?
 9        A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11   have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14   there case was going to have special significance within the
15   modus operandi of the Police Department.
16                   MS.   LEDERER:   Objection.
17                   THE COURT:   Sustained.
18        Q    Were there any Assistant District Attorneys present
19   at any time when you were involved in this case between
20   April the 19th and April the 20th?
21                   MS.   LEDERER:   Objection.
22                   THE COURT:   I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.   Lederer?
25        A    Yes.


                          H. C. Davis
```

NYCLD_023613

P-APP000404

1          T-3   Reynolds-Ppl-cross (Rivera)       911

2       Q    And was there also an A.D.A. Fairstein?

3       A    Yes.

4       Q    Were there any other members of the District

5  Attorney, District Attorney present, paticularly any

6  Assistant District Attorney?

7       A    I don't think so.

8       Q    And when for the first time did you see an

9  Assistant District Attorney on this matter?

10      A    The night of the 20th.

11      Q    Prior to the evening of the 20th, you had not seen

12  any A.D.A.s?

13      A    Regarding this matter?

14      Q    Regarding this case.

15      A    No.

16      Q    Did you see them in the building or any other

17  buildings involved in the case?

18      A    No.

19      Q    Prior to the 20th?

20      A    No.

21      Q    Officer, you testified that you spoke to a police

22  officer Alvarez; is that correct?

23      A    Yes.

24      Q    And police officer Alvarez informed you of an

25  assault on an individual; is that correct?

M. C. Davis

NYCLD_023614

P-APP000405

People - Det. Arroyo - Cross - Rivera                2951

1

2      Q.    And if I -- if -- do you recall her saying that

3  they have lived together for about five, six months, does

4  that refresh your recollection as to what she might have

5  said?

6      A.    No, it does not.

7      Q.    Now, you testified jthat you got the grandmother

8  some coffee; is that correct?

9      A.    To the best of my recollection, that is correct.

10     Q.    Where did you get the coffee from?

11     A.    To the best of my recollection, we had a Mr.

12  Coffee like coffee maker.

13     Q.    And would this be in the juvenile room?

14     A.    No.

15     Q.    Where was --

16            MR. RIVERA:  Withdrawn.

17     Q.    Where is the coffee maker located?

18     A.    In the detective squad room.

19     Q.    And this is the same detective squad where you're

20  ordinarily assigned; is that correct?

21     A.    That's correct.

22     Q.    So, you work out of the Central Park Precinct; is

23  that correct?

24     A.    That is correct.

25     Q.    So, in relationship to the juvenile room, where is

Joseph T. Tierney, CSR, RPR

People - Det. Arroyo - Cross - Rivera                    2952

1   the Detective Squad?

2        A.   It's in another building opposite the juvenile or

3   the community affairs building, across the driveway from the

4   community affairs building.

5        Q.   So, did you leave the juvenile room to get the

6   coffee from the detective squad?

7        A.   Yes, that's correct.

8        Q.   And that's when you got the soda; is that correct?

9        A.   At that time, correct.

10        Q.   Did you see any coffee in the juvenile room at

11   that point in time?

12        A.   No, I did not or there was a machine that

13   wasn't -- that didn't have enough coffee in it for some

14   reason or another.  I do believe there is one in there,

15   though.

16        Q.   You do recall there being a coffee maker in the

17   juvenile room, is that correct?

18        A.   That's correct.

19        Q.   And is there a coffee maker or --

20             MR. RIVERA:  Withdrawn.

21        Q.   Was there coffee or a coffee maker in the clerical

22   office on the 20th of April?  I'm referring specifically to

23   what we have termed the clerical office right next to the

24   juvenile room.

25

Joseph T. Tierney, CSR, RPR

NYCLD_017517

P-APP000407

```
1              People - Det. Arroyo - Cross - Rivera        2964
2    of Raymond by Detective Hartigan; is that correct?
3                    MS. LEDERER:  Objection.
4                    THE COURT:  What was your question?
5                    MR. RIVERA:  That he was present during the
6              entire questioning of Raymond by Detective
7              Hartigan.
8         Q.   Is that correct?
9                    MS. LEDERER:  Objection.
10                    THE COURT:  I'll let him answer if he was
11              present --
12                    Detective Hartigan was present at all times
13              when you were present?
14                    THE WITNESS:  Detective Hartigan was present
15              when I was present, yes.
16                    THE COURT:  At all times?
17                    THE WITNESS:  Except for the times that I
18              left the room, correct.
19         Q.   But from 1:40 to 4:40, you were present during the
20    entire questioning of Raymond Santana; is that correct?
21         A.   Again, except for those times that I left briefly.
22         Q.   Well, when did you leave the room between 1:40 and
23    4:40?
24         A.   Well, I left the room to get coffee.
25         Q.   Other than that.
```

Joseph T. Tierney, CSR, RPR

NYCLD_017529

P-APP000408

1              People - Det. Arroyo - Cross - Rivera            2965

2        A.    I might have also left the room to get myself a

3   soda.   I left the room after the signing of the written

4   statement, and that would take us beyond 4:40 p.m.

5        Q.    Okay.   Raymond signed the statement at about 4:40;

6   is that correct?

7        A.    That's correct.

8        Q.    That means that the interrogation of Raymond ended

9   about 4:40, would that be correct?

10       A.    That's correct.

11       Q.    And did you tell Raymond that the interrogation

12   had ended of Raymond?

13       A.    No.

14       Q.    You, at no time, informed him that your

15   questioning is over; is that correct?

16       A.    No.

17       Q.    You just took the statement, left the room and

18   came back several minutes later; is that correct?

19       A.    That's correct.

20       Q.    Now, you took that statement and brought it to

21   your supervisors; is that correct?

22       A.    That's correct.

23       Q.    And who, in particular, did you bring Raymond's

24   statement to?

25              MS. LEDERER:   Objection.


                  Joseph T. Tierney, CSR, RPR

NYCLD_017530

P-APP000409

People - Det. Arroyo - Cross - Rivera          2966

1
2          THE COURT:  Who did he what?
3          MR. RIVERA:  Who did he bring Raymond's
4     statement to.
5          THE COURT:  I'll let him answer.  I really
6     don't know what it has to do with this hearing.
7     A.    I brought the statement to the detective squad
8  room, where Lieutenant Doyle from Manhattan North Homicide
9  was present.
10    Q.    Was ADA Fairstein or ADA Lederer present when you
11 went to bring the statement to Lieutenant Doyle?
12         MS. LEDERER:  Objection.
13         THE COURT:  I'll let him answer that.
14    A.    No, they were not.
15    Q.    Did you discuss with Lieutenant Doyle the fact
16 that Raymond's grandmother was present and had difficulty
17 with the English language?
18         MS. LEDERER:  Objection.
19         THE COURT:  Sustained.
20    Q.    Did you ever ask Raymond to put into his own words
21 the statement that is People's 20 in evidence?
22    A.    Yes, I asked him if he wanted to write it out.
23    Q.    And what, if anything, did Raymond say?
24    A.    He said no.  I offered to write it out and he
25 agreed.


Joseph T. Tierney, CSR, RPR

T10-SC-TS

2498

1               Arroyo - Cross - Rivera

2       Q         And that part was not in when you first made out

3   this statement, is that correct?

4       A       That's correct.   Because  if  he  had  anything

5   additional to add, it would have been added there.

6       Q         But  it wasn't in when you read the statement to

7   Ramon?

8       A     That's correct.

9       Q     Now, were  you  the  one  who  called  the  district

10  attorney's office to have him come down?

11      A     No, I was not.

12      Q     Were you present when the DAs office showed up?

13      A     Yes.

14      Q       And at about what time did representatives of the

15  DAs office show up?

16      A     I'm not sure exactly what time they showed up.   I

17  first  encountered  the  DAs  at the 20th Precinct after I was

18  finished at the Central Park Precinct.

19      Q     So, they weren't at the Central Park Precinct?

20      A     Well, I don't recall seeing them there.

21      Q     First time you saw them was at the 20 Precinct, 20th

22  Precinct?

23      A     That's correct.

24      Q     And was this in the morning or in the afternoon that

25  you saw them?

NYCLD_017753

P-APP000411

T10-SC-TS

2499

Arroyo — Cross — Rivera

2    A    This was in the evening.

3    Q    And you have no recollection at about what time you

4    saw them?

5    A    No, I don't.

6    Q    And who from the district attorney's office did you

7    see at the precinct?

8    A    I saw district attorney Linda Fairstein, district

9    attorney Liz Lederer and district attorney Tim Clements.

10   Q    Do you know who Linda Fairstein is in the hierarchy

11   of the district attorney's office?

12   A    Yes.

13   Q    And who is she?

14   A    She was the sex crimes senior trial lawyer for the

15   DAs office.

16   Q    Was she the chief of the sex crime unit for the DAs

17   office?

18   A    I'm not exactly sure what her rank was, but she held

19   some position along those lines at that time.

20   Q    She had a position within the district attorney's

21   office, a high position within the DAs office, is that

22   correct?

23   A    Well, I would assume you would call it that, yeah.

24   Q    And you saw them there on the evening of April the

25   20th, am I correct in that?