Page 419

| | | |
|---|---|---|
| 1 | his statement. | 12:45:23 |
| 2 | Q.    Why did you feel it necessary to | 12:45:29 |
| 3 | go to the scene of the, alleged scene of | 12:45:31 |
| 4 | the attack on the jogger after Raymond | 12:45:35 |
| 5 | Santana had already made his statement? | 12:45:38 |
| 6 | MS. DAITZ:  Objection to form. | 12:45:40 |
| 7 | A.    I asked Raymond and his father | 12:45:45 |
| 8 | if they could point, if Raymond could | 12:45:50 |
| 9 | point out -- if he could recall where the, | 12:45:53 |
| 10 | where the initial attack on the jogger | 12:46:00 |
| 11 | took place. | 12:46:03 |
| 12 | Q.    You asked him that when, as you | 12:46:07 |
| 13 | drove through the park or before you got | 12:46:09 |
| 14 | into the park? | 12:46:12 |
| 15 | MS. DAITZ:  Objection to form. | 12:46:13 |
| 16 | A.    I'm not sure whether I asked him | 12:46:13 |
| 17 | that before we got in the car or whether I | 12:46:16 |
| 18 | mentioned it in the car, but certainly I | 12:46:20 |
| 19 | had that conversation. | 12:46:22 |
| 20 | Q.    And what did Raymond say to you? | 12:46:23 |
| 21 | A.    As we drove along the West 102nd | 12:46:31 |
| 22 | Street Drive, there were police officers | 12:46:39 |
| 23 | on the drive. | 12:46:43 |
| 24 | To the best of my recollection, | 12:46:51 |
| 25 | there were some lights set up.  Raymond | 12:46:53 |

NYCLD_044110

P-APP000939

Page 420

| | | |
|---|---|---|
| 1 | told me to stop the car at a certain | 12:46:58 |
| 2 | point.  He said it happened here. | 12:47:02 |
| 3 | Q.    And so then you got out.  Did | 12:47:14 |
| 4 | you get out when he said it happened here? | 12:47:16 |
| 5 | A.    I stopped the car. | 12:47:19 |
| 6 | Q.    I'm sorry, you said you saw a | 12:47:20 |
| 7 | police car, you drove and you saw a police | 12:47:22 |
| 8 | car and you drove past it? | 12:47:25 |
| 9 | A.    I did not, I didn't say that.  I | 12:47:27 |
| 10 | said I saw police officers on that -- | 12:47:28 |
| 11 | Q.    On the drive. | 12:47:30 |
| 12 | A.    It could have been police -- | 12:47:31 |
| 13 | Q.    On the Cross Drive? | 12:47:35 |
| 14 | A.    Yes, sir.  It could have been | 12:47:36 |
| 15 | police vehicles as well, but I | 12:47:38 |
| 16 | specifically don't recall. | 12:47:40 |
| 17 | Q.    Were there any lights? | 12:47:40 |
| 18 | A.    As I testified, there were | 12:47:42 |
| 19 | lights. | 12:47:43 |
| 20 | Q.    And then Raymond said stop here? | 12:47:43 |
| 21 | A.    Yes, sir. | 12:47:47 |
| 22 | Q.    And then what did he say or then | 12:47:48 |
| 23 | what happened? | 12:47:54 |
| 24 | A.    Jonza, myself, Santana, Jr. and | 12:47:56 |
| 25 | Raymond, Sr. all got out of the car. | 12:48:02 |

NYCLD_044111

P-APP000940

Page 421

| | | |
|---|---|---|
| 1 | Q.      And? | 12:48:05 |
| 2 | A.      Following Raymond's lead, we | 12:48:06 |
| 3 | walked to the, what would be the northern | 12:48:13 |
| 4 | edge of the path that cuts from the East | 12:48:16 |
| 5 | Drive to the West Drive and vice versa. | 12:48:23 |
| 6 | Q.      And then what happened? | 12:48:25 |
| 7 | A.      Raymond said it happened here, | 12:48:27 |
| 8 | or words to that effect. | 12:48:34 |
| 9 | Q.      And then you got back in the | 12:48:35 |
| 10 | car? | 12:48:41 |
| 11 | A.      We got back in the car. | 12:48:41 |
| 12 | Q.      I'm saying, that was a question, | 12:48:43 |
| 13 | did you get back in the car, did you walk | 12:48:45 |
| 14 | anyplace else? | 12:48:48 |
| 15 | A.      To the best of my recollection, | 12:48:49 |
| 16 | I think we walked a little off the path | 12:48:51 |
| 17 | onto the grass.  But as I sit here today, | 12:48:56 |
| 18 | all these years later, I don't remember | 12:49:01 |
| 19 | that as clearly as I did back then. | 12:49:07 |
| 20 | Q.      When you say you walked into the | 12:49:10 |
| 21 | grass, the grass at the scene where the | 12:49:12 |
| 22 | attack occurred? | 12:49:16 |
| 23 | A.      According to Raymond. | 12:49:18 |
| 24 | MS. DAITZ:  Objection. | 12:49:19 |
| 25 | Q.      According to Raymond. | 12:49:20 |

NYCLD_044112

P-APP000941

Page 422

| | | |
|---|---|---|
| 1 | Subsequent to that, did you find out where | 12:49:22 |
| 2 | the scene, where the actual crime scene | 12:49:25 |
| 3 | was -- | 12:49:27 |
| 4 | MS. DAITZ:  Objection. | 12:49:28 |
| 5 | Q.    -- involving Ms. Meili? | 12:49:28 |
| 6 | MS. DAITZ:  Objection to form. | 12:49:31 |
| 7 | A.    Subsequent to? | 12:49:32 |
| 8 | Q.    Subsequent to that.  That was | 12:49:35 |
| 9 | your first trip to the crime scene, | 12:49:37 |
| 10 | correct? | 12:49:38 |
| 11 | A.    Yes, yes, sir. | 12:49:39 |
| 12 | Q.    You made other trips to the | 12:49:40 |
| 13 | crime scene after that? | 12:49:43 |
| 14 | A.    Yes, sir. | 12:49:43 |
| 15 | Q.    And at some point you | 12:49:44 |
| 16 | established where it actually, where the | 12:49:45 |
| 17 | attack on Ms. Meili actually occurred, | 12:49:47 |
| 18 | correct? | 12:49:51 |
| 19 | MS. DAITZ:  Objection. | 12:49:51 |
| 20 | Q.    At some point during the | 12:49:52 |
| 21 | investigation? | 12:49:54 |
| 22 | A.    At some point during the | 12:49:55 |
| 23 | investigation, there were actually two | 12:49:56 |
| 24 | crime scenes. | 12:49:59 |
| 25 | Q.    And the location where you said | 12:50:00 |

NYCLD_044113

P-APP000942

Page 423

| | | |
|---|---|---|
| 1 | Raymond told you to stop, was that the | 12:50:08 |
| 2 | first crime scene or the second crime | 12:50:10 |
| 3 | scene? | 12:50:13 |
| 4 | A.     That was, what was later on to | 12:50:13 |
| 5 | be determined, the first crime scene, yes. | 12:50:17 |
| 6 | Q.     And the first crime scene is | 12:50:20 |
| 7 | where Ms. Meili was first attacked? | 12:50:23 |
| 8 | A.     That would be correct. | 12:50:26 |
| 9 | Q.     And Raymond told you to stop the | 12:50:28 |
| 10 | car close to that scene? | 12:50:33 |
| 11 | A.     Yes, sir, it was an | 12:50:35 |
| 12 | approximation. | 12:50:39 |
| 13 | Q.     And he was the one who told you | 12:50:39 |
| 14 | where to stop? | 12:50:48 |
| 15 | A.     Yes, sir. | 12:50:49 |
| 16 | Q.     Do you remember the, looking at | 12:50:49 |
| 17 | Sheehan 34, your testimony at the | 12:51:15 |
| 18 | suppression hearing, do you remember being | 12:51:17 |
| 19 | asked these questions, I'm going to refer | 12:51:22 |
| 20 | you to the page, page 1706, through line 4 | 12:51:24 |
| 21 | on page 1707, and let me know when you're | 12:52:08 |
| 22 | finished. | 12:52:27 |
| 23 | A.     Okay. | 12:52:45 |
| 24 | Q.     Do you remember being asked | 12:52:46 |
| 25 | those questions starting on 1706, well, | 12:52:48 |

NYCLD_044114

P-APP000943

Page 424

| | |
|---|---|
| 1 | actually, the question is on 170 -- I | 12:52:53 |
| 2 | don't have that page. | 12:52:58 |
| 3 | The answer is:  "Our original | 12:52:58 |
| 4 | destination was the Santana residence on | 12:53:01 |
| 5 | ███████████████ which is across the | 12:53:03 |
| 6 | street from the 25th Precinct. | 12:53:06 |
| 7 | "QUESTION:  Did you go to that | 12:53:07 |
| 8 | location? | 12:53:08 |
| 9 | "ANSWER:  On our way we stopped | 12:53:09 |
| 10 | by the crime scene. | 12:53:12 |
| 11 | "QUESTION:  Where was that? | 12:53:14 |
| 12 | "ANSWER:  The crime scene is | 12:53:15 |
| 13 | actually a multiple crime scene.  We went | 12:53:18 |
| 14 | to 102nd Street and the Cross Drive which | 12:53:21 |
| 15 | connects the East Drive on Central Park | 12:53:24 |
| 16 | with the West Drive of Central Park. | 12:53:27 |
| 17 | "QUESTION:  Where did you go on | 12:53:29 |
| 18 | 102nd Street Cross Drive? | 12:53:31 |
| 19 | "ANSWER:  Approximately midway | 12:53:32 |
| 20 | between the East and West Drive. | 12:53:34 |
| 21 | "QUESTION:  Was anything said by | 12:53:37 |
| 22 | anyone in the car? | 12:53:38 |
| 23 | "ANSWER:  Yes, sir, I asked | 12:53:39 |
| 24 | Raymond Santana if we could all exit the | 12:53:42 |
| 25 | car, including his father, if he would, if | 12:53:45 |

NYCLD_044115

P-APP000944

Page 425

| | | |
|---|---|---|
| 1 | he could possibly remember and try to show | 12:53:48 |
| 2 | us some of the pertinent sites, in | 12:53:51 |
| 3 | particular, where the woman was grabbed | 12:53:54 |
| 4 | and where the rape took place. | 12:53:55 |
| 5 | "QUESTION:  Did Raymond Santana, | 12:53:57 |
| 6 | Jr. say anything or point anywhere? | 12:54:00 |
| 7 | "ANSWER:  He pointed in the | 12:54:01 |
| 8 | general area, an area north, north of this | 12:54:04 |
| 9 | Cross Drive which is heavily wooded and | 12:54:07 |
| 10 | about 30 to 40 feet in.  It begins to | 12:54:10 |
| 11 | slope down into a ravine.  We walked into | 12:54:13 |
| 12 | the woods maybe 20 to 30 feet.  He said it | 12:54:16 |
| 13 | was really, it was really too dark for him | 12:54:20 |
| 14 | to point out anything of any | 12:54:23 |
| 15 | significance." | 12:54:27 |
| 16 | Do you remember being asked | 12:54:27 |
| 17 | those questions and giving those answers? | 12:54:29 |
| 18 | A.    I don't remember it, but if it's | 12:54:30 |
| 19 | part of my testimony -- | 12:54:34 |
| 20 | Q.    And it doesn't indicate -- | 12:54:34 |
| 21 | MS. DAITZ:  Can you just let him | 12:54:36 |
| 22 | finish his answer? | 12:54:37 |
| 23 | Q.    Okay. | 12:54:38 |
| 24 | A.    If it's part of my testimony, | 12:54:39 |
| 25 | then I would assume this is what happened. | 12:54:42 |

NYCLD_044116

P-APP000945

Page 426

| | | |
|---|---|---|
| 1 | Q.     And this deposition was on | 12:54:44 |
| 2 | October 1989 some six months -- | 12:54:48 |
| 3 | MS. DAITZ:   This hearing. | 12:54:53 |
| 4 | Q.     This hearing, I'm sorry, this | 12:54:55 |
| 5 | hearing was in October 1989 some six | 12:54:57 |
| 6 | months after the incident? | 12:55:00 |
| 7 | A.     Yes, sir. | 12:55:01 |
| 8 | Q.     when it would be fresher in your | 12:55:02 |
| 9 | mind? | 12:55:06 |
| 10 | A.     Yes. | 12:55:06 |
| 11 | Q.     And did your answer -- nowhere | 12:55:06 |
| 12 | in it does your answer indicate that | 12:55:11 |
| 13 | Raymond told you where to stop, does it? | 12:55:13 |
| 14 | A.     Nowhere in this testimony, but | 12:55:16 |
| 15 | you're asking me my independent | 12:55:19 |
| 16 | recollection? | 12:55:21 |
| 17 | Q.     Yes. | 12:55:22 |
| 18 | A.     And my independent recollection | 12:55:22 |
| 19 | is that he did tell me where to stop. | 12:55:24 |
| 20 | Q.     That's your independent | 12:55:27 |
| 21 | recollection in 2013? | 12:55:28 |
| 22 | A.     Right. | 12:55:31 |
| 23 | MS. DAITZ:   Mr. Wareham, can we | 12:55:45 |
| 24 | break for lunch?  Whenever it's convenient | 12:55:48 |
| 25 | for you. | 12:55:55 |

NYCLD_044117

P-APP000946

Page 427

| | | |
|---|---|---|
| 1 | MR. WAREHAM: Okay, 1:30. | 12:55:55 |
| 2 | MS. DAITZ: Sure. | 12:55:57 |
| 3 | MR. WAREHAM: It that good for | 12:55:59 |
| 4 | you, Jane, you and the kid? | 12:56:00 |
| 5 | Q. Do you remember Raymond making a | 12:56:03 |
| 6 | statement that you testified to that it | 12:56:11 |
| 7 | was too dark in the wooded area? | 12:56:12 |
| 8 | A. I remember, once again, to the | 12:56:16 |
| 9 | best of my recollection, I do remember | 12:56:20 |
| 10 | Raymond saying as we walked, as I | 12:56:23 |
| 11 | testified, off the path into the grassy | 12:56:26 |
| 12 | area, I do remember him saying that it | 12:56:29 |
| 13 | was, that it was dark. | 12:56:32 |
| 14 | Q. Too dark for him to be able to | 12:56:33 |
| 15 | -- | 12:56:37 |
| 16 | A. I don't recall that. | 12:56:37 |
| 17 | Q. -- to identify? | 12:56:38 |
| 18 | A. I don't recall that exactly but | 12:56:39 |
| 19 | certainly that's in my testimony. | 12:56:41 |
| 20 | Q. And this was at approximately | 12:56:42 |
| 21 | what time in the morning? | 12:56:46 |
| 22 | A. Okay, let me try to get a | 12:56:49 |
| 23 | timeline again in my head. | 12:56:53 |
| 24 | Q. Okay. | 12:56:55 |
| 25 | A. The videotaped statement was | 12:56:56 |

NYCLD_044118

P-APP000947

Page 428

| | | |
|---|---|---|
| 1 | sometime after two o'clock.  Then there | 12:57:00 |
| 2 | was a videotape of the clothes.  So this | 12:57:04 |
| 3 | was, to the best of my recollection, | 12:57:07 |
| 4 | sometime around three a.m. to four a.m., | 12:57:16 |
| 5 | and that's being very general. | 12:57:19 |
| 6 | Q.    It was before sunrise? | 12:57:22 |
| 7 | A.    Yes, sir. | 12:57:24 |
| 8 | Q.    And the assault on Ms. Meili | 12:57:25 |
| 9 | occurred, excuse me, in approximately nine | 12:57:41 |
| 10 | or ten p.m. on the night of the, on April | 12:57:45 |
| 11 | 19th; is that correct? | 12:57:51 |
| 12 | MS. DAITZ:  Objection. | 12:57:52 |
| 13 | A.    As I said, as I sit here today, | 12:57:52 |
| 14 | I'm not entirely certain when that | 12:57:56 |
| 15 | happened. | 12:57:59 |
| 16 | Q.    But you do know it was at night? | 12:57:59 |
| 17 | A.    I believe it was, I believe it | 12:58:01 |
| 18 | was at night, yes. | 12:58:04 |
| 19 | Q.    And -- | 12:58:07 |
| 20 | MR. WAREHAM:  Withdrawn. | 12:58:23 |
| 21 | Q.    Do you remember this, I'll now | 12:58:24 |
| 22 | refer you to 35, your testimony at the | 12:58:40 |
| 23 | McCray, Santana, Salaam trial in 1990. | 12:58:52 |
| 24 | And pages 3694, 3696, starting on 3694 at | 12:59:00 |
| 25 | line 10 or line 5, I'm sorry.  If you | 12:59:36 |

NYCLD_044119

P-APP000948

Page 429

```
1    would just read along with me.              12:59:49
2             Question, on line 4, on 3694.      12:59:52
3             "QUESTION:  And where did you go    12:59:55
4    and who went with you?  I'm sorry.  Let's   12:59:57
5    start at the top.                           13:00:00
6             MS. DAITZ:  Can you tell me         13:00:00
7    where you are?                              13:00:02
8             MR. WAREHAM:  3694.                 13:00:02
9             MS. DAITZ:  All right.              13:00:04
10       Q.    "QUESTION:  Approximately when?    13:00:05
11            "ANSWER:  About 3:45 in the         13:00:07
12   morning.                                    13:00:10
13            "QUESTION:  And where did you go    13:00:11
14   and who went with you?                      13:00:12
15            "ANSWER:  Myself and, again,        13:00:13
16   Detective Augie Jonza escorted Raymond      13:00:15
17   Santana Sr. and Raymond Santana, Jr. from   13:00:18
18   the 24th Precinct in a department auto to   13:00:21
19   the Santana residence which is on, located  13:00:24
20   on ████████████████     across from the 25th 13:00:27
21   Precinct.                                   13:00:27
22            "QUESTION:  Did you go directly     13:00:31
23   to the Santana residence?                   13:00:33
24            "ANSWER:  No, we did not.           13:00:34
25            "QUESTION:  Where did you go?       13:00:37
```

NYCLD_044120

P-APP000949

Page 430

| | | |
|---|---|---|
| 1 | "ANSWER:  I advised Raymond and | 13:00:38 |
| 2 | his father that en route to their home, I | 13:00:41 |
| 3 | would like to possibly take a drive by | 13:00:44 |
| 4 | where this incident happened with the | 13:00:47 |
| 5 | woman and they agreed. | 13:00:48 |
| 6 | "It was done in an effort that | 13:00:50 |
| 7 | Santana could, Raymond, Jr. could help us | 13:00:51 |
| 8 | out in pointing out perhaps the exact | 13:00:55 |
| 9 | spot.  We drove to Central Park West and I | 13:00:59 |
| 10 | went into the Central Park, I went into | 13:01:01 |
| 11 | Central Park which was closed to vehicular | 13:01:03 |
| 12 | traffic, I believe, drove to the West | 13:01:06 |
| 13 | Drive, made a left up to 102nd Street, | 13:01:08 |
| 14 | which is the Cross Drive, which is usually | 13:01:12 |
| 15 | just open for authorized vehicles, through | 13:01:14 |
| 16 | the 102nd Street Cross Drive to a point | 13:01:16 |
| 17 | between a third and a halfway between East | 13:01:20 |
| 18 | and West Drive going from the west to the | 13:01:22 |
| 19 | East Side.  We stopped on Raymond's | 13:01:24 |
| 20 | advice. | 13:01:31 |
| 21 | "QUESTION:  When you say on | 13:01:31 |
| 22 | Raymond's advice, as you were driving east | 13:01:33 |
| 23 | on 102nd Street at Cross Drive what, if | 13:01:35 |
| 24 | anything, happened that led you to stop | 13:01:38 |
| 25 | the car? | 13:01:41 |

NYCLD_044121

P-APP000950

Page 431

| | | |
|---|---|---|
| 1 | "ANSWER:   I asked him if this | 13:01:41 |
| 2 | was the particular road, and he agreed | 13:01:43 |
| 3 | this was the road.  I said you tell me | 13:01:45 |
| 4 | where to stop.  He said he thinks this is | 13:01:47 |
| 5 | the spot, so we stopped. | 13:01:50 |
| 6 | "QUESTION:   I would ask you to | 13:01:53 |
| 7 | please step down again and approach | 13:02:00 |
| 8 | People's 2 in evidence.  Would you | 13:02:02 |
| 9 | indicate on that map approximately where | 13:02:04 |
| 10 | you were when Raymond Santana told you to | 13:02:06 |
| 11 | stop? | 13:02:08 |
| 12 | "MR. RIVERA:  Objection, Your | 13:02:10 |
| 13 | Honor. | 13:02:10 |
| 14 | "THE COURT:  I'll allow him to | 13:02:11 |
| 15 | answer. | 13:02:12 |
| 16 | "ANSWER:  As I said, this is the | 13:02:13 |
| 17 | 102nd Street Cross Drive, this is not | 13:02:14 |
| 18 | normally open to vehicular traffic, | 13:02:17 |
| 19 | usually just authorized vehicles. | 13:02:19 |
| 20 | "We entered the park here.  This | 13:02:21 |
| 21 | is the West Drive, made a left straight up | 13:02:23 |
| 22 | here, made a right, straight up to here | 13:02:23 |
| 23 | made a right, into the Drive, and I said a | 13:02:29 |
| 24 | third to halfway, which is approximately | 13:02:31 |
| 25 | here, approximately here.  I'm not | 13:02:32 |

NYCLD_044122

P-APP000951

Page 432

1    completely certain.                          13:02:35

2          "QUESTION:  What, if anything,         13:02:35

3    happened at that location, was there any     13:02:37

4    conversation?                                13:02:38

5          "ANSWER:  Yes, we all got out of       13:02:39

6    the car, myself, Jonza, Santana, Jr.,        13:02:41

7    Santana, Sr.                                 13:02:43

8          "QUESTION:  Where did you go           13:02:45

9    when you got out of the car?                 13:02:46

10          "ANSWER:  Raymond indicated that      13:02:48

11   this was the area that Kevin was             13:02:50

12   struggling with the woman.  He then          13:02:52

13   pointed to a heavily wooded area, and the    13:02:54

14   area was sloped.  It doesn't slope           13:02:56

15   immediately, but it begins to slope down.    13:02:57

16   We walked into, inside the wood line, if     13:02:59

17   you know what I'm saying, like inside the    13:03:04

18   first group of trees about 30, 40 feet,      13:03:05

19   excuse me, or so.                            13:03:05

20          "He said everything else             13:03:09

21   happened in this area here, but I'm not      13:03:10

22   sure, I can't tell you, it's too dark.       13:03:14

23          MS. DAITZ:  I can't tell, it's       13:03:16

24   too dark.                                    13:03:18

25      Q.    I'm sorry, I can't tell, it's       13:03:19

NYCLD_044123

P-APP000952

Page 433

| | | |
|---|---|---|
| 1 | too dark. | 13:03:21 |
| 2 | MR. WAREHAM:  Thank you. | 13:03:22 |
| 3 | Q.   Do you remember giving this | 13:03:23 |
| 4 | testimony? | 13:03:24 |
| 5 | A.   I don't recall the exact | 13:03:24 |
| 6 | testimony again, but certainly if I gave | 13:03:26 |
| 7 | it, then it's my testimony. | 13:03:29 |
| 8 | Q.   Can you explain the difference | 13:03:32 |
| 9 | between your testimony at the hearing in | 13:03:36 |
| 10 | 1989 where you said we stopped, and your | 13:03:40 |
| 11 | testimony at the trial nine months later | 13:03:44 |
| 12 | where you said you stopped on Kevin's | 13:03:50 |
| 13 | advice? | 13:03:54 |
| 14 | MS. DAITZ:  Objection. | 13:03:54 |
| 15 | Q.   Raymond's advice, sorry. | 13:03:55 |
| 16 | MS. DAITZ:  Objection to form. | 13:03:58 |
| 17 | A.   And your question, sir? | 13:03:59 |
| 18 | Q.   My question is, your testimony | 13:04:00 |
| 19 | in October 1989 was we stopped, no | 13:04:02 |
| 20 | indication that you stopped on Raymond's | 13:04:06 |
| 21 | advice. | 13:04:09 |
| 22 | Your testimony at the trial is | 13:04:09 |
| 23 | that you stopped on Raymond's advice | 13:04:14 |
| 24 | making him more culpable in the incident. | 13:04:17 |
| 25 | MS. DAITZ:  Objection to form. | 13:04:28 |

NYCLD_044124

P-APP000953

Page 434

```
1      A.    First of all, that's your          13:04:30
2   characterization, making him more            13:04:32
3   culpable.  If you're asking me was there a   13:04:36
4   difference in my testimony, yes, there was   13:04:39
5   a slight difference in my testimony.         13:04:41
6          As to whether Raymond Santana is      13:04:44
7   the one who said stop the car, I testified   13:04:46
8   to that in the trial, and I'm testifying     13:04:50
9   to that today.                               13:04:52
10     Q.    Okay, so you're saying that the     13:04:56
11  testimony you gave in October 1989 when it   13:05:02
12  was fresher in your mind is not as           13:05:06
13  accurate as the testimony you gave in July   13:05:09
14  1990 or in May 2013?                         13:05:12
15         MS. DAITZ:  Objection to form.        13:05:18
16     A.    I'm not saying that at all, sir.    13:05:18
17  I'm saying it's slightly different.  I'm     13:05:21
18  not saying it's more accurate or less        13:05:24
19  accurate, I'm saying it's slightly           13:05:26
20  different.                                   13:05:28
21     Q.    Significantly different.            13:05:29
22         MS. DAITZ:  Objection.                13:05:30
23     A.    Perhaps in your mind, not in        13:05:30
24  mine.                                        13:05:34
25     Q.    I won't argue with you, Mr.         13:05:34
```

NYCLD_044125

P-APP000954

Page 435

```
 1    Sheehan.                                   13:05:36
 2           But you're, but you are             13:05:37
 3    consistent in that Raymond said it was too 13:05:46
 4    dark at three, four a.m. in morning?       13:05:50
 5           (Mr. Wise left the room.)           13:05:53
 6      A.    Yes, sir.                          13:05:56
 7      Q.    Darker than it would have been     13:05:57
 8    at ten p.m. that night, the night before?  13:05:59
 9           MS. DAITZ:  Objection.              13:06:00
10      A.    I didn't say that.  It's just,     13:06:01
11    all I'm testifying here is to what I read  13:06:03
12    in my testimony where Raymond said that it 13:06:05
13    was dark, and I recall that as I sit here  13:06:08
14    today.                                     13:06:11
15      Q.    Isn't it, isn't it a fact that     13:06:11
16    when you drove to that area that Raymond   13:06:15
17    Santana, Jr. and you said, you said this   13:06:18
18    is the spot where it happened.  He said    13:06:22
19    no, this is not the spot, this isn't, I    13:06:24
20    haven't been here, it's over by the water? 13:06:28
21           MS. DAITZ:  Objection.              13:06:30
22      A.    Are you saying --                  13:06:32
23      Q.    I'm saying --                      13:06:35
24      A.    I'm a bit confused.                13:06:36
25      Q.    Okay, let me rephrase it.          13:06:38
```

NYCLD_044126

P-APP000955

Page 436

| | | |
|---|---|---|
| 1 | A.    Okay. | 13:06:39 |
| 2 | Q.    Did Raymond Santana, Jr., when | 13:06:40 |
| 3 | you drove to 102nd Street Cross Drive, say | 13:06:43 |
| 4 | to you that, and you said, you said that | 13:06:46 |
| 5 | this is the spot where it occurred.  You | 13:06:49 |
| 6 | said you said that this is -- | 13:06:52 |
| 7 | MR. WAREHAM:  Withdrawn. | 13:06:54 |
| 8 | Q.    Isn't it a fact that when you | 13:06:54 |
| 9 | got to the 102nd Street Cross Drive, that | 13:06:56 |
| 10 | you told Raymond Santana this is the spot | 13:06:58 |
| 11 | where it happened, isn't it?  And he said | 13:07:01 |
| 12 | no, it happened over by the water. | 13:07:03 |
| 13 | MS. DAITZ:  Objection to form. | 13:07:07 |
| 14 | A.    No, that's not what happened. | 13:07:09 |
| 15 | Q.    And if Raymond Santana testified | 13:07:11 |
| 16 | to that under oath, you would say he was | 13:07:18 |
| 17 | lying? | 13:07:23 |
| 18 | A.    I can't say whether Raymond | 13:07:24 |
| 19 | Santana was lying. | 13:07:27 |
| 20 | Q.    Junior, that is. | 13:07:28 |
| 21 | A.    I can't say Raymond Santana, Jr. | 13:07:29 |
| 22 | was lying.  I mean, that could be his | 13:07:32 |
| 23 | version of events now.  His version of | 13:07:35 |
| 24 | events on the night when I took him there, | 13:07:40 |
| 25 | the morning that I took him there, I | 13:07:43 |

NYCLD_044127

P-APP000956

Page 437

| | | |
|---|---|---|
| 1 | recall and I testified to. | 13:07:46 |
| 2 | Q.    And if -- let me show you -- did | 13:07:47 |
| 3 | you, after you testified in the Santana | 13:09:07 |
| 4 | trial in 19 -- July 1990, did you attend | 13:09:15 |
| 5 | -- did you stay to hear any of the other | 13:09:20 |
| 6 | testimony? | 13:09:23 |
| 7 | A.    No, sir. | 13:09:23 |
| 8 | Q.    Did you hear the testimony of | 13:09:24 |
| 9 | Raymond Santana, Sr.? | 13:09:27 |
| 10 | A.    No, sir. | 13:09:29 |
| 11 | Q.    Let me show you what has been | 13:09:29 |
| 12 | marked Sheehan 37 which is an excerpt from | 13:09:34 |
| 13 | the trial testimony of Raymond Santana, | 13:09:41 |
| 14 | Sr. on August 1, 1990 -- | 13:09:45 |
| 15 | A.    Thanks. | 13:09:47 |
| 16 | MS. DAITZ:  Thank you. | 13:09:53 |
| 17 | Q.    -- at the trial of Antron | 13:09:53 |
| 18 | McCray, Raymond Santana and Yusef Salaam. | 13:09:58 |
| 19 | MS. DAITZ:  37? | 13:10:05 |
| 20 | MR. WAREHAM:  37. | 13:10:07 |
| 21 | MS. DAITZ:  Are you giving a | 13:10:08 |
| 22 | page number? | 13:10:11 |
| 23 | (Mr. Wise re-entered the room.) | 13:10:13 |
| 24 | MR. WAREHAM:  4740 through 4743. | 13:10:14 |
| 25 | 4744, excuse me, I'm sorry. | 13:10:25 |

NYCLD_044128

P-APP000957

Page 438

| | | |
|---|---|---|
| 1 | A.     What pages again, sir? | 13:10:28 |
| 2 | Q.     The entire, 4740 through 4744. | 13:10:29 |
| 3 | A.     Okay. | 13:10:33 |
| 4 | Q.     And I'll read it, and then I'll | 13:10:34 |
| 5 | ask you some questions.  This is on page | 13:10:46 |
| 6 | 4740, line 4, direct examination | 13:10:48 |
| 7 | continued. | 13:10:52 |
| 8 |         MS. DAITZ:  Can you just give me | 13:10:52 |
| 9 | one minute? | 13:10:54 |
| 10 |         MR. WAREHAM:  Okay.  Let's go | 13:10:56 |
| 11 | off, I have to take a quick break. | 13:11:23 |
| 12 |         THE VIDEOGRAPHER:  We are going | 13:11:26 |
| 13 | off the record at 1:11 p.m.  This marks | 13:11:27 |
| 14 | the end of media unit 2. | 13:11:31 |
| 15 |         (A recess was taken.) | 13:11:36 |
| 16 |         THE VIDEOGRAPHER:  We're back on | 13:16:32 |
| 17 | the record at 1:17 p.m. This starts the | 13:17:20 |
| 18 | beginning of media unit 3. | 13:17:24 |
| 19 | Q.     So did you have an opportunity | 13:17:26 |
| 20 | to look at that? | 13:17:29 |
| 21 | A.     Yes, I did. | 13:17:30 |
| 22 | Q.     On page 4740, line 5, direct | 13:17:31 |
| 23 | examination by Mr. Rivera of Mr. Raymond | 13:17:39 |
| 24 | Santana, Sr. | 13:17:39 |
| 25 |         "QUESTION:  And you, you | 13:17:43 |

NYCLD_044129

P-APP000958

Page 439

```
 1    indicated, Mr. Santana, that you went in a    13:17:44

 2    police car with your son, Raymond, and        13:17:48

 3    other police officers?                         13:17:50

 4             "ANSWER:  M-mm.                        13:17:50

 5             "QUESTION:  How many police          13:17:53

 6    officers went into that police car?           13:17:55

 7             "ANSWER:  It was, when we came        13:17:56

 8    out the precinct, it was two, two police      13:17:59

 9    cars.                                          13:18:02

10             "QUESTION:  Two police cars?         13:18:02

11             "ANSWER:  Yeah.  It was five          13:18:03

12    detectives, me and my son.                     13:18:06

13             "QUESTION:  You and your son         13:18:07

14    were in one police car?                        13:18:09

15             "ANSWER:  Yeah.                       13:18:11

16             "QUESTION:  The same police car?     13:18:12

17             "ANSWER:  With two detectives.        13:18:14

18             "QUESTION:  There were two           13:18:16

19    detectives in that car?                        13:18:18

20             "ANSWER:  Uh-huh.                     13:18:19

21             "QUESTION:  And was there            13:18:21

22    another police car?                            13:18:22

23             "ANSWER:  Yes.                        13:18:24

24             "QUESTION:  And how many             13:18:25

25    detectives were in that other police car?     13:18:26
```

NYCLD_044130

P-APP000959

Page 440

```
 1              "ANSWER:   Three.                  13:18:29
 2              "QUESTION:  And where did you      13:18:31
 3   go?                                           13:18:32
 4              "ANSWER:  To the Central Park.     13:18:33
 5              "QUESTION:  And where were you     13:18:36
 6   seated?                                       13:18:37
 7              "ANSWER:  In the back with         13:18:38
 8   Raymond.                                      13:18:40
 9              "QUESTION:  And Raymond was        13:18:41
10   seated in the back?                           13:18:42
11              "ANSWER:  Yes.                     13:18:43
12              "QUESTION:  Was Raymond seated     13:18:45
13   behind the driver or behind the --            13:18:47
14              "ANSWER:  He was seated behind     13:18:49
15   the driver.                                   13:18:51
16              "QUESTION:  And you were to the    13:18:52
17   right of Raymond; is that correct?            13:18:53
18              "ANSWER:  Yeah.                    13:18:55
19              "QUESTION:  And the other police   13:18:56
20   officer -- the other officers, where were     13:18:59
21   they?                                         13:19:00
22              "ANSWER:  Hm?                      13:19:02
23              "QUESTION:  There were two         13:19:04
24   police officers you indicated.                13:19:05
25              "ANSWER:  In the front.            13:19:06
```

NYCLD_044131

P-APP000960

Page 441

| | | |
|---|---|---|
| 1 | "QUESTION:  And where were they | 13:19:08 |
| 2 | seated, in the front seat? | 13:19:09 |
| 3 | "Yeah, front seat. | 13:19:13 |
| 4 | "QUESTION:  And where did you | 13:19:15 |
| 5 | go? | 13:19:16 |
| 6 | "ANSWER:  To the Central Park. | 13:19:17 |
| 7 | "QUESTION:  And do you know | 13:19:18 |
| 8 | where you went? | 13:19:19 |
| 9 | "ANSWER:  To -- when we got | 13:19:20 |
| 10 | there, it was a policeman there. | 13:19:23 |
| 11 | "QUESTION:  It was, there was a | 13:19:27 |
| 12 | policeman there? | 13:19:28 |
| 13 | "ANSWER:  Yeah. | 13:19:29 |
| 14 | "QUESTION:  And, other than the | 13:19:29 |
| 15 | a policeman there, were there any other | 13:19:31 |
| 16 | vehicles there? | 13:19:34 |
| 17 | "ANSWER:  No. | 13:19:35 |
| 18 | "QUESTION:  There were no | 13:19:36 |
| 19 | vehicles where this police officer was | 13:19:38 |
| 20 | standing? | 13:19:40 |
| 21 | "ANSWER:  No. | 13:19:41 |
| 22 | "QUESTION:  What happened there? | 13:19:42 |
| 23 | "ANSWER:  We got there.  They | 13:19:43 |
| 24 | tell us to get off the car. | 13:19:45 |
| 25 | "QUESTION:  Who said get off the | 13:19:48 |

NYCLD_044132

P-APP000961

Page 442

| | | |
|---|---|---|
| 1 | car? | 13:19:50 |
| 2 | "ANSWER:  Sheehan. | 13:19:50 |
| 3 | "QUESTION:  Did Raymond say | 13:19:52 |
| 4 | anything at that point in time? | 13:19:54 |
| 5 | "ANSWER:  No. | 13:19:56 |
| 6 | "QUESTION:  Did Raymond tell the | 13:19:58 |
| 7 | police officer, Detective Sheehan, stop | 13:19:58 |
| 8 | right here? | 13:19:59 |
| 9 | "ANSWER:  No. | 13:19:59 |
| 10 | "MS. LEDERER:  Objection as to | 13:20:01 |
| 11 | leading, Your Honor. | 13:20:02 |
| 12 | "THE COURT:  Yes, objection | 13:20:06 |
| 13 | sustained.  Let him testify. | 13:20:07 |
| 14 | "QUESTION:  What happened at | 13:20:09 |
| 15 | that location? | 13:20:10 |
| 16 | "ANSWER:  We got out of the car, | 13:20:11 |
| 17 | and we start walking on the grounds. | 13:20:12 |
| 18 | "QUESTION:  And were you walking | 13:20:12 |
| 19 | also? | 13:20:12 |
| 20 | "ANSWER:  Yes. | 13:20:12 |
| 21 | "QUESTION:  And what, did the | 13:20:14 |
| 22 | officer ask Raymond any questions? | 13:20:19 |
| 23 | "ANSWER:  Not yet. | 13:20:21 |
| 24 | "QUESTION:  What happened then? | 13:20:23 |
| 25 | "ANSWER:  Then we went downhill | 13:20:25 |

NYCLD_044133

P-APP000962

Page 443

| | | |
|---|---|---|
| 1 | like and he said, Raymond, you was here, | 13:20:27 |
| 2 | and Raymond said, no, I never been here. | 13:20:29 |
| 3 | "QUESTION:  And what happened | 13:20:32 |
| 4 | then? | 13:20:32 |
| 5 | "ANSWER:  "Raymond said he was | 13:20:34 |
| 6 | on the other side of the park. | 13:20:36 |
| 7 | "QUESTION:  Did Raymond point to | 13:20:38 |
| 8 | any area? | 13:20:40 |
| 9 | "ANSWER:  Yes. | 13:20:41 |
| 10 | "QUESTION:  To a general area? | 13:20:42 |
| 11 | "ANSWER:  Yes, the water well. | 13:20:44 |
| 12 | "QUESTION:  I'm sorry? | 13:20:46 |
| 13 | "ANSWER:  The water well. | 13:20:47 |
| 14 | "QUESTION:  And do you know, do | 13:20:49 |
| 15 | you know how, was he pointing with his | 13:20:51 |
| 16 | hand? | 13:20:53 |
| 17 | "Objection. | 13:20:53 |
| 18 | "MS. LEDERER:  Objection. | 13:20:54 |
| 19 | "THE COURT:  Let him tell what | 13:20:55 |
| 20 | was going on, let him describe. | 13:20:56 |
| 21 | "QUESTION:  Could you describe | 13:20:59 |
| 22 | what was happening? | 13:21:00 |
| 23 | "ANSWER:  Yeah, he was in a | 13:21:01 |
| 24 | downhill like, and Raymond, he and Raymond | 13:21:03 |
| 25 | said he was in the other side. | 13:21:06 |

NYCLD_044134

P-APP000963

Page 444

```
 1            "QUESTION:  Was he pointing with    13:21:08
 2    his hand?                                     13:21:10
 3            "ANSWER:  Yeah.                        13:21:10
 4            "THE COURT:  Mr. Rivera, let him      13:21:11
 5    describe what he was doing.                   13:21:14
 6            "MR. RIVERA:  Your Honor, he          13:21:16
 7    pointed with his hand.                        13:21:17
 8            "THE COURT:  Well, let him            13:21:18
 9    describe it.  Please describe it.             13:21:20
10            "QUESTION:  And what happened         13:21:22
11    next?                                         13:21:23
12            "ANSWER:  They didn't pay him no      13:21:24
13    mind.                                         13:21:24
14            "QUESTION:  When you say they         13:21:27
15    didn't pay him no mind, who are you           13:21:29
16    referring to?                                 13:21:29
17            "ANSWER:  Sheehan.                     13:21:32
18            "QUESTION:  Now, did Detective        13:21:33
19    Sheehan ask him any questions?                13:21:35
20            "ANSWER:  No.                          13:21:37
21            "QUESTION:  After that, what          13:21:38
22    happened?"                                    13:21:40
23            Okay.  Is, was Mr. Santana with       13:21:40
24    you when you took him into the park or you    13:21:49
25    testified Mr. Santana was with you,           13:21:51
```

NYCLD_044135

P-APP000964

Page 445

| | | |
|---|---|---|
| 1 | Senior, when you went to the park? | 13:21:53 |
| 2 | A.    If you're asking me was Mr. | 13:21:55 |
| 3 | Santana, Sr. with his son Raymond, Jr. | 13:21:57 |
| 4 | when Detective Jonza and I -- | 13:22:00 |
| 5 | Q.    Yes. | 13:22:03 |
| 6 | A.    -- went into the park en route | 13:22:04 |
| 7 | to their own home, yes. | 13:22:07 |
| 8 | Q.    And you've heard Mr. | 13:22:08 |
| 9 | Santana's -- you've read Mr. Santana's | 13:22:12 |
| 10 | testimony? | 13:22:15 |
| 11 | A.    Yes. | 13:22:15 |
| 12 | Q.    Is that accurate? | 13:22:16 |
| 13 | A.    No. | 13:22:17 |
| 14 | MR. WAREHAM:  Okay, we can take | 13:22:36 |
| 15 | a break now. | 13:22:38 |
| 16 | MS. DAITZ:  Okay. | 13:22:39 |
| 17 | MR. WAREHAM:  A break for lunch. | 13:22:39 |
| 18 | THE VIDEOGRAPHER:  We're going | 13:22:41 |
| 19 | off at 1:22 p.m. | 13:22:42 |
| 20 | (Whereupon a luncheon recess was | 13:22:44 |
| 21 | taken.) | 13:22:47 |
| 22 | (Twelve documents were hereby | 13:22:47 |
| 23 | marked as Sheehan Exhibits 41-52 for | 13:22:47 |
| 24 | identification, as of this date.) | 13:22:47 |
| 25 | AFTERNOON SESSION | 14:26:34 |

NYCLD_044136

P-APP000965

Page 446

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are back | 14:26:34 |
| 2 | on the record at 2:28 p.m. | 14:28:31 |
| 3 | Q.     Good afternoon, Mr. Sheehan. | 14:28:34 |
| 4 | A.     Good afternoon. | 14:28:37 |
| 5 | Q.     Let me ask you, going back to | 14:28:39 |
| 6 | the 20th Precinct, when, where did you | 14:28:44 |
| 7 | question Raymond Santana, Jr., where did | 14:28:54 |
| 8 | you do the interview? | 14:28:57 |
| 9 | A.     His interview was done on the | 14:28:59 |
| 10 | ground floor, it was the 20th Precinct | 14:29:02 |
| 11 | youth room. | 14:29:06 |
| 12 | Q.     And that was a designated youth | 14:29:08 |
| 13 | room? | 14:29:10 |
| 14 | A.     It's a room that certainly I had | 14:29:11 |
| 15 | believed was the designated youth room. | 14:29:14 |
| 16 | Q.     But there was a question about | 14:29:17 |
| 17 | whether it was the, whether it was | 14:29:23 |
| 18 | properly designated as a youth room? | 14:29:24 |
| 19 | A.     At some point in the | 14:29:27 |
| 20 | investigation, I'm not sure exactly when, | 14:29:28 |
| 21 | there was a question, I believe the | 14:29:31 |
| 22 | question was asked of the desk officer, | 14:29:33 |
| 23 | was this, in fact, the designated youth | 14:29:36 |
| 24 | room. | 14:29:39 |
| 25 | I, from previous experience, I | 14:29:39 |

NYCLD_044137

P-APP000966

Page 447

1   had known it to be the youth room.                14:29:43

2       Q.    Was that the reason that the            14:29:45

3   videotaping was moved from the 20th               14:29:48

4   Precinct to the 24th Precinct?                     14:29:50

5       A.    Yes, sir.                                14:29:51

6       Q.    Because there was a question of          14:29:52

7   --                                                 14:29:57

8       A.    Yes, sir.                                14:29:57

9       Q.    What were the dimensions of that         14:29:57

10  room, bearing in mind you're not good with        14:30:00

11  distances, in relation -- could you               14:30:03

12  describe it as you did in relation to this        14:30:04

13  room that we're in now, the conference            14:30:06

14  room at Beldock, Levine & Hoffman?                14:30:09

15      A.    Sure.  I would say the length of         14:30:12

16  the room was probably the same, but I             14:30:14

17  would say it's a little wider.                    14:30:15

18          MS. DAITZ:  Which is wider?               14:30:18

19      A.    In other words, push this wall           14:30:20

20  back a couple of feet.  It's the room as          14:30:22

21  you come into the precinct, the 20th             14:30:24

22  Precinct, it's directly ahead.                    14:30:31

23      Q.    That room is still there in              14:30:32

24  2013, it's the same room?  I mean, that           14:30:35

25  room hasn't gone anywhere?                        14:30:37

NYCLD_044138

P-APP000967

Page 448

| | | |
|---|---|---|
| 1 | MS. DAITZ:  Objection. | 14:30:39 |
| 2 | A.     I haven't been in the 20 in | 14:30:39 |
| 3 | awhile, but I assume that room is still | 14:30:42 |
| 4 | there, yeah. | 14:30:44 |
| 5 | Q.     When you began your interview | 14:30:45 |
| 6 | with Raymond, how would you describe his | 14:30:46 |
| 7 | demeanor? | 14:30:50 |
| 8 | A.     He seemed, he seemed relaxed. | 14:30:52 |
| 9 | Q.     He didn't seem tired? | 14:30:58 |
| 10 | A.     No. | 14:31:00 |
| 11 | Q.     He didn't seem drawn? | 14:31:00 |
| 12 | A.     No. | 14:31:03 |
| 13 | Q.     He didn't seem anxious? | 14:31:04 |
| 14 | A.     He seemed, he seemed very | 14:31:05 |
| 15 | relaxed and very coherent. | 14:31:08 |
| 16 | Q.     And you testified you didn't | 14:31:10 |
| 17 | know when he had first been put in | 14:31:17 |
| 18 | custody. | 14:31:20 |
| 19 | A.     That's correct. | 14:31:20 |
| 20 | Q.     So if I told you it was | 14:31:21 |
| 21 | approximately ten p.m. on the night of | 14:31:26 |
| 22 | April 19th, you wouldn't know whether that | 14:31:28 |
| 23 | was true or not? | 14:31:31 |
| 24 | MS. DAITZ:  Objection to form. | 14:31:32 |
| 25 | A.     That's right. | 14:31:33 |

NYCLD_044139

P-APP000968

Page 449

| | | |
|---|---|---|
| 1 | Q.   You described going to the 102nd | 14:31:34 |
| 2 | Street Cross Drive after you finished the, | 14:31:45 |
| 3 | taking the written statement, Raymond's | 14:31:49 |
| 4 | written statement, correct? | 14:31:51 |
| 5 | A.   No. | 14:31:52 |
| 6 | Q.   Okay. | 14:31:53 |
| 7 | MR. WAREHAM:   Withdrawn. | 14:31:55 |
| 8 | Q.   When you went to the 102nd | 14:31:56 |
| 9 | Street Cross Drive with Raymond Santana, | 14:32:00 |
| 10 | Jr. and his father, you said Detective | 14:32:04 |
| 11 | Jonza was with you? | 14:32:06 |
| 12 | A.   Yes. | 14:32:08 |
| 13 | Q.   Detective Hall? | 14:32:08 |
| 14 | A.   No, sir. | 14:32:09 |
| 15 | Q.   There were two or three other | 14:32:10 |
| 16 | detectives with you? | 14:32:12 |
| 17 | A.   No, sir. | 14:32:12 |
| 18 | Q.   It was just one car? | 14:32:13 |
| 19 | A.   That's correct. | 14:32:14 |
| 20 | Q.   There weren't two cars that went | 14:32:17 |
| 21 | to the 102nd Street Cross Drive when you | 14:32:24 |
| 22 | took Raymond Santana? | 14:32:27 |
| 23 | A.   No, sir. | 14:32:31 |
| 24 | Q.   So it was just you, Mr. Santana, | 14:32:32 |
| 25 | Raymond and officer, and Detective Jonza? | 14:32:41 |

NYCLD_044140

P-APP000969

Page 450

| | | | |
|---|---|---|---|
| 1 | A. | Correct. | 14:32:45 |
| 2 | Q. | And you drove? | 14:32:46 |
| 3 | A. | I drove. | 14:32:47 |

4      Q.    Okay.  When you went -- when did    14:32:48
5  you first -- was there a time when you --    14:33:07
6           MR. WAREHAM:   Withdrawn.            14:33:15
7      Q.    When did you first find out the,    14:33:15
8  that the female jogger who had been beaten    14:33:26
9  and possibly raped was a white woman?        14:33:32
10          MS. DAITZ:   Objection to form.      14:33:37
11     A.    I'm not exactly sure.   It may      14:33:38
12 have been at the briefing at the 20th        14:33:44
13 Precinct.  It may have been, it would have   14:33:47
14 to be at the briefing at the 20th.           14:33:49
15     Q.    Was there a time you found out      14:33:52
16 the racial identity of the other victims?    14:33:56
17     A.    To the best of my recollection      14:34:00
18 as I sit here today, I think it was much     14:34:06
19 later in the investigation.                  14:34:08
20     Q.    When you say "much later,"          14:34:09
21 hours, a day?                                14:34:13
22     A.    Possibly the next day.             14:34:15
23     Q.    Okay.  And when was, was there a    14:34:15
24 time you found out the racial identity of    14:34:21
25 the suspects in the attacks in the park?     14:34:26

NYCLD_044141

P-APP000970

Page 451

1      A.    Yes.   I'm not sure exactly when.    14:34:31

2   I certainly knew that Raymond Santana was      14:34:36

3   Hispanic and, just to go back to your last     14:34:39

4   question, I certainly knew from Raymond's      14:34:45

5   own description in his statement the           14:34:48

6   various races of the victims of the            14:34:51

7   assaults.                                      14:34:54

8      Q.    And would it be fair to say that     14:34:56

9   all of the suspects were either black,         14:35:01

10  either black or Hispanic?                      14:35:04

11     A.    The suspects that I physically       14:35:07

12  saw, yes, sir.                                 14:35:10

13     Q.    And that all of the victims of       14:35:11

14  the attacks, save possibly one, were           14:35:17

15  white?                                         14:35:21

16          MS. DAITZ:  Objection.                 14:35:21

17     A.    I don't recall the racial makeup     14:35:21

18  of all of the victims, but they were not       14:35:26

19  all white, no.                                 14:35:31

20     Q.    But the majority were, the vast      14:35:32

21  majority of the victims were white?            14:35:35

22          MS. DAITZ:  Objection to form.         14:35:37

23     A.    If memory serves me correct, I       14:35:38

24  would say yes, the majority.                   14:35:40

25     Q.    Did it bother you that a suspect     14:35:43

NYCLD_044142

P-APP000971

Page 452

| | | |
|---|---|---|
| 1 | had been accused of rape and possible | 14:35:58 |
| 2 | murder of a white woman? | 14:36:04 |
| 3 | MS. DAITZ: Objection to form. | 14:36:05 |
| 4 | A. I don't quite understand, would | 14:36:08 |
| 5 | it bother me? | 14:36:12 |
| 6 | Q. Right. What was -- | 14:36:13 |
| 7 | A. How would it bother me? | 14:36:15 |
| 8 | Q. What was your reaction to the | 14:36:17 |
| 9 | fact that the victim was a, the victim of | 14:36:18 |
| 10 | the jogger attack was a white woman, and | 14:36:22 |
| 11 | the accused were black and Hispanic? | 14:36:25 |
| 12 | MS. DAITZ: Objection to form. | 14:36:28 |
| 13 | A. Are you asking me how I was | 14:36:29 |
| 14 | affected by that? | 14:36:32 |
| 15 | Q. I'm asking you what was your | 14:36:33 |
| 16 | reaction. | 14:36:34 |
| 17 | A. My reaction that to was my | 14:36:35 |
| 18 | reaction to any other case. I've had | 14:36:38 |
| 19 | white victims, I've had, the majority of | 14:36:42 |
| 20 | my victims were black and Hispanic. I've | 14:36:46 |
| 21 | had white perpetrators, I've had black | 14:36:49 |
| 22 | perpetrators and I've had Hispanic | 14:36:53 |
| 23 | perpetrators. | 14:36:56 |
| 24 | Q. So it didn't bother you that the | 14:36:56 |
| 25 | victim was a white female and the accused | 14:36:58 |

NYCLD_044143

P-APP000972

Page 453

| | | |
|---|---|---|
| 1 | were black and Hispanic? | 14:37:01 |
| 2 | A.    No. | 14:37:03 |
| 3 | MS. DAITZ:  Objection to form. | 14:37:03 |
| 4 | Q.    Did that, did that scenario of a | 14:37:06 |
| 5 | white victim and black and Hispanic | 14:37:15 |
| 6 | accused, did you hear any of your fellow | 14:37:20 |
| 7 | officers comment about that? | 14:37:25 |
| 8 | MS. DAITZ:  Objection. | 14:37:26 |
| 9 | A.    No, sir. | 14:37:26 |
| 10 | Q.    No one made any comments about | 14:37:27 |
| 11 | that fact? | 14:37:32 |
| 12 | MS. DAITZ:  Objection. | 14:37:33 |
| 13 | A.    As I sit here today again, to | 14:37:33 |
| 14 | the best of my recollection, I didn't hear | 14:37:36 |
| 15 | any comments by anybody. | 14:37:38 |
| 16 | Q.    No one said anything about these | 14:37:39 |
| 17 | kids from Harlem, you know, trying to rape | 14:37:42 |
| 18 | or raping a white woman in Central Park? | 14:37:46 |
| 19 | A.    Nothing like that was ever said | 14:37:50 |
| 20 | in my presence, no, sir. | 14:37:52 |
| 21 | Q.    Were any comments made about | 14:37:53 |
| 22 | blacks and Hispanics raping a white woman | 14:37:57 |
| 23 | in Central Park or raping a white woman? | 14:38:03 |
| 24 | MS. DAITZ:  Objection. | 14:38:05 |
| 25 | A.    Certainly not.  I mean, one of | 14:38:06 |

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                                          516-608-2400

NYCLD_044144

P-APP000973

Page 454

```
 1   the detectives with me on this              14:38:08
 2   investigation happened to be African        14:38:10
 3   American.                                    14:38:13
 4       Q.    You're saying that, suggest that   14:38:14
 5   no racial comments were being made because   14:38:16
 6   a detective was African American?            14:38:19
 7             MS. DAITZ:  Objection.             14:38:22
 8       A.    No, sir.  The makeup of all of     14:38:22
 9   the detectives involved in this              14:38:26
10   investigation were from every nationality    14:38:26
11   and every race.                              14:38:29
12       Q.    And you never heard anything       14:38:33
13   around niggers or spics messing with         14:38:35
14   white, raping white women?                   14:38:40
15             MS. DAITZ:  Objection.             14:38:42
16       A.    Certainly not, no, sir.            14:38:42
17       Q.    And you never said anything like   14:38:44
18   that?                                        14:38:45
19       A.    No, sir.                           14:38:45
20       Q.    Was there a point in time when     14:38:46
21   you were at the crime scene and, with ADA    14:38:53
22   Linda Fairstein?                             14:38:59
23       A.    Yes, sir.                          14:39:01
24       Q.    When was that, when was the        14:39:02
25   first time?                                  14:39:04
```

NYCLD_044145

P-APP000974

Page 455

```
 1      A.      About, well, it would be fair to    14:39:04
 2   say the only time, the first and only time     14:39:10
 3   was a little after 7:00 a.m. on the            14:39:13
 4   morning of April 21st.                         14:39:17
 5      Q.     Okay.   That was approximately        14:39:19
 6   three or four hours after you had been         14:39:24
 7   there with Raymond Santana?                    14:39:26
 8      A.     Approximately, yes.                    14:39:29
 9      Q.      And what was the nature of the       14:39:30
10   interaction?                                   14:39:39
11           MR. WAREHAM:   Withdrawn.              14:39:39
12      Q.     What was ADA Fairstein doing at       14:39:40
13   the crime scene, what was she doing?           14:39:43
14           MS. DAITZ:   Objection.                14:39:45
15      A.     ADA Fairstein and I, Detective        14:39:45
16   Jonza, certainly Sergeant O'Connor had a       14:39:52
17   meeting in the 24 Squad, and a decision        14:39:55
18   was made, a joint decision at that time to     14:40:01
19   take two of the suspects to the park.          14:40:04
20      Q.     And which two suspects were           14:40:12
21   those?                                         14:40:15
22      A.     Kevin Richardson and Kharey           14:40:15
23   Wise.                                          14:40:18
24      Q.      And do you know why it was --        14:40:18
25   this was --                                    14:40:22
```

NYCLD_044146

P-APP000975

Page 456

| | | |
|---|---|---|
| 1 | MR. WAREHAM:  Withdrawn. | 14:40:24 |
| 2 | Q.   Had you, during that discussion, | 14:40:25 |
| 3 | had you informed ADA Fairstein that you | 14:40:27 |
| 4 | had already gone to the alleged crime | 14:40:32 |
| 5 | scene with Raymond Santana? | 14:40:37 |
| 6 | MS. DAITZ:  Objection. | 14:40:38 |
| 7 | Q.   Junior? | 14:40:40 |
| 8 | A.   I don't recall our exact | 14:40:41 |
| 9 | conversation, but I probably did tell her. | 14:40:43 |
| 10 | Q.   And, to your knowledge, she had | 14:40:47 |
| 11 | not -- well, to your knowledge, had she | 14:40:49 |
| 12 | been to the crime scene prior to you going | 14:40:53 |
| 13 | there at 7:00 a.m. the morning of the | 14:40:55 |
| 14 | 21st? | 14:40:58 |
| 15 | A.   To my personal knowledge, no. | 14:40:58 |
| 16 | Q.   Did she indicate in her | 14:41:00 |
| 17 | discussion that she had been there, in her | 14:41:02 |
| 18 | discussion with you, did she indicate that | 14:41:04 |
| 19 | she had been there? | 14:41:06 |
| 20 | A.   No, she did not. | 14:41:07 |
| 21 | Q.   And the reasons for taking | 14:41:08 |
| 22 | Kharey Wise and Kevin Richardson there | 14:41:17 |
| 23 | were what? | 14:41:22 |
| 24 | A.   Excuse me? | 14:41:22 |
| 25 | Q.   What were the reasons that you | 14:41:22 |

NYCLD_044147

P-APP000976

T3-JM-TS

4949

1                   Fairstein - People - Cross - Burns

2        Q     Now, between 8:30 and 11:30, did you participate  in

3   any questioning of any individuals?

4        A     I questioned police officers.

5        Q     Just officers.

6        A     Right.

7        Q     Now, at 11:30, you say, is the first time you --

8              MR. BURNS:  Withdrawn.

9        Q     At what point in time -- at what point in time did

10  you -- were you aware of the fact that Yusef Salaam was in the

11  20th Precinct?

12       A     I have -- I would put it in the 11  o'clock  period,

13  but it was between 11 and 11:30.

14       Q     And do you have any -- can you tell the Court who

15  told you, or how you came by that information?

16       A     I was in a room with a lot of police officers,  and,

17  as  different events unfolded that evening, because there were

18  many participants, and a lot of police activity, people  would

19  enter  the room to tell some of the supervisors what was going

20  on.

21       Q     And I believe --  and  you  were  functioning  as  a

22  supervisor?

23       A     No.  I'm talking about police supervisors.

24       Q     But you were working along with the supervisors,

25  were you not?

T3-JM-TS

4950

Fairstein — People — Cross — Burns

1

2          MS. LEDERER:  Objection.

3          THE COURT:  I'll let her answer it.

4     A    I was not supervising a police investigation, no.

5     I was there to assist, and to assist Ms.  Lederer,  if  I

6     could be of any use.

7          Q         Well,  in  the course of your assisting with the

8     investigation, while you were on the second floor squad  room,

9     someone came in and mentioned Yusef Salaam, is that it?

10    A    Yes.

11    Q    And was anything said about his age at that time?

12    A    No.

13    Q         At that point, you didn't have any —— you didn't

14    know how old he was?

15    A    No.

16    Q    Did you know that he was a teenager or older?    Did

17    you know that?

18    A    I didn't know anything.

19    Q    Nothing at all?

20    And  then,  at  11:30,  you  had a call, that there was a

21    lawyer downstairs?

22    A    Not a call.  Someone came in.

23    Q    And told you?

24    A    And said to me, particular.

25    Q    You don't know who that person was?

NYCLD_015469

P-APP000978

```
1           T-3    Reynolds-Ppl-cross (Rivera)           909
2      the Assistant District Attorneys and all sworn
3      jurors are present.
4           THE COURT:  All right, good afternoon, ladies
5      and gentlemen.
6           THE CLERK:  Officer Reynolds, may I remind you
7      you're still under oath.
8           THE WITNESS:  Yes.
9  CONTINUING CROSS EXAMINATION
10 BY MR. RIVERA:
11      Q    Officer, before we broke, you indicated to us that
12 there was some chiefs and members of the press that were
13 present at the Central Park Precinct; is that correct?
14      A    Yes.
15      Q    And is that unusual to see top brass at the Central
16 Park Precinct during an arrest?
17      A    There is not a lot of arrests there, so, but yeah,
18 I would say it is.  Slight.
19      Q    Under normal circumstances would it be unusual to
20 see a high member of the brass at any precinct when youths
21 are arrested?
22           MS.  LEDERER:  Objection.
23           THE COURT:  I'll allow it.
24      A    It depends on the precinct.
25      Q    Are there some precincts where this would not be
```

E. C. Davis

P-APP000979

```
1              T-3    Reynolds-ppl-cross (Rivera)              910
2   unusual?
3                    MS.   LEDERER:   Objection.
4        A    Yes.
5        Q    What about the Central Park Precinct, is this
6   unusual at the Central Park Precinct?
7        A    Slightly, yes.
8        Q    And the same applies for the members of the press?
9        A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11   have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14   there case was going to have special significance within the
15   modus operandi of the Police Department.
16                    MS.   LEDERER:   Objection.
17                    THE COURT:  Sustained.
18        Q    Were there any Assistant District Attorneys present
19   at any time when you were involved in this case between
20   April the 19th and April the 20th?
21                    MS.   LEDERER:   Objection.
22                    THE COURT:  I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.   Lederer?
25        A    Yes.


                            H. C. Davis
```

NYCLD_023613

P-APP000980

1          T-3    Reynolds-Ppl-cross (Rivera)                911

2     Q    And was there also an A.D.A. Fairstein?

3     A    Yes.

4     Q    Were there any other members of the District

5  Attorney, District Attorney present, paticularly any

6  Assistant District Attorney?

7     A    I don't think so.

8     Q    And when for the first time did you see an

9  Assistant District Attorney on this matter?

10    A    The night of the 20th.

11    Q    Prior to the evening of the 20th, you had not seen

12  any A.D.A.s?

13    A    Regarding this matter?

14    Q    Regarding this case.

15    A    No.

16    Q    Did you see them in the building or any other

17  buildings involved in the case?

18    A    No.

19    Q    Prior to the 20th?

20    A    No.

21    Q    Officer, you testified that you spoke to a police

22  officer Alvarez; is that correct?

23    A    Yes.

24    Q    And police officer Alvarez informed you of an

25  assault on an individual; is that correct?


                        M. C. Davis

NYCLD_023614

P-APP000981

T4-fr

390

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    At the conclusion of the interview of

3  Lamont McCall, what, if anything, happened?

4    A    At that point he was given an appearance

5  ticket for Family Court.

6    Q   When you say he was given an appearance

7  ticket, who gave him that ticket?

8    A   I did.

9    Q    Did that appearance ticket have a return

10  date?

11    A   Yes.

12    Q   What happened with Lamont McCall at that

13  time?

14    A    He was released to his mother, and given

15  the appearance ticket.

16    Q   Were you present at another interview at

17  that time?

18    A   Yes, I was.

19    Q   Where was that interview conducted?

20    A   That was in the Juvenile room.

21    Q    And is that the lower rectangular room to

22  the bottom of that building on the diagram, People's

23  1?

24    A   Yes, it is.

25    Q   Who was interviewed second?

10/13/89

NYCLD_023136

P-APP000982

T4-fr

391

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      A      Clarence Thomas.

3      Q      And who was present during the interview of

4  Thomas?

5      A      His mother.

6      Q      Did you conduct that interview?

7      A      No.

8      Q      If you know, who conducted that interview?

9      A      I believe that was Detective Whelpley.

10     Q      Would you please name everyone who  was  in

11 the  Juvenile  Room  at  the time that interview was

12 conducted?

13     A      Detective  Farrell,  Detective  Whelpley,

14 Clarence Thomas, his mother, and myself.

15     Q      And  approximately  how  long  was that

16 interview?

17     A      It was approximately an hour, an hour and a

18 half.

19     Q      During the time that -- in substance,  what

20 did Clarence Thomas say to you?

21     A      He stated that they -- the group came into

22 the park at 110th Street and they  had  no  specific

23 plans  for that evening, and they started to assault

24 -- they assaulted, I believe, a bum, and then  later

25 on  went  up to the reservoir and assaulted a jogger

10/13/89

NYCLD_023137

P-APP000983

T4-fr



REYNOLDS - PEOPLE - DIRECT - LEDERER

up there with a pipe.

Q And did he identify any of the people who were with him that night in Central Park?

A Yes, he did.

Q Who did he name?

A I'll have to look at my notes to refresh my memory on that. He named Antron McCray and Lamont McCall.

Q Did he give any information about Antron McCray?

A Yes, he did.

Q What, if any, information did he tell you about Antron McCray?

A I believe he stated that he had assaulted the jogger.

Q Did he give you any information about a description of who Antron McCray was?

A He described him as a male black, 14, 15 years old, I believe.

Q Did he tell you anything about where Antron McCray lived?

A He stated he lives on

Q What, if anything, happened at the conclusion of the interview of Clarence Thomas?

10/13/89

T4-fr

393

REYNOLDS – PEOPLE – DIRECT – LEDERER

1

2      A      He was released to his mother.

3      Q      Was he given anything prior to his release?

4      A      He was given an appearance ticket for
5  Family Court.

6      Q      And was there a date on that ticket?

7      A      Yes, there was.

8      Q      And was that the same date that had been on
9  the ticket of Lamont McCall?

10     A      Yes.

11     Q      What, if anything, did you do after being
12  present for the interview of Clarence Thomas?

13     A      After that we went -- later on that
14  afternoon we went back to his house.

15     Q      When you say later on that afternoon, what
16  time was it when you --

17     A      It was about 11:30.

18     Q      Is that in the morning or the evening?

19     A      In the morning.

20     Q      On what date?

21     A      On the 20th of April.

22     Q      Who did you go with?

23     A      Detective Whelpley and Farrell.

24     Q      And where did you go?

25     A      We went to his house.

10/13/89

T4-fr

1          REYNOLDS — PEOPLE — DIRECT — LEDERER

2      Q    Whose house?

3      A    Clarence Thomas' house.  It's

4

5      Q    AT what time was Clarence  Thomas  given  a

6  return    ticket    to    come    to    Family    Court,

7  approximately?

8      A    It was about 7:30, 8:00.

9      Q    And what, if anything, happened between

10 that  time and the time you went to Clarence Thomas'

11 home?

12     A    Kevin Richardson was interviewed.

13     Q    What happened when you arrived at  Clarence

14 Thomas' home  with the detectives at about 11:30 on

15 the morning of the 20th?

16     A    He was informed we wanted to  question  him

17 further,  and  his  rights  were read to him and his

18 mother.

19     Q    And was he reinterviewed at his home?

20     A    Yes, he was.

21     Q    Approximately how long was he spoken to  at

22 his home?

23     A    I'd say about 15, 20 minutes.

24     Q        Did there come a time -- did you conduct

25 that interview?

10/13/89

T4-fr

1        REYNOLDS - PEOPLE - DIRECT - LEDERER

2      A    No.

3      Q    Were you present for that interview?

4      A    Yes.

5      Q    After that interview was  conducted,  where
6   did you go?

7      A        THen  went  to           to Antron
8   McCray's house.

9      Q    Who did you go with?

10     A    I went with Detective Farrell and  Whelpley
11  and other detectives from Sex Crime.

12     Q    What, if anything -- withdrawn.

13          When  you  left Clarence Thomas' apartment,
14  did you leave alone?

15     A    No, I didn't.

16     Q    Who came with you?

17     A    Detective Whelpley, Detective Farrell,  and
18  we  met  with Detective Rosario and Detective Rivera
19  and Morin from Sex Crimes.

20     Q    Did Clarence Thomas and his mother go  with
21  you?

22     A    Yes, they did.

23     Q    Did you travel in the same car with them?

24     A    Yes, I did.

25     Q        Did you have any conversation with them

10/13/89

T4-fr

396

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2    about why they were going with you?

3        A    With him and his mother?

4        Q    Yes?

5        A    No.

6        Q    How did you know where to go when you left

7    Clarence Thomas' apartment?

8            MR. JOSEPH: Objection.

9            MR. BERMAN:  Objection.

10           THE COURT:  I'll allow it.

11           Where were you going?

12           THE  WITNESS:  We were going to Antron

13       McCray's house.

14       Q    How did  you  know  where  Antron  McCray's

15   house was?

16       A    Clarence's mother told us where it was.

17       Q       Where did you go to find Antron McCary's

18   apartment?

19       A    To

20       Q    What happened when  you  arrived  at

21       ?

22       A       We  knocked on the door and we spoke to

23   Antron's father, Bobby McCray.

24       Q    Did you go to the door?

25       A    I went to the door, yes.

10/13/89

NYCLD_023142

P-APP000988

T4-fr

397

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q      Was anyone else with you?

3      A      Yes.

4      Q      Who was that?

5      A      Detective Rosario, Detective Rivera, and

6  Detective Morin.

7      Q      Did you personally speak to the person you

8  identified as Bobby McCray?

9      A      No.

10      Q      Were you present when there was a

11  conversation with him?

12      A      Yes.

13      Q      Who had that conversation?

14      A      Detective Rosario.

15      Q      What did you hear him say and what did you

16  hear Bobby McCray respond?

17      A      He stated that he wanted to speak to Antron

18  at the Central Park Precinct and that Bobby McCray

19  would have to come with us also because Antron is a

20  juvenile.

21      Q      And what happened then?

22      A      And he agreed and told Antron to get

23  dressed.

24      Q      And did Antron McCray and his father then

25  leave with you?

10/13/89

T4-fr

398

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2       A       Yes, they did.
3       Q       Do you recall whether anyone else from   the
4  McCray family came?
5       A       His mother came also.
6       Q       And did they ride with you or did they ride
7  with someone else?
8       A       I believe they rode with the detectives
9  from Sex Crimes.
10      Q       What time did you   return   to   the   Central
11 Park Precinct, approximately?
12      A       I'd say it was after 12:00.
13      Q       When Antron McCray came with you — and
14 left his apartment, what was he wearing?
15      A       He had on the clothes that he   was   wearing
16 the night before.   They were —
17              MR. MOORE:   Objection.
18              MR. BURNS:   Objection.
19              THE COURT:   Objection sustained.
20              Do you remember what he was wearing?
21              THE WITNESS:   No.
22      Q       Was there a conversation with anyone in
23 your presence about what Antron McCray would wear?
24      A       Yes.
25      Q       What   do   you   remember   about   that

10/13/8

T4-fr

399

REYNOLDS - PEOPLE - DIRECT - LEDERER

2    conversation?

3        A        Detective Rosario asked Bobby McCray, he
4    asked him if Antron could wear the same  clothes  he
5    wore the night before, and they agreed.

6        Q        Did you notice anything about his clothes
7    when he came out of the apartment?

8        A        Yes, they were entirely  covered  with  dry
9    mud.

10       Q        When  you  returned to the Central Park
11   Precinct, did you conduct any interviews of  any  of
12   the  suspects that you already named, that is, Kevin
13   Richardson, Steve Lopez, or Raymond Santana?

14       A        No, I didn't.

15       Q        And did you at any time conduct or were you
16   present during any interviews with  Michael  Brisco,
17   Kharey Wise, Antron McCray or Yusaf Salam?

18       A        No.

19       Q        Did you voucher any property in connection
20   with this case?

21       A        No.

22       Q        Did you  go  out  and  pick  up  any  other
23   suspects in this case?

24       A        No, I didn't.

25                MS. LEDERER:  Thank you very much.

10/13/89

T4-fr

383

REYNOLDS — PEOPLE — DIRECT — LEDERER

came and began interviewing them one at a time.

Q    Approximately what time  was  that  if  you recall?

A    I believe that's approximately 5:50 in the morning.  Let me refresh my memory with that.    I'm sorry, that was approximately 5:30.

Q     Were you aware when parents of the family returned with food?

A    Yes.

Q    Were you aware whether any of that food was given to any of the people you had in  the  Juvenile room?

A    Yes.

Q     Who do you recall seeing have some food in that room?

A    I believe all of them ate.

Q    And do you recall whether  Raymond  Santana made  any statement in your presence while he was in that room?

A    Yes, he did.

          THE COURT:   Which room?

Q    I'm sorry.  In the Juvenile room?

A    Yes.

Q    What, if anything, did you hear him say?

10/13/8°

NYCLD_023129

P-APP000992

DETAILS: COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK

SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did
interview Clarence Thomas M/B/14yrs DOB        of
██████ in the presence of his mother Gloria Thomas who lives at the
address. Clarence Thomas was under arrest at this time so the under-
signed informed him and his mother of there rights from a card. Both
Clarence Thomas and his mother Gloria Thomas acknowledge each right
by stating yes and on the last right they agreed to answer questions
without an attorney present. Clarence Thomas states that he and his
friend Antron Mc Cray who lives on ███████ and goes to JHS 117 (
Exact address unknown) were on E110th st and they met
approx 15 other males all about 13 to 15 yrs old. Clarence states that
he did not know all of these males but he did know a guy named Polo
who is a M/Bor H/15yrs and he hangs out on E 110th and Madison , a guy
named Ralph M/B/15yrs who lives in the Taft projects and he knows
Lamont Mc'Call ( See DD 5 Det Whelpley Re; Lamont Mc Call). Clarence
states that the group was mixed with blacks and hispanics and that they
all went into the park at E 110th and started walking into the park and
south. Clarence stated that they where just hanging out that there was
no plan on what they were going to do in the park. Clarence states that
they entered the park at approx 2010hrs and he remembers the time
because he knows that he met the group at 2000hrs and it took them
about ten minutes to talk and then walk to the park. Clarence further
states that as they walked thru the park some of the guys were throw-
ing rocks at cars but none of the cars stopped except for a cab (yellow)
that did stop but did not chase the group. Clarence also states that
as they walked thru the park ( location unknown) approx eight of the
guys saw a male white40's jogging,who was wearing a sweater and blue
shorts, and these eight guys started chasing the male white but after
a few minutes five of the eight returned to the group stating that the
guy got away.                                    Continued on page two

NYC022226

REYNOLDS EXH.11

NYCLD_057950

P-APP000993

| COMPLAINT FOLLOW-UP INFORMATIONAL | | Page 2 | 000873 | Pages |
| --- | --- | --- | --- | --- |
| PD 313-081A SECOND sheet (1-80/84 | | Pct. 022 | Compliant No 281 | Date of This Report 4/20/89 |

DETAILS:

CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS

Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and then at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white (could supply
no further discription). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van turned into the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he tripped
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

When questioned about anyone else who the group had hit Clarence stated that
there was an old bum  who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three  he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who  had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then then were woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down as did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak to us without an attorney present.
At this time Clarencestated that the pipe he told us about before was passed
back and forth between the tall guy and Antron Mc Cray but  Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of the three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to ████████████ and stated
that Antron lived in this building in apartment ███. Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into
███ and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Rank/Signature/Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
| --- | --- | --- | --- | --- |
| Det _____ DBMSTF | J FARRELL | 864831 | Sgt. | |

NYC022227

NYCLD_057951

P-APP000994

```
 1            People - Det. Arroyo - Cross - Rivera          2963
 2       Q.    You don't recall --
 3              MR. RIVERA:  Withdrawn.
 4       Q.    You just stated that you don't recall that he said
 5    that; is that correct?
 6       A.    Yes, I don't recall that -- I don't recall that he
 7    said that.
 8       Q.    Okay.  Did Raymond tell you that he did not live
 9    with his father?
10       A.    I don't recall that either.
11       Q.    You don't recall any information relative to
12    Raymond's father; is that correct?
13       A.    No, that's incorrect.
14       Q.    You do recall Raymond saying something about his
15    father; is that correct?
16       A.    Yes.
17       Q.    What did Raymond tell you about his father?
18       A.    Told me he didn't get along with him very well.
19       Q.    I'm sorry?
20       A.    He told me he didn't get along with him very well.
21       Q.    Did he tell you he lived with Raymond?
22       A.    I don't recall.
23       Q.    Did he tell you he lived with his mother?
24       A.    Again, I don't recall.
25       Q.    And you were present during the entire questioning
```

Joseph T. Tierney, CSR, RPR

NYCLD_017528

P-APP000995

```
1              People - Det. Arroyo - Cross - Rivera        2964

2    of Raymond by Detective Hartigan; is that correct?

3                   MS. LEDERER:  Objection.

4                   THE COURT:  What was your question?

5                   MR. RIVERA:  That he was present during the

6              entire questioning of Raymond by Detective

7              Hartigan.

8         Q.    Is that correct?

9                   MS. LEDERER:  Objection.

10                  THE COURT:  I'll let him answer if he was

11             present --

12                  Detective Hartigan was present at all times

13             when you were present?

14                  THE WITNESS:  Detective Hartigan was present

15             when I was present, yes.

16                  THE COURT:  At all times?

17                  THE WITNESS:  Except for the times that I

18             left the room, correct.

19        Q.    But from 1:40 to 4:40, you were present during the

20   entire questioning of Raymond Santana; is that correct?

21        A.    Again, except for those times that I left briefly.

22        Q.    Well, when did you leave the room between 1:40 and

23   4:40?

24        A.    Well, I left the room to get coffee.

25        Q.    Other than that.
```

Joseph T. Tierney, CSR, RPR

NYCLD_017529

P-APP000996

1                People - Det. Arroyo - Cross - Rivera            2965

2        A.    I might have also left the room to get myself a

3   soda.  I left the room after the signing of the written

4   statement, and that would take us beyond 4:40 p.m.

5        Q.    Okay.  Raymond signed the statement at about 4:40;

6   is that correct?

7        A.    That's correct.

8        Q.    That means that the interrogation of Raymond ended

9   about 4:40, would that be correct?

10       A.    That's correct.

11       Q.    And did you tell Raymond that the interrogation

12  had ended of Raymond?

13       A.    No.

14       Q.    You, at no time, informed him that your

15  questioning is over; is that correct?

16       A.    No.

17       Q.    You just took the statement, left the room and

18  came back several minutes later; is that correct?

19       A.    That's correct.

20       Q.    Now, you took that statement and brought it to

21  your supervisors; is that correct?

22       A.    That's correct.

23       Q.    And who, in particular, did you bring Raymond's

24  statement to?

25              MS. LEDERER:  Objection.


                 Joseph T. Tierney, CSR, RPR

1                    People - Det. Arroyo - Cross - Rivera                    2966

2                    THE COURT:  Who did he what?

3                    MR. RIVERA:  Who did he bring Raymond's

4          statement to.

5                    THE COURT:  I'll let him answer.  I really

6          don't know what it has to do with this hearing.

7          A.    I brought the statement to the detective squad

8    room, where Lieutenant Doyle from Manhattan North Homicide

9    was present.

10         Q.    Was ADA Fairstein or ADA Lederer present when you

11   went to bring the statement to Lieutenant Doyle?

12                   MS. LEDERER:  Objection.

13                   THE COURT:  I'll let him answer that.

14         A.    No, they were not.

15         Q.    Did you discuss with Lieutenant Doyle the fact

16   that Raymond's grandmother was present and had difficulty

17   with the English language?

18                   MS. LEDERER:  Objection.

19                   THE COURT:  Sustained.

20         Q.    Did you ever ask Raymond to put into his own words

21   the statement that is People's 20 in evidence?

22         A.    Yes, I asked him if he wanted to write it out.

23         Q.    And what, if anything, did Raymond say?

24         A.    He said no.  I offered to write it out and he

25   agreed.


                    Joseph T. Tierney, CSR, RPR

T1O-SC-TS

2498

                    Arroyo - Cross - Rivera

1

2       Q          And that part was not in when you first made out

3   this statement, is that correct?

4       A          That's correct.    Because if he had anything

5   additional to add, it would have been added there.

6       Q          But  it wasn't in when you read the statement to

7   Ramon?

8       A      That's correct.

9       Q      Now, were  you  the  one  who  called  the  district

10  attorney's office to have him come down?

11      A      No, I was not.

12      Q      Were you present when the DAs office showed up?

13      A      Yes.

14      Q          And at about what time did representatives of the

15  DAs office show up?

16      A      I'm not sure exactly what time they showed  up.    I

17  first  encountered  the  DAs  at  the 20th Precinct after I was

18  finished at the Central Park Precinct.

19      Q      So, they weren't at the Central Park Precinct?

20      A      Well, I don't recall seeing them there.

21      Q      First time you saw them was at the 20 Precinct, 20th

22  Precinct?

23      A      That's correct.

24      Q      And was this in the morning or in the afternoon that

25  you saw them?

P-APP000999

T10-SC-TS

2499

Arroyo - Cross - Rivera

1
2      A    This was in the evening.

3      Q    And you have no recollection at about what time you

4    saw them?

5      A    No, I don't.

6      Q    And who from the district attorney's office did you

7    see at the precinct?

8      A    I saw district attorney Linda Fairstein, district

9    attorney Liz Lederer and district attorney Tim Clements.

10     Q    Do you know who Linda Fairstein is in the hierarchy

11   of the district attorney's office?

12     A    Yes.

13     Q    And who is she?

14     A    She was the sex crimes senior trial lawyer for the

15   DAs office.

16     Q    Was she the chief of the sex crime unit for the DAs

17   office?

18     A    I'm not exactly sure what her rank was, but she held

19   some position along those lines at that time.

20     Q    She had a position within the district attorney's

21   office, a high position within the DAs office, is that

22   correct?

23     A    Well, I would assume you would call it that, yeah.

24     Q    And you saw them there on the evening of April the

25   20th, am I correct in that?

P-APP001000

T10-SC-TS

2500

1                    Arroyo - Cross - Rivera

2       A    Yes.

3       Q    And the job of a district attorney, the primary job

4  of the district attorney is to assist the police in getting  a

5  statement from a defendant?

6       A    That's not correct.

7       Q    They assist the police in getting a video statement

8  from the defendant, is that correct?

9       A    They did perform video statements, yes.

10      Q    When you got the statement from Ramon  Santana,  you

11 didn't  run  out  and  call  the  DAs  office and say we got a

12 statement from Defendant Santana, come on down so we can  make

13 a video of it?

14      A    Absolutely not.

15      Q       You waited to get statements from all defendants

16 before you called the DAs office?

17           MR. CLEMENTS:  Objection.

18           THE COURT:  Objection sustained.

19      Q    And so -- were you present when  a  video  statement

20 was taken of Ramon Santana?

21      A    Yes, I was.

22      Q    And who else was present in the room?

23      A    Ramon Santana, Ramon Santana, Sr., district attorney

24 Liz Lederer and detective Mike Sheehan.

25      Q    And yourself, is that correct?

T10-SC-TS

2501

1                          Arroyo - Cross - Rivera

2        A      And myself.

3        Q          And detective Sheehan is from the Manhattan North

4    Homicide?

5        A      That's correct.

6        Q      Did you escort Ramon into the video room?

7        A      I don't recall.  I don't believe I  did.    I   don't

8    recall if I did escort him.

9        Q          Did you at any point in time tell Ramon that they

10   were going to take a video statement of him?

11       A      No, I don't recall.

12       Q      When you finished questioning Ramon at 4:40  in   the

13   afternoon,  did  you say Ramon, you got to wait around because

14   we're going to take a video statement of you?

15       A      You got to what?

16       Q      You have to wait around because we're going to  take

17   a video statement of you?

18       A      No, I didn't tell him that.

19       Q          It was your testimony you went up and you gave a

20   statement that you took from Ramon  Santana  to  one  of   the

21   supervisors, is that correct, detective supervisors?

22       A      That's correct.

23       Q      Was that detective supervisor lieutenant Doyle?

24       A      That's correct.

25       Q      And this was the commanding officer of the homicide

P-APP001002

1                      Hartigan/cross/Mr. Moore          2592

2    J O H N      H A R T I G A N,  was recalled as a witness in

3    behalf of the People, having previously been duly sworn,

4    continues to testify as follows:

5              MR. MOORE:  May we approach?

6              THE COURT:  Yes.

7              (Whereupon, there was a bench conference among

8         all counsel with the court out of the hearing and

9         presence of the jury.)

10             (Pause)

11             THE CLERK:  Detective, having been previously

12        been sworn, you're still under oath.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Members of the jury, you recall Mr.

15        Hartigan was here previously, was interrupted.  And

16        we are going to resume his examination today, cross

17        examination by Mr. Moore.

18   CROSS EXAMINATION

19   BY MR. MOORE:.

20        Q    Mr. Hartigan, good morning.

21        A    Good morning, sir.

22        Q    You indicated in previous cross examination by Mr.

23   Diller that you retired from the N Y P D sometime in July of

24   1989, am I correct?

25        A    Yes, sir.

1                    Hartigan/cross/Mr. Moore          2593

2        Q      You also indicated that you were a patrolman for

3    five years and that you were a detective for twenty years,

4    am I correct?

5        A      In the detective division for twenty years, yes,

6    sir.

7        Q      How long were you with the Manhattan North homicide

8    detective unit?

9        A      Three years.

10       Q      And during your tenure with Manhattan North, Mr.

11   Hartigan, how many cases, homicide cases have you

12   investigated?

13       A      It's hard to say.  It's a large number of homicides

14   that we did.  We worked on old homicides.  We worked on new

15   homicides as they came in.  We went back on old homicides.

16       Q      And what percentage of those cases have resulted in

17   arrests?

18                    MS. LEDERER:  Objection.

19                    THE COURT:  Objection sustained.

20       Q      Now, have those cases that you worked on, what

21   percentage of the defendants in those cases have been black

22   and Hispanic males?

23                    MS. LEDERER:  Objection.

24                    THE COURT:  Sustained.

25       Q      Of those cases that you have worked on, what

Hartigan/cross/Mr. Moore          2594

1

2   percentage of those cases have been based on statements?

3                    MS. LEDERER:  Objection.

4                    THE COURT:  Sustained.

5        Q    Now, you've indicated, Mr. Hartigan, that you have

6   in the course of your investigation, you have dealt with

7   young people, am I correct?

8        A    Yes, sir.

9        Q    Would you say in a large percentage of your cases

10  or a small percentage of those cases?

11       A    I'd say a small percentage.

12       Q    Now, in April 20, 1989 your tour of duty was from 8

13  o'clock in the morning to 4 o'clock in the afternoon, am I

14  correct?

15       A    Yes, sir.

16       Q    And in fact, Detective Hartigan, you were fairly

17  busy on that particular day, were you not?

18       A    Pardon me?

19       Q    You were fairly busy on April 20th, were you not?

20       A    Yes, sir.

21       Q    As a matter of fact, you participated in the

22  interview of Kevin Richardson from 9:40 in the morning until

23  about 1 o'clock in the afternoon, am I not correct?

24       A    From about 10 o'clock in the morning, yes, sir.

25       Q    Until about 1 o'clock?

1                    Hartigan/cross/Mr. Moore              2595

2      A    Yes, sir.

3      Q    And that interview resulted in a statement from

4 Kevin Richardson, am I not correct?

5                MS. LEDERER:  Objection as to form.

6                THE COURT:  Objection as to form is sustained.

7      Q    Well, after the interview Kevin Richardson did give

8 you a statement, is that correct?

9      A    Kevin Richardson was giving a statement at the time

10 I sat in on the interview.

11     Q    Yeah.  And he gave you a statement, a written

12 statement?

13     A    Yes, sir.

14     Q    And from 1 to 6 o'clock you participated in the

15 interview of Raymond Santana, am I correct?

16     A    Yes, sir.

17     Q    And that was from 1 to 6 o'clock?

18     A    I can't recall exactly what  --  I believe it was 1

19 --  4 to 6 o'clock.  I can not exactly recall the hour.

20     Q    And at the end of the interview Raymond Santana

21 signed a statement, isn't that correct?

22     A    Yes, sir.

23     Q    And, as a matter of fact, during your examination

24 of Raymond Santana from 1 to 4 o'clock you asked him

25 repeatedly --

P-APP001006

1               Hartigan/cross/Mr. Moore          2596

2          MS. LEDERER:  Objection.

3          THE COURT:  He didn't say he interviewed him

4     from 1 to 4 o'clock.

5     Q     Well, your interview of Raymond Santana was roughly

6  from 1 to 5 o'clock, is that correct?

7     A     I can't recall what time it ended, sir.

8          MS. LEDERER:  Your Honor, can I request a

9     sidebar with the line of questioning Mr. Moore is

10    about to proceed?

11         THE COURT:  Yes.

12         (Whereupon, the following occurred at

13    sidebar:).

14         MS. LEDERER:  Your Honor, I requested a sidebar

15    because Mr. Moore appears to be beginning a line of

16    questioning about questions that were put to

17    Raymond Santana.  I would ask for an offer of

18    proof.

19         MR. MOORE:  First of all, you in your direct

20    brought out the fact that he had questioned or

21    interviewed Raymond Santana.

22         MS. LEDERER:  That's right.  That was the only

23    question I asked him.

24         MR. MOORE:  Let me just finish.  You also

25    showed Raymond Santana's clothing.  I intend to

1                          Hartigan/cross/Mr. Moore            2597

2    show that this officer had a pattern of practice

3    not only of interviewing people, but also of

4    getting statements from almost all the individuals

5    that he interviewed.  And that certainly is

6    relevant to the whole --

7          THE COURT:  That he got statements from these

8    people?

9          MR. MOORE:  Yeah.

10         THE COURT:  All right.

11         MS. LEDERER:  I didn't object to that question.

12   You just asked him that.  What you were starting

13   to ask him, isn't it a fact that you repeatedly

14   asked him during that interview, and I --

15         THE COURT:  If you're trying to bring out the

16   substance of the statements  --  I thought that was

17   the purpose of our visit --

18         MR. MOORE:  No.  I'm just showing that he asked

19   him about his involvement in the assault on the

20   jogger.  I did not give him his involvement with

21   the assault.

22         THE COURT:  You can not do that.  You can ask

23   him if he took a statement from him, answer no.

24   But the contents of that statement --

25         MR. MOORE:  I just wanted to ask him a question

NYCLD_018275

P-APP001008

1    Hartigan/cross/Mr. Moore          2598

2    about whether he got the statement from the female

3    jogger when Raymond Santana --

4        THE COURT:  Same ruling.  I will sustain the

5    objection.

6        MR. MOORE:  Okay.  I'll ask him about whether

7    there was a statement.

8        THE COURT:  Okay.

9        MS. LEDERER:  Just while we're here, so that I

10   think the record should be clear, that line of

11   questioning would not be permitted with Steven

12   Lopez or with any of the other non-defendants in

13   this case that this detective interviewed.

14       THE COURT:  For the same reason.  They're not

15   admissible statements.  They're hearsay.

16       MR. MOORE:  I'm not bringing the statements in.

17       THE COURT:  That he took the statement, fine.

18       MS. LEDERER:  That the witness was produced,

19   fine.  But the substance of any statement by

20   another person --

21       MR. MOORE:  I understand.

22       THE COURT:  Okay.

23       (Whereupon, the following occurred in open

24   court:).

25       MR. MOORE:  Could you just read back the last

1                    Hartigan/cross/Mr. Moore              2599

2          question.

3                    THE COURT:  The last question was objected to.

4     Q       Officer, so that I can understand clearly, you

5     indicated that you did interview Raymond Santana sometime in

6     the afternoon from 1 to 4 or 4 to 6, is that correct?

7     A       Yes.

8     Q       After this interview, Raymond Santana signed a

9     statement, is that correct?

10    A       It was during the interview he signed the

11    statement, yes.

12    Q       And there came a time later on that evening from

13    6:30 to 9 o'clock that you also interviewed Steven Lopez, is

14    that correct?

15    A       I interviewed Steven Lopez.  But I don't recall the

16    times.

17    Q       And at the end of that interview Steven Lopez

18    signed a statement, correct?

19    A       Yes, sir.

20    Q       And that morning from 12:30 until about 3 o'clock

21    you interviewed Kharey Wise, am I correct?

22    A       Yes, sir.

23    Q       And at the end of that interview again Kharey Wise

24    signed a statement?

25    A       Yes, sir.

P-APP001010

1                      Hartigan/cross/Mr. Moore          2600

2      Q     And from about 2:30 to 3 o'clock that very morning

3 you participated in a videotaped statement by Raymond

4 Santana, is that correct?

5      A     I can't recall if I did or not, sir.

6      Q     But you were aware of the fact that there was a

7 videotape of Raymond Santana?

8      A     I don't recall.

9      Q     And about 3 o'clock that morning you transported

10 Kevin Richardson to the 24th Precinct, am I not correct?

11     A     Either I was transported with him or with his

12 family, yes.

13     Q     And sometime about 4:50 that morning Kevin

14 Richardson participated in a videotaped statement, is that

15 correct?

16     A     Yes, sir.

17     Q     And you were present?

18     A     Yes, sir.

19     Q     And about 8 o'clock the next morning you took Kevin

20 Richardson to the crime scene, am I not correct?

21     A     Yes, sir.

22     Q     From 8 to 9 o'clock, is that correct?

23     A     I don't believe it was that  --  exactly 9 o'clock.

24  But I would say around there.

25     Q     And then about 9:30 you came back to the 24th

P-APP001011

1                        Hartigan/cross/Mr. Moore          2601

2    Precinct and you took a second statement from Kharey Wise,

3    am I not correct?

4        A    Yes, sir.

5        Q    And then about 12:30 that day until about 1:50

6    Kharey Wise participated in a videotaped statement, am I not

7    correct?

8        A    I don't know the times.  But he did participate in

9    a statement, yes, a video statement, yes.

10       Q    And sometime during that videotaped statement you

11   came and you slipped a note to the assistant district

12   attorney Miss Lederer, am I correct?

13       A    Yes, sir.

14       Q    And then sometime at 3:15 later on that evening you

15   were present when Kharey Wise participated in a second

16   videotaped statement?

17       A    Yes, sir.

18       Q    So wouldn't you say, officer, that in those twelve

19   hours you were a very busy detective, weren't you?

20       A    We were all busy.  Yes, sir.

21       Q    I see.  You interviewed a series of young people

22   and in almost all of the cases they made statements, isn't

23   that correct?

24               MS. LEDERER:  Objection as to form.

25               THE COURT:  I'll allow it.

NYCLD_018279

P-APP001012

1                    Hartigan/cross/Mr. Moore          2602

2      A     Yes, sir.

3      Q     I see.  Now, Detective Hartigan, with respect to

4  Kevin Richardson, you indicated that you came sometime about

5  10 o'clock that morning to the Central Park Precinct?

6      A     Yes, sir.

7      Q     And you knew at that time, did you not, that a

8  female jogger had been found assaulted somewhere in Central

9  Park, isn't that correct?

10     A     Yes, sir.

11     Q     You also knew that there were a group of young

12 people who were being held for the assault on a male jogger

13 called John Loughlin around by the reservoir, isn't that

14 correct?

15     A     I didn't know the male jogger's name, no.

16     Q     Well, you were aware of the fact that they were

17 being held for the assault on a male jogger at the

18 reservoir?

19     A     I was aware that they were being held for a series

20 of assaults.

21     Q     For a series of assaults?

22     A     Yes, sir.

23     Q     Not only on the assault on the gentleman of the

24 reservoir but another assault in the park, am I correct?

25     A     I didn't know exactly what the assaults took place.

NYCLD_018280

P-APP001013

Hartigan/cross/Mr. Moore                    2603

I didn't know.  I didn't have firsthand knowledge of what assaults had taken place.

Q    But you were aware of a series of assaults?

A    That's what I understand, yes, sir.

Q    And you were aware, when you responded to the precinct, were you not, that these young men were suspected of being involved in the assault on the female jogger, isn't that correct?

A    I would assume yes.

Q    And you were also aware when you went to the precinct that Detective Gonzalez was interviewing Kevin Richardson, am I correct?

A    I'm sorry?

Q    Detective Gonzalez was interviewing.

A    Was I aware of what, sir?

Q    That he was interviewing Kevin Richardson?

A    No.  I didn't learn that until I had gone into the youth room.

Q    When you went into the youth room you saw him interviewing Kevin Richardson, am I correct?

A    Yes.

Q    And he was asking Kevin Richardson questions and Kevin Richardson was responding?

A    At that time I didn't pay attention what was going

NYCLD_018281

P-APP001014

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

1          SHEEHAN - PEOPLE - DIRECT - LEDERER          3650

2    minutes.

3              I, I then advised Raymond I was going into

4    another room, and that when his father got back here,

5    to please ask him to wait for me, I would out in a

6    few minutes.

7          Q    Did there come a time where you were notified

8    regarding Mr. Santana's senior presence at the precinct?

9          A    Yes, ma'am.

10         Q    Would you describe what happened?

11         A    After eight o'clock, again, I'm not positive

12   on the time, but after eight, and before nine, I was

13   at a briefing in the rear room of the 20th Squad, which

14   would be on the east, it's the east side of the squad,

15   and I was advised by another detective that Mr. Santana

16   senior had arrived.

17         Q    Did you return to the area where Raymond

18   Santana, Jr., the defendant, was?

19         A    Yes, I did.

20         Q    And what happened when you returned to that

21   location?

22         A    His father was there with him. We shook

23   hands. I introduced myself.

24              And I advised Mr. Santana, Sr. again that

25   we were going to take a statement, and wanted him to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

1          SHEEHAN - PEOPLE - DIRECT - LEDERER          3651

2     be present.

3               I also advised him at that time that there

4     were members of the District Attorney's Office who

5     probably are going to want to videotape any statement

6     that he gave, and his presence would also be required.

7          Q    Did there come a time where you took -- where

8     you interviewed Raymond Santana, Jr.?

9               Did there come a time where you conducted

10    an interview of Raymond Santana, the defendant?

11         A    Yes, ma'am.

12         Q    Approximately what time did that interview

13    begin?

14         A    Ten after 10:00 PM.

15         Q    Where was that interview conducted?

16         A    On the first floor of the 20th Precinct in

17    the Youth Room.

18         Q    Were you able to conduct that interview in

19    that room immediately upon Raymond Santana's father

20    arriving at the precinct?

21         A    No. The Youth Room was being utilized, and

22    we had to wait.

23         Q    Would you describe how it came about that

24    the interview began with Raymond Santana, and who was

25    present?

NYCLD_019176

P-APP001016

SHEEHAN - PEOPLE - DIRECT - LEDERER          3652

1

2      A    We entered the room, it was myself, Detective

3   Jonza, Raymond Santana, Sr. and Raymond Santana, Jr.

4   We all entered the room.

5            there was a desk or a table.

6            I sat your side if we were to use the prosecu-

7   tion table, I sat where you're sitting, Mr. Jonza sat

8   where Mr. Clements is sitting.  Raymond sat right over

9   here, at this edge, and his father sat to his left,

10  slightly to the rear.

11       Q    Prior to going into the Youth Room to conduct

12  the interview with Raymond Santana, had you had occasion

13  to see a written statement that had been prepared and

14  signed by Raymond Santana?

15       A    Yes, I did.

16       Q    When, for the first time, did you see a written

17  statement that Raymond Santana had made prior to your

18  interview?

19       A    Shortly before, I don't know how long, but

20  certainly enough time to peruse it.

21       Q    Did Detective Hartigen show you that statement

22  when you saw Detective Hartigen and Raymond Santana

23  in the Youth Room of the Central Park Precinct?

24       A    No, he did not.

25       Q    Did he tell you the contents of that statement

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J:

1

SHEEHAN - PEOPLE - DIRECT - LEDERER                3653

2    at  that  time,  when  you  saw  him  at  the  Central  Park

3    Precinct?

4         A    No, he did not.

5         Q    Describe  how  the  interview  with  Raymond  Santana

6    began?

7         A    Detective   Jonza   signed   us   into   a   logbook

8    that was on the desk.

9              I, I introduced us once again, Jonza.

10             I    then    advised    Santana,    Sr.    and    Santana,

11   Jr.  that  I  was  going  to  read  the  Miranda  warnings,

12   which I did, from a Police Department handout.

13                  MS.   LEDERER:   I   would   ask   this   please

14                  be marked as People's 179 for identification.

15                  (People's  Exhibit  179  marked  for  identifica-

16                  tion.)

17                  MS.   LEDERER:   I   would   ask   if   that   could

18                  please be shown to the witness, please.

19                  (Handed up to and examined by the witness.)

20        Q    Do you recognize People's 179 for identification?

21        A    Yes, I do.

22        Q    And what do you recognize that to be?

23        A    This   was   the   card   that   I   used   to   read   the

24   Miranda warning.

25        Q    Are  those  the  rights  that  you  read  to

NYCLD_019178

P-APP001018

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP   N.J.

T4-SC-TS

3679

1                    Sheehan — People — Direct — Lederer

2       are   you   able   to   hear   teletype   machines,   telephones   and

3       typewriters from the 124 room?

4            A     Yes, ma'am.  Because the walls do not go all the way

5       to the ceiling.

6            Q     Are there doors or gates to any of the rooms in the

7       first floor of the 24th Precinct?

8            A     What used to be the  124  room  is  now  the  arrest

9       processing   center   where   the   uniformed   force   takes   their

10      prisoners.  It's right behind a desk and there is a door there

11      that's been slamming forever.

12           Q     Are you able to hear the slamming of that door  from

13      inside the youth room at the 24th Precinct?

14           A     Yes, you are.

15           Q     Did there come a time a video taped statement was

16      taken from Raymond Santana, Jr.?

17           A     Yes.

18           Q     Approximately what time did that happen?

19           A     Approximately 2:30 in the morning.

20           Q     Where did that happen?

21           A     That happened at the 24th Precinct, in  that  little

22      room I just described, the youth room.

23           Q     Who  was  present  at  the time that video taped

24      statement was taken?

25           A     Raymond Santana, Jr., Raymond Santana, Sr.,  myself,

T4-SC-TS

3680

1          Sheehan - People - Direct - Lederer

2    detective Burt Arroyo, a video tape technician and you were.

3          Q     Approximately how long did that interview last?

4          A          Approximately  half an hour, a couple of minutes

5    after three.

6          Q     After that interview was   concluded,   was   a   second

7    video tape done of Raymond Santana?

8          A     Yes, about fifteen minutes later there was a second

9    video tape done where Raymond was asked to stand, put  on  his

10   outer  garment, a jacket and a cap.  And that was done for the

11   purposes of recording the clothing he was wearing.

12             MS. LEDERER:  If I can ask to please have  this

13             marked as People's 181 for identification.

14             (Whereupon,   the   Reporter   marked   the

15             abovementioned exhibit, as requested.)

16         Q     Detective, were you present from the very  beginning

17   of the videotape interview to the very end of the interview of

18   Raymond Santana, Jr.?

19         A     Yes, I was.

20         Q          And  were  you present from the beginning of the

21   recording of the clothing that he was wearing to the very  end

22   of that recording?

23         A     Yes, I was.

24         Q     I ask you to please look at what's been marked as

25   People's 181 for identification.  Do  you  recognize  People's

NYCLD_019205

P-APP001020

```
 1                    Hartigan/cross/Mr. Moore              2675 6
 2  correct?
 3      A    I can't recall what he said in the videotape.
 4      Q    With respect to this case, officer, did you ever
 5  ascertain what time the female jogger was attacked?
 6                 MS. LEDERER:  Objection.
 7                 THE COURT:  Sustained.
 8                 (Pause)
 9      Q    And did you make any attempts, officer, to verify
10  the accuracy of the allegations made by Kevin Richardson?
11                 MS. LEDERER:  Objection.
12                 THE COURT:  Sustained.  We've been all through
13           that, counsel.
14                 (Pause)
15      Q    Now, Mr. Hartigan, there came a time when you spoke
16  to Kharey Wise, am I correct?
17      A    Yes, sir.
18      Q    And what time was that?
19      A    12:30 a.m. on the 21st of April.
20      Q    Now, you interviewed him in the sex crimes room of
21  the 20th Precinct, am I not correct?
22      A    Yes, sir.
23      Q    And so from the time when you interviewed him you
24  had a suspicion, did you not, that he was somehow involved
25  in a sexual assault on a female jogger?
```

1                    Hartigan/cross/Mr. Moore            262057

2       A     Yes, sir.

3       Q     Now, do you know the name of the officer who

4   brought Kharey Wise into the precinct?

5       A     No.

6       Q     Did you ever try to find out the name of the

7   officer?

8       A     No.

9       Q     Do you know a Detective Freck, John Freck?

10      A     Yes, I do.

11      Q     Is he from Manhattan North?

12      A     Yes, he is.

13      Q     And do you not recall that it was Detective Freck

14  who brought Kharey Wise?

15      A     No, I don't.  I didn't recall it.  No.

16      Q     And were you also aware of the fact that Eddie De

17  LaPaz had been brought to the 20th Precinct?

18      A     I had no knowledge of Eddie De LaPaz being brought

19  to the 20th Precinct.

20      Q     Now, when Kharey Wise came into the 20th Precinct

21  on the morning of April 20th --

22      A     21st.

23      Q     -- 21st?

24      A     Yes, sir.

25      Q     Was he under arrest?

NYCLD_018335

P-APP001022

1                    Hartigan/cross/Mr. Moore          26145Ð

2      A    I don't know.

3      Q    Were you the officer who was assigned to interview

4  him?

5      A    Yes.

6      Q    And are you telling the jury that you, the assigned

7  officer, did not know whether he was under arrest?

8           MS. LEDERER:  Objection.

9           THE COURT:  I'll let him answer.

10     A    I didn't know he was going to be placed under

11 arrest or not.  I didn't know that.

12     Q    Did you know whether at the time when you began the

13 interview of him was he under arrest?

14     A    No.  I didn't know if he was under arrest at that

15 time.  No.

16     Q    Does that mean he may have been under arrest?

17     A    If they had deemed that he was one of the

18 principals and that he was under arrest, then he would have

19 been under arrest.

20     Q    You say "they."  Who are you referring to?

21     A    I had no personal contribution as to who was being

22 placed under arrest.  It was not my job.  That was not my

23 aspect of the investigation.  I wasn't placing anybody under

24 arrest.

25     Q    You were the person who was assigned to interview

1                    Hartigan/cross/Mr. Moore            26259

2  him, right?

3        A    To do an interview, yes.

4        Q    So was he free to leave?

5        A    I don't know, sir.  If he was under arrest he

6  wasn't free to leave.  If he wasn't under arrest he was free

7  to leave.

8        Q    You didn't find out from your superiors whether he

9  was under arrest or not?

10       A    At that time, no.

11       Q    Now, when you first saw Kharey Wise you told him

12  about certain incidents in Central Park that night, didn't

13  you?

14       A    No.  He told me.

15       Q    Don't you recall that it was you who initiated the

16  conversation, officer?

17       A    Oh, yes, sir.

18       Q    And did you not tell him about the incidents in

19  Central Park?

20       A    I didn't tell him about any incidents in Central

21  Park.  I told him there was something that happened in

22  Central Park.

23       Q    So is it your testimony that you did not tell him

24  what incidents in Central Park that night?

25       A    I didn't mention anything, joggers, female joggers

P-APP001024

1                    Hartigan/cross/Mr. Moore          26478

2        Q     I'm asking you exactly what he said as you can

3   recall.

4        A     If I recall correctly, that's exactly what he said.

5    I asked him what time were you and where were you.  And he

6   told me.

7        Q     He mentioned to you that he was with a girlfriend

8   Lisa, am I correct?

9        A     Yes, sir.

10        Q     He gave Lisa's apartment number, am I correct?

11        A     Yes.

12        Q     At any time on the 21st did you speak to Lisa?

13        A     No.

14        Q     But he indicated to you that he was with this

15   woman, am I correct?

16        A     Yes, sir.

17        Q     Then he also mentioned to you that he and a

18   gentleman called Eddie De LaPaz went into the park, am I

19   correct?

20        A     Yes.

21        Q     Now, there came a time subsequent to this, after

22   the  --  withdrawn.

23        There came a time later on the next day when you took a

24   second statement from Kharey Wise, am I correct?

25        A     Yes, sir.

NYCLD_018356

P-APP001025

Hartigan/cross/Mr. Moore                2681

1

2    A    I asked him if that was true.  He acknowledged that

3  it was true.

4    Q    You asked him at the end of the statement?

5    A    Yes.

6    Q    But you didn't ask him as you went through

7  sentence-by-sentence, did you?

8    A    I believe he was doing that with me.  As I was

9  reading, I was reading each word.

10   Q    You believe.  Did he or did he not?

11            MS. LEDERER:  Objection.

12            THE COURT:  Please.  You can't both talk at the

13        same time.

14            What is your question?

15   Q    Did you ask him sentence-by-sentence whether he

16  understood what each sentence meant?

17   A    No.

18   Q    Now, there came a time when he signed the

19  statement, am I correct?

20   A    Yes, sir.

21   Q    And Detective John Hartigan and yourself also

22  signed the statement, am I correct?

23   A    I'm John Hartigan.

24   Q    I'm sorry.  Detective Robert Nugent?

25   A    Yes, sir.

NYCLD_018359

P-APP001026

Hartigan/cross/Mr. Moore                26

1

2   Q    Was Robert Nugent in the room throughout the entire

3   interview?

4   A    Yes, sir.

5   Q    Now, at any time during the interview, officer, did

6   you ask Kharey Wise if he wanted anything to eat?

7   A    I can't recall if I did or not.  I don't think I

8   asked him if he wanted anything to eat, no.

9   Q    You didn't ask him if he wanted anything to drink?

10  A    I might have.

11  Q    You can't recall?

12  A    I can't recall.

13  Q    Now, after he finished the statement, what action

14  did you take or what did you do?

15  A    I went back downstairs to the 20th squad-room.

16  Q    And you left him alone?

17  A    No.  I left him upstairs in the Sex Crimes Squad.

18  Q    Did you leave him with someone?

19  A    There was police officers up there watching

20  everybody, whoever was still upstairs in that room.

21  Q    Was Detective Nugent with him when you left?

22  A    Yes.  I believe so, yes.

23  Q    Now, after you left Kharey Wise you were involved

24  in other matters, am I not correct?

25  A    After I left Kharey Wise?

NYCLD_018360

P-APP001027

Det. Hartigan / Defense / Cross (Moore)          2712

with Mr. Santana, earlier that evening?

A.    Yes.

Q.    And do you recall that there came a time --

MS. LEDERER:  Objection.

THE COURT:  I don't know what the question

is.

MS. LEDERER:  May we have a side bar?

THE COURT:  Yes.

(The following is a sidebar conversation

outside the hearing of the jury.)

MS. LEDERER:  It appears to me that Mr. Moore

is trying to ask questions about whether this

detective prefers to interview young people by

themselves without the presence of a parent.

I am aware that Raymond Santana had a

conversation with the detective out of the

presence of the father.

If that's where Mr. Moore is going, it's

objectionable and he shouldn't be allowed to ask

the question.

THE COURT:  I will allow the question.  You

can ask him on redirect how he came to do it.

(Open court.)

Q.    Mr. Hartigan, do you recall earlier that evening

Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)          2713

that you had a conversation with Mr. Raymond Santana?

A.    Early that day, yes.  The 20th I had a conversation with him.

Q.    That's correct.

And you were asking him questions about his involvement with the female jogger.  Do you remember that?

A.    No, I didn't ask him any questions about the female jogger.

Again, he had told us what had happened.

Q.    Okay.

But there came a time when he gave you some information in a statement.  Is that correct?

A.    He gave us a statement.

Q.    And you took down his statement.  Am I correct?

A.    Yes.

Q.    And in that statement he had not mentioned about the female jogger.  Do you remember that?

A.    Yes, sir.

Q.    Do you remember that there came a time when his father and his grandmother, -- I'm sorry, his father had left the precinct?  Do you remember?  That was outside of the precinct?

A.    There was different times.  I believe his father was there early in the morning and left and then again he

Michael Frankel, Sr. Court Reporter

NYCLD_018391

P-APP001029

Det. Hartigan / Defense / Cross (Moore)        2714

1 left during the conversation that I was having with Santana,

2 yes.

3 Q.   That's correct.

4       He left during that conversation.  And when his

5 father had left, then you asked him questions about his

6 involvement --

7 A.   No.

8 Q.   When the father left, he told you about his

9 involvement with the female jogger.  Is that correct?

10 A.   He asked his father for permission to talk to me

11 by himself and his father granted it.

12 Q.   During the time his father was not there is when

13 he told you about his involvement with the female jogger?

14 A.   Yes.

15 Q.   Isn't that correct?

16 A.   Yes.

17 Q.   Now, with respect to Eddie De La Paz, you

18 indicated that you wanted to take him to the precinct.  Am I

19 correct?

20 A.   I asked him if he would accompany us to the

21 precinct, yes.

22 Q.   And the purpose of taking him to the precinct, was

23 to ask him questions.  Was it not?

24 A.   To take a statement from him, yes.

Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)                     2718

    A.   I don't know.

    Q.   That was in fact Detective Kelly.  Wasn't it?

    A.   I don't know.

    Q.   Well, did you ever speak to the detective who was
assigned to speak with Al Morris?

    A.   No.

    Q.   So Detective Kelly didn't tell you that Al Morris
was with Kharey Wise?

            MS. LEDERER:  Objection.

            THE COURT:  Objection sustained.

    Q.   Or is it that you didn't want to hear what
information Al Morris was going to tell you?

    A.   There was just too many people.  It was just too
much to absorb.

    Q.   Now, there came a time when you went back to the
24th Precinct.  Am I correct?

    A.   When?

    Q.   After you spoke to Eddie De La Paz, you went back
to the 24th Precinct.  Am I correct?

    A.   Yes, sir.

    Q.   Then you put some information in a note and you
handed it to Miss Lederer?

    A.   Yes.

    Q.   And this information said that you had spoken to

Michael Frankel, Sr. Court Reporter

Det. Hartigan / Defense / Cross (Moore)          2719

Al Morris and Al Morris had not verified what Kharey Wise
had said?

         A.    No.   I never spoke to Al Morris.   I spoke to Eddie
De La Paz.

         Q.    I'm sorry.   My mistake.

               You indicated you spoke to Eddie De La Paz?

         A.    Yes, sir.

         Q.    And Eddie De La Paz said he wasn't with Kharey
Wise?

         A.    Yes.

         Q.    At that stage when you gave the information to the
district attorney, you remained room.   Didn't you?

         A.    No, I did not.

         Q.    And did you know that the district attorney had
told Kharey Wise what you had told him about -- I'm sorry,
Eddie De La Paz?

         A.    No.

         Q.    You didn't know that?

         A.    I didn't know if she did or not.

         Q.    Now, after that there came a time when Kharey Wise
finished his video taped statement.   Isn't that correct?

         A.    Yes, sir.

         Q.    At this time when he finished the first video
taped statement, was he under arrest?


                Michael Frankel, Sr. Court Reporter

NYCLD_018397

P-APP001032

1               Hartigan/redirect/People                2733

2      A     Justice got what it wanted.

3               MR. MOORE:  No further questions.

4               THE COURT:  Do you have anything else?

5  REDIRECT EXAMINATION

6  BY MS. LEDERER:.

7      Q     Detective, if I might take you back to the

8  interview of Kevin Richardson.  Do you recall when you were

9  here earlier you were cross-examined by Mr. Diller?  Do you

10 recall the questions he put to you?

11     A     Yes.

12     Q     And do you recall him asking you a series of

13 questions as to whether you promised the Richardsons, Kevin

14 Richardson or anybody from his family, that Kevin Richardson

15 can go home if he made a statement?  Do you recall those

16 questions Mr. Diller put to you?

17     A     Yes.

18     Q     On the morning of April 20th during the time that

19 you were interviewing Kevin Richardson and during the time

20 that he was writing a statement, did you ever have a

21 conversation with anyone from the Richardson family about

22 Kevin Richardson?

23     A     Yes.

24     Q     And do you recall who you spoke to at that time?

25     A     Gracie Cuffee, the sister.

1               Hartigan/redirect/People              2734

2      Q    Was that conversation at the Central Park Precinct?

3      A    Yes, it was.

4      Q    And did you say anything to Angela Cuffee about

5 Kevin Richardson at that time?

6      A    Yes.

7      Q    What did you say to her?

8      A    I  --  generally I spoke to her that Kevin had a

9 lot going for him.  He was young.  He was  --  I had met a

10 lot of people during the course of my time in the police

11 department, a lot of young people who couldn't read or

12 write.  Kevin was intelligent.  He was articulate, could

13 read, he could write.  And that he had a lot going for him.

14     Q    Did you in that conversation with Angela Cuffee,

15 did you have any conversation about what would happen with

16 Kevin Richardson with respect to the statements he had made

17 to you?

18     A    Yes.  I told her that I didn't know what was going

19 to happen, but this wasn't the end of the world for Kevin.

20 That it wasn't up to us, the police department.  But he

21 could possibly be given youthful offender treatment by the

22 courts and that he would have no record at the age of

23 eighteen.

24     Q    In that conversation did you indicate to her that

25 this case would be going to court?

NYCLD_018412

P-APP001034

1                    Hartigan/redirect/People                    2735

2       A    I assumed that she understood that this case was

3  going to court.

4                 MR. DILLER:  Objection.

5                 THE COURT:  Objection sustained what she

6            understood.

7       Q    Did you use words to her telling her that this case

8  was going to court?

9       A    I don't know if I did or not.

10      Q    When you talked about youthful offender treatment,

11 what exactly did you say to Angela Cuffee?

12      A    That the court could give him youthful offender

13 treatment, and that he would have no police record after the

14 age of eighteen.

15      Q    Did you promise her that would happen in this case?

16      A    No.  I told her we had no control  --  the police

17 department had no control over it.  But this is what

18 possibly could happen.

19      Q    Did you tell her who had control over that?

20      A    The courts.

21      Q    Detective, during the 20th and 21st, and the 22nd

22 and in the course of this investigation, were other

23 detectives other than yourself conducting interviews?

24      A    Yes.

25      Q    Did you personally do an interview of Antron

NYCLD_018413

P-APP001035

1              Hartigan/redirect/People              2736

2  McCray?

3      A    No.

4      Q    Did other detectives do that interview?

5      A    Yes.

6      Q    Did you personally interview Yusef Salaam?

7      A    No.

8      Q    Did other detectives do that interview?

9      A    Yes.

10     Q    Did you personally interview Jermaine Robinson?

11     A    No.

12     Q    Did other detectives do that interview?

13     A    Yes.

14     Q    Did you personally interview Jomo Smith?

15     A    No.

16     Q    Did other detectives do that interview?

17     A    Yes.

18     Q    Did you personally interview Alfred Morris?

19     A    No.

20     Q    Did other detectives do that interview?

21     A    Yes.

22     Q    Did you personally interview Clarence Thomas?

23     A    No.

24     Q    Did other detectives do those interviews?

25     A    Yes.

T7-1f

1       COLLOQUY

2           Michael Sheehan.

3   D E T.    M I C H A E L    S H E E H A N, Shield 421,

4       Manhattan North Homicide, New York City Police

5       Department, having been called as a witness by

6       the People, having been first duly sworn,

7       testified under oath as follows:

8           COURT OFFICER: Would you give us your

9       name, spell your last name, your shield

10      number and present assignment.

11          THE WITNESS:    Detective Michael

12      Sheehan, S-H-E-E-H-A-N; Shield 421, NYPD,

13      Manhattan North Homicide Squad.

14  DIRECT EXAMINATION

15  BY MR. CLEMENTS:

16      Q       Detective, I'd like to direct your

17  attention to April 20, 1989. Did you work on that

18  day?

19      A    Yes, sir, I did.

20      Q    And what shift did you work?

21      A    Four in the afternoon to 1:00 in the

22  morning.

23      Q    Did you receive an assignment shortly after

24  you arrived for work?

25      A    Yes, I did.

10/24/89

NYCLD_018954

P-APP001037

T7-1f

1669
SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1    Q    And what was that assignment?

2    A    I left the Manhattan North office about ten

3    after one, and responded to Central Park Squad.

4    Q    Did you arrive at Central Park?

5    A    Yes, I did.

6    Q    WHen you got there, did you receive another

7    assignment?

8    A    Yes, sir, I went to Central Park to aid in

9    the investigation of an assault on a victim that was

10   likely to die.   Upon   reaching   the   Central   Park

11   Squad,   I   was   surprised of a couple of facts by my

12   immediate supervisor, Sergeant O'Connor.

13       I was then asked to accompany the uniformed

14   force on a search.   The search   was   for   a   weapon,

15   namely, a length of pipe.

16            MR. BURNS:   A what?

17            THE WITNESS:   A length of pipe.

18   Q    Where did that search take place?

19   A    The search took place in the vicinity of

20   West 97th Street and   Central   Park   West;   actually

21   inside the park walls.

22   Q    Did   you   recover   a pipe or was a pipe

23   recovered in your presence?

24   A    No, sir.

10/24/89

NYCLD_018955

P-APP001038

T7—1f

1670
SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1   Q    At the conclusion of that search, what did

2   you do?

3   A        At the conclusion of the search, I

4   responded back to the Central Park Squad and had a

5   conversation with, again, Sergeant O'Connor and

6   Detective John Hartigan.

7   Q    What time did you return to the Central

8   Park Squad?

9   A        I returned to the Central Park Squad

10  somewhere in the vicinity of 5:30 p.m.

11  MR. BURNS:  I'm sorry, 5:30 p.m.?

12  THE WITNESS:  That's correct.

13  THE COURT:  What time was it that you

14  said you went in search of the weapon?

15  THE WITNESS:  Shortly after 4:00, your

16  Honor.  Let's say 4:30.

17  THE COURT:  Okay.

18  MR. BURNS: Again p.m.?

19  THE WITNESS:  p.m.

20  Q    When did you speak to John Hartigan?

21  A        I spoke with John Hartigan in the Central

22  Park Precinct, there is a separate building across

23  the alleyway from the main building.  It is the

24  auxilary police building.  It also houses the Youth

10/24/89

T7-1f

1671
SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1 
2   Room.    It was in that building, in the Youth Room,
3   that I spoke with John Hartigan.
4        Q    And would you relate the nature of the
5   conversation?
6        A        Sure.    Hartigan advised me that he had
7   taken a statement from -- Raymond Santana, who was
8   seated at a desk in that room.  He had also advised
9   me. that Santana wished to add certain things to the
10  statement, and that it was impossible for him to
11  continue, because there was no parents or guardian
12  present for Santana.
13        Also, during this I was advised by
14  O'Connor, Sergeant O'Connor that the entire
15  investigation was going to be moved out of the
16  Central Park Precinct to the west side of West 82nd
17  STreet into the 20th Precinct which was probably a
18  better facility to handle an investigation of this
19  size.
20        Q    You were at the Central Park Precinct,
21  would you describe the conditions around the
22  precinct at that time?
23        A    Well, Central Park Precinct is an old
24  stationhouse.  There is not a lot of room.  There is
25  not a lot of individual rooms to do interviews.

10/24/89

NYCLD_018957

P-APP001040

T7-1f

1672

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1  Also, in this case, there's only a small youth room.
2  It's also a bad place to conduct a confidential
3  investigation, especially in a matter of this nature
4  with the press.
5      The press had arrived. There were quite a
6  few people arriving from the media. And they began
7  to gather. There's actually an alleyway that
8  divides the two main parts of the stationhouse.
9  It's unlike any other in the City.
10      Q      After speaking to Sergeant O'Connor and to
11  Detective Hartigan, did you receive another
12  assignment in connection with this case?
13      A      Yes, I did.
14      Q      And what was that?
15      A      The assignment was to take Raymond Santana
16  in our car. I was with Detective Jonza, J-O-N-Z-A,
17  and Rudy Hall, H-A-L-L, both from the Manhattan
18  North Homicide Squad. We were to take Santana from
19  the Central Park Stationhouse to the 20th, notify
20  his father, try to make some arrangements to get his
21  father down to the 20th Precinct, and then take an
22  updated, more complete statement.
23      Q      Did there come a time when you left the
24  Central Park Precinct?

10/24/89

NYCLD_018958

P-APP001041

T8-fr

1677

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2  Telephone Company, or whatever, but there was a hole

3  in the street protected by barriers.  I went to that

4  hole, jumped in myself, and examined it.  It was

5  only about two feet deep.  There was no pipe.

6      Q    After you looked for the pipe at 100th

7  Street and Central Park West, where did you go next?

8      A    We all got back in the car, that is to say

9  myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th Precinct, which is located at 82nd

12  Street, West 82nd Street between Columbus and

13  Amsterdam.

14      Q    Was anything else said in the car?

15      A    On the way from that site to the 20th

16  Precinct, Mr. Santana said, "I had nothing to do

17  with the rape.  All I did is feel the woman's tits.

18  I had nothing to do with the rape."

19      Q    Did you ask him any questions in the car?

20      A    No, I didn't.

21      Q    Was there any conversation in the car?

22      A    No, there wasn't.

23      Q    When you arrived at the 20th Precinct,

24  where did you go?

25      A    Upon arrival at the 20th Precinct, went to

10/24/89

NYCLD_018963

P-APP001042

T8-fr

1678
SHEEHAN – PEOPLE – DIRECT – CLEMENTS

1  the second floor, the 20th Detective Squad. We

2  entered. As you walk into the squad, to the left

3  there's a desk by a window which would be -- if you

4  were looking at it in the scheme, it's the west wall

5  of the 20th squad.

6          MR. CLEMENTS:    With the Court's

7          permission, I would like the witness to get

8          off the stand and look at what's been

9          received as People's 3 in evidence.

10          (Witness approaches People's 3 in

11          evidence.)

12  Q    Do you recognize People's 3, Detective?

13  A    Let me get my bearings, yes, I do.

14  Q    And what do you recognize it to be?

15  A       This is a schematic drawing of the second

16  floor of the 20th Precinct. These offices here are

17  the 20th Detective Squad.

18          MR. CLEMENTS:    Indicating, for the

19          record, the offices on the lower half of

20          People's 3 in evidence.

21  Q       How did you get to the second floor with

22  Raymond Santana?

23  A       Came in the main entrance of the precinct,

24  which would be here, and up the staircase

10/24/89

Page 79

1                    Arthur Clements

2    make you think that it was a bad idea?  Were you

3    worried that it's not appropriate or not a good

4    thing to take statements from kids that are that

5    young?

6                    MR. MYERBERG:  Objection.

7         A.      No, I didn't have any concern about

8    that.  The statements were being taken in the

9    youth room with parents or guardians present.

10        Q.      Did it ever cross your mind that

11   these were young children, did you ever think of

12   them in that way?

13                   MR. MYERBERG:  Again, up to

14        arraignment or at that time?

15                   MS. FISHER-BYRIALSEN:  At that

16        time.

17                   MR. MYERBERG:  Objection.

18        A.      No, I didn't have any concern.  To

19   the extent I knew their ages, I knew statements

20   were being taken by people who were less than

21   16.

22        Q.      We talked about where the case was

23   assigned earlier, and I asked you if ADA

24   Fairstein was supervising ADA Lederer and you

25   said no.  Do you know if anyone was supervising

NYCLD_035230

P-APP001044

1                    Arthur Clements

2    her, anyone at all from the DA's office?

3                    MR. MYERBERG:   Objection.

4         A.      I think I testified earlier that I

5    did not, I did not know specifically, you know,

6    what Linda Fairstein's role at the precinct was,

7    but that from my perspective, ADA Lederer was

8    assigned to the case.  So her supervisor would

9    have been our boss, John Hogan, the Chief of

10   Trial Bureau 40.

11        Q.      During your first period at the

12   24th Precinct up to the interview of or up to

13   the conclusion of the statement by Clarence

14   Thomas, did you ever see John Hogan at the

15   precinct?

16        A.      No.

17        Q.      Did you ever see any other

18   supervisors from Trial Bureau 40 at the

19   precinct?  You mentioned earlier there was one

20   other person other than John Hogan.

21                    MR. MYERBERG:   Objection.

22        Q.      Dan McNulty, did you ever see him

23   at the precinct?

24                    MR. MYERBERG:   Objection.

25        A.      No, I did not see Dan McNulty at

NYCLD_035231

P-APP001045

1                    Arthur Clements

2    the precinct but I wouldn't have expected to see

3    him there.

4         Q.      Why not?

5         A.      Because Elizabeth Lederer was

6    qualified to handle homicide cases, and

7    Assistants who went to precincts on, you know,

8    homicide call typically did not have supervisors

9    with them at the precinct, they handled that on

10   their own.

11        Q.      In regards to this case at that

12   time, did you think of her as your superior?

13        A.      Who?

14        Q.      ADA Lederer.

15        A.      At that time in 1989, I thought

16   that John Hogan and Dan McNulty and another

17   deputy bureau chief, if there was one, were my

18   supervisors.

19             (Mr. Warren entered the room.)

20             MS. FISHER-BYRIALSEN:  Just for the

21        record, Michael Warren just came in.  This

22        is Mr. Clements.

23             MR. WARREN:  Yes, we met.

24             MS. FISHER-BYRIALSEN:  Just let the

25        record reflect Mr. Warren is here.

NYCLD_035232

P-APP001046

1598

TAGLIONI — PEOPLE — DIRECT

1    A    Yes, I was.

2    Q    And what, if anything, did you hear Kharey
say?

3    A    That he would come into the station house
with us.

4    Q    And was Kharey Wise handcuffed at that time?

5    A    No, nobody was handcuffed.

6    Q    Where did you go when you left the
?

7    A    Went down to the lobby and to our car.

8    Q    How many cars did you have?

9    A    We had two unmarked police cars.

10   Q    And did you ride in one of the cars?

11   A    Yes, I did.

12   Q    Who did you ride with?

13   A    Detective Hall and Yusaf Salaam.

14   Q    And where did Yusaf Salaam ride in the car?

15   A    In the back seat.

16   Q    Do you know where Kharey went?

17   A    Kharey went into the other unmarked vehicle
with Detective Bier and Detective Freck.

18   Q    Was Yusaf Salaam handcuffed when he rode in
the car?

19   A    No, he was not.

NYCLD_006915

P-APP001047

1599

TAGLIONI — PEOPLE — DIRECT

1

2    Q    Did you have any conversation with Yusaf

3    Salaam on the way after you left

4    A    No, I did not.

5    Q    Did you hear any conversation between him

6    and anybody else in the car, the other detective?

7    A    I don't recall it, no.

8    Q    Where did you go?

9    A    I went to the 20th Precinct.

10   Q    And where did you go when you arrived at the

11   20th Precinct?

12   A    When we arrived at the 20th Precinct, we

13   were directed to go upstairs to the third floor to

14   the Sex Crimes office.

15   Q    Directing your attention to People's 4 in

16   evidence, the third floor of the 20th Precinct,

17   could you please step down from the witness stand

18   and approach People's 4 in evidence and indicate,

19   please, where you went with Yusaf Salaam when you

20   arrived.

21   A    Okay.  We took the stairway up to the third

22   floor.  We entered the Sex Crimes office, which is

23   over here, and I took Yusaf into this room right

24   here in the Sex Crimes office.

25            MS. LEDERER:  The record should reflect

1600

TAGLIONI - PEOPLE - DIRECT

the witness is indicating a small room off
of a longer room. It has three file
cabinets and something-- and one desk in
that room.

You may resume the witness stand. Thank
you.

(Witness complies.)

Q   Now, what did you do when you arrived in
that room with Yusaf Salaam?

A   I sat there and I waited for someone,
another detective to come to do the interview.

Q   Did you have any conversation with Yusaf
Salaam while you sat there in that room with him?

A   No, I did not.

Q   Was he seated or standing?

A   He was seated.

Q   And approximately how much time elapsed
before the arrival of a detective to conduct an
interview?

A   I'm not sure, but I'd say anywhere from
fifteen to twenty minutes.

Q   And do you know the name of the detective
who arrived within that fifteen to twenty minute
period?

1601

TAGLIONI - PEOPLE - DIRECT

1   
2   A   Yes, I do.   Detective Thomas McKenna from

3   Manhattan North Homicide.

4   Q   Were you present when Detective McKenna came

5   into the room?

6   A   Yes, I was.

7   Q   Approximately what time was it-- withdrawn.

8   What, if anything, did he say or do when he came

9   into the room?

10   A   When he came into the room, I introduced him

11   to Yusaf, told him who he was, Detective   McKenna

12   from the Homicide Squad, that he would be talking   to

13   him.

14   With   this   Detective   McKenna   also   introduced

15   himself to Yusaf, read him his rights, and at that

16   point I left the office.

17   Q   Were you present when the rights were read?

18   A   Yes, I was.

19   Q   And did you see whether they were read from

20   a card or were they given by memory?

21   A   No, they were read from a card.

22   Q   Were you present-- well, withdrawn.

23   When the rights were read, did Yusaf respond in

24   any way when the rights were read?

25   A   Yes, he did.

NYCLD_006918

TAGLIONI - PEOPLE - DIRECT

1  

2    Q    What do you recall his response or responses

3  to be?

4    A    "Yes," to all the answers.

5    Q    When-- did there come a time that you left

6  the third floor?

7    A    Yes, there did.

8    Q    And where did you go when you left the third

9  floor of the 20th Precinct?

10    A    I went down to the second floor to the

11  squad, the 20th squad room.

12    Q    Did there come a time where you returned to

13  the room where you had left Yusaf and Detective

14  McKenna?

15    A    Yes, there was.

16    Q    Approximately how much time elapsed from the

17  time that Detective McKenna came into that room

18  until the time that you returned, as best as you can

19  recall?

20    Well, let me rephrase the question.  I'm sorry.

21    From the time that you left the room, not when

22  Detective McKenna came in, how much time were you

23  away from that room before you returned?

24    A    I'd-- I really-- I don't know.  I believe

25  twenty minutes, maybe more.

NYCLD_006919

P-APP001051

1603

TAGLIONI - PEOPLE - DIRECT

1   
2   Q   And do you recall for what reason-- what did
3   you do when you returned to the room?
4   A   I asked McKenna for the pad he was writing
5   on, his notebook, his spiral book.
6              MR. MADDOX:  May that answer be read
7              back?
8              THE COURT:  Read it back, please.
9              (The court reporter read back the
10             requested portion of the record.)
11  Q   And do you recall what, if anything, you did
12  with that spiral book?
13  A   Yes, I took it down to the second floor.  I
14  gave it to one of my supervisors.
15  Q   Did there come a time where you returned
16  that spiral book to Detective McKenna?
17  A   Yes.
18  Q   And approximately how much time after you
19  took it from him did you return it to him?
20  A   A few minutes.
21  Q   Sometime after you had taken Detective
22  McKenna's steno book and returned it to him did you
23  have occasion to go to the first floor of the 20th
24  Precinct?
25  A   Yes, I did.

NYCLD_006920

P-APP001052

TAGLIONI – PEOPLE – DIRECT                    1604

1

2      Q   And how was it that you came to go to the

3  first floor?

4      A   I was instructed to go downstairs by one of

5  my supervisors to talk to Yusaf's mother who had

6  arrived at the station house sometime before that.

7      Q   And do you recall who told you to go

8  downstairs?

9      A   Again, it was one of my supervisors, either

10 the sergeant or the lieutenant.

11     Q   Did you then go downstairs and have a

12 conversation with Yusaf Salaam's mother?

13     A   Yes, I did.

14     Q   And what time was it, as best you recall,

15 that you had a conversation with the defendant's

16 mother?

17     A   It was sometime between twelve and one

18 o'clock in the morning.

19     Q   Do you recall where you had that

20 conversation with Yusaf Salaam's mother?

21     A   Yes, I do.

22     Q   And if you could please step down for a

23 moment and approach the easel, People's 2 in

24 evidence.

25          (Witness complies.)

NYCLD_006921

P-APP001053

1605

TAGLIONI — PEOPLE — DIRECT

1    Q    Would you indicate, please, where you had a

2 conversation with her.

3    A    Okay.  I had it right by the main desk,

4 standing right about over here, by the back exit.

5            MS. LEDERER:  The record should reflect

6            that the witness is indicating outside a

7            room that is marked "morgue," and near a

8            "generator room."

9    Q    How many people were present at the

10 conversation you had with Yusaf Salaam's mother?

11    A    At least four.

12    Q    And do you know the names of any of those

13 people?

14    A    No, I do not.

15    Q    Would you please tell us— you may resume

16 the witness stand.

17            (Witness complies.)

18    Q    What, if anything, did she say to you and

19 what did you say to her in the course of that

20 conversation?

21    A    When we came down, I identified myself as

22 Detective Taglioni.  She identified herself as

23 Mrs.-- as Yusaf's mother.  I don't know her first

24 name.

NYCLD_006922

P-APP001054

1606

TAGLIONI – PEOPLE – DIRECT

1   She was concerned about her child, you know, if

2   he was being abused and I assured her (blank on

3   tape) that he wasn't. ER.

4   I said, "We're upstairs. They're talking to him

5   right now."

6       With that she said, "Well, you shouldn't be

7   talking to him because he's only fifteen years old."

8

/LF  9

10      Q   What, if anything, did you say to her when

11  she told you that her son was only fifteen years

12  old?

13      A   I had told her that he showed us proof of

14  age that he was sixteen years old and that's the

15  reason we were talking to him.

16      Q   And what did she say at that point?

17      A   Well, she said he was fifteen years old.

18      At that point I went upstairs. I told my

19  supervisors these facts, and then I went upstairs to

20  the third floor where Detective McKenna was talking

21  to him and asked him to come out of the room and

22  advised him of the fact Yusaf may, in fact, be only

23  fifteen years old and there may be an attorney.

24      An attorney was downstairs, a federal attorney.

25      Q   Let me just back up for a moment. Did you

NYCLD_006923

P-APP001055

TAGLIONI - PEOPLE - DIRECT

1  ever, prior to going upstairs to Detective McKenna

2  to tell him to interrupt the interview, have a

3  conversation with anyone who identified himself as

4  an attorney?

5      A    No, I didn't have a conversation, no.

6      Q    In the conversation you referred to with

7  Mrs. Salaam or Yusaf's mother, was that the only

8  conversation you had with her up until that point?

9      A    Well, I had a conversation again with her

10  later on.

11      Q    Up until that point, was that the first

12  conversation you had with her?

13      A    Yes, it was.

14      Q    Did she tell you in that conversation there

15  was someone there, an attorney on behalf of her son?

16      A    No.  She told me she had a friend there that

17  was an attorney.  She never told me he was

18  representing her son.

19      Q    Did she tell you anything about his relation

20  to the family?

21      A    Yes, that he was a friend of the family's

22  and he was a federal attorney.

23      Q    And this conversation-- I'm sorry.  She said

24  he was what?

25

1608

1   TAGLIONI — PEOPLE — DIRECT

2       A    A federal attorney.

3       Q    Did she explain to you what that meant?

4       A    No, and I didn't ask her.

5       Q    The information you are just telling us

6   about hearing this person was a federal attorney who

7   was a friend of the family, when did you learn that?

8       A    When I first spoke to her the first time.

9       Q    Was that in the same conversation that she

10  told you Yusaf Salaam was fifteen years old?

11      A    Yes, it was.

12      Q    Will you tell us now when you went upstairs

13  and spoke to Detective McKenna, after this

14  conversation with her, what, if anything, did you

15  say to her?

16      A    I told Detective McKenna that we had a

17  problem, that Yusaf might be fifteen years old and

18  that there was an attorney downstairs.  I didn't

19  know if the attorney was representing him or not,

20  that he stated-- that his mother stated that he was

21  a friend of the family.

22      At this point Detective McKenna said, "That's

23  it, we can't talk to him anymore."

24      Q    How much time went by from the time that you

25  had this conversation with Mrs. Salaam until you

NYCLD_006925

P-APP001057

1609

TAGLIONI — PEOPLE — DIRECT

1 went upstairs and interrupted the interview with

2 Detective McKenna?

3 A    It couldn't have been more than five minutes

4 tops.

5 Q    After you had the conversation with Mrs.

6 Salaam wherein she told you what you just described

7 to us, what was the very next thing you did?

8 A    I directly-- I went upstairs. I told my

9 supervisors and then went directly upstairs to

10 Detective McKenna.

11 Q    Did you do anything else other than tell

12 your supervisor and then go tell Detective McKenna?

13 A    No, I did not.

14 Q    After the conversation you had with

15 Detective McKenna, what was the next thing you did?

16 A    I then went back downstairs and had a

17 further conversation with Yusaf's mother, Mrs.

18 Salaam.

19 Q    And did you tell her what you had just done

20 with respect to Detective McKenna?

21 MR. MOORE:  Objection as to form.

22 THE COURT:  I will allow it.

23 A    Yes, I told her the detective that was

24 speaking to him was informed he was fifteen years

1610

TAGLIONI - PEOPLE - DIRECT

1  old, and that he would not be spoken to anymore.

2  Q   And did you have a further conversation with
3  Mrs. Salaam at that point?

4  A   Yes, I did.

5  Q   Would you please tell us what you said to
6  her and what she said to you.

7  A   She asked me if she would be able to talk to
8  Yusaf.   I   told   her   I   would   confer   with   my
9  supervisors, which I did, and permission was given
10  for her to speak to him.

11  Q   Going   back   for   a   moment   to   the   first
12  conversation you had with Mrs. Salaam, about how
13  long did you speak to her at that point?

14  A   I really don't-- I'm not sure.

15  Q   The   second   conversation   that   you   were
16  describing where she asked to speak to Yusaf, do you
17  recall   approximately   how   long   that   conversation
18  lasted?

19  A   Five, ten minutes, maybe.

20  Q   And after you had that conversation-- did
21  you speak to someone about arranging for Mrs. Salaam
22  to see Yusaf?

23  A   Yes, I did.

24  Q   And do you know who it was that you spoke

NYCLD_006927

P-APP001059

1611

TAGLIONI — PEOPLE — DIRECT

to?

A    Again, it was one of my supervisors. I'm not sure if it was the sergeant or the lieutenant.

Q    What, if anything, did you do after you spoke to the sergeant or the lieutenant?

A    I went back downstairs and informed Mrs. Salaam that she would be allowed to speak to him. I then went upstairs and took Yusaf down to the first floor.

Q    Where did you find Yusaf when you went upstairs?

A    In the same room where I had put him earlier.

Q    Was anyone speaking with him at that time?

A    No.

Q    What did you do when you went upstairs and found Yusaf on the third floor?

A    I told him his mother was downstairs and would like to speak to him.

Q    What, if anything, did you do with respect to that?

A    I took Yusaf downstairs to the first floor.

Q    Was he handcuffed?

A    No, he was not.

NYCLD_006928

TAGLIONI — PEOPLE — DIRECT

1

2    Q    And when you took him down to the first

3    floor, could you just approach People's 2 in

4    evidence and show us where you brought him and where

5    his mother was.

6    A    Again, we were down in the main room by the

7    main desk (indicating). His mother was still

8    standing here with the people (indicating). His

9    mother and Yusaf went over into this corner and

10   that's where they spoke (indicating).

11   Q    And were you present at the time that they

12   spoke?

13   A    Yes, I was still standing over here

14   (indicating).

15   Q    From where you were standing were you able

16   to hear what they were saying?

17   A    No, I could not.

18       MS. LEDERER: Thank you, you may resume

19       the witness stand.

20       (Witness complies.)

21   Q    You made reference to some other people in

22   addition to Yusaf Salaam's mother. Was there anyone

23   else there with respect to Yusaf Salaam?

24   A    Yes. There were a couple of women and a

25   male.

NYCLD_006929

P-APP001061

1613

TAGLIONI — PEOPLE — DIRECT

1    

2   Q   Do you know their names?

3   A   No, I do not.

4   Q   And approximately how long did Yusaf speak

5   to his mother at that point?

6   A   He spoke to her for quite awhile.   I don't

7   know the amount of time, but a couple times I had to

8   interrupt and tell her we had to bring him upstairs.

9   So it was quite awhile.

10   Q   Can you approximate the amount of time?

11   A   No, I couldn't.

12   Q   At some point did you take Yusaf someplace

13   else?

14   A   Yes.   After he was finished speaking with

15   his mother we brought him back upstairs.

16   Q   When you took him upstairs after he had

17   spoken with his mother, where did you take him?

18   A   I believe it was back up to the third floor

19   again.

20   Q   After you brought Yusaf back upstairs, did

21   you have any further conversation with the

22   defendant's mother?

23   A   Yes, I did.

24   Q   And would you tell us how much after you

25   brought him upstairs was that conversation?

1614

TAGLIONI — PEOPLE — DIRECT

1    A    Five, ten minutes; ten minutes.

2    Q    And where did that conversation take place?

3    A    Also on the third (sic) floor but at a
different location than where we had spoke to her
before.  That's-- as soon as you come into the main
entrance there is a bench against the wall.  She was
sitting there with this federal attorney who turned
out to be a family friend.

4    Q    When you say this federal attorney, did you
actually meet that person at that time?

5    A    Yes, I did.

6    Q    And was that the first time you met him that
evening?

7    A    No, it was not.

8    The first time I spoke to him?

9    Q    Yes.

10   A    It was the first time I actually spoke to
him, yes.

11   Q    Did you have a conversation with the
defendant's mother and the person you've described
as a federal attorney?

12   A    Yes, I did.

13   Q    Would you tell us, please, what they said
and what you said.

P-APP001063

1               TAGLIONI - PEOPLE - DIRECT

2     A   Mrs. Salaam stated that he was a friend of

3 the family.  I believe she used the term "a big

4 brother."

5     With that he asked me what the procedure was

6 now.  And I thought that was a little strange that

7 an attorney was asking me about——

8               MR. MOORE:  Objection.

9               THE COURT:  Yes.

10               Don't tell us what you thought.

11     A   He asked me what the criminal procedures

12 were.  I explained that Yusaf would be brought down

13 to court and he would go in front of a judge for

14 arraignment.

15     Q   And did they ask you any other questions

16 about anything, about the procedure or what would

17 happen at that point?

18     A   After I explained to him, you know, the

19 whole arrest procedure, that was the only

20 conversation I had with them.

21     Q   And about how long was that conversation, if

22 you recall?

23     A   Maybe twenty minutes, fifteen minutes,

24 twenty-five minutes.  I'm really not sure.

25     Q   What happened after you had that

TAGLIONI — PEOPLE — DIRECT

2  conversation?

3      A    I believe they left the station house and I

4  went back upstairs to the second floor.

5      Q    Did you have any further conversation with

6  Yusaf Salaam after you spoke to Detective McKenna

7  and told him not to continue the interview?

8      A    No, I did not.

9          MS. LEDERER:   If I may have just one

10         moment, please.

11     Q    At any time-- well, withdrawn.

12         MS. LEDERER:   I have nothing further.

13         Thank you very much.

14         THE COURT:  Mr. Burns.

15         MR. BURNS:  Let me have a second, Judge.

16         THE COURT:  Yes.

17         (Mr. Burns and his client confer.)

18         MR. MOORE:  Excuse me, your Honor, one

19         moment.  May I just approach?

20         (Discussion was held off the record.)

21 CROSS EXAMINATION

22 BY MR. BURNS:

23     Q    Detective Taglioni, my name is Robert Burns

24  and I represent Yusaf Salaam.

25      You and I, we have never met, have we?

TS-1f

1498

1     HILDEBRANDT — PEOPLE — DIRECT — LEDERER

2     time.   They were throwing stones at   the   cars,   and

3     they   came   across this bum.   They let the bum pass.

4     There was an individual that went   and   knocked   him

5     down.     They   went   over and beat him.   They kicked

6     him.   They took his food and his beer.

7              Someone   had   poured   the   beer   on   him.

8     Somebody   else had taken his food.   They dragged him

9     off the side of the road and left him laying in   the

10    grass.

11             Then he stated they started roaming through

12    the   park, and then they tried to catch individuals.

13    There was a guy   and   a   girl   that   were   riding   a

14    bicycle   built   for   two.     They tried to get them.

15    They got away from them.

16             Then there   came   a   time   they   grabbed   a

17    jogger,   and they knocked him down to the ground and

18    hit him with a pipe.   And then they left   the   park,

19    that the police had come.

20             They   ran   back into the park.   They hid in

21    the park, in the mud.   And   then   he   and   another

22    individual went home to his house.

23       Q           Let   me just go back for just a moment,

24    Detective.

25             Prior to beginning this interview, did   you

10/24/89

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER     1499

2    have a conversation with Detective Gonzalez?

3        A     No, I did not.

4        Q        Prior to beginning this interview, did you

5    have a conversation with anybody from the Police

6    Department with respect to any investigation that

7    had been conducted up until that point?

8        A     No, I did not.

9        Q     Did you have any knowledge at all about

10   what happened in Central Park on the night of the

11   19th, prior to beginning the interview of Antron

12   McCray?

13       A        Other than there had been a woman that had

14   been found assaulted and raped and near death.

15       Q     And had anybody at all told you anything at

16   all about what had happened in the park that night?

17       A     No, they did not.

18       Q     In the course of taking a statement of

19   Clarence Thomas, had he made any statements about

20   what happened in Central Park?

21              MR. JOSEPH:  Objection, Judge.

22              THE COURT:  Prior to what?

23              MS. LEDERER:  In the course of taking

24              the statement of Clarence Thomas, had he

25              made any statements about what happened in

10/24/89

NYCLD_016984

P-APP001067

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1500

Central Park?

THE COURT:  I will allow it.

MR. JOSEPH:  The witness already said nobody told him about it.   The Assistant may not be happy with the answer or maybe she is.  I don't know.

THE COURT:  I don't know either, but I will let him answer the question.

Q    Had Clarence Thomas made any statement about what happened in Central Park on the night of the 19th prior to the interview of Antron McCray?

A    Prior to conducting the interview of Antron McCray?

Q    Had Clarence Thomas made any statement about what happened in Central Park on the night of the 19th, prior to the interview of Antron McCray?

MR. JOSEPH:  Objection.

THE COURT:  I will allow it.

A    Yes, he did.

Q    At the time you conducted the interview of Antron McCray, was he handcuffed?

A    No, he was not.

Q    You described a moment ago a statement that Antron McCray made to you after you asked him what

10/24/89

TS-1f

1   HILDEBRANDT - PEOPLE - DIRECT - LEDERER   1501

2   had happened in Central Park on the night of April

3   19th?   In the course of his making that statement,

4   did he speak freely or did you interrupt and ask

5   questions?

6        A    In the beginning I let him talk freely.

7        Q         And during the time that he said to you

8   what you have just told us he said to you, was that

9   during the time that he was speaking freely; or was

10  that a time that you were asking him questions?

11       A    Repeat that, please.

12       Q    You have just described a statement that he

13  made when you asked him what happened in Central

14  Park, when he made that statement? Did he speak

15  freely or was this in response to questions put to

16  him?

17            MR. JOSEPH:  Objection to the form.

18            THE COURT:   I don't know about

19       "freely".

20       Q    Was he speaking without interruption or

21  were you interrupting the questions?

22       A    He was speaking without interruption.

23       Q    What, if anything, happened -- withdrawn.

24            During the time he said those things to

25  you, did either of his parents speak?

10/24/89

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER   1502

1

2   A   No, not at that time.

3   Q   What, if anything, happened after he made

4   the statement that you've just described to us?

5   A   I felt he was not telling us --

6   MR. JOSEPH:  Objection.

7   THE COURT:  Objection sustained.

8   What happened after that?

9   MS. LEDERER:   May I withdraw the

10   question and ask another question?

11   THE COURT:  Yes.

12   Q   Was there anything you observed about

13   Antron McCray's behavior during the time he made

14   that statement to you?

15   MR. JOSEPH:  Objection.

16   THE COURT:  I will allow it.

17   Just describe what you saw; not your

18   mental state.

19   THE WITNESS:   I saw he was very

20   fidgety in the seat.

21   MR. JOSEPH:  Objection to that.

22   THE COURT:  I will allow it.

23   A   (Continuing)  He was -- at times he had eye

24   contact with me.  When he was speaking to me, he

25   would constantly look down at the ground.

10/24/89

NYCLD_016987

P-APP001070

TS-1f

HILDEBRANDT — PEOPLE — DIRECT — LEDERER  1503

1

2    Q         And after he made that statement to you
3    that you've already described, what happened next?
4    A         We went outside -- I went outside into   the
5    hall   with   Detectives   McCabe,   Gonzalez,   and   Mr.
6    McCray.
7    Q         And did you have a conversation outside   of
8    the hall?
9    A         Yes.
10   Q         Would you tell us who spoke and what was
11   said?
12   A         I spoke to Mr. McCray.
13   Q         What, if anything, did you say to him?
14   A         I informed him that I felt that his son was
15   not being completely truthful with us.   That he   was
16   holding   back   some vital information that might help
17   us in this case.
18   Q         Did the -- did Mr. McCray respond when   you
19   said that to him?
20   A         Yes, he did.
21   Q         What, if anything, did he say to you?
22   A         He also felt that his son was not being --
23             MR. JOSEPH:   Objection.
24             THE COURT:   Tell us what he said.
25             THE   WITNESS:   He said, I agree, I can

10/24/89

NYCLD_016988

P-APP001071

T6-fr

1504

1    HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2              tell when my son is not telling me the

3              truth.

4         Q         Did he say anything else to you at that

5    point?

6         A    Not that I can recall.

7         Q    Approximately how long did you talk outside

8    the room?

9         A    Two or three minutes.

10        Q    And what happened after the two or three

11   minutes?

12        A         I suggested that Mr. McCray go into the

13   room and talk to his son, inform his son that we

14   felt that he was not being completely truthful with

15   us.

16        Q    And what happened at that point?

17        A    He went into the room and spoke to his son

18   and Mrs. McCray.

19        Q    And where were you at that time?

20        A    Outside the door.

21        Q    Where was Detective McCabe?

22        A    Outside the door.

23        Q    And where was Detective Gonzalez?

24        A    We were all outside.

25        Q    How long did you remain outside the door?

10/24/89

NYCLD_016989

P-APP001072

T6-fr

2    A    Several minutes.

3    Q    Did you hear what was being said outside
4    the room at that time?

5    A    No, we could not.

6    Q    And what happened after the several minutes
7    past?

8    A    We went back in the room.

9    Q    And what did you do when you went back in
10   the room?

11   A    We continued the interview with Antron.
12   Asked him to go over the chain of events again.

13   Q    When you say "we", who spoke?

14   A    I did.

15   Q    And when you asked Antron to go over the
16   events, what, if anything, did he say to you?

17   A    Basically he repeated the same story.

18   Q    What happened after he repeated the same
19   story?

20   A    Then I asked him if there came a time that
21   they saw a female jogger in the park and he claimed
22   that he didn't.

23   Q    And was there anything unusual about his
24   behavior when he answered your question about the
25   female jogger?

10/24/89

NYCLD_016990

P-APP001073

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER 1506

1

2          MR. JOSEPH:  Objection, Judge.

3          THE COURT:  Objection sustained as to

4     whether there was anything unusual or not.

5     Q          Was there anything that you noticed about

6     his behavior when he answered the question about the

7     female jogger?

8          MR. JOSEPH:  Objection.

9          THE COURT:  I'll allow it.

10    A     He was looking at me at the time  he  asked

11    the  question  and  ask he answered the question, he

12    looked away.  Looked down at the ground.  Started to

13    move around inside the seat.

14    Q     What happened next?

15    A     At that point I suggested that  --  to  Mr.

16    McCray  that we go out in the hall, I'd like to have

17    a conversation with him.

18    Q     And did you leave the room with Mr. McCray?

19    A     Yes, I did.

20    Q     And did anyone else leave with you?

21    A     Detective Gonzalez.

22    Q     Where did you go when you left the room?

23    A     Just outside, behind the door.

24    Q     And  what  conversation  occurred  at  that

25    time?   Who  spoke  and what, if anything, did they

10/24/89

NYCLD_016991

P-APP001074

T6-fr

1507

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2    say?

3        A    I had asked Mr. McCray if he felt that   his

4    son   was   still holding back, and he said, "Yes," he

5    felt that he was keeping   something   from   us.     He

6    doesn't now why.  He didn't raise him like that.  He

7    raised him to tell the truth.

8        Q    And what happened after that conversation?

9        A        I had asked him, "Do you think that he

10   would be   embarrassed   --   that   he   is   embarrassed

11   talking in there about what happened?"

12            At   that time Mr. McCray said that it could

13   be, it could possibly be.  He said, "Maybe it   would

14   be   better   if   my   wife wasn't there, that he would

15   tell us what happened."   And at that point   I   asked

16   him   if he would want to talk to his wife.  He said,

17   "Yes."   I put him back in   the   room   and   Detective

18   McCabe came out and they had a conversation.

19       Q    Approximately how long -- withdrawn.

20            Detective,   where was Detective Gonzalez at

21   this time?

22       A    He was in the hall.

23       Q    And where was Detective McCabe?

24       A    Inside the room.

25       Q    And did Detective McCabe leave the room?

10/24/89

NYCLD_016992

P-APP001075

T6-fr

1508

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2     A     Only after Mr. McCray went back in and we
3 allowed them to speak together.

4     Q     How long were they allowed to speak
5 together?

6     A     A couple of minutes.

7     Q     Could you hear what was being said in that
8 room?

9     A     No.

10     Q     After a couple of minutes passed, what's
11 the next thing that happened?

12     A     We entered. We went back into the Youth
13 Room and I asked Mr. McCray what was decided and he
14 informed me that his wife had agreed to leave and at
15 that point Detective Gonzalez escorted her from the
16 room.

17     Q     After Mrs. McCray left the room, what was
18 the next thing that happened?

19     A     Mr. McCray informed his son -- as to why
20 the mother -- he informed the son to be truthful
21 with us and to tell us what happened, and if
22 something happened to the female jogger, to tell us
23 what happened.

24     Q     And did you then have a further
25 conversation with Antron McCray?

10/24/89

NYCLD_016993

P-APP001076

T6-fr

1509
HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1   A        At that point -- just prior to that,

2   Detective Gonzalez came back into the room and   when

3   he   was   back, I had asked Antron to tell us exactly

4   what happened with the female jogger.

5   Q        And -- did Antron   McCray   then   tell   you

6   something   about   what   happened   with   the   female

7   jogger?

8   A      Yes, he did.

9   Q      In substance, can you tell us, please, what

10  did he say   happened   with   respect   to   the   female

11  jogger?

12          MR. JOSEPH:   I object to the form, "in

13          substance."

14          THE   COURT:   Give us your recollection

15          of what he said.

16          THE   WITNESS:   He   said   the   female

17          jogger was jogging along the reservoir, and

18          they   came   up   and   one of the individuals

19          grabbed her.   They   knocked   her   to   the

20          ground.   They   started   kicking   her.   He

21          admitted to kicking   her.   There   came   a

22          point   where he was holding her down by the

23          left   arm, and   another   individual   had

24          removed   her   clothing.   There   come   a time

10/24/89

NYCLD_016994

P-APP001077

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER    1510

when the jogger was struck in the chest and struck over the head with a pipe. He gives the sequence of individuals --

MR. JOSEPH: Objection, Judge.

THE COURT: I'll allow it. Go ahead.

THE WITNESS: Who jumped on top of her including himself. I believe he puts himself as the third individual. As he was on top, somebody else was holding her arm down. After he was finished, he was followed by one or two other individuals, and when they were finished, they left that area of the park.

Q    After Antron McCray made the statement to you, did there come a time you put in writing the statement that he had given you?

A    Yes.

MR. JOSEPH: I object to the question.

THE COURT: No, I'll allow it.

A    Yes, I did.

Q    Did you write the statement, or did you and Antron McCray write the statement?

A    I wrote it.

Q    And would you please describe for the Court

10/24/89

NYCLD_016995

P-APP001078

T6-fr

1511

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1  how it came about that what he said was put on
2
3  paper?
4       Did you write the whole thing at once or
5  did you write it in pieces? did you ask him
6  questions? Describe to us how it came about that
7  the statement was put into writing?
8       A    After he had admitted to what happened to
9  the female jogger --
10           MR. JOSEPH:  I object, Judge.
11           THE COURT:  I'll allow it.
12           MR. JOSEPH:  That's not responsive to
13           the --
14           THE COURT:  I'll allow it.  Go ahead.
15       A    I told him I was going to write down the
16  chain of events as he relayed them to me.  I
17  repeated the chain of events and had asked him to
18  correct me if I was wrong.  And I wrote down from
19  memory, from what he originally told me.  After I
20  wrote down the statement, I read the statement to
21  him and his parents --
22       Q    Let me stop you for a moment.
23            You just said, "his parents."  Did there
24  come a time that his mother returned to the room?
25       A    Yes, there was.

10/24/89

NYCLD_016996

P-APP001079

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER   1512

1

2      Q       And would you please tell us, in relation

3   to the writing of the statement, when   was   it   that

4   his mother returned to the room?

5      A       After he admitted to what had happened to

6   the female jogger, Detective -- I   believe   it   was

7   Detective Gonzalez   went   upstairs and brought Mrs.

8   McCray back into the room.

9      Q    Was that before or after the statement   was

10  put in writing?

11     A    Before.

12     Q       I interrupted you.  I think you said you

13  had written out the statement.  What did you do with

14  the statement after you had written it out?

15     A    After I wrote it, I read it to   Antron   and

16  his parents.

17     Q       As   you   read   it to Antron, did he say

18  anything to you when you read it back to him?

19     A    No, he did not.

20     Q    Did he make any corrections when   you   read

21  it back to him?

22     A       I believe I made a few corrections as to

23  time and --

24     Q    When you read it back, did   either   of   his

25  parents speak?

10/24/89

NYCLD_016997

P-APP001080

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER 1513

1
2       A       No, they did not.

3       Q              I ask you to please look at what's been
4   previously marked as People's 12 for identification.

5              (People's 12 handed to witness.)

6       Q       Looking at People's 12 for   identification,
7   do   you     recognize    what    that    is,    Detective
8   Hildebrandt?

9       A       Yes.

10      Q       What do you recognize that to be?

11      A       That's the   statement   that   I   wrote   down
12  after the interview of Antron.

13      Q       And is that statement signed by anyone?

14      A       Yes, it is.

15      Q              Will you please indicate who has signed
16  that statement?

17      A       Antron McCray, Linda McCray,  Bobby   McCray
18  and myself.

19      Q              And are there any initials on the end of
20  pages one or two of that three page exhibit?

21      A       Yes, there are.

22      Q       And what initials appear at the  bottom   of
23  the first page of that exhibit?

24      A       A.M., L.M. -- it looks like A.M. -- B.M., I
25  guess.  B.M.

10/24/89

NYCLD_016998

P-APP001081

T6-fr

1514

1         HILDEBRANDT — PEOPLE — DIRECT — LEDERER

2       Q       Who initialed pages one and two at the

3  bottom?

4       A   Antron McCray, Linda McCray, and Bobby

5  McCray.

6       Q      And was this document signed in your

7  presence?

8       A   Yes, it was.

9       Q   And was it initialed at the bottom of pages

10  one and two in your presence?

11      A   After I read each page.

12      Q   Are there any corrections that appear in

13  any of the lines of pages one, two, or three?

14      A   Yes, there are.

15      Q      Would you please indicate on the first

16  page, is there any correction or change that appears

17  other than the text?

18      A   Yes, I wrote down on there, "about 9 p.m."

19  and I initialed it.

20      Q     And how did it come about that that

21  addition or correction was made?

22      A   Well, as I was reading it aloud, I have on

23  here "Clarence was at my house and we left," but I

24  didn't have what time he was at the house.

25      Q   When was the correction or the addition

10/24/89

NYCLD_016999

P-APP001082

T6-fr

1515

1       HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2       made?

3       A     As I was reading it.

4       Q         And   is   that your handwriting that the

5       addition --

6       A     Yes.

7       Q     On page two are there   any   corrections   or

8       changes or additions?

9       A     Yes.

10      Q       And would you please indicate which change

11      or correction is there?

12      A     I added the word "down."

13      Q     Is that your handwriting?

14      A     Yes, it is.

15      Q     And was that added before the document   was

16      signed and initialed?

17      A     Yes.

18      Q         And the correction on the first page --

19      withdrawn.

20          The addition on the   first   page   where   it

21      says "around 9 p.m." was   that   added before the

22      document was signed and initialed?

23      A     Yes.

24          MS. LEDERER:  Your Honor, at this time

25          I offer People's 12 in evidence.

10/24/89

Linda Fairstein

Page 261

```
 1    meeting his father.  I saw Raymond      16:47:16
 2    Santana's father that morning, the morning 16:47:20
 3    seven to nine a.m. at the 24th Precinct.  16:47:24
 4            I believe I saw other parents.   16:47:36
 5    I know I saw other parents at hours       16:47:40
 6    throughout the day of the 21st and other  16:47:43
 7    young men.  I saw Michael Briscoe, I      16:47:48
 8    remember distinctly, and I believe family 16:47:53
 9    members of his.                           16:47:56
10       Q.    Did you know that Raymond       16:48:00
11    Santana had to be re-interviewed because a 16:48:02
12    parent was not present?                   16:48:05
13            MS. DAITZ:  Objection to form.    16:48:08
14       A.    Did I learn that Raymond Santana 16:48:14
15    had to be re-interviewed when, what day,  16:48:17
16    what time, I don't know.                  16:48:20
17       Q.    Whenever he was interviewed,     16:48:22
18    particularly on the 19th.                 16:48:25
19            MS. DAITZ:  Your personal         16:48:26
20    knowledge prior to arraignment is what    16:48:27
21    he's asking you.  At the precinct, did you 16:48:30
22    come to learn the fact as Mr. Beldock just 16:48:32
23    characterized it.                         16:48:35
24       A.    I didn't have any personal       16:48:36
25    knowledge of what happened on the 19th    16:48:39
```

Linda Fairstein

Page 262

| | | |
|---|---|---|
| 1 | before -- on the 19th, no. | 16:48:41 |
| 2 | Q.    Nobody gave you any information | 16:48:45 |
| 3 | about what happened on the 19th? | 16:48:48 |
| 4 | MS. DAITZ:  Objection to form. | 16:48:49 |
| 5 | You can answer. | 16:48:50 |
| 6 | A.    The information that was being | 16:48:51 |
| 7 | given was being given to Ms. Lederer who | 16:48:52 |
| 8 | was the prosecutor in charge of the | 16:48:55 |
| 9 | investigation. | 16:48:57 |
| 10 | Q.    You didn't get that information | 16:48:58 |
| 11 | as well? | 16:48:59 |
| 12 | A.    I got some of the information. | 16:48:59 |
| 13 | She was doing her job.  It wasn't as | 16:49:02 |
| 14 | though she was coming to me to tell me | 16:49:05 |
| 15 | everything. | 16:49:08 |
| 16 | Q.    So did you learn anything about | 16:49:08 |
| 17 | what happened on the 19th? | 16:49:11 |
| 18 | A.    Anything about what happened on | 16:49:12 |
| 19 | the 19th, yes, I previously answered. | 16:49:13 |
| 20 | Q.    I'm talking about questioning of | 16:49:15 |
| 21 | any of the young men. | 16:49:22 |
| 22 | A.    I don't recall now being told | 16:49:24 |
| 23 | any specifics. | 16:49:27 |
| 24 | Q.    Okay.  Back on the 20th at the | 16:49:29 |
| 25 | 20th Precinct, what were you doing for | 16:49:39 |

NYCLD_039130

P-APP001085

Linda Fairstein

Page 263

| | | |
|---|---|---|
| 1 | three and a half hours that you were | 16:49:49 |
| 2 | there? | 16:49:51 |
| 3 | A.    I was trying to facilitate what | 16:49:51 |
| 4 | Ms. Lederer needed to do.  So I spent a | 16:49:59 |
| 5 | lot of time on the phone. | 16:50:03 |
| 6 | Q.    When I said three and a half | 16:50:04 |
| 7 | hours, I think it's probably more like | 16:50:06 |
| 8 | four hours, right, 8:30 to 12:30? | 16:50:09 |
| 9 | A.    8:30 to 11:30, it was three | 16:50:12 |
| 10 | hours because, as you know, at 11:30 I | 16:50:16 |
| 11 | became involved with another issue. | 16:50:19 |
| 12 | Q.    You're giving us to understand, | 16:50:21 |
| 13 | and you'll correct me if I'm wrong, that | 16:50:27 |
| 14 | you had no supervisory involvement in Ms. | 16:50:30 |
| 15 | Lederer's work at the 20th Precinct; is | 16:50:34 |
| 16 | that correct? | 16:50:38 |
| 17 | MS. DAITZ:  Objection to form. | 16:50:38 |
| 18 | A.    Those are not my words.  That's | 16:50:39 |
| 19 | not the impression I'm trying to create. | 16:50:44 |
| 20 | Q.    Were you supervising the | 16:50:47 |
| 21 | investigation? | 16:50:49 |
| 22 | A.    No, I was not doing that. | 16:50:50 |
| 23 | Q.    Were you the senior District | 16:50:52 |
| 24 | Attorney there? | 16:50:54 |
| 25 | A.    I was the Senior Assistant | 16:50:54 |

NYCLD_039131

P-APP001086

Linda Fairstein

Page 264

| | | |
|---|---|---|
| 1 | District Attorney there for, as I've | 16:50:58 |
| 2 | testified at the trial, administrative | 16:51:02 |
| 3 | purposes. I was not there -- I assigned | 16:51:05 |
| 4 | Ms. Lederer because she did not need at | 16:51:07 |
| 5 | the precinct a legal supervisor. | 16:51:10 |
| 6 | Q. Were you participating in the | 16:51:13 |
| 7 | investigation? | 16:51:15 |
| 8 | A. As of 11:30 that night, I was | 16:51:18 |
| 9 | not participating in any part. | 16:51:22 |
| 10 | Q. As of 8:30 that night? | 16:51:24 |
| 11 | A. I'm sorry, from 8:30 to 11:30, | 16:51:26 |
| 12 | no. I set Ms. Lederer up. I began to | 16:51:30 |
| 13 | make phone calls to expedite her work. | 16:51:33 |
| 14 | Q. The phone calls were to | 16:51:36 |
| 15 | Morgenthau? | 16:51:38 |
| 16 | A. Several to Morgenthau, several | 16:51:39 |
| 17 | to and from John Hogan, her Bureau Chief. | 16:51:41 |
| 18 | I spent time on the phone with one of the | 16:51:46 |
| 19 | neurosurgeons at Metropolitan Hospital. I | 16:51:50 |
| 20 | spent a lot of time on the telephone with | 16:51:54 |
| 21 | one of Ms. Meili's brothers. | 16:51:59 |
| 22 | Q. Go on. | 16:52:04 |
| 23 | A. I spent time on the phone with | 16:52:11 |
| 24 | the desk at the 24th Precinct inquiring | 16:52:15 |
| 25 | about the designated youth room there and | 16:52:18 |

NYCLD_039132

P-APP001087

Linda Fairstein

Page 265

| | | |
|---|---|---|
| 1 | whether we could clear -- whether they | 16:52:20 |
| 2 | could clear for Ms. Lederer and Mr. | 16:52:23 |
| 3 | Clements the youth room, and could handle | 16:52:26 |
| 4 | the operation if we moved it to their | 16:52:30 |
| 5 | precinct. | 16:52:35 |
| 6 | Q.    Anyone else you were talking to? | 16:52:35 |
| 7 | A.    Possibly, but I don't recall. | 16:52:38 |
| 8 | Q.    Let me show you an exhibit | 16:52:40 |
| 9 | that's been premarked as 5. | 16:52:45 |
| 10 | MS. DAITZ:  Thank you. | 16:53:00 |
| 11 | Q.    Do you recognize -- | 16:53:05 |
| 12 | A.    Just a minute. | 16:53:07 |
| 13 | MS. DAITZ:  Fairstein Exhibit 5 | 16:53:11 |
| 14 | is a one-page document, NYC025732. | 16:53:14 |
| 15 | Q.    This -- | 16:53:25 |
| 16 | A.    Just a minute.  I'm having | 16:53:26 |
| 17 | trouble with the handwriting.  Just let me | 16:53:29 |
| 18 | read it and I'll answer your questions, | 16:53:31 |
| 19 | please.  Okay, yes. | 16:53:33 |
| 20 | Q.    This -- | 16:53:48 |
| 21 | MR. BELDOCK:  Withdrawn. | 16:53:50 |
| 22 | Q.    You said you spent some time | 16:53:51 |
| 23 | talking to a doctor, right? | 16:53:52 |
| 24 | A.    Yes. | 16:53:54 |
| 25 | Q.    This document is not the doctor | 16:53:55 |

NYCLD_039133

P-APP001088

COMPLAINT - FOLLOW UP
INFORMATIONAL
PD 313-081A (Rev. 1-86)-31

| | | | PAGE 1 OF 2 PAGE | |
|---|---|---|---|---|
| Date of Orig. Report | Date Assigned | Unit Reporting | Pct 022 | OCCB No. | Complaint No. 281 | Date of This Report 4/20/89 |

4/20/89   67   DBMSTF NIGHTWATCH

Complainant's Name - Last, First, M.I.   P.S.N.Y.

Victim's Name - if Different: Unidentified F/W/20-30yrs

003055

**DETAILS:**

COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK

SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did interview Clarence Thomas M/B/14yrs DOB ▮▮▮▮ of ▮▮▮▮ in the presence of his mother Gloria Thomas who lives at the ▮▮▮▮ address. Clarence Thomas was under arrest at this time so the under- signed informed him and his mother of there rights from a card. Both Clarence Thomas and his mother Gloria Thomas acknowledge each right by stating yes and on the last right they agreed to answer questions without an attorney present. Clarence Thomas states that he and his friend Antron Mc Cray who lives on ▮▮▮▮ and goes to JHS 117 ( Exact address unknown) were on E110th St and Madison Ave and they met approx 15 other males all about 13 to 15 yrs old. Clarence states that he did not know all of these males but he did know a guy named Polo who is a M/Blor B/14yrs and he hangs out on E 110th and Madison , a guy named Ralph M/B/15yrs who lives in the Taft projects and he knows Lamont Mc Call ( See DD 5 Det Whelpley Re; Lamont Mc Call). Clarence states that the group was mixed with blacks and hispanics and that they all went into the park at E 110th and started walking into the park and south. Clarence stated that they where just hanging out that there was no plan on what they were going to do in the park. Clarence states that they entered the park at approx 2010hrs and he remembers the time because he knows that he met the group at 2000hrs and it took them about ten minutes to talk and then walk to the park. Clarence further states that as they walked thru the park some of the guys were throw- ing rocks at cars but none of the cars stopped except for a cab (yellow) that did stop but did not chase the group. Clarence also states that as they walked thru the park ( location unknown) approx eight of the guys saw a male white40's jogging,who was wearing a sweater and blue shorts, and thess eight guys started chasing the white male but after a few minutes five of the eight returned to the group stating that the guy got away.

Continued on page two

Reporting Officer's Rank, Signature - Command: Det ▮▮▮▮ DBMSTF

Name Printed: J. FARRELL   Tax Registry No. 864831

NYC002949

Farrell Exh.
4

NYCLD_058353

P-APP001089



| COMPLAINT FOLLOW-UP INFORMATIONAL | | PCT. | Complaint No. | Date of This Report |
| --- | --- | --- | --- | --- |
| PO-241-151A SECOND SHEET (1-66)-21 | | 022 | 281 | 4/20/89 |

DETAILS:  CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE

INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS  003056

) Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and then at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white ( Could supply
no further description). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van turned into the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he tripped
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

) When questioned about anyone else who the group had hit Clarence stated that
there was an old bum who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

) On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had to be spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then went an woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak to us without an attorney present.
At this timeClarencestated that the pipe he told us about before was passed
back and forth between the tall guy and Antron Mc Cray but Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of there three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to [redacted] and stated
that Antron lived in this building in apartment [redacted] Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into [redacted]
[redacted] and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Name/Signature & command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
| --- | --- | --- | --- | --- |
| Det [signature] DBMSTF | J FARRELL | 864831 | Sgt. | |

CRIMINAL RECORDS SECTION

NYC362950

NYCLD_058354

P-APP001090

1                    Arthur Clements

2    anyone representing you from Corporation

3    Counsel?

4         A.    Again, your question is about?

5         Q.    A negative relationship or friction

6    between Nancy Ryan and Linda Fairstein.

7         A.    No, I had not heard that.

8         Q.    Ultimately, prior to arraignment,

9    this case became a case belonging to the Sex

10   Crimes Bureau; is that correct?

11                MR. MYERBERG:  Objection.

12        A.    I don't know specifically whether

13   that is accurate or not from my perspective.  It

14   was assigned to Elizabeth Lederer.

15        Q.    And to your knowledge, was Linda

16   Fairstein supervising Elizabeth Lederer?

17                MR. MYERBERG:  Objection.

18        A.    No.

19        Q.    What was your understanding of her

20   involvement in the case prior to the arraignment

21   of Linda Fairstein's involvement prior to the

22   arraignment?

23        A.    I don't know if I -- I think Linda

24   Fairstein was at the precinct, but that the case

25   was assigned to Elizabeth Lederer.

NYCLD_035224

P-APP001091

Page 74

1                    Arthur Clements

2        Q.        Did she have any other involvement

3   than simply being at the precinct on that one

4   occasion prior to the arraignment?

5                MR. MYERBERG:   Objection.

6        A.        You're asking about Linda

7   Fairstein?

8        Q.        Yes.

9        A.        I don't know specifically what

10  Linda Fairstein's involvement was at the time I

11  arrived at the precinct.

12        Q.        Let me go back.   We've discussed so

13  far the period from April 21st around 2:00 to

14  2:30 a.m. where you arrive at the precinct and

15  the events, including the statements taken from

16  Kevin Richardson, Steve Lopez, Raymond Santana

17  up to Clarence Thomas, correct?   Those are the

18  things that happened when you were initially at

19  the 24th Precinct on April 21, 1989?

20                MR. MYERBERG:   Objection.

21        A.        Well, I don't know that that's

22  everything that happened at the 24th Precinct.

23  But I was present on the first floor of the 24th

24  Precinct during the time that the videotaped

25  statements of Kevin Richardson, Raymond Santana,

NYCLD_035225

P-APP001092

E. LEDRER

Page 666

| | | |
|---|---|---|
| 1 | A.    If this document is correct, | 11:03:31 |
| 2 | then I would have been at the 20th | 11:03:39 |
| 3 | Precinct from 8:45 p.m. until | 11:03:41 |
| 4 | approximately 10:45 p.m. | 11:03:43 |
| 5 | Q.    And at some point you went to | 11:03:48 |
| 6 | the 24th Precinct, correct, because that's | 11:03:50 |
| 7 | where you then conducted the interviews, | 11:03:53 |
| 8 | right? | 11:03:54 |
| 9 | A.    I'm sorry, let me correct my | 11:03:54 |
| 10 | answer.  As I sit here today and as I | 11:03:56 |
| 11 | think about my answer, I don't believe I | 11:04:00 |
| 12 | traveled to the 24th Precinct with the | 11:04:02 |
| 13 | video technician.  I believe I stayed at | 11:04:04 |
| 14 | the 24th Precinct until approximately | 11:04:07 |
| 15 | midnight. | 11:04:09 |
| 16 | Q.    At the 20th Precinct? | 11:04:10 |
| 17 | A.    I believe so. | 11:04:10 |
| 18 | Q.    Until midnight, okay. | 11:04:11 |
| 19 | A.    Approximately.  And so, if this | 11:04:12 |
| 20 | document is correct, then arriving at the | 11:04:17 |
| 21 | 20th Precinct with the video technician at | 11:04:20 |
| 22 | 8:45, I was there for a little bit over | 11:04:23 |
| 23 | three hours. | 11:04:26 |
| 24 | Q.    Tell me how you learned, tell me | 11:04:28 |
| 25 | what you were doing for the three hours or | 11:04:31 |

NYCLD_036699

P-APP001093

E. LEDRER

Page 667

| | | |
|---|---|---|
| 1 | thereabouts that you were at the 20th | 11:04:34 |
| 2 | Precinct, what were you doing there? | 11:04:34 |
| 3 | A.    I don't, as I sit here today, | 11:04:36 |
| 4 | have a clear recollection of what I was | 11:04:41 |
| 5 | doing.  I believe I was trying to prepare | 11:04:43 |
| 6 | to take a videotaped statement, and I | 11:04:47 |
| 7 | don't recall, as I sit here today, which | 11:04:53 |
| 8 | young man that would have been. | 11:04:55 |
| 9 | But we were preparing, and I | 11:04:57 |
| 10 | believe trying to set up in what we | 11:05:00 |
| 11 | thought was the youth room at the 20th | 11:05:02 |
| 12 | Precinct. | 11:05:04 |
| 13 | So I was involved in preparing | 11:05:04 |
| 14 | for that, but I don't know what else I | 11:05:09 |
| 15 | might have been doing.  I don't remember | 11:05:12 |
| 16 | anymore. | 11:05:13 |
| 17 | Q.    Were you talking with the | 11:05:14 |
| 18 | detectives who were investigating the case | 11:05:18 |
| 19 | during this period of time before you | 11:05:20 |
| 20 | started the interviews? | 11:05:22 |
| 21 | A.    I don't remember.  I may have | 11:05:23 |
| 22 | been.  I know for part of the time I was | 11:05:24 |
| 23 | at a briefing, but I don't know how long I | 11:05:26 |
| 24 | was there. | 11:05:29 |
| 25 | Q.    Who did the briefing? | 11:05:29 |

NYCLD_036700

P-APP001094

E. LEDRER

Page 668

| | | |
|---|---|---|
| 1 | MS. DOLLIN:  Objection.  Asked | 11:05:31 |
| 2 | and answered. | 11:05:32 |
| 3 | A.    It was someone from the police | 11:05:32 |
| 4 | department. | 11:05:37 |
| 5 | Q.    Who? | 11:05:38 |
| 6 | MR. BELDOCK:  Can you repeat | 11:05:38 |
| 7 | that? | 11:05:39 |
| 8 | MR. MOORE:  She said it was | 11:05:40 |
| 9 | someone from the police department. | 11:05:41 |
| 10 | Q.    Who from the police department, | 11:05:42 |
| 11 | do you know? | 11:05:45 |
| 12 | A.    I don't know. | 11:05:45 |
| 13 | Q.    Was it one of the detectives who | 11:05:46 |
| 14 | were involved in the investigation? | 11:05:48 |
| 15 | MS. DOLLIN:  I'm just going to | 11:05:49 |
| 16 | object to this line of questioning as | 11:05:50 |
| 17 | having been asked last time. | 11:05:52 |
| 18 | MR. MOORE:  Well, we only | 11:05:54 |
| 19 | touched on it.  We didn't really go into | 11:05:55 |
| 20 | it.  We went off to something else, that's | 11:05:56 |
| 21 | why I'm going back to it. | 11:05:58 |
| 22 | Q.    Do you remember who it was?  Was | 11:06:00 |
| 23 | it one of the detectives or was it | 11:06:02 |
| 24 | somebody else from the police department? | 11:06:04 |
| 25 | A.    I think it was somebody else | 11:06:06 |

NYCLD_036701

P-APP001095

E. LEDRER

Page 669

```
 1    from the police department.            11:06:07
 2        Q.    And was the briefing about what  11:06:08
 3    evidence they had at that point in terms  11:06:11
 4    of who was responsible for what happened  11:06:13
 5    in the park, was that what the briefing   11:06:15
 6    was about?                               11:06:17
 7            MS. DOLLIN:  Objection to form.   11:06:18
 8        A.    I don't have a clear memory of  11:06:19
 9    what the briefing was about beyond, I    11:06:23
10    believe, a description of some of the    11:06:26
11    things that had happened in the park that 11:06:28
12    night.  But I'm not, I think that's what 11:06:30
13    it was, but I don't remember clearly.    11:06:33
14        Q.    When did Linda Fairstein get to 11:06:36
15    the precinct, do you know?  First of all, 11:06:39
16    was she at the 20th Precinct?            11:06:42
17        A.    ADA Fairstein was at the 20th   11:06:45
18    Precinct on the evening of April 20th.   11:06:49
19        Q.    Did you have conversations with 11:06:50
20    her about the case at the 20th Precinct on 11:06:52
21    April 20th?                              11:06:55
22        A.    I believe we spoke briefly.     11:07:00
23        Q.    Okay.  What about?              11:07:02
24        A.    I would imagine.  I remember, I 11:07:04
25    remember her telling me that the reason  11:07:15
```

NYCLD_036702

P-APP001096

E. LEDRER

Page 670

| | | |
|---|---|---|
| 1 | she had come to the 20th Precinct, to give | 11:07:17 |
| 2 | me whatever help I might need, was because | 11:07:23 |
| 3 | she had handled a case that happened in | 11:07:25 |
| 4 | Central Park, and that having a crime | 11:07:28 |
| 5 | scene in Central Park had unique problems. | 11:07:32 |
| 6 | And she felt that perhaps she'd be able to | 11:07:35 |
| 7 | assist me in dealing with a crime scene in | 11:07:38 |
| 8 | Central Park. | 11:07:41 |
| 9 | Q.    You had had an earlier phone | 11:07:42 |
| 10 | conversation with Linda Fairstein asking | 11:07:44 |
| 11 | you to take charge of the investigation, | 11:07:47 |
| 12 | correct? | 11:07:49 |
| 13 | MS. DOLLIN:  Objection to form. | 11:07:50 |
| 14 | A.    The phone call I had with ADA | 11:07:51 |
| 15 | Fairstein wasn't to take charge of an | 11:07:53 |
| 16 | investigation.  It was to stand by and | 11:07:55 |
| 17 | field the questions that might come from | 11:08:01 |
| 18 | whoever was working on this at the Central | 11:08:06 |
| 19 | Park Precinct. | 11:08:10 |
| 20 | Q.    So at what point did you learn | 11:08:10 |
| 21 | that a young white woman had been sexually | 11:08:17 |
| 22 | assaulted in the park?  Did you learn that | 11:08:23 |
| 23 | in your conversation with Linda Fairstein | 11:08:26 |
| 24 | or did you not learn that until you got to | 11:08:28 |
| 25 | the precinct? | 11:08:30 |

NYCLD_036703

P-APP001097

E. LEDRER

Page 671

1    A.    I may have heard it on the radio    11:08:31
2  before I went to work.  And I don't have a    11:08:34
3  clear memory of ADA Fairstein mentioning     11:08:38
4  it to me.  But that would have been the      11:08:42
5  reason that I got involved because it was    11:08:45
6  a sexual assault and a possible homicide.    11:08:47
7    Q.    And when did you learn that         11:08:50
8  Patricia Meili was discovered near the       11:08:51
9  102nd Street Transverse?                     11:08:54
10   A.    As I sit here today, I don't         11:09:00
11 have a memory of when I learned where she    11:09:08
12 was found.  I don't know when I learned      11:09:11
13 that.                                        11:09:14
14   Q.    Well, you knew that she was, you     11:09:14
15 knew that she had been jogging, correct,     11:09:18
16 and attacked while she was jogging?          11:09:20
17   A.    I believe I knew that at some        11:09:22
18 point during the day.                        11:09:24
19   Q.    Yeah, I'm trying to pinpoint it      11:09:24
20 because you were familiar with the route     11:09:27
21 that she ran, correct?                       11:09:29
22        MS. DOLLIN:  Objection.              11:09:30
23   A.    In 1989?                             11:09:31
24   Q.    Yeah.                                11:09:33
25   A.    Yeah.                                11:09:34

NYCLD_036704

P-APP001098