T2-fr

4506

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2      Q      Did you then tell her that you wanted to

3   speak to her?

4      A         I told her I would answer questions that

5   she had.  I didn't say I wanted to speak to her.

6      Q      And did that conversation take place in the

7   lobby?

8      A      The conversation with  --  that we just

9   described.

10      Q      Yes.

11      A      Yes, in this large lobby area.

12      Q         And were you alone at that point or were

13   there any other police people with you?

14      A      I think I was alone.   Much of that time

15   Captain Rowe and Sergeant Clebe were back and forth

16   around me, and I have no specific recollection if

17   they were literally by my side and able to hear that

18   conversation.    They were in the area, but I don't

19   have any recollection of them being there at that

20   moment.

21      Q      Was Detective Taglioni in the lobby at any

22   time during that conversation?

23      A      No, he was not.

24      Q      Do you know where Detective Taglioni was at

25   that time?

11/29/89

T2-fr

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2          MS. LEDERER:   Objection.

3   A    I believe I do.

4          THE COURT:   I'll let her answer.

5   A    To my knowledge he was then  on  the   third

6   floor of the precinct.

7   Q      And did she have some questions for you at

8   that time?

9          MS. LEDERER:   Objection  as   to   what

10  time.

11         MR.  BURNS:   We're talking about the

12  first conversation that she had  with  Mrs.

13  Salaam.

14         THE COURT:   Yes, I understand.  Do you

15  understand the question?

16         THE WITNESS:   Yes.

17         THE COURT:   Answer it.

18         THE WITNESS:   Well, at that time --

19  Q    No, no, it's a yes or no.

20         THE COURT:   Did you have --

21         THE  WITNESS:   I can't answer it that

22  way.

23         THE  COURT:   She  can't  answer  the

24  question.

25         Do you have another one?

11/29/89

T2-fr

4508

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2    Q        Was there a conversation at that time

3    between you and Mrs. Salaam?

4    A    Yes.

5    Q    Did you ask her any questions at the time?

6    A    No.

7    Q    Did she ask you any questions at the time?

8    A    No.

9    Q    Did David ask you any questions at that

10   time?

11   A    No, he did not.

12   Q        Did either the female who was present and

13   the male who was present, did they say anything in

14   your presence?

15   A    Neither one of them spoke to me at all that

16   evening.

17   Q        Can you describe the appearance of that

18   male and female?

19   A    The female was a black woman who appeared

20   to be the same approximate age as Mrs. Salaam. I

21   don't know that I would have recognized her again.

22   The gentleman was distinguished looking, well-

23   dressed man, who appeared to be significantly older

24   than both of the women. That is as much as I --

25   Q    Can you describe his complexion?

11/29/89

NYCLD_015355

P-APP001300

T2-fr

4509

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1   Can you describe whether he had a mustache?
2   Can you describe the color of his hair?

3   A   I would say he had medium complexion, but I
4   thought  there was some gray in his hair and I would
5   be guessing if — well, I thought he had a mustache,
6   and I remember him being tall, and  the  woman  were
7   tall,  but I wouldn't — I doubt I'd be able to pick
8   out the man or woman if I saw them again.   I  would
9   recognize Mrs. Salaam and I have seen her since.

10   Q         And  you  didn't  say anything to those
11   people?

12   A    No.

13   Q    You didn't ask them directly who they were?

14   A    No.  I said to Mrs. —

15   Q    Is that correct?

16   A    That's right.

17   Q        And  was  that  the  end  of  that  first
18   conversation that you had with Mrs. Salaam?

19   A      We never established what the conversation
20   was.  You asked if I asked questions.  No.  Did  she
21   ask  questions.   No.  I said to her, if you want to
22   know, I would be happy to answer her questions,  and
23   talk to her, but I would just like to do it with the
24   immediate  family  members and would she tell me who

11/29/89

NYCLD_015356

P-APP001301

T2-fr

4510

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1   was present with her. She said, "No," she had to

2   talk to Mr. Nocente and the group left. That was

3   the extent of the first conversation with her.

4

5       Q    And Mr. Nocente was present at that time?

6       A    Yes.

7       Q    And then the group left your presence at

8   that time?

9       A        Yes, and actually walked out the front

10  vestibule door of the precinct.

11      Q    And what time would that be?

12      A    It would be around midnight because -- I

13  can place it only by what happened immediately after

14  to me.

15      Q    And the next conversation that you had with

16  either David Nocente or Mrs. Salaam occurred how

17  long thereafter?

18      A    No sooner than ten minutes thereafter, ten

19  to fifteen. I was involved with Miss Lederer with

20  the videomen and the detectives in the intervening

21  10 to 15 minutes.

22      Q        Now, how do you fix the time that the

23  videoman and Miss Lederer came down?

24      A    They -- the youth room was being used

25  during the course of the evening, probably from the

11/29/89

NYCLD_015357

P-APP001302

T2-fr

4511

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1   time  I  arrived  at  the  precinct,  after  8:30,

2   throughout  these  conversations  with  Mr. Nocente  and

3   Mrs. Salaam.   I  had  been  in  it  and  had  seen

4   Detective  Sheehan  and  Detective  Jonza  were  in  it

5   with  Mr. Santana  and  his  father  in  the  period  after

6   ten.   I know that Detective Sheehan's interview with

7   Mr. Santana  ended approximately midnight.   At that

8   point  they  left  that  room.

9       Q      How  do  you  know  that?

10      A      I  know  it  a  number  of  ways.   I've  seen   the

11  written  piece  of  paper  that  has  Sheehan's  signature,

12  and  the  time  it  ended,  for  one  thing.

13      Q          So  your  frame  of  reference  is  a  notation

14  that  you  looked  at   that's   contained   on   Sheehan's

15  notes?

16      A      That  is  the  most  specific  way  of  placing  it

17  of  ending  at  that  time.   I  had  a  recollection  it  was

18  around  midnight,  and  at  one  point  I  saw  his  notes.

19      Q      And  did  you  speak  to  --  which  conversation

20  came  --  withdrawn.

21          The  conversation  you  had  with  David  and

22  Mrs.  Salaam,  were  they  together  during  that

23  conversation  or  did  you  see  them  separately?

24      A      The  conversation  I  just  described  which  was

11/29/89

NYCLD_015358

P-APP001303

T2-fr

4512

FAIRSTEIN - REBUTTAL - CROSS - BURNS

my introduction to Mrs. Salaam was when David was present and said, "This is Yusaf's mother. This is Mrs. Salaam." That preceded the end of Mr. Santana's statement.

Q      I understand that. What I'm asking, whether the third conversation you had with David, did that occur at the same time you were having the second conversation with Mrs. Salaam?

A      No. Well, Mrs. Salaam re-entered the stationhouse with her female companion and we went in the room to sit down. It was the two women -- I'm sorry, and the gentlemen. It was the three of them. Nocente did not come in with them.

Q      Had you told David Nocente to leave the precinct?

A      I told -- I asked him to wait in the lobby of the precinct where other family members were coming, but to wait outside.

Q      That's outside, get out of the precinct, I mean -- I'm not suggesting --

                MS. LEDERER:  Objection.

                THE COURT:  No, just a minute. Wait a
        second.

                When you told him to go outside, were

11/29/89

T2-fr                                              4513

1        FAIRSTEIN — REBUTTAL — CROSS — BURNS
2            you talking about the street?
3                THE WITNESS:  There was an area in the
4            vestibule and there's an area right outside
5            the  precinct  where a number of people had
6            gathered to wait, and I asked him  while  I
7            was  talking  to  other  family members, to
8            wait outside the precinct.  I did  not  say
9            get out of the precinct.
10               THE  COURT:  Is that the street you're
11           talking about?
12               THE WITNESS:  The  vestibule  area  or
13           the sidewalk area, yes.
14               THE  COURT:  Well, the vestibule is in
15           the precinct.
16               THE WITNESS:  Yes.   And  he  was  in
17           there for  a period of time.
18               THE COURT:  You asked him to leave?
19               THE  WITNESS:  No, to  get  out  of
20           earshot.
21               THE COURT:  In other words,  when  you
22           said, "Get out," you were not talking about
23           getting  out  of the precinct, you say, you
24           were talking about getting out of earshot?
25               THE WITNESS:  Correct.

11/29/89

NYCLD_015360

P-APP001305

T2-fr

4514

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2     Q     Didn't you tell him to get out of the

3  lobby?

4     A     Out of the area where the detectives -- he

5  was coming over to where detectives and I were

6  discussing what was going on.  I asked him if he

7  would step outside this area so we can conduct our

8  business.

9     Q     Indicating you're pointing your hand.  With

10  your hand pointed towards the door?

11     A     I'm doing it now because, as you can see, I

12  talk with my hands.  I wasn't pointing to the door

13  that night, Mr. Burns.  I'm sure I probably told him

14  to go outside the door.  I told him to wait

15  somewhere where he was out of earshot of our

16  business.  He was in the vestibule for a significant

17  period of time.

18     Q     You told him to step away, to get outside

19  from where you were, isn't that true?

20             MS. LEDERER:  Objection.

21             THE COURT:  I'll allow it.

22             It's not literally true in the words you

23

24                ~nt outside in response --

25                  ~e that.  I didn't say go

T2-fr

1
2      outside.
3          Q      Did you ever go outside to where he was and
4      tell him, Gee, I didn't mean for you to go all the
5      way out, just out of earshot?
6          A      No, I didn't do that.
7                 MS. LEDERER:   Objection.
8          Q      When did you have the third conversation,
9      and using as a point of reference the point where
10     you told him to go.
11         A      I can't use that as a point of reference.
12     My third conversation simply was moments before Mrs.
13     Salaam, at 12:30, the note I made, asking for a
14     lawyer, within three minutes preceding that is when
15     I spoken to Mr. Nocente.
16         Q      Where did that conversation take place?
17         A      In the lobby of the precinct.
18         Q      And that is after you had sent a detective
19     to bring him back inside; isn't that correct?
20         A      To ask him, come and talk to me, yes.
21         Q      Isn't that so?
22         A      Yes, it is.
23         Q      And you say two or three minutes after that
24     conversation, that's when you had the second
25     conversation with Mrs. Salaam?

11/29/89

T2-fr

4516

1          FAIRSTEIN — REBUTTAL — CROSS — BURNS

2     A     No, no.

3     Q          When did you have the second conversation

4   with Mrs. Salaam?

5     A.         The second conversation with Mrs. Salaam

6   followed the period that I think was between 12:05

7   and 12:15, when Miss Lederer and I were discussing

8   with the detectives and the supervisors where to

9   start the videotape procedures. That conversation,

10  with the two of us participating, lasted five to ten

11  minutes, making plans where and what we would do.

12  After that was over, Miss Lederer went upstairs. It

13  was about 12:15 and I was alone in the lobby and

14  Mrs. Salaam came back alone -- I'm sorry, Mrs.

15  Salaam came into the stationhouse with her female

16  companion, and the gentleman.

17    Q          Didn't you have a conversation with David

18  Nocente where you told David Nocente that Mrs.

19  Salaam would be permitted to see her son?

20    A     I told him that at some point. I certainly

21  told him that as I told her when the questioning was

22  finished, she would be permitted to see her son.

23    Q          Well, what time was it when you first told

24  David Nocente that Mrs. Salaam would be permitted to

25  see her son?

11/29/89

NYCLD_015363

P-APP001308

4517

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2    A    I can't answer that.

3    Q    Was it -- it was after 12?

4    A    I just said I can't answer.

5    Q    Was it before 12:30?

6         MS. LEDERER:  Objection.

7         THE COURT:  Sustained.

8         She can't answer as to time, I suppose

9    that includes all time.

10   Q    Does it include all time?

11   A    I can't tell you when I said it.

12   Q    You remember whether you told him more than

13   once?

14   A    I don't recall telling him more than once.

15   Q    Did there come a time when Mrs. Salaam  saw

16   her son?

17   A    I am informed of that.  I was not present

18   when that happened.

19   Q    Was that after you had left, you  and  Miss

20   Lederer had left to go to the 24th?

21        MS. LEDERER:  Objection.

22        THE COURT:  I'll allow it.

23   A    It was -- well, I can't answer it.  I don't

24   know  whether  it  happened just before -- I mean it

25   was in that period between 12:30 and one, I am told.

11/29/89

NYCLD_015364

P-APP001309

FAIRSTEIN - REBUTTAL - CROSS - BURNS   4518

I don't know whether they were physically in the precinct
or not.  I did not see it happen.

Q    Then there came a time, you say, when one of the
conversations took place inside a room?

A    Yes.

Q    How long did that conversation last?

A    Very few minutes, maybe three.

Q    And, did that take place prior to the
conversation that you had with Miss Salaam where Miss
Salaam said she was getting a lawyer?

A    Yes, the conversation she was getting a lawyer
was the last thing she said and the only note I wrote that
night, "12:30 she was going to get a lawyer."

Q    Do you have that note?

A    I believe Miss Lederer does.

Q    Do you remember what you wrote that note on?

A    Other than it was a piece of paper, I don't
remember.

Q    What time did you have the conversation, that
two minutes, three minute conversation in the room?

A    I believe that it was about 12:15.  That's the
best I can place it.

Q    And that's when she told you that he was 15
years old.

T2-fr

4519

              FAIRSTEIN – REBUTTAL – CROSS – BURNS

1

2      A    Yes.

3      Q    And immediately upon hearing that he was 15

4  years old, you left the room?

5      A    Immediately, no, in the sense that I asked

6  her -- we finished that conversation where --

7      Q    Do you have proof, et cetera?

8      A    Yes.

9      Q    She said no, she didn't have any proof --

10     A    But she could supply it.  It's home.

11     Q    And you  left the room?

12     A    Yes.

13     Q    And when you left the room, where  did  you

14  go?

15     A    I went out to get Sergeant Clebe, Captain

16  Rowe, and say, send someone please to go  get  those

17  detectives.

18     Q    Were they in the lobby at that time?

19     A    They were either in the lobby or in that

20  video room, but they were on the first floor.

21     Q    And when you went out of that room, did you

22  leave Mrs. Salaam and her cousin in that room?

23     A    Yes, they were there when I left.

24     Q    And there came a time when  they  left  the

25  room, isn't that true?

11/29/89

NYCLD_015366

P-APP001311

T2-fr

4520

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1
2    A    I believe so.

3    Q        And when they left the room, didn't Miss
4 Salaam ask you for some water?

5    A    She asked me for water?  No.

6    Q    Asked you where she could get some water,
7 any water, water?

8    A    No.

9    Q    Did you hear her ask anyone, police person,
10 someone   who's   associated   with   law   enforcement,
11 anything about water?

12    A    No, but I walked out of the room.    There
13 were police people at the desk --

14    Q    I'm not talking about that.

15        THE  COURT:   The question is, did you
16        ever hear it?

17        THE WITNESS:  I never  heard  her  ask
18        anybody about water.

19    Q        Did you ever hear her say anything about
20 being thirsty?

21    A    No.

22    Q    And do you deny telling her that the  water
23 in the precinct was not drinkable?

24        MS. LEDERER:  Objection.

25        THE COURT:  Objection sustained.

11/29/89

T2-fr

FAIRSTEIN – REBUTTAL – CROSS – BURNS

1

2          Did you ever tell her that?

3          THE WITNESS:  No.  I don't even know

4          --

5          THE COURT:  The answer is no?

6          THE WITNESS:  No.

7     Q     Did anyone -- did you hear anyone tell her

8  that in your presence?

9     A          I never heard that subject discussed the

10  entire time I was there.

11     Q     Did you see her go to the desk?

12     A     No.

13     Q     At any time that evening?

14     A     No.

15     Q     Now, after speaking to her in the room,

16  when she was present with the cousins, when is your

17  next -- next recollection that you have of seeing

18  Mrs. Salaam?

19     A     Could not have been more than three minutes

20  later because I told the Captain I wanted the

21  detectives down here immediately and the detectives,

22  Taglioni and Hall came down immediately and had the

23  conversation with Mrs. Salaam then.

24     Q          Did that conversation take place in the

25  room?

11/29/89

T2-fr

4522

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2      A    I think it was right outside the room.

3      Q    Outside of the room?

4      A    I believe so. It was in the doorway, I

5 think, on the outside part of the room.

6      Q    When you went into the room, you were

7 seated, everyone was seated, weren't you?

8      A    When we first went into the room, yes, we

9 sat down.

10     Q    And would it also be fair to say that all

11 the other conversations took place while you were

12 standing?

13     A    Yes.

14     Q    So this last conversation you say that when

15 Taglioni came down, that took place while everyone

16 was standing?

17     A    Yes.

18     Q    Now, it was during the conversation when

19 Taglioni came down, when the transportation pass was

20 mentioned?

21     A    Yes.

22     Q    And then Taglioni said that Yusaf had it;

23 is that right?

24     A    I believe so.

25     Q    Did Taglioni bring the pass down with him

11/29/89

NYCLD_015369

P-APP001314

T2-fr

4523

FAIRSTEIN - REBUTTAL - CROSS - BURNS

or did he just simply make reference to it?

A     My recollection is he made reference to it at that time.  I don't recall seeing it.

Q     And was there any conversation relative to whether Yusaf had any other papers on him?

A     That was my information, that was the only identification, only piece of paper he had on him and there was no conversation about other identification.

Q     Now, when you say that was the only information you had, was that information supplied by Taglioni?

A     At that point, yes.  And Hall.

Q     And they told you that the only papers that Yusaf had on him --

A     That's not -- they didn't tell me.  Mrs. Salaam was saying he was 15.  They were saying, "He's got ID.  The only ID he got says he's 16.  This is what we got to go by.  He told us he was sixteen.  He told us when we went to get him, he's sixteen, and he's got ID that says he's sixteen." And she was saying, "He's fifteen."

Q     And then you said that "He's 15," and for them not to question him anymore?

11/29/89

T2-fr                                                                    452d

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2       A          You   want   to   know what I said to them

3  exactly?

4       Q    Well, in words or substance.

5       A    Yes.

6       Q    Is that what happened?

7       A    I stepped aside  with  them,  and  I  said,

8  "Everybody has been so careful about everything that

9  has been done."

10      Q    You said this to them?

11      A    Yes.

12           "That  every other kid under 16 had parents

13  with them, or in fact, had not been  picked  up,  if

14  there  were  no  parent  at home, and they were less

15  than 16 because there was enough to do" --

16      Q    I don't mean to cut you off, but  is  this

17  the conversation --

18      A     This is the substance of the conversation.

19  I said, "Let's take her word for it.   Let's  assume

20  he's  15,  let's  cut  this  off now.    Stop  it

21  immediately.   Go upstairs."

22           THE  COURT:    Will  lunch  help,  Mr.

23           Burns?

24           MR. BURNS:  Always does.

25           THE COURT:  We will recess for lunch.

11/29/89

NYCLD_015371

P-APP001316

T2-fr

4525

FAIRSTEIN — REBUTTAL — CROSS — BURNS

2:15.

(Luncheon recess taken.)

* * *

A F T E R N O O N       S E S S I O N

COURT CLERK:   Hearings continued. People of the State of New York versus Kharey Wise, Yusaf Salaam, Antron McCray, Kevin Richardson, Steven Lopez, Michael Brisco, Raymond Santana, Indictment 4762 of '89.

Miss Fairstein, may I remind you you are still under oath?

THE WITNESS:   Yes, thank you.

BY MR. BURNS:

Q   Miss Fairstein, it was during this first conversation that you had with David Nocente where you had accused him of acting in an unprofessional manner?

A   Yes.

Q   And that he had violated ethics by being there; is that right?

A   Yes, that's right.

Q   And that's the first conversation where you threatened to call his boss; is that right?

11/29/89

T2-fr

4526

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2    A    I told him I wanted to call his boss.

3    Q    Well, you asked about, did he have the

4    number for his boss; is that right?

5    A    That's right, yes.

6    Q    He had told you that he was a friend of the

7    family at that point, right?

8    A    Yes.

9    Q    And that he never represented himself as

10   being there in his official capacity as an Assistant

11   U.S. attorney or as an ordinary attorney; is that

12   right?

13   A    He identified himself as a lawyer,

14   originally, but, no, -- when I asked him, "Are you

15   retained, are you here to represent Yusaf Salaam?"

16   he said, "No, I am not."

17   Q    But you knew that he came there on behalf

18   of the family; isn't that true, the Salaam family?

19   A    That's what he said.

20   Q    And you ordered him out of there; isn't

21   that true?

22   A    No.    Initially no, he told me he was

23   waiting for Mrs. Salaam.  He didn't even tell me in

24   that first conversation whether or not he knew Yusaf

25   Salaam and he was certainly welcome to wait for Mrs-

11/29/89

T2-fr

4527

1        FAIRSTEIN — REBUTTAL — CROSS — BURNS

2   Salaam.

3        Q    At the point where —— you're talking about

4   he acting in an unethical manner, and has no

5   business being there, aren't you really trying to

6   get him out?

7                MS. LEDERER:  Objection.

8                THE COURT:  I'll allow her to answer.

9        Q    Yes or no?

10       A    I told him he had no business participating

11   ——

12       Q    Yes or no?

13       A    No.  I did not say he had no business being

14   there.

15       Q    And when you told him that you were going

16   to call his boss or that you asked for the telephone

17   number for his boss, that —— weren't you attempting

18   to intimidate him?

19       A    No, I was —— I told him exactly what I was

20   doing.

21       Q    Well, at the point where you saw the tears

22   well up in his eyes, didn't you realize at that

23   point that you had intimidated him?   Yes or no,

24   ma'am?

25                MS. LEDERER:  Objection.

11/29/89

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2          THE COURT:  I'll let her answer.

3     A     I didn't think I had intimidated him, no.

4 I thought I had, perhaps, made him understand or

5 agree that he had done something improper.

6     Q     And at that point you saw the tears in his

7 eyes; is that correct?

8     A     Yeah.

9     Q     At what point did you tell him to go?

10    A     When the detectives approached me to ask

11 questions, unrelated to his presence, but what to

12 do, I told him that he could not be -- he could not

13 be present for that part of the conversation.

14    Q     And then he went outside?

15    A     Yes.  There were many people outside

16 related to other --

17    Q     I understand that.

18    A     -- related to other defendants.

19          THE COURT:  Yes, why don't you just

20          answer the question.  It goes much faster,

21          hopefully that way.

22          THE WITNESS:  Yes.

23    Q     After you told him to go, he went outside;

24 is that correct?

25    A     Yes, at some point, yes.  He did not turn

11/29/89

T2-fr

4529

1      FAIRSTEIN - REBUTTAL - CROSS - BURNS

2  and talk out the door.

3              MR. BURNS: I move to strike --

4              THE   COURT:    Objection   sustained,

5          strike the last part of it.

6      Q      And when you spoke to him in this manner,

7  and I'm talking about when you spoke to him in terms

8  of accusing him of unethical conduct, was your voice

9  rising, were you speaking in a loud voice?

10     A      Not at all.

11     Q      Were you speaking so that anyone who was

12  beyond where he was standing could hear you?

13             MS. LEDERER:  Objection.

14             THE COURT:  Sustained.

15     Q      Do you have any awareness of how loud you

16  were talking?

17     A      I have a pretty good idea.    I'm not a

18  screamer, Mr. Burns.

19     Q      If I were to tell you that other witnesses

20  have testified they heard the sound of your voice --

21             MS. LEDERER:  Objection.

22             THE COURT: That's not a question.    I

23          don't know what the question is.  What's

24          the question?

25     Q      Would that give you any indication of how

11/29/89

NYCLD_015376

P-APP001321

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1  

2 loud you were talking?

3         MS. LEDERER:  Objection.

4         THE COURT:  I'll allow it.

5    A    No, it would not.

6    Q      Well, isn't it true that at the time you

7 had this conversation with David Nocente, it was

8 just you and David together at that point, isn't

9 that true?

10    A    We were the only two people immediately

11 next to each other. Captain Rowe and Sergeant Clebe

12 were not more than several feet away, I would

13 imagine.

14    Q    Well, what about the woman and the man you

15 had described?

16    A     They were outside two sets of double glass

17 doors and I was not screaming.

18    Q    And if I were to tell you that they

19 testified that they heard you, would that give you

20 some indication as to how loud you were talking?

21         MS. LEDERER:  Objection.

22         THE COURT:  Sustained.

23    Q    But you were very concerned about the

24 ethics involved in David's presence there; is that

25 correct?

11/29/89

T2-fr

4531

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2      A      Yes.

3      Q      Who was the first person that told you that

4  Yusaf was a minor?

5      A      Yusaf's mother.

6      Q      Now, you knew at the time that  minors  are

7  persons under the age of 21, is that not so?

8                    MS. LEDERER:  Objection.

9                    THE COURT:  Well, that's what she said

10                earlier.

11     Q      I believe that means you can answer.

12     A       I didn't say that's my legal definition of

13  a --

14                    THE COURT:  You said someone under  21

15                is considered a minor.

16                    THE WITNESS: That most people refer to

17                people under 21 as minors.

18     Q         Is that your understanding, that people

19  under the age of 21 are minors?

20                    MS. LEDERER: Objection.

21                    THE COURT:  I'll let her answer.

22     A      In a general sense -- I don't know how  you

23  mean.  Legally?  I don't know what you mean.

24     Q          Persons  under  the age of 21, are they

25  minors?

11/29/89

NYCLD_015378

P-APP001323

T2-fr

4532

          FAIRSTEIN - REBUTTAL - CROSS - BURNS

1                    THE COURT:  Objection sustained.

2                    She's already said what she understood

3              that to mean generally.

4       Q     Well, does it mean that to you?

5                    THE COURT:  Sustained.

6                    We cannot keep going over and over,

7              and over the same stuff.

8                    MR. BURNS:  I have not covered that,

9              your Honor.

10                   THE COURT:  She said it before.  All

11             right, let's go.

12      Q     And you are aware of the fact that minors,

13   between the age of 18 and 21 are treated differently

14   than minors the age of 16, is that not true?

15                   MS. LEDERER:  Objection.

16                   THE COURT:  Sustained.

17                   MR. BURNS:  May I approach the bench,

18             your Honor?

19                   THE COURT:  Yes.

20                   (Discussion at sidebar between Mr.

21             Burns, Ms. Lederer, and Mr. Clements, off

22             the record.)

23                   (The witness, Linda Fairstein, exits

24             the courtroom, and the following occurred:)

11/29/89

NYCLD_015379

P-APP001324

T2-fr

4533

                              COLLOQUY

          MR.   BURNS:   Your   Honor,   it's   my
intention   to   question   Miss   Fairstein
concerning when she first learned that   the
defendant,   Yusaf   Salaam   was   a   minor as
opposed to when she was first told that   he
was   15   years of age.   The significance of
it is this.   IS that as a lawyer and as   an
Assistant   District   Attorney,   and   as   a
person who is   part   of   the   investigatory
process in this matter, that when she hears
that someone is a minor, then it would seem
to   me   that she has a duty to make -- that
is if she is interested in seeing that   all
the   rules   are   followed -- that she has a
duty to make inquiry as to just category of
minority, just where does this person, does
this person who is   a   minor   fit,   and   it
would   seem   to me I should be permitted to
make inquiry   concerning   this.   It   goes
towards   her   motivation in connection with
what she does, and it is a proper   area   of
impeachment.

          THE   COURT:   The fact of the matter is
you already   made   those   inquiries.   You

11/29/89

T2-fr

4534

1          COLLOQUY

2     asked  her and she said she was told he was

3     a minor.  She considered that to be someone

4     under 21 years old.  You already asked  her

5     when  she found out he was 15, and she told

6     you.

7          MR. BURNS:   That's  her  question  on

8     direct.

9          THE    COURT:    I'm  sustaining  the

10    questions in this  regard.   You  have  an

11    exception.  If some benefit flows to you as

12    a result of that ruling, you have that.  So

13    let's go onto something else.

14          Bring her back.

15          (The witness, Linda Fairstein, resumes

16    the stand.)

17   CROSS EXAMINATION (Continuing)

18   BY MR. BURNS:

19        Q     And what time was it when you learned that

20   Yusaf Salaam was a minor?

21        A     By my figuring, it had to be after 12:10 or

22   12:15 or between 12:10 and 12:20 that evening.

23        Q     But there's no writing from which  you  can

24   use  as  a frame of reference to pinpoint it further

25   than that?

11/29/89

NYCLD_015381

P-APP001326

T2-fr

4535

FAIRSTEIN — REBUTTAL — CROSS — BURNS

A     The only writing that I made that night was the final number of 12:30 when Mrs. Salaam asked for a lawyer.

Q     Well, you said you had access to David Nocente's notes, did you consult his notes with relation to the times that some of these matters occurred?

A     I once read his notes several months ago when I obtained them, and passed them on to Miss Lederer.

THE COURT: The question was, did you read and did you pinpoint times as to a result of reading those notes, that was the question.

THE WITNESS: The only time I remember pinpointing from his notes is when he said he arrived at the stationhouse at 11:30. I don't even know if he made reference to times thereafter.

Q     You don't recall?

A     I don't recall.

MR. BURNS: May we approach?

(Discussion at sidebar between Mr. Burns, Ms. Lederer, and Mr. Clements, off

11/29/89

T2-fr

4536

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1       the record.)

2               MS. LEDERER:    The   record should be

3       clear, I did provide Mr. Burns with a   copy

4       of   the   material   that   was Faxed from the

5       U.S.   Attorney's   office   to   the   District

6       Attorney's office.

7               MR. BURNS:   And I have such a copy of

8       those notes, and I have   a   copy   of   those

9       notes in my office.

10              THE COURT:   We're here now.

11              MR.  BURNS:   That's not the issue.   I

12      don't have those notes now.   The   District

13      Attorney has a copy of notes ——

14              THE   COURT:   The District Attorney has

15      her own notations   on   those   notes.   She

16      doesn't have to turn them over to you.

17              MR. BURNS:   I'm   not   asking that she

18      turn them over to me.   I'm just asking that

19      those notes be made available to   me   so   I

20      can show them to the witness.

21              THE   COURT:      Maybe   one   of   your

22      colleagues   has   a   copy.   Did   everybody

23      receive copies of those notes?

24              MS.  LEDERER:   They're Mr. Nocente's

11/29/89

NYCLD_015383

P-APP001328

T2-fr

4537

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2       notes.

3           MR. BERMAN:  We were never given them.

4           THE   COURT:    It's   cross-examination

5       time.  You're cross examining this witness,

6       presumably that applies to this witness and

7       they should be here.

8           MR. BURNS:    Your Honor, I could not

9       anticipate that Miss Fairstein would be

10      that  vague, or that her recollection could

11      possibly need refreshing,  and  I  did  not

12      bring  those  notes  with me.  She said she

13      doesn't remember  --  she  said  she's  had

14      access  to  the  notes.  She said that she

15      doesn't recall.

16          MS. LEDERER:  The record has only been

17      in reference to notes that  were  Faxed  to

18      our office.  There's no reference that this

19      witness ever saw handwritten notes.

20          MR. BURNS:  I'll ask her.

21          MS. LEDERER: The record should reflect

22      that  my  copy  of  my  notes of Mr. Burns'

23      witnesses are  being  turned  over  to  Mr.

24      Burns.

25          MR. BURNS:  Could we have that marked,

11/29/89

NYCLD_015384

P-APP001329

T2-fr

4538

1    FAIRSTEIN — REBUTTAL — CROSS — BURNS

2              that    would    be   Defense   Exhibit   J   for

3              identification.

4                   (Document marked as requested)

5       Q        I  show  you  Defense  Exhibit  J   for

6    identification,   and I ask you whether -- well, that

7    contains notations in two separate handwritings,   is

8    that not so?

9              Just look at it.

10             THE   COURT:    What   is it you want to

11   show her?

12             THE WITNESS:    I've   never   seen   this

13             before, this is not what I was referring to

14             as Mr. Nocente's notes.

15             THE COURT:   Are these Nocente's notes?

16             MS. LEDERER: Yes.

17             THE  WITNESS:      The document shown to

18             me, I've not seen before.  That's  not  the

19             Faxed notes that I'm referring to.

20             MR. BURNS:  Let me have this marked as

21             Defense K for identification.

22                   (Document marked as requested)

23      Q        Looking at Defense K for identification,

24   and I ask you, do you recognize it?

25      A     Yes.

11/29/89

NYCLD_015385

P-APP001330

T2-fr                                                                    4539

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2      Q      All right, does that -- is that the Nocente

3   notes that you had referred to in your earlier

4   testimony?

5      A      Yes.

6      Q      And those are the notes that you had used

7   which caused you to realize that you had received

8   the news that someone was downstairs in the precinct

9   on the night of the 20th at 11:30?

10             MS. LEDERER:  Objection.

11             THE COURT:  I'll let her answer.

12             She's    shaking    her    head.       She

13         understands the question.

14             Is that right?

15             THE WITNESS:  The answer is no, N-O,

16         that is not right.

17      Q      Were there some other notes that you had

18   reviewed --

19      A      No, sir, I said the notes were part of the

20   process.    These notes, as you can see, were not

21   faxed to me until September 11th, which is the first

22   time I saw that.  There were earlier conversations

23   as testified this morning with Detectives about

24   reconstructing the event of the many hours, without

25   a view to your client, but the many hours in

11/29/89

NYCLD_015386

P-APP001331

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1
2    particular that helped place the times things.

3        Q    Were these notes part of the process?

4        A    Part of the process in that when I read

5    these notes, I became aware what Mr. Nocente claimed

6    was the time he arrived at the precinct.

7        Q    And do those notes refer to an 11:30 time?

8        A    May I look at them?

9        Q    Please.

10            MS. LEDERER: Objection.

11            THE COURT:  I'll let her look at them.

12            THE WITNESS: This says that he arrived

13            at approximately 11:25 p.m.

14       Q    Would you look at the rest of the notes?

15   When you looked at the notes before, you read    the

16   whole thing, did you not?

17       A    I did.

18       Q    Now, does those notes contain any

19   references to time other than that 11:25 reference

20   as the time of his arrival?

21            MS. LEDERER:  Objection.

22            THE COURT:  I'll let her answer.

23       A    I  don't  know, I haven't read it since

24   September 11.  If you want me to read it, I'll —

25       Q    Just  look  and  see,  does  it  make  any

NYCLD_015387

P-APP001332

T2-fr

4541

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1
2  references to times?

3      A     Yes.

4      Q     Does it make any reference to the time that
5  you had the conversation with Miss Salaam when you
6  were told that he was a minor?

7                    MS. LEDERER:  Objection.

8                    THE COURT:  Sustained.

9      Q     You arrived -- what time did you arrive   at
10  the 20th Precinct?

11                    MS. LEDERER: Objection.

12                    THE COURT:  Sustained.

13      Q      At the time when received the information
14  that someone was waiting downstairs inquiring   about
15  Salaam, you were upstairs working as part of the
16  investigation; is that not so?

17      A     Yes, assisting, yes.

18      Q     And you were concerned that no -- that
19  mistakes weren't made?   In other words, that the
20  proper procedures were followed; isn't that true?

21      A     We were all concerned with the proper
22  procedures being followed, yes.

23      Q      And you were concerned because minors were
24  involved, isn't that so?

25      A     I was aware of it.  That was not my purpose

11/29/89

NYCLD_015388

P-APP001333

T2-fr

4542

            FAIRSTEIN – REBUTTAL – CROSS – BURNS

1   for going there, as I testified earlier.

2   Q    But wouldn't that be –– I'm not saying that

3   was your main purpose, but that was one of the

4   reasons that you became part of the investigation,

5   was to see that no mistakes were made and that the

6   rules, all of the rules were followed?

7   A        No, that's not what my testimony about

8   mistakes were.

9   Q    I'm not asking you about your testimony.

10  A    The answer is no.

11       THE COURT:   The answer is no.

12  Q    Were you concerned about the rules being

13  followed:

14  A        Not when I saw how well and careful they

15  were being followed by the police who were there

16  that night.

17  Q        Didn't you testify earlier that when you

18  had learned that Yusaf was 15 years old, you sent

19  for Taglioni and Hall and you pulled them aside and

20  engaged them in conversation?

21  A    No.  I asked them –– had them sent for to

22  come down to talk to Mrs. Salaam, to straighten it

23  out.  They obviously were operating under the idea

24  Yusaf was 16.  She was saying he was 15.

11/29/89

4543

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2      THE COURT: That's all the question is.

3   Just answer the one question.

4      MR. BURNS:   I   move   that   that   be

5   stricken.

6      THE COURT:   The question or --

7      MR. BURNS:   That portion of the answer

8   that is not responsive.

9      THE COURT:   Strike out the last   part.

10  Please   just   answer   the   question.   Don't

11  give us a recitation.

12     THE WITNESS:   I didn't take them aside

13  is the answer to the question, no.

14     THE COURT:   That's the question.

15  Q      Well, the conversation that   you   had   with

16  them,   relative   to   being   careful   to see that the

17  rules   were   followed,   was   that   in   Miss Salaam's

18  presence, is that your testimony?

19  A      No.

20  Q      Where was Mrs. Salaam when you took them

21  aside and told them or had   that   conversation   with

22  them   about   you   wanted   to be careful about seeing

23  that all these rules are followed; we   have   minors,

24  et cetera, et cetera.

25  A      Hall and Taglioni came downstairs, spoke to

11/29/89

NYCLD_015390

P-APP001335

T2-fr

4544

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2  Mrs. Salaam.    We  then turned away from her and I

3  said directly to them, and I said  ——  or  to  the

4  detectives,  and  said,  "Let's  err  on  the  side  of

5  caution, and cut this off."

6      Q    And that was a concern  of  yours,  was  it

7  not, to see that the rules were followed; isn't that

8  true?

9      A    Of course.

10      Q    Now, would it be fair to say that according

11  to  your  testimony,  15  minutes  earlier,  by  your

12  estimation, you had been told that he was a minor?

13      A    That was not my testimony.

14      Q    Well, how much earlier were you  told  that

15  Yusaf Salaam was a minor?

16      A    Once it was told to me ——

17      Q    How much earlier?

18      A    I estimated somewhere between three to six

19  minutes earlier.

20      Q    Is it your testimony  then  that  you  were

21  told  that  Yusaf  was  a  minor as part of the same

22  conversation when you were told that he was 15 years

23  old?

24      A    Yes.

25      Q    And that that conversation  took  place  in

11/29/89

NYCLD_015391

P-APP001336

T2-fr

4545

FAIRSTEIN - REBUTTAL - CROSS - BURNS

2  this little room off the lobby?

3      A    In the large room off the lobby.

4      Q    But it is a separate room off the lobby?

5      A    Yes.

6      Q    And this is while you were both seated?

7      A    The three were seated, yes.

8      Q    I'm sorry, the two women I mean when I said

9  both?

10     A    Right.

11     Q    Mrs. Salaam, the lady; right?

12     A    Yes, that's right.

13     Q    And you say that Vincent -- I'm sorry, the

14  man who was with them was asked to leave that room?

15     A    yes.

16     Q    And David Nocente was not permitted into

17  that room?

18     A    That's correct.

19     Q    And would it be fair to say that Mrs.

20  Salaam, from her testimony, was in the precinct a

21  half an hour before she told you that he was a

22  minor?

23     A    Certainly 20 minutes from when she arrived.

24  Five to 12 to 12:15.  Twenty minutes, it could have

25  been a half an hour.

11/29/89

NYCLD_015392

P-APP001337

T2-fr

4546

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1   Q   And it could have been a half an hour?

2   A   Yes.

3   Q    And there's no question that when she came

4   in, Yusaf was being questioned; is that right?

5   A   That's correct.

6   Q   Now, would it be fair to say that you don't

7   know what time the other people who you described,

8   that male and the female, you don't know what time

9   they had arrived at the precinct?

10   A   That's correct.

11   Q    Would it also be fair to say that

12   irrespective of what time they arrived, they were

13   not permitted to see Yusaf?

14         MS. LEDERER:  Objection.

15         THE COURT:  Well, the question  --  is

16         your question, did they see Yusaf?

17         MR.  BURNS:  Well, were they permitted

18         to see Yusaf.

19         MS. LEDERER:  Objection.

20         THE COURT:  I'll let her answer.

21   A   To my knowledge, no.

22   Q   And David Nocente, when he came as a friend

23   of the family, he was not permitted to see Yusaf?

24   A   He was not.

11/29/89

NYCLD_015393

P-APP001338

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1

2      Q      And it's very clear in your mind that David

3  arrived at least, you're saying, at least five

4  minutes before Mrs. Salaam?

5      A      Yes, that's right.

6      Q              And Mrs. Salaam had arrived, and

7  incidently, the questioning was continuing, right?

8      A      Yes.

9              MS. LEDERER:   Objection.

10             THE COURT:   I'll allow it.

11     Q      And she came in and she asked to see her

12  son  and she was not permitted to see her son, isn't

13  that correct?

14     A      Yes.

15     Q      And the conversation with Mrs. Salaam,

16  relative  to his being a minor and being 15, you say

17  that that was the same conversation?

18     A      Yes.

19     Q      Was it also part of that same  conversation

20  where  she  said  she  was going to get a lawyer for

21  him?

22     A      No.

23     Q      When did that conversation occur?

24     A      That was the last statement she made to  me

25  that I wrote down at the time, 12:30 in the evening.

11/29/89

T2-fr

4548

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1

2    Q        And   where   was   that  --  where  was  that

3    conversation held?

4    A    In the lobby area.

5    Q    That was outside  of  that  little  --  I'm

6    sorry, the large enclosed office?

7    A    Yes, she walked up to me where she had been

8    with  Nocente, and said, "I want you to know we want

9    a lawyer.  We're going to get a lawyer.

10   Q    As I understand it, you were  concerned  to

11   see -- in seeing that certainly ethical standards by

12   lawyers  were  properly followed, and that's why you

13   got agitated at David Nocente's  presence;  is  that

14   right?

15              MS. LEDERER: Objection.

16              THE COURT:  Sustained.

17   Q        Did  you feel any ethical obligation to

18   inquire when you found out he was a minor to ask him

19   his age?

20              MS. LEDERER:  Objection.

21              MR. BURNS:   I'm  sorry,  to  ask  the

22         mother, Mrs. Salaam, Yusaf's age?

23              THE WITNESS: I believe I knew his age.

24

25

11/29/89

NYCLD_015395

P-APP001340

People Rebuttal - Fairsteil - Cross - Burns        4549

1

2    Q.    No, that's --

3            MR. BURNS:  I move to strike that as being

4        not responsive.

5            THE COURT:  I'll allow it to stand.

6    Q.    Did you feel any ethical obligation to inquire as

7    to what Yusaf's age was when you learned that he was a

8    minor?

9            MS. LEDERER:  Objection.

10            THE COURT:  I'll let her answer that

11        question.

12    Q.    Yes or no.

13            THE COURT:  If you can.

14    Q.    If you can't, say you can't, but either yes, no,

15    or I can't.

16    A.    I thought I was -- please, I was being ethical

17    because we knew his age.

18            MR. BURNS:  I move to strike that as not

19        responsive.

20            THE COURT:  The question has been asked and

21        answered so many times, so many different ways,

22        you keep putting the question a different way.

23        The question has been answered, how many times you

24        have to have a question?  What difference does it

25        make whether she was ethical or unethical?  The

Joseph T. Tierney, CSR, RPR

NYCLD_015396

P-APP001341

```
 1    People Rebuttal - Fairsteil - Cross - Burns      4550
 2         law is the law, either she followed it or she
 3         didn't.  If she was ethical and didn't follow the
 4         law, I suppose she was not ethical.  Her state of
 5         mind about ethics is not important.  The question
 6         is was the law followed.
 7              MR. BURNS:  But her state of mind as a part
 8         of this investigation I think, your Honor, is very
 9         relevant, your Honor.
10              THE COURT:  Okay.
11              MR. BURNS:  That's why I asked the question.
12              THE COURT:  I'm sure you had a reason, but I
13         disagree.
14              MR. BURNS:  Does that mean she can answer it?
15              THE COURT:  No, it's already been answered
16         as far as I'm concerned on that issue.
17              MR. BURNS:  Does that mean it's a no?
18              THE COURT:  Please, you have any other
19         questions?
20              MR. BURNS:  Just one minute.
21              (Defense counsel conferring.)
22    Q.    I think that one point in your testimony I believe
23    in response to direct examination, you testified that he had
24    told you that he was a Big Brother?
25    A.    Yes.


                    Joseph T. Tierney, CSR, RPR
```

NYCLD_015397

P-APP001342

People Rebuttal - Fairsteil - Cross - Burns     4551

1

2     Q.   All right.  What was that conversation, what did

3  you say to him, what did he say to you and what did you say

4  to him?

5     A.   It was the last conversation that I had with him,

6  perhaps a minute before Mrs. Salaam said to me at 12:30, "I

7  want a lawyer."  It's when he said to me -- I had asked him

8  to come into the stationhouse because he was talking to

9  other -- to family members of other defendants and I asked

10  him to come in and asked if he was counseling or giving

11  legal advice to other people, that I wanted to know that.

12     Q.   Was he near tears at that time?

13     A.   No, he was not, he was fine.  And he said no --

14  and he said to me, "I'm answering questions for them."  He

15  said, "Can't you understand, can't you think of a similar

16  hypothetical situation?"  And we had very calm discussion

17  about that, that was brief.  And then he said to me -- I

18  asked him exactly what his involvement was that had him

19  here, and he said, "I'm his Big Brother."  And for the

20  moment, I wasn't thinking, he said, "You know.  The

21  organization" --

22     Q.   That's the -- the gist the conversation.

23     A.   Okay.  He said to me, he said he didn't mean older

24  brother, he meant the organization that sponsors.  And he

25  described that he has been for a number of years and he

Joseph T. Tierney, CSR, RPR

NYCLD_015398

P-APP001343

People Rebuttal - Fairsteil - Cross - Burns        4552

1  described in several sentences for a number of years he had

2  been Yusef Salaam's Big Brother.  Then I said something not

3  very nice to him that appears in the notes that Mr.

4  Berman --

5      Q.   Just your answer.  What did you say to him and

6  what did he say to you?

7              MR. BURNS:  That's all I asked for, Judge.

8      A.   Okay, he was describing this to me.

9              THE WITNESS:  And my apologies to the Court.

10     A.   (continuing)  You want the literal words that I

11  said?

12     Q.   If you remember what you said.

13     A.   I remember what I said, I wrote it down because I

14  assumed he would tell his supervisor.

15             THE COURT:  Please, come on, finish it and

16         stop.

17     A.   I said, "You did a real," and cursed, "job at it."

18     Q.   Is that what you remember saying?

19     A.   That's exactly what I said.

20     Q.   You did a real curse job?

21     A.   No, no, I used --

22             THE WITNESS:  Shall I say it?

23             THE COURT:  Something we've all heard before.

24     Q.   What's the word you used?

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairsteil - Cross - Burns      4553

1

2      A.    Okay.  I said, "You did a real shit job at it."

3      Q.    And what did he say at that point in response to

4   that statement?

5      A.    He did not say a word.

6      Q.    And what did you mean to convey to him when you

7   said that?

8                  MS. LEDERER:  Objection.

9                  THE COURT:  Objection sustained.

10     Q.    Did his presence in the station or in the precinct

11   anger you to the extent that you felt you had to curse him?

12                 MS. LEDERER:  Objection.

13                 THE COURT:  Sustained.

14     Q.    But you did use that word.

15     A.    I did.

16                 THE COURT:  She just said she did.

17     Q.    Did you view that as ethical?

18                 MS. LEDERER:  Objection.

19                 THE COURT:  Sustained.  Anything else?  You

20              want to collaborate further?

21              (Defense counsel conferring)

22              MR. BURNS:  I have nothing further.

23              MR. MOORE:  May I inquire?

24              MS. LEDERER:  Excuse me, your Honor, before

25         Mr. Moore takes over, Mr. Burns asked for a copy

                 Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore        4554

of notes that had previously been served on him.
I gave him my set of notes.  I asked not -- not
simply the U.S. Attorney notes, but he asked for
notes Miss Fairstein prepared with respect to a
conversation with Sharonne Salaam with respect to
a request for an attorney, I would ask for those
notes back, please.

THE COURT:  Why don't you go ahead.

MR. MOORE:  Yes, thank you.

CROSS-EXAMINATION

BY MR. MOORE:

Q.   Miss Fairstein, prior to your testimony today
here, did you confer with Mike Sheehan about the substance
of your testimony today?

A.   I haven't seen Mike Sheehan in six months.  No, I
did not.

Q.   Did you confer with Augie Jonza about the
substance of your testimony today?

A.   No, I did not.

Q.   Did you confer with anyone at the crime scene who
was there at the crime scene on 4/21 about the substance of
your testimony today?

A.   Who was at the crime scene when we took your
client there?

Joseph T. Tierney, CSR, RPR

```
 1        People Rebuttal - Fairstein - Cross - Moore      4555

 2     Q.   Right, right.

 3     A.   No.

 4     Q.   Okay.

 5     Q.   So, it is your testimony, is it not, that you were

 6   testifying about the events of 4/21 without conferring with

 7   anyone who was at the crime scene that day?

 8     A.   That's right.

 9     Q.   Now, Miss Fairstein, you have -- did you make --

10            MR. MOORE:  Sorry, withdrawn.

11     Q.   Did you make notes of your conversations at the

12   crime scene on that very day?

13     A.   No.

14     Q.   In fact, you did not make notes of your

15   conversations until three days after; isn't that correct?

16     A.   Yes.

17     Q.   On 4/24?

18     A.   Right.

19     Q.   And would you say that the notes that you made

20   reflect accurately the conversations and events that took

21   place on 4/21 of '89?

22     A.   I would say they tried to.

23     Q.   Did they?

24     A.   If you want to show them to me again, I haven't

25   seen them since last here.


               Joseph T. Tierney, CSR, RPR
```

NYCLD_015402

P-APP001347

People Rebuttal - Fairstein - Cross - Moore          4556

1

2   Q.   I'd like to show you --

3            (Document handed to the witness by the court

4        officer.).

5   A.   This is in regard to Richardson.

6   Q.   Pardom me?

7   A.   These are with regard to Richardson, not your

8   client.

9       Q.   Would you look through them?  Were there any

10  other notes with regard to 4/21?

11           MS. LEDERER:  Objection.

12           THE COURT:  I'll allow it.

13           4/21?

14           MR. MOORE:  Yes.

15  A.   The ones that refer to your client?

16  Q.   Yes.

17  A.   These are not the notes --

18           MR. MOORE:  May I ask the District

19       Attorney --

20           MS. LEDERER:  I gave copies of this stuff.

21           THE COURT:  This was all turned over, this is

22       part of the material that was turned over.

23           MR. MOORE:  One second.

24  Q.   But these notes do refer to my client, do they

25  not?

Joseph T. Tierney, CSR, RPR

1      People Rebuttal - Fairstein - Cross - Moore      4557

2          A.   Yes, but there are more notes that refer to your

3      client and what happened at the crime scene.

4                   MR. MOORE:  One second.

5          Q.   I'd like to show you what purports to be some of

6      your notes.

7                   (Documents handed to the witness by the court

8                   officer.)

9          A.   Is there a question?  There are a lot of other

10     people's notes.

11         Q.   Yes.

12                  THE COURT:  What's your question?

13         Q.   Have you seen any --

14         A.   The page I'm referring to that you used to

15     cross-examine me two weeks ago isn't in here.

16         Q.   All right, let me just show you this note again.

17                  MR. MOORE:  Could we have that marked as I

18                  think Wise J?

19         Q.   Does that reflect some of the events that took

20     place on 4/21 at about 7:00 a.m. in the morning?

21         A.   Some.  But what's missing is the page that's

22     headed with your client's name with more notes about what

23     your client said to me.

24                  THE COURT:  I think you are looking for Wise

25                  G.  Do you have your notes, Counsel, Wise G, that

                    Joseph T. Tierney, CSR, RPR

P-APP001349

People Rebuttal - Fairstein - Cross - Moore          4558

might help?

Q.   Let me just show you --

     (Document handed to the witness by the court

officer.

A.   Not even close.

          THE COURT:  Don't you have your exhibits?

          MR. MOORE:  I don't have Wise, here.

          MS. LEDERER:  Excuse me, Judge, Wise G is the

medical records.

          THE COURT:  Wise G?  Not according to my

notes, "the District Attorney's notes of

incident."  That's right, I have Wise G. I have a

G with that, maybe I mismarked mine.

          MR. BURNS:  I have a copy, Judge.

          (Exhibit handed to the witness by the court

officer.

A.   That's it.

Q.   Okay.  Now, Miss Fairstein, does this reflect --

refresh your recollection of what took place on 4/21 --

          MS. LEDERER:  Objection.

A.   I remember very well --

          MS. LEDERER:  Objection.

          THE COURT:  She didn't say she needed her

recollection refreshed.

          Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore        4559

1

2    A.   I remember those events very well.

3    Q.   All right, fine.  Now, do you recall how you got

4    from the 24th Precinct to Central Park that morning?

5    A.   Yes.

6    Q.   How -- how was that?

7    A.   In an unmarked police car with Jonza, Sheehan,

8    Wise and Richardson.

9    Q.   Was it one car or two cars?

10            MS. LEDERER:  Objection?

11   A.   One car.

12            THE COURT:  I'll allow it.

13   Q.   Miss Fairstein, if I were to tell you that

14   Detective Sheehan testified here in this hearing and

15   testified that, in fact, you went in two cars, would you say

16   that his testimony was inaccurate?

17   A.   Yes.

18            MS. LEDERER:  Objection.

19            THE COURT:  Sustained.

20   Q.   I'd like to show you some notes.

21            THE COURT:  Are these an exhibit -- have

22            these been marked?

23            MR. MOORE:  Yes, I just want to ask her a

24            question.

25   Q.   Are those notes you have prepared?


            Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore          4560

1

2     A.   No.

3     Q.   That you prepared?

4     A.   Never seen them before.

5     Q.   Okay.  At the top of the notes, does it indicate a

6  name?

7     A.   Yes.

8          MS. LEDERER:  Objection.

9     Q.   What name is that?

10         MS. LEDERER:  Objection.

11         THE COURT:  Sustained.

12    Q.   Now, when you arrived at the ravine in Central

13  Park that day, do you recall what Kharey Wise said?

14    A.   Yes.

15    Q.   And what did he, in fact, say?

16    A.   When we arrived at the ravine, he said nothing.

17  When he joined Sheehan and me on the very bloodied area of

18  the scene is when he said what I testified earlier, "Damn

19  damn, damn, there's a lot of blood.  This is bad, I didn't

20  realize how bad it was.  It was dark at night, I couldn't

21  see how much blood there was."

22    Q.   Did he say anything else?

23    A.   No, he was returned to the car within a minute of

24  that.

25    Q.   So, in fact, it is your testimony that he said,

Joseph T. Tierney, CSR, RPR

NYCLD_015407

P-APP001352

People Rebuttal - Fairstein - Cross - Moore          4561

"Damn, damn, that's a lot of blood, that's really bad, I didn't realize how much blood there was"?

A.   Yes.

Q.   Was that the sum total of what he said?

A.   I believe so.  As he said -- as I said, he kept muttering, "Damn, damn, damn, there's so much blood, there's so much blood."  He said that a few times, then Sheehan asked him the question, something, "Is this familiar to you, is is in where it happened?"

Q.   No, without looking down at your notes, Miss Fairstein.  I'm asking you if you have an independent recollection of what was said?

A.   Yes, I do, I just told you.

Q.   And I asked you if that was the sum total and you said yes, am I correct?  Am I correct, that's the sum total of what he said in the ravine that morning?

A.   Yes.

Q.   Do you recall being -- testifying here on November 13th of this year?

A.   Yes.

Q.   And do you recall being asked this question and giving this answer:

          "QUESTION:  When he arrived at the location where you
          and Detective Sheehan were" --

                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore          4562

1

2        THE COURT:  What page is that?

3        MR. MOORE:  3064.

4    Q.    "When he arrived at the location where you and

5    Detective Sheehan were, did either of you ask him a

6    question?

7        ANSWER:  I think the first thing that Detective

8    Sheehan said to him how much blood there was, Sheehan

9    said something like, 'Why does that surprise you?'  And

10   Kharey said, 'I knew she was bleeding but I didn't know

11   how bad she was, it was really dark, I couldn't see

12   much blood.'  Sheehan then asked him was that area

13   familiar, he said, 'This is where -- this is where

14   we -- we,' and then he said, 'they raped her."

15   Do you recall being asked that question?

16   A.    Yes.

17   Q.    And giving that answer?

18   A.    Yes.

19   Q.    So he did -- apart from the comment on the blood,

20   he did state, did he not, that, "This is where we -- they

21   raped her"?

22   A.    Yes.

23   Q.    I asked you that a couple of moments ago, but you

24   didn't recall that?

25   A.    I think I did.


Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore        4563

1

2     Q.   No, you did not.

3     A.   Let's not argue.

4              THE COURT:  Well, you didn't say that

5          anyway.  Whether you recalled that or not, that

6          wasn't part of your testimony.

7     Q.   Now, you recall -- do you recall that before he

8  came into the ravine, that you were in the upper roadway; am

9  I correct?

10    A.   Yes.

11             MS. LEDERER:  Objection, beyond the scope.

12             THE COURT:  I don't know whether this is part

13         of the same 102nd Street Crossdrive.

14    Q.   And do you recall whether Sheehan asked him any

15  question on the upper roadway and whether he made a

16  response?

17    A.   Yes, he did.

18    Q.   What was the question, what was the response?

19    A.   I would like to look at my notes.

20    Q.   Do you have an independent recollection?

21    A.   I would be close, but --

22    Q.   Well, could you -- could you give us a close

23  estimation of what question was asked and what he said?

24    A.   Whether that area was familiar.

25    Q.   What did he say?


                  Joseph T. Tierney, CSR, RPR

```
1        People Rebuttal - Fairstein - Cross - Moore        4564
2        A.    I believe he described where he had been coming
3    from when the girl was grabbed.  If I may look at my notes,
4    I'm sure it's there.
5        Q.    Can you look at your notes?
6        A.    Yes.
7        Q.    Close?
8        A.    Yes.
9        Q.    Yes?
10       A.    He pointed out where he was coming from, which is
11   the ball field south of the Drive, and said that was where
12   he was when "they snatched the jogger."
13       Q.    Now -- I'm sorry, could I just have that?
14       Now, you've testified, in other words, that both you
15   and Sheehan were at the crime scene that particular morning,
16   is that correct?
17       A.    Yes.
18       Q.    So, my question to you is if Detective Sheehan's
19   recollection differs from yours, it is your testimony that
20   he was inaccurate; is that correct?
21                    MS. LEDERER:  Objection.
22                    THE COURT:  Sustained.
23                    MR. MOORE:  Could we just approach?
24                    THE COURT:  Yes.
25                    (There is a discussion at the bench, off the
```

Joseph T. Tierney, CSR, RPR

NYCLD_015411

P-APP001356

1   People Rebuttal - Fairstein - Cross - Moore      4565

2         record, among the Court and Counsel and out of the

3         hearing of open court.  At the conclusion of the

4         bench conference, the following takes place in

5         open court:)

6   Q.   Miss Fairstein, what was the purpose of taking

7   Kharey Wise to the crime scene that morning?

8              MS. LEDERER:  Objection.

9              THE COURT:  I'll let him answer -- let her

10        answer.

11  A.   To try to determine over the course of the what I

12  would call three hundred feet or more that involved the

13  crime scene, to place where different events had occurred.

14  Q.   In other words, was it one of your functions to

15  match the statements that he had made with the crime scene?

16  A.   No.

17  Q.   No?

18             MR. MOORE:  Page 3050.

19  Q.   Do you recall being asked this question and giving

20  this answer?

21        "QUESTION:  What, if anything, did you say to Mr.

22        Richardson and what, if anything, did he say to you?"

23             MR. MOORE:  I don't want to go through the

24        whole thing, I'm speaking of line 22, 23, 24, 25,

25        "ANSWER:  We're going to try to put" --


                 Joseph T. Tierney, CSR, RPR

NYCLD_015412

P-APP001357

People Rebuttal - Fairstein - Cross - Moore          4566

    MS. LEDERER:  Wait, excuse me.  Objection.
Are you jumping now from line 1 down to the bottom
of the page?  You just read from the bottom of --

    MR. MOORE:  Just a moment.  I'm reading the
question and reading a part of the answer.  A
large part of the answer has nothing to do with
the question.

    MS. LEDERER:  Your Honor, I object to this
being read as part of the impeachment of this
witness.  This is pertaining to questions that
were put to Mr. Richardson, having nothing to do
with the purpose of taking Kharey Wise to the
scene.

    MR. MOORE:  In this statement, she does state
the reason why they were going to the crime scene,
that particular part.

    THE COURT:  Let me see it, please.

    MR. MOORE:  Sure.

    (There is a discussion at the bench, off the
record, among the Court and Counsel and out of the
hearing of open court.  At the conclusion of the
bench conference, the following takes place in
open court:)

    THE COURT:  Objection sustained.  The

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore        4567

1

2           questions that are posed -- the question posed and

3           the answer pertaining to Richardson, not Wise.

4                   MR. MOORE:  All right.

5       Q.   What did you say was the reason for taking Kharey

6  Wise there?

7                   MS. LEDERER:  Objection, asked and answered.

8                   THE COURT:  I'll let her answer it again.

9                   You can tell him again.

10      A.   We were -- the crime scene extended for more than

11 three hundred feet, there were a number of areas of

12 occurrence.  We were trying to determine where events

13 happened.

14      Q.   Was your reason for taking Kharey Wise different

15 from your rational for taking Kevin Richardson?

16                  MS. LEDERER:  Objection.

17                  THE COURT:  Sustained.

18      Q.   Were you taking both of them to the crime scene

19 for the same reason?

20                  MS. LEDERER:  Objection.

21                  THE COURT:  Sustained.

22      Q.   So, is it your testimony then that you did not

23 take him there for the purpose of determining whether his

24 statements were borne out by the physical layout of the

25 crime scene?


                Joseph T. Tierney, CSR, RPR

NYCLD_015414

P-APP001359

1       People Rebuttal - Fairstein - Cross - Moore        4568

2                       MS. LEDERER:  Objection.

3                       THE COURT:  Sustained.

4       Q.    Before you took him there that morning, were you

5   aware that he had made statements?

6                       MS. LEDERER:  Objection.

7                       THE COURT:  I'll let her answer that if she

8               was.

9                       Just yes or no or I don't know.

10      Q.    Let me rephrase that.  Were you aware of the fact

11  that he had made a statement?

12      A.    Not a video statement, I knew he had not made a

13  video statement.

14      Q.    No, not a video.  Were you aware of the face he

15  had made a written statement?

16      A.    I knew that he had said something.

17      Q.    Were you aware of the fact he had made a written

18  statement?

19                      MS. LEDERER:  Objection.

20                      THE COURT:  No, I'll let her answer.  That

21              was the question.

22      A.    I don't recall at this moment.

23      Q.    Did you ask Detective Sheehan to see the written

24  statement?

25                      MS. LEDERER:  Objection.


                    Joseph T. Tierney, CSR, RPR

```
 1          People Rebuttal - Fairstein - Cross - Moore      4569
 2                    THE COURT:  Sustained.
 3      Q.   Did you ask anyone to look at his written
 4  statement?
 5                    MS. LEDERER:  Objection.
 6                    THE COURT:  Sustained.
 7      Q.   So, was it your purpose, Miss Lederer, to take
 8  Kharey Wise --
 9      A.   I'm Fairstein.
10      Q.   -- Miss Fairstein, to take Kharey Wise to the
11  crime scene and to get him to smear on his body some of the
12  evidence of what -- what exactly was in the crime scene that
13  day?
14      A.   Absolutely not.
15      Q.   When he arrived at the crime scene, Detective
16  Sheehan did point out to him the blood?
17      A.   No, he did not.
18      Q.   Did he --
19      A.   No, no, as I testified earlier, Kharey Wise walked
20  up to us.  There was so much blood on the ground, he became
21  aware of the blood before he reached us and before he said a
22  word to us, before -- excuse me, before we said a word to
23  him and he started saying out loud, "Damn, damn, damn,
24  there's so much blood."
25      Q.   But you called him from the car, did you not?


                    Joseph T. Tierney, CSR, RPR
```

People Rebuttal - Fairstein - Cross - Moore          4570

1

2     A.    Correct.

3     Q.    And the place where you were standing had blood in

4   it, did it not?

5     A.    Yes, it did.

6     Q.    So you called Kharey Wise from the car where he

7   was into the area where there was blood, did you not?

8     A.    To the scene at which --

9     Q.    There was blood?

10    A.    -- part of the crime had occurred.

11    Q.    You were aware when he was coming to the scene

12  that he would, in fact, be in an area that was close to the

13  blood, were you not aware of that fact?

14    A.    As close to it?  Not as close to it as we were.

15    Q.    But you were standing in an area that was very

16  close to the blood, correct?

17    A.    Yes, within feet of the blood.

18    Q.    As a matter of fact, and there was so much blood

19  on the ground that it was obvious to anyone standing there

20  that there was blood on the ground, was there not?

21    A.    Dried blood, yes.

22    Q.    Dried blood, that's correct.  And either you or

23  Sheehan called him from the area where he was in the car to

24  the area where the blood was, yes or no?

25    A.    Where --

Joseph T. Tierney, CSR, RPR

AM003130

NYCLD_015417

P-APP001362

People Rebuttal - Fairstein - Cross - Moore        4571

1

2   Q.   Where there was blood?

3   A.   There was blood in that area, yes.

4   Q.   That's right.  And you were aware also of the fact

5   when he came to that area, there was a probability that he

6   would be stepping in the blood?

7   A.   We certainly took pains to make sure that he was

8   nowhere near the blood because I wanted the Crime Scene Unit

9   detectives to go back and work up that scene.

10   Q.   What pains did you take to make sure he would

11   avoid it?

12   A.   We didn't --

13             MS. LEDERER:  Objection.

14             THE COURT:  I'll allow it.

15   A.   We didn't let him anywhere near it, we were

16   between him and the blood.

17   Q.   And you knew as an experienced prosecutor, did you

18   not, that there may very well have come a time when DNA

19   tests would be taken of samples of clothing and so forth to

20   be compared with -- with what was found on the victim, did

21   you not?

22             MS. LEDERER:  Objection.

23             THE COURT:  Sustained.

24   Q.   Well, you have been working in the Sex Crimes Unit

25   for some time?

Joseph T. Tierney, CSR, RPR

1    People Rebuttal - Fairstein - Cross - Moore        4572

2    A.    Yes.

3    Q.    And you are also aware of the fact that on

4    especially sex related crimes, that there is an emphasis on

5    medical evidence, are you not?

6                    MS. LEDERER:  Objection.

7                    THE COURT:  Sustained.

8    Q.    That in a large number of --

9                    THE COURT:  If you are going to continue

10                   these questions on the same line, I will sustain

11                   objections to each question.  You have an

12                   exception.  There is no sense going through a

13                   whole series of questions on that line, I will

14                   sustain objections to all of them.

15                   MR. MOORE:  I want to take exception, your

16                   Honor, the fact I could not go into the purpose of

17                   taking them to the crime scene.

18                   THE COURT:  You have an exception.

19                   MR. BERMAN:  Judge, may we approach for a

20                   moment.

21                   THE COURT:  No.

22                   You have any other questions?

23                   I'm not going to recess, if that's your

24                   question.  Our problem takes precedence.

25                   MR. BERMAN:  I wasn't going to ask to recess,


                    Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Moore         4573

1  I was going to ask if there were any further

2  witnesses after the redirect.

3          THE COURT:  I don't think so.  There is a

4  stipulation going to be entered into at the

5  conclusion of this witness.

6          MR. RIVERA:  Stipulation, your Honor?

7          MS. LEDERER:  You stipulated that --

8          THE COURT:  The person called would say

9  they --

10          MS. LEDERER:  You stipulated to it.

11          THE COURT:  You will object on relevancy.

12          MR. BERMAN:  Judge, can I ask your court

13  clerk to call Judge Keenan do say I am going to be

14  a couple of minutes late?

15          THE COURT:  Give Sandra the number.

16          (There is a pause in the proceedings.)

17          Okay.

18          MS. LEDERER:  I'd ask please the witness be

19  shown Salaam Exhibit K for identification.

20          (Exhibit handed to the witness by the court

21  officer.

22 REDIRECT EXAMINATION

23 BY MS. LEDERER:

24          Q.   Do you recognize Salaam Exhibit K for identi-

25

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Redirect               4574

1   fication?

2          A.   Yes, I do.

3          Q.   Would you please tell the Court how it came about

4   that you saw it and then obtained Salaam Exhibit K?

5                 MR. BURNS:  I can object to that -- I mean

6                 may I object to that?

7                 THE COURT:  You had it marked, I'll allow it.

8          A.   I believe I first learned in a conversation with

9   you that Mr. Nocenti had said that he had written a report

10  of the events of the night of April 20th for his superiors

11  at the office and he had refused to give it to you and I

12  went to our First Assistant District Attorney, Barbara

13  Jones, and asked her if she could get a copy -- her contacts

14  with that office, she called the Chief Assistant United

15  States Attorney, Mr. Yergenson.  In her presence, I had a

16  phone conversation with Mr. Yergenson.  He then Faxed the

17  report that same day to Barbara Jones.  She gave a copy to

18  me, I read it and gave a copy to you.

19                 MR. BURNS:  I object, your Honor.

20                 THE COURT:  Overruled.

21                 MR. BURNS:  I would like to put the reasons

22                 for my objection on the record.

23                 THE COURT:  Go ahead.

24                 MR. BURNS:  I tried to get into this area on

25

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Redirect          4575

1  my cross, you didn't let me.

2           THE COURT:  Then you have an exception.

3           MR. BURNS:  Why is it --

4           THE COURT:  You have an exception.

5           MR. BURNS:  -- she can go into it on redirect

6  and bring it up?

7           THE COURT:  I overruled your objection, you

8  have an exception.

9           MR. BURNS:  That you, your Honor.

10  Q.    The top part of Salaam Exhibit K have anyway to do

11  with the way you received that report?

12           MR. BURNS:  I object.  Do I have a continuing

13  objection concerning this document, concerning --

14           THE COURT:  Yes.  Salaam K.

15           MR. BURNS:  -- which I were not permitted to

16  question the witness about?

17           THE COURT:  Yes.

18  A.    Yes, in that it has the date on it and the name of

19  the man who I spoke to about obtaining it and the -- that it

20  was Faxed to Barbara Jones at the District Attorney's

21  Office.

22           MR. BURNS:  I'm sorry, your Honor, if you

23           made an answer, I didn't hear it, if I didn't hear

24           it, the record --

Joseph T. Tierney, CSR, RPR

NYCLD_015422

P-APP001367

People Rebuttal - Fairstein - Redirect          4576

1

2          THE COURT:  I told you originally you have an

3     exception.  I am allowing this testimony, you have

4     an exception.

5          MR. BURNS:  All right.

6     Q.   Directing your attention to the conversation you

7   had with Sheronne Salaam, Mrs. Salaam or Yusaf's mother,

8   wherein she made the statement that you've testified to

9   telling us that Yusef Salaam was a minor --

10     A.   Yes.

11     Q.   -- do you recall the time that she stated that to

12  you?

13     A.   Yes.

14     Q.   Would you please repeat exactly what you said and

15  then what she said immediately thereafter until the time

16  that she told you he was 15?

17          MR. BURNS:  Your Honor, I object to that.

18     That's not proper redirect.

19          THE COURT:  Okay, overruled.

20          MR. BURNS:  All right.

21     A.   I believe she said that -- we sat down, she

22  repeated that she wanted to see her son and he's a minor,

23  and I said that she would be able to see him when the police

24  were finished questioning him.  And she said, "He's 15 years

25  old, I want to see him."  And that's when I said to her --

Joseph T. Tierney, CSR, RPR

NYCLD_015423

P-APP001368

People Rebuttal - Fairstein - Cross - Burns       4577

1   that's when I said to her that I was surprised to hear he

2   was 15, I believed he is 16, "do you have any identification

3   with you?

4       Q.   How much time elapsed between the time she

5   informed you he was a minor and the time she informed you he

6   was 15 years old?

7       A.   That was the next two sentences she said.

8           MS. LEDERER:  Thank you very much.  I have

9           nothing further.

10          THE COURT:  Mr. Burns, you have anything

11          else?

12          MR. BURNS:  Thank you, your Honor.

13  RECROSS-EXAMINATON

14  BY MR. BURNS:

15      Q.   And do I understand you that your belief that he

16  was 16 was the notation you saw on the top of McKenna's

17  notes?

18      A.   And other information.

19      Q.   What other information did you have besides

20  McKenna's notes?

21          MS. LEDERER:  Objection.

22          THE COURT:  It's not proper but I'll allow

23          it.

24      A.   That I had been told by Taglioni that when he was

25

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns        4578

1  picked up, he himself had said -- he himself meaning

2  Salaam -- had said he was 16, that he had been picked up

3  with Kharey Wise, who was the only other one in the group

4  who was also 16, and that because the detectives had been

5  not bringing in those people they knew were 15 and actually

6  leaving them and saying we'll come back for you another

7  time, that nobody was in there being questioned who had not

8  established in one way or another that they were 16 without

9  adults present.

10  Q.   And this conversation that you -- that you're

11  testifying you had with Taglioni, that was at the time he

12  showed you McKenna's notes?

13           MS. LEDERER:  Objection.  This -- objection,

14           beyond the scope.

15           THE COURT:  No, I'll allow that.

16  Q.   Yes or no?

17  A.   Part then -- the part with Taglioni was; yes, when

18  he brought me the book --

19  Q.   That's what I'm asking.

20           THE COURT:  The answer is yes, that's part

21           of it?

22           THE WITNESS:  Yes.

23  Q.   That's what I'm asking.  Did he tell you -- did he

24  have this conversation with you before you were looking at

Joseph T. Tierney, CSR, RPR

People Rebuttal - Fairstein - Cross - Burns          4579

2  the notes -- before you were looking at McKenna's notes?

3                    MS. LEDERER:  Objection.

4                    THE COURT:  I'll allow it.

5       A.   As I was looking at the notes --

6       Q.   As you were --

7       A.   His part of it, which is not the whole

8  conversation, I just told you.

9       Q.   All right.  While you were looking at the notes,

10  he told you that?

11      A.   I believe I asked him --

12      Q.   No, no, that's a yes or no answer.

13                   THE COURT:  She can answer yes or no.

14      Q.   If you can't answer it, would you say you can't

15  answer it, Miss Fairstein?

16                   THE COURT:  What is your question,

17                   specifically what is your question?

18      Q.   Did he tell you she was 16 -- I'm sorry, did

19  Tag -- Detective Taglioni tell you that Yusef said he was 16

20  in the hallway at the time he took him in while you were

21  looking at the notes?

22      A.   No.

23      Q.   Had you finished looking at the notes before

24  Detective Taglioni told you that Yusef told him that he was

25  16 in the hallway?

                    Joseph T. Tierney, CSR, RPR

NYCLD_015426

P-APP001371

People Rebuttal - Fairstein - Cross - Burns        4580

1

2    A.    I believe I made a comment to him after reading

3    the notes and seeing the kid's name, address and date of

4    birth right there on the notes.

5    Q.    And what was the comment that you made to him?

6    A.    I asked who was with him, he said McKenna.

7    Q.    I'm sorry --

8    A.    My recollection is I said anyone else, and I said

9    out loud he's 16, meaning there's no family necessary there,

10   as there were in the other rooms.  I was aware that families

11   were present there with kids under 16.

12   Q.    And you said that to Taglioni?

13   A.    I believe I said that out loud.

14   Q.    Do you have a clear recollection that that was

15   part of the conversation that you had with Taglioni?

16            MS. LEDERER:  Objection.

17            THE COURT:  Overruled.

18   A.    No.

19   Q.    But was that your basis for telling Miss -- Mrs.

20   Salaam that you believed he was 16 when she first told you

21   he was 15?

22   A.    As I said, it was part of --

23   Q.    Yes or no?

24   A.    Part of -- it was part of.  So, no, it was part

25   of.


Joseph T. Tierney, CSR, RPR

NYCLD_015427

P-APP001372

People Rebuttal - Fairstein - Cross - Burns          4581

Q.   Was there anything other than the fact that the notes that McKenna had that you read and what Taglioni told you, was there anything else which caused you to believe that Yusef Salaam was 16 instead of 15?

A.   Yes.

Q.   What else was there?

A.   As each -- as Miss Lederer was working and I was running interference for her at the stationhouse, as individuals were brought in, we were told by Captain Rowe or Sergeant Cleeve or, in fact, Inspector Powers who was being brought in, what their participation was, that we're -- there was a big problem with where to manpower this and we were being told Detective X is going to the third floor, he is going to work in that room with this kid.  And we had been told who was there and whether or not they were accompanied by a family member because these detectives knew whether or not they had to be.

Q.   Well, then when you were told also that someone was inquiring about Salaam, your understanding at that time is that he was 16; is that right?

MS. LEDERER:  Objection.

THE COURT:  Overruled.

Q.   Is that right?

A.   I personally --

Joseph T. Tierney, CSR, RPR

NYCLD_015428

P-APP001373

```
 1          People Rebuttal - Fairstein - Cross - Burns      4582

 2     Q.    Yes or no?

 3     A.    No, because I didn't know who he was for sure.

 4     Q.    All right.  When you were informed that he was

 5   brought in and that he was 16, you mean you did not have

 6   that in your mind, you didn't keep that in your mind?

 7     A.    I didn't keep by name --

 8     Q.    By name?

 9     A.    -- that he was that.  We were going through 33

10   names that night.

11     Q.    Then when Taglioni came in with McKenna's notes,

12   then it triggered your recollection oh, this is one of the

13   guys that was brought in earlier, he is 16; is that right?

14     A.    Said it right there, yes.

15     Q.    And so was that information that you had learned

16   originally, plus McKenna's notes, plus what Taglioni told

17   you, that's what caused you to believe that he was 16?

18     A.    Yes.

19     Q.    What was your reason for sending for the notes?

20               MS. LEDERER:  Objection.

21               THE COURT:  I'll allow it.

22     A.    To see before I spoke to the person who was

23   downstairs what we knew at that point about this

24   individual's participation in the events of the night.  It

25   was then I found out he is the individual who struck her
```

Joseph T. Tierney, CSR, RPR

NYCLD_015429

P-APP001374

People Rebuttal - Fairstein - Cross - Burns      4583

2  head with the pipe.

3      Q.   So, would it be fair to say then that before going

4  down to David, you wanted to know how far the questioning

5  had gone?

6      A.   No, not how far it had gone, what -- what this

7  person's involvement was, was I dealing with someone who was

8  just a witness, who was, as many people claim, present for

9  the rape but not a participant, or, in fact, as I determined

10  by reading it, one of the most violent main actors in the

11  events.

12      Q.   I see.

13           MR. BURNS:  Nothing further.

14           THE COURT:  Would you like to ask some more

15      questions?

16           (No response.)

17           THE COURT:  Thank you.

18           THE WITNESS:  Thank you.

19           (The witness leaves the witness stand.)

20           THE COURT:  Okay, we have a stipulation and

21      an objection, I believe.

22           MS. LEDERER:  There has been an exhibit

23      previously marked as People's Exhibit 44 for

24      identification, a copy has been provided to Mr.

25      Rivera.  This is a Board of Education, City of New

Joseph T. Tierney, CSR, RPR

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NEW YORK : CRIMINAL TERM : PART 59

3  THE PEOPLE OF THE STATE OF NEW YORK   INDICT: 4762/89

4             -against-

5  ANTRON MCCRAY, RAYMOND SANTANA,

6  and YUSEF SALAAM,

7                      Defendants.

8             August 6, 1990

9  B e f o r e :

10            HONORABLE THOMAS GALLIGAN,

11                      Justice, and a jury

12        (Appearances same as previously noted.)

13        ***********************

14        MORNING SESSION - JURY NOT PRESENT

15        THE COURT CLERK:   Case  on  trial  continued,

16  People  of  the  State  of  New  York versus Raymond

17  Santana, Yusef  Salaam,  Antron  McCray,  Indictment

18  4762 of '89.

19            THE COURT:  Are the People ready?

20            MS. LEDERER:  Yes.

21            THE COURT:  Defendants ready?

22            MR. JOSEPH:  Yes.

23            MR. BURNS:  Yes.

24            MR. RIVERA:  Yes.

25            JURY PRESENT

NYCLD_015431

P-APP001376

T1-JM-TS

4913

1              Colloquy

2              THE   COURT   CLERK:   The   defendants,   their

3        attorneys,   the   Assistant   District   Attorneys   and   all

4        sworn   jurors   are   present.

5              THE COURT:   Good   morning,   ladies   and   gentlemen.

6              THE JURY:   Good   morning.

7              THE COURT:   Call   your   next   witness.

8              MS. LEDERER:   People   call   Linda   Fairstein.

9    L   I   N   D   A       F A I R S T E I N, Chief   of   the   Sex   Crimes

10   Prosecution   Unit   of   the   District   Attorney's   Office,   New   York

11   County,   New   York,   called   as a   witness   by   the   People   of   the

12   State   of   New   York,   having   been   first   duly   sworn,   was   examined

13   and   testified,   under   oath,   as   follows:

14              THE   COURT   OFFICER:   In   a   loud,   clear   voice,

15        would   you   state   your   name,   and   spell   your   last   name.

16              THE WITNESS:   My   name   is   Linda   Fairstein,   F-a-

17        i-r-s-t-e-i-n.

18   DIRECT EXAMINATION

19   BY MS. LEDERER:

20        Q      Ms.   Fairstein,   how   are   you   employed?

21        A         I   am   an   Assistant   District   Attorney   in   New   York

22   County.

23        Q      And   what   is   your   title   or   position   in   the   District

24   Attorney's   office   of   New   York   County.

25        A      I   am   Chief   of   the   Sex   Crimes   Prosecution   Unit   of   the

P-APP001377

T1-JM-TS

4914

1                           Fairstein - People - Direct

2    District Attorney's office.

3         Q         How  long have you been employed as an Assistant

4    District Attorney?

5         A    Almost 18 years.

6         Q    Directing your attention to April 20th of 1989.

7         Did there come a time on that date that you went  to  the

8    20th Precinct?

9         A    Yes, there did.

10        Q    And at approximately what time did you arrive at the

11   20th Precinct?

12        A    A little after 8:30 that evening.

13        Q         Ms.  Fairstein,  are  you  familiar  with  the

14   circumstances under which an Assistant District Attorney, from

15   the New York County DA's office is assigned to go to a  police

16   precinct and assist or participate?

17              MR. RIVERA:  Objection, objection.

18        Q    (Continuing) in an investigation?

19              MR. JOSEPH:  Objection.

20              MR. BURNS:  Objection.

21              THE COURT:  Objection sustained.

22        Q    Was  an  Assistant District Attorney assigned to

23   assist in the investigation of this case?

24              MR. JOSEPH:  Objection.

25              THE COURT: Overruled.

NYCLD_015433

P-APP001378

1                    Fairstein — People — Direct

2      A    Yes.

3      Q    And who was that person?

4      A    You, Elizabeth Lederer.

5      Q    In the course of the assignment of an assistant,  of

6   an Assistant District Attorney, to this case —

7                    MS. LEDERER:   Withdrawn.

8      Q       Where  did  you  go when you arrived at the 20th

9   Precinct?

10     A    I entered the precinct, identified myself to  police

11  officer  on  the  ground  floor,  near  the entrance, and went

12  upstairs to the second  floor  Detective  Squad  Room  of  the

13  Precinct.

14     Q       For  what reason, in this case, was an Assistant

15  District Attorney assigned?

16                    MR. JOSEPH:   Objection.

17                    MR. BURNS:   Objection.

18                    THE COURT:   I'll allow it.

19     A    To aid the Police Department in the investigation of

20  this case, and to participate in  the  making  of  video  tape

21  statements,  which  the  Police Department does not do without

22  our participation.

23                    MR. JOSEPH:   I would move to strike that.

24                    THE COURT:   I'll allow it to stand.

25     Q    Would you describe the conditions that you  observed

T1-JM-TS

4916

1                    Fairstein - People - Direct

2  at  the 20th Precinct when you arrived on the evening of April

3  20th?

4       A     There were --

5                 MR. BURNS:  Your Honor, I object.

6                 I'm assuming she's being called as  a  rebuttal

7            witness, and this is beyond the scope of anything.

8                 She wasn't called during trial.

9                 THE COURT:  Objection is overruled.

10                MR. BURNS:  All right.

11      A     When I arrived at 82nd Street, I observed say more

12 than 20 people outside the front of the stationhouse,  on  the

13 sidewalk, on either side of the door.

14      I  entered,  it's  a  uniformed  officer in the lobby who

15 directed me upstairs.

16      As I entered the second floor area, there were two benchs

17 right through the doorway, before you enter the large room.

18      There  were  a  number  of  people, I  presumed  to  be

19 civilians,  seated  there,  and  a lot of detectives, in plain

20 clothes, in the large squad room, some of  whom  I  knew,  who

21 greeted  me,  and  took me into another room, where Ms. Lederer

22 and other police personnel were.

23      Q    Did there come a time  that  you  learned,  on  that

24 evening,  that  someone  was at the 20th Precinct on behalf of

25 Yusef Salaam?

P-APP001380

                    Fairstein - People - Direct

1

2       A     Yes, there did.

3       Q     When, for the first time, did you learn that someone

4   was at the 20th Precinct in behalf of Yusef Salaam?

5       A     It was about 11:30 that evening.

6       Q     And how did you learn that?

7       A     A detective in plain clothes came to me on the

8   second floor and said --

9                   MR. BURNS:  Objection, your Honor.

10                   THE COURT:  Overruled.

11                   MR. BURNS:  All right.

12       A     Detective came to me on the second floor and said,

13   "There is a lawyer downstairs for Mr. Salaam."

14       Q     Prior to that detective informing you of what you

15   have just told us, had you seen Yusef Salaam?

16       A     No, I had not.

17       Q     Did you know whether or not Yusef Salaam was in the

18   stationhouse at that time?

19       A     I believe that I had been told that he was.

20       Q     At that time, did you have any information at all

21   about how Yusef Salaam came to be in the stationhouse?

22       A     No, I did not.

23       Q     Do you recall who it was who told you that there was

24   an attorney downstairs inquiring about Yusef Salaam?

25       A     I don't remember who the person was, but it was a

NYCLD_015436

P-APP001381

T1-JM-TS

4918

1                       Fairstein - People - Direct

2    male detective in plain clothes.

3        Q    What did you do upon receiving that information?

4        A    I asked that detective to find me the detective or

5    detectives who were speaking to Salaam, to come to me, and

6    give me information that I wanted.

7        Q    And did the detective you said that to then leave

8    your presence?

9        A    Yes, he did.

10       Q    After he left, did there come a time that somebody

11   approached you and gave you some information?

12       A    Yes.

13       Q    And who was that who approached you?

14       A    That was detective John Taglioni.

15       Q    Approximately how much time had elapsed from the

16   time you first dispatched the detective to find out who was

17   talking to Salaam, before detective Taglioni approached you?

18       A    I would estimate it at less than three minutes.

19       Q    Would you tell us what, if anything, detective

20   Taglioni said to you when he arrived.

21              MR. BURNS:  Objection.  That's hearsay.

22              THE COURT:  Overruled.

23              MR. BURNS:  Jesus.

24       A    Detective Taglioni came to me, he was carrying a

25   small brown covered steno pad.

P-APP001382

T1-JM-TS

4919

Fairstein - People - Direct

I asked him who was talking to Yusef Salaam.

He told me detective Tom McKenna, I believe detective
Rudy Hall.

And he said, he handed me the pad, and showed me the
notes of the conversation to that point.

Q       Did you look at the pad that he handed you?

A       Yes, I did.

Q       Can you describe what you saw?

A       Yes.  I saw printed --

            MR. BURNS:  Objection.  This is --

            THE COURT:  I'll let her say generally what she
        saw.

            What did you see?

            THE WITNESS:  I saw defendants --

            MR. BURNS:  Your Honor, may we approach?

            THE COURT:  Yes.

            (At the bench, the following took place:)

            MR. BURNS:  Your Honor says -- you have already
        permitted hearsay in, over my objection.

            Now, with respect to the notations -- I'm
        sorry.

            You said you will permit her to describe.

            THE COURT:  What is she going to testify?

            MS. LEDERER:  Just essentially the information

NYCLD_015438

P-APP001383

T1-JM-TS

4920

1        Fairstein - People - Direct

2        she saw, about a name and some writing.

3            All of this comes in because she, based on what

4        she saw, drew information that the defendant was 16.

5            She sees his name and date of birth.

6            And I might point out, this is an exhibit  that

7        Mr. Burns introduced into evidence.

8            MR.  BURNS:    That  has nothing to do with why

9        she's being called on rebuttal.

10            THE COURT:  Wait a minute.

11            You will have an opportunity to respond.    Let

12        her respond.

13            MS.  LEDERER:    It is in evidence, and this is

14        important  evidence  about  the  whole,  about  Yusef

15        Salaam, her actions with the mother.

16            This  District Attorney, believing Yusef Salaam

17        was 16, and the  actions  she  took  based  on  that

18        belief.

19            This is how she came to that  information.

20            THE COURT:  The notes are in  evidence.

21            MS. LEDERER:  Yes.

22            Mr. Burns has the notes.

23            THE  COURT:    Do  you have the notes that were

24        offered in evidence?

25            MR. BURNS:  I have a  photocopy.    I  have  my

1          Fairstein - People - Direct

2     exhibit, Exhibit Q.

3          THE COURT:  Do you want it?

4          MS. LEDERER:    I would be content to have her

5     just describe what she saw, and what she knew from

6     that.

7          THE COURT:   Why don't you show an exhibit, as

8     long as it's in evidence, he put it in evidence, but

9     all of this stuff was discussed by your cross

10    examination of all these witnesses, allowing the

11    discussions that pertain to the age of Yusef.

12          That's how it all started.

13          MS. LEDERER:  That's why she's called.

14          MR. BURNS:  They're not talking about -- she's

15    called in here to dispute for the point of

16    determining when the police understood that he was

17    15, rather than 16.

18          There was no conversations relevant to that.

19          If she's going to talk about what she read on

20    the note, and the note said, on the notation, and

21    she read the note, and the note said that he was 16,

22    and that's the basis for understanding, that's their

23    position, and I'm not quarreling it.

24          THE COURT:  I'll allow it.

25          MR. BURNS:  If she's going to go into the rest,

T1-JM-TS

4922

1        Fairstein - People - Direct

2        the  context  of  the  thing,  I  think  that's  totally

3        inappropriate at this point.

4            THE   COURT:    At   this   point,   show   her   the

5        exhibit.

6            MS. LEDERER:  I'll show her.

7            If   she testifies this is what she read, and it

8        is  in evidence,  then  I   don't   see   that   that's   an

9        objection.

10            THE COURT:  I don't either.  Let's get it.

11            (In   open   court,   on the record,  the following

12        took place:)

13            MS. LEDERER:  I ask if the witness could please

14        be shown People's 178 in Evidence.

15            (Handed up to and examined by the witness.)

16    DIRECT EXAMINATION CONTINUED

17    BY MS. LEDERER:

18        Q    Looking at People's 178 in evidence.

19    Do you recognize that?

20        A    Yes, I do.

21        Q    And what do you recognize that to be?

22        A    I recognize it to be a xerox copy of the page in the

23    steno book, first page in the steno book that I looked at that

24    evening.

25        Q    And is that --

P-APP001386

T1-JM-TS

4923

1                    Fairstein - People - Direct

2              MS. LEDERER:  Withdrawn.

3         Q    Is that what detective Taglioni showed you  when  he

4    brought you the steno book?

5         A    Yes, it is.

6         Q         When you looked at the steno book that detective

7    Taglioni brought you, a copy of  which  is  before  you,  what

8    information, if any, did you learn about Yusef Salaam?

9         A         I learned, in addition to his name, printed there,

10   his address, his date of birth, and what he had said  to  that

11   point  to  detective  McKenna  about  his participation in the

12   attack in the park of the preceding evening.

13        Q    What did you learn his date of birth to be?

14        A    February, I believe it was the 27th, of 1973.

15        Q    How long did you spend examining the steno book that

16   detective Taglioni brought you?

17        A    Less than a minute.  I just read it.

18        Q    What, if anything, did you  do  after  you  examined

19   that steno notebook?

20        A         I  then returned it to detective Taglioni, and I

21   walked downstairs to the lobby of the building.

22        Q    Did you see anyone in the lobby of the building?

23        A    Yes.

24        Q    And who did you meet in the lobby?

25        A    I walked downstairs.

NYCLD_015442

P-APP001387

T1-JM-TS

4924

Fairstein - People - Direct

There was a young man in a business suit standing where the detective, who had informed me the lawyer was there, had been left by the detective.

So, I walked over to the young man, and held out my hand.

I said, "My name is Linda Fairstein, I'm an Assistant District Attorney."

He extended his hand and said that he was David Nocenti.

Q    Let me interrupt you for just a moment.

Was there a uniformed officer in the lobby?

A    Yes, there was.

Q    And where was that uniformed officer?

A    He was at a desk area, on the left, as one enters the lobby.

Q    What was his assignment in the lobby at that night?

A    It was a security assignment, because of the large numbers of people entering the building, because of this investigation, and because of the fact that the press had begun to gather at the building, there was a security officer there to identify people who did or did not belong in the building.

Q    When you say "Did or did not belong," were the media permitted inside the building?

A    Not at all.

Q    And were you, or did you see anybody else inform

NYCLD_015443

P-APP001388

1              Fairstein — People — Direct

2  that uniformed officer about the status of  the  investigation

3  that was being conducted?

4      A    No.  He was not a part of the investigation.

5      Q    Did you ever inform that officer that Yusef Salaam

6  was in the building?

7      A    No.

8      Q    Did anyone, in your presence, ever inform  him  that

9  Yusef Salaam was present in the stationhouse?

10     A    No.

11     Q    Would you describe how the conversation ——

12              MS. LEDERER:  Withdrawn.

13     Q    The person that you introduced yourself to, and who

14 was introduced to you, what did you learn his name to be?

15     A    David Nocenti.

16     Q    And did you have a conversation  with  him  at  that

17 time?

18     A    Yes, I did.

19     Q    Would you describe for the members of the jury what

20 that conversation was?

21     A        After  the  introductions,  I  said  to  him,  "I

22 understand that you are a lawyer."

23     He said, "Yes, I am."

24     I said, "Are you —— you've been retained by the family."

25     He said, "No.  I'm here on behalf of the Salaam family."

NYCLD_015444

P-APP001389

T1-JM-TS

4926

Fairstein - People - Direct

1

2      I said, "As a lawyer?"

3      He said, "No.  I'm a member of the family.  I'm part of

4  the family."

5      And I said, "I don't understand.

6      You told the police officer you were a lawyer."

7      He said, "No.  I'm here on behalf of the family."

8      And I said, "How are you related to Mr. Salaam?"

9      And he said, "Well, I am not actually  a  member  of  the

10 family.  I'm a friend of the family."

11     Shall I continue?

12     Q     Please continue.

13     A      I said, you said you were a lawyer, that's why the

14 police let you in.  Who do you work with?  Do  you  have  your

15 own office?  Are you with a law firm?  And he said, no, I'm an

16 Assistant  United States Attorney.  I work for the government,

17 in the Eastern District of New York.

18     Q     Did you have a conversation at that point about  the

19 fact  that  he  was  employed  by the United States Attorney's

20 Office?

21     A     Yes, we did.

22     Q     What was that conversation?

23     A      I said to him, I'm very surprised that you're  here.

24 You  know,  you  can't  practice law as an individual when you

25 work  for  the United States Attorney's Office.  You can't  give

NYCLD_015445

P-APP001390

T2-SC-TS

4927

1           Fairstein - People - Direct

2    legal advice.  You can't practice law.  You don't belong here.

3        He  said, I know that, but I'm not here in that capacity.

4    I'm here as a friend of the family.

5        I said, does your supervisor know that you're here?

6        He said, no.  I said,  I  would  like  to  call  him  and

7    discuss  this  with  him.  He said, please don't do that.  My

8    office doesn't know I'm here.  I know I'm not supposed to  be

9    here.

10        I  said, you understand you can't give legal advice.  You

11    told the police officers you were a lawyer.

12        I asked him for the phone number of his boss.   His   name

13    is Mr. Maloney.  And he said he didn't have that.  I asked him

14    for the phone number of his immediate supervisor.  The name of

15    his  immediate  supervisor,  he said, his name is Mr. Bagliter

16    (phonetic).  I said, do you have Mr. Bagliter's phone number.

17        He said, I have, but I can't give it to  you,  you  can't

18    call him.

19        I  said,  why  can't I call him.  He said, because of his

20    holiday.  I said, do you mean  because  tonight  is  Passover.

21    It's  my  holiday  too,  I'm  also  Jewish.   I want his phone

22    number.  It's the end of the  two  day  holiday,  it's  almost

23    midnight.

24        Q     Did he give you a phone number or business card at

25    that time?

NYCLD_015446

P-APP001391

T2-SC-TS

4928

1                    Fairstein - People - Direct

2        A     He gave me his own business card when he  identified

3   himself as a United States Attorney.

4        Q     Did you then go to a pay phone or telephone to make

5   a phone call?

6        A     Yes, I did.

7              MR. BURNS:  Object to leading.

8              THE COURT:  Yes, let her testify.

9        Q     Where was David Nocenti when  you  went  to  make  a

10  phone call?

11       A          The telephone is right in the lobby area of that

12  precinct, on the wall, and it is between the front door and --

13  ten or 12 feet into the precinct where that uniformed  officer

14  is.   And I went to the phone on the wall, my back was to Mr.

15  Nocenti.

16       The last I saw of him, I believe he was  walking  to  the

17  door of the precinct.

18       Q     Did you call Mr. Nocenti's supervisor at that time?

19       A     No, I didn't have the phone number.

20       Q     How long did the conversation with Mr. Nocenti last,

21  the conversation you just described?

22       A          It lasted almost, oh, between ten and 15 minutes.

23  It was more detail than I just told you.

24       Q     At the time that you were first informed  there  was

25  someone  downstairs  inquiring, an attorney inquiring of Yusef

T2-SC-TS

4929

1                  Fairstein - People - Direct

2   Salaam, about what time was that?

3        A    Approximately 11:30.

4        Q    And approximately how much time elapsed  before  you

5   went  to  the  first  floor  and  introduced  yourself  to  Mr.

6   Nocenti?

7        A    I would estimate less than five minutes.

8        Q    And approximately how  long  did  this  conversation

9   last?

10                  MR. BURNS:  Asked and answered, your Honor.

11                  THE COURT:  Objection sustained.

12        Q       At  any  time during that conversation did David

13   Nocenti -- did you ask David Nocenti  for  his  permission  to

14   speak to Yusef Salaam?

15        A    No, I did not.

16        Q    After you went to the phone booth, did you see where

17   David Nocenti was?

18        A       I  know I saw him outside the glass doors of the

19   precinct.

20        Q    Did there come a time where you met someone else  on

21   behalf of the Salaam family?

22        A    Yes.

23        Q    Will you please tell us how that came about?

24        A       Yes.  Within another five or so -- I made a phone

25   call, not to his office, but I made a phone call.  When I hung

P-APP001393

T2-SC-TS

4930

1                    Fairstein - People - Direct

2 up that phone call, shortly before midnight, Mr. Nocenti  came

3 into the precinct again with three other people.

4        Q    And did you have a conversation with Mr. Nocenti and

5 those other people at that time?

6        A    Yes.

7        Q       Will you describe what happened when those people

8 came into the precinct?

9        A    Yes.  Mr. Nocenti approached me  and  said  I  would

10 like  you  to meet Mrs. Salaam, Yusef Salaam's mother.  He may

11 have used her first name, as well.

12      I introduced myself to her.  She  introduced  herself  to

13 me.    And there was another woman and man with her, to whom I

14 was not introduced.

15      Q    Did you have any conversation with  Mrs.  Salaam  at

16 that time?

17      A    Yes, I did.

18      Q    What, if anything, did she say to you?

19      A    She told me she wanted to see her son.

20      Q    Did you respond to that when she said that to you?

21      A    Yes, I did.

22      Q    What, if anything, did you say to her?

23      A     I told her her son was upstairs with detectives, he

24 was being interviewed by detectives.

25                MS. SHERON SALAAM:  You're lying, you're lying.

NYCLD_015449

T2-SC-TS

4931

1              Fairstein - People - Direct

2         Why are you saying those things?

3              THE COURT:  Remove that woman from the room.

4              MS. SHERON SALAAM:  You're lying, you're lying.

5         He's innocent.

6              (Whereupon, Mrs. Sheron Salaam left the

7         courtroom.)

8              THE COURT:  Ladies and gentlemen of the jury,

9         you are to totally disregard that type of comment.

10        Base your determination of this case solely on the

11        evidence that's presented here.  That type of

12        interruption is inappropriate and you are to

13        disregard it entirely.

14              Go ahead.

15   DIRECT EXAMINATION CONTINUED

16   BY MS. LEDERER:

17        Q    When Ms. Salaam said to you she wanted to see her

18   son, did you respond?

19        A    Yes, I did.

20        Q    What did you say?

21        A    I told her that her son was upstairs being

22   questioned by detectives and that when they were done speaking

23   with him, she would be given the opportunity to be with him

24   and to see him.

25        Q    Did you make immediate arrangements at that time for

P-APP001395

T2-SC-TS

4932

Fairstein - People - Direct

1
2   Mrs. Salaam to see Yusef Salaam?

3        A    No, I did not.

4        Q    And why not?

5        A    Because he was 16 years old.

6             MR. BURNS:    Objection, your Honor.  This is

7             self serving.

8             THE COURT:  I'll allow it.

9        Q    I believed him to be 16 years old and she did not

10  have a legal right at that point, even though she requested

11  it, to see her son.

12       Q    After you told her the police were speaking to him

13  and you would make arrangements for her to see him when they

14  are finished, what, if anything, happened?

15       A    I told her that I would be happy to answer any

16  questions she had, to try and make her and her friends

17  comfortable until the procedures were done.  And that if she

18  had any questions for me, I would answer them.

19       She told me she wanted to speak to Mr. Nocenti without me

20  present.   I said, that was fine, and she and the other two

21  people and Mr. Nocenti left me.

22       Q    At that conversation you just described, did you

23  learn the name of the other two people, the man and woman who

24  were with Mrs. Salaam?

25       A    No, I did not.

NYCLD_015451

P-APP001396

T2-SC-TS

4933

1                         Fairstein - People - Direct

2         Q      Did you see them leave the stationhouse at that

3    time?

4         A      Yes.  The four of them walked out the front door.

5         Q           And did there come a time they returned into the

6    stationhouse?

7         A      Yes.

8         Q      Approximately how much time after you saw them leave

9    did any of those people come into the station house?

10        A      I place it close to 12:15 when they returned  inside

11   the station.

12        Q           When you say  they returned, who came into the

13   stationhouse at about 12:15?

14        A      Mrs. Salaam and the woman and man she  entered with

15   before.  Mr. Nocenti was not with them at that time.

16        Q      Did you have a conversation with Mrs. Salaam at that

17   time?

18        A      Yes.

19        Q      And what, if anything, did you say to her and what,

20   if anything, did she say to you?

21        A      She said she wanted to speak to me.  I said I  would

22   be  happy  to speak to her and answer her questions.  We could

23   go into a larger room where we could sit down, but I told  her

24   I  needed  to  know  who  the  people  were with her because I

25   explained to her  we  had  so  many  people  coming  into  the

T2-SC-TS

4934

Fairstein - People - Direct

1

2    stationhouse,  so  many  witnesses  being  spoken  to,  family

3    members present and also a problem with the press arriving  at

4    the  precinct,  that I asked her to tell me -- to introduce me

5    to the other two people with her and tell me who they were.

6         Q    Did she introduce those people to you at that time?

7         A    She refused to do that.

8         Q    Were non-family members of  the  people  --  of  the

9    young  men being questioned, were non-family members permitted

10   in the stationhouse?

11              MR. BURNS:  Objection, your Honor.

12              THE COURT:  Objection sustained.

13        Q    Did you ask Ms. Salaam the names of the  two  people

14   she was with at that time?

15        A    Yes, I did.

16        Q    And what did she say?

17        A    She said, I won't tell you.  She said, this woman is

18   my cousing and the gentleman is her fiance.

19        Q    Did you have any further conversation at that time

20   about those two people?

21        A    Yes.  I said I would be happy to talk to her in  the

22   presence  of her cousin, but the gentleman was not part of the

23   immediate family, I would prefer, since he was not  identified

24   to me, I would prefer he wait outside.

25        Q    And did the gentleman then leave?

T2-SC-TS

4935

Fairstein - People - Direct

1

2     A     Yes.

3     Q         Did you then have a conversation with either Mrs.

4     Salaam or the person she identified as her cousin?

5     A     Yes.

6     Q     Where did that conversation take place?

7     A     I took them out of the lobby to a more private area,

8     which is a large room in front of the desk, sergeant's desk,

9     where there are also seats. And I took them inside. And the

10    two women and I sat down in this room.

11    Q     Were there any detectives present with you at that

12    time?

13    A         I don't believe there were. There were a lot of

14    detectives and two supervisors I had been talking to

15    immediately before at the doorway of that room, but they were

16    not in our circle.

17    Q     And did you have a conversation with Mrs. Salaam and

18    her cousin at that time?

19    A     Yes, I did.

20    Q     What, if anything, did Mrs. Salaam say to you and

21    what, if anything, did you say to her?

22    A         She asked me where her son was. Again, I told her

23    he was upstairs with the detectives and he was being

24    questioned.

25        I said -- she knew, she expressed to me about the attacks

AM008026

NYCLD_015454

P-APP001399

T2-SC-TS

4936

Fairstein — People — Direct

1

2  in the park the preceding evening. She repeated to me, she

3  wanted to see her son and said to me, he is a minor, I want to

4  see him. And I, again, repeated, she would be able to see him

5  when the police had finished asking him questions. They begun

6  the process and I didn't expect it to be too much longer.

7      Q   In the sentence you just repeated to us, was that

8  the word Ms. Salaam used, minor?

9      A   That's exactly the word she used.

10      Q   In that sentence to you, did she specifically

11  identify the age, beyond saying a minor?

12      A   No, she did not.

13      Q   After she said what you just described, did you

14  respond in any way?

15      A   I repeated and went on with explaining what was

16  happening, why there was some many people in the stationhouse,

17  that a great number of young men had been brought in and were

18  being talked to around the stationhouse.

19      She next said to me, I want to see my son now, he's 15

20  years old.

21      Q   Prior to her telling you at that point that he was

22  15 years old, had anybody else you had spoken to on that

23  evening told you that Yusef Salaam was 15 years old?

24      A   That is the first time I heard he was 15 years old.

25      Q   What did you do when Mrs. Salaam said that?

T2-SC-TS

4937

Fairstein - People - Direct

1

2      A     I expressed surprise to her and said the information

3  I have is that he is 16.

4      Q     And what, if anything, did she say?

5      A     She said, I'm his mother, he's 15 years old.

6      I said, do you have any   kind   of   identification,   birth

7  certificate,  records, anything that would prove he's 15.  She

8  said, of course I do, but they are not here. They are at home.

9      I said, fine, as long as we  have   something  that  could

10  support that he's 15 because our information was he was 16.

11      Q     What, if anything, did you do after she said that to

12  you?

13      A     I asked the supervisors who were behind me, captain

14  Rowe and sergeant Cleve to go upstairs and immediately get the

15  detectives who   had   either   brought   Yusef   Salaam   into   the

16  stationhouse   and   the   ones   who were talking to him, to come

17  down so that we could straighten out their   information   about

18  him  being 16 with what Mrs. Salaam was saying about him being

19  15.

20      Q     After you dispatched  someone   to   go   and   get   the

21  detectives, did you remain where you were with Mrs. Salaam and

22  her cousin?

23      A     I remained in that room talking to the supervisors.

24  I believe she and her cousin were seated in   that   area   about

25  ten or 15 feet away from me.

T2-SC-TS

4938

1              Fairstein - People - Direct

2        Q    Did there come a time a detective came from upstairs

3    and came to the first floor where you were?

4        A    Yes.

5        Q    Who was that detective?

6        A    Detective John Taglioni.

7        Q    What, if anything, did you see detective Taglioni

8    do?

9        A    He came over to where Mrs. Salaam was standing.    I

10    said, why don't you tell Mrs. Salaam why you believe Yusef is

11    16, and let her explain to you what she just told me, that

12    he's 15.

13        Q    Were you present during the conversation with

14    detective Taglioni and Mrs. Salaam?

15        A    I didn't participate in it.    I was a step away

16    because I didn't have the information they claimed to have

17    had.

18        Q    Did you hear that conversation?

19        A    Yes, I did.

20        Q    What did detective Taglioni tell Mrs. Salaam?

21        A    Detective Taglioni said, Yusef had shown him a bus

22    pass with his name printed on it and with the date of birth

23    that had been copied onto the steno pad, and that the pass

24    with that date of birth showed him to be 16 years old.

25        Q    What, if anything, did Mrs. Salaam say?

NYCLD_015457

T2-SC-TS

4939

                    Fairstein - People - Direct

1
2       A       She just kept repeating, he's my son, I'm his
3   mother, he's 15.

4       Q       How long did that conversation last?

5       A       A minute, less than a minute.

6       Q       And what, if anything, happened at the end of that
7   conversation?

8       A       I said to the supervisors and Taglioni, that we had
9   better stop the interrogation now and accept her word.   She
10  said she could back it up with documents at a later point that
11  said he was 15.   Taglioni went immediately up to the
12  detectives and ceased the questioning and allowed Mrs. Salaam
13  to see her son.

14      Q       And did detective Taglioni leave your presence on
15  the first floor?

16      A       Yes, he did.

17      Q       Approximately what time was it you had that
18  conversation with detective Taglioni?

19      A       Place it at about 12:20.

20      Q       After detective Taglioni had the conversation you
21  just described with Mrs. Salaam, did you see what, if
22  anything, Mrs. Salaam and her cousin did?

23      A       No.

24      Q       Where were you after detective Taglioni went
25  upstairs?

T2-SC-TS

4940

Fairstein - People - Direct

1

2    A    I was in the lobby area, outside the large room,

3  where I had been with Mrs. Salaam, at the foot of the

4  staircase.

5    Q    Did there come a time you had another conversation

6  with David Nocenti?

7    A    Yes, there did.

8    Q    And do you recall when that conversation was?

9    A    It was certainly after 12:20 and before 12:30.

10    Q    What, if anything, did you say to David Nocenti at

11  that time and what, if anything, did he say to you?

12    A    He was back in the lobby of the precinct.  I think

13  he was again talking with Mrs. Salaam, had been talking, I saw

14  them together.  And he came over to me and I believe she had

15  told him that I had said she was going to be allowed to see

16  her son, and he asked me if that was right, and I said yes.  I

17  told the detective to stop talking to Mr. Salaam and allow his

18  mother to see him.

19    Q    Did there come a time you had another conversation

20  with Mrs. Salaam?

21    A    Yes.

22    Q    And what time was that conversation?

23    A    That was exactly 12:30.

24    Q    And what was that conversation?

25    A    She approached me again and said we want to get a

NYCLD_015459

P-APP001404

T2-SC-TS

4941

1                    Fairstein - People - Direct

2    lawyer, we're going to get a lawyer for my son.

3         Q        What, if anything, did you do when she told you

4    that?

5         A    I took a piece of paper and wrote that time,  12:30,

6    and that fact, Mrs. Salaam had informed me she wanted to get a

7    lawyer for her son, on a piece of paper.

8         Q        Did you have any further conversation with Sheron

9    Salaam at that time?

10        A    No, I did not.

11        Q    Did you have any conversation with her after that

12   conversation?

13        A    No, I did not.

14        Q    How much time went by from the conversation in which

15   she told you that Yusef Salaam was 15 years old until the

16   conversation she said she wanted an attorney?

17        A    Ten minutes, at most.

18        Q    Did there come a time you left the 20th Precinct?

19        A    Yes.

20        Q    And approximately what time did you leave  the  20th

21   Precinct?

22        A    Between 12:35 and 12:45.

23        Q    And where did you go at that time?

24        A    We went to the 24th Precinct, on 100th Street.

25        Q    And who did you go with?

T2-SC-TS

4942

1                    Fairstein - People - Direct

2      A        I went with you, yourself, and one or two

3   detectives, who drove us there.

4      Q     In any of the conversations you had with Sheron

5   Salaam that night, did she ever mention to you anything with

6   respect to a purple or blue health card?

7      A     No, she did not.

8      Q     Did she ever mention anything to do with a Mt. Sinai

9   health card?

10     A     No, she did not.

11     Q     Did you ever that night hear from anyone, from any

12   detective, from Sheron Salaam or from any family member, or

13   from David Nocenti, about a blue or purple health card?

14     A     No, I did not.

15     Q     In any conversation you had with Sheron Salaam, did

16   you ever use the expression, or words to the effect, phony

17   identification or phony ID?

18     A     No, I did not.

19     Q     Did you ever make any reference to anything as fake

20   ID?

21     A     No, I did not.

22     Q     That night, did you ever see Yusef Salaam's wallet?

23     A     No.  I did not know he had one.

24     Q        Did you ever have any conversation with any

25   detectives about Yusef Salaam's wallet or keys?

T2-SC-TS

4943

1                 Fairstein – People – Direct

2      A    No, I did not.

3      Q    Did you ever tell Sheron Salaam, words to the

4 effect, that I or we don't need your permission to talk to

5 Yusef Salaam?

6      A    No, I did not.

7      Q    At any time on that night, or next day, did you

8 return to the 20th Precinct?

9      A    No, I did not.

10     Q    During the time that you were speaking with Sheron

11 Salaam on the first floor of the 20th Precinct, was detective

12 Sheehan present?

13     A    No.

14     Q    When you went to the 24th Precinct, did you have

15 anything to do with the videotaped statement or interviews  of

16 Antron McCray or Raymond Santana?

17                 MR. JOSEPH:  Objection.

18                 THE COURT:  I'll let her answer.

19     A    I had nothing to do with the work in the room.  I

20 had to do only with keeping order outside.

21                 MR. JOSEPH:  Objection.

22                 THE COURT:  I'll allow that.

23     Q    When you say keeping order outside, what do you

24 mean?

25     A    The Youth Room in which the videos were made is a

T2-SC-TS

4944

1                Fairstein - People - Direct

2   small room, which was opened to the top of the rest of the

3   precinct. There was no -- not an enclosed space. And so while

4   the team was working in the video room, regular police

5   business was going on on the ground floor of the stationhouse.

6   Crews of police officers were coming in for roll call and

7   assignment, victims of other crimes were coming in, the

8   typists were working, the soda machines were being used, and

9   several of us were trying to keep order and quiet so that the

10   proceedings within the Youth Rooms could go on uninterrupted.

11       Q   After Sheron Salaam told you she wanted her son to

12   have a lawyer at 12:30, did you ever say to her at that time,

13   we'll stop questioning him now?

14       A   No.

15       Q   Had you directed that the questioning stop prior to

16   her telling you that she wanted a lawyer?

17       A     As soon as I heard that he was 15 years old, I

18   directed the questioning be stopped.

19       Q   Were you present at the 20th Precinct when Mrs.

20   Salaam was given an opportunity to visit with her son?

21       A   No, I was not.

22       Q   At what time was Yusef Salaam arrested?

23       A   12:30 that evening.

24       Q   Is that in the morning of April 21st?

25       A   That is correct.

NYCLD_015463

P-APP001408

T2-SC-TS

4945

1                      Fairstein - People - Direct

2        Q      Thank you.

3                     MS. LEDERER:  I have nothing further.

4  CROSS EXAMINATION

5  BY MR. BURNS:

6        Q      Good morning, Ms. Fairstein.

7        A      Good morning, Mr. Burns.

8        Q      Ms. Fairstein, when you went to the 20th Precinct,

9  had Ms. Lederer arrived before you?

10       A      Yes, she had.

11       Q      What time did you  send  Ms.  Lederer  to  the  20th

12 Precinct?

13                    MS. LEDERER:  Objection.

14                    THE COURT:  I'll let her answer.

15       A      I didn't send her there.

16       Q      What time did you assign her in relation to this

17 investigation?

18       A      I believe it was around 9:15 on the morning of April

19 20th.

20       Q      Do you know what time she left to  go  to  the  20th

21 Precinct?

22       A      More or less, yes.

23       Q      What time was that?

24       A      I believe it was about eight o'clock that evening.

25       Q      Now,  had  --  did  the police department or any

T2-SC-TS

4946

1              Fairstein - People - Cross - Burns

2  representatives  of  the  police  department  ask  for  your

3  assistance in connection with this investigation?

4              MS. LEDERER:  Objection.

5              THE COURT:  I'll allow it.

6      A    Yes, they did ask for our assistance.

7      Q    At what point was that?

8              MS. LEDERER:  Objection.

9              THE COURT:  I'll allow it.

10     A    They first --

11     Q      No.  When was the first time they asked for the

12  assistance of the District Attorney's Office  in  relation  to

13  this investigation?

14     A     When I was called at nine o'clock on the morning of

15  the 20th, I was told I would be asked later  in  the  day  for

16  assistance.

17     Q        You  were  called  by  a  police  department

18  representative?

19     A    That's right.

20     Q    And was it  a  person  who  was  in  charge  of  the

21  investigation?

22              MS. LEDERER:  Objection.

23              THE COURT:  I'll let her answer.

24     A    It was one of the supervising officers, yes.

25     Q    When you arrived at eight o'clock -- I'm sorry, 8:30

T2-SC-TS

4947

1              Fairstein - People - Cross - Burns

2    --

3        A    A little after 8:30.

4        Q    -- Ms. Lederer was already there, is that right?

5        A    Yes.

6        Q        And you went inside and went up to the 2nd floor

7    detective room?

8        A    Yes, I did.

9        Q    Ms. Lederer was there?

10       A    Yes, she was.

11       Q    Had any video begun?

12       A    No.

13       Q    Had any questioning or talking to people, had any of

14   that begun at the time that you arrived?

15            MS. LEDERER:   Objection.

16            THE COURT:   If she knows, I'll let her answer.

17       A    Yes, it had.

18       Q    At any time prior to your arrival, did you have

19   occasion to go to Metropolitan Hospital?

20       A    No, sir.

21       Q        And did you have an occasion to speak to the

22   officers who had -- the officers who had discovered the body

23   of the female jogger?

24            MS. LEDERER:   At what point?

25       Q        Prior to your arrival at the precinct, at

P-APP001411

T2A-SC-TS

4948

1              Fairstein - People - Cross - Burns

2    approximately 8:30 in the evening of the 20th.

3        A    Prior to my arrival, no.

4        Q    Incidentally, the telephone call that you received

5    about nine o'clock, that was in relation to asking the

6    District Attorney's Office for assistance in connection with

7    the investigation relative to the female jogger?

8        A    In part, yes.

9        Q    You're the -- were any other units of the District

10    Attorney's Office called?

11              MS. LEDERER:  Objection.

12        Q    To your knowledge?

13              MS. LEDERER:  Objection.

14              THE COURT:  I'll allow it.

15        A    Yes.

16        Q    Well, you're the Head of the Sex Crimes Unit, right?

17        A    Yes.

18        Q    Was there any other sex crime that was being

19    investigated, in connection with Central Park?

20              MS. LEDERER:  Objection.

21              THE COURT:  Sustained.

22        Q    Your participation, as the Chief of the Sex Crimes

23    Unit, when you were called, wasn't that in connection with the

24    investigation relative to the, to the female jogger?

25        A    Yes.

T3-JM-TS

4949

1             Fairstein - People - Cross - Burns

2        Q    Now, between 8:30 and 11:30, did you participate  in

3   any questioning of any individuals?

4        A    I questioned police officers.

5        Q    Just officers.

6        A    Right.

7        Q    Now, at 11:30, you say, is the first time you --

8             MR. BURNS:  Withdrawn.

9        Q    At what point in time -- at what point in time did

10  you -- were you aware of the fact that Yusef Salaam was in the

11  20th Precinct?

12       A    I have -- I would put it in the 11  o'clock  period,

13  but it was between 11 and 11:30.

14       Q    And do you have any -- can you tell the Court who

15  told you, or how you came by that information?

16       A    I was in a room with a lot of police officers,  and,

17  as  different events unfolded that evening, because there were

18  many participants, and a lot of police activity, people  would

19  enter  the room to tell some of the supervisors what was going

20  on.

21       Q    And I believe --  and  you  were  functioning  as  a

22  supervisor?

23       A    No.  I'm talking about police supervisors.

24       Q    But you were working along with the supervisors,

25  were you not?

NYCLD_015468

T3-JM-TS

4950

1                    Fairstein - People - Cross - Burns

2                    MS. LEDERER:  Objection.

3                    THE COURT:  I'll let her answer it.

4          A     I was not supervising a police investigation, no.

5          I was there to assist, and to assist Ms.  Lederer,  if  I

6     could be of any use.

7          Q          Well,  in  the course of your assisting with the

8     investigation, while you were on the second floor squad  room,

9     someone came in and mentioned Yusef Salaam, is that it?

10         A     Yes.

11         Q     And was anything said about his age at that time?

12         A     No.

13         Q          At that point, you didn't have any -- you didn't

14    know how old he was?

15         A     No.

16         Q     Did you know that he was a teenager or older?    Did

17    you know that?

18         A     I didn't know anything.

19         Q     Nothing at all?

20         And  then,  at  11:30,  you  had a call, that there was a

21    lawyer downstairs?

22         A     Not a call.  Someone came in.

23         Q     And told you?

24         A     And said to me, particular.

25         Q     You don't know who that person was?

NYCLD_015469

P-APP001414

T3-JM-TS

4951

                    Fairstein - People - Cross - Burns

1

2       A    No.

3       Q    When you say you don't  know,  could  it  have  been

4   detective Taglioni?

5                    MS. LEDERER:  Objection.

6                    THE COURT:  I'll let her answer it.

7       A    I know it was not detective Taglioni.

8       Q    Because you specifically remember detective Taglioni

9   coming, right?

10      A    With the book.

11      Q    Is that right?

12      Now, did you send detective Taglioni for the book?

13      A    No, no.

14      I  asked  the  person  who  alerted me to the fact that a

15  lawyer was there.

16      Q    So, you didn't send detective Taglioni for the book?

17      A    No.

18      Q    Detective Taglioni then comes to  you  with  a  memo

19  book?

20      A    That's right.

21      Q    Is that right?

22      You  had  conversation  with  detective  Taglioni at that

23  time?

24      A    Yes, yes.

25      Q    At that time, did you know that detective  Taglioni,

NYCLD_015470

P-APP001415

T3—JM—TS

4952

1              Fairstein — People — Cross — Burns

2    himself, was the arresting officer at that particular point in

3    time?

4                    MS. LEDERER:  Objection.

5                    THE COURT:  Objection sustained.

6        Q    At the time when --

7                    MR. BURNS:  At the time that Taglioni came with

8            the book.

9                    THE COURT:  That's not the objection.  The word

10           is arrest.

11                   MR.    BURNS:    Withdrawn,   withdrawn,    I'll

12           withdraw that question.

13       Q    At  the  point  that  detective  Taglioni,  detective

14   Taglioni  came to you, came to you with the book, did you know

15   that it was detective Taglioni who was the detective   who   had

16   brought him into the precinct?

17       A    No, I did not.

18       Q     At any time while you were examining the book, was

19   -- did detective Taglioni tell you that he was   the   detective

20   who had brought Yusef in?

21       A    No, he didn't.

22       Q     And that, and that his coming to you with the book,

23   that book, you're looking  at  the  book,  that  was  about  a

24   minute?

25       A     I said the whole thing was probably less than two

TS-JM-TS

4953

1            Fairstein - People - Cross - Burns

2    minutes.

3        Two for him to get to me, and --

4        Q    No.

5        I'm talking about when Taglioni came to you with the

6    book, and you're looking at the book, and you giving the book

7    back to him, and him leaving, that took about a minute?

8        A    Took, for me to read a whole written page of steno

9    notes, that was the first complete page, and perhaps the top

10   of the second page, a minute.

11       Q    A minute, right?  And then he left?

12       A    That's right.

13       Q    And then, at that point, all you knew was, insofar

14   as David Nocenti was concerned, was that he was an attorney

15   downstairs.

16       A    On behalf of Yusef Salaam, yes.

17       Q    Incidentally, did you, in the course of your

18   assisting the police in their investigation, was it understood

19   by police officers that, that if an attorney came to the

20   precinct, you were to be notified?

21            MS. LEDERER:  Objection.

22            THE COURT:  Objection sustained as to form of

23        the question.

24       Q    Do you know how it was that a police officer and

25   plain clothes came to you and told you that an attorney was

NYCLD_015472

P-APP001417

T3-JM-TS

4954

1              Fairstein — People — Cross — Burns

2    downstairs, do you know?

3        A    I have no idea.

4        Q    And you went downstairs?

5        A    Yes.

6        Q        And when you went downstairs, were you alone, or

7    were you accompanied by anybody?

8        A    I believe sergeant, captain Earl and sergeant  Cleve

9    were with me when I got the information.

10       I  think they followed me downstairs, and might have been

11   behind me, but I  don't  remember  them  participating  in  my

12   conversation with Mr. Nocenti.

13       Q    And isn't it also true that you don't remember that

14   they were actually present?  Isn't that also true?

15                 MS. LEDERER:  Objection as to form.

16                 THE COURT:   Yes,  objection  sustained  as  to

17            form.

18       Q        You  don't  remember  whether they were actually

19   present?

20       And I'm referring to  Captain  Rowe  or  sergeant  Cleve.

21   Isn't that true?

22       A    I believe that they came downstairs.

23       I  don't  remember  --  I  don't  remember  if  they were

24   actually there when I spoke to Mr. Nocenti.

25       Q    That's my question.

NYCLD_015473

P-APP001418

T3-JM-TS

4955

1              Fairstein - People - Cross - Burns

2    A    Okay.

3    Q    You don't actually --

4    A    That's right.

5    Q    Remember that.

6    A    That's right.

7    Q    And the conversation -- what time did you get

8  downstairs?

9    A    Five or six minutes, I believe, after I was told Mr.

10  Nocenti was there.

11    Q    And how long --

12              MR. BURNS:  Withdrawn.

13    Q    The conversation that you had with David Nocenti,

14  that took about ten to 12 minutes?

15    A    Ten to 15 minutes, yes.

16    Q    Ten to 15?

17    A    Mmm -mm.

18    Q    And, after that conversation, you then went to the

19  precinct, to the telephone?

20    A    Yes.

21    Q    And David Nocenti left your presence?

22    A    That's right.

23    Q    And while you were on the phone, you didn't see

24  David Nocenti?

25    A    No, I didn't.

T3-JM-TS

4956

1                    Fairstein - People - Cross - Burns

2       Q    When you went down and spoke to David  Nocenti,  he

3  told you that he was there on behalf of Yusef?

4       A    Yes.

5       Q    Is that the language he used?

6       A    He --

7       Q    No.

8       That's  a yes or no, Ma'am.  The question calls for a yes

9  or no answer.

10                 MS. LEDERER:  Your Honor, I would  ask  you  to

11            instruct the --

12                 MR. BURNS:  Your Honor --

13                 THE COURT:  Wait.  Everybody stop talking.

14                 Read the question back.

15                 (Requested testimony read.)

16                 THE  COURT:   Are you asking, is that the exact

17            language that he used?

18                 MR. BURNS:  Yes.

19                 THE COURT:  Answer the question.

20       A    Yes, he repeatedly said, "In  behalf,  I'm  here  on

21  behalf of Yusef Salaam and on behalf of the Salaam family."

22       Q         And  I  take  it then that he told you he was an

23  attorney, and he told you he  worked  for  the  US  Attorney's

24  Office in the Eastern District?

25       A    Yes.

NYCLD_015475

P-APP001420

T3-JM-TS

4957

1                    Fairstein - People - Cross - Burns

2         Q         And he was there in behalf of the family as a

3    friend, in his capacity as a friend,  in  words,  in  sum  and

4    substance, isn't that what he said?

5         That's not what he said in sum and substance?

6         A    He said he was there in behalf of Yusef Salaam.

7         I    had   to   draw   the  everythings   out   of   him   with

8    questioning.

9         Q    But that's what he said in sum and substance,  isn't

10   that true?

11        A    Yes.

12        Q    And he was not permitted to see Yusef?

13        A    That's right.

14        Q         And  he  left  the precinct, and you went to the

15   telephone?

16        A    I'm not sure where he was.

17        I thought he was either in the vestibule, as I could  see

18   through the glass doors.  He may have gone out.

19        Q    You couldn't see where he went when you were on the

20   phone?

21        A    No.

22        Q    And the next time you saw him, he was  with  someone

23   who he introduced as Mrs. Salaam?

24        A    That's right.

25        Q    And what time was that?

NYCLD_015476

P-APP001421

T3-JM-TS

4958

                    Fairstein - People - Cross - Burns

1

2    A    That was between 11:50 and midnight.

3    Q         Now,  when you say "between 11:50 and midnight,"

4 you're saying it could have been as early  as  11:50,  but  no

5 later than midnight?

6               MS. LEDERER:  Objection.

7    Q    Is that --

8               THE COURT:  I'll allow it.

9    Q    Is that what you mean?

10   A    I believe so.

11   Q    And how long did you --

12              MR. BURNS:  Withdrawn.

13   Q    And he introduced Mrs. Salaam to you?

14   A    Yes, he did.

15   Q         Now, she was accompanied at that time by a female

16 and male?

17   A    right.

18   Q    They were adults?

19   A    They were.

20   Q    And she told you at that time that she wanted to see

21 her son?

22   A    That's right.

23   Q    You didn't hear her say anything about  Yusef  being

24 15 at that time?

25              MS. LEDERER:  Objection.

NYCLD_015477

P-APP001422

T3-JM-TS

4959

1                    Fairstein - People - Cross - Burns

2                    THE COURT:  I'll allow it.

3                    MS. LEDERER:  Objection.

4                    THE COURT:  I'll allow it.

5          A    She did not say he was 15.

6          Q         Did  you hear her say anything about him being a

7    minor at that time?

8                    MS. LEDERER:  Objection as to form.

9                    THE COURT:  Yes, objection sustained.

10         Q    Did you hear Mrs. Salaam say  anything  about  Yusef

11   being a minor at that time?

12                   MS. LEDERER:  Objection as to form.

13                   THE COURT:  Sustained.

14         Q    Did you tell --

15                   MR. BURNS:  Withdrawn.

16         Q         Is it your testimony then that she came in and she

17   asked -- she in -- she gave you her name and said  she  wanted

18   to see her son, is that correct?

19                   MS. LEDERER:  Objection.

20                   THE COURT:  I'll allow it.

21         Q    Is that correct?

22         A    Yes, she asked to see her son.

23         Q    And you introduced yourself to her?

24         A    Yes, I did.

25         Q         And this conversation took place in the room beyond

NYCLD_015478

P-APP001423

T3-JM-TS

4960

1              Fairstein - People - Cross - Burns

2     the vestibule that you passed through in the 20th Precinct?

3          A    I call it a, the lobby area, right in front of the

4     telephone, and a uniformed guard.

5          Q    This took place there?

6          A    Yes.

7          Q         And were you alone at that time, or were you

8     accompanied by anyone?

9          A    When they approached me, I was, I was talking to

10    other officers.  I was rarely alone.

11         I  would separate myself to have conversations, but I was

12    not standing there alone.

13         Q    Can you tell us who you were talking to at that

14    time?

15         A    Captain Rowe and sergeant Cleve.

16         Q         And when you went and spoke to her, were captain

17    Rowe and sergeant Cleve with you?

18         A    I don't know if they were behind me or not.

19         They were not participants in the conversation.

20         Q    Well, do you know whether they were actually

21    present, or you don't remember whether they were actually

22    present.

23         A    They were present, Mr. Burns, in the sense that the

24    two gentlemen and I were standing talking.

25         I  then  turned  around  when Mr. Nocenti approached, and

NYCLD_015479

P-APP001424

T3-JM-TS

4961

1              Fairstein — People — Cross — Burns

2   asked to talk to me.

3        So, I didn't move.

4        The two men I was talking to were right behind me, but  I

5   began the other conversation.

6                MR. BURNS:  4458.

7        Q        At a prior hearing, do you recall being asked this

8   question and giving this answer?

9        "At the time that you had this conversation -- "

10       "QUESTION:  At the time that you had this conversation

11  with Mrs. Salaam, who else was immediately present?"

12       "ANSWER:    The people in her group, and, if anyone was

13  with me, it would have been captain Rowe  or  sergeant  Cleve,

14  but I don't remember that they were actually present."

15                MS. LEDERER:  Your Honor, I object.

16       Q    Did you give that answer to that question?

17                MS. LEDERER:  There's no inconsistency.

18                THE  COURT:   Well, I'll let her answer, if she

19            gave that answer to that question.

20       A    I did.

21       Q    But you don't remember whether  they  were  actually

22  present during that conversation with Mrs. Salaam?

23       A    I think it's the same answer I'm giving you now.

24       They -- I don't know if they could hear it or not.  I had

25  been talking to them.

NYCLD_015480

P-APP001425

T3-JM-TS

4962

1                     Fairstein — People — Cross — Burns

2       They were present a couple of feet away.

3       I don't know if they were present for the conversation.

4       Q     And that conversation lasted how long?

5       A       That conversation, my first conversation with Mrs.

6  Salaam and Mr. Nocenti?

7       Q     Yes.

8       A     Two minutes.

9       Q     And, and it was during that conversation, she said

10  she wanted to see her son, right?

11      A     That's correct.

12      Q     And that conversation ended in two minutes?

13      A     Yes.

14      Q     And it ended with her leaving the precinct?

15      A       She said to me she would like to speak to Mr.

16  Nocenti without me being present.  I said that was fine.

17      Q     Was it at that time when you asked her who the other

18  people were in her group?

19      A     I'm not sure if I did.

20      I know I did, when she came back with them and wanted to

21  ask me questions in their presence.

22      I may also have said it the first time when I introduced

23  myself to her, but I have no recollection of that at this

24  point.

25      Q       But when he came back -- David Nocenti came back

AM008053

NYCLD_015481

P-APP001426

T3-JM-TS

4963

1          Fairstein - People - Cross - Burns

2   into the precinct with her, and there were other people with

3   her, isn't that correct?

4       A    Yes.

5       Q    Were you asked, at the same hearing, this question,

6   and did you give these answers?

7                MS. LEDERER:  Objection, objection to the form.

8                THE COURT:  What page is that?

9                MR. BURNS:  Page 4457, bottom, line 22.

10               MS. LEDERER:  The form of the question.

11               Were you asked this question, and did you give

12          that answer, is not a proper form.

13               THE COURT:  I'll allow him to ask whether a

14          witness was asked a particular question and gave a

15          particular answer.

16               Were you asked this question -- these

17          questions, and did you give these answers?

18               "QUESTION:  Who did he come back inside with?"

19               "ANSWER:  He came back inside and told me that

20          this was Mrs. Salaam, Yusef's mother, and there was

21          another woman and a man, a woman and man with them.

22          I did not learn their names."

23               "QUESTION:  Did you have a conversation with

24          any of those people at the time?"

25               "ANSWER: Yes.  I introduced myself to Mrs.

NYCLD_015482

P-APP001427

T3-JM-TS

4964

Fairstein - People - Cross - Burns

Salaam, and I asked her to introduce me to everyone there, so that I would know the people with whom I was speaking.

I was concerned about whether or not I was speaking with people who were part of her family, or related to any of the other suspects, or witnesses.

She told me she would not tell me who the other people were."

MS. LEDERER:  Excuse me.

Q     (Continuing) "who the other people were with her."

MR. BURNS:  Right.

Q     Did you give those answers to that -- to those questions?

A     I assume I did.

Q     Is that -- does that refresh, refresh your recollection, as to the contents of the first conversation that you had with Ms. Salaam?

A     Yes.

Q     And Ms. Salaam, did she leave the precinct at that time?

A     After telling me that she wanted to speak to Mr. Nocenti, I don't know if there remained any -- inside the glass door vestibule, she left me, she left my presence.

Q     She left you?

T3-JM-TS

4965

          Fairstein - People - Cross - Burns

1

2     A     Yes.

3     Q     She left that room that you were in?

4     A     Yes, that's right.

5     Q     She walked out of that room?

6     A     That's right.

7     Q     And how long was she out?

8     A     I don't believe I saw her again until 12:15.

9     Q     And when she came back in, did she come back in with

10   Mr. Nocenti?

11    A     No, she did not.

12    Q     Who did she come back in with?

13    A     With the same woman and man that she had first

14   entered.

15    Q     And at that time, did she introduce herself again to

16   you?

17    A         No.  I knew who she was.  She had just introduced

18   herself to me.

19    Q     The other two people, were they introduced to you?

20    A     No, she would not do that.

21   She said to me, "This is my cousin," but she would not

22   tell me the name.

23    Q     And David Nocenti did not re-enter at that time?

24    A     At that moment, no.

25    Q     Did the -- then you had a -- did you proceed to have

NYCLD_015484

P-APP001429

T3-JM-TS

4966

1              Fairstein - People - Cross - Burns

2    a subsequent conversation?

3         Did that conversation take place at the time, at the same

4    location that the first conversation took place?

5         A    No, sir.

6         Q    You withdrew to another room, is that correct?

7         A    Yes.

8         Q    That room would have been off this main lobby area,

9    is that right?

10        A    That's right.

11        Q    And that's a room with what, chairs?

12        A    Yes.  It was more private, and it had chairs, in

13   which the women could sit.

14        Q    And when you entered that room, isn't it true that

15   Mrs. Salaam and the female who was with her, and the male who

16   was with them, together, with you and at least two other

17   police officers, didn't you all enter the room at that time?

18        Do you recall that?

19        A    We all first entered together, yes.

20        Q    And there came a time when the man, who was with

21   Mrs. Salaam's group, the Salaam group, was asked to leave,

22   isn't that correct?

23        A    That is correct.

24        Q    So, was it at that time that you learned the name of

25   the woman who was with Mrs. Salaam?

NYCLD_015485

P-APP001430

T3-JM-TS

4967

1           Fairstein — People — Cross — Burns

2    A    That night, I never learned her name.

3    Q    Never learned her name?

4    A    No, sir.

5    Q    She was never introduced to you in that room?

6    A    Mrs. Salaam said that "This is my cousin."

7    Q    She was never introduced to you in that room.

8    A    That's correct.

9    Q    And the man, did you ever -- was he introduced?

10   A    He was not.

11   Q    Well, how did it come about that you  knew  that  he

12   was not a member of the family?

13   A        Because  I said I needed to know their names and

14   their relationships, so that I could be sure that  these  were

15   members  of Mrs. Salaam's family, and not concerned with other

16   witnesses.

17   My particular concern was from  the  press,  since  there

18   were members of the press already outside the precinct.

19   Q    So --

20   A    I asked for the gentleman's name.

21            MS. LEDERER:  Excuse me, objection.

22            THE COURT:  No, no.  Let her finish her answer.

23            Go ahead.

24   A    I then asked for the name of the lady and gentleman.

25   Mrs.  Salaam  said,  "This is my cousin," pointing to the

NYCLD_015486

P-APP001431

T3-JM-TS

4968

1                 Fairstein - People - Cross - Burns

2     young woman."  Would not give me her name.

3          And she pointed to the gentleman and said,  "This  is  my

4     cousin's fiance."

5          And  I  said,  "If they will not identify themselves, I'm

6     going to ask the gentleman to leave because he is not part  of

7     your family."

8          Q    Well, let me get this:

9          The  female who was with Mrs. Salaam, did, did she refuse

10    to identify herself after you asked her her name?

11                    MS. LEDERER:  Objection.

12                    THE COURT:  I'll allow it.

13         A    She never spoke.  It was Mrs. Salaam who said --

14         Q    Did -- I understand that.  That's not my question.

15                    MS. LEDERER:  Objection.

16                    THE COURT: She never spoke.

17                    MR. BURNS: That's not my question.

18                    THE COURT:  That's an answer to your question.

19                    MR. BURNS:  My question is --

20                    THE COURT:  What's your next question.

21         Q    Did you ask the female who was with Mrs. Salaam  her

22    name?

23         A    Yes.

24         Q    And she never gave an answer, is that right?

25         A    Mrs. Salaam interrupted her and said she didn't have

NYCLD_015487

T3-JM-TS

4969

1               Fairstein - People - Cross - Burns

2   to answer.

3         Q       And did you put the same question to the man, did

4   you ask this, the gentleman who was with them, what   his   name

5   was?

6         A     I tried to.

7         Q     No.

8   Did you ask him his name?

9         A     I believe I did.

10        Q     And he, he did not answer either?

11        A     No, sir.

12        Q     But then he got up and left?

13        A     I asked him to.

14        I  said,  since I don't know who you are," and since even

15  Mrs. Salaam said he was not a relative, in the   sense   of   the

16  immediate   family,   I   said   I   would prefer, "I would be more

17  comfortable," were the words I used, "if you   stepped   outside

18  and let me talk to the women about this case."

19        Q       And how long did that conversation last, while you

20  were in the room?

21        A     A couple of minutes, just a few   minutes,   not   just

22  what  you talked about, but while I remained in that room with

23  Mrs. Salaam.

24        Q     Yes.

25        I'm talking about, how much time did   you   spend   in   the

NYCLD_015488

P-APP001433

T3-JM-TS

Fairstein - People - Cross - Burns

1

2  room with Mrs. Salaam?  I'm talking about this little room.

3       A    It's a big room.

4       Q    All right, the big room.

5       A    Right.  Okay.

6       In   that  room,  from the time we went in and we did this

7  business about who the other people were and the  conversation

8  that followed, all told, five minutes, not more.

9       Q    And during that period of time, there was no mention

10 of Yusef's age by, by, his age, the specific number, there was

11 no,  nobody mentioned his age at, at that time, while you were

12 in the room?

13      A    Yes, sir.

14      It was in this conversation, after  the  gentleman  left,

15 when I continued to converse, seated with the other two women,

16 that we went on to discuss the matter.

17      And  it  is  in  this conversation that Mrs. Salaam first

18 said, "I want to see my son, he's a minor," she used the  word

19 "minor."

20      And  then  I went on, and then, when she raised it again,

21 she said, "My son is 15 years old, I want to see him," it  was

22 in  that  period, between 12:15 and 12:20 that I heard his age

23 as 15 the first time.

24      Q    And then, at 12:20, did you send an officer upstairs

25 to stop the questioning, upon learning that he was 15?

NYCLD_015489

P-APP001434

T3-JM-TS

4971

1                     Fairstein - People - Cross - Burns

2          A    I sent an officer upstairs to bring me the  officers

3    who  had,  who  were responsible for eliciting the information

4    that led me to believe, a half hour earlier, that  Yusef  was

5    16,  so  that they could have a conversation with Mrs. Salaam,

6    she was saying 15.

7          He was saying Yusef is saying he's 16.

8          I want to see the basis for age, and resolve  whether  or

9    not the questioning should go on.

10         Q    You had no doubt in your mind at that time that Mrs.

11   Salaam was actually the mother, did you?

12         A    Any doubt that she was his mother?

13         Q    Yeah?

14         A    No, I did not.

15         Q        But you wanted to check whether -- what the cops

16   were relying on, upon learning from the mother that he was 15,

17   you wanted to check to find out what the cops were relying on,

18   to make them believe that he was 16?

19         A    It is not uncommon for parents to --

20         Q    No.

21             THE COURT:  Answer the question.

22         Q    Is that correct?

23         A    Did I want to?

24         Q    Yes.

25         A    I wanted police officers to tell  Mrs.  Salaam  what

NYCLD_015490

P-APP001435

T3-JM-TS

4972

1                    Fairstein - People - Cross - Burns

2    their explanation for that date of birth was, certainly, yes.

3         Q         And that conversation in the room, that was like,

4    you say, three minutes?

5         A    Five, top to bottom, I think.

6         Q    Five minutes, in the little room.

7         A    Big room, but more private than in the lobby.

8         Q    The private room?

9         A    Correct.

10        Q    And did you stay in the room at that time?

11        A    I walked to the door that leads to the lobby.

12        Q    Did Mrs. Salaam and the lady she was with remain   in

13   the room at that time?

14        A    Yes, because they were waiting for the detectives to

15   come  down  with  the  --  I told them that someone was going to

16   come down and explain why he was 16, and see if  the  date  of

17   birth  they  had was different than what she was going to tell

18   me it actually was.

19        Q    Well, Mrs. Salaam was interested in seeing her  son,

20   she didn't care about these dates.

21                   MS. LEDERER:  Objection.

22                   THE COURT:  Objection sus --

23        Q    Did she --

24                   THE COURT:  Excuse me.  Objection sustained.

25        Q        What did Mrs. Salaam say, if anything, in relation

NYCLD_015491

P-APP001436

T3-JM-TS

4973

            Fairstein - People - Cross - Burns

2   to this, when you said that they're going to bring down   these

3   dates?

4                MS. LEDERER:  Objection.

5                THE COURT:  I'll allow it.

6       A        She  didn't  say, because I was the one who knew

7   whether it was, whether I was legally responsible for allowing

8   her to see her son, depending on what age he was.  She  didn't

9   say.

10      Q    But you still, at that point, had no, no doubt that

11  she was, in fact, the mother?

12      A    None at all.

13      Q    And actually, if she is the mother, she would have a

14  right to be present during questioning, isn't that true?

15                MS. LEDERER:  Objection.

16      A    Not --

17                THE COURT:  Wait.  Just a  minute.    Objection

18          sustained.

19      Q    Well, if she's the mother, and if the child is under

20  15 --

21                MS. LEDERER:  Objection, objection.

22      Q    Did she have the right --

23                MS. LEDERER:  Objection.

24      Q    (Continuing) to be present?

25                MS. LEDERER:  Objection.

NYCLD_015492

P-APP001437

T3-jm

4974

FAIRSTEIN — REBUTTAL — CROSS — BURNS

Q     During the question?

MS. LEDERER: Can we -- objection.  Can we have a sidebar?

THE COURT:  Objection sustained.

Q     There were other people who were less  than 15, 16 years old, being questioned, isn't that true?

MS. LEDERER: Objection.

THE COURT:  I'll let her answer it.

A     Yes, there were.

Q     And their parents were present during the questioning, isn't that true?

MS. LEDERER:  Objection.

THE COURT:  If she knows.

Q     Do you know  whether  the  parents  of  the other  people who were less than 16, that were being questioned, did you know whether their parents  were present?

A     Yes.

The  police  were  very careful to see that they were.

Q     Did  there  come  a  time  when  Detective Taglioni came downstairs to the private room?

A     Yes.

Q     Did he enter the private room?

8/6/90

T3-jm

4975

FAIRSTEIN - REBUTTAL - CROSS - BURNS

A    Yes.

Q    And Mrs. Salaam and the other, the female that she was with, they were in the room as well?

A    Yes.

Q    And was there any further conversation relative to Yusef's age?

A    Yes.

Q    Did Mrs. Salaam state, or continue to state, that he was 15?

A    Yes, she did.

Q    At that time, during that conversation, did you learn that it was, in fact, Detective Taglioni, the officer who brought him to the precinct?

A    No, I didn't.

Q    And at that time, during that conversation, did Taglioni tell you that this kid told me he was 16?

Did that take place in that conversation there in the room?

A    Taglioni told Mrs. Salaam, and I heard, that "Yusef showed me a bus pass which had this date of birth, he's 16."

Q    No. We know what the bus pass says, that's not the issue.

NYCLD_015494

P-APP001439

T3-jm

                                                                    4976
                    FAIRSTEIN - REBUTTAL - CROSS - BURNS

1
2                        MS. LEDERER:  Objection.
3                        THE COURT:  Objection sustained to the
4              form of the question.
5        Q     We're not talking about the bus pass.
6                        MS. LEDERER:  Objection.
7                        THE COURT:  It's not --
8                        MR. BURNS:  It's my question.  I'm
9              directing the witness' attention to the
10             fact that I'm not talking about the bus
11             pass.
12                       THE COURT:  Ask the question properly
13             and you can do that.
14       Q     Did you --
15                       MS. LEDERER:  Objection.
16                       THE COURT:  We're not talking about
17             that.
18       Q     I'm going to ask you a question that
19       doesn't involve the pass.
20                       MS. LEDERER:  Objection.
21                       THE COURT:  Objection sustained.
22                       Counsel, please follow the direction
23             of the Court.  And it's not humorous.  If
24             you think it's humorous, it's not.
25                       MR. BURNS:  I haven't laughed in this

8/6/90

NYCLD_015495

P-APP001440

T3-jm

4977

FAIRSTEIN - REBUTTAL - CROSS - BURNS

courtroom.  It's not.  I'm not the one.

This witness has a smirk on her face.

THE COURT:  Counsel.

MR.  BURNS:  I'm not smiling.  This is serious.

THE COURT:  I  realize  it's  serious, and  the  direction  I  gave  you  is appropriate.

Q     During the  time  when  Detective  Taglioni came down to the private room --

A     Yes.

Q         -- did Detective Taglioni tell you that Yusef Salaam told him that he was 16 years old;  yes or no?

A     I heard him --

THE  COURT:   Just  a minute.  Did he tell you?

THE WITNESS:  No.

Q     Did Detective  Taglioni  say  that  in  the room?

A     Yes.

Q         In the presence of his mother, did he say that specifically, that Yusef Salaam told me that he was 16 years old?

8/6/90

NYCLD_015496

P-APP001441

T4-sc

4978

FAIRSTEIN - REBUTTAL - CROSS - BURNS

A    Yes.

Q    That's what you're saying?

A    Yes.

Q    And there was no mention at that time about a wallet?

A    No, not on that night, in my presence.

Q    Nothing about a wallet in the room?

A    Not at all.

Q    Nothing said about any other piece of identification in the room?

A    Yes.

Q    Was anything said about Mt. Sinai Hospital or a Mt. Sinai Hospital medical card?

A    Nothing at all.

Q    Now, Ms. Fairstein, what time was it when you left the room, we are talking about the private room.

A    I leave it, that conversation between Taglioni and Mrs. Salaam had been completed and I directed Taglioni to go upstairs and tell McKenna to stop the questioning.

Q    And you told him to tell McKenna to stop the questioning because Yusef was 15?

A    Yes.

8/6/90

NYCLD_015497

P-APP001442

T4-sc

4979

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1
2    Q    Is that the reason?

3    A    Yes.

4    Q    And that was at what time, ma'am?

5    A    About 12:20.

6    Q    And did you leave the room then at 12:20?

7    A    Yes.

8    Q    And did Detective Taglioni leave the room
9    at the same time?

10   A    Yes.

11   Q    And was there anything said prior to your
12   leaving the room about Mrs. Salaam being able to see
13   her son?

14   A    Yes.

15   Q    Did you tell her she would be able to see
16   her son?

17   A    Yes, I did.

18   Q    After you left the room, you went back out
19   into the first room that you had the conversation
20   with Mrs. Salaam and David Nocente?

21   A    The lobby, yes.

22   Q    Did you see David Nocente at any place
23   within that lobby area?

24   A    Yes.

25   Q    Was he seated at a bench or at the side?

8/6/90

NYCLD_015498

P-APP001443

T4-sc

4980

FAIRSTEIN - REBUTTAL - CROSS - BURNS

1
2
A       I didn't remember there being any seats
3
there.  There may have been.  he came over to me  at
4
some point.
5
Q       Did  you  see  the  other  male who you
6
understood to be the fiance of the cousin?
7
A    I don't  remember  seeing  him  again  that
8
night, no.
9
Q       When you left the room, did you tell Mrs.
10
Salaam and the cousin to remain in the room?
11
A    No.
12
Q    Did there come a time when they  then  came
13
out of the room?
14
A    Yes.
15
Q       And there was a further conversation you
16
had with Mrs. Salaam?
17
A    Yes.
18
Q    Prior to having her -- to her  having  that
19
conversation  with  you, 'did  she  speak  to  David
20
Nocente or appear to be engaged in a conversation?
21
A    Yes,  they  were  in  a  group,  there  was
22
conversation.  I didn't hear it.
23
Q       Did  there come a time when Mrs. Salaam
24
asked you for some water?
25
A    No.

8/6/90

NYCLD_015499

P-APP001444

Td-sc

4981

FAIRSTEIN - REBUTTAL - CROSS - BURNS

Q    That she was thirsty?

A    No.

Q    She didn't ask you, did you know where there was some water she could drink?

A    No, she did not.

Q    But -- what time was it when you had that conversation with Mrs. Salaam, after she came out of the room?

A    (No response)

Q    Do you understand my question?

A    I'm just trying to figure out which conversation?

Q    It's the conversation you had with her after she came out of the private room.

A    There is another one you're not referring me to. The only other thing I remember was at 12:30, that she approached me and said --

Q    Where did she approach you?

A    I was in that lobby. I was in the lobby area.

Q    In the lobby?

A    Right.

Q    So this conversation at 12:30, that followed the conversation you had with her in the

8/6/90

NYCLD_015500

P-APP001445

T4-sc

4982

FAIRSTEIN - REBUTTAL - CROSS - BURNS

room?

A     Right.

Q          And you're saying it's approximately 10 minutes later?

A     Yes.

Q     And she entered -- she came to you?

A     Yes.

Q     And that's when she said, she was going to get a lawyer?

A     That's right.

Q     And who was present when she said that?

A          I believe she and I were alone when she said it.

Q     And when she said it, she was going to get a lawyer, you said words that the questioning was going to stop again?

A     No. I had directed the questioning stop and I told her it would be stopped, when she told me that he was 15.

Q          Well, did you communicate, did you tell Taglioni or send word to McKenna that the questioning was going to stop because there was an attorney-- because of an attorney being either there or involved in the case?

8/6/90

NYCLD_015501

P-APP001446

T4-sc

1                                                                  4983
              FAIRSTEIN - REBUTTAL - CROSS - BURNS
2
      A     I said --
3
      Q     Did you convey that to McKenna?
4
      A     I first conveyed to McKenna that the
5
questioning was to stop as soon as we learned that
6
Mrs. Salaam said that Yusef was 15.
7
      Q     And that was conveyed through Taglioni?
8
      A     That's right.
9
      Q     Now, the second time you conveyed it was
10
what, did you convey any information relative to the
11
fact that there was an attorney?
12
      A     I told the supervisor --
13
              MS. LEDERER:  Objection as to form.
14
              THE COURT:  I'll allow it.
15
      Q     She said, she meaning Mrs. Salaam, said
16
that she was going to get an attorney.  Upon her
17
saying she was going to get an attorney, you
18
conveyed that information to a supervisor?
19
      A     Yes.
20
      Q     You know who the supervisor was who you
21
conveyed it to?
22
      A     I believe both Captain Rowe and Sergeant
23
Cleve.
24
      Q     You didn't convey it directly to Mc Kenna,
25
is that correct?

8/6/90

P-APP001447

T4-sc

4984

FAIRSTEIN - REBUTTAL - CROSS - BURNS

A    I did not personally, no.

Q    And Detective Taglioni was not present when you conveyed the information to those two officers; is that right?

A    Right, uh-huh.

Q    How long did the conversation with Mrs. Salaam last, that 12:30 conversation last?

A    She spoke those two sentences to me, and I said, that's fine, I'll make a note of it, and that was the entire conversation.

Q    Now, you spoke to her again. Was there a subsequent conversation?

A    I don't believe that night there was, no.

Q    And your first conversation with her was about ten minutes to 12?

A    Between 10 of 12 and 12.

Q    And you left the precinct at about 12:35, 12:40?

A    No. Earlier than 12:35 and shortly thereafter, yes.

Q    And at no time during the period that you were in the precinct, was Mrs. Salaam permitted to see her son?

A    That's right.

8/6/90

NYCLD_015503

P-APP001448

T4-sc

4985

FAIRSTEIN - REBUTTAL - CROSS - BURNS

Q        And she hadn't even seen her son at the time you left?

A    I don't know.  She may have then.  I don't know.    I directed that she be allowed to.  I don't know what arrangements the police made.

Q    You made that direction at 12:20?

A    Yes.

Q    You have  no   knowledge  at  all   what  the cousin and that other person who you never knew, you don't know what time they arrived at the precinct?

A    I do not.

Q        You don't know whether they had spoken to any officers at all?

A    I --

Q    It was never brought to your attention?

A    I just  don't  know  anything  about  them except my encounter with them.

Q      You only came into the precinct insofar as that night was concerned, when  the  detective  came and told you there was a lawyer downstairs?

A    I don't understand the question.

Q       You only got involved relative to this -- your interaction with Mrs. Salaam or members of  her family,  members or their representatives, the first

8/6/90

NYCLD_015504

P-APP001449

T4-sc

4986

FAIRSTEIN — REBUTTAL — CROSS — BURNS

1  
2  time you got involved was as a result when a
3  detective came and told you that there was an
4  attorney downstairs inquiring about Salaam?
5      A    That's right.
6      Q    And that person wasn't permitted to see him
7  either, right?
8      A    I'm sorry?
9      Q    That person, who turned out to be Nocente,
10  he wasn't permitted to see him either?
11      A    He had no standing to see him.
12      Q    And aside from the mention of what Taglioni
13  said he was relying on, there was never any
14  conversation about any other pieces of
15  identification that Yusef may or may not have had?
16              MS. LEDERER:  Objection.
17              THE COURT:   If she can answer, I'll
18          allow it.
19      A    The identification, yes, Mrs. Salaam had
20  home, she would provide, about Yusef.
21      Q    I'm not talking about -- I'm talking about
22  the identification Yusef had.   The only
23  identification Yusef had, that is the bus pass, that
24  was your understanding?
25      A    That's correct.

8/6/90

NYCLD_015505

P-APP001450

T4-sc

4987

FAIRSTEIN — REBUTTAL — CROSS — BURNS

Q      And that was conveyed to you by Detective Taglioni?

A      That is correct.

Q      Thank you, Ms. Fairstein.

            MR. RIVERA: I have a few questions.

            THE COURT: Go ahead.

REBUTTAL CROSS EXAMINATION

BY MR. RIVERA:

Q      Good afternoon, Ms. Fairstein.

            Did you visit the crime scene on the 20th or 21st?

            MS. LEDERER: Objection.

            THE COURT: Sustained.

Q      You indicated you're the Assistant District Attorney in charge of the Sex Crimes Unit; is that correct?

A      Yes.

Q      And as the Assistant District Attorney in charge of that unit, you have attorneys who work for you; is that right?

A      With me, yes.

Q      Is Ms. Lederer one of the attorneys assigned to that unit?

A      The best, yes.

8/6/90

NYCLD_015506

P-APP001451

T4-sc

4988

FAIRSTEIN - REBUTTAL - CROSS - RIVERA

1

2          MR. RIVERA:  Your  Honor,  if  we  can

3     have --

4          THE     COURT:    Yes,  strike  out  the

5     answer.

6          The  question  is  a  very  simple

7     question.

8     Q     Can you answer the question?

9     A     Yes, she is.

10    Q     Now, there are also police officers who are

11    assigned to the Sex Crimes Unit; is that correct?

12          MS. LEDERER:  Objection.

13          THE COURT: I'll allow it.

14    A     Yes, there are.

15    Q          And  there  are  police  officers  in

16    specialized bureaus,  assigned  to  the  Sex  Crimes

17    Unit; is that correct?

18          MS. LEDERER:  Objection.

19          THE COURT:  I'll let her answer.

20    A     Yes.

21    Q     In fact, that night, at Central Park there

22    were police officers from the Sex Crimes Bureau,  is

23    that correct?

24          MS. LEDERER:  Objection.

25          THE COURT:  Sustained.

8/6/90

NYCLD_015507

P-APP001452

T4-sc

4989

FAIRSTEIN - REBUTTAL - CROSS - RIVERA

Q        Did you see any police officers from the Sex Crimes Bureau that night on the 20th?

MS. LEDERER:  Objection.

THE COURT: I'll allow it.

A    I'm trying to remember. I  spoke  to  --  I can't remember seeing any.

What period of time?

Q    You were there from, you indicated, 8:00 to 12:30; is that correct?

A    I don't remember seeing any members of the Squad at the 20th Precinct in that period, no.

Q    Now, you also indicated that you received a phone call at about 9:00 in  the  morning,  is  that correct?

A    Yes.

Q     And do you recall who called you at about that time?

A    Yes.

Q    And who is that?

A    I'm  quite  sure  it  was  Sergeant  Robert Fitson,  who  is  the  supervising  officer  of  the Manhattan Sex Crimes Squad.

Q    That was about 9:00 in the morning?

A    Yes.

8/6/90

NYCLD_015508

P-APP001453

T4-sc

1                                                                    4990

FAIRSTEIN — REBUTTAL — CROSS — RIVERA

2

3      Q      Of the 20th?

A      Yes.

4      Q      Did  you  request  of  Sergeant  Fitson  he

5  assigned  detectives  from  the  Manhattan  North

6  Homicide?

7      A      I don't have any ability to  ask  a  police

8  officer to assign --

9                    THE COURT:  The question is did you?

10                    THE WITNESS: No, I did not.

11      Q         You  had worked on other occasions with

12  detectives from the  Manhattan  North  Homicide;  is

13  that right?

14                    MS. LEDERER: Objection.

15                    THE COURT:  Sustained.

16      Q         You, yourself, are a trial attorney; is

17  that correct?

18                    MS. LEDERER:  Objection.

19                    THE COURT:  I'll let her answer.

20      A      Yes.

21      Q      And  you  tried  highly  publicized  cases

22  before; is that correct?

23                    MS. LEDERER:  Objection.

24                    THE COURT:  Sustained.

25      Q         You attended a briefing at about 8:00 in

8/6/90

NYCLD_015509

P-APP001454

T4-sc

4991
FAIRSTEIN - REBUTTAL - CROSS - RIVERA

the evening, is that correct?

Q     A     I arrived after 8:30 in the evening.

Q     Did you attend a briefing at about 8:30   to
9:30 at the 20th Precinct?

A     Yes.

Q     And was Detective Sheehan at that briefing?

A     No, he was not.

Q     Was Detective Hartigen at that briefing?

MS. LEDERER:   Objection, your Honor,
this is beyond the scope.  The witness is a
rebuttal witness.

THE COURT:  Yes.  I'll allow it.

A     He was not there when the  briefing  began.
He may have been called in to answer some questions.
But  he  was  not  part  of the group there, I don't
believe.

Q     You recall him being called  in  to  answer
questions, is that correct?

A     I believe so.

Q        Was  Detective  Arroyo  present  at that
briefing?

A     I don't remember him being there.

Q     And was Captain Rowe at that briefing?

A     In  and out, doing other things, but there.

8/6/90

NYCLD_015510

P-APP001455

T4-sc

4992

FAIRSTEIN — REBUTTAL — CROSS — RIVERA

Q   By the way, what is the assignment of Captain Rowe, if you know?

MS. LEDERER:  Objection.

THE COURT: I'll allow it.

A   I don't know.

Q   Is he a detective captain or is he a patrol captain?

MS. LEDERER: Objection.

THE COURT:  I'll let her answer.

A   I don't know.

Q   What about Sergeant Cleve, is he a detective sergeant or a patrol sergeant?

A   I don't know.

Q   And how long were you at that briefing?

A   An hour, approximately, a little longer.

Q   And the purpose of that briefing was the attack on the female jogger; is that correct?

A   The entire event of the preceding night in the park.

Q   With special emphasis on the female jogger; is that correct?

A   It was a comprehensive coverage.

Q   When you say comprehensive, we're talking about all inclusive; is that correct?

8/6/90

NYCLD_015511

P-APP001456

T4-sc

1                                                                    4993

FAIRSTEIN — REBUTTAL — CROSS — RIVERA

2            MS. LEDERER:  Objection.

3            THE COURT:  I'll let her answer.

4      A    I just don't know what you mean.

5      Q       You used the term comprehensive.  When you

6  use the term comprehensive, all aspects of the   case

7  were discussed, is that correct?

8      A          Not   in   one   hour.   We   attempted to

9  summarize,  to   be   brought   to   date   on   the

10 investigation.

11     Q        And there were police officers who were

12 bringing the others up to date; is that correct?

13     A    Yes.

14     Q    And   there   was   a   give   and   take   and   a

15 question   and   answer going on during this briefing,

16 is that correct?

17     A    Some of them, yes.

18     Q    And there was no time limitation, there was

19 no specific time limitation that was placed on   this

20 briefing; is that correct?

21            MS. LEDERER:  Objection.

22            THE COURT: I'll allow it.

23     Q       In other words, the briefing was not only

24 -- there was no indication   that   the   briefing   was

25 only going to be for one hour?

8/6/90

NYCLD_015512

P-APP001457

T4-sc

4994

FAIRSTEIN — REBUTTAL — CROSS — RIVERA

1
2    A    No.

3    Q    And the female jogger was discussed during
4    this briefing; is that correct?

5    A    Certainly.

6    Q    And her medical condition was discussed; is
7    that right?

8    A    Yes.

9    Q    And events at that crime scene were
10   discussed, is that right?

11   A    Yes.

12   Q    And information that was uncovered at the
13   crime scene was discussed; is that correct?

14   A    I don't remember.  I'm not sure I know
15   exactly what you mean.

16   Q    Well, police officers were talking about
17   the crime scene, the location of the crime scene,
18   the description of the crime scene, isn't that
19   correct?

20   A    Yes.

21   Q    And other evidence that was uncovered at
22   the park was also discussed; is that correct?

23               MS. LEDERER:  Objection.

24               THE COURT:  I'll let her answer.

25   A    No, sir.

8/6/90

NYCLD_015513

P-APP001458

T4-sc

4995

FAIRSTEIN - REBUTTAL - CROSS - RIVERA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Q        The only evidence that was discussed was the crime scene, is that correct?    And the reservoir?

A    The only evidence, is that the question?

Q        The information that was discussed during this briefing was that evidence concerning the crime scene and the reservoir area, is that correct?

A    It was about the investigation and the individuals involved in the investigation.

Q    Did they talk about possible suspects?

A    Yes.

Q        Did they talk about anybody being under arrest?

A    No.

Q    And that lasted about an hour; is that correct?

A    Yes.

Q    And about 9:30 the meeting broke up?

A        Not that it actually broke up, a lot of things were going on.  A lot of us were in and out of the room actively doing things.

Q        You asked questions during this briefing; is that correct?

A    Ms. Lederer did.

8/6/90

NYCLD_015514

P-APP001459

Td-sc

4996

FAIRSTEIN - REBUTTAL - CROSS - RIVERA

1

2      Q      And the other detectives also were able to

3  ask questions during the briefing; is that correct?

4      A      Some did.

5      Q      You are familiar with Central Park, is that

6  correct?

7      A      Yes.

8      Q      You performed other investigations in

9  Central Park, is that correct?

10                MS. LEDERER:  Objection.

11                THE COURT:  Sustained.

12                MR. RIVERA:      No further questions,

13           Judge.

14                THE COURT:  Mr. Joseph?

15                MR. JOSEPH:  I have no questions.

16                THE COURT:  You have anything else?

17  REBUTTAL REDIRECT EXAMINATION

18  BY MS. LEDERER:

19      Q      You indicated that on the morning of April

20  20 you received a phonecall regarding what had

21  happened in Central Park on the prior evening and

22  morning of April 20th.   Is it unusual for the

23  District Attorney's office to be notified in a

24  possible homicide case?

25                MR. BURNS:  I'm going to object to

8/6/90

NYCLD_015515

P-APP001460

T4-sc

4997

FAIRSTEIN — REBUTTAL — REDIRECT — LEDERER

1

2          that, your Honor.  I wasn't permitted to

3          explore that in any detail.

4                    THE COURT:  I'll permit that.

5                    MR. JOSEPH:  I'll note my objection.

6      A      Yes, it is the practice of the Police

7  Department.

8      Q      It is the practice of the Police Department

9  to what?

10     A        To notify, to call the District Attorney's

11 office and notify us of the possibility of

12 involvement in a homicide case and request our

13 assistance for the investigation and possible  video

14 taping.

15     Q        I'd like to direct your attention to the

16 time where you indicated that you had been  informed

17 by Mrs. Salaam that Yusef was 15 years old and you

18 indicated you did not immediately, at that time, cut

19 off the questioning, but instead sent for  Detective

20 Taglioni.  Was there a reason you did not terminate

21 the questioning of Yusef Salaam when the mother told

22 you he was 15?

23                    MR. BURNS:  Objection, your Honor.

24                    THE COURT:  I'll allow it.

25     A      Yes.

8/6/90

T4-sc

4998

FAIRSTEIN — REBUTTAL — REDIRECT — LEDERER

Q    What was that reason?

A    Two-fold.  One because I had seen a printed figure with an actual date of birth that I know the detectives had gotten from some source, and then wanted them to explain that to Mrs. Salaam and see what her counter to that was.    And, secondly, because it is a very common occurrence for parents of minors to tell me and my colleagues that the age of an individual is not what we believe it to be.

Q    When you were at the 20th Precinct, did any detective ever tell you that any family member had come to the second floor of the 20th Precinct and had a conversation with a detective on the second floor?

A    No, I never heard that.

Q    Did Detective Taglioni ever mention to you that he had a conversation with any family member on the second floor of the precinct?

A    No, he did not.

Q    You indicated you made a phonecall from the lobby of the 20th Precinct.  About what time did you make that phonecall?

A    I made that phonecall between 10 and five of midnight.

8/6/90

T4-sc

4999

FAIRSTEIN - REBUTTAL - REDIRECT - LEDERER

1

2

Q     And who did you call at that time?

3

A     I called my husband.

4

Q     Thank you very much.

5

MS. LEDERER:   I have nothing further.

6

THE COURT:   Anything else, Mr. Burns?

7

REBUTTAL RECROSS EXAMINATION

8

BY MR. BURNS:

9

Q       Ms. Fairstein, who was it that called you

10

on the morning of the 20th from the Police

11

Department?

12

A       I said, I believe it was Sergeant Robert

13

Fitson.

14

Q     Was it he?

15

A     To the best of  my  recollection,  at  this

16

point.

17

Q     And who is Sergeant Fitson?

18

A     He was, at the time, commanding officer of

19

the Manhattan Sex Crimes Squad.

20

Q     Was that a unit of the Police Department or

21

is that a unit within your -- the District

22

Attorney's office?

23

A     That is a unit of the Police Department.

24

Q     And the Sergeant Vincent was the commanding

25

officer of the Sex Crimes Squad?

8/6/90

NYCLD_015518

P-APP001463

T5-jm

5000

FAIRSTEIN — REBUTTAL — RECROSS — BURNS

A    Right.

Q    You know where he was calling from?

MS. LEDERER: Objection.

THE COURT: Objection sustained.

Q    What time did he make that call?

A    Between 8:45 and 9:15 that morning.

Q    He called you at home?

A    No, no, at the office.

Q    He called you at the office?

A    (Witness nods)

Q    And he notified you at that time that a female jogger had been found in Central Park almost near dead?

A    Are you asking me if that's what he said or --

MS. LEDERER: Objection, objection.

THE COURT:  Objection sustained.

Q    In the notification, did he -- he notified you that --

MR. BURNS:  Withdrawn.

Q    He called you in relation to something that had happened in Central Park on the evening of April 19th?

A    Yes.

8/6/90

AM008091

NYCLD_015519

P-APP001464

T5-jm

5001

FAIRSTEIN - REBUTTAL - RECROSS - BURNS

Q        And  did  he  call  you  in  relation  to something   happening   to   a   female   who   was   in Metropolitan Hospital?

A     Yes.

Q    Did  he  also  say  that  that  person  who  was  in Metropolitan  Hospital  was  near  death;  or  it  was  a possibility of her dying?

A     He told me that the doctors did not expect her to live.

Q    He told you that the person was near death?

A     Yes.

Q    Did he ask for your assistance in the doing the  video  taping  in  the  event  that  they  received statements for videotaping, is that correct?

MR.  JOSEPH:  Objection,  Judge,  as  to what somebody else said.

THE  COURT:  She's  already  testified. So, I'll let her testify.

A     That was a little premature at that point. He asked for our assistance in the investigation and two,  to  be  available  throughout  the  day,  should, should they call upon us for help.

Q        And that would be the help in obtaining statements.

8/6/'90

NYCLD_015520

P-APP001465

TS-jm

5002

FAIRSTEIN - REBUTTAL - RECROSS - BURNS

1

2          MS. LEDERER:   Objection.

3          THE COURT:   Sustained.

4     Q      You weren't -- you weren't asked to
5  investigate -- you were not asked to, to, to look
6  for clues, were you?

7          MS. LEDERER:   Objection.

8          THE COURT:   Sustained.

9     Q      Wasn't -- isn't it a fact that the
10 assistance that you were rendering was the
11 connection with legal questions that would come up
12 in the course of the investigation?

13         MS. LEDERER:   Objection.

14         THE COURT:   I'll let her answer it.

15    A      That is part of it, yes.

16    Q      Your assistance, did it involve actually
17 going out and looking for clues?

18         MS. LEDERER:   Objection.

19    A      We leave that --

20         MS. LEDERER:   Objection.

21         THE COURT:   Sustained.

22    Q      And the assistance that you rendered, you
23 were able to render from your office at 80 Centre
24 Street?

25         MS. LEDERER:   Objection.

8/6/90

NYCLD_015521

P-APP001466

TS-jm

5003

FAIRSTEIN - REBUTTAL - RECROSS - BURNS

1

2   Q    Up until 8:00 that night?

3           MS. LEDERER: Objection.

4           THE COURT:  Sustained.

5   Q       Did  you  render  assistance   to   the
6   investigation between the time that you had received
7   the  call,  at  8:45 to 9:15 in the  morning, did you
8   render any assistance prior to 8:30?

9           MS. LEDERER:  Objection.

10          THE COURT:  Sustained.

11  Q    Did Ms. Lederer --

12          MR. BURNS:  Withdrawn.

13  Q    What time did you assign Ms. Lederer to the
14  case?

15  A    I believe it was 9:15 that morning.

16  Q       Did  you  have  any  contact  with  any
17  detectives,  any  of  the investigating officers, in
18  the Central Park Precinct, from 9:15 until 8:30?

19          MS. LEDERER:  Objection.

20          THE COURT:  I'll let her  answer  just
21          yes or no.

22  A    Did I personally is the question?

23          No, I did not.

24  Q       And  were  you  present  when the first
25  videotaping occurred?

8/6/90

NYCLD_015522

P-APP001467

T5-jm

5004

FAIRSTEIN — REBUTTAL — RECROSS — BURNS

1
2          MS. LEDERER:  Objection.

3          THE COURT:  Sustained.

4     Q    And that occurred in the  20th,  the  first

5  videotaping?

6          MS. LEDERER: Objection.

7          THE COURT:  Sustained.

8     Q          Did any of the videotaping take place in

9  the 20th Precinct?

10         MS. LEDERER:  Objection.

11         THE COURT:  Sustained.

12    Q    The bus pass, when Taglioni came downstairs

13 to the private room, he brought the  bus  pass  with

14 him?

15    A    I don't believe he did.

16    Q    When --

17    A    I didn't see it at that time.

18    Q     When you looked at the memo book, prior to

19 going down to speak to David Nocente,  did  Taglioni

20 show you the bus pass at that time?

21    A    No.

22    Q    Thank you.

23         THE WITNESS:  Thank you.

24         (Witness excused)

25         MR. JOSEPH:  May we approach?

8/6/90

NYCLD_015523

P-APP001468

Colloquy                                          3016

1

2          (Witness leaves the courtroom.)

3          MR. MOORE:  Can we just approach for one

4     minutes?

5          THE COURT:  Yes.

6          (At this time counsel approached the bench.)

7          THE COURT:  We'll take a short recess,

8     members of the jury.

9          Don't discuss the case or come to any

10    conclusions about it.

11         Wait in the jury room.  We'll be back

12    shortly.

13         (Jury leaves courtroom.)

14         (Recess)

15         COURT OFFICER:  Come to order.

16         THE COURT:  People ready?

17         MS. LEDERER:  Yes.

18         THE COURT:  Defendants ready?

19         MR. DILLER:  The defendant's ready.

20         MR. MOORE:  Yes.

21         THE COURT:  All right, bring out the jury.

22         COURT OFFICER:  Jurors entering.

23         (Jury enters courtroom.)

24         COURT CLERK:  The defendants, their

25    attorneys, the assistant district attorneys and

Michael Frankel, Sr. Court Reporter

P-APP001469

Fairstein / People / Direct (Lederer)          3017

all sworn jurors are present.

    THE COURT:  Who's the next witness, please?

    MS. LEDERER:  Linda Fairstein.

    COURT OFFICER:  Place your left hand on the Bible, raise your right and face the court clerk, please.

    COURT CLERK:  Do you solemnly swear the evidence you'll give the Court and jury shall be the truth, the whole truth and nothing but the truth, so help you God?

    THE WITNESS:  I do.

L I N D A   F A I R S T E I N, a witness herein on behalf of the People being first duly sworn, testified as follows:

    COURT OFFICER:  Please be seated.

    In a loud clear voice, state your name spelling your last name.

    THE WITNESS:   Linda Fairstein, F-A-I-R-S-T-E-I-N.

DIRECT-EXAMINATION BY

MS. LEDERER:

    Q.  Where are you employed, Miss Fairstein?

    A.  At the New York County District Attorney's Office.

    Q.  And what is your position with the New York County

Michael Frankel, Sr. Court Reporter

1
2     District Attorney's Office?

3          A.    I'm an assistant district attorney.   I'm in charge

4     of the Sex Crimes Prosecution Unit of this office.

5          Q.    How long have you been with the district

6     attorney's office?

7          A.    Eighteen years.

8          Q.    I'd like to direct your attention to approximately

9     7:00 a.m. on the morning of April 21st, of 1989.   Where were

10    you at approximately that time, on that date?

11         A.    I was at the 24th police precinct, in New York

12    County.

13         Q.    Did you have a conversation or a discussion with

14    anyone at that time at the 24th Precinct?

15         A.    Yes.   I had several discussions starting at that

16    time.

17         Q.    And did you have any discussions with a Detective

18    Sheehan?

19         A.    Yes, I did.

20         Q.    And who else was present during the conversation

21    you had with Detective Sheehan?

22         A.    The first conversation I had with him, at that

23    time we were alone together.

24         Q.    As a result of your conversation with Detective

25    Sheehan, what, if anything, did you do?


Michael Frankel, Sr. Court Reporter

Fairstein / People / Direct (Lederer)                3019

1

2      A.    I made a decision to return to or to go to Central

3   Park that morning, the area of the Cross Drive and about

4   102nd Street and to ask Kevin Richardson and Kharey Wise if

5   they would be willing to accompany us there.

6      Q.    After reaching that decision, what, if anything,

7   did you do?

8      A.    I asked Detective Sheehan if he would introduce me

9   to the father of Kevin Richardson.  And I had a conversation

10  with the gentleman who was introduced to me as Kevin's

11  father.

12     Q.    Where did that conversation take place?

13     A.    It took place in the large second floor detective

14  squad room at the 24th Precinct.

15     Q.    And at the time that you were introduced to Mr.

16  Richardson, who else was present?

17     A.    Detective Sheehan, Kevin Richardson was seated

18  within feet of us.

19     Q.    What, if anything, did you say to Mr. Richardson

20  and what, if anything, did he say to you?

21     A.    We were introduced to each other.  I identified

22  myself.  I explained my role in the proceedings.  I told him

23  that I knew that Kevin had just completed making a statement

24  to Miss Lederer who had interviewed him on video tape, which

25  I knew Mr. Richardson was present.  I told him I wanted to

Michael Frankel, Sr. Court Reporter

NYCLD_015527

P-APP001472

Fairstein / People / Direct (Lederer)          3020

go back to the park, go to the park and would like Kevin to

accompany me and the detectives.  And I told him that he,

Mr. Richardson, had the right to go with us because of

Kevin's age and explained what our purpose was and asked him

if he wanted to accompany us to the park.

    Q.   What, if anything, did Mr. Richardson say?

    A.   He said -- he asked me if after Kevin went to the

park, would he be brought back to that precinct so Mr.

Richardson could see him again.  I said "yes".  He said then

he did not want to go to the park, that we could take Kevin

and go to the park and return.

    Q.   Approximately how long did that conversation with

Mr. Richardson last?

    A.   Two or three minutes.

    Q.   At the time that you had this conversation with

Mr. Richardson with respect to going to the 102nd Street

Cross Drive, had you yourself been there during the --

either on April 20th or on the morning of April 21st?

    A.   I had not been there before.

    Q.   After you had the conversation that you described

with Mr. Richardson, what, if anything, did you see Mr.

Richardson do?

    A.   Mr. Richardson --

       MR. MOORE:  Which Mr. Richardson are we

Michael Frankel, Sr. Court Reporter

NYCLD_015528

P-APP001473

Fairstein / People / Direct (Lederer)                    3021

      talking about?

          MS. LEDERER:   Kevin Richardson's father?

A.    Senior, I believe had a conversation with Kevin.

Q.    And where was Detective Sheehan during the
conversation that you had with Mr. Richardson?

A.    He was a foot or so away from me, talking to Kevin
Richardson.

Q.    After speaking to Kevin Richardson's father, did
you speak to anyone else in the squad room of the second
floor of the 24th Precinct?

A.    Yes.   In that same room, several feet away at
another desk, was Kharey Wise.   And I then had a
conversation with Kharey Wise.

Q.    Prior to having a conversation with him at that
time, had you had any conversation with Kharey Wise prior to
that?

A.    No, I had not.

Q.    What was Kharey Wise doing when you approached him
and had the conversation?

A.    He was sitting at a desk not doing anything, not
talking to anyone but sitting at a desk.

Q.    Were other people in the squad room of the 24th
Precinct at this time?

A.    Yes.   It was a very large room and there were a

Michael Frankel, Sr. Court Reporter

NYCLD_015529

P-APP001474

1  

2 lot of people present.  There were young men.  There were

3 families of young men.  There were a lot of detectives in

4 civilian clothes present.

5     Q.   What, if anything, did you say to Kharey Wise when

6 you approached him?

7     A.   I introduced myself.  I explained what my position

8 was.  I told him that I wanted to go to the park and wanted

9 to ask if he would accompany me but that I was first going

10 to read him his rights.  And so I had read him his rights

11 and then explained to him what my purpose was after I had

12 done that.

13     Q.   And at that time, did you read something to him?

14     A.   Yes, I did.

15     Q.   And what did you read to him?

16     A.   I carry a card in my wallet --

17        MR. MOORE:  Objection, not responsive.

18     A.   I took a card from my wallet and read from this

19 card a number of questions.  And I asked Kharey Wise the

20 questions.

21        MS. LEDERER:  If I could ask please if this

22        could be marked as People's 184 for

23        identification.

24        (So marked.)

25        MS. LEDERER:  If the witness could be shown

 

Michael Frankel, Sr. Court Reporter

NYCLD_015530

P-APP001475

Fairstein / People / Direct (Lederer)          3023

what's been marked as People's 184 for

identification.

    (Given to witness.)

Q.  Do you recognize what that is?

A.  Yes.

Q.  What do you recognize that to be?

A.  This is the card with the so called Miranda

warnings or rights on it which I used on the morning of the

21st to read and ask questions to Kharey Wise.

Q.  Are those the rights that you read to Kharey Wise

on that morning?

A.  Yes, they are.

    MS. LEDERER:  At this time I would offer

People's 184 in evidence.

    (Shown to defense counsel.)

    THE COURT:  Any objection?

    MR. MOORE:  No.

    THE COURT:  Mark it.

    (So marked.)

    (Given to witness.)

Q.  I would ask you please to read the rights that you

read and as you read them to Kharey Wise and indicate what

answer, if any, he gave to anything that you said to him at

that time.

    Michael Frankel, Sr. Court Reporter

Fairstein / People / Direct (Lederer)          3024

A.    I read him the first one.

I said, "You have the right to remain silent."  I

then asked, "Do you understand that?"

"Do you understand that," is not written on the

card.  I asked that afterwards.

He said, "yeah" or "yes".

I said, "Anything you say can and will be

used against you in a court of law.  Do you understand

that?  He said "yeah".

I said, "You have the right to talk to a lawyer or

have a lawyer present with you while you're being

questioned.  Do you understand that?  He said, "yes".

"If you can not afford to hire a lawyer, one will

be appointed to represent you before we question you,

before any questioning, if you wish.  Do you understand

that?  He said, "yes".

And the fifth one was, I said, "You can decide at

any time to exercise these rights, to tell us you want

a lawyer and not answer any questions or make any

statement.  Do you understand that?  And he said,

"yes".

I turned the card over and I asked him if he

understood each of the questions I had asked him.  He said,

"yes".

Michael Frankel, Sr. Court Reporter

NYCLD_015532

P-APP001477

1              Fairstein / People / Direct (Lederer)          3025

2              And I said, "having -- I used the words on here.

3         I said, "Having these questions in mind, will you

4    answer my questions now.  And he said, "yes".

5                   (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                   Michael Frankel, Sr. Court Reporter

NYCLD_015533

P-APP001478

Fairstein/direct/People                    3026

1

2    Q    What color is that exhibit, 184 in evidence?

3    A    It's a white card with print on it.

4    Q    After reading those rights and receiving the

5    answers that you've just described, did you say anything to

6    Kharey Wise?

7    A    Yes.

8    Q    What, if anything, did you say to him?

9    A    I told him that I intended to go with the

10   detectives to Central Park to the cross drive about 102nd

11   Street.  And I asked him if he would be willing to come with

12   us.

13       I knew he had been talking to police officers.  I told

14   him that I knew that he was waiting to be interviewed by

15   Miss Lederer, and that if he was willing to do that when he

16   came back from the park, that would happen thereafter.  But

17   I wanted to clarify statements that had been made about

18   where certain events had happened in the park, if he would

19   go with us.

20       He said that he would.

21   Q    At the time that you had that conversation with

22   Kharey Wise, had you read a statement that he had made and

23   signed to John Hartigan?

24   A    I had not.

25   Q    After you said what you've just described to Kharey

Fairstein/direct/People                3027

1  Wise, what did he say to you?

2      A    He said, yes or yeah, that he would come with us.

3      Q    Did you leave the 24th Precinct at that time?

4      A    Moments -- minutes later, yes.

5      Q    And who went with you when you left?

6      A    I left in an unmarked police car which was driven

7  by Detective Sheehan.  And with us also was a detective

8  named Augie Jonza, Kevin Richardson, Kharey Wise.

9      Q    During the morning hours of April 21st, had other

10 persons been taken to the Central Park crime scene to the

11 102nd Street cross drive?

12     A    Yes.  During  --  between midnight and 7 o'clock in

13 the morning other young men had been taken to the park in

14 darkness by other detectives.  I did not accompany them.

15     Q    Where were Kharey Wise and Kevin Richardson in the

16 car that you've just described?

17     A    They were both seated in the back seat of the car.

18 I was in the front seat.  There was a Detective Jonza

19 between them.  Neither was handcuffed.

20     Q    Approximately how long did it take to get to

21 Central Park?

22     A    Less than fifteen minutes to get to that location

23 within the park that we went to.

24     Q    Where did you go within Central Park?

P-APP001480

1                    Fairstein/direct/People            3028

2       A     We entered on the west side about a Hundred or

3    110th Street.  110th Street.  And drove down.

4       And as we got on the 102nd Street cross drive and

5    proceeded from the west side towards the east our unmarked

6    car was stopped by a radio car, a blue and white police car.

7       Q     Was a conversation had at the time when your car

8    was stopped by a radio car?

9       A     Yes.

10      Q     And did you speak to anybody in the radio car?

11      A     As I recall Detective Sheehan and I both got out of

12   the car.  He did the talking to the other police officer.

13      Q     How long did that conversation last?

14      A     Two or three minutes.

15      Q     What happened after that conversation?

16      A     After that conversation, the other police car

17   pulled away.  Detective Sheehan and I asked Kevin Richardson

18   to step out of the car.

19      Q     And did Kevin Richardson get out of the car at that

20   time?

21      A     Yes, he did.

22      Q     Did either you or Detective Sheehan have a

23   conversation with Kevin Richardson at that time?

24      A     Yes.

25      Q     Would you tell the members of the jury what that

1                    Fairstein/direct/People              3029

2   conversation was?

3       A    We were standing in the paved roadway at 102nd

4   Street.  And Detective Sheehan said to Kevin, "does this

5   area -- does any of this look familiar to you?"

6       And Kevin Richardson said, "yes.  This is where we got

7   her".

8       Q    Was anything else said to Kevin Richardson at that

9   time?

10      A    Nothing that I recall.

11      Q    And what happened after he said that?

12      A    Then we asked him to get back into the car.  And we

13  asked Kharey Wise to step out onto the roadway.

14      Q    And did Kharey Wise get out of the car at that

15  time?

16      A    Yes, he did.

17      Q    And was there a conversation with Kharey Wise at

18  that time?

19      A    Yes.

20      Q    Would you tell the members of the jury what that

21  conversation was?

22      A    Again it was Detective Sheehan who spoke, who asked

23  Kharey if that  --  if anything in that area was familiar to

24  him or looked familiar to him.  And Kharey answered.

25      Q    And what did Kharey Wise say?

Fairstein/direct/People                    3030

1

2     A     He pointed to the roadway we were standing on and

3   said, "this is where they snatched her."

4     And he described then -- he pointed south of the roadway

5   to the ball fields that were there and said that he was

6   running to where the woman was and could see the other kids,

7   he said, snatch her, meaning the woman who had been

8   assaulted on the roadway.

9     Q     After Kharey Wise said that, was there any further

10  conversation with him?

11    A     No, there was not.

12    Q     What happened next?

13    A     Kharey got into the back seat of the car again.

14  Detective Sheehan and I got into the front seat of the car.

15  We were then led by this patrol car further east to a

16  clearing north of the roadway.

17    And the officer -- the two cars followed each other or

18  we followed the patrol car down a clearing, down actually a

19  steep incline to a pathway at the bottom of the steep hill.

20    Q     What happened when you arrived on the lower roadway

21  or the path that you've described?

22    A     Detective Sheehan and I got out of the car.  I

23  believe Detective Jonza and Kevin and Kharey were still in

24  the car.  And Sheehan and I were led up that pathway and

25  around the area by the uniformed police officer who was

NYCLD_015538

P-APP001483

1                    Fairstein/direct/People            3031

2    there.

3        Q    Where did you go exactly?

4        A    We walked from where the two cars were parked

5    further west along the pathway.  And the uniformed officer

6    was more familiar with the location, pointed some things out

7    to us, after which Detective Sheehan and I began to walk up

8    the hill in the direction actually of the paved roadway from

9    which we had driven.

10       Q    And when you say, "from the paved roadway from

11   which we had driven," are you referring to the 102nd Street

12   cross drive?

13       A    Yes, sir.

14       Q    What, if anything, did you observe in that area?

15       A    As we proceeded to walk up from the pathway, we

16   came upon an area which I observed a large amount of what

17   appeared to be dried blood or red substance on an area of

18   leaves and sticks on the ground.

19       Q    Had you been to that location or seen what you have

20   just described prior to the moment that you arrived with

21   Detective Sheehan?

22       A    No, I had not.

23       Q    What happened after you arrived at that location?

24       A    Detective Sheehan and I talked.  And then Detective

25   Sheehan called out to Detective Jonza, who was down at the

Fairstein/direct/People                3032

1  car, to ask him to send Kevin Richardson up to where we were

2  standing.

3

4      Q     And did there come a time where Kevin Richardson

5  approached where you were?

6      A     Yes, he did.

7      Q     Was there any conversation with Kevin Richardson

8  when he approached where you and Detective Sheehan were?

9      A     Yes.  Kevin Richardson walked up the incline to the

10 approximate area which we were standing.  He walked alone.

11 And when he got there, Detective Sheehan asked him to look

12 around and asked if any of that area -- what in that area

13 looked familiar to him.

14     Q     Did Kevin Richardson respond?

15     A     Yes.

16     Q     What did he say?

17     A     He pointed to the area where the blood was and he

18 said, "this is where it happened."  Detective Sheehan said,

19 what happened?  And Kevin's answer was, "The raping."

20     Q     Was there any further conversation with Kevin

21 Richardson at that time?

22     A     No.  Other than Detective Sheehan said he could go

23 back to the car now.

24     Q     And did he proceed to leave where you were and go

25 back to the car?

Fairstein/direct/People                    3033

2     A    Yes.

3     Q    After he left where you were, what was the next

4  thing that happened?

5     A    As Kevin was walking back, Detective Sheehan put

6  his hands to his mouth and called out to Detective Jonza,

7  "send Kharey up here."  And the two young men passed each

8  other as Kharey walked up to us.

9     Q    What, if anything, happened as Kharey Wise

10  approached where you and Detective Sheehan were?

11     A    He got within several feet of the area that we were

12  standing near.  And he, before anybody asked him anything,

13  began talking and saying, "damn, damn, that's a lot of

14  blood.  That's a lot of blood.  Damn."

15     Q    After he said those words, did either you or

16  Detective Sheehan say anything to him?

17     A    Detective Sheehan said, I believe the phrase was,

18  "does that surprise you or why does that surprise you?  "

19  and Kharey answered, "I knew she was bleeding.  But it was

20  dark and I couldn't see how much blood there was.  This is

21  bad."

22     Q    Was there any further conversation with Kharey Wise

23  at that time?

24     A    Then Detective Sheehan asked him if anything in the

25  area looked familiar to him.

NYCLD_015541

P-APP001486

1                    Fairstein/direct/People              3034

2       Q    What did Kharey Wise say?

3       A    He said, yeah."  He said, "this is where they raped

4  her."  Then he said, "we dragged her."  Then he said, "they

5  dragged her down here."

6       Q    Did you say anything further to Kharey Wise at that

7  time?

8       A    I did not.

9       Q    Did Detective Sheehan say anything?

10      A    I believe that's when Detective Sheehan asked him

11 could he point out a tree that he claimed to have been

12 behind when he observed  --  when he made his observations.

13      Q    What, if anything, did Kharey Wise do at that time?

14      A    He looked around, and there were no trees

15 immediately around us, and he looked at but could not

16 describe or point to a tree that he had been hiding behind.

17      Q    You indicated earlier that you had not seen or read

18 a written statement that had been signed by Kharey Wise

19 earlier on that morning.

20      Had you had any conversation with any detectives about

21 what Kharey Wise had said?

22      A    Yes.

23      Q    And to your knowledge, what had Kharey Wise said at

24 the time the prior  --  what statements had he made prior to

25 your taking him to the crime scene on that morning?

P-APP001487

Fairstein/direct/People                3035

1
2          MR. MOORE:  Objection to the form.

3          THE COURT:  Come up here for a minute.

4          (Whereupon, the following occurred at sidebar:)

5          THE COURT:  What is your objection?

6          MR. MOORE:  As to what she heard from some

7    officer?

8          THE COURT:  She was asked if she had read this

9    statement.  She said no.  She was asked if she had

10   talked to any detectives about what he had said and

11   she said yes.  And she said, what was she told.

12         MS. LEDERER:  You just cross-examined Detective

13   Sheehan for an hour about what he --

14         MR. MOORE:  Yeah.  But not her.

15         MS. LEDERER:  I'm asking her what she knew

16   about the statement or any information about what

17   Kharey Wise had said prior to going to the scene.

18         MR. MOORE:  I understand.  But what's she's

19   going to testify, some hearsay from some officer?

20         THE COURT:  That's what she's going to say.

21   It's all hearsay.  What somebody else told her is

22   hearsay.  All the other hearsay has been asked

23   about what people said, what information they had.

24   It's been in the record constantly and not objected

25   to.

NYCLD_015543

P-APP001488

1               Fairstein/direct/People              3036

2          MR. MOORE:  Is this some surprise  --  I just

3     want to know where we're going.

4          MS. LEDERER:  I don't believe it's a surprise.

5     This witness will testify  --  this witness

6     testified at the hearing and was cross-examined.

7     She will testify as to what she believed he had

8     indicated prior.

9          MR. MOORE:  To Detective Nugent or to detective

10    --

11         MS. LEDERER:  All I'm eliciting from this

12    witness is what was in her mind, what she knew

13    about what he had said about having been involved

14    or present or not involved or not present or behind

15    the tree.

16         You spent a good deal of time with the other

17    detective  --  with Detective Sheehan, who was at

18    the scene.

19         MR. MOORE:  This is Fairstein.

20         THE COURT:  Let's cut this short.  I'm going to

21    allow the testimony because the sense of this

22    entire trial has been that this information has

23    been brought out with every single witness who was

24    a police witness as to what they knew, who told

25    them what.  I don't see how it's different with

NYCLD_015544

P-APP001489

1        this witness.

2             MR. MOORE:  I understand.  I want to know if

3   it's from Nugent or  --

4             THE COURT:  We'll know in a couple of minutes.

5   Do you know what she's going to say?

6             MS. LEDERER:  No.  I will not ask that either.

7             MR. MOORE:  I'm not  --  it's not an anonymous

8   source?

9             THE COURT:  We'll strike it out if it's

10  anonymous.  If she doesn't know who told her I'll

11  strike it.

12            She has no knowledge who she spoke to?

13            MS. LEDERER:  I don't know.

14            THE COURT:  We'll find out.

15            (Whereupon, the following occurred in open

16  court:).

17  Q    Prior to going to the crime scene with Kharey Wise

18  on that morning, were you familiar with anything he had said

19  about his involvement in the assault on the female on the

20  night of April 19th in Central Park?

21  A    Yes, I was.

22  Q    And what did you know?

23            MR. MOORE:  Objection as to form.

24            THE COURT:  Objection sustained.

NYCLD_015545

P-APP001490

1                    Fairstein/direct/People            3038

2      Q      What, if anything, had you heard prior to going to

3  the crime scene?

4                    MR. MOORE:   Objection.

5                    THE COURT:   Sustained.

6      Q      With whom did you speak regarding what Kharey Wise

7  had said prior to going to Central Park on the morning of

8  April 21st?

9      A      Detective Sheehan.

10     Q      And what, if anything, had you learned from

11 Detective Sheehan?

12     A      That Kharey Wise had admitted being present at the

13 attack on the woman that area north of the cross drive but

14 said he was watching the attackers from behind a tree.

15     Q      You indicated that Kharey Wise was at the scene and

16 was asked certain questions about what tree he had been

17 behind.

18     What was his response to that question from Detective

19 Sheehan?

20     A      As I recall it, he tried to  --  he made a circle

21 where he was trying to look for and point out trees.   But

22 there was nothing close enough to put him in a position.

23 And he was never able to --

24                    MR. MOORE:   Objection.

25                    THE COURT:   Objection sustained.   Just tell us

NYCLD_015546

P-APP001491

1                    Fairstein/direct/People            3039

2          what he did.

3     A     He looked for a tree.  And then he said he couldn't

4   find the tree that he had hid behind.

5     Q     After he said that, what was the next thing that

6   happened?

7     A     Detective Sheehan told him he could go back to the

8   car.  And he did.

9     Q     And did you and Detective Sheehan then also go back

10   to the car?

11    A     Yes.

12    Q     And did you leave the crime scene?

13    A     Yes, we did.

14          MS. LEDERER:  I'd ask that the witness please

15          be shown what's been received in evidence as

16          People's 97?

17    Q     Do you recognize People's 97?

18    A     Yes, I do.

19    Q     And what do you recognize that to be?

20    A     I recognize it to be a photograph of a portion of

21   the area in which Detective Sheehan and I were present that

22   morning, and to which we took Kevin and Kharey.

23    Q     In People's 97 in evidence are you able to see the

24   location where you and Detective Sheehan called Kevin

25   Richardson and then Kharey Wise in the vicinity of the area

1

2     of blood?

3         A     I believe I can identify  -- the prospective is

4     different, but I --

5         Q     If you could turn and show the photograph to the

6     members of the jury and point out where you and Detective

7     Sheehan were and indicate where Kevin Richardson was and

8     where Kharey Wise was?

9         A     May I describe what we did?

10                THE COURT:  She asked you to point out the

11            areas.

12        A     Detective Sheehan and I walked past this tree and

13    up this area and were about here, which is where --

14        Q     Indicating the area of the fallen trees.

15        A     Closer than the fallen tree.  Each of the

16    defendants approached us this way.  And the blood was on the

17    ground in the area between where we were standing and the

18    direction from which they singly approached us.

19                MS. LEDERER:  I ask if the witness could please

20            be shown People's 94 in evidence?

21        Q     Do you recognize what 94 in evidence is?

22        A     Yes, I do.

23        Q     And what is reflected in People's 94 in evidence?

24        A     It is a shot of the same area from a different

25    direction.  And what I referred to as I believe dried blood

NYCLD_015548

P-APP001493

1
2  or a red stain is visible on the leaves.

3     Q     Could you hold the photograph  --  the exhibit so

4  the members of the jury can see it?

5     A     The area I'm pointing to on the lower left part of

6  the photograph is the red stain area.

7     Q     And where were you and Detective Sheehan, if you

8  can indicate that, in this exhibit, and where was Kevin

9  Richardson and Kharey Wise?

10    A     Detective Sheehan and I were standing, I would say

11  would be right off the side, to the left of where the blood

12  is.  And the young men each approached us and were on this

13  side, the top side.

14    Q     When you say, "the top side," are you referring  --

15  would that be downhill from where the blood is?

16    A     Downhill and north actually.

17    Q     Thank you very much.  When you left the crime scene

18  on that morning, where did you go?  Let me withdraw that

19  question and ask you another.

20    Did you return to the 24th Precinct at that time?

21    A     Yes, we did.

22    Q     And approximately how long had the entire trip

23  lasted from the time you left the station house with Kevin

24  Richardson and Kharey Wise until the time you returned?

25    A     Thirty-five minutes travel time included.

NYCLD_015549

P-APP001494

Fairstein/direct/People                    3042

Q    Where did you go when you return to the 24th
Precinct?

A    We returned, all of us returned back to that second
floor large squad-room.

Q    And did you see where Kevin Richardson went upon
returning to the 24th Precinct?

A    Yes.  He returned to where at least his father and
I believe some other female members of his family were
present.

Q    Did you see where Kharey Wise went upon returning
to the precinct?

A    Yes.  He went back to, if not the desk he had been
at, an adjacent desk in a large room.

Q    At any time on the morning of April 21st of 1989
did you see Kharey Wise eat anything?

A    Yes.

          MR. MOORE:  Did you see what?

          MS. LEDERER:  Kharey Wise eat anything.

Q    And approximately when was that, if you recall?
And what was that?

A    When we returned from the park, a lot of food had
been brought into the precinct.  And I brought food into
several of the young men there, including Mr. Wise.  I gave
him donuts and juice.

NYCLD_015550

P-APP001495

1                    Fairstein/direct/People              3043

2      Q     I'd like to direct your attention now to 10:30 p.m.

3  On the evening of April 21, 1989 where were you at about

4  that time on that date?

5      A     I was in  --  still on the second floor of the

6  squad-room in I believe it's Captain Blando's office.  One

7  of the small offices that actually has a door in that room.

8  And I came out of that door at about 10:30 to come into the

9  large room for a particular purpose.

10     Q     Do you know where Kharey Wise and Kevin Richardson

11 were at that time?

12     A     Yes.

13     Q     And where were they?

14     A     Shortly before that time they had been placed in a

15 --

16              MR. DILLER:  Objection.  Not responsive.

17              THE COURT:  Where were they at that time?

18              THE WITNESS:  In a holding pen, an area with

19         bars that was in the same  --  on the same floor,

20         an alcove of the same large room that we had been

21         in the better part of the day.

22     Q     Were any other people in the holding cell with

23 Kharey Wise and Kevin Richardson?

24     A     I believe, yes, at that time.  Yes, definitely.

25     Q     Do you know who else was in the holding cell at

NYCLD_015551

1                    Fairstein/direct/People              3044

2   that time?

3       A    I believe I know some of the other people who were.

4   Yusef Salaam, Antron McCray.  I believe Raymond Santana.  I

5   believe Clarence Thomas.  And maybe Michael Briscoe.

6       Q    In the room that you're describing, in the holding

7   cell that you're describing in that alcove, is there a door

8   between that alcove and the squad-room?

9       A    There is no door.

10      Q    And where were you at about 10:30 in relation to

11  that room with the holding cell?

12      A    I left the captain's office and came out to a desk,

13  which is the closest desk to the holding cell, to use a

14  telephone on that desk to make a phone call.

15      Q    From that position approximately how close were you

16  to the holding cell itself?

17      A    Between eight and ten feet from the holding cell.

18      Q    Did you see Kharey Wise at that time?

19      A    Yes, I did.

20      Q    And would you describe where you saw him?

21      A    He was standing in the holding cell.  He was the

22  closest person to me.  He was standing with his back to the

23  wall, his side to the bars.  Others were seated on the floor

24  or on benches.  And he was against the outermost corner of

25  the cell.

P-APP001497

1                     Fairstein/direct/People              3045

2       Q    In the position that you've just described seeing

3  him, what part of his body was facing the direction  --  was

4  facing you?

5       A    The side of his body and the side profile of his

6  face.

7       Q    And at that time did you hear Kharey Wise have a

8  conversation?

9       A    Yes, I did.

10      Q    Were you able to see with whom he had that

11 conversation?

12      A    Yes.

13      Q    What, if anything, did you hear Kharey Wise say?

14           MR. MOORE:  Objection.

15           THE COURT:  I'll allow it.

16      A    He said, "did you tell them about the guy who was

17 running who said to us, 'do you want to race?'"

18      Q    Was a response made to what Kharey Wise said?

19      A    Yes.

20      Q    And what was the response?

21      A    Someone I couldn't identify or see said, "yeah".

22           MR. MOORE:  Objection.

23      Q    Did Kharey Wise say something else?

24      A    Yes.

25      Q    And what did he say?

Fairstein/direct/People                3046

A     Kharey said, "I did, too.  That was funny."

Q     And did he do anything when he said that?

A     He laughed.

Q     Did you have any conversation yourself with Kharey Wise at that time?

A     I did not.

Q     And did you  --  did there come a time when you left the area by the holding cell?

A     Yes.

Q     Miss Fairstein, were Kharey Wise's clothes vouchered in the course of this investigation?

A     No.  They were not vouchered.

Q     Thank you very much.

      MS. LEDERER:  I have nothing further

CROSS EXAMINATION

BY MR. DILLER:.

Q     Good morning, Miss Fairstein.

A     Good morning, Mr. Diller.

Q     I'm going to direct your attention to the morning of the 21st of April of '89.

And you testified that you were at the 24th Precinct, is that correct?

A     Correct.

Q     And the 24th Precinct is where?

1                 Fairstein/cross/Mr. Diller              3047

2       A      It's on West 100th Street between Columbus and

3   Amsterdam Avenues.

4       Q      Now, at 7 o'clock in the morning you were with

5   Detective Sheehan, is that correct?

6       A      Yes.

7       Q      And you saw Kevin Richardson and his father Paul,

8   is that right?

9       A      Yes.  I didn't know his father's first name.

10      Q      And there were some women there with them?

11      A      I believe there were.

12      Q      And did you come to know who they were?

13      A      No.

14      Q      Had you ever seen Kevin before?

15      A      Yes.

16      Q      Have you spoken to him?

17      A      No.

18      Q      And you were aware, were you not, that Kevin had

19  given a written statement and a video statement by that

20  time?

21      A      Yes, I was.

22      Q      You were not present when either of those

23  statements were taken, were you?

24      A      I was present in the station house, but not in the

25  room.

NYCLD_015555

P-APP001500

1              Fairstein/cross/Mr. Diller              3048

2     Q    Did you see the written statement?

3     A    I did not.

4     Q    And did you see the video at that point?

5     A    No, I did not.

6     Q    Now, am I correct, that you introduced yourself

7  through Detective Sheehan?

8     A    Yes.  To --

9     Q    To Kevin?

10    A    Yes.  Detective Sheehan introduced me to Kevin.

11    Q    Kevin.  And to his father?

12    A    Yes.

13    Q    And Detective Sheehan was standing right next to

14 you, was he?

15    A    Yes.

16    Q    And you indicated to Kevin that you'd like him to

17 accompany you to the park, Central Park, is that right?

18    A    I was speaking first to his father.

19    Q    And you told his father, did you not, that you were

20 not going to ask any questions, is that right?

21    A    Any additional questions other than to clarify the

22 statements that Kevin had already made with positions he had

23 referred to in the park.

24    Q    When you say additional statements, does that mean

25 that you were going to ask questions, whatever purpose,

NYCLD_015556

P-APP001501

1              Fairstein/cross/Mr. Diller            3049

2   whether it's to clarify or for whatever purpose, you told

3   him that you were going to ask questions?

4        A    No different questions than had been asked.  He was

5   not going to be interviewed again at the park.

6        Q    On another subject, is that what you --

7        A    Right.

8        Q    And you didn't give any Miranda warnings to Mr.

9   Richardson, is that right?

10       A    Detective Sheehan was doing that while I was

11  talking to Mr. Richardson.

12       Q    Would you say the atmosphere was rather friendly?

13       A    It was very relaxed, yes.

14       Q    Pleasant?

15       A    Pleasant.

16       Q    And indeed, you and Detective Sheehan had indicated

17  to Mr. Richardson that you were seeking the assistance and

18  cooperation of Kevin?

19       A    Yes.

20       Q    And you say that you asked Mr. Richardson to come

21  along, and he declined the offer?

22       A    Told him he had the right to be present for this

23  because of Kevin's age.  And he declined the offer.

24       Q    And everything continued in a pleasant atmosphere,

25  is that correct?

NYCLD_015557

1                 Fairstein/cross/Mr. Diller          3050

2     A     He was a perfect gentleman.

3     Q     Now, when you left the station house, the 24th on

4 West 100th Street, where did you go?

5     A     Detective Sheehan drove north, I believe, on

6 Central Park West. And we went -- we had to go north to

7 enter the park, corner of 109th or 110th Street entrance.

8     Q     Let me ask you this, who was in your car?

9     A     Detective Sheehan was driving. I was in the front

10 seat with him. In the back seat were Detective Jonza in the

11 middle of Kharey Wise and Kevin Richardson.

12     Q     Now, I recognize it's a year -- over a year and a

13 half ago. But are you positive that at the time about which

14 you are speaking Kharey Wise and Kevin Richardson were in

15 your automobile?

16     A     I am positive, sir.

17     Q     And that they were not in an automobile driven by

18 two detectives? I don't mean Sheehan and Jonza.

19     A     I remember distinctly --

20     Q     It was the same car?

21     A     Same car. They were both behind me. They were not

22 handcuffed.

23     Q     Now, how did the car -- Detective Sheehan was

24 driving, you say, is that right?

25     A     Yes.

NYCLD_015558

P-APP001503

1              Fairstein/cross/Mr. Diller              3051

2      Q     And you were seated next to him in the front?

3      A     Yes.

4      Q     You remember that well?

5      A     I do.

6      Q     How did you get into the park?

7      A     We entered what I would call the northwest corner

8  of the park.  I don't know the exact street location.  I

9  believe it to be 109th or 110th.  And then drove south on

10 the roadway until we reached the cross drive at 102nd.  And

11 we drove east on that.

12     Q     He didn't enter on a Hundred Street?

13     A     I remember going up and south.

14     Q     How long did it take you to get to the place where

15 you stopped?

16     A     With traffic lights, getting in the car, I estimate

17 ten to fifteen minutes.

18     Q     This was 7 o'clock in the morning, is that right?

19     A     That's right.

20     Q     As you reflect back, there was no traffic?

21     A     I don't remember anything  --  any traffic

22 conditions.

23     Q     Would it be fair to say that it took perhaps just

24 two or three minutes?

25     A     I don't think it was that fast just because of

NYCLD_015559

P-APP001504

1          Fairstein/cross/Mr. Diller          3052

2  traffic lights and normal morning traffic.

3      Q    Well, traffic lights -- you were in a police car,

4  were you not?

5      A    We were not taking lights.  We weren't in an

6  emergency situation.  We were in an unmarked car.

7      Q    Now, where did you go when you made your first

8  stop?

9      A    The first stop, we were actually stopped by a

10 patrol car who wanted us to identify ourselves and determine

11 our purpose.

12     Q    And there came a time when you say your car

13 stopped, correct?  You got out of the car and spoke with

14 Detective Sheehan?

15     A    Yes.

16     Q    Detective Jonza remained in the car?

17     A    Yes.

18     Q    You say the two defendants remained in that car?

19     A    Yes.

20     Q    There were no other detective cars that accompanied

21 you?

22     A    At that time, no.

23     Q    And there came a point where you say Detective

24 Sheehan called Kevin out of the car?

25     A    Yes.

1                  Fairstein/cross/Mr. Diller                3053

2        Q     And you say that Sheehan asked him, "does this look

3    familiar"?

4        A     Yes.

5        Q     What area are we talking about?

6        A     We were talking  --  are talking about the paved

7    roadway in the park, on 102nd Street.

8        Q     You're not talking about the ravine?

9        A     No, no.

10       Q     You're positive?

11       A     Oh, yes.

12       Q     Where did you stop the car?  Where did Detective

13   Sheehan stop the car?

14       A     He stopped it when he was stopped in that roadway.

15   I can't tell you, since it's not by a street corner --

16       Q     He was on the paved road?

17       A     Definitely on a paved road.

18       Q     And where did you go when you exited the car?

19       A     Just pulled the car over to the side.  And we got

20   out and started to walk around the area, led by a uniformed

21   patrolman.

22       Q     And it was at that point where you say Detective

23   Sheehan says, "does this look familiar"?

24       A     After Kevin got out, yes.

25       Q     And you've indicated to us this morning, did you

NYCLD_015561

P-APP001506

1                  Fairstein/cross/Mr. Diller              3054

2  not, that Kevin said to you, "this is where we got her?"

3      A    Yes, sir.

4      Q    And you're quite positive about that?

5      A    Yes, I am.

6      Q    Now, you made notes with respect to this, did you

7  not?

8      A    At that time I did not.

9      Q    I didn't ask that.  Did you make notes with respect

10 to that?

11     A    Yes.

12     Q    When did you make the notes?

13     A    I believe it was the following Monday.  That was a

14 Friday morning.  And I believe four days later.

15     Q    When you made the notes, number one, where were

16 you?

17     A    In my office on Hogan Place.

18     Q    And when you made the notes was Detective Sheehan

19 with you?

20     A    No, he was not.

21     Q    Do I  --  withdrawn.

22     Am I correct in saying that when you made the notes on

23 that Monday you were alone?

24     A    I was.

25     Q    And you made the notes out of memory?

NYCLD_015562

P-APP001507

1          Fairstein/cross/Mr. Diller          3055

2     A     Yes, I did.

3     Q     And you wrote down in your notes  --  at what time

4  was the statement made?  In your notes you wrote down the

5  time, right?

6     A     I wrote down I believe the approximate time we  --

7  I started working on this aspect.

8     Q     I'm asking, did you write down the time that that

9  statement was made?

10    A     That statement as opposed to --

11    Q     That statement, "this is where we got her"?

12    A     I don't think I put a time next to it, as I

13 remember.

14    Q     Did you ever discuss that with Detective Sheehan?

15    A     No.

16    Q     Was he standing with you the whole time?

17    A     The whole time that Kevin was out of the car?

18    Q     Yes.

19    A     I think we were within feet of each other.

20    Q     Kevin did not whisper that to your ear, did he?

21    A     No, he did not.

22    Q     Kevin did not take you to the side and say, I have

23 something I'd like to tell you, did he?

24    A     No, he did not.

25    Q     Now, you hear Kevin say, "this is where she was

NYCLD_015563

P-APP001508

1                      Fairstein/cross/Mr. Diller                3056

2   snatched or grabbed"?

3        A     I don't believe I did.

4        Q     Do I understand that there was a time that you were

5   paying attention to something else going on in the park?

6        A     No, sir.

7        Q     Now, what happened when Kevin  --  there came a

8   time when Kevin returned to the car, did he not?

9        A     Yes.

10       Q     He went in the back seat?

11       A     Yes.

12       Q     Jonza was there?

13       A     Yes.

14       Q     And so was Kharey Wise, right?

15       A     Yes.

16       Q     Where did they go?  Where did you all go?

17       A     We then drove down the hill side to the pathway

18   below  --  by the stream.

19       Q     By the ravine?

20       A     By the stream, I said.  It was the bottom of what I

21   call the ravine, yes.

22       Q     So you went from the top to the bottom, is that

23   right?

24       A     By going around.

25       Q     You didn't go from the bottom to the top?

NYCLD_015564

P-APP001509

1          Fairstein/cross/Mr. Diller          3057

2     A    No.

3     Q    You sure?

4     A    That's my recollection, yes.

5     Q    You make notes of that?

6     A    At the time, no.

7     Q    You didn't make any notes at the time, right?

8     A    Right.

9     Q    But the Monday following?  Whenever you made the

10 notes, did you make notes as to the routine, the sequence?

11    A    I believe what you have reflects what my order was,

12 yes.

13    Q    I don't have anything.  I'm asking you, did you

14 make any notes as to what you did first and what you did

15 next?

16    A    I believe that the order in which I made the notes

17 was the order that I recall things were done.

18    Q    Now, when you got down to by the stream or the

19 ravine, did the car go there, too?

20    A    Yes.  We went by car.

21    Q    And the five of you were in the car, right?

22    A    Yes.

23    Q    And then you and Sheehan get out of the car, is

24 that right?

25    A    That's right.

NYCLD_015565

P-APP001510

1          Fairstein/cross/Mr. Diller          3058

2     Q     And when you got out of the car, you and he have a

3     conversation, do you?

4     A     We did.

5     Q     And then you called Kevin out of the car, right?

6     A     First we walked and had a conversation with the

7     other police officer.  We walked a distance.  And then we

8     asked Kevin to come over.

9     Q     Is that where you saw also what appeared to be

10    dried blood?

11    A     Yes.

12    Q     And that's where you say that Kevin said that,

13    "this is where it happened, the raping"?

14    A     Yes.

15    Q     And that you put in your notes, too?

16    A     Yes.

17    Q     And then you went back to the car, is that right,

18    after the colloquy with Kevin?

19    A     No.  Kevin went back to the car.  And Kharey came

20    up to us.

21    Q     There came a time when the five of you were back in

22    the same squad car, is that right?

23    A     Yes.

24    Q     Where did you go?

25    A     We went to Central Park West and either the corner

NYCLD_015566

P-APP001511

1                    Fairstein/cross/Mr. Diller                3059

2   of 96th or '7th Street.

3       Q    What did you do there?

4       A    We got out of the car.  And I examined an area

5   where there was scaffolding, where there were broken light

6   bulbs.

7       Q    You didn't go straight back to the precinct?

8       A    No.  Stopped for about one minute at the

9   scaffolding.

10      Q    Get out of the car?

11      A    Only I got out of the car.

12      Q    And that was where, what street?

13      A    That was at Central Park West.  And it was the

14  northwest corner of either 96th or 97th.

15      Q    You exit the park at what street?

16      A    I don't even remember where the exit is there.

17      Q    97th Street refresh you?

18      A    It doesn't.  I accept it.  I just don't remember.

19      Q    When you get to Central Park West, you go south on

20  Central Park West, that is Sheehan does?

21      A    I don't know if we went south.  We went to the

22  corner where there was scaffolding, where there were broken

23  light bulbs.

24      Q    And you and he got out of the car?

25      A    I think I may have been the only person to get out.

NYCLD_015567

P-APP001512

Fairstein/cross/Mr. Diller                    3060

1

2    Q    No conversation with Kevin at that point?

3    A    Not at that point, no.

4    Q    You returned back to the car?

5    A    Yes.

6    Q    And returned to the precinct, do you?

7    A    Yes.

8    Q    What happens when you return to the precinct?

9    A    We all five of us returned to the room from which

10   we had left.

11   Q    Do you see anyone there?

12   A    Yes.

13   Q    Who do you see?

14   A    Kevin's father was there.  And I believe there were

15   at least two women with him.  But I can't be certain of

16   that.  I saw a number of other young men, a number of

17   civilian adults, and a number of detectives.

18   Q    Did you have any conversation with Kevin's father?

19   A    No.

20   Q    What happened next?

21   A    I continued to work on other aspects of the

22   investigation.

23   Q    Did you see Detective Hartigan?

24   A    I did not.

25   Q    Did you ever go back to the park with Kevin?

NYCLD_015568

P-APP001513

1                    Fairstein/cross/Mr. Diller                3061

2        A    I went back to the park again that morning, yes.

3        Q    No.   That's not my question.   I'll say it again.

4    Did you go back to the park with Kevin Richardson?

5        A    Not in a car with Kevin Richardson, no.

6        Q    21st of April.

7        A    Yes.

8        Q    '89.

9        A    Yes, sir.

10       Q    8:30 a.m..

11       A    Yes.

12       Q    Where were you?

13       A    I believe back at the 102nd Street cross drive in

14   the park.

15       Q    At 8:30 a.m.?

16       A    Approximately, yes.

17       Q    At 8 a.m. where were you?

18       A    I'm not certain if I was in the park or at the

19   precinct.

20       Q    Well, I know you don't have notes in front of you.

21   You leave the precinct 7 o'clock in the morning and go to

22   where you described?

23       A    Uh-huh.

24       Q    There comes a point that you leave the park and go

25   to the vicinity of 96th or 97th Street and Central Park West

NYCLD_015569

P-APP001514

1              Fairstein/cross/Mr. Diller              3062

2  to examine some scaffolding, am I correct?

3      A    Some light bulbs.

4      Q    Where there was scaffolding?

5      A    Right.  I examined the light bulbs, though.

6      Q    Light bulbs.

7  And then you returned to the precinct?

8      A    Uh-huh.

9      Q    Which is West a Hundred Street?

10     A    Yes.

11     Q    When you returned to the precinct, what time was

12 that?

13     A    I would estimate it at 7:30 or 7  --  between 7:30

14 and 7:45.

15     Q    Kevin exits the car with you?

16     A    Yes.

17     Q    You return him to his father and the women?

18     A    Yes.

19     Q    The question I asked, do you then return to the

20 park?  Question, do you return to the park?

21     A    Yes, I did.

22     Q    When did you return to the park?

23     A    I honestly don't know the exact time.  I don't know

24 whether it was 8:30 or 9.  Within  --  I think within the

25 next hour at that point.

NYCLD_015570

P-APP001515

1                    Fairstein/cross/Mr. Diller              3063

2      Q     Well, within the next hour.  If you got to the

3  station house approximately 7:30, 7:45, right?

4      A     Uh-huh.

5      Q     If it was the next hour, it would have been

6  approximately 8:30 or 8:45, is that correct?

7      A     Yes.

8      Q     And you say you returned to Central Park?

9      A     Yes.

10      Q     With whom did you return to Central Park?

11      A     I returned in a car with Detective Sheehan, Miss

12  Lederer, Mr. Clements and Michael Manion, who is a video

13  technician from our office.

14      Q     Then I ask you, did Kevin go to the park?

15      A     Kevin was taken to the park by someone else, yes.

16      Q     At that time?

17      A     At that time.

18      Q     And by whom was he taken?

19      A     I don't know.

20      Q     Did you see Kevin in the park?

21      A     Yes.

22      Q     Where did you see him?

23      A     I remember seeing him in, I believe, the lower

24  area, meaning not the roadway, but the wooded lower area on

25  the side of the ravine, I believe.

1                    Fairstein/cross/Mr. Diller                3064

2        Q     Where you were before?

3        A     Yes.

4        Q     Did you see with whom he was?

5        A     He was in the presence of a detective.  I don't

6   remember now which detective it was.

7        Q     Was there one detective?

8        A     I don't know.

9        Q     Was there anyone else there?

10       A     Only other people I remember being there were news

11  people, which caused us to leave.

12       Q     Was Kharey Wise there?

13       A     I don't  --  I didn't see him.

14       Q     Now, were you doing something completely outside

15  this investigation when you went back?

16       A     No.  I was working on this investigation.

17       Q     You saw the defendant or whatever we call him,

18  youth, with whom you were just an hour or so before with you

19  and Detective Sheehan.  Now you see him in the park again,

20  is that right?

21       A     Yes.

22       Q     He wasn't in the park again because of your

23  direction, was he?

24       A     No.

25       Q     It's apparent someone else asked him to come to the

NYCLD_015572

P-APP001517

Fairstein/cross/Mr. Diller                    3065

1    park?

2    A    I accept that.

3    Q    And did you determine why he was going into the

4    park again?

5    A    At that time I did not.

6    Q    Did you go over to the detective, whoever he be,

7    and ask him, what's going on here?

8    A    I did not, because I was not charged the

9    investigation.

10    Q    Can I infer that you were not concerned about it at

11    that time?

12    A    I was concerned about everything having to do with

13    this matter that day.

14    Q    Wasn't it important that you spend time with Kevin

15    Richardson at about 7 or 7:30, and you see him in the park

16    again completely unarranged by yourself, wasn't that

17    important to you?

18    A    Other people --

19              MS. LEDERER:  Objection.

20              THE COURT:  I'll allow it.

21    A    Other people were directing the investigation.

22              (Continued on the following page.)

Fairstein / Defense / Cross (Diller)                3066

T 4

Q.   Well, you were privy, as the highest ranking member of the District Attorney's Office at the site.  Were you not?

A.   Yes.

Q.   So would it be fair to say that you were privy to everything that was going on?

A.   Yes.

Q.   And being privy to everything that's going on, is it asking too much to wonder why the subject is in a park and you didn't know about it?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

Q.   By the way, you say you don't remember the officer that was there.  Is that right?

A.   Yes.

Q.   If I mentioned the name Detective Second Grade John Hartigan, would that refresh your recollection?

A.   Not the fact of seeing him that day.  I don't dispute it.  There were so many detectives involved in the investigation, I can't tell you who was where at what time.

Q.   Did you ever speak to Detective Hartigan with respect to Kevin Richardson?

A.   On the 21st of April?

Michael Frankel, Sr. Court Reporter

NYCLD_015574

P-APP001519

Fairstein / Defense / Cross (Diller)          3067

Q.   Yes, that morning.

A.   I don't remember talking to him that day.

Q.   Did you know that Detective Hartigan took a written statement from Kevin Richardson?  At that time.

          MR. DILLER:  Withdrawn.

Q.   My question is; on the 21st, you know, in the vicinity of 8:00 o'clock in the morning, did you know that Detective Hartigan took a written statement?

A.   I believe I knew that.

Q.   Did you know Detective Hartigan was also present when there was a video statement?

A.   I knew a detective was present with Miss Lederer. But I can't recall I knew which one.

Q.   And you can't recall having any colloquy with Detective Hartigan in the vicinity of 8:00, 8:30 in the morning?

A.   I really don't remember.  It may have happened.  I don't remember.

Q.   Did you have any other conversation with Kevin, that morning?

A.   No, I did not.

Q.   What happened --

          MR. DILLER:  Withdrawn.

Q.   There came a time that you left the park.  Is that

Michael Frankel, Sr. Court Reporter

NYCLD_015575

P-APP001520

Fairstein / Defense / Cross (Diller)                    3068

1   right?

2       A.   Yes.

3       Q.   Now, when you left the park, you left because the

4   conditions weren't good for you to be there, namely the

5   media.  Is that correct?

6       A.   The second time we were there?  Yes.

7       Q.   And you all returned to the 24th Precinct?

8       A.   Yes.

9       Q.   What time was it that you returned, that you

10  actually arrived?

11      A.   After the second park visit, I honestly don't -- I

12  can't put an exact time on it.

13      Q.   When you arrived, did you go back to the squad

14  room?

15      A.   Yes.

16      Q.   And did you see Kevin Richardson?

17      A.   When exactly, Mr. Diller?  Did I see Kevin when?

18      Q.   In other words, you go to the park.  Your second

19  visit.

20      A.   Ah ha.

21      Q.   With the people you describe.  You get to the

22  park.  There was media there.  It wasn't right for you to do

23  whatever you were planning to do.  You all returned to the

24  precinct, the 24th.

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Diller)                    3069

MS. LEDERER:  Objection as to form.

THE COURT:  I'll allow it.

Go ahead.

Q.   Is that right?

A.   We returned to the precinct after the second visit.  Yes.

Q.   I ask you, if you could tell us approximately what time it was that you returned to the precinct?

A.   I said I wasn't certain.  It was in the area of 9:00 o'clock.  But it could have been a half hour either way.

Q.   The next question I asked you; when you returned, you went to the squad room.  Didn't you?

A.   Yes.

Q.   In the squad room, did you see Kevin Richardson?

A.   I don't remember whether or not he was in the room when I walked back in after the second visit.  But I saw him in that room later the same morning.

Q.   I'm asking the question; when you returned to the squad room, was he sitting there?  That's the question.

A.   I don't remember if he was there at the moment when I got back in or we came back within minutes of each other.

Q.   Did you see Detective Hartigan?

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                3070

A.   I don't remember if I did or not.

          MR. DILLER:  I have no further questions.

          THE COURT:  Mr. Moore?

CROSS-EXAMINATION BY

MR. MOORE:

     Q.   Miss Fairstein, you indicated to Mr. Diller that
you made some notes the following Monday.  Am I correct?

     A.   Yes, sir.

     Q.   Do you have those notes with you?

     A.   I have a copy of those notes.

     Q.   Do you?

     A.   Yes.

     Q.   Can I have a look at them?

          (Given to Mr. Moore.)

          MS. LEDERER:  Your Honor, so the record is

     clear --

          THE COURT:  No record is necessary.

     Just proceed.

          MR. MOORE:  Just one moment while I look at

     these.

          MS. LEDERER:  May we approach for a moment?

          THE COURT:  No.

     Q.   Now Miss Fairstein, you indicated that you are the
head of the Sex Crimes Unit of the District Attorney's

          Michael Frankel, Sr. Court Reporter

1  Office.  Am I correct?

2      A.   Yes.

3      Q.   And that you were in charge of this investigation.

4  Am I correct?

5      A.   No, I didn't say that.  Miss Lederer was in charge

6  of the investigation.

7      Q.   As head of the Sex Crimes Unit, you do have

8  over-all responsibility.  Do you not?

9      A.   In that sense, yes.

10     Q.   Miss Lederer was in fact working under you.

11  Wasn't she?

12     A.   I assigned this case to her.

13     Q.   No.  I understand.

14          She's a member of the Sex Crimes Unit.  Am I

15  correct?

16     A.   Yes.

17     Q.   But you're the person in charge.  Aren't you?

18     A.   My title, yes.

19     Q.   In fact, by title and in fact.

20     A.   Yes.  For administrative purposes, yes.

21     Q.   You were the one that assigned Miss Lederer to do

22  the foot work in the investigation.  Am I correct?

23     A.   To do the entire investigation, yes.

24     Q.   There was a time you were at the 24th Precinct.

Michael Frankel, Sr. Court Reporter

NYCLD_015579

P-APP001524

Fairstein / Defense / Cross (Moore)                3072

Am I correct?

    A.   Yes.

    Q.   Approximately what time did you arrive at the precinct?

    A.   At the 24th Precinct, I believe it was about midnight the 20th going into the morning of the 21st.

    Q.   Right.

    And when you were there, you had arranged for the video unit to be at the 24th Precinct as well.  Is that correct?

    A.   Miss Lederer had, yes.

    Q.   And in fact, the video technicians, the three video technicians had taken a series of statements from various individuals.  Am I correct?

    A.   The technicians taped the statements Miss Lederer took, yes.

    Q.   Between the hours of 1:00 o'clock in the morning to 8:00 o'clock that following morning, several statements had been taken from various individuals.  Am I not correct?

    A.   Yes.  That's correct.

    Q.   1:00 o'clock you had taken a statement from Antron McCray.  Did you not?

    A.   I had not, no.

    Q.   Miss Lederer had?

Michael Frankel, Sr. Court Reporter

NYCLD_015580

P-APP001525

Fairstein / Defense / Cross (Moore)                    3073

A.   Yes.

Q.   2:30 a statement had been taken from Raymond Santana.   Correct?

A.   Yes.

Q.   3:38 a statement had been taken from Steven Lopez. Correct?

A.   I believe so.

Q.   And at 6:15 even a statement from Clarence Thomas?

A.   You're referring to times.   I know those statements were made.   I don't have the times in front of me.   Yes.

Q.   And later on that morning -- I'm sorry.

Now, you were aware of the fact that Kharey Wise had been interviewed by Detective Hartigan?

A.   Yes.

Q.   And that he had made a or submitted a written statement.   Is that correct?

A.   I believe I knew that.   I learned that he had, at some point.

Q.   And you were aware of the fact that when you went to speak to Kharey Wise that morning, a video taped statement had not been taken from Kharey Wise.   Am I correct?

A.   That's right.


                Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)          3074

Q.   And did you ever ascertain from Miss Lederer why is it that a written statement had been taken and a video had not been made of this individual?

A.   I knew that.  I knew the reason.

Q.   You knew the reason?

A.   Yes.

Q.   And what was the reason?

A.   The reason was that Miss Lederer had been doing video statements from midnight that night, without stop, throughout the entire morning and could only do one at a time.

Q.   Well, were you aware of the fact that the last video taped statement had been taken of Kevin Richardson at about 4:50 that morning?  Were you aware of that fact?

A.   I don't have the times in front of me.  I don't know.  As I said, the statements were taken.

Q.   Could I show you --

MS. LEDERER:  Could I see what that is, Mr. Moore?

Would you mark it?

THE COURT:  Mark it for identification.

COURT CLERK:  K.

(So marked.)

(Shown to D.A..)


Michael Frankel, Sr. Court Reporter

NYCLD_015582

P-APP001527

Fairstein / Defense / Cross (Moore)                3075

                 (Given to witness.)

Q.   Okay.

    Does that refresh your recollection as to when the statement from Kevin Richardson had been taken?

A.   Yes.  Or it has a time on it.  I don't dispute that.

Q.   Okay.

    So it was in fact taken about 4:50 that morning. Isn't that correct?

A.   Yes.

Q.   And when was the next statement taken from another individual after 4:50?

A.   The next video statement?

Q.   Yes.

A.   She was taking other interviews and statements between the videos as well.  The next video statement began, according to the sheet you give me, at 6:50 a.m..

Q.   So the statement is fully two hours after the last video statement of Kevin Richardson.  Is that correct?

A.   No, sir.

Q.   Was it approximately two hours?

A.   No, sir.

Q.   How long was it?

A.   Just a little over one hour.  You have the time

Michael Frankel, Sr. Court Reporter

NYCLD_015583

P-APP001528

Fairstein / Defense / Cross (Moore)                    3076

the video of Kevin began.  You don't have the time it took
to take the statement actually.

Q.  There was an hour interval between the end and the
beginning of the next statement.  Is that correct?

A.  Only of the next video statement.

Q.  Yes.

So there was -- wasn't there enough time to take a
video statement of Kharey Wise?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

Q.  And the next statement of Clarence Thomas
commenced about what time?

A.  About 6:50 in the morning.

Q.  Okay.

And it was completed approximately what time?

A.  I'm not sure that I see any list of the duration.

Q.  About how long was it?

A.  I don't know.

Q.  Is there an indication?

A.  There doesn't appear to be.  It doesn't say how
long.

(Exhibit given to Mr. Moore.)

Q.  Okay.

(Exhibit given to witness.)


Michael Frankel, Sr. Court Reporter

NYCLD_015584

P-APP001529

Fairstein / Defense / Cross (Moore)                3077

Q.   So the statement of Clarence Thomas was taken at about 6:50.  Is that correct?

A.   It began to be recorded at about 6:50.  Correct.

Q.   And the next video taped statement was not taken until about 9:25.  Is that correct?

A.   That appears to be correct.

Q.   Okay.

So there was a three hour interval between the beginning of Clarence Thomas' statement and the beginning of the next statement.  Is that correct?

A.   No, sir.  The next video statement -- there were other statements taken in between, that are not recorded on this sheet you have given me.

Q.   I'm speaking of video.

A.   Yes.

Q.   There was a three hour interval.  Is that correct?

A.   Yes.

Q.   Now, did you -- before you spoke to Kharey Wise that morning, did you have a conversation with Miss Lederer?

A.   I had many conversations with her.

Q.   And did you try to ascertain from her, why Kharey Wise's  video taped statement had not been taken of Kharey Wise?

A.   No, sir.


Michael Frankel, Sr. Court Reporter

NYCLD_015585

P-APP001530

Fairstein / Defense / Cross (Moore)          3078

As I said, I knew why it had not been taken.

Q.   And the reason was because there were a series of other interviews being taken.  Is that correct?

A.   Because she was ceaseleslly interviewing witnesses from 8:30 the preceeding evening throughout that morning and the rest of the entire next day.

Q.   So that was the only reason why?

A.   Everything was done in order.

Q.   So the only reason why a video taped statement was not taken from him was because she was ceaselessly involved taking video taped statements.

MS. LEDERER:  Objection.

THE COURT:  I'll allow it.

Q.   Is that correct?

A.   I don't know if that's the only reason.

Q.   But that's the reason you have stated.

A.   That's one of the reasons.

Q.   Now Miss Fairstein, there came a time when you spoke to Kharey Wise.  Am I correct?

A.   Yes, sir.

Q.   And you knew at the time that he had made -- that he had given a statement, a written statement.  Is that correct?

A.   I had been told.


Michael Frankel, Sr. Court Reporter

NYCLD_015586

P-APP001531

Fairstein / Defense / Cross (Moore)          3079

Q.   You had been told by whom?

A.   I believe I had the information from Detective Sheehan.

Q.   And do you know who the detective was that was assigned to Kharey Wise, to take statements from him?

A.   I don't remember.

Q.   Does the name John Haritgan ring a bell?

A.   It rings a bell because I know Detective Hartigan. But it doesn't refresh my recollection about that day.

Q.   So you did not know that Detective Hartigan was the detective who was assigned to interview Kharey Wise?

A.   I did not.  I don't recall it now.

Q.   And you made no attempts to find out who the detective was that was assigned to interview Kharey Wise?

A.   I don't recall -- I remember speaking to Detective Sheehan about it but not to anyone else that morning.

Q.   Didn't you know that Detective Sheehan was never assigned to interview Kharey Wise?

          MS. LEDERER:  Objection.

          THE COURT:  I'll allow it.

A.   Specifically?  No.

Q.   Now, there came a time when you -- when you spoke to Kharey Wise.  Am I correct?

A.   Yes, sir.


Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)          3080

Q.   And you indicated that you understood from Detective Sheehan that he had indicated that he was at the crime scene.  Am I correct?

A.   Yes.

Q.   And did you ask Detective Sheehan the basis of his statement, that he was at the crime scene?

A.   Yes.

Q.   And did Detective Sheehan indicate the basis of that information?

A.   Yes.

Q.   What was that basis?

A.   That Kharey had said that to someone, to a detective -- it was a statement that Kharey himself had made about his involvement.

Q.   Well, as the head of the Sex Crimes Unit and the person in over-all charge, did you ask who Kharey said that to?

          MS. LEDERER:  Objection.

          THE COURT:  That's two different questions.

Q.   Did you ever ask from Sheehan who Kharey had said that to?

A.   I might well have.  I don't remember.

Q.   You didn't record it in your notes?

A.   I didn't take any notes.


Michael Frankel, Sr. Court Reporter

NYCLD_015588

P-APP001533

Fairstein / Defense / Cross (Moore)                3081

Q.   Now, it was your purpose to take Kharey to the crime scene.  Am I correct?  That was your purpose in speaking to him that morning.  Am I correct?

A.   To ask him to accompany me, yes.

Q.   That was 7:00 o'clock in the morning?

A.   About that.

Q.   Did you know what time he had been brought to the precinct?

A.   I don't know now what time.  I may have known then.

Q.   You don't recall if you knew then?

A.   No, I don't.

Q.   Before you questioned him, did you ask him if he had slept that night?

A.   I didn't ask him that.  No.

Q.   Did you ask him if he had eaten since he had come to the precinct?

A.   Not until I gave him food.

Q.   No.  When you first saw him at 7:00 o'clock, did you ask him, "Kharey, did you have anything to eat?"

A.   I didn't ask him that then.

Q.   Now, was he under arrest at that time, 7:00 o'clock in the morning?

          MS. LEDERER:  Objection.


          Michael Frankel, Sr. Court Reporter

NYCLD_015589

P-APP001534

Fairstein / Defense / Cross (Moore)                3082

1

2        THE COURT:  Objection sustained.

3   Q.   Now, you indicated that you --

4        Well, you weren't interested, of course, in his

5   health.  Were you?

6        MS. LEDERER:  Objection as to form.

7        THE COURT:  I'll allow it.

8   Q.   Were you?

9   A.   Was I interested in his health?  I was interested

10  in his physical condition.

11  Q.   Well, you were going to take him to the crime

12  scene.  Am I correct?

13  A.   Right.

14  Q.   And he was going to be video taped later on.  Is

15  that correct?

16  A.   If he consented to be.  If he was willing to be.

17  I believe that was the plan.

18  Q.   And you knew that he had been brought to the

19  precinct since about seven or eight hours before.  Is that

20  correct?

21  A.   I don't remember when he was brought there.

22  Q.   But sometime before?

23  A.   Sometime before I saw him, yes.

24  Q.   So you didn't inquire about whether he had sleep

25  or whether he had eaten anything.  Correct?


Michael Frankel, Sr. Court Reporter

NYCLD_015590

P-APP001535

Fairstein / Defense / Cross (Moore)                    3083

A.   I did not ask him those questions.

Q.   Because you were not interested.  Correct?

A.   No, that's not correct.

Q.   You were interested in the statement.  Isn't that what you were interested in getting?

A.   I was interested in the entire investigation.  I believe I had made observations about his physical condition.

Q.   And you were interested in finding out if he was implicated in this incident.  Am I not correct?

        MS. LEDERER:  Objection as to form, your Honor.

        THE COURT:  Yes.  Objection sustained.

Q.   Weren't you interested in finding out the degree of his participation in the attack on the female jogger?

A.   Yes, I was.

Q.   And that was your prime responsibility.  Wasn't it?

A.   No.

Q.   You had other responsibilities?

A.   That was Miss Lederer's prime responsibilities.

Q.   But that was your over-all responsibilities, since you were in charge of the Sex Crimes Unit.

A.   I was participating in assisting, yes.


Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                3084

Q.   As a matter of fact, you were there on the scene, at the 24th Precinct?

A.   Yes.

Q.   And you were there to direct operations.  Weren't you?

A.   No, I was not.

Q.   You were there to be an observer?

A.   To assist in an investigation that had mushroomed into enormous proportions from the time I first assigned it to a single individual.

Q.   "Mushroomed into enormous proportions".  What do you mean by that?

A.   When I first had a 'phone call from the police twenty-four hours earlier, on the morning of the 20th, I was told that a woman, who was yet unidentified, had been found in the park and there were two or three individuals at the stationhouse being questioned about participation.  It was not -- I then called Miss Lederer.  It was not until many many hours later --

Q.   Miss Fairstein, could you address me?  Could you speak to me?  I'm asking you the question.

A.   It was not until many many hours later that I learned that instead of going to talk to two or three individuals, Miss Lederer might be talking to as many as

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                3085

1  thirty individuals.

3              THE COURT:  To clarify something.

4              Witnesses are speaking to the jury in fact.

5       They're the ones that have to hear and understand

6       what a witness is saying or you are saying or

7       what I am saying.

8              MR. MOORE:  I understand.

9              She's turning her face away and I can't hear.

10             THE COURT:  She's looking at the jury, I

11      think, which is not inappropriate.

12      Q.    Now Miss Fairstein, you indicated that when you

13  spoke to Kharey Wise he was in the squad room of the 24th

14  Precinct.  Am I not correct?

15      A.    My first conversation, yes.

16      Q.    And there were other people around.  Were there

17  not?

18      A.    Yes.

19      Q.    And he was at the desk.  Is that correct?

20      A.    He was at one of many desks in the room.  Yes.

21      Q.    And Kevin Richardson was at another desk.  Am I

22  correct?

23      A.    Yes.

24      Q.    And how far was his desk away from Kevin

25  Richardson's desk?


                Michael Frankel, Sr. Court Reporter

NYCLD_015593

P-APP001538

Fairstein / Defense / Cross (Moore)          3086

A.    There were probably two or three desks separating.
The desks are two back to back --

Q.    Miss Fairstein, I'm asking you how far was his
desk away from Kevin Richardson's desk.

        MS. LEDERER:  Objection to interrupting the
        witness.

        THE COURT:  I'll let it.  That's a simple
        question, if she knows.

A.    I can't tell you in feet.

Q.    Approximately.

A.    Between fifteen feet at closest to thirty feet.

Q.    Between fifteen and thirty feet away.

     And there came a time when you advised Kharey Wise
of his Miranda rights.  Am I correct?

A.    Yes, I did.

Q.    At that time you were by the desk where he was.
Am I correct?

A.    Standing right next to it.

Q.    All right.

     And there came a time when Detective Sheehan was
advising Kevin Richardson of his rights.  Am I correct?

A.    Yes.

Q.    And at the time when you were advising Kharey Wise
of his rights, you were standing by Kharey Wise.  Am I

Michael Frankel, Sr. Court Reporter

NYCLD_015594

P-APP001539

Fairstein / Defense / Cross (Moore)                3087

correct?

A.   Yes.

Q.   And Detective Sheehan was standing by Kevin Richardson.  Am I correct?

A.   I believe that had happened earlier, Sheehan and Richardson.  I don't think they were going on at exactly the same moment.

Q.   Well, when Sheehan was advising Kevin Richardson of his rights, he was about fifteen or thirty feet away from you.  Is that correct?

A.   No.  He started advising Kevin of his rights, I believe, while I was talking to Mr. Richardson Senior.  So we were probably back to back with each other.

Q.   But when you were advising Kharey of his rights --

A.   Yes?

Q.   Sheehan was by Kevin Richardson.  Wasn't he?

A.   I don't know where Sheehan was when I was talking to Kharey.

Q.   Well, was he next to you or was he by Kevin Richardson?

A.   He may have been somewhere else.  I don't recall him being next to me.

Q.   But he was not next to you?  That's what you recall?

Michael Frankel, Sr. Court Reporter

NYCLD_015595

P-APP001540

Fairstein / Defense / Cross (Moore)                    3088

1

A.    I was reading --

2

Q.    I understand.

3

I'm asking you; was he next to you or was he not

4

next to you?

5

A.    I don't recall.  I don't remember him being next

6

to me.

7

Q.    All right.

8

Now, you indicated that you read him these Miranda

9

rights and he responded in the affirmative.  Am I correct?

10

A.    Yes.

11

Q.    Did he say "yes" or did he shake his head or what

12

gestures did he make?

13

A.    He said words.  I believe he said "yeah" more

14

often than he said, "yes".  But he said "yeah" or "yes".

15

Q.    Now, there came a time when you told him --

16

THE COURT:  Excuse me one second.

17

It's time to break, if it's convenient to

18

your questioning.

19

MR. MOORE:  Yes, your Honor.

20

THE COURT:  We'll recess for lunch.  2:15

21

members of the jury.

22

Please don't discuss the case with anyone.

23

(Jury leaves courtroom.)

24

THE COURT:  Do you have her notes?

25

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)          3089

MR. MOORE:  Yes.

THE WITNESS:  I want to make sure I get them back.

MS. LEDERER:  What I wanted to put on the record --

THE COURT:  I know what you wanted.

2:15.

MS. LEDERER:  Can I put it on the record?

THE COURT:  No.  We'll do that later.

2:15.

(Lunch recess.)

COURT OFFICER:  Remain seated.

Jury coming through.

(Jury passes through courtroom.)

THE COURT:  Mark this Court Exhibit 19.

(So marked.)

THE COURT:  People ready?

MS. LEDERER:  Yes.

THE COURT:  Defendants ready?

MR. MOORE:  Yes.

MR. DILLER:  Yes.

THE COURT:  Bring the witness in, please.

(Witness retakes the stand.)

COURT OFFICER:  Bring the jury in, please.

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                    3090

                    COURT OFFICER:  Jury entering.

                    (Jury enters courtroom.)

                    COURT CLERK:  The defendants, their

          attorneys, the assistant district attorneys and

          all sworn jurors are present.

                    Miss Fairstein, you're still under oath.

                    THE WITNESS:  Thank you.

                    THE COURT:  Good afternoon.

                    Okay, Mr. Moore.

     Q.   Miss Fairstein, good afternoon.

     A.   Good afternoon.

     Q.   Now Miss Fairstein, after you had been on the
stand this morning, did you go back to your office?

     A.   I did.

     Q.   And your office is across the street.  Am I
correct?

     A.   Yes.

     Q.   And did you have a conversation with Miss Lederer?

     A.   No.  Her office is across the street from my
office.

     Q.   I didn't ask you if her office is across the
street from yours.  I asked you if you had a conversation
with her about this case?

     A.   The only conversation I had was a 'phone call to

                 Michael Frankel, Sr. Court Reporter

NYCLD_015598

P-APP001543