Fairstein / Defense / Cross (Moore)                3091

her to say "are you ready to go back to court?"  And we did
not discuss the case at all.

    Q.   Miss Fairstein, may I just have a look at your
notes again?

               (Given to Mr. Moore.)

    Q.   Now, you indicated that Detective Sheehan had told
you that Kharey Wise was at the scene of the crime.  Am I
correct?

    A.   Yes.

    Q.   And he told you that that morning?

    A.   Yes.

    Q.   And that was just before you spoke to Kharey Wise.
Am I correct?

    A.   Shortly before.  Yes.

    Q.   Now, after you advised Kharey Wise of his rights,
you didn't ask him if he had been at the scene of the crime
the night before.  Did you?

    A.   I did not.

    Q.   And you also did not ask Detective Hartigan if
Kharey Wise had indicated to him that he had been at the
scene of the crime?

    A.   No.  That morning, no.

    Q.   And you didn't ask that of Detective Nugent
either, did you?

Michael Frankel, Sr. Court Reporter

NYCLD_015599

P-APP001544

Fairstein / Defense / Cross (Moore)                3092

1

2     A.    I spoke to Detective Nugent a lot during that

3  night.  I don't remember anything specific about Wise.

4     Q.    Now, you stated that you read him his rights.  Am

5  I correct?

6     A.    Yes.

7     Q.    And he indicated to you in the affirmative, that

8  he understood them.  Am I correct?

9     A.    Yes.

10    Q.    And he said "yes" or "yeah" to each of the

11 statements?

12    A.    Yes, he did.

13    Q.    What happened after you read him his rights?

14    A.    I explained to him that I was going back to the

15 park and was asking his consent to go with me.  And he said

16 he would go with me.

17    Q.    Well, after you read the fifth right, did you say

18 anything else to him?

19    A.    I flipped the card over and paraphrased the

20 questions on the back of the card.

21    Q.    What did you ask him?

22    A.    I have to read from the card, as I did then.

23    Q.    So you can't recall what you asked him?

24    A.    I can approximate.

25    Q.    Can you approximate what you asked him?

Michael Frankel, Sr. Court Reporter

NYCLD_015600

P-APP001545

Fairstein / Defense / Cross (Moore)                    3093

A.   I believe I asked him if he understood everything

that I had just read to him, the rights that I had just

inquired of him, as it says in some form like that on the

card.  And he said "yes".  And then I asked him if he was

now willing to talk to me and answer my questions.  And, he

said "yes".  And I explained that my question was whether he

would go with me to the park and clarify for me the points

where he said he had made observations.

Q.   But you can't remember exactly what you asked him.

Is that correct?

A.   I remember that's exactly what I asked him.  What

I can't remember is the exact words.  I am now paraphrasing

a conversation eighteen months old.

Q.   After you read him these right and you asked him

these questions, what did you say to him?

A.   When he told me that he was willing to come with

us, I said --

Q.   No.  Before he told you he was going to come with

you, what did you say to him?

A.   I told him that I wanted to go back to the park

with the detectives and with Kevin.  And I said that I knew

had made a statement and that he was going to be talking to

Miss Lederer when we came back from the park, if he was

willing to talk to her, and that I would like him to come

Michael Frankel, Sr. Court Reporter

NYCLD_015601

P-APP001546

Fairstein / Defense / Cross (Moore)          3094

with us to show us where he had said some things had
happened.

Q.    Well, you told him that you would like him to come
with you.  Isn't that correct?

A.    No.  I asked him if he would be willing to come
with us.

Q.    You told him or you asked him?

MS. LEDERER:  Objection.

THE COURT:  Objection sustained.

Q.    Well, did you tell him that you were taking him to
the park?

A.    No.  Because --

THE COURT:  No --

Q.    Not because.

A.    No.

Q.    You didn't tell him you were taking him to the
park?

A.    No.

Q.    Isn't that what you said a moment ago?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

If she said it she said it.  The jury heard
it.

Q.    Now, Kharey Wise didn't have his mother with him.

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                3095

Did he?

    A.   At that time?  No.

    Q.   He didn't have any guardians with him at that time.  Is that correct?

    A.   There was no one with him.

    Q.   And did you tell him that he had a right not to go, if he wished?  Did you tell him that?  Yes or no?

    A.   I don't know if I used that exact language.  I told him he didn't have to go with me but if he was willing to go, it was my plan to go back to the park.

    Q.   You told him he didn't have to go with you?

    A.   Yes, in one form or another I did.

    Q.   In what form did you tell him?

    A.   Paraphrasing it the same way, I told him if he was willing to come with us to the park, I would like him to come with us.

    Q.   Well, do you recall testifying at a prior proceeding in this matter?

    A.   Yes, I do.

        MR. CLEMENTS:  What page?

        MR. MOORE:  Page 305 5.

        MS. LEDERER:  Could you just give me one moment?

        May we approach?  Your Honor, may we

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                    3096

approach?

       THE COURT:  Yes.

       (The following is a sidebar conversation
outside the hearing of the jury.)

       MS. LEDERER:  I'd ask Mr. Moore what he
intends to read that is inconsistent with the
testimony we had so far?

       MR. MOORE:  She indicated that she told
Kharey Wise that he was free not to go with her,
if he had wished not to go.  She said she told him
that after reading him his rights.  And in this
question and answer I'm going to read, there is no
indication in her answer -- she indicates what she
told him in the answer but there's no indication
in the answer that she told him he's free not to
go.

       MS. LEDERER:  Are you referring to the
question on Line 4 on 3055?

       MR. MOORE:  That's correct.

       MS. LEDERER:  Your Honor, I don't believe
it's inconsistent.

       (Page given to court.)

       THE COURT:  I'll let him ask the question.

       (Open court.)


Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                    3097

Q.   Do you recall, Miss Fairstein, being asked this question and giving this answer?

"QUESTION: after you read him those rights and received those answers, did you have further conversations with Kharey Wise?

ANSWER:  Just to explain to him in a little more detail what our purpose was in going to the park.  He had not yet been questioned by Miss Lederer in the video tape.  And I explained to him we were going back to the park.  He would only be asked a few questions about where he claimed he had been, where the jogger was attacked and that he would return to the stationhouse --

MS. LEDERER:  "We would".

Q.   "And that we would return to the stationhouse. And Miss Lederer, who was then doing other video tapes would question him on our return."

Do you remember those questions being asked and those answers being given?

A.   Yes.

Q.   You had never indicated that you had told him he was free not to come with you.  Did you?

MS. LEDERER:  Objection as to form.  That's a specific question and answer.

Michael Frankel, Sr. Court Reporter

NYCLD_015605

P-APP001550

Fairstein / Defense / Cross (Moore)                3098

1

2        THE COURT:  Excuse me?

3        MS. LEDERER:  Objection as to form.

4        THE COURT:  The answer speaks for itself.

5        You just read a question and an answer and

6        she said she remembers being asked that question

7        and giving that answer.  That's it.

8    Q.    And are you now saying that you did tell him he

9   was free not to come with you?

10        MS. LEDERER:  Objection.

11        THE COURT:  As to the form, I would sustain

12        the objection.

13   Q.    Do you now recall that you had told him then that

14   he was free not to come with you?

15        MS. LEDERER:  Objection.

16        THE COURT:  If you understand the question,

17        you can answer it.

18   A.    I told him that it was his choice to make.  If he

19   was willing to come with us to the park, he could come with

20   us.  He is not going to be forced to go.

21   Q.    Now, there came a time, Miss Fairstein, when you

22   left for the park.  Am I correct?

23   A.    Yes.

24   Q.    And you had indicated that it was yourself,

25   Detective Sheehan, Kharey Wise and Kevin Richardson.  Am I


Michael Frankel, Sr. Court Reporter

NYCLD_015606

P-APP001551

1          Fairstein / Defense / Cross (Moore)          3099

2    correct?

3          A.    And Detective Jonza.

4          Q.    And Detective Jonza.   There were five of you?

5          A.    Yes.

6          Q.    You also indicated that you left in one car.  Am I

7    correct?

8          A.    Yes.

9          Q.    And you are positive as you sit there now, that

10   you did not in fact leave for the park in two separate cars?

11         A.    On my first trip, that's correct.

12         Q.    The answer being?

13         A.    I remember distinctly leaving in one car.

14         Q.    Now, you indicated also that you took between ten

15   to fifteen minutes to get to the 102nd Street Cross Drive.

16   Am I correct?

17         A.    Yes.

18         Q.    Where is the 24th Precinct located?

19         A.    On 100th Street between Columbus and Amsterdam

20   Avenue.

21         Q.    And isn't it also true that 102nd Street Cross

22   Drive is to the east of Central Park West around 102nd

23   Street.

24         A.    Yes.

25         Q.    And are you saying that it took you fifteen


          Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                    3100

minutes to get from 100th Street between Columbus and

Amsterdam to 102nd Street east of Central Park West?

A.    I believe it took at least ten minutes to get

there, possibly fifteen E.

Q.    Well, that's a fairly short drive.  Isn't it?

A.    Fairly short ride.

Q.    And did you stop anywhere on your way to 102nd

Street Cross Drive?

A.    Yes.

Q.    Where did you stop?

A.    At three or four red traffic lights.

Q.    Apart from the traffic lights, did you stop or

disembark from the car?

A.    No.

Q.    It was a continuous drive?

A.    Yes, it was.

Q.    And you also mentioned that you entered the park

about 110th Street.  Am I correct?

A.    Yes.

Q.    Isn't there in fact an entrance to the park at

100th Street?

A.    If there is, I just don't know.  I'm not aware of

it.  I know we didn't go in at 100th Street.

Q.    Do you know Central Park fairly well?


Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)        3101

A.   Yes, fairly well.  I knew you could not get to the Cross Drive --

Q.   You answered the question.

Now, after you reached at 102nd Street Cross Drive, you indicated that there came a time when you asked Kharey and Kevin to get out of the car, while you were on the Cross Drive.  Am I correct?

A.   Yes.

Q.   And you distinctly recall, the first place you went after you came to the 102nd Street Cross Drive, was the upper roadway.  Am I correct?

A.   That's what I recall.  Yes.

Q.   You don't recall going into the ravine and then coming back on the upper roadway?

A.   No.  My first stop was the roadway.

Q.   Now, you had indicated that at that point you had asked or Detective Sheehan asked Kevin to come out of the car.  Am I correct?

A.   Yes.

Q.   And he came out of the car?

A.   Yes, he did.

Q.   Then you indicated also that you asked Kharey to come out of the car.

A.   Yes.

Michael Frankel, Sr. Court Reporter

NYCLD_015609

P-APP001554

1

2     Q.   And he indicated that this is where they snatched

3 her.  Am I correct?

4     A.   Yes.

5     Q.   Now, you had indicated that a couple of seconds

6 before, Kevin had indicated an area where allegedly the

7 "they" snatched her or --

8               MR. MOORE:  Let me just rephrase that.

9     Q.   You had indicated that a couple of seconds before

10 Kevin had indicated a place in the roadway where something

11 happened.  Am I correct?

12    A.   Yes.

13    Q.   Then a couple of seconds later Kharey came and

14 indicated a spot in the roadway where, quote unquote, "they

15 snatched her".  Am I correct?

16    A.   Yes.

17    Q.   Were the two areas that Kevin -- was the area that

18 Kevin pointed out and the area that Kharey pointed out, were

19 they the same area?

20    A.   Yes, within the same area.  I mean neither one

21 pointed to a particular point on the ground.  They were

22 within --

23    Q.   Within what?

24    A.   Range of --

25    Q.   Within what range?

Michael Frankel, Sr. Court Reporter

Fairstein / Defense / Cross (Moore)                    3103

A.     Each one individually looked at what the relationship of the clearing was, to the trees --

Q.     How far was the area that Kevin pointed out from the area where Kharey pointed out?

A.     They were within ten feet of each other.

Q.     Now, you had indicated that Kharey said -- said something.  What did he say when he pointed to that spot?

A.     He was gesturing at the roadway and he said, "This is where they snatched her."  And he pointed then to the area south of the roadway which were ball fields.  And he called them "ball fields".  He was on the ball fields and that he was running from the ball fields to catch up with the group that he saw snatching the girl.

Q.     Now, when he said "This is where they snatched her," did you ask him who "they" referred to?

A.     No.  Not there I did not.

Q.     So he just tells you "This is where they snatched her," and you didn't ask him anything further about who "they" was?

A.     That's right.

Q.     And you didn't ask him how they snatched her?

A.     I did not.

Q.     "He just said "They snatched her," and you said "Okay.  No problem"?

Michael Frankel, Sr. Court Reporter

NYCLD_015611

P-APP001556

Fairstein / Defense / Cross (Moore)                    3104

           MS. LEDERER:  Objection.

A.    No, I didn't say "okay.  No problem".

Q.    You didn't have any further questions about the manner in which they snatched her.  Right?

A.    I did not.

Q.    You said he indicated to you that they were running from the ball fields to 102nd Street.  Am I correct?

A.    He said that he was running from the ball fields. He, Kharey, was running from the ball fields.

Q.    Did you see the ball fields that he was referring to?

A.    I know there are ball fields there.  I saw the area that he pointed to.

Q.    Did you ask him which ball field was he referring to?

A.    I was not interrogating him.  No.

           (Continued on next page.)

Michael Frankel, Sr. Court Reporter

Fairstein/cross/Mr. Moore                3105

1

2    Q    Now, after he said so, he went back into the car,

3 am I correct?

4    A    Yes, he did.

5    Q    The same car with Kevin, and they drove off, is

6 that correct?

7    A    We all drove off.  Yes.

8    Q    And where did you go after that?

9    A    We drove further east in our unmarked car following

10 the patrol car, which led us down an area that I would call

11 the clearing, after a lot of trees, down a hill -- ravine to

12 the pathway north of the roadway at the bottom of a ravine.

13   Q    By the way, when you were on the roadway, on top of

14 the roadway, did you see any police officers?

15   A    Yes.

16   Q    Did you or did Detective Sheehan have any

17 conversation with any police officers?

18   A    Yes.

19   Q    Did any police officers point out to any particular

20 location?

21   A    It was the police officer who stopped us, as I said

22 earlier, who then is the one who led us down the clearing to

23 the area at the bottom of the ravine.

24   Q    But did any police officers point to any spot in

25 the roadway?

P-APP001558

Fairstein/cross/Mr. Moore                3106

1

2     A     To me, no.  But -- to me, no.

3     Q     Did you see any bloodstains or any marks on the

4  roadway?

5     A     At that moment, no.

6     Q     Did you see any cones or any other sort of other

7  markings on the roadway?

8     A     I don't remember seeing cones then.

9     Q     Did you see any tapes of the area  --  taping of

10  the area?

11     A     Tape had been removed already.

12     Q     So you knew that the tape had been removed?

13     A     Yes.

14     Q     Were you there before, by the way, in the crime

15  scene?

16     A     No.

17     Q     How did you know that the tape had been removed?

18     A     Because I knew that a day earlier I had been told

19  when I asked questions of the police that the area had been

20  taped off as a crime scene and that the tapes were no longer

21  there after the crime scene was processed on April 20th, the

22  preceding day.

23     Q     But you had not seen the tapes there?

24     A     Right.  I had not been there before.

25     Q     Now, when you went down into the ravine did you

1                    Fairstein/cross/Mr. Moore          3107
2   come to a particular location?
3        A     Yes.
4        Q     And how did you come to that location?
5        A     The patrol car in front of our unmarked car
6   stopped.  And we stopped behind it.
7        Q     There was another  --  was there a patrol car or an
8   unmarked car?
9        A     We were in an unmarked car.  We were stopped by a
10  patrol car as we reached the cross drive.
11       Q     And did any of the officers in the patrol car
12  indicate anything to you?
13       A     Yes.
14       Q     And what was that?
15       A     The driver  --  there may have been only one person
16  in that patrol car, but that driver took Detective Sheehan
17  and me to the tree, a little further west of where we were,
18  at which  --  near which the body of the young woman had
19  been found hours the day earlier.
20       Q     And that's the place he indicated to you?
21       A     Yes.
22       Q     What was the condition of the soil, of the ground
23  in that particular spot?
24                    MS. LEDERER:  Objection.
25                    THE COURT:  I'll let him describe it.

NYCLD_015615

P-APP001560

Fairstein/cross/Mr. Moore                3108

1

2     A     The ground near the tree.

3     Q     Near the area where the young woman's body had been

4  found?

5     A     There was -- at the very bottom of the ravine next

6  to the water stream that was there, the ground was muddy.

7  The ground was muddy.  And then as we walked south up the

8  hill back towards the roadway the ground was firm and there

9  was a ground cover of a lot of leaves, a lot of twigs.

10 There were a lot of tree roots extending up from the ground.

11  There was some fallen branches on the ground.

12    Q     So the area that the officer pointed out to you,

13 was there any specific marking on that particular area?

14    A     What kind of marking?

15    Q     Well, was there anything that was significant, any

16 landmark or any marking?

17              MS. LEDERER:  Objection as to form.

18              THE COURT:  If she understands the question.

19              Do you understand the question?

20    A     I don't know whether you mean natural markings or

21 artificial.

22    Q     Natural markings?

23    A     A tree and ground cover.  But nothing else.

24    Q     Was it a fallen tree?

25    A     No.  The tree he showed me then was standing.

NYCLD_015616

P-APP001561

1                    Fairstein/cross/Mr. Moore              3109

2        Q     Now, around this tree, this tree that he spoke of,

3   was there blood?

4        A     I don't remember seeing blood at the foot of that

5   tree.

6        Q     You don't remember seeing a lot of blood around

7   that tree?

8        A     The blood that I described, seeing a lot of blood,

9   was further up the hill, meaning south of that tree.

10       Q     It was not around the tree?

11       A     Not at the base of that tree.

12       Q     Well, do you remember --

13              MS. LEDERER:  Excuse me, Mr. Moore.

14              MR. MOORE:  Page 3061.

15              MS. LEDERER:  Just give me a moment.

16              (Pause)

17              MS. LEDERER:  May we approach?

18              (Whereupon, the following occurred at sidebar:)

19              MS. LEDERER:  Mr. Moore is indicating that he

20          is going to ask a question on page 3061 of the

21          hearing in this case where the question begins at

22          line nineteen which says, "what, if anything, did

23          you see in that location?"  And the answer is,

24          "there was a large tree surrounded by a lot of

25          leaves and branches and an astounding amount of

Fairstein/cross/Mr. Moore            3110

what appeared to be dried blood."  In the context

in which --

     THE COURT:  Keep your voice down.

     MS. LEDERER:  I'm trying --

     THE COURT:  Talk to him.

     MS. LEDERER:  In the context in which that

question, "what, if anything, did you see in that

location," the ten lines of the answer prior to

that question being asked this witness has

described walking up to the area where she saw the

blood.  I'd like to show it to the court because I

think that question and answer taken out of context

are inconsistent with what this witness has just

testified to.

     MR. MOORE:  I asked her specifically about the

tree and she says yes, there was a large tree.  I

asked her if there was blood around that tree.  She

says no.

     THE COURT:  Where is the question you say

precedes it?

     MS. LEDERER:  If you read the answer which

refers to that location, that answer has her up the

slope and away from the tree.

          (Pause)

NYCLD_015618

P-APP001563

1          Fairstein/cross/Mr. Moore          3111
2          THE COURT:  I don't know what  --  if you
3    clarify what tree you're talking about  --  it's
4    difficult.  They've been talking about places where
5    the body have been located and large trees and no
6    blood around it.  It's difficult to understand --
7          MS. LEDERER:  In the question Mr. Moore wants
8    to ask the witness, the question is, "what, if
9    anything, did you see in that location?"  That
10   location is described by this witness in a previous
11   question indicating an area up the slope.
12         THE COURT:  That's true.  If you want her --
13         MR. MOORE:  I will ask her about the slope
14   then, if there was a tree somewhere up a slope.
15         THE COURT:  But that  --  the reference to this
16   thing is what did you see in that location.  That
17   location has to refer to a previous description of
18   a location.  If you want her to answer that
19   question --
20         MR. MOORE:  I'll try to be more specific.
21         THE COURT:  Well, even if you are being
22   specific, if you're going to ask her that question,
23   you have to ask what precedes it.  Otherwise the
24   jury is not going to understand what that location
25   is.

NYCLD_015619

P-APP001564

Fairstein/cross/Mr. Moore                3112

1

2          MR. MOORE:  Right.

3          (Whereupon, the following occurred in open

4     court:).

5     Q     Do you recall, Miss Fairstein, being in the area

6 where the woman's body had been found?

7     A     Yes.

8     Q     And do you recall after that that you walked in a

9 certain direction, am I correct?

10    A     Yes.

11    Q     You walked up a slope, am I correct?

12    A     Yes.

13    Q     And halfway up that slope there was a tree, is that

14 correct, a large tree?

15    A     Halfway up it?

16    Q     Somewhere up the slope there was a large tree, do

17 you recall that?

18    A     There were a lot of trees.  I'm not being

19 facetious.  There were a lot of trees on the slope.  It was

20 a wooded slope.

21    Q     And do you recall about a third of the way up, that

22 there was a large tree that you noticed?

23    A     I understand  --  more or less, yes.

24    Q     Now, do you recall seeing anything around the

25 ground around that large tree?

NYCLD_015620

P-APP001565

1              Fairstein/cross/Mr. Moore          3113

2     A     The area which I described the blood, that tree was

3    my landmark for the bloody area was the way I could guide

4    myself to the bloody area.  So the blood was around that

5    tree, but it was still walking distance from the tree.

6     Q     It was some distance away from the tree?

7     A     Yes.  But that was the closest tree to it.

8     Q     But the blood was not surrounding the tree, then?

9     A     No.  No.

10    Q     Well, do you remember being asked this question and

11   giving this answer --

12              MS. LEDERER:  Your Honor, I object for the same

13         reasons.

14              THE COURT:  You have to ask the previous

15         question.  If you're going to ask that question,

16         you have to ask the question before it.

17              (Pause)

18    Q     Do you recall being asked this question and giving

19   this answer:

20    "Was there any conversation what happened at the about

21   the bottom of the slope where the car stopped?

22    "ANSWER:  Detective Sheehan and I got out of the car

23   first.  The uniformed officer met us again and pointed out

24   to us where the  --  point in the mud where the young

25   woman's body had been found and pointed to a location where

1                     Fairstein/cross/Mr. Moore            3114

2   some of her items of clothing had been found.

3       "Detective Sheehan and I, while the other three

4   individuals were in the car, walked around that area and

5   proceeded to walk a way up the slope back towards the paved

6   roadway because the uniformed cop had pointed in that

7   direction and had said other evidence had been found in that

8   direction.  And we started to walk that alone.

9       "We reached a point maybe a third of the way up, back up

10  that slope when we were forced to stop.

11      "QUESTION:  What, if anything, did you see in that

12  location?

13      "ANSWER:  There was a large tree surrounded by a lot of

14  leaves and branches and an astounding amount of what

15  appeared to be dried blood."

16      Do you remember that question and that answer?

17      A    Yes.  I do.

18      Q    Well, are you not saying now that the blood was not

19  around the large tree?

20      A    It was not ringing the large tree.  The blood was

21  in one area on the far side of the tree.

22      Q    But you stated there was a large tree surrounded by

23  a lot of leaves?

24              MS. LEDERER:  Objection.

25              THE COURT:  Yeah.  You already read it.

NYCLD_015622

P-APP001567

1              Fairstein/cross/Mr. Moore      3115

2     Q    Now, when you came to the location, to a particular

3  location, you asked Kevin Richardson and Kharey Wise again

4  to come out of the car, am I correct?

5     A    Yes.

6     Q    And what location was this?

7     A    Detective Sheehan and I were standing to one side

8  of this area that looked like blood.

9     Q    Was that around the tree?  Was that the area around

10  the tree?

11     A    The tree was surrounded by leaves.  In one area of

12  leaves south of the tree was blood.  So it was near the

13  tree.  It was directly near the blood.

14     Q    Okay.  And it was in that area at that spot that

15  you asked Kevin Richardson and Kharey Wise to come out of

16  the car, is that correct?

17     A    Yes.  Sheehan and I were at that spot.  They were

18  at the car at the bottom of the ravine.

19     Q    Okay.  Now, you indicated in your questioning that

20  Kharey said something, is that correct?

21     A    Yes.

22          MR. MOORE:  One second.

23     Q    Do you not recall Officer Sheehan asking him, "does

24  this refresh your memory"?  Do you remember Officer Sheehan

25  asking Kharey that?

NYCLD_015623

P-APP001568

1                    Fairstein/cross/Mr. Moore          3116

2       A    At what point in time?

3       Q    When he came out of the car and he approached that

4   area.

5       A    No.  We were nowhere near Kharey when we got out of

6   the car.  We were quite a distance away.  And Kharey spoke

7   to us before Detective Sheehan asked him anything.

8       Q    Well, there came a time when Kharey came close to

9   where you and Detective Sheehan were, am I correct?

10      A    Yes.

11      Q    And at that particular point in time didn't

12  Detective Sheehan initiate that conversation by asking him,

13  "does this refresh your memory"?

14      A    No, sir.  Detective Sheehan did not initiate the

15  conversation.  Kharey spoke first.

16      Q    So if Detective Sheehan were to state that he

17  initiated --

18              MS. LEDERER:  Objection.

19              THE COURT:  Objection sustained.

20      Q    So when Kharey came towards you how far were you

21  away from where the blood was?

22      A    Perhaps two feet.

23      Q    You were two feet away.  So when he came to you,

24  didn't you show him the area where the blood was?

25      A    No, sir.  My recollection is that he saw this large

NYCLD_015624

P-APP001569

1           Fairstein/cross/Mr. Moore          3117

2   patch of stained red blood as he walked up to us.

3       Q    I see.  And he initiated that conversation by

4   commenting on the large amount of blood, am I correct?

5       A    Yes.

6       Q    And what did he say?  What do you recall him

7   saying?

8       A    He said, "damn, damn, damn, that's a lot of blood.

9   This is really bad.  That's a lot of blood.  I didn't know

10  she was bleeding so much."  I'm sorry.  That "I didn't know

11  she was bleeding so much" was in response Sheehan's

12  question.  It started, "damn, damn, damn.  That's a lot of

13  blood.  This is really bad."

14      Q    That's what you recall him saying?

15      A    Yes.

16      Q    Now, at that point in time Detective Sheehan said

17  something, am I correct?

18      A    Yes.

19      Q    What did Detective Sheehan say?

20      A    As close as I remember he said, "why does that

21  surprise you" or "does that surprise you."

22      Q    And what did Kharey say?

23      A    Kharey said, "I knew she was bleeding, but it was

24  dark.  I couldn't see how much.  This is really bad."

25      Q    And that was the end of the conversation?

P-APP001570

Fairstein/cross/Mr. Moore                3118

1

2      A    No.

3      Q    Oh, there was further conversation?

4      A    Yes.

5      Q    What did Sheehan say?

6      A    That's when Sheehan asked him, was the area

7  familiar, did it look familiar to him.

8      Q    And his response was?

9      A    Kharey's response was, "this is where they raped

10  her.  We --"  chaining "we"  --  "no, they dragged her down

11  here."

12     Q    He said, "they dragged her down here?

13     A    He first said "we," "we," and then he stopped, and

14  he said, "they dragged her down here."

15     Q    Well, do you recall again at the previous hearing

16  being asked this question, 3064 --

17              MS. LEDERER:  Could you give me just one

18         moment?

19              MR. MOORE:  Sure.

20              (Pause)

21              MR. MOORE:  No.  I'm sorry.  I'll withdraw

22         that.

23     Q    Now, you had indicated that after this happened

24  Kharey Wise went back in the car, am I correct?

25     A    Yes.

Fairstein/cross/Mr. Moore                3119

1

2      Q      And then what happened after that?

3      A      And then we all got into the car.  And we retraced

4  our route to leave the park.

5      Q      And what route did you leave?

6      A      We went back up the hillside and onto the cross

7  drive going westbound.  And I'm not certain which  --

8  exactly which road Detective Sheehan took out of the park.

9  It's not the road we came in because I know that was a

10  one-way road south, so --

11      Q      And again you went back in one car, am I correct?

12      A      Yes.

13      Q      And you didn't go directly back to the precinct, is

14  that correct?

15      A      That's right.

16      Q      You stopped somewhere?

17      A      Yes.

18      Q      Where did you stop?

19      A      We stopped at an area of scaffolding on Central

20  Park West.  It was either the corner of 96th or 97th Street.

21   It was the northwest corner of the street.  And we stopped

22  so I could get out of the car and look at light bulbs

23  underneath the scaffolding.

24      Q      How did the issue of light bulbs and the

25  scaffolding come in your journey?

NYCLD_015627

P-APP001572

1                    Fairstein/cross/Mr. Moore          3120

2        A      Because I had heard conversation that upon leaving

3   the park a group of young men involved in the attack had

4   seen one of the defendants Antron McCray with a metal pipe

5   breaking light bulbs, jumping and breaking light bulbs that

6   were hanging in the scaffolding.  And I stopped to see if in

7   fact there were broken light bulbs at that location.

8        Q      Who had said that in the statement?

9        A      I heard it from Detective Sheehan.  I did not hear

10  it in a statement.

11       Q      But Sheehan told you that who had said that about

12  the light bulbs being broken?

13       A      I thought he said that Kharey had said it.

14       Q      That's what you recall him saying?

15       A      That's what I recall him saying.

16       Q      Did you ever look at Kharey Wise's statement?

17              MS. LEDERER:  Objection.

18              THE COURT:  "Ever," you mean up to today?

19              MR. MOORE:  No.

20       Q      At that time, on April 21st, when you went to the

21  crime scene, had you looked at Kharey Wise's statement?

22       A      His written statement?

23       Q      Yes.

24       A      No.  I had not seen it.

25       Q      After you went back to the precinct did you look at

```
 1                    Fairstein/cross/Mr. Moore          3121

 2  his written statement?

 3                  MS. LEDERER:  Objection.

 4                  THE COURT:  Objection sustained.

 5      Q    So you didn't know whether there was any reference

 6  in his statement to light bulbs being broken, am I correct?

 7      A    Correct.

 8      Q    Miss Fairstein, I'd like you to look at this

 9  document.

10                  THE COURT:  Is it in evidence?

11                  MR. MOORE:  It's 158 in evidence.

12                  MS. LEDERER:  May we approach for a moment?

13                  THE COURT:  Yes.

14                  (Whereupon, the following occurred at

15             sidebar:).

16                  MS. LEDERER:  I believe --

17                  THE COURT:  158 is what --

18                  MS. LEDERER:  I believe that's the statement

19             from 12:30.  12:30.

20                  MS. LEDERER:  I believe the next question Mr.

21             Moore intends to ask this witness is does it say

22             that.  And I object.

23                  THE COURT:  I would sustain the objection.

24             It's in evidence.  You can argue anything you want

25             from her what she said.  You can argue from the
```

NYCLD_015629

P-APP001574

```
 1                    Fairstein/cross/Mr. Moore          3122

 2          statement that's in evidence.  I'm not going to let

 3          her compare this.

 4                    (Whereupon, the following occurred in open

 5          court:)

 6     Q    You indicated that Sheehan told you that Kharey

 7  Wise had said that, is that correct?

 8     A    That's what I  --  that's my recollection of who

 9  had said that.

10                    (Pause)

11     Q    Well, I'd like to show you, Miss Fairstein, a copy

12  of your notes, page two particularly.

13                    THE COURT:  Mark them.

14                    MR. MOORE:  It's marked already?

15                    THE COURT:  Are they marked?  Mark them.

16                    THE CLERK:  L.

17                    THE COURT:  Three pages.

18                    (Whereupon, Defendant's Wise Exhibit L was

19          marked for identification)

20     Q    Okay.  Is there a reference there to --

21                    THE COURT:  Objection sustained.

22                    MR. MOORE:  Okay.

23     Q    After having  --  do you recall why you went to

24  that location, after having refreshed your recollection?

25                    MS. LEDERER:  Objection.
```

Fairstein/cross/Mr. Moore          3123

2          THE COURT:  I don't know if she said she needed

3          it refreshed.  What is your question?

4     Q     Did you ever indicate in your note or in any

5   written document that Detective Sheehan had indicated to you

6   that Kharey had said that in a statement?

7          MS. LEDERER:  Objection.

8          THE COURT:  I'll allow that.

9     A     No.

10    Q     Okay.

11    A     Did I write that in a note, no.

12    Q     By the way, did you ever drive with Raymond Santana

13  to the park?

14         MS. LEDERER:  Objection.

15         THE COURT:  I'll let her answer.

16    A     I did not.  I personally did not.

17    Q     And you're as sure as you sit there that the two

18  people that you went with to the park were in fact Kharey

19  Wise and Kevin Richardson?

20    A     Of that I am absolutely certain, yes, sir.

21    Q     It was not Kharey Wise and Raymond Santana?

22    A     I was never in a car with Raymond Santana.  No.  It

23  was these two young men.

24    Q     Now, you indicated that sometime later on that

25  evening you heard a conversation, am I correct?

P-APP001576

```
 1                    Fairstein/cross/Mr. Moore           3124

 2      A     I'm sorry?

 3      Q     You indicated sometime later on you heard a

 4  conversation in a cell, am I correct?

 5      A     Yes.

 6            MR. MOORE:  Could I just have a look at those?

 7            (Pause)

 8      Q     And you indicated that you heard someone say

 9  something, am I correct?

10      A     Yes.

11      Q     At this time, how many people were in the cell?

12      A     At least six.

13      Q     Six people.  And how far were you away from the

14  cell when you heard this conversation?

15      A     Eight to ten feet away.

16      Q     And at that time you were in another room, am I

17  correct?

18      A     No.  I was in the same large room.  The cell was

19  --  is an alcove of that room, open to that room.

20      Q     And you said that you heard him making a statement

21  about the guy who was jogging and said, "you want to race, "

22  am I correct.

23            THE COURT:  Who is "him?"

24      Q     At that time you stated you heard certain words

25  being uttered, is that correct?
```

NYCLD_015632

P-APP001577

Fairstein/cross/Mr. Moore                    3125

A     Yes.

Q     What were those words?

A     I heard Kharey say, "did you tell them about the guy or the runner who said to us, 'do you want to race?'"

Q     But the guy, the runner?

A     The guy, the runner, "do you want to race."

Q     And what  --  did you see who he was talking to?

A     I couldn't  --  he was talking down to someone seated on the ground.  When someone answered, I could not see who it was.  One voice in that group said, "yeah."

Q     And you indicated that Kharey said something.  What was that?

A     Then Kharey said, "I did, too.  That was funny." And he laughed.

Q     He laughed, am I correct?

A     He laughed.  Others laughed.

Q     Now, you indicated that you did not make these notes until the Monday following that, am I correct?

A     Yes.

Q     And the day when you allegedly heard or when --

           MS. LEDERER:  Objection.

           THE COURT:  Objection sustained as to form.

Q     When you went to the crime scene was a Thursday, is that correct?

P-APP001578

1                    Fairstein/cross/Mr. Moore            3126

2          MS. LEDERER:  Objection as to form.

3          THE COURT:  What is the question?

4     Q    This day you went to the crime scene, what day of

5 the week was that?

6     A    It was Friday morning.

7     Q    It was a Friday morning.

8     When you heard this conversation was a Friday evening,

9 am I correct?

10    A    Yes.

11    Q    And you did not make your notes until Monday, am I

12 correct?

13    A    Yes.

14    Q    And as you sit there, Miss Fairstein, you have

15 indicated that these notes correctly reflect what transpired

16 on Friday the 21st, am I correct?

17    A    I believe so.

18    Q    And you have indicated that you and Detective

19 Sheehan and Kharey Wise and Kevin Richardson went in one car

20 to the scene, am I correct?

21    A    Yes.

22    Q    And you have also indicated that after leaving the

23 scene you stopped at some scaffolding in West 96th Street,

24 is that correct?

25    A    96th or '7th, yes.

1                    Fairstein/cross/Mr. Moore          3127

2       Q     And you also indicated that you went to the roadway

3  first, and then you went down into the ravine afterwards, am

4  I correct?

5       A     Yes.

6       Q     And you have also indicated that you did not make

7  any notes contemporaneously of what Kharey Wise said on that

8  Friday morning, am I correct?

9       A     Yes.

10      Q     You did not make those notes until the following

11 Monday?

12      A     Yes.

13      Q     And before you made those notes did you in any way

14 get together with Detective Sheehan about the accuracy of

15 what you were writing?

16      A     I did not.  These were my recollection.

17      Q     This is your recollection.

18            MR. MOORE:  No further questions.

19 REDIRECT EXAMINATION

20 BY MS. LEDERER:.

21      Q     In answer to questions by Mr. Diller and Mr. Moore

22 you described that you stopped on the morning of April 21st

23 at a location at either 97th or 96th Street and Central Park

24 West.  Would you describe what you saw when you went to that

25 location?

NYCLD_015635

P-APP001580

```
 1                   Fairstein/redirect/People                3128

 2      A     Yes.

 3                 MR. MOORE:  Objection.  Asked and answered.

 4                 THE COURT:  It hasn't been answered.  I'll

 5            allow it.

 6      A     Stopped the car on Central Park West.  I got out of

 7  the front passenger seat, which is on that side of the road.

 8   And there was in fact scaffolding that went from the

 9  building edge to the sidewalk starting on Central Park West

10  into the street, 97th or 96th.  And in fact, as I walked

11  from one end of the scaffolding to the other, every second

12  or third light bulb was broken.

13      Q     Do you recall being asked some questions by Mr.

14  Moore regarding your conversation with Kharey Wise at the

15  24th Precinct with respect to asking him to go to Central

16  Park with you on that morning?

17      A     Yes.

18      Q     Mr. Moore.

19                 MS. LEDERER:  Mr. Moore, 3051.

20      Q     Do you recall being asked --

21                 THE COURT:  Just a minute.  Wait until he gets

22            it.

23                 MS. LEDERER:  Sorry.

24                 MR. MOORE:  Could we approach?

25                 THE COURT:  Yes.
```

P-APP001581

```
 1                 Fairstein/redirect/People                3129
 2              (Whereupon, the following occurred at
 3         sidebar:).
 4              MR. MOORE:  What section are you reading?
 5              MS. LEDERER:  I'm reading question at line 25
 6         of 3051 continuing on the top of 3052 through the
 7         answer that ends on line ten of 3052.
 8              MR. MOORE:  What's the inconsistency?
 9              MS. LEDERER:  You read her a question and
10         answer that suggested that she did not tell him
11         that he had the right not to go.  And this --
12              THE COURT:  Where is the question and answer?
13         That he read?
14              MR. CLEMENTS:  3061, I believe.
15              (Pause)
16              MR. CLEMENTS:  I'm sorry, 3053.
17              THE COURT:  3055.
18              MR. MOORE:  This statement on its face, your
19         Honor, is certainly not inconsistent.
20              MS. LEDERER:  It's line four and line six.
21              (Document handed to the court.)
22              (Pause)
23              THE COURT:  What are you asking her?  What is
24         the question to her?  These are the questions you
25         asked starting on line four.
```

NYCLD_015637

P-APP001582

Fairstein/redirect/People                3130

MR. MOORE:  Line four.

MS. LEDERER:  Referring to line 25 through this
question here, answer here.

(Pause)

MR. MOORE:  She never tells him there that he
had a right not to go.  She tells him he can go
with us and explain the purpose.

THE COURT:  How is this different really from
what was said in the previous question and answer?

MS. LEDERER:  I asked him then if he would go
with us.

MR. CLEMENTS:  Mr. Moore raised the suggestion
that he was told he had to go to the crime scene.
And this is another question and answer where it is
clear that she says to him, " wanted to ask him if
he would go to the crime scene," as opposed to
forcing him to go to the crime scene, which is
opposite the suggestion raised in Mr. Moore's
questions.

MR. MOORE:  My question is if she told him he
was not free to go.  There's nothing in this answer
which advises him he has a right not to go with
her.

THE COURT:  How is this different?  It doesn't

NYCLD_015638

P-APP001583

1     Fairstein/redirect/People    3131

2 say about she told him anything.

3   MS. LEDERER:  My position is where it says, "I

4 asked him then if he would go with us" is different

5 than telling.  Just right here.  And asking him if

6 he would go with us.

7   (Pause)

8   THE COURT:  I'll allow it to be read.  We're

9 talking about page 3051, 3052.  The last question

10 3051.

11   MR. MOORE:  All I'm saying, judge, it's not

12 inconsistent because --

13   THE COURT:  It includes a portion of her

14 testimony relating to that particular subject that

15 was not part of the answer and question that you

16 read.  That's the reason why I'm allowing it.

17   (Whereupon, the following occurred in open

18 court:)

19 Q Do you recall testifying at a prior proceeding,

20 3051, and being asked this question and giving this answer:

21 "would you please tell us what, if anything, you said to him

22 and what, if anything, he said to you?

23  "ANSWER:  I introduced myself to him.  I told him that I

24 was an assistant district attorney.  And I told him -- I

25 explained to him that I was interested in going with the

NYCLD_015639

P-APP001584

1               Fairstein/redirect/People              3132

2  detectives and with him back to the park to look at the area

3  where the crime occurred.  And I then told him I was going

4  to read him his so-called Miranda warnings or his rights and

5  ask him then if he would go with us.  And I explained our

6  purposes  --  purpose in going back there."

7      Do you recall being asked that question and giving that

8  answer?

9      A    I do.

10     Q    Do you recall certain questions put to you by Mr.

11 Diller earlier today when he asked you as to whether you

12 were privy to what was being done in the course of this

13 investigation?

14     A    Yes.

15     Q    During the time that you were at the 24th Precinct

16 and at other precincts in the course of your work in this

17 investigation approximately how many detectives and police

18 officers were working on this case?

19     A    I would estimate that at least twenty police

20 officers were involved, bosses and other people included.

21 May have been as many as thirty or more over the 48-hour

22 period, forty-hour period that we were there.

23     Q    Were you running the investigation?

24     A    I was not.

25     Q    Were you made aware of everything that every

```
 1              Fairstein/redirect/People              3133
 2   officer and detective was doing at the time that they were
 3   doing those things?
 4              MR. MOORE:  Objection.
 5              THE COURT:  I'll allow it.
 6   A     I was not.
 7   Q     At any time when you saw Kharey Wise, did he ever
 8   ask you if he could go home?
 9   A     No, he did not.
10   Q     Did he ever ask for his mother?
11   A     Never.
12   Q     Did you ever see him cry while he was at the 24th
13   Precinct when you saw him?
14   A     I never did.
15   Q     Did you ever see Kevin Richardson cry?
16   A     I did not.
17   Q     Did you ever hear Kevin Richardson ask to be
18   allowed to go home?
19   A     I did not.
20              MS. LEDERER:  I have nothing further.
21              MR. DILLER:  I have no questions.
22              THE COURT:  Mr. Moore, anything else.
23              MR. MOORE:  Just one question.
24              THE COURT:  One?
25              MR. MOORE:  Just one question.
```

P-APP001586

1                    Fairstein/recross/Mr. Moore                3134

2   RECROSS EXAMINATION

3   BY MR. MOORE:.

4       Q    You indicated, Miss Fairstein, that you did not see

5   Kharey Wise cry, am I correct?

6       A    Yes.

7       Q    As a matter of fact, he was fairly calm, wasn't he?

8       A    Through much of it, yes.

9       Q    He wasn't alarmed in any way?

10               MS. LEDERER:  Objection.

11               THE COURT:  I'll let her answer if he expressed

12          an alarm.

13      A    He never expressed to me, nor did I see anything in

14  my observations of him that were alarm.

15      Q    Okay.  In other words, his demeanor was consistent

16  with someone who was innocent of a crime, wasn't it?

17               MS. LEDERER:  Objection.

18               THE COURT:  Sustained.

19      A    No.

20               MR. MOORE:  No further questions.

21               THE COURT:  Thank you.

22               (Whereupon, the witness was excused.)

23               THE COURT:  We'll take a short recess.  Don't

24          discuss the case.

25               (Whereupon, the jury left the courtroom.)

NYCLD_015642

1                          Colloquy                    3134A

2          (Whereupon, a recess was taken.)

3          (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NYCLD_015643

P-APP001588

T1-JM-TS

4914

1                          Fairstein - People - Direct

2    District Attorney's office.

3           Q        How  long have you been employed as an Assistant

4    District Attorney?

5           A     Almost 18 years.

6           Q     Directing your attention to April 20th of 1989.

7           Did there come a time on that date that you went   to   the

8    20th Precinct?

9           A     Yes, there did.

10          Q     And at approximately what time did you arrive at the

11   20th Precinct?

12          A     A little after 8:30 that evening.

13          Q          Ms.  Fairstein,  are  you  familiar  with  the

14   circumstances under which an Assistant District Attorney, from

15   the New York County DA's office is assigned to go to a  police

16   precinct and assist or participate?

17                 MR. RIVERA:  Objection, objection.

18          Q     (Continuing) in an investigation?

19                 MR. JOSEPH:  Objection.

20                 MR. BURNS:  Objection.

21                 THE COURT:  Objection sustained.

22          Q     Was  an  Assistant District Attorney assigned to

23   assist in the investigation of this case?

24                 MR. JOSEPH:  Objection.

25                 THE COURT: Overruled.

NYCLD_015433

P-APP001589

1                    Fairstein - People - Direct

2        A    Yes.

3        Q    And who was that person?

4        A    You, Elizabeth Lederer.

5        Q    In the course of the assignment of an assistant,   of

6    an Assistant District Attorney, to this case --

7                    MS. LEDERER:   Withdrawn.

8        Q        Where did you go when you arrived at the 20th

9    Precinct?

10       A    I entered the precinct, identified myself to  police

11   officer  on  the  ground  floor,  near  the entrance, and went

12   upstairs to the second  floor  Detective  Squad  Room  of  the

13   Precinct.

14       Q        For  what reason, in this case, was an Assistant

15   District Attorney assigned?

16                    MR. JOSEPH:   Objection.

17                    MR. BURNS:   Objection.

18                    THE COURT:   I'll allow it.

19       A    To aid the Police Department in the investigation of

20   this case, and to participate in  the  making  of  video  tape

21   statements,  which  the  Police Department does not do without

22   our participation.

23                    MR. JOSEPH:   I would move to strike that.

24                    THE COURT:   I'll allow it to stand.

25       Q    Would you describe the conditions that you  observed

T1-JM-TS

4916

1                   Fairstein - People - Direct

2    at  the 20th Precinct when you arrived on the evening of April

3    20th?

4         A     There were --

5                   MR. BURNS:  Your Honor, I object.

6                   I'm assuming she's being called as  a  rebuttal

7              witness, and this is beyond the scope of anything.

8              She wasn't called during trial.

9                   THE COURT:  Objection is overruled.

10                  MR. BURNS:  All right.

11        A     When I arrived at 82nd Street, I observed say more

12   than 20 people outside the front of the stationhouse,  on  the

13   sidewalk, on either side of the door.

14        I  entered,  it's  a  uniformed  officer in the lobby who

15   directed me upstairs.

16        As I entered the second floor area, there were two benchs

17   right through the doorway, before you enter the large room.

18        There  were  a  number  of  people, I  presumed  to  be

19   civilians,  seated  there,  and  a lot of detectives, in plain

20   clothes, in the large squad room, some of  whom  I  knew,  who

21   greeted  me,  and took me into another room, where Ms. Lederer

22   and other police personnel were.

23        Q    Did there come a time  that  you  learned,  on  that

24   evening,  that  someone  was at the 20th Precinct on behalf of

25   Yusef Salaam?

NYCLD_015435

P-APP001591

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.     Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.     Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.     Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.     As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.     Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.     Not that I can think of. | 15:46:46 |
| 21 | Q.     I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.     As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

NYCLD_039089

P-APP001592

Linda Fairstein

Page 222

| | | |
|---|---|---|
| 1 | Q. At that time, did you know | 15:47:29 |
| 2 | anything about the events in Central Park | 15:47:32 |
| 3 | on April 19th? | 15:47:35 |
| 4 | A. I don't believe that I did. | 15:47:36 |
| 5 | Q. You saw nothing on television, | 15:47:38 |
| 6 | you heard nothing from other sources? | 15:47:41 |
| 7 | A. I didn't see anything on | 15:47:44 |
| 8 | television the night of the 19th. I may | 15:47:46 |
| 9 | have heard a news, radio news report in | 15:47:50 |
| 10 | the morning, not about a rape, but about a | 15:47:53 |
| 11 | riot. | 15:47:58 |
| 12 | Q. Do you know why Fiston called? | 15:47:59 |
| 13 | A. Yes, I do. | 15:48:05 |
| 14 | Q. Why? | 15:48:06 |
| 15 | A. He called me shortly before nine | 15:48:07 |
| 16 | to tell me that a woman had been found | 15:48:10 |
| 17 | beaten, and presumably because of her | 15:48:22 |
| 18 | state of undress, sexually assaulted in | 15:48:24 |
| 19 | the ravine, and he had been called in | 15:48:28 |
| 20 | because there had been no sexual assault | 15:48:34 |
| 21 | allegation until that woman reached the | 15:48:38 |
| 22 | hospital. | 15:48:40 |
| 23 | Q. What else did he tell you? | 15:48:41 |
| 24 | A. He told me that the woman was as | 15:48:47 |
| 25 | yet unidentified, and he asked me in the | 15:48:52 |

NYCLD_039090

P-APP001593

Linda Fairstein

Page 223

| | | |
|---|---|---|
| 1 | usual course of prosecutorial business if | 15:48:57 |
| 2 | I would assign a prosecutor to work on the | 15:49:00 |
| 3 | prosecutorial events that might happen | 15:49:06 |
| 4 | later in the day because there were | 15:49:14 |
| 5 | already were suspects being questioned. | 15:49:16 |
| 6 | Q.    Did you make any notes about | 15:49:22 |
| 7 | this conversation? | 15:49:24 |
| 8 | A.    No. | 15:49:25 |
| 9 | Q.    Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.    Not that I recall. | 15:49:30 |
| 12 | Q.    Did he tell you anything else? | 15:49:31 |
| 13 | A.    At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.    Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.    Not exactly. | 15:49:57 |
| 24 | Q.    Why do you say that? | 15:49:58 |
| 25 | A.    Because it was not just a call | 15:50:00 |

NYCLD_039091

P-APP001594

Linda Fairstein

Page 224

| | | |
|---|---|---|
| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

P-APP001595

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q.    So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ:  Objection.  You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A.    Those are not my words, sir.  I | 15:51:43 |
| 20 | didn't say they had no connection.  I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

P-APP001596

Linda Fairstein

Page 226

| | | |
|---|---|---|
| 1 | more urgent need.  He wanted a prosecutor | 15:52:00 |
| 2 | assigned, that was the main purpose of the | 15:52:04 |
| 3 | call. | 15:52:06 |
| 4 | Q.    Did he tell you that it appeared | 15:52:06 |
| 5 | that a homicide was involved? | 15:52:08 |
| 6 | A.    No, he didn't tell me that.  He | 15:52:09 |
| 7 | told me that the victim was in very grave | 15:52:12 |
| 8 | condition. | 15:52:18 |
| 9 | Q.    The question I think I forgot to | 15:52:19 |
| 10 | ask you earlier when you spoke of one | 15:52:21 |
| 11 | person who had knowledge about the | 15:52:23 |
| 12 | investigation from Ryan, who was that? | 15:52:26 |
| 13 | A.    Lisa Friel. | 15:52:30 |
| 14 | Q.    Did you know what she had | 15:52:31 |
| 15 | learned from Ryan and how she knew about | 15:52:36 |
| 16 | it? | 15:52:38 |
| 17 | A.    I knew some of the things she | 15:52:39 |
| 18 | learned from Ryan. | 15:52:42 |
| 19 | Q.    What did you learn from Friel? | 15:52:43 |
| 20 | A.    I knew from Friel the point at | 15:52:45 |
| 21 | which Ryan no longer wanted Mooney | 15:52:55 |
| 22 | involved in the investigation. | 15:52:59 |
| 23 | I knew from Friel that she, that | 15:53:00 |
| 24 | on a day, I came to know from Friel that | 15:53:03 |
| 25 | on a date that Ryan arranged with Mooney | 15:53:08 |

NYCLD_039094

P-APP001597

Linda Fairstein

Page 227

```
 1    to go to the park with Matias Reyes, she,    15:53:14
 2    Ms. Ryan, intentionally left Mooney          15:53:18
 3    behind.                                       15:53:23
 4            I knew from Friel that Ms. Ryan      15:53:25
 5    had no intention of returning my calls to    15:53:28
 6    her and asking to interview me.              15:53:31
 7            And I know from Ms. Friel in         15:53:36
 8    that process that Ms. Ryan had asked for     15:53:39
 9    the screening sheet Detective Spencer had    15:53:42
10    given to Peter Casolaro that had never       15:53:46
11    been returned to me with Matias Reyes's      15:53:50
12    name on it.                                   15:53:53
13       Q.    Anything else?                       15:53:54
14       A.    At the moment, those are the        15:53:54
15    main things I remember.                       15:53:56
16       Q.    Did you make notes of that          15:53:57
17    conversation?                                 15:53:59
18       A.    No, it's pretty vivid.              15:53:59
19       Q.    Did you create a memo about that    15:54:02
20    conversation?                                 15:54:04
21       A.    No.                                  15:54:05
22       Q.    Did you send an e-mail about        15:54:05
23    that conversation?                            15:54:10
24       A.    To anyone?                           15:54:11
25       Q.    Yes.                                 15:54:12
```

NYCLD_039095

P-APP001598

Linda Fairstein

Page 228

| | | |
|---|---|---|
| 1 | A.    I don't believe so.  It was a | 15:54:13 |
| 2 | phone conversation, a telephone | 15:54:16 |
| 3 | conversation. | 15:54:17 |
| 4 | Q.    So let's go back to your call | 15:54:17 |
| 5 | to, pardon me, your call with Fiston. | 15:54:19 |
| 6 | What did you do after that? | 15:54:31 |
| 7 | A.    I picked up the office roster | 15:54:33 |
| 8 | that I kept on my desk.  It's a monthly | 15:54:39 |
| 9 | form distributed to every lawyer to look | 15:54:43 |
| 10 | at my unit's names to see who was | 15:54:50 |
| 11 | available for me to assign the case to. | 15:54:53 |
| 12 | Q.    And what happened next? | 15:54:57 |
| 13 | A.    I chose the name Elizabeth | 15:55:03 |
| 14 | Lederer. | 15:55:03 |
| 15 | Q.    Because? | 15:55:05 |
| 16 | A.    Because she was a skilled | 15:55:05 |
| 17 | experienced litigator.  She did excellent | 15:55:09 |
| 18 | work.  She was one of the top four names | 15:55:14 |
| 19 | that I considered at the time that I | 15:55:21 |
| 20 | looked at the list and I settled on her. | 15:55:25 |
| 21 | Q.    And you called? | 15:55:30 |
| 22 | A.    And I called her. | 15:55:31 |
| 23 | Q.    Right after that? | 15:55:32 |
| 24 | A.    Immediately after that. | 15:55:34 |
| 25 | Q.    Told her? | 15:55:35 |

NYCLD_039096

P-APP001599

Linda Fairstein

Page 229

| 1 | A. Asked her what her availability | 15:55:37 |
| 2 | was, and told her about the call from | 15:55:41 |
| 3 | Sergeant Fiston. | 15:55:45 |
| 4 | Q. She said? | 15:55:45 |
| 5 | A. She said she was available to | 15:55:47 |
| 6 | handle an investigation. | 15:55:51 |
| 7 | Q. What did you learn during the | 15:55:53 |
| 8 | day, if anything, about the events in | 15:55:56 |
| 9 | Central Park on April 19th? | 15:56:01 |
| 10 | A. Almost nothing. | 15:56:05 |
| 11 | Q. Did you follow any of the media | 15:56:14 |
| 12 | coverage at that time? | 15:56:17 |
| 13 | A. During the day, most of the day | 15:56:18 |
| 14 | I believe I was in court. | 15:56:20 |
| 15 | Q. On other matters? | 15:56:24 |
| 16 | A. Yes. | 15:56:25 |
| 17 | Q. At some point, you ended up | 15:56:26 |
| 18 | going to the 20th Precinct more or less at | 15:56:31 |
| 19 | the same time that Lederer was there. | 15:56:36 |
| 20 | What brought that about? | 15:56:38 |
| 21 | A. Throughout the day, I had calls | 15:56:39 |
| 22 | from the District Attorney asking me to | 15:56:44 |
| 23 | keep him updated about the case. I had | 15:56:48 |
| 24 | actually been in to see him when he | 15:56:54 |
| 25 | arrived that morning after I spoke with | 15:56:56 |

NYCLD_039097

P-APP001600

Linda Fairstein

Page 230

| 1  | Ms. Lederer.                                  | 15:56:59 |
| 2  | And he asked me to give him                   | 15:57:01 |
| 3  | information and updates.  He called me on     | 15:57:07 |
| 4  | the lunch break when I was down from court    | 15:57:13 |
| 5  | to ask whether Ms. Lederer was at the         | 15:57:16 |
| 6  | precinct yet, and I told him no.  The         | 15:57:19 |
| 7  | police had not asked us to come yet.          | 15:57:23 |
| 8  | Q.    Did you have any discussion with        | 15:57:30 |
| 9  | Nancy Ryan during the day about the           | 15:57:34 |
| 10 | assignment of Assistant DAs to the case?      | 15:57:39 |
| 11 | A.    None at all.                            | 15:57:43 |
| 12 | Q.    None?                                    | 15:57:44 |
| 13 | A.    None.                                    | 15:57:45 |
| 14 | Q.    Did you have any discussion with        | 15:57:45 |
| 15 | Nancy Ryan at all during that day?            | 15:57:48 |
| 16 | A.    Not that I recall.                       | 15:57:50 |
| 17 | Q.    Did you know that Nancy Ryan had        | 15:57:52 |
| 18 | assigned Peter Casolaro to the case?          | 15:57:56 |
| 19 | A.    I don't believe that's true.            | 15:57:59 |
| 20 | Nancy Ryan was not Chief of the Trial         | 15:58:02 |
| 21 | Division that day.  John Fried and I had      | 15:58:04 |
| 22 | discussions that day.                         | 15:58:07 |
| 23 | Q.    Did you know that Nancy Ryan            | 15:58:08 |
| 24 | wanted Peter Casolaro to try the case?        | 15:58:11 |
| 25 | MS. DAITZ:  Objection.                  | 15:58:14 |

NYCLD_039098

P-APP001601

Linda Fairstein

Page 231

```
 1        Q.    I said that wrong.  Did you know    15:58:17
 2   that Nancy Ryan wanted Peter Casolaro to       15:58:19
 3   be involved in the investigation and           15:58:22
 4   prosecution?                                    15:58:24
 5        A.    I don't know that Nancy Ryan         15:58:26
 6   knew anything about that case.  She, at         15:58:28
 7   that point in time, had no administrative       15:58:30
 8   role in the Trial Division.                     15:58:33
 9        Q.    Did you ever talk to Morgenthau      15:58:35
10   or did he ever talk to you about who            15:58:49
11   should be assigned to the case?                 15:58:52
12        A.    Yes, sir.                            15:58:53
13        Q.    And what was that conversation?      15:58:54
14        A.    John Fried was Chief of the          15:58:56
15   Trial Division.  After I got off the phone      15:58:58
16   with Sergeant Fiston and Ms. Lederer, Mr.       15:59:02
17   Freed came in.                                  15:59:05
18            I had a conversation with him          15:59:07
19   about, since he was up the chain of             15:59:09
20   command from me, I had a conversation with      15:59:11
21   him about my call from Sergeant Fiston and      15:59:13
22   my plan to assign Ms. Lederer to the case.      15:59:17
23            And he said that he'd already          15:59:21
24   had a call from someone in the police           15:59:25
25   department higher up.  I don't know who.        15:59:30
```

NYCLD_039099

P-APP001602

Linda Fairstein

Page 232

```
 1    And he would like to, he wanted to assign      15:59:32
 2    Peter Casolaro to the case.                     15:59:36
 3         Q.    This is what Mr. Frieze is           15:59:39
 4    telling you?                                    15:59:42
 5         A.    Mr. Fried told me, yes.              15:59:42
 6         Q.    Do you know who he got the call      15:59:45
 7    from?                                           15:59:52
 8         A.    I don't.                             15:59:52
 9         Q.    What did Mr. Freize tell you         15:59:53
10    about that competing request?                  15:59:55
11            MS. DAITZ:   Fried.                     15:59:58
12         A.    Fried, John Fried.  F-R-I-E-D,       15:59:59
13    John Fried.                                     16:00:03
14         Q.    I-E-U?                               16:00:04
15         A.    D, D, like David.                    16:00:05
16         Q.    Fried, okay.  So what did he         16:00:07
17    tell you about that issue?                      16:00:08
18         A.    That he was planning to assign       16:00:11
19    the case to Peter Casolaro.                     16:00:15
20         Q.    Fried was?                           16:00:18
21         A.    Yes.  It was his, it would have      16:00:19
22    been his job to assign the case had there       16:00:22
23    not been a Sex Crimes Unit.                     16:00:26
24         Q.    Tell us the rest of that             16:00:28
25    conversation, please.                           16:00:30
```

NYCLD_039100

P-APP001603

Linda Fairstein

Page 233

| | | |
|---|---|---|
| 1 | A.    I said I'd already spoken to Ms. | 16:00:31 |
| 2 | Lederer, one of us, either Fried or I said | 16:00:33 |
| 3 | let's talk to the boss, Mr. Morgenthau. | 16:00:39 |
| 4 |         And as I recall it, we went | 16:00:42 |
| 5 | together to talk to Mr. Morgenthau about | 16:00:45 |
| 6 | the assignment of the case that day. | 16:00:48 |
| 7 | Q.    When? | 16:00:50 |
| 8 | A.    Before ten o'clock on the | 16:00:52 |
| 9 | morning of the 20th. | 16:00:55 |
| 10 | Q.    Who else was present in the | 16:00:56 |
| 11 | meeting with Morgenthau? | 16:00:58 |
| 12 | A.    I believe only John Fried and I | 16:00:59 |
| 13 | were there. | 16:01:01 |
| 14 | Q.    What was the conversation or the | 16:01:02 |
| 15 | substance of it? | 16:01:05 |
| 16 | A.    I believe Mr. Morgenthau had | 16:01:06 |
| 17 | heard the news report and knew the case | 16:01:10 |
| 18 | had happened, and was waiting to hear from | 16:01:14 |
| 19 | us about who was going to do what. | 16:01:18 |
| 20 |         I don't recall knowing if he | 16:01:21 |
| 21 | was, if Mr. Morgenthau knew when we walked | 16:01:23 |
| 22 | in that there had been a sexual assault | 16:01:26 |
| 23 | alleged.  And we each presented reasons | 16:01:31 |
| 24 | for choosing the assistants we had | 16:01:34 |
| 25 | assigned. | 16:01:40 |

NYCLD_039101

P-APP001604

Linda Fairstein

Page 234

| 1 | Q.    Fried said, correct me if I'm | 16:01:41 |
| 2 | wrong, this is going to be a homicide | 16:01:45 |
| 3 | case, it should go to Casolaro? | 16:01:48 |
| 4 | MS. DAITZ:  Objection. | 16:01:50 |
| 5 | Q.    Or what did he say? | 16:01:51 |
| 6 | A.    Not because you're wrong, but he | 16:01:52 |
| 7 | didn't say it's going to be a homicide.  I | 16:01:55 |
| 8 | think he also said there was the bigger | 16:01:58 |
| 9 | question of riots, and a number of other | 16:02:01 |
| 10 | victims in the park that night, and that | 16:02:04 |
| 11 | he didn't use the word grave, but the | 16:02:11 |
| 12 | woman in the hospital unidentified might | 16:02:14 |
| 13 | not survive. | 16:02:17 |
| 14 | Q.    And you said? | 16:02:19 |
| 15 | A.    I said if she does survive and | 16:02:22 |
| 16 | everybody is hoping that she survives, I | 16:02:25 |
| 17 | think that the skills that Ms. Lederer has | 16:02:28 |
| 18 | working, experience working with victims | 16:02:33 |
| 19 | who sustained this kind of trauma would be | 16:02:39 |
| 20 | more appropriate, considering they both | 16:02:42 |
| 21 | have the same skill levels as attorneys. | 16:02:45 |
| 22 | Q.    And Morgenthau made a decision? | 16:02:47 |
| 23 | A.    Yes, he did. | 16:02:49 |
| 24 | Q.    How did he express that | 16:02:50 |
| 25 | decision? | 16:02:52 |

NYCLD_039102

P-APP001605

Linda Fairstein

Page 235

1        A.      There, as we stood before him,        16:02:53
2    he said something like I agree with Linda.        16:03:00
3    Elizabeth should have the case, sort of           16:03:06
4    simple like that.                                 16:03:09
5        Q.      What led to you going to the          16:03:10
6    20th Precinct?                                    16:03:13
7        A.      Throughout the day, Ms. Lederer       16:03:14
8    stayed in touch with, I believe, Sergeant        16:03:22
9    Fiston to find out -- we can't go to the          16:03:26
10   precinct, it's not our property until the         16:03:29
11   police say they're ready for us.                  16:03:32
12           Mr. Morgenthau was impatient for          16:03:34
13   prosecutors to get there and become               16:03:38
14   involved.  And in the prosecutorial work          16:03:41
15   of the investigation, and before he left          16:03:45
16   the office around 7:00 o'clock, he said           16:03:50
17   why is Elizabeth still here.  And I said          16:03:53
18   she's been told she will be called any            16:03:58
19   minute to go to the station house.                16:04:01
20           So I had no contact with the              16:04:03
21   police throughout that day other than            16:04:07
22   perhaps one additional phone call to             16:04:12
23   Sergeant Fiston to ask him what was going        16:04:14
24   on.  When I saw Mr. Morgenthau in the            16:04:17
25   morning, I had no plan to go to the              16:04:25

NYCLD_039103

P-APP001606

Linda Fairstein

Page 236

| | | |
|---|---|---|
| 1 | precinct, I was sending Ms. Lederer. | 16:04:27 |
| 2 | By the time it was the end of | 16:04:29 |
| 3 | the day Ms. Lederer or Sergeant Fiston | 16:04:31 |
| 4 | informed me that the police part of the | 16:04:34 |
| 5 | investigation had grown, and young men who | 16:04:36 |
| 6 | had come in were each naming or describing | 16:04:42 |
| 7 | other men.  And they were ready to have | 16:04:45 |
| 8 | Elizabeth come to start doing video | 16:04:48 |
| 9 | statements, video interviews. | 16:04:51 |
| 10 | And literally, I told Mr. | 16:04:53 |
| 11 | Morgenthau I was going to go with her for | 16:05:00 |
| 12 | a few hours to set up and make sure she | 16:05:02 |
| 13 | had everything she needed to do the work | 16:05:05 |
| 14 | she had to do. | 16:05:07 |
| 15 | Q.    What led directly to your going | 16:05:08 |
| 16 | to the precinct? | 16:05:12 |
| 17 | MS. DAITZ:  Objection. | 16:05:13 |
| 18 | Q.    What directly led to you going | 16:05:15 |
| 19 | to the precinct? | 16:05:18 |
| 20 | MS. DAITZ:  Same objection. | 16:05:18 |
| 21 | A.    That, that Ms. Lederer got the | 16:05:19 |
| 22 | phone call around 7:00 o'clock saying can | 16:05:21 |
| 23 | you be here within the hour, we're ready | 16:05:24 |
| 24 | for you. | 16:05:28 |
| 25 | Q.    Sorry, I missed that. | 16:05:28 |

NYCLD_039104

P-APP001607

Linda Fairstein

Page 237

| | | | |
|---|---|---|---|
| 1 | A. | Yes, there was a disturbance. | 16:05:31 |
| 2 | Q. | So you went together? | 16:05:33 |
| 3 | A. | No, we actually went separately. | 16:05:33 |
| 4 | Q. | Did you go home first? | 16:05:37 |
| 5 | A. | Yes.  Did I go home first, yes. | 16:05:38 |
| 6 | Q. | So what precinct did you go to | 16:05:41 |
| 7 | first? | | 16:05:44 |
| 8 | A. | I went to the 20th Precinct on | 16:05:44 |
| 9 | west 82nd Street. | | 16:05:47 |
| 10 | Q. | At that time, did you know what | 16:05:49 |
| 11 | police were involved in the investigation? | | 16:05:57 |
| 12 | A. | I had no idea. | 16:05:59 |
| 13 | Q. | When you first got to the | 16:06:01 |
| 14 | precinct, was Ms. Lederer there already? | | 16:06:03 |
| 15 | A. | Yes. | 16:06:06 |
| 16 | Q. | You talked to her? | 16:06:08 |
| 17 | A. | I did. | 16:06:11 |
| 18 | Q. | What did she tell you? | 16:06:12 |
| 19 | A. | That she had just arrived, that | 16:06:15 |
| 20 | she was waiting to be briefed by the | | 16:06:18 |
| 21 | senior police officials who were at the | | 16:06:23 |
| 22 | precinct at that time. | | 16:06:27 |
| 23 | Q. | Did you know who that was? | 16:06:29 |
| 24 | A. | I did not until they introduced | 16:06:32 |
| 25 | themselves. | | 16:06:34 |

NYCLD_039105

P-APP001608

Linda Fairstein

Page 238

| | | |
|---|---|---|
| 1 | Q.    Tell us about that introduction | 16:06:35 |
| 2 | and what you were told. | 16:06:38 |
| 3 | A.    I think it was about 8:30 p.m. | 16:06:40 |
| 4 | when I arrived at the 20th Precinct, went | 16:06:44 |
| 5 | up to the squad room on the second floor, | 16:06:48 |
| 6 | and the first two people I recall meeting | 16:06:53 |
| 7 | were plainclothes police officers named | 16:06:58 |
| 8 | Reynolds and Powers.  And Ms. Lederer was | 16:07:01 |
| 9 | there with them, I think. | 16:07:08 |
| 10 | And shortly thereafter, out of a | 16:07:11 |
| 11 | supervisor's room with a closed door, the | 16:07:15 |
| 12 | door opened and Captain Rowe introduced | 16:07:18 |
| 13 | himself to me. | 16:07:21 |
| 14 | There was another supervisor | 16:07:24 |
| 15 | with him, it could have been Inspector | 16:07:26 |
| 16 | Power who I met at some point that | 16:07:32 |
| 17 | evening, but I'm not certain. | 16:07:34 |
| 18 | Q.    Go on. | 16:07:36 |
| 19 | A.    Ms. Lederer and I went into the | 16:07:37 |
| 20 | office with the two senior police | 16:07:46 |
| 21 | officers, supervisors, and they gave us a | 16:07:51 |
| 22 | 15 or 20 minute sort of overview of what | 16:07:58 |
| 23 | they understood had happened from the time | 16:08:02 |
| 24 | Powers and Reynolds got the first call, | 16:08:07 |
| 25 | first 911 calls started coming in the | 16:08:10 |

NYCLD_039106

P-APP001609

Linda Fairstein

Page 239

```
 1   park.                               16:08:14
 2       Q.    Did you learn the identity of   16:08:14
 3   any of the people who were being held as  16:08:16
 4   suspects?                           16:08:19
 5            MS. DAITZ:  Objection to form.  16:08:20
 6       A.    At that point, I think what I   16:08:26
 7   remember learning is some of the names    16:08:31
 8   from the story of who were the first young  16:08:35
 9   men to have been picked up in or next to   16:08:39
10   the park.                           16:08:47
11       Q.    What did those chief officers   16:08:47
12   tell you about those young men who you    16:08:50
13   learned about?                      16:08:53
14       A.    They didn't tell us anything    16:08:53
15   about them.  They were telling the story.  16:08:55
16       Q.    What's the story they told you?  16:08:57
17       A.    They told the story, the story I  16:08:59
18   recall is that 911 calls began to come in.  16:09:09
19   The first might actually have been from a   16:09:16
20   yellow cab driver who had rocks thrown at   16:09:18
21   his cab.  There were, I think, two calls   16:09:23
22   from male joggers around the reservoir.    16:09:26
23            And then there were a lot of    16:09:31
24   calls about random activity of a group of  16:09:33
25   young men running, running through the     16:09:41
```

NYCLD_039107

P-APP001610

Linda Fairstein

Page 240

| | | |
|---|---|---|
| 1 | park, and that the two officers outside | 16:09:45 |
| 2 | the room had been among the first to | 16:09:48 |
| 3 | respond and had actually seen young men | 16:09:52 |
| 4 | running from the park and stopped them. | 16:09:56 |
| 5 | Q.    Did the officers tell you | 16:09:58 |
| 6 | anything about what the young men had | 16:10:03 |
| 7 | said, if anything? | 16:10:06 |
| 8 | A.    These two supervisor officers? | 16:10:07 |
| 9 | Q.    Yes. | 16:10:09 |
| 10 | A.    Only one thing I remember | 16:10:09 |
| 11 | specifically. | 16:10:14 |
| 12 | Q.    Being? | 16:10:17 |
| 13 | A.    Being that there was a, I | 16:10:19 |
| 14 | believe a 13-year old named Clarence | 16:10:22 |
| 15 | Thomas who was in one of the patrol cars | 16:10:25 |
| 16 | who said I didn't do the murder, but I | 16:10:28 |
| 17 | know who did.  I can tell you who did, my | 16:10:30 |
| 18 | cousin did the murder. | 16:10:34 |
| 19 | Q.    That's the only specific thing | 16:10:35 |
| 20 | you remember? | 16:10:39 |
| 21 | A.    That's the first specific | 16:10:40 |
| 22 | conversation that I remember. | 16:10:42 |
| 23 | Q.    Then what happened after that | 16:10:42 |
| 24 | conversation was ended? | 16:10:47 |
| 25 | A.    When that conversation ended, | 16:10:48 |

NYCLD_039108

P-APP001611

Linda Fairstein

Page 241

| | | |
|---|---|---|
| 1 | Ms. Lederer and I left the room, or we | 16:10:50 |
| 2 | were asked to leave by the Captain Rowe | 16:10:54 |
| 3 | and probably his senior officer. | 16:10:57 |
| 4 | Q.    They were the only two people | 16:11:00 |
| 5 | present outside of yourself and Ms. | 16:11:02 |
| 6 | Lederer in that meeting? | 16:11:06 |
| 7 | A.    In that room that I recall. | 16:11:06 |
| 8 | There were supervisors from the police | 16:11:07 |
| 9 | department of every high ranking level all | 16:11:09 |
| 10 | throughout the 30 hours we were there. | 16:11:13 |
| 11 | They kept changing off, so it wasn't | 16:11:15 |
| 12 | everybody there at the same time.  But I | 16:11:17 |
| 13 | believe Captain Rowe was there from the | 16:11:20 |
| 14 | beginning. | 16:11:23 |
| 15 | Q.    What event occurred of any | 16:11:23 |
| 16 | significance after that? | 16:11:28 |
| 17 | MS. DAITZ:  Objection. | 16:11:29 |
| 18 | Q.    Did you see any, for example, | 16:11:33 |
| 19 | did you see any suspects being brought in? | 16:11:36 |
| 20 | A.    At that time in those, in that | 16:11:39 |
| 21 | first hour, let's say, I did not. | 16:11:41 |
| 22 | Q.    Did you talk to any of the | 16:11:43 |
| 23 | police officers who had been involved in | 16:11:46 |
| 24 | the investigation? | 16:11:49 |
| 25 | A.    My memory is that I listened, I | 16:11:51 |

NYCLD_039109

P-APP001612

Linda Fairstein

Page 242

| | | |
|---|---|---|
| 1 | had a conversation with Ms. Lederer, she | 16:11:54 |
| 2 | was going to start to work. | 16:11:56 |
| 3 | She, I believe her first | 16:11:58 |
| 4 | conversation was with either Police | 16:12:01 |
| 5 | Officer Powers or Police Officer Reynolds, | 16:12:04 |
| 6 | and I was in the same room in the squad | 16:12:07 |
| 7 | area, but she began to question them.  I | 16:12:10 |
| 8 | was not was there to do the prosecutorial | 16:12:12 |
| 9 | work as she was. | 16:12:19 |
| 10 | Q.   Did you participate in the | 16:12:20 |
| 11 | questioning, in the interviews of Reynolds | 16:12:22 |
| 12 | and Powers? | 16:12:25 |
| 13 | A.   I don't believe that I did.  I | 16:12:25 |
| 14 | was in the same squad room, larger than | 16:12:26 |
| 15 | this room, but close by. | 16:12:30 |
| 16 | Q.   What did you hear them say? | 16:12:32 |
| 17 | A.   I don't recall that at all. | 16:12:33 |
| 18 | Q.   Did you take any notes? | 16:12:36 |
| 19 | A.   I did not. | 16:12:38 |
| 20 | Q.   What happened next, that is to | 16:12:38 |
| 21 | say, with whom did you interact next | 16:12:42 |
| 22 | having anything to do with the | 16:12:46 |
| 23 | investigation? | 16:12:49 |
| 24 | A.   I believe the next person I | 16:12:49 |
| 25 | interacted with was Mr. Morgenthau.  I | 16:12:51 |

NYCLD_039110

P-APP001613

Linda Fairstein

Page 243

| | | |
|---|---|---|
| 1 | called, as he asked me to, to let him know | 16:12:55 |
| 2 | that we were at the station house and that | 16:12:58 |
| 3 | the investigation seemed to be growing. | 16:13:02 |
| 4 | And then I talked to Ms. Lederer | 16:13:09 |
| 5 | about getting her a second lawyer to work | 16:13:11 |
| 6 | with her. | 16:13:15 |
| 7 | Q.    Is that how Clements came into | 16:13:16 |
| 8 | the case? | 16:13:22 |
| 9 | A.    Yes, I left the room, I asked | 16:13:22 |
| 10 | for a phone.  We didn't have cell phones | 16:13:25 |
| 11 | at that point.  I called Ms. Lederer's | 16:13:27 |
| 12 | bureau chief and asked him to find me a | 16:13:31 |
| 13 | lawyer capable, senior, who had experience | 16:13:38 |
| 14 | doing video interviews, who could work | 16:13:43 |
| 15 | with Ms. Lederer on the case. | 16:13:46 |
| 16 | Q.    Did he tell you who he was | 16:13:48 |
| 17 | choosing? | 16:13:50 |
| 18 | A.    In the first phone call, no. | 16:13:50 |
| 19 | Q.    In a subsequent phone call? | 16:13:52 |
| 20 | A.    He called me back to tell me | 16:13:55 |
| 21 | which assistant he had chosen and when | 16:13:57 |
| 22 | that assistant expected to arrive. | 16:14:01 |
| 23 | Q.    Did you know who that was? | 16:14:03 |
| 24 | A.    Mr. Clements.  I had no idea who | 16:14:04 |
| 25 | he was. | 16:14:07 |

NYCLD_039111

P-APP001614

Linda Fairstein

Page 244

```
 1        Q.     You hadn't worked with him      16:14:08
 2   before?                                      16:14:10
 3        A.     Never.  Or, excuse me, when I    16:14:10
 4   say never, I have no recollection of         16:14:13
 5   working with him.  I might have met him in   16:14:14
 6   the office in a group, but he'd never        16:14:17
 7   worked on a case with me.                    16:14:21
 8        Q.     Did he arrive before midnight on 16:14:21
 9   the 20th?                                    16:14:24
10        A.     I don't think so, but I'm not    16:14:25
11   certain.                                     16:14:26
12        Q.     Do you recall him arriving at    16:14:26
13   all?                                         16:14:28
14        A.     Oh, yes, definitely.  But I have 16:14:28
15   a clear recollection of him being at the     16:14:30
16   24th Precinct, and we didn't move there      16:14:33
17   until after 12:30, after midnight.  And so   16:14:36
18   I don't remember him making the move with    16:14:41
19   us.                                          16:14:43
20        Q.     Did you have --                  16:14:43
21             MR. BELDOCK:  Withdrawn.           16:14:50
22        Q.     Did you learn anything about the 16:14:51
23   statements being taken from any of the       16:14:54
24   suspects between your arrival at 8:30 and    16:14:56
25   let's say eleven o'clock?                    16:15:06
```

NYCLD_039112

P-APP001615

Page 66

1                    Arthur Clements

2    of the Sex Crimes Bureau or not.

3         Q.      Had you ever handled a sex crimes

4    case prior to this case?

5                    MR. MYERBERG:   Objection.

6         A.      Yes, I believe I testified earlier

7    that I may have handled a sex crimes case that

8    was a misdemeanor.

9         Q.      To your knowledge, in 1989 was

10   there a special trial bureau assigned to

11   homicide cases?

12        A.      To the best of my knowledge, there

13   was not.

14        Q.      There was not.  So a homicide case

15   could go to anyone?

16        A.      No, that's not correct.

17        Q.      What is correct, where would a

18   homicide case -- who could take a homicide case?

19                    MR. MYERBERG:   Objection.

20        A.      Assistant District Attorneys who

21   were assigned to the, what we called the

22   homicide chart.

23        Q.      And could they come from any

24   bureau?

25                    MR. MYERBERG:   Objection.

NYCLD_035217

P-APP001616

Page 67

1                      Arthur Clements

2         A.      It was my understanding back in

3    1989 that they would come only from bureaus that

4    were part of the Trial Division.

5         Q.      And who ran that, the Trial

6    Division?

7                   MR. MYERBERG:   Objection.

8         A.      I don't know what you mean by run,

9    but I think that at the time a man named John

10   Fried was chief of the Trial Division in 1989.

11        Q.      Do you know what Nancy Ryan's

12   position was in 1989?

13                   MS. FISHER-BYRIALSEN:   Let me

14        strike that.

15        Q.      Do you know who Nancy Ryan is?

16        A.      Yes.

17        Q.      Was she an ADA, to your knowledge,

18   in 1989?

19        A.      Yes, she was an Assistant District

20   Attorney.

21        Q.      Do you know what her position at

22   the District Attorney's office was in 1989?

23        A.      I do not recall what her position

24   was at that time.

25        Q.      Do you recall in April of 1989,

NYCLD_035218

P-APP001617

Page 68

Arthur Clements

1

2  prior to the arraignment of this case, any

3  discussions in regards to who would be in charge

4  of the prosecution of the case?

5              MR. MYERBERG:   Objection.

6       A.       I was not present for any such

7  discussions, to the best of my recollection.

8       Q.       Do you recall any discussions,

9  prior to the arraignment of this case, in

10 regards to what detective squad would be in

11 charge of the investigation of the case?

12             MR. MYERBERG:   Objection.

13      A.       To the best of my recollection, I

14 was not present for any such discussions.

15      Q.       Did you know what detective squad

16 was investigating the case?

17      A.       At what time?

18      Q.       Prior to arraignment.

19             MR. MYERBERG:   Objection.

20      A.       I can't, I can't answer that with

21 any certainty.  I don't know at that time what,

22 if any, detective bureau had been assigned by

23 the police department to handle the case.

24      Q.       As far as you know, the officers

25 that you worked with on April 21st, what

NYCLD_035219

P-APP001618

Page 69

1                    Arthur Clements

2     detective squad were they from?

3                 MR. MYERBERG:   Objection.

4         A.    Well, I don't know what you mean by

5     work with.  I met some detectives and police

6     officers on the 21st.

7         Q.    And were those detectives part of

8     the Manhattan North Homicide Squad?

9                 MR. MYERBERG:   Objection.

10        A.    Some of the detectives I met that

11    day were part of that squad, yes.

12        Q.    And were some part of the Sex

13    Crimes Squad?

14                MR. MYERBERG:   Objection.

15        A.    I don't recall meeting anybody who

16    was part of the Sex Crimes Squad.

17        Q.    Were you aware that during the

18    first week or so of the case when it was

19    uncertain whether or not the jogger was going to

20    survive, that both the Manhattan North Homicide

21    Unit and the Sex Crimes Detective Squad were

22    working on the case?

23        A.    Well, no, I do not know who was

24    working on the case from the police department

25    during the first week or so.  I recall different

NYCLD_035220

P-APP001619

Page 70

1                    Arthur Clements

2   detectives that I met.

3        Q.     So you don't recall there being

4   some sort of tension between the squads of who

5   was going to handle the case?

6                 MR. MYERBERG:   Objection.

7        A.     I don't know what you mean by

8   tension.  I was not aware in the first couple of

9   weeks after April 19, 1989 who in the police

10  department was assigned to work on the

11  investigation with respect to the crimes that

12  occurred on April 19th.

13       Q.     When I asked you earlier about

14  whether or not you were present at any meetings

15  where it was discussed which bureau would be in

16  charge of the rape case, you said you weren't

17  present at any such meetings.  Did you ever hear

18  about any such discussions?

19                 MR. MYERBERG:   Again, this is all

20       prior to arraignment?

21                 MS. FISHER-BYRIALSEN:   Prior to

22       arraignment.

23       A.     No, I was not present for any

24  discussions, and to the best of my knowledge,

25  Elizabeth Lederer was assigned to prosecute the

NYCLD_035221

P-APP001620

Page 71

1                        Arthur Clements

2    case.

3           Q.       Did you ever hear any rumors within

4    the office that there was some sort of tension

5    or debate about where the case should go?

6                  MR. MYERBERG:  Objection.  This is

7           prior to arraignment?

8                  MS. FISHER-BYRIALSEN:  Prior to

9           arraignment.

10          A.       No, I didn't hear about any such

11   rumors, and that's my answer.

12          Q.       Well, did you know that there was

13   disagreement between Linda Fairstein and Nancy

14   Ryan as to who should be prosecuting the case?

15                 MR. MYERBERG:  Objection.

16          A.       I don't know if that's a fact or

17   not, but I hadn't heard about it and don't know

18   anything about it.

19          Q.       Do you recall prior to the

20   arraignment of this case or any time at the DA's

21   office hearing about a negative relationship

22   between Linda Fairstein and Nancy Ryan?

23                 MR. MYERBERG:  Objection.  Just to

24          be clear, I want to preface it by saying

25          outside of any conversations you may have

NYCLD_035222

P-APP001621

Page 72

1                    Arthur Clements

2       had with counsel.

3              MS. FISHER-BYRIALSEN:  With you,

4       right.

5              MR. MYERBERG:  Or with Corp

6       Counsel.

7              MS. FISHER-BYRIALSEN:  I said up to

8       '89.  I don't know if you were talking to

9       him before 1989.

10             MR. MYERBERG:  I was a young child

11      so theoretically.

12      A.      I'm sorry, can you read the

13   question back, please?

14                 (The record was read.)

15             MR. MYERBERG:  Objection.  I think

16      you said it was up to '89.

17             MS. FISHER-BYRIALSEN:  Right.

18      A.      So qualifying your question to be

19   within the time period of 1989, the answer is

20   no.

21      Q.      Did you hear anything prior to

22   1989?

23      A.      No.

24      Q.      Did you hear anything after 1989

25   outside of your discussions with Mr. Myerberg or

NYCLD_035223

P-APP001622

Page 73

1                    Arthur Clements

2    anyone representing you from Corporation

3    Counsel?

4         A.     Again, your question is about?

5         Q.     A negative relationship or friction

6    between Nancy Ryan and Linda Fairstein.

7         A.     No, I had not heard that.

8         Q.     Ultimately, prior to arraignment,

9    this case became a case belonging to the Sex

10   Crimes Bureau; is that correct?

11            MR. MYERBERG:   Objection.

12        A.     I don't know specifically whether

13   that is accurate or not from my perspective.   It

14   was assigned to Elizabeth Lederer.

15        Q.     And to your knowledge, was Linda

16   Fairstein supervising Elizabeth Lederer?

17            MR. MYERBERG:   Objection.

18        A.     No.

19        Q.     What was your understanding of her

20   involvement in the case prior to the arraignment

21   of Linda Fairstein's involvement prior to the

22   arraignment?

23        A.     I don't know if I -- I think Linda

24   Fairstein was at the precinct, but that the case

25   was assigned to Elizabeth Lederer.

NYCLD_035224

P-APP001623

Page 74

1                    Arthur Clements

2          Q.      Did she have any other involvement

3   than simply being at the precinct on that one

4   occasion prior to the arraignment?

5               MR. MYERBERG:   Objection.

6          A.      You're asking about Linda

7   Fairstein?

8          Q.      Yes.

9          A.      I don't know specifically what

10  Linda Fairstein's involvement was at the time I

11  arrived at the precinct.

12         Q.      Let me go back.   We've discussed so

13  far the period from April 21st around 2:00 to

14  2:30 a.m. where you arrive at the precinct and

15  the events, including the statements taken from

16  Kevin Richardson, Steve Lopez, Raymond Santana

17  up to Clarence Thomas, correct?   Those are the

18  things that happened when you were initially at

19  the 24th Precinct on April 21, 1989?

20              MR. MYERBERG:   Objection.

21         A.      Well, I don't know that that's

22  everything that happened at the 24th Precinct.

23  But I was present on the first floor of the 24th

24  Precinct during the time that the videotaped

25  statements of Kevin Richardson, Raymond Santana,

NYCLD_035225

P-APP001624

# EXHIBIT E

NYCLD_030680

P-APP001625

RS.W.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK -- PART 58
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK    :

                                    :   **AFFIRMATION IN RESPONSE**

        -against-            :   **TO MOTION TO VACATE**

                                      :   **JUDGMENT OF CONVICTION**

KHAREY WISE, KEVIN RICHARDSON,         :
ANTRON MCCRAY, YUSEF SALAAM, and       :   **INDICTMENT NO. 4762/89**
RAYMOND SANTANA,                       :

                          :
                    Defendants.   :
----------------------------------------x

     NANCY E. RYAN, an attorney duly admitted to practice in the
State of New York and an Assistant District Attorney in and for the
County of New York, hereby affirms under penalty of perjury that:

     1.   I am the Assistant District Attorney in charge of the
above-captioned case, and as such I am fully familiar with the
facts and circumstances herein.

     2.   This affirmation is based upon information and belief, the
sources of said information and belief being transcripts of prior
proceedings held in connection with the above-captioned indictment;
files, records, briefs, notes, and videotapes maintained by the New
York County District Attorney's Office, the New York City Police
Department, the Federal Bureau of Investigation, and the City and
State Departments of Corrections;   interviews with police,
civilian, and expert witnesses;   and conversations with Assistant
District Attorneys.

     3.   I make this affirmation in response to motions submitted
by the defendants Kevin Richardson, Antron McCray, Raymond Santana,
Yusef Salaam, and Kharey Wise, all of whom were convicted after
trial of various charges contained in New York County Supreme Court
Indictment Number 4762/89. The motions have been made pursuant to
Criminal Procedure Law Section 440.10(1)(g).  Each motion requests
that guilty verdicts rendered against the defendants in connection
with the above-captioned indictment be vacated and set aside based
upon newly discovered evidence, and that the court grant whatever
further relief may be just and proper.

     4.   The defendants were all convicted of charges relating to
the April 19, 1989, assault and rape of a female jogger.
Additionally, defendants Richardson, McCray, Salaam, and Santana
were convicted of charges relating to the assault and robbery of a
second, male jogger on the same date. Finally, defendant Wise was
convicted of a riot charge in connection with a series of events
that encompassed both those criminal incidents.  The newly
discovered evidence relied upon by all the defendants consists of

NYCLD_030681

P-APP001626

an affidavit by Matias Reyes, in which he swears that he alone committed the attack on the female jogger of which each stands convicted.

5.  Based on the facts and for the reasons set forth below, the People consent to the defendants' motions to set aside the verdicts on all the charges of which they were convicted.

6.  This affirmation does not describe the full scope of the review, reinvestigation, and reevaluation of the evidence undertaken by the Office of the District Attorney in connection with this matter.  It outlines the principal issues considered by the People in responding to the defendants' legal motions, summarizes some of the facts relevant to those issues, and explains the analysis undertaken to resolve them.  In short, it deals with the specific legal issue presented by the defendants' motions: whether the newly discovered evidence in this matter creates a probability that, if the evidence had been received at trial, it would have resulted in a verdict more favorable to the defendants on one or more charges.

## HISTORY OF THE PROSECUTION

7.  On the night of April 19, 1989, a series of violent incidents occurred in Central Park, involving members of a group of more than 30 teenagers.  The incidents resulted in the arrests and convictions of ten young men, including the above-named defendants. At approximately 9:05 p.m. Michael Vigna, a racing biker, was accosted by a band of youths on the East Drive, just north of the 102nd Street transverse.  A few minutes later, Antonio Diaz was assaulted and robbed, also on the East Drive, at about the level of 102nd Street.  He was left unconscious.  At roughly 9:12 to 9:15 p.m., a couple on a tandem bicycle was menaced on the drive just south of the 102nd Street entrance to the park.  Moments later, slightly south of that, a taxi driver had rocks hurled at his cab, and was threatened by a group of teenagers when he got out of the car to investigate.  And, beginning at about 9:24 p.m. and continuing until roughly 9:45, a series of four male joggers were set upon on the jogging path at the northern end of the Central Park Reservoir.  Two of the male joggers escaped essentially unharmed, but two, Robert Garner and John Loughlin, were assaulted. Garner was not seriously hurt.  Loughlin, however, was knocked to the ground, kicked, punched, and beaten with a pipe and stick.  He was knocked unconscious, and sustained significant but not life-threatening injuries.

8.  At approximately 1:30 a.m., an unconscious woman was found by two men walking on a footpath through Central Park.  She lay at the edge of a wooded area, roughly 300 feet north of the 102nd Street transverse road, which runs in an "s"-shaped curve connecting the East and West Drives of the park.  Police and medical personnel were summoned.  The victim, a twenty-nine year

PAGE 2 of 34

NYCLD_030682

P-APP001627

old white woman who came to be known as the "Central Park jogger," was removed to the hospital. She had been badly beaten about the head, and suffered numerous bruises, scratches, and abrasions elsewhere on her body. Her t-shirt had been rolled into a ligature and used to tie her in a distinctive fashion.* Subsequent investigation revealed that she had left her apartment on East 83rd Street at roughly 8:55 p.m. to go jogging in the park, and that her expected route would have taken her across the transverse road. The investigation also revealed that she had been raped, and that her radio headset and keys were missing.

9. Raymond Santana and Kevin Richardson, as well as a number of other youths, were apprehended at approximately 10:15 p.m. on April 19, after police officers responding to reports concerning some of the incidents spotted them on the western outskirts of the park. Antron McCray, Yusef Salaam, and Kharey Wise were brought in for questioning on April 20, 1989, after they had been identified by other youths as having been present at or participants in some of the events in the park.

10. Each of the defendants was questioned by detectives and made one or more statements. All five of the defendants implicated themselves in a number of the crimes which had occurred in the park. None of them admitted actually raping the Central Park jogger, but each gave an account of events in which he made himself an accomplice to the crime. Kharey Wise was 16 years old at the time; Yusef Salaam and Antron McCray were 15; and Kevin Richardson and Raymond Santana were 14.

11. On May 4, 1989, Indictment Number 4762/1989 was filed charging each of the defendants with Attempted Murder in the Second Degree (Penal Law Section 110/125.25(1)), Rape in the First Degree (Penal Law Section 130.35(1)), Sodomy in the First Degree (Penal Law Section 130.50(1)), Sexual Abuse in the First Degree (Penal Law Section 130.65(1)), and two counts of Assault in the First Degree (Penal Law Sections 120.10(1) and (3)), with respect to the Central Park jogger. In addition, the indictment charged each of them with Robbery in the First Degree (Penal Law Section 160.15(3)), two counts of Robbery in the Second Degree (Penal Law Sections 160.10(1) and (2)(a)), and two counts of Assault in the Second Degree (Penal Law Sections 120.05(2) and (6)) in connection with the attack on John Loughlin, and with Assault in the Second Degree (Penal Law Section 120.05(6)) with respect to jogger David Lewis. All of the defendants were also charged with Riot in the First Degree (Penal Law Section 240.06).

---

*The shirt was placed behind her head, crisscrossed over and through her mouth, and then used to tie her hands and wrists up in front of her face.

PAGE 3 of 34

NYCLD_030683

P-APP001628

12.   Steven Lopez, 15, was also indicted in connection with the attack on the jogger.  Lopez was named by Kevin Richardson, Raymond Santana, and Kharey Wise as having participated in the crime, although they varied greatly in their descriptions of his conduct.  Lopez was interviewed and made a videotaped statement following his arrest on April 19, and denied any knowledge of an incident involving a female jogger.  However, in subsequent forensic testing, a single hair taken from his clothing was found to be "consistent with" the jogger's hair, based upon a microscopic analysis.  Lopez was charged in the same indictment as the five other defendants.  On January 30, 1991, he pled guilty to Robbery in the First Degree in connection with the assault on John Loughlin, and on March 13, 1991, he received a sentence of one and one-half to four and one-half years.

13.   Charges were also filed against five other defendants who were involved in the incidents which took place on April 19.

14.   Michael Briscoe, 17, was named by Kevin Richardson as a participant in the assault on the female jogger; he was also named by Kharey Wise, in one of two videotaped statements Wise made.  None of the other defendants mentioned him, at least by name.  He was interviewed by investigators and made a videotaped statement.  He denied knowledge of or culpability in the incident.  Briscoe was initially charged in connection with the crime in a Criminal Court complaint, but was never indicted on those charges.  On May 4, 1989, he was indicted for Riot in the First Degree (Penal Law Section 240.06) and Assault in the Second Degree (Penal Law Section 120.05(6)), in connection with the attack on jogger David Lewis.  Briscoe pled guilty to the assault charge on May 31, 1991, and received a sentence of one year to run concurrently with a sentence imposed on an unrelated case.

15.   Jermaine R███████, 15, was also indicted on May 4, 1989, charged with Robbery in the First Degree (Penal Law Section 160.15(3), two counts of Robbery in the Second Degree (Penal Law Section (2)(a) and (1)), three counts of Assault in the Second Degree (Penal Law Section 120.05(2) and (6)), and Riot in the First Degree (Penal Law Section 240.06).  The charges pertained to the assaults on John Loughlin and David Lewis.  R██████ had not been identified by any of the defendants as a participant in the attack on the female jogger, and he denied knowing anything about such an attack in his interviews.  On October 5, 1989, R██████ pled guilty to Robbery in the First Degree in connection with the incident involving John Loughlin.  He also entered into a plea agreement that required him to testify for the prosecution if called upon to do so.  R██████ was not called as a witness in the subsequent trials of the defendants, and he was sentenced to one year on April 4, 1991, and granted Youthful Offender treatment.

16.   On January 10, 1990, Antonio Montalvo, 18, was charged under Indictment Number 0009/90 with two counts of Robbery in the

PAGE 4 of 34

Second Degree (Penal Law Section 160.10(2)(a) and (1)), one count of Assault in the Second Degree (Penal Law Section 120.05(2)), and Riot in the First Degree (Penal Law Section 240.06), in connection with the assault on Antonio Diaz.  Montalvo, known as "Tony", had been named as a participant, though not a rapist, in Antron McCray's statement about the jogger attack.* None of the other defendants had named him.·  Montalvo was interviewed by investigators about the events in the park, and made a videotaped statement to an Assistant District Attorney.  He denied any knowledge of an attack on a female jogger, and was never charged in connection with the crime.  On January 29, 1991, he pled guilty to Robbery in the Second Degree.  He received a sentence of one year.

17.  Orlando Escobar, 16, was also indicted on January 10 of 1990, for Robbery in the First Degree (Penal Law Section 160.15(3)), two counts of Robbery in the Second Degree (Penal Law Sections 160.10(2)(a) and (1)), two counts of Assault in the Second Degree (Penal Law Sections 120.05(2) and (6)), and Riot in the First Degree (Penal Law Section 240.06).  The charges pertained to the assault on John Loughlin.  Antron McCray had stated that a "Puerto Rican kid with a hoodie" had raped the jogger, and Escobar may have been the person he was referring to.** None of the other defendants mentioned him in their statements.  Escobar was interviewed, denied any knowledge of the attack, and was never charged in connection with it.  On March 14, 1991, he pled guilty

---

*Montalvo's identity as the person McCray was referring to is firmly established by analyzing McCray's statement and a number of others made during the 1989 investigation.  McCray identified "Tony" as a participant in the assault on Antonio Diaz, and the person who took his food and ate some of it.  Four others said the same thing.  Raymond Santana stated that Montalvo admitted to him that he was the person who had taken and eaten the food.  In statements made to the police at the time, Montalvo acknowledged having done so.  Finally, Kevin Richardson stated that a person named "Tony" participated in the assault on Diaz, and said that he lived in the Lehman Projects.  That was Montalvo's residence at the time.

**That conclusion is based upon an analysis of the contents of McCray's statement and others.  In the course of his videotaped statement, McCray mentioned ultimately leaving the park with another youngster.  He did not know the person well, and could not immediately recall his name.  Later in the statement, he remembered that his name was Orlando.  In Escobar's own statements, he made it clear that he had played a role in the incidents involving Diaz, the tandem bicyclists, and the joggers at the reservoir, but that he was not well known to the others in the group.  In an interview with another individual conducted in 1989, that individual said that he saw McCray and Orlando Escobar when they returned to their apartment complex, and that both were wearing black hoods.

PAGE 5 of 34

NYCLD_030685

P-APP001630

to Attempted Robbery in the Second Degree.  He was sentenced to six months incarceration and four and one-half years probation.

18.  On April 21, 1989, Clarence ██████ 14, was charged in a Criminal Court complaint with Rape in the First Degree (Penal Law Section 130.35(1)), Attempted Murder in the Second Degree (Penal Law Section 110/125.25(1)), and Assault in the First Degree (Penal Law Section 120.10(1) in connection with the attack on the Central Park jogger. Antron McCray had named T███ as one of the people who actually raped the jogger; police notes reflect that Kevin Richardson had also placed him at the scene, though Richardson did not repeat the allegation in his written or recorded statements. None of the other defendants named him. T████ was interviewed and made a videotaped statement. He denied that he played any part in an attack on a female jogger. Subsequently, additional charges were filed against him in Criminal Court in connection with the attacks on Loughlin and other joggers at the reservoir. T████ was never indicted, and all charges against him were dismissed on October 31, 1989.

19.  Pursuant to motions to suppress their statements filed by each defendant, a joint Huntley hearing was held before Justice Thomas Galligan from October 10 to November 29, 1989. On February 23, 1990, the court issued an opinion denying the defendants' motions, with the exception of a single oral statement made by Raymond Santana.

20.  On June 25, 1990, Antron McCray, Yusef Salaam, and Raymond Santana proceeded to a joint trial before the Honorable Thomas Galligan. On August 18, 1990, after ten days of deliberations, the jury convicted each defendant of one count of Assault in the First Degree and Rape in the First Degree for the attack on the Central Park jogger; Robbery in the First Degree and three assault charges for the attack on John Loughlin; Assault in the Second Degree for the attack on David Lewis; and Riot in the First Degree. It acquitted each defendant of Attempted Murder and Sodomy as to the female jogger, and was instructed by the judge not to consider the other, lesser included counts. Since each was under 16 years of age, the court, on September 11, 1990, set aside all their convictions except those for First Degree Robbery and Rape, and then sentenced each of them, as juveniles, to consecutive prison terms of from three and one-third to ten years on each count. This resulted in an aggregate term of from five to ten years pursuant to Penal Law Section 70.30(1)(d).

21.  Kevin Richardson and Kharey Wise were tried jointly, also before Judge Galligan, from October 22, 1990, to December 11, 1990. The jury deliberated for eleven days before reaching a verdict. Richardson was found guilty of each count of the indictment. Wise was convicted of Assault in the First Degree and Sexual Abuse in the First Degree with respect to the attack on the Central Park jogger, and of Riot in the First Degree. He was acquitted of the

NYCLD_030686

P-APP001631

remaining charges.  Because of Richardson's age, Justice Galligan set aside all of Richardson's convictions except for those for Attempted Murder in the Second Degree and First Degree Robbery, Rape, and Sodomy.  The court sentenced Richardson, as a juvenile, to consecutive prison terms of from three and one-third to ten years on each count, resulting in an aggregate term of from five to ten years.  Wise was sentenced to terms of imprisonment of five to fifteen years for Assault in the First Degree, two and one-third to seven years for Sexual Abuse in the First Degree, and one to three years for Riot.  The sentences were imposed concurrently, for an aggregate term of five to fifteen years.

22.  Yusef Salaam's conviction was affirmed by the Appellate Division (187 A.D.2d 363) and by the Court of Appeals (83 N.Y. 2d 51).  Antron McCray's conviction was also affirmed by the Appellate Division (198 A.D.2d 200), and the Court of Appeals denied leave to appeal.  The same is true of the conviction of Kharey Wise (204 A.D.2d 133).  Kevin Richardson's conviction was affirmed by the Appellate Division (202 A.D.2d 207).  Raymond Santana never perfected an appeal.

## EVIDENCE AGAINST THE DEFENDANTS AT TRIAL

23.  A thorough and extensive investigation was undertaken at the time of the original proceedings in an effort to develop additional evidence.  Nevertheless, the People's case at both trials rested almost entirely on the statements made by the defendants.*

24.  In addition to the defendants themselves, twenty-four young men who were in Central Park on the night of April 19 were interviewed, some repeatedly, as were a number of the defendants' other associates.  However, only one associate of one defendant, Kharey Wise, testified at trial.  Her testimony related to a single inculpatory statement she said Wise had made to her, after he had been indicted.**

---

*Kevin Richardson and Antron McCray each made one written and one videotaped statement.  Raymond Santana made two written statements, with a supplement to one of them, and a videotaped statement.  Yusef Salaam made one oral, unrecorded, unsigned statement.  Kharey Wise made two written and two videotaped statements.

**That witness was Melody Jackson.  Her brother, much younger than she, was a friend of Wise, and she herself had known Wise for years.  She testified that on one occasion when she was in the family apartment where her brother lived, Wise had telephoned from jail.  He called to speak with members of the family, as he often did.  She testified that when she got on the telephone, she told
(continued...)

NYCLD_030687

P-APP001632

25. The crime scene, the victim, the defendants, and their personal effects were all examined for forensic evidence. Those examinations resulted in the collection of blood, semen, and hair evidence which was tested using the technologies in existence at the time.

26. The crime scene covered a wide area, and comprised five separate sites at which relevant evidence was recovered. All of the sites were on or north of the 102nd Street transverse. Two substantial bloodstains, each roughly two inches in diameter, were located on the transverse road itself, just north of the midline. Beginning at the edge of the roadway was a visible path of flattened vegetation, measuring from sixteen to eighteen inches wide, which extended to the treeline that began forty feet to the north. Within the wooded area where that vegetation ended, a trail continued to be visible for some distance in the dead leaves and other matter covering the ground.

27. Inside the treeline, approximately seventy-eight feet from the roadway, more bloodstains were discovered at a location where the ground -- bare earth covered by leaves and twigs -- appeared to have been disturbed. Blood samples were taken from leaves in the area, and a rock which appeared to have blood and several hairs on it was removed for testing. Approximately two hundred twenty-five feet beyond that, farther into the wooded area and down a slope, was another, larger area of disturbed ground with a considerably greater quantity of visible blood and a single hair. A trail of apparent blood spots was observed between the two sites. A white sock and the insole of a jogging shoe were found a short distance away from that second site, and a fragment of brick was also recovered. A second sock was found about forty feet away.

28. The jogger herself had been found at the bottom of the slope, near an unpaved path, forty-seven feet from the location of the disturbance above. On the opposite side of the path, scattered approximately thirty-two feet from where she lay, investigators recovered a pair of black jogging tights and two jogging shoes. One of the jogging shoes was untied, and the insole had been removed; the other shoe was tied.

29. Numerous items of physical evidence found at each of these locations were removed and tested for forensic evidence. For

---

** (...continued)

him she could not believe what she was hearing about his having sex with "that woman." According to Jackson's testimony, Wise replied that he had not had sex with her, but had only held and fondled the victim's leg. Jackson never mentioned Wise's statement to anyone, including members of her own family, until the eve of trial, when her brother was being questioned about Wise by the police, and Jackson interjected with the information.

NYCLD_030688

P-APP001633

purposes of this motion, only two of the specific test results need be delineated.

30.    The rock recovered from the disturbed site closest to the road was found to have human blood on it.  The rock was sent to the F.B.I. for DNA testing, but no DNA profile could be created.  It was, however, typed according to the far less discriminating ABO system, and certain proteins or antigens identified.  The test results indicated that it was consistent with the jogger's blood type.  The hair fragments found on the rock were also examined by the only means then available, a visual, microscopic comparison with samples taken from the jogger.  The comparison yielded the conclusion that the hair on the rock was consistent with the jogger's -- meaning that it had characteristics similar to her hair, and could have come from her.

31.    Utilizing those results, testimony about the rock and the hairs that had been found on it was elicited at both trials.  The microscopic analyst who had examined the hairs testified in the trial of Salaam, McCray, and Santana that the hair fragments on the rock were fragments of crushed and broken head hairs from the temporal area of the head.  He further stated that in his opinion, they had been crushed and broken due to force from the rock.  The expert went on to state that it was his belief that the rock could have been used to strike the head of the victim.  In the trial of Richardson and Wise, he stated it as his opinion, to a reasonable degree of scientific certainty, that the victim had probably been struck on the side of the head with the rock.

32.    DNA evidence was extracted from semen deposited on the jogger's sock, found near her at the crime scene.  It did not match any of the defendants, or any other known sample.*  The same was true of DNA evidence extracted from a cervical swab;  it did not match the defendants or any other known sample.  Expert testimony at trial, however, established that the DNA from both the victim and the sock appeared to have come from the same source.  Testimony also established that the DNA was not a mixture;  it was from a single source, meaning that only one individual had ejaculated.  A pubic hair found on the sock was also examined microscopically.  It was likewise found to be inconsistent with the defendants and every other known source.  The known samples included samples from all of the individuals whom the defendants had specifically named as rapists.

_____

*In addition to samples taken from the defendants, the jogger, John Loughlin, Antonio Diaz, and the jogger's boyfriend, samples were also secured from Steven Lopez, Michael Briscoe, Antonio Montalvo, Jermaine Robinson, Clarence Thomas, and Lamont McCall, all of whom had been with the defendants in Central Park that night.

NYCLD_030689

P-APP001634

33.  The People offered testimonial and photographic evidence about the nature and extent of the injuries sustained by the jogger.  All of the relevant medical personnel were interviewed, and a number were called to testify, including an expert witness from the Medical Examiner's Office who described each of the jogger's injuries for the juries.  The People were unable to offer medical testimony to the effect that the injuries the jogger had sustained could only have been inflicted by multiple perpetrators.[*]

34.  Ultimately, there proved to be no physical or forensic evidence recovered at the scene or from the person or effects of the victim which connected the defendants to the attack on the jogger, or could establish how many perpetrators participated.

35.  The only forensic evidence recovered which in any way connected the defendants to the crime consisted of three hairs found on Kevin Richardson's clothing and one hair found on Steven Lopez's clothing.[**]  Richardson's clothing yielded nine human hairs, all of which were examined microscopically.  Six were not consistent with the jogger.  Three others, one from his underwear, one from his t-shirt, and one from his blue jeans, were found by the examiner to be consistent with the jogger's hair.  A similar conclusion was reached with respect to one out of the twelve hairs recovered from Steven Lopez's clothing;  that hair was found on his shirt.  The examiner's report of his findings with respect to the hairs on Richardson and Lopez, as well as the hair fragments recovered from the crime scene, stated that they "could have originated" from the jogger.[***]

36.  Testimony concerning the hairs found on Richardson was introduced at both trials.  Testimony concerning the hair found on Lopez was introduced only at the trial of defendants Richardson and Wise.

---

[*]As part of the 2002 reexamination of the case, Dr. Charles Hirsch, Chief Medical Examiner of the City of New York, reviewed the jogger's medical records and photographs.  He has stated as his opinion that "Nothing about the distribution or severity of ... [the victim's] injuries indicates or reveals the number of assailants, which could have been one or more."

[**]The value of the hairs found on Richardson's clothing was compromised by the fact that the clothing was spread on the precinct floor to be photographed before the hairs were removed.  There was, therefore, a possibility of contamination.

[***]Two hairs were also removed from the clothing of Antron McCray, and ten from the clothing of Raymond Santana;  they were not consistent with the jogger's hair.  Kharey Wise's clothing was not taken because it had been laundered.  Yusef Salaam's jacket was taken;  no hairs were recovered.

PAGE 10 of 34

NYCLD_030690

P-APP001635

## NEWLY DISCOVERED EVIDENCE

The Evidence Provided by Matias Reyes

37.  In early February of 2002, the District Attorney's Office was notified that an inmate had come forward with a claim that he had attacked and raped the Central Park jogger, and that he had committed the crime alone.  The inmate, Matias Reyes, had informed a Corrections Officer of his claim.  He had then been formally interviewed, on January 17, by an investigative supervisor from the Inspector General's Office.  Following that, information about his contentions was forwarded to the District Attorney's Office.

38.  Reyes, now 31, is serving sentences totalling thirty-three and one-third years to life imprisonment for three rape/robberies, one rape/murder, and one robbery[*] that he committed between June 11 and August 5, 1989.  The sentences were imposed on November 1, 1991, after Reyes admitted his guilt and entered pleas of guilty to the top counts in each case.

39.  Reyes' 1991 prosecutions had rested in part on DNA evidence taken from his victims and from the scenes of his crimes, which matched the DNA in a sample taken from him.  That evidence had been tested using the technology then in existence, RFLP, as were the samples in the Central Park jogger case.  Immediately upon learning of Reyes' claims, efforts were undertaken to locate the evidence from both cases, and the FBI laboratories were asked to make a comparison.  On May 8, 2002, the District Attorney's Office was notified that Reyes' DNA matched the DNA taken from the sock that had been found at the Central Park crime scene.

40.  As soon as notification of the initial comparison was received from the FBI, steps were taken to bring Reyes to the District Attorney's Office for a further investigation of his account.  Reyes was interviewed for the first time on May 23.  He was interviewed again on May 28, when he was brought to Central Park, and on May 30.  He has subsequently been questioned on a number of occasions.  Reyes has also provided samples of his blood, head, and pubic hair, and signed consent forms allowing investigators access to his complete prison file and all of his mail.  He has been interviewed extensively about the Central Park jogger case, about his criminal and personal history, about his motives in coming forward, and about his associations.

41.  The information Reyes provided in each of those areas has been extensively investigated with a view toward either

---

[*]According to Reyes' 2002 statements, he intended to rape the victim, but was interrupted by neighbors before he could force her into her apartment from the hallway where he accosted her.

PAGE 11 of 34

NYCLD_030691

P-APP001636

corroborating or refuting his statements. The investigation has included interviews with police officers, Corrections personnel, inmates, and civilians, as well as a review of all relevant records pertaining to Reyes' personal, criminal, and psychological history and the original investigation and prosecution of the attack on the Central Park jogger.

42.  That investigation has led to the conclusion that Reyes' account of the attack and rape is corroborated by, consistent with, or explanatory of objective, independent evidence in a number of important respects.  Further, investigators have been unable to find any evidence that, as of 1989, Reyes knew or associated with the defendants or any of the individuals known to have been in the park with them on the night of April 19.  In any event, in their statements, several of the defendants themselves named or otherwise identified the individuals they claimed raped the Central Park jogger;  the evidence indicates that none of those individuals is Matias Reyes.  In addition, Reyes has proven to be candid and accurate about other aspects of his life, associations, and history, both personal and criminal.  A full review and investigation of that criminal history has revealed significant parallels with the jogger attack, and also resulted in the discovery of important additional evidence.

43.  Reyes states that his decision to come forward with his confession was prompted by a chance encounter with Kharey Wise in Auburn Correctional Facility, and the resultant realization that Wise was still incarcerated in connection with the attack on the Central Park jogger.  Reyes says that he feared Wise's reaction, and therefore disclosed nothing to him about his own culpability. However, he began seeking advice from different individuals in the prison system, telling them that he had committed a crime for which someone else had been convicted, and wanting to know how he could bring his information to the attention of appropriate authorities.

44.  Corrections records reflect that Wise and Reyes were both imprisoned at Auburn during the relevant time period,[*] and interviews with prison officials have established that the encounter Reyes described could have taken place.  Interviews with a number of Corrections employees, volunteers, and inmates have confirmed Reyes' assertion that he began seeking help with a problem in late 2001.  He specifically told some of them that he had committed a crime for which another person had been convicted, and that he wanted to rectify the situation.  Ultimately a Corrections Officer, observing that Reyes seemed very troubled, induced him to explain what was bothering him and set in motion the process by which he came to the District Attorney's Office.

---

[*]Wise and Reyes had last been incarcerated in the same institution from February to June of 1990, when both were in the Adolescent Reception and Detention Center at Riker's Island.

PAGE 12 of 34

NYCLD_030692

P-APP001637

45. Reyes does not attribute his decision to come forward to having "found God," although he has stated that he has found religious services to be helpful. He has consistently explained himself in terms of his positive experiences in prison, the fact that people have treated him decently despite the nature of his criminal history, and his guilty reaction to seeing Wise.

46. Reyes' motives cannot be objectively proven or disproven. However, an extensive investigation has revealed no evidence that the defendants themselves induced him to come forward. There is no evidence of any connection between the defendants and Reyes prior to their incarceration in 1989. Except for a brief period in 1990 when he and Kharey Wise were in the same jail, he has not been imprisoned with any of them.* Moreover, none of them appeared to know of Reyes' claim until many months after he first spoke with Corrections officials. In fact, Kharey Wise was still incarcerated when Reyes made his claim, and did not apply for conditional release until July 26, 2002. Further, the one assurance Reyes sought when he first spoke with a Corrections Officer was that he would receive protection. He stated that he feared what Wise might do when he learned that it was Reyes who committed the crime he was imprisoned for.

47. More important, information Reyes has provided about himself and his history has consistently proven to be reliable and accurate, both about matters related to the case and matters with no direct connection to it. Reyes has also been candid, even with respect to aspects of his history that might cast doubt on his credibility.

48. For example, Reyes volunteered that he used to commit robberies and larcenies on a regular basis, stealing jewelry, money, and Walkmans. He frequently committed such crimes in Central Park, often by the reservoir. He was able to recall the details of several of his larcenies, and described the patterns he followed with respect to robberies. Those activities were not reflected in his records. Reyes also said that he had been arrested on one occasion, for a robbery he committed with several acquaintances in 1988, but that the case never went to court.

49. This information proved to be accurate. Investigators were able to retrieve records reflecting the arrest Reyes spoke

---

*Reyes himself picked a photograph of Michael Briscoe and stated that he thought they might have been in the same jail early in his incarceration. As noted above, Briscoe was one of the individuals charged in connection with the incidents in the park. Reyes' information was correct: the two were in the Adolescent Reception and Detention Center at Riker's Island from March 5, 1990 to May 31, 1990, although at that point, Briscoe was there for an unrelated arrest.

PAGE 13 of 34

NYCLD_030693

P-APP001638

about.  They were also able to identify and locate individuals who knew Reyes in the late 1980's, and who confirmed the truth of his admissions.  A number of people observed him with stolen property, including both jewelry and Walkmans.

50.   The investigation has uncovered no evidence that Reyes knew any of the defendants or the others who were with them in Central Park on the night of April 19.   That fact has been established by proof coming from two directions -- on the one hand, from interviews with people who knew Reyes;  and on the other hand, from current and past interviews with the defendants and their associates.

51.   In 1989, Reyes was living on his own, working on an informal basis in a bodega on 102nd Street, across from the 23rd Precinct.  Much of the time, he slept in a van belonging to the bodega's owner;  occasionally he stayed with a neighborhood family who felt badly for him.  Investigators from the District Attorney's Office interviewed fourteen people who knew Reyes in 1989.  A number of them saw him on a daily basis.

52. Many of those people describe Reyes as having been a loner, whom they never saw in association with any young people other than the two teenage sons of the family which occasionally helped him.  However, Reyes himself said in interviews that he used to commit petty crimes, such as shoplifting, with some neighborhood acquaintances.  A number of those acquaintances were located.  All were from the 102nd Street area -- in their own minds, a neighborhood distinct from the defendants'.*   None knew the defendants or their associates, and none ever saw Reyes with the defendants or their associates.   Two detectives from the 23rd Precinct who knew Reyes from the bodega where he worked and saw him regularly state that he appeared to be a "loner", and that they never saw him with anyone other than those who frequented the bodega.

53.   In the defendants' own 1989 statements, they listed those they knew who were in Central Park with them.  None named Reyes, by his real name or a nickname.**  The same is true of the twenty-four other individuals from the park who were interviewed at the time.

---

*The defendants and their companions were from housing complexes located somewhat farther north.

**At the time of his arrest in 1989, Reyes told police that he liked to call himself "Tony."  However, in interviews with a dozen people who knew him in 1989, all said that they knew his nickname to be "Checo," and that they never knew him to be called "Tony." In his 2002 interviews, Reyes said that "Tony" was an older boy he admired when he was younger.  He liked the name, and occasionally called himself that.

PAGE 14 of 34

NYCLD_030694

P-APP001639

Raymond Santana, Kevin Richardson, and Michael Briscoe were interviewed in 2002, before news had broken of Reyes' information. They were shown photographs which included a picture of Reyes, and evinced no recognition at all. The same is true of a number of other individuals, present in the park in 1989, who were reinterviewed in 2002.

54. In any event, in their 1989 statements about the crime, three of the five defendants named or otherwise identified everyone they said raped the jogger. Based upon the evidence, it is a fair conclusion that none of the people they identified is Reyes.*

55. Reyes' convictions arose from crimes he committed on June 11, June 14, July 19, July 27, and August 5, 1989. The basic facts of those crimes are as follows:

(1) On June 11, 1989, Reyes stalked, raped, robbed, stabbed, and beat a twenty-four year old white woman in her apartment on 116th Street, between Park and Lexington Avenues. He used a knife he got from the victim's kitchen, and he stole, among other things, the victim's Walkman. The victim suffered a fractured nose, two black eyes, and multiple areas of bruising, some of them large, on her knees, her legs, her neck, and her flank. In addition, the victim had two superficial stab wounds on her thigh, one in her side, one on a finger, one near her left eyebrow, and one under each eye.

(2) On June 14, 1989, Reyes raped, robbed, and stabbed to death a twenty-four year old, light-skinned, blonde Hispanic woman in an apartment on 97th Street, between Madison and Park Avenues. Again, Reyes used a knife he procured from the victim's kitchen.

(3) On July 19, 1989, Reyes stalked, raped, robbed, and cut a twenty year old white woman inside an apartment on Madison Avenue, between 95th and 96th Streets. Reyes brought a knife with him. In addition to other property, Reyes took his victim's ATM card and PIN number. He then tied her with extension cords in a fashion which parallels the way the Central Park jogger was tied,** so that he could go to the bank and withdraw money. Because he had bound his victim, Reyes called 911 to summon help for her. The

_____

*Raymond Santana claimed that he left the scene after Kevin Richardson had raped the jogger, while the crime was still ongoing. Yusef Salaam's statement was incomplete, and he spoke of two unidentified individuals having raped her.

**Reyes used extension cords to tie his victim. He bound her feet with one cord, used another to tie her hands, and a third to gag her by wrapping a cord around her head and crisscrossing it through her mouth. The cords were attached so that her hands were raised in front of her face.

PAGE 15 of 34

NYCLD_030695

P-APP001640

victim suffered small, superficial cuts over one eye and under the other.

(4) On July 27, 1989, Reyes stalked, robbed, and punched a twenty-eight year old white woman in the hallway of her apartment building on Lexington Avenue, at the corner of 95th Street. Reyes was unarmed. The crime was interrupted by neighbors. In his 2002 interviews, Reyes stated that he intended to rape the woman.

(5) On August 5, 1989, Reyes stalked, raped, and robbed a twenty-four year old white woman in her apartment on East 91st Street, between Lexington and Third Avenues. Reyes was unarmed. He took the victim's bank card, and forced her to give him her PIN number. He intended to tie his victim, but she escaped before he could carry his plan out.

56. In the course of his interviews, Reyes volunteered information about other sex crimes he had committed, for which he had never been arrested. One of the crimes he discussed was a sexual assault which he said he had committed in Central Park. His memory of the event was limited. He accurately recalled the exact location of the incident, and thought it had occurred in the daytime, but beyond that, he essentially knew only that he had accosted a woman with the intention of raping her, and that the crime had been interrupted by bystanders. He did not know when the crime had taken place, although he believed it occurred in 1989.

57. The crime Reyes was describing was eventually identified, and the victim and witness located. Reyes had told the truth when he said that he committed the crime. He had in fact attacked, beaten, raped, and robbed a twenty-six year old white woman who had been exercising in the park near Lasker rink and pool, at roughly the level of 107th Street. Reyes was unarmed. A bystander intervened as the attack was ongoing, and Reyes left the park, calmly, taking the victim's property with him.

58. Substantial circumstantial evidence establishes Reyes' identity as the perpetrator. Reyes knew, and in fact drew, the precise location where the crime occurred. There are no records of any other attack occurring there during the relevant time period. The victim stated that the attacker identified himself as "Tony." The victim and witness gave descriptions which are similar to Reyes as he appeared at the time. The victim picked a photograph resembling Reyes as a look alike in 1989. The witness recently identified a 1989 photograph of Reyes as looking "most like" the attacker. The victim described the attacker as having fresh stitches in a cut on the right side of his chin, and medical records reflect that Reyes had received stitches in that location the day before the incident. Reyes is not clear about whether the incident he remembered was an attempted or completed rape, but that may be explained by the fact that, according to the victim, he apparently did not ejaculate.

PAGE 16 of 34

L

NYCLD_030696

P-APP001641

59. The incident occurred on April 17, 1989, in mid-afternoon, two days before the attack on the Central Park jogger. The victim was badly beaten about the head. She had a large hematoma on her forehead, abrasions to both knees, bite marks on her left upper arm and neck, scratches over her neck, face, knees, and back, and multiple bruises. In addition, her right ear was bruised and swollen, and her right eye was bruised and showed subconjunctival hemorrhages. She recalls that at some point her attacker had his foot on her head. The victim was treated and released, and the case was marked closed after initial efforts to contact the victim were unsuccessful.

60. Reyes disclosed information about a second sexual assault which he said occurred in a church located at Fifth Avenue and 90th Street. Reyes remembered and described the scene accurately and in detail, but again, could remember little about the incident itself. In summary, he knew that he had accosted a woman inside the church, dragged her down a staircase with the intention of raping her, and then abandoned the sexual attack when she claimed to have some sort of disease. He took money and jewelry from the victim, and left. He did not know when the crime was committed, nor did he remember any other particulars of the attack itself.

61. That incident, also, was eventually identified. It occurred in the Church of the Heavenly Rest, across from Central Park, on September 21, 1988. Again, Reyes' admission that he committed the crime proved to be truthful. Reyes attacked, choked, struck, robbed and intended to rape a twenty-seven year old white woman. He was armed with a small knife, and he forced the victim to disrobe, but was dissuaded from raping her when she told him she had an infection. The victim suffered multiple superficial scratches and bruises.* The complainant viewed photographs on file with the Police Department, and picked no one; Reyes' photograph was not on file. The case was then marked closed.

62. Reyes was also questioned about some of the other crimes for which he was convicted. The degree of detail with which he could describe them varied: in some instances his recollections were extraordinarily complete, particularly with respect to the events leading up to and following his crimes, and the concrete details of locations, pathways, and proceeds; in others, his memories were more sketchy.

63. The following summarizes the essentials of Reyes' account of his attack on the jogger:

_____

*The victim in the case was interviewed in 2002, but this description of the crime is based on her 1989 account of what occurred.

PAGE 17 of 34

NYCLD_030697

P-APP001642

(1)   Reyes states that he left the bodega where he worked and headed for Central Park.  It was likely he would commit some kind of crime, but not necessarily a rape.  He entered the park at 102nd Street, and he first saw the jogger as she proceeded north on the East Drive, just south of the 102nd Street entrance to the park. She was running in the jogging lane on the east side of the road, wearing long black or navy blue jogging tights.  They were tight, and Reyes says he was attracted to her partly because he could see her "butt."

(2)   Reyes moved to the other side of the East Drive and began to follow the jogger, with the intention of raping her.  He did not want her to sense or see him directly behind her, so he began "zig-zagging" on the side of the road.  He was waiting to see whether she would take the long route around the park, heading north until the road looped around, or the short route, cutting across the 102nd Street transverse.  She took the short route, moving to the north side of the transverse road and heading west.  He crossed to the north side as well, still following her.

(3)   Reyes states that he caught sight of a "stick" or branch lying on the ground to the north side of the road.  (In diagrams and in a visit to the park Reyes has indicated the area he is talking about.)   He picked up the stick.   The stick was substantial;   it required two hands to hold.   Reyes then accelerated to catch up to his victim.

(4)   The jogger was wearing a headset, and she seemed to be playing it loudly, as she did not hear his approach.  Reyes came up behind her and struck a heavy blow to the back of her head.  Reyes does not know exactly where or how he hit her.  He is left-handed, but says he may well have struck her overhand, or from some other angle.  The jogger fell forward.  Her Walkman fell to the roadway. Reyes has diagrammed and shown investigators the approximate point on the road where he struck her.

(5)   Reyes says the jogger was conscious but clearly stunned and incapable of fighting, and that he then dragged her off the road.   Initially, he dragged her over ground that was grassy, with some grass "higher," and some grass "lower", into a "bushy" area. He explains that by a "bushy" area, he means an area among the trees, covered with dead leaves and sticks, which becomes more overgrown in the summer;  it was not overgrown at the time of the incident.   The area he dragged her into is to the north of the roadway.

(6)   Reyes does not know how he dragged the jogger.   He stopped when he reached a reasonably secluded spot.  At that point, she appeared to be recuperating from the original blow to her head, because she was talking and protesting.   He has repeatedly described her as holding her hand up to the right rear of her head,

PAGE 18 of 34

NYCLD_030698

P-APP001643

saying that she was bleeding.  He states that he saw blood on the right shoulder of her t-shirt.

(7)  Reyes' account of what then took place inside the wooded area is more fragmentary.  He says that he cannot remember all the details of what took place, and therefore cannot give a complete narrative, but is positive about certain facts.

(8)  Reyes states that he knows that he pulled off the jogger's tights and shoes, and raped her.  At some point, which he believes was after he raped her, she broke away from him and ran; he says that he has an image of her running while naked from the waist down.  Somehow he brought her down, possibly by pulling her shirt up over her head.  Reyes had already beaten her in the spot they were in originally, but at that point the violence escalated. Reyes knows that he struck her in the face and head with a rock and other things.  He cannot specify what other things he used.  At some point in the course of the incident, he also used his hands on her.  He does not know how many times he hit her with the rock, but knows that it was "more than a couple."

(9)  Reyes says that he also knows that at some point, he found the jogger's keys;  he believes she had two, and he knows they were in a black key case which zipped around and had Velcro on it.  He describes the case as being the sort that can be attached to a belt, but says he does not recall where she wore it since she had no belt.  Reyes says he is particularly clear about the keys because after he found them, he began demanding that the jogger tell him her address.  His intention was to burglarize her apartment.  She refused to give him the information.  That, he says, angered him, and caused him to escalate the level of violence.  He knows that the jogger had no money on her, although he does not specifically remember searching for money.

(10)  Reyes states that he threw her clothes somewhere. However, he cannot remember what happened to her t-shirt.  He says that he recalls there being "something on her face" when he left, and thinks somehow her t-shirt might have been over her head.  He does not have any memory of tying or gagging her.  At various times, Reyes has also said that he may have moved her, or may have turned her over.

(11)  Reyes says that when he left the jogger, she was bloody and unconscious, but still alive.  He could hear her breathing, making some kind of hard sound in her throat, as though something had been broken.

(12)  Reyes says that he tossed the rock he used somewhere, but does not know where, or even whether it was in the immediate area.  He then made his way out of the wooded area in the same way he had come in.  When he reached the roadway, he saw that the stick he had used on the jogger was still there;  he picked it up and

PAGE 19 of 34

NYCLD_030699

P-APP001644

threw it off to one side of the road or the other.  He also saw the
jogger's headset, still lying where it had fallen.  He put it on,
walked up onto the baseball fields to the south of the road, and
headed out of the park.  At some point he tossed the keys and case
away.  He is not sure when or where;  it may have occurred as he
was leaving the park, but could have happened earlier.

(13)  Reyes came out at the 102nd Street entrance to the park,
which intersects with the East Drive at a point south of the
transverse road.  There, he saw a detective he knew from the 23rd
Precinct named "Blondie," who was just entering the park. "Blondie"
was in a yellow cab with a partner whom Reyes did not know.
"Blondie" questioned him briefly about a commotion in the park, and
let him go on his way.

64.   Reyes' version of events regarding the attack on the
jogger is corroborated by, consistent with, or explanatory of
objective, verifiable evidence in a number of important respects.
The following sets forth some of the more significant points, in
summary form:

(1)   Reyes is accurate about the direction the jogger was
coming from and the direction she was travelling in, and he
correctly describes her jogging tights, which were tight,  black,
and ankle-length.  He has also indicated that she may have been
wearing a white t-shirt, which she was.

(2)  Reyes' assertion that he began his attack by striking the
jogger in the back of the head with a heavy branch is consistent
with and explanatory of medical and crime scene evidence.  The same
is true of his description of the jogger's mental status after the
attack, of his recollection of her holding her hand to the right
rear of her head, and of his observation of blood on her right
shoulder.  The jogger had a depressed skull fracture, with a large,
overlying laceration, in the right parietal/occipital region of her
head -- in other words, in the upper right rear of her head.
According to Dr. Hirsch, that injury is fully consistent with a
blow from a heavy branch, and with the rest of Reyes' observations.

(3)  Reyes maintains that the jogger was wearing a Sony AM/FM
headset, with colors on the dial.  The jogger was in fact wearing
a headset when she was attacked.  The Walkman disappeared, and
despite an extensive search, was never found.  She does not recall
the make, but believes it may have had colors on the dial.

(4)  Reyes is accurate in his description of the location
where the attack occurred, and of the terrain he covered in
dragging the jogger into the woods.  Crime scene photographs show
a distinct path of flattened groundcover in vegetation that is a
mixture of grasses and weeds of varying heights.  The pathway is
sixteen to eighteen inches wide, and appears to be more consistent
with a single attacker dragging an inert form than with a group.

PAGE 20 of 34

NYCLD_030700

P-APP001645

Vegetation to the side of the flattened path shows some sign of being disturbed, but trial testimony established that that was the result of crime scene personnel walking there.  There are no other indications of trampling in the immediate area.

(5)  Reyes says that he took the jogger's keys, which he found in a small, black case that zipped around and had Velcro on it.  He believes there were two keys.  It was known in April of 1989 that the jogger's keys were gone; their disappearance was unexplained. At the time, nothing was known about a case.  In 2002, the jogger was asked about the possibility that she had a case.  She stated that she was inclined to say that she carried her keys on a ring, but that she did own a dark green or black case with Velcro on it. She does not think that it had a zipper.  It was the type of case that can be attached to a shoe.  One of the jogger's shoes, found at the scene, was untied, as it would have been had a case been removed from it.  The other shoe was still tied, as would be expected if it were pulled off in the course of a violent attack. The jogger also believes that she carried two keys.

(6)  Reyes' recollection that he threw the jogger's clothes is consistent with the crime scene evidence.  The location of her tights, shoes, and one sock indicate that they were in fact thrown.

(7)  Reyes says that he beat the jogger in the head repeatedly with a rock.  According to Dr. Hirsch, the medical evidence shows five lacerations and a skull fracture in the left temporal forehead area, all caused by blunt force trauma.  He also states that when he left her, she was unconscious but not dead.  He could hear her making a hard sound in her throat as she breathed.  His description of her condition is consistent with the nature and extent of her injuries.  The first officer on the scene testified that when he arrived at the scene, he could hear gurgling sounds coming from deep in her throat.

(8)  Reyes maintains that he ran into "Blondie" on his way out of the park, and had a brief conversation with him.  "Blondie" is a detective from the 23rd Precinct who knew Reyes.  He used to see him regularly at the bodega where he worked.  He does not remember whether he saw and spoke with Reyes in the park that night or not. Circumstantially, however, it is clear that Reyes did at least see "Blondie" on the night of the 19th.  "Blondie" confirms that he did in fact enter the park, and that he did so at 102nd Street, in response to reports about criminal activities in the park. "Blondie" also confirms that he was in fact in a cab and was with someone who was not his regular partner.  To the detective, Reyes was a harmless teenager.  As he candidly reports, if he had seen Reyes and spoken to him, he would not have suspected him of criminal activity, and would have let him go.  The fact that Reyes did see "Blondie" tends to confirm that he was not with the defendants.  Given the nature of the criminal activities being

PAGE 21 of 34

NYCLD_030701

P-APP001646

reported, it seems likely that "Blondie" would have stopped a group of teenagers.

65. Reyes account of events is the first that has suggested an explanation for the existence of two areas of the crime scene where it appeared that attacks took place. His specific recollection that the jogger broke away only after he had raped her is, however, probably not correct. The jogger's clothing was found below the second site where an attack appeared to have occurred. That pattern of evidence indicates that her jogging tights were undoubtedly not pulled off her until she was at that second location. A more plausible scenario than the one Reyes recounts is that she broke and ran from him before the rape. However, the inaccuracy of Reyes' account in that regard should be evaluated in light of the passage of thirteen years.

66. Moreover, in evaluating the weight a jury would be likely to place upon his testimony, his failure to recall all the details of the incident must be placed in the context of his memories of other events. It was Reyes who freely disclosed that he had committed other sexual assaults, and the investigation revealed that he was telling the truth in that regard. Yet when the facts of those cases were uncovered, his memories of those particular events proved to be incomplete.

67. Corroboration of Reyes' account of the crime is found both in the pattern of his other sexual attacks and in some of their specific facts. He consistently targeted and stalked Caucasian women, or women who appeared to be Caucasian. His crimes all involved conversation with his victims, either as a way of making initial contact or as a way of acquiring information that would enable him to steal more property.[*] Frequently, conversation or a search for property alternated with outbursts of physical or sexual violence. All of his rapes or attempted rapes also involved robbery. In particular, where a Walkman was available, he took it. His beatings often focused on the head. His claim that he demanded the jogger's address echoes the cases in which he forced his victims to give him their PIN numbers. And although he cannot remember doing it, it is clear that Reyes is the person who tied the jogger with her own t-shirt. The manner in which she was tied -- behind the head, through the mouth, with the hands in front -- is strikingly similar to the way he tied another of his victims.

68. One additional piece of physical evidence may also corroborate Reyes' account. The victim had an oddly shaped wound on her left cheek, resembling a cross, but with curved arms. Reyes owned a ring, taken from him at the time of his arrest and retained

---

[*]Reyes makes no claim that this incident was initiated with conversation, a fact explained by the circumstances in which he targeted his victim.

PAGE 22 of 34

NYCLD_030702

P-APP001647

in the District Attorney's Office, on which the figure of Christ is raised on the flat surface of a cross. Reyes, who is left-handed, states that he used to wear the ring on his left hand. The ring and photographs of the wound were examined at the Office of the Chief Medical Examiner.* The number of variables involved makes an exact comparison with the wound impossible. However, in the opinion of Dr. Hirsch, "The patterned injury over the prominence of the victim's left cheek bone is consistent with a left fist blow, striking at an acute angle, partially imprinting the image of approximately half of the prominent parts of Mr. Reyes' ring on her skin."**

## Forensic Evidence

69.   After preliminary DNA results were received from the F.B.I. in May, the District Attorney's Office retained a private laboratory to conduct additional forensic testing.

70.  The laboratory performed further tests in connection with those DNA samples which connected Reyes to the crime. The tests provide additional corroboration of Reyes' account. The private laboratory concurred with testimony given at the defendants' trials that the DNA on the sock found at the Central Park crime scene and the DNA on the cervical swab taken from the victim came from the same person. Thus, Reyes' DNA matched both.

71.  Moreover, the laboratory found additional, untested semen on the sock, which it tested using technology not in existence in 1989. That test established that Reyes was the source of the DNA to a factor of one in 6,000,000,000 people. In addition, mitochondrial DNA testing established that Reyes was also the source of the pubic hair found on the sock in Central Park.*** In short, the DNA tests showed that Matias Reyes' claim that he raped the jogger was true, and confirmed that no one else's DNA was present in the samples taken from the victim or the evidence at the scene.

72.  Efforts were also made to locate all of the physical evidence which had been gathered at the time of the original

_____

*No DNA could be recovered from the ring, which Reyes wore until August 5, 1989.

**The People introduced expert testimony in the original trial to the effect that the injury could have been caused by a rock or a brick.

***More technically, mitochondrial DNA tests only establish that a sample came from a particular person or someone else in his maternal line. In this case, for all practical purposes, the test established that Reyes was the source of the pubic hair.

PAGE 23 of 34

NYCLD_030703

P-APP001648

prosecution. Those efforts were partially successful, and every item which could be found was retested. For purposes of this motion, however, the relevant test results pertain to hairs found on Kevin Richardson and the bloody rock found at the scene of the attack, and to the blood found on that rock. The hair found on Steven Lopez could not be located.

73. The three hairs found on Kevin Richardson were reexamined following F.B.I. protocols for questioned hair samples. The hairs were first re-examined microscopically and then submitted for mitochondrial DNA testing. All had been mounted on slides for examination in 1989.

74. The microscopic analysis of the hairs was performed by Special Agent Douglas Deedrick, formerly Chief of the Hair and Fibers Unit and currently Unit Chief of the Information and Evidence section of the F.B.I. Agent Deedrick disagreed with the expert opinion offered at the original trials. His conclusion was that the hairs were not suitable for comparison, and could not be used to link Richardson to the jogger. In his opinion, they were too undifferentiated and had too few characteristics for a meaningful comparison to be possible. He also disagreed with a characterization of one of the hairs as a pubic hair. In his view, no determination could be made as to what type of hair it was.

75. DNA was extracted from all three of the hairs found on Richardson, and none of the DNA matched the victim's. However, the official finding with respect to each of the hairs is that the results are "inconclusive." The reasons differ.

(1) One hair was found to contain a mixture of DNA from two different people. The jogger's DNA sequence was inconsistent with any combination of that mixture. The opinion of the examiner is that one of the DNA sequences probably resulted from contamination at the time the hair was originally mounted on a slide. Laboratory protocols require that when a mixture of DNA is found, no conclusion will be drawn as to the source of the hair.

(2) A partial DNA sequence was extracted from a second hair and compared to the jogger's, and seven "base differences" were observed; only two base differences are required to declare an exclusion. However, laboratory protocols require that results of each test be verified in order to eliminate the possibility of contamination. The verification is accomplished by performing a second test in order to replicate the original results, before conclusively excluding a possible source of the DNA. There was insufficient DNA extracted from the second hair to permit such verification to take place.

(3) The third hair had an intact DNA sequence extracted from it, which showed one base difference from the jogger's mitochondrial DNA. Two base differences are required in order to

**PAGE 24 of 34**

NYCLD_030704

P-APP001649

exclude a source, because single differences have been observed in hairs taken from the same source. However, when such differences occur in hairs from the same person, they are usually seen in particular regions of the DNA known as "hot spots." The difference observed between the jogger's hair and the third hair tested did not occur in a "hot spot". Additional samples of the jogger's hair were tested in order to see if the same base difference appeared. It did not. Both those factors reduce the likelihood that the questioned hair originated with the jogger, but she cannot be excluded as a source to a reasonable degree of scientific certainty.

76. The bloody rock found at the scene was also submitted for examination, and a limited DNA profile was obtained. That profile showed that the blood was female human blood, but inconsistent with the jogger's DNA profile. However, contamination cannot be excluded as a possibility. The rock has been handled by a number of people, and has not been stored in a manner which would ensure the integrity of the original DNA. If the original DNA has degraded, the profile raised may be DNA from an unknown person deposited over the original DNA.

77. The hair fragments found on the rock were also submitted for testing. As with the hairs found on Richardson, they were first examined microscopically by Special Agent Deedrick. He found them unsuitable for comparison, describing them as fragmentary and of limited value. In any event, the original hair samples from the jogger could not be located. Because hair changes over time, samples taken thirteen years later do not provide a suitable basis for comparison, even against standards of high quality. Accordingly, no new microscopic comparison could be made between the jogger's hair and the evidence.

78. Only one of the hair fragments was suitable for testing. The other fragments were too small. The fragment tested yielded only a partial DNA sequence, with a number of differences from the jogger's DNA. However, the size of the sample once again precluded verification through an additional test, and as a consequence no conclusive result was provided.

## THE NEWLY DISCOVERED EVIDENCE CLAIM

79. Under <u>Criminal Procedure Law</u> 440.10(1)(g), newly discovered evidence must meet six criteria in order to justify the vacatur of a conviction: (1) it must be such that it would probably have resulted in a verdict more favorable to the defendant if it had been received at trial; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be cumulative to the issue; and (6) it must not merely impeach or contradict the

NYCLD_030705

P-APP001650

former evidence.  <u>People v. Salemi</u>, 309 N.Y. 208, 216, quoting <u>People v. Priori</u>, 164 N.Y. 459, 472 (1900).

80.  The newly discovered evidence in this case consists of the account of events provided by Matias Reyes, who states that he alone attacked and raped the Central Park jogger;  DNA test results which conclusively establish that Reyes was the sole source of semen found on a sock at the crime scene and a cervical swab taken from the victim, as well as of a pubic hair found on the same sock; the record of prior, similar attacks committed by Reyes, including an assault and rape committed in Central Park two days before the jogger attack;  and scientific test results undermining the probative value of evidence introduced in the defendants' trials. All of that evidence meets the criteria set forth in the statute.*

81.  The vacatur of a conviction, however, requires not merely that new evidence exist, but that it be ". . . of such a character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to defendant."  <u>Criminal Procedure Law</u> Section 440.10(1)(g).  In determining whether newly discovered evidence would probably change a verdict, the evidence is not evaluated in a vacuum, but in light of the evidence contained in the record on appeal.  <u>See</u> <u>People v. Salemi</u>, 309 N.Y. at 218-19;  <u>see also,</u> <u>People v. Maynard</u>, 183 A.D.2d 1099 (3d Dept. 1992).

82.  In other words, an assessment of the likely impact of newly discovered evidence requires an honest appraisal of the strength or weakness of the case originally presented by the People.  The defendants' statements in this case were sufficiently persuasive to result in the convictions of all five defendants on at least some of the charges against them, and, for that matter, persuasive enough to bring about those convictions before two separate juries.  However, the confessions also had serious weaknesses.

83.  Perhaps the most persuasive fact about the defendants' confessions is that they exist at all.  While all of the defendants began by denying knowledge of the attack, each ultimately made himself an accomplice in a terrible crime.

---

*As already noted, the People requested that the F.B.I. laboratory reexamine the hair evidence introduced at the defendants' trials before having it tested for mitochondrial DNA, and the F.B.I. examiner disagreed with the original technician's findings.  However, his opinion does not qualify as newly discovered evidence within the meaning of <u>C.P.L.</u> Section 440.10 since counsel could, with due diligence, have sought a second microscopic analysis at the time of the original proceedings.

NYCLD_030706

P-APP001651

84.   In that regard, it is important to note that, with the exception of the unrecorded statement made by Yusef Salaam, each of the statements cast the speaker in a relatively minor role, and none of the defendants admitted that he personally raped her. Kevin Richardson stated that he grabbed at the jogger, but equivocated about it and, at least on video, stopped short of saying that he did so to assist in an assault or rape.  Antron McCray said that he kicked the jogger and lay on top of her, but did not penetrate her.  Raymond Santana finally stated that he "felt her tits." And Kharey Wise eventually said that he held and fondled her leg.  Yusef Salaam, in his unrecorded statement, went furthest in ascribing culpability to himself, by saying that he struck the jogger with a pipe at the inception of the incident.

85.   In and of itself, the fact that each defendant minimized his own involvement would not be startling or necessarily significant;  defendants certainly lie, even when confessing.  On the other hand, it arguably makes the claim that the defendants made false admissions more plausible, by adding weight to their contention that, for whatever reason, each spoke about the crime with a view toward becoming a witness rather than a defendant. In that sense, it is an aspect of the confessions to be considered here.

86.   The significant weaknesses in the defendants' statements lie in the details they provide in describing the attack on the jogger.  Taking the statements individually, those details appear to give them power.  But a comparison of the statements reveals troubling discrepancies.  Using their videotaped statements as the point of comparison,* analysis shows that the accounts given by the five defendants differed from one another on the specific details of virtually every major aspect of the crime -- who initiated the attack, who knocked the victim down, who undressed her, who struck her, who held her, who raped her, what weapons were used in the course of the assault, and when in the sequence of events the attack took place.

87.   Thus, for example, on the issue of who actually knocked the jogger to the ground, Kevin Richardson said Antron, Raymond, and Steve did it;  Antron McCray said everyone charged her; Raymond Santana said Kevin did it;  Yusef Salaam said he did it; and Kharey Wise first named Raymond, and then named Steve.

88.   Similarly, as to who struck the jogger in the course of the attack, Kevin Richardson alleged that only Michael Briscoe hit her, and that he hit her only with his fist, in the face.  Raymond Santana said that Steve smacked her, and then struck her in the face with a brick.  Antron McCray stated that everyone was hitting

_____

*Since Yusef Salaam made only one, unrecorded statement, that statement is used for this analysis.

PAGE 27 of 34

NYCLD_030707

P-APP001652

and stomping her, and that a tall, skinny, black male struck her in the ribs and head with a pipe. Yusef Salaam said that he himself hit her with a pipe, and that someone else used a brick. Kharey Wise first said that Steve slapped her in the face, that someone cut her legs with a knife, and that Kevin used a "handrock"; he then said that Steve slapped her, punched her in the face, and cut her legs with a knife, and that Kevin, Steve, and Raymond punched her in the face and hit her with bricks.

89.  Likewise, on the issue of who raped her, Richardson named Antron, Raymond, and Steve. McCray identified a tall, skinny black male, a Puerto Rican with a black hoodie, Clarence, and Kevin, and said that he himself simulated having sex with her. Santana claimed that Kevin raped her, after which Santana left the park. Salaam named Kevin, Kharey, and a couple of unknown males. And Kharey Wise named Steven, Raymond, and Kevin. Kevin Richardson's is the only name common to all the statements, with the exception of his own. It was, however, Richardson who first implicated members of the group in the rape, providing a possible motive for others to accuse him.

90.  There are certainly portions of the statements made by the defendants that are consistent with the evidence presented at trial. There was, for example, testimony to the effect that certain of the jogger's injuries could have been caused by a pipe, a brick, or a rock, weapons that were named in some of the statements. The jogger had bruising which could have resulted from the kicking or blows some defendants described. Antron McCray accurately stated that the jogger wore a white shirt.

91.  That said, it is nonetheless true that in many other respects the defendants' statements were not corroborated by, consistent with, or explanatory of objective, independent evidence. And some of what they said was simply contrary to established fact.

92.  None of the defendants, for example, related where the jogger was coming from, what direction she was running in, or how they happened to catch sight of her. None offered specific or accurate descriptions of the area where she was attacked, the terrain, or the crime scene. Yusef Salaam stated that he struck the jogger on the head with a pipe. He did not say where on the head, but his statement could explain the bloodstains on the road and the injuries to the back of her head. None of the others, however, gave an account which would adequately explain either. Only Kharey Wise said anything that would explain the dispersal of physical evidence and the indications that attacks occurred at more than one site, and Wise had been taken to the scene prior to his videotaped statements. None of the defendants mentioned the jogger's Walkman, although several mentioned John Loughlin's Walkman in the statements they made about him. None said a word about her keys. None said anything about a search for money,

PAGE 28 of 34

NYCLD_030708

P-APP001653

although the insole pulled out of the victim's jogging shoe certainly suggests that someone looked for it.

93.   Some of what the defendants said is simply wrong. Kharey Wise, for instance, declared that the jogger's clothes had been cut off, and that her legs had been cut with a knife. Her clothes were not cut off, and there were no knife wounds on the jogger; in fact, the prosecution affirmatively elicited testimony to that effect at trial. Likewise, Kevin Richardson said that her bra was ripped off, whereas in fact it was still in her when she was found. Raymond Santana described her as being naked during the incident, and others said she was naked when they left, although she was found with her jogging bra still on and her t-shirt tied around her head.

94.   Other statements the defendants made are simply not corroborated.  For example, several defendants spoke of a brick being used as a weapon in the attack.  But the only brick actually removed from the crime scene had no blood or other forensic evidence that would confirm its use as a weapon.

95.   More importantly, the defendants' statements about the rape could not be corroborated by DNA evidence. Each defendant, in his statement, minimized his participation in the rape, and none acknowledged having had intercourse with the victim.  However, all but Raymond Santana claimed to have seen multiple individuals raping her.  Despite that, the DNA of only one person was found. That required the jury to believe that, in a gang of teenaged rapists, only one ejaculated.

96.   Moreover, although the prosecution argued that the DNA must have been left by one of the defendants' accomplices, that argument presented difficulties of its own.  For example, Kevin Richardson and Kharey Wise purported to name everyone who had raped her, and none of the people they named proved to be a DNA match.

97.   Perhaps most significant, none of the defendants accurately described where the attack on the jogger took place. With the exception of Kharey Wise, who had been to the scene, statements by all of the defendants describe events in such a way as to place the attack at or near the reservoir, at varying points in the sequence of events that actually occurred there.  The defendants were not similarly confused about the locations of the other crimes they described.

98.   An additional issue is raised by the other incidents which took place in the park.  For while the nature and locations of those incidents made it seem logical to believe that the defendants had attacked the jogger, the timing of events made it hard to understand when they could have.  Shortly after their initial entry into the park, the larger group of which the defendants were a part temporarily split up.  As a result, not all

PAGE 29 of 34

of the defendants participated both in the incidents that occurred along the East Drive and in the attacks at the reservoir; but at least some of them did. Given the times when each of those events were estimated to have occurred, it is difficult to construct a scenario that would have allowed the defendants the time to interrupt their progression south, detour to the 102nd Street transverse, and commit a gang rape.

99. All of these issues were apparent at the time of trial. Counsel had access to the same confessions, the same objective evidence, and the same timeline that the prosecution did, and were free to exploit the weaknesses in the People's case to whatever extent they were able to do so. It could be, and it was, credibly, honestly, and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual. Indeed, given the involvement of a number of people and the violence of the events at issue, some level of genuine confusion is probably inevitable. In this case in particular, those arguments were bolstered by the fact that the crimes occurred at night, that the lighting was poor, and that the defendants were involved in a number of incidents.

100. Nonetheless, the fact that these weaknesses in the confessions exist gives added weight to the newly discovered evidence in this matter, and increases the probability that that evidence would result in a different verdict.

101. The probative value of the only forensic evidence that connected the defendants to the attack, the hairs found on Kevin Richardson, was, by its nature, weak to begin with. It has been diminished further by the tests performed in 2002. And the specific argument the prosecution made -- that a particular rock found at the scene had been used in the attack -- has also been undermined, although the most reasonable interpretation of the new blood evidence is probably contamination.

102. The difficulties inherent in the passage of time and the small size of the hair samples in existence made it impossible to obtain definitive DNA results. But with respect to each of those samples that was large enough to test, a jury would hear expert testimony that the DNA which could be extracted from the evidence did not match the jogger. Those results do not exclude the jogger as a source to a reasonable degree of scientific certainty. Their effect, however, would be to undermine the jury's confidence in the only evidence other than the defendants' statements which showed contact between the victim and her alleged rapists.

103. Most important, the jurors who originally heard the evidence were presented with no persuasive alternative theory of the case to consider. Certainly, no one would have thought that as the defendants and their group were making their way through Central Park, a serial rapist was also at large. The newly

PAGE 30 of 34

NYCLD_030710

P-APP001655

discovered evidence provides incontrovertible proof that he was.

104.   A self-confessed and convicted serial rapist -- who habitually stalked white women in their 20's; who attacked them, beat them, and raped them; who always robbed his victims, and frequently stole Walkmans; who tied one of his victims in a fashion much like the Central Park jogger; who lived on 102nd Street; who beat and raped a woman in Central Park two days before the attack on the transverse; whose DNA was the only DNA recovered inside and alongside the victim; whose narrative of events is corroborated in a number of significant ways; who had no connection to the defendants or their cohorts; and who committed all his sex crimes alone -- has come forward to say that he alone stalked, attacked, beat, raped, and robbed a white woman in her 20's, who was set upon on the 102nd Street transverse, was missing her Walkman, and was left tied in a way that has never before been explained.   Had this evidence been available, the defendants' attorneys would have had an arguably compelling alternative to the People's theory of the case.

105.   It is the People's position that, as to those verdicts which arose specifically from the attack on the Central Park jogger, the newly discovered evidence in this case meets the standard set forth in Criminal Procedure Law Section 440.10(1)(g): it "...is of such a character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to defendant."

106.   The newly discovered evidence at issue here relates directly only to those charges which arose out of the attack on the jogger herself.   Factually, it has no relationship to the other crimes -- riot, robbery, and assault -- which occurred in Central Park on the night of April 19, 1989.   Nonetheless, all of the defendants use the newly discovered evidence provided by Matias Reyes as the basis for a request that the court vacate their other convictions as well.

107.   The papers submitted on behalf of Kharey Wise, Kevin Richardson, Antron McCray, and Raymond Santana do not specify a legal basis for that request.   Yusef Salaam argues that the nature and gravity of the charges involving the female jogger prejudiced the defendants' ability to receive a fair and dispassionate trial on the other charges against him.

108.   Under the extraordinary circumstances presented by this case, the People are constrained to consent to the defendants' motions with respect to the other charges of which they were convicted.

109.   The other crimes committed on April 19 were grave and inexcusable -- unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two

NYCLD_030711

P-APP001656

knocked into unconsciousness, and one seriously injured.
Nevertheless, as the evidence was presented at trial, the attack on
the female jogger was of a far greater order of seriousness. The
People's theory was that she was set upon by a number of young men,
gang-raped by two or more of them, kicked and pummeled by the
group, and beaten about the head with a pipe, a brick, and a rock.
Had she been discovered sooner, her injuries might well have been
less serious in their effects; but she was not, and by the time
she was found, she was close to death. The People introduced
photographs depicting her injuries, called a pathologist to
describe and characterize them one by one, and presented medical
evidence fully describing her condition thereafter; she remained
comatose for some time, endured a lengthy period of rehabilitation,
and suffered permanent impairment as a result of the attack.

110. It is commonplace for defendants to be charged in a
single indictment with crimes of very different levels of gravity.
The law permits it, and correctly presumes that juries can and will
follow instructions requiring that they weigh evidence of guilt as
to different counts separately. Thus, in and of itself, the
relative seriousness of the jogger attack plainly would not merit
setting aside the juries' verdicts as to other charges.

111. In this case, however, other factors must also be
weighed. The crimes the defendants were charged with were not
widely separated by time or location, either from each other or
from the attack on the jogger; all occurred within a single hour,
at the northern end of Central Park. In effect, all were
considered to be part of a single incident -- a rampage in the
park, as is reflected in the fact that the defendants were charged
with Riot in the First Degree.

112. In fact, the prosecutor argued to the jurors in the
trial of Kharey Wise and Kevin Richardson that they should not lose
sight of the "overall pattern of the behavior...[as] this group
continued through the park for a period of approximately an hour
attacking one after another after another person." This, it was
fairly and convincingly argued, showed that the group acted with a
joint purpose, that they were "an entire group acting together in
one violent outburst of destruction, of beating, of assaulting."
Similar references were made in summation in the earlier trial of
McCray, Salaam, and Santana.

113. It was logical for the People to suggest that the
defendants' culpability and criminal intent could be inferred from
the pattern of conduct engaged in by the group of which they were
a part. This would have been an inescapable inference for the
jurors in any event. But the new evidence detailed above would, if
credited, call into question the defendants' involvement in the
most horrific crime in the pattern of incidents in the park -- and
indeed, the involvement of the larger group as well. Accordingly,
it would likely have had a significant bearing, in the jurors'

NYCLD_030712

P-APP001657

minds, on the defendants' culpability for those other crimes as well.

114. Moreover, the trial evidence as to the other charges, like the evidence as to the attack on the female jogger, consisted almost entirely of the defendants' statements. The distinctive logo on Kevin Richardson's jacket was described by one of the tandem bikers, and he and Santana were apprehended on the outskirts of the park; but the People's proof was limited by one fundamental fact: none of the victims could identify any of the defendants.

115. Just as the other incidents in the park cannot be considered separately from the rape of the jogger, neither can the defendants' statements about those events. In the case of at least two defendants, Richardson and Salaam, the process of questioning about the rape and the process of questioning about other crimes overlapped and intertwined. And with a single exception, all of the substantial written or recorded statements made by Richardson, McCray, Wise, and Santana concern the attack on the female jogger as well as the other crimes of that night. That lone exception involves Santana, whose first substantial written statement deals only with other events; but just an hour and twenty minutes after he signed it, after further, continuous questioning, an addendum described the jogger attack.

116. Thus, the admissions concerning the other crimes were contained in the same written and recorded statements as the admissions concerning the rape, and were largely obtained as part of the same process of questioning. As a consequence, the newly discovered evidence would probably raise questions about the reliability of those admissions similar to the questions raised about the defendants' confessions to rape. There is some testimony that, in certain instances, admissions about other criminal incidents were made substantially before and apart from any statements about the rape. But that testimony alone, absent independent corroboration, would not have been sufficient to allay concerns about the defendants' confessions raised by the newly discovered evidence.

117. In sum, there was no significant evidence at trial establishing the defendants' involvement in the other crimes of which they stand convicted that would not have been substantially and fatally weakened by the newly discovered evidence in this matter. In the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements also placed Wise at the scene of earlier incidents. In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape. But none of this additional evidence was before the trial juries.

NYCLD_030713

P-APP001658

Accordingly, it cannot be considered in evaluating the newly discovered evidence claim.

118.   Assessing the newly discovered evidence, as we are required to, solely in light of the proof introduced at the earlier trials, we conclude that there is a probability that the new evidence, had it been available to the juries, would have resulted in verdicts more favorable to the defendants, not only on the charges arising from the attack on the female jogger, but on the other charges as well.

119.   The final determination of this motion must, of course, be made by the Court.   Should the Court, as requested by the parties, vacate the convictions, the People will move the Court to dismiss the indictments.   Under all the circumstances, no purpose would be served by a retrial on any of the charges contained in the indictment.

WHEREFORE, for the reasons stated, the People consent to the relief requested and recommend that the Court vacate the defendants' convictions in their entirety.

DATED:   New York, New York
         December 5, 2002


                                   NANCY E. RYAN
                                   Assistant District Attorney
                                   Chief of the Trial Division


PAGE 34 of 34

NYCLD_030714

P-APP001659



Search Twitter

Log in Sign up

**Ava DuVernay** @ava

Famke played Nancy Ryan beautifully. And the arc of the Fairstein/Ryan relationship is real. Fairstein really battled Ryan for the case in 1989. Ryan really ended up getting it back after Matias Reyes confessed. Wild. #WhenTheySeeUs

> **DeMane Davis** @DeManeDavis · Jun 1, 2019
> "While you were writing crime novels Kevin, Antron, Yusef, Raymon and Korey were serving time for crimes they didn't commit." -#FamkeJanssen
> Drop #LindaFairstein @PenguinBooks
> @WhenTheySeeUs #WhenTheySeeUs

7:44 PM · Jun 2, 2019 · Twitter for iPhone

**151** Retweets **788** Likes

**Silver** @SilverEulalia · Jun 2, 2019
Replying to @ava
Famke was a real savior in this movie... So was Logan Marshall-Green. Seeing them fight for those boys kept me in tears.
1 2 15

This account owner limits who can view their Tweets. Learn more

2 more replies

**Pfunk, the shenanigator** @Gluonsrule · Jun 2, 2019
Replying to @ava
Famke really is an underrated, underutilized actor. she's always truthful in her performance. human.
1 14

**Lisa Phillips** @lphillips729 · Jun 2, 2019
Replying to @ava
There's a dark place in hell for Fairstein, Lederer and those cops. Donald Trump will keep it warm. Outrage!
1 6

**JoyfullyMe** @me_joyfully · Jun 2, 2019
Replying to @ava
You did that, Ava. I cried for half an hour after the credits stopped rolling. Your cast, the cinematography, the directing...

## New to Twitter?

Sign up now to get your own personalized timeline!

Sign up

## Relevant people

**Ava DuVernay** @ava Follow
Cherish The Day, When They See Us, 13th, Wrinkle in Time, Queen Sugar, Selma, Middle of Nowhere, Venus VS, I Will Follow, My Mic Sounds Nice, This is The Life

**DeMane Davis** @DeManeDavis Follow
Director #SelfMadeNetflix @netflix @HowToGetAwayABC @Station19 @QueenSugarOWN @theredlinecbs @YouNetflix Film: LIFT streaming @Amazon

**Penguin Books** @PenguinBooks Follow
We publish fiction and nonfiction adorned with the famous dignified but flippant logo.

## Trends for you

Classical music · Trending
**King Bach**
56.3K Tweets

**#SolarOpposites**
Now Streaming on Hulu
Promoted by Hulu

Entertainment · Trending
**Pete Davidson**
9,563 Tweets

Movies
A closer look at semi-autographical Pete Davidson ...

Trending in United States
**#supportCostco**
8,635 Tweets

Trending in United States
**6ix9ine**
27.9K Tweets

Show more

5/8/2020 Ava Duvernay on Twitter: "Carrie played Nancy Ryan beautifully. Arc of the Halstead Ryan relationships...so Fair she really battled Ryan fo...

Case 1:20-cv-08042-PKC Document 46-8 Filed 07/01/20 Page 118 of 161

🐦   🔍  Search Twitter                                      Log in    Sign up    ⚬⚬⚬

© 2020 Twitter, Inc.

GIF

💬          ⇄          ♡ 7          ⬆️

**Nellie** @DnellieNelson · Jun 2, 2019                              ⌄
Replying to @ava
I just finished watching all 4 parts. I cried many tears esp the last epi. It blew
me away n for tire me up inside. I'm from Harlem n remembered listening 2
Kiss FM n reading the Amsterdam News 2 get the real story. Thank u @ava 4
giving us a glimpse from their perspective.

💬          ⇄ 1        ♡ 3          ⬆️

**Amie Zamudio** @amie_zamudio · Jun 2, 2019                        ⌄
Replying to @ava
@ava last year you tweeted in support of @GJonesWright for DA in
#SanDiego. We appreciate that so much. She will win 2022 because we see
now how powerful and damaging a corrupt DA can be. The COLLATERAL
damage is massive & #DangerousWhiteWomen are responsible.

💬          ⇄ 2        ♡ 2          ⬆️

P-APP001661

Log in    Sign up
Search Twitter

P-APP001662

```
1              People Reynolds Cross (Mr. Joseph)         866

2       Q    Seeing Antron McCray at the precinct?

3       A    I did have a conversation about it.

4       Q    You tell us, I think you told Ms. Lederer, that

5   you didn't interview or question Antron McCray at that point

6   or at any later point; is that correct?

7       A    That's correct.

8       Q    You didn't have any conversation with him at that

9   point; is that correct?

10      A    That's correct.

11      Q    The observations, what you have just told us, you

12  saw; right?

13      A    Correct.

14      Q    Nothing further then that, correct?

15      A    Nothing, no.

16      Q    Would I be correct -- withdrawn.

17           You have told us on the 19th of April and into

18  April 20th, you had conversations with numerous officers,

19  police officers, detectives, concerning what was happening

20  in Central Park in the investigation you were imparting?

21      A    When was this?

22      Q    On April 19th and into April 20th?

23      A    While we were on the street, you mean?

24      Q    Yes?

25      A    I didn't have any conversations with the
```

NYCLD_023569

P-APP001663

1

2      detective.

3          Q    On April 19th you didn't -- you had a conversation

4      with the sergeant; is that correct, on April 19th?

5          A    Yes.

6          Q    You had conversations with other police officers?

7          A    Yes.

8          Q    On April 20th, the morning, you did have

9      conversations with detectives as well; is that right?

10         A    Yes.

11         Q    Just so I'm understanding, that prior to arresting

12     any of the young men that you arrested, you had spoken to

13     police officers and sergeants, but no detectives?

14         A    That's correct.

15         Q    Subsequent to their arrest, then you spoke to a

16     variety of other police officers, including detectives?

17         A    Yes.

18         Q    Over a period of time you spoke to a Detective

19     Rosario; is that correct?

20         A    Yes.

21         Q    And you spoke the a Detective Farrel?

22         A    Yes.

23         Q    Detective Whelpley?

24         A    Yes.

25         Q    Were there captains also that were at the Central

LDI

NYCLD_023570

P-APP001664

```
 1              People Reynolds Cross (Mr. Joseph)          868

 2   Park Precinct, police captains?

 3        A    Yes.

 4        Q    You spoke with them as well?

 5        A    Yes.

 6        Q    Was there a Captain Gunther?

 7        A    Yes.

 8        Q    Were there also individuals who were known as

 9   chiefs, a Chief Rosenthal?

10        A    Yes.

11        Q    Was he at the Central Park Precinct in the morning

12   of the 20th?

13        A    Yes.

14        Q    Where does a chief stand in the hierarchy of the

15   Police Department?

16        A    Where?

17        Q    Yes?

18        A    Close to the top.

19        Q    I assume above a captain; is that correct?

20        A    Yes.

21        Q    Was there another, there were several chiefs that

22   came down to the Central Park Precinct that you spoke to on

23   the morning of the 20th; is that right?

24        A    I just spoke to one, I believe.

25        Q    Was there a chief Colengelo?
```

LDI

NYCLD_023571

|   |   |   |   |
|---|---|---|---|
| 1 | | People Reynolds Cross (Mr. Joseph) | 869 |

2      A     Yes.

3      Q     And a Chief Selvaggi; is that correct?

4      A     Yes.

5      Q     They were also at the precinct in the morning of

6  April 20th?

7      A     No.

8      Q     At any point did you speak with them?

9      A     Yes.

10     Q     So that would be in addition to Rosen, Chief

11 Rosenthal.  You spoke to Chief Colengelo and a Chief

12 Selvaggi.

13     A     Yes.

14     Q     Now, you told us that there came a time that you

15 went to Antron McCray's home?

16     A     Yes.

17     Q     When you went to the home, to his home, you went

18 with numerous other police officers and detectives; is that

19 right?

20     A     Yes.

21     Q     I think you told us there was a detective Whelpley

22 and Farrel, Rosario, Morin?

23     A     Yes.

24     Q     When you went to Antron McCray's door, how many of

25 those officers went with you to the door?

LDI

NYCLD_023572

P-APP001666

T-3    Reynolds-Ppl-cross (Burns)                097

answer.

Q    Isn't it true you were in the building where the juvenile room is, and you were not in the building where the, where the captain of the precinct and the-- Do you understand what I'm asking you?

A    At the time that I was doing the paperwork, the captain wasn't in.

Q    Yeah.

A    The highest ranking officer that was in the precinct at that time was the lieutenant, and that was it. Just one lieutenant and maybe one or two sergeants.

Q    Okay.  Did there come a time when you did see a chief?

A    Yes, one chief.

Q    One chief.  And where did you see the chief?

A    I saw the chief in the captain's office.

Q    And the captain's office, is that located in this other main building?

A    Yes.

Q    And what time was it when you saw the chief?

A    I have to look in my notes for that.

Q    Please.

A    That was about 12:30.

Q    You saw the chief at 12:30?

H. C. Davis

```
1                   T-3    Reynolds-Ppl-cross (Rivera)              899
2        A     Yes.
3                  MR.  BURNS:  Thank you, officer Reynolds.
4        A     You're welcome.
5    CROSS EXAMINATION
6    BY MR. RIVERA:
7        Q     Good afternoon, officer.
8        A     Good afternoon.
9        Q     Officer, you testified earlier today that you saw
10   one member, one member of the Force that's a brass, that had
11   brass; is that correct?
12       A     Well, what rank do you consider brass?
13       Q     A chief or above?
14       A     Yes, definitely yes.
15       Q     And Mr. Joseph's examining of you, you also
16   testified that you saw a Chief Colengelo and a chief
17   Selvaggi; is that correct?
18       A     I believe that was their names.  Let me take a
19   look.
20             Yes.
21       Q     Now, could you tell us who is Chief Colengelo?
22       A     He's-- Chief Colengelo?
23       Q     Yes.
24       A     I believe he's the chief of Manhattan North.
25       Q     Okay.


                              H. C. Davis
```

NYCLD_023602

P-APP001668

1           T-3   Reynolds-Ppl-cross (Rivera)       900

2    A    The Borough.

3    Q    Would he be the chief of detectives?

4    A    Yes.  Yes, Manhattan North detectives.

5    Q    And is he the chief of detectives for the City of

6 New York?

7    A    Yes.

8    Q    And would he be classified as brass?

9    A    You could call him that.

10    Q    Okay.  And could you tell us who Cheif Selvaggi?

11    A    He's the chief of the borough patrol.

12    Q    And you also testified as to see another chief; is

13 that correct?

14    A    Yes.

15    Q    And do you know, do you recall the name of that

16 chief?

17    A    Chief Rosenthal.

18    Q    Right.  And could you tell who Chief Rosenthal is?

19    A    Chief of, Manhattan chief of detectives.

20    Q    And did you see all three chiefs on either the 20th

21 or the 21st?

22    A    I believe it was the 21st.

23    Q    Okay.  Did you see Chief Rosenthal on the 20th or

24 the 1?

25    A    Chief Rosenthal I saw both days.


                      H. C. Davis

NYCLD_023603

P-APP001669

1                    T-3    Reynolds-Ppl-cross (Rivera)              901

2        Q    And the other two chiefs you saw on the 21st?

3        A    Yes.

4        Q    Do you know or do you recall when you were apprised

5    there was a chief, that there were chiefs in the building at

6    the Central Park Precinct?

7        A    Excuse me.

8        Q    When with you informed that there were chiefs at

9    the Central Park Precinct, a time?

10       A    I don't recall.   There was only one chief at the

11   Central Park Precinct.

12       Q    And did Chief Rosenthal ask you to come in and

13   speak to him?

14       A    No.

15       Q    You volunteered to go see Chief Rosenthal?

16       A    Definitely not.

17       Q    Well, there came a point in time where you saw

18   Chief Rosenthal at the captain's room; is that correct?

19       A    Yes.

20       Q    And the purpose of your visit to see Chief

21   Rosenthal was to tell him what you had observed on the night

22   of the 19th and 20th, is that correct?

23       A    That's correct.

24       Q    By the way, were there other individuals present

25   when you were speaking to Chief Rosenthal?


                         H. C. Davis

NYCLD_023604

P-APP001670

1

2    A    Yes.

3    Q    How many other individuals were present?

4    A    I'd say maybe two, three others.

5    Q    And were they also, could they also be deemed

6  police brass?

7    A    The captain could be, the others weren't.

8    Q    Was there a captain in the office?

9    A    Yes.

10    Q    And the other individuals, were they captains or

11  above?

12    A    No.

13    Q    They were below the rank of captain?

14    A    Yes.

15    Q    Outside of the precinct, were there members of the

16  press?

17    A    Yes.

18    Q    And how many members of the press were present

19  outside the precinct?

20    A    I couldn't begin to count them.

21    Q    Was it a countless number, a large number?

22    A    There were a few.

23    Q    When you say a few, would you classify it was less

24  than five, more than five?

25    A    I don't know.


                         H. C. Davis

1          T-3    Reynolds-Ppl-cross (Rivera)              909

2          the Assistant District Attorneys and all sworn

3          jurors are present.

4                THE COURT:  All right, good afternoon, ladies

5          and gentlemen.

6                THE CLERK:  Officer Reynolds, may I remind you

7          you're still under oath.

8                THE WITNESS:  Yes.

9     CONTINUING CROSS EXAMINATION

10    BY MR. RIVERA:

11       Q    Officer, before we broke, you indicated to us that

12    there was some chiefs and members of the press that were

13    present at the Central Park Precinct; is that correct?

14       A    Yes.

15       Q    And is that unusual to see top brass at the Central

16    Park Precinct during an arrest?

17       A    There is not a lot of arrests there, so, but yeah,

18    I would say it is.  Slight.

19       Q    Under normal circumstances would it be unusual to

20    see a high member of the brass at any precinct when youths

21    are arrested?

22                MS.  LEDERER:  Objection.

23                THE COURT:  I'll allow it.

24       A    It depends on the precinct.

25       Q    Are there some precincts where this would not be

                              E. C. Davis

```
 1              T-3    Reynolds-Ppl-cross (Rivera)          910
 2   unusual?
 3                  MS.  LEDERER:  Objection.
 4        A    Yes.
 5        Q    What about the Central Park Precinct, is this
 6   unusual at the Central Park Precinct?
 7        A    Slightly, yes.
 8        Q    And the same applies for the members of the press?
 9        A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11   have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14   there case was going to have special significance within the
15   modus operandi of the Police Department.
16                  MS.  LEDERER:  Objection.
17                  THE COURT:  Sustained.
18        Q    Were there any Assistant District Attorneys present
19   at any time when you were involved in this case between
20   April the 19th and April the 20th?
21                  MS.  LEDERER:  Objection.
22                  THE COURT:  I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.  Lederer?
25        A    Yes.


                         H. C. Davis
```

NYCLD_023613

P-APP001673

1        T-3    Reynolds-Ppl-cross (Rivera)              911

2        Q    And was there also an A.D.A. Fairstein?

3        A    Yes.

4        Q    Were there any other members of the District

5    Attorney, District Attorney present, paticularly any

6    Assistant District Attorney?

7        A    I don't think so.

8        Q    And when for the first time did you see an

9    Assistant District Attorney on this matter?

10       A    The night of the 20th.

11       Q    Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13       A    Regarding this matter?

14       Q    Regarding this case.

15       A    No.

16       Q    Did you see them in the building or any other

17   buildings involved in the case?

18       A    No.

19       Q    Prior to the 20th?

20       A    No.

21       Q    Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23       A    Yes.

24       Q    And police officer Alvarez informed you of an

25   assault on an individual; is that correct?


                         M. C. Davis

NYCLD_023614

P-APP001674

T10-SC-TS

2498

                    Arroyo - Cross - Rivera

1

2      Q         And that part was not in when you first made out

3  this statement, is that correct?

4      A        That's correct.    Because if he had anything

5  additional to add, it would have been added there.

6      Q         But it wasn't in when you read the statement to

7  Ramon?

8      A     That's correct.

9      Q     Now, were you the one who called the district

10  attorney's office to have him come down?

11      A     No, I was not.

12      Q     Were you present when the DAs office showed up?

13      A     Yes.

14      Q         And at about what time did representatives of the

15  DAs office show up?

16      A     I'm not sure exactly what time they showed up.     I

17  first encountered the DAs at the 20th Precinct after I was

18  finished at the Central Park Precinct.

19      Q     So, they weren't at the Central Park Precinct?

20      A     Well, I don't recall seeing them there.

21      Q     First time you saw them was at the 20 Precinct, 20th

22  Precinct?

23      A     That's correct.

24      Q     And was this in the morning or in the afternoon that

25  you saw them?

P-APP001675

T10-SC-TS

2499

                    Arroyo — Cross — Rivera

1

2        A    This was in the evening.

3        Q    And you have no recollection at about what time you

4   saw them?

5        A    No, I don't.

6        Q    And who from the district attorney's office did you

7   see at the precinct?

8        A    I saw district attorney Linda Fairstein, district

9   attorney Liz Lederer and district attorney Tim Clements.

10       Q    Do you know who Linda Fairstein is in the hierarchy

11  of the district attorney's office?

12       A    Yes.

13       Q    And who is she?

14       A    She was the sex crimes senior trial lawyer for the

15  DAs office.

16       Q    Was she the chief of the sex crime unit for the DAs

17  office?

18       A    I'm not exactly sure what her rank was, but she held

19  some position along those lines at that time.

20       Q    She had a position within the district attorney's

21  office, a high position within the DAs office, is that

22  correct?

23       A    Well, I would assume you would call it that, yeah.

24       Q    And you saw them there on the evening of April the

25  20th, am I correct in that?

T10-SC-TS

2500

1                          Arroyo - Cross - Rivera

2        A     Yes.

3        Q     And the job of a district attorney, the primary job

4    of the district attorney is to assist the police in getting a

5    statement from a defendant?

6        A     That's not correct.

7        Q     They assist the police in getting a video statement

8    from the defendant, is that correct?

9        A     They did perform video statements, yes.

10       Q     When you got the statement from Ramon  Santana,  you

11   didn't  run  out  and  call  the  DAs  office and say we got a

12   statement from Defendant Santana, come on down so we can  make

13   a video of it?

14       A     Absolutely not.

15       Q        You waited to get statements from all defendants

16   before you called the DAs office?

17            MR. CLEMENTS:  Objection.

18            THE COURT:  Objection sustained.

19       Q     And so -- were you present when  a  video  statement

20   was taken of Ramon Santana?

21       A     Yes, I was.

22       Q     And who else was present in the room?

23       A     Ramon Santana, Ramon Santana, Sr., district attorney

24   Liz Lederer and detective Mike Sheehan.

25       Q     And yourself, is that correct?

NYCLD_017755

P-APP001677

T10-SC-TS

2501

1                     Arroyo - Cross - Rivera

2       A     And myself.

3       Q         And detective Sheehan is from the Manhattan North
4  Homicide?

5       A     That's correct.

6       Q     Did you escort Ramon into the video room?

7       A     I don't recall.  I don't believe I  did.    I  don't
8  recall if I did escort him.

9       Q         Did you at any point in time tell Ramon that they
10  were going to take a video statement of him?

11      A     No, I don't recall.

12      Q     When you finished questioning Ramon at 4:40  in  the
13  afternoon,  did  you say Ramon, you got to wait around because
14  we're going to take a video statement of you?

15      A     You got to what?

16      Q     You have to wait around because we're going to  take
17  a video statement of you?

18      A     No, I didn't tell him that.

19      Q         It was your testimony you went up and you gave a
20  statement that you took from Ramon  Santana  to  one  of  the
21  supervisors, is that correct, detective supervisors?

22      A     That's correct.

23      Q     Was that detective supervisor lieutenant Doyle?

24      A     That's correct.

25      Q     And this was the commanding officer of the homicide

T4-fr

383

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2   came and began interviewing them one at a time.

3       Q       Approximately what time was that if you

4   recall?

5       A       I believe that's approximately 5:50 in the

6   morning.  Let me refresh my memory with that.    I'm

7   sorry, that was approximately 5:30.

8       Q       Were you aware when parents of the family

9   returned with food?

10      A       Yes.

11      Q       Were you aware whether any of that food was

12  given to any of the people you had in the Juvenile

13  room?

14      A       Yes.

15      Q       Who do you recall seeing have some food in

16  that room?

17      A       I believe all of them ate.

18      Q       And do you recall whether Raymond Santana

19  made any statement in your presence while he was in

20  that room?

21      A       Yes, he did.

22              THE COURT:   Which room?

23      Q       I'm sorry.  In the Juvenile room?

24      A       Yes.

25      Q       What, if anything, did you hear him say?

10/13/8

T4-fr

384

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    A    He looked over to Kevin Richardson   at   the
3 point  where we couldn't get anyone to come pick him
4 up and he stated that they were going to Spofard and
5 that they would all  stick  together,  and  fuck  up
6 anybody who got in their way.
7    Q    When the five people were taken from the
8 Youth Room and put in the  outer  office  where  the
9 parents were waiting, were they handcuffed?
10   A    No.
11   Q    Do  you  recall  where any of the three
12 defendants,  Kevin  Richardson,  Steve   Lopez,   or
13 Raymond  Santana  sat when they went into that other
14 room?
15   A    Each defendant sat  with  their  parent  or
16 whoever  it  was that came to pick them up.  I don't
17 recall specifically what desk they sat at.
18   Q    What, if anything, did you do  after  those
19 people were taken out of the Juvenile room?
20   A    I  went  back  inside  to  ——  with the
21 detectives for the interview.
22   Q    And which detective or detectives  did  you
23 go with if you recall?
24   A    That was Detective Farrell and Detective
25 Whelpley.

10/13/89

NYCLD_023130

P-APP001680

T4-fr

385

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      Q      When you say you went back inside, did  you
3  go back into the Juvenile room?
4      A      Yes.
5      Q      Was  there  anybody  else  there  besides
6  yourself and the two detectives you just mentioned?
7      A      Yes,  the  parent  of  the  defendant,  the
8  mother.
9      Q      Which person was in the room, which of the
10  people who had been taken into custody?
11          MR. MOORE:  I can't hear the last part
12          of the question.
13          THE COURT:  Restate the question.
14      Q      When you went in to  conduct  an  interview
15  with those detectives, who was in the room?
16      A      Besides  the detectives, myself and the
17  defendant.
18      Q      Who was the defendant?
19      A      I believe the first one —— that was  Lamont
20  McCall.
21          MR. MADDOX:  Objection.  The reference
22          to  the  word  "defendant" be stricken from
23          McCall.
24          THE COURT:  Don't refer to  people  as
25          defendants.   Just give us the name of the

10/13/89

T4-fr

390

REYNOLDS - PEOPLE - DIRECT - LEDERER

Q     At   the   conclusion   of   the   interview   of Lamont McCall, what, if anything, happened?

A      At that point he was given an appearance ticket for Family Court.

Q   When you say he  was  given  an  appearance ticket, who gave him that ticket?

A   I did.

Q      Did that appearance ticket have a return date?

A   Yes.

Q   What happened with Lamont  McCall  at  that time?

A      He was released to his mother, and given the appearance ticket.

Q   Were you present at  another  interview  at that time?

A   Yes, I was.

Q   Where was that interview conducted?

A   That was in the Juvenile room.

Q      And is that the lower rectangular room to the bottom of that building on the diagram, People's 1?

A   Yes, it is.

Q   Who was interviewed second?

10/13/8?

NYCLD_023136

P-APP001682

T4-fr

391

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     A    Clarence Thomas.

3     Q    And who was present during the interview of

4 Thomas?

5     A    His mother.

6     Q    Did you conduct that interview?

7     A    No.

8     Q    If you know, who conducted that interview?

9     A    I believe that was Detective Whelpley.

10     Q    Would you please name everyone who was in

11 the Juvenile Room at the time that interview was

12 conducted?

13     A    Detective Farrell, Detective Whelpley,

14 Clarence Thomas, his mother, and myself.

15     Q    And approximately how long was that

16 interview?

17     A    It was approximately an hour, an hour and a

18 half.

19     Q    During the time that -- in substance, what

20 did Clarence Thomas say to you?

21     A    He stated that they -- the group came into

22 the park at 110th Street and they had no specific

23 plans for that evening, and they started to assault

24 -- they assaulted, I believe, a bum, and then later

25 on went up to the reservoir and assaulted a jogger

10/13/89

NYCLD_023137

P-APP001683

T4-fr

392

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   up there with a pipe.

2   Q      And did he identify any of the people who

3   were with him that night in Central Park?

4   A      Yes, he did.

5   Q      Who did he name?

6   A      I'll have to look at my notes to refresh my

7   memory on that.  He named Antron McCray and Lamont

8   McCall.

9   Q      Did he give any information about Antron

10  McCray?

11  A      Yes, he did.

12  Q      What, if any, information did he tell you

13  about Antron McCray?

14  A      I believe he stated that he had assaulted

15  the jogger.

16  Q      Did he give you any information about a

17  description of who Antron McCray was?

18  A      He described him as a male black, 14, 15

19  years old, I believe.

20  Q      Did he tell you anything about where Antron

21  McCray lived?

22  A      He stated he lives on

23  Q      What, if anything, happened at the

24  conclusion of the interview of Clarence Thomas?

10/13/89

NYCLD_023138

P-APP001684

T4-fr

1        REYNOLDS - PEOPLE - DIRECT - LEDERER

2        A     He was released to his mother.

3        Q     Was he given anything prior to his release?

4        A     He was given an appearance ticket for

5   Family Court.

6        Q     And was there a date on that ticket?

7        A     Yes, there was.

8        Q     And was that the same date that had been on

9   the ticket of Lamont McCall?

10       A     Yes.

11       Q     What, if anything, did you do after being

12  present for the interview of Clarence Thomas?

13       A     After that we went -- later on that

14  afternoon we went back to his house.

15       Q     When you say later on that afternoon, what

16  time was it when you --

17       A     It was about 11:30.

18       Q     Is that in the morning or the evening?

19       A     In the morning.

20       Q     On what date?

21       A     On the 20th of April.

22       Q     Who did you go with?

23       A     Detective Whelpley and Farrell.

24       Q     And where did you go?

25       A     We went to his house.

10/13/89

T4-fr

394

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q    Whose house?

3     A    Clarence Thomas' house.  It's

4

5     Q    AT what time was Clarence  Thomas  given  a

6 return    ticket    to    come    to    Family    Court,

7 approximately?

8     A    It was about 7:30, 8:00.

9     Q    And what,  if  anything,  happened  between

10 that  time and the time you went to Clarence Thomas'

11 home?

12    A    Kevin Richardson was interviewed.

13    Q    What happened when you arrived at  Clarence

14 Thomas'  home  with the detectives at about 11:30 on

15 the morning of the 20th?

16    A    He was informed we wanted to  question  him

17 further,  and  his  rights  were read to him and his

18 mother.

19    Q    And was he reinterviewed at his home?

20    A    Yes, he was.

21    Q    Approximately how long was he spoken to  at

22 his home?

23    A    I'd say about 15, 20 minutes.

24    Q    Did there come a time —— did you conduct

25 that interview?

10/13/89

T4-fr

395

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      A     No.

3      Q     Were you present for that interview?

4      A     Yes.

5      Q     After that interview was  conducted,  where
6  did you go?

7      A         THen  went  to           to Antron
8  McCray's house.

9      Q     Who did you go with?

10     A     I went with Detective Farrell and  Whelpley
11  and other detectives from Sex Crime.

12     Q     What, if anything -- withdrawn.

13           When  you  left Clarence Thomas' apartment,
14  did you leave alone?

15     A     No, I didn't.

16     Q     Who came with you?

17     A     Detective Whelpley, Detective Farrell,  and
18  we  met  with Detective Rosario and Detective Rivera
19  and Morin from Sex Crimes.

20     Q     Did Clarence Thomas and his mother go  with
21  you?

22     A     Yes, they did.

23     Q     Did you travel in the same car with them?

24     A     Yes, I did.

25     Q         Did you have any conversation with them

10/13/89

T4-fr

396

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      about why they were going with you?

3          A      With him and his mother?

4          Q      Yes?

5          A      No.

6          Q      How did you know where to go when you   left

7      Clarence Thomas' apartment?

8                 MR. JOSEPH: Objection.

9                 MR. BERMAN:   Objection.

10                THE COURT:   I'll allow it.

11                Where were you going?

12                THE  WITNESS:  We were going to Antron

13         McCray's house.

14         Q      How did   you   know   where   Antron   McCray's

15     house was?

16         A      Clarence's mother told us where it was.

17         Q      Where did you go to find Antron McCary's

18     apartment?

19         A      To

20         Q      What happened when   you   arrived   at

21              ?

22         A      We   knocked on the door and we spoke to

23     Antron's father, Bobby McCray.

24         Q      Did you go to the door?

25         A      I went to the door, yes.

10/13/89

NYCLD_023142

P-APP001688

T4-fr

397

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q    Was anyone else with you?

3    A    Yes.

4    Q    Who was that?

5    A    Detective Rosario, Detective Rivera, and

6    Detective Morin.

7    Q    Did you personally speak to the person you

8    identified as Bobby McCray?

9    A    No.

10    Q    Were you present when there was a

11    conversation with him?

12    A    Yes.

13    Q    Who had that conversation?

14    A    Detective Rosario.

15    Q    What did you hear him say and what did you

16    hear Bobby McCray respond?

17    A    He stated that he wanted to speak to Antron

18    at the Central Park Precinct and that Bobby McCray

19    would have to come with us also because Antron is a

20    juvenile.

21    Q    And what happened then?

22    A    And he agreed and told Antron to get

23    dressed.

24    Q    And did Antron McCray and his father then

25    leave with you?

10/13/89

NYCLD_023143

P-APP001689

T4-fr

398

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      Yes, they did.

3      Q      Do you recall whether anyone else from  the

4  McCray family came?

5      A      His mother came also.

6      Q      And did they ride with you or did they ride

7  with someone else?

8      A         I believe they rode with the detectives

9  from Sex Crimes.

10     Q      What time did you  return  to  the  Central

11 Park Precinct, approximately?

12     A      I'd say it was after 12:00.

13     Q         When Antron McCray came with you -- and

14 left his apartment, what was he wearing?

15     A      He had on the clothes that he  was  wearing

16 the night before.  They were --

17            MR. MOORE:  Objection.

18            MR. BURNS:  Objection.

19            THE COURT:  Objection sustained.

20            Do you remember what he was wearing?

21            THE WITNESS:  No.

22     Q         Was there a conversation with anyone in

23 your presence about what Antron McCray would wear?

24     A      Yes.

25     Q         What  do  you   remember   about   that

10/13/8?

NYCLD_023144

P-APP001690

T4-fr

399

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2  conversation?

3     A     Detective Rosario asked Bobby McCray, he

4  asked him if Antron could wear the same  clothes  he

5  wore the night before, and they agreed.

6     Q     Did you notice anything about his clothes

7  when he came out of the apartment?

8     A     Yes, they were entirely  covered  with  dry

9  mud.

10    Q         When  you  returned to the Central Park

11 Precinct, did you conduct any interviews of  any  of

12 the  suspects that you already named, that is, Kevin

13 Richardson, Steve Lopez, or Raymond Santana?

14    A     No, I didn't.

15    Q     And did you at any time conduct or were you

16 present during any interviews with  Michael  Brisco,

17 Kharey Wise, Antron McCray or Yusaf Salam?

18    A     No.

19    Q      Did you voucher any property in connection

20 with this case?

21    A     No.

22    Q     Did you  go  out  and  pick  up  any  other

23 suspects in this case?

24    A     No, I didn't.

25         MS. LEDERER:  Thank you very much.

10/13/89

NYCLD_023145

P-APP001691

1                    Hartigan/cross/Mr. Moore              2592

2   J O H N      H A R T I G A N,  was recalled as a witness in

3   behalf of the People, having previously been duly sworn,

4   continues to testify as follows:

5               MR. MOORE:  May we approach?

6               THE COURT:  Yes.

7               (Whereupon, there was a bench conference among

8          all counsel with the court out of the hearing and

9          presence of the jury.)

10              (Pause)

11              THE CLERK:  Detective, having been previously

12         been sworn, you're still under oath.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  Members of the jury, you recall Mr.

15         Hartigan was here previously, was interrupted.  And

16         we are going to resume his examination today, cross

17         examination by Mr. Moore.

18  CROSS EXAMINATION

19  BY MR. MOORE:.

20      Q    Mr. Hartigan, good morning.

21      A    Good morning, sir.

22      Q    You indicated in previous cross examination by Mr.

23  Diller that you retired from the N Y P D sometime in July of

24  1989, am I correct?

25      A    Yes, sir.

P-APP001692

1                          Hartigan/cross/Mr. Moore          2593

2       Q      You also indicated that you were a patrolman for

3  five years and that you were a detective for twenty years,

4  am I correct?

5       A      In the detective division for twenty years, yes,

6  sir.

7       Q      How long were you with the Manhattan North homicide

8  detective unit?

9       A      Three years.

10      Q      And during your tenure with Manhattan North, Mr.

11  Hartigan, how many cases, homicide cases have you

12  investigated?

13      A      It's hard to say.  It's a large number of homicides

14  that we did.  We worked on old homicides.  We worked on new

15  homicides as they came in.  We went back on old homicides.

16      Q      And what percentage of those cases have resulted in

17  arrests?

18                    MS. LEDERER:  Objection.

19                    THE COURT:  Objection sustained.

20      Q      Now, have those cases that you worked on, what

21  percentage of the defendants in those cases have been black

22  and Hispanic males?

23                    MS. LEDERER:  Objection.

24                    THE COURT:  Sustained.

25      Q      Of those cases that you have worked on, what

AM010249

NYCLD_018271

P-APP001693

Hartigan/cross/Mr. Moore          2594

percentage of those cases have been based on statements?

MS. LEDERER:  Objection.

THE COURT:  Sustained.

Q    Now, you've indicated, Mr. Hartigan, that you have in the course of your investigation, you have dealt with young people, am I correct?

A    Yes, sir.

Q    Would you say in a large percentage of your cases or a small percentage of those cases?

A    I'd say a small percentage.

Q    Now, in April 20, 1989 your tour of duty was from 8 o'clock in the morning to 4 o'clock in the afternoon, am I correct?

A    Yes, sir.

Q    And in fact, Detective Hartigan, you were fairly busy on that particular day, were you not?

A    Pardon me?

Q    You were fairly busy on April 20th, were you not?

A    Yes, sir.

Q    As a matter of fact, you participated in the interview of Kevin Richardson from 9:40 in the morning until about 1 o'clock in the afternoon, am I not correct?

A    From about 10 o'clock in the morning, yes, sir.

Q    Until about 1 o'clock?

1                    Hartigan/cross/Mr. Moore          2595

2       A    Yes, sir.

3       Q    And that interview resulted in a statement from

4  Kevin Richardson, am I not correct?

5              MS. LEDERER:  Objection as to form.

6              THE COURT:  Objection as to form is sustained.

7       Q    Well, after the interview Kevin Richardson did give

8  you a statement, is that correct?

9       A    Kevin Richardson was giving a statement at the time

10 I sat in on the interview.

11      Q    Yeah.  And he gave you a statement, a written

12 statement?

13      A    Yes, sir.

14      Q    And from 1 to 6 o'clock you participated in the

15 interview of Raymond Santana, am I correct?

16      A    Yes, sir.

17      Q    And that was from 1 to 6 o'clock?

18      A    I can't recall exactly what  --  I believe it was 1

19 --  4 to 6 o'clock.  I can not exactly recall the hour.

20      Q    And at the end of the interview Raymond Santana

21 signed a statement, isn't that correct?

22      A    Yes, sir.

23      Q    And, as a matter of fact, during your examination

24 of Raymond Santana from 1 to 4 o'clock you asked him

25 repeatedly --

P-APP001695

1                    Hartigan/cross/Mr. Moore              2596

2              MS. LEDERER:  Objection.

3              THE COURT:  He didn't say he interviewed him

4         from 1 to 4 o'clock.

5    Q    Well, your interview of Raymond Santana was roughly

6    from 1 to 5 o'clock, is that correct?

7    A    I can't recall what time it ended, sir.

8              MS. LEDERER:  Your Honor, can I request a

9         sidebar with the line of questioning Mr. Moore is

10        about to proceed?

11             THE COURT:  Yes.

12             (Whereupon, the following occurred at

13        sidebar:).

14             MS. LEDERER:  Your Honor, I requested a sidebar

15        because Mr. Moore appears to be beginning a line of

16        questioning about questions that were put to

17        Raymond Santana.  I would ask for an offer of

18        proof.

19             MR. MOORE:  First of all, you in your direct

20        brought out the fact that he had questioned or

21        interviewed Raymond Santana.

22             MS. LEDERER:  That's right.  That was the only

23        question I asked him.

24             MR. MOORE:  Let me just finish.  You also

25        showed Raymond Santana's clothing.  I intend to

P-APP001696

1       Hartigan/cross/Mr. Moore          2597

2       show that this officer had a pattern of practice

3       not only of interviewing people, but also of

4       getting statements from almost all the individuals

5       that he interviewed.  And that certainly is

6       relevant to the whole --

7            THE COURT:  That he got statements from these

8       people?

9            MR. MOORE:  Yeah.

10           THE COURT:  All right.

11           MS. LEDERER:  I didn't object to that question.

12       You just asked him that.  What you were starting

13       to ask him, isn't it a fact that you repeatedly

14       asked him during that interview, and I --

15           THE COURT:  If you're trying to bring out the

16       substance of the statements  --  I thought that was

17       the purpose of our visit --

18           MR. MOORE:  No.  I'm just showing that he asked

19       him about his involvement in the assault on the

20       jogger.  I did not give him his involvement with

21       the assault.

22           THE COURT:  You can not do that.  You can ask

23       him if he took a statement from him, answer no.

24       But the contents of that statement --

25           MR. MOORE:  I just wanted to ask him a question

NYCLD_018275

P-APP001697

1       Hartigan/cross/Mr. Moore        2598

2   about whether he got the statement from the female

3   jogger when Raymond Santana --

4       THE COURT:  Same ruling.  I will sustain the

5   objection.

6       MR. MOORE:  Okay.  I'll ask him about whether

7   there was a statement.

8       THE COURT:  Okay.

9       MS. LEDERER:  Just while we're here, so that I

10  think the record should be clear, that line of

11  questioning would not be permitted with Steven

12  Lopez or with any of the other non-defendants in

13  this case that this detective interviewed.

14      THE COURT:  For the same reason.  They're not

15  admissible statements.  They're hearsay.

16      MR. MOORE:  I'm not bringing the statements in.

17      THE COURT:  That he took the statement, fine.

18      MS. LEDERER:  That the witness was produced,

19  fine.  But the substance of any statement by

20  another person --

21      MR. MOORE:  I understand.

22      THE COURT:  Okay.

23      (Whereupon, the following occurred in open

24  court:).

25      MR. MOORE:  Could you just read back the last

NYCLD_018276

P-APP001698

1                    Hartigan/cross/Mr. Moore          2599

2           question.

3                 THE COURT:  The last question was objected to.

4    Q      Officer, so that I can understand clearly, you

5    indicated that you did interview Raymond Santana sometime in

6    the afternoon from 1 to 4 or 4 to 6, is that correct?

7    A      Yes.

8    Q      After this interview, Raymond Santana signed a

9    statement, is that correct?

10   A      It was during the interview he signed the

11   statement, yes.

12   Q      And there came a time later on that evening from

13   6:30 to 9 o'clock that you also interviewed Steven Lopez, is

14   that correct?

15   A      I interviewed Steven Lopez.  But I don't recall the

16   times.

17   Q      And at the end of that interview Steven Lopez

18   signed a statement, correct?

19   A      Yes, sir.

20   Q      And that morning from 12:30 until about 3 o'clock

21   you interviewed Kharey Wise, am I correct?

22   A      Yes, sir.

23   Q      And at the end of that interview again Kharey Wise

24   signed a statement?

25   A      Yes, sir.

NYCLD_018277

P-APP001699

1                  Hartigan/cross/Mr. Moore           2600

2      Q     And from about 2:30 to 3 o'clock that very morning

3  you participated in a videotaped statement by Raymond

4  Santana, is that correct?

5      A     I can't recall if I did or not, sir.

6      Q     But you were aware of the fact that there was a

7  videotape of Raymond Santana?

8      A     I don't recall.

9      Q     And about 3 o'clock that morning you transported

10  Kevin Richardson to the 24th Precinct, am I not correct?

11      A     Either I was transported with him or with his

12  family, yes.

13      Q     And sometime about 4:50 that morning Kevin

14  Richardson participated in a videotaped statement, is that

15  correct?

16      A     Yes, sir.

17      Q     And you were present?

18      A     Yes, sir.

19      Q     And about 8 o'clock the next morning you took Kevin

20  Richardson to the crime scene, am I not correct?

21      A     Yes, sir.

22      Q     From 8 to 9 o'clock, is that correct?

23      A     I don't believe it was that  --  exactly 9 o'clock.

24  But I would say around there.

25      Q     And then about 9:30 you came back to the 24th

NYCLD_018278

P-APP001700

1                    Hartigan/cross/Mr. Moore          2601

2 Precinct and you took a second statement from Kharey Wise,

3 am I not correct?

4      A    Yes, sir.

5      Q    And then about 12:30 that day until about 1:50

6 Kharey Wise participated in a videotaped statement, am I not

7 correct?

8      A    I don't know the times.  But he did participate in

9 a statement, yes, a video statement, yes.

10     Q    And sometime during that videotaped statement you

11 came and you slipped a note to the assistant district

12 attorney Miss Lederer, am I correct?

13     A    Yes, sir.

14     Q    And then sometime at 3:15 later on that evening you

15 were present when Kharey Wise participated in a second

16 videotaped statement?

17     A    Yes, sir.

18     Q    So wouldn't you say, officer, that in those twelve

19 hours you were a very busy detective, weren't you?

20     A    We were all busy.  Yes, sir.

21     Q    I see.  You interviewed a series of young people

22 and in almost all of the cases they made statements, isn't

23 that correct?

24              MS. LEDERER:  Objection as to form.

25              THE COURT:  I'll allow it.

NYCLD_018279

P-APP001701

1                    Hartigan/cross/Mr. Moore              2602

2      A     Yes, sir.

3      Q     I see.  Now, Detective Hartigan, with respect to

4  Kevin Richardson, you indicated that you came sometime about

5  10 o'clock that morning to the Central Park Precinct?

6      A     Yes, sir.

7      Q     And you knew at that time, did you not, that a

8  female jogger had been found assaulted somewhere in Central

9  Park, isn't that correct?

10     A     Yes, sir.

11     Q     You also knew that there were a group of young

12 people who were being held for the assault on a male jogger

13 called John Loughlin around by the reservoir, isn't that

14 correct?

15     A     I didn't know the male jogger's name, no.

16     Q     Well, you were aware of the fact that they were

17 being held for the assault on a male jogger at the

18 reservoir?

19     A     I was aware that they were being held for a series

20 of assaults.

21     Q     For a series of assaults?

22     A     Yes, sir.

23     Q     Not only on the assault on the gentleman of the

24 reservoir but another assault in the park, am I correct?

25     A     I didn't know exactly what the assaults took place.

NYCLD_018280

P-APP001702

Hartigan/cross/Mr. Moore          2603

1  I didn't know.  I didn't have firsthand knowledge of what

2  assaults had taken place.

3      Q     But you were aware of a series of assaults?

4      A     That's what I understand, yes, sir.

5      Q     And you were aware, when you responded to the

6  precinct, were you not, that these young men were suspected

7  of being involved in the assault on the female jogger, isn't

8  that correct?

9      A     I would assume yes.

10     Q     And you were also aware when you went to the

11 precinct that Detective Gonzalez was interviewing Kevin

12 Richardson, am I correct?

13     A     I'm sorry?

14     Q     Detective Gonzalez was interviewing.

15     A     Was I aware of what, sir?

16     Q     That he was interviewing Kevin Richardson?

17     A     No.  I didn't learn that until I had gone into the

18 youth room.

19     Q     When you went into the youth room you saw him

20 interviewing Kevin Richardson, am I correct?

21     A     Yes.

22     Q     And he was asking Kevin Richardson questions and

23 Kevin Richardson was responding?

24     A     At that time I didn't pay attention what was going

NYCLD_018281

P-APP001703

COMPLAINT
INFORMATION
PD 313-081A II

Date of Orig Report

6/20/89

P.S.N.3

Last Name, First

Home Telephone

Relation of Perpetrator

Wanted

Sex   Race

Eyeglasses

Nickname, Est.

PAGE   1   OF   2   PAGE

UCOB No   | Komponent No   | Date of this Report   |
          | 281            | 6/20/89               |

CCH

tified F/H/20-30yrs
Job City, State, Zip

Sex   Race   Date of Birth   Age

Address, Include City, State, Zip   Apt No   Res Tel

Hair Length   Facial Hair   NYSID No

Wanted   Arrested   Last Name, First, M.I.

Sex   Race   Date of Birth   Age   Height   Weight   Eye Color   Hair Color   Hair Length   Facial Hair   NYSID No

Eyeglasses   Sunglasses

Nickname, First Name, Alias

Clothing Description:

Scars, Marks, M.O., Etc.

AREA WITHIN BOX FOR DETECTIVE/LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

Comp. Interviewed   In Person   By Phone   Date   Time   Results: Same as Comp. Report - Different (Explain in Details)
☐ Yes  ☐ No

Witness Interviewed   In Person   By Phone   Date   Time   Results: Same as Comp. Report - Different (Explain in Details)
☐ Yes  ☐ No

Canvass Conducted   ☐ Yes - Make Entry in Body Re: Time, Date...   Crime Scene Visited   ☐ Yes - Make Entry in Details Re: Time, Date,
☐ Yes  ☐ No                  Names, Addresses, Results       ☐ Yes  ☐ No   Evidence Obtained

Complainant Viewed Photos   Results:
☐ Yes  ☐ Refused  ☐ Future

Witness Viewed Photos   Results:
☐ Yes  ☐ Refused  ☐ Future

Crime Scene Dusted   By (Enter Results in Details)   Crime Scene Photos   By (Enter Results in Details)
☐ Yes  ☐ No                                  ☐ Yes  ☐ No

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral   ☐ C-2 Inaccurate Facts   ☐ C-3 No Evidence/Can't ID   ☐ C-4 Uncooperative Complainant

DETAILS:   COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK

SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

1) On this date at 0700hrs the undersigned along with Det Whelpley did
interview Clarence Thomas M/B/14yrs DOB        of
        in the presence of his mother Gloria Thomas who lives at the
address. Clarence Thomas was under arrest at this time so the under-
signed informed him and his mother of there rights from a card. Both
Clarence Thomas and his mother Gloria Thomas acknowledge each right
by stating yes and on the last right they agreed to answer questions
without an attorney present.Clarence Thomas states that he and his
friend Antron Mc.Cray who lives on        and goes to JHS 117 (
Exact address unknown) were on E110th st and they met
approx 15 other males all about 13 to 15 yrs old. Clarence states that
he did not know all of these males but he did know a guy named Polo
who is a M/Bor H/15yrs and he hangs out on E 110th and Madison , a guy
named Ralph M/B/15yrs who lives in the Taft projects and he knows
Lamont Mc'Call ( See OD 5 Det Whelpley Re; Lamont Mc Call). Clarence
states that the group was mixed with blacks and hispanics and that they
all went into the park at E 110th and started walking into the park and
south.'Clarence stated that they where just hanging out that there was
no plan on what they were going to do in the park. Clarence states that
they entered the park at approx 2010hrs and he remembers the time
because he knows that he met the group at 2000hrs and it took them
about ten minutes to talk and then walk to the park. Clarence further
states that as they walked thru the park some of the guys were throw-
ing rocks at cars but none of the cars stopped except for a cab (yellow
that did stop but did not chase the group. Clarence also states that
as they walked thru the park ( location unknown) approx eight of the
guys saw a male white40's jogging,who was wearing a sweater and blue
shorts, and these eight guys started chasing the male white but after
a few minutes five of the eight returned to the group stating that the
guy got away.                          Continued on page two

Continued on page two

NYC022226

REYNOLDS EXH. 11

NYCLD_057950

P-APP001704