| COMPLAINT FOLLOW-UP INFORMATIONAL | Page 2 000873 Pages | Pct. 022 | Complaint No 281 | Date of this Report 4/20/89 |
|---|---|---|---|---|

DETAILS:          CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE .
          INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS

Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and them at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white (could supply
no further discription). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van turned into the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he trippe
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

When questioned about anyone else who the group had hit Clarence stated that
there was an old bum  who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three  he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who  had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then then were woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak to us without an attorney present.
At this timeClarencestated that the pipe he told us about before was passed
back and forth between the tall guy and Antron Mc Cray but  Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's  and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of the three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to ▆▆▆▆▆▆▆▆▆▆ and stated
that Antron lived in this building in apartment ▆▆▆▆ Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into
▆▆▆▆and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Rank Signature Command Det [signature] DBMSTF | Name Printed J FARRELL | Tax Registry No. 864831 | Supervisor's Signature Sgt. | C.O.'s Initials |
|---|---|---|---|---|

NYC022227

NYCLD_057951

P-APP001705

```
 1              People - Det. Arroyo - Cross - Rivera          2963
 2        Q.    You don't recall --
 3                    MR. RIVERA:  Withdrawn.
 4        Q.    You just stated that you don't recall that he said
 5    that; is that correct?
 6        A.    Yes, I don't recall that -- I don't recall that he
 7    said that.
 8        Q.    Okay.  Did Raymond tell you that he did not live
 9    with his father?
10        A.    I don't recall that either.
11        Q.    You don't recall any information relative to
12    Raymond's father; is that correct?
13        A.    No, that's incorrect.
14        Q.    You do recall Raymond saying something about his
15    father; is that correct?
16        A.    Yes.
17        Q.    What did Raymond tell you about his father?
18        A.    Told me he didn't get along with him very well.
19        Q.    I'm sorry?
20        A.    He told me he didn't get along with him very well.
21        Q.    Did he tell you he lived with Raymond?
22        A.    I don't recall.
23        Q.    Did he tell you he lived with his mother?
24        A.    Again, I don't recall.
25        Q.    And you were present during the entire questioning
```

Joseph T. Tierney, CSR, RPR

```
 1              People - Det. Arroyo - Cross - Rivera        2964

 2   of Raymond by Detective Hartigan; is that correct?

 3                   MS. LEDERER:  Objection.

 4                   THE COURT:  What was your question?

 5                   MR. RIVERA:  That he was present during the

 6               entire questioning of Raymond by Detective

 7               Hartigan.

 8         Q.   Is that correct?

 9                   MS. LEDERER:  Objection.

10                   THE COURT:  I'll let him answer if he was

11               present --

12                   Detective Hartigan was present at all times

13               when you were present?

14                   THE WITNESS:  Detective Hartigan was present

15               when I was present, yes.

16                   THE COURT:  At all times?

17                   THE WITNESS:  Except for the times that I

18               left the room, correct.

19         Q.   But from 1:40 to 4:40, you were present during the

20   entire questioning of Raymond Santana; is that correct?

21         A.   Again, except for those times that I left briefly.

22         Q.   Well, when did you leave the room between 1:40 and

23   4:40?

24         A.   Well, I left the room to get coffee.

25         Q.   Other than that.
```

Joseph T. Tierney, CSR, RPR

```
 1              People - Det. Arroyo - Cross - Rivera        2965

 2        A.    I might have also left the room to get myself a

 3   soda.  I left the room after the signing of the written

 4   statement, and that would take us beyond 4:40 p.m.

 5        Q.    Okay.  Raymond signed the statement at about 4:40;

 6   is that correct?

 7        A.    That's correct.

 8        Q.    That means that the interrogation of Raymond ended

 9   about 4:40, would that be correct?

10        A.    That's correct.

11        Q.    And did you tell Raymond that the interrogation

12   had ended of Raymond?

13        A.    No.

14        Q.    You, at no time, informed him that your

15   questioning is over; is that correct?

16        A.    No.

17        Q.    You just took the statement, left the room and

18   came back several minutes later; is that correct?

19        A.    That's correct.

20        Q.    Now, you took that statement and brought it to

21   your supervisors; is that correct?

22        A.    That's correct.

23        Q.    And who, in particular, did you bring Raymond's

24   statement to?

25              MS. LEDERER:  Objection.


                  Joseph T. Tierney, CSR, RPR
```

NYCLD_017530

P-APP001708

```
 1              People - Det. Arroyo - Cross - Rivera          2966
 2                    THE COURT:  Who did he what?
 3                    MR. RIVERA:  Who did he bring Raymond's
 4              statement to.
 5                    THE COURT:  I'll let him answer.  I really
 6              don't know what it has to do with this hearing.
 7         A.    I brought the statement to the detective squad
 8    room, where Lieutenant Doyle from Manhattan North Homicide
 9    was present.
10         Q.    Was ADA Fairstein or ADA Lederer present when you
11    went to bring the statement to Lieutenant Doyle?
12                    MS. LEDERER:  Objection.
13                    THE COURT:  I'll let him answer that.
14         A.    No, they were not.
15         Q.    Did you discuss with Lieutenant Doyle the fact
16    that Raymond's grandmother was present and had difficulty
17    with the English language?
18                    MS. LEDERER:  Objection.
19                    THE COURT:  Sustained.
20         Q.    Did you ever ask Raymond to put into his own words
21    the statement that is People's 20 in evidence?
22         A.    Yes, I asked him if he wanted to write it out.
23         Q.    And what, if anything, did Raymond say?
24         A.    He said no.  I offered to write it out and he
25    agreed.
```

Joseph T. Tierney, CSR, RPR

```
 1                    Hartigan/cross/Mr. Moore              26 2756
 2   correct?
 3       A    I can't recall what he said in the videotape.
 4       Q    With respect to this case, officer, did you ever
 5   ascertain what time the female jogger was attacked?
 6                MS. LEDERER:  Objection.
 7                THE COURT:  Sustained.
 8                (Pause)
 9       Q    And did you make any attempts, officer, to verify
10   the accuracy of the allegations made by Kevin Richardson?
11                MS. LEDERER:  Objection.
12                THE COURT:  Sustained.  We've been all through
13           that, counsel.
14                (Pause)
15       Q    Now, Mr. Hartigan, there came a time when you spoke
16   to Kharey Wise, am I correct?
17       A    Yes, sir.
18       Q    And what time was that?
19       A    12:30 a.m. on the 21st of April.
20       Q    Now, you interviewed him in the sex crimes room of
21   the 20th Precinct, am I not correct?
22       A    Yes, sir.
23       Q    And so from the time when you interviewed him you
24   had a suspicion, did you not, that he was somehow involved
25   in a sexual assault on a female jogger?
```

Hartigan/cross/Mr. Moore                    262057

1   
2     A     Yes, sir.

3     Q     Now, do you know the name of the officer who
4   brought Kharey Wise into the precinct?

5     A     No.

6     Q     Did you ever try to find out the name of the
7   officer?

8     A     No.

9     Q     Do you know a Detective Freck, John Freck?

10    A     Yes, I do.

11    Q     Is he from Manhattan North?

12    A     Yes, he is.

13    Q     And do you not recall that it was Detective Freck
14  who brought Kharey Wise?

15    A     No, I don't.  I didn't recall it.  No.

16    Q     And were you also aware of the fact that Eddie De
17  LaPaz had been brought to the 20th Precinct?

18    A     I had no knowledge of Eddie De LaPaz being brought
19  to the 20th Precinct.

20    Q     Now, when Kharey Wise came into the 20th Precinct
21  on the morning of April 20th --

22    A     21st.

23    Q     -- 21st?

24    A     Yes, sir.

25    Q     Was he under arrest?

NYCLD_018335

P-APP001711

Hartigan/cross/Mr. Moore                    26       

1

2    A     I don't know.

3    Q     Were you the officer who was assigned to interview

4 him?

5    A     Yes.

6    Q     And are you telling the jury that you, the assigned

7 officer, did not know whether he was under arrest?

8              MS. LEDERER:  Objection.

9              THE COURT:  I'll let him answer.

10   A     I didn't know he was going to be placed under

11 arrest or not.  I didn't know that.

12   Q     Did you know whether at the time when you began the

13 interview of him was he under arrest?

14   A     No.  I didn't know if he was under arrest at that

15 time.  No.

16   Q     Does that mean he may have been under arrest?

17   A     If they had deemed that he was one of the

18 principals and that he was under arrest, then he would have

19 been under arrest.

20   Q     You say "they."  Who are you referring to?

21   A     I had no personal contribution as to who was being

22 placed under arrest.  It was not my job.  That was not my

23 aspect of the investigation.  I wasn't placing anybody under

24 arrest.

25   Q     You were the person who was assigned to interview

NYCLD_018336

P-APP001712

1                         Hartigan/cross/Mr. Moore                26259

2    him, right?

3        A    To do an interview, yes.

4        Q    So was he free to leave?

5        A    I don't know, sir.  If he was under arrest he

6    wasn't free to leave.  If he wasn't under arrest he was free

7    to leave.

8        Q    You didn't find out from your superiors whether he

9    was under arrest or not?

10       A    At that time, no.

11       Q    Now, when you first saw Kharey Wise you told him

12   about certain incidents in Central Park that night, didn't

13   you?

14       A    No.  He told me.

15       Q    Don't you recall that it was you who initiated the

16   conversation, officer?

17       A    Oh, yes, sir.

18       Q    And did you not tell him about the incidents in

19   Central Park?

20       A    I didn't tell him about any incidents in Central

21   Park.  I told him there was something that happened in

22   Central Park.

23       Q    So is it your testimony that you did not tell him

24   what incidents in Central Park that night?

25       A    I didn't mention anything, joggers, female joggers

P-APP001713

Hartigan/cross/Mr. Moore                    26478

1

2      Q      I'm asking you exactly what he said as you can

3   recall.

4      A      If I recall correctly, that's exactly what he said.

5    I asked him what time were you and where were you.   And he

6   told me.

7      Q      He mentioned to you that he was with a girlfriend

8   Lisa, am I correct?

9      A      Yes, sir.

10     Q      He gave Lisa's apartment number, am I correct?

11     A      Yes.

12     Q      At any time on the 21st did you speak to Lisa?

13     A      No.

14     Q      But he indicated to you that he was with this

15   woman, am I correct?

16     A      Yes, sir.

17     Q      Then he also mentioned to you that he and a

18   gentleman called Eddie De LaPaz went into the park, am I

19   correct?

20     A      Yes.

21     Q      Now, there came a time subsequent to this, after

22   the  --  withdrawn.

23     There came a time later on the next day when you took a

24   second statement from Kharey Wise, am I correct?

25     A      Yes, sir.

NYCLD_018356

P-APP001714

Hartigan/cross/Mr. Moore                    2647 81

1
2    A    I asked him if that was true.  He acknowledged that
3    it was true.
4    Q    You asked him at the end of the statement?
5    A    Yes.
6    Q    But you didn't ask him as you went through
7    sentence-by-sentence, did you?
8    A    I believe he was doing that with me.  As I was
9    reading, I was reading each word.
10   Q    You believe.  Did he or did he not?
11              MS. LEDERER:  Objection.
12              THE COURT:  Please.  You can't both talk at the
13          same time.
14              What is your question?
15   Q    Did you ask him sentence-by-sentence whether he
16   understood what each sentence meant?
17   A    No.
18   Q    Now, there came a time when he signed the
19   statement, am I correct?
20   A    Yes, sir.
21   Q    And Detective John Hartigan and yourself also
22   signed the statement, am I correct?
23   A    I'm John Hartigan.
24   Q    I'm sorry.  Detective Robert Nugent?
25   A    Yes, sir.

NYCLD_018359

P-APP001715

Hartigan/cross/Mr. Moore                    26**82**

1

2    Q    Was Robert Nugent in the room throughout the entire

3  interview?

4    A    Yes, sir.

5    Q    Now, at any time during the interview, officer, did

6  you ask Kharey Wise if he wanted anything to eat?

7    A    I can't recall if I did or not.  I don't think I

8  asked him if he wanted anything to eat, no.

9    Q    You didn't ask him if he wanted anything to drink?

10    A    I might have.

11    Q    You can't recall?

12    A    I can't recall.

13    Q    Now, after he finished the statement, what action

14  did you take or what did you do?

15    A    I went back downstairs to the 20th squad-room.

16    Q    And you left him alone?

17    A    No.  I left him upstairs in the Sex Crimes Squad.

18    Q    Did you leave him with someone?

19    A    There was police officers up there watching

20  everybody, whoever was still upstairs in that room.

21    Q    Was Detective Nugent with him when you left?

22    A    Yes.  I believe so, yes.

23    Q    Now, after you left Kharey Wise you were involved

24  in other matters, am I not correct?

25    A    After I left Kharey Wise?

NYCLD_018360

P-APP001716

Det. Hartigan / Defense / Cross (Moore)                    2718

A.   I don't know.

Q.   That was in fact Detective Kelly.  Wasn't it?

A.   I don't know.

Q.   Well, did you ever speak to the detective who was assigned to speak with Al Morris?

A.   No.

Q.   So Detective Kelly didn't tell you that Al Morris was with Kharey Wise?

          MS. LEDERER:  Objection.

          THE COURT:  Objection sustained.

Q.   Or is it that you didn't want to hear what information Al Morris was going to tell you?

A.   There was just too many people.  It was just too much to absorb.

Q.   Now, there came a time when you went back to the 24th Precinct.  Am I correct?

A.   When?

Q.   After you spoke to Eddie De La Paz, you went back to the 24th Precinct.  Am I correct?

A.   Yes, sir.

Q.   Then you put some information in a note and you handed it to Miss Lederer?

A.   Yes.

Q.   And this information said that you had spoken to

          Michael Frankel, Sr. Court Reporter

NYCLD_018396

P-APP001717

Det. Hartigan / Defense / Cross (Moore)          2719

2  Al Morris and Al Morris had not verified what Kharey Wise

3  had said?

4      A.    No.  I never spoke to Al Morris.  I spoke to Eddie

5  De La Paz.

6      Q.    I'm sorry.  My mistake.

7            You indicated you spoke to Eddie De La Paz?

8      A.    Yes, sir.

9      Q.    And Eddie De La Paz said he wasn't with Kharey

10 Wise?

11     A.    Yes.

12     Q.    At that stage when you gave the information to the

13 district attorney, you remained room.  Didn't you?

14     A.    No, I did not.

15     Q.    And did you know that the district attorney had

16 told Kharey Wise what you had told him about -- I'm sorry,

17 Eddie De La Paz?

18     A.    No.

19     Q.    You didn't know that?

20     A.    I didn't know if she did or not.

21     Q.    Now, after that there came a time when Kharey Wise

22 finished his video taped statement.  Isn't that correct?

23     A.    Yes, sir.

24     Q.    At this time when he finished the first video

25 taped statement, was he under arrest?


Michael Frankel, Sr. Court Reporter

NYCLD_018397

P-APP001718

Det. Hartigan / Defense / Cross (Moore)        2712

with Mr. Santana, earlier that evening?

A.    Yes.

Q.    And do you recall that there came a time --

          MS. LEDERER:  Objection.

          THE COURT:  I don't know what the question

is.

          MS. LEDERER:  May we have a side bar?

          THE COURT:  Yes.

          (The following is a sidebar conversation

          outside the hearing of the jury.)

          MS. LEDERER:  It appears to me that Mr. Moore

is trying to ask questions about whether this

detective prefers to interview young people by

themselves without the presence of a parent.

     I am aware that Raymond Santana had a

conversation with the detective out of the

presence of the father.

     If that's where Mr. Moore is going, it's

objectionable and he shouldn't be allowed to ask

the question.

          THE COURT:  I will allow the question.  You

can ask him on redirect how he came to do it.

          (Open court.)

Q.    Mr. Hartigan, do you recall earlier that evening


          Michael Frankel, Sr. Court Reporter

NYCLD_018390

P-APP001719

Det. Hartigan / Defense / Cross (Moore)        2713

that you had a conversation with Mr. Raymond Santana?

    A.    Early that day, yes.  The 20th I had a

conversation with him.

    Q.    That's correct.

    And you were asking him questions about his

involvement with the female jogger.  Do you remember that?

    A.    No, I didn't ask him any questions about the

female jogger.

    Again, he had told us what had happened.

    Q.    Okay.

    But there came a time when he gave you some

information in a statement.  Is that correct?

    A.    He gave us a statement.

    Q.    And you took down his statement.  Am I correct?

    A.    Yes.

    Q.    And in that statement he had not mentioned about

the female jogger.  Do you remember that?

    A.    Yes, sir.

    Q.    Do you remember that there came a time when his

father and his grandmother, -- I'm sorry, his father had

left the precinct?  Do you remember?  That was outside of

the precinct?

    A.    There was different times.  I believe his father

was there early in the morning and left and then again he

Michael Frankel, Sr. Court Reporter

NYCLD_018391

P-APP001720

Det. Hartigan / Defense / Cross (Moore)          2714

1   left during the conversation that I was having with Santana,

2   yes.

3   Q.    That's correct.

4         He left during that conversation.  And when his

5   father had left, then you asked him questions about his

6   involvement --

7   A.    No.

8   Q.    When the father left, he told you about his

9   involvement with the female jogger.  Is that correct?

10  A.    He asked his father for permission to talk to me

11  by himself and his father granted it.

12  Q.    During the time his father was not there is when

13  he told you about his involvement with the female jogger?

14  A.    Yes.

15  Q.    Isn't that correct?

16  A.    Yes.

17  Q.    Now, with respect to Eddie De La Paz, you

18  indicated that you wanted to take him to the precinct.  Am I

19  correct?

20  A.    I asked him if he would accompany us to the

21  precinct, yes.

22  Q.    And the purpose of taking him to the precinct, was

23  to ask him questions.  Was it not?

24  A.    To take a statement from him, yes.


          Michael Frankel, Sr. Court Reporter

1          Hartigan/redirect/People                2733

2      A    Justice got what it wanted.

3           MR. MOORE:  No further questions.

4           THE COURT:  Do you have anything else?

5   REDIRECT EXAMINATION

6   BY MS. LEDERER:.

7      Q    Detective, if I might take you back to the

8   interview of Kevin Richardson.  Do you recall when you were

9   here earlier you were cross-examined by Mr. Diller?  Do you

10  recall the questions he put to you?

11     A    Yes.

12     Q    And do you recall him asking you a series of

13  questions as to whether you promised the Richardsons, Kevin

14  Richardson or anybody from his family, that Kevin Richardson

15  can go home if he made a statement?  Do you recall those

16  questions Mr. Diller put to you?

17     A    Yes.

18     Q    On the morning of April 20th during the time that

19  you were interviewing Kevin Richardson and during the time

20  that he was writing a statement, did you ever have a

21  conversation with anyone from the Richardson family about

22  Kevin Richardson?

23     A    Yes.

24     Q    And do you recall who you spoke to at that time?

25     A    Gracie Cuffee, the sister.

NYCLD_018411

P-APP001722

1                    Hartigan/redirect/People                    2734

2      Q     Was that conversation at the Central Park Precinct?

3      A     Yes, it was.

4      Q     And did you say anything to Angela Cuffee about

5   Kevin Richardson at that time?

6      A     Yes.

7      Q     What did you say to her?

8      A     I  --  generally I spoke to her that Kevin had a

9   lot going for him.  He was young.  He was   --   I had met a

10  lot of people during the course of my time in the police

11  department, a lot of young people who couldn't read or

12  write.  Kevin was intelligent.  He was articulate, could

13  read, he could write.  And that he had a lot going for him.

14     Q     Did you in that conversation with Angela Cuffee,

15  did you have any conversation about what would happen with

16  Kevin Richardson with respect to the statements he had made

17  to you?

18     A     Yes.  I told her that I didn't know what was going

19  to happen, but this wasn't the end of the world for Kevin.

20  That it wasn't up to us, the police department.  But he

21  could possibly be given youthful offender treatment by the

22  courts and that he would have no record at the age of

23  eighteen.

24     Q     In that conversation did you indicate to her that

25  this case would be going to court?

1                    Hartigan/redirect/People                    2735

2       A      I assumed that she understood that this case was

3  going to court.

4                    MR. DILLER:   Objection.

5                    THE COURT:   Objection sustained what she

6             understood.

7       Q      Did you use words to her telling her that this case

8  was going to court?

9       A      I don't know if I did or not.

10      Q      When you talked about youthful offender treatment,

11 what exactly did you say to Angela Cuffee?

12      A      That the court could give him youthful offender

13 treatment, and that he would have no police record after the

14 age of eighteen.

15      Q      Did you promise her that would happen in this case?

16      A      No.   I told her we had no control   --   the police

17 department had no control over it.   But this is what

18 possibly could happen.

19      Q      Did you tell her who had control over that?

20      A      The courts.

21      Q      Detective, during the 20th and 21st, and the 22nd

22 and in the course of this investigation, were other

23 detectives other than yourself conducting interviews?

24      A      Yes.

25      Q      Did you personally do an interview of Antron

1               Hartigan/redirect/People                    2736

2   McCray?

3       A    No.

4       Q    Did other detectives do that interview?

5       A    Yes.

6       Q    Did you personally interview Yusef Salaam?

7       A    No.

8       Q    Did other detectives do that interview?

9       A    Yes.

10      Q    Did you personally interview Jermaine Robinson?

11      A    No.

12      Q    Did other detectives do that interview?

13      A    Yes.

14      Q    Did you personally interview Jomo Smith?

15      A    No.

16      Q    Did other detectives do that interview?

17      A    Yes.

18      Q    Did you personally interview Alfred Morris?

19      A    No.

20      Q    Did other detectives do that interview?

21      A    Yes.

22      Q    Did you personally interview Clarence Thomas?

23      A    No.

24      Q    Did other detectives do those interviews?

25      A    Yes.

SHEEHAN – PEOPLE – DIRECT – LEDERER          3650

minutes.

I, I then advised Raymond I was going into
another room, and that when his father got back here,
to please ask him to wait for me, I would out in a
few minutes.

Q     Did there come a time where you were notified
regarding Mr. Santana's senior presence at the precinct?

A     Yes, ma'am.

Q     Would you describe what happened?

A     After eight o'clock, again, I'm not positive
on the time, but after eight, and before nine, I was
at a briefing in the rear room of the 20th Squad, which
would be on the east, it's the east side of the squad,
and I was advised by another detective that Mr. Santana
senior had arrived.

Q     Did you return to the area where Raymond
Santana, Jr., the defendant, was?

A     Yes, I did.

Q     And what happened when you returned to that
location?

A     His father was there with him. We shook
hands. I introduced myself.

And I advised Mr. Santana, Sr. again that
we were going to take a statement, and wanted him to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP   NJ:

SHEEHAN - PEOPLE - DIRECT - LEDERER          3651

1

2   be present.

3           I   also   advised   him   at   that   time   that   there

4   were   members   of   the   District   Attorney's   Office   who

5   probably   are   going   to   want   to   videotape   any   statement

6   that   he   gave,   and   his   presence   would   also   be   required.

7       Q    Did   there   come   a   time   where   you   took   --   where

8   you interviewed Raymond Santana, Jr.?

9           Did   there   come   a   time   where   you   conducted

10   an interview of Raymond Santana, the defendant?

11       A    Yes, ma'am.

12       Q    Approximately   what   time   did   that   interview

13   begin?

14       A    Ten after 10:00 PM.

15       Q    Where was that interview conducted?

16       A    On   the   first   floor   of   the   20th   Precinct   in

17   the Youth Room.

18       Q    Were   you   able   to   conduct   that   interview   in

19   that   room   immediately   upon   Raymond   Santana's   father

20   arriving at the precinct?

21       A    No.   The   Youth   Room   was   being   utilized,   and

22   we had to wait.

23       Q    Would   you   describe   how   it   came   about   that

24   the   interview   began   with   Raymond   Santana,   and   who   was

25   present?

NYCLD_019176

P-APP001727

SHEEHAN - PEOPLE - DIRECT - LEDERER          3652

A     We entered the room, it was myself, Detective
Jonza, Raymond Santana, Sr. and Raymond Santana, Jr.
We all entered the room.

         there was a desk or a table.

         I sat your side if we were to use the prosecu-
tion table, I sat where you're sitting, Mr. Jonza sat
where Mr. Clements is sitting. Raymond sat right over
here, at this edge, and his father sat to his left,
slightly to the rear.

     Q     Prior to going into the Youth Room to conduct
the interview with Raymond Santana, had you had occasion
to see a written statement that had been prepared and
signed by Raymond Santana?

     A     Yes, I did.

     Q     When, for the first time, did you see a written
statement that Raymond Santana had made prior to your
interview?

     A     Shortly before, I don't know how long, but
certainly enough time to peruse it.

     Q     Did Detective Hartigen show you that statement
when you saw Detective Hartigen and Raymond Santana
in the Youth Room of the Central Park Precinct?

     A     No, he did not.

     Q     Did he tell you the contents of that statement

SHEEHAN - PEOPLE - DIRECT - LEDERER          3653

at that time, when you saw him at the Central Park

Precinct?

    A    No, he did not.

    Q    Describe how the interview with Raymond Santana

began?

    A    Detective Jonza signed us into a logbook

that was on the desk.

        I, I introduced us once again, Jonza.

        I then advised Santana, Sr. and Santana,

Jr. that I was going to read the Miranda warnings,

which I did, from a Police Department handout.

        MS. LEDERER:  I would ask this please

be marked as People's 179 for identification.

        (People's Exhibit 179 marked for identifica-

tion.)

        MS. LEDERER:  I would ask if that could

please be shown to the witness, please.

        (Handed up to and examined by the witness.)

    Q    Do you recognize People's 179 for identification?

    A    Yes, I do.

    Q    And what do you recognize that to be?

    A    This was the card that I used to read the

Miranda warning.

    Q    Are those the rights that you read to

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  NJ:

1                    Sheehan - People - Direct - Lederer

2    are  you  able  to  hear  teletype  machines,  telephones  and

3    typewriters from the 124 room?

4         A    Yes, ma'am.  Because the walls do not go all the way

5    to the ceiling.

6         Q    Are there doors or gates to any of the rooms in the

7    first floor of the 24th Precinct?

8         A    What used to be the  124  room  is  now  the  arrest

9    processing  center  where  the  uniformed  force  takes  their

10   prisoners.  It's right behind a desk and there is a door there

11   that's been slamming forever.

12        Q    Are you able to hear the slamming of that door  from

13   inside the youth room at the 24th Precinct?

14        A    Yes, you are.

15        Q    Did there come a time a video taped statement was

16   taken from Raymond Santana, Jr.?

17        A    Yes.

18        Q    Approximately what time did that happen?

19        A    Approximately 2:30 in the morning.

20        Q    Where did that happen?

21        A    That happened at the 24th Precinct, in  that  little

22   room I just described, the youth room.

23        Q    Who  was  present  at  the time that video taped

24   statement was taken?

25        A    Raymond Santana, Jr., Raymond Santana, Sr.,  myself,

NYCLD_019204

P-APP001730

T4-SC-TS

3680

1                    Sheehan - People - Direct - Lederer

2    detective Burt Arroyo, a video tape technician and you were.

3        Q     Approximately how long did that interview last?

4        A         Approximately  half an hour, a couple of minutes

5    after three.

6        Q     After that interview was  concluded,  was  a  second

7    video tape done of Raymond Santana?

8        A     Yes, about fifteen minutes later there was a second

9    video tape done where Raymond was asked to stand, put  on  his

10   outer  garment, a jacket and a cap.  And that was done for the

11   purposes of recording the clothing he was wearing.

12               MS. LEDERER:  If I can ask to please have  this

13            marked as People's 181 for identification.

14               (Whereupon,     the     Reporter     marked     the

15            abovementioned exhibit, as requested.)

16       Q     Detective, were you present from the very  beginning

17   of the videotape interview to the very end of the interview of

18   Raymond Santana, Jr.?

19       A     Yes, I was.

20       Q         And  were  you present from the beginning of the

21   recording of the clothing that he was wearing to the very  end

22   of that recording?

23       A     Yes, I was.

24       Q      I ask you to please look at what's been marked as

25   People's 181 for identification.  Do  you  recognize  People's

T7-1f

1                              COLLOQUY                        1668

2              Michael Sheehan.

3    D E T.    M I C H A E L     S H E E H A N, Shield 421,

4         Manhattan North Homicide, New York City  Police

5         Department,  having been called as a witness by

6         the  People,  having  been  first  duly  sworn,

7         testified under oath as follows:

8                   COURT OFFICER:  Would you give us your

9              name,  spell  your  last  name, your shield

10             number and present assignment.

11                  THE  WITNESS:     Detective   Michael

12             Sheehan,  S-H-E-E-H-A-N;  Shield 421, NYPD,

13             Manhattan North Homicide Squad.

14   DIRECT EXAMINATION

15   BY MR. CLEMENTS:

16        Q          Detective,  I'd  like  to  direct  your

17   attention  to  April 20, 1989.  Did you work on that

18   day?

19        A     Yes, sir, I did.

20        Q     And what shift did you work?

21        A     Four  in  the  afternoon  to  1:00  in  the

22   morning.

23        Q     Did you receive an assignment shortly after

24   you arrived for work?

25        A     Yes, I did.

10/24/89

NYCLD_018954

P-APP001732

T7-1f

1669

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1   Q     And what was that assignment?

2   A     I left the Manhattan North office about ten

3   after one, and responded to Central Park Squad.

4   Q     Did you arrive at Central Park?

5   A     Yes, I did.

6   Q     WHen you got there, did you receive another

7   assignment?

8   A     Yes, sir, I went to Central Park to aid in

9   the investigation of an assault on a victim that was

10  likely to die.    Upon   reaching   the   Central   Park

11  Squad,  I  was  surprised of a couple of facts by my

12  immediate  supervisor, Sergeant O'Connor.

13      I was then asked to accompany the uniformed

14  force on a search.  The search  was  for  a  weapon,

15  namely, a length of pipe.

16      MR. BURNS:   A what?

17      THE WITNESS:   A length of pipe.

18  Q     Where did that search take place?

19  A     The search took place in the vicinity of

20  West 97th Street and  Central  Park  West;  actually

21  inside the park walls.

22  Q     Did  you  recover  a pipe or was a pipe

23  recovered in your presence?

24  A     No, sir.

10/24/89

NYCLD_018955

P-APP001733

T7—1f

1670

                SHEEHAN — PEOPLE — DIRECT — CLEMENTS

1   Q      At the conclusion of that search, what   did

2   you do?

3   A          At   the   conclusion   of   the   search,   I

4   responded back to the Central Park Squad and   had   a

5   conversation   with,   again,   Sergeant   O'Connor   and

6   Detective John Hartigan.

7   Q      What time did you   return   to   the   Central

8   Park Squad?

9   A       I   returned   to   the Central Park Squad

10  somewhere in the vicinity of 5:30 p.m.

11              MR. BURNS:   I'm sorry, 5:30 p.m.?

12              THE WITNESS:   That's correct.

13              THE COURT:   What time was it that   you

14          said you went in search of the weapon?

15              THE WITNESS:   Shortly after 4:00, your

16          Honor.   Let's say 4:30.

17              THE COURT:   Okay.

18              MR. BURNS:  Again p.m.?

19              THE WITNESS:   p.m.

20  Q      When did you speak to John Hartigan?

21  A       I spoke with John Hartigan in the Central

22  Park Precinct, there is a separate   building   across

23  the   alleyway   from   the   main   building.   It is the

24  auxilary police building.   It also houses the   Youth

10/24/89

NYCLD_018956

P-APP001734

T7-1f

1671

SHEEHAN - PEOPLE - DIRECT - CLEMENTS

1  

2   Room.   It was in that building, in the Youth Room,

3   that I spoke with John Hartigan.

4   Q   And would you relate the nature of the

5   conversation?

6   A   Sure.   Hartigan advised me that he had

7   taken a statement from -- Raymond Santana, who was

8   seated at a desk in that room. He had also advised

9   me. that Santana wished to add certain things to the

10   statement, and that it was impossible for him to

11   continue, because there was no parents or guardian

12   present for Santana.

13   Also, during this I was advised by

14   O'Connor, Sergeant O'Connor that the entire

15   investigation was going to be moved out of the

16   Central Park Precinct to the west side of West 82nd

17   STreet into the 20th Precinct which was probably a

18   better facility to handle an investigation of this

19   size.

20   Q   You were at the Central Park Precinct,

21   would you describe the conditions around the

22   precinct at that time?

23   A   Well, Central Park Precinct is an old

24   stationhouse. There is not a lot of room. There is

25   not a lot of individual rooms to do interviews.

10/24/89

NYCLD_018957

P-APP001735

T7-1f

1    SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2    Also, in this case, there's only a small youth room.

3    It's also a bad place to conduct a confidential

4    investigation, especially in a matter of this nature

5    with the press.

6           The press had arrived. There were quite a

7    few people arriving from the media. And they began

8    to gather. There's actually an alleyway that

9    divides the two main parts of the stationhouse.

10   It's unlike any other in the City.

11      Q    After speaking to Sergeant O'Connor and to

12   Detective Hartigan, did you receive another

13   assignment in connection with this case?

14      A    Yes, I did.

15      Q    And what was that?

16      A    The assignment was to take Raymond Santana

17   in our car. I was with Detective Jonza, J-O-N-Z-A,

18   and Rudy Hall, H-A-L-L, both from the Manhattan

19   North Homicide Squad. We were to take Santana from

20   the Central Park Stationhouse to the 20th, notify

21   his father, try to make some arrangements to get his

22   father down to the 20th Precinct, and then take an

23   updated, more complete statement.

24      Q    Did there come a time when you left the

25   Central Park Precinct?

10/24/89

T8-fr

1677

1   SHEEHAN — PEOPLE — DIRECT — CLEMENTS

2   Telephone Company, or whatever, but there was a hole

3   in the street protected by barriers.  I went to that

4   hole, jumped in myself, and examined it.  It was

5   only about two feet deep.  There was no pipe.

6   Q   After you looked for the pipe at 100th

7   Street and Central Park West, where did you go next?

8   A   We all got back in the car, that is to say

9   myself, Rudy Hall, Augie Jonza, and Raymond Santana.

10  We drove from 100th Street and Columbus Avenue south

11  to the 20th Precinct, which is located at 82nd

12  Street, West 82nd Street between Columbus and

13  Amsterdam.

14  Q   Was anything else said in the car?

15  A   On the way from that site to the 20th

16  Precinct, Mr. Santana said, "I had nothing to do

17  with the rape.  All I did is feel the woman's tits.

18  I had nothing to do with the rape."

19  Q   Did you ask him any questions in the car?

20  A   No, I didn't.

21  Q   Was there any conversation in the car?

22  A   No, there wasn't.

23  Q   When you arrived at the 20th Precinct,

24  where did you go?

25  A   Upon arrival at the 20th Precinct, went to

10/24/89

NYCLD_018963

P-APP001737

T8-fr

1678

1    SHEEHAN - PEOPLE - DIRECT - CLEMENTS

2    the second floor, the 20th Detective Squad. We

3    entered. As you walk into the squad, to the left

4    there's a desk by a window which would be -- if you

5    were looking at it in the scheme, it's the west wall

6    of the 20th squad.

7                    MR. CLEMENTS:    With the Court's

8             permission, I would like the witness to get

9             off the stand and look at what's been

10            received as People's 3 in evidence.

11                    (Witness approaches People's 3 in

12            evidence.)

13    Q    Do you recognize People's 3, Detective?

14    A    Let me get my bearings, yes, I do.

15    Q    And what do you recognize it to be?

16    A      This is a schematic drawing of the second

17    floor of the 20th Precinct. These offices here are

18    the 20th Detective Squad.

19                    MR. CLEMENTS:    Indicating, for the

20            record, the offices on the lower half of

21            People's 3 in evidence.

22    Q      How did you get to the second floor with

23    Raymond Santana?

24    A      Came in the main entrance of the precinct,

25    which would be here, and up the staircase

10/24/89

1598

1    TAGLIONI — PEOPLE — DIRECT

2    A    Yes, I was.

3    Q    And what, if anything, did you hear Kharey

4    say?

5    A    That he would come into the station house

6    with us.

7    Q    And was Kharey Wise handcuffed at that time?

8    A    No, nobody was handcuffed.

9    Q    Where did you go when you left the

10    ?

11    A    Went down to the lobby and to our car.

12    Q    How many cars did you have?

13    A    We had two unmarked police cars.

14    Q    And did you ride in one of the cars?

15    A    Yes, I did.

16    Q    Who did you ride with?

17    A    Detective Hall and Yusaf Salaam.

18    Q    And where did Yusaf Salaam ride in the car?

19    A    In the back seat.

20    Q    Do you know where Kharey went?

21    A    Kharey went into the other unmarked vehicle

22    with Detective Bier and Detective Freck.

23    Q    Was Yusaf Salaam handcuffed when he rode in

24    the car?

25    A    No, he was not.

NYCLD_006915

1599

TAGLIONI — PEOPLE — DIRECT

1    

2   Q   Did you have any conversation with Yusaf

3   Salaam on the way after you left

4   A   No, I did not.

5   Q   Did you hear any conversation between him

6   and anybody else in the car, the other detective?

7   A   I don't recall it, no.

8   Q   Where did you go?

9   A   I went to the 20th Precinct.

10   Q   And where did you go when you arrived at the

11   20th Precinct?

12   A   When we arrived at the 20th Precinct, we

13   were directed to go upstairs to the third floor to

14   the Sex Crimes office.

15   Q   Directing your attention to People's 4 in

16   evidence, the third floor of the 20th Precinct,

17   could you please step down from the witness stand

18   and approach People's 4 in evidence and indicate,

19   please, where you went with Yusaf Salaam when you

20   arrived.

21   A   Okay.  We took the stairway up to the third

22   floor.  We entered the Sex Crimes office, which is

23   over here, and I took Yusaf into this room right

24   here in the Sex Crimes office.

25   MS. LEDERER:  The record should reflect

1600

TAGLIONI - PEOPLE - DIRECT

2      the witness is indicating a small room off

3      of a longer room.  It has three file

4      cabinets and something-- and one desk in

5      that room.

6          You may resume the witness stand.  Thank

7      you.

8          (Witness complies.)

9    Q    Now, what did you do when you arrived in

10   that room with Yusaf Salaam?

11   A    I sat there and I waited for someone,

12   another detective to come to do the interview.

13   Q    Did you have any conversation with Yusaf

14   Salaam while you sat there in that room with him?

15   A    No, I did not.

16   Q    Was he seated or standing?

17   A    He was seated.

18   Q    And approximately how much time elapsed

19   before the arrival of a detective to conduct an

20   interview?

21   A    I'm not sure, but I'd say anywhere from

22   fifteen to twenty minutes.

23   Q    And do you know the name of the detective

24   who arrived within that fifteen to twenty minute

25   period?

NYCLD_006917

P-APP001741

1601

TAGLIONI — PEOPLE — DIRECT

1

2      A    Yes, I do.   Detective Thomas McKenna from

3  Manhattan North Homicide.

4      Q    Were you present when Detective McKenna came

5  into the room?

6      A    Yes, I was.

7      Q    Approximately what time was it— withdrawn.

8      What, if anything, did he say or do when he came

9  into the room?

10     A    When he came into the room, I introduced him

11  to Yusaf, told him who he was, Detective McKenna

12  from the Homicide Squad, that he would be talking to

13  him.

14     With this Detective McKenna also introduced

15  himself to Yusaf, read him his rights, and at that

16  point I left the office.

17     Q    Were you present when the rights were read?

18     A    Yes, I was.

19     Q    And did you see whether they were read from

20  a card or were they given by memory?

21     A    No, they were read from a card.

22     Q    Were you present— well, withdrawn.

23     When the rights were read, did Yusaf respond in

24  any way when the rights were read?

25     A    Yes, he did.

NYCLD_006918

1602

1    TAGLIONI - PEOPLE - DIRECT

2    Q    What do you recall his response or responses

3    to be?

4    A    "Yes," to all the answers.

5    Q    When-- did there come a time that you left

6    the third floor?

7    A    Yes, there did.

8    Q    And where did you go when you left the third

9    floor of the 20th Precinct?

10   A    I went down to the second floor to the

11   squad, the 20th squad room.

12   Q    Did there come a time where you returned to

13   the room where you had left Yusaf and Detective

14   McKenna?

15   A    Yes, there was.

16   Q    Approximately how much time elapsed from the

17   time that Detective McKenna came into that room

18   until the time that you returned, as best as you can

19   recall?

20   Well, let me rephrase the question. I'm sorry.

21   From the time that you left the room, not when

22   Detective McKenna came in, how much time were you

23   away from that room before you returned?

24   A    I'd-- I really-- I don't know. I believe

25   twenty minutes, maybe more.

1603

TAGLIONI — PEOPLE — DIRECT

1      Q    And do you recall for what reason-- what did

2    you do when you returned to the room?

3      A    I asked McKenna for the pad he was writing

4    on, his notebook, his spiral book.

5            MR. MADDOX:  May that answer be read

6            back?

7            THE COURT:  Read it back, please.

8            (The court reporter read back the

9            requested portion of the record.)

10     Q    And do you recall what, if anything, you did

11   with that spiral book?

12     A    Yes, I took it down to the second floor.  I

13   gave it to one of my supervisors.

14     Q    Did there come a time where you returned

15   that spiral book to Detective McKenna?

16     A    Yes.

17     Q    And approximately how much time after you

18   took it from him did you return it to him?

19     A    A few minutes.

20     Q    Sometime after you had taken Detective

21   McKenna's steno book and returned it to him did you

22   have occasion to go to the first floor of the 20th

23   Precinct?

24     A    Yes, I did.

TAGLIONI - PEOPLE - DIRECT                    1604

1

2      Q    And how was it that you came to go to the

3  first floor?

4      A    I was instructed to go downstairs by one of

5  my supervisors to talk to Yusaf's mother who had

6  arrived at the station house sometime before that.

7      Q    And do you recall who told you to go

8  downstairs?

9      A    Again, it was one of my supervisors, either

10  the sergeant or the lieutenant.

11      Q    Did you then go downstairs and have a

12  conversation with Yusaf Salaam's mother?

13      A    Yes, I did.

14      Q    And what time was it, as best you recall,

15  that you had a conversation with the defendant's

16  mother?

17      A    It was sometime between twelve and one

18  o'clock in the morning.

19      Q    Do you recall where you had that

20  conversation with Yusaf Salaam's mother?

21      A    Yes, I do.

22      Q    And if you could please step down for a

23  moment and approach the easel, People's 2 in

24  evidence.

25          (Witness complies.)

TAGLIONI — PEOPLE — DIRECT

1  Q  Would you indicate, please, where you had a
3  conversation with her.

4  A  Okay.  I had it right by the main desk,
5  standing right about over here, by the back exit.

6          MS. LEDERER:  The record should reflect
7          that the witness is indicating outside a
8          room that is marked "morgue," and near a
9          "generator room."

10 Q  How many people were present at the
11 conversation you had with Yusaf Salaam's mother?

12 A  At least four.

13 Q  And do you know the names of any of those
14 people?

15 A  No, I do not.

16 Q  Would you please tell us-- you may resume
17 the witness stand.

18          (Witness complies.)

19 Q  What, if anything, did she say to you and
20 what did you say to her in the course of that
21 conversation?

22 A  When we came down, I identified myself as
23 Detective Taglioni.  She identified herself as
24 Mrs.-- as Yusaf's mother.  I don't know her first
25 name.

P-APP001746

1606

                    TAGLIONI — PEOPLE — DIRECT

1   She was concerned about her child, you know, if

2   he was being abused and I assured her (blank on

3   tape) that he wasnt. ER.

4   I said, "We're upstairs. They're talking to him

5   right now."

6       With that she said, "Well, you shouldn't be

7   talking to him because he's only fifteen years old."

/LF  9

10      Q    What, if anything, did you say to her when

11  she told you that her son was only fifteen years

12  old?

13      A    I had told her that he showed us proof of

14  age that he was sixteen years old and that's the

15  reason we were talking to him.

16      Q    And what did she say at that point?

17      A    Well, she said he was fifteen years old.

18      At that point I went upstairs.  I told my

19  supervisors these facts, and then I went upstairs to

20  the third floor where Detective McKenna was talking

21  to him and asked him to come out of the room and

22  advised him of the fact Yusaf may, in fact, be only

23  fifteen years old and there may be an attorney.

24      An attorney was downstairs, a federal attorney.

25      Q    Let me just back up for a moment.  Did you

1607

1    TAGLIONI - PEOPLE - DIRECT

2  ever, prior to going upstairs to Detective McKenna

3  to tell him to interrupt the interview, have a

4  conversation with anyone who identified himself as

5  an attorney?

6      A   No, I didn't have a conversation, no.

7      Q   In the conversation you referred to with

8  Mrs. Salaam or Yusaf's mother, was that the only

9  conversation you had with her up until that point?

10     A   Well, I had a conversation again with her

11 later on.

12     Q   Up until that point, was that the first

13 conversation you had with her?

14     A   Yes, it was.

15     Q   Did she tell you in that conversation there

16 was someone there, an attorney on behalf of her son?

17     A   No.  She told me she had a friend there that

18 was an attorney.  She never told me he was

19 representing her son.

20     Q   Did she tell you anything about his relation

21 to the family?

22     A   Yes, that he was a friend of the family's

23 and he was a federal attorney.

24     Q   And this conversation-- I'm sorry.  She said

25 he was what?

NYCLD_006924

P-APP001748

1   TAGLIONI — PEOPLE — DIRECT

2   A   A federal attorney.

3   Q   Did she explain to you what that meant?

4   A   No, and I didn't ask her.

5   Q   The information you are just telling us

6   about hearing this person was a federal attorney who

7   was a friend of the family, when did you learn that?

8   A   When I first spoke to her the first time.

9   Q   Was that in the same conversation that she

10  told you Yusaf Salaam was fifteen years old?

11  A   Yes, it was.

12  Q   Will you tell us now when you went upstairs

13  and spoke to Detective McKenna, after this

14  conversation with her, what, if anything, did you

15  say to her?

16  A   I told Detective McKenna that we had a

17  problem, that Yusaf might be fifteen years old and

18  that there was an attorney downstairs.   I didn't

19  know if the attorney was representing him or not,

20  that he stated-- that his mother stated that he was

21  a friend of the family.

22  At this point Detective McKenna said, "That's

23  it, we can't talk to him anymore."

24  Q   How much time went by from the time that you

25  had this conversation with Mrs. Salaam until you

NYCLD_006925

1609

TAGLIONI — PEOPLE — DIRECT

1  went upstairs and interrupted the interview with

2  Detective McKenna?

3      A    It couldn't have been more than five minutes

4  tops.

5      Q    After you had the conversation with Mrs.

6  Salaam wherein she told you what you just described

7  to us, what was the very next thing you did?

8      A    I directly-- I went upstairs. I told my

9  supervisors and then went directly upstairs to

10  Detective McKenna.

11      Q    Did you do anything else other than tell

12  your supervisor and then go tell Detective McKenna?

13      A    No, I did not.

14      Q    After the conversation you had with

15  Detective McKenna, what was the next thing you did?

16      A    I then went back downstairs and had a

17  further conversation with Yusaf's mother, Mrs.

18  Salaam.

19      Q    And did you tell her what you had just done

20  with respect to Detective McKenna?

21              MR. MOORE:   Objection as to form.

22              THE COURT:   I will allow it.

23      A    Yes, I told her the detective that was

24  speaking to him was informed he was fifteen years

1610

1    TAGLIONI — PEOPLE — DIRECT

2  old, and that he would not be spoken to anymore.

3      Q    And did you have a further conversation with

4  Mrs. Salaam at that point?

5      A    Yes, I did.

6      Q    Would you please tell us what you said to

7  her and what she said to you.

8      A    She asked me if she would be able to talk to

9  Yusaf.  I told her I would confer with my

10  supervisors, which I did, and permission was given

11  for her to speak to him.

12      Q    Going back for a moment to the first

13  conversation you had with Mrs. Salaam, about how

14  long did you speak to her at that point?

15      A    I really don't-- I'm not sure.

16      Q    The second conversation that you were

17  describing where she asked to speak to Yusaf, do you

18  recall approximately how long that conversation

19  lasted?

20      A    Five, ten minutes, maybe.

21      Q    And after you had that conversation-- did

22  you speak to someone about arranging for Mrs. Salaam

23  to see Yusaf?

24      A    Yes, I did.

25      Q    And do you know who it was that you spoke

1611

1  TAGLIONI — PEOPLE — DIRECT

2  to?

3    A   Again, it was one of my supervisors. I'm

4  not sure if it was the sergeant or the lieutenant.

5    Q   What, if anything, did you do after you

6  spoke to the sergeant or the lieutenant?

7    A   I went back downstairs and informed Mrs.

8  Salaam that she would be allowed to speak to him.  I

9  then went upstairs and took Yusaf down to the first

10  floor.

11    Q   Where did you find Yusaf when you went

12  upstairs?

13    A   In the same room where I had put him

14  earlier.

15    Q   Was anyone speaking with him at that time?

16    A   No.

17    Q   What did you do when you went upstairs and

18  found Yusaf on the third floor?

19    A   I told him his mother was downstairs and

20  would like to speak to him.

21    Q   What, if anything, did you do with respect

22  to that?

23    A   I took Yusaf downstairs to the first floor.

24    Q   Was he handcuffed?

25    A   No, he was not.

1612

TAGLIONI - PEOPLE - DIRECT

1    Q    And when you took him down to the first

2    floor, could you just approach People's 2 in

3    evidence and show us where you brought him and where

4    his mother was.

5    A    Again, we were down in the main room by the

6    main desk (indicating).   His mother was still

7    standing here with the people (indicating).   His

8    mother and Yusaf went over into this corner and

9    that's where they spoke (indicating).

10   Q    And were you present at the time that they

11   spoke?

12   A    Yes, I was still standing over here

13   (indicating).

14   Q    From where you were standing were you able

15   to hear what they were saying?

16   A    No, I could not.

17               MS. LEDERER:  Thank you, you may resume

18          the witness stand.

19               (Witness complies.)

20   Q    You made reference to some other people in

21   addition to Yusaf Salaam's mother.  Was there anyone

22   else there with respect to Yusaf Salaam?

23   A    Yes.   There were a couple of women and a

24   male.

1613

TAGLIONI — PEOPLE — DIRECT

1

2    Q    Do you know their names?

3    A    No, I do not.

4    Q    And approximately how long did Yusaf speak

5  to his mother at that point?

6    A    He spoke to her for quite awhile.  I don't

7  know the amount of time, but a couple times I had to

8  interrupt and tell her we had to bring him upstairs.

9  So it was quite awhile.

10   Q    Can you approximate the amount of time?

11   A    No, I couldn't.

12   Q    At some point did you take Yusaf someplace

13  else?

14   A    Yes.  After he was finished speaking with

15  his mother we brought him back upstairs.

16   Q    When you took him upstairs after he had

17  spoken with his mother, where did you take him?

18   A    I believe it was back up to the third floor

19  again.

20   Q    After you brought Yusaf back upstairs, did

21  you have any further conversation with the

22  defendant's mother?

23   A    Yes, I did.

24   Q    And would you tell us how much after you

25  brought him upstairs was that conversation?

1614

1    TAGLIONI — PEOPLE — DIRECT

2    A    Five, ten minutes; ten minutes.

3    Q    And where did that conversation take place?

4    A    Also on the third (sic) floor but at a

5    different location than where we had spoke to her

6    before.  That's-- as soon as you come into the main

7    entrance there is a bench against the wall.  She was

8    sitting there with this federal attorney who turned

9    out to be a family friend.

10    Q    When you say this federal attorney, did you

11   actually meet that person at that time?

12    A    Yes, I did.

13    Q    And was that the first time you met him that

14   evening?

15    A    No, it was not.

16    The first time I spoke to him?

17    Q    Yes.

18    A    It was the first time I actually spoke to

19   him, yes.

20    Q    Did you have a conversation with the

21   defendant's mother and the person you've described

22   as a federal attorney?

23    A    Yes, I did.

24    Q    Would you tell us, please, what they said

25   and what you said.

NYCLD_006931

P-APP001755

1    TAGLIONI - PEOPLE - DIRECT

2    A   Mrs. Salaam stated that he was a friend of

3    the family.   I believe she used the term "a big

4    brother."

5    With that he asked me what the procedure was

6    now.   And I thought that was a little strange that

7    an attorney was asking me about--

8                    MR. MOORE:  Objection.

9                    THE COURT:  Yes.

10                   Don't tell us what you thought.

11   A   He asked me what the criminal procedures

12   were.   I explained that Yusaf would be brought down

13   to court and he would go in front of a judge for

14   arraignment.

15   Q   And did they ask you any other questions

16   about anything, about the procedure or what would

17   happen at that point?

18   A   After I explained to him, you know, the

19   whole arrest procedure, that was the only

20   conversation I had with them.

21   Q   And about how long was that conversation, if

22   you recall?

23   A   Maybe twenty minutes, fifteen minutes,

24   twenty-five minutes.   I'm really not sure.

25   Q   What happened after you had that

1616

TAGLIONI — PEOPLE — DIRECT

1  conversation?

2

3      A    I believe they left the station house and I

4  went back upstairs to the second floor.

5      Q    Did you have any further conversation with

6  Yusaf Salaam after you spoke to Detective McKenna

7  and told him not to continue the interview?

8      A    No, I did not.

9           MS. LEDERER:   If I may have just one

10          moment, please.

11     Q    At any time-- well, withdrawn.

12          MS. LEDERER:   I have nothing further.

13          Thank you very much.

14          THE COURT:   Mr. Burns.

15          MR. BURNS:   Let me have a second, Judge.

16          THE COURT:   Yes.

17          (Mr. Burns and his client confer.)

18          MR. MOORE:   Excuse me, your Honor, one

19          moment.   May I just approach?

20          (Discussion was held off the record.)

21  CROSS EXAMINATION

22  BY MR. BURNS:

23     Q    Detective Taglioni, my name is Robert Burns

24  and I represent Yusaf Salaam.

25     You and I, we have never met, have we?

TS-1f

1498

1    HILDEBRANDT — PEOPLE — DIRECT — LEDERER

2    time.   They were throwing stones at   the   cars,   and

3    they   came   across   this bum.   They let the bum pass.

4    There   was an individual that went   and   knocked   him

5    down.   They   went   over and beat him.   They kicked

6    him.   They took his food and his beer.

7         Someone   had   poured   the   beer   on   him.

8    Somebody   else had taken his food.   They dragged him

9    off the side of the road and left him laying in   the

10   grass.

11        Then he stated they started roaming through

12   the   park, and then they tried to catch individuals.

13   There was a guy   and   a   girl   that   were   riding   a

14   bicycle   built   for   two.   They tried to get them.

15   They got away from them.

16        Then there   came   a   time   they   grabbed   a

17   jogger,   and they knocked him down to the ground and

18   hit him with a pipe.   And then they left   the   park,

19   that the police had come.

20        They   ran   back into the park.   They hid in

21   the park, in the mud.   And   then   he   and   another

22   individual went home to his house.

23   Q         Let   me just go back for just a moment,

24   Detective.

25        Prior to beginning this interview, did   you

10/24/89

NYCLD_016983

P-APP001758

T5-1f

1          HILDEBRANDT - PEOPLE - DIRECT - LEDERER $^{1499}$

2   have a conversation with Detective Gonzalez?

3          A     No, I did not.

4          Q          Prior to beginning this interview, did you

5   have a conversation with anybody from the Police

6   Department with respect to any investigation that

7   had been conducted up until that point?

8          A     No, I did not.

9          Q     Did you have any knowledge at all about

10  what happened in Central Park on the night of the

11  19th, prior to beginning the interview of Antron

12  McCray?

13         A          Other than there had been a woman that had

14  been found assaulted and raped and near death.

15         Q     And had anybody at all told you anything at

16  all about what had happened in the park that night?

17         A     No, they did not.

18         Q     In the course of taking a statement of

19  Clarence Thomas, had he made any statements about

20  what happened in Central Park?

21              MR. JOSEPH:  Objection, Judge.

22              THE COURT:  Prior to what?

23              MS. LEDERER:  In the course of taking

24              the statement of Clarence Thomas, had he

25              made any statements about what happened in

10/24/89

NYCLD_016984

P-APP001759

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1500

2          Central Park?

3                  THE COURT:  I will allow it.

4              MR. JOSEPH:  The witness already said

5      nobody told him about it.   The Assistant

6      may  not  be happy with the answer or maybe

7      she is.  I don't know.

8                  THE COURT:  I don't know either, but I

9          will let him answer the question.

10     Q      Had  Clarence  Thomas  made  any  statement

11     about  what happened in Central Park on the night of

12     the 19th prior to the interview of Antron McCray?

13     A      Prior to conducting the interview of Antron

14     McCray?

15     Q      Had  Clarence  Thomas  made  any  statement

16     about  what happened in Central Park on the night of

17     the 19th, prior to the interview of Antron McCray?

18                  MR. JOSEPH:  Objection.

19                  THE COURT:  I will allow it.

20     A      Yes, he did.

21     Q      At the time you conducted the interview  of

22     Antron McCray, was he handcuffed?

23     A      No, he was not.

24     Q      You described a moment ago a statement that

25     Antron  McCray  made to you after you asked him what

10/24/89

NYCLD_016985

P-APP001760

TS-1f

1        HILDEBRANDT — PEOPLE — DIRECT — LEDERER      1501

2   had happened in Central Park on the night of April

3   19th?    In the course of his making that statement,

4   did he speak freely or did you interrupt and ask

5   questions?

6        A    In the beginning I let him talk freely.

7        Q        And during the time that he said to you

8   what you have just told us he said to you, was that

9   during the time that he was speaking freely; or was

10   that a time that you were asking him questions?

11       A    Repeat that, please.

12       Q    You have just described a statement that he

13   made when you asked him what happened in Central

14   Park, when he made that statement? Did he speak

15   freely or was this in response to questions put to

16   him?

17            MR. JOSEPH:   Objection to the form.

18            THE   COURT:    I don't know about

19        "freely".

20       Q    Was he speaking without interruption or

21   were you interrupting the questions?

22       A    He was speaking without interruption.

23       Q    What, if anything, happened -- withdrawn.

24            During the time he said those things to

25   you, did either of his parents speak?

10/24/89

NYCLD_016986

P-APP001761

T5-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER 1502

1

2    A    No, not at that time.

3    Q    What, if anything, happened after he made

4    the statement that you've just described to us?

5    A    I felt he was not telling us --

6         MR. JOSEPH:  Objection.

7         THE COURT:  Objection sustained.

8         What happened after that?

9         MS. LEDERER:    May I withdraw the

10   question and ask another question?

11        THE COURT:  Yes.

12   Q    Was there anything you observed about

13   Antron McCray's behavior during the time he made

14   that statement to you?

15        MR. JOSEPH:  Objection.

16        THE COURT:  I will allow it.

17        Just describe what you saw; not your

18   mental state.

19        THE WITNESS:    I saw he was very

20   fidgety in the seat.

21        MR. JOSEPH:  Objection to that.

22        THE COURT:  I will allow it.

23   A    (Continuing)  He was -- at times he had eye

24   contact with me.  When he was speaking to me, he

25   would constantly look down at the ground.

10/24/89

NYCLD_016987

P-APP001762

TS-1f

HILDEBRANDT - PEOPLE - DIRECT - LEDERER 1503

1

2    Q        And after he made that statement to you

3  that you've already described, what happened next?

4    A       We went outside -- I went outside into   the

5  hall   with   Detectives   McCabe,   Gonzalez,   and   Mr.

6  McCray.

7    Q    And did you have a conversation outside   of

8  the hall?

9    A    Yes.

10   Q        Would you tell us who spoke and what was

11 said?

12   A    I spoke to Mr. McCray.

13   Q    What, if anything, did you say to him?

14   A    I informed him that I felt that his son was

15 not being completely truthful with us.  That he   was

16 holding   back some vital information that might help

17 us in this case.

18   Q    Did the -- did Mr. McCray respond when   you

19 said that to him?

20   A    Yes, he did.

21   Q    What, if anything, did he say to you?

22   A    He also felt that his son was not being --

23            MR. JOSEPH:  Objection.

24            THE COURT:  Tell us what he said.

25            THE   WITNESS:  He said, I agree, I can

10/24/89

NYCLD_016988

P-APP001763

T6-fr

1504

1   HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2           tell when my son is not telling me the

3           truth.

4       Q       Did he say anything else to you at that

5   point?

6       A       Not that I can recall.

7       Q       Approximately how long did you talk outside

8   the room?

9       A       Two or three minutes.

10      Q       And what happened after the two or three

11  minutes?

12      A       I suggested that Mr. McCray go into the

13  room and talk to his son, inform his son that we

14  felt that he was not being completely truthful with

15  us.

16      Q       And what happened at that point?

17      A       He went into the room and spoke to his son

18  and Mrs. McCray.

19      Q       And where were you at that time?

20      A       Outside the door.

21      Q       Where was Detective McCabe?

22      A       Outside the door.

23      Q       And where was Detective Gonzalez?

24      A       We were all outside.

25      Q       How long did you remain outside the door?

10/24/89

NYCLD_016989

P-APP001764

T6-fr

1505

HILDEBRANDT - PEOPLE - DIRECT - LEDERER

1    A    Several minutes.

2    Q    Did you hear what was being said outside

3    the room at that time?

4    A    No, we could not.

5    Q    And what happened after the several minutes

6    past?

7    A    We went back in the room.

8    Q    And what did you do when you went back in

9    the room?

10   A    We continued the interview with Antron.

11   Asked him to go over the chain of events again.

12   Q    When you say "we", who spoke?

13   A    I did.

14   Q    And when you asked Antron to go over the

15   events, what, if anything, did he say to you?

16   A    Basically he repeated the same story.

17   Q    What happened after he repeated the same

18   story?

19   A    Then I asked him if there came a time that

20   they saw a female jogger in the park and he claimed

21   that he didn't.

22   Q    And was there anything unusual about his

23   behavior when he answered your question about the

24   female jogger?

10/24/89

NYCLD_016990

P-APP001765

T6-fr

1506

1          HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2                    MR. JOSEPH:   Objection, Judge.

3                    THE COURT:   Objection sustained as   to

4          whether there was anything unusual or not.

5          Q      Was there anything that you noticed about

6     his behavior when he answered the question about the

7     female jogger?

8                    MR. JOSEPH:   Objection.

9                    THE COURT:   I'll allow it.

10         A      He was looking at me at the time   he   asked

11    the   question   and   ask he answered the question, he

12    looked away.   Looked down at the ground.   Started to

13    move around inside the seat.

14         Q      What happened next?

15         A      At that point I suggested that   --   to   Mr.

16    McCray   that we go out in the hall, I'd like to have

17    a conversation with him.

18         Q      And did you leave the room with Mr. McCray?

19         A      Yes, I did.

20         Q      And did anyone else leave with you?

21         A      Detective Gonzalez.

22         Q      Where did you go when you left the room?

23         A      Just outside, behind the door.

24         Q      And   what   conversation   occurred   at   that

25    time?   Who   spoke   and what, if anything, did they

10/24/89

NYCLD_016991

P-APP001766

T6-fr

1507
1    HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2  say?

3       A    I had asked Mr. McCray if he felt that   his

4  son   was   still holding back, and he said, "Yes," he

5  felt that he was keeping   something   from   us.       He

6  doesn't now why.   He didn't raise him like that.   He

7  raised him to tell the truth.

8       Q    And what happened after that conversation?

9       A        I   had asked him, "Do you think that he

10 would be  embarrassed   --   that   he   is   embarrassed

11 talking in there about what happened?"

12           At   that time Mr. McCray said that it could

13 be, it could possibly be.  He said, "Maybe it   would

14 be   better   if   my   wife wasn't there, that he would

15 tell us what happened."   And at that point   I   asked

16 him   if he would want to talk to his wife.  He said,

17 "Yes."   I put him back in   the   room   and   Detective

18 McCabe came out and they had a conversation.

19      Q    Approximately how long -- withdrawn.

20           Detective,   where was Detective Gonzalez at

21 this time?

22      A    He was in the hall.

23      Q    And where was Detective McCabe?

24      A    Inside the room.

25      Q    And did Detective McCabe leave the room?

10/24/89

NYCLD_016992

P-APP001767

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER    1508

1

2   A    Only after Mr. McCray went back in and we
3   allowed them to speak together.

4   Q    How long were they allowed to speak
5   together?

6   A    A couple of minutes.

7   Q    Could you hear what was being said in that
8   room?

9   A    No.

10   Q    After a couple of minutes passed, what's
11   the next thing that happened?

12   A    We entered. We went back into the Youth
13   Room and I asked Mr. McCray what was decided and he
14   informed me that his wife had agreed to leave and at
15   that point Detective Gonzalez escorted her from the
16   room.

17   Q    After Mrs. McCray left the room, what was
18   the next thing that happened?

19   A    Mr. McCray informed his son -- as to why
20   the mother -- he informed the son to be truthful
21   with us and to tell us what happened, and if
22   something happened to the female jogger, to tell us
23   what happened.

24   Q    And did you then have a further
25   conversation with Antron McCray?

10/24/89

NYCLD_016993

P-APP001768

T6-fr

1509

HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1    A        At that point -- just prior to that,

2    Detective Gonzalez came back into the room and when

3    he was back, I had asked Antron to tell us exactly

4    what happened with the female jogger.

5

6    Q        And -- did Antron McCray then tell you

7    something about what happened with the female

8    jogger?

9    A    Yes, he did.

10   Q    In substance, can you tell us, please, what

11   did he say happened with respect to the female

12   jogger?

13            MR. JOSEPH:  I object to the form, "in

14            substance."

15            THE COURT:  Give us your recollection

16            of what he said.

17            THE WITNESS:    He said the female

18            jogger was jogging along the reservoir, and

19            they came up and one of the individuals

20            grabbed her.    They knocked her to the

21            ground.    They started kicking her.  He

22            admitted to kicking her.    There came a

23            point where he was holding her down by the

24            left arm, and another individual had

25            removed her clothing.  There come a time

10/24/89

NYCLD_016994

P-APP001769

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER          1510

when the jogger was struck in the chest and struck over the head with a pipe. He gives the sequence of individuals --

MR. JOSEPH:  Objection, Judge.

THE COURT:  I'll allow it.  Go ahead.

THE WITNESS:  Who jumped on top of her including himself.  I believe he puts himself as the third individual.  As he was on top, somebody else was holding her arm down.  After he was finished, he was followed by one or two other individuals, and when they were finished, they left that area of the park.

Q     After Antron McCray made the statement to you, did there come a time you put in writing the statement that he had given you?

A     Yes.

MR. JOSEPH:  I object to the question.

THE COURT:  No, I'll allow it.

A     Yes, I did.

Q     Did you write the statement, or did you and Antron McCray write the statement?

A     I wrote it.

Q     And would you please describe for the Court

10/24/89

NYCLD_016995

P-APP001770

T6-fr

1      HILDEBRANDT - PEOPLE - DIRECT - LEDERER    1511

2   how it came about that what he said was put on

3   paper?

4          Did you write the whole thing at once or

5   did you write it in pieces?   did you ask him

6   questions?   Describe to us how it came about that

7   the statement was put into writing?

8      A   After he had admitted to what happened to

9   the female jogger --

10          MR. JOSEPH:   I object, Judge.

11          THE COURT:   I'll allow it.

12          MR. JOSEPH:   That's not responsive to

13          the --

14          THE COURT:   I'll allow it.  Go ahead.

15      A   I told him I was going to write down the

16   chain of events as he relayed them to me.  I

17   repeated the chain of events and had asked him to

18   correct me if I was wrong.  And I wrote down from

19   memory, from what he originally told me.   After I

20   wrote down the statement, I read the statement to

21   him and his parents --

22      Q   Let me stop you for a moment.

23          You just said, "his parents."   Did there

24   come a time that his mother returned to the room?

25      A   Yes, there was.

10/24/89

NYCLD_016996

P-APP001771

T6-fr

HILDEBRANDT - PEOPLE - DIRECT - LEDERER    1512

1

2    Q       And would you please tell us, in relation

3    to the writing of the statement, when was it that

4    his mother returned to the room?

5    A       After he admitted to what had happened to

6    the female jogger, Detective -- I believe it was

7    Detective Gonzalez went upstairs and brought Mrs.

8    McCray back into the room.

9    Q    Was that before or after the statement was

10   put in writing?

11   A     Before.

12   Q       I interrupted you.  I think you said you

13   had written out the statement.  What did you do with

14   the statement after you had written it out?

15   A     After I wrote it, I read it to Antron and

16   his parents.

17   Q       As you read it to Antron, did he say

18   anything to you when you read it back to him?

19   A     No, he did not.

20   Q     Did he make any corrections when you read

21   it back to him?

22   A       I believe I made a few corrections as to

23   time and --

24   Q     When you read it back, did either of his

25   parents speak?

10/24/89

NYCLD_016997

P-APP001772

T6-fr

1513

HILDEBRANDT — PEOPLE — DIRECT — LEDERER

1    A    No, they did not.

2    Q    I ask you to please look at what's been

4    previously marked as People's 12 for identification.

5        (People's 12 handed to witness.)

6    Q    Looking at People's 12 for identification,

7    do you recognize what that is, Detective

8    Hildebrandt?

9    A    Yes.

10    Q    What do you recognize that to be?

11    A    That's the statement that I wrote down

12    after the interview of Antron.

13    Q    And is that statement signed by anyone?

14    A    Yes, it is.

15    Q    Will you please indicate who has signed

16    that statement?

17    A    Antron McCray, Linda McCray, Bobby McCray

18    and myself.

19    Q    And are there any initials on the end of

20    pages one or two of that three page exhibit?

21    A    Yes, there are.

22    Q    And what initials appear at the bottom of

23    the first page of that exhibit?

24    A    A.M., L.M. -- it looks like A.M. -- B.M., I

25    guess.  B.M.

10/24/89

NYCLD_016998

P-APP001773

T6-fr

HILDEBRANDT — PEOPLE — DIRECT — LEDERER    1514

1
2    Q       Who initialed pages one and two at the
3    bottom?
4    A    Antron McCray, Linda McCray, and Bobby
5    McCray.
6    Q       And was this document signed in your
7    presence?
8    A    Yes, it was.
9    Q    And was it initialed at the bottom of pages
10   one and two in your presence?
11   A    After I read each page.
12   Q    Are there any corrections that appear in
13   any of the lines of pages one, two, or three?
14   A    Yes, there are.
15   Q       Would you please indicate on the first
16   page, is there any correction or change that appears
17   other than the text?
18   A    Yes, I wrote down on there, "about 9 p.m."
19   and I initialed it.
20   Q       And how did it come about that that
21   addition or correction was made?
22   A    Well, as I was reading it aloud, I have on
23   here "Clarence was at my house and we left," but I
24   didn't have what time he was at the house.
25   Q    When was the correction or the addition

10/24/89

NYCLD_016999

P-APP001774

T6-fr

1515

1       HILDEBRANDT - PEOPLE - DIRECT - LEDERER

2   made?

3       A    As I was reading it.

4       Q        And  is  that your handwriting that the

5   addition --

6       A    Yes.

7       Q    On page two are there  any  corrections  or

8   changes or additions?

9       A    Yes.

10      Q     And would you please indicate which change

11  or correction is there?

12      A    I added the word "down."

13      Q    Is that your handwriting?

14      A    Yes, it is.

15      Q    And was that added before the document  was

16  signed and initialed?

17      A    Yes.

18      Q        And the correction on the first page --

19  withdrawn.

20       The addition on the  first  page  where  it

21  says "around 9 p.m." was  that  added before the

22  document was signed and initialed?

23      A    Yes.

24          MS. LEDERER:  Your Honor, at this time

25      I offer People's 12 in evidence.

10/24/89

NYCLD_017000

P-APP001775

COMPLAINT - FOLLOW UP
INFORMATIONAL
PD 313-081A (Rev. 1-86)-31

| | | | PAGE 1 OF 2 PAGE |
|---|---|---|---|

| Pct | OCCB No. | Complaint No. | Date of This Report |
|---|---|---|---|
| 022 | | 281 | 4/20/89 |

| Date of Orig. Report | Date Assigned | Case No. | Unit Reporting |
|---|---|---|---|
| 4/20/89 | 4/20/89 | 67 | DBMSTF NIGHTWATCH |

Victim's Name - If Different
Unidentified F/W/20-30yrs          003055

P.S.N.Y.
Last Name, First, M.I.

COMPLAINT: VICTIM FOUND BEAT AND BOUND INSIDE CENTRAL PARK

SUBJECT: INTERVIEW OF CLARENCE THOMAS M/B/14yrs

DETAILS:

1) On this date at 0700hrs the undersigned along with Det Whelpley did interview Clarence Thomas M/B/14yrs DOB _____ of _____ in the presence of his mother Gloria Thomas who lives at the address. Clarence Thomas was under arrest at this time so the under-signed informed him and his mother of there rights from a card. Both Clarence Thomas and his mother Gloria Thomas acknowledge each right by stating yes and on the last right they agreed to answer questions without an attorney present. Clarence Thomas states that he and his friend Antron Mc Cray who lives on _____ and goes to JHS 117 ( Exact address unknown) were on E110th St and Madison Ave and they met approx 15 other males all about 13 to 15 yrs old. Clarence states that he did not know all of these males but he did know a guy named Polo who is a M/Blkr H/14yrs and he hangs out on E 110th and Madison , a guy named Ralph M/B/15yrs who lives in the Taft projects and he knows Lamont Mc Call ( See DD 5 Det Whelpley Re; Lamont Mc Call). Clarence states that the group was mixed with blacks and hispanics and that they all went into the park at E 110th and started walking into the park and south. Clarence stated that they where just hanging out that there was no plan on what they were going to do in the park. Clarence states that they entered the park at approx 2010hrs and he remembers the time because he knows that he met the group at 2000hrs and it took them about ten minutes to talk and then walk to the park. Clarence further states that as they walked thru the park some of the guys were throw-ing rocks at cars but none of the cars stopped except for a cab (yellow that did stop but did not chase the group. Clarence also states that as they walked thru the park ( location unknown) approx eight of the guys saw a male white40's jogging,who was wearing a sweater and blue shorts, and these eight guys started chasing the white male but after a few minutes five of the eight returned to the group stating that the guy got away.

Continued on page two

| Reporting Officer's Rank - Signature - Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
|---|---|---|---|---|
| Det DBMSTF | J. FARRELL | 864831 | Sgt | |

Farrell Eh.
4

NYC002949

NYCLD_058353

P-APP001776



COMPLAINT FOLLOW-UP INFORMATIONAL
PD 313-081A (SECOND SHEET) (1-68)-21

| | Page | of | Pages |
| PCT. 022 | Complaint No. 281 | Date of This Report 4/20/89 |

DETAILS:
CONTINUED FROM PAGE ONE RE: ASSAULT OF UNIDENTIFIED FEMALE WHITE
INSIDE CENTRAL PARK: INTERVIEW OF CLARENCE THOMAS

003056

) Cont; Clarence does not know what happened to the other three guys who chased
the male white and states that they were guys he did not know by name that
they were friends of Antron Mc Cray. Clarence states that he and the rest of
the group continued south in the park and then at approx the middle of the
park around 96th St about seven of the guys went after and beat up another
jogger at the fence near the reservoir and this was a male white ( Could supply
no further description). Clarence states that he and Antron Mc Cray ran out of
the park and after awhile the other guys came out and they all started walking
north on Central Park West and as they walked a green van turned into the
street and pulled up to the group and one of the guys in the van said that
they were the police and that no one should run but everyone ran any way.
Clarence states that he ran to W 100th St and turned into the park and he tripped
and fell to the ground and the police caught him. Clarence further states that
the others all ran in different directions

?) When questioned about anyone else who the group had hit Clarence stated that
there was an old bum who was a male white or hispanic that Lamont Mc Call
had hit with his fist in the back of the bum's head and knocked him to the
ground. Clarence further stated that the only other person he saw in the
park, outside of the three he had mentioned was some people on a bike but
that they did not go after them. Clarence states that the Bumwas in the middle
of the park and that the Bum was wearing a dark blue coat with grayish pants.
When asked if anyone in the group had a weapon Clarence stated that there was
a M/B/ in his teens tall wearing blue jeans with patches all over them and
a beige trench coat and he had a pipe that was approx 14 inches long with one
end taped with black tape. Clarence states that he does not know this tall
male's name but that he saw this male take this pipe out of his pants with his
right hand when they were at the reservoir with the man who had been beat but
he did not see if the tall male hit the male white with the pipe. Clarence
states that he was too far away from the seven guys to see who was hitting the
white male. At this time Clarence was allowed to go home with his mother and
the interview was discontinued

?) On this date at approx 1130hrs the undersigned along with Det Whelpley were
at the home of Clarence Thomas and spoke to Clarence's mother first and told her
that Clarence had tobe spoken to again. Mrs Thomas invited the undersigned
and Dte Whelpley into her home and then went an woke up Clarence. Mrs Thomas
brought Clarence into her kitchen and he sat down asf did Mrs Thomas and at this
point the undersigned reminded both of them of there rights and again told them
they had the right to have an attorney present before speaking to the police.
Both Mrs Thomas and Clarence agreed to speak to us without an attorney present.
At this timeClarencestated that the pipe he told us about before was passed
back and forth between the tall guy and Antron Mc Cray but Clarence still state
that he did not see either of them hit the guy with the pipe. When asked about
anyone else being beat in the park by this group, Clarence stated that the Bum
Lamont hit but this time Clarence states Lamont beat the Bum with three other
guy's and that they really beat the guy by punching and kicking him then they
draged this Bum off the road and on the the curb and left him there bleeding.
Clarence states he does not know the names of the three guys who beat the Bum
with Lamont by name but that Antron might know them. Clarence and his mother
agreed to show the undersigned where Antron lived and also agreed to come back
to the Central Park Pct with the undersigned. While in auto 8475 Mrs Thomas
directed the undersigned and Det Whelpley to ▮▮▮▮▮▮ and stated
that Antron lived in this building in apartment ▮▮▮. Det Rosario along with
Dets Rivera and Morin from Sex Crimes went into ▮▮▮
▮▮▮ and came out with the subject who was identified as Antron Mc Cary and his
mother Linda Mc Cray and his father Bobby MC Cary. Det Rosario informed the
undersigned that he requested Mr and Mrs Mc Cary and Antron to come to the
CPP and they agreed further Det Rosario asked that Antron wear the clothes he
had been wearing before he went to bed and this was also agreed to by both
parents and Antron. When Antron exited the building his clothes where covered
with dried mud and were very dirty. Mr and Mrs Mc Cray and Antron were trans-
ported to the CPP in Sex Crime auto 731 and Mrs Thomas and Clarence were trans-
ported in DBMSTF auto 8475.

INVESTIGATION CONTINUING

| Reporting Officer's Rank/Signature Command | Name Printed | Tax Registry No. | Supervisor's Signature | C.O.'s Initials |
| Det ▮▮▮▮▮▮ DBMSTF | J FARRELL | 864831 | Sgt. | |

CRIMINAL RECORDS SECTION

NYC362950

NYCLD_058354

P-APP001777

T1-1f

321

 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK : CRIMINAL TERM : PART 59

 3   THE PEOPLE OF THE STATE OF NEW YORK

 4              -against-

 5   RAYMOND SANTANA, KHAREY WISE, YUSAF SALAM,
     ANTRON McCRAY, KEVIN RICHARDSON, STEVE LOPEZ,
 6   MICHAEL BRISCO,

 7              Defendants.

 8              October 13, 1989

 9   B E F O R E:

10       HONORABLE THOMAS B. GALLIGAN, J.S.C.

11       (Appearances as heretofore noted)

12       *       *       *       *       *

13            COURT CLERK:  Indictment 4762 of 1989,

14   Kharey Wise, Yusaf Salam, Antron McCray,

15   Kevin   Richardson, Steve Lopez, Michael

16   Brisco, and Raymond Santana;  continued

17   hearing.

18            (Whereupon, counsel for the defendants

19   gave their appearances.)

20            THE   COURT:   Are we ready to resume?

21   It is now 10:25.  This matter was set  down

22   for  10:00.   The  usual  starting time is

23   9:30.  I  agreed  to  start  at  10:00  for

24   counsel's  convenience  so  they could take

25   care of other  matters.    I  would  advise

10/13/89

NYCLD_023067

P-APP001778

T1—1f

322

COLLOQUY

1
2   counsel  to  be here  at  the  time scheduled,
3   10:00 in the morning.
4        Ready to proceed?
5        MS. LEDERER:  Yes, your Honor.
6        Prior    to    calling    People's    next
7   witness,  Officer  Reynolds,  there  is
8   additional Rosario materials to  be  turned
9   over.   And I have prepared a packet of the
10  pages for each attorney:  one page of hand-
11  written  notes  for  Officer  Reynolds;  one
12  page, hand-written copy of UF-61, the typed
13  copy   having  been  turned  over;  on-line
14  booking  sheet,  one  copy  of  which  has  been
15  turned  over  already.  (Handing to Defense
16  Counsel)
17       MR.  MOORE:    Your  Honor,  my  only
18  request is that in the future, the District
19  Attorney   not   release   documents   on   an
20  installment basis, but  to  do  it  at  one
21  particular time so that we may maintain the
22  flow and logic of preparation.
23       THE   COURT:    Okay.  Who  is  your next
24  witness?
25       MS. LEDERER:  Officer Reynolds.

10/13/89

NYCLD_023068

P-APP001779

T1-1f

323

COLLOQUY

P. O. ERIC REYNOLDS, Shield 17510,
    Twenty-third Precinct Robbery Unit, New York
    City Police Department, called as a witness by
    the People, having been first duly sworn,
    testified under oath as follows:

          COURT OFFICER:   In a loud, clear
    voice, state your full name for the record,
    spelling your last name; your shield
    number, and present assignment.

          THE WITNESS:   Police Officer Eric
    Reynolds; R-E-Y-N-O-L-D-S; Shield 17510,
    23rd Precinct Robbery Unit.

          THE COURT:   All right.

DIRECT EXAMINATION

BY MS. LEDERER:

    Q    Officer Reynolds, on April 19, 1989, where
were you assigned?

    A    Central Park Anti-Crime Unit.

    Q    What tour of duty were you working on that
day?

    A    Four p.m. to midnight.

    Q    And did you have a particular assignment
within the Central Park Precinct?

    A    Yes, Anti-Crime duties.

10/13/89

NYCLD_023069

P-APP001780

T1—1f

324

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      Q      What are the duties of the Anti-Crime unit?

3      A            That is to make arrests for any kind of

4  crimes   in   progress   while   working   in   civilian

5  clothes.

6      Q      Does that mean you don't work in uniform?

7      A      That's correct.

8      Q      And that night of April 19, 1989, were you

9  working on foot, or were you in a vehicle?

10     A      I was in a vehicle.

11     Q      What type of vehicle were you in?

12     A      It was a green  Parks  Department  vehicle.

13  It was a van.

14            MR. MADDOX:   I can't hear.

15            THE   COURT:      Green   Parks  Department

16            vehicle.

17     Q      Did you work with a partner on that date?

18     A      Yes, I did.

19     Q      Who was your partner?

20     A      Police Officer Powers.

21     Q      Did there come a time  on  the  evening  of

22  April  19, 1989 that you heard a radio communication

23  regarding activity in Central Park?

24     A      Yes.

25     Q            At  what  time  did  you  hear  such  a

10/13/8

NYCLD_023070

P-APP001781

T1-1f

325

REYNOLDS - PEOPLE - DIRECT - LEDERER

1    communication?

2    A      It was approximately 9:30.

3    Q        What was the radio communication that you

4    heard at that time?

5    A      Disorderly males   in   the   park,   harassing

6    people.

7    Q        WHen  you heard that communication, was

8    there a   communication   give   for   where   that   this

9    orderly group was?

10   A        It was approximately, I believe, the west

11   side of 100th Street.

12   Q      Do you recall where you were when you heard

13   that?

14   A      I believe I was on Central Park West headed

15   northbound.

16   Q      Where did   you   go   after   you   heard   that

17   communication?

18   A      The north end of the park.

19   Q      Who was driving that night?

20   A      Officer Powers.

21   Q        When you say you went to the north end of

22   the park, where did you go?

23   A      We went to the location specified.   We went

24   in that area to canvas.

10/13/89

P-APP001782

T1-1f

326

REYNOLDS — PEOPLE — DIRECT — LEDERER

Q      What area did you go to?

A      The East Drive —— West Drive up on the north end, around 102nd Street.

Q      Do you recall whether you went to the east side or the west side?

A      I started at the west side, and went from the west to the east side.

Q      Were you directed to go to the east side?

A      Yes, I believe so, yes.

Q      When you say you were canvassing the area, what does that mean?

A      It means we were searching for people described in the radio run.

Q      What route did you take to go to the location of the East Drive on 102nd Street?

A      We went north on Central Park West and then into the park.

Q      Where did you go into the park?

A      I believe it was either 90th Street or 100th Street.

Q      And when you entered the park, did you drive on the roadway or any of the paths?

A      We did both. We traveled along the roadways, and then we went along some of the paths.

10/13/89

T1-1f

327

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2 Q        Did you arrive at the East Drive in the
3 area of 102nd Street?

4 A    Yes.

5 Q    What, if anything, did you see at that
6 location?

7 A    Really nothing in the beginning.

8 Q        Did you see anything resembling the
9 disorderly group?

10 A    No.

11 Q    Did you see any police vehicles?

12 A    Yes.

13 Q    Do you recall what you saw?

14 A    I saw a couple — several Central Park
15 Police vehicles and vehicles from the 23rd Precinct,
16 and the Manhattan North Task Force.

17 Q    Were those marked radio cars?

18 A    Yes.

19 Q        Did you have a conversation with any of
20 those people?

21 A    I had a couple of conversations, yes.

22 Q    At that time when you first arrived, did
23 you speak to any of these people?

24 A        We might have had a passing conversation,
25 you know, just asking if anybody had seen anything.

10/13/89

NYCLD_023073

P-APP001784

T1—1f

328

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          MR. MADDOX:  Object (inaudible).

3          THE   COURT:    Just   tell   us   what

4     conversation you had.

5          THE   WITNESS:    I asked if anybody had

6     seen anything.

7     Q    What did the people you spoke to say?

8     A    Nobody had seen anything at that point.

9     Q    The first communication you heard, did that

10    give any kind of description in the park?

11    A    I believe it was seven to eight males,  the

12    very first one.

13    Q    Did it give any description, race?

14    A    I believe it was male blacks.

15    Q    Are you sure?

16    A    I'm not quite sure.

17         MR. MADDOX:  Objection, your Honor.

18         MR. RIVERA:  Objection.

19         THE COURT:  I will allow it.

20         Are you sure?

21         THE WITNESS:  No, I'm not sure.

22    Q    Did you hear any other radio communication

23    after that first communication?

24    A    Yes.

25    Q    What was that communication?

10/13/8?

NYCLD_023074

P-APP001785

T1-1f

329

REYNOLDS - PEOPLE - DIRECT - LEDERER

1   A    That there were approximately, I believe,
2  20 to 30 male blacks harassing and assaulting people
3  in the park.

4   Q        And do you recall at approximately what
5  time you heard that radio communication?

6   A    Do you mind if I look at my notes to
7  refresh my memory?

8       THE   COURT:   If you have to, you may.
9       Just tell us what you are using to  refresh
10      your recollection.

11      THE   WITNESS:   It is a piece of paper
12      that I wrote down with the, you  know,  the
13      times.

14      MR.  BERMAN:   Judge,  if I may, this
15      speaker,  even  when  there's  no  talking,
16      makes  such a loud noise we can't hear your
17      Honor talking.

18  A    It was about a quarter to ten.

19  Q    And do you recall where you were  when  you
20 heard that communication?

21  A        Well, I was in the north end of the park.
22 It might have been at  102nd  Street  and  the  East
23 Drive.

24  Q        How long did you stay at 102nd Street and

10/13/89

P-APP001786

T1-1f

330

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2 the East Drive?

3      A      Not long.

4      Q          After   you   received   that   second

5 communication, where did you go?

6      A      Again, we --

7                MR. MOORE:  Objection.

8                THE COURT:  No, I'll allow it.

9                Go   ahead.    He was with somebody, he

10               already said that.

11     A      (Continuing)  We started to ride around the

12 park again to do a further canvas.

13     Q      What  area  of  the  park  were  you  driving

14 around in?

15     A      The north end.

16     Q          Would you indicate did you drive on the

17 road or paths?  Where did you go?

18     A      We did both.  We tried  to  concentrate  on

19 the paths because we didn't see anything.

20               THE   COURT:   You   can  tell  us  where,

21               when you say "we"  you  are  talking  about

22               driving around in the car; but tell us only

23               what  you  saw,  talking about what you saw

24               unless somebody said something.  All right.

25     Q      Did you see anything during the  time  that

10/13/89

NYCLD_023076

P-APP001787

T2-fr

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      you were driving around the north end of

3      the park?

4   A   No.

5   Q   When you referred to the north end of the

6      park, from what street north were you

7      canvassing?

8   A   North of 96th Street.

9   Q   Can you describe in a general way what

10      route you took?

11  A   In canvassing?

12  Q   Yes.

13  A   We went through all the foot paths and --

14      you know, all the routes we could to go

15      through all the dark areas, and, you know,

16      part of the park that weren't visible.

17  Q   At any time did you see anybody or any

18      group that resembled what you had heard on

19      the radio?

20  A   In the beginning, no.

21  Q   And did you hear any other radio

22      communications while you were canvassing

23      the north end of the park?

24  A   Yes.

25  Q   What was the next radio communication that

10/13/89

P-APP001788

T2-fr

332

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   you heard?

3   A   We got -- I heard our sergeant -- my

4       sergeant from Anti-Crime had a possible

5       group over at 100 Street and the West Drive

6       in the playground.

7   Q   What is your sergeant's name?

8   A   Sergeant Lyle.

9   Q   What did you do when you heard that

10      communication?

11  A   We responded to the area where he was.

12  Q   Approximately what time was it that you

13      arrived at that playground?

14  A   That was about a quarter to ten, 10:00.

15  Q   Did you have a conversation with Officer

16      Alvarez at that location?

17  A   Yes, I did.

18  Q   Did he tell you whether he had seen

19      anything in the park?

20  A   Yes.

21  Q   What, if anything, did Officer Alvarez tell

22      you?

23  A   He told me he saw a group of youths and

24      when they saw the radio car, they all ran.

25  Q   Did he describe the number of the people in

10/13/89

NYCLD_023078

P-APP001789

T2-fr

333

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      the group?

3      A     He said he saw about seven to ten of them.

4      Q     Did he indicate that he had seen a larger

5      group?

6            MR. MOORE:  Objection.

7            MR. RIVERA:  Objection.

8            MR. JOSEPH:  Objection.

9            MR. BURNS:  Objection.

10           MR. DILLER:  Objection.

11           MR. BERMAN:  Objection.

12           MR. MADDOX:  Objection.

13           THE COURT:  Sustained.  Let him

14     testify.

15     Q     What else did he tell you about the people

16 he saw?

17     A     He stated they were male blacks and

18 Hispanics and they were in their teens.

19     Q     Did he tell you where he had seen the

20 group?

21     A     I believe he said he saw them on the east

22 side.

23           MR. MOORE:  Objection.

24           THE COURT:  I'll let him answer.

25     Q     Was he able to tell you whether it was in

10/13/89

NYCLD_023079

P-APP001790

T2-fr

334

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   or out of the park?

3   A    He said it was inside the park.

4   Q      Did he tell you what time it was that he

5   had seen them?

6   A    That I don't recall.

7   Q    Did he say anything about the gender or the

8   sex of the people he had seen?

9   A    Yes, he said they were male blacks and

10  Hispanics.

11  Q    Did you have a conversation -- withdrawn.

12       How  long did you stay at the playground at

13  100 Street?

14  A    Not long, just long enough to  --  for  the

15  show-up and to get a description from Police Officer

16  Alvarez and then we resumed canvassing.

17  Q       Where  did  you  go  when  you left that

18  location?

19  A    Again we stayed in the  north  end  and  we

20  went  through  all  the  trails and the inaccessible

21  parts of the park.

22  Q    How long did you drive around in the park?

23  A    About another half-hour.

24  Q    Did you hear  another  radio  communication

25  after  you had been at the playground where Sergeant

10/13/89

NYCLD_023080

P-APP001791

335

REYNOLDS - PEOPLE - DIRECT - LEDERER

Lyle was?

A     Yes.

Q     What was the communication that you heard then?

A      That there was a male jogger found beaten and bleeding profusely from his head.

Q     Where was that -- was there a location with respect to where that jogger was found?

A     Yes. That was 96th Street, I believe, approximately, and the West Drive off the reservoir.

Q          Where were you when you got that communication, if you recall?

A     I believe we were at the East Drive again and 102nd Street.

Q     Did the communication given with respect to that jogger contain any information about any people?

A      He stated there was a group of male Hispanics and Blacks who had assaulted the jogger.

Q     Was there any further information about the assault?

A     Yes, that they had fled north.

Q          What, if anything, did you do after you heard that information?

10/13/89

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    At that point I decided to leave the park

3    and to start the canvas outside at Central Park West

4    at 100 Street.

5    Q    Where did you leave the park?

6    A    We left at 100th Street and Central Park

7    West.

8    Q    Why did you leave the park at that time?

9    A    Because I felt that the group was no longer

10   in the park.  We had canvassed for quite a while and

11   the entire park was saturated with police vehicles.

12   Q    Did you see other vehicles in the park

13   other than those you refer to at the East Drive and

14   102nd Street?

15   A    Other than what I described earlier?

16   Q    During the time you were canvassing the

17   park, other than what you already told us at the

18   East Drive and 102nd Street, did you see any other

19   police vehicles in the park?

20   A    Just what I mentioned.

21   Q    And when you were canvassing the north end

22   of the park, did you see any sign of other police

23   vehicles?

24   A    Yes.

25   Q    What did you see?

10/13/89

NYCLD_023082

P-APP001793

T2-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   A       As I was going through the fields, I could
3   see further north of me the headlights of the   other
4   vehicles going back and forth also in search for the
5   group.
6               MS.   LEDERER:   With the permission of
7           the Court, I'd ask the   witness   to   please
8           step   down   and   approach   People's   7   in
9           evidence.
10               (Witness complies)
11  Q       Would you please point   on   People's   7   in
12  evidence   and   describe   as you do, what area you're
13  possibly   pointing   to,   indicate   where   you   were
14  traveling   and   where you would see the other   lights
15  from other vehicles?
16  A       We saw the other lights ——
17               THE COURT:   Excuse me, Officer, I have
18           to remind you to speak as loud as   you   can
19           because   everybody over on this side has to
20           hear you, and it is very difficult in   this
21           courtroom.
22               THE WITNESS:   Okay.
23               I saw headlights from the other police
24           cars   going   east   and   west   across   the
25           ballfields here on the north end.   I   was

10/13/89

NYCLD_023083

P-APP001794

T2-fr

338

REYNOLDS – PEOPLE – DIRECT – LEDERER

1
2          south   of   them   and   I  could  see  them  --  I
3          could  see  that  the  ballfields  in  this   area
4          was   pretty  well  saturated  with  police  cars
5          and  there  was  probably  no   group  in   there
6          because  somebody  would  have  seen  --
7                    MR.   MADDOX:    Also  describe  the  area
8          that  he  just  referred  to  on  the  map.
9                    THE  COURT:   Yes,  if  there  is   some
10         legend   on  that  map  that  describes  the  area
11         that  you're  in,  please  tell  us  what  it   is.
12         I   see   there   is  some  writing  on  that  map.
13         If  you  could  tell  us  what  it  was,  the   area
14         that  you  say  you  were  driving  in.
15                   THE   WITNESS:    This   is   the   north
16         meadow,  and  it  contains   several   baseball,
17         softball,  and  a  football  field  and  we
18         again,  like  I  said,  I   had   seen   several
19         radio   cars   going   back  and  forth  and  they
20         pretty  well  had  the  whole  area  covered.   If
21         there  was  any  group  in  there  --
22                   MR.  BURNS:  Objection.
23                   MR.  MOORE:  Objection.
24                   THE  COURT:  Yes,  don't  speculate,  just
25         tell  us  what  you  saw.

10/13/89

NYCLD_023084

P-APP001795

T2-fr

339

REYNOLDS — PEOPLE — DIRECT — LEDERER

THE WITNESS: I saw the police cars going back and forth and they had the area well covered.

Q    Where did you go —

MR. BURNS: I'm sorry. For the record, the record should reflect the area of the North Meadow.

THE COURT: He covered the whole area of the North Meadow.

Q    When you stated earlier that you decided at this time to leave the park, will you point out the route you took to enter the park?

A    We left here at 100 Street, going west towards Central Park West.

Q    What time was it, approximately, when you were leaving Central Park?

A    It was approximately 10:30.

Q    What, if anything, did you see as you left Central Park at 100 Street?

A    Okay. When we got to Central Park West at 100th Street, just north of us, between 101st Street and 102nd, on the west side of the street, we saw a group of about 10, 15, male blacks and hispanics. They were teenagers.

10/13/89

T2-fr

340

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2    Q    What, if anything, did you do when you   saw
3    that group?
4    A         What we -- what I did was we started to
5    drive northbound towards them to get a   better   look
6    at the group.
7    Q    What side of the street were they on?
8    A    They were on the west side of the street.
9    Q    And when you were driving, what side of the
10   street were you driving on?
11   A    I was on the east side going northbound.
12   Q         What, if anything, happened as you went
13   northbound on Central   Park   West   approaching   that
14   group?
15   A         Well, we saw the group.   They were all --
16   you know, walking together.   We felt reasonably sure
17   that they didn't --
18              THE COURT:   It's not what you felt.
19              THE WITNESS:   I felt   reasonably   sure
20         they didn't know who we were.
21              MR. RIVERA:   Objection.
22              MR. BURNS:   Objection.
23              MR. MOORE:   Objection.
24              MR. JOSEPH:   Objection.
25              MR. MADDOX:   Objection.

10/13/89

NYCLD_023086

P-APP001797

T2-fr

341

REYNOLDS — PEOPLE — DIRECT — LEDERER

1 
2          MR. DILLER:   Objection.

3          MR. BERMAN:   Objection.

4          THE   COURT:    I'll   allow   that.    Go

5     ahead.

6          THE   WITNESS:   At one point   the   group

7     had stopped --

8          MR.   RIVERA:     I   didn't   hear   the

9     statement he didn't feel reasonably what?

10         THE COURT:  Did not make out who   they

11    were.

12   Q    Continue.

13   A    The group at one point stopped and they all

14   started   to   look  our  way  and  started  to  point  at  us

15   in the van, and I couldn't   understand   why   because

16   nobody wouldn't really --

17         MR. MOORE:   Objection.

18         THE COURT:   Finish your answer.

19         THE   WITNESS:    Nobody  generally  makes

20    who we were.

21         MR. MOORE:   Objection.

22         THE COURT:   Objection sustained.

23         Don't tell us   what   people   generally

24    do.   Just tell us what happened here.

25         THE   WITNESS:   What I did was I looked

10/13/89

NYCLD_023087

P-APP001798

u₁   T2-fr

REYNOLDS – PEOPLE – DIRECT – LEDERER                    342

1          to our right and a marked police three-

2          wheel scooter was on our right hand side

3          and that's what panicked them.

4              MR. MOORE:   Objection.

5              MR. MADDOX:   Objection.

6              THE COURT:   Sustained.   Just tell us

7          what you saw.

8    Q      When you looked and saw in your sideview

9    mirror a scooter, where was this scooter?

10   A      Right alongside the van on my side.   It was

11   on the other side of us, from the group.

12   Q      Who was on that scooter?

13   A      Police Officer Flores.

14   Q      What did you do when you became aware   that

15   Police Officer Flores was pulling up besides you?

16   A          Well, I felt -- it looked like the group

17   was going to run to me.

18             MR. MOORE:   Objection.

19             MR. JOSEPH:   Objection.

20             THE COURT:   I'll allow it,   go   ahead.

21        Finish.

22             THE WITNESS:   And I told my partner to

23        take  the  van and pull it up ahead of them

24        to cut them off so we can stop them.

10/13/89

NYCLD_023088

P-APP001799

T2-fr

343

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q    And did the van pull up?

3    A    Yes.

4    Q    Where did the van go?

5    A    Okay. My partner pulled up the van to

6    102nd Street and CPW, Central Park West on the

7    southwest corner.

8    Q    WHen you say the van was pulled up on the

9    southwest corner of 102nd and Central Park West, can

10   you describe exactly what position it was in in

11   relation to the sidewalk and the street of 102nd

12   Street?

13   A    Okay. The van was facing west with the

14   headlights facing west towards the building.    Then

15   my partner and myself got out of the van, we

16   identified ourselves.    AT that point the group

17   started to run except for two.    Those two were

18   Raymond Santana and Steve Lopez.

19             MR. MOORE:    Not responsive to the

20             question.

21             THE COURT:  I'll allow it.

22   Q    When you say you got out of the van -- let

23   me just go back for a second. The van that you were

24   describing, what color is the van?

25   A    Green.

10/13/8?

T2-fr

344

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q      Are there any windows in the  back  portion

3 of the van?

4      A       In the back two doors -- I'm sorry, there

5 are no windows in it.

6      Q      Are there any side panels?

7      A      I don't believe so.

8      Q      Does it have any insignia?

9      A      Yes, Parks Department emblem on the front.

10      Q      When the van pulled into the  beginning  of

11 102nd Street and Central Park West, you say you both

12 jumped out.  What exactly did you say?

13      A       We identified ourselves as police and we

14 told them not to run.

15      Q      What happened when you said, "Don't run?"

16      A      The group started to run.

17      Q      And what did you do when the group  started

18 to run?

19      A      We got out of the van and we approached the

20 two defendants that had stayed on the corner.

21      Q      And you just named the names of those two

22 people.  Did you at the time that you  stopped  them

23 know their names?

24      A      Not at that time, no.

25      Q       What,  if  anything,  happened when you

10/13/89

NYCLD_023090

P-APP001801

T2-fr

345

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  stopped those two?

3     A    We placed them against the wall.

4          MR. MADDOX:    Objection, Judge.    He

5          didn't   stop   them.   They   were   already

6          stopped.

7          THE COURT:   Yes.   Objection sustained.

8     Q    What happened   when   you   approached   those

9  two?

10    A        We   placed   them   against   the   wall   and

11  searched them.

12    Q    Did you have your gun drawn   when   you   got

13  out of the van?

14    A    No.

15    Q        When you say you placed them against the

16  wall, what exactly did you do?

17    A    We gave them a pat down of their clothes in

18  case they had weapons on them.

19    Q    Did you find any weapons?

20    A    No.

21    Q    What was the next thing that happened?

22    A     My   partner,   Police   Officer   Powers   and

23  Police Officer Flores chased the group.

24    Q        Did the two people that you placed against

25  the wall,   Raymond   Santana   and   Steve   Lopez,   did

10/13/89

T2-fr

346

REYNOLDS — PEOPLE — DIRECT — LEDERER

either of them say anything to you?

    A    Yes.

    Q    What, if anything, did they say to you?

    A    Let's see. Raymond Santana stated he had just come from his girlfriend's house and didn't state where or when.

          MR. JOSEPH: Objection.

          THE COURT: Don't tell us what he didn't said. Just tell us what he did say.

          THE WITNESS: Steven Lopez stated he just came from the movies with his girlfriend and they watched the movie "Leviathan".

    Q    Did either of them say anything about the rest of the group?

    A    They stated they weren't with the group and Steven Lopez stated, I quote, "The group had talked shit about ripping them off."

          MR. MADDOX: I can't hear.

          THE COURT: Who said that?

          THE WITNESS: Steven Lopez.

          THE COURT: Stated what?

          THE WITNESS: They were not with the group and the group had talked -- I quote,

10/13/89

NYCLD_023092

P-APP001803

REYNOLDS — PEOPLE — DIRECT — LEDERER

1      "Talked shit about ripping them off."

2    Q    When I asked you a moment ago did either of

3 those two people say anything with respect to the

4 rest of the group I believe your answer began, "They

5 said," could you tell us exactly what either one of

6 them said indicating by name what that person said?

7      MR. MOORE:    Objection.    Asked and

8      answered.

9      THE COURT:   I'll allow it again.

10      THE WITNESS:   They both stated that

11      they weren't with the group and they didn't

12      know any of the others that had run.   They

13      stated that they were walking ahead of them

14      and —

15      MR. RIVERA:    Objection, your Honor,

16      not responsive.

17      THE COURT:   Yes, objection sustained.

18    Q    Can you tell us what Raymond Santana said

19 to you when he was stopped at 102nd Street and

20 Central Park West?

21    A    Raymond Santana said he wasn't with the

22 group and he had just come from his girlfriend's

23 house.

24    Q    What, if anything, did Steven Lopez say at

NYCLD_023093

P-APP001804

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      that time?

3          A    He stated he also was not with  the   group,

4      that  he  had just come from his -- he had just come

5      from the movies with his girlfriend and they watched

6      the picture "Leviathan" and he also  stated,  and  I

7      quote, "Talked  shit  about  ripping off -- ripping

8      them off."

9          Q    Did  you  ask  either  Defendant  Lopez  or

10     Defendant Santana any questions?

11         A    No.

12         Q    When you saw this group, could you describe

13     how  the  group was in relation to the other members

14     of the group?

15         A    The two --

16              MR. BERMAN:  Object as to form.

17              THE COURT:  What is your question?

18         Q    When you saw the group walking  on  Central

19     Park  West,  would  you describe the relation of the

20     group with one to the other?

21         A    It was a  homogenized  group.   They  were

22     altogether  and  they  were  all walking northbound.

23     They were male Blacks, teenaged and Hispanics.

24         Q    When you saw the group on the west side  of

25     the  street, approximately how much of the block was

10/13/89

NYCLD_023094

P-APP001805

T2-fr

349

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    taken up by the members of the group?

3        A    Maybe a quarter of the block.

4        Q    And where were Defendant's Lopez and

5    Santana, if you remember, in relation to the others

6    in the group?

7        A    They were in the group because the group

8    was altogether.

9        Q    What, if anything, happened after Lopez and

10   Santana made those statements to you?

11       A    My partner, Police Officer Powers chased

12   the rest of the group with Police Officer Flores.

13       Q    Where did you see him go?

14       A    I saw him running southbound on Central

15   Park West and then west on 101st Street.

16       Q    Did you see where he went when he turned

17   onto that street?

18       A    When he turned west, I lost sight of him?

19       Q    Officer Reynolds -- I'm sorry --

20       A    And then I saw him again running back east

21   and the group was ahead of him and they ran into the

22   park, and he ran into the park after them.

23       Q    Approximately how much time elapsed between

24   the time you saw him disappear from your sight going

25   down the street until you saw the group coming back

10/13/89

NYCLD_023095

P-APP001806

T2-fr

350

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2  with him, chasing?

3      A     Just seconds.

4      Q     Did you then see Officer Powers -- go  into

5  the park?

6      A       Yes, I saw him run and jump over the wall

7  into the park after the defendants.

8              MR. MADDOX:  Objection to "after  the

9          defendants."

10             THE   COURT:   Yes, Objection sustained

11         as to "after the defendants."

12     Q     Did you see how many people were running in

13  front of Officer Powers?

14     A     It looked to be about ten.

15     Q     And you said that they entered the park, do

16  you know where it was that they entered the park?

17     A     It was over the wall and  at  Central  Park

18  West and 101st Street, between 101st and 100.

19     Q       And is that where you saw Officer Powers

20  enter the park?

21     A     Yes.

22     Q     Let me just stop you for  a  moment.   The

23  area  on Central Park West, near 101st and 102nd, to

24  your knowledge are there any movie theaters in  that

25  area?

10/13/89

NYCLD_023096

P-APP001807

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    No, there isn't.

3    Q        Are there any community centers in that

4  area?

5    A    No-

6            MR. MADDOX:  Judge, may I  ask  if  he

7        could repeat the question and answer?

8            THE  COURT:   Read  the  question and

9        answer back, please.

10           (Reporter complies)

11   Q    Are there any stores on Central  Park  West

12  in that area?

13   A        No.  There's just a grocery store further

14  down, but it's very small north of where they were.

15   Q    After you lost sight of Officer Powers when

16  he went into the park, what was the next thing  that

17  happened?

18   A      I stood on the corner with Raymond Santana

19  and Steven Lopez.

20   Q    Did you handcuff them?

21   A    No.

22   Q    And where was the van?

23   A    The van was right where we left it on 102nd

24  Street and Central Park West.

25   Q    Did either of them say anything further  to

NYCLD_023097

P-APP001808

T2-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     you?

3        A        They just kept stating that they were not

4     with the rest of them.

5        Q        When you say they kept saying that, who

6     kept saying that?

7        A        Steve Lopez and Raymond Santana.

8        Q        And did you ask them any questions?

9        A        No.

10       Q        Did you have your radio with you?

11       A        Yes, I did.

12       Q        Did you hear communications coming over the

13    radio?

14       A        Yes.

15       Q        Did there come a time when someone came to

16    where you were with Santana and Lopez?

17       A        Yes.

18       Q        Approximately what time was that?

19                THE WITNESS:  May I look at  my  notes

20           to refresh my memory?

21                THE COURT:  If you have to.

22                (Witness peruses notes)

23       A        It was approximately a quarter to eleven.

24                THE COURT:  And what happened at about

25           a quarter to eleven?

10/13/89

REYNOLDS — PEOPLE — DIRECT — LEDERER

THE WITNESS: Sergeant Wheeler and Police Officer Morales pulled over after the call over the radio for a unit to pick up the two.

Q    What happened when they responded?

A    They responded over and we placed them into the car.

Q    Placed whom in the car?

A    Steven Lopez and Raymond Santana.

Q    And what did you do at that point?

A    I went with Police Officer Powers into the van, and we drove back to 100 Street and Central Park West to confer with our sergeant.

Q    When Raymond Santana and Steve Lopez were put in the car with the sergeant, did you see where they went?

A    They went to 100 Street and Central Park West.

Q    And when you arrived at 100 Street and Central Park West, were Raymond Santana and Steve Lopez there?

A    Yes.

Q    Were they in the car or outside of the car?

A    They were in the car.

10/13/89

T3-1f

354

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    Q        And at what corner of that intersection

3 were you at?

4    A    The northeast corner.

5    Q    When you arrived at that location, who  did

6 you arrive with?

7    A    Police Officer Powers.

8    Q    And who was already at that location?

9    A        Sergeant Lyle and Police Officer Hennigan

10 and the other officers.

11   Q    And did you see anybody  in  custody  other

12 than Raymond Santana and Steve Lopez?

13   A    Yes.

14   Q    Who did you see at that time?

15   A        I saw Kevin Richardson, Lamont McCall and

16 Clarence Thomas.

17   Q    Where did you see them?

18   A    In the back of the radio car.

19   Q    Were all three in the same radio car?

20   A    I believe so.  I'm not sure.

21   Q    Was there a discussion at  100  Street  and

22 Central Park West?

23   A    Yes, there was.

24   Q    And what was the nature of the conversation

25 had there?

10/13/89

NYCLD_023100

P-APP001811

T3-1f

355

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  A    I discussed with our sergeant -- I was told
3  that three of the defendants had made statements.

4          MR. MOORE:   Objection.

5          THE COURT:   I will allow it.

6  A          I   was   told   three defendants had made
7  statements placing themselves at the attack   of   Mr.
8  Loughlin at 96th Street.

9  Q    Who told you that?

10  A     I was told that by Police Officer Powers
11  and Sergeant Lyle.

12  Q    And at that time was there a discussion   at
13  100 Street and Central Park West?

14  A    Yes.

15  Q    Was there a discussion about doing a show-
16  up?

17  A    Yes.

18  Q    And was a show-up conducted with John
19  Loughlin at that time?

20  A    No.

21  Q     How long did you stay at 100 Street and
22  Central Park West?

23  A    I'd say about ten minutes; ten, fifteen
24  minutes.

25  Q    During that time were you out of the van or

10/13/8

NYCLD_023101

P-APP001812

T3-1f

356

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   were you in the van?

3       A    I was out of the van.

4       Q       And at any time while you were at that

5   location, were you in a car with any of the people

6   that had been taken into custody?

7       A    No, I wasn't.

8       Q    What was the next thing that happened?

9       A    We drove to the Central Park Precinct.

10      Q    When you say "we drove" how did you get to

11  the Central Park Precinct?

12      A    I went in the green Parks Department

13  vehicle.

14      Q    Did anyone ride with you?

15      A    Yes, Police Officer Powers.

16      Q    Did you see where Raymond Santana and Steve

17  Lopez were at the time you left 100th Street and

18  Central Park West?

19      A    They were in the radio car, I believe, with

20  Sergeant Wheeler.

21      Q    And the other three people you mentioned,

22  where were they?

23      A       I believe they were with another set of

24  officers.  I don't recall specifically who it was.

25      Q    Were any of those five people taken out of

10/13/89

P-APP001813

T3-1f

357

REYNOLDS - PEOPLE - DIRECT - LEDERER

1  the car at 100 Street and Central Park West?

3  A    I don't believe so, no.

4  Q    How long did it take you to get from 100th

5  Street and Central Park West to the Central Park

6  Precinct?

7  A    I'd say about five minutes.

8  Q    And what did you see -- withdrawn.

9  What time was it that you arrived at the

10  Central Park Precinct?

11  A    It was approximately 12:00.

12  Q    I'm sorry.

13  A    Approximately 12 midnight.

14  Q    Are you sure it was midnight when you

15  arrived?

16  (Whereupon all Defense Counsel made an

17  objection to the question by the District

18  Attorney.)

19  THE COURT:    The objection is

20  sustained.

21  Q    What did you do when you arrived at the

22  Central Park Precinct?

23  A    We brought the defendants in front of the

24  desk.

25  Q    And what time did you bring the defendants

10/13/89

NYCLD_023103

P-APP001814

T3-1f

358

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   before the desk?

3          A    I believe -- may I refresh my  memory  with
4   my notes?

5                    THE COURT:  If you have to.

6                    MR. MADDOX:  When he says "defendants"
7            could he refer to who he was talking about?
8            Some are not defendants.

9                    THE COURT:  Okay.

10                    If  you  can, give us the names of the
11            people you are talking about.

12                    THE WITNESS:  All right.

13          A    That was about six minutes after eleven.

14          Q    And what happened six minutes after eleven?

15          A    They were brought to the station house.

16                    THE COURT:  They being?

17                    THE WITNESS:   Clarence Thomas, Lamont
18            McCall, Kevin Richardson, Steven Lopez, and
19            Raymond Santana.

20          Q    Were they at  the  stationhouse  when  you
21   arrived,  or  did  they arrive when you were already
22   there?

23          A    I think we got there around the same  time.
24   I  don't recall exactly who got there first.  It was
25   very close in time, though.

10/13/89

T3-1f

359

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q     And what happened in front -- what did you

3     do when you went in front of the desk?

4     A     What I did was gave their names, addresses

5     and ages to the desk officer so he could enter it

6     into the blotter.

7     Q     Did you have a conversation with anyone

8     when you arrived at the Central Park Precinct?

9     A     Yes, I did.

10    Q     Who did you have a conversation with?

11    A     I had a conversation with one of the

12    detectives; two of them.

13    Q     To whom did you speak?

14    A     Detective Nugent and Detective Gonzalez.

15    Q     What did you say to them and what did they

16    say to you?

17    A     I stated what happened; that I arrested

18    five youths for assaulting a jogger in the Park.

19    And that was pretty much it. We returned them to

20    the Youth Room.

21    Q     How long were they before the desk?

22    A     I'd say about ten minutes.

23    Q     Was anyone with you and with them before

24    the desk sergeant?

25    A     Yes.

10/13/89

NYCLD_023105

P-APP001816

T3-1f

360

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   
2   Q   Who was that?

3   A   My partner was there, Police Officer
4   Powers; Police Officer Hennigan, Sergeant Lyle and
5   the detectives might have come out also.

6   Q   After you were before the desk with those
7   five people that you have named, where did you go?

8   A   We took them, I believe, we took them to
9   the juvenile room.

10   Q   Officer Reynolds, if you would, please look
11   at what has been received in evidence as People's 1.
12   Do you recognize what that is?

13   A   Yes.

14   Q   What do you recognize that to be?

15   A   It is a layout of part of the Central Park
16   Precinct.

17   Q   What part of the precinct is depicted in
18   that diagram?

19   A   One is the Community Affairs office, and
20   the other is our muster room.

21   Q   And where is the Youth Room in People's 1?

22   A   Do you want me to point it out?

23   Q   If you would, please.

24   MR. BERMAN: The testimony was it was
25   the Juvenile Room.

10/13/89

NYCLD_023106

P-APP001817

REYNOLDS - PEOPLE - DIRECT - LEDERER

THE COURT:  Yes, you referred to it as
the Juvenile Room.

Q    Excuse me.  Would you show us the  juvenile
room?

A    This room right here (indicating).

Q        Indicating a room, the lower rectangular
room portrayed in People's 1.

When you say you went into that  room,  did
you  go  into  that room with all of the five people
that had been before the desk?

A    Yes.

Q    Before resuming the stand, could you please
point out where everyone was inside that  room  once
you went in?

A      Okay.  I was seated at this desk here and
the defendants were seated at chairs  in  this  area
(indicating).  They were all given a chair, and they
were all seated over here (indicating).

MR.  MADDOX:    Can the record reflect
that is the bottom portion of the room that
appears on that diagram?

THE COURT:  Yes, it is  the  bottom
right portion.

MS. LEDERER:  Thank you.

NYCLD_023107

P-APP001818

T3-1f

362

REYNOLDS — PEOPLE — DIRECT — LEDERER

You may resume your seat.

(Witness complies)

Q    Were any of those people handcuffed in that room?

A    Their handcuffs were removed in the room.

Q    What did you do in that room?

A        In that room I started to process the paperwork for that arrest.

Q    What does that mean?

A    I did the on-line booking sheets and juvenile packages.

Q    What is a juvenile package?

A        That's the — that's papers that you have to fill out to go to Family Court, the depositions, supporting depositions, a referral intake report, and the appearance tickets for the youths to appear in Family Court with their parents or guardians.

Q        Where was Officer Powers at that time, if you know?

A    Officer Powers was making notifications to the families, to the parents of the defendants.

Q    Was that happening in the room you were in?

A        No, that was across the way in the main part of the precinct.

10/13/89

NYCLD_023108

P-APP001819

T3—1f

363

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2       Q     During this time that you were doing the
3   paperwork in the Juvenile Room, how would you
4   describe the testimony of defendants Kevin
5   Richardson, Raymond Santana, and Steven Lopez?

6       A     They really didn't seem to care.

7               MR. RIVERA:  Objection.

8               MR. DILLER:  Objection.

9               MR. BERMAN:  Objection.

10              THE COURT:  Objection sustained.

11      Q     Describe their appearance; how would you
12  describe them.  What were they doing, what was their
13  appearance?

14              MR. BERMAN:  I would object to him
15              describing it collectively.

16              THE COURT:  I will allow it.  If they
17              differed in any respect, tell us that.
18              Tell us what each one looked like and what
19              they were doing?

20              THE WITNESS:  They were sitting around
21              talking.  Their demeanors didn't seem
22              different.  They didn't seem to care.

23              MR. RIVERA:  Objection.

24              MR. DILLER:  Objection.

25              MR. BERMAN:  Objection.

10/13/89

NYCLD_023109

P-APP001820

T3-1f

364

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2          THE  COURT:    Okay.  What do you mean

3     "they didn't seem to care"?

4          THE WITNESS:  They wanted to go  home;

5     you know, they wanted to hang out.

6          MR. RIVERA:  Objection.

7          THE COURT:  I will allow it.

8     Q    Were any one of these three people crying?

9     A    No.

10     Q     When you say you observed people in that

11     room talking  to   each  other,  did  you  see  Kevin

12     Richardson talking to anyone?

13     A    Yes, I saw him talking to Raymond Santana.

14     Q    Did you see Raymond Santana and Steve Lopez

15     talking  to   each  other  or  to other people in the

16     room?

17     A    Yes.

18     Q    Who did you see them talking to and what do

19     you remember?

20     A    They seemed to be talking  to  each  other.

21     Everybody seemed to know each other very well.

22          MR. RIVERA:  Objection.

23          MR. DILLER:  Objection.

24          MR. BERMAN:  Objection.

25          THE COURT:   Objection sustained.

10/13/89

NYCLD_023110

P-APP001821

T3-1f

365

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q       Did there come a time you were aware the

3   parents began to arrive?

4              MR. MOORE:   Objection as to form.

5              THE COURT:   I will allow it.

6      A    Yes.

7              MS. LEDERER: Your   Honor,   if  I   may

8   interrupt   at  this  point  to   reinterate

9   something said yesterday.

10             I indicated to Defense Counsel that  I

11  ask  the  parents of certain defendants and

12  potential witnesses not be present  in  the

13  courtroom.  I just want to check.

14             MR.  DILLER:   No  people  from  Mr.

15  Richardson's family that will  testify  are

16  in court.

17             MS.  LEDERER:   And no other witnesses

18  that were present at the stationhouse?

19             MR. DILLER:  That's correct.

20             MR. BERMAN:  I suppose we  should  put

21  some of it on the record, because we didn't

22  do  it  the  other  day.   I  made  the

23  representation  that  I  would  have  all

24  witnesses out of the courtroom, but I asked

25  that  my  client's  parents  remain.  And I

10/13/89

NYCLD_023111

P-APP001822

T3-1f

366

REYNOLDS - PEOPLE - DIRECT - LEDERER

2    offered, if they should testify at this
3    hearing or at the trial, that the
4    Prosecution would be free to bring out they
5    had been present during the testimony.    I
6    forget if it was your Honor or Miss Lederer
7    who rejected that.

8         With that in mind, I instructed my
9    client's parents not to be here for this
10   witness and the next witness.

11        THE COURT:  And they are not here?
12        MR. BERMAN:  Yes.
13        Do you recall who it was?
14        THE COURT:  Ultimately I'm the one who
15   made the ruling.  The important thing is
16   what I said.
17        MR. BERMAN:  I said they would have to
18   be excluded during the testimony of this
19   witness.
20        MR. RIVERA:    On behalf of Raymond
21   Santana, he has no relatives here today.
22        MR. JOSEPH:    The same is true on
23   behalf of Mr. Antron McCray.

24 BY MS. LEDERER:
25        Q    Did there come a time that you became aware

10/13/89

T3-1f

367

REYNOLDS - PEOPLE - DIRECT - LEDERER

of parents or families of any of those five people beginning to arrive at the Central Park Precinct?

A    Yes.

Q    To the best you can recall, what was the time you first became aware of the parents arriving?

A    I believe it was around midnight.

Q    And who do you recall arriving at approximately midnight?

A    That was Mrs. Richardson.

Q    How was it that you became aware that Mrs. Richardson was there?

A    She came into the room and opened the door and she stated who she was. And that was it.

Q    When you say she came into the room and opened the door, could you step down for a moment and point out on People's 1 in evidence where she was?

A    There is a door right here which she opened and let me know she was here for Kevin Richardson (indicating).

MR. BERMAN: For the record, he was pointing to the area on that chart where there was no door. There is a doorway but no door.

10/13/89

NYCLD_023113

P-APP001824

T3—1f

368

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      THE      COURT:     Yes,   it   does   appear

3    there's  no  door  drawn  into  the  diagram.   Is

4    there  an  actual  door  there?

5      THE  WITNESS:  Yes.

6      MR.  MADDOX:  Could  the  record   reflect

7    where  exactly  on  the  diagram  he  is  pointing

8    to?

9      THE    COURT:    He   is   pointing  to  the

10   upper  righthand  side  of  that  room.

11   Q     At  the  time  that  Mrs.  Richardson  or  the

12   mother   of   Kevin   Richardson  arrived,  was  that  door

13   opened  or  closed?

14   A     It  was  closed.

15   Q     And  at  the  time  that  she  came  to  the  door,

16   where  was  Kevin  Richardson  when  she  opened  the  door?

17   A     He  was  seated  in  the  back  of  the  room.

18   Q     When  you  say  in  the  back  of  the  room,  where

19   were  you  referring  to?

20   A     Shall  I  point  it  out?

21   Q     Yes.

22   A      I  believe  he  was  seated  in  this  area  here

23   (indicating).

24      MS.  LEDERER:  Indicating  in  the   lower

25    righthand   corner   of  the  Community  Affairs

10/13/89

NYCLD_023114

P-APP001825

T3-1f

369

REYNOLDS — PEOPLE — DIRECT — LEDERER

Office building.

Q    Did you observe or hear any conversation exchanged between Kevin Richardson and his mother at that point?

A    No.

Q    Was Kevin Richardson awake when she arrived?

A    Yes.

Q    And when his mother arrived at the door, did she speak?

A    Yes, she stated she was, you know, his mother. I believe I got up and just asked her to have a seat. Then I finished the paperwork, and hopefully send him home that night.

Q    Where did you ask her to have a seat?

A    I asked her to have a seat in the clerical area.

Q    The clerical area is where?

A    That's on the top of the diagram (indicating).

Q    Is that the entire room?

A    Yes.

Q    In the top portion of that building?

A    Yes.

10/13/89

T3-1f

370

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   Q   Did you become aware of any of the other

3  parents arriving at that time?

4   A   Yes.

5   Q   Who was the next parent that you became

6  aware of?

7   A   I don't recall who came in next, but they

8  all started to come in one at a time.

9   Q   And how was it that you became aware of

10  their arrival?

11   A   Either my partner would tell me the parent

12  was there, or they would stick their head in the

13  door and tell me they were there, looking for their

14  son.

15   Q   During the time that the parents and the

16  families of these five people were arriving, did

17  there come a time where you saw Antron McCray?

18   A   Yes.

19   Q   Do you recall approximately when that was?

20   A   I'm not sure. That was after midnight.

21  I'm not sure of the exact time.

22   Q   Did you have anything that would refresh

23  your recollection as to the exact time?

24   A   I can take a look. Again, I'm not sure.

25   (Witness peruses notes)

10/13/89

NYCLD_023116

P-APP001827

T3-1f

371

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   A     (Continuing)  There was no time -- I don't
3   recall what time that night I saw him.  It was after
4   midnight though.
5   Q     Did there come a time when  Officer  Powers
6   returned from making notifications?
7   A     Yes.
8   Q     And do you recall what time it was that he
9   finished and returned to the juvenile room?
10  A     That I'd have to look  up  to  refresh  my
11  memory.
12                (Witness peruses notes)
13  A             (Continuing)   I  believe  that  was
14  approximately 12:30.
15  Q     During  the  time  that  the  parents  were
16  arriving, did you have conversations with them?
17  A     Yes.  When they all got there, yes.
18  Q     And did there come a time when everybody's
19  parents or family had arrived?
20  A     No.  There was a set of parents  that  were
21  missing.
22  Q     Whose parents did not arrive?
23  A     Raymond Santana's.
24  Q     Would you please describe what efforts were
25  made to reach the family of Raymond Santana?

10/13/8

NYCLD_023117

P-APP001828

T3-1f

REYNOLDS – PEOPLE – DIRECT – LEDERER

1

2    A    Well, at first Police Officer Powers called

3  his house and spoke to his father.

4    Q    Do you recall approximately what time he

5  made that phonecall?

6    A   I'd have to refresh my memory with my

7  notes.

8             MR. RIVERA:    I object to the

9            characterization that "he spoke to his

10          father."

11            THE COURT:  I'll allow it.

12    A    It was about 20 after 12.

13    Q    And what happened after Officer Powers ––

14  withdrawn.

15            Did Officer Powers tell you that when he

16  made that phonecall he spoke with someone?

17    A    Yes.    He said he spoke with Raymond

18  Santana's father, and his father stated he was going

19  to pick him up.

20    Q    What was the next thing that happened with

21  respect to reaching the Santana family?

22    A    Well, we waited a couple of hours, and, you

23  know, he wasn't there at the stationhouse.  So I

24  asked Bobby to give him another call.

25            THE COURT:  Bobby is?

10/13/89

NYCLD_023118

P-APP001829

T3-1f

373

REYNOLDS - PEOPLE - DIRECT - LEDERER

1                  THE   WITNESS:   I'm   sorry,   Police

2    Officer   Powers called him   two hours   later,

3    I believe, and there was no   answer   at   the

4    house.

5    Q    Was   there   then a   second   effort   or   another

6   effort made to reach someone else from the family?

7    A    Well, I had to convince Raymond Santana   to

8   give me the name of another relative to call.

9    MR. RIVERA:   Objection.

10    THE   COURT:   Just tell us what you did.

11    THE   WITNESS:   Okay.   I   got   his

12   sister's telephone number and called up his

13   sister.

14    Q    Did   you   have   a   conversation   with   his

15   sister?

16    A    Yes.

17    Q    Approximately what time did you call his

18   sister?

19    A    It   was approximately 2:15.

20    Q    Did you have a conversation with her?

21    A    Yes.

22    Q    What, if anything, did she say to   you   and

23   what did you say to her?

24    A    I explained to her that her brother was

10/13/89

NYCLD_023119

P-APP001830

T3-1f

374

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    under arrest in the Central Park Precinct; that we
3    needed a parent or guardian to pick him up to
4    release him so he could leave tonight.   And she
5    stated she would come over, but she has a young
6    child and needed someone to watch the child for her.
7    I then gave her — I told her, you know, take care
8    of that.
9         I said, "You can either take a train or
10   bus."  I gave her directions for both and she stated
11   she was going to take a taxi.
12        Q    Did you give her your telephone number?
13        A    Yes.
14        Q    Did you give her your name?
15        A    Yes.
16        Q    Did you tell her what precinct you were
17   calling from?
18        A    Yes.
19        Q         Did there come a time when the sister
20   arrived at the stationhouse?
21        A    No.
22        Q    What was the next step, if any, that was
23   taken to reach someone from the family of Raymond
24   Santana?
25        A    What I did was call back the sister and she

10/13/89

NYCLD_023120

P-APP001831

T3—1f

375

REYNOLDS — PEOPLE — DIRECT — LEDERER

1  answered the phone. And she stated to me she wasn't
2
3  going to pick him up.

4  Q    What time was it that you called back the
5  sister?

6  A         That was approximately 4:00, a little
7  after; about ten after.

8  Q    And you had a conversation with the sister
9  for a second time when you called at 4:00?

10  A    Yes.

11  Q       What, if anything, did she say to you at
12  that time?

13  A    She stated she wasn't going to pick him up,
14  and further stated she couldn't get anyone to watch
15  her child for her. So I asked her, "Well, if you
16  can't come, is there anyone else that can come to
17  pick him up?"

18       She stated his grandmother could do it, and
19  she gave me her phone number.

20  Q    Did you learn the name of the grandmother?

21  A        No, I didn't. She just stated it was his
22  grandmother, and I took the phone number to call her
23  up.

24  Q    Did you then call that number?

25  A    Yes, I did.

10/13/8?

T3-1f

376

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     Q     What time did you make that phone call?

3     A     That was about ten after four.

4     Q     Did you have a discussion with Raymond

5  Santana's grandmother at that time?

6     A     Yes, I did.

7     Q     What, if anything, did you say to her and

8  what did she say to you?

9     A     I explained to her Raymond Santana was

10 under arrest in Central Park, and that I needed a

11 parent or guardian to come pick him up. She stated,

12 you know, she stated, okay, she would come to get

13 him. And I told her to stay put in her apartment,

14 we were going to send a police car to pick her up

15 and bring her back personally.

16    Q     When you spoke to the grandmother, did you

17 speak in English or in Spanish?

18    A     I spoke in English.

19    Q     Did she speak to you in English or in

20 Spanish?

21    A     She spoke English.

22    Q     Did you then direct a police car to go to

23 that address?

24    A     Yes.

25    Q     And -- what time was the police car told to

10/13/89

NYCLD_023122

P-APP001833

T4-fr

377

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    go to the grandmother's address?

3        A    About 20 minutes after four.

4        Q    And were you aware when the police car

5    returned?

6        A    Yes.

7        Q    And do you know whether or not they brought

8    the grandmother of Raymond Santana with them?

9        A    They did.

10       Q    What time was that that the grandmother was

11   picked up and brought to the Central Park Precinct?

12       A    I believe it was 4:30 going on five.

13       Q    Were the parents or family members or

14   guardians or the other people taken into custody at

15   that time already in the precinct?

16       A    Yes.

17       Q    By what time, approximately, was everybody

18   else's mother, father, or guardian present in the

19   precinct?

20       A    I'd say about by five o'clock everyone was

21   there.

22       Q    Prior to the arrival of Raymond Santana's

23   grandmother, at what time would you say that the

24   families and parents and guardians of the other four

25   had all arrived?

10/13/89

NYCLD_023123

P-APP001834

T4-fr

378

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A      I would say about one, 1:30 everyone was

3   there.

4      Q      Did you have any conversations with those

5   parents or guardians about releasing the people you

6   had at the stationhouse?

7      A      Yes.

8      Q      What, if anything, did you tell them?

9      A      I explained to them what would happen, that

10   if none of their children had any outstanding

11   warrants from Family Court, that they could all be

12   released to them as soon as Raymond Santana's

13   parents came. In order to give them an appearance

14   ticket to appear in Family Court, they all have to

15   go at the same time.

16      Q      When you say "they all have to go at the

17   same time," when you say "all" who are you referring

18   to?

19      A      Raymond Santana, Steven Lopez, Kevin

20   Richardson, Lamont McCall, Clarence Thomas.

21      Q      When you said that in order to be able to

22   give them desk appearance tickets or Family Court

23   summons, they all had to be there, why was that?

24      A      They all had to appear in court at the same

25   time if they're -- if it's one case. If one of the

10/13/89

T4-fr

379

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2  children are -- if one of the defendants go to
3  Spofard then he has to Family Court --
4              MR. BERMAN:  I'm going to object to
5        this testimony.  This is a legal --
6              THE COURT:  I'll allow it.  This is
7        what he told these people.  I'll allow it.
8        Whether he is right or wrong is irrelevant.
9              MR. BERMAN:  I didn't hear him say he
10       told the People all of that.
11             THE COURT:  He told them they all had
12       to go together.
13             MR. BERMAN:  Can we make clear this is
14       an explanation we are getting?
15             THE COURT:  I overruled your
16       objection.
17  A        I explained to them if one of the
18  defendants is remanded to Spotswood (sic) he has to
19  go to Family Court in the morning and that means
20  when the others are released, they also have to go
21  to Family Court in the morning.  However, if they
22  are all released at the same time, if all the
23  parents come, then they can be given an appearance
24  ticket for a week or two weeks in the future, so
25  what we would have to do is wait for all the parents

10/13/8

NYCLD_023125

P-APP001836

T4-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      to come so I can arrange it that they all come  back

3      in  a few weeks and they would be able to sleep that

4      night.

5          Q     And approximately how long were you working

6      on  the   paperwork  connected  with   the   Juvenile

7      packages and the other paperwork that was related to

8      the rest of these five people?

9          A     I'd say about two or three hours.

10         Q     And were you working on the paperwork alone

11     or was someone helping you?

12         A      I had some help for a period of time, and

13     then from Police Officer Powers and then he  had  to

14     leave.

15         Q     What time, to the best of your recall, did

16     Police Officer Powers leave?

17         A      I believe he finished at 2:00,  but  stayed

18     around on his own time to about 2:30.

19         Q      Sometime in the morning on April 20th, did

20     you have a conversation with a Lieutenant  from  the

21     Central Park Precinct?

22         A     Yes.

23         Q     Who was that?

24         A     That was Lieutenant McInerney.

25         Q     And at approximately what time did you have

10/13/8

T4-fr

381

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2  a conversation with him?

3      A    I believe it was a little after four.

4      Q        Do  you  recall  where  you  had  that

5  conversation with him?

6      A    I had  that  conversation  outside  of  the

7  Community  Affairs  Office.  Outside of the building

8  itself.

9      Q    What, if anything, did the Lieutenant  tell

10  you?

11      A        He  stated  that  he  was informed by a

12  Detective from NightWatch that a  woman's  body  had

13  been  found  on 102nd Street and that they wanted me

14  to keep the defendants there for  a  while  so  that

15  they could be questioned.

16      Q        At any time during that night while the

17  people that you described and named, the five people

18  in the juvenile room and the parents were in  there,

19  did  you  have  any  conversations  with the parents

20  about food?

21      A    Yes.

22      Q    Would you describe what  conversations  you

23  had  and  what happened?

24      A    They stated they wanted to get something to

25  eat for themselves and their sons and they all left,

10/13/8?

T4-fr

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   and I explained to them if they went to the west
3   side, they would be more stores open where they
4   could get something to eat.

5       Q       Do you remember -- did everyone leave or
6   did only some people leave; do you recall?

7       A       Pretty much everybody left.  A couple of
8   people stayed, but those with the people -- you know
9   -- where they had two parents or guardians and one
10  went to get the foot and I believe another one might
11  have stayed.

12      Q       With respect to the Defendant Lopez, do you
13  recall who it was from his family who arrived?

14      A       It was his father.

15      Q       And with respect to Kevin Richardson, do
16  you remember -- you testified something about his
17  mother.  Did anybody else come with the mother to
18  your knowledge?

19      A       I believe she was alone in the beginning.

20      Q       Did there come a time when the five people
21  that you had in the Juvenile Room were taken out to
22  the area where the parents were waiting?

23      A       Yes.

24      Q       And when was that?

25      A       That's when the detective from NightWatch

10/13/89

T4-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2 came and began interviewing them one at a time.

3     Q    Approximately what time was that if you

4 recall?

5     A    I believe that's approximately 5:50 in the

6 morning. Let me refresh my memory with that.    I'm

7 sorry, that was approximately 5:30.

8     Q    Were you aware when parents of the family

9 returned with food?

10     A    Yes.

11     Q    Were you aware whether any of that food was

12 given to any of the people you had in the Juvenile

13 room?

14     A    Yes.

15     Q    Who do you recall seeing have some food in

16 that room?

17     A    I believe all of them ate.

18     Q    And do you recall whether Raymond Santana

19 made any statement in your presence while he was in

20 that room?

21     A    Yes, he did.

22              THE COURT:  Which room?

23     Q    I'm sorry. In the Juvenile room?

24     A    Yes.

25     Q    What, if anything, did you hear him say?

10/13/8?

P-APP001840

T4-fr

384

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  A   He looked over to Kevin Richardson at the

3 point where we couldn't get anyone to come pick him

4 up and he stated that they were going to Spofard and

5 that they would all stick together, and fuck up

6 anybody who got in their way.

7  Q   When the five people were taken from the

8 Youth Room and put in the outer office where the

9 parents were waiting, were they handcuffed?

10  A   No.

11  Q   Do you recall where any of the three

12 defendants, Kevin Richardson, Steve Lopez, or

13 Raymond Santana sat when they went into that other

14 room?

15  A   Each defendant sat with their parent or

16 whoever it was that came to pick them up. I don't

17 recall specifically what desk they sat at.

18  Q   What, if anything, did you do after those

19 people were taken out of the Juvenile room?

20  A   I went back inside to -- with the

21 detectives for the interview.

22  Q   And which detective or detectives did you

23 go with if you recall?

24  A   That was Detective Farrell and Detective

25 Whelpley.

10/13/89

NYCLD_023130

P-APP001841

T4-fr

385

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q      When you say you went back inside, did you

3  go back into the Juvenile room?

4      A      Yes.

5      Q      Was there anybody else there besides

6  yourself and the two detectives you just mentioned?

7      A      Yes, the parent of the defendant, the

8  mother.

9      Q      Which person was in the room, which of the

10 people who had been taken into custody?

11             MR. MOORE:  I can't hear the last part

12        of the question.

13             THE COURT:  Restate the question.

14     Q      When you went in to conduct an interview

15 with those detectives, who was in the room?

16     A      Besides the detectives, myself and the

17 defendant.

18     Q      Who was the defendant?

19     A      I believe the first one -- that was Lamont

20 McCall.

21             MR. MADDOX:  Objection.  The reference

22        to the word "defendant" be stricken from

23        McCall.

24             THE COURT:  Don't refer to people as

25        defendants.  Just give us the name of the

10/13/89

T4-fr

386

REYNOLDS — PEOPLE — DIRECT — LEDERER

individual you are talking about.  You said
the first person that was  interviewed  was
Lamont McCall.

THE WITNESS:  Yes.

THE COURT:  All right.

Q    Were you present for that interview?

A    Yes.

Q    Did you personally conduct that interview?

A    No.

Q    Do you know who did?

A    That was Detective Farrell.

Q    And  approximately  what  time was that
interview conducted?

A    It started about 5:30.

Q    Were you present when rights were read?

A    Yes.

Q    And was there --

MR. MOORE:  Objection, your Honor,  it
assumes a fact not in evidence.

THE COURT:  Yes, objection sustained.

Q    Was anybody in the room with Lamont McCall
besides you and the two detectives?

A    Yes, his mother.

Q    What,  if  anything,  happened  when  the

10/13/89

P-APP001843

T4-fr

387

REYNOLDS - PEOPLE - DIRECT - LEDERER

1    interview began?

2    A    He told the story about how the -- himself

3    and another youth got together  and  went  into  the

4    park and started to assault people.

5    Q    How long was this interview?

6    A    It was approximately an hour.

7         MS. LEDERER:   If I may have just one

8         moment, please.

9    Q    During the interview of Lamont McCall,  did

10   he  name  any  of  the people that were in the group

11   with him?

12   A    Yes, he did.

13   Q    And do you recall the names of  the  people

14   that  he  mentioned as being with him during this --

15   during the night of April 19th in Central Park?

16   A    He named  Clarence  Thomas,  another  youth

17   named Mike, I believe it is, and --

18   Q        Let  me stop you for a moment.  When he

19   mentioned a person named Mike, did he give the  race

20   of that person?

21   A    Yes.

22   Q    What did he say?

23   A    A male Black.

24        MR. MOORE:   Your Honor, I'm going to

10/13/89

NYCLD_023133

P-APP001844

T4-fr

388

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2        object to the line of questioning not being

3        relevent to this hearing.

4            THE COURT:   Overruled.

5    Q    Did   he   give   an   approximate   age   of   the

6  person named Mike?

7    A    Approximately 14 to 15 years of age.

8    Q       Did he give a location where this person

9  resides?

10   A    I believe that's the Taft Projects.

11   Q    Did   he   give   you   any   information   with

12  respect to anyone else who later became -- was later

13  identified and charged in this case?

14           MR. MOORE:   Objection.

15           MR. JOSEPH:   Objection.

16           THE   COURT:   Do you know the names of

17       the people who are defendants in this case?

18           THE WITNESS:   I'm not sure exactly if

19       everybody   was   indicted,   but   he did name

20       Easy Al.

21           MR. MADDOX:   Objection.

22           MR. MOORE:   Objection.

23           THE COURT:   I'll allow it.

24           MR. MADDOX:   Judge,   may   that   answer

25       and   question   be   read   back   because   I   can't

10/13/89

T4-fr

389

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   hear it.

3           THE COURT:  Read it back.

4           (Reporter complies)

5           THE COURT:  I think I asked you do you

6   know who the defendants are in  this  case,

7   the names of the defendants in this case?

8           THE WITNESS:  That he mentioned?

9           THE  COURT:  Do you know who they are,

10   the  names  of  the  defendants  in  this

11   particular case?

12           THE WITNESS:  yes.

13           THE COURT:  The question, I think, has

14   been  asked  was  anything said about those

15   persons; is that your question?

16           MS. LEDERER:  I'll  rephrase  it.

17   BY MS. LEDERER:

18       Q    What were the names of the people that were

19   mentioned by Lamont McCall  as  being  with  him  in

20   Central Park on the night of April 19th?

21       A    Joseph McCray, Clarence Thomas, Mike, and I

22   believe another one named Easy Al.

23           THE COURT:  Easy Al?

24           THE  WITNESS:  Yes, that's a name that

25   was given.

10/13/89

NYCLD_023135

P-APP001846

T4-fr

1      REYNOLDS — PEOPLE — DIRECT — LEDERER

2      Q    At  the  conclusion  of  the  interview  of

3   Lamont McCall, what, if anything, happened?

4      A       At that point he was given an appearance

5   ticket for Family Court.

6      Q    When you say he  was  given  an  appearance

7   ticket, who gave him that ticket?

8      A    I did.

9      Q       Did that appearance ticket have a return

10   date?

11      A    Yes.

12      Q    What happened with Lamont  McCall  at  that

13   time?

14      A       He was released to his mother, and given

15   the appearance ticket.

16      Q    Were you present at  another  interview  at

17   that time?

18      A    Yes, I was.

19      Q    Where was that interview conducted?

20      A    That was in the Juvenile room.

21      Q       And is that the lower rectangular room to

22   the bottom of that building on the diagram, People's

23   1?

24      A    Yes, it is.

25      Q    Who was interviewed second?

10/13/8

T4-fr

391

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      A     Clarence Thomas.

3      Q     And who was present during the interview of

4  Thomas?

5      A     His mother.

6      Q     Did you conduct that interview?

7      A     No.

8      Q     If you know, who conducted that interview?

9      A     I believe that was Detective Whelpley.

10     Q     Would you please name everyone who   was   in

11  the  Juvenile  Room  at  the time that interview was

12  conducted?

13     A     Detective  Farrell,  Detective   Whelpley,

14  Clarence Thomas, his mother, and myself.

15     Q     And  approximately  how  long  was  that

16  interview?

17     A     It was approximately an hour, an hour and a

18  half.

19     Q     During the time that — in substance,  what

20  did Clarence Thomas say to you?

21     A     He stated that they — the group came into

22  the park at 110th Street and they  had  no  specific

23  plans  for that evening, and they started to assault

24  — they assaulted, I believe, a bum, and then  later

25  on  went  up to the reservoir and assaulted a jogger

10/13/89

NYCLD_023137

P-APP001848

T4-fr

392

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      up there with a pipe.

3          Q      And did he identify any of the people who

4      were with him that night in Central Park?

5          A      Yes, he did.

6          Q      Who did he name?

7          A      I'll have to look at my notes to refresh my

8      memory on that.  He named Antron McCray and Lamont

9      McCall.

10         Q      Did he give any information about Antron

11     McCray?

12         A      Yes, he did.

13         Q      What, if any, information did he tell you

14     about Antron McCray?

15         A      I believe he stated that he had assaulted

16     the jogger.

17         Q      Did he give you any information about a

18     description of who Antron McCray was?

19         A      He described him as a male black, 14, 15

20     years old, I believe.

21         Q      Did he tell you anything about where Antron

22     McCray lived?

23         A      He stated he lives on

24         Q      What, if anything, happened at the

25     conclusion of the interview of Clarence Thomas?

10/13/8

NYCLD_023138

P-APP001849

T4-fr

393

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    A    He was released to his mother.

3    Q    Was he given anything prior to his release?

4    A    He was given an appearance ticket for
5    Family Court.

6    Q    And was there a date on that ticket?

7    A    Yes, there was.

8    Q    And was that the same date that had been on
9    the ticket of Lamont McCall?

10   A    Yes.

11   Q    What, if anything, did you do after being
12   present for the interview of Clarence Thomas?

13   A    After that we went -- later on that
14   afternoon we went back to his house.

15   Q    When you say later on that afternoon, what
16   time was it when you --

17   A    It was about 11:30.

18   Q    Is that in the morning or the evening?

19   A    In the morning.

20   Q    On what date?

21   A    On the 20th of April.

22   Q    Who did you go with?

23   A    Detective Whelpley and Farrell.

24   Q    And where did you go?

25   A    We went to his house.

10/13/89

NYCLD_023139

P-APP001850

T4-fr

394

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    Whose house?

3    A    Clarence Thomas' house.  It's

4

5    Q    AT what time was Clarence  Thomas  given  a

6  return    ticket    to    come    to    Family    Court,

7  approximately?

8    A    It was about 7:30, 8:00.

9    Q    And what,  if  anything,  happened  between

10  that  time and the time you went to Clarence Thomas'

11  home?

12    A    Kevin Richardson was interviewed.

13    Q    What happened when you arrived at  Clarence

14  Thomas'  home  with the detectives  at  about  11:30  on

15  the morning of the 20th?

16    A    He was informed we wanted to  question  him

17  further,  and  his  rights  were read  to  him  and  his

18  mother.

19    Q    And was he reinterviewed at his home?

20    A    Yes, he was.

21    Q    Approximately how long was he spoken to  at

22  his home?

23    A    I'd say about 15, 20 minutes.

24    Q        Did there come a time — did you conduct

25  that interview?

10/13/8?

T4-fr

395

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     A     No.

3     Q     Were you present for that interview?

4     A     Yes.

5     Q     After that interview was conducted, where

6  did you go?

7     A          THen went to          to Antron

8  McCray's house.

9     Q     Who did you go with?

10    A     I went with Detective Farrell and Whelpley

11  and other detectives from Sex Crime.

12    Q     What, if anything -- withdrawn.

13          When you left Clarence Thomas' apartment,

14  did you leave alone?

15    A     No, I didn't.

16    Q     Who came with you?

17    A     Detective Whelpley, Detective Farrell, and

18  we met with Detective Rosario and Detective Rivera

19  and Morin from Sex Crimes.

20    Q     Did Clarence Thomas and his mother go with

21  you?

22    A     Yes, they did.

23    Q     Did you travel in the same car with them?

24    A     Yes, I did.

25    Q          Did you have any conversation with them

10/13/89

T4-fr

396

REYNOLDS - PEOPLE - DIRECT - LEDERER

2   about why they were going with you?

3       A    With him and his mother?

4       Q    Yes?

5       A    No.

6       Q    How did you know where to go when you left

7   Clarence Thomas' apartment?

8            MR. JOSEPH: Objection.

9            MR. BERMAN:  Objection.

10           THE COURT:  I'll allow it.

11           Where were you going?

12           THE  WITNESS:  We were going to Antron

13       McCray's house.

14      Q    How did you  know  where  Antron  McCray's

15  house was?

16      A    Clarence's mother told us where it was.

17      Q        Where did you go to find Antron McCary's

18  apartment?

19      A    To

20      Q    What happened when  you  arrived  at

21      ?

22      A        We  knocked on the door and we spoke to

23  Antron's father, Bobby McCray.

24      Q    Did you go to the door?

25      A    I went to the door, yes.

10/13/89

NYCLD_023142

P-APP001853

T4-fr

397

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    Was anyone else with you?

3    A    Yes.

4    Q    Who was that?

5    A    Detective Rosario, Detective Rivera, and

6    Detective Morin.

7    Q    Did you personally speak to the person you

8    identified as Bobby McCray?

9    A    No.

10   Q    Were you present when there was a

11   conversation with him?

12   A    Yes.

13   Q    Who had that conversation?

14   A    Detective Rosario.

15   Q    What did you hear him say and what did you

16   hear Bobby McCray respond?

17   A    He stated that he wanted to speak to Antron

18   at the Central Park Precinct and that Bobby McCray

19   would have to come with us also because Antron is a

20   juvenile.

21   Q    And what happened then?

22   A    And he agreed and told Antron to get

23   dressed.

24   Q    And did Antron McCray and his father then

25   leave with you?

10/13/89

NYCLD_023143

P-APP001854

T4-fr

398

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      A      Yes, they did.

3      Q      Do you recall whether anyone else from   the

4  McCray family came?

5      A      His mother came also.

6      Q      And did they ride with you or did they ride

7  with someone else?

8      A          I believe they rode with the detectives

9  from Sex Crimes.

10     Q      What time did you   return   to   the   Central

11  Park Precinct, approximately?

12     A      I'd say it was after 12:00.

13     Q          When Antron McCray came with you -- and

14  left his apartment, what was he wearing?

15     A      He had on the clothes that he   was   wearing

16  the night before.   They were --

17              MR. MOORE:   Objection.

18              MR. BURNS:   Objection.

19              THE COURT:   Objection sustained.

20              Do you remember what he was wearing?

21              THE WITNESS:   No.

22     Q          Was there a conversation with anyone   in

23  your presence about what Antron McCray would wear?

24     A      Yes.

25     Q          What   do   you   remember   about   that

10/13/89

NYCLD_023144

P-APP001855

T4-fr

399

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2  conversation?

3       A       Detective Rosario asked Bobby McCray, he

4  asked him if Antron could wear the same  clothes  he

5  wore the night before, and they agreed.

6       Q       Did you notice anything about his clothes

7  when he came out of the apartment?

8       A       Yes, they were entirely   covered   with   dry

9  mud.

10      Q       When   you   returned to the Central Park

11  Precinct, did you conduct any interviews of  any  of

12  the  suspects that you already named, that is, Kevin

13  Richardson, Steve Lopez, or Raymond Santana?

14      A       No, I didn't.

15      Q       And did you at any time conduct or were you

16  present during any interviews with  Michael  Brisco,

17  Kharey Wise, Antron McCray or Yusaf Salam?

18      A       No.

19      Q       Did you voucher any property in connection

20  with this case?

21      A       No.

22      Q       Did you  go  out  and  pick  up  any  other

23  suspects in this case?

24      A       No, I didn't.

25               MS. LEDERER:  Thank you very much.

10/13/89

T5-1f

400

COLLOQUY

1  MR. MOORE:  Your Honor, may I approach

2 for one second?

3  THE COURT:  Yes.

4  (Discussion   at   sidebar,   off   the

5 record, between all counsel and the Court.)

6  THE COURT:  We'll take  a  ten  minute

7 recess.

8  (Whereupon, a brief recess was taken.)

9          *     *     *

10  MS.   LEDERER:     May   I   make   an

11 application before the witness resumes?

12  THE COURT:  Yes.

13  COURT   CLERK:      Hearing   continued.

14 People  of  the  State  of New York against

15 Kharey Wise, Yusaf  Salam,  Antron  McCray,

16 Kevin   Richardson,  Steve  Lopez,  Michael

17 Brisco,  and  Raymond  Santana;  Indictment

18 4762 of '89.

19  THE COURT:  Yes.

20  MS.  LEDERER:   Your Honor, during the

21 break, when I returned from  being  in  the

22 corridor,  I returned to fine Jessie Berman

23 standing against  the  side  wall  in  this

24 courtroom  holding  some  xeroxed  pages, and

10/13/89

T5-1f

401

COLLOQUY

1
2  showing them to Pablo Guzman.  As I looked
3  at   the   pages,   I   could   see   from   that
4  distance they were  xeroxed  pages  of  the
5  Steno  book.   I asked if I could see "what
6  you have in your hands."   He  said,   "No,
7  it's Rosario material with my notes on it."
8       There   was   a   protective order issued
9  with  respect  to  this material.  Mr.  Berman
10 asked   that   the protective order be issued
11 by both sides.  Sharing the material turned
12 over  two  days  ago  with  the  media  is  a
13 violation of that protective order.
14      THE    COURT:    Mr. Berman; is  that
15 correct?
16      MR. BERMAN:   Is what correct?
17      THE COURT:   What counsel just said, is
18 that correct?
19      MR. BERMAN:  Part of  it  is  correct,
20 but  the  conversation  I had was not about
21 this case at all.
22      THE   COURT:    In  other  words,   the
23 document  you  showed  was  not a document,
24 Rosario material in this case, is that what
25 you are saying?

10/13/89

NYCLD_023147

P-APP001858

T5-1f

402

COLLOQUY

1

2    MR. BERMAN:    The    document    was    a

3    document  of Rosario material in this case,

4    but the conversation was not about this

5    case, but something completely unrelated to

6    this case.

7        THE COURT:    And you didn't show him

8    this page?

9        MR. BERMAN:  I didn't show him any of

10    the information on the paper.

11        THE COURT:    You were holding it in

12    your hand, and you were talking about

13    something else?

14        MR. BERMAN:  I make the representation

15    to the Court --

16        MS. LEDERER:    He was holding it up,

17    both were looking at the page.  It was a

18    steno book page from Officer Reynolds.

19        THE COURT:  You deny that, Mr. Berman?

20        MR. BERMAN:    I didn't check what it

21    was that I was holding.

22        THE COURT:    YOu say you were not

23    showing it to the press?

24        MR. BERMAN:  Not the text of what was

25    in it, no, no.

10/13/89

NYCLD_023148

P-APP001859

T5-1f

403

COLLOQUY

THE COURT:  That's equivocal.

MR. BERMAN:  I can tell you  in-camera what  the  conversation  was,  it  doesn't relate to this case.

THE COURT:  I don't want to know  what the  conversation  was.   I want to know if you  were  showing  the  document  you  were foreclosed from showing to the press.

MR.  BERMAN:      I  wasn't  showing anything.

THE COURT:   Bring  the  witness  out. Let's go.

(Whereupon the witness, Police Officer Eric  Reynolds,  resumed  the  stand  and continued  to   testify   under   oath   as follows:)

COURT  CLERK:    Sir,  I would like to remind you you are still under oath.

CROSS EXAMINATION

BY MR. BERMAN:

Q   Officer, where did you have the  defendants lie  down  and  go  to  sleep during that night, the people you had in custody, where did you give them a place to sleep that night?

10/13/89

T5-1f

404

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    They just, just actually, they went to
3    sleep on their own. I didn't --

4    Q    I don't imagine that you helped them go to
5    sleep. I'm asking you where did you give them a
6    place to sleep?

7    A    I didn't designate any area.

8    Q    I don't know what designate means. Did you
9    give them a place to sleep?

10   A    No, they slept where they were.

11   Q    Is that sitting in the chairs that don't
12   appear on the diagram there?

13   A    A couple of them slept in the chairs.    A
14   couple slept on the floor.

15   Q    They were permitted to sleep on the floor?

16   A    Yes.

17   Q    What time did Steve Lopez' father appear at
18   that precinct as far as you know?

19   A    Probably a little after two, I believe, or
20   around that area. I'm not sure.

21   Q    Was he given the same treatment you told us
22   you gave Mr. Richardson's mother, to wit, told to
23   wait outside in another room?

24   A    Yes.

25   Q    And as you understood the Family Court act

10/13/8

NYCLD_023150

P-APP001861

T5-1f

405

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2 and the procedures you were supposed to follow, the
3 idea was to keep defendants apart from their
4 parents?
5            MS. LEDERER:  Objection.
6            THE COURT:  Objection sustained.
7     Q    Well, did you speak to Mr. Lopez when he
8 arrived?
9     A    Yes.
10     Q    Did you tell him he could come into the
11 room and sit with his son and talk with his son?
12     A    No.
13     Q    You told him to get out of there, didn't
14 you?
15     A    No.
16     Q    You told him he couldn't come into the
17 room?
18     A    Yes.
19     Q    And it's your testimony that these various
20 parents were called and told over the phone
21 essentially, "Come down and pick up your kids;"
22 isn't that right?
23     A    My partner made the notifications.
24     Q    Well, the testimony you gave on direct, you
25 didn't have trouble remembering this. Didn't you

10/13/89

P-APP001862

T5-1f

406

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  say, your parents called, you told them to come
3  down?
4           MS. LEDERER:  Objection.
5           THE COURT:  Objection sustained.
6     Q        As far as you understand it, didn't your
7  partner call the parents in essence to come down and
8  pick up their children?
9     A    Yes.
10    Q     And when they came to pick up their
11 children, they were told to keep out and wait
12 outside in another room; is that right?
13    A    Yes, I asked them to wait in another room.
14    Q    And after they waited a few hours, you told
15 them if they wanted to, they could go out and buy
16 food for their children?
17    A    Yes.
18    Q     And is it fair to say -- well, let me ask
19 you, do you know when it was that Steven Lopez'
20 father was finally able to sit down and talk with
21 Steven Lopez at that precinct that night or the next
22 day or the next day?
23    A    It was probably the time we started the
24 interviews.
25           MR. MADDOX:  Could the witness repeat

10/13/89

T5-1f

407

REYNOLDS - PEOPLE - CROSS - BERMAN

the last answer?

THE COURT:    Read   the   answer   back,
please.

(Reporter complies)

Q     Well, the interview with Steven Lopez, did
this begin at 9 p.m. approximately on April 20th, if
you know?

A     I don't know.

Q     Did   you   see   Steven   Lopez'   father
sitting   down talking with Steven Lopez at any point
in that precinct or the next precinct   or   the   next
precinct in this case?

A     I don't recall that.

Q     Not that you can recall?

A     Excuse me?

Q     Not that you can recall?

A        I   might   have   seen   it.   I just don't
remember if I did or not.

Q     For what crime did you arrest Steven Lopez?

A     Unlawful assembly.

Q     And it's your understanding that   was   a   B
misdemeanor; is that right?

A     I believe so.

Q        Is   it your understanding what you were

10/13/89

NYCLD_023153

P-APP001864

T5-1f

408

REYNOLDS — PEOPLE — CROSS — BERMAN

2  arresting him for, what facts were you arresting him

3  for?

4           MS. LEDERER:  Objection.

5           THE COURT:  Objection sustained.

6     Q    Well, this crime of unlawful assembly, is

7  that an unlawful assembly that occurred outside of

8  Central Park or inside Central Park?

9     A    That was Central Park.

10    Q    And at the time you arrested Steven Lopez,

11 what evidence did you have that he had ever been

12 inside Central Park that night?

13          MS. LEDERER:  Objection.

14          THE COURT:  I'll let him answer.

15    A    Could you repeat the question, please?

16    Q    AT that time, the time you arrested Steven

17 Lopez, what evidence did you have that he, in

18 particular, had ever been in Central Park that

19 night?

20    A         That he was with the group that had

21 assaulted the jogger earlier.

22    Q    And what evidence did you have that the ten

23 to fifteen people you described on the west side of

24 Central Park West were people that had assaulted a

25 jogger earlier?

10/13/8

T5—1f

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A      They made statements that they were at the

3  scene of the assault.

4      Q      Those statements were after you had taken

5  Steven Lopez into custody, weren't they?

6      A      Yes.

7      Q      At the time you took Steve Lopez into

8  custody, what evidence did you have that he was part

9  of a group that had assaulted anybody that night?

10     A      What evidence did I have at that point?

11     Q      At the time you took him into custody?

12     A      That he was with the group.  He was with

13  the group that had run, that we were looking for

14  that evening.

15     Q      Let's not confuse more than one group here,

16  possibly.

17            THE   COURT:      Objection  sustained.

18            Let's not  make  observations.    Just  ask

19            questions.

20     Q      There were a number of youths that you saw

21  from your van, that you saw on Central Park West

22  walking north on the west side of Central Park West;

23  is that correct?

24     A      That's right.

25     Q      What time was that that you saw them?

10/13/8

T5-1f

410

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A     Approximately 10:30.

3    Q     Did you see them exit from the park?

4    A     No.

5    Q        Were they disorderly in any way when you

6    were watching them?

7    A     No.

8    Q     Were they carrying any weapons when you

9    were watching them?

10   A     Not that I could see.

11   Q        And at some point you and your partner got

12   out of your van, is that right?

13   A     Yes.

14   Q     And how were you dressed, by the way?

15   A     I was wearing dungarees, and I believe a

16   windbreaker and a sweatshirt.

17   Q     And your partner?

18   A        I don't recall.  I know he was wearing

19   sneakers and dungarees.

20   Q        And is it fair to say that prior to getting

21   out of this green van, your partner had driven the

22   van in such a position as to cut off the direction

23   that the youths on the street were walking?

24   A     Yes.

25   Q        You were basically --  your partner drove

10/13/89

P-APP001867

T5-1f

411

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  the van so as to block the sidewalk or the crosswalk
3  at  the  southwest  corner  of Central Park West and
4  102nd Street.
5      A    We didn't block where  they  were  walking,
6  no.
7      Q    Where exactly did that van come to a stop?
8      A      The southwest corner of 102nd Street and
9  Central Park West.
10      Q    Was the van facing -- I think you said  the
11  van was facing west; is that right?
12      A    Yes.
13      Q      And  was  any  part  of  the van in the
14  crosswalk, that is the crosswalk if one would try to
15  cross at 102nd Street, going north on the west  side
16  of Central Park West?
17      A    No.
18      Q    Was the van entirely east of that crosswalk
19  or entirely west of that crosswalk?
20      A    It was entirely east.
21      Q    In other words, out in the street?
22      A    Yes.
23      Q    In Central Park West?
24      A    Yes.
25      Q      So  this  parked van, it had the "Park"

10/13/89

T5-1f

412

1        REYNOLDS — PEOPLE — CROSS — BERMAN

2    insignia on the doors?

3        A    Yes.

4        Q    And it made a left turn into the southbound

5    lane of Central Park West such as to block that

6    southbound lane?

7        A    Yes.

8        Q    And it came to a stop in the middle of the

9    street in the roadway?

10        A    Yes.

11        Q    And the two of you got out, not in Park's

12    Department Uniforms?

13        A    No, we weren't.

14        Q    And you -- did you walk south towards the

15    youths who were walking north?

16        A    Yes.

17        Q    And at that point some of them ran and some

18    of them didn't; is that right?

19        A    That's right.

20        Q    And Steve Lopez was one of the two who

21    didn't run?

22        A    Right.

23        Q    And at that point you took him into

24    custody?

25        A    Yes.

10/13/8

NYCLD_023158

P-APP001869

T5-1f

413

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    And you took him into custody for the

3    misdemeanor of unlawful assembly that had occurred

4    where?

5    A    96th Street on the bridle path there by the

6    reservoir on the west side.

7    Q    Inside the park?

8    A    Yes.

9    Q    And your belief or hunch that he had been

10   part of the assault on Mr. Loughlin derived from the

11   fact that -- well, you tell me.

12   A    Excuse me?

13   Q    What was the source of your belief that

14   Steven Lopez had been part of an assault on the

15   jogger, Mr. Loughlin?

16   A    Because we received a description of the

17   group of male hispanics and blacks that were

18   teenaged, going through the park assaulting joggers.

19   That was the description I was given for the assault

20   on Mr. Loughlin. When we approached the group which

21   Steve Lopez was part of, the entire group ran with

22   the exception of himself. He then stated he wasn't

23   part of the group, and it was very obvious that he

24   was.

25   Q    He stated he wasn't part of the group.

10/13/89

NYCLD_023159

P-APP001870

T5-1f

414

REYNOLDS - PEOPLE - CROSS - BERMAN

1  That was after you put him in custody with him
2  against the wall; isn't that right?
3
4       A    As we were doing it.
5       Q    But your decision to seize Steve Lopez was,
6  based on the fact that he had been walking along the
7  street with a dozen or so other youths, some of whom
8  ran at the sight of the uniformed men getting out of
9  a van, is that right?
10      A    Yes.
11      Q    And in your mind you felt it was probably
12  he had assaulted Mr. Loughlin?
13           MS. LEDERER:  Objection.
14           THE COURT:  I will let him answer.
15      A    Yes.
16      Q    You felt it was more likely than not he
17  personally had assaulted Mr. Loughlin?
18           MS. LEDERER:  Objection.
19           THE COURT:  Objection sustained.
20      Q    Now, what did you arrest him for, unlawful
21  assembly or assault?
22      A    For the unlawful assembly.
23      Q    Well, didn't you fill out some forms that
24  said you arrested him for assault and had crossed
25  that out and wrote in unlawful assembly?

10/13/89

NYCLD_023160

P-APP001871

T5-1f

415

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2     A     Yes.

3     Q     Could you explain that to us?

4     A          What happened is when we make arrests,

5  behind our desks we have packages of the paperwork

6  that we have to do.     And in this case, it's an

7  unusual number we had.   You know, there was five,

8  and there was a lot, and we were trying to get them

9  done as quickly as possible.   We sort of do it as an

10  assembly line ——

11    Q     If I could interrupt.   When you say "we" as

12  plural ——

13              MS. LEDERER:   Objection.

14              THE COURT:   I will allow that.

15    Q     Could you indicate what you did yourself as

16  you go on?

17    A     As far as doing the paperwork?

18    Q     When you say "we tried to do it as  quickly

19  as  possible,"  are  you talking about all of you or

20  yourself?

21    A     I tried to do my paperwork  as  quickly  as

22  possible.

23    Q          Was  it  you who did all the paperwork?

24  Except for a little help from  Officer  Powers,  you

25  were the one that did the paperwork?

10/13/89

NYCLD_023161

P-APP001872

T5-1f

416

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A      Yeah, most of it.

3      Q         And to do it as quickly as possible you

4  didn't enlist anybody else to help  you  because  it

5  was taking so many hours?

6      A      Excuse me?

7      Q        You said it took you two, two-and-a-half

8  hours to do that initial paperwork?

9      A      Yes, approximately.

10     Q      And did you ask anybody to come up and help

11 you because it was taking so long?

12     A      I had help from Officer Powers and  Officer

13 Hennigan.

14     Q         Could  you  explain  again -- could you

15 continue with your explanation,  rather,  about  how

16 you came to write one charge against Steve Lopez and

17 cross it out and write a different one?

18     A         We had three defendants under arrest for

19 assault.  In putting in the charges, I took all  the

20 arrest reports and started to write.  I guess I must

21 have  thought  it  was someone else's report without

22 looking at the name on it.  And when I  realized  it

23 was his, I probably just crossed it out.

24     Q        Do you have any recollection of how that

25 happened?

10/13/89

NYCLD_023162

P-APP001873

T5-1f

417

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2       A       No, it was probably just a mistake.

3       Q       But is it your testimony that from the

4  start, you had in mind you were arresting him only

5  for the misdemeanor of unlawful assembly and not for

6  the assault on the jogger?

7       A       When you say, "from the start," --

8       Q       From the point where you took him into

9  custody.

10      A       At that point we were thinking assault.

11      Q       Could you use the singular-

12      A       I was thinking assault.  Sorry.

13      Q       You were thinking assault?

14      A       Yes.

15      Q       When did you change your thinking?

16      A       When we went back to 100 Street and Central

17  Park West.

18      Q       When would that be?

19      A       I'd say about ten minutes later.

20              MR. MADDOX:  Could he speak louder?

21              THE COURT:  Talk into the microphone.

22              THE WITNESS:  About ten minutes later.

23      Q       And what caused you to change your mind as

24  to Steve Lopez to the assault; to change your mind

25  to make it unlawful assembly?  What happened at 100

10/13/89

NYCLD_023163

P-APP001874

T5-1f

418

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2  Street and Central Park West about ten minutes after
3  you seized Steven Lopez that made you change your
4  mind and consider him as having been arrested for
5  unlawful assembly rather than assault?
6      A    What happened was Kevin Richardson, Lamont
7  McCall and Clarence Thomas, I was informed had made
8  statements, placing themselves at the location of
9  the assault on the jogger, Mr. Loughlin. He didn't
10  make any statement to that, but it was obvious he
11  was with the group, to me.
12             MR. MADDOX:    Objection to the
13             characterization, "obviously."
14             THE COURT:  I will allow it, that's
15             his state of mind.
16             MR. RIVERA:    Could I have the last
17             statement read back? I didn't hear it.
18             THE COURT:  Read it back.
19             (Reporter complies)
20      Q    It was obvious --
21             MR. RIVERA:  Your Honor, did you have
22             that statement read back? I didn't hear
23             it.
24             THE COURT:  Read it back.
25             (Reporter complies)

10/13/89

T6-fr

419

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    It was obvious to you that he was with the

3    group  that  you  saw  at Central Park West; is that

4    correct?

5    A    Yes.

6    Q    Did you have any evidence that he had  been

7    with the group when a group was inside the group?

8    A    No, not at that point.

9         THE  COURT:  Excuse me —— Officer, you

10        have to talk into the microphone.

11        THE WITNESS:  No, not at that point.

12   Q    And you decided to take him to the precinct

13   at that point?

14   A    Yes.

15   Q    And book  him  formally  for  the  unlawful

16   assembly?

17   A    Yes.

18   Q    But you accidently wrote down, "assault" on

19   the forms at the precinct?

20   A    That's correct.

21   Q       And then later you crossed that out and

22   wrote "unlawful assembly"?

23   A    Right.

24   Q    The complaint report that you prepared  for

25   the  unlawful  assembly  against Steve Lopez, do you

10/13/89

NYCLD_023165

P-APP001876

T6-fr

420

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2  know what time you prepared the complaint report?
3  You can certainly look at it if you need it.
4           MS. LEDERER: There are two complaint
5      reports. One is handwritten and one is
6      typed. Can I ask which one you are
7      referring to?
8           MR. BERMAN: I have the typed one in
9      front of me. The handwritten one is the
10     one we were given in court this morning.
11          THE COURT: Is that the one you're
12     asking about?
13          MR. BERMAN: Well, why don't you get
14     both of them in front of you and then you
15     can tell me about them. Actually, do you
16     have the original of any of those?
17          THE WITNESS: No.
18          MR. BERMAN: Can I inquire if the
19     prosecutor has the original because there
20     seems to be alterations on that time.
21          THE COURT:    Are the originals
22     available?
23          MS. LEDERER: I have a carbon of the
24     typed --
25          MR. BERMAN: May I show the Court what

10/13/8

T6-fr

421

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      I have?

3          THE COURT:     He   is   asking   for   the

4      handwritten original.

5          MS. LEDERER:  Yes, I do.

6          MR. BERMAN:  Can I have this marked as

7      Defendant Lopez B at this point?

8          THE COURT:  Yes.

9          (Document  so  marked Deft. Lopez B for

10     identification.)

11         MR.  BERMAN:     May  I  approach   the

12     witness and share this document with him?

13         THE COURT:  Yes.

14         MR. MADDOX:  Judge, can Mr. Berman let

15     us know what documents?

16         THE COURT:  This is Lopez B.

17         MR.  BERMAN:  I imagine its clear, but

18     in case it isn't, I also want to have Lopez

19     B-1 marked which is a xerox  that  we  were

20     given the last minute this morning.

21         THE COURT:  So marked.

22         (Document  so  marked  Deft. Lopez B-1

23     for identification.)

24  BY MR. BERMAN:

25     Q    Officer, I'm putting before you and  trying

10/13/89

NYCLD_023167

P-APP001878

T6-fr

422

REYNOLDS — PEOPLE — CROSS — BERMAN

to look at it at the same time as you two documents.
Am I correct that Defendant Lopez Exhibit B for
identification is the handwritten complaint report
prepared by you regarding Steve Lopez; regarding the
unlawful assembly charge in this case?

    A    Yes.

    Q    And that B-1 appears to be a xerox of the
same?

    A    Yes, it is.

        MR. BERMAN:  Can I offer these two in
        evidence at this time, Judge.

        THE COURT:  Any objection?

        MS. LEDERER:    I object  --  no
        foundation.

        THE COURT:  I'll allow it.

        All right, mark them.

        (Deft Lopez B and B-1 received and
        marked into evidence.)

BY MR. BERMAN:

    Q    Placing these documents in front of you
again, we can begin with that question I started to
ask about the time this report was prepared.  Can
you first tell me from your own recollection when
this report was prepared, your handwritten report,

10/13/8?

NYCLD_023168

P-APP001879

T6-fr

423

REYNOLDS — PEOPLE — CROSS — BERMAN

1   the complaint report from your own recollection?

2      A   Can I look at it?

3         THE COURT:  Why don't you  stand  over

4   here  and  he'll  look at you and he'll talk

5   into the microphone so everybody  can  hear

6   him.

7         MR. BERMAN:  Over here?

8         THE  COURT:  Do  you  have  to stand

9   beside him?

10        MR. BERMAN:  We only have one original

11  and  I  have  the  original  and  there  is

12  something --

13        THE  COURT:  I don't want to look at

14  them.

15        MR. BERMAN:  Take a look at them --

16        THE COURT:  I don't want  to  look  at

17  them now.  Show them to the witness.

18     Q   Without looking at the document, do you

19  have an  independent  recollection  about  when  you

20  prepared Defendant Lopez' Exhibit B in evidence?

21     A   No, I don't recall what time that was.

22     Q   Looking  at  it, do you recall when you

23  prepared it?

24     A   Looking  at  the  time it appears to  be  3:00

10/13/89

T6-fr

424

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2   the next day.

3       Q        Is it fair to say that somebody has put

4   some white-out on the time on this?

5       A    Yes.

6       Q    Was that you?

7       A    Probably, yes.

8       Q    And is it fair to say that through the

9   white-out you could see that someone had written a

10  number and had written another number on top of

11  that, and then there appears to be white-out on top

12  of it, do you get the same reading as you look at

13  it?

14      A    Probably yes.

15      Q    Can you explain how that happened?

16      A       I believe it was because I started it in

17  the morning, and then I put it aside and forgot to

18  complete it and then I completed it the next day, so

19  I put the time that I had completed it.

20      Q        And then you put white-out on top of the

21  changed time?

22      A    Yes, because a civilian typed this out and

23  I had to make it legible, so she could see what time

24  it was.

25      Q        And after you put the white-out on the

10/13/89

P-APP001881

T6-fr

425

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  second time, you had written — did you write a

3  number in?

4      A    Yes.

5      Q    And how about down here where you had "61

6  number 281" appears to be whited out?

7           Did you do that?

8      A    Yes.

9      Q    Now, looking at Defendant Lopez B-1, can

10  you see the number 281 for a UF-61 number on it?

11      A    No.

12      Q    In other words, the copy that was given to

13  the Defense doesn't show what is whited out on the

14  side?

15      A    No, I don't see a number on it.

16      Q    One would have to rely on the honesty of

17  the Prosecutor to know that what they gave you isn't

18  what the real thing is?

19           MS. LEDERER:   Objection.

20           THE COURT:   Objection sustained.

21           MR. BERMAN: Judge, are you ready to

22      look at them yet?

23           THE COURT:   No, I'm not.  Ask your

24      questions.  I'll look at the documents,

25      they're in evidence.  I must look at them.

10/13/89

NYCLD_023171

P-APP001882

T6-fr

426

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      Q        What time did you prepare this complaint

3  report?

4      A     Well, what time did I start?  What time did

5  I finish?

6      Q     Well, the report asks for the military time

7  and date of this report.  What's the  military  time

8  and date of this report?

9      A     I believe it's 15:00 hours.

10     Q     On what date?

11     A     4/20/1989.

12     Q        Do you see where the date has also been

13 whited out, it either says 20 or it either says   21,

14 but  it's  not  clear.   Do you see the date's been

15 altered also?

16     A     The date's changed, whether it   was   21   or

17 not, I'm not sure.

18     Q        Was it changed from 21 to 20 or 21 to 20

19 (sic)?

20     A     It could have even possibly been  the  19th

21 when I started the report.

22     Q        In terms of when it says here "military

23 time and date of this report,"  you  said  that  the

24 time of this report is 15:00.  I ask you what is the

25 date of this report?

10/13/89

NYCLD_023172

P-APP001883

T6-fr

427

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2          MS. LEDERER:   Objection.

3          THE COURT:   I'll let him answer.

4     A     The date is -- what's written on here?

5     Q          The report has a printed portion.   When

6  it's a blank   report,   it   has   a   printed   portion,

7  right?

8     A     That's correct.

9     Q          And it asks you, the officer, to fill in

10  the blanks, right?

11    A     Yes.

12    Q     It asks you under number   17   to   give   the

13  date of the report?

14    A     That's correct.

15    Q     What's your answer to number 17?

16    A     What's placed there now is 4/20/1989.

17    Q          And is it your testimony that you first

18  wrote 4/21 and later, as time went by,   you   changed

19  it to 4/20?

20    A     No, that's not my testimony.

21    Q     How do you account for the apparent 21 that

22  is also written in the same area?

23    A          Actually -- like I said before, I'm not

24  sure if it's the 19th or the 20th.

25    Q     Thank you.   Showing you the   report   again,

10/13/89

T6-fr

428

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2  Defendant  Lopez  Exhibit B in evidence, in terms of
3  the details that appear in that large block near the
4  bottom of the report, where it  calls  upon  you  to
5  reconstruct  the occurrence, including the method of
6  entry  and  escape,  including  unique  and  unusual
7  actions,  you  wrote  -- why don't you read what you
8  wrote?

9      A    "At  time  and  place  of  the  occurrence,
10 perps,  named above,  in the company of ten to twenty
11 others,  did  engage  in  violent  and  tumultuous
12 behavior,  see  UF-61  number  280  and aided number
13 156."

14     Q    And what was the  "violent  and  tumultuous
15 behavior" you were referring to?

16     A    The assault on the jogger, Mr. Loughlin.

17     Q       Specifically the assault on Mr. Loughlin,
18 is that what you're referring to?

19     A    Yes.

20     Q    And as far as you understood it,  when  you
21 prepared  the  report,  what time did the assault on
22 Mr. Loughlin happen?

23     A    Excuse me?

24     Q    What time did the assault on him happen at?

25     A    That's on the other complaint report.

10/13/89

NYCLD_023174

P-APP001885

T6-fr

429

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2     Q      If you want to look at it, if you have it
3     or if you know?

4            In other words, what is the time of the
5     crime that you're talking about here?

6     A      I don't have that complaint report with me.
7     I'm not sure of the time.

8            MR. BERMAN:   May I have a moment,
9            please, Judge?

10           THE COURT:   Yes.

11    Q      At the time of the report that we're
12    referring to, you entered a time for the occurrence,
13    is that right?

14    A      Yes.

15    Q      What time did you enter for the occurrence?

16    A      22:40.

17    Q      And that would be on the 19th of April?

18    A      Yes.

19    Q      That would be at 10:40 at night?

20    A      Yes.

21    Q      Now, is that when you claim that Mr.
22    Loughlin was assaulted?

23           MS. LEDERER: Objection.

24           THE COURT:   I'll allow it.

25           THE WITNESS: No, that's not the time

10/13/89

T6-fr

430

REYNOLDS — PEOPLE — CROSS — BERMAN

2      he was assaulted.

3      Q     All right, where it says "occurrence," Item

4  23, the time of the occurrence, you wrote "10:40   at

5  night the occurrence occurred." Is that right?

6      A     Yes, that's what I put.

7      Q     That's wrong, right?

8      A     Yes, it is.

9      Q      Mr. Loughlin was assaulted an hour earlier

10 or so, right?

11     A     Yes.

12     Q     22:40  represents  approximately   the   time

13 that you arrested Steve Lopez, isn't that right?

14     A     Yes, that's correct.

15     Q        And  when you arrested him for unlawful

16 assembly and you stated that the occurrence that you

17 were arresting him for occurred at 22:40,  you   were

18 talking  about his being on Central Park West with a

19 dozen or so youths, isn't that right?

20     A     Could you repeat that?

21     Q     When you wrote  in  this  report  that  the

22 occurrence  for  which you had arrested Steve Lopez,

23 and you wrote in here the occurrence  was  "unlawful

24 assembly," when you wrote it occurred at "22:40" you

25 were  talking  about  his being on Central Park West

10/13/8

NYCLD_023176

P-APP001887

T6-fr

431

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2   with a dozen or so youths at 22:40; isn't that

3   right?

4       A    No, it is not.

5       Q    Where does the 22:40 come from?

6       A        That's the time we brought them back to

7   Central Park West at 100 Street.

8       Q    But the box, am I right, calls for the time

9   of occurrence, right, not the time of the arrest  or

10  the  time  that  you got there to the precinct, am I

11  right?

12      A    That's correct.

13      Q    And the complaint that reflects your arrest

14  of Steven Lopez for the unlawful  assembly  has  you

15  saying  his  crime  happened  at  22:40, isn't that

16  right?

17      A    Yes.

18      Q    And at 22:40 he wasn't committing any

19  crime, was he?

20      A    No, he was in our custody.

21      Q        By the way, did Steve Lopez resist arrest

22  in any way?

23      A    No.

24      Q    Did you have to use any  force  to  arrest

25  him?

10/13/89

T6-fr

432

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    No.

3    Q        In   what   precinct   did   you   arrest   Steve

4  Lopez?

5    A    In   what   precinct   was   he   placed   under

6  arrest?

7    Q    Yes?

8    A    The Central Park Precinct.

9    Q    Tell me "what placed under arrest" means as

10 opposed to "arrest"?

11          MS. LEDERER:   Objection.

12          THE COURT:   I'll allow it.

13          THE   WITNESS:    I don't understand.   I

14       don't understand the question.

15          THE COURT:   What   do   you   understand

16       that   question to mean, location of arrest,

17       is   that   what   you're   asking   him?   The

18       precinct   of   arrest;   is   that what you're

19       asking him?

20          MR. BERMAN:   Yes.

21          THE COURT:   Do   you   understand   the

22       question?

23    Q        When you arrest somebody at Central Park

24  West and 102nd Street, you are arresting them in the

25  24th Precinct; is that right?

10/13/89

T6-fr

433

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2     A     Yes.

3     Q     When you take them down to the Central Park

4  Precinct to book them there, you are booking them in

5  the Central Park Precinct, right?

6     A     That's correct.

7     Q     What was the precinct of arrest for  Steven

8  Lopez in this case?

9     A          It was -- well, when we considered them

10 under arrest at 100th Street and Central Park  WEst.

11 That's  where  we  -- that's why we put Central Park

12 Precinct.

13    Q     Well, 100  Street  and  Central  Park  West

14 would be the 24th Precinct, wouldn't it?

15    A          No, we were inside the park, inside the

16 wall right there.   That  driveway  right  there  is

17 considered part of the park.

18    Q          But you took him into custody up on 102nd

19 Street on the west side of Central Park?

20    A     Yes.

21    Q     You are not disputing you took  him  into

22 custody in the 24th Precinct, right?

23    A     No.

24    Q     You agree with me on that?

25    A     Yes.

10/13/89

T6-fr

434

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2     Q        Do  you  have  your  on-line  booking  sheet
3     arrest worksheet?
4     A     Yes.
5     Q     Do you see item five on that, "the precinct
6     of arrest"?
7     A     Yes.
8     Q     And it says, "022"?
9     A     Yes.
10    Q     That's the Central Park Precinct;  is  that
11    correct?
12    A     That's correct.
13    Q     So in your nomenclature, although Steven
14    Lopez was arrested in the 24th Precinct, the Central
15    Park Precinct is the precinct of his arrest?
16    A     Yes.
17    Q     And the time of his arrest, Item 20 on that
18    on-line booking system arrest worksheet is 2250?
19    A     Yes.
20    Q     Would  that  be  when  he  was  taken  into
21    custody  by  you on 102nd Street, would that be when
22    you took him into the park at 100  Street  or  would
23    that  be  when  you  got him to the precinct at 86th
24    Street?
25    A     That was the time we started to  bring  him

10/13/89

T6-fr

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    back into the precinct.

3       Q       Under Item 33, where it says that his

4    mother was notified, is it you or your partner or

5    somebody else who notified his mother?

6       A     It was my partner.

7       Q     Does your partner speak Spanish?

8       A     I don't believe so, no.

9       Q     We're talking about Officer Powers?

10      A     That's correct.

11      Q       Did there come a time when you offered

12   Steve Lopez the opportunity to make a phone call?

13      A     No.

14      Q     Did anybody else offer him the opportunity

15   to make a phone call in your presence?

16      A     Not that I recall, no.

17      Q       To the extent that the on-line booking

18   system arrest worksheet under item 15 says, "Refused

19   telephone calls," can you account for that?

20      A     Whenever someone doesn't have a phone call

21   or doesn't make one, you can not leave it blank, you

22   have to put something in it, it's refused.

23      Q     So if they're never given a chance to make

24   a phone call, you write in "refused"?

25      A     It's not that he wasn't given a chance, he

10/13/89

NYCLD_023181

P-APP001892

T6-fr

436

REYNOLDS — PEOPLE — CROSS — BERMAN

didn't ask to make a phone call.  It wasn't offered.

Q        And to you, it wasn't offered means the same as refused?

A        Excuse me?

Q        To you, "wasn't offered" means the same thing as refused?

A        In the case of making phone calls, yes.

Q        Do you have the Family Court Supporting Deposition with you, the one for Steve Lopez?

A        Yes.

Q        Did you prepare that?

A        Part of it, yes.

Q        I mean, did you swear to it?

A        Yes.

Q        It's got your signature at the bottom?

A        Yes, that's it.

Q        And you swore to it on April 20th?

A        That's correct.

Q        Do you remember what time you swore to this?

A        I don't recall.

Q        Can you say whether it was early in the day or late in the evening, any idea at all when you swore to this on April 20th?

10/13/89

NYCLD_023182

P-APP001893

T6-fr

437

REYNOLDS — PEOPLE — CROSS — BERMAN

A    I don't recall.

Q    Now, in that form -- it's an affidavit basically, isn't it?

A    Yes.

Q    And in that affidavit the form asks where and when the conduct occurred; is that correct?

You see where it says "engaged in the following conduct," about a third of the way down the page?

A    Yes.

Q    And did you swear on April 20th that the criminal conduct complained of against Steven Lopez had been engaged in on April 19th at 22:50 hours?

A    Did I swear to it, is that the question?

Q    The deposition that you told us you swore to.

Q    This deposition you've already told us you swore --

THE COURT:  The question is, did you swear to it.  His question is did you swear to that?

MR. BERMAN:    I'll pose a different question.

THE COURT:  Okay.

10/13/89

NYCLD_023183

P-APP001894

T7-1f

438

REYNOLDS — PEOPLE — CROSS — BERMAN

Q    So you are clear, you swore to everything that's in this deposition; isn't that right?

A    Yes.

Q    And is one of the things you swore to -- was one of the things you swore to, was that the conduct, the criminal conduct you were complaining of as against Steve Lopez had occurred after April 19, 1989, at 22:50 hours?

A    Yes.

Q    And that was ten minutes after you arrested him; isn't that right?

A    That is the time of the arrest.

Q    Let me go back. Didn't we agree that the time of the arrest on that other form was 22:40 hours?

A    What other form?

MR. BERMAN: For Court purposes, it's Defendant Lopez Exhibit B in evidence.

Q    For your purposes, it's the complaint report. You remember under item 23, you had the time of occurrence being 22:40?

A    Right.

Q    Do you remember you told me that was a mistake; it wasn't really the time of the

10/13/89

NYCLD_023184

P-APP001895

T7-1f

439

REYNOLDS - PEOPLE - CROSS - BERMAN

occurrence. The assault of Mr. Loughlin was an hour earlier. That was the time of the arrest?

A      I didn't say that.

Q      I'm sorry. Correct me. What does 22:40 represent?

A      That was the time we were at Central Park West at 100 Street.

Q      That's after you had taken him into custody, after he had been brought down to 100 Street; is that correct?

A      That's correct.

Q      The form I'm asking about now is the supporting deposition, the one you swore to there. You have the conduct occurring at 22:50 hours, ten minutes after Mr. Lopez had been taken into custody down to 100 Street. Am I correct, the 22:50 hours would be ten minutes after he was arrested?

A      Yes, that's correct.

Q      What criminal conduct were you complaining as to Steve Lopez occurring ten minutes after he was arrested?

A      Again that was a mistake as far as the time. What I was complaining about was that he was with the group that had engaged in that behavior,

10/13/8?

NYCLD_023185

P-APP001896

T7-1f

440

REYNOLDS - PEOPLE - CROSS - BERMAN

including the assault on the jogger.

Q       These series of mistakes as to time, is it fair to say you made these series of mistakes at the time because when you arrested Steve Lopez, he wasn't doing anything wrong, and you had no evidence that he had done anything before that?

MS. LEDERER:  Objection.

THE COURT:  I will allow it.

A       Was it for that reason?

Q       Yes.

A       No.

Q       Was it a stroke of luck you continuously substituted the approximate times of the arrest for the time of the conduct you were complaining of?

MS. LEDERER:  Objection.

THE COURT:  Sustained

Q       Can we turn to the Probation Intake Referral Report, please.

In the lefthand column, about a third of the way down the page, do you see where it says advised -- and this is in the printed portion of the form in all capitals -- "advised of Constitutional Rights by". Do you see that?

A       Yes.

10/13/89

NYCLD_023186

P-APP001897

T7-1f

441

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2

Q      By the way, before I go on with that, this
is another form that you signed down at the  bottom;
isn't that right?

3

4

5

A      Yes, that's correct.

6

Q           And   the   entry   for "advised   of
Constitutional  Rights  by"  says  "P.O."  is     that
correct?

7

8

9

A      That's correct.

10

Q      And that means police officer, right?

11

A      Yes.

12

Q      Does that refer to you?

13

A      Yes, it does.  When you say police officer

14

--

15

Q      I will pose the question.

16

In this instance, when it says "P.O."  were
you referring to yourself?

17

18

A      I was going to, but I didn't complete it.

19

Q      You were going to advise him of his rights,
but you didn't?

20

21

A      Right.  I was waiting for his parents.

22

Q           So you wrote the letters P.O. as to who
gave him his Constitutional Rights, but in fact, you
didn't give him his Constitutional Rights?

23

24

25

A      No, I didn't.

10/13/89

NYCLD_023187

P-APP001898

T7-1f

442

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      Q      And the next entry where it says   "Parents

3   or   guardian   advised   of Constitutional Rights by,"

4   that is blank, right?

5      A      Right.

6      Q      And the next entry   where   it   says,   "Were

7   Constitutional   Rights   waived   by   both parents and

8   respondent," neither yes nor no was checked; is that

9   correct?

10      A      That's correct.

11      Q      And where   it   says   "Statement   made   by,"

12   that's blank too?

13      A      That's correct.

14      Q      And where it says, "Nature of statement,"

15   that's blank too, right?

16      A      Right.

17      Q      Now, this is dated April 20th and sworn   by

18   you; am I correct?

19      A      The   part that was sworn to is only the

20   bottom part.

21      Q      You don't usually sign your name   on   every

22   line of the form, do you?

23      A      No.   But that's just for what it asked,

24   what I personally   saw,   where   it   says,   "Describe

25   specifically the individual's behavior."

10/13/8?

NYCLD_023188

P-APP001899

T7-1f

443

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q     It's your impression that is your signature

3    and   you   are   swearing   only   to   the   paragraph

4    immediately before your signature?

5    A     Yes.

6    Q     And that relates to just what you  yourself

7    saw?

8    A     Yes.

9    Q     Could you read that paragraph.  But first,

10   read the instructions to the paragraph, please.

11   A     "Describe this —— "

12           MS. LEDERER:  Objection.

13           THE COURT:  Objection sustained.

14           MR. BERMAN:  Can I have  the  original

15           of  that  marked?  I don't have an original

16           on that, Judge.

17           THE COURT:  We can use a  copy.   You

18           have a copy?

19           MR. BERMAN:  You don't want to look at

20           it, but see what happens ——

21           THE  COURT:   No, I don't want to look

22           at it.  I will look at the documents at the

23           appropriate time.

24           MR. BERMAN:   The  last  time  the

25           original had white—out on it.

10/13/89

NYCLD_023189

P-APP001900

T7—1f

444

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2         THE COURT:   You have the original
3  available?
4         MS. LEDERER:  No.
5         MR. BERMAN:  I'm sorry, I didn't hear
6  the answer.
7         THE COURT:  She said, no.
8         MR. BURNS:  Has that been marked?
9         THE COURT:   No, it hasn't been
10  offered.
11         MR. BERMAN:  I don't know if you can
12  understand my reluctance to use the xerox
13  copy here.  Can they have the original by
14  after lunch?
15         THE COURT:  Is it available?
16         MS. LEDERER:   I don't have it.  I
17  don't know where it is.  I think the
18  originals of these go to Family Court.
19         MR. BERMAN:   I will proceed with the
20  xerox copy with the reservations I have
21  expressed.
22         THE COURT:  Do you want that marked?
23         MR. BERMAN:   Mine has notes.  If the
24  People have a blank xerox copy.
25         MS. LEDERER:  I only have one copy.

10/13/89

NYCLD_023190

P-APP001901

T7-1f

445

REYNOLDS – PEOPLE – CROSS – BERMAN

1

2           MR. BERMAN:   I'll  borrow  one   from   my

3      brethren.

4           Can  I  have  this marked Defendant Lopez

5      C  for  identification?

6           (One-page  document marked Deft. Lopez

7      C  for  ID)

8           MR. MADDOX:  Mr. Berman tell   what   is

9      being   marked   and   what   that   document

10      purports  to be.

11           MR. BERMAN:   This   is   the   Probation

12      Intake  Referral  Report.

13           MR.  BURNS:       Defendant    L–C   for

14      identification.

15  BY MR. BERMAN:

16      Q     Looking  at  that,  having  replaced  Defendant

17  Lopez  Exhibit  C  for  identification  in  front  of  you,

18  is  that  a  purported  xeroxed  copy  of  the  Probation

19  Intake  Referral  report  that  you  signed  in  this  case,

20  in  connection  with  this  case  as  to  Steven  Lopez?

21      A     Yes.

22      Q      Is  that  one  of  the  documents  you  referred

23  to  on  your  direct  testimony  when  you  spoke  about  the

24  packages   or   papers   that   you   spent    that    time

25  preparing?

10/13/8?

NYCLD_023191

P-APP001902

T7-1f

446

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2     A     Yes.

3           MR. BERMAN:    I would offer that,

4     Judge.

5           THE COURT:  Any objection?

6           MS. LEDERER:  Yes.

7           THE COURT:  I will have it received in

8     evidence.

9           MR. BERMAN:  Thank you, Judge.

10           (Deft. Lopez C received and marked in

11     evidence.)

12     Q     Could you read from Defendant Lopez C in

13 evidence, please, Officer, beginning where it says,

14 "Describe specifically --" the three pages of

15 instructions -- the three lines of instructions, and

16 the three lines of handwritten entries.

17     A    "Describe specifically this respondent's

18 individual actions and behavior during the

19 delinquent act."

20     Q    Let me stop you for a second. Is it fair

21 to say that the words "this" and "individual" are in

22 all caps, and underlined on this, stressing words

23 this individual?

24     A     Yes.

25     Q     Continue, please.

10/13/89

NYCLD_023192

P-APP001903

T7-1f

447

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  A  "Also in concert arrest, do not describe

3  group behavior.  Describe only this individual's

4  actions and behavior and whether or not the others

5  were apprehended.  Note if a weapon was used or

6  displaced.  Indicate if the respondent personally

7  possessed it."

8  Q  Is it fair to say, "individual" is again

9  uppercase and underlined, and that the word

10  "personally" is also uppercase and underlined?

11  A  Yes.

12  Q  All right.  Read your handwritten entry you

13  swore to.

14  A  "Respondent, and at the time and place of

15  occurrence, acting in concert with approximately ten

16  others, did strike complainant across the head with

17  a blunt instrument, causing serious physical

18  injury."

19  Q  Now, you see the portion where you read

20  where it said, "In concert arrests, do not describe

21  the group behavior.  Describe only this individual's

22  actions and behavior."  This is an in concert

23  complaint you are making, isn't it?

24  A  Yes.

25  Q  And you used the very words, "in concert"?

10/13/89

T7-1f

448

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    Yes.

3    Q         Did  you  describe  this  defendant's

4    individual actions and behavior?

5    A    As far as acting in concert, yes.

6    Q    Did you describe what you  believed  Steven

7    Lopez himself individually did?

8    A    This is what I believe he did, yes.

9    Q    You believed that he struck the complainant

10   across the head with a blunt instrument?

11   A         I believed that he was with the others,

12   with the gang that did commit  the  assault  on  the

13   jogger.

14   Q    Do you see where he says, "do not describe

15   group behavior --"

16        THE COURT:  We've been  through  that.

17        Why  do you have to repeat it?  I heard it.

18        I understand the point you are making.  Why

19        don't you go on to something else?

20        MR. BERMAN:  Okay.

21   Q    Can you locate the Juvenile Arrest Report?

22        Have you located it?  The  one  for  Steve

23   Lopez in this case?

24   A    Yes.

25   Q         Is that part of the package of papers you

10/13/8°

T7-1f

449

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2    had to work up that night?

3       A    No.

4       Q    This is the time in the upper righthand

5    corner of that give you any indication of when you

6    signed the previous two documents?

7       A    No.

8       Q    In the entire time that you were with

9    Steven Lopez that night -- let me ask you, when did

10   that end? When did you stop being with him that

11   night?

12      A    It was in the morning.

13      Q    When did that happen or what time was that?

14      A    I'm not sure of the exact time.

15      Q    When did you go off duty?

16      A    That next Saturday morning.

17      Q    You were continuously on this case from

18   Wednesday night until Saturday morning?

19      A    That's correct.

20      Q    During that time, did you ever see or hear

21   anybody give Steven Lopez his constitutional rights?

22      A    No.

23            MR. BERMAN:    Judge, is this a

24       reasonable time to break for lunch?

25            THE COURT: If it is for you, it is

10/13/89

T7-1f

450

REYNOLDS - PEOPLE - CROSS - BERMAN

1
2       for me.

3             MR.  BERMAN:     Okay.  Do you want the

4       document now or later in   evidence   that   I

5       want to show?

6             THE COURT:  I'm sure you will refer to

7       them subsequently in your argument.

8             We'll recess now to 2:15.

9             Don't   discuss   your   testimony   with

10      anyone, Officer.

11            (Whereupon   a   luncheon   recess   was

12      taken.)

13                   *      *      *

14
15
16
17
18
19
20
21
22
23
24
25

10/13/89

NYCLD_023196

P-APP001907

451

COLLOQUY

T7B/LF

A F T E R N O O N   S E S S I O N

THE COURT CLERK: Hearing continued, Indictment 4762 of '89, Kharey Wise, Yusaf Salam, Antron McCray, Kevin Richardson, Steve Lopez, Michael Brisco and Raymond Santana.

THE COURT: All right. I thought I made it clear this morning that I wanted to start on time. I really don't understand why attorneys are late. Everybody else was here on time after lunch. I don't see why you can't be here.

MR. MOORE: I apologize, your Honor.

THE COURT: All right, bring the witness in.

(Witness resumed the stand.)

THE COURT CLERK: Officer, I remind you you are still under oath.

MR. BERMAN: May I proceed, Judge?

THE COURT: Yes.

CROSS EXAMINATION (Continued)

BY MR. BERMAN:

Q    The radio runs you spoke about on direct,

NYCLD_023197

P-APP001908

1      REYNOLDS - PEOPLE - CROSS - BERMAN

2   you  spoke  about  four  different  radio  runs,  the

3   fourth  of  which  dealt  with  the  assault  of  Mr.

4   Loughlin, do you recall that?

5        A    Yes.

6        Q    That's what I want to focus on for a minute.

7   That radio run, is that the one that Officer-- what

8   was his name yesterday, Officer Carlson put out?

9        A    Yes.

10       Q    And the radio run that Officer Carlson put

11  out over the radio was that Mr. Loughlin had been

12  assaulted by four or five male blacks; is that

13  correct?

14       A    I believe so.

15       Q    You told us on your direct testimony that in

16  that fourth radio run, someone said that a jogger,

17  male jogger had been beaten, was found on 96th

18  Street and the West Drive; had been beaten by male

19  blacks and Hispanics.  Do you remember saying that

20  on your direct?

21       I  am  specifically  addressing  myself  to  Mr.

22  Loughlin having been beaten by male blacks and

23  Hispanics.

24       A    That's correct.

T8/FR  25

NYCLD_023198

P-APP001909

453

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      Q    Now, the radio run that Officer Carlson put

3  out didn't mention Hispanics, did it?

4      A    Excuse me?  You're asking me that?

5      Q    Yes.

6      A    It might not have.  He did mention male

7  blacks though.

8      Q    And when you arrested Steve Lopez, did you

9  have it in mind that he appeared to be a male black?

10     A    From when we first observed the group.

11     Q    Did his color change after awhile?

12     A    No.

13          MS. LEDERER:  Objection.

14     Q    Did he appear to be the same color

15  throughout this incident?

16          MS. LEDERER:  Objection.

17          THE COURT:  Sustained.

18     Q    What do you mean when you say he appeared to

19  be a male black when you first observed the group?

20     A    The group appeared from our vantage point to

21  be all male blacks at first.

22     Q    At the point that you took Steve Lopez into

23  custody, did he appear to be a male black?

24     A    No.

25     Q    In fact, when you filled out the on-line

NYCLD_023199

P-APP001910

454

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  booking system arrest worksheet in choosing between

3  the boxes for white Hispanic and black Hispanic, you

4  checked the box for white Hispanic for Steve Lopez,

5  didn't you?

6      A    That's what's checked.   That part wasn't

7  done by me though.

8      Q    Well, did you read it at some point, at any

9  point?

10     A    Yes, I read the report.

11     Q    Did you tell whoever did that hey, that's a

12  mistake, it should be changed?

13     A    No, I didn't.

14     Q    What was it that made you think that the

15  dozen or so black and Hispanic groups out on Central

16  Park West, on the west side of Central Park West,

17  were the same people as the four or five male blacks

18  who had attacked Mr. Loughlin?

19     A    They were the same age, same sex.

20     Q    What age--

21     A    When--

22     Q    Finish your answer.

23          THE COURT:  Go ahead.

24     A    We're told it's a male black, in my mind it

25  can also be an Hispanic also, because Hispanics do

NYCLD_023200

P-APP001911

REYNOLDS — PEOPLE — CROSS — BERMAN

range from being white in complexion to black and sometimes complainants will make a mistake, especially if they don't hear the person talk, they will say he is black and he is black, but he is a black Hispanic.

Q    In Mr. Lopez' case, is he a black Hispanic or a light Hispanic, in your opinion?

A    He's a dark-skin Hispanic.

Q    In other words, whoever made the entry put "white Hispanic" down instead of black Hispanic, that's something you take issue with?

MS. LEDERER:    Objection.

THE COURT:    Sustained.

Q    My question is really about what was on the radio run that Officer Carlson put out about the assault on Mr. Loughlin and you said to me that the youths on the street were the same age as the people who assaulted Mr. Loughlin, but there wasn't any age in that radio run, was there?

A    I'm not sure now.

Q    And--

A    I think that there was. He did mention male blacks and I did assume that it was the same group that we were looking for the whole evening.

P-APP001912

456

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      Q    But on his  radio  run,  Officer  Carlson  said

3  four or five male blacks had  assaulted  Mr.  Loughlin

4  and you were stopping twelve people.

5      A    That's correct.  In  that  part  of  the  park,

6  because I jog there at night  myself,  that  track  is

7  lit up.  Okay.  You can see  what's  going  on  in  the

8  track.   Somebody  can  stand  ten,  fifteen  feet  from

9  you and you wouldn't see  a  thing,  you  wouldn't  see

10  him.   It's  entirely  possible  the  complainant  saw

11  four  or  five  people  and  there  were  more  standing

12  nearby.

13      Q    And  you  would  arrest  people  for  standing

14  nearby?

15              MS. LEDERER:  Objection.

16              THE COURT:  Is that a general question?

17      Q    As  a  matter  of  practice,  do  you  arrest

18  people for standing nearby a crime?

19              MS. LEDERER:  Objection.

20              THE COURT:  Sustained.

21      Q    In  this  case,  did  you  arrest  Steve  Lopez

22  because maybe he was  standing  by  when  other  people

23  committed a crime?

24              MS. LEDERER:  Objection.

25              THE COURT:  Overruled.

P-APP001913

457

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    A    Not because he was standing by, no.

3    Q    What made you think he was one of the four

4  or five who participated in the assault?

5    A    Because when he was standing-- most of the

6  people ran and when we stopped him, he told us a

7  story that we didn't believe.

8    Q    That's after you stopped him.  I'm asking

9  you when you stopped him, and you took him and put

10  him against the wall; that's before he told you any

11  story you didn't believe, right?

12    A    That's correct.

13    Q    Now, if you had been able to stop all twelve

14  of those youths, would you have arrested all twelve

15  of them for being the four or five people who

16  assaulted Mr. Loughlin?

17            MS. LEDERER:  Objection.

18            THE COURT:  I'll let him answer.

19    A    Would I have arrested them?  No, we would

20  have brought them back to the scene and ascertained

21  who committed the assault and who did what.

22    Q    And if they didn't want to go back to the

23  scene, were they free to leave?

24            MS. LEDERER:  Objection.

25            THE COURT:  I'll let him answer.

NYCLD_023203

P-APP001914

458

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2  A    No, they weren't free to leave.

3  Q    And when you got out of the van, you and

4  your partner got out of the van, at that point was

5  Steve Lopez free to leave?

6  A    If he could have run from us, he was.

7  Q    Would you have let him leave at that point?

8  A    Not if I could physically help it.

9  Q    I think you answered my question.    Thank

10 you.

11     When you called for a police vehicle to come and

12 pick up Mr. Lopez and Mr. Santana, they weren't free

13 to leave at that point either, were they?

14 A    No, they weren't.

15 Q    And that was at 10:45 p.m., you testified?

16 A    About that time.

17 Q    Now, it's your testimony that apart from the

18 matters that you've discussed on your direct about

19 the girlfriend's house or the movie, that Mr.

20 Lopez-- and saying that they weren't part of the

21 group and the group wanted to attack them, what we

22 heard you say on direct, did Mr. Lopez say anything

23 else between the time you stopped him and the time

24 you got to the precinct?

25     MS. LEDERER:    Objection.

459
REYNOLDS — PEOPLE — CROSS — BERMAN

THE COURT: As to the form of the
question, I'll sustain it.

Q   Apart from what you told us on direct, did
Mr. Lopez say anything else between the time you
first saw him and the time you got to the precinct?

MS. LEDERER: To this witness?

Q   That you heard?

A   He might have made other statements.   He
just-- you know, he kept saying he wasn't involved
with the group but it was along the same lines of
what I had said earlier.

Q   All right.   By the way, whatever statement
that he made that you heard, you never recorded them
on that form that I asked you about before lunch
where there's an area for recording statements; is
that right?

A   What form is that?

Q   The Probation Intake Referral Report.

A   Did I write it in there, you're asking?

Q   That's right.

A   No, I didn't.

Q   Now, you said that you wrote in the letters
PO where it says advised of constitutional rights
by, and that's because he was going to be advised of

460

REYNOLDS - PEOPLE - CROSS - BERMAN

his constitutional rights by a police officer, but
that never happened in your presence; is that
correct?

    A    That's correct.

    Q    Do you remember when it was you wrote in PO
there as to who had advised him of his
constitutional rights?

    A    No, I don't recall.

    Q    Well, would it have been on the 19th of
April?

            THE COURT:  Would that be on the 19th?

            MR. BERMAN:  When he wrote that.

            THE WITNESS:  I don't recall.  The 19th
        or the 20th.

    Q    Is it your testimony that as of the time you
swore to the bottom of the Probation Intake Referral
Report, Mr. Lopez had not made any statements?

            MS. LEDERER:  Objection.

            THE COURT:  I'll let him answer.

            MS.   LEDERER:   In   addition   to   the
        statement he's already said?

            THE COURT:  What is the question you've
        asked?

            MR. BERMAN:  Is it his testimony that as

NYCLD_023206

P-APP001917

461

REYNOLDS — PEOPLE — CROSS — BERMAN

of the time that Officer Reynolds swore to the Probation Intake Referral Report, Mr. Lopez had not made any statements?

THE COURT: At the time he wrote that out and swore to it, he had not heard no statement from him?

MR. BERMAN: Yes.

MR. MADDOX: Judge, it's hard for us to hear Mr. Berman. He had his back toward us. Can the question be read back again?

THE COURT: It would simpler for him to ask the question again.

Q    Is it your testimony that as of the time you swore to and signed the Probation Intake Referral Report, Mr. Lopez had not made any statements?

A    In——

MS. LEDERER: Objection.

THE COURT: I'll allow it.

A    In regards to swearing to this piece of paper, the only thing we're swearing to is the bottom part. We don't swear to any of the information on the top regarding the defendant's parents name or their phone number or their address. You can't swear to it.

NYCLD_023207

P-APP001918

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    Q   I'm just using that, the time you swore to

3    it, as a point of reference.  As of the time you

4    signed this piece of paper, had Mr. Lopez made any

5    statements?

6              MS. LEDERER:   Your Honor, is that any

7              other statement?

8              THE COURT:  Any statement to him at all.

9              THE WITNESS:  Like I said, he might have

10            made passing statements asking me when is he

11            going home or, you know, did his parents get

12            there yet, but nothing that is recorded; at

13            least not by me.

14    Q   Now, your memo book.  When did you fill out

15    the entries in your memo book that referred to the

16    19th, 20th, 21st and 22nd of April?

17    A   I don't recall when I did that.

18    Q   What is your general practice?  When do you

19    fill out the entries in your memo book?

20              MS. LEDERER:  Objection.

21              THE COURT:  Objection sustained.

22    Q   Do you wait three, four, five days sometimes

23    to fill out the entries in your memo book?

24              MS. LEDERER:  Objection.

25              THE COURT:  Sustained.

463

1        REYNOLDS - PEOPLE - CROSS - BERMAN

2        Q    Do you wait until after you speak to the

3   D.A. before you put your entries in your memo book?

4              MS. LEDERER:   Objection.

5              THE COURT:   Sustained.

6        Q    Is there a rule or procedure as to when you

7   are to put the entries in your memo book?

8              MS. LEDERER:   Objection.

9              THE COURT:   I'll allow it.

10       A    I think the rule is when it is practical to

11  make such an entry, when you have time, you are to

12  do so.

13       Q    The entries in your memo book for April

14  19th, 20th, 21st and 22nd regarding this case, is it

15  fair to say that you made all of those entries on

16  Sunday, April 23rd?

17       A    No, it's not.

18       Q    Do you have your memo book there or a copy

19  of it?

20       A    I have a copy, yes.

21       Q    Can you locate for yourself the page that

22  begins-- that has on it Saturday, April 22nd, and

23  Sunday, April 23rd, please.

24       And do you find an entry for 9:05 on April 23rd

25  for memo book and Rosario material?

NYCLD_023209

P-APP001920

464

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2   A   There's nothing like that for the 23rd.

3   Q   Can you locate the page on which there's a

4   reference to "memo book and Rosario material"?

5   A   Yes.

6          MR. BERMAN:   Can  we  mark  that  page,

7       please?

8          THE COURT:   Yes.

9          (Page  of  memo  book  marked  Defendant

10      Lopez' Exhibit D for identification.)

11  Q   Detective, do you have that page in front  of

12  you now?

13  A   Yes.

14  Q   That's the same page that indicates 34 and  a

15  half hours of overtime?

16  A   Yes, that's correct.

17  Q   Now, do you see an entry for  09:05  near  the

18  bottom of that page?

19  A   Yes, I do.

20  Q   Does  it  say  "memo  book  and  Rosario

21  material"?

22  A   Yes.

23  Q   What does that mean?

24  A   I believe at that time I was  gathering--  I

25  got  my  memo  book  and  Rosario  material  for--  I

NYCLD_023210

P-APP001921

465

REYNOLDS — PEOPLE — CROSS — BERMAN

believe it was for the-- you know, to go to court
and show the District Attorney.

T9/LF

Q    And do you know when you made the entries in
your memo book for April 29-- 19th, 20th, 21st and
22nd, concerning this case?

A    No, I don't recall exactly when.

Q    When you got to the desk-- I believe you
said at 11:06 p.m. you gave either the desk sergeant
or Detectives Nuggent and Gonzalez the defendants'
names, addresses and ages.

Do you remember testifying to that?

A    Yes.

Q    Who was it that you said that to?

A    To the desk officer.

Q    And how did you have defendants' names,
addresses and ages?

A    We asked them for it.

Q    When did you start asking the defendants
questions?

A    In front of the desk, as far as pedigree.

Q    The first time you asked Steve Lopez for his
name was in front of the desk at the Central Park
Precinct?

466

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2    A    I might have asked on the scene, or the

3 first time might have been at the desk.  I don't

4 recall when.

5    Q    Do you remember during your direct on two or

6 three occasions in response to questions by Miss

7 Lederer, you indicated you asked defendant no

8 questions at the scene?

9    A    No questions regarding, you know, the crime.

10 I might have just, while we were standing there,

11 said, "By the way, what is your name?"

12   Q    When did that happen?

13   A    Excuse me?

14   Q    When did that happen?

15   A    Again, I said I might have.  I don't recall

16 specifically what our conversation was.

17   Q    Now, you testified on direct about handcuffs

18 being removed in the-- Juvenile Room; am I right

19 about that?

20   A    Yes.

21   Q    When were the handcuffs put on?

22   A    When they were placed in the car.

23   Q    That would be where and when?

24   A    That would be on 102nd Street and Central

25 Park West.  The exact time, I believe it's around

NYCLD_023212

P-APP001923

467

REYNOLDS - PEOPLE - CROSS - BERMAN

1   10:40, 10:45.

2   Q    Did you see that happen as to Steve Lopez?

3   A    Yes.

4   Q    Was it you who put the handcuffs on Steve

5   Lopez?

6   A    Yes, I believe so.

7          MR. BERMAN:   May I have just a moment,

8          Judge?

9          THE COURT:   Yes.

10  Q    Do you recall testifying on direct this

11  morning that you did not handcuff Lopez and Santana?

12  A    I might have said that.

13  Q    Well, which is true, what you said this

14  morning or what you said to me now?

15  A    I'm not sure.   They were handcuffed-- again,

16  Sergeant Wheeler and Police Officer Morales came.

17  Handcuffs were placed on them.   Whether it was me or

18  the sergeant or Police Officer Morales, I'm not sure

19  which.

20  Q    Did you understand my question a minute or

21  two ago when I asked if you in particular put the

22  handcuffs on Steve Lopez?

23         MS. LEDERER:   Objection.

24         THE COURT:   I will allow it.

NYCLD_023213

P-APP001924

468

REYNOLDS — PEOPLE — CROSS — BERMAN

1
2   Q    Did you understand that question?

3   A    Yes.

4   Q    Did you have any problem answering it then?

5        MS. LEDERER:  Objection.

6        THE COURT:  Sustained.

7   Q    Now, I believe you testified this morning on

8   direct that when Officer Powers went off into a

9   different building to call the parents, the youths

10  were talking to each other and talking about how

11  they wanted to go home; do you remember saying that?

12  A    Yes.

13  Q    And you were able to hear them say they

14  wanted to go home?

15  A    Yes.

16  Q    And did you tell Steve Lopez in essence that

17  once your parents come and pick you up, you'll be

18  able to go home?

19  A    Yes-- that is-- yeah, yes.

20  Q    Now, when the parents came, you have already

21  testified they weren't allowed to be in the same

22  room with their children; isn't that right?

23  A    Right.

24  Q    And you explained that either to them or to

25  us today, because you had to do the paperwork first,

NYCLD_023214

P-APP001925

469

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  right?

3      A    That's correct.

4      Q    Did you tell the parents that?

5      A    Yes.

6      Q    And what would have prevented them being

7  with their children while you did the paperwork?

8      A    What would have prevented them?

9      Q    Yes.

10      A    I don't understand the question.

11      Q    Why were they not allowed to visit their

12  children when you were doing the paperwork?

13      A    It is a little easier if the parents sit

14  outside, because I wasn't going to ask them

15  questions at that time.

16      Q    Easier for the parents?

17      A    Easier for me.

18      Q    And then at some point you explained to the

19  parents, you said that this delay was to go on

20  because you have to check if there are warrants

21  against the children?

22      A    That's correct.

23      Q    When did you find out that there were no

24  warrants against these five?

25      A    The exact time, I'm not sure of.

NYCLD_023215

P-APP001926

470

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2    Q    The approximate time.

3    A    Again, I'm not sure precisely when the

4 warrant check was done.

5    Q    When is the outer limit?  In other words, by

6 what point for sure you knew, what was that point?

7    A    Again--

8    Q    By three in the morning on the 20th, did you

9 know there were no warrants against any of them?

10   A    Again, I don't recall specifically when we

11 did the warrant check.

12   Q    How about by noon on the 20th, did you know

13 there were no warrants against any of them?

14   A    By noon, sure.

15   Q    How about 9 a.m. on the 20th, by then for

16 sure, did you know there were no warrants against

17 any of them?

18   A    Yes.

19   Q    How about at six in the morning on the 20th,

20 was it sure by then there were no warrants against

21 any of these five?

22   A    Yes.

23   Q    Five?

24   A    Five, I'm not sure.

25   Q    And the explanation you gave us on direct

NYCLD_023216

P-APP001927

471

REYNOLDS - PEOPLE - CROSS - BERMAN

was that that was somehow or other tied in with,
Santana's parents weren't there yet, or did I
misunderstand you?

A    You're correct.

Q    If everybody had cleared warrants, why did
the other youths have to wait for Santana's parents
to be there?

A    Because if Santana's parents didn't show up,
he would have to go to Spofard and he would have had
to appear in Family Court the same day in the
morning, which would have meant all the rest of them
would have had to come back also. So, since we
weren't sure if they were coming-- every time we
called someone, they said they were coming and then
didn't show up and I said, "Yeah, the parents are on
the way." And two hours later we know they are not
coming now.

Q    That wasn't tied in with the warrants, that
was an independent reason why you couldn't let the
others go home with their parents, is that correct?

A    Ask that again.

Q    There were two things that would have kept
at least one youth overnight, is that correct?  One
of them would be a warrant against that youth,

NYCLD_023217

P-APP001928

472

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  right?

3       A    Right.

4       Q    The other was if that youth's parents don't

5  show up to pick him up, right?

6       A    Right.

7       Q    Either one of those independently, if either

8  of those happened, that youth would have to go to

9  court the very next morning?

10      A    Right.

11      Q    And is it fair to say that you could have

12 told the four who could have been released to come

13 to court the very next morning?

14      A    I could have.

15      Q    So, I ask you again, what prevented you from

16 releasing those four to their parents and giving

17 them an appearance date the very next morning and

18 waiting to see what happened about Santana's

19 parents?

20      A    I explained to them if we waited, then

21 everybody involved could get a little sleep that

22 morning rather than sleeping two hours then going to

23 Family Court and having time to prepare themselves a

24 week or two from the day of the arrest.

25      Q    And you felt people could sleep more

473

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  comfortably   on   the   floor   of   the   precinct   than   at

3  home?

4                    MS. LEDERER:   Objection.

5                    THE COURT:   Sustained.

6      Q    Now, you told us   on   direct   that   about   four

7  in   the   morning,   Lieutenant   McInerney   told   you   a

8  woman's body   had   been   discovered   in   the   park?

9      A    I believe that's the approximate time.

10                   MR. BURNS:   I didn't   hear   that   question

11             and answer.

12                   THE COURT:   Read it back.

13                   (The   court   reporter   read   back   the

14             requested portion of the record.)

15     Q    And Lieutenant   McInerney   told   you   to   keep

16  the kids for questioning about that, didn't he?

17     A    He   stated   that   the   detectives   wanted   to

18  speak to them.

19     Q    And you understood that to mean   to   keep   the

20  kids for questioning about that woman, right?

21     A    That's correct.

22     Q    Now, you have told us   by   what   time   was   it

23  that Santana's grandmother arrived approximately?

24     A    Let's see.   It was after four.

25     Q    But by 4:30 she was there, right?

NYCLD_023219

P-APP001930

474

REYNOLDS — PEOPLE — CROSS — BERMAN

1

2      A    4:30, a quarter to five.

3      Q    And by 6:00 the warrants had all cleared,

4   nobody had any warrants, right?

5      A    I believe so.

6      Q    As of 6 a.m. in the morning of April 20,

7   1989, were those five youths free to leave?

8      A    No.

9      Q    Their parents were there, right?

10     A    That's correct.

11     Q    None of them had any warrants that was known

12  by 6 a.m.?

13     A    Yes.

14     Q    As to Steve Lopez, he was being charged as a

15  juvenile with a B misdemeanor and was due to be

16  given an appearance ticket for Family Court; is that

17  right?

18     A    That's correct.

19     Q    By what facts that you can tell us about

20  were you entitled to keep him any longer against his

21  will after 6 a.m. on the morning of April 20th?

22          MS. LEDERER:   Objection.

23          THE COURT:   Sustained.

24     Q    Did you tell him once he had pleaded

25  warrant, once all five youths had cleared warrants

475

REYNOLDS — PEOPLE — CROSS — BERMAN

1   and once there were parents or grandparents for all

2   five youths, did you tell him, "Now you're free to

3   go"?

4       A   No.

5       Q   Is it fair to say that he wasn't free to go

6   because the lieutenant said that people wanted to

7   question him?

8       A   Yes.

9       Q   Was he under arrest for any crime relating

10  to the woman victim at that point in time, 6 a.m. on

11  the morning of April 20th?

12      A   I don't believe so, no.

13      Q   As far as his arrest for the unlawful

14  assembly as of 6 a.m., was that arrest holding him

15  any longer?

16          MS. LEDERER:   Objection.

17          THE COURT:   I will let him answer.

18      A   No.   The lieutenant asked me to hold them

19  for questioning by the detectives.

20      Q   At 4 a.m. or so when the lieutenant asked

21  you to hold these five youths for questioning about

22  the woman, did you have any evidence against Steven

23  Lopez regarding that?

24      A   Regarding the woman, the woman jogger?

NYCLD_023221

P-APP001932

476

REYNOLDS - PEOPLE - CROSS - BERMAN

1

2      Q    That's right.

3      A    I had no knowledge of the crime at all other

4  than a woman was assaulted.

5      Q    Am I fair in saying you knew the woman was

6  assaulted, you had no evidence about that against

7  Steven Lopez, but nonetheless he wasn't free to go?

8      A    That's correct.

9           MR.   BERMAN:   I   have   no   further

10          questions, your Honor.

11          THE COURT:  Mr. Moore, do you have any

12          questions?

13          MR. MOORE:  Just one second, your Honor.

14  CROSS EXAMINATION

15  BY MR. MOORE:

16     Q    Officer Reynolds, you stated that on 4/19

17  you were assigned to the Anti-Crime Unit of the

18  Central Park Precinct, am I correct?

19     A    That's correct.

20     Q    How   long   have   you   been   assigned   to

21  Anti-Crime in that particular precinct?

22     A    From January.

23     Q    January of '89?

24     A    Yes.

25     Q    And prior to that, how long have you been

NYCLD_023222

P-APP001933

477

1          REYNOLDS - PEOPLE - CROSS - MOORE

2   assigned to Anti-Crime generally?

3        A    Throughout my time on the job?

4        Q    Before; were you with Anti-Crime before

5   January of '89?

6        A    No.

7        Q    Now, with regard to the events of 4/19, you

8   had stated, Officer, that you were with your

9   partner, Officer Powers; is that correct?

10       A    That's correct.

11       Q    And Officer Powers was the driver of the

12   vehicle, am I correct?

13       A    You're correct.

14       Q    What was your assignment?  Were you the

15   recorder or what?

16       A    Recorder.

17       Q    So you would have been operating and

18   receiving transmissions, am I correct?

19       A    That's correct.

20       Q    Now, you stated that you received the first

21   transmission at about 21:00, is that correct?

22       A    I believe I said 21:30 I heard.  I remember

23   hearing one of the first transmissions on it.

24       Q    Okay.  That's 9:30?

25       A    Yes.

NYCLD_023223

P-APP001934

478

REYNOLDS — PEOPLE — CROSS — MOORE

Q   Our time.  All right, but do you recall that
you had initially told, I think Detective Rosario on
April 20th that you heard the first transmission at
21:00 hours; do you recall that?

A   Can I look at my notes?

T10/FR

Q   Sure, go ahead.

A   I told him at approximately 21:00 hours the
reports started to come in.  I didn't say I first
heard it at 21:00 hours.

Q   Well, you stated at 21:00 hours there were
numerous complaints of assaults being committed, am
I correct?

A   Will you repeat that?

Q   Did you state that at 21:00 hours there were
numerous complaints of assaults being committed in
the park?

A   I informed him that I believed that at about
21:00 hours is when the reports started to come in.

Q   So that at about 9:30 you heard a particular
transmission, is that correct?

A   That's correct.

Q   Now, you testified the substance of this
transmission was disorderly mob in park harassing

NYCLD_023224

P-APP001935

REYNOLDS — PEOPLE — CROSS — MOORE

1

2 people, am I correct; that that was the substance of

3 the transmission your received?

4     A    Disorderly males.

5     Q    Disorderly males in the park harassing

6 people, am I correct?

7     A    Yes.

8     Q    Did you receive a further transmission of

9 the males in terms of their ethnic or racial origin?

10    A    Yes.

11    Q    Well, what did you receive with regard to

12 that?

13    A    They were male blacks.

14    Q    So, it was disorderly male blacks, is that

15 what you received?

16    A    Yes.

17    Q    So, this was just not disorderly males, it

18 was disorderly male blacks?

19    A    Yes.

20    Q    Well, do you recall a conversation with

21 Detective Rosario?

22    A    Parts of it, yes.

23    Q    And do you not recall telling him that the

24 assaults were committed by a large group of young

25 males?

NYCLD_023225

P-APP001936

1        REYNOLDS — PEOPLE — CROSS — MOORE

2      A    If that's what's in there, that's probably

3   what I told him.

4      Q    Well, isn't that what's in there?

5      A    Yes.

6           MS. LEDERER:  Objection.

7      Q    So, there's nothing in what you told

8   Detective Rosario the next day that indicated that

9   the first transmission at least spoke of male

10  blacks, am I correct?

11     A    My conversation with him didn't hinge upon

12  the first radio transmission.

13     Q    I'm not asking you what it hinged upon, I'm

14  asking you what you told him.

15     A    I explained the entire situation to him and

16  everything that I knew at that point.

17     Q    Now, you had indicated in response to

18  questions from the District Attorney that these

19  assaults were being committed basically on the west

20  side around 100th Street, am I correct?

21     A    Some of them, yes.

22     Q    And the others were committed where?

23     A    I believe there was one on the east side,

24  one or two.  We received numerous complaints and

25  they were scattered about the park.

481

REYNOLDS - PEOPLE - CROSS - MOORE

1

2       Q    Now, did this transmission give-- did this

3   transmission give you any further details about

4   these assaults?

5       A    Which one?

6       Q    The first transmission.

7       A    The first one that I remember?

8       Q    That's right.

9       A    I believe it was for male blacks that were

10  disorderly, harassing.

11      Q    Did it indicate who was being harassed?

12      A    I believe it just stated, you know,

13  civilians, passersby in the park.

14      Q    Assaulting passersby in the park?

15      A    I believe it was harassing.

16      Q    Harassing passersby in the park?

17      A    Yes.

18      Q    Are you sure that was the substance of the

19  transmission?

20      A    I'm not a hundred percent sure.  This is

21  what I recall at this point.

22      Q    Don't you recall, Officer, in your

23  conversation with Detective Rosario that you told

24  him that the youths were attacking joggers, cyclists

25  and anyone walking in the area; don't you recall

P-APP001938

482

REYNOLDS - PEOPLE - CROSS - MOORE

1

2  telling him that?

3      A   I believe I said that.

4      Q   You were fairly specific about the victims

5  who were being attacked, were you not?

6      A   Yes.

7      Q   Well, which was the correct transmission,

8  what you received that night and you recorded in

9  your memo book or what you told Detective Rosario

10 the next day?

11         MS. LEDERER:  Objection.

12         THE COURT:  Sustained.

13     Q   I would like you to look at your memo book,

14 Officer, the first page of your memo book.  Is there

15 anything on that first page of your memo book that

16 indicated the people who were attacked were joggers,

17 cyclists, et cetera?

18         MR. BURNS:  I'm sorry, was there an

19         answer?  I didn't hear it.

20         THE COURT:  You asked if there was an

21         answer and the answer to that is no.

22     A   No, there's no mention of what type of

23 complainant or what the complainants were doing on

24 the first page.

25     Q   And in your steno pad also could you just

REYNOLDS — PEOPLE — CROSS — MOORE

1
2  have a look at your steno pad on the first page?

3      A    There's no mention of joggers.

4      Q    All right, Officer, the second transmission

5  you received at approximately 9:45, am I correct?

6      A    I'm not sure if that was the second

7  transmission.  I remember hearing a second.

8      Q    The second transmission you recall hearing

9  was about 9:45, is that correct?

10     A    Yes.

11     Q    And that second transmission, the substance

12  of that second transmission was twenty to thirty

13  male blacks; am I correct?

14     A    Yes.

15     Q    Did it indicate twenty to thirty male blacks

16  were doing something?

17     A    It indicated that twenty to thirty male

18  blacks were the ones that were harassing and

19  assaulting people in the park.

20     Q    Again, did that second transmission indicate

21  who was being assaulted?

22     A    No.

23     Q    Did it indicate where the assaults were

24  taking place?

25     A    As far as a specific location?

1          REYNOLDS - PEOPLE - CROSS - MOORE

2     Q    Yes.

3     A    Within the park.  I'm not sure what the

4  exact locations were.  I'll have to look it up.

5     Q    Well, after you received the first

6  transmission, you made a canvass of an area in the

7  northern part of the park, is that correct?

8     A    Yes.

9     Q    And you did not see, in fact, any group of

10 male blacks, am I correct?

11    A    That is correct.

12    Q    Well, after you received the second

13 transmission, you also made a canvass of the

14 northern end of the park, is that correct?

15    A    Yes.

16    Q    And you also did not meet this group of male

17 blacks?

18    A    Well, we continuously canvassed the area

19 from when we got the first radio run.

20    Q    Now, there came a time, Officer-- did there

21 come a time when you responded to 96th Street and

22 the bridle path?

23    A    No.

24    Q    So you did not respond to the area where Mr.

25 Loughlin apparently was assaulted, is that correct?

485

REYNOLDS — PEOPLE — CROSS — MOORE

1

2    A    That's correct.

3    Q    So, you never had a conversation with Mr.

4    Loughlin?

5    A    That's correct.

6    Q    Now, do you recall receiving the

7    transmission concerning the assault by Mr. Loughlin?

8    A    Yes.

9    Q    And do you recall what that transmission

10   was?

11   A    Basically stated that there was a man

12   assaulted and there was bleeding profusely from his

13   head and there was a request to have an ambulance

14   rushed to the scene because of his condition.

15   Q    Do you know if an ambulance was, in fact,

16   sent?

17   A    I'm not sure.  I think he might have went by

18   radio car.

19   Q    Do you know where he was taken?

20   A    I believe it was St. Luke's Hospital.

21   Q    So, you did obtain the information that he

22   had been taken to St. Luke's Hospital, am I correct?

23   A    Later on, yes.

24   Q    Later on about what time?

25        MS. LEDERER:  Objection.

NYCLD_023231

P-APP001942

486

REYNOLDS - PEOPLE - CROSS - MOORE

 1

 2        THE COURT:   I'll allow it.

 3     A   I don't recall specifically what time.

 4     Q   But sometime that night?

 5     A   Yes.

 6     Q   Now,   did   that   transmission   about   Mr.

 7  Loughlin,  did  it  indicate  who  were  the  alleged

 8  perpetrators?

 9     A   I believe they stated-- I'm sorry, I believe

10  Officer Carlson stated that it was male blacks.

11     Q   How many?

12     A   I'm  not  sure.   I  think  he  said  seven  or

13  eight.

14     Q   Seven or eight?

15     A   I think so.

16     Q   What about four or five, is  it  possible  he

17  may have said four or five?

18     A   Sure.

19     Q   So,  you  are  not  sure  of  the  exact  number

20  that he spoke about?

21     A   That's correct.

22     Q   Now, Officer, there came a time that you  and

23  your partner left the park at about 10:30 p.m., am  I

24  correct?

25     A   That's correct.

REYNOLDS — PEOPLE — CROSS — MOORE

1

2   Q    And you stated that you saw a group of, I

3   think it was blacks and Hispanics, walking in a

4   northerly direction between 101st and 102nd Street?

5   A    Correct.

6   Q    Now, how many blacks and Hispanics did you

7   see walking along 101st Street?

8   A    I saw what appeared to be about ten or

9   fifteen males.

10  Q    Ten to fifteen?

11  A    Yes.

12  Q    Now, you said your partner, Officer Powers,

13  was also in the vehicle with you, am I correct?

14  A    That's correct.

15  Q    And if I was to tell you, for example, that

16  Officer Powers alleged in his report that there were

17  fifteen to twenty, would you say your estimate was

18  more accurate than his in your opinion?

19           MS. LEDERER:  Objection.

20           THE COURT:  I'll sustain the objection.

21  Q    Well, was it fifteen to twenty?

22  A    Could have been.

23  Q    Or—

24  A    Couldn't count them.

25  Q    So, it could have been anywhere between ten

NYCLD_023233

488

REYNOLDS — PEOPLE — CROSS — MOORE

1
2   to twenty?

3       A    It's entirely possible.

4       Q    But in any event, it was more than four or
5   five, am I correct?

6       A    Yes.

7       Q    Now, Officer, when you saw this group of
8   male blacks and Hispanics walking in a northerly
9   direction-- let me just ask, how were they walking
10  when you first saw them?

11      A    How were they walking?

12      Q    Yes, were they walking slow or fast or were
13  they just talking among themselves?  What were they
14  doing?

15      A    They were walking-- I guess at a brisk pace.

16      Q    At a brisk pace?

17      A    I believe so.

18      Q    Were they bothering any pedestrians in the
19  street?

20      A    I don't remember seeing anybody there.

21      Q    You don't recall that?

22      A    No.

23      Q    Now, in fact, when you saw these people,
24  these blacks and Hispanics, it was you and your
25  partner who first approached them, am I correct?

NYCLD_023234

P-APP001945

489

REYNOLDS - PEOPLE - CROSS - MOORE

1

2    A    That is correct.

3    Q    And what did you say to them when you

4 approached them?

5    A    I didn't say anything to the group.

6    Q    Did you drive to where the group was?

7    A    We drove slightly ahead of them.

8    Q    And then you manipulated your vehicle in

9 such a way that you blocked the area in which they

10 were walking?

11    A    No.

12    Q    Well, wasn't it your intention to cut them

13 off?

14    A    Yes.

15    Q    Now, at this point in time when you placed

16 your vehicle at 102nd and Central Park West, what

17 happened next?

18    A    My partner stated to them-- Officer Powers

19 stated that we were police. We were-- he identified

20 himself, told them not to run and all of the group

21 except for two ran.

22    Q    When you said you said you were police, did

23 you personally display a badge?

24    A    I had my shield around my neck.

25    Q    No, did you display your shield?

NYCLD_023235

P-APP001946

490

REYNOLDS — PEOPLE — CROSS — MOORE

A    I had it displayed around my neck.

Q    How did you have it displayed?

A    On a chain around my neck.

Q    Did you take your shield and point it in your direction and indicate that this was your shield and you were a police officer?

A    No.

Q    You just had it tangling on your neck, is that correct?

A    That is correct.

Q    Were you wearing a jacket?

A    I might have been wearing a windbreaker.

Q    And-- so that it's possible that-- your shield may have been in the windbreaker, is that possible?

A    It's possible, but the jacket has an emblem from the precinct I used to work at, 52nd Precinct.

Q    What about your police I.D., were you carrying your police I.D. with you?

A    It's in my wallet.

Q    Did you take out your wallet? Did you display your wallet?

A    No.

Q    Now, what about your revolver, did you take

P-APP001947

491

1    REYNOLDS – PEOPLE – CROSS – MOORE

2    your revolver out of the holster?

3    A    No, I didn't.

4    Q    Now, you said you were the police and you

5    stated that the individuals scattered in various

6    directions, am I right?

7    A    They all ran south on Central Park West

8    towards 101st Street.

9    Q    Now, Officer, at this point in time was it

10   your intention to apprehend anyone?

11   A    Yes.

12   Q    Was it your intention to arrest anyone?

13   A    Anyone that had committed a crime, yes.

14   Q    Well, was it your intention to arrest any

15   one of the individuals who was in that group?

16   A    If they had assaulted the jogger or anybody

17   else, yes.

18   Q    But you didn't know at this point in time,

19   did you, whether they had, in fact, assaulted

20   anyone, did you?

21   A    We had an idea that they were involved.

22   Q    You had an idea?

23   A    Yes.

24        MR. MADDOX:   I object to "we."

25        THE COURT:   Yes.  Don't tell us about

492

REYNOLDS — PEOPLE — CROSS — MOORE

1
2         anyone else.

3            THE WITNESS:   I.

4    Q   You had an idea?

5    A   Yes, I did.

6    Q   And based on that idea, you were going to

7 arrest these ten or twelve people, am I correct?

8    A   I was going to question them and I was going

9 to stop them and if they were identified by a perp

10 or we had any other evidence that they did it, yes,

11 they were going to be placed under arrest.

12    Q   You were going to question them, am I

13 correct?

14    A   We were going to ascertain if they committed

15 the crime, yes.

16    Q   When you stopped Lopez and Santana, did you

17 ask them if they had committed a crime?

18    A   No.

19    Q   But you said it was your intention to ask,

20 so did you not pursue your intention?

21    A   Well, we don't ask people if they committed

22 a crime because they always say no.

23    Q   Well, did you ask-- so there's no point in

24 asking them any questions then, am I correct?

25    A   Not if they specifically did it, no.

NYCLD_023238

P-APP001949

493

REYNOLDS - PEOPLE - CROSS - MOORE

Q    You just arrest them?

A    No.

Q    Well, in that particular point in time when you came out and you approached, you didn't ask any questions, am I correct?

A    What we did was we placed them against the wall and patted them down.  At that point they started to state that they were not with the group and that the group was going to rob them.

Q    They just stated that and there were no questions that you asked?

A    No, because my partner was chasing after the others.

Q    So, you didn't ask them are you the group? You didn't ask that question?

A    No, it was not necessary.

Q    They just bared their chest to you, they just told you that they were not with the group?

A    That's right.

Q    Without any questions having been asked?

A    That's right.

Q    Now, while this was happening, was Officer Powers next to you?

A    In the beginning, yes.

NYCLD_023239

P-APP001950

494

REYNOLDS — PEOPLE — CROSS — MOORE

1

Q    In the beginning?

A    Yes, when we first stopped them.

Q    Don't recall Officer Powers telling one of the young me, "You shouldn't be out there beating up on people, you should be with your girlfriend"?  Did you ever hear him saying that?

A    No, but I believe that was stated in the station house.

Q    No, he said it in the station house?

A    I believe so.  I didn't hear the statement. I'm under the impression that it happened in the station house.

T11/LF

Q    Now, you had stated in response to questions from Mr. Berman that Santana and Lopez was originally charged with unlawful assembly, is that correct?

A    That's correct.

Q    And I think in the charging documents you mentioned a violation of 40.10 of the Penal Law?

A    If that's unlawful assembly, yes.

Q    Well, did you look at the elements of unlawful assembly?

MS. LEDERER:  Objection.

495

REYNOLDS - PEOPLE - CROSS - MOORE

1

2      THE COURT:  Objection sustained.

3      Q    Well, would you say, Officer, that at the

4  time when you made the arrest, that they were

5  involved in tumultuous, violent conduct likely to

6  cause public alarm?

7      A    At the time of the assault they were.

8      Q    Now I'm asking you at the time of the

9  arrest.

10     A    At the time of the arrest, no.

11     Q    So, at the time of the arrest they were not

12  in violation then, they were not unlawfully

13  assembling, am I correct?

14     A    I don't think so.

15     Q    Now, you stated that this unlawful assembly

16  had to do with another incident in the park, am I

17  correct?

18     A    Yes, with several incidents.

19     Q    But at the time when you arrested them, you

20  didn't know, did you, whether they were connected

21  with a prior incident on Mr. Loughlin; did you know

22  that?

23     A    Did I know it as a fact?

24     Q    Yes.

25     A    I believed that they did.

496

1                REYNOLDS - PEOPLE - CROSS - MOORE

2      Q      And it was on that belief that they were

3   charged with unlawful assembly?

4      A      Excuse me?

5      Q      It was on this belief that they were charged

6   with unlawful assembly?

7      A      A little more than that.

8      Q      Well, when you say that Mr. Loughlin was

9   assaulted--

10     A      Yes.

11     Q      -- would you say there was blood, he was

12  bleeding profusely from the head?

13     A      That's what I was told.

14     Q      Well, so, therefore, the charge would be

15  assault, would it not be?

16     A      Yes.

17            MS. LEDERER:  Objection.

18            THE COURT:  I will allow it.

19     Q      So, why then wasn't the charge of assault

20  made instead of unlawful assembly at that point in

21  time?

22     A      Because they didn't make any statement as to

23  committing the assault.  Three other defendants did.

24     Q      So, if they made a statement then, they

25  would be charged with assault; am I correct?

NYCLD_023242

P-APP001953

497

REYNOLDS - PEOPLE - CROSS - MOORE

1
2      A     If they made a statement stating they were
3   robbed in the assault, yes.
4      Q     If they didn't make a statement, they would
5   be charged with unlawful assembly?
6      A     For being with the group that was going
7   around assaulting people, yes.
8      Q     So, if a group of individuals assault an
9   individual and do not make a statement, they would
10  not be charged with assault; am I correct?
11              MS. LEDERER:  Objection.
12              THE COURT:  Objection sustained.  I
13          don't think he said that.
14      Q     Now, Mr. Berman had made a reference to a
15  supporting deposition that was included in the
16  Family Court documents.
17      Could you just look at the supporting deposition
18  a moment.
19      A     Which one?
20      Q     These are the Family Court documents that
21  you compiled on each of the defendants.  Let's say,
22  Lopez, for example.
23      A     Lopez?
24      Q     Yes.  Is that the supporting deposition?
25      A     Yes, it is.

NYCLD_023243

P-APP001954

498

REYNOLDS — PEOPLE — CROSS — MOORE

Q    What do you understand a supporting deposition to be?

MS. LEDERER:  Objection.

THE COURT:  Let me ask counsel, what does Lopez have anything to do with your client?  Why is this a proffer area for you to be going over?  Counsel has already gone over a lot of this.

MR. BURNS:  Your Honor, is your microphone off?

THE COURT:  I'm not using my mike.  Do you have trouble hearing me?  Come up.

(Discussion was held off the record.)

Q    Let me just ask you a few more questions, Officer.

You stated that during that night several young people were charged with assault, is that correct?

A    That's correct.

Q    The assault on Mr. Loughlin, am I correct?

A    That's correct.

Q    You also knew, Officer, that Mr. Loughlin had been taken to St. Luke's Hospital, is that correct?

A    Yes.

NYCLD_023244

P-APP001955

499

REYNOLDS — PEOPLE — CROSS — MOORE

Q   Did you ever take any of those young people over to the hospital where Mr. Loughlin was held for the purposes of a showup?

A   No.

MR. MOORE:   No further questions.

THE COURT:   Mr. Diller.

CROSS EXAMINATION

BY MR. DILLER:

Q   Good afternoon, Detective Reynolds, my name is Howard Diller.   I represent Kevin Richardson. All the questions that I will be asking you will be with respect to Kevin Richardson.

Do you understand?

A   Yes.

Q   Okay.   I'm going to direct your attention specifically to the evening of the 19th of April of this year and ask you, when was it for the first time you saw Kevin Richardson?

A   When I first—

Q   The time.

A   When I first saw him?

Q   Yes.

A   When I saw him in the pack, when they started running.

NYCLD_023245

P-APP001956

REYNOLDS - PEOPLE - CROSS - DILLER

1

2    Q    Did you recognize him?

3    A    No.

4    Q    About what time was that?

5         MR. BERMAN:  I would move to strike the

6    word "pack," Judge.

7         THE COURT:  Yes, strike out the word

8    "pack."

9         Do you have another word to describe the

10   group?  Is this a group that you saw?

11        THE WITNESS:  Yes, a group.

12   Q    What time was that approximately?

13   A    It was about, when I first the group?

14   Q    Yes.

15   A    About 10:30.

16   Q    Now, did there come a time that you saw him

17   again?

18   A    Yes.

19   Q    When was that?

20   A    That was at 100th Street and Central Park

21   West.

22   Q    And at that time he was already in custody,

23   is that so?

24   A    That's correct.

25   Q    And who arrested him?

NYCLD_023246

P-APP001957

1            REYNOLDS - PEOPLE - CROSS - DILLER

2       A    I'm the arresting officer on all of them.

3  If you mean who apprehended him--

4       Q    Yes.

5       A    I'm not certain who it was.

6       Q    Now, when you saw you were the arresting

7  officer, you have a certain responsibility with

8  respect to the persons charged with your arrest, is

9  that so?

10      A    Yes.

11      Q    Different than, for example, your partner,

12 Police Officer Powers; is that so, in terms of your

13 responsibilities?

14      A    As far as what?

15      Q    Procedure, filling out forms and so forth.

16      A    Well, we both do as much paperwork as

17 possible.

18      Q    Now, there came a time that Kevin Richardson

19 was taken to the Central Park Precinct, is that

20 correct?

21      A    That's correct.

22      Q    Were you in the same car with him when he

23 came to the precinct?

24      A    No.

25      Q    Who drove Kevin Richardson to the precinct,

502

REYNOLDS — PEOPLE — CROSS — DILLER

1

2  do you remember?

3     A    I'm not sure specifically who it was.

4     Q    At any rate, there came a time when he was

5  taken to the station house, is that correct?

6     A    That's right.

7     Q    And there came a time that you saw him

8  there, is that right?

9     A    That's right.

10    Q    And where was he in the station house when

11 you first saw him?

12    A    He was in front of the desk.

13    Q    And he was there with some others, is that

14 correct?

15    A    That's correct.

16    Q    And at that desk was where he had given the

17 pedigree to the desk officer, is that correct?

18    A    That is correct.

19    Q    Up until that time did you have any

20 conversation with Kevin Richardson?

21    A    Up until what time?

22    Q    Up until the point where he was at the

23 desk-- was it a desk sergeant or lieutenant?

24              THE COURT:  You mean before the time he

25              saw him at the desk, had he had any

503

REYNOLDS – PEOPLE – CROSS – DILLER

1
2       conversation?

3       Q    Any conversation.

4       A    No.

5       Q    Now, he was at the desk but a few minutes,
6  is that correct?

7       A    That's correct.

8       Q    And then you took him somewhere, did you
9  not?

10      A    Yes.

11      Q    And where did you take him?

12      A    Across to the Juvenile Room.

13      Q    And at that point he was handcuffed, was he
14  not?

15      A    He was handcuffed from when he was
16  originally handcuffed on the street.

17      Q    And he was handcuffed in front of the desk
18  officer?

19      A    That's correct.

20      Q    And when he was taken to the Juvenile Room,
21  he was handcuffed too, was he not?

22      A    When he got in there, yes.

23      Q    And as a matter of fact, he remained
24  handcuffed for well over an hour, isn't that so?

25      A    No.

NYCLD_023249

P-APP001960

504

REYNOLDS — PEOPLE — CROSS — DILLER

1

2      Q      Are you positive about that?

3      A      Yes.   We took the handcuffs when we got

4  inside.

5      Q      And how long was he inside before you took

6  the handcuffs off?

7      A      The exact time in minutes?

8      Q      Approximately.

9      A      Fifteen minutes.

10     Q      It wasn't over an hour?

11     A      No.

12     Q      Now, when he had his handcuffs off, who was

13  in the room with him?

14     A      I was.

15     Q      And was there any other police officer?

16     A      Well, there were police officers coming back

17  and forth.

18     Q      Was at that stage he subject to any

19  questions by any officers including yourself, as far

20  as you know?

21     A      Yes.

22     Q      And did you ask him questions?

23     A      Yes.

24     Q      What did you ask him?

25     A      I asked him what his name was, his address,

NYCLD_023250

P-APP001961