T2-fr

331

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2      you were driving around the north end of

3      the park?

4   A   No.

5   Q   When you referred to the north end of the

6      park, from what street north were you

7      canvassing?

8   A   North of 96th Street.

9   Q   Can you describe in a general way what

10     route you took?

11  A   In canvassing?

12  Q   Yes.

13  A   We went through all the foot paths and —

14     you know, all the routes we could to go

15     through all the dark areas, and, you know,

16     part of the park that weren't visible.

17  Q   At any time did you see anybody or any

18     group that resembled what you had heard on

19     the radio?

20  A   In the beginning, no.

21  Q   And did you hear any other radio

22     communications while you were canvassing

23     the north end of the park?

24  A   Yes.

25  Q   What was the next radio communication that

10/13/89

NYCLD_023077

P-APP002414

T2-fr

332

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2       you heard?

3    A   We got  --  I  heard  our  sergeant  --  my

4        sergeant from  Anti-Crime  had  a  possible

5        group  over  at  100  Street  and  the  West  Drive

6        in  the  playground.

7    Q   What  is  your  sergeant's  name?

8    A   Sergeant  Lyle.

9    Q   What  did  you  do  when  you  heard  that

10       communication?

11   A   We  responded  to  the  area  where  he  was.

12   Q   Approximately  what  time  was  it  that  you

13       arrived  at  that  playground?

14   A   That  was  about  a  quarter  to  ten,  10:00.

15   Q   Did  you  have  a  conversation  with  Officer

16       Alvarez  at  that  location?

17   A   Yes,  I  did.

18   Q   Did  he  tell  you  whether  he  had  seen

19       anything  in  the  park?

20   A   Yes.

21   Q   What,  if  anything,  did  Officer  Alvarez  tell

22       you?

23   A   He  told  me  he  saw  a  group  of  youths  and

24       when  they  saw  the  radio  car,  they  all  ran.

25   Q   Did  he  describe  the  number  of  the  people  in

10/13/89

NYCLD_023078

P-APP002415

T2-fr

333

1    REYNOLDS — PEOPLE — DIRECT — LEDERER

2         the group?

3    A    He said he saw about seven to ten of them.

4    Q    Did he indicate that he had seen a larger

5         group?

6         MR. MOORE:  Objection.

7         MR. RIVERA:  Objection.

8         MR. JOSEPH:  Objection.

9         MR. BURNS:  Objection.

10        MR. DILLER:  Objection.

11        MR. BERMAN:  Objection.

12        MR. MADDOX:  Objection.

13        THE COURT:  Sustained.  Let him

14        testify.

15   Q    What else did he tell you about the people

16   he saw?

17   A    He stated they were male blacks and

18   Hispanics and they were in their teens.

19   Q    Did he tell you where he had seen the

20   group?

21   A    I believe he said he saw them on the east

22   side.

23        MR. MOORE:  Objection.

24        THE COURT:  I'll let him answer.

25   Q    Was he able to tell you whether it was in

10/13/89

NYCLD_023079

P-APP002416

T2-fr

334

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2 or out of the park?

3     A    He said it was inside the park.

4     Q    Did he tell you what time it was that he
5 had seen them?

6     A    That I don't recall.

7     Q    Did he say anything about the gender or the
8 sex of the people he had seen?

9     A    Yes, he said they were male blacks and
10 Hispanics.

11     Q    Did you have a conversation -- withdrawn.

12     How long did you stay at the playground at
13 100 Street?

14     A    Not long, just long enough to -- for the
15 show-up and to get a description from Police Officer
16 Alvarez and then we resumed canvassing.

17     Q    Where did you go when you left that
18 location?

19     A    Again we stayed in the north end and we
20 went through all the trails and the inaccessible
21 parts of the park.

22     Q    How long did you drive around in the park?

23     A    About another half-hour.

24     Q    Did you hear another radio communication
25 after you had been at the playground where Sergeant

10/13/89

NYCLD_023080

P-APP002417

T2-fr

335

REYNOLDS — PEOPLE — DIRECT — LEDERER

Lyle was?

    A    Yes.

    Q    What was the communication that you heard then?

    A    That there was a male jogger found beaten and bleeding profusely from his head.

    Q    Where was that -- was there a location with respect to where that jogger was found?

    A    Yes. That was 96th Street, I believe, approximately, and the West Drive off the reservoir.

    Q    Where were you when you got that communication, if you recall?

    A    I believe we were at the East Drive again and 102nd Street.

    Q    Did the communication given with respect to that jogger contain any information about any people?

    A    He stated there was a group of male Hispanics and Blacks who had assaulted the jogger.

    Q    Was there any further information about the assault?

    A    Yes, that they had fled north.

    Q    What, if anything, did you do after you heard that information?

10/13/89

NYCLD_023081

P-APP002418

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

A      At that point I decided to leave  the  park
and to start the canvas outside at Central Park West
at 100 Street.

Q      Where did you leave the park?

A          We left at 100th Street and Central Park
West.

Q      Why did you leave the park at that time?

A      Because I felt that the group was no longer
in the park.  We had canvassed for quite a while and
the entire park was saturated with police vehicles.

Q      Did you see  other  vehicles  in  the  park
other  than those you refer to at the East Drive and
102nd Street?

A      Other than what I described earlier?

Q      During the time  you  were  canvassing  the
park,  other  than  what  you already told us at the
East Drive and 102nd Street, did you see  any  other
police vehicles in the park?

A      Just what I mentioned.

Q      And when you were canvassing the north end
of the park, did you see any sign  of  other  police
vehicles?

A      Yes.

Q      What did you see?

10/13/89

NYCLD_023082

P-APP002419

T2-fr

337

REYNOLDS – PEOPLE – DIRECT – LEDERER

1

2  A      As I was going through the fields, I could

3  see further north of me the headlights of the  other

4  vehicles going back and forth also in search for the

5  group.

6          MS.  LEDERER:  With the permission of

7          the Court, I'd ask the witness  to  please

8          step  down  and  approach  People's  7  in

9          evidence.

10         (Witness complies)

11  Q    Would you please point  on  People's  7  in

12  evidence  and  describe  as you do, what area you're

13  possibly  pointing  to,  indicate  where  you    were

14  traveling  and  where you would see the other lights

15  from other vehicles?

16  A    We saw the other lights ––

17         THE COURT:  Excuse me, Officer, I have

18         to remind you to speak as loud as  you  can

19         because  everybody over on this side has to

20         hear you, and it is very difficult in  this

21         courtroom.

22         THE WITNESS:  Okay.

23         I saw headlights from the other police

24         cars  going  east  and  west  across  the

25         ballfields here on the north end.   I  was

10/13/89

NYCLD_023083

P-APP002420

T2-fr

338

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2       south   of   them   and   I   could   see   them   —— I
3       could   see   that   the   ballfields   in   this   area
4       was   pretty   well   saturated   with   police   cars
5       and   there   was   probably   no   group   in   there
6       because   somebody   would   have   seen ——
7              MR.   MADDOX:   Also   describe   the   area
8       that   he   just   referred   to   on   the   map.
9              THE   COURT:   Yes,   if   there   is   some
10      legend   on   that   map   that   describes   the   area
11      that   you're   in,   please   tell   us   what   it   is.
12      I   see   there   is   some   writing   on   that   map.
13      If   you   could   tell   us   what   it   was,   the   area
14      that   you   say   you   were   driving   in.
15             THE   WITNESS:   This   is   the   north
16      meadow,   and   it   contains   several   baseball,
17      softball,   and   a   football   field   and   we
18      again,   like   I   said,   I   had   seen   several
19      radio   cars   going   back   and   forth   and   they
20      pretty   well   had   the   whole   area   covered.   If
21      there   was   any   group   in   there ——
22             MR.   BURNS:   Objection.
23             MR.   MOORE:   Objection.
24             THE   COURT:   Yes,   don't   speculate,   just
25      tell   us   what   you   saw.

10/13/89

NYCLD_023084

P-APP002421

T2-fr

339

REYNOLDS - PEOPLE - DIRECT - LEDERER

THE WITNESS:  I saw  the  police  cars going  back and forth and they had the area well covered.

Q     Where did you go --

MR.  BURNS:     I'm  sorry.     For  the record,  the record should reflect the area of the North Meadow.

THE COURT:  He covered the whole  area of the North Meadow.

Q     When you stated earlier that you decided at this  time to leave the park, will you point out the route you took to enter the park?

A     We left here  at  100  Street,  going  west towards Central Park West.

Q      What time was it, approximately, when you were leaving Central Park?

A      It was approximately 10:30.

Q      What, if anything, did you see as you  left Central Park at 100 Street?

A      Okay.  When we got to Central Park West at 100th Street, just north of us, between 101st Street and 102nd, on the west side of the street, we saw  a group  of  about  10, 15, male blacks and hispanics. They were teenagers.

10/13/89

T2-fr

340

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      Q      What, if anything, did you do when you   saw
3  that group?
4      A       What we -- what I did was we started to
5  drive northbound towards them to get a   better   look
6  at the group.
7      Q      What side of the street were they on?
8      A      They were on the west side of the street.
9      Q      And when you were driving, what side of the
10 street were you driving on?
11     A      I was on the east side going northbound.
12     Q       What, if anything, happened as you went
13 northbound on Central Park West approaching that
14 group?
15     A       Well, we saw the group.  They were all --
16 you know, walking together.  We felt reasonably sure
17 that they didn't --
18              THE COURT:  It's not what you felt.
19              THE WITNESS:  I felt  reasonably  sure
20         they didn't know who we were.
21              MR. RIVERA:  Objection.
22              MR. BURNS:  Objection.
23              MR. MOORE:  Objection.
24              MR. JOSEPH:  Objection.
25              MR. MADDOX:  Objection.

10/13/89

NYCLD_023086

P-APP002423

T2-fr

341

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2          MR. DILLER:  Objection.

3          MR. BERMAN:  Objection.

4          THE   COURT:    I'll   allow   that.   Go

5     ahead.

6          THE  WITNESS:  At one point  the  group

7     had stopped ——

8          MR.   RIVERA:     I   didn't   hear   the

9     statement he didn't feel reasonably what?

10         THE COURT:  Did not make out who  they

11    were.

12    Q     Continue.

13    A     The group at one point stopped and they all

14    started  to  look our way and started to point at us

15    in the van, and I couldn't  understand  why  because

16    nobody wouldn't really ——

17         MR. MOORE:  Objection.

18         THE COURT:  Finish your answer.

19         THE  WITNESS:   Nobody generally makes

20    who we were.

21         MR. MOORE:  Objection.

22         THE COURT:  Objection sustained.

23         Don't tell us  what  people  generally

24    do.  Just tell us what happened here.

25         THE  WITNESS:  What I did was I looked

10/13/89

NYCLD_023087

P-APP002424

T2-fr

1
2       to our right and a marked police three-
3       wheel scooter was on our right hand side
4       and that's what panicked them.

5              MR. MOORE:  Objection.

6              MR. MADDOX:  Objection.

7              THE COURT:  Sustained.  Just tell us
8       what you saw.

9    Q       When you looked and saw in your sideview
10   mirror a scooter, where was this scooter?

11   A       Right alongside the van on my side.  It was
12   on the other side of us, from the group.

13   Q       Who was on that scooter?

14   A       Police Officer Flores.

15   Q       What did you do when you became aware  that
16   Police Officer Flores was pulling up besides you?

17   A       Well, I felt -- it looked like the group
18   was going to run to me.

19             MR. MOORE:  Objection.

20             MR. JOSEPH:  Objection.

21             THE COURT:  I'll allow it,  go  ahead.
22       Finish.

23             THE WITNESS:  And I told my partner to
24       take  the  van and pull it up ahead of them
25       to cut them off so we can stop them.

10/13/89

NYCLD_023088

P-APP002425

T2-fr

343

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     Q     And did the van pull up?

3     A     Yes.

4     Q     Where did the van go?

5     A     Okay. My partner pulled up the van to

6  102nd Street and CPW, Central Park West on the

7  southwest corner.

8     Q     WHen you say the van was pulled up on the

9  southwest corner of 102nd and Central Park West, can

10  you describe exactly what position it was in in

11  relation to the sidewalk and the street of 102nd

12  Street?

13     A     Okay. The van was facing west with the

14  headlights facing west towards the building.  Then

15  my partner and myself got out of the van, we

16  identified ourselves.  AT that point the group

17  started to run except for two.  Those two were

18  Raymond Santana and Steve Lopez.

19              MR. MOORE:    Not responsive to the

20         question.

21              THE COURT:  I'll allow it.

22     Q     When you say you got out of the van -- let

23  me just go back for a second.  The van that you were

24  describing, what color is the van?

25     A     Green.

10/13/8

T2-fr

344

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q      Are there any windows in the  back  portion

3  of the van?

4      A        In the back two doors -- I'm sorry, there

5  are no windows in it.

6      Q      Are there any side panels?

7      A      I don't believe so.

8      Q      Does it have any insignia?

9      A      Yes, Parks Department emblem on the front.

10     Q      When the van pulled into the  beginning  of

11  102nd Street and Central Park West, you say you both

12  jumped out.  What exactly did you say?

13     A        We identified ourselves as police and we

14  told them not to run.

15     Q      What happened when you said, "Don't run?"

16     A      The group started to run.

17     Q      And what did you do when the group  started

18  to run?

19     A      We got out of the van and we approached the

20  two defendants that had stayed on the corner.

21     Q        And you just named the names of those two

22  people.  Did you at the time that you  stopped  them

23  know their names?

24     A      Not at that time, no.

25     Q        What,  if  anything,  happened when you

10/13/89

T2-fr

345

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2  stopped those two?

3     A     We placed them against the wall.

4            MR. MADDOX:   Objection, Judge.    He

5            didn't   stop   them.    They   were   already

6            stopped.

7            THE COURT:   Yes.   Objection sustained.

8     Q     What happened when you approached those

9  two?

10    A         We   placed   them   against   the   wall   and

11 searched them.

12    Q     Did you have your gun drawn   when   you   got

13 out of the van?

14    A     No.

15    Q       When you say you placed them against the

16 wall, what exactly did you do?

17    A     We gave them a pat down of their clothes in

18 case they had weapons on them.

19    Q     Did you find any weapons?

20    A     No.

21    Q     What was the next thing that happened?

22    A     My   partner,   Police   Officer   Powers   and

23 Police Officer Flores chased the group.

24    Q     Did the two people that you placed against

25 the wall,   Raymond   Santana   and   Steve   Lopez,   did

10/13/8°

NYCLD_023091

P-APP002428

T2-fr

346

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  either of them say anything to you?

3      A    Yes.

4      Q    What, if anything, did they say to you?

5      A    Let's see.  Raymond Santana stated he had

6  just come from his girlfriend's house and didn't

7  state where or when.

8              MR. JOSEPH:  Objection.

9              THE COURT:  Don't tell us what he

10             didn't said.  Just tell us what he did say.

11             THE WITNESS:  Steven Lopez stated he

12             just came from the movies with his

13             girlfriend and they watched the movie

14             "Leviathan".

15     Q    Did either of them say anything about the

16  rest of the group?

17     A    They stated they weren't with the group and

18  Steven Lopez stated, I quote, "The group had talked

19  shit about ripping them off."

20             MR. MADDOX:  I can't hear.

21             THE COURT:  Who said that?

22             THE WITNESS:  Steven Lopez.

23             THE COURT:  Stated what?

24             THE WITNESS:  They were not with the

25             group and the group had talked -- I quote,

10/13/89

NYCLD_023092

P-APP002429

T2-fr

347

REYNOLDS - PEOPLE - DIRECT - LEDERER

"Talked shit about ripping them off."

Q    When I asked you a moment ago did either of those two people say anything with respect to the rest of the group I believe your answer began, "They said," could you tell us exactly what either one of them said indicating by name what that person said?

MR. MOORE:    Objection.    Asked and answered.

THE COURT:   I'll allow it again.

THE WITNESS:   They both stated that they weren't with the group and they didn't know any of the others that had run.   They stated that they were walking ahead of them and --

MR. RIVERA:    Objection, your Honor, not responsive.

THE COURT:   Yes, objection sustained.

Q     Can you tell us what Raymond Santana said to you when he was stopped at 102nd Street and Central Park West?

A        Raymond Santana said he wasn't with the group and he had just come from his girlfriend's house.

Q      What, if anything, did Steven Lopez say at

10/13/89

NYCLD_023093

P-APP002430

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

that time?

A    He stated he also was not with  the  group,

that  he  had just come from his -- he had just come

from the movies with his girlfriend and they watched

the picture "Leviathan" and he also  stated,  and  I

quote, "Talked  shit  about  ripping off -- ripping

them off."

Q    Did  you  ask  either  Defendant  Lopez  or

Defendant Santana any questions?

A    No.

Q    When you saw this group, could you describe

how  the  group was in relation to  the  other  members

of the group?

A    The two --

MR. BERMAN:  Object as to form.

THE COURT:  What is your question?

Q    When you saw the group walking  on  Central

Park  West,  would  you describe the relation of the

group with one to the other?

A    It was a  homogenized  group.   They  were

altogether  and  they  were  all walking northbound.

They were male Blacks, teenaged and Hispanics.

Q    When you saw the group on the west side  of

the  street, approximately how much of the block was

10/13/89

NYCLD_023094

P-APP002431

T2-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  taken up by the members of the group?

3      A    Maybe a quarter of the block.

4      Q        And   where   were   Defendant's   Lopez   and

5  Santana,  if you remember, in relation to the others

6  in the group?

7      A    They were in the group  because   the   group

8  was altogether.

9      Q    What, if anything, happened after Lopez and

10  Santana made those statements to you?

11      A        My partner, Police Officer Powers chased

12  the rest of the group with Police Officer Flores.

13      Q    Where did you see him go?

14      A    I saw him  running   southbound   on   Central

15  Park West and then west on 101st Street.

16      Q        Did you see where he went when he turned

17  onto that street?

18      A    When he turned west, I lost sight of him?

19      Q    Officer Reynolds -- I'm sorry --

20      A    And then I saw him again running back   east

21  and the group was ahead of him and they ran into the

22  park, and he ran into the park after them.

23      Q    Approximately how much time elapsed between

24  the time you saw him disappear from your sight going

25  down  the street until you saw the group coming back

10/13/89

T2-fr

350

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   with him, chasing?

3       A     Just seconds.

4       Q     Did you then see Officer Powers -- go  into

5   the park?

6       A       Yes, I saw him run and jump over the wall

7   into the park after the defendants.

8              MR. MADDOX:  Objection to "after  the

9          defendants."

10             THE  COURT:   Yes, Objection sustained

11         as to "after the defendants."

12      Q     Did you see how many people were running in

13  front of Officer Powers?

14      A     It looked to be about ten.

15      Q     And you said that they entered the park, do

16  you know where it was that they entered the park?

17      A     It was over the wall and  at  Central  Park

18  West and 101st Street, between 101st and 100.

19      Q       And is that where you saw Officer Powers

20  enter the park?

21      A     Yes.

22      Q     Let me just stop you for  a  moment.    The

23  area  on Central Park West, near 101st and 102nd, to

24  your knowledge are there any movie theaters in  that

25  area?

10/13/89

NYCLD_023096

P-APP002433

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   A    No, there isn't.

2   Q        Are there any community centers in that

3   area?

4   A    No.

5        MR. MADDOX:   Judge, may I  ask  if  he

6   could repeat the question and answer?

7        THE  COURT:   Read  the  question and

8   answer back, please.

9        (Reporter complies)

10  Q    Are there any stores on Central  Park  West

11  in that area?

12  A        No.  There's just a grocery store further

13  down, but it's very small north of where they were.

14  Q    After you lost sight of Officer Powers when

15  he went into the park, what was the next thing  that

16  happened?

17  A      I stood on the corner with Raymond Santana

18  and Steven Lopez.

19  Q    Did you handcuff them?

20  A    No.

21  Q    And where was the van?

22  A    The van was right where we left it on 102nd

23  Street and Central Park West.

24  Q    Did either of them say anything further  to

10/13/8

T2-fr

352

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  you?

3      A      They just kept stating that they were not
4  with the rest of them.

5      Q      When you say they kept saying that, who
6  kept saying that?

7      A      Steve Lopez and Raymond Santana.

8      Q      And did you ask them any questions?

9      A      No.

10      Q      Did you have your radio with you?

11      A      Yes, I did.

12      Q      Did you hear communications coming over the
13  radio?

14      A      Yes.

15      Q      Did there come a time when someone came to
16  where you were with Santana and Lopez?

17      A      Yes.

18      Q      Approximately what time was that?

19              THE WITNESS:  May I look at  my  notes
20          to refresh my memory?

21              THE COURT:  If you have to.

22              (Witness peruses notes)

23      A      It was approximately a quarter to eleven.

24              THE COURT:  And what happened at about
25          a quarter to eleven?

10/13/89

NYCLD_023098

P-APP002435

T3-1f

353

REYNOLDS - PEOPLE - DIRECT - LEDERER

THE WITNESS:   Sergeant Wheeler and Police Officer Morales pulled over after the call over the radio for a unit to pick up the two.

Q     What happened when they responded?

A     They responded over and we placed them into the car.

Q     Placed whom in the car?

A     Steven Lopez and Raymond Santana.

Q     And what did you do at that point?

A     I went with Police Officer Powers into the van, and we drove back to 100 Street and Central Park West to confer with our sergeant.

Q     When Raymond Santana and Steve Lopez were put in the car with the sergeant, did you see where they went?

A     They went to 100 Street and Central Park West.

Q     And when you arrived at 100 Street and Central Park West, were Raymond Santana and Steve Lopez there?

A     Yes.

Q     Were they in the car or outside of the car?

A     They were in the car.

10/13/89

NYCLD_023099

P-APP002436

T3-1f

354

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q        And at what corner of that intersection

3    were you at?

4    A    The northeast corner.

5    Q    When you arrived at that location, who  did

6    you arrive with?

7    A    Police Officer Powers.

8    Q    And who was already at that location?

9    A      Sergeant Lyle and Police Officer Hennigan

10   and the other officers.

11   Q    And did you see anybody  in  custody  other

12   than Raymond Santana and Steve Lopez?

13   A    Yes.

14   Q    Who did you see at that time?

15   A     I saw Kevin Richardson, Lamont McCall and

16   Clarence Thomas.

17   Q    Where did you see them?

18   A    In the back of the radio car.

19   Q    Were all three in the same radio car?

20   A    I believe so.  I'm not sure.

21   Q    Was there a discussion at  100  Street  and

22   Central Park West?

23   A    Yes, there was.

24   Q    And what was the nature of the conversation

25   had there?

10/13/89

T3-1f

355

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     A     I discussed with our sergeant -- I was told

3   that three of the defendants had made statements.

4           MR. MOORE:  Objection.

5           THE COURT:  I will allow it.

6     A        I   was   told   three defendants had made

7   statements placing themselves at the attack  of  Mr.

8   Loughlin at 96th Street.

9     Q     Who told you that?

10    A        I was told that by Police Officer Powers

11  and Sergeant Lyle.

12    Q     And at that time was there a discussion  at

13  100 Street and Central Park West?

14    A     Yes.

15    Q      Was there a discussion about doing a show-

16  up?

17    A     Yes.

18    Q     And  was  a  show-up  conducted  with  John

19  Loughlin at that time?

20    A     No.

21    Q        How long did you stay at 100 Street and

22  Central Park West?

23    A     I'd say about  ten  minutes;  ten,  fifteen

24  minutes.

25    Q     During that time were you out of the van or

10/13/89

NYCLD_023101

P-APP002438

473
REYNOLDS — PEOPLE — CROSS — BERMAN

1

2  comfortably on the floor of the precinct than at

3  home?

4              MS. LEDERER:  Objection.

5              THE COURT:  Sustained.

6      Q    Now, you told us on direct that about four

7  in the morning, Lieutenant McInerney told you a

8  woman's body had been discovered in the park?

9      A    I believe that's the approximate time.

10             MR. BURNS:  I didn't hear that question

11         and answer.

12             THE COURT:  Read it back.

13             (The court reporter read back the

14         requested portion of the record.)

15     Q    And Lieutenant McInerney told you to keep

16  the kids for questioning about that, didn't he?

17     A    He stated that the detectives wanted to

18  speak to them.

19     Q    And you understood that to mean to keep the

20  kids for questioning about that woman, right?

21     A    That's correct.

22     Q    Now, you have told us by what time was it

23  that Santana's grandmother arrived approximately?

24     A    Let's see.  It was after four.

25     Q    But by 4:30 she was there, right?

NYCLD_023219

P-APP002439

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.    Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.    Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.    Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.    As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.    Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.    Not that I can think of. | 15:46:46 |
| 21 | Q.    I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.    As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

NYCLD_039089

P-APP002440

Linda Fairstein

Page 222

| | | |
|---|---|---|
| 1 | Q.    At that time, did you know | 15:47:29 |
| 2 | anything about the events in Central Park | 15:47:32 |
| 3 | on April 19th? | 15:47:35 |
| 4 | A.    I don't believe that I did. | 15:47:36 |
| 5 | Q.    You saw nothing on television, | 15:47:38 |
| 6 | you heard nothing from other sources? | 15:47:41 |
| 7 | A.    I didn't see anything on | 15:47:44 |
| 8 | television the night of the 19th.  I may | 15:47:46 |
| 9 | have heard a news, radio news report in | 15:47:50 |
| 10 | the morning, not about a rape, but about a | 15:47:53 |
| 11 | riot. | 15:47:58 |
| 12 | Q.    Do you know why Fiston called? | 15:47:59 |
| 13 | A.    Yes, I do. | 15:48:05 |
| 14 | Q.    Why? | 15:48:06 |
| 15 | A.    He called me shortly before nine | 15:48:07 |
| 16 | to tell me that a woman had been found | 15:48:10 |
| 17 | beaten, and presumably because of her | 15:48:22 |
| 18 | state of undress, sexually assaulted in | 15:48:24 |
| 19 | the ravine, and he had been called in | 15:48:28 |
| 20 | because there had been no sexual assault | 15:48:34 |
| 21 | allegation until that woman reached the | 15:48:38 |
| 22 | hospital. | 15:48:40 |
| 23 | Q.    What else did he tell you? | 15:48:41 |
| 24 | A.    He told me that the woman was as | 15:48:47 |
| 25 | yet unidentified, and he asked me in the | 15:48:52 |

NYCLD_039090

P-APP002441

Linda Fairstein

Page 223

| | | |
|---|---|---|
| 1 | usual course of prosecutorial business if | 15:48:57 |
| 2 | I would assign a prosecutor to work on the | 15:49:00 |
| 3 | prosecutorial events that might happen | 15:49:06 |
| 4 | later in the day because there were | 15:49:14 |
| 5 | already were suspects being questioned. | 15:49:16 |
| 6 | Q.    Did you make any notes about | 15:49:22 |
| 7 | this conversation? | 15:49:24 |
| 8 | A.    No. | 15:49:25 |
| 9 | Q.    Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.    Not that I recall. | 15:49:30 |
| 12 | Q.    Did he tell you anything else? | 15:49:31 |
| 13 | A.    At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.    Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.    Not exactly. | 15:49:57 |
| 24 | Q.    Why do you say that? | 15:49:58 |
| 25 | A.    Because it was not just a call | 15:50:00 |

NYCLD_039091

P-APP002442

Linda Fairstein

Page 224

| | | |
|---|---|---|
| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

P-APP002443

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q. So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ: Objection. You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A. Those are not my words, sir. I | 15:51:43 |
| 20 | didn't say they had no connection. I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

P-APP002444

Linda Fairstein

Page 226

| | | |
|---|---|---|
| 1 | more urgent need.  He wanted a prosecutor | 15:52:00 |
| 2 | assigned, that was the main purpose of the | 15:52:04 |
| 3 | call. | 15:52:06 |
| 4 | Q.    Did he tell you that it appeared | 15:52:06 |
| 5 | that a homicide was involved? | 15:52:08 |
| 6 | A.    No, he didn't tell me that.  He | 15:52:09 |
| 7 | told me that the victim was in very grave | 15:52:12 |
| 8 | condition. | 15:52:18 |
| 9 | Q.    The question I think I forgot to | 15:52:19 |
| 10 | ask you earlier when you spoke of one | 15:52:21 |
| 11 | person who had knowledge about the | 15:52:23 |
| 12 | investigation from Ryan, who was that? | 15:52:26 |
| 13 | A.    Lisa Friel. | 15:52:30 |
| 14 | Q.    Did you know what she had | 15:52:31 |
| 15 | learned from Ryan and how she knew about | 15:52:36 |
| 16 | it? | 15:52:38 |
| 17 | A.    I knew some of the things she | 15:52:39 |
| 18 | learned from Ryan. | 15:52:42 |
| 19 | Q.    What did you learn from Friel? | 15:52:43 |
| 20 | A.    I knew from Friel the point at | 15:52:45 |
| 21 | which Ryan no longer wanted Mooney | 15:52:55 |
| 22 | involved in the investigation. | 15:52:59 |
| 23 | I knew from Friel that she, that | 15:53:00 |
| 24 | on a day, I came to know from Friel that | 15:53:03 |
| 25 | on a date that Ryan arranged with Mooney | 15:53:08 |

NYCLD_039094

P-APP002445





**DONATE**

# The Racially Charged Meaning Behind The Word 'Thug'

April 30, 2015 · 5:25 PM ET
Heard on All Things Considered

**6-Minute Listen**

PLAYLIST

Download

Transcript

NPR's Melissa Block speaks to John McWhorter, associate professor of English and comparative literature at Columbia University, about the use of the word "thug" to describe Baltimore rioters.

MELISSA BLOCK, HOST:

A certain five-letter word has been used repeatedly over the last few days.

(SOUNDBITE OF ARCHIVED RECORDING)

MAYOR STEPHANIE RAWLINGS-BLAKE: ...The thugs who only want to incite violence...

(SOUNDBITE OF ARCHIVED RECORDING)

GOVERNOR LARRY HOGAN: ...Our city of Baltimore to be taken over by thugs...

(SOUNDBITE OF ARCHIVED RECORDING)

PRESIDENT BARACK OBAMA: ...And thugs who tore up the place.

P-APP002446

BLOCK: Thugs, the word chosen by President Obama, Maryland's governor, Baltimore's mayor and others to describe those who looted and burned stores in Baltimore and in some cases that were later retracted with an apology. So why is thug so charged? John McWhorter has been thinking about this. He teaches linguistics at Columbia University and often writes about language and race. Welcome back to the program.

JOHN MCWHORTER: Thank you, Melissa.

BLOCK: John, I've been looking at the Merriam-Webster definition of thug, and it describes it as a brutal ruffian or assassin. What's the origin of this word?

MCWHORTER: Well, the word originates in India as a word for roughly that. And because the British ran India for a good long time, the word jumped the rails from Indian languages to English, and that's the reason that we in America have used the word for a very long time. And until rather recently, it did mean what you might call a ruffian, but of course, things have changed.

BLOCK: Well, how have they changed?

MCWHORTER: Well, the truth is that thug today is a nominally polite way of using the N-word. Many people suspect it, and they are correct. When somebody talks about thugs ruining a place, it is almost impossible today that they are referring to somebody with blond hair. It is a sly way of saying there go those black people ruining things again. And so anybody who wonders whether thug is becoming the new N-word doesn't need to. It's most certainly is.

BLOCK: Although, if you think about it, I mean, in two of the pieces of tape that we played, we heard from an African-American mayor of Baltimore and an African-American president of the United States using that word.

MCWHORTER: Yep, and that is because just like the N-word, we have another one of these strangely bifurcated words. Thug in the black community, for about the past 25 to 30 years, has also meant ruffian, but there is a tinge of affection. A thug in black people's speech is somebody who is a ruffian but in being a ruffian is displaying a

P-APP002447

healthy sort of countercultural initiative, displaying a kind of resilience in the face of racism etc. Of course nobody puts it that way, but that's the feeling. And so when black people say it, they don't mean what white people mean, and that's why I think Stephanie Rawlings-Blake and Barack Obama saying it means something different from the white housewife wherever who says it.

BLOCK: You're saying that African-American, in this case, politicians, who use the word thug should be given a pass because they understand it in a different way? I mean, the mayor certainly walked back her use of the word. She didn't want to be associated with it. She said, you know, I spoke out of frustration. They're really misguided young people.

MCWHORTER: No because I think that if an African-American woman uses the word thug today, we're not always conscious of all of these overtones in the words that we use. But I think that when she said that, she didn't mean it the same way as her white equivalent would. The word means two things, just like the N-word. And I think all of us are sophisticated enough to wrap our heads around that.

BLOCK: When do you see a turning point in how the word thug is used in our culture?

MCWHORTER: Well, it seems to have made a major change with the rise in popularity and cultural influence of rap music and the iconography connected with that. I would say that the word thug in the black community had a very different meaning by 1990 than it had had in 1980. But that thug image has never been a purely negative model. It's always been part ruffian and part hero.

BLOCK: I'm thinking of Tupac Shakur who had thug life tattooed across his stomach, I think.

MCWHORTER: Exactly, and Tupac Shakur is thought of as a god by many people. If he was a thug, then clearly if a black person says thugs were messing up the neighborhood, then they mean something other than reprehensible, shall we say, N-word. We have different races in this country, and different races have different ways of using language. Thug ends up straddling different subcultures.

P-APP002448

BLOCK: The word thug also - I can think of a number of other applications. I mean, folks on the far right might talk about jackbooted government thugs coming to take over our communities

MCWHORTER: That was the original meaning. It changed though. One of the things that Americans have a whole lot of trouble with - actually, that people in developed societies with written languages have trouble with - is that words never keep their meanings over time. A word is a thing on the move. A word is a process. And that's what's so confusing about the N-word. And that's what's so confusing now about this word, thug. Any discussion where we pretend that it only means one thing is just going to lead to dissension and confusion.

BLOCK: There are a lot of people now, John, who are saying, you know, why - and probably listening to this conversation saying, why are you talking about the meaning of this word, thug? That is really the wrong question to be asking and the wrong thing to be focusing on right now.

MCWHORTER: (Laughter). Well, to tell you the truth, my interest in all of these events is what made these whatever-you-want-to-call-thems rise up the way they did. And as far as I'm concerned, I feel that although the rioters were not articulate - they were not performing anything that I would call an exactly coherent action, the fact that this has happened is symptomatic of severe problems in Baltimore and similar cities. And the problem is the relationship between the police and young black men. Now, is it justified to tear up your own neighborhood to protest against it? I would say not. But the fact that it's happened is something that I think we can use as a possible turning point because I really believe that if a generation of young black men grew up in this country without thinking of the cops as the enemy, then America would really start turning a corner on race.

But nevertheless, thug is an interesting word, and to the extent that we need to be able to hear it as more than some antique, static, dictionary definition, then I think that that's part of the process of healing as well. Black people saying thug is not like white people saying thug.

BLOCK: John McWhorter, thanks for talking to us.

P-APP002449

MCWHORTER: Thank you.

BLOCK: John McWhorter teaches linguistics, American studies and music at Columbia University. His latest book is "The Language Hoax."

*Copyright © 2015 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# More Stories From NPR

P-APP002450

**OPINION**

## NPR Was Too Slow On Tara Reade's Story

P-APP002451

**OPINION**
**Opinion: Why Is Support For Media Crackdowns Rising In Africa?**

P-APP002452

P-APP002453

OPINION

**Opinion: NFL Fashion Masks But Still Not Enough Protective Masks**

P-APP002454

HEALTH
## Opinion: Always The Bridesmaid, Public Health Rarely Spotlighted Until It's Too Late

P-APP002455

OPINION

**Interview With A Coffee Shop Owner Upset Liberals: Here's What Really Happened**

P-APP002456



OPINION
**Opinion: What Our Children Will Remember**


# Popular on NPR.org

P-APP002457

GLOBAL HEALTH
**From Loss Of Smell To 'COVID Toes': What Experts Are Learning About Symptoms**

P-APP002458

Case 1:20-cv-08042-PKC Document 46-13 Filed 07/01/20 Page 46 of 219

P-APP002459

EDUCATION
**A Few Schools Reopen, But Remote Learning Could Go On For Years In U.S.**

P-APP002460

HEALTH
**U.S. Coronavirus Testing Still Falls Short. How's Your State Doing?**

P-APP002461

P-APP002462

NATIONAL

**Former Georgia Police Officer And His Son Arrested In The Death Of Ahmaud Arbery**

P-APP002463



HEALTH
**Mystery Inflammatory Syndrome In Kids And Teens Likely Linked To COVID-19**

P-APP002464

P-APP002465

HEALTH

**Tracking The Pandemic: How Quickly Is The Coronavirus Spreading State By State?**

NPR Editors' Picks

P-APP002466

NATIONAL
**More Arrests Possible In The Killing Of Ahmaud Arbery, State Investigators Say**

P–APP002467

P-APP002468

EDUCATION
**DeVos Uses Coronavirus Relief Funds To Top Off Small College Budgets**

P-APP002469

SCIENCE
**The Coronavirus Is Mutating. That's Normal. Does That Mean It's More Dangerous?**

P-APP002470

P-APP002471



INVESTIGATIONS

**Relief Payments To The Dead: Lawmakers Demand Answers From Treasury**

P-APP002472

POLITICS

**Michael Flynn Pleaded Guilty. Why Is The Justice Department Dropping The Charges?**

P-APP002473

P-APP002474

NEW MUSIC
**Ariana Grande And Justin Bieber Team Up For Fundraising Single 'Stuck With U'**

READ & LISTEN

**Home**

**News**

**Arts & Life**

**Music**

**Podcasts**

**Programs**

CONNECT

**Newsletters**

**Facebook**

**Twitter**

**Instagram**

**Contact**

**Help**

ABOUT NPR

**Overview**

**Finances**

**People**

**Press**

**Public Editor**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

P-APP002475

**Corrections**                                              **Visit NPR**

---

terms of use

privacy

your privacy choices

text only

© 2020 npr

P-APP002476

T2-fr

334

REYNOLDS — PEOPLE — DIRECT — LEDERER

or out of the park?

A    He said it was inside the park.

Q    Did he tell you what time it was that he had seen them?

A    That I don't recall.

Q    Did he say anything about the gender or the sex of the people he had seen?

A    Yes, he said they were male blacks and Hispanics.

Q    Did you have a conversation -- withdrawn.

How long did you stay at the playground at 100 Street?

A    Not long, just long enough to -- for the show-up and to get a description from Police Officer Alvarez and then we resumed canvassing.

Q    Where did you go when you left that location?

A    Again we stayed in the north end and we went through all the trails and the inaccessible parts of the park.

Q    How long did you drive around in the park?

A    About another half-hour.

Q    Did you hear another radio communication after you had been at the playground where Sergeant

10/13/89

P-APP002477

T2-fr

335

REYNOLDS - PEOPLE - DIRECT - LEDERER

Lyle was?

A    Yes.

Q    What was the communication that you heard then?

A        That there was a male jogger found beaten and bleeding profusely from his head.

Q    Where was that -- was there a location with respect to where that jogger was found?

A    Yes. That was 96th Street, I believe, approximately, and the West Drive off the reservoir.

Q        Where were you when you got that communication, if you recall?

A    I believe we were at the East Drive again and 102nd Street.

Q    Did the communication given with respect to that jogger contain any information about any people?

A        He stated there was a group of male Hispanics and Blacks who had assaulted the jogger.

Q    Was there any further information about the assault?

A    Yes, that they had fled north.

Q        What, if anything, did you do after you heard that information?

10/13/8

NYCLD_023081

P-APP002478

T2-fr

336

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    A      At that point I decided to leave the park
3 and to start the canvas outside at Central Park West
4 at 100 Street.

5    Q      Where did you leave the park?

6    A          We left at 100th Street and Central Park
7 West.

8    Q      Why did you leave the park at that time?

9    A      Because I felt that the group was no longer
10 in the park.  We had canvassed for quite a while and
11 the entire park was saturated with police vehicles.

12    Q      Did you see other vehicles in the park
13 other than those you refer to at the East Drive and
14 102nd Street?

15    A      Other than what I described earlier?

16    Q      During the time you were canvassing the
17 park, other than what you already told us at the
18 East Drive and 102nd Street, did you see any other
19 police vehicles in the park?

20    A      Just what I mentioned.

21    Q      And when you were canvassing the north end
22 of the park, did you see any sign of other police
23 vehicles?

24    A      Yes.

25    Q      What did you see?

10/13/89

NYCLD_023082

P-APP002479

T2-fr

337

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    A    As I was going through the fields, I could

3  see further north of me the headlights of the  other

4  vehicles going back and forth also in search for the

5  group.

6               MS.  LEDERER:   With the permission of

7           the Court, I'd ask the  witness   to   please

8           step   down   and   approach  People's  7  in

9           evidence.

10           (Witness complies)

11    Q    Would you please point  on  People's  7  in

12  evidence  and   describe   as you do, what area you're

13  possibly  pointing  to,   indicate   where   you   were

14  traveling  and   where you would see the other lights

15  from other vehicles?

16    A    We saw the other lights —

17           THE COURT:  Excuse me, Officer, I have

18           to remind you to speak as loud as  you  can

19           because  everybody over on this side has to

20           hear you, and it is very difficult in  this

21           courtroom.

22           THE WITNESS:  Okay.

23           I saw headlights from the other police

24           cars   going   east   and   west   across   the

25           ballfields here on the north end.   I   was

10/13/89

NYCLD_023083

P-APP002480

T2-fr

338

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2          south   of   them   and   I   could   see   them   --   I
3          could   see   that   the   ballfields   in   this   area
4          was   pretty   well   saturated   with   police   cars
5          and   there   was   probably   no   group   in   there
6          because   somebody   would   have   seen   --
7               MR.   MADDOX:      Also   describe   the   area
8          that   he   just   referred   to   on   the   map.
9               THE COURT:   Yes,   if   there   is   some
10         legend   on   that   map   that   describes   the   area
11         that   you're   in,   please   tell   us   what   it   is.
12         I   see   there   is   some   writing   on   that   map.
13         If   you   could   tell   us   what   it   was,   the   area
14         that   you   say   you   were   driving   in.
15              THE   WITNESS:      This   is   the   north
16         meadow,   and   it   contains   several   baseball,
17         softball,   and   a   football   field   and   we
18         again,   like   I   said,   I   had   seen   several
19         radio   cars   going   back   and   forth   and   they
20         pretty   well   had   the   whole   area   covered.   If
21         there   was   any   group   in   there   --
22              MR. BURNS:   Objection.
23              MR. MOORE:   Objection.
24              THE COURT:   Yes,   don't   speculate,   just
25         tell   us   what   you   saw.

10/13/8?

NYCLD_023084

P-APP002481

T2-fr

339

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2         THE WITNESS:  I saw  the  police  cars
3     going  back and forth and they had the area
4     well covered.
5  Q    Where did you go --
6         MR. BURNS:   I'm  sorry.   For  the
7     record,  the record should reflect the area
8     of the North Meadow.
9         THE COURT:  He covered the whole  area
10    of the North Meadow.
11 Q    When you stated earlier that you decided at
12 this  time to leave the park, will you point out the
13 route you took to enter the park?
14 A    We left here  at  100  Street,  going  west
15 towards Central Park West.
16 Q       What time was it, approximately, when you
17 were leaving Central Park?
18 A     It was approximately 10:30.
19 Q     What, if anything, did you see as you  left
20 Central Park at 100 Street?
21 A     Okay.  When we got to Central Park West at
22 100th Street, just north of us, between 101st Street
23 and 102nd, on the west side of the street, we saw  a
24 group  of  about  10, 15, male blacks and hispanics.
25 They were teenagers.

10/13/89

T2-fr

340

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q      What, if anything, did you do when you   saw

3  that group?

4      A          What we -- what I did was we started to

5  drive northbound towards them to get a   better   look

6  at the group.

7      Q      What side of the street were they on?

8      A      They were on the west side of the street.

9      Q      And when you were driving, what side of the

10  street were you driving on?

11      A      I was on the east side going northbound.

12      Q          What, if anything, happened as you went

13  northbound on Central   Park   West   approaching   that

14  group?

15      A          Well, we saw the group.   They were all --

16  you know, walking together.   We felt reasonably sure

17  that they didn't --

18              THE COURT:   It's not what you felt.

19              THE WITNESS:   I felt   reasonably   sure

20          they didn't know who we were.

21              MR. RIVERA:   Objection.

22              MR. BURNS:   Objection.

23              MR. MOORE:   Objection.

24              MR. JOSEPH:   Objection.

25              MR. MADDOX:   Objection.

10/13/89

NYCLD_023086

P-APP002483

T2-fr

341

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2          MR. DILLER:  Objection.
3          MR. BERMAN:  Objection.
4          THE COURT:  I'll allow that.  Go
5     ahead.
6          THE WITNESS:  At one point the group
7     had stopped ——
8          MR. RIVERA:  I didn't hear the
9     statement he didn't feel reasonably what?
10          THE COURT:  Did not make out who they
11     were.
12  Q    Continue.
13  A    The group at one point stopped and they all
14  started to look our way and started to point at us
15  in the van, and I couldn't understand why because
16  nobody wouldn't really ——
17          MR. MOORE:  Objection.
18          THE COURT:  Finish your answer.
19          THE WITNESS:  Nobody generally makes
20     who we were.
21          MR. MOORE:  Objection.
22          THE COURT:  Objection sustained.
23          Don't tell us what people generally
24     do.  Just tell us what happened here.
25          THE WITNESS:  What I did was I looked

10/13/89

NYCLD_023087

P-APP002484

T2-fr

REYNOLDS - PEOPLE - DIRECT - LEDERER

342

1
2    to our right and a marked police three-
3    wheel scooter was on our right hand side
4    and that's what panicked them.

5        MR. MOORE: Objection.

6        MR. MADDOX: Objection.

7        THE COURT: Sustained. Just tell us
8    what you saw.

9    Q    When you looked and saw in your sideview
10   mirror a scooter, where was this scooter?

11   A    Right alongside the van on my side. It was
12   on the other side of us, from the group.

13   Q    Who was on that scooter?

14   A    Police Officer Flores.

15   Q    What did you do when you became aware that
16   Police Officer Flores was pulling up besides you?

17   A        Well, I felt -- it looked like the group
18   was going to run to me.

19       MR. MOORE: Objection.

20       MR. JOSEPH: Objection.

21       THE COURT: I'll allow it, go ahead.
22   Finish.

23       THE WITNESS: And I told my partner to
24   take the van and pull it up ahead of them
25   to cut them off so we can stop them.

10/13/89

NYCLD_023088

P-APP002485

T2-fr

343

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2      Q      And did the van pull up?

3      A      Yes.

4      Q      Where did the van go?

5      A      Okay. My partner pulled up the van to

6  102nd Street and CPW, Central Park West on the

7  southwest corner.

8      Q      WHen you say the van was pulled up on the

9  southwest corner of 102nd and Central Park West, can

10 you describe exactly what position it was in in

11 relation to the sidewalk and the street of 102nd

12 Street?

13     A      Okay. The van was facing west with the

14 headlights facing west towards the building.    Then

15 my partner and myself got out of the van, we

16 identified ourselves.    AT that point the group

17 started to run except for two.    Those two were

18 Raymond Santana and Steve Lopez.

19            MR. MOORE:    Not responsive to the

20            question.

21            THE COURT:  I'll allow it.

22     Q      When you say you got out of the van -- let

23 me just go back for a second.  The van that you were

24 describing, what color is the van?

25     A      Green.

10/13/8

T2-fr

344

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2   Q      Are there any windows in the   back   portion
3   of the van?

4   A       In the back two doors -- I'm sorry, there
5   are no windows in it.

6   Q      Are there any side panels?

7   A      I don't believe so.

8   Q      Does it have any insignia?

9   A      Yes, Parks Department emblem on the front.

10  Q      When the van pulled into the   beginning   of
11  102nd Street and Central Park West, you say you both
12  jumped out.  What exactly did you say?

13  A       We identified ourselves as police and we
14  told them not to run.

15  Q      What happened when you said, "Don't run?"

16  A      The group started to run.

17  Q      And what did you do when the group   started
18  to run?

19  A      We got out of the van and we approached the
20  two defendants that had stayed on the corner.

21  Q      And you just named the names of those two
22  people.  Did you at the time that you   stopped   them
23  know their names?

24  A      Not at that time, no.

25  Q       What, if anything, happened when you

10/13/89

NYCLD_023090

P-APP002487

T2-fr

345

REYNOLDS — PEOPLE — DIRECT — LEDERER

2   stopped those two?

3      A      We placed them against the wall.

4            MR. MADDOX:   Objection, Judge.   He

5      didn't   stop   them.   They   were   already

6      stopped.

7            THE COURT:   Yes.   Objection sustained.

8      Q      What happened   when   you   approached   those

9   two?

10      A         We   placed   them   against   the   wall   and

11   searched them.

12      Q      Did you have your gun drawn   when   you   got

13   out of the van?

14      A      No.

15      Q         When you say you placed them against the

16   wall, what exactly did you do?

17      A      We gave them a pat down of their clothes in

18   case they had weapons on them.

19      Q      Did you find any weapons?

20      A      No.

21      Q      What was the next thing that happened?

22      A      My   partner,   Police   Officer   Powers   and

23   Police Officer Flores chased the group.

24      Q      Did the two people that you placed against

25   the wall,   Raymond   Santana   and   Steve   Lopez,   did

10/13/89

NYCLD_023091

P-APP002488

T2-fr

346

                REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2       either of them say anything to you?

3           A    Yes.

4           Q    What, if anything, did they say to you?

5           A       Let's see.  Raymond Santana stated he had

6       just come from his girlfriend's house and didn't

7       state where or when.

8                   MR. JOSEPH:  Objection.

9                   THE  COURT:   Don't  tell  us what he

10                  didn't said.  Just tell us what he did say.

11                  THE WITNESS:  Steven Lopez  stated  he

12                  just  came  from  the  movies  with  his

13                  girlfriend  and  they  watched  the  movie

14                  "Leviathan".

15          Q       Did either of them say anything about the

16      rest of the group?

17          A    They stated they weren't with the group and

18      Steven Lopez stated, I quote, "The group had  talked

19      shit about ripping them off."

20                  MR. MADDOX:  I can't hear.

21                  THE COURT:  Who said that?

22                  THE WITNESS:  Steven Lopez.

23                  THE COURT:  Stated what?

24                  THE  WITNESS:   They were not with the

25                  group and the group had talked -- I  quote,

10/13/89

NYCLD_023092

P-APP002489

T2-fr

347

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2          "Talked shit about ripping them off."

3     Q     When I asked you a moment ago did either of

4   those  two  people  say anything with respect to the

5   rest of the group I believe your answer began, "They

6   said," could you tell us exactly what either one  of

7   them said indicating by name what that person said?

8               MR.  MOORE:    Objection.    Asked and

9          answered.

10              THE COURT:  I'll allow it again.

11              THE WITNESS:  They  both  stated  that

12         they weren't with the group and they didn't

13         know  any of the others that had run.  They

14         stated that they were walking ahead of them

15         and --

16              MR. RIVERA:    Objection,  your  Honor,

17         not responsive.

18              THE COURT:  Yes, objection sustained.

19    Q      Can you tell us what Raymond Santana said

20   to you when he  was  stopped  at  102nd  Street  and

21   Central Park West?

22    A          Raymond Santana said he wasn't with the

23   group and he had just  come  from  his  girlfriend's

24   house.

25    Q      What, if anything, did Steven Lopez say at

10/13/89

NYCLD_023093

P-APP002490

T2-fr

348

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2    that time?

3        A    He stated he also was not with  the  group,

4    that  he  had just come from his -- he had just come

5    from the movies with his girlfriend and they watched

6    the picture "Leviathan" and he also  stated,  and  I

7    quote, "Talked  shit  about  ripping off -- ripping

8    them off."

9        Q    Did  you  ask  either  Defendant  Lopez  or

10   Defendant Santana any questions?

11       A    No.

12       Q    When you saw this group, could you describe

13   how  the  group was in relation to the other members

14   of the group?

15       A    The two --

16            MR. BERMAN:   Object as to form.

17            THE COURT:   What is your question?

18       Q    When you saw the group walking  on  Central

19   Park  West,  would  you describe the relation of the

20   group with one to the other?

21       A    It was a  homogenized  group.   They  were

22   altogether  and  they  were  all walking northbound.

23   They were male Blacks, teenaged and Hispanics.

24       Q    When you saw the group on the west side  of

25   the  street, approximately how much of the block was

10/13/89

T2-fr

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   taken up by the members of the group?

3        A      Maybe a quarter of the block.

4        Q         And    where    were    Defendant's    Lopez    and
5   Santana,  if you remember, in relation to the others
6   in the group?

7        A      They were in the group  because  the  group
8   was altogether.

9        Q      What, if anything, happened after Lopez and
10  Santana made those statements to you?

11       A         My partner, Police Officer Powers chased
12  the rest of the group with Police Officer Flores.

13       Q      Where did you see him go?

14       A      I saw him  running  southbound  on  Central
15  Park West and then west on 101st Street.

16       Q         Did you see where he went when he turned
17  onto that street?

18       A      When he turned west, I lost sight of him?

19       Q      Officer Reynolds -- I'm sorry --

20       A      And then I saw him again running back  east
21  and the group was ahead of him and they ran into the
22  park, and he ran into the park after them.

23       Q      Approximately how much time elapsed between
24  the time you saw him disappear from your sight going
25  down  the street until you saw the group coming back

10/13/89

NYCLD_023095

P-APP002492

T2-fr

350

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2   with him, chasing?

3       A     Just seconds.

4       Q     Did you then see Officer Powers -- go  into
5   the park?

6       A      Yes, I saw him run and jump over the wall
7   into the park after the defendants.

8               MR. MADDOX:  Objection to "after  the
9           defendants."

10              THE   COURT:   Yes, Objection sustained
11          as to "after the defendants."

12      Q     Did you see how many people were running in
13  front of Officer Powers?

14      A     It looked to be about ten.

15      Q     And you said that they entered the park, do
16  you know where it was that they entered the park?

17      A     It was over the wall and  at  Central  Park
18  West and 101st Street, between 101st and 100.

19      Q      And is that where you saw Officer Powers
20  enter the park?

21      A     Yes.

22      Q     Let me just stop you for  a  moment.   The
23  area  on Central Park West, near 101st and 102nd, to
24  your knowledge are there any movie theaters in  that
25  area?

10/13/89

NYCLD_023096

P-APP002493

T2-fr

351

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2      A     No, there isn't.
3      Q        Are there any community centers in that
4   area?
5      A     No-
6               MR. MADDOX:   Judge, may I   ask   if   he
7           could repeat the question and answer?
8               THE   COURT:    Read   the   question and
9           answer back, please.
10              (Reporter complies)
11     Q     Are there any stores on Central   Park   West
12   in that area?
13     A        No.   There's just a grocery store further
14   down, but it's very small north of where they were-
15     Q     After you lost sight of Officer Powers when
16   he went into the park, what was the next thing   that
17   happened?
18     A       I stood on the corner with Raymond Santana
19   and Steven Lopez.
20     Q     Did you handcuff them?
21     A     No-
22     Q     And where was the van?
23     A     The van was right where we left it on 102nd
24   Street and Central Park West-
25     Q     Did either of them say anything further   to

10/13/89

NYCLD_023097

P-APP002494

T2-fr

352

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2  you?

3      A        They just kept stating that they were not
4  with the rest of them.

5      Q        When you say they kept saying that, who
6  kept saying that?

7      A        Steve Lopez and Raymond Santana.

8      Q        And did you ask them any questions?

9      A        No.

10     Q        Did you have your radio with you?

11     A        Yes, I did.

12     Q        Did you hear communications coming over the
13  radio?

14     A        Yes.

15     Q        Did there come a time when someone came to
16  where you were with Santana and Lopez?

17     A        Yes.

18     Q        Approximately what time was that?

19             THE WITNESS:   May I look at  my  notes
20         to refresh my memory?

21             THE COURT:   If you have to.

22             (Witness peruses notes)

23     A        It was approximately a quarter to eleven.

24             THE COURT:   And what happened at about
25         a quarter to eleven?

10/13/89

NYCLD_023098

P-APP002495

T3—1f

353

REYNOLDS — PEOPLE — DIRECT — LEDERER

1             THE   WITNESS:    Sergeant  Wheeler and
Police Officer Morales pulled over after the call over the radio for a unit to pick up the two.

6    Q    What happened when they responded?

7    A    They responded over and we placed them into the car.

9    Q    Placed whom in the car?

10    A    Steven Lopez and Raymond Santana.

11    Q    And what did you do at that point?

12    A    I went with Police Officer Powers into the van, and we drove back to 100 Street and Central Park West to confer with our sergeant.

15    Q    When Raymond Santana and Steve Lopez were put in the car with the sergeant, did you see where they went?

18    A    They went to 100 Street and Central Park West.

20    Q    And when you arrived at 100 Street and Central Park West, were Raymond Santana and Steve Lopez there?

23    A    Yes.

24    Q    Were they in the car or outside of the car?

25    A    They were in the car.

10/13/89

NYCLD_023099

P-APP002496

T3-1f

354

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q        And at what corner of that intersection
3  were you at?

4     A     The northeast corner.

5     Q     When you arrived at that location, who  did
6  you arrive with?

7     A     Police Officer Powers.

8     Q     And who was already at that location?

9     A        Sergeant Lyle and Police Officer Hennigan
10 and the other officers.

11    Q     And did you see anybody  in  custody  other
12 than Raymond Santana and Steve Lopez?

13    A     Yes.

14    Q     Who did you see at that time?

15    A        I saw Kevin Richardson, Lamont McCall and
16 Clarence Thomas.

17    Q     Where did you see them?

18    A     In the back of the radio car.

19    Q     Were all three in the same radio car?

20    A     I believe so.  I'm not sure.

21    Q     Was there a discussion at  100  Street  and
22 Central Park West?

23    A     Yes, there was.

24    Q     And what was the nature of the conversation
25 had there?

10/13/89

P-APP002497

T3-1f

355

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2    A      I discussed with our sergeant -- I was told

3    that three of the defendants had made statements.

4              MR. MOORE:   Objection.

5              THE COURT:   I will allow it.

6    .    A        I   was   told   three defendants had made

7    statements placing themselves at the attack  of  Mr.

8    Loughlin at 96th Street.

9    Q      Who told you that?

10    A         I was told that by Police Officer Powers

11    and Sergeant Lyle.

12    Q      And at that time was there a discussion  at

13    100 Street and Central Park West?

14    A      Yes.

15    Q       Was there a discussion about doing a show-

16    up?

17    A      Yes.

18    Q      And  was  a  show-up  conducted  with  John

19    Loughlin at that time?

20    A      No.

21    Q         How long did you stay at 100 Street and

22    Central Park West?

23    A      I'd say about  ten  minutes;  ten,  fifteen

24    minutes.

25    Q      During that time were you out of the van or

10/13/8

T3-1f

356

REYNOLDS — PEOPLE — DIRECT — LEDERER

1   were you in the van?

2       A   I was out of the van.

3       Q   And at any time while you were at that

4   location, were you in a car with any of the people

5   that had been taken into custody?

6       A   No, I wasn't.

7       Q   What was the next thing that happened?

8       A   We drove to the Central Park Precinct.

9       Q   When you say "we drove" how did you get to

10  the Central Park Precinct?

11      A   I went in the green Parks Department

12  vehicle.

13      Q   Did anyone ride with you?

14      A   Yes, Police Officer Powers.

15      Q   Did you see where Raymond Santana and Steve

16  Lopez were at the time you left 100th Street and

17  Central Park West?

18      A   They were in the radio car, I believe, with

19  Sergeant Wheeler.

20      Q   And the other three people you mentioned,

21  where were they?

22      A   I believe they were with another set of

23  officers. I don't recall specifically who it was.

24      Q   Were any of those five people taken out of

10/13/89

T3-1f

357

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      the car at 100 Street and Central Park West?

3      A     I don't believe so, no.

4      Q     How long did it take you to get from 100th

5      Street and Central Park West to the Central Park

6      Precinct?

7      A     I'd say about five minutes.

8      Q     And what did you see -- withdrawn.

9            What time was it that you arrived at the

10     Central Park Precinct?

11     A     It was approximately 12:00.

12     Q     I'm sorry.

13     A     Approximately 12 midnight.

14     Q     Are you sure it was midnight when you

15     arrived?

16            (Whereupon all Defense Counsel made an

17            objection to the question by the District

18            Attorney.)

19            THE COURT:     The objection is

20            sustained.

21     Q     What did you do when you arrived at the

22     Central Park Precinct?

23     A     We brought the defendants in front of the

24     desk.

25     Q     And what time did you bring the defendants

10/13/89

P-APP002500

T3-1f

358

REYNOLDS — PEOPLE — DIRECT — LEDERER

1    before the desk?

3       A    I believe -- may I refresh my memory with
4    my notes?

5               THE COURT:   If you have to.

6               MR. MADDOX:   When he says "defendants"
7          could he refer to who he was talking about?
8          Some are not defendants.

9               THE COURT:   Okay.

10              If you can, give us the names of the
11         people you are talking about.

12              THE WITNESS:   All right.

13      A    That was about six minutes after eleven.

14      Q    And what happened six minutes after eleven?

15      A    They were brought to the station house.

16              THE COURT:   They being?

17              THE WITNESS:   Clarence Thomas, Lamont
18         McCall, Kevin Richardson, Steven Lopez, and
19         Raymond Santana.

20      Q    Were they at the stationhouse when you
21    arrived, or did they arrive when you were already
22    there?

23      A    I think we got there around the same  time.
24    I don't recall exactly who got there first.  It was
25    very close in time, though.

10/13/89

NYCLD_023104

P-APP002501

T3—1f

359

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2    Q    And what happened in front —— what did  you

3  do when you went in front of the desk?

4    A    What I did was gave their names, addresses

5  and ages to the desk officer so he  could   enter  it

6  into the blotter.

7    Q      Did you have a conversation with anyone

8  when you arrived at the Central Park Precinct?

9    A    Yes, I did.

10    Q    Who did you have a conversation with?

11    A    I  had  a  conversation  with  one  of  the

12  detectives; two of them.

13    Q    To whom did you speak?

14    A    Detective Nugent and Detective Gonzalez.

15    Q    What did you say to them and what did they

16  say to you?

17    A    I stated what  happened;  that  I  arrested

18  five  youths  for  assaulting  a jogger in the Park.

19  And that was pretty much it.  We  returned  them  to

20  the Youth Room.

21    Q    How long were they before the desk?

22    A    I'd say about ten minutes.

23    Q      Was anyone with you and with them before

24  the desk sergeant?

25    A    Yes.

10/13/89

NYCLD_023105

P-APP002502

T3-1f

360

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2  Q     Who was that?

3  A       My   partner   was   there,   Police   Officer

4  Powers;   Police   Officer   Hennigan,   Sergeant   Lyle   and

5  the   detectives   might   have   come   out   also.

6  Q     After   you   were   before   the   desk   with   those

7  five   people   that   you   have   named,   where   did   you   go?

8  A       We   took   them,   I   believe,   we   took   them   to

9  the   juvenile   room.

10  Q     Officer   Reynolds,   if   you   would,   please   look

11  at   what   has   been   received   in   evidence   as   People's   1.

12  Do   you   recognize   what   that   is?

13  A     Yes.

14  Q     What   do   you   recognize   that   to   be?

15  A     It   is   a   layout   of   part   of   the   Central   Park

16  Precinct.

17  Q       What   part   of   the   precinct   is   depicted   in

18  that   diagram?

19  A     One   is   the   Community   Affairs   office,   and

20  the   other   is   our   muster   room.

21  Q     And   where   is   the   Youth   Room   in   People's   1?

22  A     Do   you   want   me   to   point   it   out?

23  Q     If   you   would,   please.

24      MR.   BERMAN:   The   testimony   was   it   was

25      the   Juvenile   Room.

10/13/89

NYCLD_023106

P-APP002503

T3-1f

361

REYNOLDS - PEOPLE - DIRECT - LEDERER

1          THE COURT:  Yes, you referred to it as

2     the Juvenile Room.

3     Q     Excuse me.  Would you show us the  juvenile

4  room?

5     A     This room right here (indicating).

6     Q         Indicating a room, the lower rectangular

7  room portrayed in People's 1.

8          When you say you went into that  room,  did

9  you  go  into  that room with all of the five people

10  that had been before the desk?

11    A     Yes.

12    Q     Before resuming the stand, could you please

13  point out where everyone was inside that  room  once

14  you went in?

15    A      Okay.  I was seated at this desk here and

16  the defendants were seated at chairs  in  this  area

17  (indicating).  They were all given a chair, and they

18  were all seated over here (indicating).

19          MR.  MADDOX:    Can the record reflect

20     that is the bottom portion of the room that

21     appears on that diagram?

22          THE COURT:  Yes, it  is  the  bottom

23     right portion.

24          MS. LEDERER:  Thank you.

25

10/13/89

NYCLD_023107

P-APP002504

T3—1f

362

REYNOLDS — PEOPLE — DIRECT — LEDERER

1                    You may resume your seat.

2          (Witness complies)

3     Q     Were any of those people handcuffed in that room?

4     A     Their handcuffs were removed in the room.

5     Q     What did you do in that room?

6     A          In that room I started to process the paperwork for that arrest.

7     Q     What does that mean?

8     A     I did the on-line booking sheets and juvenile packages.

9     Q     What is a juvenile package?

10     A          That's the -- that's papers that you have to fill out to go to Family Court, the depositions, supporting depositions, a referral intake report, and the appearance tickets for the youths to appear in Family Court with their parents or guardians.

11     Q          Where was Officer Powers at that time, if you know?

12     A     Officer Powers was making notifications to the families, to the parents of the defendants.

13     Q     Was that happening in the room you were in?

14     A          No, that was across the way in the main part of the precinct.

10/13/89

NYCLD_023108

P-APP002505

T3-1f

363

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2    Q    During this time that you were doing the
3    paperwork in the Juvenile Room, how would you
4    describe the testimony of defendants Kevin
5    Richardson, Raymond Santana, and Steven Lopez?
6        A    They really didn't seem to care.
7            MR. RIVERA:  Objection.
8            MR. DILLER:  Objection.
9            MR. BERMAN:  Objection.
10           THE COURT:  Objection sustained.
11   Q        Describe their appearance; how would you
12   describe them.  What were they doing, what was their
13   appearance?
14           MR. BERMAN:  I would object to him
15               describing it collectively.
16           THE COURT:  I will allow it.  If they
17               differed in any respect, tell us that.
18           Tell us what each one looked like and what
19               they were doing?
20           THE WITNESS:  They were sitting around
21               talking.  Their demeanors didn't seem
22           different.  They didn't seem to care.
23           MR. RIVERA:  Objection.
24           MR. DILLER:  Objection.
25           MR. BERMAN:  Objection.

10/13/8

NYCLD_023109

P-APP002506

T3-1f

364

REYNOLDS — PEOPLE — DIRECT — LEDERER

THE COURT:   Okay.   What do you mean "they didn't seem to care"?

THE WITNESS:   They wanted to go home; you know, they wanted to hang out.

MR. RIVERA:   Objection.

THE COURT:   I will allow it.

Q   Were any one of these three people crying?

A   No.

Q   When you say you observed people in that room talking to each other, did you see Kevin Richardson talking to anyone?

A   Yes, I saw him talking to Raymond Santana.

Q   Did you see Raymond Santana and Steve Lopez talking to each other or to other people in the room?

A   Yes.

Q   Who did you see them talking to and what do you remember?

A   They seemed to be talking to each other. Everybody seemed to know each other very well.

MR. RIVERA:   Objection.

MR. DILLER:   Objection.

MR. BERMAN:   Objection.

THE COURT:   Objection sustained.

10/13/89

NYCLD_023110

P-APP002507

T3-1f

365

REYNOLDS - PEOPLE - DIRECT - LEDERER

1

2     Q        Did there come a time you were aware the

3  parents began to arrive?

4                MR. MOORE:   Objection as to form.

5                THE COURT:   I will allow it.

6     A    Yes.

7                MS. LEDERER:  Your  Honor,  if  I  may

8       interrupt   at  this  point  to  reinterate

9       something said yesterday.

10               I indicated to Defense Counsel that  I

11      ask   the   parents of certain defendants and

12      potential  witnesses  not  be  present   in   the

13      courtroom.  I just want to check.

14               MR.   DILLER:   No   people   from   Mr.

15      Richardson's family that will  testify  are

16      in court.

17               MS.  LEDERER:   And no other witnesses

18      that were present at the stationhouse?

19               MR. DILLER:  That's correct.

20               MR. BERMAN:  I suppose we  should  put

21      some of it on the record, because we didn't

22      do   it   the   other  day.   I  made  the

23      representation  that  I  would  have  all

24      witnesses out of the courtroom, but I asked

25      that  my  client's  parents  remain.  And I

10/13/89

T3-1f

366

REYNOLDS - PEOPLE - DIRECT - LEDERER

1
2      offered, if they should testify at this
3      hearing or at the trial, that the
4      Prosecution would be free to bring out they
5      had been present during the testimony.    I
6      forget if it was your Honor or Miss Lederer
7      who rejected that.
8              With that in mind, I instructed my
9      client's parents not to be here for this
10     witness and the next witness.
11             THE COURT:  And they are not here?
12             MR. BERMAN:  Yes.
13             Do you recall who it was?
14             THE COURT:  Ultimately I'm the one who
15     made the ruling.  The important thing is
16     what I said.
17             MR. BERMAN:  I said they would have to
18     be excluded during the testimony of this
19     witness.
20             MR. RIVERA:    On behalf of Raymond
21     Santana, he has no relatives here today.
22             MR. JOSEPH:    The same is true on
23     behalf of Mr. Antron McCray.
24  BY MS. LEDERER:
25     Q     Did there come a time that you became aware

10/13/89

P-APP002509

T3-1f

367

REYNOLDS — PEOPLE — DIRECT — LEDERER

1
2   of   parents   or   families   of   any   of   those   five   people
3   beginning   to   arrive   at   the   Central   Park   Precinct?

4       A     Yes.

5       Q     To   the   best   you   can   recall,   what   was   the
6   time   you   first   became   aware   of   the   parents   arriving?

7       A     I   believe   it   was   around   midnight.

8       Q        And   who   do   you   recall   arriving   at
9   approximately   midnight?

10      A     That   was   Mrs.   Richardson.

11      Q     How   was   it   that   you   became   aware   that   Mrs.
12  Richardson   was   there?

13      A     She   came   into   the   room   and   opened   the   door
14  and   she   stated   who   she   was.   And   that   was   it.

15      Q     When   you   say   she   came   into   the   room   and
16  opened   the   door,   could   you   step   down   for   a   moment
17  and   point   out   on   People's   1   in   evidence   where   she
18  was?

19      A     There   is   a   door   right   here   which   she   opened
20  and   let   me   know   she   was   here   for   Kevin   Richardson
21  (indicating).

22          MR. BERMAN:   For   the   record,   he   was
23          pointing   to   the   area   on   that   chart   where
24          there   was   no   door.   There   is   a   doorway   but
25          no   door.

10/13/89

NYCLD_023113

P-APP002510

T3—1f

368

REYNOLDS — PEOPLE — DIRECT — LEDERER

1    THE   COURT:   Yes,   it  does  appear
2  there's  no  door  drawn  into  the  diagram.   Is
3  there  an  actual  door  there?
4
5    THE WITNESS:  Yes.
6    MR. MADDOX:  Could  the  record  reflect
7  where  exactly  on  the  diagram  he  is  pointing
8  to?
9    THE   COURT:   He  is  pointing  to  the
10 upper  righthand  side  of  that  room.
11 Q    At  the  time  that  Mrs.  Richardson  or  the
12 mother  of  Kevin  Richardson  arrived,  was  that  door
13 opened  or  closed?
14 A    It  was  closed.
15 Q    And  at  the  time  that  she  came  to  the  door,
16 where  was  Kevin  Richardson  when  she  opened  the  door?
17 A    He  was  seated  in  the  back  of  the  room.
18 Q    When  you  say  in  the  back  of  the  room,  where
19 were  you  referring  to?
20 A    Shall  I  point  it  out?
21 Q    Yes.
22 A    I  believe  he  was  seated  in  this  area  here
23 (indicating).
24    MS. LEDERER:  Indicating  in  the  lower
25 righthand  corner  of  the  Community  Affairs

10/13/89

NYCLD_023114

P-APP002511

T3—1f

369

REYNOLDS — PEOPLE — DIRECT — LEDERER

Office building.

Q      Did you observe or hear any conversation exchanged between Kevin Richardson and his mother at that point?

A      No.

Q      Was Kevin Richardson awake when she arrived?

A      Yes.

Q      And when his mother arrived at the door, did she speak?

A      Yes, she stated she was, you know, his mother. I believe I got up and just asked her to have a seat. Then I finished the paperwork, and hopefully send him home that night.

Q      Where did you ask her to have a seat?

A      I asked her to have a seat in the clerical area.

Q      The clerical area is where?

A      That's on the top of the diagram (indicating).

Q      Is that the entire room?

A      Yes.

Q      In the top portion of that building?

A      Yes.

10/13/89

P-APP002512

T3—1f

370

REYNOLDS — PEOPLE — DIRECT — LEDERER

1

2     Q     Did you become aware of any of the other

3  parents arriving at that time?

4     A     Yes.

5     Q     Who was the next parent that you became

6  aware of?

7     A     I don't recall who came in next, but they

8  all started to come in one at a time.

9     Q     And how was it that you became aware of

10  their arrival?

11     A     Either my partner would tell me the parent

12  was there, or they would stick their head in the

13  door and tell me they were there, looking for their

14  son.

15     Q     During the time that the parents and the

16  families of these five people were arriving, did

17  there come a time where you saw Antron McCray?

18     A     Yes.

19     Q     Do you recall approximately when that was?

20     A     I'm not sure.  That was after midnight.

21  I'm not sure of the exact time.

22     Q     Did you have anything that would refresh

23  your recollection as to the exact time?

24     A     I can take a look.  Again, I'm not sure.

25              (Witness peruses notes)

10/13/89

NYCLD_023116

P-APP002513

1

2      of Raymond by Detective Hartigan; is that correct?

3                      MS. LEDERER:  Objection.

4                      THE COURT:  What was your question?

5                      MR. RIVERA:  That he was present during the

6              entire questioning of Raymond by Detective

7              Hartigan.

8      Q.     Is that correct?

9                      MS. LEDERER:  Objection.

10                     THE COURT:  I'll let him answer if he was

11             present --

12                     Detective Hartigan was present at all times

13             when you were present?

14                     THE WITNESS:  Detective Hartigan was present

15             when I was present, yes.

16                     THE COURT:  At all times?

17                     THE WITNESS:  Except for the times that I

18             left the room, correct.

19     Q.     But from 1:40 to 4:40, you were present during the

20     entire questioning of Raymond Santana; is that correct?

21     A.     Again, except for those times that I left briefly.

22     Q.     Well, when did you leave the room between 1:40 and

23     4:40?

24     A.     Well, I left the room to get coffee.

25     Q.     Other than that.


                   Joseph T. Tierney, CSR, RPR

NYCLD_017529

P-APP002514

```
 1              People - Det. Arroyo - Cross - Rivera          2965
 2        A.    I might have also left the room to get myself a
 3   soda.  I left the room after the signing of the written
 4   statement, and that would take us beyond 4:40 p.m.
 5        Q.    Okay.  Raymond signed the statement at about 4:40;
 6   is that correct?
 7        A.    That's correct.
 8        Q.    That means that the interrogation of Raymond ended
 9   about 4:40, would that be correct?
10        A.    That's correct.
11        Q.    And did you tell Raymond that the interrogation
12   had ended of Raymond?
13        A.    No.
14        Q.    You, at no time, informed him that your
15   questioning is over; is that correct?
16        A.    No.
17        Q.    You just took the statement, left the room and
18   came back several minutes later; is that correct?
19        A.    That's correct.
20        Q.    Now, you took that statement and brought it to
21   your supervisors; is that correct?
22        A.    That's correct.
23        Q.    And who, in particular, did you bring Raymond's
24   statement to?
25                   MS. LEDERER:  Objection.


                   Joseph T. Tierney, CSR, RPR
```

NYCLD_017530

P-APP002515

1              People - Det. Arroyo - Cross - Rivera        2966

2                   THE COURT:  Who did he what?

3                   MR. RIVERA:  Who did he bring Raymond's

4              statement to.

5                   THE COURT:  I'll let him answer.  I really

6              don't know what it has to do with this hearing.

7         A.    I brought the statement to the detective squad

8    room, where Lieutenant Doyle from Manhattan North Homicide

9    was present.

10        Q.    Was ADA Fairstein or ADA Lederer present when you

11   went to bring the statement to Lieutenant Doyle?

12                  MS. LEDERER:  Objection.

13                  THE COURT:  I'll let him answer that.

14        A.    No, they were not.

15        Q.    Did you discuss with Lieutenant Doyle the fact

16   that Raymond's grandmother was present and had difficulty

17   with the English language?

18                  MS. LEDERER:  Objection.

19                  THE COURT:  Sustained.

20        Q.    Did you ever ask Raymond to put into his own words

21   the statement that is People's 20 in evidence?

22        A.    Yes, I asked him if he wanted to write it out.

23        Q.    And what, if anything, did Raymond say?

24        A.    He said no.  I offered to write it out and he

25   agreed.


                    Joseph T. Tierney, CSR, RPR

NYCLD_017531

P-APP002516

1              T-1   Reynolds-Ppl-direct                798

2    dome light?

3         A    On any of the police cars?

4         Q    Yes.

5         A    Not that I recall, no.

6         Q    And while you were driving around, did you hear yet

7    another radio communication?

8         A    Yes.

9         Q    And what was that communicate?

10        A    That was from one of the auxiliary police, he had

11   found a male jogger that was --

12             MR.  JOSEPH:  Objection, Judge.

13             THE COURT:  I'll allow it.

14        A    He had found a male jogger that was severely beaten

15   on the, around 96th Street and the West Drive.

16        Q    Did you hear any further information with respect

17   to the assault on that male jogger?

18        A    Yes, another police officer--

19             MR.  JOSEPH:  Objection.

20             THE COURT:  Yes, just a minute.  Come up for a

21        minute.

22             Step down for a second.

23             (At side bar.)

24             THE COURT:  Okay.

25             MR.  JOSEPH:  The basis of my objection is

                         H.  C.  Davis

P-APP002517

T-1   Reynolds-Ppl-direct                    799

it's hearsay.

THE COURT:  Yeah, except all this stuff was
brought out throughout the other witnesses by
defense counsel.

MR.  JOSEPH:  It just seems that we don't, I
don't know that it was brought out through defense
counsel.

THE COURT:  It was brought out, all of the
radio run communications were brought out through
defense counsel's cross-examination of other
witnesses.

MR.  JOSEPH:  But as to this witness, I think
the questions call for hearsay testimony, and I'm
noting my objection, number one.

Number two, it seems to me just to be, to
serve no purpose than bring to bring it out
through this witness.

THE COURT:  what are you asking now?  He got a
communication it was a male jogger beaten?

MS.  LEDERER:  And the description that came
over the air of, that male blacks that fled
northbound from that scene.

The, this information is particularly relevant
in light of the opening given by Mr. Rivera who

H.  C.  Davis

NYCLD_023502

P-APP002518

1           T-1    Reynolds-Ppl-direct                    800

2     argued that Santana was arrested for no reason.

3     And I think the state of mind of the officers is

4     relevant to why that group of people were stopped.

5          And we had this conversation about whether the

6     hearsay would be admissible just immediately

7     before starting testimony in this case.  The Court

8     indicated that it would rule as it came up.  We

9     did not elicit from officer Alvarez, and it was

10    brought out by every defense attorney throughout

11    cross of that officer.

12         THE COURT:  I don't know if I said I would

13    allow hearsay to come in.

14         MS.  LEDERER:  I said you didn't rule at that

15    time, but after we had that conversation, and even

16    the defense had been alerted to it, they all

17    brought out what the radio runs had been.

18         THE COURT:  Yes.

19         MS.  LEDERER:  This officer that made the

20    actual stop.  His state of mind is key, specially

21    since it's an issue raised by Mr. Rivera.

22         THE COURT:  Have you people finished?

23         MS.  LEDERER:  Yes.

24         THE COURT:  Normally I would not permit the

25    District Attorney to bring out any of this

                         H. C. Davis

P-APP002519

T-1   Reynolds-Ppl-direct                    301

information, other than the fact they had received

a radio communication, radio transmission and

responded to, and where he responded to.   However,

all of this material that has been gone into by

the defense on cross examination of earlier

witnesses, so it seems to me inappropriate to at

this point foreclose this witness from testifying.

So, for that reason I'm going to allow it.   Okay.

MR.   JOSEPH:   Judge, I know appellate courts

don't generally look favorably on continuing

objections, I don't know if your Honor wishes to

object to each question.

THE COURT:   I will assume, if you want that as

to other radio transmissions, the District

Attorney may bring out.   You make a continuing

objection.

MR.   JOSEPH:   Okay.

THE COURT:   For the same reason I indicated I

will rule the same way.   I would have, initially

had the District Attorney tried to bring that

stuff out on her direct examination of any

witness, absent cross-examination, the bringing

out of that very same material, I would sustain

the objection, but that's not the situation.   So,

H.   C.   Davis

1                    T-1   Reynolds-Ppl-direct                802
2        I will allow it.
3             MR.   JOSEPH:   Our objection is preserved as to
4        all of this testimony to come?
5             THE COURT:   If you're going to object to each
6        radio transmission content, yes.
7             MR.   JOSEPH:   Right.   Correct.
8             MR.   BURNS:   I'm sorry, I make the same
9        objection, the objection is on direct examination
10       when it's brought out.
11            THE COURT:   Okay.
12            MR.   BURNS:   In other words, she's calling a
13       witness and the witness is testifying in the first
14       instance on direct examination, and the District
15       Attorney is being permitted to introduce hearsay
16       on the basis of the fact, I object to that, and I
17       also have a continuing objection.
18            THE COURT:   For the same reasons, I will allow
19       it.
20            MR.   BURNS:   Okay.
21            (In the presence of the jury.)
22       Q    The radio transmission that you described receiving
23  from the auxiliary police, would you tell us what the
24  content of that transmission were.
25       A    That he had found a male jogger that was beaten,

                              H. C. Davis

P-APP002521

1
2  had been beaten up and was bleeding and needed an ambulance.

3      Q   Was there any information given as, concerning the

4  person or persons who were responsible for that assault?

5      A   Yes, there was.

6      Q   And what was that information?

7      A   That they were male blacks.

8      Q   And was any information given about where those

9  people went after they attacked the male jogger?

10      A   That they had fled west from 96th Street.

11      Q   What did you do after you heard that report?

12      A   I started to, we started to head in that direction

13  and made our way out of the park at 100th Street and Central

14  Park West.

15      Q   When you say you exited the park, would you please

16  step down and approach People's 2 in evidence and show the

17  members of the jury the route that you took and where you

18  exited the park.

19      A   We went across the cross drive here at 102nd Street

20  and, going west and then south on the, on the South Drive.

21      Q   Excuse me, your finger is next a legend there, when

22  you say you were going south, what roadway were you

23  traveling on?

24      A   On the West Drive.  And then we went west on 100th

25  Street which took us to 100th Street and Central Park West.


H. C. Davis

NYCLD_023506

P-APP002522

T-1   Reynolds-Ppl-direct                    804

Q     Approximately what time was it as you were exiting the park?

A     That was approximately ten to.

Q     What if anything did you see when you were at 100th Street an Central Park West?

A     We saw a large group between 101st Street and 102nd Street in Central Park West, walking northbound.

          MS.   LEDERER:   The record should reflect the witness is pointing to the right side of the street.

Q     What side of the street did you see them on?

A     I saw them on the west side of the street.

Q     You may resume the witness stand.

          Would you describe the group you saw as you were leaving Central Park on that night.

A     It was a large group of teenagers, Black and Hispanic, and they were walking together as a group, northbound.

Q     How many people did you see in that group?

A     Anywhere from ten to twenty.

Q     And what were they doing when you saw them?

A     They were walking northbound.

Q     Did you observe any interaction between the people who comprised that group?

H. C. Davis

NYCLD_023507

P-APP002523

1              T-1    Reynolds-Ppl-direct                 805

2        A    Well, they were walking as a group, they were

3   talking.  And as we, as we rode alongside of them, what the

4   group did was they stopped and started pointing at our van.

5        Q    Let me go back for a moment.  When you described

6   the group and you referred, you described they were walking

7   northbound on the block on Central Park West between 101st

8   and 102nd, how close together were the members of this

9   group?

10       A    They were altogether like a pack.

11                 MR.  JOSEPH:  Objection.

12                 THE COURT:  I'll allow it.

13       Q    What direction did you turn on to Central Park

14  West?

15       A    We turned north.  Northbound.

16       Q    And what if anything happened as you were driving

17  northbound?

18       A    Well, as we started to approach them, I was going

19  to call on the radio to have other cars come so we could

20  sort of box them in, but the group stopped and they took, at

21  least what I thought was notice of us.

22                 MR.  BURNS:  Objection.

23                 MR.  JOSEPH:  Objection.

24                 THE COURT:  Don't tell us what you thought

25             they thought, just tell us what you observed.


                         H. C. Davis

P-APP002524

1

2            MR.  BURNS:  Will that be stricken, your

3     Honor?

4            THE COURT:  Yes.

5            MS.  LEDERER:  Your Honor, if we could.  Is

6     the hole answer stricken?

7            THE COURT:  Just the portion where you're

8     telling us what you thought they thought.  We don't

9     want you to five us their thought process, give us

10    your thought process and your observations.  Okay?

11           THE WITNESS:  Okay.

12    Q    What if anything did you see the members of that

13    group do as you drove northbound?

14    A    I saw them stop and what they did was they started

15    to point to us and I had thought that they recognized us.

16           MR.  BURNS:  Objection.

17           MR.  JOSEPH:  Objection.

18           THE COURT:  That's what he thought, that was

19    going through his mind.

20           MR.  JOSEPH:  I would object to that, even if

21    it was going through his mind.  No, I will allow

22    it, that's his thought process, I will allow that.

23           Go ahead.

24    Q    Did you see whether there was anybody near the

25    police, the Parks Department van that you were driving at

                        H. C. Davis

P-APP002525

1

2  that time?

3      A    Yes.

4      Q    All right.  Would you describe who you saw near the

5  van and how you became aware of that person's presence.

6      A    I saw police officer Flores and she was driving,

7  she was in uniform driving a Mark three wheel scooter.

8      Q    Where was it you saw her?

9      A    She had pulled up right alongside of us on my

10 righthandside and we were between her and the group.

11     Q    Prior to seeing officer Flores at the sight you

12 just described, had you seen her earlier in the evening?

13     A    Yes.

14     Q    And where had you seen her earlier in the evening?

15     A    I saw her driving around, also looking for the,

16 canvassing for the group.

17     Q    When did you first become aware of her as you were

18 driving north on Central Park West?

19     A    Right after the group stopped and started pointing.

20     Q    And at that point when you became aware of officer

21 Flores' presence, where did you see her?

22     A    She was on my righthandside, she had pulled up

23 alongside of us, that's when we realized that--

24          MR.  JOSEPH:  Objection.

25     A    That's when I realized they were going to run.


                       H. C. Davis

P-APP002526

```
1                    T-1    Reynolds-Ppl-direct              808

2                    MR.   JOSEPH:  Objection.

3                    THE COURT:  That's his thought process, that's

4               what he was thinking when he saw her pull up

5               alongside.  I'll allow it.

6          Q    What if anything did you and officer Powers do when

7     you became aware that officer Flores was on your right?

8          A    Well then we, I realized they were going to run

9     from us because.

10                   MR.   RIVERA:  Objection.

11                   THE COURT:  No, overruled.

12                   Go ahead.

13         A    Because they'd stopped and started to point at the

14    van, at least I thought they were pointing at the van, they

15    were really pointing at her and thought she--

16                   MR.  JOSEPH:  Objection.

17                   THE COURT:  Don't tell us what they thought.

18               You tell us what you thought.

19                   THE WITNESS:  Okay.

20         Q    What if anything did you and officer Powers do at

21    that point?

22         A    We took the van and cut them off at 102nd Street.

23         Q    Would you step down again and approach People's 2

24    in evidence and show the members of the jury where you and

25    officer Powers went with the van and describe the position
```

H. C. Davis

P-APP002527

1                     T-1    Reynolds-Ppl-direct                809

2    of the van in relation to Central Park West.

3         A     Okay.   We had, at 102nd Street we pulled in

4    perpendicular to Central Park West into the crosswalk with

5    the van sitting in traffic.

6         Q     Was the van pulled into 102nd Street?

7         A     No.  It was on Central Park West.

8         Q     And what happened when you pulled the van into that

9    location?

10        A     We got out of the van, identified ourselves and

11   told them not to run.

12        Q     Why don't you resume the witness stand.

13              From the position that you've just described that

14   the Parks Department van was in, which of you were closer to

15   the group?

16        A     Police officer Powers.

17        Q     And when the van was pulled in that postion, what

18   if anything did you do?

19        A     I got out of the van, he got out of the van and

20   again we identified ourselves and told them not to run.

21        Q     When you got out of the van, did you go around the

22   front or the back of the van?

23        A     I went around the front.

24        Q     And whether you went around the front, how close

25   were the members of the group to you at that time?


                              N. C. Davis

P-APP002528

1                    T-1   Reynolds-Ppl-direct                    210

2       A     I'd say about a car length or two.

3       Q     And what if anything did the members of the group

4    do when you said what you just described?

5       A     They ran.

6       Q     And did any members of the group not run?

7       A     Yes.

8       Q     And who, would you describe what happened with

9    respect to people who did not run.

10      A     Well, they didn't run, I, we told them to get

11   against the wall, gave them a quick, you know, frisk in case

12   they had any kind of weapons.

13      Q     How many people did not run when you identified

14   yourselves?

15      A     Two.

16      Q     And where were those people in relation to the

17   group?

18      A     They were with the group, they were right in the

19   front.

20      Q     And how close were you to them at the time --

21            MS.  LEDERER:  Withdrawn.

22      Q     How close were the others in the group to you in

23   relation to where these in the group were?

24      A     Excuse me, I'm sorry?

25      Q     You indicated that there were people in the group

                        H. C. Davis

NYCLD_023513

P-APP002529

1          T-1   Reynolds-Ppl-direct                    811

2    that didn't run, how many didn't run?

3        A    Two.

4        Q    And where were those people in relation to the

5    other members of the group that didn't run?

6        A    They were with the group, but they were right at

7    the front of the pack.

8        Q    Did you later learn the names of those two people?

9        A    Yes.

10       Q    And what were their names?

11       A    Steve Lopez and Raymond Santana.

12       Q    What did you do with respect to those people?

13       A    We took them, placed them against the wall and

14   patted them down real quick.

15       Q    When you say you took them, do you know which

16   person you took?

17       A    No, I don't recall.

18       Q    And would you describe how you, what you mean when

19   you say took them.

20       A    I grabbed him by his arm.

21       Q    And you indicated you put him against the wall?

22       A    Yes.

23       Q    Was his face to the wall or face to you?

24       A    Face to the wall.

25       Q    And what did you do at that point?


                         H. C. Davis

NYCLD_023514

P-APP002530

1
2     A     I patted his outside clothing down to make sure he
3   had, you know, didn't have a knife or a gun or anything.
4     Q     Did you find any kind of a weapon?
5     A     No.
6     Q     Okay.  Where was officer Powers while you were
7   doing this?
8     A     He was standing right alongside me.
9     Q     And what was he doing?
10    A     He was doing the same with the other person he had.
11    Q     Do you know which person you had taken hold of?
12    A     No, I don't recall.
13    Q     And do you know the name of the person officer
14  Powers had taken hold of?
15    A     No.
16    Q     Other than those two people, where did everybody
17  else in that group go?
18    A     The group ran south on Central Park West towards
19  101st Street and then at 101st Street they ran west.
20    Q     After you had frisked the person you had against
21  the wall, what did you do with him?
22    A     I stood there were them and while officer Powers
23  chased the rest of the group along with officer Flores.
24    Q     At the time that you and officer Powers stopped
25  Steve Lopez and Raymond Santana, did Raymond Santana make


                        H. C. Davis

T-1   Reynolds-Ppl-direct                    813

1   any statement to you?

2       A    Yes, he did.

3       Q    And would you tell us please what he said to you.

4       A    He stated that he had just come from a girlfriend's

5   house and that he didn't know the group and that they were

6   about to rip them off.

7       Q    How long did you say, excuse me, how long did

8   officer Powers stay at that location with you after you had

9   taken these two individuals and put them against the wall?

10      A    Just long enough to pat down the person that he was

11  holding.

12      Q    And where did he go after that?

13      A    He ran after the group.

14      Q    Did you handcuff either of those two people at that

15  time?

16      A    No.

17      Q    Did you see where officer Flores went?

18      A    Officer Flores was also in pursuit of the group.

19      Q    And was she doing that on foot or on the scooter?

20      A    In the scooter.

21      Q    Where did you see her go?

22      A    I saw her in the street go south on Central Park

23  West and then west on 101st Street.

24      Q    Did you see either officer Powers or officer Flores

25

                        H. C. Davis

NYCLD_023516

P-APP002532

1      T-1   Reynolds-Ppl-direct                          314

2    again after you saw them run west on 101st Street?

3        A    Yes.

4        Q    And would you please tell us where you saw them.

5        A    They had run east on 101st Street, doubling back,

6    you know, for the kids that had run back the other way.

7        Q    And did you see them come back to 101st Street and

8    Central Park West?

9        A    Yes.

10       Q    Did you see any members of the group at that time?

11       A    Yes.

12       Q    And approximately how many members of the group did

13   you see?

14       A    It was about six or seven of them.

15       Q    What did you see them doing?

16       A    They ran across Central Park West and when they got

17   to the wall, they jumped over the wall, into the park.

18       Q    And what if anything did you see officer Powers do.

19       A    I saw him also run cross Central Park West and he

20   jumped over the wall.

21       Q    And what did you see officer Flores do?

22       A    I believe she drove her scooter around and went

23   through the, went through the 100th Street entrance.

24       Q    What did you do during this time?

25       A    During this time I stood there with the, with Lopez


                        H. C. Davis

T-1   Reynolds-Ppl-direct                    815

and Santana and I put over the air, I called for assistance

for other units to come and help out officer Powers with

the, with the perps he was chasing.

Q    Officer Reynolds, I ask you to look around the

courtroom today, do you see Raymond Santana in court today?

A    Yes.

Q    And would you please point him out.

A    He's sitting right there with, I believe it's a

blue tie, white shirt and glasses.

MS.   LEDERER:   The record should reflect the

witness has identified Raymond Santana.

Q    Approximately how long did you stay at that sight

with Steve Lopez and raped Santana?

A    I'd say about fifteen, twenty minutes.

Q    Did there come a time where a police car came to

the location where you were?

A    Yes.

Q    And who was in that car?

A    That was Sgt. Wheeler and another police officer, I

don't recall his name now.

Q    What happened --

A    Officer Morales.

Q    What happened when that police car arrived?

A    They, when they got there, then they were placed, I

H.  C.  Davis

NYCLD_023518

P-APP002534

1                    T-1    Reynolds-Ppl-direct                    816

2    placed the handcuffs on them and put them in the back of the

3    car.

4         Q    And what did you do after they were placed in the

5    radio car?

6         A    I had waited for officer Powers to come back with

7    the keys for the van so we could drive back to 100th Street

8    and Central Park West.

9         Q    Did officer Powers come back on the location where

10   you were?

11        A    Yes.

12        Q    Approximately how much time went by to the time

13   Stephen Lopez an Raymond Santana were taken in the police

14   car, how much time went by from the time those two were

15   taken in the police car until officer Powers came back.

16        A    I'd say about five minutes.

17        Q    And after officer Powers came back, what if

18   anything did you do?

19        A    We drove back to 100th Street and Central Park

20   West, inside of the park.

21        Q    Who did you see when you got to 100th Street and

22   Central Park West?

23        A    I saw my supervisor, Sgt. Lale and the other

24   officers that were involved in the pursuit.

25        Q    And did you see Raymond Santana or Steve Lopez at

                         H. C. Davis

P-APP002535

1

2   that location?

3       A    Yes.

4       Q    Without us where you saw them?

5       A    I saw them in the back of Sgt. Wheeler's car.

6            MS.  LEDERER:  With the Court's permission.

7       Q    If you would step down People's 2 in evidence and

8   show the members of the jury the location where you went

9   after officer Powers came back with the keys to the van.

10      A    We went right here, 100th Street and Central Park

11  West, inside the park.

12      Q    Okay, thank you.  You may resume the witness stand.

13           Other than your supervisor and Raymond Santana and

14  Steve Lopez and yourself an officer Powers, who else did you

15  see at that location?

16      A    I saw the defendants.

17           MR.  RIVERA:  Objection.

18           THE COURT:  Objection sustained.

19      Q    Could you tell us by name who you saw at that

20  location.

21           MR.  JOSEPH:  Objection.

22           THE COURT:  No, I'll allow it.

23      A    Clarance Thomas, Lamont Mc Call, Kevin Richardson,

24  and Stephen Lopez and Raymond Santana.

25      Q    How long did you stay at that location?


            H. C. Davis

P-APP002536

```
 1              T-1   Reynolds-Ppl-direct              818
 2      A    I'd say about ten, fifteen minutes.
 3      Q    Add during that time did you have any conference or
 4  discussion with your sergeant and other police officers?
 5      A    Yes.
 6      Q    What did you say during that discussion with the
 7  sergeant and the other police officers?
 8              MR.  JOSEPH:  Objection.
 9              THE COURT:  Come up for a minuted, please.
10              Step down, please.
11              (At side bar.)
12              THE COURT:  What is he going to say?
13              MS.  LEDERER:  All he's going to say, there
14          was a discussion whether had heed do a showup with
15          John Loughlin, and it was decided not to do it.
16              THE COURT:  Oaky, I'll allow that.
17              MS. JOSEPH:  That's over objection.
18              THE COURT:  Yes.
19              MR.  JOSEPH:  What's the relevance that it was
20          decided not to do it?
21              MR.  BURNS:  That's my point.
22              THE COURT:  We'll find it out shortly.
23              MS.  LEDERER:  It explains why they went
24          there, what they did with him.  And it explains
25          what the police procedure is at the stationhouse.
```

                          H. C. Davis

NYCLD_023521

P-APP002537

1
2       MR.  JOSEPH:  My objection is not just
3       relevance, it seems again we're getting into
4       hearsay, which clearly the door has not been
5       opened up to.  It was decided not to do a lineup,
6       with John Loughlin.
7           THE COURT:  A show up.
8       MR.  JOSEPH:  A show up with John Loughlin,
9       that too is a determination made by more than one
10      individual which was at least implicitly, if not
11      explicitly calls for a statement as to what was
12      discussed by other officers.
13          THE COURT:  I'll allow it.  Overruled.
14      (In the presence of the jury.)
15  Q   Was there a discussion had at that location among
16  the police officers?
17  A   Yes.
18  Q   And what was the nature of that discussion?
19          MR.  JOSEPH:  Objection.
20          THE COURT:  I'll allow it.
21  A   It was regarding the arrest of the defendants.
22  Q   Was there any discussion about what, whether there
23  would be any kind of show up?
24          MR.  RIVERA:  Objection.
25          THE COURT:  I'll allow it.


                    H.  C.  Davis

1                    T-1   Reynolds-Ppl-direct                    820

2        A    Yes.

3        Q    And what was the nature of that discussion?

4        A    We had wanted to get the--

5             MR. JOSEPH:  Objection, Judge, as to what

6        they wanted to.

7             THE COURT:  Yeah, just tell us what were you

8        going to do about a show up.

9        A    We were going to have a show up with the

10   complainant, John Loughlin, and we had to ascertain if he

11   could identify the people that assaulted him at that time.

12       Q    Was a show up done with John Louhglin?

13       A    No.

14       Q    At that time did you know the name John Loughlin?

15             MR. JOSEPH:  Objection.

16             THE COURT:  I'll let him answer.

17       A    No.

18       Q    Did there come a time where you left the location

19   at 100th Street and Central Park West, inside the park?

20       A    Yes.

21       Q    And where did you go at that time?

22       A    We went back to Central Park Precinct.

23       Q    How did you get from that location to the Central

24   Park Precinct?

25       A    In the green Parks Department van.


                            U. C. Davis

NYCLD_023523

P-APP002539

T-1   Reynolds-Ppl-direct                    821

Q    Who did you travel with.

A    Police officer Powers.

Q    And did you have any of the people who had been apprehended in the van with you?

A    No.

Q    And do you know how Raymond Santana was transported to the Central Park Precinct.

A    He was transported I believe with the Sergeant, Sgt. Wheeler.

Q    How long did it take to get from that location to the Central Park Precinct?

A    About five minutes.

Q    And what happened when you arrived at the precinct?

A    We went before the desk with the, with five defendants.

Q    When you arrived at the precinct, did you arrive there first or did the People taken into custody get there before you?

A    I believe we arrived at about, just about the the same time.

Q    And you described of went before the desk, would you explain for the members of the jury what that means.

A    We go before the desk to make a record of the fact that I had made an arrest and who the people were that were

H. C. Davis

NYCLD_023524

P-APP002540

1               T-1   Reynolds-Ppl-direct                822

2   arrested, and you know, their names, addresses and what they

3   were being arrested for.

4        Q     Did you take all five of the people who had been

5   taken into custody before the desk?

6        A     Yes.

7        Q     And do you know the names and the physical

8   descriptions of each of the people that you took into

9   custody that night?

10       A     Yes.

11       Q     Would you please give the name of each person taken

12   into custody, a physical description of that person and

13   indicate their age.

14       A     Okay.  I'll just quickly look at my notes.

15             THE COURT:  If you have to.

16       A     Let me see, there was Raymond Santana, who was, who

17   is fourteen, and he was in apparently normal condition.

18             MR.  RIVERA:  Objection.

19       Q     What was his race?

20             THE COURT:  Don't tell us about normal

21             condition, just give us the name, description of

22             what they --

23             Are you asking for description of their--

24             MS.  LEDERER:  Physical appearance.

25             MR.  RIVERA:  Objection.


                        H. C. Davis

T-1   Reynolds-Ppl-direct                    823

1

2    Q    Did you learn the race of Raymond--

3         MR. BURNS:  Did you rule on the objection?

4         THE COURT:  Just a minute, I'm trying to

5    clarify the question.

6         MS. LEDERER:  I withdraw the prior question.

7         THE COURT:  They're withdrawing.

8         MR. JOSEPH:  She's withdrawing?  Oh.

9    Q    Officer, did you learn the race of Raymond Santana?

10   A    Yes.

11   Q    And what race was he?

12   A    He was a male Hispanic.

13   Q    And did you learn his address at the time he was

14   taken into custody.

15   A    Yes.

16   Q    What was the address?

17        MR. RIVERA:  Objection.

18        THE COURT:  I'll allow it..

19   A    It was

20   Q    And with respect to the others who were taken into

21   custody at that time?

22   A    Yes.

23   Q    Did you learn Kevin Richardson's age?

24   A    Yes, he was fourteen.

25   Q    And what was his, what was his racial make up?

N. C. Davis

P-APP002542

1                    T-1    Reynolds-Ppl-direct                    824

2         A    He was Black.

3         Q    And what was his address?

4         A

5         Q    Did you learn the age of Clarance Thomas?

6         A    Yes, he was 14.

7         Q    And did you learn his address?

8         A    That was

9         Q    And what was his race.

10        A    He was a male black also.

11        Q    With respect to Lamont Mc Call, did you learn his

12   age?

13        A    Yes.   He was thirteen years old.   He was a male

14   black and he lived at

15        Q    And with respect to Steven Lopez?

16        A    He was fifteen, he was a male Hispanic and he lived

17   at

18        Q    At the time that these five people were taken

19   before the desk, were they handcuffed?

20        A    Yes, they were.

21        Q    How long were you before the desk with those five

22   people?

23        A    I'd say approximately five to ten minutes.

24        Q    And during the time you were before the desk, other

25   than the address and the date of birth and the age of those

                              H. C. Davis

NYCLD_023527

P-APP002543

```
1              T-1   Reynolds-Ppl-direct               825
2   people, was any other information taken from them?
3       A    Yes.
4       Q    And what information was that?
5            MR.  JOSEPH:  Objection.
6       A    Their telephone numbers.
7       Q    Who took that information from them there?
8       A    Police officer Powers.
9       Q    After you finished appearing before the desk,
10  before the desk sergeant, where did you go?
11      A    I went to the juvenile room with the defendants.
12      Q    Where was the jouvenile room located?
13      A    It was in our clerical office, which is a seperate
14  building from the precinct.
15      Q    And how is it seperate from the precinct?
16      A    It was separated by a driveway and --
17      Q    Would you tell the members of the jury what is a
18  juvenile room?
19      A    A jouvenile room is a room designated by the Family
20  Court which is suitable for questioning of juveniles for
21  their arrest or if they're lost or if you have a juvenile in
22  police custody for any reason, this is the room which you
23  take them in.
24      Q    What is a juvenile?
25      A    A juvenile is any person under the age of sixteen.
```

H. C. Davis

NYCLD_023528

P-APP002544

T-1   Reynolds-Ppl-direct                                    826

1

2    Q    What if anything did you do when you entered the

3  juvenile room with these five young men?

4    A    I brought them in the room, took off their

5  handcuffs and arranged seating for all of them.

6    Q    What did you do after you took off the handcuffs

7  and arranged seating for these five people?

8    A    Then I started to do the paperwork.

9    Q    What paperwork are you talking about?

10   A    It's the on line booking sheet, that's the

11  paperwork you do when someone is arrested and juvenile

12  arrest package.

13   Q    How many different sets of papers are required for

14  a jouvenile package for each individual?

15   A    There is about six or seven for each juvenile.

16   Q    And where was officer Powers while you were doing

17  the paperwork?

18   A    He was calling their parents.

19   Q    And did there come a time when he finished making

20  those calls?

21   A    Yes.

22   Q    And did you see him after he finished making those

23  calls?

24   A    Yes.

25   Q    Where did you see him?


                              H. C. Davis

NYCLD_023529

P-APP002545

```
1              T-3   Reynolds-Ppl-cross (Rivera)              909
2         the Assistant District Attorneys and all sworn
3         jurors are present.
4              THE COURT:  All right, good afternoon, ladies
5         and gentlemen.
6              THE CLERK:  Officer Reynolds, may I remind you
7         you're still under oath.
8              THE WITNESS:  Yes.
9    CONTINUING CROSS EXAMINATION
10   BY MR. RIVERA:
11        Q    Officer, before we broke, you indicated to us that
12   there was some chiefs and members of the press that were
13   present at the Central Park Precinct; is that correct?
14        A    Yes.
15        Q    And is that unusual to see top brass at the Central
16   Park Precinct during an arrest?
17        A    There is not a lot of arrests there, so, but yeah,
18   I would say it is.  Slight.
19        Q    Under normal circumstances would it be unusual to
20   see a high member of the brass at any precinct when youths
21   are arrested?
22              MS.  LEDERER:  Objection.
23              THE COURT:  I'll allow it.
24        A    It depends on the precinct.
25        Q    Are there some precincts where this would not be
```

                              E. C. Davis

NYCLD_023612

P-APP002546

1    T-3 Reynolds-Ppl-cross (Rivera)   910

2 unusual?

3     MS. LEDERER:  Objection.

4  A Yes.

5  Q What about the Central Park Precinct, is this

6 unusual at the Central Park Precinct?

7  A Slightly, yes.

8  Q And the same applies for the members of the press?

9  A Yes.

10  Q Is thsi the first time you make an arrest where you

11 have that kind of brass and that kind of press present?

12  A Yes.

13  Q And at what point in time were you apprised that

14 there case was going to have special significance within the

15 modus operandi of the Police Department.

16     MS. LEDERER:  Objection.

17     THE COURT:  Sustained.

18  Q Were there any Assistant District Attorneys present

19 at any time when you were involved in this case between

20 April the 19th and April the 20th?

21     MS. LEDERER:  Objection.

22     THE COURT:  I'll let him answer.

23  A Yes.

24  Q And would that about A.D.A.  Lederer?

25  A Yes.

       H. C. Davis

NYCLD_023613

P-APP002547

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              911

 2        Q    And was there also an A.D.A. Fairstein?

 3        A    Yes.

 4        Q    Were there any other members of the District

 5   Attorney, District Attorney present, paticularly any

 6   Assistant District Attorney?

 7        A    I don't think so.

 8        Q    And when for the first time did you see an

 9   Assistant District Attorney on this matter?

10        A    The night of the 20th.

11        Q    Prior to the evening of the 20th, you had not seen

12   any A.D.A.s?

13        A    Regarding this matter?

14        Q    Regarding this case.

15        A    No.

16        Q    Did you see them in the building or any other

17   buildings involved in the case?

18        A    No.

19        Q    Prior to the 20th?

20        A    No.

21        Q    Officer, you testified that you spoke to a police

22   officer Alvarez; is that correct?

23        A    Yes.

24        Q    And police officer Alvarez informed you of an

25   assault on an individual; is that correct?


                         M. C. Davis
```

NYCLD_023614

P-APP002548

T1O-SC-TS

2498

                    Arroyo - Cross - Rivera

1

2       Q         And that part was not in when you first made out

3  this statement, is that correct?

4       A       That's correct.   Because  if  he  had  anything

5  additional to add, it would have been added there.

6       Q         But  it wasn't in when you read the statement to

7  Ramon?

8       A     That's correct.

9       Q     Now, were  you  the  one  who  called  the  district

10 attorney's office to have him come down?

11      A     No, I was not.

12      Q     Were you present when the DAs office showed up?

13      A     Yes.

14      Q       And at about what time did representatives of the

15 DAs office show up?

16      A     I'm not sure exactly what time they showed  up.    I

17 first  encountered  the  DAs  at the 20th Precinct after I was

18 finished at the Central Park Precinct.

19      Q     So, they weren't at the Central Park Precinct?

20      A     Well, I don't recall seeing them there.

21      Q     First time you saw them was at the 20 Precinct, 20th

22 Precinct?

23      A     That's correct.

24      Q     And was this in the morning or in the afternoon that

25 you saw them?

NYCLD_017753

P-APP002549

T10-SC-TS

2499

                    Arroyo — Cross — Rivera

1

2       A    This was in the evening.

3       Q    And you have no recollection at about what time  you

4  saw them?

5       A    No, I don't.

6       Q    And who from the district attorney's office did you

7  see at the precinct?

8       A    I saw district attorney Linda  Fairstein,  district

9  attorney Liz Lederer and district attorney Tim Clements.

10      Q    Do you know who Linda Fairstein is in the hierarchy

11  of the district attorney's office?

12      A    Yes.

13      Q    And who is she?

14      A    She was the sex crimes senior trial lawyer  for  the

15  DAs office.

16      Q    Was she the chief of the sex crime unit for the DAs

17  office?

18      A    I'm not exactly sure what her rank was, but she held

19  some position along those lines at that time.

20      Q    She had a position within  the  district  attorney's

21  office,  a  high  position  within  the  DAs  office,  is that

22  correct?

23      A    Well, I would assume you would call it that, yeah.

24      Q    And you saw them there on the evening of  April  the

25  20th, am I correct in that?

NYCLD_017754

T10-SC-TS

2500

                    Arroyo - Cross - Rivera

1

2    A    Yes.

3    Q    And the job of a district attorney, the primary job

4    of the district attorney is to assist the police in getting a

5    statement from a defendant?

6    A    That's not correct.

7    Q    They assist the police in getting a video statement

8    from the defendant, is that correct?

9    A    They did perform video statements, yes.

10   Q    When you got the statement from Ramon Santana, you

11   didn't run out and call the DAs office and say we got a

12   statement from Defendant Santana, come on down so we can make

13   a video of it?

14   A    Absolutely not.

15   Q    You waited to get statements from all defendants

16   before you called the DAs office?

17        MR. CLEMENTS:  Objection.

18        THE COURT:  Objection sustained.

19   Q    And so -- were you present when a video statement

20   was taken of Ramon Santana?

21   A    Yes, I was.

22   Q    And who else was present in the room?

23   A    Ramon Santana, Ramon Santana, Sr., district attorney

24   Liz Lederer and detective Mike Sheehan.

25   Q    And yourself, is that correct?

T10-SC-TS

2501

1                          Arroyo - Cross - Rivera

2        A     And myself.

3        Q          And detective Sheehan is from the Manhattan North

4   Homicide?

5        A     That's correct.

6        Q     Did you escort Ramon into the video room?

7        A     I don't recall.  I don't believe I  did.    I   don't

8   recall if I did escort him.

9        Q          Did you at any point in time tell Ramon that they

10  were going to take a video statement of him?

11       A     No, I don't recall.

12       Q     When you finished questioning Ramon at 4:40  in   the

13  afternoon,  did  you say Ramon, you got to wait around because

14  we're going to take a video statement of you?

15       A     You got to what?

16       Q     You have to wait around because we're going to  take

17  a video statement of you?

18       A     No, I didn't tell him that.

19       Q          It was your testimony you went up and you gave a

20  statement that you took from Ramon  Santana  to  one  of  the

21  supervisors, is that correct, detective supervisors?

22       A     That's correct.

23       Q     Was that detective supervisor lieutenant Doyle?

24       A     That's correct.

25       Q     And this was the commanding officer of the homicide

NYCLD_017756

Page 64

1                       Eric Reynolds
2    in the playground before you left?
3          A.     I don't recall the exact time.   It
4    wasn't long.
5          Q.     It wasn't long?
6          A.     No.
7          Q.     Could it have been five minutes,
8    ten minutes?
9          A.     It could have been.
10         Q.     After you left, where did you and
11   Officer Powers go, what did you do?
12         A.     We continued to canvas.
13         Q.     You continued to canvas the park
14   area, the northern end of the park, correct?
15         A.     Yes.
16         Q.     How long did you canvas the
17   northern end of the park inside the park?
18         A.     Well, I don't recall the exact
19   time.
20         Q.     Could it have been another 15
21   minutes, a half an hour, what?
22         A.     Again, I don't recall the exact
23   time.
24         Q.     What did you do after that, where
25   did you go after you completed your canvas of

NYCLD_057669

P-APP002553

Page 65

1                    Eric Reynolds

2    the park?

3         A.      We continued to canvas.

4         Q.      You continued to canvas, okay,

5    inside the park?

6         A.      Yes.

7         Q.      How long did you canvas inside the

8    park?

9              MR. MYERBERG:   Objection.

10        A.      Again, I don't recall.

11        Q.      Do you remember what you did?  Did

12   there come a time that you ever left the park?

13        A.      Yes.

14        Q.      And do you remember approximately

15   what time you left the park?

16        A.      I think it was, I believe it was

17   10:50.

18        Q.      About 10:50, okay.

19        A.      10:45.  I'm not sure of the exact

20   time.

21        Q.      That's okay.  And so you left the

22   park, you and Officer Powers.  Why did you leave

23   the park?  I'm curious, why did you stop the

24   canvassing inside the park?

25        A.      Because I didn't believe that the

NYCLD_057670

P-APP002554

Page 66

```
 1                   Eric Reynolds
 2    group was in the park anymore.
 3         Q.     So is it fair to say from about
 4    9:15 until the time that you left at about 10:45
 5    thereafter, you never ever saw any black males
 6    in the park; is that correct, in the northern
 7    end of the park?
 8              MR. MYERBERG:   Objection.
 9         A.     No.
10         Q.     You can answer.
11         A.     No, it's not fair to say.
12         Q.     Other than the ones who were on the
13    playground; is that correct?
14         A.     No.
15         Q.     You never saw any group of black
16    males together inside the park in the northern
17    end at any time between 9:15 and the time you
18    left; is that correct?
19              MR. MYERBERG:   Objection.
20         A.     I don't believe --
21              MR. MYERBERG:   You can answer.
22         A.     I don't believe so.
23         Q.     Right.  And as a matter of fact,
24    isn't that why you decided to leave and go over
25    to, was it Central Park West that you went to?
```

NYCLD_057671

P-APP002555

Page 67

1                    Eric Reynolds

2          A.      Yes.

3          Q.      And you went over to Central Park

4    West.   When you exited the park on Central Park

5    West, what street did you exit on?

6          A.      100th Street.

7          Q.      100th Street, okay.

8          A.      Yes.

9          Q.      And when you got to Central Park

10   West going out the 100th Street exit, which way

11   did you go from there, a left or a right?

12         A.      We made a right.

13         Q.      Is there any special reason you

14   made a right?

15         A.      Because we saw a large group of

16   male blacks and Hispanic teenagers.

17         Q.      When you first saw them, where did

18   you see them on Central Park West?

19         A.      They were between 101st and 102nd

20   Street.

21         Q.      So they were walking -- correct me

22   if I'm wrong, Detective -- they were walking in

23   a northerly direction; is that correct?

24         A.      Yes.

25         Q.      So is it fair to say they were

NYCLD_057672

P-APP002556

Page 68

1                    Eric Reynolds

2    walking in a northerly direction, they were

3    coming from a southerly direction?

4         A.    Yes.

5         Q.    On Central Park West?

6         A.    Yes.

7         Q.    So they were walking in the

8    direction of 102nd Street, correct?

9         A.    I'm sorry?

10        Q.    They were walking in a northerly

11   direction.  You say you saw them at about 101st.

12   They were walking in a northerly direction

13   toward 102nd Street; is that correct?

14        A.    That's correct, yes.

15        Q.    When you saw them, what did you and

16   Officer Powers do?

17             MR. WARREN:  Withdrawn.

18        Q.    Let me ask you a question before

19   that.  When you saw them, they were just

20   walking; is that correct?

21        A.    They were walking, talking with

22   each other.

23        Q.    Right, when you saw them, at no

24   time did you see them harassing anybody, beating

25   anybody, you didn't see any of that?

NYCLD_057673

P-APP002557

Page 69

Eric Reynolds

1
2     A.    There was no one else on the street
3     but them.
4     Q.    So they were just walking and
5     talking together; is that correct?
6     A.    That's correct.
7     Q.    Approximately how many of them were
8     there, sir?
9     A.    There was a lot.  I had estimated
10    between, you know, ten, 15.  There might have
11    been more.  I don't recall though.
12    Q.    And were they all black males?
13    A.    They were male black and Hispanics.
14    Q.    And Hispanics?
15    A.    Yes.
16    Q.    So after you saw them walking from
17    a southerly direction north in the direction of
18    102nd Street, what happened after that, what did
19    you all do?
20    A.    I was going to take my radio, and
21    first we were observing them, and I was going to
22    take my radio and ask for additional units to
23    respond so that we could stop the group.
24    Q.    Go ahead, sir.  I'm sorry, go
25    ahead.

NYCLD_057674

P-APP002558

Page 70

1                    Eric Reynolds
2          A.        That's it.
3          Q.        Okay, why were you going to be
4     asking for additional units if they were just
5     walking and talking to each other?  I'm just
6     trying to get this etched deeply in my mind in
7     understanding it.  Why would you call for
8     additional units?
9          A.        Because there was a large number of
10    them.
11         Q.        But they were just walking and
12    talking, right?
13         A.        Yes.
14         Q.        And that was it, no crimes being
15    committed, correct?
16                   MR. MYERBERG:  Objection.
17         A.        We wanted additional units so that
18    we could stop all of them in case they decided
19    to run.
20         Q.        What happened after that, after you
21    made the call for additional units?
22         A.        I didn't get to make the call.
23         Q.        Why not?
24         A.        Because the group stopped and
25    started pointing at us, and then some of the

NYCLD_057675

P-APP002559

Page 71

1                     Eric Reynolds
2    males towards the rear started to walk off.  But
3    they were, appeared to have been alarmed by our
4    presence.  I thought it was our presence.
5         Q.      What happened after that?
6         A.      There was a rap on my window and it
7    was, turned out that there was a cop in uniform
8    on a scooter, and that officer was Officer
9    Flores had pulled up to us to tell us she
10   thought that might have been the group, and we
11   explained to her that's why we were there.
12        Q.      She explained that might have been
13   the group, what did she mean?
14        A.      The group we were looking for.
15        Q.      But you never.
16                Saw anybody inside the northern end
17   of the park while you were in the park; is that
18   correct?
19        A.      Sorry?
20        Q.      You never saw any black males
21   inside the park --
22                MR. MYERBERG:  Objection.
23        Q.      -- while you were canvassing; is
24   that correct?
25        A.      No, I didn't say that.

NYCLD_057676

P-APP002560

Page 72

1                    Eric Reynolds

2          Q.     So are you saying when she said it

3     might have been the group, what group are you

4     referring to?

5          A.     The group that was harassing and

6     assaulting people.

7          Q.     So after you saw Officer Flores --

8     is it Officer Flores?

9          A.     Yes.

10         Q.     Then what happened after that?

11         A.     Because the group, some of them

12    started, some of them in the rear started to

13    walk away in the opposite direction, we decided

14    to pull the van into the intersection of 102nd

15    and Central Park West --

16         Q.     Yes.

17         A.     -- to block the group and stop them

18    so we could, so we could, you know, show up.

19         Q.     Did you stop them or what?

20         A.     We tried to stop them.

21         Q.     What did you do after that?

22         A.     We pulled the van up into the

23    intersection.  I got out of the van.  Officer

24    Powers got out also.

25         Q.     Yes.

NYCLD_057677

P-APP002561

Page 73

1                    Eric Reynolds

2        A.       We identified ourselves as police

3   officers and told them not to run and the group

4   started running.

5        Q.       In which direction did the group

6   run?

7        A.       They ran south.

8        Q.       They ran south?

9        A.       Yes.

10       Q.       On Central Park West?

11       A.       Yes.

12       Q.       All of them?

13       A.       No.

14       Q.       And what happened after that, what

15   did you do?

16       A.       I approached Raymond Santana and

17   Steven Lopez along with my partner, and we put

18   them against the wall and frisked them for

19   weapons.

20       Q.       Where did you approach Raymond

21   Santana and Seven Lopez?

22       A.       On the sidewalk between 101st and

23   102nd Street on Central Park West.

24       Q.       Is there any particular reason why

25   you approached Raymond Santana and Steven Lopez,

NYCLD_057678

P-APP002562

Page 74

```
 1                    Eric Reynolds
 2   other than the fact that you thought that they
 3   might have been a part of the group?
 4         A.      Because they were part of the
 5   group.
 6         Q.      But other than the fact that --
 7   part of what group, the group that was walking
 8   up Central Park West?
 9         A.      Yes.
10         Q.      But other than that, is there any
11   reason why you stopped those particular two?
12         A.      Well, again, they were part of the
13   group.
14         Q.      That was walking up Central Park
15   West?
16         A.      Yes.
17         Q.      But that's the only reason why you
18   stopped those two; is that correct?
19                 MR. MYERBERG:   Objection.
20         A.      No.
21         Q.      I'm sorry?
22         A.      No.
23         Q.      What was the other reason?
24         A.      They fit the description of the
25   males we were looking for.
```

NYCLD_057679

P-APP002563

Page 75

1                    Eric Reynolds

2         Q.      When you say they fit the

3    description of the males you were looking for,

4    when you heard the radio transmissions, was

5    there a clothing description given of the males?

6         A.      I don't recall.

7         Q.      Was there a color description given

8    of the males?

9                    MR. MYERBERG:   Objection.

10        A.      We were given a description of

11   teenage males, black and Hispanics.

12        Q.      Right, that was the only

13   description you were given; is that correct?

14        A.      As far as I can recall, yes.

15        Q.      What happened after that, after you

16   approached Lopez and Santana?

17        A.      They stated that they weren't with

18   the group, that the group was about to rob them.

19        Q.      Were there any other members of the

20   group that were stopped or brought back?

21        A.      You mean -- if you can rephrase

22   that.

23        Q.      Yes.   I mean after you stopped

24   Lopez and Santana, of the group that you said

25   you saw, were there any other young men, young

NYCLD_057680

P-APP002564

Page 76

1                    Eric Reynolds
2    boys who were arrested?
3         A.      Yes.
4                 MR. MYERBERG:   Objection.
5         Q.      And how many others and what are
6    their names?
7         A.      There were three others.
8         Q.      Who were they?
9         A.      Lamont McCall, Clarence Thomas and
10   Lamont McCall, Clarence Thomas, and I forgot the
11   third.  The last name was Richardson.
12        Q.      Kevin Richardson?
13        A.      Kevin Richardson.
14        Q.      So there were five in all arrested
15   from this group; is that correct?
16        A.      Yes.
17        Q.      And after these young boys were
18   arrested, what happened after that?
19                MR. MYERBERG:   Objection.
20        Q.      Go ahead, you can answer.
21        A.      Which young boys?
22        Q.      The five that you just mentioned,
23   Steven Lopez, Raymond Santana, Lamont McCall,
24   Clarence Thomas and Kevin Richardson.
25        A.      We brought them to 100th Street and

NYCLD_057681

P-APP002565

Page 77

```
 1                    Eric Reynolds

 2   Central Park West.

 3        Q.     When you say "we," was it in your

 4   vehicle?

 5        A.     No.

 6        Q.     Who transported these five young

 7   boys?

 8               MR. MYERBERG:   Objection.

 9        A.     They weren't transported together

10   in one car.

11        Q.     That's fine.  Who did the

12   transport?

13        A.     Sergeant Wheeler and I don't recall

14   who his partner was, and then I believe Sergeant

15   Lail and Officer Hennigan.

16        Q.     Who did Sergeant Wheeler transport?

17        A.     Lopez and Santana.

18        Q.     And the others were transported by

19   Sergeant Lail?

20        A.     I believe so.

21        Q.     And was there a discussion at all

22   after these boys were stopped and before they

23   were transported about doing a showup

24   identification with Mr. Loughlin?

25        A.     Yes.
```

NYCLD_057682

P-APP002566

Page 78

1                    Eric Reynolds

2          Q.     And was a showup identification

3    conducted?

4          A.     No.

5          Q.     Why not?

6          A.     Mr. Loughlin's injuries were too

7    extensive.   He wasn't able to ID.

8          Q.     Where was Mr. Loughlin at that

9    time?

10         A.     He was in the hospital.

11         Q.     And when you say -- what hospital

12   was he in?

13         A.     I don't recall that.

14         Q.     Would it refresh your recollection

15   if I told you that he was in St. Luke's

16   Hospital?

17         A.     It sounds right.

18         Q.     How did you find out his injuries

19   were such that he would not be able to

20   participate in a showup identification?

21         A.     I was informed of that by another

22   officer.

23         Q.     By who?

24         A.     I don't recall who said that.

25         Q.     You don't recall?

NYCLD_057683

P-APP002567

Page 79

```
 1                    Eric Reynolds
 2          A.      No.
 3          Q.      How soon after the arrest of these
 4   five boys were you informed that Mr. Loughlin
 5   was in such a condition that you could not
 6   conduct a showup?
 7          A.      It was maybe ten, 15 minutes.  I
 8   don't recall.
 9          Q.      Ten or 15 minutes?
10          A.      It could have been.  I don't recall
11   what the time frame was.
12          Q.      Were these young boys, were they at
13   the precinct when you found out what you
14   described as his condition, or were you still
15   out in the street?
16          A.      We were still in the street.
17          Q.      What were the nature of his
18   injuries?
19                  MR. MYERBERG:  Objection.
20          A.      He was beaten with a pipe, I
21   believe.
22          Q.      But why couldn't he participate in
23   the showup?
24                  MR. MYERBERG:  Objection.
25          A.      My understanding was both of his
```

NYCLD_057684

P-APP002568

Page 80

1                    Eric Reynolds

2    eyes were swollen shut.

3                    MR. WARREN:  I'd like to get this

4         marked as Reynolds 3.

5                    [Page 715 of a transcript was

6         hereby marked as Reynolds Exhibit 3 for

7         identification, as of this date.]

8         Q.     Let me know when you're finished

9    reading.  Have you read that document?

10        A.     Yes.

11        Q.     Having read that, this is your

12   testimony in a prior proceeding.  Does that

13   refresh your recollection that you've testified

14   previously that only one of his eyes was badly

15   damaged?

16                    MR. MYERBERG:  Objection.  That's

17        not the testimony here.

18        Q.     Were both of his eyes shut or just

19   one of his eyes?

20        A.     Again, my understanding was that

21   both of his eyes were swollen shut.  My

22   testimony here is that at least one of his eyes

23   was badly damaged.

24        Q.     Well, that at least he had one of

25   his eyes was badly damaged, is that what it

NYCLD_057685

P-APP002569

Page 81

1                    Eric Reynolds

2    says?

3         A.     Yes.

4         Q.     It doesn't say both of his eyes?

5         A.     I'm sorry, that wasn't my testimony

6    earlier.  I just said both were swollen shut.

7         Q.     I see, thank you.

8                MR. MYERBERG:  Just for the record,

9         this is page 715 in the top right corner,

10        Reynolds People Recross Colleen Moore.

11               MR. WARREN:  That's correct,

12        starting with line 11 going through 19.

13        Q.     Now, what time did you arrive at

14   the precinct, sir?

15        A.     I believe it was around 11.

16        Q.     Eleven o'clock?

17        A.     Yes.

18        Q.     When you arrived at the precinct,

19   what did you observe?

20        A.     I believe the defendants had gotten

21   there just before me and were standing in front

22   of the desk.

23        Q.     And who else was present at that

24   time that you recall?

25        A.     Sergeant Lail, Officer Hennigan,

NYCLD_057686

P-APP002570

1                      Eric Reynolds

2     Sergeant Wheeler may have been there also, I

3     believe.  I'm not 100 percent sure.

4          Q.     And what did you do after arriving

5     at the precinct?

6          A.     Went to the desk officer and

7     informed him of what I had.

8          Q.     Who was the desk officer at that

9     time?

10         A.     I don't recall.

11         Q.     Would that have been a sergeant or

12    a lieutenant?

13         A.     It could have been either.

14         Q.     Do you know a Lieutenant McInerney?

15         A.     I know who he is.

16         Q.     Was he at the desk that night when

17    you arrived?

18         A.     I don't think so.

19         Q.     After you arrived and you saw a

20    desk officer, then what did you do?

21         A.     I explained to him what I had.

22         Q.     Then what happened?

23         A.     I gave him the names and pedigree

24    information of each of the defendants.

25         Q.     Did you actually take down the

NYCLD_057687

P-APP002571

Page 83

1                        Eric Reynolds

2    pedigree information?

3          A.      From each defendant?

4          Q.      Yes.

5          A.      Well, at that point it would have

6    been the desk officer.

7          Q.      The desk officer?

8          A.      Yes.

9          Q.      And what did you do after you

10   arrived and after you saw the desk officer, what

11   did you do thereafter?

12         A.      I brought the defendants to the

13   juvenile room.

14         Q.      And what floor of the precinct was

15   that in?

16         A.      That's on the first floor.

17         Q.      The first floor?

18         A.      Yes.

19         Q.      And what did you do after that,

20   sir?

21         A.      I started to process the arrest.

22         Q.      When you started to process the

23   arrest, can you describe a little further what

24   you mean by that?

25         A.      I started to do the paperwork.

NYCLD_057688

P-APP002572

Page 84

1               Eric Reynolds

2          Q.      Okay.  On each of the young boys;

3    is that correct?

4          A.      Yes.

5          Q.      And how long did that process last,

6    doing the paperwork on each of these five young

7    boys?

8          A.      I don't recall.

9          Q.      Would it have been several hours?

10         A.      Again, I don't recall how long each

11   one took.

12         Q.      Did you do the paperwork on each

13   one of them?

14         A.      Yes.

15         Q.      And did there come a time that any

16   of their parents arrived?

17         A.      Yes.

18         Q.      Who was the first parent to arrive?

19         A.      Kevin Richardson's mother.

20         Q.      Mrs. Cuffee?

21         A.      Yes.

22         Q.      And approximately what time did Ms.

23   Cuffee arrive at the precinct?

24         A.      I believe it was around 12 o'clock

25   at night.

NYCLD_057689

P-APP002573

Page 85

1                          Eric Reynolds

2          Q.      Was she alone at that time?

3          A.      I believe so.

4          Q.      When she arrived, can you tell us

5    what took place?

6          A.      I explained to her that her son was

7    under arrest with the others.

8          Q.      What was her son under arrest for?

9          A.      Unlawful assembly, and I believe

10   the assault on Mr. Loughlin.

11         Q.      The assault on Mr. Loughlin?

12         A.      I believe so.

13         Q.      Had there been an identification at

14   that point by Mr. Loughlin of her son?

15         A.      No.

16         Q.      Nevertheless, he was arrested for

17   unlawful assembly and assault on Mr. Loughlin?

18                 MR. MYERBERG:   Objection.

19         Q.      You can answer.

20         A.      I know he was arrested for the

21   unlawful assembly.  I'm not sure if the assault

22   charge was included.

23         Q.      He was arrested for unlawful

24   assembly where?

25         A.      In Central Park.

NYCLD_057690

P-APP002574

Page 86

1              Eric Reynolds

2        Q.        In Central Park?

3        A.        Yes.

4        Q.        Is there anyone who identified him

5    as being in Central Park that night?

6              MR. MYERBERG:   Objection.

7        A.        Nobody as far as --

8        Q.        Yes.

9        A.        -- civilian witnesses?

10       Q.        Yes.

11       A.        No.

12       Q.        What about the others?

13             MR. WARREN:   Withdrawn.

14             MR. MYERBERG:   The witness has just

15        asked to take a bathroom break.   Is that

16        possible?

17             MR. WARREN:   Oh, sure.   We'll take

18        a five-minute break.

19             MR. MYERBERG:   Ten minutes.

20             MR. WARREN:   Ten minutes, fine.

21             (A recess was taken.)

22             MR. MYERBERG:   Mr. Warren, let me

23        put one thing on the record for the interns

24        that are working for your firm.   Everyone

25        signed Exhibit A; is that correct?   And the

NYCLD_057691

P-APP002575

1                    Hartigan/cross/Mr. Moore            2592

2    J O H N      H A R T I G A N,  was recalled as a witness in

3    behalf of the People, having previously been duly sworn,

4    continues to testify as follows:

5                    MR. MOORE:  May we approach?

6                    THE COURT:  Yes.

7                    (Whereupon, there was a bench conference among

8            all counsel with the court out of the hearing and

9            presence of the jury.)

10                   (Pause)

11                   THE CLERK:  Detective, having been previously

12           been sworn, you're still under oath.

13                   THE WITNESS:  Yes, sir.

14                   THE COURT:  Members of the jury, you recall Mr.

15           Hartigan was here previously, was interrupted.  And

16           we are going to resume his examination today, cross

17           examination by Mr. Moore.

18   CROSS EXAMINATION

19   BY MR. MOORE:.

20       Q    Mr. Hartigan, good morning.

21       A    Good morning, sir.

22       Q    You indicated in previous cross examination by Mr.

23   Diller that you retired from the N Y P D sometime in July of

24   1989, am I correct?

25       A    Yes, sir.

1                     Hartigan/cross/Mr. Moore          2593

2       Q     You also indicated that you were a patrolman for

3   five years and that you were a detective for twenty years,

4   am I correct?

5       A     In the detective division for twenty years, yes,

6   sir.

7       Q     How long were you with the Manhattan North homicide

8   detective unit?

9       A     Three years.

10      Q     And during your tenure with Manhattan North, Mr.

11  Hartigan, how many cases, homicide cases have you

12  investigated?

13      A     It's hard to say.  It's a large number of homicides

14  that we did.  We worked on old homicides.  We worked on new

15  homicides as they came in.  We went back on old homicides.

16      Q     And what percentage of those cases have resulted in

17  arrests?

18                  MS. LEDERER:  Objection.

19                  THE COURT:  Objection sustained.

20      Q     Now, have those cases that you worked on, what

21  percentage of the defendants in those cases have been black

22  and Hispanic males?

23                  MS. LEDERER:  Objection.

24                  THE COURT:  Sustained.

25      Q     Of those cases that you have worked on, what

AM010249

NYCLD_018271

P-APP002577

Hartigan/cross/Mr. Moore          2594

1  percentage of those cases have been based on statements?

2          MS. LEDERER:  Objection.

3          THE COURT:  Sustained.

4      Q    Now, you've indicated, Mr. Hartigan, that you have

5  in the course of your investigation, you have dealt with

6  young people, am I correct?

7      A    Yes, sir.

8      Q    Would you say in a large percentage of your cases

9  or a small percentage of those cases?

10     A    I'd say a small percentage.

11     Q    Now, in April 20, 1989 your tour of duty was from 8

12 o'clock in the morning to 4 o'clock in the afternoon, am I

13 correct?

14     A    Yes, sir.

15     Q    And in fact, Detective Hartigan, you were fairly

16 busy on that particular day, were you not?

17     A    Pardon me?

18     Q    You were fairly busy on April 20th, were you not?

19     A    Yes, sir.

20     Q    As a matter of fact, you participated in the

21 interview of Kevin Richardson from 9:40 in the morning until

22 about 1 o'clock in the afternoon, am I not correct?

23     A    From about 10 o'clock in the morning, yes, sir.

24     Q    Until about 1 o'clock?

NYCLD_018272

P-APP002578

1                    Hartigan/cross/Mr. Moore          2595

2       A     Yes, sir.

3       Q     And that interview resulted in a statement from

4    Kevin Richardson, am I not correct?

5                 MS. LEDERER:  Objection as to form.

6                 THE COURT:  Objection as to form is sustained.

7       Q     Well, after the interview Kevin Richardson did give

8    you a statement, is that correct?

9       A     Kevin Richardson was giving a statement at the time

10   I sat in on the interview.

11      Q     Yeah.  And he gave you a statement, a written

12   statement?

13      A     Yes, sir.

14      Q     And from 1 to 6 o'clock you participated in the

15   interview of Raymond Santana, am I correct?

16      A     Yes, sir.

17      Q     And that was from 1 to 6 o'clock?

18      A     I can't recall exactly what  --  I believe it was 1

19   --  4 to 6 o'clock.  I can not exactly recall the hour.

20      Q     And at the end of the interview Raymond Santana

21   signed a statement, isn't that correct?

22      A     Yes, sir.

23      Q     And, as a matter of fact, during your examination

24   of Raymond Santana from 1 to 4 o'clock you asked him

25   repeatedly --

Page 96

1           J. HARTIGAN

2      A.    No.

3      Q.    Detective Inspector Powell, did

4  you know what he looked like?

5      A.    Yes.

6      Q.    Did you see him either in the

7  building or on the grounds of the Central

8  Park Precinct?

9      A.    I don't recall seeing him.

10      Q.    You don't recall seeing him,

11  either?

12      A.    No, sir.

13      Q.    You knew ADA Fairstein at that

14  time, correct?

15           MS. DOLAN:  Objection to form.

16  BY MR. WARREN:

17      Q.    You can answer.

18      A.    Yes.

19      Q.    Do you recall seeing her on the

20  grounds at that time?

21      A.    No.  I don't recall seeing her.

22  I don't believe I saw here there.  When I

23  arrived at ten o'clock in the morning?

24      Q.    Yes, sir.

25      A.    No, I don't recall.

NYCLD_037959

P-APP002580

Page 97

1           J. HARTIGAN

2       Q.     Did you ever see her there at

3   the Central Park Precinct?

4       A.     I don't recall ever seeing her

5   at Central Park.

6       Q.     You don't recall seeing her at

7   the Central Park Precinct during the time

8   you were there?

9       A.     That's correct.

10      Q.     How about ADA Lederer?

11      A.     I don't recall seeing her in

12  Central Park.

13      Q.     So are you saying you didn't

14  see them?

15      A.     I don't recall.  I have no

16  recollection of seeing them in Central

17  Park.

18      Q.     You're saying when you first

19  arrived at Central Park, you went into a

20  building and spoke to a desk officer; is

21  that correct?

22      A.     That's correct.

23      Q.     Were there any other officers

24  or personnel in that first building that

25  you walked into?

NYCLD_037960

P-APP002581

1               J. HARTIGAN

2       A.     I don't remember.   There must

3   have been other police officers.   There's

4   always police officers within the

5   confines of the precinct or the

6   stationhouse.

7       Q.     Did you see any officers that

8   you recognized in that first building?

9       A.     No, sir, I did not.   I don't

10  remember seeing anybody.

11      Q.     What happened after you walked

12  into that first building?

13      A.     The desk officer informed us

14  that the investigation was being

15  conducted in the youth room and I believe

16  he directed us where to go to the youth

17  room.

18      Q.     At that time, what was the

19  purpose that you had in your mind for

20  going to the youth room?

21          MS. DOLAN:   Objection to form.

22      You can answer.

23      A.     To assist in any way that we

24  could.

25      Q.     Assist in any way that you

NYCLD_037961

P-APP002582

Page 99

J. HARTIGAN

1

2   could?

3       A.    Yes, sir.

4       Q.    When you got the call to go to

5   the Central Park Precinct that you had

6   referred to earlier, was there a

7   discussion by whoever called you that you

8   should at some point go to the youth room

9   once you arrived?

10      A.    I don't believe the youth room

11  was mentioned.  I have no idea.  I don't

12  know if the youth room was mentioned

13  prior to that or when I went in to see

14  the desk officer.

15      Q.    When you say you don't

16  remember, you're saying the youth room

17  could have been mentioned during that

18  initial call instructing you to go to the

19  Central Park Precinct?

20          MS. DOLAN:  Objection to form.

21      A.    I don't believe it was.

22      Q.    You don't believe it was?

23      A.    Yes, sir.

24      Q.    Okay.  When you arrived in that

25  first building -- by the way, who were

NYCLD_037962

P-APP002583

Page 100

1                    J. HARTIGAN
2     you working with on that day?
3          A.     Detective Scott Jaffer.
4          Q.     J-A-F-F-E-R?
5          A.     Yes, sir.
6          Q.     Prior to that date, how long
7     had you worked with Detective Jaffer?
8          A.     We had come into the Manhattan
9     North Homicide Division together.
10         Q.     So three years?
11         A.     Approximately three years.
12         Q.     Was he your steady partner at
13    that time?
14         A.     Yes.
15         Q.     When you went into that first
16    building, were you the one who was
17    involved with the discussion with the
18    desk officer or was it Detective Jaffer
19    or were you doing it interchangeably?
20         A.     I don't remember who it was.
21    It could have been me or Detective
22    Jaffer, I don't remember.
23         Q.     At that point, can you tell me
24    what your expectations were in terms of
25    the type of assistance that you would

NYCLD_037963

P-APP002584

Page 101

1            J.  HARTIGAN

2   render in the investigation when you were

3   talking to the desk officer?

4        A.    I don't believe the desk

5   officer knew anything in regard to the

6   investigation.  He was just directing us

7   where to go.

8        Q.    No, I'm asking you in your

9   mind, what were your expectations in

10  terms of the type of assistance that you

11  would offer investigation-wise with

12  respect to that case?

13       A.    Any type of assistance that the

14  superior officer that was assigned to the

15  case would want or the detective who was

16  assigned to the case would need.

17       Q.    Who were those superior

18  officers?

19       A.    I don't remember if Lieutenant

20  Doyle was there.

21       Q.    I'm sorry?

22       A.    I don't remember if Lieutenant

23  Doyle was there.

24       Q.    Could he have been there?

25       A.    He might have.  He could

NYCLD_037964

P-APP002585

Page 102

1                    J. HARTIGAN

2    possibly have been there, yes.

3         Q.    What was his title?

4         A.    Lieutenant of the Manhattan

5    North Homicide Squad.  Commanding officer

6    of the Manhattan North Homicide Squad.

7         Q.    So you were under his command;

8    is that correct?

9         A.    Yes, sir.

10        Q.    And Detective Jaffer was under

11   his command; is that correct?

12        A.    Yes, sir.

13        Q.    And would you agree, sir, that

14   the Central Park case received enormous

15   publicity?

16             MS. DOLAN:  Objection.

17   BY MR. WARREN:

18        Q.    You can answer.

19        A.    At what time, sir?

20        Q.    At that time?

21        A.    I don't believe so.  I don't

22   remember seeing or hearing anything about

23   it at the time I got to Central Park.

24        Q.    But would the lieutenant have

25   been your immediate supervisor if he was

NYCLD_037965

P-APP002586

Page 105

1              J. HARTIGAN

2       A.    I don't remember.

3       Q.    Okay.  So when you left that

4  first building, what did you do and where

5  did you go?

6       A.    To the youth room.

7       Q.    To the youth room.  That was in

8  an entirely different building; is that

9  correct?

10      A.    Yes, sir.

11      Q.    Once you got to the youth room,

12  did you see any white shirts, any

13  supervisors?

14      A.    No, sir, I don't believe so.

15      Q.    Okay.  When you got to the

16  building housing the youth room, what did

17  you do?

18      A.    We entered into the youth room

19  and I -- Sergeant Fiston was there.  We

20  identified ourselves to Sergeant Fiston

21  and told him we were extra manpower.  If

22  he needed anything, we were there to

23  assist him.

24      Q.    Had you ever interacted with

25  Sergeant Fiston before, prior to that?

NYCLD_037968

P-APP002587

1                    J. HARTIGAN

2        A.    I don't remember.

3        Q.    To your knowledge, what role

4    did Sergeant Fiston have with the

5    investigation at that point?

6        A.    I don't know.  All I know is

7    that he was a sergeant.

8        Q.    He was in the room when you

9    arrived?

10       A.    Yes.

11       Q.    Did Detective Jaffer accompany

12   you in the room?

13       A.    Yes.

14       Q.    Who else was in the room?

15       A.    Detective Gonzalez.

16       Q.    Detective Gonzalez?

17       A.    Yes.

18       Q.    And who else?

19       A.    Kevin Richardson, a person I

20   subsequently learned was Kevin

21   Richardson, and his mother.

22       Q.    What took place when you came

23   into the room?  What happened?

24       A.    I informed Sergeant Fiston that

25   we were from the Homicide Squad and we

NYCLD_037969

P-APP002588

Page 107

```
 1                    J. HARTIGAN
 2    were there to assist him in any way he
 3    needed it.
 4         Q.    What was Sergeant Fiston doing
 5    at that time when you first walked in?
 6         A.    As far as I remember, he was
 7    just standing there.
 8         Q.    He was just standing there?
 9    Was he talking to anybody?
10         A.    I don't recall his talking to
11    anybody.
12         Q.    And you said that Detective
13    Gonzalez was in the room, as well?
14         A.    Yes, sir.
15         Q.    What was he doing when you and
16    Detective Jaffer first walked in?
17         A.    He was sitting down.
18         Q.    He was sitting down?
19         A.    Yes, sir.
20         Q.    And what was he doing while he
21    was sitting down?
22         A.    He was talking to Mr. Richardson.
23         Q.    He was talking to Mr. Richardson?
24         A.    Yes, sir.
25         Q.    When you say talking, did it
```

NYCLD_037970

P-APP002589

Page 108

```
 1                    J. HARTIGAN
 2    appear to be an interview?
 3         A.    I believe so, yes.
 4         Q.    So is it fair to say that when
 5    you walked in, an interview was in
 6    progress?
 7              MS. DOLAN:  Objection to form.
 8         You can answer.
 9         A.    It appeared to be, yes.
10         Q.    And that was Kevin Richardson
11    being interviewed by Detective Gonzalez;
12    is that correct?
13         A.    Yes, sir.
14         Q.    What time was that when you
15    walked in, approximately?
16         A.    Somewhere around ten o'clock.
17         Q.    Somewhere around ten o'clock?
18         A.    Yes.
19         Q.    After you walked in, Detective,
20    what did you do immediately thereafter?
21         A.    Again, I spoke to Sergeant
22    Fiston.
23         Q.    What did you speak to Sergeant
24    Fiston about?
25         A.    That we were from the Homicide
```

NYCLD_037971

P-APP002590

Page 109

```
 1              J. HARTIGAN
 2   Squad and we were extra manpower if he
 3   needed us.
 4        Q.    When you were speaking with
 5   him, was the interview still going on
 6   with Kevin Richardson and Gonzalez?
 7        A.    I don't remember if the
 8   interview was still going on.
 9        Q.    And when you told him that,
10   what, if anything at all, did he say?
11        A.    I don't remember.
12        Q.    What happened after that?
13        A.    Myself and Detective Jaffer
14   left the youth room.
15        Q.    How long were you in the youth
16   room before you left?
17        A.    I don't believe we were there
18   very long; maybe five minutes.  Maybe
19   five minutes.
20        Q.    So you came in, you spoke with
21   Sergeant Fiston.  He was the only one you
22   spoke with at that time and you left,
23   correct?
24        A.    Yes, sir.
25        Q.    Other than Sergeant Fiston and
```

NYCLD_037972

P-APP002591

Page 110

1            J. HARTIGAN

2    Detective Gonzalez and Mr. Richardson,

3    was there anyone else in the room when

4    you and Detective Jaffer first arrived?

5         A.    I believe there was another

6    person in the room, yes, at that time.

7         Q.    Another person?  Would that

8    have been a detective or a police

9    officer?

10        A.    A detective or a policer

11   officer.

12        Q.    What was that person doing?

13        A.    He was just sitting there.

14        Q.    Where was Detective Gonzalez

15   seated in relation to Mr. Richardson when

16   you came into the room?

17        A.    If I remember correctly, as we

18   entered the room, Detective Gonzalez was

19   on my left seated at a desk on my left.

20   Mr. Richardson was sitting in front of

21   him and Sergeant Fiston was standing over

22   here (indicated), which would be on my

23   right-hand side.

24        Q.    On your right-hand side?

25        A.    Yes.

NYCLD_037973

P-APP002592

Page 111

1        J. HARTIGAN

2        Q.      And do you recall observing

3   Detective Gonzalez taking any notes while

4   he was having a discussion with Kevin

5   Richardson?

6        A.      I don't recall that.

7        Q.      You don't recall that?

8        A.      I don't remember, no, sir.

9        Q.      In other words, he could have,

10   you just don't remember?

11        A.      I don't remember there were any

12   conversations while we were there.   I

13   don't remember him speaking while we

14   there.

15        Q.      You don't remember who

16   speaking?

17        A.      Detective Gonzalez.

18        Q.      What was he doing?

19        A.      I guess we had interjected

20   ourselves into the interrogation and he

21   had just -- I believe he had stopped.   I

22   believe he had stopped.

23        Q.      When you say you had

24   interjected yourselves in the

25   interrogation, what do you mean?

NYCLD_037974

P-APP002593

Page 112

1                J. HARTIGAN

2        A.      Into the interrogation room.

3    Into the youth room; when we came in.

4        Q.      Okay.

5        A.      I think -- I seem to remember

6    Detective Gonzalez stopping and as we

7    talked to Sergeant Fiston.

8        Q.      What did you say to Detective

9    Gonzalez when he stopped?

10       A.      I didn't say anything to him.

11       Q.      And what did you say to -- did

12   you have a discussion with Ms. Richardson

13   at that time?

14       A.      With who, sir?

15       Q.      Ms. Richardson, at that time.

16            MS. DOLAN:  I'm sorry, Ms. or

17       Mr.?

18            MR. WARREN:  Miss.

19            THE WITNESS:  Miss?  M-I-S-S.

20            MR. WARREN:  Yes.

21            THE WITNESS:  You said a

22       Ms. Richardson --

23            MS. DOLAN:  Objection to form.

24   BY MR. WARREN:

25       Q.      Did you have discussions with

NYCLD_037975

P-APP002594

1          J. HARTIGAN

2   anyone else?

3       A.    I had no discussions with

4   anybody.

5       Q.    Then there came a time that you

6   left the room; is that correct?

7       A.    Yes, sir.

8       Q.    How long were you and Detective

9   Jaffer in the room before you left?

10      A.    I believe I already answered

11  that.  About five minutes.

12      Q.    Five minutes?

13      A.    Yes, sir.

14      Q.    For what reason did you leave?

15      A.    We went outside, waiting any

16  instructions that -- whatever they needed

17  us to do.  We had to enter back out into

18  the roadway awaiting any instructions.

19      Q.    I'm trying to piece this

20  together in my mind.  For what reason did

21  you leave the room after speaking with

22  Sergeant Fiston?  Why didn't you stay in

23  the room?

24      A.    Because we weren't part of what

25  was going on.  We went outside waiting

NYCLD_037976

P-APP002595

1          J. HARTIGAN

2    for instructions as to what they needed

3    done.

4         Q.    Did Sergeant Fiston tell you to

5    go outside or what?

6         A.    I don't remember, sir.

7         Q.    But you went outside how long

8    after you spoke with him?

9         A.    Approximately five minutes.

10   Maybe even less than five minutes.

11        Q.    Maybe less than five minutes?

12        A.    Yes, sir.

13        Q.    So it was as a result of a

14   discussion that you had with Sergeant

15   Fiston that you and Detective Jaffer went

16   outside?

17             MS. DOLAN:   Objection to form.

18   BY MR. WARREN:

19        Q.    Is that correct?

20        A.    I don't know if Sergeant Fiston

21   directed us to go outside or we just went

22   outside.   I have no recollection of what

23   happened.

24        Q.    Was he in your mind a

25   supervisory officer of the investigation

NYCLD_037977

P-APP002596

Page 115

1                    J. HARTIGAN

2    at that time?

3         A.    He was the supervisor that I

4    saw.  He was the only supervisor I saw,

5    if I remember correctly.

6         Q.    Would he have had the authority

7    to instruct both you and Detective Jaffer

8    to go outside if that's what his desire

9    was?

10              MS. DOLAN:  Objection to form.

11        A.    Yes.  I imagine so, yes.

12        Q.    So after speaking with him, you

13   and Detective Jaffer went outside.

14        A.    Yes, sir.

15        Q.    When you say you went outside,

16   where did you go when you went outside?

17        A.    There's a roadway outside

18   between the buildings.

19        Q.    So when you went outside,

20   you're saying that you left that building

21   all together; is that correct?

22        A.    The youth room, yes.

23        Q.    The youth room is in a

24   building; is that correct?

25        A.    I think the youth room is part

NYCLD_037978

P-APP002597

409

KEVIN RICHARDSON

1          MR. MYERBERG:  I think I'm entitled to ask

2          the question.

3          MR. MOORE:  Well --

4          MR. MYERBERG:  So, if you have an objection,

5          you can make the objection, but I'm entitled to

6          ask the question.

7          MR. MOORE:  Note my objection.

8     Q.    Did you have any semen on any of your clothing

9   that you had been wearing that night?

10    A.    I don't know.  I didn't have nothing.

11    Q.    Sorry?

12    A.    No.

13    Q.    Now, at any time, apart from during the

14  videotaped statement, and during the visit to Central Park,

15  did you see ADA Elizabeth Lederer?

16    A.    Repeat that, I'm sorry.

17    Q.    At any time, other than the videotaped statement

18  and the time that you went to Central Park, sometime after

19  the -- April 19th, did you ever see ADA Lederer again at

20  any of the precincts that you were at?

21    A.    I don't remember seeing her.

22    Q.    And at any point, apart from when you went to

23  Central Park, did you see ADA Fairstein at any of the

24  precincts that you had been at?

25    A.    I don't remember seeing her.

NYCLD_054900

P-APP002598



SINCE 1828

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)

- [LOG IN](#)
- [REGISTER](#)
- ⌄
  settings
- [SAVED WORDS](#)

dumpster fire

✕

🔍

dictionary thesaurus    view recents

[Login](#) or [Register](#)
Hello,

- [GAMES](#)
- [BROWSE THESAURUS](#)
- [WORD OF THE DAY](#)
- [WORDS AT PLAY](#)
- [SETTINGS](#)
-
- [SAVED WORDS](#)    view recents

# dumpster fire

[noun](#)

🏳 Save Word

P-APP002599

To save this word, you'll need to log in.

Log In

variants: or less commonly Dumpster fire

## Definition of *dumpster fire*

US, informal

**:** an utterly calamitous or mismanaged situation or occurrence **:** disaster Reese and McAdoo take the fall for what has been a dumpster fire of a season, one which has them at 2-10 on the season, and in line for one of the top two picks in the 2018 NFL Draft.— James Kratch So while 2017 has been, by many measures, a complete dumpster fire of a year, New Yorkers can at the very least take refuge in the fact that their city is becoming an even safer place to live.— Clayton Guse

## First Known Use of *dumpster fire*

2006, in the meaning defined above

Keep scrolling for more

## Learn More about *dumpster fire*

Share *dumpster fire*

Post the Definition of dumpster fire to Facebook     Share the Definition of dumpster fire on Twitter 

Time Traveler for *dumpster fire*



## The first known use of *dumpster fire* was in 2006

See more words from the same year

P-APP002600

Case 1:20-cv-08042-PKC   Document 46-12   Filed 07/01/20   Page 188 of 219

# Dictionary Entries near *dumpster fire*

dump shot

dumpster

dumpster diving

dumpster fire

dump trailer

dump truck

dump valve

See More Nearby Entries

# Statistics for *dumpster fire*

Look-up Popularity

Bottom 10% of words

Cite this Entry

"Dumpster fire." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dumpster%20fire. Accessed 12 May. 2020.

| **Style:** MLA                                                         ▼ |
|---|

Comments on *dumpster fire*

What made you want to look up *dumpster fire*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕

P-APP002601

**WORD OF THE DAY**

# flotsam 

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

---

**Test Your Vocabulary**

Name More Food!

P-APP002602

- - Name that Fruit!

| jackfruit | pomelo |
| --- | --- |
| lingonberry | pomegranate |

---

Can you spell these 10 commonly misspelled words?

TAKE THE QUIZ

---

**Test Your Knowledge** - and learn some interesting things along the way.

TAKE THE QUIZ

---

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

---

WORDS AT PLAY

---

- ### A Word on 'Descriptive' and 'Prescriptive' Defining

P-APP002603

When it comes to words, we're
descriptive.

- ## The Words of the Week - 5/8/20

  Words from the week of 5/8/2020

- ## One-Word Oxymorons: Bittersweet, Spendthrift, and More

  When a single word contains two
  conflicting ideas.

- ## 'Mano a Mano': A Hands-On Approach

  Notes on a confusing borrowing

### ASK THE EDITORS

- ## How to Remember the Spelling of 'Definitely'

  A definitive answer.

P-APP002604

- ### Video: Why Is There a 'C' in 'Indict'?

  And who put it there, anyway?

- ### Literally

  How to use a word that (literally) drives some people nuts.

- ### Is Singular 'They' a Better Choice?

  The awkward case of 'his or her'

## WORD GAMES

- ### Name More Food!

  Test your knowledge of food vocabulary!

  **TAKE THE QUIZ**

- ### April 2020 Words of the Day Quiz

P-APP002605

Reminding you that time is, indeed, passing.

**TAKE THE QUIZ**

•

## Spell It

Can you spell these 10 commonly misspelled words?

**TAKE THE QUIZ**

•

## Add Diction

Build a chain of words by adding one letter at a time.

**PLAY THE GAME**

---

Learn a new word every day. Delivered to your inbox!

Your email address

OTHER MERRIAM-WEBSTER DICTIONARIES

• SPANISH CENTRAL

• LEARNER'S ESL DICTIONARY

• WORDCENTRAL FOR KIDS

• VISUAL DICTIONARY

P-APP002606

- SCRABBLE® WORD FINDER
- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

●　　　　●　　　　●　　　　●

Browse the Dictionary:　A　B　C　D　E　F　G　H　I　J　K　L　M　N　O　P　Q　R　S　T　U　V　W　X　Y　Z
0-9

Home | Help | Apps | About Us | Shop | Advertising Info | Dictionary API |
Contact Us | Join MWU | Video | Word of the Year | Puku | Vocabulary Resources |
Law Dictionary | Medical Dictionary | Privacy Policy | Terms of Use |
Do Not Sell My Info

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary |
Browse the Spanish-English Dictionary

© 2020 Merriam-Webster, Incorporated

✕

# You have been logged out.

To access your account, please log back in or contact us at customerservice@m-w.com to report this issue

P-APP002607

T3-JM-TS

4949

1            Fairstein - People - Cross - Burns

2    Q    Now, between 8:30 and 11:30, did you participate  in

3  any questioning of any individuals?

4    A    I questioned police officers.

5    Q    Just officers.

6    A    Right.

7    Q    Now, at 11:30, you say, is the first time you --

8            MR. BURNS:  Withdrawn.

9    Q    At what point in time -- at what point in time did

10  you -- were you aware of the fact that Yusef Salaam was in the

11  20th Precinct?

12    A    I have -- I would put it in the 11  o'clock  period,

13  but it was between 11 and 11:30.

14    Q    And do you have any -- can you tell the Court who

15  told you, or how you came by that information?

16    A    I was in a room with a lot of police officers,  and,

17  as  different events unfolded that evening, because there were

18  many participants, and a lot of police activity, people  would

19  enter  the room to tell some of the supervisors what was going

20  on.

21    Q    And I believe --  and  you  were  functioning  as  a

22  supervisor?

23    A    No.  I'm talking about police supervisors.

24    Q    But you were working along with the supervisors,

25  were you not?

NYCLD_015468

P-APP002608

T3-JM-TS

4950

Fairstein — People — Cross — Burns

1          MS. LEDERER:  Objection.

2          THE COURT:  I'll let her answer it.

3     A    I was not supervising a police investigation, no.

4     I was there to assist, and to assist Ms.  Lederer,  if  I

5     could be of any use.

6          Q        Well,  in  the course of your assisting with the

7     investigation, while you were on the second floor squad   room,

8     someone came in and mentioned Yusef Salaam, is that it?

9     A    Yes.

10    Q    And was anything said about his age at that time?

11    A    No.

12    Q        At that point, you didn't have any -- you didn't

13    know how old he was?

14    A    No.

15    Q    Did you know that he was a teenager or older?    Did

16    you know that?

17    A    I didn't know anything.

18    Q    Nothing at all?

19    And  then,  at  11:30,  you  had a call, that there was a

20    lawyer downstairs?

21    A    Not a call.  Someone came in.

22    Q    And told you?

23    A    And said to me, particular.

24    Q    You don't know who that person was?

NYCLD_015469

P-APP002609

Page 73

1                    Arthur Clements

2    anyone representing you from Corporation

3    Counsel?

4         A.    Again, your question is about?

5         Q.    A negative relationship or friction

6    between Nancy Ryan and Linda Fairstein.

7         A.    No, I had not heard that.

8         Q.    Ultimately, prior to arraignment,

9    this case became a case belonging to the Sex

10   Crimes Bureau; is that correct?

11                MR. MYERBERG:   Objection.

12        A.    I don't know specifically whether

13   that is accurate or not from my perspective.   It

14   was assigned to Elizabeth Lederer.

15        Q.    And to your knowledge, was Linda

16   Fairstein supervising Elizabeth Lederer?

17                MR. MYERBERG:   Objection.

18        A.    No.

19        Q.    What was your understanding of her

20   involvement in the case prior to the arraignment

21   of Linda Fairstein's involvement prior to the

22   arraignment?

23        A.    I don't know if I -- I think Linda

24   Fairstein was at the precinct, but that the case

25   was assigned to Elizabeth Lederer.

NYCLD_035224

P-APP002610

Page 79

1                    Arthur Clements

2    make you think that it was a bad idea?  Were you

3    worried that it's not appropriate or not a good

4    thing to take statements from kids that are that

5    young?

6              MR. MYERBERG:  Objection.

7         A.    No, I didn't have any concern about

8    that.  The statements were being taken in the

9    youth room with parents or guardians present.

10        Q.    Did it ever cross your mind that

11   these were young children, did you ever think of

12   them in that way?

13             MR. MYERBERG:  Again, up to

14        arraignment or at that time?

15             MS. FISHER-BYRIALSEN:  At that

16        time.

17             MR. MYERBERG:  Objection.

18        A.    No, I didn't have any concern.  To

19   the extent I knew their ages, I knew statements

20   were being taken by people who were less than

21   16.

22        Q.    We talked about where the case was

23   assigned earlier, and I asked you if ADA

24   Fairstein was supervising ADA Lederer and you

25   said no.  Do you know if anyone was supervising

NYCLD_035230

P-APP002611

Page 80

1                    Arthur Clements

2    her, anyone at all from the DA's office?

3                MR. MYERBERG:   Objection.

4         A.      I think I testified earlier that I

5    did not, I did not know specifically, you know,

6    what Linda Fairstein's role at the precinct was,

7    but that from my perspective, ADA Lederer was

8    assigned to the case.  So her supervisor would

9    have been our boss, John Hogan, the Chief of

10   Trial Bureau 40.

11        Q.      During your first period at the

12   24th Precinct up to the interview of or up to

13   the conclusion of the statement by Clarence

14   Thomas, did you ever see John Hogan at the

15   precinct?

16        A.      No.

17        Q.      Did you ever see any other

18   supervisors from Trial Bureau 40 at the

19   precinct?  You mentioned earlier there was one

20   other person other than John Hogan.

21                MR. MYERBERG:   Objection.

22        Q.      Dan McNulty, did you ever see him

23   at the precinct?

24                MR. MYERBERG:   Objection.

25        A.      No, I did not see Dan McNulty at

NYCLD_035231

P-APP002612

Page 81

1                    Arthur Clements

2    the precinct but I wouldn't have expected to see

3    him there.

4          Q.      Why not?

5          A.      Because Elizabeth Lederer was

6    qualified to handle homicide cases, and

7    Assistants who went to precincts on, you know,

8    homicide call typically did not have supervisors

9    with them at the precinct, they handled that on

10   their own.

11         Q.      In regards to this case at that

12   time, did you think of her as your superior?

13         A.      Who?

14         Q.      ADA Lederer.

15         A.      At that time in 1989, I thought

16   that John Hogan and Dan McNulty and another

17   deputy bureau chief, if there was one, were my

18   supervisors.

19              (Mr. Warren entered the room.)

20              MS. FISHER-BYRIALSEN:  Just for the

21         record, Michael Warren just came in.  This

22         is Mr. Clements.

23              MR. WARREN:  Yes, we met.

24              MS. FISHER-BYRIALSEN:  Just let the

25         record reflect Mr. Warren is here.

NYCLD_035232

P-APP002613

E. LEDRER

Page 777

| | | |
|---|---|---|
| 1 | Yusef was in the group, and Raymond said | 13:37:41 |
| 2 | Kevin.  To me, saying everybody charged | 13:37:46 |
| 3 | her and identifying names, Steve, Raymond | 13:37:50 |
| 4 | and Kevin is not a troubling discrepancy. | 13:37:54 |
| 5 | They're saying everybody did it. | 13:38:04 |
| 6 | Q.    When you say not a troubling | 13:38:06 |
| 7 | discrepancy, would you agree that there | 13:38:09 |
| 8 | was a discrepancy in the accounts? | 13:38:11 |
| 9 | MS. DOLLIN:  Objection to form. | 13:38:16 |
| 10 | A.    I think I already said that | 13:38:17 |
| 11 | there were differences between one | 13:38:19 |
| 12 | statement and the next, and I'm happy to | 13:38:20 |
| 13 | explain why those were not significant to | 13:38:22 |
| 14 | me at the time or today if you want me to. | 13:38:26 |
| 15 | Q.    So, so do you then agree that | 13:38:30 |
| 16 | with respect to all the aspects of the | 13:38:47 |
| 17 | crime mentioned in paragraph 86, that | 13:38:52 |
| 18 | there were, that the statements by the | 13:38:54 |
| 19 | five defendants give different accounts | 13:38:58 |
| 20 | with respect to each of those five, | 13:39:01 |
| 21 | whether you regard them as significant or, | 13:39:06 |
| 22 | you know, troubling or whatever. | 13:39:08 |
| 23 | I'm just asking whether you | 13:39:09 |
| 24 | agree that with respect to who initiated | 13:39:11 |
| 25 | the attack, who knocked the victim down, | 13:39:14 |

NYCLD_036810

P-APP002614

Linda Fairstein

Page 261

| | | |
|---|---|---|
| 1 | meeting his father.  I saw Raymond | 16:47:16 |
| 2 | Santana's father that morning, the morning | 16:47:20 |
| 3 | seven to nine a.m. at the 24th Precinct. | 16:47:24 |
| 4 | I believe I saw other parents. | 16:47:36 |
| 5 | I know I saw other parents at hours | 16:47:40 |
| 6 | throughout the day of the 21st and other | 16:47:43 |
| 7 | young men.  I saw Michael Briscoe, I | 16:47:48 |
| 8 | remember distinctly, and I believe family | 16:47:53 |
| 9 | members of his. | 16:47:56 |
| 10 | Q.    Did you know that Raymond | 16:48:00 |
| 11 | Santana had to be re-interviewed because a | 16:48:02 |
| 12 | parent was not present? | 16:48:05 |
| 13 | MS. DAITZ:  Objection to form. | 16:48:08 |
| 14 | A.    Did I learn that Raymond Santana | 16:48:14 |
| 15 | had to be re-interviewed when, what day, | 16:48:17 |
| 16 | what time, I don't know. | 16:48:20 |
| 17 | Q.    Whenever he was interviewed, | 16:48:22 |
| 18 | particularly on the 19th. | 16:48:25 |
| 19 | MS. DAITZ:  Your personal | 16:48:26 |
| 20 | knowledge prior to arraignment is what | 16:48:27 |
| 21 | he's asking you.  At the precinct, did you | 16:48:30 |
| 22 | come to learn the fact as Mr. Beldock just | 16:48:32 |
| 23 | characterized it. | 16:48:35 |
| 24 | A.    I didn't have any personal | 16:48:36 |
| 25 | knowledge of what happened on the 19th | 16:48:39 |

NYCLD_039129

P-APP002615

Linda Fairstein

Page 262

| | | |
|---|---|---|
| 1 | before -- on the 19th, no. | 16:48:41 |
| 2 | Q. Nobody gave you any information | 16:48:45 |
| 3 | about what happened on the 19th? | 16:48:48 |
| 4 | MS. DAITZ: Objection to form. | 16:48:49 |
| 5 | You can answer. | 16:48:50 |
| 6 | A. The information that was being | 16:48:51 |
| 7 | given was being given to Ms. Lederer who | 16:48:52 |
| 8 | was the prosecutor in charge of the | 16:48:55 |
| 9 | investigation. | 16:48:57 |
| 10 | Q. You didn't get that information | 16:48:58 |
| 11 | as well? | 16:48:59 |
| 12 | A. I got some of the information. | 16:48:59 |
| 13 | She was doing her job. It wasn't as | 16:49:02 |
| 14 | though she was coming to me to tell me | 16:49:05 |
| 15 | everything. | 16:49:08 |
| 16 | Q. So did you learn anything about | 16:49:08 |
| 17 | what happened on the 19th? | 16:49:11 |
| 18 | A. Anything about what happened on | 16:49:12 |
| 19 | the 19th, yes, I previously answered. | 16:49:13 |
| 20 | Q. I'm talking about questioning of | 16:49:15 |
| 21 | any of the young men. | 16:49:22 |
| 22 | A. I don't recall now being told | 16:49:24 |
| 23 | any specifics. | 16:49:27 |
| 24 | Q. Okay. Back on the 20th at the | 16:49:29 |
| 25 | 20th Precinct, what were you doing for | 16:49:39 |

NYCLD_039130

P-APP002616

Linda Fairstein

Page 263

| | | |
|---|---|---|
| 1 | three and a half hours that you were | 16:49:49 |
| 2 | there? | 16:49:51 |
| 3 | A.    I was trying to facilitate what | 16:49:51 |
| 4 | Ms. Lederer needed to do.  So I spent a | 16:49:59 |
| 5 | lot of time on the phone. | 16:50:03 |
| 6 | Q.    When I said three and a half | 16:50:04 |
| 7 | hours, I think it's probably more like | 16:50:06 |
| 8 | four hours, right, 8:30 to 12:30? | 16:50:09 |
| 9 | A.    8:30 to 11:30, it was three | 16:50:12 |
| 10 | hours because, as you know, at 11:30 I | 16:50:16 |
| 11 | became involved with another issue. | 16:50:19 |
| 12 | Q.    You're giving us to understand, | 16:50:21 |
| 13 | and you'll correct me if I'm wrong, that | 16:50:27 |
| 14 | you had no supervisory involvement in Ms. | 16:50:30 |
| 15 | Lederer's work at the 20th Precinct; is | 16:50:34 |
| 16 | that correct? | 16:50:38 |
| 17 | MS. DAITZ:  Objection to form. | 16:50:38 |
| 18 | A.    Those are not my words.  That's | 16:50:39 |
| 19 | not the impression I'm trying to create. | 16:50:44 |
| 20 | Q.    Were you supervising the | 16:50:47 |
| 21 | investigation? | 16:50:49 |
| 22 | A.    No, I was not doing that. | 16:50:50 |
| 23 | Q.    Were you the senior District | 16:50:52 |
| 24 | Attorney there? | 16:50:54 |
| 25 | A.    I was the Senior Assistant | 16:50:54 |

NYCLD_039131

P-APP002617

Linda Fairstein

Page 264

| | | |
|---|---|---|
| 1 | District Attorney there for, as I've | 16:50:58 |
| 2 | testified at the trial, administrative | 16:51:02 |
| 3 | purposes.  I was not there -- I assigned | 16:51:05 |
| 4 | Ms. Lederer because she did not need at | 16:51:07 |
| 5 | the precinct a legal supervisor. | 16:51:10 |
| 6 | Q.    Were you participating in the | 16:51:13 |
| 7 | investigation? | 16:51:15 |
| 8 | A.    As of 11:30 that night, I was | 16:51:18 |
| 9 | not participating in any part. | 16:51:22 |
| 10 | Q.    As of 8:30 that night? | 16:51:24 |
| 11 | A.    I'm sorry, from 8:30 to 11:30, | 16:51:26 |
| 12 | no.  I set Ms. Lederer up.  I began to | 16:51:30 |
| 13 | make phone calls to expedite her work. | 16:51:33 |
| 14 | Q.    The phone calls were to | 16:51:36 |
| 15 | Morgenthau? | 16:51:38 |
| 16 | A.    Several to Morgenthau, several | 16:51:39 |
| 17 | to and from John Hogan, her Bureau Chief. | 16:51:41 |
| 18 | I spent time on the phone with one of the | 16:51:46 |
| 19 | neurosurgeons at Metropolitan Hospital.  I | 16:51:50 |
| 20 | spent a lot of time on the telephone with | 16:51:54 |
| 21 | one of Ms. Meili's brothers. | 16:51:59 |
| 22 | Q.    Go on. | 16:52:04 |
| 23 | A.    I spent time on the phone with | 16:52:11 |
| 24 | the desk at the 24th Precinct inquiring | 16:52:15 |
| 25 | about the designated youth room there and | 16:52:18 |

NYCLD_039132

P-APP002618

Linda Fairstein

Page 265

| | | |
|---|---|---|
| 1 | whether we could clear -- whether they | 16:52:20 |
| 2 | could clear for Ms. Lederer and Mr. | 16:52:23 |
| 3 | Clements the youth room, and could handle | 16:52:26 |
| 4 | the operation if we moved it to their | 16:52:30 |
| 5 | precinct. | 16:52:35 |
| 6 | Q.    Anyone else you were talking to? | 16:52:35 |
| 7 | A.    Possibly, but I don't recall. | 16:52:38 |
| 8 | Q.    Let me show you an exhibit | 16:52:40 |
| 9 | that's been premarked as 5. | 16:52:45 |
| 10 | MS. DAITZ:  Thank you. | 16:53:00 |
| 11 | Q.    Do you recognize -- | 16:53:05 |
| 12 | A.    Just a minute. | 16:53:07 |
| 13 | MS. DAITZ:  Fairstein Exhibit 5 | 16:53:11 |
| 14 | is a one-page document, NYC025732. | 16:53:14 |
| 15 | Q.    This -- | 16:53:25 |
| 16 | A.    Just a minute.  I'm having | 16:53:26 |
| 17 | trouble with the handwriting.  Just let me | 16:53:29 |
| 18 | read it and I'll answer your questions, | 16:53:31 |
| 19 | please.  Okay, yes. | 16:53:33 |
| 20 | Q.    This -- | 16:53:48 |
| 21 | MR. BELDOCK:  Withdrawn. | 16:53:50 |
| 22 | Q.    You said you spent some time | 16:53:51 |
| 23 | talking to a doctor, right? | 16:53:52 |
| 24 | A.    Yes. | 16:53:54 |
| 25 | Q.    This document is not the doctor | 16:53:55 |

NYCLD_039133

P-APP002619

E. LEDRER

Page 702

| | | |
|---|---|---|
| 1 | Monday, I think. | 12:00:03 |
| 2 | A.    I remember going that morning. | 12:00:06 |
| 3 | I don't, as I sit here, know whether I | 12:00:12 |
| 4 | went another time or not.  But I don't | 12:00:17 |
| 5 | believe I went a second time before | 12:00:20 |
| 6 | concluding the videotaped statements. | 12:00:23 |
| 7 | Q.    Right.  Your going to the crime | 12:00:28 |
| 8 | scene occurred in the course of you taking | 12:00:32 |
| 9 | these videotaped statements, correct? | 12:00:35 |
| 10 | MS. DOLLIN:  Objection. | 12:00:38 |
| 11 | Q.    In other words, you took some | 12:00:38 |
| 12 | before you went to the crime scene and you | 12:00:41 |
| 13 | took some after you went to the crime | 12:00:43 |
| 14 | scene, correct? | 12:00:45 |
| 15 | A.    That's correct. | 12:00:46 |
| 16 | Q.    What was your purpose in going | 12:00:46 |
| 17 | to the crime scene? | 12:00:48 |
| 18 | A.    I went to the crime scene to | 12:00:50 |
| 19 | familiarize myself with the location where | 12:01:01 |
| 20 | the crime occurred. | 12:01:07 |
| 21 | Q.    Are you finished? | 12:01:15 |
| 22 | A.    I think so. | 12:01:16 |
| 23 | Q.    At the point you went to the | 12:01:16 |
| 24 | crime scene, you had heard from -- you had | 12:01:18 |
| 25 | interviewed several of the young boys, and | 12:01:21 |

NYCLD_036735

P-APP002620

E. LEDRER

Page 703

| | | |
|---|---|---|
| 1 | at least some of them had told you that | 12:01:25 |
| 2 | the, had placed the attack on the jogger | 12:01:29 |
| 3 | at the reservoir, correct? | 12:01:33 |
| 4 | MS. DOLLIN:  Objection to form. | 12:01:35 |
| 5 | A.    I don't believe that any | 12:01:37 |
| 6 | statement, and without looking at the | 12:01:47 |
| 7 | transcripts or the statements, I can't say | 12:01:50 |
| 8 | for sure, but I don't think that any of | 12:01:53 |
| 9 | the statements made by the young men say | 12:01:56 |
| 10 | this happened at the reservoir.  I believe | 12:01:59 |
| 11 | that in the Q and A, there are several | 12:02:02 |
| 12 | questions and several answers about the | 12:02:09 |
| 13 | location. | 12:02:11 |
| 14 | And I think that that's true in | 12:02:12 |
| 15 | almost all of the videotaped statements, | 12:02:14 |
| 16 | that it's not a one-word answer, there's | 12:02:17 |
| 17 | some description. | 12:02:20 |
| 18 | And as I sit here today, I don't | 12:02:21 |
| 19 | believe anybody simply said at the | 12:02:25 |
| 20 | reservoir. | 12:02:27 |
| 21 | Q.    Is it your understanding that | 12:02:28 |
| 22 | Antron McCray allegedly placed the | 12:02:30 |
| 23 | location of the assault on Patricia Meili | 12:02:34 |
| 24 | at the reservoir? | 12:02:36 |
| 25 | A.    As I said before, I would have | 12:02:39 |

NYCLD_036736

P-APP002621

E. LEDRER

Page 704

| | | |
|---|---|---|
| 1 | to look at the statements again.  I don't | 12:02:42 |
| 2 | believe the answer given by Antron McCray | 12:02:45 |
| 3 | about the location of the attack on | 12:02:49 |
| 4 | Patricia Meili was simply the words that | 12:02:50 |
| 5 | it was at the reservoir. | 12:02:53 |
| 6 | I believe in the videotaped | 12:02:55 |
| 7 | statement that I took, I think that I had | 12:03:00 |
| 8 | asked him more questions about the | 12:03:02 |
| 9 | location. | 12:03:04 |
| 10 | Q.    What about Raymond Santana, did | 12:03:06 |
| 11 | he place the, allegedly place the location | 12:03:08 |
| 12 | of the assault of Patricia Meili at the | 12:03:12 |
| 13 | reservoir, do you recall that? | 12:03:15 |
| 14 | MS. DOLLIN:  Objection to form. | 12:03:17 |
| 15 | A.    As I sit here today, I don't | 12:03:18 |
| 16 | remember where Raymond Santana put it. | 12:03:24 |
| 17 | Q.    The location of this crime, | 12:03:26 |
| 18 | where somebody put the location of the | 12:03:28 |
| 19 | crime would be a pretty important fact in | 12:03:30 |
| 20 | the course of the investigation, right? | 12:03:33 |
| 21 | MS. DOLLIN:  Objection. | 12:03:34 |
| 22 | A.    I'm sorry, can you repeat the | 12:03:35 |
| 23 | question? | 12:03:40 |
| 24 | Q.    Right.  In the course of | 12:03:40 |
| 25 | interviewing numerous suspects about a | 12:03:42 |

NYCLD_036737

P-APP002622

E. LEDRER

Page 705

| 1 | crime, the location of that crime would be | 12:03:46 |
| 2 | an important fact to establish, correct? | 12:03:49 |
| 3 | A.    It would be one of many facts to | 12:03:52 |
| 4 | establish, yes. | 12:03:56 |
| 5 | Q.    It would be one of the important | 12:03:57 |
| 6 | facts, the location of the crime, correct? | 12:03:59 |
| 7 | MS. DOLLIN:  Objection to form. | 12:04:00 |
| 8 | A.    I could imagine that in some | 12:04:01 |
| 9 | cases the location might not be important. | 12:04:04 |
| 10 | Q.    You don't believe the location | 12:04:06 |
| 11 | in this case would have been an important | 12:04:08 |
| 12 | fact? | 12:04:11 |
| 13 | MS. DOLLIN:  Objection to form. | 12:04:11 |
| 14 | A.    In this case, I believe it was | 12:04:13 |
| 15 | one of the important facts. | 12:04:17 |
| 16 | Q.    Right.  And you knew, you knew, | 12:04:18 |
| 17 | did you not, before a decision was made to | 12:04:21 |
| 18 | charge these young men for rape that there | 12:04:25 |
| 19 | had been varying accounts as to where, as | 12:04:28 |
| 20 | to the location where the attack on | 12:04:30 |
| 21 | Patricia Meili took place, you knew that, | 12:04:33 |
| 22 | did you not? | 12:04:36 |
| 23 | A.    When I took the videotaped | 12:04:37 |
| 24 | statements, the descriptions of the | 12:04:46 |
| 25 | locations of that crime and other crimes | 12:04:52 |

NYCLD_036738

P-APP002623

E. LEDRER

Page 706

| | | |
|---|---|---|
| 1 | were described in terms of roadways and | 12:04:56 |
| 2 | pathways, and it was often confusing to | 12:04:59 |
| 3 | understand -- | 12:05:05 |
| 4 | Q.    Nobody used the term reservoir? | 12:05:06 |
| 5 | MS. DOLLIN:  Objection.  Asked | 12:05:08 |
| 6 | and answered. | 12:05:09 |
| 7 | A.    Can I finish my answer? | 12:05:10 |
| 8 | Q.    I'm asking, I want to know | 12:05:11 |
| 9 | whether anybody used the term reservoir, | 12:05:13 |
| 10 | any of the young boys when they indicated | 12:05:16 |
| 11 | the location of the attack on Patricia | 12:05:20 |
| 12 | Meili, do you recall that? | 12:05:22 |
| 13 | MS. DOLLIN:  Objection. | 12:05:24 |
| 14 | A.    I didn't finish the answer to | 12:05:24 |
| 15 | the last question. | 12:05:26 |
| 16 | Q.    All right. | 12:05:27 |
| 17 | THE WITNESS:  Can you read that | 12:05:28 |
| 18 | back, please? | 12:05:29 |
| 19 | MR. MOORE:  Actually, I'm going | 12:05:36 |
| 20 | to withdraw that question. | 12:05:37 |
| 21 | Q.    Let me ask you this question. | 12:05:38 |
| 22 | Was there confusion in your mind, after | 12:05:41 |
| 23 | having done several of the interviews, as | 12:05:43 |
| 24 | to the location of where the attack on | 12:05:46 |
| 25 | Patricia Meili took place, was there any | 12:05:48 |

NYCLD_036739

P-APP002624

E. LEDRER

Page 707

```
1    confusion in your mind at the time?      12:05:50
2         A.     Well, I'm not sure how to answer  12:05:52
3    that.  The attack covered close to 300   12:05:57
4    feet of ground, and some of the          12:06:04
5    statements, like the statement of Kharey 12:06:08
6    Wise describing the waterfall and the fire 12:06:11
7    reflect exactly where the body was found. 12:06:16
8              Some of the statements describe 12:06:20
9    the young men coming over the ball fields 12:06:23
10   onto the 102nd Street Cross Drive, which 12:06:25
11   is right north of the Cross Drive.  And   12:06:29
12   some used points of reference as roadways. 12:06:32
13             There was obvious confusion when 12:06:37
14   we were trying to determine when someone  12:06:40
15   said a roadway whether it was the roadway 12:06:42
16   where the cars, meaning the 96th or 97th  12:06:45
17   Street Transverse or whether it was the   12:06:49
18   West Drive or the East Drive --           12:06:51
19        Q.     Are you finished?             12:06:53
20        A.     No.                           12:06:54
21        Q.     All right.  I really wish you 12:06:55
22   would just try to answer the question as  12:06:56
23   succinctly as you can, because you just go 12:06:58
24   on and on and on.                         12:07:01
25             MS. DOLLIN:  Mr. Moore, would   12:07:02
```

NYCLD_036740

P-APP002625

E. LEDRER

Page 708

| | | |
|---|---|---|
| 1 | you just allow my client to answer. | 12:07:04 |
| 2 | Q.    And we don't have a lot of time, | 12:07:05 |
| 3 | we don't have unlimited time.  Let me just | 12:07:06 |
| 4 | -- | 12:07:08 |
| 5 | A.    Can I just finish just the rest | 12:07:08 |
| 6 | of the sentence? | 12:07:09 |
| 7 | Q.    Can you tell me whether there | 12:07:10 |
| 8 | was any confusion in your mind as to | 12:07:11 |
| 9 | whether the rape took place near the | 12:07:13 |
| 10 | reservoir or near, north of the 102nd | 12:07:16 |
| 11 | Street Transverse, was there any confusion | 12:07:19 |
| 12 | in your mind at any point before the | 12:07:20 |
| 13 | decision was made to charge, to arrest any | 12:07:22 |
| 14 | of these young boys for rape? | 12:07:24 |
| 15 | MS. DOLLIN:  You can finish your | 12:07:26 |
| 16 | answer. | 12:07:28 |
| 17 | A.    There was -- I don't think that | 12:07:28 |
| 18 | I knew enough of the evidence to know | 12:07:36 |
| 19 | where the attack had happened while I was | 12:07:41 |
| 20 | at the precinct. | 12:07:43 |
| 21 | Q.    So your answer is that there was | 12:07:44 |
| 22 | no confusion in your mind, correct? | 12:07:46 |
| 23 | MS. DOLLIN:  Objection to the | 12:07:48 |
| 24 | form. | 12:07:49 |
| 25 | A.    That's not my answer. | 12:07:49 |

NYCLD_036741

P-APP002626

E. LEDRER

Page 709

```
 1        Q.    Well, that was the question.     12:07:51
 2   Can you answer that question, was there     12:07:52
 3   any confusion in your mind, did you have    12:07:53
 4   any doubt in your mind at any point until   12:07:56
 5   these young boys were arrested for rape as  12:07:58
 6   to whether the rape took place near the     12:08:01
 7   reservoir or north of 102nd Street          12:08:04
 8   Transverse?                                 12:08:07
 9             MS. DOLLIN:  Objection.  You can  12:08:07
10   answer.                                     12:08:09
11        A.    While I was taking the           12:08:09
12   videotaped statements, the important        12:08:13
13   information for me was whether or not each   12:08:16
14   of the young men admitted participating in  12:08:19
15   the attack on Patricia Meili.               12:08:21
16             That was paramount in my mind at  12:08:23
17   the time we were at the precincts.  The     12:08:27
18   location of the attack was less             12:08:29
19   significant than the criminal acts          12:08:31
20   themselves.                                 12:08:35
21        Q.    That doesn't answer the          12:08:35
22   question.  The question was, was there      12:08:37
23   some confusion in your mind as to whether   12:08:38
24   some kids were saying it happened at the    12:08:41
25   reservoir or some said it happened north    12:08:44
```

NYCLD_036742

P-APP002627

E. LEDRER

Page 710

| | | |
|---|---|---|
| 1 | of the 102nd Street Transverse before the | 12:08:46 |
| 2 | decision was made to arrest these, anybody | 12:08:48 |
| 3 | for rape of Patricia Meili. | 12:08:50 |
| 4 | It's a very simple question. | 12:08:53 |
| 5 | Did you have different -- were the boys | 12:08:55 |
| 6 | saying different things as to the location | 12:09:01 |
| 7 | of the assault on Patricia Meili? | 12:09:04 |
| 8 | MS. DOLLIN:  Objection.  That | 12:09:06 |
| 9 | was asked and answered.  Go ahead. | 12:09:07 |
| 10 | A.    Are you asking me in 1989 when I | 12:09:09 |
| 11 | was at the 20 and 24 whether there was any | 12:09:12 |
| 12 | confusion in my mind at that time? | 12:09:17 |
| 13 | Q.    Yes. | 12:09:19 |
| 14 | A.    And the answer is, I wasn't | 12:09:20 |
| 15 | focussing on that.  I was focussing on | 12:09:22 |
| 16 | criminal responsibility for the attack | 12:09:25 |
| 17 | which came in the form of their admissions | 12:09:26 |
| 18 | of what they themselves had done.  That | 12:09:29 |
| 19 | was the focus at that time. | 12:09:32 |
| 20 | Q.    So the answer is there was no | 12:09:34 |
| 21 | confusion in your mind about the location? | 12:09:36 |
| 22 | MS. DOLLIN:  Objection. | 12:09:39 |
| 23 | A.    I don't think that's a fair | 12:09:40 |
| 24 | statement of what I'm telling you. | 12:09:41 |
| 25 | Q.    That was the question.  If you | 12:09:42 |

NYCLD_036743

P-APP002628

E. LEDRER

Page 711

| | | |
|---|---|---|
| 1 | can't answer it, you can't answer it. | 12:09:44 |
| 2 | Either you had some confusion in | 12:09:47 |
| 3 | your mind -- | 12:09:50 |
| 4 | MR. MOORE:  Let me withdraw it. | 12:09:50 |
| 5 | Let me ask it this way. | 12:09:52 |
| 6 | Q.    Did you receive information that | 12:09:55 |
| 7 | contradicted the information you had in | 12:09:56 |
| 8 | terms of where the location of the rape | 12:09:59 |
| 9 | took place, did you receive information | 12:10:02 |
| 10 | that was contradictory? | 12:10:05 |
| 11 | In other words, did some people | 12:10:08 |
| 12 | say it took place near the reservoir and | 12:10:09 |
| 13 | some boys said it took place north of the | 12:10:12 |
| 14 | 102nd Street Transverse prior to the | 12:10:15 |
| 15 | decision to charge, to arrest anybody for | 12:10:17 |
| 16 | rape? | 12:10:19 |
| 17 | MS. DOLLIN:  Objection.  That | 12:10:21 |
| 18 | question was asked and answered, but you | 12:10:22 |
| 19 | can answer it again. | 12:10:25 |
| 20 | A.    The videotaped statements that I | 12:10:26 |
| 21 | took gave different descriptions of where | 12:10:28 |
| 22 | the crime happened.  But you're asking me | 12:10:36 |
| 23 | if I was confused at the time, and I can | 12:10:40 |
| 24 | say I wasn't focussing on that so I can't | 12:10:42 |
| 25 | say yes, I was confused or no, I wasn't. | 12:10:45 |

NYCLD_036744

P-APP002629

E. LEDRER

Page 712

| | | |
|---|---|---|
| 1 | It was not the primary focus of, it was | 12:10:48 |
| 2 | not my primary focus. | 12:10:54 |
| 3 | Q.    Well, if you have two people who | 12:10:57 |
| 4 | are being investigated for the same crime | 12:11:00 |
| 5 | and one says it happened at one location | 12:11:04 |
| 6 | and one says it happened at another | 12:11:05 |
| 7 | location, doesn't that raise, wouldn't | 12:11:07 |
| 8 | that raise some concern for you about | 12:11:09 |
| 9 | whether you're getting an accurate | 12:11:11 |
| 10 | statement about somebody's participation? | 12:11:14 |
| 11 | A.    At what point? | 12:11:19 |
| 12 | Q.    At the point you get involved | 12:11:20 |
| 13 | and you're looking at it, you're taking | 12:11:22 |
| 14 | statements. | 12:11:25 |
| 15 | A.    If two people experience an | 12:11:26 |
| 16 | event, they often describe it differently | 12:11:28 |
| 17 | because different things catch their | 12:11:31 |
| 18 | attention.  They remember different | 12:11:34 |
| 19 | things, and the way they describe it in | 12:11:36 |
| 20 | recalling it is different. | 12:11:38 |
| 21 | As I think I testified earlier, | 12:11:39 |
| 22 | the crime scene in Central Park was | 12:11:44 |
| 23 | particularly difficult because -- | 12:11:49 |
| 24 | Q.    Right. | 12:11:51 |
| 25 | A.    -- it's trees -- | 12:11:52 |

NYCLD_036745

P-APP002630

E. LEDRER

Page 713

| | | |
|---|---|---|
| 1 | Q.    I'm going to have to interrupt | 12:11:54 |
| 2 | you at this point.  All right, let me ask | 12:11:56 |
| 3 | it this way because you're going to go on | 12:11:58 |
| 4 | and on and on. | 12:12:01 |
| 5 |         If somebody said a crime | 12:12:02 |
| 6 | occurred at 42nd Street and someone said | 12:12:04 |
| 7 | the crime occurred at 34th Street, would | 12:12:07 |
| 8 | that raise any -- and both were alleged to | 12:12:10 |
| 9 | be involved in the same crime, would that, | 12:12:11 |
| 10 | would that, as a prosecutor, would that | 12:12:14 |
| 11 | give you any concern as to whether the | 12:12:16 |
| 12 | statements that are being made are | 12:12:18 |
| 13 | truthful? | 12:12:20 |
| 14 |         MS. DOLLIN:  Objection. | 12:12:21 |
| 15 | A.    I think part of the trouble for | 12:12:21 |
| 16 | me is if each of those two people admitted | 12:12:24 |
| 17 | killing the same person, and one person | 12:12:29 |
| 18 | said it happened at 42nd Street and one | 12:12:31 |
| 19 | person said it happened at 34th Street, at | 12:12:33 |
| 20 | the point of arrest, that would be a less | 12:12:36 |
| 21 | significant contradiction than the fact | 12:12:38 |
| 22 | that they admitted together killing him. | 12:12:41 |
| 23 | Q.    So the location, what they're | 12:12:45 |
| 24 | admitting to as the location wouldn't be a | 12:12:47 |
| 25 | significant fact for you? | 12:12:49 |

NYCLD_036746

P-APP002631

E. LEDRER

Page 714

```
 1              MS. DOLLIN:  Objection to form.    12:12:50
 2       A.     At the time that I was at the     12:12:51
 3   station, and at the time that the decision   12:12:53
 4   was being made to arrest these young men,    12:12:55
 5   the location was not as significant as the   12:12:58
 6   admissions they were making.                 12:13:04
 7       Q.     So all you were concerned about   12:13:06
 8   was the fact that they had admitted their    12:13:08
 9   involvement in the rape.  It didn't matter   12:13:12
10   what the location was.  It didn't matter     12:13:15
11   if there were inconsistencies in terms of    12:13:18
12   who assaulted her.  It didn't matter if      12:13:19
13   there were inconsistencies in terms of       12:13:22
14   what was used to assault her.  It didn't     12:13:24
15   matter if there were inconsistencies with    12:13:27
16   regard to what she was wearing or not        12:13:29
17   wearing, any of those facts.                 12:13:31
18              All you were concerned about was  12:13:32
19   that they had made admissions to a rape      12:13:33
20   and that was enough for you?                 12:13:38
21              MS. DOLLIN:  Objection to form.   12:13:40
22       A.     In my prosecution of this case,   12:13:41
23   in the days and weeks after arraignment, a   12:13:44
24   lot of work was done.  And I believe         12:13:46
25   you're asking me about what was done prior   12:13:50
```

NYCLD_036747

P-APP002632