E. LEDRER

Page 715

| | | |
|---|---|---|
| 1 | to arrest, and that's a very different | 12:13:52 |
| 2 | scenario. | 12:13:56 |
| 3 | The young men had been in | 12:13:56 |
| 4 | custody.  There was a decision to | 12:13:58 |
| 5 | interview them as quickly as possible | 12:14:02 |
| 6 | using the youth room one at a time and get | 12:14:04 |
| 7 | them arraigned. | 12:14:07 |
| 8 | And to that end, the police did | 12:14:08 |
| 9 | not engage in taking the time to chart the | 12:14:11 |
| 10 | statements of, I believe at that point | 12:14:18 |
| 11 | there were 12 or 15 young men who had been | 12:14:21 |
| 12 | interviewed. | 12:14:23 |
| 13 | Q.   And so whatever the | 12:14:24 |
| 14 | inconsistencies were, is it fair to say | 12:14:27 |
| 15 | that nothing was troubling enough to you | 12:14:30 |
| 16 | that led you to doubt whether any | 12:14:34 |
| 17 | particular person should be arrested, | 12:14:36 |
| 18 | right? | 12:14:39 |
| 19 | MS. DOLLIN:  Objection. | 12:14:39 |
| 20 | Q.   Whatever the inconsistencies | 12:14:39 |
| 21 | were? | 12:14:41 |
| 22 | MS. DOLLIN:  Objection to form. | 12:14:42 |
| 23 | A.   You know -- | 12:14:43 |
| 24 | Q.   If you recall or not, you know. | 12:14:45 |
| 25 | A.   Let me just answer, okay, | 12:14:47 |

NYCLD_036748

P-APP002633

E. LEDRER

Page 716

| | | |
|---|---|---|
| 1 | because you asked me a question. | 12:14:47 |
| 2 | I don't think it's fair for you | 12:14:51 |
| 3 | to characterize the answers that I've been | 12:14:53 |
| 4 | giving you as my not being concerned.  I | 12:14:56 |
| 5 | was very concerned about what was | 12:14:59 |
| 6 | happening at the precinct, and I was very | 12:15:00 |
| 7 | concerned that the case proceed and that I | 12:15:02 |
| 8 | be given the chance to do further work on | 12:15:07 |
| 9 | the case after the arrest and arraignment. | 12:15:09 |
| 10 | Q.    And my question to you is, | 12:15:12 |
| 11 | without going into the, you know, every | 12:15:14 |
| 12 | inconsistency, did the fact that there | 12:15:17 |
| 13 | were inconsistencies in the accounts give | 12:15:19 |
| 14 | you any concern about whether the accounts | 12:15:22 |
| 15 | that you were getting from these young | 12:15:25 |
| 16 | boys were accurate and reliable? | 12:15:27 |
| 17 | MS. DOLLIN:  Prior to | 12:15:28 |
| 18 | arraignment. | 12:15:30 |
| 19 | Q.    Prior to the time made to arrest | 12:15:31 |
| 20 | them. | 12:15:37 |
| 21 | A.    I have two parts to answer to | 12:15:37 |
| 22 | that.  Should I answer them because it's | 12:15:40 |
| 23 | not yes or no. | 12:15:42 |
| 24 | Q.    If you can't answer it yes or | 12:15:44 |
| 25 | no, then answer it the best you can. | 12:15:46 |

NYCLD_036749

P-APP002634

E. LEDRER

Page 717

| | | |
|---|---|---|
| 1 | A.    Okay.  As you can see from | 12:15:48 |
| 2 | Exhibit 13, I was taking video statements | 12:15:50 |
| 3 | one after the other until the statements | 12:15:55 |
| 4 | were finished on April 22nd. | 12:16:00 |
| 5 | The information that I was | 12:16:02 |
| 6 | getting, and I think this is apparent from | 12:16:04 |
| 7 | the video statements, is that often the | 12:16:07 |
| 8 | young man I was questioning was giving me | 12:16:11 |
| 9 | new names or a crime that I hadn't yet | 12:16:13 |
| 10 | heard about or a witness that I hadn't yet | 12:16:17 |
| 11 | heard about.  And I did not stop to take | 12:16:19 |
| 12 | the time to diagram statement one and | 12:16:27 |
| 13 | statement two and compare inconsistencies. | 12:16:31 |
| 14 | Q.    Did you ever do that? | 12:16:35 |
| 15 | MS. DOLLIN:   Objection to form. | 12:16:36 |
| 16 | Prior to arraignment. | 12:16:37 |
| 17 | A.    Did I ever diagram the | 12:16:38 |
| 18 | inconsistencies? | 12:16:49 |
| 19 | Q.    Did you ever at some point look | 12:16:50 |
| 20 | at all these statements, both the written | 12:16:52 |
| 21 | statements from the detectives and the | 12:16:54 |
| 22 | video statements, and with an eye toward | 12:16:55 |
| 23 | trying to figure out why there were so | 12:17:01 |
| 24 | many inconsistencies, did you ever do | 12:17:04 |
| 25 | that? | 12:17:04 |

NYCLD_036750

P-APP002635

E. LEDRER

Page 718

| | | |
|---|---|---|
| 1 | MS. DOLLIN:  Only prior to | 12:17:05 |
| 2 | arraignment. | 12:17:06 |
| 3 | MR. MOORE:  No, at any time. | 12:17:07 |
| 4 | MS. DOLLIN:  No. | 12:17:08 |
| 5 | MR. MOORE:  No, because she as a | 12:17:09 |
| 6 | prosecutor -- well, hold on. | 12:17:11 |
| 7 | Q.   As a prosecutor, even after an | 12:17:12 |
| 8 | arrest is made, you have an obligation to | 12:17:16 |
| 9 | continue to investigate the case, correct, | 12:17:18 |
| 10 | if new evidence comes up, would you agree | 12:17:20 |
| 11 | with that? | 12:17:24 |
| 12 | A.   I think that my investigation | 12:17:24 |
| 13 | starts after the arrest, yes. | 12:17:27 |
| 14 | Q.   Well, you were involved in the | 12:17:28 |
| 15 | investigation of this case before the | 12:17:31 |
| 16 | arrests were made, correct? | 12:17:33 |
| 17 | MS. DOLLIN:  Objection to form. | 12:17:34 |
| 18 | A.   I took videotaped statements. | 12:17:35 |
| 19 | Q.   Right, that was part of the | 12:17:38 |
| 20 | investigation that led to the decision to | 12:17:39 |
| 21 | make the arrests, correct? | 12:17:41 |
| 22 | MS. DOLLIN:  Objection. | 12:17:42 |
| 23 | A.   I took videotaped statements to | 12:17:42 |
| 24 | memorialize the statements made by the | 12:17:45 |
| 25 | young men so it was possible to see the | 12:17:47 |

NYCLD_036751

P-APP002636

E. LEDRER

Page 719

| | | |
|---|---|---|
| 1 | manner in which they made them, the | 12:17:50 |
| 2 | language they used, the way they gestured, | 12:17:50 |
| 3 | the way they corrected me if I said | 12:17:52 |
| 4 | something that they didn't agree with, | 12:17:54 |
| 5 | that was my purpose of being at the | 12:17:56 |
| 6 | precinct, and that's what I did. | 12:17:59 |
| 7 | Q.    So you're saying all you did was | 12:18:00 |
| 8 | take a statement to memorialize what they | 12:18:04 |
| 9 | had already told the police officers or | 12:18:05 |
| 10 | the detectives? | 12:18:06 |
| 11 | MS. DOLLIN:  Objection. | 12:18:07 |
| 12 | Q.    Is that what you're saying? | 12:18:07 |
| 13 | A.    Essentially, yes. | 12:18:07 |
| 14 | Q.    And that you didn't do any of | 12:18:09 |
| 15 | your own probing, any of your own | 12:18:11 |
| 16 | interrogation to try to get anybody to | 12:18:14 |
| 17 | admit that they did something that they | 12:18:16 |
| 18 | weren't admitting to do? | 12:18:17 |
| 19 | MS. DOLLIN:  Objection. | 12:18:18 |
| 20 | Q.    That they had done, you didn't | 12:18:18 |
| 21 | do any of that? | 12:18:18 |
| 22 | A.    Are you asking whether I did | 12:18:18 |
| 23 | that prior to arraignment? | 12:18:20 |
| 24 | Q.    Prior to the arrests.  At the | 12:18:23 |
| 25 | time you took these statements -- | 12:18:25 |

NYCLD_036752

P-APP002637

E. LEDRER

Page 720

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:18:26 |
| 2 | Q.    -- you weren't just | 12:18:27 |
| 3 | memorializing, you were investigating as | 12:18:28 |
| 4 | well, correct? | 12:18:31 |
| 5 | MS. DOLLIN:  Objection to form. | 12:18:31 |
| 6 | A.    I wanted to have the person I | 12:18:32 |
| 7 | was talking to or questioning give me the | 12:18:34 |
| 8 | most accurate information possible about | 12:18:41 |
| 9 | what happened in the park that night. | 12:18:42 |
| 10 | And I never spoke to any of them | 12:18:44 |
| 11 | not on videotape.  So everything that I | 12:18:46 |
| 12 | said to any of them is on videotape. | 12:18:49 |
| 13 | Q.    Right, so it speaks for itself | 12:18:52 |
| 14 | so we don't have to go through it. | 12:18:54 |
| 15 | At some point, did you ever -- | 12:18:55 |
| 16 | MR. MOORE:  Withdraw that. | 12:18:59 |
| 17 | Q.    At some point when the DNA | 12:19:00 |
| 18 | evidence came back that showed no | 12:19:02 |
| 19 | connection between the samples taken from | 12:19:04 |
| 20 | any of the boys in the park and any sample | 12:19:06 |
| 21 | connected to Patricia Meili, did you at | 12:19:10 |
| 22 | that point say to yourself, maybe we don't | 12:19:13 |
| 23 | have probable cause here to proceed? | 12:19:19 |
| 24 | MS. DOLLIN:  Objection to form, | 12:19:21 |
| 25 | goes to work product.  I'm directing her | 12:19:22 |

NYCLD_036753

P-APP002638

Page 159

1      Q.     At the time you heard Reyes make     14:58:01

2   his statement?                                  14:58:03

3      A.     Was I concerned with what?            14:58:03

4      Q.     As to whether the statements by       14:58:07

5   these five defendants who had spent all         14:58:09

6   these years in jail where they admitted         14:58:12

7   their involvement in a rape, did you ever       14:58:15

8   question whether that was accurate, up          14:58:18

9   until the time you heard Reyes give his         14:58:19

10  statement?                                       14:58:21

11         MS. DOLLIN:   Objection to form.          14:58:22

12     A.     I evaluated their statements           14:58:23

13  after they were made and looked at the          14:58:24

14  other evidence in the case and the other        14:58:27

15  assaults in the case in the park that           14:58:29

16  night, and I believed the statements to be      14:58:32

17  true.                                            14:58:36

18     Q.     So at no time --                       14:58:36

19         MR. MOORE:   Well, withdraw that.         14:58:39

20     Q.     Well, no, let me ask it that           14:58:40

21  way.  At any time after Matias Reyes came       14:58:43

22  forward, did you question, in your own          14:58:46

23  mind, the liability or credibility of the       14:58:49

24  five defendants' statements with regard to      14:58:54

25  their involvement with the Central Park         14:58:57

NYCLD_036018

P-APP002639

Page 160

1   jogger?                                          14:58:59
2           MS. DOLLIN:   Objection to form.        14:58:59
3       A.    What do you mean liability?           14:59:02
4       Q.    Reliability, that they were           14:59:04
5   reliable, that they could be believed.          14:59:07
6       A.    Can you rephrase the question?        14:59:07
7   I don't understand what you're asking.          14:59:10
8       Q.    Sure.  At any time after Matias       14:59:12
9   Reyes came forward and indicated that he        14:59:14
10  raped the Central Park jogger and that he       14:59:16
11  acted alone, did you in your own mind           14:59:19
12  question whether the five people who were       14:59:22
13  convicted and sent to jail for that rape        14:59:23
14  were actually involved in the rape?            14:59:28
15          It's quite simple, did you ever         14:59:31
16  question whether they were still guilty of      14:59:33
17  that crime?                                     14:59:35
18          MS. DOLLIN:   Objection to form.        14:59:36
19      A.    When Matias Reyes came forward        14:59:37
20  and he made the statement, I considered it      14:59:39
21  with an open mind and thought perhaps this      14:59:44
22  is a person whose statement would               14:59:47
23  exculpate the defendants of the rape.           14:59:55
24          However, after I heard his              14:59:57
25  statement, and after I again reviewed the       14:59:59

NYCLD_036019

P-APP002640

Page 161

| | | |
|---|---|---|
| 1 | statements of the then defendants, now | 15:00:02 |
| 2 | plaintiffs, I was satisfied that those | 15:00:05 |
| 3 | statements were true. | 15:00:08 |
| 4 | Q.    Okay.  And you were satisfied | 15:00:09 |
| 5 | based on what?  What gave you the | 15:00:12 |
| 6 | satisfaction that those statements were | 15:00:18 |
| 7 | true? | 15:00:21 |
| 8 | A.    A lot of things.  The demeanor | 15:00:23 |
| 9 | in which the defendants described what | 15:00:27 |
| 10 | happened, the content of what they | 15:00:30 |
| 11 | described happening, the specific gestures | 15:00:32 |
| 12 | and expressions that they described, the | 15:00:35 |
| 13 | similarity between the other assaults and | 15:00:40 |
| 14 | Patricia Meili's assault in the park that | 15:00:44 |
| 15 | night. | 15:00:47 |
| 16 | The statements from other young | 15:00:48 |
| 17 | men who were not prosecuted in this case, | 15:00:49 |
| 18 | the statements of the co-defendants, and | 15:00:52 |
| 19 | the statements that the defendants made | 15:01:00 |
| 20 | other than their videotaped statements. | 15:01:03 |
| 21 | Q.    So, in other words, as you sit | 15:01:06 |
| 22 | here today, Matias Reyes having come | 15:01:09 |
| 23 | forward and having confessed to that crime | 15:01:13 |
| 24 | and having said he acted alone and having | 15:01:16 |
| 25 | the DNA samples match his DNA sample, that | 15:01:20 |

NYCLD_036020

P-APP002641

Page 162

1   doesn't lead you to question at all the        15:01:25

2   integrity of that prosecution of those         15:01:27

3   five kids, right?                              15:01:30

4           MS. DOLLIN:  Objection to form.        15:01:31

5       A.    The DNA corroborates his             15:01:33

6   statement that he was there and that he        15:01:36

7   raped her, but it doesn't corroborate his      15:01:38

8   claim that he was alone, and I don't           15:01:41

9   believe he was alone.                          15:01:43

10      Q.    What evidence --                      15:01:45

11      A.    Excuse me.                            15:01:46

12      Q.    I'm sorry, go ahead.                  15:01:46

13      A.    And I believe that he was with       15:01:47

14  others, and I believe that his statements      15:01:49

15  are true.                                      15:01:50

16      Q.    Do you believe that because it's     15:01:51

17  something you believe, or do you believe       15:01:53

18  this based on any facts that you can tell      15:01:54

19  me?                                            15:01:56

20          MS. DOLLIN:  Objection to form.        15:01:57

21      A.    I tried to tell you what things      15:01:57

22  make me believe that those statements are      15:02:01

23  accurate and truthful.                         15:02:03

24      Q.    I want you to tell me what           15:02:04

25  statements, what facts you believe that        15:02:07

NYCLD_036021

P-APP002642

Page 163

| | | |
|---|---|---|
| 1 | you are aware of support your belief that | 15:02:09 |
| 2 | Matias Reyes did not act alone when he | 15:02:14 |
| 3 | raped Patricia Meili? | 15:02:17 |
| 4 | MS. DOLLIN:  Objection, asked | 15:02:18 |
| 5 | and answered.  You can answer it again. | 15:02:19 |
| 6 | A.    The statements that the | 15:02:21 |
| 7 | defendants made contained information that | 15:02:25 |
| 8 | was not yet known about the crime and the | 15:02:28 |
| 9 | attacks on her as well as on others. | 15:02:31 |
| 10 | The statements by other young | 15:02:34 |
| 11 | men who were in the park and with these | 15:02:36 |
| 12 | people on that night contribute to my | 15:02:38 |
| 13 | opinion that the statements are truthful. | 15:02:43 |
| 14 | The statements that the | 15:02:45 |
| 15 | defendants made on their own, either to | 15:02:47 |
| 16 | Officer Powers and Reynolds when they were | 15:02:51 |
| 17 | first arrested, or statements made coming | 15:02:54 |
| 18 | from a bathroom or statements made in a | 15:02:58 |
| 19 | car on the way downtown, those factors, | 15:03:01 |
| 20 | those statements contribute to lead me | 15:03:05 |
| 21 | into having the opinion that those | 15:03:10 |
| 22 | statements are true. | 15:03:12 |
| 23 | Q.    If you -- | 15:03:13 |
| 24 | A.    I'm not done. | 15:03:14 |
| 25 | Q.    Go ahead. | 15:03:15 |

NYCLD_036022

P-APP002643

Page 164

1      A.      There were other attacks and          15:03:15

2  other behavior in the park that night that    15:03:18

3  has a resemblance and a similarity between     15:03:22

4  those attacks.                                  15:03:24

5          The radio runs and the               15:03:26

6  statements of the witnesses led me to          15:03:36

7  believe all of those factors contributed.     15:03:39

8  There may be others, but that's what I can     15:03:41

9  think of now that led me to believe the        15:03:44

10 statements were true.                           15:03:48

11     Q.      We'll go over those in more        15:03:48

12 detail later.  I want you to go back to        15:03:51

13 Lederer number 1.  If you turn to the          15:03:53

14 third page of this document, which is           15:04:00

15 Bates stamped number 1193.                      15:04:02

16     A.      Did you say 193?                   15:04:05

17     Q.      1193.  You see an entry on May     15:04:07

18 23, 2002?                                       15:04:12

19     A.      I see an entry that says May 23,   15:04:14

20 2002.                                           15:04:17

21     Q.      Right.  And are you familiar       15:04:18

22 with a lineup room on the 9th floor of 1       15:04:21

23 Hogan Plaza?                                    15:04:28

24     A.      I think I know.  It's 1 Hogan      15:04:28

25 Place.  I think I know the room that           15:04:32

NYCLD_036023

P-APP002644

E. LEDRER

Page 658

| | | |
|---|---|---|
| 1 | Is it your understanding that | 10:53:17 |
| 2 | the detectives were operating, that the | 10:53:19 |
| 3 | detectives -- | 10:53:22 |
| 4 | MR. MOORE:  Withdraw that. | 10:53:23 |
| 5 | Q.    Is it your understanding that | 10:53:24 |
| 6 | the theory that the detectives were | 10:53:25 |
| 7 | operating pursuant to at the time they | 10:53:27 |
| 8 | began investigating this case was that the | 10:53:29 |
| 9 | attack on Patricia Meili was part of an | 10:53:32 |
| 10 | overall series of unlawful acts engaged in | 10:53:35 |
| 11 | by these young kids in the park on April | 10:53:40 |
| 12 | 19, 1989? | 10:53:46 |
| 13 | A.    As I sit here today thinking | 10:53:47 |
| 14 | back to 1989, I don't know specifically | 10:53:50 |
| 15 | what the detectives were thinking. | 10:53:59 |
| 16 | I believe initially, as | 10:54:01 |
| 17 | Detective Rosario testified, the young men | 10:54:06 |
| 18 | who were at the Central Park Precinct were | 10:54:09 |
| 19 | going to be interviewed as witnesses, not | 10:54:12 |
| 20 | as suspects. | 10:54:15 |
| 21 | And it may be that as it | 10:54:19 |
| 22 | evolved, that became what the detectives | 10:54:21 |
| 23 | were thinking, but I don't know what they | 10:54:23 |
| 24 | were thinking. | 10:54:24 |
| 25 | Q.    Isn't that what you argued to | 10:54:24 |

NYCLD_036691

P-APP002645

E. LEDRER

Page 659

| | | |
|---|---|---|
| 1 | the jury in both criminal cases, that the | 10:54:26 |
| 2 | attack on Patricia Meili was part of an | 10:54:28 |
| 3 | overall series of attacks on people in the | 10:54:31 |
| 4 | park by these young boys; isn't that what | 10:54:35 |
| 5 | you argued to the jury? | 10:54:37 |
| 6 | A.    I must have misunderstood your | 10:54:38 |
| 7 | earlier question then because I thought | 10:54:41 |
| 8 | you were asking me what the state of mind | 10:54:43 |
| 9 | of the police officers was. | 10:54:46 |
| 10 | Q.    I did, and you said you didn't | 10:54:46 |
| 11 | know.  Now I'm asking you, was it your | 10:54:48 |
| 12 | theory when you got up and argued this | 10:54:52 |
| 13 | case in court was that the attack on | 10:54:53 |
| 14 | Patricia Meili was part of an overall | 10:54:56 |
| 15 | series of attacks that these young boys | 10:54:58 |
| 16 | had engaged in in the park on April 19, | 10:55:00 |
| 17 | 1989? | 10:55:03 |
| 18 | A.    After interviewing all the | 10:55:03 |
| 19 | witnesses, the evidence showed that that's | 10:55:07 |
| 20 | what this was and that's what I argued. | 10:55:10 |
| 21 | MR. MOORE:  I'm going to strike | 10:55:12 |
| 22 | that as not responsive to the question. | 10:55:14 |
| 23 | Q.    I'm asking you whether that was | 10:55:16 |
| 24 | your theory, whether the evidence was | 10:55:19 |
| 25 | consistent with it or not is another | 10:55:21 |

NYCLD_036692

P-APP002646

E. LEDRER

Page 660

| | | |
|---|---|---|
| 1 | question. | 10:55:21 |
| 2 | But was that your theory, that | 10:55:22 |
| 3 | the attack on Patricia Meili was not an | 10:55:24 |
| 4 | isolated occurrence, but that it was | 10:55:27 |
| 5 | related to the series of events that took | 10:55:29 |
| 6 | place in the park? | 10:55:31 |
| 7 | A.   My argument -- | 10:55:32 |
| 8 | MS. DOLLIN:  I'm going to direct | 10:55:33 |
| 9 | you not to answer.  Her theory is work | 10:55:34 |
| 10 | product.  If you'd like to ask her what | 10:55:36 |
| 11 | she argued, she can answer that. | 10:55:39 |
| 12 | Q.   Is that what you argued to the | 10:55:41 |
| 13 | jury? | 10:55:43 |
| 14 | A.   I argued that that's what the | 10:55:43 |
| 15 | evidence showed. | 10:55:45 |
| 16 | Q.   And to your knowledge, was that | 10:55:46 |
| 17 | also the understanding that the detectives | 10:55:47 |
| 18 | who were investigating the case had when | 10:55:53 |
| 19 | they were investigating the case back in | 10:55:55 |
| 20 | April of 1989? | 10:55:58 |
| 21 | MS. DOLLIN:  Objection, asked | 10:55:59 |
| 22 | and answered.  I believe this is the | 10:55:59 |
| 23 | fourth time. | 10:56:01 |
| 24 | A.   I don't know what was going on | 10:56:02 |
| 25 | in each officer's mind.  And I think you | 10:56:05 |

NYCLD_036693

P-APP002647

E. LEDRER

Page 661

```
 1    can't, the investigation went on for quite    10:56:08
 2    a long time.  So I believe that at some        10:56:11
 3    point that became what they believed.          10:56:16
 4    When they came to that conclusion, I don't     10:56:19
 5    know.                                          10:56:21
 6         Q.    Did anybody at any point from       10:56:21
 7    the time you got involved in the case up       10:56:24
 8    until the last prosecution, which would        10:56:28
 9    have been of Steve Lopez, I guess,             10:56:32
10    correct, that was the last one that was        10:56:36
11    disposed of?                                   10:56:37
12         A.    That's not correct.                 10:56:39
13         Q.    With regard to the rape I'm         10:56:40
14    talking about.  Only six people were           10:56:41
15    charged with the assault on Meili,             10:56:44
16    correct?                                       10:56:46
17         A.    Five people were charged with       10:56:46
18    the rape of Patricia Meili.  Steve Lopez       10:56:50
19    wasn't charged with the rape.                  10:56:53
20         Q.    At any time from your               10:56:55
21    involvement in the case, beginning on          10:56:59
22    April 20th up until, let's say, the first      10:57:00
23    trial, did anybody express to you, any         10:57:04
24    detective, any police officer express to       10:57:08
25    you the belief that maybe what happened to     10:57:10
```

NYCLD_036694

P-APP002648

E. LEDRER

Page 662

1   Patricia Meili was not connected to any of        10:57:14

2   the other events that took place in the           10:57:17

3   park on April 19, 1989?                           10:57:18

4       A.    I don't remember anyone saying          10:57:22

5   that.                                             10:57:23

6       Q.    Okay.  Did anybody express the          10:57:24

7   belief, any detectives, any police officer        10:57:28

8   that --                                           10:57:39

9           MR. MOORE:  Withdraw that.                10:57:40

10      Q.    At the point in time when you           10:57:41

11  got the report that there was no DNA match        10:57:47

12  between any sample given by the defendants        10:57:51

13  and the samples taken from Patricia Meili         10:57:53

14  or the sock, at that point, did anybody,          10:57:56

15  any detective or any police officer               10:58:00

16  express to you that maybe the attack on           10:58:02

17  Patricia Meili was unrelated to the other         10:58:05

18  events that took place in the park on             10:58:08

19  April 19, 1989?                                   10:58:10

20      A.    The fact that the DNA didn't            10:58:12

21  match the defendants who had been arrested        10:58:18

22  did not preclude that it was somebody else        10:58:22

23  who was with the young men, and therefore,        10:58:26

24  I don't believe that anybody said that to         10:58:29

25  me.                                               10:58:31

NYCLD_036695

P-APP002649

```
 1                    Veit/direct/People              2471
 2              COURT OFFICER:  Raise your right hand, put your
 3         left hand on the Bible.
 4  M A R Y    V E I T, called as a witness in behalf of the
 5  People, having been duly sworn, testifies as follows:
 6              COURT OFFICER:  Please be seated.  Pull
 7         yourself up close to the mike.  You have to talk
 8         directly into the mike.  In a loud clear voice
 9         state your full name, spelling your last name?
10              THE WITNESS:  Mary Veit, V E I T.
11  DIRECT EXAMINATION
12  BY MR. CLEMENTS:.
13     Q    Miss Veit, how old are you?
14     A    31.
15     Q    And are you married or single?
16     A
17     Q    Do you have any children?
18     A
19     Q    And what is your occupation?
20     A    I am a chemist with the New York City police
21  laboratory.
22     Q    Can you pull your chair a little closer to the
23  microphone, please?  What are your duties and
24  responsibilities as a chemist at the New York City Police
25  Department laboratory?
```

1

2      A     I work in the section called serology, which is the

3    study of body fluids.  I analyze evidence involved with

4    blood, vaginal fluid, seminal fluid, saliva and urine,

5    anything involved with the sexual assault, a rape, a

6    stabbing, anything to do with the body fluids.

7      Q     How long have you been employed with the police

8    department laboratory?

9      A     Approximately six years.

10     Q     Have you received any special training for your

11   work?

12     A     Yes, I have.

13     Q     And what training is that?

14     A     I attended St. Johns University and received a

15   bachelor of science degree.  When I graduated from St. Johns

16   I worked with the Suffolk County crime laboratory in the

17   area of serology where I received a six month training.  I

18   was employed there for approximately two years.

19         I then was employed by a private laboratory also in the

20   area of serology for a period of a year and a half.  I also

21   received training in that laboratory.  When I left there I

22   was employed by the New York City Police Department where I

23   received training.

24     Q     Do you belong to any professional associations?

25     A     Yes, I do.  I belong to the Northeastern

Viet / Direct / People (Clements)                    2509

moment ago in connection with the bloodstain, are there any

other yellow marks?

A.    Yes, there are.  I labeled each individual

cutting.

Q.    How many cuttings did you take from the jogging

tights?

A.    Twelve.

        MR. CLEMENTS:  At this time I would ask if

        the witness could be shown 81 in evidence.

        (Given to witness.)

Q.    Do you recognize People's 81?

A.    Yes, I do.

Q.    And what do you recognize it to be?

A.    This is a sock which I have analyzed.

Q.    When did you receive that sock?

A.    April 20th, 1989.

Q.    Was there an H number associated with it?

A.    Yes.

Q.    Can you tell us that number?

A.    H 10.

Q.    What condition was it in when you received it?

A.    It was in a sealed brown paper bag with a crime

scene sticker.

Q.    Did you open the bag?

Michael Frankel, Sr. Court Reporter

NYCLD_022313

P-APP002652

1

2       A.   Yes, I did.

3       Q.   And what was the condition of the sock when you

4  took it out?

5       A.   It was inside out.

6       Q.   Was it wet or dry?

7       A.   It was wet.

8       Q.   Did you test it?

9       A.   Yes, I did.

10       Q.   What did you test it for?

11       A.   I observed it for any serological stains.  I

12  observed a stain that resembled human blood.  I tested that

13  stain.  In fact, it was human blood.

14       Q.   Can you show the members of the jury where the

15  stain was that you analyzed?

16       A.   It was on the top by the ankle area.

17  (Indicating.)

18       Q.   Were you able to do any additional tests?

19       A.   No, I was not.  The quantity was insufficient,

20  which means there was not enough for me to determine a blood

21  type.

22       Q.   Did you mark H 10, People's 81, in any way?

23       A.   Yes, I did.

24       Q.   How did you mark it?

25       A.   I marked it with my initials M V for Mary Veit.

Michael Frankel, Sr. Court Reporter

Viet / Direct / People (Clements)                     2511

Q.   Thank you.

MR. CLEMENTS:   At this time I would ask that the witness be shown People's Exhibit 82 in evidence.

(Given to witness.)

Q.   Do you recognize People's 82?

A.   Yes, I do.

Q.   What do you recognize it to be?

A.   This is a second sock which I analyzed.

Q.   Was there an H number associated with that sock?

A.   Yes, H 11.

Q.   Did you also receive and analyze that sock on April 20th, 1989?

A.   Yes, I did.

Q.   What was the condition of that sock when you received it?

A.   It was sealed.

Q.   Did you -- what type of container was it in?

A.   A brown paper bag with a crime scene sticker on it.

Q.   Did you open that bag and look at the sock?

A.   Yes, I did.

Q.   What was the condition of the sock when you received it?

Michael Frankel, Sr. Court Reporter

Viet / Direct / People (Clements)                    2512

1
2   A.   It was inside out and it was also wet.

3   Q.   Did you perform any tests on the sock H 11,

4   People's 82 in evidence?

5   A.   Yes, I did.

6   Q.   What, if anything, were your results?

7   A.   I once again observed for any seroligical stains.

8   I saw a stain that looked like blood.   I tested it.   It was

9   human blood.

10  Q.   Can you show the members of the jury where that

11  stain was?

12  A.   It was also on the top area where I have my

13  initials M V.

14  Q.   Did you do any other tests on that sock on April

15  20th, 1989?

16  A.   No, I did not.

17  Q.   Now, I would like to direct your attention to

18  sometime later on March 28, 1990.  Did you do any other --

19            MR. CLEMENTS:  Withdrawn.

20  Q.   Did you have occasion to look at People's 82 in

21  evidence, the same sock H 11, that you're holding in your

22  hands?

23  A.   Yes, I did.

24            MR. MOORE:  What date was that?

25            MR. CLEMENTS:  March 28, 1990.


Michael Frankel, Sr. Court Reporter

P-APP002655

Q.   What, if anything, did you observe when you looked at the sock?

A.   I observed a yellowish crusty stain, which in my opinion was consistent with a semen stain.

Q.   Had you observed any yellow stain on that sock when you first examined it on April 20th, 1989?

A.   No, I did not.

Q.   Does semen change color over time?

A.   Yes, it does.

Q.   How does that happen?

A.   When semen dries, the semen stain dries.  The older it gets the more bacteria grows.  The more bacteria grows, the yellower it would get.

Q.   When you observed the yellowish stain on April 28th, 1990, what if anything did you do?

MR. DILLER:  April 28th?

MR. CLEMENTS:  March 28th, 1990.

A.   I cut out a portion of the stain.  I tested for the presence of acid phosphatase, which was present.  Then I scraped the stain onto a slide.  I looked under a microscope for spermatazoa.  There was spermatozoa present.

Q.   After you made those observations, was there any portion of the stain that was left?

A.   Yes.


Michael Frankel, Sr. Court Reporter

Viet / Direct / People (Clements)                    2514

Q.    And what, if anything, did you do with the remaining stain?

A.    I cut out the remaining stain of the sock and I preserved it for D.N.A. analysis.

Q.    Okay.

You pointed to a portion of the sock.  Would you show the members of the jury where it was that you observed that stain?

A.    Where the hole is in the sock is where I observed the stain.  (Indicating.)

Q.    Did there come a time that the sample that you cut out was sent somewhere?

A.    Yes.

Q.    And where was that?

A.    To the F.B.I..

Q.    Was that for D.N.A. analysis?

A.    Yes.

Q.    When was that sent?

A.    April 5, 1990.

Q.    Thank you.

MR. CLEMENTS:  I would also ask if the witness could please be shown People's 111 in evidence.

(Given to witness.)


Michael Frankel, Sr. Court Reporter

NYCLD_022318

P-APP002657

VKIT - PEOPLE - CROSS - BURNS                    2746

      MR. BURNS:   What is that, Miss Lederer?

      MS. LEDERER:   117.

Q    That's People's 117 in evidence.

     What   was   the   date   that   you   first   examined
that sock?

A    April 20, 1989.

Q    And   would   it   be   fair   to   say   that   on   April
20th   of   1989,   your   conclusion   at   that   time   was   that
your   examination   of   the   sock   did   not   show   any   stains
of serological value?

A    No, counselor.

     I   did   get   the   presence   of   human   blood   on
the sock.

Q    There was human blood on that sock?

A    Yes.

Q    And   after   you   had  --  is   that   one   of   the   items
where   you   were   not   able   to   make   a   determination   as   to
blood type, to a reasonable degree of serological certainty?

A    The   quantity   was   insufficient   for   me   to   go
any further.

Q    So,   you   were   unable   to   make   a   determination,
to   a   reasonable   degree   of   serological   certainty,   as
to that particular sock?

A    Yes.

VEIT - PEOPLE - CROSS - BURNS                    2749

Q    And, after you had completed your examination, did you then preserve the sock for the FBI?

A    No, I did not.

Q    You kept that sock?

A    I put it back in the bag that it originally came in, and sealed it, and initialled the sock.

Q    Did you take any cutting from that sock?

A    No, I did not.

Q    And then, the second time you looked at the sock, what date was that, Miss Veit?

A    Actually, counselor, when the sock came in, it was wet, that was the first time I looked at the sock.

he second time I looked at the sock was a couple of hours later, when it was dry.

And the third time I looked at the sock was March 28, 1990.

Q    The first two times you looked at the sock, that occurred on April 20th of 1989?

A    Yes, it did.

Q    And then, th second time you looked at the sock was this year, what date was that?

A    March 28th, 1990.

Q    Now, how is it that you looked at the sock

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-256-5040

CORBY GROUP  NJ:

VEIT - PEOPLE - CROSS - BURNS                    2750

on the 28th of March, how did it come about that you
looked at the sock on that date?

     A     I was going over the evidence before  trial.

     Q     Were you informed that trial was, the trial
was coming up?

     A     Yes.

     Q     Would that be Miss Lederer or one of her
representatives from the District Attorney's Office?

     A     Yes.

     Q     And when you looked at the sock in march
of this year, the sock, it looked different to you at
that time than it did when you had put it away on the
20th of April, 1989?

     A     Yes, it did.

     Q     And did you then subject it to -- did you
subject it to some kind of a test?

     A     Yes, I did.

     Q     Let me ask this question, Miss Veit:

            Is it only the samples, when you cut a swatch,
or make a cutting, it's only the cuttings are preserved
in the state that they were at the time the test was
taken?

     A     When I take a cutting to perform an analysis,
I consume that portion of the sample.

FARRN TRANSCRIPT

NATIONWIDE: 1-800-256-5040

CORBY GROUP  N.:.

```
1            VXIT - PEOPLE - CROSS - BURNS              2751

2            The   remainder   of   the   sample   is   cut   out   of

3   the item and it is put - it's frozen.

4       Q    So,   it's   only   the   cuttings,   the   unused   part

5   of the cuttings, which are preserved.

6       A    Yes,   the   unused   portion   of   the   stain   is   what

7   is being preserved.

8       Q    And   all   other   items   would   just   remain   intact,

9   is that right?

10      A    That's correct.

11      Q    Subject   to   age,   wear   and   tear,   is   that   cor-

12  rect?

13      A    That's correct.

14      Q    here's   no   lab   or   anything,   or   there's   no

15  atmospheric   condition   that   is   done   to   maintain   it   at

16  the same temperature, the same, nothing like that?

17            MS.   LEDERER:   Objection   as   to   form.

18            THE COURT:  Do you understand the question?

19      Q    Do you understand the question?

20      A    Not really.  If you could be more specific.

21      Q    Well,   it's   not   put   in   a   --   it's   not   put   in

22  an   area   where   it   is   --   where   the   atmospheric   conditions

23  are   not   --   are   controlled,   it's   not   put   in   a   controlled

24  setting, that's what I mean.

25            It's   not   maintained   in   a   controlled   setting.
```

VEIT - PEOPLE - CROSS - BURNS                    2752

Do you understand that question?

A    Yes.  It remained at room temperature.

Q    Room temperature.

did    you    have    any    occasion    to    examine    any

outer    clothing,    in    connection    with    the    work    that    you've

done    in    this    case,    any    outer    clothing,    where    you    found

blood on the clothing?

MS. LEDERER:  Objection.

THE COURT:  Objection sustained.

Q    Thank you very much, Miss Veit.

CROSS EXAMINATION

BY MR. RIVERA:

Q    Good morning.

A    Good morning.

Q    Miss Veit, you indicated yesterday that you're

-- you've been with the Police Department five years,

is that correct?

A    Yes.

Q    And you're a serologist?

A    Yes.

Q    And do you hold a title with the Police

Department of the City?

A    Yes.

Q    What's that title?

FMRRN TRANSCRIPT

NATIONWIDE 1-800-255-5040

CORBY GROUP  NJ:

1

2

3    SUPREME COURT      NEW YORK COUNTY
   TRIAL TERM        PART 59

4    -------------------------------------------x

   THE PEOPLE OF THE STATE OF NEW YORK    :  INDICTMENT NOS:

5                                   :  4762/89
       -against-              :  2790/90

6                                     :  CHARGE:

   YUSEF SALAAM, RAYMOND SANTANA, STEVE    :  Att. Murder

7    LOPEZ, ANTRON McCRAY, KHAREY WISE,     :
   KEVIN RICHARDSON & MICHAEL BRISCO,     :

8                       Defendants    :

   -------------------------------------------x  Proceedings

9

                          111 Centre Street

10                           New York, N.Y. 10013

11                           April 2, 1990

12    BEFORE:

13                 HONORABLE THOMAS B. GALLIGAN,

14                   JUSTICE OF THE SUPREME COURT

15

16    APPEARANCES:

17        For the People:     ROBERT M. MORGENTHAU, ESQ.,
                      District Attorney, New York County

18             BY:   ELIZABETH LEDERER & ARTHUR CLEMENTS, ESQS.,

19                    Assistant District Attorneys

20        For the Defendants:

21    ROBERT L. BURNS, ESQ.,        MICHAEL JOSEPH, ESQ.,
   Atty. for Yusef Salaam        Atty. for Antron McCray

22

23    PETER RIVERA, ESQ.,         HOWARD DILLER, ESQ.,
   Atty. for Raymond Santana     Atty. for Kevin Richardson

24    JESSE BERMAN, ESQ.,
   Atty. for Steve Lopez

25                     ANNA L. ROGIER, RPR
                    Senior Court Reporter

             ANNA L. ROGIER, SENIOR COURT REPORTER

NYCLD_006642

P-APP002663

```
1                      Proceedings                    2

2              COURT CLERK:  Indictment Number 4762 of '89,

3     Yusef Salaam, Raymond Santana, Steve Lopez, Antron

4     Mc Cray, Kharey Wise, Kevin Richardson and Michael

5     Briscoe; also Indictment Number 2760 of '89,

6     Michael Briscoe.

7              MR. BURNS:  Robert Burns for Yusef Salaam.

8              MR. RIVERA:  Peter Rivera for Raymond

9     Santana.

10             MR. JOSEPH:  Michael Joseph for Antron Mc

11    Cray.

12             MR. DILLER:  Howard Diller for Kevin

13    Richardson.

14             MR. BERMAN:  Jesse Berman for Steve Lopez.

15             MISS LEDERER:  Elizabeth Lederer for the

16    People.

17             MR. CLEMENTS:  Arthur Clements for the

18    People.

19             THE COURT:  All right.  Before we start, I

20    have the usual application for permission to

21    conduct audio visual coverage by the press and

22    counsel, as always, have an opportunity to accept

23    or reject the offer of the press to make the

24    proceedings public.

25             MR. BURNS:  We take the same position we
```

ALMA L. RIGGIN, SENIOR COURT REPORTER

NYCLD_006643

P-APP002664

Proceedings                                    3

previously took.

   MR. BURNS:  That is on behalf of all of the

defendants.

   THE COURT:  And I will also, and the order

will be signed.

   For the record, obviously there are two other

defendants who are not here.  They are actually

available; they're in the pens.  Their attorneys

are not here.

   Mr. Person was called and is on trial in this

court and cannot be here at the moment; he can't

be two places at the same time.  We'll call that

case later.

   Mr. Moore was advised to be here, has not

arrived, which is not unusual, and his client is

present and so we'll proceed with those defendants

who are before the court and we'll handle the

other two cases subsequently.

   Now I have received, and I right just add for

the record, Mr. Person was late but he had advised

the court he had an engagement in Brooklyn and we

were aware of that and I appreciate that courtesy.

   I have received a letter from the district

attorney, copies of which were sent to counsel

ALMA L. ROSEN, SENIOR COURT REPORTER

NYCLD_006644

P-APP002665

Proceedings                                    4

indicating that they are not ready to proceed
because of certain clothing which has been
vouchered which had previously been vouchered
which now -- well, I'll read the letter.

"Dear Justice Galligan:  Upon re-examination
of an article of clothing vouchered in connection
with the case, a semen sample was discovered.

Because the article of clothing belonged to
the female jogger, it is necessary to submit this
stain for DNA testing.

Therefore, the People respectfully request an
adjournment of the April 16, 1990 trial date in
order that this test may be performed."  The
letter is signed by Elizabeth J. Lederer, Assis-
tant District Attorney.

I must say that obviously, I'm very dis-
tressed.  The fact that a year after an incident
occurs and a year after an exhibit has been in the
possession of the Police Department, that on the
eve of trial, all of a sudden it has to be tested,
it's something that seems to me could have been
done a long time ago, so I'll be interested to
hear from the district attorney why that's so.

MISS LEDERER:  Your Honor, I cannot explain

ANNA L. SPITER, SENIOR COURT REPORTER

NYCLD_006645

P-APP002666

Proceedings                                                5

way the stain was not previously discovered.  On
Wednesday, March 28th, in anticipation for trial,
the property was examined in order to be ready for
the April 16th trial date and at that time, the
stain was discovered.

I'm not a serologist and I can't explain to
the court way the Police Department did not find
it upon their initial evaluation and review of
this piece of evidence.

MR. TIFFAN:  Judge, is it proper for me to
inquire first as to which item of clothing the
letter is talking about because the letter we
received is silent as to which item of clothing
and it would be helpful if we could identify it.

THE COURT:  What item of clothing?

MISS LEDGHER:  It was a sock belonging to the
female jogger.

MR. FERMAN:  And just for the purpose of this
discussion, obviously on behalf of my client, he
is not among the three who are scheduled to go to
trial on the 16th, but I appreciate the court
having us be here today because it does impact.

Since the court has already said it's not
going to sever my client to the extent of sending

NYCLD_006646

P-APP002667

Proceedings                                    6

it out to another judge to start preparing for a
trial, since we have to await this other trial,
the adjourning of the other trial affects my
client's rights.

I would like to know how much time the People
are asking for since the letter is silent on that
question. They just use the word "adjournment"
and they don't say how long and I remember the
last DNA work they did took five months until we
got an answer.

THE COURT: That's a fair question.

MISS LEDERER: In anticipation of that ques-
tion, I spoke with both the agent who has done the
testing thus far in this case and I also contacted
the head of the DNA lab from the F.B.I., Mr. John
Hicks. I explained to him the results of this
re-examination and I explained to him that we had
a trial date set for April 16th and that both the
court and the attorneys on both sides would be
anxious to proceed as quickly as possible.

I asked him to give me a date that would be a
reliable date for when the results of the test
would be available. I was advised it would be
eight to ten weeks. There is an outside possi-

ANNA L. BOGIRE, SENIOR COURT REPORTER

NYCLD_006647

P-APP002668

Proceedings                                    7

bility that the earliest would be six weeks but I
asked Mr. Hicks to give me a data that would
fairly state to the court what range of time we're
talking about.

THE COURT:  Well, I frankly still have great
difficulty in accepting -- it seems to me almost
negligent on the part of the police or whoever is
in charge of the lab to have an item a year later
and find out it may be valuable in terms of
evidence.

Well -- presumably if there are positive
results, we're going to have additional hearings.

They said the earliest would be six weeks?

MISS LEDERER:  It is conceivable that we
could have results as early as six weeks.  I asked
for a date so that we would not be in a position
of setting a firm date for trial and then coming
in to inform the court the tests were not ready,
and Mr. Hicks told me eight to ten weeks was a
more reliable estimate, but it depends on the
process of the testing, and they cannot defini-
tively state that it would be a minimum of six
weeks.

If the court wishes to set a date, obviously

ANNA L. ROSIER, SENIOR COURT REPORTER

NYCLD_006648

P-APP002669

Proceedings                                            8

we're ready to proceed as soon as the results are

known and if they could be known in six weeks, we

would be ready at that time, but I thought it only

fair to apprise the court of a -- exactly what

I've been informed by the DNA lab.

    THE COURT:  I will put it on for six weeks as

a control date at least.

    MR. RIVERA:  Your Honor, can we be heard on

the People's request for an adjournment?

    THE COURT:  Sure.

    MR. RIVERA:  As the court knows, my client

has been in jail for the last year on this matter.

    THE COURT:  It should also be noted that you

didn't even make a bail application until December

on his behalf.

    MR. RIVERA:  And the judge set bail in the

amount of $125,000 and my client has still been in

because he has not been able to make the bail.

The bail would have been academic at that point in

time, Your Honor.

    If the court is willing to grant the People's

adjournment, I would ask the court to reconsider

the question of bail as to my client.

    At this juncture, on behalf of my client, I'm

ANNA L. ROGIER, SENIOR COURT REPORTER

P-APP002670

Proceedings                                    9

opposed to it.  This was evidence that the People

had in their possession as the court indicated.

It was their negligence and their inadvertence

that delayed the uncovering of this evidence for

approximately one year, and on behalf of Raymond

Santana, I would oppose the People's adjournment.

THE COURT:  Anybody else want to be heard?

MR. BERMAN:  Judge, I'm just -- just to

finish up what I said before, I now understand

that this purported stain is on the sock.

There is a lab report that was given to us

months back that says on April 20, 1989, a detec-

tive named Honeyman submitted two socks, two socks

for analysis.  One is called both, 2-5 and 8-10

and the other one is called 3-5 and 8-11.

Can I relate this to subsequent reports?  Can

the People tell us which sock this is?

MISS LEDERER:  Your Honor, I have directed

the serologist who found the stain to prepare a

serology report and that will be served on each of

the attorneys this week.

THE COURT:  He's asking which of two socks,

8-10 or 8-11?

MISS LEDERER:  I don't know exactly which

ANNA L. BOSIER, SENIOR COURT REPORTER

Proceedings                            30

label and I'm reluctant to hazard a guess.  The

report will be served this week.

MR. BERMAN:  Insofar as it might aid the

court in deciding whether to grant the People's

application, this report doesn't have any other

identifying number except the case number I guess,

is a report ultimately dated 12-8-89 reporting

back on the results of what was submitted on

4-28-89 and without getting too much into it, the

comparisons were made apparently with these two

socks with various specimens submitted from each

of the defendants in this case, and I'm at a loss

to understand how they could compare whatever

serological stains of value were on the socks way

back last year and come up with nothing and now

look at the same sock and find a stain that wasn't

there between last April and last December.

I don't doubt everybody's integrity here but

maybe when the court wants to decide this motion

which is going to put things off for at least two

months or so, if you want to take a look at this

report, we'll gladly lend it to the court.

It looks like they did a lab report on this

last year and didn't see a stain and it's shocking

ANNA L. BOGIER, SENIOR COURT REPORTER

NYCLD_006651

P-APP002672

Proceedings                                11

and I'm sorry judge.

THE COURT:  I'm sorry also and I'm also
shocked, but the fact that they did not discover a
stain earlier -- I'm not a serologist -- does not
foreclose their finding something subsequently.

I will allow them to make their test and I
will grant the adjournment reluctantly but I think
necessarily, and I'll put the case on for May 14th
which is six weeks.

Obviously, based upon what the district
attorney has indicated, six to eight weeks, eight
to ten weeks, the earliest possible would be six
so I'll put it on for the earliest possible date
and find out where we are.

MR. BERMAN:  That happens to be a bad -- that
week I will not be available judge.  I know it's
just for a conference, it's not a trial date but
the Friday before or the week after.

THE COURT:  How about the Monday after?

MR. BERMAN:  Absolutely satisfactory.

THE COURT:  May 21st.

MR. DILLER:  Is this for all of the defen-
dants Your Honor?

THE COURT:  This will be for all of the

ANNA L. ROSIER, SENIOR COURT REPORTER

Proceedings                                    12

defendants because we'll have to establish -- it
may alter perhaps the trial order, I don't know.

MR. BERMAN:  This is for a status conference
rather than a firm trial date?

THE COURT:  Exactly, because presumably, if
it's a positive, there may be additional proceed-
ings.

MR. BERMAN:  May I also ask that the court
adjudicate this time not excludable time?

THE COURT:  When the time arrives to discuss
30.30 time counsel, you can make your application.

MR. BERMAN:  I just always --

THE COURT:  It's obvious the people are
making this request at this particular point in
time.  What impact that is going to have ulti-
mately we'll wait and see.  We'll await that time.

MR. BERMAN:  I just wanted to capture your
state of shock now while you're in that state of
shock and get you to rule.

THE COURT:  You can also buy the record.

MISS LEDERER:  Your Honor, in response to a
motion and an application from Mr. Joseph on
behalf of Antron Mc Cray, I am turning over at
this time, certain F.B.I. reports including copies

ANNA L. ROGIER, SENIOR COURT REPORTER

NYCLD_006653

P-APP002674

Proceedings                                    13

of 16 auto reds and the F.B.I. notes and materials

that he has requested.

THE COURT:  Your application is still on the

floor.

MR. RIVERA:  In view of the fact the court

has adjourned this case to May 21st, I would renew

my application to reduce the bail of Mr. Raymond

Santana.  He's the one most prejudiced by this

adjournment.

We were ready to start trial on April 16th

and the court is quite familiar with all the facts

and circumstances of this case.  I would just

renew my application.

My client is able to make bail in the amount

of $10,000.

THE COURT:  The bail conditions will remain

the same, $25,000, as I said.  This defendant,

your client, you threw the ball over here.  Your

client was in jail from the time he was arrested

until December, and there was no bail application

made of any kind, so whatever efforts could have

been made to obtain bail for your client from

April to December were totally lost.  That's eight

months.

ANNA L. ROGIER, SENIOR COURT REPORTER



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
NEW YORK, N.Y. 10013
(212) 553-9000

ROBERT M. MORGENTHAU
DISTRICT ATTORNEY

March 29, 1990

Justice Thomas Galligan
Supreme Court:  Part 59
111 Centre Street
New York, New York  10013

**BY HAND**

Re:  <u>People v. Lopez et. al.</u>
Indictment No. 4762/89

Dear Justice Galligan:

Upon re-examination of an article of clothing vouchered in connection with the above-captioned case a semen sample was discovered.  Because the article of clothing belonged to the female jogger it is necessary to submit this stain for DNA testing.

Therefore, the People respectfully request an adjournment of the April 16, 1990 trial date in order that this test may be performed.

Yours truly,

ELIZABETH J. LEDERER
Assistant District Attorney

EJL/jo

cc:  Michael Joseph, Esq.
     Jesse Berman, Esq.
     Robert P. Burns, Esq.
     Colin Moore, Esq.
     Alton Maddox, Esq.
     Howard Diller, Esq.
     Peter Rivera, Esq.

NYCLD_000318

P-APP002676

Proceedings                                    3

THE COURT:  She said you would be here
between 2:10 and 2:15.

MR. MOORE:  I was delayed by the traffic.

THE COURT:  I'm telling you the next time you
come in here late, come with a check for $250;
that's what it's going to cost you.

MR. MOORE:  It's not intentionally done; it
was due to forces beyond my control.

THE COURT:  As you're probably aware at the
moment, the trial date has been adjourned because
of information that was brought to the attention
of the district attorney through the Police
Department and the dates have been changed.

You want to place on the record so Mr. Moore
can know?

MISS LEDERER:  A copy of the letter that was
sent to the court was sent to Mr. Moore on
Thursday of last week indicating that a semen
stain had been found on a garment of clothing
belonging to the female jogger and that the People
were requesting an adjournment in order to perform
DNA analysis on that sustain.

A copy of the serology report that documents
the finding of that stain and the item on which it

ANNA L. ROGIER, SENIOR COURT REPORTER

1            Proceedings                    4

2    was found has been sent to all counsel and a copy

3    has been filed with the court.

4         The court granted the People's request for an

5    adjournment and I believe the date set was May

6    21st as a control date to see if we have any

7    information that results from the F.B.I. at that

8    time.

9         MR. MOORE:  The application was granted by

10   the court?

11        THE COURT:  Yes it was, May 21st.

12        MR. MOORE:  I was not here.

13        THE COURT:  I'm aware of that.

14        MR. MOORE:  I just want to state Your Honor

15   my very strong objection to this adjournment that

16   was granted to the People and the permission that

17   Your Honor has given to the district attorney to

18   conduct its test.

19        The district attorney has had this vouchered

20   clothing in their possession for over a year.

21   They have conducted a series of DNA test, four,

22   and the implication of that was that they had sent

23   for the DNA analysis every item of clothing that

24   they deemed relevant and applicable to these

25   circumstances.


ANNA L. ROGIER, SENIOR COURT REPORTER

NYCLD_006314

P-APP002678



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
NEW YORK, N.Y. 10013
(212) 553-9000

**ROBERT M. MORGENTHAU**
DISTRICT ATTORNEY

June 5, 1990

Michael Joseph, Esq.
233 Broadway
New York, New York 10279

                     Re: <u>People v. Lopez et. al.</u>
                          <u>Indictment 4762/89</u>

Dear Sir:

    Pursuant to subpoena, the FBI forwarded one set of
autoradiographs from the November 13, 1989 DNA tests.  These
autorads are available for your review.  If you wish to have
a duplicate set made, arrangements can be made to have the
set copied.  The cost of such duplication is $576.00.

    The autoradiographs produced in the May 25, 1990 DNA
tests have been subpoenaed and will be made available for
your review.

                      Sincerely,

                      Elizabeth Lederer
                      Assistant District Attorney

cc:Justice Thomas Galligan

NYCLD_000330

P-APP002679

1                                                              1

2

3      SUPREME COURT          NEW YORK COUNTY
       TRIAL TERM             PART 59
4      ------------------------------------------x
       THE PEOPLE OF THE STATE OF NEW YORK     :   INDICTMENT NOS:
5                                              :   4762/89
           -against-                           :   2790/90
6                                              :   CHARGE:
       YUSEF SALAAM, RAYMOND SANTANA, STEVE    :   Att. Murder 2
7      LOPEZ, ANTRON MC CRAY, KHAREY WISE,     :
       KEVIN RICHARDSON & MICHAEL BRISCO,      :
8                               Defendants     :
       ------------------------------------------x   Proceedings
9
                                    111 Centre Street
10                                  New York, N.Y. 10013

11                                  April 2, 1990

12     BEFORE:

13                   HONORABLE THOMAS B. GALLIGAN,
                          JUSTICE OF THE SUPREME COURT
14

15

16     APPEARANCES:

17         For the People:        ROBERT M. MORGENTHAU, ESQ.,
                                   District Attorney, New York County
18
                      BY:   ELIZABETH LEDERER & ARTHUR CLEMENTS, ESQS.,
19                          Assistant District Attorneys

20         For the Defendants:

21     ROBERT L. BURNS, ESQ.,              MICHAEL JOSEPH, ESQ.,
       Atty. for Yusef Salaam             Atty. for Antron Mc Cray
22
       PETER RIVERA, ESQ.,                HOWARD DILLER, ESQ.,
23     Atty. for Raymond Santana          Atty. for Kevin Richardson

24     JESSE BERMAN, ESQ.,
       Atty. for Steve Lopez
25                                        ANNA L. MOGIER, RPR
                                          Senior Court Reporter


                    ANNA L. MOGIER, SENIOR COURT REPORTER

1              Proceedings                    2

2              COURT CLERK:  Indictment Number 4762 of '89,

3       Yusef Salaam, Raymond Santana, Steve Lopez, Antron

4       Mc Cray, Kharey Wise, Kevin Richardson and Michael

5       Briscoe; also Indictment Number 2790 of '89,

6       Michael Briscoe.

7              MR. BURNS:  Robert Burns for Yusef Salaam.

8              MR. RIVERA:  Peter Rivera for Raymond

9       Santana.

10             MR. JOSEPH:  Michael Joseph for Antron Mc

11      Cray.

12             MR. DILLER:  Howard Diller for Kevin

13      Richardson.

14             MR. BERMAN:  Jesse Berman for Steve Lopez.

15             MISS LEDERER:  Elizabeth Lederer for the

16      People.

17             MR. CLEMENTS:  Arthur Clements for the

18      People.

19             THE COURT:  All right.  Before we start, I

20      have the usual application for permission to

21      conduct audio visual coverage by the press and

22      counsel, as always, have an opportunity to accept

23      or reject the offer of the press to make the

24      proceedings public.

25             MR. BERMAN:  We take the same position we


        ANNA L. RICHER, SENIOR COURT REPORTER

NYCLD_006643

P-APP002681

1              Proceedings                    3

2    previously took.

3         MR. BURNS:  That is on behalf of all of the

4    defendants.

5         THE COURT:  And I will also, and the order

6    will be signed.

7         For the record, obviously there are two other

8    defendants who are not here.  They are actually

9    available; they're in the pens.  Their attorneys

10   are not here.

11        Mr. Pecoon was called and is on trial in this

12   court and cannot be here at the moment; he can't

13   be two places at the same time.  We'll call that

14   case later.

15        Mr. Moore was advised to be here, has not

16   arrived, which is not unusual, and his client is

17   present and so we'll proceed with those defendants

18   who are before the court and we'll handle the

19   other two cases subsequently.

20        Now I have received, and I might just add for

21   the record, Mr. Pecoon was late but he had advised

22   the court he had an engagement in Brooklyn and we

23   were aware of that and I appreciate that courtesy.

24        I have received a letter from the district

25   attorney, copies of which were sent to counsel


ALMA L. VOGEL, SENIOR COURT REPORTER

NYCLD_006644

P-APP002682

indicating that they are not ready to proceed
because of certain clothing which has been
vouchered which had previously been vouchered
which now -- well, I'll read the letter.

"Dear Justice Galligan: Upon re-examination
of an article of clothing vouchered in connection
with the case, a semen sample was discovered.

Because the article of clothing belonged to
the female jogger, it is necessary to submit this
stain for DNA testing.

Therefore, the People respectfully request an
adjournment of the April 16, 1990 trial date in
order that this test may be performed."  The
letter is signed by Elizabeth J. Lederer, Assis-
tant District Attorney.

I must say that obviously, I'm very dis-
tressed.  The fact that a year after an incident
occurs and a year after an exhibit has been in the
possession of the Police Department, that on the
eve of trial, all of a sudden it has to be tested,
it's something that seems to me could have been
done a long time ago, so I'll be interested to
hear from the district attorney why that's so.

MISS LEDERER:  Your Honor, I cannot explain

ANNA L. SPICER, SENIOR COURT REPORTER

NYCLD_006645

P-APP002683

Proceedings                    6

way the stain was not previously discovered.  On

Wednesday, March 26th, in anticipation for trial,

the property was examined in order to be ready for

the April 16th trial date and at that time, the

stain was discovered.

I'm not a serologist and I can't explain to

the court why the Police Department did not find

it upon their initial evaluation and review of

this piece of evidence.

MR. TESTAN:  Judge, is it proper for me to

inquire first as to which item of clothing the

letter is talking about because the letter we

received is silent as to which item of clothing

and it would be helpful if we could identify it.

THE COURT:  What item of clothing?

MISS LEDGER:  It was a sock belonging to the

female jogger.

MR. FINKAL:  And just for the purpose of this

discussion, obviously on behalf of my client, he

is not among the three who are scheduled to go to

trial on the 16th, but I appreciate the court

having us be here today because it does impact.

Since the court has already said it's not

going to sever my client to the extent of sending

ANNA L. ROSIER, SENIOR COURT REPORTER

NYCLD_006646

P-APP002684

Proceedings                    6

it out to another judge to start preparing for a

trial, since we have to await this other trial,

the adjourning of the other trial affects my

client's rights.

I would like to know how much time the People

are asking for since the letter is silent on that

question.  They just use the word "adjournment"

and they don't say how long and I remember the

last DNA work they did took five months until we

got an answer.

THE COURT:  That's a fair question.

MISS LEDERER:  In anticipation of that ques-

tion, I spoke with both the agent who has done the

testing thus far in this case and I also contacted

the head of the DNA lab from the F.B.I., Mr. John

Hicks.  I explained to him the results of this

re-examination and I explained to him that we had

a trial date set for April 16th and that both the

court and the attorneys on both sides would be

anxious to proceed as quickly as possible.

I asked him to give me a date that would be a

reliable date for when the results of the test

would be available.  I was advised it would be

eight to ten weeks.  There is an outside possi-

ANNA L. BOGIRE, SENIOR COURT REPORTER

NYCLD_006647

P-APP002685

Proceedings                    7

bility that the earliest would be six weeks but I
asked Mr. Hicks to give me a data that would
fairly state to the court what range of time we're
talking about.

THE COURT:  Well, I frankly still have great
difficulty in accepting -- it seems to me almost
negligent on the part of the police or whoever is
in charge of the lab to have an item a year later
and find out it may be valuable in terms of
evidence.

Well -- presumably if there are positive
results, we're going to have additional hearings.

They said the earliest would be six weeks?

MISS LEDERER:  It is conceivable that we
could have results as early as six weeks.  I asked
for a date so that we would not be in a position
of setting a firm date for trial and then coming
in to inform the court the tests were not ready,
and Mr. Hicks told me eight to ten weeks was a
more reliable estimate, but it depends on the
process of the testing, and they cannot defini-
tively state that it would be a minimum of six
weeks.

If the court wishes to set a date, obviously

ANNA L. ROSIER, SENIOR COURT REPORTER

P-APP002686

Proceedings                                    8

we're ready to proceed as soon as the results are
known and if they could be known in six weeks, we
would be ready at that time, but I thought it only
fair to apprise the court of a -- exactly what
I've been informed by the DNA lab.

THE COURT:  I will put it on for six weeks as
a control date at least.

MR. RIVERA:  Your Honor, can we be heard on
the People's request for an adjournment?

THE COURT:  Sure.

MR. RIVERA:  As the court knows, my client
has been in jail for the last year on this matter.

THE COURT:  It should also be noted that you
didn't even make a bail application until December
on his behalf.

MR. RIVERA:  And the judge set bail in the
amount of $125,000 and my client has still been in
because he has not been able to make the bail.
The bail would have been academic at that point in
time, Your Honor.

If the court is willing to grant the People's
adjournment, I would ask the court to reconsider
the question of bail as to my client.

At this juncture, on behalf of my client, I'm

ANNA L. ROGIER, SENIOR COURT REPORTER

P-APP002687

1                           Proceedings                          9

2       opposed to it.  This was evidence that the People

3       had in their possession as the court indicated.

4       It was their negligence and their inadvertence

5       that delayed the uncovering of this evidence for

6       approximately one year, and on behalf of Raymond

7       Santana, I would oppose the People's adjournment.

8                  THE COURT:  Anybody else want to be heard?

9                  MR. BERMAN:  Judge, I'm just -- just to

10      finish up what I said before, I now understand

11      that this purported stain is on the sock.

12                 There is a lab report that was given to us

13      months back that says on April 20, 1989, a detec-

14      tive named Honeyman submitted two socks, two socks

15      for analysis.  One is called both, 2-5 and 8-10

16      and the other one is called 3-5 and 8-11.

17                 Can I relate this to subsequent reports?  Can

18      the People tell us which sock this is?

19                 MISS LEDERER:  Your Honor, I have directed

20      the serologist who found the stain to prepare a

21      serology report and that will be served on each of

22      the attorneys this week.

23                 THE COURT:  He's asking which of two socks,

24      8-10 or 8-11?

25                 MISS LEDERER:  I don't know exactly which

ANNA L. BOSLER, SENIOR COURT REPORTER

Proceedings                          10

label and I'm reluctant to hazard a guess.  The

report will be served this week.

MR. BERMAN:  Insofar as it might aid the

court in deciding whether to grant the People's

application, this report doesn't have any other

identifying number except the case number I guess,

is a report ultimately dated 12-8-89 reporting

back on the results of what was submitted on

4-28-89 and without getting too much into it, the

comparisons were made apparently with these two

socks with various specimens submitted from each

of the defendants in this case, and I'm at a loss

to understand how they could compare whatever

serological stains of value were on the socks way

back last year and come up with nothing and now

look at the same sock and find a stain that wasn't

there between last April and last December.

I don't doubt everybody's integrity here but

maybe when the court wants to decide this motion

which is going to put things off for at least two

months or so, if you want to take a look at this

report, we'll gladly lend it to the court.

It looks like they did a lab report on this

last year and didn't see a stain and it's shocking

ANNA L. ROGIER, SENIOR COURT REPORTER

Proceedings                                    11

1

2   and I'm sorry judge.

3          THE COURT:  I'm sorry also and I'm also

4   shocked, but the fact that they did not discover a

5   stain earlier -- I'm not a serologist -- does not

6   foreclose their finding something subsequently.

7          I will allow them to make their test and I

8   will grant the adjournment reluctantly but I think

9   necessarily, and I'll put the case on for May 14th

10  which is six weeks.

11         Obviously, based upon what the district

12  attorney has indicated, six to eight weeks, eight

13  to ten weeks, the earliest possible would be six

14  so I'll put it on for the earliest possible date

15  and find out where we are.

16         MR. BERMAN:  That happens to be a bad -- that

17  week I will not be available judge.  I know it's

18  just for a conference, it's not a trial date but

19  the Friday before or the week after.

20         THE COURT:  How about the Monday after?

21         MR. BERMAN:  Absolutely satisfactory.

22         THE COURT:  May 21st.

23         MR. DILLER:  Is this for all of the defen-

24  dants Your Honor?

25         THE COURT:  This will be for all of the

ANNA L. ROSIER, SENIOR COURT REPORTER

Proceedings                                      12

defendants because we'll have to establish -- it

may alter perhaps the trial order, I don't know.

     MR. BERMAN:  This is for a status conference

rather than a firm trial date?

     THE COURT:  Exactly, because presumably, if

it's a positive, there may be additional proceed-

ings.

     MR. BERMAN:  May I also ask that the court

adjudicate this time not excludable time?

     THE COURT:  When the time arrives to discuss

30.30 time counsel, you can make your application.

     MR. BERMAN:  I just always --

     THE COURT:  It's obvious the people are

making this request at this particular point in

time.  What impact that is going to have ulti-

mately we'll wait and see.  We'll await that time.

     MR. BERMAN:  I just wanted to capture your

state of shock now while you're in that state of

shock and get you to rule.

     THE COURT:  You can also buy the record.

     MISS LEDERER:  Your Honor, in response to a

motion and an application from Mr. Joseph on

behalf of Antron Mc Cray, I am turning over at

this time, certain F.B.I. reports including copies

ANNA L. ROGIER, SENIOR COURT REPORTER

NYCLD_006653

P-APP002691

Proceedings                                   13

of 16 auto reds and the F.B.I. notes and materials

that he has requested.

THE COURT:  Your application is still on the

floor.

MR. RIVERA:  In view of the fact the court

has adjourned this case to May 21st, I would renew

my application to reduce the bail of Mr. Raymond

Santana.  He's the one most prejudiced by this

adjournment.

We were ready to start trial on April 16th

and the court is quite familiar with all the facts

and circumstances of this case.  I would just

renew my application.

My client is able to make bail in the amount

of $10,000.

THE COURT:  The bail conditions will remain

the same, $25,000, as I said.  This defendant,

your client, you threw the ball over here.  Your

client was in jail from the time he was arrested

until December, and there was no bail application

made of any kind, so whatever efforts could have

been made to obtain bail for your client from

April to December were totally lost.  That's eight

months.

ANNA L. ROGIER, SENIOR COURT REPORTER

1                        Proceedings                        3

2          THE COURT:  She said you would be here

3     between 2:10 and 2:15.

4          MR. MOORE:  I was delayed by the traffic.

5          THE COURT:  I'm telling you the next time you

6     come in here late, come with a check for $250;

7     that's what it's going to cost you.

8          MR. MOORE:  It's not intentionally done; it

9     was due to forces beyond my control.

10         THE COURT:  As you're probably aware at the

11    moment, the trial date has been adjourned because

12    of information that was brought to the attention

13    of the district attorney through the Police

14    Department and the dates have been changed.

15         You want to place on the record so Mr. Moore

16    can know?

17         MISS LEDERER:  A copy of the letter that was

18    sent to the court was sent to Mr. Moore on

19    Thursday of last week indicating that a semen

20    stain had been found on a garment of clothing

21    belonging to the female jogger and that the People

22    were requesting an adjournment in order to perform

23    DNA analysis on that sustain.

24         A copy of the serology report that documents

25    the finding of that stain and the item on which it


ANNA L. ROGIER, SENIOR COURT REPORTER

NYCLD_006313

P-APP002693

Proceedings 4

was found has been sent to all counsel and a copy has been filed with the court.

The court granted the People's request for an adjournment and I believe the date set was May 21st as a control date to see if we have any information that results from the F.B.I. at that time.

MR. MOORE:  The application was granted by the court?

THE COURT:  Yes it was, May 21st.

MR. MOORE:  I was not here.

THE COURT:  I'm aware of that.

MR. MOORE:  I just want to state Your Honor my very strong objection to this adjournment that was granted to the People and the permission that Your Honor has given to the district attorney to conduct its test.

The district attorney has had this vouchered clothing in their possession for over a year. They have conducted a series of DNA test, four, and the implication of that was that they had sent for the DNA analysis every item of clothing that they deemed relevant and applicable to these circumstances.

ANNA L. SOGISR, SENIOR COURT REPORTER

NYCLD_006314

P-APP002694



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
NEW YORK, N.Y. 10013
(212) 553-9000

**ROBERT M. MORGENTHAU**
DISTRICT ATTORNEY

June 5, 1990

Robert Burns, Esq.
875 Sixth Avenue
New York, New York 10001

          Re: <u>People v. Lopez et. al.</u>
          <u>Indictment 4762/89</u>

Dear Sir:

    Pursuant to subpoena, the FBI forwarded one set of autoradiographs from the November 13, 1989 DNA tests. These autorads are available for your review. If you wish to have a duplicate set made, arrangements can be made to have the set copied. The cost of such duplication is $576.00.

    The autoradiographs produced in the May 25, 1990 DNA tests have been subpoenaed and will be made available for your review.

                  Sincerely,

                  Elizabeth Lederer
                  Assistant District Attorney

cc:Justice Thomas Galligan

NYCLD_000363

P-APP002695



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
NEW YORK, N.Y. 10013
(212) 553-9000

ROBERT M. MORGENTHAU
DISTRICT ATTORNEY

June 5, 1990

Peter Rivera, Esq.
7 Hugh Grant Circle
Bronx, New York 10279

Re: <u>People v. Lopez et. al.</u>
    Indictment 4762/89

Dear Sir:

Pursuant to subpoena, the FBI forwarded one set of autoradiographs from the November 13, 1989 DNA tests.  These autorads are available for your review.  If you wish to have a duplicate set made, arrangements can be made to have the set copied.  The cost of such duplication is $576.00.

The autoradiographs produced in the May 25, 1990 DNA tests have been subpoenaed and will be made available for your review.

Sincerely,

Elizabeth Lederer
Assistant District Attorney

cc:Justice Thomas Galligan

1
2      THE COURT:  No, I will allow it.
3      Go ahead.
4      MS.   LEDERER:  Antron Mc Cray's underwear had
5  sperm in the inside of the underwear.  Kevin
6  Richardson had sperm in the inside of his
7  underwear.
8      Pay attention when you hear these statements,
9  ladies and gentlemen.  Each of these three
10 defendants described how Kevin Richardson raped
11 Patricia Meili that night.  This account is
12 confirmed by the evidence that you will hear from
13 other witnesses.  You will learn that the clothing
14 belonging to Kevin Richardson was examined in the
15 Criminalistic Department of the Police Department
16 laboratory and you will learn that hair was found
17 on that clothing.
18     You will find, you will learn that one head
19 hair which matched and was consistent with the
20 female jogger's head hair was found on his
21 clothing.  And you will learn there was pubic hair
22 found in his clothing, and that was consistent
23 with Patricia Meili's pubic hair.
24     Ladies and gentlemen, you will also learn that
25 DNA testing was done in this case.  You will learn

                    H.  C.  Davis

1

2 that samples taken from Patricia Meili, from the

3 cervix an the rectum was sent to the F.B.I.

4 Laboratory for genetic testing. **The results of**

5 those tests on **two samples was inconclusive,** and

6 you will learn that **a semen stain found on one of**

7 **the female jogger's socks returned a result that**

8 **did not match these defendants,** nor did it match

9 any of the known samples that the Police

10 Department police had gathered in their

11 investigation.  But ladies and gentlemen, that is

12 not inconsistent with the accounts given by these

13 defendants about what they and the others did to

14 this young woman in the park on that night.

15        It was not until the morning of April 20th of

16 1989 that Patricia Meili was identified.  When she

17 did not appear at work one of her colleagues, Mr.

18 Pat Garret become concerned and he went to the

19 hospital and saw the battered, swollen and

20 comatose body of Patricia Meili and identified her

21 as his co-worker and friend.

22        Ladies and gentlemen, this case will be proven

23 to you through the evidence that I've outlined for

24 you and other evidence.  I ask you each to keep an

25 open mind, to remember the oath that you took when

H. C. Davis

NYCLD_013825

P-APP002698

1   her.

2        You will learn that samples that were taken

3   from Patricia Meili were preserved and sent to the

4   FBI laboratory for genetic testing.  Those were

5   samples from the cervix and the rectum, and a

6   sample that was recovered from a sock which she

7   had worn that night.  You will learn that those

8   results do not match Kevin Richardson and Kharey

9   Wise.  They do not watch her boyfriend, and they

10  don't match any of the samples that the police had

11  gathered in this investigation.

12       But I submit to you that that is not

13  inconsistent with what the evidence will prove to

14  you happened to Patricia Meili in that park on

15  that night.

16       Ladies and Gentlemen, it is on the evidence

17  that I have outlined to you and on other evidence

18  that will be presented in the course of this trial

19  that you will find that the People have met their

20  burden of proof in this case; and I submit to you

21  that, if you keep an open mind, if you use your

22  common sense and if you follow the instructions

23  that the Judge gives you, that you will find that

24  the People have met their burden of proof and that

Bonnie Fitzsimmons, CSR

NYCLD_013869

P-APP002699

VKIT - PEOPLE - CROSS - BURNS                    2745

       MR. BURNS:  What is that, Miss Lederer?

       MS. LEDERER:  117.

Q    That's People's 117 in evidence.

       What   was   the   date   that   you   first   examined
that sock?

A    April 20, 1989.

Q    And   would   it   be   fair   to   say   that   on   April
20th   of   1989,   your   conclusion   at   that   time   was   that
your   examination   of   the   sock   did   not   show   any   stains
of serological value?

A    No, counselor.

       I   did   get   the   presence   of   human   blood   on
the sock.

Q    There was human blood on that sock?

A    Yes.

Q    And   after   you   had   --   is   that   one   of   the   items
where   you   were   not   able   to   make   a   determination   as   to
blood type, to a reasonable degree of serological certainty?

A    The   quantity   was   insufficient   for   me   to   go
any further.

Q    So,   you   were   unable   to   make   a   determination,
to   a   reasonable   degree   of   serological   certainty,   as
to that particular sock?

A    Yes.

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-256-5040

CORBY GROUP  NJ:

VEIT - PEOPLE - CROSS - BURNS                    2749

Q    And, after you had completed your examination, did you then preserve the sock for the FBI?

A    No, I did not.

Q    You kept that sock?

A    I put it back in the bag that it originally came in, and sealed it, and initialled the sock.

Q    Did you take any cutting from that sock?

A    No, I did not.

Q    And then, the second time you looked at the sock, what date was that, Miss Veit?

A    Actually, counselor, when the sock came in, it was wet, that was the first time I looked at the sock.

he second time I looked at the sock was a couple of hours later, when it was dry.

And the third time I looked at the sock was March 28, 1990.

Q    The first two times you looked at the sock, that occurred on April 20th of 1989?

A    Yes, it did.

Q    And then, th second time you looked at the sock was this year, what date was that?

A    March 28th, 1990.

Q    Now, how is it that you looked at the sock

NYCLD_022240

P-APP002701

VEIT - PEOPLE - CROSS - BURNS                    2750

on the 28th of March, how did it come about that you looked at the sock on that date?

Q      A      I was going over the evidence before trial.

Q      Were you informed that trial was, the trial was coming up?

A      Yes.

Q      Would that be Miss Lederer or one of her representatives from the District Attorney's Office?

A      Yes.

Q      And when you looked at the sock in march of this year, the sock, it looked different to you at that time than it did when you had put it away on the 20th of April, 1989?

A      Yes, it did.

Q      And did you then subject it to -- did you subject it to some kind of a test?

A      Yes, I did.

Q      Let me ask this question, Miss Veit:

Is it only the samples, when you cut a swatch, or make a cutting, it's only the cuttings are preserved in the state that they were at the time the test was taken?

A      When I take a cutting to perform an analysis, I consume that portion of the sample.

```
 1              VXIT - PEOPLE - CROSS - BURNS              2751

 2              The   remainder   of   the   sample   is   cut   out   of

 3      the item and it is put - it's frozen.

 4         Q    So,  it's  only  the  cuttings,  the  unused  part

 5      of the cuttings, which are preserved.

 6         A    Yes,  the  unused  portion  of  the  stain  is  what

 7      is being preserved.

 8         Q    And  all  other  items  would  just  remain  intact,

 9      is that right?

10         A    That's correct.

11         Q    Subject  to  age,  wear  and  tear,  is  that  cor-

12      rect?

13         A    That's correct.

14         Q    here's   no   lab   or   anything,   or   there's   no

15      atmospheric  condition  that  is  done  to  maintain  it  at

16      the same temperature, the same, nothing like that?

17              MS.   LEDERER:   Objection   as   to   form.

18              THE COURT:  Do you understand the question?

19         Q    Do you understand the question?

20         A    Not really.  If you could be more specific.

21         Q    Well,  it's  not  put  in  a --  it's  not  put  in

22      an  area  where  it  is --  where  the  atmospheric  conditions

23      are  not --  are  controlled,  it's  not  put  in  a  controlled

24      setting, that's what I mean.

25              It's   not   maintained   in   a   controlled   setting.
```

FMRRN TRANSCRIPT

NATIONWIDE: 1-800-255-5040

CORBY GROUP  N.J:

VEIT - PEOPLE - CROSS - BURNS                    2752

Do you understand that question?

A    Yes.  It remained at room temperature.

Q    Room temperature.

did   you   have   any   occasion   to   examine   any
outer   clothing,   in   connection   with   the   work   that   you've
done   in   this   case,   any   outer   clothing,   where   you   found
blood on the clothing?

MS. LEDERER:  Objection.

THE COURT:  Objection sustained.

Q    Thank you very much, Miss Veit.

CROSS EXAMINATION

BY MR. RIVERA:

Q    Good morning.

A    Good morning.

Q    Miss   Veit,   you   indicated   yesterday   that   you're
-- you've   been   with   the   Police   Department   five   years,
is that correct?

A    Yes.

Q    And you're a serologist?

A    Yes.

Q    And   do   you   hold   a   title   with   the   Police
Department of the City?

A    Yes.

Q    What's that title?

FMRRN TRANSCRIPT

NATIONWIDE 1-800-255-5040

CORBY GROUP  NJ:

```
1                    Veit/direct/People              2471
2              COURT OFFICER:  Raise your right hand, put your
3         left hand on the Bible.
4  M A R Y    V E I T, called as a witness in behalf of the
5  People, having been duly sworn, testifies as follows:
6              COURT OFFICER:  Please be seated.  Pull
7         yourself up close to the mike.  You have to talk
8         directly into the mike.  In a loud clear voice
9         state your full name, spelling your last name?
10             THE WITNESS:  Mary Veit, V E I T.
11 DIRECT EXAMINATION
12 BY MR. CLEMENTS:.
13     Q    Miss Veit, how old are you?
14     A    31.
15     Q    And are you married or single?
16     A
17     Q    Do you have any children?
18     A
19     Q    And what is your occupation?
20     A    I am a chemist with the New York City police
21 laboratory.
22     Q    Can you pull your chair a little closer to the
23 microphone, please?  What are your duties and
24 responsibilities as a chemist at the New York City Police
25 Department laboratory?
```

1                        Veit/direct/People              2472

2       A    I work in the section called serology, which is the

3  study of body fluids.  I analyze evidence involved with

4  blood, vaginal fluid, seminal fluid, saliva and urine,

5  anything involved with the sexual assault, a rape, a

6  stabbing, anything to do with the body fluids.

7       Q    How long have you been employed with the police

8  department laboratory?

9       A    Approximately six years.

10      Q    Have you received any special training for your

11 work?

12      A    Yes, I have.

13      Q    And what training is that?

14      A    I attended St. Johns University and received a

15 bachelor of science degree.  When I graduated from St. Johns

16 I worked with the Suffolk County crime laboratory in the

17 area of serology where I received a six month training.  I

18 was employed there for approximately two years.

19      I then was employed by a private laboratory also in the

20 area of serology for a period of a year and a half.  I also

21 received training in that laboratory.  When I left there I

22 was employed by the New York City Police Department where I

23 received training.

24      Q    Do you belong to any professional associations?

25      A    Yes, I do.  I belong to the Northeastern

Viet / Direct / People (Clements)                    2509

moment ago in connection with the bloodstain, are there any

other yellow marks?

A.    Yes, there are.   I labeled each individual

cutting.

Q.    How many cuttings did you take from the jogging

tights?

A.    Twelve.

        MR. CLEMENTS:   At this time I would ask if

        the witness could be shown 81 in evidence.

        (Given to witness.)

Q.    Do you recognize People's 81?

A.    Yes, I do.

Q.    And what do you recognize it to be?

A.    This is a sock which I have analyzed.

Q.    When did you receive that sock?

A.    April 20th, 1989.

Q.    Was there an H number associated with it?

A.    Yes.

Q.    Can you tell us that number?

A.    H 10.

Q.    What condition was it in when you received it?

A.    It was in a sealed brown paper bag with a crime

scene sticker.

Q.    Did you open the bag?

                Michael Frankel, Sr. Court Reporter

NYCLD_022313

P-APP002707

Viet / Direct / People (Clements)                    2510

1

2      A.   Yes, I did.

3      Q.   And what was the condition of the sock when you

4  took it out?

5      A.   It was inside out.

6      Q.   Was it wet or dry?

7      A.   It was wet.

8      Q.   Did you test it?

9      A.   Yes, I did.

10      Q.   What did you test it for?

11      A.   I observed it for any serological stains.  I

12  observed a stain that resembled human blood.  I tested that

13  stain.  In fact, it was human blood.

14      Q.   Can you show the members of the jury where the

15  stain was that you analyzed?

16      A.   It was on the top by the ankle area.

17  (Indicating.)

18      Q.   Were you able to do any additional tests?

19      A.   No, I was not.  The quantity was insufficient,

20  which means there was not enough for me to determine a blood

21  type.

22      Q.   Did you mark H 10, People's 81, in any way?

23      A.   Yes, I did.

24      Q.   How did you mark it?

25      A.   I marked it with my initials M V for Mary Veit.


Michael Frankel, Sr. Court Reporter

P-APP002708

Viet / Direct / People (Clements)                    2511

1

2    Q.   Thank you.

3         MR. CLEMENTS:   At this time I would ask that

4    the witness be shown People's Exhibit 82 in

5    evidence.

6         (Given to witness.)

7    Q.   Do you recognize People's 82?

8    A.   Yes, I do.

9    Q.   What do you recognize it to be?

10   A.   This is a second sock which I analyzed.

11   Q.   Was there an H number associated with that sock?

12   A.   Yes, H 11.

13   Q.   Did you also receive and analyze that sock on

14   April 20th, 1989?

15   A.   Yes, I did.

16   Q.   What was the condition of that sock when you

17   received it?

18   A.   It was sealed.

19   Q.   Did you -- what type of container was it in?

20   A.   A brown paper bag with a crime scene sticker on

21   it.

22   Q.   Did you open that bag and look at the sock?

23   A.   Yes, I did.

24   Q.   What was the condition of the sock when you

25   received it?

Michael Frankel, Sr. Court Reporter

Viet / Direct / People (Clements)                    2512

A.   It was inside out and it was also wet.

Q.   Did you perform any tests on the sock H 11, People's 82 in evidence?

A.   Yes, I did.

Q.   What, if anything, were your results?

A.   I once again observed for any seroligical stains. I saw a stain that looked like blood.  I tested it.  It was human blood.

Q.   Can you show the members of the jury where that stain was?

A.   It was also on the top area where I have my initials M V.

Q.   Did you do any other tests on that sock on April 20th, 1989?

A.   No, I did not.

Q.   Now, I would like to direct your attention to sometime later on March 28, 1990.  Did you do any other --

MR. CLEMENTS:  Withdrawn.

Q.   Did you have occasion to look at People's 82 in evidence, the same sock H 11, that you're holding in your hands?

A.   Yes, I did.

MR. MOORE:  What date was that?

MR. CLEMENTS:  March 28, 1990.


Michael Frankel, Sr. Court Reporter

Viet / Direct / People (Clements)                    2513

Q.   What, if anything, did you observe when you looked at the sock?

A.   I observed a yellowish crusty stain, which in my opinion was consistent with a semen stain.

Q.   Had you observed any yellow stain on that sock when you first examined it on April 20th, 1989?

A.   No, I did not.

Q.   Does semen change color over time?

A.   Yes, it does.

Q.   How does that happen?

A.   When semen dries, the semen stain dries.  The older it gets the more bacteria grows.  The more bacteria grows, the yellower it would get.

Q.   When you observed the yellowish stain on April 28th, 1990, what if anything did you do?

MR. DILLER:  April 28th?

MR. CLEMENTS:  March 28th, 1990.

A.   I cut out a portion of the stain.  I tested for the presence of acid phosphatase, which was present.  Then I scraped the stain onto a slide.  I looked under a microscope for spermatazoa.  There was spermatozoa present.

Q.   After you made those observations, was there any portion of the stain that was left?

A.   Yes.


Michael Frankel, Sr. Court Reporter

NYCLD_022317

P-APP002711

Viet / Direct / People (Clements)                    2514

Q.    And what, if anything, did you do with the remaining stain?

A.    I cut out the remaining stain of the sock and I preserved it for D.N.A. analysis.

Q.    Okay.

You pointed to a portion of the sock.  Would you show the members of the jury where it was that you observed that stain?

A.    Where the hole is in the sock is where I observed the stain.  (Indicating.)

Q.    Did there come a time that the sample that you cut out was sent somewhere?

A.    Yes.

Q.    And where was that?

A.    To the F.B.I..

Q.    Was that for D.N.A. analysis?

A.    Yes.

Q.    When was that sent?

A.    April 5, 1990.

Q.    Thank you.

MR. CLEMENTS:  I would also ask if the witness could please be shown People's 111 in evidence.

(Given to witness.)


Michael Frankel, Sr. Court Reporter

Adams-Ppl-direct (Clements)                    2258

1

2      A     Yes, sir.

3      Q     Now, I'd like to direct your attention to Q-16, the

4   cutting from the sock.   Did you have an opportunity to

5   perform the test you described earlier on that cutting of

6   semen stain from the sock?

7      A     Yes, sir.

8      Q     And what were the results of that test?

9      A     The results of the test from the semen stain on the

10   sock showed that the profile, DNA profile from that semen

11   stain did not match any individual in which I compared that

12   semen stain to.

13     Q     With respect to the semen stain on the sock, did

14   you run the same four tests on the, that semen stain, Q-16

15   that you ran on the cervical swab?

16          MR.  RIVERA:  Objection.

17     Q     Q-11?

18     A     No.

19          THE COURT:  No, I'll allow it.

20     A     I only needed to run the first two tests on the

21   semen stain of the sock in order to be able to exclude all

22   the individuals.

23     Q     Were you able to compare it all, the faint profile

24   found in the second test on Q-11 with the profiles you

25   obtained in the two tests you ran on Q-16?

H.  C.  Davis

NYCLD_020968

P-APP002713

Adams-Ppl-direct (Clements)                    2259

1

2          A    I was only able to compare the one result obtained

3    to Q-11 cervical swab, that very faint profile with the

4    profile of the second test on the sock.  And those two

5    profiles did appear to match.

6                    MR.  JOSEPH:  May we approach for one moment?

7                    THE COURT:  Yes.

8                    (Conference held at the bench, off the

9    record.)

10                   (Transcript continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H.  C.  Davis

NYCLD_020969

P-APP002714

Agt. Adams / Direct / People (Clements)          1910

sensitive.  It has to do with how much D.N.A. is in the
sample.  In this particular sample Q 11 there was just
insufficient D.N.A. present for me to get results on all
four tests.

    Q.   Now I would like to direct your attention to Q 12,
the rectal swab.  Did you obtain a result with respect to
the rectal swab?

    A.   No results were obtained from the rectal swab Q
12.

    Q.   What happened when you ran the four tests on the
four different chromosomes?

    A.   All lanes in all four of the tests were blank.
There were no patterns or profiles in any of those lanes.

    Q.   Did you obtain a result with respect to Q 16, the
semen stain that was found on the sock?

    A.   Yes, sir.

    Q.   And what were the --

        MR. CLEMENTS:  Withdrawn.

    Q.   Did you obtain a D.N.A. profile?

    A.   Yes, sir.

    Q.   Okay.

    Did it match either Kevin Richardson or Kharey
Wise?

    A.   No, sir.

Michael Frankel, Sr. Court Reporter

NYCLD_021021

P-APP002715

Agt. Adams / Direct / People (Clements)          1911

Q.    Did it match Kevin O'Reily?

A.    No, sir.

Q.    After examining the semen stain on the sock, were
you able to compare it to the feint profile that you found
on the cervical swab Q 11?

A.    Yes, sir.

Q.    And what were the results of that comparison?

A.    The cervical swab, I only got the one result on
the second probing.  I compared that feint result to the
second probing result of the sock.  And those two profiles
appeared to match.

Q.    Now, after receiving the sample from the sock in
April of 1990, did your opinion with respect to the result
from the cervical swab change in any way?

A.    That cervical swab result is still a very week
profile and only one probe result.  But I now had something
else to compare it to, that being the D.N.A. profile from
the sock.  Making only that one comparison of that one test
result, they do appear for match.

Q.    Now, with respect to the cervical swab, does the
feint profile that you observed with respect to Q 11, the
cervical swab, does that match Kevin Richardson or Kharey
Wise?

A.    No, sir.


Michael Frankel, Sr. Court Reporter

NYCLD_021022

P-APP002716

Page 158

1                    Arthur Clements

2    meetings about this case with anyone at the

3    District Attorney's office other than ADA

4    Lederer?

5              MR. MYERBERG:   Objection.

6         Q.    She could have been there, but with

7    more people, more people at a meeting or at a

8    discussion than just you and her.

9         A.    Yes.

10        Q.    Do you recall who was at those

11   meetings?

12             MR. MYERBERG:   Objection.

13        A.    Yes.

14        Q.    Who?

15        A.    At one meeting I recall there were

16   other members of Trial Bureau 40.

17        Q.    What people and by name.

18        A.    John Hogan, I believe Steve Cronin

19   was there, other more senior Assistant District

20   Attorneys in Trial Bureau 40.

21        Q.    Do you recall their names?

22        A.    I don't recall specifically all the

23   people who were there.  I only recall John Hogan

24   and Steve Cronin being there.  As I think

25   further, I believe Dan McNulty was there as

NYCLD_035309

P-APP002717

Page 159

1                    Arthur Clements

2    well, but I can't remember what other Assistant

3    District Attorneys from Trial Bureau 40 were

4    there.

5          Q.     Was ADA Fairstein there?

6          A.     No.

7          Q.     Did you have any meetings after the

8    arraignment in regards to this case that ADA

9    Fairstein attended?

10         A.     I don't know what you mean by

11   meeting, but I do recall there were occasions

12   where Linda Fairstein, Elizabeth Lederer and I

13   were in Elizabeth's office in connection with

14   preparing Elizabeth Lederer to testify.

15         Q.     Preparing Elizabeth Lederer to

16   testify?

17         A.     Excuse me.  I misspoke, Linda

18   Fairstein.

19         Q.     Do you recall, and I'll broaden it,

20   instead of meetings, I'll call it discussions.

21   Do you recall having any discussions where Linda

22   Fairstein was present, other than what you just

23   testified to in regards to this case?

24         A.     Well, as you know, there were

25   multiple proceedings.  There was a pretrial

NYCLD_035310

P-APP002718

Page 160

1                    Arthur Clements

2    hearing and a first trial and a second trial.

3    So the witness preparation that I just described

4    for Linda Fairstein occurred before each of

5    those three events.

6                 And other than that, I do not have

7    a specific recollection of Linda Fairstein or

8    being present for meetings with Linda present.

9          Q.     So you said on three separate

10   occasions you had, what I'm going to dub as

11   witness prep meetings or discussions, with Linda

12   Fairstein?

13                 MR. MYERBERG:   Objection.

14         Q.     At least three?

15         A.     I mean there were at least three.

16   We may have had more than one session before

17   each of the different proceedings I just

18   described, but it was those witness prep

19   meetings, as you just termed it, that I recall.

20         Q.     How long were they, approximately?

21         A.     I don't recall how long they were.

22   But I don't, I don't believe that I was present

23   for the entirety of the meeting -- meetings,

24   because in all three of the proceedings I just

25   described, Elizabeth Lederer was the person who

NYCLD_035311

P-APP002719

Page 161

1                    Arthur Clements
2    did the direct examination on Linda Fairstein,
3    not me.
4         Q.    You testified that you had no
5    specific recollection of any other discussions
6    with Linda Fairstein.  Do you have any general
7    recollection of having discussions with her that
8    you just don't know the subject matter or the
9    date and time of?
10                  MR. MYERBERG:  Objection.
11        A.    I don't have any specific or
12   general recollections of meetings with Linda
13   Fairstein outside of the witness preparation
14   meetings that we've been discussing for the last
15   few minutes.
16        Q.    Just so we are on the same page, by
17   meetings, that could include just discussions in
18   your office or in her office.  It doesn't have
19   to be an official meeting.  Does that change
20   your answer?
21        A.    I'm trying to search my memory
22   here.  I do not have a recollection of any other
23   meetings.  I don't remember any other meetings
24   other than what I've testified to.  There may
25   have been, but I don't recall them.

NYCLD_035312

P-APP002720

Page 162

Arthur Clements

1

2      Q.      After arraignment, what was Linda

3  Fairstein's role in the case?

4              MR. MYERBERG:   Objection.

5      A.      Based upon my personal knowledge,

6  her role was as a witness.

7      Q.      As a witness only?

8              MR. MYERBERG:   Objection.

9      A.      That was my understanding of her

10  role.

11     Q.      Was she, as far as you know,

12  involved in the preparation of any other

13  witnesses to testify?

14             MR. MYERBERG:   Objection.

15     A.      I don't know if she was involved in

16  the preparation of other witnesses or not, but

17  to the best of my recollection, she was not.   I

18  don't know.

19     Q.      Did she attend the trial, other

20  than when she was testifying?

21             MR. MYERBERG:   Objection.

22     Q.      I'll break it up, did she attend

23  the first trial, other than when she was

24  testifying?

25             MR. MYERBERG:   Objection.

NYCLD_035313

P-APP002721

Page 163

                    Arthur Clements

 1
 2        A.        I know, because the law required a

 3   separation of witnesses, that she was not

 4   present during the proceedings unless, unless

 5   she was allowed to be present for the summation.

 6   I can't recall if she was in the audience for

 7   the summation for either of the two trials.

 8        Q.        Do you recall if she was present in

 9   the Grand Jury during the Grand Jury

10   presentations of the case against the five

11   plaintiffs in this case?

12                  MR. MYERBERG:   Objection.

13        A.        Well, she was not present, to the

14   best of my recollection, in the Grand Jury in

15   her capacity as an Assistant District Attorney.

16                  I do not recall if she testified as

17   a witness in the Grand Jury, in which case she

18   would have been present in the Grand Jury.

19        Q.        I asked you before about the media

20   coverage in the case, and I think you said there

21   was.  There was media coverage, as far as you

22   know, when you got involved in the case,

23   correct?

24        A.        Yes, I believe I testified that I

25   understood that there was some media coverage of

NYCLD_035314

P-APP002722

E. LEDRER

Page 658

| | | |
|---|---|---|
| 1 | Is it your understanding that | 10:53:17 |
| 2 | the detectives were operating, that the | 10:53:19 |
| 3 | detectives -- | 10:53:22 |
| 4 | MR. MOORE:  Withdraw that. | 10:53:23 |
| 5 | Q.    Is it your understanding that | 10:53:24 |
| 6 | the theory that the detectives were | 10:53:25 |
| 7 | operating pursuant to at the time they | 10:53:27 |
| 8 | began investigating this case was that the | 10:53:29 |
| 9 | attack on Patricia Meili was part of an | 10:53:32 |
| 10 | overall series of unlawful acts engaged in | 10:53:35 |
| 11 | by these young kids in the park on April | 10:53:40 |
| 12 | 19, 1989? | 10:53:46 |
| 13 | A.    As I sit here today thinking | 10:53:47 |
| 14 | back to 1989, I don't know specifically | 10:53:50 |
| 15 | what the detectives were thinking. | 10:53:59 |
| 16 | I believe initially, as | 10:54:01 |
| 17 | Detective Rosario testified, the young men | 10:54:06 |
| 18 | who were at the Central Park Precinct were | 10:54:09 |
| 19 | going to be interviewed as witnesses, not | 10:54:12 |
| 20 | as suspects. | 10:54:15 |
| 21 | And it may be that as it | 10:54:19 |
| 22 | evolved, that became what the detectives | 10:54:21 |
| 23 | were thinking, but I don't know what they | 10:54:23 |
| 24 | were thinking. | 10:54:24 |
| 25 | Q.    Isn't that what you argued to | 10:54:24 |

NYCLD_036691

P-APP002723

E. LEDRER

Page 659

| 1  | the jury in both criminal cases, that the | 10:54:26 |
| 2  | attack on Patricia Meili was part of an | 10:54:28 |
| 3  | overall series of attacks on people in the | 10:54:31 |
| 4  | park by these young boys; isn't that what | 10:54:35 |
| 5  | you argued to the jury? | 10:54:37 |
| 6  | A.    I must have misunderstood your | 10:54:38 |
| 7  | earlier question then because I thought | 10:54:41 |
| 8  | you were asking me what the state of mind | 10:54:43 |
| 9  | of the police officers was. | 10:54:46 |
| 10 | Q.    I did, and you said you didn't | 10:54:46 |
| 11 | know.  Now I'm asking you, was it your | 10:54:48 |
| 12 | theory when you got up and argued this | 10:54:52 |
| 13 | case in court was that the attack on | 10:54:53 |
| 14 | Patricia Meili was part of an overall | 10:54:56 |
| 15 | series of attacks that these young boys | 10:54:58 |
| 16 | had engaged in in the park on April 19, | 10:55:00 |
| 17 | 1989? | 10:55:03 |
| 18 | A.    After interviewing all the | 10:55:03 |
| 19 | witnesses, the evidence showed that that's | 10:55:07 |
| 20 | what this was and that's what I argued. | 10:55:10 |
| 21 | MR. MOORE:  I'm going to strike | 10:55:12 |
| 22 | that as not responsive to the question. | 10:55:14 |
| 23 | Q.    I'm asking you whether that was | 10:55:16 |
| 24 | your theory, whether the evidence was | 10:55:19 |
| 25 | consistent with it or not is another | 10:55:21 |

NYCLD_036692

P-APP002724

E. LEDRER

Page 660

| | | |
|---|---|---|
| 1 | question. | 10:55:21 |
| 2 | But was that your theory, that | 10:55:22 |
| 3 | the attack on Patricia Meili was not an | 10:55:24 |
| 4 | isolated occurrence, but that it was | 10:55:27 |
| 5 | related to the series of events that took | 10:55:29 |
| 6 | place in the park? | 10:55:31 |
| 7 | A.    My argument -- | 10:55:32 |
| 8 | MS. DOLLIN:  I'm going to direct | 10:55:33 |
| 9 | you not to answer.  Her theory is work | 10:55:34 |
| 10 | product.  If you'd like to ask her what | 10:55:36 |
| 11 | she argued, she can answer that. | 10:55:39 |
| 12 | Q.    Is that what you argued to the | 10:55:41 |
| 13 | jury? | 10:55:43 |
| 14 | A.    I argued that that's what the | 10:55:43 |
| 15 | evidence showed. | 10:55:45 |
| 16 | Q.    And to your knowledge, was that | 10:55:46 |
| 17 | also the understanding that the detectives | 10:55:47 |
| 18 | who were investigating the case had when | 10:55:53 |
| 19 | they were investigating the case back in | 10:55:55 |
| 20 | April of 1989? | 10:55:58 |
| 21 | MS. DOLLIN:  Objection, asked | 10:55:59 |
| 22 | and answered.  I believe this is the | 10:55:59 |
| 23 | fourth time. | 10:56:01 |
| 24 | A.    I don't know what was going on | 10:56:02 |
| 25 | in each officer's mind.  And I think you | 10:56:05 |

NYCLD_036693

P-APP002725

E. LEDRER

Page 661

| 1 | can't, the investigation went on for quite | 10:56:08 |
| 2 | a long time.  So I believe that at some | 10:56:11 |
| 3 | point that became what they believed. | 10:56:16 |
| 4 | When they came to that conclusion, I don't | 10:56:19 |
| 5 | know. | 10:56:21 |
| 6 | Q.    Did anybody at any point from | 10:56:21 |
| 7 | the time you got involved in the case up | 10:56:24 |
| 8 | until the last prosecution, which would | 10:56:28 |
| 9 | have been of Steve Lopez, I guess, | 10:56:32 |
| 10 | correct, that was the last one that was | 10:56:36 |
| 11 | disposed of? | 10:56:37 |
| 12 | A.    That's not correct. | 10:56:39 |
| 13 | Q.    With regard to the rape I'm | 10:56:40 |
| 14 | talking about.  Only six people were | 10:56:41 |
| 15 | charged with the assault on Meili, | 10:56:44 |
| 16 | correct? | 10:56:46 |
| 17 | A.    Five people were charged with | 10:56:46 |
| 18 | the rape of Patricia Meili.  Steve Lopez | 10:56:50 |
| 19 | wasn't charged with the rape. | 10:56:53 |
| 20 | Q.    At any time from your | 10:56:55 |
| 21 | involvement in the case, beginning on | 10:56:59 |
| 22 | April 20th up until, let's say, the first | 10:57:00 |
| 23 | trial, did anybody express to you, any | 10:57:04 |
| 24 | detective, any police officer express to | 10:57:08 |
| 25 | you the belief that maybe what happened to | 10:57:10 |

NYCLD_036694

P-APP002726

E. LEDRER

Page 662

```
 1      Patricia Meili was not connected to any of    10:57:14
 2      the other events that took place in the       10:57:17
 3      park on April 19, 1989?                        10:57:18
 4          A.    I don't remember anyone saying       10:57:22
 5      that.                                          10:57:23
 6          Q.    Okay.  Did anybody express the       10:57:24
 7      belief, any detectives, any police officer     10:57:28
 8      that --                                        10:57:39
 9              MR. MOORE:  Withdraw that.             10:57:40
10          Q.    At the point in time when you        10:57:41
11      got the report that there was no DNA match     10:57:47
12      between any sample given by the defendants     10:57:51
13      and the samples taken from Patricia Meili      10:57:53
14      or the sock, at that point, did anybody,       10:57:56
15      any detective or any police officer            10:58:00
16      express to you that maybe the attack on        10:58:02
17      Patricia Meili was unrelated to the other      10:58:05
18      events that took place in the park on          10:58:08
19      April 19, 1989?                                10:58:10
20          A.    The fact that the DNA didn't         10:58:12
21      match the defendants who had been arrested     10:58:18
22      did not preclude that it was somebody else     10:58:22
23      who was with the young men, and therefore,     10:58:26
24      I don't believe that anybody said that to      10:58:29
25      me.                                            10:58:31
```

NYCLD_036695

P-APP002727

E. LEDRER

Page 663

| | | |
|---|---|---|
| 1 | Q.    Did anybody in your office ever | 10:58:31 |
| 2 | express that opinion to you? | 10:58:33 |
| 3 | MS. DOLLIN:  Objection. | 10:58:34 |
| 4 | Q.    Not opinion.  Anybody in your | 10:58:35 |
| 5 | office, anybody involved in the | 10:58:37 |
| 6 | prosecution say to you, maybe you should | 10:58:38 |
| 7 | look at another theory in the case, maybe | 10:58:41 |
| 8 | you should look at whether the attack on | 10:58:43 |
| 9 | Patricia Meili is unrelated to the other | 10:58:46 |
| 10 | events that took place in the park in | 10:58:48 |
| 11 | April of 1989? | 10:58:51 |
| 12 | MS. DOLLIN:  I'm going to direct | 10:58:51 |
| 13 | you not to answer that question as work | 10:58:53 |
| 14 | product. | 10:58:55 |
| 15 | Q.    Did you ever have an opinion at | 10:58:56 |
| 16 | any time, during the time you were | 10:59:01 |
| 17 | investigating -- during the time you were | 10:59:02 |
| 18 | prosecuting this case, that the events | 10:59:05 |
| 19 | with regard to Patricia Meili were | 10:59:08 |
| 20 | unrelated to the other events that took | 10:59:10 |
| 21 | place on April 19, 1989? | 10:59:12 |
| 22 | MS. DOLLIN:  Objection.  I'm | 10:59:14 |
| 23 | directing you not to answer.  It goes to | 10:59:16 |
| 24 | work product, thought processes, opinions, | 10:59:21 |
| 25 | et cetera. | 10:59:23 |

NYCLD_036696

P-APP002728

Page 159

```
 1        Q.    At the time you heard Reyes make     14:58:01
 2   his statement?                                   14:58:03
 3        A.    Was I concerned with what?           14:58:03
 4        Q.    As to whether the statements by      14:58:07
 5   these five defendants who had spent all         14:58:09
 6   these years in jail where they admitted         14:58:12
 7   their involvement in a rape, did you ever       14:58:15
 8   question whether that was accurate, up          14:58:18
 9   until the time you heard Reyes give his         14:58:19
10   statement?                                      14:58:21
11           MS. DOLLIN:   Objection to form.        14:58:22
12        A.    I evaluated their statements         14:58:23
13   after they were made and looked at the          14:58:24
14   other evidence in the case and the other        14:58:27
15   assaults in the case in the park that           14:58:29
16   night, and I believed the statements to be      14:58:32
17   true.                                           14:58:36
18        Q.    So at no time --                      14:58:36
19           MR. MOORE:   Well, withdraw that.       14:58:39
20        Q.    Well, no, let me ask it that         14:58:40
21   way.  At any time after Matias Reyes came       14:58:43
22   forward, did you question, in your own          14:58:46
23   mind, the liability or credibility of the       14:58:49
24   five defendants' statements with regard to      14:58:54
25   their involvement with the Central Park         14:58:57
```

Page 160

```
 1   jogger?                                    14:58:59
 2           MS. DOLLIN:   Objection to form.   14:58:59
 3      A.    What do you mean liability?       14:59:02
 4      Q.    Reliability, that they were       14:59:04
 5   reliable, that they could be believed.     14:59:07
 6      A.    Can you rephrase the question?    14:59:07
 7   I don't understand what you're asking.     14:59:10
 8      Q.    Sure.  At any time after Matias   14:59:12
 9   Reyes came forward and indicated that he   14:59:14
10   raped the Central Park jogger and that he  14:59:16
11   acted alone, did you in your own mind      14:59:19
12   question whether the five people who were  14:59:22
13   convicted and sent to jail for that rape   14:59:23
14   were actually involved in the rape?        14:59:28
15           It's quite simple, did you ever    14:59:31
16   question whether they were still guilty of 14:59:33
17   that crime?                                14:59:35
18           MS. DOLLIN:   Objection to form.   14:59:36
19      A.    When Matias Reyes came forward    14:59:37
20   and he made the statement, I considered it 14:59:39
21   with an open mind and thought perhaps this 14:59:44
22   is a person whose statement would          14:59:47
23   exculpate the defendants of the rape.      14:59:55
24           However, after I heard his         14:59:57
25   statement, and after I again reviewed the  14:59:59
```

NYCLD_036019

P-APP002730

Page 161

1    statements of the then defendants, now        15:00:02

2    plaintiffs, I was satisfied that those        15:00:05

3    statements were true.                         15:00:08

4         Q.    Okay.  And you were satisfied      15:00:09

5    based on what?  What gave you the             15:00:12

6    satisfaction that those statements were       15:00:18

7    true?                                         15:00:21

8         A.    A lot of things.  The demeanor     15:00:23

9    in which the defendants described what        15:00:27

10   happened, the content of what they            15:00:30

11   described happening, the specific gestures    15:00:32

12   and expressions that they described, the      15:00:35

13   similarity between the other assaults and     15:00:40

14   Patricia Meili's assault in the park that     15:00:44

15   night.                                        15:00:47

16             The statements from other young     15:00:48

17   men who were not prosecuted in this case,     15:00:49

18   the statements of the co-defendants, and      15:00:52

19   the statements that the defendants made       15:01:00

20   other than their videotaped statements.       15:01:03

21        Q.    So, in other words, as you sit     15:01:06

22   here today, Matias Reyes having come          15:01:09

23   forward and having confessed to that crime    15:01:13

24   and having said he acted alone and having     15:01:16

25   the DNA samples match his DNA sample, that    15:01:20

NYCLD_036020

P-APP002731

Page 162

1    doesn't lead you to question at all the          15:01:25

2    integrity of that prosecution of those          15:01:27

3    five kids, right?                               15:01:30

4            MS. DOLLIN:   Objection to form.        15:01:31

5        A.    The DNA corroborates his              15:01:33

6    statement that he was there and that he         15:01:36

7    raped her, but it doesn't corroborate his       15:01:38

8    claim that he was alone, and I don't            15:01:41

9    believe he was alone.                           15:01:43

10       Q.    What evidence --                       15:01:45

11       A.    Excuse me.                             15:01:46

12       Q.    I'm sorry, go ahead.                   15:01:46

13       A.    And I believe that he was with        15:01:47

14   others, and I believe that his statements       15:01:49

15   are true.                                       15:01:50

16       Q.    Do you believe that because it's      15:01:51

17   something you believe, or do you believe        15:01:53

18   this based on any facts that you can tell       15:01:54

19   me?                                             15:01:56

20           MS. DOLLIN:   Objection to form.        15:01:57

21       A.    I tried to tell you what things       15:01:57

22   make me believe that those statements are       15:02:01

23   accurate and truthful.                          15:02:03

24       Q.    I want you to tell me what            15:02:04

25   statements, what facts you believe that         15:02:07

NYCLD_036021

P-APP002732

Page 163

| | | |
|---|---|---|
| 1 | you are aware of support your belief that | 15:02:09 |
| 2 | Matías Reyes did not act alone when he | 15:02:14 |
| 3 | raped Patricia Meili? | 15:02:17 |
| 4 | MS. DOLLIN:  Objection, asked | 15:02:18 |
| 5 | and answered.  You can answer it again. | 15:02:19 |
| 6 | A.    The statements that the | 15:02:21 |
| 7 | defendants made contained information that | 15:02:25 |
| 8 | was not yet known about the crime and the | 15:02:28 |
| 9 | attacks on her as well as on others. | 15:02:31 |
| 10 | The statements by other young | 15:02:34 |
| 11 | men who were in the park and with these | 15:02:36 |
| 12 | people on that night contribute to my | 15:02:38 |
| 13 | opinion that the statements are truthful. | 15:02:43 |
| 14 | The statements that the | 15:02:45 |
| 15 | defendants made on their own, either to | 15:02:47 |
| 16 | Officer Powers and Reynolds when they were | 15:02:51 |
| 17 | first arrested, or statements made coming | 15:02:54 |
| 18 | from a bathroom or statements made in a | 15:02:58 |
| 19 | car on the way downtown, those factors, | 15:03:01 |
| 20 | those statements contribute to lead me | 15:03:05 |
| 21 | into having the opinion that those | 15:03:10 |
| 22 | statements are true. | 15:03:12 |
| 23 | Q.    If you -- | 15:03:13 |
| 24 | A.    I'm not done. | 15:03:14 |
| 25 | Q.    Go ahead. | 15:03:15 |

NYCLD_036022

P-APP002733

Page 164

1    A.    There were other attacks and    15:03:15

2  other behavior in the park that night that  15:03:18

3  has a resemblance and a similarity between  15:03:22

4  those attacks.    15:03:24

5        The radio runs and the  15:03:26

6  statements of the witnesses led me to  15:03:36

7  believe all of those factors contributed.  15:03:39

8  There may be others, but that's what I can  15:03:41

9  think of now that led me to believe the  15:03:44

10  statements were true.  15:03:48

11    Q.    We'll go over those in more  15:03:48

12  detail later.  I want you to go back to  15:03:51

13  Lederer number 1.  If you turn to the  15:03:53

14  third page of this document, which is  15:04:00

15  Bates stamped number 1193.  15:04:02

16    A.    Did you say 193?  15:04:05

17    Q.    1193.  You see an entry on May  15:04:07

18  23, 2002?  15:04:12

19    A.    I see an entry that says May 23,  15:04:14

20  2002.  15:04:17

21    Q.    Right.  And are you familiar  15:04:18

22  with a lineup room on the 9th floor of 1  15:04:21

23  Hogan Plaza?  15:04:28

24    A.    I think I know.  It's 1 Hogan  15:04:28

25  Place.  I think I know the room that  15:04:32

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868    516-608-2400

NYCLD_036023

P-APP002734

E. LEDRER

Page 662

| | | |
|---|---|---|
| 1 | Patricia Meili was not connected to any of | 10:57:14 |
| 2 | the other events that took place in the | 10:57:17 |
| 3 | park on April 19, 1989? | 10:57:18 |
| 4 | A.    I don't remember anyone saying | 10:57:22 |
| 5 | that. | 10:57:23 |
| 6 | Q.    Okay.  Did anybody express the | 10:57:24 |
| 7 | belief, any detectives, any police officer | 10:57:28 |
| 8 | that -- | 10:57:39 |
| 9 | MR. MOORE:  Withdraw that. | 10:57:40 |
| 10 | Q.    At the point in time when you | 10:57:41 |
| 11 | got the report that there was no DNA match | 10:57:47 |
| 12 | between any sample given by the defendants | 10:57:51 |
| 13 | and the samples taken from Patricia Meili | 10:57:53 |
| 14 | or the sock, at that point, did anybody, | 10:57:56 |
| 15 | any detective or any police officer | 10:58:00 |
| 16 | express to you that maybe the attack on | 10:58:02 |
| 17 | Patricia Meili was unrelated to the other | 10:58:05 |
| 18 | events that took place in the park on | 10:58:08 |
| 19 | April 19, 1989? | 10:58:10 |
| 20 | A.    The fact that the DNA didn't | 10:58:12 |
| 21 | match the defendants who had been arrested | 10:58:18 |
| 22 | did not preclude that it was somebody else | 10:58:22 |
| 23 | who was with the young men, and therefore, | 10:58:26 |
| 24 | I don't believe that anybody said that to | 10:58:29 |
| 25 | me. | 10:58:31 |

NYCLD_036695

P-APP002735

Page 262

| | | |
|---|---|---|
| 1 | were there, that these defendants in this | 17:24:17 |
| 2 | case were there. | 17:24:19 |
| 3 | So I think to show that other | 17:24:20 |
| 4 | people were there is another piece of | 17:24:23 |
| 5 | showing that he wasn't by himself.  I'm | 17:24:25 |
| 6 | not sure I'm being clear. | 17:24:29 |
| 7 | Q.    I'm not sure you're responding | 17:24:30 |
| 8 | to the question I asked, which was | 17:24:32 |
| 9 | focussing on the factors you mentioned, | 17:24:34 |
| 10 | which was the similarity of the attack on | 17:24:37 |
| 11 | Meili to the other attacks in the park | 17:24:40 |
| 12 | that night, that was one of the factors | 17:24:42 |
| 13 | you cited as, in your mind, evidence that | 17:24:44 |
| 14 | Reyes did not act alone. | 17:24:47 |
| 15 | MS. DOLLIN:  Objection to form. | 17:24:49 |
| 16 | Q.    Is that correct? | 17:24:52 |
| 17 | A.    I think that's a correct | 17:24:53 |
| 18 | statement of what I said.  And the reason | 17:24:55 |
| 19 | I said that is because the evidence at the | 17:24:57 |
| 20 | trial and the evidence in Nancy Ryan's | 17:25:04 |
| 21 | affirmation does not speak to, it doesn't | 17:25:09 |
| 22 | undermine the convictions for the other | 17:25:14 |
| 23 | crimes that were committed in the park | 17:25:16 |
| 24 | that night. | 17:25:18 |
| 25 | So to the extent that the | 17:25:19 |

NYCLD_036121

P-APP002736

Page 263

```
 1    defendants assaulted John Loughlin and      17:25:22

 2    robbed him and assaulted Antonio Diaz, and  17:25:26

 3    her injuries, Patricia Meili's injuries     17:25:30

 4    were similar.  I think that contributes to  17:25:32

 5    a conclusion with Reyes's implausible       17:25:35

 6    statement that they were all there.         17:25:39

 7         Q.    Right.  So you believe that the  17:25:42

 8    injuries to Patricia Meili were similar to  17:25:44

 9    the injuries suffered by Diaz and           17:25:47

10    Loughlin, right?                            17:25:49

11            MS. DOLLIN:  Objection to form.     17:25:50

12         A.    I believe that her head injuries 17:25:51

13    were similar to the injuries of Loughlin    17:25:53

14    and Diaz.                                   17:25:57

15         Q.    I'm going to ask you about her   17:25:57

16    injuries in a minute.  But before I do      17:25:59

17    that, I asked you whether as you sit here   17:26:01

18    today you have an opinion as to whether     17:26:03

19    Raymond Santana, as you sit here today, is  17:26:05

20    he still guilty of raping and assaulting    17:26:08

21    Patricia Meili on 4/19/1989, and you said   17:26:09

22    yes, right?                                 17:26:09

23         A.    Yes.                             17:26:15

24         Q.    Do you have that same opinion as 17:26:15

25    to Antron McCray?                           17:26:18
```

NYCLD_036122

P-APP002737

Page 264

```
 1        A.    Yes.                              17:26:20
 2        Q.    And do you have that same         17:26:20
 3   opinion with regard to Yusef Salaam?         17:26:22
 4        A.    Yes.                              17:26:24
 5        Q.    And do you have that same         17:26:24
 6   opinion with regard to Kevin Richardson?     17:26:26
 7        A.    Yes.                              17:26:28
 8        Q.    And finally, do you have that     17:26:29
 9   same opinion with regard to Kharey Wise?     17:26:30
10        A.    Yes.                              17:26:32
11        Q.    At any time since your            17:26:33
12   involvement in this case, particularly       17:26:34
13   after Reyes came forward with his            17:26:36
14   testimony and he was investigated by your    17:26:39
15   office, at any time up until today, have     17:26:45
16   you ever said to yourself, maybe you got     17:26:48
17   it wrong?                                    17:26:50
18             MS. DOLLIN:   Objection to form.   17:26:50
19        A.    I don't think that I, I don't     17:26:51
20   think -- the conversation I had with         17:26:59
21   myself at the beginning of the Central       17:27:01
22   Park case was are they telling me the        17:27:04
23   truth, are these the people who did it.      17:27:06
24             I went into it with an open        17:27:08
25   mind.  I was convinced by the evidence       17:27:10
```

NYCLD_036123

P-APP002738

Page 265

1    that developed over the course of days and        17:27:13

2    months afterwards that yes, those were            17:27:16

3    truthful statements.                              17:27:18

4           So I revisited my conclusion on            17:27:19

5    that after Matias Reyes came forward and          17:27:24

6    said that he did it alone.  Certainly he          17:27:27

7    was there because it's his DNA, but I             17:27:29

8    revisited whether those statements,               17:27:35

9    whether my opinion would change, and it           17:27:40

10   does not.                                         17:27:42

11      Q.    Okay.  So it doesn't change              17:27:42

12   your -- at no time have you changed your          17:27:44

13   opinion since your involvement in this            17:27:46

14   case that Patricia Meili was assaulted by         17:27:48

15   these young men on that night, correct?           17:27:52

16           MS. DOLLIN:  Objection to form,           17:27:54

17   asked and answered.                               17:27:55

18      A.    Can you repeat the question?             17:27:55

19      Q.    At no time since the events that         17:27:57

20   took place in the park in April of 1989           17:28:01

21   has your opinion changed, no matter what          17:28:03

22   has transpired since then, with regard to         17:28:06

23   whether these five individuals were guilty        17:28:10

24   of assaulting and raping Patricia Meili on        17:28:12

25   April 19, 1989?                                   17:28:17

NYCLD_036124

P-APP002739

Page 266

1          MS. DOLLIN:  Objection to form,          17:28:18

2   asked and answered.                             17:28:19

3       A.    You're asking me if it's changed      17:28:20

4   since the night that the crime happened.        17:28:22

5   And again, I'm going to say when the crime       17:28:24

6   happened and when I went to the precincts       17:28:27

7   and when I took the statement, I had an          17:28:29

8   open mind and I looked at all of the            17:28:33

9   evidence.                                        17:28:35

10          So I didn't go into this case           17:28:35

11  certain that these people had committed         17:28:38

12  these crimes.  The evidence persuaded me        17:28:40

13  that they were guilty.                          17:28:43

14      Q.    When you got involved in the          17:28:44

15  case, that was, you got to the precinct,        17:28:46

16  the 20th Precinct at about eight o'clock        17:28:48

17  on April 20th, right?                           17:28:51

18      A.    That's right.                         17:28:52

19      Q.    Okay.  By that time, a number of      17:28:53

20  these individuals, and these young boys at       17:28:58

21  the time, had already been interviewed by       17:29:01

22  a number of detectives, correct?                17:29:04

23          MS. DOLLIN:  Objection to form.         17:29:05

24      Q.    As of eight o'clock on April          17:29:08

25  20th?                                            17:29:10

NYCLD_036125

P-APP002740

T3-JM-TS

4949

1              Fairstein - People - Cross - Burns

2      Q     Now, between 8:30 and 11:30, did you participate  in

3 any questioning of any individuals?

4      A     I questioned police officers.

5      Q     Just officers.

6      A     Right.

7      Q     Now, at 11:30, you say, is the first time you --

8              MR. BURNS:  Withdrawn.

9      Q       At what point in time -- at what point in time did

10 you -- were you aware of the fact that Yusef Salaam was in the

11 20th Precinct?

12      A     I have -- I would put it in the 11  o'clock  period,

13 but it was between 11 and 11:30.

14      Q       And do you have any -- can you tell the Court who

15 told you, or how you came by that information?

16      A     I was in a room with a lot of police officers,  and,

17 as  different events unfolded that evening, because there were

18 many participants, and a lot of police activity, people  would

19 enter  the room to tell some of the supervisors what was going

20 on.

21      Q     And I believe --  and  you  were  functioning  as  a

22 supervisor?

23      A     No.  I'm talking about police supervisors.

24      Q       But you were working along with the supervisors,

25 were you not?

NYCLD_015468

P-APP002741

Agt. Adams / Direct / People (Clements)          1910

1  sensitive.  It has to do with how much D.N.A. is in the

2  sample.  In this particular sample Q 11 there was just

3  insufficient D.N.A. present for me to get results on all

4  four tests.

5       Q.   Now I would like to direct your attention to Q 12,

6  the rectal swab.  Did you obtain a result with respect to

7  the rectal swab?

8       A.   No results were obtained from the rectal swab Q

9  12.

10      Q.   What happened when you ran the four tests on the

11  four different chromosomes?

12      A.   All lanes in all four of the tests were blank.

13  There were no patterns or profiles in any of those lanes.

14      Q.   Did you obtain a result with respect to Q 16, the

15  semen stain that was found on the sock?

16      A.   Yes, sir.

17      Q.   And what were the --

18           MR. CLEMENTS:  Withdrawn.

19      Q.   Did you obtain a D.N.A. profile?

20      A.   Yes, sir.

21      Q.   Okay.

22           Did it match either Kevin Richardson or Kharey

23  Wise?

24      A.   No, sir.

Michael Frankel, Sr. Court Reporter

NYCLD_021021

P-APP002742

Agt. Adams / Direct / People (Clements)          1911

Q.    Did it match Kevin O'Reily?

A.    No, sir.

Q.    After examining the semen stain on the sock, were you able to compare it to the feint profile that you found on the cervical swab Q 11?

A.    Yes, sir.

Q.    And what were the results of that comparison?

A.    The cervical swab, I only got the one result on the second probing.  I compared that feint result to the second probing result of the sock.  And those two profiles appeared to match.

Q.    Now, after receiving the sample from the sock in April of 1990, did your opinion with respect to the result from the cervical swab change in any way?

A.    That cervical swab result is still a very week profile and only one probe result.  But I now had something else to compare it to, that being the D.N.A. profile from the sock.  Making only that one comparison of that one test result, they do appear for match.

Q.    Now, with respect to the cervical swab, does the feint profile that you observed with respect to Q 11, the cervical swab, does that match Kevin Richardson or Kharey Wise?

A.    No, sir.


Michael Frankel, Sr. Court Reporter

NYCLD_021022

P-APP002743

Page 73

1                    Arthur Clements

2    anyone representing you from Corporation

3    Counsel?

4        A.     Again, your question is about?

5        Q.     A negative relationship or friction

6    between Nancy Ryan and Linda Fairstein.

7        A.     No, I had not heard that.

8        Q.     Ultimately, prior to arraignment,

9    this case became a case belonging to the Sex

10   Crimes Bureau; is that correct?

11                MR. MYERBERG:   Objection.

12       A.     I don't know specifically whether

13   that is accurate or not from my perspective.   It

14   was assigned to Elizabeth Lederer.

15       Q.     And to your knowledge, was Linda

16   Fairstein supervising Elizabeth Lederer?

17                MR. MYERBERG:   Objection.

18       A.     No.

19       Q.     What was your understanding of her

20   involvement in the case prior to the arraignment

21   of Linda Fairstein's involvement prior to the

22   arraignment?

23       A.     I don't know if I -- I think Linda

24   Fairstein was at the precinct, but that the case

25   was assigned to Elizabeth Lederer.

NYCLD_035224

P-APP002744

Page 79

1                    Arthur Clements

2   make you think that it was a bad idea?  Were you

3   worried that it's not appropriate or not a good

4   thing to take statements from kids that are that

5   young?

6              MR. MYERBERG:  Objection.

7        A.    No, I didn't have any concern about

8   that.  The statements were being taken in the

9   youth room with parents or guardians present.

10       Q.    Did it ever cross your mind that

11  these were young children, did you ever think of

12  them in that way?

13             MR. MYERBERG:  Again, up to

14        arraignment or at that time?

15             MS. FISHER-BYRIALSEN:  At that

16        time.

17             MR. MYERBERG:  Objection.

18       A.    No, I didn't have any concern.  To

19  the extent I knew their ages, I knew statements

20  were being taken by people who were less than

21  16.

22       Q.    We talked about where the case was

23  assigned earlier, and I asked you if ADA

24  Fairstein was supervising ADA Lederer and you

25  said no.  Do you know if anyone was supervising

NYCLD_035230

P-APP002745

1                    Arthur Clements

2    her, anyone at all from the DA's office?

3              MR. MYERBERG:   Objection.

4         A.    I think I testified earlier that I

5    did not, I did not know specifically, you know,

6    what Linda Fairstein's role at the precinct was,

7    but that from my perspective, ADA Lederer was

8    assigned to the case.  So her supervisor would

9    have been our boss, John Hogan, the Chief of

10   Trial Bureau 40.

11        Q.    During your first period at the

12   24th Precinct up to the interview of or up to

13   the conclusion of the statement by Clarence

14   Thomas, did you ever see John Hogan at the

15   precinct?

16        A.    No.

17        Q.    Did you ever see any other

18   supervisors from Trial Bureau 40 at the

19   precinct?  You mentioned earlier there was one

20   other person other than John Hogan.

21             MR. MYERBERG:   Objection.

22        Q.    Dan McNulty, did you ever see him

23   at the precinct?

24             MR. MYERBERG:   Objection.

25        A.    No, I did not see Dan McNulty at

NYCLD_035231

P-APP002746

Page 81

1            Arthur Clements

2  the precinct but I wouldn't have expected to see

3  him there.

4        Q.    Why not?

5        A.    Because Elizabeth Lederer was

6  qualified to handle homicide cases, and

7  Assistants who went to precincts on, you know,

8  homicide call typically did not have supervisors

9  with them at the precinct, they handled that on

10 their own.

11       Q.    In regards to this case at that

12 time, did you think of her as your superior?

13       A.    Who?

14       Q.    ADA Lederer.

15       A.    At that time in 1989, I thought

16 that John Hogan and Dan McNulty and another

17 deputy bureau chief, if there was one, were my

18 supervisors.

19            (Mr. Warren entered the room.)

20            MS. FISHER-BYRIALSEN:  Just for the

21       record, Michael Warren just came in.  This

22       is Mr. Clements.

23            MR. WARREN:  Yes, we met.

24            MS. FISHER-BYRIALSEN:  Just let the

25       record reflect Mr. Warren is here.

NYCLD_035232

P-APP002747

Page 81

| | | |
|---|---|---|
| 1 | Q.    At some point Nancy Ryan | 11:34:14 |
| 2 | succeeded John Fried as chief of the Trial | 11:34:17 |
| 3 | Division; is that right? | 11:34:21 |
| 4 | A.    Yes. | 11:34:21 |
| 5 | Q.    Do you remember what year it | 11:34:21 |
| 6 | was? | 11:34:23 |
| 7 | A.    It was around that time, but I | 11:34:23 |
| 8 | can't remember better than that. | 11:34:26 |
| 9 | Q.    And prior to April of '89, had | 11:34:28 |
| 10 | you had occasion to work with Linda | 11:34:34 |
| 11 | Fairstein, I think you testified to that, | 11:34:36 |
| 12 | right? | 11:34:38 |
| 13 | MS. DOLLIN:  Objection. | 11:34:39 |
| 14 | A.    Yes. | 11:34:39 |
| 15 | (Mr. Wareham entered the room.) | 11:34:45 |
| 16 | MS. DOLLIN:  Just for the | 11:34:49 |
| 17 | record, Mr. Wareham has just walked in. | 11:34:50 |
| 18 | Q.    How would you describe Ms. | 11:34:56 |
| 19 | Fairstein as a District Attorney? | 11:34:58 |
| 20 | MS. DOLLIN:  Objection. | 11:34:59 |
| 21 | A.    I thought that she had | 11:35:00 |
| 22 | integrity, I thought she was responsible. | 11:35:11 |
| 23 | This was in large measure by reputation | 11:35:17 |
| 24 | because I wasn't personally particularly | 11:35:21 |
| 25 | close to her.  But she had a reputation as | 11:35:26 |

NYCLD_035940

P-APP002748

Page 82

1    being a really good prosecutor.                      11:35:29

2         Q.    A good prosecutor, is that what          11:35:44

3    you said?                                            11:35:47

4         A.    Yes.                                      11:35:47

5         Q.    Okay.  Did she have a reputation          11:35:48

6    of being a strong-willed prosecutor?                 11:35:51

7              MS. DOLLIN:  Objection.                    11:35:53

8         A.    What do you mean strong willed?           11:35:54

9         Q.    Assertive in her positions as a           11:35:56

10   prosecutor.                                          11:35:58

11             MS. DOLLIN:  Objection.                    11:36:00

12        A.    In my experience, she was always          11:36:01

13   willing to hear another opinion.  So I               11:36:03

14   wouldn't characterize her that way.                  11:36:06

15        Q.    Would you use the term                    11:36:07

16   aggressive to characterize her as a                  11:36:11

17   prosecutor?                                          11:36:12

18             MS. DOLLIN:  Objection.                    11:36:13

19        A.    You know, I would say she was             11:36:14

20   aggressive within the bounds of the law.             11:36:18

21        Q.    Prior to April of '89, had you            11:36:20

22   had occasion to work with Nancy Ryan?                11:36:23

23        A.    No.  I'm sorry, no, I don't               11:36:25

24   remember having any cases that required my           11:36:35

25   meeting with her.  I may have, but it was            11:36:37

NYCLD_035941

P-APP002749

Linda Fairstein

Page 261

```
 1    meeting his father.  I saw Raymond        16:47:16
 2    Santana's father that morning, the morning 16:47:20
 3    seven to nine a.m. at the 24th Precinct.   16:47:24
 4            I believe I saw other parents.     16:47:36
 5    I know I saw other parents at hours        16:47:40
 6    throughout the day of the 21st and other   16:47:43
 7    young men.  I saw Michael Briscoe, I       16:47:48
 8    remember distinctly, and I believe family  16:47:53
 9    members of his.                            16:47:56
10        Q.    Did you know that Raymond        16:48:00
11    Santana had to be re-interviewed because a 16:48:02
12    parent was not present?                    16:48:05
13            MS. DAITZ:  Objection to form.     16:48:08
14        A.    Did I learn that Raymond Santana 16:48:14
15    had to be re-interviewed when, what day,   16:48:17
16    what time, I don't know.                   16:48:20
17        Q.    Whenever he was interviewed,     16:48:22
18    particularly on the 19th.                  16:48:25
19            MS. DAITZ:  Your personal          16:48:26
20    knowledge prior to arraignment is what     16:48:27
21    he's asking you.  At the precinct, did you 16:48:30
22    come to learn the fact as Mr. Beldock just 16:48:32
23    characterized it.                          16:48:35
24        A.    I didn't have any personal       16:48:36
25    knowledge of what happened on the 19th     16:48:39
```

NYCLD_039129

P-APP002750

Linda Fairstein

Page 262

| | | |
|---|---|---|
| 1 | before -- on the 19th, no. | 16:48:41 |
| 2 | Q.    Nobody gave you any information | 16:48:45 |
| 3 | about what happened on the 19th? | 16:48:48 |
| 4 | MS. DAITZ:  Objection to form. | 16:48:49 |
| 5 | You can answer. | 16:48:50 |
| 6 | A.    The information that was being | 16:48:51 |
| 7 | given was being given to Ms. Lederer who | 16:48:52 |
| 8 | was the prosecutor in charge of the | 16:48:55 |
| 9 | investigation. | 16:48:57 |
| 10 | Q.    You didn't get that information | 16:48:58 |
| 11 | as well? | 16:48:59 |
| 12 | A.    I got some of the information. | 16:48:59 |
| 13 | She was doing her job.  It wasn't as | 16:49:02 |
| 14 | though she was coming to me to tell me | 16:49:05 |
| 15 | everything. | 16:49:08 |
| 16 | Q.    So did you learn anything about | 16:49:08 |
| 17 | what happened on the 19th? | 16:49:11 |
| 18 | A.    Anything about what happened on | 16:49:12 |
| 19 | the 19th, yes, I previously answered. | 16:49:13 |
| 20 | Q.    I'm talking about questioning of | 16:49:15 |
| 21 | any of the young men. | 16:49:22 |
| 22 | A.    I don't recall now being told | 16:49:24 |
| 23 | any specifics. | 16:49:27 |
| 24 | Q.    Okay.  Back on the 20th at the | 16:49:29 |
| 25 | 20th Precinct, what were you doing for | 16:49:39 |

NYCLD_039130

P-APP002751

Linda Fairstein

Page 263

| | | |
|---|---|---|
| 1 | three and a half hours that you were | 16:49:49 |
| 2 | there? | 16:49:51 |
| 3 | A. I was trying to facilitate what | 16:49:51 |
| 4 | Ms. Lederer needed to do. So I spent a | 16:49:59 |
| 5 | lot of time on the phone. | 16:50:03 |
| 6 | Q. When I said three and a half | 16:50:04 |
| 7 | hours, I think it's probably more like | 16:50:06 |
| 8 | four hours, right, 8:30 to 12:30? | 16:50:09 |
| 9 | A. 8:30 to 11:30, it was three | 16:50:12 |
| 10 | hours because, as you know, at 11:30 I | 16:50:16 |
| 11 | became involved with another issue. | 16:50:19 |
| 12 | Q. You're giving us to understand, | 16:50:21 |
| 13 | and you'll correct me if I'm wrong, that | 16:50:27 |
| 14 | you had no supervisory involvement in Ms. | 16:50:30 |
| 15 | Lederer's work at the 20th Precinct; is | 16:50:34 |
| 16 | that correct? | 16:50:38 |
| 17 | MS. DAITZ: Objection to form. | 16:50:38 |
| 18 | A. Those are not my words. That's | 16:50:39 |
| 19 | not the impression I'm trying to create. | 16:50:44 |
| 20 | Q. Were you supervising the | 16:50:47 |
| 21 | investigation? | 16:50:49 |
| 22 | A. No, I was not doing that. | 16:50:50 |
| 23 | Q. Were you the senior District | 16:50:52 |
| 24 | Attorney there? | 16:50:54 |
| 25 | A. I was the Senior Assistant | 16:50:54 |

NYCLD_039131

P-APP002752

Linda Fairstein

Page 264

| | | |
|---|---|---|
| 1 | District Attorney there for, as I've | 16:50:58 |
| 2 | testified at the trial, administrative | 16:51:02 |
| 3 | purposes.  I was not there -- I assigned | 16:51:05 |
| 4 | Ms. Lederer because she did not need at | 16:51:07 |
| 5 | the precinct a legal supervisor. | 16:51:10 |
| 6 | Q.   Were you participating in the | 16:51:13 |
| 7 | investigation? | 16:51:15 |
| 8 | A.   As of 11:30 that night, I was | 16:51:18 |
| 9 | not participating in any part. | 16:51:22 |
| 10 | Q.   As of 8:30 that night? | 16:51:24 |
| 11 | A.   I'm sorry, from 8:30 to 11:30, | 16:51:26 |
| 12 | no.  I set Ms. Lederer up.  I began to | 16:51:30 |
| 13 | make phone calls to expedite her work. | 16:51:33 |
| 14 | Q.   The phone calls were to | 16:51:36 |
| 15 | Morgenthau? | 16:51:38 |
| 16 | A.   Several to Morgenthau, several | 16:51:39 |
| 17 | to and from John Hogan, her Bureau Chief. | 16:51:41 |
| 18 | I spent time on the phone with one of the | 16:51:46 |
| 19 | neurosurgeons at Metropolitan Hospital.  I | 16:51:50 |
| 20 | spent a lot of time on the telephone with | 16:51:54 |
| 21 | one of Ms. Meili's brothers. | 16:51:59 |
| 22 | Q.   Go on. | 16:52:04 |
| 23 | A.   I spent time on the phone with | 16:52:11 |
| 24 | the desk at the 24th Precinct inquiring | 16:52:15 |
| 25 | about the designated youth room there and | 16:52:18 |

NYCLD_039132

P-APP002753

Linda Fairstein

Page 265

| | | |
|---|---|---|
| 1 | whether we could clear -- whether they | 16:52:20 |
| 2 | could clear for Ms. Lederer and Mr. | 16:52:23 |
| 3 | Clements the youth room, and could handle | 16:52:26 |
| 4 | the operation if we moved it to their | 16:52:30 |
| 5 | precinct. | 16:52:35 |
| 6 | Q.    Anyone else you were talking to? | 16:52:35 |
| 7 | A.    Possibly, but I don't recall. | 16:52:38 |
| 8 | Q.    Let me show you an exhibit | 16:52:40 |
| 9 | that's been premarked as 5. | 16:52:45 |
| 10 | MS. DAITZ:  Thank you. | 16:53:00 |
| 11 | Q.    Do you recognize -- | 16:53:05 |
| 12 | A.    Just a minute. | 16:53:07 |
| 13 | MS. DAITZ:  Fairstein Exhibit 5 | 16:53:11 |
| 14 | is a one-page document, NYC025732. | 16:53:14 |
| 15 | Q.    This -- | 16:53:25 |
| 16 | A.    Just a minute.  I'm having | 16:53:26 |
| 17 | trouble with the handwriting.  Just let me | 16:53:29 |
| 18 | read it and I'll answer your questions, | 16:53:31 |
| 19 | please.  Okay, yes. | 16:53:33 |
| 20 | Q.    This -- | 16:53:48 |
| 21 | MR. BELDOCK:  Withdrawn. | 16:53:50 |
| 22 | Q.    You said you spent some time | 16:53:51 |
| 23 | talking to a doctor, right? | 16:53:52 |
| 24 | A.    Yes. | 16:53:54 |
| 25 | Q.    This document is not the doctor | 16:53:55 |

NYCLD_039133

P-APP002754

Adams-Ppl-direct (Clements)                    2258

1

2        A    Yes, sir.

3        Q    Now, I'd like to direct your attention to Q-16, the

4   cutting from the sock.  Did you have an opportunity to

5   perform the test you described earlier on that cutting of

6   semen stain from the sock?

7        A    Yes, sir.

8        Q    And what were the results of that test?

9        A    The results of the test from the semen stain on the

10  sock showed that the profile, DNA profile from that semen

11  stain did not match any individual in which I compared that

12  semen stain to.

13       Q    With respect to the semen stain on the sock, did

14  you run the same four tests on the, that semen stain, Q-16

15  that you ran on the cervical swab?

16            MR.  RIVERA:  Objection.

17       Q    Q-11?

18       A    No.

19            THE COURT:  No, I'll allow it.

20       A    I only needed to run the first two tests on the

21  semen stain of the sock in order to be able to exclude all

22  the individuals.

23       Q    Were you able to compare it all, the faint profile

24  found in the second test on Q-11 with the profiles you

25  obtained in the two tests you ran on Q-16?

B.  C.  Davis

NYCLD_020968

P-APP002755

Adams-Ppl-direct (Clements)                              2259

A    I was only able to compare the one result obtained

to Q-11 cervical swab, that very faint profile with the

profile of the second test on the sock.  And those two

profiles did appear to match.

MR.  JOSEPH:  May we approach for one moment?

THE COURT:  Yes.

(Conference held at the bench, off the

record.)

(Transcript continued on the next page.)

H. C. Davis

NYCLD_020969

P-APP002756

Page 81

```
 1        Q.    At some point Nancy Ryan         11:34:14
 2   succeeded John Fried as chief of the Trial   11:34:17
 3   Division; is that right?                     11:34:21
 4        A.    Yes.                              11:34:21
 5        Q.    Do you remember what year it      11:34:21
 6   was?                                         11:34:23
 7        A.    It was around that time, but I    11:34:23
 8   can't remember better than that.             11:34:26
 9        Q.    And prior to April of '89, had    11:34:28
10   you had occasion to work with Linda          11:34:34
11   Fairstein, I think you testified to that,    11:34:36
12   right?                                       11:34:38
13             MS. DOLLIN:  Objection.            11:34:39
14        A.    Yes.                              11:34:39
15             (Mr. Wareham entered the room.)    11:34:45
16             MS. DOLLIN:  Just for the          11:34:49
17   record, Mr. Wareham has just walked in.      11:34:50
18        Q.    How would you describe Ms.        11:34:56
19   Fairstein as a District Attorney?            11:34:58
20             MS. DOLLIN:  Objection.            11:34:59
21        A.    I thought that she had            11:35:00
22   integrity, I thought she was responsible.    11:35:11
23   This was in large measure by reputation      11:35:17
24   because I wasn't personally particularly     11:35:21
25   close to her.  But she had a reputation as   11:35:26
```

NYCLD_035940

P-APP002757

Page 82

1    being a really good prosecutor.              11:35:29

2         Q.    A good prosecutor, is that what    11:35:44

3    you said?                                     11:35:47

4         A.    Yes.                               11:35:47

5         Q.    Okay.  Did she have a reputation   11:35:48

6    of being a strong-willed prosecutor?          11:35:51

7              MS. DOLLIN:  Objection.             11:35:53

8         A.    What do you mean strong willed?    11:35:54

9         Q.    Assertive in her positions as a    11:35:56

10   prosecutor.                                   11:35:58

11             MS. DOLLIN:  Objection.             11:36:00

12        A.    In my experience, she was always   11:36:01

13   willing to hear another opinion.  So I        11:36:03

14   wouldn't characterize her that way.           11:36:06

15        Q.    Would you use the term             11:36:07

16   aggressive to characterize her as a           11:36:11

17   prosecutor?                                   11:36:12

18             MS. DOLLIN:  Objection.             11:36:13

19        A.    You know, I would say she was      11:36:14

20   aggressive within the bounds of the law.      11:36:18

21        Q.    Prior to April of '89, had you     11:36:20

22   had occasion to work with Nancy Ryan?         11:36:23

23        A.    No.  I'm sorry, no, I don't        11:36:25

24   remember having any cases that required my    11:36:35

25   meeting with her.  I may have, but it was     11:36:37

NYCLD_035941

P-APP002758

**From:** Linda Fairstein < ███████████████ >
**Subject: Re: Fm: Jane Rosenthal**
**Date:** June 7, 2016 at 4:27:30 PM EDT
**To:** enaj < ██████████████████ >
**Cc:** Elizabeth Lederer < ████████████████████ >, "DuVernay, Ava" < ██████████████ >, Berry Welsh
< ████████████████ >

Hello, Jane -
You say you would like to hear our 'perspective.'
I'd like to make something clear - there are literally facts (in the form
of sworn testimony, official reports and records, medical evidence just
to name a few of the many forms the facts take) and evidence in this
matter - from 1989, from 2002, and from the sworn depositions from 2003-2013).
I don't expect you to go forward on a 'perspective' - I expect you to
use facts and evidence.  Have you made any progress in researching
any of those things?
thank you,
Linda Fairstein


On Jun 2, 2016, at 3:19 PM, enaj < ████████████████ > wrote:

Dear Linda and Elizabeth,
Just following up to schedule an in-person meeting to further discuss the project. We
would appreciate the opportunity to hear your persepective.
Best,
Jane

**From:** Jane Rosenthal < ██████████████████ >
**Date:** Wednesday, May 18, 2016 at 10:51 PM
**To:** Elizabeth Lederer < ████████████████ >, LAF < ██████████████ >
**Cc:** Ava DuVernay < ██████████████ >, Berry Welsh < ██████████████████████ >, Nellie Norden
< ████████████████ >
**Subject: Fm: Jane Rosenthal**


Dear Linda and Elizabeth,
Apologies for taking some time to respond. We are all in different time zones and
working on a few projects at once. Your story is important to us and we look forward to
meeting and talking to  you in person or by phone.
We are in early days of researching this movie... and fact finding is of utmost importance
which is why we reached out to you. Ava will be in NYC from 5/25-5/27 if Elizabeth is
available to meet in person. Linda, we can set a conference call when you are available.
Below the answers to you questions.

Best,
Jane

Look forward to hearing back from you both. Responses to your questions in RED.

1) What stage is this project in?
We're in early stages of development. Research to go and write the script.
2) is it titled?  working title?
Untitled Ava DuVernay project for now.
3) One of your earlier emails suggests that Ava has already met with some of all of the "5".  Is that so?  which ones?
She's made contact with each of the 5 men. We are trying to meet everyone central to the story for points of view.
4) have you/ has she met with their lawyers, too?
We have not met with their lawyers about the case.
5) as I mentioned last week, we were not allowed to speak when Sarah Burns wrote her book (full of inaccuracies - factual inaccuracies, which I can point out to anyone) and when Ken Burns made his movie (Same on inaccuracies
and on libelous remarks about us - which we can also prove)….so from what source is Ava getting her facts?
We are currently researching the story to ascertain facts and background information upon which the script will be drafted. We are meeting and interviewing people central to the case from all sides, pulling public court records, and sorting through all available media coverage on the case as we do on any project based on events.
6) has she viewed the 1989 video statements?
No, we are compiling all research materials at this time. We are in the early stages and wanted to reach out before our process got too far long.
7) has she seen the hundreds of pages of police reports?
Not sure - but this is something we'd like to further discuss.
8) At least six other people were attacked in CP that night - in the same time frame and by the same group of
assailants - they were left out of the Burns movie as though they did not exist and were not seriously assaulted.
Are you addressing that central part of the case?
We're developing the story - we'd like to hear more about this from you.
9) are you talking to other police and prosecutors?  if so, which ones
We aren't in contact with anyone from NYPD side yet, we would like to hear who you think is most relevant for us to meet.
10) Approx 40 young men went into the park that night (we have that on video and police actually found and
interviewed almost all of them - and several witnessed the attack on Miele and admitted that) - are you
working with any of them?  do you know how they described the attacks?
Would like to further discuss this with you.

P-APP002760

11) you understand that for 12 years, the Corp Counsel of the city - Michael Cardozo - refused to settle the case
and preferred to take it to trial because he believed in the integrity of the original investigation and the facts
that support the involvement of these 5 in the rape of Miele.  When Zach Carter settled, he made a clear
statement - as did Cyrus Vance - that there was no wrongdoing on the part of police or prosecutors.
Would like to further discuss this with you.
12) have any of the parties been paid/signed a contract to be paid for contributing their part of the 'story.'
We have obtained exclusive life rights for the young men. This is a landmark case, and we understand there are many facets and points of view. We are interested in meeting with you all to further discuss and hear directly from you as well.
I would appreciate it if you give us short answers (where you can) to all of the above  - they will help us
make important decisions.

I repeat what I said last week - some people took our silence during/after Burns as the fact that we were meek
and wouldn't respond - or that we had given up our principles and our facts.  We were silent *only* because
the judge demanded that of us (we complied, the 5 chose not to) and because we believed in Cardozo and
our superb team of lawyers and believed we would have our day in court.  We will tell the story - with all
the facts and evidence that the 5 and Burns choose not to use - we just need to decide where and how.
thank you.
Linda
Jane Rosenthal
Tribeca



HAVE A NEWS TIP?

NEWSLETTERS

U.S. EDITION ▼

SUBSCRIBE

LOGIN

LOGIN

Introducing Variety VIP+

Subscribe |

Login

FILM

TV

WHAT TO WATCH

HOME

TV

NEWS

Jun 9, 2019 2:32pm PT

# Central Park Five Prosecutor Wouldn't Consult on Netflix Show if Producers Spoke to Accused Men

By Matt Donnelly

120



Linda Fairstein, the newly-embattled prosecutor in the Central Park Five case, declined to participate in the Netflix series "When They See Us" because the production consulted with the five young men wrongfully convicted, one of the filmmakers says.

Jane Rosenthal, a producer on the well-received Ava DuVernay project about the infamous 1989 rape of a Manhattan female jogger, said their team exchanged many emails with Fairstein about offering her perspective. Rosenthal said Fairstein was under a gag order following an explosive 2012 documentary from filmmaker Ken Burns, but "perhaps she wanted to talk to us because she had other offers, and she was also concerned that we were talking to the five men."

Speaking at a panel about the show on Sunday at the Produced By conference in Burbank, Calif., Rosenthal said plainly: "Her point of view was clearly that she didn't want us talking to the five men if we were talking to her."

The assertion surprised the audience and even DuVernay.

ADVERTISEMENT

"Are we saying that, Jane? I guess we are. That's the tea that just got spilled," director DuVernay said.

Fairstein, portrayed by Felicity Huffman in the four-part series, has suffered backlash since the show debuted on the streaming platform. On Friday, publishing house Dutton dropped Fairstein as an author after releasing more than 20 best-selling crime novels from the attorney since the mid-90s. Their decision coincided with a petition signed by over 125,000 people demanding they cease the working relationship. Similarly, Glamour magazine published an op-ed expressing regret over bestowing

P-APP002763

Fairstein with one of the magazine's Woman of the Year prizes in 1993.

DuVernay's point of entry to the project was the men themselves, she said earlier in the conversation. She pursued the life rights of the then-teenagers implicated — Raymond Santana, Kevin Richardson, Antron McCray, Yusef Salaam and Kharey Wise — in step with Participant Media scripted head Jonathan King.

Fairstein did not respond to a request for comment.

The director and the exonerated men recently sat for an interview with Oprah Winfrey, to be aired on Netflix.

`120 COMMENTS`

Want to read more articles like this one?

**S U B S C R I B E   T O D A Y**

# Sponsored Stories



**Pure Nostalgia: Shows That Defined Our Childhoods**
INVESTING.COM

**Here's Why Adam Driver Doesn't Talk About His Service**
INVESTING.COM

**14 Movies That Totally Shattered Celebrity Marriages**
RANKER

**Canceled TV Shows Announced: The Full List**
INVESTING.COM - ZA

**These Characters Ruined Great TV Shows**
INVESTING.COM

Powered by Outbrain |

# MORE FROM VARIETY



**Captain America and Ant-Man Assemble: Chris Evans and Paul Rudd on What You Didn't See From the Marvel Movies**

Sandra Oh Reveals Why She Fought With 'Grey's Anatomy' Writers and Shonda Rhimes

**Sandra Oh Reveals Why She Fought With 'Grey's Anatomy' Writers and Shonda Rhimes**

What Tom Cruise Taught Henry Cavill About Doing His Own Stunts

**What Tom Cruise Taught Henry Cavill About Doing His Own Stunts**

Sandra Oh and Kerry Washington on What They Learned From Shonda Rhimes

**Sandra Oh and Kerry Washington on What They Learned From Shonda Rhimes**

Okayplayer CEO Abiola Oke Resigns Amid Allegations of Inappropriate Behavior

**Okayplayer CEO Abiola Oke Resigns Amid Allegations of Inappropriate Behavior**

Conan Doyle Estate Sues Netflix Over 'Enola Holmes' Film Starring Millie Bobby Brown

**Conan Doyle Estate Sues Netflix Over 'Enola Holmes' Film Starring Millie Bobby Brown**

**Terry Mason**                                                    June 22, 2019 at 1:22 pm

Linda, I used to be proud of what you stood for. Now I am just ashamed. I will never read your books again. I will trash the ones I have. And you are a racist bigot who did whatever you had to do to keep Trump happy and you in power…..all at the expense of children. Why? They were black and happened to be in the park and happened to be the ones the cops could catch. Linda, that is not just not okay, it is flipping evil. You can NEVER EVER make up for what you did no matter how much you did or do right…you knew better and you did the worst you could. Shame will always be your name.

**THEFACTS**                                                      June 22, 2019 at 3:02 pm

It's amazing how a Hollywood production, plus your hatred of Trump, caused you to turn on Fairstein.

To keep Trump in power? Maybe, I was asleep, and missed Governor Trump or Mayor Trump, back during the 1990s. Could have sworn it was Dinkens (on his way out) and then, Giuliani.

You act as if Fairstein was covering for some white boys, who really committed this heinous deed.

But viola! It was a [boy] of COLOR, who eventually came forward.

Kind of trashes the "she had to find SOMEONE of color to PIN this thing on" meme.

**Chonetula**                                                    June 25, 2019 at 1:49 am

Hey since your name is "The Facts", can you tell us what the facts were for this case? Do you think it was fair for these kids to be convicted based on their unaccompanied testimony as minors and literally nothing else that connects them? Except their skin color, haha.. hmm. Trump Drumpf, he was just an opportunist in this like always, inserting himself where he didn't belong. That's beside the point, we know. But does this Hollywood production embellish the facts of the trial? It might tug on the heartstrings, and heighten the drama, but ya know, that's NOT fake news and I think it WAS pretty dramatic for them and the families. And it doesn't change the lack of evidence. Police motive? Relieve the pressure of a high profile case, and look good being tough on crime. Arrest and charge smarter not harder, in their eyes. Why waste time questioning anyone white? Even if the racism wasn't as vicious as depicted, why were these particular kids grabbed out of the hundred kids who were there? Police never explain it. I'll tell you why: they were nearby, young and the right color, so they were easy scapegoats. There, I fixed it for YOU! I fixed it because no one claims it was a white guy and a cover up. They just want to tell the story of these kids' lives getting ruined for no good reason and the careless and callousness that had to happen for it.

**Raquel**                                                      June 16, 2019 at 9:43 pm

Fairstein is a monster. Watching this movie was heartbreaking. Fairstein robbed these children of their youth and their families of years of pain and anguish to only be excused from a few organizations. I wonder how she sleeps at night or even looks in the mirror. I guess she forgot those boys would be strong men one day!

**Carolyn**                                                     June 11, 2019 at 12:44 pm

Wow; the hate is real. Almost funny. There were a number of young people in the park that night, not just black and latino. However, as with a lot of stereotyping, the blame the black kids. I still bad kids all the time, black and white. A woman was brutally raped that night and 5 young black boy were accused. There was a need to find someone to charge for thsi crime. Were they angels, no; are you children angels. I guess everyone on this thread has perfect children. The real crime is incarcerating them for a crime they did not commit. If you say they robbed and hurt other people in the part that night and had arrested them for that; fine. However, the need to arrest someone, anyone led to them convicting these young boys. FBI statistics, and you can look it up:

Of the nearly 3.7 million violent victimizations committed against white victims during 2012-15, a total of 57% were committed by white offenders, 15% by black offenders, and 11% by Hispanic offenders. Similarly, the majority of the 850,720 violent victimizations committed against black victims involved black offenders (63%), followed by white (11%) and Hispanic (7%) offenders. Forty percent of violent victimizations committed against Hispanic victims were committed by Hispanic offenders, while white and black offenders each committed 20% of victimizations against Hispanic victims.

**Jean**                                              June 17, 2019 at 3:14 am

Their DNA was nowhere near her. What are you talking about? So you will just ignore the FACT that DNA says they did not RAPE HER? The confession? You are part of the problem. Cognitive dissonance on full display here.

> **THEFACTS**                                      June 17, 2019 at 7:44 am
>
> "YES" or "NO", did they confess?

**THEFACTS**                                          June 12, 2019 at 9:25 pm

Are you suggesting, since there were a number of kids in the park, not just black and brown, that there was a grand conspiracy, to hide that it was *white* kids that did this?

Tell you what. Let's stretch the definition of *white*, since after all, Matias Reyes is fair-skinned.

See, you WIN. Linda Fairstein WAS covering for a WHITE person, committing this crime.

**THEFACTS**                                          June 11, 2019 at 9:01 am

I see the "racists" here, are starting to send in some heat.

**Jannie sue rogers**                                 June 10, 2019 at 6:25 pm

She was wrong and plainly was only looking to boost her career. Anyone that had anything to do will the false accusations of those boys should be punished I am so thankful that we all will have to answer for our wrong doings at some point in this life. If these people could sleep knowing they did that to those children then they have no compassion for man kind. It was horrific what happened to the lady jogger but it was just as horrific what happened to those boys. I fear for my son daily that something' awful will happen to him just because he is black I feel if the case had been investigated properly had they actually tried to find the person that matched the dna all of this pain and unnecessary hurt would not be upon all of us but as it often does the system failed those young black men luckily or sadly to say the person that committed this crime admitted it sad just sad God bless all of us

**dudleysharp**                                       June 11, 2019 at 7:22 am

Jannie:

Being plainly wrong is not a boost to anyone's career as I suspect we all know.

**THEFACTS**                                                    June 11, 2019 at 7:48 am

Until recently, I was critical of Linda Fairstein, but after observing this "inquisitions", and digesting more of the facts, I'm lead to believe she was NOT seeking to seek, search and destroy black and brown males, but used the tools and evidence set before her, to try her case.

We may question her competence and professionalism, but to cast these crazy conspiracy theories, is just plain wrong.

**Tracy Johnson**                                               June 21, 2019 at 10:13 pm

She used victims and defendants as characters for her novels. They only thing she cared about was winning and building her career by any means necessary. Please read this article when you get a moment. She is a horrible liar and was a rotten DA. https://www.thedailybeast.com/linda-fairstein-under-fire-after-when-they-see-us-apologizes-but-not-for-the-central-park-5-case

**THEFACTS**                                                    June 22, 2019 at 12:33 am

So what?

She has every right to fictionalize, for profit, accounts of her own career.

As she hadn't been an author, before the Central Park 5 case, it CASNOT be said, profit was her motive, then

You all sound crazy, in your pretense of caring about the plight of black boys, but your overkill, exposes you.

The ironic thing about this, is that a HOLLYWOOD production, NOT Burns' documentary. is what motivated this "concern".

**KG**                                                          June 10, 2019 at 7:19 pm

She's a f'ing MONSTER

**THEFACTS**                                                    June 10, 2019 at 5:04 pm

I guess my question is this.

Who the HELL are the "us" supposed to represent, in "When They See Us"?

**Lisa**                                                                    June 10, 2019 at 4:46 pm

I remember when this happened . I looked over at my husband and made two comments: one, I was very happy that the criminals were caught. Two, of course they were guilty. Why would anyone admit to a crime that they didn't commit? I am disgusted with myself for being so narrow minded and ignorant. I allowed the media to think for me instead of my thinking for myself. I am sickened by the realization that being a white woman I am born with an air of privilege over a person with color. I have raised three children who are now adults. I am quite sure that they will question the inequalities which plague people of color. I was raised in a racist household. I was taught to fear people who did not resemble me. My children and the children of the world will stop this divisive talk between the ethnic groups .

**LADRIENNE d WOOD**                                                         June 27, 2019 at 10:48 am

The "US" are the 5 young black and brown men. If you actually watch the series you would understand.

**Smith**                                                                    June 11, 2019 at 2:40 am

The "us" refers to black and brown people.

**FrankieB**                                                                 June 11, 2019 at 12:59 pm

You sound like a pretty stupid person, Lisa…you couldn't separate fact from fiction in 1990 and you still can't.

**Dave Jordon**                                                              June 10, 2019 at 3:59 pm

"Linda Fairstein, the newly-embattled prosecutor in the Central Park Five case, declined to participate in the Netflix series "When They See Us" because the production consulted with the five young men wrongfully convicted, one of the filmmakers says"

Linda Fairstein sounds like the blond headed equivalent of Trump in which the only opinion that maters is "hers" and hers alone where there is absolutely no middle ground. It is people like her which is why there is no faith in the judicial system.

**Sara Lopez**                                                              June 10, 2019 at 2:09 pm

Someday these people will meet there maker and Justice will be served.

**Carolyn**                                                                 June 10, 2019 at 12:33 pm

Sad is she does not feel at all remorseful about what she did. I'm not saying they did not do "wilding" in the park that night,

but they did not rape the jogger, which is what we are talking about.

---

**DJ**                                                                          June 11, 2019 at 10:26 am

We now know that those 5 boys weren't even present at the scene of the crime. They were elsewhere in Central Park, which is huge in size. This is a fact! It's sad that you're replying to each post with your racist slants.
People like you are a stain on society!

---

**dudleysharp**                                                                 June 11, 2019 at 4:36 pm

The police commission report:

— The police panel's review disputed the prosecutors' separate report that a reconstruction of events suggested that the youths could not have raped the jogger because they were elsewhere assaulting, robbing and harassing joggers, bikers and others on a night of mayhem in the park. Their criminal activity is not in dispute and the police find no timing conflict with their participation in the assault on the jogger.

---

**Carolyn**                                                                     June 10, 2019 at 12:30 pm

Racist pig. Just want to know why she has not been prosecuted for her crimes. I guess it's called privilege.

---

**Judge Alan**                                                                  June 10, 2019 at 10:32 am

Fairstein is a racist Jewish woman who had exculpatory evidence- the SEMEN/DNA that did not link any of the 5 boys to the crime-
Nor did police find any physical evidence placing them at THE SPECIFIC SCENE OF THE CRIME…..
FAIRSTEIN in an act of criminal judicial malice did NOT DISCLOSE the exculpatory evidence/DNA-SEMEN to the defense attorney's.
The coerced confessions ALL had conflicting story lines and were at odds with ALL 5 BOYS them being fed DETAILS by police interrogators which corrupted the process.
None of the 5 coerced FALSE CONFLICTING confessions are admissible.
True the 5 boys were part of a larger group that ran wild that day in the park beating people up mugging a few…..
However CENTRAL PARK IS LARGE- very very large a BIG AREA….bigger than several football stadiums COMBINED. Any given day there are many crimes happening in central park.
Yes the boys were engaged in general hooliganism – BUT they were not participants in THIS particular crime just as they were not participants in MANY crimes that happened in that VERY LARGE general area that day.
The police, the prosecutor this racist Jewish woman FAIRSTEIN all engaged in judicial and police misconduct with criminal malice in a coordinated conspiracy to LYNCH PUBLICALLY the 5 boys in a fit of RACIALLY DRIVEN MOB VENGENCE with DONALD TRUMP leading the pack calling for their heads via the death penalty by placement of full page adds in NYC newspapers.
IMMUNITY should be REMOVED from police and prosecutors who act with CRIMINAL MALICE as is shown to have happened in THIS CASE.

Btw

The BIG DANS POOL ROOM rape case depicted by Jodi Foster in the movie THE ACCUSED.

Set legal precedent to IMPRISON Donald Trump for exhorting Mob violence by his acts of placing newspaper adds – so too are the NYC newspapers who PLACED the adds ….their managers editors etc who signed off on the adds.

All that for 5 BLACK BOYS ???

Yes In 1 simple word YES.

Either the USA is a nation of LAW or it's a nation of mob hysteria……one or the other.

And by the election of Racist hysteric Trump we all know what the USA and that Racist Jewish woman FAIRSTEIN ARE – criminally corrupt ugly racists.

---

**marilyn webb**                                        June 10, 2019 at 6:35 am

The only words Linda should utter are directly to each of the 5 men whose tough lives she destroyed and they are 'im sorry; I want the world to know I made a mistake. I will do whatever you all believe is necessary to earn your forgiveness.'

---

**dudleysharp**                                         June 11, 2019 at 7:47 am

Marilyn

The article states that she is subject to a gag order, which would make it illegal for her to speak.

Seems very odd, But . . .

---

**Lujain Al-Iman**                                      June 10, 2019 at 6:24 am

That is not enough! She, and everybody else involved in any wrong doing on that case need to be investigated, and put on trial. They broke the law, yet where is justice? There should also be a civil case against them personally, and they must pay, in every possible way.

---

**Michelle**                                            June 10, 2019 at 5:48 am

Thats crazy she didn't want to talj because they were talking that shows she has some guilt!!!

---

**Tracey**                                              June 10, 2019 at 4:40 am

It's sad that Fairstein can't own her part in their wrongful prosecution, even today. Back then, the law could do things to black men and be believed then came the invention of phone cameras. They've been doing this for so long they can't stop even while on camera. Their DNA was never found on her, anywhere but Fairstein today still wants to connect them to such an awful tragedy. That's another reason why she should be cancelled. Own your $h't…even 20+ years later.

---

**Dave Wilson**                                                    June 9, 2019 at 9:07 pm

I think that it is truly disgusting that Linda Fairstein is able to live her life without consequence. I applaud her publishing company for dropping her as an author. Her, the police, and the guards at the prison, should all be punished for the abuse that the exonerated 5 endured! This is a brutal miscarriage of justice that the very people appointed to protect us, are the very ones we should be most afraid of.

**EJSJR**                                                          June 9, 2019 at 8:29 pm

What kind of a nut is Fairstein? She didn't want them talking to the men (boys at the time) she and her police thugs intimidated, coerced, violated, wrongly accused and convicted for a crime with which they had nothing to do? I think the lawsuits are all over, but Fairstein should have lost every nickel she ever made on her cheap murder mysteries.

**Adrianne Garcia**                                                June 10, 2019 at 8:38 am

Its a tragedy! My stomach turned with grief for the boys…Now Men. Just a deep, deep sadness fills me. They deserve everything they received monetarily!!! Im surprised Fairs. sleeps at night as well as the investigators which is equally if not more responsible!! Where is the Justice ����������������������������

**Dave DeLuca**                                                    June 9, 2019 at 9:38 pm

"Unfairstein" is more like it.

**Could_be_wrong_but**                                             June 9, 2019 at 7:56 pm

CAUCSIAN PEOPLE PLEASE READ! You are the "they" in title of "When THEY see us" because All you see is criminals, thugs and misfits and not kids/children, or humans worth giving the benefit of doubt that you would give to kids who looked like you. Hence the PROBLEM. No DNA doesn't mean they WEREN'T there. By that train of thought no one can ever be innocent in any crime they are accused of. My question is besides the obvious that if they looked like you, but what would it take to even consider that they are innocent and that they were railroaded into confessions and convictions?? BTW i know not ALL WHITE people believe they did it and are racist, the same way we need you to know that not ALL Black's are criminals.

**dudleysharp**                                                    June 11, 2019 at 9:12 am

I doubt anyone thinks that.

We all know that blacks and Hispanics have a disprotionately high per capita violent crime rate.

That's not racist. Its reality.

As Jesse Jackson Jr. noted:

"There is nothing more painful to me at this stage in my life than to walk down the street and hear footsteps… then turn around and see somebody white and feel relieved."

---

**Rebekah Madsen**                                      June 10, 2019 at 4:18 pm

As an educator for young POC, I vow to teach my kids their rights. I vow to teach them about the vulgar past their ancestors, great grandparents, parents have gone through. I vow to listen and report wrong doings. I vow to report racist teachers, administrators, police, etc. Us white people need to stop. Stop lying to ourselves and each other that systematic oppression isn't real. It's real, I see it every day. We need to stop acting like having different color skin means we should view people differently. Stop holding POC responsible for OUR acts. Progress isn't happening because of US and how WE treat them.

---

**Carolyn**                                      June 11, 2019 at 6:33 am

I don't know where you get your numbers, check the FBI statistics.
https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21

---

**CC**                                      June 11, 2019 at 9:26 am

I thought he was all about THE FACTS!

---

**Marilyn webb**                                      June 10, 2019 at 8:33 am

You are absolutely right! The police & prisons systems are unable to "police" themselves. Today they would simply shoot these. Kids/ men. I grew up through the 60's then I believed in justice.-no any more.

---

**Marilyn**                                      June 10, 2019 at 8:38 am

loved "Unfairstein" !!!

---

**Brian**                                      June 9, 2019 at 5:49 pm

Never let the facts get in the way of a good story!

---

**Evan**                                      June 10, 2019 at 3:40 am

P-APP002778

All Caucasian people aren't racists and all Caucasian people don't see criminals when we see black people. You're just as bad as the racist whites you're trying to call out

---

**Tamika**                                        June 10, 2019 at 8:56 am

The fact that this is your response is problematic

---

**Anthony**                                       June 10, 2019 at 5:55 am

Evan you clearly did not read the entirety of could be wrongs reply:"BTW i know not ALL WHITE people believe they did it and are racist, the same way we need you to know that not ALL Black's are criminals." Outright conclusion jumping and denial like Evan just demonstrated is exactly what causes issues like these. People like this ARE the problem. You talk and dont listen.

---

**Eric Curtis**                                   June 10, 2019 at 12:12 pm

Antron McCray, Kenneth Richardson and Steve Lopez were robbing and assaulting people that night. I have no sympathy for them. Google Antron McCray video statement at the beginning he has a steady flow only when he get to the jogger rape it makes no sense. All that money should have gone to Yusef, Raymond and especially Korey wise!!!!

---

**DJ**                                            June 11, 2019 at 10:32 am

There's nothing factual that exists to support that any of these 5 boys were robbing or assaulting anyone! They were there in the park where those acts were being committed, but it's known they did not participate. Nothing you say will make that true. Sorry

---

**THEFACTS**                                      June 11, 2019 at 2:22 am

Interesting point.

---

**THEFACTS**                                      June 10, 2019 at 3:57 am

I just want to know what happened.

The FACTS.

---

**iamsmartymcfly**                                          June 9, 2019 at 5:22 pm

It's Korey Wise. Will you print the correction, please?

---

**SIKE01**                                                 June 9, 2019 at 6:21 pm

She has a speaking and literary career from railroading those 5 teenagers.they should sue her for Royalties.

---

**JT**                                                     June 10, 2019 at 12:25 am

Actually, at the time of his conviction, it was Kharey Wise. He changes his name to Korey after they were exonerated.

---

**JS**                                                     June 9, 2019 at 2:47 pm

FYI, I believe the Burns doc came out in 2012, not 2003.

---

**Jeff Harner**                                            June 9, 2019 at 3:13 pm

It says 2012.

---

**Liz**                                                    June 10, 2019 at 1:46 am

You understand that the group of individuals that brutally beat Reginald Denny are not these individuals right? Do you also know that a group of black heroes watching Reginald Denny being beaten on live TV raced to his aid and bravely rescued him, actually physically removing him from the situation and transporting him to the hospital as EMS had stopped serving that neighborhood? Not only are you stating that theses exonerated individuals committed the crime, you are stating that they must have done it because you saw another group of individuals who YOU believe look like them committed another violent crime. I'm assuming you're a white female, as a former social worker, I saw many white females heinously abuse their children, you Effie Brown, therefore must be a child abuser. See how that works…

---

**Jeff Harner**                                            June 10, 2019 at 1:57 am

Who the fuck are you taking to? All I said was 2012, if you have an issue with something that someone wrote, direct it to them not to me.

---

**Ulysses**                                                              June 9, 2019 at 5:26 pm

They continue to authenticate the narrative be of the documentary WHEN THEY SEE US they see us through their RACIST EYES! You can not possibly be innocent, a white woman was raped and any black perp will do. Doesn't mantter IF we got the wrong ones..pick a N***A!

---

**dudleysharp**                                                         June 11, 2019 at 9:47 am

Ulysses:

I have been around a large number of crime victim, as well as survivors of those who have been murdered, for about 25 years. Not once, never, have any of those folks brought up race or ethnicity as an issue, with regard to the perpetrator.

They are just devastated by the crime.

I think we all know, on a per capita basis, blacks and Hispanics commit a considerably higher rate of violent crimes, as I detailed.

Asians, another minority, commit so few crimes, per capita, that they are often, not even mentioned within many crime studies.

None of that makes anyone racist. It makes them knowledgeable.

Doesn't everybody know who the worst criminals in history are? Hitler, Stalin and Mao.

Sadly, there is a very tiny minority that may feel they way you describe, but it is tiny, at least from my experience.

---

**THEFACTS**                                                            June 11, 2019 at 9:36 pm

Again, it's quite possible, these biys were innocent of assaulting the JOGGER.

With all of the SJW liberalism, the possibility of another side, has been al.but drowned out. I have to give kudos to those here, who have posted articles that at the very least, dispel the notion of Linda Fairstein's complicity in some grandiose conspiracy to destroy [at random]black and brown men, especially, since a white woman was the victim.

I've noticed here, since that tike, a lsime, a lessened intensity on the part of those, willing to accuse ANYONE who questioned the "reaults" of NYC, it's decision to aware the [now] men, $42M and the silly movie, which may I remind, is NOT a documentary.

I'm the hardest on the liberal whites here, in their SJW pretense, who all[add themselves to be suckered into going overboard.

Of COURSE, I'm aware of the history of racism, false accusations of rape, by white woman against black men (e.g. Scottsboro Boys), but history should never be used as the end all, in every case.

Good work for those, reminding many, what we'd heard, at the time, also bringing to light, that a BLACK COP was prominent in this case.

**dudleysharp**                                                    June 11, 2019 at 4:44 pm

Dave:

As you may know, there are a number of articles that conflict with the innocence narrative. I posted them here but someone reported the comments or Variety removed them.

They're easy to d=find Took me about 5 minutes.

Then there is the police panel/commission, that produced their report in 2003, finding among many additonal issues, that

the police report found that the five men could have assaulted the jogger, either with Mr. Reyes or before or after him. It argued that the presence of Mr. Reyes's DNA only added him to the list of attackers, but did not ruled out the others.

---

**THEFACTS**                                                       June 11, 2019 at 3:58 pm

So now, the word of a black cop, who was part of the investigation, is no good, because you and other WHITE LIBERALS, project so?

Why am I THE ONLY ONE who takes Matias Reyes to task, for waiting so long, to come forward?

I BET if he was WHITE, you'd be roasting him for his "racism" for "allowing those boys to serve HIS time in jail".

---

**Dave Jordon**                                                    June 11, 2019 at 3:12 pm

@dudleysharp Wouldn't you want money also or to be compensated if you paid for a a crime you did not commit? DNA freed the central park 5, are you capable to understand that? That was the reason there was no retrial.

---

**Dave Jordon**                                                    June 11, 2019 at 3:09 pm

@FrankieB "The 5 thugs are GUILTY and Fairstein has nothing to apologize for."

You know nothing about DNA, don't you! If the central park 5 are guilty then "you" are guilty for being so f-cking stupid.

"they just wanted the money "

And are you implying that you yourself would not want to be compensated if you were wrongly prosecuted for a crime you did not commit then i am going to have to call you a liar.

"The lead cop on the case was BLACK "

And your point is what? You do not think there are black cops who are racist too? then you obviously have not been around long enough. Or is it your white privilege that is holding you back!

---

P-APP002782

**dudleysharp**                                                    June 11, 2019 at 1:59 pm

FRank:

Odd comment.

Of course they wanted the money.

But, couldn't NY have had a retrial and didn't? Yes.

---

**THEFACTS**                                                    June 11, 2019 at 10:48 am

It's not racist to challenge the black community directly, given the claims of victimhood, especially in light of this Central Park 5 discussion.

While I know it's impossible to track your child's every move, I get the sense the parents (largely, unwed, single mothers) were derelict in not keeping closer tabs on children.

Again, how is it, that children who lived NOWHERE NEAR Central Park, had time to go no there in the evening, during a school week?

They should've been doing their homework/studying or in bed, ready for the next SCHOOL DAY.

I stand behind my challenge.

---

**Carolyn Townsend**                                            June 11, 2019 at 10:16 am

Sound like a racist to me!!! This thread is horrible, just horrible. As with any social media, bringing out the worst in people, showing their true colors. Kids hang in central park, no matter what race, just get that straight. What happened to the jogger was horrible, but what happened to those boys was horrible also. We can all agree to disagree, but I am just tried of the level of racist comments being thrown around.

---

**dudleysharp**                                                 June 11, 2019 at 10:11 am

Anne:

First, the "presumption" of innocence is only at trial and only for the fact finders, be they judge or jury. It exists no where else.

Second, a new trial would, likely, have cost way less than $40 million, indicating the prosecutors and/or the city thought they would lose in a new trial.

Fairstein has no presumption of innocent nor guilt and the irrational mob will do what it always does, with the vast majority of people going on with their lives.

---

**Judge Alan**                                                      June 10, 2019 at 10:08 am

Legal case researcher here-

according to the process of the LAW,the police investigators had ZERO demonstrative evidence placing any of the 5 boys AT THE SCENE OF THE CRIME.

1 DNA or otherwise – SHOE PRINTS it's a PARK with soft ground, fingerprints, HAIRS, torn clothing, a cig butt-saliva, anything the police had NOTHING.

What the police did have in the midst of city wide media driven MOB HYSTERIA was coerced hype job confessions that had several conflicting story lines and details fed to the boys by the police detectives themselves.

The mere FACT THE DA did not DISCLOSE exculpatory evidence – the DNA/SEMAN recovered from the victim – that did NOT MATCH any of the 5, shows the prosecutors office was engaged in an ILLEGAL COVER UP and acted with JUDICIAL MALICE against the 5 boys for reasons of RACIAL VENGENCE.

To say the entire police/prosecutors office

actions were not racist is NAIVE.

The entire fiasco shows the police acted outside of their duty as LAW enforcement since THEY HAD THE DNA/SEMAN EVIDENCE which did not match any of the 5 boys.

Further the police had NO PHYSICAL LINK/EVIDENCE placing ANY of the 5 boys at the scene of the crime.

That horrid criminally corrupt PROSECUTOR FAIRSTEIN scapegoated the 5 BLACK BOYS the DA having a cultural and social habit of being at constant odds with black people denying them their humanity and civil rights.

end result the boys while they were engaged in hooliganism beating people up while wilding through the area that day – did not participate in a gang rape.

There is no POSSIBLE WAY/METHOD through the legal process to BRING them to trial.

All coerced confessions inadmissible the DNA/SEMAN now disclosed shows that none of the 5 are physically linked or can be placed at the scene of the crime.

NO JURY would find the 5 boys guilty of anything because the prosecutor wouldn't be able to present ANY EVIDENCE of the 5 boys being tied to the crime.

The ONLY FACT the prosecutor could present is that the 5 boys were part of a larger group that ran wild through the area that day engaging in petty crimes and mugging people.

The CENTRAL PARK IS LARGE very LARGE on any given day numerous crimes happen there….unless BIG MOUTH you have EVIDENCE you should shut your uniformed racist YAP.

And FUCK FAIRSTEIN that racist should be lked locked up along with all the cops that railroaded the 5 boys

Last word Alexander the Great was once pleaded to for mercy by a young Trumpeteer of a captured army that was sentenced to death…the boy said I only sound the horn of battle I did not fight.

The Great king replied those who cry for others to join the fight are just as guilty as those who fight…. and so to should that horrible ugly racist president face justice for his sounding the horns of racism and hysteria by placing full page adds in NYC newspapers.

The BIG DANS POOL ROOM rape case depicted by JODI FOSTER in the movie THE ACCUSED where not only the rapist was convicted but so too were those who shouted him on.

So there is LEGAL PRECEDENT to put Donald Trump on trial for engaging in exhorting others to engage in ILLEGAL EXTEA JUDICIAL POLICE AND PROSECUTORIAL MISCONDUCT/CRIMINAL ACTS.

His act of calling for the death penalty for the 5 boys threw hysteria on the fire of a mob mentality to GET the 5 boys.

The Prosecutors office with holding the exculpatory evidence of DNA/SEMAN says it all

And YOU ANNECLARE are an idiot.

---

**THEFACTS**                                                        June 10, 2019 at 1:55 am

Did the boys know each other before their arrest?

If not, that's makes a strong case of they're even being innocent of the original reason they were arrested, in the first place.

---

**DJ**

June 11, 2019 at 10:02 am

Riiiiiight!!! Because you're the only person who knows what REAL racism is! GTFOH! You're letting everyone know how unintelligent you are.

---

**THEFACTS**

June 11, 2019 at 9:59 am

Let me repeat:

I DAMN-DARE any BLACK PARENTS on this forum…

---

**THEFACTS**

June 11, 2019 at 8:20 am

If they really knew and understood them, they would NOT hold it against anyone who holds in the back of their minds, that just PERHAPS, in NYC, if there's a report of a rape assault, it is more likely to be by a black or brown male.

That said, its critically important that one hearing such a case, do so, in the most objective manner, possible.

---

**THEFACTS**

June 11, 2019 at 7:44 am

At the end of the day, neither you nor I, were witnesses to what happened.

The important takeaway, is NOT that Linda Fairstein, Harry Morgenthau, Ed Koch or David Dinkins were part of some grand conspiracy to search, seek out and destroy black and brown males, but at the least, they were victims of shoddy or incompetent work, and worse (below being guilty of assaulting the jogger), they were where they shouldn't have been in the first place.

I DAMN DARE black parents in this forum, to state that they would've TOLERATED THEIR SONS , HANGING OUT IN CENTRAL PARK AT NIGHT, on a school week.

---

**dudleysharp**

June 11, 2019 at 7:53 am

You MIGHT get more consideration had you stated

I DAMN DARE any parents on this forum, to state they would've TOLERATED THEIR SONS, HANGING OUT IN CENTRAL PARK, AT NIGHT, on a school week.

---

**dudleysharp**

June 11, 2019 at 7:17 am

P-APP002785

Facts:

I think most folks know the stats.

The most important thing, in the articles context, it to not rely on a production of a case, many of which are higly distorted, on purpose.

I know very little of the facts myself, so could not rely on anyhting within this production, which may be accurate and may not be.

I have no idea and I doubt many have seen all the original documentation and videos and trial transcripts.

Yet, it appears that many find this production to be factual, when they have no idea, like me.

---

**Richard Vermaas**                                                                 June 11, 2019 at 2:06 am

I am from Europe, and after seeing the series, I started checking availanbe facts. If I read your comment, I rad stuff coming from someone who mixes up very simple thoughts.The race, color, is of no sicnificancehere.Leaving 2 issues, the victim, a given fact, and boys wrongfully jailed. Instead of taking a close look at your own ridiculous justice system, you beat around the bush. I'm so happy to live in a country, where anyone can go in any park, 24 hours a day. Without any idiot later stating, what were you doing at that time in a park!

---

**THEFACTS**                                                                        June 10, 2019 at 5:51 pm

Baseless.

That's the convenient narrative you want to run with; she was just DYING to shaft black and brown boys. Now, IF there were hoards of white boys in the park, and possibly being the perpetrators, they were conveniently overlooked, THEN, you'd have a point. But you're NOT going to find that scenario, on THAT night.

I have to thank the person who provided the article, which shed light on why Linda Fairstein was within her duty, to prosecute as she did.

The article brought back to mind, some of things I remember reading and hearing about, NOT from some politically motivated Hollywood production.

Turns out, these boys, men by then, were serving the end of their sentences. They were their way OUT. With Reyes' confession, we was aptly convicted, and with all due respect, with no (by that time, a more exact science) DNA, linking the "5", they were considered to have been denied justice, thus, their monetary awards.

That woman was beaten with a damn PIPE, and these boys CONFESSED, in front of their parents.

PLEASE tell me where this "coercion" report came from?

---

**Sammi**                                                                           June 10, 2019 at 2:31 pm

Except she still maintains that they are guilty even WITH the dna evidence and confession. She didn't consider that these were children because they were black.

---

**Sammi Ley**                                                June 10, 2019 at 9:59 am

Dam yall need to chill man listen I did 5 years fir sum shit inaint even do but I couldnt afford a lawyer and they was trying to fuck me over so its either bvtake a plea deal or take my chances with a racist corrupt justice system and risk getting 20 years I cant get that time back I did get $120,000 after legal fees and shit was more like $70,000 but it helped my kids out I feel their pain and u guys stop being petty they are the enemy not white not black not my Latinos but that evil corrupt system those cops attorney's those prosecutors with 97% conviction rate them niggaz are the problem theyre killing america slowly but surely kill the conflict my brother's aint worth it.

---

**Jeff Harner**                                              June 10, 2019 at 4:02 am

Actually they are not, they are just too far over your head and you have no true facts to stand on, and like most privileged people want others to do the work for you. So grow up little one and take the silver spoon out of your mouth

---

**THEFACTS**                                                 June 10, 2019 at 6:49 am

The "racist" comments?

---

**THEFACTS**                                                 June 10, 2019 at 6:47 am

With your pompous attitude, you need not remind me or anyone, who you are.

Why the need to curse?

Have I cursed you?

---

**Jeff Harner**                                              June 10, 2019 at 4:23 am

Really so do "Your Facts" tell you that?!! How bout grow up little one. You know nothing about me, nor what I have seen or been through, and I for one can relate to what these young men went through far more then you ever will. So take that for data and go sit on your Facts you snot nosed punk!!

---

**Jeff Harner**                                              June 10, 2019 at 4:19 am

Typical, your arm must hurt from playing that race card. How many times do you need to point out that I'm white to make your privileged ass feel better?!? Thanks for coming back though because I finally found what that smell coming from the

bottom of my shoe was…YOU, you sorry POS

---

**THEFACTS**                                                      June 10, 2019 at 4:18 am

I do know one thing.

In all of your pontificating, you have YET to show ONE example of a "racist" comment.

Experience has taught me, the very white people who would make such claims, in their pretense of being "down", are the ones that black people have to watch out for, the most.

---

**THEFACTS**                                                      June 10, 2019 at 3:54 am

Your comments are baseless,completely without merit.

That's why you rant and curse, in your desperate attempt to be "down".

---

**THEFACTS**                                                      June 10, 2019 at 4:14 am

Too far over ny head?

Man, how "white" of you.

---

**Jeff Harner**                                                   June 10, 2019 at 4:06 am

Who the fuck are you calling a troll?!? YEAH someone who puts their full name and stated an actual fact that people don't like is a troll. You racist piece of trash!

---

**FWM**                                                           June 10, 2019 at 4:03 am

All of this is incorrect! Every single point here. You are clearly a troll because you are making things up. Please stop.

---

**THEFACTS**                                                      June 10, 2019 at 3:52 am

"If I, as a white man, can see things this way, this legitimizes my position"

NONSENSE!

---

**Jeff Harner**                                       June 10, 2019 at 2:37 am

If you have to ask that question or make that comment then it just shows what kind of person you are and how you were clearly raised. So go ahead and remain stuck on stupid, it suits you well

---

**Jeff Harner**                                       June 10, 2019 at 2:34 am

You don't know what I do for a living so again STFU! You choose to see what you want to see and not learn to see what is really there. So when you learn how to actually read and know what it is you are reading then get back to me, till than GFY!

---

**THEFACTS**                                          June 10, 2019 at 2:08 am

All I see here, are those who support or question the exoneration of the 5 men.

It's ridiculous to force-fit the "racist" meme, unless you can show specific comments, that show clear, racial animus.

Stop trying to play "mighty whitey".

My request was very simple. SHOW me the examples of racist / racially motivated comments.

Incidentally, you are NOT a psychoanalyst.

---

**THEFACTS**                                          June 10, 2019 at 2:01 am

What is the significance to how you grew up, have to do with the case or how you perceive it?

---

**martin jones**                                      June 9, 2019 at 5:14 pm

Yes three black men beat me up when I was sixteen in South LA where I grew up.
Martin Jones

---

**AnneClare**                                         June 9, 2019 at 10:44 pm

Let's move past skin color and look at the case itself.

1. The evidence points to multiple perpetrators. The DNA established the guilt of one person. That person has never named anyone else connected to the crime.

2. The Five were never cleared of the crime, but sloppy handling of evidence after their conviction led them to be released and not retried. They were not tried in a court and found "not guilty".

3. We don't know if The Five are guilty or innocent. In our system of justice that means we treat them as innocent.

P-APP002789

4. Linda Fairstein has done great work in giving voice to victims or sexual crimes. The mob is trying to destroy her over their perception of a tiny portion of her career, based on a television program told from the perspective of the accused. She also deserves to be treated as innocent until proven guilty in a court of law.

**Justme**                                                      June 9, 2019 at 9:29 pm

On what are you basing your findings? do you realize that these children did not know each other until they were all convicted together? Do you realize that someone else confessed and was proven to be the perpetrator roughly 12 years into their sentence? Yet these children remained in jail?

**andersonallison**                                             June 9, 2019 at 6:06 pm

Well thank God you're no where near this case then.

**Jeff Harner**                                                 June 9, 2019 at 4:48 pm

Well it's nice to see this story has brought the racists out in full force!

**Justme**                                                      June 9, 2019 at 9:27 pm

I truly do not see the connection between you getting beat up in LA and five kids being wrongly convicted in New York.

**Could_be_wrong_but**                                          June 9, 2019 at 8:09 pm

Martin Jones: 3 black men beat you up when you were 16. But how many black men didn't beat you up? How many black men have been lynched compared to you getting beat up once? So because you were beat up by black men, means all the black boys are criminals? that is the problem with your train of thought: one size fits all mentality.

**Flying Pink Hippos**                                          June 9, 2019 at 5:49 pm

So I am black and was beat up by three white girls when I was six, holding hands and surrounding me while kicking me. What is your point?

**Jeff Harner**                                                 June 9, 2019 at 5:26 pm

Alright newsflash everyone, if you are a young black male and you beat someone up you must go to jail for 5-15 years for a rape you didn't commit. This will forever be known as the Martin Jones Law.

**THEFACTS**

June 9, 2019 at 8:39 pm

What's the basis for your view, that race is the reason for his position?

---

**ejsjr**

June 9, 2019 at 8:33 pm

How do you know? In the absence of actual evidence you're just speculating, possibly based on their race. I think YOU had something to do with it. That's just as likely.

---

**Jeff Harner**

June 9, 2019 at 8:24 pm

Sorry butt hurt, cupcake I'm far from a snowflake. Like I said before, if you are too stupid to read and see racist comments, and I'll add to it, than you are a racist and see no racist comments. Now move along racist Bitch

---

**THEFACTS**

June 9, 2019 at 8:03 pm

Typical, snowflake diversion.

Please find ONE "racist" comment here.

---

**Could_be_wrong_but**

June 9, 2019 at 8:00 pm

@THEFACTS Why is no one pointing out, that Reyes took so long to confess? The answer is because he felt Guilty for still seeing Korey Wise in jail for 12 years for a crime he know Korey didnt commit. Reyes knew he wasn't getting out, he asked other inmates what he should do and they told him to leave it alone, but he couldn't. Yes it is possible to grow a conscience while you are in Jail.

---

**Jeff Harner**

June 9, 2019 at 7:47 pm

If you can't read and understand racist comments when you see them, then I can't help you with your own stupidity. There are racist comments all over here, go learn things.

---

**Brian**

June 9, 2019 at 5:46 pm

Someone once said "Never let the facts get in the way of a good story!".

---

**Jeff Harner**                                                    June 9, 2019 at 5:22 pm

No racist, I was old enough when this actually happened and did my homework on this long before this series came out. Perhaps you should do your own and go learn things

---

**THEFACTS**                                                      June 9, 2019 at 7:09 pm

Just answer the question?

---

**andersonallison**                                               June 9, 2019 at 6:02 pm

Dear Miss Ann,

They had zero to do with this crime. ZERO. Get it? You're a bigot because they're free and black you're mad about. It's unfathomable to you that violent, brutal sex for power and sadistic anger was not on these 14-16 year old's mind.

As long as they're black they hand something to do with it, right? News flash, MOST kids don't get off on beating up a woman who could be a teacher or mentor. That's Aside from no forensic evidence tying them to the case. Let alone their DNA. Now get to the bathroom and pull up your racist slip……it's showing.

God I'm so glad all whites aren't like you. We'd be doomed.

---

**Jeff Harner**                                                    June 9, 2019 at 5:38 pm

WOW! You truly are a special kind of stupid

---

**THEFACTS**                                                      June 9, 2019 at 5:33 pm

Please identify the racist comments?

---

**Ulysses**                                                       June 9, 2019 at 5:19 pm

You can't believe they are innocent of THIS CRIME because WHEN THEY SEE US you are presumably guilty….RACISM AT WORK….GOOD JOB

---

**Ulysses**                                                       June 9, 2019 at 5:17 pm

Did you know that a notoriuos serial mudererconfesssd to this heinious crime against this white woman and DNA confirmed his confession. Maybe they were harassing other people but the point you are missing is that THEY DID NOT RAPE THIS

LADY. And your racism is showing by continuing the narrative that one crime makes them guilty of this crime. That is exactly what the documentary is about and you continue to affirm its accuracy as it relates to race and criminal prosecution.

**Jeff Harner**                                                    June 9, 2019 at 5:06 pm

Yeah thanks I know it can go both ways. As a white man growing up with a father in law enforcement back around the time of this case, what was done to these young men was wrong. The publishers should have dropped this woman years ago, and the fact she didn't want to be interviewed for this and can't be reached for comment shows she was in the wrong all along.

# MOST POPULAR

**'The Office' Blackface Scene Edited Out, Netflix Pulls 'Community' Blackface Episode**



**Sandra Oh Reveals Why She Fought With 'Grey's Anatomy' Writers and Shonda Rhimes**



**'Family Guy' Star Mike Henry Will No Longer Play Cleveland Brown**



**Chris Evans Made a Secret Video That Had the Avengers Dancing to 'Grease'**



**Sandra Oh and Kerry Washington on What They Learned From Shonda Rhimes**



**Captain America and Ant-Man Assemble: Chris Evans and Paul Rudd on What You Didn't See From the Marvel Movies**



---

**Paul Mescal Talks to Nicholas Hoult About 'Normal People,' 'The Great' and Connell's Chain**

---

**'Mulan' Release Date Postponed Again**

---

**Margot Robbie, Christina Hodson Partner on New 'Pirates of the Caribbean' Movie**

---

**'The Princess Bride' Recreation Starring Joe Jonas, Sophie Turner, Tiffany Haddish and More to Air on Quibi**

---

ADVERTISEMENT

# Must Read

FILM

**Henry Cavill Has a Few Words About the Snyder Cut of 'Justice League'**



TV

**Jenny Slate Exits 'Big Mouth': 'Black Characters Should Be Played by Black People'**

TV

**Miley Cyrus on 'Black Mirror,' Getting Sober and Her Love of Britney Spears**

TV

**Reese Witherspoon and Regina King Talk About Changing Hollywood**

MUSIC

**Best 'Friends' Episodes Ranked**

**Sign Up for Variety Newsletters**

SIGN UP

ADVERTISEMENT

# THE BIG TICKET

WITH MARC MALKIN

��}�r�H��}?E5��g$%�=�$z$�c�V[3 Q$!� ��(�����/�'�7���� ویر
3++3++*�:�&�����%�����ÿG��q7��8d���w"�Y�E���j2����� $�
��� �xIJ��p�$��7A��gldv�%]|
��A��������f)���K�nd'��%v̌��3���xēl�[�zQ]/
��n��l�6YQ�]�O�S=`I�w�a}${�[���4�z��x����=N�R[F�����:�K6Hxo��b>
Ħ�����^�qTc wk^�#/�58&`��9H�A@hm4 1MYGu��H�i ~��]
1����2~��x>&V/q������OGq��Hu��`�狐�5��bAd�j)������n�2���
�捂��2{^�"���\��[0��n�GA�����\�n�M�Vd��b�eO�-
��ly��h¸��&������_��ě�5{����A��>�l�����O^�0�$�L�!
����)��1��m�f��U��+" +0�s93�V��.e�]o�mFH �>���i<�"c�
��u xc��,"ph��R��PU�?� � gq�=I1���]ņ^^̂3/

P-APP002796

```
��0N�N28��W3���tO���8�/���♔T);�Y/
�X3��������^�c�7������L�]��0�4r��� �5�j�^��A���x�L�
�c��������i|)�0��������aP��:�8c3L�|�;��9)�2�QR�G|
�����O��H1�i�e∽}ʃ��m�m5�������mU����M�:�l�{���>?
v�f�Q��it����s�.Z�����c9���<;��o�w{�o��.�\��^��{�=8zw�^�\�_�□Gg
NN�F�����q8�>�xg�I�Z����������3|�u��49�oO;����?
��Y��������dx�o��A�7�W�o.��o��g���u�?
```

**A Variety and iHeartRadio Podcast**

# MORE FROM OUR BRANDS

INDIEWIRE

**The Time Philip Seymour Hoffman Stood Up for Patrick Fugit While Making 'Almost Famous'**

HOLLYWOODLIFE

**Celebrating Pride With… 'Below Deck' Star Captain Sandy: Why Pride Means Ultimate 'Freedom' For Her**



BGR

**NASA will pay you to design a Moon toilet**

WWD

P-APP002798

**Money Inc: Looking for Deals**



SPY

**How to Throw the Best Water Balloon Fight Ever for Your Kids**

P-APP002799

**Variety**

About Us

Newsletter

Variety Screening Series

Live Media Summits

Variety Archives

Variety Insights

Careers

**Legal**

Terms of Use

Privacy Policy

California Privacy Rights

EU Privacy Preferences

Ad Choices

Do Not Sell My Personal Information

## Variety Magazine

Subscribe

Print Plus Login

Customer Service

Help

## VIP+ Account

Login

Subscribe

Help

Learn More

## Connect

Instagram

Twitter

YouTube

Facebook

THE BUSINESS OF ENTERTAINMENT

SUBSCRIBE TODAY

© Copyright 2020 Variety Media, LLC, a subsidiary of Penske Business Media, LLC. Variety and the Flying V logos are trademarks of Variety Media, LLC.
Powered by WordPress.com VIP

HAVE A NEWS TIP? LET US KNOW