woods, where the major attack upon her occurred. She was found about 200 feet further into the park, near a footpath. Although she survived, the jogger had no memory of any of the events that occurred that evening. This attack was the basis for the most serious charges against the defendants.

Police responded immediately to several 911 calls for help that resulted from the various attacks. Two of the defendants, Raymond Santana and Kevin Richardson, were arrested on the evening of April 19th in the vicinity of Central Park shortly after the attacks. Without being contacted by the police, Antron McCray voluntarily appeared at the precinct, in the company of his mother, and was not held. Because of statements made by the defendants and others implicating them, Kharey Wise and Yusef Salaam, as well as McCray, were contacted by the police the next day, and came to the precinct voluntarily.

Out of the approximately forty teenagers who entered Central Park that night, thirty-seven were interviewed. Ten were arrested and ultimately convicted of charges resulting from their activities. Five of these ten (the defendants) were charged with the assault and rape of the female jogger, the assault of John Loughlin, the assault on David Lewis, and a riot charge. All but Wise were convicted of assault, riot, robbery and rape. Wise was convicted of assault, riot and sexual abuse.

The other individuals who were arrested pled guilty to the assaults on Diaz, Loughlin or Lewis, but not to the assault of the female jogger. The defendants had implicated these other individuals in the assaults on the victims other than the female jogger.

Matias Reyes, then 18 years of age, was also in the park on the night of April 19, 1989. In 2002, he came forward to reveal that he had raped the female jogger and to claim that he did so alone.

## FINDINGS REGARDING POLICE CONDUCT

### General Observations

Based on our review of the material referred to above and conversations with various witnesses and interested individuals, including the New York County District Attorney and his staff, we conclude that there was no misconduct on the part of the New York City Police Department in the arrests and interrogations of the defendants. The police officers followed carefully the special statutory rules relating to the questioning of individuals less than 16 years of age, in particular rules pertaining to the participation of parents or guardians in such interviews.

The New York District Attorney and his senior staff have stated to us that they have found no evidence of coercion in the questioning of the defendants or others involved in the events of April 19, 1989, and they have no criticism of the interrogation or arrest techniques employed by the police.

### Justice Galligan's Opinion

An authoritative analysis of the activities of the police leading up to and including the taking of statements from the defendants, including the parents' participation in that

P-APP003232

process, is set forth in Justice Galligan's opinion (Exhibit A), which followed a six-week pre-trial hearing into the admissibility of defendants' statements and other evidence. The hearing consisted of testimony from: twenty-nine prosecution witnesses; defendants Wise, Richardson, Santana and Salaam; an additional defendant Steven Lopez; and parents, siblings, relatives and friends of the defendants who were present or involved in their initial encounters with the police or at the time that oral, written and videotaped statements were made.

At the hearing, each defendant challenged the validity of his initial arrest by police and the admissibility of the statements he made.[2] In addition, defendants McCray, Wise and Salaam challenged the seizure of physical evidence from them.  Some of their claims included allegations that they were stopped and arrested without reasonable suspicion or probable cause; that the Family Court Act and Criminal Procedure Law provisions mandating parental notification and presence during questioning were not followed; that statements were obtained by improper trickery and/or deception; that false promises were made that they would be released if they cooperated; that physical force was used and/or threatened to obtain statements; that they were deprived of food and sleep; and that arraignments were delayed unreasonably to deny due process and the attachment of right to counsel.

Justice Galligan, an experienced and highly regarded jurist, carefully analyzed each claim raised by each defendant and found, with one exception, that there was no constitutional or statutory violation by any of the officers or prosecutors involved and thus, no basis to suppress any of the statements or evidence taken from the defendants.  The only statement made by any of the defendants that was suppressed by the Court was made by Raymond Santana shortly after his arrest.  According to the Court, while in the beginning stages of the booking process, a police officer made a remark to the defendants to the effect that they shouldn't be out beating people, but "You should be out with your girlfriends."  Santana then looked at Lopez, smiled and said, "I already got mines," and they both laughed.  (Exhibit A, p. 14) The Court suppressed this statement on the grounds that the officer's remarks were the equivalent of interrogation and should have been preceded by a waiver of Miranda rights.  (Exhibit A, p. 95)

The Court's findings as to each defendant are summarized below:

1.   <u>Probable Cause For Initial Arrests</u>

     a.   <u>Raymond Santana and Kevin Richardson</u>

Raymond Santana was initially stopped, along with Steven Lopez, by Police Officers Eric Reynolds and Robert Powers at approximately 10:30 PM following the discovery of the first two seriously injured victims of that night, and numerous radio reports of a large group of young male African-Americans and Hispanics committing violent acts in the park.  Santana and Lopez were part of a large group of similarly described individuals

---

[2] The Court held one hearing to address the claims of the seven original defendants which included two individuals, Steven Lopez and Michael Briscoe, who eventually pled guilty to charges not involving the attack upon the female jogger.

P-APP003233

who were observed by Officers Reynolds and Powers walking northbound on the east side of Central Park West near 102nd Street shortly after the radio reports of the second assault. When the group was approached by the officers, all but Santana and Lopez fled. According to Justice Galligan, Santana and Lopez were "wide-eyed and appeared in shock" when first stopped and denied being part of the larger group which Lopez falsely claimed was about to "jump" them (Exhibit A, p. 10). Both Santana and Lopez claimed to have just come from their girlfriends' houses. (People's Brief, Vol. 1, P.9)

Kevin Richardson was part of the group that fled. He was apprehended by Officer Powers after a chase through the park. He was transported to the precinct together with another individual from the group, Clarence Thomas. The Court stated:

> En route to 100th Street and Central Park West Clarence Thomas began to cry. Without being questioned, he stated, 'I know who did the murder. I know who did the murder. I know where he lives and I'll tell you his name.' Richardson said he also knew who did it and would tell them too. Then Thomas said that it was Antron McCray and that he lived at a particular address on 111th Street. Kevin Richardson concurred saying, 'Yeah. That's who did it.' (Exhibit A, pp. 11, 12).

The Court carefully reviewed all of the information that had been reported as the news of the events of that night began to unfold, including numerous 911 calls and reports of witnesses and victims concerning a large group of African-American and Hispanic youths rampaging through the northern end of Central Park. The Court found specifically that the initial detention of the defendants was legally justified. (Exhibit A, pp. 75-76) Justice Galligan held that, under the circumstances, the officers had reasonable suspicion to stop and detain the defendants and, as to Santana and Lopez, were "entitled, indeed duty bound to stop them and detain them for questioning." (Exhibit A, p. 76) Richardson's flight served to escalate the suspicion about him as well as the suspicion about Santana and Lopez.

Probable cause for their subsequent arrests was supported by the facts originally known by the officers, and in addition (1) as to Richardson, his unprompted statement following Thomas' statement and while en route to the precinct, that he too knew who committed "the murder" and would provide his identity (Exhibit A, p. 78) (People's Brief, Vol.1 P. 11) and (2) as to Santana and Lopez, additional statements by Richardson and others that Santana and Lopez were with them in the park. (Exhibit A, p. 79) In summarizing its findings concerning the initial investigation of this incident the Court said:

> [I]t is clear the police action, at every step of the escalating encounter, was properly related in scope to the surrounding circumstances (citation omitted). Neither the initial detention of Santana, Lopez or Richardson, nor their subsequent arrests were, in any respect, precipitous or unreasonable. No taint, therefore, can flow from it. (Exhibit A, p.79)

P-APP003234

b.   Kharey Wise and Yusef Salaam

The first contact between Wise, Salaam and the police officers conducting this investigation occurred around 10:30 PM on the evening of April 20th, the day after the investigation of the events began, when several officers were sent to the home of Yusef Salaam to ask him to come to the stationhouse to answer some questions. Wise and Salaam were sought for questioning because a number of the others who had been detained had implicated Salaam and a youth named "Kharey" (Exhibit A, p. 41). Wise, Salaam, and another individual were met by several detectives in the hallway of Wise's apartment building. All three voluntarily agreed to accompany the officers to the 20th Precinct. They were not handcuffed because there was no intention to arrest them, just to question them.

Wise and Salaam both asked the Court to suppress statements and physical evidence obtained from them on the grounds that the encounter in the hallway was effectively an arrest without probable cause. The Court rejected these arguments and refused to suppress any evidence, holding that the defendants agreed voluntarily to go to the precinct:

> [The officers] approached defendants Wise and Salaam in a non-threatening manner, and made brief inquiries of them as to their name and age. Salaam admitted that they knew the police were upstairs when they returned to his floor. ...The record supports the conclusion that defendants' agreements to go to the precinct were voluntary and unconstrained. (Citations omitted) Therefore, probable cause was not required as a predicate for their presence, and their statements and physical evidence will not be suppressed on that ground. (Exhibit A, pp. 80-81)

c.   Antron McCray

Antron McCray's first encounter with the investigation occurred when he appeared at the Central Park Precinct with his mother at around midnight on April 19. He was not previously contacted by police. When asked if he had been with the others earlier in the evening he admitted that he was, but he denied beating anyone. He was not arrested at that time and went home. By the next morning, he had been implicated in the attacks by other detainees. He was visited by detectives at his house and was asked to come back, to answer more questions. Both McCray and his father agreed to do so. Indeed, they even agreed, before leaving with the officers, to have McCray change back into the clothes he was wearing the night before, which when examined were found to be caked with mud and dirt.

The Court rejected McCray's arguments that he, too, was unlawfully arrested and did not go the precinct voluntarily:

> Defendant argues that a number of factors establishes his custodial status: that Antron was not a mere witness; rather the police believed they had probable cause to arrest him; the manner in which he was "picked up" at his apartment

16

including the failure of the police to first telephone and the number of police; that the questioning took place at the police precinct instead of at his home; and Detective Rosario's statement to Mr. McCray that a parent "would have" to accompany Antron to the precinct because he was a juvenile.

I find, however, that the presence of these factors either individually or in their totality, did not render Antron's status custodial ... (Exhibit A, pp. 104-105) ... and that the defendant, in the presence of his parents, voluntarily agreed to accompany the police to the precinct for the express purpose of questioning and that the circumstances of this questioning were not custodial in nature (citations omitted). (Exhibit A, p.106)

2.    Admissibility of Statements

   a.    Kevin Richardson

As discussed above, Kevin Richardson made an incriminating statement to police within the first few minutes of his apprehension when he indicated that Antron McCray committed the "murder."

Richardson's later incriminating written, oral and videotaped statements were made in the presence of his mother initially, and later in the presence of his adult sister after his mother left the precinct. Richardson's father joined the interviews in time to review and sign the first written statement prepared by his son and remained with his son during the videotaped interview.

Although Richardson, with others, was held for a number of hours awaiting the arrival of parents, he was not interrogated during that time. Comments have been made in the press implying that defendants were "grilled" during the hours they were held awaiting formal interrogation. There is no evidence to support this argument. In fact, as Judge Galligan noted, the defendants spent the waiting period together, laughing and joking. At no time was Richardson questioned by anyone outside of the presence of his mother or his older sister. Similarly, no defendant, who the police were aware was under the age of sixteen, was interrogated without a parent or guardian being present.

In claiming that his statements should be suppressed, Richardson made the following arguments, all of which were rejected by the Court:

- The significance of the Miranda rights was not adequately explained to his mother and sister and his mother's frail and nervous condition rendered her incapable of issuing a valid waiver.
- The police deceived and misled his mother into believing that his detention was to be temporary and her waiver of his rights was obtained by a false promise that Kevin would be released to her after his statement.
- Statements made at the crime scene should be suppressed because Richardson's father's consent for him to go alone with the detectives to the scene was obtained by a disingenuous representation that no further

**17**

P-APP003236

questions would be asked of Richardson.

After noting case law that "special care must be taken to insure the rights of minors who are exposed to the criminal justice system," the Court stated:

> In this case, one aspect of the special care shown to juveniles is reflected in the proper notification of Richardson's mother by the police as required by statute. Mrs. Cuffee's (Richardson's mother) ability to respond to the circumstances is demonstrated by her prompt arrival at the precinct shortly after being notified of her son's situation. Indeed, she was the first parent to respond. Moreover, that she was not passive in the presence of the police is evidenced in her taking the initiative to see that Richardson's interview proceeded ahead of other defendants. Clearly, to whatever extent the events of the evening took a physical and emotional toll on her, that toll was itself in part the product of Mrs. Cuffee's comprehension of the gravity of the charges against her son. (Exhibit A, pp. 82-83)

As to Richardson's sister's participation in place of her mother the Court found that "contrary to the defendant's contention, his sister Angela Cuffee was capable of participating in a meaningful way." Moreover, following their testimony at the hearing the Justice noted that he was satisfied that Mrs. Cuffee and her daughter "possessed the intelligence to understand Kevin's rights and the ability to press them had they chosen to." (Exhibit A, p.83)

As to Richardson himself the Court found that he, too, "understood his Miranda rights and possessed the emotional and intellectual capacity to waive them." According to the Court:

> His manner and poise reflected this.  So too did his appreciation of the significance of the scratch on his face.[3]  Further, his reluctance to incriminate himself in the most serious of crimes demonstrated both an understanding of his right not to do so and a realistic sensitivity towards law and its consequences. (Exhibit A, p. 83)

On the issue of deception, the Court concluded that no misrepresentations were made to Richardson, his parents or his sister. (Exhibit A, p.85)

On the waiver by Richardson's father of his right to accompany the detectives and his son to the crime scene the Court found:

> The clear thrust of Assistant District Attorney Fairstein's discussion with Paul Richardson, Kevin's father, was that he could accompany them if he chose, but that no new avenues or subjects of inquiry were to be pursued. This conclusion is supported not only by the testimony at the hearing but by the inherent illogic of

---

[3] The scratch on Richardson's face, which he admitted was caused by the female jogger, is discussed below at page 33.

18

taking a defendant to a crime scene for any reason except to question him about it.

I find that in issuing this waiver, Mr. Richardson was aware of Kevin's rights because they had been read to Kevin in his presence shortly before leaving for the crime scene and at the videotaped interview earlier. (Exhibit A, p. 85-86)

### b.   Raymond Santana

Santana was one of the more talkative defendants and made a number of incriminating statements which were noted in the pre-trial decision. There was significant difficulty in procuring the presence of a parent or guardian for Santana's questioning. Indeed the judge, as discussed below, was particularly critical of the failure of Santana's father to make himself available during the early stages of the investigation. Santana's grandmother was present for his initial written statement and his father was present for the videotaped interview. As grounds for suppression, Santana argued a laundry list of reasons including:

- That violations of the Family Court Act and Criminal Procedure Law occurred regarding the parental notice requirement with respect to statements made outside his father's presence.
- That deceitful representations were made to his father.
- That his grandmother should have been provided a Spanish interpreter and that the translation to her of the Miranda warnings created confusion resulting in her not being fully advised.
- That the duration of his pre-arraignment detention rendered his statements involuntary and the delay in arraignment deprived him of his right to counsel.

Again, the Court rejected all of these arguments and found that the statements made by Santana were admissible.

On the Family Court Act issue the Court found that the investigators complied with all applicable notice requirements:

The police contacted Mr. Santana promptly after their arrival at the Central Park Precinct on the evening of April 19, and made repeated efforts to obtain his presence throughout the following morning. Indeed, they sent a police car to the grandmother's residence in order to obtain her presence before they began to formally question Raymond. Raymond's father came with the grandmother.

The facts further show that Mr. Santana, despite being fully advised with regard to his son's circumstances, left the Central Park Precinct on the morning of April 20 and went to work. During the day he never called to inquire about his son. He returned after work and after he went home. He arrived as Raymond had completed his statement. He again left the Central Park Precinct later that day after consenting to his son's speaking to Detective Hartigan alone. Clearly, the

**19**

decision by Mr. Santana not to attend the questioning of his son is not attributable to any action or inaction by the police and could not operate to forestall the police inquiries of Raymond. (Exhibit A, p. 90)

The deceit argument was completely refuted at the hearing. According to the Court:

Santana's argument that Detective Sheehan made deceitful representations to his father, thereby obtaining the father's consent to take another statement is not founded in fact. The record shows, to the contrary, that the detectives delayed further questioning of Santana until the father was present and then commenced their interrogation only after fully and fairly advising the father as to what had previously occurred and as to what they intended to do and after he had an opportunity to speak to his son. (Exhibit A, p. 91)

Regarding the failure to fully advise Santana's grandmother the Justice noted:

I find that Santana's arguments addressed to his grandmother's understanding of the Miranda warnings are not sustained; in fact, they are undercut by Mrs. Colon's own testimony at the hearing in which she demonstrated an ability to understand English far beyond her willingness to admit it.

In any event, the precautions that the detectives exercised vis-à-vis Mrs. Colon were the result of an abundance of caution and were not statutorily or constitutionally required since Santana's father had previously been notified of, but waived, his right to be present. His cavalier approach to his son's situation was reflected in his initial failure to show up at the precinct when called; his later arrival with his mother after the police sent a car for her and his departure for work before Santana's case was called; his failure to communicate with anyone concerning his son, while at work. Mr. Santana's (the father) itinerant conduct throughout this time and the fact that he left his mother Mrs. Colon to stand with her grandson speaks volumes about him and also belies the argument that she did not understand English. (Exhibit A, pp.92-93)

As to the length of Santana's pre-arraignment detention and its effect on the voluntariness of his statements the Court noted:

It was established that Santana slept; he was fed, and that repeated efforts were made by the police to provide him access to a member of his family. The extent to which such access was delayed was clearly a product of his family's behavior, and not that of the police.

Moreover, the alleged debilitating effect upon Santana from lack of food and sleep are belied by his raucous behavior in the cellblock, and his participation, with his co-defendants, in the lewd comments and exuberant laughter with which they accepted their incarceration. (Exhibit A, p. 91)

Again, it is important to emphasize that although Santana was held for hours, awaiting

20

P-APP003239

the arrival of a parent or relative, he was not questioned during this period.

    c.    <u>Antron McCray</u>

Antron McCray's admissions included an initial statement admitting to the rape of the female jogger and a later videotaped interview. His father was present for both statements. His mother also was with him but, as detailed in the Court's decision, she left the initial interview following a discussion with her husband because it was felt that Antron was unwilling to be truthful about raping the female jogger in her presence. McCray's arguments for suppression of his statements included the claim discussed above that he did not voluntarily accompany the officers to the precinct and was arrested without probable cause. He also alleged that he was not given and did not waive his Miranda rights prior to the initial questioning and that his eventual waiver of Miranda was involuntary because he had been misled by the police.

As to these issues the Court rejected once again the notion that the police had done something improper in their treatment of McCray and ruled that all of his incriminating admissions were validly obtained:

> The testimony established that defendant was given his full <u>Miranda</u> warnings in the presence of both his mother and father and that he waived those rights prior to his interrogation at the 20[th] Precinct and his videotape at the 24[th] Precinct. Defendant's contention that his waiver was involuntary because his parents had been misled by the police is not substantiated. The basis for this alleged misleading was the statements by Detective Rosario that Antron should "tell the truth, no matter how horrible" and two later conversations between the father and Detectives Hildebrandt, Gonzalez and McCabe outside Antron's presence, in which they discussed whether Antron was telling the truth. In both conversations Mr. McCray agreed with the detectives that the son was not being truthful and on one occasion he relayed that information to Antron and on the second occasion he asked his wife to leave. Contrary to defendant's theory, none of the detectives' statements "rise to the level of those promises or statements which create a substantial risk that defendant might falsely incriminate himself (citations omitted)."

> Moreover, the record reflects that the direct result of the detective's second discussion with Mr. McCray was not a waiver by defendant of any right he had not previously waived, but only that his mother stepped out of the room, leaving Antron, with his father and the police. (Exhibit A, pp. 106-107)

    d.    <u>Yusef Salaam</u>

Salaam initially lied to the police about his age, claiming and showing documentary proof that he was 16 years old, not 15 as it was later determined. Initially, therefore, Salaam's parents were not notified that he was being questioned and were not present for his statements. However, his aunt and a family friend both came to the precinct after learning that Salaam was brought there. Salaam's mother also went to the precinct

P-APP003240

when she returned from work at about 10:45 that evening. Neither the aunt nor the family friend were allowed to see Salaam; the mother's request to see him was also turned down because it was believed he was sixteen. When his mother claimed that Salaam was only fifteen, the questioning was quickly ended and no further statements were taken from him.

In his suppression motion, Salaam attempted to take advantage of his misleading behavior arguing that because he was actually only fifteen, all of his statements should be suppressed. The Court rejected this argument finding that reliance by police on his misrepresentation was reasonable. The Court also stated that the "defendant should not derive a benefit from his deliberate falsification," and that "he is bound by the consequences of that falsehood." (Exhibit A, p. 111)

The Court also rejected arguments that Salaam was improperly denied access to his family and that he was tricked into making an admission when the detective questioning him claimed that others had already implicated him and that if his fingerprints were found on the jogger's clothing, he was "going down for the rape." (Exhibit A, p. 113)

        e.    <u>Kharey Wise</u>

Kharey Wise's parents were not present for his interview, because he was over the age of sixteen.

Wise made the following claims with respect to suppression of his statements:

- Physical force was used or threatened, thus rendering his admissions involuntary.
- He was falsely promised that he would be released if he talked.

On the use of physical force to obtain his statements, the Court was quite clear:

> The record simply does not sustain that. I note that the video taken of Wise after the time of the alleged beating gave no indication of any bruises. (Exhibit A, p. 114)

> Nor does the record support Wise's argument that his will was overborne by shouting, intimidation and the lack of rest, food and drink. Wise slept, ate and received milk when he asked for it. Further, his behavior while in the cell at the 24th Precinct, particularly his laughing and asking his codefendants if they had told the police allegedly humorous incidents involving joggers, belies his contention that he suffered from physical abuse or psychological duress. (Exhibit A, p. 114)

On the issue of false promises the Court was equally clear:

> Wise argues that his statements must be suppressed because he was promised that, if he made them, he would be released. The only basis in the record for this

P-APP003241

proposition is defendant's own testimony, which I find incredible.  His motion to suppress statements is in all respects denied.  (Exhibit A, p. 115)

3.        Additional Observations Regarding the Defendants' Statements

In reaching his conclusions, Justice Galligan had the benefit of analyzing the testimony and assessing the credibility of everyone involved, including defendants, victims and police personnel.  He carefully considered and rejected all of the defendants' claims that their statements had been somehow coerced.

In the course of considering the new evidence of Reyes's involvement in the attack on the jogger, some have focused anew on the defendants' statements.  It has been asserted by the press and others that the fact that there were numerous inconsistencies in the defendants' statements demonstrates that the statements were coerced.  These assertions fail to account for the fact that the inconsistencies and weaknesses of the defendants' statements were fully explored at the time of the defendants' pre-trial hearing and the Court's decision.  The same inconsistencies and weaknesses were vigorously but unsuccessfully raised again at defendants' trials.

The newly discovered evidence of Matias Reyes's involvement in the jogger's rape, upon which the dismissal of the defendants' cases was based, casts no new light on the question of whether the police interrogations were properly conducted.  No evidence, old or new, has been found that in any way disturbs or even bears upon Justice Galligan's factual findings.

It has been argued that the many inconsistencies in the statements of the defendants and the others involved in the events of April 19, 1989 indicate that the facts in the statements were not true, but were provided, deliberately or inadvertently, by the questioning of police officers or prosecutors.  But, it would seem that consistency would be a feature of planted rather than spontaneous information.  We believe that the inconsistencies contained in the various statements were not such as to destroy their reliability.  All of the defendants were obviously attempting to minimize their own involvement and the stories they told necessarily included fabrications.  On the other hand, there was a general consistency that ran through the defendants' descriptions of the attack on the female jogger.  She was jogging; she was knocked down on the road; dragged into the woods; hit and molested by several assailants; sexually abused by some while others held her arms and legs; and left semi-conscious in a state of undress, after an assault that covered a relatively short period of time.  This general description was common to all or most of the defendants' statements, despite some differences in specifics.  We find it unlikely that such similar descriptions could have been given spontaneously.  The defendants would have to have been told by their interrogators the outline of what they were supposed to say.  As discussed above, we concur with the District Attorney and Justice Galligan's opinion that no such deliberate planting of information occurred.

Another factor to be considered was the condition of the jogger at the time the interrogations were being conducted.  None of the detectives could have foreseen that, should she survive, she would have no memory of the events.  Even an unprincipled questioner, bent upon planting a story with the defendants, would hardly do so when

23

there was every chance that the jogger would refute the story upon her recovery.

### 4.   "Suggested" Confessions

It has been theorized by the New York County District Attorney's office that the defendants' confessions can perhaps be explained as the result of legitimate interrogation techniques employed by detectives operating under the erroneous but reasonable premise that the defendants and their friends were the only ones assaulting people in the park that night.   A certain amount of pressure is inevitable in any interrogation.   The device, for instance, of telling a potential defendant that his cohort has confessed and implicated him is a standard questioning technique that has been approved by the courts.   In the case of the jogger's rape, it is argued, such pressure may have been employed by detectives who operated under the logical assumption that the jogger must have been assaulted and raped in the course of the rampage that was then going on.   The detectives were not aware that Reyes, a vicious rapist, was roaming the park at the same time.   Under those circumstances, they could have suggested facts to the teenagers they were questioning which were later regurgitated in their confessions.

However, although defendants have complained of being "coerced" and have claimed that the police officers pressed them to confess, only one of them purported to explain how they got the factual details they gave in their statements.   Kharey Wise was the only defendant to claim he had been "fed" answers.   This contention was rejected in Justice Galligan's exhaustive opinion, ruling on defendants' motions to suppress.   As the prosecutor argued, apparently persuasively, in her summation at the trial of McCray, Salaam and Santana:

> Mr. McCray testified that the police said he should put himself in it, and that was all the information that was given to Antron McCray about what he was supposed to put in his statement.   He was never given any statements that he was to admit to.   People v. Antron McCray, Yusef Salaam and Raymond Santana, Trial Transcript, p. 5336, l. 16-20, 8/8/90.

* * * *

> The detectives told Mr. McCray, according to his testimony, that Antron McCray should tell them what they want to hear, without ever telling him what it was they wanted to hear.   Id., p. 5337, l. 6-9.

In this regard, at his parole hearing on February 9, 1994, Raymond Santana was asked about the events of April 19, 1989.   He admitted assaulting a man, but claimed that he made up the story regarding the rape, and he just used the names of those arrested with him that night as his cohorts.   Santana was also interviewed by an Assistant District Attorney and detectives in June 2002 at Downstate Correctional Facility.   Santana again admitted the facts other than those relating to the female jogger.   When asked why he said what he said in 1989 about his participation in the attack on the female jogger, he responded that two of the detectives "okey doked me with that good cop bad cop routine.   One of the detectives told me that the others admitted raping the woman and said I was there and that if I did not admit it he couldn't help me.   So I made up the story you see on the tape to satisfy them."   (Emphasis added)   By his own admissions in

P-APP003243

1994 and again in 2002, Santana stated that <u>he made up the story</u> -- he did not say the police fed him a story for him to adopt as his own. Had they done so, Santana would surely have said that when he reversed himself, rather than claiming, truthfully or falsely, that he made the story up himself.

It is important to note again that the parents or family members of Santana, McCray and Richardson were present during all of their interrogations and the giving of written and video statements.

## THE NEW EVIDENCE – REYES'S CLAIM THAT HE ACTED ALONE

Some have analyzed the case as if there were only two possible scenarios – either Reyes acted alone or the defendants did. According to this reasoning, since DNA testing proves that Reyes attacked the jogger, then it follows that the defendants did not. Another possibility that must be considered is that both Reyes and the defendants participated, to some degree, in attacking the jogger.

### 1. Reyes's Claim

At defendants' trials, the juries accepted the prosecution's theory that the defendants, together with an unknown attacker, committed the rape. It was brought out at trial that semen was recovered belonging to an unknown missing assailant. Thirteen years after the event, Reyes revealed that the semen was his, but he also asserted that he had attacked the jogger by himself. Reyes's claim that he acted alone qualified as new evidence that the prosecutor and the Court correctly found to be sufficient to require vacating the convictions.

The District Attorney and Justice Tejada did not have to explore alternative scenarios in order to reach the conclusion that the trial verdict should be vacated. It was enough that one permissible scenario existed that exculpated the defendants and had not been heard by the juries that convicted them. It may well be that the juries would have accepted Reyes's contention and concluded that the defendants were not present when the jogger was attacked.

We believe, however, that it is necessary, for the purposes of our inquiry, to complete the record by considering other scenarios that a jury might also accept.

### 2. Alternative Scenarios

Our examination of the facts leads us to suggest that there is an alternative theory of the attack upon the jogger – that both the defendants and Reyes assaulted her, perhaps successively.

It may have been, as a former inmate-acquaintance claimed Reyes told him, that the attack on the jogger was already in progress when Reyes joined, attracted to the scene by the jogger's screams. Or, he may have been following her and held back, temporarily, when the defendants intercepted her. Or, the defendants may have abandoned the jogger after mauling her in the hit-and-run style typical of their rampage that night. Coming upon her just after the attack, Reyes could have perpetrated a new attack, but in a much more brutal fashion.

25

In any of these scenarios, it would have been likely that Reyes, not the defendants, was guilty of the more vicious outrages inflicted upon the jogger. The bloody and sustained beating, the tying of the jogger's hands in front of her face, and the rape itself (which apparently was anal as well as vaginal) were more characteristic of Reyes than of the behavior exhibited by the defendants and their friends during their rampage.

Under any such theory, the defendants' lesser role is consistent with their confessions. In describing what they knew of the incident, they may have considered that an assault with sexual aspects to it constituted "rape," without being aware that a brutal rape, in the full sense of the term, took place after they had left.

If Reyes and the defendants both attacked the jogger at overlapping or different times, the only aspect of Reyes's account that is necessarily at odds with the statements of the defendants is the one for which there is no corroboration — that he came upon her alone.

It must be emphasized that we do not contend that any such theory would affect the correctness of the decision to vacate the defendants' convictions. That decision rested on new exculpatory evidence, which is Reyes's claim that he acted alone. The jury should have heard this new evidence regardless of whether there also might be a possibly convincing explanation for that new evidence that placed the defendants at the scene, albeit in a lesser role.

### 3.  Considerations Bearing On Reyes's Claim

In considering Reyes's claim, we have focused upon Reyes's credibility; Reyes's motive; Reyes's accounts of the attack; the defendants' statements; statements by other witnesses; the timing of the events; and forensic evidence.

#### a.     Reyes's Credibility

##### (1)     General Considerations

There is no corroboration for Reyes's claim that he acted alone. The only evidence to support the view that he acted by himself remains his own statement that he did so. This makes Reyes's general credibility a matter of considerable importance.

Recently, the presiding justice of the Central Park jogger case, Justice Galligan, who also presided over Reyes's murder/rape trial in 1991, was quoted in the press as stating, "[i]f Reyes is a credible witness, then credibility has a new meaning." [Newsday, December 20, 2002 p.4; N.Y. Daily News, December 21, 2002 p. 4.] Reyes's former attorney, Richard Siracusa, in a recent interview stated that Reyes is a "classic psychopath who cannot separate fact from fancy." [Newsday, December 20, 2002 p.4; N.Y. Daily News, December 21, 2002 p. 4.] Reyes's defense psychologist in 1991, Dr. Neftali Berrill, concluded that Reyes could not tell a consistent childhood history. Dr. Berrill described Reyes as "an infantile, impulsive individual prone to viewing the world in a peculiar fashion, marked by monsters, blood, dead animals. He is demanding, particularly with his need for respect and attention." [Newsday, December 20, 2002 p.4; N.Y. Daily News, December 21, 2002 p. 4.] In a recent

26

interview conducted on November 5, 2002 by Detective Robert Mooney, Dr. Berrill confirms his findings regarding Reyes's psychological condition. He further stated that Reyes is capable of any amount of violence when faced with a threatening position, e.g., a victim fighting back.

These assessments came from individuals with first-hand experience with Reyes. They reflect the common view that a history of committing felonies is generally thought to undermine a witness's credibility. The crimes for which Reyes has been convicted include rape, robbery and murder. In addition, he has confessed to the commission of a host of crimes for which he was never convicted, including the rape of the jogger as well as the rape of his own mother. [N.Y. Daily News, October 20, 2002; Reyes's Videotaped Statement to Assistant District Attorney Ryan on May 23, 2002.] Reyes admitted to Dr. Berrill in 1991 that he sexually assaulted his mother, referring to it as a tragedy. [N.Y. Daily News, October 20, 2002 (quoting portions of Dr. Berrill's evaluation report).] His specific behavior in committing these crimes is sufficiently deviant to cast even further doubt on the reliability of what must be described as a "twisted" mind.

The Ryan Affirmation points out that the candor with which Reyes has admitted responsibility for past crimes that had previously been unsolved and his accuracy in describing these misdeeds (all of which are beyond the statute of limitations), tends to bolster his credibility. In weighing Reyes's credibility, it is certainly necessary to balance the positive implications of his being able to describe his life accurately against the negative conclusions to be drawn from the life of horrific crime he is describing.

> (2)     Cross Examination

It is generally accepted that the best way to test a witness's credibility is to subject him or her to cross-examination. With respect to Reyes, his defense psychologist, Dr. Neftali Berrill suggested in his recent interview, that when Reyes is interrogated, it should be done with authority and control to get to the core of what he knows or thinks.

Reyes has been interviewed extensively by the staff of the District Attorney's office, for the most part without the direct participation of Department personnel, who were permitted to view one videotaped interview and one brief audio recording of an interview. No hearing was held with respect to defendants' motions to vacate their convictions, thus no opportunity was given to cross-examine Reyes in public, under oath.

It may be that the interviews of Reyes by the District Attorney's office have been sufficient to ensure his credibility. However, our lack of information precludes us from being adequately prepared to make that judgment.

In a related issue, we understand that Reyes has not been subjected to a polygraph examination. Perhaps he is thought to be too unstable to allow for a meaningful test. Such a judgment would hardly be a testimonial to his general credibility.

> b.     Reyes's Motive

Central to a consideration of the truth of Reyes's claim that he raped the jogger by himself is an assessment of his motive for coming forward to make the claim. Was he simply moved to do the right thing by feelings of guilt and the "positive experiences" that he has had in prison? Or is it possible, as has been suggested by some, that he came

P-APP003246

forward in response to threats, delivered through the underground prison communications system? Or did he act in order to get a desired change in prison assignment? Or did he have some other motive?

The District Attorney's office accepts Reyes's statement that "his decision to come forward with his confession was prompted by a chance encounter with Kharey Wise in Auburn Correctional facility, and the resultant realization that Wise was still incarcerated in connection with the attack of the Central Park jogger." (Exhibit B, p. 20.) Wise and Reyes were both at Auburn from August 2001 through January 2002. Experiencing a "guilty reaction to seeing Wise, [Reyes] began seeking advice from different individuals in the prison system telling them ... that he had committed a crime for which another person had been convicted, and that he wanted to rectify the situation." (Exhibit B, p.20.) As a result, this information came to the attention of Corrections' officials and then the District Attorney's office. Acknowledging that "Reyes's motives cannot be objectively proven or disproven" (Exhibit B, p. 21), the District Attorney's office accepts his claimed motivation:

> He has consistently explained himself in terms of his positive experiences in prison, the fact that people have treated him decently despite the nature of his criminal history, and his guilty reaction to seeing Wise. (Exhibit B, p. 21.)

It is certainly correct that Reyes's motives cannot be objectively proven or disproven, but certain factors would seem to create doubt with respect to his stated motivation.

At the outset, his prior history is not one of selfless concern for others. On the contrary, he has led a life of vicious, self-indulgent crime. As long ago as 1991, he gave as a reason for his pleading guilty to three rape/robberies, one rape/murder and another robbery, his "positive experiences" in prison – the same words he now uses to describe what prompted him to come forward about the jogger. At that time, he had been imprisoned a short enough time to make it doubtful that he had accumulated many "positive experiences." It seems unlikely that he changed much thereafter. He is described in the Ryan Affirmation as a "loner" (Exhibit B, P.28) and his prison experience has included 19 substantial conflicts or infractions ranging from arson to fighting. In fact, Reyes had a fight with Kharey Wise when they met in prison at Riker's Island in 1990. The altercation was supposedly over the selection of a television channel. There seems to be little evidence that Reyes has undergone some sort of a moral transformation in the 13 years he has been in prison.

An alternative possible motive for Reyes coming forward is that he was threatened. If, as discussed above, Reyes may have come upon the defendants as they were completing their assault upon the jogger and remained, after they moved on, to commit the rape and vicious beating that occurred, it is possible that Kharey Wise caught sight of Reyes and remembered him when he encountered him in Riker's Island soon after Wise's conviction. Their fight could have been prompted, not as claimed, by a difference of opinion over a television channel, but by Wise's understandable anger at being blamed for the particularly vicious acts that Reyes had committed after Wise and his friends had left the scene.

28

P-APP003247

According to Corrections' personnel, Wise apparently became a member of the Bloods "gang." As such, Wise would have some influence within the prison system. Reyes, on the other hand, was apparently a loner and was, therefore, vulnerable to various forms of extortion. Since he had no alignment to any group, he had no "protection." If Wise learned in 2001 that Reyes was still incarcerated, it could have occurred to him that Reyes might afford a means of exonerating himself. In interviews which the Department investigators were able to conduct with inmates and correction officers, it appears that Wise may have indirectly communicated with Reyes, threatening him with violence if he did not sign an "affidavit" that Wise's lawyer was preparing.

Interviews of two inmates in particular indicate there may have been contacts between Reyes and Wise in jail through third parties. Although inmates cannot send mail to each other, they can send mail to third parties (non-inmates) who can in turn forward messages or mail to other inmates. According to inmates Pedro Hernandez and Angel Acevedo, Reyes had sent letters to inmate Martin Mejias' relatives, who in turn would mail them back to Mejias. In the letters, Mejias would send communications directed by Wise.[4] Hernandez and Acevedo also mentioned that inmates Martin Mejias and Troy Ortega could corroborate this information. Documents from State Corrections reveals that the same 5-6 common names were on the list of visitors, phone calls or commissary (receipt of packages or letters) for Mejias, Ortega and Reyes.

Hernandez and Acevedo were not housed in the same area during the time that each had separately met Reyes. Each was interviewed separately. Mejias and Ortega refused to be interviewed, informing Department staff that they were instructed by the New York County District Attorney's office not to talk to "FBI, CIA or the police."

There is also reason to question Reyes's claim that a chance meeting with Wise in the yard at Auburn in 2001 triggered the remorse that led to his confession. Corrections officers have checked the movement records of both Wise and Reyes in 2001 at Auburn and assert that it is not possible that Wise and Reyes were at any time together in the yard.

Reyes's descriptions of his contacts with Wise have been inconsistent. According to the Ryan Affirmation, when Reyes encountered Wise at Auburn in 2001, "he feared Wise's reaction and therefore disclosed nothing to him about his own culpability." (Exhibit B, p.20.) On another occasion, he told an investigator that when he met Wise he apologized to him for the fight that had occurred in 1990 and added "we didn't get to speak much about the case" (implying that some discussion of the case took place).[5] Later, in an interview on the television show PrimeTime, Reyes admitted meeting Wise in 1990 when they had a fight at Riker's Island, but indicated that he had not met Wise later, in 2001, saying that he specifically "avoided crossing paths with Wise so nobody

---

[4] Of course, information coming from inmates must usually be regarded with considerable skepticism. Hernandez, for example, has been identified by at least two District Attorneys as an extremely unreliable source.

[5] This information was obtained by Department staff listening to an audio taped interview of Reyes at Auburn Correctional Facility by State Inspector General Investigator Vern Fonda in January 2002. The New York County District Attorney's office is in possession of this tape, and it has not been released to us to date.

P-APP003248

would say that Wise forced him to confess."

Such scraps of information, some of them of highly dubious reliability, certainly do not add up to proof that Reyes was motivated in coming forward by fear of threats. However, the possibility cannot be discounted and seems at least as likely as Reyes experiencing a sudden attack of conscience.

Another simpler and less speculative motive for Reyes to have come forward to exculpate the defendants is that he won a favorable prison assignment by doing so. Purporting to fear Wise's reaction to his revelation, Reyes demanded protection at the time he came forward. (Exhibit B, p. 21.)  Within a month, he was transferred to the Clinton Assessment Programs Prepared Unit ("APPU") at Clinton Correctional Facility. According to State Corrections personnel, this is considered the safest and one of the most desirable locations in the New York State correction system. As a 260-bed facility, it has the lowest correction officer/inmate ratio. Most of the inmates housed in this unit have some sort of notoriety (usually easy targets for inmate abuse or assault).  The inmates housed in this facility are generally on their best behavior in order to prevent being transferred to a more hostile environment.

In 2001, Reyes had been transferred out of APPU for fighting, having spent nine of his thirteen years in prison in that facility.  He was well aware of how relatively safe and desirable it was.  Reyes knew that his confession to the rape of the jogger would be confirmed by DNA.  He stood no risk by confessing to the crime and claiming that he had committed it alone, because the statute of limitations had long since run and, in any event, he was incarcerated for life.  By claiming that he had committed the crime for which others were convicted and served time, he put himself in the position of needing protection from the defendants or their friends in prison.  In this manner, he was able to be reassigned to the desirable prison location from which he had just been removed.

<blockquote>

c.     <u>Reyes's Accounts of the Attack</u>

</blockquote>

We have been informed that Reyes was first interviewed on the subject of the jogger in November, 2001 by Corrections Officer Todd Clark at Auburn.  His notes were reviewed by the District Attorney's office and the New York City Police Department.  There was a subsequent interview conducted by State Inspector General Investigator Vern Fonda in January 2002.  This interview was audiotaped.  Reyes was interviewed for the first time by prosecutors from the New York County District Attorney's office on May 23, 2002. New York City Police Department Detective Robert Mooney began the interview and was replaced by Assistant District Attorney Nancy Ryan.  This second portion of the interview was videotaped.  On May 28, 2002 Reyes was taken to the crime scene by Assistant District Attorney Ryan, accompanied by State Department of Corrections personnel and other members of the District Attorney's office. No one from the New York City Police Department was present.

On May 30, 2002, Reyes was re-interviewed by Assistant District Attorney Ryan alone. Part of this interview was audio taped.  At the beginning of the tape, Assistant District Attorney Ryan stated that an unrecorded interview had preceded the taped interview for approximately two hours.  Five to ten minutes into the tape, the tape recorder was turned off.

P-APP003249

Reyes's last known interview was aired in September 2002 on the television show PrimeTime.

From the various accounts that Reyes has given in all of his interviews that we have been able to review, we list below some observations:

(1)   Reyes alleged that he followed the jogger. (The jogger informed detectives she customarily ran at the rate of an 8-minute mile or less). He claimed to have zig-zagged behind her from one side of the path to the other, stopping along the way to pick up a "stick" so heavy that it required two hands to lift and hold.

Department personnel recently attempted to simulate the manner in which Reyes claims to have approached and attacked the jogger. A female jogger ran across the 102nd Street transverse at a pace of less than an eight minute mile while five different individuals attempted to keep up with her zig-zagging behind her and stopping to pick up a large stick, as Reyes described. None of the five, police cadets who approximated Reyes's height and weight, could catch up to or overtake her. There are many variables that are impossible to duplicate thirteen years later. While we cannot state with certainty that Reyes's account is physically impossible, the test we conducted raises some questions about the feasibility of his claim.

(2)   Reyes's description of the jogger's clothing varied from black shorts with a matching tank top (5/23/02 interview) to a white t-shirt with long, tight pants, black or blue (5/30/02 and later). She was actually wearing long tight black stirrup jogging pants with a long sleeved white shirt.

(3)   Reyes described the case used to hold the victim's keys as black with a zipper and Velcro. According to the victim, she owned a small black pouch, with Velcro only, that attached to the laces of her sneakers, but she normally carried only her door key in her hand while jogging. Initially Reyes told the District Attorney's office that the key case was brown Velcro. Later, on the PrimeTime interview, he described it as resembling a fanny pack.

(4)   Reyes claims to have run into a police officer he knew as "Blondie" while leaving the park, with whom he had a conversation about whether there was any commotion in the park. "Blondie" is Detective Charles Frietag of the 23rd Precinct Detective Squad, who was on duty and responded to Central Park on April 19, 1989. Detective Frietag, who knew Reyes from the bodega where Reyes worked, has no recollection of meeting Reyes that night.  It seems likely that Reyes saw Detective Frietag, but unlikely that Detective Frietag saw him. Detective Frietag would certainly have noticed blood on Reyes, who described bashing the jogger with the rock causing so much blood spattering that he could "smell it on himself." According to the PrimeTime reporter, Reyes said that the lower part of his pants was "drenched" with blood.

31

(5)    Reyes stated that after he raped the jogger, she got up and ran away, naked from the waist down, which would have meant that she was barefoot as she ran through rough underbrush strewn with sticks and rocks.  However, the jogger had no marks on the bottoms of her feet. Further, the original crime scene detective, Detective Robert Honeyman, has stated that there were drag marks and some blood between the first tree where there was evidence of an assault and the second tree where the evidence indicated the major assault took place, indicating that the victim did not run but was dragged.

(6)    Reyes asserts that he knew nothing about the assault except through first hand knowledge.  However, Reyes obviously read about the assault since he stated that he felt bad about the victim because he read about everything she went through.

d.    <u>Additional Factors of Significance</u>:

(1)    Wise:  Knowledge of Walkman

In his February 2002 statement to the inspector general, Reyes purported to have exclusive knowledge that the Central Park Jogger had worn a Walkman on the night of her attack. Reyes said he stole the Walkman, and only he knew about it, thereby helping to establish that he was the sole attacker. This was the first time that anyone had reason to focus on the existence of a Walkman.  In the course of our review, we uncovered notes from New York City Police Department Detective August Jonza that documented the fact that Kharey Wise knew about the Walkman on April 19, 1989.

When the Central Park Jogger was found, there was no Walkman on her body.  With the victim in a coma (she subsequently had no memory of the attack or events leading up to it), detectives had no way of knowing she had the Walkman on her at the time of the attack. Although it was her custom to wear a Walkman when jogging, the victim had no memory of whether she did so on that night.  When she was informed in 2002 that Reyes had said that he took her Walkman, she told detectives that she owned two Walkmen and one was missing.

Kharey Wise was questioned at 4:50 AM on April 21, 1989 by Detective Jonza, whose notes list what Wise told him regarding  "persons present when girl raped." (Exhibit E.) Included on the list is the reference "Rudy – played with tits/took walkman."  At the bottom of the page, it is noted, "female had pouch for Walkman on her belt."  Wise's description of the walkman "pouch" is, therefore, similar to Reyes's description of a "fanny pack."  At the time of this interview, neither Detective Jonza, nor anyone else investigating the events of the evening, had any way of knowing that the jogger had a Walkman, or a pouch.  One would have had to encounter the jogger to have that information, a point that has been emphasized by some who have claimed that only Reyes did so.  The name "Rudy" was never linked to anyone, and Wise's reference to the name could represent confusion on his part, or his understanding of the name by which Reyes introduced himself.  In any event, whatever else Wise may or may not have known, the important fact is that he knew the jogger had a Walkman, and a "pouch" to put it in.

P-APP003251

(2)    Witnesses Ronald Williams and Shabazz Head

In the afternoon of April 20, 1989, prior to being arrested, Kharey Wise made admissions to two acquaintances, Ronald Williams and Shabazz Head. They approached Wise at 110th Street and Fifth Avenue and Wise told them to get away from him because the police were after him. Williams and Head walked away. A short time later they encountered him again and asked why the police were after him. Wise replied, "You heard about that woman that was beat up and raped in the park last night. That was us!"

Both Williams and Head were re-interviewed in 2002. Head claimed to have no memory of what he said to the detectives in 1989. Williams gave the same statement that he did in 1989. In addition, he was asked to explain what the statement "that was us" meant to him. He said that he took that to mean that Wise and others had raped the woman in the park on the night of April 19, 1989.

(3)    Witness Melody Jackson

Just before trial, in an effort to locate and interview additional witnesses, detectives asked Corey Jackson, a 15-year old friend of Kharey Wise, to come into the precinct to be interviewed. Jackson came into the 25th Precinct with his 27-year old sister Melody. During this interview, Melody Jackson made an unsolicited statement concerning a conversation she had with Kharey some time after the pre-trial hearing. She explained that she was at her sister's house when the phone rang. She answered the phone and it was Wise calling from Riker's Island. She said hello and then said to him that she couldn't believe that they "did that." Wise repeatedly stated that he didn't rape anyone, finally saying that he "only held her legs down while Kevin fucked her." Jackson seemingly thought her information would be helpful to Wise. She was subpoenaed by the District Attorney's office to testify at trial, and repeated what she had said. Melody Jackson's interview in 2002 re-confirmed her testimony. She also explained the negative effect her testimony has had on her life, once it became apparent that the testimony inculpated Wise.

(4)    Richardson: Scratches

When Kevin Richardson was interrogated by Detective Gonzalez on the morning of April 20, 1989, he was asked to explain the scratches on his face. At first, Richardson said it was an injury he received when he fell. Following more questioning, Richardson stated that he got the scratches from the arresting officer. When told of the possibility that the officer would be asked to corroborate his story, Richardson admitted that he received the scratches from the female jogger while trying to stop the others from attacking her. In a later statement to a detective, Kevin Richardson explained that he lied about how he received the scratch on his face. Richardson said he received it when he tried to take the female jogger off of the road.

(5)    Witness/Defendant Dennis Commedo

Dennis Commedo was interviewed in 1989 because he was suspected of being part of the large group who initially entered the park. He stated that on the night of April 19, 1989, while standing in a ball field in the park at about 100th Street, Kevin Richardson said to him "we just raped somebody." This statement was given to Detective Jonza on

33

April 25, 1989 at 12:45 AM.  This statement by Commedo was included with culpable admissions of his own behavior.  In 2002 he claims to have no memory of the event.

(6)      Witness/Defendant Orlando Escobar

Orlando Escobar was interviewed in 1989 and again in 2002.  Escobar was also implicated as being part of the original group.  On May 11, 1989, Escobar was interviewed by Detective John Hartigan and he stated that on the night of April 19, 1989, while standing in the area of the ball fields, he saw Raymond Santana, Steven Lopez, Kevin Richardson and Yusef Salaam, with others, coming over the hill from the 102nd Street transverse road into the baseball fields.  Escobar was re-interviewed on October 29, 2002 by Detective Tony Rivera.  In this interview, he gave the same statement as in 1989, except he omitted naming Yusef Salaam, and stated others were with Santana, Lopez and Richardson.  He also specified that the group was coming from the direction of where the rape took place.  In both the 1989 and 2002 statements he admitted his own culpability.

(7)      Witness/Defendant Antonio Montalvo

Antonio Montalvo was interviewed in 1989 and gave considerable information about the events of April 19, 1989, including the assault on Diaz, in connection with which he pled guilty.  He did not mention the attack on the female jogger.  In 2002, when he was re-interviewed, Montalvo stated that he had seen Santana, McCray and five others coming over a hill from the direction of the 102nd Street transverse road on the night of April 19, 1989.  He had not realized the significance of this observation until later when he saw a memorial that had been set up at the spot where the female jogger was attacked and realized that Santana, McCray and the others had come from the place where the attack occurred.

Commedo, Escobar and Montalvo were not together when they made these observations nor when they reported them to the police.

(8)      Witness/Defendant Clarence Thomas

During Clarence Thomas' videotaped statement, Thomas stated he overheard Santana and Lopez laughing and talking about how they "made a woman bleed."

(9)      Santana:  "I already got mines"

While being processed at the Central Park Precinct and in response to a comment by Police Officer Powers that the group should be home with their girlfriends and not beating people, Santana looked at Steven Lopez, smiled and said "I already got mines."  Santana and Lopez then both laughed.  (This statement was suppressed at trial as given without a Miranda warning.)

(10)     Santana:  Admission of Contact

While being transported from the Central Park Precinct to the 20th precinct by Detective Sheehan, Santana said, not in response to any question, "I had nothing to do with the rape.  All I did was feel the woman's tits."

34

(11)    Santana: Location of Attack

Following his videotaped interview, Santana and his father were driven home by Detective Michael Sheehan to get fresh clothing, stopping at the 102nd Street transverse road along the way.  When asked where the attack occurred, Santana pointed north of the transverse road down towards the ravine.  They walked into the woods and Santana said that it was too dark to find anything else.

(12)    Richardson: Reference to Woman

While interviewed by P.O. Powers, on April 20, 1989 at 6:00 PM, the officer asked Richardson who he thought was hurt worse, the man or the woman.  Richardson replied that he thought "the man looked worse than the woman."

(13)    Richardson: Reference to "Getting Her"

After being brought back to the crime scene on the morning of April 20th, Richardson, while standing on the 102nd Street transverse, told Detective Sheehan that, "This is where we got her."

(14)    Richardson: Scene

Later that morning on a second trip to the scene, Richardson accurately identified an area northwest of a large tree on the slope north of the transverse as the area where "the raping occurred."

(15)    Wise: "That's a lot of blood"

After being brought back to the crime scene by Detective Sheehan and Assistant District Attorney Fairstein on the morning of April 20th, and while walking down towards the spot where the rape occurred, Wise was overheard muttering, "Damn, damn that's a lot of blood. Damn, this is really bad, that's a lot of blood."  When asked why he was so surprised by the amount of blood, he answered, "I knew she was bleeding but I didn't know how bad she was.  It was really dark.  I couldn't see how much blood there was at night." (See Hearing Transcript pp. 4560-4561, 4569.)

(16)    Wise: Reference to Rape – "We" and "They"

When asked if he was familiar with the area, Wise responded, "This is where we" and stopped and finished "they raped her."  When asked what happened here, Wise says, "This is where they dragged her."  Again he started to say "we" and changed to "they."

(17)    Wise: Washed his clothes

Kharey Wise was asked to go to the precinct the day after the April 19, 1989 assaults in Central Park.  During one of his interviews with Detective Hartigan at the precinct on April 20, 1989, Wise revealed that he washed his clothes when he got home the night before.

e.    The Timeline of Events

The press and others have produced elaborate analyses of proposed timelines covering the various events on the evening the jogger was attacked.  The public is asked to conclude that the defendants did not have the time to participate in the attack upon the jogger because they were busy, at specific times, with other assaults.  It is

P-APP003254

said that a series of attacks took place on the east side of the park, ending at 9:15 PM and that the first of several attacks around the reservoir occurred at 9:25 PM, leaving a window of only ten minutes for the assault on the female jogger.

This reasoning depends upon a selective analysis of the evidence from which various events are timed.   In fact, no accurate timeline can be constructed because the evidence regarding the timing of the various events and the individuals who participated in them is not sufficiently precise to allow any exact conclusion.

A key time, necessary to the "window of opportunity" theory is the time of the assault upon the first of the male joggers, David Lewis.  That time must be fixed at 9:25 PM, in order to support the argument that a "window" of only ten minutes existed.  However, the following are the various times given as the possible time of the attack on Mr. Lewis: in the original police report created April 19th, a detective recorded the time as 9:25 PM; another summary of the events by a police officer had the attack occurring at 9:42 PM; a detective's chronology summary has the attack also as occurring at 9:42 PM; the Manhattan District Attorney's office recorded it as 9:42 PM in their chronology created April 28, 1989; at the first trial no time was fixed for the assault, only the time that Mr. Lewis left his residence at 89th Street as 9:22 PM; at the second trial, testimony indicated that 9:24-9:28 PM was the time of this assault; in a 2002 interview, Mr. Lewis stated that he never knew an exact time for the assault, but in 1989 he had estimated that he left his house sometime between 9:10 and 9:15 PM based on what the prosecutors had told him.  Attached is Exhibit F, which shows some different possible timelines based on the credible testimony of individuals at different parts of these proceedings.

Illustrative of the unreliability of constructing timelines in this case is the fact that not even the basic assumption upon which the "window of opportunity" theory is based – that the jogger was attacked sometime between 9:15 PM and 9:30 PM – is free from doubt.  It has been assumed that the jogger was attacked at approximately 9:15 PM, before the attacks upon the male joggers at the reservoir.  Not previously a hotly contested issue, the evidence establishing the time of the attack on the jogger has been accepted to be:  that she left her apartment at approximately 8:55 after having a chat of unknown duration with a neighbor; that her normal jogging rate, over her normal route, would have put her at the scene of the attack at approximately 9:15 to 9:30; and that she expected to be back at her apartment at 10:00 to meet someone.  The time estimate based on these elements is hardly precise.  Perhaps the jogger arrived at the park later than estimated if she was held up by traffic, or traveled a different route than the normal one, or stopped to speak to someone or to browse in a store.  Any of these, or numerous other possibilities, could have delayed her arrival at the point of attack in the park to 9:45 PM, with still plenty of time to get back to her apartment at about 10:00. In that event, she was assaulted after the male joggers, and the "window of opportunity" theory becomes irrelevant.

We believe that no accurate timeline exists and none can be reliably constructed.

District Attorney Morgenthau and senior staff members, in a meeting with us to discuss the case, agreed that it was impossible to fix times accurately enough to support any argument, one way or the other, about the possible involvement of the defendants in the

36

P-APP003255

rape of the jogger.  No precise estimate is offered in the Ryan Affirmation as to when the jogger was attacked.

### f. Forensic Evidence

In the publicity surrounding the motions by the defendants to vacate their convictions, a common theme has been that the District Attorney's investigation demonstrated, by new DNA evidence unavailable at the time of the trial, that all of the forensic evidence admitted at trial has now been discredited.  This contention is inaccurate.

The most important new forensic evidence is, of course, the DNA tests proving that the previously unidentified semen and pubic hair belonged to Matias Reyes.  This finding adds nothing to the evidence introduced at trial other than Reyes's identity.  The proof in defendants' trials brought out the fact that the semen and pubic hair evidence was that of an unidentified person, other than the defendants.   The new DNA evidence, therefore, does not assist in determining whether the defendants were present during the attack on the jogger.

Other evidence admitted at trial consisted of: three hairs, one pubic, found on Kevin Richardson's clothing that were "consistent" with the jogger's hair; one hair "consistent" with the jogger's found on Steven Lopez' clothing; a blood stain on Raymond Santana's sneaker; individual blood stains on Yusef Salaam's jacket and Steven Lopez's underwear; and semen stains on the underwear of Antron McCray and Kevin Richardson and the sweatshirt of Raymond Santana.

We have not been given access to all of the forensic test material.[6]  Nevertheless, it is apparent, from the Ryan Affirmation, that no new DNA evidence contradicts any of the evidence introduced at trial.  Experts have now been retained by the District Attorney to redo the same tests to which their experts testified at trial.  They have, in some respects, disagreed with the previous testimony.

Tests described in the Ryan Affirmation concern hairs found on Kevin Richardson. At the original trial, testimony was presented that the hairs found on Richardson were "similar" to the jogger's hair.  The new FBI microscopic analysis tests, however, conclude that the hairs found on Richardson were not suitable for comparison. In other words, no comparison could be done. New mitochondrial DNA tests conducted on these hairs were inconclusive, i.e., no conclusions could be drawn from the results.

According to the Ryan Affirmation, the hair found on Lopez's clothing cannot be found and, therefore, cannot be retested.

In addition, new tests were conducted on hair and blood found on a rock recovered at

---

[6] As part of the District Attorney's investigation of Reyes's claim, new forensic tests were conducted by the FBI and a private laboratory on some of the physical evidence that was presented at the original trials. As yet, we have not been provided with the lab reports from the private laboratory and have been able to obtain access to only some of the lab reports prepared by the FBI in connection with those tests. Thus, it is not clear precisely what evidence was re-tested or what were the results of those tests.

P-APP003256

the crime scene. The new test results apparently concluded that: (1) no comparison could be done on the hair fiber because no suitable control was available; and (2) the blood on the rock was found to be female but inconsistent with the jogger's profile, however, contamination is noted as a possible reason for this inconsistency. These test results seem to have no bearing on the defendants' participation in the jogger attack.

The Ryan Affirmation makes no reference to the blood or semen evidence. This evidence was by no means dispositive at trial, but the fact that it exists is important. For instance, it contradicts various reports that no blood was found on any of the defendants.

In sum, the new test results establish that Matias Reyes is the previously unknown source of the semen found on the female jogger and her clothing. They do not prove that the defendants could not have participated in the attack.

## ASSAULTS ON OTHERS

In addition to their convictions for the rape and assault on the female jogger, the defendants were also convicted of crimes with respect to other attacks occurring that evening; Kevin Richardson, Antron McCray, Raymond Santana and Yusef Salaam were convicted of riot, the robbery and assault of John Loughlin and the assault upon David Lewis. Kharey Wise was convicted of riot. Another defendant, Steven Lopez, who was a central defendant in the case of the female jogger, arranged a plea bargain whereby he pleaded guilty to the assault on Loughlin and received a sentence of 1 ½ to 4 years. In addition, Michael Briscoe, Jermaine Robinson, Antonio Montalvo and Orlando Escobar pleaded guilty to various charges of riot, assault, robbery and attempted robbery with respect to the attacks upon Antonio Diaz, Loughlin and Lewis.

Justice Tejada ruled, as the District Attorney recommended, that the convictions on these charges against the defendants, as well as those involving the female jogger, should be vacated, although the newly discovered evidence of Matias Reyes's rape of the female jogger related only to that event. We understand the legal position underlying Justice Tejada's ruling, that the existence of new evidence regarding the most significant charge against the defendants may have affected the juries' ability to consider evidence regarding the other charges. However, we believe that there is no reason, on the merits, to think that a jury fairly presented with the evidence against the defendants would come to a different conclusion than was reached before.

In the first place, some of the defendants have repeated their admissions of guilt. Raymond Santana testified at a parole hearing on February 9, 1994 and he was questioned about the crimes he committed on April 19, 1989. He admitted that he and his friends planned to go to the park that night to rob and assault people. He stated that about seven or eight friends devised the plan. They were prepared to attack whoever they encountered that night in the park. Santana reiterated that they had let one, a couple, go because the man was with his girlfriend. Santana also admitted to beating a man. He denied only the rape. When Antron McCray went before the parole board in

38

November 1994, he admitted all of his crimes except for the rape of the female jogger. Two of the defendants, Raymond Santana and Kevin Richardson, during interviews conducted by detectives in 2002, admitted their participation in the assaults that did not involve the jogger.

The District Attorney has pointed out that these post-trial admissions of guilt cannot be taken into consideration with respect to the defendants' motions to vacate their convictions, since that issue must be decided on the basis of evidence that could have been introduced at trial. However, there is no reason to ignore such statements when attempting to come to a conclusion as to what actually happened.

As with the case involving the female jogger, most of the evidence with respect to the other crimes comes from the statements of the participants in those crimes.

The following is a listing of some of the evidence regarding the five defendants' participation in the other assaults:

The assault on Antonio Diaz.  A total of 23 people were named as participants or as being present:

> Richardson was implicated by 7 accomplices; he also admitted participation.
> Santana was implicated by 5 accomplices; he denied participating although he saw some kind of commotion from a distance.
> McCray was implicated by 6 accomplices; he admitted participation.
> Salaam was implicated by 3 accomplices; he did not admit or deny participation but was present.
> Wise was implicated by 5 accomplices; he acknowledged being present, but denied participation.

The harassment of the couple on the tandem bike.  A total of 13 people were named as participants or as being present:

> Richardson was implicated by 3 accomplices; he also admitted participation.
> Santana was not implicated by anyone; he did not mention this incident at all.
> McCray was implicated by 1 accomplice; he admitted participation.
> Salaam was implicated by 2 accomplices; he admitted participation.
> Wise was implicated by 2 accomplices; he admitted participation.

The crossing of the 96th Street Transverse road to the reservoir.  A total of 17 people were identified as having gone south towards the reservoir:

> Richardson was implicated by 2 accomplices; he admitted going.
> Santana was implicated by 5 accomplices; he admitted going.
> McCray was implicated by 4 accomplices; he admitted going.
> Salaam was implicated by 3 accomplices; he admitted going.
> Wise was implicated by 1 accomplice; he eventually admitted going.

39

The assault on the jogger David Lewis.   A total of 11 people were identified as participants or as being present:

> Richardson was implicated by 1 accomplice; he denied participation.
> Santana was implicated by 2 accomplices; he admitted participation.
> McCray was implicated by 3 accomplices; he did not discuss this assault.
> Salaam was implicated by 1 accomplice; he did not discuss this assault.
> Wise was not implicated by anyone; he did not discuss this assault.

The assault on the jogger John Loughlin.   A total of 19 people were identified as participants or as being present:

> Richardson was implicated by 5 accomplices; he denied participation.
> Santana was implicated by 6 accomplices; he admitted participation.
> McCray was implicated by 6 accomplices; he admitted participation.
> Salaam was implicated by 7 accomplices; he admitted participation.
> Wise was implicated by 2 accomplices; he did not discuss this assault.

Whatever conclusions may be reached regarding Matias Reyes's claim that he raped the female jogger alone, there seems to be no reason to believe that the defendants were innocent of the other crimes for which they were convicted.

CONCLUSION

The only new evidence that exists regarding the events in Central Park on the night of April 19, 1989 is the statement by serial rapist/killer Matias Reyes that he alone assaulted and raped the female jogger.   DNA confirms that Reyes raped the jogger but we have nothing but his uncorroborated word that he did so alone.   If Reyes's claim that he attacked the jogger by himself is true, it necessarily follows that the statements of the five defendants who were convicted of the crime, as well as those of the other witnesses who described it, were erroneous.

In that event, the question arises whether the statements were coerced or "suggested" by the interrogating officers.   That question is, of course, central to our task of analyzing police behavior with respect to these events.

We believe that the issue of coercion was laid to rest authoritatively by the exhaustive opinion of Judge Galligan, following a lengthy Huntley hearing.   Whether the defendants' statements were accurate or not, the methods used in obtaining them were examined by Judge Galligan with utmost care.   We have not seen any evidence to suggest that Judge Galligan was in error and our review of available information confirms that police interrogations were conducted professionally and in accordance with applicable rules.

Affirming that neither the police nor the prosecutors engaged in outright coercion, the District Attorney has theorized that facts may have inadvertently been suggested to

40

P-APP003259

defendants and witnesses, enabling them to describe the attack on the jogger with sufficient particularity to make their statements credible.  To determine whether this sort of thing went on, it is necessary to analyze the consistencies and inconsistencies in the various statements.  The considerations are similar to those relevant to the basic question of whether Reyes is to be believed when he says he attacked the jogger alone.  Those who believe Reyes emphasize the inconsistencies in the defendants' statements and those who do not believe him point to the statements' consistencies and to other supporting evidence.

The District Attorney, in responding to defendants' motions to dismiss the charges against them, laid out, in considerable detail, the arguments supporting the contention that Reyes was the sole attacker.  Since the District Attorney had no reason to explore counter-arguments, we have done so, in order to complete the record.

We conclude that the various inconsistencies in defendants' statements, and the other recently revealed weaknesses in the evidence presented at trial, when viewed in light of Reyes's claim that he alone attacked the jogger, could afford a reasonable basis for maintaining that Reyes did, indeed, commit an attack on the jogger by himself.

However, the consistencies found in the defendants' statements, the informal remarks made by the defendants at various times, the corroborative testimony of other witnesses, the absence of a convincing motive for Reyes and suspicion of his general credibility, lead us to conclude that it is more likely than not that the defendants participated in an attack upon the jogger.

We adopt the view that the most likely scenario for the events of April 19, 1989 was that the defendants came upon the jogger and subjected her to the same kind of attack, albeit with sexual overtones, that they inflicted upon other victims in the park that night.  Perhaps attracted to the scene by the jogger's screams, Reyes either joined in the attack as it was ending or waited until the defendants had moved on to their next victims before descending upon her himself, raping her and inflicting upon her the brutal injuries that almost caused her death.

On this theory of the facts, there is no reason to believe that the defendants were prompted into making erroneous statements.

With respect to the other crimes for which the defendants were convicted, we are aware of no new evidence or reason to review the old evidence regarding those crimes.  Two of the defendants reaffirmed their guilt for these crimes at parole hearings and one of these, together with a third, did so in 2002, after Reyes came forward to make his confession.  Moreover, four other individuals who had pleaded guilty to the assaults, implicated the defendants in these crimes in their interrogations or recorded statements.  We understand the technical legal position espoused by the District Attorney and adopted by the Court, vacating these convictions.  However, we firmly believe that this legal ruling affords no basis for maintaining that the defendants were not involved in the other crimes for which they were convicted.

41

P-APP003260

## OBSERVATIONS AND LESSONS LEARNED

In addition to our factual conclusions, we offer the following observations:

- **Early assignment of a senior commander**
  Some early confusion in this complex case could have been avoided if procedures which would likely be used today in a similarly complex investigation were in effect then, namely: the establishment of 12-hour tours for the senior commanders overseeing the investigation; the establishment of a command center where all information related to the investigation could be received and correlated; and the establishment of regular briefings so that all personnel assigned to the case could be kept informed.

- **Establishment of a Management Team**
  A management team should have been established on the evening of April 19, 1989, for the purpose of overseeing all investigative steps and facilitating information-sharing among all investigative personnel. Had this occurred, factual accounts provided by the suspects that lacked clarity or needed additional exploration could have been identified and resolved prior to videotaping.

- **Allocation of adequate space to conduct interview of minors**
  There was inadequate space to conduct interviews of minors. This problem has only become worse with the passage of time.  The Department should consider rehabilitating or constructing new precinct space to accommodate interviews of minors.

- **Evidence accountability and control**
  The then Manhattan Chief of Detectives brought home with him the only available copies of some Polaroid photos of the female jogger that had been taken by investigators, making them unavailable for use by the prosecutor during the videotaped questioning of the suspects. The Polaroid photos were eventually made available to the prosecutor but only during Kharey Wise's videotaped interrogation. This action could have exacerbated problems associated with the interrogations. It was obviously wrong for this to have occurred, but it does not appear to be a systemic problem and is unlikely to recur.

- **Forensic management**
  During the photographing of the pants of one of the defendants, the pants were placed on the precinct floor, creating a risk of potential evidence contamination and compromise of any trace evidence taken from them. Again, this error is unlikely to recur because of reforms implemented after the Department's crime scene unit was reorganized and its procedures were reviewed and modified in 1995.

42

- <u>Case review and coordination</u>
  It is now known that among the series of violent crimes that he committed, Matias Reyes also raped a woman in Central Park on April 17, 1989, just two days before the jogger attack. There has been some criticism directed at the Department for the failure to connect the April 17, 1989 rape to the April 19, 1989 attack on the jogger. Reyes was identified as a possible suspect in the April 17, 1989 rape, and was later arrested, in August, 1989, for another rape and murder to which he ultimately pleaded guilty. If, at the time, it had occurred to either the police or the prosecutors that the April 19th rape might have been committed by the same individual that had raped someone on April 17th, it would have been simple to compare the DNA recovered from the jogger against that of the defendant they now had in custody. But, the police and the District Attorney's office had a set of confessions and were satisfied that the defendants perpetrated the attack on the jogger. They had no cause to search for links to other cases until DNA tests in November, 1989 indicated that the semen from the jogger did not match any of the defendants. Today's case review methods would substantially increase the probability of identifying cases with seemingly very few similarities.

  Another factor that may have interfered with a realization that the April 17th and April 19th rapes were connected was the fact that one of them was investigated as a homicide case and the other as a sex crimes case. Under current procedures, information in cases like this is shared.

- <u>Use of DNA</u>
  In 1989, procedures were not in place to facilitate the comparison of DNA evidence in one case with that in another, particularly after the DNA test results were taken by the District Attorney's office to prepare for trial. This problem is unlikely to recur due to the creation in 1994 of a DNA databank. DNA is now routinely collected from defendants convicted of certain statutorily prescribed crimes and fed into a database to which both the Department and the District Attorney's office have access. Unidentified DNA evidence recovered from a crime scene is entered into the databank and stored for future comparisons.

Respectfully submitted,

Michael F. Armstrong, Esq.

Stephen L. Hammerman, Esq.

Jules Martin, Esq.

43



Davis Wright
Tremaine LLP

Suite 2400
865 South Figueroa Street
Los Angeles, CA  90017-2566

Jonathan L. Segal
213.633.8667 tel
213.633.6899 fax

jonathansegal@dwt.com

July 25, 2016

*Via Electronic Mail (robert.zimet@skadden.com)*

Robert Zimet
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, 10036-6522

Re:     Your Correspondence of June 9, 2016

Dear Mr. Zimet:

I write on behalf of the filmmakers working on the yet-untitled project regarding the Central Park jogger case, in response to your letter of June 9, 2016.

The filmmakers reached out to your clients in hopes of collecting their recollections and insights about the case, in order to gain a fuller picture of this decades-old historical event.  In response to their good-faith inquiry, your clients have retained counsel to preemptively enumerate their concerns.

This project, however, is in its very early stages, as you acknowledge in your letter.  Your clients cannot possibly object to their portrayal in the project; there is not yet any portrayal for them to find objectionable.[1]  Your clients can also rest assured that if this project comes to fruition, the film would be meticulously researched and vetted based on the public record and any new investigation undertaken by the filmmakers.  If your clients sincerely wish to for the filmmakers to receive their perspective on these events, then they will accept the filmmakers' still-open offer to sit for interviews.

---

[1] Given the fact that no film exists, and that your clients have no basis to believe that the filmmakers will wrong them in any way, the request for the filmmakers to preserve any documents related to the project is premature. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  ("Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence *in pending or reasonably foreseeable litigation.*") (emphasis added).  There is no foreseeable litigation, let alone "pending" or "reasonably foreseeable" litigation.

DWT 29947770v3 0089729-000013

Anchorage      New York        Seattle
Bellevue       Portland        Shanghai
Los Angeles    San Francisco   Washington, D.C.                        www.dwt.com

P-APP003263

Robert Zimet
July 25, 2016
Page 2

Regardless of whether interviews occur, should the filmmakers choose to include a portrayal of your clients in any project that is developed, they would be entitled to the full protection of the First Amendment. As the United States Supreme Court has held, "[m]otion pictures are a significant medium for the communication of ideas." *Burstyn v. Wilson*, 343 U.S. 495, 501, (1952). It follows that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." Id. at 502. "Popular entertainment is entitled to the same constitutional protection as the exposition of political ideas: It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories." *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 323-324 (1997). It is also worth noting that your clients, who were government officials prosecuting one of the highest-profile cases of the 20th Century, are public figures.

The filmmakers still wish to meet with your clients to discuss the case despite the initial reaction provoked by their inquiry. Any interview, however, will not be subject to any preconditions. If you'd like to discuss this matter further, or arrange an interview, please feel free to give me a call at (213) 633-8667.[2]

Sincerely,

Jonathan Segal /as

Jonathan L. Segal
DAVIS WRIGHT TREMAINE LLP

---

[2] This letter is sent without any waiver or relinquishment of the filmmakers' rights or remedies against your clients, all of which are expressly reserved.

DWT 29947770v3 0089729-000013

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2520
DIRECT FAX
212-777-2520
EMAIL ADDRESS
ROBERT.ZIMET@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

July 28, 2016

Jonathan L. Segal, Esq.
Davis Wright Tremaine LLP
Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2568

RE:     Your Correspondence of July 25, 2016

Dear Mr. Segal:

I write on behalf of this firm's clients, Elizabeth Lederer and Linda Fairstein, in response to your letter dated July 25, 2016. I assume when you indicated you were writing on behalf of the "filmmakers," you were referring to the addressees of my June 9, 2016 letter—Jane Rosenthal, Ava Duvernay, and Tribeca Film. Please let me know if that assumption is incorrect.

While I note the filmmakers' representation and claim that the yet-untitled project regarding the Central Park jogger case will be "meticulously researched and vetted," our clients retained counsel since prior efforts to document the events surrounding the same case have been biased, poorly researched, factually

P-APP003265

Jonathan L. Segal
July 28, 2016
Page 2

inaccurate, and personally and professionally damaging.[1]  Our clients are likewise

concerned about the prospects for this project.  By purchasing the life rights of the

Central Park defendants before even contacting our clients, the filmmakers aligned

themselves to a certain perspective without exercising due, much less scrupulous,

diligence.  To the extent the filmmakers are truly committed to fairness and rigorous

and thorough factual research and accuracy, there is no apparent reason for their

reluctance to represent that they will consult the sources of information named in my

June 9, 2016 letter.  Without any such assurances, however, our clients have no

reason to believe that any depiction of them will not publish erroneous or misleading

impressions and factual assertions and will not rely on biased sources of information.

Indeed, if anything, your letter underscores the risk of a casual

approach to the facts:  Ms. Fairstein, for instance, was not a prosecutor in the Central

Park jogger case as you assert.  Moreover, your reference to the case as a "historical

event" and "one of the highest-profile cases of the 20th Century" echoes the

hyperbolic tendencies of those claiming—but ultimately failing—to accurately

recount and portray the events of the case and our clients' roles in the prosecution.  If

the film's eventual portrayal of our clients also fails to adhere to the truth, our clients

---

[1]  This letter is sent with a full reservation of rights.  As we noted in our prior letter,
that Ms. Fairstein and Ms. Lederer did not sue for previous misrepresentations
during the pendency of the lawsuit against the City of New York does not license
malicious, intentional or reckless defamation of them.

Jonathan L. Segal
July 28, 2016
Page 3

are prepared to exercise the full scope of their rights to challenge any defamatory

statements, portrayals, and implications in the final released film.[2]

I understand your position to be that the filmmakers are not yet

obligated to preserve documents related to the project.  However, given that the

filmmakers are on notice of potential claims that may arise out of the project and our

clients' willingness to pursue them, the filmmakers have a present and ongoing

obligation to preserve materials that may become relevant to any future litigation

involving potentially defamatory statements, portrayals, and implications.[3]

---

[2]   See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254 (1964); Westmoreland v. CBS Inc., 596 F. Supp 1170, 1174 (S.D.N.Y. 1984) (denying defendants' motion for summary judgment in libel action arising out of television documentary's depiction of public official, because plaintiff asserted "dishonesty and willful falsity in the editing and preservation of evidence"); see also Goldwater v. Ginzburg, 414 F.2d 324, 337 (2d Cir. 1969), cert. denied, 396 U.S. 1049 (1970) (affirming judgment against defendant reporter and magazine publisher in libel action brought by presidential candidate where the reporter had "added certain innuendoes to some quoted statements and quoted other statements out of context in order to support his predetermined result").

[3]   See, e.g., Zubulake v. UBS Warburg L.L.C., 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."); Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation."); see also Blinzler v. Marriott Intern., Inc., 81 F.3d 1148, 1159 (1st Cir. 1996) ("When evidence indicates that a party is aware of circumstances that are likely to give rise to future litigation and yet destroys potentially relevant records without particularized inquiry, a factfinder may reasonably infer that the party probably did so because the records would harm its case.").

Jonathan L. Segal
July 28, 2016
Page 4

Accordingly, I reiterate my request that the filmmakers take steps to preserve materials relating to the project that are currently in the filmmakers' possession, custody, or control, and that come into the filmmakers' possession, custody, or control in the future.

Very truly yours,

Robert E. Zimet

cc:    Linda Fairstein
       Elizabeth Lederer



**Ana**
@anamunguiaoffc

Just finished When they see us on Netflix, broke my heart, most most of all i never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail, and suffer things no child should , so fuck you linda , say hi to the devil for me #CancelLindaFairstein

1:04 AM · Jun 4, 2019 · Twitter for iPhone

**376** Retweets   **1.2K** Likes

---

**JustCJ** 🎗️ @StillJustCJ · Jun 5, 2019
Replying to @anamunguiaoffc
The double standard is nuts. Remove her title & that the victim's were black and she'd be treated the same as R. Kelly or Michael Jackson. It's still an abuse of power perpetrated against defenseless children. Her position and systematic abuse of the law make it worse.
1                                    7

**Mona Herrera Urias** @herreramona · Jun 5, 2019
Replying to @anamunguiaoffc
God bless those young men for the injustice n that chick Linda will pay for what she did!!
                                       1

**Nakisha Gardner** @MzKisha_28 · Jun 4, 2019
Replying to @anamunguiaoffc
Right, they were children.... ugh!!!
2                                    7

**Ana** @anamunguiaoffc · Jun 4, 2019
Exactly!
                                       4

**Jeffrey Adjei** @Attakaay · Jun 4, 2019
Replying to @anamunguiaoffc
Lol.... It's saddening.
1                                    1

**Cathy Loiacono** @Catloia · Jun 4, 2019
It's maddening.
                                       2

**Cathy Loiacono** @Catloia · Jun 4, 2019
Replying to @anamunguiaoffc
I actually hated Felicity Huffman. They say it's the sign of a great actress. I watched with a lump in my throat and eyes filled with tears. There was also someone else that I didn't like much to begin with and now I'd like to RIP his eyes out. He is satan in the flesh.Guess who.
1                                    1

**Ana** @anamunguiaoffc · Jun 4, 2019
The detective.
1

**Cathy Loiacono** @Catloia · Jun 4, 2019
Nope. The guy who took out the ad in the newspaper. He was on the tv a couple of times.
1                                    3

**Ana** @anamunguiaoffc · Jun 4, 2019
Yes , many people throughout the show make you angry , people who really need to feel what they went through, the scariest thing is one of those people is our president...
1                                    1

**Cathy Loiacono** @Catloia · Jun 5, 2019
Bimgo!.
                                       1



 **BK**
@BrandonKitchin

Your camp issued a statement condemning the work of @ava after you requested your image be controlled in the docuseries after she reached out to you, only to later deny that conversation ever took place. You're doing a lot for someone who "did no wrong"  #CancelLindaFairstein



"Netflix and Ms. DuVernay are doing a terrible disservice to the public, and should be ashamed by their irresponsibility in failing to properly research the film and effectively compromising its accuracy."

- Statement from Andrew T. Miltenberg on behalf of Ms. Fairstein

"CENTRAL PARK FIVE" PROSECUTOR UNDER FIRE
RESIGNS FROM BOARDS AFTER NETFLIX SERIES LEADS TO BACKLASH — TODAY

11:51 AM · Jun 6, 2019 · Twitter for Android

**4** Retweets  **12** Likes

Q Search Twitter

**Relevant people**

 **BK**  [Follow]
@BrandonKitc...
UNT '21 | TCU '18 | ΩΨΦ | FBMA | Soldier of God

 **Ava DuVe...** ✔  [Follow]
@ava
Mom of 10: When They See Us, Wrinkle in Time, Queen Sugar, 13th, Selma, Middle of Nowhere, Venus VS, I Will Follow, My Mic Sounds Nice, This is The Life. xo

**Trends for you**

Politics · Trending
**Mitt Romney**
Trending with: Senator Romney, #MittRomneyIsMyHero, Senator Mitt Romney

Politics

 **MelissaSchuman** ✔
@MelissaSchuman

**#CancelLindaFairstein** What **#LindaFairstein** did to these young men is beyond disgusting & excruciating to watch. Thank u **@netflix** for bringing their story to light. Everyone pls watch **#WhenTheySeeUs** **#BlackLivesMatter** ✊🏾 **#netflix**



**Perspective | The slippery moral calculus of Linda Fairstein**
Her work on behalf of women was worthy of praise. But too many chose to overlook her disgraceful persecution of the Central Park Five.
🔗 washingtonpost.com

1:29 PM · Jun 6, 2019 · Twitter for iPhone

**5** Retweets    **11** Likes

            

**Relevant people**

 MelissaSc... ✔    **Follow**
@MelissaSch...
Actress ▪ Recording Artist ▪ MeToo Advocate ▪ Trauma informed ▪ DLive Streamer Inquiries: Melimelbookings@gmail.com

 Netflix US ✔    **Follow**
@netflix
we're all making mat this year.

**Trends for you**

Politics · Trending
**Mitt Romney**
Trending with: #MittRomneyIsMyHero, Senator Mitt Romney

World news
White House scraps

# Tweet

## Rashad Robinson ✓
@rashadrobinson

Linda Fairstein should not have any kind of platform. Clearly, she's still using hers to weaponize an unjust system to attack Black people. Publishers should be more concerned about enabling her than about rage clicks & selling crime novels. #CancelLindaFairstein #WhenTheySeeUs

> **ColorOfChange.org** ✓ @ColorOfChange · Jun 8, 2019
> #LindaFairstein prosecuted the five innocent Black boys featured in Ava's #WhenTheySeeUs. She shouldn't be able to make more money off ruining the lives of young Black people she targeted. Tell @simonschuster to #CancelLindaFairstein cancellindafairstein.org
>
> 
>
> **#CancelLindaFairstein**
> DEMAND SIMON & SCHUSTER AND RANDOM HOUSE DROP CENTRAL PARK FIVE PROSECUTOR LINDA FAIRSTEIN.
> COLOR OF CHANGE

11:51 AM · Jun 11, 2019 · Twitter Web App

**22** Retweets   **57** Likes

---

## Erica Savage @1ericasavage · Jun 11, 2019
Replying to @rashadrobinson
I want to thank you for these campaigns and the online guide/tool companion for When They See Us. I make sure that I post your calls to action on my blog. Appreciate all that you and team members of Color of Change do!🙏🏾

♡ 1

---

**Relevant people**


**Rashad R...** ✓ [ Follow ]
@rashadrobin...
President @ColorOfChange, foodie and hat aficionado. Changing the written and unwritten rules in media, tech, business & gov't. Views my own.


**ColorOfC...** ✓ [ Follow ]
@ColorOfCha...
We design campaigns powerful enough to end practices that unfairly hold Black people back, & champion solutions that move us all forward. #UntilJusticeIsReal.


**Simon & S...** ✓ [ Follow ]
@simonschus...
Welcome to Simon & Schuster's official Twitter account! Follow us for conversation on the best in books, including literary news, recommended reads, and more!

Search Twitter

# Tweet

**Rashad Robinson** ✓
@rashadrobinson

Linda Fairstein should not have any kind of platform. Clearly, she's still using hers to weaponize an unjust system to attack Black people. Publishers should be more concerned about enabling her than about rage clicks & selling crime novels. #CancelLindaFairstein #WhenTheySeeUs



**ColorOfChange.org** ✓ @ColorOfChange · Jun 8, 2019
#LindaFairstein prosecuted the five innocent Black boys featured in Ava's #WhenTheySeeUs. She shouldn't be able to make more money off ruining the lives of young Black people she targeted. Tell @simonschuster to #CancelLindaFairstein cancellindafairstein.org

#### #CancelLindaFairstein
DEMAND SIMON & SCHUSTER AND RANDOM HOUSE DROP CENTRAL PARK FIVE PROSECUTOR LINDA FAIRSTEIN.

11:51 AM · Jun 11, 2019 · Twitter Web App

22 Retweets  57 Likes

**Erica Savage** @1ericasavage · Jun 11, 2019
Replying to @rashadrobinson
I want to thank you for these campaigns and the online guide/tool companion for When They See Us. I make sure that I post your calls to action on my blog. Appreciate all that you and team members of Color of Change do!🙏🏾

1

---

Search Twitter

### Relevant people


**Rashad R...** ✓ **Follow**
@rashadrobin...
President @ColorOfChange, foodie and hat aficionado. Changing the written and unwritten rules in media, tech, business & gov't. Views my own.


**ColorOfC...** ✓ **Follow**
@ColorOfCha...
We design campaigns powerful enough to end practices that unfairly hold Black people back, & champion solutions that move us all forward. #UntilJusticeIsReal.


**Simon & S...** ✓ **Follow**
@simonschus...
Welcome to Simon & Schuster's official Twitter account! Follow us for conversation on the best in books, including literary news, recommended reads, and more!



**Yules**
@yulritch

I hope Linda Fairstein knows that nobody believes a word that comes out of her mouth. Saying the Netflix series isn't true. Just like she lied and made things up about innocent kids. Karmas a bitch Linda. Tsk tsk tsk. What goes around comes around #CancelLindaFairstein

1:15 AM · Jun 11, 2019 · Twitter for iPhone

**3** Retweets **23** Likes

### Relevant people



**Yules**
@yulritch                    Follow

the ones who like me, love me.

### Trends for you

Politics · Trending
**Steve Scalise**
4,889 Tweets

**#IrresistABowls**
You can't resist Applebee's New Irresist-A-Bowls, starting at $7.99!
Promoted by Applebee's

NBA · Trending

**-**
@avxrel

**#CancelLindaFairstein** this bitch needs to be locked tf up and die in jail

11:17 AM · Jun 24, 2019 · Twitter for iPhone

**2** Retweets   **9** Likes

Search Twitter

**Relevant people**

**-**
@avxrel                    Follow

**Trends for you**

Politics · Trending
**Sen. Mitt Romney**
16.9K Tweets

Politics · Trending
**Trayvon Martin**
67.2K Tweets

In memoriam
Trayvon Martin would

**Fiachra**
@Fiachra82726062

#CancelLindaFairstein hope the bitch dies she should rot in jail

9:39 AM · Jun 30, 2019 · Twitter Web App

**2** Retweets   **15** Likes

Search Twitter

**Relevant people**

Fiachra
@Fiachra827...                Follow

**Trends for you**

Politics · Trending
**Trayvon Martin**
66.1K Tweets

In memoriam