UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LINDA FAIRSTEIN,

      Plaintiff,

v.                                    Case No.: 2:20-cv-00180-JLB-MRM

NETFLIX, INC., AVA DUVERNAY, and
ATTICKA LOCKE

      Defendants.

_____/

## ORDER

On May 31, 2019, Defendant Netflix, Inc. ("Netflix") released the four-part series <u>When They See Us</u> ("the Series") on its global streaming platform. (Doc. 1 at ¶1.) The Series is a dramatization of the highly publicized case of the Central Park Five—a group of five African-American and Latino teenagers ("the Five") who were tried and convicted on charges connected to the violent rape of Patricia Meili in New York City's Central Park on the night of April 19, 1989. (<u>Id.</u> at ¶¶36–38.) In 2002, the Five's convictions were vacated after Mattias Reyes confessed to attacking Ms. Meili, and his DNA matched samples taken from Ms. Meili and her personal belongings. (<u>Id.</u> at ¶41.) Twelve years after their convictions were vacated, the Five settled a civil suit against New York City for $41 million. (<u>Id.</u> at ¶43.)

This case is not directly about the Five; it is about the Series' depiction of Plaintiff Linda Fairstein, the former chief of the Manhattan District Attorney's Sex Crimes Prosecution Unit. (<u>Id.</u> at ¶32.) Ms. Fairstein's character, played by actress Felicity Huffman, is essentially the "archvillain" of the Series—the architect of a

racially biased and unethical prosecution against the Five.  (Id. at ¶¶44–130.)  This depiction, regardless of its factual accuracy, was not accidental.  Both before and after the Series' release, two of its creators—Ava DuVernay and Attica Locke (collectively, "the Writers")—published multiple comments on social media suggesting that Ms. Fairstein's depiction as the Series' villain was based on facts and research, and that she should be held accountable for her real-life role in prosecuting the Five.  (Id. at ¶¶152–99.)  The Series and the Writers' social media posts allegedly created a backlash against Ms. Fairstein that she claims damaged both her reputation and career as a best-selling crime novelist.  (Id. at ¶¶232–57.)

Ms. Fairstein now sues Netflix and the Writers for defamation and conspiracy to defame.  The Writers move to: (1) dismiss the case against them for lack of personal jurisdiction, (2) dismiss the case for improper venue, or (3) transfer venue to the Southern District of New York.  (Doc. 26.)  Netflix joins in the Writers' venue-based arguments but does not challenge personal jurisdiction.  (Doc. 45.)  After a careful review of the parties' pending motions, the Court agrees that the convenience of the parties and witnesses and the interest of justice weigh in favor of transferring this action to the Southern District of New York.

<u>STATEMENT OF FACTS</u>

Assuming the uncontradicted facts in the complaint are true (as this Court must), Ms. Fairstein's relationship with the Series was contentious from the start.  In 2016, Ms. Fairstein learned that Ms. DuVernay (creator, director, writer, and executive producer of the Series) had acquired life rights from the Five.  (Doc. 1 at

¶131.)  Sometime in the spring of 2016, Ms. Fairstein exchanged e-mails with a professional colleague of Ms. DuVernay's and expressed her concern about the source materials on which Ms. DuVernay would be relying.  (Id. at ¶137.)  Then, on June 9, 2016, Ms. Fairstein's counsel sent a letter to Ms. DuVernay, echoing Ms. Fairstein's concern that prior content concerning the Five was "pursued in order to achieve a predetermined objective" and suggesting a list of twenty sources (mostly court records) that Ms. DuVernay ought to review as "part of any honest fact-finding effort."  (Id. at ¶¶138–39.)  Any meeting between Ms. Fairstein and Ms. DuVernay would apparently be conditioned on Ms. DuVernay reviewing those twenty sources and providing Ms. Fairstein with a list of specific topics for discussion.  (Id. at ¶140.)

Ms. Duvernay responded that Ms. Fairstein had no right to preemptively object to her portrayal in the Series, that any such portrayal would be constitutionally protected, and that Ms. DuVernay would not meet with Ms. Fairstein subject to any preconditions.  (Id. at ¶142.)  This response only served to confirm Ms. Fairstein's suspicions that Ms. DuVernay would rely on "potentially biased and unreliable sources" to create the Series.  (Id. at ¶144.)  After it was announced that Netflix would be streaming the Series, Ms. Fairstein expressed her concerns to Netflix's general counsel but received no response.  (Id. at ¶¶150–51.)

On November 27, 2018—six months before the Series premiered—Ms. Locke (a writer and producer of the Series) and Ms. Fairstein had a heated exchange on Twitter regarding Ms. Fairstein receiving a Grand Master award at the 2019 Edgar

Awards Ceremony, hosted by the Mystery Writers of America ("MWA"). (Id. at ¶¶152–64.) Essentially, Ms. Locke publicly asserted that Ms. Fairstein should not serve as Grand Master at the ceremony due to her involvement in prosecuting and incarcerating the Five. (Id. at ¶¶153–55.) Ms. Fairstein responded that Ms. Locke's accusations were factually incorrect. (Id. at ¶154.) Two days after this exchange, the MWA issued a press release stating that it had decided to withdraw the Grand Master award from Ms. Fairstein due to "controversy in which [Ms. Fairstein] has been involved." (Id. at ¶155.) The events leading up to the MWA's rescission were reported nationwide. (Id. at ¶161.) On December 18, 2018, Ms. Locke again posted on Twitter, explaining that she knew "so much about the case" because she did "extensive" research while working on the Series, which included reviewing the Five's trial transcripts. (Id. at ¶¶162–63.) In other words, Ms. Locke implied that the upcoming Series' depiction of Ms. Fairstein would be based on fact.

The notion that the Series was partially fact-based was allegedly aided by Netflix's marketing of the film. The taglines in the Series' trailers and in Netflix's promotional tweets implied that the Series was "based on the true story of the [Five]," and that it would show people "[t]he truth [they] haven't heard." (Id. at ¶¶165–67, 200–18) (emphasis added). According to Ms. Fairstein, Netflix even categorized the Series as a "documentary" on its streaming platform before later recategorizing it as a "Crime TV Show." (Id. at ¶347.) Statements by Cindy Holland, Netflix's Vice President of Original Content, further suggest that Netflix approved the Series because its audience was particularly attracted to "true

stories." (Id. at ¶220.)  Likewise, Ms. DuVernay and Ms. Locke repeatedly represented in interviews and social media posts that the story depicted in the Series was essentially the "real story," and that it was based on exhaustive research and interviews. (Id. at ¶¶171–81, 187–99.)  In one tweet, Ms. Locke went so far as to suggest that the Series was "one of the most accurate portrayals of a true story" because she, Ms. DuVernay, and the rest of their writing team "took the truth as [their] bible." (Id. at ¶197.)

Defendants also indicated that the Series' negative treatment of Ms. Fairstein's character was—like the rest of the narrative—based on fact.  Indeed, during an interview with Oprah Winfrey, Ms. DuVernay stated that one of her goals in creating the Series was to hold Ms. Fairstein "accountable" for her purported actions in prosecuting the Five. (Id. at ¶182.)  The Writers' stated goal is further evident from the tone of their public comments after the Series' release on May 31, 2019.  In a tweet posted on June 11, 2019, Ms. Locke wrote that "Linda Fairstein is trash, was trash, [and] will always be trash." (Id. at ¶194.)  The next day, Ms. DuVernay made a twitter post with an embedded tweet stating, "not a single publication needs to give [Ms. Fairstein] a chance to speak.  [The Five] are broken because of her actions.  She has done more than enough damage." (Id. at ¶183.)

The allegedly defamatory content of the Series itself is discussed at length in the complaint and need not be fully recited here. (Id. at 49 ¶¶130.)  Suffice it to say that Ms. Fairstein is portrayed as the primary driving force behind the racist prosecution of the Five from its very inception.  Indeed, she is one of the first people

shown examining the place where Patricia Meili's body was found in Central Park. From there, the Series repeatedly shows Ms. Fairstein pushing for the Five to be charged, tried, and convicted despite their obvious innocence because she wanted to make an example of them. The most conspicuous examples of this include the Series' depiction of Ms. Fairstein:

a)  knowingly creating a false timeline of the events that took place in Central Park on April 19, 1989 in order to blame Patricia Meili's attack on the Five, despite obvious factual discrepancies (id. at ¶¶77–86.);

b)  politicking to receive the case instead of Assistant District Attorney Nancy Ryan, who expressed doubts that the Five had done anything wrong and who is later depicted as uncovering Ms. Fairstein's manipulation of the case's timeline in 2002, after Mattias Reyes confessed to raping Patricia Meili (id. at ¶¶87–90, 94, 127.);

c)  ordering the police to round up every "young, black male" who was in Central Park on the night of April 19, 1989 and to "stop every little thug" they saw (id. at ¶97.);

d)  encouraging the coercion of false confessions from the Five (id. at ¶¶104, 108, 114.);

e)  pressuring the reluctant Elizabeth Lederer, who was the Assistant District Attorney responsible for actually trying the case in court, to extract fabricated confessions from the Five that would smooth over

the factual discrepancies in the case and to prosecute the Five despite

insufficient evidence  (id. at ¶¶108, 110, 113, 118, 120–22.)

f)      attempting to conceal exculpatory DNA evidence from the Five's

attorneys (id. at ¶118.)

Most of the allegedly defamatory scenes occur in the first two episodes of the

four-part Series.  The complaint also cites to the final scene of episode four when

Ms. Fairstein's character meets with Nancy Ryan in 2002 and is largely

unrepentant for her actions, telling Ms. Ryan she believes Mattias Reyes was

merely the "sixth rapist."  (Id. at ¶¶126–130.)

At this point, one might fairly question what any of the facts discussed by the

Court have to do with the jurisdiction in which this lawsuit was brought: Florida.

The answer, for the most part, is nothing.  None of the Writers' social media posts

mention Florida and none of the events depicted in the Series (factually or

otherwise) occurred in Florida.  The events of the Series all occurred in New York.

Both DuVernay and Locke are residents of California, and Netflix is a Delaware

corporation with its principal place of business in California.  (Id. at ¶¶23–25.)

The chief link between this matter and this forum appears to be Ms.

Fairstein herself.  From 2004 to 2008, Ms. Fairstein rented a vacation home in

Florida, where she would spend "at least one month each winter."  (Doc. 35 at ¶4.)

From 2013 until recently, she and her significant other have visited Florida

primarily for leisure purposes, although Ms. Fairstein has also participated in some

"literary events" and worked on mystery novel manuscripts while in the state.  (Id.

at ¶¶7–10.)  On October 25, 2019—over four months after the Series was released and six months before the complaint was filed—Ms. Fairstein executed a Declaration of Domicile, stating that she has been a resident of Lee County, Florida since September 27, 2019.  (Doc. 26-4.)

The Series and the Writers' public statements on social media appear to have caused <u>some</u> harm to Ms. Fairstein in Florida (if only by virtue of their worldwide accessibility on the internet).  As proof, Ms. Fairstein has provided the Court with declarations from three small-bookstore owners in Florida who aver that they are unable to sell new copies of Ms. Fairstein's novels.  (Docs. 41-1–41-3.)  But based on Ms. Fairstein's complaint, the brunt of the harm clearly occurred elsewhere.

The most detailed allegations of reputational and economic harm in the complaint focus on New York.  As a result of the negative publicity created by the Series and the Writers' public statements, Ms. Fairstein was: (1) dropped by her New York publisher, (Doc. 1 at ¶244); (2) forced to resign from the board of trustees for Vassar College, her alma matter, which is located in New York (<u>id.</u> at ¶¶250–52); and (3) forced to resign from the boards of multiple nonprofits, all of which are in New York (<u>id.</u> at ¶¶253–54).  There have apparently been calls to reopen some of the cases that Ms. Fairstein prosecuted—all in New York.  (<u>Id.</u> at ¶¶247–48.)  Ms. Fairstein was stripped of her Grand Master award by the MWA (a New York-based organization) and her 1993 Woman of the Year award from <u>Glamour</u> magazine (a New York publication).  (<u>Id.</u> at ¶¶152–64, 255–57.)  The business entities through which Ms. Fairstein apparently managed her literary and consulting career—both

impacted by the negative publicity generated by the Series—were created under

New York law.  (Docs. 26-8, 26-9; Doc. 42 at ¶6.)  The parties dispute whether these

entities remain "active," and Ms. Fairstein asserts that they are in the process of

being dissolved or merged.  (Doc. 42 at ¶¶4–6.)  But there appears to be no dispute

that these entities remain active for the time being.  In any case, they were active

when the allegedly defamatory statements in this case were published.

Furthermore, the potentially relevant witnesses in this case are clustered in

New York.  Among Ms. Fairstein's former colleagues at the Manhattan District

Attorney's Office and the New York Police Department who are mentioned in the

complaint and depicted in the Series, ten are still alive as of this writing.  (Doc. 52-2

at 1–2, 7 n.2.)  Of those ten, nine live in New York.  (Id. at 1–2.)  Although four of

those witnesses have provided this Court with declarations indicating their

willingness to travel, (Docs. 41-4, 41-5, 41-7, 41-8), that still leaves a majority of six

who have not indicated whether they are willing to testify in the Middle District of

Florida.  There are also additional prosecutors and detectives involved in the 1989

case against the Five who are identified as potential witnesses in different papers

filed before this Court and who live predominantly in New York.  (Doc. 52-2 at 7–9.)

Against this factual backdrop, the Writers have moved to dismiss based on

personal jurisdiction or, in the alternative, either dismiss for improper venue or

transfer venue to the Southern District of New York.  (Doc. 26.)  Netflix joins only in

the Writers' venue arguments and moves separately to dismiss for failure to state a

claim.  (Doc. 28.)  Ms. Fairstein opposes both motions, (Docs. 41, 45) and moves for

jurisdictional discovery, (Doc. 34).  As explained below, the Court does not address the Writers' personal jurisdiction argument.  The Court believes, however, that the convenience of the parties and witnesses and the interest of justice strongly weigh in favor of transferring this case to the Southern District of New York.  Accordingly, for the reasons explained below, the Court grants Defendants' motion to transfer venue to the Southern District Court of New York.

## LEGAL STANDARD

The Supreme Court has explained that while questions of personal jurisdiction are "typically decided in advance of venue," neither personal jurisdiction nor venue is "fundamentally preliminary in the sense that subject matter jurisdiction is."  Leroy v. Great W. United Corp., 443 U.S. 173, 180 (1979).  "Accordingly, when there is a sound prudential justification for doing so . . . a court may reverse the normal order of considering personal jurisdiction and venue.  Id. After carefully reviewing the parties' well-reasoned arguments regarding the complex issues of personal jurisdiction in this case, the Court believes there is sound prudential justification for addressing venue first.

Federal law defines "venue" as the "geographic specification of the proper court or courts for the litigation of a civil action that is within the subject-matter jurisdiction of the district courts in general."  28 U.S.C. § 1390(a).  Venue for a civil action is generally proper only in: (1) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "a judicial district in which a substantial part of the events or omissions giving

rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) "if there is no district in which an action may otherwise be brought . . . any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b)(1)–(3).  "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  If venue is proper in multiple courts, then the case may be transferred "to any other district or division where it might have been brought or to any district or division to which all parties have consented," provided the transfer serves "the convenience of parties and witnesses"  and the "interest of justice."  28 U.S.C. § 1404(a).

In dealing with a motion to dismiss for improper venue, the burden is on the plaintiff to make a facial showing that venue is proper.  Delong Equip. Co. v. Wash. Mills Abrasive Co., 840 F.2d 843, 845 (11th Cir. 1988).  The Court must accept the facts alleged in the complaint as true unless contradicted by affidavits.  Id.  Any factual conflicts are, nevertheless, to be resolved in favor of the plaintiff.  Id.  Where a party moves to transfer venue under section 1404(a), "the burden is on the movant to establish that the suggested forum is more convenient."  In re Ricoh Corp., 870 F.2d 570, 573 (11th Cir. 1989).

While a transfer of venue under section 1404(a) is discretionary, a plaintiff's choice of forum should not be disturbed unless clearly outweighed by other considerations.  See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988);

Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 260 (11th Cir. 1996).  Affidavits

may be considered in support of a section 1404(a) motion.  See, e.g., Tingley Sys.,

Inc. v. Bay State HMO Mgmt., Inc., 833 F. Supp. 882, 884 (M.D. Fla. 1993).

DISCUSSION

## I.   Whether venue is proper in the Middle District of Florida under section 1391(b).

Venue is proper in "a judicial district in which a substantial part of the events

or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  In determining

where a "substantial part" of events occurred, courts must "focus on the relevant

activities of the defendant, not of the plaintiff."  Jenkins Brick Co. v. Bremer, 321

F.3d 1366, 1371 (11th Cir. 2003) (quoting Woodke v. Dahm, 70 F.3d 983 (8th Cir.

1995)).  Moreover, "only those acts and omissions that have a close nexus to the

wrong" are relevant.  Id.

Defamation occurs "wherever the allegedly defamatory remark was

published."  Simon v. Shearson Lehman Bros., 895 F.2d 1304, 1311 (11th Cir. 1990)

(citing Stepanian v. Addis, 782 F.2d 902, 903 (11th Cir. 1986)).  This rule makes

section 1391(b)(2) particularly difficult to apply to internet defamation cases; if

publication is the act with the closest nexus to the wrong, then venue would be proper

anywhere in the United States.  See Capital Corp. Merch. Banking v. Corp.

Colocation, Inc., No. 6:07-CV-1626ORL19KRS, 2008 WL 4058014, at *3 (M.D. Fla.

Aug. 27, 2008) ("[B]ecause the harm from an online defamatory statement can occur

in any place where the website or forum is viewed, no one forum should be expected

to stand out as a particularly strong candidate for venue."); compare Corsi v. Stone,

No. 19-324(TJK), 2020 WL 999053, at *2 (D.D.C. Mar. 1, 2020) (suggesting that a venue theory based on defamatory material being accessible over the internet in the district where the plaintiff resides is improper under section 1391(b)(2) but ultimately finding that venue would be improper even if such a theory would apply).

For purposes of this case, however, the Court need not decide whether venue is technically proper in the Middle District of Florida because the convenience of the parties and witnesses and the interests of justice weigh in favor of transfer to the Southern District of New York.  Accordingly, the Court proceeds to its analysis under section 1404(a).[1]

## II. The convenience of the parties and witnesses and the interest of justice clearly weigh in favor of transferring this action to the Southern District of New York.

Regardless of whether venue is technically proper in the Middle District of Florida under section 1391(b), the Court still has discretion to transfer venue "to

---

[1] The Court has discretion to transfer the case either for convenience under section 1404(a) or based on a finding of improper venue under 28 U.S.C. § 1406(a). The venue statute applied may sometimes influence the choice-of-law rules of the transferee jurisdiction.  See Ellis v. Great Sw. Corp., 646 F.2d 1099, 1105 n.7 (5th Cir. 1981) (explaining that the assumption that few litigants will care about whether a transfer proceeds under section 1404(a) or section 1406)(a) depends on whether the choice-of-law consequences are identical).  Thus, in some cases, a court may have to decide whether venue is proper in the transferor jurisdiction for purposes of section 1406(a) before moving to section 1404(a).  But this is not such a case because it appears New York and Florida apply the same choice-of-law test to defamation claims.  Compare Berwick v. New World Network Int'l, Ltd., No. 06 CIV. 2641 JGK, 2007 WL 949767, at *7 (S.D.N.Y. Mar. 28, 2007) (explaining that New York courts apply the significant relationship test to defamation cases, which usually results in the state law of plaintiff's domicile being applied, although this factor is not conclusive), with Nix v. ESPN, Inc., 772 F. App'x 807, 810 (11th Cir. 2019) (drawing the same conclusion under Florida law).

any other district or division where it might have been brought or to any district or division to which all parties have consented," if the transfer serves "the convenience of parties and witnesses" and the "interest of justice."  28 U.S.C. § 1404(a).

Courts typically interpret the phrase "might have been brought" to mean that the transferee court must be shown to have subject matter jurisdiction over the action, that venue must be proper there, and that the defendant is amenable to service of process there.  See, e.g., Windmere Corp. v. Remington Prod., Inc., 617 F. Supp. 8, 10 (S.D. Fla. 1985).  The Writers persuasively argue that the Southern District of New York satisfies all three criteria.  (Doc. 26 at 16–17; Doc. 51 at 18). Fairstein's only counterargument is that New York would not have personal jurisdiction solely over Locke, whose work on the series took place entirely in California.  (Doc. 41. at 9; Doc 26-2 at ¶5.)  But Locke does not contest personal jurisdiction in New York, and Fairstein does not coherently explain why New York would lack personal jurisdiction Locke, apart from a general discussion of the tortious act provision in New York's long-arm statute. (Doc. 41 at 9); see also Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct . . . arguments neither made nor advanced by the parties.").

In any case, the Court is not persuaded by Ms. Fairstein's analysis of how New York's long-arm statute would apply to Ms. Locke.  See SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n, 963 N.E.2d 1226, 1228 (N.Y. 2012) (explaining that while the "tortious act" provision of New York's long-arm statute contains a specific exclusion for defamation cases, parties who "transact business" within New

York may be subject to long-arm jurisdiction in defamation cases); <u>Daventree Ltd. v. Republic of Azer.</u>, 349 F. Supp. 2d 736, 759 (S.D.N.Y. 2004) (explaining that transaction of business under New York's long-arm statute may be imputed to co-conspirators); <u>Montgomery v. Minarcin</u>, 693 N.Y.S.2d 293, 296 (App. Div. 1999) ("The newscasts were researched, written, [and] produced . . . in this State." (emphasis added)); (Doc. 51 at 18) (explaining that "Locke purposely transacted with Netflix to research and draft a script . . . about New York to be filmed and produced in New York," and that she was "credited as a coproducer of the Series").

Turning to the issue of convenience, "[s]ection 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient." <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 645–46 (1964).  "In the typical case not involving a forum-selection clause, a district court considering a [section] 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations." <u>Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.</u>, 571 U.S. 49, 62 (2013).  In so doing, the court must "weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses; and otherwise promote 'the interest of justice.'" <u>Id.</u> (quoting 28 U.S.C. § 1404(a)).

According to the Eleventh Circuit, relevant factors include:

(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and

(9) trial efficiency and the interests of justice, based on the totality of the circumstances.

Manuel v. Convergys Corp., 430 F.3d 1132, 1135 n.1 (11th Cir. 2005); see also

Stewart Org., Inc., 487 U.S. at 34 (Scalia, J., dissenting) (noting that courts have

treated the categories in section 1404(a) broadly by "examin[ing] a variety of

factors, each of which pertains to facts that currently exist or will exist").

The list of factors in Manuel is not exhaustive, and courts evaluating a

transfer under section 1404(a) must engage in an "individualized, case-by-case

consideration of convenience and fairness." Van Dusen, 376 U.S. at 622. Still, the

parties in this case rely on the Manuel factors as guideposts. Accordingly, the Court

examines each of the Manuel factors below and concludes that, on balance, they

weigh in favor of a transfer to the Southern District of New York.

### a. Convenience of witnesses

The convenience of witnesses is generally considered one of the most—if not

the most—important factors in a venue transfer analysis. See Trinity Christian

Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc., 761 F. Supp. 2d 1322, 1327

(M.D. Fla. 2010); see also Combs v. Fla. Dep't of Corr., No. 5:18-CV-266-TKW/MJF,

2020 WL 3033246, at *3 (N.D. Fla. May 20, 2020) (collecting cases).

The Writers contend that this factor weighs in favor of transfer because

"virtually all of the critical non-party witnesses are located in New York." (Doc. 26

at 17–20.) Ms. Fairstein contends that this factor is neutral because the witnesses

in this case do not reside in any single jurisdiction and, regardless, not all the New

York witnesses identified by the Writers are material to the case. (Doc. 41 at 10–

13.)  Ms. Fairstein also provides the Court with affidavits from certain witnesses who are willing to travel to Florida to testify, (Docs. 41-4, 41-5, 41-7, 41-8), and notes that many courts have adapted to holding virtual hearings and trials since the COVID-19 pandemic, (Doc. 41 at 13).  After carefully reviewing the parties' arguments, the Court agrees with the Writers.

Even excluding those nonparty witnesses who Ms. Fairstein deems irrelevant, the list of potential witnesses skews in favor of New York.  (Doc. 52-2.) Of the still-living officers and prosecutors who worked with Ms. Fairstein in 1989, almost all live in New York.  (Doc. 52-2 at 1–2, 7 n.2.)  A few of the potential New York witnesses have declared that they are willing to travel to Florida, but a majority have not.  (Docs. 41-4, 41-5, 41-7, 41-8.)  Moreover, most of the damages discussed in the complaint are centered in New York, and the witnesses most qualified to discuss those damages are in New York.  (Doc. 52-2 at 5–7.)

The Court has also considered Ms. Fairstein's argument regarding COVID-19.  While many courts across the country have undoubtedly done their best to hold virtual hearings and trials, it is not clear whether such methods will suffice in this case.  Ms. Fairstein's action necessarily calls on the Court to evaluate witnesses' recollections of controversial events that took place thirty years ago.  Virtual proceedings may not be enough for the Court (or jurors) to properly evaluate the witnesses' credibility.  Accordingly, live testimony from witnesses seated in the same room as the judge and jury may be necessary.  If so, then Ms. Fairstein cannot rely on the courts' technological competence as a shield against venue transfer.

Moreover, the potential need for witnesses to give in-person testimony means that the amount of witness travel ought to be minimized—at least given the current progression of the COVID-19 pandemic.  Accordingly, the Court believes that the convenience of the witnesses, which is one of the most important factors, weighs in favor of transferring venue to the Southern District of New York.

> **b. Location of relevant documents and the relative ease of access to sources of proof.**

The parties agree that this factor is neutral because they have no problem electronically accessing the relevant documents, although many of the court documents pertaining to the Five which may be relevant to this case are from New York legal proceedings.  (Doc. 26 at 31; Doc. 41 at 10.)

> **c. Convenience of the parties.**

The Writers contend that New York is a more convenient forum for them and would not be burdensome for Ms. Fairstein, who has had a longstanding presence in New York.  (Doc. 26 at 24.)  Ms. DuVernay also avers that she regularly conducts business in New York (although she is a resident of California).  (Id.)  Ms. Fairstein responds that she is a Florida resident and is currently in the process of selling her New York apartment (which has been on the market since September 2019).  (Doc. 41 at 14.)  She also notes that traveling during the COVID-19 pandemic poses a risk to her health due to her age.  (Id.)  Finally, Ms. Fairstein notes that Ms. Locke has no apparent ties to New York.  (Id.)  Both sides contend that Netflix has a "production presence" in Florida and New York.  (Doc. 26 at 24; Doc. 41 at 14.)

After carefully considering the parties' arguments, the Court believes this factor is neutral.  Regardless of where venue ultimately lies, some of the parties will inevitably suffer some sort of inconvenience by not litigating in the venue of their choice.  But this frequently occurs in federal litigation.  Ms. DuVernay and Ms. Locke are California residents, and while Ms. Fairstein does have longstanding ties to New York, the Court accepts her averments that she is currently a resident of Florida and trying to sell her New York apartment.  (Doc. 26-1 at ¶2; Doc. 26-2 at ¶3; Doc. 35 at ¶12).  Moreover, all parties agree that the relative-means factor is neutral.  In other words, all sides in this case have the resources to litigate this case wherever it ultimately ends up.  Accordingly, this factor does not favor either side.

### d.  Locus of operative facts

The Court believes this factor weighs in favor of New York.  Although the Series and the Writers' public statements are accessible in multiple forums, New York clearly stands out as the primary locus of facts.  See Combs, 2020 WL 3033246, at *6 ("When there are multiple loci of operative facts, a court should attempt to determine if there is one primary locus with the strongest connection to the operative facts." (citing Sheet Metal Workers' Nat'l Pension Fund v. Gallagher, 669 F. Supp. 88, 92–93 (S.D.N.Y. 1987))).[2]  The events depicted in the Series take

---

[2] The Court notes that in some cases, courts weigh this factor as neutral when there are multiple loci of operative facts.  See, e.g., Gubarev v. Buzzfeed, Inc., 253 F. Supp. 3d 1149, 1166 (S.D. Fla. 2017).  The Court agrees that in some instances, there will not be an obvious locus that stands out above the rest, and this factor should therefore be neutral.  Such a determination, however, should be made on a case-by-case basis, as instructed by the Supreme Court.  Van Dusen, 376 U.S. at 622.  The Court has made this determination here, and it concludes that, based on the facts of this case, New York is clearly the primary locus.

place almost exclusively in New York.  Ms. Fairstein's role in the Series centers on

her former career as a prosecutor in New York and her interactions with colleagues

in New York.  The trials of the Five took place in New York.  Almost all the

witnesses—that is, the officers depicted in the series as listening to the fictional Ms.

Fairstein's defamatory dialogue—are in New York.  As discussed earlier, most of

the damages described in the complaint are focused on New York, and the business

entities that Ms. Fairstein has used to manage her literary career are created under

New York law.  Accordingly, this factor weighs in favor of transfer.

### e.   Availability of process to compel the attendance of unwilling witnesses.

The Court finds that this factor weighs in favor of transfer for the same

reasons discussed with respect to the convenience-of-witnesses factor.  The Court

further notes that the story of the Five has attracted significant media controversy

for over thirty years, which might make certain witnesses unwilling to testify.  In

this context, it makes sense to transfer this case to the jurisdiction where most of

the nonparty witnesses may be reached through a subpoena—New York.

### f.   Relative means of the parties

The parties agree that this factor is neutral because they have the means to

litigate in either Florida or New York if necessary.  (Doc. 26 at 31; Doc. 41 at 10.)

### g.   Forum's familiarity with the governing law

Given the brevity of the parties' arguments on this issue and the Court's

inability to anticipate all possible conflicts that may arise, the Court does not weigh

this factor in favor of either party.  But if a conflict of law were to arise, it appears

that New York law would very likely control.  <u>See</u> Restatement (Second) of Conflict

of Laws § 150 cmt. e (1971); see also Nix v. ESPN, Inc., 772 F. App'x 807, 808 (11th

Cir. 2019); Michel v. NYP Holdings, Inc., 816 F.3d 686, 691, 695 (11th Cir. 2016).[3]

### h.  Weight accorded to a plaintiff's choice of forum

A court "must . . .  give some weight to the plaintiff's choice of forum." Atl.

Marine Constr. Co., 571 U.S. at 62 n.6; see also Robinson, 74 F.3d at 260.  But the

Eleventh Circuit gives less weight to this factor if the facts giving rise to the claim

occurred primarily outside of the chosen forum.  See Michel, 816 F.3d at 694 ("The

article was published in New York, regarding an event that took place in New York,

and that allegedly caused harm to Michel's business interests in New York. Both

the New York Post and the reporter defendants are domiciled in New York.  While

Michel is domiciled in Florida, that consideration is of little relative importance."

(emphasis added)); see also Suomen Colorize Oy v. DISH Network L.L.C., 801 F.

Supp. 2d 1334, 1338 (M.D. Fla. 2011) ("[W]here the operative facts underlying the

cause of action did not occur within the forum chosen by the Plaintiff, the choice of

forum is entitled to less consideration." (quoting Garay v. BRK Elecs., 755 F. Supp.

1010, 1011 (M.D. Fla. 1991))).  As discussed above, the primary locus of operative

facts in this case is New York.  Accordingly, while Ms. Fairstein chose to bring her

claim in the Middle District of Florida, the Court affords this factor little weight.

---

[3] Contrary to the Writers' representations, neither Florida nor New York recognize a freestanding claim for civil conspiracy without an underlying tort or wrong.  See, e.g., Tejera v. Lincoln Lending Servs., LLC, 271 So. 3d 97, 103 (Fla. 3d DCA 2019).

### i.   Trial efficiency and the interests of justice

When weighing this factor, "[c]ourts often consider such things as the relative interests of the two forum states in the litigation, relative hardship of the parties, and questions of judicial economy."  Brandywine Commc'ns Techs., LLC v. Cisco Sys., Inc., No. 6:11-CV-1843-ORL-36, 2012 WL 8281188, at *7 (M.D. Fla. Mar. 26, 2012) (quoting Suomen Colorize Oy, 801 F. Supp. 2d at 1339).  Because this case's locus of operative facts is New York and most of the material witnesses reside in New York, the Court is persuaded that trial efficiency and the interests of justice would be better served by transferring venue.

In sum, the Court concludes that it is in the interest of justice to transfer venue of this case to the Southern District of New York.  After weighing the relevant factors, it is clear to the Court that a transfer would, on balance, serve the convenience of the parties and witnesses.  Therefore, it is **ORDERED**:

1.     Defendants Ava DuVernay and Attica Locke's Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative, Joint Motion with Netflix, Inc. to Dismiss for Improper Venue or Transfer, (Doc. 26), is **GRANTED IN PART.**

2.     The Clerk is **DIRECTED** to transfer this matter to the Southern District of New York and close this Middle-District-of-Florida case.

**ORDERED** in Fort Myers, Florida, on September 24, 2020.

**JOHN L. BADALAMENTI**
**UNITED STATES DISTRICT JUDGE**