**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-8042 (PKC) |
| v. | ) | |
| | ) | Judge P. Kevin Castel |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS</u>**

Sandra D. Hauser
Kiran Patel
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700
*sandra.hauser@dentons.com*
*kiran.patel@dentons.com*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Counsel for Defendants Netflix, Inc., Ava
DuVernay and Attica Locke*

# **TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND ................................................................................................. 3

ARGUMENT ....................................................................................................................... 9

I.     Standard of Review and Material Properly Considered on a Motion to Dismiss ............. 9

II.    The Scenes and Dialogue Plaintiff Identifies Are Not Actionable Defamation ............. 11

     A.    Scenes Showing Plaintiff "At the Crime Scene" (Scene 1), "Drafting a Press Release" (Scene 2), and "Fighting With Nancy Ryan Over Who Would Prosecute Case" (Scene 5) Have No Plausible Defamatory Meaning ....................................................................................................... 14

     B.    It Is Not Defamatory to Accurately Portray Plaintiff As Expressing Views She Has Publicly Espoused for Decades ......................................................... 15

          1.    "Putting Together a Timeline" (Scene 4) ................................................. 16

          2.    Interactions With ADA Lederer (Scenes 8 and 10) ................................. 18

          3.    Interactions With ADA Ryan (Scenes 5 and 11) ..................................... 20

     C.    The Complained-of Dialogue Does Not Support Plaintiff's Claimed Defamatory Imputation That She "Violated the Law" ....................................... 22

          1.    No Claim Based On Questioning of "Unaccompanied Minors" (Scene 3) ................................................................................................. 23

          2.    No Claim Based on Purported "Directing" of Detectives (Scenes 7, 8) ....................................................................................................... 24

          3.    No Claim Based on Discussion of DNA Evidence (Scene 9) ................. 25

     D.    No Claims Based On Powerful, Hyperbolic Language in Dramatized Dialogue That Is Substantially True in Any Event ........................................... 26

III.   No Defamation Claim Based on the "Tweets" of DuVernay and Locke ....................... 29

IV.   The Purported Conspiracy Claim Does Not Exist Under New York Law ..................... 30

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3B Med., Inc. v. SoClean, Inc.*,
  2020 WL 5440440 (S.D.N.Y. Sept. 8, 2020) ........................................................................11

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985) ...........................................................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................9

*Barbash v. STX Financing LLC*,
  2020 WL 6586155 (S.D.N.Y. Nov. 10, 2020) ................................................................11, 29

*Bordoni v. N.Y. Times Co.*,
  400 F.Supp. 1223 (S.D.N.Y. 1975) ................................................................................23, 26

*Brian v. Richardson*,
  87 N.Y.2d 46 (1995) .............................................................................................................13

*Carlson v. Am. Int'l Inc.*,
  30 N.Y.3d 288 (2017) ...........................................................................................................31

*Carto v. Buckley*,
  649 F.Supp. 502 (S.D.N.Y. 1986) ........................................................................................29

*Cerasani v. Sony Corp.*,
  991 F.Supp. 343 (S.D.N.Y. 1998) ............................................................................11, 25, 27

*Chao v Mt. Sinai Hosp.*,
  476 F. App'x 892 (2d Cir. 2012) ..........................................................................................31

*Chau v. Lewis*,
  771 F.3d 118 (2d Cir. 2014)............................................................................................12, 30

*Chavez v. Martinez*,
  538 U.S. 760 (2003)..............................................................................................................24

*Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y. 2019)............................................................................10, 27

*Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*,
  29 A.D.2d 423 (1st Dep't 1968), *aff'd*, 25 N.Y.2d 943 (1969) ..............................................12

*Davis v. Costa-Gavras*,
    654 F.Supp. 653 (S.D.N.Y. 1987) ....................................................................14

*Deripaska v. AP*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ...............................................................18

*Dobies v. Brefka*,
    263 A.D.2d 721 (3d Dep't 1999) ....................................................................31

*Dworin v. Deutsch*,
    2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) (Castel, J.)................................. *passim*

*Edelman v. Croonquist*,
    2010 WL 1816180 (D.N.J. May 4, 2010) .......................................................29

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y. 2012) (Castel, J.) ....................................... *passim*

*El Meson Espanol v. NYM Corp.*,
    521 F. 2d 737 (2d Cir. 1975).........................................................................25

*Fisk v. Letterman*,
    401 F. Supp. 2d 362 (S.D.N.Y. 2005).............................................................10

*Goldman v. Barrett*,
    733 F. App'x 568 (2d Cir. 2018) ....................................................................31

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) .....................................................................................22

*John E. Reid & Assocs., Inc. v. Netflix, Inc.*,
    2020 WL 1330657 (N.D. Ill. Mar. 23, 2020).............................................. *passim*

*Kimmerle v. N.Y. Evening J.*,
    262 N.Y. 99 (1933) .........................................................................................14

*Love v. Wm. Morrow & Co.*,
    193 A.D.2d 586 (2d Dep't 1993) ...............................................................18, 27

*Lovingood v. Discovery Commc'ns*,
    800 F. App'x 840 (11th Cir. 2020) ........................................................13, 16, 18

*Marom v. Pierot*,
    2020 WL 6572509 (S.D.N.Y. Aug. 30, 2020)................................................11

*Masson v. New Yorker Magazine*,
    501 U.S. 496 (1991).......................................................................................13

*McGill v. Parker,*
    179 A.D.2d 98 (1st Dep't 1992) ...................................................................................13

*Milkovich v. Lorain J.,*
    497 U.S. 1 (1990)...........................................................................................................12

*Mirage Ent'mnt, Inc. v. FEG Entretenimientos SA,*
    326 F. Supp. 3d 26 (S.D.N.Y. 2018)..........................................................................29

*Muhlhahn v. Goldman,*
    93 A.D.3d 418 (1st Dep't 2012) ..................................................................................11

*Munno v. Town of Orangetown,*
    391 F. Supp. 2d 263 (S.D.N.Y. 2005)........................................................................10

*New York Times v. Sullivan,*
    376 U.S. 254 (1964)......................................................................................................14

*Nguyen v. New Link Genetics Corp.,*
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................11

*Partington v. Bugliosi,*
    56 F.3d 1147 (9th Cir. 1995) ...............................................................2, 13, 19, 28

*People v Salaam,*
    83 N.Y.2d 51 (1993) (Titone, J., dissenting) ......................................................6, 24

*People v. Wise,*
    194 Misc.2d 481 (N.Y. Sup. Ct. 2002) ..................................................................6, 7

*Proskin v. Hearst Corp.,*
    14 A.D.3d 782 (3d Dep't 2005) ..................................................................................26

*Rappaport v. VV Publ'g Corp.,*
    163 Misc.2d 1 (Sup.Ct. N.Y. Cty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't
    1996) ....................................................................................................................12, 29

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)............................................................................................9

*Scialdone v. Derosa,*
    148 A.D.3d 741 (2d Dep't 2017) ................................................................................20

*Seymour v. Lakeville Jour. Co. LLC,*
    150 F. App'x 103 (2d Cir. 2005) ...........................................................................23, 26

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008)....................................................................................10, 11

*Tannerite Sports, LLC v. NBCUniversal News Group*,
   864 F.3d 236 (2d Cir. 2017)............................................................................................14, 20

*Tracy v Newsday, Inc.*,
   5 N.Y.2d 134 (1959) ............................................................................................... *passim*

**Other Authorities**

Fed. R. Evid. 201(b)..................................................................................................................10

CPLR § 215(3).........................................................................................................................30

The four-part film series *When They See Us* (the "Series"), released by Defendant Netflix, Inc. ("Netflix"), is a critically-acclaimed dramatization based on the infamous 1989 "Central Park Jogger" rape case, passionately told from the perspective of the five young teenagers (the "Five") who were wrongfully accused, convicted and imprisoned for the crime.  The Series follows the lives of the Five and their families as they wind their way through the frightening maze of the criminal justice system.  Convicted despite mutually inconsistent confessions and DNA evidence that did not match *any* of them, the teens spend the rest of their youth in prison, only to be exonerated years later based on the confession and DNA match of the real offender, a serial rapist who had committed a similar assault near Central Park weeks earlier.

Plaintiff Linda Fairstein—who, in 1989, was the head of the Manhattan District Attorney's Sex Crimes Unit—was the public official who oversaw and had critical involvement in and responsibility for the prosecution of the Central Park Jogger case.  Fairstein spent more than 30 hours at the police station during the investigation of the Five as the highest-ranking prosecutor from the D.A.'s office.  She visited the crime scene with detectives and two of the Five, and testified for the prosecution at suppression hearings and trial.  Plaintiff subsequently became a famous crime novelist, touting her involvement in the case and using that platform to express her view, from which she has never wavered, that the Five are guilty of rape.  Plaintiff now sues Netflix, filmmaker Ava DuVernay, and one of the writers, Attica Locke, for defamation, claiming her portrayal in the Series by actress Felicity Huffman unfairly made her look like a "villain."  (Compl. ¶ 9.)

Plaintiff's defamation claims, which attempt to dissect assorted scenes and dialogue in the Series, fall apart upon examination for multiple independent reasons.  First, most of the allegedly defamatory scenes and dialogue are incapable of defamatory meaning, and Plaintiff improperly relies on her own spin and innuendo to manufacture one.  Second, the dramatized, hyperbolic dialogue of which she complains in various scenes is protected speech under the First Amendment,

no less than the protection that would be afforded any other expression of opinion about Plaintiff's actions as a powerful public official.  Third, Plaintiff's own public statements establish as a matter of law that by her admission, many of the challenged scenes and dialogue are substantially true.

In considering challenged statements in a defamation case, context is, of course, critical. *Dworin v. Deutsch*, 2008 WL 508019, *4, (S.D.N.Y. Feb. 22, 2008) (Castel, J.) ("statements must be read in context"; dismissing defamation claims).  On its face, the Series is not a documentary or news report, but rather an artistic film dramatization of controversial and contested historical events, told from a distinct perspective and point of view:  that of the Five.  To be clear, Defendants do not claim that this dramatic format alone provides blanket immunity, but the format cannot be disregarded, as Plaintiff tries to do.  The Complaint's premise—that the Series' portrayal of Plaintiff is ipso facto "false and defamatory" because it "depict[s] her at places where she never was" speaking dramatized dialogue "she never uttered" (Compl. ¶ 12)—is simply wrong.  The Court must look to the actual statements at issue, as well as the broader literary context.

In the context here—a "dramatic interpretation[] of events and dialogue filled with rhetorical flourishes"—courts have long held that viewers will be "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts," as opposed to the filmmakers' viewpoint.  *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995).  Indeed, another court recently recognized just that in dismissing defamation claims based on the Series, finding dialogue critical of the plaintiff interrogation training company was not actionable.  *John E. Reid & Assocs., Inc. v. Netflix, Inc.*, 2020 WL 1330657, *8 (N.D. Ill. Mar. 23, 2020).  Viewed in context, the specific dialogue at issue is simply not actionable as defamation.

In addition, in critical respects the Complaint is based on a revisionist history that is contradicted by Plaintiff's own words and admissions.  Plaintiff attempts, solely for purposes of this lawsuit, to now disclaim responsibility for the prosecution of the Five, contending that the

portrayal "assign[s] her a role" that "she did not play" and shows her "making decisions she

never made".  (Compl. ¶ 12.)  But Plaintiff cannot have it both ways:  as the public official in

charge of the Manhattan Sex Crimes Unit she had critical involvement and responsibility for the

prosecution, and for decades has publicly defended all aspects of the investigation and trial,

proclaiming, *still*, that the investigation was "brilliant" and the Five are guilty of the rape.  She

cannot now claim to be unfairly made a villain by dialogue showing her using language and

espousing the *very theories and decisions she has so vigorously defended to this day*.

Plaintiff has told her side of the story for years.  The First Amendment does not allow her

to silence the Five's belief that the prosecution she helped lead as a top public official was a colossal

injustice.  The Series and dialogue are the filmmakers' artistic and dramatic recreation of contested

historical events, expressing their viewpoint and one side of a crucial debate.  As such, Plaintiff's

lawsuit not only fails the rules of defamation law, it assaults core protected speech.  This Court

should dismiss Plaintiff's Complaint with prejudice.

## FACTUAL BACKGROUND

**The Series.**  "When They See Us is a limited film series comprised of four (4) episodes."

(Compl. ¶ 44.)  The Series dramatizes the story of "the arrests, trials and convictions of five"

young teenagers—Yusef Salaam, Antron McCray, Kevin Richardson, Raymond Santana, and

Korey Wise—in what became known as the "Central Park Jogger" case.  (*Id*. ¶¶ 4, 36-38.)  The

story is told from *the Five's perspective*:  how they were wrongfully accused and convicted

based on false confessions despite a lack of physical evidence, only to be exonerated years later.

The title, "*When They See Us*", and the Series' opening scenes, dramatically frame the

entire narrative, with viewers *seeing* the teens and their families *as they themselves did*—happy,

normal *children* making their way through the joys and struggles of everyday life in the inner city,

prior to that fateful night in Central Park.  Episodes 1 and 2 focus on the young teens' and their

parents' vulnerability during the investigation and controversial interrogations, and subsequent trials and convictions.  Episode 3 explores the families' turmoil during the teens' incarceration and the struggles they faced rejoining society; and much of Episode 4 is devoted to Korey Wise, the oldest of the Five who had disabilities and served the longest sentence; the Episode reflects his harrowing experiences in adult prison and includes dramatic interior monologues and flashbacks.[1]

As Plaintiff acknowledges, each Episode ends with a disclaimer that states:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization.  As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.  (Compl. ¶ 228, *see also* Ex. A hereto.)

**Plaintiff Linda Fairstein.**  "[F]rom 1972 until 2002, Ms. Fairstein served in the office of the New York County District Attorney, where she was chief of the County's Sex Crimes Prosecution Unit for twenty-six years" (Compl. ¶ 32); she is known for her "legal work and advocacy for survivors of sexual assault" (*id.* ¶ 34), and, drawing on her prosecutorial experience, has also achieved notoriety as an author of a bestselling "series of crime novels" (*id.* ¶ 35).

Consistent with her "storied reputation as a career prosecutor who pioneered the fight to gain access in courts for victims of sexual assault" (*id.* ¶ 19), the Series depicts the Fairstein character as passionately committed to obtaining justice for the female jogger, Trisha Meili, who was "brutally beaten, raped, and left for dead" in Central Park (*id.* ¶¶ 36-37).[2]

---

[1]  As Plaintiff selectively quotes from the Series, Defendants submit herewith a full video copy.  (Ex. A.)

[2]  *See, e.g.,* Compl. ¶ 90 ("[Fairstein] goes on to say there were '3,412 rapes reported to the NYPD last year. 3,412 times someone was assaulted, held down, threatened, degraded, forced. This is an epidemic'" (quoting Ep. 1, 17:03-18:41)); *id.* ¶¶ 122-23 ("Where's the line for Patricia [Meili]? I'm sick of this shit. Where's the line for her? . . . Fucking City, we hear something gruesome, we grimace and we move on. Well not this time. . . . Remember her" (quoting Ep. 2, 29:51-32:23)).

***Plaintiff's Responsibility for and Involvement in the Central Park Jogger Case.***

Plaintiff "was the head of the Manhattan District Attorney's Sex Crimes Unit" when the 1989

attack on the Jogger took place.  The case came under Plaintiff's area of responsibility, and she

assigned her subordinate Assistant D.A. Elizabeth Lederer to try the case.  (Compl. ¶ 39.)

"Ms. Fairstein met ADA Lederer at the 20th Precinct on the night of April 20, 1989. They

later went to the 24th Precinct." (*Id.*)  Plaintiff also visited the Central Park crime scene with

detectives and two of the Five.  (*Id.* ¶ 86.)  Plaintiff was deeply involved in the investigation from

the outset.  In her words, Plaintiff stayed with Ms. Lederer at "the stationhouse" for over 30 hours

from "the Thursday night after the crime . . . until Saturday morning at 4 a.m.," "doing a variety of

things—including witness interviews, walks of the crime scenes, talking to families, etc."  (7/15/02

letter from L. Fairstein to J. Kindler, NYCLD_039818 (Appx. Ex. 2).)[3]  She was the highest ranking

prosecutor from the D.A.'s office on the scene.  (*See* Compl. ¶ 39; 4/23/13 Fairstein Dep.,

NYCLD_038925-28 (Appx. Ex. 4).)

As Plaintiff admits, she served as a witness "in the suppression hearings and trials" of the

Five, testifying about "events that occurred on the night of April 20 and on April 21, 1989" when

the Five and other witnesses were being interrogated.  (Compl. ¶ 39; 6/4/10 letter from L. Fairstein

to R. Morgenthau, NYCLD_039803 (Appx. Ex. 3).)  The Complaint contains no discussion of

Plaintiff's conduct at the suppression hearings, but that conduct was the subject of a scathing

dissent by New York Court of Appeals Judge Vito Titone in Mr. Salaam's appeal from his

conviction in 1993, which observed that after "ascertain[ing] that [Salaam] had already made a

number of inculpatory statements," Fairstein contrived to keep his family and "Big Brother" from

---

[3]  Certain public records from the official NYC website repository for the Central Park Jogger case—on which Plaintiff's Complaint relies and incorporates by reference—are submitted herewith in an Appendix (cited as "Appx. Ex. __").  As discussed in detail *infra*, § I, these public records, including Plaintiff's written statements, cited and referenced herein, are properly considered on this Motion.

seeing him, even after his mother arrived, and there was "no other reason for . . . Assistant District

Attorney Fairstein" to do so "other than to capitalize on his youth and isolation and to assure that

he did *not* receive aid and advice from the supportive adults who were in a position to retain

counsel for him." *People v. Salaam*, 83 N.Y.2d 51, 58-64 (1993) (Titone, J., dissenting).

  ***The Case Against the Five Goes to Trial Based Solely on their Statements and***

***Notwithstanding DNA Evidence That Ruled Them Out.*** The case against the Five brought by

Plaintiff's Unit was tried in two separate trials in July and November 1990; "the People's case at

both trials rested almost entirely on the statements made by the defendants"—controversial

confessions that were retracted before trial as coerced and, as the D.A.'s office acknowledged

years later, "had serious weaknesses." *People v. Wise*, 194 Misc.2d 481, 489-90 (N.Y. Sup. Ct.

2002). Moreover, as Plaintiff concedes in her Complaint, the prosecution had the FBI's DNA

analysis "prior to trial" and it showed there was "no DNA match" to any of the Five. (Compl. ¶¶

119, 124 and fns. 84, 87, 92 (citing 5/25/90 FBI Report re DNA Analysis, at NYCLD_009083 and

trial testimony that "neither cervical DNA nor sock DNA matched defendants").) Even though the

DNA evidence did not "match the people on trial in this case," the prosecution nonetheless

proceeded on the theory that the Five were still guilty of rape and there must have been a "sixth

rapist." (People's Summation in McCray, *et al.* Trial, at NYCLD_014818-20 (Appx. Ex. 6).)

  ***Injustice Redressed:  Convictions Vacated and Civil Suit Settled.*** In 2002, an individual

and serial rapist named Matias Reyes, "came forward" and confessed to raping Ms. Meili in 1989

*alone*. (Compl. ¶¶ 5, 41.) The D.A.'s office then (without Plaintiff's involvement) reinvestigated

the Five's convictions. "Testing found that Mr. Reyes' DNA matched the DNA taken from Ms.

Meili and her personal belongings." (*Id.* ¶ 41.) Based on that DNA, and Reyes' conviction for a

similar rape near Central Park only weeks prior, the D.A.'s Office submitted to the court a 34 page

single-spaced "Affirmation in Response to Motion to Vacate Judgment of Conviction." (*See* Compl.

fn. 56; Appx. Ex. 5.)  The Affirmation detailed the reasons why the D.A. found Reyes' confession

that he was *solely* responsible for the rape (corroborated by the DNA evidence) to be credible, and

identified facts and circumstances incompatible with the Five's guilt, including the lack of physical

evidence, exclusion of DNA and troubling inconsistencies in the confessions.  (*Id.* ¶¶ 47, 80-119.)

The New York Court's opinion vacating the convictions confirmed the D.A.'s conclusion.

*People v. Wise*, 194 Misc.2d 481, 489-90 (N.Y. Sup. Ct. 2002).  While the Five's purported

confessions were contradictory on "significant details" about the rape, "Reyes was accurate about

specific details of the crimes against the jogger."  *Id.* at 492.  The Court found the Five's flawed

confessions "laid the foundation for a course of action developed, followed, and relied on for the

prosecution and conviction of the defendants.  That course was based on a theory that the

defendants were involved as a group in a single incident; a crime rampage, which included rape,

robbery and other crimes."  *Id.* at 496.  The prosecution's theory no longer being tenable, the

convictions were vacated.  *Id.* at 496-98.  The Five then brought a civil action against the City and

prosecutors, "including Ms. Fairstein, and scores of NYPD officers and detectives" arising from

the Five's claims that their convictions and confessions were wrongful; in 2014 those claims

were resolved with a settlement to the Five of $41 million.  (Compl. ¶¶ 5-6, 42-43 and fn. 2.)[4]

***Plaintiff's Public Statements.***  For decades, Plaintiff has vigorously and consistently

defended the prosecution, and still continues to express her belief that the Five are guilty of rape

and their confessions were not coerced.  In a lengthy written statement to the New York City

Council in 2003, for example, she claimed that, Reyes' DNA and confession that he alone raped

Ms. Meili notwithstanding, the rape was connected to other criminal activity in the Park that

night—and specifically, to the Five, whom she held responsible for the rape, stating her belief that

---

[4]  While not admitting liability, the City noted:  "[t]o the extent that the evidence suggests that these five young men were wrongfully convicted and sentenced to substantial prison terms for a crime they did not commit, that in and of itself constitutes an injustice in need of redress."  (Compl. fn.1; Appx. Ex. 19.)

the Five "acted in concert" with Reyes "during both the physical and sexual assault" of the jogger and participated in the "wilding and attacks".  (*See, e.g.,* Linda Fairstein, Stmt. for Pub. Safety Comm. of N.Y.C. Council (Jan. 30. 2003), NYCLD_039829, 038930, 039832 (Appx. Ex. 1).)[5]

Plaintiff not only maintains that the Five were guilty, she has taken credit for their prosecution.  The jacket cover of her 1993 book *Sexual Violence: Our War Against Rape* (Compl. ¶ 35) specifically highlights her involvement:  "Linda Fairstein has personally tried or been involved in scores of nationally prominent rape cases including the Robert Chambers Preppy Murder Trial and the case of the Central Park Jogger."  (Appx. Ex. 10.)  Plaintiff refers in her book to the Five as "vicious marauders," who attacked a jogger "without interruption."  (*Id.*)  In a 1994 *Daily News* column she wrote, Plaintiff described "the rape of a Russian woman in Coney Island by a gang of teens who showed the same lack of remorse as *the 'wilding' teens who attacked a Central Park jogger* on an April evening almost exactly two years ago"  (Linda Fairstein, *It is a season to be fearful*, DAILY NEWS (Apr. 19, 1994)) (Appx. Ex. 9) (emphasis added).)

Even now, in her 2019 *Wall Street Journal* Op-Ed condemning the Series, Plaintiff maintains that even though Reyes "confessed in 2002 to the rape of Ms. Meili," it is incorrect "to assume the prosecution had no basis on which to charge the five suspects in 1989," repeating her

---

[5]  Plaintiff's own written submission to the NYC Council (and other published statements) are consistent with many contemporaneous news articles quoting her to the same effect and noting her key role in the prosecution:  "I think Reyes ran with that pack of kids. He stayed longer when the others moved on. He completed the assault. I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night but in the attack on the jogger."  J. Toobin, *A Prosecutor Speaks Up*, THE NEW YORKER (Nov. 25, 2002) (recounting her role in the initial investigation as "the eight-hundred-pound gorilla, to help Elizabeth [Lederer] and the cops get the resources they needed"; "it was one of the most brilliant police investigations I've ever seen") (Appx. Ex. 13).  *See also* J. Dwyer, *New Light on Jogger's Rape Calls Evidence Into Question*, N.Y. TIMES (Dec. 1, 2002) ("Linda Fairstein, the chief of the Sex Crimes Unit—who oversaw the prosecution when she was a member of the district attorney's office—continue[s] to hold that the teenagers managed to have some contact with the jogger . . . starting the assault that Mr. Reyes finished"); *Key prosecutor: No regrets in Central Park attack convictions*, ASSOCIATED PRESS (Nov. 24, 2002) (quoting Fairstein); D. Goldiner, 5 *'Absolutely' Guilty: Prosecutor has no regrets in jogger rape convictions*, DAILY NEWS (Nov. 25, 2002) (quoting Fairstein).  (Appx. Exs. 14-16.)

view that the Five were properly "charged as accomplices, as persons 'acting in concert' with each

other *and with the then-unknown man who raped the jogger*."  (Compl., fn. 131:  L. Fairstein,

Netflix's False Story, WALL ST. JOUR. (June 10, 2019) (emphasis added) (Appx. Ex. 7).)  In recent

years, she also has publicly written and voiced these same opinions, in, *e.g.,* newspapers, legal

journals,[6] and on national radio while promoting her books.[7]

     ***The Complaint.***  Although she indisputably had critical responsibility for and direct

oversight of the case, was intimately involved in the investigation and prosecution, and was its

prime defender even after the convictions were vacated, Plaintiff sues on the implausible premise

that she had little to do with the prosecution and was defamed by being portrayed expressing

views about the case and the evidence she has consistently maintained.  (*E.g.,* Compl. ¶ 199.)

**ARGUMENT**

## I.    Standard of Review and Material Properly Considered on a Motion to Dismiss

     Plaintiff's claims fail as a matter of law under well-established First Amendment and

New York common law precedent.  On a motion to dismiss, the Court begins by considering the

well-pleaded facts, to decide "whether they plausibly give rise to an entitlement to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Conclusory allegations must be disregarded.  *Id.*

     ***Materials Referenced and Incorporated Into Complaint.***  It is well-settled that for

purposes of a motion to dismiss, the complaint includes any "documents incorporated in it by

reference."  *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *see also Dworin*, 2008 WL

---

[6]  L. Fairstein, *In Defense of The Central Park 5 Prosecution*, N.Y. LAW J. (July 31, 2018) ("each of the 5" were "participants in the riot, rampage, vicious attacks on civilians and some in the rape of the jogger") (Appx. Ex. 8), cited in Piccoli, *After Furor, Literary Group Withdraws Honor for 'Central Park Five' Prosecutor*, N.Y. TIMES (Nov. 28. 2018) ("Ms. Fairstein wrote an op-ed in the New York Law Journal defending the prosecution. 'The confessions were not coerced,' she wrote") (Compl., fn. 109; Appx. Ex. 12).

[7] "Linda Fairstein discusses her book and the New York Jogger muggings," Imus in the Morning, June 20, 2014, https://video.foxbusiness.com/v/3633082806001/#sp=show-clips ("I think that these men were participants in the attack on the jogger as charged")  (Appx. Ex. 11).

9

508019, at *2 (document relied upon and integral to complaint may be considered).  The Complaint here both expressly incorporates and relies heavily upon the "documents concerning the arrest, prosecution and conviction of the Five, and their subsequent lawsuit, [that] were made publicly available on the New York City Law Department's website" claiming "[a] great many of these documents . . . demonstrat[e] the falsity of the manner in which Ms. Fairstein is portrayed." (Compl. ¶ 7, citing http://www.nyc-cpj.org/Home/Disclaimer.)[8]  In fact, many of the public records on the NYC website, including Plaintiff's own written statements, flatly contradict the premises for this lawsuit.  *See Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) (on motion to dismiss, court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint").

     ***Judicial Notice.***  "The court may also consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint."  *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005); Fed. R. Evid. 201(b).  In addition to public records and articles on which Plaintiff relies, other books, statements and articles she authored are also properly subject to judicial notice, not for their truth but for what was said therein.  *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008) ("proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents").  Plaintiff cannot in good faith argue that her own written statements—in official submissions, published books and articles—are not subject to judicial notice.  *See, e.g., Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio,* 364 F. Supp. 3d 253, 262-64  (S.D.N.Y. 2019) (judicially noticing parties "made the statements attributed to them" in press release, article, and TV interview, as they are sources "whose accuracy 'cannot reasonably be questioned'" as to that fact);

---

[8]  Plaintiff's Opposition brief filed in the transferor court conceded this point.  (*See* ECF No. 45 at 27.)

*3B Med., Inc. v. SoClean, Inc.*, 2020 WL 5440440, *1 n.2 (S.D.N.Y. Sept. 8, 2020) ("Plaintiff's own press release is a source whose accuracy . . . cannot reasonably be questioned").[9]

Courts routinely dismiss defamation claims based on plaintiff's own admissions in material referenced in the Complaint or subject to judicial notice.  Just recently, in dismissing a defamation case based on the film *Hustlers*, Judge Cote took "judicial notice of the transcript of [plaintiff's] guilty plea even though [she] did not attach it" to the complaint, along with plaintiff's "interviews" and "her published memoir . . .  Both the interviews and the memoir are 'matters of public record.'"  *Barbash v. STX Financing*, 2020 WL 6586155 at *2.[10]  The specific records and statements of Plaintiff as to which Defendants seek judicial notice on this Motion are discussed below as applied to Plaintiff's claims, and summarized in the Appendix to this Motion.

## II.     The Scenes and Dialogue Plaintiff Identifies Are Not Actionable Defamation

Not one of the specific eleven scenes ("Scenes")[11] of which Plaintiff complains is actionable.  Those Scenes fall into four groups, with some overlap:  (1) innocuous portrayals of the Plaintiff; (2) portrayals of Plaintiff expressing views she has made public; (3) portrayals of Plaintiff having allegedly "violated the law"; and (4) scenes containing hyperbolic dialogue.  Each supposedly actionable Scene is either:  (1) incapable of defamatory meaning; (2) protected expression of opinion and hyperbole used for dramatic effect in the context of a dramatization of

---

[9]  Nor can Plaintiff reasonably question her own words in video interviews, *see Muhlhahn v. Goldman*, 93 A.D.3d 418, 419 (1st Dep't 2012).  While not essential to this Motion, it is also proper for the Court to consider the multitude of published interviews quoting Plaintiff that echo her oft-stated views, *see Barbash v. STX Financing LLC*, 2020 WL 6586155, *2 (S.D.N.Y. Nov. 10, 2020), and press coverage generally, *e.g.*, *Staehr*, 547 F.3d at 425*; Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018) (court may judicially notice "news articles discussing the conduct raised in the complaint").

[10]  *See also, e.g., Cerasani v. Sony Corp.*, 991 F.Supp. 343, 354 & n. 3 (S.D.N.Y. 1998) (film based on a true story did not portray plaintiff "engaged in conduct notably worse than that described" in prior testimony, book and press coverage, of which court took judicial notice in dismissing defamation claim); *Marom v. Pierot*, 2020 WL 6572509, *10 (S.D.N.Y. Aug. 30, 2020) (taking judicial notice of public records and of "admissions in pleadings and other documents in the public record" that "contradict the party's factual assertions"; dismissing defamation complaint) (citations omitted).

[11]  For the Court's convenience, Defendants attach hereto a chart of the allegedly defamatory "Scenes" (Ex. B).  The Scenes will be referred to herein by the number assigned to them in the chart.

controversial events; or (3) substantially true as a matter of law, and appropriate for adjudication based on public record admissions, publications authored by Plaintiff and other material incorporated in the Complaint or subject to judicial notice.

The law underlying these reasons for dismissal is as follows:  First, as to **defamatory meaning**:  "[w]hether particular words are defamatory presents a legal question to be resolved by the court in the first instance," and they "must be construed in the context of the entire statement or publication as a whole[.]"  *Aronson v. Wiersma*, 65 N.Y.2d 592, 593-94 (1985).  Plaintiff pleads both defamation per se and per quod; the former requires that the challenged statement be "libelous on its face" and the latter "requires an averment, called an innuendo, to show the defamatory meaning."  *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*, 29 A.D.2d 423, 427 (1st Dep't 1968), *aff'd*, 25 N.Y.2d 943 (1969).  Plaintiff cannot use innuendo to "enlarge upon the meaning of words so as to convey a meaning that is not expressed," *Tracy v Newsday, Inc.,* 5 N.Y.2d 134, 136 (1959), nor "strain[] to find a defamatory meaning."  *Rappaport v. VV Publ'g Corp.*, 163 Misc.2d 1, 6 (Sup.Ct. N.Y. Cty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996); *Dworin*, 2008 WL 508019, at *4.

Second, as to **opinion/hyperbole and dramatization**:  a defamation claim requires a *false statement of fact*; statements that "cannot 'reasonably [be] interpreted as stating actual facts" are not actionable.  *Milkovich v. Lorain J.,* 497 U.S. 1, 20 (1990); *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014).  New York's protection for opinion is even broader, in keeping with "central values protected by" New York law, focusing "first, and primarily, on context."  *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 505 (S.D.N.Y. 2012) (Castel, J.).  In determining whether a statement is one of fact or protected opinion, New York courts consider both (a) "the full context of the communication in which the statement is made" and (b) "the broader social context surrounding the communication, including the existence of any applicable customs or convention which might alert the reader that he or she is reading opinion and not fact."  *McGill v. Parker*, 179 A.D.2d 98,

12

110 (1st Dep't 1992) (citing *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 255 (1991)).

"[I]n distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995). As this Court observed in *Egiazaryan*, "in sharp contrast to news reporting," other contexts, *e.g.,* editorials and letters, "create the 'common expectation' that the communication would 'represent the viewpoint of [its] author[ ] and . . . contain considerable hyperbole, speculation, diversified forms of expression and opinion.'" 880 F. Supp. 2d at 507 (quoting *Brian*, 87 N.Y.2d at 53). Likewise, courts have long observed that "statements made in 'a so-called docudrama or historical fiction' should not be accepted unquestioningly," because, by definition, they "rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." *Partington*, 56 F.3d at 1155 (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 512-13 (1991)).[12] In the context of this genre, viewers are not getting a disinterested, line-by-line transcription of what actually was said, and "would expect [defendants] to set forth [their] personal theories about the facts of the trials and the conduct of those involved in them." *Id.* at 1154-55.[13]

---

[12] *Masson* involved allegedly fabricated quotes in a journalistic setting—the *New Yorker* magazine, which has "a reputation for scrupulous factual accuracy" and "would, or at least could, lead a reader to take the quotations at face value" as "nearly verbatim reports of statements made by the subject." 501 U.S. at 513. The Court specifically contrasted docudramas, a format that "indicate[s] that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed." *Id.*

[13] Given the Series' context, a "reasonable viewer would understand within the first two minutes that he is not watching a documentary film". *Lovingood v. Discovery Commc'ns*, 800 F. App'x 840, 847-48 (11th Cir. 2020) (viewers "would understand that the film presents the [historical] story not as a disinterested, objective narrative but through a single critical perspective"). Plaintiff asserts that "While the film series purports to be 'based on' a true story, Defendants have publicly referred to the film as a true story" (Compl. ¶ 169). Whatever statements were made outside the Series cannot govern whether, given its context and obvious genre (and disclaimer) the Series is non-actionable protected speech. *Lovingood*, at 847-48 (reasonable viewer's perspective "looks to the film itself"). Also, Plaintiff's point is disingenuous. As the external statements Plaintiff relies on make clear, this is the story and the "truth" of the Five, told *from their perspective*—that they were not guilty of rape: "The story you know is the lie that police, prosecutors and Donald Trump told you. WHEN THEY SEE US is the story of the boys *from their eyes and their hearts*." (Compl. ¶ 171 (emphasis added) (quoting DuVernay Instagram post).)

Third, as to **substantial truth**, if the overall "gist or substance" of the statement is true, such that it "could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation," no action will lie.  *Tannerite Sports, LLC v. NBCUniversal News Group*, 864 F.3d 236, 241-42 (2d Cir. 2017) (affirming dismissal); *Egiazaryan*, 880 F. Supp. 2d at 508.  Plaintiff's claims thus fail as a matter of law where the portrayal and dialogue of which she complains is not only consistent with but echoes the words in her own published and judicially noticeable statements defending the investigation, prosecution and guilt of the Five.[14]

On this backdrop, each of the scenes and dialogue at issue fails to state a claim.

A.     **Scenes Showing Plaintiff "At the Crime Scene" (Scene 1), "Drafting a Press Release" (Scene 2), and "Fighting With Nancy Ryan Over Who Would Prosecute Case" (Scene 5) Have No Plausible Defamatory Meaning**

Many of the scenes at issue simply cannot be said to bring the "hatred, shame," or "contempt" necessary to sustain a defamation claim.  *See Kimmerle v. N.Y. Evening J.*, 262 N.Y. 99, 102 (1933).

*Scene 1.*  Plaintiff asserts the scene "at the Meili crime scene on the morning of April 20, 1989" is defamatory because it purportedly shows Plaintiff stating "that there was only *one* individual involved in the rape."  (Compl. ¶¶ 46a, 54.)  First, the comment ("[m]ake sure to get those drag marks. . . . Clear as day. *His footsteps*, her body" (*id.* ¶ 52 (emphasis Plaintiff's)) is nothing but an initial observation of physical evidence and not a definitive determination that there was "only one" perpetrator.  Nor would it be defamatory to suggest that an initial impression

---

[14] Fault is another essential element of a defamation claim, and as an admitted public official and figure, the standard of fault Plaintiff must meet is actual malice under *New York Times v. Sullivan,* 376 U.S. 254 (1964).  The actual malice rule derives from "the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.  If any aspects of the dramatized portrayal of Plaintiff survive this Motion, she will be unable to meet her heavy burden of proving they were published with actual malice. *See, e.g., Davis v. Costa-Gavras*, 654 F.Supp. 653, 658 (S.D.N.Y. 1987) ("Self-evidently a docudrama partakes of author's license—it is a creative interpretation of reality—and if alterations of fact in scenes portrayed are not made with serious doubts of truth of the essence of the telescoped composite, such scenes do not ground a charge of actual malice"; granting summary judgment).

changed based on additional evidence (at that point, the authorities did not know the full extent of the criminal activity that night). The scene simply "cannot reasonably be interpreted as accusing plaintiff of misconduct" in connection with the investigation. *Dworin*, 2008 WL 508019, at *7.

  ***Scene 2.*** Plaintiff claims this scene depicts her "drafting a press release" (Compl. ¶ 59) when she allegedly did not. There is no defamation here. Like her attempt to find defamation in Scene 1, it is an impermissibly "strained or artificial construction" (*Dworin*, 2008 WL 508019, at *4) to interpret Scene 2 to convey that Plaintiff was the "source" of "widely criticized" press coverage that "fuel[ed] racial tensions in New York City, and against The Five" (Compl. ¶ 61). That is nothing but Plaintiff's spin and invention with no basis in the text; it improperly "adds an entirely new and independent thought that finds no support in the article." *Tracy,* 5 N.Y.2d at 137.

  ***Scene 5.*** Likewise, there is no defamation in the purported suggestion that Plaintiff "fought with" Nancy Ryan over "who would prosecute the case" and "wrest[ed] the case" from Ryan. (Compl. ¶ 46d and p. 25.) That ambitious, dedicated prosecutors would want to be in charge of the most high profile and significant cases is totally unremarkable—and could not be defamatory. *See, e.g., Dworin*, 2008 WL 508019, at *6 (statements "portraying plaintiff as publicity-hungry" are "not defamatory").[15]

### B. It Is Not Defamatory to Accurately Portray Plaintiff As Expressing Views She Has Publicly Espoused for Decades

  As to each scene discussed below, Plaintiff complains she is inaccurately portrayed as "singlehandedly mastermind[ing] a theory of the case[.]" (Compl. ¶ 10.) But Plaintiff undeniably was the head of the D.A.'s Sex Crimes Unit with direct oversight and critical responsibility for the

---

[15] Defendants do not raise substantial truth on this point in this Motion as it is unnecessary for dismissal, though Plaintiff has stated (as was widely reported at the time) that there was a "turf" war over who would prosecute the case and her choice prevailed. *See* 7/15/02 letter from L. Fairstein to J. Kindler, NYCLD_039818 (Appx. Ex. 2) ("at the same time I assigned the case to Liz [Lederer], Nancy [Ryan] had assigned it to Peter [Casolaro]"; D.A Morgenthau "let Liz keep it"); Timothy Sullivan, *Unequal Verdicts: The Central Park Jogger Trials* 21-22 (Am. Lawyer Books 1992) (describing "turf war") (Appx. Ex. 18).

Jogger case tried by her Unit (including the decision whether to continue to press charges after DNA evidence ruled out the Five), and she was the highest ranking prosecutor on the scene for 30-plus hours during the investigation, assisting her subordinate Lederer and detectives.  Plaintiff also has been an outspoken public face of the prosecution, for decades and to this day defending the theories under which the Five were tried and convicted.  Portraying Plaintiff as expressing views she has publicly championed for decades and as having a central role in the case is substantially true and thus in no way unfair, let alone defamatory.

### 1.    "Putting Together a Timeline" (Scene 4)

Plaintiff complains of the scenes at the police station on April 20 in which she is shown piecing together a timeline of events from the night of the rape based on the evidence gathered at that point.  Plaintiff asserts "falsity" because she allegedly "was not at any precinct at the times and places depicted" (Compl. ¶ 80); was not "in front of a map" on April 20 and did not know of "the locations of all the attacks in Central Park, as some of the victims and witnesses did not come forward until days later" (*id.* ¶ 84).  Plaintiff's claim fails for at least two reasons.

First, that Plaintiff was not at the time and place depicted, or events are "compressed" for dramatic purposes, cannot in and of itself be a false statement of defamatory fact in the context of a dramatization.  *Cf. Lovingood,* 800 F. App'x at 847 ("condensing the entire *Challenger* investigation into a 90-minute dramatic film required the selective editing of real history not only for time but also for clarity, flow, and emotional impact").

Second, Plaintiff cannot complain it is defamatory to show her constructing a timeline "to connect the rape to the other assaults that happened in Central Park on the night of April 19, 1989." (Compl. ¶ 79.)  The Complaint *admits* that both the D.A.'s Office and the NYPD created a "timeline of events" to that effect and that timeline was the basis for presentation to the grand jury and at trial.  (Compl. ¶ 85.)  And while Plaintiff objects that she "did not participate in the creation

of any of these timelines" (*id.*), she *has specifically defended that very timeline*, as well as the

"brilliant" police work in 1989 that produced it.  Linda Fairstein, Stmt. for Pub. Safety Comm. of

N.Y.C. Council (Jan. 30. 2003), at NYCLD_039832, 039835 (Appx. Ex. 1).  That timeline—in a

case over which she had supervisory authority and material involvement—supported the trial

theory that the Five participated in the "wilding and attacks" in one part of the Park and "acted in

concert" in the rape of the jogger in another part minutes later.  *Id.* at NYCLD_039830, 039832.  In

her statement to the NYC Council, Plaintiff strenuously defends the Five's rape convictions based

on the evidence *and timeline*, expressly refuting "[s]ome critics" that "have questioned the timeline

in the case, talking about exoneration as something to be determined by discrepancies of two or

three minutes."  *Id.* at NYCLD_039835.[16]

Plainly put, it cannot be defamatory to say that it was Plaintiff's theory that the rape was

connected with the other criminal activity in the Park that night and the timeline (despite its

critics) was accurate and supported by the evidence presented at trial by her Unit—after all, *that

has been Plaintiff's consistent and repeatedly expressed belief*, both then and reiterated long after

the events.  A depiction that so states is the very definition of substantial truth.  As the Court

found in *Egiazaryan*, where the plaintiff had admittedly been a "prominent financial backer" of a

controversial political party, stating that he was a "member" of that party was "likely to produce

the same, or lesser, effect on the reader," and required dismissal.  880 F. Supp. 2d at 508.[17]

---

[16]  Again, Plaintiff's public statements (to the City and in articles she wrote) may be considered on this
Motion as both incorporated in the Complaint and subject to judicial notice for the fact that Plaintiff made
the statements attributed to her.  *See supra*, § I.

[17]  *See also, e.g., Deripaska v. AP*, 282 F. Supp. 3d 133, 140, 146 (D.D.C. 2017) (dismissing claim where
"readily available, judicially noticeable information [showed] that Deripaska openly associates himself
with the Russian government.  For the AP to do the same cannot be defamatory, even if it were not true");
*Love v. Wm. Morrow & Co.,* 193 A.D.2d 586, 588 (2d Dep't 1993) (dismissing claim, "comparison of the
disputed language" in book with "plaintiff's own words in his term paper" established substantial truth).

### 2. Interactions With ADA Lederer (Scenes 8 and 10)

Plaintiff alleges that Scene 8 in Episode 1 depicts her as "devising a theory of the case that did not fit the known facts, and which ADA Lederer questioned" (Compl. ¶ 46g); and that Scene 10 in Episode 2 similarly shows the Fairstein character "forcing ADA Lederer to prosecute a case against The Five for which there was insufficient evidence." (*Id.* ¶ 46i.)

First, the dialogue in Scenes 8 and 10, viewed in context of both the specific scenes in the Series and the overall literary context (a dramatization based on controversial historical events) are non-actionable opinion. Once again, Plaintiff asserts "falsity" on the basis that these "interactions" as written "never happened." (*Id.* ¶¶ 116, 120.) But "fictionalized conversation[s], as part of series that uses actors and actresses, music, and imagined dialogue to dramatize historical events," are not automatically actionable as defamation, as Plaintiff suggests. *John E. Reid & Assocs.,* 2020 WL 1330657 at *8; *Lovingood*, 800 F. App'x at 848 ("reasonable viewer would understand the film as generally not purporting to present verbatim dialogue from the pages of history"). What the dialogue in those scenes does is dramatize a debate over the strengths and weaknesses of the prosecution's case, with the Fairstein character taking a more aggressive view of the evidence and the guilt of the Five. Using the characters to voice competing opinions about the evidence is a literary vehicle and "rhetorical device . . . designed to maintain the viewer's attention," and also must be considered in the context of a dramatization that "offer[s] the personal viewpoint" of the filmmakers "concerning the trials". *Partington,* 56 F.3d at 1157 (while depiction of attorney in TV dramatization of trial based on book by his competitor "may imply that he represented his client poorly" it was not actionable assertion of defamatory fact in context).[18]

---

[18] *See also Dworin*, 2008 WL 508019, at *4 (in context of autobiography in which defendant's purpose was to "portray[] plaintiff as 'an antagonist to his own protagonist' for literary reasons. . . it would be plain to the reasonable reader" that defendant was conveying "his own biased opinion about plaintiff").

Second, while Plaintiff argues these scenes "falsely depict Ms. Fairstein as desperate to put together a case against The Five, imposing her theory of the case on ADA Lederer" (Compl. ¶ 116), it could hardly be defamatory of Plaintiff's "ethics and integrity" (*id*. ¶ 122) to show her espousing her admitted "view of the evidence" that the Five were guilty and there was a "Sixth rapist". Indeed, the points the Fairstein character makes in Scene 10 include that (a) "there must have been another attacker? One must have gotten away"; (b) "the 5 can't be ruled out"; (c) "They were in the park beating people up the same night that she's getting beat up and you're telling me they had nothing to do with it? Bullshit" (*id*. ¶¶ 120-22). These points are, almost to the letter, the points made in her 2003 Statement to the NYC Council, her 1993 non-fiction book and 1994 Daily News column, as well as most recently in her 2019 *Wall Street Journal* Op-Ed and other articles she penned—all of which the Court can judicially notice for the fact that she stated those views.

Nothing in Scene 10 "falsely portrays Ms. Fairstein as admitting that the confessions of The Five were coerced" much less "attributes responsibility for that to Ms. Fairstein." (*Id*. ¶ 123.) The Fairstein character, consistent with what the real Linda Fairstein said she believes, says that the Five "said it themselves, they told us what happened" and when challenged that "They were told" what happened, responds that the only thing the young men were "told" was "how their one part fit into the whole". Nothing in the scene can be read as an admission by Fairstein that the confessions were "coerced"—just the opposite. Accurately portraying the Fairstein character as a "true believer" in the prosecution's theory and the guilt of the Five "could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Tannerite Sports*, 864 F.3d at 241-42; *Egiazaryan*, 880 F. Supp. 2d at 508.

Finally, in Scene 10 the Lederer character's reference to the Fairstein character as "delusional" is hyperbolic rhetoric in a dramatic setting and cannot be deemed to actionably "impugn[] Ms. Fairstein's reputation and career" by "portray[ing] her as bordering on mental illness

and lacking any sense of rationality when making judgments about cases." (Compl. ¶ 125.)  No reasonable viewer would take that dialogue as a serious accusation of mental illness.  *See Dworin*, 2008 WL 508019, at *6 (in presenting "a one-sided, highly dramatic depiction of a fight for control between two high-powered advertising executives" defendant was "not literally accusing plaintiff of suffering from 'mania'"); *Scialdone v. Derosa*, 148 A.D.3d 741, 742 (2d Dep't 2017) ("delusional" is non-actionable "expression of opinion").

### 3.   Interactions With ADA Ryan (Scenes 5 and 11)

*Scene 5.*   Plaintiff makes an editorial complaint that in Scene 5 "ADA Ryan is shown as the voice of reason, confronting Ms. Fairstein because ADA Ryan believed that the young men in custody engaged in nothing more than harassment in Central Park on the night in question". (Compl. ¶ 93.)  The confrontation reflects dueling opinions over a contested set of facts in a dramatic setting and thus, even if "[t]he show casts . . . Ryan as [a] truth-telling protagonist[]," heated dialogue "during a fictionalized conversation," where both parties have "an ax to grind" cannot be the basis for liability.  *John E. Reid & Assocs.,* 2020 WL 1330657 at *8.  The Fairstein character is only stating what the actual Linda Fairstein has repeatedly stated she believes, which, by definition, cannot be defamatory.

*Scene 11.*   Plaintiff also complains of a "final scene," Scene 11, "which takes place in 2002," depicting the Ryan and Fairstein characters meeting in a restaurant.  (Compl. ¶ 128.)  The Fairstein character tells the Ryan character, "You're here to gloat. It doesn't matter, you simply identified a sixth rapist, I always said there may be more."  Ryan responds, "You said that to cover because you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes."  The Ryan character then dramatically puts several of Ms. Fairstein's novels on the table, "noting that while she was writing crime novels, five innocent young men were serving time." (*Id*., citing Ep. 4 at 1:09:49-1:12:43.)

First, Plaintiff complains the scene is false because she and Ryan never met for lunch in 2002 (*id*. ¶ 128) and it "falsely attribute[s] the theory of the case to Ms. Fairstein" (*id.* ¶ 129).  But even if now, for purposes of this suit, Plaintiff seeks to disclaim responsibility for the prosecution she helped lead, she cannot deny that she did and has continued to publicly espouse and endorse the "sixth rapist" theory and the validity of the confessions.  The "gist or sting" cannot be defamatory when it is no different than what Plaintiff herself admits.

Second, as with the earlier scenes between the Fairstein and Lederer characters, the dialogue represents the two sides of the debate over an ambiguous historical event.  The Ryan character who led the re-examination of the case is clearly a biased partisan with "an axe to grind"; her angry outburst ("you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes") is the hyperbolic expression of the Ryan character's opinion.  Given the context, it cannot be read as a factual statement that *Plaintiff herself* was responsible for the "alleged coercive tactics used during police questioning" (*id.* ¶ 129), when the detectives themselves are the ones shown using coercion and the Fairstein character is not shown as present when it happens.  "When allegedly defamatory statements take place in a setting in which 'the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole,' language that might otherwise be thought of as statements of fact 'may well assume the character of statements of opinion.'"  *John E. Reid & Assocs.,* 2020 WL 1330657 at *9 (citation omitted).[19]

---

[19] *Accord Egiazaryan*, 880 F. Supp. 2d at 505, 507 ("even apparent statements of fact may assume the character of statements of opinion"; statement was "rife with . . . 'epithets, fiery rhetoric, [and] hyperbole'" and "reasonable reader would understand" it was "the opinion of a person 'voicing no more than a highly partisan point of view'"); *Dworin*, 2008 WL 508019, at *6 ("a one-sided, highly dramatic depiction of a fight for control"); *Immuno AG*, 77 N.Y.2d at 254 (where speech "related to a public controversy" and speakers were "fully identified to readers" as partisans of one side, the "average reader" would "look upon the communication as an expression of opinion rather than a statement of fact").

### C.   The Complained-of Dialogue Does Not Support Plaintiff's Claimed Defamatory Imputation That She "Violated the Law"

In addition to her untenable attempt to claim defamation based on attributing the views to her that she has publicly expressed for years, Plaintiff also complains of dialogue and scenes in the Series which she claims portray her as "violating the law" by "interrogating unaccompanied minors," "pressuring" detectives to "force confessions," and "withholding exculpatory evidence from defense counsel" (*e.g.,* Compl. ¶¶ 260, 340, 360).  Upon examination, however, none of these claimed defamations have a basis in the actual content of the identified scenes, but instead reflect Plaintiff's strained interpretation of what these scenes portray.

Defamation cannot be built solely on innuendo.  In *Tracy v. Newsday, supra*, for example, a newspaper article discussing a criminal defendant's failure to appear for trial reported that the plaintiff, a former policeman that the defendant had hired as an investigator, was seen carrying his luggage out of a hotel and was the "last person to hear" from the defendant before he disappeared.  5 N.Y.2d at 137.  The court held plaintiff's claim that the article impliedly accused him of aiding and abetting defendant in skipping bail was "'strained, unreasonable and unjustified,' . . . add[ing] an entirely new and independent thought that finds no support in the article."  *Id*.  The same is true of the complained-of scenes here.

Moreover, in determining whether statements are "reasonably susceptible to a defamatory connotation . . . a court does not construe the challenged statements 'with the close precision expected from lawyers and judges' but rather considers how they would be 'read and understood by the public to which they are addressed.'"  *Seymour v. Lakeville Jour. Co. LLC*, 150 F. App'x 103, 104-105 (2d Cir. 2005) (citations omitted) (no reasonable reader would infer that plaintiff deliberately violated state tax law).  As set forth below, none of the *actual* statements or scenes Plaintiff challenges is susceptible of a defamatory meaning.

### 1.   No Claim Based On Questioning of "Unaccompanied Minors" (Scene 3)

Plaintiff complains of Scene 3, at the police station on April 20, which Plaintiff describes as "a room full of young men of color, who were allegedly involved in the attacks in Central Park. They are not with their parents"; the Fairstein character is "told by the detective that the young men are ages 13 or 14"; "Fairstein then begins questioning the young men without reading them their Miranda rights, in violation of New York State law, which prohibited the questioning of minors under age 16 without a parent present."  (Compl. ¶¶ 65-66.)

Nowhere in the scene, however, is there is any mention of any law that would bar Fairstein from speaking to the teenagers, any suggestion that Fairstein is violating that unidentified law or any indication that the teenagers were not Mirandized previously, and Defendants cannot be liable for statements that were not actually contained in the Series.  *Tracy*, 5 N.Y.2d at 137; *Seymour*, 150 F. App'x at 104-105; *Bordoni v. N.Y. Times Co.,* 400 F.Supp. 1223, 1230 (S.D.N.Y. 1975) (dismissing bank director's claim that news article reporting on his resignation and referring to "pressure from the regulatory authorities" charged him with participation in crime).  The fact is, all this scene depicts is a brief exchange with a minor witness to the events in the Park; there is no suggestion that the information obtained was used against the minor or that he was charged with a crime based on it.  To the contrary, the Episode and Series make clear that the individual being questioned was *not* one of the Five and the questioning could not have resulted in any violation of unspecified rights as to him.[20]  In any event, even if the statement that Plaintiff alleges could be conjured from the scene, a technical failure to comply with *Miranda* or the New York statute is not

---

[20]  While Plaintiff admits she extensively participated (30+ consecutive hours) in the investigation from April 20 on, including "doing a variety of things—including witness interviews" (7/15/02 letter from L. Fairstein to J. Kindler, NYCLD_039818, Appx. Ex. 2), in the interest of narrowing this Motion Defendants are not asking the Court to rule on substantial truth as to this point.  Tellingly however, the Complaint does not mention the scene in Episode 1 (at 43:08 - 44:52) where Yusuf Salaam's mother challenges the Fairstein character about the interrogation of her minor son without her present.  Indisputably, Plaintiff was involved in that incident—the subject of Judge Titone's scathing dissent in *People v. Salaam.*

defatory.[21]

### 2.   No Claim Based on Purported "Directing" of Detectives (Scenes 7, 8)

*Scene 7.*  Plaintiff complains of dialogue in a scene (Scene 7) depicting the Fairstein character telling NYPD officers:  "We've got suspects, we've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this."  (Compl. ¶ 104.)  Again, Plaintiff claims "falsity" because "Ms. Fairstein was not involved in the NYPD's questioning of witnesses or suspects" (*id.* at ¶ 105), but even if that were true (it is not), the dialogue is not defamatory.  Phrases like "not business as usual. . . . No kid gloves here" are the kind of typical heated rhetoric used for dramatic purposes when a novel or film depicts authorities under pressure, trying to solve a particularly heinous crime.  *John E. Reid & Assocs.,* 2020 WL 1330657 at *8.  That dramatic trope cannot be the basis for the factual conclusion that Plaintiff "direct[ed] NYPD police officers and detectives to bend the rules, or alter procedures, with respect to the interrogation of minors in criminal cases."  (Compl. ¶¶ 46f, 107.)[22]

*Scene 8.*  Likewise, Scene 8 cannot reasonably be taken as an assertion that the Fairstein character, by stating that Mr. Wise is the "glue" that will hold the case together, is somehow responsible for Detective Sheehan "forc[ing] a confession out of Mr. Wise, resulting in Mr. Wise being beaten into confessing to involvement in the rape of Ms. Meili."  (*Id.* ¶¶ 115-16).  The actions portrayed are those of the detectives alone, and "the interpretation plaintiff attempts to

---

[21]  Non-compliance with *Miranda* is not itself a criminal act—or even a Constitutional violation, "absent use of the compelled statements in a criminal case against the witness."  *Chavez v. Martinez*, 538 U.S. 760, 769-70 (2003) ("procedural safeguards" required by *Miranda* are "not themselves rights protected by the Constitution but . . . provide practical reinforcement for the right" against self-incrimination).

[22]  Plaintiff alleges that "[t]he next image is of Mr. Richardson in an interrogation room, with a black eye" (*id.* ¶ 104), but that does not support Plaintiff's apparent inference that detectives beat him at Plaintiff's behest; an earlier scene shows Mr. Richardson *already had* a black eye when he was brought to the station.  (Ep. 1 at 07:10-22.)

establish by innuendo distorts the logical meaning of the text beyond the limits of its language."

*El Meson Espanol v. NYM Corp.*, 521 F. 2d 737, 738, 740 (2d Cir. 1975) (stating that plaintiff

restaurant was a good place "to meet a connection" to buy cocaine "cannot be read to accuse

[plaintiff] of 'knowing' acquiescence or participation in narcotics activity").  Plaintiff's attempt

to tease out a defamatory meaning from this dialogue must be rejected.  *See also Tracy*, 5 N.Y.2d

at 137; *Cerasani*, 991 F. Supp. at 354.

### 3.    No Claim Based on Discussion of DNA Evidence (Scene 9)

Finally, Plaintiff complains of a scene in Episode 2 featuring the Fairstein, Lederer and

Morgenthau characters, which she describes as follows:

> DA Morgenthau says "We have useless tape, we lost our gang narrative,
> we can't find DNA." Ms. Fairstein replies, "We have a sock, those little
> bastards shot their wad into a sock thinking we wouldn't find it, but we
> found it." Morgenthau then says, "We have DNA, good. The match will
> nail this thing down." ADA Lederer says, "How did the NYPD miss
> this?" To which Ms. Fairstein says, "Who cares? We have it now and the
> kicker is none of the defense is aware yet so we can test it right before
> the trial—surprise!" ADA Lederer, looking upset, says, "surprise."
> (Compl. ¶ 118, citing Ep. 2 at 16:39-17:14.)

Plaintiff asserts that she "is falsely portrayed as trying to conceal DNA evidence from

defense counsel before the trials began, directly attacking her prosecutorial ethics."  (*Id.* ¶ 117.)

Read in context of the entire Episode, however, it is clear that there was no "concealment":  the

sock DNA came back *negative* as to the Five, and was *not* in fact helpful evidence that the

prosecution would or could have used to "surprise" the defense.  (*See id.* ¶ 120.)

Further, the scene nowhere raises the prosecution's disclosure obligations under the rules

of criminal procedure, and ordinary viewers would not assume that the "surprise" comment was

intended to allude to those obligations, *Seymour*, 150 F. App'x at 104-105, much less to assert

that Plaintiff or the rest of the experienced prosecution team, including DA Morgenthau, would

not in fact comply with those unspecified obligations.  Plaintiff's "strained, unreasonable and

unjustified" innuendo is wholly insufficient to sustain her defamation claim.  *Bordoni,* 400 F.

Supp. at 1230; *Proskin v. Hearst Corp*., 14 A.D.3d 782, 783-84 (3d Dep't 2005) (news article

stated plaintiff lawyer "altered a client's will to leave $49,000 of the elderly woman's money to

his own children"; held, "innuendo or adverse inferences" implying that "he modified the will

illegally, surreptitiously or without authority from his client" could not render article actionable).

> **D.      No Claims Based On Powerful, Hyperbolic Language in Dramatized Dialogue That Is Substantially True in Any Event**

Throughout the Complaint, Plaintiff complains of multiple scenes where the Fairstein

character uses harsh, "dehumanizing" language (*i.e.,* "thugs"; "animals"; "bastards," *see* Compl.

¶¶ 10, 45, 74-76, 94-95, 103, 118-19) and the "loaded term 'wilding,'" which she alleges brands

her as the "villain in a racist plot against The Five" (*id.* ¶¶ 46b, 74-76).

To begin, *there is simply nothing false about depicting Plaintiff using the complained-of*

*verbiage* which she repeatedly has uttered herself.  Plaintiff asserts that she would "never . . .

use[] the language ascribed to her" (*id.* ¶ 165), but in truth, Plaintiff has repeatedly used the term

"wilding" in describing the Five teens and assorted "dehumanizing" verbiage in condemning

them.  The Court can, for example, take notice of the fact of the following recorded statements:

- Plaintiff's Statement to the NYC Council, stating the Five "*participat[ed] in the wilding* and attacks" and "mob violence" and describing them as "*a deadly pack*" and using the term "wilding" no less than three times.  (L. Fairstein, Stmt. for NYC Council (Jan. 30. 2003), at NYCLD_039827, 039832, 039835-36) (Appx. Ex. 1).

- A 1994 Daily News column *authored by Plaintiff* described a rape "by a gang of teens who showed the same lack of remorse as *the 'wilding' teens who attacked a Central Park jogger* on an April evening almost exactly two years ago"  (Appx. Ex. 9).

- Plaintiff's 1993 non-fiction book refers to the Five teens as "vicious marauders," who attacked a jogger "without interruption" (Compl. ¶ 35; Appx. Ex. 10).

- Plaintiff's 2019 *Wall Street Journal* Op-Ed describes the Five as "acting in concert" with a "sociopath," Matias Reyes (Compl., fn. 131; Appx. Ex. 7).[23]

---

[23]  As noted above, the foregoing documents authored by Plaintiff are unquestionably cognizable on this motion, as they are articles or records from the public website incorporated in the Complaint, and are

Plaintiff's own words alone bar any claim that this language is less than substantially true.  *See Love v. Wm. Morrow & Co.,* 193 A.D.2d at 588 (dismissing on substantial truth based on Plaintiff's own words); *Cerasani*, 991 F. Supp. at 354 (film did not portray plaintiff "engaged in conduct notably worse than that described" in prior testimony, book and press; dismissing).

Even if it did not accurately reflect Plaintiff's own words, the dialogue, given its context, would not be actionable.  The words in the dialogue are spoken in the wake of a brutal rape.  The audience would recognize that the Fairstein character was deeply upset by what she saw in the Park, and, committed to solving the crime and getting justice for the jogger, reacting with heat and emotion.  Powerful language is the essence of drama and this is the paradigmatic case for dramatic license.  The language used in these scenes cannot be the basis a defamation claim.

Plaintiff alleges, for example, that in Scene 6 she was "falsely portrayed as calling for a roundup of young, black males in Harlem" when she "had no authority" and "never gave orders to the investigating officers and detectives."  (Compl. ¶¶ 97-99.)  In context, it is not reasonable to read the dialogue ("Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. . . . You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night," *see id.* ¶¶ 46e, 97) as depicting Plaintiff as "a racist."  At that point in the narrative, there had been multiple eyewitness reports of people being randomly attacked in the Park by a group of "young black male[s]" so it stands to reason that those would be the persons of interest to investigators.  And Plaintiff herself has long maintained—even after Reyes' confession as the sole rapist—that it was proper to link the other attacks in the Park to the rape, and that the work the police did in rounding up suspects was "brilliant."  Depicting her as saying as much does not defame her.

---

otherwise subject to judicial notice for the fact that Plaintiff "made the statements attributed to" her. *Christa McAuliffe Intermediate Sch.*, 364 F. Supp. 3d at 262-64.

The dialogue, moreover, is clearly hyperbolic and reflects the fraught circumstances. No reasonable viewer would believe the Fairstein character was literally expecting officers to arrest "every kid" who was in Central Park. As described above, in dramatizing controversial events Defendants "have substantial latitude in describing the events involved" under the First Amendment through the "use of hyperbolic language" and the "'imaginative expression' that enlivens writers' prose." *Partington,* 56 F.3d at 1154, 1157. "Even a novice police-procedural viewer in Netflix's audience would pick up on that context and understand the character's aggressive word choice as a rhetorical device." *John E. Reid & Assocs.,* 2020 WL 1330657 at *8.

Plaintiff's assertion that the terms "thug" and "wilding" (used in dialogue in Scenes 2, 3 and 6), are "loaded" "code words" in some quarters (Compl. ¶¶ 74-76, 103) also does not mean that anyone using them would ipso facto be viewed as "racist".[24] Defamation is not measured by how terms may—or may not be—subjectively "encoded." Where statements "may mean different things to different people," they "are not capable of being proven true or false because of their subjective, relative meanings." *Mirage Ent'mnt, Inc. v. FEG Entretenimientos SA*, 326 F. Supp. 3d 26, 37 (S.D.N.Y. 2018) (citations omitted); *see also Egiazaryan*, 880 F. Supp. 2d at 508 ("Words that are imprecise, whose meanings are 'debatable, loose and varying,' are 'insusceptible to proof of truth or falsity'"). In *Barbash*, for example, the court held a film's "portrayal" of plaintiff "as a cold individual who was indifferent to the health of others" was "a statement of opinion" and "cannot form the basis of a defamation claim." 2020 WL 6586155, at *4-5. Likewise, even if a claim could be founded on how Plaintiff thinks these imprecise and debatable words are subjectively encoded, "characterization of [someone] as racist[]" is itself "a

---

[24] It is disingenuous for Plaintiff both to suggest that she has never used the term "thug" and that it has an exclusively racist connotation, when has been known to use similar language in other cases involving white defendants; in the "Preppy Murder" case, for example, her "statement at [Robert] Chambers's bail hearing was a ready-made sound bite: '*He is a thug* and a murderer.'" Benjamin Smith, *The Practitioner*, LEGAL AFFAIRS (Sept.-Oct. 2003) (Appx. Ex. 17) (emphasis added).

subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation." *Edelman v. Croonquist*, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010).

As such, even if the dialogue did not actually reflect Plaintiff's own words and even if her portrayal could be interpreted to attribute "racist motivations" to her (Compl. ¶ 46), such statements are protected opinion in the context of this dramatization and its clear point of view, countering Plaintiff's publicly stated view, even after their exoneration, that the Five not only are guilty but a "wilding" "pack" of "marauders." As *Carto v. Buckley* aptly put it, an individual like Plaintiff "who sallies forth to espouse a specific creed or conviction" cannot "resort to the courts to silence those who disagree with that viewpoint." 649 F. Supp. 502, 508 (S.D.N.Y. 1986). That is particularly so where the Plaintiff is a powerful public official. "Courts have uniformly found that the question of bias or motivation is quintessentially subjective and therefore may not form the basis for an action for defamation"; Plaintiff cannot hold Defendants liable for "expressing their opinion of" her actions as a public official who helped lead, and to this day supports, the prosecution against the Five, "no matter how unreasonable, extreme or erroneous these opinions might be." *Rappaport*, 163 Misc.2d at 9.

### III.   No Defamation Claim Based on the "Tweets" of DuVernay and Locke

The Complaint spends pages reciting various "tweets" and social media posts by Ms. DuVernay and Ms. Locke. (*See* Compl. ¶¶ 96, 153-56, 162-63, 171-84, 187-97, 238-39, 251, 300-304, 323-26.) Plaintiff does not allege why any of these tweets are false or defamatory—the rudiments of a defamation claim.[25] Indeed, the only tweets that Plaintiff even labels "false and defamatory" are Ms. Locke's tweets from November 2018 (*id.* ¶ 300, 322), which is outside the one-year defamation statute of limitations. *See* N.Y. CPLR § 215(3).

On their face, the tweets' strongly expressed opinions are not actionable but the Complaint quotes them at length, apparently for shock value (*e.g.,* Compl. ¶¶ 195, 304, 326 (quoting Ms.

---

[25] As to Netflix, none of its tweets are (or could be) identified as defamatory. (*See* Compl. ¶¶ 200-18.)

Locke's tweet using expletive in response to Plaintiff's Op-Ed assailing the Series)).  Plaintiff also attempts to tie the critical tweets to the alleged "public outcry" that followed the Series.  (*Id.* ¶¶ 232-57, 308, 328.)  On that score one thing is clear:  Plaintiff and the prosecution with which she is identified were the subject of controversy and criticism long "before the release of When They See Us."  *John E. Reid & Assocs.*, 2020 WL 1330657 at *8 n. 7.  Strong public reaction to the Series (or the tweets) cannot be used to establish defamation:  "a non-defamatory reflection on this disastrous chapter of . . . history would not necessarily have an 'innocent meaning' for those depicted."  *Chau*, 771 F.3d at 132.  "To the extent [Plaintiff] is complaining that the show echoes (and maybe amplifies) the voices of the critics," the "remedy for that kind of dispute is 'the publication of a rebuttal, not an award of damages.'"  *John E. Reid & Assocs.*, at *8 n. 7.  That is particularly true of Plaintiff—the public official with direct oversight of the prosecution and its most outspoken proponent, who, using the megaphone her notoriety affords her, has issued innumerable "rebuttals."

## IV.   The Purported Conspiracy Claim Does Not Exist Under New York Law

Plaintiff's count alleging a purported "conspiracy to defame" (Count VII) must be dismissed because New York law "does not recognize a freestanding claim for conspiracy." *Carlson v. Am. Int'l Inc.*, 30 N.Y.3d 288, 310 (2017) (affirming dismissal); *Dobies v. Brefka*, 263 A.D.2d 721, 722 (3d Dep't 1999) (dismissing claim of conspiracy to defame).  And even if it did, duplicative tort claims based on the same underlying facts as a meritless defamation claim must also be dismissed.  *Chao v Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012); *Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (affirming dismissal).

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: December 18, 2020                    Respectfully submitted,

_____
                                            /s/ Natalie J. Spears

                                            Natalie J. Spears (*pro hac vice*)
                                            Gregory R. Naron (*pro hac vice*)
                                            Jacqueline A. Giannini (*pro hac vice*)
                                            DENTONS US LLP
                                            233 South Wacker Drive, Suite 5900
                                            Chicago, Illinois 60606
                                            Phone: (312) 876-8000
                                            *natalie.spears@dentons.com*
                                            *gregory.naron@dentons.com*
                                            *jacqui.giannini@dentons.com*

                                            Sandra D. Hauser
                                            Kiran Patel
                                            DENTONS US LLP
                                            1221 Avenue of the Americas
                                            New York, New York  10020
                                            Phone: (212) 768-6700
                                            *sandra.hauser@dentons.com*
                                            *kiran.patel@dentons.com*

                                            *Attorneys for Defendants Netflix, Inc., Ava
                                            DuVernay and Attica Locke*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 18, 2020, a true and correct copy of the

foregoing was served by CM/ECF on all counsel or parties of record on the service list

/s/ Natalie J. Spears
_____