# EXHIBIT 14

**The New York Times**

# New Light on Jogger's Rape Calls Evidence Into Question

By [Jim Dwyer](#) and [Kevin Flynn](#)

Dec. 1, 2002

See the article in its original context from
December 1, 2002, Section 1, Page 1    Buy Reprints

New York Times subscribers* enjoy full access to TimesMachine—view over 150 years of New York Times journalism, as it originally appeared.

**SUBSCRIBE**

*Does not include Crossword-only or Cooking-only subscribers.

We cut her clothes off with a knife, said one boy. That was my first rape, said another. It was fun, said a third.

Once, those raw words scarred the city. Recorded in April 1989, they narrated the maiming and near-murder of a jogger in Central Park, recounted the rampage of teenagers who went into the park to rob and beat people, and ultimately provided the blunt power of confessions that sent five of those boys to prison for gang rape.

More than a decade later, the official view of those words has taken a sharp turn. The Manhattan district attorney, Robert M. Morgenthau, has signaled that he is likely to join defense lawyers on Thursday in asking a judge to vacate the convictions built on those words. Mr. Morgenthau declined to be interviewed last week; he said in October that he had been surprised by evidence that emerged in the last year. ''I didn't expect this,'' he said.

The new evidence includes a claim by Matias Reyes, a convicted murderer and serial rapist, that he alone attacked the jogger. DNA tests not only proved his involvement, but also showed that physical evidence had been wrongly used at two trials in 1990 to implicate the five teenagers.

While significant, the presence of Mr. Reyes in the assault and the collapse of the physical evidence did not clear the original defendants, Antron McCray, Kevin Richardson, Yusef Salaam, Raymond Santana and Kharey Wise.

Those developments did, however, prompt prosecutors to reconsider the original case, conducting scores of additional scientific tests and interviewing two of the convicted boys, dozens of witnesses, former detectives and others.

At the core of the original case, prosecutors found two issues that call into question the involvement of those five teenagers in the attack: the confessions that convinced two juries of their guilt, and the sequence of events that night.

A reconstruction of the events in the park has bared a significant conflict, one that was hinted at but not explored in depth at the trials: at the time the jogger was believed to have been attacked, the teenagers were said to be involved -- either as spectators or participants -- in muggings elsewhere in the park.

The confessions, too, look different in the re-examination of the case. Once they seemed to include the only reasonable explanation for what happened. Now, Mr. Reyes offers an alternative, backed with DNA results that make his version tenable.

From the outset, the confessions have been the subject of high-volume contention, with charges from the defense that the teenagers were coerced or tricked into confessing, and with law enforcement officials countering that the parents of the three were present for their videotaped statements. The New York Times has examined the record of the proceedings -- the tapes of the confessions and about 15,000 transcribed pages -- over the last six weeks. That review could not provide an unambiguous resolution to the charges of coercion, because the cameras were turned on only after the teenagers had been in custody, in some cases, for 28 hours, and already questioned at length.

The record does show that much of what the youths said about the rape was wrong, including when, where and how it took place. Indeed, their description of the location, the victim's clothing and other details makes it seem, in retrospect, almost as if they were talking about another crime.

The importance of these descriptive errors was debated at the two trials. Speaking about the confession of Mr. Santana, the lead prosecutor, Elizabeth Lederer, said, ''Don't you think that the detectives would have made him say things that were accurate, if they forced him to make the statement?'' In convicting all five defendants, jurors evidently agreed.

For many New Yorkers who followed the case, the new versions reopened a chapter in New York history that seemed long closed. The boys each admitted going to the park in a loose gang that attacked runners and bicyclists, finally chasing down the woman, taking off her

clothes and watching as she was raped. Each boy sought to minimize his own role. Given the frenzy of the attacks, the mistaken details were natural, but not important, Ms. Lederer argued. The confessions were honest.

And, she pointed out, hairs from the jogger were found on two of the suspects. How could that have happened if they were not involved?

That evidence has not stood up. Earlier this year, advanced DNA tests showed that those hairs had not come from the victim. DNA tests also found Mr. Reyes's semen -- and no one else's -- on swabs taken from the victim and a sock found near the scene of the rape.

Advances in DNA testing have also contributed to a broader understanding that not all confessions can be believed, and that few, if any, false confessions are the products of police conspiracies; a more likely formula, academic research shows, is some combination of vulnerable suspects and the investigative zeal inspired by dreadful crimes.

One of the most intriguing new views of the case rises from the reconstruction of the sequence of events. By establishing that the teenagers were part of a crowd that was bothering or beating other people during the critical time of the rape, the reconstruction provides them with an alibi that is plausible, if not airtight, and certainly unsavory.

''That was the issue,'' said Peter Rivera, Mr. Santana's lawyer in 1990. ''But we didn't say, 'No, when the jogger was raped, my client was on 96th Street, mugging someone else.' That would have been self-defeating.''

The new inquiry into the Central Park case has been the subject of bickering between the district attorney's office and the Police Department. The agencies are divided over whether the convictions are simply legally defective or represent a fundamental miscarriage of justice. Some senior prosecutors and investigators in Mr. Morgenthau's office say they now believe that the five boys were probably not involved in the assault.

==Other former and current law enforcement officials, including police detectives and Linda Fairstein, the chief of the Sex Crimes Unit -- who oversaw the prosecution when she was a member of the district attorney's office -- continue to hold that the teenagers managed to have some contact with the jogger, and perhaps ran the jogger off the path, starting the assault that Mr. Reyes finished.==

Those convinced that the original case was sound are skeptical that a timeline, with a margin of error of a few minutes for a small part of the park, will ultimately be revealing. ''I could argue that side of it to you,'' said one senior police official who has been involved in the inquiry, ''and then I could change chairs and argue the other side just as strongly. It's hard to know.''

Sequence

Trying to Pinpoint 40 Critical Minutes

The critical period in the Central Park jogger case began a few minutes after 9 p.m. on April 19, 1989, and ended about 9:40. During those 40 minutes, a group of boys who lived in or near Schomburg Plaza on 110th Street entered the park and started beating people as they moved south along East Drive. They continued the attacks on the other side of the 97th Street Transverse, at the reservoir running track.

In the days after, the chief of detectives and the lead prosecutor said publicly that the rape of the jogger took place at 10:05, following the muggings near the reservoir. Newspapers including The New York Times published timelines that the authorities had constructed from the confessions of three of the five teenagers.

Once investigators were able to retrace the woman's movements, they realized that the assault had probably taken place close to an hour earlier. ''There is not the remotest possible chance this crime happened after 10 o'clock,'' Ms. Lederer said in court.

That meant the rape could have happened only during the series of muggings along East Drive. That sequence called into question the reliability of the confessions, but juries at both trials of the case resolved the discrepancy and found the teenagers guilty.

This year, senior Manhattan prosecutors are reconsidering the timing. Was there enough time for the same people to participate in the rape and the muggings?

The jogger says she has no recollection of what happened. To investigators, the best evidence suggests she was attacked between 9:10 and 9:15, on a path that wound across the park from approximately 104th Street on the East Side toward 102nd Street on the West Side.

The physical evidence shows that she was raped by one man; if others sexually assaulted her, they did so without leaving any biological trace. That evidence provides no guidance on the time of the crime.

Still, her movements were not a secret. Based on the accounts of a neighbor and a friend, as well as her usual habits, it is likely that she left home by 9 p.m. and expected to be back about 40 minutes later.

At 8:55, she bumped into the neighbor, James Lansing, in the hallway of their building at 83rd Street near York Avenue as she was heading to the park. They chatted for a moment about the best places to run, Mr. Lansing testified, and then the woman left.

After that, the next confirmed sighting of her was four and a half hours later, at 1:30 a.m., when a police officer was summoned by two men who discovered her, unconscious, in a wooded area of the park near 103rd Street. The police officer called for an ambulance. The woman had no identification.

She had been due home on 83rd Street at 10 p.m. to meet Patrick Garrett, a friend from work, so he could look at her stereo. He later testified that he rang her bell and got no reply, so he called from a pay phone and left a message. The next morning, when she did not show up for work, he notified their supervisors. Eventually, the police called him to Metropolitan Hospital to identify the woman found in the park. It was his friend.

No one could say what time she was struck down, but the woman, an investment banker, was a creature of habit. She ran the same route six nights a week at a pace of eight-minute miles, she testified. Her regular circuit took about 40 minutes. From her home to the spot on the cross drive where she was attacked, she estimated her running time at 16 or 17 minutes.

That means she would have reached the crime scene between 9:10 and 9:15 p.m. If all had gone well, she would have completed her run and been home before her 10 p.m. appointment with Mr. Garrett.

As she reached the northern end of her run, an evening of mayhem was just picking up steam. A group of about 30 boys had assembled before 9 p.m. and made their way into the park around 110th Street. Most were between 13 and 15 years old.

During the critical time of 9 to 9:40 p.m., witnesses and the teenagers' statements placed the group in two areas: first, moving south along East Drive between 105th and 102nd Streets, where they attacked several bicyclists and a man on foot; and second, across the 97th Street Transverse, at the northwest end of the reservoir running track. Between 9:05 and 9:15 p.m., they attacked three people, each a block or two south of the preceding one.

Michael Vigna, a competitive bicycle rider, testified that he had marked his pacing time from a big clock in Columbus Circle, and had calculated that it was 9:05 p.m. when he was hassled by a group of boys on East Drive, west of the Conservatory Garden, around 105th Street. One threw a punch as he rode past, Mr. Vigna said.

The next victim, Antonio Diaz, was attacked a short distance south of Mr. Vigna, roughly where 103rd Street crosses East Drive. It appears that sometime after the Vigna attack at 9:05 and before 9:15, the group of boys found Mr. Diaz walking by himself. They knocked him to the ground, kicked him, then took his bag of food and beer. A police officer testified that he found Mr. Diaz wandering along a path at 9:30, and put out an alarm of an unruly crowd.

Mr. Diaz did not give a clear account of the time, but one detail appears to place the incident between 9:05 and 9:15: a bag that contained beer bottles, taken from Mr. Diaz, was apparently discarded on the side of the road. Mr. Vigna, the bicycle rider, said the beer had not been on the road just before he ran into the group at 9:05. At 9:15, the beer bottles were spotted by Gerry Malone, who was sharing a tandem bicycle with his fiancée, Patricia Dean.

The tandem bike riders are important time markers, along with Mr. Diaz and Mr. Vigna. If the jogger kept her regular pace, she would have reached the crime scene during this series of attacks.

Mr. Malone, another competitive rider who tracked his speed, testified that his last time check had been 9:06, on the Newsweek building clock. Based on their pace, he testified, they reached East Drive south of 102nd Street at 9:15. There, a group of boys tried to block them. Mr. Malone said he bore down, hitting top speed as he headed straight for the boys, scattering them. Ms. Dean testified that the boys grabbed at her.

Just north of the gang, Mr. Malone noticed the beer on the roadway, presumably left there when Mr. Diaz was attacked. Mr. Malone said he had not seen the bottles on an earlier circuit. After they cleared the group, Mr. Malone and Ms. Dean stopped at a police call box, then spoke to an officer on 72nd Street.

The victims' testimony varied by a minute or two at each of the two trials, but in general, the record of attacks along East Drive between 9:05 and 9:15 is well established. Investigators see that as the likeliest time that the jogger was attacked, at a spot slightly to the north and west.

In her closing argument, Ms. Lederer said the rape of the jogger happened immediately after 9:15, perhaps as late as 9:20, although it is not clear what evidence supports those times.

''So I suggest to you, ladies and gentlemen, that there is evidence'' showing that the victim was raped ''after the tandem bike people were attacked, and before the people at the reservoir were attacked,'' Ms. Lederer said. ''I submit to you, you may never know for sure. And it doesn't matter, because one thing you know for sure is that Kevin Richardson and Kharey Wise were present at that attack.''

If that is so, the crimes took place at a high velocity, given that the tandem bike attack took place at 9:15, and that the earliest of the reservoir muggings was put at 9:25 by that victim. If those times are reliable, the boys had 10 minutes to abandon their trek southward, double back to the north end of the North Meadow, intercept the jogger as she ran along the cross drive, drag or chase her nearly 300 feet from the road, subdue her during multiple rapes,

cave in her head, and then race seven or eight blocks south, climb down a wall on one side of the transverse and up the wall on the other side in time to catch the first of the reservoir victims.

Is it possible that more than 10 minutes were available to complete this? When pressed on the witness stand, David Lewis, the man who said he was attacked at 9:25, testified that it could have been as late as 9:40. Another victim, Robert Garner, said he was assaulted at 9:30 at the reservoir, and the time of an attack on a runner, David Good, was set at 9:47 through his testimony.

The last documented victim of the gang was John Loughlin, a schoolteacher who was severely beaten and kicked. He had left home for his run when a television show ended at 9:30, he testified, and he estimated that he was struck between 9:40 and 9:50. An auxiliary police officer testified that he found Mr. Loughlin wandering in a daze near the reservoir at 9:55.

As victims and witnesses called for help, police scooters and unmarked cars converged. At 10:30, the police arrested five teenagers along Central Park West and 102nd Street.

Unknown during all this were the whereabouts of Mr. Reyes, perhaps the most dangerous person in the park that night. His presence was not verified until this year, when DNA tests showed that semen recovered from the woman's body was his. His pubic hair and more of his semen were extracted from one of her socks, discarded a few yards from where she was found. No one else left physical evidence at the scene.

Confessions

Inconsistencies In Teenagers' Words

No one can dispute that the videotapes made by four of the five teenagers are a chronicle of muggings, misdemeanor and gang rape.

Nor is there any serious dispute that parts of the tapes, particularly those dealing with the rape, are broadly inaccurate on where, when and how it took place.

Three of the boys -- Mr. Santana, Mr. Wise and Mr. Richardson -- had the time wrong by 45 minutes or more.

Mr. McCray's version put the rape at a plausible time, but at an implausible location, saying it happened between the reservoir and the tennis courts, about seven blocks from where the jogger was found. He also said the victim was raped where she was jumped, although the evidence showed that the jogger was knocked down at one place and dragged or chased nearly 300 feet.

The fifth teenager convicted of the rape, Mr. Salaam, did not make a videotaped statement, nor did he sign a written summary or notes, but a detective said Mr. Salaam told him that the attack on the jogger happened before the assaults at the reservoir, effectively placing it before 9:30.

Mr. Wise said a knife was plunged into the victim repeatedly, although the prosecution's medical expert testified that he found no wounds from any sharp object.

On the other crimes, the teenagers' accounts are broadly consistent with the versions offered by the victims. Even more telling, a few of the incidents described in the confessions -- attacks on runners or bicyclists who got away -- had not yet been reported to the police when the teenagers mentioned them.

Eventually, the strengths of the confessions, combined with physical evidence of the hairs, which seemed to show contact between the suspects and the jogger, convinced two juries that the confessions were essentially true: the five teenagers had been part of the assault. Nothing else reasonably explained what had happened to the victim.

Now, the emergence of Mr. Reyes provides an alternative reality -- that he raped the woman, a fact corroborated by DNA tests, and that he did it alone, an assertion that has not been proven or disproven.

To date, only Mr. Reyes is linked to the crime by any evidence beyond words, putting pressure on the reliability of the teenagers' confessions and how they were obtained.

On that critical point, the documentary record is silent. The video camera was not turned on until the detectives had finished other, unrecorded interrogations, generally after the suspects had been in custody for seven hours or more. As a result, the debates over what happened during those hours have amounted to swearing contests between the defendants and the detectives.

Through their questions, the defense lawyers tried to raise doubts that the statements had been made voluntarily, a requirement of New York law. Did the detectives throw chairs? Did they tell Raymond Santana that he claimed not to have touched the jogger because he was homosexual? Did they promise that the boys would be better off as witnesses than defendants? Or did they, as most of the detectives testified, merely ask what happened?

Coercion, under the law, can be psychological or physical, but the line between good, aggressive police work and illegal bullying does not form a clear boundary that can be simply applied to all the ways one person can push another to answer a question. In every instance, the legality of the Central Park statements -- witnessed by parents for three of the five suspects, after readings of the Miranda warning -- was upheld by the trial judge and through the appellate process.

Even among detectives, though, there was considerable disagreement about what happened during the interviews, as explained in ''Unequal Verdicts,'' an authoritative account of the trials by Timothy Sullivan, an editor for Court TV.

A day after the rape, Mr. McCray, for instance, was interviewed by two detectives, Carlos Gonzalez and Harry Hilderbrandt. Under questioning by Michael Joseph, the lawyer for Mr. McCray, the detectives told stories that differed in several key details, the trial record shows.

Detective Hilderbrandt said Mr. McCray did not admit to penetrating the victim; Detective Gonzalez said he did. Detective Hilderbrandt said the suspect had not cried; Detective Gonzalez said he had. For much of the interview, Mr. McCray had said that he knew nothing about the rape. Once his mother left the room he discussed the rape -- although he placed it by the tennis courts, nearly half a mile south of where it had taken place.

Why had his mother left the room? Detective Hilderbrandt testified that she left at the suggestion of his stepfather, who remained; Detective Gonzalez said it was at the suggestion of the detectives.

Finally, in Detective Hilderbrandt's account, the detectives wrote out Mr. McCray's statement only after the mother returned. Detective Gonzalez testified that the statement was completed before she was brought back.

Many investigators still see a powerful logic in the teenagers' confessions. The teenagers were in the same area of the park as the jogger. About 37 boys were interviewed, and about 30 detectives were involved. To police officials reconsidering the case, such a throng rules out a coordinated plan to script the statements.

While it is true that many detectives were involved, a much smaller group of detectives obtained the confessions. One, John Hartigan, took three of the four incriminating statements before they were recorded.

Another point being considered by the investigators is what standard of precision should be applied to the confessions. Mistaken details are common even in reliable confessions from people whose guilt is thoroughly corroborated.

To the defense, the mistakes made by their clients reflect the limited information the detectives had so early in the case to feed to their suspects, whether purposely or not. ''The police did not know the time when it happened,'' argued Colin Moore, who represented Mr. Wise. ''So they got it screwed up.''

Under the law, parents are an important barrier to coercion of minors. In three cases, the parents were in the room while the videotapes were made. The two exceptions were boys thought to be past 16, the age when a parent is usually required: Mr. Wise, who was 16, and Mr. Salaam, who was 15, but had a transit pass showing his age as 16. Mr. Salaam's questioning was not videotaped because his mother arrived and, after an encounter with Ms. Fairstein, of the Sex Crimes Unit, called for a lawyer.

While the parents of the other three were present for the videotapes, they apparently were absent during key moments of the interrogations. Mr. Richardson's mother fell ill after being in the station house for 11 hours, and she left him in the custody of his sister. It was then that he incriminated himself.

Mr. Santana was questioned for three hours in the presence of his grandmother, and later his father, denying any involvement in the rape. At some point, his father and grandmother left the station house, and by Detective Hartigan's account, the teenager asked if he could speak alone to the investigator. Then, the detective said, Mr. Santana essentially confessed to the rape. The detective testified, "I never asked him questions as to what he did." Later, Mr. Santana made the same admissions on camera, with his father in the room.

Mr. Santana was interviewed again in June and described the assault on one of the joggers at the reservoir, but made no mention of the rape. Asked about it, Mr. Santana said he had been tricked by Detective Hartigan and another detective, Humberto Arroyo.

"Hartigan told me the others admitted raping the woman and said I was there and that if I didn't admit it, he couldn't help me," a police report quotes Mr. Santana as saying. "So I made up the story you see on the tape to satisfy them."

Over the last decade, DNA testing has cleared 27 people nationwide who were convicted of crimes based on some form of confession, according to records kept by the Innocence Project at the Benjamin N. Cardozo School of Law at Yeshiva University. In another category, Prof. Steven Drizzen at the Northwestern University School of Law and Prof. Richard Leo at the University of California at Irvine have identified 130 people who falsely confessed but were cleared before trial.

One legal scholar, Paul Cassell, argues that most verified false confessions come from vulnerable segments of the population, such as people with mental disabilities.

At the teenagers' trials, defense lawyers tried without success to introduce records of psychological examinations and test scores of Mr. McCray and Mr. Wise. Mr. McCray had an I.Q. of 87, and in the ninth grade was reading at a fourth-grade level. Mr. Wise, at age 16, was said to have an I.Q. of 73 and a second-grade reading level. In two separate video statements, Mr. Wise described aspects of the rape, with a roster of aggressors that shifted,

sometimes from phrase to phrase. He made bizarre statements, saying that the group had attacked a blue van, which was carrying police officers, and that later one jogger had retaliated against the group by beating up half of the teenagers. There was no evidence that such incidents occurred.

''What that illustrates very clearly is a kid who is prepared to say almost anything that the district attorney wants to hear,'' Mr. Moore, the lawyer for Mr. Wise, had argued.

Investigators were not the only ones who heard what sounded like admissions from Mr. Wise. When he was being kept at Rikers Island, he telephoned friends. One, Melody Jackson, testified that she had asked him about the assault on the jogger. ''He said: 'Mel, I didn't have sex with her. The only thing I did was touch her legs,' '' Ms. Jackson testified. Earlier this year, investigators visited her again, according to a police report, and she stuck by her story.

So, too, did the convicted teenagers: in prison, records show, at least four of them declined to accept responsibility for the rape, costing them extra time in prison.

Many people close to the case believe that the legal verdict is bound to be overturned in the coming days. If Mr. Reyes's statements and the recent DNA tests do not exonerate the original five defendants, they qualify as ''newly discovered evidence'' for which verdicts may be vacated under the New York State penal code.

Since all the defendants have finished their sentences for the gang rape and the other muggings, and because the statute of limitations has run out on Mr. Reyes's involvement, it is unlikely that any new criminal trials will be held on charges arising from that night in Central Park -- even if prosecutors determine that the confessions are a reliable guide to what happened on an April night in 1989.