**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LINDA FAIRSTEIN,** | **Case No. 20-cv-8042 (PKC)** |
| **Plaintiff,** | |
| **vs.** | |
| **NETFLIX, INC., AVA DUVERNAY, and ATTICA LOCKE,** | |
| **Defendants.** | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

Andrew T. Miltenberg
Kara L. Gorycki
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

## <u>Table of Contents</u>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

   **A.**   Ms. Fairstein's Background ................................................................................. 3

   **B.**   Ms. Fairstein's Actual Role in the Central Park Jogger Case ........................... 4

   **C.**   The False and Defamatory Portrayal of Ms. Fairstein in WTSU ...................... 5

   **D.**   WTSU Causes Public Backlash and Effort to "#Cancel" Ms. Fairstein ..................... 11

ARGUMENT .................................................................................................................... 12

   **I.**    Standard of Review ......................................................................................... 12

   **II.**   Defendants' Appendix Does Not Support Dismissal ...................................... 13

   **III.**  The Scenes In Question Are False .................................................................. 16

   **IV.**  Defendants' Portrayal of Ms. Fairstein is Defamatory .................................. 22

   **V.**   Defendants' False and Defamatory Portrayal of Ms. Fairstein is Not Protected Opinion .......................................................................................................... 23

   **VI.**  Ms. Fairstein Has Alleged A Conspiracy Claim ........................................... 30

CONCLUSION ................................................................................................................ 30

## Table of Authorities

**Cases**

*Ace Arts, LLC v. Sony/ATV Music Publ'g LLC*, 56 F. Supp. 3d 436, 441 (S.D.N.Y 2014) ......... 15

*Agbimson v. Handy*, 2019 WL 3817207, at *5 (S.D.N.Y. Aug. 14, 2019).................................. 14

*Barbash v. STX Financing, LLC*, 2020 WL 6586155, at *2 (S.D.N.Y. Nov. 10, 2020) ............... 1

*Chef's Warehouse, Inc. v. Wiley*, 2019 WL 4640208, at *9 (S.D.N.Y. 2019) ........................... 29

*Christa McAuliffe Intermediate School PTO, Inc. v. DeBlasio*, 364 F. Supp. 3d 253, 263
     (S.D.N.Y. 2019) ......................................................................................................... 15

*Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008)..................................... 20

*Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 504 (S.D.N.Y. 2012)....................................... 18

*Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223-24 (S.D.N.Y. 2014) ........................................... 13

*Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-83 (S.D.N.Y. 2020) ............. 13

*Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518 (S.D.N.Y. 2017) ................................ 24

*Guerrero v. Carva*, 10 A.D.3d 105, 113 (1st Dep't 2004) ..................................................... 29

*John E. Reid & Assocs., Inc. v. Netflix*, 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020) 20, 21,
     27

*Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)........................................ 17

*LaLiberte v. Reid*, 966 F.3d 79, 92 (2d Cir. 2020).................................................................. 29

*Liberty Lobby, Inc. v. Anderson*, 1990 WL 605337, at *2 (D.D.C. July 30, 1990)..................... 20

*Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017) *aff'd* 800
     F. App'x 840 (11th Cir. 2020)..................................................................................... 17

*Martin v. Johnson Pub. Co.*, 157 N.Y.S.2d 409, 411 (Sup. Ct. 1956) ...................................... 26

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)......................................................... 27

*Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995).................................................... 25

*Pezhman v. City of New York*, 29 A.D.3d 164, 167 (1st Dep't 2006) ................................. 20, 24

*Reid v. Viacom Int'l Inc.*, No. 1:14-cv-01252, ECF No. 138, Sept. 14, 2016 Order ("*Reid*
     Order"), at 12 n. 7........................................................................................................ 26

*Restis v. American Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718-19 (S.D.N.Y.
     2014)........................................................................................................................... 25

*Scott v. Cooper*, 226 A.D.2d 360, 360-61 (2d Dep't 1996)..................................................... 29

*Sheridan v. Carter*, 48 A.D.3d 444, 446-47 (2d Dep't 2008)................................................... 24

*Sheridan*, 48 A.D.3d at 447 .................................................................................................. 29

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1999).................................................................. 2

*Stanton v. Metro Corp.*, 438 F.3d 119, 125-26 (1st Cir. 2006)................................................. 26

*Watson v. Doe 1*, 439 F. Supp. 3d 152, 156 (S.D.N.Y. 2020) ................................................. 12

**Other Authorities**

Restatement (Second) of Torts § 564, cmt. d.......................................................................... 25

Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2:4.11 (1999)..... 19

## INTRODUCTION

*When They See Us* ("*WTSU*" or the "Series") is a Netflix, Inc. ("Netflix") original limited series, collectively developed and written by Defendants Netflix, Ava DuVernay ("Ms. DuVernay") and Attica Locke ("Ms. Locke"),[1] which addresses the arrests, trials and convictions of five young men of color—Kharey (aka Korey) Wise ("Mr. Wise"), Raymond Santana ("Mr. Santana"), Kevin Richardson ("Mr. Richardson"), Yusef Salaam ("Mr. Salaam") and Antron McCray ("Mr. McCray") (collectively "The Five"), who were accused of beating and raping female jogger, Patricia Meili ("Ms. Meili"), in addition to rioting with more than twenty other young men, and attacking seven other victims in New York City's Central Park (the "Park") on April 19, 1989. The case is known as the "Central Park Jogger" case. The Series further addresses the 2002 vacatur of the convictions after Matias Reyes ("Reyes") confessed to the rape.[2]

The Series was released on May 31, 2019, and continues to stream on Netflix. Plaintiff Linda Fairstein ("Ms. Fairstein" or "Plaintiff"), as portrayed by actress Felicity Huffman, is featured in three episodes of the four-part Series. Defendants portray Ms. Fairstein in a false and defamatory manner in nearly every scene in which she appears. This portrayal—in which Ms. Fairstein is falsely depicted plotting to convict young men of color whom she knew were innocent—was deliberately calculated to create one, clear and unmistakable villain to be targeted for hatred and vilification for what happened to The Five. Defendants cast Ms. Fairstein as morally and legally culpable by assigning her various roles in the case that she did not play. Upon viewing the Series one can only conclude that it defames Ms. Fairstein.

---

[1] Collectively they will be referred to herein as "Defendants." Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss will be cited herein as "MTD." Defendants' appendix exhibits will be cited herein as "DX." Plaintiff's appendix exhibits will be cited as "PX."

[2] Defendants submitted a copy of the Series with their motion. The Series is an integral part of the Complaint and may be considered by the Court. *Barbash v. STX Financing, LLC*, 2020 WL 6586155, at *2 (S.D.N.Y. Nov. 10, 2020). Plaintiff respectfully requests that the Court view the Series when evaluating Defendants' Motion.

Defendants marketed and promoted the Series as a true story, especially with respect to Ms. Fairstein, even though they knew that their portrayal of her bore no relationship to Ms. Fairstein's actual role in the Central Park Jogger case. Touting their research and review of public records, and taking "truth as their bible" when creating the Series, Ms. DuVernay and Ms. Locke sought to hold Ms. Fairstein "accountable" for her "misdeeds" because she is an "unrepentant liar." The views expressed in Defendants' Motion align with these public statements. In reality, Defendants' portrayal of Ms. Fairstein is a complete fabrication.

Defendants rely on statements made by Ms. Fairstein decades after the Central Park jogger case—expressing views shared by other public officials—to put forth a revisionist history that miscasts Ms. Fairstein as responsible for every aspect of the case against The Five. These statements, which span the *1993-2019* timeframe, do not even loosely support Defendants' argument that their portrayal of Ms. Fairstein is substantially true. Defendants declare that their false portrayal is "innocuous," but it is clear that viewers of *WTSU* believed it to be true, resulting in "public hatred, ridicule, aversion, and disgrace" and injury to Ms. Fairstein's professions. The public backlash against Ms. Fairstein has been overwhelming, including death threats and threats of physical harm. As a direct result of the Series, Ms. Fairstein's legal consulting jobs and longstanding publishing contracts were terminated and her reputation sullied, if not destroyed.

Defendants incorrectly argue that their false and defamatory portrayal of Ms. Fairstein is justified because the Series is a "docudrama." While creative works may be entitled to First Amendment protection "neither lies nor false communications serve the ends of the First Amendment." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1999). Defendants also unsuccessfully argue, by divorcing snippets of dialogue from their context, that the statements at issue are mere hyperbole or dramatization, yet the truth or falsity of each scene is capable of verification.

This lawsuit is not, as Defendants contend, about "silencing" The Five, retrying the case against them or denying them the right to tell their stories. In fact, the scenes at issue do not concern events or situations for which The Five were present and cannot be explained or justified as portraying their account of what happened. This is about filmmakers attempting to shroud themselves in a cloak of First Amendment protection while pursuing an obvious plan to destroy a person's reputation by knowingly conveying an utterly false and defamatory narrative of "historical" events to the viewing public.

Defendants put forth no argument warranting dismissal of the Complaint and, accordingly, the Court should deny their Rule 12(b)(6) motion.

## FACTUAL BACKGROUND

### A.  **Ms. Fairstein's Background**

Ms. Fairstein is an attorney, former prosecutor and the author of twenty-four published books, including twenty bestselling crime novels. Compl. ¶ 32. She wrote one non-fiction book that was published in 1993. *Id.* ¶ 35. None of Ms. Fairstein's books focus on, or tell the story of, the Central Park Jogger case. *Id*[3] Ms. Fairstein served as an Assistant District Attorney in the Manhattan District Attorney's Office for three decades, until 2002, and was Chief of the Sex Crimes Prosecution Unit for twenty-six years. *Id.* Ms. Fairstein has received dozens of awards for her legal work and advocacy for survivors of sexual assault, as well as in the fields of domestic violence and child abuse. *Id.* ¶ 34. For many years, until forced to resign after the Series premiered,

---

[3] Ms. Fairstein's book, "*Sexual Violence Our War Against Rape*," a New York Times "Notable Book of the Year," synopsizes the work of the Manhattan District Attorney's Sex Crimes Unit and NYPD in responding to sexual assault in the twenty years prior to the book's publication in 1993. Declaration of Kara L. Gorycki, dated January 29, 2021 ("Gorycki Decl."), Ex. A. The book contains not one chapter about the Central Park Jogger case. *Id.* Defendants incorrectly assert that the book jacket demonstrates that Ms. Fairstein has taken credit for the prosecution of The Five. MTD, at 8. DX-10.

she served on the boards of a number of non-profit organizations which advocate for survivors of sexual assault and domestic violence. *Id.*

**B.** **Ms. Fairstein's Actual Role in the Central Park Jogger Case**

Ms. Fairstein first learned of the attacks in the Park on the morning of April 20, 1989, when she received a call at her home. *Id.* ¶ 61. She next called Manhattan District Attorney Robert Morgenthau ("DA Morgenthau") to tell him about the riot that occurred in the Park, including the rape of an as yet unidentified female jogger. *Id.* ¶ 91. Ms. Fairstein then spoke with John Fried, Trial Division Chief, who assumed his unit would handle the case because it might become a homicide. *Id.* The two then spoke to DA Morgenthau, who assigned the case to Lederer. PX30, at NYCLD_039099-103.

On the night of April 20, 1989, nearly twenty-four hours after the first suspects were apprehended, Ms. Fairstein met ADA Lederer at the 20th Precinct. *Id.* ¶¶ 69-70, 99. They later went to the 24th Precinct. *Id.* ¶ 39. During her time at the precincts, Ms. Fairstein served as liaison to DA Morgenthau and assisted ADA Lederer. *Id.* ¶¶ 39, 82; PX25, at NYCLD_039129-33. At no time did Ms. Fairstein supervise the NYPD investigation of the attacks in the Park, as confirmed by the publicly available testimony of every police officer, detective, and supervising officer who worked on the investigation. *Id.* ¶ 82; PX24. On one occasion, on ***April 21, 1989***, Ms. Fairstein visited the Meili crime scene with Detective Michael Sheehan, and Messrs. Richardson and Wise. Compl. ¶¶ 55, 86; PX2.[4]

ADA Lederer was in charge of the Manhattan District Attorney's investigation of the attacks in The Park and took videotaped statements of The Five. Compl. ¶¶ 82, 106; PX25. Ms. Fairstein did not supervise suspect interviews nor was she present during videotaping sessions.

---

[4] This crime scene visit is not featured in the Series.

Compl. ¶ 116. At no time during the investigation did Ms. Fairstein have a theory of the case. *Id.* ¶ 109. It was ADA Lederer's theory of the case that the attack on Ms. Meili was part of an overall series of attacks in the Park in which The Five participated. *Id.* ¶ 116; PX45. ADA Lederer was responsible for the prosecution of The Five and was assisted by ADA Arthur Tim Clements ("ADA Clements"). Compl. ¶ 40. Ms. Fairstein played no role in the courtroom litigation, other than as a witness. *Id.* She testified about her visit to the crime scene with Messrs. Wise and Richardson, and conversations with Mr. Salaam's relatives and a family friend during the time that Mr. Salaam was being questioned by NYPD detectives. *Id.* ¶ 86.

**C.    The False and Defamatory Portrayal of Ms. Fairstein in WTSU**

When Ms. Fairstein learned of the forthcoming Series, she provided Ms. DuVernay and Netflix with a list of over twenty publicly available sources, including court records and transcripts, that could be consulted when researching the Series. Compl. ¶ 131; PX 59. These sources provided accurate information concerning Ms. Fairstein's role in the Central Park Jogger case. Ms. Fairstein also alerted Ms. DuVernay and Netflix to a number of false and defamatory sources that should not be relied upon in creating the Series. PX-59. Ms. DuVernay discounted the notice and Netflix ignored it. Compl. ¶¶ 131-51; PX58-62.

The Series contains a barely legible disclaimer which appears at the end of the credits for each episode of the Series. Compl. ¶¶ 224-231. Defendants prominently featured Ms. Fairstein in *WTSU*, identifying her by her real name. The film scenes at issue do not concern events or situations for which any of The Five were present, and cannot be explained or justified as portraying their accounts of what happened. *Id.* ¶ 231. Defendants intentionally cast Ms. Fairstein as morally and legally culpable by assigning her various roles in the case that ***she did not play***:

1. **False Portrayal 1: The Single Attacker Theory**
   **(Part One, 7:20-8:50; Part Four 1:04:11-1:04:35; Compl. ¶¶ 51-56, 127, 129)**
   The opening scene of *WTSU* depicts an NYPD officer beating Mr. Richardson in the Park. The Series' title appears and, within 10 seconds of Mr. Richardson being beaten, Ms. Fairstein is shown at the Meili crime scene. She looks around and says "Make sure to get those drag marks…. Clear as day. *His footsteps,* her body." Ms. Fairstein was not in the Park at any point in time on April 20, 1989 and never directed any police activity in the Park or otherwise. At no point did Ms. Fairstein theorize that one person was responsible for the attack on Ms. Meili. Compl. ¶¶ 53-56; PX2-5.

   In Part Four of *WTSU*, ADA Peter Casolaro ("ADA Casolaro") and ADA Nancy Ryan ("ADA Ryan"), who reinvestigated the case against The Five after the Reyes confession, discuss a case file concerning the rape. Casolaro reads the line "Fairstein acknowledged the track marks… 'this is where he pulled her in.'" Casolaro asks Ryan, "When did the theory change?" To which Ryan responds, "I was there when it changed." Ms. Fairstein did not have a changing theory, and did not discuss the investigation, or any theory, with Ryan in 1989. Compl. ¶¶ 92-93, 116, 126-27; PX30-31, 43-45. Ryan had *no* involvement in the Central Park Jogger case in April 1989.[5] Comp. ¶ 92; PX30.

2. **False Portrayal 2: Creating a Press Narrative**
   **(Part One 8:50-9:35, Compl. ¶¶ 57-61)**
   Ms. Fairstein drafts a press release about the case, incorporating details from the crime scene. Compl. ¶ 59. Ms. Fairstein was not responsible for drafting any press releases about the Central Park Jogger case. *Id.* ¶ 61. She did not have any details about Ms. Meili at the time she is depicted urgently putting together a statement to the press. *Id.* ¶ 60. *See* PX7, at NYCLD_015466-67. The press has been widely criticized for fueling racial tensions in New York City, and against The Five, in the days following the attack on Ms. Meili. Compl. ¶¶ 61, 74; PX20.

3. **False Portrayal 3: Interrogating Unaccompanied Minors**[6]
   **(Part One, 9:46-12:38; Compl. ¶¶ 62-76)**

---

[5] One viewer tweeted that Ms. Fairstein, "should get 13 years in jail-the same as Korey Wise who served the longest sentence. Those she put behind bars were innocent. But Linda Fairstein is not. ***Only one set of footprints. She knew better from the outset.***" Compl. ¶ 237; PX69.

[6] Defendants ask the Court ***not to*** rule on the "substantial truth" of this scene, yet they argue it in a footnote. MTD, at 23 n. 20. Part One of *WTSU* contains a scene depicting Ms. Fairstein in a heated exchange with Mr. Salaam's mother. The scene is not part of this lawsuit because, unlike the scenes cited in the Complaint, Defendants' depiction of this exchange could be understood as portraying Mr. Salaam's, or his mother's, point of view. Defendants suggest that evidence concerning this exchange undermines the allegation that Ms. Fairstein did not question unaccompanied minors. MTD, at 23 n. 20. Per Ms. Fairstein's suppression hearing testimony, she did not question Mr. Salaam. Ms. Fairstein first learned that Mr. Salaam was 15 when approached by his mother. PX28, at NYCLD_0015292-316. Defendants cite to Judge Titone's dissenting opinion in *People v. Salaam* for shock value. The opinion is consistent with Ms. Fairstein's account, stating that Mr. Salaam's mother "revealed for the first time that defendant was 15, not 16 as the authorities had previously been led to believe" and Ms. Fairstein was "[a]pparently caught off guard" when learning this information. *People v. Salaam*, 83 N.Y.2d 51, 60 (1993). DX2, a 2002 letter written by Ms. Fairstein, references "witness interviews." MTD, at 23 n. 20. The "witness interviews" referred to in the letter were of Mr. Salaam's mother and family friend. Gorycki Decl, Ex. B, Fairstein Dep. Tr., at NYCLD_039693-99.

Ms. Fairstein walks across the lobby of the 24th Precinct asking about the meaning of "wiling" or "wilding." Compl. ¶¶ 62-63. She is next seen in a room with a group of young men of color, who are not with their parents. She sees Mr. Richardson with a black eye and callously asks "what happened to that one?" *Id.* ¶ 65. She learns from Detective Farrell that the young men are 13 or 14 years old. *Id.* ¶ 66. Ms. Fairstein questions them without reading them their *Miranda* rights. *Id.* She asks a young man if he was "out wilding with Tron" (Mr. McCray), and asks for his address. The young man responds that Tron lives at Schomberg. *Id.*[7]

In his lawsuit against the City, Mr. Richardson testified that he did not recall seeing Ms. Fairstein at any precinct. Compl. ¶ 106; PX42. Ms. Fairstein never spoke with Detective Farrell. She never questioned any young men in custody. Compl. ¶ 67; PX13. She conducted no unlawful questioning of unaccompanied minors. *Id.* Ms. Fairstein did not interview any minors about Mr. McCray. Compl. ¶¶ 69-73; PX14-19. She was unfamiliar with the term "wilding" at the time of the attacks in the Park. Compl. *Id.* ¶68.

4. **False Portrayal 4: Manipulating Timeline to Incriminate The Five (Part One, 12:39-13:03, 15:38-16:52, 18:41-19:52, 34:45-36:24, Compl. ¶¶77-86, 94)**
Ms. Fairstein directs Detective Farrell to get "their interviews on [her] desk immediately so [she] can put together a timeline. Compl. ¶ 77. Ms. Fairstein is next seen reviewing paperwork and placing Post-It notes on a map of the Park. She is reviewing Detective Farrell's interviews and says to Detective Sheehan "all of this is happening in the Park and it's not connected?" Compl. ¶ 79. Ms. Fairstein places a Post-It on the map that says "RAPE" and declares "they're not witnesses, they're suspects." *Id.*

Ms. Fairstein is shown briefing police in front of a map of the Park. She notes a missing half hour in the timeline, asking "What did these animals do between here and here (pointing to map)?" Compl. ¶ 94. ADA Ryan tells Ms. Fairstein "good luck, you're going to need it." *Id.*

Ms. Fairstein is shown plotting the female jogger's path. She notes a 45-minute discrepancy and says, "how can the kids be raping her at the same time they are jumping bicyclists way over there?" A detective tells her, "We got problems." Ms. Fairstein devises a new order for the attacks, because the rape "happened" so obviously there was enough time. Compl. ¶ 83.

Ms. Fairstein never had a conversation about the case with Detective Farrell. Compl. ¶ 78; PX13. She ***never directed any part*** of the NYPD investigation. Compl. ¶ 78; PX5, 22. She never plotted the jogger's path or convened with the NYPD in regard to the timeline. Compl. ¶¶ 84-85; PX26-27. She was not responsible for putting together any timelines, and, accordingly, did not manipulate any timelines to account for problems or discrepancies with the attacks in the Park. Compl. ¶¶ 85, 94; PX26-27.

---

[7] Ms. DuVernay publicly stated that one purpose of the Series was to "trace and track how wiling out become wilding becomes...animals...becomes...a prison sentence for these five boys." Compl. ¶ 75; PX21.

5. **False Portrayal 5: Fighting with ADA Ryan About the Case**
   **(Part One, 16:53-19:52; Compl. ¶¶ 87-96)**

Ms. Fairstein is arguing with ADA Ryan about who will work the case. An NYPD officer tells Ms. Fairstein that ADA Ryan has already been assigned to the case, to which Ms. Fairstein replies, "This is a sex crime not a homicide." Part One, 16:53-17:03; Compl. ¶ 88. ADA Ryan and Ms. Fairstein call DA Morgenthau. ADA Ryan tells Morgenthau that Homicide has been handling the case and she was at the crime scene before daylight, to which Ms. Fairstein replies, "Well I got there before you. I have had precinct guys here interviewing suspects." ADA Ryan incredulously says "Suspects? A dozen kids harassing bicyclists." Ms. Fairstein responds, "These kids were on a rampage." Ms. Fairstein further states that there were "3,412 rapes reported to the NYPD last year…3,412 times someone was assaulted, held down, threatened degraded, forced…. This is an epidemic. We are not in control and we can be." Morgenthau tells Ms. Fairstein and ADA Ryan to work it out. Compl. ¶ 90. Ms. Fairstein is next shown briefing police about discrepancies in the timeline. ADA Ryan says "Good luck, you're gonna need it." Compl. ¶ 94.[8]

Ms. Fairstein never fought with ADA Ryan over who would work the case. Compl. ¶¶ 91-92. Ms. Fairstein and John Fried, Trial Division Chief, discussed who would be assigned to the case and spoke with DA Morgenthau, who assigned the case to Lederer. *Id.*; PX30, at NYCLD_039099-103. ADA Ryan had no involvement in the Central Park Jogger case in April 1989. *Id.*[9] Nor did she believe that the attacks in the Park were mere harassment. In her affirmation in support of vacating The Five's convictions after Reyes confessed in 2002, ADA Ryan described the events in the Park as "grave and inexcusable—unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness and one seriously injured." Compl. ¶ 93; PX31.

6. **False Portrayal 6: Ordering A Roundup of Young, Black Thugs in the Projects**
   **(Part One, 19:53-20:30, Compl. ¶¶ 97-103)**

Ms. Fairstein orders NYPD officers to conduct a roundup:

> I need that whole group…I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop

---

[8] Ms. DuVernay publicly stated that "the arc of the Fairstein/Ryan relationship is real. Fairstein really battled Ryan for the case in 1989. Ryan really ended up getting it back after Matias Reyes confessed." Compl. ¶ 96; PX32.

[9] DX 2, written in 2002, states that ADA Ryan first assigned the case to Peter Casolaro. The letter incorrectly referenced ADA Ryan. Gorycki Decl., Ex. B, at NYCLD_039697-99. In addition, DX2 does not contradict the allegations that Ms. Fairstein was falsely depicted "wresting the case from…ADA Ryan…in order to make an example of The Five, over Ryan's protestations that The Five did nothing more than harass a few cyclists." Compl. ¶ 46(d); PX30-31. DX3 shows that, *in 2010*, Ms. Fairstein thought ADA Ryan was "dishonest" and lacked "interpersonal skills."

every little thug you see. You bring in every kid who was in the park last night.[10]
Compl. ¶ 97.

Ms. Fairstein did not order a round-up nor was she involved in the NYPD investigation of
the attack on Ms. Meili, which was entirely under the supervision of senior police leaders
for the first 72 hours. She gave no orders to investigating officers and detectives to pick up
suspects, whether in the Park or in "the projects." Compl. ¶¶ 98-102; PX34-39.

7. **False Portrayal 7: "No Kid Gloves" for Interrogations**
   **(Part One, 22:35-22:53, Compl. ¶¶ 104-107)**
   Ms. Fairstein tells NYPD officers who are about to interview Mr. Richardson:

> We've got suspects, we've got kids in custody. Interrogate. Make them name
> their accomplices. This is not business as usual. The press is crawling all over
> this. No kid gloves here. These are not kids. They raped this woman. Our lady
> jogger deserves this. Compl. ¶ 104.

Ms. Fairstein did not direct officers to violate the law by treating minors in custody as
adults. She was not involved in the NYPD's questioning of witnesses or suspects at any
precinct, including Mr. Richardson. Compl. ¶¶ 105-107; PX41.[11] In his lawsuit against the
City Mr. Richardson testified that he did not recall seeing Ms. Fairstein at any precinct.
Compl. ¶ 106; PX42. Ms. Fairstein was not motivated by any concerns about the press
because she had no role in supervising the police investigation and was not permitted to
give statements to the press. Compl. ¶¶ 61, 105; PX5, 23-24.

8. **False Portrayal 8: Directing Coercion of Testimony to Fit Baseless Theory**
   **(Part One, 47:40-53:30, Compl. ¶¶ 108-116)**
   ADA Lederer tells Ms. Fairstein that The Five's statements do not align with respect to the
   rape. Compl. ¶ 108. Ms. Fairstein tells ADA Lederer "they're all guilty…they all raped her
   and we know this because in each of these boys' confessions, they all bear eyewitness
   against each other." *Id.* ADA Lederer responds "I imagine myself walking into the
   courtroom, armed with a stack of wildly conflicting statements, no physical evidence, no
   weapon." Ms. Fairstein says "all we need is for one of these little shits to tie this whole
   thing together." *Id.* While reviewing Mr. McCray's videotaped statement, ADA Lederer
   tells Ms. Fairstein "the biggest issue [is]…that nothing these boys state matches the central
   facts of the crime." *Id.* ¶¶ 110-12. Ms. Fairstein and ADA Lederer next speak with
   Detective Sheehan about Mr. Wise's interrogation. Ms. Fairstein says "He's the one, he's

---

[10] This scene is prominently featured in the trailer for *When They See Us*, released on April 19, 2019. Compl. ¶ 167.

[11] In support of its previous reply brief, Netflix submitted the 2013 testimony of Jermaine Robinson, (who admitted guilt with respect to assaulting a male jogger in the Park), to argue that Ms. Fairstein interrogated suspects during the investigation of the Central Park Jogger case. ECF No. 52-4. In the event that Defendants again submit this information, it should be noted that Ms. Fairstein's 2013 testimony contradicted Mr. Robinson's testimony. Gorycki Decl. Ex. C, Excerpts from L. Fairstein 4/24/13 Dep. Tr. Defendants also submitted Mr. Santana's irrelevant 2013 testimony which alleged that Ms. Fairstein was at his crime scene walk. ECF 52-5. This did not occur. PX2, PX78, Sheehan 5/9/13 Dep. Tr. at NYCLD_044145-46; 10/25/89 Supp. Hrg. Test. M. Sheehan, at NYCLD_018988-94.

the glue, we'll make sure he sticks it together." *Id.* ¶ 114. Detectives then beat Mr. Wise before he gives a statement. *Id.* ¶ 115.

Ms. Fairstein: i) did not argue with ADA Lederer about the focus of the prosecution's case (Compl. ¶ 109); ii) did not view the videotaped statements with Detective Sheehan or ADA Lederer (*Id.* ¶ 111); iii) did not supervise suspect interviews, nor was she present during videotaping sessions (*Id.* ¶116); and iv) never pressured Detective Sheehan to force a confession out of Mr. Wise (*Id.*). The differences in certain details of The Five's statements were not critical to ADA Lederer, who theorized that the attack on Ms. Meili was part of an overall series of attacks in the Park. *Id. See* PX43-45.

9. **False Portrayal 9: Concealing Exculpatory Evidence**
   **(Part Two, 16:39-17:14, Compl. ¶¶ 118-19)**
   Ms. Fairstein tells DA Morgenthau and ADA Lederer, "We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it." ADA Lederer, asks "How did the NYPD miss this?" Ms. Fairstein responds, "Who cares? We have it now and the kicker is none of the defense is aware yet so we can test it right before the trial—surprise!" ADA Lederer, looking upset, says "surprise." Compl. ¶ 117.

   Ms. Fairstein did not bring the sock DNA to ADA Lederer's attention. Compl. nor hide its existence from ADA Lederer or The Five's defense counsels. *Id.* ¶ 119. Ms. Fairstein never suggested concealing evidence from defense counsel or springing it on them on the eve of trial. *Id.* Ms. Fairstein played **no role** in this discovery issue. *Id.*; PX46-53. ADA Lederer immediately brought the sock to the attention of the court and defense counsel. PX47.

10. **False Portrayal 10: Pressuring ADA Lederer to Prosecute The Five**
    **(Part Two, 29:51-32:23, Compl. ¶ 120-25)**
    The sock DNA is not a match to any of The Five. ADA Lederer says "I needed this DNA in the sock to nail this all down…. The five defendants are clean." Compl. ¶ 120. Ms. Fairstein posits that there "must have been another attacker." *Id.* She tells ADA Lederer to "play up" "inconclusive" "cervical DNA." *Id.* ¶ 121. ADA Lederer asks "Are you listening to yourself? You sound delusional. You want me to pretend that the sock never existed, this is crossing a line." *Id.* Ms. Fairstein asks, "Where's the line for Patricia?" The Five "were in the park beating people up on the same night that she's getting beat up and you're telling me they had nothing to do with it? Bullshit. They said it themselves, they told us what happened." *Id.* ¶ 122. ADA Lederer says "They were told," to which Ms. Fairstein responds "they couldn't see the whole picture of how their one part fit into the whole, that is all we did." *Id.*

    Ms. Fairstein did not direct ADA Lederer to downplay the sock DNA. Compl. ¶ 123. Nor was the sock DNA downplayed at the trials. PX52. Ms. Fairstein never pressured, or forced a theory of the case on, ADA Lederer. *Id.* ¶ 123; PX54-55. Nor did Ms. Fairstein force ADA Lederer to prosecute The Five despite a lack of evidence. ADA Lederer firmly believed that the young men's statements, alone, were sufficient to prosecute the case.

PX55. Ms. Fairstein did not question The Five. She did not supervise, nor was she present for, their videotaped statements. *Id.* ¶ 203; PX43.

**11. False Portrayal 11: ADA Ryan Blames Ms. Fairstein for Coercing Confessions (Compl. ¶ 128, Part Four, 1:09:46-1:12:43)**

In the final scene, which takes place in 2002, ADA Ryan meets Ms. Fairstein in a restaurant. Ms. Fairstein says to ADA Ryan "You're here to gloat. It doesn't matter. You simply identified a sixth rapist, I always said there may be more." ADA Ryan responds "You said that to cover because ***you knew you coerced those boys into saying what they did***." "***Linda, we pored over your confession tapes***." Compl. ¶ 128 (emphasis added). ADA Ryan places several of Ms. Fairstein's novels on the table, noting that while Ms. Fairstein was writing crime novels, five innocent young men were serving time. *Id.*[12]

Ms. Fairstein did not question The Five, nor was she responsible for any alleged coercive tactics used during police questioning or during any videotaped statements. Compl. ¶¶ 116, 128-130; PX5, 23-24, 41. ADA Lederer—***not Ms. Fairstein***—took the videotaped statements of The Five. Compl. ¶ 106. At no point in 2002, during or after ADA Ryan led one of two re-investigations of the case, did Ms. Fairstein and ADA Ryan ever meet. *Id.* ¶129. ADA Ryan never spoke with Ms. Fairstein—formally or informally—about the Reyes confession. *Id.* ADA Ryan's affirmation in support of vacating The Five's convictions places no blame on Ms. Fairstein. Nor does it state that The Five's confessions were coerced. On the contrary, per ADA Ryan the confessions were admitted into evidence after a *Huntley* hearing and the prosecution "credibly, honestly and persuasively argued…that in any gang attack, discrepancies among accounts and confusion about details are not unusual." PX31, ¶¶ 19, 99. In addition, the "defendant's statements in this case were sufficiently persuasive to result in the convictions of all five defendants on at least some of the charges against them and…to bring about those convictions before two separate juries." *Id.* ¶ 82. She pointed out that inconsistencies in The Five's statements "were apparent at the time of trial" and that defense counsel "had access to the same confessions, the same objective evidence and the same timeline the prosecution did, and were free to exploit the weaknesses in the People's case." *Id.* ¶ 99.

**D.    WTSU Causes Public Backlash and Effort to "#Cancel" Ms. Fairstein**

Prior to the release of the Series, Ms. Fairstein had two thriving careers—one in law and one in literature. *Id.* ¶¶ 233, 256. Defendants marketed and promoted the Series as a true story, claiming their work was based on their review of public records. *Id.* ¶¶ 163, 166-67, 171-79, 181, 184, 187, 197, 200-222; PX63-66. Viewers understood the Series to be a true story, as evidenced

---

[12] This scene was posted by Twitter users as part of a campaign to get Ms. Fairstein's book publisher to terminate her contract. Compl. ¶ 178; PX32. Ms. DuVernay retweeted it. *Id.*

by the immediate backlash against Ms. Fairstein, including: calls for her "to die a horrific and painful death…knocked out, stomped, and spit on" (Compl. ¶ 235); #CancelLindaFairstein on social media (*Id.* ¶¶ 236-39; PX69); Ms. Fairstein's forced resignation from the boards of nonprofits that she worked with for decades (Compl. ¶¶ 250-54; PX76); the termination of agreements with her U.S. and UK publishers (Compl. ¶¶ 240-46; PX70-74); the cancellation of legal consulting jobs, speaking engagements and book signings. (Compl. ¶¶ 256-57); and calls to the Manhattan DA to reopen every one of Ms. Fairstein's cases (*Id.* 247-49; PX75).

Defendants encouraged the public's misperceptions about Ms. Fairstein's role in the Central Park Jogger case. Compl. ¶¶ 146, 153, 155, 162-63, 165-67, 178, 181-83, 188, 190-91, 193-96, 223, 238 n. 170, 243; PX32, 61, 63-65, 72. Ms. DuVernay acknowledged that a purpose of the Series was to hold Ms. Fairstein accountable. *Id.* ¶ 182. Ms. Locke touted her research for the Series as providing her with a basis for injuring Ms. Fairstein's reputation and career, because she was "almost singlehandedly responsible for the incarceration of [The Five]," (*Id.* ¶ 153), and "deserves all the rage and hate and consequences that are coming her way" because she is an "unrepentant liar." *Id.* ¶¶ 152-64, 191-98; PX63, 65.

## ARGUMENT

## I.     Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. *Watson v. Doe 1*, 439 F. Supp. 3d 152, 156 (S.D.N.Y. 2020). The Court's sole function is to determine whether the complaint itself is legally sufficient. *Id.* The Court should not dismiss the complaint if the plaintiff has stated a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* At the motion to dismiss stage, a complaint

alleging defamation does not rise or fall in its entirety. *Id.* at 160. The Court may dismiss claims based on nonactionable statements and allow claims based on actionable statements to go forward. *Id.* at 160.

## II.    Defendants' Appendix Does Not Support Dismissal[13]

The Court may consider documents that are incorporated in the complaint by reference and documents upon which Plaintiff relies, which are integral to the complaint, and as to which Plaintiff had notice. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-83 (S.D.N.Y. 2020). The Court may not consider such documents for the truth of the matters asserted therein. *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223-24 (S.D.N.Y. 2014) (court could not entertain "own words" defense to challenged defamatory statements).[14] However, if a document relied on in the complaint contradicts an allegation then the Court need not accept that allegation as true. *Gray*, 454 F. Supp. 3d at 382-83. Defendants failed to establish that any documents contradict Ms. Fairstein's allegations. *Cf. Barbash*, 2020 WL 6586155, at *2-3 (plaintiff's guilty plea, referenced and described in the complaint, was dispositive as to 2 of 5 statements). All of the statements attributed to Ms. Fairstein ***post-date*** the time period in which Ms. Fairstein is portrayed in the Series.[15] *See Agbimson v. Handy*, 2019 WL 3817207, at *5 (S.D.N.Y. Aug. 14, 2019) (court "skeptical" that documents produced in 2018 retroactively justified the 2016 statements that spawned lawsuit); Gorycki Decl., Ex. D, 11/16/20 Tr. at 12:13-13:1.

---

[13] Despite the impropriety of Defendants' submission, and the lack of contradictory evidence therein, Plaintiff was compelled to spend valuable space in this brief addressing their irrelevant points. *See* Gorycki Decl., Ex. D, 11/16/20 Tr., at 9:15-10:5, 12:13-13:1; 13:8-16:17.

[14] In *Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 146 (D.D.C. 2017), the plaintiff admitted that the article in question was substantially true. The court took judicial notice of a 2008 article that reported the same fact as the article at issue in the 2017 lawsuit. As explained below, Defendants cite no sources which contradict the Complaint.

[15] Defendants contend that Plaintiff used her platform as a crime novelist to "tout her involvement in the case" and as a "megaphone of notoriety." MTD, at 1, 30. The handful of statements in their Appendix—which span nearly twenty years—do not support this characterization. They were given in response to questions about the Reyes confession (DX13), the City's settlement with The Five (DX11), an attack on Ms. Fairstein by Mr. Wise's defense counsel (DX8; Gorycki Decl., Ex E) and in response to the Series' premiere (DX7).

a) **DX1-3**: Plaintiff did not rely on these exhibits in this lawsuit. Nor are they referenced in, or integral to, the Complaint. In any event, they do not contradict the Complaint. *See* pp. 18 & n. 27, 19 n. 29, 29 (*re* DX1); pp. 6 n. 6, 18 n. 9 (*re* DX2); pp. 8 n. 9 (*re* DX3).

b) **DX4**: Ms. Fairstein's 2013 deposition testimony, which Defendants cite for the truth of the matters asserted therein, (MTD at 5; App. Index), does not contradict the Complaint. *See* Compl. ¶¶ 5, 40, 82, 84-85, 88, 123.

c) **DX5**:[16] ADA Ryan's affirmation ***supports*** Ms. Fairstein's allegations. *See* pp. 8, 11, 14, 18 n. 29, 28 n. 45.

d) **DX6**: ***ADA Lederer's*** summation is not referenced in, or integral to, the Complaint. Nor does it contradict the Complaint. *See* Compl. ¶¶ 52-54, 83-84, 108-125.

e) **DX7**: Ms. Fairstein's 2019 Op-Ed in *The Wall Street Journal*, published after the Series' premiere, does not contradict the Complaint. Ms. Fairstein's opinion, over thirty years later, that there was a basis for bringing charges against The Five in 1989 is not the equivalent of believing—in 1989—that there was only one rapist and pursuing a baseless case against innocent young men of color. *See* Compl. ¶¶ 59-130. Defendants rely on the Op-Ed as support for Ms. Fairstein's purported belief that "The Five are guilty of rape." MTD, at 7-8. It plainly states that "Reyes's confession, DNA match and claim that he acted alone required that the rape charges against the five be vacated. I agreed with that decision and still do." DX7, at 3. Ms. Fairstein's statements concerning the charges brought in 1989 are supported by Exhibits 5 and 19.[17] *See* DX5, ¶ 10 ("[a]ll five…implicated themselves in a number of the crimes which had occurred in the park. None of them admitted actually raping the Central Park jogger, but each…made himself an accomplice to the crime"), ¶ 112 (Lederer "fairly and convincingly argued…they were 'an entire group acting together in one violent outburst of destruction, of beating, of assaulting'"); DX19, at 2 ("the Assistant District Attorneys involved in the case acted reasonably, given the circumstances").

f) **DX10**: *Sexual Violence*: *Our War Against Rape*, is not integral to the Complaint. As discussed *supra* at note 3, it does not contradict the Complaint.

g) **DX12**: Ms. Fairstein's 2018 statement that the "confessions were not coerced" does not contradict the Complaint. *See* Compl. ¶¶ 104-116, 122-125, 128-29.

Defendants ask the Court to take judicial notice of documents outside the Complaint. MTD, at 10-11. Courts may take judicial notice that "certain things were said in the press, and that assertions were made in lawsuits and regulatory filings." *Ace Arts, LLC v. Sony/ATV Music Publ'g*

---

[16] DX 5 and PX 31 are the Ryan Affirmation.

[17] DX19 is quoted in the Complaint. *Id.* ¶ 6. It is neither integral to nor contradicts the Complaint.

*LLC*, 56 F. Supp. 3d 436, 441 (S.D.N.Y 2014). *See Barbash*, 2020 WL 6586155, at *5-6. The Court may only take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Gray*, 454 F. Supp. 3d at 382. *See Christa McAuliffe Intermediate School PTO, Inc. v. DeBlasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019). Documents subject to judicial notice may not be considered as proof of adjudicative facts. *See Merrill Lynch Tyco Research Sec. Litig.*, 2004 WL 305809, at n. 3 (S.D.N.Y. Feb. 18. 2004). When judicially noticed documents contradict the complaint it is inappropriate to discredit the complaint because a ruling on a Rule 12(b)(6) motion is not an occasion to make findings of fact. *Ace Arts, LLC*, 56 F. Supp. 3d at 442:

- **DX8-9**: These opinion pieces were improperly submitted for the truth of the matters asserted therein. MTD, at 8, 9 n. 6, 26. DX8 was written in response to a letter from Mr. Wise's attorney to the editor of *The New York Law Journal*. Gorycki Decl., Ex. E. DX8 states that Ms. Fairstein "was not the prosecutor in the case, nor was [she] one of the detectives or prosecutors who took the confessions from the 5." *Id. Cf.* Compl. ¶¶ 39-40, 73, 86, 105, 123. *See* discussion at p. 29, regarding DX9.

- **DX11**: This 2014 interview was submitted to establish Plaintiff's belief that "The Five were guilty." MTD, at 8, 9 n. 7. Even if considered, it does not contradict the Complaint. Compl. ¶¶ 51-56, 77-96, 108-125.[18]

- **DX13**:[19] This 2002 article was submitted as evidence of Ms. Fairstein's "key role" in the case against The Five. MTD, at 8 n. 5. Yet it states that Ms. Fairstein "led the sex-crimes unit…at the time of the jogger case," she "went to the Twentieth Precinct" to "help Elizabeth [Lederer] and the cops get the resources they needed." DX13, at 1. Ms. Fairstein described herself as "the eight-hundred-pound-gorilla" in terms of getting resources. "[D]etectives and her colleague ADA Lederer were interrogating suspects." *Id. See* Compl. ¶¶ 5, 39, 57.

- **DX14-17**:[20] which Defendants improperly submit as evidence of adjudicative facts, are sources whose accuracy can reasonably be questioned. To the extent DX14-16 contain

---

[18] *Muhlhahn v. Goldman*, 93 A.D.3d 418, 419 (1st Dep't 2012), is inapposite. The case did not involve judicial notice and the plaintiff's allegations were contradicted by the evidence submitted.

[19] Defendants assert that DX13-16 are subject to judicial notice because they discuss "conduct raised in the complaint." MTD, at 11 n. 9. *Nguyen v. New Link Genetics Corp*, 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018), and the case it relied upon, concern allegations of securities fraud.

[20] Defendants note that these sources are not "essential to th[eir] Motion." MTD, at 11 n. 9. They should not have been submitted to the Court.

accurate quotes, they do not contradict the Complaint. To the extent that DX17 accurately quotes Ms. Fairstein, it states that she was *not* responsible for the confessions and ***did not*** try the cases against The Five. Ms. Fairstein's relationship with ADA Ryan in 2002 has no bearing on what occurred in 1989.[21] Compl. ¶¶ 92-93.

## III.   The Scenes In Question Are False[22]

Defendants fail to overcome Ms. Fairstein's allegations that the scenes in question are false.

*See supra*, False Portrayals 1-11; *Barbash*, 2020 WL 6586155, at *3 (plaintiff must allege that the complained of statement is "substantially false"). Defendants' false depiction of Ms. Fairstein extends far beyond "condensing" the investigation or the "selective editing of real history." *See* MTD, at 16; *Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017) *aff'd* 800 F. App'x 840 (11th Cir. 2020) (distinguishing between changing the location of a conversation or number of people involved and false reenactment of events which damages the reputation of the individual depicted). Defendants also offer no support for the bald assertion that the facts alleged in the Complaint are based on a "revisionist history." MTD, at 2. On the contrary, ***Defendants*** revised history to falsely cast Ms. Fairstein as the racist, unethical villain responsible for the incarceration of The Five by *inter alia* attributing "critical responsibility"[23] to Ms. Fairstein which she clearly did not have. Compl. ¶¶ 55-130, 155, 181, 182, 193, 195-197; PX62-65.

---

[21] While Part Four shows a rivalry between ADA Ryan and Ms. Fairstein (in 2002), at issue is ADA Ryan's false statement that Ms. Fairstein was responsible for the coerced confessions. Compl. ¶¶ 128-29.

[22] Defendants concede that Plaintiff has plausibly alleged publication, actual malice and special damages (with respect to the claims for defamation *per quod*). *See generally* MTD. Defendants speculate that, if this case moves forward to discovery, Ms. Fairstein will be unable to prove actual malice. MTD, at 14 n. 14. This issue is not properly before the Court.

[23] Defendants repeatedly refer to Ms. Fairstein's "critical responsibility" and "critical involvement" in the case, but offer no explanation of what they mean by this nor any evidence which contradicts the Complaint's allegations about Ms. Fairstein's actual role in the case. *See* MTD at 1, 3, 9, 16.

16

Defendants argue that certain scenes in which Ms. Fairstein is depicted are substantially true.[24] MTD, at 14-21; Ex. B.[25] A statement is substantially true when the "overall gist or substance of the challenged statement is true." *Barbash*, *LLC*, 2020 WL 6586155, at *3. The proper test is whether the statement "as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 504 (S.D.N.Y. 2012) (citation omitted).[26]

**First**, Defendants have not shown that False Portrayal 1, in which Ms. Fairstein visits the crime scene, is substantially true. Defs. Ex. B (Scene 1). They ignore that the scene falsely attributes responsibility for the rape investigation, and a single attacker theory, to Ms. Fairstein, which carries through to the end of the Series. *See supra*, False Portrayals 1, 5, 11. **ADA Lederer's** summation (DX6) does not demonstrate that Ms. Fairstein came up with a "sixth rapist" theory in order to press the case against The Five. It **supports** the allegation that ADA Lederer theorized that the attack on Ms. Meili was part of a number of attacks in which The Five participated. Compl. ¶ 116; PX44-45. The absence of the false single attacker theory from this scene certainly would cause viewers to perceive Ms. Fairstein in a more positive light throughout the Series.

**Second**, Defendants have not shown that False Portrayal 4, in which Ms. Fairstein is shown, on three occasions, manipulating the timeline of attacks in order to incriminate The Five,

---

[24] A number of opinions hold that the falsity inquiry typically requires discovery. *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005); *Church of Scientology Int'l v. Behar*, 238 F. 3d 168, 173 (2d Cir. 2001). *See also Watson*, 439 F. Supp. 3d at 164 ("Whether alleged defamatory comments…are actually true cannot be decided on a motion to dismiss.")

[25] Defendants exclude the following scenes from the Court's consideration of "substantial truth": 1) the scene in which Ms. Fairstein drafts a press release (as discussed *supra*, False Portrayal 2 is false); 2) the scene in which ADA Ryan and Ms. Fairstein argue about the case (as discussed *supra*, False Portrayal 5 is false); 3) the scene in which Ms. Fairstein is shown questioning unaccompanied minors (as discussed *supra*, False Portrayal 3 is false); 4) the scene in which Ms. Fairstein tells officers "no kid gloves" (as discussed *supra*, False Portrayal 7 is false); and 5) the scene in which Ms. Fairstein informs ADA Lederer about the sock DNA (as discussed *supra*, False Portrayal 9 is false). *See* MTD, at 15 & n. 15, 23 n. 20, 24; Defs. Ex. B.

[26] Unlike the plaintiff in *Egiazaryan*, Ms. Fairstein has not admitted facts that would have the same, or greater, effect on viewers of the Series. 880 F. Supp. 2d at 508.

is substantially true. MTD, at p. 16. It is of no moment that the Complaint "admits" that the D.A.'s Office created a timeline. *Id.* Defendants ignore that ADA Lederer, ADA Clements and NYPD Detective Nugent were responsible for the timelines. Compl. ¶ 85; PX26-27. Surely a true depiction of an NYPD detective, or ADA Lederer, creating the timeline would have a very different effect on viewers.

Defendants incorrectly assert that False Portrayal 4 as substantially true because, in 2003, Ms. Fairstein "specifically defended that very timeline"[27] and the "'brilliant' police work that produced it." MTD, at 17. Ms. Fairstein actually said that the investigation mounted by the NYPD ***in the hours after the rioting ceased*** in the Park was brilliant. DX1, at NYCLD_039832.[28] This has nothing to do with the timeline. Ms. Fairstein also discussed the chaotic nature of the attacks in the Park and the attendant difficulty of accounting for every minute. *Id.* at NYCLD_039835-36.[29] The Series does not depict Ms. Fairstein defending the timeline and police work after Reyes confessed—it falsely portrays her as manipulating the timeline to pin the rape on The Five, even though her colleagues said there were problems and she knew there was one attacker. *See supra*, False Portrayals 1 and 4.

Defendants' depiction of Ms. Fairstein ***is not***, as they contend, the "very definition of substantial truth," nor do they merely depict Ms. Fairstein espousing "[her] theory that the rape

---

[27] Defendants do not specify which of the timelines referenced in the Complaint they are referring to. MTD, at 17.

[28] Astonishingly, Defendants assert that Ms. Fairstein's statement, (DX1), gave them free license to falsely portray her directing the NYPD to round up young black "thugs" in the projects. MTD, at 27. There is not even a tenuous connection between Ms. Fairstein's statement about work conducted by the NYPD and the manner in which she is portrayed (False Portrayal 6). Consequently, the scene is not "substantially true."

[29] Ms. Fairstein's description of the timing of events is consistent with ADA Ryan's reinvestigation, in which ADA Ryan noted that "given the involvement of a number of people and the violence of the events at issue, some level of genuine confusion is probably inevitable. In this case in particular, those arguments were bolstered by the fact that the crimes occurred at night, that the lighting was poor, and that the defendants were involved in a number of incidents." PX31, ¶ 99.

was connected with the other activity in the Park that night and that the timeline was accurate and supported by the evidence presented at trial by her Unit." MTD, at 17. *See* False Portrayal 4.[30]

**Third**, Defendants incorrectly assert that False Portrayals 8 and 10, in which Ms. Fairstein pressures ADA Lederer to prosecute a baseless case against The Five, are substantially true. The scenes are not "almost to the letter" the points that Ms. Fairstein made in post-conviction public statements. MTD, at 18-19; Defs. Ex. B.[31] Nor do Defendants merely portray Ms. Fairstein as a "true believer" in the case. MTD, at 19.

In the face of ADA Lederer's assertion that she has no case against The Five, Ms. Fairstein tells her that they only need one of the "little shits" to tie the whole thing together. Shortly before detectives are shown beating Mr. Wise, Ms. Fairstein tells Detective Sheehan that Mr. Wise will "stick[] [the story] together." Compl. ¶¶ 115-16. Ms. Fairstein next forces a theory of the case on ADA Lederer, which she **knows** is not credible, in order to "help[] a jury believe what we know is true." *Id.* ¶ 120. Ms. Fairstein then "cross[es] the line" when she tells ADA Lederer to play up inconclusive DNA to argue that "the 5 can't be ruled out." *Id.* ¶ 121. In response she is called "delusional." *Id.*[32] ADA Lederer is shown questioning what in truth was **Lederer's** theory of the

---

[30] Ms. Fairstein's statement to the City Council also addressed **the defense counsel's** allegation that she was the "architect of what they call a miscarriage of justice," noting that by the time she and ADA Lederer were "invited to the precinct—twenty-one hours after the first arrests—most of the suspects had already made oral and written admissions." DX1, at NYCLD_039833. ADA Lederer took the videotaped statements. *Id.* Ms. Fairstein's description of her role in the case is further consistent with the Complaint's allegations. *Id.* at NYCLD_039827.

[31] At the same time that Defendants argue that these scenes are substantially true, they assert that they are merely fictionalized dialogue to dramatize historical events. MTD, at p. 18. They cannot have it both ways. In any event, the use of fictionalized dialogue does not shield Defendants from liability. *See St. Amant*, 390 U.S. at 732 (neither lies nor false communications serve the ends of the First Amendment); *Lovingood*, 800 F. App'x at 848 (no "invincible shield of protection" for docudrama); *John E. Reid & Assocs., Inc. v. Netflix*, 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020) (labeling something "fictitious" will not insulate it from a defamation action). *See also* Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems § 2:4.11 (1999) ("Where the defendant invents defamatory dialogue or other defamatory details in what purports to be nonfiction [or] uses actual people as fictional characters…liability for libel may result.")

[32] In this context, accusing Ms. Fairstein of being delusional is defamatory. *See Pezhman v. City of New York,* 29 A.D.3d 164, 167 (1st Dep't 2006). *See also Liberty Lobby, Inc. v. Anderson*, 1990 WL 605337, at *2 (D.D.C. July 30, 1990).

case. *Id.* ¶¶ 122-24; PX44-45, 54-55. Surely the truth—that none of this occurred—would have a significant impact on viewers' perception of Ms. Fairstein.

None of the sources relied upon by Defendants, (MTD, at 19), demonstrate that, as depicted in the scenes, Ms. Fairstein knew The Five were innocent of the rape, pressured detectives to coerce a confession out of Mr. Wise, pressured Lederer to prosecute the case without evidence, and acknowledged that the confessions were coerced.[33] DX1 is discussed at length *supra*. DX9 and DX10 pre-date the Reyes confession and post-date the convictions. DX9 merely stated that the "teens" "expressed no remorse." DX7 was published after the Series' premiere. Defendants state that the scenes are supported by "other articles she penned" but do not specify which articles. MTD, at 19.

**Fourth**, Defendants argue that False Portrayal 10 does not attribute coercive interrogation tactics to Ms. Fairstein. *Id.* at 19. In the scene, Ms. Fairstein says that The Five were not "told" what to say, they were shown how "their one part fit into the whole." Compl. ¶ 122. Telling and showing are one and the same. Defendants' position is further undermined by False Portrayal 11, in which ADA Ryan blames Ms. Fairstein for coercing confessions out of The Five. Compl. ¶ 128.

**Fifth**, Defendants cannot reasonably argue that False Portrayal 11 cannot be viewed as a "factual statement that *Plaintiff herself* was responsible for coercing the confessions." MTD, at 21. ADA Ryan clearly states that Ms. Fairstein "covered" herself with a sixth rapist theory because she "knew [she] coerced those boys into saying what they did." Compl. ¶ 128. To the viewer, ADA

---

[33] For these reasons, Defendants' assertion that False Portrayals 8 and 10 are a dramatization of a debate over the strengths and weaknesses of the case, with Fairstein "taking a more aggressive view," falls flat. *See* MTD, at 18. *Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008) is inapposite. In *Dworin*, many of the statements at issue lacked precise meaning or were incapable of being proven true or false. *Id.* It was also plain to the reader that the defendant was conveying nothing more than his own biased opinion about plaintiff. In contrast, the scenes at issue here are readily capable of being proven false, cannot be justified as portraying The Five's account of what happened, (Compl. ¶ 231), and as noted by the court in *Reid & Assocs.*, 2020 WL 1330657 at *8, the Series "sells itself as fact based."

Ryan, who reinvestigated the case, has personal knowledge—she "pored over ['Ms. Fairstein's'] confession tapes." *Id.* The viewer also knows that, earlier in the Series, Ryan questioned The Five's involvement in the rape. *See* False Portrayals 4 and 5. ADA Ryan is certainly not, as Defendants contend, a mere "biased partisan."

This scene cannot be categorized as mere hyperbole. MTD, at 21. ADA Ryan's statement can be verified as true or false. Compl. ¶¶ 105-107, 111; PX41-42. While Defendants argue that viewers would not attribute any coercive tactics to Ms. Fairstein because she was not present during the interrogation scenes, they tell viewers that Ms. Fairstein is responsible for every aspect of the case against The Five, including directing NYPD officers not to use "kid gloves" when interrogating minors, (*Id.* ¶ 104), and telling Detective Sheehan to make sure Mr. Wise provides a statement which sticks the story together (Compl. ¶ 114). The truth—that Ms. Fairstein had no such responsibilities—would certainly have a different effect on the minds of viewers. PX41-42, PX2-5, 23-24. Defendants simply have not demonstrated that the Series is "an accurate portrayal of Ms. Fairstein expressing views she has publicly espoused for decades." MTD, at 15-18. Assuming *arguendo* that Defendants used Ms. Fairstein's "own words" in the Series, this would not be an absolute defense to her defamation claims. Even an accurately quoted statement could produce a worse effect on the mind of the reader when placed in a different context. *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94-95 (1st Dep't 2015).[34]

---

[34] *Love v. Morrow & Co.*, 193 A.D.2d 586 (2d Dep't 1993), is distinguishable from the present case. In *Love*, the plaintiff filed a defamation action with respect to one sentence in a book that was based on a verbatim quote from a term paper written by the plaintiff, the accuracy of which the plaintiff did not challenge. There is further no comparison between the present case and *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 (S.D.N.Y. 1988), in which the plaintiff had a "well-publicized" reputation for "drug trafficking, illegal weapons possession…and murder." On the contrary, "[f]or much of her life Ms. Fairstein was widely viewed as a law enforcement hero" and "one of the best known prosecutors in the country." Compl. ¶ 233; PX68. It was not until Defendants *falsely* portrayed Ms. Fairstein as engaging in unethical, and potentially illegal, conduct in order to pin the rape on The Five (whom she knew were innocent) that Ms. Fairstein's reputation and career were decimated. Compl. ¶ 256; PX67-77.

### IV.     Defendants' Portrayal of Ms. Fairstein is Defamatory

"A statement is defamatory if it tends to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or if it tends to excite adverse, derogatory, or unpleasant feelings or opinions about the plaintiff." *Davis v. Costa-Gavras*, 619 F. Supp. 1372, 1375 (S.D.N.Y. 1985). Whether a statement has defamatory meaning is a question of law for the Court to decide. *Id.* at 1375. Courts should not "interpret defamatory statements in their mildest and most inoffensive sense to hold them nonlibelous." *Watson,* 439 F. Supp. 3d at 161. "The standard is not whether the statements are exclusively susceptible of the meaning alleged…but whether such an understanding is a reasonable one." *Davis*, 619 F. Supp. at 1376. In deciding whether a film is reasonably susceptible of defamatory meaning, the Court may examine particular passages of the film, considered in context, and the film as a whole. *Id.* at 1376-77. If the scenes at issue are reasonably susceptible of a defamatory meaning, the Court then determines whether they constitute defamation *per se* or *per quod*. *Dworin*, 2008 WL 508019 at *6 n. 1.

Defendants' portrayal of Ms. Fairstein in the Series is reasonably susceptible of defamatory meaning. *See* Compl. ¶¶ 44-130. A viewer could reasonably draw the false conclusions that Ms. Fairstein: (i) was in charge of every aspect of the case against The Five, from the first steps of the investigation in the Park and through the trials, including coerced confessions and a faulty timeline of the attacks; (ii) acted unethically, if not illegally, in her attempts to obtain evidence to prosecute a baseless case against innocent young men of color; (iii) always knew that one person was responsible for the rape but—fueled by racist motivations against young men she deemed to be "thugs" and "animals"—she forced ADA Lederer to prosecute the innocent; and (iv) attempted to cover up her misconduct, which was brought to light by ADA Ryan's 2002 reinvestigation.

Defendants' portrayal of Ms. Fairstein is defamatory on its face and is not, as Defendants contend, the result of any "strained interpretation." MTD, at 14-15, 22-24. Defendants' portrayal

of Ms. Fairstein constitutes defamation *per se* because it indisputably exposed Ms. Fairstein to

"public hatred…ridicule, aversion…[and] disgrace" and "induced an evil opinion of [her] in right-

thinking persons." *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 154 (S.D.N.Y. 2016). *See* Compl. ¶¶

232-57; PX67-77. Ms. Fairstein has also suffered injury to her professional reputation. *Id. See*

*Greenberg v. Spitzer*, 155 A.D.3d 27, 47 (2d Dep't 2017) (words that impute fraud, dishonesty,

misconduct or unfitness in conducting one's profession are actionable); *Sheridan v. Carter*, 48

A.D.3d 444, 446-47 (2d Dep't 2008) (statements depicting plaintiffs as racists were "clearly"

defamatory *per se*); *Pezhman*, 29 A.D.3d at 167 (describing plaintiff as "drug-induced racist" was

defamatory *per se*).[35] Ms. Fairstein need not establish that she was depicted violating the law in

order to plead a claim of defamation *per se*. *See* MTD at 22-26. Defamation *per se* includes

statements which accuse attorneys of "a lack of character or a total disregard of professional

ethics." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 518 (S.D.N.Y. 2017). This is precisely

the case here. *See* False Portrayals 1-11.[36]

## V.    Defendants' False and Defamatory Portrayal of Ms. Fairstein is Not Protected Opinion

When determining whether a statement is actionable fact or non-actionable opinion three

factors are generally considered by New York courts: 1) whether the specific language in issue has

a precise meaning which can be readily understood; 2) Whether the statements are capable of being

proven true or false; and 3) whether either the full context of the communication in which the

---

[35] Plaintiff respectfully submits that, in the event the Court does not find that she has pled defamation *per se* with respect to any particular scene in the Series, that she has also pled defamation *per quod*. *Daragjati v. NYP Holdings, Inc.*, 38 Misc. 3d 1221(A) at * 2 (2013) (for libel *per quod* cause of action, defamatory import is projected through reference to facts extrinsic to the communication); *Elhanafi v. Fox Television Stations, Inc.*, 37 Misc. 3d 1232(A) at * 5 (2012) (same). *See* Complaint, Counts II, IV and VI.

[36] Defendants baldly assert that the Series is not defamatory because it portrays Ms. Fairstein "expressing views she has publicly championed for decades." MTD at, 15-17, 20-21. As discussed at length, *supra* Points III and IV, this is not at all the manner in which Ms. Fairstein is portrayed.

statement appears or the broader social context and surrounding circumstances[37] are such as to signal to a viewer that what is being viewed is likely to be opinion, not fact. *Restis v. American Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718-19 (S.D.N.Y. 2014). Defendants focus on the third factor in arguing for dismissal of Ms. Fairstein's defamation claims.[38] MTD, at 12-13, 18-21, 26; Ex. B. With respect to the third factor, "[a]t bottom, the inquiry is whether a reasonable [viewer] is likely to have understood the statements as conveying provable facts." *Restis*, 53 F. Supp. 3d at 719.

It cannot be disputed that viewers of *WTSU* understood Defendants' false portrayal of Ms. Fairstein as conveying provable facts. *See Palin*, 940 F.3d at 816 (social media backlash suggested that readers of article perceived false statements as fact-based). Viewers of the Series believed that *inter alia* Ms. Fairstein: a) "made innocent children go to jail;" b) "prosecuted the five" and "targeted" "young Black people;" c) saw "only one set of footprints…knew better from the outset;" and d) "falsely and unfairly pushed the case forward against the …Five." Compl. ¶ 237; PX69. *See* PX70-77. This is not surprising as Defendants marketed and promoted the Series as a true story, grounded in their review of records from the original investigation and trials. Compl. ¶¶ ¶¶ 163, 166-67, 171-79, 181, 184, 187, 197, 200-222; PX63-66. Per Ms. Locke, the Series is "one of the most accurate portrayals of a true story" because Ms. DuVernay and "team took the truth as [their] bible." Compl. ¶ 197; PX65. *See Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995)

---

[37] Defendants ignore this aspect of the New York test to incorrectly assert that statements made outside the Series cannot govern whether the Series is non-actionable protected speech. MTD, at 13 n. 13 (citing *Lovingood*, 800 Fed. App'x at 847). *Lovingood* addressed the parties' dispute over how the film's genre was to be formally characterized. *Id.* In addressing this issue (true story v. docudrama) the court found that "the perspective of the reasonable viewer encompasses more than a one- or two-word label; it looks to the film itself." *Id.* Notably, the plaintiff's defamation action in *Lovingood* survived a Rule 12(b)(6) motion. *Lovingood v. Discovery Comm'ns*, 2015 WL 5719169, at *3-6 (N.D. Ala. Sept. 30, 2015). *See Palin v. The New York Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019) (considering social media backlash); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *13 (N.D. Ga. Feb. 12, 2008) (considering DVD cover).

[38] As discussed at length *supra* Points III and IV, the scenes at issue are readily capable of being proven false and have a precise meaning that can be readily understood.

(First Amendment does not shield "from scrutiny…every statement made in a docudrama [and]…authors must attempt to avoid creating the impression they are asserting objective facts."); Gorycki Decl. Ex. F, *Reid v. Viacom Int'l Inc.*, No. 1:14-cv-01252, ECF No. 138, Sept. 14, 2016 Order ("*Reid* Order"), at 12 n. 7 (declining to apply a "more relaxed 'docudrama' standard" where movie was billed as a true story and nothing about its context "would convince a viewer that it represented anything other than facts or events").

The Series contains no prominent disclaimer which cautions viewers that it is a fictionalization. Compl. ¶¶ 224-231. A viewer can only see the disclaimer if he or she elects to watch the credits at the end of an episode. *Id.*[39] The disclaimer appears at the end of the credits and is barely legible. *See Stanton v. Metro Corp.*, 438 F.3d 119, 125-26 (1st Cir. 2006) (disclaimer that could be overlooked by readers not basis for dismissal); *Thoroughbred Legends,* 2008 WL 616253, at *13 (disclaimer at end of film credits insufficient to alert viewers that film was a docudrama); *Martin v. Johnson Pub. Co.*, 157 N.Y.S.2d 409, 411 (Sup. Ct. 1956) (disclaimer in "fine print" did not preclude defendant's liability for libel); Restatement (Second) of Torts § 564, cmt. d ("The fact that the…producer states that his work is exclusively one of fiction and in no sense applicable to living persons is not decisive if [viewers] actually and reasonably understand otherwise.")

For these reasons, the Series is not, as Defendants contend, merely "a dramatization with a clear point of view."[40] Ex. B ("Scenes" 6-8, 10-11, 29). *See* Gorycki Decl., Ex. D, 11/16/20 Tr., at 17:1-13. There is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990); *Restis*, 53 F. Supp. 3d at 723. *See Lovingood*, 800 F. App'x 848 (no "invincible shield of protection" for docudrama); *Reid &*

---

[39] The copy of the Series provided to the Court does not accurately convey this Netflix-specific viewing feature.

[40] Indeed, *WTSU* was released worldwide to millions of Netflix subscribers as opposed to a group of "interested parties" with a "well-developed understanding of the issues raised" who would view the Series as expressing an opinion. *Egiazaryan*, 880 F. Supp. 2d at 512-13. Compl. ¶¶ 175, 184.

*Assocs.*, 2020 WL 1330657, at *8 (labeling something as "fictitious" will not insulate it from a defamation action). Indeed, Defendants accusations throughout the Series that Ms. Fairstein engaged in criminal or unethical conduct, and acted without professional integrity, are expressions of fact, not opinion, that are susceptible of proof. *Restis*, 53 F. Supp. 3d at 721-22. *See* False Portrayals 1-11.

Assuming *arguendo* that Defendants' depiction of Ms. Fairstein did constitute an opinion, Ms. Fairstein's defamation claims remain actionable because she alleged that the opinions set forth in *WTSU*, and the facts upon which they are based, are false. *Restis*, 53 F. Supp. 3d at 719 (citing *Dworin*, 2008 WL 508019, at *3). The Series depicts Ms. Fairstein, using her true name, as a "racist, unethical villain who is determined to jail innocent children of color at any cost," (Compl. ¶ 9), who "singlehandedly masterminds a theory of the case against the children," (*Id.* ¶ 10), which makes her "morally and legally culpable" for what happened to The Five (Compl. ¶ 12). The Complaint then details the fabricated scenes upon which these false opinions are based. Compl. ¶¶ 44-130. *See* False Portrayals 1-11. Ms. Fairstein further alleged that Defendants, had knowledge of the falsity of the manner in which they depicted Ms. Fairstein. Compl. ¶¶ 11, 14, 163, 174, 177, 179, 192, 264, 281, 298, 320-21, 344, 364.[41]

Defendants' portrayal of Ms. Fairstein as the mastermind behind a racist plot to convict innocent children cannot be discounted as mere "hyperbolic language." MTD, at 27. In making this argument, Defendants unconvincingly parse the scenes at issue, divorcing dialogue from the overall context of the Series. MTD, at 26-29. Viewers would not understand that Ms. Fairstein was

---

[41] Defendants' portrayal of Ms. Fairstein could also constitute mixed opinion because the Series purports to convey the perspective of The Five, whom viewers would perceive as having firsthand knowledge of the events portrayed in the Series. For this reason, viewers could assume that Defendants' false portrayal of Ms. Fairstein is based on facts which are unknown to the viewer. *Restis*, 53 F. Supp. 3d at 719. *See, e.g.*, Compl. ¶ 173 ("The Story you know is the lie they told you. 30 years ago. Tonight…the real story of The…5 told by the falsely imprisoned men themselves.")

"deeply upset" and "committed to …getting justice for the jogger." *Id.* Viewers **actually understood** Ms. Fairstein as engaging in unethical conduct and pursuing a racist agenda which targeted innocent children of color. Compl. ¶ 237; PX69 (referring to Ms. Fairstein as "racist bitch," "racist asshole," "ruining the lives of young Black people she targeted" "weaponize[ing] unjust system to attack Black people").

Defendants' argument that False Portrayal 6, in which Ms. Fairstein orders a roundup, merely depicts Ms. Fairstein directing the NYPD to speak to persons of interest is incredible. MTD, at 27. Defendants ignore that, at this point in the Series, the viewer has seen Ms. Fairstein unlawfully questioning unaccompanied minors, referring to young men of color as "animals," fighting with ADA Ryan, who believes the young men did nothing more than harass people, and manipulating the timeline in order to pin the Meili attack on The Five (all of these scenes being entirely false). In the scene, Ms. Fairstein tells police to get "an army" up to Harlem, to invade the homes of people of color living in the projects and to stop "every little thug,"[42] without probable cause, because "every kid" is a suspect. Compl. ¶ 97. This portrayal, in context, goes well beyond words with "subjective, relative meaning" or merely "characterizing" Ms. Fairstein as racist. MTD, at 28. *See Restis*, 53 F. Supp. 3d at 720-22; *Gross v. NY Times*, 82 N.Y.2d 146, 155-56 (1993); *Sheridan*, 48 A.D.3d at 447.[43] This is archetypal racist conduct that is capable of being proven true or false and is, therefore, actionable. *LaLiberte v. Reid*, 966 F.3d 79, 92 (2d Cir. 2020);

---

[42] Defendants' contention that today's viewing audience would not perceive the word "thug" as a racist code word because, on one occasion in 1989, Ms. Fairstein may have referred to white male Robert Chambers as a thug is unavailing because (i) as repeatedly discussed above, the audience's reaction to Defendants' portrayal of Ms. Fairstein in the Series has been clear; (ii) viewers of *WTSU* would not necessarily be familiar with the Chambers case; and (iii) in today's parlance, and as alleged in the Complaint, the word "thug" has a derogatory and hateful meaning when used in reference to people of color. Compl. ¶ 103; PX40. DX17 is not subject to judicial notice and, even if it were, it would not be dispositive at this stage of the proceedings. *Ace Arts, LLC*, 56 F. Supp. 3d at 442.

[43] *Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018) is inapposite. MTD, at 28. In *Mirage*, the statement at issue could not be objectively quantified by a jury. *Id.* There is also no comparison between the allegation made in *Barbash* that the plaintiff was depicted as a "cold individual…indifferent to the health of others" and the manner in which Ms. Fairstein was portrayed in *WTSU*. *See* MTD, at 28.

*Chef's Warehouse, Inc. v. Wiley*, 2019 WL 4640208, at *9 (S.D.N.Y. 2019); *Guerrero v. Carva*, 10 A.D.3d 105, 113 (1st Dep't 2004); *Scott v. Cooper*, 226 A.D.2d 360, 360-61 (2d Dep't 1996); *Sheridan*, 48 A.D.3d at 447.[44]

Defendants rely on *Reid & Assocs.*, throughout their brief to argue that the Series is protected opinion. Though *Reid* concerned *WTSU*, the similarities end there. The plaintiff, the creator of an interrogation method known as the Reid Technique, claimed it was defamed by a single scene, comprised of two lines of dialogue during a "bar-room back and forth" in which ADA Casolaro accuses Detective Sheehan of using the "universally rejected" Reid Technique. 2020 WL 1330657, at *2-3. The court held that the phrase "universally rejected" constituted "non-verifiable hyperbole in the mouth of a fictionalized character with an axe to grind." *Id.* at *8. Unlike *Reid*, the scenes at issue in this case are verifiable as true or false. Moreover, the words at issue are placed in Ms. Fairstein's mouth. In the few instances in which the words are being said to Ms. Fairstein (*e.g.* ADA Ryan telling Ms. Fairstein that *she* "coerced those boys"), they are also capable of being proven to be either true or false.[45]

Ms. Fairstein has not "repeatedly used…assorted 'dehumanizing' verbiage in condemning [The Five]." MTD, at p. 26. Ms. Fairstein's **1993** reference to the Central Park jogger being attacked by "vicious marauders"[46] is not the equivalent of "dehumanizing children of color by referring to them as 'animals,' while trying to create support among police officers for a weak case." Compl. ¶ 95; PX21 (NPR interview). In both post-conviction statements that use the term "wilding," Ms. Fairstein uses the term in quotes, signaling that she is not personally adopting the

---

[44] *Edelman v. Croonquist*, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010), is distinguishable from the present case because the defendant disclosed truthful facts on which her opinion was based.
[45] In *Egiazaryan*, the statements at issue were "hyperbole laden" and contained in sources which clearly expressed a partisan viewpoint. 880 F. Supp. 2d at 507-512. Certain statements at issue in *Egiazaryan* could have been actionable but, unlike Ms. Fairstein, the plaintiff admitted that they were substantially true. *Id. Dworin* also concerned non-verifiable hyperbole. 2008 WL 508019, at *4.
[46] ADA Ryan described the events in the Park in precisely this manner. *See* PX31, ¶¶ 109-113; Compl. ¶ 93.

phrase. DX1, at NYCLD_039827; DX9. Ms. Fairstein has not alleged that she never used the term wilding subsequent to the case against The Five. Compl. ¶¶ 68, 74, 76. Defendants misquote Ms. Fairstein's statements in DX7. The word "sociopath," expressly referring to Matias Reyes, appears in the second paragraph, while the reference to "acting in concert" is addressed in the tenth paragraph with respect to an "unknown man."

For the reasons set forth above, the Series is certainly not "a non-defamatory reflection on [a] disastrous chapter of our nation's…history" which holds a defamatory meaning only for Ms. Fairstein. MTD, at 30. Nor does the Series merely "echo" or "amplify" the "voices of critics." MTD, at 30. *See* False Portrayals 1-11. That Ms. Fairstein was allegedly "the subject of controversy and criticism" is not dispositive. MTD, at 30. To the extent that Defendants relied on defamatory materials in creating *WTSU*, and republished any defamatory statements about Ms. Fairstein, they would still be liable for defamation. *See Cianci v. NY Times*, 639 F.2d 54, 60-61 (2d Cir. 1980); *Watson,* 439 F. Supp. 3d at 161; PX59.

Defendants did not merely portray Ms. Fairstein as ***helping*** lead the prosecution against The Five. MTD, at 29. They falsely portrayed her—from the first scene in the Series in which she appears onward—as the "singular mastermind behind a racist plot to obtain convictions of The Five at any cost," (Compl. ¶ 46), who was responsible for every aspect of the case against The Five, including the prosecution. *Id.* ¶¶ 44-130. As a result of watching *WTSU*, viewers now believe this to be the case.[47] *Id.* ¶¶ 232-257; 67-77. *See Palin*, 940 F.3d at 816.[48]

---

[47] *Chau v. Lewis*, 771 F.3d 118, 132 (2d Cir. 2014), does not support Defendants' assertion that "[s]trong public reaction to the Series cannot be used to establish defamation." MTD, at 30.

[48] Plaintiff is not asserting defamation claims based on Defendants' social media posts. The posts have been included in Plaintiff's pleading for more than their "shock value." They demonstrate the manner in which Defendants marketed and promoted *WTSU*, the sources that Defendants claim to have reviewed when creating the Series and that Defendants encouraged the public's backlash against Ms. Fairstein. Compl. ¶¶ 152-99; PX63-66.

## VI.      Ms. Fairstein Has Alleged A Conspiracy Claim

Ms. Fairstein alleges a conspiracy grounded in the underlying tort of defamation, as permitted under New York law. *Watson*, 439 F. Supp. 3d at 167; *World Wrestling Fed. v. Bozell*, 142 F. Supp. 3d 514, 532-33 (S.D.N.Y. 2001) ("*WWF*"). The plaintiff must allege the primary tort, plus 1) an agreement between two or more parties; 2) an overt act in furtherance of the agreement; 3) the parties' intentional participation in the furtherance of a plan or purpose; and 4) resulting damage or injury. *WWF*, 142 F. Supp. 3d at 532. As detailed above, Ms. Fairstein has alleged defamation claims against each defendant. She also alleged an agreement between Defendants, who collaborated on the Series, to create "one clear and unmistakable villain to be targeted for hatred and vilification for what happened to The Five." Compl. ¶¶ 2-3, 12, 44-130, 144, 149, 164, 177, 185-86, 195, 197-199, 221-222, 230, 377. Defendants' overt acts in furtherance of the conspiracy were (i) publication of the Series (*Id.* ¶¶ 1-2); and (ii) marketing and promoting the Series as a true story even though Defendants knew their portrayal of Ms. Fairstein in the Series bore no relationship to her actual role in the case against The Five. (*Id.* 165-223, 259, 276, 294, 316, 378). Defendants' intentional participation in the plan to defame Ms. Fairstein is evidenced by (i) prominently featuring Felicity Huffman, portraying Ms. Fairstein, in Netflix trailers for *WTSU* (*Id.* ¶¶ 103, 165-66) and (ii) their public statements about Ms. Fairstein and the Series. *Id.* ¶¶ 152-64, 178, 181-83, 185-99, 188, 191, 195, 197, 376. Ms. Fairstein has also alleged damages. *Id.* ¶¶ 232-74, 379. *See* PX58-77.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Court deny Defendants' Rule 12(b)(6) motion, along with such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 29, 2021

                     Respectfully Submitted,

                  By:   /s/ Andrew T. Miltenberg
                       Andrew T. Miltenberg
                    Kara L. Gorycki
                    NESENOFF & MILTENBERG, LLP
                    363 Seventh Avenue, Fifth Floor
                    New York, New York 10001
                    (212) 736-4500
                    amiltenberg@nmllplaw.com
                    kgorycki@nmllplaw.com

                    *Attorneys for Plaintiff Linda Fairstein*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2021 a true and correct copy of the foregoing was served by CM/ECF on all counsel of record on the service list.

/s/ Kara L. Gorycki