# Exhibit 4

Peo - Honeyman - Dir                        1735

THE COURT:    Take another short recess.
Please, don't discuss the case.

(Whereupon, the jury leaves the courtroom
for recess)

          *     *     *     *

(Whereupon, after the recess, the following
occurs)

THE COURT:    Bring the jury in.

(Whereupon, the jury reenters the
courtroom)

COURT CLERK:    The defendants, their
attorneys, and assistant district attorneys,
and all sworn jurors are present.

THE COURT:    Call your next witness, please.

MS. LEDERER:    Detective Honeyman.

(Whereupon, the witness  enters the
courtroom)

COURT OFFICER:    Place your left hand on
the bible, raise your right hand, face the
clerk.

COURT CLERK:    Do you solemnly swear that
the evidence you give this court and jury will
be the truth, the whole truth, and nothing but
the truth, so help you God?

NYCLD_019626

Peo - Honeyman - Dir                1736

THE WITNESS:  I do.

COURT OFFICER:  Detective, in a loud,
clear voice, for the record, give your full
name, spelling your last name, and your shield
number and present a ssignment.

THE WITNESS:  Yes.

D E T E C T I V E   R O B E R T   H O N E Y M A N,
Shield Number 53, assigned to Crime Scene Unit,
called as a Witness by the People, having been duly
sworn, tes tified as follows:

DIRECT EXAMINATION

BY MS. LEDERER:

Q     Detective, how long have you been with the
New York City police department?

A   Approximately 17 years.

Q     And, how long have you been assigned to the
Crime Scene Unit?

A   Approximately six years.

Q     Could you describe for the members of the jury
what the duties and re sponsibilities are of a detective
with the Crime Scene Unit?

A   The duties and responsibilities of a Crime Scene
detective is to respond to the different locations and
photograph the scenes; also, to gather and package

Peo - Honeyman - Dir                          1737

the evidence.

    Q    Were you working on the morning of April 20, 1989?

A   Yes, I was.

    Q    What tour of uty did you do?

A   I did a tour of 11:15 on the 19th through 7:30 the morning on the 20th.

    Q    Did there come a time on the morning of April 20, 1989, that you received an assignment?

A   Yes, there was.

    Q    And, from whom did you receive the assignment; if you recall?

A   We received it from Night Watch.

          MR. MOORE:   Objection to "we."

          THE COURT:   You?   You got an assignment from Night Watch?

          THE WITNESS:   Right.

    Q    As a result of that assignment, where did you go?

A   We were told to respond to Central Park.   The exact location is, on the 102 Cross Drive between the East and West Drives.

    Q    Did you go to that location, then?

A   Yes, I did.

NYCLD_019628

Peo - Honeyman - Dir                 1738

Q     About what time did you arrive at 102 Cross

Drive in Central Park?

A     Approximately 4:00 o'clock in the morning.

Q     Where did you go on the Cross Drive, if you

recall, when you first arrived there?

A     It was approximately near a light post, marked 206.

Q     When you went to Central Park on that morning,

did you go alone or with someone?

A     I went with my partner.

Q     When you arrived there, did you see anybody on

the Cross Drive in Central Park?

A     Yes.

Q     And, who did you see?

A     Night Watch detectives.

Q     Do you recall which detectives you saw, then?

A     Sergeant Duffy from the Night Watch, and, also,

Detective Gilner.

Q     Did you have a conversation with either or

both of those officers at that time?

A     Yes.  Both of them.

Q     About how long did you speak to them?

A     Approximately half hour.

Q     In the course of your speaking to them, or, as

a result of your speaking to them, where did you go?

Peo — Honeyman — Dir                                1739

A    They showed me a location, approximately in the center

of the Cross Drive, adjacent to that light post, CO 206.

Q    And, when you looked at that direction, they

directed you to, what, if anything, did you see?

A    Appeared to be two locations of blood that were on the

Cross Drive.

Q    Did you do anything with respect to the possible

blood that you saw on the roadway at that time?

A    Yes, I did.

Q    Will you tell the members of the jury, please,

what you did?

A    I did field tests on the blood.

Q    How is that performed?

A    Basically, the field tests consist of a test tube

with capsules on either side of the test tube.

Q    And, what did you do, at that time?

A    I took a cotton swab, dabbed it in the solution on

the Cross Drive, and placed it inside the test tube.

Broke both capsules, mixed it with chemicals, turned a

blue green, indicating it was a positive for blood.

Q    The field test you just described, does that

distinguish whether it is human or animal blood?

A    No, it does not.

Q    What, if anything, did you do after you obtained

NYCLD_019630

Peo – Honeyman – Dir                    1740

the result that you just indicated?

A    They directed my attention to an area just north
of where the blood was, an area where the ground cover was
matted down.

I went from there to a location into the woods.

Q    When you say you saw an area where the ground
cover was matted down, what exactly did you see?

A    The area was approximately 16 to 18 inches in width.
It was apparent drag marks that went from the northern
end of the Cross Drive to a tree that I later marked
Reference Tree H-1.

Q    After you surveyed that area together with
Sergeant Duffy and Detective Gilner, where did you go?

A    They took me to a location just on the north side
of that reference tree, H-1.    They showed me a car that
was into the wood, with its headlights on.

They told me, "that's where the victim was found."

Q    Where was the car you saw?

A    The car was deep in the woods. From there, I went
back to the Cross Drive, and we got into our own vehicle
and drove through a clearing to that area.

Q    When you arrived at that location, did you see
any uniformed officers?

A    Yes, I did.

Peo - Honeyman - Dir    1741

Q    Do you know the names of any of the uniformed officers?

A    Police Officer Walsh was guarding the scene.

Q    Did you walk around the area down below where Officer Walsh was?

A    Yes, I did.

Q    And, did you have a conversation with Officer Walsh?  At that time?

A    Yes, I did.

Q    After you had been at the area where you saw Officer Walsh, where did you go?

A    Got back in the car and drove it back up to the Cross Drive.

Q    Approximately how long were you in the area where Officer Walsh was?

A    About twenty minutes.

Q    And, when you returned -- (withdrawn) -- When you say you drove back up, where did you go?

A    I went to the location where I originally had taken the field tests on the blood.

Q    What did you do at that time?

A    I then took a blood sample from that same location.

Q    Would you describe for the members of the jury how you took a blood sample?

1742

Peo – Honeyman – Dir

1 

2  A    The blood sample I took;  I took a cotton swab, dabbed

3  it into the possible blood.    I then put it in the filter

4  paper that was then folded, put it into a brown envelope,

5  then sealed it.

6      It was given a run number.   A date.  And, my name.

7      Q     Will you tell the members of the jury what is

8  a run number?

9  A    A run number is a qualification given from my office

10  to the number of jobs that are going out during the

11  course of the year.

12      Q     Was a number assigned to this case, at that time?

13  A    Yes, there was.

14      Q     And, what number was the run number assigned

15  to this case?

16  A    The run number was 89 slash, indicating year, 941.

17      Q     After you packaged that sample, did you assign

18  a reference number to it?

19  A    Yes, I did.

20      Q     And, how did you mark it?

21  A    That reference was H-1.

22      Q     What did you do with it after you packaged it

23  the way you've described and marked it as you've described?

24  I put it in my pocket.

25      Q     Where did you go after you had taken the sample

NYCLD_019633

Peo - Honeyman - Dir                    1743

you've just described?

A    I held the scene.    Let nobody else come in or out of
that location.

Q      What were the conditions like at the 102nd
Cross Drive when you were there that morning?

A    That morning, the lighting conditions was poor.
The area was very large. In order to do the job properly,
I decided to hold the scene.

Q      Did you return to the lower roadway where you
had seen Officer Walsh?

A    Yes, I did.

Q      Did you give  Officer Walsh any instructions?

A    Yes, I did.

Q      What?

A    I told him to hold the scene; not to let anyone
anywhere near the area.

Q      Did you receive anything from Officer Walsh?

A    Yes, I did.

Q      What was that?

A    At that time, he handed me a plastic bag containing
a piece of garment.

Q      After you received that from Officer Walsh, where
did you go?

A    I then proceeded to go to Metropolitan Hospital.

NYCLD_019634

1744

Peo - Honeyman - Dir

Q    When you arrived at Metropolitan Hospital, what did you do?

A    I went to the Emergency Room.   There was a vacant room right off the Emergency Room.   I decided to use that. I went inside to the examining table and took a couple pieces of wax paper off the examining table and placed it on the floor.

I then continued to open up the bag, which contained a shirt.

Q    What did you do after you removed the shirt?

A    I placed it on the wax paper and I then photographed it.

Q    What was the condition of the shirt when you took it out of the bag?

A    The shirt was blood soaked.   It was inside out.   The sleeves were twisted, and, it was in a half-knot shape.

Q    I'd ask if the witness could please be shown what's received as People's 36 in evidence.

Do you recognize what that is?

A    Yes, I do.

Q    And, what do you recognize it to be?

A    This is the blood-soaked shirt that was in the bag that I examined on the floor of the Emergency Room.

Q    You indicated that when you first took it out of

NYCLD_019635

Peo - Honeyman - Dir                    1745

the bag, it was tied in some fashion.

Would you demonstrate for the members of the jury,
as best as you can, how it was when you took it out of
the bag?

A    These sleeves were twisted in a rope-type fashion.
(demonstrating)

Q    If you could just hold that up  so the members
of the jury can see what you've done with the shirt?

A    (indicating)

Q    When you took it out of the bag, did you untie
that knot?

A    Yes, I did.

Q    Did you examine the shirt?

A    Yes, I did.

Q    If I may for a moment?

A    (handing)

Q    Was the shirt inside out or right side out
when you received it?

A    The shirt was inside out.

Q    And, when you examined the shirt, what, if
anything, did you notice about it?

A    The brand name on it was Skinners.   Also, the logo
on the front of the shirt, CCE, indicating Coca Cola
Enterprise.

NYCLD_019636

Peo - Honeyman - Dir                1746

1

2     Q      Did you notice anything about the fabric of the

3     shirt when you examined it?

4     A    The fabric was blood soaked.

5         Q      Was there any damage to the shirt when you looked

6     at it?

7     A    Yes, there was.

8         Q      What did you see when you looked at the shirt?

9     A    Half inch hole, possible, center chest.    Possibly

10    two smaller holes.

11        Q      Ask that you show the members of the jury what

12    you're referring to?

13    A    (indicating)    CCO.    Logo.

14        Q      Thank you.

15            I'd ask if the witness could please be shown

16    People's 37 in evidence?    (handing)

17            Detective, do you recognize what People's 37

18    in evidence is?

19    A    Yes, I do.

20        Q      And, what is that?

21    A    This is a photograph I took on the floor of the

22    Emergency Room.

23        Q      Did you take that photograph on the morning of

24    April 20, 1989?

25    A    Yes, I did.

NYCLD_019637

Peo – Honeyman – Dir                      1747

Q     And, is that a photograph of the shirt that's
immediately in front of you?

A     That's correct.

Q     Is that the way the shirt looked on the morning
when you took it out of the bag and unwrapped it?

A     Yes, I t was.

Q     After you finished photographing the shirt, what
was the next thing that you did?

A     I packaged up the shirt.    I used the same was paper
I had to roll it up twice, so it wouldn't leak through the
bag.     From there on, it would be transferred over to the
other police officers.

I didn't want it dripping on anybody.

          MR. MOORE:    Objection.

          THE COURT:   I'll allow it.

Q     After you packaged the shirt, what did you do?

A     I went to see the victim.

Q     Were you able to see the victim at that  time?

A     No, I wasn't.

Q     Approximately what time was it when you first
arrived, just before you photographed the shirt?

A     First photographed --

Q     At Metropolitan Hospital?

A     Probably about ten after five.

NYCLD_019638

Peo – Honeyman – Dir                    1748

Q     After you attempted to see the victim but were unable to do so, what did you do?

A     I returned to the park.   Prior to my arrival at the park, I stopped at a phone.   I called radio, and requested a helicopter.

I told them I wanted them to search the northern end of the park.   Also, I wanted them, also, to take aerial photographs.

Q     Did you then return to Central Park?

A     Yes, I did.

Q     And, where did you go within Central Park?

A     I went to 102nd Cross Drive.

Q     I'd ask if you would, for a moment, step down and see what's been received as People's 2 in evidence.

(Whereupon, the witness leaves the stand)

Q     If you could just point, for a moment, and show the members of the jury where you went in Central Park on the morning of April 20th?

A     The location where I went was approximately right about here, on the Cross Drive.

Q     If I could ask, please, that People's 3 in evidence be put on the easle  --  Just for a moment, I'd ask you to just, for a moment, take a look at People's 3 in

NYCLD_019639

Peo - Honeyman - Dir                    1749

evidence; do you recognize what's depicted in People's 3

in evidence?

A    Yes, I do.

     Q    And, what is depicted in People's 3 in evidence?

A    This is a more detailed area.

               THE COURT:    Maybe you can come around

          this side of the photo, if you can, so you

          don't block the jurors' view.

A    This is a more detailed map of that same location

showing the 102nd Cross Drive, over here, with the West

Drive here.  (indicating)

     Q    And, is that a more detailed map of the area
     surveyed
you examined on the morning of April 20th and the days

subsequent thereto?

A    Yes; that's correct.

     Q    If we could ask, please, to take People's 2

down, and replace it with People's 3?

               COURT OFFICER:   (complying)

     Q    Detective, what were the lighting conditions

like on the Cross Drive, Central Park, on the morning

of April 20th, when you returned from Metropolitan

Hospital?

A    They were getting better.

     Q    And, did you take any photographs at that time?

NYCLD_019640

Peo – Honeyman – Dir          1750

1
2    A    Approximately 6:30 I started taking photographs.

3         Q    I'd ask you, if you can, take a moment and look
4    at what has previously been marked People's 85 through 105?
5                   THE COURT:   What was the first number?
6                   MS. LEDERER:    83.
7         Q    People's 83 through 105 for identification?
8    A    (complying)
9         Q    Do you recognize People's 83 through 105 for
10   identification?
11   A    Yes, I do.
12        Q    Are those photographs you took on the morning
13   of April 20th in Central Park in the area of 102nd
14   Cross Drive and north of that area?
15   A    Yes.
16        Q    Do those photographs fairly and accurately
17   reflect the way that area in Central Park looked on the
18   morning of April 20, 1989?
19   A    Yes.
20        Q    Thank you.
21                   MS. LEDERER:    At this time, I offer
22        People's 83 to 105?
23                   THE COURT:   Any objection, Mr. Diller?
24                   MR. DILLER:   No.
25                   THE COURT:   Counsel?

Peo - Honeyman - Dir   1751

MR. MOORE:   No.

THE COURT:   They will be marked later, in evidence.

Q    Can I just have the photographs for a moment?

COURT OFFICER:   (handing)

Q    Detective, with the Court's permission, I would ask you to please step down and approach People's 3 in evidence?

(Whereupon, the witness leaves the stand)

Q    Let me hand you a red pen and I would ask you to mark in red ink, with two X's, where you saw the spots of blood on the roadway on the morning of April 20th?

A    (complying)

Q    As you do so, if you will describe for the Court and the members of the jury where you're marking?

A    The two areas of blood that were on the Cross Drive were approximately 17 feet west of the light pole 206 located here and approximately   center of the Cross Drive.

Here, and here.   (indicating)

Q    Detective, prior to coming to Court today, did you have occasion to examine the exhibit, People's 3 in evidence?

A    Yes, I did.

Q    And, did you have occasion to also examine that exhibit with the use of a ruler?

A    Yes, I did.

Q    And, at the time that you looked at it with a ruler, did you make use of a scale, one inch is twenty feet, as marked on the bottom of People's 3?

A    Yes, I did.

Q    I'd like to direct your attention to what's been received as People's 83 in evidence?

COURT OFFICER:   (handing)

Q    Would you describe for the members of the jury what is depicted in that photograph?

A    As depicted in Photograph 83, the blood, possible blood stains, here and here.   Just south of the northern end of the Cross Drive.

This comb was placed there by me.   Indicating the blood; also another comb placed here prior to the photographs.

Q    When did you place the comb that's depicted in that photograph and the other comb that isn't shown there, as you've just described?

A    Before I took the photographs of this area, as well as the rest of the park, I would place the comb and car.

Peo – Honeyman – Dir                    1753

Q      What time on April 20th did you place the comb
in those spots?

A      Approximately 6:20.

Q      I'd ask you to please look at what's been
received as People's 84 in evidence, and describe for
the members of the jury what's depicted in People's 84?

A      As depicted in this photograph, it was a ground cover
directly on the north end of the Cross Drive.   This
light post is CO 206.

What's visible in this photograph of the drag marks
leading from the northern end of the Cross Drive to a
tree later marked, Reference Tree H-1.

Q      Drag marks depicted in People's 84?   Tell the
members of the jury where these drag marks appear?

A      These drag marks are directly here, just on the
northern end of this comb.   They were consistent, from
there to the tree.

Q      Ask you if you could also describe for the
jury what's depicted in People's 85 and 86 in evidence?

A      85 is a close up of the ground cover; basically
standing a little bit closer to the ground cover showing
is the distance here back to Reference Tree H-1.

You can see the drag marks leading from the
ground cover to here.   And, depicted here.

NYCLD_019644

86 is a close up of the drag marks where the scale
or ruler from one end over distance across, approximately
eighteen inches.

Q    Was that ruler there when you got there on
April 20th?

A    Yes.

Q    Who else is depicted there?

A    That was my partner putting the ruler.

Q    Ask that you approach People's 3 in evidence;
draw with that red marker where the drag marks appear?

            (Whereupon, witness leaves the

            stand)

A    The drag marks depicted in these photographs are
on an arch to the 102nd Cross Drive.   Just adjacent
to light post 206.

Q    Approximately how long was that distance from the
tree you've indicated as H-1 to the edge of the roadway?

A    The distance from H-1 to the northern end of the road-
way was 78 feet.

Q    If you would describe for the members of the jury
what's depicted in People's 87 in evidence?

A    Depicted in 87 is the back end of those drag marks
as depicted in Photograph 85.   It is from this area to
the tree.   You can see just at the lower end of the grass

Peo – Honeyman – Dir                    1755

or the green-grass covering, showing two tracks leading

from there to the Reference Tree H-1.

Q    You're indicating a tree in People's 87;   would

you point that out?

A    Reference Tree H-1.

Q    When you say, Reference Tree H-1, is that a number

or some identifying reference that you assigned to that

tree?

A    Yes, it is.

Q    The drag marks that are depicted in the ground

cover as shown in People's 84, approximately how long was

the mark through the grassy cover before it became the

dirt as depicted in People's 87?

A    The distance between the northern end of the Cross

Drive to approximately the end of the green grass was

approximately 40 feet.

Q    And, what's the distance where the ground cover

ended to the tree, H-1?

A    This area from the northern end of the green is

approximately 35 feet.   Depicted in 87.   Also, you can

see it a little bit better in 85, from here to the tree.

Q    Describe for the members of the jury what's

depicted in People's 88?

A    This is a photograph facing north, just on the north

Peo - Honeyman - Dir                    1756

side of Reference Tree H-1.

Q    Would you indicate where that is on People's 3
in evidence?

A    That location just this side of that black dot, which
is Reference Tree H-1.

Q    What's shown in People's 89 in evidence?

A    89 is a close up of the same area, directly on the
north side of Reference Tree H-1.   These three rocks
that are visible in Number 88 are shown a little bit
more closer detail in 89.

Q    What did you observe in the area behind that tree
H-1 that's depicted in People's 89?

A    In this area, depicted in 88 -- 89, there was a
significant amount of blood directly on the north side
of the tree.

Q    I don't know if you can do it while it's still
mounted, but, detective, I'd ask you to take PEOPLE's 89,
and circle the areas where you observed blood in that
photograph?

A    The areas of blood were on the rock itself, between
a rock.   Also, on the bottom side of the rock.   Areas
up in here in the leaves.   Directly on the side over here.
(indicating)

      This location.   And, down here.   (indicating)

NYCLD_019647

Peo – Honeyman – Dir                    1757

Q     What is the view shown in People's 90 in
evidence, as depicted in Number 90?

A    As depicted in People's 90, this is a location
facing south.    This is from Reference Tree H-1 facing south
towards the 102d Cross Drive.

Two combs shown here, as depicted in Number 83.

And, this light post here is 206, as depicted in
84.

Q     Detective Honeyman, I just want to ask you to
try not to block the view of the jurors over there.

In People's 90 in evidence, there are some cars on the
roadway down there;  do you know whose cars those are?

A    Those are Crime Scene vehicles.

Q     Also appear two original ~~spikes~~ combs on the Cross
Drive;  are those the combs you described in People's 83?
That you placed there on that morning?

A    Yes, I did.

Q     In the background of People's 90 on what would
be the south side of the Cross Drive that's shown
on People's 90?

A    What you can see on the other side, south side of the
Cross Drive is the back  stop to the ball field.

Q     Where does that appear in People's 3?

A    That would be this ball field that's shown here.

NYCLD_019648

Peo – Honeyman – Dir                    1758

Q     Detective, I'd ask you to please describe for
the members of the jury what is depicted in People's 91,
People's 92, People's 93 in evidence?

A   As depicted in 91, this is a photograph facing north
to the location where she was found.   This was taken
directly alongside of Reference Tree H-1, as depicted
in this map on this location.

            MS. LEDERER:   The jurors are indicating
            they're having trouble seeing.   I think there's
            a reflection.

            You want the lights on?

            THE COURT:   Okay.   On.   It takes a
            little time for those to heat up.   Just wait
            a minute.

Q     If you could describe, please, for the members of
the jury, what is depicted in 91, 92, 93?   What direction
it's shown in?

A   As depicted in 91, this is a photograph that was taken
from adjacent to Reference Tree H-1 facing north to a
location where she was found, barely visible, in this
photograph.

You can see the marked radio car put there.

Q     How did it come about that marked radio car was
put in that location?

Peo - Honeyman - Dir                    1759

A    I replaced the marked radio car.

Q    For what reason?

A    Prior to me taking the photograph, so it can be seen more better through the woods.

Q    Please continue.

A    This photograph is approximately midway down from Reference Tree H-1, to the low path showing the same marked radio car depicted in 91, Center.

You can also see a large rock here, and area cordonned off by the police officers first responding to the scene.

Q    Is that rock depicted in People's 3 in evidence?

A    Yes, it is.

Q    Where is that?

A    That rock is shown right here.   (indicating)

Q    And, what is shown in People's 93 in evidence? Where is that taken from, and what is shown?

A    93 is shown just south of the lower path, showing the marked radio car.    Also some fallen trees that are in this location.

These trees.  Fallen trees.  Are these ones right over here.

                    MS. LEDERER:
                            Record should reflect the
          witness is indicating to the prior Exhibit 92.

NYCLD_019650

1              People Reynolds Recross (Mr. Rivera)              1002

2        Q    Do you know which detective made that decision?

3        A    No.

4        Q    Officer, you also indicated that you left the

5    precinct at about 4:15 in the morning; is that correct, on

6    April the 20th?

7        A    Yes.

8        Q    You went to the crime scene; is that correct?

9        A    Yes.

10       Q    When you call it the crime scene, what were you

11   referring to?

12       A    The area where the jogger was attacked.

13       Q    That would be, where exactly did you go, Officer,

14   can you show us on the map?

15       A    Down here in this area, what is called the lot.

16   That's north of the 102nd Street crossdrive.

17       Q    Just to repeat officer, north of the 102nd Street

18   cross drive; is that correct?

19       A    Yes, right in this area.

20       Q    That would be in the center of the east and the

21   west drive; is that correct?

22       A    More or less, yes.

23       Q    You may have a seat, Officer.  Were there other

24   police officers there?

25       A    Yes.

LDI

NYCLD_023705

```
 1                 People Reynolds Recross (Mr. Rivera)        1003
 2          Q     How many police officers did you see there?
 3          A     It was pretty dark at that time, I couldn't tell
 4    how many were there.
 5          Q     Was it pretty crowded?
 6          A     There were a few cars there.
 7          Q     Say more than 10 police officers?
 8          A     I don't know.
 9          Q     How many cars did you see?
10          A     About 3, 3, 4.
11          Q     I'm sorry?
12          A     3, 4.
13          Q     3, 4?
14          A     3, 4.
15          Q     These are both police officers and detectives; is
16    that correct?
17          A     Yes.
18          Q     Some of the cars there belonged to the detectives;
19    is that right?
20          A     Yes.
21          Q     Would these be the automobiles belonging to
22    Detective Whelpley and the other detective?
23          A     I don't know which car was there.
24          Q     Did you see Detective Whelpley at that location?
25          A     No, I don't recall.
```

LDI

```
1              People Reynolds Recross (Mr. Rivera)          1004

2         Q     Do you recall the name of the detectives you saw

3    at that location?

4         A     Detective Rosario.

5         Q     You saw Detective Rosario at that location?

6         A     Yes.

7         Q     Officer, did you discuss the case with Detective

8    Rosario?

9         A     Yes.

10        Q     Did he give you all the information -- withdrawn.

11        Did he discuss the case with you also, he gave you

12   information you were not privy to; is that correct?

13        A     Excuse me?

14        Q     He also discussed the case with you, he imparted

15   information to you; is that correct?

16        A     He just explained it, a woman's body had been

17   found at that point, that was all he had.  At least that's

18   all he told me.

19        Q     You testified that you spent about 40 minutes at

20   that location, is that correct?

21        A     About that.

22        Q     Then you went back to the precinct?

23        A     Yes.

24              MR. RIVERA:  I have no further questions,

25              Judge.
```

LDI