# Exhibit 6

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1693

answered, "Yes."

Q    Did either Raymond Santana or his father  any

difficulty with the English language?

A    No, sir.

Q    After you read Raymond Santana and his father  the

Miranda warnings, did you begin an interview?

A    Yes, I did.

Q    Would you describe for the Court how  that

interview was conducted.

A    I asked Raymond Santana, Junior, to describe to me

what  happened the night before, April 19th.  I gave  him  a

point  of reference, you know:  "Where did you  meet?  What

time did you meet?  Who were you with?  Describe to me in as

much  detail as you can what happened.  I know you spoke  to

John  Hartigan.  You didn't speak to me yet.  This  is  the

first time I am hearing it.  Try not to leave anything  out.

Try  not  to  be embarrassed.  Don't  be  embarrassed  about

anything in front of your father."

Once that was all agreed to, Santana spoke for about an

hour  orally,  I would say, back and forth.  I  asked  some

questions.   Then I advised him that I was going  to  reduce

this to writing.

Q    Did Detective Jonza ask any questions?

A    I believe he did.

NYCLD_018976

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1694

Q      How about Raymond's father?

A      Raymond's father didn't ask any questions, no.

Q      You mentioned that there came a time when a written statement was prepared. Would you describe how that was done.

A      The whole interview began about ten after ten.  On the heading of the written statement, I put down who was present in the room.  I also put, using the military time that we use in the Police Department, 22:10 hours, which is ten after ten P.M. We didn't begin writing at ten after ten.

As I said, we did an oral, more or less, discussion for about an hour.  I then reduced it to writing.  It is contained on five lined pages of white paper.

MR. CLEMENTS:  At this time I'd like to have this five page document marked People's 16 for identification.

(Whereupon the above referred to five page document was marked collectively as People's 16 for identification.)

Q      Do you recognize People's 16?

A      Yes, I do.

Q      What do you recognize it to be?

A      This is the written statement of Raymond   Santana,

NYCLD_018977

SHEEHAN - PEOPLE - DIRECT - CLEMENTS      1695

April 20, 1989, which was given to me, which was written by me in the 20th Precinct youth room.

 Q Is it signed by you as well?

 A Yes, it is.

 Q Is it in substantially the same condition as it was on April 20th?

 A Yes, sir.

   MR. CLEMENTS: At this time I offer People's 16 into evidence.

   MR. RIVERA: May I see it, your Honor.

   THE COURT: Yes.

   (Handing to Mr. Rivera.)

   MR. RIVERA: No objection for the purpose of the hearing, your Honor.

   THE COURT: Mark it.

   (Whereupon the statement was so marked People's Exhibit 16 in evidence.)

 Q Detective, if you could look at People's 16 in evidence, do any signatures appear on People's 16?

 A Yes, sir.

 Q Where do they appear?

 A Excuse me. Pages one, two, three and four contain the signatures of myself and Raymond Santana in the margin. Page five, which is the last page of the statement contains

NYCLD_018978

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1696

the signature of Raymond Santana, my own signature and  skip

one  line below that it's witnessed by, and it contains  the

signature  of  Raymond  Santana  Senior,  the  father,  and

Detective August Jonza.

Q     Could you explain to the Court the procedure  you

used  in  writing out the statement and how  the  signatures

came to appear on the pages you just mentioned?

A     After  speaking  for roughly  an  hour,  I'm  not

positive if it was an exact hour, approximately an hour.  I

then  began  to reduce it to writing.  On page one,  when  I

finished page one, page one was given to Raymond Santana and

his  father to read, as was every other page.  Each  page  I

asked  Raymond  to  initial or to sign.  He  signed  in  the

margin and I signed it.

Q     Did he sign as each page was created?

A     That's correct.  And at the end of the statement I

read  the entire statement to them.  I then gave it to  them

to  look it over and then I asked them also to sign  at  the

end  of the statement.  Raymond signed it first and  then  I

signed it, his father signed it and Jonza signed it.

Q     Were any corrections made?

A     No, sir, I don't believe.  Just let me check.  Not

to my knowledge, if I recall.  No corrections.

Q     How did the interview end?

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1697

A    It ended at 12:00 midnight.  We used the military time.  I used the military time, 2400 hours.  The statement lasted for about -- between the oral and the written, the total was one hour and 50 minutes.

MR. BURNS:  Fifty, five-O?

THE WITNESS:  Five-O, that's correct.

MR. CLEMENTS:  With the Court's permission may the witness read the statement?

MR. RIVERA:  Objection.

MR. BURNS:  It speaks for itself.

THE COURT:  It's in evidence.  It's not necessary.

Q    After midnight what did you do?

A    When the statement was completed I then asked Mr. Santana Senior if there was any -- did he have any questions about what was going to happen.  He really didn't have that many questions except for how long he would be required to stay at the precinct.  I advised him that the -- representatives from the District Attorney were present in the building and that at some time in the near future he would be required to sit with his son while he was also -- while he gave an oral statement which would be video taped for the District Attorney.  He didn't have any objections to that and I told him it would be soon, maybe an hour, two

NYCLD_018980

1        SHEEHAN - PEOPLE - DIRECT - CLEMENTS     1698

2  hours tops.

3      Q     During the period you were conducting the

4  interview in the youth room at the 20th Precinct did you or

5  Detective Jonza make any promises to Raymond Santana?

6      A    No, sir.

7      Q    Did you or Detective Jonza make any threats to

8  Raymond Santana?

9      A    No, sir, none at all.

10     Q    Did Raymond Santana stay in the youth room after

11  the interview finished?

12     A    No, sir. Raymond and his dad were escorted out of

13  the room, back upstairs to the 20th Squad. Basically to the

14  same area, the same desk, same seats and were asked to take

15  a seat until we found out when the District Attorney would

16  be ready for them.

17     Q    Did there come a time that you left the 20th

18  Precinct and went somewhere else?

19     A    Yes, sir. About 2:00 in the morning.

20     Q    Where did you go?

21     A    Myself and Jonza escorted Mr. Santana Senior and

22  his son Raymond from the 20th Precinct, by unmarked car, we

23  went from 82nd Street up to 100th Street to the 24th

24  Precinct.

25     Q    Why was the investigation moved from the 20th

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1699

Precinct to the 24th Precinct?

A       Sometime after we finished this written   statement
there was some discussion among a variety of the supervisors
at the 20th Precinct, uniform and detectives, as to  whether
or  not the room we just finished our statement in   was   the
actual designated youth room.  To continue the investigation
there was -- there was definitely some question as to   which
was  the   correct   room.  We decided to  move   to   the   24th
Precinct   which  had a designated youth room   that  everyone
agreed upon and that's where we're going to video tape.

Q       Before this investigation began did you have  any
experience concerning the youth room at the 20th Precinct?

A       Yes, sir.  I had been assigned to Manhattan  North
for   21   years.  I'd been in and out of  the   20th  Precinct
numerous  times.   That's always been the youth room  in   my
experience.

MR. JOSEPH:  Objection, your Honor.

THE COURT:  I'll allow it.

Q       The room you're speaking of is that 125, the   one
you indicated earlier?

A       That's correct.  It's the Youth  Officer's   room.
It's always been.

Q       When you went to the 24th Precinct  with  Raymond
Santana and his father and Detective Jonza where did you   go

SHEEHAN - PEOPLE - DIRECT - CLEMENTS        1700

in the precinct?

    A     Upon arriving at the 24th Precinct, which is located at 151 West 100th Street between Columbus and Amsterdam we went in passed the uniform desk and the designated youth room in the 24th is on the first floor. It's actually a part of the muster room.

           MR. CLEMENTS:  At this time, with the Court's permission, I'd like the witness to get off the stand and look at People's 5 in evidence.

           (Whereupon the witness approached People's 5 in evidence.)

    Q     Do you recognize People's 5, detective?

    A     Yes, I do.

    Q     What do you recognize it to be?

    A     It's a schematic of the 24th Precinct first floor.

    Q     When you entered the 24th Precinct with Raymond Santana and his father where did you go?

    A     This is the main uniform desk.  This is the entry. This is 100th Street. We entered. The desk is here. There are some closing folding doors which were open in the open position. This is the muster room.

           MR. CLEMENTS:  The record should reflect the witness is indicating the large room on the right-hand side of the exhibit, about the middle.

SHEEHAN - PEOPLE - DIRECT - CLEMENTS       1701

THE WITNESS:  Now straight back here -- this
is a partitioned group of offices.

Q    When you say "partitioned" do the walls go up  to
the ceiling?

A    No, they don't.  This area back here is designated
as the youth room.

MR. CLEMENTS:  The record should reflect that
the officer is pointing to a room previously
marked by another witness as room 101.

Q    Where did Raymond Santana and his father go as you
entered the precinct?

A    Along the back wall here, which would be the  east
wall  of the 24th Precinct.  Along the back wall is a  water
fountain here, a soda machine and there is a lot of  folding
metal chairs, metal desks, this is the room where roll  call
is held so there are a lot of scattered desks.  They  sat
against the wall basically waited until the room was
available to do the video tape.

Q    Did there come a time when Raymond Santana made an
oral statement that was recorded on video tape?

A    Yes.

Q    And where was that statement taken?

A    About 2:30 in the morning the -- now the 21st of
April, the video tape statement was taken in this room by  a

1        SHEEHAN - PEOPLE - DIRECT - CLEMENTS     1702

2  video tape technician from the District Attorney's office.

3  Present in the room seated at this desk on this side was

4  Raymond Santana. Seated next to him was his father. Seated

5  about here was myself. Next to me was Detective Bertaroyo

6  (phon) who was the case officer from Central Park, who was

7  in charge of the investigation. The Assistant District

8  Attorney, Elizabeth Lederer, sat here and the video tape

9  technician was back here and this is where the camera was

10  set up.

11          MR. CLEMENTS: Indicating the north east

12        corner of the room.

13          THE WITNESS: That is correct, the north east

14        corner of the room.

15          MR. CLEMENTS: You can resume the stand

16        again, detective.

17          (Whereupon Detective Sheehan resumed the

18        witness stand.)

19          MR. CLEMENTS: At this time I'd like to have

20        this video tape marked People's 17 for

21        identification.

22          (Whereupon the video tape was so marked

23        People's Exhibit 17 for identification.)

24  Q    Detective, do you recognize People's 17?

25  A    Yes, I do.

NYCLD_018985

1725

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK : CRIMINAL TERM : PART 59

THE PEOPLE OF THE STATE OF NEW YORK

              - against -

Indictment
No. 4762/89

RAYMOND SANTANA, KHAREY WISE,
YUSAF SALAAM, ANTRON MC CRAY,
KEVIN RICHARDSON, STEVE LOPEZ and
MICHAEL BRISCO,

                    Defendants.

                  October 27, 1989

B E F O R E:

        HONORABLE THOMAS B. GALLIGAN,

                Justice

     (Appearances as heretofore noted)

       *   *   *   *

     THE COURT CLERK:   Hearing continued, People of the State of New York versus Kharey Wise, Yusaf Salaam, Antron McCray, Kevin Richardson, Steven Lopez, Michael Brisco, Raymond Santana; Indictment 4762 of '89.

     THE COURT:  Are we ready to proceed?  Is the officer outside?

     MS. LEDERER:  Yes.

     (Witness entered the courtroom and

1726

COLLOQUY

    resumed the stand.)

D E T.   S H E E H A N,

   called as a witness on behalf of the People,
having been previously sworn, resumed the stand
and testified further as follows:

        THE COURT CLERK: Detective, may I
remind you you're still under oath.

CROSS EXAMINATION

BY MR. BERMAN:

   Q   Detective Sheehan, my name is Jesse Berman.
I represent Steve Lopez. I just want to ask you
about two small areas of your testimony.

   You mentioned on your direct when we were last
here, you mentioned around two in the morning on
April 21st, you and Detective Jonza took one of the
suspects to the 24th Precinct because Room 125 of
the 20th Precinct might not have been the actual
designated Youth Room. That's what I wanted to ask
you about, the designated Youth Room.

   You yourself are Manhattan-wide, Manhattan
North-wide?

   A   Manhattan North, yes, sir.

   Q   But you have experience in and out of the
various Manhattan North precincts over the past

NYCLD_019009

1727

1          SHEEHAN - PEOPLE - CROSS - BERMAN

2  several years?

3       A    For the past twenty-one years.

4       Q    And who was it that raised the issue with

5  you that Room 125 might not have been the actual

6  designated Youth Room at the 20th Precinct?

7       A    It wasn't actually raised with me.  There

8  was some discussion among the uniformed supervisors

9  in the 20th Precinct as to whether there was

10  actually a disagreement as to which was now the

11  designated room.

12       In my opinion that had always been the

13  designated room.  That's where the youth officer

14  hangs his hat, so to speak.

15       Q    In other words, that's where the desk of the

16  youth officer is?

17       A    That's where all the youth programs come out

18  of, that room.

19       Q    But the Youth Room, in the sense of the

20  Family Court ruling requiring designated Youth Room

21  for questioning purposes, that may be different?

22            MR. CLEMENTS:  Objection.

23            THE COURT:  I'll allow it.

24       A    There is an outside possibility.  It is

25  highly unusual.

NYCLD_019010

1728

SHEEHAN — PEOPLE — CROSS — BERMAN

1. Q    From your experience with Room 125 of the
2. 20th Precinct up until April 21st of this year, that
3. room was also used for other purposes beyond the
4. Youth Room; isn't that right?
5. A    I always knew it to be the Youth Room.  I
6. never had any other dealings in that precinct other
7. than whenever we dealt with the room, that's where
8. we conducted our investigation.
9. Q    As to investigate, specifically as to
10. questioning, is that where you always questioned
11. youths?
12. A    Yes, sir.
13. Q    Who actually brought it to your attention,
14. what you told us about?  Did you happen to overhear
15. the supervisors talking about it or did someone say
16. it to you?
17. A    The detective supervisors brought it to my
18. attention.  Quite naturally, I said, "Why are we
19. moving here?  We already moved once."  And it was
20. because of a difference of opinion, and until that
21. was settled, everyone concerned felt it better if
22. we're going to continue this with the video tapes,
23. let's go to the 24th.  There will be no-- without
24. question, which is the designated Youth Room.

NYCLD_019011

SHEEHAN — PEOPLE — CROSS — BERMAN

Q   Police officers, detectives in a precinct, if they want to find out whether the Family Court has designated a particular room as the Youth Room, is there some bulletin board or manual someplace you could go in a precinct to find out which is the right room?

MR. CLEMENTS:  Objection.

THE COURT:  I will allow it.

A   I would assume so, probably somewhere behind the desk.

Q   In other words, somewhere there is a written order or ruling from Family Court kept on file, and one could look up behind the desk and find out?

A   It's also common knowledge among the officers and detectives who work there.

Q   When that common knowledge comes questioned by somebody, supervisory personnel, one way to resolve it is to look up the order and find out which is the designated room for questioning youths; is that right?

MR. CLEMENTS:  Objection.

THE COURT:  Sustained.

Q   You mentioned it had already been moved once and your understanding was it had been moved from

SHEEHAN - PEOPLE - CROSS - BERMAN

1   the Central Park Precinct to the 20th Precinct, is

2   why?

3       A    We have had numerous investigations in

4   Central Park.  The facilities are very poor, to say

5   the least.  It is a very old building from the

6   1800's.

7       Q    Do you know whether, as of April 19th, 20th,

8   21st, of '89, there was a designated room for the

9   questioning of youths at the Central Park Precinct?

10      A    Yes, sir.

11      Q    And what room was that, as far as you know?

12      A    In my experience again, that room has always

13  been across the alleyway the auxilliary police and

14  the youth programs are kept, in the youth officer's

15  room.

16      Q    The room is actually a separate building,

17  isn't it?

18      A    Yes, it is.

19      Q    And it has more than one room?

20      A    Two rooms in all.

21      Q    Is it your testimony both of those rooms are

22  designated as the Youth Room, youth room for

23  questioning at the Central Park Precinct, or just

24  one of those rooms?

NYCLD_019013

SHEEHAN — PEOPLE — CROSS — BERMAN

1     A     In my experience, I think you can use one of

those-- either one of those rooms since it is a

separate facility.

Q     You yourself have never seen the written

designation from the Family Court to see which rooms

apply in the Central Park Precinct?

A     No, I have not.

Q     And similarly, in the 20th Precinct you have

never seen the designation from Family Court?

A     No, I have not.


Q     I'm placing before you the diagram in

evidence of the first floor of the 20th Precinct,

which is People's 2 in evidence.

And could you come down and I'll ask you a

question.

A     Sure.

          (Witness complies.)

Q     Room 25 appears, the number 125; is that

right?

A     Yes.

Q     Do you know where Room 107 would be?

A     No, I don't, sir.

Q     And is it fair to say that people coming in

SHEEHAN — PEOPLE — CROSS — BERMAN

and out of Room 125, such as, for example, to go to

the men's room back here at the upper righthand

corner of the diagram, would be visible to people

entering and exiting the precinct?

In other words, as they came out of the door of

125?

    MR. CLEMENTS:  Objection.

    THE COURT:  I'll allow it.

A   There's a door-- if you were questioning

somebody, you would have the door closed.

Q   I am saying if someone was going from Room

125 to the men's room, they would be visible to

people entering the precinct; is that right?

A   Yes, sir.

Q   And similarly, as they pass from Room 125 to

go around to the toilet, they would have to pass

right by the main desk, civilians, people standing

in front of the main desk for whatever reasons they

might be there?

A   That's right.

Q   When the press showed up at the 20th

Precinct, do you know where they were kept or where

they stayed?

    MR. CLEMENTS:  Objection.

NYCLD_019015

1733

SHEEHAN — PEOPLE — CROSS — BERMAN

1       THE COURT:  Objection sustained.

2    Q    I guess you can go back to your seat.

3         (Witness complies.)

4    Q    Just one more thing about Room 125.  When

5  you say for a long time, as far as you knew, it had

6  been the Youth Room, going back how far did you

7  understand Room 125 to be the room designated for

8  questioning youths rather than where the youth

9  officer had his desk, but as far as the room for

10 questioning youths?

11   A    Since they opened that building.

12   Q    And that would be when?

13   A    That's in the early 70's.

14   Q    And the other area I wanted to ask you

15 about, you said that on the late afternoon or the

16 early evening of the 21st of April, over at the 24th

17 Precinct, you heard a lot of noise or loud noise in

18 a cell up on the second floor of the-- the holding

19 cell in the detective squad area; is that right?

20   A    Right.

21   Q    As to Steve Lopez, he was one of the people

22 in that cell at that time, is that right?

23   A    That's right.  He was visible to me also.

24   Q    And your best estimate of what time of day

NYCLD_019016

1734

SHEEHAN - PEOPLE - CROSS - BERMAN

1  that was?

3       A    I said I think early evening or late

4  afternoon. I'd have to say it was after 6:00. I'm

5  not sure exactly. I was off duty at nine and they

6  were in the cell sometime after six.

7       Q    And is it fair to say that you're aware that

8  Steve Lopez was originally taken in on unlawful

9  assembly charges but ultimately charged with much

10  serious charges?

11            MR. CLEMENTS:  Objection.

12            THE COURT:  Sustained.

13       Q    If you know.

14            THE COURT:  Sustained.

15       Q    That holding cell in the detective area on

16  the second floor of the 24th Precinct, is that a

17  cell reserved for youths?

18       A    No, sir.

19       Q    What is that cell generally used for?

20       A    It's reserved for prisoners.

21       Q    And under what circumstances are youths put

22  in that cell?

23       A    After they are charged, formally arrested.

24       Q    Do you know at what time Steve Lopez was put

25  in that cell?