# Exhibit 8

```
 1                    T-1   Reynolds-Ppl-direct                  827

 2        A    I saw him back in the juvenile room.

 3        Q    Did there come a time after officer Powers had

 4   finished making those phone calls that someone arrived at

 5   the youth room, at the juvenile room?

 6        A    Yes.

 7        Q    And who was that?

 8        A    That was Mrs. Cuffee.

 9        Q    Who is Mrs. Cuffee.

10        A    That was Kevin Richardson's mother.

11        Q    Where did you see her at the jouvenile room?

12        A    She had come to the door, to the entrance and told

13   me that, you know, who she was and she was there for her

14   son.

15        Q    About how long did you have a conversation with

16   her?  How long did she stay in the juvenile room?

17        A    I'd say about five minutes.

18        Q    And then what happened?

19        A    Then she went, she waited outside the room in a

20   seperate area we have, you know, for the civilians, for

21   civilian workers, and I continued to do the paperwork.

22        Q    What is the name of the room where she was waiting?

23        A    That was the clerical office.

24        Q    How close is the clerical office to the juvenile

25   room.
```

H. C. Davis

NYCLD_023530

<pre>
 1                   T-1   Reynolds-Ppl-direct                828
 2      A    They're right next to each other.
 3      Q    Do they share a common wall?
 4      A    Yes.
 5      Q    After Mrs. Cuffee arrived, did other parents of the
 6  people in custody begin to arrive?
 7      A    Yes.
 8      Q    And did there come a time where you saw Antron Mc
 9  Cray at the Central Park Precinct?
10      A    Yes.
11      Q    Approximately what time was that, if you recall?
12      A    That was sometime before one, around twelve.
13      Q    Did you have any conversation with him at that
14  time?
15      A    I don't believe so.
16      Q    Do you recall seeing him at the precinct?
17      A    Yes.
18      Q    Where did you see him, if you recall?
19      A    I saw him in the juvenile room, he came to the
20  juvenile room and then he was, he went into the, to the
21  clerical office.
22      Q    And do you know who he came to the precinct with?
23      A    He came, I believe he came with his mother or one
24  of the other kids that were locked up.
25      Q    Did you personally speak to him at the precinct?

                        H. C. Davis
</pre>

```
 1                  T-1    Reynolds-Ppl-direct                  829
 2       A    No.
 3       Q    Did there come a time where all of the other, did
 4  there come a time where the parents for all of the youths
 5  had arrived?
 6       A    No.
 7       Q    Did there come a time where parents or family
 8  members for four of the five youths arrived?
 9       A    Yes.
10       Q    And approximately how much time went by before the
11  family members of four of those five people were there?
12       A    I'd say about an hour, an hour and a half.
13       Q    Which was the young man for whom no family arrived?
14       A    That was for Raymond Santana.
15       Q    What efforts were made to contact someone from
16  Raymond Santana's family after the initial phone call?
17       A    There was several efforts.  By two o'clock we
18  realized nobody was coming, so police officer Powers made
19  another call to his father's house and there was no answer.
20       Q    Did there come a time where you made efforts?
21       A    Yes.  At about quarter after two I had to convince
22  him to give me the name of--
23                  MR.   RIVERA:  Objection.
24                  THE COURT:  Just tell us what-- You had a
25             conversation, what it was.
```

H. C. Davis

```
1                    T-1   Reynolds-Ppl-direct              830

2       A    I had a conversation with him and told him to give

3    me the name of somebody to come pick him up.

4       Q    Would you explain for the members of the jury for

5    what purpose the family members of these five individuals

6    were notified?

7       A    Because when you arrest a juvenile, when they go to

8    Family Court--

9                    MR.   JOSEPH:  Objection, Judge.

10                   THE COURT:  What was your question?

11                   MS.   LEDERER:  For what purpose were the

12               family members of these five people contacted.

13                   THE COURT:  I'll allow it.

14                   MR.   JOSEPH:  Judge, I believe the officer is

15               giving us a general policy statement.

16                   THE COURT:  In this case, why did you call

17               them?

18                   THE WITNESS:  So that if the four, the four

19               that were already there, in order to give them an

20               appearance ticket so they could come back in the

21               future, all five defendants would have to be

22               released to their parents at the same time.  If

23               one of them weren't, then he would have to come

24               back at eight o'clock in the morning, and all the

25               rest of them would also.  So, in order to insure


                           N. C. Davis
```

T-1   Reynolds-Ppl-direct                    831

they could all come back in a week or two, all the
parents would have to be there.

Q    When these five people were arrested, were they
going to be taken to court the next morning or were they
going to be given something called a desk ticket, a desk
appearance ticket?

A    They were going to been given a desk appearance
ticket.

Q    Would you describe for the jury what is a desk
appearance ticket?

A    That's a ticket you give them to appear in court on
a certain date with their parents.  They're released to the
custody of either a parent or guardian or an adult member of
their family.

Q    And is that a date sometime in the future?

A    Yes.

Q    Are you permitted or would you be permitted in the
circumstances that you are referring to on April 19th of
1989 to release any of these juveniles in their own
recognizance to let them go from the precinct?

A    No.

            MR.  JOSEPH:  Objection.

            MR.  BURNS:  Objection.

            THE COURT:  I'll allow it.


                    H. C. Davis

```
1                   T-1    Reynolds-Ppl-direct                    832
2        A     No.
3        Q     And when you --
4                   MS.  LEDERER:  Withdrawn.
5        Q     If you could not reach a family member for one or
6    more of the young men you had in custody on that night, what
7    is required of you?
8                   MR.  JOSEPH:  Objection.
9                   MR.  RIVERA:  Objection.
10                  THE COURT:  I'll allow it.
11       A     That person would have to go to Spoffard.
12       Q     And when they go to Spoffard, how long are they
13   kept at Spoffard?
14       A     They would have to go, they would have to appear in
15   Family Court the very next morning.  As far as how long they
16   remain in Spoffard, it could be, you know, for a long time.
17       Q     With respect to your involvement in the case, the
18   person taken to Spoffard, when are you required to bring
19   them to Family Court?
20       A     The next day.
21                  MR.  JOSEPH:  Objection.
22                  THE COURT:  I'll allow it.   Overruled.
23       Q     What is Spoffard?
24                  MR.  JOSEPH:  Objection.
25                  THE COURT:  I'll allow it.


                           H. C. Davis
```

T-1   Reynolds-Ppl-direct                       833

1
2       A     Spoffard is a jouvenile detention center.

3       Q     When Raymond Santana's father did not arrive at the

4  precinct, and the other young men had family present, did

5  you get another phone number from Raymond Santana?

6       A     Yes, I did.

7       Q     And what was the number that you got from him?

8       A     I don't recall the number, but it was for his

9  sister, for his sister in The Bronx.

10      Q     And did you phone the telephone number that he gave

11  you?

12      A     Yes.

13      Q     At the time that you asked him for another

14  telephone number, did Raymond Santana say anything to you?

15  Excuse me, in your presence?

16      A     Yes, he made a statement.

17      Q     What if anything did you see, did you hear him say

18  and to whom did you see him say it?

19            MR.  RIVERA:  Objection.

20            THE COURT:  I'll allow it.

21      A     I observed him look over to Kevin Richardson and

22  say, "Yo, we're going to Spoffard, and we're going to fuck

23  up anything that gets in out way."

24      Q     Did you phone the number that he had given you at

25  that time?


                        H. C. Davis

```
 1                  T-1   Reynolds-Ppl-direct                834

 2       A    Yes.

 3       Q    And did you have a conversation with Raymond

 4  Santana's sister?

 5       A    Yes, I did.

 6       Q    What if anything did you say to her and what if

 7  anything did she said to you?

 8       A    I told her that, that her brother was under arrest

 9  for assault and for unlawful assembly in the park, and that

10  what I needed for her to do is to come down and I would

11  release him in her custody.  And you know, as long as she

12  could insure he would go to court on a future date.

13       Q    Did you give her your name?

14       A    Yes, I did.

15       Q    And did you give her a telephone number for the

16  Central Park Precinct?

17       A    I did.

18       Q    And what if anything did she she said to you?

19            MR.  RIVERA:  Objection.

20            THE COURT:  Sustained.

21       Q    About what time did you have this phone call with

22  the sister?

23       A    It was about twenty minutes after two.

24       Q    How long did the conversation last?

25       A    I'd say about ten, fifteen minutes.


                      H.  C.  Davis
```

NYCLD_023537

T-1   Reynolds-Ppl-direct                                835

Q     After you got off the telephone, did there come a time where Raymond Santana's sister arrived at the precinct?

A     No.

Q     Did there come a time where you made another phone call to Raymond Santana's sister.

A     Yes.

Q     At about what time did you make that second phone call?

A     About ten minutes after four.

Q     And when you made that phone call at ten minutes after four, did you reach Raymond Santana's sister?

A     Yes.

Q     Did you have a conversation with her about getting another telephone number?

A     Yes.

Q     And what telephone number did you obtain from her?

A     Her grandmother's, grandmother's phone number.

Q     What if anything did you do after you received the grandmother's telephone number?

A     I called up his grandmother and I explained the situation to her and I asked, I told her we don't even want her to to to take a bus or, you know, a cab or anything, I told her to stay where she is and we'd have a car come and pick her up.


                           H. C. Davis

2    Q    What time did you make that phone call?

3    A    That was, it was about a quarter after four.

4    Q    When you made that phone call, did you speak with a

5    man or a woman?

6    A    I spoke with a woman originally.

7    Q    When you say originally, did you also have a

8    conversation with a man at that time?

9    A    Yes.

10   Q    And did you speak to them at the same time or one

11   after the other?

12   A    one after the other.

13   Q    What if anything did you tell the grandmother with

14   respect to who you were and where you were?

15   A    I told her I was, I told her my name, that I worked

16   in the Central Park Precinct and I had arrested her grandson

17   for assault.

18   Q    Did you speak to her in english or in spanish?

19   A    In english.

20   Q    What did you do after you for --

21        MS.  LEDERER:  Withdrawn.

22   Q    Do you know, you indicated you spoke to a male, do

23   you know who that was?

24   A    I believe that was his father.

25   Q    And what if anything did you say to him?


H. C. Davis

2      A    I just basically told him his son was under arrest

3    for the assault.

4      Q    Did there come a time where you sent a police car

5    someplace?

6      A    Yes.

7      Q    And about what time did you send a radio car?

8      A    That was about five minutes later, I'd gotten

9    police officer Gans and police officer Martello and I handed

10   them a piece of paper with the name and the address and I

11   told them get up there as quick as you can, you know, take

12   her in the radio car, bring her here to the precinct, and

13   you know, that was it.

14     Q    And to what location did you send those officers?

15     A    That was 118th Street, I believe.

16          MS.   LEDERER:   If I may have just a moment,

17          please.

18     Q    Do you know what address you sent that radio car

19   to?

20          MR.   RIVERA:   Objection.

21          THE COURT:   I'll allow it.

22          Do you have the address?

23          THE WITNESS:   If I have it, I have to look

24          through my notes.

25          THE COURT:   If there is something to refresh


                         H. C. Davis

| | | |
|---|---|---|
| 1 | | T-1   Reynolds-Ppl-direct                              838 |
| 2 | | your recollection, you may do that. |
| 3 | A | Just it was West 118th Street. |
| 4 | | MS.   LEDERER:   I'd ask this please be marked |
| 5 | | and shown to the witness. |
| 6 | | (The reporter marked the exhibit.) |
| 7 | | MR.   RIVERA:   I would object.   May we approach |
| 8 | | for a minute? |
| 9 | | THE COURT:   Yes. |
| 10 | | (At side bar.) |
| 11 | | MR.   RIVERA:   The officer testified that he |
| 12 | | reviewed his notes and all he had was West 118th |
| 13 | | Street on his notes.   Now, apparently Ms.   Lederer |
| 14 | | is trying to show the police officer a piece of |
| 15 | | paper.   It's not to refresh his recollection, but |
| 16 | | to impeach his credibility as a witness. |
| 17 | | THE COURT:   What are you showing him? |
| 18 | | MS.   LEDERER:   It's an arrest report he did |
| 19 | | that night. |
| 20 | | MR.   RIVERA:   It's a different address there. |
| 21 | | MS.   LEDERER:   I'm going to ask if it |
| 22 | | refreshes his recollection.   If it doesn't, it |
| 23 | | doesn't. |
| 24 | | MR.   BURNS:   He didn't say his recollection |
| 25 | | needed refreshing. |

H. C. Davis

AM003992

NYCLD_023541

2      court; is that correct?

3          A    Yes.

4          Q    You said that a Mrs. Cuffee was the first parent

5      that arrived?

6          A    Yes.

7          Q    What time did she arrive?

8          A    I don't recall.

9          Q    Is there anything that you have that would refresh

10     your recollection as to what time she arrived?

11         A    I don't think so.

12         Q    Would you have a specific recollection that you

13     spoke to her for 5 minutes?

14         A    It was about five minutes, probably less.

15         Q    Did she arrive before midnight?

16         A    Probably.

17         Q    Did she arrive by 11:00 o'clock?

18         A    No.

19         Q    11:30?

20         A    Possible.

21         Q    You say there came a time when all of the parents

22     came accept Santana's parents?

23         A    Yes.

24         Q    It wasn't until after 4:00 that his grandmother

25     came?

LDI

NYCLD_023593

```
 1              People Reynolds Cross (Mr. Burns)            891

 2      A    That's correct.

 3      Q    Now, the parents who came, the last parents to

 4   arrive prior to Santana's grandmother, do you know which

 5   parent that was?

 6      A    No.

 7      Q    Isn't it also true though that as each parent came

 8   in, they went and they were sent to the utility; is that

 9   what you called it?

10      A    No.

11      Q    The clerical room.  They went into the clerical

12   office?

13      A    Yes.

14      Q    They sat in the clerical office just the parents;

15   is that right?

16      A    That's correct.

17      Q    The teenagers then just sat in another room?

18      A    They sat in a room with me.

19      Q    You said that there came a time that all of the

20   arrestees ate?

21      A    Yes.

22      Q    This is after they woke up?

23      A    They had to.

24      Q    I'm asking you?

25      A    Sure.
```

LDI

```
 1                   People Reynolds Cross (Mr. Burns)          892
 2         Q    Because you said also that the arrestees that they
 3    had fallen asleep about 3:00 o'clock on the morning of the
 4    20th; is that right?
 5         A    I know at 3:00 o'clock they were, all of them,
 6    except for one was definitely asleep.
 7         Q    It wasn't until after 4:00 that they were --
 8    withdrawn.
 9              What time was it that they ate?
10         A    I would say between 4:30 and 5:00, that's when the
11    parents went to get the food, so it would have to be
12    sometime after that.
13         Q    Would it be fair to say that neither you nor any
14    of the other police officers or police employees got them
15    food?
16         A    At that point?
17         Q    No.  From the time that they arrived in the
18    precinct, until the parents brought them food, did any of
19    them have anything to eat that was provided by police
20    personnel?
21         A    No.
22         Q    Is that true?
23         A    That's true.
24         Q    You don't know.  Would it also be fair to say you
25    don't know what time they went to sleep, you just know that
```

LDI

NYCLD_023595

1              People Reynolds Cross (Mr. Burns)              893

2    by 3:00 o'clock they were all asleep; is that a true

3    statement?

4         A    3:00 o'clock, they were definitely sleeping.

5         Q    You don't know when they started nodding off so to

6    speak, falling asleep?

7                   MR. JOSEPH:  I would object.

8                   THE COURT:  You saw them nodding off.

9         Q    Falling asleep?

10        A    I guess about 2:00, maybe a little later.

11        Q    So that then would it also be fair to say

12   certainly in the case of Mrs. Cuffee, who you say is the

13   mother of Kevin Richardson, she was there over 4 hours

14   before she was permitted to be with her son, would that be

15   fair to say?

16        A    Yes.

17        Q    Depending upon when the other people arrived and

18   you don't recall what time they arrived, other than

19   Santana's grandmother, they all had to wait and then they

20   were all permitted to be with their children at the same

21   time?

22        A    That's correct.

23        Q    That was when the children or when the teenagers

24   were awoken to eat the meal?

25        A    That's correct.

                              LDI

1              T-3    Reynolds-Ppl-cross (Rivera)                922

2        A    Yes.

3        Q    And you started to --

4             MR.   RIVERA:   Withdrawn.

5        Q    You started to ask them their names and addresses;

6   is that correct?

7        A    Yes.

8        Q    Did they have any identification on them?

9        A    I don't recall.

10       Q    Did you ask them for any I.D.?

11       A    I really don't remember.

12       Q    Did you search them?

13       A    Yes.

14       Q    Did you--

15            Did any of them have any wallets?

16       A    That I don't recall.

17       Q    Did any of them have any money?

18       A    I don't recall that either.

19       Q    If they would have had a wallet or money, would you

20   have made a note in a voucher or anything of that sort?

21       A    No.

22       Q    And you indicated that you asked your partner,

23   police officer Powers to attempt to contact Raymond

24   Santana's family; is that correct?

25       A    That's correct.


                         H. C. Davis

1              T-3    Reynolds-Ppl-cross (Rivera)              923

2     Q    And Raymond Santana was the one who gave you his

3   father's telephone number; is that correct?

4     A    Excuse me?

5     Q    Raymond Santana was the individual who gave you his

6   father's telephone number; is that correct?

7     A    Yes.

8     Q    And he also gave you his father's work number; is

9   that correct?

10    A    I believe so, I'm not sure.

11    Q    Did you--

12         You were the one who filled out the various reports

13  on Raymond Santana; is that correct?

14    A    That's correct.

15    Q    And one of the reports that you filled out was a

16  Probation Intake Referral Report; is that correct?

17    A    Yes.

18    Q    And do you have your copy of the Probation Intake

19  Referral Report?

20    A    Yes, I do.

21    Q    May I see it?

22         MR.  RIVERA:  All right.  May I have that copy

23         marked as defendant's B for identification, your

24         Honor?  Referring to the Probation Intake Referral

25         Report.


                       H. C. Davis

T-3   Reynolds-Ppl-cross (Rivera)                924

1

2               (The reporter marked the exhibit.)

3       Q    Officer, I ask you to look at defendant's Santana's

4    B.  Take a look at it.

5            Now, there is a, in the middle of that exhibit

6    there is a place for the business phone; is that correct?

7       A    That's correct.

8       Q    And you have a number listed there; is that

9    correct?

10      A    That's correct.

11      Q    You also have a location which is the fifth floor;

12   is that correct?

13      A    Yes, that's correct.

14      Q    That would be the floor where my client's father

15   works; is that correct?

16      A    Yes.

17      Q    And next to that there is a home telephone number;

18   is that correct?

19      A    Yes, it is.

20      Q    Okay.  Now just below that, officer, there is a

21   listing of the questions, advised of constitutional rights

22   by, it has your name, police officer Eric Reynolds?

23      A    Yes.

24      Q    Did you advise my client of his constitutional

25   rights?


                         M. C. Davis

NYCLD_023627

```
 1                    T-3    Reynolds-Ppl-cross (Rivera)              925

 2        A    No.

 3        Q    So,  you never advised my client of his

 4   constitutional rights; is that correct?

 5        A    No, I didn't.

 6        Q    So, this document is in error; is that correct?

 7        A    That's a mistake, yes.

 8        Q    It's a mistake, right.  And further down on that

 9   very same document where it says the question, did the

10   respondent offer resistance or verbal abuse at the time he

11   or she was taken into custody, you wrote down--

12                    MS.  LEDERER:  Objection.

13                    THE COURT:  Objection sustained.

14                    You offering that in evidence?

15                    MR.  RIVERA:  No.

16                    THE COURT:  Then don't read from it.

17                    MR.  RIVERA:  Okay.

18        Q    Officer, did my client run after being apprehended

19   by you?

20        A    No.

21        Q    Okay.  In your report you indicate that he did run;

22   is that correct?

23                    MS.  LEDERER:  Objection.

24                    THE COURT:  He's asking him.

25                    Did you make that report that he did run?


                               N. C. Davis
```

NYCLD_023628

1          T-3    Reynolds-Ppl-cross (Rivera)                926

2               THE WITNESS:  Yes, I did.

3      Q    Is that a mistake, officer?

4      A    Yes, it is.

5      Q    Now officer, when you stopped my client, my client

6  made a statement to the effect that I just came from my

7  girlfriend's house; is that correct?

8      A    That's correct.

9      Q    And you never asked him any questions; is that

10  correct?

11     A    Excuse me?

12     Q    You never asked him any questions; is that correct?

13     A    That's correct.

14     Q    With reference to coming from his girlfriend's

15  house, you never asked him any questions on that; is that

16  correct?

17     A    That's correct.

18     Q    Okay.  And you never advised him of his rights

19  either?

20     A    That's right.

21     Q    Okay.  Now, in your memo book, you made a notation

22  that my client did not elaborate where or when he was coming

23  from his girlfriend's house; is that correct?

24     A    That's correct.

25     Q    Okay.  You didn't ask him any questions about where

                    B. C. Davis

T-3   Reynolds-Ppl-cross (Rivera)                927

or when he was coming from his girlfriend's; is that
correct?

    A    That's right.

    Q    But you thought it important enough that he didn't
say anything about that to list it in your memo book, is
that correct?

    A    That's right.

    Q    But you didn't ask him any questions on that?

    A    No.

    Q    And when my client said I just came from my
girlfriend's house, you said hold it, don't say anymore, you
have not been advised of your constitutional rights?  Did
you say any words to that effect?

    A    Nothing like that.

    Q    Okay.  You didn't ask him any questions?

    A    No.

    Q    Didn't ask him what girlfriend are you talking
about?

    A    No.

    Q    Okay.  But, you thought it important enough to list
in your memo book what he did not say?

    A    That's correct.

    Q    Now, you testified that you spoke to my client's
grandmother at about four o'clock in the morning; is that

B. C. Davis

NYCLD_023630

```
 1              T-3    Reynolds-Ppl-cross (Rivera)              928
 2    correct?
 3        A     It was a little later than that.
 4        Q     That would be about 4:30?
 5        A     About 44:10, I believe.
 6        Q     Did you take her name down when you spoke to her?
 7        A     4:15.
 8        Q     Did you take her name down when you spoke to her?
 9        A     I believe I put it on a slip of paper.
10        Q     Do you have that slip of paper with you?
11        A     No.
12        Q     If I told you her name was Navida Colon, would that
13    refresh your recollection?
14              THE COURT:  Excuse me, wait a minute.
15              MR.  RIVERA:  I'm sorry.
16              THE COURT:  I didn't hear anything.  We can't
17        take that down.
18              THE WITNESS:  I really don't remember, I don't
19        remember her name.
20              THE COURT:  The reporter can only take down
21        what you say.
22        Q     And you testified that it was her who answered the
23    phone at about 4:15 in the morning?
24        A     Yes.
25        Q     And did you have an extensive conversation with
```

B. C. Davis

1              T-3    Reynolds-Ppl-cross (Rivera)              929

2    her?

3        A    No, not extensive one.

4        Q    What exactly did you tell her, if you can recall?

5        A    Excuse me.

6        Q    Do you recall what you spoke to her?

7        A    Basically I told her that Raymond was under arrest

8    and that we needed an adult to come pick him up, and I

9    couldn't reach his father.  I spoke to his, you know, his

10   sister, and she couldn't come because of the baby, I said

11   look, you don't even have to take a bus or train, I'll

12   provide transportation for you, you know, just get dressed,

13   stand by, we'll have a radio car pick you up.  You know,

14   give you door service to the precinct.

15       Q    You also testified this morning that a man also

16   answered the phone at about that time; is that correct?

17       A    A man had gotten on the phone, yes.

18       Q    And you also testified that you spoke to that man;

19   is that correct?

20       A    I briefly told him what was going on.

21       Q    And when you say you briefly told him, what you are

22   telling us now is what you told him, is that correct?

23       A    Pretty much.

24       Q    And did he identify himself as Raymond Santana's

25   father.


                            H. C. Davis

NYCLD_023632

T-3    Reynolds-Ppl-cross (Rivera)                    930

A    I believe he said he was, yes.

Q    Okay, he identified himself as Raymond Santana's father, you explained to him why you wanted him to come to the precinct and he indicated that he would come down; is that correct?

A    Well, I had already spoke to his grandmother and she said she was coming, now--

Q    But you felt, but the father got on the phone; is that correct?

A    Yes.

Q    And you explained everything to the father; is that correct?

A    Yes.

Q    And the mother got to the precinct at about five o'clock in the morning --

          MR.  RIVERA:  Withdrawn.

Q    The grandmother and the father got to the precinct at about five o'clock in the morning?

A    Around that time.

Q    Did you see Raymond Santana's father?

A    Yes.

Q    Okay.  Did you have a conversation with him?

A    I don't recall.

Q    Did you, did you tell any of the parents that were

                         H. C. Davis

NYCLD_023633

T-3   Reynolds-Ppl-cross (Rivera)            931

there that these children would be going home soon?

A    I told them, I think I told them they would be leaving soon.

Q    Right.  And did you tell them that you were waiting for Raymond Santana's parents to come before they went home; is that correct?

A    That's correct.

Q    And when Raymond Santana's parents arrived, did the parents come over to you and say, okay, we're all here, let's go home?  Did that happen?  Conversation to that effect take place?

A    Yes.

Q    Okay.  And what did you tell them at that point in time?

A    At that point I told them they'd have to wait now.

Q    Okay.

A    The detective wanted to interview them, that was it, it's out of my hands.

Q    Did you tell them what the detective wants at the time to interview them about?

A    No.

Q    Did you tell them also that all that had to happen was the detective was going to interview them and theywould be going home?

N. C. Davis

1          T-3   Reynolds-Ppl-cross (Rivera)                932

2     A    Excuse me?

3     Q    That after the detective spoke to them, they'd be

4     going home.  Did you tell them that?

5     A    I might have.

6     Q    Okay.  Did you also tell them that you were waiting

7     for a warrant search to come through before they went home?

8     A    Yes.

9     Q    And this would be at about five o'clock in the

10    morning?

11    A    Around that time.

12    Q    Okay.  And did you repeat this, that you were

13    waiting for a warrant search to come in before they can go

14    home at about six o'clock in the morning?

15    A    I don't recall if that's exactly what I said.

16    Q    Did you do a warrant search, officer?

17    A    Yes.

18    Q    At what time did you perform the warrant search?

19    A    It was 2:15 in the morning.

20    Q    How long did it take you to perform the warrant

21    search?

22    A    Let's see, I had to call up, I had to call up and

23    give the names of the, you know, of the defendants to the

24    person that takes it and you know, wait for them to do the

25    check on the computer and get back to me.


                         H. C. Davis

1              T-3   Reynolds-Ppl-cross (Rivera)              933

2       Q     And how long does it take to call to make the phone

3  call?

4       A     How long did it take to call them?

5       Q     To make the phone call, yes.

6       A     About ten minutes.

7       Q     Okay.   And what information did you impart to the

8  other person on the other side in reference to a warrant

9  search?

10      A     The defendant's name, their address and their date

11  of birth and their races.

12      Q     And their race?   So you give four pieces of

13  information to the person on the other side; is that

14  correct?

15      A     That's correct.

16      Q     And this was as to five individuals, is that

17  correct?

18      A     Excuse me.

19      Q     And this is in reference to five specific

20  individuals that you gave this information to; is that

21  correct?

22      A     That's correct.

23      Q     The five individuals that were in your custody; is

24  that correct?

25      A     That's correct.


                              H. C. Davis

```
1              T-3    Reynolds-Ppl-cross (Rivera)            934

2        Q    And that took you ten minutes, is that correct?

3        A    Took me ten minutes to give them the information.

4        Q    Right.  And did they said hold on until, we'll have

5   the information right back to you.

6        A    No, I think they had to call me back.

7        Q    Okay.  And did they ever call you back?

8        A    Yes.

9        Q    What time did they call you back?

10       A    That, I don't recall.

11       Q    Okay.  How long does it normally take to get a call

12   back on a warrant search?

13            MS.  LEDERER:  Objection.

14            THE COURT:  Is there a normal period when you

15       get the answer back?

16            THE WITNESS:  No.

17       Q    What's the longest you've ever waited for a

18   warrants search?

19            MS.  LEDERER:  Objection.

20            THE COURT:  Objection sustained.

21       Q    What's the --

22            Now the first person who arrived at the precinct

23   was Mrs. Cuffee; is that correct?

24       A    That's correct.

25       Q    That's Kevin Richardson's mother, is that correct?


                            H. C. Davis
```

AM004088

NYCLD_023637

1              T-3    Reynolds-Ppl-cross (Rivera)              935

2      A    That's correct.

3      Q    And as soon as she came into the precinct, she came

4   to see you; is that correct?

5      A    She might have went to the desk, and I think they

6   directed her to where I was.

7      Q    Now, there is a door into the juvenile room?

8      A    Yes.

9      Q    And was that door opened or was that door closed?

10     A    That door was closed.

11     Q    Okay.  And Mrs.Cuffee had to knock on that door; is

12  that correct?

13     A    I believe so.

14     Q    And was it you or one of your partners who answered

15  the door?

16     A    I think it was me.

17     Q    And at which point in time, I think you testified

18  earlier today that you told her that you were finishing up

19  some paperwork and you had arrested her son; is that

20  correct?

21     A    That's correct.

22     Q    And I think you had testified earlier there was a

23  brief conversation with Mrs. , with Mrs.Cuffee and her son,

24  Kevin Richardson; is that correct?

25     A    That's correct.


                              N. C. Davis

NYCLD_023638

T-3    Reynolds-Ppl-cross (Rivera)                936

Q    And you also told her that as soon as the paperwork was finished, she and her son would be going home. is that correct?

A    That's correct.

Q    And you told her that in front of Kevin; is that correct?

A    Yes.

Q    And by the way, the juvenile room, how big is that jouvenile room?

A    In feet?

Q    Yeah, if you know.

A    I don't know.

Q    Is it the -- Is that room also used for other purposes at the precinct?

A    Yes.

Q    What is it also used for?

A    It's also, it's the youth room, it's also the auxiliary S.E.P.A., highway safety and community affairs office.

Q    That's within one room; is that correct?

A    One little room.

Q    How many desks are in that room?

A    Approximately five.

Q    How many desks were there that night, April the

E. C. Davis

NYCLD_023639

1
2      19th?

3      A      There were five.

4      Q      Okay.   And were the juveniles kept at one section

5      of the room?

6      A      Yes.

7      Q      And that would be the sex furthest away from the

8      door; is that correct?

9      A      That's correct.

10     Q      And you were between the juveniles and the door; is

11     that correct?

12     A      That's correct.

13     Q      And that's the room that you are commanded to take

14     youths whenever you take them into custody, is that correct?

15     A      That's the designated jouvenile room.

16     Q      Right.   And there are no beds in that room; is that

17     correct?

18     A      No.

19     Q      There are no mattresses in that room; is that

20     correct?

21     A      That's correct.

22     Q      No pillows, no blankets?

23     A      That's correct.

24     Q      You did not proved any pillows, blankets or

25     mattresses to the juveniles?


                       H. C. Davis

NYCLD_023640

T-3    Reynolds-Ppl-cross (Rivera)                938

A    No.

Q    On the 19th or the 20th?

A    No.

Q    You did not buy any food for these juveniles; is that correct.

A    That's correct.

Q    You did not offer to transport juveniles to Spoffard House on the evening of April the 19th or April the 20th, is that correct?

A    I don't understand.

Q    Did you tell the parents, we're taking these kids to Spoffard House?

A    No.

Q    Did you tell the parents, we're taking these kids to the court on the morning of April the 20th?

A    No.

Q    Now, you testified earlier that the grandmother arrived at the precinct at about five o'clock in the morning; is that correct?

A    Approximately.

Q    And this was after the other parents had left to buy food for their kids?

A    I was gone at the time, so she might have got there when they got back, I don't know which happened first.

W. C. Davis

```
1                    T-3    Reynolds-Ppl-cross (Rivera)                939
2         Q    Okay.   You left the precinct?
3         A    Yes.
4         Q    What time did you leave the precinct?
5         A    About twenty after four.
6         Q    So, you left the precinct at about twenty after
7    four, is that correct?
8         A    Yes.
9         Q    When you left the precinct, you left the juveniles
10   in somebody's custody?
11        A    Yes.
12        Q    And whose custody did you leave them with?
13        A    It was another police officer.
14        Q    And how long were you gone?
15        A    About a half hour.
16        Q    Okay.   And where did you go?
17        A    Thirty five minutes.
18        Q    Where did you go?
19        A    Went to the crime scene on 102nd Street.
20        Q    And who did you go with?
21        A    I went alone.
22        Q    And what is the name of the police officer that was
23   left attending to the juveniles?
24        A    That I don't recall.
25        Q    And when you got back, you got back at about 5:15,
```

N. C. Davis

NYCLD_023642

T-3    Reynolds-Ppl-cross (Rivera)                    940

would that be correct?

 A About that time, 5, 5:15.

 Q And when you got back, the juveniles were awake; is
that correct?

 A Yes.  Yes, they were eating at that time.

 Q And they were eating; is that correct?

 A Yes.

 Q And you don't know who provided the food; is that
correct?

 A Yeah, their families did.

 Q You don't know who --

   MR.  RIVERA:  Withdrawn.

 Q You don't know what time that Evida Colon got to
the Central Park precinct?

 A No.

 Q You don't know what time her father--

   MR.  RIVERA:  Withdrawn.

 Q Raymond Santana's father got to the Central Park
Precinct?

 A No.

 Q And this was after you had told all the parents to
go out and buy food for their kids; is that correct?

 A Excuse me?

 Q They arrived at the precinct after you had told the

H. C. Davis

NYCLD_023643

1                    T-3   Reynolds-Ppl-cross (Rivera)              941

2    parents to go out and buy food for their kid; is that

3    correct?

4        A    This was after I told them where they could get

5    food.

6        Q    Right.  And after some of the parents left, is that

7    correct?

8        A    That's correct.

9        Q    And after these parents had come back and bought

10   food; is that correct?

11       A    Excuse me?

12              MR.  RIVERA:  Withdrawn.

13       Q    How long did it take for you to complete the

14   paperwork on the five juveniles that you arrested?

15       A    Excuse me.  Took a couple of hours.

16       Q    Okay.  And this would be, you started at about what

17   time?

18       A    About 11:30.

19       Q    And you finished at what time?

20       A    It was, it was late.  It was early in the morning.

21       Q    Okay.  And when you say early in the morning, that

22   would be about two, three o'clock in the morning, would that

23   about correct?

24       A    Maybe even later.

25       Q    Yeah.  And did you take any photos of Raymond

                         H.  C.  Davis

```
 1                  T-3    Reynolds-Ppl-cross (Rivera)              942
 2   Santana?
 3        A     Yes.   Well, there was a photo taken, I don't recall
 4   if I had taken it.
 5        Q     Would this be a Polaroid photo?
 6        A     Yes.
 7        Q     And photos of the other juveniles?
 8        A     Yes.
 9        Q     Did there come a point in time when individuals
10   came into the precinct to file a report against these
11   juveniles.
12        A     Some people had come in.
13        Q     And did they identify themselves to you?
14        A     Yes.
15        Q     And did they --
16              And do you recall what the names were?
17        A     No.
18        Q     Did you write it down anywhere?
19        A     No, I don't have it.
20        Q     Do you recall what they were doing, what these
21   individuals who came in to file a report, what they said
22   they were doing on the evening of April the 19th?
23        A     They were riding a bicycle.
24        Q     And did you show them the photos?
25        A     Yes.


                        H. C. Davis
```

NYCLD_023645

1          T-3   Reynolds-Ppl-cross (Rivera)          943

2      Q    And did they indicate whether or not they could

3  identify anybody?

4      A    Well, they stated from the beginning they couldn't

5  identify who it was.

6              MR. JOSEPH:  Objection.

7              THE COURT:  Just listen to his question.

8      Q    Did they indicate to you they could not identify

9  anybody?

10     A    Yes.

11     Q    And notwithstanding the fact they said they could

12 not identify anybody, you showed them the photos any way; is

13 that correct?

14     A    Excuse me?

15     Q    Notwithstanding the fact they stated to you they

16 could not identify anybody, you in any case showed them the

17 photos; is that correct?

18     A    That's correct.

19     Q    Now, the first interrogation began at 5:30; is that

20 correct?

21     A    That's correct.

22     Q    And the first person who was interrogated was

23 Lamont Mc Call; is that correct.

24              MR. LEDERER:  Objection to the

25              characterization as interrogation.


                    H. C. Davis

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              944
 2                  THE COURT:  The question?  I'll allow it.
 3                  Go ahead.
 4       Q     Was Lamont Mc Call; is that correct?
 5       A     That's correct.
 6       Q     And that took approximately two hours?
 7       A     About an hour.
 8       Q     And you were present when that interrogation was
 9   taking place; is that correct?
10       A     That's correct.
11       Q     And did you take any notes?
12       A     No.
13       Q     And the second person that was questioned was
14   Clarance Thomas; is that correct?
15       A     That's correct.
16       Q     And who was present when Lamont Mc Call was being
17   questioned?
18       A     Myself, Det. Whelpley, Farrel and his mother.
19       Q     And who was present when Mr. Thomas was being
20   questioned?
21       A     The same people.
22       Q     And you indicated earlier in your testimony that
23   you were questioned by a Chief Rosenthal; is that correct?
24       A     Excuse me?
25       Q     You were questioned by a Chief Rosenthal; is that
```

H. C. Davis

NYCLD_023647

```
 1                    T-3    Reynolds-Ppl-cross (Rivera)              945

 2    correct?

 3         A    Yes.

 4         Q    At about I think you indicated ten o'clock in the

 5    morning?  Of the 20th?

 6         A    I think I said twelve.  I have to look again.

 7    Yeah, it was about twelve.

 8         Q    And who was present when you were debriefing Chief

 9    Rosenthal.

10                    MS.  LEDERER:  Objection.

11                    THE COURT:  When he was debriefing?

12         Q    When you were speaking to Chief Rosenthal?

13         A    Captains Gunther, maybe a detective or two.

14         Q    Do you recall the name of the detectives?

15         A    No.

16                    (Transcript continued on the next page.)

17

18

19

20

21

22

23

24

25

                              H.  C.  Davis
```

NYCLD_023648