# Exhibit 9

T1-JM-TS

4914

1                          Fairstein - People - Direct

2    District Attorney's office.

3         Q       How  long have you been employed as an Assistant

4    District Attorney?

5         A    Almost 18 years.

6         Q    Directing your attention to April 20th of 1989.

7    Did there come a time on that date that you went  to  the

8    20th Precinct?

9         A    Yes, there did.

10        Q    And at approximately what time did you arrive at the

11   20th Precinct?

12        A    A little after 8:30 that evening.

13        Q         Ms.  Fairstein,  are  you  familiar  with  the

14   circumstances under which an Assistant District Attorney, from

15   the New York County DA's office is assigned to go to a  police

16   precinct and assist or participate?

17             MR. RIVERA:  Objection, objection.

18        Q    (Continuing) in an investigation?

19             MR. JOSEPH:  Objection.

20             MR. BURNS:  Objection.

21             THE COURT:  Objection sustained.

22        Q       Was  an  Assistant District Attorney assigned to

23   assist in the investigation of this case?

24             MR. JOSEPH:  Objection.

25             THE COURT: Overruled.

T2-SC-TS

4945

1                           Fairstein - People - Direct
2        Q      Thank you.
3               MS. LEDERER:  I have nothing further.
4    CROSS EXAMINATION
5    BY MR. BURNS:
6        Q      Good morning, Ms. Fairstein.
7        A      Good morning, Mr. Burns.
8        Q      Ms. Fairstein, when you went to the 20th Precinct,
9    had Ms. Lederer arrived before you?
10       A      Yes, she had.
11       Q      What time did you send Ms. Lederer to the 20th
12   Precinct?
13              MS. LEDERER:  Objection.
14              THE COURT:  I'll let her answer.
15       A      I didn't send her there.
16       Q      What time did you assign her in relation to this
17   investigation?
18       A      I believe it was around 9:15 on the morning of April
19   20th.
20       Q      Do you know what time she left to go to the 20th
21   Precinct?
22       A      More or less, yes.
23       Q      What time was that?
24       A      I believe it was about eight o'clock that evening.
25       Q      Now, had -- did the police department or any

T2-SC-TS

4946

1           Fairstein — People — Cross — Burns
2   representatives   of   the   police   department   ask     for   your
3   assistance in connection with this investigation?
4              MS. LEDERER:  Objection.
5              THE COURT:  I'll allow it.
6   A    Yes, they did ask for our assistance.
7   Q    At what point was that?
8              MS. LEDERER:  Objection.
9              THE COURT:  I'll allow it.
10  A    They first --
11  Q        No.   When was the first time they asked for the
12  assistance of the District Attorney's Office  in   relation  to
13  this investigation?
14  A     When I was called at nine o'clock on the morning of
15  the 20th, I was told I would be asked later   in   the   day   for
16  assistance.
17  Q          You   were   called   by   a   police   department
18  representative?
19  A    That's right.
20  Q    And was it  a  person  who  was  in  charge  of  the
21  investigation?
22             MS. LEDERER:  Objection.
23             THE COURT:  I'll let her answer.
24  A    It was one of the supervising officers, yes.
25  Q    When you arrived at eight o'clock -- I'm sorry, 8:30

T2-SC-TS

4947

Fairstein — People — Cross — Burns

--

1
2
3      A     A little after 8:30.

4      Q     — Ms. Lederer was already there, is that right?

5      A     Yes.

6      Q           And you went inside and went up to the 2nd floor

7    detective room?

8      A     Yes, I did.

9      Q     Ms. Lederer was there?

10     A     Yes, she was.

11     Q     Had any video begun?

12     A     No.

13     Q     Had any questioning or talking to people, had any of

14   that begun at the time that you arrived?

15           MS. LEDERER:  Objection.

16           THE COURT:  If she knows, I'll let her answer.

17     A     Yes, it had.

18     Q     At any time prior to your arrival, did you have

19   occasion to go to Metropolitan Hospital?

20     A     No, sir.

21     Q           And did you have an occasion to speak to the

22   officers who had — the officers who had discovered the body

23   of the female jogger?

24           MS. LEDERER:  At what point?

25     Q           Prior to your arrival at the precinct, at

T2A-SC-TS

4948

```
 1              Fairstein - People - Cross - Burns
 2   approximately 8:30 in the evening of the 20th.
 3        A     Prior to my arrival, no.
 4        Q     Incidentally, the telephone call that you received
 5   about nine o'clock, that was in relation to asking the
 6   District Attorney's Office for assistance in connection with
 7   the investigation relative to the female jogger?
 8        A     In part, yes.
 9        Q     You're the -- were any other units of the District
10   Attorney's Office called?
11              MS. LEDERER:  Objection.
12        Q     To your knowledge?
13              MS. LEDERER:  Objection.
14              THE COURT:  I'll allow it.
15        A     Yes.
16        Q     Well, you're the Head of the Sex Crimes Unit, right?
17        A     Yes.
18        Q     Was there any other sex crime that was being
19   investigated, in connection with Central Park?
20              MS. LEDERER:  Objection.
21              THE COURT:  Sustained.
22        Q     Your participation, as the Chief of the Sex Crimes
23   Unit, when you were called, wasn't that in connection with the
24   investigation relative to the, to the female jogger?
25        A     Yes.
```

1        T-3    Reynolds-Ppl-cross (Rivera)           909

2        the Assistant District Attorneys and all sworn

3        jurors are present.

4              THE COURT:  All right, good afternoon, ladies

5        and gentlemen.

6              THE CLERK:  Officer Reynolds, may I remind you

7        you're still under oath.

8              THE WITNESS:  Yes.

9    CONTINUING CROSS EXAMINATION

10   BY MR. RIVERA:

11        Q    Officer, before we broke, you indicated to us that

12   there was some chiefs and members of the press that were

13   present at the Central Park Precinct; is that correct?

14        A    Yes.

15        Q    And is that unusual to see top brass at the Central

16   Park Precinct during an arrest?

17        A    There is not a lot of arrests there, so, but yeah,

18   I would say it is.  Slight.

19        Q    Under normal circumstances would it be unusual to

20   see a high member of the brass at any precinct when youths

21   are arrested?

22              MS.  LEDERER:  Objection.

23              THE COURT:  I'll allow it.

24        A    It depends on the precinct.

25        Q    Are there some precincts where this would not be

                          E. C. Davis

```
1                    T-3    Reynolds-Ppl-cross (Rivera)                910
2     unusual?
3                    MS.   LEDERER:   Objection.
4         A    Yes.
5         Q    What about the Central Park Precinct, is this
6     unusual at the Central Park Precinct?
7         A    Slightly, yes.
8         Q    And the same applies for the members of the press?
9         A    Yes.
10        Q    Is thsi the first time you make an arrest where you
11    have that kind of brass and that kind of press present?
12        A    Yes.
13        Q    And at what point in time were you apprised that
14    there case was going to have special significance within the
15    modus operandi of the Police Department.
16                   MS.  LEDERER:   Objection.
17                   THE COURT:  Sustained.
18        Q    Were there any Assistant District Attorneys present
19    at any time when you were involved in this case between
20    April the 19th and April the 20th?
21                   MS.  LEDERER:   Objection.
22                   THE COURT:  I'll let him answer.
23        A    Yes.
24        Q    And would that about A.D.A.  Lederer?
25        A    Yes.


                          H. C. Davis
```

NYCLD_023613

```
 1              T-3   Reynolds-Ppl-cross (Rivera)              911
 2        Q    And was there also an A.D.A. Fairstein?
 3        A    Yes.
 4        Q    Were there any other members of the District
 5   Attorney, District Attorney present, paticularly any
 6   Assistant District Attorney?
 7        A    I don't think so.
 8        Q    And when for the first time did you see an
 9   Assistant District Attorney on this matter?
10        A    The night of the 20th.
11        Q    Prior to the evening of the 20th, you had not seen
12   any A.D.A.s?
13        A    Regarding this matter?
14        Q    Regarding this case.
15        A    No.
16        Q    Did you see them in the building or any other
17   buildings involved in the case?
18        A    No.
19        Q    Prior to the 20th?
20        A    No.
21        Q    Officer, you testified that you spoke to a police
22   officer Alvarez; is that correct?
23        A    Yes.
24        Q    And police officer Alvarez informed you of an
25   assault on an individual; is that correct?


                              M. C. Davis
```

Linda Fairstein

Page 221

| | | |
|---|---|---|
| 1 | at two precincts. | 15:45:53 |
| 2 | Q.     Others were concerned about what | 15:45:56 |
| 3 | else? | 15:45:59 |
| 4 | A.     Other officers I didn't know who | 15:45:59 |
| 5 | were in a similar position, who were not | 15:46:06 |
| 6 | being interviewed and expressed to my | 15:46:09 |
| 7 | former colleagues that they had | 15:46:14 |
| 8 | information they wanted to give to her, | 15:46:17 |
| 9 | her being Ms. Ryan. | 15:46:20 |
| 10 | Q.     Do you know what officers | 15:46:22 |
| 11 | communicated with your former colleagues | 15:46:24 |
| 12 | to express that opinion or those opinions? | 15:46:26 |
| 13 | A.     As I sit here today, I don't | 15:46:29 |
| 14 | know.  I knew in 19 -- I'm sorry, I knew | 15:46:31 |
| 15 | some of the names in 2002. | 15:46:36 |
| 16 | Q.     Did you take notes when you were | 15:46:38 |
| 17 | having these conversations with people in | 15:46:40 |
| 18 | the District Attorney's office who were | 15:46:42 |
| 19 | expressing their concern? | 15:46:43 |
| 20 | A.     Not that I can think of. | 15:46:46 |
| 21 | Q.     I guess we can go to April 20th | 15:46:49 |
| 22 | now for awhile.  Fiston called you what | 15:47:15 |
| 23 | time in the morning? | 15:47:22 |
| 24 | A.     As I recall, between 8:30 and | 15:47:24 |
| 25 | nine o'clock in the morning. | 15:47:27 |

NYCLD_039089

Linda Fairstein

Page 222

| | | |
|---|---|---|
| 1 | Q.    At that time, did you know | 15:47:29 |
| 2 | anything about the events in Central Park | 15:47:32 |
| 3 | on April 19th? | 15:47:35 |
| 4 | A.    I don't believe that I did. | 15:47:36 |
| 5 | Q.    You saw nothing on television, | 15:47:38 |
| 6 | you heard nothing from other sources? | 15:47:41 |
| 7 | A.    I didn't see anything on | 15:47:44 |
| 8 | television the night of the 19th.  I may | 15:47:46 |
| 9 | have heard a news, radio news report in | 15:47:50 |
| 10 | the morning, not about a rape, but about a | 15:47:53 |
| 11 | riot. | 15:47:58 |
| 12 | Q.    Do you know why Fiston called? | 15:47:59 |
| 13 | A.    Yes, I do. | 15:48:05 |
| 14 | Q.    Why? | 15:48:06 |
| 15 | A.    He called me shortly before nine | 15:48:07 |
| 16 | to tell me that a woman had been found | 15:48:10 |
| 17 | beaten, and presumably because of her | 15:48:22 |
| 18 | state of undress, sexually assaulted in | 15:48:24 |
| 19 | the ravine, and he had been called in | 15:48:28 |
| 20 | because there had been no sexual assault | 15:48:34 |
| 21 | allegation until that woman reached the | 15:48:38 |
| 22 | hospital. | 15:48:40 |
| 23 | Q.    What else did he tell you? | 15:48:41 |
| 24 | A.    He told me that the woman was as | 15:48:47 |
| 25 | yet unidentified, and he asked me in the | 15:48:52 |

NYCLD_039090

Linda Fairstein

Page 223

| | | |
|---|---|---|
| 1 | usual course of prosecutorial business if | 15:48:57 |
| 2 | I would assign a prosecutor to work on the | 15:49:00 |
| 3 | prosecutorial events that might happen | 15:49:06 |
| 4 | later in the day because there were | 15:49:14 |
| 5 | already were suspects being questioned. | 15:49:16 |
| 6 | Q.    Did you make any notes about | 15:49:22 |
| 7 | this conversation? | 15:49:24 |
| 8 | A.    No. | 15:49:25 |
| 9 | Q.    Did you create any memorandum | 15:49:25 |
| 10 | afterwards about this conversation? | 15:49:29 |
| 11 | A.    Not that I recall. | 15:49:30 |
| 12 | Q.    Did he tell you anything else? | 15:49:31 |
| 13 | A.    At that time, only that we | 15:49:35 |
| 14 | discussed that I would get back to him | 15:49:39 |
| 15 | with the name and number of the Assistant | 15:49:41 |
| 16 | DA, and that I would tell the District | 15:49:44 |
| 17 | Attorney. | 15:49:46 |
| 18 | Q.    Did you understand that Fiston | 15:49:46 |
| 19 | was calling you in line with the | 15:49:48 |
| 20 | arrangement that you and Morgenthau had | 15:49:50 |
| 21 | made, that whenever there was a rape in | 15:49:53 |
| 22 | New York City, you should be contacted? | 15:49:55 |
| 23 | A.    Not exactly. | 15:49:57 |
| 24 | Q.    Why do you say that? | 15:49:58 |
| 25 | A.    Because it was not just a call | 15:50:00 |

NYCLD_039091

Linda Fairstein

Page 224

| | | |
|---|---|---|
| 1 | to give me information.  It was a call in | 15:50:04 |
| 2 | which he was asking for the help that we | 15:50:07 |
| 3 | provide in the instant moment. | 15:50:12 |
| 4 | Q.    Fiston was calling you, right, | 15:50:14 |
| 5 | right? | 15:50:17 |
| 6 | A.    Fiston did call me. | 15:50:17 |
| 7 | Q.    Right? | 15:50:19 |
| 8 | A.    Yes, sir. | 15:50:21 |
| 9 | Q.    And the reason Fiston called you | 15:50:21 |
| 10 | about a rape was the arrangement you and | 15:50:24 |
| 11 | Morgenthau had made with Fiston that you | 15:50:27 |
| 12 | should be called about every rape; is that | 15:50:29 |
| 13 | correct? | 15:50:32 |
| 14 | MS. DAITZ:  Objection. | 15:50:32 |
| 15 | A.    No, sir. | 15:50:32 |
| 16 | Q.    Why is that not correct? | 15:50:33 |
| 17 | MS. DAITZ:  Let her answer the | 15:50:35 |
| 18 | question this time. | 15:50:37 |
| 19 | Q.    Why is that not correct? | 15:50:37 |
| 20 | A.    Because the practice that | 15:50:39 |
| 21 | Morgenthau and I had requested to have | 15:50:41 |
| 22 | with Mr. Fiston and other officers was for | 15:50:45 |
| 23 | the information of a case. | 15:50:49 |
| 24 | So if a rape had happened on | 15:50:50 |
| 25 | 4/15 on East 30th Street and it wasn't | 15:50:51 |

NYCLD_039092

Linda Fairstein

Page 225

| | | |
|---|---|---|
| 1 | solved, we'd know and have it under our | 15:50:55 |
| 2 | roof as well. | 15:51:00 |
| 3 | On this morning when he called | 15:51:01 |
| 4 | me, he was calling to ask me to assign a | 15:51:03 |
| 5 | prosecutor now for the purpose, as we ride | 15:51:06 |
| 6 | homicides and sex crimes as the expression | 15:51:13 |
| 7 | is called, to have a prosecutor to be | 15:51:15 |
| 8 | available to him within hours to help with | 15:51:19 |
| 9 | the prosecutorial steps that would be | 15:51:21 |
| 10 | taken at the station house. | 15:51:24 |
| 11 | Q.    So it's your answer that the | 15:51:26 |
| 12 | call that Fiston made to you had no | 15:51:29 |
| 13 | connection with the arrangements that you | 15:51:32 |
| 14 | and Morgenthau had made with Fiston to | 15:51:33 |
| 15 | call and advise you about a rape, whether | 15:51:37 |
| 16 | or not a person had been arrested? | 15:51:39 |
| 17 | MS. DAITZ:  Objection.  You can | 15:51:41 |
| 18 | answer. | 15:51:43 |
| 19 | A.    Those are not my words, sir.  I | 15:51:43 |
| 20 | didn't say they had no connection.  I said | 15:51:46 |
| 21 | this was for a much more urgent purpose. | 15:51:48 |
| 22 | It might also have served that use, hello, | 15:51:51 |
| 23 | this is the event that happened this | 15:51:55 |
| 24 | morning. | 15:51:57 |
| 25 | On top of that, there was a much | 15:51:58 |

NYCLD_039093

Linda Fairstein

Page 226

```
 1   more urgent need.  He wanted a prosecutor    15:52:00
 2   assigned, that was the main purpose of the    15:52:04
 3   call.                                         15:52:06
 4        Q.    Did he tell you that it appeared   15:52:06
 5   that a homicide was involved?                 15:52:08
 6        A.    No, he didn't tell me that.  He    15:52:09
 7   told me that the victim was in very grave     15:52:12
 8   condition.                                    15:52:18
 9        Q.    The question I think I forgot to   15:52:19
10   ask you earlier when you spoke of one         15:52:21
11   person who had knowledge about the           15:52:23
12   investigation from Ryan, who was that?        15:52:26
13        A.    Lisa Friel.                        15:52:30
14        Q.    Did you know what she had          15:52:31
15   learned from Ryan and how she knew about      15:52:36
16   it?                                           15:52:38
17        A.    I knew some of the things she      15:52:39
18   learned from Ryan.                            15:52:42
19        Q.    What did you learn from Friel?     15:52:43
20        A.    I knew from Friel the point at     15:52:45
21   which Ryan no longer wanted Mooney            15:52:55
22   involved in the investigation.               15:52:59
23             I knew from Friel that she, that   15:53:00
24   on a day, I came to know from Friel that     15:53:03
25   on a date that Ryan arranged with Mooney     15:53:08
```

NYCLD_039094