**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-8042 (PKC) |
| | ) | |
| v. | ) | Judge P. Kevin Castel |
| | ) | |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Sandra D. Hauser
Kiran Patel
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700
*sandra.hauser@dentons.com*
*kiran.patel@dentons.com*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Counsel for Defendants Netflix, Inc.,
Ava DuVernay and Attica Locke*

# TABLE OF CONTENTS

Page

I.     The Complained-of Scenes Are Not Defamation as a Matter of Law............................ 2

       *Lack of Defamatory Meaning*........................................................................... 3

       *Constitutionally Protected Opinion* ................................................................. 3

ANALYSIS OF SCENES ............................................................................................ 6

       No Plausible Defamatory Meaning (Scenes 1, 2, and 5)....................................... 7

       No Basis for Claimed Imputation That Plaintiff "Violated the Law" (Scenes 3,
              7, 8, 9). ............................................................................................. 7

       Portrayal of Plaintiff Expressing Views She Has Publicly Espoused for Decades
              Not Defamatory (Scenes 4, 5, 8, 10, 11)................................................. 9

       No Claim Based On Powerful, Hyperbolic Language in Dramatized Dialogue
              That Is Substantially True in Any Event (Scenes 2, 3, 6).............................. 15

II.    The Court May Properly Consider the Judicially Noticeable Public Records
       and Admissions From Plaintiff's Own Public Statements That Foreclose Her
       Claims............................................................................................................... 17

III.   The Court Looks to the Film Itself, Not an Anecdotal Poll of Social Media
       Users, to Assess Plaintiff's Defamation Claims ................................................... 18

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aboutaam v. Dow Jones & Co.*,
180 A.D.3d 573 (1st Dep't 2020) ..........................................................................20

*Agbimson v. Handy*,
2019 WL 3817207 (S.D.N.Y. Aug. 14, 2019).........................................................18

*Barbash v. STX Financing LLC*,
2020 WL 6586155 (S.D.N.Y. Nov. 10, 2020)...................................................16, 18

*Bordoni v. N.Y. Times Co.*,
400 F. Supp. 1223 (S.D.N.Y. 1975).........................................................................8

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) .................................................................................................4

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014).........................................................................3, 9, 20

*Deripaska v. AP*,
282 F.Supp.3d 133 (D.D.C. 2017) .........................................................................14

*Dworin v. Deutsch*,
2008 WL 508019 (S.D.N.Y. Feb. 22, 2008).......................................................7, 12

*Egiazaryan v. Zalmayev*,
880 F. Supp. 2d 494 (S.D.N.Y. 2012)............................................................ *passim*

*Fine v. ESPN, Inc.*,
11 F. Supp. 3d 209 (S.D.N.Y. 2014).......................................................................18

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020).....................................................................17

*Grayson v. Ressler & Ressler*,
271 F. Supp. 3d 501 (S.D.N.Y. 2017)........................................................................8

*Guerrero v. Carva*,
10 A.D.3d 105 (1st Dep't 2004) .............................................................................15

*John E. Reid & Assocs. v. Netflix, Inc.*,
2020 WL 1330657 (N.D. Ill. Mar. 23, 2020)..........................................5, 8, 13, 16

*Kesner v. Dow Jones & Co.*,
   2021 WL 256949 (S.D.N.Y. Jan. 26, 2021) .......................................................3, 4

*Kimmerle v. N.Y. Evening Jour.*,
   262 N.Y. 99 (1933) ...............................................................................................7

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020).....................................................................................15

*Love v. Wm. Morrow & Co.*,
   193 A.D.2d 586 (2d Dep't 1993) .............................................................................9

*Lovingood v. Discovery Comm'cns, Inc.*,
   275 F. Supp. 3d 1301 (N.D. Ala. 2017).....................................................................6

*Lovingood v. Discovery Commc'ns, Inc.*,
   800 F. App'x 840 (11th Cir. 2020) ................................................................5, 6, 19

*Masson v. New Yorker*,
   501 U.S. 496 (1991)..........................................................................................4, 19

*Milkovich v. Lorain Jour.*,
   497 U.S. 1 (1990)...................................................................................................3

*Mirage Entm't, Inc. v. FEG Entret. S.A.*,
   326 F. Supp. 3d 26 (S.D.N.Y. 2018).......................................................................16

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) ...............................................................................16

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019)...................................................................................20

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) ........................................................................ *passim*

*Rappaport v. VV Publ'g*,
   163 Misc.2d 1 (Sup.Ct. N.Y. Cty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't
   1996) ..................................................................................................................17

*Reid v. Viacom Int'l Inc.*,
   No. 14-cv-01252, Order (N.D. Ga. Sept. 14, 2016)..................................................19

*Restis v. Am. Coalition Against Nuclear Iran*,
   53 F. Supp. 3d 705 (S.D.N.Y. 2014).........................................................................8

*Seymour v. Lakeville Jour. Co.*,
   150 F. App'x 103 (2d Cir. 2005) .....................................................................3, 7, 8

*Sheridan v Carter*,
48 A.D.3d 444 (2d Dep't 2008) ........................................................................15

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008) ...........................................................................17

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) ........................................................................................4

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017) ........................................................................9, 14

*Thoroughbred Legends, LLC v. Walt Disney Co.*,
2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ....................................................14

*Tracy v Newsday, Inc.*,
5 N.Y.2d 134 (1959). (*See* Mot. .) ...........................................................3, 7, 8, 9

*Wexler v. Dorsey & Whitney*,
815 F. App'x 618 (2d Cir. 2020) .......................................................................5

## Statutes and Rules

Federal Rule of Evidence Rule 201 ...........................................................................18

Plaintiff's Opposition proves the infirmity of her lawsuit.  Plaintiff fails to address the specific arguments and case law set out in Defendants' Motion to Dismiss brief ("Mot."), which establish that each complained-of scene in *When They See Us* (the "Series") is not defamatory as a matter of law.  Eschewing a rigorous legal analysis of each scene for allegedly defamatory content, Plaintiff instead falls back on conclusory pronouncements that misrepresent the actual dialogue in the Series, her admitted role and her own publicly stated views.

Plaintiff's Opposition ("Opp.") is constructed on the erroneous premise that the Series "falsely depict[s]" her as "plotting to convict young men of color *whom she knew were innocent*" and "assign[ed] her various *roles in the case that she did not play*."  (Opp. at 1 (emphasis added).) Plaintiff's assertion is belied by the Series' actual content, which does not depict the Fairstein character as "plotting" to convict youths she believed were "innocent," but accurately depicts her as *a true believer* in their guilt—a position the real Linda Fairstein has steadfastly maintained.

Plaintiff's other notion—that Plaintiff was "not involved" and had "no role," supervisory or otherwise, in the investigation (Opp. at 9), and that the Series "falsely" attributed to her "'critical responsibility' . . . which she clearly did not have" (*id.* at 16)—is pure gaslighting.  Plaintiff was the Head of the Manhattan D.A. Office's Sex Crimes Unit that prosecuted the Central Park Jogger case, one of the most controversial in New York's history—in her own words, she "oversaw the team" that prosecuted the case.  Plaintiff admits she spent more than 30 hours at the stations as the highest-ranking prosecutor during the time the five young teenagers—Kevin, Raymond, Antron, Yusef and Korey (the "Five")—were investigated and interrogated.  She visited the crime scene with two of them.  So enmeshed was Plaintiff that she testified at trial to support the confessions. After a serial rapist confessed years later to *solely* committing the rape, and his DNA alone matched, the Five's convictions were vacated.  Plaintiff, however, has never wavered from her own conviction that the Five were still guilty "***as charged***"—a view she has publicized for years,

including on television to promote her own books.  (Defendants' Appendix ("DX") 11.)

The fundamental problem with Plaintiff's lawsuit is that none of the actual dialogue and Scenes in the Series are actionable as defamation.  For the most part, they are, on their face, typical set pieces and tropes one would find in any police procedural drama where authorities are under pressure to solve a brutal crime, reflecting debates and conversations among the "team" Plaintiff led as Unit Head, and D.A. Morgenthau, with whom she admittedly "liaised" throughout the case. Any purportedly defamatory meanings are of Plaintiff's own creation, adding words and unsaid subtexts to the dialogue, which is improper under New York law—authority she fails to address.

Defamation also requires a statement that is *both* false and factual.  In making that assessment, context matters.  The context here is a film dramatization with a strong point of view, probing the gray areas of contested events in which Plaintiff played a key role.  Despite Plaintiff's assertion otherwise, dialogue in such an artistic treatment of controversial and ambiguous historical events is not subject to the same analysis as a news report or documentary.  Just as if it were in an Op-Ed, any criticism and interpretation of Plaintiff's conduct as a powerful public official that she reads into that dialogue is given equal protection and if anything greater leeway under the First Amendment and New York law.

Plaintiff's rhetoric and embellishments aside, an examination of the Series' actual dialogue in context and in light of Plaintiff's documented words and actions, makes clear that she was not, as a matter of law, defamed.  Plaintiff's Complaint should be dismissed in its entirety.

## I.    The Complained-of Scenes Are Not Defamation as a Matter of Law

As detailed in Defendants' opening brief, for the vast majority of Scenes at issue, the Court need look no further than the Series to reject Plaintiff's claims.  Other Scenes and dialogue also are substantially true as a matter of law, as demonstrated by Plaintiff's own words in records cited in the Complaint or subject to judicial notice.  Where, as here, Plaintiff's claims have no

merit, "[t]here is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Kesner v. Dow Jones & Co.*, 2021 WL 256949, at *8 (S.D.N.Y. Jan. 26, 2021) (citations omitted).

Before turning to each Scene to address Plaintiff's scene-specific points (to the extent there are any), her failure to address the law and erroneous assertions of law merit a brief reply.

***Lack of Defamatory Meaning.*** Plaintiff offers no response to the reality that many of the complained of Scenes, on their face, convey no plausible defamatory meaning. Instead, Plaintiff grafts entirely new concepts and subtexts onto the dialogue in an effort to create defamation where none exists. Plaintiff's innuendo alone cannot, however, be the basis for a defamation claim, and it cannot be used to "enlarge upon the meaning of words so as to convey a meaning that is not expressed." *Tracy v Newsday, Inc.,* 5 N.Y.2d 134, 136 (1959). (*See* Mot. at 12.) Plaintiff does not dispute this basic legal tenet. (*See* Opp., *passim*.) Nor does Plaintiff dispute that, in determining whether statements are "reasonably susceptible to a defamatory connotation . . . a court does not construe the challenged statements 'with the close precision expected from lawyers and judges.'" *Seymour v. Lakeville Jour. Co.*, 150 F. App'x 103, 104 (2d Cir. 2005). Instead, as Plaintiff concedes, courts construe alleged defamatory language "in the context of the publication as a whole," as an average viewer or reader would. *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014).

***Constitutionally Protected Opinion.*** Plaintiff's attempt to treat dramatized dialogue like factual assertions in a news report or documentary ignores well-established New York law and offends the First Amendment. Statements that "cannot 'reasonably [be] interpreted as stating actual facts'" are not actionable under the United States Constitution. *Milkovich v. Lorain Jour.*, 497 U.S. 1, 19 (1990). New York's Constitution and absolute protection for opinion is even more speech-

protective, requiring courts to focus "first, and primarily, on context" in determining if there is an actionable factual assertion: not only the "full context of the communication in which the statement appears" but its "broader social context or setting" including "customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 504, 505 (S.D.N.Y. 2012).[1]

"[T]he common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion." *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995) (accusation that plaintiff was part of a criminal scheme not actionable in Op-Ed context). The same "common expectation" applies here. The Series is a film drama based on a true story with actors and has a strong point of view critically exploring contested, controversial events and theories. It is not "disinterested . . . objective reportage." *See id.*

Consistent with *Brian*, the U.S. Supreme Court has observed that imagined dialogue in "a so-called docudrama or historical fiction" should not be accepted unquestioningly as the actual statements of the speaker to whom they are attributed. *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (quoting *Masson v. New Yorker*, 501 U.S. 496, 512-13 (1991) (contrasting allegedly fabricated quotes in a journalistic setting)). That is because "[d]ocudramas, as their

---

[1] "Under New York law, statements of opinion are not actionable as defamation, 'however unreasonable the opinion or vituperous the expression of it may be.' . . . A statement of 'pure opinion' is 'either accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts.'" *Kesner*, 2021 WL 256949, at *11 (citations omitted). Plaintiff muses that "Defendants' portrayal of Ms. Fairstein could also constitute mixed opinion" implying undisclosed facts "because the Series purports to convey the perspective of The Five, whom viewers would perceive as having firsthand knowledge of the events portrayed in the Series." (Opp. at 26 n. 41.) Nonsense. Plaintiff herself has averred that the Five had no firsthand knowledge of the scenes involving her (*see* Opp. at 3; Compl. ¶ 231) and nothing in the context of any of those scenes conveys any implication that they are based on "undisclosed facts." *See Steinhilber v. Alphonse*, 68 N.Y.2d 283, 293 (1986) ("the statement's verbal context would clearly suggest to the ordinary person" that it was "not intended to be understood as an assertion of fact or as opinion based on undisclosed facts").

names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." *Partington*, 56 F.3d at 1155.

Plaintiff does not address, let alone distinguish, *Partington* but instead simply repeats her unsupported conclusion that "viewers of [the Series] understood" it "as conveying provable facts." (Opp. at 24.)  As *Partington* explains, however, "viewers" are "sufficiently familiar with [the docudrama] genre to avoid assuming that all statements within them represent assertions of verifiable facts.  To the contrary, most [viewers] are aware by now that parts of such programs are more fiction than fact."  56 F.3d at 1155; *John E. Reid & Assocs. v. Netflix, Inc.*, 2020 WL 1330657, at *7 (N.D. Ill. Mar. 23, 2020).  As a result, although Plaintiff argues that her "claims remain actionable because she alleged that the opinions set forth in *WTSU*, and the facts upon which they are based, are false" (Opp. at 26), the purported "fabricated" "facts" of which she complains consist of the very dramatized dialogue that readers would not take to be literal truth in the context of the Series.  *John E. Reid,* 2020 WL 1330657, at *8. "The context of the statement . . . cuts against a determination that it is an assertion of fact meant to be taken literally" or an "'attempt to convey with technical precision literal facts about'" Plaintiff.  *Wexler v. Dorsey & Whitney*, 815 F. App'x 618, 622 (2d Cir. 2020) (citations omitted).

Plaintiff's contention that obviously dramatized conversations in an artistic work must necessarily be "false" assertions of "fact" because the dialogue is imagined or not a verbatim transcript of what was actually said, or because the Series compresses events or uses composite characters and other literary devices for dramatic narrative purposes, is thus contrary to law. Dramatizations, by their nature, involve "the selective editing of real history not only for time but also for clarity, flow, and emotional impact."  *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x

840, 847-48 (11th Cir. 2020).[2]  The First Amendment grants authors and filmmakers breathing room to "criticize and interpret the actions and decisions of those involved in a public controversy." *Partington,* 56 F.3d at 1159.  Particularly in exploring the actions of public officials like Plaintiff, "the public dialogue that is so important to the survival of our democracy will be stifled" if writers are forced "to confine themselves to dry, factual recitations or to abstract expressions of opinion."  *Id.*

Defendants do not, as Plaintiff claims, contend that "the First Amendment shields from scrutiny . . . every statement made in a docudrama" (Opp. at 24-25, citing *Partington,* 56 F.3d at 1155) or claim "wholesale . . . exemption" based on format (*id.* at 25).  To the contrary, just as in *Partington,* Defendants' motion showed why no Scene, in context, is actionable by examining "the specific *context* in which the statements were made" and "*the content of the statements themselves* in order to determine whether they are protected by the First Amendment," (56 F.3d at 1155, emphasis added), and New York law.  (Mot. at § II and Ex. B (Chart of Scenes).)  Plaintiff does not refute that showing.

## ANALYSIS OF SCENES

Plaintiff fails to engage with Defendants' scene-by-scene analysis.  Instead, Plaintiff ignores or embellishes what was actually said in the Scenes and simply pronounces all of the Scenes "false" because they involve dramatized conversations.  (*See* Opp. at 6-11.)  As set forth below, however, as to each Scene Plaintiff's claims fail on the basis of (1) lack of defamatory meaning, (2) opinion and/or (3) substantial truth.

---

[2]  Plaintiff misrepresents the lower court's decision in *Lovingood* as holding that "false reenactment of *events* which damages the reputation of the individual depicted" is not protected.  (Opp. at 16 (emphasis added).)  In fact, the court held only that "[u]nder certain circumstances, a jury question concerning actual malice *could* exist" where a defendant *falsified a plaintiff's sworn testimony*.  *Lovingood v. Discovery Comm'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017).  There is nothing remotely like that here.  And even so, the claim in *Lovingood* still failed.  More important, what is apt on this Motion is the holding that "[t]his case concerns a docudrama. The 'drama' aspect of the film *presupposes that aspects of the historical event are fictionalized in the film for entertainment purposes*."  *Id.* (emphasis added).

**No Plausible Defamatory Meaning (Scenes 1, 2, and 5).**  These purportedly defamatory

Scenes, on their face, cannot be said to bring the "hatred, shame," or "contempt" necessary to sustain

a defamation claim, *Kimmerle v. N.Y. Evening Jour.*, 262 N.Y. 99, 102 (1933):

- ***Scene 1:  Plaintiff "At the Crime Scene".***  This Scene depicts the Fairstein character at the crime scene on April 20, 1989, remarking: "[m]ake sure to get those drag marks. . . . Clear as day. *His footsteps*, her body" (Compl. ¶ 52 (emphasis Plaintiff's).)  This remark cannot be read as a definitive determination that there was only a "single attacker".  (Opp. at 6, 17.)  Moreover, it is not defamatory to say an initial "theory" changed based on additional evidence learned—which is what the Series depicts.  There is no dispute that the prosecution believed the "multiple" attackers theory was correct.[3]  (*See* Mot. at 14-15.)

- ***Scene 2: "Drafting a Press Release".***  All this Scene shows is the Fairstein character "drafting a press release" (Compl. ¶ 59), which, on its face, is not defamatory.  This Scene cannot be spun, as Plaintiff argues, to convey the press release was the "cause" of "widely criticized" coverage *by the press*.  (Opp. at 6.)  Plaintiff cannot amend text with that "new and independent thought" to state a claim.  *Tracy*, 5 N.Y.2d at 137.  (*See* Mot. at 15.)

- ***Scene 5: "Fighting With Nancy Ryan".***  This Scene shows the Fairstein character "fighting with" Ryan over "who would prosecute the case" (Compl. ¶ 25)—that is, the unremarkable suggestion she would want her Unit in charge of this high profile, significant case.  Plaintiff does not dispute that showing this tension is not defamatory.  Nor does she address the on-point holding in *Dworin v. Deutsch*, 2008 WL 508019, at *6 (S.D.N.Y. Feb. 22, 2008).  (*See* Mot. at 15.)

**No Basis for Claimed Imputation That Plaintiff "Violated the Law" (Scenes 3, 7, 8, 9).**

The Scenes Plaintiff claims impute she "violated the law" do not, on their face, support that

defamatory meaning.  Plaintiff instead attempts to concoct a claim by supplementing the actual

dialogue with innuendo and dissecting naturalistic conversation in dramatized dialogue with

lawyerly precision, contrary to New York law.  Certain dialogue is also protected opinion.

- ***Scene 3: Purported Questioning of "Unaccompanied Minors".***  This Scene depicts a brief exchange between the Fairstein character and a teenage witness to the events in the Park.  While Plaintiff characterizes the Scene as imputing a "violation of New York State law" regarding the questioning of minors, no reasonable viewer would understand Plaintiff's brief exchange with one of the witnesses to constitute a violation of (unmentioned) New York statutory law.  *Seymour*, 150 F. App'x at 104-105.  (*See* Mot. at

---

[3]  Even if the theory "changed" from one to "multiple" attackers, Plaintiff approved the prosecution based on that theory and championed it for years; she cannot claim libel from being aligned with that theory.

23.)   Plaintiff's Opposition contains no legal analysis of this Scene and nowhere attempts to defend this claim.  (*See* Opp., *passim*.)

- ***Scene 7: "No Kid Gloves".***  The complained-of dialogue ("This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this") is the kind of heated rhetoric typically used for dramatic purposes when a novel or film depicts authorities under pressure to solve a heinous crime.  *E.g., John E. Reid,* 2020 WL 1330657, at *8.  Such dramatic tropes and colorful turns of phrase like "no kid gloves" are too loose and hyperbolic to defame Plaintiff based on the Fairstein character's dialogue.  *See Restis v. Am. Coalition Against Nuclear Iran*, 53 F. Supp. 3d 705, 721 (S.D.N.Y. 2014) (Opp. at 24) ("Colloquial phrases like 'shake down' or 'crawling up your back' are hyperbolic; they are 'loose' statements that don't reasonably convey the specificity that would suggest" defendants "were seriously accusing" plaintiff of committing extortion (citations omitted)).  Nor does this dialogue convey that the Fairstein character is ordering detectives to illegally "invade homes" or "violate the law" by treating minors "as adults," as Plaintiff claims.  (Opp. at 9, 27.)  (*See* Mot. at 24.)

- ***Scene 8: Korey Wise is the "Glue".***  In discussing discrepancies in the teens' statements the Fairstein character states that Korey Wise is the "glue" that will hold the case together. This "glue" statement cannot be transformed into a directive by Fairstein to an NYPD detective to "beat" and "coerce" testimony from Mr. Wise, as Plaintiff claims.  (Opp. at 9, 20.)  The actions portrayed in subsequent scenes are those of the detectives alone, and the "glue" dialogue on its face is not actionable defamation.  *See, e.g., Tracy*, 5 N.Y.2d at 136-37 (news article reporting that plaintiff was seen carrying client's luggage out of hotel and was the "last person to hear" from him before he skipped bail could not be read to accuse plaintiff of "aiding and abetting" client's actions); *Bordoni v. N.Y. Times Co.*, 400 F. Supp. 1223, 1227, 1230 (S.D.N.Y. 1975) (news article reporting bank director's resignation and referring to "pressure from the regulatory authorities" did not actionably charge him with "participat[ing] in criminal acts").  (*See* Mot. at 24-25.)

- ***Scene 9: Discussion of DNA Evidence.***  Plaintiff implausibly tries to spin this Scene, which shows the prosecution team learning that NYPD had just belatedly discovered DNA on a sock from the crime scene, and the Fairstein character saying: "none of the defense is aware yet so we can test it right before the trial—surprise!", into an accusation she "conceal[ed] exculpatory evidence." (Opp. at 10.)  It does no such thing. (Mot. at 25.)  ***First***, the actual dialogue does not suggest the evidence would be "concealed" but rather that defense counsel did not know "yet" that it had just been found by NYPD—the "surprise" comment indicates they *would be* informed and the evidence would be "tested" "right before the trial," which it was.[4]  ***Second***, the Scene does not refer to the prosecution's disclosure obligations under the rules of ethics or criminal procedure, and ordinary viewers would not assume the "surprise" comment meant they would ignore such obligations.  *Seymour*, 150 F. App'x at 104-105.[5]

---

[4]  According to Plaintiff's Complaint, after NYPD found the sock stain on March 28, 1990, only days before the April 16 trial, trial was continued for DNA testing on the sock, which was completed on June 5, 1990. The rescheduled trial began June 25.  (*See* Compl. ¶ 119 & fns. 80, 81, 82, 85, 86 citing PX 47, 48, 51, 52.)

[5]  *Contrast Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 510, 516 (S.D.N.Y. 2017) (Opp. at 23) (co-counsel's statement directly accusing plaintiff of representing client "subject to a conflict of interest, violating her ethical obligations as an attorney" had a "precise meaning" that was potentially defamatory).

Moreover, not only is nothing being "concealed," the evidence discussed in the Scene is plainly not believed to be "exculpatory," but rather, *in*culpatory.  As it turned out, the DNA test came back negative as to the Five. (*See* Compl. ¶ 120.)[6]

None of these Scenes, on their face, carry the defamatory imputation of illegal or unethical conduct Plaintiff alleges.  Plaintiff's defamation claims, to the extent they are based on any of these Scenes, must therefore be dismissed.  *See Chau*, 771 F.3d at 132 ("[I]f a writing 'is not susceptible of a libelous meaning, then innuendo cannot make it libelous'") (quoting *Tracy*, 5 N.Y.2d at 136)).

**<u>Portrayal of Plaintiff Expressing Views She Has Publicly Espoused for Decades Not Defamatory (Scenes 4, 5, 8, 10, 11)</u>**.  "[I]n defamation law, as in life, determinations of fact and fiction are not zero-sum. In New York, a statement need not be *completely* true, but can be *substantially* true, as when the overall 'gist or substance of the challenged statement' is true." *Chau*, 771 F.3d at 129 (emphasis in original).  In attempting to revise history to dodge her admitted role in the prosecution and very public continued defense of it, Plaintiff ignores not only her Complaint, but her own public words—properly considered on this motion.  *See infra*, § II.  Plaintiff's attempt to avoid the truth of her own words requires evasion and hairsplitting far beyond "overly technical," contrary to New York law.  *Tannerite Sports, LLC v. NBCUniversal News Grp.,* 864 F.3d 236, 243 (2d Cir. 2017); *Love v. Wm. Morrow & Co.*, 193 A.D.2d 586, 588 (2d Dep't 1993) ("plaintiff's own words" established substantial truth; affirming dismissal).

As to Plaintiff's role, while arguing she "did not question the Five" and had no "responsibility for the rape investigation" and quibbling that she "was not in the Park at any point

---

[6] In a later scene, the Fairstein and Lederer characters are discussing the negative sock DNA test results, and Fairstein advises her to "deal with" the sock DNA and "play up" the cervical DNA at trial (Compl. ¶ 121), again indicating the defense was informed, otherwise there would be nothing to "deal with". Further, in reality, as Plaintiff's Complaint acknowledges, while the prosecution had argued that the cervical DNA was "inconclusive" (6/25/90 Opening Stmt., PX 52) it was dramatically revealed at trial that in fact it matched the sock DNA that ruled out the five (*see* Compl. ¶ 119, fn. 87; PX 53).  *See also* DNA Prints Fail to ID Jogger's Attackers, *Daily News* (7/14/90), available at https://bit.ly/2ZvAUhC (press report of "revelation" on cross-examination of DNA analyst).

in time on April 20, 1989" (Opp. at 6, 11, 17), Plaintiff does not dispute that *she* was the one who the police called on the morning of April 20, telling her to be prepared to come help at the station (Compl. ¶ 60; PX 9 at NYCLD_015465); who handpicked ADA Lederer to be trial prosecutor (*id.* at 015464); who spent over 30 hours at the precincts during the investigation and interrogations of the Five as the highest-ranking prosecutor and the admitted key liaison with D.A. Morgenthau (Compl. ¶ 39; DX 2, 4); who visited the crime scene the following morning with two of the teens and detectives (Compl. ¶ 86; DX 2); and who had to testify at trial as a fact witness regarding the interrogation of Yusef Salaam (Mot. at 5-6; DX 3).

Despite her understandable desire to minimize her role for this lawsuit, Plaintiff also cannot avoid her own words and admissions that she "oversaw that team that prosecuted the teenagers" (DX 7 at 2) and included herself in the "*[m]any of us* [police and prosecutors] who were *involved originally"* in the "1989 investigation". (DX 1 at 12; emphasis added; *see also* Compl. ¶ 39). Plaintiff spoke these words as an authority on the investigation and prosecution.[7]  Nor can she deny the "buck stopped" with her.  No matter how furiously she backpedals, Plaintiff cannot walk away from her critical role as the public Head of the Unit that was responsible for the prosecution and could have stopped it at any point, including when the teens' DNA did not match.

What is more, Plaintiff did not retract her views *even after Matias Reyes confessed*, but continued, with no regret, to espouse that the prosecution theory taken to trial on her watch was completely valid, the outcome just, and the Five guilty.  In Plaintiff's words: "The sixth attacker *we* had hoped to identify was now known." (DX 1 at 3 (emphasis added)).  Seeking to airbrush her

---

[7]  Betraying her current protestations, Plaintiff's 2002 letter attempting to inject herself into the reinvestigation of the case touts her important and unique "perspective on these events," noting her presence at the stationhouse from "the Thursday night after the crime . . . until Saturday morning at 4 a.m."  (DX 2.)  Plaintiff also pronounces that the jacket of her book *Sexual Violence Our War Against Rape* does not "take[] credit for the prosecution" (Opp. at 3 n. 3); of course it does.  (*See* DX 10 (identifying Jogger case as "nationally prominent" case she had "personally tried or been involved in").)

record, Plaintiff now goes to absurd lengths to avoid these very public statements.  Far from ever

"agree[ing] with [the] decision" to vacate the convictions (Opp. at 14, citing DX 7 (*Wall St. Jour.*

Op-Ed))[8], Plaintiff, for example, strenuously argued against the decision to vacate the convictions in

2003 (DX 1).  And Plaintiff has never retreated from ***her consistently expressed position*** that:

"[T]hese five men were participants, not only in the other attacks that night but in the attack on the

jogger." (DX 13 (Nov. 2002).)  As Plaintiff reiterated in 2014: "I think these men were participants

in the attack on the jogger ***as charged.***"   (*See* link at ECF No. 88, n.2,  DX 11 (June 2014) (televised

interview at 2:33-5:44, also noting "they were convicted . . . of also participating in the attack on the

jogger" the evidence included "the statements these Five made," "physical evidence"; "this was not

a DNA exoneration"); *see also* DX 8, 12 (2018) ("the confessions [to rape] were not coerced").)[9]

     Viewed in this clear light, the Scenes discussed below are not only incapable of defamatory

meaning or nonactionable opinion, they are consistent with Plaintiff's role in—and the views she

has expressed in interviews, her own writings, public submissions, and testimony about—the

investigation and prosecution, and the Five.  Those admissions may be considered on this motion

---

[8]  Plaintiff's June 2019 *Wall Street Journal* Op-Ed attacking the Series represents the first time Plaintiff has stated Reyes' confession "required that the rape charges against the five be vacated"—and even that would-be concession is *wholly inconsistent the rest of the Op-Ed*, in which she graphically asserts that evidence corroborated the Five's confessions and supported their conviction as accomplices in rape.  *See* DX 7 (pointing to evidence purportedly implicating Wise and Salaam in the rape; that semen was found on the Five's clothing, "corroborating [the] confessions"; and asserting Reyes' confession "changed none of this").

[9]  Seizing on the Court's question regarding whether admissions relevant to the analysis "speak to the time that is portrayed in the story" (Nov. 16, 2020 Tr. 12:23-24), Plaintiff disingenuously argues that statements she made "decades after the Central Park jogger case" from "the 1993-2019 timeframe," do not support the substantial truth of her portrayal.  (Opp. at 2.)  Of course, Plaintiff's admitted statements *do* plainly "speak to" the relevant time—her participation in and views of the 1989 investigation and prosecution, and of the Five themselves.  In contrast to the Court's hypothetical, Plaintiff is *not* portrayed as someone who prosecuted while not believing in the Five's guilt (Tr. 12:25), but as a true believer in the prosecution.  Her multiple admissions *support and confirm that portrayal*:  unlike what the Court posited (*id.* 13:22-23), Plaintiff has never recanted her view that the Five are guilty based on *subsequent* events.  She has lauded the investigation and prosecution, dismissing any issues with either, *even in the face of the subsequent Reyes confession*.  Thus, her suggestion that her adamant belief in the Five's guilt is relevant only to the "1993-2019" timeframe, but somehow not to 1989-91, when she was involved in the investigation and approved the prosecution as Unit Head, is misleading and defies common sense.

and bear directly on substantial truth.  *See* § II, *infra*.

- **Scene 4: "Putting Together a Timeline".**  These Scenes, in which the Fairstein character is shown piecing together a timeline of events based on evidence gathered at that point (*see* Mot. at 16-17), do not defame Plaintiff.  ***First***, there is nothing defamatory about putting together a timeline and theories in an investigation as evidence is learned; it is routine.

  ***Second***, depicting Plaintiff constructing a timeline "to connect the rape to the other assaults that happened in Central Park" (Compl. ¶ 79) could not be defamatory of her since—as Plaintiff concedes—she has repeatedly stated that the rape *was* "connected with" the other criminal activity that night.  (DX 1, 8, 11.)  While Plaintiff argues that this Scene shows her "manipulating" a "faulty" timeline to falsely "incriminate" or "pin the case on" the Five (Opp. at 7, 17-18, 22), in fact *Plaintiff is nowhere shown conceding that the timeline was "faulty" or the Five were not guilty*—in this Scene or any other.  To the contrary, she is consistently depicted as truly believing the validity of the case and timeline "connecting" the Five.  As to "discrepancies" in the timeline, the Series shows Plaintiff and the detectives believed they had reason to question the witnesses' and suspects' accounts of their locations as implausible (Ep. 1, 36:00-09) and because they "didn't know the Park" (50:41-46).

  ***Third***, while Plaintiff attempts to dodge responsibility by throwing "ADA Lederer, ADA Clements and NYPD Detective Nugent" under the bus, arguing they were "responsible for the timelines" (Opp. at 18), she has publicly declared the correctness of the "timeline" and theory behind it, which were the basis for her team's presentation at trial *under her watch*.  (DX 1 at 10).[10]  Plaintiff cannot now claim that she was defamed by being associated with the timeline that she has long embraced.  *See Egiazaryan* and discussion *infra*, p. 14.

- **Scenes 8 and 10:  Interactions With ADA Lederer.**  Scene 8 depicts the Fairstein character discussing witness statements with Lederer; Scene 10 depicts a conversation between them about trial strategy when they learn that the sock DNA is not a match to The Five; in both, Fairstein is shown having confidence in the prosecution's case despite the issues Lederer points out.  ***First***, the dialogue in these Scenes is protected opinion.  Staging a debate over the strengths and weaknesses of the case, with Fairstein taking a more aggressive view, is a literary device in a dramatization, not an actionable statement of defamatory fact.  *Partington*, 56 F.3d at 1157; *Dworin*, 2008 WL 508019, at *4 (defendant's "portray[al of] plaintiff as 'an antagonist to his own protagonist' for literary reasons" not actionable).  While Plaintiff argues that *Dworin* is "inapposite" because in that case "many of the statements at issue lacked precise meaning or were incapable of being proven true or false" (Opp. at 20 n. 33),  if anything the "literary context" here of heated dialogue in a film dramatization militates even more against finding an actionable statement of false fact.[11]

  ***Second***, Plaintiff continues to this day to express her absolute confidence in the prosecution's evidence and theory; she has said repeatedly she is sure it was and is correct.

---

[10]  Plaintiff falsely asserts her 2003 statement to the NYC Council criticizing vacatur of the Five's convictions had "nothing to do with the timeline" (Opp. at 18).  In truth, her statement specifically sought to refute "critics" that "have questioned the timeline in the case" (DX 1 at 10).

[11]  Plaintiff does not address the cases holding the reference to the Fairstein character as "delusional" is not actionable (Mot. at 19-20) and instead cites two inapposite cases (Opp. at 19 n. 32) which did not involve anything like use of the loose and hyperbolic epithet "delusional" in the Scene here.

It cannot be defamatory of her "ethics and integrity" (Compl. ¶ 122) to show her saying as much in the Series, regardless of what Lederer actually thought of the evidence (Opp. at 10).  The complained-of dialogue in Scene 10 (the Five "were in the park beating people up on the same night that she's getting beat up and you're telling me they had nothing to do with it? *Bullshit. They said it themselves, they told us what happened*") emphasizes the Fairstein character's bedrock belief that the Five were guilty and that their confessions were valid and not coerced, which the real Linda Fairstein has stated repeatedly (*see, e.g.*, DX 1, 7, 8, 11).  Nothing in Scene 10 can plausibly be read as an admission by her that she "*knew* The Five were innocent of the rape" or "acknowledged that the confessions were coerced" (Opp. at 20)—just the opposite.  (*See* Mot. at 18-20.)

- **Scenes 5 and 11:  Interactions With ADA Ryan.**  Scene 5 depicts the Fairstein and Ryan characters in an early briefing debating the merits of the case.  In Scene 11, at the end of the Series, they are shown again in a lunch meeting where the Ryan character confronts the Fairstein character in the wake of the Reyes confession and DNA match.  Like the Lederer Scenes, the Fairstein character's interactions with Ryan are dramatizations of dueling opinions over a contested set of facts.  Even if "[t]he show casts . . . Ryan as [a] truth-telling protagonist[]," supporting the Five's view that they are not guilty, "it never suggests [Ryan] is incapable of exaggeration"; and the use of heated dialogue "during a fictionalized conversation," where both parties have "an ax to grind" cannot be the basis for liability.  *See John E. Reid,* 2020 WL 1330657 at *8.[12]  Considered in this context, the Ryan character's angry outburst in Scene 11 ("you knew you coerced those boys into saying what they did Linda, we pored over your confession tapes") is the hyperbolic expression of her opinion.  It is not a factual statement that *Plaintiff herself* obtained the confessions through "alleged coercive tactics" (Compl. ¶ 129).  As shown in the first Episode, she clearly did not.  The Ryan character refers to "your" confessions because Fairstein was the Head of the Unit that relied on those confessions in prosecuting the Five—*confessions Plaintiff testified in support of and has endorsed for years as valid and uncoerced*, including on publicity tours when promoting her books (*see, e.g., DX 11*).  (*See* Mot. at 20-21.)

  The Ryan character's loose reference to the collective "you" in Scene 11 also is consistent with how Fairstein has included herself in the "us" and "team" comprising the detectives and other prosecutors working the case.  *See* DX 1 at 3 (referring to "*us*," *i.e.,* the "police officer[s] and prosecutor[s] involved in the case"); *id.* at 12 (including herself in the "*Many of us who were involved originally*" in "the 1989 investigation"; "*Many of us* have notes and records of those events"); DX 2 (Plaintiff "spent days . . . working on DNA aspects of the case" with experts who "*were advising us*"); DX 11 at 3-4 ("The trial team *who worked with me* in the DA's office"; "wonderful lawyers on *my team*").  That Ryan casts Fairstein as "responsible" for convictions her Unit obtained based on the confessions (Opp. at 16 n. 21) when Plaintiff testified in support of the confessions, and has consistently defended the "team" she led and the convictions as just, is not defamatory.

---

[12] Plaintiff cannot distinguish *Reid* on this score (Opp. at 28); likewise, that the statements in *Egiazaryan* were "hyperbole laden" and "clearly expressed a partisan viewpoint" (*id.* at 28 n. 45) does not distinguish the instant case but instead confirms the same principles and outcome apply here.

Plaintiff mischaracterizes the Series in both the Complaint and Opposition.  The Series does not, as Plaintiff claims depict her as the "singular mastermind" behind the convictions (*e.g.*, Compl. ¶ 46; Opp. at 26, 29.).  Instead, the Series explores and depicts the whole system—police, prosecutors, judges, media—as contributing to the wrongful convictions.  It is not only laid at Plaintiff's feet or all about her.  The Series shows Plaintiff as the Head of the Unit, which she was.[13]  It uses dialogue among her "team" and with the D.A. (with whom she admittedly liaised, *see* Compl. ¶ 39), which is consistent with her publicly stated views.  By her own admissions, Plaintiff was a powerful public official, who supervised and participated in the investigation and prosecution.  If, in *Egiazaryan*, calling a "prominent backer" of an anti-Semitic party a "member" produced "the same, or lesser, effect on the reader" (880 F. Supp. 2d at 508), then it is also fair to identify Plaintiff with her "team's" timeline and the confessions that she "backed" in taking the case to trial.[14]

As held in a case Plaintiff cites, "statements attributed to the Plaintiffs" in a film "may not be actionable if discovery shows that *the challenged scenes contain the essence of truth*, and that any falsity was incident to 'author's license' in creating a dramatization of the story." *Thoroughbred Legends, LLC v. Walt Disney Co*., 2008 WL 616253, at *13 (N.D. Ga. Feb. 12, 2008) (emphasis added).  Even without discovery, the public record and judicially noticeable facts properly before the Court demonstrate that the complained-of Scenes have the "essence of truth" under the applicable standard.  *See Tannerite Sports,* 864 F.3d 236 (affirming dismissal).[15]

---

[13]  Again, the Series nowhere shows Plaintiff believing the Five are "innocent" and prosecuting anyway. Instead, like the real Linda Fairstein, the Fairstein character is accurately depicted as a "true believer" in the prosecution's theory and the guilt of the Five throughout.

[14]  *See also Deripaska v. AP*, 282 F.Supp.3d 133, 146 (D.D.C. 2017) (dismissing where "judicially noticeable information [showed] that Deripaska openly associates himself with the Russian government").

[15]  Plaintiff tries to avoid dismissal by throwing in the proverbial kitchen sink—a 3,000-plus page Appendix of transcripts, social media posts, news stories and evidence from the original 1990 trials. (ECF No. 90.)  That tactic does not work here because nothing Plaintiff throws at the Court bears on the legal issues raised on this Motion, nor could it change Plaintiff's own admitted actions and prior statements.

### No Claim Based On Powerful, Hyperbolic Language in Dramatized Dialogue That Is Substantially True in Any Event (Scenes 2, 3, 6).

In addition to her other claims based on Scenes 2 and 3, Plaintiff claims it is "defamatory" to show her "using" the word "wilding" in those Scenes, because it was "viewed as a word which stoked the public's fear of young black men, . . . including in the Central Park jogger case." (Compl. ¶ 74.)  Plaintiff, however, **has used that term repeatedly** to refer to the Five—in 1993 in a news article she wrote just after the convictions, and again in 2003 in her statement to the NYC Council, repeating the word three times.  (DX 1, 9.)[16] Having perpetuated use of a term she concedes "stoked" racist fears, Plaintiff cannot seriously claim that is defamatory to show her using "wilding" and other "dehumanizing" verbiage that she describes as "loaded" racist "code" words ("animals," "thugs") in condemning the Five children (*see* Mot. at 26; DX 1 at 10-11 (Plaintiff describing Five as "deadly *pack* . . . looking for more blood to spill"; moving "under cover of darkness" to commit "mob violence" (emphasis added)).

The use of these terms is not only substantially true, but also nonactionable opinion.  Using fiery language or potentially "coded" words in dramatic dialogue as a way of exploring how language and phrases like "wiling," or "wilding" or "thug" can be interpreted, can evolve or can "dehumanize" others, is part of the art form.  It is not a positive factual statement that the character speaking them is *ipso facto* a "racist."  (Opp. at 27.)[17]  To the contrary, where, as here, words can

---

[16]  Plaintiff asserts that "Ms. Fairstein uses the term in quotes, signaling that she is not personally adopting the phrase." (Opp. at 28-29.)  Not only is that no answer, it is false.  Her 2003 statement says that the Five "participat[ed] in the wilding and attacks" **without quotes**.  (DX 1 at 7, 11.)

[17]  The cases Plaintiff cites sharply contrast with her meritless claim.  To be sure, none involve dialogue in a dramatization, nor depend on drawing a conclusion of "racist motivations" from contested, subjective meanings of words used in that dialogue.  *See* Opp. at 27-28, citing, *e.g., La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) (plaintiff falsely accused of yelling racial slurs at a child and compared to segregationist from 1950s); *Guerrero v. Carva*, 10 A.D.3d 105 (1st Dep't 2004) (plaintiff said to have "illegally evicted" and "discriminated against Latino and African-American tenants based on racial prejudice"); *Sheridan v Carter*, 48 A.D.3d 444 (2d Dep't 2008) (plaintiff "physically and verbally abused" domestic worker, threatened to disclose her immigration status, and "yelled racial slurs" at her).

mean different things to different people, they cannot be the basis for an actionable factual assertion because of their subjective, relative meanings.  (Mot. at 28, citing, *e.g., Mirage Entm't, Inc. v. FEG Entret. S.A.*, 326 F. Supp. 3d 26 (S.D.N.Y. 2018) and *Egiazaryan*.)  Where a word's "meaning is variable, unverifiable, controversial, a matter of opinion, whom you listen to, and whose side you are on, among other things" it "does not have a 'precise core of meaning.'" *Ollman v. Evans*, 750 F.2d 970, 1015 (D.C. Cir. 1984) (MacKinnon, J., concurring).[18]

The context of Scene 6 makes it even more clear that the words used are not defamatory. The heated dramatic dialogue ("you stop every little thug you see")—spoken specifically in reference to the "group" of youths that were reportedly committing crimes "in the park last night" and were persons of interest in the rape of the jogger—is consistent with any police procedural where a terrible crime has been committed and the desperate authorities launch a dragnet for suspects.  "Even a novice police-procedural viewer in Netflix's audience would pick up on that context and understand the character's aggressive word choice as a rhetorical device." *John E. Reid*, 2020 WL 1330657 at *8.  That rhetorical device cannot be transformed into a *factual* assertion that the Fairstein character "was pursuing a racist agenda."  (Opp. at 27.)  The Fairstein character's use of harsh language to describe suspects and the Five is consistent with the language she has used and properly part of the creative process in bringing these historical events to life.

Finally, even if the Scene could suggest potential bias or blind-spots on the part of the Fairstein character, that criticism of official conduct is core protected speech.  "[B]ias or

---

[18]  Plaintiff has no answer to these principles, which foreclose this claim.  She argues that *Mirage* is "inapposite" because the statement there "could not be objectively quantified by a jury" (Opp. at 27 n. 43) but that is even more true of the contested and indeterminate terms Plaintiff seizes on.  She opines that there is "no comparison between the allegation" in *Barbash v. STX Financing LLC,* 2020 WL 6586155 (S.D.N.Y. Nov. 10, 2020), "that the plaintiff was depicted as a 'cold individual…indifferent to the health of others' and the manner in which Ms. Fairstein was portrayed in *WTSU*" (Opp. at 27 n. 43), but as in *Barbash*, Plaintiff's "characterization" of the portrayal "has no precise meaning, cannot readily be measured for its truth or falsity," and is not actionable as a matter of law.  2020 WL 6586155, at *4-5.

motivation is quintessentially subjective and therefore may not form the basis for an action for defamation;" no claim will lie based on Defendants expressing their opinion of her performance as a high ranking prosecutor, "no matter how unreasonable, extreme or erroneous these opinions might be," and even if it entails "impugn[ing] [her] motives". *Rappaport v. VV Publ'g*, 163 Misc.2d 1, 9, 11 (Sup.Ct. N.Y. Cty. 1994), *aff'd*, 223 A.D.2d 515 (1st Dep't 1996).  Plaintiff's actions as Head of the Unit, and her continued support of the Five's guilt as a "wilding" "pack" of "marauders" (DX 1, 9, 10) is fair game for criticism, and no less so because it is in the form of a dramatization and not an "abstract expression[] of opinion." *Partington*, 56 F.3d at 1159.

## II.    The Court May Properly Consider the Judicially Noticeable Public Records and Admissions From Plaintiff's Own Public Statements That Foreclose Her Claims

The public records and other documents in Defendants' Appendix are properly before the Court on this Motion *both* because they are from a compilation extensively referenced and relied upon by Plaintiff in bringing suit (the official New York City Law Department website compiling records from the Central Park Jogger case, *see* Compl. ¶ 7, *passim* (hundreds of footnotes citing website)); *and*, separately, because they are subject to judicial notice. *Gray v. Wesco Aircraft Holdings, Inc.,* 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020); Opp. at 13; Mot. at 9-10.

As to judicial notice, Plaintiff incorrectly asserts Defendants are asking the Court to consider the Exhibits for the truth of their contents.  (Opp. at 14-15.)  To the contrary, the news articles written by Plaintiff, televised statements made by Plaintiff and documents authored by Plaintiff, should be judicially noticed for what the documents contain (*i.e.,* plaintiff's use of certain language or expression of certain beliefs), not for the truth thereof (*i.e.,* that the Five are actually guilty). *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008).[19]

---

[19]  Plaintiff does not address, much less distinguish, those cases that judicially notice statements by parties (Mot. at 10-11), including in videotaped interviews (*id.* at 11 n. 9), or that have dismissed defamation claims based on plaintiff's admissions subject to judicial notice (*id.* at 11 & n.10).  Plaintiff has no

Plaintiff acknowledges judicial notice may be taken that "certain things were said in the press".  Notably, judicial notice here is not merely of "things [that] were said" but what *Plaintiff herself admittedly authored or said on televised video* (*see* DX 1-4, 7-11); noticing those admissions does not require the Court to "make findings of fact." (Opp. at 14-15.)  That Plaintiff made those statements is "*not* subject to reasonable dispute" within the meaning of Rule 201 because Plaintiff *admits* she made them.  They are *in fact not disputed.*  No "fact finding" is required.[20]

As Plaintiff also concedes, if a document that is part of the Complaint "contradicts an allegation then the Court need not accept that allegation as true."  (Opp. at 13.)  While Documents need not "contradict" an allegation in order to be judicially noticed, certain of the records cited by Defendants (as discussed above) constitute admissions by Plaintiff that "contradict" and are fundamentally at odds with the premises for Plaintiff's suit.

## III.   The Court Looks to the Film Itself, Not an Anecdotal Poll of Social Media Users, to Assess Plaintiff's Defamation Claims

Plaintiff's assertion that "Defendants marketed and promoted the Series as a true story, especially with respect to Ms. Fairstein" (Opp. at 2), pointing to the Series' tag line "The Story you know is the lie they told you" and tweets by the filmmakers (*see id.* at 26 n. 41; Compl. ¶¶ 171, 173), is both meritless and irrelevant.  The tag line and tweets simply reflect that "the truth" being told was *that of the Five*—namely *their* truth that they were not guilty of the crime for which they

---

response to *Barbash*, which recently dismissed a defamation claim based on admissions in plaintiff's guilty plea, memoir and interviews.

[20]  Plaintiff cites *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209 (S.D.N.Y. 2014) as holding that the Court "could not entertain 'own words' defense to challenged defamatory statements" (Opp. at 13).  But the evidence in *Fine* was a search warrant's second-hand "description and analysis" of a tape that plaintiff claimed was "doctored"—not, as here, words that Plaintiff *indisputably wrote or spoke herself*, in articles, submissions to government bodies, and taped interviews.  Plaintiff does not challenge the authenticity of any of the material submitted; she could not.  Likewise, in contrast to *Agbimson v. Handy*, 2019 WL 3817207 (S.D.N.Y. Aug. 14, 2019) (which found a fact issue as to whether documents plaintiff accountant produced in discovery established the truth of defendants' charge that he had retained financial records without their knowledge or permission), there is no factual dispute concerning Plaintiff's admissions.

were wrongfully imprisoned ("the lie they told you").  (*See* Mot. at 13 n. 13.)  Plaintiff cannot

somehow turn that into a claim that the Series purported to be a documentary examination, or the

equivalent of an investigative news story documenting her literal "role" in every moment.  That

simply was not the lens of this Series.  It is not Plaintiff's story, nor solely about her.  The Series is

a drama that explores the inequities and biases of the entire criminal justice system in New York

and society in general, dramatically told through the lens of the Five and their parents' harrowing

experience.  That narrative includes, of necessity, the antagonistic forces arrayed against them—

New York City police, prosecutors, judges, the press.  And it certainly includes the public official,

Fairstein, who oversaw and approved of the investigations (including the interrogations that led to

the "confessions") and the prosecution (even after it was clear none of the Five was a DNA match).

In any event, the Series' genre is obvious, and the Court "looks to the film itself" in

assessing how a reasonable viewer would perceive it.  *Lovingood*, 800 F. App'x at 847-48.  Given

the "overall format, tone, and direction" of the Series with actors, "[a] reasonable viewer would

understand within the first two minutes that he is not watching a documentary film that consists

mainly of historical footage and interviews with the historical figures" and "would understand the

film as generally not purporting to present verbatim dialogue from the pages of history."  *Id.*[21]

Further, the issue of whether a statement has defamatory meaning is one for the Court in

the first instance.  And, contrary to what Plaintiff argues, in evaluating whether statements are

---

[21]  Plaintiff cites a Georgia district court order that "decline[d] to apply a more relaxed 'docudrama' standard" because Viacom's "Movie was billed as a 'true story . . . without using qualifying terms such as 'based on' or 'adapted from.'"  *Reid v. Viacom Int'l Inc.*, No. 14-cv-01252, Order at 12 n. 7 (N.D. Ga. Sept. 14, 2016).  *Viacom* defies the Supreme Court's admonition in *Masson*, as well as *Lovingood*, which involved a docudrama whose opening titles even included the statement "This is a true story."  800 F. App'x at 843.  Moreover, unlike *Viacom*, Plaintiff concedes the Series here is "billed" as being "*Based on*" *a true story*.  (Compl. ¶ 169 (emphasis added); PX1 ("teaser videos").)  And each Episode ends with a disclaimer that while "inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization" (Compl. ¶ 228).  Plaintiff quibbles with the prominence of the disclaimer, and claims it is not "decisive" in warranting dismissal (Opp. at 25), but Defendants never argued it was.

actionable as a matter of law, the Court does not rely on an anecdotal poll of viewers (much less cherry-picked comments by random social media users).  *See, e.g., Aboutaam v. Dow Jones & Co.,* 180 A.D.3d 573, 575 (1st Dep't 2020) ("Whether a statement is defamatory is a legal question to be determined by the court, not by survey participants").[22]  Yet, Plaintiff attempts to improperly enlist the strong and emotional public reaction to the Series to establish that it is defamatory.  (Opp. at 27 citing Compl. ¶ 237 (reciting assorted tweets).)  But there is no getting around the fact that Plaintiff played an important role in a "disastrous chapter of . . . history," and "a non-defamatory reflection" on that chapter "would not necessarily have an 'innocent meaning' for those depicted." (Mot. at 30, quoting *Chau*, 771 F.3d at 132.)[23]  Plaintiff cannot foreclose critical discussion of the Central Park Jogger prosecution because she does not come off well in the telling or because that exploration and critique of her role as a powerful public official takes the form of an artistic film. And here, the portrayal is entirely consistent with her words and deeds.

## CONCLUSION

The Complaint should be dismissed with prejudice.

---

[22] The *Palin* court's offhand comment about social media backlash does not establish such a rule either; the court held defendant's opinion argument "goes nowhere" because whether or not the motivations of Jared Loughner were "ultimately unknowable", the affirmative statement accusing Palin of "political incitement" in the case was factual.  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815-16 (2d Cir. 2019).

[23]  For example, Plaintiff concedes that the scene depicting the Fairstein character's confrontation with Yusef Salaam's mother (Ep. 1, 43:08-44:52)—the subject of the excoriating Titone dissent (*see* Mot. at 5-6)—is not part of her defamation claim.  (Opp. at 6 n. 6.)  That non-defamatory speech could alone be the basis of the viewing public's outrage.  The incident demonstrates not only how intimately involved Plaintiff was with the interrogation process, but how the criminal justice system in this case capitalized on the Five's vulnerability as young teenagers and failed them.  As *Chau* held, in light of the history of these events, culminating in demonstrably wrongful convictions, no one involved in the investigation and prosecution would come off well—and certainly not Plaintiff.  Indeed, while D.A. Morgenthau later acknowledged "[w]e had screwed up" in prosecuting the Five—remarking "'I had complete confidence in Linda Fairstein, . . . Turned out to be misplaced.  But we rectified it'"—Plaintiff, "who supervised the case," has "defended the prosecution and investigation as sound" to this day.  Robert Morgenthau on His Years as District Attorney: 'I Don't Look Back,' *N.Y. Times* (11/23/16), available at https://www.nytimes.com/2016/11/23/nyregion/robert-morgenthau-manhattan-district-attorney.html?searchResultPosition=1.

Dated: February 19, 2021                     Respectfully submitted,

                                             */s/ Natalie J. Spears*
                                             _____

                                             Natalie J. Spears (*pro hac vice*)
                                             Gregory R. Naron (*pro hac vice*)
                                             Jacqueline A. Giannini (*pro hac vice*)
                                             DENTONS US LLP
                                             233 South Wacker Drive, Suite 5900
                                             Chicago, Illinois 60606
                                             Phone: (312) 876-8000
                                             *natalie.spears@dentons.com*
                                             *gregory.naron@dentons.com*
                                             *jacqui.giannini@dentons.com*

                                             Sandra D. Hauser
                                             Kiran Patel
                                             DENTONS US LLP
                                             1221 Avenue of the Americas
                                             New York, New York  10020
                                             Phone: (212) 768-6700
                                             *sandra.hauser@dentons.com*
                                             *kiran.patel@dentons.com*

                                             *Attorneys for Defendants Netflix, Inc., Ava
                                             DuVernay and Attica Locke*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 19, 2021, a true and correct copy of the foregoing

was served by CM/ECF on all counsel or parties of record on the service list.


*/s/ Natalie J. Spears*