UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LINDA FAIRSTEIN,

                              Plaintiff,                    20-cv-8042 (PKC)

           -against-                                        OPINION
                                                            AND ORDER

NETFLIX, INC., AVA DUVERNAY and
ATTICA LOCKE,

                              Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

On the night of April 19, 1989, a young woman was viciously beaten and raped in Central Park. Five young men of color (the "Five"), ranging in age from 14 to 16, were arrested, tried and convicted for the attack. They were exonerated in 2002, after the confession of a man whose DNA matched a sample found near the victim. The case, which is known among the press and public as the "Central Park Jogger" or "Central Park Five" case, drew intense public interest in the immediate aftermath of the attack and remains the subject of scrutiny and debate.

Plaintiff Linda Fairstein was chief of the Sex Crimes Prosecutions Unit in the District Attorney's office of New York County during the investigation and prosecution of the Five. According to her Complaint, Fairstein had supervisory authority over the case but was not one of the prosecution's trial attorneys. After a successful and high-profile legal career, Fairstein remained in the public eye as a prolific mystery writer and public speaker. In the years following the exoneration of the Five, Fairstein made public statements that defended the work of police and prosecutors on the case, and she has publicly argued that the Five were hastily exonerated.

In May 2019, the popular streaming service owned by defendant Netflix, Inc. ("Netflix") released a four-part dramatization of the arrest and prosecution of the Five, called "When They See Us." Produced by Oprah Winfrey, the limited series features high production values that have become standard in subscription television, including a cast of famous actors, a soundtrack of popular music, and atmospheric, hallucinatory sequences intended to reflect the characters' psychological states. "When They See Us" is also openly sympathetic to the Five. In early scenes, it depicts the Five as typical teenagers negotiating the challenges of school, family and social life before they are incorrectly and unjustly suspected of rape. The series then follows the Five through trial and incarceration, and their later struggles as young adults adjusting to post-release life. Throughout, "When They See Us" depicts the Five as innocent young men who are harmed by an unjust prosecution and an unsympathetic and often brutal system bent on incarcerating the Five.

Fairstein is portrayed as a central villain of "When They See Us." As depicted in the series, she quickly concludes that the Five are responsible for the attack, and is thereafter portrayed as a zealous, win-at-all-costs prosecutor. In one sequence, she intentionally delays the production of critical DNA evidence to defendants until the eve of trial, and in others, she instructs members of the New York City Police Department ("NYPD") to engage in harsh investigative techniques. The series portrays her as the architect of various theories of the Five's guilt, and through the concluding scenes of the series, she remains persuaded of their involvement in the face of countervailing evidence. Fairstein alleges that nearly every scene depicting her is a fabrication that presents her in a false and defamatory light.

The Complaint brings claims of defamation against Netflix, series director and producer Ava Duvernay, and series writer and producer Attica Locke. All defendants move to

dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., urging that it has not plausibly alleged that the depictions of Fairstein are defamatory under New York law.

In deciding the motion to dismiss, the Court is limited to the factual allegations of the Complaint, materials that are attached by the Complaint or integral thereto, and matters of which the Court may take judicial notice.  As defendants acknowledge, the issue of actual malice is more appropriately weighed at a later stage of the proceedings.  See, e.g., New York Times v. Sullivan, 376 U.S. 254, 270 (1964) (noting "the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.").  Similarly, on the present motion, defendants are not permitted to offer evidence (except the limited materials that may be considered on a motion to dismiss) to dispute Fairstein's factual assertions that she played only a limited role in the NYPD's investigation.  The arguments raised in defendants' motion are therefore narrow and directed to whether Fairstein's Complaint has plausibly alleged a defamatory meaning to eleven scenes of "When They See Us."

For the reasons that will be explained, defendants' motion will be granted in part and denied in part.  Certain scenes alleged to be defamatory merely show routine and prosaic activities that lack a plausible defamatory meaning.  In other scenes, the depictions of Fairstein are privileged against a claim of defamation because they convey the subjective opinions of defendants and could not be understood by the average viewer to be a literal recounting of her words and actions.

Fairstein has plausibly alleged a claim of defamation as to five scenes.  These scenes depict Fairstein as orchestrating acts of misconduct, including the withholding of evidence, the existence of "tapes" showing that she "coerced" confessions from the Five, an

instruction not to use "kid gloves" when questioning suspects, and directing a racially discriminatory police roundup of young men in Harlem.  The average viewer could conclude that these scenes have a basis in fact and do not merely reflect the creators' opinions about controversial historical events.  Separately, the Court concludes that defendants have not demonstrated the substantial truth of a scene depicting Fairstein's creation of an attack timeline because they rely on public remarks that are inconsistent with her depiction in the scene.

BACKGROUND.

    A.  <u>Overview of the Underlying Events Relating to the Five.</u>

    On the night of April 19, 1989, a jogger, Patricia or "Trisha" Meili, was beaten and raped in Central Park.  (Compl't ¶ 37.)  Five young men of color, ranging in age from 14 to 16, were arrested, charged, tried and convicted for their purported roles in the attack: Korey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam and Antron McCray.  (Compl't ¶¶ 4, 38.)

    Fairstein was employed in the Manhattan District Attorney's Office from 1972 to 2002, and she was chief of its Sex Crimes Prosecution Unit during the events depicted in "When They See Us."  (Compl't ¶¶ 32, 39.)  Along with District Attorney Robert Morgenthau and Trial Division Chief John Fried, Fairstein was one of the decisionmakers who assigned Assistant District Attorney Elizabeth Lederer to the case.  (Compl't ¶ 39.)

    According to Fairstein, during the prosecution of the Five, she functioned as a liaison to Morgenthau and gave technical assistance to Lederer.  (Compl't ¶¶ 39-40.)  Fairstein asserts that she was neither the lead prosecutor nor a courtroom litigator in the proceedings.  (Compl't ¶¶ 39-40.)  According to Fairstein, Lederer was responsible for the prosecution and Fairstein acted principally as a technical adviser to Lederer and a liaison to Morgenthau.

(Compl't ¶ 39.)  Fairstein also was a witness in suppression hearings and trial proceedings of the Five.  (Compl't ¶ 39.)

In 2002, after the trial and conviction of the Five, a man named Matias Reyes confessed to raping and attacking Meili.  (Compl't ¶ 41.)  Testing showed that Reyes's DNA matched samples taken from Meili and her belongings.  (Compl't ¶ 41.)  The convictions of the Five were vacated on the basis of this newly discovered evidence.  (Compl't ¶ 41.)

The Five subsequently brought civil claims against the City and individual defendants, including Fairstein.  (Compl't ¶ 42.)  According to the Complaint, during the pendency of this litigation, several books and films were published about the case, "some of which falsely portrayed Ms. Fairstein as prosecuting The Five."  (Compl't ¶ 42.)  Fairstein states that, at the direction of a federal district judge, she "was unable to comment on the case or respond to any such false portrayals."  (Compl't ¶ 42.)  The Five's civil claims settled for $41 million in 2014.  (Compl't ¶ 43.)  When the settlement was announced, the Manhattan District Attorney and the Corporation Counsel for the City publicly stated that the prosecutors acted reasonably and did not engage in acts of wrongdoing.  (Compl't ¶ 43.)

B.  Overview of "When They See Us" and Its Depiction of Fairstein.

On May 31, 2019, Netflix released "When They See Us" on its popular streaming service.  (Compl't ¶ 1.)  It was written, directed and produced by defendant Ava DuVernay and co-written and produced by defendant Attica Locke.  (Compl't ¶¶ 2-3.)  "When They See Us" consists of four episodes of approximately 60 to 90 minutes in length.  (Compl't ¶ 44.)  Fairstein features prominently in Episode 1 and makes brief but memorable appearances in Episodes 2 and

4.[1]  The Complaint asserts that as to Fairstein, "[n]early every portrayal is false and defamatory."
(Compl't ¶ 44.)

 The series primarily centers on the individual experiences of each of the Five,
beginning with their everyday lives as adolescents prior to the events of April 19, 1989, and then
following them through their arrest, trial, incarceration and exoneration.  In the first two
episodes, the Five are shown as young teenagers, and in the final two episodes they are shown as
young adults.  Episodes 3 and 4 depict their struggles adjusting to post-prison life and their
eventual exoneration following the confession of Reyes.

 Fairstein is played by the Oscar-nominated actress Felicity Huffman, and the cast
includes several other well-known actors, such as Vera Farmiga, John Leguizamo and Michael
K. Williams.  The series prominently features popular music and an orchestral score.  Certain
scenes are highly stylized, including the intense depiction of a character's hallucinations during
his incarceration.  The average viewer would not perceive "When They See Us" as a
documentary, and would instead understand it as a dramatization drawn from historical events.

 In comparison to the Five, Fairstein's screen-time is limited, but she plays a
critical role in the series.  She appears principally in Episode 1, where she is depicted as an
aggressive and capable prosecutor who is quickly convinced that the Five are responsible for the
attack on Meili.  The visual style and pacing of Episode 1 would be familiar to viewers of
scripted, prime-time programs that purport to show the work of New York's police and
prosecutors.  The episode depicts Fairstein as the principal architect of the Five's investigation
and prosecution.  She instructs members of the NYPD on their investigation tactics, develops a

---

[1] As will be discussed below, the Court will treat the episodes of "When They See Us" as a matter incorporated by
reference into the Complaint, and will consider them in connection with this Rule 12(b)(6) motion without
converting the motion into one for summary judgment.

timeline for the attack on Meili, and urges on the prosecution of the Five, despite evidence that the series depicts as highly ambiguous and even incompatible with their guilt.

Fairstein appears only briefly in Episodes 2 and 4, but her scenes are memorable. In Episode 2, Fairstein and Lederer discuss DNA found through a semen sample on the crime scene, and Fairstein suggests that the existence of this evidence and tests conducted on the eve of trial will "surprise" defendants.  Fairstein also appears late in Episode 4, in one of the series' final scenes, where she maintains that the Five were appropriately tried and convicted, in spite of their exoneration.

The following disclaimer appears in the closing credits of each episode:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

(Compl't ¶ 228.)  The Complaint notes that the disclaimer is inconspicuous and appears in a small font late in the credit rolls.  (Compl't ¶¶ 225-29.)

Broadly summarized, Fairstein alleges that the series falsely portrays her participation in the prosecution of the Five, and depicts her uttering comments that are "racist and unethical."  (Compl't ¶ 45.)  She alleges that the series falsely shows her using "inflammatory language" by "referring to young men of color as 'thugs,' 'animals' and 'bastards,'" terms that she states she never used.  (Compl't ¶ 45.)  She also alleges that the series falsely shows her "as the singular mastermind behind a racist plot to obtain convictions of The Five at any cost."  (Compl't ¶ 46.)

The Complaint identifies individual scenes that purportedly show Fairstein in a false and defamatory light.  (Compl't ¶¶ 51-130.)  The Court will discuss each of these scenes in detail, but, as examples, Fairstein alleges that the series falsely depicts her as encouraging coercive and unconstitutional investigative techniques and shows her "as singularly responsible for jailing innocent young men of color" after devising the prosecution's theory of the case.  (Compl't ¶¶ 46, 126.)  Fairstein asserts that, in truth, the NYPD was responsible for investigating the Five and that she played no significant role in developing a theory of the case.

Fairstein alleges that she attempted to warn defendants to avoid inaccuracies in her portrayal, but that her suggestions were ignored.  (Compl't ¶¶ 131-51.)

C.  Defendants' Statements about the Contents of "When They See Us."

Fairstein asserts that defendants marketed and promoted "When They See Us" as a fact-based version of the events surrounding the Five.  (Compl't ¶¶ 165-231.)  Netflix social media posts and advertising trailers described "When They See Us" as "[t]he truth you haven't heard" and "based on the true story of the Central Park Five."  (Compl't ¶¶ 166-67.)  The Complaint quotes multiple statements made by DuVernay on social media, in interviews and in public appearances that characterized "When They See Us" as fact-based, referring to it as "the real story of The Central Park 5" and "100% real."  (Compl't ¶¶ 171-86.)  The Complaint also quotes from public statements that DuVernay specifically made about Fairstein, including a remark in an interview with Oprah Winfrey where she stated, "And so the goal of this – okay, Linda Fairstein, okay Elizabeth Lederer, okay, all of these people on this particular case we need to be held accountable."  (Compl't ¶ 182.)

Locke made similar public statements, such as, "[a] piece of American History gets rewritten with the truth," and "You can't argue with facts."  (Compl't ¶¶ 187, 192.)  Locke

also made sharply critical statements about Fairstein, including, "I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes even people I hate act the way they do.  But fuck it: Linda Fairstein is trash, was trash, will always be trash."  (Compl't ¶ 194.)  In response to an op-ed piece written by Fairstein, Locke tweeted, "This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way.  She is an unrepentant liar.  Fuck her."  (Compl't ¶ 195.) Prior to the release of "When They See Us," Locke also successfully campaigned for the Mystery Writers of America to withdraw an award it planned to give Fairstein.  (Compl't ¶¶ 152-64.)

        D.   <u>Fairstein's Damages Allegations.</u>

        The Complaint asserts that following the release of "When They See Us," Fairstein has been publicly vilified, resulting in damage to her reputation and forcing her resignation from non-profit organizations.  (Compl't ¶¶ 232-57.)  The Complaint points to the hashtag "#CancelLindaFairstein" that came into use on Twitter, and it quotes negative, often profane tweets that were posted with that hashtag.  (Compl't ¶ 237.)  Following release of the series, petitions circulated online, demanding Fairstein's removal from various board, the cancellation of her publishing contracts and a halt to the retail sales of her books.  (Compl't ¶¶ 240-43.)  After the release of "When They See Us," Fairstein's publishers terminated her publishing agreement and her literary agents dropped her as a client.  (Compl't ¶¶ 244-46.)  At the suggestion of campus administrators, Fairstein resigned from the Board of Trustees for Vassar College, and she also resigned from the boards of three non-profit organizations. (Compl't ¶¶ 250-54.)  The editor-in-chief of Glamour magazine also published a statement

expressing regret that the magazine named Fairstein its Woman of the Year in 1993.  (Compl't ¶ 255.)

E.   Overview of the Complaint.

The Complaint consists of 382 paragraphs, plus 221 footnotes that cite to public records, social media posts, news reports and a variety of websites.  It brings seven causes of action.  For each defendant, the Complaint brings separate claims of defamation per se and defamation per quod.  (Compl't ¶¶ 258-374.)  Count VII of the Complaint is brought against all defendants and alleges that they engaged in a conspiracy to defame Fairstein.  (Compl't ¶¶ 375-82.)

In addition to seeking money damages, the Complaint seeks sweeping injunctive relief, including defendants' removal of certain social media posts, an order restraining defendants from making future public statements that attribute the prosecution of the Five to Fairstein, an order directing that defendants make a public statement that they had a "desire to create a fictional villain, in Ms. Fairstein, for the public to hate, that never existed in reality," and the removal and/or re-editing of portions of "When They See Us."  (Compl't at pp. 110-18.)

RULE 12(b)(6) STANDARD.

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id.  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of

which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint. The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.'" Goel v. Bunge, Ltd., 820 F.3d 554, 558-59 (2d Cir. 2016) (quoting Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)). A court reviewing a motion to dismiss "take[s] no account of [the complaint's] basis in evidence" and "may review only a narrow universe of materials." Id. at 559. Such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint, even if they are not expressly incorporated. Id.

The Complaint extensively references the contents of "When They See Us," including quotations of dialogue and descriptions of scenes, accompanied with timestamps of the relevant sequences. As part of their motion papers, defendants have submitted an electronic copy of "When They See Us." (Docket # 87-A.) In her opposition memo, Fairstein states that "[t]he Series is an integral part of the Complaint and may be considered by the Court," and "respectfully requests that the Court view the Series when evaluating Defendants' Motion." (Opp. Mem. at 1 n.2.) Because the episodes of "When They See Us" are integral to the Complaint and the parties agree that they are properly considered in connection with the motion, the Court may rely on the episodes without converting the motion to dismiss into a motion for summary judgment. See, e.g., Tannerite Sports, LLC v. NBCUniversal News Grp., a division of

NBCUniversal Media, LLC, 864 F.3d 236, 247 (2d Cir. 2017) (considering a news organization's video report in the adjudication of a motion to dismiss a defamation claim); Stepanian v. City of New York, 2015 WL 5350801, at *3 (E.D.N.Y. Sept. 14, 2015) ("Since the video is incorporated into the complaint, I am allowed to consider it on a motion to dismiss.") (Gleeson, J.).

   The parties have also submitted a large number of exhibits in connection with this motion.  Defendants' motion cites to materials that they urge should be subject to judicial notice, and they have submitted an appendix containing nineteen exhibits.  (Docket # 88.)  In opposition to the motion, Fairstein has submitted an appendix containing 78 exhibits.  (Docket # 90.)  A court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Rule 201(c)(2), Fed. R. Evid.  "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Rule 201(b)(2).  As will be discussed below, the Court takes judicial notice of public remarks that Fairstein made to the Public Safety Committee of the New York City Council on January 30, 2003.  (Docket # 88-1.)  An official's statements to a governmental body "are precisely the sort of materials of which [courts] may take judicial notice."  ACLU v. Nat'l Sec. Agency, 925 F.3d 576, 599 n. 126 (2d Cir. 2019); see also Schubert v. City of Rye, 775 F. Supp. 2d 689, 695 n.3 (S.D.N.Y. 2011) ("[T]he minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice.") (Karas, J.).

DISCUSSION.

      I.     <u>The Law of Defamation in New York.</u>

          A.  Whether a Statement Is Capable of Defamatory Meaning Is an Issue of <u>Law for the Court.</u>

The Complaint alleges that eleven scenes in "When They See Us" depict Fairstein in a false and defamatory light.  (Compl't ¶¶ 49-130.)  Defendants urge that the Complaint does not plausibly allege that the scenes are defamatory and that Fairstein's claims can therefore be dismissed as a matter of law.  The parties do not dispute that New York law governs plaintiff's claims.  (See, e.g., 11/16/20 Tr. at 5-6.)

"Allegations of defamation present, in the first instance, an issue of law for judicial determination."  <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 39 (1st Dep't 1999).  Defamation "is defined as the making of a false statement which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'"  <u>Foster v. Churchill</u>, 87 N.Y.2d 744, 751 (1996) (quoting <u>Rinaldi v. Holt, Rinehart & Winston</u>, 42 N.Y.2d 369, 379 (1977)).  "'The elements are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se.'  A statement is defamatory on its face when it suggests improper performance of one's professional duties or unprofessional conduct."  <u>Frechtman v. Gutterman</u>, 115 A.D.3d 102, 104 (1st Dep't 2014) (quoting <u>Dillon</u>, 261 A.D.2d at 38); <u>see also</u> <u>Laguerre v. Maurice</u>, 192 A.D.3d 44, 50 (2d Dep't 2020) ("A statement is defamatory per se if it . . . tends to injure the plaintiff in her or his trade, business, or profession . . . .").  "Not all (or even most) maligning remarks can be considered defamatory.  A statement is defamatory if it exposes an individual 'to public hatred, shame,

obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprive[s] one of their confidence and friendly intercourse in society.'" Chau v. Lewis, 771 F.3d 118, 127 (2d Cir. 2014) (quoting Kimmerle v. N.Y. Evening Journal, Inc., 262 N.Y. 99, 102 (1933)).

New York recognizes a defamation claim when a statement is not defamatory on its face and instead alleges "an innuendo" that attaches "a defamatory meaning" to language referencing a plaintiff. See, e.g., Cole Fischer Rogow, Inc. v. Carl Ally, Inc., 29 A.D.2d 423, 427 (1st Dep't 1968). In a claim of defamation per quod, "no defamatory statement is present on the face of the communication but a defamatory import arises through reference to facts extrinsic to the communication." Ava v. NYP Holdings, Inc., 64 A.D.3d 407, 412 (1st Dep't 2009). "[A] plaintiff would need to show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors. . . . Whether the allegedly libelous language is capable of the libelous meaning charged by innuendo is a matter of law for the courts to decide." Idema v. Wager, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000) (McMahon, J.). "The innuendo . . . may not enlarge upon the meaning of words so as to convey a meaning that is not expressed." Tracy v. Newsday, Inc., 5 N.Y.2d 134, 136 (1959).

A plaintiff "must identify a plausible defamatory meaning of the challenged statement or publication. If the statement is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory." Celle v. Filipino Rep. Enterprises Inc., 209 F.3d 163, 178 (2d Cir. 2000) (quotation marks omitted). "If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what

sense the words were used and understood." Id. (quotation marks omitted).  In deciding whether

a statement is defamatory, courts "'will not strain to interpret (allegedly defamatory works) 'in

their mildest and most inoffensive sense to hold them nonlibelous,'" but they also "will not strain

to find a defamatory interpretation where none exists." Cohn v. Nat'l Broadcasting Co., 50

N.Y.2d 885, 887 (1980) (quoting November v. Time Inc., 13 N.Y.2d 175, 178 (1963)).

   In adjudicating this motion, the Court construes the words and actions attributed

to Fairstein in the context of the series as a whole, and weighs whether they are susceptible to a

defamatory interpretation from the perspective of the average viewer.  Aronson v. Wiersma, 65

N.Y.2d 592, 593-94 (1985) ("The words must be construed in the context of the entire statement

or publication as a whole, tested against the understanding of the average reader, and if not

reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so

by a strained or artificial construction."); Chau, 771 F.3d at 126 ("When deciding how to

construe allegedly defamatory words . . . courts must do so in the context of the publication as a

whole, not just the paragraph or chapter containing them, and do so 'in the same way that the

reading public, acquainted with the parties and the subject would take [them].'") (quoting

Sydney v. MacFadden Newspaper Publ'g Corp., 242 N.Y. 208, 214, (1926)).

   The relevant context for Fairstein's claims is a lengthy television drama starring

famous actors distributed to paying subscribers of a streaming service.  As the Ninth Circuit once

observed by dictum: "Docudramas, as their names suggests, often rely heavily upon dramatic

interpretations of events and dialogue filled with rhetorical flourishes in order to capture and

maintain the interest of their audience.  We believe that viewers in this case would be sufficiently

familiar with this genre to avoid assuming that all statements within them represent assertions of

verifiable facts.  To the contrary, most of them are aware by now that parts of such programs are

more fiction than fact." <u>Partington v. Bugliosi</u>, 56 F.3d 1147, 1154-55 (9th Cir. 1995).  The

Court in <u>Partington</u> added that the presenters of the docudrama "must attempt to avoid creating

the impression that they are asserting objective facts rather than merely stating subjective

opinions." <u>Id.</u> at 1155.

Given the full content and context of the series at issue, the Court declines to

conclude that the average viewer would assume that "When They See Us" is "more fiction than

fact," a proposition that the defendants do not advance.  But it is reasonable to expect that the

average viewer of "When They See Us" would understand that dialogue in the dramatization is

not a verbatim recounting of the real-life participants and is intended to capture the essence of

their words and deeds.

B.  <u>The "Substantial Truth" Defense to Defamation.</u>

Defendants urge that certain of Fairstein's claims should be dismissed because the

events depicted are substantially true.  "Because the falsity of the statement is an element of the

defamation claim, the statement's truth or substantial truth is an absolute defense." <u>Stepanov v.</u>

<u>Dow Jones & Co.</u>, 120 A.D.3d 28, 34 (1st Dep't 2014).  "A statement is substantially true if the

statement would not have a different effect on the mind of the reader from that which the pleaded

truth would have produced." <u>Franklin v. Daily Holdings, Inc.</u>, 135 A.D.3d 87, 94 (1st Dep't

2015) (quotation marks and alteration omitted); <u>see also</u> <u>Guccione v. Hustler Mag., Inc.</u>, 800

F.2d 298, 302 (2d Cir. 1986) ("New York law recognizes that an alleged libel is not actionable if

the published statement could have produced no worse an effect on the mind of a reader than the

truth pertinent to the allegation.").  "Courts typically compare the complained of language with

the alleged truth to determine whether the truth would have a different effect on the mind of the

average reader." <u>Franklin</u>, 135 A.D.3d at 94.  If "the truth is so near to the facts as published that

fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." <u>Cafferty v. Southern Tier Publishing Co.</u>, 226 N.Y. 87, 93 (1919).

        The issue of whether a statement is substantially true may present an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion.  <u>See</u> <u>Tannerite Sports</u>, 864 F.3d at 247 ("Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint in this case must plead facts that, if proven, would establish that the defendant's statements were not substantially true."); <u>Verragio, Ltd. v. AE Jewelers, Inc.</u>, 2017 WL 4125368, at *6-8 (S.D.N.Y. Aug. 23, 2017) (dismissing defamation claim on grounds of substantial truth) (McMahon, J.).

        C.  Statements of Pure Opinion Are Privileged Against a Claim of <u>Defamation.</u>

        Defendants also urge that certain of Fairstein's claims should be dismissed because she challenges statements of pure opinion, which are privileged against claims of defamation.  Under New York law, a "defamatory statement of fact is in contrast to 'pure opinion' which under our laws is not actionable because expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation."  <u>Davis v. Boeheim</u>, 24 N.Y.3d 262, 269 (2014) (quotation marks and alteration omitted).  "A pure opinion may take one of two forms.  It may be a statement of opinion which is accompanied by a recitation of the facts upon which it is based, or it may be an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts."  <u>Id.</u>  Statements of "imaginative expression" or "rhetorical hyperbole" are "entitled to constitutional protection as opinion . . . ."  <u>Daniel</u>

Goldreyer, Ltd. v. Van de Wetering, 217 A.D.2d 434, 434-35 (1st Dep't 1995) (holding that trial

court should have dismissed as a matter of law a defamation claim directed to a statement in an

art review that "does not have a precise meaning, cannot be objectively characterized as true or

false, appears in an immediate context, the 'Art' section of defendant Time Magazine, where the

average person would understand it as, or expect to find, expression of opinion or personal taste,

and appears in a broader context of the public debate over the artistic merit of the restoration.").

  "While a pure opinion cannot be the subject of a defamation claim,

an opinion that implies that it is based upon facts which justify the opinion but are unknown to

those reading or hearing it, is a 'mixed opinion' and is actionable." Davis, 24 N.Y.3d at 269.

(quotation marks and alterations omitted). "What differentiates an actionable mixed opinion

from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown

to the audience, which support the speaker's opinion and are detrimental to the person being

discussed." Id. (quotation marks and alterations omitted). "'The actionable element of a 'mixed

opinion' is not the false opinion itself – it is the implication that the speaker knows certain facts,

unknown to his audience, which support his opinion and are detrimental to the person about

whom he is speaking.'" Frechtman, 115 A.D.3d at 105-06 (quoting Steinhilber v. Alphonse, 68

N.Y.2d 283, 290 (1986)).

  The distinction between fact and opinion is an issue of law for the courts, based

on the court's assessment of how the statement would be understood by the average person

exposed to the statement in its full context. Id. New York courts weigh three factors to decide

whether the disputed statement is fact-based or non-actionable opinion:

> "(1) whether the specific language in issue has a precise meaning
> which is readily understood; (2) whether the statements are capable
> of being proven true or false; and (3) whether either the full context
> of the communication in which the statement appears or the broader

> social context and surrounding circumstances are such as to
> signal . . . readers or listeners that what is being read or heard is
> likely to be opinion, not fact."

Id. at 270 (quoting Mann v. Abel, 10 N.Y.3d 271, 276 (2008)).  The third factor "requires that

the court consider the content of the communication as a whole, its tone and apparent purpose."

Id.  Courts should not focus on statements in isolation and instead look to the overall context to

decide whether the average viewer would conclude that challenged statements conveyed facts

about a plaintiff.  Id.

      For example, the New York Court of Appeals heavily weighed the context of a

heated labor dispute in concluding that a recording of "invective expressed in the form of heavy-

handed and nonsensical humor" should be understood as a statement of opinion, not fact.

Steinhilber, 68 N.Y.2d at 293; see also Brian v. Richardson, 87 N.Y.2d 46, 53 (1995) ("[T]he Op

Ed page is a forum traditionally reserved for the airing of ideas on matters of public concern.

Indeed, the common expectation is that the columns and articles published on a newspaper's Op

Ed sections will represent the viewpoints of their authors and, as such, contain considerable

hyperbole, speculation, diversified forms of expression and opinion.").  "[E]ven apparent

statements of fact may assume the character of statements of opinion, and thus be privileged,

when made in public debate, heated labor dispute, or other circumstances in which an audience

may anticipate [the use] of epithets, fiery rhetoric or hyperbole."  Steinhilber, 68 N.Y.2d at 294

(quotation marks omitted).  "The essential task is to decide whether the words complained of,

considered in the context of the entire communication and of the circumstances in which they

were spoken or written, may be reasonably understood as implying the assertion of undisclosed

facts justifying the opinion."  Steinhilber, 68 N.Y.2d at 290.

II.     Whether the Complaint Plausibly Alleges a Defamatory Meaning to
        <u>Certain Scenes.</u>

        A.  The Complaint Does Not Plausibly Allege a Defamatory Meaning to
            <u>Routine or Inoffensive Workplace Activities.</u>

            1.  Fairstein Does Not Plausibly Allege a Defamatory Meaning to Her
                <u>Depiction at the Central Park Crime Scene.</u>

The Complaint alleges that Fairstein is falsely depicted in the portrayal of the

events of the early morning of April 20, 1989, where she arrives at the crime scene in the pre-

dawn aftermath of the attack on Meili.  (Compl't ¶¶ 51-56; Ep. 1, 7:30-8:50.)  The scene appears

immediately after the series title card and is the first time Fairstein is shown.  After asking

NYPD officers about Meili's condition and whether members of the press are present, she

visually surveys the densely wooded area of the park where the victim was found, and states,

"What the fuck was she doing here?" and "Let's make sure to get those drag marks.  He dragged

her in, just like right there.  Look, clear as day.  His footsteps, her body.  Fucking hell."

(Compl't ¶ 52; Ep. 1, 7:30-8:50.)

According to the Complaint, the scene falsely depicts Fairstein as leading the

Crime Scene Unit of the NYPD, and also falsely depicts her as concluding that only one

individual was involved in the Meili rape.  (Compl't ¶¶ 53-54.)  Fairstein alleges that, in truth,

she was not at the crime scene on that date and that she did not direct police activity in the case.

(Compl't ¶¶ 55-56.)

Viewing the scene in the context of the entire series and construing the allegations

in the light most favorable to Fairstein, the Complaint does not allege a defamatory meaning to

the scene.  Fairstein's presence on the crime scene, her confusion and concern as to how the

victim arrived at an isolated area of Central Park, and the implication that at this early point in

the investigation she considered the possibility of a single attacker could not plausibly expose

Fairstein to public contempt, ridicule, or disgrace, or an induce an evil opinion of her.  Foster, 87

N.Y.2d at 751.  The scene orients the viewer to the circumstances of the attack and introduces

Fairstein's character as an influential presence in the investigation.  The average viewer would

not understand Fairstein's reference to "his" footsteps as indicating a studied and firm conclusion

that a single individual was responsible for the attack.  The remark is a passing observation about

the crime scene and only vaguely implies that one man apparently left "dragmarks."  The scene

does not negatively portray Fairstein, and the Complaint does not plausibly allege a basis to

conclude that the average viewer would attach a defamatory meaning to her depiction in this

scene.

Because the Complaint does not plausibly allege a defamatory meaning as to

Fairstein's presence at the crime scene in Central Park, the defamation claims directed to this

scene will be dismissed.  (Compl't ¶¶ 51-56.)

> 2.  Fairstein Does Not Plausibly Allege a Defamatory Meaning to Her
>     Role in Drafting a Press Release.

The Complaint alleges that the series falsely depicts Fairstein's participation in

drafting a press release about the case.  (Compl't ¶¶ 59-61; Ep. 1, 8:50-9:19.)  Shortly after the

Central Park sequence, Fairstein arrives to the 24th Precinct police station and begins to draft a

press release.  (Compl't ¶ 59; Ep. 1, 8:50-9:19.)  She then says, "Got to get this statement out, a

few reporters out there."  (Id.)

According to the Complaint, Fairstein was not present at any precinct on the

morning of April 20, and instead learned about the attack after receiving a call from a police

lieutenant that morning.  (Compl't ¶ 57, 60.)  The Complaint states that Fairstein never drafted a

press release about the case and that the district attorney's office had a policy against lawyers

speaking to the press.  (Compl't ¶ 61.)  It also states that the depiction of Fairstein's involvement

in drafting a press release "is significant because the press has been widely criticized as fueling racial tensions" following the attack on Meili.  (Compl't ¶ 61.)

The Complaint does not plausibly allege a defamatory meaning to Fairstein's presence at the precinct station or her participation in drafting a press release.  The contents of the press release are not revealed and the release is mentioned in passing, with no larger relevance to the series.  An average viewer is unlikely to know the district attorney's internal policies about employee communications with the press, let alone that the series shows Fairstein acting contrary to such a policy.  An average viewer also would not interpret Fairstein's remark to "get this statement out" as an effort to incite the press or to stoke public anger.  Accepting Fairstein's allegations that she was not present at the 24th Precinct and played no role in the drafting of a press release, a depiction of her participation in such a banal, administrative activity could not plausibly expose her to public contempt, ridicule, or disgrace, or an induce an evil opinion of her.  See Foster, 87 N.Y.2d at 751.

Because the Complaint does not plausibly allege a defamatory meaning as to Fairstein's involvement in the drafting of a press release, the Complaint will be dismissed to the extent that it asserts defamation based on that scene.  (Compl't ¶¶ 59-61.)

### 3.  The Scene Depicting Bureaucratic Infighting over the Case Does Not Portray Fairstein in a Defamatory Light.

The Complaint alleges that the series falsely depicted an internal rivalry within the Manhattan district attorney's office as to whether the attack on Meili would be prosecuted by Fairstein's Sex Crimes Prosecution Unit or whether the matter would be assigned to Nancy Ryan, a prosecutor who led the Homicide Division.  (Compl't ¶¶ 87-93; Ep. 1, 16:53-19:48.)  As depicted in the series, on the morning of April 20, 1989, a police officer tells Fairstein that Ryan had been assigned to the case, and Fairstein responds, "This is a sex crime not a homicide."

(Compl't ¶ 88; Ep. 1, 16:53-17:03.)  Ryan then arrives at the 24th Precinct, where she and Fairstein call District Attorney Robert Morgenthau.  (Compl't ¶ 90; Ep. 1, 17:03-18:41.)  In the call, Ryan states that the homicide department had been handling the case and had been on the scene before dawn, to which Fairstein replies, "Well I got there before you.  I have had precinct guys here interviewing suspects."  (Id.)  Ryan replies, "Suspects? A dozen kids harassing bicyclists."  (Id.)  Fairstein replies, "These kids were on a rampage," and then states, "3,412 rapes reported to the NYPD last year.  3,412 times someone was assaulted, held down, threatened, degraded, forced.  This is an epidemic, we are not in control and we can be."  (Id.)

Fairstein asserts that the scene is fabricated.  She states that she was not present in the 24th Precinct on April 20, and that she did not discuss the internal unit to which the case would be assigned with Ryan or Morgenthau.  (Compl't ¶ 91.)  Instead, she spoke privately to Morgenthau on the morning of April 20 to notify him of the rape.  (Compl't ¶ 91.)  Fairstein asserts that, at the time, the chief of the trial division believed that his unit would handle the case because it might become a homicide, but that Ryan had no role in the case at that time.  (Compl't ¶¶ 91-92.)  Fairstein asserts that the inclusion of Ryan in these scenes is significant because Ryan ultimately was involved in vacating the convictions of the Five, and these scenes left viewers with the impression that if Ryan had been assigned to the case, the Five would not have been charged with the rape of Meili.  (Compl't ¶ 92.)

The Complaint does not plausibly allege a defamatory meaning to Fairstein's interactions with Ryan or the fictional portrayal of their administrative jockeying over who would supervise the case.  The scenes depict Fairstein and Ryan as driven prosecutors competing to take the lead in a high-profile matter.  Fairstein is depicted as emphasizing the importance of lowering the incidents of rape in the City, which would be consistent with her role as chief of the

unit responsible for prosecuting sex crimes.  Fairstein's disagreement with Ryan over suspects "on a rampage" employs provocative language, but the language is not so inflammatory that it would plausibly expose her to public contempt, ridicule, or disgrace, or an induce an evil opinion of her.  See Foster, 87 N.Y.2d at 751.  Accepting Fairstein's assertion that the depiction of her conflict with Ryan has no basis in fact, the scene merely depicts a type of departmental turf war typical of many television dramas set in the workplace.  The Complaint has not plausibly alleged a defamatory meaning to the scene.

Because the Complaint does not plausibly allege a defamatory meaning as to Fairstein's jockeying for supervisory control of the case, refences to an "epidemic" of rapes or "kids . . . on a rampage" or "harassing bicyclists," the Complaint will be dismissed to the extent that it asserts defamation based on that scene.  (Compl't ¶¶ 87-93.)

B.  Defendants' Motion to Dismiss Fairstein's Claim Related to the Creation of an Attack Timeline on Grounds of Substantial Truth Will Be Denied.

Defendants urge that Fairstein has not plausibly alleged a claim of defamation as to her depiction in creating an attack timeline, they describe as "substantially true."  They urge that the scene is consistent with viewpoints that Fairstein has publicly espoused over the past thirty years.  Defendants therefore argue that even if certain actions depicted in the series varied in detail from Fairstein's actions in 1989, they are not defamatory because they are substantially true.

As characterized by defendants, Fairstein "has been an outspoken public face" for prosecution of the Five and has publicly defended the theory behind their prosecution.  (Def. Mem. 16.)  Defendants assert that the Court can properly take judicial notice of public remarks that Fairstein delivered to a committee of the New York City Council in 2003.  (Def. Mem. at 10.)  As will be explained, however, Fairstein's remarks in 2003 do not render the depiction of

her role in the creation of the timeline as substantially true and contradict the scene in important respects.  Defendants' motion to dismiss this aspect of Fairstein's claim on grounds that the scene is based in substantial truth will therefore be denied.

Fairstein asserts that the series includes a false and defamatory depiction of her attempt to create a timeline for the attack on Meili.  (Compl't ¶¶ 77-86.)  In the series, Fairstein states to a detective, "So you were just going to let possible witnesses to a rape go on a family court ticket?  Wake these kids up and start getting some information.  We've got a lady raped and clinging to life here.  I want their interviews on my desk immediately so I can put together a timeline.  Let's work."  (Compl't ¶ 77; Ep. 1, 12:39-13:03.)  Later that day, Fairstein is shown reviewing papers alone and muttering certain times and incidents, such as, "9:10.  Okay, bicyclists confirmed on East Drive."  (Ep. 1, 15:58-16:52.)  A detective enters the room, and Fairstein states, "Farrell's interviews with the boys are in.  . . .   All this is happening in the Park and it's not connected?"  (Compl't ¶ 79; Ep. 1, 15:58-16:52.)  Fairstein places a Post-It note on a map of Central Park that reads "RAPE," and states, "They're not witnesses, they're suspects." (Id.)  In a later scene, Fairstein is near a map that charts the victim's jogging path, while the series shows flashbacks to Meili jogging and a detective summarizes known details of the timeline of Meili's activities.  (Compl't ¶ 83; Ep. 1, 34:45-36:24.)  Fairstein notes a 45-minute gap in the timeline and states, "How can the same kids be raping her at the same time they are jumping bicyclists way over there?"  (Id.)  A detective in the room responds, "Nothing on the weapon.  Question marks on the timeline.  I mean, we got problems."  (Id.)  Fairstein then proposes a different sequence of events while a detective appears to remain skeptical, and Fairstein states that because the rape occurred, there "obviously" must be a feasible timeline. (Id.)

Fairstein asserts that this portrayal falsely depicts her as "imbuing urgency" to the investigation and "hastening the interviews of unaccompanied minors." (Compl't ¶ 77.) She asserts that she was not present in any precinct at the times depicted, never questioned unaccompanied minors, never directed the NYPD's investigation, never discussed which individuals should be held in custody or who should be released with a family court ticket, and did not plot the events of April 19 on a map. (Compl't ¶¶ 78, 80-82, 84.) She asserts that the depiction is inaccurate because Lederer led the investigation for the Manhattan District Attorney's office. (Compl't ¶¶ 82, 85.) Fairstein further asserts that, in the days immediately following the attack, Meili's route through Central Park was largely unknown because she remained in a coma. (Compl't ¶ 84.)

Defendants urge that this depiction cannot be defamatory because it is substantially true and point to a written statement submitted by Fairstein to the Public Safety Committee of the New York City Council on January 30, 2003. (Docket # 88-1.) As noted, public statements made to a governmental body "are precisely the sort of materials of which [courts] may take judicial notice." ACLU, 925 F.3d at 599 n. 126.

In her remarks, Fairstein stated in part:

> Some critics have questioned the timeline in the case, talking about exoneration as something to be determined by discrepancies of two or three minutes. This was a *rampage* inside the park – it was mob violence, moving in the erratic and uneven way that a deadly pack does, under cover of darkness. It was not a carefully sequenced and orchestrated event. . . . None of the victims who testified was looking at a watch when he or she was assaulted, nor did the jogger have any memory of the exact time she left her apartment. And the rioters didn't punch time cards as they took off across roadways and ball fields looking for more blood to spill.

(Docket # 88-1 at NYCLD_039835-36; emphasis in original.) As part of her remarks, Fairstein explained her view that the Five had been hastily exonerated without the appropriate scrutiny of

Reyes, and advanced an argument that the Five acted in concert with Reyes.  (See id. at

NYCLD_039829-30 ("The DNA match between the crime scene evidence involving the jogger

and Matias Reyes does *not* exonerate any of the others convicted of her attack. . . .  It was

obvious that some were guilty of rape because they 'acted in concert' by striking her on the head

or by holding down her flailing arms and legs.") (emphasis in original).)  Fairstein's statement

also included the following praise of Lederer and the NYPD:

> More than one of the defense counsels has alleged that I was the
> "architect" of what they claim was a miscarriage of justice.  By the
> time Lederer and I were invited to the precinct – twenty-one hours
> after the first arrests – most of the suspects had already made oral
> and written admissions.  Lederer then did an absolutely stunning job
> of questioning the attackers again, on videotape, with parents
> cooperating fully and sitting in on the process with their sons.  When
> I first got to the station house, I took note of how careful the police
> had been to bend over backwards to accommodate the special
> circumstances of so many juvenile suspects.

(Docket # 88-1 at NYCLD_039833.)

As noted, in deciding whether a statement is substantially true, "[c]ourts typically

compare the complained of language with the alleged truth to determine whether the truth would

have a different effect on the mind of the average reader."  Franklin, 135 A.D.3d at 94.  The

defendants have not demonstrated that Fairstein's remarks from 2003 render her portrayal in the

aftermath of the crime as substantially true.  The remarks of 2003 were a retrospective defense of

work performed by Lederer and the NYPD:  They did not describe Fairstein performing a hands-

on role in assembling the timeline or directing suspect interviews, and instead credited the

performance of Lederer and the NYPD.  Indeed, Fairstein's remarks challenged the perception

that she was an "architect" of the case, and instead pointed to the work of Lederer and the

NYPD.  (Docket # 88-1 at NYCLD_039833.)

While Fairstein's 2003 defense of the timeline's accuracy is consistent with the spirit of her dialogue in "When They See Us," it does not render her portrayal in the series as substantially true.  If the portrayal of Fairstein in "When They See Us" were substituted with some version of Fairstein's 2003 remarks, it would have depicted Lederer and the NYPD leading the investigation, and, at some later point, Fairstein's agreement with the NYPD's timeline of events.  Such a version of events would plausibly have had a different effect on the mind of the viewer, one that did not depict Fairstein as the prime mover in marshalling evidence and drawing conclusions about the events of April 19.  See Franklin, 135 A.D.3d at 94.

Because defendants have not demonstrated that substantial truth as to Fairstein's role in the creation of the timeline, defendants' motion to dismiss the defamation claims related to this depiction will be denied.  (Compl't ¶¶ 77-85.)

      C.  Defendant's Motion to Dismiss Fairstein's Claims on the Grounds that They Are Privileged as Opinion Is Granted in Part and Denied in Part.

      1.  The Depictions of Fairstein and Lederer Discussing the Guilt of the Five Are Non-Actionable Opinion, Except for the Depiction of Fairstein Withholding DNA Evidence.

Fairstein asserts that Episodes 1 and 2 of the series contain defamatory depictions of certain interactions that she had with Lederer.  As noted, Lederer was the lead trial lawyer in the case against the Five and worked in the Sex Crimes Prosecution Unit headed by Fairstein.

As depicted in the series, Lederer sometimes expresses doubt about the guilt of the Five, while Fairstein consistently views the Five as responsible for the attack.  In Episode 1, Lederer notes that witness statements conflicted about the rape of Meili, and Fairstein describes the witnesses as "lying."  (Compl't ¶ 108; Ep. 1 at 47:42-49:28.)  Lederer states, "I've got to face a judge and prosecute this Linda . . . what is your case?" and Fairstein replies that "they're all guilty, each of these boys assaulted Patricia Meili, they all raped her and we know this because

in each of these boys' confessions, they all bear eyewitness against each other." (Id.)  Lederer

notes the difficulty of presenting a case with "wildly conflicting statements, no physical

evidence, no weapon," and Fairstein replies that "all we need is for one of these little shits to tie

this whole thing together." (Id.)  Lederer later tells Fairstein that none of the Five's statements

match "the central facts of the crime," and a subsequent scene shows a detective coaching one of

the Five about changing his statement.  (Compl't ¶ 112 & Ep. 1, 49:59-50:29.)

       Lederer later tells Fairstein that the Five's accounts are inconsistent with the

victim's location.  (Compl't ¶ 113 & Ep. 1 at 50:30-50:49.)  Fairstein says that Korey Wise is

"the one, he's the glue, we'll make sure he sticks it together." (Compl't ¶ 114 & Ep. 1 at 50:46-

51:01.)  Wise is then shown being struck by NYPD detectives.  (Compl't ¶ 115 & Ep. 1 at

52:25.)

       The Complaint also alleges that the portrayal of Fairstein's conversations with

Lederer about a semen-stained sock found near the rape scene are defamatory.  The sock

contained a DNA sample that ultimately did not match any of the Five.  Episode 2 depicts a

conversation between Fairstein, Morgenthau and Lederer, where Morgenthau states, "We have a

useless tape, we lost our gang narrative, we can't find DNA." (Compl't ¶ 118 & Ep. 2, 16:39-

17:14.)  Fairstein responds, "We have a sock.  Those little bastards shot their wad into a sock

thinking we wouldn't find it, but we found it." (Compl't ¶ 118 & Ep. 2, 16:39-17:14.)

Morgenthau then says, "We have DNA, good.  The match will nail this thing down." (Id.)

Lederer wonders aloud how the NYPD initially missed the sock, and Fairstein states, "Who

cares?  We have it now.  And the kicker is none of the defense is aware yet so we can test it right

before trial.  Surprise!" (Id.)  Appearing distressed, Lederer replies, "Surprise." (Id.)

Fairstein and Lederer later learn that the sock's DNA does not match any member of the Five.  (Compl't ¶ 120 & Ep. 2 at 29:51-31:23.)  In a conversation between the two, Lederer states, "I needed the DNA and the sock to nail all this down.  It doesn't match.  So, five defendants clean.  Their DNA isn't there.  It's not anywhere."  (Id.)  Fairstein responds, "So there must have been another attacker.  One must have gotten away."  (Id.)  Lederer states, "You honestly believe that?" and Fairstein replies, "I do if it helps a jury believe what we know is true."  (Id.)  Lederer observes that this conflicts with their theory of the case, and states, "So, we have semen in a sock and it isn't theirs, any of them.  So what are we doing here?"  (Id.)

The two then discuss an inconclusive cervical DNA sample from the victim, and Fairstein states the inconclusive sample "means the Five can't be ruled out.  Deal with the sock DNA, play up the cervical DNA."  (Compl't ¶ 121 & Ep. 2 at 29:51-31:23.)  Lederer responds, "Are you listening to yourself?  You sound delusional.  You want me to pretend that the sock never existed?  This is crossing a line."  (Id.)  Fairstein replies, "What line, Elizabeth?  Where is the line for Patricia [Meili], huh?  I'm sick of this shit.  Where's the line for her? . . .  Fucking City!  We hear something gruesome, we grimace and we move on.  Well not this time."  (Id.)

Lederer then expresses concern about the Five, and Fairstein replies, "They were in the park beating people up the same night that she's getting beat up and you're telling me they had nothing to do with it?  Bullshit.  They said it themselves, they told us what happened."  (Compl't ¶ 122 & Ep. 2, 31:24-32:23.)  Lederer states, "They were told," and Fairstein responds, "Come on, the eye sees but it cannot see itself, they couldn't see the whole picture of how their one part fit into the whole.  That is all we did.  It's too late for this.  Like you said, the whole country is watching.  They are watching you.  This is your opportunity.  Remember her."  (Id.)

Fairstein asserts that these scenes were designed to make her the villain in the case, depict conversations that never occurred and falsely show her using "abusive and derogatory language." (Compl't ¶¶ 109, 115.) She asserts that the scenes falsely depict her as "desperate" to prosecute the Five and as permitting or encouraging coercive interrogation practices. (Compl't ¶ 116.)

Fairstein states that, in truth, it was Lederer who believed that the Five participated in the Meili attack as part of a series of attacks in Central Park and that Fairstein never had a personal "theory of the case." (Compl't ¶¶ 109, 116.) Fairstein also states that Lederer provided the Five's defense counsel with DNA results from the stained sock immediately after its discovery. (Compl't ¶ 119.) According to the Complaint, Lederer's reference to her as "delusional" portrayed Fairstein "as bordering on mental illness and lacking any sense of rationality when making judgments about cases." (Compl't ¶ 125.)

As noted, statements of pure opinion are non-actionable, and the distinction between statements of fact and opinion is an issue of law for the Court, which weighs "the content of the communication as a whole, its tone and apparent purpose." Davis, 24 N.Y.3d at 270. Here, defendants assert that in the context of a dramatization based on controversial historical events, an average viewer would understand the scenes to be pure opinion reflecting a dramatized debate over the strengths and weaknesses of the prosecution's case. See John E. Reid & Assocs., Inc. v. Netflix, Inc., 2020 WL 1330657, at *8 (N.D. Ill. Mar. 23, 2020) (noting that an alleged defamatory statement in "When They See Us" was uttered by "by a fictionalized character, during a fictionalized conversation, as part of series that uses actors and actresses, music, and imagined dialogue to dramatize historical events."); Lovingood v. Discovery Commc'ns, Inc., 800 Fed. App'x 840, 847-48 (11th Cir. 2020) (in reviewing a defamation claim

involving a dramatization of the Challenger space shuttle tragedy, observing that "[o]verall, a reasonable viewer would understand the film as generally not purporting to present verbatim dialogue from the pages of history.") (summary order).  The Court of Appeals for the Ninth Circuit has also observed that in a television dramatization, a character's "use of hyperbolic language" may be understood by viewers as "a rhetorical device" or "a dramatic passage of dialogue designed to maintain the viewer's attention" and not as "an objective statement of fact." Partington, 56 F.3d at 1157.

As has been discussed, the average viewer would not understand "When They See Us" to be a documentary that depicts a strictly factual version of events.  It stars famous actors, incorporates popular music and includes heavily stylized, non-realistic visual sequences.  The average viewer would also understand that "When They See Us" advocates a point of view that is sympathetic to the Five and critical of law enforcement.  For example, the well-known protest anthem "Fight the Power" by the hip-hop group Public Enemy plays in the early minutes of Episode 1, and the final episode of the series concludes with a montage where images of the actors portraying the Five dissolve into video portraits of their real-life counterparts.  Viewing the entire series in context, the average viewer would understand "When They See Us" to be a Hollywood dramatization that builds its story around the premise that the Five were wrongly prosecuted and convicted.

But the scenes in Episode 2 related to the DNA-marked sock cannot be fairly classified as pure opinion, and instead are actionable mixed opinion.  In those scenes, Fairstein explains that the prosecution is in possession of a DNA-marked sock that has not been disclosed to the defense, and that the prosecution will "surprise" the defense by testing the sock on the eve of trial.  (Compl't ¶ 118 & Ep. 2, 16:39-17:14.)  After the sock is found not to match to any of

the Five, Fairstein suggests that a sixth attacker must have been involved "if it helps a jury believe what we know is true." (Compl't ¶ 120 & Ep. 2 at 29:51-31:23.) These statements and actions attributable to Fairstein have a precise meaning, are capable of being proved or disproved, and even allowing for the artistic context of "When They See Us," the average viewer could reasonably believe that these depictions were based on undisclosed facts known to the filmmakers. Davis, 24 N.Y.3d at 270. These scenes depict Fairstein concealing evidence from defense counsel – a likely violation of law and of professional responsibility – and manipulating the timing of a DNA test with the goal of advantaging the prosecution. The average viewer would not have a reason to conclude that such actions reflect a dramatized opinion of the filmmakers and could fairly conclude that the depiction was based on undisclosed facts known to the defendants.

The scenes described in paragraphs 118 to 121 of the Complaint are therefore not statements of pure opinion and are actionable as defamation.

The remaining interactions with Lederer use the type of dramatized dialogue that, in the full context of "When They See Us," would not be understood by the average viewer as representations of fact. (Compl't ¶ 108; Ep. 1 at 47:42-49:28; Compl't ¶ 112 & Ep. 1, 49:59-50:29; Compl't ¶ 113 & Ep. 1 at 50:30-50:49; Compl't ¶ 114 & Ep. 1 at 50:46-51:01; Compl't ¶ 122 & Ep. 2, 31:24-32:23.) Fairstein's assertions that "they're all guilty" because "they all bear eyewitness against each other," that defendant Korey Wise is the "glue" of the prosecution's case, and that the prosecution needs "one of these little shits to tie this whole thing together" would be understood by the average viewer as hyperbolic dialogue in service of the series narrative. In the full context of the series, the dialogue between Fairstein and Lederer also conveys the filmmakers' opinions about the weaknesses of the case against the Five, using

heightened and pithy rhetoric for dramatic effect.  A work of popular entertainment cannot reasonably capture the many fine points and nuances of a criminal proceeding, and the somewhat simplistic dialogue between Fairstein and Lederer conveys to a general audience the filmmakers' views of the flaws in the prosecution's case.  This is in marked contrast to the scenes involving the DNA-marked sock, where Fairstein is depicted as taking direct actions to manipulate evidence and impair the Five's ability to defend themselves.

The Court therefore concludes that the Complaint has alleged actionable defamation as to the depiction of Fairstein's disclosure of the DNA-marked sock.  (Compl't ¶ 118-21 & Ep. 2, 16:39-17:14, 29:51-31:23.)  The scenes where Fairstein and Lederer debate the strengths and weaknesses of the case are privileged as pure opinion and therefore are not actionable.  (Compl't ¶ 108; Ep. 1 at 47:42-49:28; Compl't ¶ 112 & Ep. 1, 49:59-50:29; Compl't ¶ 113 & Ep. 1 at 50:30-50:49; Compl't ¶ 114 & Ep. 1 at 50:46-51:01; Compl't ¶ 122 & Ep. 2, 31:24-32:23.)

2.  The Complaint Plausibly Alleges a Defamatory Meaning to Ryan's
Statement that Fairstein "Coerced Those Boys" to Confess.

The Complaint also asserts that the series contains a defamatory depiction in a scene in Episode 4 where Fairstein meets with Nancy Ryan following exoneration of the Five.  As previously discussed, an early scene of Episode 1 depicts a non-defamatory administrative conflict about whether prosecution of the Five would be overseen by Fairstein's unit or Ryan's.

The series later depicts Ryan as an important figure in reexamining the case against the Five.  In one scene, Ryan and another assistant district attorney, Peter Casolaro, are shown reviewing a case file.  Casolaro states, "Fairstein acknowledged the track marks . . . 'this is where he pulled her in,'" and asks Ryan when the theory of the case changed.  (Compl't ¶ 127 & Ep. 4 at 1:04:11-1:04:35.)  Ryan replies, "I was there when it changed."  (Id.)

Fairstein's final appearance in "When They See Us" occurs later in Episode 4, where she and Ryan revisit the case following exoneration of the Five.  Fairstein and Ryan meet at an upscale restaurant, and Fairstein states to Ryan, "You're here to gloat.  It doesn't matter, you simply identified a sixth rapist.  I always said there may be more."  (Compl't ¶ 128 & Ep. 4 at 1:09:49-1:12:43.)  Ryan responds, "You said that to cover because you knew you coerced those boys into saying what they did."[2]  (Id.)  Ryan later recites the titles of novels authored by Fairstein while taking paperback copies from a bag, and states that while Fairstein was writing crime novels, the Five were serving time in prison.  (Compl't ¶ 128 & Ep. 4 at 1:09:49-1:12:43.)

The scene includes a more extensive exchange between the two characters that is not quoted in the Complaint.  Fairstein maintains that the Five "said what they said freely" and Ryan replies, "I actually think you convinced yourself of that.  (Ep. 4 at 1:09:49-1:12:43.)  Fairstein then explains to Ryan that a police commission would soon issue a 43-page report concluding that the Five were guilty of the attack.  (Id.)  Ryan expresses skepticism about the police conducting a self-investigation and tells Fairstein, "We pored over your confession tapes.  We reconstructed the events of that night minute by minute.  I know what was done."  (Id.)  Fairstein replies, "Oh, you know nothing," and Ryan responds by citing the extensive presence of Reyes's DNA at the crime scene and stating, "It was him.  Only him."  (Id.)  Fairstein maintains that Reyes "ran with that pack of kids.  He stayed longer while others moved on."  (Id.)  After Ryan notes Fairstein's work as an author, Fairstein appears frustrated, and states that she watched while thirty NYPD detectives conducted a "brilliant" investigation to seek justice

---

[2] The Complaint misquotes and condenses the exchange by quoting Ryan's dialogue as, "You said that to cover because you knew you coerced those boys into say what they did Linda, we pored over your confession tapes." (Compl't ¶ 128.)  However, Ryan's assertion that Fairstein "coerced" the Five is made in response to Fairstein's reference to a "sixth rapist," and Ryan's assertion that "[w]e pored over your confession tapes" is raised separately, in response to Fairstein's mention of the NYPD's internal investigation.

for a woman who was brutally beaten and discarded, and states, "We helped make sure those boys got what they deserved.  And I'll be damned if I'm going to lose a wink of sleep over it." (Id.)  Fairstein then thanks Ryan for buying her books and leaves the restaurant table.  (Id.)

The Complaint asserts that Fairstein has never spoken with Ryan about the Reyes confession.  (Compl't ¶¶ 126, 129.)  It asserts that these scenes falsely attribute the prosecution's theory of the case to Fairstein and falsely depicts her as responsible for implementing coercive interrogation techniques by the police.  (Compl't ¶ 129.)

Viewed in context, the average viewer could reasonably interpret Ryan's statement that "you [Fairstein] coerced those boys into saying what they did" to be a factual assertion.  Ryan's statement that her team "pored over your confession tapes" implies that Ryan's own investigation concluded that Fairstein directed the conduct of police interviews that secured confessions that she described as "coerced."  This notion is underscored by Ryan's assertion that her team reconstructed the sequence of events and that, "I know what was done." The statements have a precise meaning and are capable of being proved true or false.  The series depicts Ryan as an authoritative public official who questions law enforcement's approach to the case.  The damning judgment of Fairstein's conduct voiced by a professional colleague could plausibly hold Fairstein up to shame, ridicule and contempt.  Because Ryan's statements purport to be based on facts that she uncovered during her investigation and are not couched in subjective language, the average viewer could conclude that the defendants "know[ ] certain facts, unknown to the audience, which support the speaker[s'] opinion and are detrimental to the person being discussed."  Davis, 24 N.Y.3d at 269.

Defendants urge that the Ryan character merely engaged in "hyperbolic expression" and that Ryan's reference to "your" confession tapes "cannot be read as a factual

statement that *Plaintiff herself* was responsible" for alleged coercive tactics.  (Def. Mem. at 21; emphasis in original.)  For the reasons explained, the average viewer also could conclude that Ryan's statement was based in fact and implies that Fairstein had a personal role in securing the confessions.  If "words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." Celle, 209 F.3d at 178 (quotation marks omitted).  Defendants' motion to dismiss will be denied as to this exchange.

However, similar to the depiction of Fairstein's interactions with Lederer, other aspects of the exchange reflect the filmmakers' opinions about conflicting theories of the case and the underlying evidence, including the reliability of the NYPD's self-investigation, whether the NYPD was "brilliant" in investigating the attack and whether Reyes plausibly acted in concert with the Five.  The average viewer would understand such lines of dialogue to be a dramatized representation of the filmmakers' view that the Five did not act in concert with Reyes and that the NYPD's internal report did not offer a reliable accounting of events.  The Fairstein and Ryan characters are depicted as having conflicting and subjective opinions about these issues, and this scene functions in part as a closing summary of the filmmakers' views of weaknesses in the evidence.  Even though the average viewer would likely view Fairstein as the principal villain in the series, and would likely view Ryan as a fair-minded person who had been consistently seeking the truth, such an interpretative gloss is the opinion-based prerogative of the defendants as speakers.

Defendants' motion to dismiss will therefore be denied to the extent that it plausibly alleges a defamatory meaning to Ryan's assertion in Episode 4 that the police interviews resulting in the taped confessions were coerced and made at Fairstein's direction, but

will otherwise be granted as to the scene depicting Fairstein's final conversation with Ryan.

(Compl't ¶¶ 126-30.)

> ### D.   The Motion to Dismiss Fairstein's Claims Directed to Her Instructions to the NYPD Is Denied.
>
> > #### 1.   The Complaint Plausibly Alleges a Defamatory Meaning to Fairstein's Instructions for Interrogation.

Fairstein alleges that the series falsely depicts her as instructing NYPD officers to harshly interrogate suspects.  (Compl't ¶¶ 104-07.)  In the series, she instructs members of the NYPD as follows:  "We've got suspects.  We've got kids in custody.  Interrogate.  Make them name their accomplices.  This is not business as usual.  The press is crawling all over this.  No kid gloves here.  These are not kids.  They raped this woman.  Our lady jogger deserves this."  (Compl't ¶ 104 & Ep. 1 at 22:35-22:53.)  The next scene shows Kevin Richardson alone in a room and handcuffed to a chair with a black eye.  (Ep. 1 at 22:54-24:17.)  Outside of Fairstein's presence, detectives of the NYPD observe that Richardson's mother left voluntarily, and one states that it "feels like Christmas."  (Id.)  Detectives begin to question Richardson, and one tells him, "The sooner you tell us what you know, the sooner you go home."  (Id.)  Richardson then asks for his mother and is told that she left.  (Id.)  A detective tells him, "It's just us.  You and us."  (Id.)  The series then shows detectives questioning members of the Five and others with varying levels of verbal aggression and what appears to be non-injurious physical contact.  (Ep. 1 at 24:17-33:30.)

The Complaint alleges that this sequence "portrays Ms. Fairstein not only as a racist, but unethical as well."  (Compl't ¶ 105.)  It alleges that Fairstein was not involved in the NYPD's questioning of witnesses or suspects at any precinct and had no supervisory role in the police investigation.  (Compl't ¶¶ 105-07.)

Defendants urge that phrases like "not business as usual" and "no kid gloves here" are typical heated rhetoric used for dramatic purposes to depict authorities are under pressure. (Def. Mem. at 24.) Defendants urge that such a "dramatic trope" cannot support the conclusion that Fairstein directed NYPD officers to bend rules or alter procedures. (Id.)

As depicted in the series, however, Fairstein had a hands-on role in supervising the early stages of the investigation, and the series strongly suggests that she had the authority to direct the actions of the NYPD. She expressly instructs officers to "make" the suspects name their accomplices and orders them not to use "kid gloves" on the suspects because they "raped this woman" and are "not kids." This language goes beyond dramatic trope or rhetorical hyperbole: The average viewer could understand her comments as an instruction to coerce suspects into naming accomplices, and to treat the suspects as adults rather than minors because Fairstein considers them rapists. The episode immediately shows officers using rhetorical and physical intimidation against various suspects, who are minors. The words and actions depicted have a precise meaning and are capable of being proved true or untrue, and in context, the average viewer could reasonably perceive this sequence to show members of the NYPD acting pursuant to Fairstein's instruction. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience. Davis, 24 N.Y.3d at 269.

The Court concludes that the Complaint plausibly alleges a defamatory meaning to Fairstein's instructions about suspect interrogation. The Complaint plausibly alleges that the depiction is false. In full context, the average viewer would conclude that Fairstein was responsible for instructing members of the NYPD to use harsh and coercive interrogation practices against minors. The use of false confessions brought about through law enforcement

pressure and duplicity is a significant theme in later portions of the series.  The average viewer
could therefore interpret Fairstein's interrogation instructions as beginning the chain of events
that resulted in the unjust conviction of the Five, such that the depiction could plausibly expose
Fairstein to public contempt, ridicule, or disgrace, or an induce an evil opinion of her.  See
Foster, 87 N.Y.2d at 751.

The Court therefore concludes that Fairstein has plausibly alleged a defamatory
meaning to her interrogation instructions.  (Compl't ¶ 104 & Ep. 1 at 22:35-22:53.)  Defendants'
motion to dismiss will therefore be denied as to this scene.

2.   The Complaint Plausibly Alleges Defamation Based on Fairstein's
Instructions to Investigate Young Black Males.

Fairstein alleges that the series includes a defamatory depiction of her instructions
to investigate young, black males in Harlem.  (Compl't ¶¶ 97-103.)  In a scene set at the 24th
Precinct, she instructs a group of assembled NYPD officers as follows:

> I need that whole group.  I have some of them, and descriptions of
> others, but I need all of them.  Every young black male who was in
> the park last night is a suspect in the rape of that woman who is
> fighting for her life right now.  I want units out strong.  Come on,
> guys.  What did we miss?  Let's get an army of blue up in Harlem.
> You go into those projects and you stop every little thug you see.
> You bring every kid who was in the park last night.

(Compl't ¶ 97 & Ep. 1 at 19:54-20:30.)  During portions of Fairstein's remarks, the series shows
NYPD officers lining young men against a fence and searching them.  (Ep. 1 at 19:54-20:30.)
The scene immediately following her remarks shows a group of seemingly frustrated officers,
two of whom see Salaam and Wise on the street by chance, demand their ID, and take them into
custody.  (Ep. 1 at 20:31-22:20.)

Fairstein asserts that she did not instruct officers to round up young black men
who were in Central Park and that she did not instruct officers in the case.  (Compl't ¶¶ 98-102.)

She asserts that the scene is also defamatory because the word "thug" has racist connotations and therefore depicts her as a racist.  (Compl't ¶ 103.)

As depicted in "When They See Us," the average viewer could conclude from the scene that Fairstein directed NYPD officers to conduct a discriminatory canvas in Harlem.  The depiction has a precise meaning and is capable of being proved or disproved.  The instructions to "get an army of blue up in Harlem" in pursuit of "young black male[s]" and to "go into those projects and you stop every little thug you see" could reasonably be understood by a viewer as a directive to indiscriminately canvass and search young black men.  The term "thug" is not used to describe individuals who were believed, rightly or wrongly, to have committed the brutal rape. Rather, it implies that the "projects" in Harlem are populated with "thugs" ("stop every little thug you see") and among those stopped, one or more may know something about the rape. Fairstein's words are spoken against images of police searching young men along a fence and the series immediately transitions to the depiction of officers demanding ID from Salaam and Wise. Viewed in context and taken as a whole, the Complaint plausibly alleges that the dialogue attributed to Fairstein advocates unlawful police stops of young black males without reasonable suspicion, thereby subjecting her to hatred and contempt.  The average viewer would not necessarily conclude that her remarks were merely a reflection of the filmmakers' opinions about the perspective of law enforcement, and could instead conclude that Fairstein directed discriminatory policing practices.  The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience.  Davis, 24 N.Y.3d at 269.

Defendants' motion to dismiss Fairstein's defamation claims directed to her character's remarks urging the police to canvass the projects in Harlem and stop "every little thug" will therefore be denied.  (Compl't ¶¶ 97-103.)

> E.   The Complaint Does Not Allege Defamation as to Fairstein's Questions about Antron McCrae.

Defendants urge that Fairstein has not alleged a defamatory meaning to a scene where she is shown as directly questioning young suspects.  Because Fairstein's claim is based on various inferences that lack support in the events depicted, her defamation claims will be dismissed as to this scene.

In Episode 1, on the morning of April 20, 1989, Fairstein is shown reading from a folder and asking police officers about the definition of "wiling out" or "wilding out," while struggling with the pronunciation.  (Compl't ¶ 63 & Ep. 1, 9:46-9:55.)  Fairstein is then shown in a room full of young men of color who are suspected of participating in or having knowledge about the attacks in Central Park.  (Compl't ¶ 65 & Ep. 1, 11:00-12:38.)  She points to a black eye on Kevin Richardson, who is one of the Five, and says, "What happened to that one?" and asks a member of law enforcement what constitutes "wilding," who replies that he does not know.  (Id.)  Fairstein then questions an unidentified young man who is present in the room.[3] (Compl't ¶ 66 & Ep. 1, 11:00-12:38.)  She asks if he saw people doing bad things in the park, and he responds that he was with his "boy Tron."  (Id.)  Fairstein asks the boy if he was "out wilding with Tron" before inquiring about Tron's name and address.  (Id.)  The Complaint notes

---

[3] The Complaint asserts that Fairstein is depicted as questioning an individual named Clarence Thomas, who was not a member of the Five.  (Compl't ¶¶ 69-72.)  The Complaint asserts that public records indicate that on the night of April 19, 1989, Thomas was in a police van when he identified Antron McCray as responsible for a "murder" in Central Park, and that he later described attacks purportedly committed by McCray.  (Compl't ¶¶ 69, 71.)

that the young men are not shown being read <u>Miranda</u> rights and that questioning persons younger than sixteen outside the presence of their parents violates New York law.  (<u>Id.</u>)

The Complaint asserts that Fairstein never questioned suspects on April 20, including members of the Five, and that she was not familiar with the terms "wiling out" or "wilding out."  (Compl't ¶¶ 67-68.)  The Complaint asserts that based on publicly available documents, Antron McCray was first named by two persons who claimed that he was responsible for a "murder" in Central Park.  (Compl't ¶ 69.)  It asserts that the relevant interviews the Five and others occurred in the presence of a parent, following the recitation of <u>Miranda</u> rights, and that Fairstein played no role in any interviews about McCray.  (Compl't ¶¶ 70-73.)  The Complaint also asserts that Fairstein did not use the term "wilding," and asserts that the word was first used by several young men questioned about the events of April 19, before being adopted by the press as a term that stoked public fears of black men.  (Compl't ¶¶ 74-76.)

The Complaint does not plausibly allege a defamatory meaning to Fairstein's depiction in this scene.  First, the scene does not show an express or implied denial of <u>Miranda</u> protections.  The scene depicts a large number of young men gathered in a room when Fairstein arrives.  There is no suggestion that they were advised of <u>Miranda</u> protections but also no suggestion that they were not so informed.  The actions and dialogue do not reflect an express or implied limitation on their right to remain silent or to consult with an attorney.  The average viewer would not understand this scene to depict a deprivation of <u>Miranda</u>'s protections, or of any other protections afforded under the U.S. Constitution.  The Complaint's assertion that the series depicts Fairstein as violating <u>Miranda</u> protections is not supported by the scene viewed in context.

Fairstein's questioning of minors outside the presence of a parent or guardian is a somewhat closer issue.  It is true that the scene does not reflect the presence of any parent while Fairstein questions the young men, and defendants do not dispute that New York law requires that a parent be present when law enforcement questions a minor younger than age 16.  (See Def. Mem. at 23.)  Similar to the issue of <u>Miranda</u> protections, however, the series does not suggest any calculated effort to exclude parents.  The scene is brief and Fairstein's questions are generalized and conversational.  Moreover, the average viewer would be unlikely to know of a requirement under New York law that a parent be present during questioning, and the scene does not suggest that Fairstein was attempting to evade legal requirements.  In context, the average viewer would not view Fairstein's portrayal in this scene as violating New York's restrictions on the questioning of minors or otherwise defamatory.

Lastly, the scene does not defame Fairstein by having her utter the word "wilding."  Fairstein is shown to lack familiarity with the word's definition and pronunciation. At this moment in the series, she is repeating an unfamiliar word that she only recently encountered in an internal report.  Given the word's usage in context, the average viewer would not attach a defamatory meaning to Fairstein's use of the word "wilding."

Fairstein's defamation claim directed to her questioning about "Tron" turns on speculative interpretations not supported by actions or dialogue depicted in the series.  Her claim directed to these scenes will therefore be dismissed.

F.  Fairstein Has Not Plausibly Alleged Defamation Based on Language Referring to the Five as "Animals."

The Complaint alleges that the defendants defamed Fairstein by depicting her as using derogatory and "dehumanizing" language in a scene with Ryan.  (Compl't ¶¶ 94-96.)  In one of the scenes set at the 24th Precinct on April 20, Fairstein is shown briefing NYPD

- 44 -

members in front of a map of Central Park.  (Compl't ¶ 94 & Ep. 1 at 18:42-19:48.)  Fairstein

says, "They brutally raped a woman and discarded her like a piece of garbage, left her for dead,

bleeding, bound, naked.  And to think we were going to release these animals to family court and

put them back on the streets."  (Id.)  Fairstein notes that a half-hour is unaccounted for in the

timeline of the attack, and, pointing to a map of Central Park, says, "What did these animals do

between here and here?  Are there other victims still in the Park?"  (Id.)  Ryan then says to

Fairstein, "Good luck.  You're gonna need it."  (Id.)  According to the Complaint, the scene is

fabricated, and the dialogue "portrays Ms. Fairstein as dehumanizing children of color by

referring to them as 'animals,' while trying to create support among police officers for a weak

case, as indicated by ADA Ryan's skepticism."  (Compl't ¶ 95.)

          In this context, the Fairstein character's use of the word "animals" is derogatory

and appears intended to discomfort the viewer.  Accepting Fairstein's assertion that she never

uttered such a remark, the use of the word "animals" in a dramatized interpretation of historical

events is not so inflammatory that it rises to the level of defamation.  See Chau, 771 F.3d at 127

("Not all (or even most) maligning remarks can be considered defamatory.").  The word is used

to describe suspects who she believed "raped a woman and discarded her like a piece of

garbage  . . . ."  While the description of suspects as "animals" has fraught and negative

connotations, given the context of the moment, the term's use reflects a character's outrage over

the attacks, and is not the type of remark that plausibly exposes a person to the type of public

hatred or shame that forms the basis of a defamation claim.

          Additionally, the series' use of the word "animals" is also protected as a

privileged opinion on the part of the defendants.  In the full context of "When They See Us," the

average viewer would understand the term's use to reflect the filmmakers' perception that

prosecutors and law enforcement viewed the suspects as a violent, out-of-control pack presumed to be guilty, and not as individuals.  While Fairstein is free to challenge that perception, such language in a dramatized series drawn from historical events would not be understood by the average viewer as a faithful representation of Fairstein's actions and words, and would instead be viewed as heightened and hyperbolic rhetoric that reflects the filmmakers' critique of the prosecution.  The degree to which Fairstein and others pre-judged the guilt of the Five and differentiated between them as individuals is a subjective opinion that does not easily lend itself to being proved or disproved.

 The question understandably arises why the Court draws a distinction between the use of the terms "little thugs" and "animals."  The phrase "stop every little thug you see" was used in the portrayal to refer indiscriminately to young males in the projects of Harlem without cause for suspicion that the particular person was involved in the Central Park attack or any other crime.  It portrays Fairstein as advocating an unlawful stop of innocent individuals, young, black men in Harlem.  "Animals," a similarly dehumanizing term, was used to describe individuals who were believed to have participated in an exceptionally brutal and savage rape of a woman, leaving her in a coma.  Neither epithet is generally considered appropriate but, in context, only one – "stop every little thug you see" – portrays Fairstein as having contempt for and directing unlawful action against young men in Harlem regardless of their participation in criminal activity.  In context, the use of "animals" was reserved for supposed participants in an extremely brutal crime.  The average viewer seeing the entire series would understand the difference and see the word "animals" used in context as inappropriate but not implying a generalized view of all young men of color, or otherwise holding Fairstein up to ridicule and contempt for its use.

Because the Complaint does not plausibly allege a defamatory meaning to Fairstein's use of the word "animals," the Complaint will be dismissed to the extent that it asserts defamation based on that scene.  (Compl't ¶¶ 94-96.)

### III.   The Motion to Dismiss the Claim of Civil Conspiracy Will Be Denied.

Count VII alleges that defendants conspired to defame Fairstein.  (Compl't ¶¶ 375-82.)  It asserts that defendants collaboratively wrote, produced and published "When They See Us" with the intent to direct public ridicule and scorn to Fairstein and to cause her harm. (Compl't ¶¶ 377-78.)

Defendants move to dismiss this claim on the limited ground that New York "does not recognize a freestanding claim for conspiracy."  Carlson v. Am. Int'l Inc., 30 N.Y.3d 288, 310 (2017).  But New York law does, in fact, recognize a claim of civil conspiracy where a plaintiff adequately alleges an underlying tort.  See, e.g., Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort.").  "In order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement."  Perez v. Lopez, 97 A.D.3d 558, 560 (1st Dep't 2012) (reversing trial court's dismissal of claim of conspiracy to defame).

Here, the Complaint has plausibly alleges an underlying tort of defamation and that the defendants collaborated in the writing, production and publication of defamatory statements.  (Compl't ¶¶ 376-77.)  The question of whether defendants actually agreed to defame Fairstein is properly subject to discovery, but the opprobrium expressed toward Fairstein in certain of defendants' public comments lend some plausibility to the claim.  (See, e.g., Compl't ¶

194 (quoting public remark from Locke stating: "But fuck it: Linda Fairstein is trash, was trash, will always be trash.").)

      Defendants' motion to dismiss the claim of conspiracy to commit defamation will therefore be denied.

CONCLUSION.

      Defendants' motion to dismiss is granted in part and denied in part.

      Specifically, the motion is denied as to the scenes described in paragraphs 77-85 (the creation of a timeline), 118-21 (the withholding of DNA evidence), 104-07 (the instructions to interrogate), 128 (Ryan's assertion that Fairstein "coerced" the Five into confessing), and 97-103 (the instructions to canvass Harlem). The motion to dismiss Fairstein's claim of civil conspiracy is also denied. (Compl't ¶¶ 375-82.)

      The motion is granted as to the scenes described in paragraphs 51-56 (the Central Park sequence), 59-61 (the drafting of the press release), 87-93 (Fairstein's bureaucratic infighting with Ryan), 108-15, 122 (debates between Lederer and Fairstein about the strength of evidence), 127-28 (statements in Fairstein's final meeting with Ryan that do not relate to "coerced" confessions), 64-66 (questioning about Antron McCray), and 94-96 (the reference to attackers as "animals).

      The Clerk is directed to terminate the motion and the related letter-motion. (Docket # 86, 94.)

      SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
     August 9, 2021