**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-8042 (PKC) |
| v. | ) | |
| | ) | Judge P. Kevin Castel |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Sandra D. Hauser
Justin N. Kattan
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700
*sandra.hauser@dentons.com*

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
*natalie.spears@dentons.com*
*gregory.naron@dentons.com*
*jacqui.giannini@dentons.com*

*Counsel for Defendants Netflix, Inc., Ava
DuVernay and Attica Locke*

# **TABLE OF CONTENTS**

Page

STATEMENT OF FACTS ...................................................................................... 4

    I.      The Central Park Jogger Case ........................................................... 4

    II.     The Series: *When They See Us* ........................................................ 6

          A.    Vision and Point of View:  The Five's Story of Their Innocence ............ 7

          B.    Research and Sources For the Series ......................................... 8

          C.    Portrayal of the Fairstein Character ...................................... 10

          D.    The Fairstein Character's Dialogue Indisputably Captured The Essence of How Plaintiff Speaks .................... 16

    III.    Plaintiff's Threats and Goal to "Derail" the Series and "Stop it in its Tracks" ................................................................. 17

    IV.    The Court's Ruling Narrowing the Scenes at Issue ........................... 19

ARGUMENT .......................................................................................................... 19

    I.      Plaintiff's Heavy First Amendment Burden On Summary Judgment ................ 20

          A.    The Actual Malice Burden Generally ..................................... 21

          B.    The Actual Malice Standard in the Context of Dramatizations .............. 22

          C.    As a Matter of Law, Neither Hostility Toward Plaintiff Nor a Strong Point of View That Excludes Her Views Constitute Actual Malice ................................. 26

    II.     Plaintiff Cannot Prove Actual Malice as to the Series' Five Remaining Scenes .......................................................... 28

          A.    The Timeline Scenes ......................................................... 29

          B.    Police Briefing Scene ........................................................ 33

          C.    "No Kid Gloves" Scene ...................................................... 37

          D.    DNA Scene ..................................................................... 40

          E.    Nancy Ryan Lunch ........................................................... 43

    III.    The Subsidiary Meaning Doctrine Also Forecloses Plaintiff's Complaint ........ 46

    IV.    No Claim for "Conspiracy" Exists .................................................. 48

CONCLUSION ...................................................................................................... 48

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
    477 U.S. 252 (1986)......................................................................................................21

*Baiul v. Disson*,
    607 F. App'x 18 (2d Cir. 2015) ...............................................................................33, 35

*Berisha v. Lawson*,
    973 F.3d 1304 (11th Cir. 2020) ...............................................................................27, 29

*Bose Corp. v. Consumer Union of U.S., Inc.*,
    466 U.S. 485 (1984)......................................................................................................21

*Celle v. Filipino Reporter Enterps.*,
    209 F.3d 163 (2d Cir. 2000).........................................................................................27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................20

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014).....................................................................................20, 41

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001)........................................................................22, 26, 46, 48

*Church of Scientology Int'l v. Time Warner, Inc.*,
    903 F. Supp. 637 (S.D.N.Y. 1995), *aff'd*, 238 F.3d 168 (2d Cir. 2001) ....................3

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
    842 F. 2d 612 (2d Cir. 1988).........................................................................21, 22, 28

*Corporate Training Unlimited, Inc. v. Nat'l Broad. Co.*,
    981 F. Supp. 112 (E.D.N.Y. 1997) .........................................................................32, 36

*Davis v. Costa-Gavras*,
    654 F. Supp. 653 (S.D.N.Y. 1987) ............................................................... *passim*

*De Havilland v. FX Networks, LLC*,
    21 Cal. App. 5th 845 (Cal. Ct. App. 2018), *cert denied*, 139 S. Ct. 800 (2019)....22, 23, 37, 41

*Dworin v. Deutsch*,
    2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) (Castel, J.).........................................32

*Edwards v. Nat'l Audubon Soc.*,
    556 F.2d 113 (2d Cir. 1977)...................................................................................28

*Egiazaryan v. Zalmayev*,
    880 F. Supp. 2d 494 (S.D.N.Y. 2012) (Castel, J.) ..................................................36

*Fairstein v. Netflix, Inc.*,
    553 F. Supp. 3d 48 (S.D.N.Y. 2021)............................................................. *passim*

*Fodor v. Berglas*,
    1995 WL 505522 (S.D.N.Y. Aug. 24, 1995) ..........................................................29

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)............................................................................................26, 27

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)...............................................................................................22

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986)......................................................................... *passim*

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988).................................................................................................27

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*,
    838 F.2d 1287 (D.C. Cir. 1988) .............................................................................25

*Love v. William Morrow and Co., Inc.*,
    193 A.D.2d 586 (1993) ....................................................................................29, 36

*Lovingood v. Discovery Commc'ns Inc.*,
    275 F. Supp. 3d 1301 (M.D. Ala. 2017) ...........................................................23, 24

*Lovingood v. Discovery Commc'ns Inc.*,
    800 F. App'x 840 (11th Cir. 2020) ...................................................................23, 32

*Monitor Patriot Co. v. Roy*,
    401 U.S. 265 (1971)...............................................................................................25

*N.A.A.C.P. v. Button*,
    371 U.S. 415 (1963)...............................................................................................26

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964)............................................................................19, 21, 25, 26

*Newton v. Nat'l Broad. Co., Inc.*,
    930 F.2d 662 (9th Cir. 1990) .................................................................................37

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*,
  418 U.S. 264 (1974) ............................................................................................36

*Palin v. N.Y. Times*,
  482 F. Supp. 3d 208 (S.D.N.Y. 2020) .................................................................37

*Palin v. N.Y. Times Co.*,
  2022 WL 599271 (S.D.N.Y. Mar. 1, 2022) .........................................................28

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019).................................................................................28

*People v. Wise*,
  194 Misc.2d 481 (N.Y. Sup. Ct. 2002) .............................................................5, 6

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ............................................................................................20

*Reliance Ins. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977).....................................................................26

*Saenz v. Playboy Enterps., Inc.*,
  841 F.2d 1309 (7th Cir. 1988) ..................................................................27, 37, 41

*Street v. Nat'l Broad. Co.*,
  645 F.2d 1227 (6th Cir. 1981) ....................................................................... *passim*

*Thoroughbred Legends, LLC v. The Walt Disney Co.*,
  2008 WL 616253 (N.D. Ga. Feb. 12, 2008) ........................................................23

*Weiner v. Doubleday & Co.*,
  74 N.Y.2d 586 (1989) ..........................................................................................29

*World Boxing Council v. Cosell*,
  715 F. Supp. 1259 (S.D.N.Y. 1989).....................................................................25

The acclaimed series *When They See Us* (the "Series") is a dramatization of the story of the five young Black and Latino teenagers—Korey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam and Antron McCray (the "Five")—who were wrongfully convicted of raping a white female jogger in Central Park in April 1989.  The "Central Park Jogger" case was controversial from the start—sensationalized in the press, it had a racial undercurrent that echoed other ugly chapters in American history.  The Series is a scripted drama that tells the story of these contested historical events explicitly from the point of view of the Five—that they were *innocent* young teenagers who were *not seen* as children, "harmed by an unjust prosecution and an unsympathetic and often brutal system bent on incarcerating" them.  *Fairstein v. Netflix, Inc*., 553 F. Supp. 3d 48, 57, 64 (S.D.N.Y. 2021).

Plaintiff Linda Fairstein was the head of the Manhattan District Attorney's Sex Crimes Unit at the time of the arrests and prosecutions.  She spent over 32 hours as the highest ranking prosecutor and supervisor at the precincts during the interrogations and for years has been the "front" of the case to the public.  Plaintiff's status only grew after leaving the D.A.'s Office in 2002.  Plaintiff became a famous crime novelist, using her high-profile platform to publicly insist that the Five are still guilty of the rape—even after a serial rapist confessed to acting alone and his DNA alone matched.  Through interviews, articles and op-eds, she has maintained until this very day that the case was investigated and prosecuted "brilliantly." █████████████████████████████
████████████████████████████████████████████████████████████
████████████  Now, this public official, dissatisfied with her portrayal in the Series, sues for defamation, seeking the Series' "removal" from distribution.  Behind closed doors, Plaintiff starkly stated her objective regarding the Series: "I would like to derail this.  I believe the director is an African-American woman, probably has a point of view not favorable to us."  The First Amendment—and its daunting burden of proving actual malice—prohibits Ms. Fairstein's perverse use of the justice system to try to silence the story of the Five.

To protect works from censorship by public officials like Plaintiff who want to tightly control their depiction and minimize any criticism, those officials must not only prove that the depiction is false and defamatory, the First Amendment also requires them to bear the heavy burden of proving actual malice—that the defendants *subjectively* doubted that the challenged portrayal bore the essence of truth, based on their sources. *See, e.g., Davis v. Costa-Gavras,* 654 F. Supp. 653, 656, 658-59 (S.D.N.Y. 1987) (granting summary judgment in context of docudrama). This Court has already dismissed six of the eleven scenes Plaintiff put at issue in her Complaint, finding that the "fictional portrayal[s]" of her doing things she claims she didn't do were not defamatory. *Fairstein*, 553 F. Supp. 3d at 57-58, 69. In so ruling the Court explicitly left for summary judgment this issue of actual malice as to the five remaining scenes. *Id.* After extensive discovery, Plaintiff's assertions that the Defendants acted with actual malice have proven baseless.

Despite Defendants' production of over 11,000 documents, scores of interrogatories, and six depositions of people involved in creating the Series, Plaintiff has failed to adduce any evidence that Defendants had a shred of doubt that their portrayal of Plaintiff, including in the five scenes at issue, reflected the essence of truth based on their sources. These sources included: multiple books written from various perspectives on the case (including books for which Plaintiff was interviewed); a documentary by acclaimed filmmaker Ken Burns; extensive interviews with the Five, their families and their lawyers describing Plaintiff as "controlling" the cops at the precincts; and scores of news articles, including Plaintiff's *own words* recounting her direct involvement in the investigative activity as the "eight-hundred-pound gorilla" at the precincts.

Plaintiff filed this lawsuit on the disingenuous premise that she had "minimal involvement in all aspects of the original investigation" (Compl. ¶ 199). The filmmakers' sources, and Plaintiff's own admissions, say otherwise. Indeed, Plaintiff's boss, District Attorney Robert Morgenthau, made clear that he saw Plaintiff as responsible for leading the Jogger case. In confirming to the *New York*

*Times* that the convictions based on the confessions had been a "mistake," he stated:  "I had complete confidence in Linda Fairstein. . . Turned out to be misplaced. But we rectified it."  Notably, Mr. Morgenthau identified only Ms. Fairstein.  But to be perfectly clear:  The central issue on this motion is not whether Ms. Fairstein can point to aspects of her portrayal in the Series she believes are untrue; the issue is whether she can meet her constitutionally-imposed burden of producing clear and convincing evidence of actual malice.  That is, can she prove that the writers of the Series subjectively had "serious doubts" about the "manner in which Ms. Fairstein was portrayed." (Compl. ¶ 11.)  She comes nowhere close to meeting that constitutional standard.

"[W]ithout judicious use of summary judgment to dispose of libel suits, 'the threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself.'"  *Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 640 (S.D.N.Y. 1995), *aff'd*, 238 F.3d 168 (2d Cir. 2001) (citation omitted).  That observation is particularly apt here.  Plaintiff's lawsuit has implications far beyond this case, as it threatens an important form of communication and storytelling—dramatizations "based on" true stories, which are told from different and often marginalized perspectives, about controversial historical, real life events, and the actions of public officials.

Plaintiff has told her side of the story for decades, from a privileged and prominent platform, slandering the Five in the process.  The First Amendment protects the filmmakers' right to tell the other side of that story based on their extensive sources and the Five's beliefs that the investigation and prosecution Plaintiff helped lead—in a hands-on manner and as a top public official—was adjudicated a colossal injustice.  Summary judgment is in order.

## STATEMENT OF FACTS

### I.     The Central Park Jogger Case

On the night of April 19, 1989, a jogger, Trisha Meili, was beaten and raped in Central Park.  Five young Black and Latino teenagers, ranging in age from 14 to 16, were arrested, charged, tried and convicted for their purported roles in the rape: Korey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam and Antron McCray.  *Fairstein*, 553 F. Supp. 3d at 58 (citing Compl. ¶¶ 4, 38).  (SUF ¶ 6.)  The Central Park Jogger case "drew intense public interest in the immediate aftermath of the attack and remains the subject of scrutiny and debate."  *Id.* at 56.

Plaintiff "was the head of the Manhattan District Attorney's Sex Crimes Unit" when the April 19, 1989 attack on the jogger took place.  (SUF ¶ 7.)  Based on her admissions, Plaintiff cannot deny she oversaw the case from start to finish:  she was immediately notified the morning of April 20, 1989 about the rape of the jogger and other assaults in the Park that had been reported (SUF ¶ 8); she argued the case fell under her area of responsibility and assigned her subordinate Assistant D.A. Elizabeth Lederer to try the case (SUF ¶ 11); she spent 32 hours straight at the precincts, as the highest ranking prosecutor and only supervisor from the D.A.'s Office.  (SUF ¶¶ 12-13.)  She reported directly to D.A. Robert Morgenthau, who was not present at the precincts and who relied on her, "from the morning of April 20th for a month or six weeks, several times a day every day," and later for "updates of any kind."  (SUF ¶¶ 9-10.)

Plaintiff admits she supervised the prosecution team during the two separate trials held in July and November 1990 (SUF ¶¶ 14, 16), and was also a witness against the Five "in the suppression hearings and trials," testifying about "events that occurred on the night of April 20 and on April 21, 1989" when the Five and other witnesses were being interrogated.  (SUF ¶ 15.)

As Plaintiff concedes, the DNA evidence conclusively did not match any of the Five.  (SUF ¶ 17.)  Initially, the only DNA found was taken from Ms. Meili's cervix and was declared by the

FBI analyst to be "inconclusive," which was the position that the prosecution promoted in the press prior to trial. (SUF ¶ 18.) However, a DNA sample from a semen stain on Ms. Meili's sock was belatedly discovered right before the first trial was scheduled to begin. (SUF ¶ 19.) Testing on the sock conclusively showed that not only was there "no DNA match" to any of the Five from the sock, but there also was no match to any of the Five from the cervical DNA given the same forensic profile confirmed on both samples. (SUF ¶ 20.) The prosecution nonetheless proceeded on the theory that the Five were still guilty of rape, continuing to call the cervix DNA "inconclusive" and concocting the explanation that there must have been a "sixth rapist." (SUF ¶¶ 21-22.) "[T]he People's case at both trials" therefore "rested almost entirely on the statements made by the defendants"—controversial confessions that were retracted before trial as coerced and, as the D.A.'s office acknowledged years later, were fraught with "inconsistencies" and "serious weaknesses." *People v. Wise*, 194 Misc.2d 481, 489-90 (N.Y. Sup. Ct. 2002) (internal citation omitted). (SUF ¶¶ 23, 26-28.)

In 2002, a serial rapist named Matias Reyes "came forward" and confessed that he, alone, raped Ms. Meili in 1989. (SUF ¶ 24.) The D.A.'s office extensively reinvestigated the Five's convictions. Unlike the Five, Mr. Reyes' DNA alone matched the DNA taken from Ms. Meili. (SUF ¶¶ 25-26.) Assistant D.A. Nancy Ryan led the reinvestigation and submitted a 58-page "Affirmation in Response to Motion to Vacate Judgment of Conviction." (SUF ¶ 26; Appendix Exhibit ("Ex.") 21, Affirmation.) The Affirmation detailed the reasons why the D.A. found Reyes' confession that he "was *solely* responsible for the rape"—corroborated by the DNA evidence—to be credible. (SUF ¶ 27.) The Affirmation also identified facts and circumstances incompatible with the Five's guilt, including the lack of physical evidence, exclusion of DNA and disturbing inconsistencies in the confessions *that were apparent from the outset*. (SUF ¶ 28; Ex. 21, Affirmation, ¶¶ 47, 80-119.) The court's vacatur decision confirmed that the flawed confessions "laid the foundation for a course of action developed, followed, and relied on for the prosecution and conviction of the defendants. That course was based

on a theory that the defendants were involved as a group in a single incident; a crime rampage, which included rape, robbery and other crimes." *Wise*, 194 Misc.2d at 496.  (SUF ¶ 29.)  That theory no longer being tenable, the Five's convictions were vacated.  *Id.* at 496-98.[1]

The Five then brought a civil action against the City and prosecutors, "including Ms. Fairstein, and scores of NYPD officers and detectives" arising from the Five's claims that their convictions and confessions were wrongful.  (SUF ¶ 30.)  The premise for the complaint against Ms. Fairstein was that she was acting not only as a prosecutor but as an "investigator" alongside the NYPD.  (SUF ¶ 31.)  Those allegations survived a motion to dismiss, and in 2014 the case was resolved with a settlement to the Five of $41 million.  (SUF ¶ 32.)

Notwithstanding Reyes' confession to acting alone and sole DNA match, Plaintiff has for decades defended the investigation as "brilliant," publicly stating that she has "no regrets."  (SUF ¶ 35; Ex. 25, Toobin.)  To this day, she continues to express her belief that the Five are "guilty as charged" for the rape and that their confessions were not coerced.  (SUF ¶ 35, Ex. 26A-B, Imus.)

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

## II.     The Series: *When They See Us*

*When They See Us* is a four-episode limited series based on a true story:  it dramatizes the story of the Five's "arrests, trials and convictions" in the "Central Park Jogger" case and is distinctly told from their point of view.  (SUF ¶¶ 38, 51-54.)  Defendant Ava DuVernay, the acclaimed director of the motion picture *Selma* and the documentary *13th*, was one of the writers and executive producers of

---

[1]  On July 25, 2022, based on the current Manhattan D.A.'s review of the 2002 Affirmation and evidence in the civil rights lawsuit, the conviction of a sixth teenager, Steven Lopez, who was accused of being involved in part of the attacks on April 19, 1989 in Central Park, was vacated on the grounds that the video confessions the authorities elicited from Mr. Lopez and the Five were false.  (SUF ¶ 36.)

the Series, and the "showrunner" responsible for its creative vision, content, and production.  (SUF ¶¶ 40-41.)  Two award-winning, veteran production companies, Tribeca Productions and Participant Media, came on board early in the process to co-produce.  (SUF ¶¶ 42-43.)  On July 6, 2017, Netflix announced that it had greenlit the Series.  (SUF ¶ 44.)  Other talented and experienced screenwriters worked on the scripts, including Defendant Attica Locke and writer Robin Swicord.  (SUF ¶ 45.)[2]  The Series won two primetime Emmys and won or was nominated for many other awards.  (SUF ¶ 39.)

### A.  Vision and Point of View:  The Five's Story of Their Innocence

For the last thirty years, the story of the Central Park Jogger case was largely the story that the City of New York, its police and prosecutors, asserted and the story that the press ran with in 1989—that the Five were not innocent children, or even human, but an animalistic "wolfpack" of rapists on the hunt for "prey."  (SUF ¶ 48.)  Inspired by outreach from Mr. Santana, one of the Five, Ms. DuVernay's vision was to tell the other side of the story based on an extensively documented record, giving the Five the voice they had been denied:  that they were innocent teenagers, convicted and incarcerated in a rush to judgment based on coerced confessions that were inconsistent on their face, and despite no physical evidence or DNA linking them to the crime, only to be exonerated years later based on the DNA match and confession of the real offender.  (SUF ¶ 49.)  This was their truth.

Since 2015, Ms. DuVernay has spent numerous hours with each of the five men and their families discussing the case and their lives.  (SUF ¶ 50.)  "The series primarily centers on the individual experiences of each of the Five, beginning with their everyday lives as adolescents prior to the events of April 19, 1989, and then following them through their arrest, trial, incarceration and exoneration."  (*Fairstein*, 553 F. Supp. 3d at 59; SUF ¶ 51-52.)

---

[2]  Ms. Swicord and Ms. Locke did initial drafts of Episodes 1 and 2, respectively.  (SUF ¶ 46.)  Ms. DuVernay provided notes and made further revisions; all final scripts were left up to her.  (SUF ¶ 47.)

The Series has a strong point of view.  It is a harsh and emotionally wrenching critique of the criminal justice system as systematically broken and biased against Black people and children of color.  (SUF ¶ 53.)  It expresses this overarching opinion by vividly illustrating how those in positions of great power—the police, the prosecutors including Linda Fairstein, the courts, the media and even the public—were blinded by their biases and did not see these young teenagers as children, all of which led to their wrongful convictions for a terrible crime.  (SUF ¶ 54.)   The title of the Series, *When They See Us*, reflects on the opposite ways that Black teenage boys are viewed: rarely as children to be protected; instead, they are viewed in the way the writers believed Ms. Fairstein and the detectives saw them—as criminals from which the public needed to be protected. (SUF ¶ 55.)  The Series asks viewers to see the Five as innocent children and in a larger sense offers a hopeful declaration to society:  that *now* is the time they will finally see us.  (*Id.*)

The filmmakers' belief in the Five's story of their innocence is incompatible with Linda Fairstein's version of truth.  They interpret the same facts in fundamentally different ways.  For example, when the writers watched the Five's videotaped statements after extensively interviewing the Five they saw a heartbreaking scene of scared children being manipulated, whereas Plaintiff to this day points to the videos as "uncoerced" confessions by a "pack" of "wilding" criminals that justify convictions for a horrific rape.  (SUF ¶¶ 56-58.)  And because they believe the Five, the writers did not credit the testimony of the authorities who they believe lied in court to defend the coerced confessions and convicted the Five—including Plaintiff, who has a strong incentive to downplay and distort her role in this miscarriage of justice.  (SUF ¶ 60.)

## B.    Research and Sources For the Series

The Series was extensively researched.  The main writers, including Ms. DuVernay, Ms. Locke, and Ms. Swicord, participated in a writers' room (a typical process in which writers on a television series meet in person for a period of time to review materials and brainstorm) that opened in

October 2017.  (SUF ¶¶ 61-62.)  At Ms. DuVernay's direction, veteran producer Berry Welsh of Tribeca compiled a principal set of research materials for the writers from a variety of sources and perspectives, and additional materials were added over time.  (SUF ¶¶ 63-64.)  As discussed in their Declarations, the extensive sources that the writers reviewed and relied upon in the research and writing process included the following categories (*see* SUF ¶ 64 and exhibits cited therein):

- Several books that reported on the Central Park Jogger case, from different points of view, including:

    o Legal journalist Timothy Sullivan, *Unequal Verdicts: The Central Park Jogger Trials* (1993) (Ex. 17);

    o The documentarian and writer Sarah Burns, *The Central Park Five* (2011) (Ex. 27);

    o Former *Daily News* reporter and current academic Natalie Byfield, *Savage Portrayals: Race, Media, & the Central Park Jogger Story* (2014) (Ex. 20);

    o Former Manhattan prosecutor Harlan Levy, *And the Blood Cried Out: A Prosecutor's Spellbinding Account of DNA's Power to Free or Convict* (1996) (Ex. 37); and

    o The Central Park Jogger Patricia Meili, *I am the Central Park Jogger: A Story of Hope and Possibility* (2003).

- The 2012 documentary film *The Central Park Five*, directed by the respected documentarian Ken Burns, and his colleagues Sarah Burns and David McMahon, featuring interviews with the Five and their families, journalists who covered the case in 1989, and other criminal justice experts.  (Ex. 19.)

- Recorded interviews and informal conversations with the Five, their families and their counsel including interviews conducted in 2016 by Ms. DuVernay with the Five and with one of their civil rights lawyers, Michael Warren, in New York, and prior raw footage of interviews of the Five and their families from the Burns documentary.  (Exs. 38-40.)

- Extensive news coverage, in both print and broadcast, of the events of April 19, 1989; the investigation, prosecution, and trials of the Five; and the 2002 reinvestigation that led to the convictions being vacated.  (Exs. 36, 41, 42.)

- Plaintiff's own statements and views, including interviews with Plaintiff by *The New Yorker's* Jeffrey Toobin, radio personality Don Imus, and others.  (*E.g.* Exs. 25, 26.)

- The District Attorney's Dec. 5, 2002 "Affirmation" submitted by ADA Nancy Ryan, detailing her extensive reinvestigation and the deep flaws in the Five's confessions, and concluding that the convictions should be vacated.  (Ex. 21.)

- The "confession" videos, and transcripts from the Suppression Hearings and Trials.  (Exs. 32, 43.)

In addition, Ms. Swicord and Ms. Locke formally interviewed each of the Five men for many hours in person.  (SUF ¶ 65.)  Ms. DuVernay also continued to speak informally with the Five, their family members, and their lawyers.  (SUF ¶ 66.)  In addition to their lawyer Michael Warren, she spoke with other lawyers for the Five including trial counsel Michael ("Mickey") Joseph, and civil counsel Jane Fisher-Byrialsen.  (*Id.*)  The sources and writing process for the Series are discussed in detail in the Declarations of Ms. DuVernay, Ms. Locke and Ms. Swicord, and in the discussion of the five remaining scenes below.

While the writers relied on numerous sources, the Series is not a documentary "that depicts a strictly factual version of events," but rather "a dramatization drawn from historical events," told distinctly from the point of view of the Five and their families.  (*Fairstein*, 553 F. Supp. 3d at 59, 73, 74; SUF ¶ 71.)  Creating scripted drama based on real life requires the use of common storytelling techniques—imagined conversations, compressed timelines, flashbacks to past events, and other tools—both for time and dramatic purposes.  (SUF ¶ 72.)  The Series is part of the genre of films familiar to audiences as "based on true stories"—both the teaser and trailer expressly state this (SUF ¶¶ 212, 215), and the landing page for viewers' access to the Series on Netflix's streaming service contains this synopsis:  "Five teens from Harlem become trapped in a nightmare when they're falsely accused of a brutal attack in Central Park. *Based on the true story*."  (SUF ¶ 73.)[3]

### C.     Portrayal of the Fairstein Character

Plaintiff's Complaint does not purport to challenge the Series' premise that the Five are innocent and were wrongfully convicted based on coerced confessions, and that this injustice was

---

[3]  Further, each Episode of the Series ends with a disclaimer that states:  "While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization.  As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history."  (SUF ¶ 74.)

rooted in racial bias, whether explicit or implicit.  Instead, Plaintiff's lawsuit is an attempt to personally distance herself and disclaim responsibility for the wrongful convictions and the actions that led to them.  In the five remaining scenes and generally, the gist of Plaintiff's Complaint is that the Series unfairly portrays her as a "villain," "morally and legally culpable" for the case, by "assigning her a role" in the investigation that she "did not play."  (*See* Compl. ¶¶ 9-12.)  How Plaintiff would have portrayed herself is irrelevant, however.  The question on this motion is what the writers of the Series believed.  And as detailed in their declarations, Ms. DuVernay and the other writers had no doubt whatsoever, based on their sources, that Plaintiff played a central role in the investigation and prosecution, and absolutely was "morally and legally culpable" for the outcome in view of her position of power and persistence driving the case forward in disregard of numerous red flags along the way.  (SUF ¶ 75.)

In real life, and at the heart of any drama, there are protagonists and antagonists.  The writers intended that the criminal justice system would be the antagonist to the Five's protagonists in this Series—and Plaintiff was a leader of and an integral part of that system.  (SUF ¶ 76.)  It is common practice in drama, including films based on a true story, to foreground one character to speak for a group or tell one side's perspective.  (SUF ¶ 79).  The filmmakers, after extensive study, fairly viewed the Fairstein character as the face of the system that was allied against the Five, expressing the prosecution's theories and positions that she continues to advocate today.  (SUF ¶¶ 77, 80-90.)  They did so for several reasons, all grounded in, and supported by, their sources.

To begin, Plaintiff was the Head of the Sex Crimes Unit, reporting directly to D.A. Morgenthau, which meant to the writers she was a powerful public official who was ultimately in charge of the case and could have changed its course.  (SUF ¶ 81.)  As the Sullivan book recounts, the Five's supporters "considered her one of the *major villains* behind the conspiracy to frame the defendants.  The animosity toward Fairstein generated by the packed defense side of the gallery

seemed almost palpable." (SUF ¶ 86; Ex. 17, Sullivan at 202, emphasis added).  To the Five and their families—whose viewpoint the Series expressly portrays—Plaintiff was a real life "villain" whose actions and failure to protect the Five led to their wrongful convictions.  (SUF ¶¶ 84-86.)  And while the system and the Fairstein character were clear antagonists in the story, the writers sought to make Fairstein a complex character and not a one-dimensional, totemic villain.  (SUF ¶ 78.)  The writers believed Fairstein's motivations were complex and that her deep-rooted desire to protect victims like the jogger and intense pressure from the public and press—which are reflected in the final dialogue in the Series—were in part what blinded her to the red flags in the investigation.  (*Id*.)

In addition to her powerful, supervisory position, the portrayal of the Fairstein character was supported by what the writers' sources reported about her reputation, actions and words:

*First*, Plaintiff's reputation was as an aggressive, headline-seeking, hands-on investigator who went to crime scenes with cops and enjoyed that as much as the courtroom.  (SUF ¶ 83; *see e.g.* Ex. 17, Sullivan at 20 (describing Ms. Fairstein as "an ambitious career prosecutor who enjoyed an investigation as much as a trial"); Ex. 17, Burns at 36.)  A glowing *New York Times Magazine* profile of Ms. Fairstein in 1990 relates that "Fairstein is never far from the attention of the tabloids, and they serve her well," and describes her "flash and bravado" and "tough talk ('Anything between the knees and the waist goes to me')."  (SUF ¶ 83; Ex. 49, Bouton.)  The article states "[c]olleagues and opponents alike praise her skills and ingenuity as an investigator."  (*Id*.)

*Second*, consistent with her hard-charging reputation, Ms. Fairstein was described by several sources—including herself—as being a powerful authority figure at the precincts who took charge in the Jogger investigation (SUF ¶ 84):

- As Raymond Santana recounted in a recorded interview, Fairstein "was *the person behind making the phone calls, telling the officers what to get, what to do and where to go. . . She was also the person leaking information to the press.*" (Ex. 38B, Raymond audio.)  He further explained that "because she's a lead investigator" in the Jogger case, "she stepped out of that immunity" from being sued, which prosecutors normally enjoy.  "That's why

she's named in [the Five's civil] lawsuit, her and Lederer." (*Id*.)  That civil suit alleging she was acting as an investigator alongside the police survived her motion to dismiss and settled for a staggering $41 million.  (*See, e.g.,* Ex. 50, Leland.)

- Michael Warren, based on his familiarity with the evidence in the Five's civil case, told Ms. DuVernay in a recorded interview:  "*Fairstein controlled those detectives. She controlled them in the precinct*, and her only objective was to close that case against the young boys.  That was her justice." (Ex. 39A (reflecting Ms. Swicord's contemporaneous underlining and starring of this passage).)

- Ms. Fairstein described herself as having an outsized, influential presence, boasting to Jeffrey Toobin in her 2002 *New Yorker* exclusive interview that on the day after the assaults, she went to the Twentieth Precinct "*to be the eight-hundred-pound gorilla* to help Elizabeth and the cops get the resources they needed."  (Ex. 25.)

- Ms. Salaam, in Ms. DuVernay's conversations with her, said that she very much experienced Ms. Fairstein as "controlling" and in charge of the police and activity at the precincts.  (SUF ¶ 84.)  Ms. Fairstein also made a distinct impression on Kevin Richardson's sister, Angie, as an intimidating presence when she was waiting at the precinct for her brother as described in a video interview.  (Ex. 40.)

- D.A. Morgenthau himself saw Plaintiff as responsible for leading the Jogger case and the confessions it rested on, calling the convictions based on the confessions a "mistake," and recounting to the *New York Times*:  "*I had complete confidence in Linda Fairstein. . . Turned out to be misplaced. But we rectified it*."  (Ex. 50, Leland.)  Notably, Mr. Morgenthau identified only Ms. Fairstein, not Ms. Lederer or anyone else.

*Third*, the writers' research established that Ms. Fairstein was a key participant at all stages

of the case—as the highest ranking official at the precincts at a critical time in the investigation,

and then overseeing and participating in the case through trial and verdict (SUF ¶ 86):

- Ms. Fairstein "*immediately sprang to action*" after getting a call early morning on Thursday April 20.  (Ex. 27, S. Burns at 36; *see also* Ex. 17, Sullivan at 20.)

- In the Burns documentary, Mr. Warren states that "Two prosecutors, Linda Fairstein and Elizabeth Lederer, they were part of the investigation and *they were operating not only as prosecutors, but investigators*."  (Ex. 19, Burns Doc. at 22:08 – 22:56.)  This section opens with a caption labeled "Thursday Morning" (April 20), which is shown just before vivid footage of Ms. Fairstein walking the crime scene.  (*Id*.)

- Ms. Fairstein fought with Nancy Ryan for control of the case: "When Fairstein heard that Ryan had assigned the Central Park case as a homicide, she rushed to her colleague's office, ready for a turf war" and then handpicked Ms. Lederer to be the line prosecutor.  (Ex. 27, S. Burns at 36, 188-89, 201-202; Ex. 17, Sullivan at 21.)

13

- Ms. Fairstein spent over 32 hours in a row at the precincts and described, first hand, having "*watched and listened to these kids*," what she termed "one of the most brilliant police investigations I've ever seen": "I don't think there is a question in the minds of *anyone present during the interrogation process* that these five men were participants, not only in the other attacks that night but in the attack on the jogger." (Ex. 25, Toobin). According to Ms. Fairstein, describing her collective action with the cops: "*[w]e all did here what we did every day. We were there to find out who did it*." (*Id.*)

- Ms. Fairstein prevented Yusef Salaam's mother and Big Brother from seeing him at the 20th Precinct when she knew he was being interrogated and incriminating himself. (Ex. 27, Burns at 46-47; Ex. 17, Sullivan at 25-27.) Mr. Sullivan's book recounted Fairstein's views: "*[a]s far as Fairstein was concerned, they had the killer*, he was being interrogated by a skilled detective and he was incriminating himself. *Salaam was the last kid she wanted to see represented by a lawyer at that point*." (*Id.* at 26.)

- Court of Appeals Judge Vito Titone decried Ms. Fairstein's conduct at the precincts: "'it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (Ex. 27, S. Burns at 181 (citing dissent of Titone, J., in *People v. Salaam*); *see also* Ex. 42, Linda Fairstein Wikipedia, quoting Judge Titone from news article ("'I was concerned about a criminal justice system that would tolerate the conduct of *the prosecutor, Linda Fairstein, who deliberately engineered the 15-year-old's confession*. . . . Fairstein wanted to make a name. She didn't care. She wasn't a human'").)

- Ms. Fairstein took some of the Five to the crime scene without their parents, including Korey Wise before he made his video "confession," and obtained additional statements that were used against them at trial. (*See* Ex. 27, S. Burns at 51-52; Ex. 49, Bouton.)

- After the indictments, Ms. Fairstein supervised the prosecution and trial strategy. She was particularly involved in determining how to handle the DNA evidence at trial. As D.A. Harlan Levy recounted: "Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem". (Ex. 37, Levy at 95.) Sullivan's book also put Fairstein in the center of the DNA strategy, explaining that when the DNA on the belatedly discovered sock came back as not a match to the Five, "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped [Meili]" (Ex. 17, Sullivan at 103), but did not put a stop to the prosecution of the Five.

- Ms. Fairstein testified against the Five in the suppression hearings and at trial—and again, she made a big impression. The Burns book, and 1990 news articles, describe her trial testimony as "the most dramatic element of the [state's] rebuttal case." (Ex. 27, S. Burns at 155; Ex. 17, Sullivan at 94, 202-204 ("The animosity toward Fairstein generated by the packed defense side of the gallery seemed almost palpable").)

*Fourth*, Ms. Fairstein was, and continues to be, a true believer in the Five's guilt.  She took center stage to defend the convictions after Reyes confessed to acting alone (SUF ¶¶ 87-89):

- For example, in the 2002 Toobin article, titled "A Prosecutor Speaks Up":  Plaintiff made clear she did not see the Five as children, but continued to believe that they were a feral "pack" of rapists who "ran with" Reyes (evoking the dehumanizing "Wolfpack's prey" headlines from 1989).  (Ex. 25; SUF ¶ 141.)

- As for the interrogations themselves, Fairstein "has no regrets."  (Ex. 25, Toobin.)

- She made similar statements to radio host Don Imus in a 2014 interview while promoting her crime fiction books, stating that the Five were "participants in the attack on the jogger *as charged*."  (Ex. 26A-B, Imus in the Morning, "Linda Fairstein Discusses Her Book and the New York Jogger Muggings" (June 20, 2014); Ex. 27, S. Burns at 201.)

Plaintiff's admissions at her deposition and documents revealed in discovery support the filmmakers' reading of their source material as ringing true as to her powerful role and actions:

- Plaintiff admits she was informed about the events in the Park by an NYPD detective early in the morning of April 20, 1989, and from that point on was D.A. Morgenthau's liaison on the case; he counted on her to "provide him with information about the investigation as it proceeded," and she reported to him multiple times a day.  (SUF ¶ 9; Ex. 4, Fairstein Dep. at 171-74, 177-79.)

- Plaintiff admits that she was "intimately involved" since the morning after the crime occurred, and went to the precincts to "assist in an investigation that had mushroomed into enormous proportions" and after she arrived, the investigation continued to grow, with more and more statements being taken from suspects.  (SUF ¶ 10; Ex. 8, 2/7/19 Email; Ex. 4, Fairstein Dep. at 128-129, 210-212.)

- Plaintiff admits she was the highest ranking and only "supervisor" from the D.A.'s office at the precincts during the investigation.  (SUF ¶ 13; Ex. 4, Fairstein Dep. at 155, 161, 200);

- Plaintiff admits that, to the public, she was the "front" of the Central Park Jogger case for over 30 years (SUF ¶ 33; Ex. 8, 2/7/19 Email); she testified that "the media made me the front of the case" because she was "catapulted to fame by this case" such that reporters and "writers picked me up, having met me or not, as the lead  prosecutor, as the architect of the case".  (Ex. 4, Fairstein Dep. at 128-129.)

Plaintiff likewise admits the Burns documentary, an important source for the filmmakers, defined her connection to the case and is in the "public domain" as her lawyer's letter noted.  (SUF ¶ 111; Ex. 64, Zimet Letter; *Fairstein*, 553 F. Supp. 3d at 58-59 (quoting Compl. ¶ 42).)  She

concedes, among other things, that it depicted her as prosecuting the Five and "as the centerpiece of the case, including a woman journalist or prof who says I made millions on the backs of these boys" (SUF ¶ 112; Ex. 65, 4/29/18 Email).  Plaintiff cannot argue the filmmakers did not fairly interpret the Burns documentary when she herself interpreted the film the same way.

In short, the filmmakers' sources indisputably showed that Plaintiff was the most powerful and important figure who was the highest ranking official to have been involved hands-on in all stages of the case, from investigation to conviction.  (SUF ¶ 81, 90.)  Not her superior, D.A. Morgenthau, who was not present at the precincts and relied on her to handle the case.  Not her subordinate Ms. Lederer, who she handpicked to try the case in court and answered to her.  Not any of the detectives, who had no power to stop the prosecution from going forward.  Plaintiff's fingerprints are all over this case, and the narrative literary choice to make her the face of the investigation and prosecution was therefore a natural and constitutionally-protected one.  (SUF ¶ 90.)

### D. The Fairstein Character's Dialogue Indisputably Captured The Essence of How Plaintiff Speaks

Ms. Swicord and Ms. DuVernay wrote dialogue for Fairstein's character that they considered consistent with their source material and how she portrayed herself—as an "800 pound gorilla" at the precincts,[4] a "tough-talking," zealous, if not vicious, prosecutor,[5] who did not see the Five as children but as "killers" and a "pack" of guilty rapists.  (SUF ¶ 98.) ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[4] An "800 pound gorilla" is defined as "one that is dominating or uncontrollable because of great size or power."  *See e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2003).

[5] A key source, Michael Warren, described Fairstein as a "vicious, overboard, opportunistic individual who would do anything to satisfy her appetite for vindictiveness as a sex crime prosecutor."  (Ex. 39A-B.)



**III.     Plaintiff's Threats and Goal to "Derail" the Series and "Stop it in its Tracks"**

When Ms. DuVernay began research for the project that became the Series in 2016, she

sought to speak with those on the prosecution side of the case for their perspective.  On Ms.

DuVernay's behalf, Jane Rosenthal of Tribeca, one of the producers of the Series, reached out to

---

Plaintiff and to Elizabeth Lederer, the jogger (Ms. Meili), and former D. A. Robert Morgenthau. All declined interviews. (SUF ¶ 104.) In response to the outreach, Ms. Fairstein said she was speaking for Ms. Lederer and Ms. Meili (further evidence to the filmmakers that Ms. Fairstein was in charge), and stated that none of them would talk to the filmmakers unless they satisfied a list of preconditions to obtain Ms. Fairstein's approval as to how they were researching and writing the script. (SUF ¶ 105; Ex. 33, Correspondence with J. Rosenthal.) Ms. DuVernay viewed the conditions as an attempt to control what she depicted through the script. (SUF ¶ 106.)[7]

On June 9, 2016, shortly after Ms. Fairstein's exchange with Ms. Rosenthal, a lawyer representing Ms. Fairstein and Ms. Lederer wrote a threatening letter to Ms. DuVernay, Ms. Rosenthal, and Tribeca. (Ex. 107; Ex. 64, Zimet Letter.) Consistent with Ms. Fairstein's prior communications, the lawyer listed preconditions that the producers had to satisfy in order for Ms. Fairstein to consider meeting with them. (SUF ¶ 108; Ex. 64.) Once Netflix picked up the project in July 2017, the lawyer immediately sent a threatening letter to Netflix attaching his prior letter. (SUF ¶ 109; Ex. 64.)[8]

---

[7] Ms. DuVernay did not find Plaintiff's pronouncements about the investigation and the evidence to be credible, particularly since Plaintiff had (and has) an agenda to defend the case that made her career (and to minimize her role in it when it served her to do so); Ms. DuVernay considered Ms. Fairstein to be one of the most uncredible and untrustworthy sources of all. (SUF ¶ 92.) ████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████

[8] The preconditions included a long list of materials that, for the most part, were not publicly then available and Plaintiff never provided them. In July 2018, Ms. DuVernay learned that the City of New York had released documents relating to the Central Park Jogger case on its website, and was planning to release additional files at a later date. (SUF ¶ 94.) Ms. DuVernay understood that the initial documents released by the City were files from the original investigation and trials, including the "confession" videos, which the writers had already watched. (*Id.*) Plaintiff admits that when the videos were released she sent the Producers an "anonymous" package that contained the videos. (SUF ¶ 59; Ex. 4, Fairstein Dep. at 335.) Ms. DuVernay did not believe that the other documents on the website would change her view of the case given her numerous other sources, including the Five themselves, their lawyers and the news reports concerning the document release—and it was her firmly held belief, based on those sources, that authorities lied about what happened in the investigations and interrogations, such that their additional statements would not add to the research. (DuVernay Decl. ¶ 95.)

Ms. DuVernay did not believe Plaintiff ever had any intention of actually meeting and viewed her letters as attempts to bully and intimidate the producers and stop the project.  (SUF ¶ 110.) Discovery revealed this was in fact Plaintiff's intention:  "*I would like to derail this.*  I believe the director is an African-American woman, probably has a point of view not favorable to us . . ."  (SUF ¶ 115; Ex. 66, 5/11/16 Email; Ex. 67, 7/7/17 ("Would prefer to have the project stopped in its tracks."))

## IV.     The Court's Ruling Narrowing the Scenes at Issue

This Court's August 9, 2021 ruling dismissed six of the eleven scenes put at issue by Plaintiff's Complaint, finding that the "fictional portrayal[s]" were not defamatory.  *Fairstein*, 553 F. Supp. 3d at 58, 69.  The five remaining scenes depict the Fairstein character:  (1) preparing a timeline; (2) ordering officers to bring in all the kids who were in the Park the night before; (3) conferring with detectives who were interrogating the Five; (4) conferring with line prosecutor Elizabeth Lederer and D.A. Morgenthau about finding the sock DNA evidence; and (5) discussing the case with Nancy Ryan, the prosecutor who reinvestigated the case.[9]  The Court ruled only on the narrow issue of whether these scenes plausibly alleged defamatory meaning, expressly leaving for summary judgment whether Plaintiff could meet her actual malice burden. *Id.* at 57-58 (citing *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

## ARGUMENT

Plaintiff cannot meet her burden of establishing actual malice as a matter of law because the filmmakers absolutely believed that their overall portrayal of Plaintiff, including in the five scenes that remain at issue, reflected the essence of truth based on their multiple, trusted sources and research, including previously published books, news reports and the Burns documentary, and extensive

---

[9] For the Court's convenience, the full text of the dialogue in the five remaining scenes is set forth in a chart submitted herewith in the Appendix of Exhibits as Ex. 30B ("Scene Chart").  The dialogue also is quoted and discussed in detail in the Declarations of Ava DuVernay, Attica Locke, and Robin Swicord.

interviews with the Five, their families and their lawyers. As discussed below, courts routinely grant summary judgment finding no actual malice on such evidence, and it is particularly appropriate here, in the context of a dramatization like the Series. *Davis*, 654 F. Supp. at 658-59. Plaintiff has no evidence the Defendants had any doubts based on their research, let alone clear and convincing evidence that surpasses the hurdle of constitutional actual malice. In addition, the subsidiary meaning doctrine adopted by the Second Circuit for actual malice also requires summary judgment on the Complaint as a whole, independent of any scene-by-scene analysis. *Herbert v. Lando*, 781 F.2d 298 (2d Cir. 1986). That doctrine takes on particular importance in a case like this one where Plaintiff seeks to censor a work of art expressing the larger truths about the injustice perpetrated against the Five and Plaintiff's participation and leadership in it—speech at the heart of the First Amendment's protection. Finally, certain aspects of Plaintiff's portrayal are subject to summary judgment on grounds of substantial truth as a matter of law. *See, e.g., Chau v. Lewis*, 771 F.3d 118, 129-30 (2d Cir. 2014) (affirming summary judgment on substantial truth grounds).[10]

## I.    Plaintiff's Heavy First Amendment Burden On Summary Judgment

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Actual malice is such an element for public officials like Plaintiff, and one that is constitutionally mandated. "Summary judgment is appropriate in a defamation action, as in other actions, where there are no unresolved factual disputes as to issues material to the outcome of the litigation"; where the issue is actual malice, "the judge must view the evidence presented through the prism of the substantive evidentiary burden," namely, the clear

---

[10] Of course, Plaintiff also has the burden of establishing the falsity of the defamatory statements. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986).

and convincing evidence standard.  *Contemporary Mission, Inc. v. N.Y. Times Co.,* 842 F. 2d 612, 621 (2d Cir. 1988) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 252, 254 (1986)).  "[A] plaintiff opposing a fully supported motion must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor.' . . . It is not enough for the plaintiff merely to assert 'that the jury might, and legally could, disbelieve the defendant's denial'" of actual malice.  *Id.* at 621-22 (quoting *Anderson*, 477 U.S. at 256); *Herbert*, 781 F.2d at 305-06 (plaintiff "failed to produce sufficient evidence for a jury to find with convincing clarity that the statements were published with actual malice"; affirming summary judgment).

### A.    The Actual Malice Burden Generally

Public officials like Plaintiff not only have the burden of establishing falsity, they also must prove actual malice:  that the defendant made a false statement of fact "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times v. Sullivan*, 376 U.S. at 279-80.  Actual malice is *subjective* in nature, provable only by "clear and convincing" evidence that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."  *Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984).  The actual malice rule is a purposely daunting burden.  It derives from "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," including through "vehement, caustic" "attacks on government and public officials."  *N.Y. Times v. Sullivan*, 376 U.S. at 270.  "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions . . . leads to . . . 'self-censorship,'" *i.e.*, even if the criticism "is believed to be true and even though it is in fact true" the defendant will be chilled "because of doubt whether it can be proved in court or fear of the expense of having to do so."  *Id.* at 279.

Failure to investigate does not constitute actual malice:  "[t]he reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or

would have investigated before publishing . . . but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174, 177 (2d Cir. 2001) (affirming summary judgment) (citations omitted); *Contemporary Mission*, 842 F.2d at 621 (affirming summary judgment where evidence insufficient to establish "subjective awareness of probable falsity") (citations omitted).   Absent serious doubts about the truth, not even a showing of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" will sustain Plaintiff's burden.   *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989) (citations omitted).

### B.   The Actual Malice Standard in the Context of Dramatizations

The Series is not journalism or a documentary.  It is a dramatization that has a strong point of view about controversial historical events and powerful government officials like Plaintiff. "Books, films, plays, and television shows often portray real people," but public figures "do[] not own history" or "have the legal right to control, dictate, approve, disapprove, or veto the creator's portrayal. . . ."  *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 850 (Cal. Ct. App. 2018), *cert denied*, 139 S. Ct. 800 (2019); *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1236-37 (6th Cir. 1981) (in case involving dramatization of the "Scottsboro Boys" rape trial, affirming ruling that defamatory portrayal of plaintiff, the prosecuting witness, was not published with actual malice as a matter of law).

Filmed dramatizations based on real life events and other constitutionally-protected works of art and drama present special concerns that are not at issue with works of non-fiction that aim to be literally true, such as news reports.  To protect this genre of storytelling, the courts have clarified the actual malice standard in recognition of the significant First Amendment interests presented.  "Self-evidently" these productions "partake[] of author's license—[they are] a creative

interpretation of reality—and if alterations of fact in scenes portrayed *are not made with serious doubts of truth of the essence of the telescoped composite*, such scenes do not ground a charge of actual malice." *Davis,* 654 F. Supp. at 656, 658-59 (granting summary judgment on defamation claim based on depiction in film *Missing*, "a dramatic portrayal of events and interpretations" surrounding the death of a young American in Chile derived from a single book based on the views of the man's family) (emphasis added); *see Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, *13 (N.D. Ga. Feb. 12, 2008) (on motion to dismiss: "the statements attributed to the Plaintiffs in the 'Ruffian' film may not be actionable *if discovery shows that the challenged scenes contain the essence of truth*, and that any falsity was incident to 'author's license' in creating a dramatization of the story") (citing *Davis*) (emphasis added).

Dramatizations like the Series "utilize simulated dialogue" and "a telescoping of events occurring over a period into a composite scene or scenes." *Davis*, 654 F. Supp. at 658; *De Havilland*, 21 Cal. App. 5th at 866  (affirming dismissal; in "dramatized, fact-based movies and miniseries . . . scenes, conversations, and even characters are fictionalized and imagined").  As stated in a recent case following *Davis* in which summary judgment was affirmed, "unlike *Harte–Hanks*" (concerning a newspaper article), "[t]his case concerns a docudrama. The 'drama' aspect of the film presupposes that aspects of the historical event are fictionalized in the film for entertainment purposes." *Lovingood v. Discovery Comm'cns Inc.*, 275 F. Supp. 3d 1301, 1313-14 (M.D. Ala. 2017) (citing *Davis*, 654 F. Supp. at 658), *aff'd*, 800 F. App'x 840, 847 (11th Cir. 2020).

Plaintiff's complaint that she was not actually at locations depicted or did not actually speak the dialogue attributed to her character misunderstands this art form.  As this Court has recognized, scripted dialogue in a dramatization is "not a verbatim recounting of the real-life participants and is intended to capture the essence of their words and deeds." *Fairstein*, 553 F. Supp. 3d at 64.  Since it is by nature at least partially fictionalized—scenes are invented, and events

are compressed for time, location and dramatic effect—there will not always be specific sources documenting each piece of dialogue.  Historical records are incomplete, and require the filmmakers to make assumptions about what took place behind closed doors.  Writers must interpret complex, contested events and motivations.   Multi-day investigations and multi-week trials must be condensed into a handful of minutes in hour-long episodes or a single two-hour motion picture. *See, e.g., Lovingood*, 275 F. Supp. 3d at 1313, *aff'd*, 800 F. App'x at 847.

Holding dramatized dialogue and scenes to the standard of journalism or documentaries would have a profoundly chilling effect on this art form.  That is why "[l]eeway is properly afforded to an author" who attempts to dramatize real events, and courts look to the writers' belief in the truth of the "essence" of the portrayal based on the totality of their sources.  *Davis*, 654 F. Supp. at 658. There is no actual malice if the essence of the portrayal "fairly represent[s] the source materials for the film believed to be true by the filmmakers."  *Id.* (as a matter of law, actual malice could not be premised on *Missing*'s dramatization of real events that portrayed "the unassailable beliefs" of the murdered American's family as related in a single book advocating their point of view).

The evidence is undisputed that the Series' creators absolutely believed their portrayal of Plaintiff, including in the five remaining scenes, was the essence of truth based on their sources. As in *Davis,* the Series gives voice to the "unassailable beliefs" of the Five, their families, and other knowledgeable, trusted sources, including their counsel; the record thereof in the celebrated Burns documentary and accompanying book; and corroborative results of the filmmakers' other extensive research—which included not only numerous news articles and well-regarded published historical sources like the Sullivan book, but Plaintiff's own words in the Toobin article and other publications.  *See supra,* pp. 8-10.

Courts repeatedly dismiss defamation cases on summary judgment because "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual

malice as a matter of law." *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *N.Y. Times v. Sullivan*, 376 U.S. at 287 (newspaper justified in relying "upon [its] knowledge of the good reputation" of the authors of advertisement at issue); *Davis*, 654 F. Supp. at 658-59. Here not only were the filmmakers' numerous sources credible, there was nothing "inherently improbable" about what their sources told them; to the contrary, the Burns documentary was award-winning; and the Five's civil rights lawsuit led by Warren resulted in a $41 million settlement.[11]  A rule requiring filmmakers to second-guess their sources and conduct independent research on every detail of a story would create an impossible—and unconstitutional—barrier to telling their stories, set an unworkable standard for sourcing, and ultimately confer on the filmmakers' subjects a *de facto* right to censor the film.

Another equally important consideration in this context is that the Series expresses, through certain dialogue between the characters, the filmmakers' constitutionally protected opinion and social commentary about the criminal justice system and powerful officials like Plaintiff. "Statements of 'imaginative expression' or 'rhetorical hyperbole' are 'entitled to constitutional protection as opinion,'" *Fairstein*, 553 F. Supp. 3d at 65, no less so when they take the form of dialogue in creative storytelling that "conveys the filmmakers' opinions" using "heightened and pithy rhetoric for dramatic effect." *Id.* at 73-74; *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276-77 (1971) (First Amendment protects "exaggeration [and] vilification of men who have been, or are, prominent in church or state").

In *Street*, cited by the court in *Davis*, the docudrama *Judge Horton and the Scottsboro Boys* was based almost entirely on one *chapter* of a book, which in turn was based on the findings of

---

[11]  *See, e.g.*, *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1265, 1267 (S.D.N.Y. 1989) ("that various journalists throughout the sports world believe that the WBC is manipulated by gifts and favors from promoters supports Cosell's claim that he had no reason to doubt the truth of such an allegation" and it was not inherently improbable).

Judge Horton—the only jurist to believe the Scottsboro defendants.  645 F.2d at 1230.  The docudrama thus adopted wholesale the view that the plaintiff prosecutrix was lying, directly accusing her of perjury and including invented dialogue calling her a "bum[]" and a "whore"— well beyond the strained implications Plaintiff relies on here.  *Id.* at 1231.  Yet the court held no actual malice could be found as a matter of law.  *Id.* at 1237 (directing verdict).

Fundamentally, parsing the "truth" of hyperbolic and contested verbiage in dramatic scripted dialogue is contrary to everything the actual malice rule stands for—that "debate on public issues should be uninhibited, robust, and wide-open," giving "freedoms of expression . . . the 'breathing space' that they 'need . . . to survive.'"  *N.Y. Times*, 376 U.S. at 270-72 (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)); *Street*, 645 F.2d at 1236 (robust debate protected by actual malice rule applies to dramatization of historical events; "From Alfred Dreyfus to Alger Hiss, famous cases have been debated and reinterpreted by commentators and historians.  A contrary rule would tend to restrain efforts to shed new light on historical events and reconsideration of past errors").

### C. As a Matter of Law, Neither Hostility Toward Plaintiff Nor a Strong Point of View That Excludes Her Views Constitute Actual Malice

In striving to find some actual malice foothold, Plaintiff's Complaint leans heavily on alleged statements by Defendants that the Series "was intended to serve as a means to hold Ms. Fairstein accountable for her 'misdeeds' and for being unrepentant" and that "Ms. DuVernay and Ms. Locke have publicly expressed anger and hostility towards Ms. Fairstein."  (Compl. ¶¶ 14-15.)

But the law is clearly to the contrary:  "'actual malice' does not mean hatred or contempt.  [Defendants] are entitled to have and to express such views; that is no more than robust First Amendment expression."  *Reliance Ins. v. Barron's*, 442 F. Supp. 1341, 1352 (S.D.N.Y. 1977) (granting summary judgment); *Garrison v. Louisiana*, 379 U.S. 64, 78-79 (1964) (actual malice not established by "ill-will, enmity, or a wanton desire to injure"); *Scientology*, 238 F.3d at 174 ("the actual

malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication"). As *N.Y. Times* and its progeny teach: "[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53 (1988) (quoting *Garrison*, 379 U.S. at 73); *Celle v. Filipino Reporter Enterps.*, 209 F.3d 163, 183 (2d Cir. 2000) ("speech 'honestly believed,' whatever the speaker's motivation, 'contribute[s] to the free interchange of ideas and the ascertainment of truth'") (citation omitted).

Further belying Ms. Fairstein's unsupported supposition, none of the writers even knew who Plaintiff was before their work on the Series. (SUF ¶ 228.)  It was only based on what they learned about Plaintiff and her actions in researching the Series—including that she not only has never taken any responsibility for this travesty, but continues to profess that the Five are guilty and the System worked "brilliantly"—that Defendants expressed "hostility" toward her.  That expression, *after* conducting their research, including hours of conversation with the Five, is patently insufficient to establish actual malice.  *See Berisha v. Lawson*, 973 F.3d 1304, 1314 (11th Cir. 2020) (rejecting actual malice argument that defendant "was determined to publish a preconceived story about [plaintiff], regardless whether it could be supported"; emails that he could "take down" plaintiff were sent after he "had done substantial work on the book" and supplied no "reason to doubt the sincerity of [his] belief in the many sources that corroborated his depiction of" plaintiff).

Similarly, actual malice cannot be predicated on the fact that the Series has a singular perspective and point of view, *see Davis*, 654 F. Supp. at 657 (defendants "may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution"), or that it was published over the plaintiff's denial of wrongdoing, *see Saenz v. Playboy Enterps., Inc.*, 841 F.2d 1309, 1319 (7th Cir. 1988) ("the omission of [plaintiff's] vehement denials

protesting any involvement in torture or the alleged 'spiking' of source material tending to discount his personal involvement does not indicate that the defendants intended to distort or recklessly disregard the truth"). Otherwise, public figures and officials could stifle criticism merely by denying accusations—as the undisputed evidence shows was Plaintiff's goal.[12]

Thus, as a matter of law, neither Plaintiff's self-serving assertions about her lack of responsibility, nor her demand that the filmmakers "consult specific documents" in her threatening letters designed to chill production of the Series could establish actual malice.  *See*, *e.g.*, *Edwards v. Nat'l Audubon Soc.*, 556 F.2d 113, 121 (2d Cir. 1977) ("clear and convincing proof" of actual malice "cannot be predicated on mere denials, however vehement"); *Contemporary Mission*, 842 F.2d at 624 (plaintiff specifically denied accusation and pointed reporter to prior reports that accusations were false, but that was "insufficient to establish actual malice").

## II.      Plaintiff Cannot Prove Actual Malice as to the Series' Five Remaining Scenes

There is no dispute that the filmmakers subjectively believed, based on their sources, that the remaining five scenes captured the essence of Plaintiff's words and deeds, and as such Plaintiff cannot meet her actual malice burden as to any of the Defendants.  *Davis*, 654 F. Supp. at 658. The scripted dialogue in these scenes is not only grounded in source material, but serves as a springboard for expressing the prosecution's point of view, of which Plaintiff has been the chief

---

[12] The Second Circuit's decision in the *Palin* case (before the court in a unique procedural context) in no way signals hostility toward applying the actual malice rule, much less on summary judgment; to the contrary, the court reemphasized that "political opposition alone does not constitute actual malice" (*Palin v. N.Y. Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019)); "actual malice does not mean maliciousness or ill will" (*id.* at 816); a speaker's "motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice" (*id.* at 814, n.33) (internal quotation marks and citations omitted), and that the plaintiff must instead supply clear and convincing evidence "that the defendant in fact entertained serious doubts as to the truth of his publication" (*id.* at 816 n.39) (internal quotation marks and citations omitted).  Ultimately, the district court determined as a matter of law that Ms. Palin could not meet this standard and the case should not have gone to the jury.  *Palin v. N.Y. Times Co.*, 2022 WL 599271, *25 (S.D.N.Y. Mar. 1, 2022).  Of course, this case involves the very different context of a dramatization and there is no evidence that Defendants published the Series subjectively aware that the essence of their portrayal of Fairstein was "false".  Just the opposite.

proponent, and as a foil for the Five's and filmmakers' point of view.  Absent evidence that Ms. DuVernay and the other writers subjectively had any serious doubts about their portrayal of Ms. Fairstein, Plaintiff cannot show actual malice on Netflix's part either.[13]

In all the remaining five scenes, as is often the case in dramas based on true stories, there is no transcription or recording documenting the "behind the scenes" prosecutor and detective conversations at issue.  So the writers did what writers do:  they imagine what would have been said based on their research and interpretations of contested events.  Plaintiff has no evidence—let alone clear and convincing evidence—that Defendants entertained any subjective doubt that the dialogue they created captured the essence of the truth, including the larger picture and dynamics at play.

## A.    The Timeline Scenes

Plaintiff complains of scenes in Episode 1 depicting the Fairstein character's conversations with detectives trying to piece together a timeline that would support the central theory of the case that the other reported assaults in the Park were connected to the rape of the jogger.  (*See* Ex. 30B, Scene Chart, Scene 1 and Ex. 30.)  The Timeline scenes were written to reflect exactly what the source material showed:  there were problems with the chronology of events matching up to the theory of the case, and the authorities had to revise the timeline to move the attack on the jogger

---

[13]  *See, e.g.*, *Berisha*, 973 F.3d at 1316 n.8 ("Because the evidence is insufficient to support a conclusion that [author] himself acted with actual malice," claims against the publisher defendants "fail as well").  Further, Netflix, as a film distributor and publisher, was entitled as a matter of law "to rely on the research of an established writer." *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595 (1989); *Love v. William Morrow and Co., Inc.*, 193 A.D.2d 586, 589 (1993) ("Morrow was entitled to rely on Prados' status and reputation as an author in making the decision to publish") (both granting summary judgment even under lower, "gross irresponsibility" fault standard).  "Sole reliance on the experience and positive reputation of the author" in researching article "does not demonstrate malice. . . . As long as a publisher has no serious doubts as to a story's truthfulness, there is no duty to make any independent investigation." *Fodor v. Berglas*, 1995 WL 505522, *5 (S.D.N.Y. Aug. 24, 1995) (granting summary judgment on actual malice grounds).  Netflix appropriately relied on the expertise and track record of Ms. DuVernay and her veteran co-producers and writers, as it generally does with experienced filmmakers.  (SUF ¶¶ 68-70.)

back.  (SUF ¶¶ 121-123.)  The sources (including the Burns and Sullivan books, news articles, and
the Ryan Affirmation) and undisputed facts show:

- There were problems with the timeline from the outset; the Five's statements gave
  inconsistent timelines of the attacks and rape (SUF ¶ 120);

- Accordingly, the prosecutors had to choose which stories to believe or disbelieve.  A timeline
  was pushed out to the press and published by the morning of April 22 that connected the rape
  to the other events in the Park and timed it at 10:05 p.m.  (SUF ¶¶ 121-122);

- After the initial timeline was published, the prosecutors landed on a different chronology that
  moved the rape back in time, and took it to trial on that theory, stating that the jogger was
  attacked at 9:30 and there was "not the remotest chance" the attack took place after 10:00
  (SUF ¶ 123);

- Plaintiff oversaw and supervised the prosecution that went forward based on the timeline and
  has defended the convictions ever since (SUF ¶ 124).

Moreover, Plaintiff admits that both the police and prosecutors worked on timelines (Compl.
¶ 85; SUF ¶ 125), and the writers' sources indicated that the police and prosecutors were working
hand in hand to put together the timeline during those early days of the investigation (SUF ¶ 126.)[14]
It stood to reason that as the Head of the Unit prosecuting the case and highest ranking official on the
scene Plaintiff was centrally involved.  That is what the writers believed based on their sources:  as
an aggressive, hands-on prosecutor, acting in an investigative capacity and "controlling" the cops in
the precincts (SUF ¶¶ 83-86), Plaintiff absolutely had a hand in crafting a timeline that fit the theory
of the case and discussed those problems with the detectives at the precincts.  (SUF ¶¶ 127-128.)  The
writers' contemporaneous notes reflect this was their view based on their research in drafting the
scenes.  (SUF ¶¶ 127.)

---

[14] *See, e.g.*, Ex. 20, Byfield at 140 ("*Police and prosecutors, while trying to construct a logical sequence* to
explain what is often described vernacularly as 'muggings,' decided then that these alleged teen muggers,
some of whom they had in custody, were now also rapists.").

Plaintiff nevertheless argues that she had no hand in creating the timeline because she was not at the precincts until later in the evening on April 20.  This does not even bear on actual malice let alone establish it.

First, the writers' sources revealed that Ms. Fairstein "sprang to action" and was involved with the police at the precincts that day and therefore aware of the statements being given by the boys and the timeline problems.  (SUF ¶¶ 128; *see also* SUF ¶¶ 83-86, discussing sources.)  To the extent Plaintiff could prove that was false and Defendants erred, there is no evidence that they subjectively disbelieved that Plaintiff was involved.  None.

Second, and in any event, the writers believed based on their sources that the process of figuring out the timeline continued into the night of April 20 and the next day as more statements were being made about the timing of the attacks—which was of course when Ms. Fairstein herself concedes she was at the precinct *before* Korey Wise and Yusef Salaam had even been picked up, *before* she took some of the Five to the crime scene with detectives and *before* any of the videotaped "confessions" were made.  (SUF ¶ 129.)  Thus, even if the writers had been convinced that Ms. Fairstein was not physically at the precincts until later in the day on April 20, that would not have changed their portrayal of the Fairstein character.  (SUF ¶ 129.)  They believed she was a powerful presence and force in the investigation from the moment she "sprang to action," whether or not she was physically at the precincts during the day, and was by her own words there for over 32 hours at a critical time *before* two of the Five even arrived, let alone gave "confessions."  (SUF ¶¶ 128-129.)

Third, even though piecing together the timeline in this case may have actually taken place over an even longer period of time leading up to the trials, that process was compressed or "telescoped" into one scene in the Series.  (SUF ¶ 130.)  Similarly, Episode 1 condensed the action into one precinct instead of using the Central Park Precinct, the 20th Precinct and the 24th Precinct. This structural device was used to reduce the amount of back and forth needed to be shown and

condense events to their essence.  (SUF ¶ 131.)  Use of time or location compression and other literary devices is commonplace in dramatizations based on real events given the time constraints of filmed entertainment, and cannot in and of itself be a false statement of defamatory fact in the context of a dramatization (SUF ¶ 72).  *Cf. Lovingood*, 800 F. App'x at 847 ("condensing the entire *Challenger* investigation into a 90-minute dramatic film required the selective editing of real history not only for time but also for clarity, flow, and emotional impact").

Fourth, and at a fundamental level, as the Court recognized Plaintiff's continued "defense of the timeline's accuracy is consistent with the spirit of her dialogue in 'When They See Us.'"  *Fairstein*, 553 F. Supp. 3d at 71.  There is no disputing the writers firmly believed portraying Plaintiff assembling the timeline was consistent with the spirit and essence of her own publicly expressed viewpoint that the kids in the Park were connected to and guilty of the rape, even after Reyes came forward—and despite criticism of the timeline in the Ryan Affirmation and elsewhere.  (SUF ¶ 132.)[15]

Thus, these scenes are supported by sources indicating that Plaintiff was centrally involved in the investigation at a critical time—such that it would be unthinkable that she was *not* involved in discussions of the timeline—and by Plaintiff's own words.  As Plaintiff herself admits she was

---

[15] Indeed, nothing about this scene is defamatory of Plaintiff.  The Court did not previously rule on whether the scene had a defamatory meaning; it doesn't.  Even if, as Plaintiff implausibly asserts, she had nothing to do with the timeline, the scene simply "cannot reasonably be interpreted as accusing plaintiff of misconduct" in connection with the investigation.  *Dworin v. Deutsch*, 2008 WL 508019, *7 (S.D.N.Y. Feb. 22, 2008) (Castel, J.).  It is not defamatory to suggest that a timeline was created as part of a criminal investigation and that it evolved as more facts were learned.  Contrary to Plaintiff's strained reading of the scene (Compl. ¶ 46c), nowhere does the Series suggest that the Fairstein character believes the Five are innocent but is trying to "pin" the rape on them anyway.  To the contrary, Plaintiff is (accurately) portrayed as a zealous, true believer in the Five's guilt.  Certainly, Plaintiff cannot claim it is defamatory, let alone the product of actual malice, to show her constructing a timeline forcing a connection between the rape and the other assaults that happened on April 19, 1989, despite the clear discrepancies in the confessions as to location and timing.  That was not only what the writers believed based on their sources, but that was the central theory of the case taken to trial under her supervision.  *See Corporate Training Unlimited, Inc. v. Nat'l Broad. Co*., 981 F. Supp. 112, 120 (E.D.N.Y. 1997) (Dearie, J.) (it was admittedly "not a mischaracterization of [plaintiff's] statements" to say he had been discharged for financial improprieties, and even if "not substantially true, there is no evidence that could lead a reasonable jury to conclude, by clear and convincing evidence, that the statement was made with 'actual malice'").

"intimately involved" since the morning after the crime occurred, went to the precincts to assist in an investigation that continued to grow after she arrived, with more and more statements being taken from suspects (SUF ¶¶ 8-13), she can hardly contend that the filmmakers had "serious doubts of truth of the essence" of this scene, which was "a creative interpretation of reality," and cannot "ground a charge of actual malice." *Davis*, at 654 F. Supp. at 658. *See also Baiul v. Disson*, 607 F. App'x 18, 21 (2d Cir. 2015) (plaintiff skater failed to show statement that she "didn't show up. She was out shopping," was so inherently improbable as to have been made with actual malice where she admitted on deposition that "her former agent had heard the same story" and "it was gossip in the skating industry that she had missed an event because she was out shopping"; affirming summary judgment).

**B.    Police Briefing Scene**

In another scene, the Fairstein character, in a briefing with officers, dramatically summarizes what the authorities have learned about the group of youths in the Park then hyperbolically states: "I need *that whole group*.  I have some of them and descriptions of others, but I need all of them. Every young black male *who was in the park last night* is a suspect in the rape of that woman who is fighting for her life right now. . . . Let's get an army of blue up in Harlem.  You go into those projects and you stop every little thug you see.  *You bring in every kid who was in the park last night*."  (*See* Scene Chart, Ex. 30B, emphasis added.)

This dialogue reflects what the writers believed to be true about the investigation based on their sources.  Namely:

- That the investigation Ms. Fairstein presided over rushed to judgment and unjustly focused on the Black and Latino youth who were accused of committing other crimes in the Park on April 19, and ignored other possibilities and suspects (*i.e.,* Matias Reyes) (SUF ¶ 133; *see, e.g.,* Ex. 21, Affirmation, ¶ 104);

- That a round-up of Black and Latino boys who were in the Park that night occurred over a period of days; the Five and their families each expressed to Ms. Duvernay the belief that they were rounded up based solely on their race and the fact that they were in the park that

night; and contemporaneous news sources corroborated this belief (SUF ¶ 134; *see, e.g.,* Exs. 76-77, contemporaneous news articles);

- The NYPD continued, into the night of April 20 and through April 21, to round up youths from Harlem and bring them in for questioning; in fact, Korey and Yusef were not even picked up until 10:45 pm on April 20. (SUF ¶ 135; *see, e.g.,* Ex. 17, Sullivan at 54 (detectives were "riding the elevators of Schomburg Plaza and knocking on doors around the Taft Houses [housing projects in Harlem], trying to interview each of the thirty-three kids whose names had been mentioned by one suspect or another"); Ex. 27, Burns at 45);

- The filmmakers relied on the depiction in the Burns documentary (Ex. 19), which Plaintiff herself concedes made it seem like there were "sweeps" of Harlem (Ex. 63, 12/10/18 Email). (SUF ¶ 137.)

Plaintiff contends that she did not direct the NYPD officers to do anything and did not have the power to do so. (Compl. ¶ 99.) Even if Plaintiff is correct, that is irrelevant. She fails the actual malice burden because there is no basis for disputing that the writers believed otherwise based on their sources: that Plaintiff was present for and overseeing the roundup of additional suspects in Harlem. Critically, in the Toobin interview, she gave her own first-hand account, touting her power and endorsing as "brilliant" how the cops stopped kids in Harlem including based only on descriptions about the color of their skin ("a dark skinned guy") and their address ("102nd street") in Harlem:

> *On the day after the assaults*, Fairstein went to the Twentieth Precinct, on the Upper West Side, where detectives and her colleague Elizabeth Lederer were interrogating suspects. '*I was there to be the eight-hundred pound gorilla,* to help Elizabeth and the cops get the resources they needed. . . . I watched and listened to these kids*. . . . At first, the detectives didn't have much to go on. '*A kid would say something like "a dark-skinned guy who lives on 102nd Street,"*' Fairstein said. '*And these detectives would go out and find him. I think it was one of the most brilliant police investigations I've ever seen*.' (Ex. 25, Toobin.)

In addition to her own words, other sources (*e.g.,* Mr. Warren and Mr. Santana) told the writers Ms. Fairstein was present and a driving force in the investigation: she "controlled" the cops in the precinct (Ex. 39A-B), and "was the person behind making the phone calls, telling the officers what to get, what to do, and where to go" (Ex. 38B, Raymond audio). (SUF ¶¶ 84, 139-140.) Further, in the Series this scene takes place *prior to* the time Korey and Yusef are shown being "rounded up"

in the very next scene.  (SUF ¶ 136.)  Again, Fairstein admits she was in fact at the precincts at that time.

In short, the sources show: (a) an NYPD sweep of Harlem to find the kids in the Park the night before, (b) Plaintiff's intimate involvement with the investigation in the early stages "controlling" the cops, and (c) her own statements indicating that she was present for and knowledgeable about the continuing roundup.  Based on these sources, the writers firmly believed in the essence of the truth of this scene depicting Ms. Fairstein galvanizing the officers to "bring in every kid who was in the park last night."

Plaintiff also takes issue with use of the term "thug" in this scene, but that does not show actual malice.  As an initial matter, Plaintiff cannot assert that the writers had no basis for believing the word "thug" rang true as tough-talk coming from the Fairstein character ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████  Ms. Fairstein testified that a "thug" is "someone who physically attacks other people with wanton disregard for their well-being"—which is what she claims the Five and other teens in the Park that night did—and she has admitted that police officers and prosecutors, including herself, use the term.  (SUF 142, Ex. 4, Fairstein Dep. at 110-12.)

Moreover, Ms. DuVernay believed the term "thug" simply means criminal.  And based on what the writers' sources said, she believed that the authorities, including Ms. Fairstein, spoke about the Five and other boys in the Park in a derogatory manner consistent with their belief that the boys had participated in wrong doing.  (SUF ¶ 143.)  The language echoed what the men and their families told her about their experiences, consistent with other sources recounting disparaging language directed at the Five at the precincts (*e.g.*, Ex. 27, S. Burns at 53), and with Fairstein's own words

speaking about them as a "pack" that ran with serial rapist Matias Reyes and the other teens committing crimes in the Park.  (SUF ¶ 141.)  That is not actual malice.

Another concept is also important here: the challenged dialogue expressed the filmmakers' constitutionally protected opinion and social commentary that those in power did not see Black children as children first, but rather as "thugs."  (SUF ¶ 145.)   Based on their research, the filmmakers are of the opinion that Plaintiff's conduct as a powerful public official—including her blind spots on the evidence and rush to judgment based on her fixed belief that the rape was connected to the other events in the Park, and her specific conduct in the incident with Yusef Salaam and his mother—reflected precisely this kind of unconscious bias.  (SUF ¶¶ 86, 146, 153.)  The First Amendment's protection for that opinion is no less robust because it takes the form of imprecise and debatable verbiage in dramatic dialogue.  *See Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (Castel, J.) ("Words that are imprecise, whose meanings are 'debatable, loose and varying,' are 'insusceptible to proof of truth or falsity'") (citations omitted).[16]  Certainly, it cannot be the basis for finding actual malice.  "Before the test of reckless or knowing falsity can be met, there must be a false statement of fact."  *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418 U.S. 264, 284 (1974).

---

[16] Plaintiff alleges that the word "thug" "has become recognized as a racist code word" (Compl. ¶ 103) and that "wilding" is likewise a "loaded" term that signals "racism" and "stoked the public's fear of young black men, and caused the public to view them as criminals rather than people" (*see id.* ¶¶ 74, 76). ██████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ *See Love v. Morrow & Co.*, 193 A.D.2d 586, 588 (2d Dep't 1993) ("comparison of the disputed language" in book with "plaintiff's own words in his term paper" established substantial truth); *Corporate Training Unlimited*, 981 F. Supp. at 123 (rejecting defamation claim based on title of broadcast about plaintiffs' organization, "Rambo Goes to Reykjavik," where plaintiff "herself referred to the movie story, in a *Donahue* broadcast, as 'Rambo Goes Viking.' Plaintiffs should hardly be heard to complain about a virtually identical reference"; granting summary judgment).

Finally, the Court found one specific plausible reading of this dialogue was that the sweep was indiscriminate and unlawful. *Fairstein*, 553 F. Supp. 3d at 77-78. As a matter of law, Plaintiff has not shown the filmmakers intended the specific, plausibly defamatory meaning articulated in the Court's decision, and cannot sustain a charge of actual malice against them for failing to anticipate it.[17] That is because, in context, the dialogue is not only hyperbolic ("every" is used three times), but it is plainly focused on bringing in the kids who were "in the park last night" and who fit the description given by other kids ("I have some of them and descriptions of others")—not, literally or illegally, "*every* little thug" in Harlem. That is simply not what the filmmakers intended to convey. (SUF ¶ 144.) Based on what the sources said, Plaintiff and the detectives thought it was proper (even "brilliant") to pick up every kid who was in the Park that night as a suspect in the rape, because they believed the events were connected. (SUF ¶ 147.) In any event, the sources—including the Five, their families, and their counsel—support even this unintended defamatory meaning of a discriminatory sweep: the boys in the Park "were arrested because of their race . . . They were stopped by the police and prosecuted merely because of the way they looked.'" (Ex.77, quoting defense counsel Colin Moore; SUF ¶ 134.)

## C.     "No Kid Gloves" Scene

Plaintiff complains of dialogue from another invented private conversation in Episode 1 where the Fairstein character tells a detective: "We've got suspects. We've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling

---

[17] As part of Plaintiff's actual malice burden, in addition to proving awareness or reckless disregard of *falsity*, Plaintiff must prove Defendants were subjectively aware of and intended to convey a defamatory *meaning*. *Palin v. N.Y. Times,* 482 F. Supp. 3d 208, 217-18 (S.D.N.Y. 2020) (citing *Saenz v. Playboy Enterps., Inc.,* 841 F.2d 1309, 1318 (7th Cir. 1988) ("[R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern"). "[B]ecause actual malice is a 'deliberately subjective' test, liability cannot be imposed for an implication that merely 'should have been foreseen.'" *De Havilland*, 21 Cal.App.5th at 870 (quoting *Newton v. Nat'l Broad. Co., Inc*., 930 F.2d 662, 680 (9th Cir. 1990)).

all over this.  No kid gloves here.  These are not kids, they raped this woman.  Our lady jogger deserves this."  (*See* Scene Chart, Scene 3, Ex. 30B.)

This dialogue is the type of heightened language commonly heard in dramatizations of law enforcement authorities who are under great pressure to find the perpetrators of a terrible crime. (SUF ¶ 148.)  Ms. DuVernay believed that it captured the essence of the Fairstein character as reflected in her words and actions.  (SUF ¶ 149.)  Nowhere is this more vividly supported than in Plaintiff's documented treatment of Yusef Salaam and his family—which is also depicted in the Series, but is not included in the Complaint.  (SUF ¶ 150.)  As recounted in Ms. Burns' book, these adults including Yusef's "Big Brother," David Nocenti, were trying to help Yusef, but Plaintiff contrived to keep them away and prevent Yusef from getting counsel while detectives continued interrogating him.  (SUF 151-152; Ex. 27, Burns at 46-47.)  The Sullivan book, *for which Plaintiff was interviewed*, elaborates on her conduct and beliefs about this incident:

> **As far as Fairstein was concerned, they had the killer, he was being interrogated by a skilled detective and he was incriminating himself. Salaam was the last kid she wanted to see represented by a lawyer at that point. . . .**

> *[Fairstein] was at least relieved at Nocenti's ignorance of criminal law.* Instead of insisting on seeing Salaam and asking the detectives questions about the investigation, all Nocenti had to say was: 'I'm calling a lawyer for him now, so you can't question him further.'  If he had done that, *said Fairstein later*, she would have stopped the interrogation. . . .

> [A]t about 12:30 a.m., Ms. Salaam told Fairstein she was getting a lawyer for the boy.  *Somebody had finally said the magic words Fairstein had been dreading for the past hour.*

(SUF ¶¶ 153-154; Ex. 17, Sullivan at 25-27; *see also* Swicord's notes underscoring these passages.)

The Court noted that the challenged dialogue in this scene could be read "as an instruction to coerce suspects into naming accomplices, and to treat the suspects as adults rather than minors because Fairstein considers them rapists."  *Fairstein*, 553 F. Supp. 3d at 77.  Based on their sources,

Ms. DuVernay and Ms. Swicord firmly believed that Plaintiff did not view Yusef, or any of the Five, as children to be protected, but as "killers" and rapists who should be treated like adults so they would confess and "name accomplices": "Linda Fairstein had denied Yusef access to the family members and friends downstairs hoping to counsel him. 'Indeed it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (SUF ¶ 152; Ex. 27, S. Burns at 181 (citing dissent of Titone, J., in *People v. Salaam*).)

Of course, the filmmakers also firmly believe that the Five's confessions were the product of mental and physical coercion (SUF ¶ 157), which, again, the Complaint does not challenge. While the Series never depicts Ms. Fairstein as being in the interrogation rooms, the writers absolutely believed, based on their sources (discussed *supra*, pp. 10-16), that:

- As the Head of the Unit and highest ranking official on the scene, she was overseeing the investigation and was ultimately responsible for what was going on when the Five were giving statements or revising their statements, and when they committed them to video (SUF ¶ 158);

- As she related to Jeffrey Toobin, Plaintiff was intimately involved with the interrogation process, and in shepherding it to a successful conclusion for the authorities (SUF ¶ 158; Ex. 25);

- As described by Messrs. Warren and Santana and consistent with her role and reputation, she exercised control over the detectives. (SUF ¶¶ 84, 139; Exs. 38A-B, 39A-B.)

Plaintiff's power and control is reflected in her actions directing the detectives to stop interrogating Yusef. (SUF ¶ 159; Ex. 17, Sullivan at 27.) This was a power she used only after Ms. Salaam used the "magic words" she had been "dreading" because she wanted Yusef to continue "being interrogated by a skilled detective" (*id*.)—a detective the filmmakers believe was using coercive techniques.

All in all, the writers believed that having the Fairstein character speak dialogue admonishing detectives to "make them name their accomplices" and not to use "kid gloves" because "[t]hese are

not kids, they raped this woman" was entirely consistent with the essence of her character, based on her powerful position and as revealed in her documented conduct. (SUF ¶ 155.) It is also consistent with her own words, lauding and vouching for the "brilliant" investigation that resulted in the coerced confessions and the process by which detectives got suspects to "name their accomplices" so more could be brought in for questioning. (SUF ¶ 156; *e.g.,* Ex. 25, Toobin.) As with the timeline scene, Plaintiff's own words are "consistent with the spirit of her dialogue" (*Fairstein*, 553 F. Supp. 3d at 71), and again, there are zero facts establishing that the filmmakers had any doubt as to its essential truth.

### D.    DNA Scene

Plaintiff challenges a scene in Episode 2 of the Series depicting an imagined conversation behind closed doors between Ms. Fairstein, Ms. Lederer, and D.A. Morgenthau involving DNA evidence. The scene depicts the prosecution's belated discovery, on the eve of the first trial, of a DNA-marked sock that they hope will link the Five to the rape. When Lederer asks "How did the NYPD miss that?" Fairstein responds: "Who cares. We have it now. And the kicker is none of the defense is aware yet. So we can test it right before the trial. Surprise." (*See* Scene Chart, Scene 4, Ex. 30B.)

Through this scene, the writers—Ms. Locke[18] and Ms. DuVernay—intended to show what their sources related: that a DNA-marked sock was found *right before the first trial*, and that the prosecution was "hop[eful]" that the sock would match the Five and "this would be the break they needed" because they had no DNA evidence matching any of the Five. (SUF ¶¶ 161-162; Ex 27, S. Burns at 113; Ex. 17, Sullivan at 102-103 ("prosecutors had high hopes for this last chance to link the defendants scientifically with the rape").) The "Surprise" line was meant to capture the prosecution's giddy feeling upon discovering this last-minute evidence that could make their case

---

[18]  While Ms. Locke wrote an initial version of this scene, she did not write the portion of the dialogue at issue, which was later added by Ms. DuVernay. (SUF ¶ 199.) Thus, Plaintiff's focus on the "actual malice" and supposed "ill will" of Ms. Locke is even further off base.

and anticipating the "surprise" to the defense of getting evidence "nailing" them.  (SUF ¶ 163.)

*Depicting the sock discovery as an 11th hour surprise is not even false, much less is it maliciously false.*[19] ████████████████████████████████████████

████████████████████████████████████████████████

And based on the research, in particular the books by Mr. Sullivan (who interviewed Plaintiff for his 1992 book) and Mr. Levy (who worked with her on the case), the writers believed that Plaintiff was involved in the discussions surrounding the sock:

- Sullivan, pg. 103: "***Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris.***"

- Levy, pg. 79: "***I was asked to work with Linda Fairstein,*** Lederer's mentor, chief of the District Attorney's Sex Crimes Bureau, and a pioneer in the prosecution of sex crimes. . . ***Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem.***"

(SUF ¶¶ 167-169.)

There can be no finding of actual malice when this scene about the sock discovery simply shows, and was intended to show, what actually happened according to the source material:  the sock DNA was a big surprise—it was found right before trial; it was tested right before trial; and the prosecution was super hopeful it would match the Five.  (SUF ¶¶ 161-162.)  Contrary to what Plaintiff alleges, the writers did not intend this scene to convey that the prosecution was concealing forensic evidence from the defense (SUF ¶ 164); nor can that scene be fairly read that way and Defendants cannot be charged with actual malice for failing to anticipate that reading.[20]

---

[19] Plaintiff also conceded in her deposition that she was aware of the sock and reported its discovery to D.A. Morgenthau.  (SUF ¶ 171; Ex. 4, Fairstein Dep. at 282.)  A statement is substantially true and not actionable if its "overall 'gist or substance'" is true.  *Chau*, 771 F.3d at 129 (citations omitted).

[20] *See, e.g., Saenz*, 841 F.2d at 1318 (under First Amendment, publisher can't be required "to guarantee the truth of all the inferences a reader might reasonably draw from a publication"); *De Havilland*, 21 Cal.App.5th at 869 (citations omitted).

Moreover, the next scene with Fairstein and Lederer discussing the sock DNA explains that when the sock test came back negative and did *not* match the Five, the prosecution did not conceal it, but had to "deal" with it, which they did by "playing up" the cervical DNA as "inconclusive". (Ex. 30, Ep. 2, at 00:29:45 – 00:32:12) (the Fairstein character advises ADA Lederer to "Deal with the sock DNA"; "play up the cervical DNA"—signifying that the "sock DNA" has been disclosed and is something Lederer must "deal with" at trial by emphasizing the purported "inconclusiveness" of the cervical DNA). This too is absolutely supported by the source material:

- As described in the sources, the sock DNA came back as conclusively ruling out the Five, a major blow. (SUF ¶ 172; *see, e.g.*, Ex. 17, Sullivan, at 102.) Even worse, the cervical DNA— which the FBI had previously dubbed as "inconclusive"—matched the sock DNA, meaning that the cervical DNA also ruled out the Five. (SUF ¶ 173.)

- That should have been a pivotal inflection point for the prosecution to reconsider the rape case against the Five. Instead, the prosecution, supervised by Plaintiff, pushed forward with the trials. They did so based on the notion—championed by Plaintiff at the time according to sources and to this day according to Plaintiff's own words—that there was a sixth attacker who "got away." (SUF ¶ 174.)[21]

- In her opening statement at the first trial, Ms. Lederer called the cervical DNA "inconclusive" (SUF ¶ 176; Ex. 18), despite knowing it could no longer be so characterized. On direct examination, the FBI Agent, Mr. Adams, testified that he "chose to call [the cervical sample] a no conclusive result, that is no interpretation would be made because of this one very very faint result and the other blank results." (SUF ¶ 177; Ex. 79.)

- That led to a dramatic moment on cross-examination, when Adams was forced to admit that the "faint result" of the cervical swab, along with the matching sock DNA, was "sufficient" to exclude the Five. (Ex. ¶ 178.) The sources described this testimony as "'a revelation, wrested from an FBI expert under cross-examination.'" (SUF ¶ 179; Ex. 27, Burns at 147.) According to Sullivan, "the defense team had to *hope the jury would feel as misled by the prosecutors* as the media did." (SUF ¶ 180; Ex. 17, Sullivan at 148) (emphasis added).

---

[21] As Professor Saul Kassin, an expert on false confessions, summed up in the Ken Burns documentary, the prosecution made the decision that it "can still prosecute this case. And the argument we will make to the jury is just because we didn't get all of them, doesn't mean we didn't get some of them. They now created a scenario by which there is a 6th perpetrator—a 6th perpetrator who mysteriously doesn't appear in any of the confessions. But even if they were correct, that 6th perpetrator's absence in their confessions makes the confessions factually incorrect. That should have been the dilemma." (SUF ¶ 174; Ex. 19, Burns Doc. at 1:05:26 – 1:07:06.)

The writers' sources thus revealed that the prosecution's tactics and messaging about the DNA evidence being "inconclusive" was misleading and unfair— including in the opening statement at trial, by which time they certainly knew otherwise.[22]  The writers believed the prosecution misrepresented the DNA evidence in public and to the jury by claiming at trial it was "inconclusive."[23]  (SUF ¶ 185.)

In sum, the complained-of scene involving the discovery of the sock DNA is not actionable. It accurately depicts the prosecution's response when the sock was discovered.  And even if it weren't substantially true, there simply is no evidence of actual malice given the writers' reliance on sources they believed to be true about what happened in the case, and their interpretations of the behind-the-scenes discussions, all directly grounded in the source materials.  *Davis*, 654 F. Supp. at 658-59.

### E.    Nancy Ryan Lunch Scene

A scene in Episode 4 depicts an imagined luncheon conversation between the Fairstein and Ryan characters after Ms. Ryan's reinvestigation based on Matias Reyes' DNA and confession; the Fairstein character says (consistent with what Plaintiff has always maintained) that "it doesn't matter. You've simply identified a sixth rapist.  I always said there may be more."  The characters then argue for their respective positions:

> RYAN: You said that to cover because you knew you coerced those boys into saying what they did.
>
> FAIRSTEIN: They said what they said freely.  They confessed.
>
> RYAN: I actually think you've convinced yourself of that.

---

[22] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[23] A subsequent scene also depicts a conversation between Lederer and Mickey Joseph (defense counsel) in which Mr. Joseph tells Ms. Lederer: "You saying that the DNA evidence was inconclusive" was "not playing fair." (Ep. 2, 43:53 – 44:32.)  This dialogue was meant to underscore what the dramatic moment at trial revealed—that the prosecution's attempt to call the DNA evidence "inconclusive" was misleading and not fair.  (SUF ¶¶ 183-184.)

FAIRSTEIN: It doesn't really matter what you think.  There's a Police Commission Report coming out in a matter of days that maintains that the five did it.  And that Reyes is simply the one that got away.  It's a 43 page report, compiled by three lawyers named by the Commissioner.

RYAN: It's the police department investigating itself. Linda, we pored over your confession tapes.  We reconstructed the events of that night minute by minute.  I know what was done.

FAIRSTEIN: Oh, you know nothing.

(*See* full text in Ex. 30B, Scene Chart, Scene 5.)

Ms. DuVernay wrote this scene herself; it was intended to be a coda in which each these two antagonists,[24] representing opposing camps, state their position and opinion on this contested chapter in history.  (SUF ¶ 187.)  Plaintiff does not and could not contend that her dialogue in this scene is inconsistent with her actual views; it is a nearly verbatim recitation of her words in the Toobin article, the Imus interview and other reporting, declaring the interrogations were "brilliant," the Five participated in the rape, and she has no regrets.  (SUF ¶ 189.)

Ms. DuVernay drew directly from the Ryan Affirmation, which she read as a damning indictment of the original investigation and prosecution.  (SUF ¶ 190.)  In finding the confessions were invalid, Ms. Ryan specifically noted the youth of the Five and that they only implicated themselves in the attack after repeated interrogation (Ex. 21, Affirmation at ¶ 10) and that "in many other respects, the defendants' statements were not corroborated by, consistent with, or explanatory of objective, independent evidence.  And some of what they said was simply contrary to established fact." (*Id*. at ¶ 91; *see also id.* at ¶¶ 82-83, 86, 93-95, 97-99, 115.)  Ms. DuVernay read that to convey that the confessions' falsity had to be the product of some form of coercion—which is what she absolutely believes to be true based on her conversations with the Five.  (SUF ¶ 192.)

---

[24] Plaintiff does not seriously deny that she and Ms. Ryan had a contentious relationship.  Numerous sources confirmed that as well as reported their tussle over the Jogger case assignment.  (*See, e.g.,* SUF 188; Ex. 27, S. Burns at 36, 188-89; Ex. 17, Sullivan at 21.)

The Court determined for purposes of the motion to dismiss that the Ryan character's heated dialogue in this scene ("you coerced"; "your confession tapes") "implies that Fairstein had a personal role in securing the confessions." *Fairstein*, 553 F. Supp. 3d at 76.  And that is indisputably what Ms. DuVernay believed, based on her sources discussed above. (*See* SUF ¶¶ 193.)

In addition to having the power to control the police in advising them at the precincts and at the crime scene, Ms. DuVernay believed that Ms. Fairstein—the highest ranking prosecutor at the precincts, and person acting as "eyes and ears" for the D.A.—was ultimately responsible for the coercive interrogations as Head of the Unit that prosecuted the case who was on the scene at a critical time in the investigation. (SUF ¶ 194.)  She was not alone.

Among the materials Ms. DuVernay expressly relied upon in drafting this scene, as her contemporaneous emails show, was the *New York Times* interview of D.A. Morgenthau, who identified Plaintiff—not Ms. Lederer or anyone else—as responsible for the "mistake" in prosecuting based on the "confessions": "Yeah, I felt badly.  We had screwed up.  But there were confessions.' 'I had complete confidence in Linda Fairstein,' he continued, referring to the prosecutor who supervised the case.  'Turned out to be misplaced.  But we rectified it.'" (SUF ¶ 195; Ex. 50, Leland.)

Accordingly, based on the sources in their totality, Ms. DuVernay believed that Plaintiff bore personal responsibility for the coerced confessions, along with the detectives who were in the room, that Ryan's Affirmation supported her belief that the video confessions were *known at the time* to be deeply flawed, and that the Ryan character's dialogue attributing the confessions to "you" captured the essence of truth.  (SUF ¶ 196.)  That Ms. Fairstein disagrees with Ms. DuVernay's reading of Ms. Ryan's Affirmation is not evidence of actual malice.  *See Street,* 645 F.2d at 1237 ("A speaker's viewpoint can "cause him to draw different lessons from history and to see historical events and facts in a different light. . .  So long as there is no evidence of bad faith or conscious or extreme disregard of the truth, the speaker in such a situation does not violate the malice standard").

**III.     The Subsidiary Meaning Doctrine Also Forecloses Plaintiff's Complaint**

As shown above with respect to each of the five remaining scenes, there was no dialogue spoken by Fairstein that did not ring true as capturing the essence of her character and truth that the filmmakers believed based on their sources.  But for yet a further reason beyond that scene-by-scene analysis, summary judgment should be entered under the subsidiary meaning doctrine.

In *Herbert v. Lando*, the Second Circuit recognized a further gloss on constitutional actual malice:  there, having decided that defendants "could not be said to have had actual malice in publishing their view" that plaintiff lied about reporting war crimes in Vietnam, the court held that plaintiff was not "allowed to base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views"—even if those subsidiary statements "might be found to have been published with actual malice."  781 F.2d at 311-12.  The court in *Church of Scientology* confirmed the continued viability of the subsidiary meaning doctrine:  where the defendants' "overall 'view' of the plaintiff" is not susceptible to an actual malice finding, it is "illogical to hold, based on other statements, that the plaintiffs in fact had such actual malice. . . . To avoid that contradiction, we enunciated the subsidiary meaning doctrine."  238 F.3d at 176 (citing *Herbert*, 781 F.2d at 305–07, 312).

"[C]ontroversial historical events like the Scottsboro trials"—and the Central Park Jogger case—have "become symbolic and take on an overlay of political meaning."  *Street*, 645 F.2d at 1237.  The subsidiary meaning doctrine takes on special importance in the context of a work of art that aims at expressing larger truths about such contested historical events and the public officials that participated in them—speech at the core of the First Amendment's protections.  Subsidiary meaning forecloses Plaintiff's attempt to end run the actual malice rule and punish Defendants' critique of her conduct by seizing on purported "inaccuracies" in scenes that convey a message that is subsidiary to their overall, constitutionally protected viewpoint.

46

Specifically, Defendants believed, based on their sources, that as a high ranking official overseeing the case, Ms. Fairstein was uniquely positioned and morally and legally responsible for seeing that justice was served (SUF ¶ 75), but that (a) instead of protecting the Five as children, she was blinded by bias, seeing them as killers and treating them as adults (SUF ¶¶ 85-86, 146, 155), (b) when red flags appeared, she did not use her power and influence, as the Unit Head who supervised the case, to change course (SUF ¶¶ 75, 77, 81), and instead (c) took, controlled and approved aggressive actions that could be seen as crossing moral and ethical lines, including preventing Ms. Salaam from seeing her son (SUF ¶¶ 84-86, 93, 151-153), the prosecution's continuing to characterize the DNA evidence as inconclusive (SUF ¶¶ 22, 176-180) and promoting the theory of a "sixth rapist" (SUF ¶¶ 21, 175) who is nowhere mentioned in the "confessions," rendering them even more incredible.

Plaintiff does not (and could not) challenge that sources support this overarching, unassailable view of Plaintiff (even if she may disagree with it), and Defendants "could not be said to have had actual malice" in expressing it. *Herbert*, 781 F.2d at 311. Each of the five scenes at issue are "subsidiary to these larger views" and Plaintiff cannot be "allowed to base [her] defamation action" on what she claims are "inaccuracies contained within" those subsidiary scenes. *Id.* at 311-12. Depicting Plaintiff as formulating the timeline on which the case proceeded, or as being insensitive to the rights of the Five and other Black and Latino youth, or being complicit in the interrogations that led to their confessions, or presiding over a prosecution that played fast and loose with the DNA evidence could not be actionable, since the complained-of implications are merely subsidiary to the larger truth held by the filmmakers for which no claim will lie. The individual scenes and dialogue "merely imply the same view, and are simply an outgrowth of and subsidiary to" the filmmakers' overall view of Plaintiff which is not actionable. *Id.* at 312. "For [Fairstein] to base [her] defamation action on subsidiary statements whose ultimate defamatory

implications are themselves not actionable, we believe, would be a classic case of the tail wagging the dog." *Id.*; *accord Church of Scientology*, 238 F.3d at 176-77 (where "larger thrust" of article "asserted that 'Scientology, rather than being a bona fide religion, is in fact organized for the purpose of making money by means legitimate and illegitimate,'" specific complained-of statement that Vancouver Stock Exchange was a source of funds for the church "was subsidiary in meaning" to the larger truth that defendants believed; affirming summary judgment).

## IV.     No Claim for "Conspiracy" Exists

Plaintiff's "conspiracy" claim requires an actionable tort "coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." *Fairstein*, 553 F. Supp. 3d at 82 (citations omitted).  For the reasons above there is no actionable underlying tort, and further, discovery has shown Plaintiff's allegation that "defendants actually agreed to defame Fairstein" to be baseless.  *Id.*  Defendants did not know Linda Fairstein before this project and came to their opinions about her and her conduct independently, following their extensive research.  (SUF ¶¶ 228-231.)  That what they learned about Plaintiff led them to dislike her and what she stood for—and exercised their constitutional right to express their opinions on that score—does not a conspiracy make.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss the Complaint in its entirety and with prejudice.

Dated: September 30, 2022

Respectfully submitted,

_/s/ Natalie J. Spears_

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000

Sandra D. Hauser
Justin N. Kattan
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700

*Attorneys for Defendants Netflix, Inc., Ava DuVernay and Attica Locke*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 30, 2022, a true and correct copy of the

foregoing was served by CM/ECF on all counsel or parties of record on the service list.

/s/ Natalie J. Spears