## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-8042 (PKC) |
| v. | ) | |
| | ) | |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **DECLARATION OF AVA DUVERNAY**

I, Ava DuVernay, declare as follows:

1.      I submit this Declaration in support of Defendants' Motion for Summary Judgment. I am familiar with the facts herein and make this declaration from my own personal knowledge.

2.      I am a film writer, producer and director.  Since 2008, I have directed six feature films, including *Middle of Nowhere*, for which I won the Best Director Award at the 2012 Sundance Film Festival, *Selma*, which was nominated for Best Picture at the 2014 Academy Awards and *A Wrinkle In Time*, through which I am currently the highest grossing African-American woman director in American box office history.  In June 2013, I was invited to join both the Directors and Writers branches of the Academy of Motion Picture Arts and Sciences, the body which decides the Academy Awards.  I currently serve as one of three elected governors of the Directors branch, alongside Steven Spielberg and Susanne Bier.  I also serve as an elected board member of the Directors Guild of America.

3.      I created the award-winning television series *Queen Sugar*, for which I have been a writer and executive producer since 2016, directing the series opener and the series finale episodes for the show's landmark seven season run.

4.      I directed the documentary feature *13ᵗʰ*, which explores the intersection of race, justice and mass incarceration in the United States.  The film was released on Netflix in 2016 and won the Primetime Emmy Award for Outstanding Documentary or Nonfiction Special, among other honors.

5.      I created and directed, and was one of the writers and executive producers of the four-part limited series *When They See Us* ("WTSU" or the "Series"), distributed by Netflix on its subscription internet streaming service.  I also was the "showrunner" for the Series.  The showrunner encompasses a number of roles, and at a high level means that I was the leader of the Series, responsible for developing, creating, and executing the Series' creative vision and production.  In this Declaration, I first discuss my vision for the Series (¶¶ 6-15), the creative timeline for its development (¶¶ 16-27), and provide an overview of the research and source material we amassed (¶¶ 28-43).  I then detail the Series' point of view (¶ 44), the portrayal of the Plaintiff Linda Fairstein and sources that support that portrayal (¶¶ 45-60), the specific scenes she complains about that remain in this case and the sources that we relied upon in drafting the dialogue for those scenes (¶¶ 61-131).  Finally, I discuss the marketing of the Series and post-release of the Series (¶¶ 132-148).

### The Series When They See Us

6.      It was my idea to produce a film dramatizing the infamous Central Park Jogger case from the perspective of the five men—Antron McCray, Kevin Richardson, Yusef Salaam, Raymond Santana, and Korey Wise (the "Five" or as many call them, the "Exonerated Five")— who as young teenage boys ranging from 14 to 16 years of age, were wrongfully accused, convicted, and imprisoned for the crime of beating and raping Patricia Meili ("Ms. Meili" or "the

Jogger") in April 1989.  I will refer to the Five in this Declaration by their first names, not out of any disrespect, but out of enormous respect for the way I have come to know them personally.

7.      My interest in making a film about the Five began when Raymond reached out to me on Twitter in 2015.  I remember the Central Park Jogger case from when I was growing up in Los Angeles.  I am roughly the same age as the men, and this very much felt like a story that was happening to young people just like me at the time and it always stuck with me.

8.      When Raymond reached out, I was interested in the project on both a personal and professional level.  First and foremost, the Five's story was one that had not been told outside of the documentary, journalism and non-fiction space to my knowledge.  For the last thirty years, the story that has been told is the story that the City of New York, its police and prosecutors asserted and the story that the press ran with:  that the Five were not children, or even human, but an animalistic "wolfpack" of rapists.  My vision was to tell the other side of the story and give these honorable, decent men and their families the voice that they were denied for so long.  They had been convicted and incarcerated in a rush to judgment based on coerced confessions that were blatantly inconsistent.  This occurred despite no physical evidence or DNA linking them to the crime.  They were exonerated years later based on the DNA match and confession of the real offender, Matias Reyes, a serial rapist who committed a similar assault in Central Park two days earlier.  The Five were robbed of their youth and ripped from their families; they suffered unimaginably at the hands of the authorities and the media.  Even the "Central Park Five" moniker that was involuntarily applied to them denied them their individual personalities, hopes, dreams and memories.

9.      While important, the Series is not just about showing the humanity of the Five men. It also asks viewers to contemplate conceptual questions about the criminal system that we all

participate in, in some way or another.  Their stories starkly illustrate how elements of the criminal justice system in this country are biased.  Additionally, the story chronicles how those in positions of great power, including Linda Fairstein—then Chief of the Manhattan District Attorney's Sex Crimes Unit—were blinded by their biases, refusing to see these children as children.  Instead, they engaged in a process that rendered wrongful convictions for five innocent boys.  The very title of the series, *When They See Us*, reflects on the ways that Black teenage boys are viewed: rarely as children to be protected.  Instead, they are viewed in the way that Ms. Fairstein and the detectives saw them, as criminals from which the public needed to be protected.  The title also offers a hopeful declaration: that NOW is the time that they finally see us.

10.     Additionally, I was interested in the story from a media perspective, analyzing how the press vilified these young teenagers from the start and the irresponsibility of journalists for not questioning what the police and prosecutors were offering by way of facts and information.

11.     As I discuss in detail below, while I and the other writers relied on numerous primary and secondary historical sources, the Series is not a documentary.  It is a dramatization based on real events and people, told from the unique point of view of the Five men and their families.  Creating scripted drama based on real life requires the use of commonplace storytelling techniques—imagined conversations, compressed timelines, flashbacks to past events, and other tools—both for time and narrative purposes.

12.     I am proud of our work on the Series, which won two primetime Emmys and a BAFTA.  We worked hard to create both an effective drama and a faithful representation of these tragic events and the pain these men and their families experienced.

13.     As a filmmaker, I believe film and television have the power to bring about change. The conversation that the Series prompted led to real, tangible conversation and analysis in the

culture on important matters of crime and justice.[1]  This means more to me than any accolades or awards.  Films and television series "based on a true story" are ideal vehicles to bring public awareness to overlooked, marginalized voices.  In my view, the Series is a vital form of artistic expression as it amplifies a different, often unheard viewpoint—that of the Five men and their families.  The Series is a creative work that not only entertains, but does the necessary work of shining light on controversial and contested events, catalyzing conversations to spark reform and change, and holding the system and powerful public officials like Linda Fairstein accountable for failing the Five men as children.

14.     Prior to working on the project that became the Series and conducting research for the Series, I had no knowledge of Linda Fairstein or her role in the Central Park Jogger case.  I only came to learn who Ms. Fairstein was as the Head of the Sex Crimes Unit through the research I reviewed for the Series.

15.     I learned through my research that Ms. Fairstein was in charge and oversaw the investigation and prosecution of the Central Park Jogger case, and that she has never taken responsibility for the wrongful convictions.  Her fingerprints are all over this case.  She was the highest ranking official to have been involved, hands on at every stage, from investigation to conviction.  I believe that Ms. Fairstein—a powerful prosecutor charged with the public's interest—was uniquely positioned and responsible for seeing that justice was served and protecting the Five as children.  I believe she failed, and the system failed on her watch.  That being said, this story is not Linda Fairstein's story.  It is the story of the Five and is an indictment of the system writ large.

---

[1]  *See* N.Y. State Senate, "New 'Central Park Five' Law Requires Cops To Videotape Juvenile Interrogations" (Dec. 14, 2020), https://www.nysenate.gov/newsroom/in-the-news/velmanette-montgomery/new-central-park-five-law-requires-cops-videotape-0.

*Creative Timeline of the Series*

16.    After Raymond reached out on Twitter in 2015, I began thinking of the best way to tell the story.  Early in the process, I had the privilege of meeting with Raymond, Kevin, Korey, Yusef and Antron in person.  Since 2015, I have spent numerous hours with each of the five men and their families discussing the case and their lives.  I have welcomed each of the men into my home and they've welcomed me into theirs.  I tried not to "interview" them formally, except for a few times.  Instead, I often would just listen and sometimes a story would emerge in bits and pieces.

17.    In the fall of 2015, I approached Jonathan King of Participant Media about collaborating on feature film about the Central Park Five case.  Once Participant joined my project, we hired Jane Rosenthal and Berry Welsh of Tribeca Productions to join the team.

18.    I spent Thanksgiving week 2015 drafting a rough outline for the film based on my initial research, including my meetings with the Five and the 2012 documentary *The Central Park Five* by respected documentarian Ken Burns.  (Ex. 86, DEFS168977.)[2]  As I wrote in my outline, the intention for the project was to create "[a]n indictment of [the] criminal justice system in all its phases.  But furthermore, an indictment of the stories we tell ourselves as [sic] aspects of our lives that we stick to, even when we should let go."  (*Id*. at 1.)

19.    In early 2016, I hired a writer named Julian Breece to help me with the screenplay for the film.  Mr. Breece and I began outlining and conducting research for the project.  Among other things, in the Summer of 2016, Mr. Breece and I conducted interviews with Kevin, Korey, Raymond, and Raymond's civil rights lawyer, Michael Warren in New York.  In September 2016,

---

[2] All referenced exhibits are included in the Master Appendix.

Mr. Breece interviewed Antron, Kevin and Raymond by phone.  All of these interviews were audio-taped.

20.     During this time, we also sought to speak with those on the prosecution side of the case for their perspective.  In May and June of 2016, Jane Rosenthal exchanged emails with Linda Fairstein and Elizabeth Lederer, Ms. Fairstein's subordinate at the District Attorney's office at the time of the Central Park Jogger case.  Ms. Fairstein had handpicked Ms. Lederer to try the case.  Ms. Rosenthal also reached out to the jogger, Ms. Meili, and former District Attorney Robert Morgenthau.  All declined to participate.

21.     In response to Ms. Rosenthal's outreach, Ms. Fairstein wrote that she was speaking for Ms. Lederer and Ms. Meili, and stated that none of them would speak to us unless we satisfied a list of preconditions to obtain Ms. Fairstein's approval as to how we were researching and writing the script.  (Ex. 33.)  It was clear to me from these emails that Ms. Fairstein would not participate in any project that did not adopt her beliefs, and her version of the story.  I viewed her conditions as an attempt to control what I depicted through the script.

22.     On June 9, 2016, shortly after Ms. Fairstein's communications to Ms. Rosenthal, a lawyer representing Ms. Fairstein and Ms. Lederer wrote a threatening letter to me, Ms. Rosenthal, and Tribeca.  (Ex. 64 at LF00038581-88.)  Consistent with Ms. Fairstein's prior communications with Ms. Rosenthal, the lawyer identified an extensive list of materials (under the heading "Actions Required") that I must review in order for Ms. Fairstein to consider meeting with me.  I viewed this letter as an attempt to bully and intimidate me or stop the project, and I did not believe that Ms. Fairstein ever had any intention of actually meeting with me.[3]

---

[3] In 2018, when production of the Series was underway, I received a phone call from Ms. Lederer.  I tried to explain to Ms. Lederer why I thought she should sit down with me to discuss the case.  She told me she would think about it and get back to me.  When Ms. Lederer called again a bit later, she refused to speak with me about the case.  It was my distinct impression, based on our conversation and the prior

23.     The fact that Ms. Fairstein would not meet did not trouble me.  I knew what she had to say as she has been telling her version of the story, at the Five's expense, for years.  To me, Ms. Fairstein was and is one of the most uncredible and untrustworthy sources because she has an agenda and so much to lose.  On her watch and under her leadership, innocent children were jailed and the serial rapist who actually committed the crime went free to rape and kill other women, including murdering a pregnant woman.  (*See* Ex. 21, Affirmation.)

24.     As I continued to think about the men's stories, I determined that the project would be better rendered as a limited series instead of a feature film.  In May of 2017, I pitched the Series to Netflix.  On July 6, 2017, Netflix announced that it had greenlit the Series.

25.     My initial vision was a five episode series following the case from the night of April 19, 1989 through the settlement of the civil suit in 2014 with each episode focused more heavily on one of the Five.  I was not sure which of the men would be highlighted in each episode, but I envisioned the breakdown as this: (1) Episode 1—the night in the Park and the subsequent investigation, interrogations and coercions; (2) Episode 2—the trials and convictions of the Five; (3) Episode 3—Raymond, Kevin, Yusef and Antron's incarceration and how their families coped on the outside; (4) Episode 4—Raymond, Kevin, Yusef and Antron's release on parole and difficult return to society; and (5) Episode 5—Korey's harrowing time in incarceration, the reinvestigation and vacatur of the convictions and the civil suit and settlement.

26.     I then selected and hired experienced writers for the Series.  Some of the writers— Robin Swicord, Attica Locke, Thomas Bradshaw, and myself—along with the writing support

---

correspondence with Ms. Fairstein, that between the first and second calls with me, Ms. Lederer spoke with Ms. Fairstein who convinced her not to meet with me.

staff, participated in a writers' room that opened in October 2017 and closed in March 2018.[4]  I

assigned Ms. Swicord to write Episodes 1 and 4, Ms. Locke was assigned Episode 2, Mr. Bradshaw

was assigned Episode 3[5] and I planned to write Episode 5.  I have read the declarations of Ms.

Locke and Ms. Swicord in support of the motion for summary judgment and refer to them below

as necessary.

27.    Ms. Swicord and Ms. Locke did initial drafts of Episodes 1 and 2, respectively.  I

reviewed and provided notes on each of their drafts.  After a few drafts from each Ms. Swicord

and Ms. Locke, I took over Episodes 1 and 2 and made deeper revisions to the scripts.  Ultimately,

the final scripts on all episodes were approved by me.[6]

## *Overview of Research / Sources*

28.    The writers in the writers' room had a huge amount of research material from a

variety of sources and perspectives.  At my direction, Berry Welsh of Tribeca compiled a principal

set of materials for the writers, and additional materials were provided during the course of the

writing process for the Series.  The following paragraphs describe this research:

29.    ***Several books that reported on the Central Park Jogger Case***, from a variety of

perspectives, including:

> a.  Legal journalist Timothy Sullivan, *Unequal Verdicts: The Central Park*
>     *Jogger Trials* (1992) (Ex. 17);[7]

---

[4] A writers' room is a typical process in which writers on a television series meet in person for a period of time to brainstorm ideas and develop the structure of the episodes.

[5] Mr. Bradshaw's episode was ultimately not used when the Series was condensed from five to four episodes.

[6] I also brought in writers Michael Starrbury and Ruby Rae Spiegel to review drafts of Episode 2 and suggest a few revisions but I was responsible for all final drafts of scripts.  Michael Starrbury also wrote the final episode, which became Episode 4, with me.

[7] I did not keep my copies of the books.  So as not to overload the record with multiple copies of the voluminous research materials, the exhibits referenced herein are to Ms. Swicord's copies of the same research materials that I also had from the writers' room and relied upon when writing the Series.

    b.   The documentarian and writer Sarah Burns, *The Central Park Five: The Untold Story of One of New York City's Most Infamous Crimes* (2011) (Ex. 27);

    c.   Former *N.Y. Daily News* reporter and current academic Natalie Byfield, *Savage Portrayals: Race, Media, & the Central Park Jogger Story* (2014) (Ex. 20 (excerpts));

    d.   Former Manhattan prosecutor Harlan Levy, *And the Blood Cried Out: A Prosecutor's Spellbinding Account of DNA's Power to Free or Convict* (1996) (Ex. 37 (excerpts),); and

    e.   The Central Park Jogger Patricia Meili, *I am the Central Park Jogger: A Story of Hope and Possibility* (2003).

30.    The Burns and Sullivan books were valuable resources for me and the other writers. Mr. Sullivan covered the Central Park Jogger case in 1989 and 1990, and his 1992 book was based on interviews with individuals from both sides, including Ms. Lederer, Mr. Clements and Ms. Fairstein, as well as some of the defense lawyers, Judge Galligan's staff and jurors. (Ex. 17, Sullivan at 7-9.) Ms. Burns' book also relied on interviews with individuals involved in the case, the pretrial and trial transcripts, and exhaustive review of contemporaneous news reports and other secondary sources. (Ex. 27, S. Burns at 213-28.) Mr. Levy's book was also an important resource given his first-hand experience working at the DA's Office with Ms. Fairstein and Ms. Lederer on the Central Park Jogger case.

31.    ***The 2012 documentary film The Central Park Five***, directed by the respected documentarian Ken Burns, and his colleagues Sarah Burns and David McMahon. Like all of Mr. Burns' work, it was the product of extensive research and featured interviews with the Five and their families, journalists who covered the case in 1989, and other criminal justice experts. (Ex. 19).

32. ***Recorded Interviews With the Five Men***:[8]

      a. Transcripts of in-person interviews with Raymond Santana, Jr. (Ex. 38A-B), Korey Wise, and Kevin Richardson conducted by me and Mr. Breece in 2016, as well as the audio recordings of those interviews;

      b. Transcripts of telephone interviews with Antron McCray, Kevin Richardson and Raymond Santana, Jr. conducted by Mr. Breece in 2016, as well as the audio recordings of those interviews;

      c. Video of interviews conducted of Raymond Santana, Jr., Kevin Richardson, Yusef Salaam, Korey Wise, and Antron McCray by Sarah Burns and provided to me by Ms. Burns as part of my research.

33. In addition to the recorded interviews with the Five, I arranged for the Five to come to Los Angeles and meet with the other writers in the fall of 2017 so that the writers could hear from the men first-hand as I had the opportunity to do.  Each of the Five men spent several hours with Ms. Swicord, Ms. Locke and Mr. Bradshaw.  These interviews were audio recorded, and our writers' assistant, Ms. Hannah Baker, also took extensive notes.

34. ***Videotaped interviews with members of the Five's families***, conducted by Sarah Burns with Raymond Santana, Sr. (Raymond's father) and Angela Black (Kevin's sister).  (Ex. 40, excerpt of Angela Black interview.)

35. ***Recorded interview with Michael Warren***, a lawyer who represented three of the Five in the vacation of the convictions and Mr. Santana in the subsequent civil rights suit against the City, Fairstein and Lederer, among others, conducted by myself and Mr. Breece in 2016.  (Ex. 39A-B.)

36. ***Transcripts from the Suppression Hearings and Trials***.  (Ex. 43.)

---

[8] The men and their families shared deeply personal and private information in their interviews; only excerpts of relevant portions of various interviews are cited herein.

37.     ***"Confession" videos and transcripts***, for Korey Wise, Raymond Santana (transcript only), Kevin Richardson and Antron McCray.  (Ex. 32A-D.)

38.     ***The District Attorney's Dec. 5, 2002 Affirmation in Response to Motion to Vacate Judgment of Conviction***, written by ADA Nancy Ryan and detailing the results of her extensive reinvestigation following Matias Reyes' confession and concluding that the Five's convictions should be vacated.  (Ex 21.)

39.     ***News coverage, print and broadcast***, of the events of April 19, 1989; the investigation, prosecution, and trials of the Five; and the 2002 reinvestigation that led to the convictions being vacated:

> a.   News articles from the *New York Times* (Ex. 36, at DEFS007144 - 7416) and the *New York Daily News* (Ex. 36, at DEFS007417 - 7495) concerning the Central Park Jogger case from April 1989 through early 2003, following the vacation of the convictions;
>
> b.   Archived news broadcasts on the Central Park Jogger case from the time of the original arrests and prosecution and when the convictions were vacated in 2002.
>
> c.   Other online news coverage and online materials about the case and Ms. Fairstein. (Exs. 41 and 42.)

40.     Of the news coverage, particularly illuminating with respect to Ms. Fairstein was a 2002 interview she gave to journalist Jeffrey Toobin, "A Prosecutor Speaks Up", *The New Yorker* (Nov. 24, 2002) (Ex. 25), a 1990 profile in the *New York Times Magazine*, Katherine Bouton, "Linda Fairstein vs. Rape," *N.Y. Times Magazine* (Feb. 25, 1990) (Ex. 49), and an interview with Manhattan District Attorney Robert Morgenthau shortly before his death, John Leland, "Robert Morgenthau on His Years as District Attorney: 'I Don't Look Back,'" *N.Y. Times* (Nov. 23, 2016) (Ex. 50).

41.     In addition to all of these materials noted above that the other writers had, I personally conducted recorded interviews with Linda McCray (Antron's mother), Angela Black (Kevin's sister), Raymond Santana, Sr. (Raymond's father) and Sharonne Salaam (Yusef's mother).  I also spoke informally on many occasions with the Five and their family members.

42.     In addition to Michael Warren, I spoke with other lawyers for the Five including Michael ("Mickey") Joseph, Antron's criminal lawyer at trial, and Jane Fisher-Byrialsen, Korey's lawyer in the civil case.

43.     In addition to the research listed above, as part of this litigation, I answered interrogatories that set forth all of my research materials.  (Ex. 44.)  Additional materials not specifically called out above or below are included in the interrogatories.

### The Series Is a Dramatization Told From a Clear Point of View

44.     The events that are the subject of the Series are complex.  The police and prosecutors, for the most part, continue to believe one version, while the Five and their families believe another.  The Series is told from the point of view of the Five.  To be clear:  I *believe the Five*—I believe they are innocent, that their confessions were coerced, and that there was a biased rush to judgment against them.  Their truth is not Linda Fairstein's truth.  For example based on the totality of my research,

- I believe the Five that the investigation was rushed and shoddy, and overlooked obvious alternative theories, including that the crime was committed by Matias Reyes, who had assaulted another woman in Central Park just two days prior.  Ms. Fairstein calls that same investigation "brilliant."

- I believe the Five that their "confessions" were the product of mental and physical coercion.  When I watch their videotaped statements, I see scared children being

13

manipulated.  It is heartbreaking and painful to watch.  Ms. Fairstein to this day points to the videos as "uncoerced" confessions by a "pack" of criminals that justify convictions for a horrific rape.

- I believe that you cannot read District Attorney Nancy Ryan's Affirmation in support of vacating the convictions and not recognize the serious flaws in the "confessions" and in the timeline of events that were apparent from the start, and the implicit message that the confessions were the product of coercion.  On the other hand, Ms. Fairstein viciously attacked her colleague and rival, Ms. Ryan, and did everything she could to oppose vacating the convictions.

- I believe the Five, their families and their counsel that Ms. Fairstein was front and center, hands-on, controlling the cops at the precincts, and personally involved in obtaining the confessions—including treating Yusef Salaam as an adult "without kid gloves," and denying the aid of the supportive adults who wanted him to have counsel.  I find Ms. Fairstein's story that she had nothing to do with the investigation to be completely incredible.

- And because I believe the Five, I do not believe the testimony of the authorities who defended the coerced confessions and convicted the Five.  I believe that Ms. Fairstein in particular—who has a strong incentive to downplay her role in this miscarriage of justice—is a fundamentally biased source who for years has lied about what took place in the interrogations, about her encounter with Ms. Salaam on behalf of her teen son Yusef, and about the scope of her involvement in the investigation.  I believe, as detailed further below, that Ms. Fairstein was deeply involved in the investigation and "controlled the cops" at the precincts.  The claims

against her in the Five's civil suit alleged that she was acting as an investigator alongside the NYPD, and those claims withstood the City's motion to dismiss and settled for $41 million.

### The Fairstein Portrayal Generally

45.     I understand from reading the Complaint in this case that Ms. Fairstein alleges that the Series unfairly portrayed her as "a racist, unethical villain" who "mastermind[ed]" the theory of the case.  Ms. Fairstein, as I understand it, believes the Series unfairly portrays her as "morally and legally culpable" for the case by "assigning her a role" in the investigation that she "did not play".  (*See* Compl. ¶¶ 9-12.)

46.     Ms. Fairstein's assertion that we—myself and the other Defendants—"entertained serious doubts about the truth or falsity of the manner in which Ms. Fairstein was portrayed" is wrong.  (Compl. ¶ 11.)  We all believed that the convictions in this case were a horrible miscarriage of justice, the seeds of which were racial bias, both explicit and implicit.  I had no doubt whatsoever, based on the sources and information we had, that Ms. Fairstein played a central role in the investigation and prosecution, and absolutely is "morally and legally culpable" for the outcome in view of her position of power and insistence on driving the case forward while disregarding numerous red flags.  I believe that in doing so she crossed moral and ethical lines and breached the public trust.

47.     Our research and sources led us to believe that Ms. Fairstein was at the center of events from the beginning and one of the driving forces behind the investigation, prosecution and wrongful convictions of the Five.  In the Series, she, along with the entire system, is portrayed as the antagonist to the Five's protagonists.  Ms. Fairstein represents the criminal justice system, and

the criminal justice system is the villain in the Series.  That portrayal was grounded in, and supported by, both our sources and the point of view we were expressing.

48.     It is common practice in drama, including films based on a true story, to foreground one character to speak for a group or tell one side's perspective.  Here, we elected to have Ms. Fairstein represent the group of prosecutors and police, which she led, as they allied against the Five.  Her character expresses the prosecution's theories and positions (that she continues to advocate today).  We did so for several reasons.

49.     Ms. Fairstein was the Head of the Sex Crimes Unit, reporting directly to her mentor, D.A. Morgenthau (*e.g.*, Ex. 17, Sullivan at 20; Ex. 27, Burns at 36), which meant to me and the other writers that she was a powerful public official who was ultimately in charge of the case and could have changed its course.  Her image as the face and driving force behind this case was cemented early on.  As the Sullivan book recounts, the Five's supporters "**considered her one of the major villains behind the conspiracy to frame the defendants.  The animosity toward Fairstein generated by the packed defense side of the gallery seemed almost palpable**."  (Ex. 17, Sullivan at 202.)  In my informal conversations with the Five men, they also expressed their views that Ms. Fairstein was a central figure in the prosecution, and in their minds, terrorized them.

50.     In addition to her powerful position, our portrayal of the Fairstein character was supported by how sources portrayed Ms. Fairstein's reputation, actions and words.

51.     *First*, her reputation was that of an aggressive, headline-seeking, "hands-on" investigator who went to crime scenes with cops and enjoyed that part of the job as much as the courtroom:

> a.  The Sullivan book describes "Linda Fairstein" as "an ambitious career prosecutor who enjoyed an investigation as much as a trial . . . chief of the twelve-lawyer Sex Crimes Prosecution Unit . . . Her last trial, the notorious

Preppy Murder Case of 1988, had raised her to a level of celebrity". (Ex. 17 at 20.)

b. The Burns book similarly notes that "Linda Fairstein, the chief of the Sex Crimes Prosecution Unit of the district attorney's office, . . . was already famous, having prosecuted Robert Chambers, the so-called Preppie Murderer," and that she "was part of District Attorney Robert Morgenthau's inner circle, but she had a history of contentious relationships with the other high-ranking women within his office," including Nancy Ryan, "another of Morgenthau's protégées." (Ex. 27 at 36.)

c. A glowing New York Times Magazine profile of Ms. Fairstein that ran in 1990 relates that "Fairstein is never far from the attention of the tabloids, and they serve her well" and describes her "flash and bravado" and "tough talk ('Anything between the knees and the waist goes to me')". (Ex. 49, Bouton at DEFS007241.) The article states "[c]olleagues and opponents alike praise her skills and ingenuity as an investigator". (*Id*. at DEFS007240.)

I also understood that Ms. Fairstein was an advocate for victims' rights and a pioneer in the prosecution of sex crimes, but that is not how I saw her when looking at what happened in the Five's case from their perspective. I believe that her fierce desire to protect the victim is a part of what blinded her to the red flags in the investigation of the Five and their innocence. We discussed this in the writers' room and I believe the Series incorporates our collective view and opinion of the complexity of Ms. Fairstein's character and motivations. (Ex. 87, Jan. 8 Writers' Room Notes.)

52.     *Second*, consistent with her high profile and hard-charging reputation, Ms. Fairstein was described by several sources—including herself—as a powerful authority figure at the precincts who took charge of the Central Park Jogger investigation:

a. As Raymond told me in my recorded interview with him, "she was the person behind making the phone calls, telling the officers what to get, what to do and where to go. . . She was also the person leaking information to the press." (Ex. B, audio excerpt.) He further explained that "because she's a lead investigator" in the Jogger case, "she stepped out of that immunity" from being sued that prosecutors normally enjoy. "That's why she's named in [the Five's civil] lawsuit, her and Lederer." (*Id*.) That civil suit alleging she was acting as an

investigator alongside the police survived a motion to dismiss and ended up settling for $41 million.  (*See, e.g.*, Ex. 50, Leland.)

b. Based on his familiarity with the case and the evidence in the civil case, Mr. Warren described Ms. Fairstein as a "vicious, overboard, opportunistic individual who would do anything to satisfy her appetite for vindictiveness as a sex crime prosecutor.  And number two, to enhance, in an opportunistic sense, her objectives, beyond the case.  Because you gotta realize back then this was the biggest case in the country.  They had press here all over the world, and they stayed around.  Their only interest and Fairstein's only interest, all those detectives interests.  And Fairstein controlled those detectives. She controlled them in the precinct, and her only objective was to close that case against the young boys.  That was her justice." (Ex. 39A-B.)

c. In my conversations with Ms. Salaam, she said that she very much experienced Ms. Fairstein as controlling the police and activity at the precincts.  Ms. Fairstein also made a distinct impression on Kevin Richardson's sister as an intimidating presence when she was waiting at the precinct for her brother.  (Ex. 40, Angela Black interview.)

d. Ms. Fairstein herself boasted to Jeffrey Toobin of her power and influence at the precincts in her 2002 The New Yorker interview that on the day after the assaults, she went to the Twentieth Precinct "'to be the eight-hundred-pound gorilla to help Elizabeth and the cops get the resources they needed.'"  (Ex. 25.)

e. Mr. Morgenthau himself identified Ms. Fairstein with the Jogger case, noting that the convictions had been a "mistake" and stating that, at the time, "I had complete confidence in Linda Fairstein. . . Turned out to be misplaced. But we rectified it."  (Ex. 50, Leland.)  Notably, Mr. Morgenthau identifies Ms. Fairstein, not Ms. Lederer or anyone else.

53. *Third*, we believed, based on our sources, that Ms. Fairstein was a key participant in the investigation, as the highest ranking official at the precincts at a critical time, and that she oversaw and participated in the case through trial and verdict.  Our sources detailed the following:

a. Ms. Fairstein received a call early in the morning on April 20 and "immediately sprang to action."  (Ex. 27, S. Burns at 36; *see also* Ex. 17, Sullivan at 20.)

b. In the Burns documentary, Mr. Warren states that "Two prosecutors, Linda Fairstein and Elizabeth Lederer, they were part of the investigation and they

were operating not only as prosecutors, but investigators." (Ex. 19, Burns Doc. at 22:09 – 22:56.) Over Mr. Warren's voiceover is footage of Ms. Fairstein at the crime scene on what is labeled "Thursday Morning" (April 20). [9]

c.  Ms. Fairstein fought with Nancy Ryan for control of the case and to handpick the line prosecutor who would try it—Ms. Lederer. (Ex. 27, S. Burns at 36, 188-89, 201-202; Ex. 17, Sullivan at 21 ("When Fairstein heard that Ryan had assigned the Central Park case as a homicide, she rushed to her colleague's office, ready for a turf war.").)

d.  Ms. Fairstein spent over 32 hours in a row at the precincts at a critical time in the investigation, describing herself as the "eight-hundred-pound gorilla" at the precincts during that time. (Ex. 25, Toobin; *see also* Ex. 49, Bouton at DEFS007242 (her presence for 32 hours at the "precinct police station" was "invaluable to the prosecution" of the Central Park Jogger case).)

e.  Ms. Fairstein described to Mr. Toobin, first hand, what she termed "one of the most brilliant police investigations I've ever seen": "'I don't think there is a question in the minds of **anyone present during the interrogation process** that these five men were participants, not only in the other attacks that night but in the attack on the jogger. I watched more than thirty detectives—black, white, Hispanic guys who'd never met each other before—conduct a brilliant investigation.'" (Ex. 25, Toobin.) According to Ms. Fairstein, "'**[w]e all did here what we did every day. We were there to find out who did it**.'" (*Id.*)

f.  Ms. Fairstein prevented Yusef Salaam's mother and Big Brother from seeing him when she knew he was being interrogated and incriminating himself. (Ex. 27, S. Burns at 46-47; Ex. 17, Sullivan at 25-27.) According to Mr. Sullivan, **"[a]s far as Fairstein was concerned, they had the killer, he was being interrogated by a skilled detective and he was incriminating himself.  Salaam was the last kid she wanted to see represented by a lawyer at that point."** (*Id.* at 26.) New York Court of Appeals Judge Vito Titone decried Ms. Fairstein, noting that "'it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (Ex.

---

[9] Based on footage from the Burns documentary showing Ms. Fairstein at the crime scene with the labels "Thursday morning" (22:08 – 22:56) and "April 20," (02:01 – 03:05) I and the other writers believed that she went to the crime scene after being notified that same day. (Ex. 19.)

27, S. Burns at 181 (citing dissent of Titone, J., in *People v. Salaam*); see also Ex. 42, Linda Fairstein Wikipedia, quoting Judge Titone ("'I was concerned about a criminal justice system that would tolerate the conduct of *the prosecutor, Linda Fairstein, who deliberately engineered the 15-year-old's confession*. . . . Fairstein wanted to make a name.  She didn't care. She wasn't a human.'").)

g.  Ms. Fairstein took some of the Five to the crime scene without their parents where they made statements later used against them, including Korey, who made his videotaped statements after his visit to the crime scene.  (*See* Ex. 27, S. Burns at 51-54;  Ex. 49, Bouton at DEFS007242 ("At dawn the next morning, Fairstein had accompanied Lederer, the police and two of the defendants to the scene of the crime.").)

h.  Ms. Fairstein endorsed the indictments of the Five, and was seen sitting alongside DA Robert Morgenthau and ADA Lederer to announce the indictments of the Five.  (Ex. 19, Burns Doc. at 52:47.)

i.  Ms. Fairstein supervised the prosecution and trial strategy, and was particularly involved in how to handle the DNA evidence at trial.  (Ex. 37, Levy at 95 ("Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem").)  When belatedly discovered DNA on Ms. Meili's sock came back as not matching the Five, "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris"[10] (Ex. 17, Sullivan at 103), but did not put a stop to the prosecution of the Five.

j.  Several sources reported that after the indictments, Ms. Fairstein "oversaw the prosecution" as "the chief of the Sex Crimes Unit" (Ex. 51, Jim Dwyer and Kevin Flynn, "New Light on Jogger's Rape Calls Evidence Into Question," *N.Y. Times* (Dec. 1, 2002); Ex. 52, Jill Smolow, "A Radical Reversal," *People* (Dec. 23, 2002); Ex. 50, Leland).

k.  Ms. Fairstein testified against the Five in the suppression hearings and at trial—including about Kevin's and Korey's statements at the crime scene. (Ex. 49, Bouton at DEFS007241-42.)  Again, she made a big impression. The Burns book and news articles describe her trial testimony as "[t]he most dramatic element of the [prosecution's] rebuttal case".  (Ex. 27, S. Burns at 155; Ex. 17, Sullivan at 94 ("Perhaps the strongest point in the state's

---

[10] Sullivan's book uses the pseudonym "Paula Harris" for the jogger, who had not yet been publicly identified as Trisha Meili at the time of publication.

counterargument to the coercion defense was the testimony of Linda Fairstein and two detectives about the suspects' raucous behavior in the holding cell").)

54.    ***Fourth***, Ms. Fairstein has been front and center defending the convictions of the Five for rape even after the serial rapist Matias Reyes confessed to acting alone.  For example, in the Toobin article, Plaintiff made clear she did not see the Five as children, but continued to believe that they were guilty as charged as a feral "pack" of rapists (evoking the dehumanizing "Wolfpack's prey" headlines from 1989).  (Ex. 25, Toobin; Ex. 27, S. Burns at 69-70, 116-117 (headlines, photos).)  She made similar statements to radio host Don Imus in a 2014 interview while promoting her crime fiction books, stating that they were "participants in the attack on the jogger as charged."  (Ex. 26A-B, Imus in the Morning, "Linda Fairstein Discusses Her Book and the New York Jogger Muggings" (June 20, 2014); Ex. 27, S. Burns at 201.)  She thinks the investigation we believe was a travesty of justice was "'one of the most brilliant police investigations I've ever seen.'  As for the interrogations themselves, Fairstein has no regrets." (Ex. 25, Toobin.)

55.    The Fairstein character was written to be consistent with both the historical record and her own stated views.  I believed then and still believe now that her portrayal generally, and in the specific scenes she complains about in this lawsuit, captures the essence of the truth based on what we had read, seen, and believed about the case and Ms. Fairstein's role and her power from our research.  There was no dialogue spoken by the Fairstein character that did not ring true to us, capturing the essence of her character as we believe it to be.

***The NYC Website Release***

56.    In July 2018, I and the other producers became aware that documents from the original Central Park Jogger case had been released on the NYC website, and that this first batch

of documents consisted of the video confessions—some of which I already had—and the original police and DA investigatory notes.

57.    I did not believe that we needed more research at this juncture because I felt secure in our work and sources.  This was confirmed for me by the fact that the press reports in major newspapers on the first document release did not identify anything that would call into question the Five's story or the justice of their exoneration (even though the release was said to be slanted to the prosecution's point of view).  (*See* Ex. 88, Benjamin Mueller et al., "City Releases Trove of Documents in Central Park Jogger Case," *N.Y. Times* (July 20, 2018) ("**The documents released so far do not add many new details to the basic contours of the case, a tale of false confessions obtained from teenagers that has been the subject of innumerable news articles.").)**

58.    In fact, following the release, there were news reports that one of the cameramen who recorded the video statements (which I had already viewed) spoke out for the first time, stating that the room where the taping took place made the tapes look more incriminating, and suggests actions were taken to pressure the kids into confessing:  "'I was told to leave my lighting on between interviews,' Novick recalled. 'What that does is make the room really hot and really uncomfortable.'" (Ex. 89, Rich Schapiro, "Cameraman who shot Central Park 5 interrogation videos speaks out for first time," *N.Y. Daily News* (July 22, 2018).)

59.    I had no doubt that nothing in the yet-to-be-released civil case documents would vindicate her long-held, rigid assertions that the Five were guilty.  Having already watched the "confession" videos, as Ms. Fairstein had implored me to do, I had no doubt that the Five were innocent.  Nor did I feel the need to review police reports and testimony from the police and prosecutors who I believed lied about what happened in the investigation and interrogations.

60.     For all of these reasons, at the time I was working on the Series, based on the news reports about the release and all of the other sources and research we had, and the fact that the defendants in the civil suit settled for $41 million, I believed that the additional documents on the NYC website would only put Ms. Fairstein and her cohorts in a worse light because there was no new evidence that the Five were guilty.[11]

## SCENES AT ISSUE

61.     The Series is a dramatized retelling of historical events.  In telling stories based on real life, as I have done in my other films such as *Selma*, and as screenwriters practice regularly, filmmakers must compress events and characters for time and dramatic reasons, and create dialogue for the characters to speak and convey opinions.  In creating the Series, we utilized standard storytelling techniques, including inventing narrative action to portray scenes or dialogue as well as compressing time and locations in some cases.  For example, an investigation that spanned several days before the Five were indicted and two multi-week trials needed to be included in a telling of the story in less than 5 hours of screentime.

62.     While we used traditional story-telling techniques, we did so within the framework of what we believed was true based on the multitude of sources we read, spoke with and viewed. Although it is firmly rooted in fact, the Series is also a creative work.  It is not a documentary and was never intended to be.

63.     While drafting and editing the scripts, I regularly consulted my research materials to ensure that the scenes and dialogue were grounded in my research.

---

[11] Indeed, it was recently reported in the *New York Times* that based on a review of Ms. Ryan's 2002 Affirmation and the evidence in the civil case, the current Manhattan D.A. vacated the conviction of Steven Lopez, a sixth teenager who was accused of being involved in part of the attacks on April 19, 1989 in Central Park.  Jonah E. Bromwich, "Sixth Teenager Charged in Central Park Jogger Case is Exonerated," *N.Y. Times* (July 25, 2022) (Ex. 29); Ex. 28, Affirmation in *People v. Lopez*.

***"Timeline" Scenes***

64.    I understand that Ms. Fairstein takes issue with scenes in Episode 1 depicting the

Fairstein character's conversations with detectives trying to piece together a timeline of events in

the Park that would support the theory that the other reported assaults were connected to the rape

of the Jogger.

[12:36 – 12:51]

FAIRSTEIN: So you were just gonna let possible witnesses to a rape go on a Family Court ticket?  Wake these kids up and start getting some information.  We've got a lady raped and clinging to life, here. I want their interviews on my desk immediately so I can put together a timeline.  Let's work.

[15:58 - 16:52]

FAIRSTEIN: Multiple attacks. 9:00 pm, confirmed.  9:10, bicyclists confirmed on the east drive.  9:15, first walking patron confirmed assault east drive.  [SHEEHAN walks in]  Hey. Farrell's interviews with the boys are in.

SHEEHAN: Whatcha got?

FAIRSTEIN: All this is happening in the park and it's not connected.  They're not witnesses.  They're suspects.

[34:45 - 36:24]

SHEEHAN: Patricia Meili lives East 83rd street.  Her boyfriend says he spoke to her on the phone at 9:00 pm.  His assistant in the office placed the call for them.  They talk.  And she leaves to go out jogging.  She's downstairs at 9:05.  She says hi to the doorman and takes off on her regular run, north on East drive.  Boyfriend says she's an experienced runner.  She does a steady 8 minute mile.  She goes in at 88th Street, 8 minutes per mile, its 9:15 when she gets to the place where she's dragged off the road.

FAIRSTEIN: That's a 45 minute discrepancy.

SHEEHAN: We could pull the rape up to 9:20, you know, maybe she stopped to tie her shoes or something.

FAIRSTEIN: No.  It's still out of whack.  How could these same kids be raping her at the same time they're jumping bicyclists way over there?

JAFFER: Nothing on the weapon.  Question marks on the timeline.
I mean, we got problems.

FAIRSTEIN: Sheehan.  What do you think about the, you know, "I
got lost in the ballfield" bullshit we keep hearing about?

SHEEHAN: I never liked that.

FAIRSTEIN: Yeah, me neither.  There's no ballfield, they have
plenty of time to attack and rape her.

JAFFER: What, change the order?

FAIRSTEIN: Yeah.

JAFFER: Ah, so they go to the reservoir last.  Is there enough time
for all this to even happen?

FAIRSTEIN: Well it happened, so obviously there was.

(Ex. 30 at Episode 1.)

65.     Ms. Swicord wrote initial drafts of these scenes, which I then edited and added

writing.  I trusted Ms. Swicord's review of the research and that she drafted these scenes based on

her review and what she believed to be true.  Nothing in these scenes struck me as inconsistent

with our research.  I refer to Ms. Swicord's declaration for a more detailed description of the

specific research she relied upon.

66.     These scenes are creatively dramatized and invented scenes based on our research.

At their core, these scenes are intended to show the creation of a timeline, which is commonplace

in any investigation and did occur in the initial days of the investigation.  The Timeline Scenes

were written to reflect exactly what the source material showed:  that there were problems with

the timeline matching up to law enforcement's theory of the case and that the authorities had to

revise the timeline to move the attack on the jogger back.

67.     Our sources indicated that the police and prosecutors were working hand in hand

to put together the timeline during those early days of the investigation:

> [I]t was several hours *after* the police began looking for and picking
> up teens who were possibly involved in the relatively more banal
> assaults in the park that the jogger's comatose, near-dead body was
> found at 1:30 A.M.  **Police and prosecutors, while trying to
> construct a logical sequence to explain what is often described
> vernacularly as 'muggings,' decided *then* that these alleged teen
> muggers, some of whom they had in custody, were now also
> rapists. . . . Thus, they sought evidence that would allow them to
> include the rape as part of the logical sequence of events that
> had transpired in the park.**

(Ex. 20, Byfield at 140.)

68.     The police and prosecutors had difficulty constructing the initial timeline because

the statements made by the Five to the police gave inconsistent accounts of the timing of the attacks

in the park and the rape:

> That initial time line had been constructed based on the statements
> of the teenagers to the detectives, but even those statements did not
> provide a consistent time line for when the rape occurred. Antron
> and Yusef had placed the rape before the assaults at the reservoir,
> but Raymond, Kevin, and Korey had listed it as the last event of the
> night.

(Ex. 27, S. Burns at 124.)

69.     Yet the authorities went ahead anyway and released a timeline to the press:

> The detectives settled on the latter explanation early on and shared
> it with the media.  On April 22, *The New York Times* published a
> map and time line, "Two Hours of Terror," which put the rape at
> 10:05 p.m., after all the other incidents.  *Newsday*, the *Daily News*,
> and the *New York Post* also published time lines stating that the rape
> occurred after 10:00 p.m.

(Ex. 27, S. Burns at 124; Ex. 72, "Park Marauders call it: 'WILDING'," *N.Y. Daily News* (Apr.

22, 1989); Ex. 51, Jim Dwyer and Kevin Flynn, "New Light on Jogger's Rape Calls Evidence Into

Question," *N.Y. Times* (Dec. 1, 2002) ("the chief of detectives and the lead prosecutor said publicly

that the rape of the jogger took place at 10:05, following the muggings near the reservoir.

Newspapers including *The New York Times* published timelines that the authorities had

constructed from the confessions of three of the five teenagers").)

26

70.     This initial timeline released to the press was inconsistent with not only the statements given by some of the boys, but with information that the authorities had learned about the jogger. Ms. Meili was identified by her co-worker around 10:00 a.m. on April 20. (Ex. 27, S. Burns at 38.) Her co-worker "told police that he'd made a plan to meet her back at her apartment at ten o'clock" and her neighbor "reported [that] he'd bumped into Meili and chatted with her at 8:55 p.m." (*Id*. at 124.)  Given this information, the police and prosecutors knew that the initial timeline was problematic from the outset.

71.     And by the time the case was taken to trial, the initial chronology changed and the attack on the jogger was moved up in time:  "'There is not the remotest possible chance this crime happened after 10 o'clock,' Ms. Lederer said in court." (Ex. 51,  Dwyer and Flynn.) Ms. Fairstein oversaw the prosecution that went forward based on this timeline.

72.     As ADA Nancy Ryan later described in her Affirmation (supporting the overturning of the convictions), the timeline of events was inherently problematic and was yet another reason the prosecution should have questioned the case it brought against the Five:

> An additional issue is raised by the other incidents which took place in the park.  For while the nature and locations of those incidents made it seem logical to believe that the defendants had attacked the jogger, the timing of events made it hard to understand when they could have. . . .  Given the times when each of those events were estimated to have occurred, it is difficult to construct a scenario that would have allowed the defendants the time to interrupt their progression south, detour to the 102nd Street transverse, and commit a gang rape.

(Ex. 21, Affirmation at ¶ 98; *see also id*. ¶¶ 86, 97.)

73.     I understand that Ms. Fairstein alleges in her Complaint in this case that she had no hand in creating the timeline and was not at the precinct until later in the evening on April 20.  In drafting these scenes however, Ms. Swicord absolutely believed that Ms. Fairstein was involved with the police at the precincts and aware of the statements being given by the boys.  Ms. Swicord

sent me a memo in December 2017 detailing her understanding of Ms. Fairstein's involvement and the timeline issues based on the research material including the "confessions" and the interviews the writers had done with the men.  (Ex. 75.)  Nothing in Ms. Swicord's memo struck me as inconsistent with the research.

74.     Like Ms. Swicord, I believed when drafting the scripts that Ms. Fairstein was at the precincts in the afternoon of April 20 or otherwise in communication with the police and involved with the investigation.  The Burns book describes Ms. Fairstein as getting the call early in the morning and states that she "sprang to action."  (Ex. 27, S. Burns at 36.)  I also believed based on the Burns documentary that Ms. Fairstein visited the crime scene on the morning of April 20.  (Ex. 19 at 02:01 – 03:05, 22:08 – 22:56.)  Both the Burns book and the Sullivan book describe the "turf war" between Ms. Fairstein and Ms. Ryan on the morning of April 20.  (Ex. 27, S. Burns at 36; Ex. 17, Sullivan at 21.)  Both Mr. Warren and Mr. Santana, who had extensive knowledge of the civil case, described how Mr. Fairstein was "controlling the cops" and telling them what to do. (Ex. 38A-B and Ex. 39A-B.)  All of this led me to believe that Ms. Fairstein was actively involved in the investigation during the day on April 20 and would have been aware of the timeline problems.

75.     Further, even if Ms. Fairstein did not get to the stationhouse until later that same day, I believed that the essence of our portrayal was accurate.  The precise timing of when she physically arrived was not material to me given that I knew Ms. Fairstein was involved from early that morning and was at the precinct on April 20 and stayed for over 30 hours at a critical time. By her own admission and based on our sources, she was at the precincts at a critical time in the investigation:  *before* Korey and Yusef were rounded up and *before* any "confessions" were taken from them at all.  She was front and center in the confrontation with Yusef's mother and appeared

to the Five and their families to be in charge.  She physically took some of the Five to the crime scene with police officers to obtain admissions used against them, and was there while all of the video confessions were made.  My goal was to portray Ms. Fairstein as someone who was a powerful presence and force in the investigation, which I believed was accurate based on my sources.  At most, the events at the precincts that she is complaining about which show her controlling the police and giving instruction regarding the interrogations are compressed for time.  This is typical in a dramatization which must condense events that took place over a period of days (or in this case years) into a few hours.  This depiction does not depart from the essence of the truth as we understood it based on our sources.

76.     Moreover, I believed, based on our sources, that the process of figuring out the timeline continued into the night of April 20 and next day, after Korey and Yusef had been picked up (and Ms. Fairstein herself concedes she was at the precinct).  In view of the source material discussed above showing Ms. Fairstein's powerful position, her reputation for being involved in investigations and her key role and actions in this particular investigation, I firmly believed that she discussed timeline issues with the detectives and had a hand in crafting a timeline that fit the theory of the case which connected the events in the Park.

77.     Even though piecing together the timeline in this case may have actually taken place over a longer period of time, that process was compressed or "telescoped" into one scene in the Series.  As discussed above, that is commonplace in dramatizations based on real events given the time constraints of filmed entertainment.

78.     Finally, I also believed that the Timeline Scenes reflected routine actions common to any police procedural drama: detectives and prosecutors working together to develop a timeline for their theory of how the crime took place.  Moreover, I firmly believed portraying Ms. Fairstein

assembling the timeline was consistent with the spirit and essence of her own publicly expressed point of view that the kids in the park were connected to and guilty of the rape, even after Matias Reyes came forward to confess to raping the Jogger alone, and his confession was supported by DNA evidence and details about the crime:  "I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night, but in the attack on the jogger."  (Ex. 25, Toobin.)  She was a true believer in the view in 1989 and still is to this day.

### *"Police Briefing" Scene*

79.    I understand that Ms. Fairstein takes issue with another early scene in Episode 1 of the Series, which begins with the Fairstein character summarizing, in dramatic language, what the authorities have learned about the events in the Park:

> FAIRSTEIN:  These males terrorized bicyclists, here.  They put two guys in the hospital with head injuries, here.  A fifty year-old man they attacked, here, and a public school teacher, jogging at the Reservoir.  And way up here?  They brutally raped a woman, and discarded her like a piece of garbage.  Left her for dead.  Bleeding, bound and naked.  And to think, we were gonna release these animals to Family Court and put them back on the streets?  I got a question for all of you.  At 9:30, they're terrorizing folks, here.  At 10:00, one of them is raping the female jogger here.  What happened in the half hour in between?  What'd these animals do between here – and here?  Hmm.  Are there other victims still in the Park?

(Ex. 30 at Episode 1, 00:18:40 – 00:19:59.)

80.    This dialogue is drawn from the timeline and description of events that the authorities put out to the news media.  *See supra*, ¶ 69.  The focus of Ms. Fairstein's complaint about this scene, as I understand it, is the dialogue that follows:

> FAIRSTEIN: I need that whole group.  I have some of them and descriptions of others, but I need all of them.  Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now.  I want units out strong.  C'mon, guys.  What did we miss?  Let's get an army of blue

> up in Harlem.  You go into those projects and you stop every little
> thug you see.  You bring in every kid who was in the park last night.

(Ex. 30 at Episode 1, 00:19:59 – 00:20:29.)

81.    Ms. Swicord wrote initial drafts of this scene which I then edited and added writing.
I trusted Ms. Swicord's review of the research and that she drafted this scene based on her review
and what she believed to be true.  Nothing in these scenes struck me as inconsistent with our
research.  I refer to Ms. Swicord's declaration for a more detailed description of the specific
research she relied upon.

82.    This is an invented scene that is intended to show what I believe to be true.  That
based on our research, the investigation which Ms. Fairstein led had rushed to judgment and
unjustly focused on the Black and Latino youth who were accused of committing other crimes in
the Park on April 19, ignoring other possibilities and suspects—*i.e.,* Matias Reyes, "[a] self-
confessed and convicted serial rapist" who "lived on 102nd Street" and "who beat and raped a
woman in Central Park two days before the attack" on the jogger.  (Ex. 21, Affirmation, ¶ 104.)

83.    I absolutely believe that a round-up of Black and Brown boys who were in the park
that night occurred.  I spoke with the men and their families multiple times, and they each
expressed the belief that they were rounded-up based solely on their race and the fact that they
were in the park that night.  Contemporaneous news sources corroborated this belief:

   a.  William Glaberson, "Art of Questioning; Some Jogger Defense Lawyers Fear
       A Colleague's Cross Examinations," *N.Y. Times* (July 26, 1990): "Mr. Burns
       won the kind of concession lawyers often work for for hours. The detective said
       he had Mr. Salaam picked up because he learned the teen-ager had been in
       Central Park that night.  **'Is presence in the park a crime?' Mr. Burns asked.
       'On that night, yes,' the detective answered, playing into the defense
       lawyer's suggestion that Mr. Salaam had been arrested simply because he
       was a black youth in Central Park that night.**"  (Ex. 76.)

   b.  Ronald Sullivan, "Defense Calls Jogger Case a Racist Witch Hunt," *N.Y. Times*
       (Nov. 29, 1990): [Colin Moore, Korey's lawyer] argued that the two defendants,

who are black, were arrested because of their race, comparing their position to the sufferings of blacks under slavery and Jews under the Nazis. **'They were stopped by the police and prosecuted merely because of the way they looked,' he said.**" (Ex. 77.)

84. Other sources described in detail how the NYPD continued, into the night of April 20, to round up youths from Harlem and bring them in for questioning.

> The Manhattan North Homicide team working at the 20th Precinct continued their investigation by picking up other teenagers who'd been named by those already in custody. On the evening of April 20, twenty-four hours after those first arrests, four detectives from Manhattan North arrived at the Schomburg towers with a list of names.
>
> At 10:45 p.m., Detectives Taglioni, Hall, Freck, and Bier got off the elevator on the twenty-first floor of the north Schomburg tower looking for Yusef Salaam.

(Ex. 27, S. Burns at 45; *see also* Ex. 19, Burns Doc. at 27:30 – 27:40.)

85. As Mr. Sullivan's book describes, "the number of suspects was growing hourly. Detectives were cross-referencing the names mentioned in each kid's statement and trying to find and interview as many as thirty teenagers." (Ex. 17, Sullivan at 39.) Suspects continued to be brought in on Friday April 21 (*id*. at 41), and days later the "Detectives from the homicide and Central Park squads were still riding the elevators of Schomburg Plaza and knocking on doors around the Taft Houses, trying to interview each of the thirty-three kids whose names had been mentioned by one suspect or another." (*Id*. at 54.)

86. I understand that Ms. Fairstein takes issue with the fact that the Series shows one "round-up," while in reality kids were picked-up for multiple days. This however is simply the result of time compression, which is necessary and routine in the context of a dramatization. And the fact that kids continued to be brought in for multiple days does not mean it was not a "round-up." A round-up does not have to happen all at once, it can occur over a period of days. To me, based on my experience growing up in Compton, an area that was heavily policed, a round-up is

more of an intention to go into these mostly Black and brown communities with the express goal

of looking for something.

87.    I also believe that Ms. Fairstein was present for and overseeing this roundup.  Ms.

Fairstein said so herself:

> "**On the day after the assaults**, Fairstein went to the Twentieth Precinct, on the Upper West Side, where detectives and her colleague Elizabeth Lederer were interrogating suspects.  'I was there to be the **eight-hundred-pound gorilla**, to help Elizabeth and the cops get the resources they needed.  It became clear as **I watched and listened to these kids** that a few of them knew each other, but most of them hadn't seen each other before,' Fairstein recalled. **They interviewed dozens of potential suspects**.  'Twenty to thirty of them were never charged with anything,' she said.
>
> At first, the detectives didn't have much to go on.  'A kid would say something like "**a dark-skinned guy** who **lives on 102nd Street**,"' Fairstein said.  '**And these detectives would go out and find him. I think it was one of the most brilliant police investigations I've ever seen**.'"
>
> ***
>
> "'I think Reyes ran with that pack of kids.  He stayed longer when the others moved on.  He completed the assault.  I don't think there is a question in the minds of anyone **present during the interrogation process** that these five men were participants, not only in the other attacks that night but in the attack on the jogger.  **I watched more than thirty detectives—black, white, Hispanic guys who'd never met each other before—conduct a brilliant investigation**.'"

(Ex. 25, Toobin.)

88.    In addition to her own words, other sources led me to believe that Ms. Fairstein was

present and a driving force in the investigation.  Mr. Warren told me that she "controlled" the cops

in the precinct (Ex. 39A-B), and Raymond told me that she "was the person behind making the

phone calls, telling the officers what to get, what to do, and where to go."  (Ex. 38B.)  I believe

that Mr. Warren and Raymond are both credible sources and that they learned about Ms. Fairstein's

role and the inner workings of the DA's office through the civil case, which settled for $41 million

while Ms. Fairstein was an individual defendant for her role in the investigation.  As Raymond said, Ms. Fairstein did not have prosecutorial immunity when she was operating as a "lead investigator." (Ex. 38B.)  And on the prosecution side, no less an authority than D.A. Morgenthau specifically identified Ms. Fairstein with the investigation and the confessions that were at the root of the "mistake" his office had to "rectify." (Ex. 50, Leland.)

89.    In light of our source material showing (a) an NYPD sweep of Harlem looking for the kids who had been in the Park, all of whom were Black or Latino, (b) Ms. Fairstein's intimate involvement with the investigation in the early stages of the case, "controlling" cops at the precincts, and (c) her own statements indicating that she was present for and knowledgeable about the continuing roundup, I firmly believed in the essence of the truth of this scene depicting Ms. Fairstein stating to NYPD officers that she needed them to "bring in every kid who was in the park last night."

90.    I understand Ms. Fairstein also takes issue with the use of the term "thug" in this scene.  I added this language, which I believed was appropriate for a variety of reasons.  This is the type of language commonly used in that setting—a police precinct in 1989.  Ms. Fairstein is not the only character in the Series seen using this type of language.  Detective Sheehan is heard using language such as "turds" (Ep. 1, at 09:33) and "bastards" (Ep. 1, at 18:55).  This language is also consistent with what the men and their families told me about their experiences.  As Ms. Burns' book recounts, when Korey's mom arrived at the precinct, a detective asked "Why would you want to see a scumbag like him?" (Ex. 27, S. Burns at 53.)

91.    Ms. Fairstein herself has publicly used dehumanizing terms to refer to the Five.  As she told Mr. Toobin, she believed serial rapist Matias Reyes "ran with that pack of kids,"

referencing the infamous "wolf pack's prey" headlines from 1989 about the Five teens.  (Ex. 25,

Toobin; Ex. 27, S. Burns at 69-70, 116-117 (headlines, photos).)

92.     Further, the term "thug," to me, simply means criminal.

93.     Neither the term "thug" nor anything else in the scene was intended to convey that

Ms. Fairstein was ordering the police to literally stop "*every* little thug" in Harlem or break the

law by making unlawful stops.  The dialogue focuses on bringing in the kids who were "in the

park last night" and who fit the description given by other kids ("I have some of them and

descriptions of others").   My intent was to convey, based on what our sources said, that Ms.

Fairstein and her colleagues spoke about the boys in a derogatory manner consistent with their

belief that the boys had participated in wrongdoing.  Ms. Fairstein was looking to find and pick up

every kid who was in the park that night as a suspect in the rape, because they believed the events

were connected.  I had no doubt based on her own stated views that she and her colleagues believed

the Five and the other kids from Harlem who were in the park that night were a "pack" of criminals.

94.     I also incorporated the word "thug" into this dialogue in order to explore themes of

unconscious bias and of those in power not seeing Black children as children first, but rather as

criminals or "thugs."  That is what I believe about Ms. Fairstein and her conduct as a powerful

public official.  The investigation and prosecution she oversaw, her blind spots on the evidence

and rush to judgment, and her specific conduct in the incident with Yusef and his mother, reflected

precisely this kind of bias.  I expressed my opinion through this dialogue.

***"No Kid Gloves" Scene***

95.     I understand that Ms. Fairstein takes issue with dialogue from another scene in

Episode 1:

> FAIRSTEIN: We've got suspects.  We've got kids in custody.
> Interrogate.  Make them name their accomplices.  This is not
> business as usual.  The press is crawling all over this.  No kid gloves

> here.  These are not kids, they raped this woman.  Our lady jogger
> deserves this.

(Ex. 30, Episode 1 at 00:22:35 – 00:22:53.)

96.     I edited this scene based on Ms. Swicord's early drafts and added the language at issue in the complaint—"these are not kids, they raped this woman," and as such should be treated as adults, with "no kid gloves."  This dialogue is the type of heightened language commonly heard in dramatizations of law enforcement authorities who are under great pressure to find the perpetrators of a terrible crime.  I believed that it fairly reflected the essence of Ms. Fairstein's character based on my sources discussing her conduct in the investigation and her own statements about the case.

97.     I believed, based on the sources, that the particular dialogue at issue captures the essence of the Fairstein character as reflected in her words and actions.  Nowhere is this more vividly demonstrated than in her treatment of Yusef Salaam and his family—which is also depicted in the Series, but is not included in Ms. Fairstein's Complaint.  As recounted in Ms. Burns' book,

> Downstairs, Yusef's family and friends began arriving at the precinct.  Yusef's cousin and her fiancé, as well as David Nocenti, the assistant U.S. attorney who acted as Yusef's mentor, were told that they could not see him.  Linda Fairstein, chief of the Sex Crimes Prosecution Unit of the district attorney's office, came out and took issue with Nocenti's presence, pointing out that as a U.S. attorney, he had no business interfering.  She lectured him about legal ethics and threatened to call his supervisor.  **When Nocenti suggested that she try to put herself in his shoes, and explained that he was Yusef's Big Brother, Fairstein replied, 'You did a real shit job at it.'**
>
> Around 11:45 p.m., Yusef's mother, Sharonne Salaam, arrived at the precinct and asked to see Yusef.  Linda Fairstein explained that detectives upstairs were questioning him and that she could see him as soon as they were finished.  Mrs. Salaam then demanded several times to see her son immediately, saying he was a minor, but it was not until she specifically stated that he was fifteen that Fairstein and the detectives took notice.  Fairstein said that they believed him to be sixteen, but Mrs. Salaam persisted.    Fairstein demanded

documentation, which Mrs. Salaam did not have with her.
Eventually, Fairstein and the detectives relented and decided to take
her word for it, only then halting the questioning.

(Ex. 27, S. Burns at 46-47.)

98.     Mr. Sullivan's book, for which Ms. Fairstein was interviewed, further elaborates

on her conduct and beliefs about this incident:

> Before going downstairs to meet the attorney, Fairstein wanted to
> know what the cops had on Salaam, so she sent a detective upstairs
> to check on the status of the interrogation. He returned with
> McKenna's notebook, in which Fairstein read that Salaam was
> sixteen years old and admitted hitting the female jogger twice with
> a pipe.

> The presence of a lawyer inquiring about Salaam troubled Fairstein.
> The prosecutors and detectives were proceeding as though this were
> a murder investigation—a doctor at Metropolitan Hospital had told
> Fairstein that the comatose victim could not live. **As far as
> Fairstein was concerned, they had the killer, he was being
> interrogated by a skilled detective and he was incriminating
> himself. Salaam was the last kid she wanted to see represented
> by a lawyer at that point.**

> The lawyer in the lobby was David Nocenti, who worked in the civil
> division of the U.S. attorney's office in Brooklyn. Nocenti, a
> bachelor, was in the Catholic 'Big Brother' program and had been
> paired with Salaam about four years earlier . . .

> \*\*\*

> If Fairstein was appalled at the young prosecutor's bad judgment in
> inserting himself into the defense side of a criminal matter, she was
> at least relieved at Nocenti's ignorance of criminal law. **Instead of
> insisting on seeing Salaam and asking the detectives questions
> about the investigation, all Nocenti had to say was: 'I'm calling
> a lawyer for him now, so you can't question him further.' If he
> had done that, said Fairstein later, she would have stopped the
> interrogation**.

> \*\*\*

> Sharonne Salaam, Yusef's mother, arrived at the precinct at about
> midnight. . . . After conferring with Nocenti on the side-walk, Ms.
> Salaam told Fairstein, in a cultivated southern accent, that her son
> was only fifteen and she didn't want him questioned.

> **Fairstein was not inclined to believe Ms. Salaam**. . . . Fairstein asked Ms. Salaam if she had any identification that proved her son was fifteen. She did not.
>
> To resolve the issue, said Fairstein, she would send for the detectives who were questioning Yusef. . . The detectives and Ms. Salaam debated the boy's age for perhaps ten minutes. Fairstein then took the detectives aside and told them that, for the sake of protecting the case, they should accept Ms. Salaam's word that her son was fifteen and tell McKenna to stop the interview. A few minutes later, at about 12:30 A.M., Ms. Salaam told Fairstein she was getting a lawyer for the boy. **Somebody had finally said the magic words Fairstein had been dreading for the past hour**."

(Ex. 17, Sullivan at 25-27.)

99.     Based on these sources, I believed that Ms. Fairstein did not view Yusef as a child to be protected, but as a "killer" who should be treated like an adult and denied the support that adults were trying to give him. "Linda Fairstein had denied Yusef access to the family members and friends who were downstairs in the precinct hoping to counsel him. 'Indeed it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (Ex. 27, S. Burns at 181 (citing dissent of Titone, J., in *People v. Salaam*).)

100.     I do not believe she saw or cared about *any* of the Five as children. As she told Angela (Kevin's sister), she should not be worried about Kevin, she should be worried about the jogger:

> **I remember Linda Fairstein she was there in the precinct and Lederer was there; they were all there.** And I remember I walked up to Linda Fairstein and I said, "Excuse me, do you know how much longer it will be before we can go home now because we keep getting told, you know, they keep waiting for these other statements." And she says, "You're concerned about going home?" She said there's a woman in Central Park that almost had her brains beat out of her head you better be praying for the jogger. She said you better be praying for her and not concerned about yourself and your brother.

38

\*\*\*

> [T]hey were just lying to us the whole time and they were setting
> Kevin up and they were setting us up and they were threatening him
> and they were accusing him.  **But they was like an orchestra like
> they orchestrated this whole thing and I felt so dumb for not
> realizing it until it was too late.**

(Ex. 40.)

101.     I also believed, based on my sources, that the dialogue of which Ms. Fairstein

complains—admonishing cops to "make them name their accomplices" and not to use "kid gloves"

because "[t]hese are not kids, they raped this woman"—is entirely consistent with the essence of

her character as revealed in her documented conduct.  It is also consistent with her own words,

lauding and vouching for the "brilliant" investigation that resulted in the coerced confessions and

the process by which detectives got suspects to "name their accomplices" so more could be brought

in for questioning.  (*E.g.,* Ex. 25, Toobin.)

102.     I heard from the men themselves time and again how they were treated in those

interrogations—including being held for hours without food or water and being physically and

mentally abused by the officers.  This conduct to me is not how children are treated, but how adult

rapists are treated.

103.     While the Series did not depict Ms. Fairstein as being in the interrogation rooms, I

absolutely believed that she was overseeing the interrogations and, as the Head of the Unit, was

ultimately responsible for what was going on when the Five were giving statements or revising

their statements, and when they committed those statements to video.  I believed that Ms. Fairstein

controlled the detectives and was involved in shepherding the interrogation process to a successful

conclusion for the authorities.  (Ex. 25, Toobin; Ex. 39A-B, Warren; Ex. 38A-B, Raymond.  *See

supra*, ¶¶ 47-53.)

### *Scene Involving DNA-Marked Sock*

104.    I understand that Ms. Fairstein takes issue with a scene in Episode 2 of the Series

involving DNA evidence (the "DNA Scene").  The scene that Ms. Fairstein focuses on depicts the

prosecution's discovery, on the eve of the first trial, of a DNA-marked sock that they hope will

link the Five to the rape:

> MORGENTHAU: We have useless tape, we've lost our gang narrative, we can't
> find DNA.
>
> FAIRSTEIN: We have a sock.  Those little bastards shot their wad into a sock,
> thinking we wouldn't find it.  But, we found it.
>
> MORGENTHAU: We have DNA.  Good.  The match will nail this thing down.
>
> LEDERER: How did the NYPD miss that?
>
> FAIRSTEIN: Who cares.  We have it now.  And the kicker is none
> of the defense is aware yet.  So we can test it right before the trial.
> Surprise.
>
> LEDERER: Surprise.

(Ex. 30, Episode 2 at 00:16:39 – 00:17:13.)

105.    Ms. Locke wrote an initial draft of this scene, which I then edited and added writing.

I trusted Ms. Locke's review of the research and that she drafted this scene based on her review

and what she believed to be true.  Nothing in these scenes struck me as inconsistent with our

research.  I believed then, and do now, that this scene was supported by our research materials.  I

refer to Ms. Locke's declaration for a more detailed description of the specific research she relied

upon.

106.    This scene is intended to show that a DNA-marked sock was found right before the

first trial, and that the prosecution was hopeful that the sock would match the Five, having already

learned that the cervical DNA was "inconclusive."  Both the Burns book and the Sullivan book

describe how the sock was found as the FBI technician was preparing for trial.  (Ex. 27, S. Burns

at 113; Ex. 17, Sullivan at 102-103.)  Both books also described the prosecution as being "hop[eful]

that this would be the break they needed."  (Ex 27, S. Burns at 113; Ex. 17, Sullivan at 102-103

("prosecutors had high hopes for this last chance to link the defendants scientifically with the

rape").)

107.    I added the "Surprise" line to capture the giddy feeling of the prosecution in finding

this last-minute evidence that could make their case, based on the source materials above.  The

discovery of the sock was a "surprise" to both the prosecution and the defense because it had been

missed the first time around and was only found shortly before trial.  Once it was discovered, the

prosecution, including Ms. Fairstein, certainly hoped that it would be an unwelcome surprise for

the defense.  Of course, the opposite happened, and the DNA on the sock did not match any of the

Five.

108.    I also believed based on our research that Ms. Fairstein was part of the discussion

surrounding the sock.  Both Mr. Sullivan (who interviewed Ms. Fairstein for his 1992 book) and

Mr. Levy (who worked with her at the DA's office on the case before publishing his book in 1996)

placed Ms. Fairstein in the mix of the discussions regarding DNA:

 a.    Sullivan, pg. 103 (Ex. 17): "Linda Fairstein thought it probable that the semen
       on the sock belonged to someone who had raped Harris."

 b.    Levy, pg. 95 (Ex. 37): "So we had to figure out what had gone wrong here, why
       the DNA results had turned out the way they did, and how to keep the DNA
       results from destroying our case.  **Toward that end, I was asked to work with
       Linda Fairstein**, Lederer's mentor, chief of the District Attorney's Sex Crimes
       Bureau, and a pioneer in the prosecution of sex crimes. . . **Fairstein and I
       sought expert advice and spent a fair amount of time simply talking to each
       other to figure out how to address the DNA problem.**"

109.    Mr. Levy and Mr. Sullivan also provided insight into Ms. Fairstein's and Ms.

Lederer's personalities.  Ms. Fairstein, as the Head of the Sex Crimes Unit, was confident and

hard-charging.  (Ex. 17, Sullivan at 103).   And she was Ms. Lederer's boss, overseeing the prosecution at trial and the strategy on the DNA.  (*Id.*; Ex. 37, Levy at 79.)  Ms. Lederer was described by Mr. Levy as being "visibly shaken" when the DNA results came back negative (Ex. 37, Levy at 70), and the Sullivan book said that Ms. Lederer was "disturbed" by the results.  (Ex. 17, Sullivan at 103.)  This informed my decision to have Ms. Lederer's character appear unsure about the discovery of the new sock evidence.

110.    This scene and dialogue was not intended to show, and I do not believe that it shows, Ms. Fairstein directing Ms. Lederer to conceal the DNA evidence.  Ms. Fairstein is simply stating the fact that the sock can be tested right before trial—because that's when it was found and tested.  Further, in the dialogue in the subsequent scene in which the Fairstein character consults with ADA Lederer on trial strategy after the sock DNA results come back (the Fairstein character advises ADA Lederer to "Deal with the sock DNA"; "play up the cervical DNA") (Ep. 2, at 00:29:45 – 00:32:12), signifying that the "sock DNA" has been disclosed and is something Lederer must "deal with" at trial, which the research showed the prosecution did by "playing up" the cervical DNA as "inconclusive".

111.    The research revealed that the DNA evidence on the sock came back and did *not* match any of the Five or any other known subject.  Significantly, the DNA on the sock also matched the cervical DNA, meaning that the cervical DNA was also not a match.  That moment should have been a pivotal inflection point for the prosecution.  Instead of reconsidering the case against these Five boys for rape, the prosecution made the decision to continue to call the cervical evidence as "inconclusive," despite knowing that it conclusively ruled out the Five.

112.    Professor Saul Kassin, an expert on false confessions, explained the prosecution's strategy in the Burns documentary:

The problem is, once you form a strong belief that somebody is guilty of a crime, the contradictory details are just that. They're details but they're not, they don't fundamentally change our belief in their guilt. **But when the DNA results come back and none of their DNA is present, that should have stopped the investigation in its tracks and they should have at least paused and moved in another direction.**

\*\*\*

It is improbable, given the nature of this crime and the scene, that these boys would not have left a single trace of themselves on the scene or the scene a single trace on them. The improbability of that is striking. **But the decision was we can still prosecute this case. And the argument we will make to the jury is just because we didn't get all of them, doesn't mean we didn't get some of them.** They now created a scenario by which there is a sixth perpetrator—a sixth perpetrator who mysteriously doesn't appear in any of the confessions. But even if they were correct, that sixth perpetrator's absence in their confessions makes the confessions factually incorrect. That should have been the dilemma.

(Ex. 19, Burns Doc. at 1:05:26 – 1:07:06.)

113.    Ms. Burns, Mr. Sullivan and Mr. Levy also described how this strategy played out:

| Source | Passage |
|---|---|
| *Unequal Verdicts: The Central Park Jogger Trials*, by Timothy Sullivan<br><br>(Ex. 17) | Pg. 103<br><br>"Given the disappointing results of the first series of DNA tests, the prosecutors had high hopes for this last chance to link the defendants scientifically with the rape. They were sorely disappointed. The FBI reported that, unlike the semen in the victim's cervix and rectum, the DNA pattern in the semen on the sock *was* strong enough to identify. But it did not match any of the suspects. Worse in one respect was that, unlike the semen on the tights, it didn't match the victim's boyfriend, either.<br><br>The press corps duly noted the inescapable conclusion that at least one guilty party had slipped through the hands of the police and prosecutors. There was little room for dispute on that point. Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris. (The probability was later bolstered by the testimony of a DNA expert that the semen on the sock was 'similar' to the unidentified semen in the victim's cervix.)<br><br>Lederer knew enough about what had happened that night to have already suspected that some of the culprits escaped. She was not convinced, |

| | |
|---|---|
| | however, that this semen belonged to somebody who had penetrated the victim.  It could have come from a kid who masturbated at the scene and wiped himself off on the sock.  Even so, she was disturbed by this irrefutable evidence that her net hadn't caught everybody." |
| *The Central Park Five*, by Sarah Burns<br><br>(Ex. 27) | <u>Pg. 113 – 114</u><br><br>"Special Agent Dwight Adams tested this new semen sample from the sock, but he was not able to provide the evidence against the defendants that the prosecutors were hoping for.  This time, the DNA was strong and clear, and Adams had to run tests on only two of the four genetic locations before being able to definitively rule out each defendant and all the other suspects who'd been tested.  It didn't match the sample from Meili's boyfriend, either.  It did match the cervical swab, which had been too weak to be conclusive before, but now echoed this new, stronger evidence.  The new test proved that someone else had raped the jogger.<br><br>The test was devasting to the prosecution.  They were hoping that it would help to convict their suspects; instead, they could no longer refer to the DNA as inconclusive, a technically accurate description that would let them imply that it could be a match if only they had more information.  Now their expert would have to admit on the stand that it could not possibly have come from any of the defendants or the other young men they had tested from the park that night.<br><br>\*\*\*<br><br>With this setback, the prosecution needed a new strategy.  Yet there is no evidence that anyone considered looking to other suspects or theories of the crime.  Despite a prosecutor's obligation to seek justice, it seems that at that moment, winning the case trumped investigating the evidence.  The incriminating statements by these five teenagers were so convincing to the detectives and prosecutors that no one felt the need to question their conclusions, which had been so easy to jump to in the hours and days after the rape.  In steadfastly sticking to their initial theory of the case, they ignored the fact that in the summer of 1989 there was a serial rapist on the loose, whose crimes took place near where Trisha Meili had been attacked, and who used strikingly similar methods." |
| *And the Blood Cried Out: A Prosecutor's Spellbinding Account of DNA's Power to Free or* | <u>Pg. 94-96</u><br><br>"So when the DNA results came in, Lederer and I began to discuss how we could address this problem.  We dismissed out of hand the possibility of attacking the reliability of DNA testing. . ." |

| *Convict*, by Harlan Levy (Ex. 37) | We also started from the premise that we did have the right guys.  Besides the statements by these defendants, which the jury would hear, there were statements by other suspects, not on trial in the this first case, implicating these defendants, even though they would never make it to the jury because they were hearsay. |
|---|---|
| | So we had to figure out what had gone wrong here, why the DNA results had turned out the way they did, and how to keep the DNA results from destroying our case.  Toward that end, I was asked to work with Linda Fairstein, Lederer's mentor, chief of the District Attorney's Sex Crimes Bureau, and a pioneer in the prosecution of sex crimes. |
| | *** |
| | Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem.  As we did, it quickly became clear to us that the explanation for the results lay not in the complex world of DNA technology but in the simple facts of the crime. |
| | Lederer should focus on developing facts from the case consisting with guilt but explaining the absence of the semen of these defendants.  She should look for facts indicating that these defendants may not have ejaculated.  She should search for evidence suggesting that other young men, never identified, raped the jogger.  And she should look for indications that the hospital's collection of semen was less than ideal and may have missed some DNA that may actually have been present." |

114.    Further, in Ms. Lederer's opening statement in the first trial, she told the jury that the cervical sample was "inconclusive."  (Ex. 18.)  And on direct-examination, the FBI Agent testified that he "chose to call [the cervical sample] a no conclusive result, that is no interpretation would be made because of this one very very faint result and the other blank results."  (Ex. 79 at DEFS014318.)  This is in direct contradiction to what he testified on cross-examination, that the "faint view" of the cervical swab "was sufficient for [him] to see that it's different than the pattern of Antron McCray" and "different from the pattern of any of the other knowns[.]"  (*Id*. at DEFS014336.)

115.    The sources described this testimony by Agent Adams on cross-examination as "a 'revelation, wrested from an FBI expert under cross-examination.'"  (Ex. 17, Sullivan at 147 (quoting *Daily News* article); *see also* Ex. 27, S. Burns at 147.)  According to Sullivan, "the defense team had to hope the jury would feel as misled by the prosecutors as the media did."  (Ex. 17, Sullivan at 148.)

116.    I absolutely believe that the prosecution's approach to and messaging about the DNA evidence being "inconclusive"—including in the opening statement at trial, by at which time they certainly knew otherwise—was misleading and unfair.  Simply put, I believed the prosecution actively misrepresented the DNA evidence to the jury by calling it "inconclusive."

117.    A subsequent scene depicts a conversation between ADA Lederer and Mickey Joseph (defense counsel) in which Mr. Joseph tells Ms. Lederer:   "You saying that the DNA evidence was inconclusive that's not playing fair."  (Ep. 2, 43:53 – 44:32.)  This dialogue was meant to underscore the point that the dramatic moment at the trial revealed.   That the prosecution's attempt to call the DNA evidence "inconclusive" was misleading and not fair.

### *Nancy Ryan Lunch Scene*

118.    Finally, I understand that Ms. Fairstein takes issue with a scene in Episode 4 of the Series depicting an imagined luncheon conversation between Ms. Fairstein and ADA Nancy Ryan. This scene occurs after Ms. Ryan's reinvestigation into the original prosecution based on Matias Reyes' DNA and confession, and the evidence set forth in Ms. Ryan's Affirmation:

> FAIRSTEIN: I'm certainly surprised by this invitation.
>
> NANCY RYAN: [Ryan chuckling] I'm surprised to be making it. I'm here as a courtesy.
>
> FAIRSTEIN: Oh, courtesy is the last thing you're here for.  You're here to gloat.  But it doesn't matter.  You've simply identified a sixth rapist.  I always said there may be more.

NANCY RYAN: You said that to cover because you knew you coerced those boys into saying what they did.

FAIRSTEIN: They said what they said freely.  They confessed.

NANCY RYAN: I actually think you've convinced yourself of that.

FAIRSTEIN: It doesn't really matter what you think.  There's a Police Commission Report coming out in a matter of days that maintains that the five did it.  And that Reyes is simply the one that got away.  It's a 43 page report, compiled by three lawyers named by the Commissioner.

NANCY RYAN: It's the police department investigating itself. Linda, we pored over your confession tapes.  We reconstructed the events of that night minute by minute.  I know what was done.

FAIRSTEIN: Oh, you know nothing.

NANCY RYAN: I know we have a DNA match on Reyes.  His DNA was all over every article of clothing and physical sample we had of her.  Under fingernails where she fought him.  The blood on her was from him.  It was him.  Only him.

FAIRSTEIN: Well, that simply confirms that Reyes ran with that pack of kids.  He stayed longer when the others moved on.

NANCY RYAN: "Final Jeopardy." "Likely To Die." "Cold Hit." And the newest one: "The Deadhouse."  While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit.

FAIRSTEIN: I watched while more than 30 detectives did a brilliant investigation.  We got justice for a woman who was violated in the most gruesome way.  We got justice for a woman who was used and thrown away like garbage.  Those boys did that.  We helped make sure they got what they deserved.  And I'll be damned if I'm gonna lose a wink of sleep over it.  And it's too bad you are.  Thank you for buying the books.  Enjoy.

(Ex. 30, Episode 4 at 1:09:46  – 1:12:41.)

119.   I drafted this scene based on my understanding of the contentious relationship between Nancy Ryan and Linda Fairstein and the women's opposing views on the vacatur of the Five's convictions following Matias Reyes' confession.  This "lunch scene" was intended to be a

coda in which these two antagonists, representing opposing camps, state their position and opinion on this contested chapter in history.

120.     I understand that Ms. Fairstein contends that she did not fight with Ms. Ryan over the original case in 1989, although she does not explicitly deny that she and Ms. Ryan had a contentious relationship.[12]  Multiple sources confirmed the acrimonious relationship and struggle for power between the two ADAs:

| Source | Passage |
|---|---|
| *The Central Park Five* by Sarah Burns<br><br>(Ex. 27) | Pg. 36<br><br>"Fairstein was part of District Attorney Robert Morgenthau's inner circle, but she had a history of contentious relationships with the other high-ranking women within his office, including Nancy Ryan, the deputy chief of the Trial Division and another of Morgenthau's protégées. Ryan also heard about the rape that morning, and she began her day by assigning the case to homicide prosecutor Peter Casolaro. Fairstein was soon in Ryan's office, ready to do battle for the case.  She argued that since the victim was still alive, the case should not be assigned to a homicide prosecutor, saying that her team was well up to the task. Ryan backed down and let Fairstein take the case."<br><br>Pgs. 188-189<br><br>"Nancy Ryan, the very same assistant district attorney who had originally wanted to try the Central Park Jogger case before Linda Fairstein wrested it away for her Sex Crimes Prosecution Unit, was assigned to reinvestigate Reyes' explosive confession and whether it had any impact on the convictions of the Central Park Five.  The media loved to play up the supposed rivalry between Ryan and Fairstein, and some saw Ryan's involvement in the reinvestigation as an opportunity to get even with Fairstein for stealing the case out from under her in 1989." |

---

[12] I also attempted to interview Ms. Ryan for the Series, but she declined.

| | |
|---|---|
| *Unequal Verdicts*, by Timothy Sullivan<br><br>(Ex. 17) | Pg. 21<br><br>"When Fairstein heard that Ryan had assigned the Central Park case as a homicide, she rushed to her colleague's office, ready for a turf war.  The woman was not dead, said Fairstein, but she was very obviously the victim of a rape.  Moreover, she continued, Lederer had proven time and again her ability to establish firm relationships with victims and their families, which would undoubtedly become crucial in this case." |
| "Detectives Blast Morgenthau Review," *N.Y. Post* (Dec. 6, 2002)<br><br>(Ex. 90) | "The DA's new investigation was headed by prosecutor Nancy Ryan, whom Morgenthau had passed over for the original prosecution in favor of his then-sex-crimes chief, Linda Fairstein.  Law-enforcement sources charge Ryan still had an ax to grind with Fairstein and aimed the new probe at dismantling her case. The sources pointed out that Ryan never interviewed Fairstein or Elizabeth Lederer, who handled courtroom duties for the case. . . . Fairstein urged the judge to order hearings on the case, in which Reyes and the five young men could be compelled to testify.  'I think Reyes is lying, and I think there's a next step,' Fairstein said. 'The public is entitled to have this version of events tested in a public courtroom. He's been questioned; he's never been cross-examined.'" |

121.    Michael Warren also explained to me how the relationship between Ms. Fairstein and Ms. Ryan impacted the reinvestigation:

> [Ms. Fairstein] and Nancy never really liked each other.  And Nancy knew how dirty the case was I think.  She kept a lot of things to herself, and the reinvestigation, once she got involved with the reinvestigation it just reaffirmed to her a lot of things, that she had suspected before.  And so Fairstein was trying to control Morgenthau.  And she said don't let Nancy do this.  Let somebody else do it that she could control.  Morgenthau said no, Nancy gonna do it.

(Ex. 39A at DEFS007036-37.)   Mr. Warren described Ms. Ryan as a "[g]ood prosecutor, aggressive prosecutor, but a straight shooter."   In contrast, he described Ms. Fairstein, whom he knew, as a "vicious, overboard, opportunistic individual who would do anything to satisfy her appetite for vindictiveness as a sex crimes prosecutor."  (*Id*. at DEFS007037-38.)

122.     Ms. Fairstein does not contend, and could not seriously contend, that her dialogue in this scene is inconsistent with her actual views on the guilt of the Five, which she holds to this day.  While I was writing this scene on or about June 2, 2018 (and reflected in dated scripts produced in discovery), I reviewed several sources Ms. Baker provided to me that same day.  (Ex. 81.)  Those sources, some of which I had previously reviewed, describe Ms. Fairstein's adamant belief that the original investigation and prosecution was sound and that the Five participated in the rape of Trisha Meili:

  a. Ms. Fairstein's interview with Jeffrey Toobin in The New Yorker in 2002:  "'I think Reyes ran with that pack of kids.  He stayed longer when the others moved on.  He completed the assault.  I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night but in the attack on the jogger.  I watched more than thirty detectives—black, white, Hispanic guys who'd never met each other before—conduct a brilliant investigation.'"  (Ex. 25.)

  b. Ms. Fairstein's Interview with Don Imus' talk show in 2014: "I think that these men were participants in the attack on the jogger as charged."  (Ex. 26A-B.)

  c. Articles in which Ms. Fairstein expresses her disbelief of  Reyes' confession that he raped the jogger alone:

    i. Andy Geller and Neil Graves, "New Jogger Twist – Silent Witnesses to Gang Attack Back Verdicts," *N.Y. Post* (Dec. 2, 2002): "Reyes, 33, claims he knocked the jogger down with a tree branch on the night of April 19, 1989.  But Fairstein said, 'I didn't know we had redwoods in Central Park.  That's the only kind of tree that could take her down and cause the kind of injury she sustained—not a tree branch.'"  (Ex. 91.)

    ii. Andy Geller, "Why Reyes Admitted Rape: Bid to Win Protection from a Jogger Con," *N.Y. Post* (Dec. 5, 2002):  "'She was running a 7 ½ minute mile.  I don't believe for a minute he could have caught up with her,' [Ms. Fairstein] said."  (Ex. 92.)

123.     Other sources I had previously reviewed also confirmed Ms. Fairstein's position on the Five's guilt:

a. Ex. 19, Burns Documentary at 1:50:48 – 1:51:14: Journalist Lynell Hancock states that "Linda Fairstein made a huge name for herself in part because of this case. It was extremely important to her profession and her reputation. So she's got a lot to lose by saying, 'I got everything wrong' and 'I railroaded these kids into jail.'" (Over Hancock's voiceover is a chyron with Ms. Fairstein's statement to Mr. Toobin that "Reyes ran with that pack of kids[.]")

b. Ex. 27, Burns Book:

    i. 188-189: "In 2002, Linda Fairstein retired from her career as a prosecutor and focused on writing a series of novels featuring a sex crimes ADA, but she continued to share her thoughts on the case with the media, remaining steadfast in promoting the guilt of the Central Park Five."

    ii. 201-202: "The reversal of the convictions outraged many of those who were invested in the guilt of the Central Park Five. . . Linda Fairstein, who had assigned her deputy Elizabeth Lederer to prosecute the original convictions, was furious. 'It's completely outrageous—unbelievable that you're going to overturn these convictions without a hearing,' she said. 'I think that Reyes ran with that pack of kids. He stayed longer when the others moved on. He completed the assault,' Fairstein explained. 'I don't think there's a question in the minds of anyone present during the interrogation process that these five men were participants . . . in the attack on the jogger.' Fairstein also disparaged the district attorney's reinvestigation for excluding her. 'I've never been interviewed or invited to discuss the case,' she said of their investigation. 'I'm puzzled by it. I've made myself available, but it hasn't happened.'"

    iii. 203-204: "And though the convictions were vacated, erased in the court system as if they had never existed, the media coverage that told the new story was nowhere near as noisy as the original reporting had been. The *Daily News* and the *Post* published articles citing Linda Fairstein and NYPD officials defending the original convictions, so much of the information that was printed hardly broadcasted their innocence."

c. Various news articles discussing Ms. Fairstein's continued belief in the Five's guilt:

    i. Ex. 51, Jim Dwyer and Kevin Flynn, "New Light on Jogger's Rape Calls Evidence Into Questions," *N.Y. Times* (Dec. 1, 2022): "Other former and current law enforcement officials, including police detectives and Linda Fairstein, the chief of the Sex Crimes Unit—**who oversaw the**

**prosecution when she was a member of the district attorney's office**— continue to hold that the teenagers managed to have some contact with the jogger, and perhaps ran the jogger off the path, starting the assault that Mr. Reyes finished."

ii. Ex. 93, Barbara Ross, Robert Ingrassia, "Joy and Rage over Jogger 5 Morgy's decision clears them of all charges," *N.Y. Daily News* (Dec. 6, 2002): "Fairstein – whose work on the case had been one of the high points of her prosecutorial career – said the credibility of the system is at stake and that Reyes' account needs to be tested in open court. 'The internal inconsistencies in his story are extraordinary,' said Fairstein, a longtime rival of Ryan in the district attorney's office. 'Here we just have Nancy Ryan saying, 'I believe him.'"

iii. Ex. 94, Ron Stodghill, "True Confession of the Central Park Rapist," *TIME* (Dec. 9, 2002): "Fairstein continues to insist that the new evidence 'does not exonerate the other five, who by their own admissions participated in her attack by holding her down and striking her to the ground.'"

124.    Knowing that her own dialogue is amply supported, Ms. Fairstein instead challenges this scene based on Ms. Ryan's dialogue. I understand Ms. Fairstein's position is that Ms. Ryan's dialogue—"you knew you coerced those boys into saying what they did. . . . we pored over your confession tapes. We reconstructed the events of that night minute by minute. I know what was done"—implies that Ms. Ryan's investigation determined that Ms. Fairstein directed the police and had a hand in securing the confessions.

125.    In drafting this scene, I drew from Ms. Ryan's Affirmation submitted in support of vacating the convictions which I also read as seriously calling into question the original investigation and prosecution. In addition to pointing out the facts corroborating Reyes' confession, the problems with the timeline of events, and that "the defendants' statements about the rape could not be corroborated by DNA evidence" (Ex. 21, ¶¶ 86, 95-96, 98, 104), the Affirmation set out the "significant weaknesses" and "troubling discrepancies" in the Five's video

confessions and statements.  These materials "differed from one another on the specific details of virtually every major aspect of the crime."  (*Id.* ¶ 86.)  They "were not corroborated by, consistent with, or explanatory of objective, independent evidence" (*id.* ¶ 91); "some of what they said was simply contrary to established fact" (*id.*); and "[p]erhaps most significant, none of the defendants accurately described where the attack on the jogger took place" (*id.* ¶ 97).

126.    Not only did the Ryan Affirmation call out the "troubling discrepancies" in the confessions but also the process by which they were obtained:

> a.  "Each of the defendants was questioned by detectives and made one or more statements. . . . None of them admitted actually raping the Central Park jogger, but each gave an account of events in which he made himself an accomplice to the crime."  (*Id.* ¶ 10)

> b.  "Kharey Wise was 16 years old at the time; Yusef Salaam and Antron McCray were 15; and Kevin Richardson and Raymond Santana were 14."  (*Id.*)

> c.  "While all of the defendants began by denying knowledge of the attack, each ultimately made himself an accomplice in a terrible crime."  (*Id.* ¶ 83)

> d.  "[Raymond Santana's] first substantial written statement deals only with other events; but just an hour and twenty minutes after he signed it, after further, continuous questioning, an addendum described the jogger attack."  (*Id.* ¶ 115)

127.    I believed that having found the confessions were false, and specifically noting the youth of the Five and that they only implicated themselves in the attack after repeated interrogation, Ms. Ryan was conveying that the confessions had to be the product of some form of coercion.  That is what I absolutely believe to be true based on my conversations with the Five.

128.    As I have discussed above in connection with the "no kid gloves" scene, Ms. Fairstein does not complain in this lawsuit that the Series' depictions of the Five being coerced by detectives is false.  Her complaint, as I understand it, is that she had no personal responsibility for those coercive interrogations.  While the Series did not put the Fairstein character in the room

where this abuse was taking place, I firmly believed, based on our source material, that Ms. Fairstein controlled the detectives (Ex. 39A, Warren), was "present" and personally vouched for the interrogation process (Ex. 25, Toobin).  Beyond that, she also took Korey to the crime scene along with Detective Sheehan to obtain admissions from him that were then used in his video confession.  (Ex. 27, Burns at 51-54; Ex. 49, Bouton.)  As the Ryan Affirmation points out, "Wise had been taken to the scene prior to his videotaped statements" and "none of the defendants accurately described where the attack on the jogger took place. With the exception of Kharey Wise, who had been to the scene[.]"  (Ex. 21, Affirmation at ¶¶ 92, 97.)

129.    In addition to having the power to control the police in advising them while she was at the precincts and at the crime scene, I believed that Ms. Fairstein was ultimately responsible for the coercive interrogations as Head of the Unit that prosecuted the case and was on the scene at a critical time in the investigation.  Based on the dated draft scripts, I added this scene to the Episode 4 script on June 2, 2018.  Emails confirm that Ms. Baker sent me a number of news sources that same day, including a *New York Times* article featuring an interview with DA Morgenthau himself, who identified Ms. Fairstein—not Ms. Lederer or anyone else—as responsible for the "mistake" in prosecuting the Five based on the "confessions":  "'Did I feel badly?' he said.  'Yeah, I felt badly.  We had screwed up.  But there were confessions.'  'I had complete confidence in Linda Fairstein,' he continued, referring to the prosecutor who supervised the case.  'Turned out to be misplaced.  But we rectified it.'"  (Ex. 50, Leland.)

130.    Accordingly, based on my sources, Ms. Fairstein, as the highest ranking public official and defender of the interrogations, bore personal responsibility for the coerced confessions, along with the detectives who were in the room.  I believed the Ryan character's dialogue attributing the confessions to "you" captured the essence of the truth.  The dialogue conveys, in a

fiery manner (apropos of the fraught relationship between the two women) the Five's (and our) views of the system's failure on Plaintiff's watch and massive blind spots in continuing to defend the convictions and cast the Five as rapists.

131.    I also included my opinions as a filmmaker making work that asserts the perspective of the Five and their families.  In this scene as a literary device and metaphorical confrontation the,  dialogue speaks to her continued insistence that they are guilty.  Again, this was a project from the perspective of the Five men and the goal of the entire Series was to give the men the voice because they had been denied the opportunity to tell their stories for so long.

## *Marketing and Promotion of the Series as "Based on a True Story"*

132.    I worked with Netflix on the marketing and promotion of the Series, as I do with all my projects.  Prior to making my first film, I worked as a film publicist and I enjoy being involved in the process of positioning the show or film to the public.

133.    From the start, the Series was promoted as a scripted dramatization based on a true story from the men's perspective.  The men's truth, which I absolutely believe, is that they are innocent of the rape of Trisha Meili and that they were railroaded by a corrupt system.  Netflix's initial press release in July 2017 described the Series as "[b]ased on the true story that gripped New York and the world, the series will be a five-episode limited, scripted series that exposes the breakdown of the our criminal justice system at every phase of the notorious Central Park Five case" and will "focus intimately on the five young men" who were wrongfully convicted of a crime they did not commit.  (Ex. 83, Press Release.)

134.    As part of the marketing campaign for the Series, Netflix worked with a third-party vendor to create a short teaser video announcing the title of the Series and the launch date.  A

teaser is meant to give audiences a glimpse of the Series.  I reviewed cuts of the teaser and provided Netflix with comments and suggestions.

135.    The final teaser that was released by Netflix on March 1, 2019 includes a voice-over of the Linda Fairstein character's dialogue from the Police Briefing scene, discussed above: "Let's get an army of blue up in Harlem.  You go into those projects and you stop every little thug you see.  You bring in every kid who was in the park last night."  Felicity Huffman, who played Ms. Fairstein, is not seen in the teaser, it is only a voice-over.  The teaser includes a frame stating "Based on the true story of The Central Park Five."  (Ex. 84 at 50 second mark.)

136.    I asked Netflix to use this dialogue in the teaser.  I thought that the juxtaposition of Ms. Fairstein's dialogue with Ms. Salaam's dialogue[13] perfectly encapsulated one of the central themes the Series explores—when the criminal justice system sees Black teenage boys they see someone to be protected from, not someone deserving of protection.  Showing two opposing sides—on one hand a mother trying to protect her son as an innocent child, and on the other, a representative of the criminal justice system trying to put him away as a criminal—is what the whole series is about.  Moreover, as discussed above (¶¶ 79-94), I believed that the essence of this scene is supported by the research.

137.    Netflix also released a longer trailer for the Series on April 19, 2019—the 30-year anniversary of the attack on the Central Park Jogger.  I reviewed cuts of the trailer before it aired. The final trailer features video clips and voice-overs from nearly all of the main characters in the Series, including the prosecution and defense attorneys.  Ms. Fairstein is not featured in the trailer more prominently than any other character.  The trailer includes a frame stating "Based on the true story of The Central Park Five."  (Ex. 85 at 1:35 mark.)

---

[13] Ms. Salaam's dialogue in the teaser illustrates her love and concern for her son:  "You watch them grow and you start to think you did a good job, and then one night you look away."

138.    The trailer first introduced the tagline:  "The story you know is the lie they told you."  This tagline was created for Netflix by a third-party vendor.  The tagline represents the theme of the Series—the story the public knows is what they were told by the police, prosecutors and media, that the Five are guilty of the rape.  That is a lie because the Five are innocent of the rape.

139.    I understand that Ms. Fairstein takes issue with other marketing and promotion by Netflix and myself as referring to the Series as a "true" story.  Ms. Fairstein takes these statements out of context.  The truth being referred to is always the Five's truth, that they are innocent.

140.    I did not intend for audiences to believe that every frame, every piece of dialogue in the Series is the literal truth, nor do I believe that any viewer would actually come away with that impression after watching the Series, which clearly is a scripted narrative drama.  The landing page for *When They See Us* on Netflix's streaming service contains this synopsis:  "Five teens from Harlem become trapped in a nightmare when they're falsely accused of a brutal attack in Central Park.  Based on the true story."  (Ex. 48.)

141.    That said, the Series is based on extensive research and to the extent that certain comments I made in interviews or on social media referenced our research, it was because we honestly endeavored to tell the story from the Five's perspective in the form of a drama and within the framework of what we believed was true based on our research.

## Post-Release

142.    In November 2018, I became aware that Ms. Locke posted a series of tweets about the Mystery Writers of America's decision to give Ms. Fairstein an award.  Prior to these tweets I had never heard of the Mystery Writers of America and I did not communicate with Ms. Locke

before she posted these tweets.  I spoke with Ms. Locke briefly after she sent the tweets so that I could understand what had happened.  I had no further involvement with the issue.

143.    Following the release of the Series, I became aware that Ms. Fairstein was facing backlash on social media and in the press regarding her involvement in and views on the Central Park Jogger case, and eventually was dropped from her publisher and resigned from several boards.

144.    I did not speak with anyone at Ms. Fairstein's publisher, talent agency or any of the organizations from which she resigned.  I received one text message from an acquaintance who sat on the Board at Safe Horizon, a non-profit from which Ms. Fairstein resigned.  I did not even know that this person was on the Board, and I did not respond.

145.    I understand that Color of Change, a social activist organization, created an online petition after the Series was released seeking to have Simon and Schuster cancel its publishing contract with Ms. Fairstein.  I was not involved with Color of Change's petition.  To my knowledge no one from Netflix was involved either.  I know the executives at Color of Change on a professional basis and believe they do important work on systemic reforms and education in the criminal justice system.  Netflix and Participant Media worked with Color of Change on a social impact campaign for the Series targeted at education and prosecutorial reform generally.  Color of Change's petition was separate from that social impact campaign.

146.    One of my goals in creating the Series was to call attention to the injustices happening within the criminal justice system and highlight the tragedies suffered by the Five men and their families.  As a society we must learn from our mistakes so that they never happen again. If we keep showing and telling and sharing these stories I believe we get to a place where people will be intolerant of what is happening and demand change.

147.    I did not know anything about Linda Fairstein before I started my research for the Series.  It was never my goal to target or "cancel" Ms. Fairstein.  The Series was about telling the story of these five honorable men and their families from their perspective, and based on our research and sources.

148.    I was gratified that this project had the power to open people's eyes to the miscarriage of justice these men suffered, and I was pleased for Korey, Raymond, Yusef, Kevin and Antron, who were failed by the criminal justice system, and its leaders, as children.  And, on a personal level, I believe it is wrong that Ms. Fairstein has never taken any responsibility for the men's wrongful convictions.  I believe that the system, and powerful prosecutors like Ms. Fairstein, should be held accountable for wrongfully convicting the Five as children.  Ms. Fairstein has never once apologized, and to this day, maintains her belief that they are guilty.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2022

DocuSigned by:

C75EC43C681D410...

Ava DuVernay