**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

LINDA FAIRSTEIN,         )
           )
      Plaintiff,     )
           )   Case No. 20-cv-8042 (PKC)
     v.        )
           )
NETFLIX, INC., AVA DUVERNAY, and )
ATTICA LOCKE,      )
           )
      Defendants.   )
           )

**PLAINTIFF LINDA FAIRSTEIN'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**NESENOFF & MILTENBERG, LLP**

**Kara L. Gorycki**
**Andrew T. Miltenberg**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**kgorycki@nmllplaw.com**
**amiltenberg@nmllplaw.com**

*Attorneys for Plaintiff Linda Fairstein*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 4

I.    The Targeting of Fairstein in the Marketing and Promotion of the Series ..................... 4

II.   The Writers Knew Fairstein Prior to Starting Work on the Series................................. 6

III.  Defendants Avoided and Ignored Contradictory Sources.............................................. 6

  A.  The Central Park Jogger Testimony ........................................................................ 6

  B.  Deposition Testimony From the Five's Civil Action Against New York City.............. 11

     1. Lederer's Deposition Testimony  ................................................................... 11

     2. Fairstein's Testimony ..................................................................................... 11

  C.  Defendants' Sources .............................................................................................. 15

ARGUMENT .................................................................................................................... 16

I.    The Applicable Legal Framework.............................................................................. 17

  A.  The Actual Malice Standard................................................................................... 17

  B.  Falsity Must Be Established.................................................................................... 20

  C.  There Is A Question About Defamatory Meaning ................................................... 21

II.   A Reasonable Jury Would Find Clear and Convincing Evidence That Defendants Acted With Actual Malice in Falsely Depicting Fairstein in the Five Scenes................................... 21

  A.  Defendants Avoided and Ignored Contradictory Information ...................................... 22

  B.  Each of the Five Scenes is the Product of Actual Malice .............................................. 24

     1. Scene 1: Manipulating Timeline to Pin the Rape on the Five ................................ 115

     2. Scene 2: Instructions to Investigate Young Black Males ........................................ 30

     3. Scene 3: Instructions to Coerce Testimony by Treating Minors As Adults ............. 35

     4. Scene 4: Concealing the DNA-Marked Sock from Defense Counsel ...................... 39

     5. Scene 5: Nancy Ryan Accuses Fairstein of Coercing Confessions .......................... 43

III.  Defendants Misconstrue the Subsidiary Meaning Doctrine........................................... 46

IV.   Netflix Should Remain in the Action............................................................................ 47

V.    Locke Should Remain in the Action ............................................................................ 48

VI.   The Conspiracy Claim Should Not Be Dismissed ........................................................ 49

CONCLUSION................................................................................................................. 50

i

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242  (1986) ................................................................ 17, 18

*Baiul v. Disson,*
607 Fed. Appx. 18 (2d Cir. 2015)............................................... 27

*Berisha v. Lawson,*
973 F.3d 1304 (11th Cir. 2020) .............................................. 46, 48

*Celle v. Filipino Reporter Enters.,*
209 F.3d 163 (2d Cir. 2000) ................................................ passim

*Church of Scientology v. Behar,*
238 F.3d 168 (2d Cir. 2001) ....................................................... 46

*Corporate Training Unlimited, Inc. v. Nat'l Broadcasting Co.,*
981 F. Supp. 112 (E.D.N.Y. 1997)............................................. 27

*Curtis Publishing Co. v. Butts,*
388 U.S. 130 (1967) ................................................................... 16

*Davis v. Costa-Gavras,*
654 F. Supp. 653 (S.D.N.Y. 1987) ..................................... 18, 19, 23

*De Havilland v. FX Networks, LLC,*
21 Cal. App. 5th 845 (Cal. Ct. App. 2018)................................. 40

*DiBella v. Hopkins,*
403 F.3d 102 (2d Cir. 2005) ...................................................... 20

*Dworin v. Deutsch,*
2008 WL 508019 (S.D.N.Y. 2008) ............................................ 26

*Fodor v. Berglas,*
1995 WL 505522 (S.D.N.Y. Aug. 24, 1995)............................... 48

*Gaprindashvili v. Netflix, Inc.,*
   2022 WL 363537 (Jan. 27, 2022) ........................................................................ 19, 22

*Gertz v. Robert Welch, Inc.,*
   680 F.2d 527 (7th Cir. 1982) ...................................................................................... 22

*Goldman v. Reddington,*
   417 F. Supp. 3d 163 (E.D.N.Y. 2019) ..................................................................... 7, 23

*Goldwater v. Ginzburg,*
   414 F.2s 324 (2d Cir. 1969) ................................................................................... 17, 22

*Harte-Hanks v. Connaughton,*
   491 U.S. 657 (1989) ....................................................................................... 20, 22, 33

*Herbert v. Lando,*
   781 F.3d 298 (2d Cir. 1986) ................................................................................. 46, 47

*Hutchison v. Proxmire,*
   443 U.S. 111 (1979) .................................................................................................... 17

*James v. Degrandis,*
   138 F. Supp. 2d 402 (W.D.N.Y 2001) ................................................................... 46, 47

*Love v. William Morrow & Co.,*
   193 A.D.2d 586 (2d Dep't 1993) ........................................................................... 35, 48

*Lovingood v. Discovery Communications,*
   800 Fed. Appx. 840 (11th Cir. 2020) ..................................................................... 18, 20

*Masson v. New York Magazine, Inc.,*
   960 F.2d 896 (9th Cir. 1992) ...................................................................................... 22

*Masson v. New Yorker Magazine, Inc.,*
   501 U.S. 496 (1991) .................................................................................................... 20

*Mzamane v. Winfrey,*
   693 F. Supp. 2d 492 (E.D. Pa. 2010) ......................................................................... 22

*N.Y. Times v. Sullivan,*
  376 U.S. 254 (1964) ................................................................................ 3, 16, 40

*Palin v. N.Y. Times Co.,*
  482 F. Supp. 3d 208 (S.D.N.Y. 2020) ............................................................ passim

*Reid v. Viacom Int'l,*
  2016 WL 11746046 (N.D. Ga. Sept. 14, 2016) ................................................ passim

*Reid v. Viacom Int'l,*
  2017 WL 11634619 (N.D. Ga. Sept. 22, 2017) ................................................ passim

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) ...................................................................................... passim

*Stern v. Cosby,*
  645 F. Supp. 2d 258 (S.D.N.Y. Aug. 12, 2009) ...................................................... 21

*Street v. Nat'l Broadcasting Co.,*
  645 F.2d 1227 (6th Cir. 1981) ............................................................................ 16

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,*
  330 F.3d 1110 (9th Cir. 2003) .............................................................................. 5

*Thoroughbred Legends, LLC v. The Walt Disney Co.,*
  2008 WL 616253 (N.D. Ga. 2008) ........................................................................ 19

*U.S. Dominion Corp. v. Powell,*
  554 F. Supp. 3d 42 (D.D.C. 2021) .................................................................... 5, 46

*Weiner v. Doubleday,*
  74 N.Y.2d 586 (1989) ........................................................................................ 48

*World Boxing Council v. Cosell,*
  715 F. Supp. 1259 (S.D.N.Y. 1989) .................................................................... 23

# INTRODUCTION

*When They See Us* (the "Series") is a Netflix, Inc. ("Netflix") original limited series, collectively developed and written by Defendants Netflix, Ava DuVernay ("DuVernay") and Attica Locke ("Locke"),[1] which addresses the arrests, trials and convictions of five young men of color—Kharey (aka Korey) Wise ("Wise"), Raymond Santana ("Santana"), Kevin Richardson ("Richardson"), Yusef Salaam ("Salaam") and Antron McCray ("McCray") (collectively "The Five"), who were accused of beating and raping female jogger, Patricia Meili ("Meili"), in addition to rioting with more than twenty other young men, and attacking seven other victims in New York City's Central Park (the "Park") on April 19, 1989.[2] The case is known as the "Central Park Jogger" case. The Series further addresses the 2002 vacatur of the convictions after Matias Reyes ("Reyes") confessed to the rape.[3] Linda Fairstein ("Fairstein" or "Plaintiff"), as portrayed by actress Felicity Huffman, is featured in three episodes of the four-part Series using her real name. At the time of the Central Park Jogger Case, Fairstein was the head of the Manhattan District Attorney's Sex Crimes Unit.

Defendants marketed and promoted the Series as a true story.[4] Per notes taken by a Netflix executive at a meeting with DuVernay, the Series was to be a "reckoning" for Fairstein's "prosecutorial misconduct." Shortly before the Series aired, DuVernay messaged Locke that

---

[1] Collectively they will be referred to herein as "Defendants." Defendants' appendix exhibits will be cited herein as "DX." Plaintiff's appendix exhibits will be cited as "PX." Defendants' Memorandum of Points and Authorities will be cited herein as "Moving Br."

[2] *See* DX-21, Ryan Aff. (Dec. 5, 2002), ¶ 109 ("the other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured"); ¶ 117 ("[i]n the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements all placed Wise at the scene of earlier incidents."); ¶ 117("In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape.")

[3] *See* DX-30.

[4] Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Pltf R56 Resp.") ¶ 207.

Fairstein "'bout to feel it all."[5] The Series, which depicts Fairstein in a false and defamatory manner, was released on May 31, 2019, and continues to stream on Netflix.

Fairstein served as the head of the Sex Crimes Unit from 1976 until 2002.[6] As noted in a 1990 *New York Times* article that was part of Defendants' research materials for the Series, in or around 1986, Fairstein's "name became a household word" due to the Robert Chambers case. Per one former director of the American Civil Liberties Union, Fairstein was known to be "strongly moral, she so strongly wants the system to treat people equally.... If there were more people like her it would be an infinitely juster system."[7] Fairstein received a multitude of prestigious honors and awards during her legal career (as well as personally). Apart from her work as the head of the Sex Crime Unit, Fairstein had a distinguished and successful career as a prolific, internationally best-selling crime novelist and author of twenty-four published books. For decades, Fairstein served on a number of nonprofit boards, including *Safe Horizon*, *Joyful Heart Foundation*, and *God's Love We Deliver*. After the Series aired, Fairstein lost her publishing contracts, her literary agent and was forced to resign from the many nonprofit boards of which she was a member. In March 2020, she filed this lawsuit, alleging claims for defamation *per se*, defamation *per quod* and conspiracy to defame against the Defendants.

Defendants previously moved to dismiss Fairstein's complaint in its entirety, which the Court denied. *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48 (S.D.N.Y. 2021). The Court permitted Fairstein to proceed on her defamation and conspiracy claims with respect to five scenes which depict Fairstein "orchestrating acts of misconduct." *Id.* at 58 (the "Five Scenes"). *See infra* Point II.B. The Court further determined that the "average viewer could conclude that these scenes have

---

[5] Pltf. R56 Resp. ¶ 223-224.
[6] Fairstein's full biography is detailed in the Declaration of Linda Fairstein, dated November 29, 2022 ("Fairstein Decl. (11/29/22)").
[7] *See* Pltf. R56 Resp. ¶ 75."

a basis in fact and ***do not merely reflect the creators' opinions about controversial historical events***." *Id.* (emphasis added). Defendants now move for summary judgment.

A reasonable jury would find clear and convincing evidence that Defendants acted with actual malice in falsely portraying Fairstein in each of the Five Scenes. Defendants' motion mischaracterizes the evidence and misstates the law and facts. Defendants deflect from, and dismiss, Fairstein's defamation claims as a mere misunderstanding of how filmmaking works, and attempt to filter their conceived falsehoods through the lens of docudrama—a genre which they incorrectly argue is entitled to heightened protection. This strategy is necessary because Defendants ***cannot specify a single source which factually supports the Five Scenes***. Instead, they point to generalized statements about Fairstein from which they purportedly formulated beliefs in order to "invent" the scenes in question. It is also clear that Defendants avoided and ignored sources—in their own research materials—containing information that contradicted their portrayal of Fairstein in the Series. Defendants contend that they had "no doubt" that their portrayal of Fairstein was "the essence of truth." This is not the standard set forth in *New York Times v. Sullivan* which, as discussed below, Plaintiff can easily meet with clear and convincing evidence.

Defendants contend that they are entitled to additional protections at the summary judgment stage of this action, because "Plaintiff's lawsuit has implications far beyond this case" in terms of its chilling effect on free speech. Moving Br. at 3. Yet this case—which should go to trial—is also immensely important for those who have been "cancelled," silenced, and ostracized as a result of targeted, coordinated campaigns by filmmakers like Defendants who market their defamatory, "invented" works as the truth and improperly seek to shield themselves with the First Amendment. *See St. Amant v. Thompson,* 390 U.S. 727, 732 (1968) ("Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or

further proliferation.") It is Defendants—not Fairstein—who have acted in bad faith and intended significant harm to Fairstein through their false and defamatory portrayal of her in the Series, as evidenced in their "unvarnished" emails, messages, notes, testimony and public statements.[8]

As fully set forth below, Defendants' motion should be denied in its entirety and the case should proceed to trial.

**STATEMENT OF FACTS[9]**

**I.  <u>The Targeting of Fairstein in the Marketing and Promotion of the Series</u>**

Netflix ██████████████ in the Series. PX-138; PX-137, Engel Dep. 19:5-7, 26:1-9. By July 2, 2019, Netflix determined ███████████████████████████████████ ██ PX-137, Engel Dep. 26:10-27:6. The evidence shows:

- Netflix and DuVernay marketed and promoted the Series as a true story. *See* Pltf. R56 Resp. ¶ 207.[10] Netflix's social media strategy for the Series included ████ ████████████████████████." *Id.* ¶ 207. Netflix's PR strategy for the Series included ██████████████████████████████████████[11] *Id.* Netflix's marketing strategy was to "hit people on 3 levels" including "confronting viewers with the truth (for activists)." *Id.* Netflix's Communications Plan for the Series ██████████████████████████████████ *Id.* Netflix's *When They See Us* Twitter account describes the Series as the "***true story*** of the boys they called the Central Park Five." *Id.* DuVernay and Locke also promoted the Series as a true story on Twitter. PX-256, PX-259, PX-92, PX-103.

- Netflix agreed to announce the casting of Fairstein's role in the Series together with the casting of the roles of Korey Wise and Antron McCray, per DuVernay's instruction that the announcement provide "[t]he first glimpse of the boys with the woman who put them behind bars." Pltf. R56 Resp. ¶ 223.

- DuVernay later "threw down" when Netflix debated with her over the use of Fairstein's voiceover in the teaser video for the Series. *Id.* ¶ 211. Netflix ultimately agreed to use the voiceover of Fairstein ordering a roundup. *Id.* Netflix advised DuVernay and others to promote the teaser on social media as "The truth you haven't heard." *Id.* ████ ████████████████████████████████████████ *Id.* ¶ 224.

---

[8] Pltf. R56 Resp. ¶¶ 223-224.
[9] The Statement of Facts is cited herein as "SOF."
[10] DuVernay admittedly worked with Netflix on marketing and promoting the Series and drew on her prior experience as a film publicist in doing so. DuVernay Decl. ¶ 132.
[11] The Series was originally slated for five episodes rather than four. DuVernay Decl. ¶ 25.

- Netflix and DuVernay also included Fairstein's voiceover of the roundup order in the Series' trailer. Fairstein is also pictured in the sequence in which the viewer sees the Series tag line "THE STORY YOU KNOW/IS THE LIE/THEY TOLD YOU." *Id.* ¶ 214. The marketing strategy for the trailer was to leave people "emotionally charged, angry and activated." *Id.* ¶ 224.

- Netflix's Communication Plan, which pre-dated the release of the Series included ███████████████████████████████████████████████████████████ *Id.*

- Netflix and DuVernay worked with Color of Change, an activist organization, on a "social impact campaign" that targeted Fairstein via social media. *Id.*

- Netflix tracked how viewers reacted to Fairstein's character in the Series by monitoring Twitter. A June 2019 report noted that "anger towards Linda Fairstein" was a "top conversation driver" for the Series. *Id.*

- In June 2019, Color of Change provided Netflix with a letter of endorsement for a Peabody Award for the Series. The letter stated "[t]he series inspired audiences to hold lead prosecutor Linda Fairstein accountable for her role in accusing and convicting [the Five]. Viewers started the hashtag #CancelLindaFairstein, which resulted in Fairstein resigning from several nonprofit boards and ending ties with ICM Partners…Dutton…announced they will no longer publish books by Fairstein." *Id.* The Series received a Peabody Award. *Id.*

- While Locke was not involved in directly marketing and promoting the Series, she attacked Fairstein on social media after learning that Fairstein was to receive a Grand Master award from Mystery Writers of America. Locke made false statements about Fairstein—purportedly grounded in her work for the Series—to demand the withdrawal of Fairstein's award. This got noticed by DuVernay and the producers of the Series. ¶ 203. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ *Id.* ¶ 223.[12]

Defendants clearly stood to benefit from using their false portrayal of Fairstein to promote the Series.

---

[12] The evidence discussed in this section supports an inference that Defendants had financial motives to defame Fairstein. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003) (finding "sufficient circumstantial evidence of a financial motive to support the ultimate conclusion of actual malice"); *U.S. Dominion Corp. v. Powell*, 554 F. Supp. 3d 42, 64 (D.D.C. 2021) (defendants' motives to raise public profiles and profit from defamatory statements supported allegations of actual malice).

## II.   The Writers Knew Fairstein Prior to Starting Work on the Series

DuVernay, Locke and Swicord—who wrote the Series—knew about Fairstein **prior to** starting their work. Pltf. R56 Resp. ¶ 228. DuVernay was aware of the Central Park Jogger case since 1989 and "tracked the exoneration[13] [and] the grievance lawsuits." *Id.* ████████████ ███████████████████████████████████████████████████████ PX-36, at DEFS005242. ████████████████████████████████████████████████████████

████████████████████ *Id.* DuVernay definitively became aware of Fairstein in May 2016, when the film project was "in its very early stages," and it was not clear that it would "come to fruition." DX-64, at LF00038632; Pltf. R56 Resp. ¶¶ 105-110. At the time, DuVernay purportedly viewed Fairstein as a controlling "bully" and "knew what [Fairstein] had to say as she ha[d] been telling her version of the story, at the Five's expense, for years." DuVernay Decl. ¶ 23. Netflix did not greenlight the Series until one year later. *Id.* ¶ 24. Locke told a friend who was writing an article about Fairstein being stripped of her Mystery Writers award that she knew Fairstein from watching the 2012 Ken Burns film **and** working on the Series. PX-102, Locke-26; PX-81, Locke Dep. 157:12-161:18. *See* Pltf. R56 Resp. ¶¶ 202-204. Swicord testified that she was aware of the Central Park Jogger case in 1989 and followed it in the press. At that time, she became aware of Fairstein's name in connection with the case. PX-34, Swicord Dep. 18:12-20:17.

## III.   Defendants Avoided and Ignored Contradictory Sources

Defendants undisputedly undertook extensive research when developing and writing the Series. *See* DuVernay Decl. ¶ 28; Locke Decl. ¶ 9; Swicord Decl. ¶ 11; Engel Decl. ¶ 16.

### A.   The Central Park Jogger Testimony[14]

---

[13] The writers of the Series discussed ████████████████████████████████████████ ████████████████ Pltf. R56 Resp. ¶ 49.

[14] Defendants nonsensically assert that the "Complaint does not purport to challenge the Series' premise that the Five are innocent and were wrongfully convicted based on coerced confessions, and that this injustice was rooted in racial

It is undisputed that the writers of the Series were in possession of testimony from the Central Park Jogger case. Swicord ***elected not to review*** it. PX-34, Swicord Dep. 151:6-153:2; Swicord Decl. ¶ 17. Instead, she "intuited" and "retro-engineered" what she thought happened, and scripted Fairstein into scenes where "someone" ought to be. PX-41, Swicord-20; PX-34, Swicord Dep. 149:10-150:20, 177:5-177:9; Swicord Decl. ¶ 75. Swicord's writing assistant relied on the NYPD detectives' testimony to determine the chronology of certain events for Swicord but Swicord did not ask her to research Fairstein's activities in the days following the attacks in Central Park. PX-199; PX-34, Swicord Dep. 180:10-182:14. DuVernay chose not to review the testimony of all law enforcement officials because she believed they "lied." DuVernay Decl. ¶¶ 23, 44, 59. Locke reviewed the testimony. *See* PX-81, Locke Dep. 24:10-19, 25:19-22; Locke Decl. ¶ 15. The Central Park Jogger testimony provides the following information:

- NYPD Officers, including Eric Reynolds ("Reynolds"), picked up Messrs. Richardson, Santana and others in and around Central Park on the night of April 19, 1989 and brought them to the Central Park Precinct. Mr. McCray came voluntarily to the Central Park Precinct with his mother at around 1:00 a.m. on April 20. PX-24, at DEFS023673-719; PX-22, at NYCLD_023501-023529, 23552-23555 23567-23568.

- On April 20, 1989, at approximately 4:00 a.m. Lieutenant McInerney told Reynolds not to let Santana, Richardson and others leave the Central Park Precinct because Night Watch detectives wanted to question them about a woman's body that had been found in Central Park. PX-24, at DEFS023720-732.

- On the morning of April 20, 1989, Detective Humberto Arroyo ("Arroyo") went to the crime scene with an NYPD sergeant. Arroyo next interviewed Santana at the Central Park

---

bias, whether explicit or implicit." Moving Br. at 10-11. Defendants apparently misunderstand the fundamentals of defamation law. Fairstein did not have standing to challenge the scenes in which she is not depicted, much less the entirety of the Series. *See Goldman v. Reddington*, 417 F. Supp. 3d 163, 172 (E.D.N.Y. 2019) ("the complaint must allege a defamatory statement was 'of and concerning' the plaintiff") (citation omitted). In their motion to dismiss briefing, Defendants criticized Fairstein as trying to silence the voices of the Five. ECF No. 28 (Netflix MTD Br. at 3). Now they criticize her for properly alleging defamation claims. It is further disingenuous for Defendants to imply that Fairstein's failure to challenge the Series in its entirety is an admission that she agrees with the Five's narrative—Defendants targeted Fairstein in the Series because of her disagreement with this narrative following the Reyes confession in 2002 (ignoring that others held the same view). Pltf. R56 Resp. ¶¶ 56, 68, 221, 223-231; PX-140, PX-121, at DEFS153633; DuVernay Decl. ¶¶ 13, 15, 44, 54; Locke Decl. ¶¶ 38-39. Curiously, Defendants contend that Plaintiff's lawsuit is an attempt to "personally distance herself and disclaim responsibility for the wrongful convictions and the actions that led to them." Moving Br. at 11. Yet Defendants steadfastly deny that the Series—a docudrama—is a documentary. DuVernay Decl. ¶¶ 11, 62, 133; Engel Decl. ¶¶ 6-9.

Precinct. He gave Santana's statement to Lieutenant Doyle, the Commanding Officer of the Manhattan North Homicide Squad. Fairstein was not present. The first time that Arroyo saw Fairstein was when she arrived at the 20th Precinct in the evening hours of April 20. PX-25, at 25594-612; PX-26, at 14499-505, 14553, 14559-585.

- On April 20, 1989, at 9:00 a.m. Fairstein received a call from an NYPD supervisor about the sexual assault in the Park. He told Fairstein that she would be asked for assistance later in the day. She then assigned Lederer to the case. PX-29, at DEFS017012-17015. As the head of the Sex Crimes Unit, Fairstein had overall responsibility for the prosecutorial investigation "for administrative purposes" but Lederer was in charge of the investigation, and "foot work." PX-31, at DEFS021132-21133, DEFS021145-47.

- On April 20, 1989, at approximately, 11:30 a.m., Reynolds accompanied detectives to pick up Mr. McCray at his residence and returned him to the Central Park Precinct. Reynolds confirmed that Fairstein was not at the Central Park Precinct. He did not see Fairstein, or Lederer, until the night of April 20. Reynolds assisted detectives with the police investigation of the jogger case from the night of April 19, 1989 through 3:00 a.m. on April 22. He said that the detectives decided whom to question and in what order. During the time he was working on the case, he saw Chief Colangelo,[15] the Chief of Detectives for the City of New York, and Chief Selvaggi. PX-22, at NYCLD_023552-23555, 23602-23607, 23612-23614, 23702-705.

- On April 20, 1989, from 10:00 a.m. until 1:00 p.m., Detective John Hartigan ("Hartigan") sat in on Richardson's interview at the Central Park Precinct, which resulted in a written statement. Hartigan's "superior officers" told him to sit in on the interview. PX-31, at DEFS020652-653, 20660, 20663, 20791-792, 20804-805; PX-30, at DEFS038987-88, DEFS038997 DEFS039019.

- With Hartigan present, Detective Carlos Gonzalez ("Gonzalez") questioned Richardson. He informed his NYPD supervisors about the contents of Richardson's statement. Per Gonzalez, there were "a lot of chiefs in the room" and "a lot of brass" when he reported on Richardson's statement. He recalled Chief Colangelo being there. PX-30, at DEFS038896-38918.

- After Richardson's interview concluded, Hartigan interviewed Santana and Steven Lopez at the Central Park Precinct. PX-30, at DEFS039020-39021.

- On the afternoon of April 20, 1989, between 3:15 p.m. and 5:30 p.m., Gonzalez interviewed Mr. McCray at the 20th Precinct. Detectives Harry Hildebrandt ("Hildebrandt") and McCabe were also present. The interview resulted in a written statement. PX-26, at DEFS014160-164, 14179-81, 14184-86; PX-27, at DEFS014859, 14880-885.

---

[15] DuVernay's outline for the Series lists Chief Colangelo as the first law enforcement character. *See* Pltf. R56 Resp. ¶ 127. Per the writers' sources, Colangelo provided the press with information about the Central Park Jogger case in the days immediately following the attacks in Central Park, including the release of a police timeline on April 22, 1989. *Id.*

- Hildebrandt arrived at the Central Park Precinct at around noon on April 20, 1989. Deputy Inspector Power, who was in charge of the Manhattan North Homicide detectives, instructed Hildebrandt and his partner to transport Mr. McCray to the 20th Precinct for questioning. After transporting Mr. McCray and his parents to the 20th Precinct, Hildebrandt and his partner decided to interview another individual first. After conducting the first interview, Hildebrandt interviewed Mr. McCray, beginning at approximately 3:00 p.m. and concluding "after 5:00 p.m." with a written statement. Hildebrandt then advised the McCrays that they would be at the 20th Precinct for some time, and that there would probably be a district attorney who would want to talk to them and possibly take a videotaped statement. Up to that point, Hildebrandt had **not spoken to any district attorney about the case**. Hildebrandt **kept McCray's written statement "with him"** and told his supervisor he had obtained it. At around midnight on April 21, 1989, Hildebrandt transported the McCrays to the 24th Precinct. He participated in Lederer's videotaped interview of Mr. McCray at 1:00 a.m. on April 21, 1989. PX-27, at DEFS014847-857, DEFS014859, DEFS014880-900.

- On April 20, 1989, at 1:00 p.m. Detective Michael Sheehan ("Sheehan") began his shift. He was dispatched to Central Park and then went to the Central Park Precinct at 5:30 p.m. Shortly thereafter, he spoke with Sergeant O'Connor, his immediate supervisor, who told Sheehan that the entire police investigation was being moved to the 20th Precinct. At 6:00 p.m. Sheehan transported Santana to the 20th Precinct. PX-32, at DEFS024310-322.

- On April 20, 1989—between 10:00 p.m. and midnight—Detective Sheehan and Jonza took a statement from Santana. At about 2:00 a.m. on April 21, 1989, Sheehan took Santana to the 24th Precinct, after the decision was made to again move the investigation. At 2:30 a.m., Lederer took Santana's videotaped statement at the 24th Precinct. Detectives Sheehan and Arroyo were also present. On April 21 at 7:00 a.m. Sheehan spoke to Fairstein at the 24th Precinct about visiting the crime scene with Messrs. Richardson and Wise. PX-32, at DEFS024327-359.

- On April 20, 1989, at 8:30 p.m., Fairstein arrived at the 20th Precinct to assist Lederer. She was not supervising the police investigation. Prior to arriving at the 20th Precinct, Fairstein had not visited the hospital or spoken with the officers who had discovered the female jogger. While at the 20th Precinct, she did not question anyone in custody. PX-29, at DEFS016980-81, DEFS017012-17017.

- Detective John Freck ("Freck") was at the 20th Precinct at 9:30 p.m. on April 20, 1989. Lieutenant Doyle directed him to pick up Mr. Salaam at his residence. Freck and other detectives picked up Mr. Salaam, Korey Wise (known as "Corey") and another individual. PX-30, at DEFS038951-957.

- David Nocenti, Mr. Salaam's "Big Brother," arrived at the 20th Precinct at 11:25 p.m. on April 20, 1989. At about 11:35 p.m. he spoke with Fairstein. Mr. Nocenti did not tell Fairstein that Mr. Salaam was 15 years of age. Nor did he hear anyone else tell her that Mr.

Salaam was 15 years of age. Mr. Salaam's mother arrived at the 20th Precinct at 11:45 p.m. At 11:50 p.m. Ms. Salaam, Fairstein and two other individuals went to a "back room" to talk. At midnight on April 21, Fairstein told Mr. Nocenti that Ms. Salaam would be allowed to see her son. PX-28, at DEFS016370-73, DEFS016378-79, DEFS016405, DEFS016417, DEFS016426-427.

- Nocenti introduced Ms. Salaam to Fairstein shortly before midnight on April 20, 1989. Fairstein did not make immediate arrangements for Ms. Salaam to see her son because she believed Mr. Salaam was 16 years of age and, accordingly, had no right to parental access. At around 12:15 a.m. on April 21, 1989, Fairstein took Ms. Salaam and two other individuals to a private room to further discuss Ms. Salaam's request. After a few minutes, Ms. Salaam told Fairstein that Mr. Salaam was 15 years old. Fairstein asked NYPD supervisors to get the detectives who brought Mr. Salaam into the Precinct so that she could clear up the information they had about Mr. Salaam's age. Detective John Taglioni came downstairs and discussed the matter with Ms. Salaam. At about 12:20 a.m., Fairstein advised the NYPD supervisors and Taglioni that they should take Ms. Salaam's word for it. Taglioni went upstairs to stop the questioning. Fairstein remained in the lobby. Ms. Salaam approached Fairstein at 12:30 a.m. on April 21 and said she was getting a lawyer for Yusef. Shortly thereafter—between 12:30 and 12:45 a.m. on April 21, 1989—Fairstein left the 20th Precinct and traveled to the 24th Precinct with Lederer. She did not return to the 20th Precinct "that night or during the next day." Fairstein was not present when Ms. Salaam was given the opportunity to see Mr. Salaam. PX-29, at DEFS016996-17011.

- On April 21, 1989, at 12:30 a.m. Detectives Hartigan and Nugent took Wise's statement at the 20th Precinct. After taking the statement, Hartigan advised his supervisors and other detectives present at the 20th Precinct what had occurred. Hartigan next transported Richardson from the 20th Precinct to the 24th Precinct for his videotaped interview with Lederer. PX-31, at DEFS020714-20715, 20718-20719, 20736-20741.

- On April 21, 1989, at 7:00 a.m., Fairstein was at the 24th Precinct. She spoke with Sheehan, and others, about taking Messrs. Richardson and Wise to Central Park. At that point she had not reviewed Wise's written statement, though Sheehan had provided her with some information about Wise's alleged involvement in the attack on the jogger. Shortly thereafter, Fairstein went to the Park with Sheehan, Wise and Richardson. It was the first time in the case that Fairstein went to the Park. The trip took a total of 35 minutes and Fairstein returned to the 24th Precinct. Between 8:30 and 9:00 a.m., Fairstein returned to the Park with Lederer, Clements and Sheehan. PX-31, at DEFS021079-21089, 21100, 21104, 21125-21127.

- On April 21, 1989, at 9:30 a.m., Hartigan took a second statement from Wise and, later, participated in a second videotaped statement with Wise and Lederer. PX-31, at DEFS020750-751, 20776-787, 20799-20800, 20813-20817.

- During the time in which Fairstein was at the 20th and 24th Precincts as many as 30 police officers, detectives and "bosses" were working on the case. She was not running the

investigation. Nor was she made aware of everything that every officer and detective was doing on the case. PX-31, at DEFS021194-95.

The above testimony contradicts Defendants' theories that Fairstein: created a timeline; "controlled cops;" was present at any precinct prior to the night of April 20, 1989; oversaw the NYPD investigation; ordered a canvas of Harlem; supervised detectives who questioned the Five; and was at the crime scene on April 20. *See* DuVernay Decl. ¶¶ 74, 82, 84-87, 88, 101, 103; Swicord Decl. ¶¶ 34-37, 41, 48-51, 73, 82-83, 86-88; Locke Decl. ¶¶ 25-37.

## B. Deposition Testimony From the Five's Civil Action Against New York City

DuVernay admitted that, in 2016, Fairstein's and Lederer's attorney notified her that deposition transcripts from the Five's civil action against New York City contained information relevant to her film project. PX-51, DuVernay Dep. 126:13-128:6; DX-64, at LF00038585.[16] From the early stages of the film project, DuVernay was in contact with two of the Five's attorneys in the civil action, Michael Warren ("Warren") and Jane Fisher Byrialsen. Pltf. R56 Resp. ¶¶ 66, 94; DuVernay Decl. ¶ 16. She had the opportunity to get copies of Fairstein's and Lederer's depositions. PX-62, at DEFS093406. Even so, none of the writers reviewed the depositions. PX-51, DuVernay Dep. 126:13-128:6; PX-34, Swicord Dep. 81:16-82:4; PX-81, Locke Dep. 26:17-26:20. Netflix did not acquire the deposition transcripts despite being on notice that the producers had concerns about the public release of materials concerning the Central Park Jogger case. Pltf. R56 Resp. ¶ 68; PX-117; PX-137, Engel Dep. 83:4-84:23. Defendants elected to rely on the unsupported allegations in the Five's civil lawsuit rather than sworn testimony. Pltf. R56 Resp. ¶¶ 30-32; DuVernay Decl. ¶ 59.

---

[16] While Defendants retrospectively couch this as a "threat" to the filmmakers, this could not be further from the truth. DuVernay's attorneys failed to take the letter seriously and expressly reserved "rights or remedies" against Fairstein and Lederer. *See* Pltf. R56 Resp. ¶¶ 104-110.

1. **Lederer's Deposition Testimony**

In July 2013, Lederer gave three days of deposition testimony in the Five's civil action, in which she was 1 of 23 named defendants. DX-24. Lederer testified to the following:

- In April 1989, Lederer was a line assistant in Trial Bureau 40, who handled homicide and sex crimes cases. She was supervised by Dan McNulty and Steve Cronin, who were Deputy Bureau Chiefs. Declaration of Elizabeth Lederer, dated November 23, 2022 ("Lederer Decl."), Ex. A, 7/17/13 Dep., at 79-82. Lederer and Fairstein had worked together but they were not particularly close. *Id.* at 81.

- Lederer arrived at the 20th Precinct at 8:00 p.m. on April 20, 1989 to take video statements. *Id.* at 266, 269-271. Fairstein met Lederer at the 20th Precinct to provide assistance. Lederer Decl., Ex. C, 7/23/13 Tr. at pp. 669-670.

- On the night of April 20, 1989, crime victims had not yet come forward, and not all people in the Park on April 19 had been interviewed. Much of the evidence developed in the days and weeks that followed. Lederer Decl., Ex. A, at 273-274, 297-300, Ex. C, at 946-947.

- Shortly after arriving at the 20th Precinct, Lederer attended a briefing. Over the next few hours, she learned who had been interviewed and given written statements. Lederer Decl., Ex. A, at 268. The NYPD conducted the interviews. *Id.* at 268-270, Ex. C, at 938-940, 956-958, 963-964. By the time Lederer arrived at the 20th Precinct, Richardson and Santana had already given written statements. Ex. A, at 286-288.

- On the morning of April 21, 1989, Lederer visited the crime scene with Fairstein and Clements. Lederer Decl., Ex. C, at 699-702, 809-810, 931-933.

- While she was at the 20th and 24th Precincts, Lederer did not recall anyone working on a timeline. Lederer Decl. Ex. C, at 672-673. While conducting the videotaped interviews on April 20 and 21, 1989, Lederer had no sense of the distance between, or timing of, the attacks in Central Park and did not diagram the statements *Id.* at 685-686, 716-711. She did not know where Meili was attacked. *Id.* at 687-688, 708-709.

- Prior to the decision being made to charge the Five with rape, Lederer had no discussions with Fairstein about the timing of the attacks. Lederer Decl., Ex. C, at 689-690. Lederer worked on a timeline after the arraignment of the Five. *Id.* at 675-677.

- It was Lederer's theory of the case, which she argued at trial, that the attack on Meili was part of an overall series of attacks committed by the Five. Lederer Decl., Ex. C, at 658-660.[17] According to Lederer, the lack of DNA match to the Five did not preclude that it was somebody else who was with the young men. *Id.* at 662. Despite the Reyes confession, she continued to believe that the Five were guilty of the rape. Lederer Decl., Ex. A, at 260-

---

[17] Pltf. R56 Resp. ¶ 21.

266, 307. The differences in the Five's statements were not significant to her at the time she tried the Central Park Jogger case. Lederer Decl., Ex. C, at 774-777.

- Lederer did not tell Harlan Levy, (DX-37), that she felt like she had been "kicked in the stomach" after she received DNA results in August 1989. Lederer Decl., Ex. C, at 724.

This testimony contradicts Defendants' theories that: the Assistant District Attorneys had enough information to put together a timeline while at the precincts;[18] Fairstein was at the crime scene with Lederer and Clements on the morning of April 20 (as opposed to April 21); Fairstein was directing NYPD interviews or the videotaping of statements; and Fairstein devised the prosecution's theory of the case. *See* DuVernay Decl. ¶¶ 47, 67-72, 124-130; Swicord Decl. ¶¶ 67-69, 70-72, 75-76, 78; Locke Decl. ¶¶ 25-37.

## 2. **Fairstein's Testimony**

In 2013, Fairstein gave three days of deposition testimony in the civil action, in which she was 1 of 23 named defendants. DX-24. Fairstein testified:

- On the morning of April 20, 1989, Sergeant Fiston called Fairstein and told her that police found an unconscious jogger in Central Park. Fairstein Decl. (11/29/22), Ex. A, at 178. Shortly thereafter, Fairstein had a discussion with John Fried and Morgenthau about assigning Lederer to the case. *Id.* at 228-235.[19] Fairstein was in court on other matters during the day on April 20 and heard "almost nothing" about the case. *Id.* at 229-230.

- Fairstein was never at the Central Park Precinct. Fairstein Decl. (11/29/22), Ex. B, at 355. She arrived at the 20th Precinct on April 20 at 8:30 p.m. She and Lederer were briefed by Captain Roe and Deputy Inspector Power for 15-20 minutes. Fairstein Decl. (11/29/22), Ex. A, at 238-241. Lederer began her work by speaking with Reynolds and his partner. *Id.* at 242.

- Fairstein was not working the case. *Id.* at 246. She was not supervising the investigation. *Id.* at 262-264.[20] Fairstein worked separately from Lederer and made phone calls. She and Lederer also discussed the 20th Precinct's youth room. *Id.* at 249-252. Between 8:30 and 11:30 p.m. on April 20, Fairstein: spoke with Morgenthau; called Metropolitan Hospital;

---

[18] DuVernay testified that she was not concerned about what was known about the other assaults in the Park while Fairstein was at the precincts, though such information would be needed to put together a timeline. PX-51, DuVernay Dep. 147:21-149:10.

[19] *See* PX-20.

[20] *See* Pltf. R56 Resp. ¶ 13.

spoke with Meili's brother and neurosurgeon; called the 24th Precinct about a youth room and spoke with Captain Roe about Aaron Rosenthal taking Polaroids home. *Id.* at 264-273.

- While at the 20th Precinct, Fairstein did not have a clear picture of who was in custody. *Id.* She was unaware that Wise was there. *Id.* at 270-271. On April 20, at 11:30 p.m., Fairstein learned that Salaam was at the 20th Precinct after Sergeant Klev told her that someone was there on behalf of the Salaam Family. *Id.*

- Fairstein did not know most of the officers and detectives working at the precincts in the days after the attacks. *Id.* at 171-172. She was not present for any police interviews or videotaped interviews of the people charged in connection with the Central Park Jogger case. *Id.* at 269-270; Fairstein Decl. (11/29/22), Ex. B, at 350-352. She did not interview suspects. Fairstein Decl. (11/29/22), Ex. C, at 695-696. Lederer and Clements worked with detectives. *Id.* at 698.

- When Fairstein visited the crime scene with Richardson and Wise on the morning of April 21, 1989, she was not aware of any significant discrepancies in statements made by the young men in custody about the location of the rape. Fairstein Decl. (11/29/22), Ex. B, at 341-342. She had not consulted with anyone about potential charges. *Id.* at 348. Fairstein made a second visit to the crime scene with Lederer and Clements on the morning of April 21. Fairstein Decl. (11/29/22), Ex. C, at 828-829.

- Lederer and Clements made the charging decisions in the case. Fairstein assisted them in drafting complaints in the early morning hours of April 22, 1989. At that time, she was unaware of any discrepancies in the Five's statements regarding the order in which events took place in Central Park. *Id.* at 704-721.

- Because she was a trial witness, she did not supervise the day-to-day management of Lederer's work and "at almost no time was [she] present" with Lederer and Clements for the preparation of their case for trial. Fairstein Decl. (11/29/22), Ex. A, at 53-56, 68-69, 90; Ex. B, at 539-540. Lederer had other supervisors who worked more closely with her after the arraignment, through the trials of the cases." Ex. B, at 545-546.[21]

- In September 1989, Fairstein learned that Reyes committed a homicide and rape on the Upper East Side. Peter Casolaro ("Casolaro") was the Assistant District Attorney working on the case. She sent a formal request to Casolaro for information pertaining to the rape. He declined to provide the information despite repeated requests. Fairstein did not have access to Mr. Casolaro's case file. Fairstein Decl. (11/29/22), Ex. A, at 120-126, 144-153. Fairstein was not fully aware that Reyes' DNA had been used to identify him in several sex crimes until 2002. *Id.* at 124. In 1989, there was no databank which she could have used to cross-check DNA. *Id.* at 131-135. In 2002, Fairstein learned that, on April 17, 1989, a rape had been committed in Central Park. *Id.* at 155.

---

[21] *See also* Pltf. R56 Resp. ¶ 14.

- Fairstein's opinion that the NYPD officers acted properly when conducting their original investigation was based on "the 30 hours in which [she] observed the detectives with many of the defendants and their families in open spaces in the squad room" where she saw "the conversation, the demeanors, the manner in which the young people were handled and the families were treated out of the rooms. So in that sense [she] made observations." Fairstein Decl. (11/29/22), Ex. B, at 449. From the time she arrived at the 20th precinct at 8:30 p.m. on the night of April 20 through midnight the following night, Fairstein did not recall seeing any of the young men in handcuffs. *Id.* at 460. *See also* Fairstein Decl. (11/29/22), Ex. C, at 692-693.

- Harlan Levy's book exaggerated his role in the Central Park Jogger case. (DX-37). Fairstein Decl. (11/29/22), Ex. A, at 82-83. He met with Lederer to discuss DNA issues out of Fairstein's presence and Fairstein, Lederer and Mr. Levy met on one occasion. *Id.* at 84.[22]

This testimony contradicts any theory that Fairstein: created a timeline; was at the crime scene with Lederer and Clements on April 20, 1989 (as opposed to April 21); supervised the NYPD investigation; iv) devised the prosecution's theory of the case; and knew, in 1989, that Reyes raped someone in Central Park. *See* DuVernay Decl. ¶¶ 47, 67-72, 74, 82, 84-87, 88, 101, 103, 124-130; Swicord Decl. ¶¶ 34-37, 41, 48-51, 67-69, 70-72, 75-76, 78, 82-83, 86-88.

C. **Defendants' Sources**[23]

Defendants' source materials contain information which contradicts their purported beliefs about Fairstein's role in the Central Park Jogger case:

- ***None of*** the 1989-1990 press reports reviewed by Defendants place Fairstein in the role in which she is depicted in the Five Scenes. Pltf. R56 Resp. ¶ 75.[24]

- Sullivan's book, (DX-17), which was published in 1992, describes ***Lederer*** as the investigator and prosecutor of the Central Park Jogger Case. Per Sullivan, detectives were responsible for conducting a series of interrogations that produced the written statements

---

[22] The issue with the sock DNA scene in Episode 2 is not whether Fairstein ever discussed the sock DNA with anyone. It is that the Series falsely depicts Fairstein as springing the discovery of the sock on Mr. Morgenthau and Lederer and suggesting that they sit on the evidence so they can test it closer to trial. DX-30, Episode 2, at 16:39-17:13, 29:51-31:23.

[23] Other than sources in which Fairstein is quoted, Plaintiff in no way acknowledges or admits the truth of any matters asserted in Defendants' source materials unless otherwise specified. Fairstein makes no assertions about the truth or accuracy of statements in Defendants' sources about Lederer or other persons involved in the Central Park Jogger case.

[24] Netflix received these research materials in Fall 2017. Engel Decl. ¶ 14(g).

"that would serve as a prelude to Lederer's interviews." Lederer arrived at the 20th Precinct and put together a "picture" of what happened upon reviewing the detectives' written statements, strategically conducting the videotaped interviews of the young men, and formulating a strategy to prosecute "the complex case." *See* Pltf. R56 Resp. ¶ 75.[25] According to Sullivan, Fairstein did not discover the sock DNA, defense counsel was alerted about the discovery, and Lederer believed that some of the "culprits" had escaped "her net" and that the semen on the sock came from an assailant wiping himself off. Pltf. R56 Resp. ¶ 161.

- Sarah Burns' book, (DX-27), describes Lederer as responsible for prosecuting the case, conducting the videotaped interviews, failing to recognize "obvious problems and inconsistencies" in the Five's statements, presenting the most "damning evidence" against the Five, and failing to investigate the source of the DNA or why the defendants' statements were "incorrect." Pltf. R56 Resp. ¶ 75. Burns also noted that an NYPD serologist—not Fairstein—discovered the sock DNA. Pltf. R56 Resp. ¶ 161. Ms. Burns' book states that the Central Park Jogger case "was ***not*** a case of rogue detectives beating confessions out of suspects, or of the police and prosecutors conspiring to frame individuals they knew to be innocent." DX-27, at xi (emphasis added).

- Richardson vividly recalled Lederer's involvement in his case. Pltf. R56 Resp. ¶ 205. ███████ ███████████████████████████ *Id.*[26] Santana told DuVernay that he did not meet or know Fairstein "in the beginning." *Id.*

These sources clearly contradict the portrayal of Fairstein in the Five Scenes.

## ARGUMENT

"Freedom of the press under the First Amendment does not include the absolute license to destroy lives or careers." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 169-70 (1967). The actual malice rule "is not infinitely expandable. It does not abolish all of the common law of libel even in the political context. It still protects us against the 'big political lie,' the conscious or reckless falsehood." *Street v. Nat'l Broadcasting Co.*, 645 F.2d 1227, 1237 (6th Cir. 1981).[27] The Second

---

[25] Defendants attempt to justify their false and defamatory portrayal of Fairstein by relying on Sullivan's assertion that the Five's supporters considered Fairstein to be one of the "major villains behind the conspiracy to frame the defendants." DX-17, at 202. *See* DuVernay Decl. ¶ 49; Locke Decl. ¶ 37. Sullivan's overgeneralization does not support the false portrayal of Fairstein in the Five Scenes. Sullivan also wrote that the Five's supporters viewed Lederer "as the embodiment of white oppression" and she "continually had to shake off shouts of 'witch,' 'bitch,' 'white devil,' 'slut' and 'whore,' as well as death threats." DX-17, at 144. *See* Burns, DX-27, at 159 (the Five's supporters were "especially cruel to Lederer" referring to her as "[t]he devil herself, she's going to pay for it").

[26] Netflix received the interviews in which these statements were made in Fall 2017. Engel Decl. ¶ 14(e).

[27] Defendants' citation to *New York Times v. Sullivan*, concerning the "rule compelling the critic of official conduct to guarantee the truth of all his factual assertions" is not the current state of the law. *See* Moving Br. at 21. It is part

Circuit recognized that "Calculated falsehood falls into that class of utterances which '***are no essential part of any exposition of ideas***.'" *Goldwater v. Ginzburg*, 414 F.2s 324, 335-336 (2d Cir. 1969) (citation omitted) (emphasis added). As fully set forth below, Defendants relied on calculated falsehoods when depicting Fairstein in the Five Scenes.

## I.   The Applicable Legal Framework

A court shall grant summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 213-214 (S.D.N.Y. 2020). The court may not make credibility determinations or weigh the evidence. *Id.* If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.* The determination of whether a libel defendant acted with actual malice "calls a defendant's state of mind into question … and does not readily lend itself to summary disposition." *Hutchison v. Proxmire*, 443 U.S. 111, 120 n. 9 (1979); *Reid v. Viacom Int'l*, 2016 WL 11746046, at *17 (N.D. Ga. Sept. 14, 2016). Indeed, in *Hutchison,* the Supreme Court acknowledged its "'general reluctance to grant special protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 n. 7 (1986) (emphasis added).

### A.   The Actual Malice Standard

A court ruling on a motion for summary judgment "'must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists – that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.'" *Palin*, 482 F. Supp. 3d at 214 (citing

---

of the Supreme Court's discussion of the "defense of truth" under Alabama, and other, state libel laws prior to the Court's articulation of the actual malice rule. 376 U.S. 254, 278-281 (1964).

*Anderson*). "Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 182-183 (2d Cir. 2000). While the focus of the actual malice analysis is the defendant's state of mind, a defendant "cannot … automatically insure a favorable verdict by [simply] testifying that [she] published with a belief that the statements were true." *St. Amant*, 390 U.S. 727.

Because Defendants' generalized assertions about the "essence" of Fairstein's role in the Central Park Jogger case are insufficient to support their motion, Defendants attempt to win summary judgment with self-serving declarations containing statements about their "beliefs" and "intentions" in developing the Series. *See generally* DuVernay Decl.; Locke Decl.; Engel Decl. Such statements raise credibility issues, warranting denial of Defendants' motion.[28] *Palin*, 482 F. Supp. 3d at 213-214, 219.

Dramatizations are subject to the same actual malice standard as any other publication. In *Lovingood v. Discovery Communications*, 800 Fed. Appx. 840, 848 (11th Cir. 2020), the Eleventh Circuit refused to "invoke an invincible shield of protection for all works characterized as docudrama" and applied "the actual malice standard that the Supreme Court first articulated in *New York Times* and has applied for more than fifty years." *Id*. Relying on *Davis*, Defendants mistakenly argue that because the Series is a dramatization, they need only have believed that their portrayal of Fairstein was the "essence of truth." Moving Br. at 24. Unlike the character at issue in *Davis*, Fairstein ***is not*** a "telescoped composite." 654 F. Supp. at 656, 658-659. DuVernay testified "You asked me if she was a composite character…. That is a fictional character that is not

---

[28] Incredibly, Defendants contend that "[t]he evidence is undisputed that the Series' creators absolutely believed their portrayal of Plaintiff…was the essence of truth based on their sources." Moving Br. at 24. This is an issue that is hotly contested. *See* Pltf. R56 Resp. ¶¶ 38, 54, 56, 60, 81, 127-129, 132, 133, 138, 155-159, 174.

a real person *who is a combination of multiple characters and ideas*. Linda Fairstein, as a character, *represents Linda Fairstein*." PX-51, DuVernay Dep. 77:3-20 (emphasis added).

*Davis* is also inapposite because Defendants went out of their way to promote the Series as a true story. *See* Pltf. R56 Resp. ¶¶ 207. *Fairstein*, 553 F. Supp. 3d at 64[29] ("Presenters of docudrama '***must*** attempt to avoid creating the impression that they are asserting objective facts rather than merely stating subjective opinions.'") (citation omitted) (emphasis added). *See St. Amant*, 390 U.S. at 732. In *Reid*, 2016 WL 11746046, the court rejected *Davis* and declined to "apply a more relaxed 'docudrama' standard." *Id.* at *4 n. 7. The film in question was advertised as "the true story of three girls who were meant to be." *Id.* at *2. Defendants promoted the Series in the same manner. Pltf. R56 Resp. ¶ 207.[30]

Defendants conveniently assert that Fairstein "misunderstands th[e] art form" of docudrama, writing off their false and defamatory portrayal as mere time compression and dramatic effect. Moving Br. at 24. There is no misunderstanding. Defendants' chosen storytelling techniques cannot explain away their decision to "invent" the scenes at issue without a shred of evidence that Fairstein engaged in the misconduct depicted in the Five Scenes. Pltf. R56 Resp. ¶¶ 120-197; *Fairstein*, 553 F. Supp. 3d at 58 (five scenes "[d]epict Fairstein orchestrating acts of

---

[29] Defendants mischaracterize the Court's opinion addressing their motion to dismiss as determining the "narrow issue of whether these scenes plausibly allege defamatory meaning." Moving Br. at 19. However, the Court also made determinations as to whether the scenes depicting Fairstein were constitutionally protected opinion and whether the timeline scenes were substantially true. *Fairstein*, 553 F. Supp. 3d at 58, 71. Defendants improperly attempt to reargue the points raised (and decided) in their motion to dismiss by asserting that the Five Scenes are protected opinion. Moving Br. at 25-26.

[30] The presence of an illegible disclaimer at the end of the Series does not suffice to put viewers on notice that the Five Scenes are fabricated. *See Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537, at *3-4 (Jan. 27, 2022) (disclaimer ***at beginning of film*** did not bar defamation suit because line of dialogue at issue resembled a factual detail incorporated into series for believability and series referenced real people and events); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *13 (N.D. Ga. 2008) (noting disclaimer appearing at end of film and passing over screen very quickly and DVD cover describing film as "true story" did not lead to conclusion that film was understood as dramatization). In *Thoroughbred Legends*, which depicted real persons and events, the court allowed discovery on the plaintiffs' defamation claims and indicated that it would apply *Davis* later. There is no subsequent opinion in the case in which *Davis* was applied. *Thoroughbred Legends* pre-dates the Eleventh Circuit's *Lovingood* opinion.

misconduct"). This is not a case where "[h]istorical records are incomplete," as Defendants admittedly had myriad sources available for consultation in developing Fairstein's character and writing the Five Scenes. DuVernay Decl. ¶¶ 28-43, 56-60; Locke Decl. ¶¶ 9-20; Swicord Decl. ¶¶ 9-25. *See* SOF, at Pts. III.A-C.

In *Lovingood*, the District Court distinguished between "changing the location in which a conversation took place and reducing the number of people involved in the conversation" and the utter falsification of real-life events, cautioning that such falsification has "***significant potential*** to damage the reputation of the individual depicted in the historical dramatization." 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017) (emphasis added). Where, as here, a defendant had the means to "verify the accuracy of the dramatic depiction" but willfully or recklessly disregarded the opportunity" a jury question exists concerning actual malice." *Id. See* Pltf. R56 Resp. ¶¶ 120-197.

## B.  Falsity Must Be Established

As part of the actual malice analysis, the plaintiff in a defamation action must establish the falsity of the statements at issue. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513, 516-517 (1991). The United States Supreme Court has not determined whether a public figure must prove falsity by clear and convincing evidence. *See Harte-Hanks v. Connaughton*, 491 U.S. 657, 661 n. 2 (1989). Nor has the New York State Court of Appeals. The Second Circuit has found "significant and persuasive evidence from which to conclude that the New York Court of Appeals would hold that falsity must be proved by clear and convincing evidence." *DiBella v. Hopkins*, 403 F.3d 102, 115 (2d Cir. 2005). Plaintiff assumes for purposes of opposing Defendants' motion that the clear and convincing evidence standard applies to falsity, which is addressed in the scene-by-scene analysis *infra* Point II.B.

C.  **There Is A Question About Defamatory Meaning**

There is a question as to whether Fairstein must establish by clear and convincing evidence that Defendants "knew or were reckless not to know" that each of the Five scenes would carry a defamatory meaning. *See* Moving Br. at 37 n. 17; *Palin*, 482 F. Supp. 3d at 217-220. There is no binding Second Circuit precedent concerning the issue and Plaintiff does not believe that she is required to make this showing. However, for purposes of completeness, she addresses this issue with respect to each scene *infra* Point II.B.

II.  **A Reasonable Jury Would Find Clear and Convincing Evidence That Defendants Acted with Actual Malice in Falsely Depicting Fairstein in the Five Scenes**

In determining whether a plaintiff has adduced sufficient evidence of actual malice to reach a jury, the Court may consider the evidence in the aggregate. *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. Aug. 12, 2009). *See Reid*, 2016 WL 11746046, at *17. A court typically will infer actual malice from objective facts that "provide evidence of 'negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.'" *Celle*, 209 F.3d at 183 (citation omitted). Actual malice can be established "'[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence.'" *Id*. "Professions of good faith will be unlikely to prove persuasive…where a story is fabricated by the defendant, [or] is the product of…his imagination." *St. Amant*, 90 U.S. at 732.[31] "Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless [person] would have put them in circulation." *Id. See Stern*, 645 F. Supp. 2d at 278. Recklessness may also be found

---

[31] Defendants DuVernay and Locke admit that the Five Scenes are fabricated. PX-51, DuVernay Tr. 110:20-128:12; PX-59; DuVernay Decl. ¶ 82; DuVernay Decl. ¶ 66; PX-51, DuVernay Tr. 150:12-151:18; PX-67; PX-51, DuVernay Tr. 151:21-153:18; PX-68; PX-81, Locke Dep. 27:2-34:16, 70:23-72:5; 150:20-155:25; PX-101, Locke-25. *See also* Swicord Decl. ¶¶ 67-68. While they contend that the scenes are supported by their research, this is simply not the case. *See* Pltf. R56 Resp. ¶¶ 120-197.

"when there is obvious reason to doubt the veracity of an informant or the accuracy of his reports." *St. Amant*, 90 U.S. at 732. A jury might reasonably find actual malice where the totality of a defendant's conduct evidences "predetermined and preconceived plans to malign the [plaintiff's] character." *Goldwater*, 414 F.2d at 336-337.

## A.   <u>Defendants Avoided and Ignored Contradictory Information</u>[32]

"A publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982). Where, as here, a "publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place.'" *Palin*, 482 F. Supp. 3d at 221 (quoting *Masson v. New York Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992)). Moreover, where a publisher ***deliberately decides*** not to acquire knowledge of facts that might confirm the probable falsity of a story, actual malice can be found, because ***the purposeful avoidance of the truth*** is in a different category than a failure to investigate. *Harte Hanks Comm'ns v. Connaughton*, 491 U.S. 657, 692 (1989). *See Gaprindashvili, Inc.*, 2022 WL 363537, at \*9 (***Netflix show creator*** "knew the truth and ignored it, or he 'deliberately decided not to acquire knowledge of facts that might confirm probable falsity of'" line in series); *Reid*, 2016 WL 11746046, at \*15-16 (deletion of material from draft scripts supported a finding of actual malice because the scene, as published, contradicted information known to the defendants); *Mzamane v. Winfrey*, 693 F. Supp. 2d 492 (E.D. Pa. 2010) (finding clear and convincing evidence of actual malice where Oprah Winfrey undertook investigation and failed to interview person whom she publicly accused of being involved in child abuse scandal).

---

[32] Defendants' failure to investigate is not at issue in this action because they undisputedly conducted extensive research.

The writers purposefully avoided sources that would have confirmed the falsity of the portrayal of Fairstein in the Five Scenes. SOF, at Pt. III.A-B. Netflix did not review the writers' research materials in full, nor ███████████████████████████ ████████████████. *See* Pltf. R56 Resp. ¶¶ 68-70. Throughout the writing and editing process for the Series, Netflix employees questioned the accuracy of how Fairstein was portrayed in the Series. Netflix ignored their questions. *See* Pltf. R56 Resp. ¶¶ 68-70.

Defendants also chose to ignore information from their own sources that contradicted their depiction of Fairstein in the Five Scenes and, at the very least, cast doubt on their portrayal. SOF, at Pt.II.C. *See infra* Point II.B.

Defendants' assertion that they acted in good faith by relying on "previously published reports in reputable sources," (Moving Br. at 25), has no bearing in this case because ***none*** of their sources support Defendants' portrayal of Fairstein in the Five Scenes. *See infra* Pt. II.B; Pltf. R56 Resp. ¶¶ 62-71, 75-95, 111-112, 119-197, 203, 205, 207-211, 214, 221, 223-224.[33] Defendants' cases are inapposite. In *Liberty Lobby*, the sources relied upon by the defendant pointed to the same, published facts about the plaintiff (which the court found to be substantially true). 838 F. 2d 1287, 1297 (D.C. Cir. 1988). Likewise, in *World Boxing Council,* the defendant's sources contained ***identical*** statements to those made in the defendant's book. 715 F. Supp. 1259, 1265 (S.D.N.Y. 1989). In *New York Times*, the advertisement in question did not identify the plaintiff. 376 U.S. at 288-289. Likewise, *Davis* concerned a composite character and did not identify the plaintiff.[34] As discussed *supra* Point I.A, Fairstein is not a composite character.

---

[33] To the extent Defendants republished libelous statements about Fairstein, they would be liable for that republication. *Goldman v. Reddington*, 417 F. Supp. 3d 163, 175-176 (E.D.N.Y. 2019) ("it is widely recognized that 'one who republishes a libel is subject to liability as if he had published it originally'") (citation omitted).

[34] Defendants cite the Burns film as a "credible" source (DX-19). Defendants were informed in 2016 and 2017 that the film was inaccurate and libelous with respect to Fairstein and Lederer. Pltf. R56 Resp. ¶¶ 105, 110, 111, 137. *See also* Pltf. R56 Resp. ¶¶ 80, 84(d), 85, 86(b), 86(i), 112-113, 161. Defendants also suggest that the fact that the "Five's civil rights lawsuit led by Warren resulted in a $41 million settlement" is credible evidence of wrongdoing on

While Defendants contend that they should not be required to "conduct independent research on every detail of a story," (Moving Br. at 25), the writers of the Series claimed to have done just that. PX-64 ("████████████████████████████████████"); PX-51, DuVernay Dep. 129:1-133:14; PX-47, at DEFS163025; (writers can ████████████████████ ████); PX-34, Swicord Dep. 29:15-36:13; 199:8-204:4; PX-108 ("research on the project is extensive. And I actually read the trial transcripts. And I chose to share my knowledge of *Fairstein's misdeeds*.") (emphasis added); PX-81, Locke Dep. 194:19-200:1 *See also* PX-92; PX-103; PX-81, Locke Dep. 84:6-86:16, 162:6-164:12.

This is hardly a case where Fairstein has offered "self-serving assertions about her lack of responsibility" or merely denied "wrongdoing." Defendants' *own sources*—not just the Central Park Jogger case materials they chose to ignore—support Fairstein's defamation claims. *See* Moving Br. at 27-28.

## B. Each of the Five Scenes is the Product of Actual Malice

This is not merely a case of filmmakers "imagining" "behind the scenes" conversations, condensing or telescoping events. Moving Br. at 28-29. The evidence demonstrates—clearly and convincingly—that the Five Scenes falsely depict Fairstein. The source materials that Defendants relied on—and those which they avoided—make clear that Fairstein *did not play the role* in which Defendants portray her in the Series. At the very least, Defendants knew that their depiction of Fairstein in each of the Five Scenes was inherently improbable.

---

Fairstein's part. Fairstein was one of *twenty-three* named defendants in the action. DX-24, at p. 2. There was no trial and no findings were made against any defendant. At the time of settlement, the New York District Attorney and New York City Corporation Counsel stated that there was no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved in the Central Park Jogger case. *See* Pltf. R56 Resp. ¶¶ 30-32.

1.   <u>**Scene 1: Manipulating Timeline to Pin the Rape on the Five**</u>[35]

Defendants' contention that Scene 1 is not defamatory[36] is belied by their own documents,

which describe the Scene as depicting: 1) Fairstein "build[ing] her theory in front of us: there's a

rapist here"; 2) detectives getting "real clear, real fast" and "clock[ing]" Fairstein's determination

"to make this stick, whatever it takes;" 3) Fairstein "creating a timeline regardless of [the Five's]

statements" and trying to "jerry rig their statements to fit;" 4) Fairstein "juic[ing]" "the cops" to

"get what she needs;" and 5) "mangling the timeline to suit [her] theory of the case." Pltf. R56

Resp. ¶ 120. Thus, Defendants' own words match Fairstein's allegations that the Series depicts her

"creating and manipulating a timeline… in order to pin the Meili rape on The Five, even though

significant discrepancies existed in the known timing of various assaults." Compl. ¶ 46(c).[37]

Scene 1 is interspersed with interrogation scenes, with the latest scene, (34:45-36:24),

appearing in between the interrogations of McCray and Santana. This scene is viewed after

Fairstein orders police officers to round up "[e]very young black male who was in the park" and

tells detectives not to use "kid gloves" when interrogating Richardson. *Fairstein*, 553 F. Supp. 3d

at 77-79. Accordingly, in full context, the average viewer would conclude that Fairstein's

---

[35] "Scene 1" is in Episode 1 at 12:41-13:01, 15:58-16:52, and 34:45-36:24. *See* DX-30.

[36] Defendants assert that the "Court did not previously rule on whether the timeline scenes had a defamatory meaning" so Plaintiff addresses the issue here. *See* Moving Br. at 15. However, the Court's prior opinion states "Fairstein has plausibly alleged a claim of defamation as to *five* scenes. These scenes depict Fairstein orchestrating acts of misconduct." *Fairstein*, 553 F. Supp. 3d at 58 (emphasis added).

[37] Defendants *concede* that the scenes show Fairstein "*forcing* a connection between the rape and the other assaults that happened on April 19, 1989, despite the clear discrepancies in the confessions as to location and timing" Moving Br. at 32 n. 15. While Defendants contend that "there is no disputing" that the timeline scenes were "consistent with the spirit and essence" of Fairstein's "publicly expressed viewpoint that the kids in the Park were connected to and guilty of the rape," they point to no statements made by Fairstein that established that she believed that the Five were "guilty" of anything in the immediate aftermath of the attacks. None of the 1989-1990 news articles reviewed by the writers contain statements by Fairstein about the guilt of the Five. Pltf. R56 Resp. ¶ 75. The 2002 *New Yorker* article is not evidence of Fairstein's beliefs about the young men in custody in the aftermath of the attacks. *See* DuVernay Decl. ¶ 78; Swicord Decl. ¶ 78. The article was published after the Five "sued to clear their names." DX-25, at 1. Fairstein's quoted statements that she "*watched* more than thirty detectives…conduct a brilliant investigation" is nearly identical to the language she used in a statement to the City Council two months later. DX-25 (emphasis added). *Compare* DX-5. The *New Yorker* article does not state that she was involved in questioning the Five or responsible for putting together a timeline. Like the City Council Statement, the *New Yorker* interview was a "retrospective defense" of the work performed by the NYPD. *See Fairstein*, 553 F. Supp. 3d at 70-71.

instructions to detectives and pressure on them to ignore exculpatory "problems" with the timeline, are the catalyst for "the chain of events that resulted in the unjust conviction of the Five." *Id.*[38]

Scene 1 is not only defamatory, but a reasonable jury would find clear and convincing evidence that the depiction of Fairstein in the Scene is false: 1) an NYPD lieutenant directed Reynolds to keep Richardson and Santana in custody for questioning about the rape; 2) Fairstein did not direct the police investigation and police "brass" and supervisors were ever present at each precinct; 3) Fairstein was ***not at any precinct*** when written statements were taken from Messrs. Richardson, McCray and Wise; 4) during Santana's questioning at the 20th Precinct, Fairstein was speaking with Mr. Nocenti and Ms. Salaam; 5) prior to charging the Five, Lederer had no discussions with Fairstein about the timing of the attacks; and Lederer worked on a timeline after the arraignment. SOF, at Pt. III.A-B. In this action, Lederer testified that Fairstein was not involved in putting together a timeline of events based on the interviews of the Five. PX-10, Lederer Dep. 46:12-17.

Fairstein testified in the Civil Action that: 1) she was never at the Central Park Precinct and was in court on other matters during the day on April 20, 1989; 2) she did not know most of the officers and detectives working at the precincts in the days after the attacks; 3) she was unaware that Wise was at the 20th Precinct; 4) she first became aware of Mr. Salaam's presence at the 20th Precinct when an NYPD Sergeant told her someone had arrived at the precinct on behalf of the Salaam family; 5) in the three hours prior to her conversations with Mr. Nocenti and Ms. Salaam, Fairstein was engaged with numerous administrative matters; 6) when she visited the crime scene on the morning of April 21, 1989, Fairstein was unaware of discrepancies in the statements made by the young men about the location of the rape; 7) while assisting with drafting complaints on

---

[38] *Dworin v. Deutsch*, 2008 WL 508019, at *7 (S.D.N.Y. 2008), is readily distinguishable. In *Dworin*, the Court's decision was governed by specific case law concerning statements of discharge or termination from employment. *Id.*

April 22, 1989, she was unaware of discrepancies in the Five's statements regarding the order in which events took place in the Park. *See* SOF, at Pt. III.B. *See also* PX-1, Fairstein Decl. (6/29/20) ¶¶ 20-21, 37. *See also* PX-2, Fairstein Dep. 154:17-156:8, 189:7-193:20, 194:5-202:11, 211:5-216:5, 216:19-229:19, 249:25-269:14.

In this action, Reynolds testified that: 1) Fairstein had no authority over the NYPD; 2) he did not see her at the Central Park Precinct; 3) she was not "even in the loop" when the initial questioning began at Central Park Precinct; 4) he did not see any prosecutors when he visited the crime scene in the early morning hours of April 20, 1989; 5) NYPD officers were told what to do by their supervisors; and 6) he did not believe that any of Fairstein's actions in the Central Park Jogger case were racially motivated. PX-21, Reynolds Dep. 56:2-9, 67:22-68:21, 74:7-10, 106:3-19, 123:16-124:22, 176:2-178:9, 183:7-184:23, 188:6-8.[39]

A reasonable jury would also find clear and convincing evidence that Defendants "had a subjective awareness of either falsity or probable falsity of the defamatory [scene], or acted with reckless disregard of its truth or falsity." *Celle,* 209 F.3d at 182-183. This is apparent on the face of Defendants' motion papers, which point to **_no source_** that even suggests that Fairstein had "a hand" in developing a timeline at any point in time, or pressured police to coerce information from the young men in custody to fit that timeline. *See* Pltf. R56 Resp. ¶¶ 120-132; Moving Br. at 29-33.[40] On the contrary, Defendants' sources show that the **_NYPD_** put together an early timeline of the attacks in Central Park. *See* DX-27, Burns, at p. 123-124 (timeline "as it was originally

---

[39] *See also* Pltf. R56 Resp. ¶¶ 75-77, 80-81, 85-86, 120-132. Defendants' reliance on *Corporate Training Unlimited, Inc. v. Nat'l Broadcasting Co.*, 981 F. Supp. 112, 120 (E.D.N.Y. 1997), is misplaced because, here, there is no admission by plaintiff that she had any involvement in putting together a timeline. *Baiul v. Disson*, 607 Fed. Appx. 18, 21 (2d Cir. 2015), is likewise inapposite because the plaintiff admitted to the facts in dispute.

[40] In addition, the Court already ruled that Fairstein's statements after the Reyes confession, which attribute the investigation of the Central Park Jogger case to the NYPD, do not show that Defendants' portrayal of Fairstein in the timeline scenes is substantially true. *Fairstein*, 553 F. Supp. 3d at 71. It is therefore unclear why Defendants attempt to reargue this point. Moving Br. at 32. As discussed *supra* note 38, the 2002 Toobin article has nothing to do with the timeline.

constructed by police"), 124 (detectives shared timeline with the media, which was published on April 22); DX-17, Sullivan, at pp. 22-23 (detectives and Lederer reviewed written statements which significantly differed from one another); DX-72 (on April 22, Chief Colangelo spoke to press and NYPD timeline announced). Defendants' sources also state that Lederer was the person knowledgeable about the timing of the attacks at all stages of the prosecutorial investigation and prosecution of the case. Pltf. R56 Resp. ¶¶ 75, 120. DuVernay and Swicord read these materials and, incredibly, cite them as evidence that *Fairstein* was involved in creating the timeline. DuVernay Decl. ¶ 68-70; Swicord Decl. ¶ 69.[41]

The "contemporaneous notes" purportedly relied on by DuVernay are actually a single memo written by Swicord which contains *no citation* to research materials. DuVernay Decl. ¶ 73; Swicord Decl. ¶ 74; DX-75. Per the memo, "as Linda and her team changed their narrative during the day and evening of April 20, the detectives had to go back to the kids' and their signed statements, and add and change things with the kids." She notes the "Uh-Oh Moment arrived for Linda Fairstein" when Mr. McCray was being interrogated. DX-75, at DEFS092971. This is sheer fabrication. As discussed above, no source cited by Defendants in support of their motion lends credence to Swicord's view of what happened. Moreover, the sources that Swicord and DuVernay elected not to review utterly contradict. Swicord's theory. *See* SOF, at Pts. III.A-B.

Swicord admits said fabrication in her memo, noting that "without having copies of the initial signed statements from their interrogations, I have been *having to intuit* how the information

---

[41] Notably, Lederer was described as the "lead prosecutor" in the 2002 Dwyer article cited in the DuVernay and Swicord declarations. DX-51, as DEFS007368. Ms. Swicord underlined this fact in the article. *Id.* Ms. Swicord also wrote that the Five "admitted to crimes not yet reported to police." *Id.* at DEFS007371. To the extent that DuVernay and Ms. Swicord relied on the false "April 20" crime scene depiction in the Burns film, Defendants were notified by Fairstein's and Lederer's attorney that the Burns film contained inaccuracies. DX-64. Sarah Burns' book also contradicts the film. Assuming *arguendo* that the scene in the Burns' film was accurate, it does not place Fairstein at any precinct creating a timeline and pressuring detectives. *See* Pltf. R56 Resp. ¶¶ 86(b).

gets warped and lies are forced into the kids' confessions." DX-75, at DEFS092974.[42] *See* Ptlf. R56 Resp. ¶ 127. During the writing process, Swicord told DuVernay that she would have to "retro engineer" what happened in the Five's interrogations to "establish how specific misinformation was planted and coerced." PX-38; PX-34, Swicord Dep. 177:5-177:9.

Swicord testified that she did not know where the interrogations took place or whether Fairstein was ever at the Central Park Precinct. She acknowledged that police chiefs were present at the precincts and admitted she did not know "how the rankings go between cops and prosecutors." Pltf. R56 Resp. ¶ 127. DuVernay could not specify a source that placed Fairstein at any precinct creating a timeline of the attacks in the Park or stated that Fairstein knew of the timeline of the attacks while working at the precincts in April 1989. PX-51, DuVernay Dep. 142:22-149:10. DuVernay asserted, "This is not a documentary. So the movements, dialogue, actions of the characters are not pinned to, connected to backed up by specific pieces of information." *Id.* at 144:8-14. *See also* Pltf. R56 Resp. ¶ 127.[43]

There is clear and convincing evidence that, at the very least, Defendants knew that their portrayal of Fairstein in Scene 1 was "inherently improbable." *See St. Amant*, 90 U.S. at 732. No source cited by Defendants even supports their "essence of truth" argument—nothing remotely suggests that Fairstein was involved in creating a timeline on April 20-22, 1989. Fairstein's retrospective defense of the police investigation and prosecutorial timeline after the Reyes confession does not translate to coercing testimony from young men in custody in order to fit her rape narrative. *See Fairstein*, 558 F. Supp. 3d at 71.

---

[42] Given that DuVernay was in close contact with the Five's counsel she certainly could have requested the written statements.

[43] *Compare* PX-95; PX-51, DuVernay Dep. 129:1-133:14.

Assuming *arguendo* that clear and convincing evidence is required that Defendants "knew or were reckless not to know" that Scene 1 would carry a defamatory meaning, the evidence cited in Paragraph 120 of Plaintiff's Response to Defendants' Rule 56 Statement supports a finding of actual malice with respect to defamatory meaning. *See also* Pltf. R56 Resp. ¶¶ 221-224.

2.   **Scene 2: Instructions to Investigate Young Black Males**[44]

In Scene 2, Fairstein gives an order to NYPD officers:

> I need that whole group. I have some of them, and descriptions of others, but I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night.

The Court previously held that "the average viewer could conclude from the scene that Fairstein directed NYPD officers to conduct a discriminatory canvas in Harlem." *Fairstein*, 553 F. Supp. 3d at 78. The Court also held, as a matter of law, that the scene has a precise meaning, is capable of being proved or disproved and "the average viewer would not necessarily conclude that [Fairstein's] remarks were merely a reflection of the filmmakers' opinions about the perspectives of law enforcement, and could instead conclude that Fairstein directed discriminatory policing practices." *Id.* at 79.[45]

DuVernay testified that the scene depicts Fairstein "directing police to go as a group into the projects and round up boys." PX-51, DuVernay Dep. 120:1-5. She described a roundup as "an intention to go into certain communities, largely black and brown communities, with an expressed goal [of] looking for something, make something happen…. Someone might be picked up at the

---

[44] Defendants refer to this scene as the "Police Briefing Scene." Moving Br. at 33. It can be found in Episode 1 at 19:59-20:29. DX-30. *See* Pltf. R56 Resp. ¶¶ 133-147.

[45] Despite this clear ruling, Defendants improperly attempt to reargue that this scene is the "filmmakers constitutionally protected opinion and social commentary." Moving Br. at 36. This repeat argument should be disregarded. *See* Pltf. R56 Resp. ¶¶ 145-146.

top. Something might be forced or planted in the middle. An array of things can happen during a roundup." *Id.* at 119:6-25.

A reasonable jury would find clear and convincing evidence that Scene 2 is false because, per the Central Park Jogger testimony, there was no sweep of Harlem: 1) NYPD officers picked up a number of individuals in or around Central Park on the night of April 19, including Messrs. Richardson and Santana and brought them back to the Central Park Precinct; 2) Mr. McCray was first at the Central Park Precinct voluntarily, accompanied by his mother, and was sent home; 3) at 11:30 a.m. on April 20, Officer Reynolds, and detectives, went to Mr. McCray's residence, spoke with his parents, and brought him back to the Central Park Precinct; 4) at 9:30 p.m. on April 20, 1989, Lieutenant Doyle directed Detective Freck to pick up Mr. Salaam at his residence; and 5) Korey Wise (a "Corey" being known to detectives) was picked up with Mr. Salaam at his residence. *See* SOF, at Pt. III.A.

The writers' assistants provided Swicord and DuVernay with nearly identical information when they were working on Episode 1. *See* Pltf. R56 Resp. ¶ 134. DuVernay's notes regarding Netflix's revisions to Episode 1 demonstrate her awareness that young men were picked up in a certain order and after being named by others. Pltf. R56 Resp. ¶ 134 ("Instead of seeing the boys naming each other…all of that information can come out in the cops relaying that information to Fairstein.")

Per the Central Park Jogger testimony: 1) Fairstein was not at any precinct at the time that Messrs. Santana, Richardson and McCray were brought in; 2) she did not direct detectives at the 20th Precinct to pick up Messrs. Salaam or Wise; 3) police supervisors and "brass" were giving orders to NYPD detectives. *See* SOF, at Pt. III.A. Pltf. Resp. ¶ 134. *See* PX-2, Fairstein Dep. 242:6-249:14; PX-4; PX-1, Fairstein Decl. (6/29/20) ¶¶ 17-23. Fairstein testified in the Civil Action that

she did not know most of the officers and detectives working at the precincts in the days after the attacks. SOF, at Pt. III.B.

In this action, when discussing Defendants' portrayal of Fairstein in Scene 2, Reynolds testified:

> **[T]he D.A. does not tell us what to do…we have our own supervisors…our bosses tell us, you know, send certain people out to do interviews, get witnesses. You know, various tasks.** And the idea that, you know, the D.A. would tell you to go out and do something blatantly racist like that, I mean, if that actually were to happen in real life, I think the detectives would just sit there and look at her, like, is this woman crazy?

PX-21 Reynolds Dep. at 175:9-177:22 (emphasis added). Reynolds also testified that the portrayal of Fairstein is "farcical" because she did not order a roundup of every black kid in Harlem. *Id.* at 178:10-180:12. He added that NYPD detectives would "***have absolutely no reason in the world***" to follow an order like that. *Id.* (emphasis added). Reynolds further testified that a roundup never occurred. *Id.* at 23:25-41:16, 180:14-181:14.

If Swicord and DuVernay had followed the facts—including those provided to them by their writing assistants—then Fairstein should not have been scripted into Scene 2. The average viewer would clearly react very differently to a scene in which an NYPD Chief or Lieutenant directed officers and detectives to pick up suspects named by individuals in custody.

A reasonable jury would also find clear and convincing evidence that Defendants "had a subjective awareness of either falsity or probable falsity of the defamatory [scene], or acted with reckless disregard of its truth or falsity." *Celle*, 209 F.3d at 182-183. Once again, Defendants point to ***no source*** which even suggests that Fairstein ordered a roundup of young black men in Harlem. Swicord Decl. ¶¶ 83 (repeatedly referring to detectives and police); DuVernay Decl. ¶¶ 83-86. Per Swicord, the Sullivan book expressly states "***Detectives*** were cross-referencing the names mentioned in each kid's statement and trying to find and interview as many as thirty teenagers."

Swicord Decl. ¶ 83 (at p. 40) (emphasis added). Sullivan points to Lederer directing detectives to pick up individuals while she and Clements continued to work on the case. *Id. See* DX-17 at 39, 53-54; Swicord Decl. ¶ 83 (at pp. 40-41).

Warren's overly broad statement that Fairstein "'controlled' the cops in the precinct," (DuVernay Decl. ¶ 88), is not based on personal knowledge. DuVernay admitted that Warren is biased and was not involved in the Central Park Jogger case in 1989. *See* Pltf. R56 Resp. ¶ 77(c).[46] *See Reid*, 2017 WL 11634619, at *4-5.[47] While Santana—who Warren represented in the Civil Action—said that Fairstein was "telling officers what to do and where to go," he also told DuVernay, "You know, cause in the beginning, when you look at the case, ***I didn't meet her. I didn't know her***." Pltf. R56 Resp. ¶ 77(a) (emphasis added).

Defendants' reliance on Fairstein's 2002 *New Yorker* interview with Mr. Toobin is—again—misplaced. *See* DuVernay Decl. ¶ 87. Fairstein's comments are similar to those made in her subsequent statement to the City Council, which the Court previously analyzed. *Fairstein*, 558 F. Supp. 3d at 71. *Compare* DX-5 at NYCLD_09832-834 *with* DX-25. Given that the *New Yorker* interview took place after the Five sought to vacate their convictions, Fairstein is clearly defending the work that was done in 1989. The article does not even remotely suggest that Fairstein was ordering police to go out and pick up suspects or conduct a discriminatory canvas of Harlem. *Id.*[48]

---

[46] DuVernay testified that "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. 94:5-18. DuVernay conveniently elected not to take any notes (or did not produce them) about "informal" conversations with biased sources whom she contends provided information about Fairstein for the Series. *See* Pltf. R56 Resp. ¶¶ 66, 77, 84(d).

[47] In *Reid*, 2017 WL 1163419, at *4-5 (N.D. Ga. Sept. 22, 2017), which concerned a docudrama about the musical group TLC, the defendants relied on the biased accounts of the members of TLC in drafting the defamatory scenes at issue. The court denied the defendants' summary judgment motion, finding that source bias was one factor that supported a finding of actual malice "even absent specific evidence that the bias caused Defendants to doubt the veracity of the information." *Id.* (relying on *Harte-Hanks*, 491 U.S. at 689-90).

[48] Defendants' reliance on the Burns film also lends no support to the depiction of Fairstein ordering a round up of young black men in the projects. *See* Moving Br. at 34. The Burns film states "while Kevin Richardson, Raymond Santana and others were being interrogated, police rounded up several more teenagers." DX-19, at 27:30-27:40. *First*, this provides a timeframe for the "round up" which precludes Fairstein's presence because, as discussed *supra*, she

When asked at her deposition to specify what evidence she had that Fairstein actually gave an order to police to "pick anyone up at all," DuVernay testified that "this is not a documentary. So it is not a point-to-point process. It's a creative process." PX-51, DuVernay Dep. 120:1-121:1.[49] Per Swicord's testimony, when writing Scene 2 she merely "believed [Fairstein] was there" and the order to conduct the "sweep of Harlem" "came from *someone* who was integrally involved in that investigation and setting up the case." PX-34, Swicord Dep. 149:10-150:20 (emphasis added). *See* Pltf. R56 Resp. ¶ 133.

When reviewing a draft script of Episode 1, a Netflix employee asked "Why are Antron and his parents pulled in after Clarence was let go? Were others let go before then? Is it clear that Fairstein sent officers out on a witch hunt based on a list of coerced names?"[50] PX-141, at DEFS078596; PX-137, Engel Dep. 87:19-93:9.

Given the complete absence of evidence attributing a purported roundup of young black men in Harlem to Fairstein and the overwhelming evidence that *police and detectives* were in charge of bringing in suspects who had been identified during police interviews, there is clear and convincing evidence that Defendants—at the very least—knew that it was inherently improbable that Fairstein ordered police to conduct a roundup. *St. Amant*, 90 U.S. at 732. The evidence also refutes any assertion that the depiction of Fairstein is the "essence of truth," particularly since she had absolutely no power to tell NYPD officers or detectives who to pick up for questioning.

A reasonable jury could also conclude that Defendants "knew or were reckless not to know" that Scene 2 carried a defamatory meaning, *Palin*, 482 F. Supp. 3d at 219-220: 1) DuVernay

---

was not at the Central Park Precinct when Richardson and Santana were questioned. *Second*, Fairstein is not mentioned. *Third*, Defendants were on notice that the Burns film was inaccurate. DX-64.

[49] *Compare* PX-64; PX-51, DuVernay Dep. 129:1-133:14.

[50] Netflix did not bother to pursue flagged issues with respect to Fairstein's character or conduct any research in response thereto. *See* Pltf. R56 Resp. ¶¶ 68-70.

admitted that Scene 2 depicts Fairstein ordering a discriminatory roundup (Pltf. R56 Resp. ¶ 144); 2) Scene 2 was edited to portray Fairstein in an unethical light (PX-44, at DEFS007990; PX-159, at DEFS004711; DuVernay Decl. ¶¶ 81, 90);[51] 3) Netflix employees believed that Fairstein would "come after us" when they agreed to DuVernay's demand to use Fairstein's voiceover from Scene 2 in the Series teaser (Pltf. R56 Resp. ¶ 144); 4) DuVernay and Netflix agreed to use Fairstein's voiceover from Scene 2 in the Series trailer as part of their strategy to leave viewers "emotionally charged, angry and activated" (Pltf. R56 Resp. ¶ 214); and 5) Defendants targeted Fairstein's reputation and career through their portrayal of her in the Series (Pltf. R56 Resp. ¶¶ 223-224). *See* Moving Br. at 37 & n. 17.[52]

### 3. Scene 3: Instructions to Coerce Testimony by Treating Minors As Adults

In Episode 1, approximately two minutes after Fairstein is depicted ordering a roundup of young black males, she is seen instructing detectives Sheehan and Hartigan:

> We've got suspects. We've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids, they raped this woman. Our lady jogger deserves this.

---

[51] *Reid*, 2016 WL 1174606, at *15-16. Ms. Swicord's early draft of Scene 2 did not refer to every young "black" male or "thug." PX-44, at DEFS007990. DuVernay admits that she added the word "thug" to the dialogue in Scene 2 to "explore themes of unconscious bias." DuVernay Decl. ¶¶ 90, 94. This comports with Fairstein's allegation that the word "thug" has racist connotations today that *it did not have in the past*. Compl. ¶ 103. While Defendants assert that ██████████████████████████████████████████████, this is not the case. *See* Moving Br. at 36 & n. 16; Pltf. R56 Resp. ¶¶ 96-103, 145. At a "Culture Summit" about the Series, attended by DuVernay and Netflix executive Alison Engel, a topic of discussion was "the system isn't broken…. It's not due to unconscious bias. Designed to benefit those in power." Pltf. R56 Resp. ¶ 145. In addition, there is no evidence that Fairstein used the term "thug" as a racist code word. *See* DX-4, Fairstein Dep. 110:13-112:18. Assuming *arguendo* that the use of the word "thug" was deemed to accurately reflect Fairstein's language usage, it would not render Scene 2 substantially true because the scene depicts Fairstein ordering an unlawful police canvas of Harlem in search of young, black males, which she clearly did not do. *Love v. William Morrow & Co.*, 193 A.D.2d 586, 587-588 (2d Dep't 1993) is inapposite. In *Love*, the published a statement in a book that was taken, verbatim, from a term paper written by the plaintiff. In *Corporate Training Unlimited*, the plaintiffs failed to complain about a nearly identical statement made by a non-party. Here, Defendants have no sources which expressly state that Fairstein ordered a discriminatory canvas of Harlem.

[52] DuVernay's assertion that she did not intend to convey that Fairstein was ordering police to make unlawful stops, is belied by the scene itself, which depicts police officers stopping and frisking young black males on the street, (DX-30, Ep. 1, at 20:10-20:29), and is the prelude to detectives picking up Salaam and Wise. The dialogue plainly directs officers to "stop every little thug you see." This also comports with DuVernay's definition of a roundup. PX-51, DuVernay Tr. 119:14-19.

DX-30, Ep. 1, at 22:35-22:53.[53] *See* Pltf. R56 Resp. ¶¶ 148-159. Detectives Sheehan and Hartigan are next shown walking towards an interrogation room, where Reynolds tells them that Richardson, who is 14 years old, is inside. Reynolds also tells the detectives that Richardson's mother left the precinct. The overjoyed detectives commence the interrogation and physical violence is used. DX-30A, at 22:54-23:55.[54]

A reasonable jury would conclude that there is clear and convincing evidence that this scene is false because, per the Central Park Jogger testimony: 1) Fairstein was not at the Central Park Precinct at the time that detectives were questioning Richardson; 2) the detectives who questioned Richardson were directed to do so by "superior officers" at the Central Park Precinct; 3) Detective Gonzalez reported the contents of Richardson's statement to his NYPD supervisors, "chiefs" and police "brass"; 4) the detectives involved in questioning the Five received orders from their supervisors (Deputy Inspector Power, Sergeant O' Connor, Lieutenant Doyle);[55] and 5) Fairstein was not running the investigation. *See* SOF, at Pt. III.A.

Per Fairstein's deposition testimony in the Civil Action, she: 1) was not supervising the investigation; 2) was not with suspects at the 20th Precinct, nor was she in any interview rooms; 3) did not know most of the officers and detectives working at the precincts in the days after the attacks in Central Park; and 4) was not present for any police interviews or videotaped interviews of the people charged in connection with the Central Park Jogger case. *See* SOF, at Pt. III.B.

---

[53] DuVernay takes credit for adding the "no kid gloves" language to the dialogue in Scene 3. DuVernay Decl.¶ 96. The scene was added during the film editing process after Netflix appears to have given notes to DuVernay about escalating the pressure in Episode 1 and revising the timeline of the episode to "use Fairstein's manipulation to structure the rush to judgment." Pltf. R56 Resp. ¶ 148.

[54] Defendants argue that the dialogue in this scene is the "type of heightened language commonly heard in dramatizations of law enforcement authorities," (Moving Br. at 38), but the Court already held that "this language goes beyond dramatic trope or rhetorical hyperbole: The average viewer could understand [Fairstein's] comments as an instruction to coerce suspects into naming accomplices, and to treat suspects like as adults rather than minors because Fairstein considers them rapists." *Fairstein*, 553 F. Supp. 3d at 77-78.

[55] This certainly contradicts Defendants' wholly inaccurate and nonsensical assertion that Fairstein was "the highest ranking official on the scene." Moving Br. at 39. Indeed, per Defendants' own research, Lieutenant Doyle—not Fairstein—ordered detectives to pick up Salaam at his residence. Pltf. R56 Resp. ¶ 134.

If the portrayal of Fairstein were substituted with a scene in which an NYPD supervisor instructed detectives to treat Kevin Richardson like an adult and use coercive interrogation tactics such a version of events would clearly have a different effect on the mind of the viewer.

A reasonable jury would also find clear and convincing evidence that Defendants "had a subjective awareness of either falsity or probable falsity of the defamatory [scene], or acted with reckless disregard of its truth or falsity." *Celle,* 209 F.3d at 182-183. Again, no source cited by DuVernay or Swicord even suggests that Fairstein had the authority to instruct detectives in the manner in which they interrogated minors in custody. DuVernay Decl. ¶¶ 97-103; Swicord Decl. ¶¶ 93-11.[56] Nor does any source state that Fairstein instructed detectives to coerce confessions from minors in custody. *Id.* DuVernay and Swicord further chose not to review the testimony discussed above. Grasping at straws to find support for Scene 3—which does not concern Mr. Salaam[57]—Defendants assert that the basis for their depiction of Fairstein instructing detectives to treat minors in custody as adults during the interrogation process is what they incorrectly claim is Fairstein's "documented" treatment of Salaam.[58] Moving Br. at 38. *See* Pltf. R56 Resp. ¶¶ 148-159.

Defendants' citation to the Sullivan book contains ***no quoted statements*** from Fairstein. Moving Br. at 38. While Fairstein was interviewed for the book, Sullivan also interviewed the Five's defense attorneys. Pltf. R56 Resp. ¶ 153. Defendants further mischaracterize their own

---

[56] Swicord contends that she did not write the "kid gloves" dialogue. Therefore, her "beliefs" about the dialogue are irrelevant. Swicord Decl. ¶ 90. FRE 401, 402.

[57] The Series contains a scene which portrays the conflict between Ms. Salaam and Fairstein. DX-30, Ep. 1, at 43:10-45:58, which is not part of this lawsuit. Pltf. Resp. ¶ 150. The scene depicting this conflict barely touches upon the purported issues raised by DuVernay in attempting to defend Scene 3. Notably, the scene depicting the conflict between Ms. Salaam and Fairstein is clearly shown from Ms. Salaam's point of view, depicting her perspective and feelings about what occurred.

[58] Defendants also repeat their reliance on Fairstein's 2002 *New Yorker* interview which is, once again, a retrospective defense of the work that was done in the Central Park Jogger case and contains absolutely no reference to Fairstein instructing detectives in their manner of interrogation. *See* Pltf. R56 Resp. ¶ 156. They again rely on the biased statements of Warren and Santana, who had no personal knowledge of what occurred in 1989 and made generalized statements about Fairstein. *See* Pltf. R56 Resp. ¶ 77(a)(c). *See Reid*, 2017 WL 11634619, at *4-5.

sources. Sarah Burns expressly states that Fairstein "believed [Mr. Salaam] to be sixteen" and it was not until his mother "specifically stated that he was fifteen that Fairstein and the detectives took notice." Pltf. R56 Resp. ¶ 149. Per Sullivan, "[i]f Salaam was sixteen he was an adult under the law and authorities did not have to permit him to have visitors before he was questioned. And if he was fifteen (a fact of which Fairstein says she was unaware at the time) the police were only required to give access to a parent or guardian." Pltf. R56 Resp. ¶ 153.

Even under the circumstances described by their own sources, the "no kid gloves" scenario **makes no sense with respect to Salaam** because—by all accounts—Fairstein and detectives believed him to be sixteen years of age and—even if he was not—only his parent or guardian was permitted to see him. Moreover, Defendants edited Scene 3 to appear prior to the interrogation of **14-year-old Kevin Richardson**. Pltf. R56 Resp. ¶ 148.

Defendants further contend that Fairstein had "power and control over the interrogation process" because she "directed" detectives to stop the interrogation of Mr. Salaam. Moving Br. at 39. According to Sullivan, Fairstein told detectives "for the sake of protecting the case, they should accept Ms. Salaam's word that her son was fifteen and tell McKenna to stop the interview." Pltf. R56 Resp. ¶ 159. Per the Central Park Jogger testimony, Fairstein advised NYPD supervisors that they should take Ms. Salaam's word for it that Yusef was fifteen. PX-29, at DEFS017005-17007. Fairstein testified in this action that prosecutors serve as legal advisors to the NYPD but she had no power to direct NYPD action or compliance.[59] PX-2, Fairstein Dep. 188:10-20.

There is clear and convincing evidence that Defendants—at the very least—knew that it was inherently improbable that Fairstein directed detectives to treat minors in custody as adults in

---

[59] Defendants conducted no research on the differing roles of the NYPD versus Assistant District Attorneys during a criminal investigation and consulted with no one from the NYPD or the Manhattan District Attorney's office when developing the Series. PX-34, Swicord Dep. 164:15-166:12; PX-82, Locke Dep. 55:19-58:8; PX-51, DuVernay Dep. 69:10-70:20; PX-186; PX-111, Wolff 30(b)(6) Dep. 5:16-7:6; PX-137, Engel 30(b)(6) Dep. 69:5-20.

order to coerce confessions from them. *St. Amant*, 90 U.S. at 732. The evidence also refutes any assertion that the depiction of Fairstein is the "essence of truth."

A reasonable jury would further find clear and convincing evidence that Defendants knew, or were reckless not to know, that Scene 3 carried a defamatory meaning, *Palin*, 482 F. Supp. 3d at 219-220: 1) DuVernay and Netflix edited Scene 3 to portray Fairstein in an unethical light (Pltf. R56 Resp. ¶ 148);[60] 2) a draft casting description for Fairstein's role stated that "Fairstein, with the assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following thirty straight hours of interrogation and intimidation" (Pltf. R56 Resp. ¶ 223)[61]; 3) a casting description sent to a prominent actress' representative stated "Fairstein, with the assistance of detectives at the 20th Precinct, was the architect of the case against the five arrested teenagers of color, following thirty hours of interrogation" who "blurr[ed] the line between what was ethical and what was essential for the jogger." (*Id.*); and 4) Netflix employees and DuVernay attended a meeting at which it was discussed that the Series is a "***reckoning for [Fairstein's] prosecutorial misconduct.***" (Pltf. R56 Resp. ¶ 224).

### 4.   Scene 4: Concealing the DNA-Marked Sock From Defense Counsel[62]

Scene 4 depicts Fairstein as having exclusive knowledge about the discovery of the DNA-marked sock, springing the news on Lederer and Morgenthau, theorizing that the DNA resulted from the Meili assailants ejaculating into the sock and suggesting that the information be withheld from defense counsel so that the sock can be tested right before trial. DX-30, Ep. 2, at 16:39-17:14. Later, Fairstein tells Lederer that she believes a sixth attacker must have been involved "if it helps

---

[60] *Reid*, 2016 WL 11746046, at *14-16.

[61] *Id.* at *14-15.

[62] This "scene" appears in Episode 2 at 16:39-17:14 and 29:51-31:23. It is also discussed at Paragraphs 16, 19, 86(l), 160-187 of Plaintiff's Response to Defendants' Statement of Undisputed Facts.

a jury believe what we know is true." Fairstein tells Lederer to "play up the cervical DNA." DX-30, Ep. 2, at 29:51-31:23.[63]

The Court previously held that these "scenes depict Fairstein concealing evidence from defense counsel – a likely violation of law and professional responsibility – and manipulating the timing of the DNA test with the goal of advantaging the prosecution." *Fairstein*, 553 F. Supp. 3d at 74.[64]

A reasonable jury would find clear and convincing evidence that Scene 4 is false. Both Locke and DuVernay admit that, based on their research, Fairstein ***did not discover*** the sock DNA. PX-81, Locke Dep. 30:5-31:24; DuVernay Decl. ¶ 106. The sock was discovered by lab technician Mary Veit. PX-81, Locke Dep. 31:2-11; Locke Decl. ¶ 55 (citing Burns and Sullivan books) DuVernay Decl. ¶ 106. The writers also had no evidence that the prosecution concealed the sock DNA, or delayed its disclosure, so that it could be tested closer to trial. According to Burns, Veit discovered the sock DNA in March and trial was set to begin in April—Lederer requested, and received, a postponement of trial for DNA testing of the sock. Locke Decl. ¶ 55.[65] *See* Pltf. R56 Resp. ¶ 160. *See* PX-2, Fairstein Dep. 280:5-282:19. According to Sullivan, it was ***Lederer's*** belief that the semen on the sock "could have come from a kid who masturbated at the scene and wiped

---

[63] The scenes that comprise Scene 4 were scripted by Locke and edited by DuVernay. Pltf. R56 Resp. ¶¶ 198-199; DuVernay Decl. ¶ 105; Locke Decl. ¶ 52.

[64] For this reason, the Defendants' argument that Scene 4 cannot fairly be read this way is meritless. Moving Br. at 41 & n. 20. *DeHavilland*, 21 Cal. App. 5th at 869 is readily distinguishable from the present case. In the miniseries at issue in *DeHavilland*, there was evidence that the plaintiff had referred to her sister as a "Dragon Lady" and the writers changed the word to "bitch." Here, the writers fabricated the entire scene and their portrayal of Fairstein is contradicted by their own source materials. For this reason, *Saenz* is likewise inapposite. 841 F. 2d at 1318. *Saenz* is distinguishable for the additional reason that the defamatory statements at issue in Scene 4 clearly convey to the viewer that Fairstein has DNA evidence which has not been disclosed to defense counsel and—for that reason—the prosecution can test it right before trial.

[65] Locke read the Central Park Jogger testimony. Locke Decl. ¶ 15. At the trial of Messrs. McCray, Salaam and Santana, lab technician Mary Veit testified that she discovered the sock DNA on March 28, 1990. PX-27, at DEFS014810-814. Correspondence posted on the City Law Department website (which DuVernay chose not to review) shows that Lederer hand delivered a letter about the sock DNA to Justice Galligan, copying the Five's defense counsel, on the very next day—March 29, 1990. PX-17. *See* DuVernay Decl. ¶¶ 56-60.

himself off on the sock." Pltf. R56 Resp. ¶ 161. Thus, the attribution of this theory to Fairstein in Scene 4 is false.

When the sock DNA results came back, Lederer was "disturbed by the irrefutable evidence that **her net** hadn't caught everybody." *Id.*[66] Sullivan merely states that "Fairstein thought it probable that the semen on the sock belonged to someone who had raped the jogger." *Id.* ¶ 168. In comparison, Sullivan states that "Lederer knew enough about what happened that night to suspect that some of the culprits escaped." *Id.* ¶ 161. Thus, according to the writers' own sources, the attribution of the sixth attacker theory to Fairstein, as opposed to Lederer, in Scene 4 is false.[67]

Clearly a scene following actual events, in which the sock DNA is discovered by a lab technician and Lederer immediately discloses the discovery, would have a much different effect on the mind of the viewer than the scene as published. *Fairstein*, 553 F. Supp. 3d at 65. As set forth below, this is how Locke initially intended to tell the story of the sock DNA.

A reasonable jury would also find clear and convincing evidence that Defendants "had a subjective awareness of either falsity or probable falsity of the defamatory [scene], or acted with reckless disregard of its truth or falsity." *Celle,* 209 F.3d at 182-183. As set forth above, DuVernay's and Locke's own sources demonstrate that their depiction of Fairstein in Scene 4 is false. Locke's original story line for Scene 4 **did not include Fairstein**. Pltf. R56 Resp. ¶ 160.

---

[66] Locke mischaracterizes this entry in Sullivan as somehow portraying Lederer as being more concerned about the sock DNA not being a match to the Five. Locke Decl. ¶ 61. *See also* DuVernay Decl. ¶ 109. She also relied on Harlan Levy's characterization of Lederer. In the Civil Action, Lederer testified that Levy's description of her reaction to DNA results was false. Lederer Decl., Ex. C, at 724. Here, Lederer and Fairstein testified that the Levy book is inaccurate. PX-2, Fairstein Dep. 273:3-278:19; PX-10 Lederer Dep. 104:9-108:14.

[67] Defendants posit that because Fairstein testified that she was aware of the sock and reported its discovery to Morgenthau that Scene 4 is "substantially true." Moving Br. at 41 n. 19. Fairstein's testimony contradicts the scene. She stated that Lederer discovered the sock DNA when she visited the lab with Clements and an expert and went to court the very next day. After Lederer made her court appearance, Fairstein told Morgenthau about the sock because Lederer had requested an adjournment of trial. PX-2, Fairstein Dep. 280:5-283:2 (noting that defense counsel objected to the testing of the sock DNA). The "gist" of Scene 4 is not that Fairstein had a conversation with Morgenthau and Lederer about the discovery of the sock DNA—it's that Fairstein sprang the information on the two and suggested withholding and testing it closer to trial. *See* DX-30B (scene chart) ("And the kicker is none of the defense is aware yet. So we can test it right before the trial.")

Locke decided to add Fairstein to the script, but her initial draft followed her sources--depicting Veit discovering the sock DNA and Lederer petitioning to postpone trial. *Id.* In a January 2018 draft script Locke wrote "Push Fairstein harder. She goes wild so she gets a good comeuppance." *Id.* Subsequent notes call for Fairstein to be "more direct/vulgar" and "pump up Linda's reaction [to] the semen and her theory that the boys jizzed in a sock so they wouldn't be arrested." *Id.* In March 2018, Locke added the second part of Scene 4 in which Lederer and Fairstein argue over the DNA results. *Id.* In a June 2018 script, the scene located in Episode 2 at 16:39-17:13 is described as Lederer and Morgenthau looking at Fairstein with "deadpan eyes" while she "nods with a shit-eating grin." *Id.* This clearly demonstrates that the scene is not about capturing the prosecution's "giddy feeling upon discovering…last minute evidence." Moving Br. at 40. None of the notes or scripts discussed herein signal the writers' intention to convey that the prosecutors were "surprised." Pltf. R56 Resp. ¶ 160. *See* Moving Br. at 40-41.

The editing of Episode 2 to include Fairstein in the sock DNA scenes, the removal of the lab technician and the depiction of Fairstein espousing theories that she did not hold is clear and convincing evidence of actual malice. *Reid*, 2016 WL 11746046, at * 15-16 (defendants' deletion of material from draft scripts supported a finding of actual malice because the scene, as published, contradicted information known to the defendants and, as edited, cast the plaintiff in an unethical light); *Reid*, 2017 WL 11634619, at *7-8.

The editing of the scene in this manner also indicates that Locke and DuVernay "knew or were reckless not to know" that the scene would convey a defamatory meaning with respect to Fairstein. *Palin*, 482 F. Supp. 3d at 219-220; *Reid*, 2016 WL 1174606, at *15-16. The dialogue in the final scene also evidences defamatory intent as Fairstein clearly states "We have [the DNA] now. And the kicker is none of the defense is aware yet. So we can test it right before the trial.

Surprise." DX-30B (scene chart). *Palin*, 482 F. Supp. 3d at 219 (wording of defamatory statement may be considered). Prior to the release of the Series, a CBS producer asked Netflix's publicity team for clips from the Series, including the scene in which Fairstein and Lederer argue over the DNA results (DX-30, Ep. 2 at 16:39-17:13). A Netflix employee remarked that the CBS producer who requested the clips "very much feels as though Linda is the villain, and we agree those clips paint her as such." Pltf. R56 Resp. ¶ 160. Defendants further intended the Series to be a reckoning for Fairstein's "prosecutorial misconduct." Pltf. R56 Resp. ¶¶ 223-24.[68]

### 5.   Scene 5: Nancy Ryan Accuses Fairstein of Coercing Confessions[69]

The Court previously held that the average viewer could reasonably interpret Ryan's statement that Fairstein "coerced those boys into saying what they did" to be a factual assertion and that the scene "implies that Ryan's own investigation concluded that Fairstein directed the conduct of police interviews that secured confessions that she described as coerced." *Fairstein*, 553 F. Supp. 3d at 76-77.

A reasonable jury would find that there is clear and convincing evidence that Ms. Ryan's assertions against Fairstein are false. As discussed at length *supra* Points II.B.1-3, Fairstein did not have the authority or power to direct detectives to conduct coercive interrogations of the young men in custody, nor was she present when Richardson, Santana, McCray and Wise gave their written statements to police.[70] *See* SOF, at Pt.III.A; Pltf. R56 Resp. ¶¶ 193-194. The transcripts of Lederer's videotaped statements confirm that Fairstein was not present. Pltf. R56 Resp. ¶ 190.

---

[68] Defendants spend much space addressing irrelevant issues regarding Lederer's strategy around presenting the DNA evidence at trial. Moving Br. at 42-43. Plaintiff addresses these issues in Paragraphs 160-186 of her response to Defendants' Rule 56 Statement. Notably, the sources that Defendants relied upon in reference to the DNA issues in the Central Park Jogger case describe Lederer as responsible for the DNA strategy. For example, the Burns book notes "While preparing for trial, Lederer learned that no [DNA]matches had been made…. But the fact that the weak pattern that did show up was not clearly a match to …the suspects did not inspire her to look elsewhere." DX-27, at 97.

[69] This scene is located in Episode 4, at 1:09:46-1:12:41. *See* Pltf. R56 Resp. ¶¶ 187-197.

[70] Because Fairstein recommended to NYPD supervisors that they stop the questioning of Mr. Salaam, he gave no written statement to police and no video statement to Lederer. DX-17, Sullivan, at pp. 27-28.

Ms. Ryan did not find that Fairstein was personally involved in the police questioning or videotaped statements of the Five. Pltf. R56 Resp. ¶ 189. *Id.* Fairstein's name does not appear **anywhere** in Ryan's affirmation in support of vacating the Five's convictions. *Id*. Per Ryan, "each of the defendants was questioned by detectives" and that "portions of the statements made by defendants are consistent with the evidence presented at trial." *Id*. *See* DuVernay Decl. ¶ 126. Ryan further notes "it was credibly, honestly and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual." Pltf. R56 Resp. ¶ 189.

A scene depicting Ms. Ryan's actual findings in her reinvestigation, rather than falsely accusing Fairstein of coercion, would have a much different effect on the mind of the viewer than the existing scene. *Fairstein*, 553 F. Supp. 3d at 65.

A reasonable jury would also find clear and convincing evidence that DuVernay "had a subjective awareness of either falsity or probable falsity of the defamatory [scene], or acted with reckless disregard of its truth or falsity." *Celle,* 209 F.3d at 182-183. DuVernay's own sources contradict the statement that Fairstein coerced confessions from the Five. Messrs. Richardson and McCray commented on Lederer's involvement in the case and taking of their statements. Pltf. R56 Resp. ¶¶ 189, 205. Santana told DuVernay that he did not know or meet Fairstein. Pltf. R56 Resp. ¶¶ 189. Sullivan states that (i) an "elite crew" of detectives had "conducted a series of interrogations producing the written statements that would serve as a prelude to Lederer's videotaped statements;" (ii) "Lederer was distracted by disappointments…if the kids were telling the truth…they each had succeeded in minimizing his own role;" and (iii) "[b]etter informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects."

*Id.* According to Burns, "there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer." *Id.*

DuVernay acted with actual malice because she chose to ignore facts which alerted her to the inherent improbability of her statement that Fairstein coerced statements from the Five. Netflix purposefully avoided the truth. A Netflix executive questioned whether the lunch scene "actually happened." Pltf. R56 Resp. ¶¶ 68-69. Netflix was also notified of several potential flags about Fairstein's role in the Series and took no action. *Id.*

A reasonable jury would also find clear and convincing evidence that DuVernay and Netflix "knew or were reckless not to know" that Scene 5 carried a defamatory meaning, *Palin*, 482 F. Supp. 3d at 219-220. Ms. Ryan's dialogue itself—stating that Fairstein coerced the confessions—is evidence that DuVernay intended to convey a defamatory meaning because, as the Court previously noted, the scene depicts "[t]he damning judgment of Fairstein's conduct voiced by a professional colleague." *Fairstein*, 553 F. Supp. 3d at 76.[71] DuVernay described her "invented" Scene 5 as all the things she would say to Fairstein if she ever got the chance. Pltf. R56 Resp. ¶ 197. Netflix was aware of this. *Id.* ¶ 68. Locke wrote to DuVernay "When Nancy Ryan slapped her little books on the table in episode 4, I died." DuVernay replied "I told Famke: 'You are my voice here.*' I know Linda heard every word*." *Id.* (emphasis added). *See also* Pltf. R56 Resp. ¶¶ 223, 224.[72]

---

[71] While DuVernay purportedly relied on a 2016 statement Morgenthau made about Fairstein, (Moving Br. at 45), said statement does not lend support for Ms. Ryan's dialogue. *See* Pltf. R56 Resp. ¶ 195. Mr. Morgenthau justified the prosecution of the Five by saying "We had screwed up. But there were confessions." DX-50. He certainly did not accuse Fairstein of unlawful or unethical conduct related to the prosecution. The article notes that Morgenthau had "little interest in revisiting" his mistakes. It is therefore not surprising that he would use Fairstein as a scapegoat during a retrospective of his career (particularly after he had a falling out with Fairstein). *Id.*; Pltf. R56 Resp. ¶ 195. In the same article, a critic of Morgenthau places the blame squarely on him ("He was the dean and he could have used his moral authority to change the trajectory"). Notably, Warren told DuVernay that Morgenthau refused to say the Five were innocent, even though community leaders asked him to do so. DX-39A, at DEFS007034-36.

[72] Defendants do not dispute that they harbored ill will against Fairstein. While such evidence, does not constitute actual malice, the Court may consider it as part of its evaluation of Defendants' conduct. *Celle*, 209 F.3d at 183 ("[e]vidence of ill will combined with other circumstantial evidence indicating that the defendant acted with

For all the above stated reasons, Defendants' motion for summary judgment should be denied with respect to all Five Scenes.[73]

## III.    Defendants Misconstrue the Subsidiary Meaning Doctrine

Defendants make no argument which supports the application of the subsidiary meaning doctrine in this case. Moving Br. at 46-47. Instead, they baldly assert that their "views" of Plaintiff are "unassailable" and that each of the Five Scenes is subsidiary to their "overarching views" and the "larger truth held by the filmmakers." *Id.* at 47.[74] This exhibits a fundamental misunderstanding of how, and when, the doctrine is applied.

Plaintiff found no case in which the subsidiary meaning doctrine was applied in the docudrama context. Assuming *arguendo* that it applies here, the doctrine may only be applied ***after*** the Court determines whether Defendants acted with actual malice with respect to each of the Five Scenes ***and*** finds at least one of the scenes nonactionable for lack of actual malice. *Herbert v. Lando*, 781 F.3d 298, 305, 311-312 (2d Cir. 1986). The doctrine ***requires*** an actual malice analysis—it is not, as Defendants contend, a comparison of each of the Five Scenes to the "overall view" expressed in the Series. *Id. See also Church of Scientology v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001); *James v. Degrandis*, 138 F. Supp. 2d 402, 418 (W.D.N.Y 2001). The subsidiary meaning evaluation is limited to the comparison of actionable scenes to those that have been

---

reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.") *See U.S. Dominion, Inc.,* 554 F. Supp. 3d at 62.

[73] The totality of Defendants' conduct evidences "predetermined and preconceived plans to malign" Fairstein's character. *Goldwater,* 414 F.2d at 336-337. *See* Pltf. R56 Resp. ¶¶ 119-229. *Berisha*, 973 F. 3d at 1314, is readily distinguishable because the writers of the Series knew Fairstein prior to starting their work. SOF Pt. II; Pltf. R56 Resp. ¶ 228. *See* Moving Br. at 27. Defendants' statements about the impact of the Series on Fairstein are also far more suggestive of a preconceived or predetermined plan than the plaintiff's statements in *Berisha*. Pltf. R56 Resp. ¶¶ 223-224.

[74] Curiously, Defendants argue that "Plaintiff does not (and could not) challenge" the sources which support their "overarching" view of her. Given that Defendants' papers are the first submission in this motion sequence, Plaintiff had no opportunity to challenge their sources and views until now. *See* Point II, *supra,* and Plaintiff's Response to Defendants' Statement of Undisputed Facts.

dismissed as nonactionable (due to a lack of actual malice). It is also limited to "cases in which statements…made with knowing falsity or reckless disregard give rise to defamatory inferences that are ***only*** supportive of inferences that are not actionable." *Herbert*, 781 F.2d at 312 (emphasis added) ("We do not mean to imply by our holding that appellees could have published with impunity a vast collection of false statements").

It would be premature, if not presumptuous, to attempt to determine the Court's ultimate ruling with respect to actual malice. However, as detailed *supra* Point II, there is clear and convincing evidence that Defendants acted with actual malice with respect to the utterly false portrayal of Fairstein in each of the Five Scenes. Because each of the Five Scenes conveys a specific and distinct defamatory meaning about Fairstein's involvement in the Central Park Jogger case, the subsidiary meaning doctrine should not be applied here. *See Fairstein*, 558 F. Supp. 3d 58, 74, 76-79; Point II.B. Fairstein's claims do not concern minor inaccuracies, but the "vast collection of false statements" that the Second Circuit warned against. *Herbert*, 781 F.2d at 312; *James*, 138 F. Supp. 2d at 418.

## IV.   <u>Netflix Should Remain in the Action</u>

Netflix should remain in this action because, as set forth *supra* Point II, there is clear and convincing evidence that Defendants acted with actual malice when writing and editing the Five Scenes. There is also clear and convincing evidence that Netflix (i) harbored serious doubts about the accuracy of the writers' portrayal of Fairstein; and (ii) was given information that contradicted the writers' portrayal of Fairstein. Pltf. R56 Resp. ¶¶ 68-69; Engel Decl. ¶¶ 14-16. In addition, DuVernay was criticized in the press for historical inaccuracies in her docudrama *Selma*. Pltf. R56 Resp. ¶ 40. ████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Pltf. R56 Resp. ¶ 68. *See Berisha*, 973 F.3d at 1304 n. 8; *Fodor v. Berglas*, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995) (publisher may not rely on author's research where there ***doubts*** as to accuracy of book or bona fides of author); *Weiner v. Doubleday*, 74 N.Y.2d 586, 595 (1989) (same); *Love v. William Morrow & Co.*, 193 A.D.2d 586, 589 (1993) (same).

While Netflix refers to itself a mere "film distributor and publisher," the Series was created as part of Netflix's original content. *See* Engel Decl. ¶¶ 4, 9-10, 18-19. Netflix's ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ Pltf. R56 Resp. ¶ 41 (emphasis added). Netflix also had to "approve the scripts in order to move forward with the production." PX-51, DuVernay Dep. 50:12-51:3.

## V.   Locke Should Remain in the Action

Locke should remain in the action. *See* Moving Br. at 40 n. 18. Her involvement in the Series extends beyond Episode 2 because: 1) she is a "co-producer" of the Series (Locke Decl. ¶ 3); 2) Locke participated in the writers' room, during which the writers discussed research, the structure of the Series and "key moments (beats) for each episode" (*Id.* ¶ 22); 3) the writers worked as a "team with some individual responsibilities" (PX-81, Locke Dep. at 16:21-17:3); 4) Locke provided advice on research, notes and ideas to Swicord for Episode 1 (PX 81, Locke Dep. 93:4-12, 100:17-104:19, 106:4-24, 107:20-121:18; PX-94-98; PX-191, at DEFS082899; PX-34, Swicord Dep. 158:13-159:8, 168:15-18; PX-42; PX-93, at DEFS021415; and 5) Locke worked on character development for the Series, including the portrayal of Fairstein as the primary villain in the Series. PX-81, Locke Dep. 93:1-96:20.

Defendants assert that Locke cannot be held liable for defamation with respect to the sock DNA scene located in Episode 2, at 16:39-17:12, because DuVernay wrote certain dialogue for the scene. *See* Moving Br. at 40 n. 18; DX-30B. Not only did Locke write dialogue that remained in Scene 4, but Fairstein's defamation claim concerns the entirety of the scene as viewed. As discussed at Point II.B.4, *supra*, Locke made the decision to script Fairstein into Scene 4, scripted the second scene in which Fairstein and Lederer argue about the DNA results, and deleted information that would have moderated the defamatory meaning of the scene. Moreover, Locke admitted that she, herself, "can be held responsible" for scripting the scene. PX-81, Locke Dep. 152:7-155:6-8; PX-101.

## VI.    The Conspiracy Claim Should Not Be Dismissed

Defendants contend that there can be no conspiracy claim because they did not know Fairstein "before this project." Moving Br. at 48. They cite no case which requires an agreement amongst or between Defendants at a particular point in time and it is, accordingly, irrelevant whether Defendants knew Fairstein prior to commencing work on the Series. In any event, the evidence flatly contradicts Locke's and DuVernay's assertions that they did not know Fairstein. Pltf. R. 56 Resp. ¶ 228, SOF Pt. II. The record is replete with evidence of an agreement between DuVernay and Netflix to defame Fairstein and acts in furtherance of said conspiracy—in the scripting and editing of the Five Scenes, and in the social media, communications, PR and marketing strategies for the Series. *See* Pltf. R56 Resp. ¶¶ 120, 148, 160, 207, 211-215, 220-221, 223-224, 229. There was also a conspiracy between Locke and DuVernay to defame Fairstein, as evidenced by writers' room notes, Locke's revisions to the sock DNA scene, Locke's public attacks on Fairstein when she received the Grand Master Award (referring back to her research for the Series), Locke's social media posts about Fairstein and communications between Locke and

49

DuVernay concerning Fairstein. *See* Pltf. R56 Resp. ¶¶ 160, 203, 205, 223. There is also a question about whether Locke and Netflix had an agreement to defame Fairstein. Locke told a reporter seeking comments about Fairstein that she had to "coordinate with [Netflix's] publicity team." PX-109; PX-81, Locke Dep. 200:7-201:22. At a panel event sponsored by Netflix, Locke stated "We are living in a time of cognitive dissonance, which is how you have Linda Fairstein's ass talking all the stuff she's talking about." PX-91; PX-81, Locke Dep. 72:12-77:22.

## CONCLUSION

For the above state reasons the Court should deny Defendants' motion for summary judgment in its entirety and allow this case to proceed to trial.

Dated:   New York, New York
        November 30, 2022

                            Respectfully Submitted,

                By:   */s/ Kara L. Gorycki*
                    Kara L. Gorycki
                    Andrew T. Miltenberg
                    NESENOFF & MILTENBERG, LLP
                    363 Seventh Avenue, Fifth Floor
                    New York, New York 10001
                    (212) 736-4500
                    kgorycki@nmllplaw.com
                    amiltenberg@nmllplaw.com

                    *Attorneys for Plaintiff Linda Fairstein*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2022, a true and correct copy of the foregoing was served by CM/ECF on all counsel of record.

/s/ *Kara L. Gorycki*