**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

LINDA FAIRSTEIN,                                  )
                                                  )
              Plaintiff,                          )
                                                  )   Case No. 20-cv-8042 (PKC)
       v.                                         )
                                                  )   Judge P. Kevin Castel
NETFLIX, INC., AVA DUVERNAY, and                  )
ATTICA LOCKE,                                     )
                                                  )
              Defendants.                         )
                                                  )

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Sandra D. Hauser                    Natalie J. Spears (*pro hac vice*)
Justin N. Kattan                    Gregory R. Naron (*pro hac vice*)
DENTONS US LLP                      Jacqueline A. Giannini (*pro hac vice*)
1221 Avenue of the Americas         DENTONS US LLP
New York, New York  10020           233 South Wacker Drive, Suite 5900
Phone: (212) 768-6700               Chicago, Illinois 60606
*sandra.hauser@dentons.com*         Phone: (312) 876-8000
                                    *natalie.spears@dentons.com*
                                    *gregory.naron@dentons.com*
                                    *jacqui.giannini@dentons.com*


*Counsel for Defendants Netflix, Inc., Ava
DuVernay and Attica Locke*

# TABLE OF CONTENTS

Page

I.   Plaintiff Misunderstands Actual Malice Law ..................................................................... 2

II.  Unable to Meet Her Daunting Burden on This Motion, Fairstein's Actual Malice
     Arguments Miss the Point and Misstate the Record and Law ............................................. 6

     A.   Plaintiff Has No Answer to the Sources' Support for the Fairstein
          Portrayal ..................................................................................................................... 6

     B.   Plaintiff's Arguments That the Filmmakers Failed to Investigate and Did
          Not Credit Her Self-Serving Testimony Does Not Establish Actual Malice ......... 8

     C.   Asserting That the Filmmakers' Sources Were "Biased" Goes Nowhere ........... 12

     D.   Defendants' Dislike of Plaintiff After Their Research Is Not Actual Malice ...... 13

III. Plaintiff Must Also Establish Actual Malice as to Alleged Defamatory Meaning ........... 15

IV.  Plaintiff Cannot Prove Actual Malice As To The Five Scenes As A Matter of Law ...... 15

V.   The Subsidiary Meaning Doctrine Also Forecloses Plaintiff's Claims. .......................... 25

CONCLUSION ...................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................2

*Berisha v. Lawson*,
   973 F.3d 1304 (11th Cir. 2020) .................................................................14, 25

*Bose Corp. v. Cons. Union*,
   466 U.S. 485 (1984)............................................................................................3

*Cannon v. Peck*,
   36 F.4th 547 (4th Cir. 2022) .............................................................................3

*Celle v. Filipino Reporter Enterps.*,
   209 F.3d 163 (2d Cir. 2000)........................................................................13, 24

*Church of Scientology Int'l v. Time Warner*,
   903 F. Supp. 637 (S.D.N.Y. 1995), *aff'd*, 238 F. 3d 168 (2d Cir. 2001) ...............3, 12, 15, 25

*Colorado v. New Mexico*,
   467 U.S. 310 (1984)............................................................................................3

*Contemp. Mission, Inc. v. N.Y. Times Co.*,
   665 F. Supp. 248 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988)........................2, 4, 10

*Coughlin v. Westinghouse Broad.*,
   780 F.2d 340 (3d Cir. 1985)............................................................................12

*Davis v. Costa-Gavras*,
   619 F. Supp. 1372 (S.D.N.Y. 1985)................................................................6

*Davis v. Costa-Gavras*,
   654 F. Supp. 653 (S.D.N.Y. 1987) .......................................................5, 6, 12, 18

*De Havilland v. FX Networks, LLC*,
   21 Cal.App.5th 845 (2018) ...............................................................................5

*Donofrio-Ferrezza v. Nier*,
   2005 WL 2312477 (S.D.N.Y. Sept. 21, 2005), *aff'd*, 178 F. App'x 74 (2d Cir.
   2006) ...........................................................................................................10, 12

*Edwards v. Nat'l Audubon Soc.*,
   556 F.2d 113 (2d Cir. 1977)............................................................................10

*Egiazaryan v. Zalmayev,*
  2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) .........................................................15

*Fairstein v. Netflix, Inc.*,
  553 F. Supp. 3d 48 (S.D.N.Y. 2021)............................................................. *passim*

*Gross v. N.Y. Times Co.*,
  281 A.D.2d 299 (1st Dep't 2001) ........................................................................12

*Harte-Hanks Comm'ns v. Connaughton*,
  491 U.S. 657 (1989).................................................................................. *passim*

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979).............................................................................................2

*Kipper v. NYP Holdings Co., Inc.*,
  12 N.Y.3d 348 (2009) .........................................................................................14

*Liberman v. Gelstein*,
  80 N.Y.2d 429 (1992) .........................................................................................10

*Loeb v. New Times Commc'ns*,
  497 F. Supp. 85 (S.D.N.Y. 1980) ........................................................................12

*Lohrenz v. Donnelly*,
  350 F.3d 1272 (D.C. Cir. 2003) ...........................................................................11

*Lovingood v. Discovery Comm'cns Inc.*,
  275 F. Supp. 3d 1301 (N.D. Ala. 2017), *aff'd*, 800 F. App'x 840 (11th Cir.
  2020) .................................................................................................................5, 6

*Masson v. New Yorker*,
  501 U.S. 496 (1991)..............................................................................................5

*McFarlane v. Sheridan Sq. Press*,
  91 F. 3d 1501 (D.C. Cir. 1996) ......................................................................12, 13

*N.Y. Times v. Sullivan*,
  376 U.S. 254 (1964)................................................................................ *passim*

*Newton v. Nat'l Broad. Co.*,
  930 F.2d 662 (9th Cir. 1990) ..................................................................15, 22, 23

*Palin v. N.Y. Times*,
  482 F. Supp. 3d 208 (S.D.N.Y. 2020)..............................................................2, 15

*Palin v. N.Y. Times*,
  588 F. Supp. 3d 375 (S.D.N.Y. 2022)....................................................................2

*Palin v. N.Y. Times*,
    940 F.3d 804 (2d Cir. 2019)..........................................................................................11, 13

*Reid v. Viacom Int'l*,
    2016 WL 11746046 (N.D. Ga. Sept. 14, 2016) ....................................................................6, 12

*Reliance Ins. Co. v. Barron's*,
    442 F. Supp. 1341 (S.D.N.Y. 1977)..........................................................................3, 4, 14, 22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968).....................................................................................................5, 7, 9

*Stepanov v. Dow Jones & Co.*,
    120 A.D. 3d 28 (1st Dep't 2014) .......................................................................................15

*Street v. Nat'l Broad. Co.*,
    645 F.2d 1227 (6th Cir. 1981) .........................................................................................6, 17

*Suozzi v. Parente*,
    202 A.D.2d 94 (1st Dep't 1994) .........................................................................................10

*Time Inc. v. Pape*,
    401 U.S. 279 (1971).......................................................................................10, 12, 17, 24

*U.S. Dominion, Inc.. v. Powell*,
    554 F. Supp. 3d 42 (D.D.C. 2021) .......................................................................................7

To survive summary judgment, Linda Fairstein was required to produce clear and convincing evidence that the Defendants *subjectively* knew their portrayal of her in the five scenes at issue was false or seriously doubted its truth. There is no such evidence. The most Fairstein can do is reargue the underlying Central Park Jogger case and civil suit, criticize the writers' sources, and advance her view of these contested and highly controversial events. None of this has any bearing on actual malice. The uncontroverted evidence is that the writers, based on their sources, fully believed that their depiction of Fairstein captured the essence of the truth. Just as Linda Fairstein has been allowed to tell her version of the story for decades, the filmmakers, based on their extensive research, are constitutionally permitted to tell the story from the perspective of the five innocent men.

Fairstein's argument that her depiction was "inherently improbable" is frivolous:  What Defendants' sources confirmed about Fairstein exercising control at the precincts made perfect sense given everything they watched, read and heard, including her own "800-pound gorilla" boast, Michael Warren stating she "controlled" the cops, and D.A. Morgenthau identifying her (and only her) as being responsible for the case—the one in whom he "misplaced" his trust. This overwhelming source support is dispositive—Fairstein may disagree with the sources but the films, books, and articles say what they say, and the interviews were recorded. Her personal disagreements with what the sources have to say are immaterial on this motion, which concerns the filmmakers' state of mind.

Although Fairstein has said her lawsuit is not about "retrying the case against [the Five]" (ECF No. 89, at 3), that is precisely what she proceeds to do, relying exclusively on the DA's Office and NYPD narrative from 1989-91. While in the 20 years since the Five's exoneration, "society has tried to understand and make amends" for this "colossal mistake," including a $41 million settlement and just last month dedicating a new gate in Central Park to the "Exonerated Five",[1] Fairstein has "no

---

[1]   Zachary Small, *Decades After the Central Park Jogger Attack, a City Marks Its Mistake, N.Y. Times*, Dec. 12, 2022), https://www.nytimes.com/2022/12/12/arts/design/central-park-five-gate.html.

regrets" still maintaining that the Five are rapists, guilty "as charged." (SUF ¶¶ 35, ▉.)

Fairstein does not own history. Under the First Amendment, artists with the courage to speak are allowed to explore criminal justice system failures in a drama without fear that a public official at the heart of it will drag them through a retrial of the underlying case, attacking them and their sources to, as Fairstein herself said was her goal, "derail" a work by an "African-American woman" with "a point of view not favorable" to her. Defendants—and the Five—are entitled to voices and their take on contested historical events involving public officials. Otherwise the protection under *New York Times v. Sullivan* is hollow.

## I.    <u>Plaintiff Misunderstands Actual Malice Law</u>

Unable to "establish the presence of actual malice by clear and convincing evidence" as the constitution requires, *Contemp. Mission, Inc. v. N.Y. Times Co.*, 665 F. Supp. 248, 257 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir. 1988) (affirming summary judgment), Fairstein repeatedly misstates the law that governs this motion.

***Actual malice is appropriate for summary judgment***. Fairstein errantly relies on dicta in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) to argue that actual malice "does not readily lend itself to summary disposition." (Opp. 17.) *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) *expressly* rejected the proposition that summary judgment on actual malice was disfavored and that actual malice had to go to the jury because the defendant's "state of mind is at issue." *Id.* at 256.[2] Indeed the majority of cases involving public officials end at the summary judgment stage because, as here, the plaintiff cannot meet her heavy burden of proving subjective actual malice by clear and convincing evidence. (*See* Open. Br. 21-22 (citing cases affirming summary judgment).)

---

[2] Plaintiff's refrain (*e.g.,* Opp. 18, SUF Resp. ¶ 56) that a defendant's beliefs present "credibility issues" that preclude summary judgment is flatly contrary to *Anderson* and Second Circuit authority. *Contemp. Mission Inc.*, 842 F. 2d at 621-22. *Palin v. N.Y. Times*, 482 F. Supp. 3d 208 (S.D.N.Y. 2020), which she cites, did *not* so hold; as the court later noted, that would contradict *Contemporary Mission* and *Anderson*. 588 F. Supp. 3d 375, 396 (S.D.N.Y. 2022). Without producing affirmative proof as to Defendants' state of mind Plaintiff cannot create a jury issue just by saying the word "credibility."

***Fairstein's refrain that "beliefs are not facts" is a red herring.*** Fairstein disparages Defendants' declarations, suggesting that "their 'beliefs' and 'intentions' in developing the Series" are irrelevant and self-serving. (Opp. 18.) This is simply wrong; *Sullivan* itself talks in terms of what speakers "believed to be true." *N.Y. Times v. Sullivan,* 376 U.S. 254, 279 (1964). As this Circuit has emphasized,

> The speaker's belief in his statements, even his exaggerations, enhances, rather than diminishes, the likelihood that they are protected from libel attack by the First Amendment. Only where the speaker himself lacks this conviction, where the speaker entertains serious doubt as to the veracity of his statements, is the false statement actionable.

*Church of Scientology Int'l v. Time Warner*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995), *aff'd,* 238 F. 3d 168 (2d Cir. 2001). Fairstein's criticisms are particularly disingenuous considering the declarations contain extensive citations to their research materials that confirm their pre-publication state of mind.

***It is Fairstein's burden to prove with clear and convincing proof that Defendants <u>subjectively doubted</u> the truth of the portrayal.*** Fairstein spends much of her brief arguing *literal* "falsity" of the scenes at issue. But actual malice *assumes* the statements at issue are not technically true or are contested, and even if Fairstein could prove them false that has no bearing on her constitutional burden.[3] *The question is not whether the scenes and dialogue were literally true and provable with precise sourcing for each line*. The question is what the filmmakers *subjectively believed to be true* based on their sources. (Open. Br. 21-22.)[4] After extensive discovery, including lengthy depositions of DuVernay and the other writers, Fairstein has come up dry on this dispositive point.

---

[3]  *See, e.g., Reliance Ins. Co. v. Barron's,* 442 F. Supp. 1341, 1350 (S.D.N.Y. 1977) ("inaccuracy itself will not demonstrate 'actual malice' in a libel case"); *Bose Corp. v. Cons. Union*, 466 U.S. 485, 511 (1984).

[4]  "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at 511 n.30. To be "clear and convincing" it "must 'place in the ultimate factfinder an abiding conviction that the truth of [plaintiff's] factual contentions are 'highly probable.'" *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022) (internal citations omitted, alterations original) (applying clear and convincing standard from *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) in actual malice inquiry).

While a defendant cannot automatically ensure a verdict by testifying they believed a statement to be true, "when the defendant has asserted his good faith under oath, and no evidence whatever exists to counteract that assertion, then it must be credited." *Reliance Ins.*, 442 F. Supp. at 1350 (granting summary judgment); *Contemp. Mission*, 842 F. 2d at 621-22 (plaintiff cannot "merely . . . 'assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice'"). Neither Fairstein's attempts to reargue the Five's conviction and exoneration, nor her criticisms of Defendants' numerous sources, are relevant to the ultimate issue: Defendants' subjective belief in the truth of the portrayal.

Fairstein has not raised a factual dispute as to the filmmakers' lack of actual malice—to the contrary, she *cannot deny* the source materials the writers relied upon and *admits* key facts in Defendants' SUF.[5] Nor has she remotely met her burden of coming forward with the *affirmative, "concrete evidence"* of knowing falsity that the clear and convincing standard requires. *Contemp. Mission*, 842 F.2d at 621 (emphasis added). Without that specific proof, Plaintiff cannot meet her burden on summary judgment by simply saying that a jury could "disbelieve" defendants. *Id.*; *see supra* n. 2.

***Dramatizations are different from news reports and documentaries***.  Fairstein creates a straw man in objecting to Defendants' purported "heightened protection" for dramatizations. (Opp. 3.) Defendants have never argued that there is extra protection for this art form. But courts do recognize that the context of a work must be considered in assessing actual malice and that rote application of actual malice cases involving journalism or documentary would essentially eliminate protection for dramatizations. (Open. Br. 22-26 (citing cases).) This is not an academic point here. Much of Fairstein's opposition uses sleight of hand to argue that actual malice is proven by the simple fact that

---

[5]  Plaintiff admits intimate involvement in the CPJ case during the investigation as the highest ranking prosecutor and only "supervisor" from the D.A.'s office at the precincts (SUF ¶¶ 7-10, 13); admits that the sources the filmmakers relied on say what they say about her  (*id.* ¶¶ 84b, c, e, 86k, 86n, 88, 89, 139, 154, 168, 169, 170, 188), admits her own biased viewpoint about the Five and desire to "derail" Ms. DuVernay's project (*id.* ¶¶ 100, 101, 115); and makes a host of other concessions about the Series and the underlying facts of the CPJ case (*id.* ¶¶ 17, 20, 24-26, 48, 49, 71, 122, 125, 136, 139, 171, 208, 210, 212, 215). As to other undisputed facts, Plaintiff either denies them without basis or offers arguments and deflections instead of evidentiary grounds for disputing a straightforward fact. (*See* Def. SUF Reply, pp. 1-4.)

many of the scenes are "fabricated" or "invented." (*E.g.*, Opp. 19 n. 30, 21 n. 31, 40 n. 64, 45.)

For example, she cites *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968), for the proposition that "[p]rofessions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant, [or] is the product of his imagination." But *St. Amant* (and *Harte-Hanks Comm'ns v. Connaughton*, 491 U.S. 657 (1989)) are inapposite as both involved news reports, whereas "[t]his case concerns a docudrama. ***The 'drama' aspect of the film presupposes that aspects of the historical event are fictionalized*** in the film for entertainment purposes." *Lovingood v. Discovery Comm'cns Inc.,* 275 F. Supp. 3d 1301, 1313-14 (N.D. Ala. 2017), *aff'd*, 800 F. App'x 840 (11th Cir. 2020) (emphasis added) (distinguishing *Harte-Hanks* and citing *Davis v. Costa-Gavras*, 654 F. Supp. 653, 658 (S.D.N.Y. 1987)). Fairstein's pejorative use of "invented" or "fabricated" is a *non sequitur* in this context. *See Masson v. New Yorker*, 501 U.S. 496, 511-13 (1991) (distinguishing "fabricated quotations" in context of "journalistic writing" from works such as a "docudrama or historical fiction").[6] Those words simply describe the process of creating dialogue and scenes to artistically express in a drama what the writers believed happened based on their sources and interpretations. (SUF ¶ 72; Def. SUF Reply ¶ 160.)

The "First Amendment protects such dramatizations and does not demand literal truth in every episode depicted; publishing a dramatization is not of itself evidence of actual malice." *Davis*, 654 F. Supp. at 658. This Court has recognized as much: "dialogue in the dramatization is not a verbatim recounting of the real-life participants and is *intended to capture the essence of their words and deeds.*" *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 64 (S.D.N.Y. 2021) (emphasis added). That is why the courts have adopted the essence of truth standard articulated in *Davis*: "if alterations of fact in scenes portrayed are *not made with serious doubts of truth of the essence* of the telescoped composite, such scenes do not ground a charge of actual malice." 654 F. Supp. at 658 (emphasis added).

---

[6] *See also De Havilland v. FX Networks, LLC,* 21 Cal.App.5th 845, 866, 869 (2018) (a "fictionalized and imagined scene is by definition "made-up," but "[p]ublishing a fictitious work about a real person" does not amount to actual malice).

***Fairstein's attempts to avoid the Davis precedent are meritless.*** Recognizing *Davis* is the

death knell of her claims, Fairstein strains to limit its application. Her arguments are unavailing:

- *Davis'* holding is not limited to "composite character[s]" (Opp. 18). The "composite" to which the court refers includes both characters and scenes. *Davis*, 654 F. Supp. at 658 ("Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes"). Moreover, the defendant in *Davis* conceded the composite character represented the plaintiff, *see Davis v. Costa-Gavras*, 619 F. Supp. 1372, 1375 (S.D.N.Y. 1985), so that was simply not a factor. And, *Lovingood* followed *Davis* (*see* 275 F. Supp. 3d at 1313-14), and the plaintiff there was identified by name and was *not* a composite character. Likewise, in *Street v. Nat'l Broad. Co.*, 645 F.2d 1227 (6th Cir. 1981), on which *Davis* relied, the real name of the prosecuting witness in the Scottsboro trial was used in a docudrama that called her a bum and a whore.

- Fairstein argues *Davis* is "inapposite because Defendants went out of their way to promote the Series as a true story." (Opp. 19.) This is factually wrong and legally irrelevant. The prologue in *Davis* said it was "based on a true story," just like the Series' landing page that Plaintiff now admits viewers had to go to through. (SUF ¶ 73.) Fairstein cannot point to a few posts on social media to negate the overwhelming, undisputed evidence that the Series was billed as "based on a true story".[7] Nor does the fact that the writers expressed pride in their research mean the Series is now treated like a documentary or they lose critical First Amendment protections. In any event, Fairstein's point is irrelevant: *Lovingood* affirmed summary judgment even where a docudrama's opening titles said "*This is a true story.*" 275 F. Supp. 3d at 1305, n. 2.

- Fairstein's heavy reliance on an unpersuasive, out-of-context footnote from *Reid v. Viacom Int'l*[8] speaks volumes. Fairstein misleadingly argues that *Reid* "rejected *Davis* and declined to 'apply a more relaxed "docudrama" standard.'" (Opp. 19, citing 2016 WL 11746046 at *4 n.7.) The *Reid* footnote was *not* talking about actual malice, but rather, whether "leeway" should be allowed on the threshold question of whether viewers would understand that the film represented "actual facts or events" that could be a basis for defamation. This Court already answered that question on the motion to dismiss.[9]

## II.   Unable to Meet Her Daunting Burden on This Motion, Fairstein's Actual Malice Arguments Miss the Point and Misstate the Record and Law

### A.   Plaintiff Has No Answer to the Sources' Support for the Fairstein Portrayal

Fairstein *cannot point to one piece of evidence* that the filmmakers doubted the essence of

---

[7] *See* SUF ¶¶ 73, 208, 212, 215. In context, the short taglines for the Series' Teaser and Trailer refer to the "truth" that the Five were "innocent"—*their truth*; and the "lie" is that they were "guilty." SUF ¶ 219.

[8] 2016 WL 11746046 (N.D. Ga. Sept. 14, 2016), *on reconsideration*, 2017 WL 11634619 (N.D. Ga. Sept. 22, 2017).

[9] Even if *Reid* declined to follow *Davis* it would be an outlier, superseded by later circuit authority:  the *Lovingood* court relied on *Davis* in granting summary judgment, which the Eleventh Circuit affirmed.

their portrayal was true based on their sources. Certainly, a portrayal centering her in the case is far from "so inherently improbable that only a reckless [person] would have put [it] in circulation." (Opp. 21, quoting *St. Amant*, 491 U.S. at 732.) Fairstein's fingerprints were all over this case like no other figure on the police and prosecution side. (*See* Open. Br. 11-16.)[10]

Fairstein concedes that the filmmakers' sources and research were "extensive." (Opp. 6; *see* Open. Br. 8-10.) Yet less than a page of her 50 page brief is devoted to what is relevant to the actual malice inquiry—the writers' sources. And the treatment is either flatly erroneous or beside the point:

- Fairstein criticizes some of the sources as "overgeneralization[s]" or "overly broad." (Opp. 16 n. 25, 33.) For example, she argues that Sullivan "over-generaliz[ed]" in writing that the Five's supporters saw her as "one of the major villains behind the conspiracy to frame the defendants." (DX-17 at 202.) Fairstein likewise claims that Warren's statement that she "controlled the cops at the precinct" was "overly broad." ***But it is undisputed that's what Sullivan wrote and Warren said.*** The writers relied on (and were entitled to rely on) those descriptions—which were consistent with, among other things how the Five, their families, Judge Titone, and others saw her, as a real life villain who "engineered confessions" and lied on the stand. (SUF ¶¶ 85, 86g, 152.)

- Fairstein wrongly claims "[n]one of the 1989-1990 press reports reviewed by Defendants place Fairstein in the role in which she is depicted in the Five Scenes." (Opp. 15.) Not so. The 1990 *NYT Magazine* profile of Fairstein described her "invaluable" active involvement in the investigation, including going to the "precinct police station where the suspects were being held" and staying for "the next 32 hours," during which she took "two of the defendants to the scene of the crime." (SUF ¶ 83c., DX-49.) Other sources also confirmed this portrayal. (SUF ¶¶ 64, 83a-b, 84-86.)

- Fairstein contends the Sullivan and Burns books repeatedly reference Lederer (Opp. 15-16); that is neither here nor there. Both books also have numerous references to Fairstein's role, describing her as Lederer's boss (the "Big One"), as "Unit Head", fighting Ryan for the case, preventing David Nocenti and Mrs. Salaam from seeing Yusef, and taking two suspects to the crime scene and testifying against them at trial. (*See* Swicord Decl. ¶¶ 39-43.) Again, other sources confirmed this portrayal. (SUF ¶¶ 83-86.)

Critically for this motion, ***Plaintiff does not dispute that the published books, the interviews, and the other sources all say what they say about her***. (*See* n.5, *supra*.) Michael

---

[10]  As illustrated vividly by Fairstein's citations, it is the rare case in which a story is *inherently* improbable, *see U.S. Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021) (asserting "the existence of a vast international conspiracy" to "steal" the 2020 election "that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it"); nothing is remotely on par with that here.

Warren, Raymond Santana and others made the statements they made to the writers in recorded interviews—including, for example, that Fairstein "controlled" the cops at the precincts, telling them "what to do, and where to go". (SUF ¶¶ 84a-b, 139.) She may not like these sources and there may be other sources that disagree, but the writers were entitled to rely on their sources.

Her argument that the filmmakers' sources *also* refer to others involved in the case, including her subordinate Lederer, on whom she heaps all the blame, ignores what the sources say about Fairstein. (Opp. 15-16, 24; s*ee also* SUF Resp. ¶ 75.)[11] Plainly, that does not erase or "contradict" the descriptions in the multitude of (undisputed) sources that collectively supported the filmmakers' portrayal of Fairstein as a powerful figure and hands-on "controlling" investigator who supervised Lederer and was at the precincts for over 32 hours straight. (SUF ¶¶ 81-86.)

Nor does Fairstein dispute that the multiple texts and Burns documentary the filmmakers consulted were "reputable sources." And she cannot avoid the authority holding "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law" (Open. Br. 24-25 (citing cases)), by arguing that the "defendant's sources" must contain "*identical* statements to those made in the defendant's book." (Opp. 23.) No actual malice case holds that, and it is not even the rule as to substantial truth.[12]

**B.     Plaintiff's Arguments That the Filmmakers Failed to Investigate and Did Not Credit Her Self-Serving Testimony Does Not Establish Actual Malice**

The writers have testified—without contradiction—that they believed Fairstein was involved

---

[11]  Throughout, Fairstein's brief and SUF Response are mired in hairsplitting technical details designed to deflect responsibility and push it off on Lederer. She argues she was only "one of" Lederer's supervisors, while admitting she was "the only" supervisor at the precincts and that Lederer knew everything. (SUF ¶ 14.) She quibbles about which precinct she was at and when she got there and draws a technical distinction between "police" vs. "prosecutorial" investigations, but cannot deny she had overall responsibility for the "prosecutorial investigation" and was sued for being part of the "police investigation". (SUF ¶¶ 12-13, 31-32.)

[12]  Fairstein's assertion that the filmmakers were forbidden to rely on the acclaimed Burns documentary because she "informed" them in threatening letters it was "inaccurate and libelous with respect to Fairstein and Lederer" (Opp. 23 n. 34) is emblematic of everything she gets wrong with the actual malice rule. The filmmakers were not obligated to heed her denials of responsibility or adopt her view of the contested terrain that is the CPJ case. *See infra*, 10-11.

in the investigation from the start, including at the precincts, and their contemporaneous emails, memos and remarks confirm they had zero doubt of that. (PX-41; PX-57; *see* Open. Br. at 30.) With no answer to the undisputed proof of the writers' sources and state of mind based on those sources, Fairstein points to *other sources* she thinks they should have consulted instead. (Opp. 24.) This does not establish actual malice as a matter of law, let alone with convincing clarity, for several reasons.

*First*, while Fairstein tries hard to claim she is not arguing "failure to investigate" (Opp. n. 32), that is exactly what she does, arguing the writers' research was inadequate. (Opp. at 7, 38 n. 59; SUF Resp. ¶¶ 60, 127, 133). Even if she were correct (she is not), that would be, *at most*, a negligent failure to investigate, which is not actual malice. *Harte-Hanks*, 491 U.S. at 688 (not actual malice "even when a reasonably prudent person would have done so"); *St. Amant*, 390 U.S. at 730-33 (failure "to verify the information with those . . . who might have known the facts" did not prove "reckless disregard").

*Second*, while Fairstein criticizes the filmmakers for not crediting specific snippets of testimony from the dense and voluminous CPJ trial transcripts that she maintains support her claims of "falsity" as to her role, there is no evidence that her cherry-picked snippets, and the lawyerly nuances she assigns to them, were "brought home to" the filmmakers as *Sullivan* requires. *N.Y. Times*, 376 U.S. at 287. In *Sullivan*, even though information in the Times' *own files* would have shown the article to be inaccurate, the Court held that "does not, of course, establish" that it "'knew' the [publication] was false, since the state of mind required for actual malice *would have to be brought home* to" those "having responsibility for the publication." *Id.* (emphasis added).[13]

*Third*, the massive record in the CPJ case was not just complex, it is undeniably contested and highly controversial, and "remains the subject of scrutiny and debate." *Fairstein,* 553 F. Supp. 3d at

---

[13] This principle applies *a fortiori* to the depositions in the Civil Case. Fairstein ignores that those depositions were *under seal and unavailable* to the filmmakers when they were doing their research (Def. SUF Reply ¶ 12), but even later after the evidence was unsealed, the filmmakers did not believe they needed that testimony because they had the recorded interviews with Warren, who spearheaded the case, and Santana, who sat in on the depositions. (*Id.*)

56. The filmmakers adopted a "rational interpretation" of that record based on belief in the sources they trusted. *Time Inc. v. Pape*, 401 U.S. 279, 290-91 (1971) ("deliberate choice" in characterizing events in a lengthy government record that "bristled with ambiguities" is "not enough to create a jury issue of 'malice,'" even if "arguably reflect[ing] a misconception"). Actual malice cannot "be founded on the misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff or in accordance with a particular political view." *Suozzi v. Parente,* 202 A.D.2d 94, 102 (1st Dep't 1994).

In this regard, as the Court has noted, the Series was unapologetically told from the Five's point of view. The filmmakers believed and relied on what the Five and their lawyers, such as Warren, told them. (SUF ¶¶ 77, 139.) They believed that the authorities, including Fairstein, lied about what happened in the investigations and interrogations, and did not believe Fairstein and her allies would tell the truth about the details of her activities during the investigation. (SUF ¶¶ 60, 92-93, 95.)[14]

*Fourth*, Fairstein primarily cites *her own testimony* in the civil case—self-serving denials where she had a clear incentive to deflect and deny responsibility for the investigation. She ignores that, as a matter of law, the filmmakers did not have to seek out or credit Fairstein's denials of her involvement. "Publication in the face of a denial by plaintiffs of a statement's truth does not demonstrate actual malice." *Contemp. Mission*, 665 F. Supp. at 270; *Edwards v. Nat'l Audubon Soc.*, 556 F.2d 113 (2d Cir. 1977); Open. Br. 27-28. Fairstein has *no answer* to this basic principle.

The writers indisputably believed, based on their sources, that Fairstein was involved from early that morning and was at the precincts on April 20 at a critical time in the investigation exerting "control" and stayed for over 32 hours as the "800-pound gorilla." (SUF ¶¶ 81-90.) Particularly given the need for telescoping of events to tell the story in this format, details like the precise time Fairstein

---

[14]  *See Donofrio-Ferrezza v. Nier*, 2005 WL 2312477, *10 (S.D.N.Y. Sept. 21, 2005) (Castel, J.), *aff'd*, 178 F. App'x 74 (2d Cir. 2006) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992)) (summary judgment granted; "[n]othing in the record indicates that [defendant] 'in fact entertained serious doubt as to the truth' of her remarks, as would be necessary to establish actual malice," where there were two competing letters describing contested facts and defendant "simply discredited the views" in one of the letters).

arrived physically at which precincts would not have changed the writers' belief that their portrayal, including in the five scenes, was the essence of truth. (DuVernay Decl. ¶¶ 73-77, Swicord Decl. ¶¶ 51, 77.) The details Fairstein points to in her brief would have made no difference to "the critical question"—the filmmakers' "state of mind." *Palin v. N.Y. Times*, 940 F.3d 804, 810 (2d Cir. 2019).[15]

*Fifth and finally*, Plaintiff has come forward with *no evidence* that Defendants "learn[ed] facts casting doubt on the information contained" in the Series, so there were no "doubts" to "ignore" (Opp. 22, citing *Harte-Hanks*, 491 U.S. at 692). Certainly, there were no "obvious reasons" for the filmmakers to "doubt the veracity" (*Harte-Hanks*, 491 U.S. at 688) of the sources informing their views, much less to think that testimony by Fairstein and her confederates would confirm their "probable falsity" (*Id.* at 692). *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (Navy's denials did not give reporter "'obvious reasons' to doubt the veracity of her publication" since she "could reasonably infer that Admiral Bien had not been objective" in his assertions).

Thus, Fairstein's reliance on *Harte-Hanks* is wholly misplaced. Unlike that case,[16] there is *no evidence* the filmmakers deliberately avoided talking to *credible and unbiased witnesses who were identified to them* because they were afraid they would support Fairstein. The opposite is true:  DuVernay attempted to speak with Fairstein and Lederer, who refused to do so absent DuVernay's compliance with their laundry list of conditions. (SUF ¶¶ 104-110.) Having refused to sit down with the filmmakers, Fairstein now points *only* to her own denials from the Civil Suit

---

[15] Indeed, Fairstein's denials and downplaying of responsibility (Opp. at 13-15), drawn from her own deposition in the Civil Case, are incredible on their face and contradicted by Plaintiff's own admissions. (*See supra*, n.5 and 11.) All Lederer's civil deposition does is echo Fairstein's assertion that she arrived at the 20th Precinct at 8 p.m. (Lederer Decl., Ex. A at 266.) And Fairstein herself admits she was involved from early that morning, arrived before Korey and Yusef were even picked up, took Kevin and Korey to the crime scene, and was at the precincts before any video confessions were even taken. (SUF Resp. ¶¶ 9-10, 13, 64, 86h; Opp. 9.) To the extent Fairstein recites CPJ trial testimony other than her own (Opp. 7-11), it is about what others were doing at the time—and does not speak directly to Fairstein's activities on April 20.

[16]  *Harte-Hanks* involved a conversation purportedly implicating plaintiff in wrongdoing, where the newspaper editor instructed reporters not to interview or listen to tapes of the one objective witness to the conversation that could confirm or deny the source's account—a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [source's] charges." *Harte-Hanks*, 491 U.S. at 692.

and other testimony by her allies, none of which would have unequivocally, objectively disproved her involvement. *See McFarlane v. Sheridan Sq. Press*, 91 F. 3d 1501, 1510-11 (D.C. Cir. 1996) (unlike *Harte-Hanks*, was not clear that "the individuals whom the defendant failed to contact would have provided any credible information" about plaintiff's involvement in wrongdoing—particularly plaintiff who could be expected "to deny any involvement regardless of the facts").

### C. Asserting That the Filmmakers' Sources Were "Biased" Goes Nowhere

Fairstein argues that "source bias was one factor that supported a finding of actual malice 'even absent specific evidence that the bias caused Defendants to doubt the veracity of the information.'" (Opp. 33 n. 47.) That is not the law.[17] The filmmakers were entitled to credit sources "even though they reflect only one side of the story," *Davis*, 654 F. Supp. at 657, and did not have to accept Fairstein's denials or privilege *her* biased assertions over their trusted sources. The filmmakers were entitled to credit the "allegations in the Five's civil lawsuit" over Fairstein's statements, sworn or not. (Opp. 11.) As in *Time v. Pape*, where the defendants characterized an incident of police brutality as if it was fact and not simply "allegations of a civil complaint," the "choice of such an interpretation" was "not enough to create a jury issue of 'malice' under *New York Times*." 401 U.S. at 288-90. *See also Donofrio-Ferrezza*, 2005 WL 2312477, at *10.

Fairstein disingenuously points to DuVernay's testimony that Warren was "biased," ignoring she made that observation in the context of saying "[e]veryone in this case is biased" (*e.g.,* Opp. 33 n.

---

[17]  *See, e.g., Loeb v. New Times Commc'ns*, 497 F. Supp. 85, 94 (S.D.N.Y. 1980) (that some of defendants' "sources may have been biased against Loeb, is not evidence of actual malice"; granting summary judgment); *Church of Scientology*, 903 F. Supp. at 642 (that source had "obvious antagonistic relationship with Scientology does not amount to an obvious reason to doubt her veracity"); *Gross v. N.Y. Times Co.*, 281 A.D.2d 299 (1st Dep't 2001) (same; affirming summary judgment); *Coughlin v. Westinghouse Broad.*, 780 F.2d 340, 342 (3d Cir. 1985) (broadcaster's "alleged hostility towards the Philadelphia police department, reliance on biased sources and failure to investigate" was not "sufficient evidence of malice to withstand the defendant's motion for summary judgment"). Fairstein cites the outlier *Reid* case for her argument (*Reid,* 2017 WL 1163419, at *5), but *Reid*'s analysis (and attempt to enlist *Harte-Hanks* as support) is incorrect. *Harte-Hanks* does not affirm "source bias" as a basis for actual malice—to the contrary, the Court emphasized it was *not* relying on the lower court's speculative list of 11 "facts that the jury 'could have' found," that included a source's "obviously vindictive and antagonistic attitudes" toward the plaintiff. 491 U.S. at 689-90, n. 36.

46)—an honest observation that is hardly the stuff of actual malice. That this is the best Fairstein can come up with shows the complete absence of actual malice evidence. Moreover, Plaintiff ignores the same observation applies to her; she more than anyone has a deep seated agenda and much to lose. (SUF ¶¶ 58-59, ████.) That Warren "was not involved in the [CPJ] case in 1989" and lacked "personal knowledge" of Fairstein's conduct (Opp. 33) doesn't justify a malice finding either. *See McFarlane*, 91 F.3d at 1510 ("there is no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to 'willful blindness'"). Warren led the successful Civil Case alleging she acted as an investigator, and his statement that Fairstein exercised control at the precincts was consistent with other sources, including Fairstein's own words touting her actions.[18]

### D.     Defendants' Dislike of Plaintiff After Their Research Is Not Actual Malice

It is well established that evidence of ill will does not constitute actual malice. *See* Open. Br. 26-27 (citing cases); *Palin*, 940 F.3d at 814, n. 33 (neither "political opposition alone" nor a publisher's "motive in publishing a story" is "sufficient" for actual malice"). Fairstein concedes as much, but urges the Court to "consider it as part of its evaluation of Defendants' conduct." (Opp. 45 n. 72, citing *Celle v. Filipino Reporter Enterps.*, 209 F.3d 163, 183 (2d Cir. 2000).) *Celle* involved grudge-holding competitors in Filipino-American media, where the majority found defendant's news article was retribution for a similar article that plaintiff ran. 209 F. 3d at 186. The court made clear ill will evidence *must* be "combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth"; and in *Celle* there was such evidence because the defendant *admitted* he understood what he wrote was untrue. *Id.* at 183, 186-87. Here there is no such evidence of reckless disregard or of "predetermined and preconceived plans to malign" Fairstein as a result of some preexisting "personal connection." *Palin*, 940 F.3d at 814. Instead

---

[18]   Fairstein discounts the $41 million settlement of the Civil Case (Opp. 23 n. 34)—but does not dispute the claims against her, in which it was alleged that she acted as an investigator alongside the police and was complicit in the coerced interrogations, survived a motion to dismiss. (SUF ¶¶ 31-32.)

Fairstein is impermissibly trying to use Defendants' dislike of her to prove actual malice.[19]

There can be no actual malice where it is undisputed that any expressions of disapproval of plaintiff came only ***after the writers conducted their research***. *Berisha v. Lawson*, 973 F.3d 1304, 1314 (11th Cir. 2020) (affirming summary judgment). The filmmakers did not know Fairstein's role in the case before they started research for the Series; and Fairstein's unsupported attempt to argue otherwise is a farce, amounting to nothing more than the writers were generally aware of the case and the exoneration at the time each happened.[20] She presents no evidence to refute the writers' unequivocal testimony that it was only *after* their research for the Series that the writers thought Fairstein was responsible for the wrongful prosecution and hoped the Series would renew the public's attention to the case and result in some "accountability" for Fairstein and other officials who were responsible for the prosecution. (DuVernay Decl. ¶ 148; Locke Decl. ¶ 76.)[21]

Likewise, the casting descriptions and comments about "prosecutorial misconduct" to which Fairstein refers (Opp. 1, 39) do not reflect subjective disbelief in the truth of the portrayal (at most they reinforce the writers' beliefs). Nor are they about any specific scene. And all can be grounded in (at least) Fairstein's treatment of the Salaam family (which she doesn't sue over), and her role as Unit Head and supervisor, pushing the case forward despite incredible weaknesses and

---

[19]  *See Reliance Ins.*, 442 F. Supp. at 1352 (if media "had to fear libel suits when expressing dislike of certain persons" the "self-censorship that would inevitably occur would have a stifling if not smothering effect" on free speech). Fairstein also lobs unsupported accusations of Defendants' "financial motives to defame" her (Opp. 4-5, 5 n. 12), but "the U.S. Supreme Court has concluded that a defendant's profit motive in publishing allegedly false and defamatory material does not 'suffice to prove actual malice'" *Kipper v. NYP Holdings Co., Inc.*, 12 N.Y.3d 348, 356 n. 6 (2009) (citing *Sullivan*).

[20]  It is uncontroverted that the Burns documentary was DuVernay's first piece of research when she got interested in doing a film about the case and was how she learned who Fairstein was (DuVernay Decl. ¶ 18), and that Locke watched Burns as part of her research on the Series (Locke Decl. at ¶¶ 5, 9, 10, 69); and Plaintiff baldly misstates that Swicord "knew" of Fairstein in 1989. (Ex. B to Spears Supp. Decl., Swicord Dep. 20:5-8.) *See also* Def. SUF Reply ¶ 228.

[21]  Plaintiff points to third-party organization Color of Change's petition against her. (Opp. 5.) But it is undisputed that Color of Change's petition was separate from Netflix's social impact campaign and Netflix had no involvement in the petition whatsoever. (SUF ¶ 226; Def. SUF Reply ¶ 224.)

DNA ruling out the Five. (SUF ¶¶ 81, 149-150, 174; Def. SUF Reply ¶¶ 79, 144.)[22]

At the end of the day, because actual malice is a measure of the defendant's attitude toward the truth, not his attitude toward the plaintiff, allegations of a defendant's bias or "hostility fail plausibly to establish . . . actual malice." *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011) (Castel, J.). And if anything, a speaker's strong expression of conviction and belief, "even his exaggerations, enhances, rather than diminishes, the likelihood that they are protected from libel attack by the First Amendment." *Church of Scientology*, 903 F. Supp. at 641.

## III.   <u>Plaintiff Must Also Establish Actual Malice as to Alleged Defamatory Meaning</u>

In addition to actual malice as to falsity, Fairstein must also establish by clear and convincing evidence that Defendants "knew or were reckless not to know" that each of the Five scenes would carry a "defamatory meaning". While Plaintiff notes there is presently "no binding Second Circuit precedent" (Opp. 21), the authority in other Circuits and this District impose such a requirement, and the "values underlying *Sullivan*" support it. *Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 217 (S.D.N.Y. 2020) (citing, *e.g., Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 680-81 (9th Cir. 1990)).[23]

## IV.   <u>Plaintiff Cannot Prove Actual Malice As To The Five Scenes As A Matter of Law</u>

Fairstein says the five scenes are "not merely a case of filmmakers 'imagining' 'behind the scenes' conversations, condensing or telescoping events." (Opp. 24.) But the undisputed evidence is that is precisely what the writers were doing, grounded in their research. Fairstein's actual malice argument is that "Defendants knew that their depiction of Fairstein in each of the Five Scenes was inherently improbable." (*Id.*) Fairstein has not come close to carrying her burden on this point.

---

[22]   The same is true of Locke's caustic November 2018 tweets, which were informed by her extensive research and her reading of Ryan's Affirmation. (Def. SUF Reply ¶ 203.) Locke's June 2019 tweet, in response to Fairstein's Op-Ed, also reflects her beliefs based on her research and Fairstein's continued belief in the Five's guilt. (*Id.* ¶ 205.)

[23]   Further, New York common law also requires, as an element of this type of claim for "defamation by implication" that the implication was intended: "the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co.*, 120 A.D. 3d 28, 37-38 (1st Dep't 2014).

***Timeline Scenes.***   Based on what the filmmakers read and heard it would have been shocking that the hands-on supervisor of this major case, reporting to the D.A., was not involved in the timeline on which the Unit she headed brought charges and took to trial. Moreover, Swicord's December 2017 memo evidences her honest, subjective belief that Fairstein was involved in the process of figuring out the timeline. Fairstein dismisses Swicord's memo as "sheer fabrication" (Opp. 28), but that turns actual malice on its head. It simply does not matter whether Fairstein thinks Swicord's rendition of the facts is right or wrong; the memo is indisputable (and undisputed) contemporaneous evidence of her genuine "state of mind" in December 2017 based on her review of the sources that she then shared with DuVernay and Locke. (SUF ¶¶ 127-129.) It definitively shows Swicord was not simply making up facts, but was consulting sources and materials and genuinely trying to get it right. (*See* PX-41.)[24]

Collectively, those documents indicated to her that Fairstein was involved with the timeline and that Fairstein and the authorities knew there was a "problem" with the timeline, yet went ahead anyway.[25] For example, those sources stated that while Fairstein was at the precincts, "*Police and prosecutors, while trying to construct a logical sequence* to explain what is often described vernacularly as 'muggings,' decided then that these alleged teen muggers, some of whom they had in custody, were now also rapists." (DX-20 at 140.) Fairstein was of course a prosecutor.[26] Fairstein also admits (Opp. 28; SUF Resp. ¶ 127) a timeline was released to the press on April 22—shortly *after* the 32 hours she spent with detectives and Lederer and *after* she accompanied Korey and Kevin to the

---

[24] That Swicord had to "intuit" some of what happened because certain reports were not available to her (because they were under seal), is not proof of actual malice. The memo shows that she was "interpreting" and synthesizing sources that she did have in hand, including the Five's confession videos, their interviews, and a huge quantity of other sources—books, news reports, and more.

[25] Plaintiff cites Netflix's notes on the scripts and cuts of this scene, none of which suggest the Fairstein character believes the Five are *innocent* but is trying to pin the rape on them anyway. (*See* Def. SUF Reply ¶ 120.) To the contrary, these notes show the writers believed Fairstein and the authorities rushed to judgment and forced the facts, despite obvious inconsistencies, to fit the theory they blindly believed was true—that the Five were *guilty* of rape.

[26] While for purposes of this suit Fairstein seeks to deflect responsibility to Lederer, the filmmakers saw her, correctly, as the "Head" prosecutor and Lederer's "Boss", the most important authority figure in the System on the scene, and the person who "controlled" the cops. (SUF ¶¶ 77, 81, 84b; DuVernay Decl. ¶ 109; Swicord Decl. ¶ 75.)

crime scene. And she further admits *she was drafting complaints* on April 22 with Lederer. (Opp. 14.)[27]

Swicord had every reason to believe her assimilation of the facts she had was true. As in *Time v. Pape* she adopted a "rational interpretation" from records and testimony that "bristled with ambiguities". 401 U.S. at 290-91. Even assuming it was a misconception or a writer was a "bad historian," that does not establish actual malice when it comes to speech about public officials and controversies. *Street*, 645 F.2d at 1237. Nothing is inherently improbable about this scene.

Fairstein also misstates the Court's dismissal ruling. Finding that Fairstein's "retrospective defense" of the "police investigation and prosecutorial timeline" (Opp. 25 n. 37, p. 29) did not establish substantial truth has no bearing on actual malice. Her decades long defense of the investigation *does* form a basis for the essence of her portrayal in that scene working with the cops on the investigation and timeline that (she contends) "brilliantly" linked the rape to the other activity in the Park—which is the actual malice issue. As the Court said: Fairstein's continued "defense of the timeline's accuracy is consistent with the spirit of her dialogue in 'When They See Us.'" *Fairstein*, 553 F. Supp. 3d at 71.

***Police Briefing.***  Fairstein's arguments that she "should not have been scripted into Scene 2" because she "was not at any precinct at the time that Messrs. Santana, Richardson and McCray were brought in" and "did not direct detectives at the 20th Precinct to pick up Messrs. Salaam or Wise" (Opp. 30-31) have no bearing on what the writers subjectively believed. This scene was based on both the undisputed fact that Fairstein *was there* before Korey and Yusef were "rounded up", and on the writers' sources, which show: (a) a continuing NYPD sweep of Harlem to find the kids who were in the Park the night before (SUF ¶¶ 134-35, 137)[28]; (b) Fairstein "controlled" the cops in the precincts, telling them

---

[27] Fairstein's assertion that *even while drafting the complaints on April 22* she was "unaware of discrepancies in the Five's statements regarding the order in which events took place in the Park" (Opp. 26-27) is beyond belief, but irrelevant to actual malice.

[28] Fairstein asserts that "per the Central Park Jogger testimony"—that is, testimony from the cops who the filmmakers believed lied on the stand—"there was no sweep of Harlem." (Opp. 31.) Again, she simply improperly substitutes her preferred sources for the filmmakers'. Her improper denials on these points should be stricken.

"what to do, and where to go" (SUF ¶ 139); and (c) her first-hand account touting herself as the "800-pound gorilla" endorsing as "brilliant" how the cops stopped kids in Harlem (SUF ¶ 140).[29] Fairstein has no evidence that the writers subjectively did not believe the essence of the truth of this scene depicting Fairstein galvanizing the officers to "bring in every kid who was in the park last night."

In response, Fairstein asserts "she had absolutely no power to tell NYPD officers or detectives who to pick up for questioning" (Opp. 34). But her self-serving denial was not brought home to the filmmakers, *N.Y. Times*, 376 U.S. at 287, and even if it had been, the writers were not obligated to credit it over sources they trusted such as Warren and Santana. Fairstein cannot simply dismiss Warren as a "biased" source without "personal knowledge." *See supra* 12-13.[30] Given everything the writers learned from their sources—including her words in the Toobin interview—it was far from "*inherently improbable*" that she would have been taking charge as depicted. (Opp. at 34.)

Fairstein also criticizes DuVernay's response to a deposition question about "what evidence she had that Fairstein actually gave an order to police to 'pick anyone up at all,'" stating that "this is not a documentary. So it is not a point-to-point process. It's a creative process." (PX-51 at 120:1-121:1.) That answer was entirely correct. Moreover, she pointed to the specific sources to support the development of the dialogue in this scene in her interrogatory answers and elsewhere in her deposition. (Def. SUF Reply ¶ 138, citing PX-51 at 121:2–7.) At the end of the day, Fairstein cannot prove *by clear and convincing evidence* that this scene does not "fairly represent the source materials for the film believed to be true by the filmmakers." *Davis,* 654 F. Supp. at 658 (emphasis added).

---

[29] *See* DX-25 ("'A kid would say something like "a dark-skinned guy who lives on 102nd Street,"' Fairstein said. 'And these detectives would go out and find him. I think it was one of the most brilliant police investigations I've ever seen.'") Fairstein's attempt to dodge her own words in the Toobin article again misuses the Court's motion to dismiss ruling. It does not matter that this is a 2002 article (Opp. 33); it gave the filmmakers important insight into her role and how she spoke, and was consistent with their other sources that she was a powerful, influential figure who exercised control—the "800 pound gorilla" as she herself put it.

[30] Officer Reynolds also has no "personal knowledge" of what Fairstein was doing throughout the day and night of April 20. His deposition testimony in this case proves nothing, and is irrelevant to the filmmakers' state of mind.

Further, while hyperbolically exploring the theme of racial bias, the dialogue is, undeniably, specifically focused on the black youths *that were "in the Park last night"*, explicitly indicating "some" kids were there already (like Kevin who was in custody) and there "were descriptions of others" just as Fairstein told Toobin. Fairstein inexcusably just ignores this critical part of the dialogue. Thus, if the specific defamatory implication the Court identified as plausible at the motion to dismiss stage is that the dialogue to "canvass" Harlem was an *indiscriminate* and "*illegal*" directive, the filmmakers have testified *without contradiction* that such an implication was not intended. (SUF ¶ 144.) As such the claim based on this scene also independently fails at this stage under the rule requiring actual malice as to defamatory meaning, and under the New York law of implied defamation.[31]

In response, Fairstein misstates the record,[32] and irrelevantly refers to Netflix's fear that Fairstein would "come after us" in the press based on use of her voiceover from this scene in the Teaser. (Opp. 34-35.) That Netflix and DuVernay fretted from a PR perspective that Fairstein would attack the Series before it aired vividly illustrates the impact of her bullying tactics—it is a textbook example of what "chilling" speech looks like. That her tactics induced fear is not actual malice; it's the opposite. It shows DuVernay's courage in the face of Fairstein's threats to speak her mind and truth to power.

***No Kid Gloves Scene.*** As Fairstein points out, the plausible defamatory meaning the Court articulated was that Fairstein advocated treating the "suspects like as adults rather than minors because Fairstein considers them rapists." (Opp. 36 n. 54.) Just so, it is uncontroverted that the phrase was added by DuVernay to reflect Fairstein's attitude towards the Five—as she understood it from multiple sources and from Plaintiff's own words. (SUF ¶ 149.) There is no evidence that

---

[31] Use of the word "thug" in the challenged dialogue is not itself actionable (the Court did not so hold and Fairstein does not so argue). ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

[32] DuVernay did not "admit" that Scene 2 depicts Fairstein ordering an "illegal" roundup nor did Plaintiff prove it was "edited to portray Fairstein in an unethical light." (*See* Def. SUF Reply ¶¶ 120, 144[1] (noting DX-30, final dialogue).)

DuVernay doubted the portrayal in this scene reflected the essence of truth.

The prime example of Fairstein's attitude, brigaded with action, was her appalling treatment of Yusef Salaam, denying him the support of his family and Big Brother while he was interrogated because "as far as Fairstein was concerned" he was a "killer". (DX-17, Sullivan at 26-27.) While Plaintiff wants to ignore Sullivan's remarks about her attitudes towards Yusef's interrogation (Opp. 37 n. 57)—these are not kids; they are killers and rapists—that was a valid source.[33] Regardless of which of the Five her actions were directed against, the gist of her conduct in the scene—failing to see the Five as children—rang true in its essence.

In view of the source material in its totality—which included not just Sullivan, but Judge Titone's scathing remarks, and Warren's and Santana's interviews among others—it was not "inherently improbable" that Fairstein was directing detectives to treat the suspects in the rape without "kid gloves." Instead of addressing the sources, Fairstein again quarrels about the technicalities of her status and authority. (Opp. 36 n. 55, 37.) Yet Plaintiff admits she "advised" the detectives to stop interrogating Yusef eventually, and they followed her direction. (*Id*. at 38.) Even if, *arguendo*, Fairstein had no formal authority the filmmakers *believed* she was the highest ranking official and "controlled" the cops based on sources documenting her powerful status and authority at the precincts and her first-hand knowledge of the interrogations, consistent with her admissions. (SUF ¶¶ 158-159.)

***DNA Scene.***  On the Motion to Dismiss, the Court did not have the benefit of a developed record of the filmmakers' source material for the DNA Scene and what actually happened. It is now uncontroverted that the sources showed: the prosecution found the sock DNA right before trial and hoped it would nail the Five; they asked for and got a short postponement from the judge; and when

---

[33]  Fairstein's feeble response is that the Sullivan book contains "no quoted statements" from her (Opp. 37), even though Sullivan is specifically relating what Fairstein *thought* and what "troubled" her (a lawyer inquiring about Salaam)—in a book that she admittedly was interviewed for (and never sought a retraction). Beyond that her only retort is to disparage DuVernay's beliefs about "unconscious bias," and her human experience. (SUF Resp. ¶ 98 n. 8.)

the DNA came back not matching, they plowed ahead with the "6th Man" theory. (SUF ¶¶ 161-162, 165, 167-169, 172-175.) Consistent with what the sources undisputedly say, the DNA Scene conveys the sock was a welcome "surprise" discovery before trial that the prosecution had high hopes would seal the case, and it was in fact tested shortly before trial. (SUF ¶¶ 163-164.) Far from being "inherently improbable," the depiction is true and certainly cannot be the basis for finding actual malice.

Unable to dispute the writers' belief that their sources supported the essential truth of the dialogue, Fairstein falsely asserts that the writers "fabricated the entire scene" and "their portrayal of Fairstein is contradicted by their own source materials." (Opp. 40 n. 64.) "Fabricating" a conversation that took place behind closed doors is what dramatizations do based on sources, events and common sense; that cannot alone be the basis for actual malice. And the filmmakers' sources support the portrayal. Levy, the former prosecutor with first-hand knowledge, stated in his book:

> I was *asked to work with Linda Fairstein*, Lederer's mentor, chief of the District Attorney's Sex Crimes Bureau, and a pioneer in the prosecution of sex crimes.
> . . *Fairstein and I* sought expert advice and *spent a fair amount of time* simply *talking to each other to figure out how to address the DNA problem*.

(DX-37, Levy at 95; SUF ¶¶ 167-169; DX-3, Locke Dep. 51:7-20 (discussing source material supporting Fairstein's "involvement with the sock DNA").)[34] Fairstein's assertion that the writers' reliance on this source was unjustified is shocking; she blurbed Levy's book. (SUF ¶ 170).

Nor does Fairstein support her claim that the sources "contradict" the portrayal—other than an absurd attempt to fob the "6th Man" theory off on Lederer (Opp. 40-41), and her shopworn argument that because the sources also talk about Lederer they make Lederer "responsible for the DNA strategy." (*Id.* at 43 n. 68.) Not so. Levy, Sullivan and the other sources support putting Fairstein ("Lederer's mentor," Head of the Unit and sex crimes DNA expert) at the center of

---

[34] Fairstein's repeated assertions that she and Lederer think former prosecutor Harlan Levy's description of his work with them on the DNA strategy for the CPJ case is "inaccurate" (Opp. 15, 41 n. 66) is irrelevant to the actual malice issue; it is undisputed that the writers relied on Levy as a source. (SUF ¶¶ 64a, 167.)

discussions about the DNA and strategy on "how to address the DNA problem". (SUF ¶ 86k; DX-37 at 95-96 (Levy relating discussions he and Fairstein had to develop strategies for Lederer to implement, including pushing the 6th Man theory and developing evidence consistent with the Five's guilt); SUF ¶ 86l, citing *Sullivan*)).

Admitting now, as she must, that she was aware of the DNA-marked sock and reported its discovery to D.A. Morgenthau (SUF Resp. ¶ 171), Fairstein's other arguments are utterly meritless:

- Fairstein's new spin is that this scene is false and defamatory because it shows that *she personally* "discovered" the sock. (Opp. 40-41 & n. 67.) That's not what the scene shows. The Fairstein character articulates true facts that move the story along in a dramatized narrative—that *the NYPD* found a sock at the last minute before trial, not that Fairstein found the "sock" herself. *See* DX-30, Ep. 1, 00:16:52:07 - 00:16:53:22.

- Removing the lab technician from the Episode was a typical editorial decision that had to be made for time and narrative purposes, not evidence of actual malice; Fairstein once again wants to be the super-editor, but the constitution prohibits that. *See, e.g., Reliance Ins.,* 442 F. Supp. at 1352 ("Obviously the author of an article will have to choose which facts to include and which to omit" and if plaintiffs were "allowed to dictate the contents of such articles, censorship would have won out over free speech and the right to dissent").[35]

- The scene does not portray Fairstein as "espousing theories she did not hold." (Opp. 42.) The scene shows Fairstein theorizing that the sock DNA came from "[t]hose little bastards", consistent with what Sullivan reported that "prosecutors had high hopes for this last chance to link the defendants scientifically with the rape." (DX-17 at 103.) ████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████

Finally, the specific plausibly defamatory implication the Court identified based on Plaintiff's allegations, that Fairstein was "withholding" evidence from defense counsel, *Fairstein,* 553 F. Supp. 3d at 71, does not appear on the face of the dialogue; it is, at best, a claim of defamation by implication. Whether or not that implication is plausible, the uncontroverted evidence at this stage is that it was not

---

[35] Plaintiff's other arguments here (and elsewhere) about the draft scripts and writers' room notes (Opp. at 41-43) are baseless and do not prove actual malice. As the writers have testified, the brainstorming and editorial choices she cites are part of the creative and writing process—but moreover, the final scenes at issue *are supported by the sources*. (*See* Def. SUF Reply ¶¶ 120, 160.) *See Newton,* 930 F.2d at 685-86 ("'the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words'") (citation omitted).

intended by the filmmakers. (SUF ¶ 164.)[36] Indeed, a subsequent scene (where the Fairstein and Lederer characters discuss the sock DNA test results) provides additional context that the sock DNA evidence was *not* "withheld," since Fairstein's character advises Lederer how to "deal with" that evidence, which the prosecution did at trial (supervised by Fairstein, who was directly involved in the DNA strategy according to sources) by misleadingly "playing up" the "inconclusiveness" of the cervical DNA. (*See* Open. Br. 42.)[37] Under constitutional actual malice law or New York common law, Plaintiff has failed to meet her burden, let alone with convincing clarity.

***Ryan Lunch Scene.*** The Court found a plausible reading of this dialogue was "that Ryan's own investigation concluded that Fairstein directed the conduct of police interviews that secured confessions that she described as coerced." Fairstein goes beyond that, and repeatedly mischaracterizes the scene as stating that Fairstein literally "coerced statements from the Five" herself, only to knock down that straw man by arguing that "Ms. Ryan did not find that Fairstein was personally involved in the police questioning or videotaped statements of the Five." (Opp. 43-45.) First, the Series *nowhere depicts* that she was in the rooms during the questioning or taping, nor does the dialogue imply that. Second, Fairstein did not have to literally speak to the Five directly in order to have been personally part of the process that resulted in the coerced confessions that she defends to this day as "uncoerced".

The Ryan Affirmation, combined with the filmmakers' other sources, supported their conclusion reflected in the dialogue that (a) the confessions were the product of coercion by the police, and (b) Fairstein exercised control at the scene and was ultimately responsible for the coerced confessions. Even if the Ryan Affirmation does not explicitly state (for understandable political

---

[36] *See, e.g., Newton,* 930 F.2d at 681 (simply because "the broadcast may be capable of supporting" the defamatory impression does not *ipso facto* mean it was intended; on actual malice, district court "erred because it substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast").

[37] Fairstein defined the DNA scene in depositions as only the sock discovery scene; she did not raise the Fairstein/Lederer test results discussion scene with any witness. (Def. SUF Reply ¶ 119.) This was unsurprising given that what remained of that scene after the motion to dismiss (Fairstein suggesting a 6th attacker was involved) is supported by Levy, Sullivan and other sources, and not remotely actual malice. (*Id.,* DuVernay Decl. ¶¶ 110-113; Locke Decl. ¶¶ 58-60.)

reasons, including likely civil litigation) that the demonstrably false video confessions the prosecution obtained and took to trial were coerced, that conclusion is hard to avoid. (*See* DX-21, Affirmation at ¶ 10, specifically noting the Five's youth and that they only implicated themselves after repeated interrogation.) DuVernay's "choice of such an interpretation"—even if reflecting a "misconception"—is "not enough to create a jury issue of 'malice' under *New York Times*." *Pape,* 401 U.S. at 290-91.

Fairstein once again argues that she did not have the technical "authority or power to direct detectives to conduct coercive interrogations of the young men in custody" and that she was not "present when Richardson, Santana, McCray and Wise gave their written statements to police." (Opp. 43.) That is no answer to the filmmakers' belief based on their sources that she exercised control at the precincts, was involved during the day of April 20, interfered with Yusef's Mother and Big Brother seeing him, took Korey and Kevin to the crime scene before their videotaped confessions, and expressed first-hand knowledge (and approval) of the interrogations. (SUF ¶¶ 81-86, 193-194.) And Morgenthau viewed *her*—not Lederer or anyone else—as ultimately *responsible* for "screwing up" in connection with the confessions (SUF ¶ 84e; DX-50); Fairstein's only response is that he had a falling out with her and was using her as a "scapegoat," and that she is blameless. (Opp. 45 n. 71.)

There was *nothing* that "alerted" DuVernay "to the inherent improbability" of the essence of the scene.[38] Purported "contradictions" in "DuVernay's own sources" (Opp. 44-45) are non-existent; once again, they consist of nothing more than noting Lederer's involvement or Fairstein's self-serving denials. With no other card to play, Fairstein asserts "Defendants do not dispute that they harbored ill will against Fairstein" (Opp. 45 n. 72), but as discussed *supra* the Defendants' research and strong point of view that led them to dislike Fairstein is nothing like the competitors in *Celle* and cannot be

---

[38] That a "Netflix executive" asked "whether the lunch scene 'actually happened,'" is not proof that "Netflix purposefully avoided the truth." (Opp. 45.) The executive asked about whether the scene really happened for stylistic editing purposes to decide if it could be trimmed. (Def. SUF Reply ¶ 68[8].) That explanation is unrebutted.

the basis for finding actual malice.[39] Instead, like the author in *Berisha v. Lawson*, who after research thought it "might take plaintiff down" so did they here. 973 F.3d at 1314. That they were satisfied with the thought is not constitutional actual malice. Plaintiff has no answer to *Berisha*. (Opp. 46 n. 73.)

## V.    The Subsidiary Meaning Doctrine Also Forecloses Plaintiff's Claims.

Plaintiff also has no answer to the subsidiary meaning doctrine. Instead, she announces a new purported limitation on the doctrine—that it "may only be applied ***after*** the Court determines whether Defendants acted with actual malice with respect to each of the Five Scenes"—and argues that it does not contemplate "a comparison of each of the Five Scenes to the 'overall view' expressed in the Series." (Opp. 46.) *Church of Scientology* rejects Fairstein's gloss. The "overall view" in that case was not one of the enumerated alleged defamations, but rather the district court's own description of the "larger thrust of the Article". 238 F.3d at 176-77. The Second Circuit affirmed summary judgment because the specific complained-of statements were "subsidiary to" that "general message." *Id*. Here too the "general message" of Fairstein's control and approval of aggressive actions against the Five that could be seen as crossing moral and ethical lines (*see* Open. Br. 47), even if Fairstein disagrees with that message, is supported by the sources and cannot be the basis for actual malice. The five scenes are subsidiary examples of that message and even if they were published with actual malice they fail under the doctrine. (*Id*. at 46-48.)

## CONCLUSION

Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Dated: January 16, 2023                          Respectfully submitted,

                                                 /s/ Natalie J. Spears

---

[39]  Fairstein's focus on DuVernay's remark that the actor playing Ryan was her "voice" (Opp. 45) is meaningless. As the Court noted, "this scene functions in part as a closing summary of the filmmakers' views of weaknesses in the evidence," using these antagonists as proxies, and the Ryan character's "interpretative gloss is the opinion-based prerogative of the defendants as speakers" (*Fairstein,* 553 F. Supp. 3d at 76-77): that "While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit." (DX-30B at 6.)

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000

Sandra D. Hauser
Justin N. Kattan
DENTONS US LLP
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 768-6700

*Attorneys for Defendants Netflix, Inc., Ava DuVernay and Attica Locke*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 16, 2023, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record on the service list.

/s/ Natalie J. Spears