**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINDA FAIRSTEIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 20-cv-8042 (PKC) |
| v. | ) |
| | ) |
| NETFLIX, INC., AVA DUVERNAY, and | ) |
| ATTICA LOCKE, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff's response to Defendants Rule 56.1 Statement fails to comply with the Rule in critical respects that render it an improper pleading.  The Rule states that:

> (b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

L.R. 56.1(b).

First, Plaintiff's failure to include "additional paragraphs containing a separate, short and concise statement of additional facts" is particularly egregious here. In violation of the rule, Plaintiff instead embeds additional purported facts within multiple pages of single-spaced, unnumbered paragraphs (up to 40 paragraphs in response to one SUF) that go far beyond simply responding to Defendants' statements. (*See e.g.* Response to SUF ¶¶ 79, 120, 127, 203.)

Plaintiff's "responses" also add extensive verbiage that is both non-responsive to Defendants' actual plain statements, and is argument rather than fact. The Court need not accept and should disregard the numerous responses of Plaintiff that add "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions

plaintiff has been compelled to make." *Goldstick v. The Hartford, Inc*., 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (granting motion to strike plaintiff's response). This tack by Plaintiff pervades her Response.

Plaintiff's additional "facts" and narratives are not only irrelevant and immaterial to the issues on Defendants' Motion but they are confusing and misstate the record, often by omission. The result is an unwieldy, cumbersome pleading that fails to comply with L.R. 56.1 and appears purposefully designed to both obscure plain admissions and to deprive Defendants of the opportunity to respond in an orderly way to Plaintiff's statements. Had Plaintiff followed Rule 56.1(b), Defendants would have an opportunity to respond to the additional paragraphs in a counterstatement. *Emanuel v. Gap, Inc*., 2022 WL 3084317, at *5 (S.D.N.Y. Aug. 3, 2022) ("The movant, however, is obligated to respond to the counterstatement (within the same document) and, if it fails to do so, the Court could deem all the facts contained therein as admitted.").

Courts, including this court, typically allow the moving party to submit a reply to respond to new facts offered by a non-moving party. *See, e.g., Cunningham v. Cornell Univ*., 2019 WL 4735876, at *1 n.3 (S.D.N.Y. Sept. 27, 2019) (considering Defendants' Reply "to the extent it responds to new facts in Plaintiffs' Counterstatement.") (Castel, J.); *Roth v. Cheesecake Factory Restaurants, Inc*., 2021 WL 1103505, at *2 (S.D.N.Y. Feb. 5, 2021), *report and recommendation adopted*, 2021 WL 912416 (S.D.N.Y. Mar. 10, 2021) (accepting Defendant's Rule 56.1 Reply).

Accordingly, if the Court declines Defendants' request for leave, or ultimately declines to strike Plaintiff's improper pleading in its entirety, Defendants seek leave in the alternative to reply to the following Responses, which add new facts: 12, 13, 14, 18, 31, 38, 40, 41, 43, 54, 56, 57, 58, 59, 60, 64, 68, 74, 75, 77, 79, 80, 84, 85, 91, 94, 95, 98, 99, 104, 105, 106, 109, 113, 114, 119, 120, 127, 131, 132, 133, 134, 138, 142, 144, 145, 148, 149, 150, 155, 157, 160, 165, 166, 172,

173, 181, 187, 190, 195, 197, 198, 199, 200, 203, 204, 205, 206, 207, 211, 214, 219, 220, 221, 222, 223, 224, 228, 231.

Defendants' Reply to these paragraphs is limited to the new facts in Plaintiff's "Response" and is intended to aid the Court in deciphering those facts that are pertinent to summary judgment, and distinguishing those that are not. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Defendants have structured their Reply in attempt to be the most useful for the Court given Plaintiff's unstructured Response.

Second, many of Plaintiff's responses violate Rule 56.1's mandate in other ways that warrant striking her Responses as follows:

(1) Responses that deny or admit "with qualification" Defendants' SUF, while adding non-responsive matters to deflect what should be simple admissions and for which Plaintiff has no actual evidence contradicting Defendants' SUF. Plaintiff's responses to the following SUFs fall into this category and should be stricken: 5, 18, 23, 27, 28, 29, 31, 38, 40, 41, 43, 50, 53, 54, 55, 57 64, 68, 69, 71, 73, 74, 79, 80, 84e, 91, 94, 105, 106, 120, 130, 131, 142, 145, 149, 150, 166, 181, 190, 198, 199, 200, 203, 205, 206, 207, 214, 221, 222, 228;

(2) Responses that purport to deny Defendants' SUF but cite material that actually confirms the truth of Defendants' SUF. Plaintiff's responses to the following SUFs fall into this category and should be stricken: 19, 22, 33, 107, 114, 161, 175;

(3) Responses that deny Plaintiff's own admissions without providing any basis to do so. Plaintiff's responses to the following SUFs fall into this category and should be stricken: 11, 12, 13, 14, 15, 16, 58, 99, 102, 118;

(4) Responses that deny Defendants' SUF related to their sources but for which Plaintiff does not actually contest that the source says what it says. Plaintiff's responses to the following SUFs fall into this category and should be stricken: 86, 121, 124, 134, 135, 153, 162, 165, 167, 172, 173, 195;

(5) Responses that contain legal argument regarding the admissibility of Defendants' Statements as to the writers' state of mind or intent and for which Plaintiff cites no affirmative evidence that speaks to the writers' state of mind. Plaintiff's legal argument not only is improper in the Response, it is also legally

incorrect. Plaintiff's repeated argument (e.g., SUF Resp. ¶¶ 56, 57, 60 and passim) that a defendant's beliefs and state of mind present "credibility issues" that preclude summary judgment is flatly contrary to the Supreme Court's holding in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) and Second Circuit authority. See Contemp. Mission, Inc. v. N.Y. Times Co., 842 F.2d 612, 621-22 (2d Cir. 1988) (affirming summary judgment and citing Anderson 477 U.S. at 256 ) ("It is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice.").

Accordingly, Plaintiff's inappropriate responses to the following Statements should be stricken: 56, 60, 75, 76, 77, 78, 81, 85, 90, 92, 93, 127, 128, 129, 132, 133, 138, 143, 144, 146, 148, 155, 156, 157, 158, 159, 160, 163, 164, 174, 182, 184, 187, 192, 193, 194, 196, 197, 203, 204, 211, 223, 224, 229, 230, 231;

(6) Responses that fail to admit or deny Defendants' SUF. Plaintiff's responses to the following SUFs fall into this category and should be deemed admitted: 98, 109, 110, 185.

Defendants thus request leave to move to strike the above noted Responses.

In this Reply, Defendants have denoted for the Court the portions of Plaintiff's pleading that should be stricken as improper. Defendants also have responded to the additional facts improperly imbedded within Plaintiff's "Response" in the specific paragraphs noted above. For ease of reference, Defendants replies are denoted as "REPLY" and in blue ink. For convenience, Defendants include Defendants' full statement of undisputed facts and Plaintiff's Responses, so the record is contained to one document for the Court's review. To the extent that Defendants do not reply to additional facts, Defendants state that those facts are undisputed for purposes of this Motion, but not material to the legal issues raised by Defendants' Motion.

A.    **The Parties**

1.      This case involves purported defamation claims by Plaintiff Linda Fairstein ("Plaintiff" or "Fairstein") based on the four-episode limited series *When They See Us* ("WTSU" or "the Series"). (Compl. ¶ 1; Ans. ¶ 1.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that unverified pleadings are not admissible evidence. *See Thomas v. Jacobs*, 2022 WL 504787, at n. 1 (S.D.N.Y. Feb. 17, 2022).

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's "qualification" to this SUF as improper and every similar qualification herein.  (*See e.g.* SUF Resp. 8, 20, 89.) In many instances Plaintiff admits the fact asserted is undisputed, but points out that Defendants cited the Complaint and Answer in this litigation.  These pleadings are cited for reference as to facts that Plaintiff asserted and Defendant admitted, and are not contested.

Similarly, Plaintiff objects to citations to news articles and books as hearsay.  Defendants are not citing the books and newspaper articles for the truth of the matter asserted, but instead they are cited as evidence that the fact asserted was reported at the time and for context as to its undisputed nature.  Later in Defendants' 56.1 Statement, as Plaintiff recognizes (n.1), the source materials that Defendants relied upon (*e.g.*, published news reports, books, interviews, the documentary) are cited and submitted as materials relied upon in creating and writing the Series.  Plaintiff's objections are improper and should be disregarded.

2.      Plaintiff worked at the Manhattan District Attorney's Office for 30 years and was the Head of the Office's Sex Crimes Unit for the last 26 of those years, until 2002. Following her career as a public official Plaintiff achieved notoriety as an author of crime novels. (Compl. ¶¶ 32, 35; Ans. ¶¶ 32, 35; Ex. 1, excerpt of *Sexual Violence: Our War Against Rape* by Linda Fairstein (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits the first sentence in Paragraph 2 and that she is an author of crime novels. *See* Declaration of Linda Fairstein dated November 29, 2022 ("Fairstein 11/29/22 Decl.") Plaintiff denies that she "achieved notoriety" as an author of crime novels. *See* https://dictionary.cambridge.org/us/dictionary/english/notoriety (last visited on Oct. 14, 2022) (defining notoriety as "the state of being famous for something bad"). Unverified pleadings are not admissible evidence *See Thomas*, 2022 WL 504787, at n. 1.

3.    Defendant Netflix, Inc. provides a subscriber-based online video streaming service and released the Series on its platform on May 31, 2019. (Compl. ¶¶ 1, 23; Ans. ¶¶ 1, 23.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that unverified pleadings are not admissible evidence *See Thomas*, 2022 WL 504787, at n. 1.

4.    Defendant DuVernay is a writer, director, and producer of the Series, and acted as the Series' "showrunner." (Compl. ¶ 24; Ans. ¶ 24; Declaration of Ava DuVernay ("DuVernay Decl."), ¶¶ 2-5; Ex. 2, Excerpts from Deposition of Ava DuVernay ("DuVernay Dep.") at 14, 15 50.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Paragraphs 2-4 of the Duvernay Declaration do not discuss Ms. DuVernay's work on the Series.

5.    Defendant Locke is a novelist and screenwriter who co-wrote Episode 2 in the Series. (Compl. ¶ 25; Ans. ¶ 25; Declaration of Attica Locke ("Locke Decl."), ¶¶ 2-4; Ex. 3, Excerpts from Deposition of Attica Locke ("Locke Dep.") at 15-16.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Locke's work on the Series was not limited to "co-writing" Episode 2. Per Ms. Locke's Declaration, she was also a "co-producer" of the Series. Locke Decl. ¶ 3. She was "assigned to write Episode 2" of the Series. *Id.* ¶¶ 4, 7. Ms. Locke also participated in a writers' room for the Series, during which the writers of the Series met to discuss their research and the structure of the Series and discussed "key moments (beats) for each episode." *Id.* ¶ 22. Per Ms. Locke's deposition testimony, the writers "gathered to go over research, how the research might help us shape our storytelling.... We assigned scripts and wrote them and commented on them. We worked as a team with some individual responsibilities." DX-3, Locke Dep. at 16:21-17:3. Ms. Locke provided ideas for Episode 1, notes to Robin Swicord regarding the script for Episode 1, comments on dialogue in scenes involving Ms. Fairstein, and comments about what research materials Ms. Swicord should review for Episode 1. Ms. Swicord and Ms. Locke also discussed timeline issues in the Central Park Jogger case. PX 81, Locke Dep. Tr., 100:17-104:19, 106:4-24, 107:20-121:18; PX-94-98.

6

Unverified pleadings are not admissible evidence. *See Thomas*, 2022 WL 504787, at n. 1.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.

B.     <u>The Central Park Jogger Case – Background</u>

6.     On the night of April 19, 1989, a jogger, Trisha Meili ("Ms. Meili" or the "jogger"), was beaten and raped in Central Park. Five young Black and Latino teenagers, ranging in age from 14 to 16, were arrested, charged, tried and convicted for their purported roles in the rape: Korey Wise, Raymond Santana, Kevin Richardson, Yusef Salaam and Antron McCray (the "Five"). (Compl. ¶¶ 4, 37, 38; Ans. ¶¶ 4, 37, 38.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that the Five were not the only individuals arrested in connection with the attacks in Central Park. The Five were charged and convicted of crimes other than the attack on Ms. Meili. DX-21, Ryan Affirmation, at ¶ 109.

Unverified pleadings are not admissible evidence and any allegations made in Defendants' answer are certainly not facts. *See Thomas*, 2022 WL 504787, at n. 1.

7.     When the April 19, 1989 attack on the jogger took place, Plaintiff "was the head of the Manhattan District Attorney's Sex Crimes Unit," reporting directly to D.A. Robert Morgenthau. (Compl. ¶¶ 5, 39; Ans. ¶¶ 5, 39; Ex. 4, Excerpts from Deposition of Linda Fairstein ("Fairstein Dep.") at 172-74, 179.)

**PLAINTIFF'S RESPONSE**:

Admitted, subject to the qualification that unverified pleadings are not admissible evidence and any allegations made in Defendants' answer certainly would not qualify as facts. *See Thomas*, 2022 WL 504787, at n. 1.

8.     Plaintiff was notified the morning of April 20, 1989 about the rape of the jogger and other assaults in the Park that had been reported. (Compl. ¶ 60; Ex. 4, Fairstein Dep. at 162; Ex. 5, 2003 Stmt. of Linda Fairstein to NYC Council ("2003 Stmt."), at 2.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that unverified pleadings are not admissible evidence. *See Thomas*, 2022 WL 504787, at n. 1.

9.        From the morning of April 20, 1989, Plaintiff was the liaison to D.A. Morgenthau on the case. D.A. Morgenthau was not present at the precincts and he relied on Plaintiff to "provide him with information about the investigation as it proceeded," and she reported to him multiple times a day for "updates of any kind." (Compl. ¶ 39; Ans. ¶ 39; Ex. 4, Fairstein Dep. at 171-74, 177-179; Ex. 6, 5/7/14 Email (highlights added for witness at deposition); Ex. 7, 11/21/16 Email (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that unverified pleadings are not admissible evidence and any allegations made in Defendants' answer certainly would not qualify as facts. *See Thomas*, 2022 WL 504787, at n. 1.

10.        Plaintiff admits that she was "intimately involved" in the Central Park Jogger case since the morning after the crime occurred. (Fairstein Dep. at 128-29, 194, discussing Ex. 8, 2/7/19 Email (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Admitted.

11.        Plaintiff argued that the case fell under her area of responsibility and assigned her subordinate Assistant D.A. Elizabeth Lederer to try the case. (Compl. ¶ 39; Ans. ¶ 39; Ex. 4, Fairstein Dep. at 145; Ex. 5, 2003 Stmt. at 2; Ex. 9, 7/15/02 Letter to J. Kindler (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Denied.

Unverified pleadings are not admissible evidence and any allegations made in Defendants' answer certainly would not qualify as facts. *See Thomas*, 2022 WL 504787, at n. 1.

Ms. Fairstein testified at her deposition that she "selected Ms. Lederer" and "recommended her to Morgenthau who made the ultimate choice of Lederer over Casolaro, to handle the case." PX-2, Fairstein Dep Tr. at 145. Ms. Fairstein further testified that she, John Fried and Morgenthau "had a discussion. All very pleasant. Mr. Morgenthau called me about a half hour later and said [he'd] like Elizabeth [Lederer] assigned to the case." *Id.* at 194:11-196:11. Ms. Fairstein's Statement to the City Council (DX-5, at 2) states only that Ms. Fairstein discussed the case with Mr. Morgenthau and he "backed [her] decision to assign the case to Elizabeth Lederer, one of the best prosecutors in the great office." Ms. Fairstein's 2002 letter to Mr. Kindler (DX-9), states that "the Boss made the call later in the day, to let Liz keep the case after it had been assigned to Casolaro."

It is improbable that Defendants relied on Ms. Fairstein's letter to Mr. Kindler since it was published on the New York City Law Department website concerning the Central Park Jogger case, as demonstrated by the "NYCLD" Bates numbers. It also has an exhibit tag "Fairstein-48, 5/11/13" which indicates that it was used at Ms. Fairstein's deposition in the Five's civil lawsuit against New York City. Ms. DuVernay did not review the materials on the New York City Law Department website. DuVernay Decl. ¶¶ 56-60. None of the Defendants reviewed depositions from the Five's civil lawsuit against New York City. PX-51, DuVernay Dep. Tr. 126:13-128:12; PX-34, Swicord Dep. Tr. 81:16-82:4; PX-81, Locke Dep. Tr. 26:17-26:20; PX-137, Engel 30(b)(6) Dep. Tr. 83:4-84:23.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.

12.     Plaintiff admits that she went to the precincts during the Central Park Jogger investigation and spent over 32 hours straight there to "assist in an investigation that had mushroomed into enormous proportions" and continued to grow after she arrived, as additional statements were being taken from suspects. (Compl. ¶ 39; Ans. ¶ 39; Ex. 4, Fairstein Dep. at 139, 210-212, 219-21; Ex. 10, Linda Fairstein, "In Defense of The Central Park 5 Prosecution," *New York Law Journal* (July 31, 2018) ("I was an eyewitness to many of the events at the police stationhouses throughout 36 hours when the statements were obtained") (highlights added for witness at deposition); Ex. 11, 1/4/10 Letter to R. Morgenthau (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY NOTE:  For clarity in order to Reply and as an aid to the Court, here and in other places throughout this Reply, Defendants have added bracketed numbers ([1], [2], etc.) to Plaintiff's numerous paragraphs in her Responses.   Many of Plaintiff's Responses contain several un-numbered paragraphs—and in one case, more than 40—each with multiple points and evidence, and continue for multiple pages.**

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  SUF 12 reflects Plaintiff's admissions, as to which she has no basis to deny.  To the extent that the Court accepts Plaintiff's Response, Defendants further reply to the additional facts improperly contained in Plaintiff's Response as follows:

[1]  Ms. Fairstein testified at her deposition that Elizabeth Lederer and Tim Clements conducted the "precinct investigation, not a police investigation, a prosecutorial one." PX-2, Fairstein Dep. Tr., 212:7-213:21. Ms. Fairstein also testified that she "was not assisting in the investigation. [She] was assisting in enabling the things that my two assistants needed to get their path of the investigation done." *Id.* at 220:5-22; PX-1, Fairstein (6/29/20) Decl., (ECF No 44-1), ¶ 24. Ms. Fairstein was "in the unique position, while [Lederer and Clements] were in the interview rooms, to make observations about what was happening in the stationhouse." PX-2, Fairstein Dep. Tr. 212:7-213:20. *See* DX-25, Toobin article.

**DEFENDANTS' REPLY** to [1], [2] and [4]: Defendants admit that Plaintiff's added statements reflect Plaintiff's own testimony as to her physical locations at specific times but deny that Plaintiff's assertions as to the specific timing of her actions or her characterizations of the investigation are material to Defendants' Motion on the issue of lack of actual malice.  Defendants also deny that the cited testimony of other individuals is evidence that proves the truth of Plaintiff's specific statements.

[2] Ms. Fairstein was never at the Central Park Precinct, when members of the NYPD questioned a number of individuals, including Raymond Santana and Kevin Richardson. PX-2, Fairstein Dep. Tr. 215:6-216:5; PX-21, Reynolds Dep. Tr. 74:3-10; PX-22, at NYCLD_023552-23555, 23602-607, 23612-614, and 23702-705. Ms. Fairstein was not at the 20th Precinct when Mr. McCray was questioned. PX-27, at DEFS014847-857, 14859, 14880-900; PX-29, at DEFS016980-981, DEFS017012-17017. She was not at the 20th Precinct when Mr. Wise was questioned. PX-29, at DEFS016996-17011, PX-31, at DEFS020714-715, 20718-719, 20736-741.

**DEFENDANTS' REPLY** to [2]:  See above.

[3]  Angela Black, ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████ PX-202, DEFS145479, at 5:24-31:51. Ms. Black first saw Ms. Fairstein on the night of April 20 at the 20th Precinct, after Mr. Richardson made statements to the detectives. DX-40 (on the night before Mr. Richardson went to the crime scene). *See* PX-192, at DEFS91785, 91787-91788, DEFS91801, DEFS91806; DX-17, Sullivan, at p. 22. Defendants' own "Interrogation Timeline" shows that Mr. Richardson was questioned by detectives at the Central Park Precinct, where he signed a statement. PX-193, at DEFS093141-143.

**DEFENDANTS' REPLY** to [3] and [5]: Plaintiff's response regarding Ms. Black and Mr. Richardson's interviews are not responsive or relevant to SUF 12. The interviews and other documents cited speak for themselves and Defendants deny any statements inconsistent therewith.

[4] Ms. Fairstein was not at any police precinct until 8:30 p.m. on the night of April 20th, when she met Elizabeth Lederer at the 20th Precinct. PX-1, Fairstein (6/29/20) Decl., ¶ 24; PX-2, Fairstein Dep. Tr. 213:21-214:7; DX-17, at p. 22 (Lederer and Fairstein arrived at 20th Precinct after 8:00 p.m.); PX-29, at DEFS016980-81, 17012-17017; Fairstein Decl., Ex. A, at 238-242, Ex. B, at 355.

**DEFENDANTS' REPLY** to [4]: See above.

[5] In Mr. Richardson's interview for the Burns documentary, he expressed the following about Elizabeth Lederer "Honestly, I look at her as a conniving individual. And that's evil. That's an evil individual." PX-201, DEFS145477, at 1:38-15-1:39:30. ███████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

**DEFENDANTS' REPLY** to [5]: See above.

[6] DX-11, a 2010 letter written by Ms. Fairstein, could not have been relied upon by the writers when creating the Series. Ms. DuVernay's interrogatory responses cite the 2010 letter from Ms. Fairstein to Robert Morgenthau as source material for the Series. DX-44; at p. 6 (citing DEFS177281). This letter was published on the New York City Law Department website concerning the Central Park Jogger case, as indicated by the "NYCLD" Bates number. It also contains a sticker "Fairstein-42, 5/11/13" indicating that it was used at Ms. Fairstein's deposition in the Five's civil lawsuit against New York City. Ms. DuVernay's declaration (Paragraphs 56-60) states that she did not look at the website. At her deposition, Ms. DuVernay could not recall where the letter came from. PX-51,

DuVernay Dep. 138:3-139:2. It cannot reliably be authenticated as part of Defendants' source materials for the Series. It was produced as part of Netflix's document collection and listed as Exhibit 42 to Ms. Fairstein's deposition in the Five's civil action against New York City. At the deposition of Netflix 30(b)(6) witness Alison Engel, Defendants' counsel stated on the record that Ms. Fairstein's deposition transcript from the federal action was produced because it was attached to Defendants' motion to dismiss and that it was not part of Defendants' original document collection. PX-137, Engel Dep. Tr. 83:4-84:23. None of the writers read the deposition transcripts from the Five's lawsuit against New York City. PX-51, DuVernay Dep. Tr. 126:13-128:12; PX-34, Swicord Dep. Tr. 81:16-82:4; PX-81, Locke Dep. Tr. 26:17-26:20.

DX-11 states only that Ms. Fairstein was "a fact witness in the case about many things (including the 32 hours I spent at the stationhouse during the initial investigation), which required my testimony at the trials, Nany Ryan never once spoke to me."

**DEFENDANTS' REPLY** to [6]:  SUF 12 does not state that the writers relied on Plaintiff's letter to Mr. Morgenthau.  (DX-11.)  The letter is admissible evidence as an admission of Plaintiff.  FRE 801(d)(2).

Defendants admit that the writers did not review the depositions in the Five's civil case as part of the research they conducted for the Series.

Ms. DuVernay's unrebutted declaration states that she did not review the NYC website because she "did not believe that we needed more research at this juncture because I felt secure in our work and sources." (DuVernay Decl. at ¶ 57.)  She also states that she "had no doubt that nothing in the yet-to-be-released civil case documents would vindicate [Ms. Fairstein's] long-held, rigid assertions that the Five were guilty" and that "based on the news reports about the release and all of the other sources and research we had, and the fact that the defendants in the civil suit settled for $41 million, [she] believed that the additional documents on the NYC website would only put Ms. Fairstein and her cohorts in a worse light because there was no new evidence that the Five were guilty." (*Id*. at ¶¶ 59-60; *see also id.* at ¶ 58.)

Plaintiff omits the fact that the depositions were subject to a protective order in the civil case for years and had only begun to be publicly released in late 2018, at the earliest.  (DX-10.)  As Plaintiff admitted in her July 31, 2018 Op-Ed in the N.Y. Law Journal, documents would be uploaded to the City website "throughout the fall," including "hundreds of pages of transcripts made public for the first time, including 96 depositions of witnesses – taken under seal[.]" (DX-10.)  Plaintiff cites no evidence establishing when the depositions were actually uploaded to the NYC website. ████████████████████████████████
████████████████████████████████████████████████
████████████████████████

[7] DX-12, a 2018 letter written in response to a submission by one of the Five's attorneys to the *New York Law Journal*, states "As he knows well, I was not the prosecutor in the case nor was I one of the detectives or prosecutors who took the confessions from the 5.

Instead, I was an eyewitness to many of the events at the police stationhouses throughout the 36 hours when the statements were obtained."

**DEFENDANTS' REPLY** to [7]: Defendants admit that Plaintiff accurately quotes DX-12.

[8] Unverified pleadings (Complaint and Answer cited above) are inadmissible hearsay. FRE 801(c). *See Thomas*, 2022 WL 504787, at n. 1. Defendants' answer, drafted by Defendants' counsel, hardly contains an "admission" by Ms. Fairstein.

**DEFENDANTS' REPLY** to [8]:  Defendants incorporate their Reply to SUF 1 as if fully set forth herein.

13.    Plaintiff admits that she was the highest ranking prosecutor and only "supervisor" from the D.A.'s office at the precincts during the Central Park Jogger investigation. (Ex. 4, Fairstein Dep. at 155, 161, 200.)

**PLAINTIFF'S RESPONSE:**

Admitted subject to the qualification that "Central Park Jogger investigation" is not defined in the paragraph above. Ms. Fairstein was never at the Central Park Precinct and was not at any precinct until arriving at the 20th precinct at 8:30 p.m. on April 20, 1989, when Ms. Lederer commenced a prosecutorial investigation. *See* Plaintiff's Response to Paragraph 12, incorporated by reference herein; PX-2, Fairstein Dep. Tr. 215:6-216:5. Ms. Fairstein did not supervise Ms. Lederer's taking of video statements at the precincts. *Id*. at 155:14-156:7. Ms. Fairstein "had no responsibility for the police investigation that was ongoing. None." *Id.* at 201:2-25. Ms. Fairstein "had no authority...none at all, to change the direction of anything anybody in the NYPD was doing... [her] only area of advice was to ... Ms. Lederer." *Id.* at 202:25-203:19. PX-21, Reynolds Dep. Tr. 175-180. *See* Pltf. SJ Opp. Br., Statement of Facts, at Pts. III.A-B.

**DEFENDANTS' REPLY**:  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent that the Court accepts Plaintiff's Response, Defendants further reply to the additional facts improperly contained in Plaintiff's Response as follows:

Defendants admit that Plaintiff's added statements reflect her own testimony as to her physical locations at specific times but deny that Plaintiff's assertions as to the specific timing of her actions or her characterizations of the investigation are material to Defendants' Motion on the issue of lack of actual malice.  Defendants also deny that the cited testimony of other individuals is evidence that proves the truth of Plaintiff's specific statements.

14.    Plaintiff admits she supervised and had oversight over the prosecution team, including during the two separate trials that were held in July and November 1990. (Ex. 4, Fairstein Dep. at 147, 155, 278, 340-341; *see also* Ex. 12, Linda Fairstein, "Netflix's False Story of the Central Park Five," *Wall Street Journal* Op-Ed (June 10, 2019) (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Denied.

Page 147 of Ms. Fairstein's deposition transcript ***does not state*** that Ms. Fairstein had oversight and supervised the prosecution team. Page 155 of Ms. Fairstein's deposition testimony states that Ms. Fairstein ***did not supervise*** Ms. Lederer's taking of video statements at the 20th and 24th Precincts. Page 278 of Ms. Fairstein's deposition transcript states that she supervised and advised Ms. Lederer on aspects of the case dealing with sexual assault during the criminal trials of the Central Park Jogger cases. Ms. Fairstein's 2020 *Wall Street Journal* Op-Ed states that she was "***one of*** the supervisors who oversaw the team that prosecuted the teenagers apprehended after that horrific night of violence." (emphasis added) *See* DX-4 and DX-12.

The Central Park Jogger case was Elizabeth Lederer's case and Ms. Fairstein, as head of the Sex Crimes Unit, was "technically" a supervisor but Ms. Lederer "didn't go to her with questions." PX-10, Lederer Dep. Tr. 34:14-35:14. Ms. Fairstein was a "supervisor in name. But she was also a witness in the case. So she wasn't involved. [Ms. Lederer] was in a trial bureau and [she] worked with...Dan McNulty." *Id.* at 59:9-23. Per Ms. Lederer, "because it was a sex crimes case, Linda would be considered a supervisor. But she wasn't really involved in the decision-making." *Id.* at 59:24-60:4. Ms. Lederer described Ms. Fairstein's "supervisory" role as administrative in nature. For example, Ms. Fairstein would assist Ms. Lederer by "pushing through" requests to have expensive trial exhibits made so that Ms. Lederer did not have to go through the "stages of applying and asking for it." *Id.* at 60:4-61:9.

Arthur Tim Clements ("Mr. Clements"), who prosecuted the Central Park Jogger case with Ms. Lederer, testified that Ms. Fairstein "never directed [his] activities" or conduct during the prosecution. PX-18, Clements Dep. Tr. 69:4-20. Ms. Fairstein was not Mr. Clements' supervisor. *Id.* at 65:3-17.

**DEFENDANTS' REPLY**:  Defendants move to strike Plaintiff's Response as an improper denial.  To the extent that the Court accepts Plaintiff's Response, Defendants further reply to the additional facts improperly contained in Plaintiff's Response as follows:

Defendants admit that Plaintiff's added statements reflect her own testimony as to her physical locations at specific times but deny that Plaintiff's assertions as to the specific timing of her actions or her characterizations of the investigation are material to Defendants' Motion on the issue of lack of actual malice. Defendants also deny that the cited testimony of other individuals is evidence that proves the truth of Plaintiff's specific statements.

15.     Plaintiff was a witness against the Five "in the suppression hearings and trials" testifying about "events that occurred on the night of April 20 and on April 21, 1989" when the Five and other witnesses were being interrogated. (Compl. ¶ 39; Ans. ¶ 39; Ex. 11, 1/4/10 Letter to R. Morgenthau; Ex. 4, Fairstein Dep. at 133, 210-212.)

**PLAINTIFF'S RESPONSE**:

Denied.

Unverified pleadings are not admissible evidence and any allegations made in Defendants' answer certainly would not qualify as facts. *See Thomas*, 2022 WL 504787, at n. 1.

Ms. Fairstein's testimony in the suppression hearing and trials did not concern witness interrogations "on the night of April 20 and on April 21, 1989." On the night of April 20, and on April 21, 1989, while Ms. Lederer and Mr. Clements were in interview rooms, Ms. Fairstein made "observations about what else was happening in the stationhouse." She interviewed Yusef Salaam's mother and David Nocenti and "walked the crime scene twice"—once on the morning of April 21 with Kevin Richardson and Korey Wise and once with Ms. Lederer, Mr. Clements and [videographer] Mike Manion" that same morning. PX-2, Fairstein Dep. Tr. 212:7-213:20; PX-1, Fairstein (6/29/20) Decl. ¶¶ 24-26. Ms. Fairstein testified at a suppression hearing and at Mr. Salaam's trial about her interaction with Mr. Salaam's mother. PX-1, Fairstein (6/29/20) Decl. ¶ 25. Ms. Fairstein testified about one visit to the crime scene at a suppression hearing and at Mr. Wise's and Mr. Richardson's trial. Fairstein *Id.* ¶ 26. *See* PX-29, at DEFS016980-981, DEFS016996-17017; PX-31, at DEFS021079-21089, 21100-21104, 21125-21127, 21132-2133, 21145-47.

As discussed *supra* Paragraph 12, DX-11 could not have been relied on as source material for the Series.

**DEFENDANTS' REPLY**: Defendants move to strike Plaintiff's Response as an improper denial and incorporate their Reply to SUF 12 [6] and their Reply to SUF 1.

16.    Plaintiff admits she supervised Ms. Lederer's work during the trials, and continued

to report to D.A. Morgenthau, including on the DNA aspects of the case. (Ex. 4, Fairstein Dep. at

278-279, 282-285.)

**PLAINTIFF'S RESPONSE**:

Denied. *See* Response to Paragraph 14 above, incorporated by reference herein. Ms.
Fairstein testified as follows:

> Q. And you were still continuing to be the liaison to the DA, Mr.
> Morgenthau, with updates on the case and trial as they proceeded to get
> ready for trial. Correct?

> A. Most of them, I think, yes.

DX-4, Fairstein Dep. 278-279. Ms. Fairstein did not "work on DNA aspects of the case."
PX-2, Fairstein Dep. Tr. 270:5-272:13, 274:2-278:19. Ms. Fairstein testified that she
updated Mr. Morgenthau about DNA that Ms. Lederer found on Trisha Meili's sock when
Ms. Lederer visited the crime lab (Ms. Fairstein was not present). Ms. Fairstein updated
Mr. Morgenthau after Ms. Lederer appeared in court and told Judge Galligan and defense
counsel about her discovery. *Id.* at 280:5-282:19. Ms. Fairstein told Mr. Morgenthau
"mostly because [Lederer] requested an adjournment of the trial for a later date." *Id.* at
282:2-19. Ms. Fairstein "believes" she reported the results of the sock DNA test to Mr.
Morgenthau. She testified she "would have reported" that the sock DNA matched the
cervical DNA to Mr. Morgenthau. DX-4, Fairstein Dep. 284.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper
denial.

17.    There was no DNA evidence linking the Five to the rape. (Compl. ¶¶ 119, 124 and

fns. 84, 87, 92; Ex. 4, Fairstein Dep. at 283-285; Ex. 13, *People v. Wise*, 194 Misc.2d 481, 489

(N.Y. Sup. Ct. 2002) ("Ultimately, there proved to be no physical or forensic evidence recovered

at the scene or from the person or effects of the victim which connected the defendants to the attack

on the jogger") (highlights added for Court's reference); Ex. 14, Ronald Sullivan, "Scientific Link

Is Still Missing In Jogger Trial," *N.Y. Times* (July 20, 1990) (highlighting and markings original

to Ms. Locke); Ex. 15, William Glaberson, "In Jogger Case, Once Viewed Starkly, Some Skeptics

Side with Defendants," *N.Y. Times* (Aug. 8, 1990) (highlighting, markings and handwriting original to Ms. Locke).)

**PLAINTIFF'S RESPONSE**:

Admitted, subject to the qualification that the judicial opinion and *New York Times* articles cited in Paragraph 17 are inadmissible as hearsay because Defendants cite them to establish the truth of the matters asserted therein. FRE 801(c). *See Strauss v. Credit Lyonnais, S.A.*, 2017 WL 4481126, at *3 (E.D.N.Y. Sept. 30, 2017) (newspaper articles are hearsay when introduced to prove the truth of the matter asserted); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 605-606 (S.D.N.Y. 2014) (statements and conclusions contained in judicial opinions and rulings were inadmissible hearsay).[1] Unverified pleadings are, likewise, inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1.

18.    DNA taken from Ms. Meili's cervix initially was declared by the prosecution's analysts to be "inconclusive," and that was the position that the prosecution took in the press prior to trial. (Ex. 16, Ronald Sullivan, "Genetic Tests 'Inconclusive' in Jogger Rape," *N.Y. Times* (Oct. 10, 1989) ("Laboratory tests on genetic evidence that prosecutors hoped would link six young defendants to the rape and attempted murder of a Central Park jogger appear inconclusive, law enforcement officials disclosed yesterday.... prosecutors would not say definitely that the tests were negative") (highlighting, markings and handwriting original to Ms. Locke).)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Fairstein did not "work on DNA aspects of the case." PX-2, Fairstein Dep. Tr. 270:5-272:13, 274:2-278:19. Ms. Fairstein did not "remember who reported" that the initial cervical DNA results came back as inconclusive. *Id.* at 279:12-280:4. She did not remember whether there was a "court statement or a report" about the cervical DNA, and Ms. Fairstein did not remember whether it was "inconclusive or not a match." *Id.* Ms. Fairstein is neither quoted or named in the *New York Times* article cited above. The *New*

---

[1] Plaintiff makes a distinction here. To the extent Defendants submitted source materials for their work on the Series to make their arguments concerning actual malice (*e.g.*, books and newspaper articles), Plaintiff does not object to the admissibility of those materials for that purpose, provided they are authenticated as materials relied upon by Defendants at the time they were creating/writing the Series. However, Defendants' reliance on newspaper articles and books to establish the truth of facts relating to the Central Park Jogger case is improper and Plaintiff's objection thereto will be noted in her responses as necessary.

*York Times* article cited above is inadmissible hearsay. FRE 801(c). *See Strauss*, 2017 WL 4481126, at *3. The alleged "position that the prosecution took in the press prior to trial" about the cervical DNA is also irrelevant to the claims and defenses in this action. FRE 401, 402.

Ms. Locke testified that Mr. Morgenthau was aware that the DNA was "inconclusive" and that he was "the ultimate boss in the structure of the district attorney's office." PX-81, Locke Dep. Tr. 77:14-79:17. *Unequal Verdicts*, by Timothy Sullivan (hereinafter "Sullivan"), which the writers relied on when writing the Series, attributes the use of the term "inconclusive" to describe the DNA results to D.A. Robert Morgenthau and Elizabeth Lederer. DX-17, Sullivan, at 145.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants incorporate their Reply to SUF 181, *infra*, on Ms. Locke's testimony as if fully set forth herein.

Mr. Sullivan's book is a written document which speaks for itself and Defendants deny any statements inconsistent therewith.

19.    DNA from Ms. Meili's sock was belatedly discovered right before the first trial was scheduled to begin. (Compl. ¶¶ 119 and fns. 84, 87; Ex. 17, *Unequal Verdicts: The Central Park Jogger Trials* by Timothy Sullivan ("Sullivan")[2] at 102-03.)

**PLAINTIFF'S RESPONSE**:

Denied.

Unverified pleadings are inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1.

Ms. Fairstein testified that the sock was found "close to the time of trial. I don't know about right before." PX-2, Fairstein Dep. Tr. 280:5-13. Ms. Fairstein denies the theory attributed to her in Mr. Sullivan's book at page 103 and that she was one of the "prosecutors" that had "high hopes" about the result of DNA testing on the sock. DX-17, Sullivan, at 102-103. At the point in time that the sock DNA was discovered, Ms. Fairstein was to be a witness at trial. Ms. Lederer and Mr. Clements together created and constructed the prosecution strategy for the Central Park Jogger trials. PX-1, Fairstein (6/29/20) Decl. ¶

---

[2] The copy of Mr. Sullivan's book submitted as Exhibit 17 contains Ms. Swicord's original handwritten notes and markings. (*See* Declaration of Robin Swicord ("Swicord Decl.") ¶ 12.) The page numbers refer to the page of the book, located on the top, middle of the page. [**This footnote is original to Defendants' Rule 56 Statement**]

41. *See* Declaration of Elizabeth Lederer, dated November 23, 2022 ("Lederer Decl."), Ex. C, 658-660, 662. PX-27, DEFS014810-814; PX-17.

In any event, Mr. Sullivan's book is inadmissible hearsay if offered to establish the truth of the matter asserted above. FRE 801(c).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

20.     Testing on the sock was conducted and conclusively showed there was "no DNA match" to any of the Five from the sock or the cervical DNA. (Compl. ¶¶ 119, 124 and fns. 84, 87, 92; Ex. 4, Fairstein Dep. at 283; Ex. 17, Sullivan at 103.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Mr. Sullivan's book is inadmissible hearsay if offered to establish the truth of the matter asserted above. FRE 801(c). Unverified pleadings are, likewise, inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1.

21.     The prosecution nonetheless proceeded on the theory that the Five were still guilty of rape and that there must have been a "sixth rapist." (Ex. 18, Opening Statement of Elizabeth Lederer in trial of Antron McCray, Raymond Santana and Yusef Salaam at NYCLD_013824-25 (highlights added for witness at deposition); Ex. 5, 2003 Stmt. at 3 (sixth rapist theory); *see also* Ex. 19, *The Central Park Five* Documentary by Ken Burns ("Burns Doc.") at 01:05:26 – 01:07:06; Ex. 17, Sullivan at 103; Ex. 20, *Savage Portrayals: Race, Media, & the Central Park Jogger Story* by Natalie Byfield ("Byfield")[3] at 148.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Fairstein was not "the prosecution" and did not come up with the prosecution's theories or strategies for the trials against the Five. PX-2, Fairstein Dep. Tr. 55:2-7, 128:11-129:8; PX-1, Fairstein Decl. (6/29/20), ¶ 41; PX-10, Lederer Dep. Tr. 59:9-60:4, 165:5-14; Lederer Decl., Ex. C, 658-660, 662, 774-777.

---

[3] The copy of Ms. Byfield's book submitted as Exhibit 20 contains Ms. Swicord's original handwritten notes and markings. (*See* Swicord Decl. ¶ 12.) The page numbers refer to the page of the book, located at the top, left and right of the page. So as not to overload the record, Defendants submit only excerpts of Ms. Byfield's book cited herein. [**This footnote is original to Defendants' Rule 56 Statement**].

The portion of Ms. Lederer's Opening Statement cited above does not reference a "sixth rapist." DX-18. The Burns documentary, Sullivan and Byfield are inadmissible hearsay. FRE 801(c). The prosecution's strategy during the trials of the Central Park Jogger case is not relevant to the claims or defenses in this action. FRE 401, 402.

22.     At the first trial, the prosecution called the cervical DNA sample "inconclusive" in its opening statement. (Ex. 18, Opening Statement.)

**PLAINTIFF'S RESPONSE**:

Denied.

*Ms. Lederer* referred to the cervical and rectal DNA samples as inconclusive in her opening statement at the trial of Antron McCray, Yusef Salaam and Raymond Santana. DX-18, at NYCLD_013824-25. Ms. Fairstein did not prosecute the case against the Five. *See* Plaintiff's Response to Paragraph 21, *supra*, incorporated by reference herein. How Ms. Lederer described the cervical DNA in her opening statement is not relevant to any claims or defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

23.     "[T]he People's case at both trials rested almost entirely on the statements made by the defendants," which the Five had retracted before trial claiming they were the product of coercion. (Ex. 13, *Wise*, 194 Misc.2d at 489.)

**RESPONSE**:

Denied.

Ms. Fairstein did not prosecute the case against the Five. *See* Plaintiff's Response to Paragraph 21, *supra*, which is incorporated by reference herein. The law, as it stands today is that the confessions were not coerced. Judge Galligan wrote a 116-page opinion to this effect after a three-week Huntley hearing. New York has an unusual law which lets the juries decide again the voluntariness of confessions. Two juries decided the Five's confessions were voluntary. Two separate panels of the Appellate Division upheld the confessions as voluntary and valid. The Court of Appeals of the State of New York wrote an opinion affirming the voluntariness of the statements. PX-2, Fairstein Dep. Tr. 139:17-140:15.

The judicial opinion cited above is inadmissible hearsay. FRE 801(c); *Chevron Corp.*, 974 F. Supp. 2d at 605-606. The "People's case at both trials" is not relevant to any of the claims or defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.

24.     In 2002, a serial rapist named Matias Reyes "came forward" and confessed to alone raping Ms. Meili in 1989. (Compl. ¶¶ 5, 41; Ans. ¶¶ 5, 41; Ex. 13, *Wise*, 194 Misc.2d at 487-88.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Defendants cite to no admissible evidence above. Unverified pleadings inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1. As are judicial opinions. *Chevron Corp.*, 974 F. Supp. 2d at 605-606.

25.     Mr. Reyes' DNA alone matched the DNA taken from Ms. Meili's cervix, sock and personal belongings. (Compl. ¶ 41; Ans. ¶ 41; Ex. 13, *Wise*, 194 Misc.2d at 488-89.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Defendants cite to no admissible evidence above. Unverified pleadings inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1. As are judicial opinions. *Chevron Corp.*, 974 F. Supp. 2d at 605-606.

26.     Following the Reyes confession and DNA match, Assistant D.A. Nancy Ryan led a reinvestigation of the case by the D.A.'s Office and submitted an Affirmation in Response to Motion to Vacate Judgment of Conviction (the "Affirmation"). (Compl. ¶ 41; Ans. ¶ 41; Ex. 21, Affirmation, ¶¶ 1-6, 41-42; Ex. 13, *Wise*, 194 Misc.2d at 482-83, 486-91.)

**PLAINTIFF'S RESPONSE:**

Admitted subject to the qualification that, except for the Ryan Affirmation, Defendants cite no admissible evidence above. Unverified pleadings inadmissible hearsay. *See Thomas*, 2022 WL 504787, at n. 1. As are judicial opinions. *Chevron Corp.*, 974 F. Supp. 2d at 605606. Mr. Reyes' 2002 confession is not relevant to any of the claims or defenses in this action. FRE 401, 402.

27.    The Affirmation detailed the reasons why the D.A.'s Office found Reyes'
confession that he was solely responsible for the rape to be credible. (Ex. 21, Affirmation, ¶¶ 41-
71.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Affirmation discusses the investigation of the information that Reyes provided with a
view towards corroborating or refuting his statements. DX-21, Ryan Affirmation, ¶¶ 41-42.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as an improper
denial.

28.    The Affirmation also identified facts and circumstances incompatible with the
Five's guilt, including the lack of physical evidence, exclusion of DNA, and inconsistencies and
"serious weaknesses" in the Five's statements that were apparent from the outset. (Ex. 21,
Affirmation, ¶¶ 47, 80-119.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Ryan Affirmation states that the "defendants' statements in this case were sufficiently
persuasive to result in the convictions of all five defendants on at least some of the charges
against them, and, for that matter, persuasive enough to bring about those convictions
before two separate juries." DX-21, at ¶ 82. The Affirmation also states that "[t]here are
certainly portions of the statements made by the defendants that are consistent with the
evidence presented at trial." *Id.* at ¶ 90. The Affirmation further states that "[i]t was
credibly, honestly and persuasively argued by the prosecution that in any gang attack,
discrepancies among accounts and confusion about details are not unusual." *Id.* at ¶ 99.
Also, "given the involvement of a number of people and the violence of the events at issue,
some level of genuine confusion is probably inevitable." *Id.* Also, "those arguments were
bolstered by the fact that the crimes occurred at night, the lighting was poor, and that the
defendants were involved in a number of incidents." *Id.* According to the Affirmation,
"[m]ost important, the jurors who originally heard the evidence were presented with no
persuasive alternative theory of the case to consider. Certainly, no one would have thought
that as the defendants and their group were making their way through Central Park, a serial
rapist was also at large." *Id.* at ¶ 103.

The Ryan Affirmation notes that "[t]he other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured." *Id.* at ¶ 109. The Affirmation also states "[i]t was logical for the People to suggest that the defendants' culpability and criminal intent could be inferred from the pattern of conduct engaged in by the group of which they were a part." *Id.* at ¶ 113. The Affirmation notes "[i]n the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements all placed Wise at the scene of earlier incidents." *Id.* at ¶ 117. Also, "In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape." *Id.* at ¶ 117.

Ms. Fairstein further disagrees with the manner in which Ms. Ryan conducted her reinvestigation and denies that it was a "complete" investigation. PX-2, Fairstein Dep. Tr. 140:17-25; 212:7-213:20; PX-7.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive and argumentative.

29.     In vacating the Five's convictions, the New York state court held that the flawed confessions "laid the foundation for a course of action developed, followed, and relied on for the prosecution and conviction of the defendants. That course was based on a theory that the defendants were involved as a group in a single incident; a crime rampage, which included rape, robbery and other crimes." (Ex. 13, *Wise*, 194 Misc.2d at 496-98.)

**PLAINTIFF'S RESPONSE**:

Denied.

The judicial opinion cited above is inadmissible hearsay. FRE 801(c). *Chevron Corp.*, 974 F. Supp. 2d at 605-606. The judicial opinion is also not relevant to the claims and defenses in this action. FRE 401, 402. The judicial opinion cited above does not refer to the confessions as "flawed." It states that the "confessions were the quintessential evidence in the prosecution of the defendants." It also states that the prosecution's "theory cannot be said to have been unreasonable in 1990, given the evidence at the time of the trials." *People v. Wise*, 194 Misc. 2d 481, 496 (2002).

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive and argumentative.

30.     In 2003, the Five brought a federal civil rights action against the City and prosecutors, "including Ms. Fairstein, and scores of NYPD officers and detectives" arising from the Five's claims that their convictions and confessions were wrongful. (Compl. ¶¶ 5-6, 42-43 and fn. 2; Ans. ¶¶ 5-6, 42-43.)

**RESPONSE**:

> Admitted subject to the qualification that the action was filed on December 18, 2003. *See* Case Docket, Case No. 1:03-cv-9685, Doc. No. 1, Compl. The pleadings cited above are not admissible evidence. *See Thomas*, 2022 WL 504787, at n. 1.

31.     The premise for the civil rights complaint against Ms. Fairstein was that she was acting not only as a prosecutor but as an "investigator" alongside the NYPD. (Ex. 22, Op. and Order on Mot. to Dismiss, *McCray, et al. v. City of N.Y., et al.*, No. 1:03-cv-9685, 2007 WL 4352748, *16 (S.D.N.Y. Dec. 11, 2007) ("where ADAs themselves investigated or worked with police officers advising them on their investigative tactics, they are not entitled to absolute immunity"; granting leave to amend complaint to allege the investigative activity the "DA Defendants took part in") (highlights added for Court's reference); Ex. 23, Op. and Order on Mot. to Compel, *McCray, et al. v. City of N.Y., et al.,* No. 1:03-cv-09685, Doc. No. 153 at 9 (S.D.N.Y. Nov. 22, 2011) (court "permitted claims against [Fairstein and other ADAs] in their nonprosecutorial capacity to go forward . . . Plaintiffs have alleged that Defendant ADAs were heavily involved in the initial investigation and interrogations of Plaintiffs, and worked closely with police officers to manipulate and coerce confessions") (highlights added for Court's reference); Ex. 24, Am. Consolid. Compl., *McCray, et al. v. City of N.Y., et al.,* No. 1:03-cv-09685, Doc. No. 47 (S.D.N.Y. April 21, 2008), ¶ 133 (Fairstein was "present and consulting with various defendants, including Lederer and the detectives, during the questioning and investigation of the

adolescent plaintiffs" and "accompanied detectives to the crime scene") (highlights added for Court's reference); *see also id.* at ¶¶ 166, 176-189, 277, 280, 330, 510-513.

**PLAINTIFF'S RESPONSE**:

Denied.

The sources cited above—judicial opinions and an unverified pleading—are inadmissible hearsay. FRE 801(c). *See Thomas*, 2022 WL 504787, at n. 1; *Chevron Corp.*, 974 F. Supp. 2d at 605-606. Unproven allegations discussed therein bear no relevance to the claims or defenses in this action, and even if they were deemed relevant, they would confuse the issues and mislead the jury. FRE 401, 402, 403. In any event, Ms. Fairstein was not at any police precinct prior to her arrival at the 20th Precinct at 8:30 p.m. on April 20th. She, accordingly, was not "present and consulting" with any detectives conducting interviews at the Central Park Precinct. Ms. Fairstein did not consult with Ms. Lederer, Mr. Clements or any NYPD officers or detectives about the manner in which individuals at the 20th and 24th Precincts should be questioned. *See* PX-1, Fairstein Decl. (6/29/20), ¶¶24-37; PX-2, Fairstein Dep. Tr. 155:6-156:8, 215:6-216:5, 219:6-229:19; PX-10, Lederer Dep. Tr. 18:16-22:11, 30:10-18, 33:10-35:14, 77:5-78:9; PX-21, Reynolds Dep. Tr. 67:22-68:21, 74:7-10, 106:3-19, 123:16-124:22, 176:2-178:9, 179:23-181:3, 190:15-192:24. *See* Pltf. SJ Opp. Br., Statement of Facts, at Pts. III.A-B; PX-22, PX-24-PX-33. Ms. Fairstein does not deny that she visited the crime scene on two occasions. *See* PX-1, Fairstein Decl. (6/29/20) ¶¶ 24-37.

The original complaint in the Five's action against the City did not specify "what non-prosecutorial activities each of the DA Defendants engaged in." DX-22, 2007 WL 4352748, at *16. It is only after they were given leave to amend the complaint that the Five alleged Ms. Fairstein was involved in "non-prosecutorial" activities, an issue that was never fully adjudicated due to the settlement of the case.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit that Plaintiff's added statements reflect her own testimony as to her physical locations at specific times but deny that Plaintiff's assertions as to the specific timing of her actions or her characterizations of the investigation are material to Defendants' Motion on the issue of lack of actual malice.  Defendants also deny that the cited testimony of Ms. Lederer and Mr. Reynolds is evidence that proves the truth of Plaintiff's specific statements.

32.    The allegations against Ms. Fairstein survived a motion to dismiss, and in 2014 the case was resolved with a settlement to the Five of $41 million. (Compl. ¶¶ 5-6, 42-43 and fn. 2;

Ans. ¶¶ 5-6, 42-43; *see also* Ex. 22, Op. and Order on Mot. to Dismiss; Ex. 23, Op. and Order on

Mot. to Compel.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that none of the sources cited above constitute admissible evidence. FRE 801(c). *See Thomas*, 2022 WL 504787, at n. 1; *Chevron Corp.*, 974 F. Supp. 2d at 605-606. Whether or not unproven claims against Ms. Fairstein survived a motion to dismiss is irrelevant to the claims and defenses in this action. FRE 401, 401. Even if deemed to be relevant, such information is more prejudicial than probative, would confuse the issues and mislead the jury. FRE 403. Any inference by Defendants that the settlement of the Five's lawsuit was an adjudication on the merits or a finding of wrongdoing against Ms. Fairstein is inadmissible. FRE 401, 402 and 403. Defendants further ignore that the District Attorney and Corporation Counsel both made statements at the time of the settlement that there was no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved in the Central Park Jogger case. PX-254, LF00038339-340; PX-255, N.Y. Times, *Settlement Is Approved in the Central Park Jogger Case, but New York Deflects Blame*, Sept. 5, 2014 (Compl. n. 2).

33.    Plaintiff admits that, to the public, she was the "front" of the Central Park Jogger

case for over 30 years and testified that "the media made me the front of the case" because she was

"catapulted to fame by this case" such that reporters and "writers picked me up, having met me or

not, as the lead prosecutor, as the architect of the case." (Ex. 4, Fairstein Dep. at 127-29, discussing

Ex. 8, 2/7/19 Email.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Fairstein testified that she was the front of the case to the public for 30 years:

Because the media made me the front of the case. Despite the fact that I didn't prosecute it, nor did I lead the prosecutorial investigation. And certainly had no role in the police investigation.

My name was recognizable, **not because I was,** as you showed me in an earlier article, **catapulted to fame by this case.** I already had a reputation in the city for the work that our unit had done and for trials I'd handled. And then that became, I would say, national, because of the Robert Chambers case.

PX-2, Fairstein Dep. Tr. 128:23-129:16 (emphasis added).

Ms. Fairstein further testified:

> In addition, because I wrote books which became best sellers, my name was recognizable, making me, as you know all too well, a public figure. And as the New Zealand article did, writers picked me up, having met me or not, as the lead prosecutor, as the architect of the case. All those expressions were used without a morsel of truth.

PX-2, Fairstein Dep. Tr. 129:17-130:2.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

34.    Plaintiff has stated that "more than one" of the Five's counsel has alleged that she was "the 'architect' of what they claim was a miscarriage of justice." (Ex. 5, 2003 Stmt. at 8.)

**PLAINTIFF'S RESPONSE**:

Admitted.

35.    After Reyes' confession to acting alone and sole DNA match, Plaintiff has continued to defend the investigation that led to the Five's conviction as "brilliant," publicly stating that she has "no regrets," that the Five are guilty "as charged" for the rape and that their confessions were not coerced. (Ex. 25, Jeffrey Toobin, "A Prosecutor Speaks Up," *The New Yorker* (Nov. 25, 2002) (highlights added for witness at deposition); Ex. 26A, Transcript of Imus Interview; Ex. 26B, Video Excerpt of Imus Interview; Ex. 5, 2003 Stmt. at 4-5 (Five guilty of acting in concert with Reyes "during both the physical and sexual assaults"); at 7 (investigation "brilliant"); *see also* Ex. 27, *The Central Park Five: The Untold Story Behind One of New York's Most Infamous Crimes* by Sarah Burns ("S. Burns")[4] at 201.)

---

[4] The copy of Ms. Burns' book submitted as Exhibit 27 contains Ms. Swicord's original handwritten notes and markings. (*See* Swicord Decl. ¶ 12.) The page numbers refer to the page of the book, located on the top, middle of the page. **[This footnote is original to Defendants' Rule 56 Statement]**

**PLAINTIFF'S RESPONSE**:

Admitted.

36.    On July 25, 2022, based on the current Manhattan D.A.'s review of the 2002 Affirmation and evidence in the civil rights lawsuit, the conviction of a sixth teenager, Steven Lopez, who was accused of being involved in part of the attacks on April 19, 1989 in Central Park, was vacated because the video confessions the authorities elicited from Mr. Lopez and the Five were false. (Ex. 28, *People v. Steve Lopez*, Affirmation in Support of the People and Defendant's Joint Motion to Vacate; Ex. 29, Jonah E. Bromwich, "Sixth Teenager Charged in Central Park Jogger Case Is Exonerated," *N.Y. Times* (July 25, 2022).)

**PLAINTIFF'S RESPONSE**:

Denied.

The affirmation submitted in support of this statement is not the vacatur opinion. The *New York Times* article is inadmissible hearsay. FRE 801(c). *Straus*, 2017 WL 4481126, at * 3. The vacatur of Mr. Lopez's conviction is not relevant to any of the claims or defenses in this action because *When They See Us* concerns the Five. Ms. Fairstein is not referenced in the affirmation submitted as DX-28. FRE 401, 402. Even if this information is deemed relevant, it is more prejudicial than probative, would confuse the issues and mislead a jury. FRE 403.

C.    **The Series**

37.    A true and correct copy of the entire Series has been submitted to the Court in the form of a CD. (Ex. 30.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that viewing the Series on the Netflix streaming platform is a different experience than viewing it in the format provided to the Court. *See* PX-152, Dunbar Dep. Tr. 11:6-11, 14:2-15:5 (discussing disclaimer and auto play feature).

38.    The Series *When They See Us* dramatizes the story of the Five's "arrests, trials and convictions" in the "Central Park Jogger" case from their point of view. (Compl. ¶ 4; Ans. ¶ 4; Ex. 2, DuVernay Dep. at 109; DuVernay Decl. ¶¶ 6, 8, 25, 44; Ex. 30, Series.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Fairstein makes no admission with respect to the "beliefs" set forth in Paragraph 44 of Ms. DuVernay's declaration and that Defendants marketed, publicized and promoted *When They See Us* as a true story. PX-111, Wolff Dep. Tr. 11:10-12:2, 68:2-74:16, 95:2-103:4, 115:5-122:8, 144:3-150:23; PX-87; PX-121; PX-126; PX-127; PX-128; PX-129; PX-132 ████████████████████████████ PX-256; PX-81, Locke Dep. Tr. 84:6-92:3, 161:25-164:12; PX-92; PX-103.

Unverified pleadings are not admissible evidence. *See Thomas*, 2022 WL 504787, at n. 1.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants deny that they marketed, publicized and promoted the Series as a true story (*see* SUF 73, 208, 212, 215) and object to Plaintiff's mischaracterization of Ms. Wolff's testimony.  Defendants deny that Exhibits PX-121, PX-126 to 129, PX-132, PX-256, PX-92 and PX-103 support Plaintiff's statement regarding the marketing of the Series. ███

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████

Plaintiff's reference to Exhibit PX-87 should be stricken as it does not even remotely relate to marketing.  Defendants address PX-87 more fully in their Reply to SUF 79.

Ms. Locke's testimony and Exhibits PX-92 and PX-103 are likewise not relevant.

39.    The Series won two primetime Emmys and won or was nominated for many other awards. (DuVernay Decl. ¶ 12.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Plaintiff makes no admission with respect to Ms. DuVernay's representation that "[w]e worked hard to create both an effective drama and

faithful representation of these tragic events." DuVernay Decl. ¶ 12. In addition, the fact above is not relevant to any of the claims or defenses in this action and, even if deemed relevant, has the potential to confuse the issues or mislead the jury. FRE 401, 402, 403.

40.     Defendant Ava DuVernay is an acclaimed director with experience making films based on true stories, such as her Academy Award-nominated film *Selma*. (DuVernay Decl. ¶¶ 2-4.)  Ms. DuVernay also directed the award-winning documentary 13th. (*Id.* ¶ 4.)

**PLAINTIFF'S RESPONSE**:

Denied.

Paragraphs 2 and 3 of Ms. DuVernay's declaration do not expressly discuss the extent of her experience with making films based on true stories or what her role has been in making such films other than *Selma*. *Selma* faced public criticism for certain inaccuracies in its portrayal of the Civil Rights Movement, including with respect to the omission of Rabbi Abraham Joshua Heschel from the third protest march on Selma depicted in the film. *See* https://forward.com/culture/212000/selma-distorts-history-by-airbrushing-out-jewish-c/ (last visited on Oct. 18, 2022);  https://www.algemeiner.com/2015/01/18/fresh-controversy-hits-selma-daughter-of-rabbi-abraham-joshua-heschel-shocked-by-exclusion-of-her-father-from-film/ (last visited Oct. 18, 2022); https://www.theguardian.com/film/2014/dec/30/selma-director-lyndon-johnson-martin-luther-king-controversy (last visited on Oct. 18, 2022).

Ms. DuVernay's experience with other films is not relevant to the claims and defenses in this action, which concerns whether or not Defendants acted with actual malice when portraying Ms. Fairstein in a defamatory manner in the Series. FRE 401, 402. *See Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 182-183 (2d Cir. 2000). Even if Ms. DuVernay's experience were relevant, introducing evidence about other films would tend to mislead the jury, confuse issues and would also waste time. FRE 403.

**DEFENDANT'S REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants deny Plaintiff's characterization of the public's response to Ms. DuVernay's film *Selma*.  *Selma* has been recognized by, among others, the same publication Plaintiff cites as "a well-researched, accomplished and fair-minded biopic[.]" https://www.theguardian.com/film/2015/feb/12/reel-history-selma-film-historically-accurate-martin-luther-king-lyndon-johnson.

41.    Ms. DuVernay was the Series' "showrunner" responsible for its creative vision, content, and production. (Ex. 2, DuVernay Dep. at 50; DuVernay Decl. ¶ 5.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that DuVernay was, according to her testimony, the Series showrunner. However, Ms. DuVernay testified that Netflix had to "approve the scripts in order to move forward with the production." PX-51, DuVernay Dep. Tr. 50:12-51:3; PX-154 at ¶ 1 (DEFS144590), ¶ 2(a) (DEFS144591). *Compare* Engel Decl. ¶ 22.



PX-154.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

PX-154 does not contain page DEFS144419.  For the Court's assistance, Defendants believe Plaintiff is referring to page DEFS144597.  Defendants admit that Plaintiff has accurately quoted a portion of Section 2.a. of the Standard Terms and Conditions.  Defendants submit that the provision must be considered in its entirety.  In any event, Defendants deny that the language of the contracts is a material fact related to Defendants' Motion.

42.    Two production companies, Tribeca Films ("Tribeca") and Participant Media ("Participant"), came on board early in the process to co-produce. (Ex. 2, DuVernay Dep. at 1819, 27-28; DuVernay Decl. ¶ 17; Declaration of Berry Welsh ("Welsh Decl.") ¶¶ 4, 10.)

**RESPONSE**:

Admitted.

43.    Both Tribeca and Participant are experienced producers in the film industry, and have made some of the most highly-acclaimed "based on true story" films in the past decade. (Welsh Decl. ¶¶ 5-7, 10, 14.)

**PLAINTIFF'S RESPONSE**:

Denied.

Defendants have submitted no declaration from an individual with personal knowledge of Participant's experience in the film industry which is, in any event, not relevant to the claims or defenses in this action. FRE 401, 402.

The non-party declaration cited above is improper and should, at the very least, be disregarded by the Court. Mr. Welsh's declaration provides expert opinions about the film industry that are neither relevant to Defendants' summary judgment motion nor to the claims and defenses in this action. FRE 701, 702, 401. *See* Welsh Decl. ¶¶12-21. "Actual malice requires proof that the publisher had a ***subjective awareness*** of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 182-183 (2d Cir. 2000) (emphasis added). Mr. Welsh's comparison of *When They See Us* to other films based on true stories has no bearing on this issue. Defendants were not required to follow any specific customs or practices in researching the Series and testimony about this issue would confuse and mislead the jury. FRE 403. *See, e.g.*, *Palin*, 482 F. Supp. 3d at 221 ("'where [a] publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place.'") (citation omitted). Moreover, there are party witnesses such as Ms. DuVernay and Netflix employee Alison Engel who can testify about the creation of the Series, both of whom submitted declarations in support of Defendants' summary judgment motion.

Defendants have not designated Mr. Welsh as an expert in this action. Nor did Defendants disclose in their Initial Disclosures that Mr. Welsh would be offering testimony about his purported knowledge of the film making industry, including "customary" research for productions based on true stories, dramatizations as a form of "artistic expression," the creation and scripting of dramatizations, or "standard storytelling techniques." *See* ECF No. 160 (Plaintiff's Pre-Motion Letter). *See Irish v. Tropical Emerald LLC*, 2022 WL 2716182, at **4-12 (E.D.N.Y. July 13, 2022)

Mr. Welsh's declaration also contains inadmissible hearsay. FRE 801(c); Welsh Decl. ¶¶ 15, 17.

Tribeca's "based on a true story" films have faced public criticism for their inaccuracies. *See*, *e.g.*, https://www.esquire.com/uk/culture/a30137368/is-the-irishman-a-true-story/ (last visited on October 18, 2022).

**DEFENDANTS' REPLY:** Defendants move to strike as non-responsive and further object to Plaintiff's attempt to argue her Motion to Strike Mr. Welsh's Declaration in the Statement of Facts. Plaintiff's improper argument should be stricken. *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 4735876, at *1 n. 3 (S.D.N.Y. Sept. 27, 2019) (disregarding legal argument in Rule 56.1 Statements). Defendants' opposition to

32

the Motion to Strike was separately filed at ECF No. 200 per the Court's November 28, 2022 Order (ECF No. 177).

Defendants deny Plaintiff's characterization of Tribeca's films.  As the article cited by Plaintiff states, "*The Irishman* is pulled straight from the pages of 2004's *I Heard You Paint Houses*, and its author, former homicide detective Charles Brandt, continues to stand by every single word of Frank Sheeran's widely disputed deathbed confession."

44.    On July 6, 2017, Netflix announced that it had greenlit the Series. (DuVernay Decl. ¶ 24; Declaration of Alison Engel ("Engel Decl.") ¶ 12.)

**PLAINTIFF'S RESPONSE**:

Admitted.

45.    Ms. DuVernay selected experienced screenwriters to work on the scripts, including Defendant Attica Locke and writer Robin Swicord, both of whom have decades of experience writing screenplays. (Ex. 2, DuVernay Dep. at 62-64; DuVernay Decl. ¶ 26; Locke Decl. ¶¶ 2-4; Ex. 31, Excerpts from Deposition of Robin Swicord ("Swicord Dep.") at 15; Swicord Decl. ¶¶ 24, 8.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the sources cited above discuss Ms. DuVernay's selection of the writers for the Series and outline Ms. Swicord's and Ms. Locke's experience.

46.    Ms. Swicord and Ms. Locke did initial drafts of Episodes 1 and 2, respectively. (Swicord Decl. ¶ 8, 63; Ex. 31, Swicord Dep. at 28; Locke Decl. ¶ 64.)

**PLAINTIFF'S RESPONSE**:

Denied.

The sources cited above do not state that Ms. Swicord and Ms. Locke wrote "initial" drafts. Ms. Swicord turned in four drafts of Episode 1 to Ms. DuVernay. Paragraph 46 (not 64) of Ms. Locke's declaration states that she turned in five drafts of Episode 2.

47.    Ms. DuVernay edited the other writers' drafts and added writing; all final scripts were approved by Ms. DuVernay. (DuVernay Decl. ¶ 27; Swicord Decl. ¶ 65; Locke Decl. ¶ 48.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. DuVernay testified that Netflix had to "approve the scripts in order to move forward with the production." PX-51, DuVernay Dep. Tr. 50:12-51:3; PX-154, at ¶ 1 (DEFS144590), ¶ 2(a) (DEFS144591). *Compare* Engel Decl. ¶ 22.

### 1.    Vision and Point of View

48.    It is Ms. DuVernay's view that for the last thirty years, the story of the Central Park Jogger case was largely the story asserted by the City of New York, its police and its prosecutors, and the story that the press ran with in 1989: that the Five were not innocent children, or even human, but an animalistic "wolfpack" of rapists on the hunt for "prey." (DuVernay Decl. ¶ 8.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that Paragraph 8 of Ms. DuVernay's Declaration expresses this viewpoint.

49.    Ms. DuVernay's vision in creating the Series was to tell the other side of the story: that the Five were innocent, and were convicted and incarcerated in a rush to judgment based on false, coerced confessions that were inconsistent on their face, and despite no physical evidence or DNA linking them to the crime, only to be exonerated years later based on the DNA match and confession of the real offender. (Ex. 2, DuVernay Dep. at 12, 28-29, 109; DuVernay Decl. ¶ 8.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that Paragraph 8 of Ms. DuVernay's Declaration describes the above as her vision. The deposition testimony cited above does not discuss Ms. DuVernay's vision. In addition, ███████████████████████████████████████████████ ███████████████████████████████████████████████ PX-36, at DEFS005110-5111.

50.     Since 2015, Ms. DuVernay has spent numerous hours with each of the five men and their families discussing the case and their lives. (DuVernay Decl. ¶ 16.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that Paragraph 16 of Ms. DuVernay's Declaration states the above.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as improper. Plaintiff purports to only admit that Ms. DuVernay's Declaration states the content of SUF 50, but cites to no evidence to rebut or deny the truth of Ms. DuVernay's statement.

51.     The Series is told from the perspective of the Five and primarily centers on their individual experiences, beginning with their everyday lives as adolescents prior to the events of April 19, 1989, and then following them through their arrest, trial, incarceration and exoneration. (Ex. 30, Series; *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 59 (S.D.N.Y. 2021); Ex. 2, DuVernay Dep. at 12, 28-29, 109; DuVernay Decl. ¶ 6, 8, 25, 44.)

**PLAINTIFF'S RESPONSE**:

Denied.

The scenes at issue in this action concerning Ms. Fairstein falsely depict events about which the Five, their families and their counsel have no personal knowledge. In addition, judicial opinions are inadmissible hearsay. *Chevron Corp.*, 974 F. Supp. 2d at 605-606.

52.     Episodes 1 and 2 focus on the young teens' and their parents' vulnerability during the investigation and controversial interrogations, and subsequent trials and convictions. Episode 3 explores the families' turmoil during the teens' incarceration and the struggles they faced rejoining society; and much of Episode 4 is devoted to Korey Wise, the oldest of the Five who had disabilities and served the longest sentence; the Episode reflects his harrowing experiences in adult prison and includes dramatic interior monologues and flashbacks. (Ex. 30, Series; DuVernay Decl. ¶ 25.)

**PLAINTIFF'S RESPONSE**:

Denied.

Paragraph 25 of Ms. DuVernay's declaration concerns Ms. DuVernay's vision for a five-episode Series. Episode 3 is not at issue in this litigation. FRE 401, 402, 403. The entirety of Episode 4 is not at issue in this litigation. FRE 401, 402, 403. The Series is subject to interpretation by the viewer. *See* DX-30.

53.     The Series has a strong point of view, critiquing how elements of the criminal

justice system are biased. (Ex. 30, Series; Ex. 2, DuVernay Dep. at 75-76, 182-183; DuVernay

Decl. ¶ 9, 44.)

**PLAINTIFF'S RESPONSE**:

Denied.

The point of view expressed in the Series is subject to interpretation by the viewer. DX-30. The Series does more than critique "elements of the criminal justice system" as biased. It critically portrays real people using their real names, including police officers, detectives and prosecutors that were involved in the Central Park Jogger case, including Ms. Fairstein. DX-30, Ep. 1, 2 and 4.

Ms. DuVernay testified that Ms. Fairstein's character is not a composite character— "[s]he's not two characters in a made-up character. Composite is a character that isn't real. She's a real person." PX-51, DuVernay Dep. Tr. 76:6-11. Ms. DuVernay also testified that:

> You asked me if she was a composite character.... That is a fictional character that is not a real person who is a combination of multiple characters and ideas. Linda Fairstein, as a character, ***represents Linda Fairstein***, her involvement in the case and what she represented at large.... What she represents at large to me are the injustices that took place in the investigation and prosecution that she led.

*Id.* at 77:3-20 (emphasis added).

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Reply to SUF 79[3] as if fully set forth herein.

54.     The Series expresses this point of view and overarching opinion by dramatically

illustrating how those in positions of great power—the police, the prosecutors including Linda

Fairstein, the courts, the media and the public—were blinded by their biases, refusing to see the Five as children. Instead, they engaged in a process that rendered wrongful convictions for five innocent boys. (Ex. 30, Series; Ex. 2, DuVernay Dep. at 182; DuVernay Decl. ¶¶ 9, 44.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike as non-responsive and argumentative. Plaintiff's assertions are not relevant to Ms. DuVernay's beliefs, as stated in Paragraph 44 of her Declaration. To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

The point of view expressed in the Series is subject to interpretation by the viewer. DX-30. Whether the Series expresses a protected opinion about a particular issue is a question of law, not fact. *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 56 (S.D.N.Y. 2021). Ms. Fairstein cannot speak to Ms. DuVernay's "beliefs" as expressed in Paragraph 44 of the DuVernay Declaration but states in response to Paragraph 44:

   a. Ms. DuVernay states that the "investigation" in the Central Park Jogger case was "rushed and shoddy." Ms. DuVernay does not specify which investigation she is referring to—the NYPD investigation or the investigation conducted by Ms. Lederer and Mr. Clements. PX-2, Fairstein Dep. Tr., 212:7-213:21, 220:5-20. In a 2003 Statement to the New York City Council, Ms. Fairstein referred to specific aspects of the NYPD investigation in the "hours after the rioting in Central Park" as "brilliant." DX-5, at p. 7. *See* DX-25, Toobin article (retrospectively discussing hours after Ms. Fairstein's arrival at the 20th Precinct). *See Fairstein*, 553 F. Supp. 3d at 71.

**DEFENDANTS' REPLY** to Paragraph a: Plaintiff's attempt to distinguish between an NYPD investigation and a prosecutorial investigation is not relevant or material to Ms. DuVernay's state of mind and the actual malice issue on Defendants' Motion. Plaintiff admits that she called the investigation that resulted in the prosecution of the Five "brilliant".

   b. Ms. DuVernay states that "obvious alternative theories, including that the crime was committed by Matias Reyes, who had assaulted another woman in Central Park just two days prior." DuVernay Decl. ¶ 44. Ms. Fairstein was not responsible for the prosecution theories or strategies at the trials of the Five. *See* Response to Paragraph 14. Per the Nancy Ryan Affirmation, at the time of the Five's trials "[c]ertainly, no one would have thought that as the defendants and their group were making their way through Central Park, a serial rapist was also at large." DX-21,

Ryan Aff., ¶ 103. It was not until 2002 that Ms. Fairstein learned that Reyes raped a woman in Central Park on April 17, 1989. PX-2 Fairstein Dep. 285:9-11. In September 1989, Ms. Fairstein became aware of other crimes that Reyes committed. At the time, Peter Casolaro, who conducted the reinvestigation with Ms. Ryan, was in possession of Mr. Reyes' DNA. Mr. Casolaro and his unit, and the District Attorney, refused to turn over the DNA to the Sex Crimes Unit for testing. PX-2, Fairstein Dep. Tr. 285:3-290:7; Fairstein Decl. (11/29/22), Ex. A, at 120-126, 131-135, 144-153, 155.

Regardless, whether there were obvious alternative theories available to Ms. Lederer and Mr. Clements while prosecuting the case is not relevant to the claims or defenses in this action. FRE 401, 402. To the extent Ms. DuVernay's Declaration makes this assertion for the truth of what occurred in 1989 and 1990, it is inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY** to Paragraph b:   Defendants deny that Plaintiff had no responsibility for the prosecution theories or strategies at the trials of the Five.  Ms. DuVernay's sources stated otherwise.  (*See* DuVernay Decl. at ¶ 53.)  Defendants further deny that Ms. DuVernay's Declaration is hearsay.  Plaintiff's statements regarding when she learned of Reyes' other crimes are not relevant or material to Defendants' Motion.

    c.  Ms. DuVernay states that Ms. Fairstein points to the videotaped statements taken by Ms. Lederer as uncoerced. The law, as it still stands today, is that the confessions were not coerced. Judge Galligan wrote a 116-page opinion to this effect after a three-week Huntley hearing. New York allowed the juries decide again the voluntariness of confessions. Two juries decided the Five's confessions were voluntary. Two separate panels of the Appellate Division upheld the confessions as voluntary and valid. The Court of Appeals of the State of New York wrote an opinion affirming the voluntariness of the statements. PX-2, Fairstein Dep. Tr. 139:17-140:15. Ms. Ryan's affirmation in support of vacating the convictions does not state that the confessions were coerced. *See* DX-21. *See* Response to Paragraph 28, incorporated by reference herein. Regardless, Ms. Fairstein's retrospective view as to whether or not the confessions were coerced is not relevant to the scenes at issue in this action. FRE 401, 403. *See Fairstein*, 553 F. Supp. 3d at 71.

**DEFENDANTS' REPLY** to Paragraph c:  Defendants object to Plaintiff's improper denial of this statement.  She admits that she believes the confessions were uncoerced and cites no evidence to contradict Ms. DuVernay's belief that the confessions were coerced.

    d.  Ms. DuVernay describes Ms. Ryan as Ms. Fairstein's "rival." Ms. Fairstein and Ms. Ryan were not rivals in 1989. PX-20, Clements Ex. 6; PX-18, Clements Dep. Tr. 75:3-76:4. Ms. DuVernay does not specify the source for her assertion that Ms. Fairstein "viciously attacked her colleague." DuVernay Decl. p. 14. Neither of these statements are relevant to the claims or defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY** to Paragraph d:  Defendants object to Plaintiff's improper denial of this statement.  Defendants refer to SUF 188 in which Plaintiff admits that "Numerous sources reported that Plaintiff and Ms. Ryan had a contentious relationship and clashed over the Central Park Jogger case assignment."

     e.  Ms. DuVernay states that "Ms. Fairstein did everything she could to oppose vacating the convictions." DuVernay Decl., p. 14. During the reinvestigation, Ms. Fairstein opposed vacating the convictions without holding a hearing. DX-36, at DEFS007464. However, she acknowledged that the convictions may have to be vacated. DX-25, Toobin ("Ms. Fairstein understands that the convictions may have to be vacated"); PX-3, at p. 2 ("Fairstein said she understands that the Reyes confession and the new DNA evidence may be grounds for tossing out the confessions"). In July 2002, Ms. Fairstein made efforts to be interviewed by the team conducting the reinvestigation. DX-9. Ms. Fairstein was but one of a number of parties who disagreed with the manner in which the District Attorney's reinvestigation was being handled. For example, after the Reyes confession, the New York City Police commissioner convened a commission to conduct an investigation separate from the District Attorney's investigation (the "Armstrong Commission"). DX-64, at LF00038589. The Armstrong Commission's report was part of Ms. DuVernay's research for the Series. PX-51, DuVernay Dep. Tr. 137:28; PX-65, at pp. 5, 8, 12. Regardless, whether Ms. Fairstein opposed the vacatur of the convictions bears no relevance to the claims or defenses in this action and is not the subject of any scenes at issue in this action. FRE 401, 402.

**DEFENDANTS' REPLY** to Paragraph e:  Defendants state that Plaintiff's response is not relevant or material to Defendants' Motion.

     f.  Ms. DuVernay' belief that Ms. Fairstein was "controlling the cops at the precincts" is based on statements made by individuals without personal knowledge about this issue. For example, Michael Warren, counsel to Mr. Santana and Mr. Richardson, stated in an interview that Ms. Fairstein "controlled those detectives. She controlled them in the precinct." DX-39A, at DEFS007038. Mr. Warren was not at any precinct to observe Ms. Fairstein in 1989 because he did not represent any of the Five until after the Reyes confession. PX-160, at DEFS0022593. Mr. Warren was counsel to Messrs. Santana, Richardson and McCray in their civil action against New York City. DX-24, at p. 1. Ms. DuVernay testified that Mr. Warren is a biased source, and "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. 94:5-18. Ms. DuVernay also testified that Mr. Warren had no involvement in the Central Park Jogger case in 1989. *Id*. at 68:5-11.

**DEFENDANTS' REPLY** to Paragraph f:  Defendants admit that Mr. Warren was not involved in the Central Park Jogger case in 1989.  Mr. Warren led the efforts to vacate the convictions and was one of the lead counsel in the Five's successful civil rights action alleging that Fairstein acted as an investigator alongside the police, and Warren gained

detailed knowledge of the events of April 1989 through the civil case. (*See* SUF ¶¶ 30-32, 64d; SUF Reply ¶ 77b.)

     g.   Ms. DuVernay believes that Ms. Fairstein treated Yusef Salaam as an "adult 'without kid gloves'" and "denying the aid of supportive adults who wanted him to have counsel." DuVernay Decl. ¶ 14. Notes from Ms. DuVernay's production files state that "Nocenti on the stand says he didn't tell Yusef's family to tell the cops or Fairstein that Yusef was 15." PX-198. These notes reference a book that Ms. DuVernay claims was part of her research when writing the Series, *Unequal Verdicts* by Timothy Sullivan. *See, e.g.*, DuVernay Decl. ¶ 51(a). In the book, Sullivan writes:

> [m]ost damaging to Salaam's defense was the testimony of Nocenti, the civil lawyer who was a federal prosecutor.... Under cross-examination by Lederer, Nocenti testified that at no time during the many hours at the police precinct, in none of his many discussions with Salaam's relatives about the boy's rights, did he tell anybody that Yusef was fifteen, nor was he ever asked his 'little brother's' age, nor did he ever hear anybody even discuss the question. This strongly contradicted the testimony of Salaam's other witnesses, who claimed the issue was discussed almost constantly with policeman and Fairstein.

DX-17, Sullivan, at p. 89. Notably, the scenes in the Series concerning Ms. Fairstein's interactions with Ms. Salaam during the police interrogation of Yusef Salaam are not part of Ms. Fairstein's lawsuit. DX-30, Ep. 1, at 43:10-45:58; PX-2, Fairstein Dep. Tr. 383:18-387:3. FRE 401, 402, 403. Ms. DuVernay's use of the term "kid gloves" appears to harken back to a scene at issue in the Series in which Ms. Fairstein advises Detective Sheehan not to use "kid gloves" when interrogating Kevin Richardson at a precinct house. Ex. 30, Ep. 1, at 22:35-22:53. Defendants' own "Interrogation Timeline" shows that Mr. Richardson was questioned by detectives at the Central Park Precinct, where he signed a statement. PX-193, at DEFS093141-143. Ms. Fairstein was never at the Central Park Precinct nor present during Mr. Richardson's questioning by detectives. PX-2, Fairstein Dep. Tr. 215:6-216:5; PX-21, Reynolds Dep. Tr. 74:3-10. *See* Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A; PX-22; PX-24-33; PX-202.

**DEFENDANTS' REPLY** to Paragraph g: Defendants object to Plaintiff's improper denial of this paragraph. Ms. DuVernay's notes referenced by Plaintiff do not contradict her beliefs about the way Ms. Fairstein treated Yusef Salaam, regardless of whether Ms. Fairstein believed Salaam to be 15 or 16. Defendants admit that Plaintiff accurately quoted Sullivan, but state that Sullivan also contains the following passage on Ms. Fairstein's interaction with Mr. Salaam's Big Brother, David Nocenti:

> If Fairstein was appalled at the young prosecutor's bad judgment in inserting himself into the defense side of a criminal matter, she was at least

relieved at Nocenti's ignorance of criminal law.  Instead of insisting on seeing Salaam and asking the detectives questions about the investigation, all Nocenti had to say was: 'I'm calling a lawyer for him now, so you can't question him further.' **If he had done that, said Fairstein later, she would have stopped the interrogation.**

(DX-17 at 27; emphasis added.)

Defendants admit that Plaintiff testified as to her physical locations at specific times but deny that Plaintiff's assertions as to the specific timing of her actions is material to Defendants' Motion on the issue of lack of actual malice.  Defendants also deny that the cited testimony of other individuals is evidence that proves the truth of Plaintiff's specific statements.

Plaintiff does not attempt to rebut large portions of Paragraph 44 of Ms. DuVernay's Declaration, including certain statements in the fourth and fifth bullets of Paragraph 44.

55.     The very title of the series, *When They See Us*, reflects on the ways that Black teenage boys are viewed: rarely as children to be protected. Instead, they are viewed in the way that Ms. Fairstein and the detectives saw them, as criminals from which the public needed to be protected. The title also offers a hopeful declaration: that now is the time that they finally see us. (DuVernay Decl. ¶ 9.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that Paragraph 9 of Ms. DuVernay's Declaration reflects the statement above. Given that Ms. DuVernay has no personal knowledge about how Ms. Fairstein or detectives viewed the Five in 1989, the statement that "Ms. Fairstein and the detectives saw them, as criminals from which the public needed to be protected" is inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's response to this SUF as improper.  The fundamental issue on this Motion is the Defendants' subjective state of mind and beliefs as to the truth.  Evidence as to Ms. DuVernay's state of mind is not hearsay.

56.     The filmmakers believe the Five are innocent, and that belief is incompatible with Linda Fairstein's version of the story. (Ex. 2, DuVernay Dep. at 13; DuVernay Decl. ¶¶ 9, 23, 44, 59, 133, 138-139; Ex. 3, Locke Dep. at 79-80; Locke Decl. ¶¶ 23-24, 39; Ex. 31, Swicord Dep. at

177-178; Swicord Decl. ¶¶ 7, 28-29, 32-33.)

PLAINTIFF'S RESPONSE:

Denied.

The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin v. N.Y. Times*, 482 F. Supp. 3d 208, 219 (S.D.N.Y. 2020) ("the credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase"); *Mitre Sports Int'l v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 256 (S.D.N.Y. 2014) (determining defendant's fact-gathering, editing and distribution required an evaluation of the factual evidence and assessment of witness credibility that is appropriate only for a jury). Nor is the above statement appropriate for a Rule 56 Statement since it denotes clear disagreement about the evidence in the Central Park Jogger case.

Defendants' reference to "Linda Fairstein's version of the story" is an overt display of their hostility towards Plaintiff—which they carried throughout the filmmaking process—and further ignores that, over the years, numerous officials have expressed views of the Central Park Jogger case that are in agreement with Ms. Fairstein's views. *See* DX-64, at LF00038359; PX-19; PX-18, Clements Dep. Tr. 38:2-40:22; DX-36, at DEFS007368, DEFS007377, DEFS07383, DEFS07388-7389, DEFS007399, DEFS007403-405, DEFS007412, DEFS007466; PX-188, DEFS075813. In addition, whether "the filmmakers" believe the Five are innocent is not relevant to whether Defendants had a subjective awareness of either falsity or probable falsity of the defamatory statements at issue in this action, or acted with reckless disregard of their truth or falsity. *Celle*, 209 F.3d at 182-183.

DEFENDANTS' REPLY: Defendants move to strike Plaintiff's Response as non-responsive and argumentative.

To the extent that the Court accepts Plaintiff's Response, Defendants state that Plaintiff's statement of the law is incorrect. As set forth in detail in Defendants' Reply brief, on summary judgment, "[i]t is not enough for the plaintiff merely to assert that the jury might, and legally could, disbelieve the defendant's denial of legal malice." *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621-22 (2d Cir. 1988) (affirming summary judgment and citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). *Palin v. N.Y. Times*, 482 F.Supp.3d 208 (S.D.N.Y. 2020), which Plaintiff cites, did not so hold; as the court later noted, that would contradict *Contemporary Mission* and *Anderson*. 588 F.Supp.3d 375, 396 (S.D.N.Y. 2022). Plaintiff's repeated citation to *Mitre Sports Int'l v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 256 (S.D.N.Y. 2014), which she does not cite in her Opposition brief, is even more misleading; *Mitre* was applying the "gross irresponsibility" standard—not the actual malice standard. Plaintiff has presented no affirmative concrete evidence that would allow a jury to find by clear and convincing evidence that the filmmakers subjectively had serious doubts as to the truth of the Ms. Fairstein portrayal.

So as not to add unnecessary duplication, Defendants do not repeat their objection to Plaintiff's misstatement of the law in reply to each of Plaintiff's repetitive statements, below (SUF Resp. 56, 60, 66, 75-78, 81, 84, 85, 90, 92, 93, 127-129, 132-134, 138, 155-159), but incorporate by reference.

Further, Plaintiff's claim that this is an improper statement of fact is incorrect. This SUF does not purport to state the truth of whether or not the Five are innocent, but states the parties' undisputed views on that subject. Plaintiff does not contest that she believes that the Five are guilty of the rape of Trisha Meili.

57.    When the writers watched the Five's videotaped statements they saw a heartbreaking scene of scared children being manipulated. (DuVernay Decl. ¶ 44; Locke Decl. ¶ 14; Swicord Decl. ¶ 16; Ex. 32A-C, Video Statements of Antron McCray, Korey Wise and Kevin Richardson; Ex. 32D, Excerpts of Transcripts of Statements of Antron McCray, Korey Wise, Raymond Santana and Kevin Richardson.)

**PLAINTIFF'S RESPONSE**:

Denied.

The above statement is not a fact and, is accordingly, not the proper subject of a Rule 56 Statement. The writers' perception of the videotaped statements (of which there were four not five) is not relevant to the claims or defenses in this action. FRE 401. The videotaped statements, and transcripts thereof, make clear that Ms. Fairstein was not present for the interviews. DX-32D. Ms. Lederer conducted the interviews of Messrs. McCray, Santana, Richardson and Wise. PX-181-185. McCray, Santana and Richardson each had their parents present during the interview.[5] PX-181-183.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts the Response, Defendants reply as follows:

The fundamental issue on this Motion is the Defendants' subjective state of mind and beliefs as to the truth.  The writers' perception of the videotaped statements is relevant to their subjective state of mind and knowledge at the time, and are not offered for the truth of the matters asserted in the videotaped statements.  *See also* Plaintiff's Response at n. 1.

This SUF does not state that Ms. Fairstein was present, in the room for the videotaped statements, nor does the Series show that.  Defendants admit that Ms. Lederer conducted the interviews of Messrs. McCray, Santana, Richardson and Wise and that all but Mr.

---

[5] Defendants omitted the page of the transcript which shows that Mr. Richardson's father was present from Exhibit 32D. **[Defendants wrote this footnote]**.

Wise had their parents present at certain points in time.  Plaintiff admits she was at the Precincts during the period of time when all videotapes were made.  (*See* SUF 129.)

Footnote 5 erroneously states "Defendants wrote this footnote" but it is was added by Plaintiff.

58.     Plaintiff sees these videos in a fundamentally different way, pointing to them as "uncoerced" confessions that justify the convictions. (Ex. 4, Fairstein Dep. at 139-141; Ex. 33, Correspondence with Jane Rosenthal ("Have you seen the admission videos? Know the sequence of arrests? Know what 20 plus other kids who ran in the park that night say? Know which kids had semen on them? We should meet");

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that she made the statements cited above concerning the confession videos, all of which post-date the Central Park Jogger case by decades. As Ms. Fairstein testified at her deposition, it is not her "belief" that the confessions were not coerced, it's the law of the case. PX-2, Fairstein Dep. Tr. 138:18-141:6. Whether or not Ms. Fairstein believes that the confessions were obtained lawfully bears no relevance on the issues advanced in Defendants' motion. FRE 401, 402. Notably, Exhibit 34 post-dates the release of the Series.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Regarding Plaintiff's additional statement that it is the "law of the case" that the Five's confessions were not coerced, Defendants admit that no Court ever ruled that the confessions were coerced, but state that the Five's convictions, which were based almost solely on the confessions (SUF 23), were vacated (SUF 29) and the City settled the civil case brought by the Five for $41 million (SUF 32), and that the Five have testified and stated repeatedly, including to the writers, that their confessions were false and the product

44

of coercion.  (SUF 23; *see also* DuVernay Decl. at ¶ 44; Locke Decl. at ¶ 24; Swicord Decl. at ¶ 20).  Further, the Court can take judicial notice under F.R.E. 201 of the fact that in further recognition of the harm done to the Five by their wrongful conviction and incarceration, on December 19, 2022, the City of New York renamed one of the gates at Central Park the "Gate of the Exonerated" in honor of the Five. https://www.cnn.com/2022/12/19/us/central-park-five-gate-exonerated/index.html.

Defendants admit that DX-34 post-dates the release of the Series, ███████████████ ██████████████████████████████

59.      In 2018, Ms. Fairstein sent an anonymous package to Tribeca containing certain of the confession videos. (Ex. 4, Fairstein Dep. at 335.)

**PLAINTIFF'S RESPONSE**:

Admitted. This fact bears no relevance to any claim or defense in this action and, even if it did, would confuse the issues and waste time. FRE 401, 402, 403.

**DEFENDANTS' REPLY:**  Defendants deny that this fact is not relevant and would confuse the issues and waste time.  Plaintiff argues that Defendants acted with actual malice by not complying with her pre-conditions she demanded in order to meet with the filmmakers.  Ms. DuVernay believes that Ms. Fairstein "is a fundamentally biased source".  (DuVernay Decl. at ¶ 44.)  Ms. Fairstein's own actions, including sending the anonymous package with only the documents she wanted the filmmakers to have (the confession videos), demonstrate that Ms. DuVernay's beliefs about Plaintiff's bias were correct.

60.      Because they believe the Five, the writers did not believe the testimony of the authorities who they believe lied in court—including Plaintiff, who the writers believe has a strong incentive to downplay her role. (DuVernay Decl. ¶¶ 23, 44, 59; Locke Decl. ¶¶ 42, 45; Swicord Decl. ¶ 30.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] The writers "beliefs" raise credibility issues that cannot be determined on a motion for summary judgment. *Palin v. N.Y. Times*, 482 F. Supp. 3d 208, 219 (S.D.N.Y. 2020) ("the credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase"); *Mitre Sports Int'l v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 256 (S.D.N.Y. 2014) (determining defendant's fact-gathering, editing and distribution required an evaluation of the factual evidence and assessment of witness credibility that is appropriate only for a jury). Regardless, the writers' assistants used the trial testimony of police and detectives to piece together various timelines of how events unfolded and provided that information to Ms. Swicord. PX-191; PX-40. Ms. Swicord did not bother to ask the writers' assistants for a timeline of Ms. Fairstein's movements based on the trial testimony. PX-34, Swicord Dep. Tr. 36:17-22; 161:4-162:6. A review of the testimony by the writers' assistants or Ms. Swicord would have demonstrated that Ms. Fairstein was never at the Central Park Precinct where police began questioning individuals involved in the events in Central Park. Nor was she present at the 20th Precinct when Messrs. McCray and Wise were questioned. *See* Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A; PX-27, at DEFS014847-57, 14859, 14880-900; PX-29, at DEFS016996-17011; PX-31, at DEFS020714-715, 20718-719, 20736-41. *See* PX-193, at DEFS093141-143 (Writers' "Interrogation Timeline"). Eric Reynolds, who testified in the Central Park Jogger case, was portrayed favorably in the Series. This contradicts the assertion that the writers thought that all "the authorities" lied. DX-30, Episode 1, at 22:35-22:53.

**DEFENDANTS' REPLY** to [1]:  Defendants admit that the writers' assistant looked at the trial testimony to piece together "the police's timeline in starting to look for Yusef" (PX-191) and Detective Hartigan's involvement in the interrogations (PX-40). Defendants deny that Ms. Swicord should have asked "the writers' assistants for a timeline of Ms. Fairstein's movements based on the trial testimony."  Ms. Swicord testified that she "believe[d] that [Ms. Fairstein] was integrally involved in the investigation and that she was at the precinct.  She is quoted in the [Toobin] article as describing the rooms that the boys were being held in, the youth rooms, and she says that anyone who had witnessed these interviews would have been convinced.  So I am taking her at her word that she was there and could witness what was going on at the 20th Precinct."  (DX-31 at 180:12-21.)  Further, Defendants deny that Plaintiff's cited evidence conclusively establishes Ms. Fairstein's whereabouts, discussions and actions on the April 20, 1989.  Plaintiff's Opposition brief states that "Defendants' failure to investigate is not at issue in this action because they undisputedly conducted extensive research"  (ECF No. 183 at 22 n. 32), as Plaintiff knows that failure to investigate is not grounds for actual malice.  Yet the facts cited in Plaintiff's Response speak only to alleged failure to investigate.

Plaintiff's statement that Eric Reynolds "was portrayed favorably in the Series" is not a material fact related to Defendant's Motion, but is also incorrect.  First, the timestamp Plaintiff provides is for the "no kid gloves" scene, not a scene with Officer Reynolds.  The following scene does feature an African-American police officer, but that character is identified as "Billy" not Eric Reynolds.  (PX-158 at DEFS001654.)  Officer Reynolds is seen in the scene with Raymond Santana, Sr.  (*Id*. at DEFS001635-37.)

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

[2] Paragraph 42 of Ms. Locke's Declaration concerns a draft scene that did not make it into the final cut of the Series and, is accordingly, not relevant to the claims or defenses in this action. FRE 401, 402. It would further cause confusion or mislead a jury if it were deemed relevant. FRE 403. Ms. Locke's Declaration states that she relied on the trial transcripts for writing the trial scenes. Locke Decl. ¶ 43.

**DEFENDANTS' REPLY** to [2]:  Defendants deny that Paragraph 42 of Ms. Locke's Declaration is not relevant.  The Paragraph concerns Ms. Locke's beliefs regarding Ms. Fairstein's involvement in the Central Park Jogger case, which is at the heart of Defendants' Motion.

[3] Paragraph 30 of Ms. Swicord's Declaration does not support the sentence above.

**DEFENDANTS' REPLY** to [3]:  Plaintiff incorrectly states that "Paragraph 30 of Ms. Swicord's Declaration does not support the sentence above."  Plaintiff overlooks that Paragraph 30 of Ms. Swicord's Declaration states that "the police and prosecutors made a biased rush to judgment against them based on their race and their presence in the park that night, and lied about what took place in the Precincts during their interrogations." (Swicord Decl. at ¶ 30.)

[4] Paragraph 23 of the DuVernay Declaration does not concern the "testimony of the authorities." Paragraph 23 contains inadmissible hearsay – Ms. DuVernay's statement that "[o]n [Ms. Fairstein's] watch and under her leadership, innocent children were jailed and the serial rapist who actually committed the crime went free to rape and kill other women, including murdering a pregnant woman." FRE 801(c). Ms. DuVernay cites to the Ryan Affirmation, which ***does not mention Ms. Fairstein*** and expressly states that at the time of the trials of the Five, "Certainly, ***no one would have thought*** that as the defendants and their group were making their way through Central Park, a serial rapist was also at large." DX-21, Ryan Aff. ¶ 103 (emphasis added). *See also* Plaintiff's Responses to Paragraphs 28, 54 and 75 which are incorporated by reference herein. Ms. DuVernay further ignores that District Attorney Robert Morgenthau was overseeing the case, Lederer and Clements prosecuted the case and Ms. Lederer's direct supervisor was Dan McNulty. *See* Plaintiff's Response to Paragraph 14, incorporated by reference herein; Fairstein Decl. (11/29/22), Ex. A, 120-126, 131-135, 144-153, 155.

**DEFENDANTS' REPLY** to [4]: Plaintiff's objection to Paragraph 23 of Ms. DuVernay's Declaration is baseless.  The fundamental issue on this Motion is the Defendants' subjective state of mind and beliefs as to the truth.  That evidence is not hearsay.

[5] Paragraph 44 of Ms. DuVernay's declaration is addressed above. *See* Response to Paragraph 54.

**DEFENDANTS' REPLY** to [5]:  Defendants incorporate their Reply to SUF 54 as if fully set forth herein.

[6] What the writers believed and chose to rely on raises issues concerning credibility and the weight of the evidence that can only be determined by a jury. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY** to [6]:  Denied.  *See* Reply to SUF 56.

### 2.    Research and Sources

61.    The main writers, including Ms. DuVernay, Ms. Locke, and Ms. Swicord, participated in a writers' room that opened in October 2017. (DuVernay Decl. ¶ 26; Locke Decl. ¶ 6; Ex. 3, Locke Dep. at 16-17; Swicord Decl. ¶ 9; Ex. 31, Swicord Dep. at 37.)

**RESPONSE**:

Admitted.

62.    A writers' room is a typical process in which writers on a television series meet in person for a period of time to review materials, brainstorm ideas and develop the structure of episodes. (Ex. 2, DuVernay Dep. at 59-61; DuVernay Decl. ¶ 26; Locke Decl. ¶ 6; Swicord Decl. ¶ 9; Ex. 31, Swicord Dep. at 115-116.)

**RESPONSE**:

Admitted subject to the qualification that the sources cited above do not refer to the writers' room as a "typical process."

63.    At Ms. DuVernay's direction, Berry Welsh of Tribeca Films compiled a principal set of source materials for the writers from a variety of sources and perspectives, and additional materials were added over time. (DuVernay Decl. ¶¶ 28-29; Locke Decl. ¶¶ 9-10, 13; Swicord Decl. ¶¶ 11-12; Welsh Decl. ¶ 11.)

**RESPONSE**:

Denied.

The above sentence misstates Ms. DuVernay's testimony at Paragraph 28 of her declaration. Ms. Locke's declaration outlines the research materials she received from

Tribeca Productions prior to the opening of the writer's room. Locke Decl. ¶¶ 9-10. Ms. Swicord's declaration outlines the research materials she received from Tribeca Productions. Swicord Decl. ¶¶ 11-12. Paragraph 11 of Mr. Welsh's Declaration contains inadmissible hearsay – that the writers consulted the research materials he provided during the course of the writers' room. FRE 801(c). Mr. Welsh did not participate in the writers' room. DuVernay Decl. ¶ 26.

64.     The sources that the writers reviewed and relied upon in the research and writing

process included the following categories:[6]

**PLAINTIFF'S RESPONSE**:

To the extent that any sources cited below are being submitted for the truth of the matters asserted therein, as opposed to demonstrating what the writers reviewed, then the sources would constitute inadmissible hearsay. FRE 801(c).

a. Several books that reported on the Central Park Jogger case, from different points of view, including:

i.   Legal journalist Timothy Sullivan, *Unequal Verdicts: The Central Park Jogger Trials* (1993) (Ex. 17);

ii.  The documentarian and writer Sarah Burns, *The Central Park Five: The Untold Story Behind One of New York's Most Infamous Crimes* (2011) (Ex. 27);

iii. Former Daily News reporter and current academic Natalie Byfield*, Savage Portrayals: Race, Media, & the Central Park Jogger Story* (2014) (Ex. 20);

iv.  Former Manhattan prosecutor Harlan Levy, *And the Blood Cried Out: A Prosecutor's Spellbinding Account of DNA's Power to Free or Convict* (1996) (Ex. 37, excerpts of Levy book); and

v.   The Central Park Jogger Patricia Meili, *I am the Central Park Jogger: A Story of Hope and Possibility* (2003).

---

[6] In order to avoid overloading the record with multiple copies of voluminous research material, Defendants attach only Ms. Swicord's copy of the research binder (Exhibit 36) and books given to the writers. The markings and handwritten notes in the binder and books are original to Ms. Swicord. (Swicord Decl. ¶ 12.) As set forth in their testimony and Declarations, Ms. DuVernay and Ms. Locke received copies of the same material. (DuVernay Decl. ¶ 29; Locke Decl. ¶ 9.) Further, to protect the men's and their families' privacy, transcripts of their interviews, in which the men and their families shared deeply personal and private information, have been removed from the binder. Defendants attach only the portions of the interviews referenced herein at Exhibits 38 and 39. The handwriting and markings on these Exhibits is original to Ms. Swicord. **[This footnote is original to Defendants' Rule 56 Statement].**

**PLAINTIFF'S RESPONSE**: Admitted subject to the qualification that Ms. DuVernay destroyed or, as she says, "***did not keep" her books***. DuVernay Decl. ¶ 29, n. 7. Plaintiff reserves her right to seek an adverse inference or other relief with respect to Ms. DuVernay's spoliation of evidence since she was on notice of potential litigation since June 2016. DX-64. *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999).

b. The 2012 documentary film The Central Park Five, directed by the respected documentarian Ken Burns, and his colleagues Sarah Burns and David McMahon, featuring interviews with the Five and their families, journalists who covered the case in 1989, and other criminal justice experts. (Ex. 19.)

**PLAINTIFF'S RESPONSE**: Admitted subject to the qualification that Sarah Burns is Ken Burns' daughter and David McMahon is Ms. Burns' spouse. Swicord Decl. ¶ 38.

c. Recorded in-person and telephonic interviews with some of the Five conducted in 2016 by Ms. DuVernay and her former writing partner. (Ex. 38A, excerpt of Raymond Santana Pt. 2 Interview with Ms. DuVernay; Ex. 38B, audio excerpt of same.)

**PLAINTIFF'S RESPONSE**: Admitted.

d. Recorded interview with Michael Warren, a lawyer who represented three of the Five in the vacatur of the convictions and Mr. Santana in the subsequent civil rights suit against the City of New York, Fairstein and Lederer, among others. (Ex. 39A, Michael Warren Pt. 2 Interview with Ms. DuVernay; Ex. 39B, audio excerpt of same.)

**PLAINTIFF'S RESPONSE**: Admitted.

e. Prior raw footage of interviews of the Five and their families from the Burns documentary. (Ex. 40, video excerpt of Angela Black interview with Sarah Burns.)

**PLAINTIFF'S RESPONSE**: Admitted.

f. Extensive news coverage, in both print and broadcast, of the events of April 19, 1989; the investigation, prosecution, and trials of the Five; and the 2002 reinvestigation that led to the convictions being vacated. (Ex. 36, Research Binder; Ex. 41, 12/2/17 Emails from Berry Welsh; Ex. 42, Wikipedia.)

**PLAINTIFF'S RESPONSE**: Admitted subject to the qualification that Wikipedia is not news coverage and Ms. DuVernay testified that she did not rely on it. *See* PX-51, DuVernay Dep. Tr. 137:16-24.

g. Plaintiff's own statements and views, including interviews with Plaintiff by *The New Yorker's* Jeffrey Toobin, radio personality Don Imus, and others. (Exs. 25, 26A and B; *see also* DuVernay Decl. ¶¶ 122-123 (citing articles).)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants respond to the misstatements of the record in Plaintiff's Response to paragraph [g].


[g1] A "view" is not a source that could have been provided or relied upon. Whether a source is Plaintiff's "own statement" must be evaluated on a document by document basis. DX-25, "A Prosecutor Speaks Up" is an article about Ms. Fairstein which includes some quotes from Ms. Fairstein. Only the quotes contained therein are Ms. Fairstein's statements. PX-2, Fairstein Dep. Tr. 85:23-88:21. DX-26A and B are not listed in Ms. DuVernay's or Ms. Locke's Interrogatory Responses as materials upon which they relied when writing the Series. DX-44; DX-45. DX-26A appears as if it was printed off Westlaw and it is not Bates stamped. A copy of the transcript was produced, with Netflix as the document custodian, and the "date created" for this transcript was "5/17/22." *See* Declaration of Kara L. Gorycki, ("Gorycki Decl."), dated November 30, 2022 ¶ 3.

**DEFENDANTS' REPLY** to [g1]: Defendants deny that the Imus interview is not listed on Ms. DuVernay's Interrogatory Responses as materials upon which she relied when writing the Series. The video of the Imus Interview (DX-26B) was produced at DEFS176266 and is listed on page 6 of Ms. DuVernay's response under "Supplemental Response". (DX-44.) Further, Ms. DuVernay's response lists a June 2, 2018 email from Ms. Baker to Ms. DuVernay (DEFS093599-93601) which includes a link to the Imus video interview. (*See* DX-44 at 5; DX-81.) A copy of the transcript of Ms. Fairstein's interview was submitted as an aid to the Court. Defendants admit that Ms. Locke did not rely on the Imus video when writing Episode 2 of the Series.


[g2] Ms. DuVernay's reliance on the Don Imus interview with Ms. Fairstein is questionable as noted above. DuVernay Decl. ¶ 122(b). Ms. Fairstein admits that the quotes attributed to her at Paragraphs 122(a) and (c) are her own statements. Regardless, Ms. Fairstein's retrospective defense of the work performed by Ms. Lederer and the NYPD is not relevant to the film scenes at issue in this action. *See Fairstein*, 553 F. Supp. 3d at 71. FRE 401. Ms. Fairstein's statements about the credibility of Reyes' confession are not relevant to any claims or defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY** to [g2]: Defendants deny that Plaintiff's statements are not relevant. As set forth in Ms. DuVernay's Declaration, Plaintiff's statements informed Ms. DuVernay's writing of the Series. (DuVernay Decl. at ¶ 122.)


[g3] Ms. Hancock's statement, cited at Paragraph 123(a) of the DuVernay Declaration is inadmissible hearsay if submitted for the truth of the matter asserted therein. FRE 801(c). It is also irrelevant to the film scenes at issue in this action. FRE 401, 402.

**DEFENDANTS' REPLY** to [g3-g9]:  Defendants offer the statements in Paragraph 123 of Ms. DuVernay's Declaration not for the truth of the matter asserted, but as evidence of the statements contained in the sources Ms. DuVernay relied upon in research and writing the Series.

[g4] Paragraph 123(b)(i) of the DuVernay Declaration is not Ms. Fairstein's own statement and it is inadmissible hearsay if submitted for the truth of the matter asserted therein. FRE801(c). It is also irrelevant to the film scenes at issue in this action. FRE 401, 402. Ms. Fairstein's retrospective defense of the work performed by Ms. Lederer and the NYPD is not relevant to the film scenes at issue in this action. *See Fairstein*, 553 F. Supp. 3d at 71.

[g5] Paragraph 123(b)(ii) of the DuVernay Declaration cites to a passage in Sarah Burns' book which does not cite the sources from which she excerpted any quotes and, for that reason, Ms. Fairstein denies that the quotes attributed to Ms. Fairstein in that Paragraph accurately reflect her statements. Ms. Fairstein's retrospective defense of the work performed by Ms. Lederer and the NYPD is not relevant to the film scenes at issue in this action. *See Fairstein*, 553 F. Supp. 3d at 71. FRE 401, 402. This Paragraph is inadmissible hearsay if submitted for the truth of the matters asserted therein. FRE 801(c).

[g6] Paragraph 123(b)(iii) of the DuVernay Declaration contains no statement from Ms. Fairstein and is inadmissible hearsay if submitted for the truth of the matters asserted therein. FRE 801(c). The information cited in this Paragraph is also irrelevant to the scenes at issue in this action. FRE 401, 402. Ms. Fairstein's retrospective defense of the work performed by Ms. Lederer and the NYPD is not relevant to the film scenes at issue in this action. *See Fairstein*, 553 F. Supp. 3d at 71. FRE 401, 402.

[g7] Paragraph 123(c)(i) does not contain any statement made by Ms. Fairstein, contains no relevant information and constitutes inadmissible hearsay. FRE 401, 801(c); *Fairstein*, 553 F. Supp. 3d at 71.

[g8] Paragraph 123(c)(ii) contains the following quotes attributable to Ms. Fairstein "The internal inconsistencies in his story are extraordinary" and "Here we just have Nancy Ryan saying 'I believe him.'" *See Fairstein*, 553 F. Supp. 3d at 71. FRE 401. These statements are not relevant to the scenes at issue in this action. The remainder of the Paragraph is inadmissible hearsay. FRE 801(c).

[g9] Paragraph 123(c)(iii) of the DuVernay Declaration contains no information that is relevant to the scenes at issue in this action. FRE 401, 402.

h.   The District Attorney's Dec. 5, 2002 "Affirmation" submitted by ADA Nancy Ryan, detailing her reinvestigation after Reyes' confession and concluding that the convictions should be vacated. (Ex. 21.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Ryan, alone, did not conduct the reinvestigation.

    i.   The "confession" videos, and transcripts from the Suppression Hearings and Trials. (Ex. 32A-C, Confession Videos; Ex. 32D, Excerpts of Confession Transcripts; Ex. 43, 11/2/17 and 11/16/17 Emails from Hannah Baker.)

**PLAINTIFF'S RESPONSE**:

Denied. Ms. Swicord testified that she did not read the transcripts from the suppression hearings and trials. PX-34, Swicord Dep. Tr. 151:6-153:2. *See* Swicord Decl. ¶ 17. Ms. DuVernay chose not to review the testimony of any law enforcement officials because she believes they "lied." DuVernay Decl. ¶¶ 23, 44, 49.

(Ex. 44, DuVernay Interrogatory Responses; Ex. 45, Locke Interrogatory Reponses; Ex. 2, DuVernay Dep. at 23-24, 131, 135-137; DuVernay Decl. ¶¶ 29-40; Ex. 3, Locke Dep. at 19-21, 24-26, 138; Locke Decl. ¶¶ 9-10, 13-19; Ex. 31, Swicord Dep. at 42-44, 85, 92, 110, 152-153; Swicord Decl. ¶¶ 11-12, 16-23.)

**PLAINTIFF'S RESPONSE**:

Plaintiff denies that the list of materials cited in the parenthetical above is entirely reliable and accurate. Plaintiff further denies any and all subjective characterizations or opinions about the validity or value of the research materials cited above.

Ms. DuVernay's Declaration (Paragraphs 56-60) states that she did not look at the website published by the New York City Law Department in July 2018. Ms. DuVernay's interrogatory responses cite a 2010 letter from Ms. Fairstein to Robert Morgenthau that was published on the City website as source material for the Series. DX-44. At her deposition, Ms. DuVernay could not recall where the letter came from. PX-51, DuVernay Dep. 138:3-139:2. It cannot reliably be authenticated as part of Defendants' source materials for the Series. It was produced as part of Netflix's document collection and listed as Exhibit 42 to Ms. Fairstein's deposition in the Five's civil action against New York City. *See* Gorycki Decl., ¶ 4. At the deposition of Netflix 30(b)(6) witness Alison Engel, Defendants' counsel stated on the record that Ms. Fairstein's deposition transcript from the federal action was produced because it was attached to Defendants' motion to dismiss and that it was not part of Defendants' original document collection. PX-137, Engel Dep. Tr. 83:4-84:23.

Paragraph 19 of Ms. Swicord's Declaration states that Ms. Fairstein "lied" because she is quoted in the Toobin article as stating that "every kid was in open space, no handcuffs."

DX-25. The article clearly pertains to the time period after Ms. Fairstein arrived at the 20th Precinct and not "the precincts" as Ms. Swicord states. *Id.* According to the writers' "Interrogation Timeline," Mr. Santana and Mr. Richardson were questioned by the NYPD at the Central Park Precinct on April 19th and April 20th. PX-193. According to the Sullivan book that Ms. Swicord relied on when writing Episode 1, Ms. Fairstein is first placed at the ***Twentieth Precinct*** after 8:00 p.m., after Ms. Lederer received a call regarding the videotaped statements and the NYPD had moved its investigation from the Central Park Precinct to the Twentieth. Sullivan does not place Ms. Fairstein at the Central Park Precinct. DX-17, Sullivan, at p. 22; PX-34, Swicord Dep. Tr. 180:10-182:14. Though Ms. Swicord states that Ms. Fairstein "continued to lie about what took place at the precincts," she did not bother to research Ms. Fairstein's location or activities in the days following the attacks in Central Park. PX-34, Swicord Dep. Tr. 180:10-182:14. Had she done so, she would have learned that Ms. Fairstein was not at any precinct until 8:30 p.m. on April 20th, when she arrived at the 20th Precinct. By that point in time, Messrs. Richardson, Santana and McCray had given written statements. *See* Pltf. SJ Opp. Br., Pt. III.A. In addition, Ms. Fairstein's statement in the Toobin article is not specific to Mr. Richardson or Mr. Santana. Regardless, the video clips of Mr. Santana's and Mr. Richardson's interviews with Sarah Burns are inadmissible hearsay 801(c). DX-100, DX-101. The issue of whether or not individuals were handcuffed at the precincts is not relevant to any of the claims or defenses in this action. FRE 401, 402. For this reason, the portions of DX-100 and DX-101 concerning this issue are not relevant and, even if they were, they are more prejudicial than probative, could mislead or confuse a jury. FRE 403.

**DEFENDANTS' REPLY**:  Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Further, as Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's objection is thus meritless.

65.    Ms. Swicord and Ms. Locke formally interviewed each of the Five men for many hours in person. (Locke Decl. ¶¶ 11-12; Ex. 3, Locke Dep. at 25; Swicord Decl. ¶¶ 13-14; Ex. 31, Swicord Dep. at 119.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Plaintiff makes no admissions with respect to the personal views of Ms. Locke, expressed at Paragraph 12 of her Declaration, or Ms. Swicord, as expressed at Paragraph 14 of her Declaration.

66.    Ms. DuVernay also continued to speak informally with the Five and their family members, and their lawyers. In addition to their lawyer Michael Warren, she spoke with other lawyers for the Five including trial counsel Michael ("Mickey") Joseph, and civil counsel Jane

Fisher-Byrialsen. (Ex. 2, DuVernay Dep. at 67, 104-105; DuVernay Decl. ¶¶ 41-42.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. DuVernay's interrogatory responses do not list Mickey Joseph as a person who provided information to Ms. DuVernay about Ms. Fairstein's role in the Central Park Jogger case. PX-257, at Resp. No. 2. To the extent that Ms. DuVernay, or Defendants, rely on "informal," undocumented conversations with any person referenced above as "evidence" in support of Defendants' summary judgment motion any testimony related thereto raises credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

67.     Throughout the drafting process, Ms. DuVernay, Ms. Swicord and Ms. Locke were consulting and checking their research materials and sources to ensure that the scenes and dialogue were grounded in the facts as they understood them. (DuVernay Decl. ¶ 63; Swicord Decl. ¶ 59; Locke Decl. ¶ 44.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. DuVernay's Declaration states that she "consulted [her] research materials to ensure the scenes were grounded in her research" – not the facts as she understood them. DuVernay Decl. ¶ 63. Ms. Locke's Declaration makes the exact same statement. Locke ¶ 44. Ms. Swicord's Declaration also contains the exact same statement. Swicord Decl. ¶ 59.

68.     Netflix relied on the expertise, experience and track record of Ms. DuVernay and her veteran co-producers and writers, as Netflix does as a general matter with accomplished filmmakers. (Engel Decl. ¶¶ 16-17, 29; Ex. 46, Excerpts from Deposition of Alison Engel ("Engel Dep.") at 50-53, 118.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts and Plaintiff's misstatements of the record as follows:

[1] ████████████████████████████████████████████████████████ PX-154, at DEFS144594-144595 (Article 12a); PX-157, at DEFS144461; PX-48, at DEFS144625. PX-152, Dunbar Dep. Tr. 26, 37; PX-34, Swicord Dep. Tr. 23:14-23; PX-49, at DEFS144472-73; PX-199, DEFS144557, at DEFS144565-65. ████████████████████

████████████████████████ PX-258; PX-137, Engel Dep. Tr. 67:21-68:25.

**DEFENDANTS' REPLY to [1]:** ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ (PX-258.) *See also* Alison Engel testimony at PX-137 at 68:15-25.

[2] Paragraph 16 of Ms. Engel's Declaration states that "Netflix would not release a series or film if it had any doubts about its accuracy." However, Netflix employees routinely flagged issues which called into question the accuracy of the Fairstein portrayal.

**DEFENDANTS' REPLY to [2]:** Defendants deny that "Netflix employees routinely flagged issues which called into the question the accuracy of the Fairstein portrayal." Ms. Engel's unrebutted declaration states that "Netflix's notes to Ms. DuVernay on the scripts are focused on clarity, pacing, consistency and comprehension. While my review of the scripts was not focused on factual accuracy, nothing struck me as inaccurate based on the research I reviewed." (Engel. Decl.at ¶ 19.) She also stated that "Netflix's notes on the cuts were generally related to structure and pacing of the episodes and, like our review of the scripts, focused on clarity, consistency and comprehension. . . . Nothing in the cuts struck me as inaccurate based on the research I reviewed or what I had learned from my conversations with Ms. DuVernay while working on the Series." (*Id*. at ¶¶ 25-26.)

[3] In February 2018, on a call with Ms. DuVernay, Netflix executives asked if it was "the reality of what happened" when the "police align very quickly and very uniformly against these five boys." Ms. DuVernay stated that "the reality is they all lined up behind Fairstein very quickly." PX-57; PX-51, DuVernay Dep. Tr. 102:13-109:24.

**DEFENDANTS' REPLY** to [3]: With respect to PX-57, the notes state that Ms. DuVernay provided a response to Netflix's question – "[t]he reality is that they all lined up behind Fairstein quickly" – affirming her understanding of Fairstein's influence and control over the police.  Plaintiff has produced no evidence that Netflix was dissatisfied with Ms. DuVernay's response.  This is another piece of evidence that speaks to and supports the writers' subjective state of mind at the time of writing as well as what was relayed to Netflix.

[4] On August 2, 2018, a member of Netflix's communications team, Don Halcombe, raised a "Potential Flag" about Ms. Fairstein. Per Mr. Halcombe's email, after a marketing kick-off meeting for the Series, "Tribeca and Participant came up to us after the meeting and are concerned about Linda Fairstein.... She is not portrayed favorably in the scripts and was obviously not interviewed by anyone for her side of the story for the Series." Halcombe further noted, Fairstein was the "person who was pushing to get the new court documents released ahead of her book. It seems like these court documents are supposed to be released throughout the fall." PX-117; PX-111, Wolff Dep. Tr. 62:22-66:3. ***Prior to this*** communication, Ms. DuVernay had messaged Netflix executive Cindy Holland:

> A bombshell for us. Thousands of documents just released. Two sources tell me they were rushed to be made public because of our casting announcement. They want to get their version out ASAP. And Linda Fairstein has a book dropping before we debut in which she defends herself. Wild.

PX-71; PX-51, DuVernay Dep. Tr. 161:16-163:21 (claiming "bombshell" referred to Ms. Fairstein's book). Ms. DuVernay also messaged a number of individuals, including producers Berry Welsh and Jonathan King:

> The official records that were released on the city site. Only partial though. Why? Handpicked documents by Fairstein.

PX-73, at DEFS177566; PX-51, DuVernay Dep. Tr. 167:23-171:6.

**DEFENDANTS' REPLY** to [4]: With respect to Plaintiff's statements about PX-117, Ms. Colmenero's email (which Plaintiff incorrectly identifies as coming from Ms. Halcombe) does not question the accuracy of Ms. Fairstein's portrayal in the Series, but pertains to a marketing PR concern.  The document states that Ms. Fairstein "still believes the men are guilty and could be a vocal opposition and try to discredit the project in the press/on social." (PX-117.)  Ms. Wolff testified that Netflix was concerned from a PR perspective that the release of documents "could detract from the men having the opportunity to tell their story."  (Ex. A to Supplemental Spears Decl., Wolff Dep. at 78:23 – 79:17.)

With respect to PX-71, Ms. DuVernay testified that she was referring to the fact that "Linda Fairstein was going to write a book" as the "bombshell" as the document also indicates on its face.  (PX-51 at 162:10-21.)  Ms. DuVernay felt that Ms. Fairstein and the City already

had the chance to tell their side of the story, and that it was finally the men's turn to tell theirs.  (DuVernay Decl. at ¶ 8; PX-70 at DEFS177584.)

With respect to PX-73, nothing in the message indicates that Ms. DuVernay or the producers had any concerns about the accuracy of Ms. Fairstein's portrayal in the Series as Plaintiff misleadingly claims.  Ms. DuVernay stated in her Declaration that "based on the news reports about the release and all of the other sources and research we had, and the fact that the defendants in the civil suit settled for $41 million, I believed that the additional documents on the NYC website would only put Ms. Fairstein and her cohorts in a worse light because there was no new evidence that the Five were guilty."  (DuVernay Decl. at ¶ 60.)

[5] On August 4, 2018, Netflix employee Alison Engel communicated by email with Jane Rosenthal at Tribeca about "linda f discussion." PX-140. Ms. Rosenthal copied an opinion piece written by Ms. Fairstein into the email which states "I was not the prosecutor in the case nor was I one of the detectives or prosecutors who took the confessions from the 5." PX-140. Ms. Engel replied "It's impossible to me to find her position defensible." *Id.* Netflix did not ask the writers of the Series to conduct any research concerning Ms. Fairstein's statements nor did it ask the writers for research concerning whether or not Ms. Fairstein took the confessions from the Five. PX-137, Engel 30(b)(6) Dep. Tr. 77:20-83:3. The email exchange between Ms. Engel and Ms. Rosenthal also referenced the recently published City Law Department website. Netflix did not have any conversations with the writers about reviewing the materials on the website nor did anyone at Netflix download any information from the website related to Ms. Fairstein. *Id.*

**DEFENDANTS' REPLY** to [5] and [7]: Plaintiff omits that her July 2018 Op-Ed in PX-140 also states that she "was an eyewitness to many of the events at the police stationhouses throughout 36 hours when the statements were obtained", and that "[t]he confessions were not coerced." (PX-140.)  Ms. Engel's reply—that "it's impossible to me to find her position defensible"—supports Ms. Engel's state of mind at the time and now.

None of the materials Plaintiff cites indicates that Ms. Engel had concerns about the accuracy of Plaintiff's portrayal.  Plaintiff omits that Ms. Engel testified, Netflix relied on the writers' "judgment as to the scope of the research" and "had every confidence in their ability to do the research that they required."  (PX-137 at 82:6-21; *see also* Engel Decl. at ¶ 17.)

[6] On January 28, 2019, Netflix publicity team member Joanna Wolff emailed notes to herself which stated "Susie Aaron's at Rubenstein for crisis; or DKC – no Nypd consultant; Linda Fairstein never interviewed for project." PX-186; PX-111, Wolff 30(b)(6) Dep. Tr. 5:167:6.

**DEFENDANTS' REPLY** to [6] and [7]: None of the materials from Netflix's publicity team indicate that Netflix had concerns about the accuracy of Plaintiff's portrayal.  Ms. Wolff's notes to herself at PX-186 state the undisputed fact that Ms. Fairstein was never

interviewed for the project.  It is undisputed that the filmmakers reached out to try to interview Plaintiff.  (SUF 104.)  PX-188, *infra*, relates to publicity and does not suggest that Netflix had any concerns about the research or accuracy of the Series.  Ms. Wolff (Manager of Publicity, and 30(b)(6) witness) testified that "the publicity and marketing team left the research up to the producers and the writers."  (PX-111 at 65:21-23.)

[7] On January 29, 2019, Netflix's publicity team received an email from a public relations firm which summarized various articles about Ms. Fairstein, including that Ms. Fairstein pointed out that "she was neither a prosecutor on the case nor did she take their confessions. She describes herself as an eyewitness." PX-188. This email also contained a summary of a 2018 article in which Tim Clements, "co-prosecutor" of the Central Park Jogger case, "came out against the 2002 exoneration" and "objects to the settlement and the Ken Burns doc, claiming that Sarah Burns had a conflict of interest, as she served as a paralegal for one of the lawyers in the lawsuit. *Id.* at DEFS075813.

**DEFENDANTS' REPLY** to [7]:  See above.

[8] In February 2019, when the Series was in editing, Netflix employee Cindy Holland asked "wrt the lunch scene, did it actually happen?" PX-146, at DEFS078571; PX-137, Engel Dep. Tr. 137:9-141:14. Netflix's 30(b)(6) witness, Alison Engel, attributed Ms. Holland's question to "pacing." Whether this is a credible explanation is a question for a jury. *Palin*, 482 F. Supp. 3d at 219. Ms. Engel testified that Netflix "learned the purpose of the scene" as "a metaphorical representation of a discussion [Ms. DuVernay and the Five] wanted to have and never had the opportunity to have." PX-137, Engel Dep. Tr. 137:9-141:14. Ms. DuVernay testified that the Ryan lunch scene was all the things she would say to Ms. Fairstein if she ever got the chance. PX-51, DuVernay Tr. 151:19-153:16; PX-68; PX-69.

**DEFENDANTS' REPLY** to [8]:  With respect to PX-146, regarding Ms. Holland's question about the "lunch scene," Plaintiff misleadingly omits that Ms. Engel testified that this question was being asked "just for the context of it to know . . . what they're trying to communicate with the scene to better understand . . . how much of it you really need to have in that moment." (PX-137 at 138:9-19.)  Plaintiff also omits that Ms. Engel testified that she had a conversation with Ms. DuVernay about the lunch scene and "learned the purpose of the scene for her and the men", which is that "it was a metaphorical representation of a discussion that they wanted to have and had never had the opportunity to have." (PX-137 at 140:11-21.)  Ms. Engel also stated in her declaration that she "had no concerns" about the writers' use of "imagined scenes and dialogue" in a dramatization. (Engel Decl. at ¶ 20.)  Defendants admit Ms. DuVernay testified that the lunch scene represents "the things I'd say to Linda Fairstein if I ever got the chance[.]"  (PX-51 at 153:10-15.)  *See also* full dialogue in scene, including *e.g.*, "While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit." (DX-30B at 6.)  *See also* SUF ¶¶ 187-197 (regarding sources for scene).

[9]  PX-225.

**DEFENDANTS' REPLY to [9], [10], [11] and [12]:** The promotional plan materials and communications cited by Plaintiff are all related to PR and are immaterial. *See* PX-225, PX-207, PX-213, PX-130, PX-131 and PX-132.

Defendants incorporate their Reply to SUF 113 on PX-225 as if fully set forth herein.

[10] On May 3, 2019, 

PX-207. *See* PX-213, at DEFS156907-908; PX-130; PX-111, Wolff 30(b)(6) Dep. Tr. 125:8-131:14. *Selma* faced public criticism for certain inaccuracies in its portrayal of the Civil Rights Movement, including with respect to the omission of Rabbi Abraham Joshua Heschel from the third protest march on Selma depicted in the film. *See* https://forward.com/culture/212000/selma-distorts-history-by-airbrushing-out-jewish-c/ (last visited on Oct. 18, 2022); https://www.algemeiner.com/2015/01/18/fresh-controversy-hits-selma-daughter-of-rabbi-abraham-joshua-heschel-shocked-by-exclusion-of-her-father-from-film/ (last visited Oct. 18, 2022); https://www.theguardian.com/film/2014/dec/30/selma-director-lyndon-johnson-martin-luther-king-controversy (last visited on Oct. 18, 2022).

**DEFENDANTS' REPLY to [10]:  See above.** 

[11] The week before the Series came out, a Netflix employee raised concerns about how Ms. Fairstein was portrayed in the Series after she watched a 20/20 documentary about the Central Park Jogger Case. The employee stated:

> "When They See Us 'really paints a very critical portrait of Linda Fairstein and her heavy involvement in the case. Linda is almost absent in the 20/20 piece.... Instead, they are much more focused on Elizabeth Lederer's role. It's almost unclear what Linda's role in the case was at all..... I do think that the 20/20 series will add questions about Linda and Elizabeth's portrayals in the series and their roles in the case." PX-131, at DEFS158621; PX-111, Wolff 30(b)(6) Dep. Tr. 140:2-143:19.

**DEFENDANTS' REPLY to [11]:  Defendants deny Plaintiff's statement about PX-131.** Plaintiff omits that Ms. Wolff testified that the publicity team watched the 20/20 special

from a publicity perspective and "were hypothesizing different scenarios of what a viewer could watch and come up with." (PX-111 at 141:24-142:3.) And when asked "[w]as one hypothesis that a viewer of the series could conclude that the portrayal of Ms. Fairstein in the series was a false portrayal?", Ms. Wolff answered "No." (*Id.* at 142:4-8.)

[12] Netflix's Communications Plan ███████████████████████████████████

████████████████████████████████████████████████████████ PX-132 at DEFS169114; PX-111, Wolff 30(b)(6) Dep. Tr. 143:20-144:12, 153:2-157:16. Netflix did not fact check the version of the Series that aired on its streaming platform. PX-137, Engel 30(b)(6) Dep. Tr. 55:1-11.

**DEFENDANTS' REPLY** to [12]: See above reply to paragraph [11] regarding Plaintiff's omission of Ms. Wolff's testimony regarding the 20/20 special.

Further, regarding the last sentence of paragraph [12], Defendants, as stated above, Netflix states that it relied upon the experienced writers and producers for the Series to conduct thorough research to support the scripts. (PX-137 at 82:6-21; *see also* Engel. Decl. at ¶ 16-17.) Ms. Engel stated in her Declaration that "[a]s a general matter, and as is typical in the television and film industry, Netflix relied upon and trusted the Writers, with support from the producers, to conduct thorough research to support the scripts for the Series and, given its role, Netflix was not responsible for conducting research for the Series." (*Id.* at ¶ 16.)

69.    Given the amount of background research provided to Netflix at the beginning of the project, and in view of the expertise and experience of the writers and producers, Netflix was confident that the writers had ample basis for their work, including the portrayal of Ms. Fairstein. (Engel Decl. ¶¶ 16-17, 29; Ex. 47, Netflix's Interrogatories.)

**PLAINTIFF'S RESPONSE**:

Denied.

Per the testimony of Netflix's 30(b)(6) witness Alison Engel, it is unlikely that Netflix was "confident" that the writers had "ample basis for their work, including the portrayal of Ms. Fairstein." Netflix: 1) did not "rely on any research materials." 2) did not receive all of the research materials relied upon by the writers; 3) there was no specific person at Netflix that was assigned the task of reviewing the writers' research materials; 4) everyone at Netflix was "free to review what they wanted to review"; 5) the research was provided to Netflix "just for context"; and 6) did not request any specific research from the writers concerning Ms. Fairstein. PX-137, Engel 30(b)(6) Dep. Tr. 53:3-11, 61:7-20, 65:7-17, 67:15-20. Notably, Ms. Engel does not name the "other executives" who were "confident" in the research. Engel Decl. ¶ 17.

*See* Response to Paragraph 68 above, which is incorporated by reference herein.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive and argumentative.

70.    Consistent with its standard practices, Netflix relied on the expertise and experience of the writers and veteran producers to ensure that the Series was grounded in their research material and perform fact-checking on the scripts. (Engel Decl. ¶ 16; Ex. 46, Engel Dep. at 50-53, 96-97, 127.)

**RESPONSE**:

Denied.

The Engel Declaration does not discuss Netflix's "standard practices." Engel Decl. ¶ 16. *See* Response to Paragraph 68 above, which is incorporated by reference herein.

71.    While the writers relied on numerous sources, the Series is not a documentary and was not intended to be one. (Ex. 2, DuVernay Dep. 79-80, 107-109; DuVernay Decl. ¶ 11; Ex. 3, Locke Dep. at 86, 160; Ex. 31, Swicord Dep. at 204; Swicord Decl. ¶ 64.)

**RESPONSE**:

Admitted subject to the qualification that Defendants marketed, promoted and publicized the Series as a true story. PX-111, Wolff Dep. Tr. 11:10-12:2, 68:2-74:16, 95:2-103:4, 115:5-122:8, 144:3-150:23; PX-118; PX-121; PX-126; PX-127; PX-128; PX-129; PX-132 ███████████████████████████████████████████ PX-256; PX-81, Locke Dep. Tr. 84:6-92:3, 161:25-164:12; PX-92; PX-103. *See infra* Paragraph 207.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's "qualification" as non-responsive; and otherwise incorporate their Replies to SUF 38 and 207 as if fully stated herein.

72.    In creating scripted drama based on real life, writers use common storytelling techniques—invented conversations, compressed timelines, flashbacks to past events, and other tools—both for time and narrative purposes. (Ex. 2, DuVernay Dep. at 75-76, 107-109, 113-114;

DuVernay Decl. ¶¶ 11, 55, 61, 77, 86; Ex. 3, Locke Dep.at 70-71, 220-221; Locke Decl. ¶¶ 41, 43, 52; Swicord Decl. ¶¶ 54, 58, 77, 84; Welsh Decl. ¶¶ 17-20.)

**RESPONSE**:

Denied.

The DuVernay deposition testimony cited above does not describe common "storytelling" techniques. Paragraphs 55, 77, and 86 of the DuVernay Declaration do not describe common "storytelling" techniques. Ms. Locke's deposition testimony, cited above, does not describe general "storytelling" techniques. Paragraph 52 of Ms. Locke's Declaration does not discuss common "storytelling" techniques. Paragraphs 54, 58, 77 and 84 of the Swicord Declaration do not discuss general "storytelling" techniques.

As set forth in Plaintiff's response to Paragraph 48, which is incorporated by reference herein, the Welsh Declaration contains inadmissible expert testimony that is also irrelevant.

73.    The Series is part of the genre of films familiar to audiences as "based on true stories" and the landing page for viewers' access to the Series on Netflix's streaming service contains this synopsis: "Five teens from Harlem become trapped in a nightmare when they're falsely accused of a brutal attack in Central Park. Based on the true story." (Engel Decl. ¶ 28; DuVernay Decl. 140.)

**RESPONSE**:

Denied.

Plaintiff agrees that the language in the synopsis quoted above is accurate. Ms. Engel's Declaration points to no evidence concerning how many viewers actually read the synopsis before watching the Series or how viewers perceive the various categories with which the show is labeled. Engel Decl. ¶ 28. Ms. DuVernay's statement that she does not "believe that any viewer would actually come away with the impression" "that every piece of dialogue is the literal truth" is not a statement of fact and concerns matters of law which were decided in the Court's opinion regarding Defendants' motion to dismiss. *See Fairstein v. Netflix*, 553 F. Supp. 3d at 71, 74, 76-79. Ms. DuVernay's belief as to how an audience would perceive the Series is not relevant to the claims or defenses in this action. FRE 401 and, even if it were, it would tend to confuse or mislead the jury. Regardless, Ms. DuVernay's statements about what she believed raise credibility issues that cannot be decided prior to trial. *Palin v. N.Y. Times*, 482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020) (court cannot automatically credit testimony at summary judgment stage of action).

Defendants marketed, promoted and publicized the Series as a true story. *See* Paragraph 71, *supra*, incorporated by reference herein. *See infra* Paragraph 207.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive; and otherwise incorporate their Replies to SUF 38 and 207 as if fully stated herein.  Defendants further incorporate their Reply to SUF 56 as if fully stated herein.

74.     Each Episode of the Series ends with a disclaimer that states: "While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization. As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history." (Compl. ¶ 228; Ans. ¶ 228.)

**PLAINTIFF'S RESPONSE**:

The sources cited above are not admissible evidence. *Thomas*, 2022 WL 504787, at n. 1. Plaintiff admits that there is a disclaimer that appears ***at the end of*** the credits for each episode of the Series, but it scrolls within seconds and is barely legible. DX-30; PX-153; PX-152, Dunbar Dep. Tr. 11:6-11, 14:2-15:5. In addition, if a Netflix subscriber is watching an episode of the Series and has not changed the default settings from "autoplay" then the credits will not scroll to the end such that the disclaimer can be viewed. PX-152, Dunbar Dep. Tr. 14:3-25:17. Auto play is the default setting for streaming content on Netflix's platform. *Id.* at 22:2-23.

Recently, Netflix received press attention for failing to place a disclaimer at the beginning of its series The Queen. Shortly thereafter, it was announced that Netflix was adding a disclaimer at the beginning of the Series that it was a "fictionalized dramatization." *The Crown: Dame Judi Dench Accuses Netflix of Crude Sensationalism*, BBC News, Oct. 21, 2022 https://www.bbc.com/news/entertainment-arts-63326250 (last visited on Oct. 22, 2022); *Judi Dence Wins Royal Rumble as Netflix Labels Series Fictional Dramatisation*, the Guardian, Oct. 21, 2022, https://www.theguardian.com/culture/2022/oct/21/judi-dench-netflix-the-crown-fictional-dramatisation (last visited on Oct. 22, 2022).

**DEFENDANTS' REPLY:**  Defendants move to strike  the second Paragraph of Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants state that Netflix's actions with respect to a different series are not relevant to the claims or defenses in this action, and the cited article is hearsay for the purpose Plaintiff cites it in any event.

### 3.   **Portrayal of the Fairstein Character**

75.   Based on their sources, Ms. DuVernay and the other writers had no doubt that Plaintiff played a central role in the investigation and prosecution, and was responsible "morally and legally" for the outcome in view of her position of power and persistence driving the case forward while disregarding numerous red flags. (Ex. 2, DuVernay Dep. at 77-79, 87-88, 143-144; DuVernay Decl. ¶ 46; Ex. 3, Locke Dep. 55-56, 67, 96; Locke Decl. ¶¶ 25-28, 34-36; Ex. 31, Swicord Dep. at 121-122; Swicord Decl. ¶¶ 33-37, 39-40, 42-51.)

**PLAINTIFF'S RESPONSE**:

Denied.

[1] The writers' statements about what they believe, and whether or not they had doubts, raise credibility issues that cannot be determined without a trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. To the extent that Defendants assert that Ms. Fairstein was in a "position of power and persisten[t] in driving the case forward while disregarding numerous red flags" for the truth of the matter asserted therein (as opposed to what they believed) it is inadmissible hearsay. FRE 801(c). Whether Ms. Fairstein was, in Defendants' view, "morally and legally responsible" for the "outcome" of the Central Park Jogger case also has no bearing on whether or not Defendants' sources provided support for the scenes at issue in this action. FRE 401, 402.

[2] None of the newspaper articles in Defendants' research binder from the 1989 time period following the attacks in Central Park name Ms. Fairstein as involved in the Central Park Jogger "investigation" or prosecution. DX-36, at DEFS007145-7233, DEFS007428-7433; PX-34, Swicord Dep. 76:24-78:20, 92:4-111:21.

[3] Ms. Fairstein was featured in a February 1990 *New York Times* article, located in Defendants' research binder, which describes her as overseeing the "disposition of some ***500-700 cases per year***" as "chief of the sex-crimes unit." DX-36, at DEFS007234 (emphasis added). In the article, an ACLU attorney describes Ms. Fairstein as "so strongly moral, she so strongly wants the system to treat people equally.... If there were more people like her it would be an infinitely juster system." *Id.* at DEFS007236. The article further states, if "Fairstein's name is now a household word, it is because Robert E. Chambers Jr." *Id.* at DEFS007235. Also, "the first of Fairstein's big cases was the 1978 prosecution of Marvin Teicher." *Id.* at DEFS007239. The article describes Ms. Fairstein as "a witness" at pretrial hearings in the Central Park Jogger case and Ms. Lederer as "the prosecutor." *Id.* at DEFS007241. *See* DuVernay Decl. ¶ 51(c). Ms. Fairstein is referenced in only two additional articles in 1990 regarding her role as a witness at trial. DX-36, at DEFS007294-97.

[4] Ms. Lederer is named as the "prosecutor," "main prosecutor" and "lead prosecutor" in the 1989-1990 articles that comprise Defendants' research. DX-36, at DEFS007161-7163 (Ms. Swicord notes "Lederer is lying throughout" at 7163), DEFS007177, DEFS007189, DEFS007246, DEFS007247, DEFS007255, DEFS07292, DEFS007294, DEFS007298, DEFS007317, DEFS007320, DEFS007322 ("Elizabeth Lederer, who led the prosecutions' case"), DEFS007332. She is also referred to as the "lead prosecutor" in 2002. *Id.* at DEFS007367-7369, DEFS007378. Ms. Lederer's statements concerning, and involvement in, the Central Park Jogger case were routinely reported in the press during the 1989-1990 timeframe. *Id.* at DEFS007161-63, DEFS007173, DEFS007189-91, DEFS007232-33, DEFS007264-65, DEFS007275, DEFS007285-86, DEFS007304-306. One article noted that the NYPD detectives praised Ms. Lederer—not Ms. Fairstein—for her "dogged" support. *Id.* at DEFS007322.

[5] Books relied upon by the writers also describe Lederer as responsible for the investigation and prosecution. *See also* DX-17, Sullivan (Acknowledgments) ("The cooperation of the lead prosecutor, Elizabeth Lederer, and her co-counsel, Arthur "Tim" Clements was crucial to my understanding of how the two Central Park Jogger trials developed."), DEFS168821 (p. 23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168827 (p. 35) ("In the written statement detectives had shown to Lederer, Santana had described Lopez playing a particularly brutal role. She wanted to get that on tape, too."), DEFS168829 (p. 39) ("Several highly incriminating statements were on tape, but Lederer was distracted by disappointments... if the kids were telling the truth...they each had succeeded in minimizing his own role."), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week"); DX-27, Burns, DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"), DEFS168729 (p. 97) ("While preparing for trial, Lederer learned that no [DNA] matches had been made....But the fact that the weak pattern that did show up was not clearly a match to...the suspects did not inspire her to look elsewhere."), DEFS168755 (p. 140) ("Lederer was able to paint her version of the story and present the most damning evidence, the written and videotaped statements"); DEFS168785 (p. 201) ("Fairstein...had assigned her

deputy Lederer to prosecute the original convictions"), DEFS168764 (p. 159) (supporters of defendants were "especially cruel to Lederer" referring to her as "The devil herself, she's going to pay for it"), DEFS168766 (p. 162) ("Rather than investigate the reason that the defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury."). *See* PX-35, at DEFS007800-7803; PX-34, Swicord Dep. Tr. 69:12-76:20.

[6] Sarah Burns' book states "this was not a case of rogue detectives beating confessions out of suspects, or of police and prosecutors conspiring to frame individuals they knew to be innocent. If that were so, we could blame it all on those bad seeds and move on." DX-27, at DEFS168679.

[7] The writers did not consult with any outside experts about the structure of the Manhattan District Attorneys' office in 1989. PX-81, Locke Dep. Tr. 57:2-58:18; PX-51, DuVernay Dep. Tr. 69:10-24, 88:23-89:19; PX-34, Swicord Tr. 127:6-128:16, 165:6-166:11.

[8] Ms. DuVernay testified that certain of the scenes depicting Ms. Fairstein are "invented" scenes. PX-51, DuVernay Tr. 110:20-128:12 (Ep. 1 – precinct scene); PX- 58; PX-59; PX-60; PX-51, DuVernay Tr. 150:12-151:18 (Ep. 2 -sock DNA scene); PX-67; PX-51, DuVernay Tr. 151:21-153:18 (Ep. 4 – Ryan lunch); PX-68. *See also* DuVernay Decl. ¶¶ 66, 82. Also, she could not specify the sources which supported Ms. Fairstein's conduct as depicted in certain scenes. PX-51, DuVernay Dep. Tr. 140:9-149:10 (Ep. 1-timeline scene); PX-65; PX-66. Ms. Locke also testified that the sock DNA scene in Episode 2 is an invented scene. PX-81, Locke Dep. Tr. 27:2-34:16, 70:23-72:5; 150:20-155:25; PX-82; PX-101.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

The additional facts cited within this Response regarding Plaintiff's status as a witness and actions taken by Ms. Lederer and Mr. Clements are non-responsive, incomplete and in all events immaterial. Plaintiff's additional citations do not create an issue of fact on the actual malice issues before the Court. Plaintiff's additional points about the sources consist of her "spin" and do not speak to or contradict the writers' view of Plaintiff's position and role based on the cited sources themselves or the totality of the writers' sources. For example, Plaintiff ignores that while the books also refer to Ms. Lederer's role, that does not diminish Ms. Fairstein's role. Sullivan describes Ms. Fairstein as the person ready to engage in "a turf war" over the case, details her interactions with David Nocenti and Sharonne Salaam, and noted that Plaintiff took a couple of the suspects to the crime scene with detectives. (DX-17 at 21, 25-27, 40.) Burns reports, among other many things, that Plaintiff "immediately sprang to action" on the morning of April 20 and similarly discusses her confrontation with Mr. Nocenti and Mrs. Salaam. (DX-27 at 36, 46-47.)

Plaintiff's citation to Ms. DuVernay's deposition testimony also is misleadingly incomplete, as discussed below at Defendants' Replies to SUF ¶¶ 127, 133, 138.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

76.     The writers intended that the criminal justice system would be the antagonist to the Five's protagonists in this Series. (Ex. 2, DuVernay Dep. at 71, 74-76; DuVernay Decl. ¶ 47; Ex. 3, Locke Dep. at 62, 82; Locke Decl. ¶ 25; Ex. 31, Swicord Dep. at 73-74; Swicord Decl. ¶¶ 32-33.)

**PLAINTIFF'S RESPONSE**:

Denied.

The writers' statements about what they intended raises credibility issues that cannot be determined without a trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

Ms. DuVernay testified that Ms. Fairstein's character is not a composite character— "[s]he's not two characters in a made-up character. Composite is a character that isn't real. She's a real person." PX-51, DuVernay Dep. Tr. 76:6-11. Ms. DuVernay also testified that:

> You asked me if she was a composite character.... That is a fictional character that is not a real person who is a combination of multiple characters and ideas. Linda Fairstein, as a character, ***represents Linda Fairstein***, her involvement in the case and what she represented at large.... What she represents at large to me are the injustices that took place in the investigation and prosecution that she led.

*Id.* at 77:3-20 (emphasis added).

Similarly, Ms. Swicord testified that the writers of the Series chose Ms. Fairstein to play the role of antagonist in the Series. PX-34, Swicord Dep. Tr. 121:4-128:16, 186:16-187:25; PX-43, at DEFS21415, DEFS21421; PX-36, at DEFS005188, DEFS005216, DEFS005260.

Plaintiff further incorporates her response to Paragraph 75 by reference herein.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive. Defendants incorporate their Replies to SUF 56 and 79[3] as if fully set forth herein.

77.     The writers believed, based on their sources, that Plaintiff was a leader of and an integral part of the criminal justice system. (Ex. 2, DuVernay Dep. at 77-79, 87-88, 143-144;

DuVernay Decl. ¶¶ 48-53; Ex. 3, Locke Dep. at 55-56; Locke Decl. ¶¶ 25-28, 34-36; Ex. 31, Swicord Dep. at 121-122; Swicord Decl. ¶¶ 33-37, 39-40, 42-51.)

**PLAINTIFF'S RESPONSE**:

Denied.

The writers' statements about what they believed raise credibility issues that cannot be determined without a trial. Ms. DuVernay's reliance on "informal conversations" she had with the Five (DuVernay Decl. ¶ 49), also raises credibility issues that cannot be determined without a trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. Whether Plaintiff was a "leader of and an integral part of the criminal justice system" is not relevant to the manner in which Ms. Fairstein was portrayed in the five scenes at issue in this action, which concern the Central Park Jogger case. FRE 401, 402.

Plaintiff incorporates her response to Paragraph 75 by reference herein.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative. Plaintiff's Response does nothing more than offer her interpretation of the source materials which is not relevant or material to the writers' state of mind and the actual malice issue on Defendants' Motion; what matters is what the filmmakers believed. *See* Reply to SUF 56.

To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Regarding Paragraph 52 of Ms. DuVernay's Declaration:

    a. Paragraph 52(a): In response to Ms. DuVernay's direct questions about Ms. Fairstein, Mr. Santana said, in her "deposition," Ms. Fairstein testified that she had "no part in the investigation." Mr. Santana is talking about the Five's civil action against New York City and that Ms. Fairstein's "big defense" with Ken Burns was that she had nothing to do with the investigation. DX-38B. Mr. Santana also states that, at her deposition, Ms. Fairstein said "it wasn't me." Mr. Santana also references emails that Ms. Fairstein sent about the reinvestigation. Mr. Santana says that Ms. Fairstein was "making phone calls, telling officers what to do and where to go." *Id.* However, it is not clear whether this statement is based on his personal knowledge from 1989 or part of the allegations in the Five's civil action against New York City. Even assuming that these statements are accurate, they are so general that they still do not support the manner in which Ms. Fairstein was depicted in the five scenes at issue in this action. *See also* Plaintiff's Resp. to Paragraph 64, incorporated by reference herein.

In the interview transcript, Ms. DuVernay asks Mr. Santana if Ms. Fairstein is lying PX-61, at DEFS022662. *See* DX-38A. Mr. Santana also states that "You know, cause in the beginning, when you look at the case, I didn't meet her. I didn't know her." PX-61, at DEFS022662. He refers to what he heard in "depositions." *Id.* Mr. Santana further discusses Ms. Fairstein's statements about the Five's civil action against the City. *Id.* at DEFS022663 ("This case is going to trial"). Mr. Santana then states that Ms. Fairstein testified at her deposition that all she "did was answer phone calls and send out some emails." *Id.* It is not clear that the D.A.'s office had email in 1989 or that Ms. Fairstein would have had access to email at the 20th or 24th Precincts in the days after the attacks in Central Park. Ms. DuVernay could not recall whether she obtained, or reviewed, Ms. Fairstein's deposition transcript from the Five's civil action though she had the opportunity to do so. PX-62, at DEFS093406; PX-51, DuVernay Dep. Tr. 123:7-128:12. *See also* PX-34, Swicord Dep. 76:24-86:15.

**DEFENDANTS' REPLY** to [a]:  With respect to the interview of Mr. Santana, Plaintiff selectively omits that Ms. DuVernay testified that "Raymond Santana himself, after sitting through years of court proceedings and all the trials, including the civil case, obviously being very familiar with everything that happened in his own case, spoke to the fact that [Plaintiff] . . . played a leadership role, that she was deferred to, that her voice was powerful in this – in these cases."  (PX-51 at 121:12-19.)

b.   Paragraph 52(b) cites Ms. DuVernay's interview with Michael Warren. Mr. Warren has no personal knowledge about Ms. Fairstein's involvement in the Central Park Jogger case—he was not at any precinct to observe Ms. Fairstein in 1989 because he did not represent any of the Five until after the Reyes confession. PX-160. Mr. Warren was counsel to Messrs. Santana, Richardson and McCray in their civil action against New York City. DX-24, at p. 1. Ms. DuVernay testified that Mr. Warren is a biased source, and "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. 94:5-18. Ms. DuVernay also testified that Mr. Warren had no involvement in the Central Park Jogger case in 1989. *Id.* at 68:5-11. *See also* PX-34, Swicord Dep. 86:17-89:13.

**DEFENDANTS' REPLY** to [b]: Ms. Swicord stated in her Declaration that "Mr. Warren spent a decade litigating the civil case that settled successfully for $41 million.  Given this result, and that this was a story told from the Five's perspective, their lawyer was an important and trusted source for me and the other writers."  (Swicord Decl. at ¶ 35a; *see also* DuVernay Decl. ¶ 74.)

c.   Paragraph 52(c) cites Ms. DuVernay's unrecorded conversations with Mr. Salaam's mother, which raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY** to [c]:  Defendants deny that Ms. DuVernay's conversations with Ms. Salaam raise credibility issues.  Plaintiff has produced no evidence to contradict Ms. DuVernay's statements and failed to ask Ms. DuVernay about this at her deposition.

    d.    Paragraph 52(c) references an interview with Mr. Richardson's sister, Angela Black. Ms. Black did not say that Ms. Fairstein "took charge of the Central Park Jogger investigation." DX-40. According to the Sullivan book, Ms. Black (formerly known as Angela Cuffee) was twenty-four years old at the time that pre-trial hearings were held in the Central Park Jogger case. DX-17, Sullivan, at 232. In the interview cited at Paragraph 52(c), Ms. Black states that Mr. Richardson was questioned by detectives at the Central Park Precinct, where they obtained his written statements. When she arrived at the Central Park Precinct she was greeted by police officers. Ms. Fairstein is not mentioned as being at the Central Park Precinct. PX-202, DEFS145479, at 5:24-31:51. Ms. Black saw Ms. Fairstein on the night of April 20 at the 20th Precinct. DX-40 (on the night before Mr. Richardson went to the crime scene). *See* PX-192, at DEFS91785, 91787-91788, DEFS91801, DEFS91806; DX-17, Sullivan, at p. 22.

**DEFENDANTS' REPLY** to [d]: Plaintiff misrepresents Paragraph 52 of Ms. DuVernay's Declaration with respect to Ms. Black's interview.  Paragraph 52(c) of Ms. DuVernay's Declaration states that "Ms. Fairstein also made a distinct impression on Kevin Richardson's sister as an intimidating presence when she was waiting at the precinct for her brother."  (DuVernay Decl. at ¶ 52.)  Plaintiff does not dispute this characterization. The reference to seeing Ms. Fairstein "as a powerful authority figure at the precincts who took charge of the Central Park Jogger investigation" is Ms. DuVernay's belief based on the totality of her sources, including but not limited to Ms. Black's experience.  (*Id.*)

    e.    Paragraph 52(d) references Ms. Fairstein's 2002 interview with Jeffrey Toobin which clearly states that Ms. Fairstein was at the Twentieth Precinct "to help Elizabeth and the cops get the resources they needed."

**DEFENDANTS' REPLY** to [e]:  Plaintiff inappropriately fails to admit that she also told Mr. Toobin that she was the "eight-hundred-pound gorilla".

    f.    Paragraph 52(e) cites a 2016 article concerning Robert Morgenthau's career. The article does not state that, while at the precincts in 1989, Ms. Fairstein took charge of the Central Park Jogger investigation. DX-50. Mr. Morgenthau references his loss of confidence in Ms. Fairstein but does not specify why that occurred. *Id.* In the next paragraph, Mr. Morgenthau is described by a critic, who does not accept his "mea culpa," as the "dean" of "mass incarceration" who "could have used his moral authority to change that trajectory, and he was silent. He was an active contributor to mass incarceration." *Id.* The article was written after Mr. Morgenthau and Ms. Fairstein had a falling out. DX-11; PX-2, Fairstein Dep. Tr. 181:7-183:9. It is, further, unsurprising that Mr. Morgenthau would look for a scapegoat in Ms.

Fairstein given that, per the article, he had "little interest" in revisiting his mistakes. DX-50. Michael Warren told Ms. DuVernay that Mr. Morgenthau refused to say the Five were innocent even though he was asked to do so. DX-39A, at DEFS007034-35.

**DEFENDANTS' REPLY** to [f]: The phrase "took charge" is Ms. DuVernay's view and is not intending to quote Mr. Morgenthau.  (DuVernay Decl. at ¶ 52.)  That Ms. Fairstein claims to have had a falling out with Mr. Morgenthau is not stated in the cited article, nor relevant or material to Defendants' Motion.

Plaintiff incorporates her responses to Paragraphs 80, 86 and 152-153 by reference herein.

78.    While the system and Fairstein character were clear antagonists in the story, the writers sought to make Fairstein a complex character and not a one-dimensional, totemic villain. They believed Fairstein's motivations were complex and that her desire to protect victims like the jogger and intense pressure from the public and press were in part what blinded her to the red flags in the investigation. (Ex. 2, DuVernay Dep. at 98; DuVernay Decl. ¶ 51; Ex. 31, Swicord Dep. at 132-133, 186-187; Swicord Decl. ¶¶ 61-62; Ex. 3, Locke Dep. at 95-96.)

**PLAINTIFF'S RESPONSE**:

Denied.

The statement above contradicts the statement at Paragraph 76 that the "writers intended that the criminal justice system would be the antagonist" in the Series.

The writers' statements about what they believed raise credibility issues that cannot be determined without a trial. *Palin*, 482 F. Supp. at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d 240, 256.

Ms. Swicord testified that, in January 2018, there was a discussion in the writers' room about how Ms. Fairstein was portrayed in Episode 1. Ms. Swicord raised the issue of not having Ms. Fairstein be a "totemic villain" and, according to Swicord, we "reached, I suppose, a kind of compromise." PX-43; PX-34, Swicord Dep. Tr., at 183:19-187:25.

Ms. DuVernay testified about the January 2018 writers' room meeting as follows:

> The idea that we would show Linda Fairstein crying twice over this case is out of bounds from what I know to be true and believe to be true through my extensive research of her, her demeanor, her method of operation, her reputation, everything that she said about herself.... So that did not feel like

an accurate representation or characterization of her. ***And it was not something I was going to allow***.

PX-55; PX-51, DuVernay Dep. Tr. 81:14-84:24 (emphasis added); PX-35, at DEFS007814 ("take tears out for Linda"); PX-34, Swicord Dep. Tr. 69:12-76:20; Ms. DuVernay added:

> [T]he reputation of her being sympathetic to sex crimes victims is not what I think of when I think of Linda Fairstein and did not figure into the story I was telling. This story was about the boys, not about the lead investigator and prosecutor's past history.

PX-51, DuVernay Dep. Tr. 85:5-86:7. Ms. DuVernay testified that Ms. Fairstein's character is not a composite character—"[s]he's not two characters in a made-up character. Composite is a character that isn't real. She's a real person." *Id.* at 76:6-11. Ms. DuVernay also testified that:

> You asked me if she was a composite character.... That is a fictional character that is not a real person who is a combination of multiple characters and ideas. Linda Fairstein, as a character, ***represents Linda Fairstein***, her involvement in the case and what she represented at large.... What she represents at large to me are the injustices that took place in the investigation and prosecution that she led.

*Id.* at 77:3-20 (emphasis added).

Ms. Locke's deposition testimony, at pages 95-96, concerns the writers' discussion about portraying Ms. Lederer as a "more sympathetic villain" than Ms. Fairstein.

Plaintiff incorporates her response to Paragraph 75 by reference herein.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Replies to SUF 56 and 79[3] as if fully set forth herein.

79.    It is common practice in drama, including films based on a true story, to foreground one character to speak for a group or tell one side's perspective. (DuVernay Decl. ¶ 48 Swicord Decl. ¶ 33; Welsh Decl. ¶¶ 18-19.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial a.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] Plaintiff incorporates her response to Paragraph 43 by reference herein with respect to the inadmissibility of the Welsh Declaration. Whether or not foregrounding is a common practice in the film industry, in general, is not relevant to the claims or defenses in this action. FRE 401, 402. Nor have Ms. DuVernay or Ms. Swicord cited any source material for their assertion that "foregrounding" in dramatizations concerns speaking for a group.

**DEFENDANTS' REPLY** to [1]:  Defendants deny that Plaintiff's objections have any merit, and incorporate their Reply to SUF 43.  Defendants further object to Plaintiff's response as improper as Plaintiff cites to no evidence to rebut or deny this SUF or Ms. DuVernay's and Ms. Swicord's statements.

[2] The Series critically portrays real people using their real names, including individuals from each part of "the system," such as police officers, detectives and prosecutors (Reynolds, Sheehan, Fairstein, Lederer, Clements, Ryan). Ex. 30, Series, Ep. 1, 2 and 4.

**DEFENDANTS' REPLY** to [2]: Defendants admit that the Series portrays real people using their real names including individuals from the "system".

[3] Ms. DuVernay testified that Ms. Fairstein's character is not a composite character— "[s]he's not two characters in a made-up character. Composite is a character that isn't real. She's a real person." PX-51, DuVernay Dep. Tr. 76:6-11. Ms. DuVernay also testified that:

> You asked me if she was a composite character.... That is a fictional character that is not a real person who is a combination of multiple characters and ideas. Linda Fairstein, as a character, ***represents Linda Fairstein***, her involvement in the case and what she represented at large.... What she represents at large to me are the injustices that took place in the investigation and prosecution that she led.

*Id.* at Tr. 77:3-20 (emphasis added).

**DEFENDANTS' REPLY** to [3]: Defendants admit that the Fairstein character is not a composite character as Ms. DuVernay testified.  Defendants deny Plaintiff's assertion that the Fairstein character was not also representative of the system, of which she was a part and the Head of the Sex Crimes Unit.  Ms. DuVernay testified, as Plaintiff quotes, [speaking about the Fairstein character] that "What she represents at large to me are the injustices that took place in the investigation and prosecution that she led."  (PX-51 at 77:16-20.) (*See also* SUF 53, 76 and 78.)

[4] Communications about the Series also demonstrate that Ms. Fairstein's character was not merely representative of a system. *See* Swicord Decl. ¶ 33. For example, notes from a call between Ms. DuVernay and Netflix reference "how it is that Fairstein is able to get everyone on board to align the evidence (or lack thereof) with her idea of the truth" and "[m]ake sure to hit the connection between Fairstein and her agenda." PX-57. Ms. Swicord sent Ms. Locke a memo detailing Swicord's unsupported assumptions about the "problem Fairstein had" with the timeline and "coerced confessions." PX-41. Netflix employee Alison Engel took notes at a "CP5 Culture Summit" about the Series, at which Ms. DuVernay was present. Ms. Engel wrote the following in her notes. "Linda Fairstein – think of this as a reckoning for her prosecutorial misconduct." PX-150; PX-137, Engel Tr., 154:20-158:13. ████████████████████████████████████████████████

████████████████████████████████████████████████ 

███████████ PX-132.

**DEFENDANTS' REPLY** to [4]: With respect to PX-57, Plaintiff misleadingly omits that this document further states Ms. DuVernay's subjective, contemporaneous belief that "[t]he reality is that they [the police] all lined up behind Fairstein quickly[.]" (PX-57 at DEFS105017.) This further supports Ms. DuVernay's state of mind and lack of actual malice.

Ms. Swicord's memo, PX-41, is discussed more fully below in connection with SUF 120.

Defendants admit the substance of PX-150 and PX-132 but deny that they are material to Defendants' Motion. PX-150 are notes taken at a marketing workshop. There is no evidence that these notes are reflective of Ms. Engel's beliefs or instead something said by someone else at the workshop. (PX-137 at 155:8-11 (stating that the notes are a "documentation of what was discussed at the summit").) Ms. Engel testified that she can't tell from the document who that statement is attributed to (*id.* at 157:2-3) and she didn't "recall if that was specifically discussed." (*Id.* at 157:4-10.) PX-150 also does not reference any specific scene in the Series. PX-132 is a marketing document and is not evidence of the writers' views, nor does it mention any specific scene in the Series. In all events, the document does not contradict this SUF.

[5] ████████████████████████████████████████████████

████████████████████████████████████████████████ PX-47, at DEFS163025; PX-34, Swicord Dep. Tr. 29:15-36:13. Prior to the Series airing, Ms. DuVernay texted Ms. Locke about Ms. Fairstein "She 'bout to feel it all." PX-87; PX-81, Locke Dep. Tr. 59:5-63:18. Prior to the Series airing, Ms. DuVernay messaged ████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████████

PX-69; PX-51, DuVernay Dep. Tr. 152:15-153:18. Ms. Locke messaged Ms. DuVernay "When Nancy Ryan slapped her little books on the table in episode 4, I died." Ms. DuVernay replied to Ms. Locke "I told Famke: 'You are my voice here.' I know Linda heard every word." PX-63; PX-235.

**DEFENDANTS' REPLY** to [5]: Defendants deny Plaintiff's characterization of PX-47, but in all events, this email was written after Ms. Swicord conducted her research for the Series and further evidences Ms. Swicord's subjective belief in the truth of the Series and Fairstein's portrayal.

Defendants admit the substance of PX-87, but state that Plaintiff failed to include the entirety of the message chain.  In all events, these messages were exchanged *after* Ms. Locke and Ms. DuVernay had conducted extensive research for the Series.  Moreover, Plaintiff omits testimony regarding the context of this message; that this message was sent in connection with a tweet by a third-party regarding "Black Twitter" coming after Ms. Fairstein.  (*See* PX-81 at 60:17-18 (stating that this message "is disconnected from a larger chat"); *id*. at 61:6-9 ("Black Twitter is a place of ribbing and humor and calling people out and that Linda Fairstein was likely going to feel some of the ire of Black Twitter.").)

Defendants admit the substance of PX-69, PX-63 and PX-235, but deny that they are material to Defendants' Motion.  As set forth in Defendants' Replies to SUFs 187 and 197, these messages are consistent with Defendants' Statements of Fact.

[6] A casting description for the role of Ms. Fairstein—crafted by Berry Welsh and reviewed by Ms. DuVernay—stated as follows:

> The character is LINDA FAIRSTEIN: lead prosecutor, 42, headed the Manhattan district attorney's sex crimes office during the Central Park jogger case. A fully, focused, no nonsense woman. Fairstein, with the assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following thirty straight hours of interrogation and intimidation, of both the youths and their supporting adults.

PX-147; PX-148; PX-149; PX-137, Engel Dep. Tr. 11:18-24, 15:7-16, 141:15-150:20. A revised casting description for Ms. Fairstein's role was sent to a representative for a well-known actress as follows:

> The character is LINDA FAIRSTEIN: lead prosecutor, 42, headed the Manhattan district attorney's sex crimes office during the Central Park jogger case. A fully, focused, no nonsense woman. Fairstein, with the assistance of the detectives at the 20th precinct, was the architect of the case against the five arrested teenagers of color, following thirty hours of

interrogation. She believed in fighting sexual assault with the full arsenal of her skill set, blurring the line between what was ethical and what was essential for the jogger.

PX-148.

**DEFENDANTS' REPLY** to [6]: Defendants admit the substance of PX-147, PX-148 and PX-149, but deny that they are material to Defendants' Motion. Defendants discuss PX-147 and PX-148 more fully below in reply to SUF 144 and SUF 148.

80.    The writers elected, based on their research, to have Ms. Fairstein represent the group of prosecutors and police, which she led, as they allied against the Five. Her character expresses the prosecution's theories and positions that she continues to advocate today. (Ex. 2, DuVernay Dep. at 74-78; DuVernay Decl. ¶ 48; Ex. 3, Locke Dep. at 62, 64; Locke Decl. ¶¶ 2528, 34-36, 39; Ex. 31, Swicord Dep. at 121-122; Swicord Decl. ¶¶ 33-37, 39-40, 42-51.)

**RESPONSE**:

Denied.

[1] To the extent that any source materials cited in the declarations referenced above are submitted for the truth of the matters asserted therein, as opposed to materials reviewed by the writers, they are inadmissible hearsay. FRE 801(c). To the extent that the declarations cited above purport to make any assertions about Ms. Fairstein's actual involvement in the Central Park Jogger case in 1989, those assertions are inadmissible hearsay. FRE 801(c). Plaintiff incorporates her responses to Paragraphs 75, 78-79 by reference herein. Ms. Fairstein's retrospective defense of the work performed by Ms. Lederer and the NYPD is not relevant to the film scenes at issue in this action. *See Fairstein*, 553 F. Supp. 3d at 71. FRE 401.

[2] The prosecutors and police involved in the Central Park Jogger case are individually represented in the Series using their real names. DX-30, Episodes 1, 2 and 4.

[3] Ms. Fairstein was not "the prosecution" and did not come up with the prosecution's theories or strategies for the trials against the Five. PX-2, Fairstein Dep. Tr. 55:2-7, 128:11-129:8; PX-1, Fairstein Decl. (6/29/20), ¶ 41; PX-10, Lederer Dep. Tr. 59:9-60:4, 165:5-14; Lederer Decl., Ex. C. Ms. Lederer—who led the prosecutorial investigation and prosecution of the Central Park Jogger case—did not have "theories and positions" about the case while at the 20th and 24th Precincts in the days following the attacks in Central Park. PX-10, Lederer Dep. Tr. 40:22-43:13, 43:25-46:20, 48:21-52:7, 69:16-72:2; PX-11; PX-12. The police were working separately from the prosecutors and had their own

commanders. PX-10, Lederer Dep. Tr. 77:11-78:9. *See* Pltf. SJ Opp. Br., Statement of Facts, Pt.III.A; PX-22, 24-32.

[4] Ms. Locke's declaration cites Ms. DuVernay's interviews with Mr. Santana and Mr. Warren as the basis for her conclusion that Ms. Fairstein was "large and in charge at the precincts." Locke Decl. ¶ 27. While she describes Mr. Warren as one of the "gentlemen closest to the case" she admits that Mr. Warren led the civil case which resulted in a $41 million settlement. Locke Decl. ¶ 27(b). Ms. Locke ignores that Mr. Warren has no personal knowledge of the events that occurred in 1989 because he was not involved in the case at that time. PX-160, Warren Part I, DEFS0022593. Ms. Locke further ignores that the City settled the Five's lawsuit prior to trial and that any statements made by Mr. Warren in the Burns documentary pre-dated that settlement. DX-36, DEFS07484-7486; Locke Decl. ¶ 28. Sarah Burns' book notes that Mr. Warren, among others, would "have to prove that the civil rights of the teenagers and their families were violated in order to prevail." DX-27, at DEFS168790. The aforementioned points also apply to Paragraph 35(a) of Ms. Swicord's Declaration which refers to Mr. Warren as a "trusted source."

[5] Mr. Santana told Ms. DuVernay in his interview "in the beginning, when you look at the case, I didn't know her, I didn't meet her" when discussing Ms. Fairstein. DX-95, at DEFS138741. Ms. Locke wrote a question mark next to that portion of her copy of the interview transcript. *Id.* Ms. Locke further acknowledges that Mr. Santana "explained to Ms. DuVernay that he learned about what went on behind the scenes of the prosecution through his civil case." Locke Decl. ¶ 27(a). In his interview, Mr. Santana recounted Ms. Fairstein's testimony in the Five's lawsuit—that she was not in charge of the investigation or prosecution of the Central Park Jogger case. Mr. Santana and Ms. DuVernay chalked that up to Ms. Fairstein "lying." DX-95, at DEFS138742, 138744; DX-38B. The aforementioned points apply to Paragraph 35(b) of Ms. Swicord's declaration which discusses Mr. Santana's interview with Ms. DuVernay. *See* Fairstein Decl. (11/29/22), Exs. A-C.

[6] Paragraph 28 of Locke's declaration and Paragraphs 37 and 49 of the Swicord Declaration cite the Burns documentary as placing Ms. Fairstein at the crime scene on the morning of April 20, 1989. At 1:58-2:53, the documentary shows NYPD "Assistant Chief of Detectives" Aaron Rosenthal discussing the crime scene where Trisha Meili was found. At 2:54-3:15, footage is clearly spliced in which shows Ms. Fairstein, Ms. Lederer and Mr. Clements at the crime scene. At 22:08-22:43, Jim Dwyer, a New York Times reporter, is discussing police activity after the banner "Thursday morning." *See* DX-19, at 21:33. That segment then transitions into a new segment with Michael Warren—who was at the time prosecuting the Five's lawsuit against the City—declaring that Ms. Lederer and Ms. Fairstein were investigators. Following Mr. Warren's commentary Ms. Fairstein is again shown at the crime scene with Mr. Clements and Ms. Lederer, with no day or time. DX-19, Burns Doc. At 22:44-22:56.

[7] Sarah Burns' book, which pre-dates the documentary, first places Ms. Fairstein at the crime scene on the morning of ***April 21, 1989***. DX-27, at DEFS168696, DEFS 168698, DEFS168705-706. Swicord Decl. ¶ 39. Sullivan's book, *Unequal Verdicts*, states that Ms. Lederer, Mr. Clements and Ms. Fairstein together visited the crime scene on ***April 21, 1989***

at 8:30 a.m. DX-17, at DEFS168829-830. Ms. Locke selectively cites this portion of Mr. Sullivan's book in her declaration. Locke Decl., at page 14. *See also* PX-31, at DEFS020179-89, 21100, 21104, 21125-27; Lederer Decl., Ex. C, at 699-702, 809-810, 931-933.

[8] The writers' Master Timeline concerning the Central Park Jogger case, which Ms. Locke received and Ms. Swicord initially drafted, places Ms. Fairstein at the Central Park crime scene on the morning of April 21, 1989. PX-192, at DEFS91785, 91787-91788, DEFS91801, DEFS91806. PX-92; PX-81, Locke Dep. Tr. 84:9-87:21. Locke posted a photo of her "Timelines" binder on Twitter, declaring that the writers "took the truth as our bible" when writing the Series. *Id. See* Swicord Decl. ¶ 39.

[9] Ms. Swicord points to a scene in the Ken Burns documentary featuring "Ms. Fairstein at a press conference seated at a table with Mr. Morgenthau" as supportive of her assumptions about Ms. Fairstein's role in the "investigation." Swicord Decl. ¶ 37(c). However, at that press conference, ***Ms. Lederer*** is seated immediately next to Mr. Morgenthau, who is in charge of the press conference. Ms. Fairstein is one of nine people in attendance and does not speak. DX-19, 52:47-53:09. The press conference concerns the announcement of charges in the Central Park Jogger case, which clearly occurred after Ms. Lederer conducted the video interviews at the 20th and 24th Precincts. PX181-PX-185.

[10] Ms. Swicord's reference to Detective Sheehan's knowledge about Matias Reyes (Swicord Decl. ¶ 37(d)) is a statement made by Michael Warren, who, at the time of the Burns documentary, was in the midst of pursuing the Five's lawsuit against Detective Sheehan, Ms. Lederer, Ms. Fairstein and a number of other defendants. DX-27, at DEFS168790. The Ryan Affirmation, which Ms. Swicord reviewed as part of her research, (Swicord Decl.¶ 20), states that, at the time of the Five's trials, "[c]ertainly, no one would have thought that as the defendants and their group were making their way through Central Park, a serial rapist was also at large." DX-21, ¶ 103. *See* Fairstein Decl. (11/29/22), Ex. A, at 120-126, 131-135, 144-153, 155.

[11] In 2016 and 2017, Ms. Fairstein's attorney notified the filmmakers and Netflix that the Burns documentary was not a reliable source of information. PX-151, at LF00038583-84; PX-137, Engel Dep. Tr. 158:17-159:16; PX-52, at DEFS61792-93; PX-51, DuVernay Dep. Tr. 43:21-48:9.

[12] Ms. Locke's citations to Mr. Sullivan's book, at Paragraph 34 of her declaration, leave out the book's numerous references to Ms. Lederer being in charge of the prosecutorial investigation and strategies in the Central Park Jogger case, beginning at the precincts. *See* Plaintiff's Resp. to Paragraph 75.

[13] In Ms. Fairstein's ***2002*** quote in the New Yorker, cited at Paragraph 35 of Ms. Locke's declaration and Paragraph 45 of Ms. Swicord's declaration, Ms. Fairstein plainly states that she went to the 20th Precinct "to ***help*** Elizabeth and the cops get the resources they needed." *Id.* (emphasis added).

[14] Paragraph 36 of Ms. Locke's declaration and Paragraph 50 of Ms. Swicord's declaration discuss a memo that Ms. Swicord wrote, (DX-75), and discussions between Swicord and Locke as a basis for their beliefs that Ms. Fairstein was "at the precincts" and "involved in the investigations" during the day on April 20. However, at her deposition, Ms. Locke testified that she did not rely on Ms. Swicord's memo in writing her episode and that after receiving the memo she "never spoke to her further about it or at all." PX-81, Locke Dep. Tr. 121:19-125:7; PX-99. At her deposition, Ms. Swicord testified that she did not have the writers' assistants track Ms. Fairstein's whereabouts, her memo to Ms. Locke was based on her belief about Ms. Fairstein's whereabouts on April 20 and she could not answer specific questions about Ms. Fairstein's whereabouts on that day. Swicord Dep. Tr. 166:25183:18; PX-41; PX-37; PX-38. Ms. Swicord's memo states "without having copies of the defendants' initial signed statements from their interrogations, I have been having to ***intuit*** how the information gets warped and are forced into the kids' confessions." PX-99; PX-41. Ms. Swicord also told Ms. DuVernay that she would have to "retro engineer" what happened in the Five's interrogations using the videotaped statements. PX-38; PX-34, Swicord Dep. Tr. 177:5-177:9. The testimony from the Central Park Jogger case—which Swicord avoided—would have alerted Ms. Swicord to the falsity of her theories about Ms. Fairstein. *See* Pltf. SJ Opp. Br., Statement of Facts, Pt. III. A.; PX-22, 24-32.

[15] The writers' Master Timeline, (PX-192), notes Ms. Fairstein's involvement in the case. She is referenced as speaking with Yusef Salaam's mother and David Nocenti on the night of April 20, 1989/early morning of April 21, 1989 (DEFS091785, DEFS91801-91802) and at the crime scene on the morning of April 21, 1989 (DEFS91785, 91787-91788, DEFS91801, DEFS91806).

[16] Ms. Swicord's memo states that Ms. Fairstein was "working with a narrative sequenced from facts provided by the cops" and that she later "had a timeline problem." PX-99; PX-41.

[17] *Unequal Verdicts*, which both Ms. Locke and Ms. Swicord claim to have relied on, describes Ms. Lederer as being aware of the narrative and having issues with the timeline. DX-17, at DEFS168821 (p. 23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168827 (p. 35) ("In the written statement detectives had shown to Lederer, Santana had described Lopez playing a particularly brutal role. She wanted to get that on tape, too."), DEFS168829 (p. 39) ("Several highly incriminating statements were on tape, but Lederer was distracted by disappointments... if the kids were telling the truth...they each had succeeded in minimizing his own role."), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would

also present the greatest challenge to Lederer's considerable skills"). *See* Swicord Decl. ¶¶ 42-43.

[18] Sarah Burns' book noted the same. DX-27, Burns, at DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"). Neither book describes Ms. Fairstein as directing interrogations, creating a timeline or aware of timeline issues while she was at the precincts. *See generally*, DX-17, Sullivan; DX-27, Burns.

[19] Paragraph 39 of Ms. Locke's declaration concerns statements made by Ms. Fairstein in 2002, and her retrospective defense of work done in the Central Park Jogger case. FRE 401, 402; *See Fairstein*, 553 F. Supp. 3d at 71. Ms. Fairstein's retrospective statements lend no support for the five scenes at issue in this action.

[20] Paragraph 46 of Ms. Swicord's declaration references a statement by Kevin Richardson's sister Angela Black. Omitted from Ms. Swicord's discussion of Ms. Fairstein's alleged interaction with Ms. Black is that—according to various notes made by the writers' of the Series—at some point Ms. Fairstein made an announcement that the Five's family members should get lawyers. Notes produced by Ms. Swicord state "Fairstein told parents-you need to go home and get lawyers for your kids." PX-164; PX-110, at DEFS036219, ██████████████████████████████████████ ██████ PX-81, Locke Dep. Tr. 209:13-211:10.

[21] None of the sources discussed above describe Ms. Fairstein engaging in the conduct which is attributed to her in the five scenes at issue in this Series. DX-30. Ms. Fairstein's interaction with Mrs. Salaam, also depicted in the Series, is not part of Ms. Fairstein's defamation claims. *See* Swicord Decl. at pp. 13, 15-16; PX-2, Fairstein Dep. Tr. 383:18-387:4; DX-30, Ep. 1, at 43:10-45:58.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's 21-Paragraph Response as non-responsive and argumentative.  Nothing in Plaintiff's response contradicts the statements in the SUF that the writers elected to have "Ms. Fairstein represent the group of prosecutors and police" and that "[h]er character expresses the prosecution's theories and positions that she continues to advocate today."  Nor does Plaintiff deny that the writers' sources state or show what is set forth in the Defendants' Declarations.  Plaintiff's assorted statements that she thinks the sources are "biased," or that the source material talks about Ms. Lederer as well, or that she was only "seated" next to Ms. Lederer who was next to D.A. Morgenthau at the press conference announcing the charges against the Five, are argumentative and/or irrelevant as a matter of law to the writers' state of mind and the issue of actual malice on this Motion.  What matters is what the filmmakers believed.

Defendants deny that the writers' sources do not support the five scenes at issue and direct the Court to the scene-specific statements, below.

With respect to Plaintiff's Paragraph [14], Defendants object to Plaintiff's mischaracterization of Ms. Swicord's testimony. Ms. Swicord testified that she "believe[d] that [Ms. Fairstein] was integrally involved in the investigation and that she was at the precinct. She is quoted in the [Toobin] article as describing the rooms that the boys were being held in, the youth rooms, and she says that anyone who had witnessed these interviews would have been convinced. So I am taking her at her word that she was there and could witness what was going on at the 20th Precinct." (DX-31 at 180:12-21.) Ms. Swicord's memo is discussed in connection with SUF 120.

81.     To the writers, Plaintiff's position as the Head of the Sex Crimes Unit, reporting directly to D.A. Morgenthau, meant she was a powerful public official who was ultimately in charge of the case and could have changed its course. (Ex. 2, DuVernay Dep. at 77-78; DuVernay Decl. ¶ 49; Ex. 3, Locke Dep. at 55-56; Locke Decl. ¶¶ 57, 61; Ex. 31, Swicord Dep. at 121-122; Swicord Decl. ¶ 34; Ex. 27, S. Burns at 36; Ex. 17, Sullivan at 20.)

**PLAINTIFF'S RESPONSE**:

Denied.

To the extent that any source materials cited in the declarations referred to above are submitted for the truth of the matters asserted therein, as opposed to materials reviewed by the writers, they are inadmissible hearsay. FRE 801(c). To the extent that the declarations cited above purport to make any assertions about Ms. Fairstein's actual involvement in the Central Park Jogger case in 1989, those assertions are inadmissible hearsay. FRE 801(c). The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

The writers did not consult with any outside experts about the structure of the Manhattan District Attorneys' office in 1989. PX-81, Locke Dep. Tr. 57:2-58:18; PX-51, DuVernay Dep. Tr. 69:10-24, 88:23-89:19; PX-34, Swicord Tr. 127:6-128:16, 165:6-166:11. Ms. Lederer testified that Ms. Fairstein did not have the authority to recommend that the charges against the Five be dismissed. PX-10, Lederer Dep. Tr. 67:4-68:69:11.

A 2016 article that the writers relied upon states that District Attorney Robert Morgenthau could have changed the trajectory of the case. DX-50. The article quotes Ronald L. Kuby, involved "in the appeal of one of the Central Park Five" as follows: "Robert Morgenthau's tenure almost precisely tracked the era of mass incarceration.... He was the dean and could have used his moral authority to change the trajectory, and he was silent. He was an active contributor to mass incarceration." DX-50, at p. 3.

Neither the Sarah Burns reference or the Sullivan reference cited above describe Ms.

Fairstein as having the power to change the course of the Central Park Jogger case.

Ms. Swicord's own sources, including the Burns and Sullivan books, contradict her assertion that Ms. Fairstein had "supervision and control over the investigation and prosecution of the Central Park Jogger case from the morning of April 20, 1989 through the convictions of the Five in 1990." *See* Plaintiff's Response to Paragraphs 75 and 80, which are incorporated by reference herein. *See* Pltf. SJ Opp. Br., Statement of Facts, Pt. III. A; PX-22, 24-32.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative. Defendants incorporate their Replies to SUF 1 and SUF 56 as if fully set forth herein.

82.    In addition to describing Plaintiff's powerful, supervisory position, the writers' sources reported on her reputation, actions and words. (Ex. 2, DuVernay Dep. at 88-91; DuVernay Decl. ¶ 50; Locke Decl. ¶¶ 25-28, 34-36, 39, 61; Ex. 31, Swicord Dep. at 123-127; Swicord Decl. ¶¶ 35-37, 39-40, 42-51.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraphs 75 and 80 by reference herein.

83.    According to the writers' sources, Plaintiff's reputation was that of an aggressive, tough-talking, headline-seeking, hands-on investigator who enjoyed that aspect of the job as much as the courtroom:

**PLAINTIFF'S RESPONSE**:

Denied. The sources do not describe Ms. Fairstein as "headline seeking."

a. The Sullivan book describes "Linda Fairstein" as "an ambitious career prosecutor who enjoyed an investigation as much as a trial . . . chief of the twelve-lawyer Sex Crimes Prosecution Unit . . . Her last trial, the notorious Preppy Murder Case of 1988, had raised her to the level of celebrity." (Ex. 17, at 20.)

83

**PLAINTIFF'S RESPONSE**:

Admitted that the book is accurately quoted above but omits that "Fairstein, forty-one, didn't try many cases herself anymore" and "Her last trial, the notorious Preppy Murder Case of 1988 had raised her to a level of celebrity ***beyond the considerable status she had achieved*** in criminal justice and feminist circles for championing the aggressive prosecution of hitherto hushed up crimes." DX-17, at 20 (emphasis added). At page 21, Sullivan notes that "in addition to a good trial lawyer who could handle the media, Fairstein needed an experienced investigator whom victims and their kin would instinctively trust. She called Lederer."

To the extent it is submitted for the truth of the matter asserted it is inadmissible hearsay. FRE 801(c).

b. The Burns book notes that "Linda Fairstein, the chief of the Sex Crimes Prosecution Unit of the district attorney's office . . . was already famous, having prosecuted Robert Chambers, the so-called Preppie Murderer," and that she "was part of District Attorney Robert Morgenthau's inner circle, but had a history of contentious relationships with the other high-ranking women within his office," including Nancy Ryan, "another of Morgenthau's protégées." (Ex. 27, at 36.)

**PLAINTIFF'S RESPONSE**:

Admitted that the portions quoted above are accurate, but Defendants omitted that Ms. Fairstein "rarely tried cases anymore." DX-27, at 36. The same page adds, "Fairstein called on Assistant District Attorney Lederer, whom she trusted to handle the media frenzy calmly while working the case." At page 37, Burns states "Lederer was known as a competent but unforgiving prosecutor who was always thoroughly prepared and rarely lost a case. This new challenge, however, ***would define her career***." DX-27, at 37 (emphasis added).

To the extent it is submitted for the truth of the matter asserted it is inadmissible hearsay. FRE 801(c).

c. A *New York Times Magazine* profile of Ms. Fairstein that ran in 1990 relates that "Fairstein is never far from the attention of the tabloids, and they serve her well" and describes her "flash and bravado" and "tough talk ('Anything between the knees and the waist goes to me')." (Ex. 49, Katherine Bouton, "Linda Fairstein vs. Rape," *The New York Times* (Feb. 25, 1990) ("Bouton") at DEFS007241.) The article states "[c]olleagues and opponents alike praise her skills and ingenuity as an investigator." (*Id.* at DEFS007240-41.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that the article describes Ms. Fairstein as taking "the other side of the stand, appearing as a witness in pretrial hearings on the Central Park jogger

case." DX-49, at DEFS007241. The article also describes Ms. Fairstein as overseeing 500-700 cases per year as head of the Sex Crimes Unit. DEFS007234. She is also described by a former legal director of the ACLU as "'so strongly moral, she so strongly wants the system to treat people equally.... If there were more people like her it would be an infinitely juster system." DEFS007236.

To the extent it is submitted for the truth of the matter asserted it is inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY:**  As Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's objection is thus meritless.

84.     Consistent with that reputation, the writers relied on sources—including Plaintiff herself—describing Plaintiff as being a powerful authority figure at the precincts who took charge in the Jogger investigation:

a.  Raymond Santana recounted in a recorded interview that Fairstein "was the person behind making the phone calls, telling the officers what to get, what to do and where to go . . . She was also the person leaking information to the press." (Ex. 38B, audio excerpt of Santana interview.) He further explained that "because she's a lead investigator" in the Jogger case, "she stepped out of that immunity" from being sued, which that prosecutors normally enjoy. "That's why she's named in [the Five's civil] lawsuit, her and Lederer." (*Id*.)

**PLAINTIFF'S RESPONSE**:

Denied.

The audio file submitted by Defendants is not a clear recording so Plaintiff cannot confirm that Mr. Santana's statements are accurately quoted above. To the extent the statements above are submitted for the truth of the matter asserted they are inadmissible hearsay. FRE 801(c). Plaintiff incorporates her response to Paragraph 77 by reference herein.

**DEFENDANTS' REPLY to a:**  As Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's objection is thus meritless.

b.  Michael Warren, based on his familiarity with the evidence in the Five's civil case, told Ms. DuVernay in a recorded interview: "But Fairstein has been a vicious. She's always been a vicious, overboard, opportunistic individual who would do anything to satisfy her appetite for vindictiveness as a sex crime prosecutor. And number two, to enhance, in an opportunistic sense, her objectives, beyond the case. . . And Fairstein controlled those detectives. She controlled them in the precinct, and her only objective was to

close that case against the young boys. That was her justice." (Ex. 39A, Michael Warren Pt. 2 at DEFS007037-38 (reflecting Ms. Swicord's contemporaneous underlining and starring of this passage); Ex. 39B, audio excerpt of same.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the transcript cited above is accurately quoted. Plaintiff incorporates her response to Paragraph 77 by reference herein. To the extent the statements above are submitted for the truth of the matter asserted it is inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY to b:** As Plaintiff concedes, the writers' sources are admissible as non-hearsay. Pl. Resp. to SUF n. 1. Plaintiff's objection is thus meritless.

c. Ms. Fairstein told Jeffrey Toobin in her 2002 *New Yorker* exclusive interview that on the day after the assaults, she went to the Twentieth Precinct "to be the eight-hundred-pound gorilla to help Elizabeth and the cops get the resources they needed." (Ex. 25.)

**PLAINTIFF'S RESPONSE**:

Admitted.

**DEFENDANTS' REPLY to c: None.**

d. Ms. Salaam, in Ms. DuVernay's conversations with her, said that she very much experienced Ms. Fairstein as "controlling" and in charge of the police and activity at the precincts. (DuVernay Decl. ¶ 52.) Kevin Richardson's sister, Angie, also saw Ms. Fairstein as an intimidating presence when she was waiting at the Precinct for her brother as described in a video interview. (Ex. 40.)

**PLAINTIFF'S RESPONSE**:

Denied.

There is no documentary evidence that verifies Ms. DuVernay's assertion about Ms. Salaam and, accordingly, Paragraph 52 of Ms. DuVernay's declaration raises credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. Ms. Black's interview for the Burns documentary references Ms. Lederer, Ms. Fairstein and police officers. She does not describe Ms. Fairstein as intimidating. She references Ms. Fairstein's comment in the context of her dawning awareness that Mr. Richardson was being questioned about Ms. Meili's rape. More than once, Ms. Black mentions that she, and other family members were told to get lawyers. DuVernay Decl. ¶ 52(b) and DX-40. To the extent this interview is submitted for the truth of the matters asserted therein it is inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY** to d: Plaintiff has no evidence to rebut Ms. DuVernay's conversations with Mrs. Salaam.   Plaintiff's counsel deposed Ms. DuVernay in this action for an entire day and did not ask Ms. DuVernay to recount her conversations with Mrs. Salaam, or any of the other sources for that matter including the Five. Nor did Plaintiff depose any sources.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

e. The *New York Times* reported that D.A. Morgenthau had this to say about the Central Park Jogger Case: "Mr. Morgenthau would say only that his office had erred but corrected the mistake when the new evidence emerged. 'Did I feel badly?' he said. 'Yeah, I felt badly. We had screwed up. But there were confessions.' 'I had complete confidence in Linda Fairstein,' he continued, referring to the prosecutor who supervised the case. 'Turned out to be misplaced. But we rectified it.'" (Ex. 50, John Leland, "Robert Morgenthau on His Years as District Attorney: 'I Don't Look Back,'" *N.Y. Times* (Nov. 23, 2016) ("Leland") (highlights added for witness a deposition).)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the above article, published 27 years after the Central Park Jogger case, is accurately quoted. DX-50. However, the same article quotes Ronald L. Kuby, involved "in the appeal of one of the Central Park Five" as follows "Robert Morgenthau's tenure almost precisely tracked the era of mass incarceration.... He was the dean and could have used his moral authority to change the trajectory, and he was silent. He was an active contributor to mass incarceration." DX-50, at p. 3. Ms. Fairstein communicated by email with the reporter who wrote the above-cited article before it was published and informed him that she briefed Morgenthau on the Central Park Jogger case daily and that Morgenthau's comment about her was the "mean-spirited pettiness of his hindsight." PX-6; PX-2, Fairstein Dep. Tr. 178:21-179:21. She further told the reporter that she was "NOT the prosecutor on the case" and "did not take the statements." PX-6, at LF00035720. To the extent that the article is submitted for the truth of the matters asserted therein it is inadmissible hearsay. FRE 801(c). Mr. Morgenthau declined to speak with the filmmakers when they were developing the Series. DuVernay Decl. ¶ 20.

**DEFENDANTS' REPLY** to e: Plaintiff's citation of the criticism of Mr. Morgenthau in DX-50 is not relevant or material to Defendants' Motion.  Plaintiff's communications with the reporter in PX-6 are not relevant as the writers did not have that communication, though Plaintiff's admission in PX-6 that she "briefed [D.A. Morgenthau] on the facts and circumstances of the investigation and case every day", is consistent with the writers' belief that she was heavily involved in the investigation and prosecution of the Central Park Jogger Case.

85.     Further, the Five told Ms. DuVernay that they viewed Plaintiff as a central figure in the prosecution, who, in their minds, terrorized them. (Ex. 2, DuVernay Dep. at 182; DuVernay Decl. ¶ 49.)

**PLAINTIFF'S RESPONSE**:

Denied.

There is no documentary evidence that verifies Ms. DuVernay's assertions about the Five, and, accordingly, Paragraph 52 of Ms. DuVernay's declaration raises credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. In Mr. Richardson's interview for the Burns documentary, he expressed the following about **Elizabeth Lederer** "Honestly, I look at her as a conniving individual. And that's evil. That's an evil individual." PX-201, DEFS145477, at 1:38-15-1:39:30. According to notes of



PX-36, at DEFS005461. *Id.* Per the notes, *Id.* at DEFS005458. Mr. Richardson testified at his deposition in the Five's lawsuit against the City that he did not recall seeing Ms. Fairstein at any precinct. PX-33, Richardson Dep. Tr., at NYCLD_054900. Mr. Santana told Ms. DuVernay that "in the beginning" "when you look at the case, I didn't meet her. I didn't know her." DX-38A, at DEFS006977. *See* Plaintiff's Response to Paragraph 205, *infra*.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as argumentative and non-responsive. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

86.     The research showed Ms. Fairstein was the highest ranking prosecutor at the precincts at a critical time in the investigation, who then oversaw and participated in the case through trial and verdict in the following ways:

a.   The Burns book stated that Ms. Fairstein "immediately sprang to action" after getting a call early morning on Thursday April 20. (Ex. 27, S. Burns at 36; *see also* Ex. 17, Sullivan at 20.)

**PLAINTIFF'S RESPONSE**:

Denied.

To the extent this book is submitted for the truth of the matters asserted therein, it is inadmissible hearsay. FRE 801(c).

The Burns book does not state that Ms. Fairstein received a call on Thursday morning. The phrase "sprang to action" is qualified by Ms. Burns subsequent description of Ms. Fairstein assigning cases to "ADAs who reported to her" and goes on to discuss the assignment of Lederer to the Central Park Jogger case. There is no discussion of Ms. Fairstein "springing to action" by getting involved in any investigation. The Sullivan book also discusses Ms. Fairstein's assignment of the case to Ms. Lederer.

    b.   In the Burns documentary, Mr. Warren states that "[t]wo prosecutors, Linda Fairstein and Elizabeth Lederer, they were part of the investigation and they were operating not only as prosecutors, but investigators." This section opens with a caption labeled "Thursday Morning" (April 20), which is shown just before vivid footage of Ms. Fairstein walking the crime scene. (Ex. 19, Burns Doc. at 22:08 – 22:56.)

**PLAINTIFF'S RESPONSE**:

Denied.

At 22:08-22:43, Jim Dwyer, a New York Times reporter, is discussing police activity after the banner "Thursday morning." *See* DX-19, at 21:33. That segment then transitions into a new segment with Michael Warren—who was at the time prosecuting the Five's lawsuit against the City—declaring that Ms. Lederer and Ms. Fairstein were investigators. Following Mr. Warren's commentary Ms. Fairstein is again shown at the crime scene with Mr. Clements and Ms. Lederer, with no day or time. DX-19, Burns Film. at 22:44-22:56.

Sarah Burns' book, which pre-dates the documentary, first places Ms. Fairstein at the crime scene on the morning of ***April 21, 1989***. DX-27, at DEFS168696, DEFS 168698, DEFS168705-706. Sullivan's book, *Unequal Verdicts*, states that Ms. Lederer, Mr. Clements and Ms. Fairstein together visited the crime scene on ***April 21, 1989*** at 8:30 a.m. DX-17, at DEFS168829-830. Ms. Locke cites this portion of Mr. Sullivan's book selectively in her declaration. Locke Decl., at page 14.

The writers' Master Timeline concerning the Central Park Jogger case, which Ms. Locke received and Ms. Swicord initially drafted, places Ms. Fairstein at the Central Park crime scene on the morning of April 21, 1989. PX-192, at DEFS91785, 9178791788, DEFS91801, DEFS91806. PX-92; PX-81, Locke Dep. Tr. 84:9-87:21.

Ms. DuVernay testified that Mr. Warren is a biased source, and "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. 94:5-18. Ms. DuVernay also testified

that Mr. Warren had no involvement in the Central Park Jogger case in 1989. *Id.* at 68:5-11.

Plaintiff incorporates her response to Paragraph 75 by reference herein. *See also* PX-22, 24-32.

To the extent Mr. Warren's statements have been submitted for the truth the matters asserted therein they are inadmissible hearsay. FRE 801(c).

c.   Several sources recounted that Ms. Fairstein fought with Nancy Ryan for control of the case: "When Fairstein heard that Ryan had assigned the Central Park case as a homicide, she rushed to her colleague's office, ready for a turf war" and then handpicked Ms. Lederer to be the lead prosecutor. (Ex. 27, S. Burns at 36, 188-89, 201-202; Ex. 17, Sullivan at 21.)

**PLAINTIFF'S RESPONSE**:

Denied.

Neither book describes a fight occurring, as each reports Ms. Ryan immediately backing down after discussing the case with Ms. Fairstein. DX-27, at 36; DX-17, at 21. Per Sullivan, Ms. Fairstein had already selected Ms. Lederer to prosecute the case at the time of the discussion with Ms. Ryan. DX-17, at 21. Sullivan also said that Ms. Lederer was to be the investigator and prosecutor on the case. DX-17, at 21 ("in addition to a good trial lawyer who could handle the media, Fairstein needed an experienced investigator whom victims and their kin would instinctively trust. She called Lederer."). *See* PX-20.

Any purported rivalry between Ms. Fairstein and Ms. Ryan is not relevant to the claims or defenses in this action. FRE 401. *Fairstein*, 553 F. Supp. 3d at 68 (describing conflict as "bureaucratic infighting"). To the extent the above is submitted for the truth of the matters asserted therein, it is inadmissible hearsay. FRE 801(c).

d.   Ms. Fairstein stated that she spent over 32 hours in a row at the precincts and described, first hand, having "watched and listened to these kids," what she termed "one of the most brilliant police investigations I've ever seen": "'I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night but in the attack on the jogger." According to Ms. Fairstein, describing her collective action with the police: "We all did here what we did every day. We were there to find out who did it." (Ex. 25, Toobin.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Toobin article was written in November 2002 and notes that "the five men convicted in the case, who have all completed their sentences, recently sued to clear their names." DX-25, at 1. Accordingly, at this point Ms. Fairstein had been called upon to retrospectively defend the work that was done on the case. *See Fairstein*, 553 F. Supp. 3d at 71.

While the quotes above are accurate, Ms. Fairstein does not, as Defendants assert, describe her "collective action" with police. DX-25, at p. 3. She describes her observations after arriving at the Twentieth Precinct to help Lederer and police get resources. DX-25, at 2. Ms. Fairstein is not quoted as saying she directed or led the police investigation. *Id.*; PX-2 Fairstein Dep. Tr. 83:11-88:21, 233:14-242:2.

e.  Several sources stated that Ms. Fairstein prevented Yusef Salaam's mother and Big Brother from seeing him at the 20th Precinct when she knew he was being interrogated and incriminating himself. (Ex. 27, S. Burns at 46-47; Ex. 17, Sullivan at 25-27.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Burns book does not state that Ms. Fairstein knew Yusef Salaam "was being interrogated and incriminating himself." DX-27, at 46-47. Rather, Burns discusses Ms. Fairstein's belief that Mr. Salaam was sixteen until Ms. Salaam disclosed that he was fifteen, at which point the questioning of Mr. Salaam was halted. *Id.*

The Sullivan book makes clear that Mr. Nocenti had no legal right to see Mr. Salaam before his questioning and there was a question as to whether Ms. Salaam had a right to see her son. Sullivan states that Ms. Fairstein was aware of certain of Mr. Salaam's statements to detectives before speaking with Mr. Salaam's Big Brother, David Nocenti. DX-17, at 25-26. Sullivan then notes agreement between Ms. Fairstein's and Mr. Nocenti's testimony at Mr. Salaam's trial—Mr. Nocenti, a U.S. Attorney—could not provide legal representation for Mr. Salaam and was there as a friend. *Id.* at 26. Per Sullivan, Fairstein was within her rights to refuse" Nocenti's request to see Mr. Salaam. "If Salaam was sixteen he was an adult under the law." *Id.* "And if he was fifteen (a fact of which Fairstein says she was unaware at the time) the police were only required to give access to a parent or guardian." *Id.* Sullivan then notes disagreement between Ms. Fairstein, Mrs. Salaam and detectives about Yusef's age. *Id.* 27. Fairstein then told detectives "for the sake of protecting the case: they should accept Ms. Salaam's word that her son was fifteen and tell [Detective] McKenna to stop the interview." *Id.*

In the book, Sullivan also writes:

> [m]ost damaging to Salaam's defense was the testimony of Nocenti, the civil lawyer who was a federal prosecutor.... Under cross-examination by Lederer, Nocenti testified that at no time during the many hours at the

> police precinct, in none of his many discussions with Salaam's relatives about the boy's rights, did he tell anybody that Yusef was fifteen, nor was he ever asked his 'little brother's' age, nor did he ever hear anybody even discuss the question. This strongly contradicted the testimony of Salaam's other witnesses, who claimed the issue was discussed almost constantly with policeman and Fairstein.

DX-17, Sullivan p. 89.

To the extent Defendants submit the Sullivan and Burns books for the truth of the matters asserted therein they are inadmissible hearsay. FRE 801(c). The scene in the Series concerning Ms. Fairstein's discussion with Yusef Salaam's mother is not part of Ms. Fairstein's claims in this action and, accordingly, sources which purportedly recount this event are not relevant. FRE 401, 402.

f.  Mr. Sullivan's book recounted Ms. Fairstein's views of teenage Mr. Salaam: "As far as Fairstein was concerned, they had the killer, he was being interrogated by a skilled detective and he was incriminating himself. Salaam was the last kid she wanted to see represented by a lawyer at that point." (Ex. 17, Sullivan at 26.)

**PLAINTIFF'S RESPONSE**:

Denied.

Sullivan does not state that he is recounting Ms. Fairstein's views as opposed to his own, or others,' views. There are no quotes attributed to Ms. Fairstein. DX-17, at 26. While Sullivan uses the word "kid" in this paragraph, he clarifies in the paragraphs below that Ms. Fairstein believed that Mr. Salaam was legally an adult. *Id.* at 26-27.

To the extent that Defendants submit the statements above for the truth of the matters asserted therein they are inadmissible hearsay. FRE 801(c). The scene in the Series concerning Ms. Fairstein's discussion with Yusef Salaam's mother is not part of Ms. Fairstein's claims in this action and, accordingly, sources which purportedly recount this event are not relevant. FRE 401.

g.  Ms. Burns' book reported that Court of Appeals Judge Vito Titone decried Ms. Fairstein's conduct at the precincts: "'it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (Ex. 27, S. Burns at 181 (quoting dissent of Titone, J., in *People v. Salaam*); *see also* Ex. 42, Linda Fairstein Wikipedia, quoting Judge Titone from news article ("'I was concerned about a criminal justice system that would tolerate the conduct of the prosecutor, Linda Fairstein, who deliberately engineered the 15-year-old's confession. . . . Fairstein wanted to make a name. She didn't care. She wasn't a human'").)

**PLAINTIFF'S RESPONSE**:

Denied.

The Burns book states that "A panel of judges reviewed [Mr. Salaam's] case for the Court of Appeals of New York and upheld Yusef's conviction, but one judge disagreed." DX-21, at 181. Wikipedia is not news coverage and Ms. DuVernay testified that she did not rely on it. *See* PX-51, DuVernay Dep. Tr. 137:16-24. Nor have Defendants demonstrated that the piece containing Judge Titone's quote is a "news article."

To the extent Defendants submit the book and Wikipedia for the truth of the matters asserted therein they are inadmissible hearsay. FRE 801(c). The scene in the Series concerning Ms. Fairstein's discussion with Yusef Salaam's mother is not part of Ms. Fairstein's claims in this action and, accordingly, sources which purportedly recount this event are not relevant. FRE 401.

h.   Several sources reported that Ms. Fairstein took some of the Five to the crime scene without their parents, and got additional statements from Korey Wise that were used in his video "confession." (*See* Ex. 27, S. Burns at 51-52; Ex. 49, Bouton.)

**PLAINTIFF'S RESPONSE**:

Denied.

The "Bouton" article recounts Ms. Fairstein's suppression hearing testimony, noting that she "accompanied" others to the crime scene with Mr. Richardson and Mr. Wise. The article does not state whether parents were present, that the statements made at the crime scenes were "additional statements," or whether Mr. Wise's statements were used in Mr. Wise's video confession. DX-49, at DEFS007242. Nor does the article state that Ms. Fairstein was involved in taking the videotaped statements of Mr. Wise. *Id.*

Ms. Burns' book notes that Ms. Fairstein visited the crime scene with Detectives Sheehan and Jonza. DX-27, at 51. The book does not state that "additional statements" were made by Mr. Wise that were used in his video "confession." *Id.* It states that "Back at the 24th Precinct, Detective Hartigan took another pass at interrogating Korey, since he had mentioned witnessing the rape to Detective Nugent only after his statement had been signed." *Id.* Per the book, Lederer took Mr. Wise's videotaped statement. *Id.* at 53.

The Series does not depict Ms. Fairstein's visit to the crime scene with Mr. Wise and Mr. Richardson and, accordingly, information concerning this matter is not relevant to the claims or defenses in this action. FRE 401, 402.

i.   The Burns documentary shows Ms. Fairstein seated alongside DA Robert Morgenthau and ADA Lederer to announce the indictments of the Five. (Ex. 19, Burns Doc. At 52:47.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Lederer is seated next to Mr. Morgenthau. Ms. Fairstein does not speak in the clip and is one of nine attendees. Mr. Morgenthau announces the charges. DX-19. Ms. Fairstein's attendance at this press conference is not relevant to the claims or defenses in this action, or any of the remaining scenes at issue in this action. FRE 401, 402.

j.   Several sources reported that after the indictments, Ms. Fairstein "oversaw the prosecution" as "the chief of the Sex Crimes Unit". (Ex. 51, Jim Dwyer and Kevin Flynn, "New Light on Jogger's Rape Calls Evidence Into Question," *N.Y. Times* (Dec. 1, 2002) ("Dwyer & Flynn") (handwriting and markings original to Ms. Swicord); Ex. 52, Jill Smolow, "A Radical Reversal," *People* (Dec. 23, 2002) (from Ms. Swicord's files); Ex. 50, Leland.)

**PLAINTIFF'S RESPONSE**:

Denied.

DX-50, written in 2016, does not state that Ms. Fairstein oversaw the prosecution of the Central Park Jogger case.

DX-51, written in 2002, does not state that "after the indictments" Ms. Fairstein oversaw the prosecution.

DX-52, written in 2002, does not state that "after the indictments" Ms. Fairstein oversaw the prosecution.

None of the newspaper articles in Defendants' research binder from the 1989 time period following the attacks in Central Park identify Ms. Fairstein as being involved in the Central Park Jogger "investigation" or prosecution. DX-36, at DEFS007145-7233, DEFS007428-7433; PX-34, Swicord Dep. 76:24-78:20, 92:4-111:21. Ms. Fairstein was featured in a February 1990 *New York Times* article, located in Defendants' research binder, which describes her as overseeing the "disposition of some ***500-700 cases per year***" as "chief of the sex-crimes unit." *Id.* at DEFS007234 (emphasis added). The article describes Ms. Fairstein as "a witness" at pretrial hearings in the Central Park Jogger case and Ms. Lederer as "the prosecutor." *Id.* at DEFS007241. *See* DuVernay Decl. ¶ 51(c). Ms. Fairstein is referenced in only two, additional articles in 1990 regarding her role as a witness at trial. *Id.* at DEFS007294-97.

Ms. Lederer is named as the "prosecutor," "main prosecutor" and "lead prosecutor" in the 1989-1990 articles that comprise Defendants' research. DX-36, at DEFS007161-7163 (Ms. Swicord notes "Lederer is lying throughout" at 7163), DEFS007177, DEFS007189, DEFS007246, DEFS007247, DEFS007255, DEFS07292, DEFS007294, DEFS007298, DEFS007317, DEFS007320, DEFS007322 ("Elizabeth Lederer, who led the prosecutions' case"), DEFS007332. She is also referred to as the "lead prosecutor" in 2002.

DEFS007367-7369, DEFS007378. Ms. Lederer's statements concerning, and involvement in, the Central Park Jogger case were routinely reported in the press during the 1989-1990 timeframe. *Id.* at DEFS007161-63, DEFS007173, DEFS007189-91, DEFS007232-33, DEFS007264-65, DEFS007275, DEFS007285-86, DEFS007304-306. One article noted that the NYPD detectives praised Ms. Lederer—not Ms. Fairstein—for her "dogged" support. DEFS007322.

Books relied upon by the writers also point to Lederer as responsible for the investigation and prosecution. *See also* DX-17, Sullivan (Acknowledgments) ("The cooperation of the lead prosecutor, Elizabeth Lederer, and her co-counsel, Arthur "Tim" Clements was crucial to my understanding of how the two Central Park Jogger trials developed."), DEFS168821 (p. 23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168827 (p. 35) ("In the written statement detectives had shown to Lederer, Santana had described Lopez playing a particularly brutal role. She wanted to get that on tape, too."), DEFS168829 (p. 39) ("Several highly incriminating statements were on tape, but Lederer was distracted by disappointments... if the kids were telling the truth...they each had succeeded in minimizing his own role."), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week"); DEFS16880 (p. 144) (Lederer viewed "as the embodiment of white oppression" "continually had to shake off shouts of 'witch,' 'bitch,' 'white devil,' 'slut' and 'whore,' as well as death threats"); DX-27, Burns, at DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"), DEFS168729 (p. 97) ("While preparing for trial, Lederer learned that no [DNA] matches had been made....But the fact that the weak pattern that did show up was not clearly a match to...the suspects did not inspire her to look elsewhere."), DEFS168755 (p. 140) ("Lederer was able to paint her version of the story and present the most damning evidence, the written and videotaped statements"); DEFS168785 (p. 201) ("Fairstein. .had assigned her deputy Lederer to prosecute the original convictions"), DEFS168764 (p. 159) (supporters of defendants were "especially cruel to Lederer" referring to her as "The devil herself, she's going to pay for it"), DEFS168766 (p. 162) ("Rather than investigate the reason that the

defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury.").

k. D.A. Harlan Levy recounted in his book Ms. Fairstein's involvement in the DNA trial strategy: "Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem." (Ex. 37, Levy at 95.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the above quote appears in Harlan Levy's book. However, this statement is untrue. PX-2, Fairstein Dep. Tr. 273:3-278:19; PX-10, Lederer Dep. Tr. 104:9-108:14.

l. Sullivan's book also reported that when the DNA on the belatedly discovered sock came back as not a match to the Five, "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris."[7] (Ex. 17, Sullivan at 103.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the Sullivan book is quoted accurately above. Plaintiff further notes that the Sullivan book states that "a police department chemist. .had discovered a semen stain on one of Paula Harris's sock," and that Ms. Lederer had requested an adjournment of trial to test the sock which was then "delayed for seven weeks." DX-17, at 102-103.

The sock DNA scene in the Series attributes the discovery of the DNA stained sock to Ms. Fairstein, with Ms. Fairstein announcing "[W]e have a sock" and Ms. Lederer asking her "how did the NYPD miss that?" DX-30, Series, Episode 2 at 16:39-17:13; DuVernay Decl. ¶ 104. Ms. Fairstein further states "Those little bastards shot their wad into a sock." *Id.* Sullivan writes in his book that:

*Lederer* knew enough about what happened that night to have already suspected some of the culprits escaped. She was not convinced, however, that this semen belonged to somebody who had penetrated the victim. *It could have come from a kid who masturbated at the scene and wiped himself off on the sock*. DX-17, at p. 103 (emphasis added). *See* DX-27, at DEFS168729 (p. 97) ("While preparing for trial, Lederer learned that no [DNA] matches had been made....But the fact that the weak pattern that did show up was not clearly a match to...the suspects did not inspire her to look elsewhere.").

---

[7] Sullivan's book uses the pseudonym "Paula Harris" for the jogger, who had not yet been publicly identified as Trisha Meili at the time of publication. **[This footnote is original to Defendants' Statement of Undisputed Facts].**

Ms. DuVernay's declaration omits a portion of the sock DNA scene that the Court deemed actionable. *Fairstein*, 553 F. Supp. 3d, at 74. DX-30, Ep. 2, at 29:51-31:23.

m.  Several sources recounted that Ms. Fairstein testified against the Five in the suppression hearings and at trial and again made a big impression. The Burns book, and 1990 news articles, describe her trial testimony as "[t]he most dramatic element of the [state's] rebuttal case". (Ex. 27, S. Burns at 155.)

**PLAINTIFF'S RESPONSE**:

Denied.

While Defendants reference "several" sources they cite only one source above, which does not discuss the suppression hearings.

Whether or not Ms. Fairstein made a "big impression" when she testified is not relevant to the claims or defenses in this action. FRE 401, 402.

n.  The Sullivan book further recounts that the Five's supporters "considered her one of the major villains behind the conspiracy to frame the defendants. The animosity toward Fairstein generated by the packed defense side of the gallery seemed almost palpable." (Ex. 17, Sullivan at 202.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the Sullivan book is accurately quoted above and describes Ms. Fairstein as ***one of*** the villains. Mr. Sullivan also wrote that Ms. Lederer was viewed "as the embodiment of white oppression" and "continually had to shake off shouts of 'witch,' 'bitch,' 'white devil,' 'slut' and 'whore,' as well as death threats." DX-17, at DEFS16880 (p. 144). Sarah Burns' book notes that the defendants' supporters were "especially cruel to Lederer" referring to her as "The devil herself, she's going to pay for it." DX-27, at DEFS168764 (p. 159).

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive, argumentative and including improper denials.  Further, as Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's repeated objection is thus meritless.

87.     The research also showed that Ms. Fairstein defended the Five's convictions for rape after Matias Reyes confessed to acting alone. (*See, e.g.*, Ex. 25, Toobin; Ex. 26A and B, Imus; Ex. 27, S. Burns at 201.)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that Ms. Fairstein's defense of the convictions after Reyes' confessed is not relevant to any of the five scenes at issue in this action. FRE 401, 402.

88.     In 2002, Ms. Fairstein told Jeffrey Toobin of the *New Yorker*: "'I think Reyes ran with that pack of kids. He stayed longer when the others moved on. He completed the assault. I don't think there is a question in the minds of anyone present during the interrogation process that these five men were participants, not only in the other attacks that night but in the attack on the jogger. I watched more than thirty detectives—black, white, Hispanic guys who'd never met each other before—conduct a brilliant investigation.'" (Ex. 25.)

**PLAINTIFF'S RESPONSE**:

Admitted.

89.     The *New York Times* reported that "Other former and current law enforcement officials, including police detectives and Linda Fairstein, the chief of the Sex Crimes Unit—who oversaw the prosecution when she was a member of the district attorney's office—continue to hold that the teenagers managed to have some contact with the jogger, and perhaps ran the jogger off the path, starting the assault that Mr. Reyes finished." (Ex. 51, Dwyer & Flynn.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Fairstein is not quoted in the article. To the extent it is submitted for the truth of the matters asserted therein, the article is inadmissible hearsay. FRE 801(c). Nor is the subject matter of this article relevant to the five scenes at issue in this action. FRE 401.

90.     Based on the sources, the writers believed that Plaintiff was the most powerful, important, and highest-ranking official to have been involved hands on in all stages of the case, from investigation to conviction, and the narrative literary choice to make her the face of the

investigation and prosecution was therefore a natural one. (Ex. 2, DuVernay Dep. at 74-78;

DuVernay Decl. ¶¶ 46-49, 55; Ex. 3, Locke Dep. at 62, 64; Locke Decl. ¶¶ 25-26; Ex. 31, Swicord

Dep. at 121-122; Swicord Decl. ¶¶ 32-34.)

**PLAINTIFF'S RESPONSE:**

Denied.

The numerous statements condensed into one sentence above are duplicative of points
stated repeatedly above. Accordingly, Plaintiff incorporates her responses to Paragraphs
14, 16, 18, 22, 28, 31, 33, 54, 75, 80, 84, 85 and 86(a)-(n). What the writers "believed" also
raises credibility issues that cannot be determined prior to trial. *Palin*, 482 F. Supp. 3d at
219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-
responsive.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

91.     In his recorded interview with Ms. DuVernay, Raymond Santana stated that in the

civil case Ms. Fairstein attempted to downplay her role in the investigation and pass it all off on

Ms. Lederer, which Mr. Santana found incredible. (Ex. 38A-B.)

**PLAINTIFF'S RESPONSE**:

Denied.

Defendants have already discussed Mr. Santana's interview with Ms. DuVernay a number
of times above. The statement above paraphrases Mr. Santana's statements to Ms.
DuVernay in response to questions she asked Mr. Santana about Ms. Fairstein. DX-38A-
B.

In response to Ms. DuVernay's direct questions about Ms. Fairstein, Mr. Santana said, in
her "deposition," Ms. Fairstein testified that she had "no part in the investigation." Mr.
Santana is talking about the Five's civil action against New York City and that Ms.
Fairstein's "big defense" with Ken Burns was that she had nothing to do with the
investigation. DX-38B. Mr. Santana also states that, at her deposition, Ms. Fairstein said
"it wasn't me." Mr. Santana also references emails that Ms. Fairstein sent about the
reinvestigation. Mr. Santana says that Ms. Fairstein was "making phone calls, telling
officers what to do and where to go." *Id.* However, it is not clear that this statement is based
on his personal knowledge from 1989 as opposed to part of the allegations in the Five's
civil action against New York City. Even assuming that these statements are accurate, they
are so general that they still do not support the manner in which Ms. Fairstein was depicted

in the five scenes at issue in this action. *See also* Plaintiff's Resp. to Paragraph 64, incorporated by reference herein.

Per the interview transcript, Ms. DuVernay asks Mr. Santana if Ms. Fairstein is lying PX-61, at DEFS022662. *See* DX-38A. Mr. Santana also states that "when you look at the case, I didn't meet her. I didn't know her." DEFS022662. He refers to what he heard in "depositions." *Id.* Mr. Santana further discusses Ms. Fairstein's statements about the Five's civil action against the City. DEFS022663 ("This case is going to trial"). Mr. Santana then states that Ms. Fairstein testified at her deposition that all she "did was answer phone calls and send out some emails." *Id.* It is not clear that the D.A.'s office had email in 1989 or that Ms. Fairstein would have had access to email at the 20th or 24th Precincts in the days after the attacks in Central Park. Ms. DuVernay could not recall whether she obtained, or reviewed, Ms. Fairstein's deposition transcript though she had the opportunity to do so. PX-62, at DEFS093406; PX-51, DuVernay Dep. Tr. 123:7-128:12.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  Plaintiff does not contest that this Paragraph accurately recites Mr. Santana's statements in his interview. Plaintiff's interpretation of Mr. Santana's interview is not relevant or material to Defendants' Motion; what matters is what the filmmakers believed. To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit that Ms. DuVernay did not review deposition transcripts from the civil case as part of the research for the Series.  (*See* DuVernay Decl. ¶¶ 28-42 (listing her sources)).  Defendants incorporate their response to SUF 12[6] on the subject of the depositions as if fully set forth herein.

92.    The writers did not believe the testimony of the authorities who they believe lied in court to defend the coerced confessions and convict the Five—including the police and Plaintiff. The writers did not find Plaintiff credible, particularly since she had (and has) an agenda to minimize her role in the case when it served her to do so; Ms. DuVernay considered Ms. Fairstein to be one of the most uncredible and untrustworthy sources of all. (DuVernay Decl. ¶¶ 23, 44, 59; Locke Decl. ¶¶ 42, 45; Swicord Decl. ¶ 30.)

**PLAINTIFF'S RESPONSE**:

Denied.

The statement above regarding the "testimony of the authorities" was already stated, and addressed, above at Paragraph 60. Accordingly, Plaintiff incorporates her response to Paragraph 60 by reference herein. Defendants have proffered no evidence that Ms. Fairstein had an "agenda to minimize her role in the case when it served her to do so." On

the contrary, as pointed out by Defendants throughout this document, Ms. Fairstein discussed her involvement in the Central Park Jogger case in the Bouton (DX-49) and Toobin (DX-25), articles, and in a 2014 interview with Don Imus (DX-26A, at p. 4). *See also* DX-5 (2003 City Council Statement); DX-10 (2018 New York Law Journal article). Her position has been consistent over time. *Id.*

What the writers "believed" also raises credibility issues that cannot be determined prior to trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as argumentative. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

93.     The writers also believed that Ms. Fairstein lied in her testimony at trial regarding her interaction with Ms. Salaam. (DuVernay Decl. ¶ 44; Locke Decl. ¶ 42; Ex. 53, 10/27/17 Writers' Room Notes at DEFS022771; Ex. 54, 12/9/17 Email.)

**PLAINTIFF'S RESPONSE**:

Denied.

Paragraph 44 of Ms. DuVernay's declaration is addressed above in Plaintiff's response to Paragraph 54, which is incorporated by reference herein. Ms. Swicord testified that she did not read the transcripts from the suppression hearings and trials and, thus, she could not have formed an opinion about Ms. Fairstein's testimony. PX-34, Swicord Dep. Tr. 151:6-153:2. *See* Swicord Decl. ¶ 17.

The Sullivan book states as follows:

> [m]ost damaging to Salaam's defense was the testimony of Nocenti, the civil lawyer who was a federal prosecutor.... Under cross-examination by Lederer, Nocenti testified that at no time during the many hours at the police precinct, in none of his many discussions with Salaam's relatives about the boy's rights, did he tell anybody that Yusef was fifteen, nor was he ever asked his 'little brother's' age, nor did he ever hear anybody even discuss the question. This strongly contradicted the testimony of Salaam's other witnesses, who claimed the issue was discussed almost constantly with policeman and Fairstein.

DX-17, Sullivan pp. 88-89 (DEFS168854). Notably, the scenes in the Series concerning Ms. Fairstein's interactions with Ms. Salaam during the police interrogation of Yusef Salaam are not part of Ms. Fairstein's lawsuit. DX-30, Ep. 1, at 43:10-45:58; PX-2, Fairstein Dep. Tr. 383:18-387:3. FRE 401, 402, 403.

What the writers "believed" raises credibility issues that cannot be determined prior to trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

94.     In July 2018, Ms. DuVernay learned that the City of New York had released documents relating to the Central Park Jogger case on its website, and was planning to release additional files at a later date. Ms. DuVernay understood that the initial documents released by the City were files from the original investigation and trials, including the "confession" videos, which the writers had already watched. (DuVernay Decl. ¶ 56.)

**PLAINTIFF'S RESPONSE**:

Denied.

██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████

         ██████████████████████████████████████████
         ██████████████████████████████████████████
         ██████████████████████████

PX-70, at DEFS177586; PX-63; PX-51, DuVernay Dep. Tr. 154:6-16, 160:2-161:15. On July 19, 2018, Ms. DuVernay wrote to Netflix executive Cindy Holland:

> A bombshell for us. Thousands of documents just released. Two sources tell me they were rushed to be made public because of our casting announcement. They want to get their version out ASAP. And Linda Fairstein has a book dropping before we debut in which she defends herself. Wild.

PX-71; PX-51, DuVernay Dep. Tr. 161:16-163:21 (claiming "bombshell" referred to Ms. Fairstein's book). On the same day, Ms. DuVernay messaged a number of individuals, including producers Berry Welsh and Jonathan King:

> The official records that were released on the city site. Only partial though. Why? Handpicked documents by Fairstein.

PX-73, at DEFS177566; PX-51, DuVernay Dep. Tr. 167:23-171:6. Ms. DuVernay testified about this message, that "I think-I believe that Linda Fairstein has a hand in everything that is happening with this case as it relates to the presentation, manipulation and amplification of her point of view and her side of the story." *Id.*

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit the substance of PX-70 but deny that it contradicts this SUF.  Rather, this message supports Ms. DuVernay's belief, as stated in deposition and quoted by Plaintiff above, that "Linda Fairstein has a hand in everything that his happening with this case as it relates to the presentation, manipulation and amplification of her point of view and her side of the story." (PX-51 at 169:25-170.4.) ███████████████████ ████████████████████

With respect to PX-71, Ms. DuVernay testified that she was referring to the fact that "Linda Fairstein was going to write a book" as the "bombshell" as the document also indicates on its face. (PX-51 at 162:10-21.) Ms. DuVernay felt that Ms. Fairstein and the City already had the chance to tell their side of the story, and that it was finally the men's turn to tell theirs.  (DuVernay Decl. at ¶ 8; ████████████████.)

Defendants admit the substance of PX-73 but deny that it contradicts this SUF.  As stated in this message and this SUF, Ms. DuVernay understood that the initial documents released by the City were "[o]nly partial" documents from the original investigation and trials, including the confession videos. (*See also* DuVernay Decl. at ¶ 56.)

Defendants admit that Plaintiff correctly quotes Ms. DuVernay's testimony on PX-73, but states that Plaintiff omits Ms. DuVernay's testimony that her beliefs about Ms. Fairstein were based on her research and Ms. Fairstein's actions in response to Ms. Rosenthal's outreach. (*See e.g.* DX-2 at 33:4-38:5, 77:24-78:10, 87:20-88:5.)

95.    Ms. DuVernay did not believe that the other documents on the website would change her view of the case given her numerous other sources, including the Five themselves, their lawyers and the news reports concerning the document release—and it was her firmly held belief, based on those sources, that authorities lied about what happened in the investigations and interrogations, such that their additional statements would not add to the research. (DuVernay Decl. ¶ 57.)

**PLAINTIFF'S RESPONSE**:

Denied.

Paragraph 57 of the DuVernay Declaration does not support the statements above.

**DEFENDANTS' REPLY:**  Defendants state that the reference to Paragraph 57 of Ms. DuVernay's Declaration was a typo.  Paragraph 59 (not 57) of her Declaration states: "I had no doubt that nothing in the yet-to-be-released civil case documents would vindicate [Fairstein's] long-held, rigid assertions that the Five were guilty.  Having already watched the 'confession' videos, as Ms. Fairstein had implored me to do, I had no doubt that the Five were innocent.  Nor did I feel the need to review police reports and testimony from the police and prosecutors who I believed lied about what happened in the investigation and interrogations."  (DuVernay Decl. at ¶ 59.)

D.      **Plaintiff's Language**

96.      ███████████████████████████████████████

███████████████████████████████████████████

**RESPONSE**:

███████████████████████████████████████████
█

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

97.      ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

**RESPONSE**:

███████████████████████████████████████████
█

███████████████████████████████████████████
███████████████████████████████████

98.      The writers wrote dialogue for Fairstein's character that they considered consistent with their source material and how she portrayed herself—as an "800-pound-gorilla" at the

precincts, a "tough-talking," zealous prosecutor, who did not see the Five as children but as "killers" and a "pack" of rapists. (DuVernay Decl. ¶ 51-53, 55, 96-97, 101, 121; Swicord Decl. ¶¶ 45-47, 54, 58, 92-95, 98.)

**PLAINTIFF'S RESPONSE**:

None of the sources cited at Paragraphs 51-52 (a)-(c) and (e) of the DuVernay Declaration concern how Ms. Fairstein "portrayed herself." None of the citations in these Paragraphs state that Ms. Fairstein ordered police to conduct a discriminatory canvas of the projects in Harlem or demonstrate that Ms. Fairstein used the word "thugs" in relation to the Five in 1989. Paragraph 52 of Ms. DuVernay's declaration is discussed in detail in Plaintiff's Response to Paragraph 77, which is incorporated by reference herein. Paragraph 53(a)-(c), (f)-(k), do not concern how Ms. Fairstein "portrayed herself." No citation in those Paragraphs contains a statement by Ms. Fairstein that the Five were "killers" or demonstrate that Ms. Fairstein used the word "thugs" in relation to the Five in 1989. None of those Paragraphs show that Ms. Fairstein ordered a discriminatory canvas of the projects in Harlem. In the Toobin article (cited at Paragraphs 52(d) and 53 (d) and (e) of the DuVernay Decl.), published in 2002, Ms. Fairstein used the word "pack." Her description of herself as an "800-pound gorilla" concerned the assistance she could provide to "help Elizabeth and the cops get the resources they needed." DX-25; PX-2, Fairstein Dep. Tr. 231:13-238:4. Paragraph 97 of Ms. DuVernay's Declaration does not reflect how Ms. Fairstein "portrayed herself" nor does the Sullivan book quoted therein cite to Ms. Fairstein as a source. Paragraph 121 of Ms. DuVernay's declaration concerns an admittedly biased source's opinion of Ms. Fairstein though the source—Michael Warren—had no personal knowledge about what occurred in 1989. *See* Plaintiff's Response to Paragraph 54(f).

Notably, the writers' research binder contains no statements made by Ms. Fairstein about the Five during the time in which the case was being investigated and prosecuted, except for a few descriptions about her testimony at suppression hearings and trial. *See* Plaintiff's Response to Paragraph 75.

Given that Ms. DuVernay admits to writing the Episode 1 dialogue at issue in this case ("thug" "no kid gloves"), Ms. Swicord's testimony about this topic is irrelevant. *See* DuVernay Decl. ¶¶ 90-94.[8] FRE 401, 403.

No source cited above contains a statement by Ms. Fairstein that refers to the Five as "killers."

Plaintiff incorporates her responses to Paragraphs 84 and 86 above by reference herein.

---

[8] Ms. DuVernay references "unconscious bias" in her Declaration at Paragraph 94. Testimony about this topic is inadmissible because it would tend to confuse or mislead the jury and is more prejudicial than probative. Whether or not "unconscious bias" was involved in the prosecution of the Five in 1989 is not at issue in this action. Nor is Ms. DuVernay a sociologist or psychologist who can provide expert testimony about this issue. FRE 401, 403.

What the writers "believed" raises credibility issues that cannot be determined prior to trial. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. To the extent any statements made about Ms. Fairstein in the declarations cited above were submitted for the truth of the matters asserted therein they are inadmissible hearsay. FRE 801(c).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response because it fails to admit or deny the SUF.

Defendants further object to Plaintiff's statement in Footnote 8 to this Response that Ms. DuVernay's beliefs on "unconscious bias" are inadmissible. (DuVernay Decl. at ¶ 94.) The fundamental issue on this Motion is the Defendants' subjective state of mind and beliefs as to the truth. Ms. DuVernay's beliefs as to societal unconscious bias are based on her views and personal life experiences as well as research in connection with the Series. This is not expert testimony. Plaintiff's objections are both frivolous and offensive.

99. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**PLAINTIFF'S RESPONSE**:

Denied.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

████████████████████████████████████████████
████████████████████████.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial. ████████████████████████████████████████████ ████████████████████ Further, Defendants state that this email is both relevant and

admissible.   The issue on this Defendants' Motion is their portrayal of Plaintiff in the Series, ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

100.   ████████████████████████████████████████

████████████████████████████████████████

**PLAINTIFF'S RESPONSE**:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

101.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

**PLAINTIFF'S RESPONSE**:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

102.    Plaintiff has repeatedly used the term "wilding" in connection with the Jogger case and the Five, including in an article she wrote entitled "It is a Season to be Fearful" and in her official public testimony. (*See, e.g.*, Ex. 2, Fairstein Dep. at 100-102, 104-105, 109-110; Ex. 5, 2003 Stmt. at 2, 7, 11; Ex. 58, Linda Fairstein, "It is a Season to be Fearful," *N.Y. Daily News* (April 19, 1994) (highlights added for witness at deposition); Ex. 59, Linley Boniface, "Crime and

Publishing," *The Dominion Post* (April 3, 2004) (highlights added for witness at deposition); Ex. 55, 6/25/12 Email (highlights added for witness at deposition).)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Fairstein's allegations concerning the term "wilding" were dismissed from the case. *See Fairstein*, 559 F. Supp. 3d at 80. The articles cited above are, accordingly, not relevant to the claims or defenses in this action. FRE 401, FRE 402. Even if they were relevant, they would have a tendency to confuse the issues and mislead the jury. FRE 403.

In DX-58, an article written by Ms. Fairstein, she places quotes around the word wilding. (note that this article was downloaded in 2020).

In DX-5, Plaintiff puts quotes around the word wilding when she first uses the term. *See* page 2. This was a ***written*** submission to the City Council. *See* page 1.

As discussed in Plaintiff's response to Paragraph 99, Exhibit 55 discusses Ms. Burns discussion of the origination of the term wilding.

Plaintiff does not deny that she provided the statement at page 2 of DX-59 to the reporter because it appears in quotes. When shown this article (which had not been produced in discovery and is not available on Google) at her deposition, she did not have an independent recollection of speaking with the reporter. PX-2, Fairstein Dep. Tr. 104:12-108:10.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

103. ████████████████████████████████████

████████████████████████████████████

████████████████████

a. ████████████████████████████
████████████████████████████
████████████████████████████
████████████████

**PLAINTIFF'S RESPONSE**:

████████████████████████████████████████████████
████████████████████
████████████████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

b.   ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

**PLAINTIFF'S RESPONSE**:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

c.   ████████████████████████████████████████████

**PLAINTIFF'S RESPONSE:**

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

E.   **Plaintiff's Threats and Other Conduct in Response to the Series**

104.    When Ms. DuVernay began research for the project that became the Series in 2016,

she sought to speak with those on the prosecution side of the case for their perspective. On Ms.

DuVernay's behalf, Jane Rosenthal of Tribeca, one of the producers of the Series, reached out to

Plaintiff and to Ms. Lederer, Ms. Meili, and former D.A. Robert Morgenthau. All declined

interviews. (Ex. 2, DuVernay Dep. at 27-29; DuVernay Decl. ¶ 20; Ex. 33, Correspondence with

Jane Rosenthal.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Lederer and Ms. Fairstein communicated
with Ms. Rosenthal on a number of occasions prior to electing not to participate in any
interview. Ms. Lederer also spoke with Ms. DuVernay by phone on two occasions. PX-14;
PX-10, Lederer Dep. Tr. 131:19-142:23; PX-15; PX-256; PX-242; PX-2, Fairstein Dep.
Tr. 319:2-321:12.

**DEFENDANTS' REPLY:**  With respect to Plaintiff's additional facts regarding Ms.
Lederer, Defendants admit that Ms. Lederer spoke with Ms. DuVernay by phone on two
occasions in 2018 and that Ms. DuVernay testified that she "believe[s] that between the
first call and the second call that Ms. Lederer made, that there was interference by Linda
Fairstein.  A big change in demeanor from the first call to the second call.  I believe Linda
Fairstein was at play there and was involved.  And so that gave me insight into the
relationship."  (PX-51 at 39:7-13.)

105.    In response to Ms. Rosenthal's outreach, Ms. Fairstein stated that she was speaking

for Ms. Lederer and Ms. Meili, and stated that none of them would talk to the filmmakers unless

they satisfied a list of preconditions to obtain Ms. Fairstein's approval as to how they were

researching and writing the script. (Ex. 33, Correspondence with Jane Rosenthal; Ex. 4, Fairstein

Dep. 317-320; DuVernay Decl. ¶ 21; Ex. 2, DuVernay Dep. at 32-38.)

**PLAINTIFF'S RESPONSE:**

Denied.

Ms. Fairstein and Ms. Lederer communicated with Ms. Rosenthal for almost one month.
On May 11, 2016, Ms. Fairstein told Ms. Rosenthal that Ms. Meili "is going to wait to hear
whether you will meet with me." PX-242. Ms. Fairstein further stated "I have information
you need to know before moving forward.... Elizabeth and I are not going to be slandered
again." *Id.* She also stated "I have several offers and deciding how to proceed." *Id.* On May
12, 2016, Ms. Rosenthal told Ms. Fairstein that the filmmakers would like to meet with
Ms. Lederer and Ms. Meili. *Id.* Ms. Fairstein responded, "Trish and Elizabeth will not talk
with your team until you and I have talked." *Id.* On May 13, 2016, Ms. Lederer emailed
Ms. Rosenthal "Jane, nothing would make me happier than for someone to actually tell the

truth about what happened in Central Park on April 19, 1989... the only coverage has been misinformed, self-serving and factually incorrect." PX-15, at LEDERER00719. She added, "[b]efore I speak with someone from your team, I would like to know more about your project. Believe me, if it is the truth of what happened you wish to capture, I will be completely available to you." *Id.* On May 16, 2016, Ms. Lederer emailed Ms. Rosenthal "I have no interest in participating in a distortion or mischaracterization of the events of the case. Burns' so-called documentary was a self-serving, biased puff piece, designed (as he himself said) to settle the plaintiffs' lawsuit" and "if you would like to clarify for me what you are hoping to achieve with this film, I welcome a chance to talk. But that is a necessary step to my cooperation." *Id.* at LEDERER00718. At some point prior to May 18, 2016, Ms. Fairstein sent Ms. Rosenthal a list of questions about the project, stating "I would appreciate it if you give us short answers (where you can) to all of the above – they will help us make important decisions." DX-33 at DEFS064866. In the same communication, Ms. Fairstein noted her concerns about "libelous remarks" in the Ken Burns' documentary. *Id.* at DEFS064865. Ms. Rosenthal responded to Ms. Fairstein's questions on May 18, 2016, addressing both Ms. Fairstein and Ms. Lederer. *Id.* at DEFS064864-86. Nowhere in her communications with Ms. Rosenthal does Ms. Fairstein seek script approval. At the point in time in which the parties were communicating the project was "in the early stages of development" and no script had been written. *Id.* at DEFS064864. In early June of 2016, Ms. Fairstein, Ms. Lederer and Ms. Rosenthal continued to communicate about setting up a meeting with Ms. DuVernay. PX-16, LEDERER00725.

On two occasions, Ms. Lederer spoke with Ms. DuVernay by phone. PX-14; PX-10, Lederer Dep. Tr. 131:19-142:23; PX-51, DuVernay Dep. Tr. 38:10-43:20. Script approvals were not discussed. *Id.*

On June 7, 2016, Ms. Fairstein asked Ms. Rosenthal whether the filmmakers had made any progress in researching various categories of documentation. Ms. Fairstein did not request script approval. On June 9, 2016, Ms. Rosenthal replied "Yes, we are reading and researching everything we can get our hands on." DX-33, at DEFS064867-68.

On or about June 9, 2016, an attorney representing Ms. Fairstein and Ms. Lederer sent a letter to Ms. Rosenthal and Ms. DuVernay expressing their "justifiable" and "profound" concerns that the filmmakers' project "might also fail to portray them accurately." PX-9. The letter listed sources that "needed to be carefully consulted as part of any honest fact-finding effort." *Id.* at LF00038584. The letter further stated that "in light of their experience to date they are unwilling to participate in a project which is not committed to scrupulous fairness and rigorous and thorough factual research and accuracy... please seek their participation only when you can confirm that you have examined the above sources and provide a list of the topics you wish to review with them." *Id.* at LF00038587. The letter does not reference script approval.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit the content of the communications at DX-33 and PX-9. As set forth in Defendants' Reply to SUF 12[6], the underlying criminal case materials and civil case

materials were under seal at the time of these communications. Plaintiff did not provide these materials with her correspondence in 2016 or with her "anonymous" package to the producers in 2018, with the exception of the video "confession" tapes.  (SUF 59.)

106.    Ms. DuVernay viewed Ms. Fairstein's conditions as an attempt to control what she depicted through the script. (DuVernay Decl. ¶¶ 21-22; Ex. 2, DuVernay Dep. at 32-38.) She also viewed her control over the other women as evidence of her long-standing leadership position among them and continued control over them as well. (*Id.*)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. DuVernay had no concerns about Ms. Fairstein attempting to control the scripting of her film project. In July 2016, Ms. DuVernay's counsel, Jonathan Segal, wrote to Ms. Fairstein and Ms. Lederer's counsel "This project...is in its very early stages. Your clients cannot possibly object to their portrayal in the project; there is not yet any portrayal for them to find objectionable." PX-9, at LF00038632. Mr. Segal added "no film exists." *Id.* Mr. Segal added "[r]egardless of whether interviews occur, should the filmmakers choose to include a portrayal of your clients in any project that is developed, they would be entitled to the full protection of the First Amendment." *Id.* at LF00038633. The filmmakers expressly reserved their "rights or remedies" against Ms. Fairstein and Ms. Lederer.

Ms. DuVernay states in her declaration that she believes that Ms. Fairstein lied during the Central Park Jogger trials so her post hoc statements that she felt controlled by a person she did not believe or respect raises credibility issues that cannot be determined prior to trial. *See* DuVernay Decl. ¶¶ 44, 59. *Palin*, 482 F. Supp. 3d at 219.

Ms. DuVernay's beliefs about Ms. Fairstein "controlling" Ms. Lederer are belied by Ms. Lederer's communications with Ms. Rosenthal. On May 12, 2016, Ms. Rosenthal told Ms. Fairstein that the filmmakers would like to meet with Ms. Lederer and Ms. Meili. *Id.* Ms. Fairstein responded, "Trish and Elizabeth will not talk with your team until you and I have talked." *Id.* On May 13, 2016, Ms. Lederer emailed Ms. Rosenthal "Jane, nothing would make me happier than for someone to actually tell the truth about what happened in Central Park on April 19, 1989... the only coverage has been misinformed, self-serving and factually incorrect." PX-15, at LEDERER00719. She added, "[b]efore I speak with someone from your team, I would like to know more about your project. Believe me, if it is the truth of what happened you wish to capture, ***I will be completely available to you***." *Id.* (emphasis added). It further appears from Ms. Lederer's recounting of her calls with Ms. DuVernay that Ms. Lederer elected not to participate in an interview because she "didn't believe in multiple truths [and] it seemed as if [Ms. DuVernay] had already decided what she wanted to portray." PX-14; PX-10, Lederer Dep. Tr. 138:11-140:12.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants deny Plaintiff's misleading characterization of PX-14.  Ms. Lederer's calls to Ms. DuVernay (referenced in PX-14) occurred in July 2018 (referring to the scripts being finished soon), after the writers had conducted extensive research on the Series.

107.    On June 9, 2016, shortly after Ms. Fairstein's exchange with Ms. Rosenthal, a lawyer representing Ms. Fairstein and Ms. Lederer wrote a threatening letter to Ms. DuVernay, Ms. Rosenthal, and Tribeca. (Ex. 64, Letter from R. Zimet ("Zimet Letter"); Ex. 4, Fairstein Dep. 314-315, 317-320; DuVernay Decl. ¶ 22; Ex. 2, DuVernay Dep. at 43-44, 156-157.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. DuVernay was not threatened.

In July 2016, Ms. DuVernay's counsel, Jonathan Segal, wrote to Ms. Fairstein and Ms. Lederer's counsel "This project...is in its very early stages. Your clients cannot possibly object to their portrayal in the project; there is not yet any portrayal for them to find objectionable." PX-9, at LF00038632. Mr. Segal added "no film exists." *Id.* Mr. Segal added "[r]egardless of whether interviews occur, should the filmmakers choose to include a portrayal of your clients in any project that is developed, they would be entitled to the full protection of the First Amendment." *Id.* at LF00038633. The filmmakers expressly reserved their "rights or remedies" against Ms. Fairstein and Ms. Lederer.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

108.    Consistent with Ms. Fairstein's prior communications, the June 9, 2016 letter listed preconditions that the producers had to satisfy in order for Ms. Fairstein to consider meeting with them. (Ex. 4, Fairstein Dep. 317-320; DuVernay Decl. ¶ 22; Ex. 64, Zimet Letter.)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that the preconditions to meeting were put forth by Ms. Fairstein and Ms. Lederer after approximately one month of prior communications with

Ms. Rosenthal. *See* Plaintiff's Response to Paragraph 105, which is incorporated herein by reference.

109.    Once Netflix picked up the project in July 2017, Ms. Fairstein's lawyer immediately sent a threatening letter to Netflix attaching his prior letter. (Ex. 64, Zimet Letter.)

**PLAINTIFF'S RESPONSE**:

The letter was not threatening as there is no evidence that Netflix responded to it. On the contrary, Ms. Swicord told a friend that ████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████ PX-47; PX-34, Swicord Dep. Tr. 30:5-33:21. ██████████ ███████████████████████ *See* Plaintiff's Resp. to Paragraph 68, incorporated by reference herein.

**DEFENDANTS' REPLY:** Defendants move to strike as non-responsive and because Plaintiff fails to admit or deny.  To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:



Defendants incorporate their Reply to SUF 68[1] as if fully set forth herein.

110.    Ms. DuVernay did not believe Ms. Fairstein ever had any intention of actually meeting and viewed her letters as attempts to bully and intimidate the producers and stop the project. (DuVernay Decl. ¶ 22; Ex. 64, Zimet Letter.)

**PLAINTIFF'S RESPONSE**:

Ms. DuVernay was not threatened.

In July 2016, Ms. DuVernay's counsel, Jonathan Segal, wrote to Ms. Fairstein and Ms. Lederer's counsel "This project...is in its very early stages. Your clients cannot possibly object to their portrayal in the project; there is not yet any portrayal for them to find objectionable." PX-9, at LF00038632. Mr. Segal added "no film exists." *Id.* Mr. Segal added "[r]egardless of whether interviews occur, should the filmmakers choose to include a portrayal of your clients in any project that is developed, they would be entitled to the

full protection of the First Amendment." *Id.* at LF00038633. The filmmakers expressly reserved their "rights or remedies" against Ms. Fairstein and Ms. Lederer.

Given that Ms. DuVernay is, by her own description, a highly successful, award-winning filmmaker, it is unlikely that she viewed Ms. Fairstein's requests that she review certain research materials as bullying or intimidating. DuVernay Decl. ¶¶ 1-4. In addition, the thrust of the communications between Ms. Fairstein, Ms. Lederer and Ms. Rosenthal—as well as the lawyer letter—was that Ms. Fairstein was concerned about the filmmakers reliance on libelous sources. Ms. Fairstein explained in various communications that she had previously been unable to speak out about the Burns documentary and other sources because she was a defendant in the Five's civil action. PX-241; DX-33, DEFS064864-86.

What Ms. DuVernay did or did not believe raises credibility issue that cannot be decided at the summary judgement stage. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY:** Defendants move to strike as non-responsive and because Plaintiff fails to admit or deny. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

111.    Plaintiff admits that the Burns documentary defined her connection to the case and is in the "public domain" as her lawyer's June 9, 2016 letter noted. (Ex. 64, Zimet Letter; *see also Fairstein*, 553 F. Supp. 3d at 58-59 (quoting Compl. ¶ 42).)

**PLAINTIFF'S RESPONSE**:

Denied.

The June 9, 2016 letter clearly states "Certain past treatments...have been pursued in order to achieve a predetermined objective and not to represent truthfully what the facts demanded, including a book published by Sarah Burns in 2011, and a film purporting to be a documentary released in 2012 by Sarah, her father Ken Burns, and her husband David McMahon.... Accordingly, it would be reckless at best for you to accept or rely uncritically on these sources." DX-64, at DEFS00038584. Unverified pleadings and judicial opinions are inadmissible hearsay. *Chevron Corp.*, 974 F. Supp. 2d at 605-606. *Thomas*, 2022 WL 504787, at n. 1.

112.    Plaintiff admits that the Burns documentary depicted her as prosecuting the Five and "as the centerpiece of the case, including a woman journalist or prof who says I made millions on the backs of these boys. . . ." (Ex. 65, 4/29/18 Email.)

**PLAINTIFF'S RESPONSE**:

Denied.

The April 2018 memo written by Ms. Fairstein does not state that the Burns documentary depicted her as prosecuting the Five. The memo states "Movie is dishonest – can parse that for you – but you have to get beyond Burns to see facts. (minor example – I was NOT the prosecutor – but EJL's name had no traction – so he has me as the centerpiece of the case, including a woman journalist or prof who says I made millions on the backs of these boys – altho I've never written about them)." DX-65, at ALC Conf. 0163.

113.   Plaintiff never brought a lawsuit complaining about the Burns documentary, or any

of the books and news articles that were part of the source material for the Series. (Ex. 64, Zimet

Letter.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that during the pendency of the Five's lawsuit against New York City, in which Plaintiff was a named defendant, she was under a gag order. In June 2016, Ms. Fairstein told Ms. Rosenthal "I was under a gag order for 12 years and could not speak about the case. Now I can." DX-33, at DEFS064862. Ms. Fairstein further stated to Ms. Rosenthal "some took our silence during/after Burns as the fact that we were meek and wouldn't respond – or that we had given up our principles and our facts. We were silent *only* because the judge demanded that of us." *Id.* at DEFS064866. In February 2019, Netflix's publicity team ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████ PX-225.

Ms. Fairstein's failure to bring a lawsuit is not relevant to the claims or defenses in this action, particularly since none of the sources relied upon by Defendants support the specific scenes at issue in the Series. FRE 401, 402.

**DEFENDANTS' REPLY**:  Defendants reply to the additional improperly included facts as follows:

Defendants deny that Plaintiff was under an official gag order in the civil case.  Plaintiff has produced no evidence of any such order, nor is any order available on the publicly available docket for the case. Plaintiff also has produced no order preventing her from taking legal action.

Defendants admit the substance of PX-225, ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████

114.    Plaintiff also did not request that the authors or publishers of certain materials relied on by the writers retract any statement about her therein. (Ex. 4, Fairstein Dep. at 77-81, 180-183, 234-235, 276-278.)

**PLAINTIFF'S RESPONSE**:

Denied.

Fairstein Deposition Exhibit 8, discussed at pages 77-81 of Ms. Fairstein's deposition transcript contains no Bates numbers and there are no citations above which authenticate this article as something that the writers relied on. In any event the article, written in 2002, concerns Ms. Fairstein's opinions about the case in light of the Reyes confession, which are not relevant to the five scenes at issue in this action. FRE 401, 402. In addition, the article contains the general statement that Ms. Fairstein "led the probe" and does not specify Ms. Fairstein's involvement in the case in 1989. PX-3.

With respect to Fairstein Deposition Exhibit 39, which is a retrospective about Robert Morgenthau's career, Ms. Fairstein communicated with the reporter writing the article prior to its publication. PX-6; PX-2, Fairstein Dep. Tr. 178:24-183:9. The reporter acknowledged that Ms. Fairstein was not the prosecutor and did not take statements from the Five. Ms. Fairstein provided a statement to the reporter that he did not use in the article. PX-6. Ms. Fairstein testified that she called Mr. Morgenthau "[t]o ask him why he continued to use [her] to speak for him in his campaigns, long after this had happened. And why he had turned on me." PX-2, Fairstein Dep. Tr. 183:3-9.

With respect to Fairstein Deposition Exhibit 11, the Toobin article, Ms. Fairstein was asked why she did not correct the statement "on the day after the assaults, Fairstein went to the 20th Precinct." Ms. Fairstein testified that she did not ask for a correction because she "was there on the 20th." PX-2, Fairstein Dep. Tr. 233:14-235:12. Ms. Fairstein arrived at the 20th Precinct on the next day, April 20th, at 8:30 p.m. PX-27, at DEFS014847-857; PX-29, at DEFS016980-81, 17012-17017; Lederer Decl., Ex. C, at 669-670; PX-2, Fairstein Dep. Tr. 216:19-220:22.

With respect to Harlan Levy's book, Fairstein Deposition Exhibit 57, Ms. Fairstein stated that she did not read the book at the time it came out. PX-2, Fairstein Dep. Tr. 275:8-18. She had a conversation with Mr. Levy after his deposition in the Five's lawsuit against New York City in which he admitted he "exaggerated greatly" and said he would correct the book if it was issued as a paperback. PX-2, Fairstein Dep. Tr. 276:6-277:19.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial. Plaintiff does not deny that she did not seek a retraction of any of the statements in these source materials.

Plaintiff's statement that she did not read Mr. Levy's book at the time it came out is not relevant or material to Defendants' Motion on the issue of lack of actual malice. The writers were entitled to rely on the material in the book as a reputable source. And Plaintiff omits that she "blurbed" Levy's book. (*See* SUF 170.) Defendants object to Plaintiff's testimony about statements allegedly made by Mr. Levy to Plaintiff as improper hearsay.

115.    Ms. Fairstein stated in emails in 2016 and 2017 that she wanted to "derail" Ms. DuVernay's project and stop the Series "in its tracks". Corresponding with Ms. Meili, she states that "I would like to derail this. I believe the director is an African-American woman, probably has a point of view not favorable to us ..." (Ex. 66, 5/11/16 Email (highlights added for witness at deposition); *see also* Ex. 67, 7/7/17 Email (highlights added for witness at deposition) ("Would prefer to have the project stopped in its tracks."))

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that the email comprising DX-66 fully states that:

I would like to derail this. I believe the director is an African-American woman, probably has a point of view not favorable to us...***She was widely criticized for changing the facts about Selma***. (emphasis added). *See* https://forward.com/culture/212000/selma-distorts-history-by-airbrushing-out-jewish-c/ (last visited on Oct. 18, 2022); https://www.algemeiner.com/2015/01/18/fresh-controversy-hits-selma-daughter-of-rabbi-abraham-joshua-heschel-shocked-by-exclusion-of-her-father-from-film/ (last visited Oct. 18, 2022); https://www.theguardian.com/film/2014/dec/30/selma-director-lyndon-johnson-martin-luther-king-controversy (last visited on Oct. 18, 2022).

**DEFENDANTS' REPLY:** Defendants object to Plaintiff's Response as misleading. Plaintiff inaccurately quotes DX-66. The email does not contain the articles identified in Plaintiff's Response. Defendants incorporate their Reply to SUF 40 on Plaintiff's additional facts regarding articles on *Selma* as if fully set forth herein.

116.    In the fall of 2018, Ms. Fairstein sent a letter to Felicity Huffman, the actress who played the Fairstein character in the Series. (Ex. 4, Fairstein Dep. at 164-165; Ex. 68, Fairstein 9/6/18 Letter.)

**PLAINTIFF'S RESPONSE**:

Admitted.

117. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

**PLAINTIFF'S RESPONSE**:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

118. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

**PLAINTIFF'S RESPONSE**:

███████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

F.    **Remaining Scenes at Issue**

119.    A chart containing the text of the five remaining scenes, as released ("Scene Chart"), is annexed to Defendants' Brief in Support of Summary Judgment. (Ex. 30B.)

**PLAINTIFF'S RESPONSE**:

Denied.

The chart is missing a scene related to the sock DNA. Per the Court's opinion on Defendants' motion to dismiss, the scene in Episode 2 at 29:51-31:23 is an actionable part of the scene in which Ms. Fairstein is depicted withholding DNA from defense counsel with the goal of advantaging the prosecution. *Fairstein*, 553 F. Supp. 3d 74.

**DEFENDANTS' REPLY:** Defendants deny that the chart at DX-30B is missing a portion of the DNA scene at issue.  Plaintiff deposed all three defendants and specifically marked as exhibits and played only the first "sock" scene as the DNA scene at issue: Episode 2 at 00:16:39 – 00:17:13 (*See* PX-67 (DuVernay Exhibit 23) and PX-101 (Locke Exhibit 25). These exhibits do not include the scene in Episode 2 at 29:51-31:23 (where the Fairstein and Lederer characters discuss the sock DNA test results).  Further, Plaintiff states fourteen times in her responses to the SUFs that the scene in Episode 2 at issue is the scene allegedly depicting "Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13." (*See* SUFs 167 – 180.)  In all events, to the extent Plaintiff is raising this additional scene in Episode 2 at 29:51-31:23, Defendants refer to the writers' sources and testimony at DuVernay Decl. ¶¶ 110-115 and Locke Decl. ¶¶ 58-64.

1.    **Timeline (Ex. 30B, Scene Chart No. 1; Ex. 30 at Episode 1, 00:12:41 – 00:13:01, 00:15:58 – 00:16:52 and 00:34:45 – 00:36:24)**

120.    The Timeline scenes were written to reflect that there were problems with the chronology of events matching up to law enforcement's theory of the case, and that the authorities had to revise the timeline to move the attack on the jogger back. (*See* DuVernay Decl. ¶¶ 64, 66-72;

Swicord Decl. ¶ 68; Ex. 31, Swicord Dep. at 138-139.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike on the ground that Plaintiff's multi-page response to this SUF is non-responsive to the SUF and does not support her denial. To the extent that the Court allows the Response, Defendants reply to the additional facts included in Plaintiff's Response as follows:

None of the comments cited by Plaintiff refute this SUF, nor do they indicate that the writers intended to show Ms. Fairstein in the Series as revising the timeline to pin the rape on individuals that she believed were *innocent*. The comments show the writers believed that Fairstein and the authorities rushed to judgment and were forcing the facts—despite obvious problems and inconsistencies—to fit the theory they blindly believed was true— that the boys in the park were connected to the rape and the Five were guilty of the rape. (*See* DuVernay Decl. at ¶¶ 44, 47, 78; Swicord Decl. at ¶¶ 28, 32, 78.)  *See also* SUF 121-127 (citing writers' sources).

[A] The timeline scenes were always intended to portray Ms. Fairstein as manipulating the timeline of attacks in Central Park to pin the rape of Ms. Meili on the Five and pressuring detectives to get the confessions they needed in order to accomplish this:

- [1] Writers' room notes from October 25, 2017 ████████████████ ███████████████████████ PX-36, Writers' Room Notes, at DEFS005260.

- [2] Writers' room notes from October 27, 2017 state:



  PX-36, at DEFS005225.

**DEFENDANTS REPLY** to [A1] and [A2]: PX-36 does not include notes dated October 25, 2017 or October 27, 2017.  In any event, Defendants deny that the writers' room notes contradict this SUF or establllish how the Fairstein character was portrayed in the final scripts and Series.  Ms. Swicord stated in her declaration that "[d]iscussions in the writers' room were not considered final or a mandate for what had to be included in each episode." (Swicord Decl. at ¶ 27.)  Ms. Locke stated in her declaration that "[t]he discussions in the writers' room were a way to bounce ideas off of each other and were an important part of

the writing process . . . but it was ultimately up to the writer of each episode to decide what should be included in the script for their episode."  (Locke Decl. at ¶ 22.)

- [3] On December 18, 2017, Ms. Swicord writes to Ms. DuVernay and Ms. Locke:

> I've attached a document that I thought might be useful for you.... It's mostly about how I am showing the coerced confessions coming into being – there was actually a method to the madness, being driven by *the emerging problem Fairstein had*: That the rape didn't happen at 10 pm. PX-41, at DEFS092969 (emphasis added).

In the attached memo, Swicord writes "something in the timeline of the investigation actually drove decisions about what false information had to be planted, and when." *Id.* at DEFS092971. It adds, "an Uh-Oh Moment arrived for Linda Fairstein" and "[s]ince early that morning, *Linda had been working with a narrative sequenced from facts provided by the cops* who discovered the various assault victims." *Id.* (emphasis added). The memo continues, "When the true facts arrived – that Trisha had to have been attacked at 9:15 – Linda had a time line problem." *Id.*

Regarding Episode 1, Ms. Swicord writes, "In Part One, I am having [Linda] discuss the problem openly with Sheehan." *Id.* at DEFS092972. Discussing Antron McCray's video transcript, Swicord states "This shift in the timeline given by Antron's first true statements to the cops...*was something introduced by the cops to solve Linda's timeline problem*." *Id.* (emphasis added).

Swicord notes, "As Linda and her team changed their narrative during the day and evening on April 20, the detectives had to go back to the kids' [*sic*] and their signed statements, and add and change things with the kids. They were adding things right up until the video statements were taped." *Id.* at DEFS092973.

Ms. Swicord finally states "[w]ithout having copies of the defendants' initial signed statements from their interrogations, I have been having to *intuit* how the information gets warped and the lies are forced into the kids confessions." *Id.* at DEFS092974 (emphasis added).

**DEFENDANTS' REPLY** to [A3]: Defendants admit that Ms. Swicord sent Ms. Locke and Ms. DuVernay the December 18, 2017 memo at PX-41 and that the memo is contemporaneous evidence of Ms. Swicord's state of mind at the time of writing, which supports this SUF and Defendants' lack of actual malice.  As Ms. Swicord testified, she:

> looked [at] each of the interrogations, both the recorded interrogations and also what was reported to us by the men themselves, and I saw that there was a certain pattern in these interrogations in which they were trying to pin

these boys to the crimes that they knew about that had taken place in Central Park.

(DX-31 at 171:5-14; *see also id.* at 172:15 – 173:22 (discussing memo).)

- [4] On December 30, 2017, Ms. Locke and Ms. Swicord communicated by email about their respective episodes, with Ms. Locke asking Ms. Swicord "Are you making explicit that Linda needed to clean up the timeline issue?" To which Ms. Swicord replies, "Yes." PX-98; PX-81, Locke Dep. Tr. 117:7-121:6.

**DEFENDANTS' REPLY** to [A4]: Defendants admit the substance of PX-98.  Defendants deny Plaintiff's claim that this email or Ms. Swicord's memo contradict the facts set forth in this SUF.

- [5] Ms. Swicord's notes on a draft script for Episode 1, state that Fairstein "builds her theory in front of us: there's a rapist here." PX-44, at DEFS007957. This draft places Ms. Fairstein at the Central Park Precinct, telling detectives that she wants confessions. *Id.* at DEFS007990-91. When discussing the timeline with Detectives Sheehan and Jaffer, and noting the problems, Ms. Fairstein and Detective Sheehan have "instant telepathy" and Ms. Fairstein tells Sheehan to "take over" for another detective who is interrogating Antron McCray. *Id.* at DEFS008019. *See* PX-42, at DEFS093171-93176 (draft Fairstein scenes sent to Locke); PX-34, Swicord Dep. Tr. 158:8-162:10. *See also* PX-45, at DEFS008208-8211.

**DEFENDANTS' REPLY** to [A5]: With respect to PX-44, Defendants deny that the quoted note on this draft script is relevant to this scene.  Next to the note it states "p 31" and "Nancy Ryan objects"  (PX-44 at DEFS007957), which refers to the scene between Ms. Fairstein and Ms. Ryan.  (*Id*. at DEFS007988, *see* handwritten note on this page.)  That scene is no longer at issue.  *Fairstein*, 553 F. Supp. 3d at 68-69.

Defendants admit the substance of PX-42 but deny that the quoted portions are material or relevant to Defendants' Motion.

- [6] In January 8, 2018 writers' room meeting notes, the following was noted as a comment by Ms. DuVernay:

  The audience will have a hard time making the jump from a woman standing over another woman's body with tears in her eyes to her to that same woman processing the boys and pushing this crime on them without holding onto some sympathy for her, which we do not want.

  PX-55, at DEFS021415; PX-51, DuVernay Dep. Tr. 81:14-88:19.

**DEFENDANTS' REPLY** to [A6]: With respect to PX-55, Defendants incorporate their statement on writers' room notes, set forth above at [A2]. Defendants deny that the quoted portions are complete and state that they must be reviewed in context. In all events, Defendants deny that the quoted portions are relevant to this scene.

- [7] In a January 24, 2018 writers' room meeting notes, discussing Ms. Fairstein, the following was noted:

  How did she come to pinning it on them? How did she say 'Those are going to be the boys I am going to pin it on'? When did she do the math? The whole story rests on the equation that she cooked up in that moment: BOYS + PARK=RAPE.

  Fairstein says 'I want confessions' and then BAM, we should move straight into the boys being in the interrogation rooms.

  ....

  Move straight into...Kevin being questioned.

  PX-56; PX-51, DuVernay Dep. Tr. 95:9-102:10.

**DEFENDANTS' REPLY** to [A7]: With respect to PX-56, Defendants incorporate their statement on writers' room notes, set forth above at [A2].

- [8] A document concerning Netflix's notes on Episode 1, dated February 6, 2018, states "KEY BEAT: Show how it is that Fairstein is able to get everyone on board to align the evidence (or lack thereof) with her idea of the truth." PX-57, at DEFS105017.

**DEFENDANTS' REPLY** to [A8]: Defendants admit the substance of PX-57. Plaintiff's response misleadingly omits Ms. DuVernay's response above the "Key Beat" that "[t]he reality is that they all lined up behind Fairstein quickly[.]" (PX-57 at DEFS105017.) This further supports Ms. DuVernay's state of mind and lack of actual malice.

- [9] A Netflix internal email, dated April 15, 2018, commenting on the scripts for Episodes 1 and 2 of the Series, states "I like how Ava uses Fairstein's determination to make the false narrative stick as the driver for Part 1." PX-142; PX-137, Engel 30(b)(6) Dep. Tr. 97:4-100:4 (noting "our understanding from the writers and the research they had done and – is that Fairstein believed in the men's guilt and acted accordingly").

**DEFENDANTS' REPLY** to [A9]: Defendants admit the substance of PX-142 and Ms. Engel's testimony on that document. For completeness, as Ms. Engel testified, she

understood from the writers that "Fairstein believed in the men's guilt and acted accordingly", meaning that "[s]he pursed the case based on her belief that they were guilty." (PX-137 at 98:19 – 99:6.)

- [10] A May 25, 2018 draft script, with revisions by Ms. Swicord, contains the following timeline scene note:

                    DET. JAFFER
   So...Change the order? They go to the Reservoir last? Is there
enough time for all of this to even happen?

    She turns to him with a hard glare.

                    FAIRSTEIN
   It happened. So obviously there was.

   Jaffer gets real clear, real fast. A beat as both men clock Linda's determination
to make this stick, whatever it takes.

   PX-159, at DEFS004740. *See* PX-158, at DEFS001678-1679.

**DEFENDANTS' REPLY** to [A10]: Defendants admit the substance of PX-159 and PX-158, but deny they contradict this SUF.

- [11] In Netflix's Notes on a cut of Episode 1, dated 12.27.18, the question is asked:

   It feels odd that LF says here that the boys' statements are in when they're just getting started. Isn't the idea that she's creating a timeline regardless of their statements and then going to try and jerry rig their statements to fit?

   PX-143; PX-137, Engel 30(b)(6) Dep. Tr. 105:7-114:11.

**DEFENDANTS' REPLY** to [A11]: Defendants deny that this document contradicts this SUF, and deny Plaintiff fully quotes that note in PX-143. The remainder of the note makes clear that it is referring to the ordering of the scenes, not the substance or accuracy. (PX-143 at DEFS148241.) With respect to Netflix's notes on cuts, Ms. Engel testified that "we defer to the writers to look these notes, which are suggestions, and decide – based on their research and what they believe to be true about the story from the men's point of view, based on their research, how to incorporate or not incorporate those suggestions into the framework of the story." (PX-137 at 109:8-14.)

- [12] A January 2019 scene chart for a cut of the Series, describes part of the timeline scenes as "Sheehan reviews the timeline based on Trisha Meili's

running routine. Fairstein is not deterred when timeline doesn't add up." PX-195, DEFS099254, at DEFS099256.

**DEFENDANTS' REPLY** to [A12]: Defendants admit the substance of PX-195. Defendants deny that this statement contradicts this SUF.

- [13] Netflix notes from January 15, 2019, concerning a cut of Episode 1, state:

  It feels like we've lost Fairstein midway through the ep as well as the tension of whether these families will be able to help their sons.... After Fairstein talks to Lederer in the law library, should we see her go back to the cops to juice them to get what she needs?

  PX-144, at DEFS159922; PX-137, Engel Dep. Tr. 123:12129:10 (stating that "juice" does not mean pressure).

**DEFENDANTS' REPLY** to [A13]: Defendants admit the substance of PX-144, but deny that it refers to the timeline scene. Further, Ms. Engel testified with respect to this note that "the understanding is that Fairstein was acting with regard to her true belief that the men were guilty." (PX-137 at 125:10-16; *see also* 127:1-10.)

- [14] On January 27, 2019, Netflix employee Cindy Holland emailed her colleague Alison Engel notes about a cut of Episode 1, stating "I think that the first 25 minutes of 101 are much better, personally. Linda's motivation and pressure on the cops is much more clear" and "the coerced 'confessions' and the boys just trying to say whatever they had to in order to go home is much more clear." PX-219, at DEFS169178.

**DEFENDANTS' REPLY** to [A14]: Defendants admit the substance of PX-219, but deny that it refers to the timeline scene or dialogue.

- [15] On February 3, 2019, when discussing potential edits to a cut of Episode 1, Ms. Engel asked "don't we need the prior scene of Fairstein mangling the timeline to suit her theory of the case?" PX-204.

**DEFENDANTS' REPLY** to [A15]: Defendants admit the substance of PX-204.

[B] At her deposition, Ms. DuVernay testified that "In the series, we depict Linda Fairstein leading the detectives and Elizabeth Lederer putting together a timeline of activities in the park and the rape of Trisha Meili." PX-51, DuVernay Dep. Tr. 148:4-13. The above evidence contradicts this assertion. In any event, Ms. Fairstein did not "lead" detectives. PX-2, Fairstein Dep. Tr. 201:2-25, 202:25-203:19. *See* PX-22, 24-32; Pltf. SJ Opp. Br., Statement of Facts, Pt.III.A.

**DEFENDANTS' REPLY** to [B]: Defendants deny that Ms. DuVernay's testimony at 148:4-13 is contradicted by the "above evidence" regarding Plaintiff's improper argument and assertions about her conduct, which are irrelevant as a matter of law to the writers' state of mind and the issue of lack of actual malice on this Motion.

[C] Ms. DuVernay describes the timeline scenes as "***dramatized and invented scenes*** based on our research. DuVernay Decl. ¶¶ 64, 66 (emphasis added). ***Not one source*** cited at Paragraphs 67-72 of Ms. DuVernay's Declaration states that Ms. Fairstein was – at any point in time –involved in understanding or creating a timeline. The Burns book, cited at Paragraph 68, which discusses "the evidence available to the prosecution on the eve of trial" states "[t]he timeline, as it was originally constructed by ***police*** ...looked shaky." DX-27, at pp. 123-124 (emphasis added). The Dwyer article cited at Paragraph 69 names Elizabeth Lederer as the "lead prosecutor" referenced in the parenthetical. DX-51, at DEFS007368. The *Daily News* article cited in Paragraph 69 states that "Police gave the chronology after the first attacks." The Ryan Affirmation does not name Ms. Fairstein or attribute the time line to her. DX-21.

**DEFENDANTS' REPLY** to [C] and [D]: Defendants admit that, as is typical and necessary in a dramatization, the timeline scenes depicting conversations behind closed doors are "dramatized and invented," grounded in the filmmakers' sources. (DuVernay Decl. at ¶ 66.) Plaintiff has presented no evidence in her above "responses" that the writers did not subjectively believe that the essence of the timeline scene was true based on their sources.

[D] Ms. Swicord likewise states that the timeline scenes are "invented scenes based on her research" and acknowledges she "did not have any direct evidence of the conversations between police and prosecutors behind closed doors." Swicord Decl. ¶¶ 67-68. The sources cited in Ms. Swicord's declaration point to ***Ms. Lederer*** as having knowledge about the "disagreement about the timing of the attacks." Swicord Decl. p. 31 (citing Sullivan).

**DEFENDANTS' REPLY** to [D]: See above.

[E] The Sullivan and Burns books point to Lederer as the person with knowledge about the timing of the attacks at all stages of the prosecutorial investigation and prosecution of the case. *See* DX-17, Sullivan, at DEFS168821 (pp. 22-23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus" and "This was the point at which the accounts Lederer was reading began to differ significantly"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements

spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements. .could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week"); DX-27, Burns, DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"), DEFS168755 (p. 140) ("Lederer was able to paint her version of the story and present the most damning evidence, the written and videotaped statements"); DEFS168785 (p. 201) ("Fairstein. .had assigned her deputy Lederer to prosecute the original convictions"), DEFS168766 (p. 162) (regarding the time lines in Lederer's opening statements, "Rather than investigate the reason that the defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury.").

**DEFENDANTS' REPLY** to [E]: Plaintiff cites additional statements in the referenced sources, none of which contradict the writers' reading of those sources or their interpretation based on the totality of their sources.  Plaintiff's efforts throughout her "responses" to push knowledge and responsibility for problems with the case onto Lederer are not responsive to the filmmakers' state of mind based on their sources, which stated, among other things, that Fairstein was Lederer's boss and the only supervisor on the scene, before any videotaped "confessions" were taken, that she went to the crime scene with the Five, and that she exercised control over the cops at the precincts.  (*See* SUF 83.)

121.    The writers' sources reflected that, in their statements, the Five gave inconsistent timelines of the attacks and rape and the prosecutors therefore had to choose which stories to believe or disbelieve. (Ex. 21, Affirmation, ¶¶ 86, 97-98; Ex. 27, S. Burns at 125; Ex. 51, Dwyer & Flynn.)

**PLAINTIFF'S RESPONSE**:

Denied.

According to Burns' book, "Rather than investigate the reason that the defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury." DX-27, DEFS168766 (p. 162). Burns also stated that while Lederer was taking video statements, "there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer." DX-27, at DEFS168705 (p. 51). Per Sullivan, an "elite crew" of detectives had

"conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews. .. As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus" and "This was the point at which the accounts Lederer was reading began to differ significantly." DX-17, at DEFS168821 (pp. 22-23).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Responses as non-responsive and an improper denial.

122.    The writers' sources reflected that a timeline was pushed out to the press and published the morning of April 22 that connected the rape to the other events in the Park and timed it at 10:05 p.m. (Ex. 27, S. Burns at 124; Ex. 19, Burns Doc. at 1:03:19-1:05:15; Ex. 72, "Park Marauders call it: 'WILDING'," *N.Y. Daily News* (Apr. 22, 1989) (from Ms. Swicord's files).)

**RESPONSE**:

Admitted with the qualification that the writers' sources show that the New York Police Department announced the timeline to the press. DX-27, at 124; DX-72. No source cited above attributes the timeline to Ms. Fairstein.

123.    The writers' sources reflected that after the initial timeline was published, the prosecutors landed on a different chronology that moved the rape back in time, and took it to trial on that theory, stating that the jogger was attacked at 9:30 and there was "not the remotest chance" the attack took place after 10:00. (Ex. 27, S. Burns at 124-125; Ex. 51, Dwyer & Flynn; Ex. 73, Excerpt of Summation of Elizabeth Lederer in trial of Antron McCray, Raymond Santana and Yusef Salaam.)

**RESPONSE**:

Denied.

The sources cited above attribute the chronology and quote to Ms. Lederer, not "prosecutors."

124.    The writers' sources reflected that Plaintiff oversaw and supervised the prosecution that went forward based on the timeline. (Ex. 25, Toobin; Ex. 51, Dwyer & Flynn; Ex. 52, Smolow; Ex. 50, Leland; Ex. 39A, Warren; Ex. 38A, Santana.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Toobin article (DX-25), a retrospective defense of the work done on the case, does not discuss the timeline and refers to Ms. Fairstein as "the prosecutor who led the sex crimes unit of the Manhattan district attorney's office at the time of the jogger case." Dwyer (DX-51) attributes the timeline to "lead prosecutor" Elizabeth Lederer. *Id.* at DEFS007368. Smolow (DX-52), a 2002 article (with the full text cut off), merely states that Ms. Fairstein oversaw the prosecution of the original case. The 2016 Leland article, (DX-50), offers no specifics around Mr. Morgenthau's quote about Ms. Fairstein.

Michael Warren, counsel to Mr. Santana and Mr. Richardson, was not at any precinct to observe Ms. Fairstein in 1989 because he did not represent any of the Five until after the Reyes confession. PX-160, at DEFS0022596-99. Mr. Warren was counsel to Messrs. Santana, Richardson and McCray in their civil action against New York City. DX-24, at p. 1. Ms. DuVernay testified that Mr. Warren is a biased source, and "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. Tr. 94:5-18. Ms. DuVernay also testified that Mr. Warren had no involvement in the Central Park Jogger case in 1989. *Id.* at 68:5-11.

In response to Ms. DuVernay's direct questions about Ms. Fairstein, Mr. Santana said, in her "deposition," Ms. Fairstein testified that she had "no part in the investigation." Mr. Santana is talking about the Five's civil action against New York City and that Ms. Fairstein's "big defense" with Ken Burns was that she had nothing to do with the investigation. DX-38B. Mr. Santana also states that, at her deposition, Ms. Fairstein said "it wasn't me." Mr. Santana also references emails that Ms. Fairstein sent about the reinvestigation. Mr. Santana says that Ms. Fairstein was "making phone calls, telling officers what to do and where to go." *Id.* However, it is not clear that this statement is based on his personal knowledge from 1989 or part of the allegations in the Five's civil action against New York City. Even assuming that these statements are accurate, they are so general that they still do not support the manner in which Ms. Fairstein was depicted in the five scenes at issue in this action. *See also* Plaintiff's Resp. to Paragraph 64, incorporated by reference herein.

In the interview transcript, Ms. DuVernay asks Mr. Santana if Ms. Fairstein is lying PX-61, at DEFS022662. *See* DX-38A. Mr. Santana also states that "when you look at the case, I didn't meet her. I didn't know her." *Id.* at DEFS022662. He refers to what he heard in "depositions." *Id.* Mr. Santana further discusses Ms. Fairstein's statements about the Five's civil action against the City. *Id.* at DEFS022663 ("This case is going to trial"). Mr. Santana then states that Ms. Fairstein testified at her deposition that all she "did was answer phone

calls and send out some emails." *Id.* It is not clear that the D.A.'s office had email in 1989 or that Ms. Fairstein would have had access to email at the 20th or 24th Precincts in the days after the attacks in Central Park. Ms. DuVernay could not recall whether she obtained, or reviewed, Ms. Fairstein's deposition transcript though she had the opportunity to do so. PX-62, *Id.* at DEFS093406; PX-51, DuVernay Dep. Tr. 123:7-128:12.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Responses as non-responsive and further deny the unsupported assertions within Plaintiff's response.

125.    Plaintiff admits that both the police and prosecutors worked on timelines. (Compl. ¶ 85.)

**RESPONSE**:

Admitted with the qualification that Paragraph 85 of the Complaint states that "Ms. Fairstein was not responsible for putting together, nor did she put together, a timeline of events during the course of the interviews that took place between April 19, 1989-April 21, 1989, or anytime thereafter. *See* PX-1, Fairstein Decl. (6/29/20), at ¶¶ 20-21. In addition, unverified pleadings are inadmissible hearsay. FRE 801(c). *See Thomas*, 2022 WL 504787, at n. 1.

126.    The sources reflected that the police and prosecutors were working hand in hand to put together the timeline during those early days of the investigation. (Ex. 20, Byfield at 140 ("Police and prosecutors, while trying to construct a logical sequence to explain what is often described vernacularly as 'muggings,' decided *then* that these alleged teen muggers, some of whom they had in custody, were now also rapists"); Ex. 74, NBC News Clip.)

**RESPONSE**:

Denied.

The Byfield book cites a 1990 source, which post-dates the early days of the case. Byfield further notes that "early press reports" quoted an NYPD spokesperson. The sources discussed in Plaintiff's responses to Paragraphs 120 and 122, incorporated by reference herein, identify the police as releasing a timeline in the early days and Ms. Lederer being aware of the statements that were being made at the precincts. The undated, NBC News Clip is barely audible but seems to discuss that police put together a timeline based on interviews conducted by "Manhattan Detectives" and the "Manhattan District Attorney's Office." DX-74.

127.    As reflected in the writers' contemporaneous notes, the writers believed, based on their sources, that as the Head of the Unit prosecuting the case and highest ranking official on the scene, with the reputation of an aggressive, hands-on prosecutor, acting in an investigative capacity and "controlling" the cops in the precincts (SUF ¶¶ 80-86, *supra*), Plaintiff had a hand in crafting a timeline that fit the theory of the case and discussed those problems with the detectives at the precincts. (*See* DuVernay Decl. ¶¶ 73-75; Ex. 2, DuVernay Dep. at 145-147; Swicord Decl. ¶¶ 73-75; Ex. 31, Swicord Dep. at 164, 171-173, 177-178; Ex. 75, 12/18/17 Swicord Letter.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  Nothing in Plaintiff's Response contradicts this SUF and Defendants' statement that the writers believed, based on their sources, that Ms. Fairstein's portrayal in the timeline scene was accurate.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] Plaintiff incorporates her responses to Paragraphs 80-86 by reference herein. There is one "letter" cited above, which contains no references to any source material, and which hardly constitutes the "writers" contemporaneous notes. The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY** to [1]: Denied.  *See* Reply to SUF 56.

[2] None of the sources cited at Paragraph 74 of Ms. DuVernay's declaration state that Ms. Fairstein was at any precinct while individuals were being questioned prior to 8:00 p.m. on April 20, 1989. Nor do any sources state that Ms. Fairstein was working on, or aware of, timeline "problems." *Id.* On the contrary, the Burns and Sullivan books state that Ms. Lederer was aware of issues with the timeline and the statements that were taken by police. DX-17, Sullivan, at DEFS168821 (pp. 22-23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus" and "This was the point at which the accounts Lederer was reading began to differ significantly"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions"

and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week"); DX-27, Burns, DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"), DEFS168755 (p. 140) ("Lederer was able to paint her version of the story and present the most damning evidence, the written and videotaped statements"); DEFS168785 (p. 201) ("Fairstein...had assigned her deputy Lederer to prosecute the original convictions"), DEFS168766 (p. 162) (regarding the time lines in Lederer's opening statements, "Rather than investigate the reason that the defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury."). Ms. DuVernay was, further, placed on notice by Ms. Fairstein that the Burns documentary contained inaccuracies. *See* Plaintiff's Resp. to Paragraph 105. In any event, the depiction in the Burns documentary of Ms. Fairstein, Ms. Lederer and Mr. Clements at the crime scene does not lend support to the portrayal of Ms. Fairstein in the timeline scenes.

**DEFENDANTS' REPLY** to [2]: Plaintiff's statements present no evidence to contradict Ms. DuVernay's belief, based on her research, that Ms. Fairstein was in communication with the police from early in the morning and present at the precincts during the day of April 20. (DuVernay Decl. at ¶¶ 74-75.)

[3] When asked what specific source revealed to her that "Ms. Fairstein was in the precinct house creating a timeline of the attacks in the park?" Ms. DuVernay replied "This is not a documentary. So the movements, dialogue, actions of the characters are not pinned to, connected to, backed up by specific pieces of information." PX-51, DuVernay Dep. Tr. 144:8-14. This contradicts Ms. Swicord's statement to a ████████████████ ████████████████████████████████████████ PX-47, at DEFS163025; PX-34, Swicord Dep. Tr. 29:15-36:13. At her deposition, Ms. DuVernay could not specify a source that placed Ms. Fairstein at any precinct creating a timeline of the attacks in the Park or that Ms. Fairstein knew the timeline of attacks in the park on April 19, 1989-April 21, 1989. PX-51, DuVernay Dep. Tr. 142:22-149:10.

**DEFENDANTS' REPLY** to [3]: Plaintiff's response selectively quotes Ms. DuVernay's deposition testimony on this scene. Ms. DuVernay testified that she believed that "[t]he detectives, Linda Fairstein, Elizabeth Lederer worked together in the investigation to create a timeline led by Linda Fairstein." (PX-51 at 146:18-23.) She further stated that this was based on her research:

I believe that as the senior public official in the precincts for over 36 hours, as [Ms. Fairstein] states, who was present for what she calls a brilliant investigation – a brilliant investigation that was actually coerced confessions, the confessions which were all about where they were and when, which changed from boy to boy multiple times, all that backed up by multiple sources is what led me to believe and is the research that I feel confirms for me my opinion that she was there, that she was involved with creating the timeline and that she led the detectives and Lederer in that effort.

(*Id*. at 146:25 – 147:12.)

[4] When asked "[w]hat evidence did you have that [Ms.] Fairstein was creating a timeline when she was at the 20th precinct?" Ms. Swicord replied, "[i]t is commonplace for people working on solving a crime to make a timeline. So it seemed like something she would have been doing with her time as they were trying to figure out exactly what happened." PX-34, Swicord Dep. Tr. 164:15-22. Ms. Swicord did not ask the writers' assistant to put together a timeline of Ms. Fairstein's movements, nor did she ask the writers' assistant to put together a timeline of when the police became aware of the various attacks in Central Park. *Id.* at 162:2-10. Ms. Swicord did not consult with any former District Attorney's from the Manhattan D.A.'s office. *Id.* at 127:6-128:16, 165:6-17.

**DEFENDANTS' REPLY** to [4] - [6]: Plaintiff's response also selectively quotes Ms. Swicord's deposition testimony on this scene.  Ms. Swicord testified that Ms. Fairstein "is quoted in the [Toobin] article as describing the rooms that the boys were being held in, the youth rooms, and she says that anyone who had witnessed these interviews would have been convinced.  So I am taking her at her word that she was there and could witness what was going on at the 20th Precinct."  (PX-34 at 180:10-21.)  Ms. Swicord also testified that she believed Ms. Fairstein was at the 20th Precinct earlier in the day on April 20th because

She was front and center in the investigation.  She describes herself as the 800-pound gorilla in the room, because she has an MO of being intimately involved in the investigations of the cases that she takes on, and because she was checking in on these interrogations there at the precinct.

\*\*\*

[F]or example, we know that she checked with the cops to see where they were in their interrogation of Yusef. She had someone reporting to her that there was a lawyer downstairs, Nocenti.  And so she was keeping tabs on what was happening in these interrogations.

(*Id*. at 182:2-24.) Plaintiff has presented no evidence that Ms. Swicord did not subjectively believe that the essence of the timeline scene was true based on her sources.

Defendants admit that Ms. Swicord did "not ask the writers' assistant to put together a timeline of Ms. Fairstein's movements, nor did she ask the writers' assistant to put together a timeline of when the police became aware of the various attacks in Central Park" and "did not consult with any former District Attorney's from the Manhattan D.A.'s office." Defendants deny that these are material facts to Defendants' Motion.  Plaintiff's Opposition brief explicitly states that "Defendants' failure to investigate is not at issue in this action because they undisputedly conducted extensive research"  (ECF No. 183 at 22 n. 32), as Plaintiff know that failure to investigate is not grounds for actual malice.  Yet the facts cited in Plaintiff's Response speak only to alleged failure to investigate.

[5] Ms. Swicord's letter to Ms. Locke and Ms. DuVernay about the "coerced confessions" clearly states "[w]ithout having copies of the defendants' initial signed statements from their interrogations, ***I have been having to intuit*** how the information gets warped and the lies are forced into the kids' confessions." DX-75, at DEFS092974 (emphasis added).

**DEFENDANTS' REPLY** to [5]:  Defendants admit the content of Ms. Swicord's letter. See above.

[6] Ms. Swicord had no concrete information about Ms. Fairstein's alleged involvement with either the timeline or confessions. She simply "believed that [Ms. Fairstein] was at the [20[th]] precinct earlier and that she came back to the precinct at eight p.m." PX-34, Swicord Dep. Tr. 179:40-183:18. Ms. Swicord could not pinpoint where any of the interrogations occurred and did not know whether Ms. Fairstein was at the Central Park Precinct. *Id.* She did not have the writers' assistants research Ms. Fairstein's location during the morning or afternoon of April 20, 1989. *Id.* Ms. Swicord's declaration demonstrates that the "invented" timeline scenes are just that—based on sheer supposition as opposed to any semblance of evidence because she "knew that ***someone*** had to be creating the timeline behind the scenes and fitting the facts together from the interrogations." Swicord Decl. ¶ 75. At her deposition, Ms. Swicord acknowledged that ***police chiefs*** were present at the precincts. When asked if it was her "view that [Ms.] Fairstein outranked the chiefs of detectives that were at the precinct houses," she answered "I don't know how the rankings go between cops and prosecutors who are acting as investigators, as well." PX-34, Swicord Tr. 126:18128:2. The writers' research materials showed that the ***police*** announced a timeline to the press soon after the attacks in the Park. DX-27, at 124; DX-72. Ms. Swicord further ignored that, per the writing assistants' interrogation timeline, there were multiple individuals questioned at different locations at the same time, and before Ms. Fairstein was even aware of the case. PX-193 DEFS093141-143; DX-27, Burns, at p. 36 (Fairstein received call at 9:00 a.m. on April 20).

**DEFENDANTS' REPLY** to [6]: Denied. See above.

[7] Ms. DuVernay's outline for the Series, which was provided to Netflix in January 2018, lists Chief of Detectives Robert Colangelo as the first law enforcement character. PX-53, at DEFS169309; PX-51, DuVernay Dep. Tr. 51:5-52:1. Colangelo provided the press with information about the Central Park Jogger case in the days immediately following the attacks in Central Park, including the release of the timeline of the attacks on April 22, 1989. DX-72; DX-36, at DEFS007145-46, DEFS007150952, DEFS007165, DEFS007423-27, DEFS007432-33.

**DEFENDANTS' REPLY** to [7]: Defendants admit that Robert Colangelo is listed in Ms. DuVernay's January 2018 outline and that Mr. Colangelo provided the press with information about the Central Park Jogger case in the days following the attack. Defendants deny that these facts contradict this SUF. In fact, DX-72 confirms that the other attacks and timeline of the attacks was known in the early days of the investigation, contrary to Ms. Fairstein's claims otherwise.

[8] The evidence above contradicts Ms. DuVernay's assertion that "at most, the events that [Ms. Fairstein] is complaining about which show her controlling police and giving instructions regarding the interrogations are compressed for time." DuVernay Decl. ¶ 75.

**DEFENDANTS' REPLY** to [8]: Denied. Defendants incorporate their Reply to [1] – [7].

128.    The writers believed, based on their sources, that Plaintiff "sprang to action" the morning of April 20, 1989 and was involved with the police at the precincts that day (SUF ¶¶ 8386, *supra*), and therefore was aware of the statements being given by the boys and the timeline problems. (*See* DuVernay Decl. ¶¶ 73-75; Swicord Decl. ¶¶ 71-75; Ex. 31, Swicord Dep. at 121-122, 126-127, 180-183; Ex. 75, 12/18/17 Swicord Letter.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 83-86 by reference herein. Plaintiff incorporates her response to Paragraph 127 herein. The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

The Burns book contradicts Ms. Swicord's assertion that statements made by Ms. Meili's neighbor and co-worker were "reported to police shortly after Ms. Meili was identified." Swicord Decl. ¶ 71. Per Burns, on the "eve of trial" "[t]he timeline as it was originally constructed by the ***police*** and quickly disseminated to the media, also looked shaky. The initial time line had been constructed based on the statements of the teenagers to the

detectives, but even those statements did not provide a consistent time line for when the rape occurred." DX-27, at 123-124 (emphasis added). "But when Trisha Meili awoke from her coma, she was able to tell investigators about her jogging route and pace." *Id.* Burns refers to the statements made by Ms. Meili's neighbor and coworker as "new information," which post dated the time in which police released the previous timeline to the media. *Id.*

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. Defendants incorporate their Reply to SUF 56 as if set forth fully herein.

129.    The writers believed, based on their sources, that the process of figuring out the timeline continued into the night of April 20 and the next day as more statements were being made about the timing of the attacks, when Ms. Fairstein herself concedes she was at the precincts before Korey Wise and Yusef Salaam had even been picked up, before Plaintiff took some of the Five to the crime scene with detectives and before any of the videotaped "confessions" were made. (*See* DuVernay Decl. ¶ 76; Swicord Decl. ¶ 76; Ex. 31, Swicord Dep. at 172-173.) Even if the writers had been convinced that Ms. Fairstein was not physically at the precincts until later in the day on April 20, that would not have changed their portrayal. (DuVernay Decl. ¶ 75; Swicord Decl. ¶¶ 51, 75.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 121-128 by reference herein.

The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

Ms. Fairstein testified that she was at the 20th Precinct from 8:30 p.m. on April 20 until about 12:30 a.m. on April 21, 1989. She then went to the 24th Precinct. PX-2, Fairstein Dep. Tr. 213:21-214:8. When asked "[a]nd while you were there, the police and Ms. Lederer and yourself and others were continuing to sort all the facts out, like lawyers do, correct?" Ms. Fairstein responded, "No." PX-2, Fairstein Dep. Tr. 220:5-22. Ms. Fairstein testified that she was at the 20th Precinct at the same time as Messrs. Salaam and Wise but she "did not even know they had been brought in." PX-2, Fairstein Dep. Tr. 220:23-221:17. *See also*, PX-22, 24-32; Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A.

The Swicord deposition testimony cited above does not support the statement above.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Reply to SUF 56 as if set forth fully herein.

130.    While the process of putting together the timeline in this case may have actually taken place over a longer period of time, that process was compressed or "telescoped" into one scene in the Series. (*See* DuVernay Decl. ¶ 77; Swicord Decl. ¶ 77.)

**PLAINTIFF'S RESPONSE**:

Denied.

As discussed at length in Ms. Fairstein's responses to Paragraphs 120-129, which are incorporated by reference herein, in the Series' timeline scenes, the writers targeted Ms. Fairstein, and portrayed her as knowing Ms. Meili's jogging route, putting together a timeline, ignoring the discrepancy in the timeline and instructing police to obtain confessions to fit the incorrect timeline. The writers also portrayed Ms. Fairstein and police of being in possession of facts that they did not have in the days following the attacks in the Park. No sources cited by Ms. DuVernay or Ms. Swicord support this depiction of Ms. Fairstein and several contradict the manner in which she is portrayed in the timeline scenes.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.

131.    In Episode 1 of the Series, the writers condensed the action into one Precinct instead of using the Central Park Precinct, the 20th Precinct and the 24th Precinct. This structural device was used to reduce the amount of back and forth needed to be shown and condense events to their essence for time and narrative purposes. (*See* Swicord Decl. ¶ 57.)

**PLAINTIFF'S RESPONSE**:

Denied.

The writers' own "Interrogation Timeline" shows that Antron McCray, Kevin Richardson and Raymond Santana were all questioned by detectives at the Central Park Precinct. PX-193, DEFS093140-148. This timeline does not reference Ms. Fairstein. *Id.* No source relied upon by the writers places Ms. Fairstein at the Central Park Precinct. *See* DuVernay Decl. ¶¶ 64-103 and Swicord Decl. ¶¶ 67-100; DX-27, Burns, pp. 28-44. Testimony from the trials of the Central Park Jogger case—which Ms. Swicord and Ms. DuVernay elected not to read, shows that Ms. Fairstein was not at the Central Park Precinct. PX-22, 24-32; Pltf.

SJ Opp. Br., Statement of Facts, Pt. III.A; PX-34, Swicord Dep. Tr. 151:6-8, 152:11-17, 152:24-153:2; DuVernay Decl. ¶¶ 36, 59 (read trial and suppression hearing transcripts but did not review testimony of police and prosecutors who "lied"). Given that Ms. Fairstein is portrayed in the Series as directing detectives not to use "kid gloves" when interrogating Mr. Richardson it is not credible for Ms. Swicord to assert that "condensing the action into one Precinct" reduced "audience confusion." *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit that the interrogations took place at multiple precincts, but state that they were condensed into one precinct for time and narrative purposes.  Plaintiff cites no evidence to dispute this.

Plaintiff's reference to "kid gloves" is confusing and bears no relevance to the timeline scene.

132.   The writers believed based on their sources that portraying Ms. Fairstein assembling the timeline was consistent not only with her supervisory position, reputation and actions, but also with the spirit and essence of her own publicly expressed point of view that the kids in the Park were connected to and guilty of the rape, even after Reyes came forward and despite the criticism of the timeline in the Ryan Affirmation. (*See* DuVernay Decl. ¶ 78; Swicord Decl. ¶ 78; Ex. 21, Affirmation, ¶¶ 97-100.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] Plaintiff incorporates her responses to Paragraphs 121-128 by reference herein.

[2] Ms. Fairstein had no "publicly expressed view" during the investigation and prosecution of the Central Park Jogger case. None of the newspaper articles in the writers' research binder from the 1989 time period following the attacks in Central Park name Ms. Fairstein as involved in the Central Park Jogger "investigation" or prosecution. Nor do they contain any statements from Ms. Fairstein. DX-36, DEFS007145-7233, DEFS007428-7433; PX-34, Swicord Dep. Tr. 76:24-78:20, 92:4-111:21. Ms. Fairstein was featured in a

February 1990 *New York Times* article, located in Defendants' research binder, which describes her as "a witness" at pretrial hearings in the Central Park Jogger case and Ms. Lederer as "the prosecutor." DX-36, at DEFS007241. *See* DuVernay Decl. ¶ 51(c). Ms. Fairstein is referenced in only two, additional articles in 1990 regarding her role as a witness at trial. DX-36, at DEFS007294-97.

**DEFENDANTS' REPLY** to [2]: Defendants object to Plaintiff's Response as an improper denial and move to strike. Nothing in this SUF regarding Plaintiff's publicly expressed views is limited to the time period "during the investigation and prosecution of the Central Park Jogger case" as Plaintiff contends.

[3] Statements relating to Ms. Fairstein's retrospective defense of the police investigation and prosecution of the Central Park Jogger case, over a decade after the attacks in the Park, serve to show that Ms. Fairstein disagreed with the Ryan reinvestigation, conducted in 2002, not that Ms. Fairstein was involved in putting together a timeline in 1989. *Fairstein*, 558 F. Supp. 3d at 70-71.

**DEFENDANTS' REPLY** to [3]: Defendants object to Plaintiff's Response as argumentative and move to strike. Defendants deny Plaintiff's characterization of the motion to dismiss ruling.

[4] The Ryan Affirmation makes no mention of Fairstein. DX-21. The Ryan Affirmation states that timeline issues were "apparent at the time of trial." DX-21, at ¶ 99. It also states that:

> It could be, and it was, credibly, honestly and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual. Indeed, given the involvement of a number of people, and the violence of the events at issue, some level of genuine confusion is probably inevitable. In this case in particular, those arguments were bolstered by the fact that the crime occurred at night, that the lighting was poor, and that the defendants were involved in a number of incidents.

*Id.* Per Sarah Burns, the police put together the timeline at the precincts, Ms. Lederer should have noted inconsistences in the statements during the videotaping and Ms. Lederer became aware of an issue with the timeline on the eve of trial. DX-27, Burns, at pp. 49, 51, 123-124, 140, and 162.

**DEFENDANTS' REPLY** to [4]: Plaintiff's argument that the Ryan Affirmation "makes no mention" of Ms. Fairstein is not relevant. It refers to the Prosecution generally and Plaintiff was admittedly the Head of the Unit.

Plaintiff cites a sentence in the Affirmation that it could be "credibly, honestly and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual." The inclusion of this statement does

not change the principal thrust of the Affirmation, and as the writers interpreted it, was that the only evidence of the Five's guilt were the "confessions" which had "'serious weaknesses'" apparent from the start to those present at the precincts and in charge of the Prosecution, and were ultimately shown to be false. Ms. DuVernay's belief that the Affirmation was conveying that the confessions therefore had to have been coerced (DuVernay Decl. at ¶¶ 44, 125-127) is further supported by the references to the Five's youth and that they only implicated themselves after repeated interrogation. (*See* Ex. 21, Affirmation at ¶ 10).

[5] The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY** to [5]:  Denied.  *See* Reply to SUF 56.

## 2.   Police Briefing (Ex. 30B, Scene Chart No. 2; Ex. 30 at Episode 1, 00:18:40 – 00:20:29)

133.    The writers believed, based on their sources, that the investigation which Ms. Fairstein led had rushed to judgment and unjustly focused on the Black and Latino youth who were accused of committing other crimes in the Park on April 19, ignoring other possibilities and suspects (*i.e.,* Matias Reyes). (DuVernay Decl. ¶ 82; Ex. 2, DuVernay Dep. at 107; Swicord Decl. ¶ 82; Ex. 31, Swicord Dep. at 149-151; *see, e.g.,* Ex. 21, Affirmation, ¶ 104; Ex. 20, Byfield at 140; Ex. 27, S. Burns at 45.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] Plaintiff incorporates her responses to Paragraphs 54, 75, 77, 80, 84, 85, 86, 91, 93, 96-103 and 120-132 by reference herein.

**DEFENDANTS' REPLY** to [1]:  Defendants object to Plaintiff's blanket incorporation of her responses, many of which have nothing to do with this SUF, and move to strike.

[2] The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY** to [2]:  Denied.  *See* Reply to SUF 56.


[3] Ms. DuVernay's declaration, at Paragraph 82, cites the Ryan Affirmation selectively, ignoring Ryan's statement that "Certainly, ***no one would have thought*** that as the defendants and their group were making their way through Central Park, a serial rapist was also at large." DX-21, Ryan Aff. ¶ 103 (emphasis added). *See* Fairstein Decl. (11/29/22), Ex. A, at 120-126, 131-135, 144-155.

**DEFENDANTS' REPLY** to [3]:  Defendants admit that Plaintiff accurately quotes the Affirmation, but states that Plaintiff's selective quotation does not contradict Ms. DuVernay's belief as stated in Paragraph 82 of her Declaration.


[4] Page 107 of the DuVernay deposition transcript does not support the statement above. Ms. DuVernay further testified that she did not speak with any individuals, such as NYPD officers involved in the Central Park Jogger case, who would have knowledge of conversations between district attorneys and police officers at the precincts. PX-51, DuVernay Dep. Tr. 106:13-107:4. When asked, "Can you name one source that expressly states that Ms. Fairstein was involved in lining up police to agree to her strategy in 1989?" Ms. DuVernay further testified, "[i]t's not a documentary. So it's not conversation to conversation, word for word. All of our research coalesces into a point of view, a belief, an opinion, a critique about a character." *Id.* 107:16-24. Ms. Swicord told a ███████ ███████████████████████████████████ PX-47, at DEFS163025; PX-34, Swicord Dep. Tr. 29:15-36:13.

**DEFENDANTS' REPLY** to [4]: Defendants admit that Ms. DuVernay did not speak with NYPD officers involved in the Central Park Jogger case, but deny that this is a material fact to Defendants' Motion.  See Reply to SUF 60.

Defendants deny that Ms. DuVernay could not name any sources supporting this scene. When asked specifically, she stated the Burns book.  (PX-51 at 108:3-5.)  Plaintiff's counsel did not follow-up on Ms. DuVernay's response any further.  The remainder of Ms. DuVernay's sources are specifically set forth in her interrogatory response.  (DX-44.)

████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

[5] When asked "When writing the scene concerning the sweep of Harlem, what evidence did you have that Ms. Fairstein directed officers to conduct a sweep of Harlem?" Ms. Swicord stated "I believed that she was there" and "the directive came from ***someone*** who

was integrally involved in that investigation and setting up the case." PX-34, Swicord Dep. Tr. 149:10-150:20. Ms. Swicord testified that she elected not to read the trial and suppression hearing transcripts from the Central Park Jogger case. *Id.* at 151:6-153:19; PX-39. The trial and suppression hearing transcripts show that Ms. Fairstein was not involved in, nor did she direct, any round up. PX-22, 24-32; Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A. Eric Reynolds, who was an NYPD officer involved in bringing individuals into the precincts for questioning, testified in this action that there was no round up ordered by Ms. Fairstein or others, that such an order never would have been given, nor would Ms. Fairstein have had the authority to order police or detectives to round up anyone. PX-21, Reynolds Dep. Tr. 23:25-41:16; 175:4-182:20.

**DEFENDANTS' REPLY** to [5]: Defendants admit that Ms. Swicord did not read the trial and suppression hearing transcripts, but deny that it is a fact material to Defendants' Motion. Ms. Swicord stated in her declaration that she "felt that through [her] other materials, including the Burns book, Sullivan book and interviews with the Five, [she] had sufficient information to understand what happened during the early days of the investigation and that reading the actual trial testimony against the Five would not be additive—certainly not the authorities' testimony about what happened at the Precincts and their view that the Five's statements were voluntary and uncoerced, which [she] and the other writers absolutely believed to be untruthful." (Swicord Decl. at ¶ 17.) In addition, Plaintiff's general cite to hundreds of pages of suppression hearing and trial transcripts is improper and should be stricken.

Defendants state that Mr. Reynolds' testimony in this action is immaterial because it is not information that was available to the writers.

[6] The Byfield book does not support the statement above. DX-20, at 140.

**DEFENDANTS' REPLY** to [6]: Denied; Defendants state that the Byfield book is a written document which speaks for itself and deny any statements inconsistent therewith.

[7] The Burns book does not support the statement above. On the contrary it says:

> The Manhattan North Homicide team working at the 20th Precinct continued ***their investigation*** by picking up other teenagers who's been named by those already in custody. On the evening of April 20, twenty-four hours after the first arrests, four detectives from Manhattan North arrived at the Schomburg towers with a list of names.

DX-27, at 45 (emphasis added).

**DEFENDANTS' REPLY** to [7]: Denied; Defendants state that the Burns book is a written document which speaks for itself and deny any statements inconsistent therewith.

134.    The writers' sources reported that the Five and the other kids were rounded-up based on their race and the fact that they were in the park that night. (DuVernay Decl. ¶ 83; Swicord Decl. ¶¶ 82-84; Ex. 31, Swicord Dep. at 149-151; Ex. 76, William Glaberson, "Art of Questioning; Some Jogger Defense Lawyers Fear A Colleague's Cross Examinations," *N.Y. Times* (July 26, 1990) (handwriting and markings original to Ms. Swicord); Ex. 77, Ronald Sullivan, "Defense Calls Jogger Case a Racist Witch Hunt," *N.Y. Times* (Nov. 29, 1990) (from Ms. Swicord's files).)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  Plaintiff's Response fails to address the sources cited in this Paragraph.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] The research materials created by the writers' assistants showed that individuals were brought into various precincts for questioning (i) immediately upon being arrested in Central Park or (ii) after being named by individuals who had been questioned. Per the "Interrogation Timeline" Messrs. Santana and Richardson and "Lamont and Steve" were immediately brought into the Central Park Precinct after being arrested in the Park. PX-193, DEFS093140-148. Mr. McCray was questioned and then released. *Id.* at DEFS093141. Mr. Richardson implicated Mr. McCray, Clarence Thomas and Lamont McCall. Police went out and picked them up. *Id.* at DEFS093143. Mr. McCray implicated Mr. Salaam. *Id.* at DEFS093144. Later, detectives picked up Mr. Salaam and Mr. Wise. DEFS093146. Ms. Fairstein is not mentioned in this document. *See also* PX-192, at DEFS091783, 91791, 91799 and 91800. Emails between writers' assistant, Hannah Baker, and Ms. Swicord clearly state—based on the trial transcripts from the original case—that either Lieutenant Doyle told detectives to pick up Yusef Salaam at 9:30 p.m. on April 20, 1989 or Detective McKenna sent detectives to pick up Mr. Salaam after he was identified by Al Morris. PX-191, DEFS082899. In the writers' research materials, Ms. Fairstein is not mentioned as having ordered detectives to pick up Mr. Salaam. *See* PX-22, 24-32.

**DEFENDANTS' REPLY** to [1] and [2]:  Defendants admit the substance of the writers notes and emails cited in Plaintiff's Paragraphs [1] and [2], but deny that these materials contradict the writers' overall views of Fairstein's role "controlling the cops" behind the scenes based on the totality of their sources cited in SUF.  The notes at PX-191 (focusing on confirming the timing of when Yusef and Korey were picked up in the late evening on 4/20/89 between 9:30 and 10:45pm) and the notes at PX-196 (noting the writers would establish the Precinct through the cops' dialogue with Fairstein) further evidence the

writers' belief that Ms. Fairstein was present at the precinct and controlling the cops behind the scenes.

[2] Notes from February 2018 show that Ms. DuVernay was aware of the order in which the Five were picked up and that they were picked up as a result of being named by others. Per the notes, "Instead of seeing the boys naming each other in the Pre-Accusation section, all of that information can come out in the cops relaying information to Fairstein." Per the notes "Establish precinct through Fairstein. She gives directive to pick up other boys and we transition to the round up." Per the notes "You need Antron, Yusef, and Korey to be picked up after Kevin and Raymond, but can group Antron/Yusef/Korey being picked up closer together and cut the Pre-Accusation scenes in the precinct. Plump up the Fairstein scenes to help get across that information." Also "How do we sprinkle in the boys who are being held into the Fairstein scenes to motivate the narrative she creates? How does she know who to go and get?" PX-196, at DEFS100714-715.

**DEFENDANTS' REPLY** to [2]:  See above.

[3] Ms. Swicord elected not to read the trial transcripts, though, at her request, the writers' assistants relied on them to track certain events. PX-191, DEFS082899. Ms. Swicord did not read the suppression hearing transcripts. PX-34, Swicord Dep. Tr. 151:6-153:19; PX-39. Ms. DuVernay read the trial and suppression hearing transcripts but disregarded the testimony of police and prosecutors because she believes they lied. DuVernay Decl. ¶¶ 36, 44, 59. The trial and suppression hearing transcripts show that Ms. Fairstein was not involved in, nor did she direct, any round up. PX-22, 24-32; Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A. Eric Reynolds, who was an NYPD officer involved in bringing individuals into the precincts for questioning, testified in this action that there was no round up ordered by Ms. Fairstein or others, that such an order never would have been given, nor would Ms. Fairstein have had the authority to order police or detectives to round up anyone. PX-21, Reynolds Dep. Tr. 23:25-41:16; 175:4-182:20.

**DEFENDANTS' REPLY** to [3]:  Defendants incorporate their Reply to SUF 133[5] as if fully set forth herein and deny Plaintiff's unsupported assertions.

[4] The Burns book, cited in Ms. Swicord's Declaration at Paragraph 83, states that Manhattan North Homicide Detectives continued *their* investigation by picking up other teenagers who had been named by those already in custody. *See id.* Sullivan, also cited by Swicord, states that, detectives were cross-referencing *the names mentioned in each kid's statement* and trying to find and interview as many as thirty teenagers. Also, as Lederer and Clements continued their prosecutorial investigation after leaving the precincts, detectives were trying to interview "each of the thirty-three kids *whose names had been mentioned by one suspect or another.*" Swicord Decl. p. 40-41 (citing Sullivan pp. 39, 53-54) (emphasis added). None of the sources cited by Ms. Swicord indicate that police went to the projects to pick up every young black male for questioning. The only reference to detectives going to the projects is when Lederer and Clements continued their investigation

after leaving the precincts. No source even suggests that Ms. Fairstein ordered police to go out and pick up anyone or that police were directed—by Ms. Fairstein or anyone else—to go into the projects and pick up "every young black male." DX-30, Ep. 1, at 19:59-20:29.

**DEFENDANTS' REPLY** to [4]: Denied.  Nothing in this Paragraph contradicts this SUF that the Five and the other kids were rounded-up based on their race and the fact that they were in the park that night.  *See also* Reply to SUF 144, *infra*.

[5] Ms. Swicord testified that her insertion of Ms. Fairstein into the scene in which she orders a discriminatory canvas of Harlem was based on mere belief about her involvement: "policemen were sent to round up every kid that had been in the park that night before and instructed to go into Schomburg and Taft, and they did go into Schomburg and Taft, two projects.  That directive came from ***someone*** who was integrally involved in that investigation and in setting up the case." PX-34, Swicord Dep. Tr. 149:2-150:6 (emphasis added). She further testified that Ms. Fairstein is "the face of the investigation and the face of the prosecution, ***so we believe*** she would have been involved at this level." PX-34, Swicord Dep. Tr. 150:13-20. *See Fairstein*, 553 F. Supp. 3d 78-79.

**DEFENDANTS' REPLY** to [5]: Plaintiff selectively quotes Ms. Swicord's testimony on this scene.  Ms. Swicord testified that:

> Based on everything that we had reviewed, I believed that Linda Fairstein was integrally involved in the investigation, that she had participated in developing the theory of the case, which is that it was a gang narrative and a gang rape, and that the boys who were being held there were the people that had done this crime, these crimes.  And so, based on our understanding and our belief, I believed that she was there.

(PX-34 at 149:10-22.)

[6] The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY** to [6]:  Denied.  *See* Reply to SUF 56.

135.    The writers' sources reported that the police continued, into the night of April 20 and through April 21, to round up youths from Harlem and bring them in for questioning, and that Korey Wise and Yusef Salaam were not picked up until 10:45 p.m. on April 20. (DuVernay Decl. ¶¶ 84-86; Swicord Decl. ¶¶ 83-84; Ex. 17, Sullivan at 54; Ex. 27, S. Burns at 45.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Fairstein incorporates her response to Paragraph 134 by reference herein.

Ms. DuVernay's declaration, at Paragraphs 84-86, cites no source which suggests that Ms. Fairstein was involved in directing detectives who to pick up and when. Ms. DuVernay also merely "believes" this to be the case based on Ms. Fairstein's 2002 statement that the police investigation was one of the most brilliant she had ever *seen*. DuVernay Decl. ¶ 87. Ms. Fairstein's "issue", as raised in Ms. DuVernay's declaration, is that—as the writers' sources point out—the individuals brought in for questioning were identified by others as being involved in the attacks in the park and there was no general directive from Ms. Fairstein, or others, to pick up every young black male in the projects. DuVernay Decl. ¶ 86. *See* Plaintiff's Response to Paragraph 134.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.

136.    The "police briefing" scene takes place *prior to* the time Korey and Yusef are shown being "rounded up" in the very next scene. (Ex. 30 at Episode 1, 00:20:30 – 00:22:14.)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that, per the Court's opinion, the scene would be understood by viewers as Ms. Fairstein ordering police to conduct a discriminatory canvas of Harlem as opposed to "briefing" police. *See Fairstein*, 553 F. Supp. 3d 78-79. Per the *writers' own research*, individuals *other than Ms. Fairstein* ordered detectives to bring in Mr. Salaam after he was identified by either Mr. McCray or Al Morris. PX-191, PX-193, at DEFS093144, 93146; PX-192, at DEFS091783, 91791, 91799 and 91800. PX-22, 2432.

137.    The filmmakers relied on the depiction in the Burns documentary, which Plaintiff herself concedes made it seem like there were "sweeps" of Harlem. (DuVernay Decl. ¶ 84; Swicord Decl. ¶ 83; Ex. 19, Burns Doc.; Ex. 63, 12/10/18 Email.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Burns film states "while Kevin Richardson, Raymond Santana and others were being interrogated, police rounded up several more teenagers." DX-19, at 27:30-27:40. This provides a timeframe for the "round up" which precludes Ms. Fairstein's presence because,

she was not at the Central Park Precinct when Messrs. Richardson and Santana were questioned. PX-22, 24-32; Pltf. SJ Opp. Br., Statement of Facts, Pt.III.A. This frame does not mention Ms. Fairstein. Moreover, Defendants were on notice that the Burns film was inaccurate. DX-63, at LF000385893-84.

As discussed in Plaintiff's response to Paragraph 134, the sources relied upon by the writers show that detectives went out to pick up individuals who had **been identified by others** as participating in the attacks in Central Park and, thus, there was no sweep.



DX-63, at LF00035893. In any event, in 2016, Ms. Fairstein told the filmmakers that the Burns film was inaccurate and libelous. *See* Pltf. Resp. to Paragraph 105, *supra*, incorporated by reference herein.

138.    The writers believed, based on their sources, that Plaintiff was intimately involved with the investigation in the early stages and was present for and overseeing the roundup of additional suspects in Harlem. (DuVernay Decl. ¶¶ 87-88; Ex. 2, DuVernay Dep. at 121-122; Swicord Decl. ¶¶ 86-88; Ex. 31, Swicord Dep. at 149-151.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 134-137 by reference herein.

Ms. DuVernay admitted that the Series depicts Ms. Fairstein "directing the police to go as a group into the projects and round up boys." PX-51, DuVernay Dep. Tr. 120:1-5. When asked "[w]hat source do you have that she actually gave an order to police to pick anyone up at all?" Ms. DuVernay answered "Well, this is not a documentary. So it is not a point-to-point process. *Id*. at 120:12-17.

Ms. DuVernay admits that this is an "invented scene." DuVernay Decl. ¶ 82 (citing the Ryan Affirmation which makes no reference to Ms. Fairstein and, in Paragraph 103, states that no one could have known that a serial rapist was at large). Ms. DuVernay states that the dialogue in the scene is "drawn from the timeline and description of events that the authorities put out to the media." DuVernay Decl. ¶ 80. She cites to Paragraph 69 of her declaration. The sources cited in Paragraph 69 do not suggest that Ms. Fairstein was involved in the police investigation or timeline. The Burns book, which discusses "the evidence available to the prosecution on the eve of trial" states "[t]he timeline, as it was

originally constructed by ***police*** ...looked shaky." DX-27, at pp. 123-124 (emphasis added). The Dwyer article cited names Elizabeth Lederer as the "lead prosecutor." DX-51, at DEFS007368. The *Daily News* article states that "Police gave the chronology after the first attacks." DX-72. *See also* Swicord Decl. ¶¶ 69, 80-81; Plaintiff's Responses to Paragraphs 75, 121-132; Pltf. SJ Opp. Statement of Facts, Pt. III.A; PX-22, 24-32.

The filmmakers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Plaintiff's response selectively quotes Ms. DuVernay's testimony on this scene.  When asked for her sources for this scene, Ms. DuVernay responded:

> I have -- there are many times in our research, many parts of our research that speak to her leading the investigation.

> One that comes to mind is the interview with Michael Warren where he speaks to the fact that she controlled the cops were his word -- were his words.

> Raymond Santana himself, after sitting through years of court proceedings and all the trials, including the civil case, obviously being very familiar with everything that happened in his own case, spoke to the fact that she was – she played a leadership role, that she was deferred to, that her voice was powerful in this -- in these cases.

> And there was also, if I recall -- and like I said, we had extensive research.

> And Tim Sullivan's book "Unequal Verdicts," he speaks to the fact that she loved an investigation and -- as much as a prosecution. In her article, her interview with Jeffrey Toobin, she calls herself a 800-pound gorilla who was at the precincts to help assist and provide resources.

> Cumulatively, taken all together, along with many other things, I believe that she was the leader. She was the one in charge at that time. And that is what we brought into our creative process, and that is how we portrayed her.

(PX-51 at 121:2 – 122:7.)  The full list of Ms. DuVernay's sources for this scene is contained in her interrogatory responses.  (DX-44.)

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

139.    The writers' sources reported that Plaintiff was "controlling" the cops in the precincts and "was the person behind making the phone calls, telling the officers what to do, and where to go". (Ex. 39A, Warren; Ex. 38A, Santana.)

**PLAINTIFF'S RESPONSE**:

Admitted, with the qualification that Ms. DuVernay admitted that her sources were biased and neither source cited above had personal knowledge about what Ms. Fairstein was doing in 1989. Mr. Warren was Mr. Santana's attorney in the Five's lawsuit against New York City. Plaintiff incorporates the portions of her response to Paragraph 77, which discuss the Warren and Santana interviews, by reference herein. *See also*, Pltf. SJ Opp., Statement of Facts, Pt. III.A; PX-22, 24-32.

140.    In drafting this scene, the writers relied on Plaintiff's own statements in the Toobin interview indicating that she was present for and knowledgeable about the continuing roundup:

> On the day after the assaults, Fairstein went to the Twentieth Precinct, on the Upper West Side, where detectives and her colleague Elizabeth Lederer were interrogating suspects. 'I was there to be the eight-hundred-pound-gorilla, to help Elizabeth and the cops get the resources they needed. . . . I watched and listened to these kids. . . . At first, the detectives didn't have much to go on. 'A kid would say something like "a dark-skinned guy who lives on 102nd Street,"' Fairstein said. 'And these detectives would go out and find him. I think it was one of the most brilliant police investigations I've ever seen.'
>
> ***
>
> 'We all did here what we did every day. We were there to find out who did it.'

(Ex. 25, Toobin; DuVernay Decl. ¶ 87; Ex. 2, DuVernay Dep. at 121-122; Swicord Decl. ¶¶ 86-87; Ex. 31, Swicord Dep. at 180.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Fairstein's 2002 interview with Mr. Toobin does not state that, in 1989, she was present for and "knowledgeable" about "the continuing roundup." Mr. Toobin's own commentary is interspersed with Ms. Fairstein's quotes and her statements are a retrospective discussion about the case in the wake of "the five men convicted in the case ... recently su[ing] to clear their names." DX-25. *See Fairstein*, 553 F. Supp. 3d at 71.

141.    Ms. Fairstein herself publicly used dehumanizing terms to refer to the Five. As she told Mr. Toobin, she believed serial rapist Matias Reyes "ran with that pack of kids," referencing the infamous "Wolf Pack's Prey" headlines from 1989 about the Five teens. (Ex. 25, Toobin; DuVernay Decl. ¶ 91; Ex. 27, Burns at 116-117.)

**PLAINTIFF'S RESPONSE**:

Denied.

In the article, written in 2002, Ms. Fairstein does not use the term wolf pack or refer to any headlines from the 1989 timeframe. DEX-25. The Burns book, which post-dates the Toobin article by nine years, does not attribute the "wolfpack" language to Ms. Fairstein. The book points out that "[s]ince World War II, the term *wolfpack* has been used from time to time to refer to gangs of teenagers committing robberies or assaults in cities." DX-27, Burns. At 70. *See* DuVernay Decl. ¶ 91. In the Toobin article, Ms. Fairstein refers to "the kids" as opposed to the Five. DX-25. Nancy Ryan's Affirmation in support of vacating the Five's convictions, which post-dates the Toobin article, states "[t]he other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured." DX-21, Ryan Aff. ¶ 109.

142.    Plaintiff testified that a "thug" is "someone who physically attacks other people with wanton disregard for their well-being" (which is what she claims the Five and other teens in the Park that night did) and has admitted that police officers and prosecutors, including herself, use the term. (Ex. 4, Fairstein Dep. at 110-12.)

**PLAINTIFF'S RESPONSE**:

Admitted, subject to the qualification that Ms. Fairstein did not testify that she used, or would have used the word "thug" in reference to the Five in 1989 and that the Series does not merely depict Ms. Fairstein using the word, it does so in reference to a discriminatory canvas of Harlem. *Fairstein*, 553 F. Supp. 3d at 78-79, 81. DuVernay admits that she added the word "thug" to the dialogue in Scene 2 to "explore themes of unconscious bias."

DuVernay Decl. ¶¶ 90, 94. This comports with Fairstein's allegation that the word "thug" has racist connotations today that it ***did not have in the past***. Compl. ¶ 103.

Further, when moving to vacate the Five's convictions, Nancy Ryan agreed with Ms. Fairstein's "claims" referenced above—that teens in the Park acted with wanton disregard for the well being of the people attacked. The Ryan Affirmation, upon which the writers relied, states that "[t]he other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, ***apparently undertaken for the fun of it***, which left some terrorized, two knocked into unconsciousness, and one seriously injured." DX-21, Ryan Aff. ¶ 109 (emphasis added). The Affirmation further states that "[i]n the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements all placed Wise at the scene of earlier incidents." *Id.* ¶ 117. Also, "In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape." *Id.* ¶ 117.

Ms. DuVernay testified that the focus of her work was "on the investigation of the five boys and Trisha Meili" and she "wasn't concerned about what Ms. Fairstein knew about other crimes" when writing certain scenes for the Series. PX-51, DuVernay Dep. Tr. 147:21-149:10.

**DEFENDANTS' REPLY:** Defendants move to strike the second and third paragraphs of Plaintiff's Response as non-responsive. To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

The Ryan Affirmation speaks for itself and Defendants deny any statements inconsistent therewith. Further, the Ryan Affirmation also recommended that the convictions of the Five for the other crimes be vacated, finding that "there was no significant evidence at trial establishing the defendants' involvement in the other crimes of which they stand convicted that would not have been substantially and fatally weakened by the newly discovered evidence in this matter." (DX-21 at ¶ 117; *see also* SUF 36.)

The cited portion of Ms. DuVernay's testimony is not relevant to this Paragraph.

143.    Ms. DuVernay intended this scene to convey that Ms. Fairstein and her colleagues spoke about the Five and other teens in the Park that night in a derogatory manner consistent with their belief that the teens had participated in criminal wrong-doing, and Ms. Fairstein was looking to find and pick up every kid who was in the park that night as a suspect in the rape, because they believed the events were connected. (DuVernay Decl. ¶¶ 92-94.)

**PLAINTIFF'S RESPONSE**:

Denied.

Per Ms. DuVernay's declaration, she incorporated the word "thug" into the dialogue of the round up scene to demonstrate bias against Black children. DuVernay Decl. ¶¶ 94. An initial draft of the script, written by Ms. Swicord, portrayed Ms. Fairstein saying "I want an army of blue up in Harlem. Bring in every kid who was in the park last night. Go into the projects. Stop every young male you see." PX-42, at DEFS008185.

What Ms. DuVernay claims she intended raises issues of credibility that cannot be decided at this stage of the action. *Palin*, 482 F. Supp. 3d at 219.

Discussing this scene, the Court previously held that "[t]he average viewer would not necessarily conclude that [Fairstein's] remarks were merely a reflection of the filmmakers' opinions about the perspective of law enforcement and could instead conclude that Fairstein directed discriminatory policing practices. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience." *Fairstein*, 553 F. Supp. 3d at 79. As discussed in Plaintiff's responses to Paragraphs 134-142, incorporated by reference herein, Defendants were not in possession of any facts which supported their depiction of Ms. Fairstein in the "police briefing" scene.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

144.    Ms. DuVernay intended the dialogue in the police briefing scene to focus on bringing in the kids who were "in the park last night" and who fit the description given by other kids ("I have some of them and descriptions of others"). She did not intend to convey a directive to literally or illegally pick up "*every* little thug" in Harlem. (DuVernay Decl. ¶ 93.)

**RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] In email communications with her assistant, Hannah Baker, regarding notes to the Episode 1 script, Ms. DuVernay describes Ms. Fairstein as directing a "sweep." PX-194, at 93715. In the emails, Ms. Baker notes:

Potential Inconsistency: The motivation for picking up Yusef lands on p66, but his arrest has been moved up. Is there any other reasoning for his name to be on the detectives' list? Is there any motivation for him not being interrogated at this point?

To which Ms. DuVernay responds:

I've added a little emphasis on Kevin naming a tall kid as one of the potential attackers. A loose connection. I don't think we need a lot more detail there. Fairstein says **_sweep got black ma[l]es_** so I feel that functions fine for getting them all in without having to do more set-up. For now anyway. Also I see the late interrogation as a function of just processing a bunch of kids. Plus the timing fits the story we're telling :)

*Id.* (emphasis added).

DEFENDANTS' REPLY to [1]: Defendants admit the substance of PX-194 but deny that it contradicts this Paragraph. It instead supports SUF 144 and Ms. DuVernay's testimony. As quoted in Plaintiff's response, in PX-194 Ms. DuVernay stated that she "added a little emphasis on Kevin naming a tall kid as one of the potential attackers" to show why Yusef is getting picked up.  (PX-194 at DEFS093715.)  In the final Series, Ms. Fairstein tells the detectives:

I have some of them and descriptions of others, but I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now.  I want units out strong. C'mon, guys.  What did we miss?  Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see.  You bring in every kid who was in the park last night.

(DX-30 at Episode 1, 00:19:59 – 20:29.)  In the next scene, when Yusef and Korey are seen being picked up, the detective asks Yusef for his ID, states that Yusef "fits the description" and confirms "Yep, Yusef Salaam" while looking at a list.  The detective then states that Korey is "not on the list".  (*Id*. at 00:20:59 – 00:22:13.)


[2] Ms. DuVernay testified that a roundup is "when there is an overwhelming police presence at a certain – in a certain window of time, and there's an expressed intent, that's a roundup." She continued, "It's an intention...to go into certain communities, largely black and brown communities, with an expressed goal looking for something, sometimes trying to stir up something, make something happen." PX-51, DuVernay Dep. Tr. 118:21-119:25. Ms. DuVernay also testified that she portrayed Ms. Fairstein "directing the police to go as a group into the projects and round up boys." *Id.* at 120:1-5. Ms. DuVernay further testified that, "backed up by our intention to tell the stories of the men," she believed that Ms. Fairstein "did play a leading role in the men – the boys at that time – being pursued, taken off the street, taken out of their homes, and brought into the precinct to be coerced into these confessions." *Id.* at 120:6-121:1.

**DEFENDANTS' REPLY** to [2]: Defendants admit the substance of Ms. DuVernay's testimony quoted in Plaintiff's response.  Defendants incorporate their reply to Paragraph 138 as if fully set forth herein.

[3] Ms. Swicord testified that that a scene depicting Ms. Fairstein ordering "a general sweep of Harlem was in the series that aired." PX-34, Swicord Tr. 149:2-9.

**DEFENDANTS' REPLY** to [3]: Defendants admit the substance of Ms. Swicord's testimony quoted in Plaintiff's response but refer to her full testimony for completeness, and incorporate their replies above to [1] and [2].

[4] At a "Culture Summit" attended by Netflix executive Alison Engel and Ms. DuVernay, the following was noted by Ms. Engel about the Series "Linda Fairstein – think of this as a reckoning for her ***prosecutorial misconduct***." PX-150; PX-137, Engel Tr., 154:20-158:13 (emphasis added).

**DEFENDANTS' REPLY** to [4]: Defendants admit that Plaintiff accurately quoted PX-150, but deny that it is a material fact related to Defendants' Motion.  PX-150 does not reference this specific Scene, or any specific scene in the Series.  Defendants incorporate their Reply to SUF 79[4] on this document as if fully set forth herein.

[5] A producer of the Series also copied Ms. DuVernay on a casting description for Ms. Fairstein's role, sent to a well-known actress, which described Fairstein as "fighting sexual assault with the full arsenal of her skill set, ***blurring the line between what was ethical*** and what was essential for the jogger." PX-148 (emphasis added).

**DEFENDANTS' REPLY** to [5]: Defendants admit the substance of PX-148, but deny that it is a material fact related to Defendants' Motion.  PX-148 does not reference this specific Scene, or any specific scene in the Series, and is not probative of the writers' subjective intent in drafting this specific Scene.  In all events, PX-148 does not contradict this SUF or the writers' beliefs based on their research.  In addition, Plaintiff admits that she did not sue over the scene concerning her treatment of  Yusef and Mrs. Salaam, which Ms. DuVernay found unethical.  (*See* SUF 150.)

[6] A voice over of Felicity Huffman in the police briefing scene is included in the Series' teaser video, which was released On March 1, 2019. DX-84; PX-111, Wolff 30(b)(6) Dep. Tr. 26:6-27:11, 80:12-97:13. According to messages between a Netflix employee and the outside agency working on the teaser, Ms. DuVernay insisted that Ms. Fairstein be included in the teaser -- she "threw down, she wants Fairstein." PX-119; PX-120, at DEFS171553; PX-121 (discussing decision on including Fairstein in teaser as potentially setting "the tone for our working relationship later"). A Netflix marketing employee communicated to team members that using Ms. Fairstein in the teaser "nails what she's looking for: The conflict. The tension. The drama. The reason consumers would tune in." PX-121. The same employee reported "I asked her about PR...if we went with Fairstein's VO, and if Fairstein

came after us, would Ava be willing to participate, esp so our actors weren't doing press alone, having to answer Qs about whatever Fairstein might be saying. She said 'yes, of course,' she would be a 'voice' for the campaign." PX-121, at DEFS153633. Another employee weighed in "I don't know if it is worth the upfront potential backlash." PX-121, at DEFS153631.

**DEFENDANTS' REPLY** to [6]: Defendants admit that Ms. Huffman's voiceover from this scene appears in the teaser for the Series. Defendants admit that Ms. DuVernay preferred the version of the teaser with Ms. Huffman's voiceover and requested that it be included. (DuVernay Decl. at ¶¶ 135-136.) Defendants admit that Plaintiff accurately quotes PX-119 and PX-121 but refers to the documents in their entirety for completeness and context. Ms. DuVernay's reasoning for wanting to include this dialogue in the teaser is set forth in her Declaration: "Showing two opposing sides—on one hand a mother trying to protect her son as an innocent child, and on the other, a representative of the criminal justice system trying to put him away as a criminal—is what the whole series is about." (DuVernay Decl. at ¶ 136.)

[7] Prior to the Series airing, Ms. DuVernay texted Ms. Locke about Ms. Fairstein "She 'bout to feel it all." PX-87; PX-81, Locke Dep. Tr. 59:5-63:18.

**DEFENDANTS' REPLY** to [7]: Defendants admit the substance of PX-87, but deny that it is relevant to this scene or a material fact related to Defendants' Motion. Defendants state that this message was exchanged *after* Ms. Locke and Ms. DuVernay had conducted extensive research for the Series, and Defendants incorporate their Reply to SUF 79[5] on this document as if fully set forth herein.

[8] What Ms. DuVernay claims she intended raises issues of credibility that cannot be decided at this stage of the action. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY** to [8]: Denied. *See* Reply to SUF 56.

[9] Discussing this scene, the Court previously held that "[t]he average viewer would not necessarily conclude that [Fairstein's] remarks were merely a reflection of the filmmakers' opinions about the perspective of law enforcement and could instead conclude that Fairstein directed discriminatory policing practices. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience." *Fairstein*, 553 F. Supp. 3d at 79. As discussed in Plaintiff's responses to Paragraphs 134-142, incorporated by reference herein, Defendants were not in possession of any facts which supported their depiction of Ms. Fairstein in the "police briefing" scene.

**DEFENDANTS' REPLY** to [9]: Defendants admit the content of the Motion to Dismiss ruling but deny the remainder of Paragraph [9].

145.     It is Ms. DuVernay's opinion and social commentary that, as a result of unconscious bias, those in power did not see Black children as children first, but rather as criminals or "thugs." (DuVernay Decl. ¶¶ 92-94.)

**PLAINTIFF'S RESPONSE**:

Denied.

At a "Culture Summit" attended by Netflix executive Alison Engel and Ms. DuVernay, at which the Series was discussed, the following was noted by Ms. Engel about the Series "the system isn't broken; it's designed for this outcome. It's not an accident or due to unconscious bias. Designed to benefit those in power." PX-150; PX-137, Engel Tr., 154:20-158:13.

Ms. DuVernay's testimony about "unconscious bias" is inadmissible because it would tend to confuse or mislead the jury and is more prejudicial than probative. Whether or not "unconscious bias" was involved in the prosecution of the Five in 1989 is not at issue in this action. Nor is Ms. DuVernay a sociologist or psychologist who can provide expert testimony about this issue. FRE 401, 402, 403, 701, 702.

What Ms. DuVernay claims is her "opinion and social commentary" raises issues of credibility that cannot be decided at this stage of the action. *Palin*, 482 F. Supp. 3d at 219. Discussing this scene, the Court previously held that "[t]he average viewer would not necessarily conclude that [Fairstein's] remarks were ***merely a reflection of the filmmakers' opinions about the perspective of law enforcement*** and could instead conclude that Fairstein directed discriminatory policing practices." *Fairstein*, 553 F. Supp. 3d at 79 (emphasis added).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit that Plaintiff accurately quoted PX-150, but deny that the quoted statement is attributed to Ms. DuVernay or reflective of her beliefs.  There is no evidence who made this statement at the workshop.  (PX-137 at 155:8-11 (stating that the notes are a "documentation of what was discussed at the summit").)  Defendants incorporate their Reply to SUF 79[5] as if set forth fully herein.

Defendants incorporate their Reply to SUF 98 on Ms. DuVernay's statements about unconscious bias.

146.     It is Ms. DuVernay's opinion and social commentary that the investigation and prosecution which Ms. Fairstein oversaw, her blind spots on the evidence and rush to judgment,

and her conduct in the incident with Yusef and his mother all reflected bias on Ms. Fairstein's part.

(DuVernay Decl. ¶ 94.)

**RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 54, 75, 77, 80, 84, 85, 86, 91, 93, 96-103 and 120-142 by reference herein.

The "incident" with Yusef Salaam's mother (not Mr. Salaam) is not relevant to the remaining scenes at issue in this action. FRE 401, 402.

What Ms. DuVernay claims is her "opinion and social commentary" raises issues of credibility that cannot be decided at this stage of the action. *Palin*, 482 F. Supp. 3d at 219. Discussing this scene, the Court previously held that "[t]he average viewer would not necessarily conclude that [Fairstein's] remarks were ***merely a reflection of the filmmakers' opinions about the perspective of law enforcement*** and could instead conclude that Fairstein directed discriminatory policing practices." *Fairstein*, 553 F. Supp. 3d at 79 (emphasis added).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

147.    The sources reflected that Plaintiff and the detectives thought it was proper to pick up the kids who were in the park that night as suspects in the rape, because they believed the events were connected. (Ex. 20, Byfield at 140; Ex. 27, S. Burns at 45.)

**RESPONSE**:

Denied.

As discussed in Plaintiff's Responses to Paragraphs 134, 138-140, which are incorporated by reference herein, the sources relied on by the writers (i) do not even suggest that Ms. Fairstein was involved in the NYPD's decisions about who would be picked up in regard to the attacks in Central Park and (ii) show that police picked up individuals who were first identified by others during interviews with detectives.

Ms. DuVernay testified that the focus of her work was "on the investigation of the five boys and Trisha Meili" and she "wasn't concerned about what Ms. Fairstein knew about other crimes" when writing certain scenes. PX-51, DuVernay Dep. Tr. 147:21-149:10.

The Byfield book does not support the statement above and does not even mention Ms. Fairstein. DX-20, at 140.

The Burns book does not support the statement above. On the contrary it says:

> The Manhattan North Homicide team working at the 20th Precinct continued *their investigation* by picking up other teenagers who's been named by those already in custody. On the evening of April 20, twenty-four hours after the first arrests, four detectives from Manhattan North arrived at the Schomburg towers with a list of names.

DX-27, at 45 (emphasis added).

### 3. "No Kid Gloves" (Ex. 30B, Scene Chart No. 3; Ex. 30 at Episode 1_00:22:35 – 00:22:53)

148.    Ms. DuVernay believed that the dialogue in the "no kid gloves" scene is the type of heightened language commonly heard in dramatizations of law enforcement authorities who are under great pressure to find the perpetrators of a terrible crime. (*See* DuVernay Decl. ¶ 96.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] What Ms. DuVernay "believes" raises credibility issues that cannot be decided at this stage of the action. *Palin v. N.Y. Times*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY** to [1]:  Denied.  *See* Reply to SUF 56.

[2] Notably, the scene cited above must be considered in the context of Episode 1, including subsequent scenes showing the police interrogations of Mr. Richardson and "members of the Five and others with varying levels of verbal aggression and what appears to be non-injurious physical contact." *Fairstein*, 553 F. Supp. 3d at 77. The Court held that "[t]his language goes beyond dramatic trope or rhetorical hyperbole: The average viewer could understand her comments as an instruction to coerce suspects into naming accomplices, and to treat suspects as adults rather than minors because Fairstein considers them rapists." *Fairstein*, 553 F. Supp. 3d at 77-78.

**DEFENDANTS' REPLY** to [2]:  Defendants admit the content of the Motion to Dismiss ruling.

[3] At a "Culture Summit" attended by Netflix executive Alison Engel and Ms. DuVernay, the following was noted by Ms. Engel about the Series "Linda Fairstein – think of this as a reckoning for her ***prosecutorial misconduct***." PX-150; PX-137, Engel Tr., 154:20-158:13 (emphasis added).

**DEFENDANTS' REPLY** to [3]: Defendants admit that Plaintiff accurately quoted PX-150, but deny that it is a material fact related to Defendants' Motion.  Defendants incorporate their Reply to SUF 79[4] on this document as if fully set forth herein.

[4] A producer of the Series sent Ms. DuVernay a casting description for Ms. Fairstein's role which stated: "Fairstein, with the assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following thirty straight hours of interrogation and intimidation" PX-147.

**DEFENDANTS' REPLY** to [4]: Defendants admit that Plaintiff accurately quoted PX-147, but deny that it is a material fact related to Defendants' Motion, or contradicts this SUF in any event.  A *draft* casting description drafted by a third-party producer is not probative of the writers' subjective intent in drafting this scene.  Nor does this document refer to any specific scene in the Series in particular.

[5] A producer of the Series also copied Ms. DuVernay on a casting description for Ms. Fairstein's role, sent to a well-known actress, which described Fairstein as "fighting sexual assault with the full arsenal of her skill set, ***blurring the line between what was ethical*** and what was essential for the jogger." PX-148 (emphasis added)

**DEFENDANTS' REPLY** to [5]: Defendants admit the substance of PX-148.  Defendants incorporate their Reply to SUF 144[5] on this document as if fully set forth herein.

[6] A January 28, 2018 draft of the Episode 1 script included the following language, right after Ms. Fairstein orders a sweep of Harlem:

> We got twelve kids here in custody? Interrogate. Make them name their accomplices. Every young male who was in the park last night is a suspect in the rape-assault of that young woman who is fighting for her life at Metropolitan Hospital.

PX-45, at DEFS008185.

**DEFENDANTS' REPLY** to [6] – [8]: Defendants admit that this scene changed between the January 28 draft, 2018, May 29, 2018 draft and final draft of the script as quoted in PX-45, PX-159 and PX-158.

[7] A May 29, 2018 script, revised by Ms. Swicord, contains the following dialogue after Nancy Ryan walks out of the briefing room and after Ms. Fairstein directs the sweep of Harlem (including bringing in every "thug"):

> The twelve kids we've got in custody? Interrogate. Make them name their accomplices. Let's get this filth.

In the next scene, Antron McCray is escorted through a precinct with his parents. PX-159, at DEFS004711-4712.

**DEFENDANT'S REPLY** to [7]:  See above.


[8] A shooting draft of the Episode 1 script, with last pages added on September 19, 2018, contains the following dialogue:

> 12 kids in custody. Interrogate. Make them name their accomplices. Our lady jogger deserves this.

The next scene shows Antron McCray's parents at home.  PX-158, at DEFS001644-1645.

**DEFENDANT'S REPLY** to [8]:  See above.


[9] The full dialogue that comprises the "kid gloves" scene in the cut of the Series that was released to Netflix's streaming platform was added to the scene during film editing as part of ADR or "Automated Dialogue Replacement." The changes were noted in an attachment to an email dated January 31, 2019. PX-223, at DEFS172597-99. *See* PX-220; PX-197. The dialogue changes appear to have been made after Netflix gave notes concerning the ordering of the "police briefing" scene and "Linda's admonition about having 12 kids in custody, make them name their accomplices." PX-144; PX-200. Netflix also appears to have given notes prior to the dialogue replacement which state, "We truly feel the work you've done in the beginning to revise the timeline and use Fairstein's manipulation to structure the rush to judgment. There's now a strong sense of pace and energy ratcheting up as you move through the interviews and pressure escalates for all." PX-224, at DEFS174827; PX-145; PX-200.

**DEFENDANTS' REPLY** to  [9]: Defendants admit that the dialogue at issue in this scene was added using ADR.  Defendants deny that this specific dialogue was added based on Netflix's notes and Plaintiff has provided no evidence of that other than her own unsupported speculation.


[10] Netflix 30(b)(6) witness Alison Engel testified that Netflix's notes concerned the "pacing" of the episode. She described pacing as "how we all experience watching a film or series. If it's too slow, you are not so interested in continuing to watch it." PX-137,

Engel Dep. Tr. 114:1-11; 134-11-19. The notes regarding Ms. Fairstein concerned, "[t]he actual structure of the episode and the pacing of the episode and the inter-cutting things or rearranging things to increase pacing." *Id.* at 132:4-14. *See id.* at 130:3- 137:8. The *L.A. Times* published an article concerning an interview with Ms. DuVernay which states that before Ms. DuVernay started editing the Series "she and her team dove into Netflix's mountain of data, paying particular attention to the numbers that showed when viewers stopped watching a show if they weren't engaged. 'You respect that science,' DuVernay says." PX-243, at LF0038150.

**DEFENDANTS' REPLY** to [10]:  Defendants admit that Ms. Engel testified that Netflix's notes on the cuts related to pacing. Ms. Engel also testified that Netflix was "not manipulating the pacing to keep [viewers] there.  It's just a fundamental of storytelling that you want people to stay engaged, and pacing is a part of that."  (PX-137 at 134:11-19.) Defendants admit that Plaintiff accurately quotes PX-243, but deny that it is responsive or a material fact related to Defendants' Motion.

149.    Ms. DuVernay believed that the dialogue in the "no kid gloves" scene, admonishing detectives to "make them name their accomplices" and not to use "kid gloves" because "[t]hese are not kids, they raped this woman," captured the essence of the Fairstein character, based on her powerful position and as revealed in her documented conduct, including particularly her treatment of Yusef Salaam and his family (*see* SUF ¶¶ 83-86, *supra*). (DuVernay Decl. ¶¶ 96-102.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike as non-responsive.  To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

[1] Plaintiff incorporates her responses to Paragraphs 83-86 by reference herein.

[2] This is an "invented" scene. Swicord Decl. ¶ 90.

**DEFENDANTS' REPLY** to [2]: Defendants admit that this is an "invented" scene based on the writers' "sources discussing [Ms. Fairstein's] conduct in the investigation and her own statements about the case."  (Swicord Decl. at ¶ 90.)

[3] The Burns book cited at Paragraph 97 of the DuVernay Declaration does not state that Ms. Fairstein was involved in the detectives' questioning of Mr. Salaam. DX-27, at 46-47. Per Burns, "Mrs. Salaam then demanded several times to see her son immediately, saying

he was a minor, but it was not until she specifically stated that he was fifteen that Fairstein and the detectives took notice. Fairstein said that they believed him to be sixteen." *Id.*

**DEFENDANTS' REPLY** to [3]: Nowhere does Ms. DuVernay state that Ms. Fairstein "was involved in the detectives' questioning of Mr. Salaam." Rather, Ms. DuVernay cites the Burns book for Ms. Fairstein's "treatment of Yusef Salaam and his family[.]" (DuVernay Decl. at ¶ 97.)

[4] The Sullivan book cited at Paragraph 98 of the DuVernay Declaration does not state that Ms. Fairstein directed detectives in the manner in which they were interrogating Yusef Salaam. Per Sullivan, Ms. Fairstein believed that Mr. Salaam was sixteen years old (and was an adult rather than a child under the law), she would have stopped the interrogation if Mr. Nocenti (who had no right to see Mr. Salaam) had said he was calling a lawyer for Mr. Salaam, and ultimately accepted Mrs. Salaam's word that Mr. Salaam was fifteen and told detectives to stop the interview. DX-17, Sullivan at 25-27. Sullivan attributes no quotes to Ms. Fairstein. Per Sullivan:

> [m]ost damaging to Salaam's defense was the testimony of Nocenti, the civil lawyer who was a federal prosecutor.... Under cross-examination by Lederer, Nocenti testified that at no time during the many hours at the police precinct, in none of his many discussions with Salaam's relatives about the boy's rights, did he tell anybody that Yusef was fifteen, nor was he ever asked his 'little brother's' age, nor did he ever hear anybody even discuss the question. ***This strongly contradicted the testimony of Salaam's other witnesses, who claimed the issue was discussed almost constantly with policeman and Fairstein***.

DX-17, Sullivan at p. 89 (emphasis added). PX-198, DEFS133705.

**DEFENDANTS' REPLY** to [3] and [4]: Defendants deny that Plaintiff fully quotes the Burns and Sullivan books on the incidents between Ms. Fairstein and David Nocenti and Sharonne Salaam.

[5] Assuming *arguendo* that Ms. Fairstein had advised detectives in the manner in which to question Mr. Salaam—she did not—the "kid gloves" phrase would not fit this scenario because—according to Ms. DuVernay's sources above—Ms. Fairstein actually believed that Mr. Salaam was an adult. In the Series, Ms. Fairstein is depicted directing detectives not to use kid gloves immediately prior to interrogating ***Mr. Richardson*** as opposed to Mr. Salaam. DX-30, Ep. 1, at 22:35-24:18. In the scene, Eric Reynolds tells the detectives not to interview Richardson because he is only 14, they go in and then engage in physical abuse to the boy who is depicted with a black eye. *Id.* The writers' own "Interrogation Timeline" shows that Mr. Richardson was questioned by detectives at the Central Park Precinct, where he signed a statement. PX-193. Ms. Fairstein was never at the Central Park Precinct nor present during Mr. Richardson's questioning by detectives. PX-2, Fairstein Dep. Tr.

215:6-216:5; PX-21, Reynolds Dep. Tr. 74:3-10; Pltf. SJ Opp. Br., Statement of Facts, Pt. III.A; PX-22-32

**DEFENDANTS' REPLY** to [5] and [6]: Defendants admit that the interrogations took place at multiple precincts, but state that they were condensed into one precinct for time and narrative purposes. Plaintiff cites no evidence to dispute this. Both Ms. DuVernay and Ms. Swicord state in their Declarations that they believe Ms. Fairstein was in communication with the police from the early morning and at the precincts on the afternoon of April 20. (Swicord Decl. at ¶ 50; DuVernay Decl. at ¶ 74.)

[6] Paragraph 100 of Ms. DuVernay's declaration references an interview with Angela Black, Kevin Richardson's sister. According to the Sullivan book, Ms. Black (formerly known as Angela Cuffee) was twenty-four years old at the time that pre-trial hearings were held in the Central Park Jogger case. DX-17, Sullivan, at 232. In the interview cited at Paragraph 100, Ms. Black states that Mr. Richardson was questioned by detectives at the Central Park Precinct, where they obtained his written statements. When she arrived at the Central Park Precinct she was greeted by police officers. Ms. Fairstein is not mentioned as being at the Central Park Precinct. PX-202, DEFS145479, at 5:24-31:51. Ms. Black saw Ms. Fairstein on the night of April 20 at the 20th Precinct. DX-40 (on the night before Mr. Richardson went to the crime scene). *See* PX-192, at DEFS91785, 91787-91788, DEFS91801, DEFS91806; DX-17, Sullivan, at p. 22.

**DEFENDANT'S REPLY** to [6]: See above.

[7] The Toobin article, cited at Paragraph 101 of the DuVernay declaration is a retrospective defense of the case and clearly states that Ms. Fairstein was an observer at the Twentieth Precinct and there to assist Lederer and police with securing resources. The article does not state that detectives got suspects to "name their accomplices." Ms. DuVernay is reading in language that is not there. *Fairstein*, 553 F. Supp. 3d at 71; DX-25.

**DEFENDANTS' REPLY** to [7]: Defendants state that the Toobin article is a written document and deny any statements inconsistent therewith.

[8] The sources that the writers relied upon when creating the Series are all inadmissible hearsay to the extent that they are introduced as the "documented conduct" of Ms. Fairstein. FRE 801(c). Ms. Fairstein's interaction with Mr. Salaam's mother is depicted in the Series and is not part of Ms. Fairstein's defamation claims. DX-30, Ep. 1, at 43:10-45:58. Accordingly, information pertaining to this scene is not relevant to the claims and defenses in this action. FRE 401, 402. Even if it were, it confuses the issues and would mislead the jury. FRE 403.

**DEFENDANTS' REPLY** to [8]:  Plaintiff's objections are improper.  As Plaintiff admits, the sources are admissible non-hearsay.  Defendants deny that the Sharonne Salaam scene is not relevant.

150.    Ms. Fairstein's interaction with Ms. Salaam is depicted in the Series, but is not included in the Complaint. (Ex. 30, at Episode 1, 00:43:25 – 00:44:28.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Fairstein testified that the public was aware of her interaction with Mr. Nocenti and Ms. Salaam from the time of Mr. Salaam's trial. Her interaction with Ms. Salaam was widely publicized in newspaper articles and books and the publicity had no effect on her career or board involvement. For this reason, Ms. Fairstein ruled out the scene cited above as a potential source of harm. PX-2, Fairstein Dep. Tr. 382:12-386:25. The scene is not relevant to any of the claims or defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's "qualification" as non-responsive.  Defendants reply to the additional facts improperly included in Plaintiff's Response as follows:

In Opposition to Defendants' Motion to Dismiss, Plaintiff stated that she did not sue over this scene with Mrs. Salaam because it "could be viewed as portraying Mr. Salaam's, or his mother's, point of view."  (ECF No. 45 at 34 n. 31.)

151.    The Burns book reports that Yusef's mother, aunt and "Big Brother," David Nocenti, were trying to help Yusef but Plaintiff would not allow them to see Yusef while detectives continued interrogating him. (Ex. 27, S. Burns at 46-47.)

**PLAINTIFF'S RESPONSE**:

Denied.

Per Burns, Ms. Fairstein believed that Yusef Salaam was sixteen but ultimately took Ms. Salaam's "word for it" when, after first repeatedly stating Yusef was a minor, she said he was fifteen. DX-27, at 47. Ms. Salaam arrived at the Twentieth Precinct as much as 45 minutes after David Nocenti. *Id.* at 46-47.

This book is inadmissible hearsay if submitted for the truth of the matters asserted therein. FRE 801(c). The information above is not relevant to any of the claims or defenses in this action. FRE 401, 402. Even if it were it would confuse the issues and mislead the jury. FRE 403.

**DEFENDANTS' REPLY:**  As Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's objection is thus meritless.

152.    The Burns book also cites from Justice Titone's dissent on appeal stating: "Linda Fairstein had denied Yusef access to the family members and friends who were downstairs in the precinct, hoping to counsel him. 'Indeed it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'" (Ex. 27, S. Burns at 46-47, 181 (quoting dissent of Titone, J., in *People v. Salaam*).)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that the Burns book points out that the majority denied Mr. Salaam's appeal. The Burns book and Titone's dissenting opinion are both inadmissible hearsay if submitted for the truth of the matters asserted therein. FRE 801(c). *See Chevron Corp.*, 974 F. Supp. 2d at 605-606. The information above is not relevant to any of the claims or defenses in this action. FRE 401, 402. Even if it were, it would confuse the issues and mislead the jury. FRE 403.

**DEFENDANTS' REPLY:**  As Plaintiff concedes, the writers' sources are admissible as non-hearsay.  Pl. Resp. to SUF n. 1.  Plaintiff's objection is thus meritless.

153.    The Sullivan book elaborates on her conduct and beliefs about this incident:

> As far as Fairstein was concerned, they had the killer, he was being interrogated by a skilled detective and he was incriminating himself. Salaam was the last kid she wanted to see represented by a lawyer at that point. . . .

> [Fairstein] was at least relieved at Nocenti's ignorance of criminal law. Instead of insisting on seeing Salaam and asking the detectives questions about the investigation, all Nocenti had to say was: 'I'm calling a lawyer for him now, so you can't question him further.' If he had done that, said Fairstein later, she would have stopped the interrogation. . . .

> [A]t about 12:30 a.m., Ms. Salaam told Fairstein she was getting a lawyer for the boy. Somebody had finally said the magic words Fairstein had been dreading for the past hour.

(Ex. 17, Sullivan at 26-27 (including Ms. Swicord's notes underscoring these passages); Ex. 31,

Swicord Dep. at 60.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Sullivan book contains no quotes from Ms. Fairstein, nor does he cite any sources for the speculation cited above. DX-17, at 26-27. Notably, Mr. Sullivan interviewed the Five's defense attorneys for his book. DX-17, Sullivan, Acknowledgments, DEFS168813-814 (Michael Joseph, Elliot Cook, Colin Moore, Howard Diller, Jesse Berman, William Kunstler, C. Vernon Mason and Natasha Lapiner).

At page 26, Sullivan states:

> Testifying later, Fairstein and Nocenti would disagree about many of the details of their conversation at the Twentieth Precinct, but the essential points were clear. Nocenti, being a federal prosecutor, was precluded by the Department of Justice regulations from representing Salaam. He was there, he said, to assist Mr. Salaam as a friend of the family, and, in that capacity, he wanted to see Yusef.

> Fairstein was within her rights to refuse his request. If Salaam was sixteen he was an adult under the law and authorities did not have to permit him to have visitors before he was questioned. And if he was fifteen (a fact of which Fairstein says she was unaware at the time) the police were only required to give access to a parent or guardian.

DX-17.

Sullivan further states that Ms. Fairstein "had seen plenty of cases in which parents claimed their older teenagers were minors, hoping they'd be released on simple summonses to appear in Family Court" and "Fairstein...took detectives aside and told them that, for the sake of the case, they should accept Ms. Salaam's word that her son was fifteen and tell McKenna to stop the interview." *Id.* at 27.

Per Sullivan:

> [m]ost damaging to Salaam's defense was the testimony of Nocenti, the civil lawyer who was a federal prosecutor.... Under cross-examination by Lederer, Nocenti testified that at no time during the many hours at the police precinct, in none of his many discussions with Salaam's relatives about the boy's rights, did he tell anybody that Yusef was fifteen, nor was he ever asked his 'little brother's' age, nor did he ever hear anybody even discuss the question. ***This strongly contradicted the testimony of Salaam's other witnesses, who claimed the issue was discussed almost constantly with policeman and Fairstein***.

DX-17, Sullivan at p. 89 (emphasis added). PX-198, DEFS133705.

Ms. Swicord did not write the exact dialogue for the "kid gloves" scene so her testimony about the scene, cited above, is irrelevant. FRE 401, 402. *See* Swicord Decl. ¶ 90. *See* DuVernay Decl. ¶ 96.

**DEFENDANTS' REPLY:**  Defendants object to Plaintiff's Response as an improper denial.  Plaintiff does not deny that Sullivan also stated the portion quoted in this SUF.

154.    Ms. Fairstein was interviewed for Mr. Sullivan's book. (Ex. 17, Sullivan at 7; Ex. 4, Fairstein Dep. 114.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Elizabeth Lederer, Tim Clements and the Five's defense counsel were all interviewed by Sullivan. DX-17, Sullivan, Acknowledgments, DEFS168813-814 (Michael Joseph, Elliot Cook, Colin Moore, Howard Diller, Jesse Berman, William Kunstler, C. Vernon Mason and Natasha Lapiner).

155.    Based on Burns, Sullivan and their other sources, Ms. DuVernay and Ms. Swicord firmly believed that Plaintiff did not view Yusef, or any of the Five, as children to be protected, but as "killers" and rapists who should be treated like adults so they would confess and "name accomplices." (DuVernay Decl. ¶¶ 97-102; Swicord Decl. ¶¶ 92-96; Ex. 31, Swicord Dep. at 126.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 148-155 by reference herein.

Ms. Swicord states that she did not write the dialogue at issue and, accordingly, her "beliefs" about the dialogue are irrelevant. FRE 401, 402. Regardless, Ms. Swicord's expression of "shock" at how Ms. Fairstein "would treat Mr. Nocenti" displays her ignorance of the applicable law in 1989, which precluded Ms. Fairstein from allowing family friends access to individuals in custody. DX-17, Sullivan, at 26 ("Fairstein was within her rights to refuse Nocenti's request" to see Salaam). Other than the Series, Ms. Swicord had no experience writing true crime stories. The writers had no consultant to work with, so she relied on Ms. Locke's husband's advice. He is a public defender. PX-34, Swicord Dep. Tr. 164:25-166:12.

The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

Ms. Fairstein's interaction with Mr. Salaam's mother is depicted in the Series but is not part of Ms. Fairstein's defamation claims. Accordingly, information pertaining to this scene is not relevant to the claims and defenses in this action. FRE 401, 402. Even if it were, it confuses the issues and would mislead the jury. FRE 403.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Plaintiff's condescending view of Ms. Swicord's knowledge of the law applicable in 1989 and lack of experience in true crime novels is not material to Defendants' Motion. Defendants object to Plaintiff's mischaracterization of the role of Ms. Locke's husband. (*See* PX-81 at 110:22 – 111:6.)  In any event, this is not a fact material to Defendants' Motion.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

156.    Ms. DuVernay and Ms. Swicord believed that the dialogue in the "no kid gloves" scene was also consistent with Plaintiff's own words vouching for the "brilliant" investigation that resulted in the coerced confessions and the process by which detectives got suspects to "name their accomplices" so more could be brought in for questioning. (Ex. 25, Toobin; DuVernay Decl. ¶ 101; Swicord Decl. ¶ 98.)

**PLAINTIFF'S RESPONSE**:

Denied.

The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256. Ms. Swicord states that she did not write the dialogue at issue and, accordingly, her "beliefs" about the dialogue are irrelevant. FRE 401, 402.

Swicord relied on Michael Warren's statement that Ms. Fairstein was "controlling" the cops. Swicord Decl. ¶ 98. Warren, counsel to Mr. Santana and Mr. Richardson, stated in an interview that Ms. Fairstein "controlled those detectives. She controlled them in the precinct." DX-39A, at DEFS007038. Mr. Warren was not at any precinct to observe Ms. Fairstein in 1989 because he did not represent any of the Five until after the Reyes confession. PX-160, DEFS0022593. Mr. Warren was counsel to Messrs. Santana,

Richardson and McCray in their civil action against New York City. DX-24, at p. 1. Ms. DuVernay testified that Mr. Warren is a biased source, and "[e]veryone in this case is biased. Every single person." PX-51, DuVernay Dep. 94:5-18. Ms. DuVernay also testified that Mr. Warren had no involvement in the Central Park Jogger case in 1989. *Id*. at 68:511.

The Toobin article, cited at Paragraph 101 of the DuVernay Declaration, and Paragraph 98 of the Swicord Declaration, is a retrospective defense of the case and clearly states that Ms. Fairstein was an observer at the Twentieth Precinct and there to assist Lederer and police with securing resources. The article does not state that detectives got suspects to "name their accomplices." Ms. DuVernay is reading in language that is not there. *Fairstein*, 553 F. Supp. 3d at 71; DX-25.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

157.    Ms. DuVernay and Ms. Swicord believe that the Five's confessions were the product of mental and physical coercion. (DuVernay Decl. ¶ 102; Ex. 2, DuVernay Dep. at 131, 146-147; Swicord Decl. ¶¶ 99-101.)

**PLAINTIFF'S RESPONSE**:

Denied.

The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256.

Paragraphs 99-101 of Ms. Swicord's Declaration contains information that is not relevant to the claims or defenses in this action. FRE 401, 402. Even it if were, it confuses issues and would mislead the jury. Ms. Swicord also offers inadmissible expert testimony that should be disregarded by the Court. FRE 701, 702. *See* Swicord Decl. ¶¶ 99-100 and n. 8. Ms. Swicord's declaration also contains inadmissible hearsay. FRE 801(c). *See* ¶¶ 99-100 and n. 8.



Ms. DuVernay's declaration attributes the alleged "physical and mental coercion" noted above to NYPD officers. DuVernay Decl. ¶ 102. Ms. Fairstein did not participate in any

questioning of the Five. Pltf. SJ Opp. Br., Statement of Facts, Pt.III.A-B. PX-22-32.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Plaintiff's claim that Ms. Swicord's Declaration offers expert testimony is incorrect. Paragraphs 99-100 of Ms. Swicord's Declaration recites source material she relied upon and her understanding of the method of the interrogations, which is relevant to her subjective state of mind in drafting Episode 1.  The fundamental issue on this Motion is the Defendants' subjective state of mind and beliefs as to the truth.  That evidence is not hearsay.

Defendants admit that Plaintiff accurately quotes PX-46, but deny that it is a material fact relevant to Defendants' Motion. ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

158.    While the Series never depicts Ms. Fairstein as being in the interrogation rooms, the writers believed, based on their sources (discussed SUF ¶¶ 83-86), that (a) as the highest ranking official on the scene, Plaintiff was overseeing the investigation and ultimately responsible for what was going when the Five were giving or revising their statements, and committing them to video; (b) as she related to Jeffrey Toobin, Plaintiff was intimately involved with the interrogation process, and in shepherding it to a successful conclusion; (c) consistent with her role and reputation, she exercised control over the detectives. (DuVernay Decl. ¶¶ 101, 103; Ex. 2, DuVernay Dep. at 121-122; Swicord Decl. ¶¶ 90-91, 98.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 83-86 by reference herein. Plaintiff also incorporates her responses to Paragraphs 54, 75, 77, 80, 91, 93, 96-103, 120-142, 148-157 by reference herein.

At her deposition, Ms. Swicord acknowledged that police chiefs were present at the precincts. When asked if it was her "view that [Ms.] Fairstein outranked the chiefs of detectives that were at the precinct houses," she answered "I don't know how the rankings go between cops and prosecutors who are acting as investigators, as well." PX-34, Swicord Tr. 126:18-128:2. At a January 24, 2018 writers' room meeting, attended by Ms. Locke, Ms. Swicord and Ms. DuVernay the question was asked "How did the cops treat female DA's?" PX-56, at DEFS022403. Ms. DuVernay could not recall whether any research was done to answer that question. PX-51, DuVernay Dep. Tr. 101:17-102:10. Paragraph 91 of Ms. Swicord's declaration states "I understand that Ms. Fairstein's complaint does not challenge the scenes in the Series depicting the Five being physically and mentally coerced by detectives into giving confessions." As noted by Ms. Swicord the "Series does not depict Ms. Fairstein as being in the interrogation rooms." Accordingly, Ms. Fairstein would not have standing to allege defamation claims against Defendants with respect to those scenes. *See Goldman v. Reddington*, 417 F. Supp. 3d 163, 172 (E.D.N.Y. 2019) ("the complaint must allege a defamatory statement was 'of and concerning' the plaintiff"). Ms. Swicord's statement is irrelevant to the claims and defenses in this action. FRE 401, 402. Even if it were relevant, it would confuse the issues, mislead the jury and be more prejudicial than probative. FRE 403.

The above statement contains an utter mischaracterization of the Toobin article which nowhere states that Ms. Fairstein had any involvement in "shepherding the interrogation process to a successful conclusion." DX-25.

The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219; *Mitre Sports Int'l*, 22 F. Supp. 3d at 256 (S.D.N.Y. 2014).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

159.    The filmmakers' belief in Plaintiff's power and control over the interrogation process is validated by Ms. Fairstein's actions in directing the detectives to stop interrogating Yusef. (Ex. 17, Sullivan at 27.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Sullivan book does not say that Ms. Fairstein directed or controlled the detectives at the Twentieth Precinct. It states "The detectives and Ms. Salaam debated the boy's age for perhaps ten minutes. Fairstein then took detectives aside and told them that, for the sake of protecting the case, they should accept Ms. Salaam's word that her son was fifteen and tell McKenna to stop the interview." DX-17, at 27. *See* PX-29, at DEFS016996-17011.

The writers' "beliefs" are not facts and raise credibility issues that cannot be determined on summary judgment. *Palin*, 482 F. Supp. 3d at 219 ("the credibility of that testimony is for the jury to assess, not for this Court to credit at the summary judgment phase"); *Mitre Sports Int'l*, 22 F. Supp. 3d at 256 (S.D.N.Y. 2014) (determining defendant's fact-gathering, editing and distribution required an evaluation of the factual evidence and assessment of witness credibility that is appropriate only for a jury).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

### 4. DNA Scene (Ex. 30B, Scene Chart No. 4; Ex. 30 at Episode 2, 00:16:39 – 00:17:13)

160.    The DNA scene was intended to convey the prosecution's surprise and excitement in finding the sock that they believed would link the Five to the rape. (DuVernay Decl. ¶¶ 106-107; Locke Decl. ¶¶ 52-54; Ex. 3, Locke Dep. at 152-153.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and containing improper argument. To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] What the writers assert the scene was "intended to convey" raises credibility issues that cannot be addressed on a motion for summary judgement. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY** to [1]: Denied. *See* Reply to SUF 56.

[2] The scene cited above clearly depicts Ms. Fairstein informing Lederer and Morgenthau about the discovery of the semen-stained sock and uses the word "surprise" as a qualifier for "the kicker is none of the defense is aware yet." DX-30, Ep. 2, at 16:39-17:13. The scene time stamps above are missing Episode 2 at 29:51-31:23 which, together with the above-cited scene, "depict Fairstein concealing evidence from defense counsel – a likely violation of law and responsibility—and manipulating the timing of a DNA test with the goal of advantaging the prosecution." *Fairstein*, 553 F. Supp. 3d at 74. As noted below, Ms. Locke scripted a version of the scene that appears at 29:51-31:23 in March 2018.

**DEFENDANTS' REPLY** to [2]: Defendants deny that the chart at DX-30B is missing a portion of the DNA scene at issue. Plaintiff deposed all three defendants and specifically marked and played only the first "sock" scene as the DNA scene at issue at Ms. DuVernay

and Ms. Locke's depositions.  (PX-67 (DuVernay Exhibit 23) and PX-101 (Locke Exhibit 25).  These exhibits include only Episode 2 at 00:16:39 – 00:17:13 and do not include the scene in Episode 2 at 29:51-31:23.  *See* Defendants' Reply to SUF 119.

[3] Ms. Locke described the sock DNA scene at 16:39-17:14 as an invented scene. PX-81, Locke Dep. Tr. 71:5-72:3. *See also* PX-51, DuVernay Dep. Tr. 150:21-151:18.

**DEFENDANTS' REPLY** to [3]: Defendants admit that this is an invented scene based on the writers' research.  (Locke Decl. at ¶ 52.)

[4] The evidence in this case concerning the sock DNA scene shows that Ms. Fairstein was not part of the original sock DNA story line. The scene was revised over time to depict Ms. Fairstein as suddenly revealing the discovery of the sock to Ms. Lederer and Mr. Morgenthau and suggesting that it be kept from defense counsel and, later, telling Ms. Lederer a sixth attacker must have been involved if "it helps a jury know what we believe to be true":

**DEFENDANTS' REPLY** to [4] – [6]: Defendants deny Plaintiff's characterizations of the record and testimony.  Further, Plaintiff selectively quotes Ms. Locke's testimony as to why she decided to put Ms. Fairstein in this scene and omits material testimony.  As Ms. Locke's testimony that Plaintiff omitted shows, Ms. Locke went back to her source materials when editing the script and placed Ms. Fairstein in the DNA scene at issue based on the cited research discussing her behind-the-scenes role when the sock was found and DNA strategy for the prosecution's case:

> Q: Between November 2017 and January 3rd, 2018, do you have a specific recollection that Harlan Levy's book caused you to add Ms. Fairstein into the sock DNA scene?
>
> A: I have a specific recollection of going from the outline phase to the script phase, of re-looking at numerous bits of research that I'd looked at.
>
> Q: What specific source informed you that Ms. Fairstein had any involvement with the sock DNA?
>
> A: In totality, it was "And the Blood Cried Out." It was the Sarah Burns book. It was the Timothy Sullivan book. And I may have even looked at some of the articles that came out after the thing that happened in court that showed, whoa, these children are not -- there's no DNA of these children involved. It made a kind of media splash.  I may have looked at those articles, as well, in going through to the script phase.

(PX-81 at 51:3-20.)  Both Mr. Levy's book and Mr. Sullivan's book place Ms. Fairstein as a part of the behind-the-scene discussions regarding DNA.  (*See* Locke Decl. at ¶ 56.)

[5] Ms. Locke reviewed most of the research materials prior to beginning her work in the writer's room. Locke Decl. ¶ 11. The writer's room opened in October 2017. DuVernay Decl. ¶ 26. Ms. Locke's story outline for Episode 2, dated November 24, 2017, **did not include Ms. Fairstein** in the scene concerning the sock DNA. PX-84, at DEFS083154 (Lederer and Morgenthau discuss crime technician's discovery of sock and postponement of trial); PX-81, Locke Dep. Tr. 41:7-47:25. *See* PX-34, at DEFS007800-7803; PX-34, Swicord Dep. Tr. 69:12-76:20. Ms. Locke testified that, based on her research, Ms. Fairstein **did not discover** the sock DNA. PX-81, Locke Dep. Tr. 31:2-11. Ms. Locke also testified that, based on her research, the Five's defense counsel knew about the sock prior to the first trial in 1990. *Id.* at 33:4-34:13. A "legal timeline" drafted by Ms. Locke, based on the Sullivan book, states "[t]rial delayed seven weeks to test discovery of semen on sock" and, in Locke's handwriting "defense told about no match." PX-83, Locke -3; PX-81, Locke Dep. Tr. 34:14-36:15.

**DEFENDANTS' REPLY** to [5]: See above.  Further replying, Defendants admit that Ms. Fairstein did not "discover" the semen-stained sock, but deny that the DNA Scene shows that.

[6] Ms. Locke stated that at some point she "made the decision to put Ms. Fairstein in the scene with Lederer and Morg[e]nthau." PX-34, Locke Dep. Tr. 47:4-25. A draft script written by Ms. Locke, dated January 3, 2018, with the title "GUILTY, GUILTY, GUILTY" VS. "LIES, LIES, LIES" places Ms. Fairstein in the sock DNA scene. PX-85, at DEFS035835. This script still follows Ms. Locke's research, which she testified showed a lab tech discovering the DNA. PX-81, Locke Dep. Tr. 31:2-11. The draft script also has Ms. Lederer saying "[t]his is the physical proof against the defendants we have been waiting for," and petitioning the judge for a postponement of trial. PX-85, at DEFS035835. On the draft script, Ms. Locke wrote "Push Fairstein harder. She goes wild so she gets a good comeuppance." *Id.*; PX-35, Locke Dep. Tr. 51:23-53:10. Shortly after the Series aired, Ms. Locke emailed █▌▬▬▬▬▬▬▬▬ about Ms. Fairstein:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████

PX-86; PX-81, Locke Dep. Tr. 53:16-54:25.

**DEFENDANTS' REPLY** to [6]: See above.  Further replying, Defendants admit the note on the draft script at PX-85.  Plaintiff misleadingly omits Ms. Locke's testimony with respect to this note.  Ms. Locke testified the note on the script related to the story narratively matching the emotional aspects of the actual events (juxtaposing when the DNA results came back later and did not match):

> Narratively, which also matched what happened in reality, is the excitement that the prosecution had, this kind of, yay, wow, we got the sock would be in proportion to the disappointment or the falling having egg on your face in front of the press and everybody else when the shit didn't work out.

(PX-81 at 52:12-20.)  Ms. Locke further explained this scene in her Declaration:

> when the prosecution learned about this last-minute DNA evidence it was a welcome "surprise" to the prosecution because they hoped and thought it would make their case. It would in turn be a "surprise" to the defense to get DNA evidence matching them to the rape because no one—cops, DAs, the judge, the defense—knew the semen stain on the sock existed before this point. And once it was discovered, Linda Fairstein most certainly hoped and believed that the DNA obtained from the sock would point to the five boys' guilt. Hence, the look of glee on her face in the scene. And because I cannot say this enough—of course the opposite happened. No DNA matched to those kids. And everyone prosecuting this case knew it when it went to trial.

(Locke Decl. at ¶ 54.)

As part of the writing process for scripted dramas, which is based on research but also a creative and dynamic process, writers need to consider how to tell the story and convey information of what happened through dialogue.  Ms. Locke stated in her Declaration, she "had to create scenes and dialogue for the other portions of Episode 2, including the behind-closed-doors conversations between the prosecutors" and "each imagined scene and line of dialogue is based firmly in what I believed to be the essence of the truth based on my extensive research[.]"  (Locke Decl. at ¶ 43.)

Specifically with respect to this Scene, Ms. Locke stated:

> Part of the process of drafting a script based on a true story is crafting dialogue to fill in the gaps of private conversations between the characters for which there are no direct sources and to convey the story of what transpired through the characters' dialogue, consistent with the research. Drawing from the sources specifically described below, my extensive research of the facts of the case and Ms. Fairstein and Ms. Lederer's overall characters, I created this Scene to depict the prosecution's reaction to this new evidence.

(Locke Decl. at ¶ 52.) ████████████████████████████████████ ████████████████████ but Plaintiff selectively quotes Ms. Locke's deposition testimony on this exhibit and omits key testimony. Ms. Locke testified:



A When I walked into the writers' room in the fall of 2017, I didn't really know who Linda Fairstein was. Over the course of the research that I did and the interviews with the five men and all the things that we watched, over the course of working on the series, I came to form an opinion about her through the research that I read and so that when the series came out and people were responding with, hey, that didn't seem fair what she did, and were reacting in ways that could look like comeuppance, yes, I had no problem with that.

(PX-81 at 54:6-25.)

[7] ██████████████████████████████████████████
██████████████████████████████ PX-34, Locke Dep. Tr. 53:16-54:25. Ms. Locke further testified that "hundreds of thousands of Americans" would not know that persons other than Ms. Fairstein made statements which "held to the guilt" of the Five because "they're not as famous as Linda Fairstein is." *Id.* 61:25-64:21.

**DEFENDANTS' REPLY** to [7]:  Admitted.  See above for complete testimony.

[8] Writer's Room "Part Two Page Notes" from January 8, 2018, state "Have Fairstein's language be more direct/vulgar- 'These guys jacked into this sock...'" PX-93, at DEFS021422. Notes for Episode 2, produced by Ms. Locke, from January 24, 2018, state "pump up Linda's reaction [to] the semen and her theory that the boys jizzed in a sock so they wouldn't be arrested." PX-162, DEFS029031.

**DEFENDANTS' REPLY** to [8]: Defendants admit that Plaintiff accurately quoted PX-93 and PX-162.  The dialogue referenced in those notes is not at issue.

[9] Notes produced by Ms. Locke from March 29, 2018, state "New scene: see the moment Lederer has to tell Fairstein (or vice versa) the DNA doesn't match." PX-161, DEFS029029. A draft Episode 2 script produced by Ms. Locke, dated March 29, 2018, depicts Fairstein saying "We got 'em" and "an infectious crackle of excitement coming from" Lederer and Fairstein. Fairstein. Ms. Fairstein says "The little pigs shot their wad into a sock, thinking they wouldn't get caught." Ms. Fairstein, "bouncing on the balls of her feet, damn near dancing" says "Hot damn, we got 'em." PX-165, at DEFS030347. Locke also added in a new scene in Ms. Fairstein's office—a version of the scene that appears at 29:51-31:23 of Episode 2:

LEDERER

The DNA on sock doesn't match any of them. Five defendants clean. We got a continuance for this shit.

FAIRSTEIN

So there was another attacker in the group. One must have got away.

LEDERER

You don't honestly believe that?

FAIRSTEIN:

I do if it helps a jury to convict.

...

FAIRSTEIN:

Bury the sock DNA results somewhere, and play up the cervical DNA.

PX-165, at DEFS030349. *Compare* PX-163 (depicting Fairstein at press conferences).

**DEFENDANTS' REPLY** to [9], Defendants admit that Plaintiff accurately quoted PX-161.  Defendants admit that Plaintiff accurately quoted PX-165 at DEFS030347, but deny that this is in any way inconsistent with Defendants' SUF that this scene "was intended to convey the prosecution's surprise and excitement in finding the sock that they believed would like the Five to the rape."  Defendants admit the substance of PX-165 at DEFS030349.  Defendants state that this draft scene differs in material respects from the final version in the Series at 29:51-31:23.  Defendants also deny that PX-221 at DEFS171082 is inconsistent with this SUF.

[10] By June 16, 2018, the draft script for Episode 2 contained nearly identical dialogue to the scene located in Episode 2 at 16:39-17:13. In the draft, Lederer and Morgenthau look at Ms. Fairstein with "deadpan eyes" and Ms. Fairstein "nods with a shit-eating grin." PX-221, at DEFS171082.[9] The new scene drafted by Ms. Locke remains in the draft as well, with some added dialogue. PX-PX-221, at DEFS171096-97. *See* DX-30, Ep. 2, 29:51-31:23.

**DEFENDANTS' REPLY** to [9] and [10]:  Defendants admit the substance of PX-221 at DEFS171096-97.  Defendants state that this draft scene differs in material respects from the final version in the Series at 29:51-31:23.  That a scene was revised over time and condensed is evidence of the writing process and editorial decisions—not actual malice.  Further, the writers' room notes state that the writers believed the prosecution was trying to "bury [the] DNA as 'inconclusive'".  (DX-53 at DEFS022770.)

---

[9] ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████  PX-152, Dunbar Dep. Tr. 32:6-34:16, 39:22-41:12.

[11] No drafts or notes cited above, describe the sock DNA scene as showing the prosecutors' surprise over the discovery of the sock.

**DEFENDANTS' REPLY** to [11]:   Plaintiff cites no evidence to contradict the Declarations of Ms. Locke and Ms. DuVernay as to the intent of this Scene and the research supporting it.

[12] Prior to the release of the Series, on May 1, 2019, CBS Sunday Morning asked Netflix's publicity team for clips of specific scenes from the Series, including the scene of Ms. Fairstein and Ms. Lederer arguing over the sock DNA in Episode 2 (at 29:51-31:23). PX-213, DEFS156907-908; PX-130; PX-111, Wolff Dep. Tr. 125:8-131:14. The Netflix employee remarked that the CBS producer who requested the clips "very much feels as though Linda is the villain, and we agree these clips paint her as such." PX-213, at DEFS156907.

**DEFENDANTS' REPLY** to [12]: Defendants admit the substance of PX-213, but deny that it is relevant or material to Defendants' Motion.  The views of a third-party news producer and Netflix's PR team have no bearing on the writers' intention in drafting the scene or their sources and research for the scene.

[13] Prior to the release of the Series, Ms. DuVernay messaged Ms. Locke that Ms. Fairstein "bout to feel it ALL." PX-87; PX-88; PX-81, Locke Dep. Tr. 59:5-61:9. Per Ms. Locke, Ms. DuVernay was referring to Black Twitter, which calls people out "and that Linda Fairstein was going to feel some of the ire of Black Twitter." PX-81, Locke Dep. Tr. 59:5-61:9.

**DEFENDANTS' REPLY** to [13] and [14]: Defendants admit the substance of PX-87 and PX-90, which were statements made *after* Defendants conducted their research on the Series, but deny that they are relevant or material to Defendants' Motion.  Defendants incorporate their Reply to SUF 79[5] on PX-87 as if fully set forth herein.

[14] Shortly after the Series was released, ███████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████ PX-90; PX-34, Locke Dep. Tr. 69:2-70:24.

**DEFENDANTS REPLY** to [14]:  See above. *See also* SUF 223.

161.    The writers' sources reported that a DNA-marked sock was found right before the first trial, and that the prosecution had "high hopes" that the sock would match the Five and "this

would be the break they needed" because they had no DNA evidence matching any of the Five.

(DuVernay Decl. ¶ 106; Locke Decl. ¶ 53; Ex 27, S. Burns at 113; Ex. 17, Sullivan at 102-103.)

**PLAINTIFF'S RESPONSE**:

Denied.

Burns states that ***Ms. Lederer*** "begged Justice Galligan for a postponement of trial, hoping this would be the break they needed." DX-27, at 113. Burns also states "While preparing for trial, Lederer learned that no [DNA] matches had been made.... But the fact that the weak pattern that did show up was not clearly a match to...the suspects ***did not inspire her*** to look elsewhere." DX-27, at p. 97 (emphasis added). Burns attributed the discovery of the sock DNA to an NYPD serologist, not Ms. Fairstein. DX-27, at 103.

Sullivan states: 1) as Defendants admit (DuVernay Decl. ¶ 106; PX-51, Locke Dep. Tr. 31:2-11), that a police department chemist—not Ms. Fairstein—discovered the semen stain on the sock (DX-17, at 103); 2) that the trial was delayed for seven weeks because Ms. Lederer had requested another DNA test, and that, when the sock DNA results came back, "the defense lawyers immediately seized upon this finding to mount a new assault on the state's case. Clearly, they said, the *real* rapist got away." (DX-17, at 103 (emphasis in original); *See* PX-81, Locke Dep. Tr., at 33:4-34:13); 3) "Lederer knew enough about what happened that night to have ***already suspected that some of the culprits escaped***." (DX-17, at 103 (emphasis added)); 4) it was ***Lederer's belief*** that the semen "could have come from a kid who masturbated at the scene and wiped himself off on the sock" (*Id.*); and 5) Lederer was "disturbed by the irrefutable evidence that ***her net*** hadn't caught everybody." *Id.* (emphasis added).

The portion of the Burns film cited at Paragraph 106 of Ms. DuVernay's declaration concerns the opinion of Paul [*sic*; Saul] Kassin a "social psychologist" who is giving an opinion for purposes of the film. Mr. Kassin does not speak to the state, or understanding, of DNA in 1989. DX-19, Burns Doc. at 1:05:26-1:07:06. While Burns conveniently interspersed a picture of Ms. Lederer and Ms. Fairstein between points made by Mr. Kassin, he has no personal knowledge of what occurred in 1989 or the level of Ms. Fairstein's involvement. In the same segment, Michael Warren notes Ms. Lederer's discussions about the lack of DNA evidence and images are shown of Ms. Lederer walking to court. Ms. Fairstein is not mentioned. Defendants were on notice that the Burns film contained inaccuracies. *See* Plaintiff's Resp. to Paragraph 105.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

162.    As described by the writers' sources, the FBI analyst who examined the DNA taken

from Ms. Meili's cervix after the crime (and before the discovery of the sock) labeled the results

as "inconclusive." This was reported to the press. (DuVernay Decl. ¶ 106; Locke Decl. ¶ 53; Ex. 37, Levy at 70-71; Ex. 27, S. Burns at 113; Ex. 16, Ronald Sullivan, "Genetic Tests 'Inconclusive' in Jogger Rape," *N.Y. Times* (Oct. 10, 1989).)

**PLAINTIFF'S RESPONSE**:

Denied.

This information bears no relevance to the scene at issue which concerns the attempt to conceal DNA evidence from defense counsel and manipulating the timing of the test in order to advantage the prosecution. FRE 401, 402.

Both Ms. Lederer and Ms. Fairstein testified that the Harlan Levy book is inaccurate. PX-2, Fairstein Dep. Tr. 273:3-278:19; PX-10 Lederer Dep. Tr. 104:9-108:14. *See* Lederer Decl., Ex. C, at 724; Fairstein Decl. (11/29/22), Ex. A, at 82-84.

The portion of the Burns documentary cited at Paragraph 106 of Ms. DuVernay's declaration concerns the opinion of Paul [*sic*; Saul] Kassin a "social psychologist" who is giving an opinion for purposes of the documentary. Mr. Kassin does not speak to the state, or understanding, of DNA in 1989. DX-19, Burns Doc. at 1:05:26-1:07:06. While Burns conveniently interspersed a picture of Ms. Lederer and Ms. Fairstein between points made by Mr. Kassin, he has no personal knowledge of what occurred in 1989 or the level of Ms. Fairstein's involvement. In the same segment, Michael Warren notes Ms. Lederer's discussions about the lack of DNA evidence and images are shown of Ms. Lederer walking to court. Ms. Fairstein is not mentioned. Ms. DuVernay was on notice by Ms. Fairstein that the Burns documentary contained inaccuracies. *See* Plaintiff's Resp. to Paragraph 105.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.

163.    Based on the writers' sources, the "Surprise" line in the DNA scene was meant to capture the prosecution's giddy feeling upon discovering the sock—last-minute evidence that could make their case—and the thought of the "surprise" to the defendants of getting evidence "nailing" them. (DuVernay Decl. ¶ 107; Locke Decl. ¶¶ 52-54.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 160 by reference herein.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.

164.    The writers did not intend nor convey in the DNA scene that the prosecution was concealing the sock DNA from the defense. (DuVernay Decl. ¶ 110; Locke Decl. ¶ 53; Ex. 3, Locke Dep. at 152-154.)

**PLAINTIFF'S RESPONSE**:

Denied.

What was conveyed by the scene is not a fact but a question of law and the Court has already determined that the scenes "depict Fairstein concealing evidence from defense counsel – a likely violation of law and responsibility—and manipulating the timing of a DNA test with the goal of advantaging the prosecution." *Fairstein*, 553 F. Supp. 3d at 74.

Plaintiff incorporates her response to Paragraph 160 by reference herein.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.

165.    The research revealed the sock DNA discovery was a surprise to everyone involved—the prosecution, the defense, and the court—when it was found right before the first trial. (Ex. 17, Sullivan at 102-103; Ex. 27, S. Burns at 113; DuVernay Decl. ¶¶ 106-107, 110; Ex. 2, DuVernay Dep. at 207-208; Locke Decl. ¶ 54; Ex. 3, Locke Dep. at 152-154)

**PLAINTIFF'S RESPONSE**:

Denied.

Neither Burns nor Sullivan describe the discovery as a surprise. Paragraphs 152-154 of the Locke Declaration and Paragraphs 106, 107 and 110 of the DuVernay Declaration contain assertions about the writers' intentions and beliefs which are not facts and raise issues concerning credibility that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.  While the sources may not have used the word "surprise," they certainly described the discovery of the sock DNA that way.  Ms. Burns' book even makes clear that this was a surprise to the Court: "Elizabeth Lederer begged Justice Galligan for a postponement of

the trial, hoping that this would be the break they needed.  Galligan begrudgingly agreed, though he complained that the police lab had been negligent in not finding the stain earlier." (DX-27 at 113.)  Mr. Sullivan reported the same: "Galligan publicly remonstrated before postponing the trial.  'It seems to me almost negligence on the part of the police or whoever is in charge of the lab,' he complained.  'A year later they are finding *this?*'"  (DX-17 at 103, emphasis in original.)

166. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

**PLAINTIFF'S RESPONSE**:

███████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████

**DEFENDANTS' REPLY:** ███████████████████████████████████
██████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

█████████████████████████████████

███████████

██████████████████████

167.     The writers relied upon sources describing Plaintiff as being involved in the discussions surrounding the sock DNA. (DuVernay Decl. ¶¶ 108-109; Locke Decl. ¶ 56; Ex. 3, Locke Dep. at 30-34, 50-51.)

**PLAINTIFF'S RESPONSE**:

Denied.

Whether or not Ms. Fairstein was "involved in discussions surrounding the sock DNA" is not relevant to the manner in which she is portrayed in the sock DNA scene in Episode 2 which depicts Ms. Fairstein as having exclusive knowledge about the discovery of the DNA-marked sock, springing the news on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the DNA and then suggesting the information be withheld from defense counsel so it can be tested right before trial. DX-30 Ep. 2, at 16:39-17:13; FRE 401, 402.

Sullivan does not cite a source for the statement cited at Paragraph 108 (a) of Ms. DuVernay's declaration. He also interviewed Elizabeth Lederer, Tim Clements and the Five's defense counsel. DX-17, Sullivan, Acknowledgments, DEFS168813-814 (Michael Joseph, Elliot Cook, Colin Moore, Howard Diller, Jesse Berman, William Kunstler, C. Vernon Mason and Natasha Lapiner). *See also* Locke Decl. ¶ 56 (a).

Both Ms. Lederer and Ms. Fairstein testified that the Harlan Levy book is inaccurate. PX-2, Fairstein Dep. Tr. 273:3-278:19; PX-10, Lederer Dep. Tr. 104:9-108:14; Lederer Decl., Ex. C, at 724; Fairstein Decl. (11/29/22), Ex. A, at 82-84. *See* DuVernay Decl.¶ 108(b); Locke Decl. ¶ 56(b).

Assertions about the writers' intentions and beliefs are not facts and raise issues concerning credibility that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

The sources cited above contain information that does not pertain to the statement above.

At Paragraph 109 of Ms. DuVernay's declaration, she mischaracterizes Sullivan's description of the events surrounding the sock:

Per Sullivan, the trial was delayed for seven weeks because ***Ms. Lederer*** had requested another DNA test. DX-17, at 103. Per Sullivan, "Lederer knew enough about what happened that night to have ***already suspected that some of the culprits escaped***," (DX-17, at 103 (emphasis added)), it was ***Lederer's belief*** that the semen "could have come from a kid who masturbated at the scene and wiped himself off on the sock" (*Id.*); and Lederer was "disturbed by the irrefutable evidence that ***her net*** hadn't caught everybody." *Id.* (emphasis added).

Mr. Sullivan does not describe Ms. Fairstein as "hard charging" at page 103. At page 20, he describes Ms. Fairstein as an "ambitious career prosecutor" who had achieved "considerable status" in "criminal justice and feminist circles for championing the aggressive prosecution of hitherto hushed up crimes" though "she didn't try many cases herself anymore." DX-17.

Sullivan states that Fairstein chose Lederer because she needed someone "who could not be intimidated or rattled by the city's hypercompetitive press corps" as well as a "good trial lawyer" and "experienced investigator whom victims and their kin would instinctively trust." DX-17, at p. 20. On page 103, Sullivan notes that Lederer had "never lost a rape case." DX-17. At page 40, Sullivan describes Lederer as someone who "thrived on the stress of being on trial, at the center of the small but very public stage in front of a judge

and jury. She knew of no greater challenge" and while working in the private sector "she found it hard to do without the clearcut moral satisfaction she derived from putting the bad guys in jail." DX-17.

Sullivan does not state that Ms. Fairstein was Ms. Lederer's boss, that Ms. Fairstein was overseeing the prosecution at trial and the strategy on the DNA. DuVernay Decl. ¶ 103. *See also* DX-17, Sullivan (Acknowledgments) ("The cooperation of the lead prosecutor, Elizabeth Lederer, and her co-counsel, Arthur "Tim" Clements was crucial to my understanding of how the two Central Park Jogger trials developed."), DEFS168821 (p. 23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168827 (p. 35) ("In the written statement detectives had shown to Lederer, Santana had described Lopez playing a particularly brutal role. She wanted to get that on tape, too."), DEFS168829 (p. 39) ("Several highly incriminating statements were on tape, but Lederer was distracted by disappointments... if the kids were telling the truth...they each had succeeded in minimizing his own role."), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week").

Mr. Levy described Ms. Lederer as the "lead prosecutor on the Central Park Jogger case." DX-37, at 59. Levy also described Lederer as someone who had prosecuted high-profile sex cries and had "a precise manner of speech that suggests to [her] peers and to juries that the words [she] speak[s] are carefully, deliberately chosen and entirely correct." DX-37, at p. 95. While Mr. Levy describes Ms. Fairstein as Ms. Lederer's "mentor," Ms. Lederer testified in the Five's lawsuit against New York City that she was not "particularly close to Ms. Fairstein" at the time of the Central Park Jogger case. Lederer Decl., Ex. A, at 81.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.

168.    Mr. Sullivan, who interviewed Plaintiff for his 1992 book (SUF ¶ 154), reported that "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped" the jogger. (Ex. 17, Sullivan at 103.)

**PLAINTIFF'S RESPONSE**:

Admitted that Sullivan is quoted accurately, subject to the qualification that Sullivan does not cite a source for the statement above and he also interviewed Elizabeth Lederer, Tim Clements and the Five's defense counsel. DX-17, Sullivan, Acknowledgments, DEFS168813-814 (Michael Joseph, Elliot Cook, Colin Moore, Howard Diller, Jesse Berman, William Kunstler, C. Vernon Mason and Natasha Lapiner).

In any event, what Ms. Fairstein did or did not believe concerning the sock DNA bears no relevance to the scene at issue which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about its origin and then suggesting the information be withheld from defense counsel so the sock could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

169.    Mr. Levy's book, based on his time as an Assistant D.A. in Manhattan, reported that "we had to figure out what had gone wrong here, why the DNA results had turned out the way they did, and how to keep the DNA results from destroying our case. Toward that end, I was asked to work with Linda Fairstein. . . . Fairstein and I sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem". (Ex. 37, Levy at 95.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the partial quote is accurate with the qualification that both Ms. Lederer and Ms. Fairstein testified that the Harlan Levy book is inaccurate. PX-2, Fairstein Dep. Tr. 273:3-278:19; PX-10, Lederer Dep. Tr. 104:9-108:14; Lederer Decl., Ex. C, at 724; Fairstein Decl. (11/29/22), Ex. A, at 82-84. Regardless, Mr. Levy's assertions are not relevant to the manner in which Ms. Fairstein is portrayed in the sock DNA scene, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the stain's origin and then suggesting the information be withheld from defense counsel so that it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

170.    Plaintiff endorsed Mr. Levy's book on the jacket cover. (Ex. 37, Levy.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Fairstein did not read the book before providing a "blurb" to Mr. Levy and, once the book came out, and she read it, she asked Harlan Levy to correct its inaccuracies and untrue statements about his purported work with Ms. Fairstein on the Central Park Jogger case. PX-2, Fairstein Dep. Tr. 274:6-278:19.

This is not relevant to the manner in which Ms. Fairstein is portrayed in the sock DNA scene, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau and then suggesting the information be withheld from defense counsel until right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

171.    Plaintiff admitted that she was aware of the DNA-marked sock and reported its discovery to D.A. Morgenthau. (Ex. 4, Fairstein Dep. at 282.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Plaintiff's awareness of the DNA-marked sock is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the DNA and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

172.    As described by the writers' sources, when the sock DNA was found and tested right before the first trial, the test results came back and it was not the result the prosecution was hoping for: the DNA on the sock conclusively did not match any the Five. (DuVernay Decl. ¶¶110-111; Locke Decl. ¶¶ 54, 58; Ex. 17, Sullivan at 103; Ex. 37, Levy at 70-71; Ex. 27, S. Burns at 113.)

**PLAINTIFF'S RESPONSE**:

Denied.

The sources cited above contain information that does not pertain to the statement above.

Assertions about the writers' intentions and beliefs are not facts and raise issues concerning credibility that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219. *See* DuVernay Decl. ¶¶ 110-111; Locke Decl. ¶¶ 54, 58.

Ms. Locke's declaration states that according to the Sullivan and Levy books, "the prosecutors, especially Ms. Fairstein, pressed forward, promoting (and believing) a theory that there must have been another attacker, a 'sixth' man." *Id.* ¶ 58. Neither Sullivan nor Levy assert that Ms. Fairstein pressed forward, promoted or believed any theory concerning the sock DNA results. DX-17, at 103; DX-37.

Plaintiff incorporates her responses to Paragraphs 161 and 167 by reference herein.

The statement above is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau and then suggesting the information be withheld from defense counsel until right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

With respect to Paragraph 58 of Ms. Locke's Declaration, Defendants deny Plaintiff's mischaracterization of the sources.  Mr. Sullivan's book explicitly states that "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris."  (DX-17 at 103.)  Mr. Levy also reports on Ms. Fairstein's theories about the sock DNA evidence and their counsel to Lederer as to strategy for the DNA:

> Fairstein and I sought expert advice and *spent a fair amount of time simply talking to each other to figure out how to address the DNA problem*. As we did, it quickly became clear to us that the explanation for the results lay not in the complex world of DNA technology but in the simple facts of the crime.

> *Lederer should focus on* developing facts from the case *consistent with guilt but explaining the absence of the semen of these defendants*.  *She should look for* facts indicating that these defendants may not have ejaculated.  *She should search for evidence suggesting that other young men, never identified, raped the jogger.  And she should look for indications that the hospital's collection of semen was less than ideal and may have missed some DNA that may actually have been present*.

(DX-37 at 95-96, emphasis added.)

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

173.     Moreover, the sock DNA profile matched the cervical DNA profile, which meant that the cervical DNA also conclusively ruled out the Five. (DuVernay Decl. ¶¶ 111, 113; Locke Decl. ¶ 58; Ex. 17, Sullivan at 103; Ex. 37, Levy at 70-71; Ex. 27, S. Burns at 113.)

**PLAINTIFF'S RESPONSE**:

Denied.

The sources cited above include statements about the writers' beliefs which raise credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219. *See* DuVernay Decl. ¶ 111; Locke Decl. ¶¶ 54, 58.

Ms. Locke's declaration states that according to the Sullivan and Levy books, "the prosecutors, especially Ms. Fairstein, pressed forward, promoting (and believing) a theory that there must have been another attacker, a 'sixth' man." *Id.* ¶ 58. Neither Sullivan nor Levy assert that Ms. Fairstein pressed forward, promoted or believed any theory concerning the sock DNA results. DX-17, at 103; DX-37.

The DuVernay declaration cites an "expert" opinion from an individual that is not providing expert testimony in this case, is part of the Ken Burns film and constitutes inadmissible hearsay. FRE 801(c).

The statement above is inadmissible hearsay (FRE 801(c)).

The results of the DNA testing in the Central Park Jogger case are not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it can be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

**DEFENDANTS' REPLY**:  Defendants move to strike Plaintiff's Response as an improper denial.  While she takes issue with the sources cite, she does not deny that the sock DNA profile matched the cervical DNA profile, which meant that the cervical DNA also conclusively ruled out the Five.  Nor could she, as she admitted this at her deposition in this case:

> Q:  When the sock came back and it was not a match to any of the five, the sock DNA, did you report that to Mr. Morgenthau?
>
> A:  I believe I did.
>
> Q:  And at that point in time wasn't it also known that both the sock DNA matched the cervical DNA and therefore they both conclusively ruled out the five teens.  Correct?
>
> A:  I believe that's correct.

(DX-4 at 284:7-17.)

Further, Ms. DuVernay's reference to Saul Kassin's statements in the Burns Documentary (DuVernay Decl. at ¶ 112 (which are not cited in support of this SUF) are not hearsay.  As Plaintiff acknowledges, Defendants cites to source materials to support lack of actual malice is not hearsay.  See Pl. SUF Resp. fn 1.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

174.    The filmmakers believed, based on their sources, that when the prosecution got the "conclusive" DNA results from the sock, that should have been a pivotal inflection point for them to reconsider the rape case against the Five, but that they instead went ahead with the trials, based on the theory that there was a "6th perpetrator." (DuVernay Decl. ¶¶ 111, 113-115; Locke Decl.¶ 59; Ex. 3, Locke Dep. at 55.)

**PLAINTIFF'S RESPONSE**:

Denied.

The filmmakers' beliefs are not facts and raise credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

Plaintiff incorporates her responses to Paragraphs 161, 162 and 167 by reference herein.

The results of the DNA testing in the Central Park Jogger case are not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel until right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

175.    Professor Saul Kassin, an expert on false confessions, described in the Burns documentary the prosecution's strategy on the DNA evidence: the prosecution decided it "can still prosecute this case. And the argument we will make to the jury is just because we didn't get all of them, doesn't mean we didn't get some of them. They now created a scenario by which there is a 6th perpetrator—a 6th perpetrator who mysteriously doesn't appear in any of the confessions. But even if they were correct, that 6th perpetrator's absence in their confessions makes the confessions factually incorrect. That should have been the dilemma." (Ex. 19, Burns Doc. at 1:05:26 – 1:07:06.)

**PLAINTIFF'S RESPONSE**:

Denied.

The statements above are inadmissible hearsay. FRE 801(c). Mr. Kassin's opinions about the Central Park Jogger case, given as part of an interview for the Ken Burns film are not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. As Plaintiff concedes, the writers' sources are admissible as non-hearsay. Pl. Resp. to SUF n. 1. Plaintiff's objection is thus meritless.

176.    In her opening statement at the first trial, Ms. Lederer continued to call the cervical DNA "inconclusive". (Ex. 18, Opening Statement.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that this is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

177.    On direct examination, the FBI Agent, Mr. Adams, testified that he "chose to call [the cervical sample] a no conclusive result, that is no interpretation would be made because of this one very very faint result and the other blank results." (Ex. 79, Excerpt of Testimony of Dwight Adams in trial of Antron McCray, Raymond Santana and Yusef Salaam at DEFS014317-18.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that this is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

178.    On cross-examination, Adams was forced to admit that the "very faint" result of the cervical swab, along with the matching sock DNA, was in fact "sufficient" to *exclude* all of the Five. (Ex. 79, Adams Testimony at DEFS014335-38.)

**PLAINTIFF'S RESPONSE**:

Denied.

Adams' testimony is mischaracterized above and speaks for itself. This testimony is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

179.    The sources described this testimony as "'a revelation, wrested from an FBI expert under cross-examination.'" (Ex. 27, S. Burns at 147 (quoting *Daily News* article).)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that the Burns book contains the quoted language above subject to the qualification that it is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, , theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

180.    According to Sullivan, "the defense team had to hope the jury would feel as misled by the prosecutors as the media did." (Ex. 17, Sullivan at 147-148; Ex. 27, S. Burns at 147.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that the Sullivan book attributes the use of the term "inconclusive" to describe the DNA results to D.A. Morgenthau and Ms. Lederer. DX-17, at 145. The statement above is also inadmissible hearsay if asserted for the truth of the matters asserted therein. FRE 801(c). The above information is not relevant to the scene at issue, which depicts Ms. Fairstein as having exclusive knowledge about the sock, springing it on Ms. Lederer and Mr. Morgenthau, theorizing about the origin of the stain and then suggesting the information be withheld from defense counsel so it could be tested right before trial. DX-40, Ep. 2, at 16:39-17:13; FRE 401, 402.

181.    In a subsequent scene the Fairstein character consults with ADA Lederer on trial strategy after the sock DNA results come back, advising ADA Lederer to "Deal with the sock DNA"; "play up the cervical DNA"). (DuVernay Decl. ¶ 110; Ex. 30, Ep. 2, at 00:29:45 – 00:32:12.)

**PLAINTIFF'S RESPONSE**:

Denied.

The scene does not merely depict Ms. Lederer consulting with Ms. Fairstein about trial strategy, it shows Ms. Lederer questioning Ms. Fairstein and calling her "delusional" when Ms. Fairstein states that there must have been another attacker. Ms. Fairstein also directs Ms. Lederer to "play up the cervical DNA." *See* DX-30, Ep. 2, at 29:45-32:12. Yet the writers' sources point to Ms. Lederer as having responsibility for the DNA strategy at trial: D.A. Morgenthau and Lederer coined the term "inconclusive" for the DNA (DX-17, Sullivan, at 145); Lederer, as lead prosecutor, learned the DNA did not match the Five and did not "look elsewhere" (Burns, at 97); after the sock DNA came back, Lederer had "already suspected that some of the culprits escaped" and was "disturbed by this irrefutable evidence that *her net* hadn't caught everybody" (DX-17, at 103 (emphasis added)); "Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case" (DX-17, at 51-52).

In contrast, per Sullivan, Ms. Fairstein merely "thought it probable that the semen on the sock belonged to someone who had raped Harris." *Id. See* Plaintiff's Response to Paragraph 168. The Burns book does not attribute any commentary about the DNA to Ms. Fairstein. *See* DX-27.

Ms. Locke testified that Mr. Morgenthau was aware that the DNA was "inconclusive" and that he was "the ultimate boss in the structure of the district attorney's office." PX-81, Locke Dep. Tr. 77:14-79:17.

Even Harlan Levy, whom both Ms. Lederer and Ms. Fairstein have taken issue with, makes no mention of Ms. Fairstein directing Ms. Lederer to "play up the cervical DNA." Per Levy, "there was a good explanation for the presence of a DNA print from a person other than the identified suspects. Both McCray and Salaam said that two guys they did not know had gotten on top of the jogger .... The DNA print could belong to one of these two men, who was never identified and from whom no DNA sample was taken." PX-260, at DEFS175968. Per Levy, Lederer sought to convince a jury that the DNA evidence was consistent with the other evidence and that it was consistent with guilt. *Id.* at DEFS175969.

The Court considered part of the above cited scene to be a part of the sock DNA scene when ruling on Defendants' motion to dismiss. *Fairstein*, 553 F. Supp. 3d at 74.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Replying to Plaintiff's first Paragraph, Defendants deny that any portion of the second scene is still properly at issue.  *See* Reply to SUF 119.  In any event, the Court dismissed the portion of the second DNA scene in which Ms. Lederer calls Ms. Fairstein "delusional".  *Fairstein*, 553 F. Supp. 3d at 73-74.

Further replying to Plaintiff's firth Paragraph, and in support of the second DNA scene, Plaintiff ignores or overlooks the writers' sources stating that "Linda Fairstein thought it probable that the semen on the sock belonged to someone who had raped Harris" (DX-17 at 103) and that "Fairstein and [Harlan Levy] sought expert advice and spent a fair amount of time simply talking to each other to figure out how to address the DNA problem."  (DX-37 at 95.)  *See also* Reply to SUF 172, noting Levy and Fairstein's theories about the sock DNA evidence and their counsel to Lederer as to strategy for the DNA including the 6th Man theory ("that other young men, never identified, raped the jogger") and that the DNA evidence was inconclusive (the "hospital's collection of semen was less than ideal and may have missed some DNA" actually present).

Replying to Plaintiff's third Paragraph, Plaintiff selectively quotes Ms. Locke's testimony.  Ms. Locke testified that "Fairstein is Lederer's boss.  Their strategy goes together.  What happens in court is reflective of what is also Fairstein's strategy."  (PX-81 at 78:1-5.)  Further, Plaintiff omits that she admitted at her deposition that she reported the sock DNA results to D.A. Morgenthau.  (DX-4 at 284:7-17.)

182.    This dialogue was intended to signify that the "sock DNA" has been disclosed and is something Lederer must "deal with" at trial, which the research showed the prosecution did by "playing up" the cervical DNA as "inconclusive". (DuVernay Decl. ¶ 110.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 160 herein.

It is not clear from the scene in Episode 2, at 29:45 - 32:12, that the results of the sock DNA testing have been disclosed to defense counsel. Ms. Lederer says "You want me to pretend the sock never existed? This is crossing a line." In earlier drafts of the scene, including a draft written by Ms. Locke, Ms. Fairstein tells Ms. Lederer to "bury" the sock DNA. PX-165, at DEFS030349; PX-221, at DEFS171096-97.

Assertions about what was "intended" raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY**: Defendants incorporate their reply to SUF 160 [9] and [10].

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

183.    Another subsequent scene in the Series depicts a conversation between ADA Lederer and defense counsel Mickey Joseph in which Mr. Joseph tells Ms. Lederer: "You saying that the DNA evidence was inconclusive" was "not playing fair." (Ex. 30, Ep. 2, 43:53 – 44:32.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that the average viewer would not likely watch Episode 2 out of sequence. For that reason, this "subsequent" scene is not relevant to the sock DNA scenes at issue or any of the claims or defenses in this action. FRE 401, 402.

184.    This dialogue was meant to underscore what the dramatic moment at trial revealed—that the prosecution's attempt to call the DNA evidence "inconclusive" was misleading and not fair. (DuVernay Decl. ¶ 117.)

**PLAINTIFF'S RESPONSE**:

Denied.

Assertions about what was "intended" raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

Per the writers' own sources, Ms. Fairstein was not involved in the "prosecution's attempt to call the DNA inconclusive:" D.A. Morgenthau and Lederer coined the term "inconclusive" for the DNA (DX-17, Sullivan, at 145); Lederer, as lead prosecutor, learned the DNA did not match the Five and did not "look elsewhere" (Burns, at 97); after the sock DNA came back, Lederer had "already suspected that some of the culprits escaped" and was "disturbed by this irrefutable evidence that ***her net*** hadn't caught everybody" (DX-17, at 103 (emphasis added)); "Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case" (DX-17, at 51-52).

The dialogue is not relevant to the sock DNA scenes at issue or any of the claims and defenses in this action. FRE 401, 402.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

185.    The writers believed, based on their sources, that the prosecution misrepresented the DNA evidence in public and to the jury by claiming at trial it was "inconclusive". (DuVernay Decl. ¶¶ 116-117; Locke Decl. ¶¶ 59, 62.)

**PLAINTIFF'S RESPONSE**:

Assertions about what the writers "believe" raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

The writers' sources point to Ms. Lederer as having responsibility for the DNA strategy at trial: D.A. Morgenthau and Lederer coined the term "inconclusive" for the DNA (DX-17, Sullivan, at 145); Lederer, as lead prosecutor, learned the DNA did not match the Five and did not "look elsewhere" (DX-27, Burns, at 97); after the sock DNA came back, Lederer had "already suspected that some of the culprits escaped" and was "disturbed by this irrefutable evidence that **her net** hadn't caught everybody" (DX-17, at 103 (emphasis added)); "Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case" (DX-17, at 51-52).

In contrast, per Sullivan, Ms. Fairstein merely "thought it probable that the semen on the sock belonged to someone who had raped Harris." *Id. See* Plaintiff's Response to Paragraph 168. The Burns book does not attribute any commentary about the DNA to Ms. Fairstein. *See* DX-27. Even Harlan Levy, whom both Ms. Lederer and Ms. Fairstein have taken issue with, makes no mention of Ms. Fairstein directing Ms. Lederer to "play up the cervical DNA" or referring to any DNA as inconclusive. PX-260. Per Levy, "there was a good explanation for the presence of a DNA print from a person other than the identified suspects. Both McCray and Salaam said that two guys they did not know had gotten on top of the jogger .... The DNA print could belong to one of these two men, who was never identified and from whom no DNA sample was taken." *Id.* at DEFS175968. Per Levy, Lederer sought to convince a jury that the DNA evidence was consistent with the other evidence and that it was consistent with guilt. *Id.* at DEFS175969.

In any event, the above information is not relevant to any of the claims or defenses in this action. FRE 401, 402. Even if it were it would confuse the issues and mislead the jury. FRE 403.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive and for failing to admit or deny.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

186.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**PLAINTIFF'S RESPONSE:**

Denied.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

In any event, the above information is not relevant to any of the claims or defenses in this action. FRE 401, 402. Even if it were, it would confuse the issues and mislead the jury. FRE 403.

5.    **Nancy Ryan Lunch (Scene Chart No. 4; Ex. 30 at Episode 5 1:09:46 – 1:12:41)**

187.    Ms. DuVernay wrote this scene herself; it was intended to be a coda in which each of these two antagonists, representing opposing camps, state their position and opinion on this contested chapter in history. (DuVernay Decl. ¶ 119.)

**PLAINTIFF'S RESPONSE**:

Denied.

What Ms. DuVernay "intended" raises credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219. Prior to the Series airing, Ms. DuVernay ██████████████████████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

PX-69; PX-51, DuVernay Dep. Tr. 152:15-153:18. Ms. Locke messaged Ms. DuVernay "When Nancy Ryan slapped her little books on the table in episode 4, I died." Ms. DuVernay replied to Ms. Locke "I told Famke: 'You are my voice here.' I know Linda heard every word." PX-63; PX-235.

Netflix's 30(b)(6) witness Alison Engel testified that Netflix "learned the purpose of the scene" as "a metaphorical representation of a discussion [Ms. DuVernay and the Five] wanted to have and never had the opportunity to have." *Id.* Ms. DuVernay testified that the Ryan lunch scene was all the things she would say to Ms. Fairstein if she ever got the chance. PX-51, DuVernay Tr. 151:19-153:16; PX-68; PX-69, DuVernay 25.

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants admit that Plaintiff accurately quoted PX-69, but deny that it is inconsistent with this Paragraph.  Defendants further note the Scene contains additional dialogue including the filmmakers' views of weaknesses in the evidence and that "While you [Fairstein] were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit."

Defendants admit that Plaintiff accurately quoted PX-235, but deny that it is inconsistent with this Paragraph.

Defendants admit that Ms. Engel and Ms. DuVernay testified as quoted herein, but deny that their testimony is inconsistent with this Paragraph.

Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

188.    Numerous sources reported that Plaintiff and Ms. Ryan had a contentious relationship and clashed over the Central Park Jogger case assignment. (*See, e.g.,* Ex. 27, S. Burns at 36, 188-89; Ex. 17, Sullivan at 21.)

**PLAINTIFF'S RESPONSE**:

Admitted.

Any purported rivalry between Ms. Fairstein and Ms. Ryan is not relevant to the claims or defenses in this action. FRE 401, 402. *Fairstein*, 553 F. Supp. 3d at 68 (describing conflict as "bureaucratic infighting"). The Nancy Ryan Lunch scene is at issue in this action because[10]

189.    Ms. DuVernay wrote the Fairstein character's dialogue in this "lunch" scene to be consistent with Plaintiff's actual views and words reported in the Toobin article, the Imus interview and other sources, declaring the interrogations were "brilliant," the Five participated in the rape, and she has no regrets (SUF ¶¶ 87-89, *supra*). (DuVernay Decl. ¶¶ 112-123.)

**PLAINTIFF'S RESPONSE:**

Denied.

Ms. Fairstein's dialogue is not at issue in this action and, accordingly, the manner in which Ms. DuVernay researched and wrote Ms. Fairstein's dialogue is not relevant to the claims or defenses in this action. *See Fairstein*, 553 F. Supp. 3d at 75-77; FRE 401, 402.

Plaintiff incorporates her responses to Paragraphs 87-89 by reference herein.

Paragraph 112 of the DuVernay Declaration does not reference any statements made by Ms. Fairstein. *See* Plaintiff's Response to Paragraph 161.

Paragraph 113 of the DuVernay Declaration does not reference any statements by Ms. Fairstein. *See* Plaintiff's Responses to Paragraphs 161, 162, 167 and 185.

Paragraphs 114 and 115 of the DuVernay Declaration concern statements made by Ms. Lederer and an FBI agent.

Paragraphs 116-121 do not concern any statements made by Ms. Fairstein. Paragraph 131 contains a quote from a source whom Ms. DuVernay admits is biased. *See* Plaintiff's Response to Paragraph 54 at (f).

Paragraphs 123 (a), (b)(i), (b)(iii), (c)(i) and (c)(iii) do not contain any statements made by Ms. Fairstein.

190.    In writing the Ryan character's dialogue, Ms. DuVernay drew from the Ryan Affirmation, which she read as a damning indictment of the original investigation and prosecution.

---

[10] **REPLY NOTE:**  This incomplete sentence is original to Plaintiff's Response.

(DuVernay Decl. ¶¶ 125-126; Ex. 2, DuVernay Dep. at 54-55.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**   Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] The Ryan Affirmation does not identify Ms. Fairstein as being involved in the interrogation process. It does not name Ms. Fairstein at all. DX-21. The Affirmation states that the "defendants' statements in this case were sufficiently persuasive to result in the convictions of all five defendants on at least some of the charges against them, and, for that matter, persuasive enough to bring about those convictions before two separate juries." *Id.* ¶ 82. The Affirmation also states that "[t]here are certainly portions of the statements made by the defendants that are consistent with the evidence presented at trial." *Id.* ¶ 90. The Affirmation further states that "[i]t was credibly, honestly and persuasively argued by the prosecution that in any gang attack, discrepancies among accounts and confusion about details are not unusual." *Id.* ¶ 99. Also, "given the involvement of a number of people and the violence of the events at issue, some level of genuine confusion is probably inevitable." *Id.* ¶ 99. Also, "those arguments were bolstered by the fact that the crimes occurred at night, the lighting was poor, and that the defendants were involved in a number of incidents." *Id.*

**DEFENDANTS' REPLY** to [1]-[4]: The Ryan Affirmation speaks for itself as to its contents and Defendants incorporate their Reply to SUF 132 on the Ryan Affirmation.

[2] According to the Affirmation, "[m]ost important, the jurors who originally heard the evidence were presented with no persuasive alternative theory of the case to consider. Certainly, no one would have thought that as the defendants and their group were making their way through Central Park, a serial rapist was also at large." *Id.* ¶ 103.

**DEFENDANTS' REPLY** to [2]:  See above.

[3] The Affirmation notes that "[t]he other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured." *Id.* ¶ 109. The Affirmation also states "[i]t was logical for the People to suggest that the defendants' culpability and criminal intent could be inferred from the pattern of conduct engaged in by the group of which they were a part." *Id.* ¶ 113. The Affirmation notes "[i]n the original investigation, a number of individuals identified one or more of the defendants Richardson, McCray, Santana, and Salaam in connection with the attack on John Loughlin, and statements all placed Wise at the scene of earlier incidents." *Id.* ¶ 117. Also, "In interviews in 2002, both Richardson and Santana candidly acknowledged involvement in

criminal incidents that occurred on April 19, while steadfastly asserting their innocence of rape." *Id.* ¶ 117.

**DEFENDANTS' REPLY** to [3]:  See above.

[4] As pointed out in Ms. DuVernay's declaration, the Affirmation states that "each of the defendants was questioned by ***detectives***." DuVernay Decl. ¶ 126(a) (emphasis added). While Ms. DuVernay points out statements in the Ryan Affirmation concerning the videotaped statements, Ms. DuVernay's own sources make clear that Ms. Fairstein was not overseeing, conducting or even present for the videotaped interviews—they were conducted by Ms. Lederer.

**DEFENDANTS' REPLY** to [4]:  See above.

[5] The videotaped statements, and transcripts thereof, make clear that Ms. Fairstein was not present for the interviews. DX-32D. Ms. Lederer conducted the interviews of Messrs. McCray, Santana, Richardson and Wise. PX-181-185. McCray, Santana and Richardson each had their parents present during the interview.[11] PX-181-183.

**DEFENDANTS' REPLY** to [5]:  Defendants admit that Plaintiff was not in the rooms during the videotaped confession statements, but deny that the Series shows her as such or implies that she was.  *See* SUF 193.  Plaintiff was present at the precincts before any videotape statements were made, including after she took some of the Five to the crime scene.  (SUF 129.)

[6] In Mr. Richardson's interview for the Burns documentary, he expressed the following about Ms. Lederer "Honestly, I look at her as a conniving individual. And that's evil. That's an evil individual." PX-201, DEFS145477, at 1:38-15-1:39:30. ██████████████████████████
████████████████████████████████████████████████████████████████ PX-36, at
DEFS005461. ██████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████ *Id.* at DEFS005458. Mr.
Richardson testified at his deposition in the Five's lawsuit against the City that he did not recall seeing Ms. Fairstein at any precinct. PX-33. Mr. Santana told Ms. DuVernay that "in the beginning" "when you look at the case, I didn't meet her. I didn't know her." DX-38A, at DEFS006977. *See* Plaintiffs' Response to Paragraph 205.

---

[11] Defendants omitted the page of the transcript which shows that Mr. Richardson's father was present from Exhibit 32D.

**DEFENDANTS' REPLY** to [6] – [8]:  These Paragraphs are not responsive to this SUF and should be stricken.  With respect to those Paragraphs, Plaintiff's assorted arguments that she thinks the sources lacked personal knowledge or that the source material talks about Ms. Lederer as well, are irrelevant as a matter of law.  What matters is what the filmmakers believed.

[7] Sullivan attributes the investigation and prosecution of the case to Ms. Lederer, including the video statements. DX-17, Sullivan (Acknowledgments) ("The cooperation of the lead prosecutor, Elizabeth Lederer, and her co-counsel, Arthur "Tim" Clements was crucial to my understanding of how the two Central Park Jogger trials developed."), DEFS168821 (p. 23) ("elite crew" of detectives had "conducted a series of interrogations producing the written confessions that would serve as prelude to Lederer's videotaped interviews....As Lederer listened to the police officers and read the written statements of a few suspects, the picture began to come into focus"), DEFS168825 (p. 30) ("In selecting the order in which to tape interviews with the suspects, Lederer had to consider... the substance of the written statements they'd already given police"), DEFS168825 (p. 31) ("Lederer considered video sessions fact-finding missions" and "Lederer wanted to use the tapes to preclude possible defenses"), DEFS168827 (p. 35) ("In the written statement detectives had shown to Lederer, Santana had described Lopez playing a particularly brutal role. She wanted to get that on tape, too."), DEFS168829 (p. 39) ("Several highly incriminating statements were on tape, but Lederer was distracted by disappointments... if the kids were telling the truth...they each had succeeded in minimizing his own role."), DEFS168830 (p. 41) ("Better informed about the scene of the crime, Lederer and Clements spent the rest of Friday interviewing more suspects.... Wise...would also present the greatest challenge to Lederer's considerable skills"), DEFS168835-36 (pp. 51-52) ("Lederer sat down with a half-dozen colleagues in Trial Bureau 40 to formulate a strategy with which she and Clements...could prosecute this complex case.") DEFS168836 (p. 53) ("When they weren't in homicide meetings or the grand jury room, Lederer and Clements were busy with the continuing investigation, working until about eleven o'clock every night that first week").

**DEFENDANTS' REPLY** to [7]:  See above.

[8] Sarah Burns attributed the videotaped statements, and any problems or inconsistencies, to Ms. Lederer. DX-27, Burns, DEFS168704 (p. 49) ("Elizabeth Lederer, the assistant district attorney, who would prosecute the case, conducted the videotaped statements"), DEFS168705 (p. 51) ("there were obvious problems and inconsistencies in the video that should have jumped out at an experienced prosecutor like Lederer"), DEFS168707 (p. 55) (Wise's videotaped statement "hadn't resolved anything except to make Lederer and the detectives even more skeptical about his version of events"), DEFS168729 (p. 97) ("While preparing for trial, Lederer learned that no [DNA] matches had been made....But the fact that the weak pattern that did show up was not clearly a match to...the suspects did not

inspire her to look elsewhere."), DEFS168755 (p. 140) ("Lederer was able to paint her version of the story and present the most damning evidence, the written and videotaped statements"); DEFS168785 (p. 201) ("Fairstein...had assigned her deputy Lederer to prosecute the original convictions"), DEFS168764 (p. 159) (supporters of defendants were "especially cruel to Lederer" referring to her as "The devil herself, she's going to pay for it"), DEFS168766 (p. 162) ("Rather than investigate the reason that the defendants' statements were incorrect, [Lederer] chose to present an opening statement that simply hid a glaring contradiction from the jury.").

**DEFENDANTS' REPLY** to [8]: See above.

191.     In finding the confessions were invalid, the Ryan Affirmation specifically noted the youth of the Five and that they only implicated themselves in the attack after repeated interrogation and that "in many other respects, the defendants' statements were not corroborated by, consistent with, or explanatory of objective, independent evidence. And some of what they said was simply contrary to established fact." (Ex. 21, Affirmation, ¶¶ 10, 82-83, 86, 91, 93-95, 97-99, 115.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 190 by reference herein.

192.     Ms. DuVernay read the Ryan Affirmation's language to convey that the falsity of the confessions had to be the product of some form of coercion, which is what Ms. DuVernay believes to be true based on her conversations with the Five. (DuVernay Decl. ¶ 127; Ex. 2, DuVernay Dep. at 54-55.)

**PLAINTIFF'S RESPONSE**:

Denied.

Assertions about what Ms. DuVernay believed raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

Plaintiff incorporates her response to Paragraph 190 by reference herein.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

193.     While the Series did not put the Fairstein character in the room where coercion was taking place, Ms. DuVernay believed, based on the sources, that Plaintiff was personally involved in the interrogations at the precincts behind the scenes, as Plaintiff relates in the Toobin interview (SUF ¶ 89, *supra*) and was demonstrated in the incident involving Yusef Salaam where she delayed his mother and caring adults from seeing him while he was being interrogated (SUF ¶ 86, *supra*); and the fact that she visited the crime scene with some of the Five and obtained statements used against them, including in the later videotaped confessions recorded after visiting the scene with Plaintiff (SUF ¶ 86, *supra*). (DuVernay Decl. ¶ 128.)

**PLAINTIFF'S RESPONSE**:

Denied.

Assertions about what Ms. DuVernay believed raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

Plaintiff incorporates her responses to Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190 by reference herein.

Ms. DuVernay asserts at Paragraph 128 of her declaration that "Ms. Fairstein does not complain in this lawsuit that the Series' depictions of the Five being coerced by detectives is false." This statement is neither relevant nor admissible. FRE 401, 402. Ms. Fairstein had no standing to complain about those scenes because they were not "of and concerning her." *See Goldman v. Reddington*, 417 F. Supp. 3d 163, 172 (E.D.N.Y. 2019).

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and argumentative.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

194.     Ms. DuVernay believed that Ms. Fairstein, as the highest ranking prosecutor at the precincts, and person reporting to the D.A., was ultimately responsible for the coercive interrogations as Head of the Unit that prosecuted the case who was on the scene at a critical time

in the investigation. (DuVernay Decl. ¶¶ 129-130; Ex. 2, DuVernay Dep. at 77-78.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190 by reference herein.

Assertions about what Ms. DuVernay believed raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

195.    Among the materials Ms. DuVernay expressly relied upon in drafting this scene was the *New York Times* interview of D.A. Morgenthau, who identified Plaintiff as responsible for the "mistake" in prosecuting based on the "confessions": "'Did I feel badly?' he said. 'Yeah, I felt badly. We had screwed up. But there were confessions.' 'I had complete confidence in Linda Fairstein,' he continued, referring to the prosecutor who supervised the case. 'Turned out to be misplaced. But we rectified it.'" (DuVernay Decl. ¶ 129; Ex. 81, 6/2/18 Email from Hannah Baker; Ex. 50, Leland.)

**PLAINTIFF'S RESPONSE**:

Denied.

The Leland article does not identify Ms. Fairstein as responsible for making the mistake in prosecuting the Central Park Jogger case based on the confessions. On the contrary, Morgenthau justifies prosecuting the Five based on the confessions. He states "[w]e screwed up. But there were confessions." DX-50. In the next paragraph, Mr. Morgenthau references his loss of confidence in Ms. Fairstein but does not specify why that occurred. *Id.* In the next paragraph, Mr. Morgenthau is described by a critic, who does not accept his "mea culpa" as the "dean" of "mass incarceration" who "could have used his moral authority to change that trajectory, and he was silent. He was an active contributor to mass incarceration." *Id.* The article further notes that Mr. Morgenthau had little interest in discussing past mistakes, which could explain why he deflected the blame to Ms. Fairstein. The Leland article was written in 2016, after Mr. Morgenthau and Ms. Fairstein had a falling out. DX-11; PX-2, Fairstein Dep. Tr. 181:7-183:9.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as an improper denial.  Plaintiff does not deny that Ms. DuVernay relied on this article in drafting the Lunch Scene and Plaintiff's assertions about a personal falling out between her and Mr. Morgenthau—which is not mentioned in the article—have no bearing on Ms. DuVernay's subjective belief about Ms. Fairstein's role.

196.    Based on the sources in their totality, Ms. DuVernay believed that Plaintiff bore personal responsibility for the coerced confessions, along with the detectives who were in the room, and that the Ryan character's dialogue attributing the confessions to "you" captured the essence of truth. (DuVernay Decl. ¶ 130.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her responses to Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190 by reference herein. *See also* Pltf. SJ Opp. Br., Statement of Facts, Pts. III.A-B. PX-22, 24-32.

Assertions about what Ms. DuVernay believed raise credibility issues that cannot be determined on a motion for summary judgment. *Palin*, 482 F. Supp. 3d at 219.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

197.    Ms. DuVernay also used this scene as a literary device and metaphorical confrontation, and the dialogue speaks to Ms. Fairstein's continued insistence upon the Five's guilt. (DuVernay Decl. ¶ 131.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. DuVernay testified that the Ryan lunch scene was all the things *she* would say to Ms. Fairstein if she ever got the chance. PX-51, DuVernay Tr. 151:19-153:16; PX-68-69.

Prior to the Series airing, Ms. DuVernay messaged █████████████████████████████ ████████████████████

PX-69 (emphasis added); PX-51, DuVernay Dep. Tr. 152:15-153:18. Ms. Locke messaged Ms. DuVernay "When Nancy Ryan slapped her little books on the table in episode 4, I died." Ms. DuVernay replied to Ms. Locke "I told Famke: 'You are *my voice* here.' I know Linda heard every word." PX-63 (emphasis added); PX-235.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive and an improper denial. Defendants incorporate their Reply to Paragraph 187 as if fully set forth herein. Nothing in the additional materials cited by Plaintiff is inconsistent with this Paragraph.

G.   **Ms. Locke**

198.   Ms. Locke only contributed to the writing of Episode 2 of the Series. (Locke Decl. ¶¶ 46, 48.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff denies that Ms. Locke's work on the Series was limited to contributing to the writing of Episode 2. Per Ms. Locke's Declaration, she was also a "co-producer" of the Series. Locke Decl. ¶ 3. She was "assigned to write Episode 2" of the Series. *Id.* ¶¶ 4, 7. Ms. Locke participated in a writers' room for the Series, during which the writers of the Series met to discuss their research and the structure of the Series and discussed "key moments (beats) for each episode." *Id.* ¶ 22. Per Ms. Locke's deposition testimony, the writers "gathered to go over research, how the research might help us shape our storytelling.... We assigned scripts and wrote them and commented on them. We worked as a team with some individual responsibilities." PX-81, Locke Dep. Tr. at 16:21-17:3. Ms. Locke provided ideas for Episode 1, notes to Robin Swicord regarding the script for Episode 1, comments on dialogue in scenes involving Ms. Fairstein, and comments about what research materials Ms. Swicord should review for Episode 1. Ms. Swicord and Ms. Locke also discussed Ms. Fairstein's purported "timeline issues." PX 81, Locke Dep. Tr., 100:17-104:19, 106:4-24, 107:20-121:18; PX-125-129; PX-191, DEFS082899; PX-81, Swicord Dep. Tr. 158:13-159:8, 168:15-18; PX-42. Ms. Locke also worked on character development for the Series, including the portrayal of Ms. Fairstein as the primary villain. PX-81; Locke Dep. Tr. 93:1-96:20.

**DEFENDANTS' REPLY**: Defendants move to strike Plaintiff's Response as non-responsive.

Defendants do not dispute Ms. Locke's testimony, much of which also is contained in her own declaration.  None of the cited testimony refutes the fact that Ms.  Locke only wrote scripts and dialogue for Episode 2, not the other Episodes as Plaintiff admits.  (*See infra* SUF 200.)

199.    The "surprise" dialogue Plaintiff complains of in the DNA scene in Episode 2 was not written by Ms. Locke, but added later by Ms. DuVernay. (Locke Decl. ¶ 54; DuVernay Decl. ¶ 107.)

**PLAINTIFF'S RESPONSE**:

Denied.

[1] The entirety of the "invented" scenes concerning the sock DNA are at issue in this action. Compl. ¶¶ 118-121. *Fairstein*, 553 F. Supp. 3d at 73-74. DX-30, Ep. 2 at 16:39-17:14, 29:51-31:23. PX-81; Locke Dep. Tr. 160:5-161:8.

[2] Ms. Locke was shown the scene in Episode 2, located at 16:39-17:14, and testified that Ms. Locke, herself, "can be **held responsible** for [her] part in that [scene] which showed we've not told the defense yet, and this is a surprise to all of us that there's his sock." PX-101; PX-81, Locke Dep. Tr. 152:7-155:25 (emphasis added). Ms. Locke said that there are multiple ways to read "surprise," including "whenever the defense counsel gets it, a month out, six months out, whenever they get it, it might be a surprise to them to." *Id.* at 154:15-155:5. When asked "But the defense counsel were not surprised by the sock DNA evidence at trial, were they?" She said "No." *Id.* at 155:6-8.

[3] Ms. Locke "made the decision to put Ms. Fairstein in the scene with Lederer and Morg[e]nthau." PX-81 Locke Dep. Tr. 47:4-25. A draft script written by Ms. Locke, dated January 3, 2018, with the title "GUILTY, GUILTY, GUILTY" VS. "LIES, LIES, LIES" places Ms. Fairstein in the sock DNA scene. PX-85, at DEFS035835. This script still follows Ms. Locke's research, which she testified showed a lab tech discovering the DNA. PX-81, Locke Dep. Tr. 31:2-11. The draft script also has Ms. Lederer saying "[t]his is the physical proof against the defendants we have been waiting for," and petitioning the judge for a postponement of trial. PX-85, at DEFS035835. On the draft script, Ms. Locke wrote "Push Fairstein harder. She goes wild so she gets a good comeuppance." *Id.*; PX-81, Locke Dep. Tr. 51:23-53:10. Shortly after the Series aired, Ms. Locke emailed ████████████ ██████████████████

████████████████████████████████████
████████████████████████████████████
███████████████████████

PX-86; PX-81, Locke Dep. Tr. 53:16-54:25.

[4] ██████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████ PX-81, Locke Dep. Tr. 53:16-
54:25. Ms. Locke further testified that "hundreds of thousands of Americans" would not
know that persons other than Ms. Fairstein made statements which "held to the guilt" of
the Five because "they're not as famous as Linda Fairstein is." *Id.* 61:25-64:21.

[5] Writer's Room "Part Two Page Notes" from January 8, 2018, state "Have Fairstein's
language be more direct/vulgar- 'These guys jacked into this sock...'" PX-93, at
DEFS021422. Notes for Episode 2, produced by Ms. Locke, from January 24, 2018, state
"pump up Linda's reaction [to] the semen and her theory that the boys jizzed in a sock so
they wouldn't be arrested." PX-162, DEFS029031.

[6] Notes produced by Ms. Locke from March 24, 2018, state "New scene: see the moment
Lederer has to tell Fairstein (or vice versa) the DNA doesn't match." PX-161, at
DEFS29029. A draft Episode 2 script produced by Ms. Locke, dated March 29, 2018,
depicts Fairstein saying "We got 'em" and "an infectious crackle of excitement coming
from" Lederer and Fairstein. Fairstein. Ms. Fairstein says "The little pigs shot their wad
into a sock, thinking they wouldn't get caught." Ms. Fairstein, "bouncing on the balls of
her feet, damn near dancing" says "Hot damn, we got 'em." PX-165, at DEFS030347.
Locke also added in a new scene in Ms. Fairstein's office—a version of the scene that
appears at 29:51-31:23 of Episode 2:

LEDERER

The DNA on sock doesn't match any of them. Five defendants clean. We got a
continuance for this shit.

FAIRSTEIN

So there was another attacker in the group. One must have got away.

LEDERER

You don't honestly believe that?

FAIRSTEIN:

I do if it helps a jury to convict.

...

FAIRSTEIN:

Bury the sock DNA results somewhere, and play up the cervical DNA.

PX-165, at DEFS030349. *Compare* PX-163 (depicting Fairstein at press conferences).

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

Defendants incorporate their Reply to SUF 160 as if fully set forth herein (addressing Ms. Locke's drafts, notes and testimony on the DNA Scene).

Further Replying to Plaintiff's Paragraph [2], Plaintiff selectively quotes Ms. Locke's testimony on the DNA Scene.  Plaintiff omits that Ms. Locke also testified that:

> [T]here are many ways to read that surprise.  There's a surprise – it's a surprise for all of us.  We didn't know it was coming.  There's a surprise when they get this DNA evidence with the sock two weeks before trial.

> Maybe they get it then.  It will be a surprise to them, too, because we think this is going to be great for us.  It's a surprise no matter what.  There's nothing about that scene that suggests that any evidence is being withheld.

(PX-81 at 154:4-14.)

200.  Ms. Locke did not write any of the other complained-of scenes that remain at issue.

(Locke Decl. ¶¶ 46, 48.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Locke is a co-producer of the Series, contributed to character development for the Series, and exchanged ideas and gave notes to Ms. Swicord concerning Episode 1. *See* Plaintiff's Response to Paragraph 198.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's "qualification" as non-responsive.  Regarding Ms. Locke's title as a co-producer, Ms. Locke testified that "[i]n television, a lot of the producing titles are actually writing titles.  I believe I was a co-producer, but I did nothing other than my writing duties."  (PX-81 at 165:16-20.)

201.  Ms. Locke had no involvement in the marketing of the Series. (Locke Decl.¶ 73.)

**PLAINTIFF'S RESPONSE**:

Plaintiff admits that there is no evidence that Ms. Locke was involved in creating marketing pieces or strategies for the Series. However, she did promote the Series on her social media accounts in a manner that comported with Netflix's marketing strategy. *See* PX-244, LF00038401, Locke Instagram, 5/29/19 ("American history gets rewritten with the truth").

*See also* Plaintiff's Response to Paragraph 207.

202.    In November 2018, after Ms. Locke's research and work on the Series was completed, she learned that the Mystery Writers of America ("MWA"), of which Ms. Locke is a member, had chosen Plaintiff as a "Grandmaster" for its 2019 Awards Banquet. (Locke Decl. ¶¶ 48, 67-68; Ex. 3, Locke Dep. at 145.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that Ms. Locke learned about Ms. Fairstein's Grand Master Award prior to the release of the Series. PX-111, Wolff 30(b)(6) Deposition Tr. 19:19-20:3.

203.    On November 27, 2018, Ms. Locke posted a series of tweets on Twitter expressing the opinion that Plaintiff did not deserve the MWA award. She came to this opinion based on her research for the Series. (Locke Decl. ¶¶ 68-69; Ex. 3, Locke Dep. at 145.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike as non-responsive.  To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

[1] On November 27, 2018, Ms. Locke posted a series of tweets on Twitter directed at Mystery Writers of America ("@edgarawards") which stated that: 1) Ms. Fairstein was almost singlehandedly responsible for the wrongful incarceration of the Central Park Five; 2) that the Five were exonerated by the State of New York; 3) others in the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office, who were "led by Linda Fairstein"; and 4) Ms. Fairstein ruined five innocent men's lives. Ms. Locke included Ms. DuVernay in the tweets ("@ava"). PX-100.

**DEFENDANTS' REPLY** to [1], [5] and [6]: Ms. Locke's tweets speak for themselves, and Defendants deny any statements inconsistent therewith.  (*See* PX-100, PX-104 and PX-105.)  It is uncontroverted that Ms. Locke "had no knowledge of Ms. Fairstein or her involvement in the Central Park Jogger case prior to working on the Series" and that her Tweets were sent *after* conducting extensive research on the Series.  (Locke Decl. at ¶ 69)

[2] To these points, the writers' research for the Series demonstrated that Ms. Fairstein was not "almost singlehandedly responsible" for the Central Park Jogger case nor did she "lead"

the prosecutors in the District Attorney's office. *See* Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190 by reference herein. *See also* Pltf. SJ Opp. Br., Statement of Facts, Pts. III.A-B.

**DEFENDANTS' REPLY** to [2] and [5]: Defendants deny Plaintiff's Paragraphs [2] and [5]; Ms. Locke's research supported her stated opinions, though her specific statements are not the basis for Plaintiff's defamation claim.  (*See* Locke Decl. at ¶¶ 26-35.)

[3] In addition, the writers of the Series discussed ███████████████████████████████████████████████████████████████ PX-36, at DEFS005110-5111. PX-81, Locke Dep. Tr. 79:19-23 (stating that the convictions were vacated); 137:8-138:3.

**DEFENDANTS' REPLY** to [3]: ████████████████████████████████████████████████████████████████████████ In any event, this has nothing to do with Plaintiff and is not a fact material to Defendants' Motion.

[4] Ms. Locke attributed the portion of the tweet concerning "prosecutorial misconduct" to Nancy Ryan. Ms. Locke did not speak with Nancy Ryan when working on the Series. Ms. Locke pointed to Ms. Ryan's affirmation in support of vacating the convictions as a source for her statement. PX-81, Locke Dep. Tr. 138:4-17. When asked, "Did Ms. Ryan ever publicly state that prosecutorial misconduct occurred?" Ms. Locke replied "I don't know that she used that language, no." *Id.* at 138:18-20. Ms. Locke testified that prosecutorial misconduct is typically determined by a judge. PX-81, Locke Dep. Tr. 140:15-141:11. *See* Locke Dep. Tr. 138:4-142:17. The Ryan Affirmation does not mention Ms. Fairstein and does not find that prosecutorial misconduct occurred. DX-21. *See* Plaintiff's Response to Paragraph 190.

**DEFENDANTS' REPLY** to [4]: Plaintiff selectively quotes Ms. Locke's testimony on the Ryan Affirmation and omits Ms. Locke's testimony that "[m]y reading of the Nancy Ryan affirmation and as a public citizen is that she was saying, we messed up big time" (PX-81 at 138:21-25), and that the Affirmation is "a pretty extensive document that explains a lot of missteps and mistakes and bad judgment on the part of the district attorney's office."  (*Id.* at 138:4-14.)  Further, Ms. Locke stated in her Declaration that she "read Ms. Ryan's Affirmation as saying that the criminal justice system, including the prosecutors, made mistakes in prosecuting the Five."  (Locke Decl. at ¶ 19.)

[5] Responding to Ms. Fairstein on social media, Ms. Locke relied on her research for the Series to further accuse Ms. Fairstein of wrongdoing. PX-104. Ms. Locke stated that Ms. Fairstein "directed Elizabeth Lederer's work and crafted the prosecution strategy and media strategy coming out of the prosecutor's office." *Id.*; PX-81, Locke Dep. Tr. 171:7-180:4. Ms. Locke's sources said otherwise. *See* Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190 by reference herein.

**DEFENDANTS' REPLY** to [5]: See above.

[6] Ms. Locke made clear that it was her goal to "hold Ms. Fairstein accountable in the court of public opinion," noting Ms. Fairstein "started to duck and weave (with more lies)." PX-105; PX-81, Locke Dep. Tr. 181:3-184:20.

**DEFENDANTS' REPLY** to [6]: Further replying, Defendants object to Plaintiff's mischaracterization of Ms. Locke's tweet at PX-105.  Nowhere in the tweet does Ms. Locke state that it was her "goal" to hold Ms. Fairstein accountable.  The evidence is undisputed that the Tweet was spontaneous and unplanned.  (Locke Decl. at ¶ 71.)

[7] On November 28, 2018, Mystery Writers of America withdrew Ms. Fairstein's Grand Master award. PX-262.

**DEFENDANTS' REPLY** to [7]: Defendants admit that the Mystery Writers of America withdrew Ms. Fairstein's award, but deny that this is a relevant or material fact to Defendant's Motion.

[8] Ms. Locke messaged DuVernay on November 28, 2018, about the New York Times contacting her "about the Linda deal." Ms. DuVernay replied, "Who is the writer...I want to have Netflix publicity log who inquired and track the story. Damn, lady! You really set it OFF! Good job! PX-74; PX-51, DuVernay Dep. Tr. 174:17-175:14.

**DEFENDANTS' REPLY** to [8]: Defendants admit Ms. Locke and Ms. DuVernay exchanged the messages at PX-74, but deny that this is a relevant or material fact to Defendant's Motion.  These messages were also sent *after* Ms. Locke and Ms. DuVernay conducted extensive research for the Series.

[9] On November 28, 2018, Ms. DuVernay emailed Jane Rosenthal and Berry Welsh, of Tribeca Productions (a producer of the Series), "just off with Attica. She's good. Pretty sure the honor will be stripped by the org. Did you see the exchange between them on Twitter. If I were Fairstein, I'd stand down." PX-75; PX-51, DuVernay Dep. Tr. 176:16-180:8.

**DEFENDANTS' REPLY** to [9]: Defendants admit that Ms. DuVernay sent the email at PX-75, but deny that this is a relevant or material fact to Defendant's Motion.  Further, based on the date of the messages, they  were sent *after* Ms. Fairstein issued a heated public response to Ms. Locke on Twitter.  (*See* PX-105.)

[10] On November 28, 2018, Netflix publicity and marketing employees exchanged emails about press concerning the "award controversy" surrounding Ms. Fairstein's Grand Master award and whether it "heighten[ed] anticipation" for the Series. Clarissa Colmenero wrote "possibly helps raise awareness or keeps the project top of mind, but probably everyone who follows Attica or knows about this award is highly educated and might know about

the project or story already. The good news is that the twitter comments seem...much more in the men's favor and not supportive of Linda." PX-209, DEFS150385.

**DEFENDANTS' REPLY** to [10]: Defendants admit the substance of the email at PX-209, but deny that this is a relevant or material fact to Defendant's Motion.  As stated in Ms. Colmenero's email, she "just came across this in [her] Apple news feed", indicating that she had no prior knowledge of Ms. Locke's tweets.  (PX-209.)

[11] On November 29, 2018, Berry Welsh emailed Ms. Locke, "I am so proud and impressed with the movement you started on Twitter." Ms. Locke responded, "I am so happy... glad now that so many other writers know that she's THAT Linda Fairstein – she's been coasting in the community for a while." PX-106; PX-81, Locke Dep. Tr. 185:24-186:21.

**DEFENDANTS' REPLY** to [11]: Defendants admit that Ms. Locke and Mr. Welsh exchanged the emails at PX-106, but deny that this is a relevant or material fact to Defendant's Motion.

[12] Angered that some authors had spoken up in support of Ms. Fairstein, and against the Mystery Writers of America's decision to withdraw her award, Ms. Locke tweeted on December 18, 2018 "If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case – which, don't get it twisted, she did lead – I'm not sure who the real bully is." She added "And, yes, I worked on Ava DuVernay's project in the case. That's why I know so much about the case. The research on the project is extensive. And I actually read the trial transcripts. And I chose to share my knowledge of Fairstein's misdeeds with MWA." PX-108; PX-81, Locke Dep. Tr. 194:19-200:1; PX-228, DEFS176198.

**DEFENDANTS' REPLY** to [12]: Ms. Locke's December 18, 2018 tweets speak for themselves, and Defendants deny any statements inconsistent therewith.  (*See* PX-108.) Defendants deny that Plaintiff accurately characterizes the reasoning for Ms. Locke's tweets or her deposition testimony.  As Ms. Locke stated, that she was "shocked" at the "nasty way that both Otto and Nelson [Fairstein's supporters] spoke about me and Steph Cha." (PX-228.)  In any event, Defendants deny that this is a relevant or material fact to Defendant's Motion.  Further, the exhibits cited by Plaintiff show that Ms. Locke did not mention Netflix or the Series in her original tweet about the MWA award (PX-100) in an attempt to promote the Series; and PX-108 itself shows that Ms. Locke mentioned the Series in response to criticism from one of Fairstein's supporters on social media that Ms. Locke had not mentioned she was a writer for the Series.  To the extent they are relevant, Ms. Locke's expressions in the exhibits cited by Plaintiff only further evidence Ms. Locke's subjective belief in the truth of the Series and Fairstein's portrayal.

[13] Netflix's Communications Plan concerning the Series notes ███████████████ ████████████████████████████████████████████████████████ PX- 132, at DEFS169114.

**DEFENDANTS' REPLY** to [13]: Defendants admit that Plaintiff accurately quoted PX-132, but deny that this is a relevant or material fact to Defendant's Motion.  Plaintiff omits Ms. Wolff's testimony regarding this document that the PR team, "[a]s communications strategists, we look at any potential things that could come up, or we attempt to.  I think in the document there's several things that we think could come up."  (PX-111 at 147:11-14.)

204.    Ms. Locke was frustrated and disappointed that an organization of which she was a member would honor someone who allowed this tragic miscarriage of justice to occur against innocent children, and who, to this day, maintains that the Five are guilty of the rape of the jogger. (Locke Decl. ¶¶ 68-70.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. Locke's motivation for tweeting at Mystery Writers about Ms. Fairstein raises credibility issues that cannot be decided at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

Plaintiff incorporates her response to Paragraph 203 by reference herein.

**DEFENDANTS' REPLY:**    Defendants move to strike Plaintiff's Response as non-responsive and argumentative.    There are no material issues of undisputed fact or credibility regarding the Mystery Writers tweets.  Defendants incorporate their Reply to Paragraph 203 as if fully set forth herein.  In further reply, Plaintiff cites no evidence that refutes Ms. Locke's unrebutted testimony that her MWA tweets (PX-100) were a spontaneous, individual and personal reaction to the award being given to Ms. Fairstein. (Locke Decl. ¶¶ 68, 71; *see also* DX-3 at 145:13-25 (testifying that after seeing the announcement for the award "c[o]me across [her] Twitter feed" she "felt a surge of frustration".)  It is undisputed that her initial tweets did not mention the Series.  (PX-100.) It is undisputed that the tweets were made after Ms. Locke conducted her research for the Series and formed opinions about Ms. Fairstein based on her research. (Locke Decl. ¶ 69.)

205.    On June 11, 2019, after the Series was released, Ms. Locke posted tweets critical of Plaintiff that responded to Plaintiff's publication of an Op-Ed in the Wall Street Journal in which she continued to call the Five guilty—a view Ms. Locke vehemently disagrees with. (Ex. 3, Locke Dep. at 65-67.)

**PLAINTIFF'S RESPONSE**:

Denied.

[1] Ms. Fairstein's *Wall Street Journal* Op Ed, "Netflix's False Story of the Central Park Five," does not call the Five "guilty." It states that "Mr. Reyes's confession, DNA match and claim that he acted alone required that the rape charges against the five be vacated. I agreed with that decision, and still do." Ms. Fairstein then states that the "other charges, for crimes against other victims, should not have been vacated." PX-8.

[2] Ms. Locke did not read the *Wall Street Journal* Op Ed in its entirety. PX-81, Locke Dep. Tr. 66:1-19.

[3] Ms. Locke testified that she was frustrated with Ms. Fairstein's "behavior during the time period that she was supervisor leading the sex crimes unit, reporting to Morgenthau." *Id.* at 67:2-17. Ms. Locke further testified that Ms. Fairstein "was the face that haunted" the Five, but Defendants have put forth no evidence that this is the case. *Id.* However, in Mr. Richardson's interview for the Burns documentary, he expressed the following about **Elizabeth Lederer**, "Honestly, I look at her as a conniving individual. And that's evil. That's an evil individual." PX-201, DEFS145477, at 1:38-15-1:39:30. According to notes of Mr. Richardson's interview with the writers of the Series, "He remembers Lederer. He feels like she was adding in things he hadn't said before. She was slick and fast." PX-36, at DEFS005461. He also said that during his video statement "Lederer was adding and he was embellishing." *Id.* at DEFS005461. Per the notes, Mr. Richardson said "[h]e felt like none of the cops believed they really did it.... They knew these kids didn't do it. He thinks Lederer did too. There was an election that year, they had to meet their quotas. *Id.* at DEFS005458. Per Ms. Locke's notes ████████████████████ ██████████████████████████████ PX-167, DEFS035268-288. ██████████ ████████████████████████████████████████████████████████████████████ ██████ PX-168. Mr. Richardson testified at his deposition in the Five's lawsuit against the City that he did not recall seeing Ms. Fairstein at any precinct. PX-33.

[4] Per the transcript of Mr. Santana's interview with Ms. DuVernay discussing Ms. Fairstein "in the beginning" "when you look at the case, I didn't meet her. I didn't know her." DX-38A, at DEFS006977. ████████████████████████████████ ████████████████████████████ PX-179, DEFS035348-35372.

[5] Ms. Locke produced a notebook which contains her notes from ████████████ ████████████████████ PX-110, at DEFS036189, DEFS036190, DEFS036212, DEFS036213, DEFS036230, DEFS036232, DEFS036244, DEFS036247, DEFS036264, DEFS036272, DEFS036277; PX-81, Locke Dep. Tr. 209:13-215:19. According to Ms. Locke's notes ████████████████████████████████████████████████████████████ ██████████████████████ *Id.* at DEFS036212. Per Ms. Locke's notes, ████████████ █████████████████████████████████ *Id.* at DEFS036230. Ms. Locke made no

notations concerning Ms. Fairstein in the portion of her notebook concerning ███████
████████████████████████████ *Id.* at DEFS036244. Per Ms. Locke's notes,
████████████████████████████ *Id.* at DEFS036247. Per Ms. Locke's notes,
████████████████████████████████████████████████████ *Id.* at
DEFS036272. ████████████████████████████████████ *Id.* at
DEFS036277.

[6] Ms. Locke's notes ████████████████████████████████████████
███████ PX-166. Ms. Locke's notes ████████████████████████████
████████████████████████████████████████████████████████████
████ PX-180. █████████████████████████████████████████████████
████████████████████████████ PX-169, at DEFS035322-35323. The notes
further state ████████████████████████████ *Id.* at DEFS035323.

**DEFENDANTS' REPLY:** Defendants move to strike as an improper denial and as non-responsive to the SUF beyond the second paragraph. While Plaintiff quibbles with the language of her Op-Ed, she does not offer evidence to contradict that Ms. Locke's June 11, 2019 tweet was in response to the Op-Ed or that Ms. Locke disagrees with Plaintiff's position that the Five are guilty of the rape.

None of the additional facts contained in Plaintiff's response contradict this SUF. Further, Plaintiff's additional points about the sources consist of her "spin" and do not speak to or contradict the writers' view of Plaintiff's position and role based on the cited sources themselves or the totality of the writers' sources. References to Ms. Lederer's role do not diminish Ms. Fairstein's role. In addition, the notes referenced in Plaintiff's Paragraphs [3] – [6] speak for themselves and Defendants deny any statements inconsistent therewith.

206.    Prior to posting her disapproving comments and opinions about Plaintiff on social media, Ms. Locke did not discuss them with Ms. DuVernay, with anyone at Netflix, or anyone else associated with the Series. (Locke Decl. ¶ 71; Ex. 3, Locke Dep. at 185; DuVernay Decl. ¶ 142; Ex. 2, DuVernay Dep. at 173.)

**PLAINTIFF'S RESPONSE**:

Denied.

Paragraph 71 of the Locke Declaration does not discuss Ms. Locke' June 11, 2019 tweet. It refers to her Mystery Writers tweet, which is fully addressed above in Plaintiff's response to Paragraph 203. Ms. Locke's deposition testimony, at 185, likewise discusses the

Mystery Writers tweet. The DuVernay Declaration and testimony do not address the June 11 tweet.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial.  Plaintiff cites no evidence that Ms. Locke spoke with Ms. DuVernay, anyone at Netflix or anyone else associated with the Series before she sent her MWA tweets or June 11 tweet.

## H.        <u>Marketing</u>

207.    From the outset, Netflix's goal was to promote the Series as a dramatization based on the true story of the Five from their perspective. (Ex. 82, Excerpts from Deposition of Joanna Wolff ("Wolff Dep.") at 52, 74, 98; DuVernay Decl. ¶ 133.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

As set forth below, Ms. Wolff testified that Netflix's intention was to position the Series as based on the true story from the Five's point of view.  Plaintiff cites nothing to contradict this SUF, nor do the few tweets she cites contradict this SUF.  As Ms. Wolff testified, the "truth" referenced in those short tweets is "the boys' truth."  (PX-111 at 121:14-21.)  The Five's truth is that they are innocent and were falsely convicted of the rape.  (*Id*. at 117:25 – 118:5.)  *See also* SUF 219.

[1] Ms. Wolff's 30(b)(6) testimony at page 74 concerns Netflix's PR Strategy, 
PX-118; PX-111, Wolff 30(b)(6) Dep. Tr. 68:1-74:16. When asked "the series itself is not a true story, is that correct?" Ms. Wolff responded "It's based on the true story of the men." When asked "But is it a true story?" Ms. Wolff, responded, "I guess it depends on who you believe, and we believe the men." Wolff 30(b)(6) Dep. Tr. at 71:22-72:6. Wolff testified that "this is the true story of these five individual men. That's how we promoted it. *Id.* at 74:15-16.

**DEFENDANTS' REPLY** to [1] and [2]: Defendants object to Plaintiff's characterization of PX-118.  The document speaks for itself and Defendants deny Plaintiff's incomplete

quotations and statements inconsistent therewith.  Plaintiff also selectively quotes Ms. Wolff's testimony on this Exhibit.  Plaintiff omits that Ms. Wolff also testified:

> Q: Was part of Netflix's public relations strategy to position the series as a true account of what happened to the five?
>
> A: We positioned this as based on a true story, the men's account and experiences.
>
> ***
>
> Q: Was part of Netflix's public relations strategy to position the series as five hours of the truth?
>
> A: This is one bullet of an overall strategy.  But if you actually read further into the paragraph it says, Through the perspective of the accused boys, the series presents an in-depth look at the criminal justice system from a personal perspective.  It's their truth.
>
> ***
>
> Q: Was part of Netflix's strategy to emphasize the true story of the five men?
>
> A: Yes.
>
> Q: And was part of Netflix's PR strategy to have viewers believe that they were watching a true story?
>
> A: We were very clear that this was a narrative and dramatic series, not to be confused with a documentary.

(PX-111 at 68:11 – 70:12.)


[2] Netflix's PR Strategy emphasized ███████████████████████████████
███████████ PX-118, at DEFS144764. ████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████ *Id.*; PX-111, Wolff 30(b)(6)
Dep. T., at 74:17-78:3.

**DEFENDANTS' REPLY** to [2]: See above.


[3] Netflix's marketing strategy was to "hit people on 3 levels" including "confronting viewers with the truth (for activists)." PX-121; PX-111, Wolff 30(b)(6) Dep. Tr. 91:22-92:3, 99:2101:14.

**DEFENDANTS' REPLY** to [3]: PX-121 is a written document which speaks for itself and Defendants deny any statements inconsistent therewith.  As noted above, the Five's truth is that they are innocent and were wrongly convicted of the rape.

[4] ████████████████████████████████████████████████████████
March 14, 2019, state ███████████████████████████████████████████████
██████████████████████████████████████████████ PX-218,
at DEFS169213.

**DEFENDANTS' REPLY** to [4]: Defendants object to Plaintiff's selective quotation of PX-218. ████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

[5] Netflix's Social Media ██████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████ PX-205, at DEFS 147848.
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████ *Id.*

**DEFENDANTS' REPLY** to [5]: Defendants object to Plaintiff's characterization and selective quotation of PX-205; Plaintiff cites to one page in a 23-page document. In all events, this document does not contradict this SUF.

[6] Netflix's *When They See Us* Twitter account describes the Series as the "***true story*** of the boys they called the Central Park Five." PX-127; PX-111, Wolff 30(b)(6) Dep. Tr. 118:18120:5. Netflix posted the Series trailer on social media with the tag line "The story you know is the lie they told you." Netflix also posted on its Twitter account "May 31. The truth is coming out." PX-127. *See also* PX-247, LF00038425, Netflix Tweet, 5/1/19 ("It's a powerful story that allows for the truth to come out"); PX-248, LF00038426, Netflix Tweet, 5/2/19 ("It's time for the truth"); PX-249, LF00038427, Netflix Tweet, 5/8/19 ("It's almost time to witness the power of truth"); PX-250, LF00038429, Netflix Tweet, 5/12/19 ("There's power in the truth"); PX-251, LF00038430, Netflix Tweet, 5/14/19 ("we shed light on the truth May 31st"); PX-256, LF00038386, DuVernay Tweet 5/31/19 ("today the truth prevails").

**DEFENDANTS' REPLY** to [6]: Defendants admit the content of the seven tweets at PX-127, PX-247 – 251 and PX-256, except that PX-127 does not state "May 31.  The truth is coming out."  Defendants deny that these are material to Defendants' Motion, or that they contradict this SUF in all events.  None of these tweets mention Plaintiff.  As noted above, the Five's truth is "their truth" – that they are innocent and were wrongly convicted of the rape.

[7] 

PX-132, at DEFS159113 (emphasis added).

**DEFENDANTS' REPLY** to [7]: Defendants admit that Plaintiff accurately quoted PX-132 at DEFS159113. Defendants deny that this document represents Netflix's full communications plan for the Series. As noted above, the Five's truth is "their truth" – that they are innocent and were wrongly convicted of the rape; whereas, some, including Plaintiff, still believe the truth is that the Five are "guilty" of the rape.

208.    Netflix's initial press release in July 2017 described the Series as "based on the true story that gripped New York and the world, the series will be a five-episode[12] limited, scripted series that exposes the breakdown of our criminal justice system at every phase of the notorious Central Park Five case" and will "focus intimately on the five young men" who were wrongfully convicted of a crime they did not commit. (Ex. 83, DEFS145014-15.)

**PLAINTIFF'S RESPONSE**:

Admitted. *But See* Plaintiff's Response to Paragraph 207, which details the numerous occasions on which Netflix promoted the Series as the truth.

209.    The marketing team hired a third-party vendor to develop a date announce asset, also known as a "teaser", for the Series. The teaser is a short video used to set up the context for the Series while announcing the Series title and release date. (Ex. 82, Wolff Dep. at 80, 83.)

**PLAINTIFF'S RESPONSE**:

Admitted.

---

[12] Prior to release, the Series was ultimately condensed to four episodes. **[Footnote appears in Defendants' Rule 56 Statement]**

210.    The teaser for the Series is a roughly 1 minute video featuring characters from the
Series and dialogue from the Series. The teaser includes a voice-over of the Linda Fairstein
character's dialogue from Episode 1 of the Series: "Let's get an army of blue up in Harlem. You
go into those projects and you stop every little thug you see. You bring in every kid who was in
the park last night." Felicity Huffman, who played Ms. Fairstein, is not seen in the teaser; it is
only a voice-over. (Ex. 84, Teaser; DuVernay Decl. ¶ 135.)

**PLAINTIFF'S RESPONSE**:

Admitted.

211.    The Fairstein character's dialogue used in the teaser was intended to show the
contrast between the way the system saw the Five—not as kids, but as criminals—compared to
how they were seen by themselves and their families, as represented by the dialogue from the
Mrs. Salaam character in the teaser. The Fairstein character was used to represent the larger
criminal justice system in the teaser because she was the Head of the Sex Crimes Unit and oversaw
the prosecution of the Five. (DuVernay Decl. ¶ 136; Ex. 82, Wolff Dep. at 83.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-
responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the
additional improperly included facts as follows:

[1] What was "intended" by the use of the Fairstein voiceover in the teaser raises credibility
issues that cannot be decided at the summary judgment stage. *Palin*, 482 F. Supp. 3d at
219.

**DEFENDANTS' REPLY** to [1]:  Denied.  *See* Reply to SUF 56.

[2] According to messages between a Netflix employee and the outside agency working on
the teaser, Ms. DuVernay insisted that Ms. Fairstein be included in the teaser -- she "threw

down, she wants Fairstein." PX-119, at DEFS153979; PX-120, at DEFS171553; PX-121 (discussing decision about including Fairstein in teaser as potentially setting "the tone for our working relationship later"); PX-111, Wolff 30(b)(6) Dep. Tr. 26:6-27:11.

**DEFENDANTS' REPLY** to [2] and [3]: Defendants admit that Ms. Huffman's voiceover appears in the teaser for the Series. Defendants admit that Ms. DuVernay preferred the version of the teaser with Ms. Huffman's voiceover and requested that it be included. (DuVernay Decl. at ¶¶ 135-136.) Ms. DuVernay's reasoning for wanting to include this dialogue in the teaser is set forth in her Declaration and in contemporaneous documents: "Showing two opposing sides—on one hand a mother trying to protect her son as an innocent child, and on the other, a representative of the criminal justice system trying to put him away as a criminal—is what the whole series is about." (DuVernay Decl. at ¶ 136.)

Defendants admit that Plaintiff accurately quotes PX-119 and PX-121 but object to Plaintiff's selective quotation from the documents reflecting comments from two employees. Nor do these documents contradict this SUF in any event.

[3] A Netflix marketing employee communicated to team members that using Ms. Fairstein in the teaser "nails what she's looking for: The conflict. The tension. The drama. The reason consumers would tune in." PX-121. The same employee reported "I asked her about PR...if we went with Fairstein's VO, and if Fairstein came after us, would Ava be willing to participate, esp so our actors weren't doing press alone, having to answer Qs about whatever Fairstein might be saying. She said 'yes, of course,' she would be a 'voice' for the campaign." PX-121, at DEFS153633. Another employee weighed in "I don't know if it is worth the upfront potential backlash." PX-121, at DEFS153631.

**DEFENDANTS' REPLY** to [3]: See above. Further, as PX-121 states, the discussion is about "PR" and does not question the accuracy of Ms. Fairstein's portrayal in the Series, but pertains to a marketing PR concern. Defendants also incorporate their reply to SUF 68.

[4] On February 11, 2019, when discussing the Series teaser, a Netflix employee asked "I don't know that we want to lead with the Fairstein of it all do you?" Alison Engel replied, "we told [Ms. DuVernay] we didn't like that piece and it brought controversy out of the gate." PX-203.

**DEFENDANTS' REPLY** to [4]: Defendants admit the substance of PX-203. As Ms. Wolff testified, Netflix was only concerned about using Ms. Huffman's voiceover in the teaser from a PR perspective: "[o]nly in the sense that it may detract from the men and the goal of telling their story" because "Fairstein had been vocal in the past in the media, and we wanted this to be the men's turn." (PX-111 at 92:25 – 93:13.) Defendants also incorporate their reply to SUF 68.

[5] Netflix ultimately "acquiesced" to Ms. DuVernay and "went with" her "point of view" by using Ms. Fairstein's voice over in the teaser. PX-121; PX-111, Wolff Dep. Tr. 94:14-95:9. *See* PX-111, Wolff Dep. Tr. 91:22-101:14; PX-238, DEFS177578; PX-63.

**DEFENDANTS' REPLY** to [5]: Defendants admit that Netflix agreed with Ms. DuVernay's reasoning and editorial choice for using Ms. Huffman's voiceover for the Fairstein character in the teaser juxtaposed with Mrs. Salaam's character.  Plaintiff's Response misrepresents the content of PX-121.  As Ms. Wolff testified, in PX-121, her colleague "is posing a question, something to consider.  So I don't think that that draws that conclusion." (PX-111 at 96:5-12.)  Ms. Wolff testified that Netflix "aimed to have the best campaigns for our series, working closely with the creators to market and publicize the stories that they're telling.  And I think in the end collectively this is what was decided." (*Id*. at 96:22 – 97:2.)

[6] Netflix advised Ms. DuVernay and others to market the teaser with the following social media copy: "The truth you haven't heard. This is the story of the boys they called the Central Park Five." PX-122, PX-111, Wolff 30(b)(6) Dep. Tr. 101:19-103:7; PX-253. *See* https://twitter.com/WhenTheySeeUs/status/1101499740506611713   (last  visited  on November 2, 2022). Netflix's "When They See Us" Twitter account, describes the Series as the "true story of the boys they called the Central Park Five." PX-127; PX-111, Wolff 30(b)(6) Dep. Tr. 118:18-120:5.

**DEFENDANTS' REPLY** to [6]: Defendants admit that Netflix suggested the copy in PX-122 to go along with the teaser.  Defendants admit the substance of PX-127, and further state that the Five's truth is "their truth" – that they are innocent.

[7] Between March 1, 2019-March 3, 2019, the teaser, which was released internationally, was viewed 3.9 million times "across social, Netflix You Tube channels and Ava's posts." PX-124; PX-111, Wolff 30(b)(6) Dep. Tr. 106:3-109:10.

**DEFENDANTS' REPLY** to [7]: Defendants admit the viewership statistic for the teaser stated in PX-124, but deny that it is a material fact to Defendants' Motion.  In addition, as Plaintiff admits in Paragraph 212, below, the teaser also includes a frame stating "Based on the true story of The Central Park Five."

212.    The teaser includes a frame stating "Based on the true story of The Central Park

Five." (Ex. 84 at 50 second mark.)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that the frame referenced above is displayed at the end of the teaser. Netflix also advised Ms. DuVernay and others to market the teaser with the following social media copy: "The truth you haven't heard. This is the story of the boys they called the Central Park Five." PX-122; PX-111, Wolff 30(b)(6) Dep. Tr. 101:19-

103:7;  PX-253.  *See* https://twitter.com/WhenTheySeeUs/status/1101499740506611713 (last visited on November 2, 2022). Netflix's "When They See Us" Twitter account, describes the Series as the "true story of the boys they called the Central Park Five." PX-127; PX-111; Wolff 30(b)(6) Dep. Tr. 118:18-120:5.

213.    Netflix also released a longer trailer for the Series on April 19, 2019—the 30-year anniversary of the attack on the Central Park Jogger. (Ex. 85, Trailer; Ex. 82, Wolff Dep. at 109-110; DuVernay ¶ 137.)

**PLAINTIFF'S RESPONSE**:

Admitted subject to the qualification that there were a number of attacks in Central Park on April 19, 1989. DX-21, Ryan Aff. ¶ 109 ("The other crimes committed on April 19 were grave and inexcusable – unprovoked attacks on strangers, apparently undertaken for the fun of it, which left some terrorized, two knocked into unconsciousness, and one seriously injured.")

214.    The final trailer features video clips and voice-overs from nearly all of the main characters in the Series, including the prosecution and defense attorneys. Ms. Fairstein is not featured in the trailer more prominently than any other character. (Ex. 82, Wolff Dep. at 113; Ex. 85, Trailer; DuVernay Decl. ¶ 137.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional improperly included facts as follows:

[1] Ms. Fairstein's voiceover from the Series' "police briefing" scene is once again used at the beginning of the trailer stating "Every black male who was in the park last night was a suspect, I need all of them." Ms. Fairstein is also pictured in the sequence in which the viewer sees the Series tag line "THE STORY YOU KNOW/IS THE LIE/THEY TOLD YOU." DX-85.

**DEFENDANTS' REPLY** to [1]: Defendants admit that Ms. Huffman's voiceover from the "police briefing" scene is used in the trailer.  Defendants admit that the trailer contains

the tagline "The Story You Know Is They Lie They Told You."  The "lie" is that the Five were guilty.  *See also* SUF 218.

[2] A Netflix employee who was working on cutting the trailer for the Series described Ms. Fairstein as "the lead prosecutor" "who is our #1 villain and conspirator to lock these boys up." In discussing Felicity Huffman's legal troubles she mentions "there are parallel themes of white privilege exercised by Felicity (IRL) and the white privilege shown in the character she plays in the series that may help increase talkability." PX-125; PX-111, Wolff 30(b)(6) Dep. Tr. 111:7-115:16.  "Talkability" relates to viewers wanting to discuss the trailer with others after viewing it. PX-111, Wolff 30(b)(6) Dep. Tr. 114:2-21.

**DEFENDANTS' REPLY** to [2]: Defendants deny that the comments of one employee in PX-125 are representative of Netflix's views.  Plaintiff's selective quote omits that the employee, Ms. Stephens, in fact states in her email: "Those are MY thoughts – I want you guys to give share your gut reactions, all feedback is welcome!"  (PX-125 at DEFS172717 (all caps in original) (discussing her views on the Fairstein character and the parallels of "white privilege" between Linda Fairstein and Felicity Huffman).  In all events, as Netflix's corporate witness Ms. Wolff testified, "villain" is "a matter of personal opinion" and the marketing team used Ms. Fairstein in the trailer, as most of the main characters are, because "Ms. Fairstein, among others, represented a larger system that ultimately convicted these young boys."  (PX-111 at 112:23 – 113:20; *see also id.* at 83:9-19 (testifying that Ms. Fairstein "was representative of the system that failed the men . . .[b]ased on her role as the head of the sex crimes unit and the fact that she led the prosecution.")

Defendants admit that Ms. Wolff testified that "talkability" "relate[s] to viewers wanting to discuss the trailer with others after viewing it[.]"  (PX-111 at 114:18-21.)

[3] The marketing strategy for the trailer was to leave people "emotionally charged, angry and activated to not only watch the series but to talk about larger themes and seek change." PX-126, at DEFS169752; PX-111, Wolff 30(b)(6) Dep. Tr. 115:17-117:16.

**DEFENDANTS' REPLY** to [3]: Defendants admit that Plaintiff accurately quoted PX-126.

[4] Per an undated "sentiment report" the trailer received "6.4 million views across social and Netflix Youtube channels." PX-129; PX-111, Wolff 30(b)(6) Dep. Tr. 122:12-125:3. One comment in the sentiment report is "Felicity Huffman as Linda Fairstein...the timing." PX-129, at DEFS145398. The sentiment reports lists the following press mentions:

Ava DuVernay & Netflix Drop 1st Trailer for 'When They See Us' & Yes, Felicity Huffman Is In It – Deadline

'When They See Us' Trailer: Ava DuVernay's Central Park Five Mini-Series Features Felicity Huffman – New York Times

<u>Netflix Drops Emotional Trailer For "When They See Us," **True Story** of the Central Park Five</u> – Hot New Hip Hop

<u>Felicity Huffman Is **Searching for Suspects** in First Look at Ava DuVernay's Central Park Five Miniseries</u> – Yahoo News

<u>The 'When They See Us' Trailer Is Here – Check Out the **True Story** of the Central Park Five</u> - InTouch

PX-129, at DEFS145403-145404 (emphasis added).

**DEFENDANTS' REPLY** to [4]: Defendants admit the viewership statistic for the trailer stated in PX-129. Defendants deny Plaintiff's characterization of the comments in PX-129, and deny they are material to Defendants' Motion in any event. The document states "[g]iven Felicity Huffman's current college scandal, we did see a little conversation around her involvement in the series." (PX-129 at DEFS145398.) Defendants admit that Plaintiff accurately quotes five headlines in PX-129, but denies their relevance.

215.    The trailer includes a frame stating "Based on the true story of The Central Park Five." (Ex. 85 at 1:35 mark.)

**PLAINTIFF'S RESPONSE**:

Admitted with the qualification that the frame appears ***before*** the viewer is confronted with all-caps frames of the Series' tagline "THE STORY YOU KNOW/IS THE LIE/THEY TOLD YOU." DX-85.

216.    The trailer first introduced the tagline "The story you know is the lie they told you." (Ex. 85, Trailer; DuVernay Decl. ¶ 138.)

**PLAINTIFF'S RESPONSE**:

Admitted.

217.    This tagline was created for Netflix by a third-party vendor. (Ex. 82, Wolff Dep. at 117.)

**PLAINTIFF'S RESPONSE**:

Admitted.

218.    The tagline represents the theme of the Series—the story the public knows is what they were told by the police, prosecutors and media, that the Five are guilty of the rape. Defendants believe this is a lie because the Five are innocent of the rape. (DuVernay Decl. ¶ 138; Ex. 82, Wolff Dep. at 117-118.)

**PLAINTIFF'S RESPONSE**:

Denied.

Defendants cite no evidence concerning "the story the public knows." What Defendants believe raises credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

219.    Netflix's use of the term "truth" in its social media campaign was intended to refer to the *Five's* truth, that they are innocent. The *When They See Us* Twitter page says that the Series is "[t]he true story *of the boys they called the Central Park Five*." (Ex. 82, Wolff Dep. at 119, 121.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraphs 207, 211 and 214 by reference herein.

**DEFENDANTS' REPLY:**  Defendants deny that Plaintiff's Responses to SUFs 207, 211 and 214 support her denial.  Defendants incorporate their Replies to SUFs 207, 211 and 214 as if fully set forth herein.

220.    In connection with the release of the Series, Netflix's PR team coordinated interviews for Ms. DuVernay, the Five men, and other cast and crew on the Series. In selecting interview opportunities for the Five men, Netflix's focus was always on choosing settings that would make the men feel comfortable and give them the opportunity to speak for themselves

Netflix did not forbid the men from participating in other interviews as they saw fit. (Ex. 82, Wolff

Dep. at 46, 54, 135, 138-139.)

**PLAINTIFF'S RESPONSE**:

Denied.

Prior to the Five's appearance, along with Ms. DuVernay, on a panel hosted by Oprah Winfrey as part of Netflix's FYSee event (a play on "For Your Consideration"), to garner interest in the Series for awards season, Netflix attempted to prevent the Five from publicly discussing Ms. Fairstein. PX-111, Wolff Dep. Tr. 34:3-56:22; PX-112; PX-113; PX-114. Netflix drafted sample questions for the panel, which included "Linda Fairstein has taken a lot of heat in the public eye for her role in your convictions – is she solely to blame?" PX-112, at DEFS 169265. Before the panel, Netflix's marketing and publicity teams discussed that one of the Five had been asked to comment on "the Linda backlash," noting "we were wondering if we can try to keep their comments under wraps until Oprah sits down with them on Sunday and we can tackle it there in a more controlled interview with our channels/Oprah channels that we can hopefully blow out." PX-114; PX-211, at DEFS153792; PX-187. Before the panel, a member of Netflix's publicity team sent an email to the Five which said "We wanted to reach out because you may be getting some inquiries from press about Linda Fairstein. We would love for you to wait on responding if possible. We think this is something you could discuss with Oprah on Sunday night during the panel." PX-113. Netflix's 30(b)(6) witness, Joanna Wolff, testified that part of Netflix's strategy for Ms. Winfrey's FY See event, which was released to Netflix's streaming platform, was to gain more subscribers. PX-111, Wolff 30(b)(6) Dep. Tr. 54:24-55:24. *See* discussion re *When They See Us Now* in Plaintiff's Response to Paragraph 223.

**DEFENDANTS' REPLY:**  Defendants object to Plaintiff's mischaracterization of the evidence.  Regarding PX-113, Ms. Wolff testified that the email is "a suggestion that [the Five] use an opportunity that we were providing to them to discuss it."  (PX-111 at 47:21 – 48:16.)  She also testified that:

> Our goal was to protect the men.  They had been subjected to years of negativity in the media and elsewhere.  And so this was finally their opportunity to tell their stories, the stories of their family, how they were impacted.

> So we wanted to make sure that they were, you know, advised in a capacity that would ultimately give them that opportunity to tell their story in a space that's comfortable and not have to retry in the media – be retried in the media.

(*Id*. at 45:23 – 46:12; *see also id.* at 54:5-23.)

## I.    <u>Post-Release</u>

221.    Following the release of the Series, Defendants became aware that Ms. Fairstein was facing backlash on social media and in the press regarding her involvement in the Central Park Jogger case, and eventually was dropped from her publisher and resigned from several boards. (DuVernay Decl. ¶ 143; Locke Decl. ¶ 74.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants' move to strike Plaintiff's Response as non-responsive and an improper denial.  To the extent the Court accepts Plaintiff's Response, Defendants reply to the additional facts contained in Plaintiff's response as follows:

[1] Defendants were aware that the Series was going to cause a backlash prior to its premiere, including after the Series teaser and Series trailer were released.

**DEFENDANTS' REPLY** to [1]: Defendants deny that these additional facts are material to Defendants' Motion.  Defendants' awareness that the public may react negatively to Ms. Fairstein, is not relevant to actual malice and whether the Defendants believed in the truth of the portrayal based on their sources.

[2] On February 11, 2019, when discussing the Series teaser, a Netflix employee asked "I don't know that we want to lead with the Fairstein of it all do you?" Alison Engel replied, "we told [Ms. DuVernay] we didn't like that piece and it brought controversy out of the gate." PX-203.

**DEFENDANTS' REPLY** to [2],  [3] and [4]:  As Ms. Wolff testified and as the very documents cited by Plaintiff reflect, Netflix's concerns were only from a PR perspective that if Ms. Fairstein's character was featured in the teaser, Ms. Fairstein might attack the Series or the Five men *before* the Series was even released.  PX-111 (Wolf Depo. at 92:25 – 93:13 (concern was "[o]nly in the sense that it may detract from the men and the goal of telling their story" because "Fairstein had been vocal in the past in the media, and we wanted this to be the men's turn."); PX-203 (noting inclusion of Fairstein would bring "controversy out of the gate"); PX-121 (questioning if Fairstein were used in the teaser and "came after us" then "would Ava be willing to participate" in "press"; "I don't know if it is worth the upfront potential backlash" from Fairstein); PX-212 (noting determination not to let Fairstein chill the Series ("quiet this train") about the Five men's innocence).

[3] When discussing the use of Ms. Fairstein in the Series teaser, a Netflix employee relayed a conversation with Ms. DuVernay, "I asked her about PR...if we went with Fairstein's VO, and if Fairstein came after us, would Ava be willing to participate, esp so our actors weren't doing press alone, having to answer Qs about whatever Fairstein might be saying. She said 'yes, of course,' she would be a 'voice' for the campaign." PX-121, at DEFS153633. Another employee weighed in "I don't know if it is worth the upfront potential backlash." PX-121, at DEFS153631.

**DEFENDANTS' REPLY** to [3]:  See above.

[4] On March 20, 2019, a Netflix employee told Ms. DuVernay, "***No surprise***, but she's already blocked our @WhenTheySeeUs social pages [smiling emoji]. Can't block the truth Linda!" PX-123 (emphasis added). Ms. DuVernay replied "She's gonna need a lot more than that to quiet this train. It's moving!" PX-212, DEFS153803.

**DEFENDANTS' REPLY** to [4]:  See above.

[5] Prior to the release of the Series, on May 18, 2019, Ms. DuVernay messaged Ms. Locke that Ms. Fairstein "bout to feel it ALL." PX-87; PX-88; PX-81, Locke Dep. Tr. 59:5-61:9. Per Ms. Locke, Ms. DuVernay was referring to Black Twitter, which calls people out "and that Linda Fairstein was going to feel some of the ire of Black Twitter." PX-81, Locke Dep. Tr. 59:5-61:9.

**DEFENDANTS' REPLY** to [5]: Defendants incorporate their reply to SUF 79[5], *supra*.

[6] Netflix's Communications Plan, ███████████████████████████████ ████████████████████████████████████████████ ████████████████████ PX-132, at DEFS169116; PX-111, Wolff Dep. Tr. 143:20-144:9.



**DEFENDANTS' REPLY** to [6]: Defendants' object to Plaintiff's mischaracterization of PX-132. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████  This story was published on June 4, 2019, after the Series' release.  https://www.thedailybeast.com/when-they-see-us-central-park-five-prosecutor-takes-fire-over-ava-duvernay-netflix-series.  Ms. Wolff also testified that "the communications plan was regularly updated by Netflix[.]"  (PX-111 at 144:10-12.)

222.     Neither Ms. DuVernay nor Ms. Locke spoke with anyone at Ms. Fairstein's publisher, talent agency or any of the organizations from which she resigned. Ms. DuVernay

received one text message from an acquaintance on the board of Safe Horizon but did not respond.

(Ex. 2, DuVernay Dep. at 193; DuVernay Decl. ¶ 144; Locke Decl. ¶ 75.)

**PLAINTIFF'S RESPONSE**:

Denied.

When asked if she spoke to anyone at ICM about Ms. Fairstein's contract, Ms. DuVernay said "Not that I recall." PX-51, DuVernay Dep. Tr. 195:24-196:1. On June 3, 2019, Netflix employee, Denise Martin, told her colleagues "Ava...mentioned that Penguin was reviewing Linda's contracts and would probably drop her." PX-79. Ms. DuVernay testified that "it was the talk of the town" but could not specify the source of the information. PX-51, DuVernay Dep. Tr., 193:19-195:18. When asked if she spoke to anyone at Penguin about Ms. Fairstein's contract, Ms. DuVernay said "Not that I recall." *Id.* 195:21-23.

On June 3, 2019, Ms. DuVernay received a text message from ██████████████████████████████████████████ PX-237. Ms. DuVernay's self-serving declaration about this matter raises credibility issues that cannot be decided at this stage of the action. *Palin*, 482 F. Supp. 3d at 219.

Plaintiff has no reason to believe that Ms. Locke contacted her publisher, agent or any nonprofit with which Plaintiff was involved.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as an improper denial of this Paragraph. Plaintiff cites no evidence contradicting Ms. DuVernay's statement in her declaration:

> I did not speak with anyone at Ms. Fairstein's publisher, talent agency or any of the organizations from which she resigned. I received one text message from an acquaintance who sat on the Board at Safe Horizon, a non-profit from which Ms. Fairstein resigned. I did not even know that this person was on the Board, and I did not respond.

(DuVernay Decl. at ¶ 144.) Moreover, Plaintiff took the depositions of representatives from Ms. Fairstein's publisher, talent agency and Safe Horizon, and has cited no testimony that would support her denial of this SUF, as there is none.

223.    It was not the goal of the writers to target or "cancel" Ms. Fairstein. The writers' goal was to tell the story of the Five men who were wrongfully convicted as children from the perspective of the men and their families, and based on the writers' research and sources. (DuVernay Decl. ¶¶ 146-147; Ex. 2, DuVernay Dep. at 28-29; Locke Decl. ¶¶ 23, 70, 76; Ex. 3,

Locke Dep. at 61-62; Ex. 31, Swicord Dep. at 41-42, 50; Swicord Decl. ¶¶ 28, 30, 32-33, 54.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:** Defendants move to strike. Plaintiff's Response egregiously violates Rule 56.1, with over 40 un-numbered paragraphs of additional facts. To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

Defendants have already replied to many of these facts in their replies, above, and incorporate their replies by reference here:

- [3]: SUF 221
- [4]: SUFs 79, 148
- [7] and [15]: SUF 68
- [8], [29] – [31] and [33]: SUF 203
- [11]: SUF 144
- [12], [14] and [34]: SUF 79
- [13]: SUF 221
- [16] and [19]: SUFs 79, 187 and 197
- [28] and [38]: SUF 160
- [41] and [42]: SUF 38

[1] What the writers intended raises credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

[2] As discussed above at Paragraphs 12-16, 18, 19, 21-23, 28, 29, 31, 53-54, 56-57, 60, 64. 75, 81, 83-86, 90-91, 93, 98-102, 119-197—all of which are incorporated by reference herein—the writers' portrayal of Ms. Fairstein is unsupported by their sources. Accordingly, the writers' decision to portray Ms. Fairstein in the manner in which she is depicted in the Series is evidence that they targeted her.

[3] It is clear that from various pre- and post- release communications about the Series and Ms. Fairstein that the writers targeted, and intended to cancel, Ms. Fairstein.

### *Ms. DuVernay*

[4] A casting description for the role of Ms. Fairstein—crafted by Berry Welsh and reviewed by Ms. DuVernay—stated as follows:

> The character is LINDA FAIRSTEIN: lead prosecutor, 42, headed the Manhattan district attorney's sex crimes office during the Central Park jogger case. A fully, focused, no nonsense woman. Fairstein, with the

> assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following thirty straight hours of interrogation and intimidation, of both the youths and their supporting adults.

PX-147; PX-148; PX-149; PX-137, Engel Dep. Tr. 11:18-24, 15:7-16, 141:15-150:20. A revised casting description for Ms. Fairstein's role was sent to a representative for a well-known actress as follows:

> The character is LINDA FAIRSTEIN: lead prosecutor, 42, headed the Manhattan district attorney's sex crimes office during the Central Park jogger case. A fully, focused, no nonsense woman. Fairstein, with the assistance of the detectives at the 20th precinct, was the architect of the case against the five arrested teenagers of color, following thirty hours of interrogation. She believed in fighting sexual assault with the full arsenal of her skill set, blurring the line between what was ethical and what was essential for the jogger.

PX-148.

[5] On May 13, 2018, ███████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████ PX-261, DFS177653.

[6] In July 2018, Netflix agreed to announce the casting of Ms. Fairstein's role in the Series together with the casting of the roles of Korey Wise and Antron McCray, per Ms. DuVernay's instruction that the announcement provide "[t]he first glimpse of the boys with the woman who put them behind bars." PX-115; PX-116; PX-111, Wolff Dep. Tr. 57:5-62:8; PX-72; PX-51, DuVernay Dep. Tr. 163:19-166:8.

[7] On August 2, 2018, a member of Netflix's communications team, Don Halcombe, raised a "Potential Flag" about Ms. Fairstein. Per Mr. Halcombe's email, after a marketing kick-off meeting for the Series, "Tribeca and Participant came up to us after the meeting and are concerned about Linda Fairstein.... She is not portrayed favorably in the scripts." PX-117; PX-111, Wolff Dep. Tr. 62:22-66:3.

[8] On November 28, 2018, Ms. Locke messaged Ma. DuVernay that the New York Times contacting her "about the Linda deal." Ms. DuVernay replied, "Who is the writer...I want to have Netflix publicity log who inquired and track the story. Damn, lady! You really set it OFF! Good job! PX-74; PX-51, DuVernay Dep. Tr. 174:17-175:14.

[9] On November 30, 2018, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████ PX-239. *See* https://www.nytimes.com/2018/11/28/nyregion/linda-fairstein-central-park-5.html  (last visited on November 5, 2022); PX-264. ██████████████████████████████



PX-239. (emphasis added).

[10] On January 22, 2019, ███████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ PX-240.

[11] In February 2019, Ms. DuVernay insisted that Ms. Fairstein's voiceover of the "precinct briefing" scene be included in the film teaser -- she "threw down, she wants Fairstein." PX-119; PX-120, at DEFS171553; PX-121 (discussing Netflix's decision about including Fairstein in teaser as potentially setting "the tone for our working relationship later"); PX-111, Wolff 30(b)(6) Dep. Tr. 26; DX-84 (teaser).

[12] On May 18, 2019, prior to the Series airing, Ms. DuVernay texted Ms. Locke about Ms. Fairstein "She 'bout to feel it all." PX-87; PX-81, Locke Dep. Tr. 59:5-63:18.

[13] On March 20, 2019, a Netflix employee told Ms. DuVernay, "No surprise, but she's already blocked our @WhenTheySeeUs social pages [smiling emoji]. Can't block the truth Linda!" PX-123. Ms. DuVernay replied "She's gonna need a lot more than that to quiet this train. It's moving!" PX-212, DEFS153803.

[14] Netflix employee Alison Engel took notes at a "CP5 Culture Summit" about the Series, at which Ms. DuVernay was present. Ms. Engel wrote the following in her notes. "Linda Fairstein – think of this as a reckoning for her prosecutorial misconduct." PX-150; PX-137, Engel Tr., 154:20-158:13.

[15] The week before the Series came out, a Netflix communications employee raised concerns about how Ms. Fairstein was portrayed in the Series after she watched a 20/20 documentary about the Central Park Jogger Case. The employee stated:

> "When They See Us '*really paints a very critical portrait of Linda Fairstein and her heavy involvement in the case.* Linda is almost absent in the 20/20 piece.... Instead, they are much more focused on Elizabeth Lederer's role. It's almost unclear what Linda's role in the case was at all..... I do think that the 20/20 series will add questions about Linda and Elizabeth's portrayals in the series and their roles in the case."

PX-131 (emphasis added); PX-111, Wolff Dep. Tr. 140:2-143:19.

[16] On May 21, 2019, ████████████████████████████████
███████████████████





PX-69; PX-63; PX-51, DuVernay Dep. Tr. 152:15-153:18.

[17] On May 31, 2019, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ PX-232.

[18] On June 1, 2019, ████████████████████████████████████████████████ ██████████████████ PX-216.

[19] On June 2, 2019, Ms. Locke messaged Ms. DuVernay "When Nancy Ryan slapped her little books on the table in episode 4, I died." Ms. DuVernay replied to Ms. Locke "I told Famke: 'You are my voice here.' *I know Linda heard every word*." PX-63 (emphasis added); PX-235.

[20] On June 2, 2019, Ms. DuVernay messaged Ms. Locke, "Also, did you hear about the Wikipedia hack?" Ms. Locke replied "I was in stitches! Yes!" Ms. DuVernay then messaged a portion of Ms. Fairstein's Wikipedia page to Ms. Locke. The page described Ms. Fairstein as a "Nazi American" who attended "Vassar College where she studied how to destroy black and Latino children" and noted "Genre How to Be a Racist 101." Ms. DuVernay followed this with "The SHADE!!!!!" PX-227.

[21] On June 4, 2019, ████████████████████████████████████████████████ ████████████████████████████████████████████████ PX-233.

[22] On June 7, 2019, ████████████████████████████████████████████████ ████████████████████████████████████████████████ PX-230. *See* https://twitter.com/ap/status/1137072015993692161?s=12 (last visited on November 6, 2022). ██████████████████████████

[23] On June 12, 2019, Netflix aired *When They See Us Now,* an interview conducted by Oprah Winfrey of Ms. DuVernay and Messrs. McCray, Santana, Salaam, Richardson and Wise, in which Ms. Fairstein was discussed as follows:

> It is widely reported that detectives, influenced by the head of the Manhattan District Attorney's Sex Crimes Unit, Linda Fairstein, coerced the young men, then just seventh and eighth graders, into signing confessions.
>
> Ms. Winfrey says, "Linda Fairstein, as you know was a prosecutor in the Manhattan District Attorney's office, and she led the Sex Crimes Unit during this case. And it's, of course, been reported that she has stepped down from the board positions, some, and also stepped down from charities,

and has been reported that she's been dropped by her publisher. What do you have to say about that?"

Ms. DuVernay responds, "I think it's important that people be held accountable. And that accountability is happening in a way today that it did not happen for the real men 30 years ago. But I think that it would be a tragedy if this story and the telling of it, um, came down to one woman being punished for what she did, because it's not about her. It's really not all about her. She is a part of a system that's broken... And so the goal of this—okay, Linda Fairstein, okay Elizabeth Lederer, okay, all of these people on this particular case we need to be held accountable.

PX-263, at 1:43-1:58, 9:20-11:31. As discussed above at Paragraph 220, which is incorporated by reference herein, *When They See Us Now* was a panel event intended to garner awards interest in the Series.

[24] On June 12, 2019, Ms. DuVernay tweeted about *When They See Us Now*, "It's their time." Embedded in her tweet was "Not a single publication needs to give Linda Fairstein a chance to speak. These men are broken because of her actions." PX-254.

[25] On June 12, 2019,  PX-76; PX-63. Ms. DuVernay testified ██████████████████████████████████ ██████ PX-51, DuVernay Dep. Tr. 180:12-183:12.

[26] On September 23, 2019, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ PX-229 (emphasis added); PX-63.

[27] Ms. DuVernay's declaration states that the Series "does the necessary work of...holding the system and powerful public officials like Linda Fairstein accountable for failing the Five men as children." DuVernay Decl. ¶ 13.

### *Ms. Locke*

[28] On a draft script for Episode 2, Ms. Locke wrote "Push Fairstein harder. She goes wild so she gets a good comeuppance." PX-85, at DEFS035835; PX-81, Locke Dep. Tr. 51:23-53:10. Shortly after the Series aired, Ms. Locke emailed ████████████████████ 

PX-86; PX-81, Locke Dep. Tr. 53:16-54:25. Ms. Locke testified that ██████████ ████████ PX-81, Locke Dep. Tr. 53:16-54:25. Ms. Locke further testified that "hundreds of thousands of Americans" would not know that persons other than Ms. Fairstein made statements which "held to the guilt" of the Five because "they're not as famous as Linda Fairstein is." *Id.* 61:25-64:21.

[29] On November 27, 2018, Ms. Locke posted a series of tweets on Twitter directed at Mystery Writers of America ("@edgarawards") which stated that: 1) Ms. Fairstein was almost singlehandedly responsible for the wrongful incarceration of the Central Park Five; 2) that the Five were exonerated by the State of New York; 3) others in the NYC District Attorney's Office have admitted prosecutorial misconduct on the part of those handling the case in their office, who were "led by Linda Fairstein"; and 4) Ms. Fairstein ruined five innocent men's lives. Ms. Locke included Ms. DuVernay in the tweets ("@ava"). PX-100.

[30] Responding to Ms. Fairstein on social media, Ms. Locke relied on her research for the Series to further accuse Ms. Fairstein of wrongdoing. PX-104. Ms. Locke stated that Ms. Fairstein "directed Elizabeth Lederer's work and crafted the prosecution strategy and media strategy coming out of the prosecutor's office." *Id.*; PX-81, Locke Dep. Tr. 171:7-180:4. Ms. Locke's sources said otherwise. *See* Paragraphs 54, 75, 77, 80, 83-86, 91, 93, 96-103, 120-142, 148-158 and 190, incorporated by reference herein.

[31] Ms. Locke made clear that it was her goal to "hold Ms. Fairstein accountable in the court of public opinion," noting Ms. Fairstein "started to duck and weave (with more lies)." PX-105; PX-81, Locke Dep. Tr. 181:3-184:20.

[32] On November 28, 2018, ██████████████████████████

████████████ PX-81, Locke Dep. Tr. 191:14-193:6.

[33] On December 18, 2018 Ms. Locke tweeted "If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case – which, don't get it twisted, she did lead – I'm not sure who the real bully is." She added "And, yes, ***I worked on Ava DuVernay's project in the case. That's why I know so much about the case.*** The research on the project is extensive. And I actually read the trial transcripts. And I chose to share my knowledge of Fairstein's misdeeds with MWA." PX-108 (emphasis added); PX-81, Locke Dep. Tr. 194:19-200:1.

[34] On May 18, 2019, Ms. Locke messaged Ms. DuVernay, "She's so arrogant." Ms. DuVernay responded, "She 'bout to feel it all." PX-87; PX-81, Locke Dep. Tr. 59:5-63:18.

[35] On May 31, 2019, the day on which the Series premiered, Ms. Locke tweeted a People magazine article about the portrayal of Ms. Fairstein in the Series, stating "In which I remember with zeal telling Linda Fairstein her time is up."

https://twitter.com/atticalocke/status/1134473617150885889 (last visited on November 5, 2022); https://people.com/crime/linda-fairstein-central-park-five-prosecutor-controversy/?utm_source=twitter.com&utm_medium=social&utm_campaign=social-button-sharing (last visited November 5, 2022); PX-245-246. In the comments to the post, a user commented "Thank you for holding her accountable," to which Ms. Locke responded "we all have to." PX-246.

[36] On June 2, 2019, Ms. DuVernay messaged a tweet to Ms. Locke, presumably about Ms. Fairstein. Ms. Locke responded, "Ava, I had my husband read some of those tweets while I was driving yesterday. She is getting ripped to shred." PX-226.

[37] On June 2, 2019, Ms. Locke messaged Ms. DuVernay, "Family friend just graduated from Vassar. There [is] a petition to get Linda off the board of trustees." She further messaged "We get justice where we can." Ms. DuVernay "liked" the messages. PX-236.

[38] On June 7, 2019,  PX-90; PX-81, Locke Dep. Tr. 69:2-70:24.

[39] On June 8, 2019, PX-234. *See* https://www.nbcnews.com/news/nbcblk/central-park-5-prosecutor-linda-fairstein-dropped-publisher-after-public-n1015391 (last visited on November 6, 2022).

[40] On June 11, 2019, Ms. Locke tweeted about Ms. Fairstein:

> I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes ***even people I hate*** act the way they do. But fuck it: Linda Fairstein is trash, was trash, will always be trash.

> This morning she showed us exactly why she deserves ***all the rage and hate and consequences*** that are coming her way. She is an unrepentant liar. Fuck her.

PX-89 (emphasis added).

[41] On June 11, 2019, Ms. Locke tweeted at "The Wrap" about an article that was posted on its Twitter account, *Central Park 5 Prosecutor Accuses Ava DuVernay of 'Outright Fabrication' in 'When They See Us.'* Ms. Locke responded "It's pretty accurate by trial transcripts and reporting from the time. PX-103; PX-81, Locke Dep. Tr. 162:8-165:14.

[42] On July 7, 2019, Ms. Locke tweeted a photograph of a plastic bin purportedly containing her "research/work" for the Series. Per her tweet:

> Just found these... all the research/work I brought home to start writing Episode 2 of @WhenTheySeeUs. When I tell you this is one of the most accurate portrayals of a true story ... this is why. @ava our team took the truth as our bible.

PX-92; PX-81, Locke Dep. Tr. 84:6-92:4.

**DEFENDANTS' REPLY (CONT.):** Further replying to the additional facts:

Plaintiff's citations are to written documents and statements which Defendants admit were made and speak for themselves, and Defendants deny any statements inconsistent therewith. With respect to those statements:

First, not a single one of the statements Plaintiff cites in the 40-plus paragraphs above was made prior to the writers' research. Rather, ***every single one of these statements was made after the writers conducted significant research*** on the Central Park Jogger Case and Ms. Fairstein and formed opinions based on their research.

Second, the cited statements consistently show the writers felt strongly about Fairstein's conduct and believed in the truth and accuracy of their portrayal prior to and after publication of the Series based on "extensive" research they were proud of and referenced, as part of a project that was "meaningful" and an "honor" to them personally. (*See* Plaintiff's Paragraphs 28, 33, 41, 42.)

Third, the cited statements consistently show that the writers thought before publication that the truth of what they were publishing might and then did lead to public "accountability" for Fairstein (and Lederer)—the public officials at the helm of a travesty of justice that sent five innocent children "she put behind bars". (*See* Plaintiff's Paragraphs 9, 10, 12-14.) The statements show the writers were pleased with that public accountability for Fairstein and other officials after the Series renewed "light" on the case and told the Five's "true story" of their innocence from their perspective—instead of the "false story" of their guilt that Fairstein believes and has been outspoken about "for years". ("Her time is up"). (*See* Plaintiff's Paragraphs 17, 23-27, 28, 34-39.)

Fourth, the cited statements relating to PR and marketing show that the "only concern" was a PR one that Fairstein might attack the Series, including before it even aired, as she had been vocal about the men's guilt for years and did not come off "favorably" in the telling of the story in the Series. (*See* Plaintiff's Paragraphs 7, 15.)

224.    Nor was it the intent of Netflix's marketing and promotion to target or "cancel" Ms.

Fairstein. Netflix's marketing and promotion of the Series was not aimed at Ms. Fairstein. (Ex. 82,

Wolff Dep. at 77-78.)

**PLAINTIFF'S RESPONSE**:

Denied.

**DEFENDANTS' REPLY:**  Defendants move to strike.  Plaintiff's Response egregiously violates Rule 56.1, with 27 un-numbered paragraphs of additional facts.  To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

Defendants note that they have already replied to many of these facts in their replies, above, and incorporate their replies by reference here:

- [3]: SUFs 207, 211
- [5]: SUF 211
- [6] and [13]: SUF 221
- [7]: SUF 214
- [8]: SUF 214
- [10]: SUF 79
- [11] and [12]: SUF 68

[1] What Netflix's "marketing and promotion" intended raises credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

[2] In July 2018, Netflix agreed to announce the casting of Ms. Fairstein's role in the Series with the casting of the roles of Korey Wise and Antron McCray, per Ms. DuVernay's instructions, so that the announcement provided "[t]he first glimpse of the boys with the woman who put them behind bars." PX-115; PX-116; PX-111, Wolff Dep. Tr. 57:5-62:8; PX-72; PX-51, DuVernay Dep. Tr. 163:19-166:8.

[3] On February 18, 2019, a Netflix marketing employee asked about the Series teaser, "The only question that's really lingering in the back of my mind is whether this lean to Fairstein is to acquiesce Ava/talent relations. Like would we be ***pushing this hard on Fairstein version*** if Ava wasn't?" PX-121 (emphasis added).

[4] ████████████████████████████████████████████████████████ PX-217 (emphasis added).

[5] Netflix advised Ms. DuVernay and others to market the teaser, featuring the Fairstein voiceover from the "police briefing scene," (DX-84), with the following social media copy: "The truth you haven't heard. This is the story of the boys they called the Central Park Five."   PX-122; PX-111 Wolff 30(b)(6) Dep. Tr. 101:19-103:7; PX- 253. *See* https://twitter.com/WhenTheySeeUs/status/1101499740506611713   (last   visited   on November 2, 2022). Netflix's "When They See Us" Twitter account, describes the Series as the "true story of the boys they called the Central Park Five." PX-127; PX-111, Wolff 30(b)(6) Dep. Tr. 118:18-120:5.

[6] On March 20, 2019, a Netflix employee told Ms. DuVernay, "No surprise, but she's already blocked our @WhenTheySeeUs social pages [smiling emoji]. Can't block the truth Linda!" PX-123. Ms. DuVernay replied "She's gonna need a lot more than that to quiet this train. It's moving!" PX-212.

[7] Ms. Fairstein's voiceover from the Series' "police briefing" scene is used at the beginning of the Series film trailer, stating "Every black male who was in the park last night is a suspect, I need all of them." Ms. Fairstein is also pictured in the sequence in which the viewer sees the Series tag line "THE STORY YOU KNOW/IS THE LIE/THEY TOLD YOU." DX-85.

[8] A Netflix employee who was working on cutting the trailer for the Series described Ms. Fairstein as "the lead prosecutor" "who is our #1 villain and conspirator to lock these boys up." In discussing Felicity Huffman's legal troubles she mentions "there are parallel themes of white privilege exercised by Felicity (IRL) and the white privilege shown in the character she plays in the series that may help increase talkability." PX-125; PX-111, Wolff 30(b)(6) Dep. Tr. 111:7-115:16. "Talkability" relates to viewers wanting to discuss the trailer with others after viewing it. PX-111, Wolff 30(b)(6) Dep. Tr. 114:2-21. The marketing strategy for the trailer was to leave people "emotionally charged, *angry* and activated to not only watch the series but to talk about larger themes and seek change." PX-126, at DEFS169752 (emphasis added); PX-111, Wolff 30(b)(6) Dep. Tr. 115:17-117:16.

[9] Netflix's Publicity Team utilized a "When They See Us" cross-functional campaign timeline which included the March 26, 2019 date for the release of Ms. Fairstein's last-published crime novel "Blood Oath." PX-136; PX-111, Wolff 30(b)(6) Dep. Tr., 174:3-177:9. Netflix's publicity, marketing and awards departments were involved in the "When They See Us" cross-functional campaign. PX-111, Wolff 30(b)(6) Dep. Tr., 175:10-13.

[10] Netflix executive Alison Engel took notes at a "CP5 Culture Summit" about the Series, at which Ms. DuVernay was present. Ms. Engel wrote the following in her notes. "Linda Fairstein – think of this as a reckoning for her prosecutorial misconduct." PX-150; PX-137, Engel Tr., 154:20-158:13.

[11] The week before the Series came out, a Netflix communications employee raised concerns about how Ms. Fairstein was portrayed in the Series after she watched a 20/20 documentary about the Central Park Jogger Case. The employee stated:

> When They See Us' really paints a very critical portrait of Linda Fairstein and her heavy involvement in the case. Linda is almost absent in the 20/20 piece.... Instead, they are much more focused on Elizabeth Lederer's role. It's almost unclear what Linda's role in the case was at all..... I do think that the 20/20 series will add questions about Linda and Elizabeth's portrayals in the series and their roles in the case." PX-131; PX-111, Wolff Dep. Tr. 140:2-143:19.

[12] Ms. Wolff, who works in Netflix's Publicity Department, replied "I also understand your point about Linda and her involvement – she probably will come after us regardless, solely based on not liking the way she is portrayed." PX-131, at DEFS158620.

[13] Netflix's  PX-132, at DEFS169116; PX-111, Wolff Dep. Tr. 143:20-144:9.

[14] On June 3, 2019, a Netflix marketing employee learned from Ms. DuVernay that Ms. Fairstein's publisher, Penguin, was "reviewing her contracts and will probably drop her (*yesssss*)." PX-79 (emphasis added). On the same day, members of the marketing team noted that Ms. Fairstein deleted her Twitter account. One employee went on Amazon and noted that "people have started leaving criticisms as book reviews" for Ms. Fairstein. They further noted "The social chatter around her is very negative." PX-208.

[15] Netflix worked on a social impact campaign, partnering with Color of Change, which targeted Ms. Fairstein on social media. Color of Change is the "Social Action Arm" of Participant Media, which is a producer of the Series. PX-118, at DEFS144761.



PX-205, at DEFS147845

*See* PX-111, Wolff 30(b)(6) Dep. Tr. 25:18-34:2. Netflix marketing materials that were disseminated to members of the public prior to the release of the Series, state "[a]longside the release of 'When They See Us,' Participant Media, in collaboration with Color of Change... will launch a social impact campaign aimed at supporting the work of the criminal justice reform movement." PX-190, at DEFS0882217. *See* PX-111, Wolff 30(b)(6) Dep. Tr. 160:25-164:12. Prior to the release of the Series, Netflix, Participant, Color of Change and Netflix's "cross functional team dedicated to impact" spoke on a weekly basis. PX-206, DEFS147869.

[16] A June 2019 report regarding "social media insights" about "launch reactions" to the Series, tracked how consumers responded to Ms. Fairstein's character on Twitter. The report noted "Many consumers watching the series feel a sharp anger towards the individuals that helped get the boys wrongly convicted, and ***much of this anger is directed at Linda Fairstein*** and Donald Trump." PX-133 (emphasis added); PX-111. Wolff 30(b)(6) Dep. Tr. 160:6-22. On June 4, 2019, Netflix global marketing employee, Marleisse Stephens, who worked on Netflix's social media strategy, reported this information to an organization called Color of Change, referring to "anger towards Linda Fairstein, Trump and racial institutions" as one of three "***top conversation drivers***" on social media. PX-134 (emphasis added). Ms. Stephens added:

> Audiences are feeling eager to enact change and take action and want to know where to take that frustration so we are ramping up visibility for the winningjustice.org/about/wtsu site developed by Color of Change.

*Id.* at DEFS075135-136; PX-111, Wolff 30(b)(6) Dep. Tr. 160:25-164:12; PX-205, DEFS147845. Ms. Stephens asked Color of Change "based on the consumer feedback do you have social graphics that pull out specific methods of action that we can RT/share on social? We feel most confident with that communication sourcing from COC socials and WTSU channels supporting." PX-134, at DEFS075137. Color of Change responded:

> We'll be able to share assets with you no later than Friday afternoon with highlights on how people can take action from here, including how to hold ***prosecutors accountable/submit complaints for prosecutor misconduct***.

PX-134, at DEFS075135 (emphasis added). Ms. Stephens replied:

> Thanks so much. We have been brainstorming on how to keep the conversation alive and make it super easy for watchers to take action. We think supplying Ava and our cast with social graphics will help illustrate ways to take action and how these action[s] will effect change to the viewers.

*Id.* In a later email, Ms. Stephens noted "We're continuing to drive to winningjustice.org." *Id.* Netflix's 30(b)(6) witness, Joanna Wolff, testified that winningjustice.org was a "tool for consumers to learn more about action they could take in their local communities." Ms. Wolff could not recall if Netflix provided content to the website. PX-111, Wolff 30(b)(6) Dep. T. 163:16-164:12.

[17] On June 4, 2019, Ms. Stephens noted in an email that Ms. DuVernay "wrapped her arms around Color of Change," an organization that was working with Netflix and Participant Media on the "social impact" campaign for the Series.

[18] On June 4, 2019, the Hi5 agency, which was running and posting content on Netflix's *When They See Us* social media accounts, emailed members of Netflix's marketing team "Just wanted to flag this. Looks like there is going to be a demonstration tomorrow for people who want Fairstein's cases re-opened." PX-135, at DEFS135640; PX-111, Wolff 30(b)(6) Dep. Tr. 21:18-24:20, 166:25-168:5. Ms. Stephens forwarded the email to Participant and Color of Change, asking, "[a]ny of you familiar with Linda Sarsour?" to which Participant responded "Oh yes. She's one of the original founders of the Women's March. She's controversial due to ***anti-semitic*** comments in the past...but very influential." PX-135 (emphasis added). Ms. Stephens asked in a subsequent email "Is this something we should get involved with from an Impact Perspective? Would having her previous cases be re-opened and reviewed ***be a win***?" *Id.*, at DEFS153640 (emphasis added). Color of Change employee Tenicka Boyd replied that one of Color of Change's employees was invited by Ms. Sarsour to be part of the demonstration. *Id.* She advised Ms. Stephens "I should flag for you all that we are running our own campaign against Linda's publisher.... A few other things are also in the works. I don't think Netflix should get involved. Lots of things going to happen in the activist space that ***Netflix should just let happen***." *Id.* (emphasis added). Netflix followed Ms. Boyd's advice to just let things happen. PX-111, Wolff Dep. Tr. 167:23-168:5.

[19] On June 5, 2019, a message from Ms. DuVernay was posted on Justice Roundtable, in which Ms. DuVernay noted:

> I've been partnering with Color of Change for years. Their 'Winning Justice' campaign is rallying Black communities to come together and set the agenda for a new wave of prosecutors. Prosecutors have more power than anyone else in the system to fix the system. And in a dozen cities, thanks to many of you, we now have prosecutors being measured by their commitment to justice rather than by how many people they put in prison. **I'm hoping you'll watch *When They See Us* and be moved to discuss and interrogate the current criminal system of injustice. But I also hope you don't stop there.**

PX-78 (emphasis in original). The message directs the reader to visit "Winning Justice" to "join campaigns....to hold prosecutors accountable for wrongful conviction." *Id.*

[20] On June 5, 2019, Jonathan King from Participant Media informed the social impact team that "Ava/WTSU and COC, are synced up on the below." Included in the information "below" is that Color of Change "launched an email sign up hub and a Linda Fairstein petition." PX-265. The website address in Mr. King's email matches the petition referenced in the Complaint. https://act.colorofchange.org/sign/drop_linda_fairstein/?source=twitter (last visited on November 4, 2022); Compl. n. 175; PX-266. The petition contains the hashtag #cancellindafairstein. *Id.* Mr. King's email also notes "We definitely believe there's more the audience can do. We can further channel the current wave of frustration and outrage audiences are experiencing/sharing into action and engagement." PX-265.

[21] On June 7, 2019, Ms. Stephens replied to Mr. King's email, copying Ms. DuVernay, and recommended giving "people ways to learn + make change." PX-265, at DEFS144532. "In addition to the messaging @WhenTheySeeUs* has communicated in support of WinningJustice.org we have asked Color of Change to create graphics to make it super easy for watchers to know exactly how to make change...While COC is working on the impact graphics we will continue to push out action oriented messaging via Twitter/IG/Facebook." *Id.*

[22] A June 8, 2019 tweet by Color of Change concerning the petition states "#LindaFairstein prosecuted the five innocent black boys featured in @Ava's #WhenTheySeeUs. PX-252.

[23] Netflix's marketing team received the copy for the post from Color of Change, along with other suggested social media posts concerning Ms. Fairstein. PX-214. Ms. Stephens emailed her colleagues "we will continue to repost/RT social comms directing folks to WinningJustice.org. We will not engage with the more pointed action points directed to Linda Fairstein." *Id.* On the same day, Ms. Stephens told Color of Change "We/Netflix are refraining from communicating anything related to Linda...but will continue to engage around @ColorofChange social posts to take action on." PX-267. Netflix did not advise Color of Change against using #WhenTheySeeUs in its social media posts concerning Ms. Fairstein. PX-111, Wolff Dep. Tr. 169:20-173:8.

[24] In June 2019, Netflix was monitoring media coverage concerning "Linda Fairstein Backlash." PX-222, at DEFS171337.

[25] On July 2, 2019, a Netflix employee circulated a petition that she received from Color of Change which sought to reopen Ms. Fairstein's cases. The petition stated:

> Ava DuVernay's powerful 4-part series When They See Us has brought Fairstein's wretched practices back out into the open and sparked new outrage. Prompted by the series, Linda has been forced to step down from the boards of 3 nonprofit organizations, Vassar College, dropped from one of her publishing companies, and have [*sic*] had awards rescinded.
>
> ....
>
> As illuminated in Ava DuVernay's 4-part series, When They See Us, Linda oversaw the Exonerated Five case with very little oversight and there were no lengths she would stop at to secure a conviction.

PX-189, DEFS081334.

[26] In December 2019, Netflix asked Color of Change for a letter of endorsement for its Peabody Awards submission for the Series. PX-210, at DEFS151059. Color of Change obliged and Netflix added the letter to its submission folder. *Id.* at DEFS151058. The letter states:

> As one of the most-watched series in Netflix history, *When They See Us* galvanized and mobilized audiences worldwide for criminal justice reform. Transforming narrative and story to action, the series inspired audiences to hold lead prosecutor Linda Fairstein accountable for her role in accusing and convicting the Exonerated 5. Viewers started the hashtag #CancelLindaFairstein, which resulted in Fairstein resigning from several nonprofit boards and ending ties with ICM Partners, her literary agency. In addition, Dutton, an imprint within Penguin Random House, announced they will no longer publish books by Fairstein.

*Id.* at DEFS151061.

[27] *When They See Us* received a Peabody award. *See* https://peabodyawards.com/award-profile/when-they-see-us/ (last visited November 4, 2022).

**DEFENDANTS' REPLY (CONT.):** Further replying to the additional facts:

Plaintiff's citations are to written documents and statements which Defendants admit were made and speak for themselves, and Defendants deny any statements inconsistent therewith.

Reply to [15] – [26]: Defendants deny that Netflix had any involvement in the third-party organization Color of Change's Petition regarding Ms. Fairstein with Simon & Schuster. Plaintiff cites no evidence that Netflix was involved with that petition or any of the other petitions by third-party organizations and citizens exercising their own free speech rights.

Reply to [16]: Netflix promoted Color of Change's website winningjustice.org. As indicated in Plaintiff's Paragraph [20], this is not the website where the Linda Fairstein Petition appeared and the affirmative evidence is that Netflix had nothing to do with it. *See* https://act.colorofchange.org/sign/drop_linda_fairstein/?source=twitter.

Plaintiff's own documents show that Netflix did not participate in Color of Change's separate campaign. (*See* Paragraphs [18] and [23], PX-135, PX-214 ("We will not engage with the more pointed action points directed to Linda Fairstein.")  As Ms. Wolff testified, Netflix followed Color of Change's advice to let Color of Change run their own, separate campaign. (PX-111 at 167:18 – 168:5.)  Plaintiff cites absolutely no evidence that Netflix shared or posted in any way Color of Change's petition, because none exists. (*See also* SUF 222.) ███████████████████████████████████████████
████████████████

Reply to [15]: Plaintiff selectively quotes PX-190. The document states that the social impact campaign "will focus on shifting perceptions of Black and Brown youth in media coverage and helping prosecutors with new approaches rooted in human dignity and racial equity." (PX-190 at DEFS082217.)

Reply to [20] and [21]:  Plaintiff mischaracterizes PX-265. After Mr. King provides information on what Color of Change is doing, Ms. Stephens of Netflix responds with her "recommendation for next steps," which do not include Color of Change's Linda Fairstein petition.

Reply to [25]: Plaintiff's citation to PX-189 is misleading.  This is email was forwarded internally within Netflix.  Again, the url for the petition cited in PX-189 makes clear that Color of Change's petition was promoted separately from the WinningJustice site.

225.    As part of the marketing campaign for the Series, Netflix worked with producer Participant and social activist organization Color of Change on a social impact campaign to address education and prosecutorial reform generally. (DuVernay Decl. ¶ 145; Ex. 82, Wolff Dep. at 30, 163.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 224 by reference herein.

226.    After the Series aired, Color of Change notified Netflix that it had created an online petition seeking to have Simon and Schuster cancel its publishing contract with Ms. Fairstein. Color of Change's petition was separate from the social impact campaign and Netflix had no involvement with Color of Change's petition. (Ex. 82, Wolff Dep. at 167-168; 172-173; DuVernay Decl. ¶ 145.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 224 by reference herein.

227.    Color of Change is a third-party organization and Netflix had no involvement in or control over what Color of Change posted on its own social media accounts. (Ex. 82, Wolff Dep. at 30, 172.)

**PLAINTIFF'S RESPONSE**:

Denied.

Plaintiff incorporates her response to Paragraph 224 by reference herein.

**J.    No Conspiracy to Defame**

228.    Defendants did not know Linda Fairstein before this project and came to their opinions about her and her conduct independently, only after conducting their research for the Series. (DuVernay Decl. ¶ 14; Locke Decl. ¶ 5; Ex. 3, Locke Dep. at 198; Swicord Decl. ¶¶ 7, 31; Ex. 31, Swicord Dep. at 19.)

**PLAINTIFF'S RESPONSE**:

Denied.

Ms. DuVernay's outline for the Series states:

> CENTRAL PARK FIVE is a project that has been in my head and my heart since I was a teenager in Compton, California in 1989. I was a junior in high school when I heard of the case on the national news. The crime. The criminals. The confessions. The confession reversals with claims of coercion. The incarceration. The fight for freedom. The prison abuse. ***In recent years, I've tracked the exoneration [and] the grievance lawsuits***.

PX-53, at DEFS169307 (emphasis added); PX-51, DuVernay Dep. Tr. 51:5-52:1. Writer's Room notes from October 25, 2017, █████████████████████████████████



███████████████████████████████ PX-36, at DEFS005242. Ms. Swicord described the Series as Ms. DuVernay's ten-year passion project. PX-34, Swicord Dep. Tr. 32:7-14.

At the time of the Central Park Jogger case, █████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ PX-46 ██████████████ ████████████████ PX-34, Swicord Dep. Tr. 190:25-196:19. Ms. Swicord testified that, in August 2017, Ms. DuVernay told Ms. Swicord she had "an opportunity to make a limited series for Netflix about the five men" and Ms. Swicord "was familiar with the news story that took place, you know, in the 1980s." PX-34, Swicord Dep. Tr. 18:12-20:8. Ms. Swicord further testified that she "read news stories" about the Central Park Jogger case. *Id.* When asked "[i]n 1989, were you familiar with the name Linda Fairstein?" Ms. Swicord responded, "Not prior to reading about the case as the press reported it." *Id.* at 19:12-20:17.

In November 2018, Steph Cha--who wrote a piece for the L.A. Times about the "scandal" around the withdrawal of Ms. Fairstein's Grand Master Award asked Ms. Locke, "Can I ask when/how you became aware of Ms. Fairstein? I hadn't even heard of her until your thread." Ms. Locke replied, "I knew from watching the Ken Burns Central Park Five documentary on Netflix ***and*** working with Ava DuVernay on her miniseries on the subject." PX-102; PX-81, Locke Dep. Tr. 157:12-161:8; PX-215.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's response as non-responsive.  Plaintiff's additional facts do not contradict the fact as set forth in this SUF that Defendants did not know Linda Fairstein before their work on this project. Despite thousands of records and communications produced in this case, Plaintiff has offered no evidence to the contrary, as there is none. To the extent the Court accepts Plaintiff's response, Defendants reply to the additional improperly included facts as follows:

Plaintiff misstates the evidence, including the documents she cites.

With respect to Ms. DuVernay, Defendants admit that Plaintiff accurately quoted PX-53, but deny that it contradicts this SUF or Ms. DuVernay's testimony.  Prior to pitching the project that would become the Series to Netflix, Ms. DuVernay initially was working on a film of the Central Park Jogger case.  (*See* DuVernay Decl. at ¶¶ 14, 16-17.)  The Burns

documentary was DuVernay's first piece of research she reviewed when she got interested in doing a film about the case. (*Id.* at ¶ 18.) Ms. DuVernay stated she knew about the CPJ case generally from when she was growing up as she was roughly the same age as the men; and that Raymond reached out to her on Twitter in 2015. (*Id.* at ¶ 7.)

With respect to Ms. Swicord, Plaintiff misleadingly and selectively quotes Ms. Swicord's deposition testimony. Plaintiff cites Ms. Swicord's testimony that she was generally "familiar with the news story" of the CPJ case in 1989, but omits Ms. Swicord's testimony that when asked "[i]n 1989, did you read any articles that named Linda Fairstein?," Ms. Swicord responded, "I don't recall. It was too long ago for me to pull that out of my brain." (*See* Ex. B to Supplemental Spears Decl., Swicord Dep. at 20:5-8) (Despite citing this page, Plaintiff failed to attach it.) (*See also* Swicord Decl. at ¶¶ 7, 31.)

With respect to Ms. Locke, Defendants deny Plaintiff's characterization of PX-102. There is no suggestion in that document that Ms. Locke was referring to watching the Burns documentary prior to her work on the Series. Locke testified that she watched the Burns documentary as part of her research for the Series and first learned of Linda Fairstein as part of her research for the Series. (Locke Decl. at ¶¶ 5, 9, 10, 69.)

229.     There was no agreement to defame Plaintiff in the Series. In writing the Series, the Defendants honestly and sincerely believed that the portrayal of Ms. Fairstein, while dramatized, was the essence of truth based on their sources and research. (DuVernay Decl. ¶¶ 55, 75, 78, 89, 96-97, 101, 130; Locke Decl. ¶¶ 43, 49, 54; Swicord Decl. ¶¶ 58, 60, 75, 77, 88, 90, 98.)

**PLAINTIFF'S RESPONSE**:

Denied.

While the statement above refers to "Defendants," no Netflix witnesses are cited above.

What Defendants believed raises credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

Whether or not there was an agreement to defame Ms. Fairstein is a question of law.

As discussed above in Plaintiff's responses to Paragraphs 12-16, 18, 19, 21-23, 28, 29, 31, 53-54, 56-57, 60, 64. 75, 81, 83-86, 90-91, 93, 98-102, 119-197—each of which are incorporated by reference herein—Defendants' portrayal of Ms. Fairstein is unsupported by their sources.

Evidence of an agreement to defame Ms. Fairstein is cited in Plaintiff's responses to Paragraphs 68-71, 73-74, 94, 120, 137, 144, 148, 160, 187, 198-199, 203, 207, 211-212, 214-215, 221, 223 and 224, each of which are incorporated by reference herein.

251 of 253

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

230. At the time the Series was first published, none of the Defendants had any doubts that Ms. Fairstein's portrayal was the essence of truth based on their sources and materials. (DuVernay Decl. ¶¶ 55, 75, 78, 89, 96-97, 101, 130; Locke Decl. ¶¶ 43, 49, 54; Swicord Decl. ¶¶ 58, 60, 75, 77, 88, 90, 98.)

**PLAINTIFF'S RESPONSE**:

Denied.

While "Defendants" are referred to above, no sources are cited to demonstrate whether Netflix had doubts.

Whether or not Defendants had "any doubts" raises credibility issues that cannot be determined at the summary judgment stage. *Palmn*, 482 F. Supp. 3d at 219.

As discussed above in Plaintiff's responses to Paragraphs 12-16, 18, 19, 21-23, 28, 29, 31, 53-54, 56-57, 60, 64. 75, 81, 83-86, 90-91, 93, 98-102, 119-197—all of which are incorporated by reference herein—Defendants' portrayal of Ms. Fairstein is unsupported by their sources. Netflix also had reason to doubt the accuracy of Ms. Fairstein's portrayal. *See* Plaintiff's Response to Paragraph 68.

**DEFENDANTS' REPLY:** Defendants move to strike Plaintiff's Response as non-responsive. Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

231. In the time that has passed since the release of the Series, nothing has caused any of the Defendants to change their minds about the accuracy of the Series' portrayal of Ms. Fairstein, and to this day Defendants uniformly believe the Series' portrayal of Ms. Fairstein is the essence of truth. (DuVernay Decl. ¶¶ 55, 75, 78, 89, 96-97, 101, 130; Locke Decl. ¶¶ 49, 54; Swicord Decl. ¶¶ 58, 60, 75, 77, 88, 90, 98.)

**PLAINTIFF'S RESPONSE**:

Denied.

While "Defendants" are referred to above, no sources are cited to demonstrate whether Netflix had doubts.

Whether or not Defendants had "any doubts" raises credibility issues that cannot be determined at the summary judgment stage. *Palin*, 482 F. Supp. 3d at 219.

As discussed above in Plaintiff's responses to Paragraphs 12-16, 18, 19, 21-23, 28, 29, 31, 53-54, 56-57, 60, 64. 75, 81, 83-86, 90-91, 93, 98-102, 119-197—all of which are incorporated by reference herein—Defendants' portrayal of Ms. Fairstein is unsupported by their sources.

Netflix also had reason to doubt the accuracy of Ms. Fairstein's portrayal. *See* Plaintiff's Response to Paragraph 68.

**DEFENDANTS' REPLY:**  Defendants move to strike Plaintiff's Response as non-responsive.  Defendants incorporate their Reply to SUF 56 as if fully set forth herein.

As set forth above in numerous paragraphs, Plaintiff cites absolutely no evidence that Defendants, including Netflix, had any doubt that their portrayal of Fairstein is the essence of truth.  Defendants incorporate their reply to SUF 68 and 69 as if fully set forth herein.


Dated: January 16, 2023                          Respectfully submitted,

                                                 */s/ Natalie J. Spears*
                                                 _____

                                                 Natalie J. Spears (*pro hac vice*)
                                                 Gregory R. Naron (*pro hac vice*)
                                                 Jacqueline A. Giannini (*pro hac vice*)
                                                 DENTONS US LLP
                                                 233 South Wacker Drive, Suite 5900
                                                 Chicago, Illinois 60606
                                                 Phone: (312) 876-8000

                                                 Sandra D. Hauser
                                                 Justin N. Kattan
                                                 DENTONS US LLP
                                                 1221 Avenue of the Americas
                                                 New York, New York  10020
                                                 Phone: (212) 768-6700

                                                 *Attorneys for Defendants Netflix, Inc., Ava DuVernay and Attica Locke*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 16, 2023, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record on the service list.

/s/ Natalie J. Spears