UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LINDA FAIRSTEIN,

                          Plaintiff,                          20-cv-8042 (PKC)

              -against-                          OPINION AND ORDER

NETFLIX, INC., AVA DUVERNAY and
ATTICA LOCKE,

                          Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

   "When They See Us" is a four-part Netflix series that dramatizes the experiences

of the young men dubbed in the press as "The Central Park Five."  The underlying events have

been the subject of exhaustive reporting and commentary for more than three decades.  The

Netflix series was promoted as being "[b]ased on the true story of the Central Park Five."  It

follows the experiences of the Five over many years, from their arrests, trials and convictions for

the April 1989 rape and assault of Patricia Meili in Central Park, to their release from prison and

struggles to readjust to life as young adults after a serial rapist named Matias Reyes came

forward to claim sole responsibility for the Meili rape.

   The filmed dramatization of real-world events using famous actors and cinematic

production values is a well-established genre.  To advance their points of view and heighten

dramatic tension, filmmakers will sometimes use a composite character as the stand-in for a real-

world figure or groups of persons acting together.  For narrative coherence or heightened tension,

dramatizations typically contain invented dialogue and condensed timelines.  Under New York's

common law of defamation, there is neither a wholesale carve-out for dramatizations nor a per se

condemnation.  Like any work that comments on public figures or reflects an opinion on a matter of public controversy, dramatizations are afforded strong First Amendment protections.

Plaintiff Linda Fairstein is the former head of the Sex Crimes Unit in the Manhattan District Attorney's Office.  She asserts that scenes in "When They See Us" depict her by name and portray her in a false and defamatory light.  Defendant Ava DuVernay, who is the writer, director and producer of the series, has stated that Fairstein "represents the criminal justice system, and the criminal justice system is the villain in the Series.  That portrayal was grounded in, and supported by, both our sources and the point of view we were expressing."  The Fairstein role is performed by the well-known actress Felicity Huffman and, in the series, the character is portrayed as personally responsible for orchestrating nearly every aspect of the investigation and prosecution of the Five.

Fairstein's real-life role in the investigation has been chronicled in books, articles and interviews.  Beginning the night after the Meili attack, she was present for long hours at the NYPD precinct where interrogations were taking place.  Years later, when the convictions of the Five were vacated, Fairstein publicly defended the investigation and prosecution and questioned the decision to vacate the convictions.

The Court previously narrowed Fairstein's claims in its decision on the motion to dismiss, concluding that the Complaint failed to plausibly allege that seven of the challenged scenes were actionable but plausibly alleged a claim for relief as to five scenes.  Fairstein v. Netflix, Inc., 553 F. Supp. 3d 48 (S.D.N.Y. 2021).   Discovery in this case is now closed. Defendants move for summary judgment in their favor, urging that Fairstein cannot point to evidence sufficient to permit a reasonable trier of fact to find that defendants acted with actual malice in the five scenes.  See New York Times Co. v. Sullivan, 376 U.S. 254 (1964).  As will

be discussed, the actual-malice standard sets a high bar for a public figure asserting a claim of defamation and requires evidence that a speaker harbored subjective doubts about the accuracy of a statement or was recklessly indifferent to its truth.  There is evidence that, by opting to portray Fairstein as the series villain who was intended to embody the perceived injustices of a broader system, defendants reverse-engineered plot points to attribute actions, responsibilities and viewpoints to Fairstein that were not hers and are unsupported in defendants' substantial body of research materials.

The five scenes contain precise depictions of Fairstein taking actions or exercising forms of authority that are not described in the source materials.  She is often depicted as taking action or giving direction to reluctant colleagues in the NYPD or the District Attorney's Office. Fairstein is shown ordering NYPD members not to use "kid gloves" in their interrogations and instructing them to conduct a roundup of "young black male[s]" in Harlem.  The Fairstein character singlehandedly devises a much-criticized timeline of the Meili rape, enthuses about the "surprise" of conducting a DNA test "right before the trial" without the knowledge of defense counsel, and is depicted as being confronted by a former colleague about having "coerced" false confessions from the Five.

The extensive research materials used by DuVernay and two of her co-writers included many sources critical of the Five's convictions and the techniques of the NYPD and prosecutors, but these materials do not describe Fairstein taking these actions.  In some instances, the research attributes these actions to other individuals by name.

The summary judgment record also contains creative notes in which the series writers and Netflix employees suggest heightening the most negative aspects of the Fairstein character to build dramatic tension and advance storytelling goals.  The Court will discuss each

of the five scenes individually and the evidence cited by defendants as support for their subjective belief that the depiction of the Fairstein character was faithful to their understanding of the facts.  For each scene, however, the Court concludes that a jury must weigh the competing inferences arising from the evidence to determine to whether there is clear and convincing evidence that defendants were recklessly indifferent to the truth.

Defendants' motion for summary judgment will be denied.  Fairstein's separate sanctions motion and her motion to strike a declaration submitted in support of defendants' motion will be denied.

BACKGROUND.

I.      Historical Events Related to the Arrest and Prosecution of the Five.

As mentioned, the events surrounding the rape of Meili and the prosecution of the Central Park Five have long been the subject of public interest and commentary.  This defamation action is not a platform to relitigate the underlying case.  The Court briefly summarizes the relevant history only to the extent that it informs Fairstein's defamation claims and defendants' summary judgment motion.

On the night of April 19, 1989, a 29-year-old jogger, since identified as Patricia Meili, was beaten and raped while running in Central Park.  (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.) She was found at approximately 1 a.m. on April 20 near the Park's 102nd Street transverse. (See, e.g., ECF 155-18 at 20.)  The attack left Meili comatose for two weeks, with injuries so severe that authorities initially did not expect her to survive.  (See, e.g., id. at 26, 44.)

Also on April 19, beginning around 8:30 or 9 p.m., a group of about 30 teenage boys gathered in the northeast section of Central Park and engaged in a spree of violence that

included the indiscriminate beating and harassment of cyclists, joggers, taxi cabs and pedestrians.  (See, e.g., id. at 23.)

Fairstein was then the head of the Manhattan District Attorney's Sex Crime Unit and reported directly to District Attorney Robert Morgenthau.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.) She learned of the rape and other violence in Central Park on the morning of April 20, 1989. (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  She also learned that Nancy Ryan, a deputy chief of the Trial Division, had already assigned the case to a homicide prosecutor.  (See, e.g., ECF 155-18 at 21.) Fairstein persuaded Morgenthau that the case should be handled by her unit, and, with Morgenthau's blessing, she assigned the case to an assistant prosecutor named Elizabeth Lederer. (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.)

Fairstein arrived at the 20th Precinct of the New York City Police Department (the "NYPD") sometime around 8:30 p.m. on the night of April 20 and remained there for approximately 32 hours.  (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.)  The parties vehemently disagree over the proper characterization of Fairstein's role during that time, and this Opinion and Order will later discuss in greater detail the various accounts of Fairstein's actions on April 20 and 21, 1989.

There is no suggestion that Fairstein herself directly questioned individual suspects, whose interrogations were conducted by NYPD members and Fairstein's subordinates in the District Attorney's office.  In a 2002 interview, Fairstein stated that "I was there to be the eight-hundred-pound gorilla, to help Elizabeth [Lederer] and the cops get the resources they needed."  (ECF 155-28.)  Published accounts also describe Fairstein's interactions with NYPD members, some of the Five and their family members.  According to these accounts, when the mother of 15-year-old Yusef Salaam arrived at the 20th Precinct at approximately 11:45 p.m. on

April 20 and repeatedly asked to see her son, Fairstein denied the request and demanded documentation of Yusef's age, before relenting and advising NYPD members that they should halt their questioning of Salaam.  (ECF 155-18 at 27; 155-31 at 47.)  At Salaam's trial and a suppression hearing, Fairstein would later testify as a fact witness about her interactions with Salaam's mother that night.  (See, e.g., Pl. 56.1 Resp. ¶ 15.)  In 1993, then-New York Court of Appeals Judge Vito Titone mentioned Fairstein by name in a written dissent from the denial of a motion to vacate Salaam's conviction, stating "that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment."  (ECF 155-33 at 181; brackets in original.)  In a later press interview, Judge Titone opined that Fairstein "deliberately engineered" Salaam's confession.  (ECF 155-60 at 21.)

Also according to published accounts, at about 7 a.m. on the morning of April 21, 1989, Fairstein, Lederer and NYPD Detectives Michael Sheehan and Augie Jonza took Kevin Richardson and Korey Wise to the scene of Meili's attack in Central Park.  (See, e.g., ECF 155-31 at 51-52; 155-67.)  Fairstein would later testify as a fact witness about this crime-scene visit at the trial of Wise and Richardson and in a suppression hearing.  (See, e.g., Pl. 56.1 Resp. ¶ 15.)

Ultimately, five Black and Latino teenagers were charged, tried and convicted for their roles in the assault rape of Meili: Salaam, Richardson, Wise, Antron McCray and Raymond Santana (the "Five").  (See, e.g., Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6; ECF 155-24 ¶¶ 20-21.)  When questioned by Fairstein's subordinates and members of the NYPD in the days after the Meili

attack, each of the Five admitted to some level of participation in the assault and rape of Meili, though none admitted to being the person who raped her.[1]  (See, e.g., ECF 155-24 ¶¶ 84-86.)

No DNA or other physical evidence linked the Five to Meili.  (Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)  A DNA sample taken from Meili's cervix was deemed "inconclusive" as to the Five.  (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18.)  Shortly before three of the Five were scheduled to go to trial, a lab technician identified an additional DNA sample on a sock found at the crime scene.  (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.)  Lederer successfully moved for a seven-week adjournment of trial in order to test the sample, which was found not to match any of the Five.  (ECF 155-115 at 102-03; Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20.)

McCray, Salaam and Santana were tried jointly in summer 1990, and Richardson and Wise were tried jointly that fall.  (See, e.g., ECF 155-24 ¶¶ 20-21.)  The trial evidence against the Five largely centered on their confessions, with the prosecution urging that the sock's DNA belonged to a sixth, not-yet-identified rapist.  (See, e.g., Def. 56.1 ¶¶ 17, 21, 23; Pl. 56.1 Resp. ¶¶ 17, 21, 23; ECF 155-24.)  The juries returned guilty verdicts for each of the Five on counts relating to the assault and rape of Meili.  (See, e.g., ECF 155-24 ¶¶ 20-21.)  Wise was sentenced to an aggregate prison term of five to fifteen years, while the other four were sentenced to aggregate terms of five to ten years.  (See id.)

In February 2002, the Manhattan District Attorney's Office was notified that a serial rapist named Matias Reyes had come forward to claim sole responsibility for Meili's rape.  (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24; ECF 155-24 ¶ 37.)  At that time, Reyes was already incarcerated for a series of rapes and robberies that occurred in the summer of 1989.  (ECF 155-

---

[1] Many other teenagers were also questioned about the night's events in Central Park; six other individuals were charged and convicted in connection with crimes committed on April 19 that did not pertain to Meili.  (See ECF 155-24 ¶¶ 12-18.)

24 ¶ 38.)  Reyes's DNA was found to match the samples taken from Meili's cervix, the sock and

other personal belongings.  (Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 25.)

   Nancy Ryan led a reinvestigation of the case on behalf of the District Attorney's

Office and later filed an affirmation that consented to the Five's motions to vacate their

convictions.  (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26; ECF 155-24; see generally People v. Wise, 194

Misc. 2d 481 (N.Y. Sup. Ct. N.Y. Cnty. 2002).)  Ryan's affirmation explains why the Office had

concluded that Reyes's admission was credible and detailed several discrepancies and omissions

in the statements of the Five and others about the events of April 19, 1989.  (See generally ECF

155-24.)  The affirmation stated that "[p]erhaps most significant," none of the Five accurately

identified where the Meili assault and rape occurred, with the exception of Wise, who had been

escorted to the crime scene.  (Id. ¶ 97.)  Ryan's affirmation did not mention Fairstein by name,

nor did it appear to name any other member of the District Attorney's Office or the NYPD.

(ECF 155-24.)

   The motions to vacate were granted on December 19, 2002.  See Wise, 194 Misc.

2d 481.  In 2003, the Five commenced a civil action against the City, Fairstein, Lederer and

others, asserting that defendants had violated their civil rights.  (Def. 56.1 ¶¶ 30-31; Pl. 56.1

Resp. ¶¶ 30-31; In re McCray, et al., 03 Civ. 9685 (RLE).)  The action was settled by the City in

2014 for $41 million.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32.)

   Since the vacatur of the convictions, Fairstein has spoken publicly about the

investigation and prosecution of the Five.  In a 2002 interview, she stated that the NYPD

conducted "one of the most brilliant police investigations I've ever seen" and stated, "I think

Reyes ran with that pack of kids."  (ECF 155-28.)  In a 2014 appearance on the Don Imus radio

program, she stated, "I think that these men were participants in the attack on the jogger as

charged." (ECF 155-29.)  In a 2018 letter published in the New York Law Journal, Fairstein stated that "[t]he confessions were not coerced" and noted that two juries found the Five guilty despite the absence of a DNA match.  (ECF 155-11.)

II.     The Portrayal of Fairstein in "When They See Us."

"When They See Us" is a four-episode limited series that began streaming on Netflix on May 31, 2019.  (Def. 56.1 ¶¶ 1, 3; Pl. 56.1 Resp. ¶¶ 1, 3.)  It is a dramatization of the Five's experiences set over a period several years, beginning just prior to the events of April 19, 1989 and continuing through their efforts to resume their lives following their exoneration and release from prison.  (Def. 56.1 ¶ 38; Pl. 56.1 Resp. ¶ 38.)

DuVernay was a writer, director and producer of the series, and served as what is colloquially known as its "showrunner." (Def. 56.1 ¶¶ 4, 41; Pl. 56.1 Resp. ¶¶ 4, 41.)  She selected the series' other screenwriters, edited and revised their drafts, and had final script approval.  (Def. 56.1 ¶¶ 45, 47; Pl. 56.1 Resp. ¶¶ 45, 47.)  Defendant Attica Locke was one of its co-writers, as was non-party Robin Swicord, who wrote the initial drafts for several scenes challenged by Fairstein.  (Def. 56.1 ¶¶ 5, 45-46; Pl. 56.1 Resp. ¶¶ 5, 45-46.)  Employees or executives of defendant Netflix, Inc. ("Netflix") had input in the writing, production and marketing process, often giving feedback and suggestions about the depiction of Fairstein.  (See, e.g., ECF 185-83, -178, -268.)

DuVernay states that she chose to make the series because the official version of events had portrayed the Five as "an animalistic 'wolfpack' of rapists," whereas she saw them as children who became "honorable, decent men" and were convicted based on coerced and inconsistent confessions.  (DuVernay Dec. ¶ 8 (ECF 149).)  She states that she wanted to

humanize the Five and ask viewers "to contemplate conceptual questions about the criminal system that we all participate in, in some way or another." (Id. ¶ 9.)

DuVernay states that, at her direction, the series production company compiled a body of research materials for the writing staff, which included published books and articles, interviews of the Five and their family members, transcripts of suppression hearings and trials, videos and transcripts of the Five's interrogations, and news reports contemporaneous to underlying events. (Id. ¶¶ 28-42.)

The series principally depicts the life experiences of the Five. In the first two episodes, they are shown as young teenagers and in the final two they are young adults. As the Court observed in its Opinion and Order on defendants' motion to dismiss, the series includes several well-known actors, features popular music and an orchestral score, and includes highly stylized sequences, including the depiction of one character's hallucinations during his incarceration. See 554 F. Supp. 3d at 59.

The Fairstein character features most prominently in Episode 1, although her brief appearances in Episodes 2 and 4 are thematically significant. DuVernay states that before starting her research for the series, she was unfamiliar with Fairstein and did not set out "to target or 'cancel' Ms. Fairstein." (DuVernay Dec. ¶¶ 14, 147.) DuVernay states that as she learned more about the underlying events, she "had no doubt whatsoever" that Fairstein was central to the investigation and prosecution, was "morally and legally culpable" for the case's outcome, and that "she crossed moral and ethical lines and breached the public trust." (Id. ¶ 46.) DuVernay states: "In the Series, she, along with the entire system, is portrayed as the antagonist to the Five's protagonists. Ms. Fairstein represents the criminal justice system, and the criminal justice system is the villain in the Series. That portrayal was grounded in, and supported by, both

our sources and the point of view we were expressing." (Id. ¶ 47.)  She states that Fairstein

"represent[ed] the group of prosecutors and police, which she led, as they allied against the

Five." (Id. ¶ 48.)

> Early in the creative process, Fairstein declined a meeting request that was sent on

behalf of DuVernay.  In a series of emails sent in May and June 2016, one of the series'

executive producers emailed Fairstein asking if she would agree to meet DuVernay and others to

discuss her "perspective and point of view." (ECF 155-42.)  Fairstein initially replied that "it

would make great sense to talk," but the tone of the emails changed after she was told that

DuVernay had already spoken with the Five, and Fairstein ultimately sent a long series questions

about what resources the creators would consult before eventually stating, "I don't expect you to

go forward on a 'perspective' – I expect you to use facts and evidence." (Id.)  Fairstein did not

speak to the series' creators, nor did Lederer, Morgenthau or Meili.  (DuVernay Dec. ¶ 20.)  An

attorney's letter of June 9, 2016 written on behalf of Fairstein and Lederer included a section

headed "Actions Required," and contained a bullet-point list of topics and research materials that

the attorney advised "need to be carefully consulted. . . ." (ECF 155-82.)  DuVernay states that

she was ultimately untroubled by Fairstein's refusal to meet because she "was and is one of the

most uncredible and untrustworthy sources because she has an agenda and so much to lose."

(DuVernay Dec. ¶ 23.)

> The Court will later discuss in detail each of the five scenes that Fairstein asserts

were false and defamatory, and the evidence submitted by defendants directed to the issue of

actual malice.  Three of the scenes take place in Episode 1, and depict Fairstein as the

authoritative leader in the investigation during the hours after the Meili attack.  In the first scene,

the Fairstein character drafts a timeline of the Meili attack that positions the Five as responsible

for the attack, in the face of countervailing evidence and the skepticism of her colleagues.  In the second scene, the Fairstein character directs NYPD members to harshly interrogate the young suspects, admonishing them, "[n]o kid gloves here.  These are not kids."  In the third scene, Fairstein directs NYPD members to round up young suspects in Harlem, stating in part that "[e]very young black male who was in the park last night is a suspect in the rape of that woman . . . .  Let's get an army of blue up in Harlem.  You go into those projects and you stop every little thug you see."  The fourth scene is in Episode 2 and relates to the belatedly discovered DNA evidence found on the sock.  Fairstein is shown meeting with Morgenthau and Lederer, and appears to be the only character familiar with the new DNA evidence.  When Lederer wonders aloud why the DNA was not found earlier, Fairstein replies, "Who cares? We have it now.  And the kicker is none of the defense is aware yet so we can test it right before the trial.  Surprise."  The fifth scene appears late in Episode 4, after the convictions of the Five have been vacated.  The Fairstein character meets Nancy Ryan for lunch and the two debate the merits of the Five's convictions.  In the scene, Fairstein continues to maintain that the Five are guilty, and Ryan states, among other things, that "you knew you coerced those boys into saying what they did," and "we pored over your confession tapes. . . .  I know what was done."

Fairstein contends that her portrayal in these scenes is false and defamatory and is a product of actual malice.  She asserts that, in reality, she lacked the authority to instruct NYPD members on interrogation techniques or to direct them to round up suspects, and that she never did so.  She asserts that she had no involvement in the creation of a timeline for the attack, which was first assembled by the NYPD and later revised by Lederer.  Regarding the late-discovered DNA evidence, she points out that a lab technician discovered the sample and Lederer immediately disclosed its existence.  As to the scene depicting a conversation with Nancy Ryan,

Fairstein urges that the scene misrepresents Ryan's findings and wrongly attributes to Fairstein actions taken by Lederer and the NYPD.

Fairstein urges that although "[d]efendants undisputedly undertook extensive research when developing and writing the Series," they also "[a]voided and [i]gnored" contradictory sources to "retro-engineer[ ]" their depiction of her.  (Pl. Mem. at 6-7.)  She points to testimony from the criminal trials against the Five, as well as the transcripts of her own deposition and Lederer's that were taken in the Five's civil action.  (Pl. Mem. at 7-15.)

Fairstein also notes that defendants marketed the series as a true story.  Video promotions for the series included frames stating, "Based on the true story of The Central Park Five" and "The story you know is the lie they told you."  (Def. 56.1 ¶¶ 212, 215-16; Pl. 56.1 Resp. ¶¶ 212, 215-16.)  Fairstein points out that after press controversy over the portrayal of the British royal family in its series "The Crown," Netflix added a disclaimer at the beginning of that series describing it as a "fictionalized dramatization," though no such disclaimer was added to "When They See Us."  (Pl. 56.1 Resp. ¶ 74.)  On July 7, 2019, defendant Locke posted a tweet containing a photo of binders that she described as "research/work," and stated, "When I tell you this is one of the most accurate portrayals of a true story . . . this is why.  @ava and our team took the truth as our bible."  (ECF 185-124.)  Each episode of the series includes the following disclaimer in the end credits:

> While the motion picture is inspired by actual events and persons, certain characters, incidents, locations, dialogue and names are fictionalized for the purposes of dramatization.  As to any such fictionalization, any similarity to the name or to the actual character or history of any person, living or dead, or actual incident is entirely for dramatic purposes and not intended to reflect on any actual character or history.

(Def. 56.1 ¶ 74; Pl. 56.1 Resp. ¶ 74.)  Fairstein notes that the disclaimer appears only briefly in the end credits, is in small type, and is not displayed to viewers using the common "autoplay" setting on Netflix.  (Pl. 56.1 Resp. ¶ 74.)  The end credits do not identify any particular scene or dialogue as "fictionalization."

III.   <u>The Fallout from Fairstein's Depiction in the Series.</u>

Defendants acknowledge that after the series was released, Fairstein experienced a "backlash on social media and in the press . . . ."  (Def. 56.1 ¶ 221; Pl. 56.1 Resp. ¶ 221.)  Fairstein was dropped by her literary agency and by the publisher of her several crime novels.  (Def. 56.1 ¶¶ 2, 221; Pl. 56.1 Resp. ¶¶ 2, 221, 224.)  She resigned from several boards.  (Def. 56.1 ¶ 221; Pl. 56.1 Resp. ¶ 221.)  Members of the public posted criticisms of Fairstein as book reviews on Amazon and used the hashtag #CancelLindaFairstein, with one Netflix marketing employee observing that "[t]he social chatter around her is very negative."  (Pl. 56.1 Resp. ¶ 224.)

In November 2018, before the series began streaming, defendant Locke posted a series of tweets asserting that the Mystery Writers of America should not recognize Fairstein with the "Grand Master Award" at its 2019 awards banquet.  (Def. 56.1 ¶¶ 202-03; Pl. 56.1 Resp. ¶¶ 202-03.)  In December 2018, Locke tweeted that Fairstein had acted with "prejudice" and "malice in the Central Park Five case" and cited expertise she acquired from working on the series, adding, "And I chose to share my knowledge of Fairstein's misdeeds with the MWA."  (Pl. 56.1 Resp. ¶ 203.)  A Netflix communications plan stated, "In 2018, Fairstein was set to be the recipient of an Edgar award for her crime novels, but *WTSU* writer Attica Locke protested the awards body and the award was rescinded."  (Pl. 56.1 Resp. ¶ 203.)

The parties' ongoing acrimony is on display throughout their summary judgment papers.  In social-media posts and private emails produced in discovery, Fairstein and the individual defendants speak of one another using scathing, sometimes profane language.  As will be discussed, ill will or animosity alone does not support a finding of actual malice, which focuses on evidence that the speaker harbored subjective doubts about the truth of a given statement or was reckless about the truth or falsity of a statement.  See, e.g., Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 186 (2d Cir. 2000).  To the limited extent that this Opinion and Order refers to the parties' harsh remarks, they go solely toward a speaker's understanding of a disputed statement's truth.  See id.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law. . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A genuine factual dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Truitt v. Salisbury Bank & Tr. Co., 52 F.4th 80, 85 (2d Cir. 2022) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'"  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

"[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  Anderson, 477 U.S. at 254.  "[W]hen a defamatory statement is allegedly made about a public figure, the plaintiff has a heightened burden and must prove that the statement was published with 'actual malice.'"  Dongguk Univ. v. Yale Univ., 734 F.3d 113, 123 (2d Cir. 2013).  Actual malice "'must be supported by clear and convincing proof'. . . .'"  Electra v. 59 Murray Enterprises, Inc., 987 F.3d 233, 259 (2d Cir. 2021) (quoting Celle, 209 F.3d at 183); accord Sullivan, 376 U.S. at 285-86 (actual malice must be proved with "the convincing clarity which the constitutional standard demands . . . .").  "Thus, where the factual dispute concerns actual malice, clearly a material issue in a New York Times case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown

actual malice by clear and convincing evidence or that the plaintiff has not." <u>Anderson</u>, 477 U.S. at 255-56.

FAIRSTEIN'S BURDEN TO PROVE ACTUAL MALICE.

I.    <u>The Law of Actual Malice.</u>

"Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." <u>Palin v. New York Times Co.</u>, 940 F.3d 804, 809 (2d Cir. 2019). "In addition, a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made with knowledge that it was false or with reckless disregard of whether it was false or not." <u>Id.</u> (quotation marks omitted).

"When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law." <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 775 (1986). "Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." <u>Church of Scientology Int'l v. Behar</u>, 238 F.3d 168, 174 (2d Cir. 2001). "Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of the [sic] its truth or falsity." <u>Celle</u>, 209 F.3d at 182; <u>accord</u> <u>Herbert v. Lando</u>, 781 F.2d 298, 306 (2d Cir. 1986).

"When actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication." <u>Palin</u>, 940 F.3d at 810.  If

the plaintiff cannot prove that that the defendant knew the challenged statements to be false, then "a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false." Church of Scientology, 238 F.3d at 174. "The reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)); accord Rosenblatt v. Baer, 383 U.S. 75, 84 (1966) ("a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true.").

"Although actual malice is subjective, a court typically will infer actual malice from objective facts." Celle, 209 F.3d at 183 (quotation marks omitted). "These facts should provide evidence of negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." Id. (emphasis in original; quotation marks omitted). Actual malice can be established "through the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence. Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice. Standing alone, however, evidence of ill will is not sufficient to establish actual malice." Id. (quotation marks, citations and brackets omitted).

"[M]ere failure to investigate, while relevant, is also not itself sufficient to show actual malice." Electra, 987 F.3d at 259 (quotation marks omitted); accord Herbert, 781 F.2d at

308 ("a finding of actual malice cannot be predicated merely on a charge that a reasonable

publisher would have further investigated before publishing.").  "But 'evidence of an intent to

avoid the truth . . . [can be] sufficient to satisfy the [actual malice standard].'"  Dongguk

University, 734 F.3d at 124 (brackets and ellipses in original; quoting Harte-Hanks Commc'ns,

Inc. v. Connaughton, 491 U.S. 657, 693 (1989)).  "Thus, when there is evidence that the

defendant acted with a high degree of awareness of a statement's probable falsity, or that the

defendant entertained serious doubts as to the truth of his publication, or that the defendant acted

with the purposeful avoidance of the truth, then the defendant's failure to investigate can

demonstrate actual malice."  Id. (internal citations and quotation marks omitted).

      "Whatever evidence is relied upon, actual malice must be supported by clear and

convincing proof."  Celle, 209 F.3d at 183.  "This standard administers an extremely powerful

antidote to the inducement to media self-censorship of the common-law rule of strict liability for

libel and slander.  And it exacts a correspondingly high price from the victims of defamatory

falsehood.  Plainly many deserving plaintiffs, including some intentionally subjected to injury,

will be unable to surmount the barrier of the New York Times test."  Gertz v. Robert Welch,

Inc., 418 U.S. 323, 342 (1974).  It is a "demanding burden . . . based on two considerations."

Celle, 209 F.3d at 182.  "First, public figures (and public officials) generally enjoy access to the

channels of communication and hence have an effective alternative outside of litigation to

counteract false statements.  Second, they have knowingly and voluntarily exposed themselves to

increased media scrutiny and an accompanying risk of injury from defamatory falsehoods by

assuming a greater role in the public arena."  Id.  "This heavy burden of proof is designed to

'assure to the freedoms of speech and press that "breathing space" essential to their fruitful

exercise.'"  Greene v. Paramount Pictures Corp., 813 Fed. App'x 728, 731 (2d Cir. 2020)

(summary order) (quoting Gertz, 209 F.3d at 342).

II.      Actual Malice in the Context of a Dramatization.

              Courts have applied the actual-malice standard to dramatized accounts of real

events, often recognizing that the use of invented dialogue or a condensed timeline may be

necessary storytelling devices and are not themselves evidence of actual malice.  Courts also

recognize that the actual-malice standard permits a filmmaker or storyteller to advance an

opinion-based version of events, provided that the account has some support in the historical

record.

              The Second Circuit has given limited guidance on weighing actual malice in

dramatized versions of real-world events.  In Meeropol v. Nizer, 560 F.2d 1061, 1065 (2d Cir.

1977), the adult children of Julius and Ethel Rosenberg brought a defamation claim directed to a

book of non-fiction that contained "minor fictionalizations or approximations of conversations

that may have taken place between plaintiffs and their parents. . . ."  The Second Circuit affirmed

the district court's grant of summary judgment on the issue of actual malice, quoting approvingly

from its conclusion that "any deviations or embellishments upon the information obtained from

the primary sources relied upon were miniscule and can be attributed to the leeway afforded an

author who attempts to recount and popularize an historic event."  Id. at 1065 (quotation marks

omitted).

              More recently, the Second Circuit affirmed Judge Seybert's grant of defendants'

summary judgment motion directed to a composite character depicted in the movie "The Wolf of

Wall Street."  Greene, 813 Fed. App'x at 731-32.  It concluded that no reasonable jury could find

actual malice where defendants had "vetted" the film, relied on numerous sources, created a

composite character drawn from three individuals whose name and fictional role differed from the plaintiff's, and posted a disclaimer in the end credits. See id. That summary order observed that the Second Circuit "has not spoken definitively on defamation in the context of fictitious characters . . . ." Id. at 731.

The actual-malice analysis in Davis v. Costa-Gavras, 654 F. Supp. 653 (S.D.N.Y 1987) (Pollack, J.), turned heavily on the use of a fictional composite character. Judge Pollack stated that "[s]elf-evidently a docudrama partakes of author's license – it is a creative interpretation of reality – and if alterations of fact in scenes portrayed are not made with serious doubts of truth of the essence of the telescoped composite, such scenes do not ground a charge of actual malice." Id. at 658. Plaintiff Ray E. Davis, who was chief of the United States Mission to Chile at the time of that country's violent 1973 coup, asserted that nine scenes of the Hollywood movie "Missing" "distorted the context" or made "baseless suggestions" pertaining to him. Id. at 654, 657. Plaintiff was not named in the movie, which featured a character named "Ray Tower," who Judge Pollack described as "a fictional composite of the American presence operating in Chile at the time" and "a symbolic figure." Id. at 658. He concluded that each challenged scene used "permissible literary license to fit historical detail into a suitable dramatic context" with "a hybrid of fact and fiction" that "fairly represent the source materials for the film believed to be true by the filmmakers. Leeway is properly afforded to an author who thus attempts to recount a true event." Id.

The Eleventh Circuit concluded that a plaintiff had not pointed to evidence of actual malice in his allegedly defamatory portrayal in a dramatization of the Challenger space-shuttle tragedy. Lovingood v. Discovery Commc'ns, Inc., 800 Fed. App'x 840 (11th Cir. 2020) (per curiam). Plaintiff was a retired NASA manager who, in real life, twice testified before a

presidential commission about technical matters related to the disaster.  Id. at 843-45.  In the

dramatized film, he is falsely depicted as publicly giving an unrealistic estimate about the risks

associated with the flight and is then embarrassed by famed physicist Richard Feynman.  See id.

Plaintiff asserted that, as depicted in the dramatization, he is falsely shown committing perjury.

See id. 848.

        The Eleventh Circuit stated that "our 'actual malice' inquiry must take into

account how a reasonable viewer would understand the contents of the scene."  Id. at 847.  It

noted that the use of "altered historical dialogue" in a dramatization was not itself evidence of

actual malice.  Id.  The screenwriter relied on 25-year-old historical materials, including hearing

transcripts and Feynman's book, and the panel distinguished the invented dialogue attributed to

the plaintiff from a journalistic piece that falsely appeared to quote a source verbatim.  Id. at 849

(citing Masson v. New Yorker Mag., Inc., 501 U.S. 496, 513 (1991) ("an acknowledgment that

the work is so-called docudrama or historical fiction . . . might indicate that the quotations should

not be interpreted as the actual statements of the speaker to whom they are attributed.")).  It

noted that plaintiff had held a private conversation with Feynman in which he communicated a

version of the views shown in the movie, and that an average viewer would not understand the

probabilities discussed in the film in a way that would lead them to believe that plaintiff was

depicted as committing perjury.  Id. at 848-49.  It also noted that the actual-malice standard for

proving reckless disregard was subjective and required evidence that the defendant in fact had

"serious doubts" or a "high degree of awareness" of probable falsity.  Id. at 850.  Plaintiff did not

identify any such evidence, and an employee of the defendant had testified that he felt assured by

the fact-checking and legal vetting process used by the movie's co-producers.  Id.  The panel

observed that even if the plaintiff were correct that defendant's fact-checking had been deficient, the lack of evidence showing subjective doubt warranted summary judgment.  Id.

A decision of the Sixth Circuit emphasized a speaker's license to interpret political and historic events in concluding that a television dramatization of the "Scottsboro Boys" prosecution in the 1930s was not written with actual malice.  Street v. National Broadcasting Co., 645 F.2d 1227 (6th Cir. 1981).  As depicted in the movie, plaintiff falsely accused nine innocent Black men of rape in an attempt to send them to the electric chair.  Id. at 1229.  The movie centered on a trial judge who set aside a jury verdict that had sentenced one defendant to death.  Id. at 1230.  The script was based principally on a book published by an academic.  Id.  It included invented or embellished scenes that disparaged the plaintiff's honesty and depicted her as promiscuous, casting her "in an extremely derogatory light."  Id. at 1230-32. The Sixth Circuit concluded that the plaintiff's portrayal was consistent with the trial judge's findings of fact in the underlying case and the account published in the academic text.  Id. at 1236-37.  It observed that a different speaker may have chosen to portray the underlying events otherwise, by emphasizing the Communist Party's support of the Scottsboro Boys and depicting the trial judge as a Communist sympathizer seeking favor with the "eastern press."  Id. at 1237. "So long as there is no evidence of bad faith or conscious or extreme disregard for the truth, the speaker in such a situation does not violate the malice standard.  His version of history may be wrong, but the law does not punish him for being a bad historian."  Id. at 1237.

But actual malice may be present when a dramatization or fictional work includes a description of a real-life person that is contradicted by the source material.  Gaprindashvili v. Netflix, Inc., 2022 WL 363537, at *8-9 (C.D. Cal. Jan. 27, 2022), denied a motion to dismiss that urged plaintiff had not plausibly alleged actual malice as to her portrayal in the limited series

"The Queen's Gambit."  Plaintiff was the first woman to be named an international chess grandmaster and had defeated some of the world's top male chess players.  <u>Id.</u> at *1.  "The Queen's Gambit" told a fictional story about a fictional protagonist, but it referenced the real-life plaintiff by name, when a tournament announcer stated, "There's Nona Gaprindashvili, but she's the female world champion and has never faced men."  <u>Id.</u>  In truth, plaintiff's winning record against men was widely known in the chess world, and she alleged that the reference to her in the series was false and defamatory.  <u>Id.</u> at *3-5.  The series was adapted from a novel that characterized the plaintiff differently: "There was Nona Gaprindashvili, not up to the level of this tournament, but a player who had met all these Russian Grandmasters many times before."  <u>Id.</u> at *9.  The court concluded that based on the source material, the Complaint plausibly alleged that the series creator either know of or recklessly disregarded the probable falsity of the dialogue that mischaracterized plaintiff's career.  <u>Id.</u>

In <u>Reid v. Viacom International Inc.</u>, 2016 WL 11746046 (N.D. Ga. Sept. 14, 2016), <u>reconsideration granted in part</u>, 2017 WL 11634619 (N.D. Ga. Sept. 22, 2017), the district court partially denied defendants' summary judgment motion on the issue of actual malice, in a case involving a made-for-television dramatization about the popular R&B group TLC.  It pointed to a casting notice that described plaintiff's character as unethical, evidence of script revisions that portrayed plaintiff negatively in a manner that "[d]efendants knew not to be the case," and script revisions prompted by firsthand participants in underlying events who, plaintiff urged, were unreliable and inconsistent sources.  <u>Id.</u> at *14-17.  The court concluded that based on this cumulative evidence, a reasonable trier of fact could conclude that defendants purposely

or deliberately ignored facts that would have established the falsity of one or more deliberately defamatory scene.  Id. at *17-18.[2]

These decisions provide useful guidance.  Street and Davis both recognized that the First Amendment affords broad license for a dramatization to express a strong point of view: In the case of Street, the interpretation was consistent with a nonfiction text and an underlying judicial opinion, and in Davis, the filmmakers' perspective was conveyed through a composite character that acted as a literary device.  645 F.2d at 1236-37; 654 F. Supp. at 658; cf. Greene 813 Fed. App'x at 731-32 (use of a composite character weighed against finding of actual malice).  Lovingood, Gaprindashvili and Reid considered the extent to which the plaintiff's depiction was consistent with source materials that could be trusted in good faith.  800 Fed. App'x at 847-50; 2022 WL 363537, at *8-9; 2016 WL 11746046, at *14-18.  Meeropol concluded that any fictionalized deviations from the truth were so "miniscule" that no reasonable trier of fact could find actual malice.  560 F.2d at 1065.

The foregoing considerations play some role in Fairstein's claims.  Notably, Fairstein does not complain that she was defamed through the use of a fictionalized composite character.  Her claims are directed to words and deeds attributed to her by name.

DISCUSSION.

I.      Scenes or Sequences Depicting Fairstein's Involvement
        in the Investigation of the Meili Attack.

        A.   Overview of Defendants' Research Process.

Three of the disputed scenes depict the Fairstein character's role in the NYPD's investigation of the Meili attack.  These scenes show Fairstein as the principal authority figure in

---

[2] Defendants successfully moved for reconsideration to the extent that Reid initially did not consider evidence of actual malice on a scene-by-scene basis.  On reconsideration, the court concluded that a jury should weigh evidence of actual malice on six of fifteen disputed scenes. 2017 WL 11634619, at *7-9.

the hours after Meili was discovered in Central Park.  She is shown drafting a timeline of the

Meili attack, instructing NYPD members to harshly interrogate suspects, and directing a roundup

in Harlem that targets "[e]very young black male who was in the park last night" and "every

little thug you see."

Defendants urge that while these scenes contain fictional dialogue, their depiction

of Fairstein's actions on April 20 and 21, 1989 were drawn from accounts of Fairstein's actions

as described in books, articles, interviews and a PBS documentary.  Defendants state that they

subjectively believed in the truth of Fairstein's portrayal based on these sources and urge that no

reasonable trier of fact could find by clear and convincing evidence that the scenes were a

product of actual malice.

Non-party Robin Swicord wrote the early drafts of these three scenes.  (DuVernay

Dec. ¶¶ 65, 81, 96.)  DuVernay revised and expanded upon the drafts.  (DuVernay Dec. ¶¶ 65,

81, 96.)  Swicord and DuVernay state that they believed these sequences were consistent with

Fairstein's responsibilities during the early stages of the investigation of the Meili attack and her

later-expressed views.

Swicord states that Tribeca Productions, Inc., a producer of the series, provided

the writers "with extensive research material" that included books, interview transcripts and

recordings, and news articles, among other things.  (Swicord Dec. ¶ 11 (ECF 151).)  Swicord

states that she reviewed the materials in or around late October 2017 and made contemporaneous

handwritten notes on many of them.  (Id. ¶ 12.)  She states that she participated in in-person

interviews of the Five, and that writers received additional research materials throughout fall

2017.  (Id. ¶¶ 13-15.)  Swicord states that she and other writers "did our best to make sense of

these various materials, and in all cases, we believed the Five in telling their stories based on what we learned."  (Id. ¶ 25.)

DuVernay asserts that series writers "had a huge amount of research material from a variety of sources and perspectives."  (DuVernay Dec. ¶ 28.)  She identifies five published books, the 2012 PBS documentary *The Central Park Five*, newspaper and magazine articles, and contemporaneous television coverage.  (Id. ¶¶ 29-31, 39-40.)  DuVernay also states that she relied on interviews with members of the Five, their family members, and an interview with Michael Warren, the attorney who represented certain of the Five in motions to vacate their conviction and subsequent civil suits.  (Id. ¶¶ 32-35, 41.)  She also relied on court transcripts, interrogation videos and the 2002 affirmation of Nancy Ryan.  (Id. ¶¶ 36-38.)  DuVernay states that "I had no doubt whatsoever, based on the sources and information we had, that Ms. Fairstein played a central role in the investigation and prosecution, and absolutely is 'morally and legally culpable' for the outcome in view of her position of power and insistence on driving the case forward while disregarding numerous red flags."  (Id. ¶ 46.)  She also states that "[o]ur research and sources led us to believe that Ms. Fairstein was at the center of events from the beginning and one of the driving forces behind the investigation . . . .  Ms. Fairstein represents the criminal justice system, and the criminal justice system is the villain in the series.  That portrayal was grounded in, and supported by, both our sources and the point of view we were expressing."  (Id. ¶ 47.)

### B. Materials Describing Fairstein's Involvement in the Investigation of the Meili Attack.

DuVernay and Swicord point to numerous sources that, they urge, informed their depiction of Fairstein's role in the investigation of the Meili attack, including the scenes and dialogue disputed by Fairstein.

- 27 -

In the main, these sources portray Fairstein in a negative light, including a confrontational interaction with an Assistant United States Attorney who acted as "Big Brother" to one of the Five, her skepticism about the claim of the mother of one of the Five about her son's age and her initial reluctance to interrupt his interrogation, her praise of the NYPD investigation as "brilliant," the criticism of Fairstein by name in the dissenting opinion of a judge of the New York Court of Appeals, a statement by former Manhattan DA Robert Morgenthau that he lost confidence in Fairstein over her handling of the case, and her steadfast belief in the guilt of the Five in the Meili attack despite the confession of Reyes. The Court has considered the relevant source materials insofar as defendants cite them as evidence that supports Fairstein's depiction, and will refer to them in its discussion of the five individual scenes.

These sources are:

- Sarah Burns, *The Central Park Five: The Untold Story Behind One of New York City's Most Infamous Crimes* (2011) (ECF 155-31). This book by a documentarian and former attorney recounts Fairstein's actions at the 20th Precinct while the interrogation of Salaam was underway, as well as her visit to the Central Park crime scene with Richardson and Wise.
- Timothy Sullivan, *Unequal Verdicts: The Central Park Jogger Trials* (1992) (ECF 155-18). This book by a legal journalist recounts the same incidents at the 20th Precinct described in Sarah Burns's *The Central Park Five*.
- *The Central Park Five* Documentary Film. This 2012 documentary film co-directed by Ken Burns aired on PBS and included archival footage and interview clips with attorneys who represented members of the Five.
- Natalie P. Byfield, *Savage Portrayals: Race, Media, & the Central Park Jogger Story* (2014) (ECF 155-23). This book by an academic and former reporter included a reference to "[p]olice and prosecutors" working to assemble a logical sequence of events that transpired in the park.
- Jeffrey Toobin, "A Prosecutor Speaks Up," *The New Yorker*, November 25, 2002 (ECF 155-28). This article purports to summarize Fairstein's "first public discussion" after Matias Reyes claimed sole responsibility for the attack on Meili, and includes remarks by Fairstein that described the investigation of the Five as "brilliant" and her assertion that "I was there to be the eight-hundred-pound gorilla, to help Elizabeth and the cops get the resources they needed."
- Katherine Bouton, "Linda Fairstein vs. Rape," *The New York Times*, February 25, 1990 (ECF 155-67). This lengthy newspaper profile of Fairstein includes

passages describing her involvement in the investigation and prosecution of the Five, including the visit to the Central Park Crime Scene with Wise and Richardson.

- John Leland, "Robert Morgenthau on His Years as District Attorney: 'I Don't Look Back,'" *The New York Times*, November 23, 2016 (ECF 155-68).  In this profile of the former Manhattan District Attorney, Morgenthau is quoted as stating that his "complete confidence in Linda Fairstein" during the Five's criminal proceedings had "[t]urned out to be misplaced."

- Sarah Burns's Interview with Angela Black (ECF 155-58; Swicord Dec. ¶ 46).  The author of *The Central Park Five* book interviewed the sister of Kevin Richardson, who recounted Fairstein's harsh response when she asked when her brother would be allowed to leave the 20th Precinct.

- Transcript of Duvernay's Interview with Michael Warren (ECF 155-56, -57).  Michael Warren was an attorney to some of the Five in post-conviction proceedings, and, in a research interview with DuVernay, stated that "Fairstein controlled those detectives."

- The Recording of Duvernay's Interview with Raymond Santana (ECF 155-54).  In an interview with DuVernay, Santana, who is one of the Five, stated that Fairstein was "telling the officers what to do and when."

- Wikipedia quote from Judge Vito Titone (ECF 155-60).  The Wikipedia entry for Fairstein contained a quote from a former New York Court of Appeals Judge who stated, in reference to Salaam, that Fairstein "deliberately engineered the 15-year-old's confession . . . ."

- Jim Dwyer and Kevin Flynn, "New Light on Jogger's Rape Calls Evidence Into Question," *The New York Times*, Dec. 1, 2002 (ECF 155-69).  This article about internal debates over the vacatur of the Five's convictions mentioned Fairstein's continued belief "that the teenagers managed to have some contact with the jogger, and perhaps ran the jogger off the path, starting the assault that Mr. Reyes finished."

- Jill Smolow, "A Radical Reversal," *People*, Dec. 23, 2002 (ECF 155-70).  This article quoted statements from Fairstein disagreeing with the vacatur of the Five's convictions.

- Fairstein's June 20, 2014 appearance on "Imus in the Morning" (ECF 155-29).  In an appearance on a morning radio show, Fairstein stated, "I think that these men [i.e., the Five] were participants in the attack on the jogger as charged."

C.  Scene 1: The Depiction of Fairstein Creating a Timeline of the Attack.

The first of the five scenes at issue shows Fairstein directing the actions of NYPD members beginning on the morning of April 20.  (Ep. 1 at 12:36-12:51.)  Because the source materials cited by Swicord and DuVernay do not support the scene's depiction of Fairstein, defendants' motion for summary judgment as to Scene 1 will be denied.

In the scene, the Fairstein character tells NYPD officers, "Wake these kids up and start getting some information. . . . . I want their interviews on my desk immediately so I can put together a timeline."  (Id.)  At an unspecified point later that day, Fairstein states to NYPD Detective Michael Sheehan, "Farrell's interviews with the boys are in," and observes, "They're not witnesses.  They're suspects."  (Ep. 1 at 15:58-16:52.)  Over ominous orchestral music in a later scene, Fairstein notes a "45-minute discrepancy" in the timeline and states, "How can the same kids be raping her at the same time they are jumping bicyclists way over there?" (Ep. 1 at 34:45-36:24.)  A detective in the room states, "Nothing on the weapon. Question marks on the timeline.  I mean, we got problems."  (Id.)  Fairstein proposes to alter the timeline to account for the gap in chronology, and when asked, "Is there enough time for all this to even happen?" she replies, "Well it happened, so obviously there was."  (Id.)

Fairstein asserts that the scene falsely portrays her as responsible for creating a timeline of the Central Park events, including the rape and assault of Meili, and then manipulating the timeline after NYPD members pointed out chronology problems with connecting other assaults to the Meili attack.  In her deposition in this case, Fairstein testified that the NYPD had "prematurely" released a timeline to the press on or about April 21 or 22, and that over the next week or ten days, Lederer and ADA Arthur "Tim" Clements developed a timeline without her input, which "became their template for the case."  (Fairstein Dep. 261 (ECF 185-2).)  Fairstein testified that it was "impossible for me to accept" the first, NYPD-created timeline because "I knew there were events that had happened that [NYPD Chief of Detectives Robert Colangelo] didn't account for" and that she believed the later prosecution timeline was "essentially correct."  (Fairstein Dep. 262-63.)

Swicord states that "[t]hese scenes are invented scenes based on all of my research" and that they "reflect routine actions common to any police procedural drama . . . ." (Swicord Dec. ¶ 68; see also DuVernay Dec. ¶ 66 ("These scenes are creatively dramatized and invented scenes based on our research.").) Swicord cites published statements that criticized the initial law-enforcement chronology that timed the Meili attack as occurring at around 10:05 p.m., when there were indications that the attack occurred at around 9:20 p.m., a time when members of The Five were believed to be elsewhere in Central Park. (Swicord Dec. ¶ 69.) Swicord states she believes that police and prosecutors would have become aware of the timeline discrepancies while the initial interrogations were ongoing "but believed in their theory of the case despite the inconsistencies and forged ahead." (Id. ¶ 73.) She explains that she "did not have any direct evidence of the conversations between police and prosecutors behind closed doors," but that she knew "police and prosecutors worked together hand in glove," that the Five gave inconsistent accounts of the timing of the rape and various attacks in Central Park, and that "at some point, the police and prosecutors" concluded that their initial chronology was wrong "and presented a revised timeline at trial." (Id. ¶ 68.)

Swicord states that she believes "that the criminal justice system that wrongly convicted five innocent kids would be the antagonist of the story" and that Fairstein "was the face of that system." (Id. ¶ 33.) Swicord states that "[b]ased on our research, we elected to have Ms. Fairstein represent the group of prosecutors and police, which she led, as they allied against the Five." (Id. ¶ 33.)

Defendants point to a brainstorming-type message that Swicord sent to Locke with a copy to DuVernay on December 18, 2017, with the subject line "coerced confessions – how the misinformation flowed". (ECF 155-93.) The email attached a 4-1/2 page memo that

was "mostly about how I am showing the coerced confessions coming into being" based on the

Fairstein character's desire to develop a timeline that pinpointed the Meili rape as occurring at

around 9:15 p.m., as opposed to the later 10 p.m. time period initially used by law enforcement.

(Id.)  Swicord's memo states that "an Uh-Oh Moment arrived for Linda Fairstein" and that

"Linda had a time line problem" when she understood that the rape occurred earlier than initially

believed.  (Id.)  Swicord's memo theorizes that law enforcement then "coerced" confessions to

fit within a new timeline.  (Id.)

DuVernay points to the research materials summarized above and states that

"[n]othing" in Swicord's email memo "struck me as inconsistent with the research."  (DuVernay

Dec. ¶ 73.)  She states: "In view of the source material discussed above showing Ms. Fairstein's

powerful position, her reputation for being involved in investigations and her key role and

actions in this particular investigation, I firmly believed that she discussed timeline issues with

the detectives and had a hand in crafting a timeline that fit the theory of the case which

connected the events in the Park."  (Id. ¶ 76.)

Swicord says she believed at the time of writing that Fairstein was physically

present at NYPD precincts during the daylight hours of April 20 and was aware of what was

happening in the interrogations.  (Swicord Dec. ¶ 75.)  She states that she "knew that someone

had to be creating the timeline behind the scenes and fitting together the facts from the

interrogations" and believed that this person was Fairstein.  (Id. ¶ 75.)  Swicord states that she

believed that the process of assembling the timeline continued into the night of April 20 and into

the next day.  (Id. ¶ 76.)  She states: "Further, Ms. Fairstein oversaw the prosecution that went to

trial on the revised timeline."  (Id. ¶ 76.)  She states that the series "compressed" or "telescoped"

events due to the time constraints of the story, and that she "firmly believed" the portrayal of

Fairstein assembling the timeline "was consistent with the spirit and essence of her own publicly expressed points of view" about the timeline.  (Id. ¶¶ 77-78.)

None of the sources cited by Swicord or DuVernay attribute the creation of a timeline to Fairstein.[3]  For the purpose of the actual-malice analysis, it is of little moment that the series shows Fairstein at a NYPD precinct during the daylight hours of April 20 when she urges that she did not actually arrive until that evening, or that the writers chose to condense or "telescope" the timeline's evolution.  As depicted in Scene 1, Fairstein alone is responsible for altering a timeline to be consistent with the guilt of "the boys" and she brushes off a detective's skeptical question about whether there was "enough time for all this to even happen," responding, "Well it happened, so obviously there was."  (Ep. 1 at 34:45-36:24.)  The scene can reasonably be understood as depicting Fairstein alone as the person who devised a timeline with a specific intent to attribute Meili's attack to "the boys."

Consistent with the statements of DuVernay and Swicord that the Fairstein character was designated to be the face of an unjust system, Fairstein points to writers' room notes produced in discovery that urged she be portrayed harshly in this early scene in order to give viewers a negative understanding of her.  (Pl. 56.1 Resp. ¶ 120.)  One note stated, "Linda Fairstein is the clear villain in the beginning."  (ECF 215-4 at 5260.)  Other notes discuss the narrative importance of portraying her unsympathetically: "The audience will have a hard time making the jump from a woman standing over another woman's body with tears in her eyes to her to that same woman processing the boys and pushing this crime on them without holding onto some sympathy for her, which we do not want."  (ECF 185-81 at 21415.)  A document

---

[3] Natalie Byfield's *Savage Portrayals* broadly references "[p]olice and prosecutors" seeking evidence "that would allow them to include the rape as part of the logical sequence of events that had transpired in the park."  (ECF 155-23.)  It does not attribute any role to Fairstein.

headed "Network Notes Call" states in part: **KEY BEAT:** Show how it is that Fairstein is able to get everyone on board to align the evidence (or lack thereof) with her idea of the truth."  (ECF 185-83 at 105017.)  A Netflix email states, "Isn't the idea that she's creating a timeline regardless of their statements and then going to try and jerry rig their statements to fit?"  (ECF 185-178.)  A 2019 email from a Netflix employee states, "don't we need the prior scene of Fairstein mangling the timeline to suit her theory of the case?"  (ECF 185-268.)  An internal Netflix email of 2018 stated, "I like how Ava uses Fairstein's determination to make the false narrative stick as the driver for Part 1."  (ECF 185-177.)

Fairstein also points to several passages of the Sullivan and Burns books that describe Lederer as the timeline's author, including the characterization by Burns stating that Lederer "simply hid a glaring contradiction from the jury."  (Pl. 56.1 Resp. ¶¶ 120-21.)  When asked at her deposition to identify a specific source that Fairstein created a timeline in the manner depicted, DuVernay stated, "This is not a documentary.  So the movements, dialogue, actions of the characters are not pinned to, connected to, backed up by specific pieces of information."  (ECF 185-77 at 144.)

Based on the summary judgment record, a reasonable jury could conclude by clear and convincing evidence that the decision to make Fairstein "the face" of the system and the central "villain" caused defendants to act with actual malice by recklessly imputing conduct to Fairstein that is unsupported by the writers' substantial body of source materials.  The conduct imputed to Fairstein in Scene 1 is, for the reasons discussed in this Court's decision on the motion to dismiss, reasonably understood as defamatory.  It shows Fairstein working to manipulate a timeline to cover a 45-minute time gap in order to secure the conviction of young men who, based on facts brought to the attention of the Fairstein character by a dramatized

NYPD detective, may be innocent.  The choice to attribute this conduct to a real-life person is not immunized because the defendants intended the depiction to be a critique of the criminal-justice system.

The Court concludes that a reasonable trier of fact could find by clear and convincing evidence that defendants acted with reckless disregard to the truth or falsity of Fairstein's portrayal in Scene 1.  Defendants' motion for summary judgment will therefore be denied a to Scene 1.

### D.  Scene 2: The Depiction of Fairstein Instructing NYPD Members on Interrogation.

A second scene in Episode One depicts Fairstein instructing NYPD members to harshly interrogate suspects in the Meili attack.  The Fairstein character states:  "We've got suspects.  We've got kids in custody.  Interrogate.  Make them name their accomplices.  This is not business as usual.  The press is crawling all over this.  No kid gloves here.  These are not kids, they raped this woman.  Our lady jogger deserves this." (Ep. 1 at 22:35-22:54.)  The series then cuts to the interrogation of Kevin Richardson, who is shown handcuffed to a chair with a black eye.  (Ep. 1 at 22:54-24:17.)

In its decision on the motion to dismiss, the Court explained why the scene had a potentially defamatory meaning:

> In full context, the average viewer would conclude that Fairstein was responsible for instructing members of the NYPD to use harsh and coercive interrogation practices against minors. The use of false confessions brought about through law enforcement pressure and duplicity is a significant theme in later portions of the series. The average viewer could therefore interpret Fairstein's interrogation instructions as beginning the chain of events that resulted in the unjust conviction of the Five, such that the depiction could plausibly expose Fairstein to public contempt, ridicule, or disgrace, or an induce an evil opinion of her.

Fairstein, 553 F. Supp. 3d at 78.

DuVernay states that she edited the dialogue in this scene based on Swicord's drafts and personally added the language at issue.  (DuVernay Dec. ¶ 96.)  Duvernay states: "I believed that it fairly reflected the essence of Ms. Fairstein's character based on my sources discussing her conduct in the investigation and her own statements about the case."  (Id.)

DuVernay points to the books of Burns and Sullivan, as well as the remarks attributed to Fairstein in the 2002 *New Yorker* article.  (Id. ¶¶ 97-99, 101.)  The Burns and Sullivan books depict Fairstein as having some control over access to Yusef Salaam on the night of April 20, including in not allowing Salaam's mother and "Big Brother" to speak with him. (ECF 155-31 at 47; ECF 155-18 at 25-27.)  Burns's book describes Fairstein as profanely confronting Salaam's "Big Brother," an Assistant United States Attorney named David Nocenti, and threatening to call his supervisor.  (ECF 155-31 at 46.)  Both books describe Fairstein's skepticism of Ms. Salaam's assertion that her son was only fifteen and her reluctance to pause Salaam's interrogation.  (See id.)

Sullivan interviewed Fairstein for *Unequal Verdicts*, which includes a passage that appears to convey Fairstein's own perspective about the night of April 20.  As described in the book, while the interrogation was underway, Fairstein viewed Salaam as "the killer" and a "kid":  "As far as Fairstein was concerned, they had the killer, he was being interrogated by a skilled detective and he was incriminating himself.  Salaam was the last kid she wanted to see represented by a lawyer at that point."  (ECF 155-18 at 26.)  The book describes Fairstein's authority to stop questioning and summon NYPD detectives: "To resolve the issue, said Fairstein, she would send for the detectives who were questioning Yusef.  In a few minutes the women were joined by detectives Taglioni, who had brought Salaam to the precinct from Schomburg Plaza earlier that night, and Rudy Hall, who had been sitting in on the interrogation."

(Id. at 27.)  Fairstein is described as the person who halted the questioning of Salaam.  (Id. ("Fairstein then took the detectives aside and told them that, for the sake of protecting the case, they should accept Ms. Salaam's word that her son was fifteen and tell McKenna to stop the interview.").)  As phrased in Burns's *The Central Park Five* book, "Fairstein and the detectives relented" when Ms. Salaam maintained that her son was fifteen.  (ECF 155-31 at 47.)  *Unequal Verdicts* also states that Fairstein "had been dreading for the past hour" that someone would request a lawyer for Salaam, a characterization that is consistent with close involvement in the interrogation.  (ECF 155-18 at 27.)  Burns's *The Central Park Five* quotes Judge Titone's assertion that "it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting [the] defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment.'"  (ECF 155-33 at 181; brackets in original.)

DuVernay also points to the statement of Kevin Richardson's sister, who recalled that Fairstein admonished her for asking when she and Kevin could go home instead of being concerned about the well-being of Meili.  (DuVernay Dec. ¶¶ 99-100, citing ECF 155-58.)  She also cites the *New Yorker* article by Jeffrey Toobin, where Fairstein praised the investigation as "brilliant" and described herself as the investigation's "eight-hundred-pound gorilla."[4] (DuVernay Dec. ¶ 101; ECF 155-28.)

---

[4] On this motion, the Court notes that competing inferences can be drawn from the "eight-hundred-pound gorilla" comment.  The quote in the *New Yorker* piece was "I [Fairstein] was there to be the eight-hundred-pound gorilla, to help Elizabeth [Lederer] and the cops get they resources they needed."  (ECF 155-28.)  It can be read to mean that Fairstein was there to exercise her experience and influence to obtain needed resources to aid the investigation. Defendants cite the comment as one source for the proposition that Fairstein was "a key participant in the investigation, as the highest ranking official at the precincts at a critical time, and that she oversaw and participated in the case through trial and verdict."  (DuVernay Dec. ¶ 53.)  The Court concludes that the reasonable inferences to be drawn from the quote are best left to a jury.

In opposition, Fairstein points out that the series depicts NYPD members interrogating Richardson and not Salaam, and asserts that she did not instruct the NYPD on interrogation techniques.  (Opp. Mem. at 36-37.)  She observes that *Unequal Verdicts* does not quote her directly and that none of the sources cited by DuVernay suggests that she instructed detectives on interrogation techniques.  (Id. at 37.)  Fairstein notes that in her deposition, she acknowledged that prosecutors serve as legal advisors to the NYPD, but that she had no authority to direct the NYPD to comply.  (Id. at 38; ECF 18-2 at 189-90.)

Fairstein also points to earlier drafts of the scene in which her character was shown using markedly milder language.  A May 29, 2018 version drafted by Swicord read: "The twelve kids we've got in custody?  Interrogate.  Make them name their accomplices.  Let's get this filth."  (ECF 185-204 at 004711.)  A September 19, 2018 draft read: "12 kids in custody. Interrogate.  Make them name their accomplices.  Our lady jogger deserves this."  (ECF 185-198 at 001645.)  Fairstein points to evidence that the final dialogue was added after filming, using an editing technique called "Automated Dialogue Replacement.  (Pl. 56.1 Resp. ¶ 148.)  She points to an email from a Netflix employee dated January 28, 2019, that states, "We truly feel all of the work you've done in the beginning to revise the timeline and use Fairstein's manipulations to structure the rush to judgment.  There's now a strong sense of pace and energy ratcheting up as you move through the interviews and pressure escalates for all."  (ECF 185-290.)  Fairstein also points to a portion of Swicord's deposition testimony, when, in response to a question of whether Swicord understood Fairstein to outrank the NYPD's chiefs of detectives, Swicord answered, "I don't know how the rankings go between cops and prosecutors who are acting as investigators, as well."  (ECF 185-59 at 127-28.)

As support for their good-faith belief that the scene accurately depicts Fairstein's views and responsibilities, defendants have pointed to research sources that describe Fairstein as an influential figure at the 20th Precinct on the night of April 20, 1989.  But the dialogue of Scene 2 depicts Fairstein as having the authority to instruct NYPD members on their questioning techniques – telling them not to use "kid gloves" and to "[m]ake them name their accomplices." The research cited by DuVernay and Swicord does not attribute such a role or authority to Fairstein.  The research describes Fairstein as present and interacting with NYPD members during Salaam's questioning, but it does not describe her as having the authority to instruct them, or imploring them to use harsh techniques due to the urgency or heinousness of the crime.  It is also relevant to the actual-malice analysis that Fairstein has pointed to evidence suggesting that the most inflammatory language was added during the editing process and was not part of the script as drafted.  In considering whether defendants were recklessly indifferent to the truth of Fairstein's depiction, a trier of fact may conclude that this later-inserted dialogue was added for purposes of narrative momentum with no connection to the many research sources cited by defendants.

The Court concludes that a reasonable trier of fact could find by clear and convincing evidence that defendants acted with reckless disregard to the truth or falsity of Fairstein's portrayal in Scene 2.  Defendants' motion for summary judgment will therefore be denied a to Scene 2.

### E.  Scene 3: The Depiction of Fairstein Instructing NYPD Members to Conduct a Harlem Roundup.

Defendants move for summary judgment as to Scene 3 (Ep. 1, 19:59-20:30), where Fairstein is depicted as instructing NYPD members as follows:

> I need that whole group.  I have some of them and descriptions of others, but I need all of them.  Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now.  I want units out strong.  Come on, guys.  What did we miss?  Let's get an army of blue up in Harlem.  You go into those projects and you stop every little thug you see.  You bring in every kid who was in the park last night.

In its decision on the motion to dismiss, the Court outlined why the scene was plausibly alleged

to be defamatory:

> As depicted in "When They See Us," the average viewer could conclude from the scene that Fairstein directed NYPD officers to conduct a discriminatory canvas in Harlem. The depiction has a precise meaning and is capable of being proved or disproved. The instructions to "get an army of blue up in Harlem" in pursuit of "young black male[s]" and to "go into those projects and you stop every little thug you see" could reasonably be understood by a viewer as a directive to indiscriminately canvass and search young black men. The term "thug" is not used to describe individuals who were believed, rightly or wrongly, to have committed the brutal rape. Rather, it implies that the "projects" in Harlem are populated with "thugs" ("stop every little thug you see") and among those stopped, one or more may know something about the rape. Fairstein's words are spoken against images of police searching young men along a fence and the series immediately transitions to the depiction of officers demanding ID from Salaam and Wise. Viewed in context and taken as a whole, the Complaint plausibly alleges that the dialogue attributed to Fairstein advocates unlawful police stops of young black males without reasonable suspicion, thereby subjecting her to hatred and contempt. The average viewer would not necessarily conclude that her remarks were merely a reflection of the filmmakers' opinions about the perspective of law enforcement, and could instead conclude that Fairstein directed discriminatory policing practices. The average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience.

Fairstein, 553 F. Supp. 3d at 78-79.

DuVernay states that Swicord wrote the initial drafts of the scene, which she then

revised.  (DuVernay Dec. ¶ 81.)  DuVernay states that this is an invented scene intended to

reflect her belief that Fairstein led an investigation that rushed to judgment in its focus on Black

and Latino youth while ignoring other possible suspects.  (Id. ¶ 82.)  Swicord states that she

believed that NYPD members, as directed by Fairstein, attempted to "round up '[e]very young

black male who was in the park last night'" as suspects in Meili's rape.  (Swicord Dec. ¶ 82.)

She points to sources that, she urges, supported her conclusion that the NYPD conducted a mass

roundup that focused on Black and Latino youth who were present in Central Park on the night

of the Meili attack, and that Fairstein personally directed the arrests of young people of color.

(Id. ¶¶ 83-86.)

       The Five and their supporters have long maintained that law enforcement

conducted a discriminatory roundup that focused on Black youth.  In this defamation action, the

Court need not decide whether any NYPD roundup of suspects was or was not motivated in

whole or in part by discriminatory animus because the actual-malice standard is distinct from the

defense of truth and focuses on what defendants knew and believed.  Swicord and DuVernay

have pointed to contemporaneous sources that decried the NYPD's arrests and detentions as

discriminatory.  (See William Glaberson, "Art of Questioning; Some Jogger Defense Lawyers

Fear A Colleague's Cross-Examinations," *The New York Times*, July 26, 1990 (ECF 155-94);

Ronald Sullivan, "Defense Calls Jogger Case a Racist Witch Hunt," *The New York Times*,

November 29, 1990 (ECF 155-95); Swicord Dec. ¶¶ 84-85.)  DuVernay and Swicord

acknowledge that the series depicts a single "round-up" of suspects, when, in reality, suspects

were brought in over multiple days, but state that time compression was necessary to the

narrative.  (DuVernay Dec. ¶ 86; Swicord Dec. ¶ 85.)

       Swicord states that research on the series supported her belief that Fairstein

directed and supervised the NYPD's roundup.  Santana, who is one of the Five, described

Fairstein as "the person who was behind making the phone calls, telling the officers what to get,

what to do, and where to go." (Swicord Dec. ¶ 86.) Michael Warren, who was Santana's attorney in post-conviction proceedings and civil claims against the City, stated in an interview with DuVernay that "Fairstein controlled those detectives. She controlled them in the precinct, and her only objective was to close that case against the young boys." (Swicord Dec. ¶ 86; ECF 155-56.) Swicord points to portions of the 2002 *New Yorker* piece, where Fairstein stated, "'A kid would say something like 'a dark-skinned guy who lives on 102nd Street,' Fairstein said. 'And these detectives would go out and find him. I think it was one of the most brilliant police investigations I've ever seen.'" (Swicord Dec. ¶¶ 86-87; ECF 155-28.) Swicord urges the scene is consistent with Fairstein's "own descriptions of how the NYPD went into Harlem to find the kids who had been in the Park." (Swicord Dec. ¶ 87.) DuVernay cites to the *New Yorker* piece as support for her belief that Fairstein "was present and overseeing this roundup," bolding for emphasis Fairstein's self-description as the "eight-hundred-pound gorilla" and her statement that those "present during the interrogation process" did not have a question about the Five's participation in the Meili attack.[5] (DuVernay Dec. ¶ 87.) As noted, the "eight-hundred-pound gorilla" comment is susceptible to competing inferences and is of little value in deciding this motion.

Fairstein states that transcripts from the suppression hearings and trials of the underlying proceedings reflect that she had no role in any roundup of suspects, let alone the authority to order one. (Pl. 56.1 Resp. ¶ 134, citing ECF 182-27 to 57.) She cites DuVernay's notes from February 2018, which describe certain narrative goals in Fairstein's interactions with

---

[5] Swicord separately points to emails produced in discovery where Fairstein refers to the Five in derogatory terms, and urges that the dialogue is consistent with Fairstein's real-life verbiage. There is no suggestion that defendants had those emails at the time they were writing the series. They do not inform the actual-malice analysis. See, e.g., Herbert, 781 F.2d at 305-06 ("It is self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication.").

the NYPD, such as "all of that information can come out in the cops relaying information to Fairstein," "[e]stablish precinct through Fairstein," "[p]lump up the Fairstein scenes to help get across that information," and "[h]ow do we sprinkle in the boys who are being held into the Fairstein scenes to motivate the narrative she creates?  How does she know who to go and get?" (Pl. 56.1 Resp. ¶ 134; ECF 182-207.)  Fairstein also points to the deposition testimony of non-party Eric Reynolds, an officer of the NYPD who participated in arrest of Antron McCray, and testified in his deposition that NYPD members "have our own supervisors" who direct suspect interviews and that "the D.A. does not tell us what to do . . . ."  (ECF 185-26 at 176.)  Reynolds stated that there was "absolutely no reason in the world" that NYPD members would have followed a directive by Fairstein akin "to go round up all black people . . . ."  (Id. at 178-80.)

Fairstein also urges that the statements of Warren and Santana should be afforded little weight in the actual-malice analysis.  As to Warren, she urges that the statement that Fairstein "controlled the cops in the precinct" is a broad overstatement not based on personal knowledge, and that, given his role as Santana's attorney, Warren's statement was biased.  (Pl. Mem. 33.)  Regarding Santana's assertion that Fairstein was "telling officers what to do and where to go," she notes that he also stated to Duvernay that "in the beginning, when you look at the case, I didn't meet her.  I didn't know her."  (Pl. 56.1 Resp. ¶ 77(a).)

As with the depiction of Fairstein's role in creating a timeline, the depiction of Fairstein instructing NYPD members to engage in a discriminatory roundup of young Black men in Harlem lacks support in the sources cited by defendants.  Fairstein's comments to the *New Yorker* about a witness who identified a "dark-skinned guy who lives on 102nd Street" and her praise for "these detectives [who] would go out and find him" (ECF 155-28) does not suggest that she directed an "army of blue up in Harlem" to "stop every little thug you see."  Similarly,

her generalized praise for "one of the most brilliant investigations I've ever seen" does not

suggest that she directed a roundup of young Black males.

   Warren's characterization that Fairstein "controlled the cops in the precinct" also

does not in itself suggest that she directed them to round up suspects in the streets of Harlem.

Santana's assertion that he didn't "meet" or "know" Fairstein in the beginning of the case calls

into question the basis of his assertion that she told officers "what to do, and where to go."

Defendants do not assert that either man attributed the NYPD's roundup to Fairstein.  Moreover,

given their roles in years of hard-fought civil litigation against the City and Fairstein, the

potential bias of Santana and Warren is relevant to the actual-malice analysis.  A reasonable jury

could find that their roles in this litigation weigh in favor or against their credibility.  As the

Second Circuit has stated:

> Actual malice can be established "[t]hrough the defendant's own
> actions or statements, the dubious nature of his sources, [and] the
> inherent improbability of the story [among] other circumstantial
> evidence[.]"  Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d
> 1287, 1293 (D.C. Cir. 1988); see Clyburn v. News World
> Communications, Inc., 903 F.2d 29, 33 (D.C. Cir. 1990) (proof of
> actual malice "may take the form of circumstantial evidence, such
> as the existence of 'obvious reasons to doubt the veracity of the
> informant or the accuracy of his reports'").  But see St. Amant v.
> Thompson, 390 U.S. 727, 732-33 (1968) ("Failure to investigate
> does not in itself establish bad faith." (emphasis added)).

Celle, 209 F.3d at 183; see also Biro v. Conde Nast, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013)

("In cases 'involving the reporting of a third party's allegations, recklessness may be found

where there are obvious reasons to doubt the veracity of the informant or the accuracy of his

reports.") (quoting Harte-Hanks, 491 U.S. at 688), aff'd, 807 F.3d 541 (2d Cir. 2015).

   The Court concludes that a reasonable trier of fact could find by clear and

convincing evidence that defendants acted with reckless disregard to the truth or falsity of

Fairstein's portrayal in Scene 3.  Defendants' motion for summary judgment will therefore be denied a to Scene 3.

II.      Scene 4: The Depiction of Fairstein's Response to Late-Discovered DNA Evidence.

Scene 4 does not pertain to the initial investigation of the attack or Fairstein's interactions with the NYPD.  It depicts a conversation between Fairstein, Lederer and Morgenthau about late-discovered DNA evidence that was found on a semen-marked sock.

In the scene, which takes place in an office at an unspecified time shortly before the start of trial, Morgenthau states, "We have a useless tape, we lost our gang narrative, we can't find DNA." (Ep. 2, 16:39-17:14.)  Fairstein responds, "We have a sock.  Those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it."  (Id.)  Morgenthau states, "We have DNA, good.  The match will nail this thing down." (Id.)  Lederer states, "How did the NYPD miss this?"  (Id.)  Fairstein answers, "Who cares? We have it now.  And the kicker is none of the defense is aware yet so we can test it right before the trial.  Surprise." (Id.)  Appearing distressed, Lederer pauses and says, "Surprise."  (Id.)  Ultimately, DNA tested from the sock did not match any of the Five.

In deciding the motion to dismiss, the Court concluded that the Complaint plausibly alleged that the scene is capable of a defamatory meaning:

> These scenes depict Fairstein concealing evidence from defense counsel – a likely violation of law and of professional responsibility – and manipulating the timing of a DNA test with the goal of advantaging the prosecution.  The average viewer would not have a reason to conclude that such actions reflect a dramatized opinion of the filmmakers and could fairly conclude that the depiction was based on undisclosed facts known to the defendants.

553 F. Supp. 3d at 74.

The summary judgment record does not crisply and coherently set forth the real-life timeline and sequence of events relating to the sock's discovery, its disclosure to defendants

and the trial date.  Defendants have cited to paragraph 119 of the Complaint (Def. 56.1 ¶ 20), which, as a pleading, is not evidence.  See, e.g., Cohen v. Equifax Info. Servs., LLC, 827 Fed. App'x 14, 16 (2d Cir. 2020).  However, the paragraph is heavily footnoted to underlying court records, of which the Court may take judicial notice on a summary judgment motion.  See, e.g., In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 839 (2d Cir. 1992).

On March 28, 1990, an NYPD lab chemist was re-reviewing forensic evidence in anticipation of the trial of McCray, Salaam and Santana, which was scheduled to start on April 16.[6]  On March 29, 1990, in a letter addressed to the trial judge and copied to defense counsel, Lederer requested an adjournment of trial, stating that re-examination of vouchered clothing revealed a semen sample that needed DNA testing.[7]  Pretrial conferences were held on April 2 and 5, 1990 with Lederer and defense counsel present.[8]  At the April 5 conference, Lederer stated that "[a] copy of the serology report that documents the finding of that stain and the item on which it was found has been sent to all counsel and a copy has been filed with the court."[9]  In letters dated June 5, 1990, Lederer advised defense counsel that autoradiographs produced in DNA tests of May 25, 1990 would be made available for their review.[10]  Opening statements in the trial took place on June 25, 1990.[11]

Defendant Locke wrote the initial draft of the scene, which DuVernay edited and revised.  (Locke Dec. ¶ 52; DuVernay Dec. ¶ 105.)  Locke describes it as "an invented scene to

---

[6] NYCLD_022317, available at www.nyc-cpj.org / "Original Investigation And Prosecution" / "Pre Trial And Trial Transcripts"
[7] NYCLD_000321, available at at www.nyc-cpj.org / "Original Investigation And Prosecution" / "Letters and Correspondence"
[8] See www.nyc-cpj.org / "Original Investigation And Prosecution" / "Pre Trial And Trial Transcripts"
[9] NYCLD_006313-14, available at www.nyc-cpj.org / "Original Investigation And Prosecution" / "Pre Trial And Trial Transcripts"
[10] See, e.g., NYCLD_000345, available at www.nyc-cpj.org / "Original Investigation And Prosecution" / "Letters and Correspondence"
[11] NYCLD_013871, available at www.nyc-cpj.org / "Original Investigation And Prosecution" / "Pre Trial And Trial Transcripts"

convey the incredible development in the case when the sock DNA was found right before the

first trial.  While I did not have the specifics of the conversations and dialogue behind the scenes,

the source materials (discussed below) described the gist of the prosecution's discussions around

the sock."  (Locke Dec. ¶ 52.)  She states, "This scene was not intended to show, and I do not

believe that it shows, Ms. Fairstein directing Ms. Lederer to conceal the DNA evidence.  Ms.

Fairstein is simply stating the fact that the sock can be tested right before trial – because that's

when it was found and tested."  (Id. ¶ 53.)  DuVernay makes the same assertion.  (DuVernay

Dec. ¶ 110.)  Locke states that based on her research, she understood the "last-minute DNA

evidence" to be "a welcome 'surprise' to the prosecution" because they believed it would support

their theory of the Five's guilt: "Hence, the look of glee on [Fairstein's] face in the scene."

(Locke Dec. ¶ 54.)

       Locke points to sources that describe Lederer successfully moving for an

adjournment of the trial and the fallout from subsequent test results that found no match to the

Five.  (Locke Dec. ¶ 55.)  Locke cites two sources that reference Fairstein.  (Id. ¶ 56.)  Sullivan's

*Unequal Verdicts* includes the sentence, "Linda Fairstein thought it probable that the semen on

the sock belonged to someone who had raped [Meili]."[12]  (ECF 155-115 at 103.)  Locke also

cites a passage from the book *And the Blood Cried Out: A Prosecutor's Spellbinding Account of

DNA's Power to Free or Convict*, by Harlan Levy (1996) (ECF 155-53).  That book, which is

written in the first person by a former Manhattan prosecutor who apparently acquired expertise

in DNA evidence, describes the DNA results for the sock as an obstacle to prosecutors, and

includes these passages:

       So we had to figure out what had gone wrong here, why the DNA
       results had turned out the way they did, and how to keep the DNA

---

[12] *Unequal Verdicts*, which was published before Meili was publicly identified as the victim in the 1989 attack, refers to her by the pseudonym "Paula Harris."

results from destroying our case.  Toward that end, I was asked to
work with Linda Fairstein, Lederer's mentor, chief of the District
Attorney's Sex Crimes Bureau, and a pioneer in the prosecution of
sex crimes.

* * *

Fairstein and I sought expert advice and spent a fair amount of time
simply talking to each other to figure out how to address the DNA
problem.   As we did, it quickly became clear to us that the
explanation for the results lay not in the complex world of DNA
technology but in the simple facts of the crime.

(Id. at 94-95.)  Locke notes that the same book describes Lederer as "visibly shaken" when the

DNA tests showed no match with the Five, and that Sullivan's *Unequal Verdicts* described

Lederer as "disturbed" by the results, whereas the books had no such descriptions about

Fairstein.  (Locke Dec. ¶ 61.)  Locke states that this prompted her to draft contrasting reactions

from the two prosecutors.  (Id.)

The other supporting passages cited by Locke do not relate to Fairstein or the

tactical considerations she raises in Scene Four.  Burns's *The Central Park Five* book describes

Lederer's anguish about "the weak pattern" in DNA evidence taken from Meili's rape kit.  (ECF

155-116 at 96-97.)  Another passage summarizes Lederer's successful application to adjourn the

trial date and the lack of DNA match to the sock.  (Id. at 113.)  *Unequal Verdicts* describes the

prosecution learning that the DNA samples taken from Meili were "too weak" to provide a

match.  (ECF 155-115 at 89-90, 103.)  A passage states that "prosecutors had high hopes for this

last chance to link the defendants scientifically with the rape."  (Id. at 103)

DuVernay states that in her revisions, she added the "'Surprise' line to capture the

giddy feeling of the prosecution in finding the last-minute evidence that could make their case,

based on the source materials above."  (DuVernay Dec. ¶ 107.)  She identifies the same sources

cited by Locke as support for her belief that Fairstein was involved in devising trial strategy around the late-discovered DNA evidence.  (Id. ¶ 108.)

In opposition, Fairstein cites to notations and script changes during the writing process that made her character central to the DNA discovery.  One draft script depicted Lederer enthusing about the new evidence and stating that she will petition for an adjournment of the trial date.  (ECF 182-104 at 035835.)  A handwritten notation on the script states, "Push Fairstein harder / she goes wild so she gets a good comeuppance."  (Id.)  Other notes about the scene recommended emphasizing Fairstein's reaction, such as, "Have Fairstein's language be more direct/vulgar," and "pump up Linda's reaction [to] the semen and her theory that the boys jizzed in a sock so they wouldn't be arrested."  (ECF 182-111 at DEFS 021422; ECF 182-182 at DEFS 029031.)

Defendants urge that summary judgment should be granted in their favor because the scene merely depicts prosecutors' surprise at learning about the DNA-marked sock and their hope that the sample would match to the Five.  (Def. Mem. at 40.)  They urge that it shows the prosecutors' "giddy feeling upon discovering this last-minute evidence that could make their case . . . ."  (Id.)  They state that the writers did not intend the scene to convey that the prosecution was concealing forensic evidence from the defense, dispute that the scene can be fairly interpreted in that way, and assert that a finding of actual malice is not appropriate when defendants did not anticipate such an interpretation.

A jury must weigh the parties' contrasting interpretations of the scene.  If "words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood."  Celle, 209 F.3d at 178.  The assertion from

Locke and DuVernay that the scene conveys prosecutors' "giddy" feeling over a "welcome surprise" should be weighed against an understanding of the scene as depicting a cavalier approach from Fairstein about the handling of crucial evidence and enthusing about an opportunity to sandbag defense counsel with a last-minute DNA test. When Lederer wonders how the NYPD missed such crucial evidence, Fairstein responds, "Who cares? We have it now." Those remarks convey a lack of concern about the thoroughness of the investigation and a disregard for how evidence was scrutinized.[13] Fairstein then states, "And the kicker is none of the defense is aware yet so we can test it right before the trial. Surprise." In context, describing the test as "the kicker" and a "[s]urprise" can reasonably be understood as suggesting a tactic to blindside defense counsel. The scene is susceptible to the reasonable interpretation that it merely depicts surprise over the turn of events, or the very different interpretation that Fairstein enthused about the opportunity to engage in reprehensible conduct to manipulate the timing of a test in order to prejudice the defense.

       The research sources cited by defendants give no support for the depiction of Fairstein in Scene 4. They principally describe prosecutors' struggles to devise a trial strategy without DNA evidence to like the Five with Meili. The relevant mentions of Fairstein in *Unequal Verdicts* and *And the Blood Cried Out* are brief and suggest only that she thought it likely that the sock's DNA would match one of the rapists and later conferred with the author of the latter book about the absence of DNA evidence. The Burns and Sullivan books describe Lederer's successful application to adjourn the trial in order to conduct a DNA test and the trial judge's displeasure with such late-discovered evidence.

---

[13] Such a characterization of Fairstein's work is, of course, fairly asserted as an opinion, but the scene is not readily construed as a statement of opinion and defendants do not urge on this motion that it should be understood as such.

The Court concludes that a reasonable trier of fact could find by clear and convincing evidence that defendants acted with reckless disregard to the truth or falsity of Fairstein's portrayal in Scene 4.  Defendants have not pointed to research sources to support the depiction of Fairstein in the scene, and evidence in the summary judgment record suggests that the scene was revised to focus on Fairstein rather than Lederer, as well as to heighten her vulgarity and set the stage for "comeuppance," consistent with the broader narrative goal of positioning her as the series villain.  Defendants' summary judgment motion will be denied.

III.    Scene 5: The Depiction of Fairstein's Lunch Meeting with Nancy Ryan.

The fifth scene that Fairstein contends is false and defamatory comes late in the final episode of the series.  It depicts a conversation between Fairstein and Nancy Ryan during a lunch meeting at a restaurant.  DuVernay states that she wrote this scene as a "coda in which these two antagonists, representing opposing camps, state their position and opinion on this contested chapter of in history." (DuVernay Dec. ¶ 119.)  She describes the scene "as a literary device and metaphorical confrontation" directed to Fairstein's "continued insistence" that the Five are guilty.  (DuVernay Dec. ¶ 131.)

Nancy Ryan was the Assistant District Attorney who reviewed the evidence of the Five's guilt after Reyes's confession and filed an affirmation to the New York Supreme Court in 2002 that consented to the vacatur of their conviction.  (Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26; ECF 155-24.)  The affirmation detailed inconsistencies and contradictions in the confessions of the Five and explained why Reyes's confession had been deemed credible and reliable.  (ECF 155-24.)  Fairstein and Ryan were also contemporaries in the Manhattan District Attorney's Office.  (See, e.g., Def. 56.1 ¶ 86(c); Pl. 56.1 Resp. ¶ 86(c).)

The entirety of the fictional exchange between Ryan and Fairstein is as follows:

FAIRSTEIN: I'm certainly surprised by this invitation.

RYAN: I'm surprised to be making it.  I'm here as a courtesy.

FAIRSTEIN: Oh, courtesy is the last thing you're here for.  You're here to gloat.  But it doesn't matter.  You've simply identified a sixth rapist.  I always said there may be more.

RYAN: You said that to cover because <u>you knew you coerced those boys into saying what they did.</u>

FAIRSTEIN: They said what they said freely.  They confessed.

RYAN: I actually think you've convinced yourself of that.

FAIRSTEIN: It doesn't really matter what you think.  There's a Police Commission Report coming out in a matter of days that maintains that the five did it.  And that Reyes is simply the one that got away.  It's a 43-page report, compiled by three lawyers named by the Commissioner.

RYAN: It's the police department investigating itself.  Linda, <u>we pored over your confession tapes.</u>  We reconstructed the events of that night minute by minute.  <u>I know what was done.</u>

FAIRSTEIN: Oh, you know nothing.

RYAN: I know we have a DNA match on Reyes.  His DNA was all over every article of clothing and physical sample we had of her.  Under fingernails where she fought him.  The blood on her was from him.  It was him.  Only him.

FAIRSTEIN: Well, that simply confirms that Reyes ran with that pack of kids.  He stayed longer when the others moved on.

RYAN: "Final Jeopardy."  "Likely To Die."  "Cold Hit."  And the newest one: "The Deadhouse."  While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit.

FAIRSTEIN: I watched while more than 30 detectives did a brilliant investigation.  We got justice for a woman who was violated in the most gruesome way.  We got justice for a woman who was used and thrown away like garbage.  Those boys did that.  We helped make sure they got what they deserved.  And I'll be damned if I'm gonna

lose a wink of sleep over it.  And it's too bad you are.  Thank you
for buying the books.  Enjoy.

(Ep. 4, 1:09:46-1:12:41; emphasis added.)

On the motion to dismiss, the Court concluded that the Complaint plausibly

alleged that the scene was capable of a defamatory meaning:

> Viewed in context, the average viewer could reasonably interpret
> Ryan's statement that "you [Fairstein] coerced those boys into
> saying what they did" to be a factual assertion.  Ryan's statement
> that her team "pored over your confession tapes" implies that Ryan's
> own investigation concluded that Fairstein directed the conduct of
> police interviews that secured confessions that she described as
> "coerced."  This notion is underscored by Ryan's assertion that her
> team reconstructed the sequence of events and that, "I know what
> was done."  The statements have a precise meaning and are capable
> of being proved true or false.  The series depicts Ryan as an
> authoritative public official who questions law enforcement's
> approach to the case.  The damning judgment of Fairstein's conduct
> voiced by a professional colleague could plausibly hold Fairstein up
> to shame, ridicule and contempt.

Fairstein, 553 F. Supp. 3d at 76.

DuVernay states that the Fairstein character's dialogue is consistent with

Fairstein's publicly stated views about the case, and that several sources described a contentious

relationship between Fairstein and Ryan.  (DuVernay Dec. ¶¶ 120-23.)  As support for the

dialogue attributed to the Ryan character, she cites Ryan's affirmation of 2002, particularly

passages that described "significant weaknesses" and "troubling discrepancies" in the Five's

confessions.  (DuVernay Dec. ¶¶ 125-27.)  The affirmation did not state that any confession was

coerced or otherwise involuntary, but DuVernay points to passages that, she states, supported her

sincere and good-faith belief that Ryan's affirmation "was conveying that the confessions had to

be the product of some form of coercion."  (DuVernay Dec. ¶ 127.)  As phrased in the Ryan

Affirmation, the Five's statements "differed from one another on the specific details of virtually

every major aspect of the crime," "were not corroborated by, consistent with, or explanatory of

objective, independent evidence," "some of what they said was simply contrary to established fact," and "[p]erhaps most significant, none of the defendants accurately described where the attack on the jogger took place." (ECF 155-24 at ¶¶ 86, 91, 97.) The affirmation noted that at the time of questioning, Richardson and Santana were 14, Salaam and McCray were 15 and Wise was 16. (Id. ¶ 10.) It stated that "[n]one of them admitted actually raping the Central Park jogger, but each gave an account of events in which he made himself an accomplice in the crime," after initially denying knowledge about the incident. (Id. ¶¶ 10, 83.)

DuVernay also points to research materials that recounted Fairstein accompanying Wise and NYPD detectives to the Central Park Crime Scene on the morning of April 21. (DuVernay Dec. ¶ 128.) The Ryan Affirmation stated that "Wise had been taken to the scene prior to his videotaped statements" and that "none of the defendants accurately described where the attack on the jogger took place" except for Wise, "who had been to the scene . . . ." (ECF 155-24 at ¶¶ 92, 97.) DuVernay also points to the previously discussed sources that recounted Fairstein's presence in the 20th Precinct on April 20 and 21, 1989, and emphasizes Morgenthau's 2016 statement to the *New York Times* that his confidence in Fairstein's role in the case had been "misplaced." (DuVernay Dec. ¶¶ 128-29.)

Though not cited by DuVernay as a source for the dialogue attributed to Ryan, elsewhere she states that she relied on a remark published in the press by former Judge Titone, as quoted on Fairstein's Wikipedia entry. (DuVernay Dec. ¶ 53(f).) In an interview, Titone stated, "I was concerned about a criminal justice system that would tolerate the conduct of the prosecutor, Linda Fairstein, who deliberately engineered the 15-year-old's confession." (ECF

155-60 at 21.)  A view that Fairstein "deliberately engineered" the confession is akin to the Ryan character's view that she "coerced" confessions.[14]

In opposition to the motion, Fairstein points out that the Ryan Affirmation does not mention her by name.  In the Court's reading, the Affirmation does not name any members of District Attorney's Office or the NYPD, whose actions are often described in a passive voice.  The Affirmation was directed to the credibility of Reyes's claim of sole responsibility for Meili's rape and assault and the weaknesses in the Five's confessions.  It was submitted on the issue of vacatur and did not purport to diagnose misconduct or errors by any prosecutor or member of the NYPD.  It observed, for instance, "that in any gang attack, discrepancies among accounts and confusion about details are not unusual" but that "the fact that these weaknesses in the confessions exist gives added weight to the newly discovered evidence in this matter. . . ."  (ECF 155-24 at ¶¶ 99-100.)  Fairstein also points to passages from Burns's *The Central Park Five* and Sullivan's *Unequal Verdicts* that identified Lederer, Clements and NYPD detectives as responsible for questioning suspects.  (Pl. 56.1 Resp. ¶¶ 190.)

In her deposition, DuVernay stated that the exchange reflected what she personally would say to Fairstein if given the opportunity and that "it's one of my favorite scenes."  (ECF 182-73 at 152-53.)  In a chat message, DuVernay told the actress who played Fairstein that "I scripted for you all the things I'd say to Linda Fairstein if I ever got the chance – which will never happen."  (ECF 185-95.)  DuVernay also messaged Locke: "I know Linda heard every word."  (ECF 182-235.)

---

[14] The Court cites the Wikipedia page because it is evidence in the summary judgment record and is cited by DuVernay as a research source.  The text of Judge Titone's dissent is found in People v. Salaam, 83 N.Y.2d 51, 58 (1993).  It is critical of Fairstein because she permitted Salaam to be questioned by detectives despite the presence of his aunt, his mother and a "Big Brother" who happened to be an Assistant United States Attorney but was not his lawyer.  All other judges of the New York Court of Appeals voted to affirm the conviction of Salaam, concluding that his questioning was lawful.  The Wikipedia article quoting Titone cites to a 2002 article in the Village Voice as the source of his remark.  (ECF 155-60 at 23.)

The exchange between Fairstein and Ryan is on a somewhat different footing than the other four scenes at issue in this motion.  The claim is not directed to the words or actions of the Fairstein character but to the invented dialogue of another character, one that is also based on a real person.  Fairstein' character strongly rejects the Ryan character's views, retorting, "They said what they said freely.  They confessed," and, "You know nothing."

As observed in <u>Gaprindashvili</u>, remarks about an actual person may be defamatory even when uttered by a character in a work of pure fiction.  2022 WL 363537, at *8-9.  In its decision on the motion to dismiss in this case, this Court concluded that the Complaint plausibly alleged that the dialogue attributed to the Ryan character could be understood by a reasonable viewer as a factual assertion that Fairstein personally coerced false confessions.  <u>Fairstein</u>, 553 F. Supp. 3d at 75-76.  A reasonable jury could conclude that the Ryan character is an authoritative figure who speaks from direct knowledge, based on her assertion that "we pored over your confession tapes.  We reconstructed the events of that night minute by minute."  A reasonable jury could conclude that the Ryan character's description of a "minute-by-minute" reconstruction that scrutinized "your confession tapes" was a factual assertion that videos exist in the historical record to show that Fairstein "coerced those boys into saying what they did."

As Duvernay states, the Ryan Affirmation identified contradictions, omissions and gaps in the Five's confessions.  But it did not purport to make findings about the conduct of the NYPD or prosecutors.  Investigative practices and the existence (or not) of official wrongdoing were beyond the Affirmation's focus on the vacatur of the Five's convictions.

A jury is best positioned to weigh all of the evidence, including DuVernay's interpretation of the Ryan Affirmation, as well as source materials that identified NYPD detectives, Lederer and Clement as responsible for the questioning of suspects.  A jury also may

weigh the import of defendants' choice to use the Fairstein character as a villain that stands in for the broader criminal-justice system and DuVernay's assertion that the dialogue written for the Ryan character reflected "all the things I'd say to Linda Fairstein if I ever got the chance . . . ." A reasonable jury could find by clear and convincing evidence that defendants were recklessly indifferent to the truth of the statements attributed to the Ryan character in this scene.

The Court concludes that a reasonable trier of fact could find by clear and convincing evidence that defendants acted with reckless disregard to the truth or falsity of Fairstein's portrayal in Scene 5. Defendants' motion for summary judgment will therefore be denied a to Scene 5.

IV.    Defendants' Motion Premised on the "Subsidiary Meaning Doctrine" Will Be Denied.

Defendants separately move for summary judgment in their favor on the grounds that, as a matter of law, there can be no finding of actual malice under the "subsidiary meaning doctrine." That motion will be denied.

False or inaccurate statements made with actual malice may not give rise to liability if those statements are premised "solely on inaccuracies contained within statements subsidiary to [the speaker's] larger views." Herbert, 781 F.2d at 311. Specifically, if the statement relates to "merely a subsidiary matter to the primary, nonactionable issue," that statement may be nonactionable. Id. at 311-12. In Herbert, the plaintiff had long asserted that he was relieved from command in the Vietnam War in retaliation for reporting war crimes to superiors, and he asserted that the "60 Minutes" news program published eleven false and defamatory statements that differed from his version of events. Id. at 302-04. As to nine statements, the district court granted defendants' motion for summary judgment on actual malice grounds but denied the motion as to two statements. Id. at 304. The Second Circuit concluded

that the motion should have been granted as to the remaining two statement because they were

"subsidiary" to the primary issue of whether plaintiff had "lied about reporting war crimes . . . ."

Id. at 311-12.  The decision cautioned:

> We do not mean to imply by our holding that appellees could have published with impunity a vast collection of false statements so extensive as to portray [plaintiff] as a liar in every respect.  Such a portrayal may well be actionable.   Rather, we hold that if the appellees' published view that [plaintiff] lied about reporting war crimes was not actionable, other statements – even those that might be found to have been published with actual malice – should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery.

Id. at 312.

Church of Scientology summarized the subsidiary meaning doctrine as holding

that when a defendant's "overall 'view' of the plaintiff" was "backed by evidence that was not

known to be false, and as to the reliability of which the defendants had not shown reckless

disregard," it would be "illogical" to find that a defendant had actual malice in publishing a

"subsidiary" statement consistent with that evidence.  238 F.3d at 176.

Defendants have not demonstrated that, as a matter of law, the subsidiary meaning

doctrine applies to Fairstein's portrayal in the five scenes at issue.  In essence, defendants point

to the series' broad critique of the criminal justice system and of Fairstein specifically, urging

that they reasonably understood Fairstein to be a high-ranking official who presided over a

biased prosecution that ignored several red flags.  (See Def. Mem. at 46-47.)  But the application

of the subsidiary meaning doctrine in Herbert and Church of Scientology was premised on

plaintiff's failure to point to evidence of actual malice as to certain statements, and also was

directed to the advancement of viewpoints that are narrower than those described by defendants

here.  Here, there is evidence of actual malice sufficient to survive defendants' summary

judgment motion, and the point of view described by defendants is so broad that the subsidiary

meaning doctrine could encompass nearly any perfidious act attributed to Fairstein.

Defendants' motion for summary judgment on the subsidiary meaning doctrine

will be denied.

V.      Defendants' Motion for Summary Judgment as to the Conspiracy Claim Is Denied.

The Complaint brings a claim asserting that DuVernay, Locke and Netflix

conspired to write, produce and publish a defamatory portrayal of her.  Defendants move for

summary judgment in their favor on the basis that none of the disputed scenes are defamatory.

Alternatively, they urge that there is no evidence that defendants entered into any type of

agreement to defame Fairstein, and that defendants separately arrived upon their opinions about

her.  In response, Fairstein points to defendants' various communications in the writing,

production and marketing process regarding the series depiction of Fairstein, many of which are

quoted above.

"To establish a claim of civil conspiracy, the plaintiff must demonstrate the

primary tort, plus the following four elements: an agreement between two or more parties; an

overt act in furtherance of the agreement; the parties' intentional participation in the furtherance

of a plan or purpose; and resulting damage or injury."  Cohen Bros. Realty Corp. v. Mapes, 181

A.D.3d 401, 404 (1st Dep't 2020).  In cursory fashion, defendants assert "[t]hat what they

learned about Plaintiff led them to dislike her and what she stood for" on an independent basis,

not as a consequence of any conspiracy.  (Def. Mem. at 48.)  Of course, a speaker's subjective

dislike of a public figure does not playing a controlling role in a defamation claim against that

public figure.  Celle, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial

evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.").

In the event that a trier of fact were to conclude that defendants made a defamatory statement concerning Fairstein, the summary judgment record contains communications between defendants that could permit a trier of fact to conclude that defendants agreed to such a depiction, and took overt acts and intentionally participated in such a depiction, resulting in damage or injury.  See generally Cohen Bros., 181 A.D.3d at 404.

Defendants' motion for summary judgment on Fairstein's conspiracy claim will be denied.

## VI.    Any Motion Directed to the Claims against Locke and Netflix Individually Is Denied.

In a footnote, defendants urge that summary judgment should be granted to Netflix because Fairstein cannot demonstrate actual malice as to the series writers, and because, in any event, Netflix reasonably relied on the expertise and track record of DuVernay and her team of writers and producers.  (Def. Mem. at 29 n.13.)  As discussed, defendants' motion will be denied.  Fairstein also has pointed to notes and emails where Netflix employees or executives appear to suggest that Fairstein be portrayed in a negative light for dramatic or thematic purposes.  Typically, courts will separately consider the evidence of actual malice going toward each defendant.  See, e.g., Lovingood, 800 Fed. App'x at 845-51 (reviewing evidence of actual malice as to the Discovery Channel in light of the work of the movie's co-producers and writer). Aside from the footnote, defendants have not addressed actual malice as to Netflix in a way that distinguishes its knowledge and responsibilities from DuVernay and Locke, and there is evidence that Netflix proposed changes to heighten Fairstein's negative depiction for narrative purposes.  The motion will therefore be denied as to Netflix.

Defendants do not expressly move for summary judgment as to Locke on separate grounds, but state in a footnote that she did not write the dialogue at issue in Scene 4.  (Def. Mem. at 40 n. 18.)  Locke wrote the initial drafts of Scene 4 and defendants state that "[t]he 'surprise' dialogue Plaintiff complains of in the DNA scene in Episode 2 was not written by Ms. Locke, but added later by Ms. DuVernay."  (Def. 56.1 ¶ 198-99.)  Locke states in a declaration that she wrote five drafts of episode two and did not thereafter have further involvement with the series.  (Locke Dec. ¶¶ 46-48.)  Fairstein cites to drafts written by Locke and to her deposition testimony in which she seems to acknowledge some role in writing the final version of the scene, although the extent to which it reflects her work and not DuVernay's is not entirely clear.  (Pl. 56.1 Resp. ¶ 199; ECF 185-107 at 152-55.)  On this record, defendants have not demonstrated that the disputed aspects of Scene 4 do not reflect the work of Locke, and any motion for summary judgment specific to Locke will be denied.

FAIRSTEIN'S SANCTIONS MOTION WILL BE DENIED.

Fairstein has filed a motion to sanction DuVernay pursuant to Rules 33(b)(3) and 37(b)(2), Fed. R. Civ. P., and the Court's discretion.  (ECF 197.)  The motion urges that the Court should draw an adverse inference against DuVernay on the issue of actual malice because she engaged in the spoliation of evidence.

The motion arises from the following footnote in DuVernay's declaration in support of summary judgment: "I did not keep my copies of the books.  So as not to overload the record with multiple copies of the voluminous research materials, the exhibits referenced herein are to Ms. Swicord's copies of the same research materials that I also had from the writers' room and relied upon when writing the Series."[15]  (DuVernay Dec. ¶ 29 n.7.)  Plaintiff urges that the

---

[15] The referenced books were *Unequal Verdicts*, Burns's *The Central Park Five*, *Savage Portrayals* and *The Blood Cried Out*, all of which are referenced above, as well as Patricia Meili's memoir.  (DuVernay Dec. ¶ 29.)

Court should draw the adverse inference that the books "contained markings or notations which evidenced actual malice . . . ." (ECF 199 at 1.) Plaintiff does not urge that DuVernay was unfamiliar with the books or did not actually rely on them as research sources.

Rule 37(b)(2) provides that a court may sanction a party if it "fails to obey an order to provide or permit discovery . . . ." Rule 33(b)(3) states that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." "The plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed and we have clearly held that dismissal under this subdivision is improper in the absence of an order." Salahuddin v. Harris, 782 F.2d 1127, 1131 (2d Cir. 1986) (quotation marks and alteration omitted). In crafting a sanction under Rule 37(b), a court considers the willfulness of non-compliance, the efficacy of lesser sanctions, the duration of non-compliance and whether the non-compliant party has been warned of the consequences of non-compliance. S.E.C. v. Razmilovic, 738 F.3d 14, 25 (2d Cir. 2013).

The parties' memoranda do not address the standards for sanctioning a party under Rule 37(b)(2). Fairstein does not identify a discovery order that DuVernay violated. In support of the motion, Fairstein annexes DuVernay's December 6, 2021 response to plaintiff's document requests, her May 23, 2022 response to plaintiff's Second Set of Interrogatories and her June 6, 2022 supplemental response to those same interrogatories. (ECF 198.) DuVernay's deposition was held on June 6, 2022, and while she was questioned extensively about her research practices, the issue of whether and where she possessed original copies of the sources materials does not appear to have come up. (ECF 182-73.) Discovery did not close until August 29, 2022. (ECF 116.) Fairstein had ample time to review defendants' production of materials, take DuVernay's deposition and make any application to compel the production of her personal

copies of any relied-upon books, or to seek further discovery as to the circumstances of why DuVernay did now know their whereabouts.  She does not now identify any order that would allow for a sanction under Rule 37(b)(2).[16]

To the extent that Fairstein invokes the Court's discretion, the application for an adverse inference is denied.  To draw an adverse inference based on destruction of evidence, the movant must establish that the party with control over the evidence had an obligation to preserve it at the time of destruction, that it was destroyed with a culpable state of mind and that a reasonable trier of fact could find that the evidence would support a claim or defense. Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).  The drawing of an adverse inference most typically comes up in the context of an instruction to the jury, see id., though an adverse inference may sometimes be drawn at summary judgment.  See, e.g., Balestriere PLLC v. CMA Trading, Inc., 2014 WL 929813, at *4 (S.D.N.Y. Mar. 7, 2014) (Dolinger, M.J.).  An adverse inference "is considered a severe sanction" that requires some showing of prejudice.  See id.

Assuming arguendo that DuVernay had an obligation to maintain custody of her copies of the books, the record does not demonstrate that they were lost with a culpable state of mind or that they contained additional evidence that would go toward a claim or defense.

DuVernay has submitted a declaration under penalty of perjury stating that she did not make notations or other markings in her copies of the books and does not have a practice of taking notes in books' margins.  (DuVernay Sanctions Dec. ¶¶ 5-6 (ECF 212).)  She states that she understood that multiple copies of the books exist, that she did not keep track of her copies and that she is not sure what happened to them.  (Id. ¶ 7.)  She states that she is "confident" that

---

[16] Rule 33(b)(3) does not set forth its own sanctions mechanism.

she "never told anyone to get rid of my copies of the books," that there was nothing unique to her copies, and that she did not understand them to have a "separate significance."  (Id. ¶ 8.) Fairstein evinced no concern with the whereabouts of DuVernay's personal copies of these books prior to the footnote in DuVernay's summary judgment declaration.  Fairstein's document request sought "[a]ll 'books and films about the Central Park Jogger case [that] have portrayed Plaintiff as prosecuting The Five,'" to which DuVernay stated that she "will produce materials responsive to Request No. 64."  (ECF 198-1 at Resp. 64.)  DuVernay also responded that she would produce non-privileged documents and communications concerning the development of the Fairstein character.  (Id. at Resp. 30-32, 39-46, 54.)  Plaintiff's Second Set of Interrogatories asked DuVernay to identify by Bates Number range the documents and communications relied upon as research for Fairstein's character, and, separately, to identify by Bates Number the research relied upon when writing and editing the five disputed scenes.  (ECF 198-3.)  DuVernay responded with bullet-point lists of Bates Numbers ranges.  (Id.)  DuVernay's Supplemental Response to the Second Set of Interrogatories added more source materials, and, in addition to identifying items by Bates Number range, included information such as title, author and date. (ECF 198-2.)

The interrogatories asked DuVernay to identify source materials by Bates Number range, which suggests that Fairstein was content for her to cite materials produced in discovery. While the full text of DuVernay's deposition transcript was not submitted in connection with the summary judgment motion, the excerpts include extensive questions and answers about DuVernay's research process and the sources she relied upon.  (See, e.g., 182-73 at 84, 87-89, 102, 104-09, 114, 116, 120-22, 126, 130-31 137-39, 141, 144-47, 152.)  From the best that the Court can discern, at no point did plaintiff's counsel inquire as to the whereabouts of

DuVernay's personal copies of the books or any written notations she may have made in them. Fairstein has not pointed to any previous efforts to obtain DuVernay's personal copies or any obfuscations as to their existence or whereabouts.

Further, the summary judgment record thoroughly documents the views that DuVernay and others working on the series held about Fairstein and the underlying events. Fairstein speculates that the books "potentially contained markings and notations which spoke to Ms. DuVernay's state of mind with respect to her portrayal of Ms. Fairstein in the Series." (ECF 199 at 1-2.) DuVernay's declaration states that she does not have a practice of making notations or margin notes in books. "To the extent that plaintiff believes that there may be [relevant] remarks handwritten on the original documents, she cannot establish her right to sanctions by claiming that defendant['s] conduct deprived her of a pond in which she would like to have gone on a fishing expedition." Humphreys v. New York City Health & Hosps. Corp., 2022 WL 614677, at *5 (S.D.N.Y. Mar. 2, 2022) (Netburn, M.J.), R&R adopted, 2023 WL 155446 (S.D.N.Y. Jan. 11, 2023). The Court also affords weight to the fact that this issue arose solely because DuVernay volunteered unprompted that she did not keep her personal copies of the books and raised the matter only to explain why there were not duplicative exhibits in the summary judgment record.

Fairstein's motion to sanction DuVernay by drawing an adverse inference on the issue of actual malice is therefore denied.

FAIRSTEIN'S MOTION TO STRIKE THE WELSH DECLARATION WILL BE DENIED.

Fairstein moves to strike portions of a declaration filed by Berry Walsh, an executive producer of the series who compiled research materials for the program's writers. (ECF 186, 153.) She also moves to preclude Welsh from testifying at trial.

Welsh works for Tribeca Productions.  (Welsh Dec. ¶ 2.)  In addition to "When They See Us," he has been an executive producer of several other film and television productions.  (Welsh Dec. ¶¶ 5-8.)  Welsh is not a party to this action, nor is Tribeca Productions.

Welsh describes the artistic and cultural importance of telling stories based on real people and events, citing to several prominent films released in recent years.  (Welsh Dec. ¶¶ 13-16.)  He states that certain standard storytelling techniques, such as fictionalized dialogue and compression of time, are common, and opines that Fairstein's portrayal is "faithful to the essence of the truth."  (Id. ¶¶ 17-21.)

Fairstein urges that the declaration includes "expert opinions and previously undisclosed subject matter. . . ."  (ECF 188 at 4.)  She states that Welsh was not identified in any expert disclosures, Rule 26(a)(2)(A), Fed. R. Civ. P., and that defendants have not satisfied the reliability requirement of Rule 702, Fed. R. Evid.

In response, defendants note that Welsh was disclosed as a potential fact witness and that Fairstein elected not to take his deposition, having described it as "a waste of time and expense."  (ECF 200, citing ECF 187 ¶ 14.)  They urge that Welsh may give lay opinion testimony under Rule 701, Fed. R. Evid., and that his firsthand participation in the series production makes him knowledgeable about relevant facts at issue, as opposed to an expert who would testify based solely on training or specialized knowledge.  (ECF 200 at 4-5.)

The motion to strike portions of the Welsh Declaration will be denied.  The Court has not relied on the contents of the declaration, which mostly describe truisms about dramatizations and storytelling technique and a laundry list of popular works based on true

events.  To the extent that plaintiff moves to preclude Welsh from testifying at trial, the motion is denied without prejudice, subject to renewal as an <u>in limine</u> motion.

CONCLUSION.

Defendants' motion for summary judgment is DENIED.  Plaintiff's motion for sanctions is DENIED.  Plaintiff's motion to strike is DENIED.  The Clerk is respectfully directed to terminate the motions and the related letter-motion.  (ECF 146, 186, 197, 208.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
          September 19, 2023

- 67 -