# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Case No. 1:20-cv-08042-PKC**

**LINDA FAIRSTEIN**

**v**

**NETFLIX, INC., AVA DUVERNAY AND ATTICA LOCKE**

---

**SUPPLEMENTAL EXPERT REPORT PREPARED FOR**
**PLAINTIFF LINDA FAIRSTEIN BY ROBERT J. FISHER**

---

## <u>BACKGROUND AND QUALIFICATIONS</u>

<u>General Summary</u>

I am a veteran public relations, advertising, marketing and communications executive and counselor and journalist with 54 years of experience, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California.  During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions and industries as well as to nonprofits and government entities on a local, national and international basis as required.

While I am a communications generalist through the breadth of my professional background and experience (e.g. journalism, public relations, marketing, advertising), I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling.  My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession.  My firm has provided litigation support for over 100 civil and criminal cases (including trials) throughout the United States.  Additionally, for the past 16 years I have served as an expert witness and for decades have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image and reputation.

<u>Litigation Experience</u>

Because of my 42-year background in representing law firms and being involved in litigation and trials, handling communications and the "Court of Public Opinion," I have amassed a great amount of background and experience in the judicial process and all aspects of litigation.  This has led to me periodically receiving calls from throughout the U.S. from those who needed aid and counsel.  A brief list of some of the major litigation in which I was called to provide counsel or services, includes:

Confidential

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Trial (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

## Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble.  Generally, this related to what the public perception of the situation was, how could it be changed by those involved and what damage has or was it causing to their image, reputation or brand in the short and/or long terms.  As an example, with both of the O.J. Simpson civil and criminal trials, and in-between the two, I was regularly interviewed by local, national and international print and electronic media as an expert media information source and analyst.

## Expert Witness

In 2006, due to my long career in journalism, public relations, marketing and advertising, I began providing service to litigants as an expert witness.  Since then I have served as an expert witness in approximately 76 cases – 66 related to defamation or reputational harm - on behalf of both Defendants and Plaintiffs in 27 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, Illinois, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Maryland, Wisconsin, Louisiana, Delaware, Texas, Kentucky, Arizona, Texas, Michigan, Alabama) plus the District of Columbia.  I have provided sworn testimony in depositions, hearings, arbitration hearings and trials.  The bulk of the cases have primarily been in the areas of journalism, defamation (libel and slander) and public opinion/perception.  I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation and damage to a future professional career.

## Education

San Jose State College                Bachelor of Arts degree      Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge.
Numerous seminars, workshops and other education forums to enhance knowledge.

## Professional Experience

- New York Times                Newspaper                Reporter

- Los Angeles Beautiful, Inc.    Non-profit organization    Public Relations Director
- Harshe, Rotman & Druck    National PR Firm    Asst. Account Executive
- Burson-Marsteller, Inc.    National PR Firm    Account Executive
- Atlantic Richfield Plaza    Shopping Center    Promotion Director
- Doremus & Company    National PR Firm    Account Supervisor
- Fisher & Associates, Inc.    PR Firm (Founded 1978)    President

Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany.  I provided traditional public relations counsel and services for the Army and I also interacted with the German media/community.

Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during my four-plus decade career.

Professional Memberships

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing and communications for business as well as for specialty areas (e.g. crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g. UCLA), to national conventions (e.g. American Bar Association) and at a variety of speaking forums (e.g. weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional and national general, business, professional (e.g. legal) and trade publications, online and offline, including newspapers, magazines, newsletters and websites.  (I have also been interviewed for, quoted in and had articles written about me in local, regional and national legal publications.)

  - Defamation/Reputation Harm Articles – Among the articles I have written specifically addressing  reputation damage and defamation have included:

    - *"Image/Reputation/Brand Damage:  Does Litigation Solve the Problem?"*
    - *"Defamation:  The Stain That Can Never Be Removed."*
    - *"Negative Communications:  The Process of Absorption and Transmission."*

Confidential

- *"Harmful Media Exposure:  Beware of the Hidden Sources of Damage."*
- *"Defamation:  Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
- *"Defamation Defense:  Is there a Third Bite of the Apple."*
- *"Image/Reputation Damage From Media News Reports:  Is it Legally Actionable."*
- *"Reputation Damage Can Emanate From Actions/In-Actions…As well as Words."*
- *"Defamation Cases:  Why an Expert Witness is Vital."*

## LEGAL INFORMATION

Following is a list of cases for which I have provided testimony over the past four years.

During this period I have had my deposition taken 14 times:

- October 10, 2017 and November 6, 2017 – *Lewis M. McLeod v. Duke University, Suzanne Wasiolek, Stephen Bryan, Dr. Cecile Irvine Bradshaw (nee Cecile Starke Irvine) aka Dr. Celia Irvine Starke Irvine) aka Dr. Celia Irvine*, Superior Court, Durham County, North Carolina.

- April 18, 2018 – *UTC-10 Consulting LLC and Brian McKee v. Board of Water Supply, City and  County of Honolulu*, Circuit Court of the First Circuit Court, State of Hawaii.

- December 19, 2018 – *Ohana Military Communities, LLC and Forest City Residential Management, LLC v Cara Barber*, United States District Court, District of Hawaii.

- May 8, 2019 – *Robert Gish, M.D.; Robert G.  Gish Consultants, LLC v Celeste E. Le Sage*, Superior Court of California, County of San Diego.

- January 23, 2020 – *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

- January 31, 2020 – *Examination Board of Professional Home Inspectors and American Society of Home Inspectors, Inc. v International Association of Certified Home Inspectors and Nickifor Gromicko a/k/a Nick Gromicko.*  United States District Court for the District of Colorado.

- February 27, 2020 – *Party Animal, Inc. v Evanger's Dog and Cat Food Co, Inc., Nutripack, LLC,* United States District Court, Central District of California.

- June 12, 2020 – *Riley's American Heritage Farms, James Patrick Riley v James Elsasser, Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, David S. Nemer, Ann O'Connor, and Brenda Hamlett,* United States District Court Central District of California – Eastern Division.

- February 24, 2021 - *Hebrew Health Homes Network, Inc., Arch Plaza, Inc. Arch Plaza Properties, Inc. Aventura Plaza, Inc. Jackson Plaza, Inc., Hebrew Homes of Miami Beach, Inc., Ponce Plaza, Inc. Ponce Plaza Properties, Inc., Hebrew Home Sinai, Inc., South Beach Plaza, Inc., Hebrew Homes of South Beach, Inc., South Beach Nursing and Rehabilitation Center, Inc., University Plaza Rehabilitation and Nursing Center,*

Confidential

*Inc., University Plaza Properties, Inc., Hebrew Homes management Services, Inc. v Greenberg Traurig, P.A., a Florida Corporation, Greenberg Traurig, LLP, a New York Limited Liability Partnership and William B. Eck.* Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

- April 27, 2021 – *Russ Newman v American Psychological Association (APA), David H. Hoffman, Sidley Austin LLP and Sidley Austin (D.C.) LLP.* American Arbitration Association, Washington, D.C.

- June 18, 2021 - *The Law Offices of Brenden R. Appel and Brenden R. Appel v Georgia's Restaurant and Pancake House, Inc. and Harry Kulubis.* Circuit Court of Cook County, Illinois County Department, Law Division

- December 10, 2021 – *Legno Bastone, Inc. v Provenza Floors, Inc. and Brian J. Sullivan.* In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida Civic Action.

- March 16, 2022 – *Doan Restoration of Arizona, LLC and Doan Restoration of Michigan, LLC v Paul Curtis, Jane Doe Curtis and PR&C Specialities, LLC,* State of Michigan, In the Circuit Court for the County of Oakland.

- April 7, 2022 – *Michael Coleman and Jamael Stewart v City of Delray Beach.* In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

During this period, I have testified at the following two arbitration hearings:

- On June 6, 2016, I provided video testimony at the American Arbitration Association hearing in the case of *Lopez v. UnitedHealth Groups, Inc.*, referenced above.

- On December 11, 2019, I testified at an arbitration hearing in the case of *Susan M. Packard v Morgan Stanley,* Financial Industry Regulation Authority, Washington, D.C.

During this period I have testified in three jury trials:

- On January 24, 2020, I testified in the trial of *Harry Loveland; Charlene Loveland v Sol Del Cielo, LLC; Abraham Sandoval, Jr, an individual; M. L. Culkin Construction Company, Inc.,* Superior Court of California County of Los Angeles.

- On February 24 and March 2, 2020, I testified in the trial of *Justice Protection Project, Lenore Albert v Xcentric Ventures LLC, Yelp, Inc. George Olivo, Megan Nikolic, Pam Ragland, Karen Rozier, Sheryl Alexander and Rene Dawson,* Superior Court of California County of Orange.

- On February 25, 2020, I testified in the trial of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona.

During this period, I have testified in one bench trial:

- On September 21, 2021 I testified in the trial of *Kenneth L. Creal and Kenneth L. Creal, an Accountancy Corporation v Amitiss Nasiri,* Superior Court of the State of California for the County of Los Angeles.

Assignment

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing.  I have been also acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair.  Additionally, I am an experienced expert witness who has been involved in approximately 76 cases, 66 of which were defamation or reputational harm-related cases.  Due to that experience and expertise, I have been retained by the law firm of Nesenoff & Miltenberg LLP to serve as an expert witness in this case on behalf of the Plaintiff, Linda Fairstein.  Specifically, I have been asked to analyze and offer my insights, comments, conclusions and opinions regarding the reputation harm and damage to the Plaintiff emanating from all Causes of Action relating to Defamation cited in this lawsuit by the Plaintiff as a result of the false statements, misrepresentations and actions attributed to her in the Netflix series "When They See Us" as well as other actions and inactions of the Defendants, Netflix, Inc., Ava DuVernay and Attica Locke.

Compensation for Review, Report and Testimony

For consultations, information gathering, research and the preparation of this report, my compensation is $600 per hour.  If a deposition is required, the rate will be $700 per hour with a four hour minimum.  Should I testify at the trial for this case, the rate will be $2,500 for a half day and $5,000 for a full day of testimony.  Travel fee is $175 per hour and travel expenses would be reimbursed as well.

## CASE BACKGROUND

Overview on Litigation

According to Netflix, its series, "When They See Us" was produced for the purposes of providing the "truth" of the "Central Park Jogger" rape and the subsequent investigation and litigation from the perspective of the five youths who were arrested, investigated and incarcerated for the crime.  In what the internet TV network described as a "dramatization" of what transpired, it depicted the real people who were involved in the investigation and litigation in the series.  One of those people was Linda Fairstein (Plaintiff in this lawsuit) who, at the time, was Chief of the New York County District Attorney's Sex Crimes Prosecution Unit.  She filed this lawsuit because she contends that the portrayal of her in the series was false as it depicted her involved in activities and events which never occurred, actions she never took, and words she didn't utter – all of which resulted in severe reputational harm and damage to her professionally and personally.

Parties in this Case

A brief profile of the Plaintiff, Defendants and other pertinent individuals and entities to this case is as follows:

Plaintiff

Linda Fairstein ("Fairstein") – A resident of Boca Grande, Florida, she was formerly Chief of the New York County District Attorney's Sex Crimes Prosecution Unit.  (A more complete profile of Ms. Fairstein appears below.)

<u>Defendants</u>

- <u>Netflix, Inc. ("Netflix")</u> -  A Delaware corporation, Netflix is an American subscription-based digital streaming service and original programming production company. It offers subscription-based video on demand from a library of films and television series, 40% of which is Netflix original programming produced in-house.  It has 222 million paid members in 190 countries.  Netflix produced, edited and approved the script and released the limited series, *When They See US* on its worldwide streaming service.

- <u>Ava DuVernay ("DuVernay")</u> – A resident of California, she is a writer, director, producer and film distributor.  Ms. DuVernay co-wrote, directed, produced and served as the showrunner for the television series "*When They See Us*" in collaboration with Netflix.

- <u>Attica Locke ("Locke")</u> – A resident of California, she is a novelist as well as a screenwriter.  She co-wrote, and produced *When They See Us* in collaboration with DuVernay and Netflix.

<u>Others</u>

- <u>When They See Us ("series")</u> – Netflix series featuring four episodes which chronicled the "Central Park Jogger" attack and its aftermath including the investigation and litigation.

- <u>Kharey Wise, Raymond Santana, Kevin Richardson,Yusef Salaam, Antron McCray ("Central Park Five")</u>

- <u>Robert Morgenthau ("Morgenthau")</u> – New York County District Attorney

- <u>John Fried ("Fried")</u> – Chief of the Trial Division in the New York County District Attorney's Office.

- <u>Elizabeth Lederer ("Lederer")</u> – New York County Assistant District Attorney and lead prosecutor in the two trials of the Central Park Five.

- <u>Tim Clements ("Clements")</u> – New York County Assistant District Attorney and co-counsel to Lederer on the two trials.

- <u>Nancy Ryan "Ryan"</u> – Deputy Chief of the New York County's Trial Division

- <u>Jane Rosenthal ("Rosenthal")</u> – A business associate of DuVernay, she is the head of Tribeca Productions, Inc., a producer of the series.

- <u>New York City Police Department ("NYPD")</u>

- <u>Robin Swicord ("Swicord")</u> – A scriptwriter hired by Netflix who wrote part of the series.

- <u>Joanna Wolff ("Wolff")</u> – Netflix Manager of Publicity.

- **<u>Alison Engel ("Engel")</u> – A Director of Original Series for Netflix.**

- **<u>Christine Ball ("Ball")</u> – Publisher for Dutton, Putnam and Berkley.**

Confidential

- **Laura Rossi ("Rossi") – Owner of Lauri Rossi Public Relations firm.**

- **Esther Newberg ("Newberg") - Fairstein's Literary Agent who was a Partner of ICM and co-head of its publications department.**

- <u>Patricia Meili ("Meili")</u> – The female jogger attacked in Central Park.

- <u>Matias Reyes ("Reyes")</u> – A man who confessed to the rape and assault on Meili, in Central Park.

Fairstein Profile

A native of Mount Vernon, New York, Fairstein attended Vassar College from which she graduated with honors in 1969.  She received her law degree from the University of Virginia Law School in 1972.  Following graduation she became an Assistant District Attorney in New York County and in the mid-80's became a Deputy Chief of the Trial Division until her retirement in 2002.   In 1976, she became Chief of the County's pioneering Sex Crimes Prosecution Unit, a position she held until 2002.  During her tenure as Chief, the staff grew from four people to 40 and during that period, she trained and lectured to prosecutors and police officers throughout the United States.  After leaving that position in 2002, she entered private practice and served as a legal consultant and public speaker on issues related to sexual violence.  In addition to her legal career, Fairstein was a highly successful international best-selling author who wrote 24 books between 1996 and 2019, 16 of which were on the New York Times list of best sellers.  Her book, Sexual Violence: Our War Against Rape, published in 1993, is used as a textbook on many college and university campuses and was a New York Times Notable Book of the Year.

(More extensive information on Fairstein's legal career, business and personal involvements will be provided later in this report.)

Central Park "Jogger" Attack

Following is a brief summary of the incident in Central Park that ultimately led to the arrest and conviction of what became known as the "Central Park Five."  On the evening of April 19, 1989, approximately 30 to 40 young people, mostly African-American and Hispanic, entered Central Park and went on a rampage accosting and assaulting at least nine people and robbing them.  One of the victims was a 29-year old white woman (Meili) who was jogging in the park.  She was beaten and raped and left for dead.  A total of 10 of the youths were arrested that night including five who were charged with the attack on Meili.  They were: Kharey Wise (16), Raymond Santana (14), Kevin Richardson (14), Yusef Salaam (15) and Antron McCray (15).  When interviewed by the police all five implicated themselves in the crimes in the park and as an accomplice in the incident and also accused others of the five of the rape.  As there was little forensic evidence to tie the five youths to the rape by 1989 methods of DNA analysis, they were indicted on May 4, 1989 based on confessions and other information they provided.

Prosecution Background/Fairstein's Initial Involvement

The morning after the incident (April 20), Fairstein received a call from Sargent Robert Fiston of the NYPD asking her to assign a prosecutor to assist in the taking of video statements of those arrested.  She talked with Fried and ultimately Morgenthau about who to appoint as prosecutor.

Fairstein recommended Lederer, who was assigned to the case by Morgenthau.  Approximately 21 hours after the arrests, on the night of April 20, Fairstein met Lederer at the 20th Precinct after 8 p.m. They later moved to the 24th Precinct shortly after midnight as Lederer wanted to use designed youth rooms for her questioning.  During her time at the precincts, Fairstein served as liaison to Morgenthau, assisted Lederer and handled some administrative assignments.  Fairstein maintains that at no time did she supervise the NYPD investigation of the attacks in the park.  This was confirmed by the publicly available testimony of police officers, detectives, and supervising officers who worked on the investigation.  The following day, Fairstein did make two brief visits to the crime scene – the first with two detectives and two of the suspects, Richardson and Wise.  The second visit was with Lederer and Clements.

Pre-Trials, Trials and Fairstein Role

Two trials were held for the "Central Park Five" suspects.  On August 18, 1990, McCray, Salaam and Santana went on trial and they were each convicted of Assault and Rape in the First Degree.  On October, 23, 1990, the trial of Richardson and Wise began and that resulted in Wise being convicted of First Degree Assault and First Degree Sexual Abuse.  Because of his age, the judge waived all the charges against Richardson except for Attempted Murder in the Second Degree and Robbery, Rape and Sodomy in the First Degree.  Ultimately, Wise was in prison for 11.5 years, Salaam and Richardson each served seven years, Yusef was in prison for 6.89 months and Santana served five years.

Lederer, along with Tim Clements tried both cases and were in charge of the litigation.  During the period leading up to the trials, Fairstein provided occasional technical  support and consulted with Lederer as requested in preparation for the prosecutions and trials.  She served as a liaison to Morgenthau providing him with updates at times throughout the prosecution.  Fairstein testified at both trials.

Confession/Convictions Vacated/Lawsuit

In February 2002, an inmate (Reyes) who was imprisoned in the Auburn Correctional Center met Wise who was also serving his time there.  He confessed to the attack on Meili and his DNA matched that found on her clothing.  His account was corroborated in other ways and, as a result, the convictions of the "Central Park Five" were vacated and those still in prison were released.  Subsequently, they sued New York City, New York District Attorney Robert Morgenthau, three prosecutors including Fairstein and scores of NYPD officers and detectives.  The case settled in 2014 for $41 million.

Assessments After Convictions Are Vacated

In the wake of the Reyes confession and subsequent convictions of the Central Park Five being vacated, there was a significant amount of outrage expressed by various factions of the community from a number of perspectives, ranging from racial injustice to the five youths being "railroaded" as well as the incompetence and mishandling of the prosecution.  Most if not all of these allegations and accusations were refuted by the following:

- Prior to their trials, the Central Park Five challenged the admissibility of certain of their statements at a Huntley hearing before Judge Thomas Galligan.  Judge Galligan issued a lengthy decision, finding *"No constitutional or statutory violation by any officers or prosecutors involved."*

- The New York City Law Department Statement issued the following statement:

  *"Our review of the record suggest that both the investigating detectives and the Assistant District Attorneys involved in the case acted reasonably given the circumstances with which they were confronted on April 19, 1989 and thereafter."*

- A report issued shortly after the convictions were vacated, at the conclusion of an investigation commissioned by the NYPD, (Armstrong Report) found that no misconduct occurred during the investigation and said it *was "more likely than not that the defendants participated in an attack upon the jogger."* The report concluded:
  - There was no misconduct by police in arrests and investigations.
    - There was no evidence of coercion in questioning.
    - There was no criticism of interrogation or arrest techniques.

    (Note: In the report, the only mention of Fairstein's involvement was that she had visited the crime scene.)

- When New York City settled the Central Park Five's lawsuit, then New York District Attorney, Cyrus Vance, Jr. said *"[a]fter more than a decade in which numerous parties have investigated and litigated the case, there has been no finding of wrongdoing or unprofessional behavior by any of the prosecutors involved."*

- When New York City settled the Central Park Five's lawsuit, the New York City Law Department issued the following statement:

  *"Our review of the record suggest that both the investigating detectives and the Assistant District Attorneys involved in the case acted reasonably given the circumstances with which they were confronted on April 19, 1989 and thereafter."*

Netflix "When They See Us" Series

The series emanated from a contact on Twitter made by Raymond Santana, one of the Central Park Five, to DuVernay in which he suggested a motion picture be made about the "Jogger" incident and subsequent prosecution. She decided to make it a limited series instead and approached Netflix with the concept in April or May of 2017. Ultimately, on May 31, 2019, Netflix aired a four-part series titled "When They See Us" which chronicled the "Central Park Five" case from the incident in the park through the trials of the Central Park Five and the subsequent confession of Reyes and the sentences being vacated. DuVernay directed and co-wrote the series with Locke and others. The episodes (each at least one hour in duration) focused on the following:

- Episodes one and two focused on the young teens and their parents' vulnerability during the investigation and controversial interrogations as well as the subsequent trials and convictions.

- Episode three explored the families' turmoil during the teens' incarceration and the struggles they faced rejoining society.

Confidential

- Episode four was devoted to Wise, the oldest of the Five who had disabilities and served the longest sentence; the episode reflects his harrowing experiences in adult prison and includes dramatic interior prison monologues and flashbacks.

The series (four episodes of 74 minutes each) was viewed in 190 countries.  According to IMDB, it had 27 distributors who provided the series to all corners of the globe, including North America (e.g. U.S. Canada, Mexico), Asia (e.g. Japan, Thailand, Singapore, South Korea), Middle East (e.g. Israel, India), South America (e.g. Argentina, Brazil), Europe (e.g. France, Italy, Greece, Germany, Spain) and other geographical areas such Russia, Turkey, Australia and the United Kingdom.

███████████████████████████████████████████████ and it received 16 Emmy nominations.

Netflix gave approval to the series because its audiences liked true stories.  The series was marketed as being the truth based on research and evidence.  Initially it was marketed as *"based on the true story of the (Five)"* and *"the truth they haven't heard."*  Prior to the series airing, in a series of posts on its Twitter account between April 19 and May 28, 2019, Netflix reported:

- "The truth is coming out."  (April 19)
- "It's a powerful story that allows for the truth to come out."  (May 1)
- "It's time for the truth."  (May 2)
- "We are ready to share the truth."  (May 15)
- "The truth will finally be revealed."  (May 28)

(It is important to note that Netflix aired a disclaimer with the series that essentially stated that the series was a dramatization based on real events.  However, it was placed at the end of the credits which appear at the end of each episode instead of the beginning where it would have been more visible and warn viewers in advance that this is not entirely a true and factual accounting of what occurred.)

Pre-Series Airing Warnings

In 2017, prior to the release of the series, Fairstein learned of its development in a news article and notified Lederer.  Aware of previous periodic misinterpretations and misrepresentations of the facts of the Central Park "Jogger" incident emanating from various sources in the wake of the Reyes confession, vacated convictions and the youths' lawsuit against the City (e.g. books and Burns documentary), Fairstein and Lederer decided to contact those responsible for the creation and production of the series and advise them of the importance of ensuring that the series was factually correct.  Following are some of the actions taken in that regard:

- The first action taken was to hire a litigator.  Fairstein and Lederer hired Robert Zimet, a litigation partner at Skadden Arps, to contact Netflix and DuVernay.  On June 9, 2016, Zimet sent a letter to DuVernay and Rosenthal warning them about the importance of accuracy the past unfair treatment of them in the media and grossly inaccurate portrayals of them in public accounts in 2003 and thereafter. The letter recommended 20 sources for DuVernay's and Rosenthal's research for the series that would give them complete and accurate information.  On July 25, 2016, DuVernay and Rosenthal's attorney responded by saying they wouldn't meet with Fairstein or Lederer under any preconditions and wrote that Fairstein and Lederer had no right to preemptively object to their portrayal in the

Confidential

project and the "filmmakers" had no obligation to preserve evidence. DuVernay and Rosenthal's attorney also stressed that any portrayal of Fairstein and Lederer would be protected by the First and Fourteenth Amendments. On July 28, 2016, Fairstein's and Lederer's legal counsel sent a response letter.

- Lederer contacted DuVernay and during a telephone conversation asked her if she had reviewed specific documents in the public records when creating the series in order to avoid portraying the participants (including Fairstein) in a false and defamatory manner. DuVernay said she would not. Lederer told her that extensive information and critical documents would soon be up on the New York City Law Department's website that she could review as part of her research. DuVernay replied that she didn't want to wait for them. She asked Lederer for an interview but Lederer declined because she felt DuVernay was not interested in presenting a true account of what transpired.

- Fairstein, responding to an email from Rosenthal, an associate of DuVernay, wrote her the following message:

  *"Hello, Jane – You say you would like to hear our 'perspective.' I'd like to make clear-there are literally facts (in the form of sworn testimony, official reports and records, medical evidence just to name a few of the many forms the facts take) and evidence in this matter-from 1989,from 2002, and from the sworn depositions from 2003-2013). I don't expect you to go forward on a 'perspective' - I expect you to use facts. Have you made any progress in researching any of those things?"*

- On June 9, 2016, legal counsel for both Fairstein and Lederer sent a letter to DuVernay and Rosenthal warning them about the importance of accuracy given the past unfair treatment of them in the media and grossly inaccurate portrayals of them in public accounts in 2003 and thereafter. The letter recommended 20 sources for DuVernay's and Rosenthal's research for the series that would give them complete and accurate information. On July 25, 2016, DuVernay's and Rosenthal's attorney responded by saying they wouldn't meet with Fairstein or Lederer under any preconditions, wrote that Fairstein and Lederer had no right to preemptively object to their portrayal in the project and the "filmmakers" had no obligation to preserve evidence. DuVernay's and Rosenthal's attorney also stressed that any portrayal of Fairstein and Lederer would be protected by the First and Fourteenth Amendments. On July 28, 2016, Fairstein's and Lederer's legal counsel sent a response letter.

- As it became clear to Fairstein that DuVernay intended to portray her inaccurately, or, at the very least, act in reckless disregard as to the truth or falsity on how she would be portrayed in the film series, on July 11, 2017 she had her attorney (and Lederer's) write a letter to Netflix's legal counsel expressing concern. Netflix did not respond to this letter.

Disputed Portrayal of Plaintiff

Fairstein was depicted in episodes one, two and four of the series. Following are the words and actions attributed to Fairstein in each of the series' episodes which she contends are false, defamatory and/or are misrepresentative:

Episode I

<u>Summary</u>:  Portrayed the Plaintiff Fairstein as desperate to pin the brutal rape and beating of Meili on innocent children of color; manipulating evidence and the media to build a case against the Central Park Five; and knowingly and willingly breaking the law to build the prosecution's case. Per the Court's decision regarding Defendants' motion to dismiss, discussed more fully below, the following scenes in Episode 1 are relevant to this litigation:

- Depicted Fairstein demanding a detective speed up the interrogation of the youth so she could produce a timeline.

- Shows Fairstein on April 20 putting "post-it" notes (one with the word "Rape") on a map of Central Park at the police station and telling a detective *"they're not witnesses, they're suspects."*

- Fairstein was shown in front of the map tracing the jogger's path and adjusting the timeline saying: "*How can the same kids be raping her at the same time they are jumping bicyclists way over there?*"

- Had Fairstein directing police officers to round up black youth in Harlem, stating:

  *"I need that whole group…I need all of them. Every young black male who was in the park last night is a suspect in the rape of that woman who is fighting for her life right now. I want units out strong. Come on, guys. What did we miss? Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night.")*

- Another scene depicts Fairstein telling officers who are about to interrogate Mr. Richardson.

  *"We've got suspects, we've got kids in custody. Interrogate. Make them name their accomplices. This is not business as usual. The press is crawling all over this. No kid gloves here. These are not kids. They raped this woman. Our lady jogger deserves this."*

<u>Episode 2</u>

<u>Summary</u>:  The scene at issue in Episode 2 falsely portrays Ms. Fairstein as trying to conceal DNA evidence from defense counsel before the trials begin, directly attacking her prosecutorial ethics. Fairstein is portrayed having a conversation with Lederer and Morgenthau in which she suggests suppressing DNA evidence discovered on Meili's sock:

  *"We have a sock, those little bastards shot their wad into a sock thinking we wouldn't find it, but we found it." We have it now and the kicker is none of the defense is aware yet so we can test it right before the trial—surprise!"*

(The events in this scene never occurred.)

<u>Episode 4</u>

<u>Summary</u>:  In the final scenes of this episode, Fairstein is portrayed as singularly responsible for jailing innocent young men of color after changing the theory of the case from a single attacker

to multiple attackers. As relevant to this lawsuit, as cited in the Complaint, one scene in Episode 4 depicts Ryan and Fairstein meeting in a restaurant. Fairstein says:

> *"You're here to gloat. It doesn't matter, you simply identified a sixth rapist, I always said there may be more."*

Ryan responded: "*You said that to cover because you knew you coerced those boys…*"

(Side note: Ryan's Vacatur affirmation does not describe the confessions as coerced, nor do any of the previous court decisions. They still stand as valid – the law of the case.)

<u>Fairstein General Denials</u>

Just prior to the airing of the series, Fairstein issued a statement to Today which was published

on May 22, 2019 ("Read Linda Fairstein and Trisha Meili's Full Statements on the Netflix Series 'When They See Us'") that included these excerpts:

> *"Ava DuVernay's depiction of Linda Fairstein in her Netflix firm "When They See Us" is grossly and maliciously inaccurate. It is very clear from the trailer that Netflix and Ms. DuVernay have created a fictional dramatization of events by misrepresenting the Facts in an inflammatory and inaccurate manner."*

> *"Netflix and Ms. DuVernay are doing a terrible disservice to the public, and should be Ashamed by their irresponsibility in failing to properly research the film and effectively compromising its accuracy."*

In reference to all the false statements, allegations, misrepresentations and the false depictions of her as she was portrayed in the series, Fairstein issued the following denials in a Declaration she filed in this case on June 29, 2020:

- She never created a timeline of events related to the "Jogger" attack.

- She never gave police orders to round up *"every young black male thug"* in the projects in Harlem.

- She didn't tell NYPD officers not to use *"kid gloves"* in questioning Richardson because she wasn't even present at time of the interview.

- She never presented a theory of the case to Lederer that it was a group assault.

- She was never confronted by Lederer about a lack of evidence against the five suspects.

- She never directed the NYPD investigation at any time.

- She was not in charge of, nor participated in, either the NYPD's or Lederer's stationhouse interviews of the Central Park Five or any other witnesses or suspects nor was she present for, or did she participate in, the videotaping of any statements made by the them or any other suspects.

Confidential

- She did not engage in a discussion with Morgenthau and Lederer about DNA found on Meili's sock because this meeting did not occur nor did a conversation of this nature occur through any other means.

- She did not fight with Lederer over inconclusive DNA evidence and did not attempt to force the theory of the case on Lederer that the youths participated in the attack on Meili.

- She did not encourage Lederer to continue prosecuting the case, despite a lack of substantial evidence, because "*the whole country is watching.*"

- She did not discuss any theories of the case with Ryan in April 1989 as she was neither assigned to nor involved in the investigation of the case.

Addition denials of Fairstein not included in the Declaration:

- She never made many of the comments/words that her character said in the series – many of them racist – which were outrageously offensive.

- She was not at the station house during the 22 hours of the police investigation as depicted in the series.  She was at the New York District Attorneys' offices that entire day, and there is sworn proof of that.  She states no documentation exists that supports any of their allegations.

(Source: Wall Street Journal Op-Ed piece authored by Fairstein, published on June 10, 2019)

## **LAWSUIT INFORMATION**

The lawsuit was originally filed on behalf of the Plaintiff, Linda Fairstein, on March 18, 2020 in the United States District Court, Middle District of Florida, Fort Myers Division.  On September 24, 2020, it was transferred to the United States District Court, Southern District of New York.

Plaintiff's Position

In filing the lawsuit, the Plaintiff alleges that the Defendants marketed and promoted "When They See Us" as a true story and fact-based version of the events surrounding the Central Park Five.  She also alleges that the series falsely shows her "as the singular mastermind behind a racist plot to obtain convictions of the Central Park Five *"at any cost."* Further she maintains that the Defendants agreed and maliciously conspired together to write, produce and publish scenes in Defendants' film series, *When They See Us*, which portray Fairstein in a false and defamatory manner, are essentially a complete fabrication and depict Fairstein as singlehandedly responsible for *inter alia* the arrest, conviction and wrongful imprisonment of the Central Park Five.  Additionally, the Plaintiff makes the following assertions:

- As part of the settlement in the lawsuit brought by the Central Park Five, hundreds of thousands of pages of documents concerning the arrest, prosecution and conviction of The Five, and their subsequent lawsuit, were made publicly available on the New York City Law Department's website.  The Defendants were made aware of the availability of this information and failed to review them and/or ignored their content during the creation of the series.

Confidential

- There was never a plan of "surprise" presented by Fairstein to Lederer about the use of the sock evidence at trial.

- As a result, the Defendants falsely portrayed Fairstein - from the first scene in the series in which she appears and onward—as the "singular mastermind" behind a racist plot to obtain convictions of the Central Park Five and who was responsible for every aspect of the case against them including the prosecution.

- That the series falsely portrays her participation in the prosecution of the Five, and depicts her uttering comments that are "racist and unethical."

- That the series falsely shows her using "inflammatory language" by "referring to young men of color as 'thugs,' 'animals' and 'bastards,'" terms that she states Ryan never used.

It was further noted that there was extensive publicly-available evidence - which the Defendants were made aware of during the production process by both Fairstein and Lederer, and their counsel, Robert Zimet - that Defendants could have reviewed to obtain correct information, including hearing and trial transcripts, sworn testimony in the original proceedings against the Central Park Five and depositions taken in the subsequent lawsuit.

The Plaintiff contends that the Defendants further conspired and agreed to purposefully market and aggressively promote *When They See Us* as a true story, in order to cause substantial harm to the Plaintiff's reputation both personally and professionally in her careers as an attorney and author.

Causes of Action/Relief

The Causes of Action in this lawsuit are:

- Defamation Per Se (DuVernay)
- Defamation Per Quod (DuVernay)
- Defamation Per Se (Locke)
- Defamation Per Quod (Locke)
- Defamation Per Se (Netflix)
- Defamation Per Quod (Netflix)
- Conspiracy to Defame (All Defendants)

Through the lawsuit, the Plaintiff is seeking:

- Defamation Per Se and Defamation Per Quod (DuVernay and Locke)
  - Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
  - Punitive damages
  - Costs and attorneys' fees
  - Injunctive relief against Duvernay directing her to:
  --- Remove the posts detailed specified posts from her social media accounts
  --- Refrain from making posts on social media, or making public statements, in the future which refer to Fairstein as responsible for the prosecution of the Central Park Jogger case

--- Remove all posts from her social media accounts which refer to *When They See Us* as a true, real or fact-based story

--- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are present in *When They See Us*, as specified and which states that the series is "a fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate, that never existed in reality

--- Direct the removal of Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed

--- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein detailed as specified are removed; and

--- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted.

- <u>Defamation Per Se and Defamation Per Quod (Netflix)</u>
    - Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
    - Punitive damages
    - Costs and attorneys' fees
    - Injunctive relief against Netflix directing it to:

    --- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are present in *When They See Us*, as specified and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate that never existed in reality"

    --- Remove Parts One, Two and Four of *When They See Us* from its streaming platform, and from any other platform, service or other medium that it controls through which the film series is, or will be, viewed

    --- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein as specified are removed

    --- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted

    --- Categorize *When They See Us* on its streaming service only as a TV Drama; and

    --- Remove all posts from its social media accounts which refer to *When They See Us* as a true, real or fact-based story, including those specified.

- <u>Conspiracy to Defame (All Defendants)</u>
    - Damages in an amount to be determined at trial, including economic losses, lost career opportunities, reputational harm, and emotional distress.
    - Punitive damages
    - Costs and attorneys' fees
    - Injunctive relief against all Defendants, directing them to:

    --- Issue a public statement correcting the false and defamatory statements concerning Fairstein that are contained in *When They See Us*, as specified and which states that the series is a "fictionalized dramatization, comprised of scenes and dialogue that never happened and were never spoken, a product of the

writers' fertile imagination and desire to create a fictional villain, in Fairstein, for the public to hate that never existed in reality."

--- Remove Parts One, Two and Four of *When They See Us* from Netflix's streaming platform, and from any other platform, service or other medium through which the film series is, or will be, viewed.

--- Edit Parts One, Two and Four of *When They See Us* so that the false and defamatory scenes depicting Fairstein are removed.

--- Place a prominent disclaimer at the beginning of each episode which states that the series is a dramatization, is not a true story, and that the characters identified by their actual names in the film series are not truthfully depicted; (e) categorize *When They See Us* only as a TV Drama on any streaming service or other Medium.

--- Remove all posts from their social media accounts which refer to *When They See Us* as a true, real or fact-based story.

--- Remove all posts from their social media accounts and refrain from making posts on social media, or making public statements, in the future which refer to Fairstein as responsible for the prosecution of the Central Park Jogger case.

--- Remove from their social media accounts the posts detailed in the Paragraphs specified.

Defendants' Position

The Defendants maintain that their portrayal of the Plaintiff in the series as the prime mover in the conviction of the Central Park Five is accurate based on the following facts:

- Plaintiff was the head of the Manhattan District Attorney's Sex Crimes Unit and was the public official who oversaw and had critical involvement in and responsibility for the prosecution of the Central Park Jogger case.
- Plaintiff assigned ADA Lederer to the case.
- Plaintiff spent more than 30 hours at the police stations during the investigation of the Five as the highest-ranking prosecutor from the D.A.'s office.
- Plaintiff served as a liaison to Morgenthau.
- Plaintiff visited the crime scene with detectives and two of the Five.
- Plaintiff testified for the prosecution at suppression hearings and trial regarding her personal involvement.

The Defendants contend that although she indisputably had critical responsibility for and direct oversight of the case, was intimately involved in the investigation and prosecution, and was its prime defender even after the convictions were vacated, she is suing on the implausible premise that she had little to do with the prosecution and was defamed by being portrayed expressing views about the case and the evidence she has consistently maintained to be true.

The Defendants also maintain that the series is not a documentary but a dramatization based on true events and that this was labeled as such at the end of each episode.

Defendants' General Defenses

With respect to the Causes of Action in this lawsuit, the Defendants offer the following General Defenses:

Confidential

- Defendants deny that the Series was "false and defamatory"
- Defendants admit that Plaintiff was not the trial prosecutor but deny that she did not "personally prosecute the case."
- Defendants deny that these documents "demonstrate the falsity of the manner in which [Plaintiff] is portrayed" and object to the generic allegation that a "great many" of these "millions of pages" of unspecified documents do so.
- Defendants deny that the dramatized dialogue and portrayal of which she complains was false.
- Defendants deny Plaintiff's characterization of Defendants' "marketing and promotion" and what Defendants "led the public to believe."
- Defendants deny that Plaintiff suffered damages "[a]s a result of" any "misrepresentations" by Defendants.
- Defendants state that the Series is a dramatization labeled as being "based on" a true story.
- Defendants deny that Plaintiff is entitled to any recovery in this lawsuit.
- Defendants deny Plaintiff's characterization of her involvement in the prosecution of the case.
- Defendants deny Plaintiff's characterization of the series, deny that the dramatized dialogue and portrayal of which she complains is actionable as defamation.
- Defendants deny Plaintiff's characterization of the Series and of her involvement in the investigation and prosecution, and deny that the portrayal of which she complains is actionable as defamation.
- Defendants deny that Plaintiff had no involvement in the NYPD's questioning of witnesses or suspects or in supervising the investigation.
- Defendants purport that the events surrounding the prosecution of the Five, and testimony about those events, have long been the subject of controversy and debate.
- Defendants deny Plaintiff's characterization of the Series.
- Defendants deny that the disclaimer at the end of the credits is "barely legible."
- Defendants deny that the Series or Ms. DuVernay's social media posts contain actionable defamatory statements about Plaintiff.
- Defendants deny that the Series or Ms. Locke's social media posts contain actionable defamatory statements about Plaintiff.
- Defendants deny that the Series or Netflix's social media posts contain actionable defamatory statements about Plaintiff.

Defendants' Affirmative Defenses:

In this lawsuit, the Defendants offer the following Affirmative Defenses:

- The challenged statements are not defamatory per se.
- The challenged statements are not reasonably capable of the defamatory meaning attributed to them by Plaintiff.
- Some or all of the statements at issue are matters of opinion that are not capable of being proven true or false.
- Some or all of the statements at issue under not actionable under the First Amendment and New York law because they constitute statements of opinion or rhetorical hyperbole.
- Some or all of the statements at issue are true or substantially true, and Plaintiff cannot carry her burden of proving that they are materially false.
- Plaintiff is a public figure for purposes of this case, and Defendants did not publish with Constitutional actual malice.

Confidential

- The Series and statements at issue are in furtherance of Defendants' exercise of the constitutional right of free speech in connection with an issue of public interest, and subject to the requirements of N.Y. Civil Rights Law §76-a(2) which Plaintiff cannot meet.
- Defendants acted without malice, in both the constitutional sense and the common law sense, and without the requisite scienter, in both the constitutional sense and common laws sense, in all of their conduct relating to the challenged statements.
- Defendants acted without fault as required by the U.S. Constitution and N.Y. Civil Rights Law § 76-a(2) in all of its conduct relating to the challenged statements.
- Plaintiff is barred from recovery, in whole or in part, by the doctrine of incremental harm.
- Plaintiff is barred from recovery, in whole or in part, by the doctrine of subsidiary meaning.
- Plaintiff cannot recover damages because, at the time the challenged statement was made, her reputation had already been irreparably damaged as a result of her own behavior or by the actions of others.
- Neither Defendants nor the Series proximately caused any injury that Plaintiff allegedly suffered.
- Plaintiff's alleged damages, if any, are the result of her own conduct or the conduct of others beyond Defendants' control and for whom Defendants are not legally responsible.
- Plaintiff is libel-proof with respect to the claims asserted in this action.
- Plaintiff has failed to mitigate her damages as required by law.
- Plaintiff has not suffered special damages.
- The challenged statements are protected by and privileged under the First Amendment to the U.S. Constitution.
- The challenged statements are protected by and privileged under Article I, Section 8 to the New York State Constitution.
- By reason of the First and Fourteenth Amendments to the Constitution of the United States, Defendants are immune from liability for punitive or exemplary damages under the circumstances alleged in the Complaint.
- Plaintiff's claims for punitive or exemplary damages are barred, in whole or in part, by the operation of the applicable provisions of the U.S. Constitution and the New York Constitution respecting due process of law and/or the imposition of excessive fines.

<u>Motion to Dismiss</u>

On December 18, 2020, the Defendants filed a motion to dismiss the Complaint, which Plaintiff opposed. The Court granted the motion in part and denied the motion in part. The Court allowed the Plaintiff's claims to go forward with respect to five (5) scenes in the film series:

- **<u>Fairstein creating and manipulating a timeline of the events that took place in Central Park on the night of April 19, 1989 in order to pin the Meili rape on the Central Park Five</u>**.

  Plaintiff asserted that the film series includes a false and defamatory depiction of her attempting to create a timeline for the attack on Meili which depicts Plaintiff as "imbuing urgency" to the investigation and "hastening the interview of unaccompanied minors." Plaintiff further asserted that she was not present in any precinct at the times depicted, never questioned unaccompanied minors, never directed the NYPD's investigation, never discussed which individuals should be held in custody, and did not plot the events of April 19 on a map. Plaintiff also asserted that the depiction is inaccurate because Lederer

led the prosecutorial investigation and, in the days immediately following the attack, Meili's route through Central Park was largely unknown.

Defendants asserted that their depiction of Plaintiff creating an attack timeline was "substantially true" because it is consistent with viewpoints that Fairstein publicly espoused over the past thirty years.  Defendants further asserted that Fairstein has been an "outspoken public face" for the prosecution of the Central Park Five and publicly defended the theory behind their prosecution. Defendants also asked the Court to take "judicial notice" of a statement that Fairstein made in 2003.

The Court found that remarks the Plaintiff made in 2003 "do not render the depiction of her role in the creation of the timeline as substantially true and contradict the scene in important respects." According to the Court, if the portrayal of Plaintiff in the film series were substituted with some version of Plaintiff's 2003 remarks, it would have depicted "Lederer and the NYPD leading the investigation, and, at some later point, Fairstein's agreement with the NYPD's timeline of events.  Such a version of events would plausibly have had a different effect on the mind of the viewer, one that did not depict Fairstein as the prime mover in marshaling evidence and drawing conclusions about the events of April 19." As a result, the Court denied Defendants' motion to dismiss Plaintiff's claim that this scene is false and defamatory.

- **Fairstein advocating for withholding from defense counsel that DNA evidence was found on Meili's sock to prevent the defense from using it at trial.**

Plaintiff alleged that the scenes in the film series depicting Plaintiff's conversations with Lederer about a semen-stained sock found near the rape scene are defamatory. Plaintiff asserts that the scenes concerning the sock falsely depict her as desperate to prosecute the Central Park Five and, in truth, Lederer provided their defense counsel with DNA results from the stained stock immediately after it was discovered.

Defendants argued for dismissal of these allegations on the ground that "in the context of dramatization based on controversial historical events, an average viewer would understand the scenes to be pure opinion reflecting a dramatized debate over the strengths and weakness of the prosecution's case."

The Court found that the "average viewer would not understand 'When They See Us' to be a documentary that depicts a strictly factual version of events." However, the Court also found that the scenes relating to the sock DNA cannot be fairly classified as pure opinion because the statements and actions attributable to Plaintiff in the film series have a precise meaning, are cable of being proved or disproved and the average viewer could reasonably believe that the depictions of Plaintiff were based on undisclosed facts known to the filmmakers.

- **Fairstein's instructions to police officers during their interrogation not to use "kid gloves" when questioning the suspects.**

Plaintiff alleged that this sequence of scenes portrays her as racist and unethical. Plaintiff further alleges that she was not involved in the NYPD's questioning of witnesses or suspects at any precinct and had no supervisory role in the police investigation.

Confidential

Defendants argued that the phrases used in the scenes such as "no kid gloves here" are typical heated rhetoric used for dramatic purposes. Such a "dramatic trope" cannot support the conclusion that Plaintiff directed NYPD officers to bend rules or alter procedures.

The Court found that the Complaint plausibly alleged a defamatory meaning as to Plaintiff's instructions about suspect interrogation and that the depiction is false. The Court also found that the "average viewer could therefore interpret Fairstein's interrogation instructions as beginning the chain of events that resulted in the unjust conviction of the Central Park Five.

- **Fairstein's instructions to investigate young black males.**

  Plaintiff alleged that the film series includes a defamatory depiction of her instructions to investigate young, black males in Harlem. Plaintiff asserted that she did not instruct officers to round up young black men who were in Central Park and did not instruct officers in the case.

  Defendants argued that this scene was typical heated rhetoric used for dramatic purposes.

  The Court found that the average viewer could conclude that Fairstein directed officers to conduct a discriminatory canvas in Harlem and that the depiction has a precise meaning and is capable of being proved or disproved. The Court further found that, "[v]iewed in context and taken as a whole, the Complaint plausibly alleges that the dialogue attributed to Fairstein advocates unlawful police stops of young black males, without reasonable suspicion, thereby subjecting her to hatred and contempt. Further, the average viewer could reasonably believe that this depiction is based on facts known to defendants but unknown to the audience.

- **Ryan tells Fairstein that She "Coerced Those Boys" to confess.**

  Plaintiff alleged that the scene in which Nancy Ryan tells Plaintiff that she "coerced those boys" to confess is false because Plaintiff has never spoken with Ryan about the Reyes confession. The scene with Ryan also falsely attributes the prosecution's theory of the case to Plaintiff and falsely depicts her as responsible for implementing coercive interrogation techniques by the police.

  Defendants argued that Ryan's character merely engaged in "hyperbolic expression" which cannot be read as a factual statement that Plaintiff herself was responsible for alleged coercive tactics.

  The Court found that the average viewer could reasonably interpret Ryan's statement about Plaintiff to be a factual assertion, that Ryan's statements in the scene have a precise meaning and are capable of being proved true or false and *that "[t]he damning judgment of Fairstein's conduct voiced by a professional colleague could plausibly hold Fairstein up to shame, ridicule and contempt."* The Court also found that the average viewer could conclude that the Defendants know certain facts, unknown to the audience, which support the speaker's opinion and are detrimental to the person being discussed.

In addition, in its ruling, the court let stand the Cause of Action of Conspiracy to Defame in the lawsuit.

Confidential

**INFORMATION/INPUT RECEIVED TO FORM OPINIONS**

In connection with my preparation of this report, I have received and reviewed from the Plaintiff's legal counsel the following documents and information relating to this case:

Complaints

- Complaint:  Linda Fairstein v Netflix, Inc., Ava DuVernay and Attica Locke  (March 18, 2020)

Legal Documents

- (Portions) Hearing Transcripts:  Detective Michael Sheehan  (October 25, 1989, July 25, 1990, July 20, 2011, May 9, 2013)
- (Portions) Hearing Transcripts:  Officer E. Reynolds (October 13, 1989, July 2, 1990)
- (Portion)  Hearing Transcripts:  Detective W. Arroyo  (November 8, 1989, July 16, 1990)

- (Portions)  Hearing Transcripts:  Officer Robert Powers  (October 13, 1989, October 16, 1989)
- (Portion)  Hearing Transcript:  Detective Robert Honeyman (November 2, 1990)
- (Portion)  Hearing Transcript:  Detective John Farrell  (February 22, 2013)
- (Portion)  Hearing Transcript:  Antron McCray, Kevin Richardson and Kharey Wise (October 24, 1989)
- (Portion)  Hearing Transcripts:  Linda Fairstein  (October 27, 1989November 29, 1989, August 6, 1990, April 23, 2013)
- (Partial) Transcript of the trial of McCray, Santana and Salaam  (August 6, 1990)
- Affirmation in Response to Vacate Judgment of Conviction, New York v. Central Park Five Indictment No. 4762/89  (December 5, 2002)
- (Portion) Examination Before Trial of Linda Fairstein  (April 23, 2013)
- Order:  Perri "Pebbles" Reid v Viacom International, Inc., Viacom, Inc. and Kate Lanier (May 1, 2013)
- (Portions) Deposition of  Linda Fairstein in McCray, Richardson, Wise and Salaam litigation  (May 1, 2013)
- Appendix of Additional Exhibits in Support of Netflix's Motion to Dismiss  (May 18, 2020)
- Affidavit or Linda Fairstein  (May 27, 2020)
- Declaration of Carolyn Madden  (June 17, 2020)
- Declaration of Chad Leonard  (June 19, 2020)
- Declaration of Linda Fairstein  (June 29, 2020)
- Declaration of Linda Fairstein in Support of Opposition to Netflix, Inc.'s California Anti-Slapp Motion  (June 29, 2020)
- Declaration of Linda Fairstein  (July 1, 2020)
- Order Re change of venue  (September 24, 2020)
- Civil Docket for Case #1:20-cv-08042-PKC  (September 29, 2020)
- Motion to Dismiss Telephone Transcript  (November 16, 2020)
- Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss (December 18, 2020)

Confidential

- Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)  (January 29, 2021)
- Appendix in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss (January 29, 2021)
- Declaration of Kara Gorycki  (January 29, 2021)
- Defendants' Reply Memorandum in Support of Motion to Dismiss  (February 19, 2021)
- Opinion and Order  (August 9, 2021)
- Defendants' Answer and Additional Defenses (September 22, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Ava DuVernay (October 4, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Attica Locke (October 4, 2021)
- Plaintiff's First Request for the Production of Documents to Defendant Netflix, Inc. (October 4, 2021)
- Plaintiff's Initial Disclosures  (October 4, 2021)
- Plaintiff's Objections and Responses to Defendant Netflix's Amended First Set of Interrogatories  (December 13, 2021)
- Defendant Netflix, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Ava DuVernay's Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Attica Locke's Responses and Objections to Plaintiff's First Set of Interrogatories  (December 14, 2021)
- Defendant Netflix, Inc.'s Responses and Objections to Plaintiff's 30(B)(6) Notice to Netflix  (May 5, 2022)

## Depositions

- (Portions) Linda Fairstein  (April 23, 2013)
- (Portions) Elizabeth Lederer  (July 24, 2013)
- Robin Swicord (May 12, 2022)
- Joanna Wolff  (May 25, 2022)
- Ava DuVernay  (June 7, 2022)
- Linda Fairstein (June 15, 2022)
- **Christine Ball  (June 21, 2022)**
- **Attica Locke  (June 22, 2022)**
- **Allison Engel  (June 24, 2022)**
- **Laura Rossi  (June 30, 2022)**
- **Esther Newberg  (July 11, 2022)**

## Miscellaneous Documents

- Linda Fairstein Biography  (No date)
- Ava DuVernay interview (partial) with Kevin Richardson (No date)
- Ava DuVernay interview (partial) with Raymond Santana  (No date)
- Ava DuVernay interview (partial) with Michael Warren  (No date)
- Linda Fairstein: Ava DuVernay and Netflix:  The Lies Have It"  (No date)
- Chart of Alleged Film Series Scenes  (No date)
- Book:  Unequal Verdicts: The Central Park Jogger Trial  (No date)

- Felicity Huffman Biography  (No date)
- Book (Two portions):  Sexual Violence – Our War Against Rape  (No date)
- Vassar College Announcement Regarding Trustee Resignation  (No date)
- Netflix: When They See Us Social Campaign  (No date)
- Netflix: When They See Us WIP x Functional Campaign Timeline  (DEFS000648-000657)
- Netflix:  Untitled Central Park Project  (DEFS000692-DEFS000714)
- Central Park Five Writers' Room  (DEFS005074-005657)
- Central Park Five Research Binder  (DEFS006947-007495)
- Executive Summary  (DEFS008875-008917)
- Notes Central Park Five Documentary  (DEFS009694-009725)
- Central Park Five Timelines  (DEFS094398-094439)
- Netflix:  Editor's Work on Complete Cut  (DEFS 11037 – DEFS11041)
- Netflix:  "When They See Us aka Central Park Five PR Strategy  (DEFS144628-DEFS144666)
- When They See Us Trailer Sentiment Report  (DEFS145397-145405)
- When They See Us Fka Central Park Five PR Strategy  (DEFS144759-144767)
- The Central Park Five  (DEFS168672)
- When They See Us Task Force Agenda  (DEFS169055-169071)
- Book:  "Unequal Verdicts: The Central Park Jogger Trials  (DEFS168809-168976)
- When They See Us Communications Plan  (DEFS169113-169117)
- Federal Bureau of Investigation DNA Analysis  (May 25, 1990)
- Linda Fairstein:   Statement for the Public Safety Committee of the New York City Council (January 30, 2003)
- Agreement: Fairstein Enterprises, LLC and Doubleday  (April 4, 2007)
- Agreement:  Fairstein Enterprises, LLC and Dutton, a Division of Penguin Group (USA), Inc.  (June 15, 2009)
- The Central Park Five National Publicity Report  (May 10, 2013)
- Statements of Mayor de Blasio and Corporation Counsel Zachary W. Carter on Central Park Five Settlement  (September 5, 2014)
- Netflix: Central Park Five Writer's Room Notes, First Writer's Draft Notes PT 1-3 (January 8, 2018)
- Central Park Five Writers' Room Notes  (January 24, 2018)
- CP5 Part One Draft, Fairstein Scenes  (January 29, 2018)
- Netflix: Central Park Five Writers' Room Notes  (January 24, 2018)
- Netflix: Central Park Five Part One Linda Fairstein Scenes  (January 29, 2018)
- Netflix:  Central Park Network Notes  (February 6, 2018)
- Netflix: Central Park Five Writing Notes  (February 10, 2018)
- Statement:  "Mystery Writers of America Withdraw Fairstein Award  (November 29, 2018)
- When They See Us: Limited Series – CP&A Performance Update  (May 31, 2019)
- **Agreement between Fairstein Enterprises, LLC and Dutton  (June 4, 2019)**
- Color of Change Petition: Simon & Schuster Drop Central Park Five Prosecutor Linda Fairstein  (June 5, 2019)
- Petition:  Reopen Linda Fairstein's Cases Now  (May 13, 2020)
- Expert Witness Report of Doug Bania  (June 17, 2022)

Confidential

Letters

- Elizabeth Lederer to Michael Joseph  (No date)
- Elizabeth Lederer to Justice Thomas Galligan  (March 29, 1990)
- Linda Fairstein to Robert M. Morganthau  (January 4, 2010)
- Robert E. Zimet to Jane Rosenthal, Ava DuVernay and Tribeca Film  (June 9, 2016)
- Jonathan L. Segal to Robert E. Zimet  (July 25, 2016)
- Robert E. Zimet to Jonathan L. Segal  (July 28, 2016)
- Robert E. Zimet to David Hyman  (July 11, 2017)
- Linda Fairstein to Carey Dunne  (July 29, 2017)
- Linda Fairstein to Felicity Huffman  (September 6, 2018)
- Linda Fairstein to Anthony Friscia  (June 4, 2019)
- Christine Ball to Linda Fairstein  (June 7, 2019)
- Robert E. Zimet to Cyrus R. Vance, Jr.  (June 9, 2019)
- Matthew W. Knect, Tim Luongo and Stan German to Cyrus Vance, Jr.  (June 13, 2019)
- Linda Fairstein to Cyrus Vance, Jr.  (June 14, 22019)
- Linda Fairstein to Jim Kindler  (July 15, 2002)
- **Madeline McIntosh to Fairstein Enterprises, LLC  (June 26, 2019)**

Emails

- Nelson DeMille and Linda Stass to President and Board of Directors of Mystery Writers of America  (No date)

- **Linda Fairstein to Christine Ball  (March 12, 2013)**
- Linda Fairstein to Ben Dey  (May 5, 2016)
- Jane Rosenthal to Esther Newberg  (May 10, 2016)
- Esther Newberg to Linda Fairstein  (May 10, 2016)
- Linda Fairstein (5) to Elizabeth Lederer  (May 11, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 11, 2016)
- Felicity Huffman to Linda Fairstein  (May 11, 2016)
- Trisha Meili to Linda Fairstein  (May 11, 2016)
- Linda Fairstein to Trisha Meili  (May 11, 2016)
- Linda Fairstein to Jane Rosenthal  (May 12, 2016)
- Jane Rosenthal to Linda Fairstein  (May 12, 2016)
- Elizabeth Lederer to Jane Rosenthal  (May 13, 2016)
- Linda Fairstein (2) to Elizabeth Lederer  (May 15, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 15, 2016)
- Linda Fairstein to Elizabeth Lederer  (May 16, 2016)
- Elizabeth Lederer to Linda Fairstein  (May 16, 2016)
- Linda Fairstein (2) to Trisha Meili  (May 17, 2016)
- Trisha Meili (2) to Linda Fairstein  (May 17, 2016)
- Jane Rosenthal to Linda Fairstein and Elizabeth Lederer  (May 18, 2016)
- Jane Rosenthal to Linda Fairstein and Elizabeth Lederer  (June 2, 2016)
- Linda Fairstein to Jane Rosenthal  (June 7, 2016)
- Hannah Baker to Ava DuVernay  (March 27, 2018)
- Don Halcombe to Clarissa Colmenero  (August 2, 2018)

- **Linda Fairstein to Donna Andrews, Dan Hale and MWA Board of Directors (November 27, 2018)**
- **Linda Fairstein to Emily Canders  (November 27, 2018)**
- **Emily Canders to Linda Fairstein  (November 28, 2018)**
- Linda Fairstein to Donna Andrews  (November 28, 2018)
- **Amanda Walker to Claire Von Schilling and Stuart Applebaum  (November 29, 2018)**
- **Stuart Applebaum to Amanda Walker and Claire Von Schilling  (November 29, 2018)**
- **Claire Von Schilling to Amanda Walker and Stuart Applebaum  (November 29, 2018)**
- Donna Andrews to Linda Fairstein  (November 29, 2018)
- **Christine Ball to Linda Fairstein  (November 29, 2018)**
- **Linda Fairstein to Laura Rossi Totten  (November 29, 2018)**
- Nelson DeMille to MWA Board of Directors  (December 3, 2018)
- Linda Fairstein to Barbara (unknown)  (December 10, 2018)
- Denise Martin to Unknown Recipient  (February 15, 2019)
- Summer Simmons to Marleisee Stephens  (February 17, 2019)
- Clarissa Colmenero to Spencer Peeples, et. al.
- Linda Fairstein to Esther Newberg, Christine Ball and John Parsley  (March 4, 2019)
- **Christine Ball to Linda Fairstein  (March 4, 2019)**
- Clarissa Colmenero to Ava DuVernay, Jane Rosenthal, Berry Welsh, Jonathan King  (March 15, 2019)
- Joanna Wolff to Ava DuVernay  (May 1, 2019)
- Eliza Abramson to Joanna Wolff  (May 24, 2019)
- **Christine Ball to Emily Canders  (June 3, 2019)**
- **Emily Canders to Multiple Recipients  (June 3, 2019)**
- **Amanda Walker to Allison Dobson, Ivan Held and Claire Von Schilling  (June 3, 2019)**
- **Christine Ball to Amanda Walker  (June 3, 2019)**
- Rachel Krupitsky (PRH) to Claire Von Schilling  (June 3, 2019)
- **Linda Fairstein to Christine Ball and Esther Newberg  (June 6, 2019)**
- **Lucy Dauman to John Parsley  (June 6, 2019)**
- **Madeline McIntosh to Esther Newberg  (June 6, 2019)**
- **Sean Mandell to Emily Canders  (June 4, 2019)**
- **Emily Canders to Christine Ball, et. al.  (June 4, 2019)**
- Megan Tallmer to Elizabeth Barkley  (June 4, 2019)
- Marleisse Stephens to Ava DuVernay, Jane Rosenthal, Berry Welsh and Jonathan King  (June 4, 2019)
- Clarissa Colmenero to Unknown Recipient  (June 4, 2019)
- Clarissa Colmenero to Korey Wise, Yusef Salaam, Raymond Santanna, Antron Brown, Kevin Richardson  (June 5, 2019)
- **Claire Von Schilling to John Lovallo  (June 6, 2019)**
- **Skip Dye to Amanda Walker, Christine Ball and Claire Von Schilling  (June 6, 2019)**
- **Claire Von Schilling to Allison Dobson and Christine Ball  (June 6, 2019)**
- **John Lovallo to Claire Von Schilling  (June 6, 2019)**
- **Linda Fairstein to Christine Ball  (June 7, 2019)**

Confidential

- Robin Swicord to ███████  (June 10, 2019)
- Robin Swicord to David Kramer  (June 11, 2019)
- Robin Swicord to ███████  (June 13, 2019)
- Catherine Burke to Linda Fairstein  (October 23, 2019)
- Edward K. Cheffy and Andrew T. Miltenberg to Ava DuVernay  (March 2, 2020)
- Edward K. Cheffy and Andrew T. Miltenberg to Attica Locke  (March 2, 2020)
- Edward K. Cheffy and Andrew T. Miltenberg to David Hyman (Netflix)  (March 20, 2020)
- Martin London to Adam Liptak  (August  11, 2021)

Netflix Series

"When They See Us"  (May 31, 2019)

Social Media

- NetflixTwitter Posts  (April 19, 2019, May 8, 2019, May 9, 2019), May 11, 2019, May 12, 2019, May 14, 2019, May 15, 2019, May 28, 2019, May 31, 2019, June 1, 2019, June 4, 2019, June 12, 2019), June 15, 2019, July 5, 2019)
- Ava DuVernay Social Media Posts (April 19, 2019, May 18, 2019, May 24, 2019, May 31, 2019, June 1, 2019, June 9, 2019, June 10, 2019, June 12, 2019, June 25, 2019)
- Attica Locke Twitter Posts  (November 27, 2018, May 25, 2019, May 31, 2019, June 3, 2019, June 4, 2019, June 7, 2019, June 11, 2019)
- Linda Fairstein Instagram Posts  (No date)
- Change.org: Remove Linda Fairstein From Vassar College Board of Trustees  (No date)
- YouTube:  Interview with Linda Fairstein at Lincoln Center.  (No date)

Media Coverage

(Note:  The media coverage listed below is a representative sample of the countless articles and reports that I reviewed.  There were dozens more I reviewed that aren't listed.)

- History vs Hollywood:  "When They See Us"  (No date)
- Mystery Tribune:  "The Abyss:  Linda Fairstein, 'When They See Us,' and the Central Park Five"  (No date)
- New York Post: "Central Park Five Fallout"  (No date)
- NPQ Magazine:  "When They See Us – Reflections as a White Woman in Newspaper Leadership"  (No date)
- New York Times:  "Literary Group is Chided for Honoring Central Park Five's Prosecutor  (No date)
- Emmy:  "Seeing and Believing"  (No date)
- (Unknown): "Feeling Seen"  (No date)
- New York Post:  "Cancelling a Heroine"  (No date)
- **New York Times: "Literary Group is Chided for Honoring 'CP5" Prosecutor  (No date)**
- New York Times: "Jogger's Attackers Terrorized at Least 9 in 2 Hours"  (April 22, 1989)

- New York Times: "Genetic Tests 'Inconclusive' in Jogger Rape" (October 10, 1989)
- New York Times Magazine: "Linda Fairstein vs Rape" (February 25, 1990)
- New York Daily News: "DNA Prints Fail to ID Jogger's Attackers" (July 14, 1990)
- New York Times: "Semen Tested in Jogger Case Was Not That of Defendants" (July 14, 1990)
- Newsday: "Mother's Outburst at Jogger Trial: Proclaims Son's Innocence on Final Day of Testimony" (August 7, 1990)
- New York Daily News: "It is a Season to be Fearful" (April 19, 1994)
- Transcript: "Imus in the Morning" Radio Program (June 20, 2014)
- Variety: "Ava DuVernay Bringing Central Park Five Limited Series to Netflix" (July 6, 2017)
- USA Today: "The Real 'SVU' We Kicked on the Courtroom Doors and Got Justice for Sex-Crime Victims" (May 21, 2018)
- New York Times: "After Furor, Literary Group Withdraws Honor for 'Central Park Five' Prosecutor" (July 28, 2018)
- New York Law Journal: (Letter to the Editor): "In Defense of the Central Park 5 Prosecution" (July 31, 2018)
- Los Angeles Times: "Linda Fairstein's Past as a Prosecutor Overseeing the Central Park Five Case Causes Award Controversy" (November 27, 2018)
- New York Times: "Literary Group Under Fire For Honoring 'Central Park Five' Prosecutor" (November 28, 2018)
- Bustle: "A Literary Group Rescinds Award for Linda Fairstein Amid Outcry Over Her Role in the Central Park Five Case" (November 29, 2018)
- City Journal: "Linda Fairstein Defamed for Being Right" (December 13, 2018)
- New York Post: "The Defamation of Linda Fairstein and Other Commentary" (December 18, 2018)
- Screenrant.com: "When They See Us Trailer Teases Ava DuVernay's Central Park Five Series" (March 1, 2019)
- Netflix: Oprah Winfrey Special "When They See Us" (May 14, 2019)
- CBS This Morning: "The Untold Story: DuVernay's New Series on Wrongful Conviction of Central Park Five" (May 20, 2019)
- Today: "Read Linda Fairstein and Trisha Meili's Full Statements on the Netflix Series 'When They See Us'" (May 22, 2019)
- Hollywood Reporter: "Ava's Way" (May 22, 2019)
- The Daily Show: "Ava DuVernay – Revisiting the Central Park Jogger Case with 'When They See Us'" (May 28, 2019)
- Hollywood Reporter: "Murder They Wrote" (May 30, 2019)
- Los Angeles Times: "Power in the Retelling" (May 30, 2019)
- People: "Inside the Controversy About Linda Fairstein Central Park 5 Prosecutor Played by Felicity Huffman" (May 31, 2019)
- New York Times: "Suing the Accused Were Victims Too" (May 31, 2019)
- (Unknown): "What is 'Wilding' and What Does it Have to Do With the Central Park 5?" (May 31, 2019)
- New York Daily News: "Justice Denied" (May 31, 2019)
- Hyperallergic: "Ava DuVernay's When They See Us is a Brutal Look at a 30-Year Old Injustice." (May 31, 2019)
- The Atlantic: "How the 'Central Park Five' Changed the History of American Law" (June 2, 2019)

- Associated Press: "Publisher Drops Central Park Five Prosecutor Linda Fairstein" (June 2, 2019)
- New York Law Journal: "Weaknesses in Central Park 5 Case Were Clear All Along" (June 3, 2019)
- The Root: "Raymond Santana Supports Boycott of Central Park Five Prosecutor Linda Fairstein: 'She Has to Pay for Her Crime'" (June 3, 2019)
- Newsweek: "Central Park Five Prosecutor Linda Fairstein Resigns From Vassar College Board of Trustees" (June 4, 2019)
- Glamour: " Note on Linda Fairstein's 1993 'Woman of the Year Award'" (June 4, 2019)
- Variety: "Central Park Five Prosecutor Resigns from Vassar Board Amid 'When You See Us' Criticism" (June 5, 2019)
- Washington Post: "The Slippery Moral Calculus of Linda Fairstein " (June 5, 2019)
- New York Post: "'Cancelling a Heroine: The Mobbing of Linda Fairstein  (June 5, 2019)
- **Simple Justice: "Dramatic License: Is Fairstein Fair Game" (June 6, 2019)**
- Variety: "Limited Series and TV Movie – Contenders: In Conversation" (June 6, 2019)
- Washington Post: "A Critical Look at Linda Fairstein, an Acclaimed Sex Crimes Prosecutor" (June 6, 2019)
  New York Times: "Linda Fairstein, Once Cheered, Faces Storm After 'When They See Us'" (June 6, 2019)
- New York Post: "Canceling a Heroine" (June 6, 2019)
- Esquire: "When They See Us Sparked a Boycott Against Central Park Five Prosecutor Linda Fairstein" (June 7, 2019)
- Glamour: "What Real Reparations Could Look Like for the Exonerated Five" (June 7, 2019)
- New York Times: "Prosecutor in Rape Case Dropped by Publisher" (June 8, 2019)
- New York Times: "Trump Won't Retreat on his Central Park Five Comments" (June 19, 2019)
- Roulou.com: "Elite Black Prosecutors Honor the Exonerated With Prestigious Award" (July 7, 2019)
- Vox.com: "Who's the Villain in "When They See Us?" (June 8, 2019)
- New York Times: "Prosecutor in Rape Case is Dropped by Publisher" (July 8, 2019)
- CNN: "Linda Fairstein Resigns From Board of Alma Mater Vassar College" (June 8, 2019)
- Associated Press: "Publisher Drops Central Park Five Prosecutor Linda Fairstein  (June 8, 2019)
- Variety: "Central Park Five Prosecutor Wouldn't  Consult on Netflix Show if Producers Spoke to Accused Men" (June 9, 2019)
- New York Daily News: "'They See' $3.9 Million More: State's Quiet Payout to Central Park Five Adds to City's $41 Million for Wrongful Conviction" (June 9, 2019)
- Workers World: "Ongoing Repercussions for the Central Park Five Case" (June 9, 2019)
- New York Times: (Op-Ed by Linda Fairstein) "Netflix's False Story of the Central Park Five" (June 10, 2019)
- Wall Street Journal: "Netflix's False Series of the Central Park Five" (June 10, 2019)
- Hollywood Reporter: "Ava DeVernay Talks Linda Fairstein With Oprah Winfrey During 'When They See Us' Event" (June 10, 2019)
- Hostile Therapy (Podcast): "A Funeral for Linda Fairstein" (June 10, 2019)

- New York Times:  "Linda Fairstein Attacks Her Portrayal "When They See Us"  (June 11, 2019)
- Wall Street Journal:  (Op-Ed by Linda Fairstein) "Netflix's False Story of the Central Park Five"  (June 11, 2019)
- The Nation:  "Linda Fairstein is Still Trying to Take Down the Central Park Five  (June 13, 2019)
- Newsday: "Netflix Miniseries Spurs Prosecutor to Quit"  (June 14, 2019)
- CNN:  "Netflix Series About Central Park Five Case Accurate?"  (June 14, 2019)
- Los Angeles Times: "'Central Park Five' Goes Where Netflix Doesn't"  (June 17, 2019)
- NPR Radio (Transcript):  "Ava DuVernay Focuses on the Central Park Five's Perspective:  Now People Know"  (June 19, 2019)
- Washington Post:  "'WTSU' Tells the Important Story of the Central Park Five.  Here's What it Leaves Out"  (June 29, 2019)
- (Unknown): "Produced by Ava DuVernay  (June-July 2019)
- New York Daily News:  "A Prosecutor Unfairly Maligned:  Linda Fairstein is Ill-Treated by a TV Movie about Central Park Five  (July 1, 2019)
- **Washington Post: "A Mob is on the Loose and it's After Linda Fairstein"  (July 1, 2019)**
- Vox.com:  "A Changing America Finally Demands That the Central Park Five Prosecutors Face Consequences"  (July 8, 2019)
- Preen.PH:  "Fairstein and Lederer Deserve Their Fate After 'When They See Us' Premiered"  (July 9, 2019)
- Variety:  "Ava DuVernay on Moving from PR to Filmmaking, Directing 'When They See Us'"  (August 9, 2019)
- Vanity Fair:  "When They See Us and Chernobyl Prove Truth is Stronger Than Fiction"  (August 28, 2019)
- Essence:  "Linda Fairstein Dropped By Hollywood Literary Agency Amid 'When They See Us" Backlash"  (June 27, 2002)
- Voice:  "Ash Blonde Ambition"  (November 19, 2002)
- Associated Press:  "Key Prosecutor:  No Regrets in Central Park Five Convictions"  (November 25, 2002)
- New York Daily News:  "5 'Absolutely' Guilty Prosecutor Has No Regrets in Jogger Rape Convictions"  (November 25, 2002)
- New Yorker: "A Prosecutor Speaks Up"  (November 25, 2002)
- New York Times:  "New Light on Jogger's Rape Calls Evidence Into Question"  (December 1, 2002)
- New York Daily News:  "Joy and Rage Over Jogger 5 Morgy's Decision Clears Them of All Charges"  (December 6, 2002)
- People:  "A Radical Reversal"  (December 23, 2002)
- Legal Affairs:  "The Practitioner"  (September/October 2003)
- New York Amsterdam News:  "We Must Reopen Central Park 5 Prosecutor Linda Fairstein's Cases  (September 27, 2019)
- YouTube:  "When They See Us:  Ava DuVernay Explains Series is 'Biased and Slanted'"  (April 27, 2020)
- CBS News: "Ava DuVernay: Not Our Job to Explain to White Folk How to Combat Racism"  (May 28, 2020)
- Variety:  "Ex-Prosecutor Linda Fairstein Can Sue Netflix Over 'When They See Us' Portrayal"  (August 9, 2021)

Confidential

- Vogue:  "Ava DuVernay's Moving New Netflix Show, Colin in Black & White" (November 2, 2021)
- New York Daily News:  "Justice Delayed: How prosecutors Should and Shouldn't Revisit Past Convictions"  (November 10, 2021)
- C/Net: "Netflix: 45 of the Absolute Best TV Shows to Watch"  (December 12, 2021)

Internet Research

During the course of this assignment, I conducted research to obtain information on the internet as well as to seek clarification and definition on various subjects.

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel and the Plaintiff provided me with the information related to this case and specific to it which formed the basis for the findings, conclusions and opinions I offer in this report.

## PREFACE TO ANALYSIS AND OPINIONS

My Responsibility

Following are my conclusions and opinions as they pertain to the issues I was asked to address as outlined in the previous "Assignment" section of this report.  My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report.  The information, which emanated from both sides in this litigation, reflects both of their understandings of the facts as well as their interpretations and views of them.  In some instances, they agree on information and facts and in others they don't.  It is not my task or responsibility to determine who is right or wrong; that will be determined in court.  My responsibility is to analyze, evaluate and opine on reputational damage from the facts I know to be true.  Where there is a disagreement, since I was retained by the Plaintiff, I will presume that the information provided on her behalf is correct and will base my conclusions and opinions on it being true unless I am made aware of – or will be subsequently provided - evidence to the contrary.

Methodology Utilized

To reach these conclusions and opinions, the methodology I used in this case is consistent with that which is standard operating procedure that public relations and communications professionals as well as expert witnesses use when addressing issues and situations for clients similar to those in this case in making their determinations and offering their findings, conclusions and opinions.

- Carefully reviewed all documentation and information on the background to this dispute as well as that related to the litigation as well any other unrelated information that is germane to this the issues in contention in this case.

- Carefully analyzed the information provided regarding the dispute and their positions on it as espoused by both parties in this litigation (as reflected in the Case Background section of this report).

Confidential

- Queried Plaintiff's counsel to get additional information and clarification as needed.

- Queried the Plaintiff in this case to obtain relevant information as well as her personal assessment of the personal, professional and reputational harm and damage she incurred.

- Researched information as needed on the internet.

- Applied the principles of negative communications to this case as appropriate.

- Reviewed and analyzed previous applicable experiences I have had in my professional communications and expert witness background that may be applicable to this situation and would provide me with insight to assist me in forming my conclusions and opinions.

Relative to the last point above, it is important to note that any conclusions and opinions I offer are based on the professional background and the experience and expertise I have amassed during my 54-year background in communications (outlined in earlier sections of this report) and not emanating from surveys, studies, tests, research or other forms of qualitative or quantitative types of analyses or fact-gathering procedures.  They are based on direct experience and observations working with people, businesses and/or entities in similar situations and what transpired from them.  This is covered in Rule 702 and 703 which states:

- The use of opinions will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.

- The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education."

- Using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert is qualified; (2) the testimony addresses a subject matter on which the factfinder can be assisted by an expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case.

My five-decade-plus background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 16 years as an expert witness clearly gives credence to the validity of the following comments, conclusions and opinions I offer relating to this case.

<u>Depiction Definition</u>

The action or result of representing or characterizing someone or something in words or images. (The amalgamation of definitions by Merriam-Webster, Oxford and dictionary.com)

<u>Legal Definitions</u>

The reputational impact of the Causes of Action that I am addressing in this case and for this report all relate to Defamation.  Following are the legal definitions of each under New York law:

- <u>Defamation:</u> A statement is defamatory if it tends to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or if it tends to excite adverse,

derogatory, or unpleasant feelings or opinions about the plaintiff. "Davis v. Costa-Gavras,619 F. Supp. 1372, 1375(S.D.N.Y. 1985).

- <u>Defamation Per Se</u> – Defamation per se recognizes that some statements are so inherently damaging that reputational harm will be presumed. These include:

  - Statements charging a Plaintiff with a serious crime.
  - Statements that tend to injure another in their trade, business, or profession.
  - Statements imputing a loathsome disease on a Plaintiff.
  - Statements imputing unchastity on a woman.

- <u>Defamation Per Quod</u> – A form of defamation that is either not apparent and requires extrinsic evidence to prove its injurious nature; or is apparent but is not an actionable per se statement.  The plaintiff has to prove actual monetary damages.

- <u>Conspiracy to Defame</u> – Multiple parties joining together to conspire.   Four elements required, include:

  - An agreement between two or more parties.
  - An overt act in furtherance of the agreement.
  - The parties' intentional participation in the furtherance of a plan or purpose.
  - Resulting in damage or injury.


<u>Reputation Importance</u>

One's reputation – regardless of whether it is a person, business, organization or any other type of entity is critical because that is most often the "prism" through which the subject is view and/or judged.  According to an amalgamation of definitions offered by the Cambridge, Oxford and Merriam-Webster dictionaries, reputation is defined as:

> *"The beliefs or opinions that are generally held about someone or something. The overall quality or character as seen or judged by people in general; the opinion that people in general have about someone or something or how much respect; the estimation in which a person or thing is held."*

In the public relations profession, there is an old "tried and true" axiom that is sacrosanct and that is "perception is more important than reality."   Reputation and perception are basically interchangeable in this context.

Further, when negative communications are directed at an individual related to his/her business or profession, the reputational harm is more widespread than on a business or other type of entity primarily because it can also negatively impact the individual's personal life as well. The damage does not stop at the "office door."

<u>Impact/Effects of Reputational Damage and Harm</u>

Prior to addressing the reputational harm in this case, there is one critical factor that needs to be understood and considered when analyzing the real and potential reputational harm to the Plaintiff as a result of false statements, misrepresentations, actions and inactions of the Defendants which has already has a profound negative impact on the Plaintiff.

34

Confidential

When assessing a situation involving reputational harm and damage, it is important to understand how a stained reputation not only has a detrimental impact emanating from the Defendants in this case contributing to the negative communications but also the added negative consequences that occur when the Defendants will also be the catalyst to cause the negative communications to spread the reputational harm and damage to negatively influence even more people.  These forms of reputational "negative communications" (e.g. word of mouth) are then communicated, transmitted and perpetuated which then often result in additional exposure that takes on a life of their own both in terms of the disparaging content and widespread distribution.  Also, it is nearly impossible to counteract or negate the harmful effects of this negative reputational spread either in the short or long term.

There are several sayings that are apropos in relation to the dissemination of negative information about some person and/or entity – regardless of whether it is true or not, to wit:

- It takes years to establish a reputation and seconds to destroy it.
- You can't un-ring a bell.
- You can never wipe a slate clean
- Where there is smoke, there is fire.
- Perception is more important than reality

There are two methods of disseminating negative information (or, in this instance, a negative reputational view of the Plaintiff) – controlled and uncontrolled. "Controlled" means that one can pinpoint everyone who actually was exposed to the negative communications passed on (e.g. person-to-person remark, written communication to only certain people, a speech to a group of people) in a contained environment.   The theory here is that only these people have the information and they have hopefully not yet passed it on in any way (e.g. word of mouth, written communication).  When this occurs, there is a chance to be somewhat effective in refuting it by reaching those people and providing an opposing view to the input they received.

"Uncontrolled" means that either the negative communications resulting in the negative reputational view has already passed it on in various ways to others that cannot be identified or contacted – or it was disseminated in such a way (e.g. in the media or on internet) that there is no way of knowing exactly who received it or what they may have done with that information (e.g. disseminate it to others).  In this instance, it is impossible to ensure that everyone exposed to the negative communications has access to the opposing viewpoint – and thus, without any counter information, the original (negative) view or opinion formed as a result of it could be considered to be accurate making it extremely damaging.

In this case, it is my opinion that the "uncontrolled" method of communication would clearly apply because of the type of exposure (four-part television series) that was widespread in its reach (seen internationally by millions of people) added to the massive media exposure that resulted, the extensive internet and social media exposure as well as a campaign initiated by all three Defendants both before and after the series aired to hype and proclaim the accuracy and justification for the series while at the same time disparaging the Plaintiff.   One must reasonably add to this the "word of mouth" factor that would undoubtedly emanate from this widespread exposure.  As both the Plaintiff and the Defendants are established and prominent in their fields, the supplemental distribution of the negative communications has realistically been substantial.  Therefore, it is clear that the reputational damage was extensive, more absorbed and impactful.

Negative impressions or perceptions, once implanted can often never be completely erased or overcome – to some people completely and for others, to a certain degree.

- To change their thinking is never as effective because the person may have already given credence to the initial opinion or they will filter the second outlook through the original information received (not a clean slate).

- Even if people receive a contrary view, there could always be an element of doubt (e.g. where there is smoke, there is fire).

- If someone receives contrary views of a reputation, and doesn't know which is right, it would be human nature to take a conservative approach to steer clear of the subject of the information (e.g. "why take the chance") and go with another choice.

- People will believe a negative impression or perception of a reputation if it seems plausible and there is no counterbalancing input that refutes or challenges that information.

- As a negative reputation is communicated to others, when there is no way to identify who has received the information, there is no chance to provide them with the correct the negative impression or perception.

- When a damaged reputation is communicated and isn't countered, it can be passed on by "word of mouth."  This is particularly dangerous and harmful because when passing this view from one person to the other, the original view can be misinterpreted, exaggerated, embellished and/or distorted which could make it even more negative in nature.

- Finally, and most importantly, if the negative impression or perception cannot be stopped with the original people who heard it, it can go on forever and the spreading of it can be limitless.

In short, reputational damage through negative communications can be devastating and lasting.

## ANATOMY OF REPUTATION HARM

In her lawsuit the Plaintiff cites seven causes of action involving defamation.  As an expert witness, I am not allowed to offer a legal opinion as to the validity of those claims.  That is for the trier of fact (i.e. jury) to determine.  My professional background, experience and expertise do however qualify me to assess the reputational damage and/or negative consequences emanating from the words and actions of the Defendants which led to this litigation.  In this section I will offer my analysis and conclusions as to how the Netflix series from its conception through production and public airing as well as the actions and inactions of the Defendants have contributed to the damage to the Plaintiff's reputation and subsequent harm to her professionally and personally.

Plaintiff's Pre-Netflix Series Reputation

Prior to the issues the Plaintiff had with the series as well as the Defendants both before and after it aired which resulted in this lawsuit, the Plaintiff Fairstein had a long and distinguished career

as an attorney, civil servant and as an author (briefly profiled in the Case Background section of this report) and had two thriving careers—one in the law and one in literature. She also had an excellent personal reputation based on her contributions to community, civic, cultural, educational and other non-business endeavors.

Throughout her service for 26 years as Chief of the New York County's Sex Crimes Prosecution Unit, Fairstein was held in high-esteem for her decades of work as a prosecutor and advocate for crime victims, including her work to assist the wrongfully accused. She was considered one of the best-known prosecutors in America. Her reputation is reflected in assessments by the National Book Review which wrote that Fairstein is "widely regarded as the nation's leading legal expert on sexual assault and domestic violence" and in a New York Post article on June 5, 2019 which reported:

> "She was a pioneer woman in courts that were male-dominated and in a society and legal system that did little to achieve justice for victims of sexual crimes. Far too many sexual predators get away with their crimes, and Fairstein spent her life fighting against that. There are few women who fill the role Fairstein did, or who can step in with the institutional knowledge and power to make an impact in the criminal justice system on behalf of victims as she did."

Fairstein, who was the recipient of a multitude of honors and awards during her legal career (as well as personally), was credited for innovations and initiatives she developed in the way sex crimes are investigated and prosecuted, to include:

- She pioneered the fight to gain access in courts for victims of sexual assault, domestic violence, and child abuse.
- She made it routine to have the victim of an acquaintance rape place a call to the accused and catch him on tape admitting the crime, or even apologizing for it.
- She got police to begin systematically dispatching Crime Scene Units to collect evidence of rape as well as at murder scenes.
- She pioneered practices that made it easier for women to see a rape prosecution through to the end and to have one assistant District Attorney follow each victim throughout the whole process.
- She had a reputation as a career prosecutor who pioneered the fight to gain access in courts for victims of sexual assault"
- She pioneered the prosecutions of the first "date rape" cases in New York State.
- She instituted the first drug-facilitation rape prosecutions.
- She instituted the first use of DNA matching technology in the investigation of Sexual assault and murder cases in New York.
- She instituted the first "John Doe DNA" indictments.
- She was responsible for the country's first rape kit backlog elimination of 16,000 cold cases.

The achievements and prominence of the Sex Crimes Unit which Fairstein headed was the inspiration for the NBC Television Series "Law & Order: Special Victims Unit." Individually, Fairstein was the model for the lead character in the television movie "Farrell For the People" starring Valarie Harper and she often served as a role model, advisor and technical consultant for female prosecutors in motion pictures (e.g. "The Accused" and "Presumed Innocent"). A testament to this was contained in an article in the Washington Post:

*"For years, Fairstein was renowned for being the New York prosecutor whose sex-crimes unit not only spawned a hit TV show but gave sex crimes the prominence they deserve. She garnered numerous honors and, after she retired, wrote several best-selling novels grounded in her long career as a prosecutor. "*

She was also "in the conversation" for future high level positions in law enforcement such as that of the New York District Attorney and United States Attorney General.

Regarding her literary career, she was a highly successful author, having written 24 fiction novels, a large portion of which were on the New York Times best-selling list and one was selected as its "Notable Book of the Year."

Fairstein was active in numerous community, charitable, educational and other public service endeavors as well serving on boards of directors and contributing her time, expertise and financial resources to community, nonprofit, charitable and educational organizations.

During her distinguished career, prior to the Netflix series, she received numerous honors and awards for her legal and literary accomplishments and community service.   A partial list includes:

- New York Women's Agenda 2010 Lifetime Achievement Award
- Glamour Magazine's Woman of the Year Award
- American Heart Association Women of Courage Award
- Federal Bar Council's Emory Buckner Award for Public Service
- United Jewish Appeal Federation's Proskauer Award
- Nero Wolfe Award for Excellence in Crime Writing
- Columbia University School of Nursing's Second Century Award for Excellence in Health Care
- International Thriller Writers 2010 Silver Bullet Award
- Distinguished Woman of the Year Award - Boy Scouts of America
- Humanitarian Award – National Conference of Christians and Jews
- International Woman of Achievement – Sorophomists

Due to her achievements, national prominence and reputation in the field of seeking justice for abused women, Fairstein also functioned as a consultant and was a national lecturer and public speaker on such topics as violence against women, domestic violence, and aspects of the criminal justice system speaking to professional organizations, colleges and universities as well as healthcare professionals and women's groups.

While Fairstein, as is normal for a high profile public figure, was the source of periodic criticism for her words or actions, her reputation prior to the Netflix series was highly positive.

<u>Netflix Series Mission</u>

The Defendants have clearly stated, in information I have reviewed including records, legal filings and interviews, that their primary goal for the series was to "tell the truth" of what transpired - from the night of the attack through the subsequent litigation and their incarceration - from the point of view of the Central Park Five.  The clear inference was that they much of the prior public exposure concerning them was distorted and this series would set the record straight.

Defendants Target

To accomplish this, through the Defendants' own admission, they sought to expose the unfair treatment the Central Park Five received and the injustices they experienced from the moment they were brought in for questioning through their trials and incarceration. To do so, they basically put the justice system on trial. According to the Defendants, for storytelling purposes, the best means of doing this was to select and focus on one primary "villain" who was a real person actually involved in this situation but would also serve the dual purpose of being the "face" of all the other individuals and segments of the law enforcement and the justice system whose words and actions were responsible for the plight of the Central Park Five. The person they selected was the Fairstein. Part of the rationale for that was expressed in a writers' room recording, in which the speaker said: *"How do we treat the fact that there is on one hero helping them throughout, there is no one clear villain?" Linda Fairstein is a clear villain..."* Also, in an email on February 17, 2019, Summer Simmons, Netflix's Director of Creative Product wrote:

> *"Felicity plays Linda Fairstein (the lead prosecutor) who is our #1villain and conspirator to  lock these boys up."*

 Possibly though the most damning example of this designation of Fairstein as the villain is an email from Wolff, the Director of Publicity, to DuVernay on May 1, 2019, a few weeks before the series aired, commenting on advance clips sent to CBS. She wrote:

> *"This was just a first round of clips that the CBS producer requested. He very much feels as though Linda is the villain, and we agree these clips paint her as such. It is a way for them to frame the injustices these men faced."*

In her deposition Wolff verified that the publicity team told the CBS Producer that *"Ms. Fairstein acts as a vehicle to represent the many injustices in the series."* She also acknowledged that the clips from the series sent to CBS portrayed Fairstein as a villain.

**The extent to which she was proclaimed the villain even extended to the description of her character which was submitted to actresses that were considered to portray her in the series.  The description presented to them, as reported in Engel's deposition, read as follows:**

> **"Fairstein, with the assistance of the detectives at the 20th precinct, coerced false confessions from the five arrested teenagers following 30 straight hours of interrogation and intimidation of both the youths and their supporting adults"**

In a following section of this report on the Development of the Plaintiff's portrayal, evidence on the Defendants' efforts to single out Fairstein as the primary source of blame will be detailed.

Media Assessment of Who Was Targeted

To reinforce the contention of the Plaintiff that the Defendants specifically targeted her as the centerpiece of their representation of who was responsible for the unjust conviction and resulting harm to the Central Park Five, the mass media weighed in with its own analysis, assessment and conclusions on who the series targeted in this respect. Following are some examples.

Confidential

- *"Fairstein, who's set up to be the villain in the miniseries…"*  DuVernay's trial-by-fiction has helped to convince the media, the public, and the original Central Park 5 that Fairstein is the villain.
  (History vs Hollywood)

- *"…and the villainous characterization of Ms. Fairstein…*
  (New York Times)

- *"With the exception of Mary Queen of Scots, probably no woman has risen as high and fallen so far as Linda Fairstein, the one-time sex-crimes prosecutor now accused of railroading the convictions of five teenagers for a rape they did not commit…it is not the Central Park Five who got railroaded, but Fairstein"*
  (New York Daily News)

- *"Fairstein as she is portrayed in the film, was in the crosshairs. "The anger spilling from viewers is being aimed at Linda Fairstein, perhaps the most conspicuous villain of the story."*
  (Vox.com)

- *"When I went home, I wanted to tweet-bomb Linda Fairstein for her role in sending five innocent black boys to jail, but others beat me to it".*
  (Glamour Magazine)

- Host: *"…singled out for particular scorn was Linda Fairstein."*
  (CNN News)

- *"In DuVernay's creative retelling, Santana, Salaam, Richardson, Wise and McCord are  completely innocent.  They are victims who were railroaded by Prosecutor Linda Fairstein…"*
  (New York Daily News)

- *"In the films, Linda Fairstein comes off as one of the principal villains."*
  (The Nation Magazine)

- "Fairstein is portrayed *in the series as willing to do anything to convict even when evidence didn't support her theories."*
  (Newsday)

- *"Felicity Huffman plays sex crimes prosecutor Linda Fairstein…as the ethically compromised, sanctimonious character…"*
  (Hollywood Reporter)

- *"Whether or not you believe the narrative that DuVernay presents, you can't argue with how effectively she presents it.    …a couple of ink-stained wretches yelling on Facebook   and in the pages of The Los Angeles Times isn't nearly the same as a deep, systematic racking by an Netflix mini-series executive-produced by Oprah."*
  (Mystery Tribune)

- *"When They See Us, a Docuseries on Netflix has brought a bright unforgiving light back to  the case and has made Linda Fairstein a pariah.*
  (Hostile Therapy Podcast)

Confidential

Preemptive Warning and Response

The Plaintiff became aware of the plans by Netflix to produce and air a series about the Central Park "Jogger" case and the arrest and conviction of the Central Park Five. As there had been some sporadic comments over the years questioning her role in the investigation and litigation process, particularly after the Reyes confession and their convictions were overturned, Fairstein made every effort (in concert with Lederer and legal counsel) to caution the Defendants to do extensive research to get the facts and provide an accurate portrayal of the people and events in the series. These efforts are detailed in the earlier Case Background section of this report.

Theme/Story Development

Significant information on the process of developing the series is contained in the Case Background section of this report. The clear intent of the series, as reflected in all the information and documents I reviewed, was to present the viewpoint of the Central Park Five on what they experienced from their original arrest through the subsequent trials to the Reyes confession and their convictions being vacated. In her deposition, DuVernay demonstrated in her research a clear intention to present their story at the expense of a more balanced view. She stated that she interviewed some of the attorneys who represented the Central Park Five but never talked to anyone in law enforcement or the district attorney's office who were involved. She never personally reached out to or communicated with the Plaintiff Fairstein who she admitted she intended to focus the series on as representing the unfairness of the whole criminal justice system. While she instructed surrogates (e.g. Rosenthal) to reach out to her, she claimed that they never obtained Fairstein's input because allegedly Fairstein wanted to control the "narrative." In her deposition, she stated: *"she would not participate in any story that did not reflect her beliefs, her truth, what she saw as facts in evidence that supported her theories."*

(Side note: It is my opinion that if you are producing a four-part series based on true events that is going to be broadcast internationally and you have determined to make one individual – a real person – the most prominent nemesis to the central theme of the series – you would do anything and everything required to ensure that you received direct information and input from that person. This is particularly true when it is clear the portrayal of that person is going to be controversial and would result in severe reputational damage.)

More insight can be provided by the testimony of Swicord who was the primary writer on the first episode of the series (DuVernay also contributed to the first) which contains the bulk of the damaging portrayal of Fairstein. According to Swicord, an important and influential part of, and most of her research, came from two books:

- "The Central Park Five," a book authored by Sarah Burns
- "Unequal Verdicts The Central Park Jogger Trials" a book authored by Timothy Sullivan

(Observation: I reviewed both books and Fairstein was hardly mentioned in either. References to her were primarily in the beginning during the investigation phase and to a lesser degree when she testified at the trials. By contrast, Lederer was an integral part of the books and appeared in throughout them. Since Lederer actually led and oversaw the interviews and interrogations of the Central Park Five immediately following the incident in the park and was the lead prosecutor throughout both trials, the question arises as to why she wasn't targeted as the villain in the series instead of Fairstein. I would surmise there are three primary reasons.

- Fairstein had a much higher position as head of the Sex Crimes Unit and had more authority (even though lot less involvement in the investigation and trials).

- Fairstein had a national reputation and was had a higher profile and was well known by the news media (good for ratings).

- Fairstein became somewhat controversial and upset many people when she actively and publicly continue to maintain the Central Park Five were guilty in the immediate aftermath of the Reyes Confession.

In short, because of her higher ranking position, public profile and making her the villain made for better "theatre" and would result in higher ratings.)

In an email to ████████ on June 13, 2019, Swicord wrote *"We can back up every frame of what we made with evidence."* Yet, in relation to the two books, she admitted in her deposition that she did not know who the authors' sources were and never questioned the authors about parts of the books that were in doubt or highly contentious. She just accepted what they wrote as fact. Of other sources she cited (including an attorney who represented one of the Central Park Five in court), she stated that she never checked on the accuracy of information provided to her or verified it because she trusted them - because them seemed knowledgeable.

Equally concerning, when asked in the deposition dozens of times to explain how the source of a fact or how she knew it, her response was repeatedly *"I believe…"* In other words, she wrote a script that vilified an individual and caused severe reputational damage based on two books which contained information she "believed" was accurate (without knowing the sources or questioning the authors), from other sources who she "trusted" they were knowledgeable and wrote a script based on what she "believed." As a writer myself and former newspaper reporter, this is not how legitimate writers present information that they purport is true.

When you combine this with the obvious extreme bias of the other two primary writers of the series – DuVernay and Locke – who have publicly denigrated Fairstein, it provides a "window" of explanation and insight into why this series has caused her such reputational harm which translated to damage to her career and personal life.

<u>Development of Plaintiff Portrayal</u>

The most telling glimpse into their depiction of Fairstein in the series came from an assessment of her that was contained in some internal Netflix notes (DEFS009725)

> *"Vicious, overboard, opportunistic, would do anything to satisfy her appetite for vindictiveness as a sex crime prosecutor and enhance opportunities beyond the case."*

This is a reflection of the mindset of DuVernay who produced, directed, co-wrote and was the showrunner for the series. A "window" into her thinking was revealed throughout her deposition. She repeatedly stressed that she was convinced that Fairstein the "chief architect" and single-handedly masterminded the entire process from the time they were detained to the incarceration of the Central Park Five. She stated that Fairstein controlled all aspects of the investigation because of her relationship with and command over the police detectives and that she was in total charge of the litigation from the appointment of Lederer to supervising all aspects of the trials. Because of these assessments by DuVernay, Fairstein was targeted as the "villain" in the series. Some excerpts from her deposition reflect this:

Q  *Were there conversations in the writers' room about Ms. Fairstein being the clear villain?*

A  *Probably...most likely.*

Q  *Is her character the villain in your series?*

A  *She represents the criminal justice system as a character, and the criminal justice system is the villain. So yes, she is -- can be seen as that.*

In her deposition, DuVernay stated that Fairstein was portrayed as a real person and not a "composite" character which would lead the viewer to believe the portrayal was real and accurate as opposed to a fictional character that was a combination of many.  Despite that, she admitted the following

Q   *Is your portrayal of Linda Fairstein in the series an accurate portrayal of her role in the Central Park Jogger case?*

A   *My portrayal of Linda Fairstein as a character in the series speaks to what I believe she represents at large in this case.*

Q   *Are any aspects of Ms. Fairstein's character in the series fictionalized?*

A   *Aspects of her character. Yes. Dramatized and fictionalized, yes.*

It is clear from the following excerpts from the Writers' Room Notes of January 24, 2018, the pre-planned, intentional targeting of Fairstein by the Defendants as they sought to develop the series and write the script.  Following is a small, representative sample of the innumerable notes that define the negative portrayal of Fairstein:

> *"We don't want to introduce Fairstein in a soft way.*

> *"Have Fairstein's language be more direct, vulgar.   "These guys jacked into this sock…"*

> *"Showing Linda Fairstein with tears in her eyes twice (p32,p52) made her too sympathetic to Ava.  We don't want to connect the audience to her.  Ava doesn't want to communicate that her ferocious and malicious violence to these boys was based in a good place (her love for the victims.")*

> *"How did she come to pinning it on them? How did she say "Those are going to be the boys I'm going to pin it on"?  When did she do that math?  The whole story rests on the equation that she cooked up in that moment:  BOYS+PARK=RAPE."*

Another telling example of the Defendants' intent to make Fairstein the central villain came from Eliza Abramson, Head of Policy and Corporate Communications, APAC at Netflix in an May 14, 2019 email to Wolff, a company publicist, when she wrote:

> *"When They See Us really paints a very critical portrait of Linda Fairstein and her heavy involvement in the case.  Linda is almost absent in the 20/20 piece, minus a few interviews. Instead, they are much more focused on Elizabeth*

Confidential

> *Lederer's role. It's almost unclear what Linda's role in the case was at all. In watching the series, I think it clearly comes across that Linda is leading the case and it almost seems at times that Elizabeth has moments of doubt.  We've always known that Linda would be critical of the series...but I do think that the 20/20 series will add questions about Linda and Elizabeth's portrayals in the series and their roles in the case."*

This demonstrates that two full weeks before the airing of the series, a senior communications executive at Netflix was questioning both the extent of Fairstein's role and the critical nature of it as portrayed in the series.

**As a postscript to the inaccurate portrayal of Fairstein, Locke once put up a Twitter post claiming that Fairstein was in charge of both the media and prosecution strategy.  When asked in her deposition where she obtained that information, she couldn't cite one source but she referenced it was based on "assumptions" she made from books which she had read.  I reviewed two of the four books she cited in her depositions that she read and didn't see any such insertions in them regarding Fairstein's role.**

<u>Plaintiff's Response to the Investigation Portrayal</u>

The bulk of distorted portrayal alleged by the Plaintiff Fairstein was contained in the first episode which concentrated on the capture, interrogation and arrest of the Central Park Five.
It her deposition, she addressed several of the scenes she contends that had resulted in severe reputational harm to her.  In her deposition, stressed the inaccuracies as follows:

- In reference to her giving orders to and controlling the police detectives and micro-managing the alleged torturous and possibly illegal interrogations of the five youths.

   Q   *"As the head of the unit and the highest ranking prosecutor at the stationhouse, you were responsible for what was happening on your watch; were you not?"*

   A   *"I had no responsibility for the police investigation that was ongoing.  None.  I had no authority, once again, none at all, to change the direction of anything anybody in the NYPD was doing.  The members of the NYPD are directed by and responsive to their commanding officers and legal bureau.  So I have no power, had no power over them to direct actions or compliance.  I am their legal advisor.  I have no authority to give any police officer an order."*

- In reference to Fairstein ordering the police (using racist language) to conduct a mass roundup of all the youth rampaging in Central Park the night of the attack and rape.

   Q   *"The police were looking to round up the kids who were in the park that night rampaging, as you have described it previously.  Correct?"*

   A   *"It was a one by one by one location of the young men who had been involved.  Not a sweep.  Not a let's just go get everybody and sweep them in.  It was precision searches one-by-one."*

- In reference to directing the creation of a timeline of the actions in Central Park at the precinct for the police to show the five youth could have committed the assault and rape.

44

Confidential

   Q   *"So after the time you say you arrived at the precincts on April 20, were the police*

*and Ms. Lederer and yourself working on trying to make sense of the timing of the attacks in the park the evening before?"*

A   *"In regard to the known attacks, I had no role, either at the precinct nor the DA's Office, in trying to establish the timing of the attacks.  None.  The prosecutors had nothing to do with the creation of this timeline."*

Manipulation of "Facts" to Fit Portrayal

As stated in the Case Background section both the Plaintiff and the lawsuit tie the defamation and reputation damage to her directly from the fabrication by the Defendants of the words and actions they attributed to her as well as activities and events she was involved in which never took place.  Following are excerpts from a variety of documents I reviewed which demonstrate a clear pattern of manipulating the truth and creating false statements and situations that that misrepresent and justify their narrative of Fairstein as "mastermind and chief architect" of all the harm and damage to the Central Park Five.

- From Netflix notes on the second cut of the first episode of the series on January 15, 2019:

    *"It feels like we've lost Fairstein midway through the ep as well as the tension of whether or not these families will be able to help their sons. We feel it would be helpful to pull up scenes from both the investigation/Fairstein thread and the Family threads to address this."*

    *"After Fairstein talks to Lederer in the law library, should we see her go back to the cops to juice them to get what she needs?"*

    *"Statement to the press and then Fairstein orders the cops to bring in every thug you see in Harlem – could this section potentially come before we see the cops at Tron's apartment and Tron and parents' arrival at precinct and before Raymond Sr. arrives? This order might help to better establish we're into the next morning? From here maybe we then go to 23:00 Linda's admonition about having12 kids in custody, make them name their accomplices. Could we try bringing up the press conference before the cops bring in Antron and right after Fairstein says they are suspects not witnesses?"*

    *"Could we try bringing up the press conference before the cops bring in Antron and right after Fairstein says they are suspects not witnesses?."*

    *"Could we try moving the Fairstein/Lederer library scene up sooner?  This is such a critical moment that forces her back to the drawing board and to pressuring the cops to get the information she wants."*

- From an email written by Hannah Baker on March 27, 2018 email to DuVernay.

    *"...perhaps link her in viewers minds to Trisha as the reason why she's so passionate" about the case at various points to add to just her blind ambition and bias..."*

Confidential

> *"...she thinks they are witnesses. I have her switch the suspects theory when she's fighting Nancy Ryan for the case. Is that clear or no?  Important for me to strengthen if not. Let me know.  The moment of the switching Fairstein's line of thought wasn't completely clear to me when I read over the script, but maybe it's just a matter of noting briefly in the scene that Fairstein's emotional state is somewhat haphazard or desperate."*

- From DuVernay's deposition:

> *Q   What specific source listed here revealed to you that Ms. Fairstein was in the precinct house creating a timeline of the attacks in the park?*

> *A   This is not a documentary.  So the movements, dialogue, actions of the characters are not pinned to, connected to, backed up by specific information.*

- **From Locke's deposition:  In the original script, there was a scene discussing the DNA found on one of the youth's socks. In it, Morgenthau was told that *"Lederer has to inform the defense."*  Fairstein wasn't in the scene at the time but she was inserted into it later to ostensibly have her part of the attempt to suppress that evidence.**

- **From Engel's Deposition: In reference to a scene which depicts Fairstein directing detectives to round up kids in Harlem without using a specific list of names:**

> **Q   *And how would the men have known if Ms. Fairstein was directing police to conduct a roundup in Harlem if they had not yet been brought into a precinct house?***

> **A   *Because it's not about the literal behavior; it's about their perception of how a system was behaving with regard to them."***

> **Q   *But they would not specifically know what Ms. Fairstein was doing in regard to directing police activity, would they?***

> **A   *Again, it's not about a literal document of what happened. It is their perception of how a system treated them.***

No better example possibly exists to both demonstrate the manipulation of the facts and the willful vilification, disparagement and demonization of Fairstein than the last scene in which she appears in the series.  Late in the fourth episode, it shows her meeting with Ryan in a restaurant (a fabricated scene, the meeting never happened).  The purpose of the meeting was for Ryan to inform Fairstein that all the forensic evidence (e.g. DNA, blood, semen test results) confirm that Reyes was the killer.  One by one, Ryan puts copies of four of Fairstein's books on the table and chastises her by saying:

> *"While you were writing crime novels, Kevin, Antron, Yusef, Raymond and Korey were serving time for crimes they didn't commit."* (Or diplomatic-speak for "While you were stuffing your pockets with money, they were rotting in prison.")

At that point, Fairstein says *"I'm damned if I am going to lose a wink of sleep over it."*  She then stands up and says: *"Thank you for buying the books"* and walks off.   (Translated, that is effectively having her say, with much insensitivity, "Tough, who Cares!")

In my opinion, there was no purpose for the "book" part of this scene other than to further denigrate her.  It was the last image of her in the series and serves as sort of an epitaph to the entire vilification of her throughout the series.   The scene could have just encompassed Ryan telling her about the evidence and her defending her position.  Putting the books on the table and commenting about her writing books was not needed or appropriate to what Ryan wanted to accomplish in the meeting.  It is the type of gratuitous, deliberate attempt to disparage Fairstein that inevitably resulted in her reputation being destroyed as a result of her depiction in this series.

<u>Belief Not Knowledge</u>

Throughout the depositions of Swicord and DuVernay – both who wrote the script for Episode One – they sought to justify the words and actions they attributed to Fairstein in the series based on what they believed and not what they knew.  Two examples:

- One the most harmful pieces of dialogue attributed to Fairstein in the series was an instruction she gave to police to go to Harlem and arrest all youth they encounter:

    *"Let's get an army of blue up in Harlem. You go into those projects and you stop every little thug you see. You bring in every kid who was in the park last night."*

    In reference to this, in her deposition, Swicord wrote those words because she "believed" Fairstein was at the precinct.  In the testimony, Swicord stated:

    *"She is the face of the investigation and the face of the prosecution and so we **believed** that she would have been involved at this level."*

- In her deposition, DuVernay was also queried on the scene where Fairstein gave the police the order to go to Harlem to pick up kids.  An excerpt:

    Q    *What evidence do you have that Ms. Fairstein gave such an order?*

    A    *The spirit of the scene is based on my **belief** about Linda Fairstein's role in the investigation.  And I **believe** that she played a leading role.*

    Q    *But what source do you have that she actually gave an order to police to pick anyone up at all?*

    A    *Well, this is not a documentary. So it is not a point-to-point process. It's a creative process.*

    Q    *So the precinct scene is an invented scene?*

    A    *Yes. I stated that earlier.*

    Q    *And that means that it's not factual?*

    A    *That means that it is a fictional scene based on our research and what we **believe** to be true.*

It is my opinion that these are prime examples of negligence and reckless disregard for the truth. To make such a negative (and bigoted) portrayal about someone - which would clearly cause significant reputational harm - without taking time to check the facts or verify information is both lazy and reprehensible.  It is indicative of the mindset and carelessness that permeates the entire depiction of Fairstein in this series.

## Public Perception of Plaintiff From Portrayal

**Based on the portrayal of the Plaintiff in the series – which depicts actual events and had no clear disclaimer that the series wasn't entirely factual (see section on disclaimer to follow) – an average viewer/person could reasonably believe the following about Fairstein's involvement in the case, her actions relating to it and/or her character in general:**

- **That she was in charge of every aspect of the case against the Central Park Five from the first steps of the investigation in Central Park and throughout the trials.**
- **That she was a racist, unethical villain who was determined to jail innocent children of  color at any cost.**
- **That she singlehandedly masterminded a theory of the case against the children engaging in unlawful and unethical conduct motivated by racism.**
- **That she was in total charge of the police investigation in Central Park and various stationhouses.**
- **That she unlawfully interrogated unaccompanied minors and subsequently called for the roundup of "young black thugs."**
- **That she directed police detectives to coerce confessions which conceivably led to them being beaten in custody.**
- **That she manipulated a timeline of events for the specific purpose of pinning the rape on the Central Park Five.**
- **That she forced her colleagues to prosecute a meritless case.**
- **That she suppressed DNA evidence.**
- **That she repeatedly attempted to cover up her misconduct.**
- **That she knew from the outset that only one person was responsible for the rape and it wasn't one of the Central Park Five but her actions were fueled by racist motivations against the young men who she referred to as "thugs" and "animals."**

**These perceptions of the Plaintiff could have reasonably emanated from the series depicting words she never said, actions she never took, events she was never involved in and decisions she never made – all of which the Defendants have admitted to fabricating in their depiction of the Plaintiff in the series. The fact that the series was treated like a documentary, had no disclaimer that was visible and was treated in many media reports as a semi-factual portrayal all contributed to a negative perception of her.**

## Netflix Lack of Oversight and Accountability

**Based on the evidence, while there was clearly animus (and possibly hate) towards Fairstein on the part of Defendants DuVernay and especially Locke, which can explain the negative depiction of Fairstein through their writing (and even directing), the other Defendant, Netflix, contributed greatly to the highly negative portrayal (and resulting reputation harm) by not taking prudent actions or providing oversight of the series that they produced and aired.  This is particularly egregious given the controversial nature of**

the subject and the universal agreement pre-airing that it would harm the reputations of many who were depicted negatively in the series (e.g. Fairstein, detectives, prosecutors). This was evidenced in the deposition of Engel, the person who was responsible for overseeing the development of the script, preparing the show for production and overseeing the services through its process and launch. Much of the "blind faith" (lack of oversight) was evident in this response:

> *Q*   *In telling stories based on real-life people such as Ms. Fairstein, is any consideration given to any harm that might occur by an inaccurate portrayal?"*
>
> *A*   *Nobody is sanctioning an inaccurate portrayal.  Generally, we relied on the writers and trusted the writers and their integrity to do the research which supported what they believed to be true about the story.*

Once again, the reliance on "belief" - not facts - as addressed in the preceding section of this report.  Some other alarming admissions by Engel in her deposition:

- **Netflix did not conduct any research concerning Linda Fairstein's involvement in the Central Park Five case during the series development.  It relied on the writers' research.**

- **Netflix did not ask to see any of the research conducted by writers and producers.**

- **Netflix did see all draft scripts and gave notes to writers.**

- **Netflix did not fact check the series before it was aired.**

<u>The "Ghost" Disclaimer</u>

From all available evidence and even self-admission, the Defendants knew this series would be highly controversial and that some of some of the words and actions depicted could place some (e.g. Fairstein, detectives) in a negative light.  They also recognized the need for a disclaimer.

Generally, if a production faces a known risk, it often put a disclaimer at the start of a program or each episode of a series to effectively alert (or warn) viewers that what they see may not be entirely true so they can keep that in mind and process it as they watch the program.  As an example, the NBC television series "Law and Order" puts this disclaimer at the beginning of each program:

> *"The following story is fictional and does not depict any actual persons, entity or event."*

Additionally, the Showtime series "First Ladies" also places a disclaimer in front of its program with the following words:

> *"While this series is based on actual events, dramatic license was taken with certain scenes, dialogue and characters."*

Both programs have these 15-17 words in large type against a blank background and leave it visible for five to 10 seconds as the first visual scene when the program starts.

Confidential

Contrast this to Netflix's disclaimer for its series.  A few points:

- The disclaimer contains 65 words and is on the screen in small type and are sandwiched between other words in small type and immediately underneath is the words "When They See Us" in large bold type along with three logos.  A viewers eyes would be drawn to them, not small type.

- The credits are rolling from bottom to top.  From the disclaimer's first appearance at the bottom to it disappears at the top, it is in view for nine seconds.  This means a viewers has to read 67 words in small type which are in motion in nine seconds without distraction of large bold copy and logos immediately underneath.  (Note I tried it four times and I couldn't get past the first 20-25 words.)

- The disclaimer was at the end of the program not the beginning. Any "reasonable person" would know that very few people (probably less than 5%) watch credits at the end of a motion picture or television program to the end, if at all.  In a motion picture, they get up and leave and at home, they switch the channel or do something else.   (Side Note:  For business reasons, I often stay to watch the credits until the end at a motion picture and 98% of the time I do, I am the only one left in the theatre when the cleaning crew comes in.)

- When the credits start, Netflix has two "buttons" on the screen.  The first is to "Watch Credits" and the second is to "Watch Next Episode."  If the viewer does not press either button in approximately four sections, it automatically goes to the next episode.  Therefore, the viewer doesn't automatically see the credits (where the disclaimer is) and unless they act within four seconds, they won't.

- The disclaimer in the credits at the end of the last episode never appears.  This is arguably the most important episode not only because it is the end of the series but also is the only one that shows photos and identifies all the actors.  It is the credits that most viewers would most likely watch if any at all.  At approximately four minutes into the credits, they cut off and Netflix goes to other content.

Given that the disclaimer is in the worst possible and most unlikely place for viewers to see it (end of credits), given that the disclaimer is buried in small type on a moving screen for such a short period of time that makes it impossible for anyone to read the whole disclaimer and understand it and given that it is not even available for viewing in some situations, it is my opinion that it is totally ineffective and basically useless for its purpose.  This, in effect, adds to reputational damage because it does not alert or warn the viewers that it is a dramatization and that all words, actions and scenes depicted should not be taken as complete truth.

<u>Marketing of Series By Defendants</u>

The Defendants initially marketed the series as a true story.  Some examples:

- Locke's twitter post that stated: *"One of the most accurate portrayals of a true story"* and her writing team *"took the truth as (their) bible."*

- Swicord's email to ▮▮▮▮▮▮▮: *"We can back up every frame of what we made with evidence. Mission in writing room was to tell the truth."*

- Wolff acknowledged in her deposition that Netflix had declared in a social media post that through the series *"the truth is coming out."*   She also said the phrase *"The truth you haven't heard"* had been used.

- Netflix made statements on its social media accounts which led the public to believe that the film series' portrayal of Ms. Fairstein was truthful, factually accurate and based on documentary evidence.

- The media reported its truth depiction.   In a December 12, 2021 C/Net article: *"Ava DuVernay's When They See Us comes under the tough but essential viewing banner.  It depicts the real life events of the 1989 Central Park jogger case."*

Internally, there were doubts though. In Netflix's Communications Plan, the question was raised:

███████████████████████████████████████████████████

Eventually the Defendants changed its description to a "dramatization."   The Defendants were well aware that their series would be controversial and would cause reputational harm.   This evident in a comment in Netflix's Communications Plan which stated: ███████████████████████

███████████████████████████████████

The Defendants were well aware that Fairstein particularly would be upset by her portrayal in the series.   An excerpt from an email from Don Halcombe, Netflix Director of Communications to Clarissa Colmenero on August 2, 2018 signals their concert.

> *"Yesterday, we had the marketing kick-off meeting for Central Park Five with Ava DuVernay, Jane Rosenthal and Berry Walsh from Tribeca and Jonathan King from Participant.  I think it went well, but wanted to flag that Tribeca and Participant came up to us after the meeting and are concerned about Linda Fairstein.  She is not portrayed favorably in the scripts and was obviously not interviewed by anyone for her side of the story for the series.  She still believes the men are guilty and could be a vocal opposition and try to discredit the project in the press/on social.  We could be extra cautious but just making sure this is on your radar as I still think she carries some influence s with certain circles in NY and within the media."*

An internal email from Denise Martin, Manager of Marketing, to unknown recipients on February 17, 2019 compares Fairstein to Mark Furhman as a threat over a bad depiction in the series:

> *"For me it's as if we were working on American Crime Story: The People vs OJ and knew Mark Fuhrman was going to come after us for an early promo. What is the worst case scenario? Fairstein made headlines last for having been on the wrong side of this case. That's not to say she wouldn't be able to give us trouble.  I just have a hard time imagining anything she had to say would sway someone who might have been open to watching this in the first place."*

Indicative of the effort to villainize Fairstein in the marketing was the insistence of DuVernay in having Fairstein prominent in both the teaser and trailer for the series (as opposed to Lederer or the police).  Against the advice and cautionary warnings of both marketing and publicity

personnel at Netflix, she insisted that she be prominent in both.  This is reflected in an email from Ashley Lew to Denise Martin on February 18, 2019:

> *"If the only question that's really lingering in the back of my mind is whether this lean to Fairstein is to acquiesce to Ava/talent relations. Like would we be pushing this hard on Fairstein -- on Fairstein version if Ava wasn't pushing it? And the reason why I ask this: If the main reason why we're considering Fairstein is for Ava, then think we should call a spade a spade and say it's for talent relations versus trying to explain to others why we think this is the best approach?"*

(Note:  The reputational damage incurred by Fairstein relating to the Defendants using her to hype the series in advance – which was marketed internationally - is reflected in the viewership numbers reported by Netflix.  The teaser video was received 3.9 million views and the trailer was viewed 6.4 million times.



This anticipated adverse reaction from Fairstein was also evident through a ███████████ ███████ in the Communications Plan which was posed ██████████████████

- ███████████████████████
- ███████████████
- ████████

Tellingly, ████████████████████████████████

Finally, it is quite evident that disparaging Fairstein in the marketing (as well as in the teasers and trailers previewing the series in advance) of the series both before and after the series aired was a key part of the marketing strategy.  As was reported earlier the Defendants felt they needed a villain.  United States District Judge Kevin Castel even commented on it in a court hearing noting that DuVernay and Locke had made critical comments about Fairstein while promoting the series.

Post Series Actions/Disparagement

The campaign to vilify Fairstein was especially ratcheted up after the series aired – from Locke's vitriolic comments in social media formats  (prior the series airing, she had led a campaign to deprive Fairstein of a writer's award) to Duvernay's numerous media interviews in which she disparaged Fairstein to Netflix's active social media campaign.  The Case Background section of this report contains extensive information on their negative communications.

A social media campaign was launched by Netflix through their social media platforms (e.g. Facebook, Instagram, Twitter) to coincide with the release of the series.  (Note: partnering in this effort with Netflix was the advocacy group Color of Change which independently was one of the leaders of the "#Cancel Linda Fairstein" campaign on the internet.  The Defendants reported that the social media campaign was highly successful. (Viewer figures were reported in the Case Background section of this report.)  In terms of reputational harm, it is significant to note that as reported by Wolff in her deposition, one of the three top "conversation drivers" was anger at Fairstein.

The extent of the involvement, control and coordination of the Defendants in executing such a campaign is uniquely exemplified by its manipulation of the Central Park Five as it relates to public exposure.  This is best reflected in two emails:

- Excerpts from an email from Clarissa Collmenero to DuVernay, Rosenthal , Berry Welsh and Jonathan King on March 13, 2019:

    *"As mentioned above, we would like to hire a media trainer to work with Antron, Kevin, Korey, Raymond and Yusef prior to the press we have coming up."*
    *"Arm the men with the tools to navigate tough interview questions and topics (ranging from Trump, Linda Fairstein, NYPD, how accurate the portrayal/series is, etc."*

- An excerpt from an email by Clarissa Colmenero to unknown recipient on June 4, 2019:

    *"We just got a request for CBS This Morning for Raymond to tape something out of Atlanta tonight and comment on the Linda backlash.  Joanna and I were speaking and we were wondering if we can try to keep their comments under wraps until Oprah sits down with them on Sunday and we can tackle it there in a more controlled interview with our channels! Oprah channels that we can hopefully blow out. I'm not sure if we can keep the men quiet until then but we can try and obviously want to discuss this with Ava too so we will try to get to her ASAP about this."*

    (Observation:  In this one email paragraph, Netflix seeks to put off an interview, suppress what the men might say, manipulate the interview with Oprah and keep the men quiet until the situation is under control.)

- An excerpt from an email from Clarissa Colmenero to the Central Park Five on June 5, 2019:

    *"We want to reach out because you may be getting inquiries from press about Linda Fairstein.  We would love for you to wait on responding if possible.  We think this is something you could discuss with Oprah on Sunday night during the panel…we want to talk this through with you first."*

Basically, the Defendants sought to dictate what interviews the Central Park Five did, with whom, when, where and control what the message would be.  In short, to program them to conform to their narrative – especially as it related to Fairstein.

## SOURCES OF REPUTATION HARM

After reviewing all the aforementioned documentation and informational materials along with input I have received and factoring in the principles of reputation damage as outlined above, I believe that the Plaintiff has been harmed as a result of the false statements, misrepresentations, actions and inactions of the Defendants.

Defendants Public Disparagement of Plaintiff

Both before and after the release of the Network series, the Defendants proactively engaged in a vitriolic campaign to denigrate Plaintiff Fairstein. It appears they had a vendetta to cause her irreparable professional and reputational arm. Foremost were the efforts of Locke to disparage Fairstein. As an example, following are a series of "tweets" negative to Fairstein which she placed on Twitter.

- *"...was an "Unrepentant liar" and deserved "all the "rage and hate and consequences that are coming her way."*

- *"This blood is on Linda Fairstein's hands."*

- *"But fuck it: Linda Fairstein is trash, was trash, will always be trash."*

- *"This morning she showed us exactly why she deserves all the rage and hate and consequences that are coming her way. She is an unrepentant liar. Fuck her."*

- *"LADY, you stay seeing mobs where they ain't none. That's what got you in this trouble in the first place."*

- *"These women deserved better from NYPD and Linda Fairstein. By locking in on five children as rapists, many more lives were ruined."*

- *"She is almost singlehandedly responsible for the wrongful incarceration of the Central Park Five."*

- *"She has never apologized or recanted her insistence on their guilt for the most heinous of crimes, "guilt" based solely on evidence procured through violence and ill treatment of children in lock up."*

- *"Just because she has a flourishing publishing career does not mean we should ignore her past--or continued unwillingness to accept responsibility for ruining five innocent [sic] men's lives."*

- *"Ms. Fairstein deserved al the rage and hate and consequences that are coming her way."*

- *"...willingness to overlook Linda Fairstein's racist actions is very upsetting."*

- *"She tried to defend herself, couldn't, and started to duck and weave (with more lies)."*

- *"If you think that Linda Fairstein acted professionally and responsibly and without prejudice or malice in the Central Park Five case - which, don't get it twisted, she did lead - then I'm not sure who the real bully is."*

- *"I am generally someone who always tries to find the humanity in people, to understand the psychology behind what makes even people I hate act the way they do."*

**Locke also disparaged Fairstein in a number of written communications with friends and colleagues:**

Confidential

- **Email to** ▮▮▮▮▮▮▮▮▮**:** *"Linda's getting some comeuppance but not enough…but I'll take it."*

- **Locke to DuVernay:** *"She's so arrogant."* **(To which DuVernay replied:** *"She's about to feel it all."*

- **Email to** ▮▮▮▮▮▮**:** *"The ass-kicking has been a pleasure."*

DuVernay was also quite critical and disparaging of Fairstein at every opportunity she had both before the series aired, when she was promoting it, and after it aired when she was commenting on it. Some examples include the following.

- *"It is widely reported that detectives, influenced by the head of the Manhattan District Attorney's Sex Crimes Unit, Linda Fairstein, coerced the young men, then just seventh and eighth graders, into signing confessions."*

- *"These men are broken because of her actions. She has done more than enough damage."*

- *"I think it's important that people to be held accountable.  But I think it would be a tragedy if this story and the telling of it…came down to one woman being punished for what she did.  And so the goal of this – okay, Linda Fairstein…all these people need to be held accountable."*

- *"Not a single publication needs to give (Ms. Fairstein) a chance to speak.  She has done more than enough damage."*

Finally, the disparagement of Fairstein by the Defendants is not in question.  This was attested to by United States District Judge Kevin Castel who opined:

> *"The question of whether defendants actually agreed to defame Fairstein is properly subject to discovery, but the opprobrium expressed toward Fairstein in certain of defendants' public comments lends some plausibility to the claim."*

<u>Negative Impact from Social Media Resulting from Netflix Series</u>

Almost immediately after the airing of the first episode, a veritable "firestorm" of negative social media comments was leveled against Fairstein.  As reported by Netflix, following is a glimpse of the impact the series generated on social media:

- On Twitter, 460,000 "tweets" were recorded during the launch weekend.
- Top conversation drivers and anger towards Fairstein ranked #3.
- As of January 2020, after the series aired, over 35 million impressions were recorded on Facebook and Twitter as well as 14.8 million video views and 1.45 engagements on other platforms.

After the series debut, the hashtag #CancelLindaFairstein was instituted on Twitter with generated such demeaning, denigrating and disparaging comments as:

- *"Just finished When they see us on Netflix, broke my heart, most of all I never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail, and suffer things no child should, so fuck you linda, say hi to the devil for me #CancelLindaFairstein."*

- *"There's absolutely NO excuse for her behavior. I can now understand why people want to #CancelLindaFairstein."*

- *"What #LindaFairstein did to these young men is beyond disgusting & excruciating to watch. Thank u @netflix for bringing their story to light."*

- *"Karmas a bitch Linda. Tsk. What goes around comes around #CancelLindaFairstein."*

- *"This bitch needs to be locked tf up and die in jail."*

- *"I hope the bitch dies she should rot in jail."*

- *"She should get 13 years in jail - the same as Korey Wise who served the longest sentence. Those she put behind bars were innocent."*

- *"There's a special V.I.P spot in hell for this wretched deceitful bitch may she suffer for the pain misery & heartache she caused…"*

- *"Having Linda Fairstein on Vassar's Board is utterly despicable.  She destroyed the lives of the innocent now involved in the Central Park Jogger's case."*

- *"Forget cancelling her put her ass in jail in a mens jail where she can be raped and maned like those poor boys #cancellindafairstein*

- *"I hope you burn in hell, you're a parasite to this society I really hope you die like a parasite for what you have done."*

- *"What a disgusting piece of human garbage.  Burning in hell is not good enough punishment for her!  Why isn't this rapist b\*itch in jail for what she has done?????  My heart bleeds for the injustice that has been done."*

- *There's a special V.I.P. spot in hell for this wretched deceitful bitch may she suffer the pain misery & heartache she caused, she needs to be locked up for destroying the lives of those men."*

- ***"You are a monster, a horrible racist woman."***

- ***"You're a disgusting bitch @LindaFairstein!  I hope you rot in hell.  You're trash."***

- ***"Linda, how do you live with yourself.  From one white successful women to another, you are a pig a twit and should be in Guantanamo r better yet Rikers where you send innocent kids."***

- ***"@LindaFairstein also how do you feel that ultimately they got the justice they deserved and made your lying sack of shit ass look like a fucking crazed racist maniac."***

Confidential

- **"Linda only an evil twit wouldn think it's winning to build a resume on jailing innocent people.  A evolved himan would want to only jail guilty and only want to. You are PAF that's Psycho.  Hope they run you out of NYC."**

- **"@LindaFairstein how do you feel being a racist fucking devil and that you effectively
  ruined the lives of 5 black men".**

- *"Just finished "When They See Us on Netrlix, broke my heart most of all I never hated someone as much as I hate Linda Fairstein, she made innocent children go to jail and suffer things no child should, so fuck you Linda say hi to the devil for me."*

- *"She is pure evil."*

- *"What Linda Fairstein did to these young men is beyond disgusting and excruciating watch."*

- *"She lied and made things up about innocent kids karma is a bitch Linda.  Tsk tsk tsk what goes around comes around."*

- *"This bitch needs to be locked up and die in jail."*

- *"Hope the bitch dies and rots in jail."*

- *"She's a sad excuse for a human being and should have lost her job, she is honestly the most disgusting person I've ever heard of, hope she has a horrible life being a racist asshole."*

- *"Fairstein committed a criminal act of being a thief who stole the childhood of FIVE innocent children.  She knowingly and willfully frame them for a crime they didn't commit and proceeded to profit financially from her crime by writing…"*

- *"I'm disgusted by Linda's transgressions against the Central Park Five.  She needs to pay restitution to these innocent now and be locked away for leading the witch hunt to falsely accuse and coerced the innocent boys.  Justice needs to be served."*

- *"Having Linda Fairstein on Vassar's Board is a utterly despicable.  She destroys the lives of the innocent now involved in the Central Park Jogger's Case."*

- *"Linda Fairstein led a witch hunt against five teenage boys.  She hunted these boys for their lives.  Her actions were led by greed and desire to be relevant and famous.  These character flaws of hers led her to KNOWINGLY and WRONGFULLY hunt these boys into a conviction."*

- *"All my New Yorkers need to catch that raggedy bitch lacking beat TF out of her.  I want to see blood period."*

- *"She is a racist pig who should be put behind bars."*

- *"Aww, my heart bleeds for this poor, poor racist lady."*

                    Confidential

- *"She's racist.  She believes the ideology of a black man being nothing but a criminal, that's why it is easy for her to see those little boys as racists."*

- *"Never new a woman without a heart, now I saw one."*

- *"She was ready to destroy these boys lives."*

- *"She is a wickedness person."*

- *"Central Park 5 teens were framed by Manhattan DA/bestselling author Linda Fairstein of gangrape they never committed."*

- *"When They See Us #Centralpart5 the damn prosecutor is not only not held accountable but is a celebrated author and socialite?  Linda Fairstein, you white ass Karen ass Chihuahua bitch, pls suffer the equivalent of being imprisoned for 5-12 yrs for the color of your skin."*

- *"Why is Linda Fairstein still alive?  Trifling dirty white racist ass big fat bitch."*

- *"I hope Linda Fairstein rots in hell."*

- *"...joins Linda Fairstein and Elizabeth Lederer, the prosecutor's of the Central Park 5 and the prosecutor's of the Scottsboro Boys in a long line of people who are responsible for ruining the lives of black men with false rape allegations."*

- *"Linda Fairstein is odious, despicable & evil. A special place in hell is reserved for her for what she did to the Central Park Five YOUNG KIDS."*

- *"Why tf isn't Linda Fairstein in jail ??!!!?!?*

- *"Shame on you Linda Fairstein !! u got to go to jail."*

- *"OMG!  I just watched the Oprah Netflix documentary about the exonerated 5 in New York.  I hope @LindaFairstein has a special place in hell."*

- *"We definitely should. I'd love see an evil witch like Linda Fairstein tried and incarcerated."*

- *"When They see Us, swear i wanted to kill Linda Fairstein."*

- *"I really don't wish bad things on ppl but if I have to Linda Fairstein would be the number one person I'd like to see suffer, slowly."*

- *"Idc if Linda Fairstein is 90. When I catch her it's up."*

- *"I will never have faith in humanity because of horrible people like Fairstein."*

- *"Linda Fairstein should be in jail.  But it probably won't happen in this lifetime."*

                                                                    Confidential

- *"Looks like #LindaFaristein deleted her account, your Time is up you vile disgusting creature."*

(Note:  While this list may seem excessive, it is infinitesimal in terms of the possibly thousands of vitriolic and hateful comments made and reflects the passion and animosity that was targeted at Fairstein as a result of the depiction of her in the Netflix series.)

<u>Negative Impact From Media Exposure Resulting From Netflix Series</u>

In the "Information/Input Received to Form Opinions" section of this report, I list (98) media news reports that I read relating to the background that led to and revolved around this litigation. These are samples of hundreds of various types of media exposure.  Roughly 95% are negative or detrimental to Fairstein's reputation.

One only needs to look at the headlines to see the damage that they would have on Fairstein's reputation and how people would form a negative opinion of her.  Following are a few of these headlines which represent this harm:

- "A Funeral for Linda Fairstein"  (Hostile Therapy Podcast)
- "The Slippery Moral Calculus of Linda Fairstein "  (Washington Post)
- "'Cancelling a Heroine:  The Mobbing of Linda Fairstein  (New York Post)
- **"A Mob is on the Loose and it's After Linda Fairstein"  (Washington Post)**
- "Fairstein and Lederer Deserve Their Fate After 'When They See Us' Premiered" (Preen P.H.)
- "A Critical Look at Linda Fairstein, an Acclaimed Sex Crimes Prosecutor"  (Washington Post)
- "Linda Fairstein, Once Cheered, Faces Storm After 'When They See Us'"  (New York Times)
- "Inside the Controversy About Linda Fairstein Central Park 5 Prosecutor Played by Felicity Huffman" (People Magazine)
- "We Must Reopen Central Park 5 Prosecutor Linda Fairstein's Cases" (New York Amsterdam News)
- "A Literary Group Rescinds Award for Linda Fairstein Amid Outcry Over Her Role in the Central Park Five Case"  (Bustle Magazine)
- "Publisher Drops Central Park Five Prosecutor Linda Fairstein"  (Associated Press)
- "Central Park Five Prosecutor Linda Fairstein Resigns From Vassar College Board of Trustees"  (Newsweek Magazine)
- "Linda Fairstein Dropped By Hollywood Literary Agency Amid 'When They See Us" Backlash"  (Essence Magazine)
- "Dramatic License:  Is Fairstein Fair Game"  (Simple Justice)
- "When They See Us Sparked a Boycott Against Central Park Five Prosecutor Linda Fairstein"  (Esquire Magazine)
- "Linda Fairstein Resigns From Board of Alma Mater Vassar College"  (CNN)
- "Publisher Drops Central Park Five Prosecutor Linda Fairstein"  (Associated Press)
- "Raymond Santana Supports Boycott of Central Park Five Prosecutor Linda Fairstein: 'She Has to Pay for Her Crime'"  (The Root)
- Dramatic License:  Is Fairstein Fair Game"  (Simple Justice)

As a former journalist (New York Times), I can attest to the fact that headlines in and of themselves can make a major negative impact on readers. In fact, they can be more harmful than if the reader actually read the article because the article would generally present both sides of a controversy to meet the journalistic creed of "fair and balanced" reporting.

As to the text/content of the news reports themselves concerning Fairstein in connection with her involvement and/or role in the Central Park Five investigation and litigation, often the reporting was extremely harsh, damning and detrimental. A few of many examples:

- *"There's more than enough horror to go around in "When They See Us. There are police officers who coerce confessions, and prison guards who brutalize the minors under their watch. But the most concentrated depravity by far, is embodied in Assistant District Attorney Linda Fairstein."*

  *"It is no surprise that viewers of 'When They See Us' have come away enraged; the character of Fairstein is enraging."*
  (Washington Post)

- *"In real life, Fairstein appears to be an even worse person than she is portrayed to be. Fairstein is full of it. She's been full of it for 30 years."*
  (The Nation Magazine)

- *"These interrogations were ordered by Linda herself just so she could justify her theory—even when the facts didn't align. Do you see how f\*cked up all this is? It reeks of prejudice and discrimination."*
  (preen.ph website)

- *"It's easy to focus on Linda Fairstein. Her behavior is so unmitigated, her racism so overt and encompassing."*
  (NPQ Magazine)

- *"...the chief architect of their captivity was author and former prosecutor Linda Fairstein—which is Wakandan for "evil-ass white woman."*

  *"@lindafairstein went on to become a successful author after she coerced and convicted 5 innocent boys of a crime they did not commit. These boys sat in prison and lost their youth inside of a broken system while she made millions!"*
  (The Root Magazine)

- *Whether or not you believe the narrative that DuVernay presents, you can't argue with how effectively she presents it. ...a couple of ink-stained wretches yelling on Facebook and in the pages of* The Los Angeles Times *isn't nearly the same as a deep, systematic racking by an Netflix mini-series executive-produced by Oprah."*
  (Mystery Tribune)

The above excerpts are a representative sample of the negative comments the media offered about Fairstein in the wake of the Netflix series. The damage is compounded by the fact that they appeared in some of the nation's most respected media (e.g. New York Times, Washington Times, The Nation, Esquire Magazine).

Confidential

<u>General Overview on Negative Perception of Plaintiff</u>

It is my opinion that any reasonable person who read these alleged false statements outlined in the Case Background section as well as the misrepresentations by the Defendants contained in this report – without counter information - could plausibly conclude that the Plaintiff was:

| | |
|---|---|
| • Racist/bigoted | • Vengeful |
| • Ruthless | • Vicious |
| • Vindictive | • Resentful |
| • Spiteful | • Uncaring |
| • Intolerant | • Rigid |
| • Manipulative | • Unrelenting |
| • Arrogant | • Narcissistic |
| • Deceitful | • Possessed |

Therefore, clearly, the accumulated impact of all the negative communications emanating from the Defendants towards the Plaintiff represent considerable reputational harm in terms of how the public or "average person" would assess and view the Plaintiff.

<u>Media Assessment of Harm to Plaintiff</u>

The damage to Fairstein's reputation and the harm to her in general can be attested to by comments and reports in the mass media which validate the devastating effect that the Netflix series had on both her both professionally and personally.  Following are excerpts from media reports that specifically address this issue.

- *"A Netflix series about the Central Park jogger case has led to intense criticism of the famous prosecutor-turned-novelist who oversaw the investigation.  But the Netflix series has placed the prosecution back on center stage, where the power of television's narrative focus, the lightning speed of online reaction and the villainous characterization of Ms. Fairstein have made her a target of public outrage.  The script took liberties with dialogue and timing of events, a use of artistic license…" The facts now forcing Ms. Fairstein into exile."*
      (New York Times)

- *"After When They See Us was released last weekend, #Cancel Linda Fairstein started trending on Twitter, with users calling for a boycott of the prosecutor-turned-novelist's books."*
      (Esquire Magazine)

- *"Fairstein had a long and distinguished career both as prosecutor and author that has all but disappeared because of this one dramatization."*
       (Simple Justice Blog)

- *"Linda Fairstein, a former prosecutor who has been the focus of public outrage since Netflix began streaming a series based on the Central Park Five case…."*
       (New York Times)

- *"The miniseries turning Linda Fairstein, Elizabeth Lederer and others into racist villains is not only inaccurate, their fictional portrayals have led to a social media backlash that has largely ruined their lives."*

*"As much as the miniseries' fiction has made pariahs of the real-life Fairstein…"*

*"It placed blame on Fairstein for how she handled the case, but it didn't reason that this was mainly due to her being a racist. There's no evidence of that. Yet, it's largely why she has been the target of public outrage after the release of the miniseries."*

*"Creator and director Ava DuVernay has invented the incriminating comments sex-crimes prosecutor Linda Fairstein (Felicity Huffman) makes…  We found no reports that anyone had ever witnessed these bigoted comments or heard such conversations taking place.  Her reputation has been ruined."*

(History vs Hollywood)

- *"…viewers spent the weekend taking to social media to not only drag Fairstein to the gates of Hell and back, but to call for retailers and publishers to boycott her various bestselling novels—the first step in a plan to upend the lucrative empire she built on the backs of innocent black children."*

    (The Root Magazine)

- *"It's the image of Fairstein – as a pugnacious figure cramming the confessions of five teenage boys into the mold she's already determined to fill – that has rocked the viewers of When They See Us.  And it has rocked Fairstein!*

    (Vox.com)

- *"Since the series 'When They See Us' premiered last week, Fairstein, 72, has been the target of tremendous public outrage…"*

    (New York Post)

- *"When They See Us, a Docuseries on Netflix has brought a bright unforgiving light back to the case and has made Linda Fairstein a pariah.*

    (Hostile Therapy Podcast)

- *"Trouble is, others feel it is not the Central Park Five who got railroaded, but Fairstein. But now a different sort of mob is on the loose, pillaging Linda Fairstein's reputation. In a movie, she's guilty. In real life, she's not."*

    Washington Post

- *"…show Linda Fairstein, head of the sex crimes unit of the Manhattan District Attorney's office, as a key orchestrator of the railroading…"  As portrayed by Huffman, Fairstein is a psychopath's psychopath, breathtaking in her cruelty and disregard for human rights."*

    (Mystery Tribune)

- *"Linda Fairstein Dropped By ICM Amid 'When They See Us' Backlash – The FORMER PROSECUTOR OF THE CENTRAL PARK FIVE CASE CONTINUES TO EXPERIENCE THE FALLOUT OF THE CRITICALLYACCLAIMED NETFLIX SERIES."*

    (Essence Magazine)

- *"Author and former prosecutor Linda Fairstein—facing a  swarm of controversy over a Netflix series that examines a wrongful conviction in a high-profile rape case…."*

    (CNN)

Confidential

These comments are reflective of others in countless articles on this subject and clearly delineate the nature and extent of the damage inflicted on Fairstein as a result of the Netflix series.

## HARM AND DAMAGE TO THE PLAINTIFF

The reputational damage to the Plaintiff Fairstein from the Netflix series is evident and outlined in previous sections of this report.  Following is an attempt to summarize and categorize the harm and negative consequences to her professional career and the severe adverse effect it has had on her personally.

Social Media

Doug Bania, an expert witness retained by the Plaintiff, conducted a study of Google Trends related to the Plaintiff and reported that the highest numbers of searches of her name throughout her career by a considerable amount came immediately after the airing of the Netflix series.
The negative repercussions began instantly with the airing of the first episode of the four-part series. It is reasonable to presume that the viewers and the public immediately adopted the false narrative espoused in the film series as true based on its incessant attacking of the Plaintiff's ethics and character.  Examples of the vitriolic and disparaging comments are on social media are contained in an earlier section of the report.  A hashtag #CancelLindaFairstein on Twitter was instituted immediately.  This was not only a "call" for every person and entity to reject and divest themselves from Fairstein but it also spawned a "firestorm" of negative comments and vilification on social media.  As previously mentioned in this report, within the first 28 days of the airing, 1.8 million posts were made on Twitter alone.  This forced Fairstein to shut down her social media accounts which she utilized as a national, promotional tool for books and film projects.

Petitions

In addition to #CancelLindaFairstein, the series spurred the creation of numerous other petitions (e.g. Change.org, Color of Change) that had the sole aim of seeking such actions as urging her publishers to sever their relationships with her and for retailers not to sell her books.

Another form of petition was placed online coming from the legal community with a concerted effort to convince the New York District Attorney to examine all Fairstein's previous cases. Direct attempts were made as well.  On June 13, 2019, three public defenders wrote a letter to Cyrus Vance, Jr. calling for such a case review:

> *"...based on the deeply disturbing portrayal of both Fairstein and Lederer during the Central Park Five case in the Netflix miniseries "When They See Us." It is imperative that you investigate every case that has been led by Ms. Fairstein and Ms. Lederer to ensure that your office is not responsible for even one more innocent black or brown life sitting in prison today. Given the blatant and inexcusable foul play that Ms. Fairstein wielded during the prosecution of the Central Park Five, it is quite plausible that other innocent defendants have been wrongly convicted and arecurrently living in cages, lives and families destroyed."*

                    Confidential

Literary Career Impact

As detailed earlier in this report, Fairstein was a highly successful and acclaimed author.
As a direct result of this public furor and pressure, both of the companies that published
Fairstein's books – Dutton (Penguin Random House) in the United States and Little
Brown/Hachette UK cancelled her contracts with them.  She had three books remaining on the
Dutton contract.  Additionally her literary agent in the United States – ICM Partners – ended its
business relationship with her after 25 years.  Her agent in the United Kingdom did so as well.

Consulting Work

After ending her legal career in New York, due to the national exposure for her successful career
as a prosecutor and her pioneering efforts in the field of sexual assault and protecting women's
rights, she was highly sought after as a consultant.   She was often referred for consulting work
by other attorneys.   As a result of the series, such assignments ceased due to the negative
exposure from the series.

Speaking Engagements

Fairstein's accomplishments and national prominence also generated opportunities across the
country as a paid speaker at various types of forums.  These opportunities evaporated as well as a
negative consequence of the series – both in terms of those she had scheduled which were
cancelled and potential future opportunities.

Non-Business Harm

Throughout her career and life, Fairstein was actively involved and participated in many civic,
community, charity, cultural and educational organizations as well as non-profit entities.  Due to
the scandal emanating from the Netflix series, Fairstein was either ejected or forced to resign
from many of these positions.  Examples of this harmful impact, include:

- Charitable Organizations – Fairstein was forced to resign from the Boards of Directors of
  these organizations:  Safe Horizon, Joyful Hearts Foundation, and God's Love We
  Deliver.

- Vassar College – Fairstein was forced to resign from the Board of Directors of Vassar
  College, her alma mater.

Loss of Honors and Awards

The reputational damage to Fairstein was so severe that it resulted in some honors and awards
that she had received or scheduled to receive being cancelled.  Examples of this include:

- Glamour Magazine – Rescinded its 1993 "Woman of the Year" Award it had previously
  bestowed on her.

- Mount Vernon High School – As alumnus of the school, the institution removed her
  from its Hall of Fame.

Additionally, prior to the airing of the series – because of all the pre-series public exposure for it, the Mystery Writers of America – a prestigious organization in the literary field – rescinded its announced awarding of its "Grand Master" Award to Fairstein for lifetime achievement.  It gave the award to another recipient.  (It should be noted that Defendant Locke spearheaded a vigorous campaign, both directly and through social media) to pressure the organization rescind the award to Fairstein.)

Economic Damage

While it is not my assignment to address the negative economic consequences of the Netflix series on the Plaintiff, clearly much of the economic loss to her emanates from reputational damage. As reported in this lawsuit, following is a partial summary of the ways that she lost income as a result of damage to her reputation as a direct result of the airing of the series:

- Lost income due to the cancellation of her publishing contracts with Dutton and Brown/Hachette UK.

- The corresponding removal of her novels from circulation in the United States and overseas, resulting in lost royalties.

- Dutton's refusal to publish the paperback versions of *Blood Oath* and the children's book *Secrets of the Deep*; lost royalties and the lost opportunity to publish the three books that remained on her publishing contract.

- Dutton also cancelled Plaintiff's Devlin Quick series of children's books and she was unable to contract for additional books as planned.

- Lost income due to the cancellation of speaking engagements for which Plaintiff was paid a fee, as well as appearances (e.g. book signings) at which books were sold. Plaintiff was also unable to book new and future speaking engagements.

- Lost income due to termination of consulting agreements, including one with a prominent, national athletic association that Plaintiff advised on issues concerning domestic violence and sexual assault.

Plaintiff Response to Defendants Theory of Reputation Harm

The previous section contained an itemization of all the negative consequences which the Plaintiff has experienced as a result of the reputation damage emanating from the Netflix series. The Defendants dispute that many if not all of these resulted from the poor reputation he had prior to the airing of the series (e.g. from books, documentaries, negative media exposure and her defense of the original conviction in the wake of the Reyes Confession).  In her deposition, she was queried on some of these consequences and she directly tied the series reputation damage to each.

- In reference to having her talent agency, ICM, cease representing her.  She cited the explanation of Newberg, the ICM literary agent who represented her.

  *"She told me because -- it was because of the portrayal of me, the very unflattering,  false portrayal that was in the film series."*

- In reference to losing her publisher, Dutton after the series aired.

  Q    *"Were you told by anyone at Dutton as to why your contract was being cancelled?"*

  A    *"That the film series had unleashed a torrent of calls blocking the phone lines at Penguin Random House."*

  **(Side note:  In her deposition, Newberg stated that Penguin/Random House fired Fairstein because their phone lines were being tied up after the series aired.)**

- In reference to being forced to resign from the non-profit organization, Safe Horizon.

  *"The week that the series aired, Ariel Zwang, the CEO, said that they had come to the conclusion, the decision that I had to resign.  Because of the film series."*

  In her deposition, Zwang confirmed Fairstein's feedback as to why she had to be removed from the Safe Horizon board specifically because of the Netflix series .  In the deposition, she verified that prior to the series airing, Fairstein's reputation was fine.

  Q    *"In 2016 Safe Horizon did not view Ms. Fairstein as a problem with regards to Their image; correct?"*

  A    "No"

  Zwang then confirmed that she was forced to resign because of the Netflix series.

  Q    *"Had the Netflix series not been released, would Linda Fairstein still have been a board member on June 4, 2019?"*

  A    *"Quite possibly."*

- In reference to her being removed from the board of her alma mater, Vassar.

  *"I was asked to resign by Elizabeth Bradley, the president, and Tony Friscia, the board chair.  I was told that there -- that as a result -- as a direct result of "When They See Us" airing, there was a student protest on campus, protesting my board involvement."*

  (Side note:  At the same time, Fairstein had been picked to be one of the three speakers at the 50th Reunion of her graduating class.  That opportunity was cancelled.)

<u>Personal Harm</u>

It is evident that the fallout and negative consequences experienced by any individual from worldwide exposure of this magnitude would have a devastating impact.  Basically the Plaintiff's life work and her reputation were destroyed by the portrayal of her in the Netflix series (regardless if it was accurate or not which to a large extent will be determined in this litigation). The psychological and emotional distress would likely be significant from the extreme amount of public backlash (see earlier section with public comments on social media) that occurred to include threats of injury and death (e.g. *"die a horrific and painful death"* and *"be hanged, drawn and quartered"*).  One social media post published her home address which was a major

threat to her well-being.  As a result, from information and documents I reviewed, I learned of the following forms of personal harm she experienced:

- Experiencing mental anguish, emotional and psychological suffering.
- Subjected to hatred, scorn, contempt, ridicule, disgrace, embarrassment.
- Caused damage to her personal and social relationships.
- Victim of cyberbullying.
- Ostracized by people in both her professional and personal relationships.

For this report, I queried the Plaintiff directly to obtain additional information about the personal harm she has suffered and/or continues to experience emanating from the reputation damage she incurred.  Following is what she reported to me:

- Upon watching the series the day it aired, from beginning to end, she got violently sick, cried extensively and then throwing up at one point during the viewing.
- She didn't leave the house for 72 hours after the series aired and spent almost all of that time sick in bed.
- She is still prone to outbreaks of crying both privately and in public.
- She still finds it difficult to sleep and experiences ongoing anxiety.
- She has ongoing problems with her self-esteem.
- She stopped socializing for an extensive period of time and still socializes only with people she knows and trusts.
- She generally read three to four books a week and now rarely reads even one.
- She cannot focus or write anything that requires extensive organization or concentration. (She noted that she used to write one book a year.)
- She can't promote her books anymore because she cannot go on social media because of the vitriolic feedback she receives and she can't make public appearances any more.
- She used to campaign for political candidates which also benefited the promotion of her books but that has not been possible.

## The Phantom "Tarnished" Defense

**Without question, it is reasonable to conclude that all of the above reputational damage and harm to Fairstein's career and the personal trauma she experienced was a direct result of the Netflix series.  A main thrust of the Defendants' defense is that her reputation had been tarnished by a series of actions and events and even her own words over the years which tarnished her reputation and made her "damaged goods" reputation-wise long before the Netflix series aired.  Following is a list of these cited by the Defendants and some facts and perspective on each:**

- **Reyes Confession – In 2002, in the aftermath of the confession which led to the Central Park Five's convictions being vacated, Fairstein continued to maintain their guilt publicly and that led to some short-term backlash and negative articles in the press.  There is no evidence that it had a significant impact on her reputation or stature in the legal community between then and when the series aired.  Also it had no impact on her career as evidenced by information provided by her agent, Newberg, during her deposition:**

- At her deposition, Newberg had a chart of the total sum of the advances which Fairstein received for her books from 2003 (the year after the Reyes Confession) until she was terminated by her publishers in 2019 in the wake of the Netflix series.  It revealed that she had received ███████████ in advances which clearly indicates the Reyes Confession had no impact on her book writing career.

- In her deposition, Newberg was queried about Fairstein's writing career post-Reyes Confession.  Following is a brief exchange:

  Q  But you continued to represent her.

  A  I did.

  Q  What, 17 years after that; is that correct?

  A.  I did, yes.

  Q  Did Ms. Fairstein's involvement in the Central Park Jogger case prevent her from publishing her 24 novels?

  A  No.

- <u>CP5 Lawsuit</u> – After their convictions were vacated, the Central Park Five filed a lawsuit against the City of New York.  Fairstein was among the Defendants in the lawsuit.  The Plaintiffs were awarded $40 million.  This brought some negative attention to Fairstein at the time.  Indicative of the lack of impact on her career, Ball gave the following response relating to Fairstein's publisher:



- <u>Burns Documentary</u> – In 2012, Ken Burns produced and aired a documentary called "Central Park Five" which partially portrayed Fairstein in a negative light.  The documentary spurred newspaper articles on the documentary specifically and the experiences of the Central Park Five in general.  From my perspective as a former journalist, I reviewed possibly 15-20 newspaper articles relating to the Burns documentary after it aired and only one or two of them mentioned Fairstein at all and the references about her weren't particularly negative. They also didn't have a negative impact on her career.  Another response from Ball in her deposition attests to that:



Another insight to the lack of reputation damage to Fairstein from the Burns documentary came in the deposition of Rossi:

> **Q**   *From time to time were there additional surges, if you will, of negative commentary following the airing of the Ken Burns documentary?*
>
> **A**   *My memory is that it was rarely and not often.*

- **Mystery Writers Award** – In 2018, the Mystery Writers of America organization decided to bestow one of its highest honors on Fairstein.  When Locke, a previous recipient of the award, heard about it, she wrote the organization decrying the selection and started a campaign online to convince it to not to bestow the award.  The organization subsequently withdrew the award.  Between Locke's campaign, the organization's withdrawal and media coverage of the situation, Fairstein's reputation was indeed sullied to an extent – but, once again, not to the extent it negatively affected her career.

In reference to the negative exposure from the Locke campaign, Rossi addressed the harm relating to Fairstein's own social media outlets:

> **Q**   *Do you recall that there were additional negative comments on Ms. Fairstein's social media accounts following her Twitter exchange with Ms. Locke on social media?*
>
> **A**   *No, I don't.*

As to the effect on Fairstein's relationship with her publisher and any negative consequences to her publishing career, in her deposition Ball provided this insight:



It is clear and the evidence shows that nothing that happened prior to the airing of the Netflix series caused damage to her reputation and career to the extent that it resulted in her being dropped by two publishers and her literary agent, losing speaking engagements and consulting work, having awards rescinded, losing positions on boards of directors of nonprofit organizations and educational institutions and being savaged on the internet in a variety of social media platforms).  All of this was directly attributable to her portrayal in the series.  This is not my opinion, it is verifiable fact.

**Assessing the Post-Series Backlash and Reputation Damage**

As I have opined throughout this report, the evidence shows that while Fairstein was controversial and her reputation had suffered to some degree from her actions and words prior to the airing of the Netflix series, none of that was consequential in interfering with or harming her professional career (and standing in the community as well).  While there is evidence of some elements of the public being upset with her prior to the series, it was minimal and isolated and didn't translate into career damage.  Addressing this subject, following are some comments and observations regarding the degree of negative backlash from the public both before and after the series.

- Newberg's assessment in her deposition:

    *Q*  *Prior to the film series coming out, had Ms. Fairstein ever faced a public backlash like she had in June 2019?*

    *A*  *I don 't think so. I don't know what happened. No, I don't think so.*

    *Q*  *Ms. Fairstein had not faced the public backlash of the kind she faced after When They See Us came out; is that correct?*

    *A*  *I think so.*

- Rossi's assessment in her deposition commenting on the negative feedback on the day of the airing of the series:

    *"The difference was that May 31st there was more than I had ever seen in my entire time knowing Linda Fairstein on the day the series was released.  It wasn't humanly impossible to keep up with the negativity and the content that was being posted on her social media on the release day of When They See Us."*

- A series of comments and observations from Ball made during her deposition:





From any reasonable review of the evidence, the negative impact of the Netflix series to Fairstein's reputation is indisputable as is the resulting damage to her career.  A few examples of the damage as testified to in depositions:

- **Loss of Social Media** - Commenting on the necessity of eliminating all of Fairstein's social media exposure in the wake of the series, Rossi stated:

    *"…but to the point of it being completely destroyed on all platforms, the decision was to take it all down and there was never a discussion because of how bad it had gotten to ever think about restoring starting new accounts or doing anything ever again.  It was completely obliterated."*

- **Loss of Publishing Contracts** – In her deposition Ball addressed this subject:



**REPUTATION DAMAGE REPAIR PROGRAM**

In the communications business, there are several axioms pertaining to reputational damage and harm – e.g. when a person or entity has been the recipient of negative input or communications – which I outlined earlier in this report, which include:

- It takes a lifetime to build a reputation and seconds to destroy it
- Perception is more important than reality
- You can never un-ring a bell
- Where there is smoke, there's fire
- You can never wipe a slate clean

In short, the image and reputation of the Plaintiff has been permanently stained by the onslaught of negative public exposure tracing to the Defendants. Regardless of what the outcome of this lawsuit is for her (prevail or not), the fact is her image and reputation has been severely and irreparably harmed and damaged. Should the Plaintiff prevail in this litigation, it would only be reasonable and fair that the Defendants should be responsible for funding a program to repair the damage to the Plaintiff's reputation. (Side note: A good analogy. If I was visiting my neighbor and broke a vase, I would of course pay for a new one.) Since the Defendants' "broke" the Plaintiffs' reputation, they should be required to pay for it to be restored (as much as possible).

Even a well planned and executed reputation damage repair program can only limit the damage by combatting or minimizing the negative exposure the Plaintiff received from the negative communications to a certain degree and it is not a short time effort. It takes careful planning, time, patience, a sustained, professional effort and sufficient funding.

(Side Note: Occasionally, in the past when I have proposed this type of program for a Plaintiff(s) in other cases, it has been challenged by opposing counsel. Such a program has validity and it is important to note that it has been upheld in previous litigation even in the face of numerous exclusion motions. In the case of *Nicholas Krakana v Scottsdale Police Department,* United States District Court, District of Arizona, Judge John J. Tuchi opined:

> *"In his report, Mr. Fisher opines that, where a Plaintiff's reputation and image have been so damaged, a repair program of certain duration and with itemized components would be needed to make that image and reputation as near whole as possible. Mr. Fisher assigns a value or cost to that remedial program and lists the steps such a program would entail. The Court concludes that addressing and repairing the harm a person's reputation and image could suffer as a result of defamation is specialized knowledge not within the ken of the lay juror, and which would assist jurors in determining issues of fact surrounding that aspect of damages. While the report lays out the bare minimum in terms of support for Mr. Fisher's damages figure and components of the remedial program he opines is necessary, it is sufficient to allow a jury to understand and evaluate the basis for his opinion."*

Important to add, I have subsequently testified to such a program in federal and state courts as well as arbitration hearings.)

The following is an outline for such a program.

<u>Program Overview</u>

- <u>Objectives</u>:  The primary purposes of this program are as follows:

    - Through this program, to eliminate as much as possible and counter the negative communications which resulted in the reputational harm and damage that the Plaintiff, Fairstein, has incurred and ensure that the program reaches and impacts its target audiences to mitigate the negativity in the most timely, expeditious and effective way.

    - To restore her damaged reputation by generating positive exposure for the Plaintiff creating awareness for and emphasizing her long and distinguished professional career as well as her public service contributions and innumerable pioneering accomplishments in aiding and protecting victims of sexual violence.

- <u>Target Audiences</u>:  The primary target audiences that this program is intended to impact, include:

    - The American public in general, the vast bulk of which, before the Netflix series, were unaware of the Plaintiff and as a result of her depiction or portrayal in the series, now have a negative view of her because there has been no counterbalancing positive view or impression.

    - Special emphasis on reaching all segments of life (e.g. public, business, society, government, media and community) in the state of New York where the Plaintiff lived the bulk of her life and where she was best known and suffered reputational harm and damage as well as the state of Florida where she now resides and is active.

    - Specific audiences to be targeted where the Plaintiff had the highest profile (e.g. legal profession, judicial system, law enforcement, publishing business, educational field, entertainment and community/charitable organizations).

    - Any other publics to be identified that are determined to be critical to approach and impact in order to restore the Plaintiff's reputation.

<u>Program Activities</u>

The following is an outline of a suitable and prudent reputation damage repair program which would seek to achieve the objectives for such a program as stated above.  I believe that such a program is necessary and a realistic approach to correct reputational damage based on my 52 years of experience in handling crisis communications and reputational damage programs and on what information and insight I have at this point on this situation.  As such, this outline is subject to adjustments if and when more information is obtained.

- <u>Audit/Assessment</u> – In order to fully assess the degree of the reputational harm that the Plaintiff has suffered since the series aired to which the program would have to address. Updated research and analysis would need to be conducted to determine the nature and extent of the damage emanating from the Defendants at that point in time (post-litigation**).**  The result of the litigation will have an influence on the perspective and perceptions on how the Plaintiff's key target audiences view her and the harm that has (or will) occur.  The program created would then be based on, and factor in, the litigation

73

Confidential

results as to how best to counter the negativity and restore the Plaintiff's positive reputation to include what the message is, what needs to be done and to what extent.

- <u>Program Plan</u> – A strategy for the program would be devised and a detailed plan would be created to achieve the program's goals.

- <u>Search Optimization Program</u> - The internet would need to be researched and monitored for the negative information and content about the Plaintiff and actions taken to mitigate the damage as well as generate more positive links with high domain authority to effectively push down negative search results as much as possible.  Positive content will have to be added to the internet as well.

- <u>Website</u> – A website is a very critical outlet for the dissemination of information and to impact reputations and public perception.  One would be created for the Plaintiff and would contain not only standard information but also means by which she could provide ongoing information to key target audiences (e.g. blog, videos).

- <u>Internet/Social Media Exposure</u> – At this point in time, the Plaintiff has no website and virtually no social media presence.  This is a result of the relentless and extensive negative feedback she received in the wake of the series.  As social media exposure is vital to this type of program, a review and analysis of all existing social media platforms would be conducted and a plan generated and implemented to utilize them to generate ongoing internet exposure to effectively restore and enhance her reputation.  Similarly, other forms of internet exposure would be created and utilized.

- <u>Public Relations Program</u> - As all matters relating to image and reputation are the purview of the public relations profession, such a program would be a critical element of this effort. There are myriad of activities that would need to be undertaken to help counter or overcome the damage and restore the Plaintiff's image and reputation.

  - ■ <u>Strategic planning/counseling/oversight for all aspects of the program.</u>

  - ■ <u>Generating Media Exposure</u> – This would be a critical component of the entire program to serve as a means to generate positive exposure for the Plaintiff to offset the negative communications emanating from the Defendants.  Such exposure would be primarily targeted to reach and impact the public in general and all important target audiences as well. This exposure is needed to counter the negativity and restore her reputation plus this type of exposure can reach mass audiences in a cost-prudent manner.  Such vehicles to general media exposure could include: news conferences, news releases and statements, media interviews, press events, bylined articles, columns and opinion-editorial pieces, press tours, editorial board meetings, etc.

  - ■ <u>Personal Outreach</u> - A vital component of the program will be to identify and take action to generate direct and indirect exposure for the Plaintiff with the general public or key target audiences directly (e.g. correspondence, direct meetings, speaking engagements, serving on panels, participation in/or presenting seminars, conferences, conventions, seminars) or indirectly (e.g. internet, social media, videos, direct mail)

- ■ <u>Informational Materials</u> - Creation of printed and electronic informational materials as warranted and needed.

  (Note:  All program management as well as the bulk of the creative and writing would be planned, implemented and coordinated under this program.)

- <u>Paid Exposure</u> – There will be times when certain types of exposure important to providing information or delivering messages to improve the Plaintiff's reputation aren't available and could be obtained through paid means.  These will be investigated and utilized as appropriate.

- <u>Videos</u> – One or more videos would be produced for reputation restoration and the other for enhancement purposes and exposure for them would be placed on many places on the internet (e.g. Plaintiff website and its social media forums, YouTube) and also used for viewing on an individual basis.

- <u>Miscellaneous Communications</u> – Throughout the program, continual efforts would be made to seek out opportunities to generate exposure and deliver information through existing channels whether online or offline.

- <u>Additional Program Activities</u> – To be determined as needed to achieve goals.

<u>Program Overview and Budget</u>

Based on my extensive background conducting similar campaigns, and my analysis of the nature of the communications program that would be needed to counteract that damage to the Plaintiff's reputation from the harm caused by the Defendants' false statements and depictions, misrepresentations, actions and inactions, I believe a two year proactive reputation damage repair program would be required with the bulk of the program initiated in the first year and the second year devoted to continued reinforcement and maintenance of the program as needed.  The primary focus of the program would be oriented to repairing the Plaintiff's reputation with a secondary goal of supplementing the restoration with generating as much positive exposure as possible.  From past experience conducting similar reputation damage repair programs on various scales across the United States, I believe a very conservative estimate of the cost of such a program for the Plaintiff would be in the range of $650,000 to $700,000.

The scope of the program and the budget amount is based on my assessment of what I believe would be needed to repair the damage to the reputation of the Plaintiff based on the information I have at this point in time.  Further, I have made no attempt to put individual budget figures to each of the program elements above because of the following factors:

- The result of the litigation.  Should the Plaintiff prevail, it would validate that the false portrayal, misrepresentations and allegations made by the Defendants caused her severe reputation harm and this would provide a legal decision on which to create and build a program to restore the firm's reputation and good will.   However, if the Plaintiff was not to prevail, it would require a totally different approach to the program to achieve its objectives as well as impact the scope of the program to be instituted.

Confidential

- The result of the litigation would dictate which of the program elements listed would become more essential and require more emphasis, thus it is not possible at this point to determine the exact expenditure for each.  (Note:  However, most all of them would likely be used regardless who prevails in the litigation, it is a matter of to what extent.  The projected budget is appropriate range regardless of whether the Plaintiff should prevail or not.

- It's not prudent to plan the specifics of a program before receiving the approval of the Plaintiff as to what will be done and the nature and degree of her participation based on her preferences at the time.  I would not expect the Plaintiff to make these decisions until she knows the results of the litigation.

To reiterate, this program and budget is a realistic assessment of the scope and cost of a program that would be required to meet the needs and goals of this reputation damage repair program based on my current knowledge.

## REPUTATIONAL DAMAGE COMPENSATION

The Plaintiff justly needs to be compensated for the "pain and suffering" she has incurred as well as the harm and damage to her reputation which emanated from the Defendants' false statements, misrepresentations, actions and inactions from the moment the series was conceived through production, airing and beyond as well as other resulting negative consequences.  Also, even if the Plaintiff prevails in this litigation, the negative exposure she has suffered because of the Defendants will always be present to some degree and will continue to cause reputational harm and the damage to the professionally and personally to her well into the future.

Factoring in this negative impact on her, it would be my recommendation that the Plaintiff justifiably receives fair compensation from the Defendants based on the extent of the reputational damage and the massive disruption to her as a professional and personally as reflected in the observations, comments and opinions I have expressed in this report.    The Plaintiff believes that a damage award in the range of $6,000,000 to $8,000,000 would be fair and equitable for the negative consequences she has had to bear.  It is my opinion that is a very conservative range given the malicious intent and the reckless disregard for the truth exhibited by the Defendants and the extent of the damage to her professional career and harm to her personally.

## PERSONAL OBSERVATIONS

- In my 50 years as a public relations professional, during I which I represented hundreds of clients with reputation damage, as well my 16 years as an expert witness handling nearly 70 defamation and reputation harm cases, there is only one instance I can cite where the reputation damage has had a more devastating effect on an individual and /or entity who/which had the stature, success and/or prominence of Fairstein.  Regardless of what is determined in this litigation, the negative impact on this person's reputation, business career and personal life has been truly consequential and devastating.

## OBSERVATIONS OF A VIEWER FROM TWO PERSPECTIVES

I've personally watched the series twice.  The first was as an average viewer in 2019 within a week of its initial airing.  I'm old enough that I was aware of the Central Park "Jogger" attack at the time it happened albeit I didn't follow the subsequent litigation and I don't remember hearing

about the Reyes confession.   After viewing the series then, my impression was that there was a rush to judgment, the five youth weren't treated fairly and their lives were shattered, possibly irreparably even though ultimately they got a large monetary settlement and seemed to be leading normal lives (e.g. working, married with kids).  What I remembered most with the brutal way they were interrogated and deceived by the brutal, heavy handed tactics of the police, aided by the DA's representative (Fairstein), who was out to convict them at all costs. (Side note:  I didn't know who Fairstein was at that time).  Having represented nearly 100 law firms at that time and been involved in countless litigation and trials, I had no problem with Lederer who I remember thinking was very professional and a strong prosecutor.   It is important to add that I never sit through the credits when watching a television show so I never saw any disclaimer. Knowing that it was based on a true event, I assumed it was pretty much factual.

The second time I watched the series (June 18, 2022) – this time all four episodes in one sitting – I did so in my role as an expert witness.  I purposely waited to watch it again until I had the opportunity to go through all the discovery I was provided, do some research, communicate with the Plaintiff and be thoroughly acquainted with both sides of the case.  Having accumulated all that background, information, knowledge and insight, I had a totally different perspective on what I saw in this viewing which is reflected in the conclusions and opinions I have offered in this report.  The mission of the Defendants – to present the "truth" of the Central Park Five and their view of what transpired from the night of the attacks in Central Park to the airing of the series – was certainly accomplished and impressively so.  However as someone who was "schooled" while at the New York Times to adhere to the sacred journalistic creed of "fair and balanced reporting" – this series clearly failed the test.  I realize the Defendants purport that this was a "dramatization" (albeit the disclaimer was probably unseen to the vast majority of viewers like myself), it still presented a highly negative and misleading view of many of the participants depicted as well as self-admitted fabrications of words, actions, activities and events shown in the series.  Foremost was the depiction of Fairstein which led to the filing of this lawsuit.

## SUMMARY OF CONCLUSIONS AND OPINIONS

A general summary of my conclusions and opinions are as follows:

- The Defendants self-stated mission for the series was to "tell the truth" from the perspective of the five individuals convicted in the "Central Park Jogger" case.

- In doing so, they wanted to "put a face" to the injustice and unfair treatment which the five individuals ("Central Park Five") experienced which ultimately led to their conviction and incarceration.

- They predetermined that the Plaintiff would be the primary "villain" in this respect and further, for her to be the focal point in representing all those in the law enforcement and judicial system that contributed to the injustice.  In effect she would be the "boogeyman" that would be targeted as the chief culprit and architect of the wrongdoing.

- All the Defendants from the production company to the directors and producers to the writers and even marketing department conspired throughout the whole process – from series conception through the production process to the series airing and in the pre-and-post marketing - to lay the blame for the injustice to the Central Park Five on the Plaintiff.

- In anticipation of a possible negative portrayal in the series, the Plaintiff along with her legal counsel and Lederer all reached out in advance of production and cautioned the Defendants to ensure the series was accurate in terms of the depiction of the Plaintiff and others. They referenced and provided information on where accurate records could be found of what had transpired from the time of the assault through the trials. The Defendants ignored the pleadings of Fairstein and Lederer to either review or factor in the evidence that was available in the creation of the series.

- The Defendants proceeded to prepare a script and produce the series to fulfill their mission without regard to the truth in their zeal to tell the story of the Central Park Five to the detriment of others. In doing so, they exhibited recklessness, disregard for the truth and malicious intent towards Fairstein, as evidenced by the way she was portrayed in the series, reflected by the detriment, disparagement and vitriol towards her as the primary target for their wrath. They self-admittedly sought to portray her as the primary person that choreographed masterminded and single-handedly directed the demise of the Central Park Five. In doing so, they portrayed her as a racist and bigot, a morally corrupt human being and someone who is insensitive and uncaring to the plight of others.

- Throughout the series, they fabricated her words and actions as well as activities and events in which she reportedly was involved. Their justification for this was they "believed" that many of the actions they depicted the Plaintiff involved in throughout the series were true based on what they "believed" her role was in the investigation and litigation. They "believed" the words they put in her mouth were representative of what she thought and expressed. In most cases, they had no direct knowledge, only belief.

- Through their own internal documents in the planning, preparation, writing and production of the series, the Defendants made clear every step of the process that the Plaintiff must be portrayed in the most negative light possible.

- In the period in advance of the airing of the series, the Plaintiff was featured in the series' marketing in a negative manner.

- The series was initially marketed, with heavy emphasis, as being a true story (i.e. *"the truth will be told")* and that was emphasized repeatedly. Somewhat later, they portrayed it as a dramatization.

- It was the Defendants' contention that viewers would understand that this was not actually a totally factual, true account. In a court finding, a judge disputed that contention. To cover themselves, the Defendants put a disclaimer at the end of each episode stating that it was a dramatization – completely ignoring the fact that 90% of television viewers do not watch the credits after a program – especially to the end. If they truly wanted to alert viewers that everything was not fact, they would have put the disclaimer before the episode began to pre-warn viewers not to accept everything as true. Further, the disclaimer would have been on its own page, devoid of any others words or graphics – and not buried in small type "lost" among other copy and artwork as it is.)
Finally, he series is still on Netflix and the disclaimer does not appear after Episode Four and to see the disclaimer (or credits) in the first three requires selecting a button within four seconds or the start or the credits disappear.

Confidential

- Both before and after the series aired, the Defendants executed a massive publicity and promotional campaign both offline and online. Extensive media interviews were arranged, including many involving the participation of the Central Park Five. Evidence shows that they coached and manipulated them and dictated with whom they did interviews, when and what they said. Much to the detriment of the Plaintiff.

- Part of the marketing effort was generating exposure on social media in which all three defendants participated. Much of it contained disparagement of the Plaintiff. Defendant DuVernay remarked that the Plaintiff "must be held accountable" (purportedly for the unfair treatment and convictions of the Central Park Five) and Defendant Locke spearheaded a vitriolic social media campaign to disparage the Plaintiff.

- Defendant Locke also led a campaign prior to the series airing to cause direct negative consequences to the Plaintiff (e.g. instrumental in getting the Mystery Writers of America to rescind an award it had planned for the Plaintiff).

- The series itself, the pre-and-post airing marketing campaign and the proactive efforts of the Defendants to denigrate the Plaintiff caused both irreparable reputation harm to her personally but also had devastating negative consequences to her professional career.

- Despite this litigation, and the alleged devastating reputation harm to the Plaintiff, the series is still available for viewing today on Netflix.

- While it not my position to advocate for such an occurrence, if the Plaintiff should prevail in this case, it would only be reasonable for her to be compensated for the damage to her reputation in an amount that would be fair and equitable reflecting the harm to her personal life as well as professional career.

- Even if she were to prevail, that would not alter the fact that her reputation has been severely – if not fatally – damaged. The only way to mitigate the damage is to institute a reputation damage repair program. Much like "humpty dumpty," while it won't put all the pieces back together again, all efforts must be made to mitigate the damage to her reputation. It must be noted that even the most successful program will not restore her reputation to a pre-series level. Based on my experience of creating and implementing such programs for more than four decades, even the most effective program possibly might only restore 70% of her reputation.

- Netflix's mantra throughout both the marketing of the series and litigation is that the series was intended to tell the "truth" of what occurred from the viewpoint/perspective of the Central Park Five. In other words, to provide them a forum to get out their side of the story so-to-speak. What that doesn't explain is the demonization of Fairstein who did not nearly have as impactful a role in the Central Park "Jogger" case as Lederer did, for example. There is no reason why the Defendants couldn't tell their "truth" without singling out Fairstein to be the villain and creating a false, erroneous and highly damaging depiction of Fairstein.

- The Plaintiff is undoubtedly a "public figure" because of her nationally prominent legal career and her fame as an accomplished author. New York Times v Sullivan required the proof of "actual malice" in a defamation claim. While I can't offer a legal opinion, this case reeks with malice exhibited by the Defendants – emanating from the concept of the

series until even now. Although their primary mission was to "tell the truth" from the perspective of the Central Park Five, their main means of achieving that was to use/portray the Plaintiff as the chief villain and person responsible for destroying the lives of the Central Park Five. Netflix clearly acted either with knowledge of, or in reckless disregard of, the falsity of the manner in which Fairstein was portrayed in the film series.

- The Plaintiff was once asked what she would like her legacy to be and she responded:

  *"I would hope to be remembered as a prosecutor who was fierce in her efforts to do justice for victims of violence, creative in her vision to lead investigations, fair in her dealings with all parties and whose integrity was paramount."* (LF0000805)

  In her deposition, Fairstein opined that she believed that assessment was not realistic because the Netflix series had cast her in a negative light.

  Q  *"Do you think that some people generally could have a basis for feeling hostility towards you for your participation in and continued defense of a prosecution that they believe to be a travesty of justice?"*

  A  *"After the false portrayals of me that your clients have produced, I would expect anybody to be hostile to me."*

I was retained by the Plaintiff to assess the reputation damage to her in this case, not to offer a legal opinion. I cannot offer a legal opinion on the Causes of Action in this lawsuit. However, it is my professional opinion as an expert - based on all available evidence, the information I reviewed as well as my experience and expertise in the communications field and as an expert witness - that all the Causes of Action related to Defamation cited by the Plaintiff, Linda Fairstein, in this lawsuit against the Defendants, Netflix, Inc. Ava DuVernay and Attica Locke, I have concluded are valid based on the observations, conclusions and opinions I have offered in this report.

## REPORT DISCLAIMER

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date. Based on receiving additional documents or information (e.g. legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

_____                      _August 8, 2022_
Robert J. Fisher                              Date

80                                                          Confidential