# Exhibit 4

September 2, 2022

THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

LINDA FAIRSTEIN,

        Plaintiff,

    v.-

NETFLIX INC., AVA DUVERNAY, and
ATTICA LOCKE,

        Defendants.

Case No. 1:20-cv-08042-PKC

# EXPERT REPORT OF
# DAVID P. KAPLAN



**BRG**
Berkeley Research Group
1800 M Street, NW, 2nd Floor
Washington, DC  20036



EXHIBIT
Kaplan-1
10/7/22 ao

September 2, 2022

# Table of Contents

I.    INTRODUCTION ................................................................................................. 4

II.   ASSIGNMENT AND OVERVIEW OF DAMAGE CLAIMS ........................................ 5

III.  NATURE OF THE ALLEGATIONS .......................................................................... 9

IV.   ECONOMIC FRAMEWORK ................................................................................. 12

       A.  Causation ............................................................................................... 12

       B.  Causation And Mitigation ....................................................................... 14

       C.  Reliable And Non-Speculative Calculations ........................................... 15

V.    SUMMARY OF CONCLUSIONS REGARDING BANIA'S REPORT ........................ 15

VI.   SUMMARY OF CONCLUSIONS REGARDING FISHER'S REPORT ...................... 17

VII.  ISSUES RELATED TO CAUSATION AND BANIA'S REPORT .............................. 18

       A.  Claims In The Fairstein Complaint .......................................................... 18

       B.  Google Trends ........................................................................................ 19

       C.  Possible Implications Of Fairstein's Conduct Related To The Central Park Five
           Prosecution ............................................................................................. 21

               1.    Fairstein ....................................................................................... 21

               2.    Lauren Rossi ................................................................................. 23

               3.    Safe Horizon ................................................................................. 24

               4.    Penguin ........................................................................................ 25

               5.    Mystery Writers of America .......................................................... 29

               6.    Esther Newberg ............................................................................ 30

       D.  Bania's Figures 1, 4, and 5 ..................................................................... 31

       E.  Summary ................................................................................................. 32

2

September 2, 2022

VIII.  ISSUES RELATED TO ALTERNATIVE PUBLISHING POSSIBILITIES
        (MITIGATION AND CAUSATION) AS IT CONCERNS BANIA'S REPORT ........... 32

        A.  Apparent Standard Used by Bania And State Of The Evidence ................................. 32

        B.  So-Called Terminated Contract ................................................................................ 33

        C.  Possible Publishers Of Twelve Hypothetical Novels ............................................... 33

        D.  Possible Publication Of Memoir ............................................................................... 36

IX.    ISSUES RELATED TO BANIA'S CALCULATIONS ................................................... 37

        A.  Book Advances ........................................................................................................... 37

            1.  Penguin ................................................................................................................ 37

            2.  Curtis Brown ....................................................................................................... 39

        B.  Use Of 15 Percent Discount Rule ............................................................................. 39

        C.  Understated Costs ...................................................................................................... 40

        D.  Anther Omission From Bania's Report .................................................................... 42

X.     FISHER'S DAMAGES ANALYSIS .............................................................................. 43

        A.  Causation And Mitigation ........................................................................................ 43

        B.  Proposed Reputational Repair Program .................................................................. 46

        C.  Damages Claims ........................................................................................................ 46

XI.    CONCLUSION ............................................................................................................... 47

3

September 2, 2022

## I.      INTRODUCTION

1.      I am an economist. I am an Executive Director at the Berkeley Research Group, an economic and financial consulting firm.  I served as Vice Chairman of the company and a member of the Board of Managers between 2011 and January 2021.  I specialize in analyzing changes in various forms of conduct and its effect, if any, on industries, markets, firms, and individuals.  In particular, I specialize in, among other issues, analyzing damage claims in various matters such as those related to intellectual property (including defamation), antitrust, fraud, unfair competition, and breach of contract, and more generally, claims related to alleged damages associated with some form of business interruption.

2.      I have testified as an economic expert in federal and state courts in some 20 cases, including both jury and bench trials, as well as before arbitration panels and regulatory agencies such as the International Trade Commission.[1]  Almost all of these cases involved allegations related to alleged damages and related calculations.

3.      I served as an economic consultant to the Federal Trade Commission's Bureau of Economics, the Department of Justice, and the Senate Judiciary Committee.  I have published in the field of economics, including a book and a number of economic articles.  I also have made presentations concerning various economic issues, including damage analysis, before different groups such as the American Bar Association, the Conference Board, and The Brookings Institution.  I also have testified before Congress on competition policy-related issues.

---

[1] In this and all my consulting work, my compensation is not dependent in any way on the opinions I express.  In this matter, my hourly billing rate is $975.

September 2, 2022

4.      I taught Business Statistics in the MBA program at Johns Hopkins University for 10 years, including the study of many different types of financial data (e.g., sales and profits) and tools to be used when analyzing these types of data.  In this capacity, I regularly lectured on how to analyze the relationship between changes in certain economic factors and the possible impact of such changes on other economic variables (e.g., marketing changes and possible impact on sales).  I also served as a lecturer in economics at George Mason University for 10 years, primarily teaching microeconomics and the study of market competition.  Again, I regularly lectured at George Mason University, as I did at Johns Hopkins, concerning the analysis of how changes in one economic variable (say price) might possibly impact another (say sales).  I also have lectured at Columbia University, the University of Utah, and George Washington University.  I also have taught a number of Continuing Legal Education courses at the request of the DC Bar Association, among others, on economic issues, including those related to damage calculations in intellectual property matters.

5.      I have a Bachelor of Arts in Economics and Master of Arts in Economics from the George Washington University, and a J.D. from the George Washington University National Law Center.  (Although I earned a J.D., I have never practiced law and offer no legal opinions in this matter.)  My current Curriculum Vitae, which identifies my publications and cases where I have testified in the last four years, is attached as **Exhibit 1**.

## II.      ASSIGNMENT AND OVERVIEW OF DAMAGE CLAIMS

6.      I was asked to review the Expert Report of Doug Bania ("Bania Report") related to alleged damages experienced by Linda Fairstein ("Fairstein") associated with five claimed defamatory statements included in a Netflix series ("When They See Us") made available to the

public by Netflix on May 31, 2019, in addition to the claim of an alleged civil conspiracy to publish the allegedly defamatory scenes in the same series.[2]  This four part series related to the so-called Central Park Jogger or Central Park Five matter (focused on the rape of a woman in Central Park in 1989).[3]  The alleged defamatory statements were included in this series and related to how Fairstein was portrayed in association with the investigation and prosecution of the five individuals at issue.[4]  The five individuals at issue were convicted of charges associated with the rape but had their convictions vacated in 2002 after another individual confessed to the rape (Reyes).[5]  The five brought civil claims against New York City and Fairstein, among others, and settled for $41 million in 2014.[6]

7.      Bania reported his assignment as calculating "economic damages" experienced by Fairstein purportedly caused by the defamation claims memorialized in the Complaint filed by Fairstein in March 2020.[7]  Bania's damage analysis is focused on Fairstein's work as a mystery writer.[8]  Fairstein published 20 books related to a fictional prosecutor, Alexandra Cooper, between 1996 and 2019.[9]  She published the first nine through Simon & Schuster with the last such book published in 2007, and published the next 11 with Penguin (or Dutton Publishing)) .[10]  Fairstein has not published any books since 2019.[11]

---

[2] Expert Report of Doug Bania, Linda Fairstein v. Netflix, Ava DuVernay, and Attica Locke, dated June 17, 2022. See also Complaint And Demand For Jury Trial, dated March 18, 2020 ("Complaint"), at ¶s 375-382.  Hereinafter, references to the five scenes at issue, and related statements, are designed to incorporate the civil conspiracy claim related to these same scenes and statements.

[3] Opinion and Order by P. Kevin Castel, United States District Judge, in Linda Fairstein v. Netflix, Inc., Ava DuVernay, and Attica Locke, dated August 9, 2021 ("Judge Castel Opinion"), at pp. 1-2.  The five individuals are Raymond Santana, Antron McCray, Yusef Salaam, Kory Wise, and Kevin Richardson. (Fairstein Dep. Tr. at 56.)

[4] Judge Castel Opinion, at p. 2.

[5] Id., at pp. 4-5.

[6] Id., at p. 5.

[7] Bania Report, at ¶ 4; and Complaint.

[8] Bania Report, at ¶ 20.

[9] https://www.orderofbooks.com/characters/alexandra-cooper/.

[10] Bania Report, at ¶s 10, 21 and 22, and Schedule 5a; and https://www.orderofbooks.com/characters/alexandra-cooper/.

[11] Fairstein Dep. Tr. at 393-396.

September 2, 2022

8.      Bania claims total economic damages allegedly caused by the conduct at issue of

$1,371,218.[12]  He generated this estimate by projecting Fairstein's alleged earnings assuming the

conduct at issue he considered never took place (i.e., the but-for world) between May 31, 2019

and 2032 and subtracted from this figure what he determined Fairstein's earnings would have

been over this same time period in the "actual" world where the alleged conduct he considered

did take place.[13]  Specifically, Bania generates his but-for damage estimate by claiming four

sources of Fairstein's future income or earnings.

- First, Bania asserts that Fairstein would earn ████████ in advances related to book sales in the United States for 12 books to be written (but not yet written) by Fairstein between 2019 and the early 2030s, all to be published by Penguin.[14]  (As noted above, Fairstein has not written any books since 2019, including any of the 12 included in Bania's damage analysis.)[15]  As discussed below, Fairstein has ██████ ████████████████████████████ included in Bania's damage analysis (what Bania defines as books related to the so-called ████████████) and Bania describes the future agreements between Fairstein and Penguin with respect to the nine additional books (12 − 3 = 9) as "hypothetical."[16]  Bania also reports that the 12 additional books would be written while Fairstein was in her late 70's until she is 83 years old.[17]

- Second, he includes in his but for damage analysis advances on nine of these 12 books reportedly to be paid by a publisher in the United Kingdom, ████████ ████████████████████████).[18]

- Third, he concludes Fairstein would allegedly earn $31,669 in yearly royalties on books published by Simon & Schuster through 2032.[19]

- Bania also included $400,000 in his damage calculations for a memoir he claims Fairstein would have authored in 2021 (a thirteenth book to be written within the

---

[12] Bania Report, at ¶ 123.
[13] Id., at ¶s 80-83, 86, 89, 102, and 120-121.
[14] Id., at ¶s 104 and 109-110 and Schedules 6a and 6b.
[15] Fairstein Dep. Tr. at 393-394 and 396.
[16] LF00036862; Fairstein Dep. Tr. at 395-396; and Bania Report, at ¶ 109.
[17] Bania Report, at ¶s 86-87 and 89.
[18] Id., at ¶ 111.
[19] Id., at ¶s 112-113.

September 2, 2022

span of a hypothetical writing carrier between 2019 and the early 2030s) and that also would have been published by Penguin.[20]

- Finally, all future revenues are adjusted for costs estimated by Bania and resulting earnings are then reduced to present value by Bania by use of a discount rate of 15 percent.[21]  These calculations totaled $2,371,321.[22]

9.      From this estimated but-for total of $2,371,321, Bania subtracted $1,000,103 reflecting what he calculated Fairstein would earn in the actual world over the same time period to arrive at his damage estimate of $1,371,218 ($2,371,321 - $1,000,103 = $1,371,218).[23] Claimed "actual" profits calculated by Bania and projected through 2032 include Fairstein's earnings in 2019, including ██████████████████████ provided by Penguin (three of the 12 books included in Bania's but-for projection); royalties associated with Simon & Schuster ($11,529 a year) based on actual such royalties in 2021 after the Netflix series was made available; and royalties of $20,972 earned by Fairstein in 2021 and projected to be earned by Fairstein by Bania yearly through 2032 from an e-book publisher (Gere) who Fairstein contracted with after the series was made available.[24]  In this "actual" world, Bania does not deduct any costs because he claims Fairstein would "no longer [be] incurring costs related to her career as an author" but does reduce this revenue stream by the same 15 percent discount rate used in his but-for world calculations.[25]

10.      I also was asked to review claims related to alleged damages included in the Supplemental Expert Report of Robert J. Fisher ("Supplemental Fisher Report").[26]  Fisher also

---

[20] Id., at ¶ 114.
[21] Id., at ¶s 116-118.
[22] Id., at ¶ 114 and Schedule 3.
[23] Id., at ¶s 120-121.
[24] Id., at ¶s 90-98 and Figure 8; and Fairstein Dep. Tr. at 391, 393, and 395-396.
[25] Bania Report, at ¶s 96-98.
[26] Supplemental Expert Report Prepared For Plaintiff Linda Fairstein by Robert J. Fisher, dated August 8, 2022.  Mr. Fisher also submitted an initial report in June 2022. (Expert Report Prepared For Plaintiff Linda Fairstein by Robert J. Fisher, dated June 28, 2022.)

offered opinions related to alleged "reputation harm and damage" to Fairstein purportedly caused by the alleged defamation included in the Netflix series.[27]  Fisher claims Fairstein suffered reputational-related economic damages associated with lost book sales (like Bania) and those associated with consulting and speaking engagements (both rejected by Bania).[28]  Under the heading "Reputational Damage Compensation," Fisher reports that Fairstein told him that a damage award of $6 million to $8 million would be "fair and equitable" and he found such figures to be "very conservative."[29]  He also claims Fairstein suffered "personal harm" but does not advance any damage claims associated with such alleged harm that I am aware of.[30]

11.     No explanation or basis is provided by Fisher as to how Fairstein arrived at the $6 to $8 million figure provided by Fairstein to Fisher or how Fisher concluded such figures were conservative.  Finally, Fisher proposed that Fairstein might participate in a reputation rebuilding program that he estimates would cost $650,00 to $700,000, to be paid for by defendants.[31]  He does not provide a basis as to how he derived this specific amount.

## III.     NATURE OF THE ALLEGATIONS

12.     In her Complaint, Fairstein claimed that "throughout the [Netflix] film series," she was "portrayed as making statements that she never said, taking actions that she did not take – many of them racist and unethical, if not unlawful" and that the series contained "numerous false and defamatory depictions of Ms. Fairstein."[32]  Fairstein specifically alleged that the series contained 11 different defamatory statements in scenes that cast her in a false, negative, and

---

[27] Supplemental Fisher Report, at pp. 6 and 65-71.
[28] Id., at pp. 64-65; and Bania Report, at ¶s 12-13, 62, 67, and 70.
[29] Supplemental Fisher Report, at p. 76.
[30] Id., at pp. 66-67.
[31] Id., at pp. 75-76.
[32] Complaint, at ¶s 45-46 (emphasis added).

September 2, 2022

villainous way.[33]  In its decision on Defendants' motion to dismiss, the Court stated that Fairstein alleges the "series falsely portrays her participation in the prosecution of the Five, and depicts her uttering comments that are 'racist and unethical.'"[34]  The Court also observed that "Fairstein alleges that nearly every scene depicting her is a fabrication that presents her in a false and defamatory light."[35]  At her deposition, Fairstein testified that the Netflix "movie" "make[s] me" into an "incredibly horrible character" and that the "film series" was "hideously unfair" to her.[36]

13.     However, the Court only found five of the 11 relevant scenes and certain related statements possibly defamatory (Complaint paragraphs 77-85, 97-103, 104-107, 118-121, and 128) and it is these five of 11 alleged in the Complaint that are the foundation of Fairstein's claim here.[37]  The Court found that other relevant scenes and related statements were not defamatory and did not expose Fairstein to public contempt, ridicule, disgrace, or including an evil opinion of Fairstein.[38]  However, the Court found other scenes, scenes described by Fairstein as casting her in a false, negative, and villainous manner, as "opinion" and, as a result, non-defamatory.[39]  The Court also found the Fairstein character's use of the word "animals" was not actionable as defamation -- although the Court noted that the word "animals" is "derogatory," "fraught" with "negative connotations," and a "dehumanizing term" -- because use of the term in the series reflected a "privileged opinion" and a "subjective opinion."[40]

14.     I also noted that Fairstein does not allege defamation based on a scene in the Netflix series where Fairstein delayed the mother of one of the five young teens (Yusuf Salaam)

---

[33] Id., at ¶s 51-130.
[34] Judge Castel Opinion, at p. 7 (emphasis added).
[35] Id., at p. 2.
[36] Fairstein Dep. Tr. at 296-297 and 347.
[37] Judge Castel Opinion, at p. 48.
[38] Id., at pp. 20-24 and 42-44.
[39] Id., at pp. 28-29 and 34.
[40] Id., at pp. 44-47.

September 2, 2022

from seeing her underage son while he was being questioned by police without her being present.[41]  Fairstein testified that she did not "know" if that scene damaged her reputation.[42]

15.    Finally, as discussed more below, Fairstein's opinions related to the case, both before and after the series aired, including that the five men at issue participated in the rape, has created controversy surrounding Fairstein as explained by various witnesses and discussed in publications.[43]  (This issue is discussed more below.)  In fact, Fairstein's long-time former agent (Esther Newberg) wrote to her in March 2020 and said Fairstein's "life would not be blown up" if she had admitted that the "Five did not rape the jogger."[44]  (As discussed more below, Ms. Newberg testified that Fairstein would still be publishing books if she just admitted that the Central Park Five were wrongly convicted.)  According to Fairstein, others also advised her to accept responsibility for the convictions and for her to apologize.[45]  Fairstein also has represented that as early as 2003, as discussed below, misinterpretations and misrepresentations have characterized her association with the Central Park Five matter.  Indeed, in a 2016 letter written by lawyers representing Fairstein, three years before the Netflix series was made available, it was represented that public accounts of Fairstein's participation in the Central Park Five case beginning in "2003 and thereafter" were "grossly inaccurate and defamatory."[46]  (As discussed herein, Fairstein also participated in other controversial conduct such as assisting Harvey Weinstein that has been the subject of media attention.)[47]

---

[41] Fairstein Dep. Tr. at 383-384.
[42] Id., at 385.
[43] See also Id., at 91-92, 94-95, 345-346, and 363.
[44] Id., at 357-358; and Fairstein Dep. Ex. 14.
[45] Fairstein Dep. Tr. at 356-357.
[46] LF00001377-384.
[47] Fairstein Dep. Tr. at 397-400.  Fairstein testified that at least the New York Times reported on her relationship with Weinstein. (Id.; and Twohey, Megan, James C. McKinley Jr., Al Baker and William K. Rashbaum, "For Weinstein, a Brush With the Police, Then No Charges," The New York Times, October 15, 2017, https://www.nytimes.com/2017/10/15/nyregion/harvey-weinstein-new-york-sex-assault-investigation.html.)

September 2, 2022

16.     I offer no legal opinions related to any of these issues or whether certain scenes in the Netflix series, that Fairstein describes as defamatory but the Court did not because, for example, they reflected opinion-related conduct, actually damaged Fairstein's reputation.  Nor do I offer any opinion as to whether any of Fairstein's statements related to her role in the prosecution at issue over time (or other conduct including that related to Weinstein) damaged her reputation.  Rather, I highlight these issues, as explained herein, as they relate to the <u>failure</u> of Bania and Fisher to estimate alleged damages caused <u>only</u> by the specific scenes deemed by the Court to be at issue here and not isolate such conduct from other conduct that may have damaged Fairstein's reputation and caused some form of business interruption or at least contributed to any such interruption.  As a publication relied on by Bania noted (Bania footnote 66), a damages expert should consider "all other relevant factors" that may affect estimated damages beyond the conduct at issue and a "failure to do so could result in the expert's testimony being excluded."[48]

## IV.     ECONOMIC FRAMEWORK

17.     The opinions expressed in this report are primarily based on three generally accepted economic concepts.

A.  <u>Causation</u>

18.     The first is <u>causation</u>.  For Bania's or Fisher's opinions related to any claimed damages to be considered reliable, the claimed damages must have been caused by the five allegedly defamatory scenes and statements at issue here.  Bania, citing economic literature entitled the <u>Comprehensive Guide To Economic Damages: Volume One</u>, concluded that a plaintiff must "tie damages to the wrongful act," that any damage claim is <u>only</u> "recoverable"

---

[48] The Comprehensive Guide To Economic Damages, Volume One, Chapter 11 ("Comprehensive Damage Guide"), at pp. 248-249.

September 2, 2022

when they "can be traced to and result directly from, the wrong to be addressed" and that any alleged damages are not recoverable "unless they are directly and proximately caused by a defendant's wrongful act."[49]  Other literature also concluded that "proof that a defendant's wrongful conduct caused a plaintiff to suffer damages is a key concept in the determination of culpability in civil litigation."[50]

19.     In this regard, Bania also reported that any reliable damage calculation here "<u>must</u> be due to the [alleged] defamatory portrayal" in the Netflix series and "not other factors."[51]  And Bania noted that if the relevant alleged lost earnings or profits result from voluntary and independent business decisions by the plaintiff, the plaintiff may not be able to recover purported losses "even if defendant's activities are a contributing factor" associated with any such losses.[52] As discussed below, Bania and Fisher have not established the necessary causation here, including precluding the possibility that other factors may have affected Fairstein's publishing career.

20.     When considering the issue of causation, it is also important to distinguish between correlation (things happening at the same time) and a causal relationship between economic factors (i.e., one caused the other to happen).  Put simply, two economic developments can happen simultaneously, but one may not be caused by the other.  As one article stated, a

---

[49] Bania Report, at ¶s 38-39.
[50] <u>Litigation Services Handbook: The Role of the Financial Expert</u>, Eds. Weil, Lentz, and Hoffman, Fifth Edition, Wiley, 2007, at p. 3.1.  <u>See</u> <u>also</u> Lopatka, John E., and William H. Page, "Economic Authority and the Limits of Expertise in Antitrust Cases," Cornell Law Review, Vol. 90, 2005, at pp. 684 and 687-691; Snail, Timothy, "Chapter 8 Estimating Damages in Collusion Case," <u>Antitrust Economics For Lawyers</u>, LexisNexis, 2017, at pp. 13-14 and 25; <u>Proving Antitrust Damages, Legal and Economic Issues</u>, Third Edition, American Bar Association, 2017, at pp. 8-10, 13, and 127; and <u>Econometrics, Legal Practical and Technical Issues</u>, Second Edition, American Bar Association, 2014, at pp. 308-309.
[51] Bania Report, at ¶ 48 (emphasis added).
[52] <u>Id</u>., at ¶ 38.

13

plaintiff must "prove more than correlation to establish causation." [53]   Another article similarly concluded that even a "strong correlation does not necessarily imply a causal association" between "two variables."[54]   The author of one economic textbook concluded that "[s]imply finding an association between two or more [economic] variables might be suggestive, but unless causality can be established, it is rarely compelling."[55]   The important difference between correlation and causation is specifically discussed more below with respect to Bania's Google Trend analysis.

### B.   Causation And Mitigation

21.      The second generally accepted economic principle discussed herein is mitigation. By mitigation, I mean the possibility that the claimed injured party could have mitigated or escaped any such injury by taking steps to mitigate any possible adverse effects.  For example, if a manufacturer refuses to sell a given product to a company, but that company can buy the product from another manufacturer, it can avoid (or at least diminish) any alleged harm associated with the lack of supply provided by the first manufacturer.  Carlton and Perloff, well known economists, discuss just such a situation focusing on distribution channels, and the possibility that a firm is precluded from using a particular distributor, and concluded that unless the firm in question is precluded from finding alternative distribution, or in my example buying from an alternative manufacturer, the firm in question would not be precluded from continuing in business.[56]

---

[53] Litigation Services Handbook: The Role of the Financial Expert, Eds. Weil, Lentz, and Hoffman, Fifth Edition, Wiley, 2007, at p. 3.2.
[54] Locke, Robin H., Patti Frazer Locke, Kari Lock Morgan, Eric F. Lock, and Dennis F. Lock, Statistics Unlocking The Power of Data, Third Ed., Wiley, 2021, at p. 124.
[55] Wooldridge, Jeffrey M., Introductory Econometrics: A Modern Approach, Fifth Ed. South-Western Cenage Learning, 2013, at p. 12.
[56] Carlton, Dennis W., and Jeffrey M. Perloff, Modern Industrial Organization, Pearson Addison Wesley, 2005, at p. 375-377, and 668.

22.     The concept of mitigation is directly related to that of causation.  Here, if Fairstein had found an alternative publisher to publish the hypothetical books that Bania discusses, then the Defendants' alleged conduct could not be considered as causing those books not to be published.

C.  Reliable And Non-Speculative Calculations

23.     Any alleged damages calculations must be reliable and non-speculative.  As the Comprehensive Damage Guide relied on by Bania concluded, a damage expert's conclusions are only "credible" if they "carefully consider" case "materials" and these materials "substantiate and support the estimates being proffered."[57] This same publication concluded that "recoverable" lost profits calculations must meet the standard of "reasonable certainty" and not represent "speculation."[58] This publication emphasizes that when claimed damages are being forecast into the future for multiple years, such projections can become "more speculative."[59]

V.     **SUMMARY OF CONCLUSIONS REGARDING BANIA'S REPORT**

24.     Bania's economic damage calculations are unreliable and speculative for a number of reasons.  Although Bania used a before and after method and recognized the importance of causation and related mitigation issues when advancing his claims, he did not adopt generally accepted economic methods when analyzing these issues and generating his damage estimates.  And his actual calculations are unreliable and speculative:

1)  Bania's calculations do not meet the burden of demonstrating economic causation.  They are not properly tied to the alleged five defamatory scenes and related statements in the series, as opposed to being based on the series as a whole that includes other scenes that, according to Fairstein, cast her in a

---

[57] Comprehensive Damage Guide, at p. 237; and Bania Report, at ft. 66, for example.
[58] Comprehensive Damage Guide, at pp. 237 and 243-244.
[59] Id., at pp. 245 and 247.  I also discuss the issue of the economic benefits associated with leisure time herein.

September 2, 2022

false, negative, and villainous light and were found not to be defamatory by the Court because they reflected opinion-based commentary. Bania has made no attempt to disaggregate his damage claims associated with these possible disparate causes or address the possibility that the components of his calculations (e.g., failure to publish more books) would not have happened in a but-for world because of such scenes and statements (including the one involving the mother of Yusuf Salaam).

2) Bania made a substantial mistake in his analysis as he <u>explicitly represented in his report</u> that he based his calculations on <u>all</u> of the 11 alleged defamatory scenes and statements included in the Fairstein Complaint.[60] But only five of the 11 scenes and statements are now relevant. This mistake renders his analysis unreliable.

3) Bania also does not properly consider, despite his own citation to academic literature concerning this exact issue, how his but-for world would be impacted by Fairstein's own conduct related to her continuous defense of the original prosecution at issue and the impact of such conduct may have had on Fairstein's reputation (in addition to other conduct such as that related to Weinstein). Ms. Newberg testified that Fairstein's reputation was damaged because she would not admit that the Central Park Five were wrongly convicted and if she had so admitted, she would still be publishing books.

4) Bania also does not discuss the ramifications to his damages calculations if Fairstein were to win this lawsuit and the possible impact any such outcome would have on her reputation and ability to find a publisher in the future.[61]

5) Bania's opinion that Fairstein would publish nine additional books plus a memoir, ███████████████████████████, even though she never wrote any of them, is improper speculation.[62]

6) Bania does not properly investigate the possibility that Fairstein could have found a different publisher for her purported memoir or the additional nine books embedded in his calculations.

7) Bania's calculations are unreliable, including, for example, (i) his estimate of a ███████ advance for each of the 12 books included in his damage calculations, in light of Fairstein's inability to cover any advance associated with a Penguin-published book, the downward trend in relevant advances (the advance on each of her last two books was ████████ not ████████), a

---

[60] <u>See</u>, for example, Bania Report, at ¶ 4.

[61] Nor does the Bania Report consider Fisher's proposed reputation repair program and how it might impact his calculations.

[62] Fairstein, in fact, for a number of the hypothetical books at issue, represented that they were based on an idea she "started thinking about writing" in 2017 and 2018 related to a "new series" but never approached Penguin (Dutton) about this "new series." (Plaintiff's Objections And Responses To Defendant's Third Set of Interrogatories, dated August 8, 2022, at pp. 4-5.)

September 2, 2022

decrease from some ▮▮▮▮▮ years before), and testimony from a Penguin representative (and Ms. Newberg) that Fairstein was facing declining book sales; (ii) his inclusion of any royalties associated with the U.K. publisher (who provided no advance on the last three books Fairstein was to write and paid an advance on only five of the 11 published by Penguin) or the use of a figure much higher in his calculations than Fairstein earned for her last published book by the same U.K. publisher; (iii) the inappropriate use of a too low 15 percent discount rate that inflates his damage calculations; and (iv) errors associated with his cost calculations that also inflate his damage calculations. With regard to (iv), Bania inappropriately excludes the year 2018 and related costs from at least certain of his calculations, a year where Fairstein's revenue and profits declined substantially.[63]

## VI.    SUMMARY OF CONCLUSIONS REGARDING FISHER'S REPORT

25.    Fisher's damage calculations also are unreliable and speculative for a number of reasons, including the fact that he failed to employ generally accepted methods when calculating estimated damages. In fact, the numbers he advances appear to lack any factual basis. In this regard, as noted above, the publication related to damages relied on by Bania in his footnote 66 states that a damage expert developing "credible opinions" is "require[ed]" to "carefully consider" relevant case "materials" and to "substantiate and support the estimates being proffered."[64]  Fisher fails to meet this standard. For example:

1)  The $6 million to $8 million damage figures he advances have no apparent economic basis and appear to not be grounded in any way that can be tested or verified.

2)  Fisher's damage analysis does not tie damages to the five allegedly defamatory statements and scenes in the series at issue. In fact, Fisher attributes alleged reputational harm purportedly suffered by Fairstein, not only to the series as a whole, but to headlines in articles and statements made before and after the series. His analysis fails the necessary test of causation.

3)  Fisher also fails to investigate other firms that might publish Fairstein's hypothetical new books.

---

[63] Bania also does not properly consider the economic benefits of leisure time as discussed more herein.
[64] Comprehensive Damage Guide, at p. 237.

17

4) Fisher produces no empirical evidence to support his $650,000-$700,000 cost for a reputational rehabilitation program.

26.     The materials considered in forming my opinions are identified in **Exhibit 2**.[65]

## VII.     ISSUES RELATED TO CAUSATION AND BANIA'S REPORT

27.     Below I examine issues related to causation as it concerns Bania's Report.

### A.   Claims In The Fairstein Complaint

28.     Bania describes his <u>assignment</u> as calculating alleged economic damages "as it relates to the <u>defamation claims in the Complaint</u>" filed by Fairstein.[66] Bania's damage calculations are unreliable and speculative because Bania incorrectly based his damage calculations on all 11 defamation claims alleged in the Complaint, even though only five of them remain at issue in the case.  In other words, he has <u>not</u> shown that his estimated damages were caused by the five allegedly defamatory scenes and related statements at issue, an essential economic element of any damage analysis.

29.     Bania's failure to isolate just the effects, if any, of the five scenes and statements at issue is a substantial mistake that renders his damage analysis unreliable.

30.     Beyond this error, Bania does not discuss Fairstein's own representations that other scenes, found not to be actionable by the Court, cast her in a false, negative, and villainous light.  Nor does it consider the scene with the mother of one of the five, Yusuf Salaam, related to Fairstein's involvement in delaying the mother from stopping the interrogation of her underage son.[67]  As Fairstein testified, "there is nothing in the movie series that paints me in a flattering

---

[65] In advancing my opinions, I reserve the right to consider any additional relevant material that comes to my attention.
[66] Bania Report, at ¶ 4 (emphasis added).
[67] Fairstein Dep. Tr. at 383-385.

light."[68]  In other words, Bania has not established that the alleged components of his

calculations (e.g., book deal termination with respect to three books and failure to publish nine

additional books) would not have happened in a but-for world because of such other scenes and

related statements in the series involving Fairstein, which the Court found were not actionable, or

that Fairstein did not bring as part of her Complaint.

B.  <u>Google Trends</u>

31.     Bania presents a Google Trends analysis in his Figure 3 before and after the

Netflix series was made available.[69]  This analysis is purportedly designed to show that a

substantial number of Google searches were conducted associated with the Netflix series itself

when it was made available (orange line) and of Fairstein individually (blue line) and that

substantially fewer searches were conducted prior to the series being made available with respect

to other public discourse concerning Fairstein's association with the Central Park Five case.[70]

Bania concludes from this analysis that "it is apparent" that the series was the "proximate cause"

of Fairstein's lower earnings.[71]  <u>He is wrong</u>.

32.     Google Trend searches focused on the series itself may have included scenes,

according to Fairstein, that cast her in a false, negative, and villainous light but are <u>not</u> at issue in

this lawsuit.  Bania has made <u>no attempt</u> to disaggregate any possible negative impact of such

scenes from those that remain relevant here and his "search" analysis provides no methodology

for any such distinction.

---

[68] <u>Id.</u>, at 384.
[69] Bania Report, at ¶s 53-58 and Figure 3.
[70] <u>Id.</u>, at Figure 3.
[71] <u>Id.</u>, at ¶ 58.

33.     In fact, Bania's Google Trend search analysis focuses on the terms "Linda

Fairstein," "Central Park Five," and "When They See Us."[72]  In other words, his reported results

do not isolate any search related to the allegedly defamatory scenes and statements relevant here.

And, as explained below, Fairstein's own public position related to the Central Park Five that

predate the series has created a meaningful amount of public discourse, and any number of

"searches" could have focused on such conduct, or on what Fairstein and Fisher claim is a long

history of alleged misinterpretations and misrepresentations that predate the series.[73]  Such

supposed misinterpretations and misrepresentations took place before the Netflix series was

made available in 2019.

34.     Bania's search analysis related to the series itself does not tell us what the subject

of any individual search was.  As the Court pointed out, the series "primarily centers on the

individual experiences of each of the Five," from childhood to exoneration.[74]  The Court also

describes Fairstein's "screen-time" as "limited."[75]  Bania simply cannot tell us what the object

was of any individual when conducting a Google search related to the series or, with respect to

searches specifically related to Fairstein, what such searches uncovered.  Bania also reports

lower search results for other previous events associated with Fairstein's historical association

with the Central Park Five case and concludes that such events were not defamatory.[76]  He is

missing the point.  The Google searches he reports in 2019 could well have retrieved results

---

[72] Id., at ¶ 54.
[73] For example, searches of Fairstein could have generated information concerning her assistance to Harvey
Weinstein or others accused of sexual misconduct. (See Twohey, Megan, James C. McKinley Jr., Al Baker and
William K. Rashbaum, "For Weinstein, a Brush With the Police, Then No Charges," The New York Times, October
15, 2017, https://www.nytimes.com/2017/10/15/nyregion/harvey-weinstein-new-york-sex-assault-
investigation.html; and Golding, Bruce, "Linda Fairstein vouched for Weinstein's lawyer in model-grope case:
report," The New York Post, October 15, 2017, https://nypost.com/2017/10/15/linda-fairstein-vouched-for-
weinsteins-lawyer-in-model-grope-case-report/).
[74] Judge Castel's Opinion, at p. 6.
[75] Id.
[76] Bania Report, at ¶s 53 and 56, and Figure 2.

concerning such events and/or the misinterpretations and misrepresentations Fairstein claims

were in the public discourse concerning her association with the case dating back to the early

2000s.   Such searches may have been related to alleged scenes and statements that Fairstein

claims that cast her in a false, negative, and villainous light but are not at issue here.   Bania

claims that public discourse related to Fairstein's participation in the Central Park Five case was

not defamatory, but Fairstein disagrees and expressly represented so (through her lawyers) in

2016 referring to information in the public domain dating back to 2003.[77]

35.     Bania's use of Google Trend analysis here is focused on correlation not causation.

Even if there was more interest in the Central Park Five matter and Fairstein after the series was

made available, such a finding does not establish that the conduct at issue caused any claimed

damages.   To suggest that such an unscientific analysis is somehow economic evidence of

causation related to the alleged defamation at issue here is unreliable.

C.   Possible Implications Of Fairstein's Conduct Related To The Central Park Five
Prosecution

36.     Neither the Bania Report nor the Supplemental Fisher Report properly considered

Fairstein's continued defense of the Central Park Five prosecution and its possible impact on her

reputation and how this impact may have contributed to any diminution in her reputation.   I

discuss such evidence below.

1.   Fairstein

37.     Fairstein, prior to the Netflix series being made available, and thereafter,

continued to defend the prosecution of the five individuals, calling the related police

investigation "brilliant" and maintained that the five individuals were guilty of the rape and the

---

[77] LF00001377-384.

convictions were not "wrongful."[78]  For example, as early as 2002, Fairstein represented in the

New Yorker Magazine that "'these five men were participants, not only in the other attacks that

night but in the attack on the jogger,'" contending that the five had "moved on" before the

confessed rapist (Reyes) finished the assault.[79]  At her deposition, Fairstein discussed a

November 25, 2002 Daily News article that reported that she had "no regrets in [the] jogger rape

convictions" and that the five individuals at issue were "absolutely" guilty of rape.[80]  At her

deposition, Fairstein also discussed previous alleged misrepresentations about her role in the

prosecution such as those she claims were in the book written by Sarah Burns and the related

documentary.[81]  In addition, in 2016, the New York Times published an article reporting that

Robert Morgenthau, the then New York District Attorney, who Fairstein reported to during the

prosecution of the Central Park Five case, stated that he had "complete confidence in Linda

Fairstein" but it "turned out to be misplaced" and the convictions were a mistake.[82]

38.     Fairstein, in 2018, also defended the prosecution in an essay published in the New

York Law Journal.[83]  Fairstein described this essay as responding to an "ad hominem attack on

me" and she responded by defending the prosecution.[84]  Similarly, in an op-ed published in the

Wall Street Journal on June 10, 2019, Fairstein represented that the five were not "innocent."[85]

---

[78] See, for example, Fairstein Dep. Tr. at 238-239, 347-348, 353, 364, 370-371, and 376-377.
[79] LF00051085 and 1088.
[80] Fairstein Dep. Tr. at 77-82.
[81] Id., at 146, 149-150, and 319.
[82] Id., at 179-183; and Fairstein Dep. Ex. 39.
[83] Fairstein Dep. Tr. at 138-139.  See also Fairstein Dep. Ex. 25.
[84] Fairstein Dep. Tr. at 138-139.
[85] Fairstein, Linda, "Netflix's False Story of the Central Park Five," Wall Street Journal, June 10, 2019, https://www.wsj.com/articles/netflixs-false-story-of-the-central-park-five-11560207823.

September 2, 2022

2. Lauren Rossi

39.     Lauren Rossi, who worked with Fairstein beginning in 2012, helped her with "social media and as an extension of the [Penguin] Dutton publicity team."[86]  Ms. Rossi also was aware of negative comments related to Fairstein's association with the Central Park case well before the Netflix series was made available. Ms. Rossi was aware of negative comments concerning Fairstein's participation in the Central Park Five case in 2012 and 2013 related to the Ken Burns documentary.[87] Ms. Rossi, in fact, began "blocking" negative commentary concerning Fairstein's participation in the Central Park matter from various social media in the 2012 time period.[88]  She also was aware of related "trash talk" related to Fairstein on Twitter in 2013.[89]  Ms. Rossi, in fact, compiled examples of these tweets and they are reflected in Rossi Dep. Exs. 3, 4, and 5.[90]  Ms. Rossi apparently blocked some of these tweets by blocking individuals.[91]  Apparently, Fairstein inquired about an "autoblock" feature to limit particular negative tweets in 2016 that used certain words.[92]

40.     Ms. Rossi continued to participate in reviewing similar negative tweets during 2018.[93]  She exchanged an e-mail with Fairstein in November 2018 where Ms. Rossi represented, in response to a tweet by Ms. Locke, that "we always handle this negativity regularly."[94]  Ms. Rossi also discussed a website established by Fairstein designed to respond to

---

[86] Rossi Dep. Tr. at 25-26.
[87] Id., at 47-48 and 53; Rossi Dep. Ex. 1.
[88] Rossi Dep. Tr. at 56-57.
[89] Id., at 65-66; and Rossi Dep. Ex. 2.
[90] Id., at 67-84.
[91] Id., at 79-80 and 98-101.
[92] Id., at 86-88; and Rossi Dep. Ex. 8.
[93] Rossi Dep. Tr. at 94-96; and Rossi Dep. Ex. 11.
[94] Rossi Dep. Tr., at 103-105; and Rossi Dep. Ex. 12.

23

negative publicity concerning her role in the Central Park Five matter in April 2019 (before the Netflix series was made available).[95]

### 3.  Safe Horizon

41.     The Chief Executive Officer of Safe Horizon, a non-profit organization where Fairstein served as a Board Member until resigning in 2019, Ms. Ariel Zwang, was aware of concerns about Fairstein's response to the Central Park Five prosecution prior to at least 2018, including that reflected in a 2012 documentary by Ken Burns related to the prosecution.[96] Ms. Zwang also expressed concern that in 2018, including in the essay published by the New York Law Journal in 2018, months before the Netflix series was made available, that Fairstein's response to the prosecution lacked "empathy," was "striking a defiant tone," and was "problematic."[97] Ms. Zwang also noted that Fairstein, to her knowledge, never expressed any empathy for the five relevant individuals.[98] Mike Slocum, the Board Chair at Safe Horizon, also believed that Fairstein was being "defiant."[99]

42.     Ms. Zwang also referred to a tweet issued by Fairstein in December 2018, again months before the series was made available, after having a mystery writers award revoked that related to her public position concerning the Central Park Five prosecution, that represented a "problematic response" because, according to Ms. Zwang, Fairstein continued to represent that the five individuals were "guilty of something" despite the relevant history.[100] Another representative of Safe Horizon also expressed the view that the "tweets themselves are now a

---

[95] Rossi Dep. Tr. at 134-140; and Rossi Dep. Ex. 19.
[96] Zwang Dep. Tr. at 9 and 17-22.
[97] Id., at 29-31, 33, 35, and 48-49.
[98] Id., at 48-49.
[99] Id., at 51.
[100] Id., at 40-41.

September 2, 2022

problem as are some statements like her law journal letter."[101]  Ms. Zwang added that in 2018,

again months before the series was made available, that the Safe Horizon executive team

"broadly was concerned" and that it was "inappropriate" for Safe Horizon to be associated with

Fairstein because of the "prosecution" and Fairstein's "statements about it."[102]

43.     Ms. Zwang also explained at her deposition that it would have been "helpful" if

Fairstein took a different approach in her public statements and, rather than being defiant,

explained that a "wrong thing happened" and that in hindsight I "might do it differently."[103]  Ms.

Zwang added that Safe Horizon had concluded that the Central Park Five has been wrongfully

convicted and agreed that if Fairstein had acknowledged that the five were wrongfully convicted,

it would have "helped mitigate negative public perceptions" as would an expression of

"empathy."[104]

44.     Ms. Zwang testified that Safe Horizon's concern related to its relationship with

Fairstein represented more than just the Netflix series because Safe Horizon had issues with

Fairstein's conduct "since November of 2018" and Safe Horizon's position with respect to

Fairstein's participation on the Board followed months of discussion.[105]  In light of such facts,

Ms. Zwang was only willing to admit that it was only "possible" that Fairstein could have

continued with Safe Horizon assuming the Netflix series was never made available.[106]

4.   Penguin

45.     Penguin Books also was aware of Fairstein's position related to the prosecution

separate from the Netflix series.  Penguin published all of Fairstein's Alexandra Cooper books

---

[101] Id., at 49; and Zwang Dep. Ex. 4.
[102] Zwang Dep. Tr. at 45.
[103] Id., at 30-31 and 34-35.
[104] Id., at 59-61
[105] Id., at 114-115.
[106] Id., at 140.

September 2, 2022

beginning in 2009 and Fairstein described Penguin as the "mother ship."[107] 

---

[107] Fairstein Dep. Tr. at 368-369 and 388; and Ball Dep. Tr. at 13 and 118-120.
[108] Ball Dep. Tr. at 13 and 118-120.
[109] Id., at 121-125; and Ball Dep. Ex. 24.
[110] Ball Dep. Tr. at 121-125.
[111] Id., at 123-126.  See also Ball Dep. Ex. 25.
[112] Ball Dep. Tr. at 126-128.
[113] Id., at 131-136; and Ball Dep. Exs. 26 and 27.
[114] Ball Dep. Tr. at 137-140; and Ball Dep. Ex. 28.
[115] Ball Dep. Ex. 28.

September 2, 2022



47.

---

[116] Ball Dep. Tr. at 152-153.
[117] Id., at 142-147; and Ball Dep. Exs. 29 and 31.
[118] Ball Dep. Tr. at 147.
[119] Id., at 147-148 and Ball De. Ex. 32.
[120] Ball Dep. Tr. at 148-149.
[121] Id., at 150.
[122] Id., at 150-151 and Ball Dep. Ex. 32, at PRH000505.
[123] Ball Dep. Tr. at 154-156; and Ball Dep. Ex. 33. ███████████████ (Ball Dep. Tr. at 160-161.)

September 2, 2022



Fairstein authored an e-mail in 2017 where she stated that "[m]y book numbers are so depressing" and Ms. Newberg testified that Fairstein's book sales were declining before 2017.[129]

---

[124] Ball Dep. Tr. at 73-74 and 170-173.  See also Id., at 163-169 and 173-176.
[125] Id., at 170-173.
[126] Id., at 92.
[127] Id., at 104.
[128] Newberg Dep. Tr. 60-61.
[129] Id., at 141.

September 2, 2022

5.  Mystery Writers of America

50.    Fairstein had a mystery writer award revoked in 2018, months before the Netflix series was made available.  In this regard, Fairstein agrees that the award was rescinded before the series ran.[130]  In 2018, the Mystery Writers of America bestowed its Grand Master Award to Fairstein, but it revoked the honor explaining that the award "lacks the support of such a large percentage of our members."[131]  Ms. Newberg testified that the Mystery Writers award was withdrawn in 2018 due to "bad press" and by bad press Ms. Newberg meant that Fairstein "was not saying she was sorry that the kids were in jail" and would not admit that "these young men didn't commit the crimes" and "she [Fairstein] seemed to be the only one to feel that way."[132]  Ms. Newberg also testified that other writers were saying "how can you give the Mystery award to someone who couldn't admit that these kids didn't do that."[133]

51.    In connection with the rescinding of this award, it should be noted that Bania concluded that winning the award in question "should be viewed as a positive indicator of Ms. Fairstein's future career" as it would have "served as promotional material for Ms. Fairstein's future books."[134]  In this same capacity, the highly publicized rescinding of the award, which took place months before the series was made available, according to Bania's stated reasoning, could well have had a negative effect on Fairstein's future prospects.

---

[130] Fairstein Dep. Tr. at 375-377.
[131] "Mystery Writers of America Withdraws Fairstein Award" MWA, November 29, 2018, https://mysterywriters.org/mystery-writers-of-america-withdraws-fairstein-award/; and "Mystery Writers group rescinds award from sex crimes prosecutor over her role in Central Park Five case," The Washington Post, November 30, 2018, https://www.washingtonpost.com/nation/2018/11/30/mystery-writers-group-rescinds-award-sex-crimes-prosecutor-over-her-role-central-park-five-rape-case/.
[132] Newberg Dep. Tr. 36-39 and 41-44.
[133] Id., at 44.
[134] Bania Report, at ¶ 115.

September 2, 2022

6.  Esther Newberg

52.     Esther Newberg, Fairstein's long-time former agent, believed that Fairstein should have admitted that Reyes "was the person who committed the rape and that would have ended everything" in 2018, months before the Netflix series was made available.[135]  In fact, Ms. Newberg added: "she [Fairstein] should have apologized after Matias Reyes said he raped the jogger and they found the DNA," an outcome that would have predated the Netflix series by over 15 years."[136]  And, according to Ms. Newberg, telling Fairstein's "side of the story was not going to work" unless Fairstein said the "five guys didn't do the rape."[137]  She added that after the Netflix series was made available, Fairstein "couldn't bring herself to say the five young men shouldn't have been in jail for the length of time they were in jail and so her career blew up" and Fairstein could have saved her "career by standing up and saying Matias Reyes had done the rape" and by doing so she would be agreeing with the "Mayor and district attorney."[138]

53.     Ms. Newberg added that Fairstein's "reputation was damaged" because "she could never say that the boy's didn't rape the jogger."[139]  She added that the "climate was different in 2019 and 2020" and it was better understood that in some cases "cops were too tough" and the country had become "more aware of the things that we did to people that were under privileged."[140]  Ms. Newberg added that the Central Park case was one where "[f]ive young men went to jail for way too long for a crime they didn't commit," and she asked Fairstein

---

[135] Newberg Dep. Tr. 46-47.
[136] Id., at 67-68.
[137] Id.
[138] Id., at 73-76.  Ms. Newberg testified that she could have tried to get Fairstein another publishing contract but she "didn't think people were going to buy [Fairstein's] books" because of Fairstein's public position on the case. (Id., at 73-80 and 108-110)  She added that she was "not sure" if she would continue to represent Fairstein even if the series was not made available. (Id.)
[139] Id., at 101-104.
[140] Id., at 104-105.

"why did the young men go to jail if [Reyes] is the guy who did it."[141]  Ms. Newberg added that Fairstein was "stubborn and ridiculous because she could still be writing books" if she just admitted that Reyes had committed the rape.[142]

### D. Bania's Figures 1, 4, and 5

54.       Bania's Figures 1, 4, and 5 depict Fairstein's declining gross sales after the Netflix series was made available.  In this regard, I noted that for two of these Figures (4 and 5) related to Fairstein Consulting and Bobbie & Bones and Bania admitted that he had no basis to claim any diminution in gross sales that could be attributed to the conduct at issue here with respect to either entity.[143]  I would also note that Fairstein Enterprises represented in Bania's Figure 1 experienced a substantial decline in gross revenues in 2018, before the series was made available.  Bania also claims that 2018 included unspecified "non-recurring litigation expenses" but does not explain how such "expenses" explain a decline in gross sales.[144]

55.       I also noted that the Fairstein Enterprises 2019 gross sales depicted in Bania's Figure 1 presumably would reflect ██████████████████████████████████████
██████████████████████████████████).  If these revenues were removed from reported 2019 gross sales, Fairstein Enterprises' gross sales in 2018 and 2019 would be lower than in any other previous year reported by Bania in his Figure 1.

---

[141] Id., at 19 and 22-23.
[142] Id., at 77-80 (emphasis added).  In this regard, Bania cites to email exchanges and claims that Penguin was "pressured" to "cut ties" with Fairstein.  (Bania Report, at ¶s 49-51.)  But he does not isolate the impact, if any, of the five scenes and related statements at issue from other issues concerning Fairstein included in the series not at issue here or Fairstein's own conduct or other public discourse concerning her participation in the prosecution of the Central Park Five.  Bania is again confusing correlation with causation.
[143] Bania Report, at ¶s 12, 13, 62, 67, and 70.
[144] Id., at ¶ 45.

September 2, 2022

E. Summary

56.    Bania has not properly advanced damage claims purportedly caused by the five scenes and statements at issue.  In fact, Bania admits his calculations are based on all 11 of Fairstein's defamation claims in her Complaint, only five of which are now relevant.  Bania's analysis also never considers the implications of Fairstein's reputation if she were to win this lawsuit and the possibility of her then publishing new novels or her memoir.

VIII.    **ISSUES RELATED TO ALTERNATIVE PUBLISHING POSSIBILITIES (MITIGATION AND CAUSATION) AS IT CONCERNS BANIA'S REPORT**

57.    As discussed above, three critical elements of Bania's damage claim relate to (i) Fairstein purportedly being unable to publish a memoir; (ii) advances related 12 additional books to be published in the U.S., including three ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (iii) advances related to publication of nine books to be paid by a U.K. publisher.  But what Bania has done is present evidence that Fairstein could not, in fact, publish the books in question by investigating possible publishers willing to do so.  Of course, if the books could be published, then the damages attributed to these claims could well be extinguished or at least reduced.  In this regard, it should be noted that purported damages related to the memoir, the three books related to the "terminated contract," and the nine additional books are estimated to represent over 90 percent of Bania's damage claim.[145]

A. Apparent Standard Used by Bania And State Of The Evidence

58.    With respect to the hypothetical books in question, Bania appears to represent that Fairstein's only possibility of publishing these books, is with a "major" publisher because, as he

---

[145] This figure is determined by adding up Bania's calculation of claimed but-for earnings and using this percentage as an approximation of claimed damages after "actual" earnings are considered.

September 2, 2022

explains, "more often than not, high profile authors prefer to sign a contract with one of the five main book publishers" because they have a "track record for giving authors the largest compensation as well as selling the highest volume of books."[146] He concluded that "major publishers no longer want to publish Ms. Fairstein's works."[147]

B.  So-Called Terminated Contract

59.     As discussed herein, Bania includes 12 hypothetical books in his calculations. But three of these books were included in contracts entered into between Fairstein and Penguin. And, as discussed above, Penguin ████████████████████████████████████ ██████ and freed Fairstein to engage another publisher to publish these books.  To the extent Fairstein could find another publisher to publish these three books, she has the opportunity to ██ ███████████████████████[148]

C.  Possible Publishers Of Twelve Hypothetical Novels

60.     For the nine books beyond the three associated with the "terminated contract," Bania creates "four hypothetical contracts" between Fairstein and Penguin.[149]  His damages analysis is predicated on Penguin publishing these nine additional books.  However, Bania has provided no evidence that Penguin would publish these books in Bania's but-for world.  █████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[146] Bania Report, at ¶ 30.
[147] Id., ¶ 58.
[148] ████████████████████████████████████████████████████
[149] Bania Report, at ¶ 109.

September 2, 2022

████████████████████████████████████████████████

████████████████████████████████ [150]

61.     Moreover, putting aside the nature of the evidence related to the willingness of Penguin or any of the other so-called "big five" publishers to publish any of the 12 unwritten and hypothetical Fairstein novels, there is no evidence that Bania has conducted any investigation as to whether any other publisher outside of these five would be willing to publish some or all of these 12 novels.  Bania's discussion of this issue appears limited to only the "big five" publishers because "more often than not," according to Bania, authors such as Fairstein "prefer" to sign publishing deals with such publishers.[151]  But Fairstein's apparent preference does not preclude the possibility that other publishers would, in fact, publish all or at least some of these books which would mitigate her claimed damages.

62.     There are many other publishers beyond the "big five" that publish mystery and thriller books related to crime and there is no evidence reported by Bania that he conducted any investigation to determine if any of these publishers would publish any of the 12 hypothetical novels in question.[152]  And any number of other firms publishing bestselling crime and mystery novels by female writers.[153]

---

[150] Ball Dep. Tr. at 104.
[151] Bania Report, at ¶s 30 and 58.
[152] Corson-Knowles, Tom, "List of Mystery and Thriller Writers," TCK Publishing, December 6, 2018, https://www.tckpublishing.com/list-of-mystery-thriller-publishers/; and "Publishing Companies Approved to Date by Membership Committee," Mystery Writers of America, revised January 123, 2022, https://mysterywriters.org/how-to-become-a-member-of-mwa/approved-publisher-list/.  The U.K. also has publishers of similar books other than Curtis Brown.  (See, for example, "Best Mystery & Crime Book Publishing Companies in the UK," Reedsy, 2022, https://blog.reedsy.com/publishers/gb/mystery-crime/.)  I also note that according to testimony by a former literary agent in another matter, "authors do leave the bigger publishers to work with smaller imprints," and "many successful authors" that make such a move "choose to remain at these houses their whole careers."  (Periman, Matthew, "Agent Says Authors Want Best Deal, Not Most Upfront Money," Law360, August 10, 2022, https://www.law360.com/articles/1519936/print?section=competiton.)
[153] For example, Kensington Publishing publishes bestselling crime and mystery books by Joanne Fluke and Lisa Jackson; Bloomsbury publishes similar books by Lynn Truss; Algonquin does the same with B. A. Shapiro; Soho Crime with Cara Black; and Sourcebooks with Clare MacKintosh. ("About Kensington Publishing," Kensington

63.     I refer to examples of other publishers in footnotes 161 and 162 not to suggest that these particular publishers would publish any of the 12 novels in question if they were ever written.  Rather, I discuss these examples to highlight that Bania's singular fixation on the "big five" and what Fairstein might "prefer" to do is insufficient to establish that Fairstein could not publish the books in question.  Of course, publishers other than the "big five" could refuse to publish the hypothetical novels in question because of factors unrelated to the conduct at issue here such as Fairstein's public position with respect to the Central Park Five matter, other supposedly misrepresentative statements written about Fairstein and her connection to the case and related misinterpretations, or scenes and statements from the series that are not relevant in this matter but, according to Fairstein, cast her in a false, negative, and villainous light.

64.     It also should be noted that individuals that have faced controversies have been able to continue to publish books.  For example, Woody Allen was accused of child molestation and Hachette, one of Bania's "big five," dropped the publication of his memoir.[154]  But Mr. Allen had his memoir and a second book published by Arcade Publishing, an imprint of Skyhorse Publishing.[155]  Mr. Allen's memoir was a New York Times bestseller.[156]  (In fact,

---

Publishing Corp., https://www.kensingtonbooks.com/pages/about/; Cowles, Gregory, "Inside the List," The New York Times, March 6, 2015, https://www.nytimes.com/2015/03/15/books/review/inside-the-list.html; "Lisa Jackson," Kensington Publishing Corp., https://www.kensingtonbooks.com/author/lisa-jackson/; "About Lisa," https://www.lisajackson.com/bio.cfm; "Overview: About Bloomsbury USA," https://www.bloomsbury.com/us/connect/about-us/overview/#; "Lynn Truss," https://www.bloomsbury.com/us/author/lynne-truss/; and https://www.bloomsbury.com/us/constable-twitten-mysteries-9781635579086/; "About Algonquin Books," Algonquin Books, https://www.algonquin.com/about-us; "New York Times Bestselling Author B.A. Shapiro," https://bashapirobooks.com/; "New York Times Bestselling Author B.A. Shapiro, The Art Forger," https://bashapirobooks.com/novels/the-art-forger/; "Travel the Globe with Soho Crime," Soho Crime, https://sohopress.com/soho-crime/; "Murder at the Porte de Versailles," Soho Press, https://sohopress.com/books/murder-at-the-porte-de-versailles/; "About Us," Source Books, https://read.sourcebooks.com/about-us.html; "Clare Mackintosh, https://read.sourcebooks.com/author/A4728/clare-mackintosh; and "Clare Mackintosh," https://us.claremackintosh.com/books_/.)
[154] LF00051162-171.
[155] "Welcome to Arcade Publishing," Arcade Publishing, https://www.skyhorsepublishing.com/arcade-publishing/about/; https://www.skyhorsepublishing.com/arcade-publishing/9781951627348/apropos-of-nothing/; and https://www.skyhorsepublishing.com/arcade-publishing/9781956763294/zero-gravity/.
[156] https://www.skyhorsepublishing.com/arcade-publishing/9781951627348/apropos-of-nothing/.

September 2, 2022

Arcade recently launched a new crime fiction imprint, Arcade CrimeWise.)[157]  Similarly, Blake Bailey, accused of the rape of two women, had his publisher of a Philip Roth biography stop printing his books and take the book entirely out of print.[158]  But subsequently, Skyhorse announced it would publish the book in paperback, and in e-book and audiobook form.[159]

### D.  Possible Publication Of Memoir

65.  ██████████████████████████████████████

██████[160]  Fairstein has not written a memoir and had no contract with Penguin to write one. The e-mail Bania relies on to support his claim that ████████████████████████ for the hypothetical memoir, was not from Penguin and only reported Ms. Newberg's interpretation of what someone at Penguin told her.  Ms. Newberg testified that there was no formal offer from Penguin to Fairstein related to a memoir.[161]  And Bania has provided no evidence that he meaningfully investigated the possibility that such a memoir could be published (beyond references to the "big five").  Woody Allen was able to publish a memoir after being dropped by a so-called "big-five" publisher, an outcome consistent with the possibility Fairstein could publish a memoir if she wanted to write one and ever wrote it.[162]

---

[157] Milliot, Jim, "Skyhorse Forms Arcade CrimeWise," April 23, 2019, https://news.publishersglobal.com/story/show/skyhorse-forms-arcade-crimewise; Simon & Schuster Arcade CrimeWise books, https://www.simonandschuster.com/search/books/Category-Fiction/Imprint-Arcade-Crimewise/_/N-g1hZ1z0ye0a/Ne-g1h.

[158] LF00051164.

[159] Alter, Alexandra, and Rachel Adams, "Phillip Roth Biography Finds New Publisher," New York Times, May 18, 2022, https://www.nytimes.com/2021/05/17/books/blake-bailey-philip-roth-biography.html.

[160] Bania Report, at ¶s 114; and LF00041888.)

[161] Newberg Dep. Tr. at 147-149.  Ms. Newberg testified that she believed that Fairstein "would have" authored a memoir but admitted that there was not a "formal deal" with Penguin and Penguin offered no formal terms to Fairstein concerning any such memoir, including no delivery dates and no royalty percentages ("nothing"). (Id.  See also Plaintiff's Objections And Responses To Defendant's Third Set Of Interrogatories, dated August 8, 2022, at pp. 4-5.)

[162] "Welcome to Arcade Publishing," Arcade Publishing, https://www.skyhorsepublishing.com/arcade-publishing/about/; https://www.skyhorsepublishing.com/arcade-publishing/9781951627348/apropos-of-nothing/;

September 2, 2022

## IX.      ISSUES RELATED TO BANIA'S CALCULATIONS

66.      Below I discuss a number of issues that render Bania's damage calculations unreliable and speculative.

### A.  Book Advances

67.      The most important components of Bania's but-for revenue projections relate to book advances in the United States and the U.K., representing over some 90 percent of his damage claims.  I address both below.

### 1.  Penguin

68.      Bania assigns a ███████ advance to all 12 fiction books he claims Fairstein would publish in his but-for world related to the United States.[163]  He bases this figure on the advances provided to Fairstein in 2017 for two different books, one she wrote (Blood Oath) and one not written (Graveyard).[164]  This calculation is unreliable because it ignores that for the last two books Fairstein contracted with Penguin for in 2019, ████████████████████████ ████████.[165]  Bania agrees that Fairstein was paid an advance of ████████ for each of her last two planned books.[166]  Bania claims that the ████████ advance associated with these last two books was somehow affected by the Netflix series.[167]  Putting aside the issue of causation, the e-mail cited by Bania to support this claim does not.  It supports the opposite conclusion.  In an e-mail authored by Fairstein on June 7, 2019, she states that Penguin is ████████████████████ ████████████████████████████████████████████████████[168]

---

[163] Bania Report, at ¶ 110.
[164] Id., at ¶ 110 and Schedules 6a and 6b.
[165] LF00005575-576.
[166] Bania Report, as ¶ 105.
[167] Id., at ¶s 105-106.
[168] LF00036570.

September 2, 2022

69.     Bania does not discuss that, as reflected in **Exhibit 3**, Fairstein was not covering the advances provided by Penguin and that the level of advances was declining substantially, from ███████ per book in 2009 to ████████ in 2017 and ██████ in 2019.  Ms. Newberg testified that Fairstein's "book advances started to go down after about five books" beginning in 2010.[169]  She explained that Fairstein "could never get along with the PR department at the various publishing houses."[170]  She explained that representatives of those that published Fairstein's books "constantly" told Ms. Newberg that Fairstein did "not get along" with these representatives.[171]

70.     Ms. Ball, with Penguin, testified that ████████████████ as reflected in **Exhibit 3** are ███████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ██████████.[172]  Ms. Newberg also testified to Fairstein's declining book sales as did Fairstein herself.[173]  And, as also set out in **Exhibit 3**, Fairstein failed to cover ████████ advances that Penguin had provided to her.

71.     In the face of such objective facts, Bania's claim that for the next 10 years over multiple books and contract negotiations Fairstein would experience no diminution in advance payments is not credible and is speculative.  In this regard, it also should be noted again that the last advance she received was ████████ per book not ████████).  Bania claims that but-for the conduct at issue here Fairstein would continue to be paid advances "commensurate with her

---

[169] Newberg Dep. Tr. 12-14 and 63.
[170] Id.
[171] Id., at 16-17, 60-62, and 145-146.
[172] Ball Dep. Tr. at 104.
[173] Newberg Dep. Tr. at 60-61 and 141.

38

historical performance."[174]  But this historical performance was decidedly in decline, a fact he did not properly capture in his analysis.

### 2.   Curtis Brown

72.      In his damage calculations, Bania assigns a value of £38,950 (converted to U.S. dollars) for advances from Curtis Brown, a U.K. publisher, associated with nine of the 12 books at issue.[175]  This calculation is not reliable.  As set out in **Exhibit 4**, there is no evidence that Fairstein received any advance from Curtis Brown in the U.K. for Graveyard or for Alexandra Cooper #22 and Alexandra Cooper # 23 (the three books Penguin did provide advances for and negotiated in 2017 and 2019).  Moreover, of the 11 books published by Penguin as set out in **Exhibit 4**, Curtis Brown only paid advances for five or less than half of the total (based on information provided by Bania).  And the last advance, £28,250 in 2017, is much less than the £38,950 figure used by Bania in his calculations.  These calculations are unreliable and speculative.

### B.   Use Of 15 Percent Discount Rule

73.      When projecting possible earnings into the future that would be paid today, it is customary to discount possible future revenues or earnings to present value by use of a discount rate.  Here, Bania used a discount rate of 15 percent based on a rate applied to tangible assets, such as actual inventory or machinery.[176]  But there is nothing similarly tangible about books Fairstein has not written.  Moreover, such a discount rate does not properly adjust for the risk that Fairstein, now in her mid-70s, can continue to write into her mid-80s.  In this regard, Bania

---

[174] Bania Report, at ¶ 106.
[175] Id., Schedule 5B.
[176] Id., at ¶ 97 and ft. 73.

refers to six women authors who continued to publish later in life.[177]  Based on this analysis,

Bania concludes it is "not uncommon for women crime novelists to continue publishing books

into their mid-80s" and, therefore, it is "reasonable" that Fairstein would have "likely published

her last book when 83 years old."[178]  But he does not point out that one of these authors, Ms.

Rinehart, only published 3 books, not 12, after her 74th year and died when 82, according to his

own source.[179]  Nor does he refer to Sue Grafton, a prolific writer until she died at 77.[180]  In fact,

available data indicates that a 75 year old woman with a professional degree, on average (using

the median) is expected to work only 3.5 additional years.[181]

74.     By advancing this discussion, I am not arguing that Fairstein could not publish

more books in the future (although she has not written one in some three years).  Or that health

would prevent her from doing so.  Rather, a discount rate for a tangible asset is simply

inappropriate in such a circumstance.  It is too low and, therefore, overstates alleged damages.

C.  Understated Costs

75.     Bania also made a mistake when calculating his costs that are deducted from the

future projected revenue he generates in his damage calculations.  In his analysis, Bania reduced

his future revenue estimates by three types of costs, including product-specific costs, direct

assistance costs, and overhead. [182]  To generate his estimate for these costs, he averaged data for

2013-2017 for the first two cost categories and 2015-2017 for overhead.[183]  He excluded 2018

---

[177] Id., at ¶s 86-89 and Figure 7.
[178] Id., at ¶ 89.
[179] "Mary Roberts Rinehart Books In Order," https://www.bookseriesinorder.com/mary-roberts-rinehart/.
[180] Genzlinger, Neil, "Sue Grafton, Whose Detective Novels spanned the Alphabet, Dies at 77," December 29, 2017, https://www.nytimes.com/2017/12/29/obituaries/sue-grafton-dies-best-selling-mystery-author.html.
[181] Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger, "The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," Journal of Forensic Economics 28(1-2), 2019, at pp. 82-83.  See also National Vital Statistics Reports, United States Life Tables 2019, Volume 70, Number 19, March 22, 2022.
[182] Bania Report, at ¶ 116.
[183] Id.

from his calculations for the first two cost categories because he claims it included "nonrecurring litigation expenses."[184] Bania also excluded 2013 and 2014 (in addition to 2018) from his projection of overhead expenses because Fairstein paid rent during these two years but not in 2015-2017.[185] (In this regard, Bania never explains why it is reasonable for Fairstein to pay no rent expenses for some 10 additional years into the future.)

76.    Bania did not include 2018 when projecting so-called product-specific costs, which relate to commissions and research costs, and generated a cost estimate for this category of 17.0 percent of revenues. However, this cost category does not include any litigation expenses. As a result, Bania had no basis to exclude 2018 from his analysis of this cost category. If the year 2018 were included in these calculations, the relevant cost estimate, using Bania's method to calculate such costs, a simple average across relevant years, would increase to 18.4 percent from 17.0 percent and meaningfully reduce his claimed damage estimate. His damage estimate of $1.37 million would decline by some $51,000.

77.    When reviewing this cost category, I also noted that research-related costs included in this cost category varied significantly from $14,278 in 2013 to below $10,000 in 2014 and 2015 but in 2016, 2017, and 2018, this figure increased to over $25,000. Given these significant changes, I recalculated Bania's product-specific costs average for just 2016, 2017, and 2018 and arrived at 20.9 percent instead of his 17.0 percent. Use of this figure, 20.9 percent, in Bania calculations would reduce his damage estimate by some $140,000.

---

[184] Id., at ¶ 45 and Schedule 1a. I noted in this regard that the accountant who informed Bania about the alleged nonrecurring expense in 2018, stated in an email that he did not have access to "all of the underlying" backup material related to the expenditure at issue and, as a result, did "not know the nature of each expenditure." (Email from Ralph Minardo to Kara Gorycki dated August 25, 2022.)
[185] Bania Report, at ft. 86.

September 2, 2022

78.     One final point.  Bania excludes 2018 from two of his three cost category calculations (product-specific and direct assistance) due to, in part, what he defines, as noted above, as "non-recurring litigation expenses."[186]  But the cause of these expenses is never identified nor is any information provided by Bania as to why they are "non-recurring."  If one were to include 2018 in Bania's cost calculations for all three cost categories, including overhead, and average all costs for the years 2013-2018 for each cost category, using Bania's averaging method, his damage estimate would decline by roughly $282,000.[187]

D.  Anther Omission From Bania's Report

79.     It is well established in economic literature that individuals gain economic benefits (defined as utility) from leisure.[188]  If Fairstein does not write the books at issue and she remains in good health, she will have more leisure time.  That leisure time has economic value.  Bania's failure to discuss the economic value of leisure time adds to the unreliable nature of his damage calculations.  By advancing this argument, I am not claiming that Fairstein might not prefer to publish additional books.  Rather, I am pointing out the well-established economic principle that if she does not, she will gain an economic benefit in leisure time.[189]

---

[186] Id., at ¶ 45 and Schedule 1a.

[187] Although the royalties Fairstein earned on sales of her books published by Simon & Schuster varied significantly from year to year, it is unlikely that adjusting these figures he used for these calculations (both in his but-for and actual worlds) would materially alter his final calculations. That also is true for his projected royalties associated with Fairstein's relationship with Gere concerning projected e-book royalties.

[188] See, for example, Ehrenberg, Ronald G., and Robert S. Smith, Modern Labor Economics: Theory and Policy, 12th Ed., Routledge, 2016, at pp. 173 and 178. (emphasis in original); Mankiw, N. Gregory, Principles of Microeconomics, 5th Ed., South-Western Cenage Learning, 2009, at p. 399; and Becker, Gregory S., "A Theory of the Allocation of Time," The Economic Journal, September, 1965, Vol. 75, No. 299, at pp. 494, 498, and 502.

[189] In this regard, Fairstein noted in an e-mail dated June 7, 2019 that not writing provided her with the "first summer vacation in 30 years." (LF00036570.)

## X.   FISHER'S DAMAGES ANALYSIS

80.      Fisher's damages analysis is unreliable and speculative.

### A. <u>Causation And Mitigation</u>

81.      Although Fisher claims that Fairstein's reputation was diminished by the Netflix series, he does not properly link the purported diminution related only to the five scenes and related statements at issue.  He repeatedly refers to the "series" as a whole when discussing his opinions related to Fairstein's reputation.[190]  For example, he reports his analysis was focused on claimed reputational harm and damage suffered by Fairstein as a result of the Netflix "series" as whole.[191]  At another point, Fisher opines that Fairstein was vilified "throughout the series."[192]  For this reason alone, Fisher's damage-related opinions are fatally flawed.

82.      Under the heading "Sources Of Reputational Harm," Fisher also cites to statements purportedly made by defendants before and after the series was made available.[193]  In other words, Fisher appears to be attributing alleged diminished reputation to specific statements that are not included among Fairstein's claims that were deemed actionable by the Court in this case.  In addition, Fisher also claims Fairstein's reputation was diminished by social media posts and media exposure.[194]  In fact, Fisher asserts that headlines in published articles "can be more harmful than if the reader actually read the article" because the article would tend to be "'fair and balanced.'"[195]

---

[190] <u>See</u>, for example, Supplemental Fisher Report, at pp. 6, 14, 42, 44, 59, 61, 67, and 78.
[191] <u>Id.</u>, at, for example, p. 6.
[192] <u>Id.</u>, at p. 49.
[193] <u>Id.</u>, at pp. 53-55 (including statements allegedly designed to "denigrate" or "disparage").
[194] <u>Id.</u>, at pp. 55-60.
[195] <u>Id.</u>, at p. 60.

83.    Fairstein maintains that prior to the series running, public discourse included misinterpretations and misrepresentations related to the Central Park prosecution and Fairstein's participation in it.  Fairstein was aware in 2017, two years before the Netflix series was made available, that there were, as Fisher described them, "previous periodic misinterpretations and misrepresentations" regarding the "facts of Central Park 'jogger' incident."[196]  Fisher points to two letters sent by lawyers representing Fairstein in 2016 and 2017 that detailed at least some of these claimed misinterpretations and misrepresentations.[197]  Fisher reports that prior to the series being available, there was "past unfair treatment" of Fairstein in the "media and grossly inaccurate portrayals" in public accounts going back to 2003 and "thereafter."[198]

84.    In one of the letters, dated in 2016, Fairstein's lawyers represented that the "media" "ignored" relevant facts and "misrepresented others" with respect to Fairstein's association with the Central Park Five and that the "public domain" contains "erroneous or misleading impressions and factual assertions" based on "unreliable and biased sources of information."[199]  Fairstein's attorney points to a book by Sarah Burns and a documentary produced, in part, by her and her father, Ken Burns.[200]  Indeed, in this letter, it was represented that public accounts of Fairstein's participation in the Central Park Five case beginning in "2003 and thereafter" were "grossly inaccurate and defamatory."[201]  Similarly, in a 2017 letter to Netflix lawyers, Fairstein expressed many of the same concerns.[202]

85.    In this regard, I also noted that Ms. Newberg testified that she began to have doubts about the Central Park Five convictions when she saw the Burns' movie and that the

---

[196] Supplemental Fisher Report, at p. 11.
[197] Id., at pp. 11-12
[198] Id., at p. 12.
[199] LF00001377-384 (emphasis added).
[200] Id.
[201] LF00001377-384.
[202] LF00051386-387.

September 2, 2022

movie "didn't help [Fairstein]."[203]  She agreed that along with the film and the vacated sentences there was an increasing awareness that "the five were wrongly convicted," but that Fairstein continued to take the position that they were guilty.[204]

86.    In his Supplemental Report, Fisher argues when referring to various testimony, that pre-series events such as the Reyes confession and related lawsuit, the Burns documentary, and the MWA rescinding its award in 2018 did not damage Fairstein's reputation to the same extent as "her portrayal in the series."[205]  That argument not only disregards important parts of the testimony of Ms. Newberg, Ms. Ball, Ms. Rossi, and Ms. Zwang discussed above, but it also inappropriately focuses on the Netflix series as a whole as opposed to the five alleged defamatory scenes and statements at issue.[206]  As the literature cited by Bania emphasized, if conduct by Fairstein in this matter caused reputational harm, the plaintiff may not be able to recover any alleged damages, even if the defendant's activities are a contributing factor" associated with any losses.[207]

87.    Like Bania, as discussed above, Fisher also does not properly investigate possible opportunities for Fairstein to publish additional books, including a memoir with alternative publishers.

---

[203] Newberg Dep. Tr. 82-84 and 132.
[204] Id., at 132-136.
[205] Supplemental Fisher Report, at pp. 65-71.
[206] In support of his opinion, Fisher cites selectively to certain testimony of various deponents but does not refer to testimony discussed herein by these witnesses.  (See, for example, Newberg Dep. Tr. at 19, 67-68, 73-80, 101-104, and 108-110; Ball Dep. Tr. at 60-61, 92, 104 and 137-153; Rossi Dep. Tr. at 25-26, 56-57, 65-66, 79-80, 86-88, 94-96, 98-105, and 139-140; and Zwang Dep. Tr. at 9, 17-22, 29-35, 40-41, 45, 48-51, 59-61, 114-115, and 140.)
[207] See Bania Report, at ¶ 38.

September 2, 2022

B. Proposed Reputational Repair Program

88.     Fisher also discusses the possibility of Fairstein participating in a reputational repair program that would cost, he claims, between $650,000 and $700,000.[208]  He provides no support for these figures making it impossible to test verify them empirically.  He also claims that he has not received the approval of Fairstein to participate in such a program and her participation would be based on the "nature and degree of her participation based on her preferences."[209]  Fisher also concludes that the result of the litigation could "create and build a program to restore" Fairstein's reputation.[210]

89.     Fisher also observed that such a program could only "limit" the alleged reputational damage to Fairstein and claims that such a program "might only restore 70% of" Fairstein's reputation.[211]  Like the $6 million to $8 million figures advanced by Fisher, discussed below, he provides no support for how this number was generated making it impossible to test and verify empirically numbers he discusses.

C. Damages Claims

90.     Fisher reports, under the heading of "Reputational Damage Compensation," that Fairstein "believes" that her reputational-related damages were $6 million to $8 million.[212]  Fairstein has provided no economic basis for this claim.  Fisher claims, also with no economic basis, that these figures are "very conservative."[213]  It also is not obvious if this $6 to $8 million figure is based on a projection into the future and if it is, what is the basis for the projection and

---

[208] Supplemental Fisher Report, at pp. 72-76.
[209] Id., at pp. 75-76.
[210] Id.
[211] Id., at p. 79.
[212] Id., at p. 76.
[213] Id.

46

September 2, 2022

what discount rate is used, what costs are used, etc. This number just appears without any economic or factual basis and with no way to test or verify its reliability.

## XI.      CONCLUSION

91.      Bania has not advanced a reliable claim for any alleged reputational damages to Fairstein associated with the conduct at issue here for the reasons stated herein. Nor has Fisher.

_____

David P. Kaplan

47





# CURRICULUM VITAE
## DAVID P. KAPLAN

**OFFICE**

BERKELEY RESEARCH GROUP, LLC
1800 M Street, NW, 2nd Floor
Washington, DC 20036
Tel. (202) 480-2656
Fax (202) 419-1844
Email dkaplan@thinkbrg.com

**EDUCATION**

Master of Arts in Economics, THE GEORGE WASHINGTON UNIVERSITY, 1982

Bachelor of Arts in Economics, THE GEORGE WASHINGTON UNIVERSITY, 1977

J.D., THE GEORGE WASHINGTON UNIVERSITY SCHOOL OF LAW, 1987

**PRESENT POSITION**

BERKELEY RESEARCH GROUP, LLC, 2021
Executive Director

**TEACHING EXPERIENCE**

JOHNS HOPKINS UNIVERSITY, Carey Business School, Business and Educational
Instruction (formerly School of Professional Studies and Education, Graduate Division of
Business and Management), 1999-2010
Faculty Associate/Practitioner Faculty/Instructor

GEORGE MASON UNIVERSITY, Fairfax, VA, 1990-2000, 2002
Lecturer in Economics

UNIVERSITY OF UTAH, 1997-2000
Adjunct Professor of Economics

COLUMBIA UNIVERSITY, Industrial Engineering & Operations Research,
Entrepreneurial Business Creation For Engineers, 2012 - 2013
Guest Lecturer Concerning Entrepreneurship

THE GEORGE WASHINGTON UNIVERSITY SCHOOL OF LAW, 1988
Guest Lecturer in Antitrust Economics

**OTHER PROFESSIONAL EXPERIENCE**

Berkeley Research Group, LLC, (April) 2011-2021 (January)
<u>Vice Chairman</u>
<u>Member, Board of Managers</u>

LECG, LLC, 2006 (March)-2011
<u>Executive Director</u>

LECG, Corporation, 2003-2006 (February)
<u>President</u>
<u>Member, Board of Directors</u>

LECG, LLC, 2000-2006 (February)
<u>President</u>

LECG/Navigant, 1999-2000
<u>Managing Director, Washington, DC Office</u>
<u>[Fall 1999, Senior Managing Director]</u>

LECG, 1998-1999
<u>Principal</u>
<u>Executive Vice President for Corporate Development</u>
<u>Managing Director, Washington, D.C. Office</u>

UNIVERSITY OF UTAH, 1997-1999
<u>Law and Economics Society, Community Board</u>

CAPITAL ECONOMICS (formerly WERC), Wash., DC and Los Angeles, 1985-1998
<u>President</u>

HOWREY & SIMON, Washington, DC 1977-1985
<u>Chief Economist</u> (1981-1985)

<u>Economic Analyst/Asst.</u> (1977-1981)

**PREVIOUS CONSULTING EXPERIENCE**

SENATE JUDICIARY COMMITTEE, Subcommittee on Antitrust, Monopolies & Business Rights, 1994 and 1995
<u>Consultant</u>

DEPARTMENT OF JUSTICE, 1993
<u>Consultant</u>

FEDERAL TRADE COMMISSION, Bureau of Economics, 1992
<u>Consultant</u>

**PROFESSIONAL AFFILIATIONS**

Member, American Economic Association

Member, Southern Economic Association

Member, Western Economic Association International

Member, American Bar Association

Member, Economic Honorary Society (college)

## PUBLICATIONS

### Books

*Competition and Concentration, The Economics of the Carbonated Soft Drink Industry*, with R. Tollison and R. Higgins, Boston: Lexington Books, December 1990.

### Chapters in Books

"Economics and Antitrust Issues in Franchise Matters," with M. Glueck, *The Antitrust Review of the Americas 2000, A Global Competition Review Special Report,* October, 1999.

"The Causes and Consequences of the Aluminum MOU," with R. Higgins, M. Glueck, and M. McDonald, *Economic Inputs, Legal Outputs:  The Role of Economists in Modern Antitrust*, New York:  John Wiley & Sons, 1998.

### Articles

"Case Currently Pending Before the Supreme Court Could Upend Indirect Purchaser Litigation," with Jeffery Klenk, *Competition & Antitrust Law 2019, Expert Guide*, Corporate Livewire.

"The Nuts and Bolts of Antitrust Analysis:  Some Thoughts on How to Develop the Facts," *Management and Decision Economics* vol. 17, 179-192, 1996.  Also republished in *Economic Inputs, Legal Outputs: The Role of Economists in Modern Antitrust*, New York:  John Wiley & Sons, 1998.

"Residual Demand Analysis of the Carbonated Soft Drink Industry," with R. Higgins, M. McDonald, and R. Tollison, *Empirica, Journal of Applied Economics and Economic Policy,* vol. 22, no. 2, 1995.

"Hospital Mergers and Joint Ventures: Is there a Conflict in Current Government Policy?" published in "The Structure of the Hospital Industry in the 21[st] Century," hearings before *The Joint Economic Committee,* Congress of the United States, June 17 and 24, 1992.

### Reports

"The Case for Maintaining Current Balance Between Management and Labor," with M. Glueck, published by *Alliance to Keep Americans Working,* October 1993.

"Stock Options, Executive Compensation, and Stockholder Disclosure," with R. Higgins, submitted to the *Securities and Exchange Commission,* 1992.

### Working Papers

"Some New Applications of the Dominant Firm Model in Antitrust Merger Analysis," with R. Higgins, *Capital Economics Working Paper* (93-01).

"The New Learning:  Carbonated Soft Drinks and the FTC," with R. Tollision and R. Higgins, *George Mason Working Paper*, Center for Study of Public Choice, Department of Economics, George Mason University, 1992.

"Section 7 and Concentration, A Historical Perspective," *Capital Economics Working Paper* (86-01).

"Damages for a Precluded Plaintiff:  A Brief Overview," with A. Hoh, *Capital Economics Working Paper* (85-01).

"Analysis of Department of Justice Merger Guidelines," *Howrey & Simon Working Paper* (82-02).

"Explanation of the Herfindahl Index," *Howrey & Simon Working Paper* (82-01).

## Statistical Reports

"Wallcovering Manufacturers Quarterly Report," prepared for the *Wallcovering Manufactures Association*, 1984-1987.

"Ceramic Floor and Wall Tiles, Quarterly Statistical Report," prepared for the *Tile Council of America*, 1982-1984.

"Ceramic Floor and Wall Tiles, Port-of-Entry Analysis," prepared for the *Tile Council of America*, 1982-1984.

"Automotive Warehousing Institute:  1985 Consumer Survey," prepared for the *Automotive Warehousing Institute*, 1985.

## PRESENTATIONS AND CONFERENCES

"Economics And Class Action Issues In The United Kingdom," a CLE available course and presented as a panel member associated with *The Beard Group* "Class Action Money And Ethics Conference," 2021.

"Economics And Antitrust Class Actions," A CLE available course presented by *The Knowledge Group*, November, 2020.

"Understanding Economic Damages In Intellectual Property Disputes," presented before *DC Bar Association* CLE Course, October, 2020.

"Understanding The Economics Of Antitrust Damages," presented before *DC Bar Association* CLE Course, November, 2019.

"Using Economic Experts In Litigation," presented with Jeffery Klenk, before the *DC Bar Association,* May 17, 2019.

Expert participant on panel related to "Class Actions And Two-Sided Markets," presented at Class Action Money & Ethics, Third Annual Conference, *Beard Group*, May 6, 2019.

"Class Action Issues," presented before *Association of Corporate Counsel*, Chicago Chapter, 2006.

Moderator, "Remedies and Ways of Measuring Damages" 4th International Judges Conference on Intellectual Property Law, sponsored by the *Intellectual Property Owners Education Foundation*, 2005.

Expert Participant in "Class Certification Discussion and Demonstration," presented before The Antitrust Litigation Course, *ABA Section of Antitrust Law*, 2005.

"Pricing Claims:  Theories, Reality and the Use of Economic Experts," presented at the 2005 *Petroleum Marketing Attorneys Meeting* (with Michelle Burtis), 2005.

Discussion of "Class Action Issues," presented before *LECG (XPRT) Forum*, 2005.

"Analyzing Damages in Transnational Litigation," presented at a program entitled "Antitrust Beyond Borders," sponsored by Freeborn & Peters in conjunction with *The American Lawyer*, 2001.

"Examining Alleged Cartel Behavior," presented at 49th Annual Spring Meeting, Section of Antitrust Law, *American Bar Association*, 2001.

"Antitrust Economics and the Bush Administration," presented at a program entitled "Antitrust in a Bush Administration," sponsored by *AEI - Brookings Joint Center on Regulatory Studies*, 2001.

"Intellectual Property and Incentives," presented at program entitled "Emerging Antitrust, Intellectual Property, and Finance Issues in the New Millennium," as sponsored by *LECG*, 2000.

"Economic Consulting," presented at program entitled "Multidiscipline Professional Practice:  Lawyers, Accountants, Economists, and Consultants," sponsored by *The Conference Board, Council of Chief Legal Officers,* 1999.

"Introduction to Patent Damage Topics," presented at program entitled "Intellectual Property Conference," as sponsored by *LECG*, 1998.

"Economics and the Hart-Scott-Rodino Act," presented before program entitled "1997 Post-Annual Leadership Meeting," as sponsored by the Section of Antitrust Law, *American Bar Association*, 1997.

"Vertical Restraints and Single Firm Behavior," presented before program entitled, "Basic Economics for Lawyers," as sponsored by the Section of Antitrust Law, *American Bar Association*, 1996.

"Economics and Slotting Allowances," presented before the 1996 Public Policy and Marketing Conference, sponsored by the *Marketing Science Institute*, 1996.

"Mergers and Economic Analysis," presented before the *Dallas Bar Association*, Antitrust and Trade Regulation Section, 1995.

"Market Power and Kodak," presented before *Howrey & Simon Intellectual Property Seminar*, 1995.

"Residual Demand Analysis of the Carbonated Soft Drink Industry," with Higgins, McDonald, and Tollison, presented by McDonald before the *Southern Economic Association*, November 1993, and the *Western Economic Association,* June 1993.

"The Robinson-Patman Act:  Injury and Damage Analysis," presented before *The Conference Board, Antitrust Issues in Today's Economy,* March 1993.

"Tying Cases and Determination of Market Power," presented before *The Conference Board, Antitrust Issues in Today's Economy,* March 1992.

"Economic Basis for the Department of Justice Merger Guidelines," presented before *Howrey & Simon Merger Seminar*, 1992.

"Antitrust Issues Associated with Teaming Agreements and Joint Ventures," presented before *Howrey & Simon Government Contracts Seminar*, 1992.

"Determination of Injury in Trade Matters," presented before *Howrey & Simon International Trade Seminar*, 1988.

"Demand for Wallcovering," presented before the Annual Meeting of the *Wallcovering Manufacturers Association*, 1984.

**TESTIMONY**

**Judicial/Testimony (last four years)**

Duke/NTE – Deposition testimony in matter involving alleged anticompetitive acts, unfair competition, breach of contract, and defamation related to wholesale electricity competition, 2022. [Duke Energy Carolinas, LLC v. NTE Carolinas II LLC, NTE Carolinas II Holdings LLC, and NTE Energy LLC, Western District of North Carolina, Charlotte Division, Civil Action No. 3: 19-cv-00515]

AOT/ADM – Deposition testimony on matter involving class action issues concerning pricing of ethanol, 2022. Also submission of two Declarations during 2022. [AOT Holdings AG v. Archer Daniels Midland Company, United States District Court, Central District of Illinois, Urbana Division, Case No. 19-cv-2240]

PepsiCo/VPX – Trial testimony before arbitration panel concerning issues related to beverage distribution, 2021. [PepsiCo, Inc. v. Vital Pharmaceuticals, Inc, before the American Arbitration Association, Case No. 01-20-0015-8060]

Air Cargo/Netherlands – Submission of report and Court testimony in matter involving alleged overcharges and related volume of commerce, 2020. [District Court, Amsterdam, Equilib and SCC proceedings]

Visa/Interchange – Deposition testimony in matter involving alleged damages associated with antitrust claims, 2020 and submission of supplemental expert report in 2021. [In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, United States District Court for the Eastern District of New York, Master File 05-MD-1720]

Visa/Credit Cards – Deposition testimony in matter involving class certification and damage claims concerning antitrust issues related to "chip" technology, 2017, 2019, and 2021. Also submission of Declaration in 2022. [B&R Supermarket, Inc. d/b/a Milam's Market, Grove Liquors, Monsieur Marcel, Palero Food Corp. and Cagueyes Food Corp. d/b/a Fine Fare Supermarket, et al. v. Visa Inc., Visa U.S.A. Inc., Mastercard International, Inc., American Express Company, and Discover Financial Services, United States District Court for the Eastern District of New York, Case No. 1:17-cv-2738-MKB-VMS]

Steves/Jeld-Wen – Trial and deposition testimony in matter involving alleged damages associated with antitrust and contract issues, 2017 and 2018. [Steves and Sons, Inc. v. Jeld-Wen Inc.; United States District Court for the Eastern District of Virginia, Richmond Division; Civil Action No. 3:16-CV-00545-REP]

**Expert Report (last four years where no deposition taken)**

MRE/ADM – Expert report in matter involving class action issues concerning pricing of ethanol and related antitrust claims, 2022. [MRE v. Archer Daniels Midland, United States District Court, Central District Of Illinois, Urbana Division, Case No. 2.20-cv-02212-CSN-EIL]

XBT/BuzzFeed – Expert report in matter involving alleged damages in defamation matter, 2018 [Aleksej Gubarev, XBT Holdings S.A. and Webzilla, Inc. v. BuzzFeed Inc. and Ben Smith; United States District Court for the Southern District of Florida; Case No. 17-cv-60426-UU]

**Legislative**

"Hospital Mergers and Joint Ventures:  Is There a Conflict in Current Government Policy?" Submission of oral and written testimony concerning antitrust and healthcare issues associated with hospital mergers and joint ventures before the Subcommittee on Investment, Jobs, and Prices of the Joint Economic Committee, 1992.

**Regulatory Rulemaking**

"Slotting Allowances and Proposed Amendments to the Bureau of Alcohol, Tobacco, and Firearms Trade Practices Regulations." Submission of written testimony before the Bureau of Alcohol, Tobacco, and Firearms concerning certain trade regulation practices related to the alcoholic beverage industry, 1994.

July 2022



September 2, 2022

## Expert Reports

Expert Report of Doug Bania, Linda Fairstein v. Netflix, Ava DuVernay, and Attica Locke, dated June 17, 2022, including materials cited therein and provided for support.

Expert Report Prepared For Plaintiff Linda Fairstein by Robert J. Fisher, dated June 28, 2022, including materials cited therein and provided for support.

Supplemental Expert Report Prepared for Plaintiff Linda Fairstein by Robert J. Fisher, dated August 8, 2022 including materials cited therein and provided for support.

## Legal Documents

Complaint And Demand For Jury Trial, dated March 18, 2020.

Opinion and Order by P. Kevin Castel, United States District Judge, in Linda Fairstein, Plaintiff, v. Netflix, Inc., Ava DuVernay, and Attica Locke, dated August 9, 2021.

Plaintiff's Objections And Response To Defendant Netflix's Amended First Set of Interrogatories, dated December 13, 2021.

Plaintiff's Objections And Responses To Defendants' Third Set of Interrogatories, dated August 8, 2022.

## Depositions and Related Exhibits

Ball, Christine, June 21, 2022
DuVernay, Ava, June 8, 2022
Engel, Alison, June 24, 2022
Fairstein, Linda, June 15, 2022
Newberg, Esther, July 15, 2022
Locke, Attica, June 22, 2022
Rossi, Laura, June 30, 2022
Swicord, Robin, May 12, 2022
Wolff, Joanna, May 25, 2022
Zwang, Ariel, June 17, 2022

## Emails

Email from Ralph Mirando to Kara Gorycki, Subject: Fairstein Enterprises LLC, sent August 25, 2022 at 9:14 AM.

September 2, 2022

## Produced Documents

ICM-00000100
ICM-00000126
LF00001377-384
LF0005575-593
LF00032758-768
LF00032769-779
LF00032780-787
LF00032788-801
LF00032802-815
LF00036570
LF00036862-863
LF00039355-356
LF00041888
LF00051085-093
LF00051162-171
LF00051386-387
Mystery001358
Mystery001362
VC00000447

## Public

"About Algonquin Books," Algonquin Books, https://www.algonquin.com/about-us.

"About Kensington Publishing," Kensington Publishing, https://www.kensingtonbooks.com/pages/about/.

"About Lisa," https://www.lisajackson.com/bio.cfm.

"About Us," Source Books, https://read.sourcebooks.com/about-us.html.

"Best Books of 2021" in Mystery/Thriller, Publishers Weekly,
   https://best-books.publishersweekly.com/pw/best-books/2021/mystery.

"Clare Mackintosh, https://read.sourcebooks.com/author/A4728/clare-mackintosh.

"Clare Mackintosh," https://us.claremackintosh.com/books_/.

"Lisa Jackson," Kensington Publishing, https://www.kensingtonbooks.com/author/lisa-jackson/.

"Lynn Truss," https://www.bloomsbury.com/us/author/lynne-truss/.

"Mass Market - June 12, 2022" The New York Times, https://www.nytimes.com/books/best-sellers/mass-market-monthly/.

"Murder at the Porte de Versailles," Soho Press, https://sohopress.com/books/murder-at-the-porte-de-versailles/.

"Mystery Writers group rescinds award from sex crimes prosecutor over her role in Central Park Five case," The Washington Post, November 30, 2018, https://www.washingtonpost.com/nation/2018/11/30/mystery-writers-group-rescinds-award-sex-crimes -prosecutor-over-her-role-central-park-five-rape-case/.

"Mystery Writers of America Withdraws Fairstein Award" MWA, November 29, 2018, https://mysterywriters.org/mystery-writers-of-america-withdraws-fairstein-award/.

"New York Times Bestselling Author B.A. Shapiro," https://bashapirobooks.com/.

"New York Times Bestselling Author B.A. Shapiro, The Art Forger" https://bashapirobooks.com/novels/the-art-forger/.

"Overview: About Bloomsbury USA," https://www.bloomsbury.com/us/connect/about-us/overview/#.

"Publishing Companies Approved to Date by Membership Committee," Mystery Writers of America, Revised January 13, 2022, https://mysterywriters.org/how-to-become-a-member-of-mwa/approved-publisher-list/.

"Travel the Globe with Soho Crime," Soho Crime, https://sohopress.com/soho-crime/.

"Welcome to Arcade Publishing," Arcade Publishing, https://www.skyhorsepublishing.com/arcade-publishing/about/.

"What Does a Book Publisher Do?" https://work.chron.com/book-publisher-do-6716.html.

Alter, Alexandra, and Rachel Adams, "Phillip Roth Biography Finds New Publisher," New York Times, May 18, 2022, https://www.nytimes.com/2021/05/17/books/blake-bailey-philip-roth-biography.html.

Arias, Elizabeth and Jiaquan Xu, "United States Life Tables, 2019," National Vital Statistics Report, Vol. 70, No. 19, March 22, 2022

Becker, Gregory S., "A Theory of the Allocation of Time," The Economic Journal, September, 1965, Vol. 75, No. 299.

Carlton, Dennis W., and Jeffrey M. Perloff, Modern Industrial Organization, Pearson Addison Wesley, 2005.

Corrigan, Maureen, "Does Linda Fairstein deserve a literary honor? Criticssay her past as a prosecutor sullies her art," The Washington Post, https://www.washingtonpost.com/entertainment/books/does-linda-fairstein-deserve-a-literary-honor-critics-say-her-past-as -a-prosecutor-sullies-her-art/2019/04/23/efb34e2-6083-11e9-9ff2-abc9844c9eec_story.html.

Corson-Knowles, Tom, "'List of Mystery and Thriller Writers," TCK Publishing, December 6, 2018, https://www.tckpublishing.com/list-of-mystery-thriller-publishers/.

Cowles, Gregory, "Inside the List," The New York Times, March 6, 2015, https://www.nytimes.com/2015/03/15/books/review/inside-the-list.html.

Econometrics, Legal Practical and Technical Issues, Second Edition, American Bar Association, 2014.

Ehrenberg, Ronald G., and Robert S. Smith, Modern Labor Economics: Theory and Policy, 12th Ed., Routledge, 2016

Fairstein, Linda, "Netflix's False Story of the Central Park Five," Wall Street Journal, June 10, 2019, https://www.wsj.com/articles/netflixs-false-story-of-the-central-park-five-11560207823.

Gardner, Abby, "A Complete Breakdown of the J.K. Rowling Transgender-Comments Controversy," Glamor, June 11, 2020, https://www.glamour.com/story/a-complete-breakdown-of-the-jk-rowling-transgender-comments-controversy.

Genzlinger, Neil, "Sue Grafton, Whose Detective Novels spanned the Alphabet, Dies at 77," December 29, 2017, https://www.nytimes.com/2017/12/29obituaries/sue-grafton-dies-best-selling-mystery-author.html.

September 2, 2022

Golding, Bruce, "Linda Fairstein vouched for Weinstein's lawyer in model-grope case: report," The New York Post, October 15, 201'
https://nypost.com/2017/10/15/linda-fairstein-vouched-for-weinsteins-lawyer-in-model-grope-case-report/.

https://www.bloomsbury.com/us/constable-twitem-mysteries-9781635579086/.

https://www.orderofbooks.com/characters/alexandra-cooper/.

https://www.simonandschuster.com/search/books/Category-Fiction/Imprint-Arcade-Crimewise/_/N-g1hZ1z0ye0a/Ne-g1h.

https://www.skyhorsepublishing.com/arcade-publishing/9781951627348/apropos-of-nothing/.

https://www.skyhorsepublishing.com/arcade-publishing/9781956763294/zero-gravity/.

Jackson, Jon, "J.K. Rowling Stirs More Controversy With International Women's Day Message," Newsweek, March 8, 2022,
https://www.newsweek.com/jk-rowling-stirs-more-controversy-international-womens-day-message-1686090.

Locke, Robin H., Patti Frazer Locke, Kari Lock Morgan, Eric F. Lock, and Dennis F. Lock, Statistics Unlocking The Power of Data,
Third Ed., Wiley, 2021.

Liederman, Mack, Jessica Moss, and Frankie Knuckles, "Fairstein resignation sparks debate on College culture, previous inaction,"
June 6, 2019, The Miscellany News,
https://miscellanynews.org/2019/06/06/news/fairstein-resignation-sparks-debate-on-college-culture-previous-inaction/.

Litigation Services Handbook: The Role of the Financial Expert, Eds. Weil, Lentz, and Hoffman, Fifth Edition, Wiley, 2007.

Lopatka, John E., and William H. Page, "Economic Authority and the Limits of Expertise in Antitrust Cases," Cornell Law Review,
Vol. 90, 2005.

Mankiw, N. Gregory, Principles of Microeconomics, 5th Ed., South-Western Cenage Learning, 2009.

Milliot, Jim, "Skyhorse Forms Arcade CrimeWise," April 23, 2019,
https://news.publishersglobal.com/story/show/skyhorse-forms-arcade-crimewise.

Piccoli, Sam and Michael Gold, "After Furor, Literary Group, Withdraws Honor for 'Central Park Five' Prosecutor," The New York
Times, November 28, 2018, https://www.nytimes.com/2018/11/28/nyregion/linda-fairstein-central-park-5.html.

Proving Antitrust Damages, Legal and Economic Issues, Third Edition, American Bar Association, 2017.

Sharp, Rachel, "Central Park five prosecutor Linda Fairstein is intervening in criminal cases on behalf of her Martha's Vinyard friends
and offering former DA office colleagues positive press coverage, emails reveal," dailymail.com, May 6, 2021,
https://www.dailymail.co.uk/news/article-9549909/Linda-Fairstein-intervenes-criminal-cases-behalf-Marthas-Vineyard-friends.
-emails-reveal.html

Skoog, Gary, James E. Ciecka, and Kurt V. Krueger, "The Markov Model of Labor Force Activity 2012-17: Extended Tables of
Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," Journal of Forensic Economics 28(1-2), 2019

Snail, Timothy, "Chapter 8 Estimating Damages in Collusion Case," Antitrust Economics For Lawyers, LexisNexis, 2017

September 2, 2022

Twohey, Megan, James C. McKinley Jr., Al Baker and William K. Rashbaum, "For Weinstein, a Brush With the Police, Then No Charges," The New York Times, October 15, 2017, https://www.nytimes.com/2017/10/15/nyregion/harvey-weinstein-new -york-sex-assault-investigation.html.

*When They See Us*, created by Ava Duvaney, Netflix, 2019.

Wooldridge, Jeffrey M., Introductory Econometrics: A Modern Approach, Fifth Ed.. South-Western Cenage Learning, 2013.

Page 5 of 5



September 2, 2022

## Cumulative Royalties and Advances Received by Fairstein Enterprises
## On Alexandra Cooper Series
## From Penguin Random House
## As of Mid-2019

| Contract Year | Title | Penguin Royalties | Advances |
|---|---|---|---|
| 2007 | Killer Heat | ███████ | ███████ |
| 2007 | Lethal Legacy | ███████ | ███████ |
| 2009 | Hell Gate | ███████ | ███████ |
| 2009 | Silent Mercy | ███████ | ███████ |
| 2009 | Night Watch | ███████ | ███████ |
| 2012 | Death Angel | ███████ | ███████ |
| 2012 | Terminal City | ███████ | ███████ |
| 2012 | Devil's Bridge | ███████ | ███████ |
| 2015 | Killer Look | ███████ | ███████ |
| 2015 | Deadfall | ███████ | ███████ |
| 2017 | Blood Oath | ███████ | ███████ |
| 2017 | Graveyard | | ███████ |
| 2019 | Alex Cooper #22 | | ███████ |
| 2019 | Alex Cooper #23 | | ███████ |
| TOTAL | | ███████ | ███████ |

Sources:  LF00032758, LF00032769, LF00032780, LF00032788, LF00032802, and Bania's Schedule 5a.



September 2, 2022

## Advances Received by Fairstein Enterprises
## On Alexandra Cooper Series
## From Curtis Brown
## As of Mid-2019

| Contract Year | Title | Advances |
|---|---|---|
| 2012 / 2014 | Terminal City | £54,750 |
| 2015 | Devil's Bridge | £34,750 |
| 2015 | Killer Look | £34,750 |
| 2017 | Deadfall | £42,250 |
| 2017 | Blood Oath | £28,250 |
| 2017 | Graveyard | No Advance |
| 2019 | Alex Cooper #22 | No Advance |
| 2019 | Alex Cooper #23 | No Advance |

Sources:  Bania's Schedule 5b.