# Exhibit 8

# Econometrics

## Legal, Practical, and Technical Issues

### Second Edition

SECTION OF ANTITRUST LAW
Promoting Competition Protecting Consumers

AMERICAN BAR ASSOCIATION
Defending Liberty Pursuing Justice

This volume should be officially cited as:

ABA SECTION OF ANTITRUST LAW,
ECONOMETRICS, SECOND EDITION (2014)

Cover design by ABA Publishing.

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

© 2014 American Bar Association. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org or via fax at (312) 988-6030, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

18 17 16 15 14 5 4 3 2 1

ISBN: 978-1-61438-935-4
Library of Congress Catalog Number: 2014933353

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

CHAPTER 12

# APPLYING ECONOMETRICS TO ESTIMATE DAMAGES

The calculation of damages requires estimating the economic impact of an allegedly anticompetitive act. A damages analysis, however, must isolate the impact of an allegedly illegal act from other potentially causal factors. Econometric analysis is often used to identify and quantify the impact of allegedly illegal acts and distinguish that impact from effects caused by other factors.

To illustrate when and how econometric analysis can be useful, this chapter considers estimating damages in an alleged price-fixing case in which defendants are alleged to have fixed the sale price of the product in question, i.e., a sell-side price-fixing conspiracy. Assuming there has been an agreement to raise prices, the basic questions relating to the calculation of damages are (a) whether the alleged conspiracy affected prices (the fact of injury) and, if so, (b) the extent to which prices have increased as a result of the alleged conspiracy (the amount of injury).[1] Because prices prevailing in the market likely were affected by a wide variety of other demand and supply factors unrelated to the alleged conspiracy, isolating and measuring the effect of the alleged conspiracy on price requires properly accounting for these other factors. Otherwise, one might confuse the effects of one or more of these other factors with the effects of the alleged conspiracy, thus overestimating or underestimating damages attributable to the alleged anticompetitive conduct. The goal is to isolate the impact of the conspiracy on prices (the overcharge), and then multiply the overcharge by the quantity of sales to calculate damages recoverable by the purchasers.

---

1. *See* John E. Lopatka, *Antitrust Injury and Causation*, in 3 ISSUES IN COMPETITION L. & POL'Y 2299, 2311 (ABA Section of Antitrust Law 2008); Theon van Dijk & Frank Verboven, *Quantification of Damages*, in 3 ISSUES IN COMPETITION L. & POL'Y 2331, 2334 (ABA Section of Antitrust Law 2008).

## A. Non-Econometric Approaches to Damages

One approach to estimate the overcharge could be to perform a simple comparison of prices in the market before and after an allegedly anticompetitive event (i.e., the alleged agreement to fix prices) to determine if prices increased after the alleged agreement.[2] The underlying premise of this approach is that the market has not changed substantially over the relevant time period, except as a result of the allegedly illegal behavior.

Figure 1 below provides a hypothetical example in which prices are substantially higher in the period after the alleged price-fixing agreement than they were before the agreement came into force. The dots show actual prices over the entire period. The horizontal line shows the average price before the alleged agreement, which extends into the period after the alleged agreement. Absent any substantial changes in supply and demand in the market, an economist might use the average price in the pre-conspiracy period to predict prices during the alleged damages period, but for the alleged conspiracy. The difference in average prices between the pre-conspiracy and post-conspiracy periods is illustrated in Figure 1 as the difference between the dots and solid line after the date of the alleged agreement (shown as the vertical line). The difference between these actual and estimated prices "but for" the alleged conspiracy multiplied by the units of sales in the conspiracy period might be used to measure damages,[3] so long as (a) there are no significant changes in the market other than the alleged illegal behavior and (b) the time period of the alleged anticompetitive conduct has been identified correctly.

---

2. See detailed discussion of before and "during" analyses below.
3. In addition to estimating the but-for price in this conspiracy example, economic analysis also predicts that the but-for quantity could be larger than actual quantity because of the lower but-for price. However, most conspiracy cases focus on overcharges as the measure of the damages. Accordingly, this example focuses on overcharges.




Figure 1. Average Price Approach to Price Overcharge

There are, however, limitations to this approach.[4] In particular, other important external influences on prices often have changed during the time period of the alleged anticompetitive actions and thus may explain the price increase, at least to some degree. The simple approach described above would mistakenly attribute the effects of these external influences to the alleged conspiracy. If so, this approach would not be reliable for estimating prices but for the alleged conspiracy.

Several methods can be used to control for other influences. For example, using the example above but assuming that a significant cost increase occurred at or about the time of the alleged price-fixing agreement, which similarly affected all firms in the market, a more complete analysis than just comparing prices before and after the alleged

---

4 For example, determining the end of the alleged conspiracy to coincide with a decline in price can cause a bias to finding damages and suggesting a conspiracy. Dennis Carlton and Gregory Leonard have suggested an approach to address this problem. *See* Dennis Carlton & Gregory K. Leonard, *Correcting the Bias When Damage Periods Are Chosen to Coincide With Price Declines*, 2004 COLUM. BUS. L. REV. 304 (2004).

conspiracy would likely find that the cost increase caused at least some of the price increase that occurred after the agreement. Figure 2 replicates the Figure 1 example above, except that the predicted prices during the conspiracy period now equal the average price before the alleged conspiracy plus the increased per unit cost that occurred about the same time as the alleged agreement.

This approach assumes that the cost increases are passed on in the form of higher prices, although one presumably needs to conduct some analysis to document how much of a given cost increase would be passed on absent any conspiracy. Figure 2 shows that much of the price increase is explained by the cost increase, and that at least a portion of the price increase would have occurred even without the alleged conspiracy. Accordingly, damages might be estimated by calculating the difference between (a) the actual prices and (b) average pre-conspiracy prices plus the per unit cost increase (the price but for the conspiracy), and then multiplying this difference by the number of units sold during the conspiracy period.




Figure 2. Average Price Approach Adjusting for Cost Increase

## B. The Econometric Approach to Damages

The example above illustrates how one might estimate damages without using econometric analysis. However, in many situations it is difficult to estimate what would occur in a market but for the alleged anticompetitive behavior because there could be other major influences that affect prices or other important variables one needs to take into account to estimate damages. Econometric and regression analyses are particularly useful in separating the impact of an alleged anticompetitive act on market outcomes (such as pricing) from the impact of other influences.[5] That is, when correctly implemented, econometric techniques can isolate and measure the effect of a single explanatory factor on the economic outcomes that are relevant when estimating damages.[6]

To illustrate the potential benefits of econometric analysis, assume that in the example discussed above, there is also a substantial increase in demand about the time of the alleged agreement. Increased demand would typically be expected to increase prices, which may explain at least part of the price increase during the alleged conspiracy period. Neither of the approaches illustrated by Figures 1 and 2 easily addresses how multiple factors can affect prices simultaneously. In fact, other influences may explain the observed price increase, and the allegedly anticompetitive practices may have had no significant causal effect on the market.

Figure 3 shows how using econometric estimation that includes both supply and demand factors (e.g., cost and demand increases) can predict prices but for the alleged conspiracy. Figure 3 illustrates that there may not be measureable impact of the alleged agreement once the impact of both cost and demand increases have been taken into account, since the estimated prices but for the conspiracy would be very similar to the prices in the actual world. This result would be consistent with cost and demand driving up prices, and there being no measureable effect of the alleged agreement. Because the actual and "but-for" predicted prices are relatively close, the difference between them is about zero and so damages would be about zero.

---

5. *See* Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation: Review and Critique*, 1 AMER. L. & ECON. REV. 386, 388 (1999).

6. *See* JEFFREY M. WOOLDRIDGE, ECONOMETRIC ANALYSIS OF CROSS SECTION AND PANEL DATA 3-4 (2002).




Figure 3. Econometric Approach Accounting for Changes in Cost and Demand Conditions

As with the simple non-econometric approach, the econometric approach has its own limitations. For example, even sophisticated econometric techniques are of no use if the partial effect of interest is not identified (i.e., distinguishable from other "confounding" factors).[7] Identification is often a function of the available data. In many situations, identification requires that the existence (or the extent) of the alleged unlawful conduct varies over the observations in the data in a way that is not perfectly mirrored by ("correlated" with) other explanatory variables. If such data exist and there are adequate controls for the effects of other economic factors, identification generally will be possible.[8]

## C. Overview of Legal and Economic Framework

The legal requirements for regression analysis fall under the rules for testimony by experts. Under Federal Rule of Evidence 702:

---

7. *Id.* at 52-53.

8. *Id.*

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[9]

Regression analyses have been found to meet these requirements in litigation for a wide range of issues, including the estimation of antitrust damages.[10] A competent expert should be able to tell the litigant whether sufficient facts and data are available for econometric analysis, explain the types of econometric analyses that are applicable, and reliably apply these econometric techniques.

As suggested above, a key advantage of econometric analysis is that it allows the expert to separate the impact of an anticompetitive act from other economic factors that may affect the variable of interest, such as sales volumes and prices. In general, econometric results will be more reliable as the amount and quality of data increase. If sufficient data are available, econometric analysis has been found necessary for achieving the minimum scientific standard for establishing lost sales and price changes. For example, in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,[11] expert opinion and internal forecasts for sales growth were excluded because data to estimate sales growth via regression analysis were available but not used.

The use of regression analysis, however, does not guarantee that the analysis will be admitted or accepted. The regression must be in a form that assists in determining a material fact, such as the amount of lost sales or the size of price changes.[12] The analysis also must be based on

---

9. FED. R. EVID. 702.
10. *See, e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002); City of Tuscaloosa v. Harcros Chems., 158 F.3d 548 (11th Cir. 1998); Allapattah Servs. v. Exxon, 61 F. Supp. 2d 1335 (S.D. Fla. 1999).
11. 395 F.3d 416 (7th Cir. 2005).
12. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 186 (2d ed. 2000), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/sciman03.pdf/$file/sciman03.pdf.

data "reasonably relied upon by experts in the field."[13] Because experts typically verify data for accuracy in consulting work or academic research, experts presenting regression analyses in court need to conduct similar verifications of the data that they use.[14]

The principle for reliability encompasses many factors bearing on the regression analysis, and a competent expert should conduct reliability checks to ensure that the results survive the rigors of litigation. Part D of this chapter discusses many of the issues that arise in implementing reliable econometric techniques and econometric tests that a testifying expert should perform when appropriate. Moreover, econometric results typically should not change materially with minor changes in the data (e.g., deleting a few potentially inaccurate observations).[15]

In addition to requiring experts to verify the reliability of the underlying data, courts typically require an analysis of damages that not only quantifies the amount of damages, but also demonstrates that those damages are causally linked to the allegedly anticompetitive acts.[16] In a price-fixing case, for example, there must be an analysis that provides evidence of a clear link between the agreement to fix prices and an increase in prices that is not explained by other factors.[17]

### D. Estimating Damages Using Econometric Techniques

As discussed above, assuming liability and the construction of a reasonable explanatory variable representing the anticompetitive act at issue, econometric tests can be used to determine whether the data are consistent or inconsistent with the anticompetitive act having caused changes in the dependent variable.[18] Properly applied econometric techniques can provide both reliable estimates of the magnitude of damages and useful information about causation.[19]

---

13. FED. R. EVID. 703.
14. *See, e.g.*, Cooper v. Travelers Indem. Co., 113 F. App'x 198 (9th Cir. 2004).
15. *See* Rubinfeld, *supra* note 12, at 199.
16. *See, e.g.*, Lopatka, *supra* note 1, at 2299.
17. *See* van Dijk & Verboven, *supra* note 1, at 2335.
18. *See* WOOLDRIDGE, *supra* note 6, at 3-4.
19. *See* Rubinfeld, *supra* note 12, at 184-85. An econometric test called the Granger Causality Test is designed to determine whether changes in one variable occur before changes in another variable. While this property can potentially supply some useful information, it is not the same as causality

For example, assume a properly specified econometric analysis finds a measure of the partial impact of the allegedly anticompetitive act on the dependent variable of interest to be statistically significant and of the expected sign.[20] This result would be consistent with the act resulting in damages, as long as there is a clear economic explanation of the link between the act and the measure of the partial effect. Econometric analysis also can provide an estimate of the magnitude of the impact to estimate the amount of damages. A finding that the estimated impact is not statistically different than zero would be consistent with a lack of causation and zero damages.

Assuming liability and given the construction of a reasonable explanatory variable to represent the anticompetitive act, properly applied econometric techniques can provide a reliable estimate of damages based on a statistical estimate of the partial effect of the anticompetitive act on the dependent variable of interest, such as price. These techniques also can provide useful information about the important damage-related issue of causation, which is linking the assumed anticompetitive acts to adverse outcomes for competition and for plaintiffs. In particular, econometric analyses can test whether the data are consistent or inconsistent with the proposition that the relevant explanatory variable "caused" changes in the dependent variable.[21]

One frequently used econometric method is the before-during approach. It can be used when data exist from both the period before an alleged anticompetitive act (e.g., a price-fixing conspiracy) and the period of the alleged anticompetitive act. This approach identifies the effect of an alleged anticompetitive act by comparing, for example, prices in the "during" period (the affected period, frequently referred to as *treatment* period) to prices in the "before" period (the control period), while also controlling for differences in other economic factors between

---

in the sense in which this chapter uses the term. For example, as PETER KENNEDY, A GUIDE TO ECONOMETRICS 64 (6th ed. 2008), notes, Christmas cards "Granger-cause" Christmas, but obviously do not "cause" Christmas. *See also* Jerry A. Hausman, *Specification and Estimation of Simultaneous Equation Models*, *in* 1 HANDBOOK OF ECONOMETRICS 391, 435-436 (Z. Griliches & M.D. Intriligator eds., 1983).

20. For example, the "expected sign" would be positive if the allegedly competitive act was a price-fixing conspiracy and the dependent variable of interest was price.

21. *See* WOOLDRIDGE, *supra* note 6, at 3-4.

the during and before periods. "Before-during" is used here to distinguish it from a "before-during-after" approach. This latter approach can be used when data exist not only from before and during, but also from after, the alleged unlawful conduct.[22]

Another frequently employed method uses data from a benchmark market,[23] where the alleged unlawful conduct did not occur, as a control.[24] A benchmark market may be a different geographic area than where the unlawful conduct occurred, a different product, or a different end-use market. The idea again is that one can compare the prices or profit margins in the market of interest (the treatment market) to prices in the benchmark (control) market, accounting for other economic factors that might have differed between the two markets. This approach may be particularly useful when the data available from the time before the anticompetitive act are limited or unreliable.

In some instances, the benchmark and before-during approaches can be combined into what is called the difference-in-differences approach.[25] Under this approach, the before period is used to calibrate the difference between the variable of interest (e.g., price) in the treatment and benchmark markets in the absence of the alleged unlawful conduct. To identify the partial effect of the alleged unlawful conduct, this approach then subtracts the difference between the variable (price) in the market at issue and the benchmark market in the before period from that difference in the during period (i.e., the difference in the differences).[26] For

---

22. *See* van Dijk & Verboven, *supra* note 1, at 2335.
23. Unless otherwise noted, our use of the term "market" is meant to denote an economic market, and not necessarily an antitrust relevant market.
24. For a discussion of benchmark approaches see, e.g., PHILLIP E. AREEDA ET AL., ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 483 (2d ed. 2005); Robert H. Lande & James Langenfeld, *The Perfect Caper? Private Damages and the Microsoft Case*, 69 GEO. WASH. L. REV. 902, 903, 907, 908-09 (2001). A benchmark approach or before-during-after approach is similar to a natural experiment, in that both rely on a control group or event that is economically similar to the market being studied, but is unaffected by the alleged anticompetitive act. *See* Mary Coleman & James Langenfeld, *Natural Experiments*, in 1 ISSUES IN COMPETITION L. & POL'Y 743 (ABA Section of Antitrust Law 2008).
25. *See* WOOLDRIDGE, *supra* note 6, at 130.
26. One might still want to control for other economic factors that might have changed between the two periods in the two markets.

example, suppose prices were $10 higher on average in the affected market than in the benchmark market before the alleged conduct, but that differential increased to $15 during the alleged conduct, controlling for changes in other economic factors. In this example, an estimate of the effect of the alleged conduct would be a $5 price increase.




Figure 4. Difference in Difference Approach

With sufficient and sufficiently reliable data and identification, economists have a wide variety of econometric techniques available to estimate the partial effect of the alleged unlawful conduct in an antitrust case.[27] The appropriate technique to use in a given circumstance depends on the type of available data, the properties of the underlying economic variables, and the specification of the econometric model used.

27. Such techniques include ordinary least squares regression, nonlinear least squares regression, maximum likelihood, instrumental variables estimators, generalized method of moments estimators, and various semi-parametric and nonparametric estimators. For a description of a wide range of econometric techniques, see generally WOOLDRIDGE, *supra* note 6, and WILLIAM GREENE, ECONOMETRIC ANALYSIS (4th ed. 2000).

### *1. Before-During Approach*

The before-during approach identifies the effect of the alleged conduct by using data from a period before the alleged conduct in combination with data from the period when the alleged conduct occurred.[28] Comparing the values of the dependent variable in the before period to the values it took on in the during period may serve to identify the effect of the alleged conduct.[29] In making this comparison, however, it is critical to account for any significant differences in other economic factors between the before and during periods.[30]

a. "Dummy Variable" Models Versus "Prediction" Models

For simplicity of exposition, assume that the best explanatory variable available for capturing the potentially anticompetitive effects is a dummy variable representing the time period when the alleged anticompetitive acts took place.[31] This variable will be one during that

---

28. *See* van Dijk & Verboven, *supra* note 1, at 2335-36.
29. *Id.* The before period may be considered the control period and the during period the treatment period. See the discussion in part A of this chapter.
30. *See* van Dijk & Verboven, *supra* note 1, at 2335-36.
31. Depending on the nature of the antitrust allegations, the theory of causation, and specific facts of the case, variables other than a dummy may better measure the anticompetitive behavior in estimating damages. *See* Philip Johnson & Armen Markosyan, *Regression Techniques for Estimating Overcharges Using Market Concentration Data*, 12 ECON. COMM. NEWSL. 7 (2012). Assume, for example, prices can only increase when existing customer contracts expire over time. The impact of the alleged conspiracy would not increase prices to all customers immediately, so average price increases related to the alleged conspiracy would be expected to trend upward over time. There could be several ways to model this effect other than using a simple dummy variable for the alleged conspiracy period, depending on the available data. *Id.* Under certain circumstances, one simple method to create a variable to approximate the conspiracy might be a "time trend" beginning at the period of the alleged conspiracy, with the value "1" in the first observation (e.g., a month) of the conspiracy period, "2" in the second, "3" in the third, etc. If average prices were the appropriate dependent variable, then the coefficient on this trend variable would be interpreted as the average monthly price increase due to the conspiracy. The

period and zero at other times. Assuming prices relate to other economic factors in the during period in the same way as they did in the before period, prices can be expressed of as an equation of these other economic factors plus the dummy variable.[32]

With data on prices and other economic factors in the before and during periods available, one can estimate the relationship between the price, other economic factors, and the dummy variable, using regression techniques. The coefficient on the dummy variable represents the estimated impact of the alleged anticompetitive conduct on prices in the during period while taking into account the impact of other economic factors on price. Because of the crucial role played by the dummy variable, this type of model is often called a *dummy variable model*.[33]

---

overcharge in any month during the conspiracy would be the corresponding time trend value multiplied by that coefficient. However, care must be used with this and any approach for creating a variable that measures the impact of an alleged anticompetitive act. For example, at some point all contracts will have been renegotiated, so it would be inappropriate to continue to predict price increases beyond a certain number of observations.

32. Specifically focusing on a reduced form model, one can account for the differences, if any, between the way price was determined in the during period (for example, with alleged price-fixing) and the way price was determined in the before period (without price-fixing). Suppose that the reduced form equation for price in the before period and the during period can be represented by a single equation that applies to both periods (See Chapter 5 for a discussion of reduced form models). Further, suppose that the price-fixing conspirators set price by adding a fixed amount "$\Delta$" to the price that would have prevailed otherwise. The "overcharge" resulting from the price-fixing conspiracy would then simply be $\Delta$. The reduced form equation for price would then be:
$P_t = \alpha + \beta_1 x_{1t} + \beta_2 x_{2t} ... + \beta_n x_{nt} + \Delta A_t + v_t$
where α is an intercept term, $x_{1t}$ , $x_{2t}$ ..., $x_{nt}$ are a full set of exogenous explanatory variables (identified by any relevant economic analysis), $\beta_1$, $\beta_2$ ..., $\beta_n$ are the estimated coefficients capturing the partial impact of these variables on the price $P_t$, $A_t$ is a dummy or indicator variable that takes the value of one if the time period t is in the during period and the value of zero if the time period t is in the before period, and $v_t$ is the error term.

33. *See* Daniel L. Rubinfeld, *Econometrics in the Courtroom*, 85 COLUM. L. REV. 1048 (1985); James F. Nieberding, *Estimating Overcharges in*

This model assumes that the relationships between price and the predetermined variables that represent other economic factors are the same in both the before and during periods. This assumption may not always be valid. For example, price-fixing conspirators may react differently to changes in supply and demand factors than they would have had they not been conspiring.[34] Thus, it may be important to test whether prices relate differently to the supply and demand factors in the during period than they did in the before period. In more technical terms, it can be important to test whether there has been a significant shift in the relationship between the exogenous variables and the dependent variable of interest.[35] Statistical tests of whether the additional restrictions inherent in the dummy variable model are appropriate can be performed by including *interaction* terms in the equation; this is equivalent to testing whether the parameters of the model differ between the before and during period.[36] If the hypothesis that the coefficients of the regression have not changed is rejected, then this test suggests that the underlying assumption of the dummy variable model is inconsistent with the data.

An alternative to the dummy variable model is the *prediction model*.[37] The prediction model assumes the relationships between prices and other economic factors would have been the same in the during period but for the anticompetitive acts as they were in the before period. The first step in implementing a prediction model is to estimate the relationship between prices and other economic factors using data from the before period. One can then predict what the prices would have been in the during period but for the alleged anticompetitive conduct based on the estimated relationship in the before period.[38] Finally, the differences

---

*Antitrust Cases Using a Reduced-Form Approach: Methods and Issues*, 9 J. APPLIED ECON., 361, 367-69 (2006). See Appendix and Glossary.

34. For example, Rosa M. Abrantes-Metz, Luke M. Froeb & Christopher T. Taylor, *A Variance Screen for Collusion*, 24 INT'L J. INDUS. ORG. 467 (2006) shows that the relationship between prices and costs during a collusive period may be very different from the relationship during a competitive period.

35. *See* GREENE, *supra* note 27, at 287-93.

36. *Id.*

37. *See* G.S. MADDALA, INTRODUCTION TO ECONOMETRICS 5 (3d ed. 2001), § 4.7; Nieberding, *supra* note 33, at 367-69.

38. Let $x_{1t}$ , $x_{2t}$ ..., $x_{nt}$ denote the values of the exogenous variables in the during period and $\alpha$ , $\theta_1$ , $\theta_2$ ..., $\theta_n$ are the coefficients for these

between the actual and the predicted but-for prices in the during period provide a measurement of the overcharge due to the alleged anticompetitive conduct.

As noted above, the prediction model assumes the relationships between the variable of interest (e.g., price) and other economic factors would have been the same in the during period in the but-for world as they were in the before period in the actual world. Under certain conditions, however, this assumption may not be valid. For example, assume there was a change in the relationship between other economic factors and the price in the during period that had nothing to do with the alleged anticompetitive conduct (e.g., entry or exit of firms from the market) and the prediction model does not take that change into account. Under these conditions, estimates using data solely from the before period may not accurately predict pricing but for an alleged conspiracy or other anticompetitive act.[39] Moreover, a prediction model should be tested where possible to check whether it accurately predicts turning points in the data.[40]

In addition, the model also may be fit to the during period and used to predict back ("backcast") into the before period. To the extent that the backcast is above the actual prices in the before period, that would suggest the price-setting process in the during period produced higher prices than the price-setting process in the before period. This finding would be consistent with the proposition that the alleged anticompetitive behavior in the during period increased prices, and the difference between the actual and predicted prices in the before period could form the basis for calculating an overcharge and damages.[41]

---

variables estimated based only on data from the before period. Then the "predicted" price for time t of the during period, $\hat{P}_t$, can be written as: $\hat{P}_t = \alpha + \theta_1 x_{1t} + \theta_2 x_{2t} \ldots + \theta_n x_{nt}$.

39. In this way, the prediction model may suffer from some of the same limitations related to the dummy variable model discussed above. However, unlike the dummy variable model, the prediction model does not assume that the coefficients for the exogenous variables are the same across the before and during periods in the actual world.

40. A dummy variable model can suffer from a similar problem of failing to fit turning points well, and thus incorrectly attributing to the conduct turning points that may have nothing to do with the alleged conduct. *See* WOOLDRIDGE, *supra* note 6, at 61-62.

41. Of course, the backcast model suffers from some of the same limitations as the forecast model.

### 2. *Before-During-After Models*

The previous section discussed before-during models that assume there is a single unaffected period (the before period). Sometimes, data might exist on several unaffected periods. For example, data may exist not only for the before period, but also for an after period. With more than one unaffected period, the question arises as to whether one should combine the two unaffected periods and, if not, then which of the two unaffected periods should be compared to the affected period.[42]

The before and after periods should be combined, if appropriate, since that will result in a larger sample and more precise estimation.[43] It is appropriate to combine them if the parameters of the reduced form equation are the same across the two periods.[44] The difficult decision arises when this test rejects combining the two periods into a single model and one must choose which unaffected period is the better basis of comparison for the affected period, assuming both are truly unaffected.

Before addressing how to decide which unaffected period to use, first consider why two unaffected periods might exhibit different relationships between the dependent variable and the explanatory variables. There are economic models of competition that suggest that periods of more intense competition ("price wars") will alternate with periods of less intense competition.[45] These models suggest that the relationship between price and the explanatory variables may change over time with the intensity of competition. In this case, a before period that was dominated by more intense competition might look different than an after period that was dominated by less intense competition, even though both periods were unaffected by the anticompetitive conduct at issue.[46] Alternatively, there may have been substantial differences in market conditions between the two periods (e.g., there may have been

---

42. *See* van Dijk & Verboven, *supra* note 1, at 2336. Of course, it is important to ensure that the supposedly unaffected periods really are unaffected.

43. *See* MADDALA, *supra* note 37, at 69, 270; A.H. STUDENMUND, USING ECONOMETRICS: A PRACTICAL GUIDE 71 (5th ed. 2006).

44. *See* Appendix and Glossary, and TAKESHI AMEMIYA, ADVANCED ECONOMETRICS 399-402 (1985).

45. *See, e.g.*, Jerry Green & Robert Porter, *Noncooperative Collusion Under Imperfect Price Information*, 52 ECONOMETRICA 87 (1984).

46. *Id.*

substantial new entry into the market), which led to the differences in the model coefficients.

In the event that there are substantial differences between the before and after periods, one needs to determine how to select which period to use. One way to answer this question is to try to model explicitly the switches between competitive regimes, and then use this model to predict which competitive regimes would have prevailed during the affected period in the but-for world. *Switching models* are econometric techniques that can be used to do this.[47] Although not commonly applied, a switching model of this sort may also provide a more realistic picture of competition in the during period. In contrast to the implicit assumption of the dummy variable model, a price-fixing conspiracy may be subject to breakdowns, where price would return to competitive levels (or even below-competitive levels) for a period before the conspiracy price level was re-established. Failure to model this possibility may lead to less precision in the estimate of the damages, or possibly even to an unreliable estimate of damages if explanatory variables are correlated with the onset of price wars because of omitted-variable bias.

An alternative approach for choosing between the before and after periods involves using general market information and non-quantitative evidence from the case. For example, suppose that the after and during periods were characterized by strong demand for the product, while the before period was characterized by weak demand. These factors would suggest that the after period would provide a better basis of comparison for the affected period than would the before period. It is also possible that the effects of the anticompetitive conduct at issue last beyond the time when the conduct actually ended.[48] If so, then the after period is not truly "unaffected" and the before period may be the superior basis for comparison.

Another approach is to predict but-for prices (absent the allegedly anticompetitive acts) for the affected period alternatively using the before and after periods, using the greater of these two predictions. Both of these predictions are consistent with competitive behavior. Using the higher of the predicted but-for prices will yield a lower estimate of

47. *See* AMEMIYA, *supra* note 44, at 399-402.

48. For example, Joseph E. Harrington, Jr., *Post-Cartel Pricing During Litigation*, 52 J. INDUS. ECON. 517 (2004) argues that standard methods for calculating antitrust damages in price-fixing cases may create a strategic incentive for firms to price above the non-collusive price after the cartel has been dissolved.

damages (calculated as the difference between the actual and but-for prices) and thus represents a "conservative" approach from the plaintiffs' perspective.

When assessing damages using a before-during or a before-during-after approach, the beginning and end points of the damages period must be identified. However, the beginning and the end of the damages period alleged in many cases may not accurately reflect the actual beginning or end of the alleged unlawful conduct. For example, in price-fixing class action cases, the plaintiffs' attorneys often choose the beginning and end dates for the "class period" before discovery is undertaken. Moreover, the beginning or end of the effects of the alleged unlawful conduct may not coincide with the beginning or end of the conduct itself. The effects might occur later, end earlier, or last longer than the conduct. Experts should rely on the evidence developed in discovery, market facts, and the analysis of liability experts when determining the relevant starting and ending dates for calculating damages.

Damages experts should be flexible when determining the appropriate beginning and end dates for damages, and econometric analysis may be able to assist in this respect. Recently, econometric methods have been developed that may be used to choose beginning and end dates based on market data.[49] These methods involve estimating the point in time when an econometric model exhibits a *structural change*, or shift in the model parameters. In the case of alleged anticompetitive conduct that had an effect, a structural shift in the econometric model should have occurred when the effect of the conduct began and a second structural shift should have occurred when the effect of the conduct ended. Thus, for example, identifying when there were structural shifts in the regression model can provide useful evidence concerning the beginning and end of overcharges from a price-fixing conspiracy.[50]

---

49. Jushan Bai & Pierre Perron, *Estimating and Testing Linear Models with Multiple Structural Changes*, 66 ECONOMETRICA 47 (1998). See Carlton & Leonard, *supra* note 4, for a discussion of the application of these methods to price-fixing cases.

50. *See* Carlton & Leonard, *supra* note 4.

### *3. Benchmark and Difference-in-Differences Approaches to Damages*

The benchmark approach to damages is based on the same basic principles and econometric tools as the before-during-after approach.[51] However, in a benchmark analysis, the variable of interest (e.g., price) in the affected market is compared to that variable in an unaffected benchmark market.[52] Instead of using past prices in the affected market as a control, the benchmark approach uses prices in the unaffected market as a control. The benchmark market (or markets) can be a different area or a different end-use market. The key is that the benchmarks (the control group) were unaffected by the alleged anticompetitive conduct. This approach may be particularly useful if there are insufficient data for the before period, such that a before-during approach cannot reliably be performed.

One potentially significant problem with the benchmark approach is that differences in economic conditions between benchmark and affected markets make it likely that prices in those markets would not be identical, even if there were no anticompetitive behavior.[53] Comparing variable profit margins between the market of interest and the benchmark can control for many cost- and demand-based differences in prices, although there are recognized problems in calculating and comparing economically meaningful profit margins.[54]

The difference-in-differences approach also can be used to account for at least some of the persistent unobserved differences between the benchmark market and the market of interest. This approach requires data for the market of interest and the benchmark that cover both a period of time that is unaffected by the alleged anticompetitive act and the period of time when the market of interest allegedly was affected.

---

51. The benchmark approach is sometimes also referred to as the cross-sectional approach.

52. *See* van Dijk & Verboven, *supra* note 1, at 2336.

53. *Id.*

54. *See, e.g.*, Franklin Fisher, *On the Misuse of the Profits-Sales Ratio to Infer Monopoly Power*, 18 RAND J. ECON. 384 (1987). However, if the benchmark and the market of interest can be shown (1) to have similar supply and demand characteristics and (2) to have similar accounting methodologies, then one may be able to estimate the difference in those margins and from that calculate whether prices are higher in the market of interest, even if data are only available in the during period.

Thus, the difference-in-differences approach combines the before-during and benchmark approaches.[55] The difference-in-differences approach can be implemented using a regression that takes into account the various factors that differ between markets and time periods, as shown in the Appendix and Glossary.

## E. Key Considerations in Creating and Evaluating Econometric Models of Damages

A number of considerations should be taken into account when building or evaluating an econometric model used to estimate damages.[56] As discussed in previous chapters, model specification and estimation involve many choices: explanatory variables, functional form, dynamic specification in a time series, estimation technique, and which of the basic approaches to damages to use. In many cases, statistical tests can help guide these choices. However, the starting point for any econometric model is economic theory and knowledge of the industry, and being sure that there are sufficiently reliable data to perform an econometric analysis.

Economic theory provides guidance as to the general types of explanatory variables that should be included in the model. For example, for an econometric model of price, economic theory suggests that variables representing cost, demand, and competitive factors would be important types of explanatory variables.[57] Knowledge of the industry helps determine with more specificity which variables to include. For example, if the industry in question were plastics, the price of petroleum (an important input to plastics) likely would be a relevant cost variable and production levels in downstream industries that use plastics likely would be relevant demand shifters.

One must be able to obtain sufficiently reliable data to implement an economically sound econometric model. Econometric analysis based on very few data points in general will be much less reliable than econometric analysis based on a larger data set. There may also be issues with how accurate the data are, and whether they represent an unbiased

---

55. *See* WOOLDRIDGE, *supra* note 6, at 130.

56. Much of the discussion here and elsewhere in this chapter can be applied to any econometric analysis. *See, e.g.*, WOOLDRIDGE, *supra* note 6; GREENE, *supra* note 27.

57. *See* van Dijk & Verboven, *supra* note 1, at 2335.

sample of what has occurred in the market. Accordingly, the data need to be checked for accuracy and any potential selection bias. Finally, in many instances the data will need to be "cleaned" to some extent, removing obviously incorrect observations. For example, many damages analyses use data from a company's sales database. Care must be taken with such data to ensure that all significant discounts have been accounted for, and to weed out any obvious errors.[58]

Economic theory and industry knowledge might suggest a large number of potential explanatory variables. While there is a benefit to parsimony (namely, potentially increased precision of the estimates), there is typically a greater concern with omitting a potentially important explanatory variable, which can induce omitted-variable bias. Thus one generally should exercise great care if potentially important variables are to be excluded from a model. In general, statistical tests or the Akaike Information Criterion ("AIC") and Schwarz Criterion ("SC") criteria should be employed before dropping variables.[59] It is rarely advisable to drop a theoretically important variable, especially if its coefficient is statistically significantly different from zero. Similarly, one generally should not drop a group of theoretically important variables when their coefficients are jointly statistically significantly different from zero (even if they are individually not statistically significantly different from zero).[60] In some circumstances, "shrinkage" estimators may be used to help make a model more parsimonious.[61]

An important step of model specification concerns the selection of the mathematical formula (functional form) relating the dependent variable to the explanatory variables.[62] For example, the dependent variable might be the price level (i.e., dollars per unit) of the product at issue, and the explanatory variable could be its variable costs of production. This model would provide an estimate of the price increase

58. For example, frequently these transactions data sets include credits for returned goods, etc. It is important to use net revenue and net sales to calculate a measure of the price actually paid.

59. *See* the Appendix and Glossary for the definitions of AIC and SC.

60. *See* KENNEDY, *supra* note 19, at 94.

61. Shrinkage estimators adjust least squares estimates by imposing a constraint on the estimates. The resulting estimator is no longer unbiased, but may have lower mean squared error than least squares. *See, e.g.*, Robert Tibshirani, *Regression Shrinkage and Selection via the Lasso*, 58 J. R. STATIST. SOC. B 267 (1996).

62. *See* Chapter 5. Results may be sensitive to the functional form selected.

related to a dollar increase in costs (The coefficient on costs represents the answer to the following question: what is the price increase in dollars caused by a one dollar increase in costs?) However, there may be good theoretical or industry-specific reasons to believe that the relationship between price and production costs is better measured in percentage change terms. If so, then it would be more appropriate to regress the logarithms of price on the logarithm of variable costs (The coefficient on the logarithm of costs represents the answer to the following question: what is the percentage price increase caused by a one percentage increase in costs?)[63] Statistical tests can help determine which functional form is most appropriate for the situation at hand.[64]

In a time series context, specification of the dynamics is important. Again, model specification might be guided by industry knowledge and statistical tests. The AIC and SC tests can help identify the appropriate lag structure.[65]

The statistical distribution of the econometric error term also must be carefully specified. It is frequently appropriate to use estimates of the standard errors that are robust to deviations from the assumption of independent, identically distributed error terms. Only with correct standard errors will the resulting statistical inference be valid. The correct method for calculating standard errors can be determined based on the outcome of statistical tests, and in general such tests should be performed.[66]

The decision of which of the basic damages models to use can be of great importance. A reduced-form model typically will provide the most straightforward model for damage estimation. However, the explanatory variables to be included in such a model need to reflect the important underlying supply and demand aspects of the market, and in some

---

63. More precisely, if $a$ is the coefficient on the logarithm of variable costs, the percentage price increase caused by a one percentage increase in costs is $exp(a) - 1$, where $exp(a)$ is the exponential transformation of $a$. For values of $a$ close to zero, $exp(a)\ 1$ is approximately equal to $a$ (for example, when $a = 5$ *percent*, then $exp(a)\ 1 = 5.13$ *percent*) but the approximation is less precise away from zero (for example, when $a = 50$ *percent*, then $exp(a)\ 1 = 64.9$ *percent*).
64. *Id.*
65. *See* Chapter 5 and the Appendix and Glossary for further discussion.
66. *See* Chapter 6 and the Appendix and Glossary for further discussion.

instances estimating the underlying structural model will be a superior approach.[67]

The decision regarding which damages approach to employ also will depend on the available data and the nature of the market. Are there sufficient data to implement a before-during or before-during-after model? Is there a good benchmark? Can a difference-in-differences approach be used? In general, if reliable data are available from outside of the period of that alleged anticompetitive act, then techniques that take advantage of those data will likely be the most reliable.[68]

Deciding whether to use a dummy variable or prediction model can also be important. Is there evidence that the dummy variable technique is unreliable due to substantial changes in the model coefficients due to the alleged illegal act? Will the prediction model yield reliable results? Again, there are statistical tests that can help determine if one approach is clearly superior to another.[69] Because neither approach likely is perfect, in the absence of strong statistical test results favoring one or the other, it may make sense to use both approaches and see if they yield similar results.

Once the econometric model is specified and estimated, another series of statistical tests and checks can be performed on the reliability and robustness of the estimates.[70] The starting place is typically examining the sign and statistical significance of the coefficients. If, for example, the coefficient on cost in a price regression is negative and statistically significantly different from zero, this would cast doubt on the reliability of the model, since we would normally expect cost to have a positive effect on price. When performing this sort of check, however, one must take care that there is a clear interpretation to the coefficients; there may not be one in a reduced-form model, for instance.[71]

When there is reason to question a model's specification, a variety of specification tests can and should be employed. For example, a model may impose potentially questionable restrictions on the coefficients, such as that the coefficients are the same during two time periods. Specifically, an econometric model of pricing at the customer level might assume that all customers have the same coefficients on the cost and demand variables. However, there may be reason to think that

---

67. *See* Chapter 5.
68. *See* Chapter 5 and the Appendix and Glossary for further discussion.
69. *See* Chapters 5 and 6 for additional discussion.
70. *See* Chapters 5 and 6 for additional discussion.
71. *See* Baker & Rubinfeld, *supra* note 5, at 392.

customers have different responses to cost and demand conditions, so there could be different coefficients on the explanatory variables across customers, including the variable measuring damages. In this case, it may be necessary to estimate the model for different groups of customers, or otherwise to employ a more complex model that takes these differences into account.[72] Similarly, a time series model might assume that the coefficients are the same over the course of the entire time period, but there may be evidence that the structure of the model changed at some point in time. A Chow test (or a more sophisticated test for structural breaks) can be used to test whether such a change occurred.[73] If so, the appropriate model needs to adequately control for such a change.

There may also be reason to question the crucial assumption that the error term of the regression is uncorrelated with the explanatory variables (which leads to endogeneity bias). This assumption often can be tested using a form of the Hausman specification test. For example, if there is concern that an explanatory variable might be endogenous (which would bias OLS regression results), then the Hausman specification test comparing the OLS results to the IV results can be used to check for this problem.[74] If such a problem is found to exist, then more complex econometric techniques can be used to correct for the bias.[75]

Finally, virtually any regression model eventually will fail one or more tests if enough tests and specifications are run, even if nothing is wrong with the model. However, failure of a test should be taken seriously, and a model should be rejected when it fails a test of a critical assumption, or if it fails a large number of the specification tests to which it is subjected.[76]

72. *See, e.g.*, John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases*, 3 J. COMP. L. & ECON. 341, 351-52 (2007).

73. The Chow test is a statistical and econometric test of whether the coefficients in two linear regressions on different data sets are equal. *See* Gregory C. Chow, *Tests of Equality Between Sets of Coefficients in Two Linear Regressions*, 28 ECONOMETRICA 591 (1960).

74. *See* Jerry A. Hausman, *Specification Tests in Econometrics*, 46 ECONOMETRICA 1251 (1978).

75. *See* WOOLDRIDGE, *supra* note 6, at 167-180.

76. *See* KENNEDY, *supra* note 19, at 76-79.

## F. Case Study: Applying the Before-During and Benchmark Approaches

As discussed above, econometric techniques can be applied in a variety of ways to estimate the impact of alleged anticompetitive conduct on certain economic outcomes, such as estimating lost sales or price changes due to the alleged conduct. This is illustrated in the following sections, in which some of the econometric techniques and tests discussed above are applied to estimate the price effects of alleged collusive behavior using actual data relating to Southern Powder River Basin ("SPRB") coal that was the subject of a DOJ investigation in 2001.

### *1. Background*

Virtually all coal produced in the United States is used for electric power generation.[77] About one-third of the coal now comes from the SPRB, which contains vast amounts of low-sulfur coal available in low-cost surface mines. SPRB coal is relatively homogeneous, with two main types: 8400 Btu/lb. coal and 8800 Btu/lb. coal. SPRB coal mining began with the 8400 Btu coal, which was closer to the surface and easier to mine. During the 1970s, many coal-powered electric generation units were constructed to burn this coal. Virtually all of these units also can burn the higher-quality 8800 Btu coal. As sulfur emissions regulations became more stringent, older electric generation units were converted from burning 12,000 Btu bituminous coals to burning 8800 Btu SPRB coals. Because these plants already suffer capacity losses from burning lower Btu SPRB coals, they generally will not burn 8400 Btu coal.

During 1999 and 2000, the three leading SPRB coal producers conducted what economists may describe as "cheap talk." Cheap talk refers to communications between oligopolists about future intentions. Such talk can facilitate understanding of each other's goals and intentions, which can lead to collusive production and pricing.[78] The statements were of the nature that they would reduce production "until

---

77. U.S. ENERGY INFORMATION ADMINISTRATION, ANNUAL COAL REPORT 2008 8 (2010), *available at* http://www.eia.gov/coal/annual/archive/05842010.pdf.

78. *See* MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 20 (2006). Whether such behavior constitutes an unlawful price-fixing "agreement" is a legal question.

prices improved." The largest producer, Peabody Energy, closed a mine in 1999. The third largest producer—Arch Coal, Inc.—closed another mine in 2000, and several other planned expansions were cancelled. The result was a spot price increase in 2001. In the aftermath of the capacity reductions, prices settled about 30 percent above the level before the shut-downs. The DOJ opened an investigation in July 2001, but ultimately took no action against the SPRB producers.

### 2. *Economic Model, Data, and Choice of Explanatory Variables*

For the purpose of this case study, the simplest economic model hypothesizes that if the alleged collusion had an effect, then prices of SPRB coal during the damages period should be higher than before the damages period after controlling for other supply and demand influences. As will generally be the case, the most straightforward econometric models for estimating damages use a reduced form, rather than a structural form,[79] but the model still needs to include the major supply and demand influences on price that would be included in a structural model. Here, we assume a linear relationship between the relevant market forces and SPRB prices. A full analysis would investigate (and potentially test) whether the relationship of these factors to price should be specified differently, such as in percentage change terms.[80]

The price of SPRB coal used in the analysis is the spot price reported by the utilities that purchased the SPRB coal.[81] The utilities reported the spot price at the time of delivery instead of at the time of actual sales. As a result, there was a lag between the reported spot price and the spot price at the time of actual sales that ranges from one quarter to one year. Therefore, although the alleged collusion occurred in the first quarter of 2001, the reported spot price did not increase until late 2001. This case study defines the before collusion period as before November 2001 and the during collusion period as between November 2001 and May 2005.

79. See Chapter 5 for a discussion of structural form models versus reduced form models.

80. *See* WILLIAM H. GREENE, ECONOMETRIC ANALYSIS § 8.3 (2d ed. 1990).

81. The data source is FERC Form-423; Energy Velocity. Regulated utilities report the delivered price of their fuels in FERC Form-423. Energy Velocity estimates transportations costs and subtracts these from the delivered costs to provide a comparable FOB mine price for each utility. The average of these monthly spot FOB prices provides data for our dependent variable.

Before one can engage in econometric analysis of the data, it is important to review the data and check whether there are potential coding errors or other issues in the data that deserve further investigation. As discussed in section A, data do not have to be perfectly accurate to be useful in econometric analysis, but it is important to ensure that the data are reasonably reliable. To illustrate the importance of initial data review before running any regression analysis, the original data on the average SPRB coal price are plotted in Figure 5.




Figure 5. Average Price of SPRB Coal before Data Cleaning

As can be seen clearly from Figure 5, something is not right with the SPRB coal price data before 1998. Further review of the data reveals that before 1998, the transportation cost from the coal mines to the utilities was in the column for the spot price and vice versa. Correcting these data and conducting some other cleaning of the data, such as estimating the spot prices that were missing, results in data on the corrected average spot price for SPRB coal that are presented in Figure 6.




Figure 6. Average Price of SPRB Coal

These prices represent the prices of SPRB coal delivered from January 1993 to May 2005. Through most of the 1990s, these prices display significant volatility, but they did not have any trend up or down. Beginning in November 2001, prices began increasing from average levels of around $5.60/ton in the before period to over $7.00/ton in the during period. The question is whether this increase in prices was caused by changes in demand, changes in costs, or changes in the behavior of mine operators.

To take into account the major demand and supply factors that potentially could affect the prices of the SPRB coal, data on these factors were obtained from public sources. Supply data include quality measures of SPRB coal (Btu content, ash percentage, and sulfur content); productivity of the mines that produce the SPRB coal as measured by the average tons of SPRB coal produced per person day; and costs of fuels that are used in the production of SPRB coal, including diesel fuel cost and electricity cost.[82] Demand was measured using data on total electric power production.[83]

82. Time series data on capacity for SPRB coal production were not available. If the data were available, one may want to consider capacity in

### 3. *Assumption of Liability and Causation*

In performing a damage analysis, experts usually assume that the plaintiff has been found liable for the alleged anticompetitive conduct. Accordingly, this case study assumes that SPRB coal producers engaged in collusive behavior from November 2001 to May 2005. As discussed above, however, even assuming collusion did occur, one still needs to study whether the observed price increase was at least in part due to other demand or supply changes or could be attributed to the collusive behavior. To help answer this question and estimate the price increase that resulted from the assumed collusion, the dummy variable model and the prediction model under the before-during approach are used to isolate the price effects of the alleged collusive behavior.

### 4. *Stationarity of the Time Series*

As discussed in the Appendix and Glossary, when using time series data to conduct regression analysis, one should test whether the time series are stationary.[84] If they are not stationary, different econometric techniques should be employed. To study whether nonstationarity is an

---

the analysis as well since it may affect the supply of SPRB coal. As discussed in the "Background" section for this case study, some of the producers reduced capacity during the alleged collusive period. If the alleged collusion increased prices solely through capacity reduction, but did not alter producers' pricing behavior conditional on available capacity, the coefficient for the collusion dummy variable could be zero in a model where capacity is included as an independent variable. In this case, one may be able to estimate the relationship between the SPRB coal price and the supply and demand factors, including capacity, first, and then estimate the but-for SPRB coal price using the but-for capacity in the absence of the alleged collusion.

83. The spot prices of SPRB coal were reported by the utilities at the time of delivery instead of at the time of sales, so there is a lag between the time when the prices were reported and the time when the prices were determined. This delay in reporting is not an issue for other independent variables, such as diesel cost, electricity cost, electricity production and SPRB coal productivity measurement. Therefore, in theory, one should lag these independent variables for certain periods and include these lagged variables as independent variables in the regression as well.

84. See Appendix and Glossary.

issue in the time series data, Dickey-Fuller/Augmented Dickey-Fuller unit root tests were conducted[85] on the SPRB coal price data and certain independent variables.

The unit root test results indicate that the SPRB coal price data are stationary while some of the independent variables may be nonstationary, such as the diesel price series. However, as pointed out in the Appendix and Glossary, many unit root tests have a low ability to reject nonstationarity.[86] Therefore, one should view the results of the tests within the context of the economic theory. In this case, if the dependent variable, SPRB coal price, is stationary, it is unlikely that the demand or supply factors that interact with each other to determine the SPRB coal price are nonstationary. If these demand or supply factors were nonstationary, they likely would drive the SPRB coal price to be nonstationary as well.

To further investigate the nonstationarity issue, a Dickey-Fuller/Augmented Dickey-Fuller test and a KPSS test were conducted on the residuals from the OLS regression where the SPRB coal price is the dependent variable and other demand and supply factors along with a collusion dummy variable are included as the explanatory variables.[87] These stationarity tests indicate that the residuals from the OLS regression are stationary. Since the SPRB coal price is stationary, this result again suggests that nonstationarity of other explanatory variables is

---

85. *See* MADDALA, *supra* note 37, at 548-52. In the Dickey-Fuller/Augmented Dickey-Fuller test, the null hypothesis is that the time series is nonstationary. *Id.* For a brief introduction to stationarity tests, see MADDALA, *supra* note 37, ch. 14.

86. See Appendix and Glossary.

87. The OLS regression model specification is discussed in more detail in part F.5. of this chapter. In conducting the Dickey-Fuller/Augmented Dickey-Fuller tests of the OLS regression residuals, one should use the Engle-Granger critical values instead of the standard Dickey-Fuller critical values because the Dickey-Fuller test of the residuals is a co-integration test. For more details on the Engle-Granger critical values, see WALTER ENDERS, APPLIED ECONOMETRIC TIME SERIES 335-42 (2d ed. 2003). However, the exact Engle-Granger critical values for these tests were not available because the number of independent variables in our regression exceeds those listed in the table of Engle-Granger critical values in Enders. Therefore, the KPSS test was also performed. In the KPSS test, the null hypothesis is that the time series is stationary. See MADDALA, *supra* note 37, ch. 14, for more details.

not an issue in the case study. Thus, an OLS regression analysis was conducted to assess how the assumed collusion affected the SPRB coal price.

### 5. *The Before-During Approach with the Dummy Variable Model*

The dummy variable model under the before-during approach can be used to measure how assumed collusion changed the price of SPRB coal. The dummy variable is constructed by creating a variable equal to zero before November 2001 (before period) and equal to one from November 2001 onward (during period). Then the SPRB coal price can be expressed as an equation of the dummy variable and other factors that can affect the SPRB coal price, including the Btu content of the SPRB coal, the ash percentage of the SPRB coal, the pounds of sulfur per million Btu of energy in the coal, the average tons of SPRB coal produced per person day, the price of diesel, the price of electricity, the production of electricity.[88]

If the assumed collusion led to an increase in the price of SPRB coal, the coefficient on the dummy variable should be positive and statistically significant after controlling for the demand and supply factors that affect the price of SPRB coal. As discussed in part E of this chapter, valid hypothesis testing requires consistent estimates of the standard error of the coefficient estimates. Tests for serial correlation indicate that the error terms in the regression are serially correlated. To estimate the standard errors consistently, the Newey-West procedure was used to obtain the heteroskedasticity and autocorrelation consistent Newey-West

88. More specifically, the dummy variable model for the before-during approach can be specified as follows:

$$SPRB_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot ton_prod_t$$
$$+ \beta_5 \cdot diesel_price_t + \beta_6 \cdot electricity_price_t + \beta_7 \cdot electricity_production_t$$
$$+ \gamma \cdot dummy_t + \varepsilon_t$$

where $Btu_t$ is the Btu content of the SPRB coal, $Ash_t$ is the ash percentage of the SPRB coal, $lbsSO2_t$ is the pounds of sulfur per million Btu of energy in the coal, $ton_prod_t$ is the average tons of SPRB coal produced per person day, $diesel_price_t$ is the price of diesel, $electricity\text{-}price_t$ is the price of electricity, $electricity_production_t$ is the production of electricity, $dummy_t$ is the dummy variable, and $\varepsilon_t$ is the error term.

standard errors.[89] The result of the OLS regression with the Newey-West standard errors is presented in Table 1.[90]

| Dependent Variable: | Average Price of SPRB Coal | | | |
|---|---|---|---|---|
| R-squared: | 0.7132 | | | |
| Adj R-squared: | 0.6968 | | | |
| Number of Obs: | 149 | | | |
| | **Coefficient** | **Newey-West Standard Error** | **t-Statistic** | **P>\|t\|** |
| Dummy variable for the alleged collusion period | 1.2362 | 0.1798 | 6.8800 | 0.0000 |
| Btu content of SPRB coal | -0.0013 | 0.0011 | -1.1300 | 0.2590 |
| Ash percentage of the SPRB coal | -1.0727 | 0.7633 | -1.4100 | 0.1620 |
| Pounds of sulfur per million Btu | -1.1665 | 1.5701 | -0.7400 | |
| Average tons of SPRB coal produced per person day | 0.0015 | 0.0024 | 0.6200 | 0.5330 |
| Price of diesel | 0.0978 | 0.3283 | 0.3000 | 0.7660 |
| Price of electricity | 0.0497 | 0.0483 | 0.2400 | 0.8080 |
| Production of electricity | 4.33E-10 | 1.78E-09 | 0.2400 | 0.8080 |
| Constant | 20.7707 | 11.0578 | 1.8800 | 0.0620 |

Table 1. Regression Results for Dummy Variable Method

As can be seen from Table 1, the variables that control for supply and demand changes are of the expected signs. Individually they are not statistically significant from zero at the 5 percent level, although they are statistically significant when taken together.[91] The coefficient on the

89. *See* JEFFREY M. WOOLDRIDGE, INTRODUCTORY ECONOMETRICS—A MODERN APPROACH 428-30 (4d ed. 2009).

90. Obtaining the Newey-West standard error requires determining the maximum order of lag in advance. This illustration follows the practice of using the smallest integer greater than or equal to T/4 where T is the sample size. *See* GREENE, *supra* note 27, at 465.

91. The hypothesis that all of the coefficients for the supply and demand factors are zero is rejected at about the 5 percent level based on the joint F-test with a P-value for the F-statistic equal to 0.05. In a more detailed analysis, other measures of supply and demand might be considered or the estimating equation might be modified to better take into account more specific demand and supply considerations for each of the utilities.

dummy variable is positive and statistically significant. The regression result indicates that on average, SPRB coal prices were $1.23/ton (or about 22 percent) higher in the during period compared to the before period, holding constant the exogenous variables.

As discussed in part D of this chapter, the dummy variable model assumes that the relationship between the dependent variable and the explanatory variables in the during period is the same as in the before period. To test this assumption, interaction terms involving the dummy variable and each of the other explanatory variables except the intercept term were added as explanatory variables in the model specification as well.[92] The null hypothesis that all of the coefficients on the interaction terms are jointly equal to zero was tested. If this hypothesis is not rejected, it indicates that the relationship between the price of SPRB coal and the demand and supply factors did not change from the before period to the during period. If the null hypothesis is rejected, it suggests that the relationship has changed, either due to the alleged behavior or because of other reasons.[93]

92. These interaction terms are equal to zero in the pre-collusion period and equal to the respective values of the original explanatory variables during the collusion period. *See* MADDALA, *supra* note 37, at 307-10.

93. *See* part C.1. of this chapter.

As shown in Table 2, the test rejected the null hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors remained the same in the during period.[94] As discussed above, even though the test suggests that the coefficients on the demand and supply factors in the during period have changed (contrary to the assumption of the dummy variable model), it does not necessarily mean that the coefficient estimate of the dummy variable will not provide any economically meaningful information. A possibility that should be investigated is that the restrictions on the coefficients of the demand and supply factors imposed by the dummy variable model may not have substantially affected the model's estimate of the effect of the alleged antitrust violation. Accordingly, the next section uses the prediction model to assess the impact of the assumed collusion on the price of SPRB coal.[95]

94. To implement the joint F-test correctly, again, the Newey-West covariance matrix is used. *See* WOOLDRIDGE, *supra* note 89.

95. When one fully interacts the dummy variable with other explanatory variables, one in fact is assuming that the regression equations in the before period and in the during period are completely different. *See* MADDALA, *supra* note 37, at 309. For example, the regression equation in the during period can have smaller intercept terms, hence a negative coefficient on the dummy variable, but higher slope terms. As a result, one cannot interpret the coefficient on the dummy variable as the measurement of the average impact of the alleged collusion anymore.

| | |
|---|---|
| Dependent Variable: | Average Price of SPRB Coal |
| R-squared: | 0.7417 |
| Adj R-squared: | 0.7126 |
| Number of Obs: | 149 |

| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
|---|---|---|---|---|
| Dummy variable for the alleged collusion period | -57.0152 | 23.4560 | -2.4300 | 0.0160 |
| Btu content of SPRB coal | -0.0021 | 0.0016 | -1.3000 | 0.1940 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8683 | -2.2200 | 0.0280 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7494 | 0.5300 | 0.5980 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5300 | 0.1280 |
| Price of diesel | -0.0652 | 0.4501 | -0.1400 | 0.8850 |
| Price of electricity | 0.0296 | 0.0860 | 0.3400 | 0.7310 |
| Production of electricity | 9.85E-10 | 2.32E-09 | 0.4300 | 0.6710 |
| Interaction term for Btu content of SPRB coal | 0.0056 | 0.0025 | 2.2600 | 0.0260 |
| Interaction term for ash percentage of the SPRB coal | 2.5203 | 1.2294 | 2.0500 | 0.0420 |
| Interaction term for pounds of sulfur per million Btu | -5.2794 | 2.4693 | -2.1400 | 0.0340 |
| Interaction term for average tons of SPRB coal produced per person day | 0.0038 | 0.0081 | 0.4700 | 0.6370 |
| Interaction term for price of diesel | 0.5961 | 0.5924 | 1.0100 | 0.3160 |
| Interaction term for price of electricity | -0.0406 | 0.1036 | -0.3900 | 0.6960 |
| Interaction term for production of electricity | -6.07E-10 | 2.96E-09 | -0.2100 | 0.8380 |
| Constant | 29.8307 | 14.1026 | 2.1200 | 0.0360 |
| **Joint F test for all interaction terms are equal to zero** | F(7, 133) = 3.09 | | Prob>F = 0.0048 | |

Table 2. Regression Results—Testing for Relationship Change in the Dummy Variable Method

### *6. The Before-During Approach with the Prediction Model*

The prediction model assumes that the relationship between the price of SPRB coal and the demand and supply factors in the actual world before the alleged anticompetitive behavior would have remained the same but for the alleged behavior in the during period.[96] If the relationship change found in the last section is all due to the collusive behavior, then the prediction model still would be valid.

To use the prediction model to estimate the impact of the assumed collusion on the price of SPRB coal, one would first run an OLS regression similar to the dummy variable model, but instead using the data in the before collusion period only and excluding the dummy variable from the explanatory variables. The result of this regression is presented in Table 3.

| | | | | |
|---|---|---|---|---|
| Dependent Variable: | | | Average Price of SPRB Coal | |
| R-squared: | | | | 0.2104 |
| Adj R-squared: | | | | 0.1540 |
| Number of Obs: | | | | 106 |
| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
| Btu content of SPRB coal | -0.0021 | 0.0015 | -1.3300 | 0.1870 |
| Ash percentage of the SPRB coal | -1.9244 | 0.8532 | -2.2600 | 0.0260 |
| Pounds of sulfur per million Btu | 0.9237 | 1.7189 | 0.5400 | 0.5920 |
| Average tons of SPRB coal produced per person day | 0.0038 | 0.0025 | 1.5600 | 0.1220 |
| Price of diesel | -0.0652 | 0.4423 | -0.1500 | 0.8830 |
| Price of electricity | 0.0296 | 0.0845 | 0.3500 | 0.7270 |
| Production of electricity | 9.85E-10 | 2.28E-09 | 0.4300 | 0.6660 |
| Constant | 29.8307 | 13.8571 | 2.1500 | 0.0340 |

Table 3. Regression Results for Prediction Model

Given the coefficients from the before period OLS regression, the next step is to predict the price of SPRB coal in the but-for world without collusion, using the data on the explanatory variables in the during period. Figure 7 shows the actual price of the SPRB coal, the predicted price of the SPRB coal based on relationships estimated in the before

96. *See* part C.1. of this chapter.

period, and the lower and upper bound of the 95 percent confidence interval for the predicted price of the SPRB coal.[97]




Figure 7. Average vs. Predicted Price of SPRB Coal—Newey Standard Error

As shown in Figure 7, in every month in the during period the actual price of the SPRB coal is higher than its predicted price. Moreover, in 28 of the 43 months in the during period the actual price of the SPRB coal is higher than the upper bound of the 95 percent confidence interval for the predicted price of the SPRB coal. The average predicted price of the SPRB coal for the during period is $5.72/ton, while the average actual

97. The 95 percent confidence interval for the predicted value of the SPRB coal price means that the there is a 95 percent "confidence" that the price of the SPRB coal in the but-for world will fall within this interval. See GREENE, *supra* note 27, § 6.6, for detailed discussion on how to construct a confidence interval for the predicted values. Constructing a confidence interval for the predicted value requires estimating the variances of the predicted value and the error term. The illustration uses the Newey-West standard errors in estimating the variance of the predicted value and uses the residuals from the OLS regression to estimate the variance of the error term.

price of the SPRB coal is $7.16/ton in the during period. Therefore, according to the prediction model the assumed collusion resulted in a $1.66/ton (or about a 30 percent) increase of the SPRB coal price. The prediction model results suggest a somewhat larger impact of the assumed collusion on the price of the SPRB coal compared to the $1.23/ton (or 22 percent) increase of the SPRB coal price based on the dummy variable model. The results of both of these approaches are consistent with the alleged behavior causing higher prices. However, the prediction approach in this case would yield greater damages.

Given that the test shown in Table 2 above rejected the hypothesis that the relationship between the price of the SPRB coal and the demand and supply factors were the same in the before and during periods, the prediction approach would appear to yield the more reliable quantification of the impact of the hypothesized conspiracy. However, to determine if the prediction approach is clearly superior, one could test the prediction approach for a portion of the period before the alleged anticompetitive behavior, as discussed above in part D. If it predicted prices before the alleged anticompetitive act reasonably accurately, then the prediction approach presumably would be more accurate in this example. If it does not predict prices before the alleged anticompetitive act that well, then it would be more accurate to say that the impact of the alleged anticompetitive behavior likely falls somewhere in the range indicated by the two methodologies.

### *7. Benchmark Approach*

The first question in a benchmark analysis is whether there are any products that might provide a reasonably good benchmark. As discussed in part D above, the benchmark should be (1) subject to similar supply and demand factors as SPRB coal and (2) unaffected by alleged anticompetitive acts. This illustration will use the price of bituminous coal ("BIT").[98]

98. Utilities also purchase BIT to generate electricity, and so BIT prices likely reflect many of the same cost and demand factors. There is no allegation that the conspiracy extended to BIT. Moreover, most utilities cannot substitute SPRB and BIT, at least in the short run, so the alleged conspiracy should have no direct effect on the price of BIT. In *FTC v. Arch Coal, Inc.*, the court found "the relevant product market is no broader and no narrower than SPRB coal." FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 123 (D.D.C. 2004).

An econometric analysis using the benchmark approach can be implemented in several ways. To keep the illustration relatively simple, the impact of the alleged conspiracy is tested using the dummy variable model discussed above. Most of the supply and demand factors used in the before-during approaches are replaced by the benchmark BIT price, since it should be capturing those effects.[99] The model includes the same dummy variable, as well as the three variables that control for the quality of SPRB coal, namely, the Btu content of the SPRB coal, the ash percentage of the SPRB coal, and the pounds of sulfur per million Btu of energy in the coal.[100] The results of this regression are shown in Table 4.

| | | | | |
|---|---|---|---|---|
| Dependent Variable: | | | | Average Price of SPRB Coal |
| R-squared: | | | | 0.7191 |
| Adj R-squared: | | | | 0.7093 |
| Number of Obs: | | | | 149 |
| | Coefficient | Newey-West Standard Error | t-Statistic | P>\|t\| |
| Dummy variable for the alleged collusion period | 1.1527 | 0.1867 | 6.1700 | 0.0000 |
| Btu content of SPRB coal | -0.0005 | 0.0010 | -0.4800 | 0.6300 |
| Ash percentage of the SPRB coal | -1.1329 | 0.6171 | -1.8400 | 0.0680 |
| Pounds of sulfur per million Btu | -1.1130 | 1.3201 | -0.8400 | 0.4010 |
| Price of BIT coal | 0.0063 | 0.0028 | 2.2800 | 0.0240 |
| Constant | 15.7235 | 9.7266 | 1.6200 | 0.1080 |

Table 4. Regression Results for Benchmark Approach

As shown in Table 4, the BIT price is of the expected sign (positive) and is statistically significant. The results show a statistically significant impact on SPRB prices in the period during the alleged conspiracy, again

99. The supply and demand factors could still be included in the model, and if they affect the benchmark differently than the price in question, including them will generally improve the model.

100. The estimating equation can be specified as:

$$SPRB_price_t = \alpha + \beta_1 \cdot Btu_t + \beta_2 \cdot Ash_t + \beta_3 \cdot lbsSO2_t + \beta_4 \cdot BIT_price_t + \gamma \cdot dummy_t + \varepsilon_t$$

where $BIT_price_t$ is the price of BIT coal in period t.

consistent with the alleged conspiracy increasing price. This specification of the benchmark dummy variable model estimates a $1.15/ton (or about 21 percent) increase in the SPRB coal price, which is somewhat smaller than the reduced form estimates in the before-during models using either the dummy variable or prediction approaches. Although BIT should not have been directly affected by the alleged anticompetitive act related to SPRB coal, it is possible that the customers who bought BIT faced substantially different supply and demand conditions than the plants purchasing the SPRB coal. In deciding whether the benchmark approach yields a more accurate quantification of the alleged anticompetitive behavior than the dummy variable or prediction approaches, one would need to analyze in more depth the comparability of the exogenous influences on BIT and SPRB to determine how good a benchmark BIT is for SPRB. If there are substantial questions about how comparable BIT is to SPRB, then the other approaches likely would yield more accurate estimates.

## G. Conclusions

Econometric analysis can be an extremely useful technique for estimating damages, if performed correctly. Estimating damages attributable to alleged anticompetitive acts requires separating the impact of the alleged anticompetitive acts from other influences on key variables, such as prices or the quantity sold. Econometric techniques are particularly useful in separating the effect of an alleged anticompetitive act from other influences.

To perform econometric analyses reliably, the testifying expert must verify that available data are of sufficient quality for the techniques chosen. Depending upon the data, the expert may use before-during techniques, before-during-after, or benchmarking approaches. These approaches to damage estimation may employ one or more well accepted regression techniques, such as dummy variable, prediction, or difference-in-differences to estimate the effects of the alleged anticompetitive acts. However, the expert should be able to state and support the reason for choosing particular techniques and data over potential alternatives. Moreover, since the finder of fact is not typically an economist or econometrician, the expert needs to be able to clearly and simply explain both the fundamental intuition of econometric analysis and why his approach is most appropriate.