# Exhibit 9

LexisNexis®

**User Name:** FRANCESCO GAGLIARDI
**Date and Time:** Friday, September 7, 2018 3:09:00 PM EDT
**Job Number:** 73108167

## Documents (10)


1. *Synopsis to CHAPTER 8 : Estimating Damages in Collusion Cases*
   **Client/Matter:** 0000000-0000000
2. *§ 8.01 Introduction*
   **Client/Matter:** 0000000-0000000
3. *§ 8.02 The Economics of Damages from Collusion*
   **Client/Matter:** 0000000-0000000
4. *§ 8.03 Building A Model for the Damages Analysis*
   **Client/Matter:** 0000000-0000000
5. *§ 8.04 Estimating Damages Using Econometric Models*
   **Client/Matter:** 0000000-0000000
6. *Synopsis to CHAPTER 9 : Class Certification*
   **Client/Matter:** 0000000-0000000
7. *§ 9.01 Introduction*
   **Client/Matter:** 0000000-0000000
8. *§ 9.02 First Generation Statistical Models Used in Class Certification*
   **Client/Matter:** 0000000-0000000
9. *§ 9.03 Statistical Models with Individualized Impact Results*
   **Client/Matter:** 0000000-0000000
10. *§ 9.04 Conclusion*
    **Client/Matter:** 0000000-0000000

# *1-8 Antitrust Economics for Lawyers CHAPTER 8.syn*

***Antitrust Economics for Lawyers > PART 3 Damages > CHAPTER 8 Estimating Damages in Collusion Cases***

## Author

Timothy S. Snail*Charles River Associates*

## CHAPTER 8 Estimating Damages in Collusion Cases

**Synopsis**

**CHAPTER 8Estimating Damages in Collusion Cases**

*§ 8.01 Introduction*

*§ 8.02 The Economics of Damages from Collusion*

*§ 8.03 Building A Model for the Damages Analysis*

*[1] What is the Conduct at Issue?*

*[2] How Would Market Prices Be Set Absent the Alleged Conduct?*

*§ 8.04 Estimating Damages Using Econometric Models*

*[1] Econometric Model Specification*

*[2] Data and Evidence*

*[3] Comparative Approaches to Estimating Damages*

*[4] Before-During-After Models*

*[5] Yardstick Method*

*[6] Difference-In-Differences Approach*

*[7] Market Simulations*

*[8] Critical Loss Analysis*

*[9] Validating the Model and Estimated Results*


Copyright 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

End of Document

# *1-8 Antitrust Economics for Lawyers § 8.01*

***Antitrust Economics for Lawyers > PART 3 Damages > CHAPTER 8 Estimating Damages in Collusion Cases***

## Author

Timothy S. Snail*Charles River Associates*

## § 8.01 Introduction*

There is no single approach to estimating damages associated with collusion. As a result, a variety of approaches may be used to estimate overcharges and damages in collusion cases. Damages methodologies must be adapted to the economics of the alleged conduct, the complexities of industry practices, and the facts of the case. The intricacies of these factors may lead to different economic modeling choices. Further there may be various economic mechanisms through which collusive effects are manifested (e.g., prices, output or quality), and any such effects may differ at each stage of the distribution chain depending on the nature of competition and market conditions.

In this chapter, we discuss the different approaches to damages estimation that are routinely used by experts—plaintiff and defendant experts—in collusion cases. We begin by discussing the potential economic effects of collusion,[1] considerations in building the theoretical model for the damages analysis, data and evidence requirements, methods for estimating damages from collusion using econometric methods, and the validation of results from damages models.

In principle, collusive behavior may affect direct purchasers as well as others. Indirect purchasers may be affected to the extent that direct purchasers pass on any overcharges that they incur to entities downstream in the distribution chain (e.g., distributors, wholesalers, retailers, and end consumers); or other market participants may charge higher prices to their customers even if they are not direct participants in the conspiracy, which is referred to as "umbrella effects."

In practice, collusion damages models that involve estimating overcharges to direct purchasers most commonly compare prices across allegedly affected and unaffected time periods ("benchmark" or "before-during-after" approach) or between the affected market and a reasonably comparable alternative market ("yardstick" approach).[2]

---

* The views expressed herein are the views and opinions of the author and do not reflect or represent the views of Charles River Associates or any of the organizations with which the author is affiliated.

[1] In discussing collusion, I refer to firms that have entered into anticompetitive agreements or cartels such as those to fix prices (or rig bids) above competitive levels or allocate markets among participating members. The discussion also applies to other matters—such as those involving alleged monopolization or pharmaceutical patent settlements with so-called "reverse payments"—wherein plaintiffs assert damages in the form of overcharges.

[2] It is possible that a collusive agreement is not effective, or that customers are not adversely affected for other reasons. Some potential economic effects of collusion are not generally recognized as damages by certain courts, and not all plaintiffs have standing to recover every form of damages. To the extent that there are no damages because collusion has been ineffective, the techniques described in this chapter will indicate that damages are nil.

Collusion damages models for indirect purchasers also require estimating the extent to which any overcharges that are proven to be incurred by direct purchasers are passed-through to indirect purchasers. While the concept of an overcharge is relatively straightforward, the mechanics of developing overcharge or other collusive damage estimates need not be. Antitrust damages estimates often are proffered by economic experts in litigation or government investigations, and they may be important in settlement negotiations.

Even when agreement exists on the methodology to be employed to estimate damages, experts may differ on how the approach is applied to the case at hand. The challenges in estimating damages due to collusion are illustrated in the matter *In re: Urethane Antitrust Litigation*. The defendants allegedly engaged in a multi-year conspiracy to coordinate price increase announcements for a myriad of chemicals that industrial customers used to produce polyurethane products during a period of excess production capacity in the industry. A U.S. district court jury awarded $400 million to a class of direct purchaser plaintiffs in a multidistrict litigation, and the judge ordered the last standing defendant to pay $1.06 billion after trebling and deducting amounts paid by defendants who had already settled. The jury verdict was affirmed on appeal by the Tenth Circuit. The defendant ceased pursuing Supreme Court review of the judgment after the passing of Justice Scalia and settled the matter for $835 million.[3] Plaintiffs' damages expert estimated overcharges by predicting prices that would have existed in a competitive market for three groups of polyurethanes, which were compared to actual prices during the alleged conspiracy period. The regression model was estimated using data for approximately one-quarter of the class members and half of the purchase volume. Plaintiffs' expert found average overcharges of approximately fifteen percent and no overcharges for ten percent of the transactions. The estimated average overcharge was statistically extrapolated to the entire class under the assumption that each transaction involved an overcharge. The expert for defendants objected to the choice of variables in the model and the benchmark period, argued the extrapolations yielded damages for a named plaintiff, for example, that had in fact successfully negotiated away price hikes, and noted the extrapolations yielded damages during periods when the overcharge models found prices to be competitive.[4] Ultimately, the court rejected the defendant's challenges to plaintiffs' expert's damages methodology and the expert's failure to disaggregate damages to the one remaining theory of liability of the two initial theories.

Antitrust Economics for Lawyers
Copyright 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

[3] In re Urethane Antitrust Litig., No. 13-3215 (Sept. 29, 2014 10th Cir.). While much of the appeals proceedings were focused on whether the class should have been certified and whether price-fixing creates an inference of classwide impact, many of the issues were rooted in the damages methodology.

[4] *See* Petition for a Writ of Certiorari, Dow Chem. Co. v. Indus. Polymers (S. Ct. Mar. 9, 2015); and Brief in Opposition, Dow Chem. Co. v. Indus. Polymers (S. Ct. May 11, 2015).

# 1-8 Antitrust Economics for Lawyers § 8.02

***Antitrust Economics for Lawyers > PART 3 Damages > CHAPTER 8 Estimating Damages in Collusion Cases***

## Author

Timothy S. Snail*Charles River Associates*

## § 8.02 The Economics of Damages from Collusion*

In principle collusion may affect consumer welfare through increased prices, reduced output or reduced quality,[5] which we can visualize with the assistance of basic economic concepts. Consumer welfare is the value to consumers[6] of a product above the price they paid for it; consumer welfare depends on supply and demand. Economists describe the relationship between the prices and quantities that consumers prefer to consume as the "demand curve" (see the line running through points A and G in Figure 1). Demand curves are downward sloping because as price decreases, demand increases. Producers' preferences are important as well, thus economists refer to the relationship between the prices and quantities at which sellers are willing and able to supply the product as the "supply curve" (see the line running through points D and G in Figure 1). Supply curves are generally upward sloping to reflect diminishing marginal productivity and increasing marginal costs as output increases.[7]

The intersection of the supply and demand curves determine the competitive market equilibrium price and quantity ($P_C$, $Q_C$). (See point G in Figure 1.) The shaded area between the supply curve and the demand curve (triangle ADG) represents the total consumer surplus under competitive market conditions.

In the event that the colluding firms (or a monopolist) are able to reduce output to the level $Q_M$(without inviting entry of other firms), the demand curve in Figure 2 shows that the profit-maximizing price would rise from $P_C$ to $P_M$. There could be several economic effects. First, consumers would pay more for the units of the product that they purchase at higher prices. This amount is calculated as the amount by which prices are elevated (here, the difference between $P_M$ and $P_C$) times the number of units purchased from the colluding firms ($Q_M$), which is reflected in the shaded rectangle BCFH in Figure 2.[8] This transfer of wealth from consumers to producers is the price "overcharge" that is typically awarded as antitrust damages.[9]

---

* The views expressed herein are the views and opinions of the author and do not reflect or represent the views of Charles River Associates or any of the organizations with which the author is affiliated.

5 Franklin M. Fisher, Economic Analysis and Antitrust Damages, 29 World Competition 383 (2006).

6 Where I use the word "consumers," one generally could substitute "buyers" or "customers" or "purchasers." The use of the word consumers does not require buyers to be final end consumers of the product at issue.

7 In a canonical "perfectly competitive" market, the supply curve marks out a horizontal line under the assumption that suppliers would be willing to supply any quantity of the product at the price $P_C$.

8 This calculation assumes that in response to the price increase, consumers could not shift purchases to less costly alternative products that they view as substitutes.

9 The price effects of the cartel are fully captured in the overcharge when the cartel's direct customers are end-consumers.

Second, consumers would not have the opportunity to purchase further units at the competitive price, thus they would experience the welfare loss reflected in the shaded triangle HEG in Figure 3.[10] This second amount—the so-called "deadweight loss"—is typically not awarded as antitrust damages.[11] Third, direct purchasers may pass on the price effects of collusion to entities downstream in the distribution chain (e.g., distributors, wholesalers, retailers, and end consumers). Such pass-on typically is not considered in awarding antitrust damages for direct purchasers, although it is a central issue in matters involving indirect purchasers.[12]

In the stylized description of collusive behavior depicted in Figures 1–3, the collusive behavior is the only factor behind the reduction in output from the competitive level ($Q_C$) to the collusive (monopoly) level ($Q_M$). Most real world markets involve additional considerations, as discussed below. First, many markets are (or would likely be) oligopolies[13] absent collusive behavior, thus the appropriate point of comparison is not a perfectly competitive market. Second, there may be other supply and demand factors unrelated to alleged collusion that cause output to be restricted or prices to be elevated during the time period when collusion is alleged to take place. Third, the extent that overcharges to direct purchasers are passed-on to indirect purchasers may vary at each stage in the distribution chain depending on the nature of competition and strategic interaction between competitors at that point in the distribution chain, and there may be multiple distribution chains.[14] Damages methodologies must be adapted to the economics of the alleged conduct, the complexities of industry practices, and the facts and legal parameters of the case. As discussed below, antitrust damages analyses typically involve building an economic model then estimating the model using multiple regression techniques that can control for potential explanatory factors including the alleged antitrust violation and unrelated factors (e.g., changes in market conditions).

Antitrust Economics for Lawyers
Copyright 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

**End of Document**

---

[10] This calculation also assumes that in response to the price increase, consumers could not shift purchases to less costly alternative products that they view as substitutes.

[11] Deadweight loss is the reduction in consumer surplus caused by consumers' unwillingness to pay the cartel (monopoly) price when they would have been willing to purchase at the perfectly competitive price. The loss is deadweight because it is a pure loss to society rather than a transfer of wealth from consumers to the cartel (monopolist). Deadweight loss can be difficult to determine in practice since it requires knowledge of the elasticity of demand (either through estimation of it or reference to prior studies). Further, some consumers in this region may have purchased another product in lieu of the cartelized product, and the alternative product's price may not have been the perfectly competitive price of the cartelized product.

[12] *See* Philip A. Viton & Clifford M. Winston, Passing on the Monopoly Overcharge: The Welfare Implications, 129 Univ. Pa. L. Rev. 1516 (1981).

[13] An oligopolistic market is one where there are relatively few market participants in comparison to a perfectly competitive market; the products may be homogenous or differentiated. In an oligopoly, a market participant's performance is affected by that of its rivals (in contrast to a monopolist or firm in a perfectly competitive market).

[14] Daniel L. Rubinfeld, Antitrust Damages, in Research Handbook on the Economics of Antitrust Law 378 (Einer R. Elhauge ed., 2012). *See also* the discussion of suits by indirect purchasers by Colin Kass & Timothy Snail, Overcharges, in Proving Antitrust Damages: Legal and Economic Issues. 220 (ABA 2d ed. 2010); and Theon van Dijk & Frank Verboven, Cartel Damages and the Passing-on Defense, 57 J. Ind. Econ. 457 (2009).

# *1-8 Antitrust Economics for Lawyers § 8.03*

***Antitrust Economics for Lawyers > PART 3 Damages > CHAPTER 8 Estimating Damages in Collusion Cases***

## Author

Timothy S. Snail*Charles River Associates*

## § 8.03 Building A Model for the Damages Analysis[*]

### [1] What is the Conduct at Issue?

"It is a capital mistake to theorize before one has data. Insensibly one begins to twist facts to suit theories, instead of theories to suit facts."

—Sherlock Holmes in *A Scandal in Bohemia* by Arthur Conan Doyle

There are three stages in developing econometric estimates of damages: (1) specification of the model (building the underlying economic model and the econometric model), (2) using statistical methods to econometrically estimate the model ("estimation") and developing damages estimates, and (3) validation of the results of the model. In practice, tradeoffs may be made between various alternatives in the specification and estimation of the model (often due to data limitations or analytic convenience). These choices are often a focus of critical examination of the expert's damages methodology. This section addresses the first step in specifying the model: building the underlying economic model for the damages analysis.

At the outset of an analysis of damages associated with collusion it is important to identify the conduct at issue and how it could affect competition. For example, does the disputed conduct involve market participants at the same stage of the distribution chain or entities along the vertical chain? A typical starting point is to identify the stage of the distribution chain wherein the alleged collusion occurred and which entities were involved, as well as the position of those who claim to have been affected.[15] The relevant product(s) and market(s) should be identified; these market definition issues typically require economic analysis of business practices in the

---

[*] The views expressed herein are the views and opinions of the author and do not reflect or represent the views of Charles River Associates or any of the organizations with which the author is affiliated.

[15] While collusion is commonly hypothesized to involve a group of competitors within a market, some have argued that collusion could affect the pricing or production decisions of non-colluding firms within the market that produce substitutes. *See* Roman Inderst et al., Umbrella Effects, 10 J. Comp. L. & Econ. 739 (2014). U.S. courts generally have held that plaintiffs cannot recover damages for purchases made from entities outside a cartel because the intervening pricing decisions of noncartel members render the chain of causation too indirect and attenuated, and therefore the damages are too speculative. See, e.g., *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, 459 U.S. 519 (1983)*; *Antoine Garabet, M.D., Inc. v. Autonomous Techs. Corp., 116 F. Supp. 2d 1159, 1167–68 (C.D. Cal. 2000)*. U.S. courts have also rejected experts' attempts to infer that there were passive conspirators on the grounds that such a theory does not distinguish between collusion and conscious parallelism—the latter in itself is not unlawful. See Alice H. Allen et. al. v. Dairy Farmers of America, U.S. District Court for the District of Vermont, Case No. 5:09-cv-230, Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Exclude Various Opinions of Plaintiffs' Merits Expert Dr. Gordon Rausser, December 31, 2013. However, the Court of Justice of the European Union has ruled that damages may be recovered from cartel members for higher prices paid to noncartel members that were able to raise their prices under a pricing "umbrella" created by a cartel. See Judgment of the Court (Fifth Chamber) of June 5, 2014, in the Case C-557/12, Kone AG and others, [2014] ECR I-0000.

FRANCESCO GAGLIARDI

relevant industry. The results of the analysis may be affected by whether the alleged collusion involved price-fixing, market division, bid-rigging, or other potentially anticompetitive conduct. The results may be affected by, for example, whether prices are set through a competitive bidding process, individualized negotiations, or other means. And the results may be affected by the extent to which products are purchased on a spot market basis versus under contracts (which may contain price protection clauses).

Also, the beginning and end of the alleged conduct should be specified. This may be a contentious issue as there is not necessarily a bright line demarcating the relevant time period of misconduct. For example, it may be unclear when the alleged collusive behavior first became effective, there may be periods when collusion was ineffective (i.e., there may be lapses in enforcement of collusive agreements or "cheating" by alleged participants), the collusive agreement may have unwound in stages, and some effects of the collusive agreement may linger.[16] Many of these parameters are determined through analysis of case documents and the testimony of fact witnesses, although some may be aided by economic analysis (e.g., analysis of substitutes to inform product market definition), econometric analysis,[17] or maintained as assumptions.

With these basic parameters in hand, we can begin to hypothesize how the alleged conduct could have affected markets as well as the potentially relevant forms of damages. Among the greatest challenges is determining how prices would have been set in the market absent the alleged collusive behavior. The extent to which damages flow from the alleged collusive conduct—causation—is intertwined with this analysis.

### [2] How Would Market Prices Be Set Absent the Alleged Conduct?

In principle there are essentially five steps in economic modeling of damages: establishing the counterfactual scenario, building the basic economic model using economic theory and adapting it to the instant circumstances, developing testable research hypotheses, econometrically estimating the model with available data, and validating the results. This section focuses on the first three of these steps.

*Counterfactual Scenario*

To evaluate antitrust damages attributable to alleged collusion in a specific market, the plaintiff's actual situation is compared with the hypothetical situation that would have existed absent the collusion. While actual market prices and quantities during the relevant time period generally are observable, the prices and quantities that would have existed but for the collusion are not known and thus must be estimated. Furthermore, even when the alleged collusive conduct is clearly defined, the behavior of firms and markets in the absence of such conduct generally is not obvious. The market outcomes in the "but for" world (or "counterfactual scenario") would be the result of complex interactions involving different economic conditions than those that were actually observed.[18] Furthermore, the often made simplifying assumption that the industry would revert to a perfectly competitive marginal cost pricing regime after the alleged cartel dissolves would not be plausible if the industry had been an oligopoly before the alleged cartel formed. Since oligopoly prices usually are higher than perfectly competitive prices, this assumption about the nature of competition absent collusion could produce biased but-for price estimates and overstated damages.

*Economic Model*

---

[16] A later section will discuss "sensitivity analyses" that explore the extent to which the estimated results are affected by underlying assumptions such as the duration of the alleged collusive period.

[17] For example, the relevant time period may be identified statistically through "structural break" analysis that seeks to identify nonstationary factors underlying a model (such as the mean, variance, or trend over time). *See* Bruce E. Hansen, The New Econometrics of Structural Change: Dating Breaks in U.S. Labor Productivity, 15 J. Econ. Perspectives 117 (2001); William H. Greene, Modeling and Testing for a Structural Break, in Econometric Analysis 130–34 (5th ed. 2003). Such econometric techniques have been used as screens to detect collusion. See Pim Heijnen, Marco A. Haan & Adriaan R. Soetevent, Screening for Collusion: A Spatial Statistics Approach (Tinbergen Inst., Discussion Paper TI-2012-058-1, 2012).

[18] *See* Phillip E. Areeda, Roger D. Blair, Herbert Hovenkamp & Christine Piette Durrance, ¶340 Reasonably Ascertainable Damages, in Antitrust Law: An Analysis of Antitrust Principles and Their Application, Vol. IIA, 134 (3d ed. 2007) (estimating the hypothetical situation is exceedingly difficult in a constantly changing world, where, in the absence of the violation, many factors would have affected both plaintiff and defendant).

Estimating but-for prices generally requires the construction of an economic model that captures the essential factors that affect prices and output. Merely identifying the relevant factors is not sufficient; the factors need to be incorporated into the model in a way that reflects the market dynamics that drive prices and output. The economic model should be capable of distinguishing between the effects of lawful activities and events that influence supply and demand (and hence prices) from the effects of the alleged anticompetitive conduct. In doing so, the model should capture all of the essential economic relationships and factors that are likely to influence prices. The accuracy and reliability of the damages analysis is affected by the appropriateness of the economic model and its ability to distinguish the alleged collusive effects from other plausible explanations.

A common starting point in developing the economic model (also called the “behavioral model”) is to examine how, in principle, supply and demand are determined in the market. Prices are determined by demand and supply factors. Econometric models seeking to measure the extent to which prices were inflated by collusion must first determine how prices are affected by demand and supply conditions that are unrelated to collusion. The basic economic demand relationship may be expressed as an equation that relates the observable market outcome (quantity demanded) to various explanatory factors such as price of the relevant product, prices of substitutes, and other factors determined independently of demand (i.e., “exogenous” demand factors). Similarly, the supply relationship may involve the quantity supplied as a function of factors such as price of the relevant product, input costs, market structure (e.g., seller concentration), quantities of substitutes (e.g., imported substitute products), and other exogenous supply factors.[19] These are the “structural” equations that describe the fundamental economic processes driving prices and output in the market.

The economic model should be adapted to the particulars of the industry, products, and markets at issue. Adaptations to the basic model may involve adding several elements relevant to an underlying economic factor (e.g., several different inputs’ prices that may affect supply decisions, demographic characteristics that may affect demand), removing factors (e.g., factors that did not vary for the market at issue), and substituting similar information where the ideal data are not available. Also, the model should control for factors that changed during the relevant time period, in particular if they would have occurred even without the alleged collusion (e.g., increased costs or changes in government regulations that materially affect market behavior).

The processes of creating the basic economic model and adapting it to the instant circumstances are not without risks. If the model omits important explanatory factors unrelated to collusion that influence price, the model may be unable to explain price movements or it may incorrectly attribute the effects of omitted explanatory factors to variables that are included in the model (such as the alleged collusion), producing biased results. If proxies are used for underlying economic parameters, they may introduce measurement error. Adaptations of the model that diverge from the underlying economic theory may undermine its reliability. These issues should be addressed in the econometric analysis.

*Testable Research Hypotheses*

While the alleged conduct at issue may suggest general hypotheses for the economic analysis, once the economic model is specified it is possible to construct specific testable research hypotheses. For example, an hypothesis may be that increases in incremental costs would be expected to result in increases in the product’s price; the hypothesis may depend on the specific time frame, firms’ contracting practices associated with the cost factors, and the importance (or lack thereof) of the particular cost being considered. Economic theory may provide predictions for the expected sign of the relationship between each explanatory variable and price: a positive sign indicates that increases in the explanatory variable are associated with increases in price, whereas a negative sign indicates that changes in the explanatory variable and price are in opposite directions. Economic analysis also may inform expectations about the relative magnitudes of these relationships; for example, an increase in wholesale gasoline prices is expected to have a large positive relationship with retail gasoline prices, and prior empirical economic analyses may inform the magnitude of the relationship.

There are numerous methods by which “but-for” prices (or quantities) may be estimated as we explain in the next section. But-for prices are often econometrically estimated using actual prices or quantities that were

[19] Alternatively, the supply side may be modeled using a cost function that reflects a firm’s choice of inputs to produce a desired quantity of output while minimizing the total cost.

unaffected by the alleged collusion (and thus serve as a competitive benchmark) and assumptions about unknown factors (such as the relevant time period). The estimation of but-for prices usually is a contentious issue.

Antitrust Economics for Lawyers
Copyright 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

**End of Document**

# 1-8 Antitrust Economics for Lawyers § 8.04

***Antitrust Economics for Lawyers > PART 3 Damages > CHAPTER 8 Estimating Damages in Collusion Cases***

## Author

Timothy S. Snail*Charles River Associates*

## § 8.04 Estimating Damages Using Econometric Models[*]

**[1] Econometric Model Specification**

"True genius resides in the capacity for evaluation of uncertain, hazardous, and conflicting information."
—Winston Churchill

Econometrics involves applying statistical techniques to test economic theories under specific circumstances, quantifying relationships whose characteristics are measured with error, and forecasting future values of economic parameters. One of the main tools of econometrics is the linear multivariate regression model, which provides a means of estimating how a change in individual economic variables—"explanatory" variables (also called "independent" variables or "covariates")—affect the variable being explained—the "dependent" variable—taking into account the effect of other determinants of the dependent variable.[20]

*Structural or Reduced-Form Modeling*

Economic modelling may involve a full structural model that explains demand and supply conditions that in turn explain price, or it may make use of "reduced form" modelling techniques that do not require a full system of demand and supply conditions to be explained. In estimating damages for collusion cases, the typical approach is one of reduced form modelling. The reduced-form model seeks to explain price (the "dependent" variable) as a function of various exogenous or predetermined factors thought to influence supply and demand (such as costs, prices of substitutes, etc.). Since the reduced-form equation is created under the assumption that supply equals demand, it is more difficult to separate movements along the supply curve caused by anticompetitive behavior from shifts in the supply or demand curves caused by exogenous factors.[21] It is not uncommon to create a reduced-form price equation by eliminating the output (quantity) variable; since the reduced-form equation has no quantity variable, it would not provide a means of estimating the price elasticity of demand (although structural equations would allow such estimation). Reduced-form models generally have more manageable data requirements and are easier to econometrically estimate than structural models, but these

---

[*] The views expressed herein are the views and opinions of the author and do not reflect or represent the views of Charles River Associates or any of the organizations with which the author is affiliated.

[20] The basic statistical assumptions that must be satisfied for linear regression models are described in a later section on validating the model.

[21] *See* Jonathan B. Baker & Daniel L. Rubinfeld, Empirical Methods in Antitrust Litigation: Review and Critique, 1 Am. L. & Econ. Rev. 386 (1999), (discussing class certification damages models in *In re Propylene Carpet Antitrust Litig., 996 F. Supp. 18 (N.D. Ga., 1997))*. The simultaneous system of equations can only be estimated if there are some variables that only enter the supply equation and others that only enter the demand equation. See James A. Brander & Thomas W. Ross, Estimating Damages from Price-Fixing, 3 Canadian Class Action Rev. 335, 348 (2006).

advantages may come at a cost. While structural equation parameters are generally linked directly to the underlying economic theory, reduced-form parameters often are not.[22] Reduced-form equations may produce misleading results if, for example, the nature of competition changes over time.[23] In general, attempts to specify a reduced-form model directly without building the specification from an underlying economic model or building on prior similar empirical research runs the risk of misspecification.[24]

*Causation*

Establishing causation has important ramifications for antitrust damages analysis: it determines whether the alleged harms are the result of the alleged anticompetitive activities or unrelated lawful factors, and it affects the amount of damages (if any) associated with specific theories of harm.[25] In real-world markets, there are usually numerous supply and demand factors that could affect economic outcomes such as price, quality and output. Further, market dynamics may be driven simultaneously by different economic relationships. Econometric modeling techniques are commonly used to sort out these issues.

The extent to which a specific econometric model is able to distinguish between simultaneous economic relationships—such as movement along the demand curve and a shift in the supply curve—is the topic of econometric "identification."[26] Identification is essential for reliable statistical and causal inference; if more than one theory is consistent with the data, there is no way of distinguishing theories on the basis of the model. The crux of establishing a causal relationship is the determination that a change in an explanatory variable is associated with a change in the dependent variable holding all other relevant factors constant (i.e., the *ceteris paribus* condition).[27]

The finding of a correlation between a factor of interest and a market outcome does not by itself establish causation. Causation could run in either direction (often called "simultaneity" or "reverse causality"),[28] or there

---

[22] For a discussion of this topic, *see* Daniel L. Rubinfeld, Quantitative Methods in Antitrust, in 1 Issues in Competition L. & Pol'y 723 (ABA Section of Antitrust Law 2008). More generally, structural econometric modeling is discussed in Aviv Nevo & Michael D. Whinston, Taking the Dogma out of Econometrics: Structural Modeling and Credible Inference, 24 J. Econ. Perspectives 69 (2010); Peter C. Reiss & Frank A. Wolak, Structural Econometric Modeling: Rationales and Examples from Industrial Organization, in Handbook of Industrial Organization Econometrics 4278 (2007).

[23] For example, increased consolidation in the industry could result in efficiencies (and lower costs or prices) or increased prices regardless of any collusive effects.

[24] *See infra* Sections 4.04[1] and 4.04[9].

[25] *See* M. Sean Royall, Disaggregation of Antitrust Damages, *65 Antitrust L. J. 311 (1997).* In *Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)*, the Supreme Court rejected a plaintiff's expert's damages model that incorporated three of four theories of harm that were found to be inapplicable when the model did not provide an estimate of the damages attributable to the only remaining theory of harm; the Court ruled that class certification was improper.

[26] *See, e.g.*, Greene, The Problem of Identification, *supra* note 17, at 384–94; Joshua D. Angrist & Alan B. Kreuger, Instrumental Variables and the Search for Identification: From Supply and Demand to Natural Experiments, 15 J. Econ. Perspectives 69 (2001); Judea Pearl, Causality: Models, Reasoning, and Inference (2000); Kevin D. Hoover, Causality in Economics and Econometrics, in The New Palgrave Dictionary of Economics (2006). See also the discussion of the "instrumental variables" econometric technique in section 4.04[9] infra.

[27] Jeffrey M. Woolridge, Sec. 1.1, Causal Relationships and Ceteris Paribus Analysis, in Econometric Analysis of Cross-section and Panel Data (2002).

[28] For example, the issue of simultaneity was considered by the Canadian Competition Tribunal in the Superior Propane case (Comm'r of Competition v. Superior Propane, Inc., [2000] C.C.T.D. No. 15, [2000] Comp. Trib. 15 at para. 276); *see* discussion in Margaret F. Sanderson, Economic Analysis, in Brian A. Facey & Cassandra Brown, Competition and Antitrust Laws in Canada: Mergers, Joint Ventures and Competitor Collaborations 118 (2013).

could be a third factor that is a common cause driving the first two variables (often called "confounding").[29] For example, relatively wealthy people tend to be relatively healthy as well. While there is a plausible causality between wealth and health—wealth may allow individuals to afford better healthcare—there is also plausible reverse causality—healthier individuals may be more successful professionally and thus attain greater wealth. Confounding can be illustrated in the correlation between ice-cream consumption and drowning deaths. Despite the correlation between these two factors, it is unlikely that either factor causes the other. Instead, it is likely that a third factor—warmer weather—leads both to increased ice-cream consumption and drowning deaths. Here, weather is a confounding variable. Failing to account for this confounder could lead to inferences of a spurious relationship between ice-cream consumption and drowning deaths.

While a randomized experiment is an accepted method to identify and test causal relationships, most antitrust damages analyses are conducted in nonexperimental settings that make the identification of causal factors more challenging. Additional facts, statistical techniques, or principled economic analyses may be required to resolve "endogeneity"—such as reverse causality or confounding—and conclude that a correlation reflects causation.[30] In some situations a relationship can be described as causal conditional on specific assumptions, and those assumptions may be subject to independent verification. Without an economic model, it would be difficult to distinguish correlation from causation. For example, is it reasonable to assert that a head-of-state's policies are responsible for the economy's performance during her administration if the two appear to be correlated? The administration may have enacted policies that were likely to increase employment and stimulate investment by businesses—although whether they in fact did so would require empirical study. An economic model of the economy may reveal that policies enacted in one administration affect the economy during future administrations, business cycles are driven by underlying economic factors outside of politics, and the specific policies enacted had countervailing effects on the economy. Without an economic model, an antitrust damages analysis generally would have no principled economic means to evaluate competing theories of causation and assess whether and the extent to which any theory resulted in antitrust damages, if any.

### [2] Data and Evidence

The data required for the damages analysis depends on the economic model that is to be estimated. The data may describe cross-sectional or time series units. "Cross sectional" data have one observation per unit of analysis and the data reflect a specific point in time; the units of analyses could be firms, individual, geographic entities, etc. For example, a cross-sectional data set could contain prices and quantities purchased by a firm's customers for a particular year. Surveys generally produce cross-sectional data. "Time series" data includes observations of the unit of analysis over time, where units of analysis are as above. For example, sales transactions by customer by date over a five-year period provide time series data for a given customer and cross-sectional data across customers. In time series data, one cannot assume that the observations are independent across time. If the time series data include the same units (e.g., customers) at each measured point of time, it is called "panel" data (or "longitudinal" data). Even when an econometric analysis focuses on the time-series properties of the data, it may be helpful (and sometimes necessary) to also conduct cross-sectional

---

[29] *See, e.g.*, Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in Reference Manual on Scientific Evidence 309, 310 (3d ed. 2011). When a relationship between an independent variable (such as defendant's conduct) and a dependent variable (such as the prices) has been misestimated because a model failed to include a confounding factor, statisticians refer to the relationship as a spurious relationship. See Areeda et. al., *supra* note 18, at 127–128.

[30] The use of antitrust damages methodologies that compare actual performance to that which allegedly would have occurred but for the anticompetitive activity "… virtually always requires the use of an expert economist or statistician, and a competent model typically requires the use of a multiple regression analysis, which not only estimates the extent of the plaintiff's poorer performance during the alleged damages period, but also controls for other factors that differentiate the 'before and after' or 'yardstick' markets from the damages market. It would be a rare case in which such factors were not present … It is an extraordinarily rare situation that a yardstick or before-and-after market resembles the damages market so perfectly that there is only a single relevant difference (typically price or profits earned) between the two. In sum, as soon as multiple differentiating factors must be taken into account, a multiple regression analysis becomes necessary." *See* Areeda et. al., *supra* note 18, at 127.

analyses. There are different econometric techniques for grappling with issues that arise with cross-sectional, time series, and panel data.

Typically a damages analysis of collusion that focuses on prices uses sales transactions data, publicly available data (e.g., input prices, imports), company documents, surveys, or testimony (e.g., delineating the relevant time period). If the damages analysis focuses on profits (or margins), often internal company data is used (e.g., *proforma* estimates of the profitability of specific product lines). Economists generally prefer disaggregate data for damages analyses as it is more detailed, facilitates interweaving of other data sources, and variation across observations assists with precisely estimating relationships between the explanatory variables and price (or margin). Regardless of the data sources used, it is often necessary to link together various data sources using common identifiers (e.g., customers, locations) and to identify (and perhaps "clean" up) potential anomalies in the data. Assumptions and processes used in data handling can become a focus of critical examination of the expert's damages methodology, for example, whether the expert's choices have the effect of disproportionately excluding higher-priced or lower-priced items, resulting in bias.

Also, estimation of the economic model relies in part on parameters that describe the specific instances of alleged anticompetitive behavior and its legal or regulatory context. For example, the model would require a delineation of the relevant product(s) and the relevant time period. These parameters may be derived from the factual record, legal or regulatory guidance (e.g., a statute of limitations), or economic analysis; alternatively, they may be maintained assumptions.

The difficulties of obtaining sufficient and reliable data complicate the process of modeling the but-for world. Even apart from the fact that there will be no data from the but-for world (which never did exist), the data that exist from the actual world may have severe limitations. Damages analyses of collusion often rely on price and sales data from proprietary sources. However, such data may not be consistently recorded (across companies, business units or time), may contain gaps (periods of time, specific companies or products), and may inaccurately reflect the factors of interest in the instant matter since the data was compiled for other purposes.[31] For models that are predicated on comparing the relevant time period to a different period that was not influenced by the alleged anticompetitive conduct, it may be difficult to distinguish between such periods under some circumstances. Some relevant data, such as changes in certain costs or changes in capacity, might not be available or might not be measured accurately. With respect to sales data, for example, there may be time gaps in the data record, it may not be sufficiently detailed, or it may exclude relevant transactions or components of the price. Alternative estimation methods may rely on different assumptions (which should be verified), and have different capacities to address data limitations and different degrees of accuracy and precision. Nevertheless, most of these issues can be addressed in the construction of an appropriate economic model and use of appropriate econometric estimation techniques.

### [3] Comparative Approaches to Estimating Damages

While there are numerous approaches to estimating damages associated with collusion, each approach faces the challenge that the but-for world cannot be observed and thus must be estimated. Most collusion damages analyses analogize the unknown but-for world economic factors (e.g., prices) to those in another time period, company, product, or market. These comparative analyses have been the cornerstone of collusion damages analysis, but the assumptions in making these comparisons often are a focus of critical examination of the expert's damages methodology.

This section focuses principally on econometrically estimating price overcharges for direct purchasers in cases involving allegations of horizontal price-fixing.[32] While the concept of a price overcharge is straightforward, a simple price comparison generally would be misleading as a measure of damages for a number of reasons.

---

[31] For example, costs commonly recorded in accounting records may not capture the relevant economic costs.

[32] More broadly, the analysis is applicable to other collusive conduct. *See, e.g.*, Kass & Snail, *supra* note 14, at 213–16 (bid rigging), 217–19 (collusion focused on product dimensions other than price), 219 (collusion in regulated industries), 226–31 (umbrella effects), and 231–33 (overcharge incident to exclusion). Furthermore, the analytic framework is applicable to models focused on economic variables other than price, such as costs or margins.

Factors unrelated to the alleged collusive behavior that affect prices may vary across collusive/non-collusive periods, relevant/non-relevant geographic markets, etc.[33] Also, factors that are correlated with the alleged collusive behavior may affect prices (e.g., shifts in demand due to factors unrelated to the alleged collusion); if the factors are positively correlated with prices, they may result in overestimates of the overcharge.[34] Thus, collusion damages are most commonly estimated using regression models that provide techniques for addressing these complex issues.[35]

**[4] Before-During-After Models**

The most conceptually straightforward method for estimating the overcharge associated with collusion is through a before-during-after model—commonly referred to as the "benchmark" approach. This model is premised on the assumption that prices before and after, but not during, the relevant period were set free of any illegal collusive behavior. Using pricing and quantity data from both the before and after time periods as competitive benchmarks, a model is constructed to estimate the but-for prices during the relevant period. Overcharges are then the difference between the actual prices charged and the prices predicted by this model during the relevant period. When sufficient data for the period after the anticompetitive behavior are not available, a variation of the before-during-after model—the before-during model—may be used, where the competitive benchmark is restricted to the period before the alleged conspiracy. These approaches are in the spirit of treatment effects models whereby the average difference in outcomes (i.e., prices) between the "treatment" (i.e., prices during collusion) and "control" groups (i.e., competitive prices) is attributed to the treatment (i.e., collusion) provided that the relationships between the explanatory variables and prices without collusion would be the same in the two groups or are otherwise controlled for.[36]

The simplest form of the before-during-after model assumes that the weighted average prices from outside the relevant period are a reasonable approximation of the prices during the relevant period absent the conspiracy. Put differently, this approach assumes that the entire price difference between the conspiracy period and competitive period was due to the alleged anticompetitive conduct. While this strong assumption could hold in some circumstances, it is rarely justified, especially for lengthy conspiracy periods.[37] Similarly, if a benchmark period with prices that are artificially low is used, the result would be an overestimate of overcharges. Four examples of these issues that may factor into the choice of models are discussed: non-equilibrium pricing, market structure assumptions, static market conditions, and individualized pricing.

First, the before-during-after model assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices. It is important to examine the economic conditions in the before and after periods for entry or exit, surpluses or shortages, or factors that would indicate that the market had not reached long-run equilibrium. For example, if price wars give rise to a cartel, then prices shortly before the beginning of the conspiracy would not reflect long-run equilibrium prices. Or if there was a surge in imports beginning near the end of the cartel period, the imports likely would depress prices regardless of the cartel. Also, in dynamic markets the relationship between prices and other economic factors may evolve rapidly in which case using prices from distant points outside the conspiracy period may present challenges.

---

[33] These issues often involve the econometric issue of bias due to "omitted variables;" *see* the discussion of this issue in Section 4.04[9] *infra*.

[34] These issues often involve the statistical issue of "confounding" or "spurious correlation." See Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in Reference Manual on Scientific Evidence 309, 310 (3d ed. 2011).

[35] A general discussion of damages associated with collusion is provided in Kass & Snail, *supra* note 14.

[36] Guido W. Imbens, Nonparametric Estimation of Average Treatment Effects Under Exogeneity: A Review, 86 Rev. Econ. & Statistics 4 (2004).

[37] *See* Areeda et. al, *supra* note 18, at 135. See also, *Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th. Cir. 1992)* (Judge Posner's opinion that post hoc ergo prompter hoc will not suffice).

Second, an assumption that the absence of the alleged conspiracy would result in perfect competition should be verified, as but-for prices generally would be higher if instead the market were oligopolistic. It is rare to see markets that are perfectly competitive even in the absence of collusion.

Third, the assumption that but-for prices would have been constant during the relevant period implies that there were also no changes in the economic factors that normally determine prices—for example, changes in demand, changes in costs, entry or exit of firms, capacity constraints, or lawful managerial decisions.[38] Again, this static state of affairs is unlikely especially for lengthy conspiracy periods. In dynamic markets the relationship between explanatory variables and prices may evolve rapidly. In these circumstances, the before-and-after method may substantially overstate or understate the true measure of damages.[39]

Fourth, the use of aggregate average prices from the benchmark period would produce inaccurate overcharge estimates for individual customers if their prices would have differed, for example, due to individualized negotiations or variation in bargaining power.

These limitations are typically addressed through more rigorous methods that apply econometric techniques to estimate the but-for prices while controlling for other factors that may have affected prices. Within the before-during-after framework, there are two main regression-based alternatives for estimating overcharges: the “dummy variable” (or “indicator”) method and the forecasting (or “residuals”) method.

*Dummy Variable Method*

The dummy variable method makes use of all available data for alleged conspiracy and non-conspiracy periods, and the data are augmented with one or more explanatory dummy variables to denote these periods. The dummy variable takes on the value of one for values during the conspiracy period and zero for values outside the conspiracy period;[40] this type of variable also is called a “binary variable.” More than one dummy variable may be used if there were various sub-periods during which the effectiveness of the conspiracy varied or if there would have been important changes in economic conditions affecting but-for prices that would not otherwise be captured by the model. When properly specified, this type of model provides an estimate of the difference between but-for and actual average prices given specific values of the explanatory variables and their estimated coefficients.

The dummy variable method implicitly assumes that the relationship between the explanatory variables and the dependent variable is approximately the same in the conspiracy and non-conspiracy periods; this assumption can be tested statistically.[41] Under some conditions it may be appropriate to estimate the model allowing the

---

[38] *See* Areeda et. al., *supra* note 18, at 338. A failure to control for changes between non-conspiracy and conspiracy periods can undermine an analysis. For example, class action plaintiffs' expert for In re Industrial Silicon Antitrust Litigation performed a price/cost analysis margin analysis, assuming that pre-conspiracy and conspiracy period margins should have been similar. However, because the analysis failed to control for factors that changed between the two periods and the errors were correlated over time, the model was not reliable. *See* Damages, in Econometrics: Legal, Practical, and Technical Issues 173 (ABA 2005). In the matter *In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497 (D. Kan. 1995)*, the court rejected plaintiffs' experts' before-and-after damages model because it assumed the sole cause of price differences between the damages period and benchmark period was the alleged conspiracy, an assumption conclusively refuted by the economic literature. In the matter *In re Live Concert Antitrust Litig., 863 F. Supp. 2d 966 (C.D. Cal. 2012)*, the court excluded the testimony of an economist who proffered a before-and-after regression model with no independent variables other than time.

[39] Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice 662 (2d. 1999). Hovenkamp provides an example of using the before-and-after method to estimate the impact of a uranium cartel without accounting for the effects of an unrelated crude oil cartel that came into existence during the same period. The creation of the oil cartel effectively shifted out the demand (i.e., a shift to the right in Figure 2). The oil price increase would have pushed up the uranium price even absent the uranium cartel.

[40] The addition of a conspiracy indicator variable does not necessarily denote a factual finding that a conspiracy occurred or was effective; it is more appropriately viewed as a maintained assumption.

[41] The assumption that data from conspiracy and non-conspiracy periods reflects similar underlying economic relationships can be examined with a Chow test. Further economic analysis would be necessary to determine whether any such differences would result in biased coefficient estimates.

effects of the explanatory variables to differ before and during the alleged conspiracy period, or alternatively to constrain the influence of the explanatory variables on price to have the same effects before and during the conspiracy period.[42]

In this type of model, the coefficient of the conspiracy period dummy variable is the average overcharge expressed in the same units as the price for linear models. For example, where the price variable is expressed in dollars (often referred to as price "level"), the overcharge is also in dollars. If the price variable reflects the natural logarithm of the prices, the conspiracy dummy variable coefficient (multiplied by 100) is approximately the percentage overcharge.[43]

In some cases, the use of a dummy variable to estimate the impact of the conspiracy on prices yields a negative result, suggesting that collusive prices were lower than competitive prices. This apparently surprising result does not necessarily mean that the use of the dummy variable approach was incorrect; it may be an artifact of a variety of data and other econometric issues. A negative coefficient for the dummy variable, however, may be consistent with the economic model and suggest that the alleged conspiracy never occurred, was ineffectual, or was outweighed by other events that took place during the relevant time period that exerted downward pressure on prices. If prices are affected by the alleged conspiracy in complex ways, it is possible the use of a single cartel dummy variable may be too simplistic an approach.[44] In general, estimated results that do not comport with the underlying economic model—such as an estimated coefficient that has the wrong sign or one that should be, but is not, statistically significant—could indicate problems with the econometric approach. For example, the prices of substitutes included as explanatory variables may also be influenced by the dependent variable. This problem cannot be resolved by estimating a single-equation reduced-form model.

*Forecasting Method*

An alternative to the indicator variable model is the forecasting method (also called the "residuals" or "prediction" method),[45] which may be used, for example, where the alleged conspiracy affected prices in a more complex fashion than may be captured in one or more "conspiracy" indicator variables. The forecasting method involves using data from the non-conspiracy period to econometrically estimate the coefficients for the independent variables, and then using those estimates and the observed values of independent variables during the conspiracy period to predict prices during the conspiracy period. The difference or "residuals" between the predicted prices and the actual prices during the conspiracy period provides an estimate of the overcharge. Unlike the dummy variable model, this model uses price data solely from outside the conspiracy period (or from a non-conspiracy market as is discussed further below) to construct counterfactual prices. Whether it is appropriate to pool pre- and post-conspiracy price data depends on the economic characteristics of those periods. Because pooling may have a significant effect on econometric results, it should be carefully considered.

Applying estimates of pre-conspiracy or post-conspiracy prices to the conspiracy period is known as forecasting; forecasting based on post-conspiracy data alone is sometimes referred to as backcasting. There are many techniques for forecasting as well as many types of information that may be forecasted. Both approaches may involve assumptions that should be carefully validated, as should the performance of the regression model in forecasting outside the benchmark period.[46] For example, it is possible to forecast the

---

[42] *See* Justin McCrary & Daniel L. Rubinfeld, Measuring Benchmark Damages in Antitrust Litigation, 3 J. Econometric Methods 63, 72 (2014).

[43] The coefficient estimate is transformed using the following formula to be the estimated overcharge: $\%\Delta(\text{price}) = \exp(\text{coefficient}) - 1$.

[44] Michael O. Finkelstein & Hans Levenbach, Regression Estimates of Damages in Price-Fixing Cases, 46 L. & Contemp. Probs. 145, 156 (1983).

[45] *See* generally James F. Nieberding, Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues, 9 J. Applied Econometrics 361, 367–75 (2006).

[46] The failure to address fundamental problems in price-fixing prediction models was illustrated in In re Corrugated Container Antitrust Litigation. Class action plaintiffs' expert estimated a model during the alleged conspiracy, projected forward to estimate

changes in prices from the pre-conspiracy period into the conspiracy period based on the underlying changes in another economic factor—such as costs—during the conspiracy period. However, this method of forecasting for use in calculating overcharges assumes that margins from the pre-conspiracy period are identical to those during the conspiracy period. Econometric techniques may be used to estimate the error in forecasting. The most appropriate method of forecasting the but-for prices may depend on the dynamics of the economic markets at issue as well as the available data.

Under some circumstances the dummy variable and forecasting approaches yield similar or identical results. For example, if either the quantity is constant over the conspiracy period or the equation estimated is quantity weighted, the two approaches will yield identical results.[47]

### [5] Yardstick Method

An alternative to before-during-after models for estimating overcharges is the "yardstick" method. This method seeks to estimate the but-for prices (or other variable of interest) using data from analogous geographic markets (or products or industries) as a benchmark, and to compare these to the prices in the collusive market during the same time period. For example, if the plaintiffs allege a conspiracy in the Northeast, pricing trends from the Northeast could be compared with prices in other parts of the country, which presumably were not affected by the alleged cartel. Or if the supply and demand factors driving prices for the product in the collusive market are otherwise similar to another product that was not affected by the conspiracy (for example, a technology product with similar characteristics), this approach would involve a comparison of prices between the two products.

An advantage to this method is that it might correct for other factors such as cost shocks, exchange rate movements, and some types of demand shocks that are difficult to fully control for over time.[48] It may also shed light on the conspiracy period to the extent that the yardstick is a product that potentially was subject to the conspiracy and prices tracked each other for a period of time and then diverged. The principle disadvantage of this method is that it generally is challenging to find an alternative market (or product) that is a good analogue to that allegedly affected by the conspiracy but which is truly a competitive comparison. The yardstick should be comparable to the relevant market in all important economic respects other than the alleged collusion. It is extraordinarily rare that a yardstick (or before-and-after) market resembles the relevant market so perfectly that there is only a single relevant difference (typically price) between the two.[49] However, if there is a yardstick time period or control group in which the only substantial difference between economic conditions in the yardstick scenario and the actual scenario is the alleged collusive behavior, then in principle a direct comparison could be made to calculate damages.[50]

---

what prices would have been if the conspiracy had continued, then assumed that the ratio of conspiratorial to competitive prices would have been the same had there been competition in the earlier period (and thereby calculated an "overcharge"). The results were found to be driven by cost as an explanatory variable, and the results were sensitive to the choice of "conspiracy" periods. *See* Franklin M. Fisher, Statisticians, Econometricians and Adversary Proceedings, in Industrial Organization, Economics, and the Law 461–67 (1991).

[47] *See* McCrary & Rubinfeld, *supra* note 42, at 66.

[48] *See* James A. Brander & Thomas W. Ross, Estimating Damages from Price-Fixing, 3 Canadian Class Action Rev. 335, 346 (2006).

[49] Areeda et. al., *supra* note 18, at 127–128. The use of industry averages as a yardstick poses challenges: there is no way to determine how closely the plaintiff matches the average profile, and therefore one cannot be confident that the plaintiff would have performed as did the industry on average.

[50] Here, the period without the collusive behavior serves as the "but-for scenario." This approach was employed by both government and Microsoft economists in the government case against Microsoft relating to its Internet browser. *See* Jonathan T. Tomlin, Distinguishing the Illegal from the Legal in Antitrust Damages Calculations: Lessons from "Netscape v. Microsoft," 17 J. Forensic Econ. 223 (2004).

Regardless of the method used, however, it is important to ensure that the model controls for any differences between the yardstick used and the specific market and time frame under consideration. The plausibility of this method depends on the comparability of the two markets as well as appropriate control variables, and thus these areas are a likely focus of critical examination of the expert's damages methodology.[51]

**[6] Difference-In-Differences Approach**

If data are available, the before-during-after and yardstick methods may be combined in a difference-in-differences model. In a difference-in-differences model, the effect of the conspiracy is measured as any difference in the ratio of relative prices between the conspiracy and non-conspiracy benchmarks that occurred during the conspiracy period.[52] In this approach, the unaffected market serves as a "control" group.

This approach can be illustrated with a numerical example. Assume that the price of a cartelized product was $130 during the collusive period, while it was $100 during the benchmark period. Further assume that in a control market, the price was $90 in the benchmark period and $100 during the collusive period. The difference-in-differences approach, in its simplest form, would indicate that the collusion increased unit prices by $20 (i.e., the $30 difference between the collusive and non-collusive periods in the affected market, from which one subtracts the $10 price difference between these two periods in the non-affected market).[53]

The difference-in-differences approach exploits both cross-sectional and time-series variation in the data as a source of econometric identification. Further, the difference-in-differences approach has the advantage of controlling not only for observable variables included in the regression, but also for unobservable changes to the extent that they impact both the affected and control groups in the same manner.

This approach assumes that the control group (another market, time period, or combination of both) is, except for the collusion, similar to the affected market/period. In particular, the control group should be comparable in terms of competitive structure, cost and demand characteristics to the collusive market/period—the outcome should reflect the outcome in the collusive market/period in the counterfactual scenario. Departures from comparability of these two groups could be a focus of critical examination of the expert's damages methodology.

The three approaches discussed above—the before-during-after, yardstick, and difference-in-differences methods—rely on different assumptions. It is important to consider the strength of these assumptions in a specific case and whether applying a particular technique is likely to bias the econometric estimates or render the results unreliable. In a given market the difference-in-differences analysis may be preferred to the before-during-after analysis if it is unlikely that important changes in economic conditions during the collusive period were caused by the collusion or could be controlled for in a multiple regression analysis using observable variables.

**[7] Market Simulations**

---

[51] Yardstick approaches are sometimes described in similar terms as "natural experiments." A natural experiment is an empirical study conducted on two groups (or markets) whose exposure to the "experimental" and "control" conditions were not controlled by the researcher, yet the process resembles random assignment to the groups. For example, it is sometimes possible to identify a market other than the relevant antitrust market that experienced periods of the alleged anticompetitive conduct and periods without such conduct. However, the ability to draw causal inferences from the natural experiment depends on whether the assignment to the groups was random and the extent to which the anticompetitive conduct and market conditions are comparable to those of the relevant antitrust market.

[52] Equivalently, it reflects the difference of outcome between the two markets during the collusive period less the difference between the two markets in the non-collusive period. For a discussion of the difference-in-differences method, *see* Raphaël De Coninck, Estimating Private Antitrust Damages, 1 L. & Econ. Concurrences 39 (2010).

[53] The difference-in-differences and before-after approaches to estimating consumer damages were illustrated for German consumers in the context of the European detergent cartel in the early 2000s. See Ulrich Laitenberger & Florian Smuda, Estimating Consumer Damages in Cartel Cases (Centre for Econ. Research, Discussion Paper No. 13-069, 2013).

An alternative to comparative approaches for estimating damages in collusion matters is to conduct a market simulation, which is the most flexible framework for estimating the underlying economic relationships in the market. Earlier we explained that the reduced-form models used in most collusion damages analyses are derived from the structural equations reflecting the underlying economic relationships in the market. Market simulations involve estimating the structural equations, an econometric technique that is commonly used in merger simulations.[54] Whereas in merger simulations the competitive outcomes are observed and the "collusive" outcomes are predicted from the model, in a collusion context often only the "collusive" outcomes are observed while the competitive outcomes are predicted from the model.[55]

There are numerous ways to conduct market simulations depending on how the competitive and collusive regimes are specified. A basic approach involves simultaneous solution of three conditions: a demand equation, an equation describing price-setting behavior under the collusive regime, and an equation describing price-setting under competition, where non-conspirators are treated as if they were a single firm.[56] The demand equation describes the relationship between prices and various exogenous or predetermined factors that could affect demand; the factors usually are assumed to enter the model in a linear fashion.[57] The price-setting behavior under collusion is examined under the assumption that conspirators select prices to jointly maximize their profits, whereas any non-conspirators would set prices independently. One would then derive the "first order condition" to describe how profits would be maximized with respect to price under the collusive regime.[58] Similarly, a first-order condition is derived to describe the situation where the firm sets prices to maximize its own profits taking the prices of other firms as given (as would occur under competition). This simulation would require various assumptions (such as the collusive price, quantities for the cartel members and the non-cartel group, the margin for cartel members, and the industry elasticity of demand) and would produce estimates of the marginal costs of the cartel members and non-cartel group, the within group and group price coefficients, and the demand intercepts for the cartel members and non-cartel group.

Market simulations typically require one to make assumptions about industry demand curve and competitors' cost functions. The simulation results may be sensitive to these assumptions, in particular those relating to cost functions. For example, the basic approach to market simulations described above was applied to the Vitamin A cartel in the 1990s. The simulation results were somewhat sensitive to the assumptions of the alleged conspirators' price-cost mark-ups, aggregate conspirator shares, and the industry elasticity of demand.[59] More generally, most markets where price-fixing has been alleged involve oligopoly competition where marginal cost pricing is unlikely. Thus, the assumption of pricing at marginal cost generally leads to a lower bound on competitive prices and the least conservative estimates of cartel overcharges. Because various competitive outcomes are possible, a principled economic analysis of the facts or critical review of prior similar research may be important in supporting these assumptions. In a cartel context, non-cartel members may be called the "competitive fringe." The supply function of the competitive fringe may be a central focus because simulation results can be highly sensitive to the elasticity of fringe supply at the competitive equilibrium. Simulation results are affected by the accuracy of information about the ability of the fringe to increase output and the marginal

---

[54] While economists have developed various oligopoly models, merger simulations typically use an underlying economic model reflecting Bertrand competition with differentiated products. *See* Sanderson *supra* note 28, at 114, 115.

[55] For a discussion of using structural models to estimate price-fixing damages, *see* J. Douglas Zona, Structural Approaches to Estimating Overcharges in Price-Fixing Cases, *77 Antitrust L.J. 1 (2011)*.

[56] *See* Zona, *supra* note 55 at 9–11.

[57] Commonly used linear demand specifications involve logit and nested logit demand. *See, e.g.*, the discussion of demand estimation in Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 J. Econ. & Mgmt. Strategy 513 (2000); Steven T. Berry, Estimating Discrete-Choice Models of Product Differentiation, 25 RAND J. Econ. 242 (1994).

[58] This first-order condition is the partial derivative of the profit function with respect to price, where the result is set to zero. Economic theory tells us that the profit function includes factors such as prices and costs.

[59] *See* Zona *supra* note 55, at 9–15.

cost of the capacity from which output would be increased.[60] As in comparative approaches to estimating cartel damages, market simulations must control for non-collusive factors that affect supply and demand.

In general, structural modeling has greater data requirements (generally requiring more detailed and highly accurate data from the companies) and uses more advanced econometric techniques than reduced-form modeling. However, market simulations can be used to estimate overcharges as well as the "deadweight loss" triangle.

An alternative approach is to use a combination of estimation and simulation.[61] For example, demand could be estimated using a reduced-form model that controls for important non-collusive factors that could account for market outcomes thereby requiring data from competitive and allegedly collusive periods to be used. Simulation methods would be used to estimate the supply side of the market during the alleged collusive periods, for example, by using cost data obtained from the companies to estimate a cost function using a structural equation. The competitive outcomes would be simulated under an economic model of imperfect competition (e.g., Cournot or Bertrand models). As with any simulation the results may be sensitive to the assumptions, thus a principled economic analysis would be important in supporting the assumptions.

### [8] Critical Loss Analysis

Critical loss analysis, which is more commonly used in merger analysis, may be used in some circumstances to estimate an upper bound to overcharges associated with collusion.[62] Critical loss analysis focuses on identifying the volume of sales that would have to shift to another product to make a specified hypothetical price increase unprofitable. Assume one has sufficient information about the alleged cartel members' cost structures and contribution margins to determine the maximum reduction in sales that a cartel member could sustain without reducing its profits at the estimated cartelized price (including the overcharge)—this is the "critical loss." If one also has sufficient information to estimate the actual loss in sales associated with a price increase of a similar magnitude, the two can be compared. If the actual lost sales are greater than the critical loss, then the estimated overcharge is not plausible. One could repeat this exercise with lower hypothesized cartelized prices (i.e., lower overcharges) until the actual lost sales just equal the break-even lost sales.[63]

### [9] Validating the Model and Estimated Results

While estimating damages associated with collusive behavior can be challenging, the exercise is not complete once the regression model has been estimated. The results must also be validated—both from theoretical and statistical perspectives. Since economic data used in competition-related analyses are not typically generated by controlled experiments, economists must make educated assumptions about the processes that generated the data. The validation of econometric models may involve reexamination of decisions made throughout the model building (or "specification") as well as the econometric estimation process. For example, the estimation process may involve statistical methods that assume specific conditions are satisfied, although such assumptions must be verified. These issues are often the focus of econometric "specification analysis," which may involve examining underlying assumptions and functional form of the model.[64] Since typically there are numerous such decisions and assumptions made in the econometric modeling of damages (including

---

[60] Gregory J. Werden, An Overview of Merger Simulation, Presentation to the Norwegian Competition Authority (Sept. 13, 2007), *available at* http://www.konkurransetilsynet.no/iKnowBase/Content/427553/070913_werden_merger_simulation.pdf.

[61] *See* James A. Brander & Thomas W. Ross, Estimating Damages from Price-Fixing, 3 Canadian Class Action Rev. 335, 349–51 (2006).

[62] *See* Sanderson, *supra* note 28, at 104, 105.

[63] *See* Theon van Dijk & Frank Verboven, Quantification of Damages, in 3 Issues in Competition Law & Pol'y 2338 (ABA Section of Antitrust Law 2008).

[64] For a general discussion of specification tests in time series cross sectional and simulation models, *see* Jerry A. Hausman, Specification Tests in Econometrics, 46 Econometrica 1251 (1978).

numerous methods for estimating econometric models), this section will focus on issues often encountered in the most commonly used class of models in damages analyses of collusion—linear regression models. These choices and assumptions may or may not substantively affect the estimated results of the model, but they will most certainly be a focus of critical examination of the expert's damages methodology.

*Economically Sensible Results*

First, it is important to assess whether the estimated model makes economic sense, i.e., does it yield meaningful economic predictions? Basic lines of inquiry include: (1) whether the signs of the estimated parameters that connect the dependent variable to the explanatory variables are consistent with the predictions of the underlying economic theory; (2) whether the magnitudes of estimated coefficients are reasonable in light of prior similar research; and (3) whether the model appears to explain the data.[65] For example, consider a reduced-form demand model that includes indicator variables for several alleged collusive sub-periods. If the model finds that price (the dependent variable) is negatively related to the alleged collusion in some sub-periods, it could call into question the model, the collusive time period, or the existence (or effectiveness) of the alleged collusive agreement.

*Statistical Assumptions*

Second, it is important to assess whether the statistical assumptions of the model are valid.[66] Unexpected signs or magnitudes of estimated coefficients could be a symptom of underlying problems with the model and its assumptions, including whether the standard errors of the coefficients are estimated consistently. Reliable statistical inference requires not only good estimates of the coefficients of the model, but also good estimates of the standard errors of these coefficient estimates. Even if the results of the model do not appear to be anomalous at first glance, it is common practice to evaluate the specification of the econometric model. Common lines of inquiry include: (1) whether important variables were omitted; (2) whether irrelevant variables were included; (3) whether there was measurement error in variables; and (4) whether the functional form is appropriate.

Omitted variables refer to factors that could reasonably influence the dependent variable but are omitted from the model. As long as the omitted variables are uncorrelated with the included explanatory variables, ordinary least squares regression will produce unbiased estimates. However, if the omitted variables are in fact correlated with the included independent variables, ordinary least squares regression generally produces biased and inconsistent estimates of the explanatory variables that are included in the model.[67] For example, if the demand model included price as the dependent variable but excludes cost as an explanatory variable, another explanatory variable could exhibit a spurious correlation with price even though what is driving the relationship is cost. In practice it may not be possible to include all potentially relevant explanatory variables in the model, thus the expert must make principled decisions about which variables to include or exclude.

Inclusion of irrelevant variables does not cause inconsistency or bias in estimated coefficients, but it may lead to a different problem: collinearity. If the irrelevant variables are correlated with the relevant variables in the model, their inclusion generally increases the variance of estimated coefficients, causing the estimates to be

[65] Software packages for regression analysis typically report various statistics for each explanatory variable (the sign, coefficient estimate, and the standard error) and the R-squared statistic (a measure of the amount of variance in the dependent variable that is explained by the explanatory variables in the model). However, regression models containing a large number of dummy variables may have misleadingly high R-squared statistics. *See* Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach 488, 489 (5th ed. 2013).

[66] *See* Greene, Assumptions of the Classical Linear Regression Model, *supra* note 17, at 10–18 (including that the model specifies a linear relationship between the dependent and explanatory variables, there is no exact linear relationship between the explanatory variables, the explanatory variables are exogenous, the error term does not exhibit heteroskedacticity or autocorrelation, and the error term is normally distributed).

[67] A biased coefficient estimate is one that differs from the true value of the parameter in the population. An inconsistent coefficient estimate is one that does not converge to the true value in the population value as the sample size grows large. For a general discussion of omitted variable bias, *see* Greene, Specification Analysis and Model Selection, *supra* note 17, at 149.

inefficient.[68] This can have serious consequences in testing hypotheses in that, due to the increased variance, we might infer that some variables are not relevant variables when they truly are relevant (a "false negative" or type II error).

The estimates also may be affected if either the dependent variable or explanatory variables are measured with error. For example, the available price data reflect some but not all of the price components experienced by purchasers (e.g., off-invoice discounts and rebates are not included), or the measure of income for an individual consumer is taken to be household income. If an explanatory variable is measured with error, the model's error term will reflect the "true" error as well as the measurement error. For ordinary least squares models, measurement error in an explanatory variable usually results in downward bias in the estimated coefficients of the explanatory variable—the estimated result is attenuated in comparison to the "true" value.[69] If the dependent variable is measured with error (and the explanatory variables are not measured with error), the coefficient estimates are unbiased but the variance is increased. This results in reduced precision in the coefficient estimate, a lower *t*-statistic for the coefficient estimate, and a reduced $R^2$ for the model, which measures the extent of variation in the dependent variable that is explained by the variation in the included explanatory variables.[70]

The economic model described to this point has focused on the deterministic elements of economic relationships, but most relationships have both deterministic and stochastic components. The deterministic component often is represented as an algebraic function of observable variables and unknown parameters. The algebraic function is called the "functional form," and the choice of functional form addresses the fundamental topic of whether a graph of the dependent variable and an explanatory variable should be a straight line ("linear") or curved. For example, the basic linear model is of the form $Y = a + bX + e$, where $Y$ is the dependent variable, $X$ is a vector of explanatory variables, $a$ is the intercept, $b$ is the coefficient that is estimated for each explanatory variable (also called the "slope" of the regression line), and $e$ is an error term.[71] As long as the right-hand side of the model is of the form of an intercept plus a slope term (plus an error term), the parameters enter the model in a linear way.[72] Different functional forms can result in different estimated relationships between the dependent variable and the explanatory variables based on the same data.[73]

---

[68] *See* Greene, Specification Analysis and Model Selection, *supra* note 17, at 150, 151.

[69] For a general discussion of measurement error and its consequences, *see* Jerry A. Hausman, Mismeasured Variables in Econometric Analysis: Problems from the Right and Problems from the Left, 15 J. Econ. Perspectives 57 (2001). As the variance in the "noise" becomes larger relative to variance of the true variable (the "signal"), the bias increases. This typically occurs in panel data models with fixed effects. *See* Zvi Griliches & Jerry Hausman, Errors in Variables in Panel Data, 31 J. Econometrics 93 (1986).

[70] Hausman, *supra* note 64, at 59, 60. One potential remedy for measurement error in an explanatory variable is to estimate the value of the variable using instrumental variables (IV) techniques. IV estimation requires additional data on another economic variable that is correlated with the "true" variable but not with the "true" error term or the measurement error term.

[71] The dependent variable is the "left-hand side" variable, and the explanatory variables are the "right-hand side" variables.

[72] In some circumstances, individual variables are "transformed" by applying a mathematical function—for example, the natural logarithm or a quadratic function. While this does not change the fact that the individual parameters enter the model in a linear fashion, the transformation generally changes the estimated relationship between the dependent variable and the explanatory variables.

[73] For example, the effect of various functional forms on estimates of overcharges for Vitamin A has been studied, including scenarios that assume that the cartel members select prices to jointly maximize profits (nested logit model), that one member was a Stackelberg leader and the others were followers, that members allocated territories and maximized profits assuming the price of non-cartel competitors were fixed and other conspirators would not enter, and others. *See* Zona, *supra* note 55.

The choice of functional form can have a substantial effect on the estimated results of the model and their interpretation.[74] The functional form typically is either a maintained hypothesis (based on theory or tractability) or it is chosen based on statistical tests of alternative functional forms. Treating the functional form as a maintained hypothesis is not without risks because in some circumstances economic theory may provide no guidance on the choice of functional form. Commonly used functional forms in damages analyses of collusion include linear ($Y = a + bX + e$), quadratic ($Y = a + bX^2 + e$), and double logarithmic ($\ln(Y) = a + b^* \ln(X) + e$) forms.[75] The choice of functional form may constrain the way estimated demand elasticities change as price changes.[76]

The differences in estimated results under different functional forms may be insubstantial or substantial depending on the circumstances. Often economic theory does not provide a single preferred alternative for the choice of functional form. In these situations, a principled economic analysis or critical review of prior similar research may be important in supporting the choice of functional form.[77] Where economic theory does not provide clear guidance, it is common to make statistical assumptions. One can attempt to validate such assumptions during the econometric estimation process, for example, by estimating several models with different functional forms and evaluating the results in a comparative manner.

*Robustness Checks*

Third, a crucial step in validating the results is to test whether they change substantially with reasonable alternative choices of the econometric specification of the model or data and assumptions used in estimating the model. If the results are sensitive to the underlying methodology or assumptions in this manner, they are not robust and may be misleading. In some instances, the effect of making a particular assumption or modeling choice may be testable, for example, by estimating the model using an alternative assumption, or through the use of econometric techniques. For example, in *Conwood v. U.S. Tobacco*, Conwood's expert's results from an ordinary least squares before-and-after model were driven by a single data point reflecting the smallest market for the product at issue; this flaw was readily determined by a sensitivity test that estimated the model without this data point.[78]

Fourth, even if the model appears to meet many of the statistical requirements for a sound specification, one should not lose sight of the fact that the analysis must establish that the alleged collusive behavior caused the alleged damages. For example, the use of a simple before-and-after model that does not control for relevant economic factors and attribution of all differences to the behavior of defendants would not pass muster in a peer-reviewed economic journal or an economics class.[79]



---

[74] *See* Section 4.04[1] *supra*. For a general discussion of the choice of functional form, *see* Lawrence J. Lau, Functional Forms in Econometric Model Building, in 3 Handbook of Econometrics 1516–66 (1983).

[75] The double logarithmic form has the advantage that coefficient estimates (b) are approximations to elasticity of Y with respect to X.

[76] Baker & Rubinfeld, *supra* note 21, at 413–414. In order to investigate statistically the extent to which demand elasticities vary with price, econometricians employ more flexible demand systems such as translog systems or the almost ideal demand system.

[77] The choice of functional forms is discussed in Melvin Fuss, Daniel McFadden & Yair Mundlak, A Survey of Functional Forms in the Economic Analysis of Production, in 1 Production Economics: A Dual Approach to Theory and Applications 222–25; the authors mention criteria such as parsimony in parameters, ease of interpretation, computational ease, interpolative robustness, and extrapolative robustness.

[78] *See* Damages (ABA), *supra* note 38, at 168–76. Econometric "influence statistics" demonstrated that the data point had the greatest influence of all data points (markets) on the regression results. The data point was determined to be a statistical "outlier."

[79] Fisher, *supra* note 5, at 293.

Copyright 2017, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

**End of Document**