nost appropriate when the injury method is more likely to be useful

d methodology is occasionally aded company, the change in the cate the damages suffered. In an npany, including the effects of an corporated in the market price of was discovered and made public ely short period of time), then the ust subsequent to that date may he magnitude of the act's adverse / and judgment must be used to ovements in the stock in order to

l, at 896.

event study, which is commonly used fraud litigation. *See* Nicholas I. Crew, , *Federal Securities Acts and Areas of* VICES HANDBOOK: THE ROLE OF THE Veil et al. eds., 5th ed. 2012).

CHAPTER 6

# ECONOMETRICS AND REGRESSION ANALYSIS

Econometrics refers to a set of statistical methods or tools that economists use to assess antitrust damages. Regression analysis is the most common tool of econometrics. It enables one to uncover the relationship between a dependent variable (the outcome being modeled, such as prices) and one or more explanatory variables (the potential influences on the dependent variable, such as anticompetitive conduct, supply factors including costs or capacity, and demand factors).[1] Regressions can prove useful in answering the basic "counterfactual" question: What would market outcomes (e.g., prices) have been in the absence of the anticompetitive act? By their very nature, these but-for market outcomes are unobserved and, as such, must be estimated by the damages expert.

Market outcomes are often the result of a complex interaction among a large number of factors. For example, market prices were likely affected by a wide variety of demand and supply factors unrelated to the alleged anticompetitive act. Isolating and measuring the effect of an alleged anticompetitive act on price (or on other market outcomes) requires properly accounting for these other factors. Otherwise, one might attribute to the alleged anticompetitive act the effect of one or more of these other factors or miss the effects of the act in question by failing to control for a relevant factor.

Econometric models—particularly those involving regression analysis—are uniquely suited to isolating the effect of a single factor on the market factor of interest, while properly accounting for other relevant factors. The measured effect of an explanatory variable, controlling for other factors, is referred to as an estimate of the "partial effect" of the explanatory variables on the dependent variable. In other words, an explanatory variable's partial effect is the change in the dependent variable that would result from a change in that explanatory variable, holding all of the other explanatory variables constant.[2] Thus, when correctly implemented, econometric techniques can isolate and measure the effect of a single explanatory factor—such as the impact of the alleged

1. *See* Jeffrey M. Wooldridge, Econometric Analysis of Cross Section and Panel Data 3-4 (2d ed. 2010).
2. *See* William Greene, Econometric Analysis 36 (7th ed. 2010).



KAPLAN000547

conduct—on the economic outcomes that are relevant when estimating damages.

The key role of econometrics in legal proceedings is to use the available data to provide accurate and reliable measures of the economic impact of the alleged conduct for the finders of fact (judges or juries). This chapter describes the legal requirements, the methods, and a wide range of issues in the use of econometrics and statistics in expert testimony. To begin, the damages methodology must be designed to causally determine the impact of the alleged conduct. Implementation must address issues of: data, model specification, estimation, interpretation of estimation results, and hypothesis testing. The following discussion explains the use of econometrics to implement before-during-after and benchmark analyses in general and in the specific context of a case study.[3] Not all of the tests or analyses discussed here need to be performed in every damages analysis; the ones that are important for a particular case will depend on the specific facts of the case.

## A. Legal Requirements

The legal requirements for methods used to estimate damages, including all econometric methods, fall under the rules for testimony by experts. Under Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[4]

Regression analyses have met these requirements many times in litigation for a wide range of issues, including the estimation of antitrust damages,[5] as well as showing at the class certification stage that such

3. See Chapter 4, Section C for an overview of the different approaches used to quantify damages, including before-during-after and benchmark (or yardstick) analyses.
4. Fed. R. Evid. 702.
5. *See, e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002); *In re* Urethane Antitrust Litigation, 768 F.3d 1245 (10th Cir. 2014).



damages are consistent with t
competent expert should be able t
and data are available for econ
econometric analyses that are
econometric techniques.

Using regression analysis doe
will be viewed as reliable.[7] In ge
reliable as the amount and qualit
available, econometric analysis h
minimum scientific standard for e
For example, in *Zenith Electronic*
expert opinion and internal for
because data to estimate sales
available and not used. The regr
determining a material fact, such
price changes.[10] The analysis also
upon by experts in the field."[11] E
accuracy in consulting work or

6. Comcast Corp. v. Behrend, 1
Freight Surcharge Antitrust
(remanding in light of *Behr*
whether the regression mo
sufficient muster at the class
7. *In re* Hydrogen Peroxide Anti
Kottaras v. Whole Food Mark
*In re* Live Action Antitrust
2012).
8. Roy J. Epstein, *An Econo*
Summer 2011, at 29.
9. 395 F.3d 416 (7th Cir. 2005);
Litigation, 289 F.R.D. 555,
proposed factors analysis an
regression analysis provided
espoused by plaintiffs).
10. Daniel Rubinfeld, *Reference*
JUDICIAL CENTER, REFERENC
ed. 2011), *availa*
pdf.nsf/lookup/sciman03.pdf
11. Fed. R. Evid. 703.

.t are relevant when estimating

:gal proceedings is to use the
iable measures of the economic
:rs of fact (judges or juries). This
he methods, and a wide range of
atistics in expert testimony. To
: designed to causally determine
ıentation must address issues of:
:rpretation of estimation results,
discussion explains the use of
g-after and benchmark analyses
ı case study.[3] Not all of the tests
: performed in every damages
a particular case will depend on

'ds used to estimate damages,
under the rules for testimony by
702:

:d knowledge will assist the trier
to determine a fact in issue, a
:dge, skill, experience, training,
'orm of an opinion or otherwise,
ıfficient facts or data, (2) the
ciples and methods, and (3) the
ethods reliably to the facts of the

se requirements many times in
:luding the estimation of antitrust
lass certification stage that such

/iew of the different approaches used
ore-during-after and benchmark (or

:co Co., 290 F.3d 768 (6th Cir. 2002);
68 F.3d 1245 (10th Cir. 2014).



damages are consistent with the plaintiff's theory of liability.[6] A competent expert should be able to tell the litigant whether sufficient facts and data are available for econometric analysis, explain the types of econometric analyses that are applicable, and reliably apply these econometric techniques.

Using regression analysis does not, by itself, guarantee that an analysis will be viewed as reliable.[7] In general, econometric results will be more reliable as the amount and quality of data increase.[8] If sufficient data are available, econometric analysis has been found necessary to achieve the minimum scientific standard for establishing lost sales and price changes. For example, in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,[9] expert opinion and internal forecasts for sales growth were excluded because data to estimate sales growth via regression analysis were available and not used. The regression must be in a form that assists in determining a material fact, such as the amount of lost sales or the size of price changes.[10] The analysis also must be based on data "reasonably relied upon by experts in the field."[11] Because experts typically verify data for accuracy in consulting work or academic research, experts presenting

---

6. Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013); *See also In re* Rail Freight Surcharge Antitrust Litigation, 725 F.3d 244 (D.C. Cir. 2013) (remanding in light of *Behrend* so that the district court could analyze whether the regression model proffered by plaintiffs' expert passed sufficient muster at the class certification stage).
7. *In re* Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008); Kottaras v. Whole Food Market, Inc., 281 F.R.D. 16, 25-26 (D.D.C. 2012); *In re* Live Action Antitrust Litigation, 863 F. Supp. 2d 966 (C.D. Cal. 2012).
8. Roy J. Epstein, *An Econometrics Primer for Lawyers*, ANTITRUST, Summer 2011, at 29.
9. 395 F.3d 416 (7th Cir. 2005); *see also In re* High-Tech Employee Antitrust Litigation, 289 F.R.D. 555, 582 (N.D. Cal. 2013) (rejecting as evidence proposed factors analysis and compensation charts, but accepting that a regression analysis provided plausible support for the class-wide theory espoused by plaintiffs).
10. Daniel Rubinfeld, *Reference Guide on Multiple Regression*, *in* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 303 (3d ed. 2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/sciman03.pdf/$file/sciman03.pdf.
11. Fed. R. Evid. 703.

regression analyses in court need to conduct similar verifications of the data that they use.[12]

The principle for reliability encompasses many factors entering the regression analysis, and a competent expert should conduct reliability checks to ensure that the results survive the rigors of litigation.[13] Part C of this chapter discusses the basic regression method, and Part D describes many of the design issues that arise in reliably implementing econometric techniques and econometric tests that a testifying expert should perform when appropriate. Moreover, econometric results typically should not change materially with minor changes to the data (e.g., deleting a few observations).[14] Note, though, that while the court decides as a matter of law whether a regression analysis is admissible under the Federal Rules of Evidence, the finder of fact is ultimately responsible for deciding the probative value of such evidence,[15] considering questions including whether the dataset used in analysis is reliable and complete,[16] and, in certain instances, whether statistical significance provides sufficient reliability for the factfinder to base its factual conclusions on the study.[17]

---

12. *See, e.g.*, Maddox v. Claytor, 764 F.2d 1539, 1552 (11th Cir.1985) ("[Multiple regression analysis] measures the probability that the calculated disparity could occur randomly—but the analysis in no way validates the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then standard deviation analysis is foredoomed to yield an equally faulty result.").
13. Reed v. Advocate Health Care, 268 F.R.D. 573, 593 (N.D. Ill. 2009) ("The issue is not whether [the expert] has shown just any method for proving impact and damages on a class-wide basis; it is whether the method he proposes is a *reliable* means of common proof.") (emphasis in original).
14. Rubinfeld, *supra* note 10, at 199.
15. Cook v. Rockwell Int'l Corp. 580 F. Supp. 2d 1071, 1113 (D. Colo. 2006).
16. *See, e.g.*, Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *but see In re* Graphics Processing Units Antitrust Litigation, 253 F.R.D. 478 (N.D. Cal. 2008) (finding missing variables and experts' decision to average certain factors insufficient to carry plaintiff's burden at class certification stage with respect to most of proposed class).
17. Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 362 (7th Cir. 2001) (finding that there is no bright line test for an acceptable significance level, although such a factor still goes towards weight of the evidence). *See also In re* High-Tech Employee Antitrust Litigation, 289 F.R.D. 555, 581 (N.D. Cal. 2013) ("Assuming *arguendo*, that…the [ ] Regression's results are not statistically significant at the 95 percent level does not persuade the Court that the regression is inadmissible (although this failure might affect the



**B. Causation and Quantificati**

Courts typically require an quantifies the amount of dama damages are causally linked to t price-fixing case, for example, t evidence of a clear link between th in prices that is not explained by been as high in the counterfactua occurred).[19]

The econometric challenge effects comes from the fact that data, derived from observation experiments. Therefore, the econ the data were generated. For exan is variation over time in the exis variation in prices may or may opposed to the effect of other fac What makes this challenge parti may *cause* the changes in the e example, collusion is easier to r good, then there will tend to be correlation between high prices little or no actual causal effect on

Another way to state the prob "treatment effects" as they ar econometric literature) requir

---

model's probative value)."); Inc., 279 F.R.D. 257, 271 (D. showing a statistical signific insufficient to show damage certification, because the mod

18. *See, e.g.*, John E. Lopatka, SECTION OF ANTITRUST LAW, (2008). *See also* Comcast ( (finding that a court must determination at the class cert is consistent with their theory the merits of the claims).
19. Theon van Dijk & Frank Verb SECTION OF ANTITRUST LAW, (2008).

luct similar verifications of the

ısses many factors entering the
pert should conduct reliability
e rigors of litigation.[13] Part C of
ı method, and Part D describes
ably implementing econometric
estifying expert should perform
ic results typically should not
ɔ the data (e.g., deleting a few
the court decides as a matter of
ssible under the Federal Rules of
ly responsible for deciding the
ɔnsidering questions including
eliable and complete,[16] and, in
ignificance provides sufficient
tual conclusions on the study.[17]

F.2d 1539, 1552 (11th Cir.1985)
easures the probability that the
omly—but the analysis in no way
ity itself. If the tested disparity is
ıffers from flaws in the underlying
is foredoomed to yield an equally

R.D. 573, 593 (N.D. Ill. 2009) ("The
shown just any method for proving
basis; it is whether the method he
ɔn proof.") (emphasis in original).

upp. 2d 1071, 1113 (D. Colo. 2006).
U.S. 385, 400 (1986) ("Normally,
the analysis' probativeness, not its
aphics Processing Units Antitrust
2008) (finding missing variables and
ctors insufficient to carry plaintiff's
ı respect to most of proposed class).
255 F.3d 359, 362 (7th Cir. 2001)
for an acceptable significance level,
ds weight of the evidence). *See also*
itigation, 289 F.R.D. 555, 581 (N.D.
...the [ ] Regression's results are not
nt level does not persuade the Court
lthough this failure might affect the



### B. Causation and Quantification

Courts typically require an analysis of damages that not only quantifies the amount of damages, but also demonstrates that those damages are causally linked to the allegedly anticompetitive acts.[18] In a price-fixing case, for example, there must be an analysis that provides evidence of a clear link between the agreement to fix prices and an increase in prices that is not explained by other factors (i.e., prices would not have been as high in the counterfactual world in which the agreement had not occurred).[19]

The econometric challenge in establishing and measuring causal effects comes from the fact that most economic data are observational data, derived from observations of market outcomes, not controlled experiments. Therefore, the economist typically has no control over how the data were generated. For example, in a price-fixing case, even if there is variation over time in the existence or extent of collusion, associated variation in prices may or may not capture the *effect* of the cartel, as opposed to the effect of other factors that are changing at the same time. What makes this challenge particularly vexing is that the other changes may *cause* the changes in the existence or extent of collusion. If, for example, collusion is easier to maintain when economic conditions are good, then there will tend to be cartels when prices are high, creating a correlation between high prices and cartel existence even if cartels have little or no actual causal effect on prices.

Another way to state the problem is that identifying causal effects (or "treatment effects" as they are often called in the statistical and econometric literature) requires estimating an unobserved and

---

model's probative value)."); *but see* Allen v. Dairy Farmers of America, Inc., 279 F.R.D. 257, 271 (D. Vt. 2011) (finding plaintiffs' damage model showing a statistical significance with a 99 percent confidence level insufficient to show damage results on classwide basis and denying class certification, because the model lacked a necessary price component).

18. *See, e.g.*, John E. Lopatka, *Antitrust Injury and Causation*, *in* III ABA SECTION OF ANTITRUST LAW, ISSUES IN COMPETITION LAW & POLICY 2299 (2008). *See also* Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013) (finding that a court must make, as part of its "rigorous analysis," a determination at the class certification stage that plaintiffs' damages theory is consistent with their theory of liability, even if this analysis overlaps with the merits of the claims).

19. Theon van Dijk & Frank Verboven, *Quantification of Damages*, *in* III ABA SECTION OF ANTITRUST LAW, ISSUES IN COMPETITION LAW & POLICY 2335 (2008).

unobservable counterfactual outcome. That is, determining the causal effect of an anticompetitive act requires estimating the difference between the outcomes that were actually observed (e.g., the actual prices during a cartel period) and the counterfactual, "but-for" outcomes that were not observed (e.g., prices that would have been observed absent the cartel), holding all other economic conditions fixed. But if other economic conditions were changing at the same time as the cartel—particularly if those other economic conditions were affecting the likelihood of cartel existence and success—then observed prices in non-cartel periods (often called "clean periods") *do not* provide a good measure of prices during the cartel period but-for the cartel, because in the "clean period" other economic conditions are *not* held fixed.

In statistics, the "gold standard" for answering these kinds of causal questions is the randomized controlled trial (RCT).[20] An investigator conducting a controlled laboratory experiment can set the values of the factor of interest and apply different levels to different test subjects. For example, a sample of subjects in a pharmaceutical clinical trial can be assigned randomly to a "test" group and a "control" group, with the factor of interest (e.g., a pharmaceutical treatment) given only to the test group. Given this experimental design, if, after treatment (or conduct at issue), the outcome of interest (e.g., disease prevalence) changes in the test group in a way that is not found in the control group, then the treatment very likely caused that change and the impact of the treatment can be estimated. Effectively, the experimental design assures that all other conditions are held equal.[21]

The key problem in econometrics, then, is how to identify and measure causal relationships without the ability to use randomization in laboratory

20. *See* JOSHUA D. ANGRIST & JÖRN-STEFFEN PISCHKE, MOSTLY HARMLESS ECONOMETRICS 9-18 (2009).

21. In practice, this is generally accomplished by randomization. The role of randomization in this experimental context is not to guarantee that the treatment group and the control group are "matched" on all factors other than the specific treatment being studied; rather, randomization seeks to ensure that there are no systematic differences between the two groups that may affect the outcome of interest other than the treatment. Randomization achieves a kind of matching that recognizes that exact matching is unlikely to be possible in complex situations such as those arising in economics—there are simply too many things that can impact economic outcomes, and it would be difficult, even in experimental settings, to match between treatment and control group on all these factors. *See* RONALD A. FISHER, THE DESIGN OF EXPERIMENTS (1935); RONALD A. FISHER, STATISTICAL METHODS FOR RESEARCH WORKERS (1925).



experiments, but rather based o
marketplaces. This problem was d
Sir Austin Bradford Hill.[22] In thi
identifying causal effects in obser
nine criteria, while specific to th
arising in epidemiology, also ap
speaking, the Hill criteria mand
observational data, the analysis
implications of the proposed cau
timing, effect size, specificity, n
theory, etc.?

The key point of the Hill c
inferences when using observati
statistical analyses without care
ideas. Usually, this approach requ
grounded in relevant economic
emphasized in the recent work
Heckman.[23]

Keeping these cautions abou
relationships and the limitations
certainly true that, if grounded in
econometric techniques can pr
magnitude of damages and us
discussed above, assuming liabili
explanatory variable representing
constructed, econometric tests c
whether the data are consistent or
having caused changes in the dep

While, in principle, it mig
circumstances involving the con
outcomes in circumstances free

22. A.B. Hill is best known for
smoking on health using obse
criteria are detailed in A.
*Association or Causation?*, 5

23. *See* James J. Heckman, *The*
METHODOL. 1-97 (2005). *S*
*Causality*, 76 INT. STAT.
elucidation and extensions
understanding economic caus

24. WOOLDRIDGE, *supra* note 1,

'hat is, determining the causal
;timating the difference between
(e.g., the actual prices during a
ut-for" outcomes that were not
:en observed absent the cartel),
fixed. But if other economic
ne as the cartel—particularly if
ffecting the likelihood of cartel
ices in non-cartel periods (often
ɔod measure of prices during the
ɛe in the "clean period" other

answering these kinds of causal
trial (RCT).[20] An investigator
:iment can set the values of the
ɛls to different test subjects. For
:maceutical clinical trial can be
ı "control" group, with the factor
ɛnt) given only to the test group.
treatment (or conduct at issue),
alence) changes in the test group
l group, then the treatment very
ɔf the treatment can be estimated.
ɪres that all other conditions are

ɛn, is how to identify and measure
ı use randomization in laboratory

.FFEN PISCHKE, MOSTLY HARMLESS

shed by randomization. The role of
:ontext is not to guarantee that the
ɔ are "matched" on all factors other
lied; rather, randomization seeks to
ferences between the two groups that
ɛr than the treatment. Randomization
ɟnizes that exact matching is unlikely
uch as those arising in economics—
can impact economic outcomes, and
imental settings, to match between
ese factors. *See* RONALD A. FISHER,
); RONALD A. FISHER, STATISTICAL
(1925).



experiments, but rather based on observational data from real world marketplaces. This problem was discussed at length in a famous paper by Sir Austin Bradford Hill.[22] In this paper, Hill identifies nine criteria for identifying causal effects in observational studies in epidemiology. These nine criteria, while specific to the kind of biomedical data and models arising in epidemiology, also apply in an economic context. Broadly speaking, the Hill criteria mandate that to identify causal effects with observational data, the analysis needs to examine a broad range of implications of the proposed causation: does it make sense in terms of timing, effect size, specificity, mechanism, consistency with economic theory, etc.?

The key point of the Hill criteria is that to reach reliable causal inferences when using observational data, one cannot rely on purely statistical analyses without careful consideration of broader economic ideas. Usually, this approach requires the econometric models to be firmly grounded in relevant economic theory. This basic requirement is also emphasized in the recent work on estimating causal effects by James Heckman.[23]

Keeping these cautions about the difficulties of establishing causal relationships and the limitations of observational data in mind, it is certainly true that, if grounded in economic theory and carefully applied, econometric techniques can provide both reliable estimates of the magnitude of damages and useful information about causation. As discussed above, assuming liability has been established and a reasonable explanatory variable representing the anticompetitive act at issue has been constructed, econometric tests can often reliably be used to determine whether the data are consistent or inconsistent with the anticompetitive act having caused changes in the dependent variable.[24]

While, in principle, it might be possible to match outcomes in circumstances involving the conduct at issue (e.g. cartel behavior) with outcomes in circumstances free of the conduct at issue (e.g. non-cartel

---

22. A.B. Hill is best known for his work establishing the causal effects of smoking on health using observational data in human populations. The Hill criteria are detailed in A.B. Hill, *The Environment and Disease: Association or Causation?*, 58 P. R. SOC. MED. 295-300 (1965).
23. *See* James J. Heckman, *The Scientific Model of Causality*, 35 SOCIOL. METHODOL. 1-97 (2005). *See also* James J. Heckman, *Econometric Causality*, 76 INT. STAT. REV. 1-27 (2008) (providing additional elucidation and extensions of the role of economic modeling in understanding economic causality).
24. WOOLDRIDGE, *supra* note 1, at 3-4.

behavior) and use such comparisons to draw conclusions about the causal effects of the conduct, such an approach is generally not practical. This matching would need to compare outcomes under the same demand conditions, technology conditions, market structure conditions, and general economic environment between the cartel and the non-cartel circumstances. The possibility of such matching is typically remote because of the number of characteristics involved.

Statisticians have recently proposed an alternative approach to matching for estimation of causal effects: matching on a function (called the "propensity score") that measures the likelihood (or propensity) of receiving the treatment conditional on explanatory factors, rather than matching on all the explanatory factors themselves.[25] Once this match has been made, one can compare outcomes for treated and untreated observations that have similar predicted probabilities of receiving the treatment to infer the causal effects of the treatment.

In some cases, there may be difficulties with propensity score matching, however. For example, there may be little overlap between treated and untreated observations in estimated propensity scores: the observations corresponding to the cartel data and the observations corresponding to the non-cartel data often may not seem to match at all in terms of propensity score. In this case, this approach cannot be applied (and, indeed, estimating the causal effect of the cartel activity may be difficult using any statistical methodology).

Because laboratory experiments are generally not an option and the use of propensity scores can be limited, regression models are the more common approach to measuring causal effects of the conduct at issue. As explained above, the regression model allows one to adjust for differences in the economic conditions between the cartel observations and the non-cartel observations by "controlling for," or taking into account the impact of, these differing conditions.

However, these regression models also need to be applied with great care and close linkage to the underlying economic theory. For example, Cochran and Rubin have shown that regression controls can fail to accurately adjust for differing circumstances, if the regression model is not

25. Paul R. Rosenbaum & Donald B. Rubin, *The Central Role of the Propensity Score in Observational Studies for Causal Effects*, 70 BIOMETRIKA 41-55 (1983). *See also* Guido W. Imbens, *Nonparametric Estimation of Average Treatment Effects Under Exogeneity: A Review*, 86 REV. ECON. STAT. 4-29 (2004) (providing a more recent review of the literature with a focus on economic applications).



an accurate reflection of the
particularly challenging case i
explanatory variables and the out
and non-cartel period. Althougł
may be possible, the regression a
same basic model applies to th
observations—that is, that the
periods. This may be problemati
when economic conditions are h

In summary, econometric tec
provide evidence consistent wit
The combination of: (1) a prope
that an explanatory variable has
the dependent variable, holding
economic theory explaining w
variable to have a causal effect,
with the existence of a caus
magnitude of the effect.[27]

For example, suppose a prop
a measure of the effect of th
dependent variable of interest
below) and of the expected sign.
act resulting in damages, as long
of the linkage between the act ar

26. *See* William G. Cochran
*Observational Studies: A Re*

27. *See* Rubinfeld, *supra* note 1
Granger Causality Test is de
variable occur before change
potentially supply some use
criteria is that causal effects
treatment), it is not the same
uses the term. For exam
ECONOMETRICS 64 (6th ed. 2
Christmas, but obviously d
Hausman, *Specification and*
*in* 1 HANDBOOK OF ECONO
Intriligator eds., 1983) (pro
Granger causality in simulta

28. For example, the "expecte
competitive act was a price-
of interest was price.

ıw conclusions about the causal
is generally not practical. This
›mes under the same demand
·ket structure conditions, and
the cartel and the non-cartel
matching is typically remote
nvolved.
d an alternative approach to
matching on a function (called
ıe likelihood (or propensity) of
:xplanatory factors, rather than
emselves.[25] Once this match has
ıes for treated and untreated
l probabilities of receiving the
treatment.
iculties with propensity score
may be little overlap between
stimated propensity scores: the
tel data and the observations
ı may not seem to match at all in
this approach cannot be applied
ct of the cartel activity may be
y).
generally not an option and the
regression models are the more
ffects of the conduct at issue. As
ows one to adjust for differences
cartel observations and the non-
›r taking into account the impact

lso need to be applied with great
; economic theory. For example,
regression controls can fail to
ces, if the regression model is not

Rubin, *The Central Role of the*
' *Studies for Causal Effects*, 70
Guido W. Imbens, *Nonparametric*
*cts Under Exogeneity: A Review*, 86
*r*iding a more recent review of the
›plications).



an accurate reflection of the true underlying economic model.[26] A particularly challenging case is when the relationship between the explanatory variables and the outcome of interest varies between the cartel and non-cartel period. Although some adjustments for such differences may be possible, the regression approach fundamentally assumes that the same basic model applies to the data for both the cartel and non-cartel observations—that is, that the economic model is stable across both periods. This may be problematic in markets that are rapidly evolving or when economic conditions are highly unstable over the study period.

In summary, econometric techniques applied to observational data can provide evidence consistent with causality and quantification of impact. The combination of: (1) a properly specified econometric model showing that an explanatory variable has a statistically significant partial effect on the dependent variable, holding constant other factors; and (2) a sound economic theory explaining why one would expect the explanatory variable to have a causal effect, can together provide evidence consistent with the existence of a causal relationship and an estimate of the magnitude of the effect.[27]

For example, suppose a properly specified econometric analysis finds a measure of the effect of the allegedly anticompetitive act on the dependent variable of interest to be statistically significant (discussed below) and of the expected sign.[28] This result would be consistent with the act resulting in damages, as long as there is a clear economic explanation of the linkage between the act and the measure of the partial effect. In this

---

26. *See* William G. Cochran & Donald B. Rubin, *Controlling Bias in Observational Studies: A Review*, 35 SANKHYĀ SER. A 417-46 (1973).

27. *See* Rubinfeld, *supra* note 10, at 184-85. An econometric test called the Granger Causality Test is designed to determine whether changes in one variable occur before changes in another variable. While this property can potentially supply some useful information (for example, one of the Hill criteria is that causal effects of a treatment should not occur before the treatment), it is not the same as causality in the sense in which this chapter uses the term. For example, as PETER KENNEDY, A GUIDE TO ECONOMETRICS 64 (6th ed. 2008), notes, Christmas cards "Granger-cause" Christmas, but obviously do not "cause" Christmas. *See also* Jerry A. Hausman, *Specification and Estimation of Simultaneous Equation Models*, *in* 1 HANDBOOK OF ECONOMETRICS 391, 435-436 (Z. Griliches & M.D. Intriligator eds., 1983) (providing additional discussion of the role of Granger causality in simultaneous equations econometric models).

28. For example, the "expected sign" would be positive if the allegedly competitive act was a price-fixing conspiracy and the dependent variable of interest was price.

case, the econometric estimate can also provide a measure of the magnitude of the impact to estimate the amount of damages. In contrast, a finding that the estimated impact is not statistically different from zero would not provide any statistical support for causation or positive damages, but this lack of statistical support for causation and damages could arise from either lack of actual economic causation and damages or from lack of sufficient information in the observed data.

## C. Classic Regression Analysis and Hypothesis Testing

Regression analysis is a statistical method used to analyze the relationship between a dependent variable and a set of explanatory variables based on a sample of observed data. In the context of assessing antitrust damages, the dependent variable is typically an economic outcome important in estimating any damages sustained by the plaintiff. Examples of such outcomes include price, profit margin, and sales quantity. The explanatory variables are typically the major economic factors that may explain variation in the dependent variable.[29] Examples of such economic factors can include consumer income, other consumer demographics that can affect willingness to pay for the product, and manufacturing costs.

Econometric analyses begin with a consideration of the underlying economic forces that generated the data being used to estimate the model. This knowledge should guide the construction of the econometric model, which should incorporate the underlying economic forces.[30] In building the econometric model, the economist makes initial modeling or specification choices by employing economic theory and reasoning. This modeling process identifies the likely major influences on the dependent variable and the potential interactions between those influences. Within the model, the magnitude of the impact of a given economic factor on the dependent variable is typically summarized by a parameter or coefficient that can be estimated from the available data.[31]

These modeling choices are very important. Deviations of the econometric model specification from the true, underlying economic process generating the data can lead to specification error, which make the resulting parameter estimates unreliable—even if they are statistically significant.[32] Fortunately, the validity of many specification choices can

29. *See* KENNEDY, *supra* note 27, at 75.
30. *Id.*
31. *See* KENNEDY, *supra* note 27, at 3-4.
32. *See* WOOLDRIDGE, *supra* note 1, at 54-55.



be tested statistically to ensure t
chapter discusses the rationale for
validity of specification choices c

### *1. Basic Structure of a Regress*

To understand the basics of
relationship between one depende
as a simple regression analysis. A
plus some fixed mark-up for pro
a direct positive relationship bet
exposition assume a simple mod
cost though, in practice, more exp
demand) and a more complicated
be considered. The deterministic
cost and price can be described b
$= ß_0 + ß_1$Cost.

Here, the *regression coeffic*
increase with cost.[34] For exam
increases by $0.90 for every do
increases, then $ß_1 = 0.9$. A secon
*term* reflecting a fixed markup o
equal the sum of these two effect
then *PRICE* = $5 + (0.9) x ($10)
+ (0.9) x ($12) = $15.80. This rel

33. Jonathan B. Baker & Timo
*Antitrust*, *in* HANDBOOK C
Buccirossi ed., 2008).
34. G.S. Maddala & Kajal Lahiri,
2009).
35. The "constant term" is som
because it gives the value of
which the line Figure 1 cros
values of cost (or the explana
often far from zero, the valu
economic significance.