**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LINDA FAIRSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-8042 (PKC) |
| v. | ) | |
| | ) | Judge P. Kevin Castel |
| NETFLIX, INC., AVA DUVERNAY, and | ) | |
| ATTICA LOCKE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S OMNIBUS MOTION *IN LIMINE***

Natalie J. Spears (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Phone: (312) 876-8000
natalie.spears@dentons.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com

Justin N. Kattan
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Phone: (212) 768-6700
justin.kattan@dentons.com

Bart H. Williams (*pro hac vice*)
Alyson C. Tocicki (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Phone: (310) 284-4520
bwilliams@proskauer.com
atocicki@proskauer.com

Seetha Ramachandran
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 11036
Phone: (212) 969-3455
sramachandran@proskauer.com

*Attorneys for Defendants Netflix, Inc.,*
*Ava DuVernay and Attica Locke*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................... 1

RESPONSES TO PLAINTIFF'S MOTIONS *IN LIMINE* .......................... 2

    I.    MIL 1 Seeking to Exclude "Irrelevant and Prejudicial Scenes" Should Be Denied Because the Jury Should View the Scenes and Series as Average Viewers Would—Not in Isolation .............................................. 2

    II.    MIL 2 Regarding "Relitigating The CPJ Case"is Misleading and a Non-Issue ....... 6

    III.    MIL 2(A) Improperly Seeks to Exclude Individuals *With* "Relevant Information" .............................................. 7

    IV.    MIL 2(B) Attempts to Exclude "Evidence Concerning the Presentation of DNA" that is Highly Relevant to Defamatory Meaning, Substantial Truth, Actual Malice and Damages .............................................. 8

    V.    MIL 2(C) Improperly Seeks to Exclude "Evidence Related to the Vacatur of the Five's Convictions" from the Writers' Research that is Directly Relevant to their State of Mind .............................................. 14

    VI.    MIL 2(D) Improperly Seeks to Exclude "Evidence Related to Matias Reyes' Other Crimes" from the Ryan Affirmation that the Writers Relied Upon in their Research .............................................. 16

    VII.    MIL 2(E) Wrongly Seeks to Exclude Writers' Research About "the Five's Civil Lawsuit" .............................................. 17

    VIII.    MIL 2(F) Asking to Bar "Evidence Concerning 'Unconscious Bias'" Defies Logic .. 20

    IX.    MIL 3 Regarding "Evidence Concerning Steven Lopez" is Not Contested ............... 21

    X.    MIL 4 Purportedly Addressing Plaintiff's "'Libel Proof' Reputation" Improperly Seeks to Exclude Reputational Evidence in a Defamation Case ............................... 21

    XI.    MIL 5 Concerning "The 'Essence of Truth'" Relates to Jury Instructions on the Law .............................................. 28

    XII.    MIL 6 Improperly Seeks to Preclude "Fairstein's Private Emails" That Demonstrate Substantial Truth, Character and Lack of Reputational Damages 28

    XIII.    MIL 7 Seeks to Bar Evidence of Plaintiff's "Anonymous CPJ Website" That Is Highly Probative of Her Character, Claimed Reputation, Bias and Veracity ...... 35

i

XIV.   MIL 8 Regarding Plaintiff's Failure to Request "Retractions" is Relevant to Actual Malice ................................................................................................................. 39

XV.   MIL 9 Requesting the Value of "Plaintiff's Assets" is Not Contested ................ 40

XVI.   MIL 10 Regarding "Highlighting" Trial Exhibits is Not Contested ..................... 40

CONCLUSION ................................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose,*
  282 F. Supp. 2d 126 (S.D.N.Y. 2003)........................................................................................5

*Matter of Application of O'Keeffe,*
  184 F. Supp. 3d 1362 (S.D. Fla. 2016) ...................................................................31, 34, 35

*Bah v. Apple Inc.,*
  2021 WL 4084500 (S.D.N.Y. Sept. 8, 2021)........................................................................11

*Bose Corp. v. Cons. Union,*
  466 U.S. 485 (1984).........................................................................................................12, 16

*Bustos v. A & E Television Networks,*
  646 F.3d 762 (10th Cir. 2011) ..............................................................................................11

*Celle v. Filipino Reporter Enters.,*
  209 F.3d 163 (2d Cir. 2000)..................................................................................3, 4, 5, 9

*Chau v. Lewis,*
  771 F.3d 118 (2d Cir. 2014)...........................................................................................11, 32

*Condit v. Dunne,*
  225 F.R.D. 100 (S.D.N.Y. 2004) ................................................................................. *passim*

*Corporate Training Unlimited, Inc. v. Nat'l Broad. Co.,*
  981 F. Supp. 112 (E.D.N.Y. 1997) .......................................................................................30

*Fairstein v. Netflix, Inc.,*
  2023 WL 6125631 (S.D.N.Y. Sept. 19, 2023) (*Fairstein II*).....................................................1

*Fairstein v. Netflix, Inc.,*
  553 F. Supp. 3d 48 (S.D.N.Y. 2021) (*Fairstein I*) .............................................................1, 3

*Fed. Housing Finance Agency v. Nomura Holding Am., Inc.,*
  74 F.Supp.3d 639 (S.D.N.Y. 2015) ......................................................................................31

*Fischer v. OBG Cameron Banfill LLP,*
  2010 WL 3733882 (S.D.N.Y. Sept. 24, 2010)........................................................................5

*Guccione v. Hustler Mag., Inc.,*
  800 F.2d 298 (2d Cir. 1986) .................................................................................................24

*Hall v. United Parcel Serv.*,
  76 N.Y.2d 27 (1990) ........................................................................................22

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) .............................................................................11

*James v. Gannett Co.*,
  40 N.Y.2d 415 (1976) .......................................................................................3

*Kelly v. Schmidberger*,
  806 F.2d 44 (2d Cir. 1986)................................................................................2

*Levin v. McPhee*,
  917 F. Supp. 230 (S.D.N.Y. 1996) ...................................................................3

*Love v. Wm. Morrow & Co.*,
  193 A.D.2d 586 (2d Dep't 1993) ....................................................................30

*Marchuk v. Faruqi & Faruqi, LLP*,
  100 F. Supp. 3d 302 (S.D.N.Y. 2015).............................................................5

*Marcone v. Penthouse Int'l Mag.*,
  754 F.2d 1072 (3d Cir. 1985)..........................................................................22

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
  2012 WL 2568972 (S.D.N.Y. July 3, 2012) ...................................................6

*MF Global Holdings Ltd. v. PriceWaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017).............................................................19

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016)............................................................................32

*Mimms v. CVS Pharmacy, Inc.*,
  889 F.3d 865 (7th Cir. 2018) ......................................................22, 23, 28, 39

*Monitor Patriot Co. v. Roy*,
  401 U.S. 265 (1971).........................................................................................21

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964).........................................................................................12

*In re O'Keeffe*,
  16-mc-00008 (S.D.N.Y. April 1, 2016), ECF No. 23, *aff'd*, 650 F. App'x 83
  (2d Cir. 2016)...................................................................................................30

*In re O'Keeffe*,
  16-mc-00008 (S.D.N.Y. Mar. 29, 2016), .................................................30, 31

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005) ..................................................................33, 38

*Phila. Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986) .................................................................................................11

*M.A.R. ex rel. Reisz v. U.S.*,
   2011 WL 6188726 (S.D.N.Y. Dec. 12, 2011) ..........................................................6

*Rosario v. City of New York*,
   2021 WL 1930293 (S.D.N.Y. May 13, 2021) ........................................................35

*Sanders v. Madison Square Garden, LP*,
   525 F.Supp.2d 364 (S.D.N.Y. 2007).......................................................................18

*Schafer v. Time, Inc.*,
   142 F.3d 1361 (11th Cir. 1998) ...................................................................... *passim*

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999).....................................................................................19

*Stern v. Cosby*,
   645 F. Supp. 2d 258 (S.D.N.Y. 2009).................................................................3, 23

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017).....................................................................................11

*Telewizja Polska USA v. Echostar Satellite Corp.*,
   2004 WL 2367740 (N.D. Ill. Oct. 15, 2004)...........................................................23

*U.S. Bank Nat'l. Ass'n v. PHL Variable Life Ins. Co.*,
   112 F. Supp. 3d 122 (S.D.N.Y. 2015)................................................................17, 39

*U.S. v. Abu-Jihaad*,
   630 F.3d 102 (2nd Cir. 2010)...................................................................................31

*U.S. v. Massino*,
   546 F.3d 123 (2d Cir. 2008)...............................................................................35, 39

*Uzamere v. Daily News*,
   34 Misc.3d 1203(A), 2011 WL 6934526 (Sup. Ct. N.Y. Cnty. 2011).............30, 31

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*,
   450 F.3d 1132 (10th Cir. 2006) ...............................................................................23

**Other Authorities**

12 Tracy Bateman, et al, Fed. Proc., L. Ed.§ 33:153, Westlaw (2023)  .........................33

Fed. R. Evid. 801(c)(2) ...............................................................................................26

Fed. R. Evid. 403 ...............................................................................6, 17, 19, 34, 35, 39

Fed. R. Evid. 405(b)..................................................................................23, 33, 34

Fed. R. Evid. 408 ..................................................................................................18, 19

Michael H. Graham, Handbook of Fed. Evid. § 405:2 (9th ed.) ..................................................33

Defendants Netflix, Inc., Ava DuVernay and Attica Locke (collectively, "Defendants") respectfully submit this memorandum of law in opposition to Plaintiff's Omnibus Motion *in Limine*.

## PRELIMINARY STATEMENT

Plaintiff Linda Fairstein claims she was defamed by certain scenes in Netflix's series *When They See Us* (the "Series"), a dramatization about the Central Park Jogger case, told from the point of view of the five then-teenagers (the "Five") who were wrongly convicted by the prosecution unit that Ms. Fairstein headed. The Series featured Ms. Fairstein's character in twelve scenes, eleven of which she originally claimed were defamatory. This Court held six of those scenes were nonactionable, including because they "lack[ed] a plausible defamatory meaning" or "were privileged against a claim of defamation [and] convey[ed] the subjective opinions of defendants." *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 58 (S.D.N.Y. 2021) (*Fairstein I*). On summary judgment, the Court held it was for the jury to "weigh the competing inferences arising from the evidence to determine whether there is clear and convincing" proof of actual malice, and to "weigh the parties' contrasting interpretations" of the five scenes as to which Plaintiff has "plausibly alleged" a defamatory meaning. *See Fairstein v. Netflix, Inc.*, 2023 WL 6125631, at *1, *2, *24, *27 (S.D.N.Y. Sept. 19, 2023) (*Fairstein II*).

Thus, in addition to Plaintiff's constitutional burden of proving actual malice at trial, the fundamental issues remaining for the jury to decide, and which Plaintiff has the burden of proving, are: 1) defamatory meaning; 2) material falsity; and 3) Plaintiff's claimed reputational and economic damages. The evidence Plaintiff seeks to exclude in her Omnibus Motion *in Limine* ("MIL") is probative of these crucial jury issues on liability and Plaintiff's claimed harm to her reputation and good character—which she put squarely at issue in this case. Having brought this case touting her reputation as an unbiased "storied" prosecutor and "champion" of sexual assault victims, Plaintiff cannot now attempt through her MILs to prevent the jury from hearing probative

evidence to the contrary, contradicting her claimed reputation and purported damages.

In her quest to exclude evidence against her claims, Plaintiff's Motion misstates the record, the Court's rulings and the governing law. While her entire Motion is flawed, two issues stand out: First, she falsely asserts the Court's prior rulings have already determined that all scenes except for the "DNA Scene" were defamatory as a matter of law, taking from the jury the question of defamatory meaning. (MIL at 2-3.) But the Court's prior decisions said only that Plaintiff's defamatory reading was "plausible"; they did not—and under the authority the Court cited, could not—usurp the jury's role. Second, Plaintiff asks the Court to prohibit the jury from viewing the five remaining scenes at issue (the "Scenes") as an average viewer would—as part of the entire Series. Instead, Plaintiff wants the jury to view the scenes in isolation, devoid of any context. That request is plainly at odds with New York law.

The contorted trial Plaintiff seeks to curate in her MIL—excising the five Scenes from their context and excluding critical evidence on actual malice, falsity, and her claimed damages resulting from the Scenes—is a roadmap to error. With the exception of MILs 3, 9 and 10, to which Defendants do not object, the extraordinary relief Plaintiff requests should be denied in its entirety.

## RESPONSES TO PLAINTIFF'S MOTIONS *IN LIMINE*

## I.    MIL 1 Seeking to Exclude "Irrelevant and Prejudicial Scenes" Should Be Denied Because the Jury Should View the Scenes and Series as Average Viewers Would−Not in Isolation

Plaintiff argues the jury should not see the Series as ordinary viewers did, but should only see the five Scenes she complains of, in isolation. That is plainly wrong for several reasons.

*First*, defamatory meaning is a live issue for the jury. Plaintiff's assertion that the Court already determined all Scenes except for the "DNA Scene" were defamatory as a matter of law (MIL at 2-3) misstates the Court's rulings and the law. The Court has not decided that issue. "On a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction." *Kelly v.*

*Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).  Thus, "the court's role is to determine whether a statement is 'reasonably susceptible to the defamatory meaning imputed to it.' . . . *the court does not determine as a matter of law that the statement is defamatory, as that is the exclusive province of the jury*." *Stern v. Cosby*, 645 F. Supp. 2d 258, 272 (S.D.N.Y. 2009) (emphasis added) (quoting *Jewell v. NYP Holdings*, 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998)).[1]

The Court's rulings were consistent with what the law requires.  The Court's motion to dismiss ruling held "Fairstein has plausibly alleged a claim of defamation as to five scenes." *Fairstein I*, 553 F. Supp. 3d at 58.  It took care to note that "[t]he arguments raised in defendants' *motion are therefore narrow and directed to whether Fairstein's Complaint has plausibly alleged a defamatory meaning* to eleven scenes of 'When They See Us.'" *Id.* at 57-58 (emphasis added). While Plaintiff points to the Court's summary judgment ruling (MIL at 3) the Court made no finding that any of the five Scenes were defamatory as a matter of law.  To the contrary, this Court simply reiterated its motion to dismiss ruling that Plaintiff "plausibly alleged a claim for relief as to five scenes." *Fairstein II*, at *1.  It nowhere found that any Scene *only* had a defamatory meaning, but simply that "for the reasons discussed in this Court's decision on the motion to dismiss," the remaining scenes "can reasonably be understood" as conveying such alleged meaning

---

[1] Judges in this District have stressed "*the Court's limited function on the issue of defamatory meaning*.  Under New York law, the court determines as a matter of law whether the statements complained of are reasonably susceptible of a defamatory construction. . . . If they are 'it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.'"  *Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996) (Kaplan, J.) (quoting *James v. Gannett Co.*, 40 N.Y.2d 415, 419 (1976)), *aff'd*, 119 F. 3d 189, 195 (2d Cir. 1997) (emphasis added).  While Plaintiff parenthetically asserts that if a court finds a statement "susceptible of only one meaning" it must determine if that one meaning was defamatory (MIL at 3, citing *Celle v. Filipino Reporter Enters.*, 209 F.3d 163 (2d Cir. 2000)), that is misleading.  *Celle* did not purport to expand the court's "limited function on the issue of defamatory meaning."  To the contrary, it approved instructions that sent defamatory meaning to the jury.  *See id.* at 174.  While courts frequently find on dispositive motions that a statement has only one meaning that is *not* defamatory and dismiss, it would be extraordinary for a court to find as a matter of law that a statement only has a defamatory meaning and take the issue of defamatory meaning from the jury.  The Court here did not make that extraordinary finding.

3

(*id.* at *16 (Scene 1)); have a "potentially defamatory meaning" (*id.* (Scene 2)); are "plausibly alleged to be defamatory" (*id.* at *19 (Scene 3)); plaintiff "plausibly alleged that the scene is capable of a defamatory meaning" and "[a] jury must weigh the parties' contrasting interpretations of the scene" (*id.* at *22-24 (Scene 4)); and their meaning ultimately depends on what a "reasonable jury could conclude" (*id.* at *25-27 (Scene 5)).  The Court did not take the issue of defamatory meaning from the jury.

*Second*, viewing the scenes in isolation would violate basic New York law requiring that "disputed language" must be given "'a fair reading in the context of *the publication as a whole*.' . . . Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177, 178 (2d Cir. 2000) (quoting *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 625 (1995); *November v. Time Inc.*, 13 N.Y.2d 175 (1963)).  This Court has acknowledged and applied these principles in this case:  "The relevant context for Fairstein's claims is a lengthy television drama starring famous actors distributed to paying subscribers of a streaming service" and the Court viewed "*the full content and context of the series at issue*" in assessing the perspective of an "average viewer." *Fairstein I*, at 64; *id.* at 74 ("Viewing the entire series in context"); *id.* at 62 (Plaintiff admitted "the episodes of [the Series] are integral to the Complaint" and  "properly considered").  It would be plain error for the trier of fact in this case *not* to "view the entire series in context"—the way an average viewer of the Series would have watched it.

*Third,* evaluating Plaintiff's claims of material falsity and actual malice also requires that the dialogue and scenes at issue be viewed in context of the entire Series, including to understand the writers' intentions and choices in developing the characters, dialogue and overall narrative.  *See infra* Resp. to MIL 2(b).

4

*Fourth*, in addition to liability, context also is critical to the jury's consideration of Plaintiff's claimed damages.  Plaintiff has the burden of proving her alleged reputational damages attributable to the claimed defamation[2], and that any economic harm was the direct, non-speculative result of the defamation, and not other factors.  *See, e.g., Marchuk v. Faruqi & Faruqi, LLP,* 100 F. Supp. 3d 302, 314 (S.D.N.Y. 2015).  Where, as here, Plaintiff has claimed damages based on multiple statements in a publication, some actionable and some not, she must prove that damages were caused by the allegedly defamatory speech, rather than non-defamatory, or constitutionally-protected, speech.  *See, e.g., Celle,* 209 F.3d at 191; *see also* Defts' Omnibus MIL re Damage Experts, at  20-24, and cases cited therein.  Contrary to what Plaintiff argues, the complained-of statements in the five scenes at issue cannot be viewed in isolation, where the jury has no context for assessing whether the claimed harm flows from them, as opposed to the other, nonactionable but unflattering parts of the Series depicting Plaintiff, or other public statements by or about Plaintiff.  The Series as a whole is fundamentally relevant to lack of causation as to Plaintiff's claimed economic damages and the extent of her claimed reputational damages.[3]

Aside from her erroneous belief that defamatory meaning has been decided, Plaintiff's only reasons to prohibit the jury from seeing the Series are that it could prejudice her and the Series is too

---

[2]  "The presumption of general damages in libel per se cases does not mean that the court can award substantial damages without plaintiff having adduced any evidence."  *Fischer v. OBG Cameron Banfill LLP*, 2010 WL 3733882, at *2 (S.D.N.Y. Sept. 24, 2010).  The amount of such damages "will always be in issue" and "evidence must be introduced to demonstrate that the award should be more than nominal." *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 282 F. Supp. 2d 126, 132 (S.D.N.Y. 2003) (internal citation omitted).

[3] Plaintiff also vainly seeks to bar the jury from considering this essential context by arguing that under the doctrine of incremental harm "it is for the Court—not the jury—to determine as a matter of law whether non-actionable scenes impacted Fairstein's ability to recover damages."  (MIL at 5.)  Absolutely wrong. Evidence "impacting" Plaintiff's purported damages—including, as she concedes, the nonactionable scenes—is by definition relevant to the jury's role in fixing damages.  That the incremental harm doctrine also exists does not foreclose the jury from considering this evidence.  Whether incremental harm can be a jury question to defeat liability is academic; Defendants are not seeking to instruct the jury on it.  However, Defendants reserve their right to have the Court decide that issue as a matter of law at the end of trial.

long.  Neither has merit.

Plaintiff argues that she will be prejudiced "if non-actionable depictions of her are admitted into evidence."  (MIL at 2, 4.)  But the Series as a whole is crucial to virtually every issue the jury must decide.  That relevant evidence may be harmful to Plaintiff's "litigation position" doesn't mean that it is *unfairly* prejudicial under Rule 403.  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 2012 WL 2568972, at *11 (S.D.N.Y. July 3, 2012); *M.A.R. ex rel. Reisz v. U.S.*, 2011 WL 6188726, at *2 (S.D.N.Y. Dec. 12, 2011) (email "no doubt harmful to Plaintiff's case" was not "'unduly prejudicial' as Rule 403 is meant to be construed").  On the other hand, if Plaintiff were allowed to chop up the Series and present it as no ordinary viewer ever saw it, *that* would be unfairly prejudicial—to Defendants—not to mention contrary to law for the reasons discussed.

Plaintiff also points to the Series' "run time of nearly five hours" and argues that the jury will be confused as to "what scenes are at issue".  (MIL at 2, 4.)  Given its essentiality to the issues of defamatory meaning, material falsity, actual malice, and damages, there is no question that the entire Series needs to be viewed by the jury.  The only question is when— and Defendants submit that the Series should be shown to the jury before opening statements so the jury views it as ordinary viewer would, before either side has a chance to characterize the Series or Scenes.  This has been done in other cases in this District and elsewhere.  (*See* Defts' Motion *in Limine* No. 1: Motion to Have Jury View the Series Before Opening Statements, at 5-6.)  Any would-be confusion is easily addressed by thereafter informing the jury what is and is not at issue, as Defendants have proposed in their Jury Instructions.  (*See* Defts' Mem. in Supp. of Jury Instructions § II.A.)

## II.     MIL 2 Regarding "Relitigating The CPJ Case" Is Misleading and a Non-Issue

This is a non-issue, because Defendants do not intend to "relitigate" the CPJ case.  In one form or another, all of the information Plaintiff wants to exclude through this Motion is contained in the writers' source material.  Plaintiff cannot prevent the jury from hearing about source material that

goes directly to the writers' state of mind, or other evidence corroborating it.  Such evidence is highly probative of actual malice, not "collateral." (MIL at 8.)  Plaintiff's attempt to limit what parts of the research the writers can refer to by characterizing it as "relitigating" the CPJ case is spurious.   The writers' collective research and overall understanding of the underlying case, and of Plaintiff and her role, is critical to their subjective state of mind:  what they believed, who they believed and why they believed what they did.

### III.    MIL 2(A) Improperly Seeks to Exclude Individuals *With* "Relevant Information"

Plaintiff's sweeping request to preclude testimony from 19 individuals is overbroad and should be denied.  Defendants' goal is not to parade in irrelevant witnesses and unnecessarily prolong the trial.  Defendants intend to offer testimony from a few key individuals, all of whom are relevant and should not be precluded.

*First*, Plaintiff seeks to preclude testimony from the five men themselves who are the center of the Series—Kevin Richardson, Antron McCray, Raymond Santana, Yusef Salaam, and Korey Wise.  Plaintiff incorrectly asserts that these men cannot speak to the Defendants' state of mind in writing the series and that their testimony is unnecessary because Defendants produced transcripts of their formal interviews with the writers.  Plaintiff overlooks that Ms. DuVernay testified at her deposition that she relied on "[h]ours of conversation with the men and their families that were ***unrecorded***." (Ex. 1, DuVernay Tr. at 150:2-11 (emphasis added).)[4]  At trial, Defendants reserve the right, and should be allowed to, present both the testimony of Ms. DuVernay, and certain individuals she spoke with about her research for the Series and Scenes, including Mr. Salaam.[5]

---

[4]   All exhibits referenced herein are attached to the contemporaneously filed Declaration of Seetha Ramachandran ("Ramachandran Decl.").

[5] As identified on Defendants' witness list, served on Plaintiff herewith, Defendants do not at this time intend to call Mr. Richardson, Mr. McCray, Mr. Santana or Mr. Wise.

*Second*, Plaintiff moves to exclude several other witnesses, most of whom Defendants do not intend to call. Defendants, however, reserve the right to call Angela Cuffee (Kevin Richardson's sister), Sharonne Salaam (Yusef Salaam's mother), and David Nocenti (Yusef Salaam's "Big Brother"). Their testimony is relevant to (i) actual malice, as Ms. DuVernay spoke to Ms. Cuffee and Ms. Salaam as part of her research, and (ii) substantial truth, as all three had hostile encounters with Ms. Fairstein at the precincts. With respect to actual malice, the experiences of Ms. Cuffee and Ms. Salaam directly influenced Ms. DuVernay's subjective understanding of Ms. Fairstein and, as Ms. DuVernay explained, Scene 3 ("No Kid Gloves") was intended to "capture[ ] the essence of the Fairstein character as reflected in her words and actions." (ECF No. 149, DuVernay Decl. ¶ 97.) Further, these encounters are relevant to proving the ***substantial*** truth of Plaintiff's role and power in the investigation, which are depicted in the challenged Scenes. *See infra* Resp. to MIL 2(B).

*Third*, Defendants also may call Michael ("Mickey") Joseph, Antron McCray's lawyer from his 1990 criminal trial. Plaintiff concedes that Mr. Joseph has personal knowledge and his testimony would be relevant to the substantial truth of the DNA scene. Plaintiff's attempt to limit Mr. Joseph's testimony to the narrow issue of the "timing of the disclosure of the sock DNA" is improper, as other aspects of the prosecution's strategy related to the DNA evidence are also relevant. *See* discussion *infra*, Resp. to MIL 2(B).

## IV.   MIL 2(B) Attempts to Exclude "Evidence Concerning the Presentation of DNA" that is Highly Relevant to Defamatory Meaning, Substantial Truth, Actual Malice and Damages

Citing no precedent, Plaintiff argues that all evidence relating to the prosecution's use of DNA evidence against the Five[6]—other than the simple fact of when the evidence was disclosed

---

[6] According to her MIL, this evidence includes, but is not limited to, the writers' research on: DNA testing on a cervical swab and how the results were presented at trial; how the DNA impacted the prosecution's case; whether the sock DNA matched the cervical DNA and conclusively ruled out the Five; and whether the writers believed that the conclusive DNA should have caused the prosecution to reconsider the rape case against the Five and that the prosecution misrepresented the DNA evidence in public and to the jury.

to the defense—should be excluded as irrelevant and inadmissible.  This motion 2(B)—like Plaintiff's improper attempt in MIL I to have the jury view the five challenged Scenes in isolation—is  a vivid illustration of the danger of approving Plaintiff's attempts to balkanize the story.  Scene 4 is only the beginning of a sequence of DNA-related scenes that tell a key narrative: that the prosecution Plaintiff supervised was so fixated on the guilt of the Five that they marched onwards even when the DNA evidence raised obvious weaknesses in their case.  Starting with Scene 4, the DNA-related scenes dramatize the historical reality—understood by the writers based on their research—that the prosecution misleadingly presented the DNA evidence as "inconclusive" at trial when they knew the opposite:  that the sock DNA matched the cervical DNA and that therefore both samples ***conclusively*** did not match any of the Five.

Plaintiff's attempt to keep the jury in the dark and consider Scene 4 in isolation, unaware of the factual backdrop and context, would be grossly unfair and plain error.[7]  *Celle,* 209 F.3d at 177-78 (context is critical in defamation cases). This evidence in the writers' research materials, and the context provided by the other DNA scenes in Episode 2 that reflect this evidence, are critical to the jury's ability to evaluate whether Plaintiff can prove (1) that Scene 4 carries the defamatory meaning that the court found "plausible," and meet her constitutional burden of proving (2) that the portrayal of her in Scene 4 was materially false; (3) that the writers subjectively believed it was highly probable their portrayal was false (first prong of actual malice); and (4) that the writers *intended* it to have a defamatory meaning (second prong of actual malice).  The evidence also provides critical context for the writers' notes that Plaintiff will surely seek to offer as proof of actual malice.

---

[7] Indeed, Plaintiff herself all but concedes elsewhere in her brief that the other DNA scenes in Episode 2 are relevant to the jury's consideration for "context".  (MIL at 7 and n. 8.)

***Context is Critical to Defamatory Meaning.***   The entirety of Episode 2 is necessary to understand whether Scene 4 has a defamatory meaning. *See* Resp. to MIL I, *supra.* Plaintiff's theory of defamation is that Ms. Fairstein's use of the word "surprise" in Scene 4 suggests to the average viewer that the prosecution withheld disclosure of the DNA evidence from the defense. But in fact, Scene 4 reflects what actually happened—at first, the prosecution was thrilled, and *surprised*, to learn that DNA had been found on the victim's sock.  A positive DNA match would, as DA Robert Morgenthau remarks in the scene, "nail this thing down."  When watched as part of Episode 2, the DNA Scene is followed by a scene where the sock DNA comes back negative and Ms. Fairstein instructs Ms. Lederer to "deal with it," conveying that under Ms. Fairstein's direction, the prosecution would "deal with" the sock DNA at trial—not withhold or conceal it. (*See* Compl. ¶ 121; Ep. 2 at 29:45–32:12)  Later on in Episode 2, an FBI agent testifies that the evidence is "inconclusive," and defense attorney Mickey Joseph elicits on cross that the DNA evidence did not in fact match any of the Five.  (Ep. 2 at 41:41-43:47.)  If there were any doubt left about what the DNA scenes portray, the final scene where Mr. Joseph confronts Ms. Lederer in the law library spells it out.  He tells Ms. Lederer that she did not "play fair" when she called the evidence "inconclusive" at trial, further confirming that the DNA evidence ***had been disclosed***, but he objected to the way the prosecution characterized it at trial.  (Ep. 2 at 43:53-44:32.)  This final scene from Episode 2, which Plaintiff doesn't want the jury to see, conclusively establishes that there is no defamatory meaning to Scene 4.

These scenes (and the research on which they are based) give context to Scene 4, and support Defendants' interpretation that the "surprise" Ms. Fairstein refers to in Scene 4 is the late-breaking discovery of the DNA evidence that was soon to be tested, as opposed to the defamatory meaning Plaintiff derives from use of the word "surprise."  It is for the jury to decide which has merit.

**Substantial Truth.**  Plaintiff has the "burden of showing that the speech at issue is false." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 245 (2d Cir. 2017).  The standard is one of *substantial* truth, that is, "if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation."  *Id.* at 241-42 (internal citation omitted); *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (statement is substantially true if its "overall 'gist or substance'" is true).  It is axiomatic then that when a plaintiff sues for defamation, evidence bearing on the substantial truth of the statements at issue is relevant and admissible.  Determining substantial truth requires "consider[ation of] facts brought out in discovery and not contested, although they are not in" the complained of publication; "it makes no difference that the true facts were unknown until the trial. A person does not have a legally protected right to a reputation based on the concealment of the truth."  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227-28 (7th Cir. 1993) (Posner, J.); *Bustos v. A & E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (Gorsuch, J.).

Scene 4 contains no falsehood:  it is substantially, if not literally true, because the overall "gist" of the DNA Scene accurately reflects the way the prosecution reacted to the belated discovery of DNA evidence—as a welcome surprise.[8]  Further, "[u]nder New York law, courts are required to consider the statement's context in assessing whether it was substantially true."  *Bah v. Apple Inc.*, 2021 WL 4084500, at *5 (S.D.N.Y. Sept. 8, 2021) (Castel, J.). The scenes following Scene 4 show how, once their hopes were dashed, the prosecution went on to misrepresent what the DNA evidence meant at trial.  Thus, viewed in context, these other scenes in Episode 2 further clarify that Scene 4 does *not* portray Plaintiff as withholding the sock DNA from the defense, but rather, instructing

---

[8] ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Lederer to "deal with" that disclosed evidence by playing up the cervical DNA evidence at trial—which is what actually happened, according to the trial transcripts and Plaintiff's own colleagues.

Even taking as true Plaintiff's interpretation of Scene 4 (i.e., that the prosecution concealed or withheld evidence), the evidence Plaintiff moves to exclude would still be admissible because it tends to prove that the defamatory sting of unethical conduct that Plaintiff alleges (an "attack[]" on "her prosecutorial ethics," Compl. ¶ 117) is substantially true.  The evidence shows Plaintiff directly supervised the DNA strategy; and the actual trial transcripts show that the prosecution's entire approach to the DNA evidence—representing that it was "inconclusive," including in the opening statement at trial, by which time they certainly knew otherwise—was misleading and unfairly "hid the ball." [9]  *It is for the jury to decide* whether withholding the truth about the evidence from the court and jury is more or less ethically problematic—i.e., whether the "sting" is the same or greater—than the purported discovery gamesmanship Plaintiff discerns in the challenged dialogue.

***Actual Malice.***   Actual malice is subjective in nature, provable only by "clear and convincing" evidence that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Cons. Union*, 466 U.S. 485, 511 n.30 (1984); *Fairstein II*, at *2, *8; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Plaintiff moves to exclude information the writers reviewed, including their research materials for Scene 4, and prevent the jury from learning the context for why the writers set up the DNA scenes the way they did and the overall point they intended to make.  For example, Plaintiff seeks to exclude core facts discussed in *And the Blood Cried Out*, where Harlan Levy

---

[9] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

discussed his work on the DNA aspects of the case with Ms. Fairstein and the challenges the evidence presented.  Mr. Levy specifically describes how the prosecution team, under Ms. Fairstein, dealt with the fact that the DNA did not match any of the Five.  Similarly, Plaintiff seeks to exclude an interview with Professor Kassin from the Burns documentary.  But the documentary—and  Kassin interview in particular—helped form the writers' overall impressions and understanding of the DNA evidence, including Plaintiff's role.  (*See* ECF No. 149, DuVernay Decl. ¶ 112; ECF No. 150, Locke Decl. ¶ 60.)  This evidence, like all of the DNA evidence Plaintiff seeks to exclude, goes directly to the writers' state of mind and belief that their portrayal accurately captured the gist of what actually happened.

That evidence is also highly relevant to the second prong of actual malice—intent as to defamatory meaning.  To meet this burden, Plaintiff must prove by clear and convincing evidence that ordinary viewers would understand Scene 4 to have the defamatory meaning she claims it does, and that the Defendants intended to convey that meaning, namely that the prosecution withheld or concealed DNA evidence.  (*See* Defts' Mem. in Supp. of Jury Instructions at § II.B.3.)

Among the evidence Plaintiff moves to exclude is that the sock DNA results matched the cervical DNA, thereby conclusively ruling out the Five, yet the prosecution still went on to mischaracterize the cervical DNA results as "inconclusive" at trial.  This is what the writers understood and what the other scenes in Episode 2 discussed above convey; it is precisely the kind of context that demonstrates the writers did not intend to convey the defamatory meaning Plaintiff assigns to Scene 4—that she withheld the DNA evidence from the defense—but instead, that under Ms. Fairstein's supervision, the prosecution would barrel ahead and "deal with it" by misleadingly "play[ing] up the cervical DNA" as inconclusive.[10]

---

[10] While Plaintiff has now abandoned her claim based on this second DNA scene, presumably because it is supported by Levy's book which she endorsed, she cannot prevent the jury from hearing why the writers set up the first DNA scene to flow into this second DNA scene and what they intended to convey.

The challenged DNA evidence also provides critical context for documents Plaintiff will likely offer as proof of actual malice at trial—context that would clearly rebut Plaintiff's characterization of those documents.  For example, Plaintiff's exhibit list includes PX G2, a copy of the script for Episode 2, with a handwritten notation from Ms. Locke. The notation reads "she goes wild so she gets a good comeuppance."  (Ex. 5, PX G2.)  Ms. Locke explained in her deposition that her note means that "narratively, which also matched what happened in reality, is the excitement that the prosecution had, this kind of yay, wow, we got the sock would be in proportion to the disappointment or the falling having egg on your face in front of the press and everybody else when the shit didn't work out.  Excuse my language."  (Ex. 6, Locke Tr. 52:12-20.)  The evidence from which these two scenes are drawn—that the sock DNA results matched the cervical DNA, effectively ruling out the Five and dashing the prosecution's hopes for a match—shows that Ms. Locke wanted to make the prosecutors (Fairstein or Lederer, as she testified) go "wild" in the first scene, so that the next scene with the test results would deliver a "good comeuppance," dramatizing what she described as having "egg on their faces" in the public eye when there was no match.

Evidence concerning the DNA issues is relevant on multiple grounds.  Plaintiff's attempt to keep the jury from hearing it speaks volumes about the improper goal of her MILs.

### V.   MIL 2(C) Improperly Seeks to Exclude "Evidence Related to the Vacatur of the Five's Convictions" from the Writers' Research that is Directly Relevant to their State of Mind

Plaintiff concedes, as she must, that the "the affirmation of Assistant District Attorney Nancy Ryan" ("Ryan Affirmation"), submitted in support of vacating the Five's convictions, is "relevant to whether Defendants acted with actual malice," but broadly asserts that other "evidence concerning the 2002 vacatur of the Five's convictions is not relevant and should be excluded at trial."  (MIL at 11.)[11]   The evidence Plaintiff apparently wants to exclude is, like the Ryan

---

[11]  Plaintiff discusses Judge Tejada's opinion, but Defendants do not intend to offer that into evidence, and, absent a stipulation, will seek judicial notice of the undisputed fact that the convictions were vacated.

Affirmation, part of the writers' research, including parts of the Burns documentary and book, and the Toobin article and others where Plaintiff defends the investigation and prosecution, and opposes vacatur.  These materials are centrally relevant to the writers' state of mind.

Based on their sources, including but not limited to the Ryan Affirmation, the writers believed that the investigation that Plaintiff led had rushed to judgment and blindly focused on the Black and Latino youth who were accused of committing other crimes in the Park on April 19, 1989, and went to trial based on deeply flawed and contradictory "confessions" in the absence of forensic evidence, while ignoring other possibilities and suspects—namely, Matias Reyes.  (Ex. 7, Affirmation, ¶ 104; Ex. 8, Burns Book, at 27, 115-16, 125-26, 188-95.)  The vacatur of the convictions following Reyes' confession and DNA match informed the filmmakers' state of mind overall.  The writers believe the Five—not Linda Fairstein and the police—who they believe lied in order to convict the Five.  It would be error to excise portions of source materials relating to the vacatur and prevent the jury from seeing what shaped Defendants' thoughts and understandings.

Plaintiff's own words and reported point of view on the vacatur also were essential building blocks for the writers' portrayal.  For example, the writers believed based on their sources that portraying Plaintiff assembling the timeline (Scene 1) was consistent not only with her supervisory position, reputation, and actions, but also with the spirit and essence of her own publicly expressed point of view that the kids in the Park were connected to and guilty of the rape, even after Reyes came forward and despite the criticism of the timeline in the Ryan Affirmation (*see* Ex. 7, ¶¶ 97-100).

Finally, Plaintiff's stridently expressed views on the vacatur and the Five's guilt also are highly probative of her reputation and claimed damages.  *See* discussion *infra* Resp. to MIL IV.

**VI.    MIL 2(D) Improperly Seeks to Exclude "Evidence Related to Matias Reyes' Other Crimes" from the Ryan Affirmation that the Writers Relied Upon in their Research**

Plaintiff seeks to exclude evidence of the other crimes committed by serial rapist Matias Reyes before he confessed to raping Trisha Meili alone.  These crimes are extensively detailed in the Ryan Affirmation, which Plaintiff concedes the writers read and relied upon in writing the Series.  Plaintiff's Motion to Exclude this evidence as irrelevant ignores that the writers' knowledge of these other crimes, coupled with Ms. Fairstein's offensive statements including that "Reyes ran with that pack of kids," is part of what led the writers to form their beliefs about Plaintiff and shaped her portrayal in the Series.

Plaintiff acknowledges that the Ryan Affirmation is relevant, although, again, she seeks to let in only certain parts that *she* considers relevant (without identifying what those might be).  But this is not about what Plaintiff believes.  It is about what the *writers* subjectively found relevant and true.  *See Bose,* 466 U.S. at 511 n.30.

Both Ms. DuVernay and Ms. Locke will testify that they believed Ms. Fairstein's Sex Crimes Unit committed an error in judgment by not connecting the April 19 rape of Trisha Meili to Reyes' other rapes, and thus allowing a serial rapist to go free.  (*See* ECF No. 149, DuVernay Decl. ¶ 23; Ex. 6, Locke Tr. at 203:11 – 205:10.)  The writers believed, based on their research, that Ms. Fairstein and others, failed to connect the crimes due in part to her biases and rush to judgment against the Five, just as Ms. DuVernay intended to depict in the police briefing scene. (ECF No. 149, DuVernay Decl. at ¶¶ 44, 82.)

The research concerning Reyes' other crimes was relevant to the writers' belief in the unreasonableness of Ms. Fairstein's continued—and very public—position that the Five are guilty of the rape.  As Ms. Locke explained, "Ms. Fairstein's continued insistence on the Five's guilt for the rape of the jogger demonstrated [ ] her deep-rooted bias against the Five."  (ECF No. 150,

Locke Decl. ¶ 39.)  Plaintiff's insistence on the Five's guilt not only informed the writers' portrayal of Ms. Fairstein, it also provides context for the statements made by Defendants following the public backlash against Ms. Fairstein.  Plaintiff is undoubtedly going to claim that statements from Defendants following the Series show actual malice, and Defendants must be allowed to show why the facts support their beliefs about Ms. Fairstein and context for their statements.  Similarly, the absurdity of Plaintiff's continued insistence on the Five's guilt, *especially* in light of the evidence of Reyes' other crimes, is relevant to her reputation and the jury's determination of damages.

Finally, Plaintiff argues that this evidence of Reyes' other crimes should be excluded because it is unduly prejudicial.  But she cites no case finding a source that defendants explicitly relied on could ever be excluded under Federal Rule of Evidence 403.  Given the extraordinary impact the full Ryan Affirmation had on the writers' subjective state of mind and its relevance to actual malice, its probative value is in no way outweighed by other issues.  *See U.S. Bank Nat'l. Ass'n v. PHL Variable Life Ins. Co*., 112 F. Supp. 3d 122, 155 (S.D.N.Y. 2015) ("Rule 403 is for weeding out 'unfair' prejudice—prejudice not related to the actual merits of the case in suit").

## VII.    MIL 2(E) Wrongly Seeks to Exclude Writers' Research About "the Five's Civil Lawsuit"

Plaintiff asserts that "[n]one of the Five Scenes at issue concern the Five's [civil rights] lawsuit" (the "Civil Suit") and that "any testimony about this subject is irrelevant."  (MIL at 15.) That is plain wrong.  The Five's Civil Suit and settlement, featured as the coda to the Series,[12] are highly relevant to the writers' state of mind in writing the Series and the portrayal of Plaintiff.

The premise for the Civil Suit against Plaintiff was that she was acting not only as a prosecutor but as an "investigator" alongside the NYPD.  That the Civil Suit's allegations against

---

[12]  The conclusion of Episode 4 states in voiceover: "We're so proud to welcome these men. We're so proud as they are finally awarded the proper settlement for their damages. As their records are cleared and they're fully exonerated for the lies told about them" (Ep. 4, 1:15:48), and then in text that, "In 2014 a federal judge awarded the five men a settlement of $41 million, the largest in New York State history" (*id.*, 1:19:05).

Plaintiff survived a motion to dismiss and were the basis for a multi-million dollar settlement were part of the writers' extensive source material.  For example:

- The epilogue to the Burns book relates that in 2003, the Five filed the Civil Suit, naming "many individuals involved in the case, including Linda Fairstein, Elizabeth Lederer, and more than a dozen police detectives and supervisors. . . . In late 2007 a decision was rendered on the defendants' motions to dismiss the case, keeping intact many of the arguments made in the original civil complaint."  (Ex. 8, Burns Book at 211-12.)

- The filmmakers' interviews with civil counsel Michael Warren, and civil plaintiff Raymond Santana delved further into the Civil Suit and allegations against Plaintiff.  Mr. Santana explained that because she was "a lead investigator" in the Jogger case, "she stepped out of that immunity" from being sued that prosecutors normally enjoy.  "That's why she's named in [the Five's civil] lawsuit, her and Lederer."  (Ex. 9, Santana Int.)

- In the Burns documentary, Mr. Warren stated:  "Two prosecutors, Linda Fairstein and Elizabeth Lederer. They were part of the investigation. And they were operating not only as prosecutors but investigators."  (*See* Burns Documentary at 22:09 – 22:56.)  As he bluntly put it in a recorded interview: "Fairstein controlled those detectives. She controlled them in the precinct. . . ."  (Ex. 10, Warren Int.)

- The filmmakers' sources also included a 2016 interview with Robert Morgenthau that, in the course of discussing his regrets over the jogger case and his misplaced trust in Plaintiff to prosecute it, discusses vacatur of the Five's convictions "followed by an eventual settlement of $41 million to the five men."  (Ex. 11, Leland Art.)

The fact that the Civil Suit, which named Plaintiff as a defendant who participated alongside police, settled for $41 million is a critical fact to the writers' state of mind.  Not even Plaintiff argues for exclusion of the source material.  Instead, she proffers a collection of straw men trying to exclude this evidence.  But Defendants have no intention of using the pleadings or rulings, or settlement, to contend there was a "finding on the merits" regarding Plaintiff's conduct. (MIL at 13.)  And the "weight" to be given this evidence is for the jury.  (*Id.* at 15.)

Plaintiff's assertion that settlements are not proof of wrongdoing in a court of law misses the point.[13]  The writers are not lawyers or judges.  In their minds, the $41 million settlement lent

---

[13] While the Federal Rules of Evidence prohibit offering evidence of settlement "to prove . . . [the] invalidity of . . . a claim that was disputed . . . [t]he rule expressly does not prohibit the use of such evidence for any other purpose."  *Sanders v. Madison Square Garden, LP*, 525 F.Supp.2d 364, 368 (S.D.N.Y. 2007) (citing Fed. R. Evid. 408(a)-(b); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999)). The settlement

credence to the Five's civil rights case and innocence.  It also bolstered Mr. Warren's credibility

that the case settled for such a large number.  Separately, the settlement affected public opinion

about the case and goes to damages.  Plaintiff was the most recognizable names among the settling

defendants, and as such, the settlement necessarily impacted her reputation.  She can argue it did

not, and she was only "1 of over 20 named defendants" (MIL at 14); but Defendants can argue it

did.  In fact, Plaintiff took to the media to object to the settlement, voicing her view on the Don

Imus show that the Five are guilty; and that was specifically part of the research for the Ryan lunch

scene.  (ECF No. 140, DuVernay Decl. at ¶ 122; Ex. 12, 6/2/18 Email; Ex. 13, Imus Transcript.)

Information not included in source material (*e.g.*, the pleadings and District Court's

opinions from the Civil Suit) is also relevant because it is consistent with what Santana and Warren

told the writers were in fact the allegations in the case that made it past motions to dismiss: that

Plaintiff was sued as an investigator, tried (and failed) to claim immunity, and the case settled for

$41 million.  Plaintiff is free to argue that these were only allegations but she cannot exclude this

evidence which supports that the writers' reliance on their sources was not inherently

improbable.[14]  Plaintiff further puts the allegations of the Civil Suit squarely at issue by asserting

(quoting her lawyer's threatening letter to the filmmakers) that she was "wrongly accused" of

---

is *not* submitted as "evidence that Fairstein engaged in the misconduct alleged in the Five's lawsuit" (MIL at 15) but rather for a wholly different issue—Plaintiff's actual malice burden in a defamation case. Admitting this evidence is in no way unfairly prejudicial. *Starter*, 170 F.3d at 293-94 (admitting evidence of settlement for other purposes and rejecting Rule 408 and 403 arguments).

[14] Plaintiff argues that "evidence relating to previous litigation involving one or both of the same parties" should be excluded "where the merits of those prior litigations would 'become inextricably intertwined with the case at bar.'"  (MIL at 13, citing *MF Global Holdings Ltd. v. PriceWaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (quoting *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007)).)  The court in *MF Global* found the issues in debtor's other post-bankruptcy litigation "could easily" have been confused by the jury with "any evidence regarding the merits" of Chapter 11 administrator's malpractice action against debtor's accountant.  232 F. Supp. 3d at 568. Not so with the Civil Suit and the instant defamation action, which present entirely different issues, on which the jury will be instructed.  Vague assertions of purported confusion do not outweigh the probative value of this evidence, much less substantially.

"having participated in an unlawful conspiracy to violate the then-defendants' civil rights". (Compl. ¶ 138.)   Plaintiff cannot voice her views about the merits of the Civil Suit while foreclosing Defendants' perspective.

## VIII.   MIL 2(F) Asking to Bar "Evidence Concerning 'Unconscious Bias'" Defies Logic

Plaintiff argues that any evidence concerning implicit or unconscious bias—some of the themes the writers sought to explore in the Series—should be excluded as irrelevant.  (MIL at 15-16.)  This argument defies logic.

Plaintiff must prove as an element of her claims that Defendants acted with actual malice. Defendants intend to adduce evidence that the Series is a dramatization based upon true events that was written from the perspective of the Five and their families.  Testimony from the writers on what they understood motivated Ms. Fairstein's actions based on their research (Ex. 1, DuVernay Tr. at 97:13-98:23), and what they sought to convey in the Series (including why they chose certain narratives or words like "thug"), goes directly to their state of mind.  Defendants DuVernay and Locke believe that detectives and prosecutors, including Plaintiff, rushed to a judgment that the Five were guilty of rape and either consciously refused to credit, or were unable to credit, factual developments that were inconsistent with that conclusion.  The inability to credit potentially exculpatory evidence is the very essence of implicit bias, and Ms. DuVernay and Ms. Locke are expected to testify they believed Plaintiff's rigidity concerning the events in question resulted, at least in part, from that bias.

Plaintiff emphasizes that Scene 3 (the "Roundup Scene") allegedly "depicts Fairstein *overtly* discriminating against Black youth" but does not explain how this renders evidence of her implicit bias irrelevant to this scene or to the four other scenes at issue.  (MIL at 15-16.)  Implicit bias is clearly relevant to the writers' state of mind in drafting all five scenes at issue.  Each of these scenes show her, in one way or another, presupposing or reaffirming the Five's guilt in spite

of contradictory evidence—conduct that Defendants could reasonably believe was the product of Fairstein's implicit or unconscious biases (for example, "no kid gloves, these aren't kids"). The "Roundup Scene" shows how implicit bias infected the actions of law enforcement even where police and prosecutors were not consciously engaged in race discrimination.

Plaintiff further argues that the probative value of the evidence of unconscious or implicit bias in this case "is far outweighed by the prejudice it will cause Fairstein, because the jury could be misled into thinking Fairstein is required to prove by clear and convincing evidence that she acted without any unconscious or implicit bias in 1989." (MIL at 16.) But Plaintiff fails to explain why the mere introduction of evidence on a subject will mislead the jury into thinking Plaintiff bears any particular burden to disprove that evidence, particularly since the jury will be clearly charged as to the elements of defamation and Plaintiff's burden as to each element.

## IX.    MIL 3 Regarding "Evidence Concerning Steven Lopez" is Not Contested

Defendants do not intend to submit the noted evidence at trial regarding Steven Lopez.

## X.    MIL 4 Purportedly Addressing Plaintiff's "'Libel Proof' Reputation" Improperly Seeks to Exclude Reputational Evidence in a Defamation Case

Plaintiff claims the five scenes in the Series damaged her "storied reputation" as a prosecutor and advocate for "victims of sexual assault." (*See*, *e.g.*, Compl. ¶¶ 19, 32, 34, 164, 230).[15] Because Plaintiff "seeks to recover compensation for damage to . . . her reputation," Defendants are entitled to introduce evidence of Plaintiff's character and reputation. *Schafer v. Time, Inc.*, 142 F.3d 1361, 1370 (11th Cir. 1998); *see, e.g.*, *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971) ("damage to reputation

---

[15] The very title of this Motion is misleading. Evidence of Plaintiff's reputation is not relevant only to a potential "libel-proof plaintiff" defense. (MIL at 17-20.) This evidence is relevant to reputation and damages independent of a "libel-proof plaintiff." Simply because the Court *could* throw out the case as a matter of law if Plaintiff is libel proof does not mean that the jury does not hear evidence going to the state of her reputation unless it meets the libel-proof definition. To be clear, Defendants are *not* arguing to the jury that there is no liability because Plaintiff is "libel proof" and are not proffering a jury instruction on the subject. As with incremental harm, *supra*, Defendants reserve their rights to move for judgment as a matter of law on those grounds at the end of trial.

is, of course, the essence of libel"); *Hall v. United Parcel Serv.*, 76 N.Y.2d 27, 32 (1990) (defamation claims seek compensation for "[i]njuries to an individual's personal and professional reputation").

Yet Plaintiff's overreaching Motion seeks to sweepingly exclude what she deems "irrelevant and prejudicial media sources . . . concerning Fairstein's reputation," including interviews and other media references to "Fairstein's statements about the Five, the Central Park Jogger case and subsequent proceedings (*e.g.* the vacatur)," as well as about other issues, such as her involvement with Harvey Weinstein.  (MIL at 18.)  In seeking to paint an incomplete (and inappropriately flattering) picture of her reputation, Plaintiff is improperly trying to keep the jury from hearing evidence that is *directly relevant to the reputation she has put at issue.*  It is for the jury to consider whether she has met her burden of proof as to her claimed damages or whether her damages were caused by, among other things, her own statements and actions.  *See Condit v. Dunne*, 225 F.R.D. 100, 110 n.4 (S.D.N.Y. 2004) (Leisure, J.) ("damages may be mitigated by plaintiff's own actions causing damage to his reputation"; both public and private materials reflecting on a plaintiff's personal history held relevant); *Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 871 (7th Cir. 2018) (even if damage to reputation is presumed in a defamation *per se* case, "evidence regarding the extent of the harm to [a plaintiff's] professional reputation was critical for minimizing damages"; vacating jury verdict, holding court erred in not allowing defendant's evidence regarding plaintiff's reputation).

There is no basis in law for Plaintiff's assertion that the media coverage she recites should be excluded because it "bear[s] no relationship to the 'precise point of the alleged libel' in this case"—the false depiction of Fairstein engaging in unlawful and unethical acts" in the five Scenes.  (MIL at 19.) This is another improper attempt by Plaintiff to limit admissibility of reputational evidence to what she argues is the "narrow scope of evidence that is admissible in support of the libel-proof plaintiff doctrine."  (*Id.*)  That doctrine does not circumscribe what the jury can consider in terms of the extent of damages to award.  *Marcone v. Penthouse Int'l Mag.*, 754 F.2d 1072, 1079 (3d Cir. 1985) (even

though court could not "say as a matter of law that [plaintiff] was libel proof," it held "a string of items of negative publicity regarding" plaintiff "widely reported by the local media" was "[e]vidence of a tarnished reputation" that was "admissible and should be considered as a factor to mitigate the level of compensatory damages"). And, to be sure, the publicity that Plaintiff's statements and actions attracted could not be more relevant. *See, e.g.*, *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137-38 (10th Cir. 2006) (holding news articles properly admitted to mitigate alleged defamation damages and show lost profits could have resulted from other, alternative sources).[16]

Furthermore, under Federal Rule of Evidence 405(b), a plaintiff's "specific acts" are admissible because character is an essential part of defamation claims. *Schafer*, 142 F.3d at 1372 & n. 14. Such character evidence does not have to be related to the alleged defamation, because it goes to the plaintiff's reputation generally—the baseline from which the alleged harm is measured. Courts have therefore admitted a broad range of evidence about a defamation plaintiff's negative reputation. *See*, *e.g.*, *id.* at 1365, 1371 (defamation plaintiff—whose photo was mistakenly substituted for a terrorist's—could be questioned about, *inter alia*, his "convictions for driving under the influence, an arrest for writing a bad check, failure to file tax returns, [and] failure to pay alimony and child support"); *Mimms*, 889 F.3d at 871 (reputational evidence included sexual harassment complaints, that plaintiff was barred from practicing at a hospital and investigated for a relationship he had with a nurse; rejecting argument that "this evidence had nothing to do with his reputation as a prescriber"): *Telewizja Polska USA v. Echostar Satellite Corp.*, 2004 WL 2367740, at *8 (N.D. Ill. Oct. 15, 2004)

---

[16] Plaintiff's argument that the media sources are inadmissible on hearsay grounds is meritless, as the case she cites held. *See, e.g., Stern*, 645 F. Supp. 2d at 265 n.2 (rejecting defamation plaintiff's hearsay objection to newspaper articles as they "are not offered for their truth. Rather, they are offered to show that [plaintiff] was subjected to media criticism for his behavior").

(admitting evidence of "collateral bad acts").  In any event, here, the evidence Plaintiff seeks to exclude goes to *precisely* the alleged reputational harm she has put at issue.

   ***Media reports about Plaintiff's association with the CPJ case and her statements about the Five's Guilt.***  News reports, including Plaintiff's own statements that the Five are still guilty of raping the jogger, are not only admittedly relevant to the writers' state of mind,[17] but also centrally relevant to Plaintiff's attempt to show that her reputation has been damaged by the Scenes in the Series and the purported extent of such damage.  Plaintiff's "reputation as a storied prosecutor" derives from her leadership of "the Manhattan District Attorney's Sex Crimes Unit" (Compl. ¶ 164), and the jogger case was the most celebrated—then the most notorious—case that Unit brought under her watch. Plaintiff's reputation was tied to the case and she promoted the connection starting with her first book (Ex. 14, excerpt from *Sexual Violence*), and in all forms of major publications over the years.  (*See* Ramachandran Decl. ¶¶ 19–20 and Exhibits 15-16.) [18] Indeed, Plaintiff described herself as the "front" of the jogger case (Ex. 17, Fairstein Tr. at 128:11-21).  Robert Morgenthau publicly singled *her* out in lamenting the botched prosecution of the Five. (Ex. 11, Leland Article.)

   Plaintiff's reputation has long been tied to the Central Park Jogger case as the Head of the Unit—and then as someone who continues to defend the investigation and prosecution and insist the Five are guilty of rape.  It is not *Defendants'* "mere disagreement with Fairstein's purported

---

[17]  Plaintiff concedes, as she must, that "statements or news sources that Defendants relied upon as source materials for the Five Scenes" are relevant "to the way she is depicted".  (MIL at 18 n. 21.)

[18]  Plaintiff quarrels that "many of these media sources are too remote in time to evidence Fairstein's reputation in May 2019 and, accordingly, they would be more prejudicial than probative because they will confuse or mislead the jury."  (MIL at 19.)  That is a meritless argument too, as demonstrated by the *Guccione* case Plaintiff cites.  *Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 304 (2d Cir. 1986) (articles from early 70s were not "too remote in time to be relevant to the state of Guccione's reputation in 1983" and were "improperly excluded").  If anything, that conclusion is especially apt in the age of the Internet when the publications at issue are available for all to access and see at any time.

views about the Central Park Jogger case" that is the basis for Plaintiff's "negative reputation" (MIL at 18), but that, *society at large* strongly disapproved of her very public position, which was an outlier by 2019, as society's views continued to evolve.

Further, Defendants contend, and the evidence produced in discovery by Plaintiff and third parties shows, that Plaintiff cannot tie her alleged harm solely to any allegedly defamatory scene in the Series—as she is constitutionally required to do. Instead, the evidence shows that Plaintiff's reputation was formed by her own touted involvement in the case and statements, including her defiant stance on the Five's guilt after Reyes confessed (as depicted in the non-actionable part of the Ryan lunch scene), and her refusal to apologize to the Five or admit any mistakes were made. The Challenged Scenes show her acting in accordance with that reputation. As even Plaintiff's allies, including her former agent Esther Newberg, have stated, it is Plaintiff's demonstrated lack of remorse or contrition toward the Five that "blew up" her career. (Ex. 18, Newberg Tr. at 73:11-18, 76:5-16, 78:12-17; Ex 19, 3/22/20 Email). Other evidence produced by third party organizations on whose Boards Plaintiff served shows the same sentiment about Plaintiff's lack of remorse being expressed and impacting her reputation, as do social media comments by the public. (*See* Ramachandran Decl. ¶¶ 25 – 26, 58 -59 and Exs. 20 – 21, 53 -54.)

The harm to Plaintiff's reputation comes not from the Scenes, but from her own actions, including an op-ed she published in the New York Law Journal shortly *before* the Series aired titled, "In Defense of The Central Park 5 Prosecution." (Ex. 22.) That op-ed was then referenced as problematic by others—including the CEO of a non-profit where Plaintiff served as a board member—before and after the Series aired. (Exs. 20-21.) After the Series was released, on June 10, 2019, Plaintiff wrote another op-ed in the Wall Street Journal—again asserting her belief that the Five participated in the rape, and refusing to apologize or express any remorse, which even her

own expert admitted may have harmed her reputation.  (Ex. 23, WSJ Op-Ed; Ex 24, Fisher Tr. at 316:6-23.)[19]  These and other instances of Plaintiff's self-inflicted harm to her reputation make clear that, her damages theories are laden with problems arising from her public statements on the Five's guilt and her lack of remorse.  (Ex. 28, Freinberg Report.)  Her attempt to prevent the introduction of and cross-examination on this evidence should be rejected.

***Media Reports About Plaintiff's Assistance to Harvey Weinstein Impacting Her Professional Reputation.***  While Plaintiff is seeking millions of dollars for alleged damages to her reputation, all of which she attributes to the five scenes in the Series, she improperly seeks to prevent the jury from considering media reports[20] about her efforts to help one of the country's most notorious sexual criminals—Harvey Weinstein.  This evidence cuts against her claimed injuries and is highly probative of how her professional reputation was mired in a separate controversy that began *before* the Series, gained renewed attention around the time of the Series, and was specifically mentioned *along with* the Series on social media and elsewhere.  This problematic reputational news continued to grow *afterward*, impacting her claims to future damages as well.  Yet Plaintiff asks for the jury to never hear this significant countervailing reputation and damages evidence.  Accepting that invitation would be plain error.

During this case, Ms. Fairstein has celebrated herself as a "pioneer[] . . . for victims of sexual assault" (Compl. ¶ 19); an award-winner for her "advocacy for survivors of sexual assault" (*id.* ¶ 34), "held in high esteem" as an "advocate for crime victims" (*id.* ¶ 256).  But that self-

---

[19] This public sentiment had been building for years.  Plaintiff's own emails with her social media manager Laura Rossi, as early as 2012 and 2013, note "comments on facebook and Twitter to [Ms. Fairstein] about The Central Park Five" – such as: "@LindaFairstein You are evil for what you did to the Central Park 5. Glad you're enjoying life with no repercussions of your actions".  (Exs. 25 – 26.)  The evidence shows Plaintiff's assistant Ms. Rossi "dealt" with the negative commentary for years by "deleting" the social media posts and blocking users, and by 2018, was something Ms. Rossi handled "regularly."  (Ex. 27.) .

[20] Again, such news articles are not offered for the "truth" but for what was "said".  Fed. R. Evid. 801(c)(2).

portrait is in tension with widely publicized news reports about her assistance to Weinstein, which

impacted her purportedly "storied" reputation and are probative of a different side of Ms. Fairstein:

- In October 2017, the national news media published reports that Ms. Fairstein had assisted Weinstein with his sex scandals, starting with a bombshell exposé in the *New York Times*, reporting that Plaintiff attempted to discredit at least one of Weinstein's accusers and helped him avoid prosecution.  (Ex. 29.)  The same day the *New York Post* ran a similar article headlined "Linda Fairstein vouched for Weinstein's lawyer in model-grope case: report."  (Ex. 30.)  Several other media outlets also reported later in 2017 and 2018 that Ms. Fairstein had assisted Weinstein in evading prosecution, using her stature and influence as the former head of the Sex Crimes Prosecution Unit.[21]

- After Netflix released the Series on May 31, 2019, Ms. Fairstein's assistance to Harvey Weinstein was revisited in the press and on social media.  Her role in assisting Weinstein was cited as a similar failure of character and leadership.  Social media reactions in June 2019 just after the Series aired reflect outrage at Ms. Fairstein's apparent hypocrisy—*intertwined with* comments about her role in the Central Park Jogger case.  (*See* ¶¶ 57 - 59 of Ramachandran Decl. (*e.g.*, one post expressing "anger" that Linda Fairstein is "defending white rapists [ ] Harvey Weinstein").)  These posts come from Plaintiff's own trial exhibits.[22]

- In the months following the Series release, new details continued to emerge and impact Plaintiff's reputation.  In September 2019, *The New York Times* journalists who broke the Weinstein story published a book titled *She Said*, in which Fairstein was featured by name as a Weinstein enabler, and reported that, before the *Times* published the October 2017 exposé, it was Fairstein who had first "discouraged" the *Times* reporters by phone from looking into Weinstein.  (Ex. 36-37.)  News reports also stated that Plaintiff  accompanied Weinstein and his attorney to the *Times* building in an attempt to kill the story.  (Ex. 38.)  A *Variety* article on September 10, 2019 was blunt: Ms. Fairstein would be "hurt" by the revelations and fell on "[a] list of people who will see their reputations harmed by the book."  (Ex. 36; *see also* Ex. 39.)[23]

The jury needs to hear this *whole story* about Plaintiff's character and reputation—not just

the favorable parts she wants them to hear.  The law does not allow a defamation plaintiff like Ms.

Fairstein to sanitize the public record and straitjacket Defendants from introducing evidence of

---

[21] *See, e.g.,* ¶¶ 36 – 38 of the Ramachandran Declaration and Exs. 31-33 thereto.

[22] In addition, and again by way of example, an organization affiliated with Plaintiff received similar complaints about Weinstein intertwined with the Series.  (*See* Ramachandran Decl. ¶ 39, Ex. 34.)  A petition to have Plaintiff dropped by her publisher also mentioned her connection to Harvey Weinstein.  (Ex. 35.)

[23] While Plaintiff seeks over $1.3 million in economic damages, mostly based on her expert's assessment of lost *future* book sales, that expert completely failed to consider how the Weinstein - *She Said* aftermath would have impacted her sales *even if the Series had never been released*.  (Ex. 40, Bania at 96:13-101:26.)

mitigation and cross-examining her and her experts about other causes of professional reputational harm.  *Mimms,* 889 F.3d at 871 ("any evidence tending to show that a defamation plaintiff's reputation was already tarnished is going to be prejudicial to the plaintiff," but that is not grounds for exclusion).  Neither Plaintiff, nor any of her witnesses, should be allowed to testify before the jury about her "good character" and "storied reputation," particularly as a champion of sexual assault victims, while she blocks Defendants from presenting contradictory evidence that was widely publicized and impacted her claimed reputation before and at the time the Series aired.

## XI.   MIL 5 Concerning "The 'Essence of Truth'" Relates to Jury Instructions on the Law

Plaintiff's motion is not an MIL but a commentary on how the jury should be instructed on actual malice in the novel context of a dramatization.  This issue is addressed in Defts' Mem. in Supp. of Jury Instructions at § II.B.1.

## XII.   MIL 6 Improperly Seeks to Preclude "Fairstein's Private Emails" That Demonstrate Substantial Truth, Character and Lack of Reputational Damages

In another sweeping argument devoid of authority, Plaintiff asserts that her "personal and private emails . . . bear no relevance to any claim or defense in this action."  (MIL at 21.)[24]  As a public official suing for defamation based on dramatized dialogue attributed to her, Plaintiff cannot exclude from evidence *the words she has written by her own hand* that directly contradict her Complaint and support the substantial truth of the challenged portrayal.  These party admissions also go to the very heart of her alleged character and reputational damages.

---

[24] The records consist principally of Plaintiff's own email correspondence (including with other current and former public officials) in which she discusses the Central Park Jogger case and individuals involved, and the writers of the Series.  *See* Ramachandran Decl. ¶¶ 46 - 50 and Ex. 41, 3/13/19 Email ("they bought the 'life rights' of the 5 bastards"); Ex. 42, 11/30/12 Email (Ken Burns documentary "is so dishonest and such bullshit - leaves out all the critical facts of the guilt of the 5 assholes . . . the perps and their Sharpton allies"); Ex. 43,11/28/18 - 11/29/18 Emails (referring to Attica Locke as a "black mystery writing woman" and a "bitch" and mocking her name); Ex. 44, 8/27/18 Email (answering the question of who will play Yusef Salaam's mother:  "Iman, wearing a colostomy bag on her waist, I hope"); Ex. 45 12/10/18 Email (referring to ▮▮▮▮▮ as "brain dead" for not supporting Plaintiff).

***Plaintiff Put Her Own Words At Issue.***  Plaintiff's Complaint is premised on her claim that the dialogue attributed to her character in the Series is "false" and defamatory.  Her long-standing position—which the Court credited in holding there were triable issues for a jury (*see Fairstein II*, at 1-2)—is that Defendants chose to make her the "racist" "villain" of the Series.  Plaintiff claims that "the means of doing so," *inter alia*, were to "put[] words in her mouth—that were outrageously offensive—that she never uttered."  (Compl. ¶ 12.)  Consistent with that position, Plaintiff has repeatedly claimed that her use of "abusive and derogatory" and "racist" language in the Series "is entirely false." (*Id*. ¶¶ 95, 109, 260, 277, 295, 317, 340, 360.)  In particular, she claims Defendants falsely portrayed her "using inflammatory language, referring to young men of color as 'thugs,' 'animals' and 'bastards,' that she never used." (*Id*. ¶ 45.)  *It is Plaintiff* who has made the alleged imputation of racist views and "motivations," through the use of dialogue attributed to her character in the Series, a principal underpinning of her claims.  (*See id.* ¶¶ 9, 46.)

The records at issue in this Motion are directly relevant to Plaintiff's claims because, as it turns out, she has uttered those racist code words and other harsh, biased language to describe the Five and their families, and that *is* the way she talks about them behind closed doors.

***Records of Plaintiff's Own Words Are Relevant to Substantial Truth.***  Plaintiff's own words support the substantial truth ("gist or sting") of scenes portraying Plaintiff as tough talking and aggressive through dialogue that she alleges is offensive and gives the impression that she is racist or has racist motivations and views.  Such evidence has particular importance where Plaintiff is attacking dramatized dialogue in a work of art attempting to capture the overall essence of a person's true character traits and motivations.

At its core, Plaintiff's Complaint claims that the dialogue attributed to her in the Series misrepresents her character.  But Plaintiff cannot file a Complaint premised on being falsely

portrayed using foul, offensive, and racially insensitive language, and then object to Defendants introducing evidence tending to prove that very same conduct as true.  Having "opened that door [her]self by filing this lawsuit, the Court cannot allow plaintiff to walk through freely while holding defendant in check at the gate." *Condit v. Dunne*, 225 F.R.D. 100, 111 (S.D.N.Y. 2004); *accord* Transcript, *In re O'Keeffe*, 16-mc-00008, (S.D.N.Y. Mar. 29, 2016), ECF No. 19 at 25:6-26:19 (Batts, J.) (defamation plaintiff "placed in issue his own alleged use of foul language, and that is a decision he must live with"); *see also* Order, *In re O'Keeffe*, 16-mc-00008 (S.D.N.Y. April 1, 2016), ECF No. 23, *aff'd*, 650 F. App'x 83, 84 (2d Cir. 2016).  Indeed, perhaps the most relevant evidence bearing on substantial truth is evidence from the plaintiff's own mouth or pen.[25]  The unique context of this case makes such evidence arguably more important and relevant.  By its nature, dramatized dialogue (unlike journalism) is not meant to be "literal" but rather an attempt to capture, based on source material, the essence of how a person would speak in a particular situation.  *Fairstein I*, at 58, 64 ("[D]ialogue in the dramatization is not a verbatim recounting of the real-life participants and is intended to capture the essence of their words and deeds").

Plaintiff's own unvarnished emails reveal how she actually talks behind closed doors and belie the fundamental premises for her Complaint.  They include Plaintiff's use of *precisely* the type of language used in the Series that Plaintiff claims she would "never use" to describe the Five ("bastards"; "thugs"; "assholes"; "perps"; "wilding"), and other offensive and racially insensitive language as a matter of course to describe her enemies ("black mystery writer"; "bitch"; "Sharpton allies") and even her own erstwhile allies ("brain dead").  This evidence goes directly to the truth

---

[25] *See, e.g.*, *Corporate Training Unlimited, Inc. v. Nat'l Broad. Co.*, 981 F. Supp. 112, 123 (E.D.N.Y. 1997) (rejecting claim based on title of broadcast about plaintiffs' organization where plaintiff described it using "a virtually identical reference"); *Love v. Wm. Morrow & Co.*, 193 A.D.2d 586, 588 (2d Dep't 1993) ("comparison of the disputed language" in book with "plaintiff's own words in his term paper" established substantial truth); *Uzamere v. Daily News*, 34 Misc.3d 1203(A), 2011 WL 6934526 (Sup. Ct. N.Y. Cnty. 2011) (plaintiff's website refuted alleged falsity of statement that she was known for anti-Semitic screeds).

of the alleged defamatory imputation that she claims the dialogue shows—namely, that the essence of her character is that she is offensive, foul-mouthed and has racist views.[26]

The fact that Plaintiff made these statements "about the Five, decades after the Central Park Jogger case" does not mean they are irrelevant to "the events that are depicted in the Five Scenes, or what might have been said in 1989." (MIL at 21.) Quite the contrary. "[A] party may rely on evidence gleaned from any point in time to prove the truth or falsity of a representation of fact about a past event." *Fed. Housing Finance Agency v. Nomura Holding Am., Inc.*, 74 F.Supp.3d 639, 651, 652-53 (S.D.N.Y. 2015) (subsequently acquired evidence "is admissible if it tends to show the existence or non-existence of a fact during the relevant period of time"). If anything, under the adage that zebras don't change their stripes—as well as the common-sense observation that society is *less* tolerant of racially insensitive language now than in was in 1989—it is *more* telling and probative that Fairstein **continues** to use inflammatory and racist language about the Five (and their "Sharpton allies") in this day and age and after all that has transpired. In any event, Plaintiff is free to argue to the jury that these emails are from decades later and do not reflect her views in 1989, but that is for the jury to weigh and determine and is not a basis to exclude the emails. *See*, *e.g.*, *U.S. v. Abu-Jihaad*, 630 F.3d 102. 132 (2d Cir. 2010) (noting that "factors which make evidence less than conclusive affect only weight, not admissibility") (internal citation omitted).

Plaintiff's true colors (as reflected in these unguarded emails, along with interviews, and her own writings) are indisputably relevant to refuting Plaintiff's position that the complained-of

---

[26] *See, e.g.*, *Uzamere*, 2011 WL 6934526, at *2-3; *Matter of Application of O'Keeffe*, 184 F. Supp. 3d 1362, 1369 (S.D. Fla. 2016) (private conversations with plaintiff in which he used foul language were relevant and discoverable in libel suit over article describing him as "foul-mouthed"; evidence of the conversations "has a tendency to make the truth of O'Keeffe's statement more probable than it would be without the evidence"); *In re O'Keeffe*, ECF No. 19 at 25:6-26:19 (plaintiff's "alleged penchant for foul-mouthed behavior in the years preceding *The Wall Street Journal* story at the center of this litigation" were "squarely in issue" in his defamation suit; *Condit*, 225 F.R.D. at 111 ("plaintiff's false statements to others regarding this matter. . . . could support a defense of substantial truth").

dialogue reflects an "attitude [Plaintiff] does not hold." *Chau*, 771 F.3d at 131 (quotes attributed to plaintiff in nonfiction book either not defamatory, or substantially true).[27]   Clearly, precluding Defendants from presenting this evidence on the issue of substantial truth would be plain error.[28]

**This Evidence is Also Relevant to Actual Malice in the Context of This Case.**   While Plaintiff correctly notes that her emails "refer[ring] to the Five in derogatory terms" did not inform the Court's actual malice analysis on summary judgment because Defendants did not have them "at the time they were writing the series" (*Fairstein II*, at *20 n.5), Plaintiff's comments in these emails *are* relevant to refute *Plaintiff's* particular arguments on actual malice, *which she has put at issue*: (1) that the writers made "dubious" and "inherently improbable" inferences from their source materials that she would use inflammatory and racist language (ECF No. 183 at 21-22); and (2) that the filmmakers should be charged with actual malice because they did not meet with her (on her terms), and that Ms. DuVernay's beliefs that Plaintiff was not acting in good faith and trying to push her own biased agenda "raise[] credibility issues that cannot be determined prior to trial" (ECF No. 184 at ¶ 106). The personal emails that Plaintiff now seeks to exclude are relevant as they confirm that the writers' interpretation of sources in crafting "tough talking" dialogue to depict the Fairstein character's "foul" manner of speaking and her biases was not "improbable," but spot on.   It also supports Ms. DuVernay's view that Plaintiff was the farthest thing from a good-faith interlocutor possessing reliable

---

[27] It is rare for a person to publicly state "I have racist views or biases"; rather, how one speaks about people and issues, particularly in private, is revealing and perhaps the best evidence of true feelings. *Cf. Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609-10 (2d Cir. 2016) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications . . . quite obviously, discrimination is rarely admitted") (citation omitted).

[28] Further, this evidence would at minimum be admissible to impeach Fairstein's credibility, having averred that she "never used" offensive or racist terms.  *See Condit*, 225 F.R.D. at 111 ("[D]efendant is allowed to impeach plaintiff via plaintiff's false statements to others regarding this matter. . . . Such impeachment could support a defense of substantial truth and also contradict plaintiff's truthfulness at trial").   Lying about the matters on which she has the burden of establishing a falsehood simply could not be more relevant.

information, with whom she was obliged to meet. *See, e.g., OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 55 n.56 (D.D.C. 2005) (post-publication evidence undercutting notion that "defendants would have elicited" credible specific information from subjects of article refuted plaintiff's contention that defendants' failure to contact the subjects showed actual malice).

*Plaintiff's Own Words Are Relevant and Admissible to Plaintiff's Character and Claimed Reputational Harm.*  The offensive expressions in Plaintiff's emails also are admissible because they are revelatory of her character and the ultimate issue in suit—the purported damage to her reputation. *See supra*, Resp. to MIL IV.  Under Rule 405(b), "specific acts" are admissible "to prove character in an action for libel. . . ." *Schafer*, 142 F.3d at 1372 & n. 14 (citing Fed. R. Evid. 405(b)).[29]

The "specific acts" illuminating Plaintiff's character—and undermining the claimed reputational damage—are not limited to acts that are already publicly known.  In *Condit*, for example, the plaintiff Congressman tried to parse the allegedly defamatory statement as relating only to the disappearance and death of the young intern, and not the Congressman's sexual relationship with her, arguing that "information regarding Condit's personal, perhaps sexual, relationships," including with other women, was "completely irrelevant to the instant matter."  225 F.R.D. at 110.  Judge Leisure rejected that argument and held the Congressman's private sexual affairs both with the missing woman *and other women* were relevant to mitigation of damages, and subject to discovery.  *Id*. at 111.  The court further and specifically rejected as "clearly erroneous" the plaintiff's argument that "whatever Condit now says regarding the relationships cannot bear on the [damage] causation issue," holding that "*both publicly available information*

---

[29] *See also* 12 Tracy Bateman, et al., Fed. Proc., L. Ed. § 33:153, Westlaw (2023) ("An illustration of when character would be an essential element of a claim, charge, or defense, thus making evidence of character admissible under Fed. R. Evid. 405(b), would be a defamation case where the plaintiff's claim is that the defendant's defamatory statements harmed his or her reputation for good character"); 3 Michael H. Graham, Handbook of Fed. Evid. § 405:2 (9th ed.) (defamation plaintiff's character is at issue for purposes of Rule 405(b) and "proof by specific instances of conduct is recognized as proper as part of the case in chief").

*and Condit's private actions could have contributed to Condit's alleged reputation damage*." *Id.* at 110 n. 4 (emphasis added). That is consistent with what other courts have held applying Rule 405(b) in defamation cases. *See*, *e.g.*, *Schafer*, 142 F.3d at 1372 & n.14; *Application of O'Keeffe*, 184 F.Supp.3d at 1367-69 (private conversations with plaintiff bore on his "alleged character trait of being foul-mouthed" and was "substantively at issue" in libel case).

Plaintiff claims damage to her character and reputation—including as someone who does not have "racist" biases, views or motivations. Defendants are entitled to challenge that claim, including through evidence of her emails in which she broadcasts offensive and biased comments about the Five and their families to friends, former colleagues, fellow writers, and current public officials—the very people she says hold her in such high esteem. For example, Plaintiff claims her character is as a respected public official who took her duties as a prosecutor seriously; a champion of "victim's rights"; and a person of "integrity". (*See*, *e.g.*, Compl. ¶¶ 19, 125, 164.) But that portrait of her character is contradicted by her own email calling ▮▮▮▮▮▮▮▮▮ in this case "brain dead" and needing to "man up" because she won't go on television to support Plaintiff's views. (Ex. 45, 12/10/18 Email.) Her email reflects insensitivity to victims and callous opportunism, prioritizing her reputation above others and all else. Likewise, referring to the Five as "bastards" and mocking Mrs. Salaam and her illness is conduct unbecoming of a public official of supposed integrity, who took an oath to represent all of the people, including the accused and their families, without bias. *See* Ex. 17, Fairstein Tr. at 186:20-187:2.[30]

***No Basis for Rule 403 Exclusion.*** Finally, perhaps recognizing these records are relevant on multiple grounds, Plaintiff argues they should be excluded under Rule 403 as "more prejudicial

---

[30] Contrary to Plaintiff's unsupported assertion, these offensive expressions did not have to be "written in any official capacity" to bear on her professional "reputation as a public figure" (MIL at 21-22) and refute her professed character for unbiased integrity.

than probative because jurors could be misled about their relevance" or "will cause juror confusion and waste time". (MIL at 21-22.) Plaintiff does not identify what would be confusing about this evidence and its relevance, nor why admission of a handful of relevant emails would waste time. She cites no Rule 403 case in support of her motion, much less one barring evidence bearing directly on a defamation plaintiff's constitutional burdens of falsity and actual malice. In balancing potential prejudice against probative value, the court's judgment is "informed by the availability of alternative means to present similar evidence." *U.S. v. Massino,* 546 F.3d 123, 132-33 (2d Cir. 2008) (internal citation omitted). There is no substitute for the highly probative evidence reflected in Plaintiff's own words. Given the multiple grounds for admitting this highly probative evidence, Plaintiff comes nowhere close to justifying exclusion under Rule 403.[31]

### XIII. MIL 7 Seeks to Bar Evidence of Plaintiff's "Anonymous CPJ Website" That Is Highly Probative of Her Character, Claimed Reputation, Bias and Veracity

In 2018, Plaintiff created a website to promote the "confession" videos of the Five and other teens; she titled this website "THE CENTRAL PARK FIVE JOGGER ATTACKERS: Guilty—in Their Own Words." (Ex. 17, Fairstein Tr. at 323-29.) The website, www.centralpark5joggerattackers.com, remains accessible today. The first line of text reads: "This site has been created as a home for the facts – for the truth – about what happened in Central Park on the night of April 19, 1989." Describing her website in an email to ███████ and ███████, on February 6, 2019—before the Series was released—Plaintiff stated:

---

[31] *See, e.g., Schafer*, 142 F.3d at 1372 n. 13 (finding admission of specific act character evidence "cannot be said to constitute an abuse of discretion under" Rule 403); *Application of O'Keeffe*, 184 F. Supp. 3d at 1369 (finding that evidence showing that the defamation plaintiff used foul language was relevant and court "cannot discern any unfair prejudice, confusion of the issues, misleading of the jury, delay, waste of time, or cumulative evidence that would substantially outweigh the probative value of the evidence"); *see also Rosario v. City of New York*, 2021 WL 1930293, at *4 (S.D.N.Y. May 13, 2021) ("any unfair prejudice from unflattering descriptions of Plaintiff is outweighed by the jury's need to determine the cause and extent of his injury"; rejecting Rule 403 argument).

I have found a professional who will create a website for me – *not using my name* – on which I can post all the CPJ case videos that are public – and Galligan's decision – and anything else We want. . . .

1) *My plan is not to have it 'receive' any messages – I don't want a shitstorm and I don't want to reply*

2) *I am thinking of naming it – the Central Park Jogger Case – GUILTY, in their Own Words* (All ideas welcome)

*I just want somewhere I can direct people when the movie airs (by duVernay)* that is direct *and have only stuff we want on it*, since nobody can navigate the city's site.  (Ex. 46, 2/6/19 Email (emphasis added).)

As Plaintiff says in her email, the website promoting the guilt of the Five is meant to be anonymous and not traceable to her—cognizant of the "shitstorm" it would cause her if she put her name to it.  In addition to the disparaging title, the website makes a variety of inflammatory, offensive comments about the Five:

[HOME page:]  You can watch the videotaped admissions of *the self-named* Central Park Five and see them confess to all the crimes they committed that night, in their own words, in the presence of their parents.

On the night of April 19, 1989, Antron McCray, Kevin Richardson, Raymond Santana, Yusef Salaam, and Korey Wise *went wilding in Central Park* with 28 other young men.  After a thorough investigation, these five were tried in front of two separate juries and were found GUILTY.  *They have never been exonerated.*

["TIMELINE" page:]  On April 19, 1989, shortly after 9pm, a group of 33 teenagers went into Central Park at 110th Street and 5th Avenue for the purpose of beating and robbing people in the park – *an activity known as "wilding."* . . .

["VIDEOS" page:  None of the others admitted that they were involved in the rape and beating of Trisha Meili – unlike the Five – but their own words corroborate every detail that the Five themselves have stated.  They are remarkable in that regard, and in the calm and cool way that *each of these young men describe going into Central Park that night to go 'wilding'* – to beat and rob ordinary citizens who were enjoying their use of the park.  (Ex. 47, emphasis added.)

Plaintiff disseminated the website to news media without revealing that she was the one who had created it.[32]  For example, Plaintiff directed Rachel Stockman, President of the "Law and Crime" media network, to the website.  Ms. Stockman asks:  "I am reading the website you sent me. who founded this? I want to make sure the information can be trusted. there is no contact information -- and i looked up the registration and they used a company to conceal the domain owner. . . ."  In response to that direct question, Ms. Fairstein dissembled, stating that it was created by

> A group of lawyers and people who could not as easily navigate the City's website ... the 11 videos and the Court's decision (Judge Galligan .... all statements voluntarily made ... no evidence to support coercion). You are welcome to find all the same on the city's site.  (Ex. 51, 6/13 – 6/19/19 Email thread.)

Plaintiff's website propounds her biased and offensive views on the Central Park Jogger case, and evidence her continuing efforts to promote her view that the Five are guilty of raping the Central Park Jogger and to undermine, or as she has put it, "derail" the Series' contrary message and point of view.  This evidence is relevant to substantial truth, to Plaintiff's arguments in support of actual malice, to her character and claimed reputational damages.

***Substantial truth.***  Plaintiff's website "THE CENTRAL PARK FIVE JOGGER ATTACKERS:  Guilty—in Their Own Words," repeatedly uses the racist term "wilding," which goes to the substantial truth of her portrayal.  As discussed *supra*, Plaintiff claims Defendants falsely portrayed her "using inflammatory language," referring to "young men of color as 'thugs,' 'animals' and 'bastards,'" and that those words, like "wilding," are "racist" code words.  (*See* Compl. ¶¶ 45, 74.)  Plaintiff cannot file a lawsuit premised on being falsely portrayed as using

---

[32] *See, e.g.,* Ex. 48, 5/14/19 Email (Plaintiff stating her desire to "direct reporters" to the site); Ex. 49, 6/15/19 Email to radio host Michael Smerconish ("there is a clear clean website at www.centralpark5joggerattackers.com All public info pulled from the nyc law dept site"); Ex. 50, (directing *Today* show to review "all 11 videos made by the young men charged in the park riot in 1989 (available to the public at www.centralpark5joggerattackers. com)").

racist language she would never use and then object to Defendants introducing evidence tending to prove she in fact uses that same racially-charged language in a ***public*** website. For this, and the related reasons set forth in response to MIL VI, this MIL should be denied as to Plaintiff's website.

 ***Actual malice.*** Evidence relating to Plaintiff's website is also relevant to actual malice. As discussed above, even though the writers did not have this evidence, it refutes Plaintiff's argument that the filmmakers acted with actual malice because they did not comply with Plaintiff's pre-conditions for meeting with her, Ms. Lederer and Ms. Meili. *See supra,* Resp. to MIL VI. Evidence regarding Plaintiff's website—and her attempt to hide her involvement with that site— demonstrates her deep-seated, biased views about the Five and continued belief in their guilt. That evidence also undermines Plaintiff's actual malice arguments that Ms. DuVernay's beliefs about Plaintiff's bias were unfounded and that Plaintiff was trustworthy, unbiased and possessed credible information. *See, e.g., OAO Alfa Bank*, 387 F. Supp. 2d at 54-55 & n.56.

 ***Character and reputation.*** The website also is highly probative of Plaintiff's character and reputation. First, notwithstanding the vacation of the Five's convictions and settlement of their Civil Suit, Plaintiff created an entire website promoting her continued insistence that the Five are rapists, were rightly convicted and were "never exonerated." Plaintiff's attitudes and positions reflected on the website, including her utter lack of remorse, accountability, and empathy for the Five, reflects her character as a person, a leader and a public official.

 That Plaintiff purportedly intended for the website to be anonymous (MIL at 22) in no way diminishes its probative value. The "specific acts" illuminating Plaintiff's character—and undermining the claimed reputational damage—are not limited to acts that are already publicly known. *Condit*, 225 F.R.D. at 110 & n. 4 ("[B]oth publicly available information and Condit's private actions could have contributed to Condit's alleged reputation damage."). And, of course

it was by no means certain that the website would remain anonymous. Reporters such as Ms. Stockman raised suspicions about the origin of the website Plaintiff was promoting.

Plaintiff's deceptive conduct in promoting the "anonymous" website also reflects discreditably upon her character. Not only did Plaintiff proffer the site to news media as a supposed "neutral" source without disclosing that she created it herself, she also lied to at least one reporter, Ms. Stockman, about the site's origin. Plaintiff's deceitful and underhanded use of the website reflects poorly on and is probative of her character, including her character for truthfulness about the topics at issue in this trial.

**No Basis for Rule 403 Exclusion.** There is no substitute for the highly probative evidence at issue. *Massino,* 546 F.3d at 132-33. Although Plaintiff may face further public backlash when her own words and actions come to light, that is simply a consequence of her own behavior—not the *unfair* prejudice called for in Rule 403. *U.S. Bank*, 112 F. Supp. 3d at 155. Plaintiff filed this public lawsuit to redeem her alleged good name and character—and with that, must face the reality of evidence that does not reflect well on her character. *Mimms,* 889 F.3d at 871 (evidence reflecting on defamation plaintiff's reputation "is going to be prejudicial to the plaintiff," but that is not grounds for exclusion).

## XIV.   MIL 8 Regarding Plaintiff's Failure to Request "Retractions" is Relevant to Actual Malice

Plaintiff seeks to exclude evidence that she failed to request redactions or corrections of media reports describing her involvement in the Central Park Jogger case. These accounts are highly relevant to the assessment of actual malice, and should not be excluded. Defendants were under no obligation to adopt Plaintiff's perception, expressed in her self-serving communications with them, that certain source materials were "grossly inaccurate"; "unreliable" and "defamatory" (Compl. ¶¶ 138-39, 343), when Plaintiff did not seek to correct the record at the time. It was perfectly sensible for Defendants to rely on the works of reputable authors and reporters.

To the extent that Plaintiff contends, as she did at her deposition, that journalists misquoted her or took her quotations out of context (*e.g.,* Ex. 17, Fairstein Tr., at 38:17-44:5, 77:8-81:12, 243:15-244:15), Defendants should not be prohibited from informing the jury that a source the Defendants relied upon containing quotes from Plaintiff herself was never redacted or corrected. That said, Defendants will not insinuate at trial that Plaintiff "had an obligation to request retractions or corrections of every statement ever made about her," or suggest that she should have requested a retraction of articles that merely reference her (MIL at 23).

## XV.   MIL 9 Requesting that the Value of "Plaintiff's Assets" be Excluded is Not Contested

Defendants do not intend to elicit testimony or submit evidence related to the "value or sale price" of Ms. Fairstein's residential properties, or those of her husband.[33]

## XVI.   MIL 10 Regarding "Highlighting" Trial Exhibits is Not Contested

Defendants do not object to this request, applied to all parties.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the relief sought in Plaintiff's Omnibus Motion *in Limine*.

---

[33] Plaintiff does not appear to be moving to exclude evidence related to her income from book sales, speaking engagements, and other work over the years.  That evidence is of course directly relevant to Plaintiff's claims for economic damages, including her claim for lost earnings and business opportunities.

Dated: January 19, 2024                    Respectfully submitted,


                                           /s/ *Bart H. Williams*

Natalie J. Spears (*pro hac vice*)         Bart H. Williams (*pro hac vice*)
Gregory R. Naron (*pro hac vice*)          Alyson C. Tocicki (*pro hac vice*)
Jacqueline A. Giannini (*pro hac vice*)    PROSKAUER ROSE LLP
DENTONS US LLP                             2029 Century Park East, Suite 2400
233 South Wacker Drive, Suite 5900         Los Angeles, California 90067
Chicago, Illinois 60606                    Phone: (310) 284-4520
Phone: (312) 876-8000                      bwilliams@proskauer.com
natalie.spears@dentons.com                 atocicki@proskauer.com
gregory.naron@dentons.com
jacqui.giannini@dentons.com
                                           Seetha Ramachandran
                                           PROSKAUER ROSE LLP
Justin N. Kattan                           Eleven Times Square
DENTONS US LLP                             New York, New York 11036
1221 Avenue of the Americas                Phone: (212) 969-3455
New York, New York 10020                   sramachandran@proskauer.com
Phone: (212) 768-6700
justin.kattan@dentons.com
                                           *Attorneys for Defendants Netflix, Inc., Ava*
                                           *DuVernay and Attica Locke*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel or parties of record on the service list.

*/s/ Bart H. Williams*