IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA FAIRSTEIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NETFLIX, INC., AVA DUVERNAY, and )<br>ATTICA LOCKE, )<br>)<br>Defendants. )<br>) | Case No. 20-cv-8042 (PKC) |

**PLAINTIFF LINDA FAIRSTEIN'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' "MOTION *IN LIMINE* NO. 6: MOTION TO
PRECLUDE ANY THIRD-PARTY THREATS"**

Kara L. Gorycki
Andrew T. Miltenberg
Stuart Bernstein
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
kgorycki@nmllplaw.com
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.    Evidence Concerning Post-Series Threats Against Plaintiff is Relevant ............................ 2

    II.   Preclusion Is Not Warranted Under FRE 403 ..................................................................... 9

CONCLUSION ........................................................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Cantu v. Flanigan*,
 705 F. Supp. 2d 220 (S.D.N.Y. 2010) ............................................................................. 6

*Carroll v. Trump*,
 No. 22-cv-10016 (S.D.N.Y.) ........................................................................................... 6

*Coomer v. Make Your Life Epic LLC*,
 659 F. Supp. 3d 1189 (D. Colo. 2023) ........................................................................ 6, 7

*Doe v. McKesson*,
 71 F.4th 278 (5th Cir. 2023) ........................................................................................... 8

*Erickson v. Sawyer*,
 650 F. Supp. 3d 758 (D. Minn. 2023) ............................................................................. 6

*Fairstein v. Netflix*,
 2023 WL 6125631 (S.D.N.Y. Sept. 19, 2023) ............................................................ 2, 3

*N.A.A.C.P. v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982) .................................................................................................... 8, 9

*Old Chief v. U.S.*,
 519 U.S. 172 (1997) ..................................................................................................... 10

*Palin v. N.Y. Times*,
 940 F.3d 804 (2d Cir. 2019) ........................................................................................... 2

*Palin v. N.Y. Times*,
 No. 17-cv-4853 (S.D.N.Y.) ............................................................................................ 6

*U.S. v. Carmichael*,
 326 F. Supp. 2d 1267 (M.D. Ala. 2004) ......................................................................... 9

*U.S. v. Cummings*,
 858 F.3d 763 (2d Cir. 2017) ......................................................................................... 10

*U.S. v. Segui*,
 2019 WL 8587291 (E.D.N.Y. 2019) ............................................................................ 10

*U.S. v. Stevens*,
 559 U.S. 460 (2010) ....................................................................................................... 7

*United States ex rel. Davis v. U.S. Training Ctr., Inc.*,
 498 F. App'x 308 (4th Cir. 2012) ..................................................................................11

*Webber v. Dash*,
 607 F. Supp. 3d 407 (S.D.N.Y. 2022) ............................................................................ 6

*Wells v. Rice*,
 2023 WL 6050566 (E.D. Ky. Sept. 15, 2023) ................................................................ 9

## **INTRODUCTION**

Defendants' "Motion *In Limine* No. 6: Motion to Preclude Any Third-Party Threats" should be denied with respect to Defendants' request to exclude "any references or evidence regarding third parties' violent threats of physical harm directed at Plaintiff Linda Fairstein ("Plaintiff"), including on social media."[1] The evidence at trial will show that the firestorm that immediately erupted against Plaintiff in response to the Series—on social media and elsewhere—was due to careful planning and strategy on Defendants' part, including their collaboration with the group that launched #CancelLindaFairstein and a related petition on Twitter. While Defendants urge that "the Series could in no way be found to solicit violence against Plaintiff," in the days following the release of the Series Defendants found—based on a study of hundreds of thousands of Twitter posts—that viewers of the Series were outraged at Plaintiff and had no outlet for that anger. In such a case, where filmmakers act unlawfully and ***set out on a mission*** to destroy a real-life person through a false and defamatory portrayal that is publicized as the truth, "bedrock" First Amendment principles do not apply.

Defendants attempt to cloak themselves in First Amendment protections which are inapplicable here. The issue is whether the jury may consider the ***full impact*** that the Series ***and*** Defendants' alleged conspiracy to defame Plaintiff had on Plaintiff's reputation, mental state and career. Threats made to Plaintiff in the aftermath of the Series are highly relevant to these issues. While Defendants would like to try this case in a vacuum—divorcing the aftermath of the Series

---

[1] Plaintiff is not seeking to present evidence to the jury regarding threats made to non-parties. *See* ECF No. 304, Moving Br. at 1, 8-9. Nor will she present expert testimony on emotional distress. *See id.* at n. 4.

1

from the Series itself by sanitizing the public's response for the jury—they should not be permitted to do so.[2]

## ARGUMENT

### I. Evidence Concerning Post-Series Threats Against Plaintiff is Relevant

Evidence concerning the public's reaction to the Series, including threats of violence to Plaintiff on social media, should not be excluded at trial because it is relevant to Plaintiff's compensatory damages, including emotional distress.[3] Defendants' conduct in marketing and promoting the Series (which elicited the backlash against Plaintiff) is relevant to Defendants' motives, Plaintiff's conspiracy claim and whether or not Defendants acted with common law malice. FRE401-403. *See Fairstein v. Netflix*, 2023 WL 6125631, at *29 (S.D.N.Y. Sept. 19, 2023) (discussing conspiracy claim).

The evidence at trial will show that,[4] in June 2016, Ms. DuVernay and producer Jane Rosenthal were notified by Plaintiff's counsel that:

> Of particular concern to our client[] is that more recent public accounts (2003 and thereafter) of their roles in the underlying events were grossly inaccurate and defamatory. **These have prompted a series of death threats and other threats of violence** (which often specifically reference the depictions of them in a particular book, film and other speeches), have given rise to other reasons for concern for their personal safety and have prompted other serious, unwarranted retributive conduct against them. (emphasis added).

---

[2] Ironically, Defendants seek to introduce social media posts responding to the Ken Burns' series as relevant to reputational harm but seek to exclude posts about the Series from Plaintiff's case in chief. Ex. 18, DX-464 LF00050705; ECF No. 262-1, Freinberg Rpt., at 7-8. Defendants also seek to introduce social media posts from 2012/2013 through their rebuttal expert which include a comment about "five black boys being raped by New York City's 'justice' system'" immediately followed by "@lindafairstein. *Id.* at 7. Such graphic commentary, posted over a decade earlier, is irrelevant to any issue in this case and should be excluded at trial because of its certainty to anger and disgust jurors. FRE401-403. Even if it were relevant, the substantial prejudice it would cause Plaintiff outweighs its probative value.

[3] Defendants have argued in their motions that the jury also needs to evaluate defamatory meaning with respect to all five scenes (Plaintiff disagrees). In *Palin v. N.Y. Times*, 940 F.3d 804, 816 (2d Cir. 2019), the Second Circuit considered the social media backlash resulting from a New York Times article when evaluating defamatory meaning.

[4] Plaintiff does not purport to summarize all of the evidence to be presented at trial in this opposition brief.

2

Declaration of Kara L. Gorycki in Opposition to Defendants' Motion *In Limine* Number 6, dated February 16, 2024 ("Gorycki Decl."),[5] Ex. 1, DX-490, DEFS061790. Defendants subsequently opted to "reverse-engineer[] plot points to attribute actions to Fairstein that were **not hers** and are unsupported in [D]efendants' substantial body of research." *Fairstein*, 2023 WL 6125631, at *1 (emphasis added).

DuVernay and Netflix then embarked on a public relations strategy that targeted Plaintiff by: i) prominently featuring actress Felicity Huffman in a casting announcement for the Series which, according to DuVernay, depicted Plaintiff as the "woman who put [the Five] behind bars" (Ex. 2, (PX-T3), DEFS169873, at 169876-77); ii) depicting Plaintiff in the date announcement film teaser for the Series and using the voiceover from the roundup scene (at **DuVernay's insistence**) (Ex. 3A, Joanna Wolff Dep., at 87-88; Ex. 3B, (PX-B5), DEFS153979-984, at DEFS153979 ("Ava threw down, she wants Fairstein so let's show her how it feels") Ex. 4, (PX-C5), DEFS153631-633 ("I asked her about PR and if we went with Fairstein's VO and if Fairstein came after us"). The teaser video was published to Netflix's When They See Us Twitter account with the slogan "The truth you haven't heard." *See* https://twitter.com/WhenTheySeeUs/status/1101499740506611713. Netflix employee Alison Engel and DuVernay also discussed the Series as a "reckoning" for Plaintiff's "prosecutorial misconduct." Ex. 5, (PX-T4), DEFS145244. Prior to the release of the Series, Netflix informed DuVernay that Plaintiff blocked *When They See Us* social media accounts, to which DuVernay replied "She's gonna need a lot more than that to quiet this train. It's moving." Ex. 6, (PX-K5), DEFS153803.

Attica Locke waged a Twitter smear campaign against Plaintiff prior to the release of the Series, directed at the Mystery Writers of America, telling them to revoke Plaintiff's Grand Master

---

[5] All exhibits cited herein are attached to the Gorycki Declaration.

3

award. Ex. 7, (PX-L2), LF00046408. She discussed the matter with DuVernay who had Netflix "log" the publicity around the controversy. Ex. 8, (PX-U3), DEFS177533-34. Even after the award was revoked, and prior to the release of the Series, Locke continued to post about Plaintiff on social media, supporting her statements with her "research" for the Series. Ex. 9, (PX-P2), LF00046339 ("And yes I worked on Ava DuVernay's project in the case. The research on that project is extensive…. And I chose to share my knowledge of Fairstein's misdeeds with MWA"). Shortly before the Series aired, DuVernay told Locke that Plaintiff was about "to *feel it all*." Ex. 10, (PX-C4), DEFS177542-43 (emphasis added).

Shortly after the Series aired, DuVernay and the Series producers received a report from a Netflix marketing employee which noted that the Series was "driving a strong buzz with 460k tweets over launch weekend." Ex. 11, (PX-V5), DEFS145532, at DEFS145534. A "top conversation driver for the Series" was "*anger toward* Linda Fairstein" and "we are seeing consumers feeling frustrated watching the series because they feel *there's no productive outlet for their anger*." *Id.* (emphasis added). The report further noted "*due to the immense response from fans on social, Linda Fairstein deleted all of her social media accounts…very exciting!*" *Id.* (emphasis added). Netflix and DuVernay were also in direct contact with Color of Change, about their "Linda Fairstein hub" including #CancelLindaFairstein and a related petition. Ex. 12, (PX-N9), DEFS146916-146922.

Tweets posted to #CancelLindaFairstein, and included on Plaintiff's trial exhibit list, directly relate to the Series. For example:

> Just finished When they see Us on Netflix, broke my heart, most of all I never hated someone so much as I hate Linda Fairstein, she made innocent children go to jail, and suffer things no child should, so fuck you Linda, say hi to the devil for me #CancelLindaFairstein.

Ex. 13, (PX-T6), LF00038675-38690. Plaintiff's book publicist also took screen shots of Tweets posted to Plaintiff's Twitter account—which Defendants were monitoring—on May 31, 2019, when the Series aired. For example:

> I hope God sends Linda Fairstein to hell so she can get her tongue cut off for spewing lies and convicting five innocent black and brown men for profit and exploitation. They should throw you in jail for the injustice you've caused and to let you rot till your impending death.

Ex. 14, (PX-I7), LF00038120. Also posted to Plaintiff's Twitter account in relation to the Series:

> Dog…@LindaFairstein IS AN EVIL ENTITY!!! Someone like her CANNOT be human! I pray that karma comes for you and everyone connected to you. #WhenTheySeeUs

The same individual posted that Plaintiff is "an evil mass of cancerous cells." Ex. 14, at LF00038127.[6]

On June 2, 2019, a friend messaged Locke, "It has been such a pleasure to see you all kick Linda Fairstein's ass all up and down the internet." Locke responded, "The ***ass-kicking*** has been a pleasure." Ex. 15, (PX-W2), DEFS176145-146 (emphasis added). On the same day, Locke and DuVernay joked about the alteration of Plaintiff's Wikipedia page, which included a description of Plaintiff as a "Nazi-American." Ex. 16, (PX-T2), DEFS176133-140.

The evidence above links the public backlash against Plaintiff—including threats of violence—***directly to*** the Series. It further demonstrates that Defendants were aware of the intensity of viewers' reaction to the depiction of Plaintiff in the Series and their corresponding anger. They wanted Plaintiff to "feel it all." Under these facts, Defendants cannot reasonably argue that Plaintiff is attempting to "leverage" third-party threats for "shock value" or that "they should have nothing to do with this action." Moving Br. at 3.[7]

---

[6] Notably, the posts that Defendants submitted in support of their motion also directly reference the Series. *See* ECF No. 305-3, Ramachandran Decl., Ex. 3.

[7] Without citing any support, Defendants nonsensically argue that Plaintiff has "never asserted that anyone followed through on the threats" against her. Moving Br. at 2. A person can certainly experience mental anguish from a barrage of threatening attacks on her social media account. There is no claim in this case for physical injury or—thankfully—

Death threats and threats of physical harm may be considered by the jury in assessing a libel plaintiff's damages claim. In *Carroll v. Trump*, Ms. Carroll's attorney argued in summation that "the backlash from [the defendant's] statements was terrifying. You heard E. Jean Carroll tell you that she started sleeping at night **with a loaded gun in her bed**." No. 22-cv-10016, ECF No. 199, Trial Tr. at 1246-1247 (emphasis added). In *Palin v. N.Y. Times*, Ms. Palin testified about death threats she and her family received. No. 17-cv-04853, ECF No. 185, at 896-897, 958-959. In *Webber v. Dash*, 607 F. Supp. 3d 407, 418 (S.D.N.Y. 2022), the jury considered evidence of the defendants' continued course of conduct in libeling the plaintiff after they knew he received death threats when determining a punitive damages award. *Id.* The District Court upheld the award, noting that the defendants conduct was **highly reprehensible** because it was carried out with intent to harm the plaintiff. *Id.* (noting that the evaluation of reprehensibility included whether conduct "presented a threat of violence"). *See Erickson v. Sawyer*, 650 F. Supp. 3d 758, 770 (D. Minn. 2023) (court considered death threats and "serious and extraordinary" hazards arising from libelous statements on social media and internet in awarding punitive damages); *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 228-229 (S.D.N.Y. 2010) (considering defendant's deliberate course of conduct as "enhancing" mental suffering the plaintiff experienced due to the defamatory statements). While not yet tried to a jury, in *Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1205 (D. Colo. 2023), the court found that "[n]o reasonable person, or trier of fact, can credibly dispute that Plaintiff has been damaged... [he] has lost his job (and potentially his career), he has been harassed and stalked, threatened with physical harm…and his reputation has allegedly

---

loss of life. Defendants mischaracterize Plaintiff's deposition testimony about the threats received after the Series. She said that they were credible threats and that she rarely received death threats prior to the release of the Series. Ex. 17, Fairstein Dep. Tr. at 380:20-382:5. She also pointed to a specific group that published her address. *Id.* Regardless, it is the jury's job to weigh evidence and assess the credibility of Plaintiff's testimony concerning the threats she received.

6

been destroyed." *Id.* In *Coomer*, a podcast host accused the plaintiff of rigging the election in favor of President Biden. The statement was "amplified" by Rudy Giuliani, Sidney Powell, and others. As a result, the plaintiff began receiving death threats, by voicemail and email, and continues to receive them on a daily basis. *Id.* at 1197. Like the plaintiffs in the aforementioned cases, evidence that Plaintiff received threats to her safety after the release of the Series is relevant to her claims for compensatory and punitive damages in this case. Accordingly, the Court should deny Defendants' motion to exclude such evidence.

While Defendants liken their actions here to civil rights protests in the 1960s, the comparison is inapt. *See* Moving Br. at 4-5. This case concerns the "the world's largest video streaming service"[8] and equally powerful filmmakers' abuse of the protections afforded by the First Amendment to **defame** a real-life person under the guise of artistic expression. The constitutional protections afforded to Defendants in this case are found in the actual malice standard and the higher burdens of proof that the jury will apply to certain evidence at trial—the Court should not countenance Defendants' attempts to transmogrify this action into something other than a straightforward libel case.[9] *See U.S. v. Stevens*, 559 U.S. 460, 468 (2010) (citing defamation and incitement as **separate** categories of restricted speech).

Assuming *arguendo* that the First Amendment principles in *Claiborne* are at issue in this case, they do not bar a damages award that includes third-party threats to Plaintiff arising from the Series. Defendants wrongfully assert that all of their speech is protected, ignoring the very issue they raise in their motion—whether death threats may be considered as a cause of Plaintiff's

---

[8] ECF No. 311, Defs. MIL No. 9, at 2.
[9] Defendants' reliance on *Celle v. Filipino Rptr. Enters. Inc.*, 209 F.3d 163, 191 (2d Cir. 2000), is likewise misplaced. *Celle* concerned the Second Circuit's **post-verdict** review a punitive damages award based on three articles that a jury found to be defamatory. Because the Court found that only two of the three articles were defamatory a remittitur was ordered.

emotional distress, or damages arising from their ***unlawful*** and ***unprotected*** speech.[10] They further ignore the part they played in targeting Plaintiff in the marketing and promotion of the Series, provocatively positioning her to be the focus of viewers' unquenchable anger because they wanted to show Plaintiff "how it feels." This is the very definition of stochastic terrorism.

"It is well-established that expressive activity is not a defense to an individual's own unlawful conduct." *Doe v. McKesson*, 71 F.4th 278, 292 (5th Cir. 2023). No "'federal rule of law restricts a State from imposing tort liability' for damages 'that are caused by violence and threats of violence.'" *Id.* (quoting *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982)). In addition, "a protest leader may be liable for the consequences of a demonstrator's unlawful act" and the specific tortious activity caused by the protest leader ***need not be violent*** to lawfully impose liability. *Id.* at 291.

Where, as here, "a defendant creates unreasonably dangerous conditions, and where his creation of those conditions causes a plaintiff to sustain injuries, that defendant has 'directed' his own 'tortious activity' for purposes of *Claiborne*." *Id.* at 292-293 (citation omitted). For this reason, "a protest leader who commits a tort cannot avoid liability for that tort merely by pointing to his participation in a protest." *Id.* at 293. In *McKesson*, the protest leader did not throw the projectile that injured the plaintiff during a civil rights protest, but committed the independent tort of negligence that led to the plaintiff's injuries. *Id.* In *McKesson*, the protest leader: i) directed the movements of the protest; and ii) caused the protest to become unlawful. *Id.* at 293. More specifically, the defendant directed the protesters to obstruct a public highway, organized the protest to begin in front of a police station and did nothing to discourage protesters from engaging

---

[10] *See* Plaintiff's Opposition to Defendants' Motion *In Limine* No. 1 (discussing Defendants' arguments concerning nonactionable scenes).

8

in unlawful conduct. *Id.* at 294. The plaintiff was injured within the same timeframe. *Id.* The Fifth Circuit held that the defendant "directed, authorized or ratified specific tortious activity" and engaged in speech that was "likely to incite lawless action" under *Claiborn*. *Id.* The Fifth Circuit clarified that it was the ***manner in which the defendant led the protest*** that made a violent encounter likely as opposed to statements that he made. *Id.* Likewise, the manner in which Defendants led their "protest," made violent threats against Plaintiff a likely outcome once the Series was released to Netflix's streaming platform.[11] Should they be found to have unlawfully defamed Plaintiff, any damages award against them may include third-party threats arising from the Series.

## II. Preclusion Is Not Warranted Under FRE 403

The probative value of evidence concerning the public's reaction to the Series, including threats of harm to Plaintiff, is not substantially outweighed by the danger of unfair prejudice to Defendants. FRE 403. As explained above, evidence concerning the impact of the Series is not, as Defendants contend, "marginally" relevant, but a result of Defendants' choice to target Plaintiff and portray her in a false and defamatory manner. Moving Br. at 7. While Defendants contend that jurors will be "overwhelmed" by the "uniquely toxic" and "inflammatory impact" of the threats to Plaintiff and confused or misled "away from the real parties' speech," these concerns are unfounded in light of the fact that the jury will receive specific instructions from the Court on

---

[11] *U.S. v. Carmichael*, 326 F. Supp. 2d 1267, 1288 (M.D. Ala. 2004), involved a website set up by a criminal defendant in a money laundering and drug possession case which was intended to help him gather evidence in his case. Certain aspects of the website were found to be protected by the First Amendment. The court considered that there was no evidence that the defendant ***or any of his supporters*** had engaged in retaliatory acts against persons identified on the website. The government also failed to meet its burden of proving that the statements on the site were not protected speech. This case is also readily distinguishable from *Wells v. Rice*, 2023 WL 6050566, at *4 (E.D. Ky. Sept. 15, 2023), which involved a Facebook post criticizing the conduct of an active member of the local police department—who was ***not identified by name***—at a Black Lives Matter protest. *Id.* at *2. The officer in the case feared that he and his family would be harmed but there was no evidence that he received death threats. *Id*. The statements in the post were also deemed to be protected opinion.

9

determining liability and assessing damages. Moreover, it is hard to be "led away" from the speech at issue when the vast majority of posts that threatened or made derogatory remarks about Plaintiff reference the Series, Netflix, DuVernay or Locke. *See, e.g.*, ECF No. 305-3, Ramachandran Decl., Ex. 3.

The jury will be viewing and hearing inflammatory and emotional evidence throughout the course of trial, including in the five scenes at issue. Jurors will also hear testimony about the Central Park Jogger case as related to the five scenes. The social media posts in question are no more inflammatory than what certain Defendants, themselves, said about Plaintiff in their own social media posts and text messages. Defendants also ignore the numerous libel cases cited above in which evidence of death threats has been presented to the jury as part of the overall impact of the defamation on the plaintiff.

The criminal cases cited by Defendants are inapplicable in the context of civil litigation and it is farcical for Defendants to compare themselves to criminal defendants facing drug and murder convictions. "'The term 'unfair prejudice,' **as to a criminal defendant**, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *U.S. v. Segui*, 2019 WL 8587291, at *3 (E.D.N.Y. 2019) (quoting *Old Chief v. U.S.*, 519 U.S. 172, 180 (1997)) (emphasis added). In *U.S. v. Cummings*, 858 F.3d 763, 775 (2d Cir. 2017), a post-conviction appeal, the defendant was convicted of murder and the court found that jury may have viewed unrelated death threat evidence as propensity evidence which poses a risk of "arousing the jury's passions to the point where they would act irrationally." *Id.* The similarity of the threat evidence and the crimes charged also may have suggested to the jury that it should convict the defendant of the charged murders. *Id.* Here,

there is no such risk. Defendants are not litigating whether they made death threats against Plaintiff—at issue is whether they defamed and conspired to defame her.

In *United States ex rel. Davis v. U.S. Training Ctr., Inc.*, 498 F. App'x 308, 317 (4th Cir. 2012), a case alleging fraudulent billing practices, the death threat was irrelevant—there was no evidence that it was related to a search for billing discrepancies or other falsehoods. *Id.* n. 15. In contrast, the threats at issue here are ***directly related*** to the Series. For example, a May 31, 2019 post to Plaintiff's Twitter account states "@LindaFairstein disgraceful, should be put away or put down, scum! #WhenTheySeeUs." ECF No. 305-3, Ramachandran Decl., Ex. 3, at LF0003803.

## CONCLUSION

For the above stated reasons, the Court should deny that portion of Defendants' "Motion *In Limine* No. 6: Motion to Preclude Any Third-Party Threats" that seeks to preclude references or evidence regarding third-party threats to Plaintiff. The remainder of Defendants' Motion is moot because Plaintiff does not intend to introduce evidence of third-party threats to nonparties.

Dated: New York, New York
February 16, 2024

Respectfully Submitted,

By:   /s/ *Kara L. Gorycki*
Kara L. Gorycki
Andrew T. Miltenberg
Stuart Bernstein
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
kgorycki@nmllplaw.com
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com

*Attorneys for Plaintiff Linda Fairstein*

11

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2024, a true and correct copy of the foregoing was served by CM/ECF on all counsel of record.

/s/ *Kara L. Gorycki*